**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION**

| | | |
|---|---|---|
| **BETTY ANN BURKS, <u>et</u> <u>al.</u>** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **No. 2:06-CV-1081-MEF** |
| **v.** | : | |
| | : | |
| **EQUITY GROUP-EUFAULA** | : | |
| **DIVISION, LLC,** | : | |
| | : | |
| **Defendant.** | : | |

---

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT.

---

Howard A. Rosenthal
Gary D. Fry
Malcolm S. Gould
  Attorneys for Defendant
  Equity Group-Eufaula
  Division, LLC

<u>OF COUNSEL</u>:
Pelino & Lentz, P.C.
One Liberty Place
Thirty-Second Floor
1650 Market Street
Philadelphia, PA 19103-7393
215-665-1540


Joel P. Smith, Jr., Esquire
Williams, Potthoff, Williams
  & Smith, LLC
125 South Orange Avenue
Eufaula, AL  36027
334-687-5834

## **TABLE OF CONTENTS**.

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . .   iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . .   1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . .   2

    A.    Equity's Operation And Clothing Worn By
          Employees . . . . . . . . . . . . . . . . . . . .   2

          1.    Master Card Time . . . . . . . . . . . . . . .   2

          2.    Work Clothes . . . . . . . . . . . . . . . . .   4

          3.    The Work Day . . . . . . . . . . . . . . . . .   7

    B.    The Collective Bargaining Negotiations And
          Agreements With The RWDSU Established Custom
          and Practice . . . . . . . . . . . . . . . . . .   13

          1.    The Contracts . . . . . . . . . . . . . . . .   13

          2.    The Established Custom And Practice And
              Labor Negotiations . . . . . . . . . . . . .   16

PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . .   21

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . .   25

A R G U M E N T . . . . . . . . . . . . . . . . . . . . . . .   26

    A.    Summary Judgment Standard . . . . . . . . . . . .   26

    B.    Summary Judgment Is Appropriate Under
          Section 3(o) Of The FLSA As Evidenced By The
          Collective Bargaining Agreements With The RWDSU
          And The Long Existing Custom And Practice . . . . .   28

          1.    The Eleventh Circuit, Applying Section 3(o),
              Has Approved Identical Line Time Arrangements
              In The Poultry Industry . . . . . . . . . . .   28

          2.    The Eleventh Circuit's Holding Is Consistent
              With Other Judicial Interpretations Under
              Section 3(o) . . . . . . . . . . . . . . . . .   36

          3.    The Well Established Custom And
              Practice Mandates Summary Judgment Under
              Section 3(o) . . . . . . . . . . . . . . . . .   40

          4.    The Department Of Labor Has Concluded
              That Section 3(o) Requires Approval of
              Collective Bargaining Relationships . . . . . .   45
          5.    The Legislative History . . . . . . . . . . .   47

C.   Even In The Absence Of The Bar Of Section 3(o),
     Plaintiffs' Claims Are Precluded By The
     Provisions Of The Portal-To-Portal Act . . . . . . . 49

     1.   Applicable Legal Principles . . . . . . . . . 49

     2.   Equity Is Entitled To Summary Judgment On
          Plaintiffs' Claims For "Clearing Security"
          And Walking Time Since Such Activities Are
          Not "Integral And Indispensable" To A
          Principal Work Activity . . . . . . . . . . 55

     3.   Equity Is Entitled To Summary Judgment On
          Plaintiffs' Claims For Donning and Doffing
          Since Such Activities Are Preliminary And
          Postliminary Under The Portal-to-Portal Act
          And Do Not Constitute Work Under The FLSA . . . 59

     4.   Assuming, Arguendo, That Plaintiffs'
          Activities Are Compensable, Such
          Donning And Doffing Is De Minimis As
          A Matter of Law And Equity Is Entitled
          To Summary Judgment . . . . . . . . . . . . . . 62

CONCLUSION   . . . . . . . . . . . . . . . . . . . . . . . . . 66

## <u>TABLE OF AUTHORITIES</u>.

<u>CASES</u>                                                              <u>PAGE</u>

<u>Anderson v. Cagle's Inc.</u>, 488 F.3d 945 (11th Cir.
2007) . . . . . . . . . . . . . . . . . . . . . . . . . passim

<u>Anderson v. Cagle's Inc.</u>, 2005 U.S.Dist.LEXIS 41747 (M.D.Ga.,
December 8, 2005), <u>aff'd</u>, 488 F.3d 945 (11th Cir. 2007)
(petition for cert. pending) . . . . . . . . . . . . . . . . 14

<u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 66
S.Ct. 1187 (1946) . . . . . . . . . . . . . . . . . 49,50,63

<u>Anderson v. Pilgrim's Pride Corp.</u>, 147 F.Supp.2d 556
(E.D. Tex. 2001), <u>aff'd</u>, 44 Fed.Appx. 652, 2002
U.S.App.LEXIS 13429 (5th Cir., June 6,
2002) . . . . . . . . . . . . . . . . 36,37,43,48,58,59,61,62,64

<u>Arcadi v. Nestle Food Corp.</u>, 38 F.3d 672 (2d Cir. 1994) . . . 43

<u>Bejil v. Ethicon, Inc.</u>, 125 F.Supp.2d 192 (N.D.Tex. 2000),
<u>aff'd</u>, 269 F.3d 477 (5th Cir. 2001) . . . . . . . . . . 37,44

<u>Blain v. General Electric Co.</u>, 371 F.Supp. 857
(W.D.Ky. 1971) . . . . . . . . . . . . . . . . . . . . . . 65

<u>Bonilla v. Baker Concrete Construction, Inc.</u>, 487 F.3d
1340 (11th Cir.), <u>cert</u>. <u>denied</u>,   U.S.   , 128 S.Ct.
813 (2007) . . . . . . . . . . . . . . . . . . . . . . 56,60

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 106 S.Ct. 2548
(1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

<u>Conerly v. Marshall Durbin Company</u>, 2007 U.S.Dist.LEXIS
85994 (S.D.Miss., November 5, 2007) . . . . . . . . . . . . 42

<u>Davis v. Charon Pokphand (USA), Inc.</u>, 302 F.Supp.2d
1314 (M.D.Ala. 2004) . . . . . . . . . . . . . 17,20,41,42

<u>Fox v. Tyson Foods, Inc.</u>, Case No. 99-1612 (N.D.Ala.,
August 31, 2007) . . . . . . . . . . . . . . . . . . . . . 36

<u>Gorman v. Consolidated Edison Corporation</u>, 488 F.3d
586 (2d Cir. 2007) . . . . . . . . . . . . . . . 54,57,60,62

<u>Gutierrez v. Specialty Brands, Inc.</u>, Civ. No. 00-102
DJS/RLP (D.New Mexico, January 14, 2002) . . . . . . . . . 37

<u>Hoover v. Wyandotte Chemicals Corp.</u>, 455 F.2d 387 (5th
Cir.), <u>cert. denied</u>, 409 U.S. 847, 93 S.Ct. 52 (1972) . . . . 44

<u>IBP, Inc. v. Alvarez</u>, 546 U.S. 21, 126 S.Ct. 514
(2005) . . . . . . . . . . . . . . . . . . . . 22,36,54,58,64

Irby v. Bittick, 44 F.3d 949 (11th Cir. 1995) . . . . . . . . 27

Kassa v. Kerry, Inc., 487 F.Supp.2d 1063 (D.Minn. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 36,38,42

Leigh v. Warner Brothers, Inc., 212 F.3d 1210 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Lindow v. United States, 738 F.2d 1057 (9th Cir. 1984) . . . 63

Manning v. Engelhard Corp., 929 F.Supp. 1508 (M.D. Ga. 1996), aff'd, 111 F.3d 897 (11th Cir. 1997) . . . . . . . . 27

Mitchell v. King Packing Co., 350 U.S. 260, S.Ct. 337 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Myracle v. General Elec. Co., 1992 U.S.Dist.LEXIS 22474 (W.D.Ky., November 30, 1992), aff'd, 33 F.3d 55 (6th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . 65

Nardone v. General Motors, Inc., 207 F.Supp. 336 (D.N.J. 1962) . . . . . . . . . . . . . . . . . . . . . . . 44

Pressley v. Sanderson Farms, Inc., 2001 U.S.Dist.LEXIS 6535 (S.D.Tex., April 20, 2001) . . . . . . . . . . . . . . . . 37

Reich v. IBP, Inc., 38 F.3d 1123 (10th Cir. 1994) . . . 60,61,64

Reich v. Oscar Mayer Foods Corp., 1995 U.S.Dist.LEXIS 22225 (E.D.Tex., March 2, 1995) . . . . . . . . . . . . . . . . . 37

Riley v. Newton, 94 F.3d 632 (11th Cir. 1996), cert. denied, 519 U.S. 1114, 117 S.Ct. 955 (1997) . . . . . . . . . . . . 28

Saunders v. John Morrell & Co., 1991 U.S.Dist.LEXIS 21069 (N.D. Iowa, December 24, 1991) . . . . . . . . . . . . . . 43

Smith v. Aztec Well Servicing Company, 462 F.3d 1274 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 62

Steiner v. Mitchell, 350 U.S. 247, 76 S.Ct. 330 (1956) . . . . . . . . . . . . . . . . . . . . . . . 52,53,59

Turner v. City of Philadelphia, 96 F.Supp.2d 460 (E.D.Pa. 2000), aff'd, 262 F.3d 222 (3d Cir. 2001) . . . . . 44

Williams v. W. R. Grace & Co., 247 F.Supp. 433 (E.D. Tenn. 1965) . . . . . . . . . . . . . . . . . . . . . 44

**STATUTES AND OTHER AUTHORITIES.**

95 Congressional Record - House 11210 (August 10, 1949) . . . 47

29 U.S.C. § 203(o) . . . . . . . . . . . . . . . . . . . . . 14

29 U.S.C. § 207(a)(1) . . . . . . . . . . . . . . . .   49

29 U.S.C. § 215(a)(2) . . . . . . . . . . . . . . . .   49

29 U.S.C. § 254 . . . . . . . . . . . . . . . . . . .   49

29 U.S.C. § 254(a) . . . . . . . . . . . . . . . .   51,52

29 C.F.R. § 785.19 . . . . . . . . . . . . . . . . .   65

29 C.F.R. § 785.47 . . . . . . . . . . . . . . .   50,63

29 C.F.R. § 790.7(g) . . . . . . . . . . . . . . . .   54

29 C.F.R. § 790.8(a) . . . . . . . . . . . . . . . .   53

### INTRODUCTION.

Plaintiffs, claiming to act for themselves and on behalf of those allegedly similarly situated, initiated this purported collective action against Equity Group-Eufaula Division LLC ("Equity"), alleging violations of the Fair Labor Standards Act ("FLSA"), primarily for uncompensated time related to donning, doffing and washing work clothes.  [App., Tab 3 (Amended Complaint), ¶¶ 19-20.]  In light of the Eleventh Circuit's clear directive in Anderson v. Cagle's Inc., 488 F.3d 945 (11th Cir. 2007)(petition for cert. pending), Equity now seeks summary judgment, principally under Section 3(o) of the FLSA, 29 U.S.C. § 203(o), which excludes from the definition of "hours worked," in the context of the FLSA's minimum wage and maximum hours provisions:

> "[T]ime spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee."

As the facts and issues in Anderson and this case are virtually identical, plaintiffs' claims here cannot survive.  The law in this Circuit is clear that employees in the unionized poultry industry, like these plaintiffs, are not required to be compensated for donning, doffing and washing where excluded by the terms of a negotiated collective bargaining agreement, or otherwise by custom or practice.  This is exactly as Congress intended in adopting Section 3(o) -- giving deference to the parties' negotiated terms of employment, or custom or practice -- as interpreted by the Eleventh Circuit.

## FACTUAL BACKGROUND

### A.   Equity's Operation And Clothing Worn By Employees.

Equity, a poultry processing facility with integrated breeder and broiler hen operations located in or near Baker Hill, Alabama, principally engages in the slaughtering, deboning and processing of chickens.  [App., Tab 3 (Amended Complaint), ¶ 2; App., Tab 5 (Mills Affidavit), ¶ 1.]  Equity purchased this facility from Charoen Pokphand (USA), Inc. ("CP"), effective March 12, 2004, pursuant to the terms of an asset purchase agreement.  Equity effectively continued all relevant practices at the time of its acquisition of the facility, including the union contract.  [App., Tab 5 (Mills Affidavit), ¶ 52.]

The production facility is comprised of two separate processing plants -- the Fresh Plant and the Further Processing Plant.  [App., Tab 5 (Mills Affidavit), ¶ 4.]  Live birds arrive at the Fresh Plant and are slaughtered in its First Processing ("Evisceration") Department and deboned in the Second Processing ("Debone") Department.  [See App., Tab 3 (Amended Complaint), ¶¶ 9-11.]  The bulk of the deboned chicken is shipped to other facilities for additional processing but the remaining meat is delivered to the Further Processing Plant, where it is cooked and otherwise finished as specified by the customer.  Most of the employees at Equity work in the Fresh Plant (which is the only plant at issue in this litigation).  [Id.; App., Tab 3 (Amended Complaint), ¶ 26; App., Tab 5 (Mills Affidavit), ¶¶ 6,7.]

### 1.   Master Card Time.

Employees assigned to the production lines in the

Evisceration and Debone Departments at the Fresh Plant are generally paid under a variation of "line time" or "master card time."[1]  [App., Tab 5 (Mills Affidavit), ¶ 11; App., Tab 27 (Delbridge Dep.) 44:3-45:3; App., Tab 26 (Davis Dep.) 70:14-71:3.]  Employees swipe in at one of several time clocks (KRONOS machines) throughout the Fresh Plant which document, for attendance purposes, that the employees are at work on any given day.  The employees are required to "swipe out" when they leave work.  [App., Tab 5 (Mills Affidavit), ¶¶ 12,13.]  These production employees are paid, together with actual hours worked before the start of line time or after completion of line time, on the basis of the Master Card system, which reflects the scheduled start time for production at the beginning of each shift and the time when production ends at the end of each shift (less two 30 minute breaks).  [See App., Tab 12 (Responses to Interrogatories) No. 20; App., Tab 5 (Mills Affidavit), ¶ 14.]  Employees are paid from a scheduled start time, whether or not work (i.e., birds) is available, and they are required to be at their work stations when the Master Card is swiped at the end of their shift and the last bird to be processed passes the final work station.  [App., Tab 5 (Mills Affidavit) ¶ 15.]  Hours worked before or after scheduled line or Master Card time are

---

[1]In another poultry industry case pending before this Court -- Anderson v. Perdue Farms Incorporated, 06-1000 (United States District Court for the Middle District of Alabama) -- the employer, Perdue, modified its procedures and no longer compensates employees on the basis of line time.  However, Perdue was not subject to a collective bargaining agreement and, therefore, could not take advantage of the Section 3(o) bar or the Eleventh Circuit's decision in Anderson v. Cagle's Inc., supra.

recorded by the employee's supervisor and the employee's time record is adjusted for pay purposes.[2]  [Id. at ¶ 16.]  Sanitation employees are paid for 8 hours per day whether or not they complete work in advance of that time.  [Id. at ¶ 17]  If sanitation employees work overtime, they are paid time and one-half for each overtime hour worked subject to the collective bargaining agreement with the union.  [Id.]  The remaining employees are paid on the basis of established schedules of work, actual clock in and clock out times or, at times, on a piece rate basis.  [Id. at ¶ 18; App., Tab 13 (Pay Rules)(E173-E189).]

     2.  **Work Clothes**.

     Production employees in the Fresh Plant are required to wear a smock, boots or shoe covers, a hairnet/beardnet and ear protection, which items were determined by the Eleventh Circuit in Anderson v. Cagle's Inc., supra, to constitute "clothing" for purposes of Section 3(o).  [App., Tab 5 (Mills Affidavit), ¶ 19; App., Tab 59 (E. Morris Dep.) 28:12-17; App., Tab 31 (Glenn Dep.) 11:22-2:13; App., Tab 37 (T. Jackson Dep.) 13:13-14:10; App., Tab 44 (T. Kennedy Dep.) 12:6-17; App., Tab 51 (Mahone Dep.) 14:17-23 (no arm guard); App., Tab 47 (S. Lampley Dep.) 13:22-14:10 (no arm guard or mesh gloves).]  Employees in the Fresh Plant are permitted to don their boots or shoe covers, hair net, beard net and earplugs outside of the production area.  [App., Tab 5 (Mills Affidavit), ¶ 26.]  Employees may wear their boots or shoe covers outside of the plant and may wear their boots, hair net and

---

[2]For example, employees assigned to HACCP duties (safety inspectors) are paid for pre-production inspections and paperwork they are assigned to complete.  [App., Tab 42 (P. Jones Dep.) 38:14-19, 41:22-42:2.]

earplugs from home.  [App., Tab 5 (Mills Affidavit), ¶ 25; App.,
Tab 19 (Avery Dep.) 18:19-19:1; App., Tab 31 (Glenn Dep.) 15:3-5;
App., Tab 51 (Mahone Dep.) 17:3-4; App., Tab 47 (S. Lampley Dep.)
14:15-17; App., Tab 70 (V. Shorter Dep.] 23:12-16.]  Employees
are required to enter the production area in the Fresh Plant
before putting on their smock or related sanitary garments.
[App., Tab 5 (Mills Affidavit), ¶¶ 27,28; App., Tab 37 (T.
Jackson Dep.) 19:5-20.]  However, employees can don and doff the
smock, apron, gloves and hairnet as they walk to their work
station.  [See, e.g., App., Tab 78 (C. Young Dep.) 35:9-36:14,
37:5-9.  As to gloves, apron, smock, admitted that she can and
"ordinarily" does put them or take them off while walking to or
from her work area).]  Employees may fold those garments and
carry them outside the production area but may not wear them
outside of that area.  [App., Tab 5 (Mills Affidavit), ¶¶ 27,29.]
Employees who work in "live hang" may don their garments in their
break room.  [App., Tab 28 (Ford Dep.) 24:16-19.]

    Only those employees in the Evisceration and Debone
Departments whose particular jobs require the use of a knife are
required to wear arm guards and steel mesh gloves, also
determined by the Eleventh Circuit to constitute "clothing" for
purposes of Section 3(o).  [App., Tab 25 (Darby Dep.) 18:7-11;
App., Tab 49 (F. Laseter Dep.) 22:11-15 ("If you don't use a
knife, you don't have to wear an arm guard.").]  The steel mesh
gloves are distributed to the employees by their supervisors at
the production line, and can be put on after the start of line
time and while the employee is on the production line and being
paid; these gloves also are cleaned, maintained and washed by

Equity.  [App., Tab 5 (Mills Affidavit), ¶¶ 20,21; App., Tab 59
(E. Morris Dep.) 36:21-37:12; App., Tab 37 (T. Jackson Dep.)
26:21-27:16; App., Tab 44 (T. Kennedy Dep.) 16:14-16, 24:3-6;
App., Tab 53 (M. March Dep.) 26:6-12, 33:13-15; App., Tab 48 (E.
Laseter Dep) 21:19-22, 22:4-6; App., Tab 55 (McNair Dep.) 30:23-
31:4.]  Likewise, any knives or other cutting tools used by
employees are provided to them by supervisors or line leaders at
the production line.  [App., Tab 37 (T. Jackson Dep.) 27:1-8;
App., Tab 48 (E. Laseter Dep.) 23:2-7; App., Tab 55 (McNair Dep.)
31:14-19; App., Tab 35 (Ivery Dep.) 25:1-8.]  Employees are not
required to walk to obtain those items, nor are they responsible
for cleaning or sharpening the knives or other tools.  [App., Tab
5 (Mills Affidavit), ¶ 21; App., Tab 19 (Avery Dep.) 21:20-22:6;
App., Tab 59 (E. Morris Dep.) 36:21-37:12; App., Tab 37 (T.
Jackson Dep.) 20:7-19, 26:17-20; App., Tab 55 (McNair Dep.)
31:20-23.]

    Optional clothing items made available for the convenience
of the employees, if requested, include blue plastic aprons and
sleeves, cotton gloves and safety glasses, all declared by the
Eleventh Circuit to be "clothing" under Section 3(o).  [App., Tab
5 (Mills Affidavit), ¶ 22; see, e.g., App., Tab 28 (Ford Dep.)
17:19-22; App., Tab 49 (F. Laseter Dep.) 20:8-13, 21:14-20.]  Not
all employees are required to wear all of the referenced
clothing; instead, employees may wear some or all, or various
combinations, of this clothing depending on the nature of the
specific tasks being performed by, or the personal preference of,
the employee.  [App., Tab 5 (Mills Affidavit), ¶ 23; App., Tab 42
(P. Jones Dep.) 39:7-40:8; App., Tab 40 (D. Johnson Dep.) 14:1-

15:17; App., Tab 19 (Avery Dep.) 14:21-15:7 ("it depended on what
work area they were working in.  They didn't have to have on all
of that."); App., Tab 71 (Spann Dep.) 14:10-13 (no arm guards in
Rehang); App., Tab 49 (F. Laseter Dep.) 20:8-13 ("Some people
wear sleeves and some don't.").]

     As in Anderson v. Cagle's Inc., supra, the exact manner in
which any employee dons or doffs any of this clothing, and the
time it takes to do so, is controlled by the employee.  [App.,
Tab 5 (Mills Affidavit), ¶ 31; App., Tab 31 (Glenn Dep.) 30:1-
12.]  Some employees don their smocks and aprons while walking
through the production area to their work stations.  [App., Tab
32 (Glover-Patrick Dep.) 24:18-25:2; App., Tab 78 (C. Young Dep.)
35:9-36:14, 37:5-9.]

          3.   **The Work Day**.

     First Shift/Day Shift in the Fresh Plant begins at 5:50 a.m.
(live hang) and continues through 2:50 p.m.; the Evisceration
Department starts at 6:00 a.m.; and the Debone Department starts
at 7:30 a.m.  Employees are provided two unpaid half-hour breaks.
[App., Tab 5 (Mills Affidavit), ¶¶ 32,38.]  Second Shift/Night
Shift employees walk on to their work stations as soon as they
are ready to relieve the First Shift employees in the
Evisceration Department.  [App., Tab 5 (Mills Affidavit), ¶ 33.]
Because of the need to maintain control over the knives and the
steel mesh gloves, work is stopped in the Debone Department for
approximately 3 to 5 minutes between shifts.  [App., Tab 5 (Mills
Affidavit), ¶ 35.]

     Contrary to plaintiffs' allegations in the Amended

Complaint, Equity's employees are not required to "clear security" -- they may drive onto and exit the property without stopping and neither their persons nor their possessions are searched.  [App., Tab 25 (Darby Dep.) 43:12-20; App., Tab 19 (Avery Dep.) 31:3-16; App., Tab 78 (C. Young Dep.) 41:15-42:10 ("drive right through" and no other security).]  Nor are employees required to pass through any security at the entrance to the buildings, including any form of metal detectors, turnstiles or barriers at the entrance to the Fresh Plant. [App., Tab 59 (E. Morris Dep.) 31:23-32:18; App., Tab 47 (S. Lampley Dep) 15:8-16:1; App., Tab 48 (E. Laseter Dep.) 17:20-18:10, 33:9-23; App., Tab 38 (Jacobs Dep.) 15:6-22; App., Tab 35 (Ivery Dep.) 16:16-17:9 (could just walk right in).]

As the employees enter the production area, they walk past a boot wash, which is just beyond the door in the Fresh Plant.[3] [App., Tab 5 (Mills Affidavit), ¶ 30; App., Tab 48 (E. Laseter Dep.) 20:15-17 ("By just when you walk in, the little thing at the door would automatically spray.  And I just put my foot down and it would spray.").]  In addition, before breaks or the end of the day, employees may spend a brief amount of time rinsing their work clothing at a sink spray station.

Before each 30 minute break, employees generally wash their hands and run their aprons, if worn, through the sink spray.[4]

---

[3]Not all employees are required to sanitize their boots. Those employees who work in "live hang," for example, are not required to sanitize their boots.  [App., Tab 28 (Ford Dep.) 19:19-23.]

[4]Some employees, such as those in the box room, do not wash anything when going on break.  [App., Tab 40 (D. Johnson) 22:9-23.]

The aprons and smocks are then hung or placed on racks inside the production area as employees exit the production area.  [App., Tab 5 (Mills Affidavit), ¶ 36.]  After employees leave the production area, they may go to the break room, which is directly across the hall from the production area, outside the building or they are free to leave the premises entirely.  [App., Tab 5 (Mills Affidavit), ¶ 37; App., Tab 37 (T. Jackson Dep.) 22:18-22; App., Tab 78 (C. Young Dep.) 49:20-50:14 (can get in car and drive to the store and come back).]  Employees generally leave for and return from break in a staggered fashion -- they may leave for break when the last bird passes their position on the line and they need not be back at the line until product reaches their position.  [App., Tab 25 (Darby Dep.) 34:13-19; App., Tab 27 (Delbridge Dep.) 28:15-23; App., Tab 38 (Jacobs Dep.) 28:4-12 (agreed that she would be late only "if you were not on the line when the first piece of meat reached your position."); App., Tab 72 (Thomas Dep.) 18:21-19:10; App., Tab 49 (F. Laseter Dep.) 32:1-15; App., Tab 77 (B. Young Dep.) 23:11-20 ("you've got to be in place when the meat's to you").]  When returning from break, employees are not required to wash their aprons again before stepping to the production line.  [App., Tab 27 (Delbridge Dep.) 41:19-42:1; App., Tab 41 (J. Johnson Dep.) 30:7-17.]  Indeed, it takes different people different times to exit and return to the production floor before and after the assigned breaks.  [App., Tab 40 (D. Johnson) 30:20-31:6.]

When leaving for the day, employees throw their smocks in bins located outside the doors to the production area and then "swipe" out and go home.  [App., Tab 5 (Mills Affidavit), ¶ 37;

App., Tab 59 (E. Morris Dep.) 46:17-47:1; App., Tab 31 (Glenn Dep.) 14:15-17.]  Any work clothing issued to the employees can be placed in a locker or taken home.  [App., Tab 5 (Mills Affidavit), ¶ 37; App., Tab 27 (Delbridge Dep.) 38:10-12.]

Although not relevant for this Motion for Summary Judgment, estimates of the time for donning and doffing at Equity made by various employees, including RWDSU stewards, widely varied.  As Chanda Young admitted:

> "Q.  .... Is it fair to say it would really only take you a <u>few seconds</u> to put your smock on.  Is that a fair statement?
>
> "A.  Fair statement.  Yes, it could be.
>
> "Q.  Same with the gloves?
>
> "A.  You could say.
>
>             * * *
>
> "Q.  Right.  And it would be fair to say that it would only take <u>a few seconds</u>, right, to put your hair net on?
>
> "A.  Yes."  [App., Tab 78 (C. Young Dep.) 37:13-18, 38:7-10.]

Another employee testified that he can don his smock in as little as 30 seconds.  [App., Tab 67 (Shabazz Dep.) 40:16-21.]

Jacqueline Davis, the Chief Union Steward (and who has been employed at the plant since it opened and active in all contract negotiations), testified in response to questions by plaintiffs' counsel:

> "Q.  How was it decided you'd pay three minutes -- the company would pay three minutes?  Who came up with that number?

"A.   That was a number that we
settled at.  We first asked for ten
minutes, but that was to the
extreme and we knew it, but that
was in order to get enough time in
order for them to undress.

"Q.   And why did you know that was
extreme?

"A.   Because it -- basically, the
hardest thing for them to put on is
the boots.  And going in and out of
the break, we looked at it and we
timed taking on/taking off, and it
doesn't take ten minutes to do none
of it.

"Q.   Who timed it?

"A.   I have.

"Q.   How did you time it?

"A.   With a stopwatch.

"Q.   What did you time?

"A.   From the time they walked in
and started to dress to go to the
lines.

"Q.   I mean, what do you mean by
that?  Tell me exactly what you
timed.

"A.   When the break was over, they
came back in, put on their apron,
smocks, and whatever.  I timed the
time it takes for them to put that
stuff back on.

          *   *   *

"Q.   Well, tell me -- that's what
I'm trying to figure out.  What
exactly did you time?

"A.   I timed from the time they
walked back in the door putting the
smocks, apron, sleeves, and
everything on, going to the sink,
washing their hands, and stepping
onto the line.

-11-

\*   \*   \*

"Q.   In what department?

"A.   Debone.

"Q.   And why debone?

"A.   Basically, because they have more to put on.

"Q.   And what was the time you got?

"A.   About three minutes and a half.  How many seconds?  It was more than three minutes."  [App., Tab 26 (Davis Dep.) 57:17-60:2.]

Emily Laseter, an employee in Debone, admitted she arrives at the plant at 7:25 a.m., "clocks in" at 7:28 a.m. and is ready to work at her assigned work on the Debone line by 7:30 a.m. [App., Tab 48 (E. Laseter Dep.) 17:11-15.]  Similarly, Laurie Robinson, assigned to Debone Rework, arrives at 7:20-7:25 a.m., and is required to be ready for and at work at 7:30 a.m.  [App., Tab 66 (Robinson Dep.) 16:10-11, 17:16-19]; see also App., Tab 71 (Spann Dep) 24:11-15 ("couple of minutes"); App., Tab 72 (L. Thomas) 17:16-18:1; App., Tab 77 (B. Young Dep) 18:12-15 ("Like, 25 after [leaves break room].  At 7:30 you've got to be on the line").]  Other employees testified that they are able to enter the production floor no more than five minutes before their start time and have sufficient time to don their required clothing to be ready to work when production starts [App., Tab 42 (P. Jones Dep.) 30:21-31:7], or can don or doff within 3 to 5 minutes.  See App., Tab 26 (Davis Dep.) 57:17-60:4; App., Tab 59 (E. Morris Dep.) 37:20-23, 39:19-40:1.]  In any event, for purposes of this Motion for Summary Judgment, this time is not deemed "hours worked" by Section 3(o) or is otherwise not a basis for any

-12-

claim.

**B.   The Collective Bargaining Negotiations And Agreements
With The RWDSU Established Custom and Practice.**

      **1.   The Contracts.**

At all relevant times, Equity's processing employees,
including those specifically named in the Amended Complaint, were
employed and paid pursuant to the terms of labor agreements with
the Retail, Wholesale and Department Store Union - Alabama and
Mid-South Council ("RWDSU") for the periods (a) March 1, 2004 to
March 1, 2008 ("2004 CBA")[App., Tab 7]; and (b) March 1, 2008 to
March 1, 2011 ("2008 CBA")[App., Tab 8].  The prior owner of the
facility, CP, also was a party to a collective bargaining
agreement with the RWDSU, with an effective date of March 1, 2000
to March 1, 2004 ("2000 CBA").  [App., Tab 6; App., Tab 5 (Mills
Affidavit), ¶ 48.]  The 2000 CBA, and all established practices
and customs, were adopted by Equity when it acquired the
facility, and the 2000 CBA remained effective until the 2004 CBA
was negotiated and ratified by Equity's employees.  [App., Tab 5
(Mills Affidavit), ¶ 52.]  All of these CBAs contain provisions
regulating wages and time worked and, most relevant here,
establish "line time" as the agreed method pursuant to which the
production employees would be paid.  [App., Tabs 6-8.]

Pursuant to Article 2.1 of the 2004 CBA and the 2008 CBA,
Equity has general authority to manage the plant, including the
ability to schedule work hours and times, schedule breaks and
schedule shift start and end times.  [App., Tabs 7, 8 at 1.]
Article 12 of these CBAs, entitled "Hours of Work," contains
extensive, agreed provisions concerning work hours and pay

-13-

practices:

        12.1 --    Work Schedule

        12.2 --    Overtime Pay

        12.3 --    Reporting Pay

        12.4 --    Time Cards

        12.5 --    Line Time

        12.6 --    Extra Time

[App., Tab 7 at 20; App., Tab 8 at 21.]

Most important, and as expressly permitted by Section 3(o) of the FLSA, pursuant to these CBAs (as well as the 2000 CBA), the RWDSU, on behalf of the employees, and Equity agreed to "line time" as the method of calculating pay and, thus, agreed to exclude "time spent in changing clothes or washing ... from measured working time during the week." See 29 U.S.C. § 203(o). Article 12.5.A of the 2004 CBA provided that:

> "**12.5    Line Time**
>
> "A.  All employees will be paid according to the hours of work indicated by the Master Line Time Card."  [App., Tab 7 at 20.][5]

---

[5]A similar provision appeared in the 2000 CBA between the RWDSU and CP.  [App., Tab 6 at 17.]  As such, there was an existing union relationship and custom and practice at the Baker Hill plant that preceded Equity's ownership and continued after the sale to Equity.  Similar language also appeared in the contract at issue in Anderson v. Cagle's Inc., supra, where the Eleventh Circuit enforced the Section 3(o) bar and affirmed summary judgment for that employer.  See Anderson v. Cagle's Inc., 2005 U.S.Dist.LEXIS 41747, *19 (M.D.Ga., December 8, 2005), aff'd, 488 F.3d 945 (11th Cir. 2007)(petition for cert. pending): "Article XI(6) of the 1997 CBA, Article 11.6 of the 2000 CBA, and Article 11.6A of the 2003 CBA state that '[a]ll employees shall be paid according to the time record on their line card or the time on the individual's card if less than on the line card....' Line card time is generally determined by the start and stop time of the operating times and does not include the donning and
                                    (continued...)

As part of the 2008 labor negotiations, Equity and the RWDSU
agreed to continue this long established practice but also
negotiated and agreed to a payment for donning, doffing and
washing as follows:

> "12.5    **Line Time**
>
> "A.  All employees will be paid
> according to the hours of work
> indicated by the Master Line Time
> Card.
>
> "B.  <u>All employees shall be paid an
> additional 3 minutes per day, at
> their regular rate, for clothes
> changing and cleaning time, in
> addition to any pay for hours
> worked.  Such payment shall be paid
> at the employee's normal hourly
> rate.</u>"  [App., Tab 8 at 21
> (emphasis added).]

In addition to these agreed provisions controlling the
manner and method of calculating "hours worked," Article 13 of
each CBA contains negotiated provisions relating to breaks and
rest periods:

> "13.2    **Meal/Rest Periods**
>
> "A.  Employees will receive two (2)
> thirty (30) minute non-paid
> meal/rest breaks each full work
> day.  In addition, where an
> employee is required to work more
> than 9 hours in any workday, except
> in the case of equipment or
> mechanical malfunctions or
> circumstances beyond the control of
> the Company, the employee shall be
> entitled to an additional 10 minute
> paid break to be scheduled by the
> Company, or to be paid for such
> break if not granted."  [App., Tab
> 7 at 21; App., Tab 8 at 22.]

---

[5] (...continued)
doffing time spent by each employee."

Article 13.4, titled "Supplies," enumerates the types of work clothing employees might be required to wear and provides detailed rules for what items Equity will provide, how often items can be replaced, and Equity's right to alter the procedures as necessary.  [App., Tab 7 at 21-22; App., Tab 8 at 22-23.]

Article 14 of the CBAs, entitled "Wages," incorporates a detailed, negotiated schedule of wage rates, job differentials and shift differentials.  [App., Tab 7 at 23-24; App., Tab 8 at 24-5.]  Finally, Article 18.1 of each CBA provides "that this Agreement has been reached as a result of good faith collective bargaining by both parties hereto and it contains the entire understanding between the parties...."  [App., Tab 7 at 27; App., Tab 8 at 28.]

### 2.    The Established Custom And Practice And Labor Negotiations.

Jacqueline Davis, who served as the Chief Union Steward over the life of all of these CBAs and was involved in the negotiation of each of the CBAs, including the CBA with CP [App., Tab 26 (Davis Dep.) 12:23-13:17; App., Tab 5 (Mills Affidavit), ¶¶ 46, 49, 59], admitted that, at the time that the RWDSU first entered into a CBA with CP, she and the RWDSU well understood that the basis for calculating hours was "line time" and that employees were not being, and would not be, paid for any time other than when they were at their work stations pursuant to CP's line time arrangements.[6]  [App., Tab 26 (Davis Dep.) 26:15-30:13.]  In

---

[6]Davis, in addition to being the chief Union Steward, was the named plaintiff in similar litigation filed against CP in 2002, captioned <u>Davis v. Charoen Pokphand (USA), Inc.</u>, Civil Action No. 02-CV-1029-N (M.D.Ala.).  The Court's decision
(continued...)

fact, Davis admitted that she knew it was CP's practice, even before the first CBA was negotiated, to pay only for time worked at the work station, and that she raised her concerns, as early as 1999, with officials at the RWDSU.  [App, Tab 26 (Davis Dep.) 17:3-18:9, 21:5-16; App., Tab 5 (Mills Affidavit), ¶ 56.]  This custom and practice was continued by Equity after it acquired CP's assets in 2004, commenced operations at the facility and assumed the 2000 CBA between CP and the RWDSU.  [App., Tab 26 (Davis Dep.) 21:17-22:1; App., Tab 5 (Mills Affidavit), ¶ 58.]

As a member of the Union and a member of the Bargaining Committee that participated in the formation of the 2000 CBA between CP and the RWDSU [App., Tab 26 (Davis Dep.) 12:23-13:17, 31:7-32:15; App., Tab 5 (Mills Affidavit), ¶¶ 49,59], Davis also discussed not being compensated for donning and doffing prior to and after work at various employee meetings, and communicated the employees' concerns to Henry Jenkins, RWDSU President, and Jerry Foster, Business Agent, who headed the Union's negotiating committee for the Agreement with CP.  [App., Tab 26 (Davis Dep.) 26:15-30:13; App., Tab 5 (Mills Affidavit), ¶ 60.]  Those discussions were held in connection with the negotiation of the collective bargaining agreement between the RWDSU and CP, and later with Equity, which had carried over the CBA between the RWDSU and CP.[7]  [App., Tab 26 (Davis Dep.) 17:3-18:9, 21:17-22:1;

---

[6](...continued)
granting the Motion for Summary Judgment is discussed in the Argument, Sections B.1 and 3, infra.  See Davis v. Charoen Pokphand (USA), Inc., 302 F.Supp.2d 1314 (M.D.Ala. 2004).

[7]In addition, at least some of the plaintiffs admitted discussing the lack of compensation for donning and doffing time with their Union stewards, including Davis.  [App., Tab 70 (V.
(continued...)

App., Tab 5 (Mills Affidavit), ¶¶ 58, 61.]  As the Davis Court concluded: "Davis was on the union's bargaining committee, and she testified that she talked about the issue of compensation for donning and doffing with the union's negotiator prior to negotiation on the CBA....  Davis testified that she knew that under the CBA, she was not to be compensated for such time. Green [another plaintiff in Davis] also testified that it was Pokphand's practice not to compensate for pre-shift donning-and-doffing time both before and after Pokphand and the union entered into the CBA."  302 F.Supp.2d at 1320-1 (footnotes omitted).

Indeed, Davis confirmed that during both periods of ownership, by CP and Equity, production employees wore some combination of the items of clothing made available to them:

> "Q.  And during the time that CP owned the plant, would the production employees wear some combination of these items [of clothing or equipment]?
>
> "A.  Yes.
>
> "Q.  And during the time that Equity owned the plant, did the employees wear some combination of these items?
>
> "A.  Yes." [App., Tab 26 (Davis Dep.) 26:7-14.]

Davis testified that she discussed the issue of non-compensation

---

[7](...continued)
Shorter Dep.) 13:11-21.]  Ebone Morris, a member of the bargaining committee for the 2008 CBA, admitted that she was aware of the existing custom and practice of not paying for donning, doffing and washing before the 2008 CBA was negotiated. [See App., Tab 59 (E. Morris Dep.) 18:23-19:8.]  Lakeshia Warren, a Packout Employee, also admitted that pay issues regarding donning and doffing were raised in Union meetings and in employee discussions, without any change in the agreed program.  [App., Tab 15 (Warren Dep.) 15:5-17:9.]

for donning and doffing with the bargaining committee and that
the issue was raised in the negotiations for the 2000 CBA with
CP:

> "Q.  Now, in connection with the
> negotiation of the contract
> with CP, did you have an
> opportunity to discuss with
> anyone from the international
> union your concerns over the
> issues that you raised in your
> lawsuit?
>
> "A.  Yes.
>
> "Q.  And was that Mr. Jenkins and
> Mr. Foster?
>
> "A.  That's correct.
>
> "Q.  Did you have an opportunity to
> discuss those concerns with
> both of them?
>
> "A.  Yes.
>
> "Q.  And did you have an
> opportunity to discuss those
> concerns in the presence of
> other members of the
> bargaining committee?
>
> "A.  Yes.
>
> "Q.  Do you know whether being paid
> for donning and doffing was
> raised in connection with the
> union negotiations to the
> company [in connection with
> the 2000 CBA]?
>
> *  *  *
>
> "A.  Yes.
>
> "Q.  And to the best of your
> knowledge, in that first
> contract between the union and
> CP, was there any provision
> added for payment for donning
> and doffing?
>
> "A.  No."  [App., Tab 26 (Davis
> Dep.) 26:15-28:9.]

Likewise, similar issues were known and raised by Davis and other employees during the 2004 CBA negotiations with Equity:

> "Q.   Now, the next contract that was entered into with the union, was that with Equity Group?
>
> "A.   Yes.  Yes.
>
>              *    *    *
>
> "Q.   In connection with the 2004 contract, who were the representatives from the international union?
>
> "A.   Jerry Foster and Henry Jenkins.
>
> "Q.   And you were still on the bargaining committee?
>
> "A.   Yes.
>
> "Q.   You were still the chief steward?
>
> "A.   Yes.
>
> "Q.   And during those negotiations relating to the 2004 contract, did you have an opportunity to discuss with Mr. Foster or Mr. Jenkins any concerns you had relating to donning and doffing?
>
> "A.   Yes.
>
> "Q.   And do you recall whether in connection with those 2004 negotiations payment for donning and doffing was raised as a formal proposal?
>
> "A.   Yes, sir.
>
> "Q.   And in the 2004 contract, was there any change in the contract made for payment for donning and doffing?
>
> "A.   No."  [App., Tab 26 (Davis

Dep.) 28:10-29:22.]

Finally, Davis, the employees and the RWDSU raised these
longstanding issues again as part of the 2008 CBA negotiations,
when the RWDSU was able to negotiate a provision for donning,
doffing and washing pay in the 2008 CBA with Equity:

"Q.   All right.  Am I correct that
the next contract between the
union and Equity Group became
effective in 2008?

"A.   Yes.

"Q.   March of 2008?

"A.   Yes.

"Q.   And I'm just going to call
that the 2008 contract.  And I
believe you've testified
previously that in the 2008
contract there was a provision
added for –

"A.   Yes.

"Q.   -- payment for donning and
doffing?

"A.   Yes.

"Q.   Now, prior to that provision
in 2008, during the entire
time that you've worked at
that plant, was there any
specific payment for donning
and doffing?

                    *   *   *

"A.   No."  [App., Tab 26 (Davis
Dep.) 29:23-30:21.]

### PROCEDURAL BACKGROUND

This action was commenced by plaintiffs on December 5, 2006,
when 230 employees allegedly working in the Evisceration or
Debone Departments of the Fresh Plant filed a Complaint "for

-21-

purposes of obtaining relief under the FLSA for unpaid wages,
unpaid overtime wages" and other relief permitted by the FLSA
[App., Tab 1 (Complaint), ¶¶ 1, 9-13 and 26], principally
claiming, based on the Supreme Court's decision in <u>IBP, Inc. v.
Alvarez</u>, 546 U.S. 21, 126 S.Ct. 514 (2005), that plaintiffs were
not paid "for all time worked." [App., Tab 1 (Complaint), ¶ 5.]
Without apparent reference to, or verification of, Equity's
practices or systems, plaintiffs falsely alleged that they "are
required to pass through security when entering and leaving the
facility" and "to have their employment status verified and their
arrival and departures documented as well as submit to searches
of the person and personal possessions." [<u>Id.</u> at ¶ 15.]
Plaintiffs then alleged that they are required to obtain, don or
doff "required clothing and/or personal protective equipment
(PPE) that is required for the work to be performed," and,
without any factual basis, "to acquire special tools for the work
to be performed," which they are allegedly required to clean and
maintain. [<u>Id.</u> at ¶¶ 16-17.] Plaintiffs' claims are summarized
in Paragraph 22 of their Complaint:

> "The time for which Plaintiffs and
> other similarly situated employees
> are paid is significantly less than
> the time they spend at work between
> the time they begin their integral,
> essential and indispensable work
> duties and the time they arrive at
> their workstations on the line.
> The work time for which Plaintiffs
> are not paid include, but are not
> limited to: (1) changing into the
> protective required work uniforms,
> sanitary clothing and protective
> safety equipment that can include,
> among other things (depending on
> the task and whether First or
> Second Processing): ear plugs,

> smocks, work pants and shirts;
> safety jump suits; safety boots;
> hair nets; face nets; hard hats;
> aprons; belts with holsters and
> knifes; and hand and arm
> protections; and (2) walking to and
> from the security, changing areas,
> work areas and break areas; washing
> activities; and (3) breaks that are
> effectively compensable." [App.,
> Tab 1 (Complaint), ¶ 22.][8]

Plaintiffs indicated that they would request that this action be certified as a collective action pursuant to Section 216(b) of the FLSA.[9] For the reasons reflected in the Factual Background (which confirmed that many of these allegations were false) and the Argument, including the specific application of Section 3(o), Equity timely responded and denied these allegations. [See App., Tab 2 (Answer), ¶¶ 15-17, 19-20.][10]

On May 10, 2007, plaintiffs filed the Motion for Supervised Notice, which (subject to the resolution of certain differences) Equity did not oppose. [See App., Tab 9 (Motion for Order Permitting Court Supervised Notice); App., Tab 10 (Response to Plaintiffs' Motion for Class Notice).] Plaintiffs, however, made clear that the proposed FLSA class only was to include former and current "1st and 2nd processing employees," which limited the scope of the claims to the Fresh Plant:

---

[8]Plaintiffs filed an Amended Complaint on March 14, 2007 without substantial changes. [Court Docket, # 33.]

[9]Notwithstanding the claims alleged in the Amended Complaint and the class description set forth in the Motion for an Order Permitting Court Supervised Notice to Employees of Their Opt-In Rights ("Motion for Supervised Notice"), some members of the purported class are asserting claims in this proceeding for allegedly uncompensated time spent on the actual production line. [App., Tab 42 (P. Jones) 15:1-6.] See Footnote 11, infra.

[10]The Answer to the Amended Complaint was filed on March 28, 2007. [Court Docket, # 35.]

"Hourly processing employees
primarily work in 1st processing
where chickens are placed or hung
on lines, killed, disemboweled,
inspected, diseased parts are
removed or trimmed, cleaned and
chilled or 2nd processing where
chickens after completing 1st
processing are placed or hung on
lines and are further processed,
cut-up, marinated, deboned,
weighed, sized, packed, loaded on
trucks, etc. for delivery to plant
customers." [App., Tab 9
(Plaintiffs' Motion) at 6.]

As reflected by the Notice approved by the Court on October 24,

2007, plaintiffs' claims were likewise limited:

"Plaintiffs claim that they were
paid on the basis of 'line time',
'master key time,' or that their
individual time clock punches were
not the basis for hours worked and
as a result they were not fully
paid regular time or overtime for
pre-production and post-production
activities as well as activities
during their shift, including
putting on and taking off
protective and sanitary
equipment/clothing at the beginning
and end of the work day, putting on
and taking off protective and
sanitary equipment/clothing during
the shift at breaks, related
washing/cleaning time at the
beginning and end of the shift and
during breaks, waiting time and
time spent walking to and from the
line at the beginning and end of
the day as well as at breaks, and
that unpaid breaks are compensable,
due to putting on
equipment/clothing, taking off
equipment/clothing, walk time, and
wash time that occurs while
employees are on break." [App.,
Tab 11 (Notice) at 1.][11]

---

[11]Equity is reviewing the opt-in consents to determine if
this collective action is appropriate and reserves the right to
(continued...)

In light of the Eleventh Circuit's decision in Anderson v. Cagle's Inc., supra, it is clear that plaintiffs' claims, as properly limited by the Notice, cannot survive.

## SUMMARY OF ARGUMENT

Plaintiffs' claims, as outlined in the Amended Complaint [App., Tab 3, ¶¶ 22, 42-45; see also id. at ¶ 32], and as detailed in their Motion for Supervised Notice [App., Tab 9], focus on the practices which, in light of Section 3(o) and Anderson v. Cagle's Inc., supra, do not violate the FLSA:

- Failing to pay for time donning, doffing and washing equipment and clothing.

- Failing to account for and pay for time walking to and from the production lines.

- Failing to account for and pay for time spent clearing security and for time walking to and from security to donning and doffing areas.

- Failing to account for and pay for time allocated as unpaid breaks.

As the Eleventh Circuit unequivocally concluded in Anderson, where hours worked for donning, doffing or washing are covered by the terms of a collective bargaining agreement, or related custom and practice, Section 3(o) of the FLSA dictates that the parties' labor agreement, whether express or implied, controls whether such hours are compensable.  As in Anderson, in these

---

[11](...continued)
request that the conditional certification be rejected.  [See, e.g., App., Tab 59 (E. Morris Dep.) 12:8-10 (claiming time while still on line working); App., Tab 42 (P. Jones) 15:1-6.] Moreover, despite the uniform and rote statements in the "Declarations" seeking conditional certification that employees were "discouraged" by Equity from joining this litigation or otherwise intimidated, no employee knew of any basis for such remarks (even though they signed the Declarations containing those allegations).  [See, e.g., App., Tab 28 (Ford Dep.) 14:6-16:3; App., Tab 43 (A. Kennedy Dep.) 44:22-46:10.]

circumstances, payment is not required for time spent donning, doffing or washing as it is <u>not</u> included within the definition of "work."  There is no contrary case, including the recent decision by the Supreme Court in <u>IBP, Inc. v. Alvarez</u>, especially as applied in the poultry industry.

The remaining claims in the Amended Complaint are factually unsupported; as such, they cannot survive in face of the unrebutted record -- employees do not need to "clear" security nor are they required to wait in line for or obtain any "equipment" (such as knives or chain mesh gloves) for the performance of their work.  Breaks of 30 minutes are provided and are not required to be paid under the FLSA and related Regulations.

Finally, any time spent donning, doffing or washing -- even if not excluded by the agreed provisions of the CBAs, the dictates of <u>Anderson</u> and the terms of Section 3(o) -- is excluded from pay by the terms of the Portal-to-Portal Act (as it amended the FLSA) or is <u>de</u> <u>minimis</u> as a matter of law under well-established principles applicable to the poultry industry.

For all of these reasons, summary judgment in favor of Equity on all claims is appropriate.

## **A R G U M E N T**

### A.   **Summary Judgment Standard.**

Viewed through the "prism" of the applicable substantive law, especially <u>Anderson v. Cagle's Inc.</u>, <u>supra</u>, the particular and undisputed facts of this case render it appropriate for summary judgment.  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as

an integral part of the Federal Rules as a whole, which are
designed 'to secure the just, speedy and inexpensive
determination of every action.'"   Celotex Corp. v. Catrett, 477
U.S. 317, 327, 106 S.Ct. 2548, 2555 (1986).  The standard
governing motions under Rule 56(c), as articulated by the Supreme
Court, is simple:

> "[T]he plain language of Rule 56(c)
> mandates the entry of summary
> judgment . . . against a party who
> fails to make a showing sufficient
> to establish the existence of an
> element essential to that party's
> case, and on which that party will
> bear the burden of proof at trial.
> In such a situation, there can be
> 'no genuine issue as to any
> material fact,' since a complete
> failure of proof concerning an
> essential element of the nonmoving
> party's case necessarily renders
> all other facts immaterial."   Id.
> at 322-23, 106 S.Ct. at 2552.

"The [summary judgment] movant is not required to negate his
opponent's claim, but may instead discharge this burden by
showing the district court 'that there is an absence of evidence
to support the non-moving party's case.'"   Manning v. Engelhard
Corp., 929 F.Supp. 1508, 1511 (M.D. Ga. 1996), aff'd, 111 F.3d
897 (11th Cir. 1997).

      In response, "[t]he non-moving party cannot rely solely on
its pleadings, Fed. R.Civ.P. 56(e); it 'must do more than simply
show that there is some metaphysical doubt as to the material
facts....'"   Irby v. Bittick, 44 F.3d 949, 953 (11th Cir.
1995)(emphasis in original)(quoting Matsushita Elec. Indus. Co.
v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356
(1986)); see also Leigh v. Warner Brothers, Inc., 212 F.3d 1210,

-27-

1217 (11th Cir. 2000)("'One who resists summary judgment must
meet the movant's affidavits with opposing affidavits setting
forth specific facts to show why there is an issue for trial.'");
Riley v. Newton, 94 F.3d 632, 638-39 (11th Cir. 1996), cert.
denied, 519 U.S. 1114, 117 S.Ct. 955 (1997)(on defendant's motion
for summary judgment, "burden of producing issuable facts" is on
plaintiff).

    **B.**    **Summary Judgment Is Appropriate Under Section 3(o) Of
The FLSA As Evidenced By The Collective Bargaining
Agreements With The RWDSU And The Long Existing Custom
And Practice.**

            **1.**    **The Eleventh Circuit, Applying Section 3(o), Has
Approved Identical Line Time Arrangements In The
Poultry Industry.**

In Anderson v. Cagle's Inc., supra, a nearly identical case
applying Section 3(o) to a related poultry processing plant,[12]
and reviewing virtually identical contract language, the District
Court granted summary judgment in favor of the employer, and that
grant was affirmed by the Eleventh Circuit.  There, as here,
poultry workers asserted, inter alia, claims under the FLSA for
donning, doffing and washing work clothing as well as related
walking and waiting time before and after line time.  As in this
case, those plaintiffs were subject to the terms of several
collective bargaining agreements between the employer and RWDSU.
Just as in this case, the production employees generally were
paid by line time, using contract language almost identical to
the language in the CBAs here.  In affirming the grant of summary

_____

[12]Anderson focused on the integrated poultry processing
facilities in Camilla, Georgia, and owned by Equity-Group Georgia
Division, LLC (formerly known as Cagle Foods JV LLC), which also
is the sole member and owner of the Equity plant here.

judgment as to <u>all</u> of plaintiffs' claims under Section 3(o), the
Eleventh Circuit first determined that the items worn by those
plaintiffs (as here) -- smocks, hair nets, beard nets, ear
protection, boots, gloves, arm guards, sleeves and aprons --
constitute "clothing" under Section 3(o), relying on the "plain
meaning" of the term:

> "The dictionary defines 'clothes'
> as 'clothing,' which itself is
> defined as 'covering for the human
> body or garments in general: all
> the garments and accessories worn
> by a person at any one time.'
> Webster's Third New International
> Dictionary 428 (unabridged) (1986)
> ['Webster's']. This broad
> definition, we believe, is
> consistent with the common
> understanding of the word, and we
> see no need to distinguish uniforms
> from protective clothes, for
> example, worn in the workplace.
>
> "We recognize that there may be
> limits to the application of §
> 203(o) based on the nature or
> purpose of the garments at issue.
> Other courts have drawn
> distinctions between general
> protective clothing, like the
> garments we are concerned with in
> this case, and specialized
> protective clothing, such as
> plastic shields, steel mesh gloves
> or, perhaps, spacesuits. <u>See</u>
> <u>Alvarez</u>, 339 F.3d at 903-05
> (describing as nonunique
> 'protective gear such as hardhats
> and safety goggles'; holding that
> the donning/doffing of these items
> required only de minimis time and
> effort and therefore were
> noncompensable; and noting later
> that the broad dictionary
> definition would encompass all
> manner of items worn on the body,
> including 'armor, spacesuits, riot
> gear, or mascot costumes'); <u>Reich</u>
> <u>v. IBP, Inc.</u>, 38 F.3d 1123, 1125-26
> (10th Cir. 1994) (concluding that

the donning/doffing of 'standard
safety equipment' such as 'a pair
of safety glasses, a pair of ear
plugs and a hard hat' was not
'work' under the FLSA whereas 'the
donning, doffing, and cleaning of
the special protective gear used by
the knife-workers' was).... [W]e
conclude that the garments the
named CFJV plaintiffs were required
to don/doff to perform their job
duties fit squarely withing the
commonly understood definition of
'clothes' as that term is used in §
203(o)."   488 F.3d at 956.[13]

Likewise, the Eleventh Circuit ruled that the act of donning and

doffing that protective clothing constitutes "changing clothes":

"The definition of 'change' is
similarly broad.  It means 'to make
different,' that is 'to modify in
some particular way but short of
conversion into something else.'
Webster's 373.  Thus, we see no
logic in appellants' unsupported
argument that '"changing clothes"
can only refer to the specific act
of arriving at work in one set of

---

[13]In <u>Davis v. Charoen Pokphand (USA), Inc.</u>, <u>supra</u>, the Court
easily dismissed plaintiffs' assertion that the "sanitary
equipment" worn by those plaintiffs (which is the same as worn by
plaintiffs here) was not "clothing" under Section 3(o):

"The plaintiffs attempt to
distinguish their case by claiming
that the sanitary garments used in
the present case are not 'clothes'
under § 203(o) and therefore, that
section should not be applicable.
<u>The distinction plaintiffs make,
however, is nonsensical</u>....
Webster's defines 'clothing' as
'covering for the human body or
garments in general.'  The
plaintiffs here put on, among other
things, (1) a lab coat; (2)
dedicated shoes or shoe coverings;
and (3) hair or beard coverings.
These items all appear to fall
under the definition of 'clothes.'"
<u>Id.</u> at 1321.

> clothes, removing those clothes,
> and putting on a different set of
> clothes.'...  Nothing in the
> statute's language suggests that
> its application turns on whether
> one must fully disrobe or exchange
> one shirt, for example, for
> another.  Therefore, we conclude
> that one need not exchange clothes
> to change clothes for the purpose
> of applying § 203(o)."  <u>Id.</u>

The Eleventh Circuit noted that this interpretation was

consistent with the then existing guidance from the Wage and Hour

Division of the Department of Labor ("DOL"), the agency charged

with administering the FLSA:

> "Our interpretation of the term
> 'changing clothes' is consistent
> with that of the agency responsible
> for administering the FLSA.  In a
> recent advisory opinion, the
> Administrator of the Wage and Hour
> Division of the Department of Labor
> stated that, for the purpose of
> applying § 203(o), clothes 'include
> items worn on the body for
> covering, protection, or
> sanitation.'  Fair Labor Standards
> Act, U.S. Dep't of Labor, Wage &
> Hour Div. Advisory Op. Ltr. No.
> FLSA2002-2 (June 6, 2002)
> ('Advisory Opinion I')."  488 F.3d
> at 956.

The Eleventh Circuit then held that plaintiffs' claims, exactly

the same as the claims here, were barred by Section 3(o) as a

"custom or practice" even if they were not addressed directly by

the applicable CBA (which they are in this case):

> "The ... plaintiffs contend that
> the pay policy at issue does not
> qualify as a 'custom or practice
> under a bona fide' CBA, as §203(o)
> requires, because, although the
> terms of their employment during
> the relevant period were governed
> by a CBA, prior to 2003, the CBAs
> in effect never addressed the

relevant compensation issue.
Moreover, they contend that the
parties to the CBA never discussed
the matter.  According to ...
plaintiffs, '[a] custom or practice
'under a collective-bargaining
agreement' of not compensating
employees for changing clothes or
washing cannot arise absent some
actual negotiation or agreement
between the union and employer on
that subject.'

"[ ]Rather than address their
allegations of error directly, we
simply assume that the CBAs never
addressed the compensation policy
with respect to clothes changing
and that the parties to the
relevant CBAs never discussed the
policy.  We nevertheless conclude
that the named CFJV plaintiffs'
view of the law is incorrect.

"Relying again on a common sense
understanding of the statute's
language, we believe that a policy
concerning compensation (or
noncompensation, as the case may
be) for clothes changing, written
or unwritten, in force or effect at
the time a CBA was executed
satisfies § 203(o)'s requirement of
a 'custom or practice under a bona
fide' CBA.  Absence of negotiations
cannot in this instance equate to
ignorance of the policy.  Rather,
it demonstrates acquiescence to
it."  488 F.3d at 958-59 (citations
omitted)

The Eleventh Circuit finally noted that its conclusion was

consistent with Section 3(o)'s legislative history:

"The statute's plain meaning aside,
our conclusion in this regard also
finds support in the circumstances
surrounding passage of the
provision that became § 203(o).  In
1947, approximately nine years
after the FLSA was enacted to
eliminate "conditions detrimental
to the maintenance of the minimum
standard of living necessary for

-32-

health, efficiency, and general
well-being of workers," 29 U.S.C.
§ 202 (2000), Congress passed the
Portal-to-Portal Act, 29 U.S.C.
§§ 251-262 (2000).  The Portal-to-
Portal Act aimed to countermand
judicial interpretations of the
FLSA that Congress found to
evidence a:

> disregard of long-
> established customs,
> practices, and contracts
> between employers and
> employees, thereby
> creating wholly
> unexpected liabilities,
> immense in amount and
> retroactive in operation,
> upon employers with the
> results that, if said Act
> as so interpreted or
> claims arising under such
> interpretations were
> permitted to stand, (1)
> the payment of such
> liabilities would bring
> about financial ruin of
> many employers and
> seriously impair the
> capital resources of many
> others ...; (2) the
> credit of many employers
> would be seriously
> impaired; (3) there would
> be created both an
> extended and continuous
> uncertainty on the part
> of industry, both
> employer and employee, as
> to the financial
> condition of productive
> establishments and a
> gross inequality of
> competitive conditions
> between employers and
> between industries; (4)
> employees would receive
> windfall payments,
> including liquidated
> damages, of sums for
> activities performed by
> them without any
> expectation of reward
> beyond that included in

> their agreed rates of
> pay; (5) there would
> occur the promotion of
> increasing demands for
> payment to employees for
> engaging in activities no
> compensation for which
> had been contemplated by
> either the employer or
> employee at the time they
> were engaged in; [and]
> (6) voluntary collective
> bargaining would be
> interfered with and
> industrial disputes
> between employees and
> employers and between
> employees and employees
> would be created.

"29 U.S.C. § 251 (2000).

"Congress's efforts to curtail
employee-protective interpretations
of the FLSA continued when the FLSA
was amended two years later to add,
among other things, what would
become § 203(o).  As the sponsor of
the relevant amendment explained to
fellow representatives, the purpose
of the amendment was to 'avoid[]
another series of incidents which
led to the portal-to-portal
legislation.'  95 Cong. Rec. 11,433
(daily ed. Aug. 10, 1949)(comments
of Representative Herter).
Essentially, he explained, the
amendment would strengthen the
employer-protective Portal-to-
Portal Act by closing a 'loophole'
therein.  Id.  Consequently,
construing § 203(o) narrowly
against employers as an FLSA
'exemption' contravenes not only
basic tenets of statutory
construction but also the readily
apparent intent of the legislators
who approved the amendment's
language."  488 F.3d at 957-58.

Consequently, the Eleventh Circuit affirmed summary judgment as
to all of the claims asserted by the plaintiffs.  Id. at 959.

Plaintiffs' focus here on the Supreme Court's decision in

IBP, Inc. v. Alvarez, 546 U.S. 21, 126 S.Ct. 514 (2005), was
rejected by the Eleventh Circuit in Anderson v. Cagle's Inc.,
supra: "[T]he Supreme Court's opinion in Alvarez did not discuss
issues relevant to this appeal...," or here.  Id. at 955, n.12.
In fact, the Supreme Court did not address the application of
Section 3(o), proscribe "line time" arrangements in the poultry
industry nor declare that donning and doffing all clothing are
principal activities and compensable under the FLSA, despite the
contrary suggestion in plaintiffs' Amended Complaint.  [App., Tab
3 (Amended Complaint), ¶ 3.]  Rather, the Supreme Court only held
that time spent walking to the production floor after donning
unique protective gear, and the time spent walking from the
production floor to doff unique, protective gear is compensable
when the donning or doffing time is otherwise compensable.

Critically, the Ninth Circuit's underlying decision in
Alvarez was based upon the distinct nature of the clothing worn
by those employees (in the beef, and not chicken, industry).  339
F.3d at 898; see also id. at 901, n.65 (noting that the time
spent donning and doffing non-unique protective gear such as hard
hats, frocks, ear plugs, safety goggles and hair nets was not
compensable).  Quite simply, the Ninth Circuit in Alvarez (and,
thus, the Supreme Court) only considered the impact of donning,
doffing and washing the armor-like, specialized protective
equipment used in the red meat industry -- a face shield; weight-
lifting-type belts to prevent back injury; chain-link (i.e.,
"mesh") metal aprons, leggings, vests, sleeves and gloves;
plexiglass arm guards; Kevlar gloves; and puncture-resistant
protective sleeves.  Id. at 898, n.2.

Conversely, the donning and doffing of <u>non-unique items</u> (as used by plaintiffs here) was not part of those employees' "principal activity,"[14] nor part of the Ninth Circuit's or Supreme Court's decisions.  <u>See</u>, <u>e.g.</u>, <u>Kassa v. Kerry, Inc.</u>, 487 F.Supp.2d 1063, 1066-7 (D. Minn. 2007):  "[T]his case does not involve a mixture of what <u>Alvarez</u> labeled 'non-unique protective gear' and what <u>Alvarez</u> labeled 'specialized protective gear.'  To the contrary, this case involves <u>only</u> items that <u>Alvarez</u> labeled 'non-unique safety gear.'  As noted, <u>Alvarez</u> was silent on the question of whether such items should be considered 'clothes' under § 203(o), and neither <u>Gonzalez</u> nor <u>Fox</u> establishes that such items are not 'clothes.'"

Most relevant, the Supreme Court held that the time employees spend waiting to obtain the first piece of "integral and indispensable gear" (such as waiting in line at the supply room) is <u>not</u> compensable under the FLSA.  546 U.S. at 40-1.

### 2.    The Eleventh Circuit's Holding Is Consistent With Other Judicial Interpretations Under Section 3(o).

Virtually every Court which has reviewed similar facts and issues has reached conclusions similar to the Eleventh Circuit's holding in <u>Anderson</u>.  <u>See</u> <u>Fox v. Tyson Foods, Inc.</u>, Case No. 99-1612 (N.D.Ala., August 31, 2007)("The Plaintiffs concede that <u>Anderson</u> reverses this Court's conclusion that § 203(o) does not apply to their pre- and post-shift clothes changing activities.

---

[14]The Supreme Court also recognized that the nature of the clothing worn by the employees was critical:  "[T]he Court of Appeals endorsed the distinction between the burdensome donning and doffing of elaborate protective gear, on the one hand, and the time spent donning and doffing nonunique gear such as hardhats and safety goggles, on the other."  546 U.S. at 32.

Hence, as to this conceded issue, the court hereby GRANTS
Defendant's Motions to Reconsider."); <u>Anderson v. Pilgrim's Pride
Corp.</u>, 147 F.Supp.2d 556, 564-5 (E.D. Tex. 2001), <u>aff'd</u>, 44
Fed.Appx. 652, 2002 U.S.App.LEXIS 13429 (5th Cir. June 6,
2002)("The UFCW's understanding that clothes-changing time and
'wait time' were not compensable under the agreements constitutes
a 'practice' for purposes of Section 203(o).  Pilgrim's Pride
long-standing policy of non-compensation for these activities
similarly constitutes a "custom' for purposes of Section
203(o)."); <u>Pressley v. Sanderson Farms, Inc.</u>, 2001 U.S.Dist.LEXIS
6535 (S.D.Tex. April 20, 2001)(as to the claims of those
employees covered by a collective bargaining agreement, "[t]he
Court might be inclined to agree that this agreement excludes
time spent changing or washing clothes pursuant to section
3(o)"); <u>Gutierrez v. Specialty Brands, Inc.</u>, Civ. No. 00-102
DJS/RLP at 2, 6 (D.New Mexico, January 14, 2002)(Court granted
summary judgment to employer under Section 3(o) on claims for
donning and doffing smock, hairnets and boots: "activities which
Plaintiffs engage in generally fall within the common meaning of
'changing clothes' and washing and so fall within the exception
contained in 29 U.S.C. § 203(o)"); <u>Bejil v. Ethicon, Inc.</u>, 125
F.Supp.2d 192, 196, n.3 (N.D.Tex. 2000), <u>aff'd</u>, 269 F.3d 477 (5th
Cir. 2001)(smocks, hair nets, beard nets, special shoes were
"clothes" under Section 3(o) and related donning and doffing time
is noncompensable in light of established practice, even in the
absence of express collective bargaining); <u>Reich v. Oscar Mayer
Foods Corp.</u>, 1995 U.S.Dist.LEXIS 22225, *6 (E.D.Tex., March 2,
1995)(Section 3(o) excludes from compensable work time the time

spent by unionized employees at a meat processing plant donning
and doffing work uniforms that were worn over their street
clothes, as well as shoe covers, hair nets and bump hats).

Most recently, in <u>Kassa v. Kerry, Inc.</u>, <u>supra</u> at 1068, the
Court granted summary judgment, rejected plaintiffs' reliance on
terms and "labels," without more, and held that smocks, pants,
shirts and boots constitute "clothes" for purposes of Section
3(o):

> "Plaintiffs attach too much
> significance to labels.  Regardless
> of whether it is labeled 'personal
> protective equipment' or something
> else, a hair net is still a hair
> net, pants are still pants, and a
> smock is still a smock.  Whether
> the items that plaintiffs don and
> doff are 'clothes' under § 203(o)
> depends on what those items <u>are</u>,
> not on what they are called by the
> CBA, by Kerry's plant manager, or
> by anyone else.

> * * *

> "The Court agrees with Judge Graham
> that, based on the undisputed
> evidence adduced so far, the items
> at issue in this case -- except
> perhaps the hair nets and the beard
> nets -- are 'clothes' under §
> 203(o).  Specifically, based on the
> word's ordinary meaning, 'clothes'
> includes pants, shirts, smocks, and
> boots.  And, for people who wear
> them, glasses are essentially part
> of their clothing, so standard
> safety glasses also qualify as
> 'clothes.'  (Even if standard
> safety glasses are not 'clothes,'
> the time that it takes to put on a
> pair of glasses is <u>de</u> <u>minimis</u>.)

> * * *

> "The Court believes that whether a
> particular item of protective gear
> should be considered 'clothes'

-38-

under § 203(o) depends on the exact
nature of the item and the exact
circumstances under which it is
used....  <u>None of the items at
issue in this case, however,
presents a close question.</u>  All of
those items are 'clothes' for
purposes of § 203(c)[<u>sic</u>] -- or, in
the case of hair nets and beard
nets, the time devoted to donning
the items is <u>de minimis</u>."  487
F.Supp.2d at 1066-7 (footnote
omitted).[15]

As there are no relevant distinctions between <u>Anderson</u> and
the facts here (which in light of Davis' testimony are even more
compelling), the Eleventh Circuit's decision dictates the same
result here and summary judgment should be granted.  In fact, as
reflected by the specific provisions of the 2000, 2004 and 2008
CBAs, and Davis' admissions that the pay practices and use of
line time were well known to the RWDSU and employees as far back
as 1999,[16] it is clear that the parties understood that the
reference to "line time" would exclude donning, doffing and
washing from paid work time and, exactly as permitted by Section
3(o), agreed to proceed on that basis.  In light of Section 3(o)
and <u>Anderson</u>, the collective bargaining process and agreement
must be honored and there can be no basis for plaintiffs' present
claims.

---

[15]As to hair nets and beard nets, the Court held that, while
they <u>may</u> not be "clothes," "donning and doffing those items alone
is surely a <u>de minimis</u> activity."  <u>Id.</u> at 1067, n.1.

[16]For example, Ebone Morris, another RWDSU steward and
member of the bargaining committee, also was aware of Equity's
pay systems and raised issues related to those systems regarding
putting on or taking off of items of clothing with RWDSU
officials.  [App., Tab 59 (E. Morris Dep.) 16:3-20:12, 25:18-23.]

###   3.   The Well Established Custom and Practice Mandates Summary Judgment Under Section 3(o).

Even if the CBAs did not address donning, doffing and washing directly (which the repeated reference in the CBAs to line time clearly does), summary judgment is still appropriate based upon the well established custom and practice of non-payment for this time.  Here, plaintiffs have been represented by the same union since CP owned the plant [App., Tab 26 (Davis Dep.) 26:7-30:21; App., Tab 37 (T. Jackson Dep.) 10:15-17 (member of union for period spanning CP and Equity ownership)] and the practices and terms of the CBAs have remained consistent, with the exception of the negotiated addition of pay for clothes changing and washing in the 2008 CBA.  In light of the established record summarized in the Factual Background, as far back as when CP owned the plant, the RWSDU and its negotiating team (including Davis, who participated in each contract negotiations as a Union/employee representative) and the employees were aware of the use of "line time" as the basis for pay and had considered issues of donning and doffing in prior negotiations.  In fact, Davis, the Chief Union Steward, was the lead plaintiff in an identical, but unsuccessful, lawsuit.  [See App., Tab 26 (Davis Dep.) 21:5-16, 26:4-28:9 (RWDSU officials aware of employee concerns with line time, yet agreed to pay on that basis without "added payment for donning or doffing.").] Individual employees also were aware of the pay practices and "complained" about them:

> "A.  ...I just talked to him [her supervisor].  I figured that's who I needed to talk to.

> "Q.  And is this part of what you
> are claiming in this lawsuit, the
> time?
>
> "A.  Yes.  And not getting paid the
> money I've worked for the hours I
> worked."  [App., Tab 55 (McNair
> Dep.) 40:1-8; see also App., Tab 70
> (V. Shorter Dep.) 13:11-21.]

Indeed, in Davis v. Charoen Pokphand (USA), Inc., supra, the
Court, pursuant to Section 3(o), granted summary judgment in
favor of the prior owner of the same plant at issue here.  As
plaintiffs here, the Davis plaintiffs wore standard poultry
industry sanitary clothing: hat or hairnet, smock, apron,
earplugs, rubber gloves, boots, protective gloves, plastic
sleeves and arm guards.  Id. at 1317-8, 1319.  Although the
District Court noted that the CBA did not expressly refer to
donning, doffing and washing time in those terms (although it
does refer to "line time"), and such compensation was never part
of the direct negotiations between the Union and the Company, id.
at 1320-21, the Court had "no trouble finding that the FLSA's
§ 203(o) exception" barred the claims related to any position
covered by the CBA, especially in light of Davis' testimony
regarding the negotiating process, even if not incorporated into
the agreement:

> "The CBA does not expressly exclude
> donning-and-doffing time, so the
> determinative issue is whether that
> time is excluded from compensation
> by practice or custom.  The non-
> compensation of time spent donning
> and doffing clothing prior to a
> shift becomes a "practice" under §
> 203(o) when the union raises the
> issue of compensation prior to
> collective bargaining and the CBA
> is silent on the issue.  Hoover v.
> Wyandotte Chem. Corp., 455 F.2d

387, 389 (5th Cir. 1972) n1; <u>see also</u> <u>Bejil v. Ethicon, Inc.</u>, 269 F.3d 477, 480 (5th Cir. 2001); <u>Arcadi v. Nestle Food Corp.</u>, 38 F.3d 672, 675 (2d Cir. 1994).  In <u>Bejil</u>, plaintiffs sought compensation under the FLSA for their time spent donning and doffing lab coats, hair covers, and shoe covers prior to beginning their shifts at a medical supplies factory.  269 F.3d at 478-79.  The union representing plaintiffs had raised the issue of compensation prior to negotiating the CBA in effect at the factory, but the agreement did not provide compensation.  <u>Id.</u> at 479.  The court held that 'by not incorporating compensation for clothes changing ... into the collective-bargaining agreement ..., nonpayment became the "custom and practice."'"  302 F.Supp.2d 1320.

As the practice held to be a bar to recovery in <u>Davis</u> was continued by Equity, it is equally a bar to these plaintiffs' claims.

Likewise, in <u>Kassa v. Kerry, Inc.</u>, <u>supra</u>, the Court refused to define the "custom or practice" narrowly, and <u>rejected</u> plaintiffs' argument that, for purposes of Section 3(o), "a 'custom or practice' does not exist in this case because the issue of paying for changing clothes has never been raised and abandoned by the union in the course of negotiations."  487 F. Supp.2d at 1068.  The Court concluded that the issue need not be raised during collective bargaining negotiations provided that the practice of non-payment was well known to the employees.  <u>See also</u> <u>Conerly v. Marshall Durbin Company</u>, 2007 U.S.Dist.LEXIS 85994, *20 (S.D.Miss., November 5, 2007)(holding that acquiescence in custom or practice of non-compensation for

-42-

donning and doffing is appropriate upon proof to support argument); Anderson v. Pilgrim's Pride Corp., 147 F.Supp.2d at 564-5 ("It is evident that Local 408 and Local 540 signed the collective bargaining agreements knowing that line employees would not be compensated for the activities at issue in this case.  The UFCW's understanding that clothes-changing time and 'wait time' were not compensable under the agreements constitutes a 'practice' for purposes of Section 203(o).  Pilgrim's Pride long-standing policy of non-compensation for these activities similarly constitutes a 'custom' for purposes of Section 203(o).").  This is exactly the case here, especially as confirmed by the deposition testimony of Davis and the other employees -- the relevant pay issues were known, discussed and either rejected as bargaining issues or subject to non-payment by agreement in each of the CBAs (except as part of the most recent CBA which provides for a supplemental donning and doffing payment).  See App., Tab 26 (Davis Dep.) 26:7-30:21); App., Tabs 6-8(CBAs).]

The Eleventh Circuit's holding regarding custom and practice, especially for labor purposes, is not unique or an aberration -- courts repeatedly have made clear that, even without any mention of clothes changing and washing time in a labor contract, an existing practice still may be a "custom or practice under a bona fide collective-bargaining agreement" and the related "hours" properly deemed not compensable under the FLSA.  See, e.g., Arcadi v. Nestle Food Corp., 38 F.3d 672, 674-5 (2d Cir. 1994); Saunders v. John Morrell & Co., 1991 U.S.Dist.LEXIS 21069, *11 (N.D. Iowa, December 24, 1991)("Even if

-43-

plaintiff were correct that Morrell has not expressly excluded clothes-changing time from hours worked, the court believes that the undisputed facts also show a custom or practice to exclude the time."); Nardone v. General Motors, Inc., 207 F.Supp. 336, 340 (D.N.J. 1962); Bejil v. Ethicon, Inc., supra, 125 F.Supp.2d. at 196-7.

Nor is it a novel suggestion that, under basic tenets of labor law and employer-union relationships, acquiescence can establish a custom or practice.  In Turner v. City of Philadelphia, 96 F.Supp.2d 460 (E.D.Pa. 2000), aff'd, 262 F.3d 222 (3d Cir. 2001), the Court rejected plaintiffs' argument that Section 3(o) was not applicable because the employer and union had not negotiated over compensation for clothes changing time: "[n]o court ... has held that the absence of such formal negotiations precludes the existence of a requisite custom or practice."  96 F.Supp.2d at 462; see also Hoover v. Wyandotte Chemicals Corp., 455 F.2d 387 (5th Cir.), cert. denied, 409 U.S. 847, 93 S.Ct. 52 (1972); Williams v. W. R. Grace & Co., 247 F.Supp. 433, 435 (E.D. Tenn. 1965); DOL Field Operations Handbook § 31b01 [App., Tab 16].

Since Equity's employees do not don or doff anything other than "non-unique" clothing, just as in Anderson v. Cagle's Inc., supra, and the CBAs, or custom and practice, consistently since 2000, at least, confirm that pay is to be based on "line time" only, the conduct here is non-compensable, as the Eleventh Circuit in Anderson v. Cagle's Inc., supra, and all Circuit Courts in similar circumstances, have held.

However, this is not a case of mere acquiescence to a known

practice -- although that is certainly a fact -- it is a case of agreement with the union and employees wholly consistent with and controlled by Section 3(o).  Quite simply, the Eleventh Circuit's holding in Anderson v. Cagle's Inc., supra, is fully applicable here[17] -- there is no basis to suggest that the donning, doffing and washing time referenced by plaintiffs' Amended Complaint, or as reflected in their Motion for Supervised Notice require a different result.  As these activities are not compensable under the terms of the FLSA, they are not the first "principal" work activity and, therefore, no subsequent activity is compensable until "line time" commences, exactly as contemplated by Congress and the Eleventh Circuit.

**4.  The Department Of Labor Has Concluded That Section 3(o) Requires Approval of Collective Bargaining Relationships.**

As the Eleventh Circuit noted, the DOL's Opinion Letter dated June 6, 2002 (FLSA 2002-2) advised that "for the purpose of applying § 203(o), clothes 'include items worn on the body for covering, protection, or sanitation'."  [See Anderson v. Cagle's Inc., supra at 956.]  Like the Eleventh Circuit, the DOL stated:

> "One dictionary defines 'clothes' as 'garments for the body; articles of dress; wearing apparel' (The Random House College Dictionary (revised ed. 1982)), and another defines 'clothes' as 'articles, usually of cloth, designed to cover, protect or adorn the body...' (Webster's New World Dictionary (2d college ed. 1982))(emphasis in original).  See also 29 C.F.R. § 1920 1050 App.A

---

[17]In fact, the plants are related, the clothing worn and practices are virtually identical and similar contract language was similarly negotiated and agreed upon.

> (OSHA regulations characterizing
> 'face shields' as a kind of
> <u>protective clothing</u>')."

Subsequent to <u>Anderson v. Cagle's Inc.</u>, <u>supra</u>, the DOL
<u>reaffirmed</u> its 2002 position in an Opinion Letter dated May 14,
2007 (FLSA 2007-10), which also was issued <u>after</u> the Supreme
Court's decision in <u>Alvarez</u>. [App., Tab 15.]  In that opinion,
the DOL emphasized that Section 3(o) should be given its plain
meaning, and that collective bargaining relationships are
paramount.  The DOL <u>again</u> concluded that "clothing" under Section
3(o) included <u>all</u> of the clothes of the type worn by Equity's
employees:

> "After carefully reviewing the
> interpretation of section 3(o) set
> forth in Wage and Hour Opinion
> Letter FLSA 2002-2 (June 6, 2002),
> it remains our view, based upon the
> statute and its legislative
> history, that the 'changing
> clothes' referred to in section
> 3(o) applies to putting on and
> taking off the protective safety
> equipment typically worn by
> employees in the meat packing
> industry....  As specified in the
> 2002 letter, this clothing
> includes, among other items, heavy
> protective safety equipment worn in
> the meat packing industry such as
> mesh aprons, sleeves and gloves,
> plastic belly guards, arm guards,
> and shin guards."  [App., Tab 15 at
> 1.]

The DOL also, <u>and</u> <u>again</u>, rejected any suggestion that the
activities excluded by Section 3(o) could be "principal
activities" (and, thus, could not mark the start of the
"continuous workday"):

> "In promulgating this provision
> Congress plainly excluded
> activities covered by section 3(o)

-46-

> from time that would otherwise be
> '[h]ours worked.'  29 U.S.C. §
> 203(o).  <u>Accordingly, activities</u>
> <u>covered by section 3(o) cannot be</u>
> <u>considered principal activities and</u>
> <u>do not start the workday.  Walking</u>
> <u>time after a 3(o) activity is</u>
> <u>therefore not compensable unless it</u>
> <u>is preceded by a principal</u>
> <u>activity.</u>"  [App., Tab 15 at 1-2
> (emphasis added).]

As such, even to the extent plaintiffs rely on some sort of
"continuous workday" theory, <u>all</u> of the pre- and post- shift
activities of which they complain must be excluded from the
plaintiffs' "continuous workday"; their workday commences when
their actual work on the production line commences, exactly as
they are paid.

### 5.   **The Legislative History**.

The Eleventh Circuit's well supported holding is consistent
with the stated legislative intent in adopting Section 3(o), as
reflected in the Congressional Record when the amendment to FLSA
was adopted.  See 95 <u>Congressional Record - House</u> at 11210
(August 10, 1949).  Congressman Herter (R. Mass.) specifically
indicated that the amendment was offered to prevent the need for
further legislation where hours of work "have been spelled out in
... collective bargaining agreements but have not necessarily
been defined in the same ways."  As Congressman Herter, who
offered the amendment, noted:

> "But, in either case the matter has
> been carefully threshed out between
> the employer and the employee and
> apparently both are completely
> satisfied with respect to their
> bargaining agreements.

> "The difficulty, however, is that

> suddenly some representative of the
> Department of Labor may step into
> one of those industries and say.
> 'You have reached a collective
> bargaining agreement which we do
> not approve.  Hence the emloyer
> must pay for back years the time
> which everybody had considered was
> excluded as a part of the working
> day.'  <u>That situation may arise at
> any moment</u>.  This amendment is
> offered merely to prevent such a
> situation arising and to <u>give
> sanctity once again to the
> collective-bargaining agreements as
> the determining factor in finally
> adjudicating that type of
> arrangement</u>."  (Emphasis added.)

Thus, it is clear, from the very purpose of Section 3(o), and legislative history, that donning, doffing and washing before and after work and unpaid breaks constitute the beginning and end to parts of the workday, which then starts again upon the return from break, and requires no change in the outcome.  As such, Section 3(o) properly defers to the agreements and judgments between companies and their employees' duly-designated representatives for purposes of negotiating the terms and conditions of employment.  <u>See Anderson v. Pilgrim's Pride Corp.</u>, <u>supra</u> (judgment entered in favor of a chicken processing facility where the production workers, represented by the United Food and Commercial Workers Union ("UFCW"), sought unpaid wages and overtime compensation for donning, doffing and washing sanitary and safety equipment before and after work <u>and</u> for breaks taken during the work day).

Each of these nearly identical cases directly supports Equity's position here regarding the application of Section 3(o) and its applicable legislative history, and mandates summary

judgment; each involved situations where plaintiffs worked in chicken plants (wearing virtually identical articles of clothing) and engaged in similar, if not exactly the same, donning, doffing and washing before and after work <u>and</u> before and after breaks in their workday.

 **C. Even In The Absence Of The Bar Of Section 3(o), Plaintiffs' Claims Are Precluded By The Provisions Of The Portal-To-Portal Act.**

 Assuming, <u>arguendo</u>, that Section 3(o) somehow does not bar plaintiffs' claims for donning and doffing and related activities, those claims, as well as plaintiffs' "break," "wait time" and "walk time" claims, are barred by the Portal-to-Portal Act and related principles well recognized under FLSA case law. Indeed, as set forth below, plaintiffs' claims for "clearing security" (for which there is no factual predicate), walk time and donning and doffing (both before and after the shift as well as breaks) fail as a matter of law.

 **1. Applicable Legal Principles.**

 The FLSA requires employers to pay minimum wage for all hours worked and overtime for all hours worked over 40 hours per week.  29 U.S.C. §§ 207(a)(1) and 215(a)(2).  In 1946, the Supreme Court, in <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 66 S.Ct. 1187 (1946), interpreted the FLSA to require compensation for certain activities performed after employees arrived at their place of work but before they began actual production.  Specifically, the Court determined (with reference to a pottery plant) that the time spent, after punching time clocks, walking from the time clocks to the employee's work stations constituted "working time" which was compensable under

the FLSA.  66 S.Ct. at 1194.  The Supreme Court also determined
that certain "preliminary activities" of employees after arriving
at their work stations were compensable:

> "The employees proved, in addition,
> that they pursued certain
> preliminary activities after
> arriving at their places of work,
> such as putting on aprons and
> overalls, removing shirts, taping
> or greasing arms, putting on finger
> cots, preparing the equipment for
> productive work, turning on
> switches for lights and machinery,
> opening windows and assembling and
> sharpening tools.  These activities
> are clearly work falling within the
> definition enunciated and applied
> in [past cases].  They involve
> exertion of a physical nature,
> controlled or required by the
> employer and pursued necessarily
> and primarily for the employer's
> benefit.  They are performed solely
> on the employer's premises and are
> a necessary prerequisite to
> productive work.  There is nothing
> in such activities that partakes
> only of the personal convenience or
> needs of the employees.  Hence they
> constitute work that must be
> accorded appropriate compensation
> under the statute."  66 S.Ct. at
> 1195.[18]

---

[18]The Supreme Court in <u>Mt. Clemens</u> recognized, however, that
it may be appropriate "to apply a de minimus doctrine so that
insubstantial and insignificant periods of time spent on
preliminary activities need not be included in the statutory
workweek."  66 S.Ct. at 1195.  The so-called <u>de minimus</u> rule is
codified at 29 C.F.R. § 785.47:

> "In recording working time under
> the Act, insubstantial or
> insignificant periods of time
> beyond the scheduled working hours,
> which cannot as a practical
> administrative matter be precisely
> recorded for payroll purposes, may
> be disregarded.  The courts have
> held that such trifles are de

(continued...)

Congress reversed the Mt. Clemens decision in the Portal-to-Portal Act of 1947, 29 U.S.C. § 254, which created two exceptions to required FLSA compensation, as follows:

> "[N]o employer shall be subject to any liability or punishment under the [FLSA]... on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee ...
>
> > (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
> >
> > (2) activities which are preliminary to or postliminary to said principal activity or activities,
>
> which occur either prior to the time on any particular workday at which such employee commences, or

---

[18](...continued)
> minimus.  (Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1947)) This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realties. An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him."

> subsequent to the time on any
> particular workday at which he
> ceases, such principal activity or
> activities."  29 U.S.C. § 254(a).

Subsequently, in _Steiner v. Mitchell_, 350 U.S. 247, 76 S.Ct. 330 (1956), the Supreme Court interpreted the Portal-to-Portal Act and held that compensation for preliminary activities <u>only</u> was required when such activities "are an integral part of <u>and</u> indispensable to [the employees'] principal activities":

> "We ... conclude that activities
> performed either before or after
> the regular work shift, on or off
> the production line, are
> compensable under the portal-to-
> portal provisions of the Fair Labor
> Standards Act if those activities
> are an integral and indispensable
> part of the principal activities
> for which covered workmen are
> employed and are not specifically
> excluded by Section 4(a)(1)."  76
> S.Ct. at 335.[19]

In _Steiner_, the Court determined that clothes changing and showering were compensable where employees at a battery production plant were exposed to dangerous toxic chemicals and lead.  The Court reasoned that the employees' jobs required exposure to toxic substances which remained on their clothes and bodies and that, accordingly, clothes changing and showering <u>both</u> were an integral <u>and</u> indispensable part of the activity in the performance of the workers' jobs.  76 S.Ct. at 332.  In fact, the Court noted:

> "Nor is the question of <u>changing
> clothes and showering under normal
> conditions</u> involved because the

_____

[19]The referenced Section 4(a)(1) exclusion is to "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities...."  29 U.S.C. § 254(a).

> Government concedes that these
> activities ordinarily constitute
> 'preliminary' or 'postliminary'
> activities <u>excluded</u> from
> compensable work time as
> contemplated in the Act."  76 S.Ct.
> at 332.

In a companion case, the Supreme Court used the "integral
and indispensable" test set forth in <u>Steiner</u> to determine that
time spent sharpening knives by employees at a meat packing plant
was compensable.  In <u>Mitchell v. King Packing Co.</u>, 350 U.S. 260,
S.Ct. 337 (1956), the Court, on a record which demonstrated that
"a dull knife would slow down production which is conducted on an
assembly line basis, affect the appearance of the meat as well as
the quality of the hides, cause waste and make for accidents,"
determined that:

> "[T]he facts clearly demonstrate
> that the knifesharpening activities
> of these workmen are an integral
> part of and indispensable to the
> various butchering activities for
> which they were principally
> employed, and that they must be
> compensated for by respondent in
> compliance with the [FLSA]...."  76
> S.Ct. at 339.[20]

Thus, under <u>Steiner v. Mitchell</u>, <u>supra</u>, 350 U.S. at 256, 76
S.Ct. at 335, for preliminary activities to be compensable, they
must be "integral" <u>and</u> "indispensable."[21]

_____

[20]Here, the chain mesh gloves and any knives, scissors or
cutters used by these plaintiffs are provided to them on the
production line and employees are not required to walk to obtain
them nor are they responsible for cleaning or sharpening those
items.  [App., Tab 5 (Mills Affidavit), ¶¶ 20,21; App., Tab 37
(T. Jackson Dep.) 20:7-19.]

[21]The Regulations adopted by the DOL define "principal
activities" to mean "activities which the employee is 'employed
to perform.'" 29 C.F.R. § 790.8(a).  According to the DOL,
activities such as "checking in and out and waiting in line to do
(continued...)

-53-

In its most recent review of these principles, the Supreme Court, in IBP, Inc. v. Alvarez, supra, further explained that "principal activities" under the FLSA are those which are an "'integral and indispensable part of the principal [work] activities'." The Supreme Court made clear that "[t]he fact that certain preshift activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable' to a 'principal activity.'" In fact, the Supreme Court's focus in Alvarez only was whether employees' walk time following compensable donning time (which was not contested) was itself compensable. The Court did not (1) consider whether donning and doffing in the poultry industry was work; (2) disturb the Ninth Circuit's holding that donning and doffing of normal work clothing is not compensable time; or (3) affect the continuing viability of Section 3(o) and the priority given to collective bargaining negotiations.

Moreover, as the Second Circuit noted in Gorman v. Consolidated Edison Corporation, 488 F.3d 586, 592 (2d Cir. 2007)(petition for cert. pending):

> "'[I]ndispensable' is not synonymous with 'integral.' 'Indispensable' means 'necessary.' See Webster's Third New Int'l Dictionary (Unabridged) 1152, 1510-11 (1986). 'Integral' means, inter alia, 'essential to completeness'; 'organically joined or linked'; 'composed of consistent parts making a whole.' Id. at 1173."

---

[21](...continued)
so, changing clothes, washing up or showering" are generally regarded as "preliminary" or "postliminary" activities and, hence, non-compensable. 29 C.F.R. § 790.7(g); see also IBP, Inc. v. Alvarez, supra, 546 U.S. at 41, 126 S.Ct. at 528.

**2.   Equity Is Entitled To Summary Judgment On Plaintiffs' Claims For "Clearing Security" And Walking Time Since Such Activities Are Not "Integral And Indispensable" To A Principal Work Activity.**

Plaintiffs purport to seek compensation "for time spent clearing security and time spent walking from security to their changing areas and from changing areas to security."  [App., Tab 3 (First Amended Complaint) ¶¶ 32(a)-(b).]  For a variety of reasons, these claims are untenable and Equity is entitled to summary judgment.

First and foremost, plaintiffs are not required to "clear security."  At no time are Equity employees required to pass through security, metal detectors or turnstiles when entering or leaving its premises or facilities, nor are they required to submit to searches of their person or personal possessions. [App., Tab 5 (Mills Affidavit), ¶¶ 8-9; App., Tab 77 (B. Young Dep.) 14:20-15:5; App., Tab 59 (E. Morris Dep.) 31:23-32:18; App., Tab 31 (Glenn Dep.) 22:17-23:4; App., Tab 28 (Ford Dep.) 28:16-21; App., Tab 44 (T. Kennedy Dep.) 14:1-3; App., Tab 25 (Darby Dep.) 43:12-20; App., Tab 32 (Glover-Patrick Dep.) 34:17-23; App., Tab 51 (Mahone Dep.) 16:8-21; App., Tab 47 (S. Lampley Dep.) 15:8-16:1; App., Tab 24 (Corbitt Dep.) 17:11-14.]  The only "security" which exists is at the front gate where employees' vehicles enter the premises.  However, if an employee has a plant sticker on his or her vehicle, the employee merely drives into the parking areas without stopping.  [App., Tab 5 (Mills Affidavit), ¶ 9; App., Tab 59 (E. Morris Dep.) 32:7-11; App., Tab 69 (R. Shorter Dep.) 24:2-5; App., Tab 31 (Glenn Dep.) 22:19-22; App., Tab 28 (Ford Dep.) 28:16-21, 30:17-18; App., Tab 19 (Avery

-55-

Dep.) 31:3-16; App., Tab 51 (Mahone Dep.) 16:11-21.]  As there is
no factual support for any scenario where employees expend any
time to "clear security," summary judgment is wholly appropriate.

Moreover, even _if_ there were security procedures with which
plaintiffs were required to comply (which there are not), it is
clear that such activities would be regarded as "preliminary"
activities which are _not_ "'integral and indispensable' to a
principal work activity."  In Bonilla v. Baker Concrete
Construction, Inc., 487 F.3d 1340 (11th Cir.), _cert_. _denied_,
U.S.     , 128 S.Ct. 813 (2007), plaintiffs sought compensation
for time spent going through security screening at Miami
International Airport, arguing that it was necessary to go
through the screening in order to do their jobs.  Noting that
"the 'integral and indispensable' test is not a but-for test of
causal necessity" and that the Portal-to-Portal Act, "to have any
meaning at all ... cannot be swallowed by an all-inclusive
definition of 'integral and indispensable,'" the Eleventh Circuit
affirmed the District Court's grant of summary judgment to the
employer:

> "This circuit has not interpreted
> the Portal-to-Portal Act in a
> published opinion since the Supreme
> Court decided IBP.  The statutory
> language of the exemptions does not
> allow for a clean analytical
> distinction between those
> activities that are 'integral and
> indispensable' and those that are
> not.  But it is clear to us from
> the Act's language and history that
> the activity in question must be
> work in the benefit of the
> employer, and that the security
> screening mandated by the FAA in
> this case is not compensable work.
> We therefore hold that the time

> appellants spent going through the
> mandatory security screening is not
> compensable under the FLSA because
> that screening is not 'integral and
> indispensable' to a principal
> activity under IBP, Steiner, or
> Dunlop [v. City Elec., Inc. , 527
> F.2d 394 (5th Cir. 1976)]." 487
> F.3d at 1344, 1345.

Similarly, in Gorman v. Consolidated Edison Corporation,

supra, plaintiffs at a nuclear power station brought suit for

compensation for the time it took to pass through substantial,

invasive and time-consuming security procedures when entering and

leaving the facility.  Even so, the Second Circuit affirmed the

District Court's dismissal of this claim:

> "The activities required to enter
> and exit Indian Point -- from
> waiting in line at the vehicle
> entrance through the final card-
> swipe and handprint analysis -- are
> necessary in the sense that they
> are required and serve essential
> purposes of security; but they are
> not integral to principal work
> activities.  These security-related
> activities are modern paradigms of
> the preliminary and postliminary
> activities described in the Portal-
> to-Portal Act, in particular,
> travel time....
>
> "Plaintiffs argue that the Portal-
> to-Portal Act was enacted when the
> time-consuming security measures at
> issue may not have been envisioned,
> and there is some force to the
> observation that security measures
> at sensitive facilities (and
> elsewhere) are becoming
> increasingly invasive, layered and
> time-consuming.  But the text of
> the statute does not depend on the
> purpose of any preliminaries, or
> how much time such preliminaries
> may consume....  [S]ecurity
> measures that are rigorous and that
> lengthen the trip to the job-site
> do not thereby become principal

> activities of the employment.  At
> Indian Point, this is easily
> demonstrated because the security
> measures at entry are required (to
> one degree or another) for everyone
> entering the plant -- regardless of
> what an employee does (servicing
> fuel rods or making canteen
> sandwiches) -- and including
> visitors."  488 F.3d at 593-94.

Plaintiffs' claims here for "time spent walking from security to their changing areas and from changing areas to security" fare no better.  By its very terms, the Portal-to-Portal act excludes from compensation the time spent "walking ... to and from the actual place of performance of the principal activity or activities which such employee is employed to perform."  29 U.S.C. § 254(a).  As the Supreme Court observed in IBP, Inc. v. Alvarez, supra, 546 U.S. at 41, 126 S.Ct. at 527, "walking from a time clock near the factory gate to a workstation is certainly necessary for employees to begin their work, but it is indisputable that the Portal-to-Portal Act evinces Congress' intent to repudiate Anderson's holding that such walking time was compensable under the FLSA."  Here, plaintiffs' claim for the time it takes to walk from "security to their changing areas" and back does not even take plaintiffs' to their workstations -- under any view the time is non-compensable.  See also Anderson v. Pilgrim's Pride, supra at 563, n.12, ("The Court also concludes that the 'walk time' to an employee's work station is not compensable.").

**3.    Equity Is Entitled To Summary Judgment On Plaintiffs' Claims For Donning and Doffing Since Such Activities Are Preliminary And Postliminary Under The Portal-to-Portal Act And Do <u>Not</u> Constitute Work Under The FLSA.**

The donning and doffing of the clothing worn by Equity's employees is not different in kind from "changing clothes and showering under normal conditions" which, under <u>Steiner v. Mitchell</u>, <u>supra</u>, 350 U.S. at 249, 76 S.Ct. at 332, is not compensable:  "[n]or is the question of changing clothes and showering under normal conditions involved because the Government concedes that these activities ordinarily constitute 'preliminary' or 'postliminary' activities excluded from compensable work time as contemplated in the [Portal-to-Portal] Act."[22]

Hence, in <u>Anderson v. Pilgrim's Pride</u>, <u>supra</u>, judgment was entered in favor of a poultry processing facility where the production workers sought compensation for donning and doffing the same items of clothing worn by plaintiffs here (<u>i.e.</u>, hairnet, ear plugs, rubber boots, cotton and rubber gloves, aprons and smocks), before and after work and before and after breaks.  In doing so, the District Court, noting that "[u]nder the Portal-to-Portal Act, employers are not required to compensate employees for activities which are preliminary or postliminary to the employee's principal work activities," relied on <u>Steiner</u> and held:

"[I]n light of preexisting case

---

[22]The Supreme Court's decision in <u>Alvarez</u> did <u>not</u> address when donning and doffing are principal activities rather than preliminary or postliminary activities which are non-compensable under the Portal-to-Portal Act.

law, the clothes changing activity
required of the line employees in
this case is not 'integral and
indispensable' to their principal
jobs.  Thus, the Court concludes
that the donning and doffing of the
sanitary and safety equipment
qualifies as a preliminary and
postliminary activity within the
meaning of the Portal-to-Portal
Act."  147 F.Supp. 2d at 562,
563.[23]

In Reich v. IBP, Inc., 38 F.3d 1123 (10th Cir. 1994), the

Tenth Circuit arrived at the same result in considering donning

and doffing claims brought by employees of a meat packing plant:

"[T]he time utilized donning,
removing, picking up, and
depositing for laundering sanitary
outergarments is essentially time
used to change clothes and thus is
preliminary and postliminary within
the meaning of the Portal Act."  38
F.3d at 1126.

With respect to the time spent donning and doffing "standard

protective gear" such as hard hats, safety glasses, earplugs and

safety shoes, the Tenth Circuit concluded that these activities

were non-compensable because they were "not work within the

meaning of the FLSA:"

"Work is 'physical or mental
exertion (whether burdensome or
not) controlled or required by the
employer and pursued necessarily

_____

[23]The District Court in Pilgrim's Pride rejected "the
argument that donning and doffing sanitary clothing is a
compensable, principal activity merely because both the employer
and the [U.S. Department of Agriculture] require the sanitary
clothing to be worn...."  147 F.Supp. 2d at 563.  Accord Gorman
v. Consolidated Edison Corporation, supra, 488 F.3d at 594 ("The
donning and doffing of generic protective gear is not rendered
integral by being required by the employer or by government
regulation."); see also Bonilla v. Baker Concrete Construction,
Inc., supra at 1344-5 (requirement to conduct activity does not
render it integral, indispensable or compensable).

and primarily for the benefit of
the employer.' <u>Tennessee Coal,
Iron & R.R. Co. v. Muscoda Local</u>,
321 U.S. 590, 598, 88 L.Ed. 949, 64
S.Ct. 698 (1944).  While the use of
the standard safety equipment may
have met the second prong of this
test, it fails the first.

"The placement of a pair of safety
glasses, a pair of earplugs and a
hard hat into or onto the
appropriate location on the head
takes all of a few seconds and
requires little or no
concentration.  Such items can
easily be carried or worn to and
from work and can be placed,
removed, or replaced while on the
move or while one's attention is
focused on other things.
Similarly, safety shoes can be worn
to and from work and require little
or no additional effort to put on
as compared to most other shoes.
Thus, although essential to the
job, and required by the employer,
any time spent on these items is
not work."  38 F.3d at 1125-26.

The Tenth Circuit distinguished the donning and doffing of

"standard protective gear" (non-compensable) from donning and

doffing of "special protective gear" (compensable), such as belly

guards, mesh aprons and scabbards, items which "are heavy and

cumbersome, [requiring] physical exertion, time, and a modicum of

concentration to put ... on securely and properly."  38 F.3d at

1126.

Plaintiffs here (and in general in the poultry industry) do

not wear cumbersome "body armor" or the type of "special

protective gear" common to red meat industry workers.  Indeed,

that was the precise holding in <u>Anderson v. Pilgrim's Pride</u>,

<u>supra</u>, where the District Court, in addition to finding donning

and doffing activities to be preliminary and postliminary under

the Portal-to-Portal Act, also determined that such activities did not constitute compensable work under the FLSA:

> "[I]n the instant case, the items worn by the poultry workers are not cumbersome when compared to the additional armor-like gear that must be worn by their counterparts in the meat packing industry.  As such, it takes much less time, energy, and concentration for the poultry workers to don, doff, and clean their sanitary clothing. Accordingly ... the activities performed by the line employees in this case do not constitute compensable work."  147 F.Supp.2d at 562.

See also Gorman v. Consolidated Edison Corporation, supra, 488 F.3d at 594 (donning and doffing of helmet, safety glasses and steel-toes shoes not integral to plaintiffs' principal activities at nuclear power plant); Smith v. Aztec Well Servicing Company, 462 F.3d 1274, 1289 (10th Cir. 2006)(Reich v. IBP, Inc. forecloses claim for compensation for loading personal safety equipment into vehicles -- such activities are not "work" and are "'purely preliminary in nature'").

Here, the donning and doffing of standard clothing at any time during the workday constitutes non-compensable activities as they are preliminary and postliminary within the plain language of the Portal-to-Portal Act.  Likewise, as such activities are not "work" within the meaning of the FLSA, the time spent donning and doffing is not compensable.

> **4.    Assuming, Arguendo, That Plaintiffs' Activities Are Compensable, Such Donning And Doffing Is De Minimis As A Matter of Law And Equity Is Entitled To Summary Judgment.**

As demonstrated supra, the activities at issue here are

protected by Section 3(o) and, as defined by the FLSA, excluded from the definition of work, or simply are not work and are preliminary and postliminary under the FLSA.  However, assuming, arguendo, that other limited activities not otherwise excluded from time worked by the terms of Section 3(o) are compensable, the de minimis doctrine precludes any recovery.

The de minimis rule applies to render non-compensable "insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes...."  29 C.F.R. § 785.47.  As the Supreme Court remarked in Anderson v. Mt. Clemens Pottery Co., supra, 328 U.S. at 692, 66 S.Ct. at 1195, "[w]hen the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded[, for] split-second absurdities are not justified by the actualities or working conditions or by the policy of the [FLSA]."  See Lindow v. United States, 738 F.2d 1057, 1063-64 (9th Cir. 1984)(employees should not be compensated for an average of seven to eight minutes of pre-shift activities).

In fact, in the Ninth Circuit's decision in Alvarez v. IBP, Inc., supra at 904, the donning and doffing of the non-unique protective gear used by Equity's employees was held to be de minimis as a matter of law:

> "[W]e agree with the district
> court's alternative conclusion as
> to why the time spent donning and
> doffing non-unique protective gear
> such as hardhats and safety goggles
> is not compensable:  The time it
> takes to perform these tasks vis-a-

-63-

> vis non-unique protective gear is
> <u>de</u> <u>minimis</u> as a matter of law."

In its hearing of the appeal, the Supreme Court noted this
holding and left it untouched.  <u>IBP, Inc. v. Alvarez</u>, <u>supra</u>, 546
U.S. at 32, 126 S.Ct. at 522-23.

In <u>Reich v. IBP, Inc.</u>, <u>supra</u>, the Tenth Circuit earlier
recognized the overlap of its reasoning that donning and doffing
of standard protective gear was not "work" with the <u>de</u> <u>minimis</u>
doctrine:

> "It could also be said that the
> time spent putting on and taking
> off these items is <u>de</u> <u>minimis</u> as a
> matter of law, although it is more
> properly considered not work at
> all.  Requiring employees to show
> up at their workstations with such
> standard equipment is no different
> from having a baseball player show
> up in uniform, a businessperson
> with a suit and tie, or a judge
> with a robe.  It is simply a
> prerequisite for the job, and is
> purely preliminary in nature."  38
> F.3d at 1126 n.1.

<u>See</u> <u>also</u> <u>Anderson v. Pilgrim's Pride</u>, <u>supra</u>, 147 F.Supp.2d at
564:

> "The Court has already determined
> that the activities at issue are
> not work and are preliminary and
> postliminary under the FLSA....
> [A]ssuming arguendo that the
> activities at issue in this case
> were compensable, the de minimis
> doctrine would still preclude the
> Plaintiffs from recovering their
> otherwise compensable time because
> of the small duration of time spent
> on the activities....  The majority
> of courts have found daily periods
> of approximately 10 minutes de
> minimis as a matter of law.  <u>See</u>
> <u>Lindow</u>, 738 F.2d at 1062.
> Therefore, the Court finds that the
> amount of time spent donning the

-64-

> various items, doffing the various
> items, and sanitizing the clothing
> is de minimis as a matter of law."

Likewise, any time here <u>not</u> barred by Section 3(o) would be equally <u>de minimis</u> and not subject to any claim by plaintiffs. In fact, and as summarized in the Factual Background, one employee candidly admitted that it takes "seconds" to don and doff the various items of clothing worn by employees, while another employee testified that he can put on his smock in as little as 30 seconds.  [App., Tab 78 (C. Young Dep.) 37:13-18, 38:7-10; App., Tab 67 (Shabazz Dep.) 40:16-21.]  It is inconceivable that the time required to don or doff <u>any</u> of the other items required consumes more than 30 seconds (if not less) or that the total aggregate time to don or doff exceeds the approximate ten minutes per day generally accepted as <u>de minimis</u> as a matter of law.

And, as to the employee breaks, the DOL has made clear that "[b]ona fide meal periods are not worktime," where the employees are "completely relieved from duty...."  29 C.F.R. § 785.19. Although the DOL "ordinarily" focuses on a 30 minute break, courts have approved unpaid breaks of substantially less time. <u>See</u> <u>Blain v. General Electric Co.</u>, 371 F.Supp. 857, 861 (W.D.Ky. 1971)(court held that 18 minute break was <u>not</u> compensable, noting that "no court has held or implied that a meal period of less than 30 minutes or even less than 20 minutes is necessarily compensable"; instead, the focus is primarily on whether the "employees are completely free for the purpose of eating a meal."); <u>Myracle v. General Elec. Co.</u>, 1992 U.S.Dist.LEXIS 22474, *24-5 (W.D.Ky. December 1, 1992), <u>aff'd</u>, 33 F.3d 55 (6th Cir.

1994)(20 minute break was not compensable, holding that "the 'essential consideration in any case is whether the employees are in fact completely relieved from work for the purpose of eating a regularly scheduled meal.'").[24]  As there is no evidence that these plaintiffs are forced to work during their breaks, even if not a full 30 minutes given the de minimis interruptions claimed by plaintiffs, summary judgment on plaintiffs' claims related to the break is still appropriate.

### CONCLUSION

In all respects, therefore, the determination of the claims raised by these plaintiffs is controlled by the Eleventh Circuit's decision in Anderson v. Cagle's Inc., supra, or prior case law.  Plaintiffs argue nothing new nor can they assert different facts or relevant distinctions, although they try to do so.  In fact, the plant in Anderson and the plant here, and the work performed by the Anderson employees and the work performed by plaintiffs here, is identical in all legally critical respects.  For these reasons, summary judgment should be granted in favor of defendant and against plaintiffs.

/s/Howard A. Rosenthal
Howard A. Rosenthal
Gary D. Fry
Malcolm S. Gould
  Attorneys for Equity Group
  Eufaula Division, LLC

OF COUNSEL:
Pelino & Lentz, P.C.
One Liberty Place
Thirty-Second Floor
1650 Market Street
Philadelphia, PA  19103
(215)665-1540

---

[24]The employees' testimony regarding break times was extremely divergent but, as Kenderick Spann testified: "About 30 minutes before you go back in."  [App., Tab 71 (Spann Dep.) 28:16.]

Joel P. Smith, Jr., Esquire
Williams, Pothoff, Williams
    & Smith, LLC
125 South Orange Avenue
Eufaula, Alabama 36027-1626
(334)687-5834

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA - NORTHERN DIVISION**

| | | |
|---|---|---|
| BETTY ANN BURKS, <u>et</u> al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | No. 2:06-CV-1081-MEF |
| | : | |
| EQUITY GROUP EUFAULA | : | |
| DIVISION LLC, | : | |
| | : | |
| Defendant. | : | |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel for Equity Group Eufaula Division LLC certifies that a true and correct copy of the Memorandum of Law in Support of Motion for Summary Judgment was filed and served electronically with the Clerk of Court and also was served by depositing true and correct copies in the United States Mail, first class postage prepaid, on May 30, 2008, and addressed as follows:

> Robert J. Camp, Esquire
> The Cochran Firm
> 505 North 20th Street
> Suite 825
> Birmingham, AL  35203
> rcamp@cochranfirm.com

> M. John Steensland, III, Esquire
> Parkman, Adams & White
> 739 West Main Street
> Dothan, AL  36301
> parkman@graceba.net, jjsteensland@yahoo.com

> Richard Martin Adams, Esquire
> Parkman, Adams & White
> 505 North 20th Street
> Suite 825
> Birmingham, AL  35203
> parkman@graceba.net

> Samuel A. Cherry, Jr. Esquire
> Cochran, Cherry, Givens, Smith, Lane
>   & Taylor, P.C.
> 163 West Main Street
> Dothan, AL  36301
> scherry@cochranfirm.com, samcherry@cochranfirm.com

> Joseph David Lane, Esquire
> Cochran, Cherry, Givens, Smith, Lane
>   & Taylor, P.C.
> 163 West Main Street
> Dothan, AL  36301
> jlane@cochranfirm.com, jdavidlane@aol.com

Robert Lee Wiggins, Jr., Esquire
Wiggins Childs Quinn & Pantanis, P.C.
301 North 19th Street
Birmingham, AL  35203-3204
rwiggins@wcqp.com

Attorneys for Plaintiffs

/s/Howard A. Rosenthal
Howard A. Rosenthal
Gary D. Fry
Malcolm S. Gould
  Attorneys for Equity Group
  Eufaula Division, LLC

**OF COUNSEL**:
Pelino & Lentz, P.C.
One Liberty Place
Thirty-Second Floor
1650 Market Street
Philadelphia, PA  19103
(215)665-1540

Joel P. Smith, Jr., Esquire
Williams, Pothoff, Williams
   & Smith, LLC
125 South Orange Avenue
Eufaula, Alabama 36027-1626
(334)687-5834