IN THE
UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DISTRICT

| | | |
|---|---|---|
| BETTY ANN BURKS, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 2:06-cv-1081-MEF |
| EQUITY GROUP EUFAULA DIVISION, LLC, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO SUMMARY JUDGMENT**

Robert L. Wiggins, Jr.
Candis A. McGowan
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building, 301 19th Street North
Birmingham, Alabama 35203
05/314-0500, Fax:205-254-1500

Robert Joseph Camp
The Cochran Firm - Birmingham
The Financial Center
505 North 20th Street, Suite 825
Birmingham, Alabama 35203
205/244-1115, Fax: 205/244-1171

June 17, 2008

## TABLE OF CONTENTS

PAGE NO.

I.    STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   SECTION 203(o) DOES NOT COVER THE  MAJORITY OF THE UNPAID TIME
      AT ISSUE IN THIS CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    Work Activities Occurring During Unpaid  Rest Breaks Are Not Covered
            §203(o) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    Sanitation Of The Company's Equipment Is Not Covered By §203(o) . . . . . . . . 7

      C.    Sanitation Activities Are The First Principal Activities That Trigger The
            Continuous Workday Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.  DISPUTED ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON
      DEFENDANT'S  § 203(o) DEFENSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A.    Defendant Has Failed To Offer Sufficient Evidence Of Long-Standing
            Acquiescence To An Established Custom Or Practice Under A Bona Fide
            Collective Bargaining Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      B.    There Is A Genuine Issue Of Material Fact About Whether Defendant Follows
            A Master Line Time Card Method Of Compensation . . . . . . . . . . . . . . . . . . 23

      C.    Credibility Issues And Disputed  Facts About Collective Bargaining
            Preclude Summary Judgment Under §203(o)  . . . . . . . . . . . . . . . . . . . . . 26

      D.    No Bona Fide Custom Or Practice Exists For Not Paying For Work Performed
            During Rest Breaks  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      E.    The Continuous Workday Rule Is Still Triggered By The Same Work Activities
            Regardless Of Section 203(o)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

IV.   SANITIZING DONNING, DOFFING ARE PRINCIPAL WORK ACTIVITIES THAT
      START AND  END THE CONTINUOUS WORKDAY . . . . . . . . . . . . . . . . . . . . . . 35

      A.    The Essential-To-The-Job Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

      B.    The Primary Benefit Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

i

## TABLE OF CONTENTS

PAGE NO.

C.  Defendant's Pre-*Alvarez* Caselaw Is No Longer Persuasive Or Consistent With The Better Reasoned Post-*Alvarez* Decisions Involving Meat Or Poultry Processing Plants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

D.  *Gorman* Has Been Roundly Criticized By Other Courts . . . . . . . . . . . . . . . . . . 59

E.  The Evidence Is Disputed On Whether Aprons And Sleeves Are Required Or Essential To Plaintiffs' Job Performance . . . . . . . . . . . . . . . . . . . . . . . . . . 62

F.  Defendant Has Not Sought Summary Judgment Against Plaintiffs' Sanitation Activities On The Ground That It Is Not "Work" Or "Integral And Indispensable" To A Principal Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

V.  THE WORK ACTIVITIES AT ISSUE ARE NOT *DE MINIMIS* . . . . . . . . . . . . . . . . . 64

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

## TABLE OF AUTHORITIES

PAGE NO.

*Alton & S. Lodge No. 306 v. Alton & S. Ry. Co.,*
    849 F.2d 1111 (8th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Alvarez v. IBP, Inc.,*
    2001 WL 34897841 (E.D. Wash. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Alvarez v. I.B.P., Inc.,*
    339 F.3d 894 (9th Cir. 2003), aff'd, 546 U.S. 21 (2005) . . . . . . . . . 5, 9, 34, 35, 36, 37,
    46, 47, 48, 49, 53

*Anderson v. Cagle's, Inc.,*
    488 F.3d 945 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 14, 20, 21, 35

*Anderson v. Mt. Clemens Pottery,*
    328 U.S. 680 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Anderson v. Perdue Farms, Inc.,*
    2008 WL 541286 (M.D. Ala. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 54

*Anderson v. Pilgrim's Pride Corp.,*
    147 F.Supp.2d 556 (E.D. Tex. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 59

*Arrington v. National Broadcasting Co.,*
    531 F. Supp. 498 (D.D.C. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Ballaris v. Wacker Siltrionic Corp.,*
    370 F.3d 901 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12, 36, 37, 47,
    49, 53, 58

*Bishop v. United States,*
    72 Fed.Cl. 766 (Fed.Cl.2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 58

*Bonilla v. Baker Concrete Const., Inc.,*
    487 F.3d, 1340 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 49

*Brock v. City of Cincinnati,*
    236 F.3d 793 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 67, 70

# TABLE OF AUTHORITIES

**PAGE NO.**

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 70

*Chao v. Tyson Foods, Inc.,*
  2008 WL 2020323 (N.D. Ala. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 36, 49, 57, 59, 61

*Continental Casualty Co. v. Compass Bank,*
  2006 WL 533510 (S.D. Ala. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Conerly v. Marshall Durbin Co.,*
  2007 WL 3326836 (S.D. Miss. 2007) . . . . . . . . . . . . . . . . . . . . . 4, 5,  6, 7, 12, 14, 20

*Davis v. Charoen Pokphand (USA), Inc.,*
  302 F.Supp.2d 1314 (M.D. Ala. 2004) . . . . . . . . . . . . . . . . . . . . . 4, 11, 13, 21, 22,
                                                                          23, 36, 48, 57,
                                                                          58, 65, 66, 67,
                                                                          68, 69, 70, 71

*De Asencio v. Tyson Foods, Inc.,*
  500 F.3d 361 (3rd Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 11, 36, 37, 54, 57,
                                                                            58, 67, 68, 70

*Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union,*
  396 U.S. 142 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Dunlop v. City Electric, Inc.,*
  527 F.2d 394 (5th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 41, 42, 46, 47, 55, 59

*Fox v. Tyson Foods, Inc.,*
  2001 U.S. Dist. LEXIS 26050 (N.D. Ala. Feb. 13, 2001) . . . . . . . . . . . . . . . . . . . . . . . 7

*Garcia v. Tyson Foods, Inc.,*
  474 F.Supp.2d 1240 (D. Kan. 2007) . . . . . . . . . . . . . . . . . . . . . 4, 11, 35, 36, 37, 58, 59

*Gonzalez v. Farmington Foods, Inc.,*
  296 F. Supp. 2d 912 (N.D. Ill. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Gorman v. The Consolidated Edison Corp.,*
  488 F.3d 586 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 59-62

# TABLE OF AUTHORITIES

**PAGE NO.**

*IBP v. Alvarez,*
546 U.S. 21 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 56, 57, 58, 59

*In re Cargill Meat Solutions Wage and Hour Litig.,*
2008 U.S. Dist. LEXIS 31824 (M.D. Pa. Apr. 10, 2008) . . . . . . . . . . . . . . . . . . . 4, 5, 11

*Jordan v. IBP, Inc.,*
542 F.Supp. 2d 790 (M.D. Tenn. 2008) . . . . . . . . . . . . . . . . . . . 4, 11, 35, 36, 37, 49, 53,
54, 55, 57, 58, 59, 60,
62, 63, 66, 67, 69, 70

*Kassa v. Kerry, Inc.,*
487 F. Supp. 2d 1063 (D. Minn. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 18, 19,20

*Lindow v. United States,*
738 F.2d 1057 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 70

*Livadas v. Bradshaw,*
512 U.S. 107 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Mitchell v. King Packing Co.,*
350 U.S. 260 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 61, 62

*Pressley v. Sanderson Farms, Inc.,*
2001 WL 850017 (S.D. Tex. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Reeves v. Sanderson Plumbing Products, Inc.,*
530 U.S. 133 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Reich v. IBP,*
820 F.Supp. 1315 (D. Kan. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Reich v. IBP, Inc.,*
38 F.3d 1123 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 57, 58, 59

*Reich v. Monfort, Inc.,*
1995 WL 817796 (D. Colo. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 66

# TABLE OF AUTHORITIES

**PAGE NO.**

*Reich v. Monfort, Inc.,*
144 F.3d 1329 (10th Cir. 1998) (same) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 67, 70

*Reich v. New York Transit Auth.,*
45 F.3d 646 (2d Cir. 1995) (same) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Reich v. Oscar Meyer Foods Corp.,*
1995 WL 1765643 (E.D. Tex. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Saunders v. John Morrell & Co.,*
No. C88-4143, 1991 WL 529542, at *5 (N.D. Iowa 1991 (same) . . . . . . . . 7, 67, 69, 70

*Secretary of Labor v. E. R. Field, Inc.,*
495 F.2d 749 (1st Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Spoerle v. Kraft Foods Global, Inc.,*
527 F.Supp.2d 860 (W.D.Wis.2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 11, 35, 36, 49, 53,
                                                                        56, 57, 59, 61, 66
                                                                        67, 68

*Steiner v. Mitchell,*
350 U.S. 247 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 53, 59, 61, 62

*Tum v. Barber Foods, Inc.,*
360 F.3d 274 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 48, 49

*Turner v. City of Philadelphia,*
262 F.3d 222 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*W.R. Grace & Co. v. N & M, Inc.,*
2006 WL 3694595 (S.D. Miss. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## STATUTES:

Fed. R. Civ. P. 30(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 30

Fed. R. Civ. 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

## TABLE OF AUTHORITIES

**PAGE NO.**

21 C.F.R. § 110.10(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

9 C.F.R. §308.3 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

29 U.S.C. §203(o) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

29 U.S.C. § 254(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

29 C.F.R. §784.47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

29 C.F.R. § 785.19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

29 C.F.R. §785.47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 68

29 C.F.R. § 790.2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

29 C.F.R. § 790.6(b)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

29 C.F.R. §790.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

29 C.F.R. §790.8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

29 C.F.R. §790.8(c), n. 65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

29 C.F.R. § 1910.132(a) (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

## OTHER AUTHORITIES:

Eleventh Circuit Pattern Jury Instruction #3 . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

95 Cong. Rec. 11210 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Portal-to-Portal Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 42, 63

S. Rep. No. 81-640 (1949), *reprinted in* 1949 U.S.C.C.A.N. 2251, 2255 . . . . . . . . . . . . . . . . . . 7

## I.    STATEMENT OF FACTS

The plaintiffs' principal job responsibility is to process sanitary and uncontaminated poultry products.[1] In order to accomplish that, the defendant requires employees to sanitize the company's equipment at various points in the workday.[2] The equipment employees are required to sanitize includes pans, knives, scissors, tables, processing tools/utensils and rubber gloves, aprons, sleeves, boots and earplugs.[3] Employees are also required to use various other sanitary gear and equipment in order to produce uncontaminated poultry products, including donning and doffing a sanitary smock, and hairnet/beardnet.[4]

These various sanitizing activities occur throughout the workday both on paid time and at six unpaid times during the shift.[5] The unpaid sanitizing work occurs when employees: (1) first enter the production room at the start of the shift; (2) leave the production line during first unpaid meal or rest period; (3) re-enter the production area on return to the production line during the first meal or rest break; (4) leave the production line again during the second break period; (5) re-enter the production area to return to the line near the end of the second break; and (6) sanitized, doff and

---

[1] *Mills* 29:5-30:8; *see also* 170:8-171:12, 172:6-14, 172:22-174:12, 175:15-176:1, 176:22-177:5, 178:13-179:2, 179:12-181:15, 182:22-183:2, 183:21-184:1, 205:11-206:14, 167:4-15, 168:15-20, 169:5-16, 177:9-178:12, 183:9-184:7;  PX24-25 ¶5; PX27-29 ¶4.

[2] *Mills* 211:11-16, 226:1-19; PX24-25 ¶6; PX26 ¶7: PX27-29 ¶5.

[3] *Mills* 179:12-18, 180:8-16; PX17, ¶24; PX1, ¶¶32, 34; PX24-25 ¶¶6, 11; PX26 ¶¶7, 12; PX27-29 ¶¶5, 10.

[4] *Mills* 83:1-3, 83:6-8, 210:1-5; PX17, ¶¶4-7; PX1, ¶¶4-5, 7, 11-15, 29; PX24-25 ¶¶6, 11; PX26 ¶¶7, 12; PX27-29 ¶¶5, 10.

[5] *Mills* 180:8-16; PX17, ¶¶2, 4-7, 10-11, 14, 24, 30; PX1, ¶¶1-2, 4-5, 11, 13; PX24-25 ¶6; PX26 ¶7; PX27-29 ¶5.

put up the company's sanitary gear and equipment at the end of the shift.[6]  At the beginning of the shift employees are required to obtain new sanitary smocks and other sanitary gear and equipment from the company's supply room, carry it to the production room, sanitize the rubber boots, gloves, aprons, sleeves and their hands upon entry into the production room, don all of their sanitary gear and equipment, and then travel to their station on the production line where they wait for chickens to began to arrive on the line.[7]  Prior to paid time beginning, supervisors lead employees in the Debone Department in physical exercising in order to increase their dexterity in handling chickens when they begin to arrive on the line. *Davis* 75:21-76:12.

Employees are required to perform these same sanitizing, donning and doffing activities on unpaid time during their two rest periods each day.[8]  They travel back to the sanitation sinks, doff their sanitary gear and equipment, resanitize their rubber gloves, aprons and sleeves, store their gear and equipment before leaving the production area, resanitize their hands whenever they are in the restrooms outside the production area, travel back to the production area, regather their sanitary gear and equipment inside the production room, resanitize their gloves, hands, boots, aprons, and sleeves, redonn all their gear and equipment and then travel back to the production line where they again wait on chickens to arrive at their station.[9]  It is undisputed that all of these work activities are required

---

[6]  PX24-25 ¶6; PX26 ¶7; PX27-29 ¶5.; *Mills* 206:8-12; *see also* 45:21-46:2, 170:8-171:12, 209:23-210:16, 211:10-18.

[7]  PX24-25 ¶¶6, 11; PX26 ¶¶6, 12; PX27-29 ¶¶5, 10; *Mills* 44:1-45:2; *see also* 78:16-21, 171:22-172:10, 206:19-207:22, 209:23-210:16, 211:10-18, 212:14-213:2, 226:11-18.

[8]  PX24-26 ¶¶ 6, 12; PX27-29.

[9]  *Mills* 211:10-18, 212:10-213:2, 225:16-227:18, 76:8-77:18, 143:6-12, 207:14-22, 35:15-37:5, 73:1-74:11, 84:11-16, 225-16-227:18; PX24-25 ¶¶6, 11, 12; PX26 ¶¶7, 12, 13; PX27-29 ¶¶5, 10, 11; PX17,¶¶2, 4-7, 10-12, 19, 24-25; PX1 ¶¶2, 4-7, 11-13, 16, 23, 28, 32-33; *Mills* 32:13-33:3; *see also* 37:9-22, 205:3-206:1, 207:14-22, 210:18-22, 211:10-11, 225:23-226:1.

to be performed on an unpaid basis during employees' two breaks in the middle of the workday. *Mills* 210:11-17, 212:10-213:2; PX24-25 ¶6; PX26 ¶7; PX27-29 ¶5. Employees do not know what job to return to until they get back to the production line after the break because jobs are "rotated" after each break. *Davis* 75:6-20; DX59; *Morris* 28:22-29:22. The defendant's chief witness admits that all employees in each department leave for and return from breaks at the same time. DX5, *Mills* Aff. at ¶44..

At the end of the shift, employees are again required to perform these same doffing and sanitizing activities on an unpaid basis.[10] During that unpaid time, employees must travel back to the sanitation sinks, doff their sanitary gear and equipment, resanitize their rubber gear and equipment so that it does not harbor or produce bacteria or other contaminants overnight, exit the production area, carry their smocks to the laundry bin, and store their reusable sanitary gear and equipment in their locker so that it will be ready for use the next workday.[11] They punch the time clock in the breakroom on the way out of the plant.

All of such sanitizing, donning and doffing of the company's gear and equipment is both required by the defendant and essential to plaintiffs' ability to perform the principal activity for which they are hired — to produce sanitary, uncontaminated poultry products for sale.[12] *Mills* 29:5-30:8; *see also* 183:18-184:1, 205:16-206:14; *Stevens* 105:13-106:21; PX24-25 ¶¶5, 7, 9; PX26 ¶¶5, 6, 8; PX27-29 ¶¶4, 6; PX17, p. 4 (defining "purpose" to be "to minimize the introduction of bacteria,

---

[10] *Mills* 205:3-207:4, 205:3-207:18; PX24-25 ¶¶5, 10; PX26 ¶¶7, 12; PX27-29 ¶¶5, 10; PX17, ¶¶2, 4-7, 10-12, 19, 24-25; PX1 ¶¶2, 4-7, 11-13, 16, 23, 28, 32-33.

[11] *Mills* 206:19-23; *see also* 206:7-11, 205:18-206:4; PX24-25 ¶¶5-6, 9-12; PX26 ¶¶5-7, 10-13; PX27-29 ¶¶4-5, 8-11; PX17, ¶¶3, 10, 11, 14, 24, 30; PX1, ¶¶1-2, 11-18, 32, 39.

[12] *Mills* 29:5-30:8; *see also* 170:8-171:12, 172:6-14, 172:22-174:12, 175:15-176:1, 176:22-177:5, 178:13-179:2, 179:12-181:15, 182:22-183:2, 183:21-184:1, 205:11-206:14, 167:4-15, 168:15-20, 169:5-16, 177:9-178:12, 183:9-184:7.

contaminants; or foreign material into our manufacturing environment").[13]

The Supreme Court has recently held that these type of activities in meat and poultry processing plants are part of the "continuous workday" for which compensation must be paid. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 36-37 (2005). Courts considering the issue since then have held that "[a]fter *Alvarez*, there can be little doubt that donning and doffing protective gear at the beginning and end of the workday are 'principal activities under the Portal-To-Portal Act.'" *Spoerle v. Kraft Foods Global, Inc.*, 527 F.Supp.2d 860, 865 (W.D.Wis.2007); *see also Jordan v. IBP, Inc.*, 542 F.Supp.2d 790, 806-807 (M.D. Tenn. 2008); *Garcia v. Tyson Foods, Inc.*, 474 F.Supp.2d 1240, 1246-1247 (D. Kan. 2007); *De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 371 (3rd Cir. 2007); *see generally Davis v. Charoen Pokphand (USA), Inc.*, 302 F.Supp.2d 1314, 1321-1322 (M.D. Ala. 2004); *In re Cargill Meat Solutions Wage and Hour Litig.*, 2008 U.S. Dist. LEXIS 31824 (M.D. Pa. Apr. 10, 2008); *Conerly v. Marshall Durbin Co.*, 2007 WL 3326836, *5-*6 (S.D. Miss. 2007); *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 910 (9th Cir. 2004).

## II. SECTION 203(o) DOES NOT COVER THE MAJORITY OF THE UNPAID TIME AT ISSUE IN THIS CASE

### A. Work Activities Occurring During Unpaid Rest Breaks Are Not Covered §203(o)

Section 203(o) obviously does not apply to the unpaid activities occurring at the two rest

---

[13] Citations to PX24 through 29 are the declarations of six opt-in plaintiffs who are representative of the class as a whole at each of the three plants. Citations to "PX24-29" followed by a paragraph number are to all such declarations together. Citations to a proper name are to that person's deposition followed by page and line numbers of the deposition, such as *Mills* 10:3-5 which cites Greg Mills' deposition at page 10 lines 3-5. Greg Mills is the defendant's Complex Operations Manager for the two Eufaula plants. He was designated by the defendant to speak for and bind the defendant corporation under F. R. Civ. P. 30 (b)(6). Plaintiffs' six declarations use similar language for the most part because they all saw and experienced the same events, policies and practices at the plants. *See e.g. Anderson v. Perdue Farms, Inc.*, 2008 WL 541286, *2 (M.D. Ala. 2008) (relying on similar declarations).

break periods during the middle of the day. The plain words of the statute apply only to "changing clothes or washing at the beginning or end of each workday." 29 U.S.C. §203(o). This Court and others have held that §203(o) has no application to unpaid activities that do not occur at "the beginning or end of each workday." 29 U.S.C. §203(o); *In Re Cargill*, 2008 U.S. Dist. LEXIS 31824, *58 (M.D. Pa. 2008) ("Additionally, §203(o) does not relate to donning, doffing and travel time during lunch breaks because such activities do not arise 'at the beginning or end of such workday.'"); *Fox v. Tyson Foods, Inc.*, 4:99-cv-1612-VEH (N.D. Ala. 2007 (same) (copy attached as PX30); *see also Alvarez v. IBP, Inc.*, 2001 34897841 *16 (E.D. Wash. 2001) (Section 203(o) cannot extend "beyond clothes changing and washing time"); *Conerly v. Marshall Durbin Co.*, 2007 WL 3326836, *7 (S.D. Miss. 2007) (denying summary judgment under §203(o) for activities "during unpaid rest periods or breaks"); *cf.* 29 U.S.C. § 254(a); *Alvarez*, 339 F.3d at 906-07 (concluding that any activity occurring after the first principal act of the day was compensable) (citing *Steiner*, 350 U.S. at 252-53; 29 C.F.R. § 790.6(b) (1999)). These issues were not addressed in the cases defendant cites. The Eleventh Circuit specifically declined to address work activities during mid-day rest breaks in *Anderson v. Cagle's, Inc.*, 488 F.3d 945 (11th Cir. 2007), holding that this issue had not been addressed in appellants' brief. *Id.* at 959-960. [14]

If Congress wanted to extend Section 203(o) beyond "clothes changing and washing at the beginning and end of the workday," it could easily have done so. Unions simply have no authority to waive FLSA rights beyond the narrow statutory terms of "clothes changing or washing at the beginning or end of each workday." 29 U.S.C. § 203(o); *Alvarez v. IBP, Inc.*, 2001 WL 34897841,

---

[14] Even absent the statutory restriction to the "beginning or end of each workday", it is undisputed that there are no "express terms" of a collective bargaining agreement, or a "custom or practice under a bona fide collective bargaining agreement", which applies to unpaid activities occurring during breaks or other parts of the "continuous workday" recognized in *Alvarez*, 546 U.S. at 37.

*16 (E.D. Wash. 2001) ("Even if the union did bargain away rights under 3(o), they are unable to negotiate and bargain beyond clothes changing and washing time. Union representatives may not bargain away employee rights under the FLSA.").

Recognizing this limitation, the defendant has not moved for summary judgment under §203(o) on anything other than "changing clothes" at the "beginning or end of each workday." 29 U.S.C. §203(o). Plaintiffs' claims involve six different periods of unpaid work — that at the beginning of the workday, on the way to their first and second break, on return from their first and second break, and at the end of the workday. PX24-25 ¶5; PX26 ¶7; PX27-29 ¶5. Plaintiffs spend significant unpaid time donning, doffing and sanitizing the Company's sanitary gear and equipment during all six of these points of the day. *See* footnote 35 *infra* at p.64.[15]

Thus, as the Court observed in the similar situation in *Conerly, supra*, "even if the court granted summary judgment by finding that the noncompensation for donning and doffing was an established custom or practice under §203(o), the summary judgment would only be partial." *Conerly, supra* at * 7:

> At oral argument the defendant contended that if the court granted summary judgment on the donning and doffing issue, then the case would go away. The plaintiffs argued that donning and doffing was only a small part of the case and in fact involved only minimal time in the overall compensation claim. The plaintiffs contend that the bulk of their case lies in their claims of waiting, walking and washing, working before and after their shifts and during unpaid rest periods or breaks, not donning and doffing. The court agrees. Reviewing the plaintiffs' Complaint and the amended iterations thereof, it is clear to the court that the plaintiffs are claiming non-compensation for activities other than merely donning and doffing.

---

[15] The defendant itself distinguishes between plaintiffs' donning and doffing time that is covered by §203(o) and plaintiffs' "'breaks', 'wait time', and "walk time' claims", saying at page 49 of its brief that even if "§3(o) somehow does not bar plaintiffs' claims for donning and doffing and related activities, those claims, as well as plaintiffs' 'breaks', 'wait time' and 'walk time' claims, are barred by the Portal-to-Portal Act and related principles."

6

*Conerly, supra* at *7.

**B.    Sanitation Of The Company's Equipment Is Not Covered By §203(o)**

Section 203(o) also applies only to "washing" the human body "at the beginning or end of each workday", not washing or sanitizing the company's equipment or premises. *Saunders v. John Morrell & Co.*, No. C88-4143, 1991 WL 529542, at *4 (N.D. Iowa Dec. 24, 1991) ("every other source of authority" interpreting § 3(o) has found that the word "washing" refers only to cleaning the person, not cleaning equipment); S. Rep. No. 81-640 (1949), *reprinted in* 1949 U.S.C.C.A.N. 2251, 2255; *IBP*, 38 F.3d at 1126; *see also Gonzalez*, 296 F. Supp. 2d at 930 n. 29 ("equipment cleaning . . . clearly [is] not within the ambit of Section 203(o)"); *see Fox v. Tyson Foods, Inc.*, 2001 U.S. Dist. LEXIS 26050 at *27-29; *Conerly v. Marshall Durbin Co.*,2007 WL 3326836, *7 (S.D. Miss. 2007).

If the term "washing at the beginning or end of each workday" is not limited to the time the employee is washing or showering him or herself, there will be no limit to what employees can be required to scrub and clean without pay. Everything from equipment, tools, machines, cars and trucks to the bathrooms, floors, yard and parking lot could be required to be washed without pay if the term "washing at the beginning or end of each workday" is disconnected from the statute's obvious context and intent. No court has adopted a definition of the term "washing" that goes beyond an employee washing or showering himself or herself "at the beginning or end of each workday." 29 U.S.C. §203(o).

The defendant has not argued otherwise, or moved for summary judgment under §203(o) for time spent sanitizing protective gear and equipment. The only company official offered by the defendant, Greg Mills, admits that sanitation of the company's equipment is considered to be work that must be included in paid time. *Mills* 112:3-13, 179:12-180:16, 191:21-192:6; PX 25-25; PX26,

7

¶7; PX27-29, ¶5.

> Q.   Do you provide any disinfectants to clean equipment?
>
> A.   We have disinfectants that we clean the plant with.
>
> Q.   When employees clean equipment with disinfectant, are they considered to be working?
>
> A.   Yes.
>
> Q.   Is that considered to be compensable time?
>
> A.   Paid time?
>
> Q.   Paid time.
>
> A.   Yes.
>
> &ast; &ast; &ast;
>
> Q.   Rule 24 says, "Any item that becomes contaminated must be washed and sanitized before being placed back into use. Processing tools and utensils are, but not limited to the following items: pens, calculators, thermometers, clipboards, pans, edible totes, edible shovels, earplugs, maintenance tools, etc."
>
> Has that always been the rule since at least March of 2004?
>
> A.   I can't answer that since March of 2004. It's a rule today.
>
> &ast; &ast; &ast;
>
> Q.   For example, it says, "Any item that becomes contaminated must be washed and sanitized..." And it gives examples like pens, calculators, thermometers, clipboards, pans, etc. You pay employees for that sanitation, correct?
>
> A.   Yes.
>
> Q.   That's considered work?
>
> A.   Yes.
>
> &ast; &ast; &ast;
>
> Q.   Who sanitizes knives or arm guards?
>
> A.   I don't know the answer to that.
>
> Q.   But somebody is in charge of sanitizing the knives and arm guards, correct?
>
> A.   Yes.
>
> Q.   And they're paid for that, correct?
>
> A.   Yes.
>
> Q.   And that's considered work?
>
> A.   Correct.

*Mills* 112:3-13, 179:12-21, 180:8-14, 191:21-192:6; *see also* PX24-29, ¶¶5-12.

Defendant also pays for time spent sanitizing the protective gear and equipment at issue in this case when performed at times other than during breaks or at the beginning and end of the shift.

*Mills* 209:23-211:9.

> Q.   Now, when an employee goes to the restroom while the
> line is running, they also have to doff everything, as you have already
> told us, before they can leave the production area, correct?
> A.   Correct.
> Q.   That's considered work time and they're paid for it, correct?
> A.    They get paid for that.
> Q.   They're exerting the same amount of effort to doff when
> they go to the restroom during the production line as they are when
> they doff on an unpaid break, correct?
> A.   I would say so.

*Mills* 210:18-211:9 (objection omitted).

For all of these reasons, plaintiffs' unpaid sanitation activities are not covered or barred by

§ 203(o).

### C.    Sanitation Activities Are The First Principal Activities That Trigger The Continuous Workday Rule

The sanitation activities required at the entry into the production work area are the first

principal activities of the workday regardless of whether donning and doffing itself is excluded from

"measured work time" by operation of §203(o). The "continuous workday rule" recognized by the

Supreme Court in *Alvarez* requires compensation for all time between the first and last principal

activity each day. *Alvarez*, 546 U.S. at 36-37. The Court held that any activity that is "integral and

indispensable" to an employee's "principal activities" is itself a "principal activity" that starts or ends

the continuous workday for which compensation must be paid. *Alvarez*, 546 U.S. at 36-37. The

first principal activity upon entering the defendant's production room is to sanitize the knee-length

boots provided by the company as part of its quality assurance program and USDA compliance.

DX59, *Morris* 36:14-23, 37:20-23, 45:3-22; DX36, *Jackson* 18:21-19-21; DX46, 36:6-21; DX33,

*Gullette* 35:3-23; DX74; *Turner* 33:6-17; DX66, *Robinson* 19:9-15; DX 49, *Laseter* 51:16-52:15;

DX52, *March* 24:17-25:1; DX47, *Lampley* 16:7-8; DX38, *Jacobs* 20:21-21:2l; *Mills* 37:9-19;

9

*Stevens* 108:6-10, 13-15.[16] The mandatory boot sanitation at the start of each shift requires employees to go to the boot sanitation machine, push a button, lather-up the boots with soap and sanitizer, move the boots up and down to make sure they get covered from knee to sole, then wash the soap suds and sanitizer out of the boots before proceeding further in the production room. *Id.* As explained in plaintiffs' depositions:

> Q.   Can you describe for me what you do as you enter the production area?
> A.   I clean and sanitize my boots before I go all the way into the production floor. Then I wash the soap and stuff out of my boots, go to the smock rack and put my smock and everything else on.
> \* \* \*
> Q.   Approximately how long does it take you from the time you enter the production doors to get to your position on the line?
> A.   I'd say about five minutes.
> \* \* \*
> Q.   When you enter the plant, you said that you sanitize your boots. How do you do that?
> A.   There is a machine sitting on the wall as you come in the production doors, and you have to mash that button for the foam to come out. And you stand there and let the foam come out on your boots.
> Q.   You stand there.  And does it spray the foam on your boots?
> A.   Yes.
> Q.   And when you push the button, the spray gets on your boots?
> A.   Yes.
> Q.   Do you have to move your feet up and down to make sure that it's covered all over your boots?
> A.   Yes.
> Q.   And then you walk out?
> A.   Yes.

*Morris* 36:14-20, 37:20-23, 45:3-20; *see also* DX36, *Jackson* 18:21-19:21; DX46, 36:6-21; DX33, *Gullette* 35:3-23; DX74; *Turner* 33:6-17; DX66, *Robinson* 19:9-15; DX 49, *Laseter* 51:16-52:15;

---

[16] The defendant furnishes employees specialized knee-length boots that meet its sanitation and design requirements. *Mills* 180:17-181:15, 182:22-183:23; PX17, ¶25; PX1, ¶23; PX3, ¶28..

DX52, *March* 24:17-25:1; DX47, *Lampley* 16:7-8; DX38, *Jacobs* 20:21-21:2. The boot sanitation process takes "three or four minutes if done right. DX74; *Turner* 33:16-17. Once the boots are properly sanitized, the employee then goes to the sanitation vats a few feet away to begin sanitizing the company's other rubberized or plastic gloves or equipment — gloves, aprons, sleeves — and their hands. *Mills* 170:8-19, 174:2-11, 205:11:20, 225:16-227:8; PX17, ¶¶1, 2, 10; PX24-29. ¶¶5-12; PX26, ¶12; PX27-29, ¶10; PX1, 2, 11, 12, 32; PX3, ¶¶3, 7, 23, 24, 26. The defendant prohibits employees from doing any of this activity outside the production room or at home. *Id.*

Once the employees enter the production room doors to begin such sanitation work, they are cut-off from food, drink, candy, gum or other personal items which are not allowed in the production room, and also cut-off from the restroom, breakroom, nurse's station, and supply room which are all outside the production room. *Mills*, 142:4-143:12, 143:2-12, 177:9-178:12, 226:19-227:6; 227:1-5, PX17, ¶¶6, 8, 12, 13, 15; PX2, ¶¶1-5; PX26, ¶¶5, 7, 8, 11-13; PX27-29, ¶¶4, 5, 7, 11. Employees are not permitted to go back outside, or to the breakroom, restroom or other non-production areas, without first taking off their sanitary gear and equipment and storing it on designated racks inside the production room, and then re-donning and re-sanitizing when they return. *Mills* 76:8-77:18, 143:6-12, 207:14-22, 35:15-37:5, 73:1-74:11, 84:11-16, 225:16-227:18, 211:10-18, 212:10-213:2, 225:16-227:18; PX8, pp. 44-41; PX17, ¶2, PX2, ¶¶1-5; PX17, ¶¶6, 8, 12, 13, 15; PX2, ¶¶1-5; PX26, ¶¶5, 7, 8, 11-13; PX27-29, ¶¶4, 5, 7, 11; *Stevens* 85:6-21, 86:14-87:6, 96:12-97:1, 5-11.

For these reasons, crossing the threshold of the door into the production room and immediately sanitizing the company's boots, gloves, aprons and sleeves are the employees' first principal work activity of the day.[17] *Id.* Doffing these same sanitizing activities in reverse, and then

---

[17] *Spoerle*, 527 F.Supp.2d at 865; *see also Jordan*, 542 F.Supp.2d at 806-807; *Garcia*, 474 F.Supp.2d at 1246-1247; *De Asencio*, 500 F.3d at 371; *see generally Davis*, 302 F.Supp.2d at 1321-1322; *In re Cargill Meat Solutions Wage and Hour Litig.*, 2008 U.S. Dist. LEXIS 31824 (M.D. Pa.

exiting the production room to carry the company's protective gear and equipment to bins where the smocks are deposited and other items are discarded if not stored for reuse in the lockeroom, are the last principal activities of the continuous compensable workday. *Mills* 206:15-23; PX24-25, ¶11; PX27-29, ¶10; PX26, ¶12; PX17, ¶¶6, 7, PX1, ¶29. Employees are required to wash and sanitize the company's protective gear and equipment before leaving the production room so that it does not grow bacterial or other contaminants overnight from the blood, viscera, organs and grease splattered on such equipment during the production process. *Mills* 205:3-206:14; PX24-29, ¶¶5-12.

Thus, it does not matter for summary judgment purposes whether the time spent "changing clothes" should be deducted from backpay or "measured work time" under §203(o) because the principal activity of boot sanitation, followed by sanitation of the company's other rubberized equipment — gloves, aprons and sleeves — triggers the continuous workday rule without regard to the added steps of donning and doffing the equipment "at the beginning or end of each workday." 29 U.S.C. §203(o). For this reason, the most significant issue for summary judgment is not §203(o), which does not cover many of the principal activities at issue in this case, but whether the required sanitation of the company's boots, gloves, aprons and sleeves are "work" that is "integral and indispensable" to plaintiffs' principal job of producing and processing uncontaminated poultry products, and thus the first principal activity that starts the continuous compensable workday. Those issues are addressed at pages 34-54 *infra*.

---

Apr. 10, 2008); *Conerly*, 2007 WL 3326836 at *5-*6; *Ballaris*, 370 F.3d at 910.

### III. DISPUTED ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON DEFENDANT'S § 203(o) DEFENSE

#### A. Defendant Has Failed To Offer Sufficient Evidence Of Long-Standing Acquiescence To An Established Custom Or Practice Under A Bona Fide Collective Bargaining Agreement

A genuine issue of material fact exists as to whether plaintiffs' "acquiesced" to a bona fide "custom or practice" of not paying for activities that were not reflected on the company's "Master Line Time Card." First, both sides' witnesses have testified that paid time has never been limited to the time reflected on such a Master Line Time Card by custom or otherwise. *Mills* 122:9-123:12, 57:13-58-5, 59:12-61:5, 195:5-197:16, 198:7-199:1; PX24, ¶¶2-4; PX25, ¶¶2-4; PX26, ¶¶2-4; PX27-PX29, ¶¶2-3. Second, the plaintiffs have submitted substantial evidence that there has been no such custom or practice "under a bona fide collective bargaining agreement", as those terms are used in §203(o). *Id.*

Mere knowledge of a practice is not enough to establish a "custom or practice under a bona fide collective bargaining agreement." 29 U.S.C. §203(o). There must also be acquiescence for an extended period of time. The defendant "bears the burden of establishing that its policy of noncompensation for clothes-changing time lasted for a sufficiently long time, with sufficient knowledge and acquiescence by [its] employees, that the policy became an implicit term — a 'custom or practice' — under the CBA." *Kassa v. Kerry, Inc.*, 487 F. Supp. 2d 1063, 1070-1071 (D. Minn. 2007). "Whether a CBA implicitly contains certain terms is normally a question of fact for the jury." *Id.* (citing *Alton & S. Lodge No. 306 v. Alton & S. Ry. Co.*, 849 F.2d 1111, 1115 (8th Cir. 1988)). This district has also held that the defendant bears the burden of proof on §203(o) issues. *Davis*, 302 F.Supp.2d at 1320.

To establish a custom or practice under a collective bargaining agreement, the defendant must

show that the custom or practice "had occurred for a sufficient period of time with the knowledge and acquiescence of the employees to become in reality a part of the actual working conditions." *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 154 (1969); *Kassa*, 487 F. Supp.2d at 1070-1071(applying *Detroit & Toledo* to §203(o)). The Eleventh Circuit stressed the same factors of longstanding knowledge and "acquiescence" in *Anderson v. Cagle's, Inc.*, 488 F.3d at 959, noting that the practice of non-compensation in that case had gone unchallenged since at least the 1997 CBA and had continued through the time of new three year CBAs that were agreed upon in 2000 and 2003. In *Conerly*, the Court noted that the Eleventh Circuit's decision in *Cagle's* had evidence of "the long history of negotiations of issues between the employer and union and certain specific knowledge by principals of the union regarding the very issue of donning, doffing and the union's acquiescence in the practice of non compensation." *Conerly, supra* at **6-7. The Court in that case denied summary judgment because that evidence "is not present here." *Id.*

Here, the defendant adopted its practice of not paying for work performed donning and doffing *on its own* at a time when that practice was actively opposed in court by the Chief Union Steward and other employees. PX24-29, ¶¶2-4; *Davis* 14:6-16:4, 43:8-19, 46:20-48:6, 50:2-7; DX26 17:3-20. There has not been a single moment in time since the first CBA that has not been covered by the liability period of either that case or the current one. *Id.* This is explained in the testimony from several employees, including the following testimony of Ebone Morris, who was a Union Steward and member of the union's bargaining committee.

> 2.    I am also a Union Steward and a member of the union bargaining committee. The collective bargaining agreement did not limit employee's pay to just the time spent on the production line handling or processing chicken. Employees' pay was also not limited to time on a Master Line Time Card. Employees were paid for time before and after chickens were on the production line for things like set-up, sanitation of equipment, clean up, and other activities. There

were also other methods of keeping time and paying employees who were covered by the collective bargaining agreement, such as clock-in/clock-out time and pre-set scheduled time.

3.      As a member of the union bargaining committee, the employees of the plant opposed the company's refusal to pay for similar work activities before and after chickens were processed on the line, such as when we were required to sanitize the company's protective gear and equipment, put it on and take it off at least six times a day without pay.  The company decided not to pay for this work on its own, not as part of any collective bargaining agreement. The Chief Union Steward and other employees directly opposed the refusal to pay for this additional work during the time I was employed by Equity Group.  During the period leading up to that changeover in 2003-2004, there was a lawsuit in federal court that had been filed by our Chief Union Steward protesting the company's refusal to pay for these additional work activities before and after chickens were on the line.  That lawsuit covered the period from 1999 forward, which was before there was ever any collective bargaining agreement with CP.  The first collective bargaining agreement with CP was a year later in 2000. The Chief Union Steward's lawsuit was still in court while Equity Group was in the process of taking over the plant and, to my knowledge, was still in court after Equity Group took over. At some point in time, the case against CP was dropped because it no longer owned or ran the plant. The employees, however, did not stop protesting Equity Group's refusal to pay for the additional work activities that were part of that lawsuit.  A new lawsuit was planned and later filed based on my and other employees' understanding that we had three years to file such a case in order to cover the period since Equity Group took over.  It was our understanding that this case would cover the period since Equity Group took over in early 2004.

4.      There has been no period of my employment during which I did not object to the refusal to pay me and other employees for performing the additional work that was challenged in the lawsuit filed by our Chief Union Steward and in this lawsuit. Both CP and Equity Group refused to pay for that work on their own without any approval under our collective bargaining agreement.  The two lawsuits challenging that practice made it clear that we did not acquiesce to that practice. It was my and other employees understanding that each of our collective bargaining agreements have stated that any part of it which violated federal law would be changed if a court decided it was invalid. We understood from this provision that a lawsuit was the proper way to challenge the refusal to pay us for the additional sanitizing, donning and doffing activities that we

were required to perform without pay. We were never told or understood that we could file a grievance about issues that were already in court. We also were never told, and never understood, that we could file a grievance about violations of federal law or things that were not covered by the collective bargaining agreement, like the company's refusal to pay for our putting-on, taking-off and sanitizing its sanitary gear and equipment six times everyday.

PX24; *Morris Declaration*, ¶¶2, 3, 4; *see also* PX25-29 at ¶¶2-4.

The Chief Union Steward who filed the first such lawsuit testified that it began in 1999 before there was ever a collective bargaining unit at the plant, that the first such CBA came into existence in 2000, and that her lawsuit continued into the period that the current defendant took over the plant in 2004. *Davis* 14:6-16:4, 17:3-20, 43:8-19, 46:20-48:6, 50:2-7. She dropped that lawsuit when the only defendant at that time, Charoen Pokphand, Inc., sold the plant to the current defendants. *Davis* DX26, 14:6-16:4, 43:8-21, 46:20-48:6, 50:2-7. The period since the defendant took over the plant in early 2004 is within the limitations period covered by this case, leaving no point in time that opposition to the defendant's non-payment practice has not been actively opposed since 1999, which was well before the first collective bargaining agreement in 2000. *Davis* 14:6-16:4, 17:3-20, 43:8-19, 46:20-48:6, 50:2-7.

Thus, there was no acquiescence to defendant's practice of not paying for sanitizing donning and doffing the company's protective gear and equipment. The collective bargaining in 2000 and 2003-2004 were entered subject to the Chief Union Steward's direct challenge to defendant's practice of not paying wages for such work during certain times of the day. PX24-29, ¶¶2-4; *Davis* 14:6-16:4, 26:15-30:21, 43:8-19, 46:20-48:6, 50:2-7. Defendant's chief official and witness, Greg Mills, admits that the resulting collective bargaining agreement did not address non-payment of donning and doffing time. *Mills* 122:9-123:12, 57:13-58-5, 59:12-61:5, 195:5-197:16, 198:7-199:1; PX 24-29, ¶¶2-4. Instead, the parties agreed in §18.2 of the CBA that any "any provision of this

Agreement . . . held to be in conflict with or a violation of any . . . federal statute or . . . rule or regulation" shall be "invalid" and "renegotiat[ed]" within 30 days. DX6, §18.2, p. 19; DX7,§ 18.2, p. 27; DX8,§18.2, p. 28; PX24-29, ¶¶2-4. This contractual reservation of rights, together with the Union Steward's lawsuit under that reservation create a genuine issue of material fact as to whether the union or the employees acquiesced in the defendant's refusal to pay for the donning and doffing activities at issue in that lawsuit and the current one. The CBA clause quoted above from §18.2 clearly preserved the union's and employees' non-acquiescence to the defendant's unilateral practice of not paying for such activities. PX24-29, ¶¶2-4. Having timely exercised that right for the past nine years, plaintiffs and their union cannot be held to have acquiesced to a custom or practice that was the opposite of the relief they sought in court. All inferences must be construed in favor of the opponent to summary judgment.

The defendant stresses conflicting testimony about the union making some unspecified comments or proposals about donning and doffing during collective bargaining negotiations, but there is no evidence about what such comments or proposals were, or whether they were contrary to the understanding in both 2000 and 2003-2004 that the Chief Union Steward's lawsuit would continue to challenge the validity of the defendant's unilateral practice of not paying for donning and doffing during certain periods of the day rather than acquiescing in that practice. PX24-29, ¶¶2-4. The content of what was actually said or proposed by the union or the company is entirely missing from the record. The records of the 2004 negotiations reflect no such union proposal or comments, and the defendant's chief witness admits that he has never known of a union proposal or position that was not exchanged in writing. *Mills* 221:11-16, 152:23-153:3;PX19 & 20. The court must assume for summary judgment purposes that the undisclosed content of the union's comments and proposals in 2000 and 2004 were not inconsistent with the testimony of the plaintiffs, and that there was no

17

acquiescence to the defendant's non-payment practice at issue in this case and the earlier lawsuit. PX24-29, ¶¶2-4  Even if Davis' testimony is assumed to be inconsistent with that of the plaintiffs' declarations, however, that would only create a disputed credibility issue of material fact that cannot be resolved  at the summary judgment stage of this case.

The evidence here, like that in *Kassa*, "is simply too thin for the Court to find, on motion for summary judgment, that there was a 'custom or practice' of nonpayment for clothes-changing time under the CBA." *Kassa, supra* at 1071-1072.  Even silent acquiescence was held not to be enough to establish a lack of genuine issue of material fact where it had lasted only six years.

> The Court is unprepared to find that [defendant's] six-year history of nonpayment for clothes-changing time, together with evidence that the union never complained about such nonpayment, is sufficient to establish, as a matter of law, a "custom or practice" of nonpayment under § 203(*o*).   Indeed, to the extent that the union members never raised the issue even among themselves, this may suggest that they did *not* knowingly acquiesce in Kerry's policy of nonpayment for clothes-changing time.   If an employer's history of nonpayment for clothes-changing time were sufficient, by itself, to establish a "custom or practice" under § 203(*o*), then § 203(*o*) would essentially be an unlimited FLSA exemption applicable to every unionized employer that did not pay for clothes-changing time.  The Court does not believe that § 203(*o*) is so sweeping.
>
> The Court expresses no opinion as to whether Kerry will be able to establish its § 203(o) defense at trial (or, conceivably, on a later motion for summary judgment).   The Court merely holds that a reasonable jury could conclude that Kerry's failure to pay plaintiffs for donning and doffing did not reflect a "custom or practice under a bona fide collective-bargaining agreement."  For that reason, Kerry's motion for summary judgment is denied.

*Kassa*, 487 F.Supp.2d at 1071-1072.

The particular deficiencies in the evidence in *Kassa* were much like the deficiencies here:

> In particular, [defendant] has not provided sufficient evidence of its employees' knowledge of or acquiescence in [its] policy of noncompensation.  Kerry notes that Teamsters Local 160 represented plant employees "for many years" before 2000, when Kerry took over

the Albert Lea plant. But Kerry has not explained the relevance (if any) under § 203(o) of the history of relations between Local 160 and the *former* owner of the Albert Lea plant. On the issue of whether a "custom or practice" exists between *Kerry* and its employees, it would seem that events since 2000 are centrally important. But even if past relations between Armour and Local 160 are relevant, Kerry has not provided sufficient information about those past relations to warrant summary judgment.

Furthermore, although (as noted above) evidence that the issue of payment for clothes-changing time was raised in union negotiations may demonstrate the knowledge and acquiescence necessary to establish a "custom or practice" of nonpayment under § 203(o), Kerry has provided no such evidence. Instead, Kerry has provided a declaration stating that there is a "long-standing practice" between Kerry and the union of nonpayment for clothes-changing time and that there is "no evidence" that the union ever raised the issue in CBA negotiations. Kerry has also submitted deposition testimony given in a different case by the president of Local 160, Wayne Perleberg. Perleberg said that union members never raised the issue of payment for clothes-changing time among themselves or with the company, and that the union never filed a grievance over this issue.

*Kassa*, 487 F.Supp.2d at 1071-1072 (citations omitted; emphasis in original).

The six years of alleged acquiescence found insufficient to establish a custom or practice in *Kassa, supra* was longer than that here. The Chief Union Steward's lawsuit was filed before the current defendant's first collective bargaining in 2003-2004, and covered the period before even its predecessor's first collective bargaining in 2000. Even if that prior period of ownership is not considered, as in *Kassa*, there is still has no period of acquiescence because of the plaintiffs' testimony that they actively opposed defendant's non-payment from the inception of the defendant's takeover in 2004. PX24-29, ¶2-4. The challenge to such practice in this case in 2006 extends back to that takeover under the applicable FLSA limitations period. Thus, there was no period of knowledge or acquiescence at the start of the liability period in this case. Such a disputed issue of

19

fact was found in *Conerly* on less evidence than is now submitted.[18] *Conerly, supra* at * 7. There, the Court found that the union had the opportunity to raise such issue "for the 14 years Marshall Durbin has been bargaining with the Union", but summary judgment was still denied because "[t]he Court cannot agree that the present record supports that conclusion." *Id.*

The defendant relies upon cases involving longstanding acquiescence over a period of years, far longer than the short period alleged here. For example, *Turner v. City of Philadelphia*, 262 F.3d 222, 226 (2001), held only that "a particular custom or practice can become an implied term of a labor agreement through a prolonged period of acquiescence" — a period of more than 30 years in that case. *Id.* When faced with shorter periods of time, courts have been unwilling to infer such acquiescence for purposes of summary judgment. *See e.g. Kassa*, 487 F. Supp.2d at 1071 (finding six years insufficient for purposes of summary judgment). The defendant has failed to cite any authority holding that a "custom or practice under a *bona fide* collective bargaining agreement" can be established over a relatively short period of time like that in this case.

Requiring evidence of acquiescence over a longer period than that alleged here is consistent with the Supreme Court's characterization of Section 203(o) as a "narrowly drawn opt-out provision[]." *Livadas v. Bradshaw*, 512 U.S. 107, 131-32 (1994). There, the Court explained that Section 203(o) guarantees "union-represented employees . . . the full protection of the minimum standard, absent an agreement for something different." *Id.* The historical context and legislative

_____

[18] Any suggestion that the union's failure to address donning and doffing time amounted to an implicit agreement to the practice is particularly ill-founded in the current circumstances. Prior to the Eleventh Circuit's unprecedented construction of the statute in *Cagle's*, the union would have had every reason to believe that its workers were entitled to compensation for clothes changing time absent some agreement, express or implied, under the CBA to the contrary. Accordingly, the failure to address the question in the CBA, particularly in light of the contract's integration clause, should have protected the employees' continued right to compensation, rather than resulting in an accidental forfeiture of that right.

history confirms this understanding. In proposing Section 203(o), Representative Herter explained that the provision was directed at circumstances like those present in the bakery industry: "In some of those collective-bargaining agreements the time taken to change clothes and to take off clothes at the end of the day is considered a part of the working day.  In other collective-bargaining agreements it is not so considered.  But, in either case the matter has been carefully threshed out between the employer and the employee . . . ." 95 Cong. Rec. 11210.

In defendant's view, however, the issue of compensation for such activities need not be "threshed out" between the union and the employer – it is enough that the employer was unilaterally refusing to pay for the activity at the time the CBA was entered into.  The result is to convert Section 203(o) from a "narrowly drawn opt-out provision," *Livadas v. Bradshaw,* 512 U.S. 107, 131-32 (1994), into an expansive "opt-in" provision that forecloses a right to compensation unless the union secures an express right to it in the CBA (in which case, the FLSA serves no independent function).

This is not a case like those cited by the defendant in which the union or the employees were silent and did nothing to oppose a longstanding practice that had been followed through a succession of collective bargaining opportunities.  Unlike the plaintiffs in the Eleventh Circuit's decision in *Anderson v. Cagle's, Inc., supra,* the current plaintiffs did not sit silent or do nothing to oppose defendant's non-payment practice through three successive three-year collective bargaining agreements, or even one such opportunity.  The Eleventh Circuit held that the plaintiffs in that case did "not contend that they lacked notice of the relevant compensation policy when executing the 1997, 2000 or 2003 CBA's."  The Court held that this failure to register any form of opposition "demonstrates acquiescence" to such a longstanding practice (ten years by the time the Eleventh Circuit ruled in 2007).

In the same way, Judge Thompson's ruling in *Davis,* 302 F.Supp.2d at 1320, was not based

on a finding that the union acquiesced to a "custom or practice under a bona fide collective bargaining agreement." 29 U.S.C. §203(o). The Court noted that plaintiffs' counsel had "offer[ed] no evidence [of] whether a practice or custom was established", but argued instead that the "protective gear at issue . . . is outside the meaning of the term 'clothing' in the statute." *Id.* at 1320. That is not the case here. The current plaintiffs have offered evidence of their longstanding opposition and non-acquiescence to the defendant's non-payment practice, and it is the defendant that has failed to show the lack of any genuine issue of material fact on that issue.

No court has held that such active opposition through a means approved by the parties in the CBA amounts to silent acquiescence to the very practice challenged in court. Not one of the cases cited by the defendant involved any prior lawsuits or opposition of the type described in the plaintiffs' testimony in this case. *See* PX24-29, ¶¶2-4. At the summary judgment stage of the case, the court must give the plaintiffs the benefit of all reasonable inferences, which in this case includes the inference from the current evidence that the defendant was on notice from the time it first began trying to purchase the plant in 2003 that the Chief Union Steward and other members of the union were actively challenging, and not acquiescing in, the practice of not paying for work performed donning and doffing the company's sanitary equipment. PX24-29, ¶¶2-4; DX 26 *Davis* 14:6-16:4, 27:20-29:22, 43:8-19, 46:20-48:6, 50:2-7. Knowing this, and that the collective bargaining agreement did not specifically address such practice and made it subject to being "held to be invalid" or "held to be in conflict with or violation of . . . federal statute", the defendant still went forward with the purchase of the plant without any effort to negotiate a new provision that would resolve the matter by collective bargaining.

22

**B.**     **There Is A Genuine Issue Of Material Fact About Whether Defendant Follows A Master Line Time Card Method Of Compensation**

This district has already determined that the CBA during CP's ownership of the plant "does not expressly exclude donning-and-doffing time, so the determinative issue is whether that time is excluded from compensation by practice or custom." *Davis*, 302 F.Supp.2d at 1320.  The defendant argues contra to *Davis* that there is explicit language in the CBA stating that "[a]ll employees will paid according to the hours of work indicated by the Master Line Time Card." *Def. Br.* at 20, 41; DX8, §12.5; DX9, §12.5.  This same language, however, was in the CBA before Judge Thompson in *Davis* when he held that "[t]he CBA does not expressly exclude donning-and-doffing time." *Davis*, 302 F.Supp.2d at 1320. Both parties' evidence in this case supports that finding. *Mills* 122:9-123:12, 57:13-58:5, 59:12-61:5, 195:5-197:16, 198:7-199:1; PX24-26 at ¶2. The defendant's only official to offer testimony in its summary judgment submission, Greg Mills, admits that the CBA language that "[a]ll employees will be paid according to the hours of work indicated by the Master Line Time Card", does not mean that employees will be paid *only* the hours of work  indicated by the Master Line Time Card.  *Mills* 122:9-123:12; *see also Mills* 57:13-58:5, 59:12-61:5, 195:5-197:16, 198:7-199:1

> Q.    All right.  Let's look back at the collective bargaining agreement, Exhibit 12. Let's look at page 20 of the agreement, Section12.5 called "Line Time."
> It consists of this one sentence:  "All employees will be paid according to the hours of work indicated by the Master Line Time Card." Correct?
> A.    Yes, sir.
> Q.    Now, you earlier told us though that that's not true for all employees that are under the collective bargaining agreement, correct?
> A.    Correct.
> Q.    Do you have a list of jobs or employees for which it is not true that they will be paid according to the Master Line Time Card?

A.   I do not.

Q.   Can you name any such jobs?

A.   Floor personnel would be one. I mean, **there's probably many**, but I don't know them all.

Q.   Tell us the ones you do know.

A.   I honestly don't know. I know floor personnel wouldn't because they come early and stay late. They're on a different time than the line card. I don't know what employees are on what time system, whether it be master card, clock in to clock out, so I don't know.

*Mills* 122:9-123:12 (emphasis added); *see also* DX5, *Mills Aff.* at ¶¶16-18. Mills admits that even

if an employee is subject to a Master Line Time Card, their pay is not limited to the time appearing

on that card, but includes time spent "before or after scheduled line or Master Card Time." *Mills*

194:22-196:22; DX5, *Mills Aff.* ¶¶14 & 16. The defendant presents no other evidence on the issue.

Rather than "all employees" being "paid according to the hours of work indicated by the

Master Line Time Card", as those words appear in §12.5 of the CBA, the defendant has applied three

different forms of time keeping — "scheduled time, master card, and clock-in/clock out." *Mills*

60:14-18; PX24-26, ¶2. Employees on "scheduled time" are paid according to a pre-set start and

stop time contained in the computerized payroll system, rather than the swiped time on a Master Line

Time Card, and employees on a clock-in/clock-out method are paid according to their personal time

cards rather than by swiping of a Master Line Time Card. *Mills* 57:13-58:5, 59:12-61:5, 122:9-

123:12, 195:5-197:16, 198:7-199:1; DX5, *Mills Aff.* at ¶¶16-18. Defendant's only witness, Greg

Mills, admits that he cannot identify which employees are paid by a Master Line Time Card rather

than a pre-set "scheduled time" or "clock-in/clock-out" time. *Id.*

Thus, the defendant has not carried its burden of proof that any of the plaintiffs are required

to be paid only according to the time appearing on a Master Line Time Card. It also fails to carry

its burden of showing a "custom or practice under a bona fide collective bargaining agreement", 29

24

U.S.C. §203(o), which limits employees' pay to the time appearing on a Master Line Time Card. *Id.* Notwithstanding the fact that the words of §12.5 of the CBA , standing alone, state that "all employees . . . to the hours of work indicated by the Master Line Time Card", that is not, in fact, the custom or practice that is actually followed. For example, employees in the Debone Department are uniformly paid three to five minutes that is not spent processing chickens on the line. *Mills* 201:11-203:7, 218:1-17. The defendant admits such time is not part of the time on a Master Line Time Card.

> Q.   So how does this three- to five minutes work?
> A.   There's no birds on the line at that time. They're not actually working. They're out there but they're not working.
> Q.   So this is like from 4:33 to 4:35?
> A.   I can't give you a definite answer on what time it is. But it takes three to five minutes to gather all the tools up and put the new tools out for the second shift to start. So that's in between day shift and the second shift.
>      They're out there but they're not actually working on the line during that three to five minutes.
> Q.   So are the debone employees getting paid for that three to five minutes?
> A.   Yes.
>                              * * *
> Q.   Now, in that three to five minutes, you said that the employees are being paid on the evening shift, even though there's no birds coming down the line?
> A.   Evening or day shift, whichever it falls in. It could be half on each. I don't know the answer to that. But they are being paid because it's within their time frame at work.
> Q.   So they're being paid -- Either or both of the day shift and evening shift are being paid for the three to five minutes that there is no chickens on the line?
> A.   Correct.
> Q.   And that three to five minutes is obviously not line time because there are no chickens on the line, correct?
> A.   Correct.

*Mills* 202:11-203:4, 218:1-17. The same could be done for the activities at issue here.

Because the defendant has not applied the CBA language as written, and has instead paid

employees according to other timekeeping methods, such as "scheduled time" and "clock-in/clock-out time", and has also restricted none of the employees to just the time appearing on a Master Line Time Card, there can be no custom or practice "under a bona fide collective bargaining agreement" regarding use of such a Master Line Time Card. The defendant has failed to establish the lack of any genuine issue of material fact regarding the Master Line Time Card custom or practice that it argues as the basis for its affirmative defense under §203(o).

Just as importantly, it is obvious that the practice at issue in this case arose not under §203(o) or a collective bargaining agreement, but under a mistaken notion of what constitutes "work" and an "integral and indispensable" work activity under the FLSA. This is shown by the fact that the defendant refuses to pay for work activities in the middle of the day that it does not even argue to be covered by §203(o), as well as the fact that the actual timekeeping practice that is followed is quite different from the Master Line Time Card described in the collective bargaining agreement. The practice actually followed is simply not provided for "under" the collective bargaining agreement in this case, making §203(o) inapplicable.

For all the foregoing reasons, there is a genuine issue of material fact that precludes summary judgment under §203(o).

### C.  Credibility Issues And Disputed Facts About Collective Bargaining Preclude Summary Judgment Under §203(o)

The defendant tries to skirt the short period of alleged acquiescence by arguing that it ought to be allowed to count the period that a CP operated the plant from 2000-2004, but the sole evidence on whether the defendant assumed CP's practice is too disputed to permit summary judgment. Defendant presents only the affidavit testimony from one of its officials on this issue, Greg Mills, but Mills later contradicted his affidavit when he admitted in his deposition that he cannot truthfully

testify that the defendant assumed its predecessors' agreements, customs or practices. *Compare Mills Aff.* at ¶52 *with Mills Depo.* at 160:6-12.

> Q.   Were you involved in any of the decisions or considerations that went into whether or not Equity Group would follow the customs or practices of CP?
> A.   No.
> Q.   Do you have any knowledge on that subject?
> A.   No.

*Mills* 160:6-12.

The defendant's credibility on these issues is further damaged when Mills states under oath in his affidavit that he has knowledge of what was said and done during the collective bargaining that occurred between CP and the union, describing very specific conversations between the negotiators. DX5, *Mills Affidavit* at ¶¶55-61. When later deposed, however, Mills again had to admit that he had not been privy to any such conversations or negotiations. *Mills* 157:22-158:10, 159:4-9, 12-15.

> Q.   Now, you said you started with the company September '99, correct?
> A.   I believe that's correct.
> MR. ROSENTHAL:  He said started with CP.
> Q.   CP in September of '99. And were you involved in the collective bargaining negotiations while you were with CP?
> A.   No.
> Q.   And the contract that CP had ran from 2000 to 2004; is that correct? Or do you know?
> A.   I don't know.
>                                  * * *
> Q.   Do you have any personal knowledge about the collective bargaining agreement while CP ran the plant?
> A.   No, other than the handbook that we had to go by. I don't recall what was in the union handbook. I was not part of the negotiations.
>                                  * * *
> Q.   Do you know who negotiated on behalf of the union when CP ran the plant and the collective bargaining was being negotiated?
> A.   No, I don't.

*Mills* 157:22-158:10, 159:4-9, 12-15.

Additional credibility issues arose in Mills' testimony about conversations with the Chief

Union Steward, Jacqueline Davis.  He testified in his affidavit that :

> 56.    At the time that Davis signed the Agreement with CP,
> she admitted that she understood that she had not been paid, and that
> the Contract meant that she would not be paid, for any time other than
> when she was at her work station.
>
> 57.    Davis also admitted that it was the well known
> practice of CP to pay only for the time worked at the work station.

DX5, *Mills Aff.* ¶¶56, 57. But under cross-examination in his deposition, he again testified that he

had no knowledge on this subject, having never heard Jacqueline Davis say any of the things he

attributed to her in his affidavit:

> Q.    Have you ever had any conversations with Jacqueline
> Davis about donning and doffing?
> A.    She was in the negotiations.
> Q.    Do you remember anything she said?
> A.    No, not her personally.
>                          * * *
> Q.    Do you know what Jacqueline Davis understood or said
> she understood about whether she could expect to be paid for donning
> and doffing activities while CP ran the plant?
> A.    She wasn't expecting to be paid for it, as far as I know.
> Q.    But have you ever heard her express her understanding?
> A.    No, I have not.
> Q.    Have you ever read anything in which she expressed her
> understanding?
> A.    I don't recall.

*Mills* 160:13-17, 161:21-162:9

Mills' deposition also contradicts his affidavit testimony that " [w]hile on the Bargaining

Committee, Davis discussed not being compensated for donning and doffing prior to and after work,

and communicated her concerns to Jenkins and Foster, who headed the Union's negotiation

committee for the Agreement with CP."   DX5, *Mills Aff.* at ¶60.   In his deposition he states the

opposite — that he recalls no occasion that he "ever hear[d] Davis say anything to Jenkins or Foster about donning or doffing." *Mills* 163:15-18. Mills' affidavit also included detailed testimony about the terms and intended meaning of the collective bargaining agreement, but when deposed two weeks later he admitted that "I'm not that familiar with the contract." *Mills* 115:1-11; *compare id. with Mills Aff.* at ¶¶46-62.

Still further credibility issues arose about Mills' affidavit testimony that "[n]o employee has filed a grievance on any donning and doffing issues relative to CP or Equity." DX5, *Mills Aff.* at ¶62. He had to admit in his deposition that he has no such knowledge about grievances that may have been filed at Step One. *Mills* 164:20-22; *see also Mills* 163:19-164:19. The CBA does not even list Mills' position as one that is involved at any step of the grievance process. DX7, p. 11. The contract specified only the "shift manager" at Step 1, "the plant manager" at Step 2 and the Human Resources Manager at Step 4. *Id.* Mills has been the Complex Operations Manager, a position not mentioned in the grievance procedure. *Id.* Even if the defendant had established that no grievance was ever filed, that would not support a finding of acquiescence because it is undisputed that the Chief Union Steward and the employees were permitted to challenge defendant's practice in the two lawsuits already discussed. PX24-29, ¶¶2-4. Those two lawsuits presented a seamless nine year period of non-acquiescence to the non-payment of work performed sanitizing, donning and doffing the Company's equipment. Thus, a grievance was not necessary in order for the employees and their union to create a clear record of non-acquiescence sufficient to preclude formation of a "custom or practice under a bona fide collective bargaining agreement", as those terms are used in §203(o).

The foregoing credibility issues are material to summary judgment because Mills is defendant's only official who has offered testimony on the collective bargaining issues related to

§203(o), and he was formally designated as the one to speak for and bind the corporation under Rule 30(b)(6). PX21. As a result, his testimony is that of the defendant itself.[19] Thus, Mills' lack of credibility undermines the credibility of the defendant's entire affirmative defense under §203(o). It is well recognized that a factfinder can reject all of parties' testimony if there are credibility issues about any part of that testimony. *See* Eleventh Circuit Pattern Jury Instruction #3. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 151 (2000) ( "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. See Wright & Miller 299. That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses.'").

The damage to defendant's credibility is not salvaged by the deposition it took from one of the Union Stewards, Jacqueline Davis. Davis is not a plaintiff in this action, having been promoted to Leadman and been given more advantageous hours and overtime pay than when she brought her

---

[19] Rule 30(b)(6) states that an official designated by an organization "consent[s] to testify on its behalf." F. R. Civ. P. 30(b)(6).

> When a corporation or association designates a person to testify on its behalf the corporation appears vicariously through that agent.
> * * *
> Moreover, a corporation served with a Rule 30(b)(6) notice of deposition has a duty to . . . prepare them so that they may give complete, knowledgeable and binding answers on behalf of the corporation." * * * The individual(s) so deposed are required to testify to the knowledge of the corporation, *not* the individual.

*Continental Casualty Co. v. Compass Bank*, 2006 WL 533510, *18 (S.D. Ala. 2006) (emphasis in original); *see also W.R. Grace & Co. v. N & M, Inc.*, 2006 WL 3694595, *2 (S.D. Miss. 2006) ("In a Rule 30(b)(6) deposition, there is no distinction between the corporate representative and the corporation; the Rule 30(b)(6) designee presents the corporation's 'position' on the topic." ).

prior action. *Davis* 25:9-10; 74:1-18. Davis was appointed as a Union Steward, not elected. *Davis* 53:2-5. To the extent that the defendant tries to use her testimony to dispute the plaintiffs' declarations and depositions, that merely creates a genuine issue of credibility and material fact. It is not a reasonable inference for purposes of summary judgment that union leaders must always be telling the truth whenever the company relies on their testimony. If Davis' testimony is construed to conflict with that of the plaintiffs, then part of the assessment of Davis' credibility will be to consider whether union leaders are sometimes compromised in their dealings with the company, as shown by the fact that an entire field of law concerning "sweetheart" agreements and breach of a union's duty of fair representation has had to be developed over the last 60 years to combat such tendency.

Davis' credibility is further questionable because there are no documents reflecting the union comments or proposals that she mentions, but does not describe. *Mills* 221:11-16,152:23-153:3;PX19 & 20. Defendant's negotiator, Greg Mills, admits that he has never known a union negotiating proposal not to be in writing, and he produced the proposals made by the union and company in 2004 and 2008 which show that no proposal of the type mentioned by Davis was ever made. He also admits that he does not recall what proposals were made during the negotiations. *Mills* 152:15-19.

In addition, Davis mistakenly testified that production employees are not paid by clock-in/clock-out time and are only paid in the way specified in the CBA — by "Master Line Time Card." *Davis* 30:22-31:3, 32:11-33:4, 33:21-34:3. That testimony was obviously wrong because even the defendant admits that production employees are paid by "clock-in/clock-out" and "scheduled time" methods of timekeeping, and that the provision of the CBA dealing with pay according to Master Line Time Cards does not limit any employees' pay to the time shown on such line time card, and

does not even apply to "all employees" in the way stated in the CBA. *See* pages 22-24, *supra*. A reasonable factfinder could infer one of two things from this contradiction, either Davis was negligent in learning what the real payroll practices at the plant were or she was not credible in trying to bolster the position she thought the company was taking in this lawsuit. Under standard Eleventh Circuit jury instructions, the jury would be entitled as the factfinder to rely upon its own experiences and understandings in the world in weighing whether to believe Davis now that she has gained a more favorable job as a Leadman with better hours and pay than she had before her prior lawsuit. Even if the jury chose to believe her testimony, it may choose not to give it as much weight as that of the plaintiffs. Davis' credibility will ultimately have to be compared to that of the sixty plaintiffs who have been deposed, none of whom support the construction of Davis' testimony argued by the defendant.

**D.    No Bona Fide Custom Or Practice Exists For Not Paying For Work Performed During Rest Breaks**

The defendant has also not argued or shown that the collective bargaining agreement permits unpaid work activities during the two thirty minute rest periods each day. To the contrary, the collective bargaining agreement does the opposite when it states that "[e]mployees will receive two thirty minute non-paid meal rest breaks each full work day." DX6 at §13.2. There is no other provision of the collective bargaining agreement that covers meal or rest breaks or that suggests that employees may be required to perform unpaid work activities during such breaks rather than resting or eating. The defendant admits that the "master line time card" referred to in §12.5 of the collective bargaining agreement does not apply to meal or rest breaks. *Mills*: 208:13-15, 209:6:10.

> Q.    Have you ever known a master card to be used to determine breaks?
> A.    No.
>                           * * *

32

> Q.    Equity Group is not calculating the amount of time employees actually spend on break free from any responsibilities; it's simply deducting a standard 30 minutes, correct?
> A.    Yes.

*Mills* 208:13-15, 209:6:10. If the master line time card were to be applied to meal or break periods, they would become paid rather than unpaid breaks because the mastercard is swiped only at the beginning and end of the shift, not during breaks. *Mills* 208:13-15; 209:6-10; DX5, *Mills Aff.* at ¶14 ("[T]he mastercard system . . . reflects the scheduled start time . . . at the beginning of each shift and the time when production ends at the end of each shift."); *see also id.* at ¶39 ("Accordingly, employees are paid from their scheduled start time until a master card/line card is swiped at the end of their shift, whether working or not."). Rather than being included as part of the "master line time card", employees' meal or rest breaks are expressly *excluded* by being automatically subtracted from the time shown on the master line time card each day. *Mills* 208:13-15, 209:6-10; *see also Preston* 71:9-16.

Section 203(o) requires that a custom or practice must exist "under a bona fide collective bargaining agreement", which means at the very least that it cannot be contrary to the written agreement. The defendant has not argued or shown that either the collective bargaining agreement or the "master line time card" permits unpaid work activities during the two meal or rest periods provided by §13.2 of the labor contract. A custom or practice has not been argued, and cannot be shown, because the explicit terms of the contract provides that the two thirty minute periods are for "rest" or "meals", not work.

The CBA itself states that it cannot supercede or abrogate federal or state law. DX7 at § 18.2; DX8 at §18.2; *Davis* 46:20-50:7. Thus, there could be no "custom or practice" that was "under" such agreement which went beyond what §203(o) allows "at the beginning or end of each workday",

such as mid-day rest periods. Both the union and the company were aware of this provision and the fact that "the union cannot waive an employee's federally-protected rights." *Davis* 50:2-7.

### E.    The Continuous Workday Rule Is Still Triggered By The Same Work Activities Regardless Of Section 203(o)

Even if it is assumed for the sake of argument that the time spent donning and doffing must itself be excluded from "measured work time" under §203(o), that does not affect the independent questions of: (1) whether the required sanitation of the company's protective gear and equipment independently triggers the "continuous workday rule" on its own; and (2) whether donning and doffing at the beginning and end of the workday still triggers the continuous workday rule for *subsequent* activities.

Section 203(o) does not affect whether donning and doffing are "integral and indispensable" activities that commence and end the "continuous work day" under the Supreme Court's decision in *Alvarez*, 546 U.S. 21. That section merely carves-out the time spent "changing clothes" from "the measured working time" for pay purposes without altering the fact that such activity remains "integral and indispensable" for purposes of starting the continuous workday for activities *subsequent* to such clothes changing. As such, the statute precludes *recovery* for "changing clothes", but does not affect the fact that such activity is still the first "integral and indispensable" act that triggers the start of the continuous workday for *subsequent* activities that are not covered by §203(o), such as post-donning sanitation and travel time.

The defendant has not cited any legal authority for the proposition that §203(o) either: (1) narrows the definition of a "principal activity" for purposes of defining the parameters of the compensable workday; or (2) operates to exclude compensation for principal activities other than "changing clothes or washing at the beginning or end of each workday." 29 U.S.C. § 203(o). The

34

cases cited by defendant, including *Cagle's*, do not consider whether donning and doffing at the beginning or end of the workday are "integral and indispensable" to employees' principal activity in poultry processing. Defendant's cases merely hold that the time spent in "changing clothes" does not itself have to be paid under §203(o). *Cagle's* is silent on this issue, leaving intact the body of law holding that donning and doffing are "integral and indispensable" activities that commence and end the continuous compensable workday, regardless of whether the time spent strictly donning and doffing has to be included in "measured working time" standing alone or not. *See* p. 35 *infra*. Thus, donning gear, such as that at issue in *Cagle's*, may be subject to § 203(o) without losing its character as a "principal activity." *Cagle's* only shortens the time that must be compensable without eliminating it altogether. There remain disputes of material fact regarding substantial periods of time for which summary judgment is improper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (the moving party has the responsibility of demonstrating the "absence of a genuine issue of material fact").

## IV.   SANITIZING DONNING, DOFFING ARE PRINCIPAL WORK ACTIVITIES THAT START AND END THE CONTINUOUS WORKDAY

The defendant is mistaken in arguing that the issue of what constitutes an "integral and indispensable" activity was not before the Supreme Court in *Alvarez*, 546 U.S. at 36-37. The Court stated its holding as follows: "we hold that any activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity' under §4(a) of the Portal-to-Portal Act." *Id.* at 36-37. Courts considering the issue since then have held that "[a]fter *Alvarez*, there can be little doubt that donning and doffing protective gear at the beginning and end of the workday are 'principal activities' under the Portal-To-Portal Act.'" *Spoerle v. Kraft Foods Global, Inc.*, 527 F.Supp.2d 860, 865 (W.D.Wis.2007); *Jordan v. IBP, Inc.*, 542 F.Supp.2d 790, 806-807 (M.D. Tenn. 2008); *Garcia*

35

*v. Tyson Foods, Inc.*, 474 F.Supp.2d 1240, 1246-1247 (D. Kan. 2007); *see generally De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 371 (3rd Cir. 2007).

The cases relied upon by defendant were decided without benefit of the Supreme Court's decision in *Alvarez* except for one case from the Second Circuit which involved an electric generation plant rather than a meat or poultry processing plant like those in *Alvarez*.[20]  Cases considering sanitary gear and equipment in a poultry processing plant since *Alvarez* have consistently found donning, doffing and sanitizing the company's sanitary gear and equipment to be sufficiently "integral and indispensable" to start and end the continuous workday rule set forth in *Alvarez*. *See e.g., Jordan, supra* at 806-807; *Spoerle*,  527 F.Supp.2d at 864; *Garcia*, 474 F.Supp.2d at 1246-1247; *Chao v. Tyson Foods, Inc.*, 2008  WL 2020323, *7-*8 (N.D. Ala. 2007).  The better-reasoned cases prior to *Alvarez* have also held such activities to be "integral and indispensable."   *Alvarez v. IBP, Inc.*,339 F.3d 894, 903 (9th Cir. 2003), *affirmed*, 546 U.S. 21 (2005); *Ballaris*, 370 F.3d at 911; *Tum v. Barber Foods, Inc.*, 360 F.3d 274, 279 (1st Cir. 2004); *Davis v. Charoen Pokphand (USA), Inc.*, 302 F.Supp.2d 1314, 1322 (M.D. Ala. 2004); *see generally De Asencio*, 500 F.3d at  373 (holding donning, doffing and sanitizing in a poultry processing plant to be "work" on the basis of standards similar to the standards for "integral and indispensable" activities).

The defendant's brief never really provides any explanation of what it considers the plaintiffs' "principal activity" to be or why the sanitary gear and equipment at issue in this case is not "integral and indispensable" to such activities.  Binding precedent in this Circuit has held that the employees' "principal activities" must be properly defined in order to assess whether a given task

---

[20] The only post-*Alvarez* decision relied upon by the defendant on the "integral and indispensable" issue is the Second Circuit's decision in *Gorman v. The Consolidated Edison Corp.*, 488 F.3d 586 (2d Cir. 2007). *Gorman* involved safety equipment in an electric generation plant that is inapposite to  the sanitary gear and equipment in this case. As shown more fully in a later section, *Gorman* has been roundly criticized and rejected by a number of courts.

is "integral and indispensable" to such activity: "By narrowly defining the principal activity of the employees in the instant case . . . , the district court severely limited the range of potentially compensable activities, thus committing the precise error which Congress sought to avoid in its careful wording of the statute." *Dunlop v. City Electric, Inc.*, 527 F.2d 394, 400 (5th Cir. 1976) When the current plaintiffs' principal activity is properly defined, the integral and indispensable character of the required sanitizing, donning and doffing as "work" that is "integral and indispensable" to such principal activity becomes immediately apparent.

### A.    The Essential-To-The-Job-Test

Both sides' evidence satisfy the three-part test of what constitutes compensable "work" that is "integral and indispensable" to a "principal activity." The standard three-part test is "whether the activity is required by the employer and is necessary to the employee's principal activities, and whether the benefit of the activity inures primarily to the employer." *Jordan*, 542 F.Supp.2d at 807-808;  *Dunlop*, 527 F.2d at 398-401; *Bonilla v. Baker Concrete Const.,Inc.*, 487 F.3d, 1340, 1344 (11th Cir. 2007); *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d  901, 910 (9th Cir. 2004); *Alvarez v. IBP, Inc.*, 339 F.3d 894, 902-03 (9th Cir. 2003), *affirmed*, 546 U.S. 21 (2005) ("To be 'integral and indispensable,' an activity must be necessary to the principal work performed and done for the benefit of the employer."); *De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 370-371 (3rd Cir. 2007); *Garcia v. Tyson Foods, Inc.*, 474 F.Supp.2d 1240, 1245(D. Kan. 2007).

The evidence clearly shows that the required sanitizing, donning and doffing activities satisfy the essential-to-the-job test.  Both sides' witnesses agree that plaintiffs' principal activity is not to process poultry products but to process *uncontaminated* poultry products.[21]  Plaintiffs' attest that they

---

[21] *Mills* 29:5-30:8; *see also* 170:8-171:12, 172:6-14, 172:22-174:12, 175:15-176:1, 176:22-177:5, 178:13-179:2, 179:12-181:15, 182:22-183:2, 183:21-184:1, 205:11-206:14, 167:4-15, 168:15-20, 169:5-16, 177:9-178:12, 183:9-184:7;  PX24-25 ¶5; PX27-29 ¶4.

"have always been trained and instructed that the job we were hired and trained to do was to process chicken in a safe and sanitary manner, and that this could not physically be done without donning, doffing and sanitizing the gear and equipment that the company required." PX24, ¶5; PX25-29, ¶5. Defendant's chief witness also testifies that the "principal activity" employees are hired to perform is to produce and process sanitary, uncontaminated poultry products for sale, and that defendant's policy on sanitizing, donning and doffing protective equipment in its Good Manufacturing Practices ("GMP's") is an essential part of the plaintiffs' performance of that principal activity:

> Q.    Are employees required to process chicken or produce poultry products in a way that does not contaminate the product?
> A.    Yes.
> Q.    Is that one of their principal responsibilities?
> A.    Yes.
> Q.    Are all employees required to do their processing or production work in a manner that produces uncontaminated chicken products?
> A.    Yes.
> Q.    These Good Manufacturing Practices that we have in Exhibit 3 and Exhibit 17, the purpose of them is for employees to be able to produce uncontaminated poultry products, correct?
> A.    Yes.
> Q.    And that benefits the company so that it can sell its products to its customers, correct?
> A.    Yes. And it's a USDA regulation.
> Q.    Your customers are purchasing from you uncontaminated poultry products, correct?
> A.    Yes.
> Q.    You represent to them that when they purchase poultry products from your company, they are receiving wholesome, uncontaminated products, correct?
> A.    Yes.
>                          * * *
> Q.    All right. Let's look at No. 2. It says, "All team members and visitors must wash and sanitize hands before starting work..." That's always been a requirement, correct?
> A.    Best of my knowledge.
> Q.    And then it says, "All team members must wash and sanitize hands after each absence from the work area...," correct?
> A.    Yes.

Q. And that's always been a requirement, correct?

A. Best of my knowledge.

Q. And what will cause absences from the work area?

A. If you leave and go to the break room, or you go to the nurse's station, or you go to HR,

QA, anywhere you go.

Q. Restroom?

A. Restroom, which it states up here.

Q. And the reason for that rule No. 2 that you must wash and sanitize hands after each absence from the work area and before starting work is to protect the poultry products from contamination, correct?

A. Yes. You're handling food.

Q. And that's the reason for the rule; is that right?

A. Correct.

\* \* \*

Q. The next sentence of Rule 6 under General Requirements says, "Smocks are to be changed during the shift if needed."

Has that always been a rule?

A. Yes.

Q. And when will a change in smocks be needed?

A. Only if they get contaminated.

Q. And what would contaminate a smock?

A. Wet, bloody, for example.

\* \* \*

Q. And then Rule 7 of General Requirements says, "Smocks, hair nets, and beard nets must be removed before exiting the facility." And I believe you've already said that's always been the rule?

A. Yes. Can't wear them outside.

Q. Why?

A. Contamination.

Q. Of the poultry product?

A. Yes. Of the smock that's going back to the poultry product.

\* \* \*

Q. Rule 11 of the General Requirements says, "Plastic sleeve covers will be worn to cover any street clothes that extend beyond smock coverage on the arms when handling product."

Is the purpose of that to prevent contamination of the chicken product?

A. And to cover your street clothes.

\* \* \*

Q. Okay. Rule 12 of the General Requirements in Exhibit 17 says, "Maintain gloves used for handling food and food contact

39

packaging supplies intact and in a sanitary condition."

Q.    The purpose of that is to protect the chicken from contamination, correct?

A.    Yes, and to cover your hands.

* * *

Q.    And then Rule 16 says, "Don't use hands or equipment for practices which may result in contamination of food products. Such practices include but are not limited to: touching face, wiping forehead; scratching head or body; placing fingers on/or in mouth, nose, or ears."

Has that always been a rule?

A.    I can't answer that. I don't know. It is today.

Q.    But the purpose of that rule is stated on its face, correct, that it might result in contamination of food products?

A.    Yes.

* * *

Q.    Rule 34 says, "Only approved tools may be used... Examples of non-approved tools: pocket knives, fingernail clippers, etc. or any tool with a wooden handle."

What's the purpose of that rule?

A.    Because the tools have to be cleanable, sanitizable, and we furnish the tools. We don't want the employees to have to furnish tools. We furnish tools for the employees.

Q.    And that's so you can make sure you keep the poultry processing area in a sanitary condition?

A.    So the tools meet the USDA requirements.

Q.    And the requirements of USDA are to ensure the sanitary production of uncontaminated chicken products?

A.    Yes.

* * *

Q.    How about their gloves and sleeves?

A.    It's a standard practice for them to rinse them.

Q.    Where do they rinse?

A.    In the sinks, as they go out of the plant.

Q.    What do they rinse it with?

A.    Soap and water.

Q.    Is that part of the process you require in order to produce uncontaminated chicken products?

A.    I guess you could say that.

Q.    You don't want blood and guts and other things building up on the aprons, sleeves, gloves, and harboring or growing microorganisms, correct?

A.    Correct.

Q.    And employees are reusing gloves, aprons, or sleeves the next day sometimes?

> A.   Yes.
> Q.   And they're storing them in their lockers?
> A.   Yes.
> Q.   And the purpose of that rule that they have to wash their aprons, gloves, and sleeves at the end of the day or on breaks is to prevent contamination to the chicken, correct?
> A.   Yes.
> Q.       And the wash basins, for that purpose, are in the production area, correct?
> A.   Yes.

*Mills* at 29:5-30:8, 170:8-171:12, 172:6-14, 174:2-12, 175:15-21, 176:22-177:5, 178:13-179:2, 183:9-184:1, 205:11-206:14.

Binding precedent in this Circuit holds that an activity need not be "predominant in same way over all other activities", or "uniquely related to the predominant activity of the business", or even "directly related" to such an activity. *Dunlop*, 527 F.2d at 400-401.

> The test, therefore, to determine which activities are 'principal' and which are 'an integral and indispensable part' of such activities, is not whether the activities in question are uniquely related to the predominant activity of the business, but whether they are performed as part of the regular work of the employees in the ordinary course of business. It is thus irrelevant whether [the activity] is 'directly related' to the business of electrical wiring; what is important is that such work is necessary to the business and is performed by the employees, primarily for the benefit of the employer, in the ordinary course of that business.

*Dunlop*, 527 F.2d at 400-401.   The Court also noted that "Congress intended the words 'principal activities' to be construed liberally." *Id.* Because the statute uses the plural term "activities", the Court held that this "'makes clear that in order for an activity to be a 'principal activity', it need not be predominant in some way over all other activities engaged in by the employee in performing his job" and that employees can have "several 'principal activities' during the workday. *Dunlop*, 527 F.2d at 398 (quoting 29 C.F.R. §790.8(a)).   "The 'principal' activities reflected in the statute are

41

activities which the employee is 'employed to perform.'" *Id.* (quoting 29 C.F.R. §790.8(a)).[22]

Defendant's policies and witnesses confirm that the required sanitizing, donning and doffing activities are essential to plaintiffs' principal activity of producing safe, sanitary and uncontaminated poultry products.    The company's written policy on donning, doffing and sanitizing states the purpose of such policy as follows: "The following GMP's were established to minimize the introduction of bacteria, contaminants, or foreign material into our manufacturing environment and must be adhered to by all team members and visitors while in production areas including coolers, shipping and receiving docks."    PX17, p. 4; PX1,, p. 1; PX3, p. 4; PX24-29, ¶¶5-11.  The policy then lists the sanitizing, donning and doffing activities that are at issue in this case, stating that employees are subject to discipline or discharge if they enter the production area without having performed such activities. PX17, p. 13; PX1, p. 9; PX3, p. 6; PX24-29, ¶¶5-11. This policy is part of defendant's "Quality Assurance" program and defines "Good Manufacturing Practices" ("GMP's") to include the unpaid work activities now at issue. PX17, pp. 5-13. It is undisputed that "quality assurance" is a principal activity and responsibility of every employee, and that they are subject to discipline or discharge if they fail to follow the required GMP's on donning, doffing and

---

[22] The former Fifth Circuit characterized Section 4 of the Portal-to-Portal Act as "excepting language" *id.* at 398 . Consistent with this characterization, the Court applied a narrow construction to Section 4 in order to ensure for American workers "broad coverage" of the FLSA's benefits. *Id.* at 398-99; *see also Arrington v. National Broadcasting Co.,* 531 F. Supp. 498, 503 (D.D.C. 1982) ("[T]he Portal-to-Portal Amendments were specifically directed at resolving an emergency situation and beyond that context they should be interpreted narrowly."). The Department of Labor's regulations reaffirm that Section 4 of the Portal-to-Portal Act is an exception that must be construed narrowly against the employer. "Congress did not intend by the Portal Act to change the general rule that the remedial provisions of the [FLSA] are to be given a liberal interpretation and exemptions therefrom are to be narrowly construed and limited to those who can meet the burden of showing that they come plainly and unmistakably within the terms and spirit of such an exemption." 29 C.F.R. § 790.2(a). In quoting the foregoing FLSA regulation when defining "integral and indispensable" activities, the Fifth Circuit reiterated that "[i]t is well settled that such administrative interpretations are entitled to great weight." *Dunlop,* 527 F.2d at 398 n.5.

sanitation. *Id.*; *see also* PX24-29, ¶¶5-11. Defendant's Quality Assurance policy states: "*The above GMP's will be strictly enforced. Anyone failing to comply with these procedures will be subject to being corrected immediately, possible disciplinary action up to and including termination.*" PX17, p. 3 (emphasis in original). The policy then lists the following "quality assurance" GMP's on donning, doffing and sanitizing:

> All team members and visitors must maintain a high degree of personal cleanliness to prevent contamination of food products.
>
> All team members and visitors must wash and sanitize hands before starting work, after each absence from the work area, after visiting the restroom and at any other times whereby hand become soiled or contaminated.
>
> * * *
>
> A solid (non-mesh) hair net must be worn to contain the hair as completely as possible. Scarves, bandannas, barrettes, etc., may be worn neatly under the hair net.
>
> All team members and visitors shall be clean shaven, or wear restraints over beards and mustaches.
>
> A clean smock must be obtained daily. Smocks are to be changed during the shift if needed. Smocks must fasten or tie properly to cover street clothes. Smocks may not have sewn on buttons or an external upper pocket.
>
> Smocks, hairnets, and beard nets must be removed before exiting the facility. Carrying garment over arm, etc., is permitted. The only exception is during an emergency evacuation.
>
> Keep hands and fingernails clean. Keep fingernails properly trimmed and If fingernail polish or false fingernails are worn, gloves must cover hands in while in any production area including box rooms, shipping/receiving, dry storage, product storage.
>
> * * *
>
> Clothing must be clean at start of operation and kept reasonably clean during operations.
>
> Plastic sleeve covers will be worn to cover any street clothes that extend beyond smock coverage on the arms when handling product.

43

Maintain gloves used for handling food and food contact packaging supplies intact and in a sanitary condition.

* * *

Don't use hands or equipment for practices which may result in contamination of food products. Such practices include but are not limited to:

   * touching face, wiping forehead
   * Scratching head or body
   * Placing fingers on/or in mouth, nose, or ears

Avoid uncontrolled, uncovered coughing or sneezing. Leave food areas if excessive coughing or sneezing occurs until it ceases. Sanitize hands afterwards. Use the upper arm to cover mouth when coughing or sneezing.

* * *

Any item that becomes contaminated must be washed and sanitized before being placed back into use. Processing tools and utensils are, but not limited to the following items: pens, calculators, thermometers, clipboards, pans, edible totes, edible shovels, earplugs, maintenance tools, etc.

Only approved footwear shall be worn in the processing area to include coolers, shipping, and receiving docks.  * * *

All equipment (pallet jacks, forklifts, and etc.) and utensils used for handling edible product will be of such material that can be maintained in a manner necessary to prevent the creation on unsanitary conditions

* * *

All utensils and product-contact surfaces of equipment shall be cleaned as frequently as necessary, by authorized personnel only, to prevent contamination of food and products.

* **

Single-service articles (such as utensils intended for one-time use, paper cups, paper towels, etc.) should be stored in appropriate containers and handled, dispensed, used and disposed of in a manner that prevents contamination of food or food-contact surfaces.

Where necessary, to prevent the introduction of undesirable microbiological organisms into food products, all utensils and product-contact surfaces of equipment used in the plant shall be cleaned and sanitized, by authorized personnel only, prior to such use and following any interruption during which such utensils and contact surfaces may have become contaminated.

44

Where equipment and utensils are used in a continuous production operation, the contact surfaces of such equipment and utensils shall be cleaned and sanitized on a predetermined schedule, by authorized personnel only, using adequate methods for cleaning and sanitizing.

\* \* \*

Any facility, procedure, machine or device may be acceptable for cleaning and sanitizing equipment and utensils if it is established that such facility, procedure, machine, or device will routinely render equipment and utensils clean and provide adequate sanitizing treatment.

\* \* \*

Finished products and raw ingredients shall be handled and maintained in a manner to prevent exposure to extraneous matter.

\* \* \*

Good sanitation practices shall be implemented and maintained to assure product integrity.

\* \* \*

Hand wash facilities with antiseptic soap and single use towels will be provided in employee rest rooms and product handling areas. Employees must wash and

\* \* \*

Sanitize tools before assembling equipment.

\* \* \*

Do not use equipment aids with wooden handles. Do not use equipment with hollow handles unless sealed properly

PX 17, pp. 5-13. The obvious purpose of such rules is to require employees to work in a way that produces uncontaminated poultry products for sale. PX24-29, ¶¶5-11; *see also Mills Depo.* cited at footnote 1 above. Defendant's officials admit that these GMP's were established as strict guidelines for food handling. *Id.*

Because such unpaid activities are an organic part of the process of producing wholesome, uncontaminated poultry products, they are both integral and indispensable to the principal activity that the plaintiffs are hired to perform. PX24-29, ¶5-12.[23] Cutting-up or other handling of raw

---

[23] The Chief Union Steward testifies that employees are required to sanitize the company's gloves, boots, aprons and sleeves , and if they do not do so properly they are "written up" for disciplinary purposes. *Davis* 65:21-67:9; DX59, *Morris* 28:8-17, 54:2-55:8. Employees are also disciplined if they do not don and doff the company's sanitize gear and equipment at the appropriate

45

poultry without such sanitation or sanitary gear would not produce the wholesome, uncontaminated products that is the principal activity the plaintiffs are hired to perform. *Id.* The production room is sanitized during the downshift each night and during breaks on the two production shifts. *Id.* Employees are required to maintain themselves in a sanitary condition at all times while in the production room. *Id.* Employees maintain the sanitary condition of both the production process and the production room itself by donning their sanitary gear and equipment before entering, sanitizing their hands, gloves, shoes, aprons and sleeves upon entry, doffing their smocks and other items whenever they go to the restroom, breakroom, supply room, nurse's station, maintenance bin, administrative offices or outside the plant, and re-donning their sanitary gear and equipment and re-sanitizing their hands, gloves, shoes, aprons and sleeves whenever they return to the production room from such areas. Employees' sanitation of their hands, gloves, shoes, aprons and sleeves is no less integral and indispensable than their sanitation of the production room itself — a task that even the defendant concedes to be compensable.

Relying upon the Fifth Circuit's decision in *Dunlop*, the Court of Appeals for the Ninth Circuit has explained why donning, doffing and sanitation activities are "integral and indispensable" when plaintiffs are required to produce an uncontaminated product in a sanitary production room:

> Here, as in *Alvarez*, Wacker "required" Fab 2 workers to change into and out of their uniforms at the plant, and only at the plant, in the normal course of the employees' jobs. *Id.* at 903. Wacker issued instructions to Fab 2 employees that they must wear the plant uniforms daily and strictly enforced this requirement. Employees were prohibited from leaving the plant in their uniforms and were monitored by security cameras and guards to ensure compliance. These facts weigh heavily in favor of a determination that the activity

---

times. *Davis* 67;19-69:23; DX59; *Morris* 28:8-17, 54:2-55:8. The defendant does not permit employees to work on the production line without first sanitizing and donning the company's gear and equipment. *Davis* 90:10-91:9. None of such gear or equipment can be donned at home or worn into the plant except for boots. DX59; *Morris* 31:5-20.

is *not* excluded by the Portal-to-Portal Act. *See Dunlop v. City Electric, Inc.,* 527 F.2d 394, 399-401 (5th Cir.1976) (suggesting that the employer's directive to perform an action weighs in favor of compensability).

Further, this activity was performed "at both broad and basic levels" for the "benefit of [the company]." *Alvarez,* 339 F.3d at 903. The workplace introductory manual and other supporting company manuals state that the uniforms were required to limit potential cleanroom contamination, and thereby to assist the employer in ensuring the quality of the silicon chips manufactured at the plant. The uniforms were also mandated to keep the company competitive, to promote a clean internal philosophy, and to attract favorable industry attention, outcomes that clearly inured to the benefit of Wacker. As in *Alvarez,* because the plant uniforms were "required by" the employer, and because the wearing of those uniforms was for the employer's benefit, the time spent putting them on and taking them off must be included as compensable time. *Id.*

\* \* \*

Because it determined that all employees in the second plant must wear uniforms daily and must put them on and take them off on the plant premises, and it adopted that rule in order to improve overall business performance and to provide additional protections in its manufacturing process, the company, by its conduct, made such activities integral and indispensable to the job. 29 C.F.R. § 790.8(c) n. 65.

*Ballaris.,* 370 F.3d at 911-912 (footnote omitted); *see also Alvarez,* 339 F.3d at 903 ("These plaintiff-performed activities allow IBP to satisfy its requirements under the law, *see* 9 C.F.R. § 308.3 (1999); 29 C.F.R. § 1910.132(a) (1999), and these activities prevent unnecessary workplace injury and contamination, both of which would inevitably impede IBP's 'disassembly' process.").

The applicable government regulations for food safety also require that employees handling poultry products conform to "hygiene practices while on duty to the extent necessary to protect against contamination", including adoption of "methods for maintaining cleanliness", such as "wearing outergarments . . . in a manner that protects against contamination", and "wearing . . . hairnets . . . or other effective hair restraints." 21 C.F.R. § 110.10(b). Once the defendant decided to enter the poultry processing business when it bought the Eufaula plants from Charoen Pokphand,

Inc. in March 2004, it took on the responsibility of hiring and paying employees to perform the sanitary activities necessary to allow it to satisfy U.S.D.A.'s food safety and health standards and to sell poultry products in interstate commerce. *See e.g. Davis*, 302 F.Supp.2d at 1322. Judge Thompson's decision in *Davis* held that the USDA's regulations are additional evidence that donning, doffing and sanitizing activities are integral and indispensable to both plaintiffs' job of producing uncontaminated food products and to defendant's ability to market and sell such products and otherwise operate its business. *Davis*, 302 F.Supp.2d at 1322; *see also Tum*, 360 F.3d at 279 ("Employees are required by Barber Foods and or government regulation to wear the gear. Therefore, these tasks are integral to the principal activity and therefore compensable."). Section 790.8 of the FLSA's overtime regulations states that activities may be integral and indispensable "where the changing of clothes on the employer's premises is required by law, by rules of the employer, or by the nature of the work." 29 C.F.R. §790.8(c), n. 65; *Alvarez*, 339 F.3d at 903.

The rigorous manner in which the defendant monitors and enforces the required donning, doffing and sanitizing activities further demonstrates that such activities are essential to plaintiffs' ability to perform the principal activities of cutting-up and processing poultry in an uncontaminated manner. PX24-29, ¶¶5-12. It is undisputed that the company prohibits employees from even entering the production area without donning the required protective gear and equipment, that employees are subject to discipline or discharge for infractions of this rule, and that Quality Assurance employees monitor compliance with such requirements. *Id.* Defendant's Food Safety Group in the corporate office in Philadelphia, Pennsylvania audits the Eufaula Division's sanitation activities to prevent poultry contamination by employees in the plant's production area. *Mills* 132:18-134:22.

"That an activity is required by an employer is evidence of its necessity." *Davis*, 302 F.Supp.2d at 1322; *see also Alvarez*, 339 F.3d at 903 ("First, because the donning and doffing of this

48

gear on the Pasco plant's 'premises is required by law, by rules of [IBP], [and] by the nature of the work,' *see* 29 C.F.R. § 790.8(c) n.65 (1999), this donning and doffing is 'necessary' to the 'principal' work performed."); *Spoerle*, 527 F.Supp.2d at 864 ("It is indispensable and integral in another sense as well because plaintiffs are *required* by both company policy and federal law to don and doff the equipment."); *Tum*, 360 F.3d at 279 (same); *Chao*, 2008 WL 2020323 at *7; *Ballaris*, 370 F.3d at 911 n.4 ("Although evidence that an employee has been disciplined for the failure to follow a clear rule established by a company would weigh in favor of a finding that the activities are "integral and indispensable," such evidence is not necessary to prove that the activities are not excludable.").

Plaintiffs, however, do not rely on the mere fact that the defendant and the government required the donning, doffing and sanitation at issue, although that is certainly a factor supporting an inference that such activities are essential to plaintiffs' job. *See e.g. Jordan*, *supra* at 810; *Spoerle*, 527 F.Supp.2d at 864; *Ballaris*, 370 F.3d at 911-912; *Alvarez*, 339 F.3d at 903. Plaintiffs' evidence goes much further by showing that the required activities are essential to plaintiffs' ability to produce uncontaminated poultry products, which is their principal activity. PX24-29, ¶¶5-12. Plaintiffs are also not relying on mere "causal necessity", such as the commuting time or airport security screening at issue in *Bonilla v. Baker Concrete Construction Co.*, 487 F.3d 1340, 1344 (11th Cir. 2007). Mere "causal necessity" was not enough in *Bonilla* because those activities did not benefit the employer to any degree. *Id.* at 1345. That is not the case here. PX24-25, ¶¶8-10, PX26, ¶9-11; PX27-29, ¶¶7-9; PX17; PX2.[24]

---

[24] It is irrelevant that plaintiffs might physically be able to cut-up chickens or produce poultry products without complying with such rules and regulations because that is simply not allowed by the defendant. *See* PX1, 2, 3, 17, 24-29, ¶¶5-12. Discipline, discharge and physical prevention of entry into the production room make it impossible for plaintiffs to produce poultry products without donning the required gear and equipment and sanitizing their hands, gloves, aprons, sleeves, and shoes in the prescribed manner. *Id.*

49

Doffing is also essential to the plaintiffs' principal activity of producing uncontaminated poultry products, as evidenced by the defendant's strict policy against taking the smock or other gear being taken into the restrooms or outside the plant. PX2,¶1,¶15, ¶6 ("Always remove your smock, gloves, and aprons before exiting production area" * * * "The only place to dress with smocks, aprons, and gloves is in the processing area." *  * * "Do not wear your smock outside of the plant, in the breakrooms, bathrooms, or hallways."). The purpose of these rules is to prevent contamination of the poultry through contact with smocks that have been in the restrooms or outside the plant. PX1, 2, 3, 17, 24-29, ¶¶5-12. Employees are required to doff their smocks and other items on unpaid time before entering the restrooms, going outside, or eating in the breakroom. *Id.* They are also required to re-don their smocks and other protective gear and equipment and resanitize their hands and feet on unpaid  time when returning to the production area from the restroom, breakroom or outside. *Id.* All of this doffing, donning and sanitizing during unpaid breaks is essential to the plaintiffs' principal activity of producing safe, sanitary and uncontaminated poultry products. *Id.*

The defendant itself admits that it considers activities to be work even when such activities required no exertion or effort, such as when they are waiting, sitting or even at home asleep at defendant's behest. *Mills* 192:7-194:1, 194:13-16.

### B.    The Primary Benefit Test

The evidence also clearly satisfies the "primary benefit" test for determining if an activity is compensable "work" and "integral and indispensable" to a principal activity. PX24-29, ¶¶7-11. The defendant has taught employees that it would be unable "to market and sell uncontaminated poultry products . . . with USDA's seal of approval" without the required donning, doffing and sanitizing. PX24-29, ¶¶7-8.

The fact that the Quality Assurance Department is in charge of monitoring and enforcing the

company's donning, doffing and sanitation policies is additional evidence that the primary beneficiary of such requirements is the company's quality assurance, marketing and sales programs. PX17, p. 4. Here again, the rigorous manner in which the defendant monitors and enforces its donning, doffing and sanitation policies belies any notion that such activities are primarily for the benefit of the employee. First, the requirement of doffing the smock or other items before entering the restrooms, eating in the breakroom or going outside the plant can only benefit the defendant, not the employee. As the plaintiffs testify:

> 9.  I have been asked whether the required sanitary gear and equipment benefits employees by keeping their clothes clean. We have never been trained or taught that this is the purpose or benefit intended by the required gear and equipment. If that were the intent , employees would not be prohibited from taking their smock or other equipment into the restroom or outside the plant. Employees are exposed to the restroom and other areas upon entry. Keeping the smocks and other items out of the restrooms only prevents contamination of the chickens, not the employee. If employee protection were the issue, we would be allowed to wear the smocks, aprons, sleeves and gloves into the restroom and would not be subject to discipline or discharge for doing so.

> 10.  The additional requirement that employees must rewash and resanitize their gloves and other plastic or rubber gear upon reentry into the protection area only benefits Equity Groups' quality assurance, marketing and sales programs, not the employee. Sanitation facilities are provided in the restrooms for employees' personal hygiene, but we are still subject to discipline or discharge if we do not resanitize our hands, gloves, and other plastic or rubber items all over again upon reentry into the production area a few minutes later. This resanitization within the production area is on unpaid time and done solely for the benefit of Equity Groups' quality assurance, marketing and sales programs. There is no benefit to the employee from this additional unpaid work activity or requirement.

PX24-29, ¶¶8-10; PX17, p. 5, ¶¶2, 12, 16, 24. To go to the restroom or breakroom, employees are required to doff their protective gear, store it and then put it back on and sanitize their hands, gloves

and aprons before returning to the production area. *Mills*. 44:1-5, 83:12-17, 211:10-18, 226:6-18.[25]

Employees must leave the production area in order to eat or go to the restroom because food and

drink are prohibited in the production area. *Mills* 142:4-143:12, 143:2-12; 177:9-178:12, 226:19-

227:6; PX17, ¶¶13, 15; PX2, ¶¶ 1, 7, 15.

Second, defendant's tight control over the design and laundering of the smock and other

sanitary protective gear and equipment demonstrates that they are for the benefit of the company's

marketing, sales and "quality assurance" programs, not the employee. PX17, ¶6; PX24-29, ¶10.

> The primary benefit to Equity Group is also shown by its rule
> against employees using or laundering their own smocks. We are
> required to use only the specially designed smocks furnished and
> laundered each day by the company. The sanitary gear and
> equipment issued by the company are unique items not normally used
> outside the plant or in other businesses. The smocks issued to each
> employee are designed to prevent any part of the employee's clothes
> from touching or contaminating the chicken. That is also the purpose
> and primary benefit of the rubber or plastic gloves, sleeves, aprons
> and boots that are part of the standard package of sanitary gear and
> equipment issued to each employee. Employees are subject to
> discipline or discharge if they do not use the specially designed
> smock and other items issued by the company, or if they otherwise
> attempt to use their own smocks, gear or equipment. We are also
> subject to discipline or discharge if we take the smocks and other
> items home or outside the plant, or if we attempt to launder them for
> ourselves. These restrictions are solely for the benefit of Equity
> Group-Eufaula Division, not the employees.

PX24-29, ¶¶10-11.[26] Defendant's officials testified to similar facts. *Mills* 172:22-174:1.

---

[25] Employees are required to be on the production line dressed and ready to work at the time the break ends. *Mills* 212:10-18. They are unpaid up to that point, which means that the donning, doffing, and sanitizing is done during their 30 minutes on unpaid time. *Mills* 212:19-213:2. Employees are docked a full 30 minutes without regard to whether they were still working during that 30 minutes, including donning, doffing and sanitizing during the break. Employees can be disciplined for being late returning from breaks.

[26] Smocks and gloves must be obtained from the Supply Room every morning before proceeding to the production area. PX24-29, ¶¶5-12. Employees also pick up aprons, sleeves, hairnets, beard-nets, ear-plugs and dust masks from the Supply Room. *Id.* This takes time because

Similar facts were recently held to preclude summary judgment on the "work" and "integral and indispensable" issues:

> With respect to the question of whether the activities are required by the employer, the undisputed fact is that the defendants require the plaintiffs to wear frocks that are owned, maintained, cleaned, and provided to the plaintiffs by the defendants. Whether those frocks are "specially designed" is irrelevant; the fact of the matter is that the plaintiffs are not permitted to wear frocks of their own choosing or to take the provided frocks home with them. They may not launder the frocks themselves and must store the frocks in the locker room at the Goodlettsville Plant. Prior to their shifts, they must don the frocks at the plant, and they must doff the frocks and exchange the soiled frocks for clean frocks, which are stowed in their lockers, before leaving the plant at the end of their shifts. Finally, they may be subject to discipline if they do not wear the frocks on the production floor. As the Ninth Circuit noted, such facts "weigh heavily in favor of a determination that the activity is *not* excluded by the Portal-to-Portal Act." *Ballaris,* 370 F.3d at 911 (citing facts that employees were required to wear frocks, were required to change at the plant, were disciplined for failing to wear the frocks on the production floor, and were prohibited from taking frocks from the plant).
>
> * * *
>
> The undisputed facts demonstrate that the defendants here required the plaintiffs to remove these particular frocks from their lockers, don and doff these frocks, and exchange and stow the frocks prior to and following every shift, satisfying the first element of the test to determine whether the plaintiffs engaged in work compensable under FLSA.

*Jordan,* 542 F.Supp.2d at 806; *Alvarez,* 339 F.3d at 903 (holding that "it is beyond cavil that the donning, doffing, washing, and retrieving of protective gear is, at both broad and basic levels, done for the benefit of IBP."); *Spoerle,* 527 F.Supp.2d at 864 ("Like the clothes changing in *Steiner,* plaintiffs' donning of equipment is performed for the purpose of protecting the employee from

---

there are lines and smocks are distributed one at a time at the Supply Room window. *Id.* Employees are given a packet each week which contains their allotment of protective gear. *Id.* The packet contains rubber gloves, cotton gloves, aprons, sleeves, hairnet, and beard-net. *Id.* Lines can form because so many people are scheduled to begin work at the same time. *Id.*

work-related hazards and occurs immediately before entering the production area. Because plaintiffs need to put on the equipment in order to perform their job safely, their doing so is 'an integral and indispensable part' of a 'principal activity.'"); *see generally, Anderson v. Perdue Farms, Inc.*, 2008 WL 541286, *2 (M.D. Ala. 2008) (". . . Defendant argues that Plaintiffs' declarations contain unsubstantiated legal conclusions, such as (1) line activities are 'necessary, integral, and indispensable' to the declarant's overall activities . . . * * * The first conclusion is obvious because the equipment that declarants had to put on before clocking in was for sanitation reasons, and the declarants' work involved killing, disemboweling, inspecting, cleaning, cutting, weighing, and packing poultry. Therefore, the sanitation equipment was necessary for the processing work.").[27]

The fact that the protective gear or equipment might also provide collateral benefits to the employee was held to be insufficient to detract from the primary benefit to the company's quality assurance, marketing and sales programs in *Jordan*:

> The defendants do not dispute that the purpose of the frock is to maintain sanitary conditions on the production floor and to prevent the defendants' product from becoming contaminated. The defendants argue, however, that the frocks also benefit the plaintiffs by keeping their street clothes from becoming dirty. Though it is perhaps the case that the frocks provide a benefit to the plaintiffs, that does not alter the fact that the reason the defendants require their employees to wear frocks is motivated not by the employees' needs, but rather by the defendants' need to maintain a sanitary production floor. Moreover, although the frocks are not specifically required by federal law, their use enables the defendants to meet federal regulations requiring employees to wear clean garments and the company to maintain hygienic practices on the production floor. * * * The fact is that the frocks enable the defendants to maintain the cleanliness of their facilities and prevent their product from becoming contaminated. This benefit is enormous when one considers the damage that would result

---

[27] Moreover, if "changing clothes and washing" were not integral or indispensable, Congress would not have had to make a partial exception for those activities in §203(o): "the very existence of this carve-out for changing time in the statute provides at least some indication that such activity is itself properly considered 'work' under the FLSA." *De Asencio*, 500 F.3d at 373 n.11.

> to the defendants if they were to sell a contaminated food product.
> The minor benefit to the employees of keeping their street clothes
> clean pales by comparison. As such, there is no question that, as a
> matter of law, it is the defendants who reap not only *some* benefit
> from the donning and doffing of the frocks, but the *primary* benefit
> of doing so.

*Jordan, supra* at 807. Binding precedent in this Circuit establishes the same standard: "The fact that

the employees too may have benefitted from filling out time sheets recording their hours worked and

the compensation due them is not inconsistent with the conclusion that the work was 'an integral and

indispensable function of the defendant business.'". *Dunlop*, 527 F.2d at 400 n.11 (quoting

*Secretary of Labor v. E. R. Field, Inc.*, 495 F.2d 749, 751 (1st Cir. 1974)).

Defendant's argument that it does not "control" the manner in which employees don or doff

the required protective gear and equipment has been found "feeble" on nearly identical facts:

> The defendants' feeble assertion that they do not "control" the
> manner in which the plaintiffs don and doff the frocks does not stand
> up to analysis and, indeed, borders on the absurd. It is irrelevant
> whether the plaintiffs have "flexibility" to put the frocks on in the
> locker room or the hallway; by this logic, taken to its extreme, the
> defendants could also argue that the donning of the frocks is not
> required, as they do not specify that plaintiffs must don the frocks feet
> first or head first, while sitting or while standing.

*Jordan, supra* at 806. Plaintiffs have described the specific ways the defendant controls how the

unpaid donning, doffing and sanitation activities are performed:

> 12.    I have been asked whether employees control how or
> when they don, doff or sanitize the required protective gear and
> equipment. The answer is no, we are required to follow standard
> procedures on how and when to perform these parts of our job. We
> are required to sanitize boots, gloves, aprons, sleeves and hands  at
> the sanitation vats stationed at the front entry to the production area
> of the plant. Rubber or plastic gloves, sleeves  and aprons can only
> be put on after the smock; cotton or plastic gloves can only be put on
> after hands are sanitized upon entry into the production area; smocks,
> hairnets and beardnets have to be replaced at the supply room at the
> start of each shift, which means that employees almost always put on

such items after going to the supply room to pick them up. This is monitored by employees from the Quality Assurance Department who watch and keep records of employee's compliance with these requirements as they are performed when entering the production area. Each day I have to wait in line to pick up my smock and hairnet from the Supply Room on unpaid time. Employees have no control over doffing either. We are required to take off our smocks, gloves, sleeves and aprons whenever we leave the production room, and to store them at designated racks in the production room. At the end of the shift we are required to take the smocks to a specified bin at the front of the plant. Employees also do not control how they use rubber or plastic gloves, sleeves, aprons, or boots, but are required to keep them and themselves in a sanitary condition at all times on the production room floor. This cannot physically be done without putting on and sanitizing the standard gear and equipment the company issues for this purpose.

PX24-29, ¶11-12.

### C.    Defendant's Pre-*Alvarez* Caselaw Is No Longer Persuasive Or Consistent With The Better Reasoned Post-*Alvarez* Decisions Involving Meat Or Poultry Processing Plants

The defendant misquotes *Alvarez* in arguing that a required or "necessary" activity might still not be "integral and indispensable." *Def. Br.* at 54. As in *Spoerle*, the defendant "points to one sentence in *Alvarez*, 546 U.S. at 40, 126 S.Ct. 514, in which the Court stated that activities may be 'necessary' but still not 'integral and indispensable' to a 'principal activity.'" *Spoerle*, 527 F.Supp.2d at 865. The latter case explains why this phrase from *Alvarez* is taken out of context. At that point the Supreme Court was only:

> . . . discussing the time employees may wait **before** donning their equipment and **after** doffing it, an activity that is not at issue in this case. Further, in concluding that such waiting time was "preliminary" and "postliminary," the Court emphasized that it was "two steps removed from the productive activity on the assembly line," *id.* at 42, 126 S.Ct. 514, and that, "unlike the donning of certain types of protective gear, which is *always* essential if the worker is to do his job, the waiting may or may not be necessary in particular situations or for every employee," *Id.* at 40, 126 S.Ct. 514 (emphasis in original). Thus, although the sentence defendant cites may suggest

56

that the line between "preliminary" and "principal" activities will not always be a clear one, **there is no room left to argue after *Alvarez* that donning and doffing of protective gear are not "principal activities" within the meaning of the Portal-to-Portal Act.**

*Spoerle*, 527 F.Supp.2d at 865-866 (emphasis added).

Defendant cites no decisions involving a meat or poultry processing plant since the Supreme Court addressed two such plants in *Alvarez*, 546 U.S. at 521, 525-526. All three cases defendant relies upon from the meat or poultry industry were decided before *Alvarez* and primarily rely upon the Tenth Circuit's 1994 decision in *Reich v. IBP, Inc.*, 38 F.3d 1123 (10th Cir. 1994).[28] The *Jordan* decision two months ago explains that "[t]he persuasive effect of the *Reich* decision is extremely limited [because] it was issued before the Supreme Court's decision in *Alvarez*." *Jordan, supra* at 803-804. Several other courts have reached the same conclusion. "After *Alvarez*, there can be little doubt that donning and doffing protective gear at the beginning and end of the workday are 'principal activities' under the Portal-to-Portal Act. The Court could not have reached its conclusion regarding the walking time without concluding that donning and doffing protective gear are compensable activities." *Spoerle*, 527 F.Supp.2d at 865; *see also De Asencio*, 500 F.3d at 371 ("Although we recognize, of course, that whether donning and doffing is work was not directly at issue in *Alvarez*, the Court could not have concluded that walking and waiting time are compensable under the Portal-to-Portal Act if they were not work themselves."); *Bishop v. United States*, 72

---

[28] Defendant relies on two decisions by the Eastern District of Texas — the 1995 decision in *Reich v. Oscar Meyer Foods Corp.*, 1995 WL 1765643 (E.D. Tex. 1995), and the 2001 decision in *Anderson v. Pilgrim's Pride Corp.*, 147 F.Supp.2d 556 (E.D. Tex. 2001) — and a 2001 decision from the Southern District of Texas in *Pressley v. Sanderson Farms, Inc.*, 2001 WL 850017 (S.D. Tex. 2001). All three of such decisions rely heavily on the Tenth Circuit's 1994 decision in *Reich*, 38 F.3d at 1125. Several courts have found these cases unpersuasive. *See e.g. Davis*, 302 F.Supp.2d at 1322 n.8; *Spoerle*, 527 F.Supp.2d at 867; *Chao, supra* at *7-*8. The recent decision in *Spoerle* held that the reasoning of *Reich v. Oscar Meyer, supra*, is "conclusory and it was decided before the Supreme Court decided *Alvarez*." *Spoerle*, 527 F.Supp.2d at 867.

Fed.Cl. 766, 780 (Fed.Cl.2006) (concluding that in *Alvarez*, the Supreme Court "endorsed" the court

of appeals' conclusion that donning and doffing of protective gear are "principal activities").

The Third and Ninth Circuits have explicitly ejected the Tenth Circuit's decision in *Reich*.

*De Asencio*, 500 F.3d at 372; *Ballaris*, 370 F.3d at 911 & n.13; *see also Davis*, 302 F.Supp.2d at

1322 n.8 (holding that the Tenth Circuit's decision in *Reich* is unpersuasive). The Third Circuit held

that "the better view is that stated in *Ballaris* . . . which rejected *Reich* and reaffirmed the analysis

. . . in *Alvarez*, which was affirmed by the Supreme Court." *De Asencio*, 500 F.3d at 372. While this

holding was in the context of whether donning and doffing is compensable "work", the *Jordan* court

has held that "[f]actors relevant to whether an activity is integral and indispensable are essentially

the same as those relevant to whether an activity qualifies as work, requiring consideration of

whether the activity is required by the employer and is necessary to the employee's principal

activities, and whether the benefit of the activity inures primarily to the employer. " *Jordan, supra*

at 808. A court from the Tenth Circuit has explained why even that Circuit may no longer follow

its own decision in *Reich* after *Alvarez*:

> The court is convinced that the Circuit, if given the
> opportunity to revisit the issues in *Reich,* would approach its analysis
> of the pertinent issues differently in light of *Alvarez*, regardless of
> whether the Circuit ultimately reached the same conclusions
> concerning compensability. Significantly, the Circuit did not analyze
> the issues through the lens of the continuous workday rule as clarified
> by the Supreme Court in *Alvarez*. In light of *Alvarez*, it would seem
> that the Circuit, if revisiting *Reich* today, would focus not on whether
> the donning and doffing constituted "work" within the meaning of
> *Tennessee Coal*, but on whether standard protective clothing and gear
> are "integral and indispensable" to the work performed by production
> employees. Indeed, the Circuit in *Reich,* although in dicta, certainly
> stated that standard clothing and gear are integral and indispensable
> to the work performed by production employees, suggesting that the
> Circuit might reach a different conclusion on compensability if
> analyzed in the context of *Alvarez*.

*Garcia v. Tyson Foods, Inc.*, 474 F.Supp.2d 1240, 1246 (D. Kan. 2007).

Defendant's cited cases were also decided on the basis of the overly-restrictive pre-*Alvarez* view that *Steiner* does not apply to the less dangerous work environment in meat and poultry processing plants. For example, the district court in *Anderson v. Pilgrim's Pride*, 147 F. Supp. at 561-562, not having the benefit of *Alvarez*, relied on older precedent which mistakenly "relegated the precedential value of the *Steiner* decision to its unique facts", including *Reich v. IBP*, 820 F.Supp. 1315, 1324 (D. Kan. 1993). As already shown, *Reich* erroneously held that *Steiner* is limited to cases involving dangerous toxic chemicals. In both *Alvarez* and *Mitchell*, the Supreme Court applied *Steiner* as controlling in meat processing and poultry processing facilities. *Alvarez,*, 339 F.3d at 904; *Alvarez*, 546 U.S. at 521; *Mitchell*, 350 U.S. 260. Defendant's effort to limit *Steiner* to employees exposed to toxic chemicals was rejected in both *Jordan, supra* at 808, and *Spoerle, supra* at 864-865 for this reason.[29]

### D.    *Gorman* Has Been Roundly Criticized By Other Courts

Defendant's cases involved no comparable evidence that the unpaid activities were essential to the plaintiffs' ability to perform their principal activity of producing uncontaminated poultry products that met the employer's food safety and quality assurance standards. Defendant's principal case did not even involve a food processing plant or any need for sanitary production procedures.

---

[29] Courts in the Eleventh Circuit may be precluded from following the Tenth Circuit's decision in *Reich* because it is inconsistent with *Dunlop*, which is controlling in this Circuit. *Reich* held that "although required and of some value to the employer, the outergarments are primarily for the benefit of the employee, and thus . . . not integral and indispensable." *Reich*, 38 F.3d at 1126. The binding Fifth Circuit precedent in *Dunlop*, however, adopted the opposite standard — that "[t]he fact that the employees may have benefitted . . . is not inconsistent with the conclusion that the work was an integral and indispensable function of the defendant business." *Dunlop*, 527 F.2d at 400 n.11; *see also Chao, supra* at *7 (holding that the similar decision in *Gorman* is in conflict with *Dunlop*.).

Instead, *Gorman v. The Consolidated Edison Corp.*, 488 F.3d 586 (2d Cir. 2007), involved an electric generation plant in which the only gear at issue was *safety* boots, gloves and a helmet — gear that is inapposite to the *sanitary* gear and equipment at issue here. There was no evidence that any of the safety items in *Gorman* was essential to the production of sanitary food products, or that the plaintiffs in that case had to repeatedly sanitize themselves and their gear and equipment as they entered and left a sanitary production area. The recent decision in *Jordan, supra*, explained why the electric generation plant in *Gorman* is distinguishable from the activities at issue in a food processing plant.

> . . . *Gorman* is distinguishable from the case at hand. The gear at issue in *Gorman* was only safety boots, safety glasses, and a helmet. The "gear" at issue here — that is, the frock that the plaintiffs are required to don and doff — can hardly be characterized as generic, as evidenced by the facts that the frock has certain design features specific to the job and that plaintiffs are not permitted to use a frock of their choosing. Moreover, the plaintiffs are not permitted to clean, store, or don their frocks at home, are required by the defendants to wear those frocks at all times on the production floor, and are subject to discipline for failing to do so; additionally, the frocks are both necessary to the plaintiffs' jobs and benefit the defendants, in that they allow for the maintenance of sanitary conditions on the production floor and prevent the defendants' product from becoming contaminated. *See Spoerle,* 527 F.Supp.2d at 863-64 (holding that donning and doffing of gear and frock at meat processing plant was integral and indispensable where it was necessary to perform job safely, where it was required by company policy and federal law, and where the failure to do so resulted in discipline). Thus, the donning and doffing of the frocks do not constitute the "changing of clothes and showering under normal conditions," which is not compensable under *Steiner,* 350 U.S. at 249, 76 S.Ct. 330, but rather an integral and indispensable activity for which compensation is required.

*Jordan, supra* at 809. In an identical case brought by the Department of Labor against Tyson Foods' plant in Blountsville, Alabama, the Northern District of Alabama has held that *Gorman* is not persuasive in the context of meat or poultry processing plants, and is in conflict with the binding

Fifth Circuit precedent in *Dunlop*:

> *Gorman,* however, is less on point with the present action than *Alvarez,* as the Second Circuit there did not address donning and doffing claims in a meat or poultry processing plant, nor did it consider factors similar to *Dunlop's* three-part analysis. Therefore, while the Second Circuit espouses a narrow application of *Steiner,* binding, former Fifth Circuit precedent persuades the court that the Eleventh Circuit would more likely agree with the position of the Ninth Circuit as expressed in *Alvarez.*

*Chao,* 2008 WL 2020323 at * 7. The reasoning in *Gorman* has been held "truly bizarre" by a third

court. *Spoerle,* 527 F.Supp.2d at 864.

> The [*Gorman*] court appears to be saying that the holding of *Steiner* does not apply unless the "work is done in a lethal atmosphere." In other words, unless the activity is necessary to prevent the employee from actually *dying,* it is not "integral" to a principal activity. From a public policy perspective, this reading is obviously troubling because it creates an uncomfortable distinction between hazards that kill and hazards that maim (or pose only a *risk* of death) and suggests that an employee is entitled to compensation for protecting herself from the former only.
>
> Fortunately, *Steiner* does not support such a distinction. Although it is true that the facts of *Steiner* involved life-threatening risks, the Court did not limit its holding to that situation, but said only that the facts before it presented one of the "clear[est]" examples of an activity that was integral and dispensable to the principal activity. *Steiner,* 350 U.S. at 256, 76 S.Ct. 330. Further, the legislative history cited by the Court distinguished between a job that the employee "could not perform ... without putting on certain clothes" and an activity that was "merely a convenience to the employee and not directly related to the specific work." *Id.* at 258, 76 S.Ct. 330. Because the equipment in this case is donned for safety purposes and is required by law and company policy, it cannot be said to be "merely a convenience" for the employee.

*Spoerle,* 527 F.Supp.2d at 864-865. Even the Supreme Court applied *Steiner* to a meat processing

facility in a companion case issued the same day as *Steiner* itself. *Mitchell v. King Packing Co.,* 350

61

U.S. 260 (1956).[30]  For these reasons, the better reasoned decisions are those involving the meat and poultry industry cited at page 34-35 above.  *See Jordan, supra* at 804.

### E.    The Evidence Is Disputed On Whether Aprons And Sleeves Are Required Or Essential To Plaintiffs' Job Performance

The defendant admits that most of the sanitary gear and equipment at issue is required upon entry into the production area, but it argues that aprons, sleeves and cotton gloves are optional.  The evidence on that point is disputed, making summary judgment improper.  *See* PX26, ¶¶1, 5, 6, 7, 12; PX24-25, ¶¶5-7, 12; PX27-29, ¶¶5-7, 12.  Plaintiffs attest that aprons and sleeves are required in order to be able to produce uncontaminated poultry products, which is the principal activity they are employed to do.  *Id.*  It is undisputed that the defendant purchases and distributes aprons and sleeves to employees for use during the workday, giving rise to a permissible inference that such items are needed in order to produce uncontaminated poultry products.  *Mills* 77:16-78:21, 81:2-82:5; *Stevens* 98:6-16; PX9, p. 83; PX17, ¶11; PX2, ¶¶1, 7, 8, 15.  Plaintiffs must be given the benefit of all reasonable inferences for purposes of summary judgment. Defendant's policy requires that employees are required to keep themselves sanitary at all times they are in the production area. *Mills* 29:5-33; PX17, ¶¶1, 2, 5, 6, 10, 11, 12; PX2, ¶¶1-15; PX1, 3, 17.  It is at least a reasonable inference for summary judgment purposes, if not a direct fact, that the defendant goes to the expense and trouble of distributing aprons and sleeves to employees for two reasons that primarily benefit the company: (1) to facilitate production of uncontaminated poultry products by preventing poultry

---

[30] The Court applied *Steiner* in deciding whether activities were "integral or indispensable" even though the case did not involve any dangerous or lethal work environment like that of the battery plant in *Steiner*.  It held that sharpening of knives was "integral and indispensable" to the employee's ability to perform their principal activity of processing meat despite the fact that such sharpening was preliminary to the actual use of the knives on the production line.  The sanitation activities at issue here, including donning and doffing the requisite sanitary gear and equipment and sanitizing hands, gloves, shoes, aprons and sleeves, are no different.

blood, viscera, organs and grease from building up on the gear and equipment during the day and by preventing employees' own sleeves and pants from touching or contaminating the poultry or the sanitary equipment and work station in production area; and (2) to keep the company-owned smocks clean while in use and to reduce blood, viscera and other stains, wear and tear which make defendant's nightly laundering more difficult, shortens the useful life of the equipment, and requires defendant to go to the expense of replacing such gear more frequently than is the case when aprons and sleeves are worn. PX26, ¶1; PX24-29, ¶¶5-12. Even absent such evidence and inferences, defendant "suffered" such sanitizing of its aprons and sleeves when it distributed them to employees, which is all that the FLSA requires for such activities to be compensable. *Jordan, supra* at 806 (". . . the relevant inquiry here is not whether the pre-production activities at issue are required by law, but rather whether the employer 'required or suffered' the employees to engage in those activities, *see Brock,* 236 F.3d at 801.").

F.   **Defendant Has Not Sought Summary Judgment Against Plaintiffs' Sanitation Activities On The Ground That It Is Not "Work" Or "Integral And Indispensable" To A Principal Activity**

Defendant offers no evidence or argument that the required sanitation of the company's boots, gloves, aprons and sleeves at various points throughout the workday is not "work" or "integral and indispensable" to the principal activity plaintiffs are hired to perform. The defendant limits its summary judgment argument under the Portal-to-Portal Act to the requirements of: (1) "clearing security" (*Def. Br.* at 55); (2) "time spent walking from security to their changing areas and from changing areas to security" (*Def. Br.* at 59); and (3) "donning and doffing of clothing" and "showering." (*Def. Br.* at 59). No argument is made that the required sanitation of boots, gloves, hands, aprons and sleeves is not "work" or "integral and indispensable" to the principal activity plaintiffs were hired to perform — the production and processing of sanitary and uncontaminated

63

poultry products. PX24-29, ¶¶5-11. Plaintiffs have found no reference to such activities in Section C of defendant's brief, which is the section dealing with its Portal-to-Portal Act and related defenses.

The first two categories of other activities for which summary judgment has been sought — security clearance and walking to and from security clearance — are no longer pursued as claims in this case. Plaintiffs' counsel notified the defendant that such claims were being dropped several times before summary judgment motions were due so that time and space would not have to be wasted on such issues. The defendant elected to file for summary judgment on them anyway rather than stipulations to their dismissal under Rule 41. The plaintiffs cannot dismiss such claims unilaterally without such a stipulation after an Answer has been filed. *See* Fed. R. Civ. 41.

That leaves only donning and offing as the only category of activities for which the defendant has sought summary judgment on the ground that it is neither "work" nor an "integral and indispensable" part of plaintiffs' "principal activities."

## V.     THE WORK ACTIVITIES AT ISSUE ARE NOT *DE MINIMIS*

The evidence on the defendant's *de minimis* defense is too disputed for summary judgment. Defendant argues that "one employee admitted that it takes 'seconds' to don and doff" the required items, and that another employee said "he can put on his smock in as little as 30 seconds." *Def. Br.* at 65. The defendant, however, took sixty plaintiffs' depositions, not just two. Even for those two, the defendant misquotes what was said. Chandra Young testified that it took "five to ten minutes" each time she had to sanitize, don and doff the required equipment throughout the day, not a "few seconds." DX78, *Young* 58:14-59:13. The other plaintiff cited by defendant, Samuel Shabazz, also said it took "10 minutes or more" each time he had to perform such activities, not 30 seconds. DX67, *Shabazz* 41:2-5, 16-20. Because the activities at issue went unpaid six times a day, both of these plaintiffs lost half an hour to an hour of pay per day, averaging three to six hours of unpaid

64

work per week and more than a 130 hours of unpaid work per year.

The full sixty depositions also reflect that it takes as much as an hour per day to sanitize, don and doff the required gear and equipment because such activities are required six times a day.[31] Employees testified that it took 5 to 10 minutes or more to perform such activities on each of these six occasions, for a total of half an hour to an hour or more of unpaid work each day, 2.5 to 5 unpaid hours or more a week, and 130 to 260 unpaid hours a year per employee.[32] Judge Thompson denied summary judgment on CP's *de minimis* defense in *Davis, supra,* because "Davis testified that she spends between 15 and 17 minutes" per day and an "aggregate of . . . at least an hour a week" on the same activities at issue in this case. *Davis,* 302 F.Supp.2d at 1323. Here, the plaintiffs have shown that the current defendant has extended that one hour per week to an hour *per day* and five hours per week — an amount far beyond what any court has ever held to be *de minimis.* A jury in the Northern District of Alabama has found that as little as an aggregate of 8 minutes per day is not *de minimis* and must be paid. PX31(Jury Verdict in *Brothers v. Tyson Foods, Inc.,* case no. Case No. 4:06-CV-4676-VEH) (Doc. 164); *see also Reich v. Monfort, Inc.,* 1995 WL 817796, *2 -*4 (D.

---

[31] *See e.g.* DX 22, *W.M. Blackmon* 26:3-7 (15 minutes per occasion); DX 30, *Fuller* 21:6-11 (5 minutes per occasion); DX 57, *Merrill* 14:7-13, 17:3-15 (8-16 minutes per occasion); DX 25, *Darby* 42:3 (8-10 minutes per occasion); DX 52, *March* 27:5-20 (7-10 minutes per occasion); DX 40, *D. Johnson* 23:18-20, 27:7-13 (10 minutes per occasion); DX 35, *Ivery* 24:20, 27:8-9 (at least 5 minutes per occasion); DX 75, *Warren* 25:10-13, 28:20-21, 31:22-23 (7-10 minutes per occasion); DX 20, *Bedell* 24:20, 30:15, 33:22 (10-15 minutes per occasion); DX 54, *McCall* 14: 7-15, 35:10-11 (5-10 minutes per occasion); DX 18, *Allen* 36:15, 53:2-6 (10-15 minutes per occasion); DX 42, *Jones* 33:4-21 (15 minutes or more per occasion); DX 43, *Kennedy* 36:19-22 (10-15 minutes per occasion); DX 64, *Reeves* 22:8-12 (6-8 minutes per occasion); DX 66, DX 76, *White* 20:21, 21:18, 25:16-17 (as much as 10 minutes per occasion); *see also* PX24-29, ¶5.

[32] This amounts to $1,560,000 to $3,120,000 unpaid labor the defendant receives per year for the 1200 hourly employees at the plant. An aggregate claim of millions of dollars owed to thousands of employees is a fact favoring plaintiffs on the *de minimis* defense. *See Monfort,* 144 F.3d at 1334.

Colo. 1995) (ten minutes a day held not to be *de minimis*); *Spoerle*, 527 F.Supp.2d at 868 (rejecting requirement of 10 minutes or more to avoid *de minimis* defense).

Because the defendant's *de minimis* argument is limited to the disputed "few seconds" it argues in its brief, there is obviously a genuine issue of material fact about how much time it takes to perform the activities at issue. The defendant does not argue that such activities are *de minimis* when they reach the five-to-ten minutes six-times-a-day level testified to by the vast majority of the deponents. Summary judgment on *de minimis* grounds has been held to involve genuine issues of material fact that are not amenable to summary judgment. *See e.g. Jordan* 542 F.Supp.2d at 810-811 ("As the process of parsing out how much time plaintiffs engage in compensable activities is fundamentally factual, and as there exist genuine issues of fact as to the application of the *de minimis* rule in this case, summary judgment on this issue is inappropriate."); *Davis*, 302 F.Supp.2d at 1323-1324; *Spoerle*, 527 F.Supp.2d at 868. .

The defendant has not offered any determinations of its own on the amount of time it takes to perform the sanitizing, donning and doffing activities at issue in this case. Its only official to testify at this stage admits that he knows of no such determination of the time necessary to perform these activities. *Mills* 143:13-144:18, 149:13-18, 150:5-18. The activities were timed by videotapes, but Mills knows of no effort to tally the resulting time shown on the tapes. The Plant Manager, Robin Stevens, also testified that he was not aware of the results of the video time studies and that he had never conducted any time studies to determine the time necessary to perform these activities. *Stevens* 126:3-20. The defendant also has not offered the videotapes themselves. This alone should preclude summary judgment on an issue for which the defendant bears the substantive burden of proof. *Spoerle*, 527 F.Supp.2d at 868 (Summary judgment denied because "defendant has adduced no evidence regarding the amount of time it takes to perform the activities at issue."); *Jordan* 542

66

F.Supp.2d at 810 ("[T]he *de minimis* analysis is complicated by the parties' dispute over the feasibility of determining the amount of time that the employees spend performing compensable pre- and post-production activities as well as variations in the amount of time spent by employees engaged in these activities.").

The defendant's argument is also mistaken on the legal standard for establishing a *de minimis* defense. That defense does not rest on the time it takes to perform each activity separately, but requires that the *aggregate* unpaid time be so little that it "cannot as a practical administrative manner be precisely recorded for payroll purposes." 29 C.F.R. §785.47; *Lindow v. United States*, 738 F.2d 1057, 1062-1063 (9th Cir. 1984); *De Ascenio.* 500 F.3d at 374  (following *Lindow*); *Jordan*, 542 F.Supp.2d at 810 (same); *Brock v. City of Cincinnati*, 236 F.3d 793, 804 (6th Cir. 2001) (same); *Reich v. Monfort, Inc.*, 144 F.3d 1329, 1333 (10th Cir. 1998) (same); *Reich v. New York Transit Auth.*, 45 F.3d 646, 652 (2d Cir. 1995) (same); *Saunders v. John Morrell & Co.*, No. C88-4143, 1991 WL 529542, at *5 (N.D. Iowa 1991 (same).

"After all, many jobs could be divided up into tasks that take only a few minutes a piece. Taken to its logical conclusion, a 'de minimis' rule that focuses only on time could swallow up an entire shift. " *Spoerle*, 527 F.Supp.2d at 869. The defendant does not address any of the three factors commonly recognized for determining whether unpaid activities are *de minimis*: (1) the administrative difficulty of recording the time spent on the activities; (2) the aggregate amount of time at issue; and (3) the regularity of the work. *Lindow*, 738 F.2d at 1062-1063. This district applied these three standards in denying summary judgment on CP's *de minimis* defense in *Davis*, 302 F.Supp.2d at 1323.

"[W]hen providing compensation for a task imposes no additional burden on the employer, there is no justification for denying the employee compensation for that task, regardless how fast the

task was performed. Any other rule would deny employees 'the just remuneration guaranteed them by the Act for contributing their time, liberty and strength primarily for the benefit of others.'" *Id.* *Spoerle*, 527 F.Supp.2d at 869. The regulation appearing in 29 C.F.R. § 785.47 states that: "An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him." 29 C.F.R. § 785.47; *see De Asencio*, 500 F.3d at 374 (same); *Spoerle*, 527 F.Supp.2d at 869 (same).

The defendant quotes the "administrative practicality" standard from §784.47 of the FLSA regulations, but has not offered any evidence of such impracticality. The only company official from which it offers testimony, Greg Mills, admits that he knows of no determination that it would be administratively impractical to record and pay for the amount of time it takes to perform the sanitizing, donning and doffing activities the company requires each day. *Mills* 147:13-148:16; *see also* Mills 117:5-118:20. No evidence of such a determination has been offered. As the defendant's spokesman, Mills admits that no one has ever attempted to determine how much time the activities at issue take. *Mills* 143:13-144:18. Without at least knowing the amount of time at issue, the defendant cannot even begin to carry its burden of establishing that it is *de minimis*. *Spoerle*, 527 F.Supp.2d at 869 ("Because defendant has not adduced any evidence that it would be difficult to compensate plaintiffs for donning and doffing the personal protective equipment, I cannot conclude that those activities are "de minimis" as a matter of law.").

Moreover, the defendant concedes that its computerized timekeeping system tracks employees' time down to a minute or less, and that it routinely checks each employee's time every day each day in order to subtract as little as one minute from their pay when they come in late. *Mills* 57:13-16, 60:19-61:5. Employees' time records are also checked daily for as little as one minute of

lateness for disciplinary purposes. *Mills* 56:14-57:16; PX5; *Gilmore* 88:19-89:14; *see also Stevens*

78:11-23; *Preston* 73:4-7. A half point demerit is given for each such tardiness, with six points

causing the employee to be discharged under the company's policy. *Id.* Summary judgment on

CP's *de minimis* defense in *Davis* was denied, in part, because the defendant "already requires its

employees to 'clock-in' prior to starting their shift, which is evidence that administrative means of

recording time spent donning and doffing clothes and protective gear exist." *Davis*, 302 F.Supp.2d

at 1323.

The defendant cannot contend that it is administratively impractical to record time when it

already does so down to as little as a minute or less. *See Saunders*, 1991 WL 529542, at *4

(rejecting administrative difficulty argument in donning and doffing case where defendant kept

"detailed records of the actual time each employee spends working in the plant."). The required

clock-in/clock out times for each employee are punched just a few feet away from the entrance to

the production room at which plaintiffs' first principal activities begin each day, so that such time

necessarily includes the activities at issue in this case. The defendant has offered no evidence for

why such clock-in/clock-out times cannot be used as the determinant of paid time. It is undisputed

that clock-in/clock-out time is already used for that purpose for various employees in the production

area, and the defendant has not offered evidence that this method of timekeeping is limited to a small

number of employees. *Mills* 59:12-60:13, 122:9-123:17; *Preston* 19:23-20:6; *Stevens* 42:15-19.

*Jordan*, 542 F.Supp.2d at 810 ("The Supreme Court has noted . . . that the precise amount of time

that can be considered *de minimis* ultimately is a question for the trier of fact.") (citing *Anderson

v. Mt. Clemens Pottery*, 328 U.S. 680, 692(1946)).

It is also undisputed that donning and doffing is performed on a regular, daily basis at the

same point in the workday — a fact which favors finding that it is administratively practical to

69

record and pay for such regularly performed work. *See Monfort*, 144 F.3d at 1334; *Saunders*,1991

WL 529542, at *6. *De Asencio*, 500 F.3d at 374; *Brock v. City of Cincinnati*, 236 F.3d 793, 805

(6th Cir. 2001) ("Nevertheless, the gross amount of time spent and its regular recurrence likely

outweigh the administrative difficulty factor, so we may fairly presume that the *de minimis* doctrine

does not apply.").

The defendant's argument about rest breaks at the end of the *de minimis* section of its brief

is confusing at best. It is unclear whether it is arguing that the unpaid time during the break is *de*

*minimis* standing alone, but if that is what is argued it is contrary to the well-established rule that the

unpaid time must be considered in the aggregate. *Davis*, 302 F.Supp.2d at 1323; *Lindow*, 738 F.2d

at 1063; *Jordan*, 542 F.Supp.2d at 810; *De Ascenio*, 500 F.3d at 374-375. Even if parsed out

separately, the plaintiffs have shown that they are required to spend between an hour forty minutes

and three hours per week on unpaid work just during their two rest breaks — an amount far greater

than the hour per week this district found not to be *de minimis* in *Davis*, 302 F.Supp.2d at 1323. *See*

footnote 35 *supra*.

If the defendant's argument at the end of the *de minimis* section of its brief is intended to

raise some other issue about plaintiffs' rest period, it does not satisfy the procedural requirement for

summary judgment imposed by the Supreme Court: "a party seeking summary judgment always

bears the initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine

issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). That has not been done

in respect to the rest period paragraph of defendant's *de minimis* argument. Plaintiffs are unable to

tell what point is being made about lunch breaks at the end of defendant's *de minimis* argument. If

the argument being made is that plaintiffs can be required to perform work during their rest breaks, that is clearly contrary to the FLSA regulations which requires that employees be "completely relieved" of all responsibilities in order to deduct the rest period from compensation as part of the continuous workday. 29 C.F.R. §785.19. This district has already rejected any suggestion that work required during a rest period can be deducted from the compensable workday in *Davis*, 302 F.Supp.2d at 1362.

## CONCLUSION

The defendant has failed to show a lack of genuine issue of material fact justify in summary judgment.

Respectfully submitted,

s/Robert L. Wiggins, Jr.
Robert L. Wiggins, Jr., ASB-1754-G-63R
Candis A. McGowan, ASB-9358-036C
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building, 301 19th Street North
Birmingham, Alabama 35203
205/314-0500, 205-254-1500 (Facsimile)

Robert Joseph Camp
The Cochran Firm - Birmingham
The Financial Center
505 North 20th Street, Suite 825
Birmingham, Alabama 35203
205/244-1115, Fax: 205/244-1171

71

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to counsel for all parties by operation of the court's electronic filing system.

This 17th day of June, 2008.

s/Robert L. Wiggins, Jr.
**OF COUNSEL**

72