# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## MONTGOMERY DIVISION

| | | |
|---|---|---|
| **BETTY ANN BURKS, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **V.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:06-CV-01081-MEF-DRB** |
| **EQUITY GROUP EUFAULA** | ) | |
| **DIVISION, L.L.C.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFFS' EVIDENTIARY SUBMISSION IN SUPPORT OF THEIR OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs submit the following evidentiary materials in support of its Opposition to Defendant's Motion for Summary Judgment:

1.  New Hire GMP Policy

2.  Good Manufacturing Practices (GMPs)

3.  Equity Group Eufaula Division, LLC, Good Manufacturing Practices, Fresh Processing, Revision Date:10-02-06

4.  Correct Hand/Glove Washing

5.  Attendance Policy

6.  General Safety #4

7.    New Hire Allergen Awareness Training, New Hire HACCP Training, and New Hire Pest Management Awareness

8.    Keystone Foods, Equity Group Eufaula Division, LLC,  - Employee Handbook (selected excerpts)

9.    Keystone Foods, Equity Group Eufaula Division, LLC,  - Employee Orientation Manual (selected excerpts)

10.    Equity Group Eufaula Division, LLC - Operating Organizational Charts

11.    Keystone Foods, Equity Group Eufaula Division - New Hire Check List and other documents

12.    Collective Bargaining Agreement - Effective March 1, 2004 - March 1, 2008 (selected excerpts)

13.    Work Rules

14.    U. S. Department of Labor, letters dated May 14, 2007 and June 6, 2007

15.    Equity Group Eufaula Division - Payroll Processing Manual (selected excerpts)

16.    Equity Group Eufaula Division, LLC - Fresh Organizational Charts, Revised Date:4-3-08

17.    Equity Group Eufaula Division, LLC - Good Manufacturing Practices, Revision Date:08-18-07

18. Equity Group Eufaula Division, LLC - Employee Orientation Manual

19. Equity Group of Eufaula, AL - 2004 Contract Proposals

20. Equity Group of Eufaula, AL - 2008 Contract Proposals

21. Defendant's Designation of Rule 30(b)(6) Deposition Witnesses

22. Purposely Omitted

23. Kronos Time Detail Reports for week ending June 9, 2008

24. Declaration of Ebone Morris

25. Declaration of Christopher Laster

26. Declaration of Patricia Jones

27. Declaration of Evelyn Lampley

28. Declaration of Laurie Delbridge

29. Declaration of Betty Jean Young

30. *M. H. Fox, et. al. v. Tyson Foods, Inc.*, 4:99-cv-1612-VEH (N.D. Ala. 2007) - Docket Number 659 - Order on Motion to Reconsider

31. Jury Verdict in *Teresa Brothers v. Tyson Foods, Inc.*; 4:06-cv-4676-VEH - Docket Number 164

32. Deposition of Jacqueline Davis (selected excerpts)

33. Deposition of Kathy Gilmore (selected excerpts)

34. Deposition of Greg Mills (selected excerpts)

35.    Deposition of Robin Stevens (selected excerpts)

36.    Deposition of Joseph Preston (selected excerpts)

Respectfully submitted,


/s/Robert L. Wiggins, Jr.
Candis A. McGowan, ASB-9358-036C
Robert L. Wiggins, Jr., ASB-1754-G-63R
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building, 301 19th Street North
Birmingham, Alabama 35203
Telephone: 205/314-0500
Facsimile: 205-254-1500

4

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to counsel for all parties by operation of the court's electronic filing system.

This 17th day of June, 2008.

/s/ Robert L. Wiggins, Jr.
Robert L. Wiggins, Jr.

5

# EXHIBIT 1

# New Hire GMP Policy

## Purpose

The following GMP's were established to minimize the introduction of bacteria, contaminants, or foreign material into our manufacturing environment and must be adhered to by all team members and visitors while in production areas including coolers, shipping, and receiving docks.

## Policy

Everyone entering the facility and production facility must observe the GMP requirements (Team Members, visitors, contractors, and etc) must adhere to the procedure outlined herein.

## Frequency

To be followed at all times.

## Responsibility

The Quality Assurance Department primarily administers this program. The QA Manager is responsible for the review and application of these procedures. The Department Managers, Supervisors Coordinators are primarily responsible for the training, implementation and maintenance of these procedures. Every Team Member is responsible for ensuring that the GMP policy is followed diligently.

## DEFINITION

> *"Processing Area"* – all areas of product handling to include hallways, coolers, and shipping/receiving docks.

## GENERAL REQUIREMENTS

1. All team members and visitors must maintain a high degree of personal cleanliness to prevent contamination of food products.

2. All team members and visitors must wash and sanitize hands before starting work, after each absence from the work area, after visiting the restroom and at any other times whereby hand become soiled or contaminated.

E 633

4

3. People known, or suspected, to be suffering from, or to be a carrier of a disease or illness to be transmitted through food should not be allowed to enter any food handling area if there is a likelihood of their contaminating food. Any person so affected should immediately report illness or symptoms of illness to the management. Conditions which should be reported to management so that any need for medical examination and/or possible exclusion from food handling can be considered, include: Jaundice, diarrhea, vomiting, fever, sore throat with fever, visibly infected skin lesions (boils, cuts, etc) discharges from ear, eye or nose. (Section 7.1,7.2 of Codex Alimentarius)

4. All team members and visitors shall be clean shaven, or wear restraints over beards and mustaches.

5. Do not wear smocks outside the facility. Carrying garment over arm, etc., is permitted. Smocks may only be worn in at the Further Processing plant hallway and offices.

6. The wearing of beards within production facilities is permissible providing:

   - Any facial hair shall be covered with a plant supplied restraint.
   - Appropriate facial hair covering shall be of a tight mesh and be worn in such a manner as to contain all facial hair.
   - Facial hair coverings are to be worn at all times in all production areas.

7. A solid (non-mesh) hair net must be worn to contain the hair as completely as possible. Scarves, bandannas, barrettes, etc., may be worn neatly under the hair net.

8. Keep hands and fingernails clean. Keep fingernails properly trimmed.

9. If fingernail polish or false fingernails are worn, gloves must cover hands in any production area including box rooms, shipping/receiving, dry storage, product storage.

10. No jewelry is allowed inside the processing area earrings, facial jewelry, wristwatches, and other jewelry shall not be worn in any production area. Any body piercing of the ears, eyebrows, nose, tongue, etc. *is considered jewelry and is prohibited.* (The only exception is plain wedding band with no stone setting), Medic alert identification is exempt from the jewelry clause.

11. Clothing must be clean at start of operation and kept reasonably clean during operation.

12. A clean smock must be obtained daily. Smocks are to be changed during the shift if needed. Smocks must fasten or tie properly to cover street clothes. Smocks *may not* have sewn on buttons or an external upper pocket.

E 634

5

13. Plastic sleeve covers will be worn to cover any street clothes that extend beyond smock coverage on the arms when handling product.

14. Internal or external pockets above the waist are not allowed. Items with clips may not be attached to garment necklines.

15. Smocks shall not have button closures.

16. Maintain gloves used for handling food and food contact packaging supplies intact and in a sanitary condition.

17. Gum, candy, cough drops, and tobacco products are not permitted in any production area. Employees shall not hold toothpicks, match sticks, or similar objects in mouth while on the job. Pencils, cigarettes, or other objects held behind ears are forbidden.

18. Maintain lockers clean and fee of trash or soiled clothing.

19. No food or beverages are allowed in production areas or lockers.

20. Don't use hands or equipment for practices which may result in contamination of food products. Such practices include but are not limited to:

    *    touching face, wiping forehead
    *    Scratching head or body
    *    Placing fingers on/or in mouth, nose, or ears

    Should a team members and visitors hands contact the above areas, their hands should be washed and sanitized prior to resuming work.

21. Avoid uncontrolled, uncovered coughing or sneezing. Leave food areas if excessive coughing or sneezing occurs until it ceases. Sanitize hands afterwards. Use the upper arm to cover mouth when coughing or sneezing.

22. All team members and visitors shall not handle product with cuts and open sores in fingers/hands unless covered by Band-Aid. A glove shall be worn over any bandaging.

23. All hearing protection devices shall be worn in a manner to preclude introduction into product. (i.e. No individual loose earplugs)

24. No cell phones in the processing area.

E 635

25. Absolutely no Spitting anywhere in the processing area is prohibited.

26. The carrying of items (e.g. pens, pencils, note pads, etc.) in external upper pockets or clothing is not allowed.

27. No personal belongings are allowed in the processing areas

28. Rubber gloves must be kept clean.

29. Smocks, hairnets, and beard nets must be removed before exiting the facility. _The only exception is during an emergency evacuation._

30. No baseball style caps are to be worn in processing areas to include coolers, shipping and receiving docks.

31. All trash will be disposed of in appropriate receptacles.

32. Any item that becomes contaminated must be washed and sanitized before being placed back into use. Processing tools and utensils are, but not limited to the following items: pens, calculators, thermometers, clipboards, pans, edible totes, edible shovels, earplugs, maintenance tools, etc.

33. Only approved footwear shall be worn in the processing area to include coolers, shipping, and receiving docks. Rubber boots are available at the Supply and may be cut down, but cannot be left where they are hanging loose or flapping over. _Do not cut below the ankle._ The Further processing plant is permitted to wear footwear with slip resistant soles and _No tennis shoes_ will be allowed in the production areas at both plants.

34. All equipment (pallet jacks, forklifts, and etc.) and utensils used for handling edible product will be of such material will be maintained in a manner necessary to prevent the creation on unsanitary conditions

35. If hoods are worn on your head they must be covered with a hair net. In this sequence: 1. Hair net. 2. Hood. 3. Hair net.

36. **_NO SMOKING ALLOWED IN THE BUILDING._** Smoking will be allowed only in the designated smoking areas OUTSIDE the Evis patio break area, Debone patio break area, Further processing break patio area, and the Admin patio area. Food will be allowed in these areas and placed in the appropriate receptacles.

37. Paper clips, thumbtacks, newspapers, magazines, cell phones, or any unnecessary electronic devices (such as MP3 radios) or any glass items are not permitted in the production area.

E 636          7

38. No personal items are to be stored in clipboards such as personal pictures, unauthorized pens, and etc.

39. Lockers must be cleaned out the last scheduled workday of each week to allow the Sanitation Team to clean and sanitize over the weekend. Anything left in a locker will be discarded.

40. Inedible totes may be stacked inside each other. Boxes may be stacked top to top. Any time boxes or totes are placed on any other clean surface that surface will become contaminated.

41. No glass objects for personal use are allowed beyond the front administrative offices including the break room. No glass containers of any form shall be taken into the production areas. **No glass shall be brought into the facility in employees' personal effects. All breakage of eyeglasses and lost contact lenses must be reported to Quality Assurance.**

42. Waste paper or trash is to be discarded only in the proper containers and not to be thrown on the floor or ground.

43. Only company issued metal writing tools with engraved identification are permitted in the processing area. **NO rubber or foam pen grips added to pen in processing areas.**

44. Do not use any equipment or tools that have a wooden handle.

45. Only approved tools may be used by Equity Group-Eufaula Division employees in the production areas. Approved tools are tools that are issued by Equity Group-Eufaula Division with identification engraved on tool. Examples of non-approved tools: pocketknives, fingernail clippers, etc.

46. Work stands (ergo stands) are to be adjusted by management or floor persons only.

47. During production do not use high-pressure hoses to wash floor and avoid splashing of water on to clean product or product contact areas.

48. When not in use, water hoses must be neatly coiled and stored on hangers with nozzles off the floor.

49. Never place clean parts, belts, tools, or trays on the floor or on a catwalk or any surface that will be walked on.

8

E 637

50. Contaminated boxes and liners will be discarded.

51. Safety in all phases of work is the first consideration in any job and all necessary
precautions must be taken to prevent accidents.

52. Packaging materials (vat liners or box liners) shall not be used as aprons.

**The above GMP's will be strictly enforced. Any one failing to follow the policy
outline will be subject to being corrected immediately, possible disciplinary
action up to and including termination.**

E 638        9

# EXHIBIT 2

# EQUITY GROUP - EUFAULA DIVISION, LLC

**Confidential Commercial Information**

## GOOD MANUFACTURING PRACTICES (GMP'S)

1. Always remove your smock, gloves, and apron before exiting production areas.
2. Always wash your hands after using the bathroom.
3. Always use protective gloves when using knives and scissors.
4. When touching an inedible container or anything on the floor, you must wash your hands, gloves, and apron before returning to work or touching any product.
5. Always wear hairnet, earplugs, and a beard net (if you have facial hair) while in the plant.
6. Always remember that edible product pans/totes/or boxes must never sit directly on the floor, they must be placed on stands.
7. Always hang apron and smocks on racks.
8. Always put your gloves, arm guards and plastic sleeves in an area provided for such items.
9. Always contact your supervisor if you have problems or questions.
10. Always make sure all products, packaging supplies and boxes are covered properly, especially at break and during a wash down.
11. Always make sure paper towels, soap, and trash receptacles are available at hand wash sinks.
12. Always put trash in containers marked "TRASH."
13. Always make sure doors are kept closed. Special attention should be given to doors that open to the outside of the plant.
14. All combos and barrels must be labeled edible or inedible.
15. The only place to dress with smocks, aprons, and gloves is in the processing area.

<br>

1. Do not eat, chew gum or tobacco, wear jewelry (wedding bands with no stones are acceptable), or smoke in the plant.
2. Do not pick product up of the floor unless you have been properly trained to do so. If you do, then you must wash your hands, gloves, sleeves, and apron before returning to work.
3. Do not remove product from condemned cans.
4. Do not put inedible or dirty product in edible totes/pans/or boxes.
5. Do not use boxes or lids that have fallen on the floor if they do not have a wax coating. Boxes and lids that fall on the floor can be rinsed off and used only if they are wax coated.
6. Do not wear your smock outside of the plant, in the breakrooms, bathrooms, or hallways.
7. Do not put trash or condemned products in any container unless it is clearly marked or labeled for such.
8. Boxes should not be used to hold condemned product.

SIGNATURE _Mary Allen_

13                                                    E 955

# EXHIBIT 3

| Equity Group-Eufaula Division, LLC P-20322 | Initial Issuance: 3/15/04 |
|---|---|
| Good Manufacturing Practices | Revision Date: 10/2/06 |





# EQUITY GROUP
# EUFAULA
# DIVISION, LLC

# GOOD MANUFACTURING
# PRACTICES

Fresh Processing
P-20322
57 Melvin Clark Rd.
Baker hill, Al 36027

Issue Date: 3-15-04
Revised Date: 10-2-06

E 161

Fresh Good Manufacturing Practices                    1

| Equity Group-Eufaula Division, LLC P-20322 | Initial Issuance: 3/15/04 |
|---|---|
| Good Manufacturing Practices | Revision Date: 10/2/06 |

# EQUITY EUFAULA DIVISION, LLC

## Signature Page

## GOOD MANUFACTURING PRACTICES

_____          10-2-06
     Signature                                  Date
Greg Mills, Operations Manager

_____          10-2-06
     Signature                                  Date
Butch White, Complex QA Director

E 162

Fresh Good Manufacturing Practices                              2

| Equity Group-Eufaula Division, LLC P-20322 | Initial Issuance: 3/15/04 |
|---|---|
| Good Manufacturing Practices | Revision Date: 10/2/06 |

# REVISION PAGE
## Good Manufacturing Practices

| Revision Date | Reason for Revision |
|---|---|
| 3-15-04 | Initial Issuance –Date of Plant started up after Keystone Foods LLC purchased |
| 8-29-06 | Added GMP #29 was added about pallet jacks. |
| 10-2-06 | Added word clarity GMP #29. Added hairnet and beard nets to GMP#17. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

E 163

| Equity Group-Eufaula Division, LLC P-20322 | Initial Issuance: 3/15/04 |
|---|---|
| Good Manufacturing Practices | Revision Date: 10/2/06 |

## Purpose

The following GMP's were established to minimize the introduction of bacteria, contaminants, or foreign material into our manufacturing environment and must be adhered to by all employees and non-employees while in production areas including coolers, shipping, and receiving docks.

## Policy

All Team Members and visitors entering the production facility must adhere to the procedure outlined herein.

## Frequency

To be followed at all times.

## Responsibility

The Quality Assurance Department primarily administers this program. The Complex QA Director is responsible for the review and application of these procedures. The Department Managers, Supervisors Coordinators are primarily responsible for the training, implementation and maintenance of these procedures. Every Team Member is responsible for ensuring that the GMP policy is followed diligently.

## DEFINITION

> "*Processing Area*" – all areas of product handling to include hallways, coolers, and shipping/receiving docks.

1. Hairnets will be appropriately worn to cover and contain hair.
2. Beard nets must be worn to cover *any facial hair.*
3. A clean smock must be obtained daily. Smocks are to be changed during the shift if needed. Smocks must fasten or tie properly to cover street clothes. Smocks *may not* have sewn on buttons or an external upper pocket.
4. Plastic sleeve covers will be worn to cover any street clothes that extend beyond smock coverage on the arms when handling product.

E 164

| Equity Group-Eufaula Division, LLC P-20322 | Initial Issuance: 3/15/04 |
|---|---|
| Good Manufacturing Practices | Revision Date: 10/2/06 |

5.  No jewelry is allowed inside the processing area.  Any body piercing of the ears, eyebrows, nose, tongue, etc. *is considered jewelry and is prohibited.*  The only exception is a plain wedding band with no stone settings.

6.  Wristwatches are not to be worn in the processing area at any time.

7.  All clothing worn in the plant must be clean and in good repair. Consideration should be given to loose threads of clothing to prevent foreign-object issues in product.

8.  Rubber gloves must be kept clean.

9.  Smocks, hairnets, and beard nets must be removed before exiting the facility.  The *only* exception is during an emergency evacuation.

10.  All false fingernails and / or fingernail polish must be covered at all times while in the processing areas.

11.  No baseball style caps are to be worn in processing areas to include coolers, shipping and receiving docks.

12.  All trash will be disposed of in appropriate receptacles.

13.  No open sores or cuts in the processing area.

14.  No food or beverages are allowed in production areas.

15.  Use of tobacco, chewing gum, and candy is strictly prohibited in production areas.

16.  Spitting is not allowed.

17.  No smocks, aprons, sleeve covers, arm guards, hairnets, beard nets or any type of glove are allowed in the restrooms.

18.  The carrying of items (e.g. pens, pencils, note pads, etc.) in external upper pockets is not allowed.

19.  No glass objects for personal use are allowed beyond the front administrative offices including the break room.

20.  No cell phones in the processing area.

21.  Personal items are not to be stored in the processing area.

22.  Only approved, plant issued, metal pens are allowed for use in production areas.

23.  Before exiting a restroom, all employees or non-employees *must* wash their hands with sanitizing soap and water.

24.  Upon entering production areas, all employees and non-employees *must* wash their hands with sanitizing soap and water.

25.  People known, or suspected, to be a carrier of a disease or illness to be transmitted through food should not be allowed to enter any food handling area if there is a likelihood of their contaminating food. Any person so affected should immediately report illness or symptoms of illness to the management. Medical examination of a food handler should be carried out if clinically or epidemiologically indicated. Conditions which should be reported to management so that any need for medical examination and/or possible exclusion from food handling can be

| Equity Group-Eufaula Division, LLC P-20322 | Initial Issuance: 3/15/04 |
|---|---|
| Good Manufacturing Practices | Revision Date: 10/2/06 |

considered, include: Jaundice, diarrhea, vomiting, fever, sore throat with fever, visibly infected lesions (boils, cuts, etc) discharges from ear, eye, or nose. ( Section 7.1, 7.2 of Codex Alimentarius)

26. Hands _must_ be washed with sanitizing soap and water after handling inedible product, inedible containers, and picking up items from the floor, handling pallets or any other unclean surfaces before handling of product or product contact surfaces can take place.

27. Any item that becomes contaminated must be washed and sanitized before being placed back into use.  Processing tools and utensils are, but not limited to the following items:  pens, calculators, thermometers, clipboards, pans, edible totes, edible shovels, earplugs, maintenance tools, etc.

28. Only approved footwear shall be worn in the processing area to include coolers, shipping, and receiving docks. Rubber boots are available at the Supply and may be cut down, but cannot be left where they are hanging loose or flapping over.  Do not cut below the ankle. No tennis shoes will be allowed in the production areas.

29. All equipment (pallet jacks, forklifts, and etc.) and utensils used for handling edible product will be of such material will be maintained in a manner necessary to prevent the creation on unsanitary conditions.

The above GMP's will be strictly enforced. Anyone failing to comply with these procedures will be subject to disciplinary action up to and including termination.

E 166

# EXHIBIT 4

# CORRECT
# HAND / GLOVE
# WASHING

1.  WET HANDS.

2.  USE ABOUT A DIME SIZE AMOUNT OF SANITIZING SOAP.

3.  RUBBING HANDS TOGETHER FOR AT LEAST 10 SECONDS, WASHING ALL PARTS OF HANDS AND WRIST.

4.  RINSE WITH A LOT OF WATER.

5.  DRY HANDS THOROUGHLY.

6.  REPEAT PROCEDURE FOR GLOVED HANDS.

S 3243

# G.M.P.S

*Floor person only does floor work, no work on the line.
*No Jewelry allowed.
*Hair nets & beard nets must be worn.
*Any equipment used or worn must be washed or replaced if it comes in contact with floor.
*Prior to Break Room & Bathroom visits smocks/apron/gloves must be removed.
*No Smocks are to be worn outside the plant.
*Maroon smocks must be worn in fully cooked areas.
*Hands must be washed before going to the line.
*Water hoses (black for floor, clear for machines) must be on racks when not in use.
*All product in plant must be labeled.
*Persons working on a Par Fried Line cannot randomly visit persons working on a  Fully Cooked Line.
*No boxes are to be set on open products to be used.
*Foot stands cannot be used for tote stands.
*Gloves/sleeves must be worn when handling food products.
*Pallets must not be walked on.
*V-Megs/Combos/Totes must be washed out when changing from one product to another.

S 3244

**ENTERING LINE TIME (EVERY MONDAY) FOR MASTER CARDS**

You will enter the in punch for all of the mastercards on first and second shifts. The supervisors over that department will clock out the cards.

To do:

Kronos:

Reconcile Timecard
Show: Line Time Supervisors (all the way down)
Time Period-previous
Actions-Select all
Timecard---see what time they come in
Time Period---current week
Enter in time
Save

Arrow over to the next sheet and continue on until all in punches for MASTERCARDS ONLY are entered.

If there is no time set up under the previous week then the dept is not in use.

In times:

| | | | | |
|---|---|---|---|---|
| 1st | Debone and Packout | 7:30am | 2nd | 4:30pm |
| 1st | EVIS | 5:50a and 6a | 2nd | 250p and 3p |

E 739

# EXHIBIT 5

## ATTENDANCE POLICY

As an employee of Equity Group Eufaula you are expected to be regular in attendance and punctual. Regularly scheduled attendance by all employees is mandatory. Any tardiness or absence causes problems for your fellow employees and your supervisor.

As part of meeting performance standards, represented employees are expected to work as scheduled during Equity Group Eufaula business hours or their scheduled shift. Employees are required to notify the Company as soon as possible but no later than within the first hour of their shift if they will be absent or late for work where he or she may be reached. Employees with unscheduled absences are required to contact their supervisor or on each days of his or her absence.    The number to call in to report any absence is **1-877-573-8127.**

On each day of absence, employees not previously excused are required to call the absence reporting number at **1-877-573-8127** as soon as practical giving the following information:  (1) Employee's Name, (2) Reason of Absence, (3) Expected Return Date and (4) Name of Person Calling.

This policy will set the requirements and corrective action schedule for absenteeism, late arrival, early departure, Weekend/Holiday work and important definitions for absences and occurrences.

**Accumulation of six (6) points will result in voluntary separation from the Company.** Each day of absence equals one (1) point or if proper documentation is supplied each occurrence will equal (1) point (i.e. Two (2) to four (4) consecutive days' absence with a doctor's statement will equal one (1). For five (5) of more days leave of absence should be applied for in advance whenever possible). Documentation must be supplied the day the employee returns to work. If documentation is not presented, point will be accumulated for each day's absence. Additional points may be incurred as follows:

- Arriving to work late and otherwise failing to be ready to work at your designed start times equals one-half (1/2) point.
- Leaving work early (after lunch break) equals one-half (1/2) point.
- An employee missing more than four hours per day equals one (1) point
- An absence which occurs when scheduled to work on Saturday, Sunday or a holiday the occurrence will be doubled.

When an employee has worked forty-five (45) calendar days with perfect attendance one (1) point will be subtracted from any points that have been accumulated.

Approved absences pursuant to the following leave policies are not counted against the employee for purposes of this attendance policy.

- Funeral Leave
- Jury Duty
- Subpoenaed Witness (not as a Defendant or Plaintiff)
- Worker's Compensation
- Military Leave
- FMLA Leaves

E 628

- Approved Unpaid Leaves of Absence

When unscheduled absences indicate a potential pattern, management may request further information regarding such absences and may require medical certification for any future occurrence. Excessive absences, falsification of reason for any absence, failure to provide medical documentation when required, or unauthorized time away from the Company during working hours may result in corrective action, up to and including termination. Failure to call in or report to work for two consecutive days or shifts is considered job abandonment.

The Company will comply with applicable laws relating to time off from work, but it is the employee's responsibility to provide sufficient information to enable the Company to determine if any such law(s) applies to the absence. Employees should keep in touch with their supervisor and notify the Company of any change in their status as soon as possible. Individuals with disabilities may be granted reasonable accommodation in complying with these policies if undue hardship does not result to the Company's operations. Regular attendance and promptness are considered part of an employee's essential job functions. Attendance records are examined when an employee is being considered for promotional opportunities.

E 629

# EXHIBIT 6

# GENERAL SAFETY
# #4

1. Don't put your hands in to any moving equipment.
2. Don't clean out any moving equipment, you must be trained on LOCK OUT AND TAG OUT.
3. No horse playing
4. Know your surrounding. Always listen and look before walking.
5. You are required to wear safety glasses and ear plugs when entering the process area.
6. When ever you are using a knife or scissors, you must be wearing a chain glove and arm guard.
7. Always ask your Supervisor or Superintendent if you have any safety questions.
8. Watch where you are walking so to avoid slip, trips and falls. Always watch where you are placing your feet, to avoid slipping. Do not step on any product; this will cause you to slip down.
9. Everyone is responsible for keeping there areas clean. Pay attention to the work you are doing.
10. Only trained employees are to handle chemicals, they are to wear the required safety equipment.
11. Evacuation of the plant is for your safety, walk up the driveway. Do not walk through the park cars. This is to prevent damage to employee's cars.
12. Be carefully when working or on break, don't take chances.
13. Respect the people you are working with and they are to respect you.
14. Do not step over the chains that surround the picnic tables or the nurse's station.
15. When operating pallet jacks or fork lift, you must follow the operating procedures. Watch where you are going with the jack.
16. You should work cautious and don't taking anything for granted.
17. Use proper lifting techniques.

E 639

4/17/2007

# EXHIBIT 7

# New Hire Allergen Awareness Training

**Allergen** – A protein that will produce an immune response in sensitive individuals.

**Food Allergy** – An immune response to a food that the body mistakenly believes is harmful.

**According to estimates:**
- 11-12 million people in the U.S. suffer from food allergies
- 150-200 people die each year from food allergies.

**"The Big 8" in the United States**
Milk, Eggs, Soy, Wheat, Peanuts, Tree Nuts, Shellfish, Fish

**Allergenic Tree Nuts**
Almonds, Cashews, Brazil Nuts, Pistachios, Macadamia Nuts, Walnuts, Pecans, Hazelnuts, Pine Nuts

**Why so Much Concern?**
- The potential impact of severe reactions
- Increased attention by Government Regulatory Agencies
- Increased number of Recalls
- The threshold dose is very low

**Allergen Control Programs**
- **Assessment of Raw Materials and Ingredients** – Avoid using allergenic ingredients if others will work just as well
- **Production Scheduling** – Minimize potential for cross contamination
- **Cleaning of Equipment** – Establish appropriate procedures for cleaning – SOP's
- **Training** – Awareness and specific to job functions
- **Labeling** – Manufacturers are required to identify in "Common Language" the presence of any of the eight major food allergens

E 630

1

# NEW HIRE HACCP TRAINING

**HACCP** is an acronym that stands for *Hazard Analysis Critical Control Points.*

**HACCP is a system of food control based on prevention. In identifying where the hazards are likely to occur in the process, we have the opportunity to put in place the measures needed to prevent those hazards from occurring.**

**There are 7 Principles of HACCP:**
1. Conduct a hazard analysis-Identify and evaluate all potential Biological, Chemical, and Physical food safety hazards.
2. Identify critical control points-a point, step, or procedure in the production process at which control can be applied to prevent, eliminate, or reduce a food safety hazard to an acceptable level of safety before the product leaves the company.
3. Determine critical limits for each CCP-boundaries of safety for each CCP to control the identified food safety hazard.
4. Develop monitoring procedures-a planned sequence of Observations or measurements to make sure the CCP is under control.
5. Establish corrective actions-a procedure to be followed when monitoring indicates that there is a deviation from an established limit at a CCP.
6. Perform verification procedures-activities verify that The HACCP plan is adequate to control food safety hazards and that the system is operating as intended.
7. Develop an effective record keeping system-documents that the HACCP system is operating according to the written plan.

H.\CCP is a proven system, and if properly applied will give confidence that `ͻͼ ͺ` safety is being managed effectively.
`.ͷͳ` l enable you to focus on food safety as a top priority.

E 631

2

# New Hire Pest Management Awareness

**Pest Management** – those actions which result in the exclusion of pests from food processing or storage facilities and the detection and elimination of pests already present in the facility. Pest Management encompasses Pest Control activities such as baiting and pesticide application while addressing long-term objectives such as excluding pests from facilities and modifying buildings and the grounds to make them unattractive to pests.

## Goals of Pest Management
- Prevent contamination of food products by pests or chemicals used in their control
- Reduce pesticide exposure for customers
- Keep pests out of the facility and away from the outside of the facility
- Deprive pests of food, water, and shelter

## Common Target Pests
- Cockroaches – Can live up to 2 years, leave signs of infestation, prefer to hide and lay eggs in dark places, typically nocturnal
- Flies – Prefer places protected from wind
- Rodents – Typically travel along walls or fences, usually nocturnal
- Birds – Look for droppings or nesting materials
- Other Insects – (moths, beetles, ants, and spiders)  Can infest dry ingredients

## Major Causes of Pest Problems
- Poor House Keeping Practices – garbage handling, leaking dumpsters, poor food storage practices
- Poor Maintenance of Buildings and Grounds – weak, crumbling masonry or gaps around pipes, weeds along fences or buildings, poorly fitting doors or windows

**All pest sightings should be reported to your Supervisor or the QA department and recorded in the "Pest Sighting Log."**

E 632

3

# EXHIBIT 8



**KEYSTONE FOODS** LLC

*Equity Group Eufaula Division, LLC*

# EMPLOYEE HANDBOOK

E 516

## WELCOME

Welcome to Equity Group Eufaula Division. We are happy you chose to join our team! Teamwork will be crucial to your success here because every job and every person is important. Our collective efforts will determine our future success.

**SAFETY IS A PRIORITY.** It is essential that you become involved. Join a safety committee, provide input during safety audits, report unsafe conditions to a manager, and always maintain high awareness of safety for yourself and your fellow employees. One bad decision by one individual can affect the safety of that person and even others. Likewise a good decision does the same but in a positive way! Please make every effort to make good, safe decisions. Safety should always be the most important issue of your day – everyday.

**QUALITY IS ABSOLUTE.** We produce high quality and wholesome products. Know your job requirements and take pride in your work. Our success is dependent upon producing a better product than our competition. Always keep in mind that it may be your loved one buying our product.

Each of us will probably spend more waking hours at work than anywhere else. Sometimes our work can be difficult, but it can also be rewarding. My commitment to you is to provide a safe and respectful work environment with competitive wages, excellent benefits, and stability, so you can enjoy long-term success.

Please commit yourself to dependability, safety awareness, and a high quality conscience. Again, thanks for choosing Equity Group Eufaula Division as your employer. I wish you a long and rewarding career.

Spence Jarnagin
General Manager

2                    E 517

## TABLE OF CONTENTS                    E 518

**Employment Policies**
Employment At Equity Group is At-Will ..........................Page    4
Equal Employment Opportunity Policy............................Page    4
Anti-Harassment Policy ....................................................Page    5
Substance Abuse and Prevention Policy ..........................Page    7
Non-Retaliation Policy.....................................................Page    16
Corrective Action Policy..................................................Page    16
Work Rules and Regulations............................................Page    17
Attendance Policy ............................................................Page    20
Employment of Relatives and Others
    With Close Personal Relationships Policy ....................Page    22
Non-Solicitation and Distribution Policy .........................Page    23


**Employment Practices and Procedures** ..........................Page    23
Introductory Period ..........................................................Page    23
Immigration Compliance .................................................Page    24
Notification of Changes ...................................................Page    24
Rehire Policy....................................................................Page    24
Length of Service .............................................................Page    24
Overtime...........................................................................Page    25
Report Time Pay Policy ...................................................Page    25
Shift Differentials............................................................Page    26
Temporary Rate of Pay ....................................................Page    26
Management Rights ..........................................................Page    26
Garnishments....................................................................Page    26
Meal and Rest Periods .....................................................Page    27


**Employee Benefits** .........................................................Page    27
Holidays ...........................................................................Page    28
Birthday Holiday ..............................................................Page    28
Personal Holiday ..............................................................Page    29
Vacation Policy ...............................................................Page    29
Benefit Programs..............................................................Page    29
Health Insurance ..............................................................Page    29
Sickness & Accident Insurance........................................Page    30
Consolidated Omnibus Reconciliation Act (COBRA) ......Page    30

401(k) Plan .............................................................Page   30
Social Security ......................................................Page   31
Family and Medical Leave ....................................Page   31
Military Leaves ......................................................Page   32
Jury Duty Leave .....................................................Page   32
Bereavement Leave ...............................................Page   33

**Company Facilities** ...........................................Page   34
Safety .....................................................................Page   34
Prohibition of Workplace Violence ......................Page   34
Employee Property ...............................................Page   35
Visitors ..................................................................Page   35
Security .................................................................Page   35
Identification Badges ...........................................Page   36
Code of ethics policy ...........................................Page   36

**Safety** .................................................................Page   37
Chemical Right-to-Know .....................................Page   37
Hazardous Chemical Rules ..................................Page   38
Emergency Response Planning ............................Page   39
Hazardous Materials Response Team ..................Page   39
General Safety Rules.............................................Page   40
Conservation ........................................................Page   43
Inclement Weather Procedures.............................Page   44
Safe Lifting Procedures........................................Page   45
Knife Safety ..........................................................Page   46
Lockout/Tagout Policy .........................................Page   47
Powered Industrial Truck Safety..........................Page   47
Reporting Accidents and Illnesses ......................Page   50
Reporting Safety Hazards or Complaints .............Page   50

E 519

## ABOUT THIS HANDBOOK

This employee handbook contains information about the employment policies and practices of Equity Group – Eufaula Division LLC. (hereinafter referred to as "Equity Group Eufaula" or the "Company"). We expect each employee to read this handbook carefully, as it is a valuable reference for understanding your job and this Company. This handbook will assist you in finding the answers to questions you may have and to familiarize you with the Equity Group Eufaula philosophy, policies, guidelines and employee benefits. This handbook is only intended to provide a summary of the policies and benefits of Equity Group Eufaula. The policies and practices contained in this handbook apply to all Equity Group Eufaula employees.

This handbook supersedes all other previously distributed handbooks and any inconsistent policy statements, oral or written. Although every effort has been made to make this handbook as comprehensive as possible, it cannot answer every question or anticipate every situation. Our business is ever changing and our policies, procedures, and benefits may be changed from time to time. The Company reserves the rights to modify, rescind, delete or add to the provisions of this handbook, with the exception of the employment at-will policy. All such revisions, deletions or additions must be in writing, and employees will be notified. The Personnel Policy manual will always take precedence over the Employee Handbook.

Your supervisor and your Human Resources representative will be your best resource for information. We welcome your interest and will do our best to give you a prompt response.

E 520

3

1. Unsatisfactory work performances, including but not limited to, carelessness, neglect of duty, failure to maintain established performance standards, and willful waste of supplies or materials.

2. Excessive or habitual absenteeism or tardiness as defined in the Attendance Policy.

3. Being absent for two (2) consecutive days without notifying your supervisor.  NOTE:  An employee who has violated this rule will be considered to have voluntarily terminated his/her employment with Equity Group Eufaula

4. Insubordination, including but not limited to, failure or refusal to follow instructions or directions of a supervisor or management representative, direct or implied.

5. Fighting or provoking a fight.

6. Horseplay, harassment of any employee, physical assault on any person, or any act that could cause harm to an individual or damage to Company property.

7. Use of abusive, profane, threatening or insulting language.

8. Using and/or possessing and/or distributing illegal drugs and/or alcoholic beverages and/or illegally or improperly using otherwise legal and/or prescription drugs on or in all workplace premises, vehicles, offsite locations, or otherwise while on duty and/or participating in any other conduct which violates Equity Group Eufaula's Drugs and Alcohol Policy.

9. Bringing, possession or using weapons or explosives on or about Company premises or assignment location.

10. Immoral conduct, indecency, improper behavior or improper dress on or about Company premises or assignment location.

11. Failing to wear Safety Equipment and/or required clothing/uniform.  In addition to any prescribed discipline, an employee violating this policy may be forced to leave the facility until the Company dress code is met.

E 535

12. Gambling, participating in games of chance or loan sharking on Company premises or assignment location.

13. Failure of an employee to be at his/her appointed work station and ready to work at his/her scheduled starting time.

14. Leaving assigned work area or Company premises during working hours without supervisory permission.

15. Failure to work scheduled overtime unless excused.

16. Falsification or improper filling out of any work records, work reports, work documents, expense reports, personnel records, employment applications, time cards, injury claims or reports, and/or any other Company record of your own or of another employee.

17. Clocking in or out for another employee without prior written authorization from a Supervisor.

18. Violation of safety rules and/or policies.

19. Willful damage or destruction or theft of company property, tools, and/or equipment, whether leased or owned, or property of another employee.

20. Misusing, unauthorized using or removing from the premises without proper written authorization. Company property, whether leased or owned, records, materials or the property of another employee.

21. Unauthorized carrying of passengers in Company vehicles or equipment whether leased or owned.

22. Failing to report any inoperable equipment, unsafe equipment or equipment malfunction to your immediate supervisor.

23. Failing to report any injury or accident to your supervisor.

24. Interfering with the work of others.

**19**                    E 536

## COMPENSATION

Hourly employees of Equity Group Eufaula are normally paid on a weekly basis with Friday considered as payday. Employees' payroll checks will be given to their immediate supervisor for distribution. Should any questions arise concerning your compensation, consult with your immediate supervisor or the Human Resources Department.

The hours that an employee works is calculated by either the employee's scanning of his/her own time card before the commencement of the work period and immediately at the end of the work period, or by the hours of work indicated by the Master Card line time. Accurately recording all of your time is required in order to be sure that you are paid for all hours worked.

### Overtime

As necessary, employees may be required to work overtime. Non-exempt employees will be compensated at one and one-half (1 1/2) times the individual's regular rate of pay for all hours worked in excess of forty (40) in the workweek, except where otherwise required by state law and does not include hours payable for holidays, vacation, sickness, leave of absence, or premium pay. Compensatory time will not be offered to or used by employees in lieu of overtime pay.

### Report Time Pay Policy

Report time pay is payment for non-exempt employees of four (4) hours pay by the Company under circumstances for time not worked. Employees who report for work at the commencement of a scheduled shift without having been given reasonable notice of a change in schedule shall be given a minimum of four (4) hours work, except in cases where work cannot be provided due to circumstances beyond the Company's control.

Report time pay will not be paid to employees in instances where an employee makes a request to leave work early for personal reasons, to employees on standby status or to employees who are called to perform standby work on nonscheduled time. The report time pay requirements also do not apply when an employee is sent home early or is discharged as a result of a disciplinary action.

25

E 542

The Company reserves the unrestricted right to suspend or curtail the operation of the plant and to discontinue processes, products, and department in whole or in part whenever in its judgment conditions warrant such suspension, curtailment, or discontinuance.

If the company should sub-contract any portion of its business, any displaced employees would be offered a position, by seniority, for which they are qualified.

## GARNISHMENTS

Normally, creditors will not be assisted in the collection of personal debts from employees. However, under certain legal procedures known as garnishments, Equity Group Eufaula is compelled by law to withhold a specified amount of an employee's earnings. If a garnishment is placed on an employee's wages, the Company will notify the employee pursuant to legal requirements.

## MEAL AND REST PERIODS

Meal and rest periods are scheduled by management for non-exempt employees to ensure the employee's position and duties will be covered during periods of rest. You are expected to observe your assigned working hours and the time allowed for meal and rest periods. Employees will receive two (2) thirty (30) minute non-paid meal/rest breaks each full work day. In addition, where an employee is required to work more than 9 hours in any workday, except in the case of equipment or mechanical malfunctions or circumstances beyond the control of the company, the employee shall be entitled to an additional 10 minutes paid break to be scheduled by the Company, or to be paid for such break if not granted.

Employees should remain on the premises during their rest periods and not take more than the allotted time for each rest period.

## EMPLOYEE BENEFITS

Equity Group Eufaula offers a competitive benefits program to its employees as part of their employment with the Company. New employees receive benefit enrollment information during their orientation. The following information is a summary of the Company's current benefits programs.

27

E 544

## GENERAL SAFETY RULES

Safety is the most important task each of us must complete each day. When safety rules or policies are violated, appropriate disciplinary action, up to and including termination will take place. Due to the possible consequences of these violations (injury to worker/co-worker) management reserves the right to determine the disciplinary action based on the severity of the infraction.

1. All injuries must be reported immediately to your Supervisor and the Medical Services Staff. This is to be reported on the day the injury occurs. Treatment for injuries or illnesses will be administered. After treatment employee must complete the Injured Workers Statement.

2. All work related injuries must have a pre-approved written authorization from the Medical Services Staff before an outside provider can render treatment. You must go to one of the Doctors specified by the Company in the event of an on-the-job-injury. All light duty restrictions must be pre-approved by the Medical Services Staff.

3. Personal Protective Equipment, which is provided initially by the Company, must be worn.

4. All knives/scissors are to be placed in their proper containers during breaks and at the end of a shift. Work tools are not to be carried around in the plant except in proper containers.

5. Never place your hand or any part of your body or other objects in moving machinery.

6. Report any unsafe condition to your Supervisor at once.

7. Never remove any machine guard cover or screen. Only trained and authorized personnel may operate any machinery (this includes Forklift and Pallet Jack or mobile equipment). All guards, covers, screens barriers, must be in place before any machine is started.

40

E 557

8.  Report any Chemical leak or spill to your Supervisor. Do not touch a spill or leak unless you have been trained and authorized to remove the leak or spill. All unlabeled containers must be reported to your supervisor immediately. Do not handle any chemicals unless approved to do so by your supervisor.

9.  All employees must share the responsibility of keeping work and break areas clean in order to maintain safe work facilities.

10. All trash is to be placed in the trash cans provided.

11. Wrestling, playing, horseplay, running, fighting, use of alcoholic beverages and or illegal drugs, etc. is forbidden.

12. Threatening another employee, Supervisor, or Management staff member is forbidden. This type of behavior will be subject to disciplinary action up to and including termination.

13. Proper Maintenance Safety Procedures are to be adhered to as prescribed in the "Lockout/Tagout" policies.

14. Seatbelts are to be worn in all Company vehicles, including fork-lifts, back hoes, mules etc.

15. Non-slip, skid resistant footwear is to be worn in all areas of the Plant. (production footwear is not to be worn outside of plant.)

16. Jewelry consisting of any stone material, loose or ragged cloth-ing, and loose neckties must not be worn. Clothing must be worn in a manner in which it would not interfere with the safe opera-tion of any equipment, also as not to be offensive to others.

17. Obey all warning signs (example: No Smoking, Wear Hearing Protection).

18. Wash hands and arms thoroughly with soap and water before and after using bathroom facilities.

41

E 558

19. All gloves and aprons must be stored and/or disposed of proper-
    ly. Do not throw on the floor.

20. No equipment will be worn outside of work areas. Boots are not
    to be worn outside of plant.

21. All electrical equipment, including fuses and breakers, must be
    serviced by authorized personnel only.

22. All State of Alabama Traffic laws must be obeyed while operat-
    ing any Company vehicle.

23. All traffic signs must be obeyed. The speed limit on company
    property is 15 mph.

24. All Visitors entering the plant must check in with security upon
    arrival. Security will issue the visitor a pass that must be worn
    around the neck at all times while on company property.

25. Park only in authorized parking spaces; do not park in driving
    isles, reserved or truck traffic areas. Do not stop in driving isles
    to drop off employees. Speed limit of 5 MPH must be obeyed in
    the parking lot areas.  Right of way must be yielded to pedestri-
    ans.

26. Any acts of vandalism to vehicles will be prosecuted. Any dam-
    age to vehicles must be reported and proper paper work com-
    pleted before leaving the scene.  The company is not liable for
    vehicle accidents or acts of vandalism to vehicles.

27. Before starting a new job, make sure you are trained to perform
    it safely.

28. Anyone bringing or picking personnel up from work, is not
    allowed inside the plant areas and must park in a parking spot
    before allowing employees to exit from vehicle.

42                    E 559

## KNIFE SAFETY

Knife Safety means "preventing cuts" - cuts to yourself or to your fellow workers. In many of our jobs, knives are the tools of our trade. They must be handled correctly and with respect. The following are some recommended knife safety guidelines.

1. Always wear issued personal protective equipment, i.e., metal mesh or cut-resistant gloves, and plastic arm guards and wrist guards.

2. If skin irritation occurs, wear snug-fitting cotton liners underneath mesh gloves.

3. Inspect protective equipment regularly for defects, holes or sharp projections.

4. Keep knives sharp. Request "fresh" knives as needed and learn "steeling" techniques from your Supervisor. Sharp knives reduce fatigue and potential injury.

5. Cut away from your body.

6. Never engage in horseplay with knives.

7. Return knives to sheaths or racks when not in use. Don't place knives in positions where they can fall into product containers.

E 563

46

# EXHIBIT 9



# Employee Orientation Manual

Name_____

E 40



# New Hire Orientation Agenda

## HR Conference Room

| Moderator | Topic | |
|---|---|---|
| 8:30am - 9:30am | HR New Hire Paperwork | Lisa Ledbetter, HR |
| 9:30am - 9:45am | History, Ethics, Policies, & Procedures Review | Lisa Ledbetter, HR |
| 9:45am - 11:15am | Retail, Wholesale & Department Store Union AFL-CIO | Jackie Davis, Chief Steward |
| 11:15am - 12:00pm | Benefits Overview & Enrollment | Jennifer Baker, HR |
| 12:00pm - 12:30pm | Attendance, Days Off, Leaves of Absence | Lisa Ledbetter, HR |
| 12:30pm - 1:00pm | Lunch | |
| 1:00pm - 1:30pm | QA, HACCP, GMPs, SSOPs, SOPS, & Animal Welfare | Tape |
| 1:30pm - 1:45pm | Safety Policies & Procedures Overview | Safety Rep. |
| 1:45pm - 2:45pm | Emergency Evacuation, Fire Prevention, Confined Spaces & Lock-Out/Tag-Out Procedures | Safety Rep. |
| | Ergonomics presentation and exercises | |
| 2:45pm - 3:00pm | BREAK | |
| 3:00pm - 3:45pm | Hazardous Communications & Material Training (Including PPE use) | Safety Rep. Tape |
| 3:45pm - 4:15pm | Bloodborne Pathogens, Medical Services, & Hearing Protection | Beatrice Battle, Nurse Scott Little, EMT |
| 4:15pm - 4:30pm | Security & Workplace Violence | JB Glass, Security |
| 4:30pm - 5:00pm | Programs and Activities Presentation | Lisa Ledbetter, HR |

1

MANAGEMENT RESERVES THE RIGHT TO CHANGE OR MODIFY THIS POLICY AS NEEDED.

## ATTENDANCE POLICY

As an employee of Equity Group Eufaula you are expected to be regular in attendance and punctual. Regularly scheduled attendance by all employees is mandatory. Any tardiness or absence causes problems for your fellow employees and your supervisor.

As part of meeting performance standards, represented employees are expected to work as scheduled during Equity Group Eufaula business hours or their scheduled shift. Employees are required to notify the Company as soon as possible but no later than within the first hour of their shift if they will be absent or late for work where he or she may be reached. Employees with unscheduled absences are required to contact their supervisor or on each days of his or her absence. The number to call in to report any absence is 1-877-573-8127.

On each day of absence, employees not previously excused are required to call the absence reporting number at 1-877-573-8127 as soon as practical giving the following information: (1) Employee's Name, (2) Reason of Absence, (3) Expected Return Date and (4) Name of Person Calling.

This policy will set the requirements and corrective action schedule for absenteeism, late arrival, early departure, Weekend/Holiday work and important definitions for absences and occurrences.

Each employee will be allowed to accumulate up to six (6) points. Each day of absence equals one (1) point or if proper documentation is supplied each occurrence will equal (1) point (i.e. Two (2) to four (4) consecutive days' absence with a doctor's statement will equal one (1). For five (5) or more days, leave of absence should be applied for in advance whenever possible). Documentation must be supplied the day the employee returns to work. If documentation is not presented, point will be accumulated for each day's absence. Additional points may be incurred as follows:

- Arriving to work late and otherwise failing to be ready to work at your designed start times equals one-half (1/2) point.
- Leaving work early (after lunch break) equals one-half (1/2) point.
- An employee missing more than four hours per day equals one (1) point.
- An absence which occurs when scheduled to work on Saturday, Sunday or a holiday the occurrence will be doubled.

When an employee has worked forty-five (45) calendar days with perfect attendance one (1) point will be subtracted from any points that have been accumulated.

Approved absences pursuant to the following leave policies are not counted against the employee for purposes of this attendance policy.

- Funeral Leave
- Jury Duty

31

E 71

- Subpoenaed Witness (not as a Defendant or Plaintiff)
- Worker's Compensation
- Military Leave
- FMLA Leaves
- Approved Unpaid Leaves of Absence

When unscheduled absences indicate a potential pattern, management may request further information regarding such absences and may require medical certification for any future occurrence. Excessive absences, falsification of reason for any absence, failure to provide medical documentation when required, or unauthorized time away from the Company during working hours may result in corrective action, up to and including termination. Failure to call in or report to work for two consecutive days or shifts is considered job abandonment.

The Company will comply will applicable laws relating to time off from work, but it is the employee's responsibility to provide sufficient information to enable the Company to determine if any such law(s) applies to the absence. Employees should keep in touch with their supervisor and notify the Company of any change in their status as soon as possible. Individuals with disabilities may be granted reasonable accommodation in complying with these policies if undue hardship does not result to the Company's operations. Regular attendance and promptness are considered part of an employee's essential job functions. Attendance records are examined when an employee is being considered for promotional opportunities.

E 72



**Equity Group – Eufaula Division, LLC**
57 Melvin Clark Road
Bakerhill, AL 36027
(334) 687-7790

## FURTHER PROCESSING GMP's

The following GMP's were established to minimize the introduction of bacteria, contaminants, or foreign material into our manufacturing environment and must be adhered to by all employees and non-employees while in production areas including coolers, shipping, and receiving docks.

1. Hairnets will be appropriately worn to cover and contain hair.
2. Beard nets must be worn to cover _any facial hair._
3. A clean smock must be obtained daily. Smocks are to be changed during the shift if needed. Smocks must fasten or tie properly to cover street clothes. Smocks _may not_ have sewn on buttons or an external upper pocket.
4. Plastic sleeve covers will be worn to cover any street clothes that extend beyond smock coverage on the arms when handling product.
5. No jewelry is allowed inside the processing area. Any body piercing of the ears, eyebrows, nose, tongue, etc. _is considered jewelry and is prohibited._ The only exception is a plain wedding band with no stone settings.
6. Wristwatches are not to be worn in the processing area at any time.
7. All clothing worn in the plant must be clean and in good repair. Consideration should be given to loose threads of clothing to prevent foreign-object issues in product.
8. Rubber gloves must be kept clean.
9. Smocks, hairnets, and beard nets must be removed before exiting the facility. The _only_ exception is during an emergency evacuation.
10. All false fingernails and / or fingernail polish must be covered at all times while in the processing areas. All fingernails will be kept cut to a reasonable length.
11. No baseball style caps are to be worn in processing areas to include coolers, shipping and receiving docks.
12. All trash will be disposed of in appropriate receptacles.
13. No food or beverages are allowed in production areas.
14. Use of tobacco, chewing gum, and candy is strictly prohibited in production areas.
15. Spitting is not allowed.
16. No smocks, aprons, sleeve covers, arm guards, or any type of glove are allowed in the restrooms.
17. The carrying of items (e.g. pens, pencils, note pads, etc.) in external upper pockets is not allowed.
18. No glass objects for personal use are allowed beyond the front administrative offices including the break room.

E 73



**Equity Group – Eufaula Division, LLC**
57 Melvin Clark Road
Bakerhill, AL 36027
(334) 687-7790

19. Only approved, plant issued, metal pens are allowed for use in production areas.

20. Before exiting a restroom, all employees are and non-employees _must_ wash their hands with sanitizing soap and water.

21. Upon entering production areas, all employees and non-employees _must_ wash their hands with sanitizing soap and water.

22. Hands _must_ be washed with sanitizing soap and water after handling inedible product, inedible containers, picking up items from the floor, handling pallets or any other unclean surfaces before handling of product or product contact surfaces can take place.

23. Any item that becomes contaminated must be washed before being placed back into use. Processing tools and utensils are, but not limited to the following items: pens, calculators, thermometers, clipboards, pans, edible totes, edible shovels, earplugs, maintenance tools, etc.

24. Only approved footwear shall be worn in the processing areas to include coolers, shipping and receiving docks. Rubber boots are available at the Supply Room, or footwear may be purchased from an outside source as long as the soles are slip resistant. _No tennis shoes_ will be allowed in production areas.

The above GMP's will be strictly enforced anyone failing to comply with them will be subject to disciplinary action up to and including termination.

Approved By:             Effective Date: October 4, 2004

Greg Mills - Operations Manager_____

Butch White -Complex QA Manager_____

Pearl Lovell - 1st Shift Manager_____

Craig Spangler-2nd Shift Manager_____

E 74

# QUALITY ASSURANCE

## Terms

HACCP:    Hazard Analysis and Critical Control Point
GMP:    General Manufacturing Practices
SSOP:    Standard Sanitation Operational Procedure
SOP:    Standard Operational Procedure

## Seven Principles of HACCP

1. Conduct a hazard analysis – Identify and evaluate all potential biological, chemical, and physical food safety hazards.
2. Identify critical control points – a point, step, or procedure in the production process at which control can be applied to prevent, eliminate, or reduce a food safety hazard to an acceptable level of safety before the product leaves the company.
3. Determine critical limits for reach CCP – boundaries of safety for each CCP to control the identified food safety hazard.
4. Develop monitoring procedures – a planned sequence of observations or measurements to make sure CCP is under control.
5. Establish corrective actions – a procedure to be followed when monitoring indicates that there is a deviation from an established limit at a CCP.
6. Perform verification procedures – activities performed to verify that the HACCP plan is adequate to control food safety hazards and that the system is operating as intended.
7. Develop an effective record keeping system – documents that the HACCP system is operating according to the written plan.

## Standard Sanitation Operational Procedures (SSOPs)

1. Cleaning of equipment and food work areas.
2. Sanitizing equipment and food work areas.
3. Pest Control
4. Personal hygiene and cleanliness.
5. Wear proper clothing to clean.

## Standard Operational Procedures (SOPs)

1. Clean break rooms
2. Clean offices
3. Check garbage containers for cracks or holes.
4. Lining containers with plastic bags.
5. Clean and sanitize garbage containers.
6. Taking out the garbage
7. Washing hands properly.
8. Keeping work area clean.

35

E 75

# SAFETY ORIENTATION

## Equity Group Eufaula Division, LLC
## Eufaula, AL

## Agenda

1. Safety Policy Statement
2. Central Safety Committee
3. Safety Rules & Disciplinary
4. Medical Rules
5. Fire Extinguishers
6. Evacuation Procedures
7. Hearing Protection
8. Lock out – Tag out
9. Emergency Stops – Switches
10. Eye Wash – Shower Stations
11. MSDS / Chemical Hazards

12. Personal Protective Equipment
13. Safety Audit Program
14. Proper Lifting
15. Ergonomics
16. Ladder Safety
17. Electrical Safety
18. Confined Spaces
19. Blood Borne Pathogens
20. Forklifts / Pallet Jacks
21. Machine Guarding
22. Substance Abuse

## Welcome to Equity Group Eufaula Division, where SAFETY is number ONE!

36

E 76

# Safety Policy Statement

Safety is the most important task each of us must complete each day. The safety of each individual must be our first priority all day, every day. Each of us has a responsibility to work safely and to help each of our co-workers work safely. The only way to excel in safety is to live minute to minute with safety first in our minds and actions. We should not only feel responsible for safety, we must be accountable for any actions that disregard the safety of our co-workers or ourselves.

Our managers will be accountable for the safety of their people and will be held accountable for the safety performance of the people in their space. The safety of the department is a direct reflection of our commitment to provide the safest conditions and our requirement that each individual be accountable for his/her actions concerning safety. Employees are urged to report any safety condition or idea that will provide a safer and more enjoyable work environment. Every injury or illness shall be reported to your supervisor and the medical services group immediately.

Our success will depend on your contribution to providing and committing your efforts to the safety of everyone affiliated with this operation. Each of us will be accountable for our safety performance individually and collectively.

*Randy Cline*
General Manager

37

E 77

# Summary

- ◆ Protect yourself on and off the job - know the facts

- ◆ Practice good personal hygiene

- ◆ Follow work rules, use gloves and protective clothing

- ◆ Wash your hands often, after work or exposure

- ◆ Keep areas clean - report problems immediately to supervisors

E 79

24. Material Safety Data Sheets will be kept current and will be available to all employees in a MSDS manual located in each facility and in the safety manager's office.

25. All visitors and outside contractors will be made aware of and must abide by the facility safety rules, policies and procedures while on the site.

26. Gasoline, chemicals and other combustibles will only be stored and transported in approved and properly marked containers.

27. All drain covers must be in place at all times, except when required for cleaning or repairs and *must be replaced immediately.*

28. Follow ladder safety when using ladders.

29. Know the location of primary and secondary emergency evacuation routes and assembly areas in the event of an emergency.

30. All employees will follow department safety rules, policies and procedures. Failure to follow safety rules will result in disciplinary action up to and including termination.

31. Restrictions on employees wearing contacts. Employees working in Live Hanging, Live Receiving, Sanitation, or the Feedmill may either: wear their contacts with safety goggles or wear their prescription glasses. Contacts without goggles are not allowed in these areas.

# First Processing Safety Rules

1. Obey all Personal Protective Equipment requirements.

2. When using knife sharpeners to sharpen knives, always leave them attached to stands.

3. Knives, scissors and all other blades should be kept in approved holders when not in use. Blades should only be carried from one location to another in an approved sharps carrier / container.

# Second Processing Safety Rules

1. Only authorized employees are allowed in the knife sharpening room.

2. Knives, scissors and all other blades should be kept in approved holders when not in use. Blades should only be carried from one location to another in approved sharps carrier / container.

3. Obey all Personal Protective Equipment requirements.

4. Ergonomic stands must be stabilized before use and adjusted for proper work height.

# Maintenance Safety Rules

1. Bump caps will be worn except while in the break rooms.

2. Obey all Personal Protective Equipment requirements.

40

E 80

3. Always wear clothing suitable for the –60 degree Fahrenheit temperatures in the freezer when repairing it.
4. It is the user's responsibility to inspect and repair electrical cords on powered equipment before use and before return to the tool room.
5. A job is not considered complete until the area is cleaned up and all tools, materials and equipment have been accounted for.
6. Replace all guards on equipment before operating.
7. Remove blades before transporting saws, equipment, or machinery.

# Sanitation Safety Rules

1. Obey all Personal Protective Equipment requirements.
2. Always wear rain pant legs outside the boot.
3. Transporting chemicals in open top containers is prohibited.
4. Helmets will be worn at all times while in the processing plant.
5. The uses of acid and chlorine compounds at the same time are prohibited.
6. All chemical containers, cleaning buckets, spray jugs, etc. shall be labeled appropriately.
7. The sanitation employee assigned to the chemical room is the only employee authorized to mix and issue chemicals, and he/she must be trained and certified. The supervisor will verify chemicals issued.
8. Spray jugs will be issued and returned clean to the chemical room on a nightly basis. Return all other cleaning equipment and ladders to the chemical room nightly.
9. Each lead person will complete an equipment checklist prior to pre-op nightly.
10. Avoid spraying high-pressure when others are present in the immediate area. Never point a hose directly at someone or discharge it at close proximity to another individual.

# Safety Violation Disciplinary Action

Safety is the most important task each of us must complete each day. When safety rules or policies are violated, appropriate disciplinary action, up to and including termination will take place. Due to the possible consequences of these violations (injury to worker / co-worker) management reserves the right to determine the disciplinary action based on the severity of the infraction. The following list is a set of guidelines for safety violation disciplinary action and is not intended to be an all-inclusive list.

# THREE DAY SUSPENSION PENDING INVESTIGATION / FINAL NOTICE

- Failure to report any accident which has resulted in personal injury or property damage.

41

E 81

- Failure to schedule physicians visits through Medical Services for work-related injury or illness.
- Failure to report for follow up as instructed by Medical Services personnel.
- Unsafe acts which lead or contribute to injury / illness to the employee or another employee.
- Failure to wear or to properly wear required personal protective equipment.

# TERMINATION

- Lock out –Tag out violation.
- Injury to yourself or others when not wearing proper safety equipment.

E 82



# HEARING CONSERVATION

Equity Group Eufaula Division has a Written Hearing Conservation Program that is available for viewing by employees. The program is located in the Safety/First Aide Department.

## Why Should I Know About Hearing Conservation?

Because your hearing is priceless.
Good hearing helps you:

a. Communicate with others (being with other people is more rewarding if you can hear and understand sounds).

b. Enjoy life (many of life's valued pleasures involves hearing – music, voices of friends and family)

c. Help you stay safe – on & off the job!

## How Can Noise Affect Your Hearing?

Exposure to excessive noise raises your hearing threshold – the point at which you begin to hear.
Excessive noise may harm your overall health. Too much noise will contribute to mental and physical stress, illness and accidents.

**Remember** – noise is a safety hazard. It can damage hearing – temporarily or permanently.

1. It may create stress that can affect your mental as well as physical being.
2. It can cause accidents – when workers cannot hear instructions or warnings.

**Everyone is affected by noise to some degree depending on:**

1. Loudness of the noise
2. Frequency of the noise
3. Length of exposure to the noise
4. Health and age
5. Continuous or intermittent noise

**Temporary Hearing Loss:**
Can be caused by exposure to loud noises for a few hours. Fortunately, hearing is usually restored after a period of time away from the noise.

**Permanent Hearing Loss:**
Occurs after the ears have been continually exposed to excess noise and have gradually become unable to recover from temporary hearing loss.

45

E 85

*No cure exists for permanent hearing loss caused by noise.  Surgery, medication or hearing aids will not help noise induced hearing loss.*

<u>Signs of possible Hearing Loss:</u>
1. A noise or ringing in the ears (medical condition called "tinnitus")
2. Difficulty hearing people speak
3. Difficulty hearing certain sounds – like a watch tick.
4. Need to raise TV or radio volume so loud that others complain.





**Prolonged exposure to more than 85dBs can cause hearing damage if proper hearing protection is not used.**

**A decibel level of 120 decibels or more is considered highly dangerous!**

<u>**"There Are Legal Limits on Noise in the Workplace!"**</u>

**OSHA Regulations 29 CFR 1910.95 states:**
1. A worker may not be exposed to more than an average of 90 dBs over an 8 hour period.
2. Employees must be included in a hearing conservation program if noise exposure averages 85 dBs or more over an 8 hour period of time (TWA).

**It is extremely important that you wear your hearing protection at all times when you are in your work area.  No Exceptions!**

# HOW TO USE PLUGS

Ear plugs must be worn correctly to give you the best protection possible.

1. Your hands and plugs should be clean before you put the plugs in your ears.
2. Put your left arm over your head and with you left hand pull up on your right ear.
3. With your right hand insert plug well into your ear canal.
4. Switch hands and insert the other plug in the same manner.

| **1st Day** | **2nd Day** | **3rd Day** |
|---|---|---|
| It can be hard to wear protectors all the time on the first day – but don't give up. Keep trying! | On the second day, you double the wearing time. If you are trying earplugs, it's only natural if they seem to fit badly the first few days. With earmuffs it is usually the head pressure that is uncomfortable during the first few days. | It sounds strange when you talk. This is because the sound comes from inside you to the hearing organ instead of through the air. Try to use the protector the whole day. |
| **4th Day** | **5th Day** | **6th** |
| You might think it is hard to hear the sounds you want to hear – for instance, conversation, but in fact, hearing protectors muffle noise much better than speech at normal distances. | Everything has its disadvantages. Hearing protectors cut down ventilation to the contact areas and consequently feel a bit hot. The first five days are the worst. | Try listening for a moment today to the noise without your hearing protectors. How good it feels to place them in again! |
| **7th Day** | **8th Day** | **9th Day** |
| For many the seventh day is the crunch. It is tempting to give up or give it a rest. Your will-power is put to the test, but it is important that you continue. | Many find the eighth day something of a release. The discomfort gets less and the idea of stopping the noise from getting to our ears takes over. | After nine days of using hearing protectors continuously during working hours, most people will have become used to them and will continue to use them. Something for which they will be thankful in years to come. |

47

E 87

# Personal Protective Equipment (PPE)

Personal Protective Equipment is any piece of equipment, article of clothing, or items deemed necessary for the health and safety of employees, prevention of injuries, loss of life or limb, or disease while employees perform their daily job assignments as prescribed.

## General PPE Information

- Inspect PPE daily for defects.  Report damaged PPE to your supervisor.  Turn in damaged PPE to your supervisor.
- Keep PPE clean and sanitary.
- If you are unsure about the proper PPE or the proper use of PPE, ask your supervisor or the safety office.
- Do not loan your PPE to other employees.
- Do not use PPE for any purpose other than its intended purpose.
- Dispose of PPE properly.  Do not throw earplugs on the ground.
- Wash hands before inserting earplugs.
- Any PPE other than that issued by Equity Group Eufaula Division must be approved through the safety office.

# Safety Audit Program

The Safety Audit is a valuable tool for creating a safe work environment.  Safety audits are conducted to identify and correct unsafe acts and conditions in the workplace.  The information gathered from these audits is compiled by members of the Safety Audit Subcommittee which reports this information to the Central Safety Committee. Interviews are an important part of the safety audit.  Answer honestly and to the best of your knowledge if you are interviewed during an audit.  Safety audits, when conducted properly, decrease accidents and injuries in the workplace.

# Ergonomics / Proper Lifting

**Q:  What is ergonomics?**
**A:**  Ergonomics is fitting the job to the worker.
**Q:  What is work?**
**A:**  Work = Force x Distance.  Any time you exert force through a distance, you have performed work!

**Ergonomics**

- ❖ One goal of ergonomics is to postpone fatigue.  Work or play, if performed over a long enough period of time, will cause fatigue.  By knowing the body postures and positions that cause fatigue, we can minimize or postpone its effects.  Also, by understanding ergonomically incorrect body positions, we can greatly decrease cumulative trauma disorders.

E 91

**Ergonomic Principles**

❖ Hands should be no more than 2" above or below the navel. This is considered the neutral position of the body.

❖ Elbows should hang loosely by the side. Arms should be at a 45-degree angle to the upper body.

❖ An extended reach creates greater force on the back. The reach should be no more 16" from the spinal cord.

❖ Your work should be towards you and at a 45-degree angle. It places greater stress upon your back muscles, arms and hands if you work away from your body.

❖ Keep your wrist straight while working. Bending the wrist at odd angles could cause cause irritation of the medial nerve.

❖ Avoid twisting the neck and lower back. Work only in a 60-degree arc in front of you.

❖ Your workstation must provide proper support. Ergonomic stands allow for less stress and force to be placed on the feet and legs, reducing the onset of fatigue.

❖ Be aware of your surroundings. Note any objects that could cause injury to the soft tissues of your body. Keep your workplace clean.

❖ Keep stress on the back as low as possible. Avoid twisting while lifting. Do not bend with your back. Lift with your legs, using the larger muscles.

❖ Keep the joints of the body working at the best angle to exert the necessary force. Remember, optimum angle for optimum force. When the tendons of a muscle pass over a joint, the muscle cannot fully contract. When a joint such as the wrist is fully flexed, the hand cannot fully grip because the muscles cannot move freely.

❖ Avoid improperly fitting gloves. Gloves that do not fit correctly can impede circulation and decrease the sense of touch.

❖ Cold temperatures can reduce the function of the nerves and muscles. In cold temperatures, the fibers of the muscles do not work smoothly, which increases the risk of tearing fibers.

❖ Take mini breaks during work. It is helpful to pause frequently to flex and stretch. This will improve flexibility and increase blood-flow.

❖ Avoid gripping knives or scissors tightly. This can decrease blood-flow.

❖ When possible, use as much of the hand as possible to grip. If you can use five fingers instead of two to grip an object, you have spread the force exerted over a wider area.

Report all injuries, illnesses, or pain to your supervisor and medical services. Address all ergonomic issues with your manager. Equity Group Eufaula Division is committed to providing a safe and healthy working environment for all employees.

E 92

methane, hydrogen sulfide, or oxygen deficient / enriched atmospheres. Sewers could also cause an engulfment (flowing water) hazard.

**Remember**
- Our policy is that only authorized and trained employees enter confined spaces.
- Confined spaces are clearly marked at this facility.
- Hazards are not always readily apparent in a confined space.
- Never attempt to rescue a person in a confined space. Call for help! Ask questions.

# Blood Borne Pathogens

Blood borne pathogens are pathogenic microorganisms that are present in human blood that may cause disease or death.

**Examples of Blood borne Pathogens**
- o  HIV: Human Immunodeficiency Virus – Causes AIDS, attacks the body's immune system, reducing its ability to fight disease.
- o  HBV: Hepatitis B Virus – Infects the liver; It is more common than HIV and is a greater risk on the job. Many HBV infected people have no problems or symptoms. Some, however, develop serious or fatal problems such as cirrhosis, liver cancer, or chronic liver disease.

**Protection**
- o  Avoid direct exposure to infectious blood or bodily fluids.
- o  Avoid participating in any high- risk activity such as:  unprotected sexual contact, sharing of IV drug needles, exchange of body fluids.
- o  Wash hands immediately after exposure to potentially infectious materials.

**Important Reminders**
- o  Know what the biohazard warning looks like. Only biohazard containers can be used to collect, handle, store, or transport blood or other potentially infectious materials.
- o  Our exposure control plan is located in medical services.
- o  Utilize universal precautions; treat all blood and bodily fluids as infectious.
- o  Sharps containers are located in medical services.
- o  Clean up of potentially infectious blood or bodily fluids is to be performed by those that have been trained.
- o  Notify your supervisor immediately in the event of a poke, stab, nosebleed, or laceration. Report to medical services for treatment.
- o  Let trained personnel administer first aid treatment to injured persons and clean up any potentially hazardous material. Avoid blood or bodily fluids in the event of an accident.

E 97

# Hazardous Communications, Hazardous Materials, & Personal Protection Equipment

- Importance of Hazard Communications (HAZCOM) awareness

- Locations of HAZCOM materials

- General understanding of HAZCOM materials (simple "filter-through of implemented process)

- Importance of personal protective equipment (PPE)

- Limitations of required PPE

- Donning and appropriate use of PPE

- Demonstration of donning and appropriate use of require PPE

- Use of cutting utensils and what to do in the event of an emergency or power outage

- Climate awareness throughout the facility

E 111



**KEYSTONE FOODS** LLC
Equity Group Eufaula Division

Equity Group Eufaula Division • 57 Melvin Clark Road
Eufaula, AL 36027 • (334) 687-7790 • Fax (334) 687-7779

# BLOOD BORNE PATHOGENS

Blood borne pathogens are pathogenic microorganisms that are present in human blood that may cause disease or death.

## Examples of Blood borne Pathogens

- HIV - Human Immunodeficiency virus - Causes AIDS, attacks the body's immune system, reducing its ability to fight disease.
- HBV: Hepatitis B Virus - Infects the liver; it's more common than HIV and is a greater risk on the job. Many HBV infected people have no problems or symptoms. Some, however, develop serious or fatal problems such as cirrhosis, liver cancer, or chronic liver disease.

## Protection

- Avoid direct exposure to infectious blood or bodily fluids.
- Avoid participating in any high-risk activity such as: unprotected sexual contact, sharing of IV drug needles, exchange of body fluids.
- Wash hands immediately after exposure to potentially infectious materials.

## Important Reminders

- Know what the biohazard warning looks like. Only biohazard containers can be used to collect, handle, store, or transport blood or other potentially infectious material.
- Our exposure control plan is located in first aid.
- Treat all blood and bodily fluid as infectious.
- Sharps containers are located in first aid.
- Clean up of potentially infectious blood or bodily fluids is to be performed by those that have been trained.
- Notify your manager immediately in the event of a poke, stab, nosebleed, or laceration. Report to first aid.
- Let trained personnel administer first aid treatment to injured persons and clean up any potentially hazardous material. Avoid blood or bodily fluids in the event of an accident.

E 113

# Bloodborne Pathogens

Presented by

Argonaut Insurance Southeast Region, Atlanta, Georgia

E 114

# Protect Yourself

Universal Precautions

◆ TREAT ALL BLOOD AND BODY FLUIDS AS POTENTIALLY INFECTIOUS.

◆ Skin protects from pathogens - cuts, dermatitis chapping, small cracks allow germs to enter body

◆ First aid - use gloves, have as little contact as possible with blood or body fluids

◆ Wash hands with antibacterial soap after contact

◆ After contact, flush eyes and face with fresh water for several minutes

78

E 118

# Means of Transmission - Must Enter Body

◆ HBV, HIV virus present in blood, body fluids

◆ Sexual contact with an infected partner

◆ Sharing infected needles

◆ Accidentally cutting yourself with a sharp object that is contaminated with infected blood, body fluids

◆ Infected blood or body fluid on skin especially with open cuts, sores

◆ Getting contaminated blood or body fluid in eyes, mouth.

E 119

# Clean-Up and Safe Housekeeping

◆ After an accident, the entire area must be cleaned with disinfectant

◆ Cleaning equipment must be disinfected

◆ Wear gloves while cleaning, apron or goggles if appropriate

◆ Restrict access to the area

◆ Use disposable towels - dispose of properly

E 120

# Common Sense Rules

◆ Wash hands & remove protective clothing before eating, drinking, smoking, handling contact lenses, applying lip balm or cosmetics

◆ Keep hands away from eyes, nose, mouth while cleaning

◆ Frequent handwashing is best defense against spreading infection

81                                    E 121

# General Safety Rules

1. Report all injuries, or near misses, to your supervisor and Medical Services immediately.
2. Report defective equipment and unsafe conditions / practices to your supervisor immediately. Do not operate unsafe or defective equipment.
3. All required personal protective equipment (PPE) shall be worn and worn properly while performing the duty the PPE is intended for.
4. Hearing protection is required in all areas except the break-rooms, front hall and office areas.
5. No horseplay or fighting is allowed on Equity Group Eufaula Division property.
6. Running is prohibited at this facility.
7. Use caution when using high -pressure hoses. Roll hoses up neatly after each use.
8. Do not ride pallet jacks.
9. Only employees that have successfully completed the Powered Industrial Truck Training and completed an evaluation will be authorized to operate equipment such as forklifts, pallet jacks, scissor lifts, etc.
10. Pedestrians should stay clear of pallet jack/forklift traffic.
11. Lockout / Tag-out requirements shall be followed when cleaning or repairing equipment or machinery. Do not reach into any machinery without first shutting that machinery OFF and locking and tagging out the energy source or sources Only authorized employees may lock and tag equipment or machinery.
12. Do not attempt to operate machinery that has been locked and tagged out. Only the authorized employee that places a lock and tag on machinery may remove it.
13. Do not operate machinery unless its machine guards are in place.
14. Do not operate machinery unless you have been trained by your line manager.
15. Smoking is permitted only in designated areas.
16. Know where fire extinguishers, exits, emergency stops (e-stops) and eye wash stations are located. Know how to operate e-stops and eye wash stations. When working in unfamiliar areas, take the time to locate the e-stops and eye wash stations.
17. Jewelry is NOT to be worn inside the production area. (Exception: wedding band without stones is allowed.)
18. Report all ammonia, gas leaks, or unsafe chemical conditions immediately to your manager and the maintenance department.
19. Obey all warning and safety signs.
20. Do not wear loose fitting or baggy clothing when working around equipment or machinery.
21. Use the proper technique when lifting: bend your knees when lifting, keep the load close to your body, and avoid twisting motions.
22. Firearms, drugs and alcohol are prohibited on company property.
23. Place all refuse in the proper container. Work areas and walkways must be kept neat and free of obstructions. Do not block emergency exit routes, fire extinguishers, electrical boxes and eye wash stations. Do not store items on electrical boxes, fire extinguishers, or eye wash stations.

E 122

# Other Exposure Hazards

◆ Cleaning surfaces contaminated with blood, vomit, feces

◆ ALWAYS wear gloves and protective apron or clothing

◆ Be alert for sharp objects, broken glassware, used syringes in trash

◆ Do not pick up broken glass - use brush or broom & dustpan

◆ Dispose of glass, sharp objects safely

◆ Laundry - bloody or contaminated linens or sharp objects

83

E 123

# EQUITY GROUP - EUFAULA DIVISION, LLC

### Confidential Commercial Information

# GOOD MANUFACTURING PRACTICES (GMP'S)

1. Always remove your smock, gloves, and apron before exiting production areas.
2. Always wash your hands after using the bathroom.
3. Always use protective gloves when using knives and scissors.
4. When touching an inedible container or anything on the floor, you must wash your hands, gloves, and apron before returning to work or touching any product.
5. Always wear hairnet, earplugs, and a beard net (if you have facial hair) while in the plant.
6. Always remember that edible product pans/totes/or boxes must never sit directly on the floor, they must be placed on stands.
7. Always hang apron and smocks on racks.
8. Always put your gloves, arm guards and plastic sleeves in an area provided for such items.
9. Always contact your supervisor if you have problems or questions.
10. Always make sure all products, packaging supplies and boxes are covered properly, especially at break and during a wash down.
11. Always make sure paper towels, soap, and trash receptacles are available at hand wash sinks.
12. Always put trash in containers marked "TRASH."
13. Always make sure doors are kept closed. Special attention should be given to doors that open to the outside of the plant.
14. All combos and barrels must be labeled edible or inedible.
15. The only place to dress with smocks, aprons, and gloves is in the processing area.

1. Do not eat, chew gum or tobacco, wear jewelry (wedding bands with no stones are acceptable), or smoke in the plant.
2. Do not pick product up of the floor unless you have been properly trained to do so. If you do, then you must wash your hands, gloves, sleeves, and apron before returning to work.
3. Do not remove product from condemned cans.
4. Do not put inedible or dirty product in edible totes/pans/or boxes.
5. Do not use boxes or lids that have fallen on the floor if they do not have a wax coating. Boxes and lids that fall on the floor can be rinsed off and used only if they are wax coated.
6. Do not wear your smock outside of the plant, in the breakrooms, bathrooms, or hallways.
7. Do not put trash or condemned products in any container unless it is clearly marked or labeled for such.
8. Boxes should not be used to hold condemned product.

SIGNATURE_____

91

E 131



**Equity Group – Eufaula Division, LLC**
57 Melvin Clark Rd.
Bakerhill, AL 36027
(334) 687-7790

# Equity Group Eufaula Division
## New Hire Check List

I agree to take this information and apply it while performing my duties at Equity Group Eufaula Division. I understand that failure to follow safety or medical policies, plans, or procedures could result in disciplinary action up to and including discharge.

Please initial every item.

_____ Safety Policy Statement     _____ Personal Protective Equipment

_____ Safety Rules & Disciplinary     _____ Safety Audit Program

_____ Medical Rules     _____ Proper Lifting

_____ Evacuation Procedures     _____ Ergonomics

_____ Hearing Protection     _____ Ladder Safety

_____ Lock out – Tag out     _____ Electrical Safety

_____ Eye Wash – Shower Stations     _____ Confined Spaces

_____ MSDS / Chemical Hazards     _____ Blood Borne Pathogens

_____ Benefits     _____ Forklifts / Pallet Jacks

_____ Harassing Information     _____ Machine Guarding

_____ Substance Abuse     _____ Drug & Alcohol Policy

_____ GMP'S     _____ Company Rules

I have participated in the Equity Group Eufaula Division new hire safety orientation. I acknowledge that I have listened and have been given the chance to ask questions.

Employee Signature: _____ Date: _____

Company Representative: _____ Date: _____

101          E 141

# SOCIAL ACCOUNTABILITY TRAINING
# EQUITY GROUP EUFAULA DIVISION
# EUFAULA, AL

Equity Group Eufaula Code of Conduct
- Employees are treated with dignity & respect
- Employee Satisfaction = Customer Satisfaction
- Legal Compliance at all location
- High standards of business conduct
- Equity Group Eufaula record & reputation for honesty & integrity
- Principles apply to all locations worldwide
- Cornerstones of our success

Legal Compliance
- All business activities must conform to national & local legal requirements pertaining to employment

Employment Practices:
### Prison or Forced Labor
- Prison or forced labor is forbidden
- Indentured servitude is forbidden
- Physical punishment, confinement, threats of violence, harassment (physical, sexual, psychological, verbal) & abuse are forbidden
- These principles apply to subcontractors of Equity Group Eufaula

### Child Labor
- The use of child labor is forbidden
- Employees must be at least the legal minimum age according to local law
- If local law does not stipulate, the minimum age of employees is 18 years of age

### Working Hours
- Must be in compliance with national & local laws
- Reasonable daily & weekly work schedules
- Reasonable time off
- Exceptions – extraordinary business circumstances

### Compensation
- Wages and benefits must comply with national & local laws
- Includes overtime
- If local laws does not provide for overtime, regular pay must be paid as a minimum for overtime work

E 147

**Non-Discrimination**
- Non-discrimination policy must comply with national & local laws
- Includes - race, color, religion, sex, age, physical ability, national origin & any other prohibited basis.

**Workplace Environment**
- Employees must be provided a safe & healthy workplace
- When provided by the company, employees must be provided with safe & healthy living conditions
- Requirements include potable drinking water, adequate & clean restrooms, adequate workplace lighting, adequate ventilation, fire exits, essential safety equipment, access to emergency aid kit & access to emergency medical care
- Facilities must be constructed and maintained according to local codes and ordinances

**Employee Notification**
- Equity Group Eufaula employees are to be notified of these employment practices on company letterhead, in the local language and posted in a prominent place accessible to all employees.

I have read and I understand the contents of this document.

_____        _____
              Employee                              Date

108                                    E 148

# EXHIBIT 10

Revised Date: N/A

# Equity Group Eufaula Division, LLC





Operations Organizational Chart 12-1-06



Revised Date: N/A

# Equity Group Eufaula Division, LLC



Sanitation Organizational Chart 3-30-07

E 663

# Equity Group Eufaula Division, LLC

Revised Date:7-10-07



E 664

Fresh Organizational Chart 12-1-06

Revised Date: 7-10-07

# Equity Group Eufaula Division, LLC



Mike Corbet
Further Plant Manager

Pearl Lovell,
1st Shift Manager

Vacant
2nd Shift Manager

Bob Patrzalek
Shipping Manager

Thelma Lane,
1st Shift Fur.
Process Supervisor

Rollins Walker,
1st Shift Fur.
Process Supervisor

Jason White
2nd Shift Fur.
Supervisor

Tony Horsley,
2nd Shift Fur.
Process Supervisor

Lillian Tarver,
2nd Shift Fur.
Process Supervisor

Sara Cooper,
2nd Shift Shipping
Supervisor

Further Organizational Chart 12-1-07

E 665



Equity Group Eufaula Division, LLC

Revised Date: 7-20-07

Maintenance Organizational Chart 3-30-07

E 666

Equity Group Eufaula Division, LLC

Revised Date: 5-29-07



Human Resource Organizational Chart 3-30-07

E 667

Revisd Date:5-7-07

# Equity Group Eufaula Division,LLC



E 668

Production System and IT  Organizational Chart 3-30-07

Revised Date: N/A

# Equity Group Eufaula Division, LLC



QA Organizational Chart 12-1-06

E 669

# EXHIBIT 11



**Equity Group – Eufaula Division, LLC**
57 Melvin Clark Rd.
Bakerhill, AL 36027
(334) 687-7790

# Equity Group Eufaula Division
## New Hire Check List

I agree to take this information and apply it while performing my duties at Equity Group Eufaula Division. I understand that failure to follow safety or medical policies, plans, or procedures could result in disciplinary action up to and including discharge.

Please initial every item.

| | | | |
|---|---|---|---|
| MB | Safety Policy Statement | MB | Personal Protective Equipment |
| MB | Safety Rules & Disciplinary | MB | Safety Audit Program |
| MB | Medical Rules | MB | Proper Lifting |
| MB | Evacuation Procedures | MB | Ergonomics |
| MB | Hearing Protection | MB | Ladder Safety |
| MB | Lock out – Tag out | MB | Electrical Safety |
| MB | Eye Wash – Shower Stations | MB | Confined Spaces |
| MB | MSDS / Chemical Hazards | MB | Blood Borne Pathogens |
| MB | Benefits | MB | Forklifts / Pallet Jacks |
| MB | Harassing Information | MB | Machine Guarding |
| MB | Substance Abuse | MB | Drug & Alcohol Policy |
| MB | GMP'S | MB | Company Rules |

I have participated in the Equity Group Eufaula Division new hire safety orientation. I acknowledge that I have listened and have been given the chance to ask questions.

Employee Signature: _Marcus Blair_          Date: _9-12/05_

Company Representative: _Robbie Ledbetter_    Date: _9-12-05_

**E 2312**

# Equity Group Eufaula Division
# New Hire Safety Orientation

I have participated in the Equity Group Eufaula Division new hire safety orientation and have received a copy of the orientation materials. I acknowledge that I have listened and have been given the opportunity to ask questions. Training covered the following topics:

| | | | |
|---|---|---|---|
| 1. | Safety Policy Statement | 12. | Personal Protective Equipment |
| 2. | Central Safety Committee | 13. | Safety Audit Program |
| 3. | Safety Rules & Disciplinary | 14. | Proper Lifting |
| 4. | Medical Rules | 15. | Ergonomics |
| 5. | Fire Extinguishers | 16. | Ladder Safety |
| 6. | Evacuation Procedures | 17. | Electrical Safety |
| 7. | Hearing Protection | 18. | Confined Spaces |
| 8. | Lock out – Tag out | 19. | Blood Borne Pathogens |
| 9. | Emergency Stops – Switches | 20. | Forklifts / Pallet Jacks |
| 10. | Eye Wash – Shower Stations | 21. | Machine Guarding |
| 11. | MSDS / Chemical Hazards | 22. | Substance Abuse |

I agree to take this information and apply it while performing my duties at Equity Group Eufaula Division. I understand that failure to follow safety or medical policies, plans, or procedures could result in disciplinary action up to and including discharge.

| | |
|---|---|
| Date: | 6-27-05 |
| Print Employee's Name: | Brenda Chambers |
| Employee's Signature: | Brenda Chambers |
| Company Representative: | Amanda Gunly |

28

E 4142



**KEYSTONE FOODS** LLC
*Equity Group Eufaula Division*

# New Hire Orientation Agenda
## HR Conference Room

| Time | Topic | Moderator |
|------|-------|-----------|
| 8:30am – 9:30am | HR New Hire Paperwork | Lisa Ledbetter, HR |
| 9:30am – 9:45am | Retail, Wholesale & Department Store Union, AFL-CIO | Jackie Davis, Chief Steward |
| 9:45am – 11:15am | Facility Tour/Name Badges/Supplies | Lisa Ledbetter, HR |
| 11:15am – 12:00pm | Benefits Overview & Enrollment | Jennifer Baker, HR |
| 12:00pm – 12:30pm | Attendance, Days Off, Leaves of Absence | Laconya Hawkins, HR |
| 12:30pm – 1:00pm | LUNCH | |
| 1:00pm – 1:30pm | QA, HACCP, GMPs, SSOPs, SOPs, & Animal Welfare | AJ Owens/Julie Seaborn Quality Assurance Dept. |
| 1:30pm – 1:45pm | Safety Policies & Procedures Overview | Harry Wilson, Safety Manager |
| 1:45pm – 2:45pm | Emergency Evacuation, Fire Prevention, Confined Spaces & Lock-Out/Tag-Out Procedures | Terence Skinner/Refrigeration Supervisor |
| 2:45pm – 3:00pm | BREAK | |
| 3:00pm – 3:45pm | Hazardous Communications & Materials Training (Including PPE use) | JJ White, PSM Coordinator |
| 3:45pm – 4:15pm | Bloodborne Pathogens, Medical Services, & Hearing Protection | Beatrice Battle, Nurse Scott Little, EMT |
| 4:15pm – 4:30pm | Security & Workplace Violence | JB Glass, Security |
| 4:30pm – 5:00pm | Employee Handbook, Keystone history, Ethics, Policies, & Procedures Review | Kymberli Skipper, Employee Relations Manager |

_Posey Anglin_
Employee Name

05-31-05
Date

E 985

  

**7-Minute SAFETY TRAINER**

**Protect Yourself With Universal Precautions**

**Trainer Outline 430**

**Goals:** **This safety session should teach employees to:**
- Know what bloodborne pathogens are and how they spread.
- Understand why and how to follow universal precautions.

## Applicable Regulations: 29 CFR 1910.1030



### 1. The Bloodborne Pathogens Standard Helps Prevent Exposure to HIV and HBV

Bloodborne pathogens are disease-causing microorganisms in blood and other body fluids.

- HIV is the bloodborne pathogen that causes AIDS and destroys the immune system, preventing the body from fighting disease.
- HBV, or Hepatitis B, is the bloodborne pathogen that infects the liver and can lead to such problems as cirrhosis or liver cancer.
- OSHA's Bloodborne Pathogens Standard covers the steps employers and employees must take to prevent exposure to possibly infected blood or other body fluids.
- The regulation applies to workers at health care facilities, emergency responders, law enforcement professionals, and others whose jobs could expose them to human body fluids.
- *Note for those who work in hospitals:* The Centers for Disease Control and Prevention (CDC) recommends following "standard precautions," which expand precautions to reduce the risk of transmission of microorganisms from both recognized and unrecognized sources of infection in hospitals.

### 2. HIV and HBV Are Spread Through Direct, Not Casual, Contact

HIV and HBV are transmitted by:

- Sexual contact, shared drug needles, being stuck by an infected needle or other sharp instrument, or direct contact between broken or chafed skin and infected body fluids.
- HBV is also spread by contact with caked, dried blood and contaminated surfaces.

HIV and HBV are not spread by:

- Coughing or sneezing, touching an infected person, or sharing equipment, materials, toilets, water fountains, or showers with an infected person

### 3. Universal Precautions Prevent the Spread of Bloodborne Infection

Universal Precautions means: Treat all blood and body fluids as if they are infectious.

### 4. Universal Precautions Include Using PPE to Prevent Possibly Infectious Contact

- Wear gloves if there's a risk of direct contact with body fluids or with possibly contaminated items or surfaces.
- Bandage cuts or broken skin before putting on gloves.
- Wear eye and face protection if there's a risk of blood splashes or sprays.
- Wear protective clothing if there's a risk of contact with body fluids.

E 652

(11001500) © Business & Legal Reports, Inc. Reproduction is strictly prohibited.

A-1

 

# Protect Yourself With Universal Precautions



**Trainer Outline 430**

- Use only PPE that's been inspected for damage before wearing.
- Remove contaminated PPE carefully so contamination doesn't touch your skin.
- Dispose of contaminated PPE in proper containers so contamination can't spread.

## 5. Universal Precautions Include Good Hygiene

- Wash hands and exposed skin carefully with soap and water after exposure.
- Flush eyes, nose or mouth with water as soon as possible after contact with blood or potentially infectious materials.
- Don't eat, drink, smoke, apply cosmetics, or handle contact lenses in areas that could contain infectious materials.

## 6. Universal Precautions Include Avoiding Direct Contact With Sharps

OSHA says to treat all sharps as though they're contaminated.

- Don't shear or break or bend needles.
- Don't reach your hand into a container that might contain sharps.
- Use tongs or a similar tool, not your hands, to clean up broken glass.
- Place all used sharps immediately in puncture-resistant, leakproof containers.

## 7. Apply Universal Precautions to Possibly Contaminated Materials and Surfaces

OSHA requires:

- Prompt and proper cleaning and decontamination for equipment or surfaces that have had contact with blood or potentially infectious materials
- Wearing gloves and using leakproof transport containers to handle laundry that may have had contact with blood or other potentially infectious fluids

## Discussion Points:

 — Ask participants what job situations might call for universal precautions and how they might apply the precautions.

## Conclusion: Precautions Prevent Exposure to Bloodborne Pathogens

Take care to avoid direct contact with blood or other body fluids and to thoroughly clean and decontaminate anything that does make that contact.

## Test Your Knowledge

 Have your employees take the universal precautions quiz. By testing their knowledge, you can judge their ability to understand universal precautions and whether you need to review this important topic again soon.

E 653

[11001500] © Business & Legal Reports, Inc. Reproduction is strictly prohibited.

# EXHIBIT 12

F I N A L - May 25, 2004

# AGREEMENT

by and between

EQUITY GROUP - EUFAULA DIVISION, LLC

and the

RETAIL, WHOLESALE AND
DEPARTMENT STORE UNION
AFL-CIO•CLC

EFFECTIVE

March 1, 2004

to

March 1, 2008

E 1

F I N A L – May 25, 2004

## TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| ARTICLE 1 – RECOGNITION | | |
| Section 1.1. | Recognition | 1 |
| ARTICLE 2 – MANAGEMENT RIGHTS | | 1 |
| Section 2.1. | Reserved | 1 |
| Section 2.2. | Discontinue Operations | 2 |
| Section 2.3. | Subcontracting | 2 |
| ARTICLE 3 – SENIORITY | | |
| Section 3.1. | Principle | 2 |
| Section 3.2. | New Employees | 3 |
| Section 3.3. | Discharge | 3 |
| Section 3.4. | Seniority Broken | 3 |
| Section 3.5. | Seniority Lists | 4 |
| ARTICLE 4 – LEAVE OF ABSENCE | | |
| Section 4.1. | Personal | 4 |
| Section 4.2. | Union Business | 4 |
| Section 4.3. | Applications | 5 |
| Section 4.4. | Extensions | 5 |
| Section 4.5. | Compensation | 5 |
| Section 4.6. | Return | 5 |
| Section 4.7. | Another Job | 5 |
| Section 4.8. | Funeral Leave | 5 |
| Section 4.9. | Jury Duty | 7 |
| Section 4.10. | Military Leave | 7 |
| Section 4.11. | Family and Medical Leave Act | 7 |
| ARTICLE 5 – JOB VACANCIES | | |
| Section 5.1. | Temporary Vacancy Defined | 7 |
| Section 5.2. | Permanent Vacancy Posted and Defined | 8 |
| Section 5.3. | Temporary Employees | 10 |
| ARTICLE 6 – STEWARDS AND GRIEVANCE PROCEDURE | | |
| Section 6.1. | Shop Stewards | 10 |
| Section 6.2. | Grievance Procedure | 10 |

E 2

F I N A L - May 25, 2004

|  |  | PAGE |
|---|---|---|
| Section 6.3. | Cost of Arbitration | 14 |
| Section 6.4. | Executive Board Authority | 14 |
| Section 6.5. | Presence of Stewards | 15 |
| **ARTICLE 7 – BULLETIN BOARDS** | | |
| Section 7.1. | Posting | 15 |
| **ARTICLE 8 – UNION VISITS** | | |
| Section 8.1. | Union Representation | 15 |
| **ARTICLE 9 – SAFETY AND HEALTH** | | |
| Section 9.1. | Occupational Safety and Health Act | 16 |
| Section 9.2. | Accidents, Injuries | 16 |
| Section 9.3. | Joint Safety Committee | 17 |
| **ARTICLE 10 – HOLIDAYS** | | |
| Section 10.1. | Holidays Defined | 17 |
| Section 10.2. | Celebration | 17 |
| Section 10.3. | Birthday Holiday | 18 |
| Section 10.4. | Personal Holiday | 18 |
| Section 10.5. | Qualifications for Holiday Pay | 18 |
| Section 10.6. | Hours Worked on a Holiday | 18 |
| Section 10.7. | Holiday in Vacation | 18 |
| **ARTICLE 11 – VACATIONS** | | |
| Section 11.1. | Length | 18 |
| Section 11.2. | Vacation Pay | 19 |
| Section 11.3. | Vacation Period | 19 |
| **ARTICLE 12 – HOURS OF WORK** | | |
| Section 12.1. | Work Schedule | 20 |
| Section 12.2. | Overtime Pay | 20 |
| Section 12.3. | Reporting Pay | 20 |
| Section 12.4. | Time Cards | 20 |
| Section 12.5. | Line Time | 20 |
| Section 12.6. | Extra Time | 20 |

E 3

F I N A L - May 25, 2004

|  |  |  | PAGE |
|---|---|---|---|
| ARTICLE 13 - MISCELLANEOUS |  |  |  |
| Section 13.1. | Physical Examination |  | 21 |
| Section 13.2. | Meal/Rest Periods |  | 21 |
| Section 13.3. | Anti-Discrimination |  | 21 |
| Section 13.4. | Supplies |  | 21 |
| Section 13.5. | Discipline |  | 22 |
| Section 13.6. | Orientation |  | 23 |
| ARTICLE 14 - WAGES |  |  |  |
| Section 14.1. | Schedule A |  | 23 |
| Section 14.2. | Pay Day |  | 23 |
| Section 14.3. | Incentive Pay |  | 24 |
| ARTICLE 15 - NO STRIKE - NO LOCKOUT |  |  |  |
| Section 15.1. | Prohibited Conduct |  | 24 |
| ARTICLE 16 - CHECK-OFF |  |  |  |
| Section 16.1. | Collection of Dues and Remittance |  | 24 |
| Section 16.2. | Check-Off Authorization Form |  | 25 |
| ARTICLE 17 - BENEFITS |  |  |  |
| Section 17.1. | Employee Coverage |  | 26 |
| Section 17.2. | Dependent Coverage |  | 27 |
| Section 17.3. | Substitution of Coverage |  | 27 |
| ARTICLE 18 - SAVINGS CLAUSE |  |  |  |
| Section 18.1. | Good Faith |  | 27 |
| Section 18.2. | Separability |  | 27 |
| ARTICLE 19 - LENGTH OF AGREEMENT |  |  |  |
| Section 19.1. | Duration |  | 28 |
| SCHEDULE A - PAY SCALES AND JOB CLASSIFICATIONS |  |  |  |
| INDEX |  |  |  |

E 4

F I N A L - May 25, 2004

## AGREEMENT

This Agreement made and entered into this 12th day of May, 2004, by and between Equity Group-Eufaula Division, LLC, as to its Baker Hill, Alabama plant located at 57 Melvin Clark Drive, Eufaula, Alabama, 36027 and that plant only (hereinafter referred to as the "Company"), and the Retail, Wholesale and Department Store Union, AFL-CIO, and its Alabama & Mid-South RWDSU Council (hereinafter referred to as the "Union").

## ARTICLE 1 -- RECOGNITION

### 1.1  Recognition

A.    The Company hereby recognizes the Union as the exclusive bargaining agent for the following employees of the Company: all production employees and line leaders within Company excluding chicken catching crews, truck drivers, office clerical employees, Quality Assurance, HACCP, professional and exempt employees, supervisors, watchmen, guards, nurses, maintenance, refrigeration, contract employees and other employees as defined in the National Labor Relations Act as amended.

## ARTICLE 2 - MANAGEMENT RIGHTS

### 2.1  Reserved

A.    The Company reserves all rights to the management and the direction of the workforce, including the right to establish reasonable shop rules and regulations; right to hire new employees from any source, transfer, promote, counsel, warn suspend or discharge for just cause, to retire employees; the right to maintain discipline, assign and reassign employees to jobs; to transfer employees from department to department; to re-classify, upgrade, downgrade to increase and decrease the workforce; to sub-contract work as deemed appropriate; to

E 5

F I N A L - May 25, 2004

Company. Such visits shall not interfere with the Company's operation and shall be for the express purpose of contract administration and grievance investigation. Union officials shall not go into production areas of the plant without permission of management, which reserves the right to accompany Union officials. The Company and the Union agree that neither will hand out political material on Company premises.

## ARTICLE 9 - SAFETY AND HEALTH

### 9.1 Occupational Safety and Health Act

A. The Company affirms its intention of complying with the provisions of the Occupational Safety and Health Act, and the Union agrees that it will support management in its efforts at compliance and general improvements of safety conditions. The Union further agrees to encourage its members to work safely and to follow the instructions of the Company in the proper care, use operation, protection, and maintenance of property, equipment, and vehicles.

### 9.2 Accidents, Injuries

A. It shall be the responsibility of each individual employee to notify the employee's superior immediately of any accidents, injuries or defective equipment. An employee who is injured during working hours, while performing the employee's assigned work and who is physically unable to return to work on the shift as determined by medical opinion, shall be paid for the remainder of the employee's normal work shift for that day at the employee's regular basic hourly rate in an amount not to exceed eight (8) hours. Employees required by the doctor to return for further treatment of an on-the-job injury shall endeavor to make

all doctors' appointments during non-working hours.

### 9.3 Joint Safety Committee

A.   The Company and the Union shall establish a Joint Safety Committee consisting of two members appointed by the Company and two members appointed by the Union.  The function of the Joint Safety Committee shall be to review all safety regulations, and to promote health and safety education of the employees and to meet monthly on definitely established dates for the purpose of considering safety issues, inspecting the facilities as may be necessary and recommending measures for the elimination or control of conditions which may be unsafe or hazardous to the health and safety of other employees.  The Joint Safety Committee shall not discuss general grievances or otherwise consider disciplinary issues, nor shall it adopt rules or procedures.  This provision does not modify the Management Rights set forth in Article 2.

### ARTICLE 10 – HOLIDAYS

### 10.1 Holidays Defined

A.   All employees having established seniority shall receive eight (8) hours' pay at their regular rate of pay for the following holidays:

| | |
|---|---|
| New Year's Day | Thanksgiving Day |
| Martin Luther King Day | Christmas Eve Day |
| Memorial Day | Christmas Day |
| Fourth of July | Birthday Holiday |
| Labor Day | |

### 10.2 Celebration

A.   Holidays falling on Saturday will be observed on the preceding Friday, holidays falling on Sunday will be observed on Monday.

E 21

-17-

vacation request has been made prior to the posting of weekend work.

## ARTICLE 12 – HOURS OF WORK

### 12.1 Work Schedule

A.    Work schedules for employees will vary in the Company. Operational demands may necessitate variations in starting and ending times, as well as variations in the total hours that may be scheduled each workday and workweek.

### 12.2 Overtime Pay

A.    Employees will be paid overtime pay at the rate of one and one half (1-1/2) times their regular rate of pay for hours actually worked in excess of forty (40) hours per week.

### 12.3 Reporting Pay

A.    All employees who report for work at the commencement of a scheduled shift without having been given reasonable notice of a change in schedule shall be given a minimum of four (4) hours' work, except in cases where work cannot be provided due to circumstances beyond the Company's control.

### 12.4 Time Cards

A.    Each employee will scan in the employee's own time card immediately before the commencement of the work period and immediately at the end of the work period.

### 12.5 Line Time

A.    All employees will be paid according to the hours of work indicated by the Master Line Time Card.

### 12.6 Extra Time

A.    Employees designated by their supervisor or superintendent to work beyond their scheduled time shall be

E 24

F I N A L – May 25, 2004

governed by their individual time card reports, which will be approved by management.

## ARTICLE 13 – MISCELLANEOUS

### 13.1 Physical Examination

A.   The Company will follow all applicable State, Federal and local laws for physical exams and drug screening as they relate to hiring, promotions, transfers, job assignments, near accidents, accidents and property damage.

### 13.2 Meal/Rest Periods

A.   Employees will receive two (2) thirty (30) minute non-paid meal/rest breaks each full work day.  In addition, where an employee is required to work more than 9 hours in any workday, except in the case of equipment or mechanical malfunctions or circumstances beyond the control of the Company, the employee shall be entitled to an additional 10 minute paid break to be scheduled by the Company, or to be paid for such break if not granted.

### 13.3 Anti-Discrimination

A.   The Company and Union agree each will comply with all Federal, State and Local anti-discrimination laws.

### 13.4 Supplies

A.   Supplies will be furnished to new employees, where required, in accordance with Company procedures as follows:

```
-Smocks (3)
-Arm Guards
-Cutting Glove
-Hair Net
-Beard Net
-Blue Gloves
-Cotton Gloves
-Ear Plugs
-Apron - heavy duty
-Sleeves
```

-21-

E 25

B.    Arm guards and cutting gloves are not provided to new employees assigned to Packout, Live Hang, Shipping and Sanitation.

C.    Employees are entitled to receive, on a weekly basis, Blue Gloves (cotton liners in Shipping), Hair Nets and Beard Nets.

D.    In addition, employees are entitled to receive, on the first Monday of each month, sleeves and ear plugs; and shall be entitled to receive one new smock and a heavy duty apron every 6 months as of January 1 and July 1 of each calendar year.  The employee must turn in one smock in order to receive a new one without charge.  If the plant is not operating on a scheduled replacement day, the replacement clothing will be distributed on the next work day that the plant is operating.

E.    Employees who are required by the Company to wear boots will be provided boots at that time and may obtain replacement boots as needed in the determination of the Company, provided, however, that the employee turns in the original boots.

F.    Except as noted, employees must purchase replacement supplies from the Company.

G.    The Plant Manager shall approve these supply procedures.  The Company reserves all rights to revise these procedures as necessary.

13.5 Discipline

A.    If an employee has not violated any Work Rules or General Safety Rules or incurred any discipline pursuant to the general progressive disciplinary system within 24 months, the last level of discipline shall be reduced to the next lower level

-22-                          E 26

of discipline and not be considered in future discipline under
the Work Rules, General Safety Rules or general progressive
disciplinary system.  Any remaining disciplinary levels shall be
deemed reduced to the last lower level, one level at a time, if
the employee does not violate any Work Rule or general safety
Rule or incur any discipline under the general progressive
disciplinary system every subsequent 12 months.  This provision
does not modify the application of the Work Rules or the General
Safety Rules or the applicable discipline which may be assessed
for any violation, including the right to increase the
disciplinary level depending on the severity of the violation or
the employee's disciplinary history which is subject to
consideration.

**13.6 Orientation**

A.   The Union shall be permitted to have a representative
selected by the Union to address new employees at any formal
orientation session.  If no Orientation is held, the Union
representative shall have the opportunity to meet with each such
new employee at least one week prior to the completion of the
employee's probationary period.

## ARTICLE 14 - WAGES

**14.1 Schedule A**

A.   The Company shall pay its employees the amount of wages
for the various classification set out in Schedule A attached
hereto and made a part hereof.

**14.2 Pay Day**

A.   Checks will be distributed at the end of the shift on
Friday unless changed by the Company.

E 27

F I N A L - May 25, 2004

eligible for the benefits described in Section 17.1.A plus
$125.00 per week accident and sickness benefits payable after 15
days of accident or illness for a period of 13 weeks as set forth
in the applicable insurance plan, to be paid for by the Company.

17.2 Dependent Coverage

A.    Employees may elect dependent coverage, and if so shall
be responsible for payment of the applicable premium.    This
coverage will be as set forth in Blue Cross Blue Shield of
Alabama Low Option PPO, or its equivalent.

17.3 Substitution of Coverage

A.    So long as coverage and service levels are maintained
without material change, the Company may alter insurance
providers or administrators with prior notification to and
opportunity for discussion with the Union.

ARTICLE 18 - SAVINGS CLAUSE

18.1 Good Faith

A.    The Company and the Union each acknowledge that this
Agreement has been reached as a result of good faith collective
bargaining by both parties hereto and it contains the entire
understanding between the parties and is to be strictly
construed.

18.2 Separability

A.    In the event any provision of this Agreement is held to
be in conflict with or violation of any state or federal statute
or other applicable law, administrative rule or regulation, such
decision shall not affect the validity of the remaining
provisions of the Agreement.    The parties further agree that they
will meet within thirty (30) days to renegotiate the provision or

-27-                          E 31

<u>F I N A L</u> - May 25, 2004

provisions of this Agreement held to be invalid.

<u>ARTICLE 19 – LENGTH OF AGREEMENT</u>

19.1 <u>Duration</u>

A.   This Agreement shall become effective the 12th day of May, 2004 and shall remain in full force and effect until the 1st day of March, 2008, and shall remain in full force and effect for one (1) additional year thereafter unless terminated by either party by written notice to the other at least sixty (60) days prior to the 1st day of March, 2008.

THE RETAIL AND WHOLESALE DEPARTMENT
STORE UNION, SOUTHEAST COUNCIL,
DISTRICT COUNCIL OF THE UFCW,
AFL-CIO-CLC

EQUITY GROUP – EUFAULA DIVISION, LLC

Henry Jenkins,
International Vice President

Spence Jarragin, General Manager

Jerry Foster, Representative

James Davis, Human Resources Director

Jacqueline Davis

Greg Mills, Plant Manager

Barbara Green

Kelvin Granger

Shekina Freeman

Joanne Bussey

-28-

E 32

F I N A L ~ May 25, 2004

I N D E X

| Title | Article/Section | Page |
|---|---|---|
| Accidents, Injuries | 9.2 | 16 |
| Another Job | 4.7 | 5 |
| Anti-Discrimination | 13.3 | 21 |
| Applications | 4.3 | 5 |
| Arbitration | 6.2 | 12 |
| Benefits | 17 | 26 |
| Benefits – Dependent Coverage | 17.2 | 27 |
| Benefits – Employee Coverage | 17.1 | 26 |
| Benefits – Substitution of Coverage | 17.3 | 27 |
| Bulletin Boards | 7 | 15 |
| Check-Off | 16 | 24 |
| Check-Off Authorization Form | 16.2 | 25 |
| Collection of Dues and Remittance | 16.1 | 24 |
| Compensation | 4.5 | 5 |
| Cost of Arbitration | 6.3 | 14 |
| Discharge | 3.3 | 3 |
| Discipline | 13.5 | 22 |
| Discontinue Operations | 2.2 | 2 |
| Duration | 19.1 | 28 |
| Employee Quits/Discharge | 3.4A | 3 |
| Executive Board Authority | 6.4 | 14 |
| Extensions | 4.4 | 5 |
| Extra Time | 12.6 | 20 |
| Family and Medical Leave Act | 4.11 | 7 |
| Funeral Leave | 4.8 | 5 |
| Good Faith | 18.1 | 27 |
| Grievance Procedure | 6.2 | 10 |
| Holiday – Celebration | 10.2 | 17 |
| Holiday – Birthday | 10.3 | 18 |
| Holiday in Vacation | 10.7 | 18 |

E 35

F I N A L – May 25, 2004

| Title | Article/Section | Page |
|---|---|---|
| Recognition | 1.1 | 1 |
| Reporting Pay | 12.3 | 20 |
| Return | 4.6 | 5 |
| Safety and Health | 9 | 16 |
| Savings Clause | 18 | 27 |
| Schedule A | 14.1 | 23 |
| Seniority Broken | 3.4 | 3 |
| Seniority | 3 | 2 |
| Seniority – Principle | 3.1 | 2 |
| Seniority Lists | 3.5 | 4 |
| Separability | 18.2 | 27 |
| Shop Stewards | 6.1 | 10 |
| Stewards and Grievance Procedure | 6 | 10 |
| Subcontracting | 2.3 | 2 |
| Supplies | 13.4 | 21 |
| Temporary Vacancy Defined | 5.1 | 7 |
| Temporary Employees | 5.3 | 10 |
| Time Cards | 12.4 | 20 |
| Union Visits | 8 | 15 |
| Union Business | 4.2 | 4 |
| Union Representation | 8.1 | 15 |
| Vacation Period | 11.3 | 19 |
| Vacation Pay | 11.2 | 19 |
| Vacations | 11 | 18 |
| Vacations – Length | 11.1 | 18 |
| Wages | 14 | 23 |
| Work Schedule | 12.1 | 20 |

-3-

E 36

# EXHIBIT 13

# Work Rules

Printed:    8/9/2007  2:02:38PM
Printed for:  SuperUser

**Work Rule Name**

## 2 BRKS, LINE TIME

**Rounding Rule**
LINE TIME

**Exception Rule**

**Shift Guarantee**

**Pay Code for Unapproved OT**

**Bonus/Deduction Rule(s)**
1ST 30 AUTO DEDUCTION
2ND 30 AUTO DEDUCTION

**Deviation Rule(s)**

**Overtime Rule(s)**
WEEKLY OT

**Core Hours Rule(s)**

**Call-In Rule**

**Pay Code Distribution**
STANDARD

**Day Divide**

**Break Rule(s)**
2ND OF TWO 30 MIN BREAK
1ST OF TWO 30 MIN BREAK

**Majority Rule(s)**

**Zone Rule(s)**

## 2 BRKS, MIN TO MIN

**Rounding Rule**
MIN TO MIN

**Exception Rule**
STANDARD

**Shift Guarantee**

**Pay Code for Unapproved OT**

**Bonus/Deduction Rule(s)**
1ST 30 AUTO DEDUCTION
2ND 30 AUTO DEDUCTION

**Deviation Rule(s)**

**Overtime Rule(s)**
WEEKLY OT

**Core Hours Rule(s)**

**Call-In Rule**

**Pay Code Distribution**
STANDARD

**Day Divide**

**Break Rule(s)**
2ND OF TWO 30 MIN BREAK
1ST OF TWO 30 MIN BREAK

**Majority Rule(s)**

**Zone Rule(s)**

## 2 BRKS, SCHEDULE - 15 MIN SCH-RN

E 173

# Work Rules

Printed:      8/9/2007  2:02:38PM
Printed for:  SuperUser

**Work Rule Name**

## 2 BRKS, SCHEDULE - 15 MIN SCH-RN

| | |
|---|---|
| **Rounding Rule** | **Call-In Rule** |
| SCHEDULE - 15 MIN SCH-RND | |
| **Exception Rule** | **Pay Code Distribution** |
| STANDARD | STANDARD |
| **Shift Guarantee** | **Day Divide** |
| **Pay Code for Unapproved OT** | |
| **Bonus/Deduction Rule(s)** | **Break Rule(s)** |
| 1ST 30 AUTO DEDUCTION | 2ND OF TWO 30 MIN BREAK |
| 2ND 30 AUTO DEDUCTION | 1ST OF TWO 30 MIN BREAK |
| **Deviation Rule(s)** | **Majority Rule(s)** |
| **Overtime Rule(s)** | **Zone Rule(s)** |
| WEEKLY OT | |
| **Core Hours Rule(s)** | |

## 2 BRKS, SCHEDULE - MIN TO MIN

| | |
|---|---|
| **Rounding Rule** | **Call-In Rule** |
| SCHEDULE - MIN TO MIN | |
| **Exception Rule** | **Pay Code Distribution** |
| STANDARD | STANDARD |
| **Shift Guarantee** | **Day Divide** |
| **Pay Code for Unapproved OT** | |
| **Bonus/Deduction Rule(s)** | **Break Rule(s)** |
| 1ST 30 AUTO DEDUCTION | 2ND OF TWO 30 MIN BREAK |
| 2ND 30 AUTO DEDUCTION | 1ST OF TWO 30 MIN BREAK |
| **Deviation Rule(s)** | **Majority Rule(s)** |
| **Overtime Rule(s)** | **Zone Rule(s)** |
| WEEKLY OT | |
| **Core Hours Rule(s)** | |

## 30 MN BRK MIN TO MIN

E 174

# Work Rules

Printed:    8/9/2007  2:02:38PM
Printed for:  SuperUser

**Work Rule Name**

## 30 MN BRK MIN TO MIN

| | |
|---|---|
| **Rounding Rule** | **Call-In Rule** |
| MIN TO MIN | |
| **Exception Rule** | **Pay Code Distribution** |
| STANDARD | STANDARD |
| **Shift Guarantee** | **Day Divide** |
| | |
| **Pay Code for Unapproved OT** | |
| | |
| **Bonus/Deduction Rule(s)** | **Break Rule(s)** |
| SINGLE 30 MIN AUTO DEDUCTION | SINGLE 30 MIN BREAK |
| **Deviation Rule(s)** | **Majority Rule(s)** |
| | |
| **Overtime Rule(s)** | **Zone Rule(s)** |
| WEEKLY OT | |
| **Core Hours Rule(s)** | |

## 60 MN BRK, LINE TIME

| | |
|---|---|
| **Rounding Rule** | **Call-In Rule** |
| LINE TIME | |
| **Exception Rule** | **Pay Code Distribution** |
| STANDARD | STANDARD |
| **Shift Guarantee** | **Day Divide** |
| | |
| **Pay Code for Unapproved OT** | |
| | |
| **Bonus/Deduction Rule(s)** | **Break Rule(s)** |
| SINGLE 60 MIN AUTO DEDUCTION | SINGLE 60 MIN BREAK |
| **Deviation Rule(s)** | **Majority Rule(s)** |
| | |
| **Overtime Rule(s)** | **Zone Rule(s)** |
| WEEKLY OT | |
| **Core Hours Rule(s)** | |

## 60 MN BRK, MIN TO MIN

E 175

# Work Rules

Printed:    8/9/2007  2:02:38PM
Printed for:  SuperUser

**Work Rule Name**

## 60 MN BRK, MIN TO MIN

| | |
|---|---|
| **Rounding Rule** | **Call-In Rule** |
| MIN TO MIN | |
| **Exception Rule** | **Pay Code Distribution** |
| STANDARD | STANDARD |
| **Shift Guarantee** | **Day Divide** |
| **Pay Code for Unapproved OT** | |
| **Bonus/Deduction Rule(s)** | **Break Rule(s)** |
| SINGLE 60 MIN AUTO DEDUCTION | SINGLE 60 MIN BREAK |
| **Deviation Rule(s)** | **Majority Rule(s)** |
| **Overtime Rule(s)** | **Zone Rule(s)** |
| WEEKLY OT | |
| **Core Hours Rule(s)** | |

## FM 30MN BRK SCHED 15 MIN SCH-RN

| | |
|---|---|
| **Rounding Rule** | **Call-In Rule** |
| SCHEDULE - 15 MIN SCH-RND | |
| **Exception Rule** | **Pay Code Distribution** |
| STANDARD | STANDARD |
| **Shift Guarantee** | **Day Divide** |
| **Pay Code for Unapproved OT** | |
| **Bonus/Deduction Rule(s)** | **Break Rule(s)** |
| SINGLE 30 MIN AUTO DEDUCTION | SINGLE 30 MIN BREAK |
| **Deviation Rule(s)** | **Majority Rule(s)** |
| **Overtime Rule(s)** | **Zone Rule(s)** |
| WEEKLY OT | |
| **Core Hours Rule(s)** | |

## HATCHERY CLERKS 1HR NO DED

E 176

# Work Rules

Printed:     8/9/2007  2:02:38PM
Printed for:  SuperUser

**Work Rule Name**

## HATCHERY CLERKS 1HR NO DED

| | |
|---|---|
| **Rounding Rule** | **Call-In Rule** |
| SCHEDULE - 30 MIN  SCH-RND | |
| **Exception Rule** | **Pay Code Distribution** |
| STANDARD | STANDARD |
| **Shift Guarantee** | **Day Divide** |
| **Pay Code for Unapproved OT** | |
| **Bonus/Deduction Rule(s)** | **Break Rule(s)** |
| | MINUTE TO MINUTE |
| **Deviation Rule(s)** | **Majority Rule(s)** |
| **Overtime Rule(s)** | **Zone Rule(s)** |
| WEEKLY OT | |
| **Core Hours Rule(s)** | |

## LINE TIME STAY-LATE

| | |
|---|---|
| **Rounding Rule** | **Call-In Rule** |
| LINE TIME -STAY-LATE | |
| **Exception Rule** | **Pay Code Distribution** |
| | STANDARD |
| **Shift Guarantee** | **Day Divide** |
| **Pay Code for Unapproved OT** | |
| **Bonus/Deduction Rule(s)** | **Break Rule(s)** |
| 1ST 30 AUTO DEDUCTION | 2ND OF TWO 30 MIN BREAK |
| 2ND 30 AUTO DEDUCTION | |
| **Deviation Rule(s)** | **Majority Rule(s)** |
| **Overtime Rule(s)** | **Zone Rule(s)** |
| WEEKLY OT | |
| **Core Hours Rule(s)** | |

## LINE TIME-STAYLATE 30M LO-RN-SCH

E 177

# Work Rules

Printed:    8/9/2007  2:02:38PM
Printed for: SuperUser

**Work Rule Name**

## LINE TIME-STAYLATE 30M LO-RN-SCH

**Rounding Rule**

LINE TIME-STAYLATE 30M LO-RN-SCH

**Call-In Rule**

**Exception Rule**

STANDARD

**Pay Code Distribution**

STANDARD

**Shift Guarantee**

**Day Divide**

**Pay Code for Unapproved OT**

**Bonus/Deduction Rule(s)**

1ST 30 AUTO DEDUCTION
2ND 30 AUTO DEDUCTION

**Break Rule(s)**

2ND OF TWO 30 MIN BREAK
1ST OF TWO 30 MIN BREAK

**Deviation Rule(s)**

**Majority Rule(s)**

**Overtime Rule(s)**

WEEKLY OT

**Zone Rule(s)**

**Core Hours Rule(s)**

## MAINTENANCE, MIN TO MIN SCH- RND

**Rounding Rule**

MIN TO MIN

**Call-In Rule**

**Exception Rule**

STANDARD

**Pay Code Distribution**

STANDARD

**Shift Guarantee**

**Day Divide**

**Pay Code for Unapproved OT**

**Bonus/Deduction Rule(s)**

SINGLE 30 MIN AUTO DEDUCTION

**Break Rule(s)**

SINGLE 30 MIN BREAK

**Deviation Rule(s)**

**Majority Rule(s)**

**Overtime Rule(s)**

WEEKLY OT

**Zone Rule(s)**

**Core Hours Rule(s)**

## NO BREAK, LINE TIME - MIN-MIN

E 178

# Work Rules

Printed:    8/9/2007 2:02:38PM
Printed for: SuperUser

**Work Rule Name**

## NO BREAK, LINE TIME - MIN-MIN

| | |
|---|---|
| **Rounding Rule** | **Call-In Rule** |
| LINE TIME -STAY-LATE | |
| **Exception Rule** | **Pay Code Distribution** |
| STANDARD | STANDARD |
| **Shift Guarantee** | **Day Divide** |
| **Pay Code for Unapproved OT** | |
| **Bonus/Deduction Rule(s)** | **Break Rule(s)** |
| **Deviation Rule(s)** | **Majority Rule(s)** |
| **Overtime Rule(s)** | **Zone Rule(s)** |
| WEEKLY OT | |
| **Core Hours Rule(s)** | |

## NO BREAK, LINE TIME

| | |
|---|---|
| **Rounding Rule** | **Call-In Rule** |
| LINE TIME | |
| **Exception Rule** | **Pay Code Distribution** |
| STANDARD | STANDARD |
| **Shift Guarantee** | **Day Divide** |
| **Pay Code for Unapproved OT** | |
| **Bonus/Deduction Rule(s)** | **Break Rule(s)** |
| | SINGLE 30 MIN BREAK |
| **Deviation Rule(s)** | **Majority Rule(s)** |
| **Overtime Rule(s)** | **Zone Rule(s)** |
| WEEKLY OT | |
| **Core Hours Rule(s)** | |

## NO BREAK, MIN TO MIN

E 179

# Work Rules

Printed:     8/9/2007  2:02:38PM
Printed for:  SuperUser

**Work Rule Name**

## NO BREAK, MIN TO MIN

| | |
|---|---|
| **Rounding Rule** | **Call-In Rule** |
| MIN TO MIN | |
| **Exception Rule** | **Pay Code Distribution** |
| STANDARD | STANDARD |
| **Shift Guarantee** | **Day Divide** |
| | |
| **Pay Code for Unapproved OT** | |
| | |
| **Bonus/Deduction Rule(s)** | **Break Rule(s)** |
| | MINUTE TO MINUTE |
| **Deviation Rule(s)** | **Majority Rule(s)** |
| | |
| **Overtime Rule(s)** | **Zone Rule(s)** |
| WEEKLY OT | |
| **Core Hours Rule(s)** | |

## NO BREAK, SCHED - MIN TO MIN

| | |
|---|---|
| **Rounding Rule** | **Call-In Rule** |
| SCHEDULE - MIN TO MIN | |
| **Exception Rule** | **Pay Code Distribution** |
| STANDARD | STANDARD |
| **Shift Guarantee** | **Day Divide** |
| | |
| **Pay Code for Unapproved OT** | |
| | |
| **Bonus/Deduction Rule(s)** | **Break Rule(s)** |
| | |
| **Deviation Rule(s)** | **Majority Rule(s)** |
| | |
| **Overtime Rule(s)** | **Zone Rule(s)** |
| WEEKLY OT | |
| **Core Hours Rule(s)** | |

## SAL 30 MIN BRK MIN-MIN

E 180

# Work Rules

Printed:    8/9/2007  2:02:38PM
Printed for:  SuperUser

**Work Rule Name**

## SAL 30 MIN BRK MIN-MIN

**Rounding Rule**
MIN TO MIN

**Call-In Rule**

**Exception Rule**
STANDARD

**Pay Code Distribution**
A SAL PCD

**Shift Guarantee**

**Day Divide**

**Pay Code for Unapproved OT**

**Bonus/Deduction Rule(s)**
SINGLE 30 MIN AUTO DEDUCTION

**Break Rule(s)**
SINGLE 30 MIN BREAK

**Deviation Rule(s)**

**Majority Rule(s)**

**Overtime Rule(s)**
WEEKLY OT

**Zone Rule(s)**

**Core Hours Rule(s)**

## SAL 60 MIN BRK MIN-MIN

**Rounding Rule**
MIN TO MIN

**Call-In Rule**

**Exception Rule**
STANDARD

**Pay Code Distribution**
A SAL PCD

**Shift Guarantee**

**Day Divide**

**Pay Code for Unapproved OT**

**Bonus/Deduction Rule(s)**
SINGLE 60 MIN AUTO DEDUCTION

**Break Rule(s)**
SINGLE 60 MIN BREAK

**Deviation Rule(s)**

**Majority Rule(s)**

**Overtime Rule(s)**
WEEKLY OT

**Zone Rule(s)**

**Core Hours Rule(s)**

## SAL NO BRK MIN-MIN

E 181

# Work Rules

Printed:    8/9/2007 2:02:38PM
Printed for:  SuperUser

**Work Rule Name**

## SAL NO BRK MIN-MIN

**Rounding Rule**
MIN TO MIN

**Call-In Rule**

**Exception Rule**
STANDARD

**Pay Code Distribution**
A SAL PCD

**Shift Guarantee**

**Day Divide**

**Pay Code for Unapproved OT**

**Bonus/Deduction Rule(s)**

**Break Rule(s)**
MINUTE TO MINUTE

**Deviation Rule(s)**

**Majority Rule(s)**

**Overtime Rule(s)**
WEEKLY OT

**Zone Rule(s)**

**Core Hours Rule(s)**

## SANITATION

**Rounding Rule**
MIN TO MIN

**Call-In Rule**

**Exception Rule**
STANDARD

**Pay Code Distribution**
STANDARD

**Shift Guarantee**
SANITATION

**Day Divide**

**Pay Code for Unapproved OT**

**Bonus/Deduction Rule(s)**

**Break Rule(s)**

**Deviation Rule(s)**

**Majority Rule(s)**

**Overtime Rule(s)**
WEEKLY OT

**Zone Rule(s)**

**Core Hours Rule(s)**

## SCHEDULE - 30 MIN  SCH-RND

E 182

# Work Rules

Printed:    8/9/2007  2:02:38PM
Printed for:  SuperUser

**Work Rule Name**

## SCHEDULE - 30 MIN  SCH-RND

| | |
|---|---|
| **Rounding Rule** | **Call-In Rule** |
| SCHEDULE - 30 MIN  SCH-RND | |
| **Exception Rule** | **Pay Code Distribution** |
| STANDARD | STANDARD |
| **Shift Guarantee** | **Day Divide** |
| **Pay Code for Unapproved OT** | |
| **Bonus/Deduction Rule(s)** | **Break Rule(s)** |
| 1ST 30 AUTO DEDUCTION | 2ND OF TWO 30 MIN BREAK |
| 2ND 30 AUTO DEDUCTION | 1ST OF TWO 30 MIN BREAK |
| **Deviation Rule(s)** | **Majority Rule(s)** |
| **Overtime Rule(s)** | **Zone Rule(s)** |
| WEEKLY OT | |
| **Core Hours Rule(s)** | |

## SETUP - LINE TIME 30MN L0

| | |
|---|---|
| **Rounding Rule** | **Call-In Rule** |
| SETUP - LINE TIME 30MN ER SCH-RN | |
| **Exception Rule** | **Pay Code Distribution** |
| STANDARD | STANDARD |
| **Shift Guarantee** | **Day Divide** |
| **Pay Code for Unapproved OT** | |
| **Bonus/Deduction Rule(s)** | **Break Rule(s)** |
| 1ST 30 AUTO DEDUCTION | 2ND OF TWO 30 MIN BREAK |
| 2ND 30 AUTO DEDUCTION | 1ST OF TWO 30 MIN BREAK |
| **Deviation Rule(s)** | **Majority Rule(s)** |
| **Overtime Rule(s)** | **Zone Rule(s)** |
| WEEKLY OT | |
| **Core Hours Rule(s)** | |

## SETUP - LINE TIME

E 183

# Work Rules

Printed:     8/9/2007 2:02:38PM
Printed for: SuperUser

**Work Rule Name**

## SETUP - LINE TIME

| | |
|---|---|
| **Rounding Rule** | **Call-In Rule** |
| SETUP - LINE TIME | |
| **Exception Rule** | **Pay Code Distribution** |
| STANDARD | STANDARD |
| **Shift Guarantee** | **Day Divide** |
| **Pay Code for Unapproved OT** | |
| **Bonus/Deduction Rule(s)** | **Break Rule(s)** |
| 1ST 30 AUTO DEDUCTION | 2ND OF TWO 30 MIN BREAK |
| 2ND 30 AUTO DEDUCTION | 1ST OF TWO 30 MIN BREAK |
| **Deviation Rule(s)** | **Majority Rule(s)** |
| **Overtime Rule(s)** | **Zone Rule(s)** |
| WEEKLY OT | |
| **Core Hours Rule(s)** | |

**Total Number of Work Rules:  23**

E 184

# EXHIBIT 14

**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division
Washington, D.C. 20210

FLSA2007-10

May 14, 2007

Dear Name*:

This is in response to your request on behalf of your client, **Name***, for an opinion regarding the application of section 3(o) of the Fair Labor Standards Act (FLSA) to employees in the meat packing industry. Specifically, you request an opinion on the following questions:

    (1)  Whether, notwithstanding the opinion of the Court of Appeals for the Ninth Circuit in *Alvarez v. IBP, Inc.* 339 F. 3d 894 (9th Cir. 2003), the Department of Labor continues to maintain the interpretation of section 3(o) of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 203(o), set forth in the opinion letter issued by Administrator Tammy McCutchen on June 6, 2002 FLSA2002-2?

    (2)  Whether, outside states within the jurisdiction of the Ninth Circuit, **Name*** may continue to rely on the June 6, 2002 opinion letter as the basis for a "good faith" defense under 29 U.S.C. § 259 against donning and doffing claims at locations where it has negotiated collective bargaining agreements that exclude equipment donning and doffing time from compensable work time by the express terms or by custom and practice under the collective bargaining agreements?

Section 3(o) of the FLSA excludes "any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee." 29 U.S.C. § 203(o). In promulgating this provision Congress plainly excluded activities covered by section 3(o) from time that would otherwise be "[h]ours worked." 29 U.S.C. § 203(o). Accordingly, activities covered by section 3(o) cannot be considered principal activities and do not start the workday. Walking time after a 3(o) activity is therefore not compensable unless it is preceded by a principal activity.

After carefully reviewing the interpretation of section 3(o) set forth in Wage and Hour Opinion Letter FLSA 2002-2 (June 6, 2002), it remains our view, based upon the statute and its legislative history, that the "changing clothes" referred to in section 3(o) applies to putting on and taking off the protective safety equipment typically worn by employees in the meat packing industry. As in our previous letter, we take no position on what constitutes a custom or practice for purposes of excluding time under section 3(o), or on whether there is such a custom or practice by any employers in your industry. As specified in the 2002 letter, this clothing includes, among other items, heavy protective safety equipment worn in the meat packing industry such as mesh aprons, sleeves and gloves, plastic belly guards, arm guards, and shin guards.

E 171

The Ninth Circuit rejected the June 6, 2002 opinion letter in its decision in *Alvarez v. IBP, Inc.,* 339 F. 3d 894 (2003), but the issue was not addressed by the Supreme Court in *IBP v. Alvarez,* 126 S.Ct. 514 (2005). The Division has not changed its interpretation as a result of the circuit court's opinion and continues to believe that the opinion letter is correct for the reasons stated therein. Therefore, you may continue to rely on the letter for practices outside states within the jurisdiction of the Ninth Circuit. Of course, we will monitor any case law that addresses this issue in other courts, and may reconsider our interpretation if case law so requires.

This opinion is based exclusively on the facts and circumstances described in your request and is given based on your representation, express or implied, that you have provided a full and fair description of all the facts and circumstances that would be pertinent to our consideration of the question presented. Existence of any other factual or historical background not contained in your letter might require a conclusion different from the one expressed herein. You have represented that this opinion is not sought by a party to pending private litigation concerning the issue addressed herein. You have also represented that this opinion is not sought in connection with an investigation or litigation between a client or firm and the Wage and Hour Division or the Department of Labor.

We trust the above information is responsive to your inquiry.

Sincerely,

Paul DeCamp
Administrator

**Note: *The actual name(s) was removed to preserve privacy in accordance with 5 U.S.C. 552 (b)(7).**

E 172

Page 2 of 2

**U.S. Department of Labor**    Employment Standards Administration
Wage and Hour Division
Washington, D.C. 20210



June 6, 2002

Dear

This responds to your letter of December 12, 2001, on behalf of
requesting reconsideration of two opinion letters issued by the Acting Administrator of the Wage
and Hour Division and the Administrator of the Wage and Hour Division, respectively, on
December 3, 1997, and January 15, 2001. The opinion letters concern application of section 3(o) of
the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203(o), to employees in the meat packing
industry. Specifically, the letters set forth the position that section 3(o) does not apply to the
putting on, taking off, or washing of the protective safety equipment typically worn in the meat
packing industry, such as mesh aprons, plastic belly guards, mesh sleeves or plastic arm guards,
wrist wraps, mesh gloves, rubber gloves, polar sleeves, rubber boots, shin guards, and weight belts.

As noted in the January 15, 2001 opinion letter, the construction of section 3(o) enunciated in the
December 3, 1997 Opinion Letter had never previously been put forward by the Administrator.
Further, a number of regional and district officials of the Wage and Hour Division and the Office
of the Solicitor had, in their enforcement of some cases, historically applied section 3(o) if a
bona fide collective bargaining agreement excluded from hours worked the time spent by
employees putting on, taking off and cleaning protective equipment.

We have completed a careful review of the interpretation of section 3(o) set forth in these opinion
letters, as well as in the opinion letter issued by the Acting Administrator on February 18, 1998. It
is our view, based upon a reexamination of the statute and legislative history, that the "changing
clothes" referred to in section 3(o) applies to the putting on and taking off of the protective safety
equipment typically worn in the meat packing industry, as described in your letter. It remains our
view, however, that the term "washing" in section 3(o) applies only to washing of the person and
does not apply to the cleaning or sanitizing of protective equipment. Accordingly, for the reasons
set forth below, we are withdrawing as of this date the opinion letters dated December 3, 1997,
February 18, 1998, and January 15, 2001 (as it relates to section 3(o)).

Section 3(o) of the FLSA, enacted in 1949, provides that an employer does not have to pay for time
spent "changing clothes or washing at the beginning or end of each workday" if such time is
excluded from working time "by the express terms or by custom or practice under a bona fide
collective-bargaining agreement." 29 U.S.C. § 203(o). (We take no position in this letter on what
constitutes a custom or practice for purposes of excluding time under section 3(o), or on whether
there is such a custom or practice by any employers in your industry.) The FLSA does not define
the term "changing clothes or washing" for purposes of section 3(o), and we do not believe that a
plain meaning of the term is evident from the statute. One dictionary defines "clothes" as

*Working to Improve the Lives of America's Workers*

"garments for the body; articles of dress; wearing apparel" (The Random House College Dictionary (revised ed. 1982)), and another defines "clothes" as "<u>articles</u>, usually of cloth, designed to cover, <u>protect</u> or adorn the body ...." (Webster's New World Dictionary (2d college ed. 1982)) (emphases added). <u>See also</u> 29 C.F.R. § 1910.1050 App. A (OSHA regulations characterizing "face shields" as a kind of "protective <u>clothing</u>") (emphasis added). The Department's interpretative regulations on "hours worked," published in 1965, merely repeat the terms "changing clothes" and "washing." <u>See</u> 29 C.F.R. § 785.26.

The legislative history is specific only with respect to the interpretation of "washing." The House version of section 3(o) would have allowed the elimination from hours worked of any activity of an employee as provided by the express terms of, or custom or practice under, a collective bargaining agreement. <u>See</u> S. Rep. No. 640 (1949), <u>reprinted in</u> 1949 U.S.C.C.A.N. 2241, 2255. The conference committee explained that it narrowed the scope of the provision by "limit[ing] this exclusion to time spent by the employee in changing clothes and <u>cleaning his person</u> at the beginning or at the end of the workday." <u>Id.</u> (emphasis added). This explicitly narrow reading of "washing" is supported by a statement in the debates that describes the conference agreement as "limit[ing]" the provision's application "to time spent in changing clothes or washing (including bathing) at the beginning or end of each workday." 95 Cong. Rec. 14875 (1949). <u>See also</u> 29 C.F.R. § 790.7(g) & n. 49 (interpretative rule addressing the Portal-to-Portal Act's test for preliminary or postliminary activities using the phrases "changing clothes" and "washing up or showering"); Wage and Hour Division's Field Operations Handbook 31b01 (using the phrase "wash up time" in discussing section 3(o) and "hours worked").

The legislative history does not specifically address the scope of "changing clothes" under section 3(o). The provision was enacted subsequent to the Portal-to-Portal Act of 1947, which in turn was enacted in response to the Supreme Court's decision in <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680 (1946). In <u>Mt. Clemens</u>, the Supreme Court held that the time that employees spent walking to and from their work stations on the employer's premises was "hours worked." 328 U.S. at 691-92. The Court also found compensable, as a necessary prerequisite to the employees' production work, such preliminary activities as putting on aprons and overalls, removing shirts, taping or greasing arms, putting on finger sheaths, preparing equipment, turning on switches for lights and machinery, opening windows, and assembling and sharpening tools. <u>Id.</u> at 692-93.

The legislative history indicates that some clothes changing was expected to remain compensable after enactment of the Portal Act, and the Supreme Court has so held. <u>See</u> Steiner v. Mitchell, 350 U.S. 247 (1956). During debate on the Act, one of the bill's sponsors stated that the clothes changing and showering that might be required of "chemical plant workers" would remain a compensable principal activity. 93 Cong. Rec. 2297-98 (1947). The Supreme Court appended this legislative history to its decision in <u>Steiner</u>, where it held that the time spent by workers in a battery plant changing into and out of old work clothes and showering was compensable. Although "changing clothes and showering under normal conditions ... ordinarily constitute 'preliminary' or 'postliminary' activities excluded from compensable work time" under the Portal Act, the Court ruled, clothes changing and showering under the circumstances of this case are "an integral and indispensable part of the production of batteries." 350 U.S. at 249, 255-56. Thus, while the Portal Act excluded "ordinary" clothes changing from compensable time, other clothes changing that was

2

E 168

not "merely a convenience to the employee" and that was "directly related to the specific work" remained compensable (93 Cong. Rec. 2297-98 (1947)).

The function of section 3(o) is to allow companies and unions to agree to treat as non-compensable clothes-changing activities that otherwise would be compensable under the Portal Act. In stating that the Act invalidates such agreements in the case of protective gear in the meat packing industry, the 1997 opinion letter confined its reasoning to a single sentence where it explained that "clothes" has a "plain meaning" which excludes (i) "protective" articles that (ii) may be "cumbersome in nature" and (iii) are "worn over . . . apparel." Upon review, we have concluded that none of these qualities should prohibit a company and union from regarding the gear worn in the meat packing industry as clothes for purposes of section 3(o).

The Department of Labor has described articles worn for protective purposes as clothing, and so has a leading dictionary. See 29 C.F.R. § 1910.1050 App. A (OSHA regulations characterizing "face shields" as a kind of "protective clothing"); Webster's New World Dictionary (2d college ed. 1982) ("clothes" are "articles, usually of cloth, designed to cover, protect or adorn the body ..."). The Supreme Court has used the phrase "protective clothing" on more than one occasion. See, e.g., Industrial Union Department, AFL-CIO v. American Petroleum Institute, 448 U.S. 607, 660-61 (1980) (the "Benzene" case) (plurality) (stating that compliance with an OSHA requirement "could be achieved simply by the use of protective clothing, such as impermeable gloves"); United States v. Stanley, 483 U.S. 669, 671, 690 (1987) (referring to clothing to protect from chemical exposure and radiation). Congress, in enacting the Portal Act, and the Supreme Court, in interpreting it in Steiner, recognized that the purpose of clothing specially worn for the workplace might well be protection. Indeed, it was in part precisely because the clothing at issue served protective purposes that, in the legislative debates and Steiner, Congress and the Court indicated that donning and doffing the clothing at issue was "integral" to the job and, accordingly, compensable.

That an article may be "cumbersome" also is no indication that it is not clothing. Many items of clothing are cumbersome. In the case of clothing worn for protective purposes in particular, it often will be more protective if it is larger, heavier, and therefore more cumbersome than street clothes. It would disserve the workers the Fair Labor Standards Act is meant to protect if employers who wished to introduce bulkier and more protective gear in the workplace knew that in doing so they would lose their ability to bargain with their union over the compensability of donning and doffing protective gear. Such an intent should not be attributed to Congress in interpreting 3(o). In addition to lacking basis in the statutory text and legislative intent, a distinction between apparel that is "cumbersome" and that which is not is vague, difficult to administer, and fails to provide useful guidance to employers and unions regarding the legitimate parameters of their agreements and practices.

Finally, that an item is worn on top of another item plainly is no reason to believe they are not both items of clothing.

There are other bases in the history and purpose of section 3(o) for concluding that a broader interpretation of the provision is appropriate. It is reasonable to assume that when Congress enacted section 3(o), it had in mind the kind of "clothing" at issue in the Mt. Clemens case just

3

E 169

three years earlier; that case involved aprons and overalls, shirts, and finger sheaths. Finally, a less rigid definition of "clothes" comports with Congress's intent in enacting section 3(o), which was to give a measure of deference on this aspect of wage-hour practice to the agreements and judgments shared by companies and their employees' duly-designated representatives for purposes of negotiating the terms and conditions of employment. See 95 Cong. Rec. 11210 (1949).

In sum, for the foregoing reasons we believe that the term "clothes" in section 3(o) includes the protective safety equipment typically worn by meat packing employees. Accordingly, we interpret "clothes" under section 3(o) to include items worn on the body for covering, protection, or sanitation, but not to include tools or other implements such as knives, scabbards, or meat hooks. Furthermore, the term "washing" refers only to washing of the person, and not to the washing, cleaning, or sanitizing of protective or safety equipment. See Saunders v. John Morrell & Co., 1 WH Cases 2d 879 (N.D. Iowa 1991).

Sincerely,

Tammy D. McCutchen
Administrator

4

E 170

# EXHIBIT 15

# EQUITY GROUP EUFAULA DIVISION
# PAYROLL PROCESSING MANUAL

E 692

**Time Detail**

Data Up to Date: 10/11/2006  1:04:37PM
Printed: 10/11/2006  1:04:48PM
Printed for:     carol

Time Period:     Current Pay Period
Query     6ZA Debone 2
nal/Adjusted:     Actual Only

| Employee: | 6ZA Slg Leg Debone 1-2 2nd | ID: 60006401 | Timezone: | Central |
|---|---|---|---|---|
| | | Status: Active | Status Date: | 6/26/2003 |
| | | Pay Rule: MASTER CARDS | | |

Home Labor Accounts

| START | END | LABOR ACCOUNT |
|---|---|---|
| 12/10/2004 | No End | B&E/6000/6400/6ZA/2ND/6431/5555 |

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| Xfr/Move: Labor Level | | Comment | | | | | Xfr Workrule | | |
| 10/9/2006 | | 4:30:00PM | | 2:00:00AM | | | | 8.50 | 8.50 |
| | | | US | | | | | | |
| 10/10/2006 | | 4:30:00PM | | 1:49:00AM | | | | 8.32 | 16.82 |
| | | | US | | | | | | |
| 10/11/2006 | | 4:30:00PM | | | | | | 0.00 | 16.82 |
| | | | US | | MO | | | | |
| 10/12/2006 | | 4:30:00PM | | | | | | 0.00 | 16.82 |
| | | | US | | MO | | | | |
| 3/2006 | | 4:30:00PM | | | | | | 0.00 | 16.82 |
| | | | US | | MO | | | | |

B&E/6000/6400/6ZA/2ND/6431/5555
Regular                                                  16.82

Regular                                                  16.82
                                    Totals:     $0.00     16.82

| Employee: | DIAZ, MATEO G | ID: 10920 | Timezone: | Central |
|---|---|---|---|---|
| | | Status: Active | Status Date: | 10/13/2004 |
| | | Pay Rule: 2 BRKS LINE TIME | | |

Home Labor Accounts

| START | END | LABOR ACCOUNT |
|---|---|---|
| 1/7/2005 | No End | B&E/6000/6400/6ZA/2ND/6431/9999 |

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| Xfr/Move: Labor Level | | Comment | | | | | Xfr Workrule | | |
| 1/   /2006 | | 4:07:00PM | | 2:07:00AM | | | | 8.50 | 8.50 |
| /0/2006 | | 4:16:00PM | | 1:55:00AM | | | | 8.32 | 16.82 |

B&E/6000/6400/6ZA/2ND/6431/9999
Regular                                                  16.82                     E 695

| W/E DATE: | First Shift | | | | | |
|---|---|---|---|---|---|---|
| Payroll Dept | Payroll Department | Supervisor | Monday IN / OUT | Tuesday IN / OUT | Wednesday IN / OUT | Thursday IN / OUT | Friday IN / OUT |
| 21A | SECURITY | J. B. Glass | E | E | E | E | E |
| 6HA | DSI MACHINE 2 | Leon Jones | | | | | |
| 6JB | PLANT GENERAL | Sampson Reeves | | | | | |
| 6JC | KNIFE ROOM | Donna Bell | | | | | |
| 6KB | EVISCERATION | J. McElory | E | E | E | E | E |
| 6KC | EVIS REHANG | Brenda Thomas | E | E | E | E | E |
| 6KD | LIVE HANG | Dee Green | E | E | E | | E |
| 6LA | PAWS | Brenda Thomas | E | E | E | | E |
| 6NA | DEBONE REHANG | Sampson Reeves | | | | | |
| 6OC | DEBONE - LINE 3 | Joann Bussey | | | | | |
| 6OD | DEBONE - LINE 4 | Joann Bussey | | | | | |
| 6OE | DEBONE - LINE 5 | Seretha Nelson | | | | | |
| 6OF | DEBONE - LINE 6 | Seretha Nelson | | | | | |
| 6OG | DEBONE - LINE 7 | Anthony Smith | | | | | |
| 6OH | DEBONE - LINE 8 | Donna Bell | | | | | |
| 6OI | BONE SAMPLERS LINE 1-8 | Vera Marshall | E | - E | E | E | |
| 6OJ | DEBONE - LINE 9 - TRAINING | Donna Bell | | | | | |
| 6PA | BOX ROOM | Kathleen Brevard | | | | | |
| 6QA | PACKOUT | S. Devorse | | | | | |
| 6RA | LEG CUTTERS | Levern Johnson | | | | | |
| 6RB | LEG PACKERS | S. Devorse | | | | | |
| 6SA | SHIPPING | Melvin Arnold | E | E | E | E | |
| 6SB | WING CUTTERS | S. Devorse | | | | | |
| 6SD | WING PACKERS | S. Devorse | | | | | |
| 6TB | QA | Nikita Hall | E | E | E | E | E |
| 6TC | HAACP | Felisha Lewis | E | E | E | E | E |
| 6UA | PRODUCTION SYSTEMS | Chris Miller | E | E | E | E | E |
| 6VA | MAINTENANCE | Warren Gallimore | E | E | E | E | E |
| 6VA | MAINTENANCE | Johnny Bell | E | E | E | E | E |
| 6VC | YARD MAINTENANCE | Terrell Smith | E | E | E | E | E |
| 6VD | PAINTER – PALLETJACK REPAIR | Terrell Smith | E | E | E | E | E |
| 6XA | ENVIRONMENTAL | Terrell Smith | E | E | E | E | E |
| 6YA | JANITORIAL | Kathleen Brevard | | | | | |
| 6ZA | DEBONE 1 | Carolyn Jenkins | | | | | |
| 6ZB | DEBONE 2 | Carolyn Jenkins | | | | | |
| 72A | FURTHER - MAINTENANCE | June White | E | E | E | E | E |
| 72A | FURTHER - MAINTENANCE | Charlie Mobley | E | E | E | E | E |
| 72B | MAINT - REFRIG - FURTHER | Johnny Bell | E | E | E | E | E |
| 72C | PAINTER – PALLETJACK REPAIR | Terrell Smith | E | E | E | E | E |
| 74A | FURTHER - LABORATORY | Trunae Powell | E | E | E | E | E |
| 75A | FURTHER - MATERIAL & PREP | Rollins Walker | E | E | E | E | E |
| 76A | FURTHER - COOKING | Rollins Walker | E | E | E | E | E |
| 77A | FURTHER - LINE 2 | Rollins Walker | E | E | E | E | E |
| 7AA | FURTHER - R & D | Thelma Lane | E | E | E | E | E |
| 7CA | FURTHER - SHIPPING | Bob Patzralek | E | E | E | E | E |

E 696

W/E DATE: _____  Second Shift

| Payroll # | Payroll Department | Supervisor | Monday IN / OUT | Tuesday IN / OUT | Wednesday IN / OUT | Thursday IN / OUT | Friday IN / OUT |
|---|---|---|---|---|---|---|---|
| 6HA | DSI MACHINE 2 | Johnson | | | | | |
| 6JC | KNIFE ROOM | Sarah Lynn | | | | | |
| 6KB | EVISCERATION | Johnny Moore | | | | | |
| 6KC | EVIS REHANG | Johnny Moore | | | | | |
| 6KD | LIVE HANG | Corneil Green | | | | | |
| 6LA | PAWS | Johnny Moore | | | | | |
| 6NA | DEBONE REHANG | Johnson | | | | | |
| 6OC | DEBONE - LINE 3 | Clemons | | | | | |
| 6OD | DEBONE - LINE 4 | S. Wims | | | | | |
| 6OE | DEBONE - LINE 5 | Teresa Drake | | | | | |
| 6OF | DEBONE - LINE 6 | Faith Avellinda | | | | | |
| 6OG | DEBONE - LINE 7 | S. Patrick | | | | | |
| 6OH | DEBONE - LINE 8 | Margaret Griffin | | | | | |
| 6OI | BONE SAMPLERS LINE 1-8 | Vera Marshall | E | E | E | E | E |
| 6OJ | TRAINING | Margaret Griffin | | | | | |
| 6QB | LINE 1-8 PARTS PACKOUT | Washington | | | | | |
| 6RA | LEG CUTTERS | S. Patrick | | | | | |
| 6RB | LEG PACKERS | Washington | | | | | |
| 6SA | SHIPPING | Bruce Burks | E | E | E | E | E |
| 6SA | SHIPPING | Rev Ross | E | E | E | E | E |
| 6SB | WING CUTTERS | S. Wims | | | | | |
| 6SD | WING PACKERS | Corneil Green | | | | | |
| 6TB | QA | Malvia Baxter | E | E | E | E | E |
| 6TC | HAACP | Martha Corley | E | E | E | E | E |
| 6VA | MAINTENANCE | Brad Hutto | E | E | E | E | E |
| 6WA | SANITATION #1 | Fred Thomas | | | | | |
| 6WB | SANITATION #2 | Fred Thomas | | | | | |
| 6XA | ENVIRONMENTAL | Terrell Smith | E | E | E | E | E |
| 6YA | JANITORIAL | Latrell Baxter | | | | | |
| 6ZA | DEBONE 1 | Johnson | | | | | |
| 6ZB | DEBONE 2 | Johnson | | | | | |
| 72A | MAINTENANCE | Buck Giles | E | E | E | E | E |
| 72B | FURTHER | Johnny Bell | E | E | E | E | E |
| 73A | FURTHER - SANITATION | Casi Ortiz | | | | | |
| 74A | FURTHER - LABORATORY | Melinda Stinson | E | E | E | E | E |
| 75A | PREP | Tony Horsely | | | | | |
| 76A | FURTHER - COOKING | Tony Horsely | | | | | |
| 77A | FURTHER - LINE 2 | Tony Horsely | | | | | |
| 7AA | FURTHER - R & D | Lillian Tarver | | | | | |
| 7CA | FURTHER - SHIPPING | Sarah Cooper | E | E | E | E | E |

E 697

**EDITING:**

You must go through and edit each time sheet turned in by the supervisor.  You are looking for any punches missed are corrections in time.

Open Kronos on your desktop and sign in.



E 698

Begin checking the sheets for corrections.

In the attached correction you can see the supervisor has written in that the employee has stayed later than the line time (mastercard) was clocked.

What you will do now is in Kronos on the left hand side of the screen click on quick find



Put in the employees ID # (located beside their name on the timesheet) or last name
An asterisk * should follow

Time Period should be CURRENT if it is Wednesday – Friday or PREVIOUS if it is Monday or Tuesday

Click Find
Click on the employee
Click timecard

The supervisor has asked to pay line time stay late for 10/10/2006
Find the correct date in the timecard
Click in the transfer column and drop down to line time stay late.  If the correction you're looking for is not present click on search in the drop down.

SAVE

SEE EXAMPLES THAT FOLLOW!!!

E 699

| | | Data Up to Date: | 10/11/2006 | 1:00:01PM |
| | | Printed: | 10/11/2006 | 1:00:16PM |
| | | Printed for: | carol | |

Current Pay Period
6SD - Wing Packers 2nd
Adjusted:    Actual Only

| | | | | | |
|---|---|---|---|---|---|
| Regular | | | | 18.02 | |
| | | Totals: | $0.00 | 18.02 | |

**Employee:** CARTER, MARY     **ID:** 11808     **Timezone:** Central

**Status:** Active     **Status Date:** 5/2/2005

**Pay Rule:** 2 BRKS LINE TIME

Home Labor Accounts

START     END       LABOR ACCOUNT
9/29/2006    No End    B&E/6000/6400/6SD/2ND/6474/9999

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| Xfr/Move: | Labor Level | Comment | | | | | Xfr Workrule | | |
| 10/8/2006 | Birthday | | | | | | 8.00 | | 8.00 |
| 10/9/2006 | | 4:03:00PM | | 2:26:00AM | | | | 9.38 | 17.38 |
| 10/10/2006 | | 4:01:00PM | | 2:07:00AM | | | | 8.62 | 26.00 |

/6000/6400/6SD/2ND/9999

|nday | | | | | | | 8.00 | | |
|ular | | | | | | | 18.00 | | |

|day | | | | | | | 8.00 | | |
|r | | | | | | | 18.00 | | |

| | | Totals: | $0.00 | 26.00 | |

Employee: DAVILA, JOSE     **ID:** 11242     **Timezone:** Central

**Status:** Active     **Status Date:** 1/14/2005

**Pay Rule:** 2 BRKS LINE TIME

Home Labor Accounts

START     END       LABOR ACCOUNT
9/29/2006    No End    B&E/6000/6400/6SD/2ND/6474/9999

| ate | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| /Move: | Labor Level | Comment | | | | | Xfr Workrule | | |
| /9/2006 | | 4:01:00PM | | 2:44:00AM | | | | 9.72 | 9.72 |
| | | | | | | LINE TIME STAY-LATE | | | |
| /10/2006 | | 4:03:00PM | | 2:38:00AM | | | | 8.62 | 18.33 |

/6000/6400/6SD/2ND/9999

|ar | | | | | | | 18.33 | | |

E 700

|ul | | | | | | | 18.33 | | |



E 701

IN THE NEXT EXAMPLE YOU CAN SEE THAT THE EMPLOYEE HAS MISSED A PUNCH.

Follow the same steps as before in pulling up his time card.

This employee works 2nd shift so you will enter the in time in the column for the previous date.

Then left click on the time that you just entered.  This will highlight that time.
Right click
This pulls up 2 selections:  your choice for this is to add comment
Select: employee forgot to clock in or out
Save

This will be the case in most instances when an employee misses a punch.

NO PUNCHES CAN BE CHANGED THAT AN EMPLOYEE HAS MADE!!!!!

Make sure he has the correct amount of hours in the shift column.  Make sure there is no large amount of hours.  If you maybe you entered pm when you should have enter am and vice versa.

For a missing punch on a 1st shift employee you follow the same steps except you enter the time on the line same as the date of the missing punch.

If the employee has missed a punch and his clock out time is showing up in his clock in slot or vice versa you left click on the time as before but this time select edit punch.  You then select to move the punch to an in punch or an out punch, whatever the case under the pull down.

Then enter the missing punch and don't forget to ADD A COMMENT!!

E 702







Totals & Schedule

TORRES, CARLOS 10/08/2006-10/14/2006

Timecard

E 703

## PAY PROBLEMS

Pay problems will be turned in when proper corrections weren't made by the supervisor

They must be signed by the department supervisor as well as the Manager

1st and 2nd First Processing shifts must have ROBIN STEVENS' signature

Further Processing must be signed by Mike Cortner
Maintenance must be signed by Reb Bludsworth

Check the employees ID
Pull up the hours for the week of the discrepancy in Kronos
Print out a time report
Write employees rate on sheet
Pull weekly time sheets
Make copy of timesheet for that employee only

Figure the total hours and write them on the pay problem
Making sure you have figure the regular and overtime properly
Write an explanation on the sheet

I.e.: no correction by supervisor

For pay problems due to cut a manual check on Friday you will then fill out a manual request sheet



E 718

  

# EQUITY GROUP-EUFAULA DIVISION, LLC
## PAYCHECK PROBLEM

DATE: 10-6-06

NAME: Gerardo Carrillo     DEPT: Tender sizing

COST CENTER: 60K     SUPV: Ida Toney

PROBLEM:
The employee was suspended for 3 days (9-21-06, 9-22-06, and 9-25-06). HR brought the employee back and is requesting that he receive pay for that de those days.

Pay 24 hrs.
(16.83 Reg + T.TIOE)

RECEIVED HR: ___ 10/6/06

SUPV APPROVAL: I Toney

VP APPROVAL: _____

ACCOUNTING DEPT: C Baker     E 720

CHECK STUB ATTACHED? ___ YES ___ NO



EQUITY GROUP EUFAULA DIV LLC
ST MELVIN CLARK ROAD
BAKERHILL AL 36027

PERIOD END DATE  09/30/2006     CHECK NUMBER
EMPLOYEE NUMBER

| WAGES | HOURS | RATE | AMOUNT | YTD AMOUNT | DEDUCT | AMOUNT | YTD AMOUNT | DEDUCT | AMOUNT | |
|-------|-------|------|--------|------------|--------|--------|------------|--------|--------|--|
| ERReg | 17.52 | 7.547 | 132.23 | 12818.93 | Al Tax | 10.63 | 451.40 | | | |
| H HOLTS | | | | 300.95 | Fed Tax | | 1199 | | | |
| H V3G | | | | 294.00 | SocSec | 8.20 | 884.89 | | | |
| H Hol | | | | 291.60 | MED | 1.92 | 206.88 | | | |
| H Vac | | | | 288.00 | Purch | 6.44 | 230.68 | | | |
| H Hol H | | | | 116.80 | UnDues | 5.56 | 126.50 | | | |
| H Bol | | | | 59.80 | | | | | | |

| | | | | | | DEDUC TOTALS | | | 22.68 | 1911.90 |
|--|--|--|--|--|--|--------------|--|--|-------|---------|
| TOTALS | 17.52 | | 132.23 | 14267.53 | | NET PAY | | | 109.55 | 12355.63 |
| | TAXABLE GROSS | | 132.23 | 14267.53 | | | | | | |



E 721

Time Detail

Time Detail

Use the browser's Print command to print this page.

**Time Period:** Range of Dates
**Dates:** 9/17/2006 - 9/23/2006

**Printed:** 10/10/2006

**Name:**
CARRILLO, GERARDO      **ID:** 11896      **Pay Rule:** 2 BRKS LINE TIME
**Home Account:** B&E/6000/6400/6OK/2ND/6439/9999 5/17/2005 - No End

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | $Amt | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount | Absence |
|------|----------|----------|--------|-----------|---------|------|----------------|----------------|------------------|---------|
| Sun 9/17 | | | | | | | | | 0.00 | |
| Mon 9/18 | | 4:00PM | | 3:05AM | | | -- | 9.58 | 9.58 | |
| Tue 9/19 | | 4:04PM | | 3:02AM | | | | 9.53 | 19.12 | |
| Wed 9/20 | | 4:00PM | | 9:03PM | | | | 4.05 | 23.17 | |
| Thu 9/21 | | | | | | | | | 23.17 | Absent |
| Fri 9/22 | | | | | | | | | 23.17 | Absent |
| Sat 9/23 | | | | | | | | | 23.17 | Absent |

| Totals | | | | | | 0.00 | 0.00 | 23.17 | 23.17 | |

| Pay Code | Money | Hours |
|----------|-------|-------|
| B&E/6000/6400/6OK/2ND/6439/9999 | | |
| Regular | | 23.17 |

| Pay Code | Money | Hours | Wages |
|----------|-------|-------|-------|
| Regular | | 23.17 | 0.00 |
| -- | | | |
| Totals | 0.00 | 23.17 | 0.00 |

| Combined Pay Code | Money | Hours | Wages |
|-------------------|-------|-------|-------|

**NO DATA AVAILABLE**

E 722



**KEYSTONE FOODS**

## CO's #3, 4, 5, 7
## REQUEST FOR PAYROLL MANUAL CHECK
*Please Print*

E 723

Company: _____

Bank Code: _____ ▼

| Employee # | Employee Name | Hourly or Slrd? | Pay Code or Ded Code | Hours | Rate | Week Ending Date | Ded Cycle* | Reason for Manual | Corporate use Check # |
|---|---|---|---|---|---|---|---|---|---|
| | | | ▼ | | | | ▼ | | |
| | | | ▼ | | | | ▼ | | |
| | | | ▼ | | | | ▼ | | |
| | | | ▼ | | | | ▼ | | |
| | | | ▼ | | | | ▼ | | |
| | | | ▼ | | | | ▼ | | |
| | | | ▼ | | | | ▼ | | |
| | | | ▼ | | | | ▼ | | |
| | | | ▼ | | | | ▼ | | |

DEADLINE FOR SUBMISSION-FRIDAY 12 PM EST (SUMMER-10 AM EST)

REQUESTED BY: _____ DATE: _____

AUTHORIZED APPROVAL: _____ DATE: _____
HR MANAGER, CONTROLLER OR CENTER/PLANT MANAGER

*Ded Cycle: 1-deduct all req'd taxes and vol ded's
2-deduct all req'd taxes & monthly, weekly
vol ded's
3-deduct all req'd taxes only

Email form to Corporate Payroll: corppayroll@keystonefoods.com

Five Tower Bridge • 300 Barr Harbor Drive • Suite 600
West Conshohocken, PA 19428-2998
610-367-8700 • 610-668-7625

create         -06, ppo



KEYSTONE FOODS

Five Tower Bridge • 300 Bar __ Drive • Suite 600
West Conshohocken, PA 19428-2998
610-667-6700 • 610-668-7625

## CO's #3, 4, 5, 7
## REQUEST FOR PAYROLL VOID PAYMENT
*Please Print*

**IF A STOP PAYMENT OF A CHECK IS NEEDED; COMPLETE & SUBMIT THE 'STOP PAYMENT OF CHECK FORM'**

**IF A REVERSAL OF A DIRECT DEPOSIT IS NEEDED; COMPLETE & SUBMIT THE 'DIRECT DEPOSIT REVERSAL' FORM'**

DEADLINE FOR SUBMISSION-FRIDAY 12 PM EST   (SUMMER-10 AM EST)

Company: _____   Account: _____

| Employee # | Employee Name | Payment # | Check Net $ Amount | Direct Deposit Net $ Amount | Total Net $ Amount | Payment Date | Was Stop Pay Req'd? | Reason for Void |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

REQUESTED BY: _____   DATE: _____

AUTHORIZED APPROVAL: _____   DATE: _____
HR MANAGER, CONTROLLER OR CENTER/PLANT MANAGER

Email form to Corporate Payroll: corppayroll@keystonefoods.com

E 724

created 8-16-06, ppowers

**EXPORT:**

**This is to be done every afternoon or first thing in the morning if you weren't able to run the previous evening.**

This step pulls the information from Lawson to Kronos

Open Microsoft Excel



Click on Lawson   Query Wizard
Then click on the yellow folder
With badge
Open
Finish
File save as   With badge
Save   Do you want to..........yes
Lawson employee data   on desktop
Lawson employees to Kronos.fp5 (with badge)
Opens filemaker   Password: mypassword
Create----red letters inside of box
Copy and paste to the k drive   Replace   yes

E 738

**ENTERING LINE TIME (EVERY MONDAY) FOR MASTER CARDS**

You will enter the in punch for all of the mastercards on first and second shifts.  The supervisors over that department will clock out the cards.

To do:

Kronos:

Reconcile Timecard
Show: Line Time Supervisors (all the way down)
Time Period-previous
Actions-Select all
Timecard---see what time they come in
Time Period—current week
Enter in time
Save

Arrow over to the next sheet and continue on until all in punches for MASTERCARDS ONLY are entered.

If there is no time set up under the previous week then the dept is not in use.

In times:

| 1st | Debone and Packout | 7:30am | 2nd | 4:30pm |
| 1st | EVIS | 5:50a and 6a | 2nd | 250p and 3p |

E 739

*Make sure there are no missing punches.*

**DOWNLOAD KRONOS HOURS TO LAWSON**

nav. bar: pay period closed
timeperiod: all home excluding temp & BI
make sure time period is PREVIOUS PAY PERIOD

**MISSED PUNCHES**

Pay period closed

Look for check marks ( if all is ok go to next step if not do corrections then proceed to next step)

Actions-select all- approvals- sign off- sure-yes

Reports-timecard-catagories- hours by labor account- all home excluding temp & BI

**MAKE SURE IT SAYS PREVIOUS PAY PERIOD !!!!!**

SEND TO PRINTER  ( WFC PRINTER 2)

BE- HOURLY
BI – SALARY

LOOK OVER REPORT (really big #'s)
MAKE SURE EVERYTHING SAYS " BE" NOT " BI"

** B&I HOURS SHOW UP LAST***

IF THERE IS A B&I TO SHOW UP CALL CAROL OR SHAUNA

PULL UP EMPLOYEE-APPROVALS-SIGN OFF-REMOVE
REPORTS-TIME DETAIL-PRINT

DELETE ALL OF THE EMPLOEES  TIME
APPROVALS-SIGN OFF- REFRESH

** EMPLOYEE WILL STILL GET CHECK**
REDO ABOVE STEPS!!!!

E 751

## 2. Change or Delete a time record



| Company | 7-Equity Group Eufaula Div LLC |
|---|---|
| Batch | Enter batch number of original time record |
| Employee | Enter employee number or use 'select' |
| **Inquire** | Press 'Inquire' button to retrieve original record |
| FC (Function Code) | Enter or choose the function you wish to execute:  C-to Change an existing time record  D-to Delete an existing time Record |
| Optional Fields | CG, PG  (*See instructions, next page) |
| **Change** | Press the 'Change' button |

E 847

## PR39.1 - One Time Deduction



Use **One Time Deduction** to add, change or delete one time deductions for individual employees. You may also use this form to reimburse a deduction taken in error in a previous payroll cycle.

Note: Use One Time Deduction Speed to create the same deduction for multiple employees. (See instructions on page 24)

**Add a One Time Deduction:**

| | |
|---|---|
| Company | 7- Equity Group Eufaula Div LLC |
| FC (Function Code) | Enter or choose A to Add |
| Employee | Enter or 'select' employee number |
| Deduction | Enter or 'select' deduction code |
| Amount | Enter deduction amount * |
| Date | Enter Saturday week ending date |
| Add | Press the Add button |

\* Amount- must be a positive number to be deducted, and must be a negative number to be reimbursed (ie: 10.00-)

If you are reimbursing an employee for a deduction taken in error, that deduction must still be active (no end date can be in the PR14 record) If the deduction has stopped and there is an end date in the PR14 record, then you must submit a manual check request to the corporate payroll department to reimburse the employee for the deduction taken in error.

E 849

## PR135 – Time Record Edit



Use **Time Record Edit** to create a listing of all active time records. You must verify the total hours and amounts, in addition verify the week ending dates on all batches.

| | |
|---|---|
| **Job Name** | Enter or select PR135 |
| **Inquire** | Press Inquire button (if job already set up) |
| **Company** | 7-Equity Group Eufaula Div LLC |
| **Report Selection** | 1 Time Record Edit |
| **Time Record Selection** | 5 All |
| **Batch** | Enter the batch number |
| **Process Level** | 7-Equity Group Eufaula Div LLC |
| **Employee Sequence** | A-Alpha |
| **Summary Option** | N-No |
| **Comments** | N-No |
| **Check TA Balances** | N-No |
| **Change** | Press 'Change' button if you changed any parameters |
| **Related Actions**<br>Submit Job<br>Print Manager<br>Job Definition | Press Submit Job, under Related Actions |

Complete the report ordering process, see General Instructions page 5 for details.

E 854

# EXHIBIT 16

# Equity Group Eufaula Division, LLC

Fresh Organizational Chart

Revised Date: 4-3-08

PLAINTIFF'S EXHIBIT

Bobby Burnett 1st & 2nd Shift First Processing Manager

- Lamar Davis, Evis Superintendent
  - Donnell Green, Live Hang Supervisor
  - Leon Bowen, 1st & 2nd Live Hang Supervisor
  - Gary Lynn Davis, Savage Supervisor
- Charles Baker, Evis Superintendent
  - Neal McCoy, Live Hang Supervisor
  - James McElroy, Paws Savage Supervisor
  - Dee Green, 1st & 2nd Evis Supervisor

Sharon Bouyer, Production Coordinator
- Jamie Faison, Production Coordinator Assistant

Ricky Lewis 1st & 2nd Shift Debone Manager

- Vicki Wentland, 1st Shift Debone Superintendent
  - Anthony Smith, Debone Supervisor
  - Serena Kebort, Debone Supervisor
  - Ocell Debose, Debone Supervisor
  - Sampson Reeves, Rehang Supervisor
  - Open, Debose Supervisor
  - Donna Bell, Debone Supervisor
- Marlyn Smith, 2nd Shift Debone Superintendent
  - Teresa Drake, Debone Supervisor
  - Shannon Patrick, Debone Supervisor
  - Keri Kus, Debone Supervisor
  - Margaret Griffen, Rehang Supervisor
  - Open, Debone Supervisor
  - Faith Arredendo, Debone Supervisor

Russell Spivey, Shipping Manager
- Melvin Arnold, 1st Shift Shipping Supervisor
- Bruce Burks, 2nd Shift Shipping Supervisor
- Alonzo Ross, 3rd Shift Shipping Supervisor

- Ree Allen, Pack-out Superintendent
  - Sharonda Devorse, Pack-out Supervisor
  - Leven Johnson, Pack-out Supervisor
  - Kathleen Bevard, Pack-out Supervisor
- Patrick-Spencer, Pack-out Superintendent
  - Daisy Washington, Pack-out Supervisor
  - Tim Nolan, Pack-out Supervisor
  - Ida Toney, Pack-out Supervisor

Ricky Lewis DSI Manager
- Carl Ortiz DSI 1st Shift Superintendent
  - Tonya Jones, DSI Supervisor
  - Leon Jones, DSI Supervisor
  - Shameka Green, DSI Supervisor
- Miguel Stroter, 2nd Shift DSI Superintendent
  - Candice Johnson, DSI Supervisor
  - AL Owens, DSI Supervisor
  - Alexis Jones, DSI Supervisor

James Henderson, Transportation Coordinator

# Equity Group Eufaula Division, LLC

General Organizational Chart 3-30-07

Tim Easlinger, General Manager

| Jim Bice, Human Resource Director | Joe Preston, Complex Controller | Greg Mills, Operations Manager | Ken Edwards, I/S Operations Manager | Joey Seaborn, Purchasing Director | Butch White Complex QA Director | Open, Production Systems Manager |
|---|---|---|---|---|---|---|

Revised Date:5-7-07



Equity Group Eufaula Division, LLC

Maintenance Organizational Chart 3-30-07

Revised Date: 7-20-07



# Equity Group Eufaula Division, LLC



Operations Organizational Chart 3-24-08

Revised Date: N/A



# Equity Group Eufaula Division, LLC

Human Resource Organizational Chart 3-30-07

Cheryl Bellfield,
1st Shift Medical
Nurse

Leona Vann,
2nd Shift Medical
Nurse

Dana Byrd,
3rd Shift Medical
Nurse

Michelle Walters,
3rd Shift Medical
Nurse

Darlene Ledbetter,
3rd Shift Medical
Assistant

Regina Wade,
Medical Clerk &
Aide Responder

Celicia Ledbetter
Interview Clerk

Aroa Love,
Bilingual Interview
Clerk

Scott Little,
Safety Supervisor

Roberta Williams,
2nd Trainer
Trainee

Steven Jackson,
Safety Trainer

Amanda Jones, HR
Clerk

Jennifer Baker,
Benefits Clerk

Madeline Thornton,
HR Clerk

Heather Allen,
HR Clerk

Tanya Norris, Data
Entry Clerk

Teresa Lewter,
HR Clerk

Revised Date: 5-29-07

# Equity Group Eufaula Division,LLC



Production System and IT  Organizational Chart 3-30-07

**Open, IT Manager**

Del Hollis
IT Support Analyst

Craig Houston
IT

Open
Production
Systems
Superintendent

Steve Bouterse,
1st shift System
Tech.

Shawn Jackson,
2nd shift System
Tech.

Open,
3rd shift System
Tech.

Revisd Date:5-7-07

# Equity Group Eufaula Division, LLC



**Butch White**
Complex QA Director

**Shirley Crouch**, Lab Technician

**Trunae Powell**, Further QA Supervisor

**Melinda Stinson**, Further QA Supervisor

**Felicia Lewis**, HACCP/QA Supervisor

**Vera Marshall**, Bone Sampler Supervisor

**Nickita Hall**, QA Supervisor

**Tracy Prine**, HACCP Clerk

**Kandy Steward**, QA Clerk

**Charlie Cotton**, HACCP/QA Supervisor

**Malvia Baxter**, Bone Sampler Supervisor

QA Organizational Chart 12-1-06

Revised Date: N/A



# Equity Group Eufaula Division, LLC



Further Organizational Chart 12-1-07

Revised Date: 7-10-07

# EXHIBIT 17

# EQUITY GROUP
# EUFAULA
# DIVISION, LLC

# GOOD MANUFACTURING PRACTICES

Slaughter, Debone, and Further Processing
P-20322
57 Melvin Clark Rd.
Baker hill, Al 36027

Issue Date: 3-15-04
Revised Date: 8-21-07



PLAINTIFF'S
EXHIBIT

**GOOD MANUFACTURING PRACTICES**

Equity Group Eufaula Division, LLC P-20322
Good Manufacturing Practices

Initial Issuance: 3-15-04
Revision Date: 08-18-07

# EQUITY EUFAULA DIVISION, LLC

## Signature Page

# GOOD MANUFACTURING PRACTICES

| Signature | Date |
|---|---|
| Robin Stevens, Fresh Plant Manager | |

| Signature | Date |
|---|---|
| Roy Williams, Fresh QA Manager | |

| Signature | Date |
|---|---|
| Mike Cortner, Further Plant Manager | |

| Signature | Date |
|---|---|
| Tom Milhous, Further QA Manager | |

**GOOD MANUFACTURING PRACTICES**

Equity Group Eufaula Division, LLC P-20322                    Initial Issuance: 3-15-04
Good Manufacturing Practices                                  Revision Date: 08-18-07

# HISTORY OF ADMENDMENTS
## Good Manufacturing Practices

| Revision Date | Revised By | Reason for Revision |
|---|---|---|
| 3-15-04 | Butch White | Initial Issuance –Date of Plant started up after Keystone Foods LLC purchased |
| 8-29-06 | Jretha Diggs | Added GMP #29 was added about pallet jacks. |
| 10-2-06 | Jretha Diggs | Added word clarity GMP #29. Added hairnet and beard nets to GMP#17. |
| 8-18-07 | Jretha D. Thompson | Reassessed the GMP Policy. |

**GOOD MANUFACTURING PRACTICES**

Equity Group Eufaula Division, LLC P-20322                              Initial Issuance: 3-15-04
Good Manufacturing Practices                                                    Revision Date: 08-18-07

## Purpose

**The following GMP's were established to minimize the introduction of bacteria, contaminants, or foreign material into our manufacturing environment and must be adhered to by all team members and visitors while in production areas including coolers, shipping, and receiving docks.**

## Policy

Everyone entering the facility and production facility must observe the GMP requirements (Team Members, visitors, contractors, and etc) must adhere to the procedure outlined herein.

## Frequency

To be followed at all times.

## Responsibility

The Quality Assurance Department primarily administers this program. The QA Manager is responsible for the review and application of these procedures. The Department Managers, Supervisors Coordinators are primarily responsible for the training, implementation and maintenance of these procedures. Every Team Member is responsible for ensuring that the GMP policy is followed diligently.

## DEFINITION

> *"Processing Area"* – all areas of product handling to include hallways, coolers, and shipping/receiving docks.

## GROUNDS

- The grounds around the facility shall be kept in a condition that will protect against the contamination of food.
- The methods for adequate maintenance of grounds include:
  - Properly storing equipment, removing litter and waste, and cutting weeds or grass within the immediate vicinity of the plant buildings or structures that may constitute an attractant, breeding place, or harborage for pests.
  - Adequately draining areas that may contribute to contamination or providing a breeding place for pests.
  - Operating systems for waste treatment and disposal in an adequate manner so that they do not contamination areas.

GOOD MANUFACTURING PRACTICES

Equity Group Eufaula Division, LLC P-20322
Good Manufacturing Practices

Initial Issuance: 3-15-04
Revision Date: 08-18-07

## PLANT CONSTRUCTION AND DESIGN

- Plant buildings and structures shall be suitable in size, construction and design to facilitate maintenance and sanitary operations for food – manufacturing purposes.  The plant and facilities shall:
  - o Be constructed in such a manner that floors, walls, and ceilings may be adequate cleaned and kept clean and kept in good repair; that drip or  condensate from fixtures, ducts and pipes does not contaminate food, food contact surfaces, or food packaging materials and that aisle or working spaces are provided between equipment and walls and are adequately unobstructed and of adequate width to permit employees to perform their duties and to protect against contaminating food or food contact surfaces with clothing or personal contact.
  - o Provide adequate lighting in hand washing areas, dressing and locker rooms and toilet rooms and in all areas where food is examined, processed, or stored and where equipment or utensils are cleaned; and provide safety type light bulbs and fixtures to protect food contamination in case of glass breakage.
  - o Provide adequate ventilation or control equipment to minimize odors and vapors in areas where they may contaminate food, food contact surfaces or food packaging materials.
  - o Cleaning compounds, sanitizing agents shall be identified, held and stored in a manner that protects against contamination of food, food contact surfaces or food packaging materials.

## GENERAL REQUIREMENTS

1. All team members and visitors must maintain a high degree of personal cleanliness to prevent contamination of food products.

2. All team members and visitors must wash and sanitize hands before starting work, after each absence from the work area, after visiting the restroom and at any other times whereby hand become soiled or contaminated.

3. People known, or suspected, to be suffering from, or to be a carrier of a disease or illness to be transmitted through food should not be allowed to enter any food handling area if there is a likelihood of their contaminating food.  Any person so affected should immediately report illness or symptoms of illness to the management. Conditions which should be reported to management so that any need for medical examination and/or possible exclusion from food handling can be considered, include: Jaundice,

**GOOD MANUFACTURING PRACTICES**

diarrhea, vomiting, fever, sore throat with fever, visibly infected skin lesions (boils, cuts, etc) discharges from ear, eye or nose.  (Section 7.1,7.2 of Codex Alimentarius)

4. A solid (non-mesh) hair net must be worn to contain the hair as completely as possible. Scarves, bandannas, barrettes, etc., may be worn neatly under the hair net.

5. All team members and visitors shall be clean shaven, or wear restraints over beards and mustaches.

6. A clean smock must be obtained daily.  Smocks are to be changed during the shift if needed.  Smocks must fasten or tie properly to cover street clothes.  Smocks _may not_ have sewn on buttons or an external upper pocket.

7. Smocks, hairnets, and beard nets must be removed before exiting the facility. Carrying garment over arm, etc., is permitted.  _The only exception is during an emergency evacuation._

8. Keep hands and fingernails clean.  Keep fingernails properly trimmed and If fingernail polish or false fingernails are worn, gloves must cover hands in while in any production area including box rooms, shipping/receiving, dry storage, product storage.

9. No jewelry is allowed inside the processing area earrings, facial jewelry, wristwatches, and other jewelry shall not be worn in any production area. Any body piercing of the ears, eyebrows, nose, tongue, etc. _is considered jewelry and is prohibited._ (The only exception is plain wedding band with no stone setting), Medic alert identification is exempt from the jewelry clause.

10. Clothing must be clean at start of operation and kept reasonably clean during operations.

11. Plastic sleeve covers will be worn to cover any street clothes that extend beyond smock coverage on the arms when handling product.

12. Maintain gloves used for handling food and food contact packaging supplies intact and in a sanitary condition.

13. Gum, candy, cough drops, and tobacco products are not permitted in any production area.  Employees shall not hold toothpicks, match sticks, or similar objects in mouth while on the job.  Pencils, cigarettes, or other objects held behind ears are forbidden.

14. Maintain lockers clean and fee of trash or soiled clothing.

**GOOD MANUFACTURING PRACTICES**

Equity Group Eufaula Division, LLC P-20322
Good Manufacturing Practices

Initial Issuance: 3-15-04
Revision Date: 08-18-07

15. No food or beverages are allowed in production areas and placing food lockers is highly discouraged unless there is no other alternative and it must be properly sealed and removed daily.

16. Don't use hands or equipment for practices which may result in contamination of food products. Such practices include but are not limited to:

   * touching face, wiping forehead
   * Scratching head or body
   * Placing fingers on/or in mouth, nose, or ears

17. Avoid uncontrolled, uncovered coughing or sneezing. Leave food areas if excessive coughing or sneezing occurs until it ceases. Sanitize hands afterwards. Use the upper arm to cover mouth when coughing or sneezing.

18. All team members and visitors shall not handle product with cuts and open sores in fingers/hands unless covered by Band-Aid. A glove shall be worn over any bandaging.

19. All hearing protection devices shall be worn in a manner to preclude introduction into product. (i.e. No individual loose earplugs)

20. Absolutely no Spitting anywhere in the processing area is prohibited.

21. The carrying of items (e.g. pens, pencils, note pads, etc.) in external upper pockets or clothing is not allowed. Items with clips may not be attached to garment necklines.

22. No baseball style caps are to be worn in processing areas to include coolers, shipping and receiving docks.

23. All trash will be disposed of in appropriate receptacles and not thrown on the floor or ground.

24. Any item that becomes contaminated must be washed and sanitized before being placed back into use. Processing tools and utensils are, but not limited to the following items: pens, calculators, thermometers, clipboards, pans, edible totes, edible shovels, earplugs, maintenance tools, etc.

25. Only approved footwear shall be worn in the processing area to include coolers, shipping, and receiving docks. Rubber boots are available at the Supply and may be cut down, but cannot be left where they are hanging loose or flapping over. *Do not cut below the ankle.* The Further processing plant is permitted to wear footwear with slip resistant soles and *No tennis shoes* will be allowed in the production areas at both plants.

**GOOD MANUFACTURING PRACTICES**

Equity Group Eufaula Division, LLC P-20322                    Initial Issuance: 3-15-04
Good Manufacturing Practices                                 Revision Date: 08-18-07

26. All equipment (pallet jacks, forklifts, and etc.) and utensils used for handling edible product will be of such material that can be maintained in a manner necessary to prevent the creation on unsanitary conditions

27. If hoods are worn on your head they must be covered with a hair net.  In this sequence: 1. Hair net.  2. Hood.  3. Hair net.

28. ***NO SMOKING ALLOWED IN THE BUILDING.*** Smoking will be allowed only in the designated smoking areas OUTSIDE the Evis patio break area, Debone patio break area, Further processing break patio area, and the Admin patio area. Food will be allowed in these areas and placed in the appropriate receptacles.

29. Personal items, Cell Phones, magazines, Paper clips, thumbtacks, newspapers, or any unnecessary electronic devices (such as MP3 radios) items are not permitted in the production areas and can not be stored in clip boards.

30. Lockers must be cleaned out the last scheduled workday of each week to allow the Sanitation Team to clean and sanitize over the weekend.  Anything left in a locker will be discarded.

31. Inedible totes may be stacked inside each other.  Boxes must be stacked top to top and bottom to bottom.  Any time boxes or totes are placed on any other clean surface that surface will become contaminated.

32. No glass objects for personal use are allowed beyond the front administrative offices including the break room. No glass containers of any form shall be taken into the production areas. **No glass shall be brought into the facility in employees' personal effects. All breakage of eyeglasses and lost contact lenses must be reported to Quality Assurance.**

33. Only company issued metal writing tools with engraved identification are permitted in the processing area. **NO rubber or foam pen grips added to pen in processing areas.**

34. Only approved tools may be used by Equity Group-Eufaula Division employees in the production areas.  Approved tools are tools that are issued by Equity Group-Eufaula Division with identification engraved on tool.  Examples of non-approved tools: pocketknives, fingernail clippers, etc. or any tool with a wooden handle.

35. Work stands (ergo stands) are to be adjusted by management or floor persons only.

36. During production do not use high-pressure hoses to wash floor and avoid splashing of water on to clean product or product contact areas.

**GOOD MANUFACTURING PRACTICES**

Equity Group Eufaula Division, LLC P-20322
Good Manufacturing Practices

Initial Issuance: 3-15-04
Revision Date: 08-18-07

37. When not in use, water hoses must be neatly coiled and stored on hangers with nozzles off the floor.

38. Never place clean parts, belts, tools, or trays on the floor or on a catwalk or any surface that will be walked on.

39. Contaminated boxes and liners will be discarded.

40. Safety in all phases of work is the first consideration in any job and all necessary precautions must be taken to prevent accidents.

41. Packaging materials shall not be used as aprons or to store personal items.


## SANITATION OF EQUIPMENT AND UTENSILS

- All utensils and product-contact surfaces of equipment shall be cleaned as frequently as necessary, by authorized personnel only, to prevent contamination of food and products.
- Non product-contact surfaces of equipment used in the plant shall be cleaned as frequently as necessary, by authorized personnel only, to minimize accumulation of dust, dirt, food particles, and other debris.
- Single-service articles (such as utensils intended for one-time use, paper cups, paper towels, etc.) should be stored in appropriate containers and handled, dispensed, used and disposed of in a manner that prevents contamination of food or food-contact surfaces.
- Where necessary, to prevent the introduction of undesirable microbiological organisms into food products, all utensils and product-contact surfaces of equipment used in the plant shall be cleaned and sanitized, by authorized personnel only, prior to such use and following any interruption during which such utensils and contact surfaces may have become contaminated.
- Where equipment and utensils are used in a continuous production operation, the contact surfaces of such equipment and utensils shall be cleaned and sanitized on a predetermined schedule, by authorized personnel only, using adequate methods for cleaning and sanitizing.
- Sanitizing agents shall be effective and safe under conditions of use.
- Any facility, procedure, machine or device may be acceptable for cleaning and sanitizing equipment and utensils if it is established that such facility, procedure, machine, or device will routinely render equipment and utensils clean and provide adequate sanitizing treatment.
- Cleaned and sanitized portable equipment and utensils with product-contact surfaces shall be stored in such a location and manner that product-contact surfaces are protected from splash, dust and contamination. Non-disposable vats will be processed through the proper cleaning procedure using the proper sanitizer and temperature settings to ensure the container (vat) is in an acceptable condition to be placed in production.

Equity Group Eufaula Division, LLC P-20322
Good Manufacturing Practices

Initial Issuance: 3-15-04
Revision Date: 08-18-07

- Seams on food contact surfaces shall be smoothly bonded or maintained so as to minimize accumulation of food particles, dirt and organic matter and thus minimize the opportunity for growth of microorganisms.
- Equipment that is in the manufacturing or food handling area and that does not come into contact with food shall be so constructed that it can be kept in a clean condition.
- Freezer and cold storage compartments used to store food shall be equipped with an accurate thermometer.

## *INGREDIENT, PROCESS AND PRODUCT INTEGRITY*

1.  Finished products and raw ingredients shall be handled and maintained in a manner to prevent exposure to extraneous matter.

2.  Maintain bagged/boxed product in a neat and orderly manner. Avoid product overhang on pallets.

3.  Clean up broken packages or spilled product immediately. Notify QA to verify corrective actions were appropriate.

4.  Store all items off floor, on pallets, or racks.

5.  Make sure that the outer surface of raw material bags/boxes are clean before bringing into processing areas.

6.  Do not remove outer bags from raw materials until just before use. Remove outer bag with care to prevent contamination of the next layer, or other materials in the work area.

7.  Close partially used raw material bags to protect contents and include lot identification. Use these materials as soon as possible. Metal closures or twist ties are not permitted.

8.  Store empty lugs (totes/barrels, etc.) covered or inverted and off the floor.

9.  Bulk preweighed ingredients are to be stored in sanitary container. Note: bulk pre-weighed means weighed by plant personnel.

10.  Cover pre-lined product containers until time of use.

11.  Cover partially used packaging material when not in use. Finished product boxes/lugs on the production floor shall not be used for anything other than product.

**GOOD MANUFACTURING PRACTICES**

Equity Group Eufaula Division, LLC P-20322      Initial Issuance: 3-15-04
Good Manufacturing Practices      Revision Date: 08-18-07

12. Use clearly labeled or color standardized containers for waste and rework product to minimize the possibility of product contamination. Do not store product, rework, or ingredient containers next to containers for waste or non-product items.

13. Pre-lined containers shall not be nested. They may be cross stacked inside to inside or bottom to bottom.

14. Properly cover any product left unattended during breaks, lunch periods, etc., with clean plastic or other suitable material if a wash down occurs.

15. Exercise care when moving product. Avoid damage to product and/or packaging by careless or improper handling.

16. Do not sit or stand on product shipping cases.

17. Littering or practices which cause poor housekeeping or other sanitary conditions are prohibited. Put all refuse in trash containers and label them as "trash". Do not throw used toilet tissue or hand paper towel on the floor in rest rooms.

18. Mark all products of "hold" status with a HOLD tag. Quality Assurance "Hold" product shall be retained until released for shipment by Quality Assurance. Operations "Hold" tags may be removed by Operations personnel. . USDA "Hold" product shall be retained until released for shipment by USDA personnel.

19. Pallets shall be cleaned and inspected for missing and broken deck boards, exposed nails, etc., prior to use. Pallets not conforming to specification shall be immediately removed from the plant.


## _SANITATION RELATED_

### A. SLAUGHTER, DEBONING, AND FURTHER PROCESSING:

1. Good sanitation practices shall be implemented and maintained to assure product integrity.

2. Follow cleaning procedures as outlined in Company Sanitation Master manual.

3. Remove ingredient and packaging supplies from the production area prior to sanitation.

4. Hand wash facilities with antiseptic soap and single use towels will be provided in employee rest rooms and product handling areas. Employees must wash and

sanitize hands before starting work, after each absence from the work area, after visiting rest rooms and at any other times when hands have become soiled or contaminated. Post "Wash Hands before Returning to Work" signs in employee's rest rooms.

5.  During clean up, place all cleaned equipment parts, pipes, cleaning aids, etc., on racks, stands, or metal carts specifically designated for such purposes. Cleaned equipment shall not be placed directly on floor or on pallets.

6.  Hands must be cleaned and sanitized before handling clean equipment.

7.  Store production cleaning equipment separate from floor cleaning equipment. Equipment used for cleaning drains should be separate, identified, and stored in an isolated area.

8.  Sanitize tools before assembling equipment.

9.  Do not drag cleaned equipment across the floor.

10. Do not splash water from floor or unclean equipment to cleaned equipment.

11. Clean or replace product contact gaskets on equipment as needed. Discard used worn gaskets.

12. Do not use equipment aids with wooden handles. Do not use equipment with hollow handles unless sealed properly

13. Volatile solvents which are toxic and harmful must not be used during product production. Solvent cleaned food contact surfaces must be detergent washed and rinsed with potable water prior to use.

14. Use chemicals at their proper solution strength. Do not mix chemicals.

15. Remove excess water from cleaned equipment.

16. The ingredients of all cleaning and sanitizing preparations shall be FDA and/or USDA approved or meets other applicable laws and regulations for food plant use.

17. Use only lubricants approved for food contact. Avoid excessive use of lubricants on equipment to prevent product contamination. Wipe off excess after lubricating.

18. Follow proper insect and rodent control procedures daily.

**GOOD MANUFACTURING PRACTICES**

Equity Group Eufaula Division, LLC P-20322
Good Manufacturing Practices

Initial Issuance: 3-15-04
Revision Date: 08-18-07

19. Do not allow bottom, sides, or edges of product containers that will later be nested together to come into contact with the floor during the cleaning and sanitizing process.

20. Employees cleaning drains and restrooms must not handle product contact equipment without first changing clothes and washing and sanitizing their hands.

21. Equipment used for cleaning drains and floors shall be identified and stored in an isolated area away from each other types of cleaning equipment, particularly product contact equipment.

22. Welds should be smooth and sanitary.

23. Note equipment that is missing screws, nuts, or bolts.

24. Equipment should be free of rust.

25. Pipes should be sloped to drain properly

26. Lockers must be emptied, cleaned, and sanitized at least quarterly

*The above GMP's will be strictly enforced. Anyone failing to comply with these procedures will be subject to being corrected immediately, possible disciplinary action up to and including termination.*

**GOOD MANUFACTURING PRACTICES**

# EXHIBIT 18



**Equity Group Eufaula Division, LLC**

# Employee Orientation Manual



PLAINTIFF'S
EXHIBIT

Name_____



# New Hire Orientation Agenda
## HR Conference Room

| Moderator | Topic | |
|---|---|---|
| 8:30am - 9:30am | HR New Hire Paperwork | Lisa Ledbetter, HR |
| 9:30am - 9:45am | History, Ethics, Policies, & Procedures Review | Lisa Ledbetter, HR |
| 9:45am - 11:15am | Retail, Wholesale & Department Store Union AFL-CIO | Jackie Davis, Chief Steward |
| 11:15am - 12:00pm | Benefits Overview & Enrollment | Jennifer Baker, HR |
| 12:00pm - 12:30pm | Attendance, Days Off, Leaves of Absence | Lisa Ledbetter, HR |
| 12:30pm - 1:00pm | Lunch | |
| 1:00pm - 1:30pm | QA, HACCP, GMPs, SSOPs, SOPS, & Animal Welfare | Tape |
| 1:30pm - 1:45pm | Safety Policies & Procedures Overview | Safety Rep. |
| 1:45pm - 2:45pm | Emergency Evacuation, Fire Prevention, Confined Spaces & Lock-Out/Tag-Out Procedures<br><br>Ergonomics presentation and exercises | Safety Rep. |
| 2:45pm - 3:00pm | BREAK | |
| 3:00pm - 3:45pm | Hazardous Communications & Material Training (Including PPE use) | Safety Rep. Tape |
| 3:45pm - 4:15pm | Bloodborne Pathogens, Medical Services, & Hearing Protection | Beatrice Battle, Nurse Scott Little, EMT |
| 4:15pm - 4:30pm | Security & Workplace Violence | JB Glass, Security |
| 4:30pm - 5:00pm | Programs and Activities Presentation | Lisa Ledbetter, HR |



**Equity Group – Eufaula Division, LLC**
57 Melvin Clark Rd.
Bakerhill, AL 36027
Direct line: (334) 688-6546
(334) 687-7790, ext. 26546

Jennifer Baker, Complex Benefits Administrator
Email: jennifer.baker@keystonefoods.com.

# Hourly Summary of Benefits

## Health Care Plan (Effective 1st of the month following your 90 days)

**Medical Plan**-Insurance Provider: Blue Cross Blue Shield of AL
Web Site: www.bcbsal.com.
Type of Plan: PPO (Preferred Provider Organization)

Cost to Employee:
Single Coverage: This benefit is paid for by the company. No cost to the employee.
Family Coverage (2 or more): $61.85 weekly

---

**Prescription**-Insurance Provider: Blue Cross Blue Shield of AL
Web Site: www.bcbsal.com.
As long as you use a BCBS Pharmacy all you pay are your co-pays.
Co-Pays:
    Generic--$10.00 or less
    Preferred Name Brand--$20.00 or less
    Non-preferred Name Brand--$35.00 or less

---

## COBRA (Consolidated Omnibus Budget Reconciliation Act)

This notice explains about COBRA coverage and when it may become available to you and your family.

---

## Vision & Dental Plan (Effective 1st of the month following your 90 days)

Employee Cost: Single Coverage-$2.63 weekly & Family Coverage (2 or more) $7.05 weekly
        Vision & Dental are offered together. You cannot have one without the other.

**Vision**-Insurance Provider: Ameritas Life Insurance Corp
Web Site: www.ameritasgroup.com.
                Discount Program Provider: EyeMed Vision Care.
                Web Site: www.ameritasgroup.com. & click on the EyeMed link
There is not a network for the vision. You may see any eye doctor that you like.
In order to receive the discount benefits you must stay within the EyeMed Network (this can be found on the web site).

**Dental**-Insurance Provider: Ameritas Life Insurance Corp
Web Site: www.ameritasgroup.com.
There is not a network for the dental. You may use the dentist of your choice.

---

2

**KEYSTONE FOODS** LLC

**Equity Group – Eufaula Division, LLC**
57 Melvin Clark Rd.
Bakerhill, AL 36027
Direct line: (334) 688-6546
(334) 687-7790, ext. 26546

## Short Term Disability (Effective 1st of the month following your year)

This benefit is paid for by the company. No cost to the employee. In order to qualify for this benefit you must be working on the day your insurance goes into effect. In order to receive Short Term Disability (maximum of 13 weeks at a $125.00 per week) while you are out of work you must request payment.

## 401k Retirement Plan- Administrator: Vanguard-1-800-523-1188

After 1 (one) year of employment you are eligible to enroll in the 401k plan, must be at least age 21 and work 1000 hrs. You can contribute up to 75% of weekly pay. Federal law establishes the annual dollar limit. If you are over age 50 or will turn age 50 during the current calendar year you may contribute an additional amount on a weekly basis up to the established annual federal limit. You are always 100% vested in your 401k contributions. Matching contribution – Keystone will provide 50% matching contributions for up to the first 4% of employee contributions. In order to receive the company match you must be working in a non-union dept. (dept. not eligible to join the union). Matching contributions are fully vested after 6 years of plan service.

## Holidays (Effective after 90 days)

9 regular paid holidays per year (this includes b-day). In order to receive pay you must be employed 90 days & work your scheduled shift the day before & the day after the holiday, you can not leave early or come in late. Non-probationary employees are eligible for birthday pay (you must schedule this with your supervisor) and 1 personal day after 90 days. Personal days run from March 1 to February 28 of each year.

## Vacations (Effective after 1 year)

| | |
|---|---|
| 1-2 years of service | 1 week (5 working days)-you must take these days or loose them. |
| 3 years of service | 2 weeks (10 working days)-you may sell your 2nd week. |
| 10 years or more of service | 3 weeks (15 working days)-you may sell your 3rd week. |

## HIPPA (Health Insurance Portability & Accountability Act)

This policy applies to all employees and restricts the Company's ability to use and disclose protected health information.

## Janet's Law (Women's Health & Cancer Right Acts of 1998)

This law requires all health plans to cover reconstructive breast surgery after a mastectomy.

**If you have any questions concerning any of the benefits outlined in this summary, please feel free to come by the Personnel office or to call me at 334-688-6546 or 334-687-7790, ext. 26546**

3



**Equity Group – Eufaula Division, LLC**
57 Melvin Clark Rd.
Bakerhill, AL 36027
Direct line: (334) 688-6546
(334) 687-7790, ext. 26546

## Short Term Disability (Effective 1st of the month following your year)

This benefit is paid for by the company. No cost to the employee. In order to qualify for this benefit you must be working on the day your insurance goes into effect. In order to receive Short Term Disability (maximum of 13 weeks at a $125.00 per week) while you are out of work you must request payment.

## 401k Retirement Plan- Administrator: Vanguard-1-800-523-1188

After 1 (one) year of employment you are eligible to enroll in the 401k plan, must be at least age 21 and work 1000 hrs. You can contribute up to 75% of weekly pay. Federal law establishes the annual dollar limit. If you are over age 50 or will turn age 50 during the current calendar year you may contribute an additional amount on a weekly basis up to the established annual federal limit. You are always 100% vested in your 401k contributions. Matching contribution – Keystone will provide 50% matching contributions for up to the first 4% of employee contributions. In order to receive the company match you must be working in a non-union dept. (dept. not eligible to join the union). Matching contributions are fully vested after 6 years of plan service.

## Holidays (Effective after 90 days)

9 regular paid holidays per year (this includes b-day). In order to receive pay you must be employed 90 days & work your scheduled shift the day before & the day after the holiday, you can not leave early or come in late. Non-probationary employees are eligible for birthday pay (you must schedule this with your supervisor) and 1 personal day after 90 days. Personal days run from March 1 to February 28 of each year.

## Vacations (Effective after 1 year)

| | |
|---|---|
| 1-2 years of service | 1 week (5 working days)-you must take these days or loose them. |
| 3 years of service | 2 weeks (10 working days)-you may sell your 2nd week. |
| 10 years or more of service | 3 weeks (15 working days)-you may sell your 3rd week. |

## HIPPA (Health Insurance Portability & Accountability Act)

This policy applies to all employees and restricts the Company's ability to use and disclose protected health information.

## Janet's Law (Women's Health & Cancer Right Acts of 1998)

This law requires all health plans to cover reconstructive breast surgery after a mastectomy.

**If you have any questions concerning any of the benefits outlined in this summary, please feel free to come by the Personnel office or to call me at 334-688-6546 or 334-687-7790, ext. 26546**

3

# NOTICE OF PRIVACY PRACTICES

## THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY.

Effective Date of Notice: 4/14/03

The Keystone Employee Health Plan (the "Plan") is required by law to take reasonable steps to ensure the privacy of your personally identifiable health information and to inform you about:

- the Plan's uses and disclosures of Protected Health Information (PHI);
- your privacy rights with respect to your PHI; • the Plan's duties with respect to your PHI; • your right to file a complaint with the Plan and to the Secretary of the U.S. Department of Health and Human Services; and
- the person or office to contact for further information about the Plan's privacy practices.

The term "Protected Health Information" (PHI) includes all individually identifiable health information transmitted or maintained by the Plan, regardless of form (oral, written, electronic).

## Section 1. Notice of PHI Uses and Disclosures

### Required PHI Uses and Disclosures
Upon your request, the Plan is required to give you access to certain PHI in order to inspect and copy it. Use and disclosure of your PHI may be required by the Secretary of the Department of Health and Human Services to investigate or determine the Plan's compliance with the privacy regulations.

### Uses and disclosures to carry out treatment, payment and health care operations
The Plan and its business associates will use PHI without your consent, authorization or opportunity to agree or object to carry out treatment, payment and health care operations. The Plan also will disclose PHI to the Plan Sponsor Keystone Foods for purposes related to treatment, payment and health care operations. The Plan Sponsor has amended its plan documents to protect your PHI as required by federal law.

*Treatment* is the provision, coordination or management of health care and related services. It also includes but is not limited to consultations and referrals between one or more of your providers.

For example, the Plan may disclose to a treating orthodontist the name of your treating dentist so that the orthodontist may ask for your dental X-rays from the treating dentist.

*Payment* includes but is not limited to actions to make coverage determinations and payment (including billing, claims management, subrogation, plan reimbursement, reviews for medical necessity and appropriateness of care and utilization review and preauthorizations).

For example, the Plan may tell a doctor whether you are eligible for coverage or what percentage of the bill will be paid by the Plan.

*Health care operations* include but are not limited to quality assessment and improvement, reviewing competence or qualifications of health care professionals, underwriting, premium rating and other insurance activities relating to creating or renewing insurance contracts. It also includes disease management, case management, conducting or arranging for medical review, legal services and

4

auditing functions including fraud and abuse compliance programs, business planning and development, business management and general administrative activities.

For example, the Plan may use information about your claims to refer you to a disease management program, project future benefit costs or audit the accuracy of its claims processing functions.

Uses and disclosures that require your written authorization
Your written authorization generally will be obtained before the Plan will use or disclose psychotherapy notes about you from your psychotherapist. Psychotherapy notes are separately filed notes about your conversations with your mental health professional during a counseling session. They do not include summary information about your mental health treatment. The Plan may use and disclose such notes when needed by the Plan to defend against litigation filed by you.

Uses and disclosures that require that you be given an opportunity to agree or disagree prior to the use or release
Disclosure of your PHI to family members, other relatives and your close personal friends is allowed if:

- the information is directly relevant to the family or friend's involvement with your care or payment for that care; and
- you have either agreed to the disclosure or have been given an opportunity to object and have not objected.

Uses and disclosures for which consent authorization or opportunity to object is not required
Use and disclosure of your PHI is allowed without your consent, authorization or request under the following circumstances:

1. When required by law.

2. When permitted for purposes of public health activities, including when necessary to report product defects, to permit product recalls and to conduct post-marketing surveillance. PHI may also be used or disclosed if you have been exposed to a communicable disease or are at risk of spreading a disease or condition, if authorized by law.

3. When authorized by law to report information about abuse, neglect or domestic violence to public authorities if there exists a reasonable belief that you may be a victim of abuse, neglect or domestic violence. In such case, the Plan will promptly inform you that such a disclosure has been or will be made unless that notice would cause a risk of serious harm. For the purpose of reporting child abuse or neglect, it is not necessary to inform the minor that such a disclosure has been or will be made. Disclosure may generally be made to the minor's parents or other representatives although there may be circumstances under federal or state law when the parents or other representatives may not be given access to the minor's PHI.

4. The Plan may disclose your PHI to a public health oversight agency for oversight activities authorized by law. This includes uses or disclosures in civil, administrative or criminal investigations; inspections; licensure or disciplinary actions (for example, to investigate complaints against providers); and other activities necessary for appropriate oversight of government benefit programs (for example, to investigate Medicare or Medicaid fraud).

5. The Plan may disclose your PHI when required for judicial or administrative proceedings. For example, your PHI may be disclosed in response to a subpoena or discovery request provided certain conditions are met. One of those conditions is that satisfactory assurances must be given to the Plan that the requesting party has made a good faith attempt to provide written notice to you, and the notice provided sufficient information about the proceeding to permit you to raise an objection and no objections were raised or were resolved in favor of disclosure by the court or

5

tribunal.

6. When required for law enforcement purposes (for example, to report certain types of wounds).

7. For law enforcement purposes, including for the purpose of identifying or locating a suspect, fugitive, material witness or missing person. Also, when disclosing information about an individual who is or is suspected to be a victim of a crime but only if the individual agrees to the disclosure or the covered entity is unable to obtain the individual's agreement because of emergency circumstances. Furthermore, the law enforcement official must represent that the information is not intended to be used against the individual, the immediate law enforcement activity would be materially and adversely affected by waiting to obtain the individual's agreement and disclosure is in the best interest of the individual as determined by the exercise of the Plan's best judgment.

8. When required to be given to a coroner or medical examiner for the purpose of identifying a deceased person, determining a cause of death or other duties as authorized by law. Also, disclosure is permitted to funeral directors, consistent with applicable law, as necessary to carry out their duties with respect to the decedent.

9. The Plan may use or disclose PHI for research, subject to conditions. When consistent with applicable law and standards of ethical conduct if the Plan, in good faith, believes the use or disclosure is necessary to prevent or lessen a serious and imminent threat to the health or safety of a person or the public and the disclosure is to a person reasonably able to prevent or lessen the threat, including the target of the threat.

10. When authorized by and to the extent necessary to comply with workers' compensation or other similar programs established by law. Except as otherwise indicated in this notice, uses and disclosures will be made only with your written authorization subject to your right to revoke such authorization.

## Section 2. Rights of Individuals

*Right to Request Restrictions on PHI Uses and Disclosures*
You may request the Plan to restrict uses and disclosures of your PHI to carry out treatment, payment or health care operations, or to restrict uses and disclosures to family members, relatives, friends or other persons identified by you who are involved in your care or payment for your care. However, the Plan is not required to agree to your request.

The Plan will accommodate reasonable requests to receive communications of PHI by alternative means or at alternative locations.

You or your personal representative will be required to complete a form to request restrictions on uses and disclosures of your PHI.

Such requests should be made to the following officer: Jerry Gotro, Vice President Human Resources & Communications, Keystone Foods LLC, 300 Barr Harbor Drive, Suite 600, West Conshohocken, PA 19428. Phone: (610) 667-6700.

*Right to Inspect and Copy PHI*
You have a right to inspect and obtain a copy of your PHI contained in a "designated record set," for as long as the Plan maintains the PHI.

*"Protected Health Information"* (PHI) includes all individually identifiable health information transmitted or maintained by the Plan, regardless of form.

6

*"Designated Record Set"* includes the medical records and billing records about individuals maintained by or for a covered health care provider; enrollment, payment, billing, claims adjudication and case or medical management record systems maintained by or for a health plan; or other information used in whole or in part by or for the covered entity to make decisions about individuals. Information used for quality control or peer review analyses and not used to make decisions about individuals is not in the designated record set.

The requested information will be provided within 30 days if the information is maintained on site or within 60 days if the information is maintained offsite. A single 30-day extension is allowed if the Plan is unable to comply with the deadline.

You or your personal representative will be required to complete a form to request access to the PHI in your designated record set. Requests for access to PHI should be made to the following officer: Jerry Gotro, Vice President Human Resources & Communications, Keystone Foods LLC, 300 Barr Harbor Drive, Suite 600, West Conshohocken, PA 19428. Phone: (610) 667-6700.

If access is denied, you or your personal representative will be provided with a written denial setting forth the basis for the denial, a description of how you may exercise those review rights and a description of how you may complain to the Secretary of the U.S. Department of Health and Human Services.

*Right to Amend PHI*
You have the right to request the Plan to amend your PHI or a record about you in a designated record set for as long as the PHI is maintained in the designated record set. The Plan has 60 days after the request is made to act on the request. A single 30-day extension is allowed if the Plan is unable to comply with the deadline. If the request is denied in whole or part, the Plan must provide you with a written denial that explains the basis for the denial. You or your personal representative may then submit a written statement disagreeing with the denial and have that statement included with any future disclosures of your PHI.

Requests for amendment of PHI in a designated record set should be made to the following officer: Jerry Gotro, Vice President Human Resources & Communications, Keystone Foods LLC, 300 Barr Harbor Drive, Suite 600, West Conshohocken, PA 19428. Phone: (610) 667-6700.

You or your personal representative will be required to complete a form to request amendment of the PHI in your designated record set. This request form must include a reason for the requested amendment.

*The Right to Receive an Accounting of PHI Disclosures*
At your request, the Plan will also provide you with an accounting of disclosures by the Plan of your PHI during the six years prior to the date of your request. However, such accounting need not include PHI disclosures made: (1) to carry out treatment, payment or health care operations; (2) to individuals about their own PHI; or (3) prior to the compliance date.

If the accounting cannot be provided within 60 days, an additional 30 days is allowed if the individual is given a written statement of the reasons for the delay and the date by which the accounting will be provided.

If you request more than one accounting within a 12-month period, the Plan will charge a reasonable, cost-based fee for each subsequent accounting.

*The Right to Receive a Paper Copy of This Notice Upon Request*
To obtain a paper copy of this Notice contact the following: Local HR Department.

*A Note About Personal Representatives*

You may exercise your rights through a personal representative. Your personal representative will be required to produce evidence of his/her authority to act on your behalf before that person will be given access to your PHI or allowed to take any action for you. Proof of such authority may take one of the following forms:

- a power of attorney for health care purposes, notarized by a notary public;
- a court order of appointment of the person as the conservator or guardian of the individual; or
- an individual who is the parent of a minor child. The Plan retains discretion to deny access to your PHI to a personal representative to provide protection to those vulnerable people who depend on others to exercise their rights under these rules and who may be subject to abuse or neglect. This also applies to personal representatives of minors.

## Section 3. The Plan's Duties

The Plan is required by law to maintain the privacy of PHI and to provide individuals (participants and beneficiaries) with notice of its legal duties and privacy practices. This notice is effective beginning 4/14/03 and the Plan is required to comply with the terms of this notice. However, the Plan reserves the right to change its privacy practices and to apply the changes to any PHI received or maintained by the Plan prior to that date. If a privacy practice is changed, a revised version of this notice will be provided to all past and present participants and beneficiaries for whom the Plan still maintains PHI. Active Participants will receive notice through worksite distribution. Past participants will receive such notice by US Mail at last known address.

Any revised version of this notice will be distributed within 60 days of the effective date of any material change to the uses or disclosures, the individual's rights, the duties of the Plan or other privacy practices stated in this notice.

*Minimum Necessary Standard*

When using or disclosing PHI or when requesting PHI from another covered entity, the Plan will make reasonable efforts not to use, disclose or request more than the minimum amount of PHI necessary to accomplish the intended purpose of the use, disclosure or request, taking into consideration practical and technological limitations.

However, the minimum necessary standard will not apply in the following situations:

- disclosures to or requests by a health care provider for treatment;
- uses or disclosures made to the individual;
- disclosures made to the Secretary of the U.S. Department of Health and Human Services;
- uses or disclosures that are required by law; and
- uses or disclosures that are required for the Plan's compliance with legal regulations.

This notice does not apply to information that has been de-identified. De-identified information is information that does not identify an individual and with respect to which there is no reasonable basis to believe that the information can be used to identify an individual is not individually identifiable health information.

In addition, the Plan may use or disclose "summary health information" to the plan sponsor for obtaining premium bids or modifying, amending or terminating the group health plan, which summarizes the claims history, claims expenses or type of claims experienced by individuals for whom a plan sponsor has provided health benefits under a group health plan; and from which identifying information has been deleted in accordance with HIPAA.

8

**MEMORANDUM**

TO:           All Equity Group Eufaula Division Employees

FROM:      Jennifer Baker, Benefits Administrator

RE:           Women's Health & Cancer Rights Act of 1998

The 1998 federal budget passed by Congress requires all health plans to cover reconstructive surgery following a mastectomy. The Blue Cross and Blue Shield of Georgia PPO Health Care Plan offered by Equity Group Georgia Division LLC covers reconstructive surgery and **the law mandates that we provide all new hires with this information, as well as, all employees annually.**

*Coverage for Reconstructive Surgery Following Mastectomy*

When a covered individual receives benefits for a mastectomy and decides to have breast reconstruction, based on consultation between the attending physician and the patient, the health plan must cover:

- reconstruction of the breast on which the mastectomy was performed;
- surgery and reconstruction of the other breast to produce symmetrical appearance; and
- prostheses and physical complications in all stages of mastectomy, including lymphedema.

This coverage must be the same as for any other benefit under the plan.

If you have any questions about your health care plan, please contact **Jennifer Baker, Equity Group Eufaula Division, 57 Melvin Road, Bakerhill, AL, 36027, 334-688-6500, ext. 26546**

9

**Section 4. Your Right to File a Complaint With the Plan or the HHS Secretary**

If you believe that your privacy rights have been violated, you may complain to the Plan in care of the following officer: Jerry Gotro, Vice President Human Resources & Communications, Keystone Foods LLC, 300 Barr Harbor Drive, Suite 600, West Conshohocken, PA 19428. Phone: (610) 667-6700. Email: jgotro@keystonefoods.com. You may file a complaint with the Secretary of the U.S. Department of Health and Human Services, Hubert H. Humphrey Building, 200 Independence Avenue S.W., Washington, D.C. 20201.

The Plan will not retaliate against you for filing a complaint.

**Section 5. Whom to Contact at the Plan for More Information**

If you have any questions regarding this notice or the subjects addressed in it, you may contact the following officer: Jerry Gotro, Vice President Human Resources & Communications, Keystone Foods LLC, 300 Barr Harbor Drive, Suite 600, West Conshohocken, PA 19428. Phone: (610) 667-6700.

**Conclusion**

PHI use and disclosure by the Plan is regulated by a federal law known as HIPAA (the Health Insurance Portability and Accountability Act). You may find these rules at 45 Code of Federal Regulations Parts 160 and 164. This notice attempts to summarize the regulations. The regulations will supersede any discrepancy between the information in this notice and the regulations.

**SUMMARY PLAN DESCRIPTION**
**OF THE**
**KEYSTONE FOODS LLC**
**HOURLY 401(k) PROFIT SHARING PLAN**

**GROUP IV**

**Employees of Keystone Foods LLC Covered by Agreements with**
**UFCW Locals #56, 204, 911, 1995**
**Teamsters Locals #20, 312**

**Employees of Equity Group – Eufaula Division LLC Covered by Agreements with**
**RWDS #932**

**January, 2006**

11

# TABLE OF CONTENTS
## FOR 401(k) PROFIT SHARING PLAN

**PAGE**

INTRODUCTION ................................................................................14

GENERAL INFORMATION ABOUT YOUR PLAN .........................................15

    General Plan Information .........................................................15

    Employer and Plan Sponsor Information ...........................................15

TYPE OF PLAN ................................................................................16

    What type of Plan is this? ........................................................17

ELIGIBILITY TO PARTICIPATE .................................................................17

    What is the definition of Participant? ............................................17

    Who is eligible to become a Plan Participant? .....................................17

    Are there minimum age and service requirements to become a Plan Participant? ......17

    What is a Year of Service? .......................................................17

    What is an Hour of Service? ......................................................18

    On what date do I actually become a Plan Participant? .............................18

CONTRIBUTIONS TO THE PLAN ..............................................................18

    What can you contribute to the Plan through salary deferrals? .....................18

    What are Catch-up Contributions? ................................................19

    May I make a rollover contribution to the Plan? ..................................19

COMPENSATION ..............................................................................19

    What is the definition of Compensation? ..........................................19

MAXIMUM ANNUAL ADDITION ..............................................................19

    Is there a maximum amount that can be contributed to my account each year? ........19

INVESTMENT OF PLAN ASSETS ..............................................................19

    Whap happens to the Contributions made to the Plan? .............................19

    Who is responsible for investing the trust fund? ...................................20

BENEFITS UNDER THE PLAN ................................................................20

    What benefits are payable when I leave the Company? ................................20

    May I withdraw Contributions while I am employed by the Company ...............20

    May I take a loan from my account? .......................................................21

    What benefits are payable at retirement? ................................................21

        Normal Retirement ...................................................................21

        Later Retirement ......................................................................21

        Disability Retirement................................................................21

    What benefits are payable upon my death? ..............................................22

    How are benefits paid by the Plan? .......................................................22

    When must distributions begin? ............................................................22

    May I choose to make a tax-free rollover of my distribution? .......................23

    What is a "One Year Break in Service"? .................................................24

    If I leave the Company for a reason other than retirement, disability, or death,
      how is the vested part of my account balance determined? ........................24

AMENDMENT AND TERMINATIONS OF THE PLAN ..............................24

    Can the Plan be Amended....................................................................24

    What happens when the Plan is terminated?...........................................24

YOUR RIGHTS UNDER THE PLAN .................................................25

    May I assign my interest under the Plan? ...............................................25

    Is the value of my interest in the Plan insured by the Pension
      Benefit Guaranty Corporation? .........................................................25

BENEFIT CLAIMS AND REVIEW PROCEDURE .................................25

    What procedure should I follow to claim a distribution from the Plan? ............25

    What happens if my claim is denied?......................................................26

    How do I submit my claim for review? ...................................................26

STATEMENT OF ERISA RIGHTS...................................................27

    What are my rights under the law?........................................................27

# SUMMARY PLAN DESCRIPTION

## INTRODUCTION

KEYSTONE FOODS LLC has established this 401(k) profit sharing plan for you.

We all need to plan for the future, especially for our retirement. We hope this Plan will play a part in helping you to achieve financial security in the coming years.

This document is a summary of the important terms and provisions of the Keystone Foods LLC Hourly 401(k) Profit Sharing Plan known as a Summary Plan Description ("SPD"). A copy of the SPD is being distributed to all Participants to advise the Participants and their beneficiaries of their benefits and rights under the Plan.

The SPD is intended to supply a general overview of your Plan. It generalizes in some instances for the sake of conciseness and clarity. Although every effort has been made to present the important Plan provisions in a fully accurate manner, any error, misstatement or omission will be disregarded, and the actual Plan provisions will be controlling. If you wish to verify that the Plan operates as described in the SPD with respect to your particular situation, you should contact the Plan Administrator for a further explanation of the Plan.

## GENERAL INFORMATION ABOUT YOUR PLAN

There is certain general information which you may need to know about your Plan. This information has been summarized for you in this section.

1.    General Plan Information.

Plan Name:    Keystone Foods LLC
                     Hourly 401(k) Profit Sharing Plan

Plan Number: 008

The provisions of your Plan became effective on January 1, 2006, which is called the Effective Date of the Plan. The Plan was established by means of a spin-off from the Keystone Foods LLC Salaried 401(k) Profit Sharing Plan, which was previously called the Keystone Foods Employees' Pension Retirement Plan (the "Pension Plan"). The following plans were merged into the Pension Plan before this spin-off:

> Keystone Foods 401(k) Plan
> Keystone Foods Employees' Pension Retirement Plan
> Cagle's-Keystone Foods LLC 401(k) Plan
> Cagle's-Keystone Foods LLC Pension Retirement Plan
> Equity Group-Georgia Division LLC Pension Retirement Plan
> Equity Group-Georgia Division LLC 401(k) Plan

This Summary Plan Description reflects the Plan provisions as of January 1, 2006.

Your Plan's records are maintained on a twelve-month period of time. This is known as the Plan Year. The Plan Year begins on January 1st each year and ends on December 31st. The Pension Plans listed above each had a short Plan Year from March 1, 2005, through December 31, 2005.

Certain valuations are made on the Anniversary Date of your Plan. This date is the last day of the Plan Year. The Plan Administrator may establish additional valuation dates.

Your Plan and Trust shall be governed by the laws of the Federal Government and of the State of Delaware.

2.    Employer and Plan Sponsor Information:

The Employer's Name, Address, Telephone Number and Employer Identification Number are:

Keystone Foods, LLC
Five Tower Bridge
300 Barr Harbor Drive, Suite 600
West Conshohocken, PA 19428-2998

Telephone Number: (610) 667-6700        EIN: 23-3073393

Participating Employers:

15

CS Grain LLC
Cagle's-Keystone Foods LLC
Equity Group - Eufaula Division LLC
Equity Group - Georgia Division LLC
Keystone Management, Inc.
LD Foods LLC
M&M Restaurant Supply (MI/OH) LLC

The Plan Administrator's Name, Address, Telephone Number and Employer Tax Identification Number are:

Keystone Foods LLC
Five Tower Bridge
300 Barr Harbor Drive, Suite 600
West Conshohocken, PA 19428-2998

Telephone Number   (610) 667-6700        EIN:   23-3073393

Your Plan Administrator keeps the records for the Plan and is responsible for the administration of the Plan. Under the terms of the Plan, the Administrator has full discretionary authority to interpret the Plan and to determine eligibility for benefits. The Administrator's decision on any question will be final.

3.      <u>Plan Trustee Information and Agent for Service of Legal Process</u>.

The name and principal place of business of your Plan's Trustees are:

Plan Trustee:          The Vanguard Group
                       P.O. Box 2900
                       Valley Forge, PA 19482

Trust B (insurance) Trustees: John J. Coggins, Jerald S. Gotro and D. Paul McGarvie

Agent for Legal Process:          Any Trustee.

## TYPE OF PLAN

**What type of Plan is this?**

This is a 401(k) Profit Sharing Plan authorized under Sections 401(a) and (k) of the Internal Revenue Code. The record of the amounts accumulated for the benefit of a Participant is known as the Participant's Account. Your retirement benefit will be an amount equal to the accumulated value of your Accounts.

## ELIGIBILITY TO PARTICIPATE

**What is the definition of Participant?**

A Participant is an Employee who has met the eligibility requirements described below. You will continue to be a Participant as long as the Plan holds any assets for your benefit.

**Who is eligible to become a Plan Participant?**

Any hourly Employee who is assigned principally to the U.S. except:

Employees subject to a collective bargaining agreement which does not provide for benefits under this Plan;

Employees who are nonresident Aliens;

Employees of Affiliated Employers unless such Affiliated Employers are listed as Participating Employers in this Plan;

Leased Employees; and

Employees classified by the Employer as independent contractors.

**Are there minimum age and service requirements to become a Plan Participant?**

Eligible Employees must also satisfy the following minimum age and service requirements:

Minimum Age:        21
Minimum Service:    1 Year of Service

**What is a Year of Service?**

A Year of Service is a twelve consecutive month period (the Plan Year) in which you have completed at least 1,000 Hours of Service.

If you have satisfied the eligibility requirements with a predecessor or Affiliated Employer, you will receive credit for that service in meeting the eligibility requirements for this Plan. Your Years of Service with Bill Kraft Restaurant Food Products Co., Cagle's Inc., Cagle Foods JV, LLC, LD Foods, Equity Group-Georgia Division, LLC, and

Charoen Pokphand (USA), Inc., will also be recognized for purposes of eligibility in this Plan.

### What is an Hour of Service?

An Hour of Service is:

a.  each hour for which you are directly or indirectly compensated by your Employer for the performance of duties;

b.  each hour for which you are directly or indirectly compensated by your Employer for reasons other than performance of duties (such as vacation, holidays, illness, disability, lay-off, military duty, jury duty or leave of absence during the Plan Year);

c.  each hour for which back pay is awarded or agreed to by your Employer; and

d.  each hour of employment with an Affiliated Employer, subject to Break-in-Service rules.

### On what date do I actually become a Plan Participant?

You will become a Plan Participant on the January 1st or July 1st coincident with or next following the date you meet the minimum age and service requirements.

If you go from a classification of a noneligible Employee to an Eligible Employee, you will become a Plan Participant on the date you become an Eligible Employee, provided that you have met the eligibility requirements.

If you go from a classification of an Eligible Employee to a noneligible Employee, you will cease to be an active Participant until you again become an Eligible Employee.

## CONTRIBUTIONS TO THE PLAN

### What can you contribute to the Plan through salary deferrals?

Each year you may make before-tax contributions to the Plan in whole percentage increments through payroll deductions. These contributions are referred to as salary deferrals. Each year you may defer up to 75% of your salary, including bonuses, subject to limits established by Federal Law. You may change the amount of your salary deferral at any time. The change will take effect the following payroll period. The maximum dollar amount you may defer will be adjusted from time to time to reflect changes in the cost of living. If you defer more than the allowable amount, the excess will be returned to you and it will be taxable for the year in which you put the excess into the Plan.

18

**What are Catch-up Contributions?**

If you are or attain age 50 at any time during the calendar year, you may make an additional contribution to the Plan. This contribution is called a Catch-up Contribution. The maximum catch-up contribution you may make will be adjusted from time to time to reflect changes in the cost of living.

**May I make a rollover contribution to the Plan?**

You are permitted to make rollover contributions whether or not you have become a Participant in the Plan. You are always 100% vested in your rollover contribution account.

## COMPENSATION

**What is the definition of Compensation?**

For purposes of your Plan, Compensation has a special meaning. Compensation is defined as total compensation (including base pay, bonuses and overtime) paid by the Employer for the Plan Year, excluding relocation pay, GED, any other amounts paid by the Employer as Non-Cash Items (NCI), and severance pay. Compensation does include any salary reduction contributions made to the Plan by you.

Compensation for any Employee who becomes or ceases to be eligible to participate during a Plan Year shall only include Compensation while that Employee is an Eligible Employee.

If you are returning from qualified military service on or after December 12, 1994, you may be treated as having received Compensation from the Employer during the period of military service equal to the Compensation you otherwise would have received from the Employer during that period. The Plan Administrator can provide further details if this applies to you.

The Plan will not recognize Compensation of any Participant in excess of an annual limit set by the government and adjusted from time to time to reflect cost of living changes.

## MAXIMUM ANNUAL ADDITION

**Is there a maximum amount that can be contributed to my account each year?**

The law imposes a maximum amount that may be contributed to all of the Employer's plans on your behalf. This amount is adjusted from time to time to reflect cost of living changes.

## INVESTMENT OF PLAN ASSETS

**What happens to the Contributions made to the Plan?**

Contributions are paid into a trust fund. Your share of the trust fund is represented by an

19

account balance.

## Who is responsible for investing the trust fund?

Subject to written "Guidelines" adopted by the Plan Trustee, you self-direct the investment of your retirement account. The Trustee will have no obligation to look after the prudence of your investment decisions. Any income, losses or expenses resulting from your investment decisions will be charged directly to your self-directed investment account. The Trustee will provide you with information regarding investment procedures and options, including restrictions on fund transfers.

The Plan intends to comply with ERISA §404(c), under which the Plan provides you with an opportunity to control your Plan investments. The Plan Trustees and other fiduciaries are, therefore, relieved of any liability for losses experienced as a result of your investment instructions. In addition to information provided by the Trustee to assist you in investing your Plan accounts. You have the right to receive additional information upon your request. You can contact the Trustee if you would like to receive:

1 - A description of the annual operating expenses of each designated investment alternative, including investment manager fees, administrative fees, and transaction costs which reduce the rate of return to you. The aggregate amount of these expenses must be expressed as a percentage of average net assets of the designated investment alternative.

2 - Copies of prospectuses, financial statements and reports and other materials related to the investment alternatives to the extent the information is provided to the Plan.

3 - Regarding the designated investment alternatives: (a) a list of assets comprising the portfolio; (b) the value of each asset; (c) for fixed rate investment contracts, the issuer, terms and rate of return; (d) value of shares and units; and (e) past and current investment performance.

## BENEFITS UNDER THE PLAN

## What benefits are payable when I leave the Company?

You will receive your entire account balance in the event of your retirement, disability or death. If you terminate your employment for any other reason, the amount of your benefit will be determined by your Years of Service. (See Section on Vesting).

## May I withdraw Contributions while I am employed by the Company?

The Plan allows for In-Service Distributions. You may request a distribution of all or part of your vested Account Balances provided that you have reached your Normal Retirement Date, which is the first day of the month coinciding with or next following your Normal Retirement Age. You may withdraw your Rollover Contribution Account at any time.

The Plan allows for in-service distributions pursuant to a Qualified Domestic Relations Order (QDRO). Please contact the Plan Administrator for more information or for a free

20

copy of the QDRO procedures if your plan assets are the subject of a divorce or separation agreement or Court Order. Also see the section of this SPD entitled "YOUR RIGHTS UNDER THE PLAN" for related information.

The Plan allows for hardship withdrawals from your Elective Deferral and Rollover accounts only. The Plan Administrator will advise you whether you are eligible to take a hardship withdrawal.

## May I take a loan from my account?

You are permitted to take a loan from the vested portion of your account, subject to certain rules. You may have only 1 outstanding loan at a time and there is a minimum loan amount of $1,000. The loan will be repayable by payroll withholding and must be completely repaid over a period of not longer than 5 years, unless the loan is for the purchase of your principal residence. Please see the Loan Policy and contact the Plan Administrator for additional information.

## What benefits are payable at retirement?

a.  <u>Normal Retirement.</u>

Your Normal Retirement Age will be (a) the date you reach your 65th birthday, (b) your 60th birthday, if you have at least 10 Years of Service, or (c) your 55th birthday if you have at least 15 Years of Service as a Plan Participant. A Year of Service is a Plan Year during which you work at least 1,000 Hours.

At your Normal Retirement Age, you will become 100% vested in your account balance, and you may, but are not required to, begin to draw benefits from your account.

b.  <u>Later Retirement.</u>

You may keep working past your Normal Retirement Age. If you do, you will continue to share in the allocation of Company contributions and forfeitures (as long as you meet all other requirements).

Once you reach your Normal Retirement Date, you may elect to begin taking distributions from your Plan Account(s), even if you continue to be employed by the Company. If you are a 5% owner of the Company and if you continue to be employed at the time you reach age 70½, you will be required to begin taking distributions from this Plan. If you are subject to this rule, you should contact the Plan Administrator in order to get additional information about the "Minimum Distribution Requirements" applicable by law. If you are not a 5% owner of the Company, you may postpone distribution of your Account Balance until the later of attainment of age 70½ or your actual retirement.

c.  <u>Disability Retirement.</u>

If you become permanently disabled (the inability to perform your usual duties of employment, or the duties of any other position the Employer makes available to you for which you are qualified because of your training, education, or

experience), you will become fully vested in your account balance and will be permitted to withdraw the balance at any administratively convenient time after you supply proof of your disability. Your benefit will consist of the full value of your account.

**What benefits are payable upon my death?**

Your beneficiary will be entitled to 100% of your account balance upon your death.

If you are married at the time of your death, your spouse will be the beneficiary of the death benefit unless you otherwise elect in writing on a form to be furnished to you by the Administrator. IF YOU WISH TO DESIGNATE A BENEFICIARY OTHER THAN YOUR SPOUSE, YOUR SPOUSE MUST IRREVOCABLY CONSENT THERETO. YOUR SPOUSE'S CONSENT MUST BE IN WRITING, BE WITNESSED BY A NOTARY OR A PLAN REPRESENTATIVE AND ACKNOWLEDGE THE SPECIFIC ACTION TAKEN.

If however,

    (a)    your spouse has validly waived any right to the death benefit in the manner outlined above;

    (b)    your spouse cannot be located; or

    (c)    you are not married at the time of your death, then your death benefit will be paid to the beneficiary of your own choosing in a single sum, as you or your beneficiary may elect. You may designate such beneficiary on a form to be supplied to you by the Administrator. If you change your designation, or if you become married, your spouse must again consent to the change.

Since your spouse participates in these elections and has certain rights in the death benefit, you should immediately report any change in your marital status to the Administrator.

**How are benefits paid by the Plan?**

Your benefits from your 401(k) Account will be paid in a single lump sum payment.

**When must distributions begin?**

DISTRIBUTIONS MUST BEGIN NO LATER THAN THE 60TH DAY AFTER THE CLOSE OF THE PLAN YEAR IN WHICH THE LATEST OF THE FOLLOWING EVENTS OCCURS:

    a.    the date on which you reach the Normal Retirement Age;

    b.    the 10th anniversary of the year in which you became a Participant in the Plan;

22

      c.      the date you terminate employment with your Employer.

The Plan Administrator may establish a policy of paying out benefits sooner than the latest date required by law. If the total of your account is valued at more than $5,000, you and your spouse must consent to the earlier distribution.

## May I choose to make a tax-free rollover of my distribution?

As a general rule, all plan distributions are subject to federal, state and local income taxation in the year you receive the distribution. In addition, if you are under age 59½ at the time you receive a distribution, it will (with few exceptions) be subject to an additional 10% penalty tax on premature distributions. However, you can postpone taxation on any amounts that you "roll over" to another qualified plan or Individual Retirement Account (IRA) within 60 days of your receipt. Most distributions from this Plan will qualify for tax-free rollover treatment.

If you become eligible to receive a distribution that qualifies for tax-free rollover treatment, you will have the right to direct the Plan Administrator to make your distribution payable directly to the trustee (or custodian) of whatever Plan you select to receive your rollover contribution.

If your distribution qualifies for tax-free rollover treatment, and if you decide not to have it made payable directly to another Plan or IRA, the law requires this Plan to automatically withhold 20% of the distribution, and pay it over as Federal Tax Withholding. This will be useful to you if you plan not to rollover the distribution, because the 20% withholding will be credited against the income tax (and the possible 10% penalty) you will have to pay on the distribution. If, however, within 60 days of receipt of the remaining 80%, you decide you want to avoid taxation (by making a tax-free rollover), you must understand that you will have to come up with the 20% that was paid off as withholding tax out of your own pocket. If you don't come up with the 20% and add it to your rollover deposit, you will be taxed on the 20% withholding. (This is because you will be treated as having taken the 20% as a taxable distribution from the Plan.)

If you terminate your employment and your vested account balance is greater than $1,000 but not more than $5,000 and you do not make an election with respect to your benefit, the Plan Administrator will pay your distribution in a direct rollover to an Individual Retirement Account that is designated by the Plan Administrator and communicated to you. If your benefit is not more than $1,000 and you do not make an election with respect to your benefit, the Plan administrator will pay the benefit directly to you and withhold taxes as described above.

If you are not a 5% owner of the Company, you may postpone distribution of your Account Balance until the later of attainment of age 70 ½ or your actual retirement.

Rest assured, you will receive additional information about these rules (including any technical changes, and/or limitations) before a distribution is actually paid out to you. In addition, you should always consult with a competent and independent advisor before you make any elections.

**What is a "One Year Break in Service"?**

You incur a "One Year Break in Service" when you complete 500 or fewer Hours of Service during a Plan Year.

A One Year Break in Service does not occur in the computation period in which you interrupt your continuous service as the result of an authorized leave of absence or on account of pregnancy, birth or adoption of your child. These Hours of Service shall be credited solely to avoid your incurring a One Year Break in Service. The Plan Administrator may require you to furnish proof that your absence qualifies as a maternity or paternity absence.

If you are rehired before you have five consecutive "One Year Breaks in Service," your entire account will be restored if you repay the amount previously distributed, if any, as provided in the Plan.

For example:

You terminated employment on January 1, 2000 with 2 Years of Service. You were not vested at the time of your termination of employment. You return to work on January 5, 2003. You will be credited with your 2 pre-break Years of Service because your number of Breaks in Service (3) did not exceed 5.

These restoration of service rules apply in determining your eligibility and vesting in future contributions.

If you are returning from qualified military service, you will be treated as not having incurred a break in service because of the period of military service. The military service is treated as service with the employer for vesting and benefit accrual purposes. Speak with your Employer to learn more about your reemployment rights.

**If I leave the Company for a reason other than retirement, disability or death, how is the vested part of my account balance determined?**

Salary Deferral and Rollover Contributions

Immediate                              100%

## AMENDMENT AND TERMINATION OF THE PLAN

**Can the Plan be Amended?**

Your Employer has the right to amend the Plan at any time. However, in no event shall any amendment reduce the amount already credited to your account.

**What happens when the Plan is terminated?**

Your Employer has the right to terminate the Plan at any time. Upon termination, all amounts credited to your accounts will become 100% vested.

24

If plan termination occurs, the Company may direct that either:

    (a)    benefits be distributed to you in any manner permitted by the Plan as soon as practicable; or

    (b)    the Trust created by the Plan be continued and benefits be distributed to you or your beneficiaries as if the Plan had not terminated.

If the Plan is merged with another Plan maintained by the Company, your account balances will be separately accounted for under the new plan.

## YOUR RIGHTS UNDER THE PLAN

### May I assign my interest under the Plan?

You have no right to assign or transfer your interest under the Plan, and except in certain limited cases specified by the Internal Revenue Code, your interest is not subject to the claims of your creditors until distributed to you. However, a portion of your benefits may be assigned if you become divorced and a "Qualified Domestic Relations Order" (QDRO) is delivered to the Plan Administrator. A QDRO is a court order providing for child support, alimony or marital property rights to a former spouse, child or dependent, pursuant to a state domestic relations law, which is "qualified" by the Plan Administrator. Your account will bear the expense of qualifying the Order. Contact the Plan Administrator for forms you may use to expedite this process.

### Is the value of my interest in the Plan insured by the Pension Benefit Guaranty Corporation?

Benefits provided by your Plan are not insured by the Pension Benefit Guaranty Corporation (PBGC) under Title IV of the Employee Retirement Income Security Act of 1974 (ERISA) because this is a plan that provides for separate annual account balances for Participants and does not provide for a specific amount of benefit at retirement.

## BENEFIT CLAIMS AND REVIEW PROCEDURE

### What procedure should I follow to claim a distribution from the Plan?

Benefits will be paid to you and your beneficiaries without the need for formal claims. However, you or your beneficiaries may make a request for any Plan benefits to which you believe you may be entitled. Any such request must be made in writing to the Plan Administrator.

Your request for Plan benefits shall be considered a claim for Plan benefits, and it will be subject to a full and fair review by the Plan Administrator. The Plan Administrator will have full and final authority to interpret this Plan, and the Plan Administrator's decision will not be reversible unless it is clearly erroneous.

**What happens if my claim is denied?**

If your claim is wholly or partially denied, the Plan Administrator shall furnish you with a written notice of this denial. This written notice must be provided to you within a reasonable period of time (generally 90 days) after the receipt of your claim by the Plan Administrator. The written notice must contain the following information:

    a.    the specific reason or reasons for denial;

    b.    specific reference to those Plan provisions on which the denial is based;

    c.    a description of any additional information or material necessary to correct your claim and an explanation of why such material or information is necessary; and

    d.    appropriate information as to the steps to be taken if you or your beneficiary wish to submit your claim for review.

If notice of the denial of a claim is not furnished to you in accordance with the above within a reasonable period of time, your claim shall be deemed denied. You will then be permitted to proceed to the review stage.

**How do I submit my claim for review?**

If your claim has been denied, and you wish to submit your claim for review, you must follow the Claims Review Procedure.

    a.    Upon the denial of your claim for benefits, you may file your claim for review, in writing, with the Administrator.

    b.    YOU MUST FILE THE CLAIM FOR REVIEW NO LATER THAN 60 DAYS AFTER YOU HAVE RECEIVED WRITTEN NOTIFICATION OF THE DENIAL OF YOUR CLAIM FOR BENEFITS.

    c.    You may review all pertinent documents relating to the denial of your claim and submit any issues and comments, in writing, to the Administrator.

    d.    Your claim for review must be given a full and fair review. If your claim is denied, the Administrator must provide you with written notice of this denial within 60 days after the Administrator's receipt of your written claim for review. There may be times when this 60 day period may be extended. This extension may only be made, however, where there are special circumstances which are communicated to you in writing within the 60 day period. If there is an extension, a decision shall be made as soon as possible, but not later than 120 days after receipt by the Administrator of your claim for review.

    e.    The Administrator's decision on your claim for review shall be communicated to you in writing and shall include specific references to the pertinent Plan provisions on which the decision was based.

f.    If the Administrator's decision on review is not furnished to you within the time limitations described above, your claim shall be deemed denied on review.

g.    If benefits are provided or administered by an insurance company, insurance service, or other similar organization which is subject to regulation under the insurance laws, the claims procedure relating to these benefits may provide for review. If so, that company, service, or organization shall be the entity to which claims are addressed. If you have any questions regarding the proper person or entity to address claims, you should ask the Administrator.

## STATEMENT OF ERISA RIGHTS

### What are my rights under the law?

As a Participant in the Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan Participants shall be entitled to:

a.    Examine, without charge, at the Plan Administrator's office, all Plan documents, including insurance contract, and copies of all documents filed by the Plan with the U.S. Department of Labor, such as detailed annual reports and plan descriptions.

b.    Obtain copies of all Plan documents and other Plan information upon written request to the Plan Administrator. The Plan Administrator may make a reasonable charge for such copies.

c.    Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each Participant with a copy of the Summary Annual Report.

d.    Obtain a statement telling you whether you have a right to receive a pension at Normal Retirement Age, and, if so, what your benefits would be at Normal Retirement Age if you stop working for the Company now. If you do not have a right to a full pension, the statement will tell you how many more years you have to work to get a right to a pension. This statement must be requested in writing and is not required to be given more than once a year. The Plan must provide the statement free of charge.

In addition to creating rights for the Plan Participants, ERISA imposes duties upon the people who are responsible for the operation of the Plan. These people who operate the Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan Participants and beneficiaries.

No one, including your Employer or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a pension benefit under the Plan or exercising your rights under ERISA. If your claim for a pension benefit is denied in whole or in part, you must receive a written explanation of the reason for the denial. You have the right to have the Plan review and reconsider your claim. Under

ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the Plan and do not receive them within thirty days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $100 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, you should contact the nearest area office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, DC 20210.

**KEYSTONE FOODS LLC**

**HOURLY 401(K) PROFIT SHARING PLAN**


**SUMMARY PLAN DESCRIPTION**

<u>ACKNOWLEDGMENT OF RECEIPT</u>

   I hereby acknowledge receipt of the Summary Plan Description and Loan Policy

for the above referenced 401(k) Profit Sharing Plan of:

      **KEYSTONE FOODS LLC**



Dated: _____    _____

              **Signature of Employee**



              _____

              **PLEASE PRINT YOUR NAME**

**MANAGEMENT RESERVES THE RIGHT TO CHANGE OR MODIFY THIS POLICY AS NEEDED.**

## ATTENDANCE POLICY

As an employee of Equity Group Eufaula you are expected to be regular in attendance and punctual. Regularly scheduled attendance by all employees is mandatory. Any tardiness or absence causes problems for your fellow employees and your supervisor.

As part of meeting performance standards, represented employees are expected to work as scheduled during Equity Group Eufaula business hours or their scheduled shift. Employees are required to notify the Company as soon as possible but no later than within the first hour of their shift if they will be absent or late for work where he or she may be reached. Employees with unscheduled absences are required to contact their supervisor or on each days of his or her absence. The number to call in to report any absence is 1-877-573-8127.

On each day of absence, employees not previously excused are required to call the absence reporting number at 1-877-573-8127 as soon as practical giving the following information: (1) Employee's Name, (2) Reason of Absence, (3) Expected Return Date and (4) Name of Person Calling.

This policy will set the requirements and corrective action schedule for absenteeism, late arrival, early departure, Weekend/Holiday work and important definitions for absences and occurrences.

Each employee will be allowed to accumulate up to six (6) points. Each day of absence equals one (1) point or if proper documentation is supplied each occurrence will equal (1) point (i.e. Two (2) to four (4) consecutive days' absence with a doctor's statement will equal one (1). For five (5) or more days, leave of absence should be applied for in advance whenever possible). Documentation must be supplied the day the employee returns to work. If documentation is not presented, point will be accumulated for each day's absence. Additional points may be incurred as follows:

- Arriving to work late and otherwise failing to be ready to work at your designed start times equals one-half (1/2) point.
- Leaving work early (after lunch break) equals one-half (1/2) point.
- An employee missing more than four hours per day equals one (1) point.
- An absence which occurs when scheduled to work on Saturday, Sunday or a holiday the occurrence will be doubled.

When an employee has worked forty-five (45) calendar days with perfect attendance one (1) point will be subtracted from any points that have been accumulated.

Approved absences pursuant to the following leave policies are not counted against the employee for purposes of this attendance policy.

- Funeral Leave
- Jury Duty

31

- Subpoenaed Witness (not as a Defendant or Plaintiff)
- Worker's Compensation
- Military Leave
- FMLA Leaves
- Approved Unpaid Leaves of Absence

When unscheduled absences indicate a potential pattern, management may request further information regarding such absences and may require medical certification for any future occurrence. Excessive absences, falsification of reason for any absence, failure to provide medical documentation when required, or unauthorized time away from the Company during working hours may result in corrective action, up to and including termination. Failure to call in or report to work for two consecutive days or shifts is considered job abandonment.

The Company will comply will applicable laws relating to time off from work, but it is the employee's responsibility to provide sufficient information to enable the Company to determine if any such law(s) applies to the absence. Employees should keep in touch with their supervisor and notify the Company of any change in their status as soon as possible. Individuals with disabilities may be granted reasonable accommodation in complying with these policies if undue hardship does not result to the Company's operations. Regular attendance and promptness are considered part of an employee's essential job functions. Attendance records are examined when an employee is being considered for promotional opportunities.



Equity Group - Eufaula Division, LLC
57 Melvin Clark Road
Bakerhill, AL 36027
(334) 687-7790

# FURTHER PROCESSING GMP's

The following GMP's were established to minimize the introduction of bacteria, contaminants, or foreign material into our manufacturing environment and must be adhered to by all employees and non-employees while in production areas including coolers, shipping, and receiving docks.

1. Hairnets will be appropriately worn to cover and contain hair.
2. Beard nets must be worn to cover _**any facial hair.**_
3. A clean smock must be obtained daily. Smocks are to be changed during the shift if needed. Smocks must fasten or tie properly to cover street clothes. Smocks _**may not**_ have sewn on buttons or an external upper pocket.
4. Plastic sleeve covers will be worn to cover any street clothes that extend beyond smock coverage on the arms when handling product.
5. No jewelry is allowed inside the processing area. Any body piercing of the ears, eyebrows, nose, tongue, etc. _**is considered jewelry and is prohibited.**_ The only exception is a plain wedding band with no stone settings.
6. Wristwatches are not to be worn in the processing area at any time.
7. All clothing worn in the plant must be clean and in good repair. Consideration should be given to loose threads of clothing to prevent foreign-object issues in product.
8. Rubber gloves must be kept clean.
9. Smocks, hairnets, and beard nets must be removed before exiting the facility. The _**only**_ exception is during an emergency evacuation.
10. All false fingernails and / or fingernail polish must be covered at all times while in the processing areas. All fingernails will be kept cut to a reasonable length.
11. No baseball style caps are to be worn in processing areas to include coolers, shipping and receiving docks.
12. All trash will be disposed of in appropriate receptacles.
13. No food or beverages are allowed in production areas.
14. Use of tobacco, chewing gum, and candy is strictly prohibited in production areas.
15. Spitting is not allowed.
16. No smocks, aprons, sleeve covers, arm guards, or any type of glove are allowed in the restrooms.
17. The carrying of items (e.g. pens, pencils, note pads, etc.) in external upper pockets is not allowed.
18. No glass objects for personal use are allowed beyond the front administrative offices including the break room.



**Equity Group – Eufaula Division, LLC**
57 Melvin Clark Road
Bakerhill, AL 36027
(334) 687-7790

19. Only approved, plant issued, metal pens are allowed for use in production areas.
20. Before exiting a restroom, all employees are and non-employees _must_ wash their hands with sanitizing soap and water.
21. Upon entering production areas, all employees and non-employees _must_ wash their hands with sanitizing soap and water.
22. Hands _must_ be washed with sanitizing soap and water after handling inedible product, inedible containers, picking up items from the floor, handling pallets or any other unclean surfaces before handling of product or product contact surfaces can take place.
23. Any item that becomes contaminated must be washed before being placed back into use. Processing tools and utensils are, but not limited to the following items: pens, calculators, thermometers, clipboards, pans, edible totes, edible shovels, earplugs, maintenance tools, etc.
24. Only approved footwear shall be worn in the processing areas to include coolers, shipping and receiving docks. Rubber boots are available at the Supply Room, or footwear may be purchased from an outside source as long as the soles are slip resistant. _No tennis shoes_ will be allowed in production areas.

The above GMP's will be strictly enforced anyone failing to comply with them will be subject to disciplinary action up to and including termination.

Approved By:                    Effective Date: October 4, 2004

Greg Mills - Operations Manager_____

Butch White -Complex QA Manager_____

Pearl Lovell - 1ˢᵗ Shift Manager_____

Craig Spangler-2ⁿᵈ Shift Manager_____

34

# QUALITY ASSURANCE

## Terms

HACCP:     Hazard Analysis and Critical Control Point
GMP:       General Manufacturing Practices
SSOP:      Standard Sanitation Operational Procedure
SOP:       Standard Operational Procedure

## Seven Principles of HACCP

1. Conduct a hazard analysis – Identify and evaluate all potential biological, chemical, and physical food safety hazards.
2. Identify critical control points – a point, step, or procedure in the production process at which control can be applied to prevent, eliminate, or reduce a food safety hazard to an acceptable level of safety before the product leaves the company.
3. Determine critical limits for reach CCP – boundaries of safety for each CCP to control the identified food safety hazard.
4. Develop monitoring procedures – a planned sequence of observations or measurements to make sure CCP is under control.
5. Establish corrective actions – a procedure to be followed when monitoring indicates that there is a deviation from an established limit at a CCP.
6. Perform verification procedures – activities performed to verify that the HACCP plan is adequate to control food safety hazards and that the system is operating as intended.
7. Develop an effective record keeping system – documents that the HACCP system is operating according to the written plan.

## Standard Sanitation Operational Procedures (SSOPs)

1. Cleaning of equipment and food work areas.
2. Sanitizing equipment and food work areas.
3. Pest Control
4. Personal hygiene and cleanliness.
5. Wear proper clothing to clean.

## Standard Operational Procedures (SOPs)

1. Clean break rooms
2. Clean offices
3. Check garbage containers for cracks or holes.
4. Lining containers with plastic bags.
5. Clean and sanitize garbage containers.
6. Taking out the garbage
7. Washing hands properly.
8. Keeping work area clean.

35

# SAFETY ORIENTATION

## Equity Group Eufaula Division, LLC
## Eufaula, AL

## Agenda

| | | | | |
|---|---|---|---|---|
| 1. | Safety Policy Statement | 12. | Personal Protective Equipment |
| 2. | Central Safety Committee | 13. | Safety Audit Program |
| 3. | Safety Rules & Disciplinary | 14. | Proper Lifting |
| 4. | Medical Rules | 15. | Ergonomics |
| 5. | Fire Extinguishers | 16. | Ladder Safety |
| 6. | Evacuation Procedures | 17. | Electrical Safety |
| 7. | Hearing Protection | 18. | Confined Spaces |
| 8. | Lock out – Tag out | 19. | Blood Borne Pathogens |
| 9. | Emergency Stops – Switches | 20. | Forklifts / Pallet Jacks |
| 10. | Eye Wash – Shower Stations | 21. | Machine Guarding |
| 11. | MSDS / Chemical Hazards | 22. | Substance Abuse |

# Welcome to Equity Group Eufaula Division, where SAFETY is number ONE!

36

# Safety Policy Statement

Safety is the most important task each of us must complete each day. The safety of each individual must be our first priority all day, every day. Each of us has a responsibility to work safely and to help each of our co-workers work safely. The only way to excel in safety is to live minute to minute with safety first in our minds and actions. We should not only feel responsible for safety, we must be accountable for any actions that disregard the safety of our co-workers or ourselves.

Our managers will be accountable for the safety of their people and will be held accountable for the safety performance of the people in their space. The safety of the department is a direct reflection of our commitment to provide the safest conditions and our requirement that each individual be accountable for his/her actions concerning safety. Employees are urged to report any safety condition or idea that will provide a safer and more enjoyable work environment. Every injury or illness shall be reported to your supervisor and the medical services group immediately.

Our success will depend on your contribution to providing and committing your efforts to the safety of everyone affiliated with this operation. Each of us will be accountable for our safety performance individually and collectively.

*Randy Cline*
General Manager

37

# Central Safety Committee

**Equity Group Eufaula Division** is dedicated to creating a safe work environment for all employees. Your health and safety, both on and off the job, is very important to us. The Central Safety Committee has been organized to provide direction and leadership on safety issues. The committee is headed by our General Manager and is comprised of 10 different subcommittees. Each subcommittee has a chair and co-chair person and additional members, comprised of both salaried and hourly employees. Each month the Central Safety committee meets, with each subcommittee reporting its activities since the last meeting. The subcommittees are as follows:

- Emergency Response
- Rules, Policies and Procedures
- Safety Audit
- On the Job Safety
- Off the Job Safety
- Ergonomics
- New and Altered Equipment
- Wellness
- Accident Investigation
- Transportation

Support your Central Safety Committee. Suggestions and ideas are encouraged. Let your supervisor or a committee chairperson know if you are interested in serving on a sub-committee.

# Summary

◆ Protect yourself on and off the job - know the facts

◆ Practice good personal hygiene

◆ Follow work rules, use gloves and protective clothing

◆ Wash your hands often, after work or exposure

◆ Keep areas clean - report problems immediately to supervisors

24. Material Safety Data Sheets will be kept current and will be available to all employees in a MSDS manual located in each facility and in the safety manager's office.
25. All visitors and outside contractors will be made aware of and must abide by the facility safety rules, policies and procedures while on the site.
26. Gasoline, chemicals and other combustibles will only be stored and transported in approved and properly marked containers.
27. All drain covers must be in place at all times, except when required for cleaning or repairs and *must be replaced immediately.*
28. Follow ladder safety when using ladders.
29. Know the location of primary and secondary emergency evacuation routes and assembly areas in the event of an emergency.
30. All employees will follow department safety rules, policies and procedures. Failure to follow safety rules will result in disciplinary action up to and including termination.
31. Restrictions on employees wearing contacts. Employees working in Live Hanging, Live Receiving, Sanitation, or the Feedmill may either: wear their contacts with safety goggles or wear their prescription glasses. Contacts without goggles are not allowed in these areas.

# First Processing Safety Rules

1. Obey all Personal Protective Equipment requirements.
2. When using knife sharpeners to sharpen knives, always leave them attached to stands.
3. Knives, scissors and all other blades should be kept in approved holders when not in use. Blades should only be carried from one location to another in an approved sharps carrier / container.

# Second Processing Safety Rules

1. Only authorized employees are allowed in the knife sharpening room.
2. Knives, scissors and all other blades should be kept in approved holders when not in use. Blades should only be carried from one location to another in approved sharps carrier / container.
3. Obey all Personal Protective Equipment requirements.
4. Ergonomic stands must be stabilized before use and adjusted for proper work height.

# Maintenance Safety Rules

1. Bump caps will be worn except while in the break rooms.
2. Obey all Personal Protective Equipment requirements.

3. Always wear clothing suitable for the –60 degree Fahrenheit temperatures in the freezer when repairing it.
4. It is the user's responsibility to inspect and repair electrical cords on powered equipment before use and before return to the tool room.
5. A job is not considered complete until the area is cleaned up and all tools, materials and equipment have been accounted for.
6. Replace all guards on equipment before operating.
7. Remove blades before transporting saws, equipment, or machinery.

# Sanitation Safety Rules

1. Obey all Personal Protective Equipment requirements.
2. Always wear rain pant legs outside the boot.
3. Transporting chemicals in open top containers is prohibited.
4. Helmets will be worn at all times while in the processing plant.
5. The uses of acid and chlorine compounds at the same time are prohibited.
6. All chemical containers, cleaning buckets, spray jugs, etc. shall be labeled appropriately.
7. The sanitation employee assigned to the chemical room is the only employee authorized to mix and issue chemicals, and he/she must be trained and certified. The supervisor will verify chemicals issued.
8. Spray jugs will be issued and returned clean to the chemical room on a nightly basis. Return all other cleaning equipment and ladders to the chemical room nightly.
9. Each lead person will complete an equipment checklist prior to pre-op nightly.
10. Avoid spraying high-pressure when others are present in the immediate area. Never point a hose directly at someone or discharge it at close proximity to another individual.

# Safety Violation Disciplinary Action

Safety is the most important task each of us must complete each day. When safety rules or policies are violated, appropriate disciplinary action, up to and including termination will take place. Due to the possible consequences of these violations (injury to worker / co-worker) management reserves the right to determine the disciplinary action based on the severity of the infraction. The following list is a set of guidelines for safety violation disciplinary action and is not intended to be an all-inclusive list.

# THREE DAY SUSPENSION PENDING INVESTIGATION / FINAL NOTICE

- **Failure to report any accident which has resulted in personal injury or property damage.**

41

- **Failure to schedule physicians visits through Medical Services for work-related injury or illness.**
- **Failure to report for follow up as instructed by Medical Services personnel.**
- **Unsafe acts which lead or contribute to injury / illness to the employee or another employee.**
- **Failure to wear or to properly wear required personal protective equipment.**

# TERMINATION

- **Lock out –Tag out violation.**
- **Injury to yourself or others when not wearing proper safety equipment.**

# Medical Rules

- All injuries must be reported to your manager and First Aid immediately.
- Seek treatment in the First Aid Department.
- Work - related physicians visits must be scheduled through the First Aid department.
- Unauthorized treatment may be your responsibility.
- Post-accident drug and alcohol testing will be conducted. This includes the initial visit for all work related physicians visits for injury or illness.
- Alternate, light, or modified duty available as directed by physician.
- Physician's restrictions must be followed to ensure medical recovery.
- Falsification of medical records, documents, information, or questionnaires may result in disciplinary action up to and including termination.
- All accidents and near misses will be investigated by the Accident Investigation Committee.
- The First Aid department is available to answer workers compensation questions as needed. Additional information about our workers compensation insurance carrier is available in First Aid.

# Fire Extinguishers

**Type of Fire Extinguishers**
- Type A      Combustibles, such as wood, papers.
- Type B           Flammable Liquids such as gasoline, diesel fuel, grease, etc.
- Type C           Electrical Fires
- Type D      Combustible Metals, such as magnesium.
- Type K      Kitchen fires, grease and oil.

**Steps for using a fire extinguisher (PASS)**
- Remove extinguisher from wall.
- **P**ull pin.
- **A**im wand at the base of the fire.
- **S**queeze handle
- **S**weep wand while aiming at the base of fire. Start at the lowest point closest to you and work your way up.
- Never start sweeping at the top of a fire; it will blow the fire back on you.

43

# Evacuation Procedures / Emergency Response

**Alarm Systems**
- The alarm services the front offices, break rooms, hallways, production and maintenance areas.
- Radios are our primary means of announcement for areas that are not serviced by the alarm system.
- Supervisors carry radios.

**Familiarize yourself with evacuation routes.**
- Evacuation routes are posted throughout the plant. The evacuation route may change due to the nature of the emergency. Your supervisor will announce this information.

**Know your assembly areas.**
- *Primary Assembly Area* > Located in grassy area in front of plant. Zones are indicated by color and department.
- *Secondary Assembly Area* > Behind the plant by the live haul truck access road Zones are indicated by color and department.
- *Severe Weather Assembly Area* >

- **Listen to your supervisor.**
- In the event of an emergency, your supervisor will announce the evacuation route and the assembly area. Your manager is responsible for accounting for you in the event of an emergency.

**Remain calm and orderly.**
- Do not run or panic; evacuate in an orderly manner. Report any injuries to your manager as soon as possible.

**Employees out of their work when an evacuation is announced.**
- Evacuate the plant and report to your department's assembly area, notify your supervisor immediately to ensure you are accounted for.

**Stay away from emergency traffic areas.**
- Cooperate with emergency personnel and plant management in the event of an emergency.

**Know Your Part In An Emergency!!**
**The life you save may be your own!**



# HEARING CONSERVATION

Equity Group Eufaula Division has a Written Hearing Conservation Program that is available for viewing by employees. The program is located in the Safety/First Aide Department.

### Why Should I Know About Hearing Conservation?
Because your hearing is priceless.
Good hearing helps you:
a. Communicate with others (being with other people is more rewarding if you can hear and understand sounds).
b. Enjoy life (many of life's valued pleasures involves hearing – music, voices of friends and family)
c. Help you stay safe – on & off the job!

### How Can Noise Affect Your Hearing?
Exposure to excessive noise raises your hearing threshold – the point at which you begin to hear.
Excessive noise may harm your overall health. Too much noise will contribute to mental and physical stress, illness and accidents.

**Remember** – noise is a safety hazard. It can damage hearing – temporarily or permanently.
1. It may create stress that can affect your mental as well as physical being.
2. It can cause accidents – when workers cannot hear instructions or warnings.

### Everyone is affected by noise to some degree depending on:
1. Loudness of the noise
2. Frequency of the noise
3. Length of exposure to the noise
4. Health and age
5. Continuous or intermittent noise

### Temporary Hearing Loss:
Can be caused by exposure to loud noises for a few hours. Fortunately, hearing is usually restored after a period of time away from the noise.

### Permanent Hearing Loss:
Occurs after the ears have been continually exposed to excess noise and have gradually become unable to recover from temporary hearing loss.

*No cure exists for permanent hearing loss caused by noise.  Surgery, medication or hearing aids will not help noise induced hearing loss.*

**Signs of possible Hearing Loss:**
1. A noise or ringing in the ears (medical condition called "tinnitus")
2. Difficulty hearing people speak
3. Difficulty hearing certain sounds – like a watch tick.
4. Need to raise TV or radio volume so loud that others complain.

**Noise Can Be Measured by Decibels**
**Decibel Levels of Typical Everyday Noises**



**Prolonged exposure to more than 85dBs can cause hearing damage if proper hearing protection is not used.**

**A decibel level of 120 decibels or more is considered highly dangerous!**

**"There Are Legal Limits on Noise in the Workplace!"**

**OSHA Regulations 29 CFR 1910.95 states:**
1. A worker may not be exposed to more than an average of 90 dBs over an 8 hour period.
2. Employees must be included in a hearing conservation program if noise exposure averages 85 dBs or more over an 8 hour period of time (TWA).

**It is extremely important that you wear your hearing protection at all times when you are in your work area.  No Exceptions!**

46

# HOW TO USE PLUGS

Ear plugs must be worn correctly to give you the best protection possible.

1. Your hands and plugs should be clean before you put the plugs in your ears.
2. Put your left arm over your head and with you left hand pull up on your right ear.
3. With your right hand insert plug well into your ear canal.
4. Switch hands and insert the other plug in the same manner.

| 1st Day | 2nd Day | 3rd Day |
|---|---|---|
| It can be hard to wear protectors all the time on the first day – but don't give up. Keep trying! | On the second day, you double the wearing time. If you are trying earplugs, it's only natural if they seem to fit badly the first few days. With earmuffs it is usually the head pressure that is uncomfortable during the first few days. | It sounds strange when you talk. This is because the sound comes from inside you to the hearing organ instead of through the air. Try to use the protector the whole day. |
| 4th Day | 5th Day | 6th |
| You might think it is hard to hear the sounds you want to hear – for instance, conversation, but in fact, hearing protectors muffle noise much better than speech at normal distances. | Everything has its disadvantages. Hearing protectors cut down ventilation to the contact areas and consequently feel a bit hot. The first five days are the worst. | Try listening for a moment today to the noise without your hearing protectors. How good it feels to place them in again! |
| 7th Day | 8th Day | 9th Day |
| For many the seventh day is the crunch. It is tempting to give up or give it a rest. Your will-power is put to the test, but it is important that you continue. | Many find the eighth day something of a release. The discomfort gets less and the idea of stopping the noise from getting to our ears takes over. | After nine days of using hearing protectors continuously during working hours, most people will have become used to them and will continue to use them. Something for which they will be thankful in years to come. |

# Lockout – Tagout Awareness Level (Affected Employees)

***The purpose of the lockout-tagout standard is to prevent the accidental or unexpected energization, start-up or release of stored energy in order to prevent injury to employees.*** Each year numerous people are injured, permanently disabled or killed while working on improperly locked and tagged equipment. These injuries could be prevented by following proper Lockout – Tagout procedures (LOTO).

*Affected Employees:* An employee whose job requires him/her to operate or use a machine or equipment on which servicing or maintenance is being performed under LOTO, or whose job requires him/her to work in an area in which such servicing or maintenance is being performed.

*Authorized Employees:* A person who locks or implements a tagout system procedure on machines or equipment to perform the servicing, sanitation, or maintenance on the machine or equipment.

**General LOTO Procedures**

The key point of lockout-tagout procedures is to shut down completely machinery and electrical equipment before repair, maintenance, and cleaning. There are detailed procedures for shutting down each piece of equipment. The first step of LOTO procedures is to notify the affected employee.

**LOTO procedures are based on the following steps:**

- Prior to shutting down, the authorized employee must know the type and magnitude of energy, the hazards of the energy to be controlled, and the method or means to control the energy. The authorized employee must notify all affected employees of the LOTO.
- The authorized employee shuts down the machine or equipment by the normal stopping procedure (pressing the stop button, moving the switch to the "off" position, etc.)
- The main power switches, circuits, or other sources of energy are moved to the "off" position or otherwise rendered inoperative.
- Locks and tags are placed on switches or other energy sources in the safe or off position.
- Test effectiveness of LOTO. All potentially hazardous stored or residual energy sources (springs, water pressure, hydraulic pressure, gravity, air pressure, etc.) are relieved and or disconnected. After ensuring that no employees are exposed, and as a check on having disconnected the energy sources, the authorized employee operates the push button or other normal operating controls to make certain the equipment will not operate. Caution: Return the operating control to the neutral or off position after the test.

**General LOTO Rules**

- ➢ Never place any part of your body in moving equipment without following LOTO.
- ➢ Do not attempt to start equipment that is locked and tagged out.
- ➢ *Do Not* remove locks or tags placed on machinery by authorized employees.

48

➢ Do not use locks and tags designated for LOTO for personal use or any use other than LOTO.
➢ Do not attempt to lockout-tagout equipment without attending the authorized employee training.
➢ Notify management or the safety office of LOTO violations.
➢ Failure to follow Lockout-Tagout rules will result in disciplinary action up to and including termination.
➢ **This training material does not authorize employees to lock and tag equipment. Additional authorized training and evaluation is required before an employee is considered authorized.**

# Emergency Stops

Emergency Stops (E-stops) are located throughout the facility and are used to stop machinery or lines in the event of an emergency. Familiarize yourself with the location of E-Stops in your new job. Any time you move to a new job or location, always know where the E-Stops are located.

# Eye Wash – Shower Stations

Eye wash and shower stations are located throughout the facility and are there in the event of any emergency which may require immediate flushing of your eyes, body, or clothing. Familiarize yourself with the locations of these stations. Do not block eye stations.

# MSDS / Chemical Hazards in the workplace.

Hazard Communication is a process of educating employees on the hazards associated with chemicals in the workplace. 29 CFR 1910.1200 defines the Hazard Communication Standard and the steps employers must take to educate employees on the hazards of chemicals in the workplace. Chemicals are considered hazardous if they pose either a physical or health hazard to workers exposed to them. A copy of this standard and the written Hazard Communication Program is located in the Safety Office.

## Labels
♦ Indicate who manufactured the chemical (name, address, and phone number).
♦ Indicate a signal word (danger , warning, and caution) that indicates the danger level of the chemical.
♦ Indicates physical hazards like flammable, explosive, or corrosive.
♦ Labels will not be defaced or removed from incoming containers. Notify your supervisor if you discover a missing or defaced label.

49

**Site Specific Chemical Information**
This facility uses ammonia and carbon dioxide, and it falls under OSHA's Process Safety Management standard. A copy of this standard is located in the safety office along with our Process Safety Management (PSM) written program.

- Anhydrous Ammonia: This chemical is used as a refrigerant. It is a colorless gas with a pungent, suffocating odor. This chemical is an irritant and corrosive to the skin, eyes, respiratory tract and mucous membranes. It may cause severe, frostbite-like burns. In case of contact with skin or eyes, flush continuously with water for fifteen (15) minutes and seek first aid. Remove contaminated clothing. Do not apply ointments to skin burns. If inhaled, respiratory support may be needed. If ammonia odor is detected, notify your manager. Evacuate the area if necessary.

- CO2 (Carbon Dioxide): Colorless to faint-yellow liquid with a sweet ether-like odor. This facility uses both liquid and pellet form (dry ice). Do not handle CO2 without scoops and proper PPE. Handling CO2 pellets without using a scoop and proper PPE's could cause frostbite-like symptoms or burns. A low-lying fog can accompany the presence of CO2 concentrations. Low concentration inhalation may cause increased respiration or headaches. Higher concentration inhalation may cause nausea or vomiting. If CO2 is inhaled seek fresh air and report to first aid. Direct contact with CO2 may cause frostbite or burns.

# Personal Protective Equipment (PPE)

Personal Protective Equipment is any piece of equipment, article of clothing, or items deemed necessary for the health and safety of employees, prevention of injuries, loss of life or limb, or disease while employees perform their daily job assignments as prescribed.

### General PPE Information

- Inspect PPE daily for defects. Report damaged PPE to your supervisor. Turn in damaged PPE to your supervisor.
- Keep PPE clean and sanitary.
- If you are unsure about the proper PPE or the proper use of PPE, ask your supervisor or the safety office.
- Do not loan your PPE to other employees.
- Do not use PPE for any purpose other than its intended purpose.
- Dispose of PPE properly. Do not throw earplugs on the ground.
- Wash hands before inserting earplugs.
- Any PPE other than that issued by Equity Group Eufaula Division must be approved through the safety office.

## Safety Audit Program

The Safety Audit is a valuable tool for creating a safe work environment. Safety audits are conducted to identify and correct unsafe acts and conditions in the workplace. The information gathered from these audits is compiled by members of the Safety Audit Subcommittee which reports this information to the Central Safety Committee. Interviews are an important part of the safety audit. Answer honestly and to the best of your knowledge if you are interviewed during an audit. Safety audits, when conducted properly, decrease accidents and injuries in the workplace.

## Ergonomics / Proper Lifting

**Q: What is ergonomics?**
**A:** Ergonomics is fitting the job to the worker.
**Q: What is work?**
**A:** Work = Force x Distance. Any time you exert force through a distance, you have performed work!

**Ergonomics**
- ❖ One goal of ergonomics is to postpone fatigue. Work or play, if performed over a long enough period of time, will cause fatigue. By knowing the body postures and positions that cause fatigue, we can minimize or postpone its effects. Also, by understanding ergonomically incorrect body positions, we can greatly decrease cumulative trauma disorders.

51

**Ergonomic Principles**

- ❖ Hands should be no more than 2" above or below the navel. This is considered the neutral position of the body.
- ❖ Elbows should hang loosely by the side. Arms should be at a 45-degree angle to the upper body.
- ❖ An extended reach creates greater force on the back. The reach should be no more 16" from the spinal cord.
- ❖ Your work should be towards you and at a 45-degree angle. It places greater stress upon your back muscles, arms and hands if you work away from your body.
- ❖ Keep your wrist straight while working. Bending the wrist at odd angles could cause cause irritation of the medial nerve.
- ❖ Avoid twisting the neck and lower back. Work only in a 60-degree arc in front of you.
- ❖ Your workstation must provide proper support. Ergonomic stands allow for less stress and force to be placed on the feet and legs, reducing the onset of fatigue.
- ❖ Be aware of your surroundings. Note any objects that could cause injury to the soft tissues of your body. Keep your workplace clean.
- ❖ Keep stress on the back as low as possible. Avoid twisting while lifting. Do not bend with your back. Lift with your legs, using the larger muscles.
- ❖ Keep the joints of the body working at the best angle to exert the necessary force. Remember, optimum angle for optimum force. When the tendons of a muscle pass over a joint, the muscle cannot fully contract. When a joint such as the wrist is fully flexed, the hand cannot fully grip because the muscles cannot move freely.
- ❖ Avoid improperly fitting gloves. Gloves that do not fit correctly can impede circulation and decrease the sense of touch.
- ❖ Cold temperatures can reduce the function of the nerves and muscles. In cold temperatures, the fibers of the muscles do not work smoothly, which increases the risk of tearing fibers.
- ❖ Take mini breaks during work. It is helpful to pause frequently to flex and stretch. This will improve flexibility and increase blood-flow.
- ❖ Avoid gripping knives or scissors tightly. This can decrease blood-flow.
- ❖ When possible, use as much of the hand as possible to grip. If you can use five fingers instead of two to grip an object, you have spread the force exerted over a wider area.

Report all injuries, illnesses, or pain to your supervisor and medical services. Address all ergonomic issues with your manager. Equity Group Eufaula Division is committed to providing a safe and healthy working environment for all employees.

# Ladder Safety

**General Ladder Rules**
Inspect ladders before each use.  Take defective ladders out of service immediately.
You want to be sure that:
- o No steps or rungs are missing.
- o Support braces, bolts, and screws are in place and tight.
- o Steps, rungs, and siderails are in good condition.
- o No splinters or sharp edges are present.
- o Nothing slippery is on steps or rungs.

**Setup**
- o Place the ladder on a firm, level surface.
- o Position the ladder so feet are parallel to the surface that the ladder rests against.
- o Position the ladder at the proper angle.  The simple rule suggested by OSHA is to place the base of the ladder "a distance from the vertical wall equal to one-fourth the working length of the ladder."
- o Make sure there is clear access at ladder top and bottom.
- o Secure the bottom firmly, or have someone hold it.
- o Do not place a ladder in front of a door unless the door is blocked, locked, or guarded.
- o Do not rest a ladder on a window or window sash.
- o Position an extension ladder before extending it.

**On the Ladder**
- o Only one person should be on a ladder at a time.
- o Do not climb a ladder if you have a tendency to faint or become dizzy.
- o Face the ladder when climbing up or down.
- o Hold side rails with both hands while climbing, one hand while working.
- o Wear shoes with clean, non-skid surfaces.
- o Do not use the top two steps on a **stepladder.**
- o Do not carry tools while climbing; use a rope, belt, pocket, etc.
- o Do not lean to the side while working on a ladder.
- o Do not move a ladder while you are on it.
- o Move slowly and carefully while on a ladder.
- o Never have one foot on a ladder and the other on a piece of equipment.
- o Do not use a ladder as a brace, skid, gangway, or any reason other than its intended purpose.
- o For work on or near exposed energized parts, portable ladders shall have nonconductive side rails.

# Electrical Safety

**Electrical Hazards are a major cause of on the job injuries and accidents.** Safety requires understanding how electricity works and when it's hazardous.

**Electrical current travels through insulated conductors.**

*Conductors* are the wires and cables that carry electricity from the power plant. Conductors are wrapped in *insulators* / electricity-resistant materials like rubber, plastic, and glass that keep the electric current on its path and prevent accidents. *Don't use anything electrical that has missing or frayed cord or wire insulation.*

**Grounding connects electrical equipment to earth.**

Grounding keeps the power on a low-resistance path and helps protect against shock.

- ❖ Most electrical equipment is grounded with metal frames and covers and / or 3-pronged plugs.
- ❖ In outdoor or wet areas, special electric outlets called *ground fault circuit interrupters* (GFCI's) provide added protection.

**Un-insulated or ungrounded electrical equipment can cause shock.**

Inspect electrical equipment before use to be sure insulation is in good condition. Check that plugs have a good, tight connection. Shock occurs when you touch the ground plus a live wire or poorly insulated tool or machine at the same time. When electric current goes through your body, it causes shock and may result in:

- Pain or loss of muscle control that can lead to falls or contact with powered equipment.
- Nerve, muscle, or tissue damage.
- Internal bleeding.
- Cardiac arrest or death.

The longer your contact with live power, the greater the shock (especially if the current enters your body near your heart). Water, even moisture in the air, can turn you, your equipment, or even wooden items into conductors.

Metal is a conductor; don't wear metal jewelry when working with electricity.

**Electricity can burn your body.**

- ❖ Contact with electrical arcs, flashes and fires, or overheated electrical wires or equipment can burn the skin.
- ❖ Electric current that enters your body can also burn body tissue.

**Electricity can cause fire and explosion.**

Overheated currents or electrical contact with flammable liquids, or vapors, or combustible dust can cause fires or explosions. Dispose promptly of oily rags, paper, sawdust, etc. Do not let them contact electric lights or equipment.

**Check equipment to prevent accidents and injuries.**

- ❖ Be sure cords have good insulation and have coding that shows they are adequate for the voltage, wire size, and conditions.
- ❖ Don't bend 3-pronged plugs or try to force them into 2-pronged outlets.

❖ When working around flammable materials, use only tools designed for such use.
❖ If an electrical tool shocks, smokes, smells, or sparks, turn it off.  Do not use it.

**Know and follow electrical safety precautions**
Do not work on or with live power unless you are trained as a qualified worker.  OSHA defines qualified workers as those trained to identify exposed live parts and their voltage and know the safety procedures to use with them.

o  Be sure electrical equipment is properly locked and tagged out before testing, repair, or maintenance is performed.
o  Obey warning signs and locks; *KEEP OUT UNLESS AUTHORIZED!*
o  Don't use cords to raise or lower equipment.  Inspect cords; do not use frayed cords.
o  Don't reach blindly into a space that may contain energized equipment.
o  Do not place objects (tape, clothing, etc.) on top of electrical boxes.  Do not block electrical boxes.

**Conclusion**
Be aware of electrical hazards!
*Electrical shock can be deadly.  Take precautions to keep power on its proper path and keep yourself from becoming an electrical conductor.*

Warning:  Electricity Can
♦ Burn Skin
♦ Burn Body Tissue
♦ Cause Fires or Explosions

# Confined Spaces

This training is designed to give the employee information at the awareness level about the hazards and dangers of confined spaces. It is not intended to satisfy OSHA's requirements for confined space entry.

**General:** OSHA defines a confined space as follows:
- It is large enough and so configured that an employee can bodily enter and perform assigned work.
- Has limited or restricted means for entry or exit.
- It is not designed for continuous employee occupancy.
- Examples of confined spaces would be tanks, vessels, silos, storage bins, hoppers, vaults, and pits (confined spaces at this facility are clearly marked).

**General Hazards of Confined Spaces**
OSHA separates confined spaces into two categories, permit-required and non-permit confined spaces. This training will deal mainly with the hazards of permit-required confined spaces. The following is a list of hazards associated with permit-required confined spaces:
- Hazardous atmospheres, which could be caused by:
  - Flammable gas, vapor, or mist levels.
  - Airborne combustible dust.
  - Oxygen deficient or enriched atmospheres. Too little oxygen and breathing problems could lead to unconsciousness or even death. Too much oxygen and the potential for explosions and fires increase.
  - Potential for engulfment (liquid, solid, or gas) that could immerse, bury, or smother an individual.
- Additional hazards associated with confined spaces includes:
  - Combustibility: If something can burn or explode, it is more likely to do so (and faster) in a confined space.
  - Falls: Falling in a confined space could lead to entrapment, asphyxiation, or contact with moving equipment. An entrapping design such as walls that converge inward or a floor that slopes and tapers down; in a space such as this, a slip or fall could be disastrous.
  - Heat: Heat can build up quickly in a confined space.
  - Noise: Sounds reverberate in a confined space. This could lead to failure to hear important instructions or warnings.
  - Moving equipment: such as augers or conveyors, pulleys, belts, chains, sprockets, or machinery.

**Important Information About Confined Spaces**
Now that we have identified and explained a confined space and the hazards associated with them, take a minute to think about confined spaces away from work and how these hazards could apply to places that your children may decide to play. One of the problems with the hazards associated with confined spaces is that we cannot always readily see them. In order to determine problems associated with atmospheric hazards, readings and sampling must be performed. Sewers could potentially contain

methane, hydrogen sulfide, or oxygen deficient / enriched atmospheres. Sewers could also cause an engulfment (flowing water) hazard.

**Remember**
- Our policy is that only authorized and trained employees enter confined spaces.
- Confined spaces are clearly marked at this facility.
- Hazards are not always readily apparent in a confined space.
- Never attempt to rescue a person in a confined space. Call for help! Ask questions.

# Blood Borne Pathogens

Blood borne pathogens are pathogenic microorganisms that are present in human blood that may cause disease or death.

**Examples of Blood borne Pathogens**
- HIV: Human Immunodeficiency Virus – Causes AIDS, attacks the body's immune system, reducing its ability to fight disease.
- HBV: Hepatitis B Virus – Infects the liver; It is more common than HIV and is a greater risk on the job. Many HBV infected people have no problems or symptoms. Some, however, develop serious or fatal problems such as cirrhosis, liver cancer, or chronic liver disease.

**Protection**
- Avoid direct exposure to infectious blood or bodily fluids.
- Avoid participating in any high- risk activity such as: unprotected sexual contact, sharing of IV drug needles, exchange of body fluids.
- Wash hands immediately after exposure to potentially infectious materials.

**Important Reminders**
- Know what the biohazard warning looks like. Only biohazard containers can be used to collect, handle, store, or transport blood or other potentially infectious materials.
- Our exposure control plan is located in medical services.
- Utilize universal precautions; treat all blood and bodily fluids as infectious.
- Sharps containers are located in medical services.
- Clean up of potentially infectious blood or bodily fluids is to be performed by those that have been trained.
- Notify your supervisor immediately in the event of a poke, stab, nosebleed, or laceration. Report to medical services for treatment.
- Let trained personnel administer first aid treatment to injured persons and clean up any potentially hazardous material. Avoid blood or bodily fluids in the event of an accident.

# Drug and Alcohol Policy

Equity Group Eufaula Division is committed to providing a workplace free from drugs and alcohol. The use, or being under the influence of, distribution, sale, or possession of any drug, controlled substance, or alcohol on company property or in a company vehicle is prohibited and may lead to disciplinary action up to and including termination. Any employee taking prescribed medication that may impair their ability to safely perform his or her job must report to medical services. Although we do not prohibit the proper use of medication prescribed by a physician, we do prohibit the abuse or misuse of such substances. It is a violation of this company's drug and alcohol policy to take prescription medication prescribed to other persons. Equity Group Eufaula Division conducts pre-employment, post-accident, reasonable suspicion, and random drug testing. Equity Group Eufaula Division reserves the right to search any person or vehicle while on company property or any company vehicle, on or off company property. Failure to comply with any portion of these, or other rules relating to Equity Group Eufaula Division's drug and alcohol policy may result in disciplinary action up to and including termination.

# FIRE EXTINGUISHER TRAINING

In order to understand how fire extinguishers work, you first need to know a little bit about fire.

**Four things must be present at the same time in order to produce fire:**

. Enough **oxygen** to sustain combustion,

. Enough **heat** to raise the material to its ignition temperature,

. Some sort of **fuel** or combustible material, and

. The **chemical, exothermic reaction** that is fire.



Oxygen, heat, and fuel are frequently referred to as the "fire triangle." Add in the fourth element, the chemical reaction, and you actually have a fire

tetrahedron. The important thing to remember is: take any of these four things away, and you will not have a fire or the fire will be extinguished.

**Essentially, fire extinguishers put out fire by taking away one or more elements of the fire triangle/tetrahedron.**

**Fire safety**, at its most basic, is based upon the principle of keeping fuel sources and ignition sources separate.



 Not all fires are the same, and they are classified according to the type of fuel that is burning. If you us the wrong type of fire extinguisher on the wrong class of fire, you can, in fact, make matters worse. It i therefore very important to understand the four different fire classifications

 **Class A - Wood, paper, cloth, trash, plastics**

Solid combustible materials that are not metals. (Class **A** fires generally leave an **Ash**.)

 **Class B - Flammable liquids: gasoline, oil, grease, acetone**

Any non-metal in a liquid state, on fire. This classification also includes flammable gases.   (Class **B** fires genera involve materials that **Boil** or **Bubble**.)

 **Class C - Electrical: energized electrical equipment**
As long as it's "plugged in," it would be considered a class C fire.  (Class **C** fires generally deal with electrical Current.)

 **Class D - Metals: potassium, sodium, aluminum, magnesium**
Unless you work in a laboratory or in an industry that uses these materials, it is unlikely you'll have to deal with a Class D fire. It takes special extinguishing agents (Metal-X, foam) to fight such a fire.

Most fire extinguishers will have a pictograph label telling you which classifications of fire the extinguisher is designed to fight. For example, a simple water extinguisher might have a label like the one below, indicating t should only be used on Class A fires





**Different types of fire extinguishers are designed to fight different classes of fire. The three most common types of fire extinguishers are:**

Water (APW)

Carbon Dioxide (CO2)

Dry Chemical (ABC,BC,DC)

63

# AIR - PRESSURIZED WATER EXTINGUISHER

**Will have gauge**



APW stands for "air-pressurized water." APWs are large, silver extinguishers that are filled about two-thirds of the way with ordinary tap water, then pressurized with normal air. In essence, an APW is just a giant squirt gun.

APWs stand about 2 feet tall and weigh approximately 25 pounds when full.

## Water (APW) Extinguishers

APWs are designed for Class A (wood, paper, cloth) fires only.



**Never use water to extinguish flammable liquid fires.** Water is extremely ineffective at extinguishing this type of fire, and you may, in fact, spread the fire if you try to use water on it.

**Never use water to extinguish an electrical fire.** Water is a good conductor, and there is some concern for electrocution if you were to use water to extinguish an electrical fire. Electrical equipment must be unplugged and/or de-energized before using a water extinguisher on it.

APWs extinguish fire by taking away the "heat" element of the fire triangle.

APWs will be found in older buildings, particularly in public hallways, as well as in Residence Halls. They will also be found in computer laboratories. It is important to remember, however, that computer equipment must be disconnected from its electrical source before using a water extinguisher on it.

# CARBON DIOXIDE EXTINGUISHER





Carbon Dioxide is a non-flammable gas that extinguishes fire by displacing oxygen, or taking away the oxygen element of the fire triangle. The carbon dioxide is also very cold as it comes out of the extinguisher, so it cools the fuel as well. CO2s may be ineffective at extinguishing Class A fires because they may not be able to displace enough oxygen to successfully put the fire out. Class A materials may also smolder and re-ignite.

CO2s will frequently be found in laboratories, mechanical rooms, kitchens, and flammable liquid storage areas.

65

# DRY CHEMICAL EXTINGUISHER

## Dry Chemical Extinguisher (ABC)



### Dry Chemical Extinguishers

Dry Chemical Extinguishers come in a variety of types. You may see them labeled:

**"DC"** short for "dry chem"

**"ABC"** indicating that they are designed to extinguish class A,B,and C fires, or

**"BC"** indicating that they are designed to extinguish class B and C fires.

"ABC" fire extinguishers are filled with a fine yellow powder. The greatest portion of this powder is composed of monoammonium phosphate. Nitrogen is used to pressurize the extinguishers.

ABC extinguishers are red and range in size from 5 lbs to 20 lbs on campus.

**It is extremely important to identify which types of dry chemical extinguishers are located in your area.**

Read the labels and know their locations! You don't want to mistakenly use a "BC" extinguisher on a Class A fire, thinking that it was an "ABC" extinguisher.

  

**An "ABC" extinguisher will have a label like this, indicating that it may be used on class A, B and C fires.**

Dry chemical extinguishers put out fire by coating the fuel with a thin layer of dust, separating the fuel from the oxygen in the air. The powder also works to interrupt the chemical reaction of fire, so these extinguishers are extremely effective at putting out fire.

These extinguishers will be found in a variety of locations. New buildings will have them located in public hallways. They may also be found in laboratories, mechanical rooms, break rooms, chemical storage areas, offices, university vehicles, etc.

Dry chemical extinguishers with powder designed for Class B and C fires may be located in places such as commercial kitchens or areas with flammable liquids.

# Rules for Fighting Fires

Fires can be very dangerous and you should always be certain that you will not endanger yourself or others when attempting to put out a fire. For this reason, when a fire is discovered:

Assist any person in immediate danger to safety, if it can be accomplished without risk to yourself.

Activate the building fire alarm system or notify the fire department by dialing 911 (or designating someone else to notify them for you). When you activate the building fire alarm system, it will automatically notify the fire department and get help on the way. It will also sound the building alarms to notify other occupants, and it will shut down the air handling units to prevent the spread of smoke throughout the building.

Only after having done these two things, if the fire is small, you may attempt to use an extinguisher to put it out.

**However, before deciding to fight the fire, keep these rules in mind:**

**Know what is burning.** If you don't know what is burning, you don't know what type of extinguisher to use. Even if you have an ABC extinguisher, there may be something in the fire that is going to explode or produce highly toxic smoke. Chances are, you will know what's burning, or at least have a pretty good idea, but if you don't, let the fire department handle it.

**The fire is spreading rapidly beyond the spot where it started.** The time to use an extinguisher is in the incipient, or beginning, stages of a fire. If the fire is already spreading quickly, it is best to simply evacuate the building, closing doors and windows behind you as you leave.



## Do Not Fight the Fire If:

**You don't have adequate or appropriate equipment.** If you don't have the correct type or large enough extinguisher, it is best not to try to fight the fire.

**You might inhale toxic smoke.** If the fire is producing large amounts of smoke that you would have to breathe in order to fight it, it is best not to try. Any sort of combustion will produce some amount of carbon monoxide, but when synthetic materials such as the nylon in carpeting or foam padding in a sofa burn, they can produce highly toxic gases such as hydrogen cyanide, acrolein, and ammonia in addition to carbon monoxide. These gases can be fatal in very small amounts.

**Your instincts tell you not to.** If you are uncomfortable with the situation for any reason, just let the fire department do their job.

The final rule is to always position yourself with an exit or means of escape at your back before you attempt to use an extinguisher to put out a fire. In case the extinguisher malfunctions, or something unexpected happens, you need to be able to get out quickly, and you don't want to become trapped. Just remember, always keep an exit at your back.

67



# How to Use a Fire Extinguisher

It's easy to remember how to use a fire extinguisher if you can remember the acronym **PASS**, which stands for **Pull, Aim, Squeeze, and Sweep.**



### Pull the pin.

**This will allow you to discharge the extinguisher.**



### Aim at the base of the fire.

**If you aim at the flames (which is frequently the temptation), the extinguishing agent will fly right through and do no good. You want to hit the fuel.**



### Squeeze the top handle or lever.
**This depresses a button that releases the pressurized extinguishing agent in the extinguisher.**



### Sweep from side to side

**until the fire is completely out. Start using the extinguisher from a safe distance away, then move forward. Once the fire is out, keep an eye on the area in case it re-ignites.**

# Fire Extinguisher Quiz

**First Name:**

**Last Name:**

**Dept./Class:**

**1 An example of two "Class B" fuels would be:**

Cardboard, newspapers

Lamp, hot plate

Grease, paint thinner

**2 An APW (water extinguisher) is safe to use on an electrical fire.**

TRUE

FALSE

**3 Carbon Dioxide extinguishers are designed for which types fuels?**

Class B and C

Class A, B, and C

Class A and C

Class A and B

**4 Which type of extinguisher has a hard horn on the end of a flexible hose or metal arm?**

APW (Air Pressurized Water)

CO2 (Carbon Dioxide)

ABC (Dry Chemical)

**5 As a general rule, you should not attempt to fight a fire if it is spreading rapidly.**

TRUE

FALSE

**6 ABC fire extinguishers extinguish fire by cooling it down.**

TRUE

FALSE



**7 Water will not extinguish most flammable liquid fires.**

- [ ] TRUE
- [ ] FALSE

**8 You should always keep an exit or means of escape at your back when trying to fight a fire.**

- [ ] TRUE
- [ ] FALSE

**9 The three elements of the fire triangle are:**

- [ ] Water, a heat source, and fuel
- [ ] Oxygen, water, and fuel
- [ ] Oxygen, fuel, and a heat source
- [ ] Fuel, oxygen, and earth

**10 Do you know where the nearest fire extinguisher is in your work area?**

- [ ] Yes
- [ ] No

# Hazardous Communications, Hazardous Materials, & Personal Protection Equipment

- Importance of Hazard Communications (HAZCOM) awareness

- Locations of HAZCOM materials

- General understanding of HAZCOM materials (simple "filter-through of implemented process)

- Importance of personal protective equipment (PPE)

- Limitations of required PPE

- Donning and appropriate use of PPE

- Demonstration of donning and appropriate use of require PPE

- Use of cutting utensils and what to do in the event of an emergency or power outage

- Climate awareness throughout the facility



Equity Group Eufaula Division • 57 Melvin Clark Road
Eufaula, AL 36027 • (334) 687-7790 • Fax (334) 687-7779

# MEDICAL CLINIC SERVICES

## PROVIDES

(A)  Physical and Drug screens prior to hire.

(B)  Treatment and follow-up visits after any on the job injuries while working with this company.

(C)  Work-related Physicians visits must be scheduled through the Medical Clinic.

(D)  Unauthorized Physician treatment may be your responsibility.

(E)  **ALL INJURIES MUST BE REPORTED TO YOUR MANAGER/ SUPERVISOR AND MEDICAL SERVICES IMMEDIATELY.**

Any further questions concerning medical services can be answered through the medical department.



Equity Group Eufaula Division • 57 Melvin Clark Road
Eufaula, AL 36027 • (334) 687-7790 • Fax (334) 687-7779

# BLOOD BORNE PATHOGENS

Blood borne pathogens are pathogenic microorganisms that are present in human blood that may cause disease or death.

## Examples of Blood borne Pathogens

- HIV - Human Immunodeficiency virus - Causes AIDS, attacks the body's immune system, reducing its ability to fight disease.
- HBV: Hepatitis B Virus - Infects the liver; it's more common than HIV and is a greater risk on the job. Many HBV infected people have no problems or symptoms. Some, however, develop serious or fatal problems such as cirrhosis, liver cancer, or chronic liver disease.

## Protection

- Avoid direct exposure to infectious blood or bodily fluids.
- Avoid participating in any high-risk activity such as: unprotected sexual contact, sharing of IV drug needles, exchange of body fluids.
- Wash hands immediately after exposure to potentially infectious materials.

## Important Reminders

- Know what the biohazard warning looks like. Only biohazard containers can be used to collect, handle, store, or transport blood or other potentially infectious material.
- Our exposure control plan is located in first aid.
- Treat all blood and bodily fluid as infectious.
- Sharps containers are located in first aid.
- Clean up of potentially infectious blood or bodily fluids is to be performed by those that have been trained.
- Notify your manager immediately in the event of a poke, stab, nosebleed, or laceration. Report to first aid.
- Let trained personnel administer first aid treatment to injured persons and clean up any potentially hazardous material. Avoid blood or bodily fluids in the event of an accident.

73

# Bloodborne Pathogens

Presented by

Argonaut Insurance Southeast Region, Atlanta, Georgia

# Bloodborne Diseases

◆ HIV: Human Immunodeficiency Virus causes AIDS - no cure or vaccination

◆ HBV: Hepatitis B virus causes liver disease - vaccination available

◆ Non-A or Non-B Hepatitis

◆ Syphilis

◆ Malaria

# HBV or Hepatitis

◆ Inflammation of the liver - most common bloodborne disease

◆ Symptoms range from flu-like to none at all

◆ No symptoms - person is infectious and can spread the disease

◆ Hepatitis infects about 300,000 people in USA annually

# HIV or AIDS (Acquired Immune Deficiency Syndrome)

◆ 35,000 people are infected annually

◆ An infected person may carry the virus for years before symptoms appear

◆ No cure and no vaccine at present

# Protect Yourself

## Universal Precautions

◆ TREAT ALL BLOOD AND BODY FLUIDS AS POTENTIALLY INFECTIOUS.

◆ Skin protects from pathogens - cuts, dermatitis chapping, small cracks allow germs to enter body

◆ First aid - use gloves, have as little contact as possible with blood or body fluids

◆ Wash hands with antibacterial soap after contact

◆ After contact, flush eyes and face with fresh water for several minutes

# Means of Transmission - Must Enter Body

◆ HBV, HIV virus present in blood, body fluids

◆ Sexual contact with an infected partner

◆ Sharing infected needles

◆ Accidentally cutting yourself with a sharp object that is contaminated with infected blood, body fluids

◆ Infected blood or body fluid on skin especially with open cuts, sores

◆ Getting contaminated blood or body fluid in eyes, mouth.

# Clean-Up and Safe Housekeeping

◆ After an accident, the entire area must be cleaned with disinfectant

◆ Cleaning equipment must be disinfected

◆ Wear gloves while cleaning, apron or goggles if appropriate

◆ Restrict access to the area

◆ Use disposable towels - dispose of properly

# Common Sense Rules

◆ Wash hands & remove protective clothing before eating, drinking, smoking, handling contact lenses, applying lip balm or cosmetics

◆ Keep hands away from eyes, nose, mouth while cleaning

◆ Frequent handwashing is best defense against spreading infection

81

# General Safety Rules

1. Report all injuries, or near misses, to your supervisor and Medical Services immediately.
2. Report defective equipment and unsafe conditions / practices to your supervisor immediately. Do not operate unsafe or defective equipment.
3. All required personal protective equipment (PPE) shall be worn and worn properly while performing the duty the PPE is intended for.
4. Hearing protection is required in all areas except the break-rooms, front hall and office areas.
5. No horseplay or fighting is allowed on Equity Group Eufaula Division property.
6. Running is prohibited at this facility.
7. Use caution when using high-pressure hoses. Roll hoses up neatly after each use.
8. Do not ride pallet jacks.
9. Only employees that have successfully completed the Powered Industrial Truck Training and completed an evaluation will be authorized to operate equipment such as forklifts, pallet jacks, scissor lifts, etc.
10. Pedestrians should stay clear of pallet jack/forklift traffic.
11. Lockout / Tag-out requirements shall be followed when cleaning or repairing equipment or machinery. Do not reach into any machinery without first shutting that machinery OFF and locking and tagging out the energy source or sources Only authorized employees may lock and tag equipment or machinery.
12. Do not attempt to operate machinery that has been locked and tagged out. Only the authorized employee that places a lock and tag on machinery may remove it.
13. Do not operate machinery unless its machine guards are in place.
14. Do not operate machinery unless you have been trained by your line manager.
15. Smoking is permitted only in designated areas.
16. Know where fire extinguishers, exits, emergency stops (e-stops) and eye wash stations are located. Know how to operate e-stops and eye wash stations. When working in unfamiliar areas, take the time to locate the e-stops and eye wash stations.
17. Jewelry is NOT to be worn inside the production area. (Exception: wedding band without stones is allowed.)
18. Report all ammonia, gas leaks, or unsafe chemical conditions immediately to your manager and the maintenance department.
19. Obey all warning and safety signs.
20. Do not wear loose fitting or baggy clothing when working around equipment or machinery.
21. Use the proper technique when lifting: bend your knees when lifting, keep the load close to your body, and avoid twisting motions.
22. Firearms, drugs and alcohol are prohibited on company property.
23. Place all refuse in the proper container. Work areas and walkways must be kept neat and free of obstructions. Do not block emergency exit routes, fire extinguishers, electrical boxes and eye wash stations. Do not store items on electrical boxes, fire extinguishers, or eye wash stations.

# Other Exposure Hazards

◆ Cleaning surfaces contaminated with blood, vomit, feces

◆ ALWAYS wear gloves and protective apron or clothing

◆ Be alert for sharp objects, broken glassware, used syringes in trash

◆ Do not pick up broken glass - use brush or broom & dustpan

◆ Dispose of glass, sharp objects safely

◆ Laundry - bloody or contaminated linens or sharp objects

# Security

- Parking Permit: make sure your parking permit is in clear view of the security guard as you approach the gate.

- Do not park in handicap parking for any reason or length of time unless you have a legal handicap tag on your vehicle.

- No parking in the USDA reserved slots!!!

- No parking in any of the reserved slots.

- In you are being dropped off, please make sure your ride pulls into a parking slot to drop you off and does not block traffic.

- The Security Department operates 24/7 to ensure a safe and secure work environment.

- We are team and we must work together to provide a safe, secure work environment.

Keystone Foods LLC





**KEYSTONE FOODS** is a global manufacturer of food products and custom distributor to the food industry in 14 countries around the world.



- we operate 49 facilities in **North America, Europe/Middle East, Asia** and **Australia**.

- Annually we produce over 1.4 billion pounds of poultry products and 348 million pounds of beef products.

- Our customer base **exceeds 24,500** restaurants.



Site Index | Legal Notices & Terms of Use | Contact Us
Copyright 2001 Keystone Foods LLC. All Rights Reserved

Keystone Foods LLC



ABOUT KEYSTONE FOODS    PRODUCTS & SERVICES    EMPLOYMENT    OPERATING DIVISIONS    HOME

*ABOUT | HISTORY*
*COMMUNITY*

## • KEYSTONE FOODS LLC



Herb Lotman - Chairman

Keystone's vision is based on honest and caring relationships with each customer. Our founder's single red truck was the delivery system, bringing quality meats to local butcher shops, grocery stores and restaurants throughout the neighborhood.

Over the years, Keystone's neighborhood has expanded across the globe. Keystone Foods has become an international leader in processing and distribution to the food industry.

Keystone Foods has come a long way since our beginnings in the 1960s. But we have never lost sight of the fundamental values on which we built our business.

It is our commitment to customers, quality, service and community that keeps us in the forefront of our industry.

Copyright 2001 Keystone Foods LLC. All Rights Reserved    Site Index | Legal Notices & Terms of Use | Contact Us



ABOUT KEYSTONE FOODS    PRODUCTS & SERVICES    EMPLOYMENT    OPERATING LOCATIONS

About    History    Community

*ABOUT | HISTORY*
*COMMUNITY*

| PRE-<br>1960's | LATE<br>1960's | YEAR of<br>1972 | YEAR of<br>1973 | YEAR of<br>1974 | EARLY<br>1980's | YEAR of<br>1987 | EARLY<br>1990's | YEAR of<br>1996 | TODAY<br>PRESENT |
|---|---|---|---|---|---|---|---|---|---|

## • HISTORY

### 1960's

A small, family-owned, beef-boning business founded in the early 1960's is now **Keystone Foods** -- a worldwide leader in food manufacturing and custom distribution servicing the food industry.

The business converts from a beef-boning operation to a manufacturing facility. The company develops a mass production and freezing system for producing hamburgers. The innovation in freezing technology, known as cryogenics, instantly locks in freshness, juiciness and flavor. It also preserves the product for storage in the frozen state for extended periods. This provides great value to the rapidly expanding quick service restaurant industry.

### 1970's

With the success of the frozen hamburger, and ever-increasing production demands, **Equity Meat Corporation** is established.

1970 hamburgers manufactured in US: 1.5 million lbs. per year

1972 hamburgers manufactured in US: 50 million lbs. per year

In 1974, Keystone enters a new area of customer service by purchasing **M&M Restaurant Supply**. Keystone pioneers the "Total Distribution" concept. Restaurants receive their entire delivery from one truck. From frozen, to refrigerated, to dry goods, the restaurants can schedule only one delivery. The volume buying and delivery efficiencies allow the restaurants to reduce costs and better concentrate on servicing their customers.

### 1980's

By the end of the 1970's, Keystone has recognized the need for a formal R&D effort in the company. An R&D group is formed and the development of the first chicken nugget takes place at Equity's recently acquired manufacturing facility in Tennessee. Pioneered by Keystone, mass-produced, boneless, chicken nuggets are another first in the food industry.

Keystone expands into international markets when it opens operations in France and Malaysia.

McKey Food Services opens near Orleans (south of Paris) to manufacture hamburgers for quick serve restaurants in France, Belgium and Morocco.

**MacFood Services**, a beef, fish and poultry manufacturing plant in Malaysia (near Kuala Lumpur) opens to supply quick serve restaurants in Malaysia, Singapore and Hong Kong. The facility also operates as a distribution center for Malaysia. The same standards for excellence are employed outside the U.S.

87

Keystone Foods LLC

**1990's**
During the decade of the '90's, Keystone expanded rapidly into many international markets; adding distribution centers in Korea and Europe, as well as manufacturing facilities in China, Thailand and Australia.

In 1995 Keystone begins manufacturing fish portions for quick serve restaurants in the eastern United States, under the name of **LD Foods** and locates its new facility in Wisconsin.

**Present**
Today, as we help our customers expand into new markets around the world, their success depends on our understanding

In the late 90's and into the new century, Keystone expands its US Poultry business by building 2 new fully integrated poultry facilities in Georgia and Kentucky. Korea expands into manufacturing of protein products and Distribution expands into Mexico.

of their needs and the constant changes in the marketplace.



Copyright 2001 Keystone Foods LLC. All Rights Reserved

Site Index | Legal Notices & Terms of Use | (

**Group Enrollment /**
**Change or Waiver Form**

COBRA - If the individual is a continuee:
Qualifying Event _____ Date of Event _____

**AMERITAS**
LIFE INSURANCE CORP
MAILING ADDRESS:
P.O. BOX 81889, LINCOLN, NE 68501-1889
800-659-2223 / FAX: 402-467-7338

POLICY AND DIV. # 010- _____ CERT.# _____

NAME AND ADDRESS OF EMPLOYER (Policyholder) _____

## 1. TO ENROLL  ☐ DENTAL  ☐ EYE CARE  ☐ TO TERMINATE ALL COVERAGES

EMPLOYEE INFORMATION: MARITAL STATUS  ☐ SINGLE  ☐ MARRIED

SOCIAL SECURITY NUMBER _____  DEPT.# _____

EMPLOYEE'S LAST NAME, FIRST, MI _____

DATE OF BIRTH _____  ☐ MALE  ☐ FEMALE

FULL TIME DATE OF HIRE _____  ☐ REHIRE - REHIRE DATE _____

OCCUPATION _____

HOURS WORKED EACH WEEK _____  ARE YOUR EARNINGS PAID:  ☐ HOURLY OR  ☐ SALARIED

STREET ADDRESS _____  CITY _____ STATE _____ ZIP _____

ARE YOU COVERED UNDER ANOTHER <u>DENTAL</u> INSURANCE PLAN?  EMPLOYEE: ☐ YES ☐ NO  DEPENDENTS: ☐ YES ☐ NO

ARE YOU COVERED UNDER ANOTHER <u>EYE CARE</u> INSURANCE PLAN?  EMPLOYEE: ☐ YES ☐ NO  DEPENDENTS: ☐ YES ☐ NO

DEPENDENT COVERAGE INFORMATION.  LIST ALL ELIGIBLE DEPENDENTS TO BE ADDED OR DELETED.  (Employee must be enrolled to cover dependents)

| PRINT FULL LEGAL NAME (LAST, FIRST, M) | ADD | DROP | RELATIONSHIP | SEX | DATE OF BIRTH | SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|---|
| 1 | ☐ | ☐ | | | | |
| 2 | ☐ | ☐ | | | | |
| 3 | ☐ | ☐ | | | | |
| 4 | ☐ | ☐ | | | | |
| 5 | ☐ | ☐ | | | | |
| 6 | ☐ | ☐ | | | | |
| 7 | ☐ | ☐ | | | | |

## PLEASE SIGN (EMPLOYEE / POLICYHOLDER SIGNATURES)

As an employee, I hereby apply for, or waive (if indicated), group insurance, for which I am eligible or may become eligible. If contributions are required, I authorize my employer to deduct premiums from my salary. *THE FOLLOWING APPLIES ONLY TO SECTION 125 FLEXIBLE BENEFITS PLANS.* I am signing up for coverage until the next enrollment period except in the case of a life event. This information was explained in the plan's solicitation materials which I have read and understand. I represent that the information I have provided is complete and accurate. The policyholder certifies the date of employment, job title, hours worked and salary information are correct according to the Policyholder's records.

X _____  X _____
Employee Signature (Do Not Print)        Date          Policyholder Signature        Date

In several states, we are required to advise you of the following: Any person who knowingly and with intent to defraud provides false, incomplete, or misleading information in an application for insurance, or who knowingly presents a false or fraudulent claim for payment of a loss or benefit, is guilty of a crime and may be subject to fines and criminal penalties, including imprisonment. In addition, insurance benefits may be denied if false information provided by an applicant is materially related to a claim. (State-specific statements on back.)

EMPLOYEE LATE ENTRANT DATE _____

DEPENDENT LATE ENTRANT DATE _____

| Effective Date | Class | Dep. Code |
|---|---|---|
| | | |

## 2. TO CHANGE

☐ NAME CHANGE

NEW NAME _____  OLD NAME _____

☐ ADD DEPENDENT COVERAGE

☐ IF DUE TO MARRIAGE, WHAT IS THE **DATE OF MARRIAGE?** _____

☐ IF DUE TO BIRTH/ADOPTION OF A CHILD, WHAT IS THE **DATE OF EVENT?** _____

☐ IF DUE TO LOSS OF COVERAGE, **DATE AND REASON:** _____

☐ OTHER, THE **DATE OF EVENT AND PLEASE EXPLAIN:** _____

☐ DROP DEPENDENT COVERAGE  NUMBER OF DEPENDENTS STILL COVERED: _____

☐ DUE TO DIVORCE  ☐ DUE TO DEATH  ☐ DUE TO ANNUAL ELECTION PERIOD

☐ OTHER: PLEASE EXPLAIN: _____

EFFECTIVE DATE OF DROP: _____

## 3. TO WAIVE

IF YOU DO NOT WANT COVERAGE, COMPLETE THE WAIVER SECTION. THE WAIVER MAY NOT BE ALLOWED FOR THIS PLAN, CHECK WITH YOUR EMPLOYER.
I have been given an opportunity to apply for Group Insurance offered by my employer, and have decided not to accept the offer for:

☐ **myself** (does not apply to TRUST policies)  ☐ **spouse only**  ☐ **child(ren) only**  ☐ **spouse and child(ren)**

because _____  Name of Insurance Co. & Employer of Dependent _____

Should I desire to apply for this group insurance in the future, I realize that a "late entrant" penalty may be applied.

GR 875 Rev. 8-03

89

101804E

# EQUITY GROUP - EUFAULA DIVISION, LLC

**Confidential Commercial Information**

# GOOD MANUFACTURING PRACTICES (GMP'S)

1. Always remove your smock, gloves, and apron before exiting production areas.
2. Always wash your hands after using the bathroom.
3. Always use protective gloves when using knives and scissors.
4. When touching an inedible container or anything on the floor, you must wash your hands, gloves, and apron before returning to work or touching any product.
5. Always wear hairnet, earplugs, and a beard net (if you have facial hair) while in the plant.
6. Always remember that edible product pans/totes/or boxes must never sit directly on the floor, they must be placed on stands.
7. Always hang apron and smocks on racks.
8. Always put your gloves, arm guards and plastic sleeves in an area provided for such items.
9. Always contact your supervisor if you have problems or questions.
10. Always make sure all products, packaging supplies and boxes are covered properly, especially at break and during a wash down.
11. Always keep paper towels, soap, and trash receptacles are available at hand wash sinks.
12. Always put trash in containers marked "TRASH."
13. Always make sure doors are kept closed. Special attention should be given to doors that open to the outside of the plant.
14. All combos and barrels must be labeled edible or inedible.
15. The only place to dress with smocks, aprons, and gloves is in the processing area.

<br>

1. Do not eat, chew gum or tobacco, wear jewelry (wedding bands with no stones are acceptable), or smoke in the plant.
2. Do not pick product up of the floor unless you have been properly trained to do so. If you do, then you must wash your hands, gloves, sleeves, and apron before returning to work.
3. Do not remove product from condemned cans.
4. Do not put inedible or dirty product in edible totes/pans/or boxes.
5. Do not use boxes or lids that have fallen on the floor if they do not have a wax coating. Boxes and lids that fall on the floor can be rinsed off and used only if they are wax coated.
6. Do not wear your smock outside of the plant, in the breakrooms, bathrooms, or hallways.
7. Do not put trash or condemned products in any container unless it is clearly marked or labeled for such.
8. Boxes should not be used to hold condemned product.

<br>

SIGNATURE_____

Form **8850**
(Rev. November 1998)
Department of the Treasury
Internal Revenue Service

**Pre-Screening Notice and Certification Request for the Work Opportunity and Welfare-to-Work Credits**

▶ See separate instructions.

OMB No. 1545-1500

### Job applicant: Fill in the lines below and check any boxes that apply. Complete only this side.

Your name _____    Social security number ▶ _____

Street address where you live _____

City or town, state, and ZIP code _____

Telephone no. ( ___ ) ___ - ___

If you are under age 25, enter your date of birth (month, day, year) ___ / ___ / ___

---

### Work Opportunity Credit

1  ☐  Check here if you received a conditional certification from the state employment security agency (SESA) or a participating local agency for the work opportunity credit.

2  ☐  Check here if **any** of the following statements apply to you.

- I am a member of a family that has received assistance from Aid to Families with Dependent Children (AFDC) or its successor program, Temporary Assistance for Needy Families (TANF), for any 9 months during the last 18 months.
- I am a veteran and a member of a family that received food stamps for at least a 3-month period within the last 15 months.
- I was referred here by a rehabilitation agency approved by the state or the Department of Veterans Affairs.
- I am at least age 18 but **not** over age 24 and I am a member of a family that:
  a Received food stamps for the last 6 months, OR
  b Received food stamps for at least 3 of the last 5 months, BUT is no longer eligible to receive them.
- Within the past year, I was convicted of a felony or released from prison for a felony AND during the last 6 months I was a member of a low-income family.
- I received supplemental security income (SSI) benefits for any month ending within the last 60 days.

---

### Welfare-to-Work Credit

3  ☐  Check here if you received a conditional certification from the SESA or a participating local agency for the welfare-to-work credit.

4  ☐  Check here if you are a member of a family that:
- Received AFDC or TANF payments for at least the last 18 months, OR
- Received AFDC or TANF payments for any 18 months beginning after August 5, 1997, OR
- Stopped being eligible for AFDC or TANF payments after August 5, 1997, because Federal or state law limited the maximum time those payments could be made.

---

### All Applicants

Under penalties of perjury, I declare that I gave the above information to the employer on or before the day I was offered a job, and it is, to the best of my knowledge, true, correct, and complete.

Job applicant's signature ▶                                          Date ___ / ___ / ___

For Privacy Act and Paperwork Reduction Act Notice, see page 2.        Cat. No. 22851L        Form **8850** (Rev. 11-98)

Department of Homeland Security
U.S. Citizenship and Immigration Service

OMB No. 1615-0047; Expires 03/31/07
**I-9, Employment Eligibility Verification**

Please read instructions carefully before completing this form. The instructions must be available during completion of this form. **ANTI-DISCRIMINATION NOTICE:** It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins.

| Print Name:   Last | First | Middle Initial | Maiden Name |
|---|---|---|---|
| Address (Street Name and Number) | | Apt. # | Date of Birth (month/day/year) |
| City | State | Zip Code | Social Security # |

| I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form. | I attest, under penalty of perjury, that I am (check one of the following):<br>☐ A citizen of the United States<br>☐ A national of the United States<br>☐ A Lawful Permanent Resident (Alien # A_____<br>☐ An alien authorized to work until ___/___/___<br>(Alien # or Admission #) _____ |
|---|---|

| Employee's Signature | Date (month/day/year) |
|---|---|

**Preparer and/or Translator Certification.**     (To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Preparer's/Translator's Signature | Print Name |
|---|---|
| Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C, as listed on the reverse of this form, and record the title, number and expiration date, if any, of the document(s).

| | List A | OR | List B | AND | List C |
|---|---|---|---|---|---|
| Document title: | | | | | |
| Issuing authority: | | | | | |
| Document #: | | | | | |
| Expiration Date (if any): | ___/___/___ | | ___/___/___ | | ___/___/___ |
| Document #: | | | | | |
| Expiration Date (if any): | ___/___/___ | | | | |

**CERTIFICATION** - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on (month/day/year) ___/___/___ and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment.)

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|
| Business or Organization Name   Equity Group Eufaula Division | Address (Street Name and Number, City, State, Zip Code)   57 Melvin Clark Road   Baker Hill, AL  36027 | Date (month/day/year) |

**Section 3. Updating and Reverification.** To be completed and signed by employer.

| A. New Name (if applicable) | B. Date of rehire (month/day/year) (if applicable) |
|---|---|

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

Document Title:_____     Document #:_____     Expiration Date (if any):___/___/___

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|

Form I-9 (Rev. 05/31/05)N (Prior editions may be used until 12/31/05) Page 2

# LISTS OF ACCEPTABLE DOCUMENTS

**LIST A**     **OR**     **LIST B**     **AND**     **LIST C**

**Documents that Establish Both Identity and Employment Eligibility**

**Documents that Establish Identity**

**Documents that Establish Employment Eligibility**

**LIST A**

1. U.S. Passport (unexpired or expired)

2. Certificate of U.S. Citizenship (INS Form N-560 or N-561)

3. Certificate of Naturalization (INS Form N-550 or N-570)

4. Unexpired foreign passport, with I-551 stamp or attached INS Form I-94 indicating unexpired employment authorization

5. Alien Registration Receipt Card with photograph (INS Form I-151 or I-551)

6. Unexpired Temporary Card (INS Form I-688)

7. Unexpired Employment Authorization Card (INS Form I-688A)

8. Unexpired Reentry Permit (INS Form I-327)

9. Unexpired Refugee Travel Document (INS Form I-571)

10. Unexpired Employment Authorization Document issued by the INS which contains a photograph (INS Form I-688B)

**LIST B**

1. Driver's license or ID card issued by a state or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, sex, height, eye color and address

2. ID card issued by federal, state or local government agencies or entities, provided it contains a photograph or information such as name, date of birth, sex, height, eye color and address

3. School ID card with a photograph

4. Voter's registration card

5. U.S. Military card or draft record

6. Military dependent's ID card

7. U.S. Coast Guard Merchant Mariner Card

8. Native American tribal document

9. Driver's license issued by a Canadian government authority

**For persons under age 18 who are unable to present a document listed above:**

10. School record or report card

11. Clinic, doctor or hospital record

12. Day-care or nursery school record

**LIST C**

1. U.S. social security card issued by the Social Security Administration (other than a card stating it is not valid for employment)

2. Certification of Birth Abroad issued by the Department of State (Form FS-545 or Form DS-1350)

3. Original or certified copy of a birth certificate issued by a state, county, municipal authority or outlying possession of the United States bearing an official seal

4. Native American tribal document

5. U.S. Citizen ID Card (INS Form I-197)

6. ID Card for use of Resident Citizen in the United States (INS Form I-179)

7. Unexpired employment authorization document issued by the INS (other then those listed under List A)

**Illustrations of many of these documents appear in Part 8 of the Handbook for Employers (M-274)**

Form I-9 (Rev. 11-21-91)N Page 3

# EQUITY GROUP-EUFAULA DIVISION
# PRE-EMPLOYMENT INQUIRY RELEASE

IN CONNECTION WITH, AND DURATION OF MY EMPLOYMENT OR VOLUNTEER SERVICE (INCLUDING CONTRACT FOR SERVICES) WITH YOU, I UNDERSTAND THAT INVESTIGATIVE BACKGROUND INQUIRIES ARE TO BE MADE ON MYSELF INCLUDING CONSUMER, CRIMINAL, DRIVING AND OTHER REPORTS.  THESE REPORTS COULD INCLUDE INFORMATION AS TO MY CHARACTER, WORK HABITS, PERFORMANCE, AND EXPERIENCE ALONG WITH REASONS FOR TERMINATION OF PAST EMPLOYMENT FROM PREVIOUS EMPLOYERS.     FURTHER, I UNDERSTAND THAT YOU WILL BE REQUESTING INFORMATION FROM VARIOUS FEDERAL, STATE AND OTHER AGENCIES WHICH MAINTAIN RECORDS CONCERNING MY PAST ACTIVITIES RELATING TO MY DRIVING, CREDIT, CRIMINAL, CIVIL, EDUCATION AND OTHER EXPERIENCES AS WELL AS CLAIMS INVOLVING ME   IN THE FILES OF INSURANCE COMPANIES.

I AUTHORIZE, WITHOUT RESERVATION, ANY PARTY OR AGENCY CONTACTED BY THIS EMPLOYER TO FURNISH THE ABOVE MENTIONED INFORMATION:

PRINT FULL NAME _____

SOC. SEC. NUM. _____/_____/_____      DATE OF BIRTH ____/_____/_____

CURRENT ADDRESS _____ HOW LONG _____

_____/ _____/_____/ _____
       CITY       STATE    ZIP         COUNTY

PREVIOUS ADDRESS _____ HOW LONG_____
(IF AT CURRENT ADDRESS LESS THAN 7 YEARS)

_____/ _____/_____/ _____
       CITY       STATE    ZIP         COUNTY

DRIVERS LICENSE NUMBER _____STATE _____

PRIOR_____/ _____/_____/_____/ _____/ _____
EMPLOYER(S)
_____/ _____/_____/ _____/ _____
    NAME           CITY  STATE  FROM   TO    PHONE NUMBER

EDUCATIONAL _____/ _____-_____/ _____/ _____
INSTITUTION(S)
_____/ _____-_____/ _____/ _____
      NAME          FROM    TO   STATE   DEGREE

**APPLICANT'S SIGNATURE** _____DATE _____

PROSPECTIVE EMPLOYER _____



**Equity Group – Eufaula Division, LLC**
57 Melvin Clark Rd.
Bakerhill, AL 36027
(334) 687-7790

# NEW EMPLOYEE
# PLEASE COMPLETE THIS FORM
# ANSWER EACH QUESTION

NAME:_____

ADDRESS:_____CITY_____STATE____ZIP_____

IN CASE OF EMERGENCY CONTACT:_____

EMERGENCY PHONE #_____RELATIONSHIP_____

HOME PHONE #_____SOCIAL SECURITY_____

DRIVER'S LICENSE#_____STATE_____

DATE OF BIRTH_____

COUNTY_____

SIGNED_____DATE_____

99



**Equity Group – Eufaula Division, LLC**
57 Melvin Clark Rd.
Bakerhill, AL 36027
(334) 687-7790

# Equity Group Eufaula Division
## New Hire Check List

      I agree to take this information and apply it while performing my duties at Equity Group Eufaula Division. I understand that failure to follow safety or medical policies, plans, or procedures could result in disciplinary action up to and including discharge.

Please initial every item.

| | |
|---|---|
| _____ Safety Policy Statement | ____ Personal Protective Equipment |
| _____ Safety Rules & Disciplinary | ____ Safety Audit Program |
| _____ Medical Rules | ____ Proper Lifting |
| _____ Evacuation Procedures | ____ Ergonomics |
| _____ Hearing Protection | ____ Ladder Safety |
| _____ Lock out – Tag out | ____ Electrical Safety |
| _____ Eye Wash – Shower Stations | ____ Confined Spaces |
| _____ MSDS / Chemical Hazards | ____ Blood Borne Pathogens |
| _____ Benefits | ____ Forklifts / Pallet Jacks |
| _____ Harassing Information | ____ Machine Guarding |
| _____ Substance Abuse | ____ Drug & Alcohol Policy |
| _____ GMP'S | ____ Company Rules |

I have participated in the Equity Group Eufaula Division new hire safety orientation. I acknowledge that I have listened and have been given the chance to ask questions.

Employee Signature: _____  Date: _____

Company Representative: _____ Date: _____

101



**Equity Group – Eufaula Division, LLC**
57 Melvin Clark Road
Bakerhill, AL 36027
(334) 687-7790

Employee Acknowledgment (cont)

## Acknowledgment of Receipt of Policy

I acknowledge receipt of the attached copy of the **EQUITY GROUP-EUFAULA DIVISION, LLC PROFESSIONAL CONDUCT AND PROHIBITION AGAINST HARASSMENT.** I have carefully read the Policy, understand its contents, and agree to abide by this Policy and understand that my conduct will be governed by this Policy.

_____

Print Full Name

_____

Signature

_____

Date

103



**Equity Group – Eufaula Division, LLC**
57 Melvin Clark Road
Bakerhill, AL 36027
(334) 687-7790

# Substance Abuse Policy
# Acknowledgement

    I, _____, hereby acknowledge that I have been instructed in the Equity Group Eufaula Division Substance Abuse Policy. I also acknowledge that I have been given an opportunity to ask my manager or other members of management any questions that I might have about this policy. I further understand that my signature below indicates that I have carefully read and understand the following.

- I understand that my employment is terminable "at will" and neither this policy nor any of its terms are intended to create a contract of employment.
- I further understand that Equity Group Eufaula Division retains the sole right to change, amend or modify any term or provision of this policy without notice.
- I am aware that as a mandatory condition of continued employment I must comply with any request by the Company to submit to a medical examination and/or to submit a urine specimen for drug testing and breath sample or blood alcohol testing. Equity Group Eufaula Division conducts the following types of drug/alcohol testing.
  - ➢ Pre-Employment
  - ➢ Reasonable Suspicion Testing
  - ➢ Post Accident/All work-related Physicians visits
  - ➢ Random

| | |
|---|---|
| Print Name: | |
| Signature: | |
| Date: | |

# SOCIAL ACCOUNTABILITY TRAINING
# EQUITY GROUP EUFAULA DIVISION
# EUFAULA, AL

Equity Group Eufaula Code of Conduct
- Employees are treated with dignity & respect
- Employee Satisfaction = Customer Satisfaction
- Legal Compliance at all location
- High standards of business conduct
- Equity Group Eufaula record & reputation for honesty & integrity
- Principles apply to all locations worldwide
- Cornerstones of our success

Legal Compliance
- All business activities must conform to national & local legal requirements pertaining to employment

Employment Practices:
### Prison or Forced Labor
- Prison or forced labor is forbidden
- Indentured servitude is forbidden
- Physical punishment, confinement, threats of violence, harassment (physical, sexual, psychological, verbal) & abuse are forbidden
- These principles apply to subcontractors of Equity Group Eufaula

### Child Labor
- The use of child labor is forbidden
- Employees must be at least the legal minimum age according to local law
- If local law does not stipulate, the minimum age of employees is 18 years of age

### Working Hours
- Must be in compliance with national & local laws
- Reasonable daily & weekly work schedules
- Reasonable time off
- Exceptions – extraordinary business circumstances

### Compensation
- Wages and benefits must comply with national & local laws
- Includes overtime
- If local laws does not provide for overtime, regular pay must be paid as a minimum for overtime work

**Non-Discrimination**
- Non-discrimination policy must comply with national & local laws
- Includes - race, color, religion, sex, age, physical ability, national origin & any other prohibited basis.

**Workplace Environment**
- Employees must be provided a safe & healthy workplace
- When provided by the company, employees must be provided with safe & healthy living conditions
- Requirements include potable drinking water, adequate & clean restrooms, adequate workplace lighting, adequate ventilation, fire exits, essential safety equipment, access to emergency aid kit & access to emergency medical care
- Facilities must be constructed and maintained according to local codes and ordinances

**Employee Notification**
- Equity Group Eufaula employees are to be notified of these employment practices on company letterhead, in the local language and posted in a prominent place accessible to all employees.

I have read and I understand the contents of this document.

_____    _____
Employee                                    Date

Keystone Foods LLC

## CONFLICT OF INTEREST COMPANY POLICY FORM

CHECK WHERE APPROPRIATE:

☐ I do have a conflict of interest which is:_____
_____
_____
_____
_____
_____

☐ Although I am not involved in any conflict of interest, I would like to advise the company of the following which might be perceived as a possible conflict of interest:
_____
_____
_____
_____

☐ I do not have a conflict of interest.

☐ I have neither a direct nor indirect interest in an individual, partnership, corporation or enterprise that sells to, buys from or competes with Keystone.

☐ I do not own or hold financial interest in property leased or otherwise used by Keystone Foods Corporation.

☐ I will neither use nor disclose for personal gain any information obtained as a result of employment at Keystone, except information in the public domain.

☐ I will neither solicit nor accept any payment or gift involving any transaction involving Keystone unless the gift, gratuity or entertainment is of nominal value and unlikely to create the appearance of influencing business decisions.

☐ I have read and am familiar with Keystone Foods LLC's Conflict of Interest Policy and agree to follow its provisions.

Signature: _____ Date _____

Print Name: _____

Company:    Equity Group Eufaula Division • 57 Melvin Clark Road • Bakerhill, AL 36027

Please return the **SIGNED ORIGINAL** of this form to:

Francine Shandler
Keystone Foods LLC
300 Barr Harbor Drive, Suite 600
Conshohocken, PA  19428-2998

109

110



# Keystone Foods' Animal Welfare Orientation Policy for Employees

All employees who handle live animals for Keystone Foods and its divisions must at all times be aware that the product they are handling in the course of their tasks is live and every consideration for the animal must be taken to ensure that no mistreatment takes place.

Examples of mistreatment include but are not limited to; purposely throwing the animal, purposely striking the animal, purposely kicking the animal, purposely smashing the animal, purposely over aggressively handling while transferring the animal, purposely not properly stunning the animal before killing, and purposely failing to properly kill the animal before scalding.

Keystone Foods is committed to handling the live animals with the welfare of the animal in mind and has a detailed audit system to track key indicating factors of potential abuse in the processing flow and performs scheduled verifications of this system. All efforts to minimize the discomfort of the live animal in our process must be taken at all times by our employees and management team.

Any employee or manager who is found to be abusing live animals in the course of their tasks within Keystone Foods will be subject to termination.

All employees are encouraged to report any observation of abuse, or conditions in the facility that could be improved to reduce animal discomfort, to the company for correction or improvement.

I understand the policy for the treatment of live animals.


_____          _____

Employee                                          Date

111

# Form W-4 (2007)

**Purpose.** Complete Form W-4 so that your employer can withhold the correct federal income tax from your pay. Because your tax situation may change, you may want to refigure your withholding each year.

**Exemption from withholding.** If you are exempt, complete **only** lines 1, 2, 3, 4, and 7 and sign the form to validate it. Your exemption for 2007 expires February 16, 2008. See Pub. 505, Tax Withholding and Estimated Tax.

**Note.** You cannot claim exemption from withholding if (a) your income exceeds $850 and includes more than $300 of unearned income (for example, interest and dividends) and (b) another person can claim you as a dependent on their tax return.

**Basic instructions.** If you are not exempt, complete the **Personal Allowances Worksheet** below. The worksheets on page 2 adjust your withholding allowances based on

itemized deductions, certain credits, adjustments to income, or two-earner/multiple job situations. Complete all worksheets that apply. However, you may claim fewer (or zero) allowances.

**Head of household.** Generally, you may claim head of household filing status on your tax return only if you are unmarried and pay more than 50% of the costs of keeping up a home for yourself and your dependent(s) or other qualifying individuals.

**Tax credits.** You can take projected tax credits into account in figuring your allowable number of withholding allowances. Credits for child or dependent care expenses and the child tax credit may be claimed using the **Personal Allowances Worksheet** below. See Pub. 919, How Do I Adjust My Tax Withholding, for information on converting your other credits into withholding allowances.

**Nonwage income.** If you have a large amount of nonwage income, such as interest or dividends, consider making estimated tax payments using Form 1040-ES, Estimated Tax

for Individuals. Otherwise, you may owe additional tax. If you have pension or annuity income, see Pub. 919 to find out if you should adjust your withholding on Form W-4 or W-4P.

**Two earners/Multiple jobs.** If you have a working spouse or more than one job, figure the total number of allowances you are entitled to claim on all jobs using worksheets from only one Form W-4. Your withholding usually will be most accurate when all allowances are claimed on the Form W-4 for the highest paying job and zero allowances are claimed on the others.

**Nonresident alien.** If you are a nonresident alien, see the Instructions for Form 8233 before completing this Form W-4.

**Check your withholding.** After your Form W-4 takes effect, use Pub. 919 to see how the dollar amount you are having withheld compares to your projected total tax for 2007. See Pub. 919, especially if your earnings exceed $130,000 (Single) or $180,000 (Married).

---

### Personal Allowances Worksheet (Keep for your records.)

**A** Enter "1" for **yourself** if no one else can claim you as a dependent . . . . . . . . . . . . . . **A** ____

**B** Enter "1" if:
- You are single and have only one job; or
- You are married, have only one job, and your spouse does not work; or
- Your wages from a second job or your spouse's wages (or the total of both) are $1,000 or less. **B** ____

**C** Enter "1" for your **spouse.** But, you may choose to enter "-0-" if you are married and have either a working spouse or more than one job. (Entering "-0-" may help you avoid having too little tax withheld.) . . . . . . . . . **C** ____

**D** Enter number of **dependents** (other than your spouse or yourself) you will claim on your tax return . . . . **D** ____

**E** Enter "1" if you will file as **head of household** on your tax return (see conditions under **Head of household** above) . **E** ____

**F** Enter "1" if you have at least $1,500 of **child or dependent care expenses** for which you plan to claim a credit . **F** ____
(**Note.** Do not include child support payments. See Pub. 503, Child and Dependent Care Expenses, for details.)

**G** **Child Tax Credit** (including additional child tax credit). See Pub 972, Child Tax Credit, for more information.
- If your total income will be less than $57,000 ($85,000 if married), enter "2" for each eligible child.
- If your total income will be between $57,000 and $84,000 ($85,000 and $119,000 if married), enter "1" for each eligible child plus "1" **additional** if you have 4 or more eligible children. **G** ____

**H** Add lines A through G and enter total here. (**Note.** This may be different from the number of exemptions you claim on your tax return.) ▶ **H** ____

For accuracy, complete all worksheets that apply.
- If you plan to **itemize or claim adjustments to income** and want to reduce your withholding, see the **Deductions and Adjustments Worksheet** on page 2.
- If you have **more than one job** or are **married and you and your spouse both work** and the combined earnings from all jobs exceed $40,000 ($25,000 if married) see the **Two-Earners/Multiple Jobs Worksheet** on page 2 to avoid having too little tax withheld.
- If **neither** of the above situations applies, **stop here** and enter the number from line H on line 5 of Form W-4 below.

- - - - - - - - - - - - Cut here and give Form W-4 to your employer. Keep the top part for your records. - - - - - - - - - - - -

---

| Form **W-4** | **Employee's Withholding Allowance Certificate** | OMB No. 1545-0074 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | ▶ Whether you are entitled to claim a certain number of allowances or exemption from withholding is subject to review by the IRS. Your employer may be required to send a copy of this form to the IRS. | **2007** |

| 1 | Type or print your first name and middle initial. | Last name | | 2 Your social security number |
|---|---|---|---|---|

| | Home address (number and street or rural route) | **3** ☐ Single ☐ Married ☐ Married, but withhold at higher Single rate. |
|---|---|---|

Note. If married, but legally separated, or spouse is a nonresident alien, check the "Single" box.

| | City or town, state, and ZIP code | **4** If your last name differs from that shown on your social security card, check here. You must call 1-800-772-1213 for a replacement card. ▶ ☐ |
|---|---|---|

| **5** | Total number of allowances you are claiming (from line **H** above **or** from the applicable worksheet on page 2) | **5** ____ |
|---|---|---|
| **6** | Additional amount, if any, you want withheld from each paycheck | **6** $ ____ |

**7** I claim exemption from withholding for 2007, and I certify that I meet **both** of the following conditions for exemption.
- Last year I had a right to a refund of **all** federal income tax withheld because I had **no** tax liability **and**
- This year I expect a refund of **all** federal income tax withheld because I expect to have **no** tax liability.

If you meet both conditions, write "Exempt" here . . . . . . . . . . . . . ▶ **7** ____

Under penalties of perjury, I declare that I have examined this certificate and to the best of my knowledge and belief, it is true, correct, and complete.

**Employee's signature**
(Form is not valid unless you sign it.) ▶ _____ Date ▶ _____

| **8** Employer's name and address (Employer: Complete lines 8 and 10 only if sending to the IRS.) | **9** Office code (optional) | **10** Employer identification number (EIN) |
|---|---|---|

**For Privacy Act and Paperwork Reduction Act Notice, see page 2.**      Cat. No. 10220Q      Form **W-4** (2007)

113

## Deductions and Adjustments Worksheet

**Note.** Use this worksheet *only* if you plan to itemize deductions, claim certain credits, or claim adjustments to income on your 2007 tax return.

| | | | |
|---|---|---|---|
| 1 | Enter an estimate of your 2007 itemized deductions. These include qualifying home mortgage interest, charitable contributions, state and local taxes, medical expenses in excess of 7.5% of your income, and miscellaneous deductions. (For 2007, you may have to reduce your itemized deductions if your income is over $156,400 ($78,200 if married filing separately). See *Worksheet 2* in Pub. 919 for details.) . . | **1** | $ |
| 2 | Enter: { $10,700 if married filing jointly or qualifying widow(er) / $ 7,850 if head of household / $ 5,350 if single or married filing separately } . . . . . | **2** | $ |
| 3 | **Subtract** line 2 from line 1. If zero or less, enter "-0-" . . . . . | **3** | $ |
| 4 | Enter an estimate of your 2007 adjustments to income, including alimony, deductible IRA contributions, and student loan interest | **4** | $ |
| 5 | **Add** lines 3 and 4 and enter the total. (Include any amount for credits from *Worksheet 8* in Pub. 919) . | **5** | $ |
| 6 | Enter an estimate of your 2007 nonwage income (such as dividends or interest) . . . . | **6** | $ |
| 7 | **Subtract** line 6 from line 5. If zero or less, enter "-0-" . . . . | **7** | $ |
| 8 | **Divide** the amount on line 7 by $3,400 and enter the result here. Drop any fraction | **8** | |
| 9 | Enter the number from the **Personal Allowances Worksheet**, line H, page 1 . . . | **9** | |
| 10 | **Add** lines 8 and 9 and enter the total here. If you plan to use the **Two-Earners/Multiple Jobs Worksheet**, also enter this total on line 1 below. Otherwise, **stop here** and enter this total on Form W-4, line 5, page 1 | **10** | |

## Two-Earners/Multiple Jobs Worksheet (See *Two earners/multiple jobs* on page 1.)

**Note.** Use this worksheet *only* if the instructions under line H on page 1 direct you here.

| | | | |
|---|---|---|---|
| 1 | Enter the number from line H, page 1 (or from line 10 above if you used the **Deductions and Adjustments Worksheet**) | **1** | |
| 2 | Find the number in **Table 1** below that applies to the **LOWEST** paying job and enter it here. **However,** if you are married filing jointly and wages from the highest paying job are $50,000 or less, do not enter more than "3." . . . . . | **2** | |
| 3 | If line 1 is **more than or equal to** line 2, subtract line 2 from line 1. Enter the result here (if zero, enter "-0-") and on Form W-4, line 5, page 1. **Do not** use the rest of this worksheet | **3** | |

**Note.** If line 1 is *less than* line 2, enter "-0-" on Form W-4, line 5, page 1. Complete lines 4–9 below to calculate the additional withholding amount necessary to avoid a year-end tax bill.

| | | | |
|---|---|---|---|
| 4 | Enter the number from line 2 of this worksheet . . . . . . **4** | | |
| 5 | Enter the number from line 1 of this worksheet . . . . . . **5** | | |
| 6 | Subtract line 5 from line 4 . . . . . . | **6** | |
| 7 | Find the amount in **Table 2** below that applies to the **HIGHEST** paying job and enter it here . . . | **7** | $ |
| 8 | **Multiply** line 7 by line 6 and enter the result here. This is the additional annual withholding needed . . | **8** | $ |
| 9 | Divide line 8 by the number of pay periods remaining in 2007. For example, divide by 26 if you are paid every two weeks and you complete this form in December 2006. Enter the result here and on Form W-4, line 6, page 1. This is the additional amount to be withheld from each paycheck . . . . . . | **9** | $ |

### Table 1

| Married Filing Jointly | | All Others | |
|---|---|---|---|
| If wages from LOWEST paying job are— | Enter on line 2 above | If wages from LOWEST paying job are— | Enter on line 2 above |
| $0 - $4,500 | 0 | $0 - $6,000 | 0 |
| 4,501 - 9,000 | 1 | 6,001 - 12,000 | 1 |
| 9,001 - 18,000 | 2 | 12,001 - 19,000 | 2 |
| 18,001 - 22,000 | 3 | 19,001 - 26,000 | 3 |
| 22,001 - 26,000 | 4 | 26,001 - 35,000 | 4 |
| 26,001 - 32,000 | 5 | 35,001 - 50,000 | 5 |
| 32,001 - 38,000 | 6 | 50,001 - 65,000 | 6 |
| 38,001 - 46,000 | 7 | 65,001 - 80,000 | 7 |
| 46,001 - 55,000 | 8 | 80,001 - 90,000 | 8 |
| 55,001 - 60,000 | 9 | 90,001 - 120,000 | 9 |
| 60,001 - 65,000 | 10 | 120,001 and over | 10 |
| 65,001 - 75,000 | 11 | | |
| 75,001 - 95,000 | 12 | | |
| 95,001 - 105,000 | 13 | | |
| 105,001 - 120,000 | 14 | | |
| 120,001 and over | 15 | | |

### Table 2

| Married Filing Jointly | | All Others | |
|---|---|---|---|
| If wages from HIGHEST paying job are— | Enter on line 7 above | If wages from HIGHEST paying job are— | Enter on line 7 above |
| $0 - $65,000 | $510 | $0 - $35,000 | $510 |
| 65,001 - 120,000 | 850 | 35,001 - 80,000 | 850 |
| 120,001 - 170,000 | 950 | 80,001 - 150,000 | 950 |
| 170,001 - 300,000 | 1,120 | 150,001 - 340,000 | 1,120 |
| 300,001 and over | 1,190 | 340,001 and over | 1,190 |

**Privacy Act and Paperwork Reduction Act Notice.** We ask for the information on this form to carry out the Internal Revenue laws of the United States. The Internal Revenue Code requires this information under sections 3402(f)(2)(A) and 6109 and their regulations. Failure to provide a properly completed form will result in your being treated as a single person who claims no withholding allowances; providing fraudulent information may also subject you to penalties. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation, to cities, states, and the District of Columbia for use in administering their tax laws, and using it in the National Directory of New Hires. We may also disclose this information to other countries under a tax treaty, to federal and state agencies to enforce federal nontax criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism.

You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by Code section 6103.

The average time and expenses required to complete and file this form will vary depending on individual circumstances. For estimated averages, see the instructions for your income tax return.

If you have suggestions for making this form simpler, we would be happy to hear from you. See the instructions for your income tax return.



FORM
**A-4** REV. 1/00

ALABAMA DEPARTMENT OF REVENUE
## Employee's Withholding Exemption Certificate

| FULL NAME | | | SOCIAL SECURITY NO. | |
|---|---|---|---|---|
| HOME ADDRESS | | CITY | STATE | ZIP CODE |

**EMPLOYEE:**
File this form with your employer. Otherwise, Alabama income tax must be withheld from your wages without exemption.

**EMPLOYER:**
Keep this certificate with your records. If the employee is believed to have claimed too many exemptions, the Alabama Department of Revenue should be so advised.

If you had no Alabama income tax liability last year and you anticipate no Alabama income tax liability this year, you may claim "exempt" from Alabama withholding tax.
To claim exempt status, check this block, sign and date this form and file it with your employer. Employees claiming exempt status are not required to complete Lines 1 through 5 ........ ☐

**HOW TO CLAIM YOUR WITHHOLDING EXEMPTIONS**

1.  IF YOU ARE SINGLE, $1,500 personal exemption is allowed.
   (a) if you claim full personal exemption ($1,500) write a letter "S"
   (b) if you claim no personal exemption write the figure "0" (Note: If you claim no personal
      exemption on Lines 1 or 2, you cannot claim dependents on Line 3.) ........................

2.  IF YOU ARE MARRIED or SINGLE CLAIMING HEAD OF FAMILY, $3,000 personal exemption is allowed.
   (a) if you claim exemption for both spouses ($3,000), write the letter "M"
   (b) if you are single claiming head of family ($3,000), write the letter "H" (see "head of family" instructions on back of this form)
   (c) if you claim exemption for yourself only ($1,500) write the letter "S"
   (d) if you claim no personal exemption write the figure "0" (see note under 1(b).) ........................

3.  If during the year you will provide more than one-half of the support of persons closely related
   to you (other than spouse) write the number of such dependents. (See instructions on other side.) ........................

4.  Additional amount, if any, you want deducted each pay period. ........................ ▶ $ ____

THIS LINE TO BE COMPLETED BY EMPLOYER.
5.  TOTAL EXEMPTIONS (Example: Employee claims "S" on Line 2 and "1" on line 3. Employer should use column headed S-1 in Withholding Tables.) ........................ ____

I certify that the withholding exemptions claimed on this certificate do not exceed the amount to which I am entitled.

| DATE | SIGNED |
|---|---|

---

**CHANGES IN EXEMPTIONS**

You may file a new certificate at any time if the number of your exemptions INCREASES.

You must file a new certificate within 10 days if the number of exemptions previously claimed by you DECREASES for any of the following reasons:

(a) Your spouse for whom you have been claiming exemption is divorced, legally separated, or claims her or his own exemption on a separate certificate.

(b) The support of a dependent for whom you claimed exemption is taken over by someone else, so that you no longer expect to furnish more than half the support for the year.

OTHER DECREASES in exemption, such as the death of a spouse or dependent, do not affect your withholding until the next year, but require the filing of a new certificate by December 1 of the year in which they occur.

Any correspondence concerning this form should be sent to the Alabama Department of Revenue, Individual and Corporate Tax Division, Withholding Tax Section, P.O. Box 327480, Montgomery, AL 36132-7480 or telephone (334) 242-1300 (fax (334) 242-0112).

**EXCLUSION FROM WITHHOLDING TAX**

"No tax liability last year" means that your previous year's tax return indicated no tax liability for that taxable year. Therefore, if you had Alabama income tax withheld or paid estimated tax, all of this tax must have been refunded to you. If any portion of the tax paid last year was not refunded, you may not qualify for this exemption from Alabama withholding tax.

**DEPENDENTS**

To qualify as your dependent (Line 3 on other side), a person must receive more than 1/2 of his or her support from you for the year and must be related to you as follows:

Your son or daughter (including legally adopted children), grandchild, stepson, stepdaughter, son-in-law, or daughter-in-law;

Your father, mother, grandparent, stepfather, stepmother, father-in-law, or mother-in-law;

Your brother, sister, stepbrother, stepsister, half brother, half sister, brother-in-law, or sister-in-law;

Your uncle, aunt, nephew, or niece (but only if related by blood).

**PENALTIES**

Penalties are imposed for willfully supplying false information or willful failure to supply information which would reduce the withholding exemption.

**HEAD OF FAMILY**

Employers: If you are computing Alabama withholding tax using the formula method and an employee claims "H" (head of family), the deduction allowed in item "A" of the formula is 20% limited to $2,000. The deduction allowed in item "C" for employees claiming "H" is $3,000.

If you are computing tax using the tax tables and an employee claims "H", the "M" column (along with the appropriate number of dependents) should be used.

115



# EMPLOYMENT AT WILL
# ACKNOWLEDGEMENT FORM

I_____understand that my employment

with Keystone Foods is "at will" and that the company has the right to terminate

my employment at any time with or without reason. I also understand that I am

free to resign at any time without reason.


The company's Employment at Will policy was reviewed with me on

_____.



_____        _____
Employee's Signature                          Date



_____        _____
Company Representative                       Date


117

118



**The American Cancer Society and Equity Group Eufaula Division**

invite you to ...

# Put a Little Relay in Every Payday!

### Payroll Contribution Form

Employee Name _____

Home Address _____

City _____  State _____  Zip _____

Phone _____  E-mail: _____

_____ I want to support the American Cancer Society through my payroll contributions to Relay for Life.

Amount Per Pay Period:      _____  $1
                            _____  $2
(please check one)          _____  $5
                            _____  Other $ _____
              Times _____  Pay Periods

Equals TOTAL CONTRIBUTION:  $ _____

Signature _____  Date _____

Team Name   Equity Group Eufaula Division

PLEASE RETURN THIS FORM TO: *Shannon Steele*

*For Cancer information 24-hour a day, call 1-800-ACS-2345 or visit www.cancer.org.*

119

# EXHIBIT 19

**EQUITY GROUP OF EUFAULA, AL**
**2004 Contract Proposals**



PLAINTIFF'S
EXHIBIT

19 Mills

**11. Wages**

All employees shall receive a substantial wage increase each of the agreement and the union purposes a four-year agreement.


12.  The Union reserves the right to add to, to amend, to delete or modify these proposals at anytime during negotiations.

7.    **Article XIII – Miscellaneous**

**(4)** Supplies:    Applicable employees will receive the following at the expense of the company:

Safety glasses, earplugs, bump cap/hard hat, arm guards, chain gloves, hairnets, sleeves, aprons, ice house boots, cotton gloves for sanitation, and gloves for draw hand.

These items will be replaces by the company as needed provided they are turned in and the replacement is not necessary due to employee abuse or neglect.

May 4, 2004 REV.1

EQUITY GROUP - EUFAULA DIVISION - 2004 NEGOTIATIONS
RESPONSE TO UNION PROPOSALS

| | | |
|---|---|---|
| 12. | Article XIII - Miscellaneous<br><br>**Section 2(4)** Supplies: Applicable employees will receive the following at the expense of the company:<br><br>Safety classes, earplugs, bump cap/hard hat, arm guards, chain gloves, hairnets, sleeves, aprons, ice house boots, cotton gloves for sanitation, and gloves for draw hand.<br><br>These items will be replaced by the | Economic. |

| 21. | Wages<br><br>All employees shall receive a substantial wage increase each of the agreement and the union purposes a four-year agreement. | Economic. | |

May 4, 2004 REV.2

**EQUITY GROUP – EUFAULA DIVISION – 2004 NEGOTIATIONS**
**RESPONSE TO UNION PROPOSALS**

| 12. | Article XIII - Miscellaneous | Economic. |
|---|---|---|
| | **Section 2(4)** Supplies: Applicable employees will receive the following at the expense of the company: | |
| | Safety classes, earplugs, bump cap/hard hat, arm guards, chain gloves, hairnets, sleeves, aprons, ice house boots, cotton gloves for sanitation, and gloves for draw hand. | |
| | These items will be replaced by the company as needed provided they are turned in and the replacement is not necessary due to employee abuse or neglect. | |

| 21. | Wages<br><br>All employees shall receive a substantial wage increase each of the agreement and the union purposes a four-year agreement. | Economic. | |

May 5, 2004 REV.3

**EQUITY GROUP – EUFAULA DIVISION – 2004 NEGOTIATIONS**
**RESPONSE TO UNION PROPOSALS**

| 12. | Article XIII - Miscellaneous | Modify Article 13.4 as follows: | |
|---|---|---|---|
| | **Section 2(4)** Supplies: Applicable employees will receive the following at the expense of the company:<br><br>Safety classes, earplugs, bump cap/hard hat, arm guards, chain gloves, hairnets, sleeves, aprons, ice house boots, cotton gloves for sanitation, and gloves for draw hand.<br><br>These items will be replaced by the company as needed provided they are turned in and the replacement is not necessary due to employee abuse or neglect. | "Supplies will be furnished to **new** employees, where required, in accordance with Company procedures **as follows:**<br><br>       **-Smocks (3)**<br>       **-Arm Guards**<br>       **-Cutting Glove**<br>       **-Hair Net**<br>       **-Beard Net**<br>       **-Blue Gloves**<br>       **-Cotton Gloves**<br>       **-Ear Plugs**<br>       **-Apron**<br>       **-Sleeves**<br><br>**Arm guards and cutting gloves are not provided to new employees assigned to Packout, Live Hang, Shipping and Sanitation. Employees are entitled to receive, on a weekly basis, Blue Gloves (cotton liners in Shipping), Hair** | |

| 21. | Wages | Economic. | |
|---|---|---|---|
| | All employees shall receive a substantial wage increase each of the agreement and the union purposes a four-year agreement. | | |

May 12, 2004 REV.4

**EQUITY GROUP – EUFAULA DIVISION – 2004 NEGOTIATIONS**
**RESPONSE TO UNION PROPOSALS**

| 12. | Article XIII – Miscellaneous | Modify Article 13.4 as follows: | |
|---|---|---|---|
| | **Section 2(4)** Supplies: Applicable employees will receive the following at the expense of the company: | "**A.** Supplies will be furnished to **new** employees, where required, in accordance with Company procedures **as follows:** | |
| | Safety classes, earplugs, bump cap/hard hat, arm guards, chain gloves, hairnets, sleeves, aprons, ice house boots, cotton gloves for sanitation, and gloves for draw hand. | **-Smocks (3)**<br>**-Arm Guards**<br>**-Cutting Glove**<br>**-Hair Net**<br>**-Beard Net**<br>**-Blue Gloves**<br>**-Cotton Gloves**<br>**-Ear Plugs**<br>**-Apron – heavy duty**<br>**-Sleeves** | |
| | These items will be replaced by the company as needed provided they are turned in and the replacement is not necessary due to employee abuse or neglect. | "**B. Arm guards and cutting gloves are not provided to new employees assigned to Packout, Live Hang, Shipping and Sanitation.** | |
| | | "**C. Employees are entitled to** | |

| 21. | Wages<br><br>All employees shall receive a substantial wage increase each of the agreement and the union purposes a four-year agreement. | Economic. | |

# EXHIBIT 20

**EQUITY GROUP OF EUFAULA, AL**
**2008 Contract Proposals**

7.    **Article XIII – Miscellaneous**

    A.  The company shall furnish supplies to employees as needed in order to
       get replacement supplies, old ones shall be turned in



PLAINTIFF'S
EXHIBIT

2u Mills

    D.  Add a classification of a Bone Sampler and Trainer

    E.  All write ups shall be removed from file after 6 months

    F.  The union proposes the same point system that Kentucky has

8.  **Wages**

    H. All employees shall receive a substantial wage increase across the board.

February 19, 2008 REV.1

EQUITY EUFAULA -- 2008 NEGOTIATIONS
RESPONSE TO UNION PROPOSALS

| 7.A. | **Article XIII - Miscellaneous**<br><br>The company shall furnish supplies to employees as needed in order to get replacement supplies, old ones shall be turned in | No. | | |

8.H.  **Wages**          ECONOMIC

**All employees shall receive a
substantial wage increase across
the board**

**EQUITY EUFAULA -- 2008 NEGOTIATIONS**
**RESPONSE TO UNION PROPOSALS**

| 7.A. | **Article XIII - Miscellaneous**<br><br>The company shall furnish supplies to employees as needed in order to get replacement supplies, old ones shall be turned in | No. |

| 8.H. | Wages | ECONOMIC | | |
|---|---|---|---|---|
| | All employees shall receive a substantial wage increase across the board | | | |

**EQUITY EUFAULA -- 2008 NEGOTIATIONS
RESPONSE TO UNION PROPOSALS**

| 7.A. | **Article XIII - Miscellaneous**<br><br>The company shall furnish supplies to employees as needed in order to get replacement supplies, old ones shall be turned in | Modify Article 13.4 as follows:<br><br>"A.  Supplies will be furnished to new employees, where required, in accordance with Company procedures as follows:<br><br> -Smocks (3)<br> -Arm Guards<br> -Cutting Glove<br> -Hair Net<br> -Beard Net<br> -Blue Gloves<br> -Cotton Gloves<br> -Ear Plugs<br> -Apron - heavy duty<br> -Sleeves<br><br>"B.  Arm guards and cutting gloves |

| 8.H. | **Wages** | ECONOMIC |
| | All employees shall receive a substantial wage increase across the board | |

**EQUITY EUFAULA -- 2008 NEGOTIATIONS**
**RESPONSE TO UNION PROPOSALS**

| 7.A. | **Article XIII - Miscellaneous**<br><br>The company shall furnish supplies to employees as needed in order to get replacement supplies, old ones shall be turned in | Modify Article 13.4 as follows:<br><br>"A.   Supplies will be furnished to new employees, where required, in accordance with Company procedures as follows:<br><br>    -Smocks ~~(3)~~<br>    -Arm Guards<br>    -Cutting Glove<br>    -Hair Net<br>    -Beard Net<br>    -Blue Gloves<br>    -Cotton Gloves<br>    -Ear Plugs<br>    -Apron - heavy duty<br>    -Sleeves<br><br>"B.   Arm guards and cutting gloves |

| 8.H. | Wages | ECONOMIC | |
|------|-------|----------|---|
| | All employees shall receive a | | |

February 28, 2008 REV.5

EQUITY EUFAULA -- 2008 NEGOTIATIONS
RESPONSE TO UNION PROPOSALS

| 7.A. | **Article XIII - Miscellaneous**<br><br>The company shall furnish supplies to employees as needed in order to get replacement supplies, old ones shall be turned in | Modify Article 13.4 as follows:<br><br>"A.   Supplies will be furnished to new employees, where required, in accordance with Company procedures as follows:<br><br>      -Smocks ~~(3)~~<br>      -Arm Guards<br>      -Cutting Glove<br>      -Hair Net<br>      -~~Beard~~ Net<br>      -<u>Rubber</u> (blue <u>or green</u>) Gloves<br>      -Cotton Gloves<br>      -Ear Plugs<br>      -Apron - ~~heavy~~ duty<br>      -Sleeves<br><br>"B.   Arm guards and cutting gloves | OKAY<br>2/27/08 |

| 8.H. | Wages | ECONOMIC | |
| | All employees shall receive a | | |

# EXHIBIT 21

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA – NORTHERN DIVISION**

BETTY ANN BURKS, <u>et</u> al.,            :
                                           :
            Plaintiffs,                    :
                                           :
      v.                                   :Civil Action No. 2:06-CV-1081-MEF
                                           :
EQUITY GROUP EUFAULA                       :
DIVISION, LLC,                             :
                                           :
            Defendant.                     :

PLAINTIFF'S
EXHIBIT

21 Mills

---

**DESIGNATION OF RULE 30(b)(6) DEPOSITION WITNESSES**

---

Pursuant to the Notice of 30(b)(6) Deposition served as of June 3, 2008, defendant designates the following persons as responsive to the stated subjects:

**<u>GENERAL OBJECTIONS</u>**

1.   Defendant objects to the Rule 30(b)(6) Deposition Notice and proposed scope as oppressive and burdensome and not designed to lead to the discovery of relevant or admissible evidence.

2.   Defendant objects to the areas of inquiry to the extent they seek information which is not relevant to the issues in this litigation.  Further, this designation does not waive any objections to the scope of the Notice of Deposition or the areas of proposed inquiry.  The identification of persons as the defendant's designees is not intended to suggest that defendant has any responsive information, or agreement with the inquiry in any circumstance.  Nor does any response suggest that defendant agrees with the premises stated by plaintiffs or the existence of any legal violation.

3.   Defendant objects to the Notice of Deposition to the

extent that it seeks to expand or avoid the limitations

applicable to depositions as set forth in the Federal Rules of

Civil Procedure.

## RESPONSES

1.  The organizational structure of Equity, including specifically any mechanisms for oversight of individual plants by corporate or regional managers.

- Greg Mills
- Joseph Preston
- Kathy Gilmore

2.  Equity's policies and practices regarding the maintenance of records of hours worked and wages paid for non-exempt workers at the chicken processing plants, including the positions of the persons involved in formulating the policies, what training, if any, is provided to inform employees and supervisors of these policies, and what measure, if any, are taken to ensure compliance with these policies.

- Joseph Preston (Maintenance of Records)
- Greg Mills (Training)

3.  Equity's policies and practices regarding the calculation, record keeping and compensation of "hours worked" by chicken processing workers, including but not limited to (a) Equity's policies and practices regarding the use of "line time" or "master card time," and (b) Equity's policies and practices regarding the compensability of time spent obtaining, donning, doffing and cleaning safety and sanitary equipment or gear for hourly poultry processing plant workers; and (c) the positions of the persons involved in formulating the policies, what training, if any, is provided to inform employees and supervisors of these policies, and what measures, if any, are taken to ensure compliance with these policies.

- Joseph Preston (calculation and record keeping)
- Greg Mills (policies and practices and training)

4.  Equity's policies, practices or requirements regarding the "clocking in," scanning of identification cards, or punching of time cards by hourly chicken processing plant employees and the use of such information.

- Greg Mills
- Robin Stevens

5.  Equity's policies, practices or requirements relating to the time that chicken processing workers must arrive at their plant and the time they must report to their respective positions on the processing line either at the beginning of their shift or

after unpaid breaks.

- Greg Mills
- Robin Stevens

6. The respective job responsibilities all of the various lines, groups or sections of workers in Equity's poultry processing plants (such as live hangers, killers, evisceration line, deboning line, further processing line, etc.).

- Greg Mills

7. The safety or sanitary equipment or gear (for example, aprons, rubber gloves, cutting gloves, boots, ear plugs, safety glasses, etc.) or tools (for example, knives or knife sharpeners, etc.) that workers on each line or department wear or use for their jobs, the function and/or purpose of such gear and tools, and the existence of any company documents that in any way concern or pertain to the function, purpose, maintenance, storage, wearing, or utilization of such gear or tools.

- Greg Mills
- Robin Stevens
- Kathy Gilmore (documents)

8. Equity's policies or practices regarding whether such equipment or gear is required, and, if required, the reason that Equity requires it.

- Greg Mills
- Robin Stevens

9. The incidence of, and responses to, complaints by either employees or government agencies regarding any failure to pay overtime compensation to employees.

- Greg Mills
- Kathy Gilmore

10. Any time studies, analyses or investigations commissioned by or in the possession of Equity, which relate in whole or in part to the allegations in the complaint, including any of the following: (a) the time it takes for chicken processing plant workers to obtain, don, doff safety or sanitary equipment, clothing or gear; (b) compensating hourly chicken processing plant workers based on master card time; (c) the payment of overtime to hourly chicken processing plant workers; (d) the savings, labor costs, profits or losses resulting from using master card time to compensate hurly processing plant employees instead of other methods, or from compensating or not compensating hourly processing plant employees for the time spent obtaining, donning and doffing safety or sanitary equipment, clothing and gear.

- Defendant objects to this inquiry to the extent

-3-

that it seeks to modify the time frame to produce
expert reports established by the Court.  Further,
no representative of defendant can testify to the
items set forth in Paragraph (b)-(d).

11.  The collective bargaining that occurred regarding the
subjects covered by §203(o) of the FLSA which Equity has pled as
a defense to the plaintiffs' claims in this action, including,
but not limited to, the collective bargaining that occurred
regarding compensable work time and/or the practice by which such
compensable work time "excluded any time spent in changing
clothes or washing at the beginning or end of each workday...from
measured working time during the week involved by the express
terms of or by custom or practice under a bona fide collective-
bargaining agreement applicable to the particular employee."  29
U.S.C. §203(o).

- Greg Mills
- Kathy Gilmore

12.  Any communication between Equity and the Retail,
Wholesale and Department Store Union regarding: (a) the use of
master card time to compensate chicken processing plant workers,
or (b) the compensation of chicken processing plant workers for
the time they spend buying, obtaining, donning, doffing or
clearing safety or sanitary equipment, clothing and gear.

- Greg Mills
- Kathy Gilmore

13.  Any communications between Equity and the National
Broiler Council, National Chicken Council, or any poultry
company, trade association or governmental agency regarding (a)
the use of master card time to compensate chicken processing
plant workers, or (b) the compensation of chicken processing
plant workers for the time they spend buying, obtaining, donning,
doffing or clearing safety or sanitary equipment, clothing or
gear.

- None

14.  The nature and extent of any information concerning
current and former employees that is maintained on, or
retrievable from, any computer or other electronic, or mechanical
source of Equity, including, but not limited to, information
concerning hire date, job assignments, hours worked, overtime
worked, compensation, rates of pay, termination date, and any
other personnel, human resource, or employment data.

- Joseph Preston
- Kathy Gilmore

15.  The most efficient, effective and reliable method of
tabulating or compiling information of Equity concerning hire
date, job assignments, hours worked, overtime worked,

-4-

compensation, rates of pay, termination date, and any other
personnel, human resource, or employment data.

- Defendant objects to this inquiry as oppressive
and burdensome since it is not defendant's role to
determine how information may or should be
tabulated or compiled by plaintiffs.

16. The record retention policy of Equity and the means by
which Equity maintains information on current and former
employees.

- Joseph Preston
- Kathy Gilmore

17. The nature and type of work performed by plaintiffs and
similarly situated workers on Equity's behalf.

- Greg Mills

18. The identity of the persons who supervised, managed,
evaluated or otherwise monitored the work performed by the named
plaintiffs on Equity's behalf.

- Greg Mills
- Robin Stevens

19. The types of work gear, clothes or equipment put on and
taken off by the named plaintiffs, including but not limited to
plastic sleeves, aprons, smocks, rubber and/or cotton gloves,
hairnets, earplugs, boots or slip resistant shoes, knives or
scissors, mesh gloves and hard plastic arm guards.

- Greg Mills
- Robin Stevens

20. The operation of Equity's "line" or "master card"
method of compensation and/or recording compensable time for the
jobs performed by the named plaintiffs.

- Greg Mills
- Robin Stevens

21. The time spent by the named plaintiffs and other
similarly situated employees on activities that were excluded
from "line," "master card" or compensable time, including, but
not limited to the time spent by them in putting on, taking off,
cleaning, sanitizing, and/or stowing gear or equipment worn while
working on Equity's chicken processing line at the beginning or
end of the day or at the beginning or end of breaks or lunch
during the day.

- Greg Mills
- Robin Stevens

22. The reasons for not paying for activities the

-5-

plaintiffs and other similarly situated employees performed on Equity's behalf while line or master card time was not recorded, including but not limited to such activities as putting on, taking off, cleaning, sanitizing, and stowing the gear and equipment worn while working on Equity's chicken processing line.

- • Greg Mills

23. The identity of the persons who decided not to pay the plaintiffs and other similarly situated employees for activities done on Equity's behalf while line or master card time was not recorded, including, but not limited to, putting on, taking off, cleaning, sanitizing, and stowing the gear and equipment worn while working on Equity's chicken processing line.

- • Greg Mills

24. The type of gear, clothes or equipment the plaintiffs and other similarly situated employees were required to wear pursuant to Equity's policies, custom, or practice, and/or the requirements of the Occupational Safety and Health Administration ("OSHA"), and/or United States Department of Agriculture ("USDA").

- • Greg Mills
- • Robin Stevens

Howard A. Rosenthal
Gary D. Fry
Malcolm S. Gould
    Attorneys for Equity Group
    Eufaula Division, LLC

**OF COUNSEL:**
Pelino & Lentz, P.C.
One Liberty Place
Thirty-Second Floor
1650 Market Street
Philadelphia, PA  19103
(215)665-1540

Joel P. Smith, Jr., Esquire
Williams, Pothoff, Williams
    & Smith, LLC
125 South Orange Avenue
Eufaula, Alabama 36027-1626
(334)687-5834

-6-

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA – NORTHERN DIVISION


BETTY ANN BURKS, <u>et</u> al.,          :
                                        :
          Plaintiffs,                   :
                                        :
     v.                                 :     No. 2:06-CV-1081-MEF
                                        :
EQUITY GROUP EUFAULA                    :
DIVISION LLC,                           :
                                        :
          Defendant.                    :


## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel for Equity Group Eufaula Division LLC certifies that true and correct copies of the Designation of Rule 30(b)(6) Deposition Witnesses were served by depositing true and correct copies in the United States Mail, first class postage prepaid, on June 6, 2008, and addressed as follows:

          Robert J. Camp, Esquire
          The Cochran Firm
          505 North 20th Street
          Suite 825
          Birmingham, AL  35203

          M. John Steensland, III, Esquire
          Parkman, Adams & White
          739 West Main Street
          Dothan, AL  36301

          Richard Martin Adams, Esquire
          Parkman, Adams & White
          505 North 20th Street
          Suite 825
          Birmingham, AL  35203

          Samuel A. Cherry , Jr, Esquire
          Cochran, Cherry, Givens, Smith, Lane
            & Taylor, P.C.
          P.O. Box 927
          Dothan, AL  36302

          Joseph David Lane, Esquire
          Cochran, Cherry, Givens, Smith, Lane
            & Taylor, P.C.
          163 West Main Street
          Dothan, AL  36301

Candis A. McGowan, Esquire
Wiggins Childs Quinn & Pantanis, P.C.
The Kress Building
301 North 19th Street
Birmingham, AL  35203-3204

      Attorneys for Plaintiffs

Howard A. Rosenthal
Gary D. Fry
Malcolm S. Gould
    Attorneys for Equity Group
    Eufaula Division, LLC

**OF COUNSEL:**
Pelino & Lentz, P.C.
One Liberty Place
Thirty-Second Floor
1650 Market Street
Philadelphia, PA  19103
(215)665-1540

Joel P. Smith, Jr., Esquire
Williams, Pothoff, Williams
    & Smith, LLC
125 South Orange Avenue
Eufaula, Alabama 36027-1626
(334)687-5834

# EXHIBIT 23

**Time Detail**

| | |
|---|---|
| | Data Up to Date: | 6/9/2008 12:59:00PM |
| Time Period: | Previous Pay Period | Executed on: | 6/9/2008 12:59:18PM |
| Query: | 7-6OE-2nd DeboneLine5 +8185 | Printed for: | u0s7al00 |
| Actual/Adjusted: | Actual hours only | Insert Page Break After Each Employee: | No |

---

| Employee: | 6OE SLG Breast Deb 1-2 2nd | ID: | 60006402 | Time Zone: | Central |
|---|---|---|---|---|---|
| Primary Account | | Status: | Active | Status Date: | 8/19/2007 |
| Start | End | Pay Rule: | 7 MASTERCARDS2NDSHIFT | | |
| Beginning of time | Forever | | 8185/81850/81850/2/81856OE/81850 /8185MSTRCRD | | |

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| | *Xfr/Move: Account* | | *Comment* | | | | *Xfr: Work Rule* | | |
| 6/2/2008 | | 4:30:00PM | | 3:04:00AM | | | | 9:34 | 9:34 |
| 6/3/2008 | | | | 3:13:00AM | | | | 9:43 | 19:17 |
| | | | MP | | | | | | |
| 6/4/2008 | | | | 3:02:00AM | | | | 9:32 | 28:49 |
| | | | MP | | | | | | |
| 6/5/2008 | | | | 3:11:00AM | | | | 9:41 | 38:30 |
| | | | MP | | | | | | |
| 6/6/2008 | | | | 1:52:00AM | | | | 8:22 | 46:52 |
| | | | MP | | | | | | |

RECEIVED JUN 09 2008 By___

| Labor Account Summary | | Pay Code | Money | Hours |
|---|---|---|---|---|
| 8185/81850/81850/2/81856OE/81850/8185MSTRCRD | | OT2 | | 6:52 |
| | | Reg2 | | 40:00 |

| Pay Code Summary | Pay Code | Money | Hours |
|---|---|---|---|
| | OT2 | | 6:52 |
| | Reg2 | | 40:00 |
| Totals: | | $0.00 | 46:52 |

---

| Employee: | COOPER, JACQUELINE D | ID: | EUF13831 | Time Zone: | Central |
|---|---|---|---|---|---|
| Primary Account | | Status: | Active | Status Date: | 10/9/2006 |
| Start | End | Pay Rule: | 7LINESCH2 | | |
| 8/30/2007 | Forever | | 8185/81850/81850/2/81856OE/81850 /8185DEBONE 5 | | |

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| | *Xfr/Move: Account* | | *Comment* | | | | *Xfr: Work Rule* | | |
| 6/2/2008 | | 4:00:00PM | | 3:06:00AM | | | | 9:34 | 9:34 |
| | | | VE | | | | | | |
| 6/3/2008 | | 3:59:00PM | | 3:14:00AM | | | | 9:43 | 19:17 |
| | | | VE | | | | | | |
| 6/4/2008 | | 3:46:00PM | | 3:05:00AM | | | | 9:32 | 28:49 |
| | | | VE | | | | | | |
| 6/5/2008 | | 3:42:00PM | | 3:16:00AM | | | | 9:41 | 38:30 |
| | | | VE | | | | | | |
| 6/6/2008 | | 3:47:00PM | | 1:56:00AM | | | | 8:22 | 46:52 |
| | | | VE | | | | | | |

PLAINTIFF'S EXHIBIT

PRESTON 23

# Time Detail

| | | Data Up to Date: | 6/9/2008 12:59:00PM |
|---|---|---|---|
| | | Executed on: | 6/9/2008 12:59:18PM |
| Time Period: | Previous Pay Period | Printed for: | u0s7al00 |
| Query: | 7-6OE-2nd DeboneLine5 - 8185 | Insert Page Break After Each Employee: | No |
| Actual/Adjusted: | Actual hours only | | |

### Labor Account Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| 8185/81850/81850/2/81856OE/81850/8185DEBONE 5 | 7DaD | | 0:15 |
| | OT2 | | 6:52 |
| | Reg2 | | 40:00 |

### Pay Code Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| | 7DaD | | 0:15 |
| | OT2 | | 6:52 |
| | Reg2 | | 40:00 |
| Totals: | | $0.00 | 47:07 |

| Employee: | GUSMAN, JOSE | ID: | EUF11623 | Time Zone: | Central |
|---|---|---|---|---|---|
| Primary Account | | Status: | Active | Status Date: | 3/30/2005 |
| Start | End | Pay Rule: | 7LINESCH2 | | |
| 10/9/2007 | Forever | 8185/81850/81850/2/81856OE/81850 /8185DEBONE 5 | | | |

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| | Xfr/Move: Account | | Comment | | | Xfr: Work Rule | | | |
| 6/2/2008 | | 4:06:00PM | EV | 3:13:00AM | EV | | | 9:43 | 9:43 |
| 6/3/2008 | | 4:01:00PM | EV | 3:22:00AM | EV | | | 9:52 | 19:35 |
| 6/4/2008 | | 3:57:00PM | VE | 3:11:00AM | EV | | | 9:41 | 29:16 |
| 6/5/2008 | | 3:58:00PM | VE | 3:23:00AM | EV | | | 9:53 | 39:09 |
| 6/6/2008 | | 3:59:00PM | VE | 2:03:00AM | EV | | | 8:33 | 47:42 |

### Labor Account Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| 8185/81850/81850/2/81856OE/81850/8185DEBONE 5 | 7DaD | | 0:15 |
| | OT2 | | 7:42 |
| | Reg2 | | 40:00 |

### Pay Code Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| | 7DaD | | 0:15 |
| | OT2 | | 7:42 |
| | Reg2 | | 40:00 |
| Totals: | | $0.00 | 47:57 |

| Employee: | HAMILTON, DENISE | ID: | EUF14783 | Time Zone: | Central |
|---|---|---|---|---|---|
| Primary Account | | Status: | Active | Status Date: | 8/1/2007 |
| Start | End | Pay Rule: | 7LINESCH2 | | |

# Time Detail

| | | Data Up to Date: | 6/9/2008 12:59:00PM |
| | | Executed on: | 6/9/2008 12:59:18PM |
| | | Printed for: | u0s7al00 |

| | | |
|---|---|---|
| Time Period: | Previous Pay Period | |
| Query: | 7-6OE-2nd DeboneLine5 - 8185 | Insert Page Break After Each Employee: No |
| Actual/Adjusted: | Actual hours only | |

| Beginning of time | Forever | 8185/81850/81850/2/81856OE/81850 |
| | | /8185DEBONE 5 |

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| | Xfr/Move: Account | | Comment | | | Xfr: Work Rule | | | |
| 6/2/2008 | | 4:09:00PM | | 3:09:00AM | | | | 9:34 | 9:34 |
| | | | EV | | | | | | |
| 6/4/2008 | | 4:10:00PM | | 3:06:00AM | | | | 9:32 | 19:06 |
| | | | EV | | | | | | |
| 6/5/2008 | | 4:09:00PM | | 3:18:00AM | | | | 9:41 | 28:47 |
| | | | EV | | | | | | |
| 6/6/2008 | | 4:08:00PM | | 1:57:00AM | | | | 8:22 | 37:09 |
| | | | EV | | | | | | |

### Labor Account Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| 8185/81850/81850/2/81856OE/81850/8185DEBONE 5 | 7DaD | | 0:12 |
| | Reg2 | | 37:09 |

### Pay Code Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| | 7DaD | | 0:12 |
| | Reg2 | | 37:09 |
| Totals: | | $0.00 | 37:21 |

| Employee: | HERNANDEZ, CONSUELO G | ID: | EUF11593 | Time Zone: | Central |
|---|---|---|---|---|---|
| Primary Account | | Status: | Active | Status Date: | 3/14/2007 |
| Start | End | Pay Rule: | 7LINESCH2 | | |
| 10/19/2007 | Forever | | 8185/81850/81850/2/81856OE/81850 | | |
| | | | /8185DEBONE 5 | | |

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| | Xfr/Move: Account | | Comment | | | Xfr: Work Rule | | | |
| 6/2/2008 | | 3:58:00PM | | 3:15:00AM | | | | 9:34 | 9:34 |
| | | | VE | | | | | | |
| 6/3/2008 | | 4:03:00PM | | 3:23:00AM | | | | 9:43 | 19:17 |
| | | | EV | | | | | | |
| 6/4/2008 | | 4:05:00PM | | 3:14:00AM | | | | 9:32 | 28:49 |
| | | | EV | | | | | | |
| 6/5/2008 | | 4:11:00PM | | 3:23:00AM | | | | 9:41 | 38:30 |
| | | | EV | | | | | | |
| 6/6/2008 | | 3:55:00PM | | 2:06:00AM | | | | 8:22 | 46:52 |
| | | | VE | | | | | | |

### Labor Account Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| 8185/81850/81850/2/81856OE/81850/8185DEBONE 5 | 7DaD | | 0:15 |

# Time Detail

| | | Data Up to Date: | 6/9/2008 12:59:00PM |
|---|---|---|---|
| | | Executed on: | 6/9/2008 12:59:18PM |
| Time Period: | Previous Pay Period | Printed for: | u0s7al00 |
| Query: | 7-6OE-2nd DeboneLine5 - 8185 | Insert Page Break After Each Employee: | No |
| Actual/Adjusted: | Actual hours only | | |

| | | |
|---|---|---|
| 8185/81850/81850/2/81856OE/81850/8185DEBONE 5 | OT2 | 6:52 |
| | Reg2 | 40:00 |

### Pay Code Summary

| Pay Code | Money | Hours |
|---|---|---|
| 7DaD | | 0:15 |
| OT2 | | 6:52 |
| Reg2 | | 40:00 |
| Totals: | $0.00 | 47:07 |

| | | | | |
|---|---|---|---|---|
| Employee: | HOLMES, DIANE M | ID: EUF13946 | Time Zone: | Central |
| Primary Account | | Status: Active | Status Date: | 11/21/2006 |
| Start | End | Pay Rule: 7LINESCH2 | | |
| 12/21/2007 | Forever | 8185/81850/81850/2/81856OE/81850/8185DEBONE 5 | | |

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| | Xfr/Move: Account | | Comment | | | Xfr: Work Rule | | | |
| 6/2/2008 | | 4:24:00PM | | 3:11:00AM | | | | 9:34 | 9:34 |
| 6/3/2008 | | 4:05:00PM | | 3:18:00AM | | | | 9:43 | 19:17 |
| | | | EV | | | | | | |
| 6/4/2008 | | 4:15:00PM | | 3:11:00AM | | | | 9:32 | 28:49 |
| | | | EV | | | | | | |
| 6/5/2008 | | 4:07:00PM | | 3:32:00AM | | | | 9:41 | 38:30 |
| | | | EV | | | | | | |
| 6/6/2008 | | 4:18:00PM | | 2:12:00AM | | | | 8:22 | 46:52 |
| | | | LV | | | | | | |

*pay clock out m.s*
*pay clock out m.s*
*pay clock out m.s*

### Labor Account Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| 8185/81850/81850/2/81856OE/81850/8185DEBONE 5 | 7DaD | | 0:15 |
| | OT2 | | 6:52 |
| | Reg2 | | 40:00 |

### Pay Code Summary

| Pay Code | Money | Hours |
|---|---|---|
| 7DaD | | 0:15 |
| OT2 | | 6:52 |
| Reg2 | | 40:00 |
| Totals: | $0.00 | 47:07 |

| | | | | |
|---|---|---|---|---|
| Employee: | JACKSON, BIANCA M | ID: EUF14845 | Time Zone: | Central |
| Primary Account | | Status: Active | Status Date: | 8/8/2007 |
| Start | End | Pay Rule: 7LINESCH2 | | |
| Beginning of time | Forever | 8185/81850/81850/2/81856OE/81850/8185DEBONE 5 | | |

# Time Detail

| | | | | |
|---|---|---|---|---|
| Data Up to Date: | 6/9/2008 12:59:00PM |
| Executed on: | 6/9/2008 12:59:18PM |
| Printed for: | u0s7al00 |
| Insert Page Break After Each Employee: | No |

Time Period: Previous Pay Period
Query: 7-6OE-2nd DeboneLine5 - 8185
Actual/Adjusted: Actual hours only

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| | Xfr/Move: Account | | | Comment | | | Xfr: Work Rule | | |
| 6/4/2008 | | 4:12:00PM | | 7:30:00PM | | | | 2:30 | 2:30 |
| | | | EV | | SE, EV | | | | |
| | | | | O:Did Not Punch | | | | | |

**Labor Account Summary**

| | Pay Code | Money | Hours |
|---|---|---|---|
| 8185/81850/81850/2/81856OE/81850/8185DEBON E 5 | 7DaD | | 0:03 |
| | Reg2 | | 2:30 |

**Pay Code Summary**

| Pay Code | Money | Hours |
|---|---|---|
| 7DaD | | 0:03 |
| Reg2 | | 2:30 |
| Totals: | $0.00 | 2:33 |

| Employee: | JOHNS, HELEN Y | ID: | EUF11204 | Time Zone: | Central |
|---|---|---|---|---|---|
| Primary Account | | Status: | Active | Status Date: | 1/10/2005 |
| Start | End | Pay Rule: | 7LINESCH2 | | |
| 11/5/2007 | Forever | | 8185/81850/81850/2/81856OE/81850/8185DEBONELL | | |

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| | Xfr/Move: Account | | | Comment | | | Xfr: Work Rule | | |
| 6/2/2008 | | 3:51:00PM | | 3:30:00AM | | | | 10:15 | 10:15 |
| | | | EV | | LE, EV | | | | |
| 6/3/2008 | | 3:52:00PM | | 3:40:00AM | | | | 10:25 | 20:40 |
| | | | EV | | EV, LE | | | | |
| 6/4/2008 | | 3:50:00PM | | 3:25:00AM | | | | 10:10 | 30:50 |
| | | | EV | | LE, EV | | | | |
| 6/5/2008 | | 4:01:00PM | | 3:41:00AM | | | | 10:26 | 41:16 |
| | | | | | EV, LE | | | | |
| 6/6/2008 | | 4:03:00PM | | 2:10:00AM | | | | 8:55 | 50:11 |
| | | | | | EV | | | | |

**Labor Account Summary**

| | Pay Code | Money | Hours |
|---|---|---|---|
| 8185/81850/81850/2/81856OE/81850/8185DEBONELL | 7DaD | | 0:15 |
| | OT2 | | 10:11 |
| | Reg2 | | 40:00 |

**Pay Code Summary**

| Pay Code | Money | Hours |
|---|---|---|
| 7DaD | | 0:15 |
| OT2 | | 10:11 |

# Time Detail

| | | Data Up to Date: | 6/9/2008 12:59:00PM |
|---|---|---|---|
| | | Executed on: | 6/9/2008 12:59:18PM |
| Time Period: | Previous Pay Period | Printed for: | u0s7al00 |
| Query: | 7-6OE-2nd DeboneLine5 - 8185 | Insert Page Break After Each Employee: | No |
| Actual/Adjusted: | Actual hours only | | |

| | Reg2 | | | 40:00 |
|---|---|---|---|---|
| Totals: | | | $0.00 | 50:26 |

| Employee: | LAMAR, EDUARDO | ID: | EUF12280 | Time Zone: | Central |
|---|---|---|---|---|---|
| Primary Account | | Status: | Active | Status Date: | 7/27/2005 |
| Start | End | Pay Rule: | 7LINESCH2 | | |
| Beginning of time | Forever | 8185/81850/81850/2/81856OE/81850 /8185DEBONE 5 | | | |

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| | Xfr/Move: Account | | | Comment | | | Xfr: Work Rule | | |
| 6/2/2008 | | 4:02:00PM | | 3:14:00AM | | | | 9:34 | 9:34 |
| | | | EV | | | | | | |
| 6/3/2008 | | 3:55:00PM | | 3:22:00AM | | | | 9:43 | 19:17 |
| | | | VE | | | | | | |
| 6/4/2008 | | 3:52:00PM | | 3:13:00AM | | | | 9:32 | 28:49 |
| | | | VE | | | | | | |
| 6/5/2008 | | 3:55:00PM | | 3:25:00AM | | | | 9:41 | 38:30 |
| | | | VE | | | | | | |
| 6/6/2008 | | 3:55:00PM | | 2:03:00AM | | | | 8:22 | 46:52 |
| | | | VE | | | | | | |

| Labor Account Summary | Pay Code | Money | Hours |
|---|---|---|---|
| 8185/81850/81850/2/81856OE/81850/8185DEBON E 5 | 7DaD | | 0:15 |
| | OT2 | | 6:52 |
| | Reg2 | | 40:00 |

| Pay Code Summary | Pay Code | Money | Hours |
|---|---|---|---|
| | 7DaD | | 0:15 |
| | OT2 | | 6:52 |
| | Reg2 | | 40:00 |
| Totals: | | $0.00 | 47:07 |

| Employee: | MATHIS, SCOTTIE | ID: | EUF15159 | Time Zone: | Central |
|---|---|---|---|---|---|
| Primary Account | | Status: | Active | Status Date: | 9/19/2007 |
| Start | End | Pay Rule: | 7LINESCH2 | | |
| 11/16/2007 | Forever | 8185/81850/81850/2/81856OE/81850 /8185DEBONE 5 | | | |

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| | Xfr/Move: Account | | | Comment | | | Xfr: Work Rule | | |
| 6/2/2008 | | 4:15:00PM | | 3:13:00AM | | | | 9:34 | 9:34 |
| | | | EV | | | | | | |
| 6/3/2008 | | 3:58:00PM | | 3:22:00AM | | | | 9:43 | 19:17 |
| | | | VE | | | | | | |

# Time Detail

| | | | Data Up to Date: | 6/9/2008 12:59:00PM |
|---|---|---|---|---|
| | | | Executed on: | 6/9/2008 12:59:18PM |
| Time Period: | Previous Pay Period | | Printed for: | u0s7al00 |
| Query: | 7-6OE-2nd DeboneLine5 - 8185 | | Insert Page Break After Each Employee: | No |
| Actual/Adjusted: | Actual hours only | | | |

| 6/4/2008 | 4:30:00PM | 3:11:00AM | | 9:32 | 28:49 |
|---|---|---|---|---|---|
| 6/5/2008 | 4:17:00PM | 3:24:00AM | | 9:41 | 38:30 |
| 6/6/2008 | 4:21:00PM | 2:01:00AM | | 8:22 | 46:52 |

### Labor Account Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| 8185/81850/81850/2/81856OE/81850/8185DEBONE 5 | 7DaD | | 0:15 |
| | OT2 | | 6:52 |
| | Reg2 | | 40:00 |

### Pay Code Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| | 7DaD | | 0:15 |
| | OT2 | | 6:52 |
| | Reg2 | | 40:00 |

| Totals: | | $0.00 | 47:07 |
|---|---|---|---|

| Employee: | MONTANO, LETICIA A | ID: | EUF11399 | Time Zone: | Central |
|---|---|---|---|---|---|
| Primary Account | | Status: | Active | Status Date: | 2/9/2005 |
| Start | End | Pay Rule: | 7LINESCH2 | | |
| Beginning of time | Forever | 8185/81850/81850/2/81856OE/81850/8185DEBONE 5 | | | |

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| | Xfr/Move: Account | | | Comment | | | Xfr: Work Rule | | |
| 6/2/2008 | | 4:11:00PM | | 3:12:00AM | | | | 9:34 | 9:34 |
| | | | EV | | | | | | |
| 6/3/2008 | | 4:00:00PM | | 3:21:00AM | | | | 9:43 | 19:17 |
| | | | VE | | | | | | |
| 6/4/2008 | | 3:56:00PM | | 3:11:00AM | | | | 9:32 | 28:49 |
| | | | VE | | | | | | |
| 6/5/2008 | | 4:00:00PM | | 3:22:00AM | | | | 9:41 | 38:30 |
| | | | VE | | | | | | |
| 6/6/2008 | | 4:03:00PM | | 2:00:00AM | | | | 8:22 | 46:52 |
| | | | EV | | | | | | |

### Labor Account Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| 8185/81850/81850/2/81856OE/81850/8185DEBONE 5 | 7DaD | | 0:15 |
| | OT2 | | 6:52 |
| | Reg2 | | 40:00 |

### Pay Code Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| | 7DaD | | 0:15 |
| | OT2 | | 6:52 |
| | Reg2 | | 40:00 |

| Totals: | | $0.00 | 47:07 |
|---|---|---|---|

**Time Detail**

| | | | | Data Up to Date: | 6/9/2008 12:59:00PM |
|---|---|---|---|---|---|
| | | | | Executed on: | 6/9/2008 12:59:18PM |
| Time Period: | Previous Pay Period | | | Printed for: | u0s7al00 |
| Query: | 7-6OE-2nd DeboneLine5 - 8185 | | | Insert Page Break After Each Employee: | No |
| Actual/Adjusted: | Actual hours only | | | | |

---

| Employee: | PEREZ JR, ANTONIO | | ID: | EUF11709 | | Time Zone: | Central |
|---|---|---|---|---|---|---|---|
| Primary Account | | | Status: | Active | | Status Date: | 4/13/2005 |
| Start | End | | Pay Rule: | 7LINESCH2 | | | |
| Beginning of time | Forever | | 8185/81850/81850/2/81856OE/81850 /8185DEBONE 5 | | | | |

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| | Xfr/Move: Account | | | Comment | | | Xfr: Work Rule | | |
| 6/2/2008 | | 4:05:00PM | | 3:13:00AM | | | | 9:34 | 9:34 |
| | | | EV | | | | | | |
| 6/3/2008 | | 3:59:00PM | | 3:21:00AM | | | | 9:43 | 19:17 |
| | | | VE | | | | | | |
| 6/4/2008 | | 4:08:00PM | | 3:11:00AM | | | | 9:32 | 28:49 |
| | | | EV | | | | | | |
| 6/5/2008 | | 4:08:00PM | | 3:19:00AM | | | | 9:41 | 38:30 |
| | | | EV | | | | | | |
| 6/6/2008 | | 3:59:00PM | | 2:02:00AM | | | | 8:22 | 46:52 |
| | | | VE | | | | | | |

---

| Labor Account Summary | | Pay Code | Money | Hours |
|---|---|---|---|---|
| 8185/81850/81850/2/81856OE/81850/8185DEBON E 5 | | 7DaD | | 0:15 |
| | | OT2 | | 6:52 |
| | | Reg2 | | 40:00 |

---

| Pay Code Summary | | Pay Code | Money | Hours |
|---|---|---|---|---|
| | | 7DaD | | 0:15 |
| | | OT2 | | 6:52 |
| | | Reg2 | | 40:00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Totals: | | | | $0.00 | | 47:07 |

---

| Employee: | PEREZ, FLOR S | | ID: | EUF10677 | | Time Zone: | Central |
|---|---|---|---|---|---|---|---|
| Primary Account | | | Status: | Active | | Status Date: | 8/17/2004 |
| Start | End | | Pay Rule: | 7LINESCH2 | | | |
| Beginning of time | Forever | | 8185/81850/81850/2/81856OE/81850 /8185DEBONE 5 | | | | |

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| | Xfr/Move: Account | | | Comment | | | Xfr: Work Rule | | |
| 6/1/2008 | | 4:22:00PM | | 7:17:00PM | | | | 4:00 | 4:00 |
| | | | | | | 72ndCalledIn4hrs | | | |
| 6/1/2008 | Reg2 | | | | | | 4:00 | | |
| | ///2/81856HA// | | | | | | | | |
| 6/2/2008 | | 4:25:00PM | | 3:12:00AM | | | | 9:34 | 13:34 |
| 6/3/2008 | | 4:28:00PM | | 3:21:00AM | | | | 9:43 | 23:17 |
| 6/4/2008 | | 4:27:00PM | | 3:11:00AM | | | | 9:32 | 32:49 |

# Time Detail

| | | |
|---|---|---|
| Data Up to Date: | 6/9/2008 12:59:00PM | |
| Executed on: | 6/9/2008 12:59:18PM | |
| Printed for: | u0s7al00 | |

| | |
|---|---|
| Time Period: | Previous Pay Period |
| Query: | 7-6OE-2nd DeboneLine5 - 8185 |
| Actual/Adjusted: | Actual hours only |

Insert Page Break After Each Employee:        No

| | | | | | |
|---|---|---|---|---|---|
| 6/5/2008 | 4:27:00PM | 3:20:00AM | | 9:41 | 42:30 |
| 6/6/2008 | 4:25:00PM | 2:06:00AM | | 8:22 | 50:52 |

### Labor Account Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| (X)8185/81850/81850/2/81856HA/81850/8185DEB ONE 5 | Reg2 | | 4:00 |
| 8185/81850/81850/2/81856OE/81850/8185DEBON E 5 | 7DaD | | 0:15 |
| | OT2 | | 10:52 |
| | Reg2 | | 36:00 |

### Pay Code Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| | 7DaD | | 0:15 |
| | OT2 | | 10:52 |
| | Reg2 | | 40:00 |
| Totals: | | $0.00 | 51:07 |

| | | | | |
|---|---|---|---|---|
| Employee: | RAMIREZ, MARELY R | ID: | EUF14176 | Time Zone: | Central |
| Primary Account | | Status: | Active | Status Date: | 3/7/2007 |
| Start | End | Pay Rule: | 7LINESCH2 | | |
| Beginning of time | Forever | 8185/81850/81850/2/81856OE/81850 /8185DEBONE 5 | | | |

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| | Xfr/Move: Account | | Comment | | Xfr: Work Rule | | | | |
| 6/2/2008 | | 4:05:00PM | | 3:13:00AM | | | | 9:34 | 9:34 |
| | | | EV | | | | | | |
| 6/3/2008 | | 4:10:00PM | | 3:20:00AM | | | | 9:43 | 19:17 |
| | | | EV | | | | | | |
| 6/4/2008 | | 4:08:00PM | | 3:12:00AM | | | | 9:32 | 28:49 |
| | | | EV | | | | | | |
| 6/5/2008 | | 4:10:00PM | | 3:11:00AM | | | | 9:41 | 38:30 |
| | | | EV | | | | | | |
| | | | O:Did Not Punch | | | | | | |
| 6/6/2008 | | 4:10:00PM | | 1:59:00AM | | | | 8:22 | 46:52 |
| | | | EV | | | | | | |

### Labor Account Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| 8185/81850/81850/2/81856OE/81850/8185DEBON E 5 | 7DaD | | 0:15 |
| | OT2 | | 6:52 |
| | Reg2 | | 40:00 |

### Pay Code Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| | 7DaD | | 0:15 |
| | OT2 | | 6:52 |
| | Reg2 | | 40:00 |

# Time Detail

| | |
|---|---|
| Data Up to Date: | 6/9/2008 12:59:00PM |
| Executed on: | 6/9/2008 12:59:18PM |
| Printed for: | u0s7al00 |
| Insert Page Break After Each Employee: | No |

| | |
|---|---|
| Time Period: | Previous Pay Period |
| Query: | 7-6OE-2nd DeboneLine5 - 8185 |
| Actual/Adjusted: | Actual hours only |

| Totals: | | $0.00 | 47:07 |
|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| Employee: | RODRIGUEZ, ARLEEN O | ID: | EUF14426 | Time Zone: | Central | |
| Primary Account | | Status: | Active | Status Date: | 5/23/2007 | |
| Start | End | Pay Rule: | 7LINESCH2 | | | |
| Beginning of time | Forever | 8185/81850/81850/2/81856OE/81850 /8185DEBONE 5 | | | | |

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| | Xfr/Move: Account | | Comment | | | | Xfr: Work Rule | | |
| 6/1/2008 | ILV | | | | | | | 40:00 | 40:00 |
| 6/2/2008 | | 4:01:00PM | | 3:12:00AM | | | | 9:34 | 49:34 |
| | | | EV | | | | | | |
| 6/3/2008 | | 3:54:00PM | | 3:20:00AM | | | | 9:43 | 59:17 |
| | | | VE | | | | | | |
| 6/4/2008 | | 3:59:00PM | | 3:13:00AM | | | | 9:32 | 68:49 |
| | | | VE | | | | | | |
| 6/5/2008 | | 3:54:00PM | | 3:22:00AM | | | | 9:41 | 78:30 |
| | | | VE | | | | | | |
| 6/6/2008 | | 3:52:00PM | | 2:02:00AM | | | | 8:22 | 86:52 |
| | | | VE | | | | | | |

### Labor Account Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| 8185/81850/81850/2/81856OE/81850/8185DEBONE 5 | 7DaD | | 0:15 |
| | ILV | | 40:00 |
| | OT2 | | 6:52 |
| | Reg2 | | 40:00 |

### Pay Code Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| | 7DaD | | 0:15 |
| | ILV | | 40:00 |
| | OT2 | | 6:52 |
| | Reg2 | | 40:00 |

| Totals: | | $0.00 | 87:07 |
|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| Employee: | SEBASTIAN, JUAN | ID: | EUF10048 | Time Zone: | Central | |
| Primary Account | | Status: | Active | Status Date: | 4/25/2004 | |
| Start | End | Pay Rule: | 7LINESCH2 | | | |
| Beginning of time | Forever | 8185/81850/81850/2/81856OE/81850 /8185DEBONE 5 | | | | |

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| | Xfr/Move: Account | | Comment | | | | Xfr: Work Rule | | |
| 6/2/2008 | | 4:16:00PM | | 3:13:00AM | | | | 9:34 | 9:34 |
| 6/3/2008 | | 4:11:00PM | | 3:19:00AM | | | | 9:43 | 19:17 |

# Time Detail

| | | | | |
|---|---|---|---|---|
| Data Up to Date: | | | 6/9/2008 12:59:00PM | |
| Executed on: | | | 6/9/2008 12:59:18PM | |
| Printed for: | | | u0s7al00 | |

| Time Period: | Previous Pay Period |
|---|---|
| Query: | 7-6OE-2nd DeboneLine5 - 8185 |
| Actual/Adjusted: | Actual hours only |

Insert Page Break After Each Employee:     No

| Date | | In Punch | | Out Punch | | | | Totaled | Cum. Tot. |
|---|---|---|---|---|---|---|---|---|---|
| | | | EV | | | | | | |
| 6/4/2008 | | 4:13:00PM | | 3:11:00AM | | | | 9:32 | 28:49 |
| | | | EV | | | | | | |
| 6/5/2008 | | 4:12:00PM | | 3:19:00AM | | | | 9:41 | 38:30 |
| | | | EV | | | | | | |
| 6/6/2008 | | 4:09:00PM | | 2:03:00AM | | | | 8:22 | 46:52 |
| | | | EV | | | | | | |

### Labor Account Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| 8185/81850/81850/2/81856OE/81850/8185DEBONE 5 | 7DaD | | 0:15 |
| | OT2 | | 6:52 |
| | Reg2 | | 40:00 |

### Pay Code Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| | 7DaD | | 0:15 |
| | OT2 | | 6:52 |
| | Reg2 | | 40:00 |

| Totals: | | | $0.00 | 47:07 |
|---|---|---|---|---|

| Employee: | WILLIAMS, CYNTHIA | | ID: | EUF14479 | Time Zone: | Central |
|---|---|---|---|---|---|---|
| Primary Account | | | Status: | Active | Status Date: | 6/11/2007 |
| Start | End | | Pay Rule: | 7LINESCH2 | | |
| 10/9/2007 | Forever | | 8185/81850/81850/2/81856OE/81850 /8185DEBONE 5 | | | |

| Date | Apply To | In Punch | In Exc | Out Punch | Out Exc | Money Amount | Adj/Ent Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|
| *Xfr/Move: Account* | | | *Comment* | | | *Xfr: Work Rule* | | | |
| 6/2/2008 | | 3:56:00PM | | 3:05:00AM | | | | 9:34 | 9:34 |
| | | | VE | | | | | | |
| 6/3/2008 | | 4:05:00PM | | 3:13:00AM | | | | 9:43 | 19:17 |
| | | | EV | | | | | | |
| 6/4/2008 | | 4:10:00PM | | 3:03:00AM | | | | 9:32 | 28:49 |
| | | | EV | | | | | | |
| 6/5/2008 | | 4:06:00PM | | 3:14:00AM | | | | 9:41 | 38:30 |
| | | | EV | | | | | | |
| 6/6/2008 | | 4:08:00PM | | 1:58:00AM | | | | 8:22 | 46:52 |
| | | | EV | | | | | | |

### Labor Account Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| 8185/81850/81850/2/81856OE/81850/8185DEBONE 5 | 7DaD | | 0:15 |
| | OT2 | | 6:52 |
| | Reg2 | | 40:00 |

### Pay Code Summary

| | Pay Code | Money | Hours |
|---|---|---|---|
| | 7DaD | | 0:15 |

# Time Detail

| | |
|---|---|
| Data Up to Date: | 6/9/2008 12:59:00PM |
| Executed on: | 6/9/2008 12:59:18PM |
| Printed for: | u0s7al00 |
| Insert Page Break After Each Employee: | No |

Time Period:        Previous Pay Period
Query:              7-6OE-2nd DeboneLine5 - 8185
Actual/Adjusted:    Actual hours only

| | | |
|---|---|---|
| OT2 | | 6:52 |
| Reg2 | | 40:00 |
| Totals: | $0.00 | 47:07 |

**Time Detail**

Data Up to Date:        6/9/2008  12:59:00PM
Executed on:            6/9/2008  12:59:18PM
Printed for:            u0s7al00

| | |
|---|---|
| Time Period: | Previous Pay Period |
| Query: | 7-6OE-2nd DeboneLine5 - 8185 |
| Actual/Adjusted: | Actual hours only |

Insert Page Break After Each Employee:        No

Pay Code Summary

| Pay Code | Money | Hours |
|---|---|---|
| 7DaD | | 3:45 |
| ILV | | 40:00 |
| OT2 | | 111:09 |
| Reg2 | | 639:39 |
| Totals: | $0.00 | 794:33 |

Total Number of Employees:  17

# EXHIBIT 24

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
MONTGOMERY DIVISION**

| | | |
|---|---|---|
| **BETTY ANN BURKS, et. al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO.: 2:06-cv-01081-MEF-** |
| | ) | **DRB** |
| | ) | |
| **EQUITY GROUP-EUFAULA DIVISION,** | ) | |
| **LLC** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DECLARATION OF EBONE MORRIS**

Pursuant to 28 U.S.C. § 1746, I, Ebone Morris, declare under penalty of perjury:

1.      I began working at the Plant in Baker Hill when it was owned by Equity Group-Eufaula Division. When I started at Equity Group, I was working in the DSI Department. After six (6) months, I was moved to a USDA trimmer position in the Evisceration Department. Along with maintaining my work activities as a USDA trimmer, I am also required to rotate to the position of an Open Cutter or as a Mirror. As a USDA trimmer, I am responsible for checking the birds coming down the line and remove any unwanted or "unharvestable" product from the bird so that Equity Foods is able to meet its primary goal of providing its' corporate customers with the cleanest, high quality, uncontaminated product possible.

2.      I am also a Union Steward and a member of the union bargaining committee.  The collective bargaining agreement did not limit employee's pay to just the time spent on the production line handling or processing chicken. Employees' pay was also not limited to time on a Master Line Time Card.  Employees were paid for time before and after chickens were on the production line

1

for things like set-up, sanitation of equipment, clean up, and other activities. There were also other methods of keeping time and paying employees who were covered by the collective bargaining agreement, such as clock-in/clock-out time and pre-set scheduled time.

3.    As a member of the union bargaining committee, the employees of the plant opposed the company's refusal to pay for similar work activities before and after chickens were processed on the line, such as when we were required to sanitize the company's protective gear and equipment, put it on and take it off at least six times a day without pay. The company decided not to pay for this work on its own, not as part of any collective bargaining agreement. The Chief Union Steward and other employees directly opposed the refusal to pay for this additional work during the time I was employed by Equity Group. During the period leading up to that changeover in 2003-2004, there was a lawsuit in federal court that had been filed by our Chief Union Steward protesting the company's refusal to pay for these additional work activities before and after chickens were on the line. That lawsuit covered the period from 1999 forward, which was before there was ever any collective bargaining agreement with CP. The first collective bargaining agreement with CP was a year later in 2000. The Chief Union Steward's lawsuit was still in court while Equity Group was in the process of taking over the plant and, to my knowledge, was still in court after Equity Group took over. At some point in time, the case against CP was dropped because it no longer owned or ran the plant. The employees, however, did not stop protesting Equity Group's refusal to pay for the additional work activities that were part of that lawsuit. A new lawsuit was planned and later filed based on my and other employees' understanding that we had three years to file such a case in order to cover the period since Equity Group took over. It was our understanding that this case would cover the period since Equity Group took over in early 2004.

2

4.     There has been no period of my employment during which I did not object to the refusal to pay me and other employees for performing the additional work that was challenged in the lawsuit filed by our Chief Union Steward and in this lawsuit. Both CP and Equity Group refused to pay for that work on their own without any approval under our collective bargaining agreement. The two lawsuits challenging that practice made it clear that we did not acquiesce to that practice. It was my and other employees understanding that each of our collective bargaining agreements have stated that any part of it which violated federal law would be changed if a court decided it was invalid. We understood from this provision that a lawsuit was the proper way to challenge the refusal to pay us for the additional sanitizing, donning and doffing activities that we were required to perform without pay. We were never told or understood that we could file a grievance about issues that were already in court. We also were never told, and never understood, that we could file a grievance about violations of federal law or things that were not covered by the collective bargaining agreement, like the company's refusal to pay for our putting-on, taking-off and sanitizing its sanitary gear and equipment six times everyday.

5.     Employees' principal work activity was not just to process chickens, but to process chickens in an uncontaminated manner. To perform this principal activity, all employees were required to sanitize, put-on and take-off standard sanitary gear and equipment issued by Equity Group- Eufaula Division for that purpose. Employees have always been trained and instructed that the job we were hired and trained to do was to process chicken in a safe and sanitary manner, and that this could not physically be done without donning, doffing and sanitizing the gear and equipment that the company required. We have been trained and taught that the performance of our jobs requires these things to be done in order to produce uncontaminated poultry products that will

3

pass company and USDA inspections and standards. Just washing our hands was not what we were required to do. We were required to thoroughly sanitize the company's rubber or plastic gloves, aprons, sleeves and boots and our hands with disinfectant soap in a specified manner whenever we first entered or reentered the production area, and whenever else we needed to do so during production.

6.      Employees are specifically prohibited from processing chickens without putting-on the required sanitary gear and equipment and sanitizing the company's gloves, aprons, sleeves and boots. This work was required to be performed without pay at least six times a day. This included when we first entered the production room at the start of the shift, when we left the production line during our first unpaid meal or rest period, when we re-entered the production area on return to the production line during our first meal or rest break, when we left the production line again during our second break period, when we re-entered the production area to return to the line again near the end of our second break,  and when we sanitized, took off and put up our sanitary gear and equipment at the end of the shift. Company rules state that we may be disciplined or discharged if we attempt to process chickens without sanitizing and using such sanitary gear and equipment in the manner required. Employees who fail to do so are not allowed to proceed to the production line or beyond the sanitation basins at the front of the production area.

7.      Equity Group-Eufaula Division employees have always been taught that the primary purpose and benefit of the donning, doffing and sanitizing that we are required to perform is to allow the company to market and sell uncontaminated poultry products to their large corporate customers with USDA's seal of approval. Equity Groups' customers are not the consuming public, but other corporations that sold directly to the public, such as McDonald's and other restaurants or grocery

4

chains. We are taught that Equity Group and its customers have their own standards for protecting against contamination of the food products being marketed and sold, such as sanitary boots and shoe covers that are required beyond the minimum standards of the USDA.

8.    I have been asked whether the required sanitary gear and equipment benefits employees by keeping their clothes clean. We have never been trained or taught that this is the purpose or benefit intended by the required gear and equipment. If that were the intent , employees would not be prohibited from taking their smock or other equipment into the restroom or outside the plant. Employees are exposed to the restroom and other areas upon entry. Keeping the smocks and other items out of the restrooms only prevents contamination of the chickens, not the employee. If employee protection were the issue, we would be allowed to wear the smocks, aprons, sleeves and gloves into the restroom and would not be subject to discipline or discharge for doing so.

9.    The additional requirement that employees must rewash and resanitize their gloves and other plastic or rubber gear upon reentry into the protection area only benefits Equity Groups' quality assurance, marketing and sales programs, not the employee.    Sanitation facilities are provided in the restrooms for employees' personal hygiene, but we are still subject to discipline or discharge if we do not resanitize our hands, gloves, and other plastic or rubber items all over again upon reentry into the production area a few minutes later. This resanitization within the production area is on unpaid time and done solely for the benefit of Equity Groups' quality assurance, marketing and sales programs. There is no benefit to the employee from this additional unpaid work activity or requirement.

10.    The primary benefit to Equity Group is also shown by its rule against employees using or laundering their own smocks. We are required to use only the specially designed smocks

5

furnished and laundered each day by the company. The sanitary gear and equipment issued by the company are unique items not normally used outside the plant or in other businesses. The smocks issued to each employee are designed to prevent any part of the employee's clothes from touching or contaminating the chicken. That is also the purpose and primary benefit of the rubber or plastic gloves, sleeves, aprons and boots that are part of the standard package of sanitary gear and equipment issued to each employee. Employees are subject to discipline or discharge if they do not use the specially designed smock and other items issued by the company, or if they otherwise attempt to use their own smocks, gear or equipment. We are also subject to discipline or discharge if we take the smocks and other items home or outside the plant, or if we attempt to launder them for ourselves. These restrictions are solely for the benefit of Equity Group-Eufaula Division, not the employees.

11.    I have been asked whether employees control how or when they don, doff or sanitize the required protective gear and equipment. The answer is no, we are required to follow standard procedures on how and when to perform these parts of our job. We are required to sanitize boots, gloves, aprons, sleeves and hands at the sanitation vats stationed at the front entry to the production area of the plant. Rubber or plastic gloves, sleeves and aprons can only be put on after the smock; cotton or plastic gloves can only be put on after hands are sanitized upon entry into the production area; smocks, hairnets and beardnets have to be replaced at the supply room at the start of each shift, which means that employees almost always put on such items after going to the supply room to pick them up. This is monitored by employees from the Quality Assurance Department who watch and keep records of employee's compliance with these requirements as they are performed when entering the production area. Each day I have to wait in line to pick up my smock and hairnet from the Supply Room on unpaid time. Employees have no control over doffing either. We are required to

6

take off our smocks, gloves, sleeves and aprons whenever we leave the production room, and to store them at designated racks in the production room. At the end of the shift we are required to take the smocks to a specified bin at the front of the plant. Employees also do not control how they use rubber or plastic gloves, sleeves, aprons, or boots, but are required to keep them and themselves in a sanitary condition at all times on the production room floor. This cannot physically be done without putting on and sanitizing the standard gear and equipment the company issues for this purpose.

12.    I have also been asked about our meal and rest periods. Equity Group requires employees to leave the production area in order to use the restroom, or to eat, drink or obtain supplies during their breaks. There were no restrooms, breakrooms or supply rooms in the production area, and employees were prohibited from carrying food or drink into the production area. Employees were also required to leave the production area during their breaks so that the area can be recleaned while they are away. In my experience, all employees left the production area during their breaks because of these restrictions. In order to be able to use the restroom, the company requires employees to take off and store their smock and related sanitary gear and equipment whenever they leave the production area, to re-don such gear and equipment before returning to the production area, and to then resanitize their gloves, aprons, sleeves, boots and hands upon reentry into the production area. The Quality Assurance Department monitors compliance with such requirements at the sanitation basins at the front door of the production area when employees return from the restroom, breakroom, supply room or other areas outside the production area. We are subject to discipline or discharge if we do not take off such gear and equipment when doing these things during our breaks, put it back on before returning to the production line, and resanitize our

7

gloves, aprons, sleeves, boots and hands upon reentry into the production area from our breaks. All of these work activities are done on unpaid time during our breaks.

The above and foregoing is true and correct to the best of my knowledge.

_Ebone Morris_
EBONE MORRIS

_June 16, 08_
DATE

8

# EXHIBIT 24

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**MONTGOMERY DIVISION**

| | | |
|---|---|---|
| **BETTY ANN BURKS, et. al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO.: 2:06-cv-01081-MEF-** |
| | ) | **DRB** |
| | ) | |
| **EQUITY GROUP-EUFAULA DIVISION,)** | | |
| **LLC** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DECLARATION OF EBONE MORRIS**

Pursuant to 28 U.S.C. § 1746, I, Ebone Morris, declare under penalty of perjury:

1.      I began working at the Plant in Baker Hill when it was owned by Equity Group-Eufaula Division. When I started at Equity Group, I was working in the DSI Department. After six (6) months, I was moved to a USDA trimmer position in the Evisceration Department. Along with maintaining my work activities as a USDA trimmer, I am also required to rotate to the position of an Open Cutter or as a Mirror. As a USDA trimmer, I am responsible for checking the birds coming down the line and remove any unwanted or "unharvestable" product from the bird so that Equity Foods is able to meet its primary goal of providing its' corporate customers with the cleanest, high quality, uncontaminated product possible.

2.      I am also a Union Steward and a member of the union bargaining committee. The collective bargaining agreement did not limit employee's pay to just the time spent on the production line handling or processing chicken. Employees' pay was also not limited to time on a Master Line Time Card.  Employees were paid for time before and after chickens were on the production line

1

for things like set-up, sanitation of equipment, clean up, and other activities.   There were also other methods of keeping time and paying employees who were covered by the collective bargaining agreement, such as clock-in/clock-out time and pre-set scheduled time.

3.     As a member of the union bargaining committee, the employees of the plant opposed the company's refusal to pay for similar work activities before and after chickens were processed on the line, such as when we were required to sanitize the company's protective gear and equipment, put it on and take it off at least six times a day without pay.   The company decided not to pay for this work on its own, not as part of any collective bargaining agreement. The Chief Union Steward and other employees directly opposed the refusal to pay for this additional work during the time I was employed by Equity Group.   During the period leading up to that changeover in 2003-2004, there was a lawsuit in federal court that had been filed by our Chief Union Steward protesting the company's refusal to pay for these additional work activities before and after chickens were on the line.   That lawsuit covered the period from 1999 forward, which was before there was ever any collective bargaining agreement with CP.  The first collective bargaining agreement with CP was a year later in 2000. The Chief Union Steward's lawsuit was still in court while Equity Group was in the process of taking over the plant and, to my knowledge, was still in court after Equity Group took over. At some point in time, the case against CP was dropped because it no longer owned or ran the plant. The employees, however, did not stop protesting Equity Group's refusal to pay for the additional work activities that were part of that lawsuit.  A new lawsuit was planned and later filed based on my and other employees' understanding that we had three years to file such a case in order to cover the period since Equity Group took over.  It was our understanding that this case would cover the period since Equity Group took over in early 2004.

2

4.      There has been no period of my employment during which I did not object to the refusal to pay me and other employees for performing the additional work that was challenged in the lawsuit filed by our Chief Union Steward and in this lawsuit. Both CP and Equity Group refused to pay for that work on their own without any approval under our collective bargaining agreement. The two lawsuits challenging that practice made it clear that we did not acquiesce to that practice. It was my and other employees understanding that each of our collective bargaining agreements have stated that any part of it which violated federal law would be changed if a court decided it was invalid. We understood from this provision that a lawsuit was the proper way to challenge the refusal to pay us for the additional sanitizing, donning and doffing activities that we were required to perform without pay. We were never told or understood that we could file a grievance about issues that were already in court. We also were never told, and never understood, that we could file a grievance about violations of federal law or things that were not covered by the collective bargaining agreement, like the company's refusal to pay for our putting-on, taking-off and sanitizing its sanitary gear and equipment six times everyday.

5.      Employees' principal work activity was not just to process chickens, but to process chickens in an uncontaminated manner. To perform this principal activity, all employees were required to sanitize, put-on and take-off standard sanitary gear and equipment issued by Equity Group- Eufaula Division for that purpose. Employees have always been trained and instructed that the job we were hired and trained to do was to process chicken in a safe and sanitary manner, and that this could not physically be done without donning, doffing and sanitizing the gear and equipment that the company required. We have been trained and taught that the performance of our jobs requires these things to be done in order to produce uncontaminated poultry products that will

3

pass company and USDA inspections and standards. Just washing our hands was not what we were required to do. We were required to thoroughly sanitize the company's rubber or plastic gloves, aprons, sleeves and boots and our hands with disinfectant soap in a specified manner whenever we first entered or reentered the production area, and whenever else we needed to do so during production.

6.       Employees are specifically prohibited from processing chickens without putting-on the required sanitary gear and equipment and sanitizing the company's gloves, aprons, sleeves and boots. This work was required to be performed without pay at least six times a day. This included when we first entered the production room at the start of the shift, when we left the production line during our first unpaid meal or rest period, when we re-entered the production area on return to the production line during our first meal or rest break, when we left the production line again during our second break period, when we re-entered the production area to return to the line again near the end of our second break, and when we sanitized, took off and put up our sanitary gear and equipment at the end of the shift. Company rules state that we may be disciplined or discharged if we attempt to process chickens without sanitizing and using such sanitary gear and equipment in the manner required. Employees who fail to do so are not allowed to proceed to the production line or beyond the sanitation basins at the front of the production area.

7.       Equity Group-Eufaula Division employees have always been taught that the primary purpose and benefit of the donning, doffing and sanitizing that we are required to perform is to allow the company to market and sell uncontaminated poultry products to their large corporate customers with USDA's seal of approval. Equity Groups' customers are not the consuming public, but other corporations that sold directly to the public, such as McDonald's and other restaurants or grocery

4

chains. We are taught that Equity Group and its customers have their own standards for protecting against contamination of the food products being marketed and sold, such as sanitary boots and shoe covers that are required beyond the minimum standards of the USDA.

8.     I have been asked whether the required sanitary gear and equipment benefits employees by keeping their clothes clean. We have never been trained or taught that this is the purpose or benefit intended by the required gear and equipment. If that were the intent , employees would not be prohibited from taking their smock or other equipment into the restroom or outside the plant. Employees are exposed to the restroom and other areas upon entry. Keeping the smocks and other items out of the restrooms only prevents contamination of the chickens, not the employee. If employee protection were the issue, we would be allowed to wear the smocks, aprons, sleeves and gloves into the restroom and would not be subject to discipline or discharge for doing so.

9.     The additional requirement that employees must rewash and resanitize their gloves and other plastic or rubber gear upon reentry into the protection area only benefits Equity Groups' quality assurance, marketing and sales programs, not the employee.   Sanitation facilities are provided in the restrooms for employees' personal hygiene, but we are still subject to discipline or discharge if we do not resanitize our hands, gloves, and other plastic or rubber items all over again upon reentry into the production area a few minutes later. This resanitization within the production area is on unpaid time and done solely for the benefit of Equity Groups' quality assurance, marketing and sales programs. There is no benefit to the employee from this additional unpaid work activity or requirement.

10.     The primary benefit to Equity Group is also shown by its rule against employees using or laundering their own smocks. We are required to use only the specially designed smocks

5

furnished and laundered each day by the company. The sanitary gear and equipment issued by the company are unique items not normally used outside the plant or in other businesses. The smocks issued to each employee are designed to prevent any part of the employee's clothes from touching or contaminating the chicken. That is also the purpose and primary benefit of the rubber or plastic gloves, sleeves, aprons and boots that are part of the standard package of sanitary gear and equipment issued to each employee. Employees are subject to discipline or discharge if they do not use the specially designed smock and other items issued by the company, or if they otherwise attempt to use their own smocks, gear or equipment. We are also subject to discipline or discharge if we take the smocks and other items home or outside the plant, or if we attempt to launder them for ourselves. These restrictions are solely for the benefit of Equity Group-Eufaula Division, not the employees.

11.    I have been asked whether employees control how or when they don, doff or sanitize the required protective gear and equipment. The answer is no, we are required to follow standard procedures on how and when to perform these parts of our job. We are required to sanitize boots, gloves, aprons, sleeves and hands at the sanitation vats stationed at the front entry to the production area of the plant. Rubber or plastic gloves, sleeves and aprons can only be put on after the smock; cotton or plastic gloves can only be put on after hands are sanitized upon entry into the production area; smocks, hairnets and beardnets have to be replaced at the supply room at the start of each shift, which means that employees almost always put on such items after going to the supply room to pick them up. This is monitored by employees from the Quality Assurance Department who watch and keep records of employee's compliance with these requirements as they are performed when entering the production area. Each day I have to wait in line to pick up my smock and hairnet from the Supply Room on unpaid time. Employees have no control over doffing either. We are required to

6

take off our smocks, gloves, sleeves and aprons whenever we leave the production room, and to store them at designated racks in the production room. At the end of the shift we are required to take the smocks to a specified bin at the front of the plant. Employees also do not control how they use rubber or plastic gloves, sleeves, aprons, or boots, but are required to keep them and themselves in a sanitary condition at all times on the production room floor. This cannot physically be done without putting on and sanitizing the standard gear and equipment the company issues for this purpose.

12.     I have also been asked about our meal and rest periods. Equity Group requires employees to leave the production area in order to use the restroom, or to eat, drink or obtain supplies during their breaks. There were no restrooms, breakrooms or supply rooms in the production area, and employees were prohibited from carrying food or drink into the production area. Employees were also required to leave the production area during their breaks so that the area can be recleaned while they are away. In my experience, all employees left the production area during their breaks because of these restrictions. In order to be able to use the restroom, the company requires employees to take off and store their smock and related sanitary gear and equipment whenever they leave the production area, to re-don such gear and equipment before returning to the production area, and to then resanitize their gloves, aprons, sleeves, boots and hands upon reentry into the production area. The Quality Assurance Department monitors compliance with such requirements at the sanitation basins at the front door of the production area when employees return from the restroom, breakroom, supply room or other areas outside the production area. We are subject to discipline or discharge if we do not take off such gear and equipment when doing these things during our breaks, put it back on before returning to the production line, and resanitize our

7

gloves, aprons, sleeves, boots and hands upon reentry into the production area from our breaks.  All

of these work activities are done on unpaid time during our breaks.

The above and foregoing is true and correct to the best of my knowledge.

_Ebone Morris_

EBONE MORRIS

_June 16, 08_

DATE

8

# EXHIBIT 25

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
MONTGOMERY DIVISION

| | | |
|---|---|---|
| BETTY ANN BURKS, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: 2:06-cv-01081- |
| | ) | MEF-DRB |
| | ) | |
| EQUITY GROUP-EUFAULA DIVISION,) | | |
| LLC | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF CHRISTOPHER LASTER

Pursuant to 28 U.S.C. § 1746, I, Christopher Laster, declare under penalty of perjury:

1.      I began working at the Plant in Baker Hill, Alabama  when it was owned by

Charoen-Pokphand, Inc. ("CP") and became an employee of the defendant, Equity Group, when

it took over the plant in early 2004.  After Equity Group took over, I work live hang, back dock,

kill room, and sometimes evisceration. At one time, I was employed as a Line Leader as well as a

Supervisor Trainee.

2.      The collective bargaining agreement did not limit employee's pay to just the time

spent on the production line handling or processing chicken. Employees' pay was also not

limited to time on a Master Line Time Card.   Employees were paid for time before and after

chickens were on the production line for things like set-up, sanitation of equipment, clean up, and

other activities.   There were also other methods of keeping time and paying employees who were

covered by the collective bargaining agreement, such as clock-in/clock-out time and pre-set

1

scheduled time.

3.      The employees of the plant opposed the company's refusal to pay for similar work activities before and after chickens were processed on the line, such as when we were required to sanitize the company's protective gear and equipment, put it on and take it off at least six times a day without pay. The company decided not to pay for this work on its own, not as part of any collective bargaining agreement. The Chief Union Steward and other employees directly opposed the refusal to pay for this additional work both during the time I was employed by CP and after Equity Group took over. During the period leading up to that changeover in 2003-2004, there was a lawsuit in federal court that had been filed by our Chief Union Steward protesting the company's refusal to pay for these additional work activities before and after chickens were on the line. That lawsuit covered the period from 1999 forward, which was before there was ever any collective bargaining agreement with CP. The first collective bargaining agreement with CP was a year later in 2000. The Chief Union Steward's lawsuit was still in court while Equity Group was in the process of taking over the plant and, to my knowledge, was still in court after Equity Group took over. At some point in time, the case against CP was dropped because it no longer owned or ran the plant. The employees, however, did not stop protesting Equity Group's refusal to pay for the additional work activities that were part of that lawsuit. A new lawsuit was planned and later filed based on my and other employees' understanding that we had three years to file such a case in order to cover the period since Equity Group took over. It was our understanding that this case would cover the period since Equity Group took over in early 2004.

4.      There has been no period of my employment during which I did not object to the

2

refusal to pay me and other employees for performing the additional work that was challenged in the lawsuit filed by our Chief Union Steward and in this lawsuit. Both CP and Equity Group refused to pay for that work on their own without any approval under our collective bargaining agreement. The two lawsuits challenging that practice made it clear that we did not acquiesce to that practice. It was my and other employees understanding that each of our collective bargaining agreements have stated that any part of it which violated federal law would be changed if a court decided it was invalid. We understood from this provision that a lawsuit was the proper way to challenge the refusal to pay us for the additional sanitizing, donning and doffing activities that we were required to perform without pay. We were never told or understood that we could file a grievance about issues that were already in court. We also were never told, and never understood, that we could file a grievance about violations of federal law or things that were not covered by the collective bargaining agreement, like the company's refusal to pay for our putting-on, taking-off and sanitizing its sanitary gear and equipment six times everyday.

5.    Employees' principal work activity was not just to process chickens, but to process chickens in an uncontaminated manner. To perform this principal activity, all employees were required to sanitize, put-on and take-off standard sanitary gear and equipment issued by Equity Group- Eufaula Division for that purpose. Employees have always been trained and instructed that the job we were hired and trained to do was to process chicken in a safe and sanitary manner, and that this could not physically be done without donning, doffing and sanitizing the gear and equipment that the company required. As a supervisor trainee I was taught that every employee of Equity Group must have on their sanitary gear and equipment when you are in the production area. If you get caught without wearing your sanitary gear, you would receive a

3

disciplinary write-up. We have been trained and taught that the performance of our jobs requires these things to be done in order to produce uncontaminated poultry products that will pass company and USDA inspections and standards. Just washing our hands was not what we were required to do. We were required to thoroughly sanitize the company's rubber or plastic gloves, aprons, sleeves and boots and our hands with disinfectant soap in a specified manner whenever we first entered or reentered the production area, and whenever else we needed to do so during production.

6.     Employees are specifically prohibited from processing chickens without putting-on the required sanitary gear and equipment and sanitizing the company's gloves, aprons, sleeves and boots. This work was required to be performed without pay at least six times a day. This included when we first entered the production room at the start of the shift, when we left the production line during our first unpaid meal or rest period, when we re-entered the production area on return to the production line during our first meal or rest break, when we left the production line again during our second break period, when we re-entered the production area to return to the line again near the end of our second break, and when we sanitized, took off and put up our sanitary gear and equipment at the end of the shift. Company rules state that we may be disciplined or discharged if we attempt to process chickens without sanitizing and using such sanitary gear and equipment in the manner required. Employees who fail to do so are not allowed to proceed to the production line or beyond the sanitation basins at the front of the production area.

7.     Equity Group-Eufaula Division employees have always been taught that the primary purpose and benefit of the donning, doffing and sanitizing that we are required to

4

perform is to allow the company to market and sell uncontaminated poultry products to their large corporate customers with USDA's seal of approval. Equity Groups' customers are not the consuming public, but other corporations that sold directly to the public, such as McDonald's and other restaurants or grocery chains. We are taught that Equity Group and its customers have their own standards for protecting against contamination of the food products being marketed and sold, such as sanitary boots and shoe covers that are required beyond the minimum standards of the USDA.

8.    I have been asked whether the required sanitary gear and equipment benefits employees by keeping their clothes clean. We have never been trained or taught that this is the purpose or benefit intended by the required gear and equipment. If that were the intent , employees would not be prohibited from taking their smock or other equipment into the restroom or outside the plant. Employees are exposed to the restroom and other areas upon entry. Keeping the smocks and other items out of the restrooms only prevents contamination of the chickens, not the employee. If employee protection were the issue, we would be allowed to wear the smocks, aprons, sleeves and gloves into the restroom and would not be subject to discipline or discharge for doing so.

9.    The additional requirement that employees must rewash and resanitize their gloves and other plastic or rubber gear upon reentry into the protection area only benefits Equity Groups' quality assurance, marketing and sales programs, not the employee. Sanitation facilities are provided in the restrooms for employees' personal hygiene, but we are still subject to discipline or discharge if we do not resanitize our hands, gloves, and other plastic or rubber items all over again upon reentry into the production area a few minutes later. This resanitization

5

within the production area is on unpaid time and done solely for the benefit of Equity Groups' quality assurance, marketing and sales programs. There is no benefit to the employee from this additional unpaid work activity or requirement.

10.    The primary benefit to Equity Group is also shown by its rule against employees using or laundering their own smocks. We are required to use only the specially designed smocks furnished and laundered each day by the company. The sanitary gear and equipment issued by the company are unique items not normally used outside the plant or in other businesses. The smocks issued to each employee are designed to prevent any part of the employee's clothes from touching or contaminating the chicken. That is also the purpose and primary benefit of the rubber or plastic gloves, sleeves, aprons and boots that are part of the standard package of sanitary gear and equipment issued to each employee. Employees are subject to discipline or discharge if they do not use the specially designed smock and other items issued by the company, or if they otherwise attempt to use their own smocks, gear or equipment. We are also subject to discipline or discharge if we take the smocks and other items home or outside the plant, or if we attempt to launder them for ourselves. These restrictions are solely for the benefit of Equity Group-Eufaula Division, not the employees.

11.    I have been asked whether employees control how or when they don, doff or sanitize the required protective gear and equipment. The answer is no, we are required to follow standard procedures on how and when to perform these parts of our job. We are required to sanitize boots, gloves, aprons, sleeves and hands at the sanitation vats stationed at the front entry to the production area of the plant. Rubber or plastic gloves, sleeves and aprons can only be put on after the smock; cotton or plastic gloves can only be put on after hands are sanitized upon

6

entry into the production area; smocks, hairnets and beardnets have to be replaced at the supply room at the start of each shift, which means that employees almost always put on such items after going to the supply room to pick them up. This is monitored by employees from the Quality Assurance Department who watch and keep records of employee's compliance with these requirements as they are performed when entering the production area. Each day I have to wait in line to pick up my smock and hairnet from the Supply Room on unpaid time. Employees have no control over doffing either. We are required to take off our smocks, gloves, sleeves and aprons whenever we leave the production room, and to store them at designated racks in the production room. At the end of the shift we are required to take the smocks to a specified bin at the front of the plant. Employees also do not control how they use rubber or plastic gloves, sleeves, aprons, or boots, but are required to keep them and themselves in a sanitary condition at all times on the production room floor. This cannot physically be done without putting on and sanitizing the standard gear and equipment the company issues for this purpose.

12.    I have also been asked about our meal and rest periods. Equity Group requires employees to leave the production area in order to use the restroom, or to eat, drink or obtain supplies during their breaks. There were no restrooms, breakrooms or supply rooms in the production area, and employees were prohibited from carrying food or drink into the production area. Employees were also required to leave the production area during their breaks so that the area can be recleaned while they are away. In my experience, all employees left the production area during their breaks because of these restrictions. In order to be able to use the restroom, the company requires employees to take off and store their smock and related sanitary gear and equipment whenever they leave the production area, to re-don such gear and equipment before

7

returning to the production area, and to then resanitize their gloves, aprons, sleeves, boots and hands upon reentry into the production area. The Quality Assurance Department monitors compliance with such requirements at the sanitation basins at the front door of the production area when employees return from the restroom, breakroom, supply room or other areas outside the production area. We are subject to discipline or discharge if we do not take off such gear and equipment when doing these things during our breaks, put it back on before returning to the production line, and resanitize our gloves, aprons, sleeves, boots and hands upon reentry into the production area from our breaks. All of these work activities are done on unpaid time during our breaks.

The above and foregoing is true and correct to the best of my knowledge.

CHRISTOPHER LASTER

June 16, 2008
Date

8

# EXHIBIT 26

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
MONTGOMERY DIVISION

BETTY ANN BURKS, et. al.,           )
                                    )
        Plaintiffs,                 )
                                    )
v.                                  )        CIVIL ACTION NO.: 2:06-cv-01081-MEF-
                                    )        DRB
                                    )
EQUITY GROUP-EUFAULA DIVISION,)
LLC                                 )
                                    )
        Defendant.                  )

DECLARATION OF PATRICIA JONES

Pursuant to 28 U.S.C. § 1746, I, Patricia Jones, declare under penalty of perjury:

1.      I began working at the Plant in Baker Hill, Alabama when it was owned by Charoen-

Pokphand, Inc. ("CP") and became an employee of the defendant, Equity Group, when it took over the

plant in early 2004. I worked as a Bone Sampler for CP. One of my work activities was to take the

poultry product from the line, put it in a pan and pick it up and search it for bones. I moved to the

Hazardous Critical Control Point team ("HACCP"), which is part of the Quality Assurance

Department, when Equity Group-Eufaula Division, LLC took over ownership of the Baker Hill Plant

from CP. As part of the HACCP team and the Quality Assurance Department, I was responsible for

checking to make sure that all Equity Group employees sanitized and used the proper sanitary gear and

equipment in performing their jobs. The items employees were required to sanitize and use included

rubber or plastic gloves, aprons, sleeves, and boots. Employees were also required to put on and take

off other sanitary gear and equipment, such as smocks, hairnets/beardnets, earplugs, chain mesh

gloves, plastic arm guards, cotton liner gloves and safety glasses. In addition to monitoring and

1

enforcing such requirements, I was also responsible for monitoring the amount of "unharvested" meat on the production area floor to make sure it was not excessive.

2.  I was a member of the union while the Eufaula plant was owned by CP and after it was sold to Equity Group-Eufaula Division LLC in 2003-2004. The collective bargaining agreement did not limit employee's pay to just the time spent on the production line handling or processing chicken. Employees' pay was also not limited to time on a Master Line Time Card. Employees were paid for time before and after chickens were on the production line for things like set-up, sanitation of equipment, clean up, and other activities. There were also other methods of keeping time and paying employees who were covered by the collective bargaining agreement, such as clock-in/clock-out time and pre-set scheduled time.

3.  The employees of the plant opposed the company's refusal to pay for similar work activities before and after chickens were processed on the line, such as when we were required to sanitize the company's protective gear and equipment, put it on and take it off at least six times a day without pay. The company decided not to pay for this work on its own, not as part of any collective bargaining agreement. The Chief Union Steward and other employees directly opposed the refusal to pay for this additional work both during the time I was employed by CP and after Equity Group took over. During the period leading up to that changeover in 2003-2004, there was a lawsuit in federal court that had been filed by our Chief Union Steward protesting the company's refusal to pay for these additional work activities before and after chickens were on the line. That lawsuit covered the period from 1999 forward, which was before there was ever any collective bargaining agreement with CP. The first collective bargaining agreement with CP was a year later in 2000. The Chief Union Steward's lawsuit was still in court while Equity Group was in the process of taking over the plant and, to my knowledge, was still in court after Equity Group took over. At some point in time, the case

2

against CP was dropped because it no longer owned or ran the plant. The employees, however, did not stop protesting Equity Group's refusal to pay for the additional work activities that were part of that lawsuit. A new lawsuit was planned and later filed based on my and other employees' understanding that we had three years to file such a case in order to cover the period since Equity Group took over. It was our understanding that this case would cover the period since Equity Group took over in early 2004.

4.     There has been no period of my employment during which I did not object to the refusal to pay me and other employees for performing the additional work that was challenged in the lawsuit filed by our Chief Union Steward and in this lawsuit. Both CP and Equity Group refused to pay for that work on their own without any approval under our collective bargaining agreement. The two lawsuits challenging that practice made it clear that we did not acquiesce to that practice. It was my and other employees understanding that each of our collective bargaining agreements have stated that any part of it which violated federal law would be changed if a court decided it was invalid. We understood from this provision that a lawsuit was the proper way to challenge the refusal to pay us for the additional sanitizing, donning and doffing activities that we were required to perform without pay. We were never told or understood that we could file a grievance about issues that were already in court.    We also were never told, and never understood, that we could file a grievance about violations of federal law or things that were not covered by the collective bargaining agreement, like the company's refusal to pay for our putting-on, taking-off and sanitizing its sanitary gear and equipment six times everyday.

5.     Employees' principal work activity was not just to process chickens, but to process chickens in an uncontaminated manner. To perform this principal activity, all employees were required to sanitize, put-on and take-off standard sanitary gear and equipment issued by Equity Group-

3

Eufaula Division for that purpose. Employees have always been trained and instructed that the job we were hired and trained to do was to process chicken in a safe and sanitary manner, and that this could not physically be done without donning, doffing and sanitizing the gear and equipment that the company required. We have been trained and taught that the performance of our jobs requires these things to be done in order to produce uncontaminated poultry products that will pass company and USDA inspections and standards. Just washing our hands was not what we were required to do. We were required to thoroughly sanitize the company's rubber or plastic gloves, aprons, sleeves and boots and our hands with disinfectant soap in a specified manner whenever we first entered or reentered the production area, and whenever else we needed to do so during production.

6.    As a member of the HACCP team, I have personal knowledge regarding the strict policies established by Equity Group and the USDA on producing clean, wholesome, and uncontaminated food products. My responsibilities as a member of the HACCP team and the Quality Assurance Department included checking to make sure that all employees were properly using the required sanitary gear and equipment while in the plant's production area. If an employee was not using the necessary items to keep poultry products from becoming contaminated, I was responsible for writing-up the employee for that infraction. This gear and equipment included a smock specially designed to protect poultry from contamination by employees clothes. It also included other unique gear the company issued for that purpose, such as gloves, boots, aprons, sleeves, hairnets/beard-nets and ear-plugs that met the company's specifications. Employees who cut-up the chickens with knives and scissors must also put-on and take-off steel mesh cutting gloves in addition to cotton gloves, rubber gloves, aprons, smocks, hairnets/beardnets and ear-plugs.

7.    Employees are specifically prohibited from processing chickens without putting-on the required sanitary gear and equipment and sanitizing the company's gloves, aprons, sleeves and boots.

4

This work was required to be performed without pay at least six times a day. This included when we first entered the production room at the start of the shift, when we left the production line during our first unpaid meal or rest period, when we re-entered the production area on return to the production line during our first meal or rest break, when we left the production line again during our second break period, when we re-entered the production area to return to the line again near the end of our second break, and when we sanitized, took off and put up our sanitary gear and equipment at the end of the shift. Company rules state that we may be disciplined or discharged if we attempt to process chickens without sanitizing and using such sanitary gear and equipment in the manner required. Employees who fail to do so are not allowed to proceed to the production line or beyond the sanitation basins at the front of the production area.

8.    Equity Group-Eufaula Division employees have always been taught that the primary purpose and benefit of the donning, doffing and sanitizing that we are required to perform is to allow the company to market and sell uncontaminated poultry products to their large corporate customers with USDA's seal of approval. Equity Groups' customers are not the consuming public, but other corporations that sold directly to the public, such as McDonald's and other restaurants or grocery chains. We are taught that Equity Group and its customers have their own standards for protecting against contamination of the food products being marketed and sold, such as sanitary boots and shoe covers that are required beyond the minimum standards of the USDA.

9.    I have been asked whether the required sanitary gear and equipment benefits employees by keeping their clothes clean. We have never been trained or taught that this is the purpose or benefit intended by the required gear and equipment. If that were the intent, employees would not be prohibited from taking their smock or other equipment into the restroom or outside the plant. Employees are exposed to the restroom and other areas upon entry. Keeping the smocks and

5

other items out of the restrooms only prevents contamination of the chickens, not the employee. If employee protection were the issue, we would be allowed to wear the smocks, aprons, sleeves and gloves into the restroom and would not be subject to discipline or discharge for doing so.

10.     The additional requirement that employees must rewash and resanitize their gloves and other plastic or rubber gear upon reentry into the protection area only benefits Equity Groups' quality assurance, marketing and sales programs, not the employee. Sanitation facilities are provided in the restrooms for employees' personal hygiene, but we are still subject to discipline or discharge if we do not resanitize our hands, gloves, and other plastic or rubber items all over again upon reentry into the production area a few minutes later. This resanitization within the production area is on unpaid time and done solely for the benefit of Equity Groups' quality assurance, marketing and sales programs. There is no benefit to the employee from this additional unpaid work activity or requirement.

11.     The primary benefit to Equity Group is also shown by its rule against employees using or laundering their own smocks. We are required to use only the specially designed smocks furnished and laundered each day by the company. The sanitary gear and equipment issued by the company are unique items not normally used outside the plant or in other businesses. The smocks issued to each employee are designed to prevent any part of the employee's clothes from touching or contaminating the chicken. That is also the purpose and primary benefit of the rubber or plastic gloves, sleeves, aprons and boots that are part of the standard package of sanitary gear and equipment issued to each employee. Employees are subject to discipline or discharge if they do not use the specially designed smock and other items issued by the company, or if they otherwise attempt to use their own smocks, gear or equipment. We are also subject to discipline or discharge if we take the smocks and other items home or outside the plant, or if we attempt to launder them for ourselves. These restrictions are

6

solely for the benefit of Equity Group-Eufaula Division, not the employees.

12.     I have been asked whether employees control how or when they don, doff or sanitize the required protective gear and equipment.  The answer is no, we are required to follow standard procedures on how and when to perform these parts of our job.  We are required to sanitize boots, gloves, aprons, sleeves and hands  at the sanitation vats stationed at the front entry to the production area of the plant.  Rubber or plastic gloves, sleeves  and aprons can only be put on after the smock; cotton or plastic gloves can only be put on after hands are sanitized upon entry into the production area; smocks, hairnets and beardnets have to be replaced at the supply room at the start of each shift, which means that employees almost always put on such items after going to the supply room to pick them up. This is monitored by employees from the Quality Assurance Department who watch and keep records of employee's compliance with these requirements as they are performed when entering the production area.  Each day I have to wait in line to pick up my smock and hairnet from the Supply Room on unpaid time.  Employees have no control over doffing either.  We are required to take off our smocks, gloves, sleeves and aprons whenever we leave the production room, and to store them at designated racks in the production room. At the end of the shift we are required to take the smocks to a specified bin at the front of the plant.  Employees also do not control how they use rubber or plastic gloves, sleeves,  aprons, or boots,  but are required to keep them and themselves in a sanitary condition at all times on the production room floor.  This cannot physically be done without putting on and sanitizing the standard gear and equipment the company issues for this purpose.

13.     I have also been asked about our meal and rest periods.  Equity Group requires employees to leave the production area in order to use the restroom, or to eat, drink or obtain supplies during their breaks. .There were no restrooms, breakrooms or supply rooms in the production area, and employees were prohibited from carrying food or drink into the production area.  Employees were

7

also required to leave the production area during their breaks so that the area can be recleaned while they are away. In my experience, all employees left the production area during their breaks because of these restrictions. In order to be able to use the restroom, the company requires employees to take off and store their smock and related sanitary gear and equipment whenever they leave the production area, to re-don such gear and equipment before returning to the production area, and to then resanitize their gloves, aprons, sleeves, boots and hands upon reentry into the production area. The Quality Assurance Department monitors compliance with such requirements at the sanitation basins at the front door of the production area when employees return from the restroom, breakroom, supply room or other areas outside the production area. We are subject to discipline or discharge if we do not take off such gear and equipment when doing these things during our breaks, put it back on before returning to the production line, and resanitize our gloves, aprons, sleeves, boots and hands upon reentry into the production area from our breaks. All of these work activities are done on unpaid time during our breaks.

The above and foregoing is true and correct to the best of my knowledge.

*Patricia Jones*
PATRICIA JONES

June 16, 08
Date

8

# EXHIBIT 27

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### MONTGOMERY DIVISION

BETTY ANN BURKS, et. al.,        )
                                       )
          Plaintiffs,         )
                                       )
v.                               )     CIVIL ACTION NO.: 2:06-cv-01081-MEF-
                               )     DRB
                               )
EQUITY GROUP-EUFAULA DIVISION,)
LLC                                )
                                     )
          Defendant.        )

## DECLARATION OF EVELYN LAMPLEY

Pursuant to 28 U.S.C. § 1746, I, Evelyn Lampley, declare under penalty of perjury:

1.     I began working at the Plant in Baker Hill when it was owned by Charoen-Pokphand, Inc. ("CP") and became an employee of the defendant, Equity Group, when it took over the plant in early 2004.. I worked on the Debone Production line as a tender puller. My work responsibility was to pull breasts, and tenders. I currently work in the wash station on the Debone production line.

2.     The employees of the plant opposed the company's refusal to pay for similar work activities before and after chickens were processed on the line, such as when we were required to sanitize the company's protective gear and equipment, put it on and take it off at least six times a day without pay.   The company decided not to pay for this work on its own, not as part of any collective bargaining agreement.  The Chief Union Steward and other employees directly opposed the refusal to pay for this additional work both during the time I was employed by CP and after Equity Group took over.   During the period leading up to that changeover in 2003-2004, there was a lawsuit in federal court that had been filed by our Chief Union Steward protesting the company's refusal to pay

1

for these additional work activities before and after chickens were on the line. That lawsuit covered the period from 1999 forward, which was before there was ever any collective bargaining agreement with CP. The first collective bargaining agreement with CP was a year later in 2000. The Chief Union Steward's lawsuit was still in court while Equity Group was in the process of taking over the plant and, to my knowledge, was still in court after Equity Group took over. At some point in time, the case against CP was dropped because it no longer owned or ran the plant. The employees, however, did not stop protesting Equity Group's refusal to pay for the additional work activities that were part of that lawsuit. A new lawsuit was planned and later filed based on my and other employees' understanding that we had three years to file such a case in order to cover the period since Equity Group took over. It was our understanding that this case would cover the period since Equity Group took over in early 2004.

3. There has been no period of my employment during which I did not object to the refusal to pay me and other employees for performing the additional work that was challenged in the lawsuit filed by our Chief Union Steward and in this lawsuit. Both CP and Equity Group refused to pay for that work on their own without any approval under our collective bargaining agreement. The two lawsuits challenging that practice made it clear that we did not acquiesce to that practice. It was my and other employees understanding that each of our collective bargaining agreements have stated that any part of it which violated federal law would be changed if a court decided it was invalid. We understood from this provision that a lawsuit was the proper way to challenge the refusal to pay us for the additional sanitizing, donning and doffing activities that we were required to perform without pay. We were never told or understood that we could file a grievance about issues that were already in court. We also were never told, and never understood, that we could file

2

a grievance about violations of federal law or things that were not covered by the collective bargaining agreement, like the company's refusal to pay for our putting-on, taking-off and sanitizing its sanitary gear and equipment six times everyday.

4.      Employees' principal work activity was not just to process chickens, but to process chickens in an uncontaminated manner.  To perform this principal activity, all employees were required to sanitize, put-on and take-off standard sanitary gear and equipment issued by Equity Group- Eufaula Division for that purpose.  Employees have always been trained and instructed that the job we were hired and trained to do was to process chicken in a safe and sanitary manner, and that this could not physically be done without donning, doffing and sanitizing the gear and equipment that the company required.  We have been trained and taught that the performance of our jobs requires these things to be done in order to produce uncontaminated poultry products that will pass company and USDA inspections and standards.  Just washing our hands was not what we were required to do.  We were required to thoroughly sanitize the company's rubber or plastic gloves, aprons, sleeves and boots and our hands with disinfectant soap in a specified manner whenever we first entered or reentered the production area, and whenever else we needed to do so during production.

5.      Employees are specifically prohibited from processing chickens without putting-on the required sanitary gear and equipment and sanitizing the company's gloves, aprons, sleeves and boots.  This work was required to be performed without pay at least six times a day.  This included when we first entered the production room at the start of the shift, when we left the production line during our first unpaid meal or rest period, when we re-entered the production area on return to the production line during our first meal or rest break, when we left the production line again during our

3

second break period, when we re-entered the production area to return to the line again near the end

of our second break, and when we sanitized, took off and put up our sanitary gear and equipment

at the end of the shift. Company rules state that we may be disciplined or discharged if we attempt

to process chickens without sanitizing and using such sanitary gear and equipment in the manner

required. Employees who fail to do so are not allowed to proceed to the production line or beyond

the sanitation basins at the front of the production area.

6.    Equity Group-Eufaula Division employees have always been taught that the primary

purpose and benefit of the donning, doffing and sanitizing that we are required to perform is to allow

the company to market and sell uncontaminated poultry products to their large corporate customers

with USDA's seal of approval. Equity Groups' customers are not the consuming public, but other

corporations that sold directly to the public, such as McDonald's and other restaurants or grocery

chains. We are taught that Equity Group and its customers have their own standards for protecting

against contamination of the food products being marketed and sold, such as sanitary boots and shoe

covers that are required beyond the minimum standards of the USDA.

7.    I have been asked whether the required sanitary gear and equipment benefits

employees by keeping their clothes clean. We have never been trained or taught that this is the

purpose or benefit intended by the required gear and equipment. If that were the intent , employees

would not be prohibited from taking their smock or other equipment into the restroom or outside

the plant. Employees are exposed to the restroom and other areas upon entry. Keeping the smocks

and other items out of the restrooms only prevents contamination of the chickens, not the employee.

If employee protection were the issue, we would be allowed to wear the smocks, aprons, sleeves and

gloves into the restroom and would not be subject to discipline or discharge for doing so.

4

8.    The additional requirement that employees must rewash and resanitize their gloves and other plastic or rubber gear upon reentry into the protection area only benefits Equity Groups' quality assurance, marketing and sales programs, not the employee.    Sanitation facilities are provided in the restrooms for employees' personal hygiene, but we are still subject to discipline or discharge if we do not resanitize our hands, gloves, and other plastic or rubber items all over again upon reentry into the production area a few minutes later. This resanitization within the production area is on unpaid time and done solely for the benefit of Equity Groups' quality assurance, marketing and sales programs. There is no benefit to the employee from this additional unpaid work activity or requirement.

9.    The primary benefit to Equity Group is also shown by its rule against employees using or laundering their own smocks. We are required to use only the specially designed smocks furnished and laundered each day by the company. The sanitary gear and equipment issued by the company are unique items not normally used outside the plant or in other businesses. The smocks issued to each employee are designed to prevent any part of the employee's clothes from touching or contaminating the chicken. That is also the purpose and primary benefit of the rubber or plastic gloves, sleeves, aprons and boots that are part of the standard package of sanitary gear and equipment issued to each employee. Employees are subject to discipline or discharge if they do not use the specially designed smock and other items issued by the company, or if they otherwise attempt to use their own smocks, gear or equipment. We are also subject to discipline or discharge if we take the smocks and other items home or outside the plant, or if we attempt to launder them for ourselves. These restrictions are solely for the benefit of Equity Group-Eufaula Division, not the employees.

10.    I have been asked whether employees control how or when they don, doff or sanitize

the required protective gear and equipment. The answer is no, we are required to follow standard procedures on how and when to perform these parts of our job. We are required to sanitize boots, gloves, aprons, sleeves and hands at the sanitation vats stationed at the front entry to the production area of the plant. Rubber or plastic gloves, sleeves and aprons can only be put on after the smock; cotton or plastic gloves can only be put on after hands are sanitized upon entry into the production area; smocks, hairnets and beardnets have to be replaced at the supply room at the start of each shift, which means that employees almost always put on such items after going to the supply room to pick them up. This is monitored by employees from the Quality Assurance Department who watch and keep records of employee's compliance with these requirements as they are performed when entering the production area. Each day I have to wait in line to pick up my smock and hairnet from the Supply Room on unpaid time. Employees have no control over doffing either. We are required to take off our smocks, gloves, sleeves and aprons whenever we leave the production room, and to store them at designated racks in the production room. At the end of the shift we are required to take the smocks to a specified bin at the front of the plant. Employees also do not control how they use rubber or plastic gloves, sleeves, aprons, or boots, but are required to keep them and themselves in a sanitary condition at all times on the production room floor. This cannot physically be done without putting on and sanitizing the standard gear and equipment the company issues for this purpose.

11.    I have also been asked about our meal and rest periods. Equity Group requires employees to leave the production area in order to use the restroom, or to eat, drink or obtain supplies during their breaks. There were no restrooms, breakrooms or supply rooms in the production area, and employees were prohibited from carrying food or drink into the production area.

6

Employees were also required to leave the production area during their breaks so that the area can be re-cleaned while they are away. In my experience, all employees left the production area during their breaks because of these restrictions. In order to be able to use the restroom, the company requires employees to take off and store their smock and related sanitary gear and equipment whenever they leave the production area, to re-don such gear and equipment before returning to the production area, and to then resanitize their gloves, aprons, sleeves, boots and hands upon reentry into the production area. The Quality Assurance Department monitors compliance with such requirements at the sanitation basins at the front door of the production area when employees return from the restroom, breakroom, supply room or other areas outside the production area. We are subject to discipline or discharge if we do not take off such gear and equipment when doing these things during our breaks, put it back on before returning to the production line, and resanitize our gloves, aprons, sleeves, boots and hands upon reentry into the production area from our breaks. All of these work activities are done on unpaid time during our breaks.

The above and foregoing is true and correct to the best of my knowledge.

_Evelyn Lampley_
EVELYN LAMPLEY

_6 16 - 0 8_
Date

7

# EXHIBIT 28

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### MONTGOMERY DIVISION

| | | |
|---|---|---|
| **BETTY ANN BURKS, et. al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.: 2:06-cv-01081-MEF-** |
| | ) | **DRB** |
| | ) | |
| **EQUITY GROUP-EUFAULA DIVISION,)** | | |
| **LLC** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DECLARATION OF LAURIE DELBRIDGE

Pursuant to 28 U.S.C. § 1746, I, Laurie Delbridge, declare under penalty of perjury:

1.     I began working at the Plant in Baker Hill, Alabama when it was owned by Charoen-Pokphand, Inc. ("CP") and became an employee of the defendant, Equity Group, when it took over the plant in early 2004. After Equity Group took over, I continued to work in the Evisceration Department. One of my work activities was as a trimmer. I was responsible for removing bad parts of the chicken with a knife or pair of scissors. At the same time that I was performing my responsibilities as a Trimmer, I was also performing the duties of a Lead Person on the day shift in the Evisceration department.

2.     The employees of the plant opposed the company's refusal to pay for similar work activities before and after chickens were processed on the line, such as when we were required to sanitize the company's protective gear and equipment, put it on and take it off at least six times a day without pay. The company decided not to pay for this work on its own, not as part of any collective bargaining agreement. The Chief Union Steward and other employees directly opposed the refusal

1

to pay for this additional work both during the time I was employed by CP and after Equity Group took over. During the period leading up to that changeover in 2003-2004, there was a lawsuit in federal court that had been filed by our Chief Union Steward protesting the company's refusal to pay for these additional work activities before and after chickens were on the line. That lawsuit covered the period from 1999 forward, which was before there was ever any collective bargaining agreement with CP. The first collective bargaining agreement with CP was a year later in 2000. The Chief Union Steward's lawsuit was still in court while Equity Group was in the process of taking over the plant and, to my knowledge, was still in court after Equity Group took over. At some point in time, the case against CP was dropped because it no longer owned or ran the plant. The employees, however, did not stop protesting Equity Group's refusal to pay for the additional work activities that were part of that lawsuit. A new lawsuit was planned and later filed based on my and other employees' understanding that we had three years to file such a case in order to cover the period since Equity Group took over. It was our understanding that this case would cover the period since Equity Group took over in early 2004.

3.      There has been no period of my employment during which I did not object to the refusal to pay me and other employees for performing the additional work that was challenged in the lawsuit filed by our Chief Union Steward and in this lawsuit. Both CP and Equity Group refused to pay for that work on their own without any approval under our collective bargaining agreement. The two lawsuits challenging that practice made it clear that we did not acquiesce to that practice. It was my and other employees understanding that each of our collective bargaining agreements have stated that any part of it which violated federal law would be changed if a court decided it was invalid. We understood from this provision that a lawsuit was the proper way to challenge the

2

refusal to pay us for the additional sanitizing, donning and doffing activities that we were required to perform without pay. We were never told or understood that we could file a grievance about issues that were already in court. We also were never told, and never understood, that we could file a grievance about violations of federal law or things that were not covered by the collective bargaining agreement, like the company's refusal to pay for our putting-on, taking-off and sanitizing its sanitary gear and equipment six times everyday.

4.     Employees' principal work activity was not just to process chickens, but to process chickens in an uncontaminated manner. To perform this principal activity, all employees were required to sanitize, put-on and take-off standard sanitary gear and equipment issued by Equity Group- Eufaula Division for that purpose. Employees have always been trained and instructed that the job we were hired and trained to do was to process chicken in a safe and sanitary manner, and that this could not physically be done without donning, doffing and sanitizing the gear and equipment that the company required. We have been trained and taught that the performance of our jobs requires these things to be done in order to produce uncontaminated poultry products that will pass company and USDA inspections and standards. Just washing our hands was not what we were required to do. We were required to thoroughly sanitize the company's rubber or plastic gloves, aprons, sleeves and boots and our hands with disinfectant soap in a specified manner whenever we first entered or reentered the production area, and whenever else we needed to do so during production.

5.     Employees are specifically prohibited from processing chickens without putting-on the required sanitary gear and equipment and sanitizing the company's gloves, aprons, sleeves and boots. This work was required to be performed without pay at least six times a day. This included

3

when we first entered the production room at the start of the shift, when we left the production line during our first unpaid meal or rest period, when we re-entered the production area on return to the production line during our first meal or rest break, when we left the production line again during our second break period, when we re-entered the production area to return to the line again near the end of our second break, and when we sanitized, took off and put up our sanitary gear and equipment at the end of the shift. Company rules state that we may be disciplined or discharged if we attempt to process chickens without sanitizing and using such sanitary gear and equipment in the manner required. Employees who fail to do so are not allowed to proceed to the production line or beyond the sanitation basins at the front of the production area.

6.    Equity Group-Eufaula Division employees have always been taught that the primary purpose and benefit of the donning, doffing and sanitizing that we are required to perform is to allow the company to market and sell uncontaminated poultry products to their large corporate customers with USDA's seal of approval. Equity Groups' customers are not the consuming public, but other corporations that sold directly to the public, such as McDonald's and other restaurants or grocery chains. We are taught that Equity Group and its customers have their own standards for protecting against contamination of the food products being marketed and sold, such as sanitary boots and shoe covers that are required beyond the minimum standards of the USDA.

7.    I have been asked whether the required sanitary gear and equipment benefits employees by keeping their clothes clean. We have never been trained or taught that this is the purpose or benefit intended by the required gear and equipment. If that were the intent, employees would not be prohibited from taking their smock or other equipment into the restroom or outside the plant. Employees are exposed to the restroom and other areas upon entry. Keeping the smocks

4

and other items out of the restrooms only prevents contamination of the chickens, not the employee. If employee protection were the issue, we would be allowed to wear the smocks, aprons, sleeves and gloves into the restroom and would not be subject to discipline or discharge for doing so.

8.      The additional requirement that employees must rewash and resanitize their gloves and other plastic or rubber gear upon reentry into the protection area only benefits Equity Groups' quality assurance, marketing and sales programs, not the employee.    Sanitation facilities are provided in the restrooms for employees' personal hygiene, but we are still subject to discipline or discharge if we do not resanitize our hands, gloves, and other plastic or rubber items all over again upon reentry into the production area a few minutes later. This resanitization within the production area is on unpaid time and done solely for the benefit of Equity Groups' quality assurance, marketing and sales programs. There is no benefit to the employee from this additional unpaid work activity or requirement.

9.      The primary benefit to Equity Group is also shown by its rule against employees using or laundering their own smocks. We are required to use only the specially designed smocks furnished and laundered each day by the company. The sanitary gear and equipment issued by the company are unique items not normally used outside the plant or in other businesses. The smocks issued to each employee are designed to prevent any part of the employee's clothes from touching or contaminating the chicken. That is also the purpose and primary benefit of the rubber or plastic gloves, sleeves, aprons and boots that are part of the standard package of sanitary gear and equipment issued to each employee. Employees are subject to discipline or discharge if they do not use the specially designed smock and other items issued by the company, or if they otherwise attempt to use their own smocks, gear or equipment. We are also subject to discipline or discharge if we take the

5

smocks and other items home or outside the plant, or if we attempt to launder them for ourselves. These restrictions are solely for the benefit of Equity Group-Eufaula Division, not the employees.

10.    I have been asked whether employees control how or when they don, doff or sanitize the required protective gear and equipment. The answer is no, we are required to follow standard procedures on how and when to perform these parts of our job. We are required to sanitize boots, gloves, aprons, sleeves and hands at the sanitation vats stationed at the front entry to the production area of the plant. Rubber or plastic gloves, sleeves and aprons can only be put on after the smock; cotton or plastic gloves can only be put on after hands are sanitized upon entry into the production area; smocks, hairnets and beardnets have to be replaced at the supply room at the start of each shift, which means that employees almost always put on such items after going to the supply room to pick them up. This is monitored by employees from the Quality Assurance Department who watch and keep records of employee's compliance with these requirements as they are performed when entering the production area. Each day I have to wait in line to pick up my smock and hairnet from the Supply Room on unpaid time. Employees have no control over doffing either. We are required to take off our smocks, gloves, sleeves and aprons whenever we leave the production room, and to store them at designated racks in the production room. At the end of the shift we are required to take the smocks to a specified bin at the front of the plant. Employees also do not control how they use rubber or plastic gloves, sleeves, aprons, or boots, but are required to keep them and themselves in a sanitary condition at all times on the production room floor. This cannot physically be done without putting on and sanitizing the standard gear and equipment the company issues for this purpose.

11.    I have also been asked about our meal and rest periods. Equity Group requires

6

employees to leave the production area in order to use the restroom, or to eat, drink or obtain supplies during their breaks. There were no restrooms, breakrooms or supply rooms in the production area, and employees were prohibited from carrying food or drink into the production area. Employees were also required to leave the production area during their breaks so that the area can be recleaned while they are away. In my experience, all employees left the production area during their breaks because of these restrictions. In order to be able to use the restroom, the company requires employees to take off and store their smock and related sanitary gear and equipment whenever they leave the production area, to re-don such gear and equipment before returning to the production area, and to then resanitize their gloves, aprons, sleeves, boots and hands upon reentry into the production area. The Quality Assurance Department monitors compliance with such requirements at the sanitation basins at the front door of the production area when employees return from the restroom, breakroom, supply room or other areas outside the production area. We are subject to discipline or discharge if we do not take off such gear and equipment when doing these things during our breaks, put it back on before returning to the production line, and resanitize our gloves, aprons, sleeves, boots and hands upon reentry into the production area from our breaks. All of these work activities are done on unpaid time during our breaks.

The above and foregoing is true and correct to the best of my knowledge.

LAURIE DELBRIDGE

6/16/08
DATE

7

# EXHIBIT 29

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
MONTGOMERY DIVISION

| | | |
|---|---|---|
| BETTY ANN BURKS, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: 2:06-cv-01081-MEF-DRB |
| | ) | |
| | ) | |
| EQUITY GROUP-EUFAULA DIVISION,) | | |
| LLC | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF BETTY JEAN YOUNG**

Pursuant to 28 U.S.C. § 1746, I, Betty Jean Young, declare under penalty of perjury:

1.      I began working at the Plant in Baker Hill when it was owned by Charoen-Pokphand,

Inc. ("CP") and became an employee of the defendant, Equity Group, when it took over the plant in

early 2004. After Equity Group purchased the facility from CP, I moved to a position on the Debone

Production line. I moved to the Tender Belt in the Debone Production Department sometime around

2006.

2.      The employees of the plant opposed the company's refusal to pay for similar work

activities before and after chickens were processed on the line, such as when we were required to

sanitize the company's protective gear and equipment, put it on and take it off at least six times a day

without pay.  The company decided not to pay for this work on its own, not as part of any collective

bargaining agreement.  The Chief Union Steward and other employees directly opposed the refusal

to pay for this additional work both during the time I was employed by CP and after Equity Group

took over.  During the period leading up to that changeover in 2003-2004, there was a lawsuit in

1

federal court that had been filed by our Chief Union Steward protesting the company's refusal to pay

for these additional work activities before and after chickens were on the line. That lawsuit covered

the period from 1999 forward, which was before there was ever any collective bargaining agreement

with CP. The first collective bargaining agreement with CP was a year later in 2000. The Chief

Union Steward's lawsuit was still in court while Equity Group was in the process of taking over the

plant and, to my knowledge, was still in court after Equity Group took over. At some point in time,

the case against CP was dropped because it no longer owned or ran the plant. The employees,

however, did not stop protesting Equity Group's refusal to pay for the additional work activities that

were part of that lawsuit. A new lawsuit was planned and later filed based on my and other

employees' understanding that we had three years to file such a case in order to cover the period

since Equity Group took over. It was our understanding that this case would cover the period since

Equity Group took over in early 2004.

      3.      There has been no period of my employment during which I did not object to the

refusal to pay me and other employees for performing the additional work that was challenged in the

lawsuit filed by our Chief Union Steward and in this lawsuit. Both CP and Equity Group refused

to pay for that work on their own without any approval under our collective bargaining agreement.

The two lawsuits challenging that practice made it clear that we did not acquiesce to that practice.

It was my and other employees understanding that each of our collective bargaining agreements have

stated that any part of it which violated federal law would be changed if a court decided it was

invalid. We understood from this provision that a lawsuit was the proper way to challenge the

refusal to pay us for the additional sanitizing, donning and doffing activities that we were required

to perform without pay. We were never told or understood that we could file a grievance about

2

issues that were already in court. We also were never told, and never understood, that we could file a grievance about violations of federal law or things that were not covered by the collective bargaining agreement, like the company's refusal to pay for our putting-on, taking-off and sanitizing its sanitary gear and equipment six times everyday.

4.     Employees' principal work activity was not just to process chickens, but to process chickens in an uncontaminated manner. To perform this principal activity, all employees were required to sanitize, put-on and take-off standard sanitary gear and equipment issued by Equity Group- Eufaula Division for that purpose. Employees have always been trained and instructed that the job we were hired and trained to do was to process chicken in a safe and sanitary manner, and that this could not physically be done without donning, doffing and sanitizing the gear and equipment that the company required. We have been trained and taught that the performance of our jobs requires these things to be done in order to produce uncontaminated poultry products that will pass company and USDA inspections and standards. Just washing our hands was not what we were required to do. We were required to thoroughly sanitize the company's rubber or plastic gloves, aprons, sleeves and boots and our hands with disinfectant soap in a specified manner whenever we first entered or reentered the production area, and whenever else we needed to do so during production.

5.     Employees are specifically prohibited from processing chickens without putting-on the required sanitary gear and equipment and sanitizing the company's gloves, aprons, sleeves and boots. This work was required to be performed without pay at least six times a day. This included when we first entered the production room at the start of the shift, when we left the production line during our first unpaid meal or rest period, when we re-entered the production area on return to the

3

production line during our first meal or rest break, when we left the production line again during our second break period, when we re-entered the production area to return to the line again near the end of our second break, and when we sanitized, took off and put up our sanitary gear and equipment at the end of the shift. Company rules state that we may be disciplined or discharged if we attempt to process chickens without sanitizing and using such sanitary gear and equipment in the manner required. Employees who fail to do so are not allowed to proceed to the production line or beyond the sanitation basins at the front of the production area.

6.    Equity Group-Eufaula Division employees have always been taught that the primary purpose and benefit of the donning, doffing and sanitizing that we are required to perform is to allow the company to market and sell uncontaminated poultry products to their large corporate customers with USDA's seal of approval. Equity Groups' customers are not the consuming public, but other corporations that sold directly to the public, such as McDonald's and other restaurants or grocery chains. We are taught that Equity Group and its customers have their own standards for protecting against contamination of the food products being marketed and sold, such as sanitary boots and shoe covers that are required beyond the minimum standards of the USDA.

7.    I have been asked whether the required sanitary gear and equipment benefits employees by keeping their clothes clean. We have never been trained or taught that this is the purpose or benefit intended by the required gear and equipment. If that were the intent, employees would not be prohibited from taking their smock or other equipment into the restroom or outside the plant. Employees are exposed to the restroom and other areas upon entry. Keeping the smocks and other items out of the restrooms only prevents contamination of the chickens, not the employee. If employee protection were the issue, we would be allowed to wear the smocks, aprons, sleeves and

4

gloves into the restroom and would not be subject to discipline or discharge for doing so.

8.    The additional requirement that employees must rewash and resanitize their gloves and other plastic or rubber gear upon reentry into the protection area only benefits Equity Groups' quality assurance, marketing and sales programs, not the employee.    Sanitation facilities are provided in the restrooms for employees' personal hygiene, but we are still subject to discipline or discharge if we do not resanitize our hands, gloves, and other plastic or rubber items all over again upon reentry into the production area a few minutes later. This resanitization within the production area is on unpaid time and done solely for the benefit of Equity Groups' quality assurance, marketing and sales programs. There is no benefit to the employee from this additional unpaid work activity or requirement.

9.    The primary benefit to Equity Group is also shown by its rule against employees using or laundering their own smocks. We are required to use only the specially designed smocks furnished and laundered each day by the company. The sanitary gear and equipment issued by the company are unique items not normally used outside the plant or in other businesses. The smocks issued to each employee are designed to prevent any part of the employee's clothes from touching or contaminating the chicken. That is also the purpose and primary benefit of the rubber or plastic gloves, sleeves, aprons and boots that are part of the standard package of sanitary gear and equipment issued to each employee. Employees are subject to discipline or discharge if they do not use the specially designed smock and other items issued by the company, or if they otherwise attempt to use their own smocks, gear or equipment. We are also subject to discipline or discharge if we take the smocks and other items home or outside the plant, or if we attempt to launder them for ourselves. These restrictions are solely for the benefit of Equity Group-Eufaula Division, not the employees.

10.     I have been asked whether employees control how or when they don, doff or sanitize the required protective gear and equipment. The answer is no, we are required to follow standard procedures on how and when to perform these parts of our job. We are required to sanitize boots, gloves, aprons, sleeves and hands at the sanitation vats stationed at the front entry to the production area of the plant. Rubber or plastic gloves, sleeves and aprons can only be put on after the smock; cotton or plastic gloves can only be put on after hands are sanitized upon entry into the production area; smocks, hairnets and beardnets have to be replaced at the supply room at the start of each shift, which means that employees almost always put on such items after going to the supply room to pick them up. This is monitored by employees from the Quality Assurance Department who watch and keep records of employee's compliance with these requirements as they are performed when entering the production area. Each day I have to wait in line to pick up my smock and hairnet from the Supply Room on unpaid time. Employees have no control over doffing either. We are required to take off our smocks, gloves, sleeves and aprons whenever we leave the production room, and to store them at designated racks in the production room. At the end of the shift we are required to take the smocks to a specified bin at the front of the plant. Employees also do not control how they use rubber or plastic gloves, sleeves, aprons, or boots, but are required to keep them and themselves in a sanitary condition at all times on the production room floor. This cannot physically be done without putting on and sanitizing the standard gear and equipment the company issues for this purpose.

11.     I have also been asked about our meal and rest periods. Equity Group requires employees to leave the production area in order to use the restroom, or to eat, drink or obtain supplies during their breaks. There were no restrooms, breakrooms or supply rooms in the

6

production area, and employees were prohibited from carrying food or drink into the production area. Employees were also required to leave the production area during their breaks so that the area can be re-cleaned while they are away. In my experience, all employees left the production area during their breaks because of these restrictions. In order to be able to use the restroom, the company requires employees to take off and store their smock and related sanitary gear and equipment whenever they leave the production area, to re-don such gear and equipment before returning to the production area, and to then resanitize their gloves, aprons, sleeves, boots and hands upon reentry into the production area. The Quality Assurance Department monitors compliance with such requirements at the sanitation basins at the front door of the production area when employees return from the restroom, breakroom, supply room or other areas outside the production area. We are subject to discipline or discharge if we do not take off such gear and equipment when doing these things during our breaks, put it back on before returning to the production line, and resanitize our gloves, aprons, sleeves, boots and hands upon reentry into the production area from our breaks. All of these work activities are done on unpaid time during our breaks.

The above and foregoing is true and correct to the best of my knowledge.

BETTY JEAN YOUNG

5 - 16 - 08
Date

7

# EXHIBIT 30

FILEI
2007 Aug-31 PM 05:
U.S. DISTRICT COUI
N.D. OF ALABAN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| M. H. FOX, TERESA BROTHERS, and ANGELA HATCHETT | ) ) ) |
| Plaintiffs, | ) ) ) Case No.: 4:99-CV-1612-VEH |
| v. | ) Case No.: 4:06-CV-4676-VEH ) Case No.: 4:06-CV-4677-VEH ) |
| TYSON FOODS, INC., | ) ) |
| Defendant. | ) |

---

## ORDER ON MOTION TO RECONSIDER

On August 30, 2007, a hearing was held before the undersigned regarding the Defendant's Motions to Reconsider the court's denial of its motion for partial summary judgment. (*Fox v. Tyson Foods, Inc.*, case # 4:99-CV-1612-VEH, docs. 640, 483, respectively; *Hatchett v. Tyson Foods, Inc.*, case # 4:06-CV-4676-VEH, doc. 15 (motion to reconsider); and *Brothers v. Tyson Foods, Inc.*, case # 4:06-CV-4677-VEH, doc. 15 (motion to reconsider)).

On March 24, 2003, the court denied the Defendant's motion for partial summary judgment, based on its conclusion that 29 U.S.C. § 203(o) (hereinafter "§ 203(o)") – which excludes from compensability under the FLSA certain types of

"clothes changing" activities – does not apply to the Plaintiffs' pre- and post-shift donning and doffing of protective outer wear.  (doc. 483 at 3).

On June 11, 2007, the Eleventh Circuit decided *Anderson v. Cagles, Inc.*, 488 F.3d 945 (11th Cir. 2007).  In *Anderson*, the court instructed that § 203(o) applies to the donning and doffing of various articles of protective clothing, including smocks, hair/beard nets, gloves, and hearing protection similar to those at issue in the present cases.  488 F.3d at 955.

On August 1, 2007, the Defendant filed the pending Motions to Reconsider, asking the court to reconsider its denial of partial summary judgment due to the intervening change in controlling law established in *Anderson*.[1]

"A motion to reconsider is only available when a party presents the court with evidence of an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or manifest injustice."  *Summit Medical Center of Alabama, Inc. v. Riley*, 284 F.Supp.2d 1350, 1355 (M.D. Ala. 2003).  *See*

---

[1] In its Motion to Reconsider, Defendant asserts that, if the court reconsiders its decision as to Defendant's entire motion for partial summary judgment, the only claims that will remain for trial are the Plaintiffs' pre- and post-meal period donning and doffing, which are not covered by § 203(o).  Defendant argues, however, that these claims are subject to the *de minimis* doctrine, and therefore are also not compensable.

If the court agrees that these activities are *de minimis*, Defendant argues that the necessity for trials in these cases will be obviated.  Hence, while Defendant seeks reconsideration of its motion for partial summary judgment, Defendant asserts that the court's granting of that motion in its entirety will necessarily dispose of all the Plaintiffs' claims.

2

*also Richards v. United States*, 67 F.Supp.2d 1321,1322 (M.D.Ala. 1999) (same).

The grant or denial of a motion to reconsider is left to the discretion of the district

court. *See Chapman v. AI Transport*, 229 F.3d 1012, 1023-24 (11th Cir. 2000).

The Plaintiffs concede that *Anderson* reverses the court's conclusion that §

203(o) does not apply to their pre- and post-shift clothes changing activities. Hence,

as to this conceded issue, the court hereby **GRANTS** Defendant's Motions to

Reconsider. **JUDGMENT is hereby entered in favor of Defendant and against**

**Plaintiffs as to their claims for compensation for pre- and post- shift clothes**

**changing activities.**

The Motions to Reconsider are otherwise **DENIED** as explained below.

*Anderson* does not address any other issue asserted in the motion for partial

summary judgment. For example, *Anderson* has no effect on the application of the

*de minimis* doctrine, e.g., what activities count as total compensable time, and what

constitutes regular activities versus irregular activities, to the particular facts of these

cases. *Anderson* also does not address the compensability of washing activities that

the Plaintiffs performed at home.[2]

---

[2] Defendant argues that it is also entitled to summary judgment as to Plaintiffs' washing claims. *Anderson*, however, held only that pre- and post-shift <u>clothes changing</u> was covered by § 203(o), and does not address "washing." As the court has already decided that Plaintiffs' washing claims are not excluded from the FLSA under § 203(o), and *Anderson* does not address this issue, the court finds no basis to reconsider its denial of summary judgment as to these claims. (See doc. 227 at 21-22; Docket Modification entered 03/31/03).

3

The court finds that none of the factors entitling Defendant to reconsideration of any issue, other than the application of § 203(o) to the Plaintiffs' pre- and post-shift donning and doffing, is satisfied.  Therefore, it is not appropriate to reconsider the court's previous decisions as to these issues.

**DONE** and **ORDERED** this the 31st day of August, 2007.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

4

# EXHIBIT 31

FILED
2007 Nov-02 PM 05:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

**FILED**

NOV - 1 2007

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

|  |  |  |
|---|---|---|
| **TERESA BROTHERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 4:06-CV-4676-VEH** |
| | ) | |
| **TYSON FOODS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

---

## VERDICT FORM

1. Has Tyson Foods established by a preponderance of the evidence that the amount of time Ms. Brothers spent on uncompensated activities was de minimis?

   YES_____          NO___X____

2. What amount of time did Ms. Brothers spend on uncompensated activities:

   ___1___ at the beginning of the day

   ___4___ during the uncompensated meal break

   ___3___ at the end of the day

   ___8___ total uncompensated time each day

3. If you answered "no" to question number 1, what amount of overtime pay is owed to Ms. Brothers?

   $ __47400__

SO SAY WE ALL.

# EXHIBIT 32

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


BETTY ANN BURKS, et al.,

    Plaintiffs,


vs.  CIVIL ACTION 2:06-cv-01081-MEF-DRB


EQUITY GROUP EUFAULA DIVISION, LLC,

    Defendant.


\*   \*   \*   \*   \*   \*

    DEPOSITION OF JACQUELINE SMITH
DAVIS, taken pursuant to notice and
stipulation on behalf of the Defendant,
at Williams, Pothoff, Williams & Smith,
125 South Orange Avenue, Eufaula,
Alabama, before Bridgette Mitchell,
Shorthand Reporter and Notary Public in
and for the State of Alabama at Large,
on May 23, 2008, commencing at
9:35 a.m.

Page 5

```
 1   EXHIBIT                           Page

 2   DX-1    Subpoena                   12

 3   DX-2    3/1/00-3/1/04 agreement    31

 4   DX-3    3/1/04-3/1-08 agreement    32

 5   DX-4    3/1/08-3/1/11 agreement    34

 6           COURT REPORTER:  Usual

 7   stipulations?

 8           MR. GOULD:  Yes.

 9           MS. McGOWAN:  You might want to

10   explain since she's under subpoena.

11   She may --

12           MR. GOULD:  All right.  Ma'am,

13   normally when the -- you're not

14   represented by an attorney here today;

15   is that correct?

16           THE WITNESS:  That's right.

17           MR. GOULD:  You're here under

18   subpoena.  Generally, as a witness, you

19   would have the option of reading and

20   signing your deposition transcript or

21   you could just -- you could do what's

22   called waiving reading and signing and

23   just allow the court reporter to issue
```

1   Q. Southeast.  I'm sorry.  Southeast

2      Alabama council?

3   A. Yes.

4   Q. I get turned around when I'm down here.

5   A. Okay.

6   Q. And do you recall when the RWDSU began

7      representing the employees at the

8      plant?

9   A. In March of 2000.

10  Q. And was that when the first collective

11     bargaining agreement was signed?

12  A. Yes.

13  Q. Were you involved in any sort of union

14     organizing campaign at the plant,

15     ma'am?

16  A. Yes, sir.

17  Q. And do you recall when that campaign

18     began?

19  A. '99.

20  Q. Ma'am, have you served on the

21     negotiating or bargaining committee for

22     each collective bargaining agreement

23     that has been entered into between the

1      RWDSU and the owner of the plant?

2   A. Yes.

3   Q. And am I correct that there was one

4      collective bargaining agreement

5      executed between CP and the RWDSU?

6   A. That's correct.

7   Q. And there have been two collective

8      bargaining agreements entered between

9      Equity Group and the RWDSU?

10  A. That's correct.

11  Q. And you served on the bargaining

12     committee for all three of those

13     contracts?

14  A. Yes, sir.

15  Q. Now, ma'am, the current lawsuit that

16     I've asked you to appear for your

17     deposition today involves allegations

18     of unpaid time for things including

19     donning and doffing clothing or

20     equipment.  Were you ever a plaintiff

21     in any sort of similar lawsuit?

22  A. Yes, sir.

23  Q. And was that lawsuit filed against CP?

1    A. Yes.

2    Q. Do you recall when it was that you

3       filed that lawsuit?

4    A. '99.

5    Q. And did you give a deposition in

6       connection with that lawsuit?

7    A. No.

8    Q. All right.  Were you asked to sit down

9       and answer questions from a lawyer from

10      CP similar to what I'm doing with you

11      today during that particular lawsuit?

12   A. No.

13   Q. Have you ever given a deposition

14      before?

15   A. Yes, on another case, another lawsuit

16      not pertaining to Equity Group.

17   Q. Okay.  And what lawsuit was that?

18   A. Insurance.

19   Q. All right.  Ma'am, have you ever

20      testified at a trial before?

21   A. No.

22   Q. And when I say "trial," I mean

23      something in a courtroom with a judge

```
 1      present.

 2   A. No.

 3   Q. Now, in the lawsuit that you filed in

 4      1999 against CP, do you recall what

 5      sort of claims or allegations you were

 6      making in that lawsuit?

 7   A. Donning and doffing, people taking on

 8      work items that they insisted that we

 9      wore -- aprons, smocks, gloves, stuff

10      like that, how long did it take.  It

11      also dealt with the time of the break.

12   Q. And can you describe what you mean by

13      that?

14   A. Okay.  Say if break was at 10:15 and I

15      worked at the front of the line, then

16      maybe I was the first one to get out to

17      go to break.  But the time -- my break

18      would be a little bit longer than the

19      person who worked, basically, at the

20      end of that line.

21   Q. All right.  So other than the donning

22      and doffing and that issue with the

23      breaks, did you make any other claims
```

1        in that lawsuit that you're aware of

2        today?

3    A. No.

4    Q. All right.  At the time that you filed

5        the lawsuit in 1999, did CP

6        specifically pay the employees for the

7        time that they were, I think as you

8        described it, donning and doffing?

9    A. No.

10   Q. And has that practice changed since

11       Equity Group purchased the plant?

12   A. Yes.

13   Q. And can you describe for me what change

14       has happened?

15   A. After this contract right here, the

16       last contract, the set-up is totally

17       different.  Break time is, like, say,

18       10:15 -- again, I use that for an

19       example -- the lines will stop 10:10.

20       And by the time the line is finished,

21       it's about 10:15 and that's the break

22       time.  So everyone gets correct time

23       on -- on their breaks.  The ones that

1   A. Yes.

2   Q. And have you had an opportunity to see

3      what people in the pack-out area would

4      wear in connection with their job?

5   A. Yes.

6   Q. Is your current position a chiller

7      operator?  Is that correct?

8   A. No.  That was 1999.

9   Q. Okay.  What's your current position?

10  A. Lead person in pack-out.

11  Q. And was the chiller area kind of in

12     between the evisceration and debone

13     area?

14  A. Yes, sir.

15  Q. And during your employment at the plant

16     and your tenure as a union steward,

17     have you had an opportunity to see what

18     people in the chiller area wear in

19     connection with their job?

20  A. Yes.

21  Q. All right.  Now, when you listed all of

22     those different items of clothing or

23     equipment for me, would employees in

Page 26

1    the different production areas wear

2    some combination of these items?

3  A. Yes.

4  Q. There are -- some employees don't wear

5    all of those items; is that correct?

6  A. That's correct.

7  Q. And during the time that CP owned the

8    plant, would the production employees

9    wear some combination of these items?

10  A. Yes.

11  Q. And during the time that Equity owned

12    the plant, did the employees wear some

13    combination of these items?

14  A. Yes.

15  Q. Now, in connection with the negotiation

16    of the contract with CP, did you have

17    an opportunity to discuss with anyone

18    from the international union your

19    concerns over the issues that you

20    raised in your lawsuit?

21  A. Yes.

22  Q. And was that Mr. Jenkins and

23    Mr. Foster?

1   A. That's correct.

2   Q. Did you have an opportunity to discuss

3      those concerns with both of them?

4   A. Yes.

5   Q. And did you have an opportunity to

6      discuss those concerns in the presence

7      of other members of the bargaining

8      committee?

9   A. Yes.

10  Q. Do you know whether being paid for

11     donning and doffing was raised in

12     connection with the union negotiations

13     to the company?

14           MS. McGOWAN:  When?

15           MR. GOULD:  In connection with

16     the negotiation of this first

17     collective bargaining agreement with

18     CP.

19  A. Ask that question again.

20  Q. Certainly.  In connection with this

21     first collective bargaining agreement,

22     the one between the union and CP, do

23     you know whether payment for donning

Page 28

1       and doffing was actually raised as a

2       formal proposal in connection with the

3       negotiations?

4    A. Yes.

5    Q. And to the best of your knowledge, in

6       that first contract between the union

7       and CP, was there any provision added

8       for payment for donning and doffing?

9    A. No.

10   Q. Now, the next contract that was entered

11      into with the union, was that with

12      Equity Group?

13   A. Yes.  Yes.

14   Q. All right.  And in connection with the

15      negotiations for that contract -- and

16      that was the one that started in 2004;

17      is that correct?

18   A. Yes.

19   Q. I'm just going to call that the 2004

20      contract.

21   A. Okay.

22   Q. In connection with the 2004 contract,

23      who were the representatives from the

Page 29

1    international union?

2    A. Jerry Foster and Henry Jenkins.

3    Q. And you were still on the bargaining

4       committee?

5    A. Yes.

6    Q. You were still the chief steward?

7    A. Yes.

8    Q. And during those negotiations relating

9       to the 2004 contract, did you have an

10      opportunity to discuss with Mr. Foster

11      or Mr. Jenkins any concerns you had

12      relating to donning and doffing?

13   A. Yes.

14   Q. And do you recall whether in connection

15      with those 2004 negotiations payment

16      for donning and doffing was raised as a

17      formal proposal?

18   A. Yes, sir.

19   Q. And in the 2004 contract, was there any

20      change in the contract made for payment

21      for donning and doffing?

22   A. No.

23   Q. All right.  Am I correct that the next

1      contract between the union and Equity

2      Group became effective in 2008?

3   A. Yes.

4   Q. March of 2008?

5   A. Yes.

6   Q. And I'm just going to call that the

7      2008 contract.  And I believe you've

8      testified previously that in the 2008

9      contract there was a provision added

10     for --

11  A. Yes.

12  Q. -- payment for donning and doffing?

13  A. Yes.

14  Q. Now, prior to that provision in 2008,

15     during the entire time that you've

16     worked at that plant, was there any

17     specific payment for donning and

18     doffing?

19          MS. McGOWAN:  Object to the

20     form.

21  A. No.

22  Q. All right.  And during the entire time

23     that you worked at the plant prior to

```
 1        2008, were the production employees

 2        paid from clock-in to clock-out?

 3   A.  No.

 4   Q.  All right.

 5             (Defendant's Exhibit 2 was

 6             marked for identification.)

 7   Q.  Ma'am, I'm showing you what's been

 8        marked as Exhibit No. 2 for purposes of

 9        identification.  It's entitled

10        Agreement by and between Charoen

11        Pokphand, USA Inc., and the Retail,

12        Wholesale, and Department Store Union

13        Effective March 1, 2000, to March 1,

14        2004.  Have you seen that document

15        before, ma'am?

16   A.  Yes.

17   Q.  And is this the collective bargaining

18        agreement that was negotiated between

19        the union and CP?

20   A.  Yes.

21   Q.  And is this, as far as you know, the

22        first collective bargaining agreement

23        that was negotiated between the union
```

Page 32

 1      and CP?

 2   A. Yes.

 3   Q. Ma'am, could you turn to the last page

 4      of that document, Page No. 22?

 5           (Witness complies.)

 6   Q. And I believe the second signature --

 7      the first signature from the bottom, is

 8      that your signature, ma'am?

 9   A. From the bottom?  The second signature

10      from the bottom, yes.

11   Q. And at the time you signed this

12      agreement, did you believe that it

13      accurately reflected the agreement that

14      was reached at the bargaining table?

15   A. Yes.

16           (Defendant's Exhibit 3 was

17           marked for identification.)

18   Q. Now, ma'am, I'm showing you what's been

19      marked as Exhibit No. 3.  For purposes

20      of identification, it's entitled

21      Agreement by and between Equity Group,

22      Eufaula Division, LLC, and the Retail,

23      Wholesale, and Department Store Union

Page 33

```
 1      Effective March 1, 2004, to March 1,

 2      2008.  Have you seen this document

 3      before, ma'am?

 4   A. Yes, sir.

 5   Q. If you could turn to page 28 of that

 6      document.

 7           (Brief pause)

 8   Q. And when you get to page 28, can you

 9      tell me if that is -- I'm sorry.  I'm

10      talking about the number without the E

11      in front of it.  I apologize.

12   A. All right.

13   Q. There are two sets of numbers on there.

14      Page No. 28 with the number 28 in the

15      middle of the page.  That's also E32.

16      I apologize for that.

17   A. Okay.

18   Q. And, ma'am, is that your signature

19      under the signature for Jerry Foster?

20   A. Yes, sir.

21   Q. And, ma'am, at the time you signed this

22      collective bargaining agreement, did

23      you believe that it accurately
```

Page 34

1       reflected the agreement that was

2       reached at the bargaining table?

3   A. Yes, sir.

4              (Defendant's Exhibit 4 was

5              marked for identification.)

6   Q. Ma'am, the court reporter has handed

7       you what's been marked Exhibit No. 4.

8       For purposes of identification, it's

9       entitled Agreement by and between

10      Equity Group, Eufaula Division, LLC,

11      and the Retail, Wholesale, and

12      Department Store Union Effective

13      March 1, 2008, to March 1, 2011.  I

14      would ask that you turn to page 29 of

15      that contract.

16             (Witness complies.)

17  Q. That's also E6007.  And, ma'am, is that

18      your signature under the signature for

19      Jerry Foster?

20  A. Yes, sir.

21  Q. And at the time you signed this

22      contract, did you believe that it

23      accurately reflected the agreement that

1       what it was pertaining to, until this

2       past week.

3    Q. How did you find out about it?

4    A. When I first saw it, I saw Ms. Betty

5       Burk's name on it.  And I know

6       Ms. Betty Burks, so I asked her did she

7       know anything about it.  And she told

8       me that it wasn't -- that Betty Burks

9       wasn't her, and I believed her.  I

10       didn't -- so I just left it alone.  I

11       said, That's someone else.  I don't

12       know how we are a part of it.  No one

13       has called me.  And I've been in a

14       lawsuit like that before.  And no one

15       has come to me and said anything to me.

16       Basically, I couldn't give them no

17       answers, because I didn't know.

18    Q. Did you get a notice from the court

19       informing you of your right to join

20       this lawsuit?

21    A. No, I didn't receive nothing.

22    Q. You never got an opt-in notice from the

23       court?

1    A. No.

2    Q. Did you hear people in the plant

3       talking about it?

4    A. Yes, I did.

5    Q. Did you call them and ask for any

6       information to call in?

7    A. Yeah, I did.  I asked them, you know,

8       how you go about getting in touch with

9       the lawyers, and they said -- well,

10      they gave me a phone number.  I never

11      called the phone number or anything

12      like that because, basically, I was

13      confused because of the lawsuit that I

14      had been in.  And I said, I don't even

15      know if that has anything to do with

16      with us or not, because, if I'm not

17      mistaken, there was a lawsuit out at

18      Wayne Farms in Union Springs.  And

19      that's what I told them, that I think

20      this is dealing with Wayne Farms, not

21      us, because no one has said anything to

22      me about it.

23   Q. All right.  Just because nobody said

```
 1        anything to you about it, does that

 2        mean there's not really a lawsuit?

 3   A. No, it doesn't mean that.

 4   Q. So why didn't you call the lawyers?

 5   A. I guess because of what happened to me

 6        the last time.

 7   Q. All right.  So you haven't joined --

 8        made any attempt to try to join in to

 9        this lawsuit?

10   A. No, I have not.

11   Q. And you haven't discussed it with

12        any -- and gotten legal advice from

13        anyone on it?

14   A. No, I have not.

15   Q. Did you talk to the union about it?

16   A. I told Jerry about it.

17   Q. Jerry who?

18   A. Foster.

19   Q. When did you tell Jerry about it?

20   A. It's been some time ago, when everybody

21        start talking about the lawsuits and

22        stuff.  I told him about it and I said

23        probably basically the same -- like the
```

1          one that I was in before these people

2          bought.

3     Q. And what did Jerry Foster tell you?

4     A. That you ain't getting paid for the

5          donning and doffing; feel free to do

6          whatever you want to do.  But he never

7          advised me not to do it.

8     Q. What happened to your other lawsuit?

9     A. The -- it was a -- they were buying --

10         Equity Group.  Equity Group was buying

11         CP, and the -- the lawsuit was -- I

12         mean, it was, like, right during the

13         time that they were sitting down -- we

14         were supposed to sit down and do

15         something like this and they sold.  And

16         what happened between that time and the

17         Equity Group bought, I don't know.  All

18         I know is the lawyer contacted me, gave

19         me a check for $250.

20    Q. So you settled your lawsuit?

21    A. I assume it was settled.

22    Q. Who was your lawyer?

23    A. I forgot his name, but it was out of

1      negotiation time.

2   Q. What clothes-changing are you doing?

3   A. Clothes-changing?

4   Q. Yeah.  It says you'll be paid for

5      clothing changing and cleaning time.

6      What clothes-changing?

7   A. Well, whenever they put on the apron.

8      It's not changing.  It's putting back

9      on or taking off the equipment that

10     they use on the line.  When they come

11     back in, they also have to wash hands

12     and stuff.  Same thing going out.

13  Q. All right.  And cleaning time, what are

14     you talking about there?  What's your

15     understanding what cleaning time means?

16  A. Washing your hands and spraying off

17     your boots.

18  Q. Anything else?

19  A. That's it.

20  Q. You've got a clause in here in your

21     contract that says if any of these

22     terms are found to be in violation of

23     any statute or law, that it's void;

1       correct?

2              MR. GOULD:  Let me object to

3       form of the question.

4    A. Yes.

5    Q. Do you understand that?

6    A. Yes.

7    Q. All right.  Let's look at it.  Let's

8       look over Article 18, I think is what

9       it is.  Let's look at Exhibit No. 4,

10      Article 18, your savings clause, 18.2.

11      It's on page 28.

12             (Witness complies.)

13   Q. And that reads, In the event any

14      provision of this agreement is held to

15      be in conflict with or violation of any

16      state or federal statute or other

17      applicable law, administrative rule or

18      regulation, such decision shall not

19      affect the validity of the remaining

20      provisions of this agreement; is that

21      correct?

22   A. That's correct.

23   Q. What's your understanding of that?

Page 48

1    A. It's if anything that's in there

2        violates a law or any kind of statute,

3        then it's null and void.

4    Q. And you've got to go back and

5        renegotiate; correct?

6    A. Correct.

7    Q. Let's look at Exhibit No. 2 and see if

8        that same language is in Exhibit No. 2,

9        Article 18. I'm sorry. The very first

10       agreement.

11           MR. GOULD: Exhibit 2.

12   Q. Exhibit 2. Look on page 19.

13   A. You said 19?

14   Q. Article 18, Section 2. Same language;

15       correct?

16   A. Yes.

17   Q. And then again look at Exhibit No. 3,

18       Article 18 there, and see if that same

19       provision is contained in there.

20   A. You said Article 18?

21   Q. Yes, ma'am.

22   A. What page is that?

23   Q. I didn't flip it over. I'm sorry.

Page 49

1      Article 18, 18.2.  It's on page 27 of

2      the contract.

3   A. Okay.

4   Q. Is that same language contained in this

5      article --

6   A. Yes.

7   Q. All right.  -- in this contract,

8      Exhibit No. 3.  So is it your

9      understanding that the union can't do

10     away with employees' rights that are

11     protected by federal statute or state

12     statute?

13          MR. GOULD:  Let me object to

14     the form of the question.

15  A. Repeat the question again.

16  Q. Do you have an understanding as to

17     whether or not the union can waive an

18     employee's federally-protected rights?

19          MR. GOULD:  Object to the form

20     of the question again.

21  A. Yes.

22  Q. You do have an understanding?  What is

23     your understanding?

Page 50

1                    (No immediate response given.)

2    Q. Let me put it this way.  Are you aware

3        that the union cannot waive an

4        employee's federally-protected rights?

5                    MR. GOULD:  Object to the form

6        of the question.

7    A. Yes, I'm aware.

8    Q. What training did the RWDSU give you to

9        negotiate contracts?

10                   MR. GOULD:  Let me object to

11       form of the question again.

12   A. None.

13   Q. None?  Have you been provided any

14       training for negotiating contracts?

15   A. I have some experience in negotiating

16       contracts.

17   Q. Where did you get that experience?

18   A. From another union I was in.

19   Q. Which union is that?

20   A. Electrical workers.  I worked at Cooper

21       Lighting.

22   Q. And they gave you training on

23       negotiating?

1   A. No, it's not.

2   Q. How did you get your --

3   A. I was appointed.

4   Q. Who appoints you?

5   A. Mr. Jenkins did.

6   Q. All right.  Do you have local -- does

7      your local have union meetings?

8   A. Yes.

9   Q. Who runs those meetings?

10  A. Jerry Foster.

11  Q. Does Mr. Jenkins come?

12  A. Sometimes.

13  Q. Who makes the decisions whether or not

14     a case goes to arbitration?

15  A. There's a committee, an arbitration

16     committee, and it's voted on by those

17     people that's on that committee.

18  Q. Who heads up that committee?

19  A. Mr. Jenkins.

20  Q. Mr. Jenkins.  When you say that the

21     issue of donning and doffing was

22     presented in the very first contract

23     negotiations, had your lawsuit been

# EXHIBIT 33

# FREEDOM COURT REPORTING

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    MONTGOMERY DIVISION

4

5    CASE NUMBER:  2:06-CV-01081-MEF-DRB

6    BETTY ANN BURKS, ET AL.,

7        Plaintiffs,                ORIGINAL

8        vs.

9    EQUITY GROUP, EUFAULA DIVISION, L.L.C.,

10       Defendant.

11

12       S T I P U L A T I O N

13       IT IS STIPULATED AND AGREED by and

14   between the parties through their respective

15   counsel, that the deposition of Kathy

16   Gilmore may be taken before Sara Mahler,

17   CCR, at the offices of Williams, Pothoff,

18   Williams & Smith, at 125 South Orange

19   Avenue, Eufaula, Alabama 36027, on the 12th

20   day of June, 2008.

21

22       DEPOSITION OF KATHY GILMORE

23

**FREEDOM COURT REPORTING**

88

1    employee's late?

2          A.      Yes.

3          Q.      How is that reflected?

4          A.      If an employee clocks in at

5    like 10:20, it will reflect 10:20.

6          Q.      Does it have a flag like an L

7    or a code showing --

8          A.      No.  It just shows in 10:20.

9          Q.      Is the time in regular time,

10   or is it military time, or do you know how

11   it's reflected?  The punch, does it show

12   punch in at 10:20 or does it have a

13   different scale?

14         A.      No, it's regular.  I can read

15   it regular time.

16         Q.      You don't have to have any

17   chart to decipher the --

18         A.      No.

19         Q.      Okay.  If an employee's shift

20   starts at 7:30, and they check in -- punch

21   in at 7:31, are they considered late, if

22   they clock in?

23         A.      They could be late, yes,

# FREEDOM COURT REPORTING

89

1    ma'am.

2         Q.    What happens if an employee's

3    late?

4         A.    If an employee clocks in at

5    7:31, he would be pretty much late to the

6    line.

7         Q.    Do they get points -- Are you

8    on a point system?

9         A.    We are on a points system.

10        Q.    What is your point system for

11   tardies?

12        A.    If you are tardy or leave

13   early, you get half an occurrence; if you're

14   gone for the day, you get a whole.

15        Q.    If an employee is one minute

16   late, do they get half an occurrence?

17        A.    I wouldn't --

18        Q.    Can a supervisor do it?

19        A.    They probably could.  But I

20   think a minute's a little too harsh.

21        Q.    Do you know if supervisors

22   have given that to employees?

23        A.    Not to my knowledge.

# EXHIBIT 34

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


CASE NUMBER:  2:06-CV-01081-MEF-DRB


BETTY ANN BURKS,

et al.,

        Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

        Defendant.



BEFORE:

        Cynthia M. Noakes, Commissioner

        and Certified Court Reporter


        DEPOSITION TESTIMONY OF

                GREG MILLS


        ****************************

FREEDOM COURT REPORTING

Page 29

1           MR. ROSENTHAL:  It's your deposition.

2    Q.    While he's getting that copied, let me ask

3    you some other questions, and then we'll take a

4    break at that point.

5           Are employees required to process chicken or

6    produce poultry products in a way that does not

7    contaminate the product?

8    A.    Yes.

9    Q.    Is that one of their principal

10   responsibilities?

11   A.    Yes.

12   Q.    Are all employees required to do their

13   processing or production work in a manner that

14   produces uncontaminated chicken products?

15   A.    Yes.

16   Q.    These Good Manufacturing Practices that we

17   have in Exhibit 3 and Exhibit 17, the purpose of

18   them is for employees to be able to produce

19   uncontaminated poultry products, correct?

20   A.    Yes.

21   Q.    And that benefits the company so that it can

22   sell its products to its customers, correct?

23   A.    Yes.  And it's a USDA regulation.

FREEDOM COURT REPORTING

Page 30

1    Q.    Your customers are purchasing from you

2    uncontaminated poultry products, correct?

3    A.    Yes.

4    Q.    You represent to them that when they

5    purchase poultry products from your company, they

6    are receiving wholesome, uncontaminated products,

7    correct?

8    A.    Yes.

9    Q.    Now, I don't have a real good copy of this

10   map -- I suppose it's as good as you've got -- but

11   I want you to help me read it.

12          MR. WIGGINS:  We'll mark this as

13   Exhibit 22.

14          (Plaintiffs' Exhibit No. 22 was

15          marked for identification and a

16          copy of the same is attached

17          hereto.)

18   Q.    Which side do you read this from?  This

19   side, I suppose.  Show me the parking lot.

20          MR. ROSENTHAL:  You'll have to explain

21   for the court reporter what you're pointing to.

22   Q.    Let's take this red pen and mark the parking

23   lot for us.

FREEDOM COURT REPORTING

Page 32

1    A.    Yes.

2    Q.    And what's the first thing they come to as

3    they enter each door in the fresh plant?

4    A.    A hallway leading to production or break

5    room areas.

6    Q.    And is the break room listed on the map?

7    A.    Yes.  Debone break room listed, evis break

8    room listed, back dock break room right here.

9    Q.    Back dock; it's not listed, is it?

10   A.    I can't read it if it is.

11   Q.    Well, write that on there for us.

12   A.    (Witness complies.)

13   Q.    Now, where do employees sanitize their boots

14   or shoes?

15   A.    At the entrance of each processing area they

16   walk through a floor sanitizer.

17   Q.    All right.

18   A.    Any entrance into the building has floor

19   sanitizers you walk through nonstop.

20   Q.    You've got two entries marked.  Are there

21   others?

22   A.    Any door leading from the outside.  This

23   print is so small I can't designate every little

Page 33

1    door.  But every door entering into the processing

2    area has a floor sanitizer that keeps the floor

3    wet with sanitizer.

4    Q.    Okay.  Show me where the other entrance

5    doors are.

6    A.    I don't know if that's possible, as small as

7    this print is.

8          There's one in this area; there's one out of

9    this control room; there's one out of this

10   maintenance shop area; there's one in a doorway

11   over here that I cannot see on this print.

12         Every door leading into processing has a

13   floor sanitizer.

14   Q.    Okay.  Now, is there north, south, east, and

15   west on this map?

16   A.    I do not see one.

17   Q.    Do y'all -- how do you describe the plant?

18   Do you call it the north end or south end, or do

19   you have words that describe where you're at in

20   the plant?

21   A.    Just departments.

22   Q.    Okay.  Tell me what the departments are.

23   A.    Debone.

FREEDOM COURT REPORTING

Page 35

1    coordinator; this is debone break room; this is

2    the locker area in the break room; there's also a

3    locker area in this break room that I can't even

4    see where it's at it's so small.

5    Q.    Okay.

6    A.    This is the entrance for the office

7    personnel right here.

8    Q.    All right.  Where are the first line

9    supervisors' offices?

10   A.    It's not even shown on this print.  Right

11   here.

12   Q.    That's in the production area, correct?

13   A.    There's an office area right here, and then

14   there's a --

15   Q.    Let me stop you.  Is this in the production

16   area where these first line supervisors' offices

17   are?

18   A.    No.

19   Q.    Okay.  You've got to go outside the

20   production area to get the supervisors?

21   A.    Through this door right here, and there's a

22   door on each end that's going to lead to these

23   offices.

Page 36

1    Q.    Okay.  And does that door from the

2    supervisor's office into debone have a foot

3    sanitizer?

4    A.    No.

5    Q.    Okay.

6    A.    Just doors from the outside into the

7    processing plant.

8    Q.    All right.  Now, I interrupted you.  Where

9    are the other supervisors' offices?

10   A.    There's another supervisor office in this

11   area.  Honestly, this thing's so jumbled up, I

12   can't make out where it's at.  But right in this

13   area here is a supervisor's office.  I believe

14   it's in this corner right here.

15          And then offices here.  Production manager

16   is in this area.  Sanitation manager has an office

17   in this warehouse.  This has got offices in it

18   which are not drawn.

19   Q.    What's this called here?

20   A.    Warehouse.  And there's offices in here that

21   houses sanitation manager for this plant and

22   purchasing for this complex.

23          There's a maintenance manager's office in

Page 37

1    this area, a maintenance supervisor's office in

2    this area.

3    Q.    Okay.  And the evisceration department

4    supervisors' offices are where?

5    A.    Right here, this back corner right here.

6    Q.    All right.  Now, the production process goes

7    from live receiving down to debone?

8    A.    Yes.

9    Q.    All right.  Now, you had marked for us, but

10   let's get it in the record, where these foot

11   sanitizing activities are taking place.

12   A.    There's a number of them.  I don't know all

13   the exact locations, but I know it's a requirement

14   that they are on every entrance into the

15   production area on the inside.

16   Q.    That's a company requirement?

17   A.    No.

18   Q.    Whose requirement?

19   A.    USDA.

20   Q.    And the company has a policy that employees

21   must comply with USDA requirements, correct?

22   A.    Yes.

23   Q.    Let's see if we can get a verbal description

Page 44

1    Q.    Okay.  So as I understand your testimony,

2    there is nothing that employees are required to do

3    before they enter the production area, other than

4    punch their clock?

5    A.    As I stated, hair nets, beard nets, and

6    earplugs before entering into the production area.

7    Q.    Okay.  What are they required to do upon

8    entry into the production area?

9    A.    Put on their smock, wash their hands before

10   going to the line.

11   Q.    Anything else?

12   A.    Arm guard if they're using knives or

13   scissors, after they enter into the production

14   area.

15   Q.    When you say "arm guard," you mean put it

16   on?

17   A.    Slide it over your arm.

18   Q.    Okay.  Anything else?

19   A.    That's all I'm aware of.

20   Q.    All right.  Now, where are the wash basins?

21   A.    Wash basins?  When you enter into debone,

22   they're in this area right here.  When you enter

23   into evis, they're in this area right here.  When

FREEDOM COURT REPORTING

Page 45

1    you enter from the picking/receiving break room

2    area when you enter into production, they're right

3    on the wall when you go through the door.  There's

4    wash basins back here in this area.

5    Q.    What do you call that area?

6    A.    DSI area.  There's wash basins here.

7    There's wash basins in the evisceration department

8    on this wall here.  They're in a lot of locations.

9    That's the ones I remember at this time.

10   Q.    All right.  Now, the first one you told me

11   about, you're coming from the hall adjacent to the

12   break room into the debone department?

13   A.    Yes.

14   Q.    And the wash basin is adjacent to the entry

15   to the debone department?

16   A.    Right beside the entry.

17   Q.    How many stations or spigots do you have?

18   A.    I don't know the answer to that.

19   Q.    Give me an approximation.

20   A.    I don't know.

21   Q.    Are employees required to wash their hands

22   at that station?

23   A.    They are required to wash their hands before

FREEDOM COURT REPORTING

Page 46

1    going to the line, after entering the production

2    area.

3    Q.    And that's the only wash basin that they use

4    for that purpose?

5    A.    No.

6    Q.    All right.

7    A.    They've got wash basins in evis department;

8    they've got wash basins in debone department.  The

9    people that work in DSI can wash here before going

10   to their job.  The people in picking and receiving

11   can wash here before going to their job.

12   Q.    Okay.  Now, the evisceration sink you told

13   us about is right there as you come in that door

14   to that area?

15   A.    Yes.  Right in front of the door, yes.

16   Q.    Okay.  Where do the DSI employees enter into

17   the production area at the start of the day?

18   A.    I can't really answer where they enter.

19   They can enter here and walk across; they can

20   enter into the debone entrance and walk around;

21   they can enter either one of these areas and walk

22   to the DSI.  I can't tell you that all DSI enter

23   this area.  They're not required to enter no

Page 56

1    policy because I don't do attendance on hourly

2    personnel; but I know we do have an attendance

3    policy.  To state this is the attendance policy we

4    have in place, I can't do that.

5    Q.    Okay.  Let me refer you to one part of it

6    though.

7          It says, "Accumulation of six points will

8    result in voluntary separation from the company."

9    Is that a true statement for the two plants you

10   supervise?

11   A.    Yes.

12   Q.    What does it mean "voluntary separation"?

13   A.    They quit.

14   Q.    Okay.  And then it says, first bullet point,

15   "Arriving to work late and otherwise failing to be

16   ready to work at your designated start time equals

17   one-half point," correct?

18   A.    I believe that's correct, to the best of my

19   knowledge.

20   Q.    Is that a policy that's been followed since

21   Equity took over in March 2004?

22   A.    That was a policy that was negotiated in a

23   union contract, and we go by the union contract

FREEDOM COURT REPORTING

Page 57

1    between Equity and RWDSU.  We go by the contract

2    agreement.

3    Q.    Okay.  But is this arriving to work late and

4    otherwise failing to be ready to work at your

5    designated start time equaling one-half point, is

6    that the practice followed since March 2004?

7    A.    I don't know since March 2004.  It's in

8    place today.  I don't remember if it went all the

9    way back to 2004.

10    Q.    Okay.  If an employee is one minute late,

11    can they be given a half point?

12    A.    Yes.

13    Q.    Does the company timekeeping system allow

14    you to identify when an employee is one minute

15    late?

16    A.    Yes.

17    Q.    And do you dock an employee's pay when

18    they're one minute late?

19    A.    It's according to where they work.  When you

20    say "dock their pay," you need to...

21    Q.    Is that one minute that they're late

22    subtracted from their pay?

23    A.    When you say "subtracted," what department

FREEDOM COURT REPORTING

Page 58

1    are you talking about?  If they're on a scheduled

2    time and they get paid from point A to point B and

3    they're not there at point A, yes.  But if they're

4    on a clock in/clock out, it will be their clock

5    in/clock out time.

6    Q.    And which departments are on scheduled time?

7    A.    When you say "scheduled," you mean from a

8    clock in to clock out, or are you talking about

9    from a standard starting time to a standard ending

10   time?

11   Q.    You used the words "scheduled time."

12   A.    Master card time.  Is that what you're

13   referring to?

14   Q.    I don't know; I'm asking you.  You used the

15   term "scheduled time."  What did you mean by that?

16   A.    If you're scheduled to be there at 7 a.m.

17   and work until 3:30 p.m., that's scheduled.

18   Q.    Okay.

19   A.    And if they clock in at 7:01, they get paid

20   from 7:01 until.

21   Q.    All right.  Now, is that different than

22   master card time?

23   A.    Master card is a scheduled time, per se.

Page 59

1    Q.    Is master card something that's swiped?

2    A.    Yes.

3    Q.    Where is the master card swiped?

4    A.    At either one of the Kronos time clocks.

5    Q.    That's the same time clock that the personal

6    time card is swiped?

7    A.    Yes.

8    Q.    Who swipes the master card?

9    A.    I don't know the answer to that.  Either

10   supervisor, superintendent, production manager.

11   One of the managers.

12   Q.    Now, is an employee on a clock-in/clock-out

13   basis, is that something different than an

14   employee that's on a scheduled time basis?

15   A.    Yes.

16   Q.    What's the difference?

17   A.    The clock in and clock out is from when they

18   clock in until the end of their shift they clock

19   out.

20   Q.    Which employees are on a clock-in/clock-out

21   timekeeping system?

22   A.    I'm not familiar with every one of them.  I

23   know maintenance is on the clock in/clock out.

FREEDOM COURT REPORTING

Page 60

1    Q.    Is there a document that identifies which

2    jobs or employees are on a clock-in/clock-out

3    method?

4    A.    I don't know the answer to that.

5    Q.    Do you know if there's a document that lists

6    the jobs or employees that are on a scheduled time

7    method?

8    A.    I don't know the answer to that.

9    Q.    And what about the master card?  Is there

10   anything that identifies which employees or jobs

11   are subject to a master card method?

12   A.    I don't know the answer to that.  I don't do

13   payroll.

14   Q.    Are there any other methods of timekeeping

15   used for hourly employees, besides those three:

16   scheduled time, master card, and clock in/clock

17   out?

18   A.    Not as I'm aware of.

19   Q.    An employee that's on a master card method,

20   if he's one minute late, is that subtracted from

21   his pay time?

22   A.    Yes.

23   Q.    And, of course, an employee on a clock

FREEDOM COURT REPORTING

Page 61

1    in/clock out, if they're a minute late, they would

2    have that minute subtracted also; is that correct?

3    A.    It would be in their clock in/clock out.  It

4    would be calculated in their clock in to clock

5    out.

6    Q.    Okay.  Let's look at Exhibit 6.  Do you

7    recognize this document called "General Safety

8    #4"?

9    A.    No.

10   Q.    It was produced by the company as Bates

11   number 639.  Read it.  There's 17 sentences --

12   numbered sentences.  And tell me is there anything

13   in there that has not been followed or required of

14   employees since March 2004.

15              (The witness examines the

16              document.)

17   A.    We don't require safety glasses.  "You are

18   required to wear safety glasses and earplugs when

19   entering the process area."

20         We don't require safety glasses for all

21   employees of the complex.

22   Q.    Do you require them for any employees?

23   A.    Yes.

FREEDOM COURT REPORTING

Page 73

1    Q.    And another item since March 2004 that

2    employees can be disciplined for is violation of

3    safety rules and/or policies, correct?

4    A.    Yes.

5    Q.    All right.  Now turn over to page 40 of the

6    employee handbook.

7    A.    (Witness complies.)

8    Q.    Are these the safety rules that are referred

9    to in No. 18 that you can be disciplined and

10   discharged for?  It's called "General Safety

11   Rules."

12              (The witness examines the

13              document.)

14   A.    To the best of my knowledge.

15   Q.    All right.  And when you sat there and read

16   through the General Safety Rules, you didn't

17   identify any that have not been required of

18   employees since March of 2004, did you?

19   A.    No.  On page 40.

20   Q.    Well, the safety rules are on page 40 to 42,

21   correct?

22   A.    I need to read 41 and 42.

23   Q.    Okay.

FREEDOM COURT REPORTING

Page 74

1              (The witness examines the

2              document.)

3    A.    This must be an old one because this has

4    changed.

5    Q.    What's changed?

6    A.    This says, "Wash hands and arms

7    thoroughly..."

8    Q.    Which number?

9    A.    No. 18.  We don't wash arms.  Our current

10   policy says to wash hands.  I know that one's

11   changed.

12         Also, it says, "No equipment will be worn

13   outside of work areas."  You can wear hair nets,

14   beard nets, earplugs outside of work areas.  You

15   can't wear them outside, but you can wear them

16   outside of production areas.

17         It also states here that, "Boots are not to

18   be worn outside of plant."  You can wear your

19   boots to and from work.

20         That's the changes I see at this point.

21   Q.    Okay.  Now, looking at the cover of this

22   employee handbook from which those safety rules at

23   pages 40 to 42 come, it's called Keystone Foods

FREEDOM COURT REPORTING

Page 76

1    Q.    Is there a document that changed any part of

2    the employee handbook?

3    A.    I don't know that.

4    Q.    Is there a document that reflects any

5    non-enforcement of certain items in the employee

6    handbook?

7    A.    I don't know the answer to that.

8    Q.    All right.  Now, identify the numbers in

9    pages 40 to 42, General Safety Rules, that you

10   were speaking of that you don't think are

11   currently in force.

12   A.    No. 18, No. 20.  That's the changes I see.

13   Q.    Okay.  Now, let's do No. 20 first.  That

14   says, for the record, "No equipment will be worn

15   outside of work areas.  Boots are not to be worn

16   outside of plant."

17        Now, you say that's a true statement except

18   for hair nets and earplugs and --

19   A.    Beard nets.

20   Q.    -- beard nets, correct?

21   A.    Correct.  And safety glasses for the

22   employees that wear safety glasses.

23   Q.    But for all other equipment, they're not to

FREEDOM COURT REPORTING

Page 77

1    be worn outside of the work area, correct?

2    A.    Yes.  Back up and ask me that question

3    again.  All other equipment?

4    Q.    Yes.

5    A.    Smocks are to be took off before exiting the

6    production area.

7    Q.    All right.

8    A.    And then their rubber gloves are took off

9    before exiting the production area, and put back

10   on after they get in the production area.

11   Q.    All right.

12   A.    Arm guards are put on normally after they

13   enter the production area.  And if they wear

14   sleeves, they can put them on any time, the

15   production area or going to the production area.

16   Q.    Turn over to Exhibit 12, page 21.  This is

17   the contract with the union effective March 1,

18   2004, to March 1, 2008.

19         There in Section 13.4, is that a complete

20   list of all the equipment that the employees are

21   provided?

22              MR. ROSENTHAL:  What page did you

23   reference?

Page 78

1           MR. WIGGINS:  21.

2    A.    I'm looking at the wrong number.

3           This is a list of equipment that we issue to

4    new employees.  And we've got this listed in our

5    union negotiations on when they can come back and

6    get replacement equipment.  But not all employees

7    are required to get all this equipment.

8    Q.    All right.  But the contract says, for the

9    record, in Section 13.4, "Supplies will be

10   furnished to new employees, where required, in

11   accordance with company procedures as follows..."

12   and then lists three smocks, arm guards, cutting

13   glove, hair net, beard net, blue gloves, cotton

14   gloves, earplugs, apron - heavy duty, and sleeves,

15   correct?

16   A.    Yes.  In this contract, some of these was

17   changed.  At some time, and I don't know what

18   time, we did not issue three smocks.  They come in

19   and got a new, clean smock every day.  They didn't

20   have smocks; they just come in and got one out of

21   the supply room.

22   Q.    Do you know when that began?

23   A.    No.

FREEDOM COURT REPORTING

Page 81

1    require all of these supplies.

2    Q.    Okay.  Let's put aside arm guards and

3    cutting gloves.  Are all the other items in

4    Section 13.4, including boots and safety glasses

5    -- no, leave off safety glasses.  Let me start

6    over.

7         Other than arm guards, cutting gloves, and

8    safety glasses, are all the items in Section 13.4

9    supplied to hourly employees by the company in

10   both your plants, in all departments?

11   A.    No.  Aprons are not.

12   Q.    Okay.  Which employees receive aprons?

13   A.    I can't answer that.  None of them are

14   required.  That's up to them if they want to wear

15   them, as long as they've got their smock on.

16   Q.    We're going to get to that.  I'm just trying

17   to get right now what they're provided.

18        Let's take debone department employees, for

19   example.  Are they provided aprons?

20   A.    What position in debone?

21   Q.    First, are any employees in debone provided

22   aprons?

23   A.    They can get aprons if they'd like to.

FREEDOM COURT REPORTING

Page 82

1    Q.    Are there any employees that are prohibited

2    from getting aprons from the company?

3    A.    Not that I'm aware of.

4    Q.    Where do they get the aprons?

5    A.    Supply room.

6    Q.    Okay.  Do you furnish employees a standard

7    package of items at the beginning of each week?

8    A.    I honestly don't know how the supply room

9    and the management team handles that.  I don't

10   know how they do that.

11   Q.    Do you know who would know that?

12   A.    I sure don't.

13   Q.    Do you know if there are any standard

14   operating procedures or other documents that

15   describe how and when protective equipment is

16   issued?

17   A.    I'm not aware of that.  We go by the union

18   contract.

19   Q.    Okay.  Do you know what protective equipment

20   is provided to employees initially?

21   A.    It's according to the position the employee

22   holds.  All employees are required to wear

23   earplugs.

Page 83

1    Q.    Are all employees required to wear hair nets

2    and beard nets?

3    A.    Yes.

4    Q.    Are all employees required to wear smocks?

5    A.    No.

6    Q.    All employees in the production area are

7    required to wear smocks?

8    A.    Yes.

9    Q.    All right.  Let's look back at page 40 of

10   the Exhibit 8, the employee handbook.

11   A.    (Witness complies.)

12   Q.    One of the items for which an employee can

13   be disciplined or discharged is No. 3 of the

14   safety rules which says, "Personal protective

15   equipment, which is provided initially by the

16   company, must be worn," correct?

17   A.    Yes.

18   Q.    All right.  Now let's look at No. 18.  You

19   identified that as one you said is not fully

20   enforced.  I think what you told me is that No. 18

21   is an accurate statement of what employees are

22   required to perform subject to discharge or

23   discipline, except for washing of arms, correct?

FREEDOM COURT REPORTING

Page 84

1    A.    Correct.

2    Q.    So then was there a period of time that you

3    did require washing of arms?

4    A.    I do not remember.  I don't know.

5    Q.    Who would know that?

6    A.    I don't know.

7    Q.    Your first line supervisor would probably

8    know that, wouldn't they?

9    A.    Should, I would say.  I don't know.  I can't

10   answer that.

11   Q.    All right.  But at all times since March of

12   2004, employees could be disciplined or discharged

13   for not washing hands thoroughly with soap and

14   water before and after using bathroom facilities,

15   correct?

16   A.    Yes.

17   Q.    Now let's go to Exhibit 9.  This is the

18   Employee Orientation Manual.  You brought a new

19   one that we marked earlier.

20        Page 1 is an agenda of a day of training or

21   orientation for new hires, correct?

22   A.    That's what it looks like.

23   Q.    All right.  And it says between 1:00 and

FREEDOM COURT REPORTING

Page 112

1          Is that required at the plant?

2    A.    I don't even know what that means.

3    Q.    Do you provide any disinfectants to clean

4    equipment?

5    A.    We have disinfectants that we clean the

6    plant with.

7    Q.    When employees clean equipment with

8    disinfectant, are they considered to be working?

9    A.    Yes.

10   Q.    Is that considered to be compensable time?

11   A.    Paid time?

12   Q.    Paid time.

13   A.    Yes.

14   Q.    Next page, 81, "Common Sense Rules" is the

15   heading, in the orientation manual.

16         Are each of these items practices followed

17   in your two plants?

18   A.    I can't answer that.  First time I ever seen

19   it.

20   Q.    But in terms of the practices followed in

21   your two plants, is it a rule that employees must,

22   quote, Wash hands and remove protective clothing

23   before eating, drinking, smoking, handling contact

Page 115

1    Q.    Let's look at the contract.  And if you need

2    the full contract, I think we have it out here for

3    you somewhere.

4              MR. ROSENTHAL:  If you need it, I have

5    a copy of it.

6    Q.    Do you know of any items within the

7    2004-2008 contract that were not in force or that

8    were modified in some way?

9    A.    I'm not that familiar with the contract.  I

10   don't remember it word for word.  I'd have to look

11   through it and see.

12   Q.    Well, let's take the pages that I've

13   excerpted out here in Exhibit 12 in order to

14   narrow it down a little bit.  These are the pages

15   that look like they might be relevant to this

16   case.

17         Tell me, on those pages in Exhibit 12, are

18   there any parts that were not in force during the

19   2004 to 2008 contract period?

20   A.    These smocks, again, as stated earlier.

21   Sometime during this contract we started

22   furnishing them smocks, and they pick them up at

23   the supply window.  They was not issued three

FREEDOM COURT REPORTING

Page 117

1    to 172; the other one has a 2002 date, E 167 and

2    168.

3           Have you ever seen these before?

4    A.    I'm not familiar with these documents.

5    Q.    Have you ever had any responsibility for

6    keeping abreast of Department of Labor

7    requirements on overtime?

8    A.    No.

9    Q.    Have you ever had any responsibility for

10   determining compliance with overtime rules or

11   regulations?

12   A.    No.

13   Q.    Do you know anybody in the company who has

14   had responsibility for keeping abreast of overtime

15   requirements of the Department of Labor?

16   A.    I don't have a clue.  I mean, I don't know.

17   Q.    Do you know who made the decision not to pay

18   employees for donning, doffing, or sanitizing

19   activities before their production line begins?

20          MR. ROSENTHAL:  Objection to the form

21   of the question.  You can answer.

22   A.    We're just following the union contract.

23   Everything was negotiated in the union contract,

FREEDOM COURT REPORTING

Page 118

1    and that's what we go by.

2    Q.    But do you know who made the decision that

3    the company would not pay for donning, doffing, or

4    sanitizing time that occurs before the production

5    line commences?

6            MR. ROSENTHAL:  Again, I object to the

7    form for the same reason.

8    A.    No.  We were just following the union

9    contract.

10   Q.    So then it wasn't your decision, obviously,

11   correct?

12   A.    No.  We just follow in the union contract

13   what we negotiated with the union.

14   Q.    Who do you think is the most knowledgeable

15   of the Department of Labor overtime requirements

16   or regulations?

17   A.    I can't answer that.

18   Q.    Do you know anybody who's knowledgeable?

19   A.    No.  I don't know who would be knowledgeable

20   of that.

21   Q.    Let's go to the last exhibit in the book,

22   Exhibit 15.  This is called "Equity Group Eufaula

23   Division Payroll Processing Manual."

FREEDOM COURT REPORTING

Page 122

1   A.     I don't know.

2   Q.     And what does he compare the punch-in time

3   to, to determine if someone is late?

4   A.     Master card time.  Start time/ending time,

5   according to what schedule he's on.

6   Q.     All right.  Master card time, is that the

7   same thing as line time?

8   A.     Yes, I would think so.

9   Q.     All right.  Let's look back at the

10  collective bargaining agreement, Exhibit 12.

11  Let's look at page 20 of the agreement, Section

12  12.5 called "Line Time."

13         It consists of this one sentence:  "All

14  employees will be paid according to the hours of

15  work indicated by the Master Line Time Card."

16  Correct?

17  A.     Yes, sir.

18  Q.     Now, you earlier told us though that that's

19  not true for all employees that are under the

20  collective bargaining agreement, correct?

21  A.     Correct.

22  Q.     Do you have a list of jobs or employees for

23  which it is not true that they will be paid

FREEDOM COURT REPORTING

Page 123

1    according to the Master Line Time Card?

2    A.    I do not.

3    Q.    Can you name any such jobs?

4    A.    Floor personnel would be one.  I mean,

5    there's probably many, but I don't know them all.

6    Q.    Tell us the ones you do know.

7    A.    I honestly don't know.  I know floor

8    personnel wouldn't because they come early and

9    stay late.  They're on a different time than the

10   line card.  I don't know what employees are on

11   what time system, whether it be master card, clock

12   in to clock out, so I don't know.

13   Q.    If you were to attempt to determine that,

14   what documents would you want to look at?

15   A.    I would have to just do some research.  I

16   don't know what documents I'd look at because

17   right now I wouldn't know where to look.

18   Q.    Who would be the first person you would ask

19   because you would think they were the most

20   knowledgeable?

21   A.    Payroll department.

22   Q.    Who in the payroll department?

23   A.    You've got Joe Preston who's the accountant

FREEDOM COURT REPORTING

Page 142

1    A.    And right here.

2    Q.    Okay.

3    A.    It's hard to tell on this print.

4    Q.    Yeah, it is.  So there are no restrooms

5    within the production area in either plant,

6    correct?

7    A.    Correct.

8    Q.    There are no break rooms in the production

9    area in either plant?

10   A.    Correct.

11   Q.    Where is the nurse's station?

12   A.    Nurse's station?  I believe that's labeled

13   nurse's station.

14   Q.    And that serves both plants?

15   A.    Yes.

16   Q.    And it's, just for the record's sake, it

17   looks like it's a separate building; is that

18   right?

19   A.    Yes.

20   Q.    And it sits out by the parking lot?

21   A.    Yes.  Right off the sidewalk.

22   Q.    Right out front of the fresh processing

23   plant, correct?

FREEDOM COURT REPORTING

Page 143

1    A.    Correct.

2    Q.    All right.  Employees are not allowed to

3    have candy, gum, food, drink, or anything of that

4    sort, in the production area; is that correct?

5    A.    Correct.

6    Q.    So employees have to leave the production

7    area to either get supplies from the supply room,

8    to go to the nurse's station, to go to bathroom,

9    to go to the QA office, correct?

10   A.    Correct.

11   Q.    Is that true of both plants?

12   A.    Yes.

13   Q.    All right.  Do you know how much time it

14   takes for employees to walk from the front door to

15   the time clock?

16   A.    No.

17   Q.    Do you know how long it takes employees to

18   walk from the supply room to the entry to the

19   production room?

20   A.    No.

21   Q.    Do you know how long it takes employees to

22   walk from the break room to the entry to the

23   production area?

FREEDOM COURT REPORTING

Page 144

1    A.    No.

2    Q.    Do you know how long it takes employees to

3    walk from their station on the line back to the

4    bathroom?

5    A.    No.

6    Q.    Or to the break room?

7    A.    No.

8    Q.    Or to the QA department?

9    A.    No.

10   Q.    Do you know the amount of times it takes

11   employees to don or doff or sanitize their

12   protective gear or equipment?

13   A.    No.

14   Q.    Has the company ever studied any of the

15   amounts of time it takes to do any task related to

16   donning, doffing, or sanitizing protective gear or

17   equipment?

18   A.    Not that I'm aware of, but I don't know.

19   Q.    Has the company, or anyone on behalf of the

20   company, videotaped employees donning, doffing,

21   sanitizing, or walking time?

22   A.    Has the company -- are you talking about the

23   company officials?

FREEDOM COURT REPORTING

Page 147

1    is administratively impractical to keep up with

2    employees' donning, doffing, or sanitizing time?

3    A.    Repeat the question.

4    Q.    Have you ever made a determination that it's

5    administratively impractical to record or keep up

6    with the amount of time employees are spending

7    donning, doffing, or sanitizing protective gear or

8    equipment?

9              MR. ROSENTHAL:  Objection to the form

10   of the question.  You can answer.

11   A.    I don't know the answer.  I don't understand

12   the question.

13   Q.    Have you ever made a determination that

14   it's, from an administrative standpoint,

15   impractical for the company to track and record

16   and then pay for the amount of time it takes to

17   don or doff or sanitize protective gear or

18   equipment?

19             MR. ROSENTHAL:  Objection again to the

20   form of the question.

21   A.    Not that I'm aware of.  I really don't know.

22   Are you asking me have I made a decision not to

23   pay for donning and doffing, in simple terms?  Is

FREEDOM COURT REPORTING

Page 148

1    that what you're asking?

2    Q.    No.    I think I asked you that earlier today.

3    But right now I'm just asking if you've made a

4    decision or made a determination that it's

5    administratively too difficult or impractical to

6    keep up with the amount of time employees

7    typically take to don, doff, or sanitize their

8    protective gear or equipment.

9              MR. ROSENTHAL:    Objection to the form

10   of the question.

11   A.    No, I haven't made that decision.

12   Q.    Do you know anybody who has?

13   A.    No.

14   Q.    Do you know anybody who has that as part of

15   their responsibility?

16   A.    Not that I'm aware of.

17   Q.    Did you participate in the decision to pay

18   three minutes for donning and doffing time?

19   A.    I was at the negotiating table when it was

20   negotiated between the company and RWDSU.

21   Q.    Other than sitting at the table, did you

22   participate in that decision, that three minutes

23   would be the amount of time the company would pay

Page 149

1    for donning and doffing clothes or equipment?

2    A.    As a group, that's what we negotiated as a

3    group.

4    Q.    Okay.  Yeah.  I'm going to get into the

5    negotiation in a minute.  But right now I'm trying

6    to figure out are you the decision maker.

7          Did you make the decision that three minutes

8    was the appropriate amount of time, or were you

9    just going along for the ride?

10   A.    As a group, we made the decision.

11   Q.    What role did you play in that decision?

12   A.    As a group member.

13   Q.    But you said you never tried to determine

14   the actual time it takes to do these activities,

15   correct?

16   A.    No, I have not.

17   Q.    Do you know anybody who has?

18   A.    No.

19   Q.    Do you know how they arrived at three

20   minutes?

21   A.    I get dressed and go out in the plant, and

22   it don't take me three minutes.

23   Q.    What do you put on?

FREEDOM COURT REPORTING

Page 150

1    A.    Smock, hair net, beard net, earplugs, boots.

2    Q.    You don't wear your boots during the regular

3    part of your day?

4    A.    No.

5    Q.    Now, do you know anybody who has made a

6    determination that three minutes is the actual

7    amount of time it takes to do donning/doffing of

8    protective gear or equipment?

9    A.    Not that I'm aware of.

10    Q.    Did you ever see any documents that

11    referenced three minutes as the amount of time to

12    be paid or negotiated for donning and doffing?

13    A.    No.

14    Q.    Did the union, to your knowledge, make any

15    time study or effort to determine the amount of

16    time it actually takes to don and doff?

17    A.    I can't answer that.  Not to my knowledge,

18    but I don't know.

19    Q.    Who was in the group that you say was

20    involved in the negotiations that led to the

21    three-minute time period?

22    A.    It's listed in the contract.  I don't

23    remember all the names, but it's on the contract.

FREEDOM COURT REPORTING

Page 152

1    A.    Not as I'm aware of.

2    Q.    Have you ever looked into what other

3    companies do in terms of keeping up with the time

4    taken to don or doff protective gear or equipment

5    for pay purposes?

6    A.    No, I haven't.

7    Q.    Do you know anything at all that was

8    considered in deciding that three minutes would be

9    the appropriate amount of time to pay for donning

10   and doffing?

11   A.    Other than our own personal time for what it

12   takes for us to get dressed and walk out to the

13   plant.  That's all I know.  That's what I based my

14   ruling on.

15   Q.    What did the union propose as the

16   appropriate amount of time, prior to reaching the

17   final agreement?

18   A.    I can't remember.  I can't answer that.  I

19   don't know.

20   Q.    Now, we were given some documents this

21   morning, Exhibits 19 and 20, which had to do with

22   union proposals and company responses.

23         Do any of those documents reference the

FREEDOM COURT REPORTING

Page 153

1    negotiations over the three minutes?

2    A.    I do not see anything in 19; I don't see

3    anything in Exhibit 20 either.

4    Q.    Okay.  Is Spence Jernigan still with the

5    company?

6    A.    Yes.

7    Q.    What's his job now?

8    A.    I don't know his job title, but he's

9    director of HR.

10   Q.    Where is he located?

11   A.    Huntsville.

12   Q.    Did he play any role in the new contract

13   negotiations in 2008?

14   A.    No.

15   Q.    Is James Davis still with the company?

16   A.    No.

17   Q.    Where is he now?

18   A.    He's working for another firm in Eufaula.

19   Q.    And what's the name of it?

20   A.    I think Cooper Lighting, but I don't know.

21   Q.    It's not a poultry --

22   A.    No.

23   Q.    Why did he leave the company?

FREEDOM COURT REPORTING

Page 157

1    Q.    What part of the day were those exercises

2    being done?

3    A.    In the mornings, normally after they got on

4    their line.

5    Q.    And how long would they do the physical

6    exercises?

7    A.    I don't know the answer to that.

8    Q.    I think I asked you this, but I want to make

9    sure:  Do you know which departments did the

10   physical exercises?

11   A.    The best of my knowledge, debone was the

12   only department doing that.

13   Q.    And was it the whole department?

14   A.    I don't know the answer to that.

15   Q.    Did the company consider doing physical

16   exercises to be work?

17   A.    Yes.  They was on the clock.  It was after

18   the line was started, after they got on the line.

19   Q.    Are all activities that employees are paid

20   for considered work?

21   A.    Yes.

22   Q.    Now, you said you started with the company

23   September '99, correct?

FREEDOM COURT REPORTING

Page 158

1    A.    I believe that's correct.

2              MR. ROSENTHAL:  He said started with

3    CP.

4    Q.    CP in September of '99.  And were you

5    involved in the collective bargaining negotiations

6    while you were with CP?

7    A.    No.

8    Q.    And the contract that CP had ran from 2000

9    to 2004; is that correct?  Or do you know?

10   A.    I don't know.

11   Q.    How many employees are paid on a piece

12   basis?

13   A.    None.

14   Q.    When did that cease?

15   A.    I don't recall the date.

16   Q.    How many, when you were paying employees on

17   a piece basis, did you have that you were doing

18   that?

19   A.    I don't remember the number of employees.

20   Q.    Which employees were paid on a piece basis?

21   A.    Tender sizing and thigh sizing.

22   Q.    How are they paid now?

23   A.    That department no longer exists.

FREEDOM COURT REPORTING

Page 159

1    Q.    Now, you said earlier you didn't know if you

2    had any setup employees?

3    A.    Correct.

4    Q.    Do you have any personal knowledge about the

5    collective bargaining agreement while CP ran the

6    plant?

7    A.    No, other than the handbook that we had to

8    go by.  I don't recall what was in the union

9    handbook.  I was not part of the negotiations.

10   Q.    You're calling the handbook the contract?

11   A.    I meant the contract.  Sorry.

12   Q.    Do you know who negotiated on behalf of the

13   union when CP ran the plant and the collective

14   bargaining was being negotiated?

15   A.    No, I don't.

16   Q.    Do you know of any differences in the way CP

17   paid employees and the way Equity Group pays

18   employees?

19   A.    No, I don't.  The same system we had then

20   carried through all contracts.

21   Q.    Were you involved in any of the decision

22   making that led Equity Group to take over the

23   plant from CP?

FREEDOM COURT REPORTING

Page 160

1   A.      Tell me what you're talking about.

2   Q.      Were you involved in making any of the

3   decisions that went into the transition of

4   ownership from CP to Equity Group?

5   A.      No.

6   Q.      Were you involved in any of the decisions or

7   considerations that went into whether or not

8   Equity Group would follow the customs or practices

9   of CP?

10  A.      No.

11  Q.      Do you have any knowledge on that subject?

12  A.      No.

13  Q.      Have you ever had any conversations with

14  Jacqueline Davis about donning and doffing?

15  A.      She was in the negotiations.

16  Q.      Do you remember anything she said?

17  A.      No, not her personally.

18  Q.      Have you ever heard Jacqueline Davis say

19  anything that touched on the subject of donning

20  and doffing or pay for donning and doffing?

21  A.      No.  I read her depositions where --

22  Q.      When did you do that?

23  A.      When this come up, I read everything about

Page 161

1    donning and doffing that I knew.  And I knew that

2    she had filed a case against us, so I read her,

3    you know -- we reviewed her documents.

4    Q.    "We" being who?

5    A.    Myself, Kathy Gilmore.

6    Q.    All right.  So did you read her deposition

7    in this case or some other case?

8    A.    I read one she made in another case.

9    Q.    And that's when CP owned the plant?

10   A.    I don't remember who owned it at the time.

11   Q.    Do you remember anything you learned?

12   A.    There's some in my affidavit there about

13   what was in there about the Jackie Davis case

14   about the donning and doffing.

15   Q.    Yeah.  But I'm talking now about what you

16   learned when you read the deposition.

17   A.    I learned that the judge didn't grant her

18   any donning and doffing pay.

19   Q.    Okay.  Anything else?

20   A.    No.  That was the main concern.

21   Q.    Do you know what Jacqueline Davis understood

22   or said she understood about whether she could

23   expect to be paid for donning and doffing

FREEDOM COURT REPORTING

Page 162

1    activities while CP ran the plant?

2    A.    She wasn't expecting to be paid for it, as

3    far as I know.

4    Q.    But have you ever heard her express her

5    understanding?

6    A.    No, I have not.

7    Q.    Have you ever read anything in which she

8    expressed her understanding?

9    A.    I don't recall.

10   Q.    Have you ever read or heard anything that

11   indicated what Jacqueline Davis understood about

12   whether it's a well-known practice for CP to pay

13   only for time worked at the workstation?

14   A.    From what I read, that's what she understood

15   she got paid.  That it was understood that she got

16   paid for time worked at the workstation.

17   Q.    But you never heard her say that?

18   A.    I never heard her say that.

19   Q.    Do you know why CP decided to sell the

20   plant?

21   A.    I've heard rumors.

22   Q.    What did you hear?

23   A.    Nonprofit organization.

Page 163

1    Q.    Wasn't make any money?

2    A.    No money.

3              MR. ROSENTHAL:  It was a profit-making

4    organization that was not making profit.

5              MR. WIGGINS:  Right.

6    Q.    Have you ever heard Jacqueline Davis say

7    anything to Jenkins or Foster?

8              MR. ROSENTHAL:  Anything at all?

9    Q.    About donning and doffing.

10   A.    Not that I recall, but I'm sure she did in

11   the contract negotiations.

12   Q.    Now, Jenkins and Foster were the union

13   representatives, correct?

14   A.    Correct.

15   Q.    But did you ever hear Davis say anything to

16   Jenkins or Foster about donning and doffing; and

17   if so, what did you hear?

18   A.    I don't recall.

19   Q.    Do you handle grievances, union grievances?

20   A.    If they come up to my level.

21   Q.    What's your level?

22   A.    Operations manager.

23   Q.    Is that the fourth level? third? second?

Page 164

1    What is that?

2    A.    I don't remember.  I haven't seen a

3    grievance in years.

4    Q.    How many?

5    A.    I don't recall.

6    Q.    All right.  So you don't have any knowledge

7    about grievances until they reach your level,

8    correct.

9    A.    Correct.

10    Q.    Let's see if we can figure out what your

11    level is.  Look in this union contract.  Can you

12    find where it defines your level?

13    A.    Actually, I'm not even on here.  But I know

14    about them if it goes to the plant manager level.

15    We have a grievance if it gets to the step two.

16    If it gets to the plant manager, I'm made aware of

17    it.

18    Q.    Okay.

19    A.    If we ever have one.

20    Q.    But you have no knowledge of any grievances

21    that only went to the step one?

22    A.    No.

23    Q.    Who was the chief negotiator for the company

Page 167

1    Q.    And how long did she hold that job?

2    A.    I don't know the answer to that.

3    Q.    Was she with CP?

4    A.    I don't know the answer to that.

5    Q.    Look at page 4, under the title "Purpose."

6    It says, "The following GMP's were established to

7    minimize the introduction of bacteria,

8    contaminants, or foreign material into our

9    manufacturing environment and must be adhered to

10   by all team members and visitors while in

11   production areas including coolers, shipping, and

12   receiving docks."

13         Do you know of any other purpose for these

14   practices that are then listed in the policy?

15   A.    Not as I'm aware of.

16   Q.    Under "Responsibility" it says, "The Quality

17   Assurance Department primarily administers this

18   program."

19         How do they do that?

20   A.    I don't know.

21   Q.    Do you know of any recordkeeping they do in

22   terms of checking employees' donning, doffing, or

23   sanitizing practices?

FREEDOM COURT REPORTING

Page 168

1    A.    No.   But I'm not that familiar with the QA.

2    They don't report to me.

3    Q.    When it uses the words "team members," what

4    does that mean?

5    A.    Everybody, I would guess.  I don't know.

6    Q.    That would include you?

7    A.    Every team member.  I don't know what the

8    definition of it is in this sentence.

9    Q.    But you don't divide employees into teams?

10   A.    No.

11   Q.    How many first line supervisors do you have

12   in debone?

13   A.    I don't remember off the top of my head.

14   It's in the flowchart or organizational chart.

15   Q.    Okay.  Now, look at the "Grounds" section,

16   page 4.  Do you see that section?

17   A.    Yes.

18   Q.    Has that always been the practice since

19   March of 2004?

20   A.    Yes.

21   Q.    And the purpose of that part of the GMP is

22   to prevent contamination of the poultry products?

23   A.    Not the grounds.  Grounds is to protect

FREEDOM COURT REPORTING

Page 169

1    against insects.  Pest control.  That sort of

2    stuff that could lead into the plant:  rats

3    rodents, so forth, on the grounds.  Grounds is

4    outside perimeter, not the plant.

5    Q.    All right.  Let's go to the next page to the

6    "Plant Construction and Design" section.

7          It says, "Plant buildings and structure

8    shall be suitable in size, construction and design

9    to facilitate maintenance and sanitary operations

10   for food - manufacturing purposes."  Correct?

11   A.    Yes.

12   Q.    Now, have you always followed these

13   practices listed under "Plant Construction and

14   Design" at the two plants here in Eufaula, since

15   March of 2004?

16   A.    To the best of my knowledge.

17   Q.    And then under "General Requirements," do

18   you see any part of the general requirements that

19   have not always been required of employees since

20   March of 2004?

21               (The witness examines the

22               document.)

23   A.    I don't know if this goes all the way back

FREEDOM COURT REPORTING

Page 170

1    to 2004; but to the best of my knowledge after

2    briefly reading through it, these are the rules

3    that we follow today.

4    Q.    And sitting here watching you, you read

5    through all 41 items; is that right?

6    A.    I scanned through it.  I didn't read every

7    one of them word for word.

8    Q.    All right.  Let's look at No. 2.  It says,

9    "All team members and visitors must wash and

10   sanitize hands before starting work..."

11         That's always been a requirement, correct?

12   A.    Best of my knowledge.

13   Q.    And then it says, "All team members must

14   wash and sanitize hands after each absence from

15   the work area...," correct?

16   A.    Yes.

17   Q.    And that's always been a requirement,

18   correct?

19   A.    Best of my knowledge.

20   Q.    And what will cause absences from the work

21   area?

22   A.    If you leave and go to the break room, or

23   you go to the nurse's station, or you go to HR,

Page 171

1    QA, anywhere you go.

2    Q.    Restroom?

3    A.    Restroom, which it states up here.

4    Q.    And the reason for that rule No. 2 that you

5    must wash and sanitize hands after each absence

6    from the work area and before starting work is to

7    protect the poultry products from contamination,

8    correct?

9    A.    Yes.  You're handling food.

10   Q.    And that's the reason for the rule; is that

11   right?

12   A.    Correct.

13   Q.    Now, No. 4 says, "A solid (non-mesh) hair

14   net must be worn to contain the hair as completely

15   as possible."

16         That's always been the rule that employees

17   are required to follow?

18   A.    Not always, but it has been for the last

19   period of time.  I don't know how long.

20   Q.    Since March of 2004 at least?

21   A.    I would think, but I don't know that.

22   Q.    And No. 6 says, "A clean smock must be

23   obtained daily."

Page 172

1              That's been required since at least March of

2     2004, correct?

3     A.    No.

4     Q.    When did that first start?

5     A.    I don't know.

6     Q.    The next sentence of Rule 6 under General

7     Requirements says, "Smocks are to be changed

8     during the shift if needed."

9              Has that always been a rule?

10    A.    Yes.

11    Q.    And when will a change in smocks be needed?

12    A.    Only if they get contaminated.

13    Q.    And what would contaminate a smock?

14    A.    Wet, bloody, for example.

15    Q.    Are there any jobs in which employees never

16    get wet, bloody, or contaminated?

17    A.    Yes.

18    Q.    Which ones?

19    A.    QA, for example.  I don't know all the jobs

20    and what does and don't get contaminated or

21    bloody.

22    Q.    Okay.  The next sentence of Rule 6 of

23    General Requirements says, "Smocks must fasten or

Page 173

1    tie properly to cover street clothes.  Smocks may

2    not have sewn on buttons or an external upper

3    pocket."

4         Has that always been true since March of

5    2004?

6    A.    I can't answer that since March of 2004.

7    Q.    Why do you have a rule that the smocks must

8    fasten or tie properly to cover street clothes?

9    A.    To cover street clothes.

10   Q.    Is that to protect the poultry from

11   contamination by street clothes?

12   A.    Yes.  And to protect the clothing of the

13   employee.

14   Q.    All right.  "Smocks may not have sewn on

15   buttons."

16        What purpose does that serve?

17   A.    You don't want a button getting in your

18   product.

19   Q.    And can't have an external upper pocket.

20   What purpose does that serve?

21   A.    You don't want nothing in your pocket to

22   fall over in your product.

23   Q.    It would contaminate the product?

Page 174

1    A.    Yes.

2    Q.    And then Rule 7 of General Requirements

3    says, "Smocks, hair nets, and beard nets must be

4    removed before exiting the facility."

5          And I believe you've already said that's

6    always been the rule?

7    A.    Yes.  Can't wear them outside.

8    Q.    Why?

9    A.    Contamination.

10   Q.    Of the poultry product?

11   A.    Yes.  Of the smock that's going back to the

12   poultry product.

13   Q.    Okay.  Then Rule 8 says, "Keep hands and

14   fingernails clean.  Keep fingernails properly

15   trimmed, and if fingernail polish or false

16   fingernails are worn, gloves must cover hands

17   while in any production area, including box rooms,

18   shipping/receiving, dry storage, product storage."

19         Has that always been the requirement that

20   employees are required to follow?

21   A.    I don't know about always.  It is today.

22   Q.    Do you know if that's been since March of

23   2004?

FREEDOM COURT REPORTING

Page 175

1    A.    No, I don't.  I don't recall that far back.

2    Q.    Rule 10 of the General Requirements says,

3    "Clothing must be clean at the start of operation

4    and kept reasonably clean during operations."

5          Which clothing is that talking about?

6    A.    Smock.

7    Q.    Is it talking about the street clothes too?

8    A.    No.

9    Q.    Well, are you just repeating yourself in No.

10   10 from what you said in No. 6 about smocks?

11   A.    Looks that way.

12   Q.    Did you author these rules?  Did you have

13   any role in the authorship of these rules?

14   A.    No.

15   Q.    Rule 11 of the General Requirements says,

16   "Plastic sleeve covers will be worn to cover any

17   street clothes that extend beyond smock coverage

18   on the arms when handling product."

19         Is the purpose of that to prevent

20   contamination of the chicken product?

21   A.    And to cover your street clothes.

22   Q.    To prevent contamination?

23   A.    And to keep your street clothes from getting

FREEDOM COURT REPORTING

Page 176

1   messed up.

2   Q.    And the company furnishes the plastic

3   sleeves to the employees?

4   A.    Yes, according to the union contract.

5   Q.    Do you know how often?

6   A.    No.  It's in the contract.

7   Q.    I believe that's the rule that you said part

8   of it you no longer follow, like the three smocks.

9            MR. ROSENTHAL:  Objection to the form

10  of the question.

11  Q.    When you say it's in the contract, are you

12  speaking of Section 13.4, page 21, of the

13  2004-2008 contract?

14  A.    See right there, sleeves?

15  Q.    Right.  But that's what you were referring

16  to is that 13.4 Section, correct?

17  A.    Referring to as this being in the contract?

18  Q.    In your last answer you said it was in the

19  contract.  Is that what you were referring to?

20  A.    Yes.  You said the company supplied them;

21  that's what I'm referring to.

22  Q.    Okay.  Rule 12 of the General Requirements

23  in Exhibit 17 says, "Maintain gloves used for

Page 177

1    handling food and food contact packaging supplies

2    intact and in a sanitary condition."

3         The purpose of that is to protect the

4    chicken from contamination, correct?

5    A.    Yes, and to cover your hands.

6    Q.    To cover your hands so your hands can't

7    touch the chicken, right?

8    A.    Or the chicken can't touch your hand, yeah.

9    Q.    Rule 13 says, "Gum, candy, cough drops, and

10   tobacco products are not permitted in any

11   production area."

12        Has that been a rule since at least March of

13   2004?

14   A.    Best of my knowledge.

15   Q.    Rule 14:  "Maintain lockers clean and free

16   of trash or soiled clothing."

17        Has that always been a rule?

18   A.    Yes, best of my knowledge.

19   Q.    Rule 15 says, "No food or beverages are

20   allowed in production areas and placing food in

21   lockers is highly discouraged unless there is no

22   other alternative and it must be properly sealed

23   and removed daily."

FREEDOM COURT REPORTING

Page 178

1        What's the purpose of that rule?

2    A.    Pests.

3    Q.    To keep down pests that would cause poultry

4    contamination?

5    A.    Yeah.  You don't want food or beverage in

6    your production area.

7    Q.    Because it might lead to the contamination

8    of the poultry?

9    A.    And it's a USDA requirement.

10   Q.    And the USDA requirement is put there in

11   order to protect poultry from contamination?

12   A.    I would think so, yes.

13   Q.    And then Rule 16 says, "Don't use hands or

14   equipment for practices which may result in

15   contamination of food products.  Such practices

16   include but are not limited to:  touching face,

17   wiping forehead; scratching head or body; placing

18   fingers on/or in mouth, nose, or ears."

19        Has that always been a rule?

20   A.    I can't answer that.  I don't know.  It is

21   today.

22   Q.    But the purpose of that rule is stated on

23   its face, correct, that it might result in

FREEDOM COURT REPORTING

Page 179

1    contamination of food products?

2    A.    Yes.

3    Q.    And then Rule 17 says, "Avoid uncontrolled,

4    uncovered coughing or sneezing.  Sanitize hands

5    afterwards."

6          Has that always been a rule?

7    A.    I don't know the answer to that.

8    Q.    Now, the purpose of that rule is to protect

9    the poultry from contamination, correct?

10   A.    To keep from sneezing over the food that

11   somebody is going to eat.

12   Q.    Rule 24 says, "Any item that becomes

13   contaminated must be washed and sanitized before

14   being placed back into use.  Processing tools and

15   utensils are, but not limited to the following

16   items:  pens, calculators, thermometers,

17   clipboards, pans, edible totes, edible shovels,

18   earplugs, maintenance tools, etc."

19         Has that always been the rule since at least

20   March of 2004?

21   A.    I can't answer that since March of 2004.

22   It's a rule today.

23   Q.    And the reason for requiring that type of

FREEDOM COURT REPORTING

Page 180

1    equipment to be kept free from contamination,

2    including the earplugs, is to prevent

3    contamination of the poultry products, correct?

4    A.    Contamination of the earplugs could

5    contaminate a human's ears.  You want to clean

6    them before you put them in your ears, I would

7    think.

8    Q.    For example, it says, "Any item that becomes

9    contaminated must be washed and sanitized..."  And

10   it gives examples like pens, calculators,

11   thermometers, clipboards, pans, etc.

12        You pay employees for that sanitation,

13   correct?

14   A.    Yes.

15   Q.    That's considered work?

16   A.    Yes.

17   Q.    Now, Rule 25 says, "Only approved footwear

18   shall be worn in the processing area to include

19   coolers, shipping, and receiving docks."

20        Is there any footwear approved other than

21   that which the company distributes to the

22   employees?

23   A.    Yes.

FREEDOM COURT REPORTING

Page 181

1    Q.    The company does provide boots to employees,

2    correct?

3    A.    Yes.

4    Q.    Free of charge?

5    A.    Yes.

6    Q.    And why does it do that?

7    A.    Because it's required to wear washable

8    footwear, so we supply boots.

9    Q.    And is that to prevent contamination of the

10   poultry processing areas?

11   A.    It's a requirement by the USDA.

12   Q.    And the purpose of their requirement is to

13   prevent contamination of the poultry processing?

14   A.    I guess.  But as it states here, you can

15   also wear shoe covers.

16   Q.    Does the company furnish the shoe covers?

17   A.    We have them available.  They're not in the

18   contract, but they can buy them if they would

19   rather have the shoe covers than the rubber boots.

20   Q.    Well, the company pays for the rubber boots.

21   Does it pay for the shoe covers?

22   A.    Not as I'm aware of.

23   Q.    Do most employees wear the rubber boots?

FREEDOM COURT REPORTING

Page 182

1    A.    Yes.

2    Q.    It says, "Rubber boots are available at the

3    Supply and may be cut down..."

4          What does that mean, "cut down"?

5    A.    If you don't like them coming all the way up

6    to your knees, you can cut them off.  A lot of

7    employees do that.

8    Q.    These are boots that come all the way to

9    your knee if you don't cut them down?

10   A.    Yes.

11   Q.    Then it goes on to say, "...but cannot be

12   left where they are hanging loose or flapping

13   over.  Do not cut below the ankle."

14         Has that always been a rule?

15   A.    I can't answer that.  It's a practice we

16   have today.

17   Q.    What's the purpose of that rule about not

18   cutting your boots or letting them flap?

19   A.    Safety.  Safety for the employee.

20   Q.    And does it also have to do with sanitation?

21   A.    No.  It's for the safety of the employee.

22   Q.    Are the rubber boots provided for sanitary

23   purposes?

FREEDOM COURT REPORTING

Page 183

1    A.    They're provided because it's a USDA

2    regulation.

3    Q.    There's nothing in the union contract about

4    boots?

5    A.    Yes, it's in the union contract.

6    Q.    What does the union contract say about

7    boots?

8    A.    I don't recall.  We do furnish them.

9    Q.    Rule 34 says, "Only approved tools may be

10   used...  Examples of non-approved tools:

11   pocketknives, fingernail clippers, etc. or any

12   tool with a wooden handle."

13         What's the purpose of that rule?

14   A.    Because the tools have to be cleanable,

15   sanitizable, and we furnish the tools.  We don't

16   want the employees to have to furnish tools.  We

17   furnish tools for the employees.

18   Q.    And that's so you can make sure you keep the

19   poultry processing area in a sanitary condition?

20   A.    So the tools meet the USDA requirements.

21   Q.    And the requirements of USDA are to ensure

22   the sanitary production of uncontaminated chicken

23   products?

FREEDOM COURT REPORTING

Page 184

1    A.    Yes.

2    Q.    Rule 35 talks about work stands, ergo

3    stands.  What are those?

4    A.    The stands they get up on to make their job

5    more ergonomically correct.

6    Q.    Where are they provided at?

7    A.    On the lines where the employees work.

8    Q.    Turn to page 11 of Exhibit 17.

9    A.    (Witness complies.)

10   Q.    Under "Sanitation Related" for "Slaughter,

11   Deboning, and Further Processing," Rule 2 says,

12   "Follow cleaning procedures as outlined in Company

13   Sanitation Master manual."

14        I haven't seen that master manual.  Are you

15   familiar with what it is?

16   A.    I know what it is; I don't know what's in

17   it.

18   Q.    Have you ever read it?

19   A.    No.

20   Q.    You don't use it at all?

21   A.    I don't.

22   Q.    Does the Company Sanitation Master manual

23   have anything in it related to donning, doffing,

FREEDOM COURT REPORTING

Page 191

1    the normal production line employees are gone on

2    break?

3    A.    Some areas are rinsed down.  But they don't

4    sanitize.

5    Q.    Okay.  What's the difference between rinsing

6    down and sanitizing?

7    A.    Rinsing down and sanitizing.

8    Q.    Physically what's the difference?  What are

9    you doing differently?

10   A.    Taking a water hose and washing it down

11   would be rinsing it down.  If you're sanitizing,

12   you would be spraying sanitizer on it.

13   Q.    What kind of sanitizer do you use?

14   A.    Chlorine, Clorox.

15   Q.    So you don't use any sanitizer except on the

16   third shift, in terms of sanitizing the production

17   area itself?

18   A.    Unless we have a breakdown and maintenance

19   has to work on that piece of equipment.  Then it

20   has to be rinsed off and sanitized.

21   Q.    Who sanitizes knives or arm guards?

22   A.    I don't know the answer to that.

23   Q.    But somebody is in charge of sanitizing the

FREEDOM COURT REPORTING

Page 192

1    knives and arm guards, correct?

2    A.    Yes.

3    Q.    And they're paid for that, correct?

4    A.    Yes.

5    Q.    And that's considered work?

6    A.    Correct.

7    Q.    If any employee is scheduled to be at work,

8    arrives at work, there's no work for him, he has

9    to wait, is he paid?

10   A.    Yes.

11   Q.    Is there a rule on that?

12   A.    They're paid at their normal start time or

13   their master card time, which starts at a certain

14   time every day and ends at a certain time.

15   Q.    And they're paid even though they're just

16   sitting?

17   A.    Exactly.

18   Q.    Doing nothing?

19   A.    Correct.

20   Q.    That's still considered work that has got to

21   be paid?

22   A.    Correct.

23   Q.    That's always been the case?

Page 193

1    A.    Yes.

2    Q.    So the company --

3          MR. WIGGINS:  Strike that.

4    Q.    Now, the sanitation department employees are

5    paid eight hours even if they work less, correct?

6    A.    Correct.

7    Q.    What's the least amount of time you've known

8    an employee to work and get paid for eight hours?

9    A.    I don't know exactly on times.  I mean, I

10   would guess five, six hours.

11   Q.    And is that typical that employees will

12   spend five or six hours but get paid for eight?

13   A.    On sanitation, yes.

14   Q.    And their time after five or six hours,

15   they're at home, correct?  They've left the

16   building?

17   A.    Not necessarily.

18   Q.    Well, employees are paid in the sanitation

19   department even though they've left the premises?

20   A.    Correct.

21   Q.    Even though they may be home?

22   A.    Correct.

23   Q.    Even though they may be in the bed asleep?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 194

1    A.    Correct.

2    Q.    They're still considered to be working on

3    paid time?

4    A.    They're paid eight hours a day, unless they

5    work over eight hours.

6    Q.    So the company does not require you to exert

7    yourself in order to be considered working,

8    correct?

9            MR. ROSENTHAL:  Objection to the form

10   of the question.  You can answer.

11   A.    I don't know the answer.  I don't know what

12   your question is.

13   Q.    Well, the company pays employees sometimes

14   when they're sleeping, sometimes when they're

15   sitting and doing nothing, correct?

16   A.    Correct.

17   Q.    Okay.  Now, in your affidavit you said, in

18   paragraph 16 -- Well, let's start at paragraph 14.

19           You said, "These production employees are

20   paid" -- Well, let's see which production

21   employees you're talking about.  Paragraph 11.

22           Let me show you a copy of your affidavit.

23   In paragraph 11 you're taking about employees in

FREEDOM COURT REPORTING

Page 195

1    the production department of the fresh plant,

2    evisceration and debone, are generally paid under

3    a form of line time or master card time, correct?

4    A.    Correct.

5    Q.    And you then describe, in the next several

6    paragraphs, various things about these employees

7    that are subject to master card time or line time,

8    correct?

9    A.    Yes.

10   Q.    And then paragraph 14, about them you say

11   this:  "These production employees are paid

12   together with hours worked before the start of

13   line time or after completion of line time on the

14   basis of the master card system."

15         Now, what type of activities are those that

16   you are describing that are before the start of

17   line time or after the completion of line time?

18   A.    I need to go back and read it all.  But what

19   it states here is if we have an employee to come

20   in early to set up or we ask them to stay late,

21   come in early or stay late, we pay them on the

22   outside of the master card time.  That time is

23   adjusted by the supervisor to the actual time

FREEDOM COURT REPORTING

Page 196

1    worked.

2    Q.    Based on their personal time card?

3    A.    Yes.

4    Q.    All right.  Now --

5    A.    Anyone that's not falling within the window

6    of the master card.

7    Q.    Right.  Now, are there any jobs that that

8    type of before-line-time and after-line-time

9    activities is in regular part of their job?

10    A.    Yes.  There's some people that's not on the

11    master card system.

12    Q.    Even though they're subject to the

13    collective bargaining agreement?

14    A.    Correct.

15    Q.    And I think I asked you this earlier, but I

16    want to ask you one more time to make sure:  Are

17    you able to name those jobs?

18    A.    No, I'm not.

19    Q.    The only one you named earlier was the floor

20    person.

21    A.    Correct.  Setup people, floor person, could

22    be the same.

23    Q.    Now, you earlier said you didn't know

FREEDOM COURT REPORTING

Page 197

1    anything about setup persons, but are you now

2    remembering?

3    A.    No.  I said it could be floor person or

4    setup person.

5    Q.    All right.  Is that two different kinds of

6    employees?

7    A.    I don't know.  I said "or."

8    Q.    Okay.  Do you know of any part of the

9    production area that does not have floor persons

10   or setup persons?

11   A.    No, I don't.

12   Q.    Do you know how many floor persons or setup

13   persons you have?

14   A.    No.

15   Q.    Is that a job that's rotated?

16   A.    I can't answer that.  I don't know.

17   Q.    Who would know that?

18   A.    Production supervisors.

19   Q.    Then the next paragraph, 15, refers to the

20   master card being swiped at the end of the shift.

21       Is there a master card swiped at the

22   beginning of a shift?

23   A.    Yes.

FREEDOM COURT REPORTING

Page 198

1    Q.    Is the master card used --

2              MR. WIGGINS:  I'm sorry.  Strike that.

3    Q.    Is the master card swipe used for pay

4    purposes at the start of the day for any employee?

5    A.    For people that's on the master card, yes;

6    for people that's on the master card time.

7    Q.    The reason I ask is your paragraph 15 says,

8    "As employees are paid from the scheduled start

9    time, employees are required to be at their

10   workstations through the time when the master card

11   is swiped at the end of the shift when the last

12   bird to be processed passes the final

13   workstation."

14         Is that a true statement?

15   A.    Yes.

16   Q.    Has that always been true since March of

17   2004?

18   A.    I can't answer that.  Best of my knowledge,

19   it has been.

20   Q.    Is there any document that describes a rule

21   or requirement that the master card be swiped only

22   after the last bird passes the final workstation?

23   A.    I don't know of a document.  I'm not aware

FREEDOM COURT REPORTING

Page 199

1    of one.

2    Q.    If an employee's scheduled work time is --

3    Well, let me ask you this:  Give me an example.

4    Let's take debone.  What's their scheduled start

5    time?

6    A.    Day shift?

7    Q.    Day shift.

8    A.    7:30.

9    Q.    If an employee's scheduled start time is

10   7:30 and the master card is swiped at 7:35, which

11   controls the pay of the employee?

12   A.    The master card would be swiped at 7:30.

13   Q.    Well, let's say that something prevents the

14   supervisor from getting back out to the break room

15   to swipe it.

16   A.    7:30.

17   Q.    So the scheduled time would control?

18   A.    Yes.

19   Q.    At the end of the day, what's the 7:30 shift

20   end time?

21   A.    4:30.

22   Q.    If the supervisor swipes the master card at

23   4:35, which controls? the scheduled time or the

FREEDOM COURT REPORTING

Page 201

1    Q.    But the evening shift though, the start of

2    pay is on scheduled time?

3    A.    Yes.  At 4:30.

4    Q.    And that's the scheduled time, correct?

5    A.    Correct.

6    Q.    If the master card is swiped at a time

7    different than 4:30, the 4:30 scheduled time still

8    controls the pay?

9    A.    Unless there's a reason why it was swiped

10   later.

11   Q.    Okay.  Now, you mentioned something in your

12   affidavit about a three- to five-minute lag in one

13   area, in change over from one shift to the other?

14   A.    Yeah.

15   Q.    Do you recall that?

16   A.    Let me find it.

17   Q.    Says, "In debone, work is stopped for

18   approximately three to five minutes between

19   shifts."

20         Why is that?

21   A.    To gather up the knives and the metal

22   gloves, for them to have the other ones out for

23   the employees when they get out there.

FREEDOM COURT REPORTING

Page 202

1    Q.    Okay.  So in debone, after the last bird

2    passes the final station, the master card is

3    swiped for the first shift, day shift; is that

4    right?

5    A.    Correct.

6    Q.    And you said that normally is at 4:30?

7    A.    Normally.

8    Q.    All right.  You also said the evening shift,

9    their scheduled start time is 4:30?

10   A.    Correct.

11   Q.    So how does this three- to five minutes

12   work?

13   A.    There's no birds on the line at that time.

14   They're not actually working.  They're out there

15   but they're not working.

16   Q.    So this is like from 4:33 to 4:35?

17   A.    I can't give you a definite answer on what

18   time it is.  But it takes three to five minutes to

19   gather all the tools up and put the new tools out

20   for the second shift to start.  So that's in

21   between day shift and the second shift.

22        They're out there but they're not actually

23   working on the line during that three to five

Page 203

1    minutes.

2    Q.    So are the debone employees getting paid for

3    that three to five minutes?

4    A.    Yes.

5    Q.    Are there records that will reflect this

6    down time of three to five minutes?

7    A.    No, not as I'm aware of.

8    Q.    Do you know of any documents that describe

9    this practice?

10   A.    Not as I'm aware of.

11   Q.    All the other areas, besides debone, you

12   just have a skip in the line; and second shift

13   steps up as the first shift steps off?

14   A.    Correct.

15   Q.    How much is the skip?

16   A.    I don't know the exact time amount of that.

17   It's short.  I don't know.

18   Q.    Is it as much as a minute?

19   A.    I don't know, as I stated.

20   Q.    What's the longest time, that you're aware

21   of, from the first station to the last station, in

22   terms of from the time a bird arrives at the first

23   station until it arrives at the last station?

FREEDOM COURT REPORTING

Page 205

1    rest of them, I really don't know.  I know evis is

2    approximately ten minutes.

3    Q.    Look at paragraph 31 of your affidavit.  It

4    says, "Before breaks or at the end of the day

5    employees may spend a brief amount of time rinsing

6    their work clothing."

7          Is that a requirement?

8    A.    It's according to if they've got on an apron

9    and there's nothing on it, no, they don't have to

10   rinse it.

11   Q.    How about their gloves and sleeves?

12   A.    It's a standard practice for them to rinse

13   them.

14   Q.    Where do they rinse?

15   A.    In the sinks, as they go out of the plant.

16   Q.    What do they rinse it with?

17   A.    Soap and water.

18   Q.    Is that part of the process you require in

19   order to produce uncontaminated chicken products?

20   A.    I guess you could say that.

21   Q.    You don't want blood and guts and other

22   things building up on the aprons, sleeves, gloves,

23   and harboring or growing microorganisms, correct?

FREEDOM COURT REPORTING

Page 206

1    A.    Correct.

2    Q.    And employees are reusing gloves, aprons, or

3    sleeves the next day sometimes?

4    A.    Yes.

5    Q.    And they're storing them in their lockers?

6    A.    Yes.

7    Q.    And the purpose of that rule that they have

8    to wash their aprons, gloves, and sleeves at the

9    end of the day or on breaks is to prevent

10   contamination to the chicken, correct?

11   A.    Yes.

12   Q.    And the wash basins, for that purpose, are

13   in the production area, correct?

14   A.    Yes.

15   Q.    Employees, at that point, still have on

16   their smocks, correct?

17   A.    I can't answer that.  Some do; some don't.

18   I can't answer that.

19   Q.    They don't -- The employees at the end of

20   the day are required to put their smocks in a bin?

21   A.    Correct.

22   Q.    The bin's outside of the production area?

23   A.    Correct.

Page 207

1  Q.    So they still have their smocks with them

2  when they're cleaning their aprons, gloves, and

3  sleeves?

4  A.    Yes.  But they could have them off.

5  Q.    I was thinking -- I need to read the rules,

6  and I don't have time to really, but I was

7  thinking though the rules say you had to take your

8  smock off after you left the production room.  Am

9  I wrong in that?

10 A.    Take the smock off before you leave the

11 production area.  At the end of the shift, they

12 take them off as they go out the door because

13 they're not going to wear them back in.

14 Q.    Okay.  At breaks, employees are not allowed

15 to take their aprons and smocks outside the

16 production area, correct?

17 A.    Correct.  They hang them on a rack that's

18 supplied for them.

19 Q.    And they're not allowed to take their gloves

20 or sleeves outside the production area either, are

21 they?

22 A.    Correct.

23 Q.    And they're not allowed to take their hair

FREEDOM COURT REPORTING

Page 208

1    nets or beard net out of the production area

2    during breaks, correct?

3    A.    They can wear their hair nets and beard nets

4    outside the production area.

5    Q.    How long has that been the case?

6    A.    I can't answer that.  As long as I can

7    remember.  They can't wear them outside, but they

8    can wear them outside the production area.

9    Q.    Employee breaks are automatically deducted

10   through the computer payroll system rather than

11   through the use of a master card swipe, correct?

12   A.    The best of my knowledge.  I don't know.

13   Q.    Have you ever known a master card to be used

14   to determine breaks?

15   A.    No.

16   Q.    Have you ever known a personal time card to

17   be used to determine breaks?

18   A.    Yeah.  I have known that.

19   Q.    When?

20   A.    It's been several years ago, before I come

21   to work here.  But we used to clock in and out for

22   breaks.

23   Q.    Which company was that?

FREEDOM COURT REPORTING

Page 209

1    A.     Wayne Farms.

2    Q.     But that was never a practice at CP?

3    A.     Not to the best of my knowledge.

4    Q.     And it's never been under Equity Group?

5    A.     Best of my knowledge it's hasn't been, no.

6    Q.     Equity Group is not calculating the amount

7    of time employees actually spend on break free

8    from any responsibilities; it's simply deducting a

9    standard 30 minutes, correct?

10   A.     Yes.

11   Q.     And the 30 minutes begins when the last

12   chicken passes the last station on the line?

13   A.     No.  The 30 minutes begins when it passes

14   your station, whether you be the first or the

15   last.

16   Q.     Is that in writing anywhere?

17   A.     Not as I know of.

18   Q.     Have you observed when employees are being

19   sent on break?

20   A.     I've seen employees leave the line as soon

21   as the last bird passes them, and they follow

22   pursuit back in.

23   Q.     Now, at the time the last bird passes their

FREEDOM COURT REPORTING

Page 210

1    station at break, they still have on their smock,

2    apron, gloves, sleeves, earplugs, hair nets, beard

3    nets, and boots; is that right?

4    A.    Correct.

5    Q.    Before they can leave the production area,

6    they've got to doff all that?

7    A.    No.

8    Q.    Except for, I think you said, the hair net

9    and the beard net?

10   A.    And their boots and their earplugs.

11   Q.    Okay.  But everything else they've got to

12   doff after the break has begun?

13   A.    After they leave the line.

14   Q.    So they're doffing all of that on unpaid

15   time, correct?

16   A.    As far as I know.  But I've never put a

17   stopwatch on it.

18   Q.    Now, when an employee goes to the restroom

19   while the line is running, they also have to doff

20   everything, as you have already told us, before

21   they can leave the production area, correct?

22   A.    Correct.

23   Q.    That's considered work time and they're paid

FREEDOM COURT REPORTING

Page 211

1    for it, correct?

2    A.    They get paid for that.

3    Q.    They're exerting the same amount of effort

4    to doff when they go to the restroom during the

5    production line as they are when they doff on an

6    unpaid break, correct?

7            MR. ROSENTHAL:   Objection to the form

8    of the question.  You can answer.

9    A.    I would say so.

10   Q.    And during the break, the employees are

11   required to sanitize their hands, gloves, sleeves,

12   aprons that they're using when they return --

13   before they return to the production area, or when

14   they return to the production area?

15   A.    When they return to the production room.

16   Q.    They have to do that inside the production

17   room at the sinks; is that right?

18   A.    Correct.

19   Q.    But their pay time doesn't begin until after

20   that, when they return to the line and the

21   chickens start coming again, correct?

22   A.    No.  Their 30 minutes is up when they're

23   called back to break.  And then they walk through

FREEDOM COURT REPORTING

Page 212

1   the door and they start getting ready to go to the

2   line.

3   Q.    But an employee's break continues until he's

4   back on the line working?

5   A.    Not necessarily.

6   Q.    I don't know if you might have an exception,

7   but that's the standard situation, isn't it?

8   A.    I don't know the answer to that.  I've never

9   timed them.

10  Q.    Well, an employee's unpaid time is from the

11  time he peels off the production line until the

12  time he's back on the production line.  That's

13  supposed to be 30 minutes, correct?

14  A.    He's got 30 minutes of unpaid breaks.

15  Q.    And that 30 minutes he's required to be on

16  the line at the commencement of it and back on the

17  line at the end of it, correct?

18  A.    Should be.

19  Q.    And during that period he has had to doff

20  all of his protective equipment, resanitize it,

21  and redon it, correct?

22  A.    Yeah.

23  Q.    And all that's on unpaid time during the

Page 213

1    break?

2    A.    Yes.

3    Q.    But if he goes to the nurse's station or to

4    the quality assurance office or to the restroom or

5    to the supply room during the production line, he

6    does the exact same amount of activities, but he's

7    paid for that?

8         MR. ROSENTHAL:   Objection to the form

9    of the question.

10   Q.    Correct?

11   A.    Yes.

12        MR. WIGGINS:   Let's take a break.   I'm

13   about done.

14        (A brief recess was taken.)

15   (BY MR. WIGGINS)

16   Q.    Employees rotate jobs when they come back

17   from break too, don't they?

18   A.    I can't answer that.   I don't know.

19   Q.    You mentioned a HACCP plan.   That's a

20   written document, correct?

21   A.    Correct.

22   Q.    You said it's required to be kept out on the

23   floor, along with the sanitation master plan?

FREEDOM COURT REPORTING

Page 218

1   Q.    Now, in that three to five minutes, you said

2   that the employees are being paid on the evening

3   shift, even though there's no birds coming down

4   the line?

5   A.    Evening or day shift, whichever it falls in.

6   It could be half on each.  I don't know the answer

7   to that.  But they are being paid because it's

8   within their time frame at work.

9   Q.    So they're being paid -- Either or both of

10  the day shift and evening shift are being paid for

11  the three to five minutes that there is no

12  chickens on the line?

13  A.    Correct.

14  Q.    And that three to five minutes is obviously

15  not line time because there are no chickens on the

16  line, correct?

17  A.    Correct.

18  Q.    And that's handled in the same way you

19  handle the three minutes for donning and doffing?

20  A.    No.

21  Q.    You said you pay them three minutes?

22  A.    We pay them three minutes.

23  Q.    And the same thing on the three to five

Page 219

1    minutes on the shift changeover; you simply pay it

2    even though it's not line time, correct?

3    A.    Correct.  But the three minutes on donning

4    and doffing that we now pay is just added to their

5    normal ever how many hours they work that week.

6    Q.    And they normally work eight hours, correct?

7    A.    On day shift.

8    Q.    So they are now been paid eight hours and

9    three minutes?

10   A.    If they work an eight-hour shift that day,

11   they're getting paid eight hours and three

12   minutes, whatever the contract says.

13   Q.    And that's simply programmed into the

14   computer payroll system?

15   A.    Correct.

16   Q.    And that three minutes is not paid by any

17   master card swipe time?

18   A.    It's on their check as D&D or donning and

19   doffing or some way.  It's set up where it pays

20   that.  It's shown it on the bottom of their check.

21   Q.    Now, that three to five minutes in the

22   debone department between day shift and evening

23   shift, that's not on master card time either?

FREEDOM COURT REPORTING

Page 220

1    A.    Yes, it is.

2    Q.    As I understand it, the evening shift swipes

3    and then -- I'm sorry.  Let me start over.

4         The day shift swipes three to five minutes

5    different than the evening shift swipes on the

6    master card?

7    A.    I don't know.  I don't know the answer to

8    that.  I wouldn't think so.  Our normal ending

9    time is at 4:30 on day shift; our normal start

10   time is at 4:30 on evening shift.

11   Q.    Is there any other time of day that you

12   combo the birds off the line?

13   A.    Sure.  Any time we have a breakdown we have

14   to combo them.

15   Q.    And combo-ing the birds off means that you

16   take the birds off the moving line, put them in

17   some storage container, keep them there for three

18   to five minutes, and then put them back on the

19   line, right?

20        MR. ROSENTHAL:  Objection.  You're

21   talking about the three to five minutes between

22   the shifts or at any time?

23        MR. WIGGINS:  Between the shifts.

Page 221

1    A.    We put them back on the line whenever we can

2    work them back in.

3    Q.    But that's extra work that you're having to

4    do that you wouldn't have to do if you left them

5    on a continuous line, correct?

6    A.    Correct.

7    Q.    And who's responsible for that extra work?

8    A.    The debone employees, or wherever it's at,

9    whatever department it's in any time we have a

10    mechanical breakdown.  So it could be evis.

11    Q.    Have you ever known any item to be

12    negotiated in the collective bargaining process

13    without having a written proposal from the union

14    or the company on that topic?

15    A.    I don't recall.  Not that I'm aware of.  I

16    don't recall.

17    Q.    Did the four people that signed the 2008

18    collective bargaining agreement have the authority

19    to agree to that three minutes to be paid for

20    donning and doffing by themselves, without getting

21    any higher approval?

22    A.    I don't know the answer to that.  Because

23    when the final decision was made, Huntsville was

FREEDOM COURT REPORTING

Page 225

1    shift?

2    A.    Part of it.

3    Q.    Which part?

4    A.    At the ending of the cleanup.

5    Q.    Do you keep records of your quality

6    assurance holds?

7    A.    I don't; QA does.

8    Q.    Do you know how long you keep those?

9    A.    No.

10   Q.    What about your USDA holds?  Do you keep

11   those for any period of time?

12   A.    No, I don't; USDA does.

13   Q.    I mean, does the company?

14   A.    If it does, QA keeps them.  I'm not aware of

15   it.  They may.

16   Q.    Top of page 12, it refers to posting a "Wash

17   Hands before Returning to Work" sign.  Has that

18   been done?

19   A.    I don't know the answer to that.

20   Q.    It says that's supposed to be in the

21   restrooms, correct?

22   A.    That's what it says.

23   Q.    Employees are required to wash and sanitize

FREEDOM COURT REPORTING

Page 226

1    their hands before leaving the restroom, correct?

2    A.    Correct.

3    Q.    They then can go either to the break room,

4    supply room, or outside, correct?

5    A.    Repeat your question.

6    Q.    After they have washed their hands in the

7    restroom, if they're still on break they can go on

8    outside, or to the supply room, or to the break

9    room, or anywhere they want to go, correct?

10    A.    Correct.

11    Q.    But when they enter the production area

12    again, they have to resanitize their hands a

13    second time, correct?

14    A.    Have to rewash their hands, correct.

15    Q.    And that's true on any type of leaving the

16    work area, whether it's on production line time or

17    on break time, correct?

18    A.    Correct.

19    Q.    Employees are not allowed to stay in the

20    production area during breaks, are they?

21    A.    Yeah, they can.  I mean, some do; some

22    don't.  Very few do.  But they can stay in there.

23    That's their choice.

FREEDOM COURT REPORTING

Page 227

1   Q.    But you've already told us there's no food

2   or drink allowed.

3   A.    Correct.

4   Q.    And there's no bathrooms in there?

5   A.    No bathrooms.

6   Q.    Okay.  Thank you.

7             MR. ROSENTHAL:  I don't have any

8   questions for you.

9             MR. WIGGINS:  Howard, we want, in

10  addition to the sanitation manual we asked for, we

11  think that the SOPs of sanitation, boots, all

12  these SOPs that deal with donning, doffing,

13  sanitation, that type of thing are due to be

14  produced.

15        We'd like to have an updated layout of the

16  plant now that it's been revised, if you've got

17  one.  And we'd like to have HACCP plan.  Anything

18  else?

19            MS. MCGOWAN:  When we were having our

20  conversation, I kept saying, "Do we have this in

21  an electronic version?"  And y'all kept saying,

22  "We've produced everything."

23            MR. ROSENTHAL:  No, no.

FREEDOM COURT REPORTING

Page 229

1    are --

2              MS. MCGOWAN:  You printed it off.  Do

3    they print it every day and dump it, or why is it

4    not available electronically?

5              MR. ROSENTHAL:  I can't answer that

6    question, Candis.  I can tell you what we have

7    available and what we've offered to make

8    available.  It's the same thing we've offered

9    since September.

10        I can't today find out what else will be

11    available when the first time we got a request was

12    today.

13             MS. MCGOWAN:  No, no.

14             MR. ROSENTHAL:  That's the first

15    request we had.  We were not asked for an

16    electronic copy from the time we responded to

17    discovery last September.  You asked about it last

18    Friday, and I told you what the answer was.

19             MR. WIGGINS:  Let me see if I

20    understand you, Howard.  Y'all have it on

21    electronic form, but you say it's a problem

22    converting it?

23             MR. ROSENTHAL:  I don't know that we

# EXHIBIT 35

# FREEDOM COURT REPORTING

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    MONTGOMERY DIVISION

4

5    CASE NUMBER:  2:06-CV-01081-MEF-DRB

6    BETTY ANN BURKS, ET AL.,

7         Plaintiffs,          *ORIGINAL*

8         vs.

9    EQUITY GROUP, EUFAULA DIVISION, L.L.C.,

10        Defendant.

11

12        S T I P U L A T I O N

13        IT IS STIPULATED AND AGREED by and

14   between the parties through their respective

15   counsel, that the deposition of Robin

16   Stevens may be taken before Sara Mahler,

17   CCR, at the offices of Williams, Pothoff,

18   Williams & Smith, at 125 South Orange

19   Avenue, Eufaula, Alabama 36027, on the 12th

20   day of June, 2008.

21

22        DEPOSITION OF ROBIN STEVENS

23

# FREEDOM COURT REPORTING

42

1    processing.

2         Q.      In the plant or in the break

3    rooms?

4         A.      In the break room.

5         Q.      There's a separate break room

6    for deboning?

7         A.      It's just what we call them.

8    They're in the same hallway.

9         Q.      Can employees use either break

10   room?

11        A.      Yes.

12        Q.      Are employees paid from their

13   punch-in time to their punch-out time?

14        A.      It depends on the employee.

15        Q.      Production line employees, are

16   they paid from punch-in to punch-out?

17        A.      If they are on a scheduled

18   time or clock-in/clock-out, they would be

19   paid from clock-in to clock-out.

20        Q.      What employees are on the

21   clock-in to clock-out?

22        A.      I don't know specifics.  But a

23   lead person could be setting up on a

# FREEDOM COURT REPORTING

78

1      A.      It should be a line time.

2      Q.      How does that operate?

3      A.      They are -- The master card of

4   the line time is swiped at the end of the

5   shift when the work is complete.

6      Q.      What about at the beginning of

7   the shift, how do they start it?

8      A.      The employees, they swipe in

9   whenever they get ready, as long as it's

10  before 7:30.

11     Q.      What if an employee swipes in

12  at 7:31, what happens?

13     A.      They would be late.

14     Q.      Are they deducted that one

15  minute of pay?

16     A.      I don't do the time sheets,

17  so --

18     Q.      Do you know, if an employee

19  swipes in after 7:30, are they paid from

20  7:30 or are they paid from when they swipe

21  in?

22     A.      If you were late, you'd be

23  paid from when you clock in.

# FREEDOM COURT REPORTING

85

```
 1          Q.     Is that a written policy?
 2          A.     I'm not sure if it's a written
 3    policy.
 4          Q.     Is it a company policy?
 5          A.     It's a company policy.
 6          Q.     Why does the company have that
 7    policy?
 8          A.     We had a lot of trouble
 9    with -- The reason you put your smock on in
10    the room is because we had a lot of
11    employees going into the bathrooms with
12    their smocks on, and that's -- you can't do
13    that as far as USDA.  All that's USDA
14    policies.
15          Q.     Can they wear their hair nets
16    into the rest room?
17          A.     No.  They must take those off.
18    You can wear them outside the production
19    area into the break room.  They must take
20    those off before they go in the bathroom,
21    hair nets and beard nets.
22          Q.     Can they wear ear plugs into
23    the rest room?
```

## FREEDOM COURT REPORTING

86

1          A.      Most of them have them around

2    their neck.   They don't have them in their

3    ear, but around their neck.

4                  They can wear their boots in

5    there as well.

6          Q.      Do they have to have boots on

7    to go on the production floor?

8          A.      Yes.

9          Q.      What does an employee have to

10    have on to go onto the production floor in

11    addition to -- Well, you said debone.   Is

12    debone considered the production floor?

13          A.      Yes.

14          Q.      So let's go over what an

15    employee must have on to go onto the

16    production floor.   You have to have a hair

17    net?

18          A.      Yes.

19          Q.      Beard net?

20          A.      Yes.

21          Q.      Ear plugs?

22          A.      Yes.

23          Q.      Boots?

87

1       A.      Yes.

2       Q.      Anything else?

3       A.      No.

4       Q.      And once they get on to the

5   production floor, they put their smock on?

6       A.      Yes.

7       Q.      All right.  How many doors are

8   there on to the production floor?  Is there

9   one door or several doors?

10      A.      Are you talking about just the

11  deboning floor?

12      Q.      For the employees that --

13  let's start debone because that's a separate

14  department; right?

15      A.      Employees can go in different

16  entrances.

17      Q.      How many are there?

18      A.      There's three in the main

19  hallway.

20      Q.      The main hallway of debone

21  area?

22      A.      Uh-huh.

23      Q.      All right.  Where do the

# FREEDOM COURT REPORTING

88

1    employees put on the smock once they enter

2    the production area?   Is there a certain

3    place they have to put the smock on?

4        A.      No.

5        Q.      Could you walk to the line

6    without it on?  Could you go up to the

7    tender line without a smock on?

8        A.      They put it on right inside

9    the door, there.

10        Q.      So they have to put it on once

11    they get right inside the door --

12        A.      Yeah.

13        Q.      -- the smock?

14              When I say it, they have to

15    put the smock on right when they come in the

16    door?

17        A.      When they get in the

18    production area, they put on their smock.

19        Q.      Is it one door right in or is

20    it double doors?

21        A.      There's double doors.

22        Q.      All right.  What do they do --

23    Are there any wash basins?  Do they have to

## FREEDOM COURT REPORTING

96

1      Q.      The company provides the soap?

2      A.      Yes.

3      Q.      And it has whatever sanitation

4   in it?

5      A.      Whatever's in it, yes.

6      Q.      It's not like the soap -- It's

7   not like a floral-smelling soap you get at

8   Bath and Body Works.  It's like some soap

9   that the company puts in there for the

10  employees to use; correct?

11     A.      Yes.

12     Q.      Then after they wash their

13  hands, are they required to wash their

14  gloves?

15     A.      When I say you've got to wash

16  your hands, most of them have already got

17  their gloves on, and they wash their gloves

18  and head to the line.  Me, when I go in,

19  I've already got my stuff on, hit the sink,

20  wash my hands, and go on.  Because I don't

21  normally wear the gloves when I go in.

22     Q.      When do you have to wear

23  gloves?

# FREEDOM COURT REPORTING

97

1    A.    When you're handling product.

2    Q.    Is that a requirement of Koch

3 Foods?

4        MR. ROSENTHAL:  Of what?

5    Q.    I'm sorry, of Equity.  I

6 called you Koch Foods.

7    A.    If you're going to handle

8 product, you need to wear the gloves.

9    Q.    That is a requirement of

10 Equity Foods?

11    A.    Yes.

12    Q.    What about -- Are there any

13 requirements with regards to wearing plastic

14 sleeves?

15    A.    To cover your street clothes,

16 if you've got them exposed working on the

17 debone line.  And that's there for the

18 employees, to keep themself dry.  They need

19 to be dry.

20    Q.    If you -- Are your smocks long

21 sleeve or short sleeve?

22    A.    They're three-quarter.

23    Q.    So if you had on a long sleeve

# FREEDOM COURT REPORTING

98

1    shirt under your smock that stuck out past

2    the smock, are there any requirements with

3    regards to sleeves?

4         A.    You need to cover your street

5    clothes.

6         Q.    So you'd have to wear the

7    plastic sleeves to cover your street

8    clothes --

9         A.    Uh-huh.

10         Q.    -- if your street clothes

11    stuck out below the smock sleeve; is that

12    correct?

13         A.    Yes.

14         Q.    Is that a requirement of

15    Equity Foods?

16         A.    As far as I know it is, yes.

17         Q.    And that is to keep the

18    product uncontaminated by the street

19    clothes?

20         A.    Just to keep the street

21    clothes from coming in contact with the

22    product.

23         Q.    Which would contaminate the

# FREEDOM COURT REPORTING

105

1          A.     If they retain it -- If they

2     retain that bird.

3          Q.     Why would -- What are areas

4     that they can tag it for, the bird, USDA?

5                 That's not a good question.

6     Let me start over.

7                 What are reasons that the USDA

8     can tag a bird?

9          A.     Sometimes they tag specific

10    birds because they want to evaluate them

11    more or they want to evaluate them with

12    their online inspectors.

13         Q.     Is food safety the top

14    priority for Equity Food?

15         A.     It is a top priority.

16         Q.     And the policies with regards

17    to how employees work on the line and handle

18    the product, does that go towards --

19    majority of it towards food safety?

20         A.     Yes.

21         Q.     The use of a hair net, does

22    that go towards -- by employees, does that

23    go towards food safety?

## FREEDOM COURT REPORTING

106

1      A.      It's for food safety, yes.

2      Q.      The use of the smocks by the

3    employees, does that go towards food safety?

4      A.      Yes.

5      Q.      The use of the rubber gloves

6    by the employees, does that go to food

7    safety?

8      A.      It protects their hands and it

9    is for food safety, yes.

10      Q.      And the use of beard nets, is

11    that for food safety?

12      A.      Yes.

13      Q.      The use of the rubber boots,

14    is that for food safety?

15      A.      That's a requirement from

16    Russia.  It's a Russian requirement for

17    USDA.

18      Q.      It's a Russian requirement for

19    USDA, is that a customer?

20      A.      It's -- We ship all of our

21    dark meat to Russia, and you have to adhere

22    to their requirements.  They require all

23    employees to wear rubber boots, pervious to

## FREEDOM COURT REPORTING

108

1    processing plant, if they ever had to push a

2    button?

3                    MR. ROSENTHAL:   Objection to

4    the form of the question.

5            A.      I don't know.

6            Q.      Is the walking through the

7    foot sanitizer or the boot sanitizer the

8    first act of sanitizing the equipment that

9    the employees do when they walk on the

10   production floor?

11                   MR. ROSENTHAL:   Objection to

12   the form of the question.

13           A.      That's the first sanitizing of

14   what the employee would be wearing, which is

15   their boots.

16           Q.      Okay.  And those boots are

17   required by USDA because of the Russian

18   requirement; correct?

19           A.      We have to adhere to that

20   policy, and that policy would require us to

21   wear rubber boots or a shoe cover to cover

22   up their regular shoe if they have it on.

23           Q.      Does USDA also require that

## FREEDOM COURT REPORTING

126

1      A.      I don't ever wear cotton

2  liners.

3      Q.      Do you know whether there have

4  been any time studies conducted in your

5  plant on how long it takes employees to put

6  on and sanitize this equipment at the

7  beginning of the shift?

8      A.      There was some video taken as

9  part of this litigation, but I wasn't

10  involved in that and don't know really what

11  it entails.  But as far as time studies,

12  that's all that I'm aware of.

13      Q.      Do you know who conducted the

14  video-taking?

15      A.      Malcolm, as part of -- I don't

16  know the other folks.

17      Q.      Do you know -- Have you ever

18  timed how long it takes to put on this

19  equipment and sanitize?

20      A.      No.

21      Q.      Do you know how long it takes

22  employees to put on the equipment and

23  sanitize at the beginning of a shift?

# EXHIBIT 36

# FREEDOM COURT REPORTING

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    MONTGOMERY DIVISION

4

5    CASE NUMBER:  2:06-CV-01081-MEF-DRB

6    BETTY ANN BURKS, ET AL.,

7         Plaintiffs,                    *ORIGINAL*

8         vs.

9    EQUITY GROUP, EUFAULA DIVISION, L.L.C.,

10        Defendant.

11

12        S T I P U L A T I O N

13        IT IS STIPULATED AND AGREED by and

14   between the parties through their respective

15   counsel, that the deposition of Joseph

16   Preston may be taken before Sara Mahler,

17   CCR, at the offices of Williams, Pothoff,

18   Williams & Smith, at 125 South Orange

19   Avenue, Eufaula, Alabama 36027, on the 12th

20   day of June, 2008.

21

22        DEPOSITION OF JOSEPH PRESTON

23

## FREEDOM COURT REPORTING

19

1    that shift it's a walk-on/walk-off like

2    deboning is or not.

3        Q.    Any other departments that are

4    production workers that have a set time?  We

5    talked about live hang, evisc, debone.  Am I

6    missing a department?

7        A.    Well, we have a lot of other

8    departments, okay, and I can't list those

9    for you through --

10        Q.    Do you know --

11        A.    -- memory.  Each one can be --

12    I mean, they can be the same as each other,

13    they can be different, depending on our

14    production.

15        Q.    But do you know any other

16    department in which production hourly

17    employees work that do not have a set start

18    time to begin -- start the shift?

19        A.    That do not have a set start

20    time?

21        Q.    Yes.

22        A.    I can't say that I do.

23        Q.    Do you know any employees that

## FREEDOM COURT REPORTING

20

1  are paid on a clock-in/clock-out of their

2  personal clock time?

3         A.     We have employees like that.

4  I can't name any for you.

5         Q.     Do you know the job positions?

6         A.     No.

7         Q.     Who would know that?

8         A.     That information is within --

9  If I were in my office and somebody asked me

10  that question, I could go find out.  But I

11  can't do that from here.

12         Q.     What would you do to find out?

13         A.     Ask.

14         Q.     Who would you ask?

15         A.     I'd start with my payroll

16  manager.

17         Q.     And that is?

18         A.     Shauna Bouterse.

19         Q.     Spell that for the Record.

20         A.     B-O-U-T-E-R-S-E.

21         Q.     And Shauna, can you spell that

22  for the court reporter?

23         A.     S-H-A-U-N-A.

# FREEDOM COURT REPORTING

71

1    Q.    Does that represent nine hours

2    and thirty-four minutes?

3    A.    Yes.

4    Q.    And at the bottom, it shows on

5    6/6, twenty-eight for the master card,

6    forty-six hours and fifty-two minutes worked

7    that week?

8    A.    Yes.

9    Q.    Now, does the computer

10   automatically deduct the one hour for the

11   two thirty-minute breaks?

12   A.    Yes.

13   Q.    So the supervisor is not

14   swiping in and out for the thirty-minute

15   breaks?

16   A.    That's correct.

17   Q.    Can a supervisor go in to the

18   system and change the swipe out time?

19   A.    No.

20   Q.    Who can change that?

21   A.    Payroll department.

22   Q.    Go down to the -- Ms. Cook.

23   Under the total amounts worked on the next

# FREEDOM COURT REPORTING

73

1      that for that.  It would be the same thing.

2                Q.      Do you know of an example?

3                A.      No.

4                Q.      If an employee's late, do you

5      use clock-in or clock-out -- do you use the

6      clock-in time or master time?

7                A.      Clock-in.

8                Q.      So that would be an example of

9      when you would use the clock-in time for the

10     employee?

11               A.      Yes.

12               Q.      Is the computer set up to

13     recognize that, the computer Kronos system,

14     if an employee's late, or does the

15     supervisor have to physically denote -- do a

16     notation?

17               A.      If they swipe their card, the

18     computer will see it.

19               Q.      And pay them on the clock-in

20     time if that's late?

21               A.      Yes.

22               Q.      Is there a code flagging that?

23               A.      I don't know.