IN THE
UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DISTRICT

BETTY ANN BURKS, et al.,            )

      Plaintiffs,                )

v.                                  )            Case No. 2:06-cv-1081-MEF

EQUITY GROUP EUFAULA                )
DIVISION, LLC,

      Defendant.                 )

### SUBSTITUTION OF FULL DEPOSITION OF GREG MILLS AS SUBSTITUTE EXHIBIT 34 TO PLAINTIFFS' SUBMISSION OPPOSING SUMMARY JUDGMENT

The excerpts from Greg Mills' deposition submitted June 17, 2008 as plaintiffs' Exhibit 34

(Doc. 95-34) are hereby supplemented to include the full deposition of Mr. Mills with the same

exhibit number.

Respectfully submitted,

s/Robert L. Wiggins, Jr.
Robert L. Wiggins, Jr., ASB-1754-G-63R
Candis A. McGowan, ASB-9358-036C
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building, 301 19th Street North
Birmingham, Alabama 35203
205/314-0500, 205-254-1500 (Facsimile)


Robert Joseph Camp
The Cochran Firm - Birmingham
The Financial Center
505 North 20th Street, Suite 825
Birmingham, Alabama 35203
205/244-1115, Fax: 205/244-1171

1

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to counsel for all parties by operation of the court's electronic filing system.

This 18th day of June, 2008.

s/Robert L. Wiggins, Jr.
**OF COUNSEL**

2

# Substitute Exhibit 34

FREEDOM COURT REPORTING

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


CASE NUMBER:  2:06-CV-01081-MEF-DRB


BETTY ANN BURKS,

et al.,

    Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

    Defendant.



BEFORE:

    Cynthia M. Noakes, Commissioner

    and Certified Court Reporter


DEPOSITION TESTIMONY OF

GREG MILLS


*****************************

Page 2

```
 1        S T I P U L A T I O N
 2
 3        IT IS STIPULATED AND AGREED by and
 4  between the parties through their respective
 5  counsel, that the deposition of GREG MILLS may be
 6  taken before Cynthia M. Noakes, Court Reporter,
 7  at the Law Offices of WILLIAMS, POTTHOFF,
 8  WILLIAMS & SMITH, 125 South Orange Avenue,
 9  Eufaula, Alabama 36027, on the 11th day of June,
10  2008.
11        IT IS FURTHER STIPULATED AND AGREED
12  that the signature to and the reading of the
13  deposition by the witness is not waived, the
14  deposition to have the same force and effect as
15  if full compliance had been had with all laws and
16  rules of Court relating to the taking of
17  depositions.
18        IT IS FURTHER STIPULATED AND AGREED
19  that it shall not be necessary for any objections
20  to be made by counsel to any questions except as
21  to the form or leading questions, and that
22  counsel for the parties may make objections and
23  assign grounds at the time of the trial, or at
```

Page 3

```
 1  the time said deposition is offered in evidence,
 2  or prior thereto.
 3        IT IS FURTHER STIPULATED AND AGREED
 4  that the notice of filing of the deposition by
 5  the Court Reporter is waived.
 6
 7
 8
 9
10
11
12
13
14
15
16
17  *******************************************
18
19
20
21
22
23
```

Page 4

```
 1             INDEX
 2  EXAMINATION BY:          PAGE NUMBER:
 3  MR. WIGGINS              12-227
 4
 5
 6           EXHIBITS:
 7  PLAINTIFFS'              PAGE NUMBER:
 8  Plaintiffs' Exhibit No. 1      47
 9  Plaintiffs' Exhibit No. 2      48
10  Plaintiffs' Exhibit No. 3      22
11  Plaintiffs' Exhibit No. 4      50
12  Plaintiffs' Exhibit No. 5      55
13  Plaintiffs' Exhibit No. 6      61
14  Plaintiffs' Exhibit No. 7      67
15  Plaintiffs' Exhibit No. 8      69
16  Plaintiffs' Exhibit No. 9      84
17  Plaintiffs' Exhibit No. 10
18  Plaintiffs' Exhibit No. 11     114
19  Plaintiffs' Exhibit No. 12      77
20  Plaintiffs' Exhibit No. 13     116
21  Plaintiffs' Exhibit No. 14     116
22  Plaintiffs' Exhibit No. 15     118
23  Plaintiffs' Exhibit No. 16      10
```

Page 5

```
 1        INDEX (continued)
 2
 3  Plaintiffs' Exhibit No. 17      11
 4  Plaintiffs' Exhibit No. 18      11
 5  Plaintiffs' Exhibit No. 19      11
 6  Plaintiffs' Exhibit No. 20      11
 7  Plaintiffs' Exhibit No. 21      17
 8  Plaintiffs' Exhibit No. 22      30
 9  (All exhibits were retained
10  by Plaintiffs' attorneys)
11  Colloquy                227-232
12
13  Reporter's Certificate      233
14
15
16
17
18  *******************************************
19
20
21
22
23
```

Page 6

1      APPEARANCES
2
3  ON BEHALF OF THE PLAINTIFFS:
4      MR. ROBERT L. WIGGINS, JR.
5      MS. CANDIS A. MCGOWAN
6      MR. JACOB A. KISER
7      WIGGINS, CHILDS,
8      QUINN & PANTAZIS, LLC
9      ATTORNEYS AT LAW
10     The Kress Building
11     301 19th Street North
12     Birmingham, Alabama 35203
13     (205) 314-0500
14
15     MR. ROBERT J. CAMP
16     THE COCHRAN FIRM
17     ATTORNEYS AT LAW
18     505 North 20th Street
19     Suite 825
20     Birmingham, Alabama 35203
21
22     ***************************
23

Page 7

1      APPEARANCES (continued)
2
3  ON BEHALF OF THE DEFENDANT:
4      MR. HOWARD A. ROSENTHAL
5      MR. MALCOLM S. GOULD
6      PELINO & LENTZ
7      ATTORNEYS AT LAW
8      One Liberty Place
9      1650 Market Street
10     Thirty-Second Floor
11     Philadelphia, Pennsylvania 19103
12     (215) 665-1540
13
14     ***************************
15
16     I, CYNTHIA M. NOAKES, a Certified
17  Court Reporter of Eufaula, Alabama, acting as
18  Commissioner, certify that on this date, as
19  provided by the Alabama Rules of Civil Procedure
20  and the foregoing stipulation of counsel, there
21  came before me at the Law Offices of WILLIAMS,
22  POTTHOFF, WILLIAMS & SMITH, 125 South Orange
23  Avenue, Eufaula, Alabama 36027, beginning at 9:10

Page 8

1  a.m., GREG MILLS, witness in the above cause, for
2  oral examination, whereupon the following
3  proceedings were had:
4
5         GREG MILLS,
6  being first duly sworn, was examined and
7         testified as follows:
8
9         THE COURT REPORTER:  Usual
10  stipulations?
11         MR. WIGGINS:  Yes.
12         MR. ROSENTHAL:  Yes, except for reading
13  and signing.
14         MR. WIGGINS:  All right.
15         MR. ROSENTHAL:  Before we get started
16  with the deposition, I just wanted to inform
17  Plaintiffs' counsel of the documents which we are
18  producing today at their request during a
19  conversation on Friday of last week.
20      First would be various updated
21  organizational charts, some of which -- and
22  principally the fresh plant organizational chart
23  -- was revised to be updated as of April 3, 2008.

Page 9

1      We've also produced the most current Good
2  Manufacturing Practices, which was revised as of
3  August 18 -- excuse me -- August 21, 2007.  And
4  that would be 13 pages.
5      We're producing the current Employee
6  Orientation Manual which updates the version which
7  we had previously produced.
8      We are producing redacted copies of the 2004
9  contract proposals.  The top proposal in this
10  packet are the proposals which were given by the
11  union to the company; and then there were various
12  responses by the company to the union, which were
13  revisions 1, 2, 3 and 4.  They redact everything
14  other than proposals relating to work clothing,
15  supplies, and wages.  These were the written
16  documents which were produced during the 2004
17  contract negotiations.  They don't include,
18  obviously, any proposals which were made across
19  the table and not in writing.
20      We've also produced, likewise, the 2008
21  union contract proposals, redacted, to show those
22  which relate to supplies, work clothing, and
23  wages.  And then the company's various responses

3  (Pages 6 to 9)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 10

1  to them during the course of the negotiations,
2  which were revisions 1, 2, 3, 4, and 5. And these
3  copies are for Plaintiffs.
4      MR. WIGGINS:  Okay.
5      MS. MCGOWAN:  On the union
6  negotiations, the proposals, you said they don't
7  include proposals made across the table?  Were
8  they noted on there?
9      MR. ROSENTHAL:  No.  Those would be
10  just proposals which were made orally across the
11  table.  There's no written document that reflects
12  them.
13      MR. WIGGINS:  I'm going to mark all
14  these that he just gave us.  All right.  I'm going
15  to mark the updated organizational charts as of
16  April 3, 2008, that were just produced, as Exhibit
17  16.
18      (Plaintiffs' Exhibit No. 16 was
19      marked for identification and a
20      copy of the same is attached
21      hereto.)
22      MR. WIGGINS:  The updated or revised
23  Good Manufacturing Practices policy revision dated

Page 11

1  August 18, 2007, is being marked as Exhibit 17.
2      (Plaintiffs' Exhibit No. 17 was
3      marked for identification and a
4      copy of the same is attached
5      hereto.)
6      MR. WIGGINS:  The current Orientation
7  Manual is being marked as Exhibit 18.
8      (Plaintiffs' Exhibit No. 18 was
9      marked for identification and a
10      copy of the same is attached
11      hereto.)
12      MR. WIGGINS:  The 2004 contract
13  proposals and response documents are Exhibit 19.
14      (Plaintiffs' Exhibit No. 19 was
15      marked for identification and a
16      copy of the same is attached
17      hereto.)
18      MR. WIGGINS:  And the 2008 contract
19  proposals and responses will be Exhibit 20.
20      (Plaintiffs' Exhibit No. 20 was
21      marked for identification and a
22      copy of the same is attached
23      hereto.)

Page 12

1      MR. WIGGINS:  Now, I've got Mr. Mill's
2  affidavit, so I'm not going to go into his
3  background.  It's all clear in his affidavit, I
4  think.
5
6      EXAMINATION
7  BY MR. WIGGINS:
8  Q.  Let me show you the orientation manual that
9  was produced previously, Bates numbers E 40 to E
10  160; and I'll show you what you produced this
11  morning, Exhibit 18.
12      Are you able to tell us what's changed in
13  those documents?
14  A.  No, sir.
15  Q.  Who would be able to tell us that?
16  A.  HR department.
17  Q.  Who in the HR department?
18  A.  HR department.  There's a lot of information
19  in these manuals.  QA, HR.  So the QA department
20  supervisor or a manager, or the HR director would
21  be the one to tell you the changes in these
22  manuals.
23  Q.  And what are their names?

Page 13

1  A.  Kathy Gilmore in HR, or Butch White in QA.
2  Q.  And what is Ms. Gilmore's title?
3  A.  HR manager.
4  Q.  And what is Mr. Whiting's (sic) title?
5  A.  QA manager.
6      MR. ROSENTHAL:  Is it Wade or Whiting?
7      THE WITNESS:  White.
8  Q.  White.  I'm sorry.  And he's QA manager, not
9  supervisor, correct?
10  A.  QA manager.
11  Q.  Okay.  Anyone else involved in revising the
12  Employee Orientation Manual?
13  A.  Not to my knowledge.
14  Q.  The manual that you've produced is a bound
15  copy in pamphlet form, correct?
16  A.  Yes.
17  Q.  Is that the way it's given to the employees?
18  A.  Yes.
19  Q.  And at what point is this employee manual,
20  Exhibit 18, provided to the employees?
21  A.  To the best of my knowledge, when they're
22  hired.
23  Q.  What role do you play in employee

4  (Pages 10 to 13)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 14

1  orientation or the use of the Employee Orientation
2  Manual?
3  A.   None.
4  Q.   Who is most knowledgeable about the employee
5  orientation and the use of the manual?
6  A.   Dante Rogers.
7  Q.   What is Dante Roger's job title?
8  A.   He's a QA manager, I do believe, and he's
9  over new hire orientation.
10  Q.   And is Ms. Gilmore, Mr. Rogers in the QA
11  shown on Exhibit 16?
12  A.   Yes.
13  Q.   All right.  What page?  This is the page
14  that has Jim Bice, Complex Human Resource Manager
15  at the top?
16  A.   Yes.
17  Q.   And it shows Dante Rogers as the human
18  resource manager, correct?
19  A.   Yes.
20  Q.   Now, you're calling him a QA manager.  Is
21  that the same thing?
22  A.   No.  Dante Rogers, HR manager; Butch White,
23  QA manager.

Page 15

1  Q.   Oh, I wrote it down wrong.  I misunderstood
2  you.
3        Now, I had asked you about Mr. White.  I'm
4  not seeing him on here.
5  A.   He's on QA.
6  Q.   Okay.
7  A.   Complex QA director is his title.
8  Q.   Now, what is the complex?
9  A.   The complex is both facilities, the fresh
10  and the further processing plants.
11  Q.   And you're the head of both plants?
12  A.   I'm the operation manager.
13  Q.   Are you shown in Exhibit 16?
14  A.   Yes.
15  Q.   Where are you at?
16  A.   On the front page -- on the second page.
17  You see Tim Esslinger, the general manager?
18  Q.   Yes.
19  A.   I'm under him as operations manager.
20  Q.   All right.  And is anyone under you?
21  A.   Yes.
22  Q.   Who is under you?
23  A.   It's on the second page.

Page 16

1        MR. GOULD:  It's the fourth page
2  actually, I believe.
3  Q.   All right.  I see you now on the fourth
4  page.  And is that a complete description of
5  everyone that reports to you?
6  A.   Yes.
7  Q.   And where is Mr. Esslinger located?
8        MR. ROSENTHAL:  On the organizational
9  charts?
10        MR. WIGGINS:  No.  Physically.
11  Q.   Where is his office?
12  A.   At the Eufaula complex.
13  Q.   Okay.  So Mr. White, as complex QA director
14  does not report to you?
15  A.   No, sir.
16  Q.   Is that right?
17  A.   Yes.
18  Q.   And the human resource director, Jim Bice,
19  does not report to you?
20  A.   Correct.
21  Q.   And therefore Kathy Gilmore does not report
22  to you?
23  A.   Correct.

Page 17

1  Q.   And Dante Rogers does not report to you?
2  A.   Correct.
3  Q.   So does anyone that reports to you have
4  anything to do with these orientation manuals?
5  A.   No, not as I'm aware of.
6  Q.   Now, you were designated for various topics
7  here today.  Are you aware of that?
8  A.   No.
9  Q.   Okay.  I'm going to show you the next
10  exhibit, 21.
11        (Plaintiffs' Exhibit No. 21 was
12        marked for identification and a
13        copy of the same is attached
14        hereto.)
15  Q.   This is the company's designation of
16  witnesses under a rule called Rule 30(b)(6), which
17  means that you have been designated to speak for
18  and to bind the corporation.
19        Have you seen this list of topics that you
20  have been designated for?
21        MR. ROSENTHAL:  I'm going to object to
22  the legal conclusion with respect to the impact of
23  a designation.  But you can answer the question.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 18

1  A.   No, I have not seen these.
2  Q.   Okay.  Well, let's go over that real quick,
3  please.  Look at topic No. 1.  "The organizational
4  structure of Equity, including specifically any
5  mechanisms for oversight of individual plants by
6  corporate or regional managers."
7      You've been designated as the person
8  knowledgeable on that subject.  Do you agree that
9  you are properly designated and have knowledge on
10 that subject?
11     MR. ROSENTHAL:  Objection to the
12 request for a legal conclusion whether he was
13 properly designated.  To the extent you have
14 knowledge of the subject, you can answer.
15 A.   I have knowledge of some of it, but not all
16 of it.
17 Q.   Two other people were designated for that
18 topic too.
19     Now let's look at topic No. 2 on Exhibit 21.
20 You were designated for the training portion of
21 Equity's policies and practices regarding the
22 maintenance of records of hours worked and wages
23 paid, and the training to inform employees and

Page 19

1  supervisors of these policies, and measures that
2  were taken to ensure compliance with these
3  policies.
4      What role do you play in that area of
5  training on that topic?
6  A.   None.  I have people under me that do the
7  training; I don't do the training.
8  Q.   Okay.  Who are they?
9  A.   There's different levels from supervisors
10 all the way up to shift managers, plant managers.
11 Q.   Okay.  And take the organizational chart,
12 Exhibit 16, and tell me those persons.
13 A.   It could be any of these sheets.
14 Q.   The entire exhibit?
15 A.   According to what department and where they
16 work and what they're training on.
17 Q.   Okay.  Which employees -- are you saying all
18 these employees shown here do training or are you
19 saying particular ones?
20 A.   All of them do training.
21 Q.   All right.  But do they do training on
22 maintenance of records of hours worked and wages
23 paid?

Page 20

1  A.   Maintenance of records?  Explain what you're
2  asking now.
3  Q.   Look at No. 2 there.  Read No. 2 to yourself
4  to make sure you're on the same page with me.
5  A.   (Witness complies.)
6  Q.   Okay.
7  A.   They do time sheets and, you know, turn in
8  weekly daily time sheets.  Supervisors and
9  superintendents do time sheets and turn those in
10 to accounting.
11 Q.   Okay.
12 A.   The payroll department.
13 Q.   All right.  Just take a minute and read each
14 of the topics in Exhibit 21 that you've been
15 designated for, and tell me if you believe that
16 you do not have knowledge on any of those topics.
17     (The witness examines the
18     document.)
19 A.   I mean, on some of these I've got general
20 knowledge of, but not in detail on all these
21 items.  You know, there's a lot of stuff here.
22 Some of it I know something about, but not all;
23 because I've got people under me that's

Page 21

1  responsible for this.
2  Q.   Okay.  We'll get into that as we go along.
3  But you don't see any topics in Exhibit 21 that
4  you disagree with you being designated to speak
5  on, do you?
6  A.   I mean, when you're talking about the
7  plaintiffs on their required wear, I don't even
8  know the plaintiffs; and I don't know 1700
9  employees by name and where they work, so I don't
10 know what they're required to wear in the position
11 they're in.  You know what I'm saying?
12 Q.   Uh-huh.
13 A.   So I don't have knowledge of that.  I know
14 what positions, what is required to be worn in
15 that position, according to what they're doing.
16 But I don't know by plaintiff's name.
17 Q.   All right.  Now, while you were looking at
18 that, I was looking at Exhibit 17, which is what's
19 called the revised GMP's; and it's considerably
20 more involved than the one we had before today.
21     Exhibit 17, is it in force as of today?
22     MR. ROSENTHAL:  I'm going to object to
23 the extent to the premise of the question that

6 (Pages 18 to 21)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 22

1  it's considerably more involved than the prior
2  Good Manufacturing Practices which were supplied,
3  which were multiple versions of the GMP's for each
4  of the plants. But you can answer the question.
5  A.    Would you repeat the question?
6         MR. ROSENTHAL: Is it in force today?
7  Q.    Yeah.
8  A.    Yes.
9  Q.    And has this Exhibit 17 been in force since
10  August 18, 2007?
11  A.    Yes.
12  Q.    And it doesn't bear your signature, does it?
13  A.    No.
14  Q.    All right. But it bear's your boss's
15  signature, correct, or a place for the signature,
16  correct?
17  A.    I don't see that.
18  Q.    Page 2 of my copy of Exhibit 17 says, at the
19  top, "Robin Stevens, Fresh Plant Manager." He
20  reports to you though, doesn't he?
21  A.    Correct.
22  Q.    All right. I brought the old exhibits that
23  have been previously produced. Look at Exhibit 3.

Page 23

1  A.    (Witness complies.)
2  Q.    Is this the version of the Good
3  Manufacturing Practices that were in force and
4  effect from October 2, 2006, to August 18, 2007?
5  A.    Yes. To the best of my knowledge, yes.
6  Q.    And look at page 2. That's your signature,
7  correct?
8  A.    Yes.
9  Q.    You signed it October 2, 2006, correct?
10  A.    Yes.
11  Q.    Do you know why, when it was revised in
12  August of 2007, it didn't call for your signature?
13  A.    No.
14  Q.    Okay. Look at page 3 of Exhibit 17.
15  A.    (Witness complies.)
16  Q.    Is that an accurate and complete list of the
17  revisions, dates, and type of revisions?
18  A.    To the best of my knowledge.
19  Q.    How long have you been with Equity Group?
20  A.    Since March of '04.
21  Q.    And what was your job history prior to that?
22  A.    I was with CP.
23  Q.    And what does CP stand for?

Page 24

1  A.    Charoen Pokphand.
2  Q.    And how long were you with them?
3  A.    Started September 1999.
4  Q.    And what were your jobs for CP?
5  A.    First job, I was maintenance manager; then I
6  was promoted in 2000 to plant manager; then I was
7  plant manager when Equity Group bought Charoen
8  Pokphand.
9  Q.    And when did that take place?
10  A.    When it was purchased?
11  Q.    Correct.
12  A.    I believe March of '04.
13  Q.    And when did you become complex manager?
14  A.    Operations manager.
15  Q.    Complex operations manager I think is your
16  title.
17  A.    I don't remember the date. It was sometime
18  October or November of '04.
19  Q.    Who did you replace?
20  A.    No one.
21  Q.    From 2000 to 2004 you said you were plant
22  manager. Of which plant?
23  A.    Fresh plant.

Page 25

1  Q.    To whom did you report?
2  A.    Lee Allen.
3  Q.    And what was his job?
4  A.    Complex manager.
5  Q.    So they created a new position called
6  complex operations manager sometime in late 2004?
7  A.    Yes.
8  Q.    Do you know why?
9  A.    No.
10  Q.    Now, looking at Exhibit 3 again, which you
11  said was the predecessor to Exhibit 17, it has 19
12  numbered paragraphs, correct?
13  A.    What are you talking about 19 paragraphs?
14  Q.    I'm sorry. 29 paragraphs. You've got
15  Exhibit 3 in front of you, correct?
16  A.    Uh-huh.
17  Q.    All right. It has six pages with 29
18  numbered paragraphs, correct?
19  A.    Yes.
20  Q.    All right. Now, looking at the revised
21  2007, Exhibit 17, it has 41 numbered paragraphs,
22  then a series of bullet point paragraphs, then it
23  looks like it picks up with some more numbered

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 26

1  paragraphs; so I really don't know how many in
2  total.
3      But you would agree that this new policy has
4  many, many more paragraphs than the predecessor
5  policy, correct?
6      MR. ROSENTHAL: Objection to the extent
7  you're referring to P3 as the predecessor. This
8  P17 is a combination of GMP's for all the entire
9  complex plants. This is limited to the fresh
10 plant only. It is not correct to say that this is
11 the predecessor to this; this is one part of it.
12     MR. WIGGINS: All right. But I think
13 you're going to have to let the witness be the
14 witness.
15     MR. ROSENTHAL: Well, I'm objecting to
16 your question.
17     MR. WIGGINS: Well, he had already
18 answered that question.
19     MR. ROSENTHAL: No.
20     MR. WIGGINS: Well, the record will
21 show that. But still, I don't think that's a
22 proper objection. And I think the witness needs
23 to be the witness, not the lawyer.

Page 27

1      MR. ROSENTHAL: Well, I objected before
2  and you continued to try to refuse the witness by
3  referring to a document incorrectly, which is
4  improper under the rules.
5      MR. WIGGINS: Well, the rules say you
6  can object to the form. And I'm going to object
7  to speaking objections. If the witness answers
8  wrong and you need to redirect him, that's fine;
9  but I don't want you interrupting in the middle of
10 the deposition like that.
11     MR. ROSENTHAL: You don't set the
12 rules, Mr. Wiggins.
13     MR. WIGGINS: No, but I know the rules,
14 and I don't want to have to go to the judge about
15 them.
16 (BY MR. WIGGINS)
17 Q.   Did you play any role in this revision
18 that's Exhibit 17?
19 A.   No.
20 Q.   Do you know why it was revised?
21 A.   No.
22 Q.   Do you know how it was revised?
23 A.   No.

Page 28

1  Q.   But you would agree that it's longer, has
2  more paragraphs than Exhibit 3, correct?
3  A.   It has more paragraphs than Exhibit 3.
4  Q.   Do you know why?
5  A.   Because this covers slaughter, debone, and
6  further processing, as it states.
7  Q.   And what did Exhibit 3 cover?
8  A.   To the best of my knowledge, this only
9  covers slaughter/debone. It states "Fresh
10 Processing" on the cover sheet.
11 Q.   All right. Is there any part of Exhibit 17
12 that does not relate to slaughter, debone, and
13 further processing in the same way?
14     MR. ROSENTHAL: Object to the form. In
15 the same way?
16 Q.   Is there any part of Exhibit 17 which does
17 not apply to all three areas -- slaughter, debone,
18 and further processing -- in the same way?
19 A.   I don't know the answer to that.
20 Q.   All right. Well, given the length of this
21 one, I think I'm going to take a few minutes to
22 read it.
23     MR. WIGGINS: Take a break?

Page 29

1      MR. ROSENTHAL: It's your deposition.
2  Q.   While he's getting that copied, let me ask
3  you some other questions, and then we'll take a
4  break at that point.
5      Are employees required to process chicken or
6  produce poultry products in a way that does not
7  contaminate the product?
8  A.   Yes.
9  Q.   Is that one of their principal
10 responsibilities?
11 A.   Yes.
12 Q.   Are all employees required to do their
13 processing or production work in a manner that
14 produces uncontaminated chicken products?
15 A.   Yes.
16 Q.   These Good Manufacturing Practices that we
17 have in Exhibit 3 and Exhibit 17, the purpose of
18 them is for employees to be able to produce
19 uncontaminated poultry products, correct?
20 A.   Yes.
21 Q.   And that benefits the company so that it can
22 sell its products to its customers, correct?
23 A.   Yes. And it's a USDA regulation.

Page 30

1  Q.  Your customers are purchasing from you
2  uncontaminated poultry products, correct?
3  A.  Yes.
4  Q.  You represent to them that when they
5  purchase poultry products from your company, they
6  are receiving wholesome, uncontaminated products,
7  correct?
8  A.  Yes.
9  Q.  Now, I don't have a real good copy of this
10 map -- I suppose it's as good as you've got -- but
11 I want you to help me read it.
12      MR. WIGGINS:  We'll mark this as
13 Exhibit 22.
14      (Plaintiffs' Exhibit No. 22 was
15      marked for identification and a
16      copy of the same is attached
17      hereto.)
18 Q.  Which side do you read this from?  This
19 side, I suppose.  Show me the parking lot.
20      MR. ROSENTHAL:  You'll have to explain
21 for the court reporter what you're pointing to.
22 Q.  Let's take this red pen and mark the parking
23 lot for us.

Page 31

1  A.  This is the parking lot that I'm marking in
2  red.
3  Q.  All right.
4      MR. ROSENTHAL:  For the record, Mr.
5  Mills marked three areas in red and designated
6  them "parking lot."
7  Q.  And this bigger parking lot is for the fresh
8  plant?
9  A.  Yes.
10 Q.  And this second biggest parking lot is for
11 the further processing plant?
12 A.  Yes.
13 Q.  And what's this smallest parking lot for?
14 A.  Admin parking lot.
15 Q.  Okay.  Now, in the fresh plant, where do
16 employees enter the plant?
17 A.  They can enter at either end, the north or
18 south end of the further processing plant.
19 Q.  All right.  Put the word "entry."
20 A.  (Witness complies.)
21 Q.  All right.  You put E-N-T for the two
22 entrances.
23      Are employees allowed to enter either door?

Page 32

1  A.  Yes.
2  Q.  And what's the first thing they come to as
3  they enter each door in the fresh plant?
4  A.  A hallway leading to production or break
5  room areas.
6  Q.  And is the break room listed on the map?
7  A.  Yes.  Debone break room listed, evis break
8  room listed, back dock break room right here.
9  Q.  Back dock; it's not listed, is it?
10 A.  I can't read it if it is.
11 Q.  Well, write that on there for us.
12 A.  (Witness complies.)
13 Q.  Now, where do employees sanitize their boots
14 or shoes?
15 A.  At the entrance of each processing area they
16 walk through a floor sanitizer.
17 Q.  All right.
18 A.  Any entrance into the building has floor
19 sanitizers you walk through nonstop.
20 Q.  You've got two entries marked.  Are there
21 others?
22 A.  Any door leading from the outside.  This
23 print is so small I can't designate every little

Page 33

1  door.  But every door entering into the processing
2  area has a floor sanitizer that keeps the floor
3  wet with sanitizer.
4  Q.  Okay.  Show me where the other entrance
5  doors are.
6  A.  I don't know if that's possible, as small as
7  this print is.
8      There's one in this area; there's one out of
9  this control room; there's one out of this
10 maintenance shop area; there's one in a doorway
11 over here that I cannot see on this print.
12      Every door leading into processing has a
13 floor sanitizer.
14 Q.  Okay.  Now, is there north, south, east, and
15 west on this map?
16 A.  I do not see one.
17 Q.  Do y'all -- how do you describe the plant?
18 Do you call it the north end or south end, or do
19 you have words that describe where you're at in
20 the plant?
21 A.  Just departments.
22 Q.  Okay.  Tell me what the departments are.
23 A.  Debone.

9 (Pages 30 to 33)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 34

1  Q.  Write that down.
2  A.  (Witness complies.)
3  Q.  Okay.
4  A.  DSI, shipping, maintenance shop,
5  refrigeration room, control room.
6      This thing is so small I can't read it.
7  This is not right. This is cooler.
8  Q.  What you had marked as maintenance is really
9  the cooler?
10  A.  This is the maintenance shop.
11  Q.  Okay.
12  A.  This is the refrigeration room; this is the
13  chiller room; this is the evis department; this is
14  the picking room; this is the shackling room; this
15  is the back dock, back dock/live receiving; this
16  is office areas right here in this area; this is
17  the evis break room right here in this open spot;
18  this is USDA.
19  Q.  Where's QA?
20  A.  QA office is right here; QA manager's office
21  is right here; plant manager is right here; my
22  office is right here; conference room, production
23  manager, production manager, production

Page 35

1  coordinator; this is debone break room; this is
2  the locker area in the break room; there's also a
3  locker area in this break room that I can't even
4  see where it's at it so small.
5  Q.  Okay.
6  A.  This is the entrance for the office
7  personnel right here.
8  Q.  All right. Where are the first line
9  supervisors' offices?
10  A.  It's not even shown on this print. Right
11  here.
12  Q.  That's in the production area, correct?
13  A.  There's an office area right here, and then
14  there's a --
15  Q.  Let me stop you. Is this in the production
16  area where these first line supervisors' offices
17  are?
18  A.  No.
19  Q.  Okay. You've got to go outside the
20  production area to get the supervisors?
21  A.  Through this door right here, and there's a
22  door on each end that's going to lead to these
23  offices.

Page 36

1  Q.  Okay. And does that door from the
2  supervisor's office into debone have a foot
3  sanitizer?
4  A.  No.
5  Q.  Okay.
6  A.  Just doors from the outside into the
7  processing plant.
8  Q.  All right. Now, I interrupted you. Where
9  are the other supervisors' offices?
10  A.  There's another supervisor office in this
11  area. Honestly, this thing's so jumbled up, I
12  can't make out where it's at. But right in this
13  area here is a supervisor's office. I believe
14  it's in this corner right here.
15      And then offices here. Production manager
16  is in this area. Sanitation manager has an office
17  in this warehouse. This has got offices in it
18  which are not drawn.
19  Q.  What's this called here?
20  A.  Warehouse. And there's offices in here that
21  houses sanitation manager for this plant and
22  purchasing for this complex.
23      There's a maintenance manager's office in

Page 37

1  this area, a maintenance supervisor's office in
2  this area.
3  Q.  Okay. And the evisceration department
4  supervisors' offices are where?
5  A.  Right here, this back corner right here.
6  Q.  All right. Now, the production process goes
7  from live receiving down to debone?
8  A.  Yes.
9  Q.  All right. Now, you had marked for us, but
10  let's get it in the record, where these foot
11  sanitizing activities are taking place.
12  A.  There's a number of them. I don't know all
13  the exact locations, but I know it's a requirement
14  that they are on every entrance into the
15  production area on the inside.
16  Q.  That's a company requirement?
17  A.  No.
18  Q.  Whose requirement?
19  A.  USDA.
20  Q.  And the company has a policy that employees
21  must comply with USDA requirements, correct?
22  A.  Yes.
23  Q.  Let's see if we can get a verbal description

10 (Pages 34 to 37)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 38

1  of where these places are.
2      On the debone end of the plant entrance, you
3  come down -- you come into the entry and exit
4  door, and you walk down a hall that runs parallel
5  to the debone department and the debone break
6  room, correct?
7  A.  Correct.
8  Q.  Then there's a main entrance there across
9  the hall from the debone break room that the
10  employees enter the production area, correct?
11  A.  Correct.
12  Q.  And there is a foot sanitation process at
13  that door, correct?
14  A.  Yes.
15  Q.  Employees entering the evisceration end of
16  the building and the live receiving end of the
17  building, when they come in that door, they come
18  down that same hall but from the other end of the
19  building, correct?
20  A.  Either end.  They can come in either end
21  they'd like.  They're not required for evis to
22  come in one end and debone to come in the other
23  end.  They can come in either end they'd like.

Page 39

1  Q.  Okay.  But down on the evisceration end
2  there is another entrance from the hall into the
3  production area that has a required boot
4  sanitation station, correct?
5  A.  Yes.
6  Q.  Now, you pointed us to some others back in
7  here.  Verbally tell us where you're going from
8  and to at the point that you have those boot
9  sanitation activities occurring.
10  A.  Best of my knowledge, and I'm not familiar
11  with all that, there is one coming out of the
12  control room into the evis department; there is a
13  foot sanitizer coming out of the maintenance shop
14  into the production area, and --
15  Q.  Which production area?
16  A.  Evis.  There is a foot sanitizer coming off
17  the shipping loading area onto the production
18  area.
19  Q.  Which production area?
20  A.  Debone.  Debone staging area.  And I'm sure
21  there's more, but I don't remember the other ones.
22  I don't remember where the rest of them are
23  located.

Page 40

1  Q.  Okay.  Do you know of any documents that
2  list them?
3  A.  Not as I'm aware of.
4  Q.  Now, describe your current boot sanitation
5  process.
6  A.  It is a unit mounted on the wall that takes
7  and blows chemicals on the floor; it keeps the
8  floor wet.  And all they do is walk across the
9  floor.
10  Q.  How long has that been the practice?
11  A.  I don't recall when we started that up.
12  Q.  Give me your best estimate.
13  A.  This is totally a guess:  three years.
14  Totally a guess.  I don't know.  It's been in a
15  while.
16  Q.  Who would know?
17  A.  I don't know the answer to that either.
18  Q.  Are there any documents that describe the
19  boot sanitation process that you've said you walk
20  across a wet floor?
21  A.  Not as I'm aware of.
22  Q.  Does an employee have to push any buttons?
23  A.  No.  They're on timers.  They come on

Page 41

1  automatic.
2  Q.  And are they motion-sensored or just pure
3  time?
4  A.  Pure time.
5  Q.  Now, describe your prior boot sanitation
6  process.
7  A.  We didn't have one prior to this.
8  Q.  All right.  I've heard described -- I wasn't
9  at the depositions, but I've had people tell me
10  some of the things that were said.  But there was
11  mention apparently of some boot sanitation process
12  where employees had to punch a button of some
13  type.  Are you familiar with that?
14      MR. ROSENTHAL:  Objection to the
15  reference that any employee said that at the
16  deposition.  You can answer.
17  A.  No, I'm not aware of that.  No employee has
18  to push a button on the boot sanitizer.
19  Q.  Does an employee have to do anything other
20  than walk across a wet floor?
21  A.  That's it.
22  Q.  And that's been the only process you've ever
23  had?

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 42

1  A.   Yes.
2  Q.   Now, is an employee required to do anything,
3  other than enter the building and punch his clock,
4  before going into the production area?
5  A.   He's not required to.  He's required to put
6  on a hair net, beard net if he has a beard, and
7  earplugs.
8  Q.   All right.  But he's not required to do that
9  in the production area?
10  A.   No.
11  Q.   Is he required to do it before the employee
12  enters the production area?
13  A.   Yes.
14  Q.   All right.  Is that in writing?
15  A.   Not that I'm familiar with.  I'm not saying
16  it's not; I don't know.
17  Q.   Okay.  Now, where is the time card punch
18  clock?
19  A.   Just inside the doors at the break rooms.
20  There's a time clock right here that I'm aware of.
21  Q.   Put "TC" right there, so I can remember it
22  when I see it.
23  A.   Okay.  And there's one in this area.  I

Page 43

1  don't remember which side of the door it's on.
2  Q.   All right.
3  A.   And I know there's one at the hallway right
4  here for maintenance.
5  Now, I'm not for sure on the picking and
6  receiving if there's one back there; I don't know,
7  because I'm not in that area that much.  But I
8  know these are here.  And there's also one in this
9  break room in that area right there, in the evis
10  break room.
11  Q.   The picking and receiving employees, they
12  enter these two main entrance doors that you've
13  shown us?
14  A.   They can enter either at this entrance, or
15  if they are live shacklers, they can enter at this
16  entrance, or they can enter through the
17  picking/receiving break room area.  Either or.
18  Q.   At the beginning of the day, they can come
19  in through the picking and receiving area?
20  A.   Yes.  If they work in that area.
21  Q.   And you think there's a time clock back
22  there?
23  A.   I don't know; I think.  I don't know.

Page 44

1  Q.   Okay.  So as I understand your testimony,
2  there is nothing that employees are required to do
3  before they enter the production area, other than
4  punch their clock?
5  A.   As I stated, hair nets, beard nets, and
6  earplugs before entering into the production area.
7  Q.   Okay.  What are they required to do upon
8  entry into the production area?
9  A.   Put on their smock, wash their hands before
10  going to the line.
11  Q.   Anything else?
12  A.   Arm guard if they're using knives or
13  scissors, after they enter into the production
14  area.
15  Q.   When you say "arm guard," you mean put it
16  on?
17  A.   Slide it over your arm.
18  Q.   Okay.  Anything else?
19  A.   That's all I'm aware of.
20  Q.   All right.  Now, where are the wash basins?
21  A.   Wash basins?  When you enter into debone,
22  they're in this area right here.  When you enter
23  into evis, they're in this area right here.  When

Page 45

1  you enter from the picking/receiving break room
2  area when you enter into production, they're right
3  on the wall when you go through the door.  There's
4  wash basins back here in this area.
5  Q.   What do you call that area?
6  A.   DSI area.  There's wash basins here.
7  There's wash basins in the evisceration department
8  on this wall here.  They're in a lot of locations.
9  That's the ones I remember at this time.
10  Q.   All right.  Now, the first one you told me
11  about, you're coming from the hall adjacent to the
12  break room into the debone department?
13  A.   Yes.
14  Q.   And the wash basin is adjacent to the entry
15  to the debone department?
16  A.   Right beside the entry.
17  Q.   How many stations or spigots do you have?
18  A.   I don't know the answer to that.
19  Q.   Give me an approximation.
20  A.   I don't know.
21  Q.   Are employees required to wash their hands
22  at that station?
23  A.   They are required to wash their hands before

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 46

1  going to the line, after entering the production
2  area.
3  Q.   And that's the only wash basin that they use
4  for that purpose?
5  A.   No.
6  Q.   All right.
7  A.   They've got wash basins in evis department;
8  they've got wash basins in debone department. The
9  people that work in DSI can wash here before going
10  to their job. The people in picking and receiving
11  can wash here before going to their job.
12  Q.   Okay. Now, the evisceration sink you told
13  us about is right there as you come in that door
14  to that area?
15  A.   Yes. Right in front of the door, yes.
16  Q.   Okay. Where do the DSI employees enter into
17  the production area at the start of the day?
18  A.   I can't really answer where they enter.
19  They can enter here and walk across; they can
20  enter into the debone entrance and walk around;
21  they can enter either one of these areas and walk
22  to the DSI. I can't tell you that all DSI enter
23  this area. They're not required to enter no

Page 47

1  certain area.
2  Q.   All right. Let me read that new exhibit you
3  brought me. We'll take a break for a few minutes.
4  A.   Okay.
5       (A brief recess was taken.)
6  (BY MR. WIGGINS)
7  Q.   All right. Let's take this book I gave you
8  and let's look at Exhibit 1. This is called "New
9  Hire GMP Policy."
10       During what period of time was this in force
11  and effect?
12  A.   I can't answer that.
13  Q.   Is it currently in force or effect?
14  A.   Yes.
15  Q.   Give me your best estimate of how long it
16  has been in force and effect.
17  A.   I don't have a clue on this particular
18  policy exhibit.
19  Q.   Okay. Let's go to -- Before I go to No. 2,
20  let me ask you this: Does this New Hire GMP
21  Policy apply to all employees that are under you,
22  including the hourly employees in the two plants?
23       (The witness examines the

Page 48

1       document.)
2  A.   Yes.
3  Q.   And you took your time to read the document
4  before answering, correct?
5  A.   I scanned over it.
6  Q.   Okay. Now let's go to Exhibit No. 2. This
7  is called "Equity Group - Eufaula Division, LLC
8  Good Manufacturing Practices (GMP'S)," correct?
9  A.   Yes.
10  Q.   And is this currently in force and effect?
11       (The witness examines the
12       document.)
13  A.   Yes, to the best of my knowledge.
14  Q.   All right. And we sat here while you took
15  your time to read that document also, correct?
16  A.   I scanned over it, yes.
17  Q.   And it's got a signature, Mary Allen. Is
18  that an hourly employee, more than likely?
19  A.   I don't have a clue. I don't know Mary
20  Allen.
21  Q.   Are employees required to sign this document
22  at some point in the process?
23  A.   I don't have an answer to that; I don't

Page 49

1  know.
2  Q.   All right. Let's look back at the other
3  exhibit real quick. It starts at page 4. Do you
4  know why?
5  A.   No, I don't.
6  Q.   Let's go to Exhibit 3. This is the Equity
7  Group Eufaula Good Manufacturing Practices for
8  fresh processing, correct?
9  A.   Yes.
10  Q.   And it says the issue date was March 15,
11  2004, correct?
12  A.   Yes.
13  Q.   Revised date, October 2, 2006?
14  A.   Yes.
15  Q.   And this is one you earlier identified that
16  you had signed.
17       When did Equity Group take over at this
18  plant, the fresh processing plant?
19  A.   In March of 2004, I believe.
20  Q.   So this was the very first one under Equity
21  Group's ownership, correct?
22  A.   I can't answer that. I would think so, but
23  I don't know.

13 (Pages 46 to 49)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 50

1   Q.   All right.  Do you see any part of Exhibit 3
2   that is not currently in force and effect?
3        (The witness examines the
4        document.)
5   A.   To the best of my knowledge, briefly
6   scanning over it, I believe they're all in force
7   at this time.
8   Q.   And we sat here while you took time to read
9   through the document.
10       MR. ROSENTHAL:  Objection.  Not a point
11  in the question.  You can answer.
12  A.   Well, I briefly scanned over it.
13  Q.   Well, we sat here; it appeared you read
14  every paragraph.
15  A.   I did not read every paragraph.
16  Q.   All right.  Well, if you need to read every
17  paragraph to answer my next question, please do
18  so.
19       But as I understand your testimony, the
20  items listed in Exhibit 3 employees have been
21  required to comply with from March 2004 to
22  present, correct?
23  A.   Yes, to the best of my knowledge.

Page 51

1   Q.   Okay.  Let's look at Exhibit 4.  What is
2   this document, page 1, called "Correct Hand/Glove
3   Washing"?
4   A.   First time I've ever seen it.  I don't know.
5   Q.   Does it accurately describe what the company
6   instructs employees to do in regard to hand/glove
7   washing?
8   A.   I can't answer that.  First time I've ever
9   seen this document.
10  Q.   I understand that.  But the six items listed
11  there, is that what employees are required to do
12  in washing hands and gloves?
13  A.   We do not measure the soap by a dime to see
14  if they're using a dime-size soap.  I've never
15  known nobody doing that.  We never time them to
16  see if they scrub for 10 seconds.
17  Q.   It doesn't say anything about timing, but go
18  ahead and finish your answer.
19  A.   It says, "Rubbing hands together for at
20  least 10 seconds..."  We don't put a stopwatch on
21  them.
22  Q.   Do you attend the training that employees
23  receive in regard to sanitation?

Page 52

1   A.   No.
2   Q.   Are employees given training and instruction
3   in how to properly sanitize their hands and
4   gloves?
5   A.   I can't answer that.  That's handled under
6   my management.
7   Q.   What is an SOP?
8   A.   Standard operating procedure.
9   Q.   Do you have a standard operating procedure
10  for hand/glove washing, other than Exhibit 4, page
11  1?
12       MR. ROSENTHAL:  Objection.  This
13  witness said he -- he didn't identify this as an
14  SOP.  He said he's never seen it before.
15  A.   I can't answer that.
16       MR. ROSENTHAL:  It appears by the
17  number it was produced by one of the employees.
18  Q.   But my question is:  Do you have a standard
19  operating procedure?
20  A.   I can't answer that.
21  Q.   You don't know if there is one for
22  hand/glove washing?
23  A.   No, I don't.

Page 53

1   Q.   Do you know if there's one for boot
2   sanitation?
3   A.   No, I don't.
4   Q.   Look at Exhibit 4, page 2.  This is called
5   "G.M.P.S."  Do you know what that means?
6   A.   No.
7   Q.   But you do know what a GMP is, correct?
8   A.   Yes.
9   Q.   What is a GMP?
10  A.   Good manufacturing practice.
11  Q.   And that's the policies of the company; is
12  that correct?
13  A.   Yeah.  That's the manufacturing practices.
14  Q.   Those are the practices employees are
15  required to follow?
16  A.   Yes.
17  Q.   All right.  Now, do you see anything in
18  Exhibit 4, page 2, that employees have not been
19  required to do since March 2004?
20       (The witness examines the
21        document.)
22  A.   Would you repeat that question, please?
23  Q.   Is there any item on Exhibit 4, page 2,

14 (Pages 50 to 53)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 54

1  called "G.M.P.S" that employees have not been
2  required to comply with since March 2004?
3  A.  Yes.
4  Q.  Which?
5  A.  First, this is the first time I've ever seen
6  this document. We don't have maroon smocks; we
7  don't do fully cooked. And I don't understand
8  this, "V-Megs/Combos/Totes must be washed out when
9  changing from one product to another." I don't
10  know what that means. Because we can put wings in
11  one combo and drumsticks in the combo. But I've
12  never seen this G.M.P.S before.
13  Q.  Okay. But the items listed there though
14  accurately reflect what employees are required to
15  do, except for those you just listed, correct?
16  A.  Says "No jewelry allowed." We do allow a
17  wedding band as long as it doesn't have sets.
18  Q.  Anything else?
19  A.  "Floor person only does floor work, no work
20  on the line." That's not a true statement.
21  Q.  Okay. Now, what is a true statement in
22  regard to floor persons as to whether they work on
23  the line?

Page 55

1  A.  They can do whatever their supervisor asks
2  them to do, as long as they do the proper
3  procedure to do it. I mean, if they work on the
4  floor and they change aprons and wash their hands,
5  they're allowed to work on the line.
6  Q.  Okay.
7  A.  This, "Water hoses (black for floor, clear
8  for machines)..." I've never seen that before. I
9  have no idea where this document come from. I've
10  never seen it at our plant.
11  Q.  I understand that. Do you have a par fried
12  line?
13  A.  Yes.
14  Q.  Let's go to the next page of Exhibit 4.
15  This is E 739, which apparently means it's
16  produced by the company. Do you recognize it?
17  A.  No, I'm not familiar with this.
18  Q.  All right. Let's go to Exhibit 5. This is
19  the attendance policy. Are you familiar with that
20  document?
21       (The witness examines the
22       document.)
23  A.  I'm not that familiar with the attendance

Page 56

1  policy because I don't do attendance on hourly
2  personnel; but I know we do have an attendance
3  policy. To state this is the attendance policy we
4  have in place, I can't do that.
5  Q.  Okay. Let me refer you to one part of it
6  though.
7       It says, "Accumulation of six points will
8  result in voluntary separation from the company."
9  Is that a true statement for the two plants you
10  supervise?
11  A.  Yes.
12  Q.  What does it mean "voluntary separation"?
13  A.  They quit.
14  Q.  Okay. And then it says, first bullet point,
15  "Arriving to work late and otherwise failing to be
16  ready to work at your designated start time equals
17  one-half point," correct?
18  A.  I believe that's correct, to the best of my
19  knowledge.
20  Q.  Is that a policy that's been followed since
21  Equity took over in March 2004?
22  A.  That was a policy that was negotiated in a
23  union contract, and we go by the union contract

Page 57

1  between Equity and RWDSU. We go by the contract
2  agreement.
3  Q.  Okay. But is this arriving to work late and
4  otherwise failing to be ready to work at your
5  designated start time equaling one-half point, is
6  that the practice followed since March 2004?
7  A.  I don't know since March 2004. It's in
8  place today. I don't remember if it went all the
9  way back to 2004.
10  Q.  Okay. If an employee is one minute late,
11  can they be given a half point?
12  A.  Yes.
13  Q.  Does the company timekeeping system allow
14  you to identify when an employee is one minute
15  late?
16  A.  Yes.
17  Q.  And do you dock an employee's pay when
18  they're one minute late?
19  A.  It's according to where they work. When you
20  say "dock their pay," you need to...
21  Q.  Is that one minute that they're late
22  subtracted from their pay?
23  A.  When you say "subtracted," what department

15 (Pages 54 to 57)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 58

1  are you talking about? If they're on a scheduled
2  time and they get paid from point A to point B and
3  they're not there at point A, yes. But if they're
4  on a clock in/clock out, it will be their clock
5  in/clock out time.
6  Q.  And which departments are on scheduled time?
7  A.  When you say "scheduled," you mean from a
8  clock in to clock out, or are you talking about
9  from a standard starting time to a standard ending
10 time?
11 Q.  You used the words "scheduled time."
12 A.  Master card time. Is that what you're
13 referring to?
14 Q.  I don't know; I'm asking you. You used the
15 term "scheduled time." What did you mean by that?
16 A.  If you're scheduled to be there at 7 a.m.
17 and work until 3:30 p.m., that's scheduled.
18 Q.  Okay.
19 A.  And if they clock in at 7:01, they get paid
20 from 7:01 until.
21 Q.  All right. Now, is that different than
22 master card time?
23 A.  Master card is a scheduled time, per se.

Page 59

1  Q.  Is master card something that's swiped?
2  A.  Yes.
3  Q.  Where is the master card swiped?
4  A.  At either one of the Kronos time clocks.
5  Q.  That's the same time clock that the personal
6  time card is swiped?
7  A.  Yes.
8  Q.  Who swipes the master card?
9  A.  I don't know the answer to that. Either
10 supervisor, superintendent, production manager.
11 One of the managers.
12 Q.  Now, is an employee on a clock-in/clock-out
13 basis, is that something different than an
14 employee that's on a scheduled time basis?
15 A.  Yes.
16 Q.  What's the difference?
17 A.  The clock in and clock out is from when they
18 clock in until the end of their shift they clock
19 out.
20 Q.  Which employees are on a clock-in/clock-out
21 timekeeping system?
22 A.  I'm not familiar with every one of them. I
23 know maintenance is on the clock in/clock out.

Page 60

1  Q.  Is there a document that identifies which
2  jobs or employees are on a clock-in/clock-out
3  method?
4  A.  I don't know the answer to that.
5  Q.  Do you know if there's a document that lists
6  the jobs or employees that are on a scheduled time
7  method?
8  A.  I don't know the answer to that.
9  Q.  And what about the master card? Is there
10 anything that identifies which employees or jobs
11 are subject to a master card method?
12 A.  I don't know the answer to that. I don't do
13 payroll.
14 Q.  Are there any other methods of timekeeping
15 used for hourly employees, besides those three:
16 scheduled time, master card, and clock in/clock
17 out?
18 A.  Not as I'm aware of.
19 Q.  An employee that's on a master card method,
20 if he's one minute late, is that subtracted from
21 his pay time?
22 A.  Yes.
23 Q.  And, of course, an employee on a clock

Page 61

1  in/clock out, if they're a minute late, they would
2  have that minute subtracted also; is that correct?
3  A.  It would be in their clock in/clock out. It
4  would be calculated in their clock in to clock
5  out.
6  Q.  Okay. Let's look at Exhibit 6. Do you
7  recognize this document called "General Safety
8  #4"?
9  A.  No.
10 Q.  It was produced by the company as Bates
11 number 639. Read it. There's 17 sentences --
12 numbered sentences. And tell me is there anything
13 in there that has not been followed or required of
14 employees since March 2004.
15         (The witness examines the
16          document.)
17 A.  We don't require safety glasses. "You are
18 required to wear safety glasses and earplugs when
19 entering the process area."
20      We don't require safety glasses for all
21 employees of the complex.
22 Q.  Do you require them for any employees?
23 A.  Yes.

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 62

1 Q. Which?
2 A. Maintenance.
3 Q. Any others?
4 A. Sanitation. And there may be some others
5 that I've not aware of.
6 Q. Would there be a document that would list
7 which jobs or employees are required to wear
8 safety glasses?
9 A. Not that I'm aware of.
10 Q. And No. 5, I guess, is the one you're
11 speaking of about safety glasses, right?
12 A. Yes.
13 Q. And says, quote, You are required to
14 wear safety glasses and earplugs when entering the
15 process area.
16     The process area, that's the production
17 area?
18 A. Yes.
19 Q. Okay. Now, why would you require some
20 employees to wear safety glasses in the production
21 area and not others?
22 A. It's according to the job they do.
23 Q. Do you have job descriptions?

Page 63

1 A. Yes.
2 Q. Do you have job descriptions for hourly
3 jobs?
4 A. I don't know the answer to that.
5 Q. Do you have job descriptions for your job?
6 A. Yes.
7 Q. Do you have job descriptions for the
8 employees that report to you?
9 A. Yes, there are some generic job
10 descriptions.
11 Q. What do you mean by "generic"?
12 A. Generic is kind of broad. It's not saying
13 in the job description, you know, you get to work
14 at X number of time in the morning; you do this,
15 this, and this.
16     The job description is kind of generic on
17 what you need to handle in your area of
18 responsibility.
19 Q. Let's take you as an example. Is your job
20 description as complex operations manager
21 different than the job description of Mr. Stevens
22 as first processing plant manager?
23 A. I don't know that because I'm not that

Page 64

1 familiar with job descriptions. There are job
2 descriptions.
3 Q. You've never looked at the job descriptions
4 for the employees that report directly to you?
5 A. Yes, I've looked at them; I didn't memorize
6 them.
7 Q. This Exhibit 16 you produced today shows
8 five employees reporting to you, other than your
9 administrative assistant; is that right?
10 A. Yes.
11 Q. Do you know anything about the job
12 descriptions for those five people?
13 A. Not as they're written I don't know. I know
14 what their job is, but I don't know what their job
15 description says.
16 Q. Who is responsible for having job
17 descriptions or getting them written?
18 A. Job descriptions are normally written out of
19 our Huntsville office.
20 Q. Is that the home office?
21 A. That's the division office.
22 Q. All right. The head person here in the
23 Eufaula division is Mr. Esslinger; is that right?

Page 65

1 A. Correct.
2 Q. And who does he report to?
3 A. Tim Lawson.
4 Q. What is his job?
5 A. I don't know his correct title.
6 Q. Where is he located?
7 A. Huntsville, Alabama.
8 Q. And you called that a division office,
9 correct?
10 A. Yes.
11 Q. And what geographical territory does it
12 cover?
13 A. All poultry in the U.S.
14 Q. How many plants is that?
15 A. I honestly don't know the total correct
16 answer to that exactly.
17 Q. Give me your best estimate.
18 A. I'm guessing seven or eight total plants,
19 but that's a guess.
20 Q. All right. And what did you say the
21 fellow's name in Huntsville is? I didn't write it
22 down.
23 A. Tim Lawson.

17 (Pages 62 to 65)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

4a4efcd4-222a-4134-9214-747cf2d63865

Page 66

1  Q.  Who does he report to?
2  A.  Keith Lewis.
3  Q.  What's his job?
4  A.  I don't know his exact job title.
5  Q.  Where is he located?
6  A.  Huntsville, Alabama.
7  Q.  And who does Mr. Lewis report to?
8  A.  He reports to Philadelphia.
9  Q.  Who?
10 A.  I believe his name is Jerry Dean.  I'm not
11 for sure.
12 Q.  Do you know his title?
13 A.  I sure don't.
14 Q.  What is in Philadelphia?
15 A.  Our corporate office.
16 Q.  All right.  Other than your job description,
17 are there any other documents that would describe
18 your duties and responsibilities?
19 A.  Not as I'm aware of.
20 Q.  Who would be knowledgeable as to whether
21 there are job descriptions for hourly employees?
22 A.  I can't really answer that.  I don't know.
23 Q.  The quality assurance department, does it

Page 67

1  have job descriptions?
2  A.  Can't answer that; I don't know.
3  Q.  Has there been any period of time that all
4  production employees have been required to wear
5  safety glasses?
6  A.  Yes.
7  Q.  What period was that?
8  A.  I don't know the dates.
9  Q.  Give me your best estimate.
10 A.  It's been -- we stopped everybody from
11 wearing them probably, a guess, a total guess, a
12 year ago.  And I don't know when we started.  I
13 don't have a clue.
14 Q.  At the time Equity Group took over in March
15 of 2004, were safety glasses required?
16 A.  I don't remember.
17 Q.  Let's look at Exhibit 7.  This is called
18 "New Hire Allergen Awareness Training."
19     Are you familiar with this document?
20 A.  No.
21 Q.  Who would be?
22 A.  Can't answer that; I don't have a clue.
23 Q.  Do you know what department this originates

Page 68

1  from?
2  A.  No.
3  Q.  Is there anything within that New Hire
4  Allergen Awareness Training that appears not to
5  apply to your two plants?
6  A.  I'm not familiar with it at all.
7  Q.  Okay.  I know you're not familiar with the
8  document, but the items listed, are you familiar
9  with allergen control programs at your two plants?
10 A.  No.
11 Q.  All right.  The next page of that Exhibit 7
12 is called "New Hire HACCP Training."  Who's in
13 charge of the HACCP program or policy?
14 A.  Butch White.  It falls under his umbrella.
15 Q.  And does this New Hire HACCP Training apply
16 to your two plants?
17 A.  Yes.
18 Q.  And has it applied at all times since March
19 of 2004?
20 A.  Yes.
21 Q.  The purpose of the -- well, let's first get
22 this identified.
23     HACCP stands for Hazard Analysis Critical

Page 69

1  Control Points, correct?
2  A.  Yes.
3  Q.  And the purpose of that Hazard Analysis
4  Critical Control Points Program is to prevent
5  contamination of poultry products, correct?
6  A.  Food control based on prevention, yes.
7  Q.  Now let's look at Exhibit 8.  I've not
8  produced all in Exhibit 8, the pages; but here's
9  the whole book if you want it of the employee
10 handbook.
11    Looking at the pages that I've excerpted out
12 of the employee handbook, have they been in full
13 force and effect since March of 2004?
14    MR. WIGGINS:  And for the record, those
15 excerpted are Exhibit 8.
16    (The witness examines the
17    document.)
18 A.  I don't know how long this has been in place
19 because I'm not familiar with this book, but it
20 looks like, just scanning over a few pages, this
21 is something we still do.  And I don't know how
22 long we've been following this.  Has this handbook
23 been changed?  I don't know.

18 (Pages 66 to 69)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 70

1  Q.  All right.  The handbook we've been given,
2  is E 516 through 571.  And we weren't given a new
3  one today.
4      Do you know if there's ever been another
5  employee handbook besides this one that I'm
6  placing in front of you?
7  A.  I don't know.
8  Q.  Who would know that?
9  A.  HR is the one that hands these out and has
10  them printed.  I don't know.
11  Q.  Anyone in particular in charge of that in
12  HR?
13  A.  Not as I'm aware of.  I don't know.
14  Q.  Now, look at page 534.  It's called "Work
15  Rules and Regulations" in the employee handbook,
16  correct?  It's actually page 17 in the employee
17  handbook, but Bates numbered 534.  It got cut off
18  there.
19      Page 17, at the bottom, says "Work Rules and
20  Regulations," correct?
21  A.  That's what it says there.
22  Q.  And it says that you can be disciplined for
23  failing to follow these rules and regulations,

Page 71

1  correct?
2  A.  It says the company expects you to follow
3  them, yes.
4  Q.  All right.  And employees that fail to
5  follow these rules and regulations are subject to
6  discipline, correct?
7  A.  Uh-huh.
8  Q.  Is that right?
9  A.  Yes, sir.  That's what it says.
10  Q.  Okay.  Now, turning to the next page, look
11  at No. 11.  One item that employees are subject to
12  discipline or discharged for is, in No. 11,
13  "Failure to wear safety equipment and/or required
14  clothing/uniform," correct?
15  A.  Yes, that's what it says.
16  Q.  It also says, "In addition to any prescribed
17  discipline, an employee violating this policy may
18  be forced to leave the facility until the company
19  dress code is met," correct?
20  A.  Correct.
21  Q.  Does quality assurance monitor employees'
22  use of safety equipment and required
23  clothing/uniforms?

Page 72

1  A.  Quality assurance monitors that; supervisors
2  monitor that; superintendents monitor that.
3  Q.  Okay.  And does quality assurance have
4  employees at the start of a shift there at the
5  production room entrance to make sure employees
6  have their protective equipment on?
7  A.  I can't answer that.
8  Q.  Does anyone stand there at the door when
9  they come through to make sure people are properly
10  donning their protective gear and equipment and
11  sanitizing themselves?
12  A.  Not as I'm aware of.  But we don't sanitize
13  ourselves entering the room.
14  Q.  Okay.  No. 13 of that same rules and
15  regulations policy says that one item an employee
16  can be disciplined or discharged for is, quote,
17  Failure of an employee to be at his/her appointed
18  workstation and ready to work at his/her scheduled
19  starting time, correct?
20  A.  Correct.
21  Q.  And that's been in force and effect, to your
22  knowledge, since March 2004?
23  A.  Yes, as far as I can remember.

Page 73

1  Q.  And another item since March 2004 that
2  employees can be disciplined for is violation of
3  safety rules and/or policies, correct?
4  A.  Yes.
5  Q.  All right.  Now turn over to page 40 of the
6  employee handbook.
7  A.  (Witness complies.)
8  Q.  Are these the safety rules that are referred
9  to in No. 18 that you can be disciplined and
10  discharged for?  It's called "General Safety
11  Rules."
12      (The witness examines the
13      document.)
14  A.  To the best of my knowledge.
15  Q.  All right.  And when you sat there and read
16  through the General Safety Rules, you didn't
17  identify any that have not been required of
18  employees since March of 2004, did you?
19  A.  No.  On page 40.
20  Q.  Well, the safety rules are on page 40 to 42,
21  correct?
22  A.  I need to read 41 and 42.
23  Q.  Okay.

19 (Pages 70 to 73)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 74

1     (The witness examines the
2     document.)
3  A.   This must be an old one because this has
4  changed.
5  Q.   What's changed?
6  A.   This says, "Wash hands and arms
7  thoroughly..."
8  Q.   Which number?
9  A.   No. 18. We don't wash arms. Our current
10 policy says to wash hands. I know that one's
11 changed.
12    Also, it says, "No equipment will be worn
13 outside of work areas." You can wear hair nets,
14 beard nets, earplugs outside of work areas. You
15 can't wear them outside, but you can wear them
16 outside of production areas.
17    It also states here that, "Boots are not to
18 be worn outside of plant." You can wear your
19 boots to and from work.
20    That's the changes I see at this point.
21 Q.   Okay. Now, looking at the cover of this
22 employee handbook from which those safety rules at
23 pages 40 to 42 come, it's called Keystone Foods

Page 75

1  Equity Group Eufaula Division Employee Handbook,
2  correct?
3  A.   Uh-huh.
4  Q.   Is that right?
5  A.   Yes.
6  Q.   So we know then that at some point in time
7  those rules you just listed as not currently being
8  followed were in force and effect, correct?
9  A.   We've never enforced no equipment to be
10 worn. We've always allowed hair nets, beard nets,
11 and earplugs to be worn outside the production
12 area. When they were wearing safety glasses, they
13 could wear them to and from work.
14    At one time, we were requiring them to put
15 boots on after they got to work and take them off
16 before they left.
17 Q.   What time period was that?
18 A.   I cannot answer that. I don't have a clue.
19 Q.   Can you tell us if it was more than a year
20 ago?
21 A.   I can't answer that. I do not have a clue.
22 Q.   Who would know?
23 A.   I can't answer that either.

Page 76

1  Q.   Is there a document that changed any part of
2  the employee handbook?
3  A.   I don't know that.
4  Q.   Is there a document that reflects any
5  non-enforcement of certain items in the employee
6  handbook?
7  A.   I don't know the answer to that.
8  Q.   All right. Now, identify the numbers in
9  pages 40 to 42, General Safety Rules, that you
10 were speaking of that you don't think are
11 currently in force.
12 A.   No. 18, No. 20. That's the changes I see.
13 Q.   Okay. Now, let's do No. 20 first. That
14 says, for the record, "No equipment will be worn
15 outside of work areas. Boots are not to be worn
16 outside of plant."
17    Now, you say that's a true statement except
18 for hair nets and earplugs and --
19 A.   Beard nets.
20 Q.   -- beard nets, correct?
21 A.   Correct. And safety glasses for the
22 employees that wear safety glasses.
23 Q.   But for all other equipment, they're not to

Page 77

1  be worn outside of the work area, correct?
2  A.   Yes. Back up and ask me that question
3  again. All other equipment?
4  Q.   Yes.
5  A.   Smocks are to be took off before exiting the
6  production area.
7  Q.   All right.
8  A.   And then their rubber gloves are took off
9  before exiting the production area, and put back
10 on after they get in the production area.
11 Q.   All right.
12 A.   Arm guards are put on normally after they
13 enter the production area. And if they wear
14 sleeves, they can put them on any time, the
15 production area or going to the production area.
16 Q.   Turn over to Exhibit 12, page 21. This is
17 the contract with the union effective March 1,
18 2004, to March 1, 2008.
19    There in Section 13.4, is that a complete
20 list of all the equipment that the employees are
21 provided?
22    MR. ROSENTHAL:  What page did you
23 reference?

20 (Pages 74 to 77)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 78

1      MR. WIGGINS: 21.
2   A.   I'm looking at the wrong number.
3      This is a list of equipment that we issue to
4   new employees. And we've got this listed in our
5   union negotiations on when they can come back and
6   get replacement equipment. But not all employees
7   are required to get all this equipment.
8   Q.   All right. But the contract says, for the
9   record, in Section 13.4, "Supplies will be
10  furnished to new employees, where required, in
11  accordance with company procedures as follows..."
12  and then lists three smocks, arm guards, cutting
13  glove, hair net, beard net, blue gloves, cotton
14  gloves, earplugs, apron - heavy duty, and sleeves,
15  correct?
16  A.   Yes. In this contract, some of these was
17  changed. At some time, and I don't know what
18  time, we did not issue three smocks. They come in
19  and got a new, clean smock every day. They didn't
20  have smocks; they just come in and got one out of
21  the supply room.
22  Q.   Do you know when that began?
23  A.   No.

Page 79

1   Q.   Do you know any documents that would tell
2   us?
3   A.   No, I don't.
4   Q.   All right. Now, this list though that I
5   just read to you and that you have in front of you
6   from Section 13.4 of the collective bargaining
7   agreement, is that a complete list of the
8   equipment employees are furnished by the company?
9   A.   No.
10  Q.   What's missing?
11  A.   If we require safety glasses, they are also
12  issued by the company.
13  Q.   Okay. Anything else to make that a complete
14  list?
15  A.   I don't see boots on here.
16  Q.   Okay. Anything else?
17  A.   Not that I'm aware of.
18  Q.   Okay. So with the addition of boots and
19  safety glasses, Section 13.4 lists all the
20  equipment that employees are provided upon hire,
21  correct?
22  A.   Where required. As this states,
23  "...furnished to new employees, where required..."

Page 80

1   Not all employees get this -- got this. This is
2   changed, because this contract ended in March of
3   this year, I believe.
4   Q.   Okay. We'll get to your new contract. But
5   during the period of this contract, this was the
6   contractual agreement, correct?
7   A.   Yes. But "Supplies will be furnished to new
8   employees, where required..." I want to make that
9   clear, "...where required..."
10  Q.   Yeah, I understand. Is there any document
11  that tells us where it is required?
12  A.   Not that I'm aware of.
13  Q.   Are there any of these items in Section 13.4
14  that are not provided to debone employees --
15  employees in the debone department?
16  A.   Not that I'm aware of.
17  Q.   Are there any of these items in Section 13.4
18  of the collective bargaining agreement that are
19  not supplied to evisceration employees?
20  A.   Well, you've got positions that don't
21  require arm guards, don't require cutting gloves;
22  so saying all of debone, all of evis, there are
23  employees in those two departments that does not

Page 81

1   require all of these supplies.
2   Q.   Okay. Let's put aside arm guards and
3   cutting gloves. Are all the other items in
4   Section 13.4, including boots and safety glasses
5   -- no, leave off safety glasses. Let me start
6   over.
7      Other than arm guards, cutting gloves, and
8   safety glasses, are all the items in Section 13.4
9   supplied to hourly employees by the company in
10  both your plants, in all departments?
11  A.   No. Aprons are not.
12  Q.   Okay. Which employees receive aprons?
13  A.   I can't answer that. None of them are
14  required. That's up to them if they want to wear
15  them, as long as they've got their smock on.
16  Q.   We're going to get to that. I'm just trying
17  to get right now what they're provided.
18     Let's take debone department employees, for
19  example. Are they provided aprons?
20  A.   What position in debone?
21  Q.   First, are any employees in debone provided
22  aprons?
23  A.   They can get aprons if they'd like to.

21 (Pages 78 to 81)

FREEDOM COURT REPORTING

Page 82

1  Q.   Are there any employees that are prohibited
2  from getting aprons from the company?
3  A.   Not that I'm aware of.
4  Q.   Where do they get the aprons?
5  A.   Supply room.
6  Q.   Okay.  Do you furnish employees a standard
7  package of items at the beginning of each week?
8  A.   I honestly don't know how the supply room
9  and the management team handles that.  I don't
10  know how they do that.
11  Q.   Do you know who would know that?
12  A.   I sure don't.
13  Q.   Do you know if there are any standard
14  operating procedures or other documents that
15  describe how and when protective equipment is
16  issued?
17  A.   I'm not aware of that.  We go by the union
18  contract.
19  Q.   Okay.  Do you know what protective equipment
20  is provided to employees initially?
21  A.   It's according to the position the employee
22  holds.  All employees are required to wear
23  earplugs.

Page 83

1  Q.   Are all employees required to wear hair nets
2  and beard nets?
3  A.   Yes.
4  Q.   Are all employees required to wear smocks?
5  A.   No.
6  Q.   All employees in the production area are
7  required to wear smocks?
8  A.   Yes.
9  Q.   All right.  Let's look back at page 40 of
10  the Exhibit 8, the employee handbook.
11  A.   (Witness complies.)
12  Q.   One of the items for which an employee can
13  be disciplined or discharged is No. 3 of the
14  safety rules which says, "Personal protective
15  equipment, which is provided initially by the
16  company, must be worn," correct?
17  A.   Yes.
18  Q.   All right.  Now let's look at No. 18.  You
19  identified that as one you said is not fully
20  enforced.  I think what you told me is that No. 18
21  is an accurate statement of what employees are
22  required to perform subject to discharge or
23  discipline, except for washing of arms, correct?

Page 84

1  A.   Correct.
2  Q.   So then was there a period of time that you
3  did require washing of arms?
4  A.   I do not remember.  I don't know.
5  Q.   Who would know that?
6  A.   I don't know.
7  Q.   Your first line supervisor would probably
8  know that, wouldn't they?
9  A.   Should, I would say.  I don't know.  I can't
10  answer that.
11  Q.   All right.  But at all times since March of
12  2004, employees could be disciplined or discharged
13  for not washing hands thoroughly with soap and
14  water before and after using bathroom facilities,
15  correct?
16  A.   Yes.
17  Q.   Now let's go to Exhibit 9.  This is the
18  Employee Orientation Manual.  You brought a new
19  one that we marked earlier.
20  Page 1 is an agenda of a day of training or
21  orientation for new hires, correct?
22  A.   That's what it looks like.
23  Q.   All right.  And it says between 1:00 and

Page 85

1  1:30, the employees are shown a tape about the QA,
2  HACCP, GMP's, SSOPs, and animal welfare, correct?
3  A.   That's what it says.
4  Q.   Have you ever seen that tape?
5  A.   No.
6  Q.   Do you know what's covered in the tape?
7  A.   No.
8  Q.   Then, at 1:45, it says, among other things,
9  the employees are given training in ergonomics
10  presentation and exercises.  What does that mean?
11  A.   I have no idea.  I've never sat through a
12  new hire orientation for hourly associates.
13  Q.   Are you familiar with what ergonomic
14  exercises employees are trained to do?
15  A.   No.
16  Q.   Do you know anything about ergonomic
17  exercises at the two plants you supervise?
18  A.   No.
19  Q.   Has there been a period where employees do
20  calisthenics?
21  A.   What's calisthenics?  I don't understand.
22  Q.   Exercise.  Physical exercise.
23  A.   There has been some time when they did do

22 (Pages 82 to 85)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 86

1  some exercise in the debone department alone.
2  Q.  What period of time?
3  A.  I don't know the answer to that.
4  Q.  What did they do?
5  A.  I don't know the answer to that.
6  Q.  Are there any documents that describe it?
7  A.  Not as I'm aware of.  I don't know.
8  Q.  Are there any standard operating procedures
9  regarding that exercise?
10  A.  I don't know the answer to that.
11  Q.  All right.  Then, at 3:00, the employees are
12  given training in several things, including PPE
13  use, correct?
14  A.  That's what this says.
15  Q.  And it says there's a tape on that subject.
16  Have you seen that tape?
17  A.  No.  Never been through a new hire
18  orientation for hourly associates.
19  Q.  What about the safety representative that's
20  doing the training on the PPE?  Do you know who
21  that is?
22  A.  I don't know who that is.
23  Q.  Now, PPE means personal protective

Page 87

1  equipment; is that correct?
2  A.  Yes.
3  Q.  And what is personal protective equipment?
4  What items?
5  A.  It's according to what we're talking about.
6  In this scenario, it was for safety; it's for
7  hazardous communications and material handling.
8  Q.  So in that context, what PPE exists?
9  A.  I don't know the answer to that.  I've never
10  been through a new hire orientation.
11  Q.  All right.  Do you know anything about this
12  hearing protection training that's at 3:45, listed
13  on this document?
14  A.  No.  As I stated, I've never been through a
15  new hire orientation, so I don't know what goes
16  on.
17  Q.  You've never had any hearing protection
18  training?
19  A.  Yes, I have, but I've never been through
20  this.
21  Q.  Okay.  Have you ever had any ergonomics
22  exercise training?
23  A.  No.

Page 88

1  Q.  Now, look through the items that I've
2  excerpted out of your Employee Orientation Manual,
3  in Exhibit 9, and tell me are there any of those
4  items that have not been in full force and effect
5  or the employees have not been required to comply
6  with since March of 2004.
7  A.  You're talking about these items?
8  Q.  Yes.  Just those pages out of the
9  orientation manual that are in Exhibit 9.
10  A.  Well, I'm not familiar with the orientation
11  manual because, as I stated earlier, I've never
12  been through an orientation for hourly associates,
13  so I don't know what they do during that process.
14     If you'd like me to read these pages, I'll
15  be more than glad to, but I still don't know if I
16  can answer your question.
17  Q.  Okay.  Well, put aside what they're told in
18  the orientation.  Someone else will have to tell
19  us that, apparently.
20     But in terms of the operation of the two
21  plants on a day-to-day basis, are there any of
22  those items that are in Exhibit 9 that employees
23  have not been required to comply with since March

Page 89

1  2004?
2  A.  Okay.  The first sheet, the attendance
3  policy, I'm not that familiar with the attendance
4  policy because I don't do attendance on hourly
5  associates.  So to give you an answer on the first
6  page, I don't know because I don't do the
7  attendance.
8  Q.  Okay.  Go to the next document, which is
9  "Further Processing GMP's."
10     Are there any of those items that employees
11  have not been required to comply with since March
12  of 2004? at any point in time since March of 2004.
13  A.  Looks like page 33, I believe we're doing
14  that on page 33.
15  Q.  All right.  Look at page 34, which has just
16  a few more paragraphs.
17  A.  It looks like we are doing this on page 34
18  and 33.
19  Q.  Okay.  So this Further Processing GMP's,
20  which lists 24 numbered sentences of requirements,
21  employees have been required to comply with those
22  items since March of 2004 at all points in time?
23  A.  To the best of my knowledge.

23 (Pages 86 to 89)

FREEDOM COURT REPORTING

Page 90

1  Q.   All right.  Let's go to the next document in
2  the orientation manual, Exhibit 9, which is Bates
3  number E 75, page 35 of the manual, called
4  "Quality Assurance."
5      Has this been in force and effect at all
6  times since March 2004?
7  A.   I can't answer that; I'm not over quality
8  assurance.
9  Q.   Looking at the items themselves, let's take
10  the first section called "Seven Principles of
11  HACCP."
12      Is that an accurate description of what the
13  company requires in term of identifying and
14  monitoring food safety hazards?
15  A.   I can't answer that because I'm not over
16  HACCP or quality assurance.
17  Q.   Okay.  Look at the second section called
18  "Standard Sanitation Operating Procedures" with an
19  acronym of "SSOPs."  Are you familiar with those?
20  A.   I'm familiar with what an SSOP is.  I'm not
21  familiar with this because I didn't write this
22  document and I'm not over this area.
23  Q.   Is there a standard sanitation operational

Page 91

1  procedure for each of those five items?
2  A.   I can't answer that.  I don't know.
3  Q.   Then the next section is called "Standard
4  Operational Procedures SOPs."  Is there a document
5  that has an SOP for each of those eight items?
6  A.   I can't answer that.  I don't know.
7  Q.   One of those items, No. 7, is "Washing hands
8  properly."  Have you ever seen an SOP on washing
9  hands properly?
10  A.   No, I haven't.
11  Q.   Who would know if there is an SOP on that
12  subject?
13  A.   I can't answer that.  I don't know.
14  Q.   Turn over to page 39 of the orientation
15  manual.
16  A.   (Witness complies.)
17  Q.   These items listed, the five bullet points,
18  have been required of employees since March of
19  2004?
20  A.   Yes.  We ask our people to do this, but I've
21  never seen this summary, per se, here.
22  Q.   It accurately summarizes what employees are
23  required to do since March of 2004?

Page 92

1  A.   Yes.
2  Q.   Let's turn to the next page in Exhibit 9,
3  which is page 40 of the operations (sic) manual.
4  And specifically No. 30, there at the top of the
5  page, says, "All employees will follow department
6  safety rules, policies and procedures.  Failure to
7  follow safety rules will result in disciplinary
8  action up to and including termination."
9      Has that always been the policy since March
10  of 2004?
11      MR. ROSENTHAL:  I'm going to object to
12  that term.  I think you referenced this as the
13  operations manual; I believe we're still in the
14  orientation manual.
15      MR. WIGGINS:  Okay.  I meant
16  orientation manual.
17  A.   I don't know about the orientation manual.
18  We do require people to follow our safety rules,
19  policies and procedures.
20  Q.   All right.  Turn to page 41 of the
21  orientation manual under "Sanitation Safety
22  Rules."
23  A.   (Witness complies.)

Page 93

1  Q.   It says, No. 2, "Always wear rain pant legs
2  outside the boot."  What does that mean?
3  A.   You wear your rain pants on the outside of
4  your boots where chemicals can't get in your
5  boots.
6  Q.   And does the company furnish the rain pants?
7  A.   Yes.
8  Q.   Who is that furnished to?
9  A.   Sanitation employees.
10  Q.   All right.  How many employees do you have
11  in sanitation?
12  A.   I don't know the exact number.
13  Q.   Are the employees required to wear their
14  rain pants when they're in the production area
15  doing the sanitation work?
16  A.   They wear them to home and from home if
17  they'd like.
18  Q.   But they're required to have them on in the
19  production area?
20  A.   Yes.
21  Q.   Okay.  Now look at the bottom of that page.
22  It's called, "Three Day Suspension Pending
23  Investigation/Final Notice."  It lists five bullet

24 (Pages 90 to 93)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

1   points.
2       Is that an accurate description of what will
3   get a three-day suspension pending
4   investigation/final notice given to an employee
5   for each of those items?
6   A.   I don't know if that's accurate now with HR
7   what steps they follow in disciplinary action.  I
8   don't know if that is the steps they do follow at
9   this time.
10  Q.   Now let's look at the last bullet point.  It
11  is accurate since March 2004, isn't it, that you
12  can get a three-day suspension pending
13  investigation if you, quote, Failure to wear or
14  properly wear required personal protective
15  equipment, correct?
16  A.   That's what it says.
17  Q.   And that's been the practice?
18  A.   Can't answer that.
19  Q.   You don't get involved in disciplining
20  employees on a three-day suspension?
21  A.   No.
22  Q.   Who does?
23  A.   HR, human resources.

1   Q.   Are they the decision maker as to whether an
2   employee will be put on a suspension?
3   A.   They are, with the employee's manager.
4   Q.   So if a first line supervisor saw an
5   employee not complying with the personal
6   protective equipment rules, would they have the
7   authority to discipline the employee themselves?
8   A.   All disciplinary action goes through HR
9   department, all suspensions.  And that's what we
10  were talking about here, three-day suspensions.
11  Q.   Okay.  The first line supervisor can
12  initiate the suspension, but it has to be approved
13  by human resources?
14  A.   Yeah.  They go up to HR and discuss what
15  happened, and they make a decision together.
16  Q.   The first line supervisor and the HR make a
17  joint decision?
18  A.   Yes.
19  Q.   Who in HR has responsibility for that?
20  A.   HR manager.
21  Q.   But what's the person's name?
22  A.   What shift are you talking about?
23  Q.   Each shift.  Tell me their names.

1   A.   You've got Kathy Gilmore can make that
2   decision; you've got Dante Rogers could make that
3   decision; you've got the one on night shift, and I
4   don't know his full name, Julio, can make that
5   decision; Jim Bice, as the complex QA manager, can
6   make that decision.
7       So there's several in HR that has the
8   ability to make that decision, along with the
9   management person.
10  Q.   All right.  Let's look at page 47 of the
11  orientation manual in Exhibit 9.  It's called "How
12  to Use Plugs."  This is referring to earplugs,
13  correct?
14  A.   I guess.  First time I've ever seen it.
15  Q.   All right.  But is this an accurate
16  statement of the company policy and practice --
17  A.   I can't answer that.
18  Q.   Well, I wasn't finished yet.
19  A.   Okay.
20  Q.   Since March of 2004, has it been a
21  requirement of employees to comply with the
22  following sentence:  "Your hands and plugs should
23  be clean before you put the plugs in your ears"?

1   A.   I can't answer that because I don't never
2   see no one checking earplugs and ears to see if
3   they're clean -- or hands.  I'm sorry.
4   Q.   Do you have any reason to believe that this
5   statement in the orientation manual that your
6   hands and earplugs should be clean before you put
7   the plugs in your ears is not something that the
8   employees are trained to do?
9   A.   As I said, I've never been through a new
10  hire orientation, so I don't know what goes on in
11  a new hire orientation.  I don't know if they
12  train them.  I don't know.
13  Q.   I understand that.  But do you have any
14  reason to believe that this part of the
15  orientation manual is not in fact part of the
16  training employees are given?
17  A.   I don't know.
18  Q.   Okay.  Turn to page 51 of the orientation
19  manual.
20  A.   (Witness complies.)
21  Q.   It has "General PPE Information" at the top.
22  This document is called "Personal Protective
23  Equipment."

25 (Pages 94 to 97)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 98

1    At the second bullet point, it lists this
2  requirement: "Keep PPE clean and sanitary."
3    Has that always been a requirement that
4  employees are expected to comply with since March
5  of 2004?
6  A.  I can't answer that on personal protective
7  equipment.  You would think they would like to;
8  it's their ears they're putting the earplugs in.
9  Q.  All right.  It defines here the personal
10  protective equipment in the following way; I want
11  to see if you agree with this way it defines it.
12  It says, quote, Personal protective equipment is
13  any piece of equipment, article of clothing, or
14  items deemed necessary for the health and safety
15  of employees, prevention of injuries, loss of life
16  or limb, or disease while employees perform their
17  daily job assignments as prescribed.
18    Do you agree with that?
19  A.  Yes.
20  Q.  What are those items?
21  A.  As in?
22  Q.  What items of personal protective equipment
23  exist at the two plants?

Page 99

1  A.  It's according to what you're doing.  I
2  mean, you're talking about production employees
3  that uses a -- I mean, give me a particular job or
4  a position, and I'll tell you what the PPE is for
5  that job.
6  Q.  Is there a document that tells us?
7  A.  No, not that I'm aware of.  I don't know.
8  Q.  Are you able to catalog for every job the
9  PPE that's required?
10  A.  Not that I'm aware of.
11  Q.  One item on this document, the Employee
12  Orientation Manual, says, at page 51, "Wash hands
13  before inserting earplugs."
14    Has that been a requirement of employees
15  since March of 2004?
16  A.  Not that I'm aware of.
17  Q.  Do you have any reason to believe that
18  that's something employees are not trained to do?
19  A.  I don't know.  I don't know what they're
20  trained in new hire orientation.
21  Q.  And then the next bullet point says, "Any
22  PPE other than that issued by Equity Group Eufaula
23  Division must be approved through the safety

Page 100

1  office."
2    Has that been a policy and practice followed
3  since March of 2004?
4  A.  I'm not aware of it.  I don't know.
5  Q.  Do you know if employees are allowed to wear
6  their own smocks?  Bring them from home and wear
7  their own?
8  A.  No, they're not allowed to wear their own
9  smocks.
10  Q.  Do you know of any items that employees are
11  allowed to furnish themselves as a substitute for
12  the ones that the company furnishes to them?
13  A.  Well, it states here that if they do, they
14  need to get it approved through the safety office.
15  This is talking about safety equipment, from what
16  I'm reading here.  Personal protective equipment
17  is not a smock.
18  Q.  You don't consider a smock part of the
19  personal protective equipment?
20  A.  No.  We're talking safety here.
21  Q.  All right.  Well, let's look back at the
22  list of items in the collective bargaining
23  agreement.  Look at Exhibit 12 again, page 21.

Page 101

1  A.  (Witness complies.)
2  Q.  Does the company consider hair nets and
3  beard net to be personal protective equipment?
4  A.  It doesn't state that here.
5  Q.  But does the company, in its operations,
6  consider hair nets and beard nets to be personal
7  protective equipment?
8  A.  Not that I'm aware of.
9  Q.  Does the company consider blue gloves to be
10  personal protective equipment?
11  A.  Not that I'm aware of.
12  Q.  Does the company consider cotton gloves to
13  be personal protective equipment?
14  A.  Not that I'm aware of.
15  Q.  Does the company consider aprons or heavy
16  duty aprons to be personal protective equipment?
17  A.  Not that I'm aware of.
18  Q.  What about sleeves?  Are they considered
19  personal protective equipment by the company?
20  A.  Not as I'm aware of.
21  Q.  And I think you've already said smocks are
22  not considered personal protective equipment,
23  correct?

26 (Pages 98 to 101)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 102

1   A.   Not for safety.
2   Q.   All right. I'm not sure what you mean.
3   You're saying smocks don't play any role in
4   safety?
5   A.   Correct. In human safety.
6   Q.   But are smocks considered to be personal
7   protective equipment?
8   A.   Not in my dictionary.
9   Q.   Okay. What about boots? Are they
10  considered personal protective equipment?
11  A.   Yes.
12  Q.   Safety glasses?
13  A.   Yes.
14  Q.   Arm guards?
15  A.   Yes.
16  Q.   Cutting gloves?
17  A.   Yes.
18  Q.   Okay. Anything else that's considered to be
19  personal protective equipment, other than arm
20  guards, cutting gloves, boots, and safety glasses?
21  A.   Earplugs.
22  Q.   Anything else?
23  A.   Not that I'm aware of, in a normal

Page 103

1   production job.
2   Q.   Okay. Now, going back to the page we were
3   on, page 51, at the bottom of that page in the
4   orientation manual, Exhibit 9, it's got a section
5   called "Ergonomics/Proper Lifting."
6       Read those items and tell me are those
7   things that employees are expected to comply with
8   since March of 2004.
9           (The witness examines the
10              document.)
11  A.   This is just a brief guideline to go by on
12  ergonomics. We don't require all our people to do
13  all this, measure 2 inches or do these procedures,
14  but it is a proper lifting for ergonomics that we
15  would like for our employees to practice. Do we
16  require it? Not that I'm aware of. I don't know.
17  Q.   Look at the bullet point that says, "Avoid
18  improperly fitting gloves. Gloves that do not fit
19  correctly can impede circulation and decrease the
20  sense of touch."
21      Do you agree with that?
22  A.   Yeah.
23  Q.   If an employee has his circulation impeded

Page 104

1   or his sense of touch decreased, that would affect
2   his ability to perform his job, correct?
3   A.   Yes.
4   Q.   How does the company make sure that the
5   gloves its dispensing to employees are properly
6   fitting?
7   A.   We have different sizes; they can get
8   whatever size they need.
9   Q.   Who determines that?
10  A.   The employee.
11  Q.   The supply room attendant hands them to them
12  or do they go in there and get them themselves?
13  A.   The supply room gives them whatever size
14  they need.
15  Q.   Okay. The next bullet point says, "Cold
16  temperatures can reduce the function of the nerves
17  and muscles. In cold temperatures, the fibers of
18  the muscles do not work smoothly, which increases
19  the risk of tearing fibers."
20      Do you agree with that?
21  A.   I guess. I mean, I'm not a doctor; I don't
22  know.
23  Q.   Do you agree that employees working in cold

Page 105

1   temperatures, that can adversely affect their
2   ability to perform their jobs in your two plants?
3   A.   Yes, without proper clothing.
4   Q.   And what areas of the plant have cold
5   temperatures?
6   A.   Cooler.
7   Q.   Any other areas?
8   A.   And the further processing plant, the
9   freezer.
10  Q.   What temperature are the chickens at during
11  the processing after slaughter?
12  A.   At what point?
13  Q.   Let's take before they go to the chiller.
14  A.   90 degrees.
15  Q.   And what about when they go past the
16  chiller, what are they at?
17  A.   40 degrees when they come out.
18  Q.   Is that the lowest they ever get?
19  A.   38 to 40. I mean, I don't know exactly
20  whatever temperature the birds are.
21  Q.   What is the temperature in the debone area?
22  A.   I don't know the answer to that. I'm
23  guessing -- and I shouldn't guess -- but 65, 68

27 (Pages 102 to 105)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 106

1  degrees.
2  Q.   Are there any areas of the plant colder than
3  that?
4  A.   Cooler.
5  Q.   How cold is the cooler?
6  A.   28 to 36 degrees.
7  Q.   How many employees work in the cooler?
8  A.   When you say "work in the cooler," define
9  "work in the cooler."
10  Q.   Well, they're in the cooler enough to be
11  affected by the coldness.
12  A.   I still don't understand your question.
13  Q.   How many employees are going in and out of
14  the cooler on a regular basis?
15  A.   I don't know the answer to that, how many
16  there are.
17  Q.   Are there employees stationed so that they
18  have to go in the cooler as a regular part of
19  their job?
20  A.   Are they stationed in the cooler or they go
21  in and out of the cooler?
22  Q.   Stationed in a way that they go in and out
23  of the cooler frequently.

Page 107

1  A.   We have employees that go in and out of the
2  cooler.
3  Q.   And how many of those employees do you have?
4  A.   I don't know the answer to that.
5  Q.   Which employees are they?
6  A.   Shipping employees, normally.  I mean, we
7  may have other employees go in and out, but
8  shipping is one.
9  Q.   And then this next bullet point says, "Take
10  mini breaks during work."  That's m-i-n-i.  "Take
11  mini breaks during work.  It is helpful to pause
12  frequently to flex and stretch.  This will improve
13  flexibility and improve blood-flow."
14     Is it permissible for employees to do that
15  while on paid time?
16  A.   We need to define "mini breaks."  If an
17  employee wants to, after a bird goes by, if they
18  work in a certain area, they can stop for a minute
19  and move.
20     I mean, I don't know the definition of this
21  question.
22  Q.   But you think up to a minute employees would
23  be within their rights to --

Page 108

1  A.   It's according to what position they're
2  working in.
3  Q.   Do you know any positions that employees
4  would not be allowed to take mini breaks in order
5  to flex and stretch frequently?
6  A.   Define "mini break."  I don't know what
7  m-i-n-i, means, mini.  As in what's the time frame
8  of a mini break?
9  Q.   What would it be in your view?
10  A.   I don't know.  I mean, I don't really know
11  what your definition of a mini break is.
12  Q.   Would employees be considered to be in the
13  wrong if they took three to five minutes?
14  A.   Yes.
15  Q.   Would they be considered to be in the wrong
16  to take a full minute?
17  A.   According to what position they're in, where
18  they're at.
19  Q.   Which positions would employees have the
20  right to take a minute off to frequently flex and
21  stretch to improve flexibility and increase
22  blood-flow?
23  A.   There could be numbers of them; and I don't

Page 109

1  know all of them off the top of my head.
2  Q.   All right.  Turn over to page 71 of the
3  orientation manual.
4     By the way, let me ask you this question
5  before we go to page 71:  If an employee took a
6  mini break during production time, would they
7  still be considered to be at work or working?
8  A.   It goes back to the definition of mini
9  break.
10  Q.   I mean, if an employee were flexing or
11  stretching in order to increase blood-flow, would
12  that be considered part of their work?
13  A.   It's according to the definition of mini
14  break.
15  Q.   Within whatever definition the company
16  recognizes, which you said you don't know what it
17  is, but within whatever the company considers a
18  mini break, is that considered to be work time?
19     MR. ROSENTHAL:  Objection to the form
20  of the question.  You can answer if you can.
21  A.   I don't know the answer to that question.
22  Q.   All right.  Let's go to page 71 of the
23  orientation manual, Exhibit 9.

28  (Pages 106 to 109)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 110

1    This is called "Hazardous Communications,
2  Hazardous Materials, & Personal Protective
3  Equipment."
4    One of the bullet points says,
5  "Demonstration of donning and appropriate use of
6  required PPE."
7    Have you ever seen that demonstration by the
8  company as to how employees are supposed to don
9  their PPE?
10  A.   No, I have not.
11  Q.   Who provides that demonstration of proper
12  donning of PPE?
13  A.   I can't answer that.  Probably supervisors.
14  I don't know the answer to that.
15  Q.   Do you know if the company provides a
16  demonstration of proper donning of smocks, gloves,
17  aprons, or sleeves?
18  A.   I don't know the answer to that.
19  Q.   Let's go to page 80 of the orientation
20  manual.  It's called "Clean-Up and Safe
21  Housekeeping."
22    The first bullet point says, "After an
23  accident, the entire area must be cleaned with

Page 111

1  disinfectant."
2    Give me an example of what kind of accident
3  we're talking about there.
4  A.   I don't know.  I've never seen this before.
5  Q.   What type of event would occur in one of
6  your two plants that would require employees to
7  clean with disinfectant?
8  A.   If an employee gets cut, for example.
9  That's all I can think of because I'm not familiar
10  with this document.
11  Q.   If an employee, in that situation of being
12  cut and having to clean with disinfectant, is that
13  considered to be part of their work or their paid
14  time?
15  A.   Which employee are you talking about?
16  Q.   Any employee in your two plants.  If they
17  were -- During the period they're having to clean
18  with disinfectant, is that considered to be part
19  of their work and paid time?
20  A.   Yes.
21  Q.   All right.  Then it says, next bullet point
22  in Exhibit 9, page 80 of the orientation manual,
23  that, "Cleaning equipment must be disinfected."

Page 112

1    Is that required at the plant?
2  A.   I don't even know what that means.
3  Q.   Do you provide any disinfectants to clean
4  equipment?
5  A.   We have disinfectants that we clean the
6  plant with.
7  Q.   When employees clean equipment with
8  disinfectant, are they considered to be working?
9  A.   Yes.
10  Q.   Is that considered to be compensable time?
11  A.   Paid time?
12  Q.   Paid time.
13  A.   Yes.
14  Q.   Next page, 81, "Common Sense Rules" is the
15  heading, in the orientation manual.
16    Are each of these items practices followed
17  in your two plants?
18  A.   I can't answer that.  First time I ever seen
19  it.
20  Q.   But in terms of the practices followed in
21  your two plants, is it a rule that employees must,
22  quote, Wash hands and remove protective clothing
23  before eating, drinking, smoking, handling contact

Page 113

1  lenses, applying lip balm or cosmetics?
2  A.   Not that I'm aware of.
3  Q.   But you don't have any reason to believe
4  that this is not an item that employees are taught
5  to do in the orientation?
6  A.   As I said earlier, I don't know what they
7  teach them in orientation.  I don't know.
8  Q.   I know you don't know.  But do you have any
9  reason to suspect that this is not taught?
10    MR. ROSENTHAL:  Objection to the form
11  of the question.
12  A.   I don't know.
13  Q.   Let's go to page 83 of the orientation
14  manual called "Other Exposure Hazards."  It says
15  this to the employees:  "Always wear gloves and
16  protective apron or clothing."
17    Is that an accurate statement of what
18  employees have been required to do?
19  A.   I can't answer that, not on "explosion" of
20  hazardous.  I would think so on "explosion" of
21  hazard, but I don't know.  Exposure of hazards.  I
22  don't know.
23  Q.   Yeah.  You were saying "explosion," but the

Page 114

1  word -- let's get the record straight.
2      The wording at the top is "Other Exposure
3  Hazards," correct?
4  A.  Yes.
5  Q.  What's an exposure hazard?
6  A.  I don't know.
7  Q.  All right.  Let's look at page 91 of the
8  Employee Orientation Manual, Exhibit 9 called
9  "Good Manufacturing Practices (GMP'S)."
10     Have all of these items listed on this page
11 been requirements that employees have been
12 required to comply with since March of 2004?
13     (The witness examines the
14     document.)
15 A.  The best of my knowledge.
16 Q.  Okay.  Let's look at Exhibit 11, the last
17 two pages which is called "7 Minute Safety
18 Training."
19     "Protect yourself with universal
20 precautions."  Trainer outline 4:30.
21     Are you familiar with this type of training
22 document?
23 A.  No, I'm not.

Page 115

1  Q.  Let's look at the contract.  And if you need
2  the full contract, I think we have it out here for
3  you somewhere.
4      MR. ROSENTHAL:  If you need it, I have
5  a copy of it.
6  Q.  Do you know of any items within the
7  2004-2008 contract that were not in force or that
8  were modified in some way?
9  A.  I'm not that familiar with the contract.  I
10 don't remember it word for word.  I'd have to look
11 through it and see.
12 Q.  Well, let's take the pages that I've
13 excerpted out here in Exhibit 12 in order to
14 narrow it down a little bit.  These are the pages
15 that look like they might be relevant to this
16 case.
17     Tell me, on those pages in Exhibit 12, are
18 there any parts that were not in force during the
19 2004 to 2008 contract period?
20 A.  These smocks, again, as stated earlier.
21 Sometime during this contract we started
22 furnishing them smocks, and they pick them up at
23 the supply window.  They was not issued three

Page 116

1  smocks.  That happened in this contract.  I don't
2  know the time frame.
3  Q.  Okay.  Anything else?
4  A.  To the best of my knowledge, we've followed
5  everything else that's in the contract.
6  Q.  Okay.  I'm going to come back to one or two
7  of those items.  Let me finish these documents
8  first.
9      Look at Exhibit 13.  What is this?  It's
10 called "Work Rules," but I can't figure out what
11 it is.
12 A.  I don't have a clue.
13 Q.  Look at the first page of it and see if it
14 gives you any idea even remotely what it might be.
15 A.  No, I have no idea.
16 Q.  Who would probably know something about what
17 this is?
18 A.  I can't answer that.
19 Q.  All right.  Let's look at Exhibit 14.  There
20 are two letters here that were produced by the
21 company from the Department of Labor, but they're
22 not addressed to Equity Group, or anybody really.
23     But one document has got a 2007 date, E 171

Page 117

1  to 172; the other one has a 2002 date, E 167 and
2  168.
3      Have you ever seen these before?
4  A.  I'm not familiar with these documents.
5  Q.  Have you ever had any responsibility for
6  keeping abreast of Department of Labor
7  requirements on overtime?
8  A.  No.
9  Q.  Have you ever had any responsibility for
10 determining compliance with overtime rules or
11 regulations?
12 A.  No.
13 Q.  Do you know anybody in the company who has
14 had responsibility for keeping abreast of overtime
15 requirements of the Department of Labor?
16 A.  I don't have a clue.  I mean, I don't know.
17 Q.  Do you know who made the decision not to pay
18 employees for donning, doffing, or sanitizing
19 activities before their production line begins?
20     MR. ROSENTHAL:  Objection to the form
21 of the question.  You can answer.
22 A.  We're just following the union contract.
23 Everything was negotiated in the union contract,

4a4efcd4-222a-4134-9214-747cf2d63865

Page 118

1   and that's what we go by.
2   Q.   But do you know who made the decision that
3   the company would not pay for donning, doffing, or
4   sanitizing time that occurs before the production
5   line commences?
6        MR. ROSENTHAL:   Again, I object to the
7   form for the same reason.
8   A.   No.  We were just following the union
9   contract.
10  Q.   So then it wasn't your decision, obviously,
11  correct?
12  A.   No.  We just follow in the union contract
13  what we negotiated with the union.
14  Q.   Who do you think is the most knowledgeable
15  of the Department of Labor overtime requirements
16  or regulations?
17  A.   I can't answer that.
18  Q.   Do you know anybody who's knowledgeable?
19  A.   No.  I don't know who would be knowledgeable
20  of that.
21  Q.   Let's go to the last exhibit in the book,
22  Exhibit 15.  This is called "Equity Group Eufaula
23  Division Payroll Processing Manual."

Page 119

1        Do you use this?
2   A.   This manual?
3   Q.   Yes.  Or any parts of the manual that we
4   have there in that exhibit.  I excerpted out
5   certain pages.  I'm just asking you about these
6   pages.
7   A.   I don't know because I don't do time sheets.
8   I don't know what's being used.
9   Q.   Have you ever seen this manual before?
10  A.   No.
11  Q.   The whole manual?  This is the whole manual.
12  A.   No, I've never seen it.
13  Q.   This is not something that you use in your
14  work?
15  A.   No, I don't.
16  Q.   Does anybody under you use this manual?
17  A.   I can't answer that.
18  Q.   Let's look at page 1, which is E 695 of
19  Exhibit 15.  This is called a "Time Detail"
20  report, correct?
21  A.   Yes.
22  Q.   Do you use that type of document in your
23  work?

Page 120

1   A.   I don't.
2   Q.   Do you know how to read this document?
3   A.   No.  I don't use this document.
4   Q.   Okay.  But do you know how to read it?
5   A.   I could figure it out.  But, you know, I'm
6   not familiar with it because I don't use it.  I
7   don't have hourly associates reporting to me.
8   Q.   Okay.  Let's look at the next page, E 696.
9   Do you use this type of document or are you
10  knowledgeable of it?
11  A.   I don't use it.  I mean, I know what it is.
12  Q.   What is it?
13  A.   It just tells the positions and the payroll
14  department and the supervisor in that area is, you
15  know, what I get out of it.  I don't know what
16  else you could use it for.
17  Q.   Let's take the first line, for example.  It
18  says, Department 21A, Security; Supervisor, J.B.
19  Glass; Monday In/Out, and then it has an "E."
20       Do you know what that is telling?
21  A.   No.
22  Q.   All right.  Let's go to E 698 of Exhibit 15.
23  This is called "Editing."

Page 121

1        Do you edit time sheets?
2   A.   No.
3   Q.   And do you have any knowledge about the time
4   sheet editing process?
5   A.   No.
6   Q.   Who would be knowledgeable about the editing
7   of time sheets?
8   A.   I can't answer that.
9   Q.   We talked earlier about if an employee is
10  late by a minute, his payroll will be reduced by
11  that minute.  How does the company go about doing
12  that?
13  A.   The supervisor would make the changes on the
14  time sheets, and then payroll would make the
15  adjustments.
16  Q.   So the supervisor would have the punch-in
17  time, correct?
18  A.   Yes.  It would be on his time sheet.
19  Q.   And where does the supervisor get the
20  punch-in time from?
21  A.   Payroll department.
22  Q.   Is it on line where he can just dial in to
23  it?

31 (Pages 118 to 121)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 122

1  A.  I don't know.
2  Q.  And what does he compare the punch-in time
3  to, to determine if someone is late?
4  A.  Master card time.  Start time/ending time,
5  according to what schedule he's on.
6  Q.  All right.  Master card time, is that the
7  same thing as line time?
8  A.  Yes, I would think so.
9  Q.  All right.  Let's look back at the
10  collective bargaining agreement, Exhibit 12.
11  Let's look at page 20 of the agreement, Section
12  12.5 called "Line Time."
13      It consists of this one sentence:  "All
14  employees will be paid according to the hours of
15  work indicated by the Master Line Time Card."
16  Correct?
17  A.  Yes, sir.
18  Q.  Now, you earlier told us though that that's
19  not true for all employees that are under the
20  collective bargaining agreement, correct?
21  A.  Correct.
22  Q.  Do you have a list of jobs or employees for
23  which it is not true that they will be paid

Page 123

1  according to the Master Line Time Card?
2  A.  I do not.
3  Q.  Can you name any such jobs?
4  A.  Floor personnel would be one.  I mean,
5  there's probably many, but I don't know them all.
6  Q.  Tell us the ones you do know.
7  A.  I honestly don't know.  I know floor
8  personnel wouldn't because they come early and
9  stay late.  They're on a different time than the
10  line card.  I don't know what employees are on
11  what time system, whether it be master card, clock
12  in to clock out, so I don't know.
13  Q.  If you were to attempt to determine that,
14  what documents would you want to look at?
15  A.  I would have to just do some research.  I
16  don't know what documents I'd look at because
17  right now I wouldn't know where to look.
18  Q.  Who would be the first person you would ask
19  because you would think they were the most
20  knowledgeable?
21  A.  Payroll department.
22  Q.  Who in the payroll department?
23  A.  You've got Joe Preston who's the accountant

Page 124

1  which is over the payroll department.  I would ask
2  him who I needed to talk to, and he would send me
3  in the right direction.
4  Q.  All right.  Are there floor personnel in the
5  evisceration department?
6  A.  I would think so, yes.
7  Q.  Do you know how many?
8  A.  No.
9  Q.  Are there floor personnel in the debone
10  department?
11  A.  Yeah, I think so.
12  Q.  Is a floor person different than a setup
13  person?
14  A.  I don't know the answer to that.  I don't
15  know how they've got it staffed.
16      MR. WIGGINS:  Now, do you have his
17  affidavit that he can look at?
18      MR. ROSENTHAL:  I don't have an extra
19  copy of it.
20      MR. WIGGINS:  Okay.
21      MR. GOULD:  Would this be a good time
22  to take a break?
23      MR. WIGGINS:  Sure.

Page 125

1      (A lunch recess was taken.)
2  (BY MR. WIGGINS)
3  Q.  All right.  We're talking about the two
4  plants you had under you.  How many employees are
5  in each plant, hourly?
6  A.  A guess, 11-, 1200 total.  That's a guess.
7  Q.  And that's in both plants together?
8  A.  Yes.
9  Q.  And how many in the fresh plant?
10  A.  A guess, a thousand.
11  Q.  All right.  And are there any practices
12  different in the further processing plant from
13  those in the fresh plant?
14  A.  Yes.
15  Q.  All right.  And are there any practices on
16  donning, doffing, or sanitizing that are different
17  between the two plants?
18  A.  Yes.
19  Q.  What?
20  A.  Boot sanitation is not required at further
21  processing.
22  Q.  What is the McDonald's rule?
23  A.  On?

32  (Pages 122 to 125)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 126

1   Q.   I've just heard referred to the McDonald's
2   rule.  Do you know what that means?
3   A.   No, I don't.
4        MR. ROSENTHAL:  They don't use tomatoes
5   anymore.
6   Q.   Is McDonald's a customer?
7   A.   Yes.
8   Q.   And is it a customer of both plants, fresh
9   plant and further processing?
10  A.   The fresh plant feeds to further processing
11  plant.
12  Q.   Is McDonald's one of your bigger customers?
13  A.   Yes.
14  Q.   Is it your biggest customer?
15  A.   Yes.
16  Q.   And does it have certain sanitation
17  requirements for you to operate under?
18  A.   Yes.
19  Q.   What are they?
20  A.   I don't know all of them.  I don't know.
21  Q.   Tell me the ones you know.
22  A.   Pretty much what we went over today on
23  GMP's, SSOPs.  Just standard operating procedures.

Page 127

1   Q.   McDonald's requires all those things?
2   A.   They require us to produce safe food is
3   their requirements.
4   Q.   All right.  And all your GMP's are put
5   together in order to satisfy that requirement?
6   A.   Not all of them.
7   Q.   All right.  Are most of them for that
8   purpose?
9   A.   No, I wouldn't say most of them.  And I
10  don't know how many.
11  Q.   Okay.  Do you deal with McDonald's?
12  A.   No.
13  Q.   Does anybody under you deal with McDonald's?
14  A.   Nothing but produce product for them.
15  Q.   Who does interact with McDonald's, if
16  anyone, at the Eufaula Division?
17  A.   No one directly deals with McDonald's at
18  Eufaula Division.
19  Q.   Okay.  Who is your second biggest customer?
20  A.   I don't know the answer to that.
21  Q.   All right.  Does the company market chicken
22  products to the public itself?
23  A.   No.

Page 128

1   Q.   When you said there were 11- or 1200 hourly
2   employees at the two plants, are all those
3   employees subject to the collective bargaining
4   agreement?
5   A.   No.
6   Q.   How many are subject to the collective
7   bargaining agreement?
8   A.   I don't know the answer to that.
9   Q.   Which employees are not subject to the
10  collective bargaining agreement?
11  A.   QA department, maintenance department.
12  Q.   Does QA have hourly employees?
13  A.   Yes.
14  Q.   How many employees are in QA?
15  A.   I don't know the answer to that.
16  Q.   And QA stands for quality assurance?
17  A.   Quality assurance.
18  Q.   Does the quality assurance department
19  interact with McDonald's?
20  A.   Not directly with McDonald's, no.
21  Q.   Does McDonald's review and sign off on or
22  approve your GMP's on sanitation?
23  A.   Not at my location they don't.

Page 129

1   Q.   Do you know if they do that anywhere?
2   A.   I don't know that.
3   Q.   How many departments are in the fresh plant?
4   A.   I don't know.  When you say "department,"
5   job codes?  I don't know how many there are
6   totally.
7   Q.   Each department has a job code?
8   A.   Yes.
9   Q.   Well, we had identified various areas here.
10  Let me see if I can get the nomenclature down.
11       Evisceration, that's a department, correct?
12  A.   There could be two or three departments
13  within that department.  Evis is an area.
14  Q.   What departments are within the evisceration
15  department?
16  A.   You've got salvage.  I mean, I don't know
17  how they're all broke out.  I honestly don't.
18  You've got salvage; you've got line 1, line 2;
19  you've got rehang; you've got picking and
20  receiving; you've got live shacklers.
21       There's a lot of them, and I don't know all
22  the departments, how they're broke out.
23  Q.   Okay.  And what about evisceration?

33 (Pages 126 to 129)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 130

1  A.  That's what I was talking about.
2  Q.  I'm sorry. Debone. How many departments
3  are within debone?
4  A.  I honestly don't know. Several.
5  Q.  More than five?
6  A.  I would say so. That's a guess.
7  Q.  Are there any documents that would reflect
8  the areas or departments within the debone
9  department?
10 A.  I don't know the answer to that. Payroll
11 may have something, but I don't know that. I
12 don't know.
13 Q.  What areas in the production or processing
14 part of the plant are not a part of debone or
15 evisceration?
16 A.  DSI is not a part of either.
17 Q.  All right. Any others?
18 A.  Shipping, QA, HACCP, maintenance. Those are
19 just a few I can name.
20 Q.  How many employees are in HACCP?
21 A.  I don't know the answer to that.
22 Q.  And HACCP, that's the H-A-C-C-P; is that
23 what that is?

Page 131

1  A.  Yes.
2  Q.  Okay. And does it have hourly employees?
3  Did I ask you that?
4  A.  Yes.
5  Q.  And you don't know how many?
6  A.  Huh-uh.
7  Q.  Do you know approximately how many?
8  A.  No.
9  Q.  How many employees are in shipping?
10 A.  I don't know the answer to that.
11 Q.  Give me a ballpark.
12 A.  It's a total guess: 30.
13 Q.  And those are all hourly?
14 A.  Yes.
15 Q.  And DSI. How many employees are in DSI?
16 A.  This is an estimate: I'm guessing 160.
17 That's a guess; I don't know.
18 Q.  All right. What about the cooler employees?
19 Is that a department?
20 A.  Shipping.
21 Q.  Part of shipping? And tell me again what
22 DSI stands for.
23 A.  I don't really know.

Page 132

1  Q.  What do they do over there?
2  A.  Cut meat with a water jet.
3  Q.  The back dock, is that a department?
4  A.  Picking and receiving.
5  Q.  So that's part of the evisceration
6  department?
7  A.  It's got a department of its own, but it
8  falls under the first processing or evisceration
9  department.
10 Q.  Now, at the further processing plant, it
11 doesn't have an evisceration or debone?
12 A.  No.
13 Q.  What does it have?
14 A.  You've got several areas, but I don't know
15 all those departments either, how the people are
16 laid out. But you've got a prep area; you've got
17 a laydown area; you've got packout area.
18 Q.  Does McDonald's conduct on-site audits of
19 the plant?
20 A.  McDonald's don't.
21 Q.  Does someone do that for McDonald's?
22 A.  Keystone has a group out of Philadelphia
23 that does audits.

Page 133

1  Q.  Who is that?
2  A.  Keystone.
3  Q.  I know. But who? What persons?
4  A.  I don't know all of them's names. They're
5  out of Philadelphia. I don't know.
6  Q.  And Keystone is the corporation that you are
7  employed by; is that correct?
8  A.  As far as I know. I hope so.
9  Q.  What's the name of this area that does
10 audits of your plant?
11 A.  Keystone. They're part of the company.
12 Q.  I mean, is it a department? Does it have a
13 name?
14 A.  Food safety group.
15 Q.  Who is the head of that group?
16 A.  Dane Bernard, I think. And I'm not for sure
17 of that.
18 Q.  How often do they audit your food safety
19 standards, your practices?
20 A.  This is a guess totally; I don't know:
21 annually. It's according to what part of it
22 you're talking about auditing.
23 Q.  What do they audit?

34 (Pages 130 to 133)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 134

1  A.   Sanitation; they audit animal welfare, pest
2  control.  Those are three that I know.  They may
3  audit more than that.
4  Q.   Is the donning, doffing, and sanitizing
5  activities done by employees with their gloves,
6  smocks, aprons, sleeves, that type of thing, is
7  that part of the sanitation audit?
8  A.   I don't know.  I don't remember.  I honestly
9  don't know.
10  Q.   Do you get a report on the results of the
11  audit?
12  A.   I don't know the answer to that.
13  Q.   Do you know if anybody at the plant
14  interacts with the food safety department more
15  than you?
16  A.   QA department.
17  Q.   But you don't know any outside group or
18  entity that audits or reviews your food safety
19  practices or your sanitation practices other than
20  USDA?
21  A.   Not that I'm aware of.  They may, but I'm
22  not aware of it.
23  Q.   Now, you told me the different areas that

Page 135

1  are in the plant.  Write them down for me on this
2  map that we have marked.  Write each of the
3  production areas down and show me where they're
4  at.
5  A.   Explain what you're wanting me to write
6  down.  I mean, like, parking lot, debone.
7  Q.   The production area.  Tell us where each
8  thing is.
9  A.   First off, this print is not up to date, so
10  whatever I write down won't be accurate because
11  the plant has been changed since whenever this
12  print was made.
13  Q.   When was it changed?
14  A.   It was back the first of this year, I
15  believe.
16  Q.   How was it changed?
17  A.   We added to it, put another line in.  This
18  plant is not nothing like what the plant is now.
19  Q.   Even the old part is not laid out the same
20  way?
21  A.   Not all of it.  Some of it is; some of it's
22  not.
23  Q.   All right.  Well, why don't you just take a

Page 136

1  sheet of paper and just draw further processing
2  for me roughly.
3  A.   I'm not good at drawing, sir.  I'm not a
4  draftsman.
5  Q.   Yeah.  Well, I understand that.
6  A.   Well, I'll just point them to you on this
7  piece of paper.
8  Q.   All right.
9  A.   There's one of these over here.
10  Q.   What is that?
11  A.   Fry line.
12  Q.   Okay.
13  A.   There's a marination room back here; there's
14  another spiral freezer sitting right here; another
15  packout area right here; forklift battery pallet
16  jack area right here has been added on;
17  refrigeration room has been added onto; and a
18  hydraulic room built on here.
19      That's most of the changes that we've made
20  in the plant.
21  Q.   How many hourly employees did you have
22  before the changes at the further processing
23  plant?

Page 137

1  A.   Total guess:  100.
2  Q.   And now you've got about 200?
3  A.   Yes.  And them are all ballpark figures.  I
4  do not know the exact numbers.
5  Q.   How many fry lines do you have?
6  A.   Two.
7  Q.   And before the change you had one?
8  A.   Yes.
9  Q.   How many marination do you have?
10  A.   Explain to me what you're asking.
11  Q.   You said you have a marination area over
12  here now.  Is that the only one you've got?
13  A.   The marination feeds the fry room.  Yes,
14  that's the only one we have.
15  Q.   How many spiral freezers do you have now?
16  A.   Two.
17  Q.   And you had one before the change?
18  A.   Yes.
19  Q.   You have two packout areas now?
20  A.   Yes.
21  Q.   And you had one before the change?
22  A.   Yes.
23  Q.   The forklift battery pallet jack area, did

35 (Pages 134 to 137)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 138

1  you have one before the change?
2  A.   Yes.
3  Q.   And now you have two?
4  A.   No, we just have one.  We had to move this
5  one to put marination in it.
6  Q.   Okay.  And the refrigeration room.  You had
7  one before the change?
8  A.   Yes.
9  Q.   And how many do you have now?
10  A.   We've got one, but it's a lot larger.
11  Q.   Okay.  And the hydraulic area, did you have
12  that before the change?
13  A.   Yes.
14  Q.   Do you have two now or just a larger one?
15  A.   Just one.
16  Q.   Okay.  Now, what production areas do you
17  have in the further processing, other than fry
18  line, marination, spiral freezer, packout,
19  forklift battery, refrigeration, and hydraulic?
20  A.   Got a cooler and we've got a freezer.
21  Q.   Anything else?
22  A.   That's all I can remember.
23  Q.   All right.  Now, organizationally, are each

Page 139

1  of those considered a separate department?
2  A.   I don't know how the employees are charged
3  to what area.  I don't know that.  I don't know.
4  Q.   Do you have any administrative offices at
5  the further processing plant?
6  A.   Yes.
7  Q.   Where are they?
8  A.   Right here, these four offices.  There's an
9  office in the maintenance shop; there's an office
10  right here in the maintenance shop; there's an
11  office right here; there's a USDA office right
12  here; there's an office right here; there's an
13  office right here; all accounting offices is over
14  here; general manager's office is right here.
15  Q.   So is there an HR function in the further
16  processing plant?
17  A.   No.
18  Q.   Is there a QA function within that plant?
19  A.   Yes.
20  Q.   Where are they?
21  A.   Right in this area.
22  Q.   Okay.  And where do employees enter the
23  further processing plant?

Page 140

1  A.   Normally, right here.
2  Q.   Okay.  Just write "entry" right there.
3  A.   (Witness complies.)
4  Q.   And is that location of the entry the same
5  before and after the recent changes?
6  A.   Yes.  An entry here, got an entry right
7  here, maintenance and QA enters here, there's an
8  entrance, accounting/admin entrance here.
9  Q.   Now, which entrance does the production room
10  employees come through?
11  A.   Mainly right here.
12  Q.   And that's the one next to the picnic area?
13  A.   Yes.
14  Q.   Y'all have one picnic area for that plant?
15  A.   Yes.
16  Q.   And they come into a hall?
17  A.   Yes.
18  Q.   And the first thing they have there is a
19  break room?
20  A.   Yes.
21  Q.   Where's the supply room?
22  A.   Right there.
23  Q.   All right.  So that's down the hall from the

Page 141

1  break room, correct?
2  A.   Yes.
3  Q.   Where do you enter the production area?
4  A.   Right here.
5  Q.   All right.  So you come in the door by the
6  picnic area, you walk down a hall that runs
7  adjacent to the break room; and at the end of the
8  break room, you turn right into another hall that
9  leads into the entry door to the production area?
10  A.   Yes.
11  Q.   Now, where's the time clock?
12  A.   Right here, I believe.  Right in that
13  hallway, right on the break room wall, I think.
14  Q.   And you have no boot sanitation in this
15  plant; is that correct?
16  A.   No.
17  Q.   Is that correct?
18  A.   Correct.
19  Q.   Never have had any?
20  A.   Not as I'm aware of.
21  Q.   Where are the restrooms?
22  A.   I believe they're right here.
23  Q.   Across the hall from the break room?

FREEDOM COURT REPORTING

Page 142

1 A. And right here.
2 Q. Okay.
3 A. It's hard to tell on this print.
4 Q. Yeah, it is. So there are no restrooms
5 within the production area in either plant,
6 correct?
7 A. Correct.
8 Q. There are no break rooms in the production
9 area in either plant?
10 A. Correct.
11 Q. Where is the nurse's station?
12 A. Nurse's station? I believe that's labeled
13 nurse's station.
14 Q. And that serves both plants?
15 A. Yes.
16 Q. And it's, just for the record's sake, it
17 looks like it's a separate building; is that
18 right?
19 A. Yes.
20 Q. And it sits out by the parking lot?
21 A. Yes. Right off the sidewalk.
22 Q. Right out front of the fresh processing
23 plant, correct?

Page 143

1 A. Correct.
2 Q. All right. Employees are not allowed to
3 have candy, gum, food, drink, or anything of that
4 sort, in the production area; is that correct?
5 A. Correct.
6 Q. So employees have to leave the production
7 area to either get supplies from the supply room,
8 to go to the nurse's station, to go to bathroom,
9 to go to the QA office, correct?
10 A. Correct.
11 Q. Is that true of both plants?
12 A. Yes.
13 Q. All right. Do you know how much time it
14 takes for employees to walk from the front door to
15 the time clock?
16 A. No.
17 Q. Do you know how long it takes employees to
18 walk from the supply room to the entry to the
19 production room?
20 A. No.
21 Q. Do you know how long it takes employees to
22 walk from the break room to the entry to the
23 production area?

Page 144

1 A. No.
2 Q. Do you know how long it takes employees to
3 walk from their station on the line back to the
4 bathroom?
5 A. No.
6 Q. Or to the break room?
7 A. No.
8 Q. Or to the QA department?
9 A. No.
10 Q. Do you know the amount of times it takes
11 employees to don or doff or sanitize their
12 protective gear or equipment?
13 A. No.
14 Q. Has the company ever studied any of the
15 amounts of time it takes to do any task related to
16 donning, doffing, or sanitizing protective gear or
17 equipment?
18 A. Not that I'm aware of, but I don't know.
19 Q. Has the company, or anyone on behalf of the
20 company, videotaped employees donning, doffing,
21 sanitizing, or walking time?
22 A. Has the company -- are you talking about the
23 company officials?

Page 145

1 Q. The company, or anybody acting on the
2 company's behalf, such as an outside consultant or
3 person.
4     Has anybody ever videotaped employees when
5 they are performing activities related to donning,
6 doffing, or sanitizing protective gear or
7 equipment, or walking from a supply room, break
8 room, or bathroom to their workstation?
9 A. Yes.
10 Q. When was that done?
11 A. I don't know the answer to that.
12 Q. Approximately when?
13 A. I don't have a clue how to even guess. I
14 don't remember.
15 Q. Is it possible it was within the last year?
16 A. It's possible, but I don't know the date.
17 Q. Did you see them videotape?
18 A. No, I did not see them videotape.
19 Q. What's the source of your knowledge?
20 A. Just that somebody come in and done a study
21 on how long it would take to don and doff.
22 Q. And have you seen the results of the study?
23 A. No, I have not.

37 (Pages 142 to 145)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 146

1  Q.  Do you know any of the amounts of time that
2  were learned or determined?
3  A.  No.
4  Q.  Do you know who it is that did the
5  videotaping?
6  A.  No.
7  Q.  Did you assist in making arrangements for
8  the videotaping?
9  A.  No, I did not.
10  Q.  Have you watched the videotapes?
11  A.  No.
12  Q.  Have you seen any parts, pictures or
13  anything, produced from the videotapes?
14  A.  No.
15  Q.  Do you know anybody at the plant who has
16  been involved with the videotaping?
17  A.  Not directly I do not.
18  Q.  Who was in charge of supervising the
19  videotape process?
20  A.  I don't know.  I honestly don't know.
21  Q.  Why did you do the videotaping?
22  A.  I don't know that.
23  Q.  Have you ever made a determination that it

Page 147

1  is administratively impractical to keep up with
2  employees' donning, doffing, or sanitizing time?
3  A.  Repeat the question.
4  Q.  Have you ever made a determination that it's
5  administratively impractical to record or keep up
6  with the amount of time employees are spending
7  donning, doffing, or sanitizing protective gear or
8  equipment?
9        MR. ROSENTHAL:  Objection to the form
10  of the question.  You can answer.
11  A.  I don't know the answer.  I don't understand
12  the question.
13  Q.  Have you ever made a determination that
14  it's, from an administrative standpoint,
15  impractical for the company to track and record
16  and then pay for the amount of time it takes to
17  don or doff or sanitize protective gear or
18  equipment?
19        MR. ROSENTHAL:  Objection again to the
20  form of the question.
21  A.  Not that I'm aware of.  I really don't know.
22  Are you asking me have I made a decision not to
23  pay for donning and doffing, in simple terms?  Is

Page 148

1  that what you're asking?
2  Q.  No.  I think I asked you that earlier today.
3  But right now I'm just asking if you've made a
4  decision or made a determination that it's
5  administratively too difficult or impractical to
6  keep up with the amount of time employees
7  typically take to don, doff, or sanitize their
8  protective gear or equipment.
9        MR. ROSENTHAL:  Objection to the form
10  of the question.
11  A.  No, I haven't made that decision.
12  Q.  Do you know anybody who has?
13  A.  No.
14  Q.  Do you know anybody who has that as part of
15  their responsibility?
16  A.  Not that I'm aware of.
17  Q.  Did you participate in the decision to pay
18  three minutes for donning and doffing time?
19  A.  I was at the negotiating table when it was
20  negotiated between the company and RWDSU.
21  Q.  Other than sitting at the table, did you
22  participate in that decision, that three minutes
23  would be the amount of time the company would pay

Page 149

1  for donning and doffing clothes or equipment?
2  A.  As a group, that's what we negotiated as a
3  group.
4  Q.  Okay.  Yeah.  I'm going to get into the
5  negotiation in a minute.  But right now I'm trying
6  to figure out are you the decision maker.
7        Did you make the decision that three minutes
8  was the appropriate amount of time, or were you
9  just going along for the ride?
10  A.  As a group, we made the decision.
11  Q.  What role did you play in that decision?
12  A.  As a group member.
13  Q.  But you said you never tried to determine
14  the actual time it takes to do these activities,
15  correct?
16  A.  No, I have not.
17  Q.  Do you know anybody who has?
18  A.  No.
19  Q.  Do you know how they arrived at three
20  minutes?
21  A.  I get dressed and go out in the plant, and
22  it don't take me three minutes.
23  Q.  What do you put on?

38 (Pages 146 to 149)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 150

1   A.   Smock, hair net, beard net, earplugs, boots.
2   Q.   You don't wear your boots during the regular
3   part of your day?
4   A.   No.
5   Q.   Now, do you know anybody who has made a
6   determination that three minutes is the actual
7   amount of time it takes to do donning/doffing of
8   protective gear or equipment?
9   A.   Not that I'm aware of.
10  Q.   Did you ever see any documents that
11  referenced three minutes as the amount of time to
12  be paid or negotiated for donning and doffing?
13  A.   No.
14  Q.   Did the union, to your knowledge, make any
15  time study or effort to determine the amount of
16  time it actually takes to don and doff?
17  A.   I can't answer that.  Not to my knowledge,
18  but I don't know.
19  Q.   Who was in the group that you say was
20  involved in the negotiations that led to the
21  three-minute time period?
22  A.   It's listed in the contract.  I don't
23  remember all the names, but it's on the contract.

Page 151

1   Q.   All right.  Tell me what part your speaking
2   of.
3   A.   This is not a signed contract.  It would be
4   one with signatures in it.
5   Q.   See if that's one.
6   A.   (Witness complies.)
7   Q.   Okay.  Page 29 you're handing me, which is
8   Bates number E 6007.  I don't see your name on
9   here.  There you are.  Okay.
10      So for the company it's Tim Esslinger, Jim
11  Bice, Greg Mills, and Kathy Gilmore?
12  A.   Yes.
13  Q.   Anyone else involved in that decision to
14  agree to three minutes?
15  A.   Just the ones on that list, and the union.
16  Q.   And the union members are listed to the left
17  of your name on page 29 of that exhibit?
18  A.   Yes.
19  Q.   Are all the union members employees of
20  Equity Food Group, except Henry Jenkins?
21  A.   Jerry Foster's not.
22  Q.   Okay.  Have you had any administrative
23  difficulties since paying the three minutes?

Page 152

1   A.   Not as I'm aware of.
2   Q.   Have you ever looked into what other
3   companies do in terms of keeping up with the time
4   taken to don or doff protective gear or equipment
5   for pay purposes?
6   A.   No, I haven't.
7   Q.   Do you know anything at all that was
8   considered in deciding that three minutes would be
9   the appropriate amount of time to pay for donning
10  and doffing?
11  A.   Other than our own personal time for what it
12  takes for us to get dressed and walk out to the
13  plant.  That's all I know.  That's what I based my
14  ruling on.
15  Q.   What did the union propose as the
16  appropriate amount of time, prior to reaching the
17  final agreement?
18  A.   I can't remember.  I can't answer that.  I
19  don't know.
20  Q.   Now, we were given some documents this
21  morning, Exhibits 19 and 20, which had to do with
22  union proposals and company responses.
23      Do any of those documents reference the

Page 153

1   negotiations over the three minutes?
2   A.   I do not see anything in 19; I don't see
3   anything in Exhibit 20 either.
4   Q.   Okay.  Is Spence Jernigan still with the
5   company?
6   A.   Yes.
7   Q.   What's his job now?
8   A.   I don't know his job title, but he's
9   director of HR.
10  Q.   Where is he located?
11  A.   Huntsville.
12  Q.   Did he play any role in the new contract
13  negotiations in 2008?
14  A.   No.
15  Q.   Is James Davis still with the company?
16  A.   No.
17  Q.   Where is he now?
18  A.   He's working for another firm in Eufaula.
19  Q.   And what's the name of it?
20  A.   I think Cooper Lighting, but I don't know.
21  Q.   It's not a poultry --
22  A.   No.
23  Q.   Why did he leave the company?

FREEDOM COURT REPORTING

Page 154

1  A.   Better benefits he said, and better
2  opportunity.
3  Q.   Now, when you signed the 2004 contract, you
4  signed it as plant manager, correct?
5  A.   Yes.
6  Q.   Were you in charge of both plants at that
7  time?
8  A.   No.
9  Q.   Did this contract apply to both plants, the
10  2004 contract?
11  A.   Yes.
12  Q.   It did?
13  A.   Yes.  All bargaining units.
14  Q.   Okay.  What employees in the further
15  processing plant are not subject to the collective
16  bargaining agreement?
17  A.   QA and maintenance.
18  Q.   Now, are employees rotated from job to job?
19  A.   Yes.
20  Q.   Are there any employees who are not subject
21  to rotation?
22  A.   Yes.
23  Q.   Hourly employees, I mean, production

Page 155

1  employees.  Are any of them not subject to
2  rotation?
3  A.   I don't know the answer to that.
4  Q.   Why do you rotate employees?
5  A.   Repetitive motion.
6  Q.   Is that a physical injury type thing?
7  A.   Yes.
8  Q.   What part of the body does it affect?
9  A.   Could be wrists, hands, arms.
10  Q.   How often do you rotate employees?
11  A.   I don't know the answer to that.
12  Q.   Are employees subject to rotation on a daily
13  basis?
14  A.   I don't know the answer to that.  People
15  under me does the rotation; I don't.  I don't get
16  involved in that.
17  Q.   Do you know of any documents that speak to
18  the issue of rotation?
19  A.   I don't.
20  Q.   How long have you been rotating employees?
21  A.   I don't know the time frame.
22  Q.   Are there documents that would show on a
23  particular day what a given employee would be

Page 156

1  performing, what job he would be performing?
2  A.   I don't know.  I don't know the answer to
3  that at this point.
4  Q.   Who do you think would be knowledgeable on
5  that subject?
6  A.   Supervisors or shift managers.
7  Q.   But employees, when they come to work in the
8  morning, don't know which job they're going to be
9  assigned?
10  A.   I don't know the answer to that.  I don't
11  know how they manage their people.
12  Q.   You said earlier that the company has
13  employees doing physical exercises in some areas,
14  correct?
15  A.   I don't remember saying that.
16  Q.   Well, I thought I remember you saying this
17  morning that the employees at some point in time
18  have done physical exercises during the day.
19  A.   They have at some point in time.
20  Q.   Are they doing that currently?
21  A.   I don't know the answer to that.
22  Q.   Were they doing that on paid or unpaid time?
23  A.   Paid.

Page 157

1  Q.   What part of the day were those exercises
2  being done?
3  A.   In the mornings, normally after they got on
4  their line.
5  Q.   And how long would they do the physical
6  exercises?
7  A.   I don't know the answer to that.
8  Q.   I think I asked you this, but I want to make
9  sure:  Do you know which departments did the
10  physical exercises?
11  A.   The best of my knowledge, debone was the
12  only department doing that.
13  Q.   And was it the whole department?
14  A.   I don't know the answer to that.
15  Q.   Did the company consider doing physical
16  exercises to be work?
17  A.   Yes.  They was on the clock.  It was after
18  the line was started, after they got on the line.
19  Q.   Are all activities that employees are paid
20  for considered work?
21  A.   Yes.
22  Q.   Now, you said you started with the company
23  September '99, correct?

40  (Pages 154 to 157)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 158

1 A. I believe that's correct.
2     MR. ROSENTHAL: He said started with
3 CP.
4 Q. CP in September of '99. And were you
5 involved in the collective bargaining negotiations
6 while you were with CP?
7 A. No.
8 Q. And the contract that CP had ran from 2000
9 to 2004; is that correct? Or do you know?
10 A. I don't know.
11 Q. How many employees are paid on a piece
12 basis?
13 A. None.
14 Q. When did that cease?
15 A. I don't recall the date.
16 Q. How many, when you were paying employees on
17 a piece basis, did you have that you were doing
18 that?
19 A. I don't remember the number of employees.
20 Q. Which employees were paid on a piece basis?
21 A. Tender sizing and thigh sizing.
22 Q. How are they paid now?
23 A. That department no longer exists.

Page 159

1 Q. Now, you said earlier you didn't know if you
2 had any setup employees?
3 A. Correct.
4 Q. Do you have any personal knowledge about the
5 collective bargaining agreement while CP ran the
6 plant?
7 A. No, other than the handbook that we had to
8 go by. I don't recall what was in the union
9 handbook. I was not part of the negotiations.
10 Q. You're calling the handbook the contract?
11 A. I meant the contract. Sorry.
12 Q. Do you know who negotiated on behalf of the
13 union when CP ran the plant and the collective
14 bargaining was being negotiated?
15 A. No, I don't.
16 Q. Do you know of any differences in the way CP
17 paid employees and the way Equity Group pays
18 employees?
19 A. No, I don't. The same system we had then
20 carried through all contracts.
21 Q. Were you involved in any of the decision
22 making that led Equity Group to take over the
23 plant from CP?

Page 160

1 A. Tell me what you're talking about.
2 Q. Were you involved in making any of the
3 decisions that went into the transition of
4 ownership from CP to Equity Group?
5 A. No.
6 Q. Were you involved in any of the decisions or
7 considerations that went into whether or not
8 Equity Group would follow the customs or practices
9 of CP?
10 A. No.
11 Q. Do you have any knowledge on that subject?
12 A. No.
13 Q. Have you ever had any conversations with
14 Jacqueline Davis about donning and doffing?
15 A. She was in the negotiations.
16 Q. Do you remember anything she said?
17 A. No, not her personally.
18 Q. Have you ever heard Jacqueline Davis say
19 anything that touched on the subject of donning
20 and doffing or pay for donning and doffing?
21 A. No. I read her depositions where --
22 Q. When did you do that?
23 A. When this come up, I read everything about

Page 161

1 donning and doffing that I knew. And I knew that
2 she had filed a case against us, so I read her,
3 you know -- we reviewed her documents.
4 Q. "We" being who?
5 A. Myself, Kathy Gilmore.
6 Q. All right. So did you read her deposition
7 in this case or some other case?
8 A. I read one she made in another case.
9 Q. And that's when CP owned the plant?
10 A. I don't remember who owned it at the time.
11 Q. Do you remember anything you learned?
12 A. There's some in my affidavit from those
13 what was in there about the Jackie Davis case
14 about the donning and doffing.
15 Q. Yeah. But I'm talking now about what you
16 learned when you read the deposition.
17 A. I learned that the judge didn't grant her
18 any donning and doffing pay.
19 Q. Okay. Anything else?
20 A. No. That was the main concern.
21 Q. Do you know what Jacqueline Davis understood
22 or said she understood about whether she could
23 expect to be paid for donning and doffing

41 (Pages 158 to 161)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 162

1  activities while CP ran the plant?
2  A.   She wasn't expecting to be paid for it, as
3  far as I know.
4  Q.   But have you ever heard her express her
5  understanding?
6  A.   No, I have not.
7  Q.   Have you ever read anything in which she
8  expressed her understanding?
9  A.   I don't recall.
10 Q.   Have you ever read or heard anything that
11 indicated what Jacqueline Davis understood about
12 whether it's a well-known practice for CP to pay
13 only for time worked at the workstation?
14 A.   From what I read, that's what she understood
15 she got paid.  That it was understood that she got
16 paid for time worked at the workstation.
17 Q.   But you never heard her say that?
18 A.   I never heard her say that.
19 Q.   Do you know why CP decided to sell the
20 plant?
21 A.   I've heard rumors.
22 Q.   What did you hear?
23 A.   Nonprofit organization.

Page 163

1  Q.   Wasn't make any money?
2  A.   No money.
3       MR. ROSENTHAL:  It was a profit-making
4  organization that was not making profit.
5       MR. WIGGINS:  Right.
6  Q.   Have you ever heard Jacqueline Davis say
7  anything to Jenkins or Foster?
8       MR. ROSENTHAL:  Anything at all?
9  Q.   About donning and doffing.
10 A.   Not that I recall, but I'm sure she did in
11 the contract negotiations.
12 Q.   Now, Jenkins and Foster were the union
13 representatives, correct?
14 A.   Correct.
15 Q.   But did you ever hear Davis say anything to
16 Jenkins or Foster about donning and doffing; and
17 if so, what did you hear?
18 A.   I don't recall.
19 Q.   Do you handle grievances, union grievances?
20 A.   If they come up to my level.
21 Q.   What's your level?
22 A.   Operations manager.
23 Q.   Is that the fourth level? third? second?

Page 164

1  What is that?
2  A.   I don't remember.  I haven't seen a
3  grievance in years.
4  Q.   How many?
5  A.   I don't recall.
6  Q.   All right.  So you don't have any knowledge
7  about grievances until they reach your level,
8  correct.
9  A.   Correct.
10 Q.   Let's see if we can figure out what your
11 level is.  Look in this union contract.  Can you
12 find where it defines your level?
13 A.   Actually, I'm not even on here.  But I know
14 about them if it goes to the plant manager level.
15 We have a grievance if it gets to the step two.
16 If it gets to the plant manager, I'm made aware of
17 it.
18 Q.   Okay.
19 A.   If we ever have one.
20 Q.   But you have no knowledge of any grievances
21 that only went to the step one?
22 A.   No.
23 Q.   Who was the chief negotiator for the company

Page 165

1  in the collective bargaining in 2008?
2  A.   Howard Rosenthal.
3  Q.   All right.  And who was the chief negotiator
4  for the company in the collective bargaining in
5  2004?
6  A.   Howard.
7  Q.   Okay.  Were there any other attorneys
8  involved in either of the collective bargaining
9  years that went on, 2004 and 2008?
10 A.   Not that I'm aware of.
11 Q.   Now I may be assuming too much.  Has the
12 collective bargaining agreement ever been
13 negotiated, to your knowledge, except in 2004 and
14 2008?
15 A.   Not to my knowledge, no.
16 Q.   You haven't had any midterm or interim
17 negotiations?
18 A.   No, not to my knowledge.
19 Q.   Who was the chief negotiator for the union
20 in 2004?
21 A.   I would guess Henry Jenkins.
22 Q.   What about 2008?
23 A.   Same.

42 (Pages 162 to 165)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 166

1  Q.   I'm showing you the new exhibit you gave me
2  this morning, Exhibit 17, called "Good
3  Manufacturing Practices." Look at page 3. Who is
4  Jretha Diggs?
5  A.   She was a QA supervisor, I believe.
6  Q.   Is she still with the company?
7  A.   No.
8  Q.   Do you know where she is now?
9  A.   No.
10 Q.   Do you know if she's in the Eufaula area?
11 A.   I don't have a clue.
12 Q.   And why did she leave the company?
13 A.   I don't know the answer to that.
14 Q.   Is she the same person as Jretha Thompson?
15 A.   Yes.
16 Q.   And it looks like she was still with the
17 company as of August 18, 2007, according to this
18 page, correct?
19 A.   Correct.
20 Q.   Who replaced her?
21 A.   I don't know the answer to that.
22 Q.   And what was her title?
23 A.   QA supervisor, I believe.

Page 167

1  Q.   And how long did she hold that job?
2  A.   I don't know the answer to that.
3  Q.   Was she with CP?
4  A.   I don't know the answer to that.
5  Q.   Look at page 4, under the title "Purpose."
6  It says, "The following GMP's were established to
7  minimize the introduction of bacteria,
8  contaminants, or foreign material into our
9  manufacturing environment and must be adhered to
10 by all team members and visitors while in
11 production areas including coolers, shipping, and
12 receiving docks."
13      Do you know of any other purpose for these
14 practices that are then listed in the policy?
15 A.   Not as I'm aware of.
16 Q.   Under "Responsibility" it says, "The Quality
17 Assurance Department primarily administers this
18 program."
19      How do they do that?
20 A.   I don't know.
21 Q.   Do you know of any recordkeeping they do in
22 terms of checking employees' donning, doffing, or
23 sanitizing practices?

Page 168

1  A.   No. But I'm not that familiar with the QA.
2  They don't report to me.
3  Q.   When it uses the words "team members," what
4  does that mean?
5  A.   Everybody, I would guess. I don't know.
6  Q.   That would include you?
7  A.   Every team member. I don't know what the
8  definition of it is in this sentence.
9  Q.   But you don't divide employees into teams?
10 A.   No.
11 Q.   How many first line supervisors do you have
12 in debone?
13 A.   I don't remember off the top of my head.
14 It's in the flowchart or organizational chart.
15 Q.   Okay. Now, look at the "Grounds" section,
16 page 4. Do you see that section?
17 A.   Yes.
18 Q.   Has that always been the practice since
19 March of 2004?
20 A.   Yes.
21 Q.   And the purpose of that part of the GMP is
22 to prevent contamination of the poultry products?
23 A.   Not the grounds. Grounds is to protect

Page 169

1  against insects. Pest control. That sort of
2  stuff that could lead into the plant: rats
3  rodents, so forth, on the grounds. Grounds is
4  outside perimeter, not the plant.
5  Q.   All right. Let's go to the next page to the
6  "Plant Construction and Design" section.
7       It says, "Plant buildings and structure
8  shall be suitable in size, construction and design
9  to facilitate maintenance and sanitary operations
10 for food - manufacturing purposes." Correct?
11 A.   Yes.
12 Q.   Now, have you always followed these
13 practices listed under "Plant Construction and
14 Design" at the two plants here in Eufaula, since
15 March of 2004?
16 A.   To the best of my knowledge.
17 Q.   And then under "General Requirements," do
18 you see any part of the general requirements that
19 have not always been required of employees since
20 March of 2004?
21      (The witness examines the
22      document.)
23 A.   I don't know if this goes all the way back

43 (Pages 166 to 169)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 170

1  to 2004; but to the best of my knowledge after
2  briefly reading through it, these are the rules
3  that we follow today.
4  Q.   And sitting here watching you, you read
5  through all 41 items; is that right?
6  A.   I scanned through it.  I didn't read every
7  one of them word for word.
8  Q.   All right.  Let's look at No. 2.  It says,
9  "All team members and visitors must wash and
10  sanitize hands before starting work..."
11      That's always been a requirement, correct?
12  A.   Best of my knowledge.
13  Q.   And then it says, "All team members must
14  wash and sanitize hands after each absence from
15  the work area...," correct?
16  A.   Yes.
17  Q.   And that's always been a requirement,
18  correct?
19  A.   Best of my knowledge.
20  Q.   And what will cause absences from the work
21  area?
22  A.   If you leave and go to the break room, or
23  you go to the nurse's station, or you go to HR,

Page 171

1  QA, anywhere you go.
2  Q.   Restroom?
3  A.   Restroom, which it states up here.
4  Q.   And the reason for that rule No. 2 that you
5  must wash and sanitize hands after each absence
6  from the work area and before starting work is to
7  protect the poultry products from contamination,
8  correct?
9  A.   Yes.  You're handling food.
10  Q.   And that's the reason for the rule; is that
11  right?
12  A.   Correct.
13  Q.   Now, No. 4 says, "A solid (non-mesh) hair
14  net must be worn to contain the hair as completely
15  as possible."
16      That's always been the rule that employees
17  are required to follow?
18  A.   Not always, but it has been for the last
19  period of time.  I don't know how long.
20  Q.   Since March of 2004 at least?
21  A.   I would think, but I don't know that.
22  Q.   And No. 6 says, "A clean smock must be
23  obtained daily."

Page 172

1      That's been required since at least March of
2  2004, correct?
3  A.   No.
4  Q.   When did that first start?
5  A.   I don't know.
6  Q.   The next sentence of Rule 6 under General
7  Requirements says, "Smocks are to be changed
8  during the shift if needed."
9      Has that always been a rule?
10  A.   Yes.
11  Q.   And when will a change in smocks be needed?
12  A.   Only if they get contaminated.
13  Q.   And what would contaminate a smock?
14  A.   Wet, bloody, for example.
15  Q.   Are there any jobs in which employees never
16  get wet, bloody, or contaminated?
17  A.   Yes.
18  Q.   Which ones?
19  A.   QA, for example.  I don't know all the jobs
20  and what does and don't get contaminated or
21  bloody.
22  Q.   Okay.  The next sentence of Rule 6 of
23  General Requirements says, "Smocks must fasten or

Page 173

1  tie properly to cover street clothes.  Smocks may
2  not have sewn on buttons or an external upper
3  pocket."
4      Has that always been true since March of
5  2004?
6  A.   I can't answer that since March of 2004.
7  Q.   Why do you have a rule that the smocks must
8  fasten or tie properly to cover street clothes?
9  A.   To cover street clothes.
10  Q.   Is that to protect the poultry from
11  contamination by street clothes?
12  A.   Yes.  And to protect the clothing of the
13  employee.
14  Q.   All right.  "Smocks may not have sewn on
15  buttons."
16      What purpose does that serve?
17  A.   You don't want a button getting in your
18  product.
19  Q.   And can't have an external upper pocket.
20  What purpose does that serve?
21  A.   You don't want nothing in your pocket to
22  fall over in your product.
23  Q.   It would contaminate the product?

44 (Pages 170 to 173)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 174

1  A.  Yes.
2  Q.  And then Rule 7 of General Requirements
3  says, "Smocks, hair nets, and beard nets must be
4  removed before exiting the facility."
5      And I believe you've already said that's
6  always been the rule?
7  A.  Yes.  Can't wear them outside.
8  Q.  Why?
9  A.  Contamination.
10  Q.  Of the poultry product?
11  A.  Yes.  Of the smock that's going back to the
12  poultry product.
13  Q.  Okay.  Then Rule 8 says, "Keep hands and
14  fingernails clean.  Keep fingernails properly
15  trimmed, and if fingernail polish or false
16  fingernails are worn, gloves must cover hands
17  while in any production area, including box rooms,
18  shipping/receiving, dry storage, product storage."
19      Has that always been the requirement that
20  employees are required to follow?
21  A.  I don't know about always.  It is today.
22  Q.  Do you know if that's been since March of
23  2004?

Page 175

1  A.  No, I don't.  I don't recall that far back.
2  Q.  Rule 10 of the General Requirements says,
3  "Clothing must be clean at the start of operation
4  and kept reasonably clean during operations."
5      Which clothing is that talking about?
6  A.  Smock.
7  Q.  Is it talking about the street clothes too?
8  A.  No.
9  Q.  Well, are you just repeating yourself in No.
10  10 from what you said in No. 6 about smocks?
11  A.  Looks that way.
12  Q.  Did you author these rules?  Did you have
13  any role in the authorship of these rules?
14  A.  No.
15  Q.  Rule 11 of the General Requirements says,
16  "Plastic sleeve covers will be worn to cover any
17  street clothes that extend beyond smock coverage
18  on the arms when handling product."
19      Is the purpose of that to prevent
20  contamination of the chicken product?
21  A.  And to cover your street clothes.
22  Q.  To prevent contamination?
23  A.  And to keep your street clothes from getting

Page 176

1  messed up.
2  Q.  And the company furnishes the plastic
3  sleeves to the employees?
4  A.  Yes, according to the union contract.
5  Q.  Do you know how often?
6  A.  No.  It's in the contract.
7  Q.  I believe that's the rule that you said part
8  of it you no longer follow, like the three smocks.
9      MR. ROSENTHAL:  Objection to the form
10  of the question.
11  Q.  When you say it's in the contract, are you
12  speaking of Section 13.4, page 21, of the
13  2004-2008 contract?
14  A.  See right there, sleeves?
15  Q.  Right.  But that's what you were referring
16  to is that 13.4 Section, correct?
17  A.  Referring to as this being in the contract?
18  Q.  In your last answer you said it was in the
19  contract.  Is that what you were referring to?
20  A.  Yes.  You said the company supplied them;
21  that's what I'm referring to.
22  Q.  Okay.  Rule 12 of the General Requirements
23  in Exhibit 17 says, "Maintain gloves used for

Page 177

1  handling food and food contact packaging supplies
2  intact and in a sanitary condition."
3      The purpose of that is to protect the
4  chicken from contamination, correct?
5  A.  Yes, and to cover your hands.
6  Q.  To cover your hands so your hands can't
7  touch the chicken, right?
8  A.  Or the chicken can't touch your hand, yeah.
9  Q.  Rule 13 says, "Gum, candy, cough drops, and
10  tobacco products are not permitted in any
11  production area."
12      Has that been a rule since at least March of
13  2004?
14  A.  Best of my knowledge.
15  Q.  Rule 14:  "Maintain lockers clean and free
16  of trash or soiled clothing."
17      Has that always been a rule?
18  A.  Yes, best of my knowledge.
19  Q.  Rule 15 says, "No food or beverages are
20  allowed in production areas and placing food in
21  lockers is highly discouraged unless there is no
22  other alternative and it must be properly sealed
23  and removed daily."

45 (Pages 174 to 177)

FREEDOM COURT REPORTING

Page 178

1    What's the purpose of that rule?
2   A.   Pests.
3   Q.   To keep down pests that would cause poultry
4   contamination?
5   A.   Yeah.  You don't want food or beverage in
6   your production area.
7   Q.   Because it might lead to the contamination
8   of the poultry?
9   A.   And it's a USDA requirement.
10  Q.   And the USDA requirement is put there in
11  order to protect poultry from contamination?
12  A.   I would think so, yes.
13  Q.   And then Rule 16 says, "Don't use hands or
14  equipment for practices which may result in
15  contamination of food products.  Such practices
16  include but are not limited to:  touching face,
17  wiping forehead; scratching head or body; placing
18  fingers on/or in mouth, nose, or ears."
19    Has that always been a rule?
20  A.   I can't answer that.  I don't know.  It is
21  today.
22  Q.   But the purpose of that rule is stated on
23  its face, correct, that it might result in

Page 179

1   contamination of food products?
2   A.   Yes.
3   Q.   And then Rule 17 says, "Avoid uncontrolled,
4   uncovered coughing or sneezing.  Sanitize hands
5   afterwards."
6    Has that always been a rule?
7   A.   I don't know the answer to that.
8   Q.   Now, the purpose of that rule is to protect
9   the poultry from contamination, correct?
10  A.   To keep from sneezing over the food that
11  somebody is going to eat.
12  Q.   Rule 24 says, "Any item that becomes
13  contaminated must be washed and sanitized before
14  being placed back into use.  Processing tools and
15  utensils are, but not limited to the following
16  items:  pens, calculators, thermometers,
17  clipboards, pans, edible totes, edible shovels,
18  earplugs, maintenance tools, etc."
19    Has that always been the rule since at least
20  March of 2004?
21  A.   I can't answer that since March of 2004.
22  It's a rule today.
23  Q.   And the reason for requiring that type of

Page 180

1   equipment to be kept free from contamination,
2   including the earplugs, is to prevent
3   contamination of the poultry products, correct?
4   A.   Contamination of the earplugs could
5   contaminate a human's ears.  You want to clean
6   them before you put them in your ears, I would
7   think.
8   Q.   For example, it says, "Any item that becomes
9   contaminated must be washed and sanitized..."  And
10  it gives examples like pens, calculators,
11  thermometers, clipboards, pans, etc.
12    You pay employees for that sanitation,
13  correct?
14  A.   Yes.
15  Q.   That's considered work?
16  A.   Yes.
17  Q.   Now, Rule 25 says, "Only approved footwear
18  shall be worn in the processing area to include
19  coolers, shipping, and receiving docks."
20    Is there any footwear approved other than
21  that which the company distributes to the
22  employees?
23  A.   Yes.

Page 181

1   Q.   The company does provide boots to employees,
2   correct?
3   A.   Yes.
4   Q.   Free of charge?
5   A.   Yes.
6   Q.   And why does it do that?
7   A.   Because it's required to wear washable
8   footwear, so we supply boots.
9   Q.   And is that to prevent contamination of the
10  poultry processing areas?
11  A.   It's a requirement by the USDA.
12  Q.   And the purpose of their requirement is to
13  prevent contamination of the poultry processing?
14  A.   I guess.  But as it states here, you can
15  also wear shoe covers.
16  Q.   Does the company furnish the shoe covers?
17  A.   We have them available.  They're not in the
18  contract, but they can buy them if they would
19  rather have the shoe covers than the rubber boots.
20  Q.   Well, the company pays for the rubber boots.
21  Does it pay for the shoe covers?
22  A.   Not as I'm aware of.
23  Q.   Do most employees wear the rubber boots?

46 (Pages 178 to 181)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 182

1   A.   Yes.
2   Q.   It says, "Rubber boots are available at the
3   Supply and may be cut down..."
4        What does that mean, "cut down"?
5   A.   If you don't like them coming all the way up
6   to your knees, you can cut them off.  A lot of
7   employees do that.
8   Q.   These are boots that come all the way to
9   your knee if you don't cut them down?
10  A.   Yes.
11  Q.   Then it goes on to say, "...but cannot be
12  left where they are hanging loose or flapping
13  over.  Do not cut below the ankle."
14       Has that always been a rule?
15  A.   I can't answer that.  It's a practice we
16  have today.
17  Q.   What's the purpose of that rule about not
18  cutting your boots or letting them flap?
19  A.   Safety.  Safety for the employee.
20  Q.   And does it also have to do with sanitation?
21  A.   No.  It's for the safety of the employee.
22  Q.   Are the rubber boots provided for sanitary
23  purposes?

Page 183

1   A.   They're provided because it's a USDA
2   regulation.
3   Q.   There's nothing in the union contract about
4   boots?
5   A.   Yes, it's in the union contract.
6   Q.   What does the union contract say about
7   boots?
8   A.   I don't recall.  We do furnish them.
9   Q.   Rule 34 says, "Only approved tools may be
10  used... Examples of non-approved tools:
11  pocketknives, fingernail clippers, etc. or any
12  tool with a wooden handle."
13       What's the purpose of that rule?
14  A.   Because the tools have to be cleanable,
15  sanitizable, and we furnish the tools.  We don't
16  want the employees to have to furnish tools.  We
17  furnish tools for the employees.
18  Q.   And that's so you can make sure you keep the
19  poultry processing area in a sanitary condition?
20  A.   So the tools meet the USDA requirements.
21  Q.   And the requirements of USDA are to ensure
22  the sanitary production of uncontaminated chicken
23  products?

Page 184

1   A.   Yes.
2   Q.   Rule 35 talks about work stands, ergo
3   stands.  What are those?
4   A.   The stands they get up on to make their job
5   more ergonomically correct.
6   Q.   Where are they provided at?
7   A.   On the lines where the employees work.
8   Q.   Turn to page 11 of Exhibit 17.
9   A.   (Witness complies.)
10  Q.   Under "Sanitation Related" for "Slaughter,
11  Deboning, and Further Processing," Rule 2 says,
12  "Follow cleaning procedures as outlined in Company
13  Sanitation Master manual."
14       I haven't seen that master manual.  Are you
15  familiar with what it is?
16  A.   I know what it is; I don't know what's in
17  it.
18  Q.   Have you ever read it?
19  A.   No.
20  Q.   You don't use it at all?
21  A.   I don't.
22  Q.   Does the Company Sanitation Master manual
23  have anything in it related to donning, doffing,

Page 185

1   or sanitizing protective equipment?
2   A.   I don't know that.  I've never read it.
3        MR. WIGGINS:  Howard, we'd like to have
4   that sanitation master manual.
5        MR. ROSENTHAL:  We'll consider your
6   request.
7   Q.   Now, page 13 of this Exhibit 17 closes by
8   saying, "The above GMP's will be strictly
9   enforced."
10       Has that always been the case?
11  A.   No.  We have not strictly enforced them,
12  unfortunately.  They have things that went by that
13  we didn't take action on.  But to the best of our
14  ability, we strictly enforce them.
15  Q.   Have you ever been written up by USDA?
16  A.   Have I?
17  Q.   Or cited or anything like that?
18  A.   The company has, yes.
19  Q.   Have you ever been written up or cited about
20  donning and doffing?
21  A.   No.
22  Q.   What about sanitizing protective equipment?
23  A.   Not as I recall.

47 (Pages 182 to 185)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 186

1  Q.  Have you been written up about contaminated
2  poultry products?
3  A.  Yes.
4  Q.  How many times?
5  A.  I don't know the answer to that.
6  Q.  What was the cause of the contamination?
7  A.  Different ones. I don't recall all of it.
8  Q.  What does USDA call that type of write-up?
9  A.  NR.
10  Q.  And who's in charge of NRs?
11  A.  USDA.
12  Q.  What does NR mean?
13  A.  Noncompliance report.
14  Q.  Who's in charge at the company of NRs?
15  A.  Nobody at the company's in charge of it.
16  USDA's in charge of it. They write them and issue
17  them.
18  Q.  Okay. But who's responsible for responding
19  to the problem?
20  A.  It's according to who gets the NR.
21  Q.  I mean, is that a first class supervisor job
22  or --
23  A.  It entails the first line supervisor all the

Page 187

1  way up to the plant manager.
2  Q.  Does it involve quality assurance?
3  A.  Yes.
4  Q.  Safety department?
5  A.  It's according to what the NR was written
6  on.
7  Q.  Okay. And how long do you keep your NRs?
8  A.  I don't recall. They have to be kept on
9  site. I don't know.
10  Q.  Who's the recordkeeper for the NRs for the
11  company?
12  A.  Probably QA. I don't know the answer to
13  that.
14  Q.  Are they kept electronically?
15  A.  No, not as I'm aware of. I don't know.
16  Q.  And then the next sentence in the closing
17  paragraph of Exhibit 17, after listing all those
18  rules we went over, says, "Anyone failing to
19  comply with these procedures will be subject to
20  being corrected immediately, possible disciplinary
21  action up to and including termination." Correct?
22  A.  Yes.
23  Q.  Have you disciplined employees for improper

Page 188

1  donning and doffing?
2  A.  I haven't.
3  Q.  Has the company?
4  A.  I don't know the answer to that.
5  Q.  What about for improper sanitizing
6  protective gear or equipment?
7  A.  I don't know the answer to that.
8  Q.  But employees are subject to discipline and
9  discharge for improper donning and doffing or
10  sanitizing, correct?
11  A.  Yes, subject to it.
12  Q.  Do you remember any NRs that you received
13  about contaminated poultry products?
14  A.  I don't remember. I'm sure we have had
15  some, but I don't remember.
16  Q.  What are your duties and responsibilities as
17  complex operations manager?
18  A.  My duties and responsibilities are that both
19  plant managers report to me. And I deal with, as
20  the organizational chart states, the plant
21  managers, the maintenance complex manager, and the
22  sanitation managers on third shift. They report
23  to me. I'm also over the projects which falls up

Page 189

1  under the maintenance umbrella.
2  Q.  The company has a sanitation department,
3  correct?
4  A.  Correct.
5  Q.  And you said it comes in under third shift?
6  A.  Yes.
7  Q.  Do they have any employees on the first or
8  second shift?
9  A.  No.
10  Q.  Describe what the company does to sanitize
11  the production area on the third shift.
12  A.  They clean the production area.
13  Q.  How do they go about doing that?
14  A.  Wash it, scrub it, foam it, rinse it, and
15  then spray it down with sanitizer.
16  Q.  And does the USDA inspect it?
17  A.  Yes.
18  Q.  Does the USDA have to release it before you
19  can start up production?
20  A.  Yes.
21  Q.  Is that in writing?
22  A.  It's a USDA regulation.
23  Q.  I mean, the release every day. Is that

48 (Pages 186 to 189)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 190

1  recorded in some way as the time of day that you
2  were released?
3  A.   We know our down time.  If we're not
4  released by our normal start-up time, we know our
5  down time.
6  Q.   What records show your down time?
7  A.   Production records.
8  Q.   And employees get paid for that type of
9  sanitation activity?
10 A.   Which employees are you talking about.
11 Q.   Your sanitation department.  Employees are
12 paid to sanitize the company's equipment?
13 A.   Yes.
14 Q.   You also sanitize on lunch breaks, meal
15 breaks?
16 A.   No.
17 Q.   I thought y'all, during break periods,
18 you're setup or your floor persons have to
19 resanitize.
20 A.   No.
21 Q.   That's never been the case?
22 A.   Not sanitize, no.
23 Q.   Do they do anything during the break, while

Page 191

1  the normal production line employees are gone on
2  break?
3  A.   Some areas are rinsed down.  But they don't
4  sanitize.
5  Q.   Okay.  What's the difference between rinsing
6  down and sanitizing?
7  A.   Rinsing down and sanitizing.
8  Q.   Physically what's the difference?  What are
9  you doing differently?
10 A.   Taking a water hose and washing it down
11 would be rinsing it down.  If you're sanitizing,
12 you would be spraying sanitizer on it.
13 Q.   What kind of sanitizer do you use?
14 A.   Chlorine, Clorox.
15 Q.   So you don't use any sanitizer except on the
16 third shift, in terms of sanitizing the production
17 area itself?
18 A.   Unless we have a breakdown and maintenance
19 has to work on that piece of equipment.  Then it
20 has to be rinsed off and sanitized.
21 Q.   Who sanitizes knives or arm guards?
22 A.   I don't know the answer to that.
23 Q.   But somebody is in charge of sanitizing the

Page 192

1  knives and arm guards, correct?
2  A.   Yes.
3  Q.   And they're paid for that, correct?
4  A.   Yes.
5  Q.   And that's considered work?
6  A.   Correct.
7  Q.   If any employee is scheduled to be at work,
8  arrives at work, there's no work for him, he has
9  to wait, is he paid?
10 A.   Yes.
11 Q.   Is there a rule on that?
12 A.   They're paid at their normal start time or
13 their master card time, which starts at a certain
14 time every day and ends at a certain time.
15 Q.   And they're paid even though they're just
16 sitting?
17 A.   Exactly.
18 Q.   Doing nothing?
19 A.   Correct.
20 Q.   That's still considered work that has got to
21 be paid?
22 A.   Correct.
23 Q.   That's always been the case?

Page 193

1  A.   Yes.
2  Q.   So the company --
3       MR. WIGGINS:  Strike that.
4  Q.   Now, the sanitation department employees are
5  paid eight hours even if they work less, correct?
6  A.   Correct.
7  Q.   What's the least amount of time you've known
8  an employee to work and get paid for eight hours?
9  A.   I don't know exactly on times.  I mean, I
10 would guess five, six hours.
11 Q.   And is that typical that employees will
12 spend five or six hours but get paid for eight?
13 A.   On sanitation, yes.
14 Q.   And their time after five or six hours,
15 they're at home, correct?  They've left the
16 building?
17 A.   Not necessarily.
18 Q.   Well, employees are paid in the sanitation
19 department even though they've left the premises?
20 A.   Correct.
21 Q.   Even though they may be home?
22 A.   Correct.
23 Q.   Even though they may be in the bed asleep?

4a4efcd4-222a-4134-9214-747cf2d63865

Page 194

1  A.  Correct.
2  Q.  They're still considered to be working on
3  paid time?
4  A.  They're paid eight hours a day, unless they
5  work over eight hours.
6  Q.  So the company does not require you to exert
7  yourself in order to be considered working,
8  correct?
9      MR. ROSENTHAL:  Objection to the form
10 of the question.  You can answer.
11 A.  I don't know the answer.  I don't know what
12 your question is.
13 Q.  Well, the company pays employees sometimes
14 when they're sleeping, sometimes when they're
15 sitting and doing nothing, correct?
16 A.  Correct.
17 Q.  Okay.  Now, in your affidavit you said, in
18 paragraph 16 -- Well, let's start at paragraph 14.
19     You said, "These production employees are
20 paid" -- Well, let's see which production
21 employees you're talking about.  Paragraph 11.
22     Let me show you a copy of your affidavit.
23 In paragraph 11 you're taking about employees in

Page 195

1  the production department of the fresh plant,
2  evisceration and debone, are generally paid under
3  a form of line time or master card time, correct?
4  A.  Correct.
5  Q.  And you then describe, in the next several
6  paragraphs, various things about these employees
7  that are subject to master card time or line time,
8  correct?
9  A.  Yes.
10 Q.  And then paragraph 14, about them you say
11 this: "These production employees are paid
12 together with hours worked before the start of
13 line time or after completion of line time on the
14 basis of the master card system."
15     Now, what type of activities are those that
16 you are describing that are before the start of
17 line time or after the completion of line time?
18 A.  I need to go back and read it all.  But what
19 it states here is if we have an employee to come
20 in early to set up or we ask them to stay late,
21 come in early or stay late, we pay them on the
22 outside of the master card time.  That time is
23 adjusted by the supervisor to the actual time

Page 196

1  worked.
2  Q.  Based on their personal time card?
3  A.  Yes.
4  Q.  All right.  Now --
5  A.  Anyone that's not falling within the window
6  of the master card.
7  Q.  Right.  Now, are there any jobs that that
8  type of before-line-time and after-line-time
9  activities is in regular part of their job?
10 A.  Yes.  There's some people that's not on the
11 master card system.
12 Q.  Even though they're subject to the
13 collective bargaining agreement?
14 A.  Correct.
15 Q.  And I think I asked you this earlier, but I
16 want to ask you one more time to make sure:  Are
17 you able to name those jobs?
18 A.  No, I'm not.
19 Q.  The only one you named earlier was the floor
20 person.
21 A.  Correct.  Setup people, floor person, could
22 be the same.
23 Q.  Now, you earlier said you didn't know

Page 197

1  anything about setup persons, but are you now
2  remembering?
3  A.  No.  I said it could be floor person or
4  setup person.
5  Q.  All right.  Is that two different kinds of
6  employees?
7  A.  I don't know.  I said "or."
8  Q.  Okay.  Do you know of any part of the
9  production area that does not have floor persons
10 or setup persons?
11 A.  No, I don't.
12 Q.  Do you know how many floor persons or setup
13 persons you have?
14 A.  No.
15 Q.  Is that a job that's rotated?
16 A.  I can't answer that.  I don't know.
17 Q.  Who would know that?
18 A.  Production supervisors.
19 Q.  Then the next paragraph, 15, refers to the
20 master card being swiped at the end of the shift.
21     Is there a master card swiped at the
22 beginning of a shift?
23 A.  Yes.

4a4efcd4-222a-4134-9214-747cf2d63865

Page 198

1   Q.   Is the master card used --
2        MR. WIGGINS: I'm sorry. Strike that.
3   Q.   Is the master card swipe used for pay
4   purposes at the start of the day for any employee?
5   A.   For people that's on the master card, yes;
6   for people that's on the master card time.
7   Q.   The reason I ask is your paragraph 15 says,
8   "As employees are paid from the scheduled start
9   time, employees are required to be at their
10  workstations through the time when the master card
11  is swiped at the end of the shift when the last
12  bird to be processed passes the final
13  workstation."
14       Is that a true statement?
15  A.   Yes.
16  Q.   Has that always been true since March of
17  2004?
18  A.   I can't answer that. Best of my knowledge,
19  it has been.
20  Q.   Is there any document that describes a rule
21  or requirement that the master card be swiped only
22  after the last bird passes the final workstation?
23  A.   I don't know of a document. I'm not aware

Page 199

1   of one.
2   Q.   If an employee's scheduled work time is --
3   Well, let me ask you this: Give me an example.
4   Let's take debone. What's their scheduled start
5   time?
6   A.   Day shift?
7   Q.   Day shift.
8   A.   7:30.
9   Q.   If an employee's scheduled start time is
10  7:30 and the master card is swiped at 7:35, which
11  controls the pay of the employee?
12  A.   The master card would be swiped at 7:30.
13  Q.   Well, let's say that something prevents the
14  supervisor from getting back out to the break room
15  to swipe it.
16  A.   7:30.
17  Q.   So the scheduled time would control?
18  A.   Yes.
19  Q.   At the end of the day, what's the 7:30 shift
20  end time?
21  A.   4:30.
22  Q.   If the supervisor swipes the master card at
23  4:35, which controls? the scheduled time or the

Page 200

1   swipe time?
2   A.   It's according to the situation.
3   Q.   How does it vary?
4   A.   Normal, 99 percent of the time you've got to
5   walk on/walk off. They would be leaving. But if
6   we only run one shift, which we haven't done in
7   years, and they have to work until 4:35, they'll
8   get paid until 4:35.
9   Q.   They won't get paid until their clock-out
10  time person --
11  A.   No. They'll get paid by master card time,
12  which you said 4:35.
13  Q.   Okay. Now, if the master card is swiped at
14  4:25, what controls the pay?
15  A.   Going back to my answer, if we're only
16  running one shift that day and they get through at
17  4:25, they'll get paid at 4:25. As stated
18  earlier, when the last bird goes down the line is
19  when it's swiped. But on a normal basis, it's
20  7:30 to 4:30 on day shift.
21  Q.   How is it different on the evening shift?
22  A.   You run until you get finished. It starts
23  at 4:30 in debone and runs until you get finished.

Page 201

1   Q.   But the evening shift though, the start of
2   pay is on scheduled time?
3   A.   Yes. At 4:30.
4   Q.   And that's the scheduled time, correct?
5   A.   Correct.
6   Q.   If the master card is swiped at a time
7   different than 4:30, the 4:30 scheduled time still
8   controls the pay?
9   A.   Unless there's a reason why it was swiped
10  later.
11  Q.   Okay. Now, you mentioned something in your
12  affidavit about a three- to five-minute lag in one
13  area, in change over from one shift to the other?
14  A.   Yeah.
15  Q.   Do you recall that?
16  A.   Let me find it.
17  Q.   Says, "In debone, work is stopped for
18  approximately three to five minutes between
19  shifts."
20       Why is that?
21  A.   To gather up the knives and the metal
22  gloves, for them to have the other ones out for
23  the employees when they get out there.

4a4efcd4-222a-4134-9214-747cf2d63865

## Page 202

1  Q.  Okay.  So in debone, after the last bird
2  passes the final station, the master card is
3  swiped for the first shift, day shift; is that
4  right?
5  A.  Correct.
6  Q.  And you said that normally is at 4:30?
7  A.  Normally.
8  Q.  All right.  You also said the evening shift,
9  their scheduled start time is 4:30?
10  A.  Correct.
11  Q.  So how does this three- to five minutes
12  work?
13  A.  There's no birds on the line at that time.
14  They're not actually working.  They're out there
15  but they're not working.
16  Q.  So this is like from 4:33 to 4:35?
17  A.  I can't give you a definite answer on what
18  time it is.  But it takes three to five minutes to
19  gather all the tools up and put the new tools out
20  for the second shift to start.  So that's in
21  between day shift and the second shift.
22      They're out there but they're not actually
23  working on the line during that three to five

## Page 203

1  minutes.
2  Q.  So are the debone employees getting paid for
3  that three to five minutes?
4  A.  Yes.
5  Q.  Are there records that will reflect this
6  down time of three to five minutes?
7  A.  No, not as I'm aware of.
8  Q.  Do you know of any documents that describe
9  this practice?
10  A.  Not as I'm aware of.
11  Q.  All the other areas, besides debone, you
12  just have a skip in the line; and second shift
13  steps up as the first shift steps off?
14  A.  Correct.
15  Q.  How much is the skip?
16  A.  I don't know the exact time amount of that.
17  It's short.  I don't know.
18  Q.  Is it as much as a minute?
19  A.  I don't know, as I stated.
20  Q.  What's the longest time, that you're aware
21  of, from the first station to the last station, in
22  terms of from the time a bird arrives at the first
23  station until it arrives at the last station?

## Page 204

1  A.  What department are you talking about?
2  Q.  The longest.  Just pick what you think is
3  the longest.
4  A.  Evis is about ten minutes.  That's a guess;
5  I don't actually know.
6  Q.  What's a typical amount of time from the
7  first bird to the last?
8      MR. ROSENTHAL:  Objection to the form
9  of the question.
10  A.  In what area are you talking about?  What
11  plant are you talking about?
12  Q.  Well, let's do it this way:  What's the
13  shortest amount of time it takes a bird to travel
14  from the first station to the last station on a
15  given line?
16      MR. ROSENTHAL:  Objection to the form
17  of the question.  You can answer.
18  A.  I don't know how to answer because I don't
19  know what area you're talking about.
20  Q.  I'm hoping to talk about the shortest one.
21  Q.  Which could be?
22  Q.  That's what I wanted you to tell me.
23  A.  The cone line is less than two minutes.  The

## Page 205

1  rest of them, I really don't know.  I know evis is
2  approximately ten minutes.
3  Q.  Look at paragraph 31 of your affidavit.  It
4  says, "Before breaks or at the end of the day
5  employees may spend a brief amount of time rinsing
6  their work clothing."
7      Is that a requirement?
8  A.  It's according to if they've got on an apron
9  and there's nothing on it, no, they don't have to
10  rinse it.
11  Q.  How about their gloves and sleeves?
12  A.  It's a standard practice for them to rinse
13  them.
14  Q.  Where do they rinse?
15  A.  In the sinks, as they go out of the plant.
16  Q.  What do they rinse it with?
17  A.  Soap and water.
18  Q.  Is that part of the process you require in
19  order to produce uncontaminated chicken products?
20  A.  I guess you could say that.
21  Q.  You don't want blood and guts and other
22  things building up on the aprons, sleeves, gloves,
23  and harboring or growing microorganisms, correct?

Page 206

1   A.   Correct.
2   Q.   And employees are reusing gloves, aprons, or
3   sleeves the next day sometimes?
4   A.   Yes.
5   Q.   And they're storing them in their lockers?
6   A.   Yes.
7   Q.   And the purpose of that rule that they have
8   to wash their aprons, gloves, and sleeves at the
9   end of the day or on breaks is to prevent
10  contamination to the chicken, correct?
11  A.   Yes.
12  Q.   And the wash basins, for that purpose, are
13  in the production area, correct?
14  A.   Yes.
15  Q.   Employees, at that point, still have on
16  their smocks, correct?
17  A.   I can't answer that.  Some do; some don't.
18  I can't answer that.
19  Q.   They don't -- The employees at the end of
20  the day are required to put their smocks in a bin?
21  A.   Correct.
22  Q.   The bin's outside of the production area?
23  A.   Correct.

Page 207

1   Q.   So they still have their smocks with them
2   when they're cleaning their aprons, gloves, and
3   sleeves?
4   A.   Yes.  But they could have them off.
5   Q.   I was thinking -- I need to read the rules,
6   and I don't have time to really, but I was
7   thinking though the rules say you had to take your
8   smock off after you left the production room.  Am
9   I wrong in that?
10  A.   Take the smock off before you leave the
11  production area.  At the end of the shift, they
12  take them off as they go out the door because
13  they're not going to wear them back in.
14  Q.   Okay.  At breaks, employees are not allowed
15  to take their aprons and smocks outside the
16  production area, correct?
17  A.   Correct.  They hang them on a rack that's
18  supplied for them.
19  Q.   And they're not allowed to take their gloves
20  or sleeves outside the production area either, are
21  they?
22  A.   Correct.
23  Q.   And they're not allowed to take their hair

Page 208

1   nets or beard net out of the production area
2   during breaks, correct?
3   A.   They can wear their hair nets and beard nets
4   outside the production area.
5   Q.   How long has that been the case?
6   A.   I can't answer that.  As long as I can
7   remember.  They can't wear them outside, but they
8   can wear them outside the production area.
9   Q.   Employee breaks are automatically deducted
10  through the computer payroll system rather than
11  through the use of a master card swipe, correct?
12  A.   The best of my knowledge.  I don't know.
13  Q.   Have you ever known a master card to be used
14  to determine breaks?
15  A.   No.
16  Q.   Have you ever known a personal time card to
17  be used to determine breaks?
18  A.   Yeah.  I have known that.
19  Q.   When?
20  A.   It's been several years ago, before I come
21  to work here.  But we used to clock in and out for
22  breaks.
23  Q.   Which company was that?

Page 209

1   A.   Wayne Farms.
2   Q.   But that was never a practice at CP?
3   A.   Not to the best of my knowledge.
4   Q.   And it's never been under Equity Group?
5   A.   Best of my knowledge it's hasn't been, no.
6   Q.   Equity Group is not calculating the amount
7   of time employees actually spend on break free
8   from any responsibilities; it's simply deducting a
9   standard 30 minutes, correct?
10  A.   Yes.
11  Q.   And the 30 minutes begins when the last
12  chicken passes the last station on the line?
13  A.   No.  The 30 minutes begins when it passes
14  your station, whether you be the first or the
15  last.
16  Q.   Is that in writing anywhere?
17  A.   Not as I know of.
18  Q.   Have you observed when employees are being
19  sent on break?
20  A.   I've seen employees leave the line as soon
21  as the last bird passes them, and they follow
22  pursuit back in.
23  Q.   Now, at the time the last bird passes their

FREEDOM COURT REPORTING

Page 210

1  station at break, they still have on their smock,
2  apron, gloves, sleeves, earplugs, hair nets, beard
3  nets, and boots; is that right?
4  A.  Correct.
5  Q.  Before they can leave the production area,
6  they've got to doff all that?
7  A.  No.
8  Q.  Except for, I think you said, the hair net
9  and the beard net?
10  A.  And their boots and their earplugs.
11  Q.  Okay.  But everything else they've got to
12  doff after the break has begun?
13  A.  After they leave the line.
14  Q.  So they're doffing all of that on unpaid
15  time, correct?
16  A.  As far as I know.  But I've never put a
17  stopwatch on it.
18  Q.  Now, when an employee goes to the restroom
19  while the line is running, they also have to doff
20  everything, as you have already told us, before
21  they can leave the production area, correct?
22  A.  Correct.
23  Q.  That's considered work time and they're paid

Page 211

1  for it, correct?
2  A.  They get paid for that.
3  Q.  They're exerting the same amount of effort
4  to doff when they go to the restroom during the
5  production line as they are when they doff on an
6  unpaid break, correct?
7      MR. ROSENTHAL:  Objection to the form
8  of the question.  You can answer.
9  A.  I would say so.
10  Q.  And during the break, the employees are
11  required to sanitize their hands, gloves, sleeves,
12  aprons that they're using when they return --
13  before they return to the production area, or when
14  they return to the production area?
15  A.  When they return to the production room.
16  Q.  They have to do that inside the production
17  room at the sinks; is that right?
18  A.  Correct.
19  Q.  But their pay time doesn't begin until after
20  that, when they return to the line and the
21  chickens start coming again, correct?
22  A.  No.  Their 30 minutes is up when they're
23  called back to break.  And then they walk through

Page 212

1  the door and they start getting ready to go to the
2  line.
3  Q.  But an employee's break continues until he's
4  back on the line working?
5  A.  Not necessarily.
6  Q.  I don't know if you might have an exception,
7  but that's the standard situation, isn't it?
8  A.  I don't know the answer to that.  I've never
9  timed them.
10  Q.  Well, an employee's unpaid time is from the
11  time he peels off the production line until the
12  time he's back on the production line.  That's
13  supposed to be 30 minutes, correct?
14  A.  He's got 30 minutes of unpaid breaks.
15  Q.  And that 30 minutes he's required to be on
16  the line at the commencement of it and back on the
17  line at the end of it, correct?
18  A.  Should be.
19  Q.  And during that period he has had to doff
20  all of his protective equipment, resanitize it,
21  and redon it, correct?
22  A.  Yeah.
23  Q.  And all that's on unpaid time during the

Page 213

1  break?
2  A.  Yes.
3  Q.  But if he goes to the nurse's station or to
4  the quality assurance office or to the restroom or
5  to the supply room during the production line, he
6  does the exact same amount of activities, but he's
7  paid for that?
8      MR. ROSENTHAL:  Objection to the form
9  of the question.
10  Q.  Correct?
11  A.  Yes.
12      MR. WIGGINS:  Let's take a break.  I'm
13  about done.
14      (A brief recess was taken.)
15  (BY MR. WIGGINS)
16  Q.  Employees rotate jobs when they come back
17  from break too, don't they?
18  A.  I can't answer that.  I don't know.
19  Q.  You mentioned a HACCP plan.  That's a
20  written document, correct?
21  A.  Correct.
22  Q.  You said it's required to be kept out on the
23  floor, along with the sanitation master plan?

54 (Pages 210 to 213)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 214

1   A.   No.  It's required to be kept on site.  Not
2   on the floor, on site.
3   Q.   Okay.  What's covered in the HACCP plan?
4   A.   HACCP plan is a government-regulated
5   program.  And I don't know really the details.
6   But you have to go through the entire process and
7   list critical control points, CCPs as they are
8   called, and you have to follow that plan.  It's a
9   plan that's mandated by USDA.
10  Q.   Okay.  Now, looking at Exhibit 17, it's got
11  this P-20322 number right below the name of the
12  plant.  Do you see that?
13  A.   Yes.
14  Q.   What does that stand for?
15  A.   That's the plant number.  That's the number
16  that USDA issued that plant.
17  Q.   So USDA is treating slaughter, debone, and
18  further processing as one plant?
19  A.   Yes.
20  Q.   Has that always been the case?
21  A.   Here, yes.
22  Q.   In Eufaula?
23  A.   Yes.

Page 215

1   Q.   And what's that P number used for?
2   A.   That's our number that USDA -- that's our
3   name for USDA.
4   Q.   To track meat?
5   A.   Track meat.  That's our number.
6   Q.   In other words, if poultry gets out in the
7   market and something's wrong with it, they can
8   track it back to you; is that the purpose?
9   A.   Yes.  That number is on our labels of our
10  product.
11  Q.   Okay.  And when I asked you the various
12  questions about whether the activities listed in
13  Exhibit 17, such as the donning, doffing, and the
14  sanitizing activities were for the purpose of
15  preventing contamination of chicken, that's a
16  requirement of the USDA, correct?
17       MR. ROSENTHAL:  Objection to the form
18  of the question.  It's not a summary of what the
19  witness said.  But you can answer.
20  A.   I don't remember what's in 17 at this point.
21  But, you know, the USDA does have regulations.
22  Q.   That's 17, the one we went over for a good
23  bit after lunch.

Page 216

1   A.   Talking about this entire 17?
2   Q.   Yes.
3   A.   Some of it is USDA requirements; some of it
4   is our requirements.
5   Q.   But the items that you do to prevent
6   contamination of poultry product is because that's
7   a requirement of the USDA?
8       MR. ROSENTHAL:  Objection to the form
9   of the question.
10  A.   The USDA, us as a company, both.
11  Q.   Both the company requirement and the USDA
12  requirement?
13  A.   Could be both.  Could be.
14  Q.   All right.  Now, as I understand -- And I've
15  never been in a chicken plant, so you tell me if
16  I've got a bad understanding -- the line is a
17  continuous production line, correct?
18  A.   Yes, most of them are.
19  Q.   It doesn't stop from when it goes from
20  evisceration to debone?
21  A.   Yes, it stops.  There's no one line that
22  runs all the way through that facility.
23  Q.   Does the chicken on the --

Page 217

1   A.   The production flow starts here and goes to
2   here, but there's not no one line.
3   Q.   Okay.  But for any one line, the flow
4   doesn't stop when it moves from evisceration to
5   debone, does it?
6   A.   No.
7   Q.   So you really couldn't stop for three to
8   five minutes in debone without stopping for three
9   to five minutes in evisceration, could you?
10  A.   Yes.
11  Q.   How would you do that?
12  A.   Combo the birds off.  We've got a system
13  that will hold birds.
14  Q.   What do you mean by "combo the birds off"?
15  A.   Put them into a container.
16  Q.   Is that done every shift?
17  A.   Yeah.  Do it every day to some degree.  Some
18  days worse than others.
19  Q.   Are there days when you don't do that?
20  A.   If there is additional space on tables and
21  areas that we have for birds to stay, yes, we can
22  do that.  We can stop for three minutes and not
23  shut down the entire plant.

55 (Pages 214 to 217)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 218

1  Q.   Now, in that three to five minutes, you said
2  that the employees are being paid on the evening
3  shift, even though there's no birds coming down
4  the line?
5  A.   Evening or day shift, whichever it falls in.
6  It could be half on each. I don't know the answer
7  to that. But they are being paid because it's
8  within their time frame at work.
9  Q.   So they're being paid -- Either or both of
10  the day shift and evening shift are being paid for
11  the three to five minutes that there is no
12  chickens on the line?
13  A.   Correct.
14  Q.   And that three to five minutes is obviously
15  not line time because there are no chickens on the
16  line, correct?
17  A.   Correct.
18  Q.   And that's handled in the same way you
19  handle the three minutes for donning and doffing?
20  A.   No.
21  Q.   You said you pay them three minutes?
22  A.   We pay them three minutes.
23  Q.   And the same thing on the three to five

Page 219

1  minutes on the shift changeover; you simply pay it
2  even though it's not line time, correct?
3  A.   Correct. But the three minutes on donning
4  and doffing that we now pay is just added to their
5  normal ever how many hours they work that week.
6  Q.   And they normally work eight hours, correct?
7  A.   On day shift.
8  Q.   So they are now been paid eight hours and
9  three minutes?
10  A.   If they work an eight-hour shift that day,
11  they're getting paid eight hours and three
12  minutes, whatever the contract says.
13  Q.   And that's simply programmed into the
14  computer payroll system?
15  A.   Correct.
16  Q.   And that three minutes is not paid by any
17  master card swipe time?
18  A.   It's on their check as D&D or donning and
19  doffing or some way. It's set up where it pays
20  that. It's shown it on the bottom of their check.
21  Q.   Now, that three to five minutes in the
22  debone department between day shift and evening
23  shift, that's not on master card time either?

Page 220

1  A.   Yes, it is.
2  Q.   As I understand it, the evening shift swipes
3  and then -- I'm sorry. Let me start over.
4       The day shift swipes three to five minutes
5  different than the evening shift swipes on the
6  master card?
7  A.   I don't know. I don't know the answer to
8  that. I wouldn't think so. Our normal ending
9  time is at 4:30 on day shift; our normal start
10  time is at 4:30 on evening shift.
11  Q.   Is there any other time of day that you
12  combo the birds off the line?
13  A.   Sure. Any time we have a breakdown we have
14  to combo them.
15  Q.   And combo-ing the birds off means that you
16  take the birds off the moving line, put them in
17  some storage container, keep them there for three
18  to five minutes, and then put them back on the
19  line, right?
20       MR. ROSENTHAL: Objection. You're
21  talking about the three to five minutes between
22  the shifts or at any time?
23       MR. WIGGINS: Between the shifts.

Page 221

1  A.   We put them back on the line whenever we can
2  work them back in.
3  Q.   But that's extra work that you're having to
4  do that you wouldn't have to do if you left them
5  on a continuous line, correct?
6  A.   Correct.
7  Q.   And who's responsible for that extra work?
8  A.   The debone employees, or wherever it's at,
9  whatever department it's in any time we have a
10  mechanical breakdown. So it could be evis.
11  Q.   Have you ever known any item to be
12  negotiated in the collective bargaining process
13  without having a written proposal from the union
14  or the company on that topic?
15  A.   I don't recall. Not that I'm aware of. I
16  don't recall.
17  Q.   Did the four people that signed the 2008
18  collective bargaining agreement have the authority
19  to agree to that three minutes to be paid for
20  donning and doffing by themselves, without getting
21  any higher approval?
22  A.   I don't know the answer to that. Because
23  when the final decision was made, Huntsville was

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 222

1    made aware of what we had come up with, and then
2    decided on it.
3    Q.    Had other Equity Group plants put in three
4    minutes for donning and doffing?
5    A.    I don't know.
6    Q.    Do you know who had the final authority to
7    agree to that three minutes?
8    A.    No. The four that signed the contract, I
9    guess, with leadership from our attorney and our
10   Huntsville group involved in it.
11   Q.    Who in the Huntsville group?
12   A.    I don't know the answer to that.
13   Q.    Do you still have your copy of Exhibit 17
14   there?
15   A.    Here it is.
16   Q.    Turn to page 6.
17   A.    (Witness complies.)
18   Q.    Do you see at the top of the page, the end
19   of No. 3, it refers to Section 7.1, 7.2 of Codex
20   Alimentarius?
21   A.    Yeah, I see it.
22   Q.    What is that?
23   A.    I have no idea. I don't know.

Page 223

1    Q.    Turn over to page 11.
2    A.    (Witness complies.)
3    Q.    No. 18. It refers to a quality assurance
4    hold. What is that?
5    A.    If for any reason product doesn't meet spec,
6    QA puts the product on hold and applies a QA hold
7    tag that states "QA Hold."
8    Q.    If you had employees on the line who had not
9    sanitized their hands, gloves, sleeves, or apron,
10   would it be subject to a quality assurance hold?
11   A.    I've never been made aware that anything's
12   been put on QA hold for not washing their hands.
13   Q.    First of all, are you knowledgeable of the
14   reasons for quality assurance holds?
15   A.    Some of them, not all of them.
16   Q.    What type of sanitation matters would cause
17   a quality assurance hold?
18   A.    If the plant's not clean.
19   Q.    What about the employees? What if they're
20   not meeting sanitation requirements?
21   A.    I've never known of anything being put on
22   hold that the employee was dirty.
23         If the employee drops product on the floor

Page 224

1    and picks it up and puts it into a clean edible
2    tote, it's put on hold.
3    Q.    If an employee drops product on the floor
4    and touches it and doesn't resanitize his hands,
5    is it put on hold?
6    A.    Yes, can be.
7    Q.    And then it refers in the same paragraph to
8    a USDA hold. What type of sanitation infraction
9    would cause a USDA hold?
10   A.    Same thing, if they catch you before QA
11   does.
12   Q.    You have USDA employees inspecting on every
13   part of the production process?
14   A.    Yes.
15   Q.    How many USDA employees do you have in your
16   fresh plant?
17   A.    A minimum of 11 per shift.
18   Q.    And do you have them in there during the
19   sanitation shift also?
20   A.    No.
21   Q.    That's just your two operating shifts?
22   A.    Two operating shifts.
23   Q.    Do you have USDA in during the sanitation

Page 225

1    shift?
2    A.    Part of it.
3    Q.    Which part?
4    A.    At the ending of the cleanup.
5    Q.    Do you keep records of your quality
6    assurance holds?
7    A.    I don't; QA does.
8    Q.    Do you know how long you keep those?
9    A.    No.
10   Q.    What about your USDA holds? Do you keep
11   those for any period of time?
12   A.    No, I don't; USDA does.
13   Q.    I mean, does the company?
14   A.    If it does, QA keeps them. I'm not aware of
15   it. They may.
16   Q.    Top of page 12, it refers to posting a "Wash
17   Hands before Returning to Work" sign. Has that
18   been done?
19   A.    I don't know the answer to that.
20   Q.    It says that's supposed to be in the
21   restrooms, correct?
22   A.    That's what it says.
23   Q.    Employees are required to wash and sanitize

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

4a4efcd4-222a-4134-9214-747cf2d63865

Page 226

1  their hands before leaving the restroom, correct?
2  A.  Correct.
3  Q.  They then can go either to the break room,
4  supply room, or outside, correct?
5  A.  Repeat your question.
6  Q.  After they have washed their hands in the
7  restroom, if they're still on break they can go on
8  outside, or to the supply room, or to the break
9  room, or anywhere they want to go, correct?
10  A.  Correct.
11  Q.  But when they enter the production area
12  again, they have to resanitize their hands a
13  second time, correct?
14  A.  Have to rewash their hands, correct.
15  Q.  And that's true on any type of leaving the
16  work area, whether it's on production line time or
17  on break time, correct?
18  A.  Correct.
19  Q.  Employees are not allowed to stay in the
20  production area during breaks, are they?
21  A.  Yeah, they can.  I mean, some do; some
22  don't.  Very few do.  But they can stay in there.
23  That's their choice.

Page 227

1  Q.  But you've already told us there's no food
2  or drink allowed.
3  A.  Correct.
4  Q.  And there's no bathrooms in there?
5  A.  No bathrooms.
6  Q.  Okay.  Thank you.
7      MR. ROSENTHAL:  I don't have any
8  questions for you.
9      MR. WIGGINS:  Howard, we want, in
10  addition to the sanitation manual we asked for, we
11  think that the SOPs of sanitation, boots, all
12  these SOPs that deal with donning, doffing,
13  sanitation, that type of thing are due to be
14  produced.
15      We'd like to have an updated layout of the
16  plant now that it's been revised, if you've got
17  one.  And we'd like to have HACCP plan.  Anything
18  else?
19      MS. MCGOWAN:  When we were having our
20  conversation, I kept saying, "Do we have this in
21  an electronic version?"  And y'all kept saying,
22  "We've produced everything."
23      MR. ROSENTHAL:  No, no.

Page 228

1      MS. MCGOWAN:  Well, for some reason we
2  had a communication problem.  So just so we're
3  clear, so there's no communication problem, we
4  want the Kronos information on electronic disk,
5  because you keep it, don't you?
6      MR. ROSENTHAL:  We don't have one.  The
7  Kronos information is in hard copy, and it's
8  available for you to review.
9      MS. MCGOWAN:  What are you using now?
10      MR. ROSENTHAL:  I've got the hard
11  copies.
12      MS. MCGOWAN:  I know.  But do you use
13  Kronos now?
14      MR. ROSENTHAL:  They're not something
15  which we can convert.  It's a specialized program.
16  We have the hard copies.  It's the only thing that
17  I'm aware of that I can give you, and we've made
18  them available since September.  And that's what
19  we told you.  We read right from the response.
20      MS. MCGOWAN:  Well, we can agree to
21  disagree what I understand and what you
22  understood, but --
23      MR. ROSENTHAL:  And those documents

Page 229

1  are --
2      MS. MCGOWAN:  You printed it off.  Do
3  they print it every day and dump it, or why is it
4  not available electronically?
5      MR. ROSENTHAL:  I can't answer that
6  question, Candis.  I can tell you what we have
7  available and what we've offered to make
8  available.  It's the same thing we've offered
9  since September.
10      I can't today find out what else will be
11  available when the first time we got a request was
12  today.
13      MS. MCGOWAN:  No, no.
14      MR. ROSENTHAL:  That's the first
15  request we had.  We were not asked for an
16  electronic copy from the time we responded to
17  discovery last September.  You asked about it last
18  Friday, and I told you what the answer was.
19      MR. WIGGINS:  Let me see if I
20  understand you, Howard.  Y'all have it on
21  electronic form, but you say it's a problem
22  converting it?
23      MR. ROSENTHAL:  I don't know that we

58 (Pages 226 to 229)

Page 230

1  have it for every employee going back as far as
2  March of 2004. And all I'm saying is I will have
3  some time after this week to determine what's
4  available and what we can make available and how
5  we can make it available.
6      MR. WIGGINS: Well, I hope it doesn't
7  come to this, but once we get these SOPs and these
8  other things I've listed, it could trigger some
9  questions of this witness.
10     MR. ROSENTHAL: Our position is very
11 simple: We produced responses to discovery in
12 September. The first time we were asked to
13 present witnesses was when we received the Notice
14 of Deposition. We objected to the Request For
15 Production; that's been ruled on.
16     So I'm not suggesting that you have a right
17 to bring anyone back.
18     MR. WIGGINS: Yeah, I understand you're
19 not. And I'm not taking a position on it until I
20 see the documents. But I do want to be clear
21 though that the documents that I've asked for --
22 and I don't know much about the Kronos thing --
23 but the documents I'd asked for I think were due

Page 231

1  under the original document production.
2      MR. ROSENTHAL: I disagree with that.
3  And at the close of this deposition, our position
4  is that you're done with this witness. I
5  understand you can take a different position.
6      As I said to Candis last week, we'll take
7  all requests under advisement and get the
8  documents to you to the extent that we can. It
9  won't happen this week.
10     MR. WIGGINS: I understand. And it may
11 be Much Ado About Nothing when we see them.
12     MR. ROSENTHAL: Even to the extent we
13 can locate them, I'm going to assume that whatever
14 you told the court reporter is the extent of what
15 you're asking for, and we'll see what we can do.
16     For example, I don't know that there's any
17 layout of the plant as it is currently; we'll
18 certainly look for that.
19     MR. WIGGINS: Well, the ones I listed
20 were just ones that showed up today. There may be
21 some that will show up with the next witness, I
22 don't know. But we can worry about that later. I
23 just wanted to tell you that it could trigger the

Page 232

1  need for further questions. Hopefully, it won't.
2      MR. ROSENTHAL: Okay.
3
4      (The deposition was concluded
5      at 4:30 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 233

1      C E R T I F I C A T E
2
3  STATE OF ALABAMA
4  BARBOUR COUNTY
5
6      I hereby certify that the above and
7  foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10 transcription, and that the foregoing represents
11 a true and correct transcript of the testimony
12 given by said witness upon said hearing.
13     I further certify that I am neither of
14 counsel, nor kin to the parties to the action,
15 nor am I in anywise interested in the result of
16 said cause.
17
18
19     CYNTHIA M. NOAKES, Commissioner
20     Certified Court Reporter,
21     ACCR #327 - Expires 09/30/2008
22
23     Commission Expires 07/08/2009

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

4a4efcd4-222a-4134-9214-747cf2d63865