**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION**

| | | |
|---|---|---|
| BETTY ANN BURKS, <u>et</u> <u>al.</u> | : | |
| | : | |
| Plaintiffs, | : | |
| | : | No. 2:06-CV-1081-MEF |
| v. | : | |
| | : | |
| EQUITY GROUP-EUFAULA | : | |
| DIVISION, LLC, | : | |
| | : | |
| Defendant. | : | |

---

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT.

---

Howard A. Rosenthal
					Gary D. Fry
					Malcolm S. Gould
					  Attorneys for Defendant
					  Equity Group-Eufaula
<u>OF COUNSEL</u>:				  Division, LLC
Pelino & Lentz, P.C.
One Liberty Place
Thirty-Second Floor
1650 Market Street
Philadelphia, PA 19103-7393
215-665-1540


Joel P. Smith, Jr., Esquire
Williams, Potthoff, Williams
  & Smith, LLC
125 South Orange Avenue
Eufaula, AL  36027
334-687-5834

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       A.   The Terms Of, And Custom Or Practice Under,
           The CBAs With The RWDSU Cannot Be Eliminated
           Simply By Some Plaintiffs' Claims That They
           Did Not Acquiesce To The Practice. . . . . . . . . 2

             1.   There Is No <u>Genuine</u> Issue Of Material Fact
                  As To The Terms Of, And The Existence Of A
                  Custom Or Practice Under, A Series Of Bona
                  Fide Collective Bargaining Agreements. . . . . 2

             2.   Plaintiffs' Attempts To Misrepresent The
                  Length Of The Custom Or Practice Supporting Summary
                  Judgment In <u>Anderson</u> Are Insufficient
                  To Withstand Summary Judgment Here. . . . . . 4

             3.   Plaintiffs Cannot Manufacture A Genuine
                  Issue Of Material Fact By Reliance On Sham
                  Affidavits Claiming That The Individual
                  Plaintiffs Did Not Acquiesce To The Custom
                  Or Practice Between Equity And The Union. . . . 7

                a.   The Litigation Relating To This Plant
                     Does Not Prevent A Finding Of Custom
                     Or Practice. . . . . . . . . . . . 7

                b.   Plaintiffs Cannot Claim Ignorance
                     Of Their Collective Bargaining Process
                     To Avoid Summary Judgment. . . . . . . . 10

       B.   Plaintiffs Cannot Eliminate Washing Time From
           Section 3(o)'s Purview Simply By Characterizing
           It As "Sanitizing Equipment" And Then
           Mischaracterizing Deposition Testimony. . . . . . . . 14

             1.   Washing Time Is Properly Excluded Under
                  <u>Anderson</u> And Its Application Of
                  Section 3(o). . . . . . . . . . . . . . . . 16

             2.   Equity Specifically Focused On Cases That
                  Held Plaintiffs' Washing Activities Fall
                  Within The Ambit Of Section 3(o). . . . . . . 19

              3.   Plaintiffs' Tortured "Interpretation" Of
                  Section 3(o) Does Not Limit Its Application
                  To Plaintiffs' Washing Activities. . . . . . . 22

       C.   Plaintiffs' Misunderstanding Of The Concept
           Of Master Card Or Line Card Time At Equity's
           Plant Does Not Prevent Summary Judgment Under
           The Plain Language Of The CBAs. . . . . . . . . . . 26

D.    Plaintiffs' Purported "Credibility Issues"
Are Misplaced And Cannot Save Plaintiffs
From The Lack Of Contrary Evidence On Any
Genuine Dispute. . . . . . . . . . . . . . . . . .  32

E.    Pre- And Post-Break Activities Fall Within
Section 3(o) And, Thus, Are Not a Part of
Compensable Time. . . . . . . . . . . . . . . . .  37

F.    Plaintiffs' Activities For Which Compensation
Is Sought Are De Minimis. . . . . . . . . . . . .  40

G.    The Supreme Court's Decision In IBP, Inc. v.
Alvarez Is Not Applicable To Equity's Motion
for Summary Judgment. . . . . . . . . . . . . . .  44

CONCLUSION . . . . . . . . . . . . . . . . . . . . . .  45

## TABLE OF AUTHORITIES

**CASES**

Adediji Adesola Soremekuan v. Thrifty Payless, Inc.,
509 F.3d 978 (9th Cir. 2007) . . . . . . . . . . . . . . . 11

Alvarez v. IBP, Inc., 339 F.3d 894 (9th Cir. 2003) . . . . . . 42

Anderson v. Cagle's, Inc., 488 F.3d 945 (11th Cir. 2007),
cert. denied, 2008 U.S.LEXIS 4743 (June 9, 2008) . . . . . *passim*

Anderson v. Cagle's Inc., 2005 U.S.Dist.LEXIS 41747 (M.D.
Ga. December 8, 2005) . . . . . . . . . . . . . . . . . . 5,17

Anderson v. Pilgrim's Pride, 147 F.Supp.2d 556 (E.D.
Tex. 2001), aff'd, 44 Fed.Appx. 652, 2002 U.S.App.
LEXIS 13429 (5th Cir., June 6, 2002) . . . . . . 20,26,38,39,42

Bonilla v. Baker Concrete Construction, Inc., 487 F.3d 1340
(11th Cir.), cert. denied, 128 S.Ct. 813 (2007) . . . . . . . 4

Bowen v. United States Postal Service, 459 U.S. 212, 103
S.Ct. 588 (1983) . . . . . . . . . . . . . . . . . . . . . 11

Conerly v. Marshall Durbin Co., 2007 U.S.Dist.LEXIS 85994
(D.Miss., November 7, 2007) . . . . . . . . . . . . . . . . 6

Davis v. Charoen Pokphand (USA), Inc., 302 F.Supp.2d 1314
(M.D.Ala. 2004) . . . . . . . . . . . . . . . . . . . . . 3,34

Gorman v. Consolidated Edison Corporation, 488 F.3d 586
(2d Cir. 2007), cert. denied, 2008 U.S.LEXIS 4864 (2008) . . . 1

Gutierrez v. Specialty Brands, Inc., Civil Action
No. 00-102 (D.N.M., January 14, 2002) . . . . . . . . 8,9,10,19,39

Hart v. Jefferson County, 1995 U.S.Dist.LEXIS 9707 (D.Or.
June 15, 1995) . . . . . . . . . . . . . . . . . . . . . . 1

IBP, Inc. v. Alvarez, 546 U.S. 21, 126 S.Ct. 514 (2005) . . . . 21

Jordan v. IBP, Inc., 542 F.Supp. 2d 790 (M.D.Tenn. 2008) . . . 4

Kassa v. Kerry, 487 F.Supp.2d 1063 (D.Minn. 2007) . . . . . . . 6

Moorman v. Unum Provident Corp., 464 F.3d 1260
(11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 32

McShane v. Gonzales, 144 Fed. Appx. 779 (11th Cir. 2005) . . . 32

Pressley v. Sanderson Farms, Inc., 2001 U.S.Dist.LEXIS 6535
(S.D.Tex. April 20, 2001) . . . . . . . . . . . . . . . . 20,21

Reich v. IBP, Inc., 38 F.3d 1123 (10th Cir. 1994) . . . . . . . 42

Turpen v. Missouri-Kansas-Texas Railroad Company, 573 F.Supp.
820 (N.D.Tex. 1983), aff'd, 736 F.2d 1022 (5th Cir. 1984) . . . 12

**OTHER**

95 Congressional Record-House 11210 . . . . . . . . . . .  7,21,40

Anderson v. Cagle's, Inc., Appeal No. 06-10306 (11th Cir.
June 11, 2007) . . . . . . . . . . . . . . . . . . . . . . . 18

## INTRODUCTION.[1]

The main thrust of plaintiffs' Response to the Motion for Summary Judgment filed by Equity Group-Eufaula Division, LLC ("Equity"), is that this Court should either ignore <u>Anderson v. Cagle's, Inc.</u>, 488 F.3d 945 (11th Cir. 2007), <u>cert. denied</u>, 2008 U.S.LEXIS 4743 (June 9, 2008)(<u>Anderson</u>"),[2] or effect a tortured reading of that case and effectively ignore its <u>facts</u>. Indeed, despite plaintiffs' efforts to distract the Court, the facts of this case supporting summary judgment, including factual admissions and prior judicial findings, are more compelling than those in <u>Anderson</u>. Quite simply, plaintiffs here have presented no evidence that creates a genuine issue of material fact as to the Union's and employees' knowledge and consideration of the labor contract, customs and practices both at the time of the negotiation and at the time of ratification of the 2000, 2004 and 2008 CBAs. Accordingly, as in <u>Anderson</u>, Section 3(o) bars plaintiffs' claims. Plaintiffs' attempts to recast their Complaint, suggest exaggerated hypotheticals not based on the record or misstate the record and testimony do not create <u>genuine</u> issues of material facts or prevent summary judgment.

---

[1]Although defendant's witnesses -- Greg Mills, Robin Stevens, Kathy Gilmore and Joe Preston -- reserved the right to read and review the transcripts of their depositions pursuant to Rule 30(e)(1), F.R.C.P., plaintiffs elected to cite portions of their unedited transcripts without providing those witnesses the full 30 day period for review. Equity objects to such use but, in the interest of time, will not move to strike those transcripts. However, Equity reserves the right to file and serve Errata Sheets for each of those deposition transcripts and object to any further use of the unedited versions. <u>See</u> <u>Hart v. Jefferson County</u>, 1995 U.S.Dist.LEXIS 9707 (D.Or., June 15, 1995).

[2]Since the filing of Equity's Motion for Summary Judgment, the Supreme Court denied plaintiffs' Petition for Writ of Certiorari in <u>Anderson</u>, as well as in <u>Gorman v. Consolidated Edison Corporation</u>, 488 F.3d 586 (2d Cir. 2007), <u>cert denied</u>, 2008 U.S. LEXIS 4864 (2008)("<u>Gorman</u>").

Equity limits this Reply Brief to those issues to which a response is necessary and otherwise stands on the arguments made in its principal Memorandum of Law on all remaining issues.[3]

### ARGUMENT.

**A.    The Terms Of, And Custom Or Practice Under, The CBAs With The RWDSU Cannot Be Eliminated Simply By Some Plaintiffs' Claims That They Did Not Acquiesce To The Practice.**

**1.    There Is No <u>Genuine</u> Issue Of Material Fact As To The Terms Of, And The Existence Of A Custom Or Practice Under, A Series Of Bona Fide Collective Bargaining Agreements.**

Despite plaintiffs' baseless "credibility" attacks [Plaintiffs' Brief at 26-32], plaintiffs have offered <u>no evidence</u> to refute the fact that the Union was aware of, discussed and considered the exact same issues (no compensation for donning, doffing and washing) now being raised in this lawsuit prior to the negotiation of <u>each and every</u> CBA that has covered the employees at this plant.[4]   Likewise, there is <u>no</u> <u>evidence</u> that

_____

[3]Plaintiffs <u>now</u> acknowledge that their claims for security clearance and walking to and from security to the production areas are without merit (no doubt for the very reasons and authority cited in Equity's principal Brief at 55-58) and are withdrawn.  [<u>See</u> Plaintiffs' Brief at 64.]  Contrary to the assertion of plaintiffs' counsel, at <u>no</u> <u>time</u> prior to the date in which summary judgment motions were due (and, indeed, at no time prior to the filing of Plaintiffs' Brief) did plaintiffs' counsel advise Equity or its counsel that <u>any</u> claims were being dropped. Had any such information been communicated, counsel for Equity, at least, would have sought to confirm the withdrawal of claims in writing; no such writing is offered by plaintiffs or exists.

[4]Plaintiffs' statement that Greg Mills, Complex Operations Manager, admitted that none of the CBAs addressed non-payment of donning and doffing time is <u>false</u>.  [<u>See</u> Plaintiffs' Brief at 16.]  Not a single line of the testimony references cited by plaintiffs in any way suggests such an admission.  On the contrary, when asked why employees are not paid for donning, doffing and sanitizing, Mills clearly testified: "We're just following the union contract.  Everything was negotiated in the union contract, and that's what we go by."  [Supp.App., Tab 80 (Mills Dep.) at 117:17-118:13.]  Plaintiffs resort to record
(continued...)

the Union did not agree to continue the same contract terms and relevant customs and practices.  [See App., Tabs 6, 7 and 8 (CBAs).]   Indeed, plaintiffs offer no evidence contrary to the specific findings in <u>Davis v. Charoen Pokphand (USA), Inc.</u>, 302 F.Supp.2d 1314 (M.D.Ala. 2004)("<u>Davis</u>"), which dealt with the same CBA and terms, customs and practices as are involved here,[5] or the testimony of a <u>third party witness</u>, Jacqueline Davis (the chief Union steward).[6]  Quite simply, just as in <u>Anderson</u>, plaintiffs "do not contend that they lacked notice of the relevant compensation policy when executing the ... CBAs.  Nor do they contend that the CBAs in effect during the relevant time period were somehow not 'bona fide.'"  <u>Anderson</u>, <u>supra</u>, 488 F.3d at 959.  Accordingly, just as in <u>Anderson</u>, summary judgment is appropriate under Section 3(o).

Plaintiffs' focus on the purpose of the clothes worn by Equity's employees or the related washing is a diversion and not relevant for purposes of Section 3(o) or Equity's Motion for Summary Judgment.  Even if required by Equity exactly as

---

[4] (...continued)
misstatements as they cannot rely on the facts or applicable law to oppose summary judgment.

[5] Equity agrees that <u>Davis</u> notes that the CBA between CP and the Union does not "<u>expressly</u>" exclude "donning" or "doffing." [<u>See</u> Plaintiffs' Brief at 23.]  That statement, though obviously true, does not change any analysis as, more critically, <u>Davis</u> also concluded that the CBA contained no provision for payment for donning, doffing or washing.  302 F.Supp.2d at 1321.  And, the requirement for pay "by Master Line Time Card" in all of the relevant CBAs is not disputed by plaintiffs.  [<u>See</u> App., Tabs 6-8.]  The application of that language and related customs and practices under the CBAs results in the same conclusion as in <u>Davis</u> -- summary judgment should be granted.

[6] Davis' undisputed testimony and evidence is discussed at Pages 15 through 21 of Equity's principal Brief and is not repeated here.

described by plaintiffs, Section 3(o) still applies pursuant to its terms and still excludes "from measured working time" any "time spent in changing clothes or washing ... by the express terms of or by custom or practice under a bona fide collective-bargaining agreement."  Plaintiffs' focus on such arguments, and Jordan v. IBP, Inc., 542 F.Supp. 2d 790 (M.D.Tenn. 2008), a case which did not involve a CBA, is merely a diversion from Section 3(o) and the focus of the Motion for Summary Judgment.  Moreover, as noted in Gorman, 488 F.30 at 594, that donning, doffing and washing protective gear is required by an employer or the government does not make it compensable.  See also Bonilla v. Baker Concrete Construction, Inc., 487 F.3d 1340, 1344-5 (11th Cir.), cert. denied, 128 S.Ct. 813 (2007).

**2.    Plaintiffs' Attempts To Misrepresent The Length Of The Custom Or Practice Supporting Summary Judgment In _Anderson_ Are Insufficient To Withstand Summary Judgment Here.**

Plaintiffs' attempts to misrepresent the length of time that supported a custom or practice in Anderson, especially when the same lawyers represented the Anderson plaintiffs, reveal their desperation.  Contrary to plaintiffs' assertion, there was not a 10 year period that supported a finding of custom or practice in Anderson.  [See Plaintiffs' Brief at 21.]  As plaintiffs well know, the Anderson case was filed in 2000,[7] and the Motions for Summary Judgment were filed on June 1, 2005.  The Collective Bargaining Agreements that the Anderson District Court construed

---

[7]The Court can take judicial notice of the fact that Anderson, Docket No. 1:00-CV-166, was filed on September 22, 2000 in the United States District Court for the Middle District of Georgia.  The Motion for Summary Judgment was filed on June 1, 2005.  [See Anderson, Dkt. No. 196.]

in granting summary judgment (and the Eleventh Circuit considered in affirming summary judgment) covered the three year periods beginning in 1997. See Anderson, 488 F.3d at 959.[8] Accordingly, the first applicable CBA considered by the Courts in Anderson went into effect only approximately three years before the lawsuit was filed.

Here, the 2000 CBA was negotiated six years before the filing of this lawsuit and eight years prior to the filing of the Motion for Summary Judgment. Unlike in Anderson, there is undisputed testimony from the chief Union steward, and a judicial finding, that the issues of donning, doffing and washing were known by the Union and discussed by the Union negotiating committee prior to the negotiation of each of the CBAs at issue in this litigation. [See App., Tab 26 (Davis Dep.) 17:14-18:9, 21:5-14, 26:7-30:21.] Indeed, in Davis, the Court specifically held that this knowledge and the negotiations (covering an obviously briefer period of time than in this case) constituted a custom or practice sufficient under Section 3(o) and, in fact, granted summary judgment. See 302 F.Supp.2d at 1320-21.

Notwithstanding plaintiffs' now apparent blindness to the facts of Anderson and Davis, the inescapable conclusion is that, under the framework set forth in Anderson, a custom or practice of non-compensation for donning, doffing and washing (and related walking) under established CBAs exists at Equity. Moreover, any necessary period of acquiescence was clearly present in Davis

---

[8]The 2000 CBA was negotiated after the filing of the Anderson lawsuit. See Anderson v. Cagle's, Inc., 2005 U.S.Dist.LEXIS 41747, *16 (M.D.Ga., December 8, 2005)(listing effective dates for Anderson CBAs).

and, likewise, in connection with the two subsequent CBAs negotiated by Equity and the Union in 2004 and 2008 (despite now alleged objections by some employees).  Those objections, however, are not relevant to the collective bargaining process -- clearly the employees and Union (especially after Davis) were aware of the CBA terms and related customs and practices and agreed to continue them notwithstanding, exactly as contemplated by Section 3(o).  Otherwise, Section 3(o) could have no meaning.

Plaintiffs' reliance on Conerly v. Marshall Durbin Co., 2007 U.S.Dist.LEXIS 85994 (S.D.Miss., November 5, 2007), and Kassa v. Kerry, 487 F.Supp.2d 1063 (D.Minn. 2007), is entirely misplaced. In both cases, summary judgment was denied in response to Motions filed before substantive discovery and even before class notice. In Conerly, the District Court took note of Anderson and expressly relied on the fact that it did not have a fully developed discovery record before it.  2007 U.S.Dist.LEXIS 85994 at *1, 19-20 ("However, the district court in Cagle's, Inc. had a fully developed record on summary judgment before it to make its decision.  That is not present here.").

Similarly, in Kassa, the District Court emphasized that "[d]iscovery has not yet begun," 487 F.Supp.2d at 1065, and, thus, the lack of evidence relating to what had transpired between the union and the employees after the employer acquired the plant precluded summary judgment at that stage of the case. Id. at 1071.  The Court suggested that summary judgment may be appropriate at a later stage.[9]  Id.

[9]To the extent Kassa is interpreted to stand for the proposition that a period of 6 years is too short to substantiate
(continued...)

Here, unlike <u>Kassa</u> and <u>Conerly</u>, there is a fully developed factual record, and prior judicial findings, that the Union and its negotiating committee were aware of and discussed the donning, doffing and washing issues before negotiating the 2000 CBA, which, by agreement with the RWDSU, Equity accepted and adopted when it purchased the plant, as well as the 2004 and 2008 CBAs. Such record facts and judicial findings make clear that the issues were "threshed out" by the parties to the CBA and not unilaterally implemented by CP or Equity, exactly as contemplated by Congress, <u>see</u> 95 <u>Congressional</u> <u>Record</u>-<u>House</u> at 11210, despite plaintiffs' repeated contrary plea. [<u>See</u> Plaintiffs' Brief at 21.]

        **3.** **Plaintiffs Cannot Manufacture A Genuine Issue Of Material Fact By Reliance On Sham Affidavits Claiming That The Individual Plaintiffs Did Not Acquiesce To The Custom Or Practice Between Equity And The Union.**

        **a.** **The Litigation Relating To This Plant Does Not Prevent A Finding Of Custom Or Practice.**

Plaintiffs' claim that the <u>Davis</u> litigation and this lawsuit demonstrate a lack of acquiescence to any custom or practice borders on the ridiculous. Plaintiffs initially ignore the fact that, despite the lawsuit, the <u>Davis</u> Court found a custom or practice and granted summary judgment under Section 3(o) based upon the 2000 CBA, which terms, customs and practices continue today.[10] <u>See</u> 302 F.Supp.2d at 1320-1. Similarly, in <u>Anderson</u>,

_____

[9](...continued)
a custom or practice, it would directly conflict with <u>Anderson</u>.

[10]Contrary to plaintiffs' suggestion, the <u>Davis</u> case was filed in 2002 and not in 1999 before the 2000 CBA was ratified. [<u>See</u> Plaintiffs' Brief at 16; <u>Davis</u> Dkt. at Civil Action No. 02-1029 (M.D.Ala.).] The employees' lack of agreement in <u>Davis</u>, as here, and subsequent litigation did not prevent the entry of
(continued...)

although plaintiffs filed their lawsuit in 2000 (prior to the ratification of the 2000 and 2003 CBAs), the Court found that a custom or practice existed.  Plaintiffs' arguments simply would eviscerate the meaning and context of Section 3(o), and a plaintiff could avoid its application simply by claiming that he or she, _individually_, did not agree to the Union's collective and binding decisions or that litigation outside of the contract negotiations or the CBA's grievance procedures could somehow defeat the entire collective bargaining process.

Virtually the same arguments now raised by plaintiffs were rejected by the Court in _Gutierrez v. Specialty Brands, Inc._, Civil Action No. 00-102 (D.N.M., January 14, 2002)[App., Tab 17], where litigation challenging an alleged custom or practice for purposes of Section 3(o) was commenced, as in _Davis_ and here, during the term of the labor agreement:

> "The parties agree that Defendant Specialty Brands and UFCW Local No. 1654 entered into a collective bargaining agreement with a term of December 1, 1997 to November 30, 2000. The Union represents the Plaintiffs in this case as well as other employees of Specialty Brands' Albuquerque facility.  Further, the agreement was the first such between the Union and Defendants.  A second collective bargaining agreement was entered into between the Union and Specialty Brands which runs from January 28, 2001 to January, 2005. Compensation for preliminary and postliminary activities such as those at issue in this lawsuit _was raised during the negotiation of_

---

[10](...continued)
summary judgment in _Davis_ and does not in any way minimize the terms and effect of the later CBAs, each of which was ratified by the employees, or the related customs and practices adopted pursuant to the CBAs.  Otherwise, _Davis_ was wrong (which even plaintiffs do not contend) and there could never be a custom or practice as any single employee could simply object and file a lawsuit -- which would totally destroy any employer-union relationship and the _collective_ nature of union representation.

>the first collective bargaining agreement.
>This suit was filed during the pendency of
>that agreement and the issue of compensation
>for preliminary and postliminary activities
>was not raised when the current collective
>bargaining agreement was negotiated." Id. at
>3 (emphasis added).

Although raised during the initial negotiations, the union and

the company did not agree to any compensation for such activities

and, as noted (and as in this case), "the Union did not seek such

compensation for its members during negotiations on the second

collective bargaining agreement." Id. at 4. Based on that

approximate three year practice, plaintiffs argued, as do these

plaintiffs, that no custom or practice existed and they could not

be deemed to have acquiesced to any such practice as they

resorted to litigation to contest it. The Court rejected that

argument and concluded that a practice, in fact, existed within

the meaning of Section 3(o) and that, for such purposes,

ratification of the CBA established the necessary acquiescence:

>"The Union to which Plaintiffs belong raised
>the issue of compensation for those
>activities during the course of negotiations
>of the collective bargaining agreement which
>was in effect when this action was filed.
>Per the affidavit of Henry Ares, Vice
>President of Human Resources at Specialty
>Brands, Inc., Defendants have not considered
>preliminary and postliminary activities
>compensable work since the inception of their
>Albuquerque plant....

>"The undisputed facts reveal a consistent
>practice of not compensating Plaintiffs for
>preliminary and postliminary activities. The
>Union sought compensation for such
>activities, but was unable to obtain it. The
>Union concluded that the only remedy
>available to it was to litigate under the
>FLSA. However, that conclusion ignores the
>alternative option of refusing to ratify any
>agreement which did not include compensation
>for such activities. The question of whether
>a right exists to have the time included

-9-

> within 'hours worked' under the FLSA is
> irrelevant to the question of whether a
> custom or practice of non-compensation for
> such activities exists within the meaning of
> §203(o)." Id. at 4-5 (emphasis added).[11]

Likewise, if these plaintiffs truly objected to the negotiated contract or wished to avoid a custom or practice, they should not have ratified three separate CBAs which contained no provision for donning, doffing or washing time (until the 2008 CBA), and which focused, instead, on the "Master Line Time Card" as the basis for compensation. In fact, despite plaintiffs' present argument, the 2004 CBA was negotiated by the Union and ratified by the employees (including some of these plaintiffs) after the Court in Davis entered summary judgment and held that Section 3(o) barred the relief (payment for donning, doffing and washing) that the chief Union steward had sought. Those facts present a compelling framework of acquiescence (plaintiffs' present contrary assertions notwithstanding). As in Gutierrez, plaintiffs' proper alternative was to reject the proposed CBA, and not to mislead Equity by ratifying the CBA while secretly contemplating future litigation over the same issues rejected in Davis. [See, e.g., Plaintiffs' App., Tab 26 at ¶ 4.]

### b. Plaintiffs Cannot Claim Ignorance Of Their Collective Bargaining Process To Avoid Summary Judgment.

In addition to claiming that subsequent litigation, or thoughts of litigation [see Plaintiffs' Brief at 14-19], allows them to avoid Section 3(o) and the collective bargaining process, certain of these plaintiffs (who filed virtually identical

---

[11] Gutierrez also held that donning and doffing cotton smocks, hairnets, rubber boots and earplugs, and related washing and disinfecting, was covered by Section 3(o). Id. at 5-6.

Affidavits in Opposition to summary judgment) take the equally untenable position that they can avoid the application of Section 3(o) by claiming that they, individually and despite their collective representation by the RWDSU, (a) did not agree to forego compensation for donning, doffing and washing time (despite ratifying each of the relevant CBAs) or (b) were ignorant of the available remedies under the CBAs. [See, e.g., Plaintiffs' Brief, at 19; Plaintiffs' App., Exs. 24-29.] These arguments likewise fail.

The Supreme Court has made clear that a union's decision-making is binding and can be relied upon by the employer. Thus, in Bowen v. United States Postal Service, 459 U.S. 212, 103 S.Ct. 588, 596-7 (1983), the Supreme Court recognized the union's right to speak for and bind employees despite their individual objections:

> "There is no unfairness to the union in this approach. By seeking and acquiring the exclusive right and power to speak for a group of employees, the union assumes a corresponding duty to discharge that responsibility faithfully -- a duty which it owes to the employees whom it represents and on which the employer with whom it bargains may rely. When the union, as the exclusive agent of the employee, waives arbitration or fails to seek review of an adverse decision, the employer should be in substantially the same position as if the employee had had the right to act on his own behalf and had done so. Indeed, if the employer could not rely on the union's decision, the grievance procedure would not provide the 'uniform and exclusive method for [the] orderly settlement of employee grievances,' which the Court has recognized is essential to the national labor policy."

See also Adediji Adesola Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 986 (9th Cir. 2007)(union acts as "exclusive agent" of

employees); <u>Turpen v. Missouri-Kansas-Texas Railroad Company</u>, 573 F.Supp. 820, 824 (N.D.Tex. 1983)("union, as exclusive bargaining agent, has the power to bind the employees in negotiation, administration and enforcement of the agreements"), <u>aff'd</u>, 736 F.2d 1022 (5th Cir. 1984).

As such, plaintiffs' efforts to manufacture a question of fact -- by providing self-serving affidavits from certain employees after their depositions -- must fail even if the six plaintiffs allegedly (a) had a supposed "plan" to file a lawsuit, which they felt could wait three years (which was never mentioned in any of their depositions, including when they were asked how they learned about the lawsuit); (b) did not acquiesce individually; or (c) were not individually aware or informed of the ability to file a grievance.  Indeed, one of those affiants, Ebone Morris, was and is <u>a</u> <u>Union</u> <u>steward</u>, but yet had the audacity to claim no knowledge of the issues for which a grievance could be filed.  [Plaintiffs' App., Tab 24 at ¶ 4.]

Moreover, Morris admitted at her deposition that she only was employed, as of the date of her deposition, for approximately 1-1/2 years; in fact, she was hired <u>by Equity</u> as of September 19, 2006 and never worked at CP.  [App., Tab 59 (E. Morris Dep.) at 48:5-6.]  Thus, the statements in her Affidavit, now relied upon by plaintiffs in opposing summary judgment, regarding the prior negotiations in 2000 or 2004 with CP or Equity, or any alleged lack of custom or practice, are hearsay and inadmissible.  Morris simply cannot state how or why CP's or Equity's pay practices developed, nor that they were implemented by either company without any discussion or negotiations.  [<u>See</u> Plaintiffs' Brief

at 14-15; Plaintiffs' App., Tab 24 at ¶ 3.]  Neither "company
decided not to pay for this work on its own," as confirmed by
<u>Davis</u> and the admissible facts of record.  [<u>See</u> Plaintiffs' App.,
Tab 24 at ¶ 3.]  Morris was the only "Union" representative
relied upon by plaintiffs, but her "testimony" is neither
competent nor truthful; it cannot contradict the clear and
unrefuted testimony provided by Jacqueline Davis, chief Union
steward, who participated in each of the negotiations.  [<u>See</u>
Equity's Brief at 15-21.]

Even assuming that Morris' entirely disingenuous declaration
were competent and admissible, it does nothing to change the
still undisputed facts relating to the Union's knowledge of the
custom and practice under the CBA, even if implemented
unilaterally.  [<u>See</u> App., Tab 59 (E. Morris Dep.) at 17:17-18:7,
18:23-19:8.]  Morris even admitted that, despite the claims in
her proffered Affidavit, she <u>never</u> complained about her pay to
her supervisor (the first step in the CBA grievance procedure) or
Equity's payroll department:

> "Q.  Have you ever had any instance where you
> got your paycheck and you didn't believe it
> reflected the proper hours and you went and
> complained to your supervisor or someone in
> payroll?
>
> "A.  No."  [App., Tab 59 (E. Morris Dep.) at
> 43:20-44:1.]

Moreover, it is clear from plaintiffs' depositions that they
were aware of the availability of the grievance procedure (even
if Morris was not) but never filed any grievances over any pay
issues.  [<u>See</u>, <u>e.g.</u>, App., Tab 20 (J. Bedell Dep.) at 40:23-41:3;
App., Tab 21 (D. Blackmon Dep.) at 30:11-20; App., Tab 26 (J.
Davis Dep.) at 81:10-13; App., Tab 29 (S. Fuller Dep.) at 28:17-

29:6; App., Tab 33 (G. Gullette Dep.) at 29:14-30:23; App., Tab
39 (A. Johnson Dep.) at 39:22-40:4; App., Tab 43 (A. Kennedy
Dep.) at 18:3-19:4; App., Tab 44 (T. Kennedy Dep.) at 33:2-23;
App., Tab 47 (S. Lampley Dep.) at 30:17-31:4; App., Tab 48 (E.
Laseter Dep.) at 38:21-39-11; App., Tab 53 (M. March Dep.) at
35:7-11; App., Tab 55 (D. McNair Dep.) at 38:23-40:8; App., Tab
59 (E. Morris Dep.) at 43:20-44:1; App., Tab 67 (S. Shabazz Dep.)
at 22:13-23:2, 60:9-61:4, 63:14-17; App., Tab 75 (L. Warren Dep.)
at 15:3-11, 15:19-16:10; App., Tab 19 (V. Avery Dep.) at 48:23-
49:3, 51:5-11; App., Tab 23 (P. Burks Dep.) at 44:12-14; App.,
Tab 25 (B. Darby Dep.) at 60:19-61:4, 62:2-9; App., Tab 31 (T.
Glenn Dep.) at 35:11-13; App., Tab 34 (J. Hamilton Dep.) at
25:23-26:3, 27:9-12; App., Tab 37 (T. Jackson Dep.) at 41:8-11,
42:14-17, 43:3-5; App., Tab 40 (D. Johnson Dep.) at 35:16-18;
App., Tab 41 (J. Johnson Dep.) at 32:13-15; App., Tab 46 (E.
Lampley Dep.) at 31:13-15; App., Tab 54 (M. McCall Dep.) at 38:9-
15; App., Tab 56 (G. McCrae Dep.) at 27:8-12; App., Tab 73 (S.
Thompkins Dep.) at 35:8-13; App., Tab  78 (C. Young Dep.) at
57:2-5.]

### B. Plaintiffs Cannot Eliminate Washing Time From Section 3(o)'s Purview Simply By Characterizing It As "Sanitizing Equipment" And Then Mischaracterizing Deposition Testimony.

Contrary to plaintiffs' assertion that Equity has not moved
for summary judgment under Section 3(o) for time spent sanitizing
protective gear and equipment, or clothing [see Plaintiffs' Brief
at 7], Equity clearly sought summary judgment under Section 3(o)
as to all of plaintiffs' claims, including for such time.  [See,
e.g., Equity's Brief at 1, 25, 35-38.]  As the Introduction to
Equity's Memorandum of Law makes clear, summary judgment was

sought pursuant to Section 3(o) for <u>all</u> claims raised by plaintiffs as "donning, doffing <u>and washing</u> were excluded by the terms they negotiated in the collective bargaining agreement, or otherwise by custom or practice." (Emphasis added.) Equity's ARGUMENT section also made clear that summary judgment was sought for all <u>such</u> claims.

As the Amended Complaint does not seek any compensation for sanitizing or cleaning <u>the plant and its equipment</u>, nor could it do so, and there is <u>no</u> evidence that <u>such</u> time is unpaid, Equity did not need to seek summary judgment related to such activity, although such activities are now referenced by plaintiffs' Brief apparently as a diversion from the real issues.[12]  In fact, the undisputed testimony makes clear that Equity pays employees for all such work.  As Greg Mills, Equity's Complex Operations Manager, testified:

> "Q.  Do you provide any disinfectants to clean equipment?
>
> "A.  We have disinfectants that we clean the plant with.
>
> "Q.  When employees clean equipment with disinfectant, are they considered to be working?
>
> "A.  Yes.
>
> "Q.  Is that considered to be compensable time?
>
> "A.  Paid time?
>
> "Q.  <u>Paid time</u>
>
> "A.  <u>Yes</u>." [Supp.App., Tab 80 (Mills Dep.) at 112:3-13 (emphasis added).]

---

[12]The approved Collective Action Notice (App., Tab 11) clearly limits plaintiffs' claims to "protective and sanitary equipment/clothing" and not the plant and its equipment.

Mills also confirmed that employees are paid for other cleaning, unrelated to plaintiffs' clothes or PPE:

> "Q.  Who sanitizes knives or arm guards?
>
> "A.  I don't know the answer to that.
>
> "Q.  But somebody is in charge of sanitizing the knives and arm guards, correct?
>
> "A.  Yes.
>
> "Q.  <u>And they're paid for that, correct</u>?
>
> "A.  <u>Yes</u>.
>
> "Q.  And that's considered work?
>
> "A.  Correct."  [Supp.App., Tab 80 (Mills Dep.) at 191:21-192:6 (emphasis added).]

Plaintiffs offer no contrary facts and not a single employee suggested they were not properly paid for cleaning the plant and its equipment.  [Plaintiffs' Brief at 7-9.]  There is no basis for plaintiffs' related argument, nor for a trial on extraneous claims.

### 1.    Washing Time Is Properly Excluded Under <u>Anderson</u> And Its Application Of Section 3(o).

As with their other arguments, plaintiffs' suggestion that "Sanitation Of The Company's Equipment Is Not Covered By §203(o)" [Plaintiffs' Brief at 7], to the extent related to work clothing or PPE, ignores their counsel's own arguments in <u>Anderson</u>, the District Court's grant of summary judgment in <u>Anderson</u>, and the affirmance of summary judgment by the Eleventh Circuit in <u>Anderson</u>.  In fact, in plaintiffs' Response in Opposition to Motion for Summary Judgment filed with the District Court in <u>Anderson</u>, plaintiffs argued that their claims for "uncompensated labor" included, in addition to donning and doffing, the time to "sanitize their PPE," before and after work and during unpaid

lunch breaks.  [See Anderson v. Cagle's Inc., Civil Action No.
00-166, Dkt. #216 (M.D.Ga.).]  Plaintiffs, who were represented
by the same counsel that now represents plaintiffs in this case,
defined one of the issues to be determined by the District Court
as:

> "3. Whether the plaintiffs were compensated
> for cleaning and sanitizing their PPE before,
> during, and after their shifts, including
> during unpaid breaks."  [Id. at 4.]

An entire section of the Anderson plaintiffs' Response was
titled: "The PPE Worn By Plaintiffs Are Not 'Clothes' and Washing
PPE Does Not Fall Within Section 203(o)."  [Id. at 7.]
Notwithstanding those arguments, the District Court, which noted
that employees were not compensated for changing or "cleaning
time" under any of the applicable collective bargaining
agreements, granted defendant's Motion for Summary Judgment in
all respects.  See Anderson v. Cagle's Inc., supra, *22.

    Plaintiffs similarly ignore the arguments made by their
counsel before the Eleventh Circuit in Anderson, which repeatedly
focused on "sanitizing protective equipment."  Those plaintiffs
again clearly included working/cleaning as one of the issues on
appeal:

> "In granting summary judgment based on
> §203(o) of the Fair Labor Standards Act which
> allows for the non-payment of wages for time
> spent 'changing clothes or washing... which
> was excluded from measured working time... by
> the express terms of or by custom or practice
> under a bonafide collective bargaining
> agreement,' did the district court err by:
>
> "a.  Failing to consider whether work
>       activity after donning and doffing
>       protective equipment, such as walking to
>       the production line or sanitizing
>       protective equipment, is covered by the
>       terms 'changing clothes or washing at

> the beginning or end of each work day'
> in §203(o) of the FLSA...."  [Anderson
> v. Cagles, Inc., Appeal No. 06-10306
> (11th Cir.)(June 11, 2007) at 1.]

The Anderson plaintiffs thereafter repeatedly argued that the requirement that employees "sanitize" PPE when entering or re-entering the production area and washing PPE before doffing at the end of the work day, notwithstanding the terms of Section 3(o), was required to be compensated.  [Id. at 2-3, 17 ("the district court failed to consider the waiting, walking, sanitizing, and cleaning claims in its summary judgment opinion dismissing the named plaintiffs who worked at the Camilla plant."), 18-19, 20, 21, 22 and 23.]  Yet, the Eleventh Circuit affirmed the grant of summary judgment on all claims raised by the named plaintiffs in Anderson.  The Eleventh Circuit also concluded that each of the claims raised by plaintiffs had been rejected by the District Court, which "disposed of" all claims whether or not explicitly addressed by the District Court. Anderson, 488 F.3d at 959.  Thus, debate on these issues is now foreclosed.

Moreover, as noted, plaintiffs' undocumented and unproven hyperbole regarding the alleged non-payment for cleaning tools, machines, cars, trucks, bathrooms, floors, yards and parking lots [see Plaintiffs' Brief at 7] is unsupported by any record evidence or citation.  Moreover, such "claims" are irrelevant as there could be no such claim here -- in fact, all such activities, to the extent required of these production workers, are performed on paid time, exactly as Equity's Complex Operations Manager, Greg Mills, testified, and as acknowledged by plaintiffs.  [See Supp.App., Tab 80 (Mills Dep.) at 112:3-13,

191:21-192:4.]  Plaintiffs offer nothing to the contrary.

In lieu of giving due recognition to the now final and conclusive determination by the Eleventh Circuit, and despite counsel's involvement in those proceedings, plaintiffs simply suggest that this issue was not raised in Anderson (or here) and rely on cases arising out of other Circuits or which predate Anderson.  Those arguments are makeweight at best.  Exactly as the Eleventh Circuit held in Anderson in affirming the grant of summary judgment by the District Court, and for all of the reasons set forth in Equity's Memorandum of Law, the time spent changing clothes (or PPE) and washing those clothes (or PPE) is not compensable under Section 3(o).

> **2.    Equity Specifically Focused On Cases That Held Plaintiffs' Washing Activities Fall Within The Ambit Of Section 3(o).**

Plaintiffs' claim that Equity failed to cite any cases where washing items of clothing was excluded from compensable time, as opposed to pieces of equipment, is abjectly false.  [Compare Plaintiffs' Brief at 7 and Equity's Brief at 35-38.]  Not only was that issue clearly considered and disposed of by the District Court and Eleventh Circuit in Anderson, as noted above, but it also was determined to be governed by Section 3(o) in a series of earlier cases.

In Gutierrez v. Speciality Brands, Inc., supra, where the District Court granted summary judgment under Section 3(o) involving similar issues, plaintiffs sought "compensation for time spent donning clothing and hairnets, washing and sanitizing their hands, and walking to their respective work places," before and after work and "numerous times each day."  Id. at 2.  In

granting summary judgment, the Court was "unpersuaded by [those employees'] argument or the proffered authority," and held that the "activities which Plaintiffs engage in generally fall within the common meaning of 'changing clothes' <u>and washing</u> and so fall within the exception contained in 29 U.S.C. § 203(o)." <u>Id.</u> at 6 (emphasis added).

Similarly, in <u>Anderson v. Pilgrim's Pride Corp.</u>, 147 F.Supp.2d 556 (E.D. Tex. 2001), <u>aff'd</u>, 44 Fed. Appx. 652, 2002 U.S.App.LEXIS 13429 (5th Cir. 2002), the Court, in discussing Section 3(o), specifically stated:

> "The Lufkin and Nacogdoches plants are union facilities governed by collective bargaining agreements.... None of these collective bargaining agreements provided that line employees would be compensated for changing <u>and cleaning sanitary clothing</u>. In fact, line employees were never compensated for changing <u>and cleaning sanitary clothing</u> during the aforementioned period of time.
>
> "The Court finds that there is both a custom and practice under the collective bargaining agreements of not compensating line employees for donning and doffing sanitary clothing and equipment.
>
>     *   *   *
>
> "<u>It is evident that Local 408 and Local 540 signed the collective bargaining agreements knowing that line employees would not be compensated for the activities at issue in this case</u>. The UFCW's understanding that clothes-changing time and 'wait time' were not compensable under the agreements constitutes a 'practice' for purposes of Section 203(o). <u>Pilgrim's Pride long-standing policy of non-compensation for these activities similarly constitutes a 'custom' for purposes of Section 203(o)</u>." 147 F.Supp.2d at 564-5 (emphasis added).

In <u>Pressley v. Sanderson Farms, Inc.</u>, 2001 U.S.Dist.LEXIS 6535 (S.D.Tex. April 20, 2001), involving another chicken

processing plant, the Court indicated that it would grant summary judgment under Section 3(o) as to the washing claims of those employees who were covered by a collective bargaining agreement:

> "In this case, there was a collective bargaining agreement between the Sanderson Farms Bryan, Texas plant and the United Food and Commercial Workers Union, Local 408, AFL-CIO. <u>The Court might be inclined to agree that this agreement excludes time spent changing or washing clothes pursuant to section 3(o)</u>. <u>See id.</u> However, it is unclear whether <u>all</u> Plaintiffs worked at the Bryan, Texas plant, which was the only Sanderson Farms plant covered by an agreement. Accordingly, the Court determines that it is inappropriate to find, as a matter of law, that section 3(o) excludes time spent changing clothes or washing equipment. Given the Court's rulings above, however, this determination does not change the conclusion that the time spent donning, doffing, and cleaning equipment is not compensable under the FLSA." <u>Id.</u> at *12 (emphasis added and footnote omitted).[13]

All of these cases, including the quoted language, were discussed in Equity's principal brief.

    In addition, Jacqueline Davis, the chief Union steward, made it clear that she understood that the three minute "donning,

---

[13]Plaintiffs' criticism of these cases is based on timing, not substance -- that is, they predate the Supreme Court's decision in <u>IBP, Inc. v. Alvarez</u>, 546 U.S. 21, 126 S.Ct. 514 (2005)("<u>IBP</u>"), which dealt with the application of the continuous work day rule where compensation for donning and doffing was <u>not</u> disputed. However, even if somehow relevant to these holdings, the <u>IBP</u> decision had no impact on the scope of Section 3(o) or the definition of covered work activities. <u>See</u> <u>Anderson v. Cagle's, Inc.</u>, <u>supra</u>, 488 F.3d at 955, n.12. More relevant is the applicable legislative history supporting Section 3(o), which focused on the parties' collective bargaining customs and practices. <u>See</u> 95 <u>Congressional Record-House</u> at 11210 (intended to prevent future litigation where CBAs negotiated but not defined in same ways, to give "sanctity" to <u>CBA</u> "as the determining factor in finally adjudicating that type of arrangement"). <u>IBP</u> in no way calls these holdings into question and plaintiffs' continuing contrary suggestion should be rejected.

doffing and cleaning" pay under the 2008 CBA was sufficient to cover the washing of gloves and other clothing covering the person each time that they reported to and left the production floor.  [See App., Tab 26 (Davis Dep.) at 62:5-63:4.]

As such, there is little question that plaintiffs' washing activities are considered and included under Section 3(o) and Equity's Motion.

### 3. Plaintiffs' Tortured "Interpretation" Of Section 3(o) Does Not Limit Its Application To Plaintiffs' Washing Activities.

In an attempt to avoid the clear application of these cases and facts, plaintiffs attempt to mislead the Court by equating the plant and its "equipment" with the clothing worn by plaintiffs.  [See Plaintiffs' Brief at 7-8.]  Contrary to plaintiffs' strained argument, Equity emphasizes that it never has claimed that washing "tools, machines, cars and trucks ... bathrooms, floors, yard and parking lot" fall within the definition of "washing" for purposes of Section 3(o) or that it does not pay plaintiffs for these activities -- they should be and are paid for all such activity.  These ridiculous propositions aside, Equity is claiming only that, as other Courts have determined, washing aprons, gloves, sleeves or the like constitutes "washing" under Section 3(o).  Nothing in Section 3(o) or its legislative history, nor in the controlling decision of Anderson v. Cagle's, Inc. or other Section 3(o) cases, limits Section 3(o) to "washing the human body."  [See Plaintiffs' Brief at 7.]

More critically, despite the confusion deliberately proffered by plaintiffs, their references to payment for time

spent "sanitizing" or "disinfecting" the plant and its equipment
have no relevance to this Motion.  [See, e.g., Plaintiffs' Brief
at 8-9.]  For example, one of the cited references to
disinfecting equipment in Greg Mills' deposition was in response
to questions relating to a portion of a document that dealt with
disinfecting equipment after a plant accident.  [Supp.App., Tab
80 (Mills Dep.) at 110:22-112:13; Plaintiffs' App., Tab 9 at 80.]
Again, Mills made clear that employees doing so were paid for
such time.  The fact that Equity has a specific person who is
responsible for, and paid for, cleaning and sanitizing all of the
knives and mesh gloves and delivering them to the production line
for the employees has no effect on whether Section 3(o) applies
to employees' donning, doffing and washing of clothes.  Indeed,
the fact that these other tasks (cleaning the plant, cleaning
knives and mesh gloves, etc.) might constitute "work" is
irrelevant to these plaintiffs since they are not required to
clean those items, whether on paid or unpaid time; the employees
who do are paid.  In addition, it is irrelevant for purposes of
Section 3(o) that employees can take a bathroom break during
production time (and doff, don and wash) and not have that time
deducted from their paid time.  Simply because Equity, through
custom and practice developed under its CBAs, pays employees
during short bathroom breaks does not mean that it is required to
pay for activities excluded by Section 3(o).

Plaintiffs' focus on the method of "sanitizing" their boots
is makeweight since that washing activity, as noted above, again

is clearly covered by Section 3(o) and <u>Anderson</u>.[14]  In any event,

it involves nothing more than walking to the production floor and

is not "work," even as defined by <u>IBP</u>.  For example, Mills

clearly explained:

> "Q.  Now, where do employees sanitize their
> boots or shoes?
>
> "A.  At the entrance of each processing area
> they walk through a floor sanitizer.
>
> "Q.  All right.
>
> "A.  Any entrance into the building has floor
> sanitizers <u>you walk through nonstop</u>."
> [Supp.App., Tab 80 (Mills Dep.) at 32:13-19
> (emphasis added).]

Mills further described that process:

> "Q.  Now, describe your current boot
> sanitation process.
>
> "A.  It is a unit mounted on the wall that
> takes and blows chemicals to don on the floor; it
> keeps the floor wet.  <u>And all they do is walk
> across the floor.</u>
>
> *    *    *
>
> "A.  No, I'm not aware of that.  No employee
> has to push a button on the boot sanitizer.
>
> "Q.  Does an employee have to do anything
> other than walk across a wet floor?
>
> "A.  That's it."
>
> "Q.  And that's been the only process you've
> ever had?
>
> "A.  Yes."  [Supp.App., Tab 80 (Mills Dep.)
> at 40:4-9 and 41:17-42:1 (emphasis added).]

The automatic nature of this process was confirmed by Robin

---

[14]It also is undisputed that employees may wear their boots from home and are not required to don or doff them at the plant before or after work or breaks.  [<u>See</u>, <u>e.g.</u>, App., Tab 19 (Avery Dep.) 18:19-19:1; App., Tab 31 (Glenn Dep.) 15:3-5; App., Tab 51 (Mahone Dep.) 17:3-4; App., Tab 47 (S. Lampley Dep.) 14:15-17; App., Tab 70 (V. Shorter Dep.) 23:12-16.]

Stevens, the Fresh Plant Manager:

> "Q.  All right.  Was there ever a time when
> the employees had to punch a button to get
> the sanitizers to work on the boots, to your
> knowledge?
>
> "A.  No.  It's automatic.
>
> "Q.  Has it always been automatic since
> you've been there?
>
> "A.  Yes."  [Supp.App., Tab 82 (Stevens Dep.)
> at 107:15-22.]

Indeed, despite plaintiffs' claim that boot sanitation is some
sort of cumbersome process, numerous plaintiffs confirmed the
automatic, non-stop, effortless process reviewed by Mills and
Stevens.  [See, e.g., App., Tab 44 (T. Kennedy Dep.) at 17:20-21
("You open up the door, then you've got to walk through that
stuff...."); App., Tab 45 (S. Kincey Dep.) at 34:17 ("[n]o, you
just walk right through"); App., Tab 33 (Guilette Dep.) at 36:21-
38:3; App., Tab 71 (K. Spann Dep.) at 22:16-23:2; App., Tab 18
(M. Allen Dep.) at 32:4-33:22; App., Tab 48 (E. Laseter Dep.) at
20:3-17; App., Tab 43 (A. Kennedy Dep.) at 31:11-33:2.; App., Tab
57 (R. Merrill Dep.) at 17:9-11; App., Tab 32 (Glover-Patrick
Dep.) at 58:16-22.]

Thus, plaintiffs' suggestion that "sanitation activities"
are the first principal activities and trigger the continuous
workday rule is factually and legally flawed.  First, "washing"
the employees' boots requires nothing more than entering the
production floor -- the employee simply walks across the floor.
[Supp.App., Tab 80 (Mills Dep.) at 40:4-9, 41:17-42:1; Supp.App.,
Tab 82 (Stevens Dep.) at 107:15-22.].  This is nothing more than
the activities which the Supreme Court defined as non-compensable
in IBP.  Even if the employees stop and are sprayed, this washing

activity is directly covered by Section 3(o) and cannot be counted as "hours worked."  See, e.g., Anderson v. Pilgrim's Pride Corp., supra, 147 F.Supp.2d at 559 (spraying boots included in claim).  Anderson requires no less.

Moreover, plaintiffs' reference to the "continuous workday" rule does not somehow avoid the mandate of Section 3(o) whenever the hours for donning, doffing and washing are incurred.  No case has suggested that the time incurred donning, doffing and washing which is barred by Section 3(o) must be paid simply because it occurs after a "principal" activity, especially where the related time is, by definition, not "hours worked."

For all of these reasons, it is clear (a) that Equity moved for summary judgment as to plaintiffs' washing claims and (b) that summary judgment is warranted under Section 3(o) for those activities.

### C.    Plaintiffs' Misunderstanding Of The Concept Of Master Card Or Line Card Time At Equity's Plant Does Not Prevent Summary Judgment Under The Plain Language Of The CBAs.

Plaintiffs argue that, since not all employees are paid on the basis of Master Card time, the language of the CBAs precludes summary judgment.  Equity explained the Master Card system, as defined in the CBAs and as implemented by the parties' custom and practice pursuant to the CBAs, in its principal Memorandum of Law:

> "Employees assigned to the production lines in the Evisceration and Debone Departments at the Fresh Plant are generally paid under a variation of 'line time' or 'master card time.'  Employees swipe in at one of several time clocks (KRONOS machines) throughout the Fresh Plant which document, for attendance purposes, that the employees are at work on any given day.  The employees are required to

'swipe out' when they leave work.  These production employees are paid, together with actual hours worked before the start of line time or after completion of line time, on the basis of the Master Card system, which reflects the scheduled start time for production at the beginning of each shift and the time when production ends at the end of each shift (less two 30 minute breaks). Employees are paid from a scheduled start time, whether or not work (*i.e.*, birds) is available, and they are required to be at their work stations when the Master Card is swiped at the end of their shift and the last bird to be processed passes the final work station.  Hours worked before or after scheduled line or Master Card time are recorded by the employee's supervisor and the employee's time record is adjusted for pay purposes."  [Equity's Brief at 2-4 (citations and footnotes omitted).]

These facts are also set forth in Equity's responses to plaintiffs' written discovery.  [See App., Tab 12 (Response to Interrogatories), No. 20.]  As Stevens noted:

"Q.  Who determines whether the employee is on a clock-in to clock-out?  Who makes that determination?

"A.  Specific departments are set up on master cards, but then a supervisor would designate employees to be on a clock-in/clock-out, if they were a setup person or somebody that stayed late." [Supp.App., Tab 82 (Stevens Dep.) at 43:9-16.]

As such, there is no surprise that, if plaintiffs report early to perform set-up work or stay late to perform clean-up work, they are paid for that time, *i.e.*, that time is added to their Master Card time, as the FLSA and the CBAs would require. Clearly, under the CBAs, and related customs and practices, Equity is responsible for paying employees for time actually worked in excess of Master Card time and unrelated to the production activities covered by the Master Card, to the extent

-27-

not limited by Section 3(o) or the language of the CBAs. That is exactly what the parties negotiated in Section 12.5 of the CBAs and the related customs or practices implementing that system, now over 8 years without any grievance under these CBAs.[15] Plaintiffs' contrary argument ignores the specific terms of Section 3(o), which focus not only on the "express terms of" the CBA but also any "custom or practice under" a CBA. Here, the nature of this system, as agreed to and accepted by the parties, and as implemented pursuant to three separate CBAs, is not disputed. The customs or practices do not diminish the impact of Section 3(o), as plaintiffs suggest, but reflect its specific terms.[16] There is nothing in Section 3(o) which requires all employees to be paid on the same basis (nor even a specific

---

[15]Despite plaintiffs' claims, they do not offer any evidence of a single grievance or challenge to this pay system as set forth in the CBAs and as consistently applied. See ARGUMENT, Part A.3.b., supra. More critically, plaintiffs simply ignore testimony by Felicia Laseter, a member of the plaintiff class and a Union representative, who admitted, consistent with Mills' testimony, that no employee ever filed a grievance related to any pay issue through her. [See App., Tab 49 (F. Laseter Dep.) at 11:16-23, 14:15-19, 48:8-20.]

[16]For whatever purpose, plaintiffs suggest that the fact that employees are paid for 3 to 5 minutes at shift change in the Debone Department, allegedly outside of Master Card time based on a misstatement of Mills' testimony, somehow impacts on the application of the custom or practice. [See Plaintiffs' Brief at 25.] First, Section 3(o) does not require that all employees be paid on exactly the same basis and this testimony shows nothing more than how the practices and customs are applied for 1,300 employees. In any event, plaintiffs fail to properly excerpt Mills' testimony and exclude his almost immediate clarification:

> "Q.   Now, that three to five minutes in the debone department between the day shift and evening shift, that's not on master card time either?
>
> "A.   Yes, it is." [Supp.App., Tab 80 (Mills Dep.) at 219:21-220:1 (emphasis added).]

contract provision). What is clear, as the <u>Davis</u> Court held: "It is not disputed that the bargaining agreement contains no provision for compensation for ... donning-and-doffing time...." <u>Davis</u>, <u>supra</u>, at 1321.

To the extent that some production positions may be paid on a clock-in/clock-out basis determined by their position or for pre-shift and post-shift activities, those employees are paid for time spent donning, doffing and cleaning. As such, those employees do not have claims for the allegedly unpaid activities in this case and, more importantly, are not properly a part of this plaintiff class. Plaintiffs simply neglect the Collective Action Notice to which they agreed and the Court approved, which limits those employees covered by this action:

> "Plaintiffs claim that they were <u>paid on the basis of 'line time', 'master key time,' or that their individual time clock punches were not the basis for hours worked</u> and as a result they were not fully paid regular time or overtime for pre-production and post-production activities as well as activities during their shift, including putting on and taking off protective and sanitary equipment/clothing at the beginning and end of the work day, putting on and taking off protective and sanitary equipment/clothing during the shift at breaks, related washing/cleaning time at the beginning and end of the shift and during breaks, waiting time and time spent walking to and from the line at the beginning and end of the day as well as at breaks, and that unpaid breaks are compensable, due to putting on equipment/clothing, taking off equipment/clothing, walk time, and wash time that occurs while employees are on break." [App., Tab 11 (Notice) at 1.]

At this late stage, plaintiffs should not be allowed to re-cast or expand the plaintiff class or change their claims. Nor does such payment impact the application of Section 3(o) as plaintiffs

suggest -- to the contrary, Section 3(o) focuses on the CBA and the parties' customs and practices, all of which are relevant when defining any collective bargaining relationship and do not suggest nor require a single pay system or plan.

Plaintiffs' reference to unpaid exercises required by employees in the Debone Department again misstates the facts. [See Plaintiffs' Brief at 2.]  Even the employees who performed those exercises admit that they are paid for such time.  [See App., Tab 68 (R. Shaw Dep.) at 60:7-17, 61:16-21; App., Tab 23 (P. Burks Dep.) at 61:7-15; App., Tab 44 (T. Kennedy Dep.) at 34:5-35:16; App., Tab 45 (S. Kincey Dep.) at 45:5-47:9; App., Tab 46 (E. Lampley Dep.) at 37:14-38:9, 39:5-21; App., Tab 52 (A. March Dep.) at 50:14-53:18; and App., Tab 63 (M. Person Dep.) at 48:19-51:11.]  This fact was confirmed by Robin Stevens, the Fresh Plant Manager:

> "Q.  Are you aware whether employees actually do ergonomic exercises?
>
> "A.  We have done them in the past.
>
> "Q.  And why were they doing these exercises in the past?
>
> "A.  To help the employee loosen up, loosen up their hands and mainly their shoulders before they begin work.
>
> "Q.  Were these exercises you did in the past mandatory?
>
> "A.  When we were doing them, yes.  But we lack in that area.  We don't do them like we should.
>
> "Q.  And where were they conducted?
>
> "A.  Once the employees got on the line or got in their area.  It's mainly just before the debone lines.
>
> "Q.  Is this before the scheduled shift of

<u>7:30?</u>

"A.  <u>No.</u>

"Q.  <u>After 7:30?</u>

"A.  <u>It would be after the employee got on
the line, yes.</u>"  [Supp.App., Tab 82 (R.
Stevens Dep.) at 158:14-159:13 (emphasis
added).]

Greg Mills, the Complex Operations Manager, agreed:

"Q.  Well, I thought I remember you saying
this morning that the employees at some point
in time have done physical exercises during
the day.

"A.  They have at some point in time.

"Q.  Are they doing that currently?

"A.  I don't know the answer to that.

"Q.  <u>Were they doing that on paid or unpaid
time</u>?

"A.  <u>Paid</u>.

"Q.  What part of the day were those
exercises being done?

"A.  In the mornings, normally after they got
on their line.

"Q.  And how long would they do the physical
exercises?

"A.  I don't know the answer to that.

"Q.  I think I asked you this, but I want to
make sure:  Do you know which departments did
the physical exercises?

"A.  The best of my knowledge, debone was the
only department doing that.

"Q.  And was it the whole department?

"A.  I don't know the answer to that.

"Q.  Did the company consider doing physical
exercises to be work?

"A.  Yes.  <u>They [were] on the clock.</u>  It was
after the line was started, after they got on

-31-

the line." [Supp.App., Tab 80 (Mills Dep.) at 156:16-157:18 (emphasis added).]

Thus, there are no genuine issues of fact which suggest that there are any activities for which employees (a) are not paid or (b) are not fully covered by Section 3(o). Summary Judgment is appropriate despite plaintiffs' contrary arguments.

### D. Plaintiffs' Purported "Credibility Issues" Are Misplaced And Cannot Save Plaintiffs From The Lack Of Contrary Evidence On Any Genuine Dispute.

Recognizing that they have no contrary evidence to refute the history of bargaining at this plant, plaintiffs attempt to "shoot the messenger" and manufacture credibility issues with the testimony of Greg Mills, Equity's Complex Operations Manager, and Jacqueline Davis, third party witness and chief Union steward. [Plaintiffs' Brief at 26-32.] These attempts fall well short of the intended target even if the Court could consider credibility where there exists no genuine dispute. See Moorman v. Unum Provident Corp., 464 F.3d 1260, 1266 n.1 (11th Cir. 2006)("Credibility determinations at the summary judgment stage are impermissible." )(citation omitted); see also id. at 1267 ("Thus, even if the district court erred by improperly making a credibility determination or by misconstruing and disregarding certain evidence, [plaintiff] still must show that there is a genuine issue of material fact as to ERISA governance.")(emphasis added); McShane v. Gonzales, 144 Fed. Appx. 779, 787 (11th Cir. 2005)("Thus, instead of showing that the court made improper credibility determinations and findings of fact, the record reflects that the court properly concluded that [plaintiff] had failed to show that a genuine issue of material fact existed.")(emphasis added).

Plaintiffs first take issue with Paragraphs 55 through 61 of Greg Mills' Affidavit and his deposition testimony related to those Paragraphs.  Plaintiffs, of course, adopt a tortured interpretation of Mills' Affidavit in an attempt to convince the Court that Mills made untrue statements.  The Paragraphs at issue read:

> "55.  Employees employed by CP or later Equity were part of the RWDSU negotiating team on every contract negotiations and they were free to revise any issue of concern or to be presented to the Company.
>
> "56.  At the time that Davis signed the Agreement with CP, she admitted that she understood that she had not been paid, and that the Contract meant that she would not be paid, for any time other than when she was at her work station.
>
> "57.  Davis also admitted that it was the well known practice of CP to pay only for time worked at the work station.
>
>             *   *   *
>
> "59.  Davis was a member of the Union and a member of the Bargaining Committee that participated in the formation of the Agreement between Charoen Pokphand and the RWDSU.
>
> "60.  While on the Bargaining Committee, Davis discussed not being compensated for donning and doffing prior to and after work, and communicated her concerns to Jenkins and Foster, who headed the Union's negotiation committee for the Agreement with CP.
>
> "61.  These discussions were held in connection with the negotiations of the Collective Bargaining Agreement between the RWDSU and CP; the relevant language and practices have been carried over to the agreements between the RWDSU and Equity."
> [App., Tab 5.][17]

_____

[17]In the <u>Davis</u> Opinion, which Mills testified he reviewed, the Court stated:  "Davis was on the union's bargaining
(continued...)

During his examination, Mills truthfully responded that he learned the information and facts summarized in his Affidavit from Davis' prior deposition testimony <u>and</u> the Court's opinion in <u>Davis</u>. [<u>See</u> Supp.App., Tab 80 (Mills Dep.) at 160:13-161:3, 162:10-16.]  Nowhere in his Affidavit does Mills indicate that he was a party to any conversations or that he personally heard those conversations.  As Mills testified:

> "Q.  Have you ever had any conversations with Jacqueline Davis about donning and doffing?
>
> "A.  She was in the negotiations.
>
> "Q.  Do you remember anything she said?
>
> "A.  No, not her personally.
>
> "Q.  Have you ever heard Jacqueline Davis say anything that touched on the subject of donning and doffing or pay for donning and doffing?
>
> "A.  No.  <u>I read her depositions where</u> --
>
> "Q.  When did you do that?
>
> "A.  <u>When this come up, I read everything about donning and doffing that I knew.  And I knew that she had filed a case against us, so I read her, you know -- we reviewed her documents</u>.

_____

[17](...continued)
committee, and she testified that she talked about the issue of compensation for donning and doffing with the union's negotiator prior to negotiation on the CBA.  [<u>Compare</u> Mills Affidavit, ¶¶ 59-61.]  It is not disputed that the bargaining agreement contains no provision for compensation for pre-shift donning-and-doffing time, and Davis testified that she knew that under the CBA, she was not to be compensated for such time.  [<u>Compare</u> Mills Affidavit, ¶¶ 56-57.]  Green also testified that it was Pokphand's practice not to compensate for pre-shift donning-and-doffing time both before and after Pokphand and the union entered into the CBA."  [<u>Compare</u> Mills Affidavit, ¶¶ 56-57.]  302 F.Supp.2d at 1320-1 (footnote omitted).  This is wholly consistent with Mills' Affidavit; more critically, Mills' Affidavit and deposition testimony are supported by Davis' independent testimony pursuant to subpoena in this case.

*    *    *

> "Q. Have you ever <u>read or heard</u> anything that
> indicated what Jacqueline Davis understood
> about whether it's a well-known practice for
> CP to pay only for time worked at the
> workstation?
>
> "A.  <u>From what I read</u>, that's what she
> understood she got paid.  That it was
> understood that she got paid for time worked
> at the workstation."  [Supp.App., Tab 80
> (Mills Dep.) at 160:13-161:3, 162:10-16.]

Plaintiffs' poor questioning of Mills cannot alter the source of

his information (the <u>Davis</u> opinion and her deposition), nor

render Mills untruthful.

Likewise, plaintiffs selectively ignore Mills' testimony

regarding the grievance procedure.  Contrary to plaintiffs'

characterization, Mills indicated that he would be made aware of

any grievance that made it to "Step 2" of the process.

[Supp.App., Tab 80 (Mills Dep.) at 164:10-19.].  As such, had

there been any grievances related to payment for donning, doffing

or washing, he would have become aware of those grievances

(because they certainly would have escalated beyond Step 1).

They also fail to acknowledge that this testimony was confirmed

by the Fresh Plant Manager, Robin Stevens (and the person

designated at the second step of the contractual grievance

procedure to hear grievances), who testified to the "seldom"

number of incidents which make it to him.  [Supp.App., Tab 82

(Stevens Dep.) at 154:12-19.]  Likewise, Kathy Gilmore, Assistant

Complex Human Relations Director, confirmed that she <u>never</u> had a

grievance by any employee "about not being paid for all the time

they thought they were [due]."  [Supp.App., Tab 79 (Gilmore Dep.)

at 86:22-87:5; <u>see also</u> Supp.App., Tab 79 (Gilmore Dep.) at

-35-

50:17-51:3, 70:17-71:2, 72:9-20.]  Even the employees universally testified as to the lack of such grievances.  See ARGUMENT, Part A.3.b., supra.  Plaintiffs ignore these uncontradicted facts and attempt to create credibility disputes and genuine issues where they do not exist.

Plaintiffs' shameful attempts to paint Davis, a third party witness who was subpoenaed to testify, as a Company "patsy" likewise fail.[18]  In fact, Davis' testimony was entirely consistent with her testimony as cited in Davis -- that she was a member of the Union's bargaining committee for the negotiation of the 2000 CBA and that the bargaining committee, including the representatives from the International Union, were aware of and discussed issues relating to donning, doffing and washing before each of the CBAs at issue in this case.  [Compare 320 F.Supp.2d at 1320-31 and App., Tab 26 (Davis Dep.) at 26:7-30:21.]  Davis' recollection of the nature of the proposals to the Company some four or eight years ago -- that is, whether written or oral -- does not impact her testimony detailing the discussions among the Union bargaining committee.  Nor is it unusual that proposals made orally across the table were not confirmed in writing, especially where the agreed language, as here, was included in the written contract.

Although plaintiffs claim that Davis' testimony is not

---

[18]Plaintiffs suggest that Davis' testimony was influenced by "having been promoted to Leadman." [Plaintiffs' Brief at 30-1.] None of the cited portions of her deposition transcript suggest that her position resulted from a promotion by the Company.  On the contrary, the position of Leadman is a negotiated position in the CBA (see Schedule A) and subject to bidding and award by seniority under Section 5.2 of the CBA.  [See, e.g., App., Tab 8 (2008 Contract).]  This is but another example of plaintiffs' desperation and lack of regard for the record and facts.

consistent with "the sixty plaintiffs who have been deposed, none
of who support the construction of Davis' testimony argued by"
Equity, <u>plaintiffs do not cite a single line of deposition
testimony that contradicts Davis' testimony relating to the Union
negotiations</u>.  In fact, virtually all of those witnesses
testified that they did not participate in the negotiations and
were unaware of any related discussions.  Indeed, Ebone Morris,
who was a Union steward at the time of the 2008 CBA negotiations,
supports Davis' recollection as to the 2008 negotiations and was
not employed by CP or Equity at the time of the 2000 or 2004
negotiations (making her entire Affidavit suspect).  [<u>See</u> App.,
Tab 59 (E. Morris Dep.) at 17:17-18:7.]

The names of each and every individual who signed each of
the CBAs were equally available to plaintiffs throughout
discovery.  The same representatives from the International Union
negotiated each of the CBAs.  Plaintiffs took no depositions to
refute Davis' testimony.  As such, plaintiffs' unavailing effort
to make up for the lack of their own affirmative evidence does
not create a <u>genuine</u> issue of material fact to prevent entry of
summary judgment under Section 3(o).

**E.  Pre- And Post-Break Activities Fall Within Section 3(o)
And, Thus, Are Not A Part Of Compensable Time.**

The District Court in <u>Anderson</u> granted summary judgment as
to all of those plaintiffs' claims, which included claims for
donning, doffing and washing before and after their one unpaid
break.  Before the District Court, the <u>Anderson</u> plaintiffs also
argued that they were required to don or doff before and after
their breaks.  [<u>See</u>, <u>e.g.</u>, <u>Anderson</u>, Plaintiffs' Response in
Opposition to Motion for Summary Judgment, Civil Action No. 00-

166 (M.D.Ga.), Dkt. # 216, at 3-4].  Nonetheless, the District Court granted summary judgment as to all claims.  The fact that the <u>Anderson</u> plaintiffs failed to properly present those issues for appeal does not change the fact that both the panel that heard the appeal and the entire Eleventh Circuit, in denying rehearing, saw no reason to alter the District Court's ruling.

Likewise, in <u>Anderson v. Pilgrim's Pride Corp.</u>, <u>supra</u>, and <u>Gutierrez v. Speciality Brands, Inc.</u>, <u>supra</u>, the Courts granted summary judgment as to plaintiffs' donning, doffing and washing claims, each of which also included break time claims.  Thus, in <u>Anderson v. Pilgrim's Pride</u>, <u>supra</u>, at 559, the Court explicitly noted:

> "3.  Production employees are responsible for making sure that their clothing is properly sanitized prior to arriving at their individual work station.  Accordingly, production employees spend a short amount of time prior to their work day, <u>during breaks</u>, and after their work day sanitizing their equipment.  The sanitization process usually involves dipping their gloves in a sanitary solution, spraying off their apron, and spraying off their rubber boots.  In most cases, the various production employees complete this process in a matter of seconds, not minutes.
>
> "4.  Production employees don and doff their sanitary and safety equipment <u>several times during the course of the day depending on the number of breaks taken</u>.  In most cases, employees put on and remove ear plugs, smock, apron, and gloves (rubber and cotton). Some employees leave their hairnets on <u>during the breaks</u>. The amount of time spent donning and doffing the various pieces of clothing varies according to department, individual dexterity, and individual preference.
>
> "5.  <u>At various points during the day,</u> the employees will don and doff sanitary equipment at a casual pace.  In those instances, the employees may spend over one minute with this process.  However, many

> employees accomplish this process in a matter
> of seconds if they so choose.  In fact, it is
> not uncommon to find employees putting on
> their apron, gloves, hairnet, and hearing
> protection as they walk to their individual
> work station."  (Emphasis added.)

That Court rejected all of those claims and concluded:

> "It is evident that Local 408 and Local 540
> signed the collective bargaining agreements
> knowing that line employees would not be
> compensated for the activities at issue in
> this case.  The UFCW's understanding that
> clothes-changing time and 'wait time' were
> not compensable under the agreements
> constitutes a 'practice' for purposes of
> Section 203(o).  Pilgrim's Pride
> long-standing policy of non-compensation for
> these activities similarly constitutes a
> 'custom' for purposes of Section 203(o)."
> 147 F.Supp.2d at 565.

In Gutierrez, plaintiffs argued as follows:

> "Plaintiffs assert that they are entitled to
> compensation for time spent donning clothing
> and hairnets, washing and sanitizing their
> hands, and walking to their respective work
> places.  The activities take place after
> Plaintiffs have punched in at the time clock
> but before they report to the production
> line.  They contend that they are required to
> perform those activities numerous times each
> day and allege that Defendants dock time
> spent in those activities from its employees'
> time cards."  Memorandum Opinion Order at 2
> (emphasis added) [see App., Tab 17].

As in Anderson v. Pilgrim's Pride and Anderson v. Cagle's, Inc.,

the Gutierrez Court granted the Motion for Summary Judgment as to

all claims:

> "The Union sought compensation for such
> activities, but was unable to obtain it.  The
> Union concluded that the only remedy
> available to it was to litigate under the
> FLSA.  However, that conclusion ignores the
> alternative option of refusing to ratify any
> agreement which did not include compensation
> for such activities.  The question of whether
> a right exists to have the time included
> within 'hours worked' under the FLSA is
> irrelevant to the question of whether a

-39-

> custom or practice of non-compensation for
> such activities exists within the meaning of
> §203(o)."  Id. at 5.

These decisions, as argued in Equity's principal brief, are consistent with the legislative history and its focus, appropriately, on the parties' negotiations and collective bargaining relationship in order to avoid, as here, subsequent litigation following negotiation and ratification of a collective bargaining agreement.  See 95 Congressional Record-House at 11210.  As Congressman Herter explained: "This amendment is offered ... to give sanctity once again to the collective-bargaining agreements as the determining factor in finally adjudicating that type of arrangement."  Id.

### F.   Plaintiffs' Activities For Which Compensation Is Sought Are De Minimis.

Plaintiffs' argument regarding the amount of time involved misses the point, as the clothing at issue is not complicated to don, doff or wash as, contrary to plaintiffs' suggestion, Equity's witnesses made clear.  As the Fresh Plant Manager testified:

> "After I got my supplies as I was going to
> the production floor, I'd put on my hair net,
> beard net, ear plugs, have my boots on, go
> through the foot sanitizers, continue on in,
> put my smock on, and wash my hands, and head
> to the line."  [Supp.App., Tab 82 (Stevens
> Dep.) at 89:20-90:2.]

He later testified:

> "Q.  Do you know how long it takes employees
> to put on the equipment and sanitize at the
> beginning of a shift?
>
> "A.  It don't take that long to do it.  It
> don't take me long to go in, get dressed and
> go in."  [Supp.App., Tab 82 (Stevens Dep.) at
> 126:21-127:3.]

Stevens concluded:

> "Q.  With regards to the donning and doffing
> or putting on at the beginning of the shift
> and sanitizing and the taking off and
> cleaning up, either during breaks or at the
> end of the day, does that differ any from
> department to department?
>
> *   *   *
>
> "Q.  In the production lines.
>
> "A.  On the deboning line, generally,
> everybody does things virtually the same as
> far as the way they put on and take off their
> clothing.  Evisceration should be the same as
> well.
>
> "When I go in, I put mine on the same way all
> the time, and it takes me about thirty
> seconds, forty seconds, it's on and I'm in
> the plant, my hands are washed, and I'm on
> the line." [Supp.App., Tab 82 Stevens Dep.)
> at 169:17-170:12 (emphasis added).]

Likewise, Mills, the Complex Operations Manager, testified:

> "Q.  Do you know how they arrived at three
> minutes?
>
> "A.  I get dressed and go out in the plant,
> and it don't take me three minutes.
>
> "Q.  What do you put on?
>
> "A.  Smock, hair net, beard net, earplugs,
> boots." [Supp.App., Tab 80 (Mills Dep.) at
> 149:19-150:1.][19]

There is no doubt that some plaintiffs testified that they

took up to 15 minutes to don or doff the limited clothing

required to be put on at the plant and worn in production (hair

net, beard net, smock, ear plugs, apron, gloves).  [See

Supp.App., Tab 80 (Mills Dep.) at 44:1-19.]  However, when broken

down by individual item of clothing, their "estimate," untimed at

_____

[19]As employees may wear their boots from home and are not
required to don or doff them before or after their shift or
breaks, their time would even be less.

best, dissembled, as exemplified by employees C. Young and
Shabazz who, as pointed out in Part C.4 of the ARGUMENT in
Equity's principal brief, necessarily admitted that it took only
seconds to don and doff each individual item of clothing.
Seconds for each do not add up to 10-15 minutes for all, and
explains why even the Ninth Circuit in Alvarez v. IBP, Inc., 339
F.3d 894, 904 (9th Cir. 2003), concluded that donning and doffing
similar "non-unique" protective gear, there including hard hats
and goggles, was legally de minimis and not compensable. See
also Reich v. IBP, Inc., 38 F.3d 1123 (10th Cir. 1994); Anderson
v. Pilgrim's Pride, supra, at 564 (citing Lindow v. United
States, 738 F.2d 1057 (9th Cir. 1984), Court found virtually
identical activities to be de minimis as a matter of law).
Despite plaintiffs' current suggestion, and unlike Davis,
employees and Equity agree that the time involved, by piece of
clothing, takes "seconds" and plaintiffs' uneducated, untimed and
mathematically incorrect conclusions need not be accepted and do
not create a genuine issue of fact or anything other than, at
best, severe puffing.  That conclusion is well supported
factually on this record and legally and properly compels summary
judgment.

     Nor does Equity ignore the standards established in Lindow
v. United States, supra, which did not prevent judgment for the
employer in Alvarez or Pilgrim's Pride, as noted above.[20]  It is

_____

     [20]Mills did not state the there had been any determination
that Equity could record the time involved in donning, doffing or
washing, but merely that he was not involved in the decision
"that it's administratively too difficult or impractical to keep
up with the amount of time employees typically take to don, doff,
or sanitize their protective gear or equipment."  [Supp.App., Tab
                                                   (continued...)

because such activity takes "seconds" that recording the time spent doing so is administratively difficult if not impossible, which was the conclusion negotiated by the Union and Equity. Plaintiffs' hourly rate was negotiated by the parties knowing full well the requirements of the contract, plaintiffs' self-serving Affidavits notwithstanding.  As Mills noted:

> "Q.  Do you know who made the decision not to pay employees for donning, doffing, or sanitizing activities before their production line begins?
>
> *    *    *
>
> "A.  We're just following the union contract. Everything was negotiated in the union contract, and that's what we go by.
>
> "Q.  But do you know who made the decision that the company would not pay for donning, doffing, or sanitizing time that occurs before the production line commences?
>
> *    *    *
>
> "A.  No.  We were just following the union contract.
>
> "Q.  So then it wasn't your decision, obviously, correct?
>
> "A.  No.  We just follow in the union contract what we negotiated with the union." [Supp.App., Tab 80 (Mills Dep.) at 117:17-118:13.]

This becomes especially true with almost 1,300 total employees who would need to record "seconds" of time as they enter the production floor, causing needless lines and delay even if it were possible (which plaintiffs no doubt would also challenge).

---

[20](...continued)
80 (Mills Dep.) at 148:4-8.]  And, no one testified that Equity's "computerized timekeeping system tracks employees' time down to a minute <u>or less</u>...."  [Plaintiffs' Brief at 68-69.]  Plaintiffs' contrary statement is false and unsupported by the record.

[Supp.App., Tab 82 (Stevens Dep.) at 31:4-10.]

Moreover, once the "hours worked" are eliminated by Section 3(o), the de minimis rule compels summary judgment on all remaining claims, even if only the donning, doffing and washing at the beginning and end of the actual workday (and not at the beginning and end of each work activity which constitutes the workday) is excluded.

> **G.    The Supreme Court's Decision In IBP, Inc. v. Alvarez Is Not Applicable To Equity's Motion For Summary Judgment.**

Plaintiffs purport to construe the Supreme Court's decision in IBP, Inc. v. Alvarez, supra, as some sort of great divide which altered the entire legal landscape of donning and doffing litigation. [See Plaintiffs' Brief at 56-59.] In fact, the Supreme Court did not address the application of Section 3(o), proscribe "line time" arrangements in the poultry industry nor declare that donning and doffing all clothing are principal activities and compensable under the FLSA. Rather, IBP held that time spent walking to the production floor after donning unique protective gear, and the time spent walking from the production floor to doff unique protective gear is compensable when the donning time or doffing time is otherwise compensable. The issue of compensability of donning and doffing time was not before the Court in IBP. See Anderson v. Cagle's, Inc., supra, 488 F.3d at 955, n.12 ("The named CFJV plaintiffs devote a great deal of attention to the Supreme Court's opinion affirming the Ninth Circuit in Alvarez. The Supreme Court's opinion in Alvarez did not discuss issues relevant to this appeal, however. The Court limited certiorari review to the question '[w]hether walking that occurs between compensable clothes-changing time and the time

employees arrive at or depart from their actual work stations constitutes non-compensable "walking . . . to and from the actual place of performance of the principal activity" within the meaning of Section 4(a)' of the Portal-to-Portal Act of 1947, 29 U.S.C. § 254(a) (2000). Petition for Writ of Certiorari, _Alvarez_, 546 U.S. 21, 126 S.Ct. 514, 163 L.Ed.2d 288 (No. 03-1238); _see also Alvarez_, 543 U.S. 1144, 125 S.Ct. 1292, 161 L. Ed.2d 104 (2005) (granting certiorari review). Thus, the Court did not address the application of § 203(o). See _generally Alvarez_, 546 U.S. 21, 126 S.Ct. 514, 163 L.Ed.2d 288.").

## CONCLUSION

In all respects, the determination of the claims raised by these plaintiffs is controlled by Section 3(o) and the Eleventh Circuit's decision in _Anderson v. Cagle's Inc._, _supra_, and related case law. Alternatively, any remaining time involved is preliminary or postliminary or legally _de minimis_. For these reasons, as well as those set forth in Equity's principal brief, summary judgment should be granted in favor of Equity and against plaintiffs.

/s/Howard A. Rosenthal
Howard A. Rosenthal
Gary D. Fry
Malcolm S. Gould
  Attorneys for Equity Group
  Eufaula Division, LLC

**OF COUNSEL**:
Pelino & Lentz, P.C.
Thirty-Second Floor
1650 Market Street
Philadelphia, PA  19103-7393
(215) 665-1540

Joel P. Smith, Jr., Esquire
Williams, Pothoff, Williams
  & Smith, LLC
125 South Orange Avenue
Eufaula, Alabama  36027-1626
(334) 687-5834

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA – NORTHERN DIVISION**

```
BETTY ANN BURKS, et al.,        :
                                :
            Plaintiffs,         :
                                :
        v.                      :    No. 2:06-CV-1081-MEF
                                :
EQUITY GROUP EUFAULA            :
DIVISION LLC,                   :
                                :
            Defendant.          :
```

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned counsel for Equity Group Eufaula Division LLC certifies that a true and correct copy of the Reply Memorandum of Law in Support of Motion for Summary Judgment was filed and served electronically with the Clerk of Court and also was served by depositing true and correct copies in the United States Mail, first class postage prepaid, on June 24, 2008, and addressed as follows:

>       Robert J. Camp, Esquire
>       The Cochran Firm
>       505 North 20th Street
>       Suite 825
>       Birmingham, AL  35203
>       rcamp@cochranfirm.com
>
>       M. John Steensland, III, Esquire
>       Parkman, Adams & White
>       739 West Main Street
>       Dothan, AL  36301
>       parkman@graceba.net, jjsteensland@yahoo.com
>
>       Richard Martin Adams, Esquire
>       Parkman, Adams & White
>       505 North 20th Street
>       Suite 825
>       Birmingham, AL  35203
>       parkman@graceba.net
>
>       Samuel A. Cherry, Jr. Esquire
>       Cochran, Cherry, Givens, Smith, Lane
>         & Taylor, P.C.
>       163 West Main Street
>       Dothan, AL  36301
>       scherry@cochranfirm.com, samcherry@cochranfirm.com
>
>       Joseph David Lane, Esquire
>       Cochran, Cherry, Givens, Smith, Lane
>         & Taylor, P.C.
>       163 West Main Street
>       Dothan, AL  36301
>       jlane@cochranfirm.com, jdavidlane@aol.com

Robert Lee Wiggins, Jr., Esquire
Wiggins Childs Quinn & Pantanis, P.C.
301 North 19th Street
Birmingham, AL  35203-3204
rwiggins@wcqp.com

Attorneys for Plaintiffs

/s/Howard A. Rosenthal
Howard A. Rosenthal
Gary D. Fry
Malcolm S. Gould
  Attorneys for Equity Group
  Eufaula Division, LLC

**OF COUNSEL**:
Pelino & Lentz, P.C.
One Liberty Place
Thirty-Second Floor
1650 Market Street
Philadelphia, PA  19103
(215)665-1540

Joel P. Smith, Jr., Esquire
Williams, Pothoff, Williams
  & Smith, LLC
125 South Orange Avenue
Eufaula, Alabama 36027-1626
(334)687-5834

**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION**

| | |
|---|---|
| **BETTY ANN BURKS, et al.** | : |
| | : |
| **Plaintiffs,** | : |
| | : No. 2:06-CV-1081-MEF |
| **v.** | : |
| | : |
| **EQUITY GROUP-EUFAULA** | : |
| **DIVISION, LLC,** | : |
| | : |
| **Defendant.** | : |

---

## SUPPLEMENTAL APPENDIX IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT.

---

Howard A. Rosenthal
Gary D. Fry
Malcolm S. Gould
  Attorneys for Defendant
  Equity Group-Eufaula
  Division, LLC

<u>OF COUNSEL</u>:
Pelino & Lentz, P.C.
One Liberty Place
Thirty-Second Floor
1650 Market Street
Philadelphia, PA 19103-7393
215-665-1540


Joel P. Smith, Jr., Esquire
Williams, Potthoff, Williams
   & Smith, LLC
125 South Orange Avenue
Eufaula, AL  36027
334-687-5834

# TABLE OF CONTENTS

**TAB**

Deposition transcript of Kathy Gilmore . . . . . . . . . . . 79

Deposition transcript of Greg Mills . . . . . . . . . . . . 80

Deposition transcript of Joe Preston . . . . . . . . . . . 81

Deposition transcript of Robin Stevens . . . . . . . . . . 82

# TAB 79

FREEDOM COURT REPORTING

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


CASE NUMBER:  2:06-CV-01081-MEF-DRB

BETTY ANN BURKS, ET AL.,

       Plaintiffs,

       vs.

EQUITY GROUP, EUFAULA DIVISION, L.L.C.,

       Defendant.


      S T I P U L A T I O N

       IT IS STIPULATED AND AGREED by and
between the parties through their respective
counsel, that the deposition of Kathy
Gilmore may be taken before Sara Mahler,
CCR, at the offices of Williams, Pothoff,
Williams & Smith, at 125 South Orange
Avenue, Eufaula, Alabama 36027, on the 12th
day of June, 2008.


      DEPOSITION OF KATHY GILMORE

Page 2

1       IT IS FURTHER STIPULATED AND
2  AGREED that the signature to and the reading
3  of the deposition by the witness is not
4  waived, the deposition to have the same
5  force and effect as if full compliance had
6  been had with all laws and rules of Court
7  relating to the taking of depositions.
8       IT IS FURTHER STIPULATED AND
9  AGREED that it shall not be necessary for
10  any objections to be made by counsel to any
11  questions except as to form or leading
12  questions, and that counsel for the parties
13  may make objections and assign grounds at
14  the time of the trial, or at the time said
15  deposition is offered in evidence, or prior
16  thereto.
17       IT IS FURTHER STIPULATED AND
18  AGREED that the notice of filing of the
19  deposition by the Commissioner is waived.
20
21       * * * * * * * * * * * * *
22
23

Page 3

1       * * * * * * * * * * * * *
2            I N D E X
3            EXAMINATION
4                PAGE
5  By Ms. McGowan ...................... 6
6
7  (There Were No Exhibits Marked)
8
9
10
11       * * * * * * * * * * * * *
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1    IN THE UNITED STATES DISTRICT COURT
2     FOR THE MIDDLE DISTRICT OF ALABAMA
3          MONTGOMERY DIVISION
4
5  CASE NUMBER: 2:06-CV-01081-MEF-DRB
6
7  BETTY ANN BURKS, ET AL.,
8       Plaintiffs,
9       vs.
10  EQUITY GROUP EUFAULA DIVISION, L.L.C.,
11       Defendant.
12
13  BEFORE:
14       SARA MAHLER, Commissioner.
15
16  APPEARANCES:
17       CANDIS A. MCGOWAN, ESQUIRE, of
18  WIGGINS, CHILDS, QUINN & PANTAZIS, 301
19  Nineteenth Street North, Birmingham, Alabama
20  35203, appearing on behalf of the
21  Plaintiffs.
22
23

Page 5

1  APPEARANCES: (Cont.)
2       JACOB A. KISER, ESQUIRE, of
3  WIGGINS, CHILDS, QUINN & PANTAZIS, 301
4  Nineteenth Street North, Birmingham, Alabama
5  35203, appearing on behalf of the
6  Plaintiffs.
7       ROBERT J. CAMP, ESQUIRE, of THE
8  COCHRAN FIRM, 505 North 20th Street, Suite
9  825, Birmingham, Alabama 35203, appearing on
10  behalf of the Plaintiffs.
11       HOWARD A. ROSENTHAL, ESQUIRE, of
12  PELINO & LENTZ, 1650 Market Street,
13  Thirty-Second Floor, Philadelphia,
14  Pennsylvania 19103, appearing on behalf of
15  the Defendant.
16
17       * * * * * *
18
19       I, SARA MAHLER, CCR, a Court
20  Reporter of Wetumpka, Alabama, acting as
21  Commissioner, certify that on this date, as
22  provided by the Federal Rules of Civil
23  Procedure and the foregoing stipulation of

FREEDOM COURT REPORTING

Page 6

1 counsel, there came before me at the offices
2 of Williams, Pothoff, Williams & Smith, 125
3 South Orange Avenue, Eufaula, Alabama 36027,
4 beginning at 1:30 p.m., Kathy Gilmore,
5 witness in the above cause, for oral
6 examination, whereupon the following
7 proceedings were had:
8     KATHY GILMORE,
9 being first duly sworn, was examined and
10 testified as follows:
11     COURT REPORTER:  Usual
12 stipulations?
13     MS. MCGOWAN: Yes.
14     MR. ROSENTHAL:  With reserving
15 reading and signing.
16     EXAMINATION
17 BY MS. MCGOWAN:
18     Q.    Would you state your name for
19 the Record, please.
20     A.    Kathy Gilmore.
21     Q.    Ms. Gilmore, my name is Candis
22 McGowan, and I'm going to be taking your
23 deposition today and asking you a series of

Page 7

1 questions.
2     Have you ever had your
3 deposition taken before?
4     A.    Yes, ma'am.
5     Q.    So you understand that you
6 need to give a verbal response to all the
7 questions?
8     A.    Yes, ma'am.
9     Q.    And we have the agreement that
10 if at any point you do not understand my
11 question, you will ask me to repeat or
12 rephrase the question?
13     A.    Yes, ma'am.
14     Q.    Can we have the agreement that
15 if you don't hear me, you will ask me to
16 repeat or rephrase the question?
17     A.    Yes, ma'am.
18     Q.    Can we further have the
19 agreement that if you don't ask me to repeat
20 or rephrase the question, you've heard it,
21 you understand it, and you're giving me the
22 best possible answer to that question?
23     A.    Yes, ma'am.

Page 8

1     Q.    What did you do to prepare for
2 this deposition?
3     A.    Prepare for the deposition?
4     Q.    Yes.
5     A.    I don't understand.
6     Q.    Did you do anything to prepare
7 for this deposition testimony?
8     A.    I met with Howard.
9     Q.    Did you review any documents?
10     A.    Yes, ma'am.
11     Q.    What did you review?
12     A.    The orientation manual.
13     Q.    Let me show you what was
14 previously marked as Exhibit 18.  Is that
15 the orientation manual or was it -- There's
16 also an earlier version, I think, that's in
17 here.
18     MR. ROSENTHAL:  That would be
19 P-9, the earlier version first.
20     Q.    Plaintiff's Exhibit 9 is the
21 earlier version.  Which one did you review?
22     A.    I scanned both of them.
23     Q.    What is your responsibility

Page 9

1 with regards to the orientation manual?
2     A.    None.
3     Q.    Who prepares the orientation
4 manual?
5     A.    Employment manager.
6     Q.    Who is the employment manager?
7     A.    Laconya Hawkins.
8     MR. KISER:  Who is that?
9     Q.    Spell her name, please.
10     A.    L-A-C-O-N-Y-A H-A-W-K-I-N-S
11     Q.    And her job is the employment?
12     A.    Employment manager.
13     Q.    Does she report to you?
14     A.    No, ma'am.
15     Q.    To whom does she report?
16     A.    Jim Bice.
17     Q.    Any other documents that you
18 reviewed to prepare other than exhibits --
19 is that 18?
20     A.    Yeah.
21     Q.    18 and Exhibit --
22     MR. ROSENTHAL:  9.
23     Q.    -- 9?

3 (Pages 6 to 9)

FREEDOM COURT REPORTING

Page 10

1        A.    No, ma'am.
2        Q.    You said you'd given a
3    deposition before.  In what kind of case?
4        A.    Actually, there was one, week
5    before last.
6        Q.    What kind of case?
7        A.    Wrongful termination.
8        Q.    Where was this deposition?
9        A.    Here in this office.
10       Q.    Do you recall the lawyer who
11   took your deposition?
12       A.    Jerry Roberson; Robertson or
13   Roberson.
14       Q.    Do you know where the case is
15   filed?
16       A.    No, ma'am.
17       Q.    Do you know where
18   Mr. Robertson's from?
19       A.    I think Birmingham.
20       Q.    When you say wrongful
21   termination, do you know under what statute
22   or theory the case is proceeding?  Is it a
23   discrimination case or breach of contract

Page 11

1    case?  Is it under the union contract?
2        A.    No, ma'am.
3        Q.    What's the employee's name?
4        A.    Ron Blocker.
5        Q.    What job did Ron Blocker have?
6        A.    Supervisor.
7        Q.    Of what?
8        A.    Maintenance, further
9    processing.
10       Q.    The further processing plant?
11       A.    Yes, ma'am.
12       Q.    Any other time you've given a
13   deposition?
14       A.    Yes, ma'am.
15       Q.    When?
16       A.    A few years back, I don't
17   recall the date.
18       Q.    What kind of case?
19       A.    Worker's comp.
20       Q.    And where did you give that
21   deposition?
22       A.    Here at this facility.
23       Q.    Any other depositions?

Page 12

1        A.    No, ma'am.
2        Q.    Do you recall the worker's
3    name?
4        A.    Henry Williams.
5        Q.    How was he injured?
6        A.    Slip in the plant.
7        Q.    What injury did he have?
8        A.    Leg injury.
9        Q.    Do you recall who his attorney
10   was that deposed you?
11       A.    No, I don't.
12       Q.    You told me about three
13   depositions.  Have you given any other
14   depositions that you can recall?
15       A.    No, ma'am.
16       Q.    You're employed by Equity
17   Group?
18       A.    Yes, ma'am.
19       Q.    Of Eufaula Division or just --
20   What is the name of your employer?
21       A.    Equity Group, Eufaula
22   Division.
23       Q.    What is your job title?

Page 13

1        A.    Assistant human resources
2    manager.
3        Q.    To whom do you report?
4        A.    Jim Bice.
5        Q.    And Mr. Bice's title again?
6        A.    Complex human resources
7    manager.
8        Q.    To whom does Mr. Bice report?
9        A.    We have a corporate HR
10   manager, Spence Jarnagin.
11       Q.    Spence, S-P-E-N-C-E?
12       A.    Right.  Jarnagin.
13       Q.    J-A-R --
14       A.    -- N-I-G-A-N.
15            MR. ROSENTHAL: N-A-G-I-N.
16       Q.    Just for the Record, where is
17   Mr. Jarnagin?
18       A.    He is in Huntsville.  He is
19   the corporate HR director.
20       Q.    Is it for the division or how
21   is it set out?
22       A.    Poultry division.
23       Q.    Do you know to whom he

4 (Pages 10 to 13)

FREEDOM COURT REPORTING

Page 14

1  reports, Mr. Jarnagin?
2      A.   I do not.
3      Q.   What is located in Huntsville?
4      A.   The poultry division corporate
5  office.
6      Q.   Let me have you look at what
7  was previously marked as 16.
8          MS. MCGOWAN:  Howard, do you
9  have yours?
10         MR. ROSENTHAL:  The
11  organizational chart?
12         MS. MCGOWAN:  Yes.
13         MR. ROSENTHAL:  Uh-huh.
14     Q.   Let me show you what we marked
15  yesterday as Exhibit 16 in a previous
16  deposition, and these are some updated
17  organizational charts that were produced to
18  us yesterday.
19         Would you please flip through
20  and see if you can find your organizational
21  chart.
22         MR. ROSENTHAL:  It's the very
23  last page.

Page 15

1      Q.   And they are not Bates
2  stamped, so I can't -- I don't know if they
3  have anything identifying on it.
4          Does it say human resource
5  organizational chart, 3/30/07 at the bottom?
6      A.   Yes, ma'am.
7      Q.   You are a direct report to
8  Mr. Bice?
9      A.   Yes, ma'am.
10     Q.   Are these other managers
11  listed on the same level as you, or do you
12  have any interaction with these other
13  managers?
14         MR. ROSENTHAL:  Objection to
15  the form of the question.  I think there are
16  two parts there.
17     Q.   Yeah.  Are all of you on the
18  second row considered on the same level of
19  the management team?
20     A.   All these people (indicating)?
21     Q.   Right.
22     A.   Yes.
23     Q.   Do you supervise anyone?

Page 16

1      A.   Yes.
2      Q.   Who do you supervise?
3      A.   I have J.B. Glass, security
4  manager.
5      Q.   Where is he?
6      A.   Right over here (indicating).
7      Q.   Okay.  But he's on the same
8  level as you?
9      A.   Yes.
10     Q.   But you supervise him?
11     A.   Yes.  His operations, security
12  operations, yes, ma'am.
13     Q.   Anyone else you supervise?
14     A.   No, ma'am.
15     Q.   Now, it looks like the medical
16  services manager, who is right next to you,
17  Jeanette Anglin, how do you say her last
18  name?
19     A.   Anglin.
20     Q.   She doesn't have a line up as
21  to reporting to Mr. Bice, does she?  Is that
22  just a mistake?
23     A.   I guess, yes, ma'am.  She

Page 17

1  reports to Jim Bice.
2      Q.   She does?
3      A.   Uh-huh.
4      Q.   Do you have any supervisory
5  role over Ms. Anglin?
6      A.   No, ma'am.
7      Q.   Other than Mr. Glass, do you
8  have any supervisory role, over anyone else
9  listed on this organizational chart?
10     A.   Julio Rojas.
11     Q.   That is who?
12     A.   Second shift HR manager.
13     Q.   That's two over from you?
14     A.   Yes, ma'am.
15     Q.   It says human resource
16  manager.  How do you know he's second shift?
17     A.   How do I know he's second
18  shift?
19     Q.   Uh-huh.
20     A.   He comes in after me.
21     Q.   What does he do?
22     A.   He manages the employee -- HR
23  manager functions on the second shift.

5 (Pages 14 to 17)

FREEDOM COURT REPORTING

Page 18

1      Q.    Okay.  Are you first shift HR
2  manager?
3      A.    Yes, ma'am.
4      Q.    Or do you have -- Is that your
5  job?
6      A.    Right.  I'm under Jim,
7  assistant human resource manager.
8      Q.    But you said he's second shift
9  HR manager.  Is there a first shift HR
10 manager?
11     A.    I guess you'd consider me.
12 Uh-huh.
13     Q.    Dante Rogers also says human
14 resource manager.  Who is that and what do
15 they do?
16     A.    He is the HR manager over our
17 employee/employment center.
18     Q.    Where's your employment
19 center?
20     A.    It's on-site.
21     Q.    So that would be the
22 employee/employment HR manager.  What do
23 they do?  What does your employment center

Page 19

1  do?
2      A.    That's where applications are
3  taken and, you know, people that come in to
4  put in applications and interviews are
5  conducted.
6      Q.    What do you do?  What are your
7  actual job duties and responsibilities?
8      A.    I do employee-relations type,
9  grievance processes and employee complaints.
10     Q.    Anything else?
11     A.    Just employee-relation type
12 functions.
13     Q.    Who handles orientation for
14 employees?
15     A.    Okay.  Who actually does
16 orientation?
17     Q.    In HR, is there a manager in
18 charge of orientation?
19     A.    Laconya Hawkins.
20     Q.    Okay.  She's employment
21 manager.  Who under -- And is she over the
22 person that actually does the orientation or
23 does she do it herself?

Page 20

1      A.    She's over the one that does
2  orientation.
3      Q.    Who does orientation?
4      A.    Theresa Laster.
5      Q.    Who is Lisa Ledbetter?
6      A.    She works in the employment
7  center.
8      Q.    Under Mr. Rogers?
9      A.    Dante, yes, ma'am.
10     Q.    Does Ms. Ledbetter do anything
11 with orientation?
12     A.    No, ma'am.
13     Q.    Who trains employees on the
14 GMPs?
15           Let me back up.  Do you know
16 what a GMP is?
17     A.    Yes, I do.
18     Q.    Okay.  What is a GMP?
19     A.    They are rules that people
20 follow in the plant.  They're practices.
21     Q.    Good manufacturing practices?
22     A.    Yes, ma'am.
23     Q.    Okay.  Do you have any

Page 21

1  involvement with GMPs?
2      A.    No, ma'am.
3      Q.    Do you help write or establish
4  GMPs?
5      A.    No, ma'am.
6      Q.    Do you know who does develop
7  GMPs?
8      A.    That would be the QA and HACCP
9  managers.
10     Q.    Do you have any involvement
11 with the QA and HACCP managers?
12     A.    No, ma'am.
13     Q.    Do you know who is responsible
14 for training new employees on the GMPs?
15     A.    I know that during orientation
16 we have a manager that comes in there and
17 explains the GMPs, those kind of rules to
18 employees.
19     Q.    Who is that manager?
20     A.    Tom -- Excuse me, Roy
21 Williams.
22     Q.    Roy?
23     A.    Williams.

6 (Pages 18 to 21)

FREEDOM COURT REPORTING

Page 22

1    Q.    What is Mr. Williams' title?
2    A.    He's the manager -- one of the
3  managers over QA and HACCP.
4    Q.    Okay.  Have you ever sat
5  through an orientation?
6    A.    Not entirely, no, ma'am.
7    Q.    What parts have you sat
8  through?
9    A.    Usually I sit through the
10  union part.
11    Q.    Why do you sit through the
12  union part?
13    A.    So that when the union steward
14  does their presentation explaining the union
15  functions, I sit in that part.
16    Q.    But why?
17    A.    I was instructed to.
18    Q.    Who told you to?
19    A.    Jim Bice.
20    Q.    Who's the union steward that
21  does their part?
22    A.    We have several.
23    Q.    So it could be any of them?

Page 23

1    A.    Yes, ma'am.
2    Q.    How often do you have employee
3  orientation?
4    A.    Sometimes twice a week.  Here
5  lately, once a week.
6    Q.    Why has it changed?
7    A.    We haven't had to employ as
8  many people.
9    Q.    Any reason why?
10    A.    Adequately staffed.
11    Q.    How many employees do you
12  have?
13    A.    Approximately -- In the plant?
14    Q.    Yes.
15    A.    Company -- Equity Group,
16  Eufaula wide, about sixteen hundred.
17    Q.    That includes the further
18  processing plant and the fresh plant?
19    A.    Yes, ma'am.
20    Q.    Do you have anything to do
21  with the further processing plant?
22    A.    Just handling employee issues
23  over there.

Page 24

1    Q.    You're HR manager for both
2  plants?
3    A.    Yes, ma'am.
4    Q.    Does the collective bargaining
5  agreement for the union apply to the further
6  processing plant?
7    A.    Yes, ma'am.
8    Q.    It applies to all sixteen
9  hundred employees?
10    A.    No, ma'am.
11    Q.    Just the bargaining unit in
12  the -- both plants?
13    A.    Do what now?
14    Q.    Let me back that up.
15    Does the collective bargaining
16  agreement apply to all bargaining unit
17  employees in both plants?
18    A.    Yes.
19    Q.    And when I say both plants,
20  there's been some testimony that you have
21  the fresh plant and the further processing
22  plant all under the Equity Group complex; is
23  that correct -- your understanding?

Page 25

1    A.    Yes, ma'am.
2    Q.    Were you involved in any of
3  the contract negotiations?
4    A.    Yes, ma'am.
5    Q.    What was your involvement?
6    A.    I was a part of the group that
7  sat in on negotiations.
8    Q.    When you say you sat in on
9  negotiations, what did you do?
10    A.    I was, I guess, a part of the
11  discussions for the contract.
12    Q.    When you say part of the
13  discussions, was this in with the company
14  and union on both sides or discussions among
15  the company team?
16    Or what do you mean by part of
17  the discussions?
18    A.    I was on the company team for
19  the contract negotiations.
20    Q.    Explain how many times you've
21  been on the company team for contract
22  negotiations.
23    A.    Once.

7 (Pages 22 to 25)

FREEDOM COURT REPORTING

Page 26

1      Q.    When was that?
2      A.    This year, 2008.
3      Q.    So you don't know what
4   happened in prior union negotiations?
5      A.    No, ma'am.
6      Q.    How did the process work?
7      A.    We -- The -- We had a company
8   team, the union stewards and the union
9   proposed contract things back and forth.
10     Q.    Were all the proposals in
11  writing?
12     A.    No, ma'am.
13     Q.    Okay.  Did you speak during
14  the proposals?
15     A.    Yes, ma'am.
16     Q.    Okay.  Did you make any
17  proposals to the union, you personally?
18     A.    No, ma'am.
19     Q.    Who made the proposals to the
20  union on behalf of the company?
21     A.    I guess collectively as a
22  group.
23     Q.    When you say collectively as a

Page 27

1   group, what do you mean?
2      A.    Me and Greg Mills and Jim Bice
3   and the people that were on the company --
4      Q.    Tell me who was on the company
5   team.
6      A.    Myself, Jim Bice, Greg Mills,
7   Tim Esslinger, Howard.
8      Q.    Who was the spokesperson for
9   the group?
10     A.    Howard.
11     Q.    If a proposal was made by the
12  company verbally, who made it on behalf of
13  the company?
14     A.    Verbally to?
15     Q.    The union.
16     A.    Howard.
17     Q.    Were there any verbal
18  proposals made by the company to the union?
19     A.    Yes.
20     Q.    Do you recall those verbal
21  proposals?
22     A.    No, ma'am.
23     Q.    Do you recall any verbal

Page 28

1   proposal that was made to the company --
2   made from the company to the union?
3      A.    We talked about all kind of
4   proposals.  We talked about pay; we talked
5   about added let-off days; our holidays; we
6   talked about leave; we talked about FMLA.
7   We talked about numerous issues.
8      Q.    And when you say we talked,
9   were you in the room with the union team and
10  the company team and y'all were talking back
11  and forth?
12     A.    At times.
13     Q.    And that's what I'm focusing
14  on.  When y'all were in the room together,
15  both teams, do you recall what verbal
16  proposals were made by the company to the
17  union?
18     A.    You mean in addition to those?
19     Q.    Okay.  These were all done
20  when you were in the room together?
21     A.    Yes.
22     Q.    Okay.  Any additional
23  proposals you recall?

Page 29

1      A.    Yes.  We talked about shift
2   differential pay; we talked about the
3   donning and doffing issue; we talked about
4   the premium pays; walking union steward
5   issue.
6      Q.    The what?
7      A.    Walking union steward issue.
8      Q.    What is that?
9      A.    They proposed -- They wanted
10  to have a walking union steward employed.
11     Q.    Was that in writing?
12     A.    We just talked about it.
13     Q.    All right.  What was discussed
14  with the donning and doffing issue?  Who
15  raised it first?
16     A.    I'm not sure.
17     Q.    What do you recall being
18  discussed about donning and doffing?
19     A.    How much time to allow for
20  donning and doffing.
21     Q.    Did you make any comments in
22  these conversations?
23     A.    No, ma'am.

8 (Pages 26 to 29)

FREEDOM COURT REPORTING

Page 30

1     Q.     Did Greg Mills make any
2  comments?
3     A.     Yes.
4     Q.     What did Greg Mills say?
5     A.     Greg would propose certain
6  minutes.
7     Q.     Do you recall any minutes Greg
8  proposed?
9     A.     Three.
10    Q.     Okay.  Did he have a basis for
11 these three minutes?
12    A.     Well, we started -- I think
13 the union started at one end, they may have
14 said ten, and we'd say one; and then they'd
15 come back with nine and we'd -- So it was a
16 negotiation, and this is how it ended up.
17    Q.     Was this everybody in the same
18 room when these were being proposed, these
19 minutes, or did y'all leave and they would
20 leave and you would come back?
21    A.     Both, yes.
22    Q.     Were there any written
23 proposals on the donning and doffing issue?

Page 31

1     A.     Not to my knowledge.
2     Q.     Did the union make a written
3  proposal to the company --
4     A.     Not to my knowledge.
5     Q.     -- on any issue?
6     A.     Not to my knowledge.
7     Q.     Was there any basis for
8  determining the number of minutes on the
9  donning and doffing issue?  Was there any
10 discussion about time studies or any
11 documents to support any of these minutes or
12 proposals?
13    A.     Not to my knowledge, no,
14 ma'am.
15    Q.     Was there any discussion among
16 the negotiating team about -- from either
17 side, we timed it, and it takes this amount
18 of time to do this?
19    A.     No.
20    Q.     Did the union tell you how
21 they came up with their ten minutes?
22    A.     No.
23    Q.     Who was speaking on behalf of

Page 32

1  the union?
2     A.     Jerry Foster and Henry
3  Jenkins.
4     Q.     Were there any sidebar
5  negotiations between the union and Howard
6  where the rest of the team were not present?
7     A.     They would step out every now
8  and again.
9     Q.     Okay.  Who is they?
10    A.     Howard and Tim Esslinger and
11 Henry and Jerry.
12    Q.     Were there any of these such
13 sidebar meetings between Howard and Tim and
14 Jenkins and Foster regarding the donning and
15 doffing issue?
16    A.     Not to my knowledge.
17    Q.     Were all discussions on the
18 donning and doffing issue done at the table?
19    A.     As far as I know.
20    Q.     Other than Greg Mills, did
21 anyone else speak up when the donning and
22 doffing issue was discussed, on behalf of
23 the company?

Page 33

1     A.     Not that I recall.
2     Q.     Was Greg Mills the one
3  actually making the verbal proposals on the
4  donning and doffing to the union?
5     A.     No.
6     Q.     Who made those verbal
7  proposals?
8     A.     Howard.
9     Q.     Were Greg Mills' verbal
10 proposals on the minutes when the management
11 team was just talking?
12    A.     Do what now?
13    Q.     You said Greg Mills talked
14 about the minutes.  Were those conversations
15 when it was just the management negotiating
16 team -- company negotiation team or was that
17 when everybody was present?
18    A.     Company.
19    Q.     Other than Greg Mills, did
20 anyone else talk about donning and doffing
21 in the minutes, that you recall?
22    A.     I don't recall.
23    Q.     Do you remember, did Tim

9 (Pages 30 to 33)

FREEDOM COURT REPORTING

Page 34

1  Esslinger say anything?
2      A.    Not that I remember.
3      Q.    Was there any discussion about
4  whether or not the company could pay for
5  donning and doffing?
6      A.    Not just the donning and
7  doffing.  We met -- We discussed a lot of
8  the benefits, the pay, the economic impact
9  of the company.
10      Q.    Do you recall what was
11  discussed with regards to the economic
12  benefit for paying for donning and doffing?
13      A.    No.
14      Q.    Did you make any notes during
15  these meetings?
16      A.    No.
17      Q.    Was anybody making any notes,
18  to your knowledge on the donning and doffing
19  issue?
20      A.    No, ma'am.  Not to my
21  knowledge.
22      Q.    Who made the -- had the
23  ultimate decision-making authority on

Page 35

1  whether the company would pay any minutes
2  for donning and doffing?
3      A.    Do what now, I'm sorry?
4      Q.    Who had the ultimate
5  decision-making authority on whether or not
6  the company would pay for any minutes for
7  donning and doffing?
8      A.    Tim, being the general
9  manager, would have the ultimate decision on
10  any of the proposals.
11      Q.    Did he have to receive
12  permission from anybody else?
13      A.    I don't know.
14      Q.    Did he have to stop and call
15  anyone to get permission, to your knowledge?
16      A.    Not to my knowledge.
17      Q.    The decision to pay for
18  donning and doffing, was that made in one
19  session or more than one session?
20      A.    More than one.
21      Q.    How many?
22      A.    I don't recall how many.
23      Q.    Do you know how many sessions

Page 36

1  were in the whole bargaining process?
2      A.    We met for two, two and a half
3  days, so there were quite a few.
4      Q.    So the whole contract was
5  negotiated in a two-and-a-half-day period?
6      A.    Yes.  Approximately, yes,
7  ma'am.
8      Q.    Was there any discussion when
9  you were meeting for this contract proposal,
10  was there any discussion whether or not the
11  donning and doffing issue had been raised in
12  prior negotiations?
13      A.    No, ma'am, not to my
14  knowledge.
15      Q.    Who first raised it, the
16  donning and doffing issue?
17      A.    I don't know.
18      Q.    Do you know whether the union
19  raised it first or the company?
20      A.    I do not.
21      Q.    Okay.  Do you recall anybody
22  saying we've talked about this in prior?
23      A.    No.

Page 37

1      Q.    Do you know whether it's been
2  discussed in prior issues?
3      A.    No, ma'am.
4      Q.    Was there any discussion on
5  the donning and doffing issue by either --
6  when y'all were all together or if
7  separately of how it would affect this
8  lawsuit?
9      A.    No, ma'am.
10      Q.    Do you recall how many actual
11  proposals went back and forth before the
12  three minutes was decided?
13      A.    No, ma'am.
14      Q.    What was the three minutes to
15  cover?
16      A.    I don't know.
17      Q.    What is your understanding of
18  what donning and doffing means?
19      A.    Putting on a smock, boots,
20  hair net, beard net, arm guards.
21      Q.    Where did you obtain this
22  understanding?
23      A.    That's just my understanding.

10 (Pages 34 to 37)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660
42f217cb-4461-468a-bcd3-d6610bf1ec7d

FREEDOM COURT REPORTING

Page 38

1    Q.    Have you ever reviewed
2  anybody's deposition testimony regarding a
3  donning and doffing issue?
4    A.    No, ma'am.
5    Q.    Have you ever read Jackie
6  Davis' deposition testimony?
7    A.    No, ma'am.
8    Q.    Did you and Greg Mills read
9  Jackie Davis' testimony from a prior
10 lawsuit?
11   A.    Not that I recall.
12   Q.    Did you ever discuss Jackie
13 Davis' deposition testimony from a prior
14 lawsuit with Greg Mills?
15   A.    Not that I can recall.
16   Q.    Do you work regularly with
17 Greg Mills?
18   A.    What do you mean regularly?
19   Q.    Do y'all interact regularly,
20 your job functions and duties?
21   A.    We have total different --
22 totally different functions.  So if he's got
23 an issue with an employee, then I get

Page 39

1  involved.
2    Q.    Only when there's an issue
3  involved with employees?
4    A.    Yes, ma'am.
5    Q.    I guess what I'm trying to
6  find out, some HR department functions with
7  management, like other managers and plant
8  managers and different aspects, and I'm just
9  trying to see if yours and Mr. Mills' jobs
10 worked closely together every day or if it's
11 just on certain issues that you work closely
12 with him on a day-to-day basis.
13   A.    Just certain issues.
14   Q.    And that would be if it's a
15 benefit issue with an employee, such as
16 complaints or grievances and what else did
17 you say you're responsible like for?
18         Do you handle like health
19 insurance benefits and that or is that
20 someone else?
21   A.    That's someone else.
22   Q.    Yours is just mainly -- When
23 you say employee relations, is that just

Page 40

1  whether they have complaints or concerns
2  about their jobs or under the union
3  contract?
4    A.    Yes, ma'am.
5    Q.    Or grievances under the
6  contract?
7    A.    Yes, ma'am.
8    Q.    What is your responsibility
9  with regard to grievances?
10   A.    The initial complaints and the
11 decisions are made by me or someone else,
12 and I get to receive the grievances and
13 follow the process to make sure it's done
14 properly.
15   Q.    So all grievances come through
16 you or filed with you?
17   A.    Well, no.  They're done
18 according to the contract.  I think they go
19 to the first step, second step.  I am aware
20 usually that they are done.
21   Q.    How are you made aware?
22   A.    Union steward.  Chief union
23 steward Jackie Davis keeps me abreast of

Page 41

1  what's going on, and I make sure that it's
2  properly done in the timely manner.
3    Q.    How many union grievances have
4  you handled, that have gotten up to you?
5    A.    A few.
6    Q.    When you say a few --
7    A.    Over a year?  What are we
8  looking at?
9    Q.    Over the last year, how many
10 have you handled?
11   A.    Two.
12   Q.    And what were they about?
13   A.    I don't recall right now.
14   Q.    What step are you on in the
15 process?
16   A.    I am the last.
17   Q.    Do you have the ultimate
18 decision making on whether to resolve a
19 grievance?
20   A.    Me and Jim Bice.
21   Q.    When you said that you
22 supervise Mr. Glass, does he have any
23 employees under him that you also supervise?

11 (Pages 38 to 41)

Page 42

1    A.    He directly supervises the
2  security officers.
3    Q.    But you don't directly
4  supervise the security officers?
5    A.    No, ma'am, I don't.
6    Q.    And then Mr. Rojas --
7    A.    Rojas.
8    Q.    -- does he have any employees
9  directly under him?
10    A.    No, ma'am.
11    Q.    And so the only two employees
12  you directly supervise are Mr. Glass and
13  Mr. Rojas?
14    A.    Yes.
15    Q.    Were you aware that Jackie
16  Davis brought a prior lawsuit against the
17  company to pay for donning and doffing?
18    A.    Yes.
19    Q.    How did you know about that?
20    A.    I was employed at CP.
21    Q.    In what job?
22    A.    Assistant HR manager.
23    Q.    Have you ever -- Were you

Page 43

1  aware she gave a deposition in that case?
2    A.    Yes.
3    Q.    Have you ever reviewed her
4  deposition testimony from that case?
5    A.    Not that I can recall.
6    Q.    Have you ever reviewed any
7  testimony or statement that Jackie Davis
8  gave in that case?
9    A.    Not that I can recall.
10    Q.    Have you ever reviewed any
11  documents relating to that case that Jackie
12  Davis brought?
13    A.    No, ma'am.  Not that I can
14  recall.
15    Q.    Other than being on the
16  negotiating team, did you have any other
17  involvement with the union contract that was
18  negotiated, the last one -- this year, that
19  was negotiated this year?
20    A.    What I'm sorry, did I --
21    Q.    Other than being a member of
22  the negotiating team, did you have any other
23  involvement with the union contract?

Page 44

1    A.    No, ma'am.
2    Q.    Did you have any ultimate
3  decision-making ability on provisions for
4  this contract that went into effect March
5  1st, 2008?
6    A.    Was I the ultimate?
7    Q.    Or any -- Did you have the
8  authority to make a decision on any
9  provision of it?
10    A.    No, ma'am.
11    Q.    Would your role in the union
12  negotiations just be to provide information
13  to the management team?
14    A.    I'm not sure.
15    Q.    Did -- Let me back that up.
16  As part of the management team, when a
17  proposal was made by the union, did y'all go
18  back and vote on whether it should be
19  accepted or did you just discuss it and
20  someone else make the decision whether a
21  proposal would be accepted?
22    A.    We all discussed it and came
23  to a general consensus.

Page 45

1    Q.    What was your position on the
2  proposal for donning and doffing, if you had
3  one?
4    A.    I don't -- That's not my area
5  of expertise.
6    Q.    What is your area of
7  expertise?
8    A.    Personnel issues.
9    Q.    Who's responsible for making
10  sure the company complies with the Fair
11  Labor Standards Act and overtime
12  requirements?
13    A.    Who's ultimate responsibility
14  is -- excuse me?
15    Q.    Whose responsibility in HR --
16  Or whose responsibility for Equity Foods,
17  who's responsible to make sure they comply
18  with the federal government's wage and hour
19  laws?
20    A.    I don't know who ultimately is
21  the --
22    Q.    Do you have any involvement in
23  deciding how employees will be paid?

12  (Pages 42 to 45)

FREEDOM COURT REPORTING

Page 46

1    A.    No, ma'am.
2    Q.    Or setting work schedules?
3    A.    No, ma'am.
4    Q.    Who makes that decision on how
5  employees will be paid?
6    A.    I don't know.
7    Q.    Do you have any involvement
8  with the payroll department?
9    A.    If issues should arise between
10 employees and payroll, then I would get
11 involved, yes.
12    Q.    What kind of issues can you
13 recall arising where you've been involved?
14    A.    If an employee comes and tells
15 me that they didn't have enough hours on
16 their pay for last week, then I would
17 contact payroll and resolve the issue with
18 them.
19    Q.    Do you edit time sheets or
20 review time sheets?
21    A.    I have, yes.
22    Q.    Okay.  What kind have you
23 edited or reviewed, when you say you have

Page 47

1  done it?  Is that for hourly workers or for
2  people under your control?
3    A.    Hourly workers; I have interns
4  this summer, I edit their time if need be.
5    Q.    When would you edit hourly
6  worker's times records?
7    A.    You mean my interns?
8    Q.    No, I mean you -- Let's focus
9  on production workers, I'm sorry.
10 Bargaining unit workers.
11    A.    I do not edit their times.
12    Q.    Who does that?
13    A.    Supervisors.
14    Q.    Who's responsible for running
15 payroll and paying employees?
16    A.    Payroll department.
17    Q.    Who's over payroll department?
18    A.    Joe Preston.
19    Q.    Do you know why the company
20 has GMPs?
21    A.    To maintain the product has
22 gone out good without contamination and that
23 kind of thing.

Page 48

1    Q.    Are you aware of what the USDA
2  requirements are for the product?
3    A.    No, ma'am.
4    Q.    Are you aware of what USDA
5  requires with regards to how the product's
6  handled?
7    A.    No, ma'am.
8    Q.    Are you aware of what
9  production workers/employees are required to
10 wear when they go on the production floor?
11    A.    I do know they have to wear a
12 smock.
13    Q.    Okay.  Anything else you need?
14    A.    Hair net.
15    Q.    Anything else?
16    A.    The ear plugs, beard net, and
17 boots.
18    Q.    Do you know whether they have
19 to wear gloves if they handle the product?
20    A.    I'm not sure.
21    Q.    How are you aware of what of
22 these other items that the employees have to
23 wear?

Page 49

1    A.    When I go into the plant, I
2  wear that.  And I do wear gloves because of
3  my finger nails.  I'm always told that I
4  have to, so they won't get into the product.
5  But now I don't know who's required to wear
6  what.
7    Q.    Who tells you you have to wear
8  that?
9    A.    I've just done it for years.
10    Q.    Do you have to wash your hands
11 when you walk in the plant or wash the
12 gloves?
13    A.    No, ma'am.
14    Q.    Do you know if employees have
15 to?
16    A.    I don't know.
17    Q.    Why would you be going in the
18 plant?
19    A.    I just go in there sometimes
20 to look around, make my presence known, talk
21 to employees, just as a PR type.
22    Q.    Have any employees complained
23 to you about not getting paid for the time

13 (Pages 46 to 49)

FREEDOM COURT REPORTING

Page 50

1  that they're losing in their breaks or when
2  they have to take off this equipment, wash
3  it and put it back on?
4        MR. ROSENTHAL: Objection to
5  the form of the question. You can answer.
6        A.    Do what now? Say it again.
7        Q.    Have any employees complained
8  to you about not getting all their break
9  time?
10       A.    Yes.
11       Q.    What have they told you?
12       A.    That they don't have enough
13 time to go to the bathroom and eat and do
14 stuff they have to do. Nothing specific,
15 but just fuss about they don't think they
16 get enough time to do what they need to do.
17       Q.    Have any of them complained to
18 you're not getting their full thirty
19 minutes for unpaid break?
20       A.    No.
21       Q.    Have any of them complained to
22 you that by the time they finish their work
23 on the line, take off their items, and go to

Page 51

1  break that they're losing some of their
2  time?
3        A.    No.
4        Q.    Any of them complain to you
5  that by the time they put their stuff back
6  on and sanitize and get back on the line
7  that they've lost some of their break time?
8        A.    Not to me, no.
9        Q.    Are they complaining that they
10 need more than thirty minutes for a break?
11       A.    The complaints to me are if
12 they have to come out and see me, or they
13 don't have enough time to go to the rest
14 room and eat and warm their food and do
15 everything they need to. Those are the kind
16 of complaints that come to me.
17       Q.    That's if they have to go see
18 you?
19       A.    Right.
20       Q.    Where are you located?
21       A.    I'm located between the two
22 plants.
23       Q.    Have any of them complained to

Page 52

1  you they're not getting their full thirty
2  minutes because they're having to take off
3  these items that are required when they're
4  on the floor, and then have to put them back
5  on and sanitize before they can go back to
6  the line?
7        A.    Not to me.
8        Q.    Are you aware that employees
9  cannot wear their hair nets into the rest
10 room?
11       A.    Yes, ma'am.
12       Q.    Are you aware they can't wear
13 their smock into the rest room?
14       A.    Yes, ma'am.
15       Q.    Do any of them complain about
16 that takes time out of their break, having
17 to take off the hair net and the smock?
18       A.    Not to me.
19       Q.    Are you aware that employees
20 are rotated during the day on the line?
21       A.    To different positions, yes,
22 ma'am.
23       Q.    How are you made aware of

Page 53

1  that?
2        A.    That's an ergonomic issue that
3  we rotate the employees out. Employees may
4  come to me and tell me that they're not
5  being rotated properly and that kind of
6  thing, and that's when I get involved.
7  That's how I know about the rotations.
8        Q.    Are there rules as to when the
9  employees get rotated?
10       A.    There's certain rules as to
11 when they use scissors, when they use
12 knives, pulling tenders, that kind of thing.
13       Q.    What are the rules?
14       A.    I don't know them, myself.
15       Q.    Are they written rules?
16       A.    I'm not sure.
17       Q.    If an employee's complaining
18 to you about not being rotated properly,
19 what do you look at to see if they are?
20       A.    I contact the superintendent,
21 or supervisor, and say: Tell me what you've
22 got Ms. Smith doing.
23       Q.    I guess what I'm trying to

14 (Pages 50 to 53)

FREEDOM COURT REPORTING

Page 54

1  find out, how do you know what's the proper
2  way to rotate an employee?
3      A.   I do not.
4      Q.   Are there set guidelines as to
5  how they're supposed to be rotated?
6      A.   I'm not sure.
7      Q.   Who would know that?
8      A.   Supervisors, superintendents.
9      Q.   Is there a manner in which
10  employees are rotated, like you move down
11  the line to different jobs or do you move
12  out of department to department, or how does
13  the rotation process work?
14          MR. ROSENTHAL:  Object to the
15  form of the question.
16      Q.   You can answer.
17      A.   I guess the line -- at the
18  line they're on.
19      Q.   Okay.  What do you mean on the
20  line?  How does the process work on the
21  line?
22      A.   Debone line?
23      Q.   Uh-huh.

Page 55

1      A.   They have different jobs on
2  the line.  They cut wings, pull breasts, cut
3  tenders, I think, clip wings; there's just
4  different jobs on the line.
5      Q.   But how are they rotated among
6  those jobs?
7      A.   I don't know.
8      Q.   But if they have a problem
9  about how they're rotated, they come to you?
10      A.   Initially.
11      Q.   And why are employees rotated?
12      A.   Ergonomic issues.
13      Q.   Why, based on ergonomic
14  issues?
15      A.   Because, I mean, you let
16  somebody do something for so long in one
17  certain position, and we feel like it will
18  be harmful.
19      Q.   How would it be harmful?
20      A.   Injuries.
21      Q.   Is it to cut down on worker's
22  injuries?  Is that why employees are
23  rotated?

Page 56

1      A.   I'm assuming, yes.
2      Q.   Do you know how often they're
3  rotated?  Is it once a day, once a shift?
4      A.   I don't.
5      Q.   Is there any provision in the
6  union contract about how employees are
7  supposed to be rotated?
8      A.   No, ma'am.
9      Q.   Let's back up just a little
10  bit.  How long have you been employed at
11  this chicken plant location, whether or not
12  it was with Equity or with somebody else?
13      A.   March of 2001.
14      Q.   Who owned it when you first
15  went to work there?
16      A.   Charoen Pokphand.
17  C-H-A-R-O-E-N, P-O-K-P-H-A-N-D.
18      Q.   What was your first job, let's
19  call it CP, with CP?
20      A.   Assistant HR manager.
21      Q.   The same position you're in
22  now?
23      A.   Yes, ma'am.

Page 57

1      Q.   Have your job duties and
2  responsibilities changed any since you went
3  to work in March of 2001?
4      A.   No, ma'am.
5      Q.   Was there a union when you
6  went to work in March of 2001?
7      A.   Yes, ma'am.
8      Q.   Do you know when the union
9  first came into the plant?
10      A.   I don't.
11      Q.   Do you know how long the union
12  had been in the plant when you went to work
13  in March of 2001?
14      A.   No, I don't.
15      Q.   Where did you work prior to
16  working at CP?
17      A.   Beaulieu of America.  It's a
18  textile plant here in Eufaula.
19      Q.   What's the name of it?
20      A.   Beaulieu, B-E-A-U-L-I-E-U, of
21  America.
22      Q.   How long did you work for
23  Beaulieu of America?

15 (Pages 54 to 57)

42f217cb-4461-468a-bcd3-d6610bf1ec7d

FREEDOM COURT REPORTING

Page 58

1      A.    Five years.
2      Q.    That would have been '96 to
3  2001?
4      A.    Yes, ma'am.
5      Q.    What did you do for them?
6      A.    HR manager.
7      Q.    Where did you work prior to --
8  Let me back up.  Were you an HR manager the
9  entire time you were with them?
10      A.    Yes, ma'am.
11      Q.    Where did you work prior to
12  Beaulieu of America?
13      A.    Alabama Power.
14      Q.    What did do you with Alabama
15  Power?
16      A.    I was there fifteen years, I
17  progressed -- started out in the mail room,
18  worked the claims department, worked in
19  transportation, worked in -- my last was in
20  substation engineering -- I mean
21  transmission lines.
22      Q.    Where did you work for Alabama
23  Power?

Page 59

1      A.    Here in Eufaula.
2      Q.    Why did you leave Alabama
3  Power?
4      A.    I went to Beaulieu.
5      Q.    What was your last job at
6  Alabama Power?
7      A.    Transmission substations,
8  transmission line substation department.
9      Q.    What'd you do?
10      A.    I maintained recordkeeping and
11  substation crew information, transmission
12  line information around the Southeast
13  Division.
14      Q.    To whom did you report?
15      A.    Larry Branning.
16      Q.    What was his title?
17      A.    Transmission substation --
18  Transmission substation line manager.
19      Q.    Was he over the employees that
20  went out and worked on the substations and
21  transmission lines?
22      A.    We had substation foremen
23  under him.

Page 60

1      Q.    But you weren't responsible
2  for any of the guys that went out and
3  worked?
4      A.    Right.
5      Q.    You were just keeping
6  paperwork?
7      A.    Yes.
8      Q.    Did you supervise anyone?
9      A.    No, ma'am.
10      Q.    Did you work for anybody else
11  besides Alabama Power?
12      A.    No, ma'am.
13      Q.    Give me your educational
14  background.  What year did you graduate from
15  high school?
16      A.    '78.
17      Q.    From where?
18      A.    Apalachicola High School.
19      Q.    Outside of Apalachicola,
20  Florida?
21      A.    Yes, ma'am.
22      Q.    Then what did you do?
23      A.    Graduated from Troy State

Page 61

1  University in Troy in 1982.
2      Q.    What was your degree?
3      A.    Office management.
4      Q.    Then what'd you do?
5      A.    I went to work.
6      Q.    At Alabama Power?
7      A.    Yes, ma'am.
8      Q.    And you've worked in the
9  Eufaula area ever since?
10      A.    Yes, ma'am.
11      Q.    Are you aware of how
12  employee's time is recorded, the production
13  worker's time is recorded on a daily basis?
14      A.    They hit a time clock.
15      Q.    Do you know whether they're
16  paid based on their clock-in and clock-out?
17      A.    Certain positions are paid
18  clock-in/clock-out.
19      Q.    Do you know how the other
20  positions are paid?
21      A.    No, ma'am.
22      Q.    Do you know which positions
23  are paid by clock-in/clock-out?

16 (Pages 58 to 61)

FREEDOM COURT REPORTING

Page 62

1      A.    No, ma'am.
2      Q.    Do you know what the purpose
3 of the hair nets -- What the purpose is for
4 the employees wearing hair nets?
5      A.    So hair won't get in the
6 chicken.
7      Q.    Do you know what the purpose
8 of the smock is?
9      A.    Keep water and stuff off the
10 employee.
11     Q.    Okay.  Do you know whether it
12 has any other purpose?
13     A.    No, ma'am.
14     Q.    Can employees work in their
15 street clothes?
16     A.    No, ma'am.
17     Q.    Do you know why?
18     A.    No, ma'am.
19     Q.    Do you know why you have to
20 put on a smock when you go in the plant?
21     A.    To keep my clothes clean.
22     Q.    Any other reason?
23     A.    Not to my knowledge.

Page 63

1      Q.    Have you ever reviewed the
2 GMPs?
3      A.    I've looked at them.  I don't
4 know them, but I have scanned them, yes.
5      Q.    Do you know what the purpose
6 of the boots are for?
7      A.    So as to not slip.
8      Q.    All right.  Do you have to
9 wear boots when you go in?
10     A.    Yes, ma'am.
11     Q.    Do you know if there's any
12 other purpose?
13     A.    No, ma'am.
14     Q.    Have you ever heard of
15 anything called a Russian rule or a Russian
16 requirement?
17     A.    Years ago we had a -- we were
18 doing some product, I think for -- they
19 called it Russian product, and there was a
20 rule about the boots then.  But I don't
21 remember what that was.
22     Q.    Do you know why -- or have you
23 ever heard anything called a McDonald's

Page 64

1 rule?
2      A.    As regard to?
3      Q.    Employees, what's required
4 that they wear?
5      A.    No, ma'am.
6      Q.    Do you know what the purpose
7 for the aprons?  Do you know what the
8 purpose is for the aprons?
9      A.    No, ma'am.
10     Q.    Do you know what the purpose
11 is for an employee wearing a cutting glove?
12     A.    So as to not get cut when
13 they're cutting the chicken.
14     Q.    Do you know what the purpose
15 is for the ear plugs?
16     A.    Hearing protection.
17     Q.    Do you know if any of these
18 items are required by USDA?
19     A.    No, ma'am.
20     Q.    Do you know if the USDA
21 requires any items for an employee to wear
22 working in the chicken production process?
23     A.    I don't know that.

Page 65

1      Q.    Do you know whether there are
2 any documents that reflect the purpose for
3 the different items that production workers
4 must wear?
5      A.    Not that I've seen, no.
6      Q.    Do you know if there are any
7 documents that set out what employees must
8 wear on the production floor?
9      A.    No, I don't.
10     Q.    Do you know if there are any
11 documents that establish what employees must
12 sanitize before they can begin working?
13     A.    Do what now?
14     Q.    Do you know if there are any
15 documents that reflect what production
16 workers and employees must sanitize?
17     A.    No, ma'am.
18     Q.    Have you ever had an employee
19 complain to you that they haven't received
20 overtime payment?
21     A.    Yes.
22     Q.    Who?
23     A.    Oh, I --

17 (Pages 62 to 65)

FREEDOM COURT REPORTING

Page 66

1    Q.    How many?
2    A.    I don't know.
3    Q.    What kind of complaints?
4    A.    An employee may come over and
5  tell me that they worked extra on such and
6  such a day, and I can pull it up and look
7  and see, well, you clocked out at 3:30 so
8  you didn't work the entire shift that day.
9    Q.    And what do you look at to see
10  what time they --
11    A.    I have access to the Kronos
12  system.
13    Q.    When you say you have access
14  to the Kronos system, how do you have
15  access?
16    A.    I have it on my computer.
17    Q.    How do you obtain access to it
18  on the computer?
19    A.    I don't know.  I've had it for
20  years.
21    Q.    Is there a button, an icon,
22  you click or how do you get in the system?
23    A.    Through -- Yes, ma'am.

Page 67

1    Q.    Yes, ma'am, what?
2    A.    I guess, I don't know much
3  about that IT stuff.  I have an icon on my
4  computer that I can get it on.
5    Q.    Can you make -- Can you print
6  out?
7    A.    I don't think I'm able to
8  print out.
9    Q.    Are other people able to print
10  out?
11    A.    I don't know.
12    Q.    Okay.  What do you see when
13  you go into the Kronos system?
14    A.    What time employees clock in
15  and out, whether they're there that day,
16  whether they took a vacation day or personal
17  day.
18    Q.    Do you know what a master card
19  is, a master card for the production
20  workers?
21    A.    Yes, ma'am.
22    Q.    What is that?
23    A.    A card that is swiped when

Page 68

1  time begins.
2    Q.    Okay.  Who swipes the master
3  card?
4    A.    Supervisor, superintendent.
5    Q.    On the Kronos system, when you
6  go to look at -- gain access to it, does it
7  show the master card time for the department
8  that the employee worked in?
9    A.    No, ma'am.
10    Q.    What does it show?
11    A.    That somebody worked 7:30 to
12  4:20.
13    Q.    Does it show their initial
14  clock-in time and their -- Let me back up.
15        Employees are required to
16  swipe their personal card when they come in
17  each day; is that correct?
18    A.    Yes, ma'am.
19    Q.    And employees are required to
20  swipe their personal cards when they clock
21  out every day?
22    A.    Yes, ma'am.
23    Q.    Are those two swipes reflected

Page 69

1  on the Kronos reports?
2    A.    That I see, yes.
3    Q.    That you see.  Does it show
4  the master card swipes for the department on
5  that day?
6    A.    No.
7    Q.    So how can you tell if
8  somebody's entitled to overtime or not
9  entitled to overtime, by looking at those
10  swipes?
11    A.    If somebody clocked in at 7:30
12  and works until six, I can see that they
13  worked until six.
14    Q.    So your decision on whether
15  anybody's entitled to overtime is just based
16  on their two personal swipes -- their
17  personal swipe in and swipe out time?
18    A.    My decision?
19    Q.    Yeah.  When somebody comes to
20  you and says, I didn't get paid over time,
21  and you pull them up on the Kronos system,
22  does it show -- are you looking at what
23  they've actually swiped in and swiped out or

18  (Pages 66 to 69)

FREEDOM COURT REPORTING

Page 70

1  are you looking at what the department ran
2  that day?
3          I'm trying to figure out what
4  you're seeing on the screen.
5      A.    I just see start time and an
6  end time.  That's all I know.
7      Q.    And you don't know where that
8  start time came from?
9      A.    No.
10     Q.    And you don't know where that
11 end time came from?
12     A.    No.
13     Q.    Is it possible that the start
14 time came from the master card and the end
15 time came from the master card?
16     A.    I don't know.
17     Q.    Have you ever had an employee
18 come to you and complain that they had to
19 keep working past the master card end time
20 and were not paid for it?
21     A.    No.
22     Q.    Have you ever had an employee
23 come to you and complain that they worked

Page 71

1  over and were not paid for it?
2      A.    No.
3      Q.    When you say that employees
4  complain to you about not getting their
5  overtime, how were they supposed to be
6  getting overtime?
7      A.    Do what now?
8      Q.    You said you've had employees
9  come and complain to you about not getting
10 overtime.
11     A.    Well, the employees that come
12 to me and I pull them up are usually the
13 ones that haven't worked their full shift or
14 didn't work a day, that kind of thing.
15     Q.    Can employees go in and check
16 their time themselves on the Kronos system?
17     A.    I don't think so.
18     Q.    Do you know how the Kronos
19 system works with regards to the line time
20 or master card time?
21     A.    No, ma'am.
22     Q.    Do you know if employees are
23 paid by a preset shift time at the beginning

Page 72

1  of the day or by master card time?
2      A.    I don't know.
3      Q.    Do you know if employees are
4  paid by preset ending shift time at the end
5  of the day or by master card?
6      A.    I don't know.
7      Q.    Who would know that?
8      A.    Payroll.
9      Q.    Have you ever had any employee
10 complain to you that they should be paid for
11 donning and doffing?
12     A.    No, ma'am.
13     Q.    Have you ever heard any
14 employees discuss about donning and doffing
15 payment?
16     A.    Say that again.
17     Q.    Have you ever heard the
18 employees discussing the donning and doffing
19 and payment for the same?
20     A.    No, ma'am.
21     Q.    Have you ever had any classes
22 or training on Fair Dismissal Act -- I mean
23 Fair Labors Standard Act.

Page 73

1          MS. MCGOWAN:  Off the Record.
2          (Off-the-Record discussion
3          was held.)
4          MS. MCGOWAN:  Back on the
5  Record.
6      Q.    Have you had any training or
7  seminars or classes on Fair Labor Standards
8  Act or overtime laws?
9      A.    No, ma'am.
10     Q.    Do you know what is referred
11 to as the 2030 exemption in the Fair Labor
12 Standards Act?  Do you know what that is?
13     A.    No, ma'am.
14     Q.    Do you know of any exemptions
15 to overtime under overtime laws?
16     A.    I don't understand.
17     Q.    Do you know whether
18 employees -- Do you know of any exemptions
19 where employees don't have to be paid
20 overtime?
21     A.    Well, I'm not.
22     Q.    Okay.  What about the hourly
23 production employees?

19 (Pages 70 to 73)

FREEDOM COURT REPORTING

Page 74

1    A.    No, I don't know.
2    Q.    Do you know when an hourly and
3  production employee is entitled to overtime
4  payment?
5    A.    Employees are paid for hours
6  worked.
7    Q.    And how do you define work?
8    A.    If employees are out on the
9  floor working, they will get compensated for
10  it.
11    Q.    When are they entitled to
12  overtime?
13    A.    Over forty hours a week.
14    Q.    Have you had any discussions
15  with anybody from the union with regards to
16  the use of line time to compensate employees
17  on the production floor?
18    A.    No, ma'am.
19    Q.    Have you had any
20  communications with the union with
21  regards -- and the union, I mean the RWD
22  issue that's at this plant, with regards to
23  the use of the master card time system for

Page 75

1  compensating employees?
2    A.    No, ma'am, not that I can
3  recall.
4    Q.    Do you know whether Equity
5  belongs to any poultry councils or trade
6  associations such as the National Broilers
7  Council or any other poultry --
8    A.    Egg and Poultry Association?
9    Q.    Yes.
10    A.    Yeah. Egg and Poultry
11  Association.
12    Q.    Do you attend any of those
13  meetings?
14    A.    No, ma'am.
15    Q.    Do you have any knowledge
16  about how employment records are maintained
17  for employees that worked or have worked for
18  Equity?
19    A.    Our employee records are kept
20  in HR.
21    Q.    Are they paper or electronic?
22    A.    Paper.
23    Q.    Do you have what's called a

Page 76

1  personnel file for every employee?
2    A.    Yes, ma'am.
3    Q.    What kind of documents are
4  maintained in that personnel file?
5    A.    Attendance records,
6  disciplinary records, when you're initially
7  hired, your application, your emergency
8  contact information.
9    Q.    Do you have any involvement in
10  maintaining those records?
11    A.    I don't maintain them, no,
12  ma'am.
13    Q.    Do you know who does?
14    A.    The ladies in the office.
15    Q.    Okay. Who's over that
16  department that maintains the files?
17    A.    Laconya Hawkins.
18    Q.    Do you have any responsibility
19  for establishing policies on how long
20  employment records will be maintained?
21    A.    No, ma'am.
22    Q.    Do you know if there is a
23  policy on how long employment records will

Page 77

1  be maintained?
2    A.    Not to my knowledge.
3    Q.    Who has the responsibility for
4  maintaining the information on hours worked
5  for employees, like the Kronos information?
6    A.    Payroll.
7    Q.    Who's over payroll again?
8    A.    Joe Preston.
9    Q.    Okay. Do you know if there
10  are policies on how long payroll information
11  is maintained?
12    A.    No, I don't.
13    Q.    Is there a record retention
14  policy for Equity to your knowledge?
15    A.    There is.
16    Q.    What is that policy?
17    A.    I don't know.
18    Q.    Do you know where it's
19  located?
20    A.    It's in the company policy
21  manual.
22    Q.    What other policies are in the
23  company policy manual?

20  (Pages 74 to 77)

FREEDOM COURT REPORTING

Page 78

1    A.    How to conduct a background
2  check, sexual harassment claim.
3    Q.    What do you mean a sexual
4  harassment claim?  How to investigate one?
5    A.    The paperwork to be filled out
6  for that.
7    Q.    Anything else that's in there?
8    A.    Not that I can recall.
9    Q.    Is each employee given a
10 company policy manual?
11   A.    No.  No.
12   Q.    Where is the company policy
13 manual kept?
14   A.    In HR offices.
15   Q.    Is there anything in the
16 company policy manual on how employees will
17 be paid, the hourly employees?
18   A.    I don't know.
19   Q.    Is there anything in the
20 company policy manual on how to calculate
21 overtime?
22   A.    I don't know.
23   Q.    Do you have a copy of the

Page 79

1  company policy manual in your office?
2    A.    Yes.
3    Q.    Does each HR manager have a
4  copy of the company policy manual?
5    A.    I don't --
6    Q.    There's several HR managers.
7  I mean you've got the -- You've got you
8  listed as HR manager, Dante Rogers,
9  Mr. Rojas?
10   A.    Rojas.
11   Q.    Do all three of you have one
12 or is there just one?
13   A.    I think Jim has one.
14   Q.    Jim Bice has it?
15   A.    Uh-huh.
16   Q.    Are y'all all in the same
17 office?
18   A.    All except Dante.
19   Q.    And where is Dante?
20   A.    He's at the employee services
21 employment center.
22   Q.    Where is that?
23   A.    On-site, just away from our

Page 80

1  offices.
2    Q.    Okay.  Let me get you to look
3  at this book.  Look at Exhibit Number 1 in
4  this book.
5        MS. MCGOWAN:  Can we take a
6  quick break?
7        (Recess was taken.)
8    Q.    (BY MS. MCGOWAN):  Look at
9  Exhibit Number 1.  Have you ever seen this
10 document before?
11   A.    Yes.
12   Q.    Okay.  When did you first see
13 this document?
14   A.    I don't know.  Just looking
15 at -- I've seen a document like this that
16 has rules, I know the GMP rules, on it.
17   Q.    Okay.  Look at Exhibit 2.  Is
18 that the document you've seen?
19   A.    I've this one before, yes,
20 ma'am.
21   Q.    Is there a different document
22 that has the GMP rules on it that you've
23 seen?

Page 81

1    A.    I've seen both of these.  I
2  don't know if there's another different one.
3    Q.    Flip through all the documents
4  that have been listed that we've got tabbed.
5    A.    All these?
6    Q.    Yeah.  You said you've seen
7  another document, I just want you to see if
8  you can find what you're talking about.
9    A.    I've seen this one
10 (indicating).
11       MR. ROSENTHAL:  That's P-3.
12   Q.    Just kind of flip through, and
13 then we'll -- What I'm trying to do is --
14   A.    Not all this (indicating)?
15   Q.    You said there's another
16 document list in the GMP rules, another
17 document list in the GMP rules that you've
18 seen?
19   A.    No.  I mean I've seen these.
20   Q.    Right.  But you just said
21 you've seen a document listing the GMP
22 rules.  Is there a different document you're
23 talking that you've seen listing the GMP

21 (Pages 78 to 81)

42f217cb-4461-468a-bcd3-d6610bf1ec7d

FREEDOM COURT REPORTING

Page 82

1  rules?
2      A.    No.  Like general rules of
3  GMPs.
4      Q.    Right.  But your testimony
5  when you were looking at Exhibit 1 was that
6  you've seen a document like that listing the
7  GMP rules.  I'm trying to find out if we're
8  talking about different documents.
9      A.    No.  This one lists the rules.
10  That's what I'm saying, I've seen the rules.
11      Q.    Okay.
12      A.    And these rules (indicating).
13      Q.    You're referring to Exhibit 3?
14      A.    Right.
15      Q.    Okay.  Are you aware of any
16  other documents that exist that list the GMP
17  rules?
18      A.    No, ma'am.
19      Q.    Okay.
20      A.    Just general GMPs.
21      Q.    All right.  Look at Exhibit 2.
22  This appears to be a signature at the
23  bottom.  Is this something that all

Page 83

1  employees must sign and put in their
2  personnel files?
3      A.    Yes.  They do acknowledge the
4  GMPs, that they've gone over them.
5      Q.    Is this a document that they
6  sign and put in their personnel file,
7  similar to Exhibit 2?
8      A.    I'm not sure if this is the
9  one.  There is one in here.  I'm not sure
10  which one they sign off on.
11      Q.    And you're referring to
12  Exhibit 18?
13      A.    The employee orientation
14  manual.
15      Q.    Okay.  Find that document,
16  Exhibit 18, so that we're talking about the
17  same document.
18      A.    There we go (indicating).
19      Q.    What page is it in Exhibit 18?
20      A.    Ninety-one.
21      Q.    Since we only have one copy,
22  I'm going to stand behind you.
23      A.    Okay.

Page 84

1      Q.    That appears to be similar to
2  Exhibit Number 3, maybe different type.
3            So page ninety-one in Exhibit
4  18, are employees required to sign this
5  after they go through the orientation
6  process and then they place it in their
7  personnel file?
8      A.    Yes, ma'am.
9      Q.    Okay.  All employees do that?
10      A.    Yes, ma'am.
11      Q.    So the good manufacturing
12  processes are something that is taught to
13  employees in their orientation?
14      A.    Yes, ma'am.
15      Q.    Do you know who teaches that
16  section of orientation?
17      A.    Roy Williams.
18      Q.    Do you know how long the
19  practice has been in effect at the Equity
20  Group of Eufaula that the employees might
21  sign a document such as page ninety-one of
22  Exhibit 18 to go in their personnel file
23  setting out the manufacturing practices?

Page 85

1      A.    What's the question, how long?
2      Q.    How long that practice has
3  been in effect.
4      A.    No, ma'am.  I don't know how
5  long.
6      Q.    Was it there when you came in
7  in 2001?
8      A.    I don't recall.
9      Q.    Do you know whether employees
10  are ever disciplined for violating the good
11  manufacturing policy -- practices?
12      A.    I have seen disciplinary
13  write-ups on not wearing ear plugs.
14      Q.    What about for not wearing
15  smocks?
16      A.    Never seen one for smocks.
17      Q.    What about gloves?
18      A.    I've seen them for chain
19  gloves.
20      Q.    What about hair nets?
21      A.    I've seen them for beard nets,
22  not hair nets.
23      Q.    Do you see all disciplinary

22 (Pages 82 to 85)

FREEDOM COURT REPORTING

Page 86

1  write-ups that go in their files?
2       A.    No, ma'am, not all of them.
3       Q.    Okay.  Is it part of your duty
4  to handle any grievances filed over
5  disciplinary write-ups?
6       A.    Say again.  I'm sorry.
7       Q.    In your position, HR, do you
8  have the responsibility for handling
9  grievances over write-ups?
10      A.    Yes, ma'am.
11      Q.    Have you ever handled any
12 grievances over a write-up for not following
13 any of these good manufacturing practices?
14      A.    No.  Not that I recall, none
15 of these.
16      Q.    Earlier we were talking about
17 your responsibilities, and you said that
18 employees would call and complain to you
19 about not getting their overtime.  Remember
20 that line of questioning?
21      A.    Yes.
22      Q.    I mean that could be one
23 complaint, and you said you would look at

Page 87

1  the Kronos system.  Have you ever had a
2  written grievance filed on -- by a new
3  employee about not being paid for all the
4  time they thought they were --
5       A.    No.
6       Q.    -- due?
7       A.    No.
8       Q.    Now, on the Kronos printout
9  that you pull up, do you ever print it out
10 and give a copy of it to the employee?
11      A.    No.
12      Q.    Does the printout you see
13 reflect any edits to it, the report?
14            MR. ROSENTHAL:  Objection.
15 Just for the Record --
16      Q.    Not the printout.  The screen
17 that you see.  Do you know whether that
18 reflects any edits?
19      A.    There's a little yellow box
20 there.  Like if an employee misses a punch,
21 there's a little box that comes up if
22 something is edited, yes.
23      Q.    Does it also reflect if an

Page 88

1  employee's late?
2       A.    Yes.
3       Q.    How is that reflected?
4       A.    If an employee clocks in at
5  like 10:20, it will reflect 10:20.
6       Q.    Does it have a flag like an L
7  or a code showing --
8       A.    No.  It just shows in 10:20.
9       Q.    Is the time in regular time,
10 or is it military time, or do you know how
11 it's reflected?  The punch, does it show
12 punch in at 10:20 or does it have a
13 different scale?
14      A.    No, it's regular.  I can read
15 it regular time.
16      Q.    You don't have to have any
17 chart to decipher the --
18      A.    No.
19      Q.    Okay.  If an employee's shift
20 starts at 7:30, and they check in -- punch
21 in at 7:31, are they considered late, if
22 they clock in?
23      A.    They could be late, yes,

Page 89

1  ma'am.
2       Q.    What happens if an employee's
3  late?
4       A.    If an employee clocks in at
5  7:31, he would be pretty much late to the
6  line.
7       Q.    Do they get points -- Are you
8  on a point system?
9       A.    We are on a points system.
10      Q.    What is your point system for
11 tardies?
12      A.    If you are tardy or leave
13 early, you get half an occurrence; if you're
14 gone for the day, you get a whole.
15      Q.    If an employee is one minute
16 late, do they get half an occurrence?
17      A.    I wouldn't --
18      Q.    Can a supervisor do it?
19      A.    They probably could.  But I
20 think a minute's a little too harsh.
21      Q.    Do you know if supervisors
22 have given that to employees?
23      A.    Not to my knowledge.

23  (Pages 86 to 89)

FREEDOM COURT REPORTING

Page 90

1    Q.    Who handles the points system?
2 Who's responsible for recording and keeping
3 up with the points system?
4    A.    There's different people that
5 do it. I know Vicki Ellis does it, the
6 majority from debone on first shift.
7    Q.    Who's Vicki Ellis?
8    A.    She's a superintendent over
9 debone.
10          Supervisors can do it. I
11 think at the further plant, Pearl Lovell,
12 the superintendent, may handle that point
13 system.
14    Q.    Does the Kronos system
15 automatically flag somebody as tardy to give
16 the information to the supervisors so they
17 can give the points or half points or
18 whatever?
19    A.    Every day the supervisors get
20 a printout of who was there and who not, and
21 I guess that would reflect on that printout
22 whether somebody was tardy. And then
23 it's -- But, no. And then they put it on an

Page 91

1 absentee sheet.
2    Q.    Who gets that absentee sheet?
3    A.    The employee, to sign.
4    Q.    Okay. Once the employee signs
5 it, what's done with the absentee sheet?
6    A.    It's in the personnel file.
7    Q.    Do you have any -- in your
8 position at HR have any responsibility for
9 keeping up with the number of points an
10 employee has?
11    A.    Say that --
12    Q.    Is that part of your duties
13 as -- with employee complaints and
14 grievances and stuff, to keep up with the
15 points system or is that somebody else in HR
16 that does that?
17    A.    The attendance sheets are
18 brought over to HR to put in the personnel
19 files.
20    Q.    Who keeps up with how many
21 absences -- What happens if you have --
22 Explain the points system. You get a half a
23 point if you're late?

Page 92

1    A.    Yes, or leave early.
2    Q.    All right. And a whole point
3 if you're out?
4    A.    Right.
5    Q.    What do you do with these
6 points?
7    A.    They're put in the personnel
8 file.
9    Q.    What happens -- Can you just
10 get as many points as you want or how --
11    A.    You can accumulate six points.
12    Q.    What happens when you
13 accumulate six points?
14    A.    Then you're separated for
15 attendance.
16    Q.    Do you get any notification
17 prior to separation?
18    A.    Yes. Every time they get an
19 occurrence, they are shown the sheet, and
20 they sign it.
21    Q.    Who is responsible for keeping
22 up with the points per employee, to let them
23 know or to find out if they're over their

Page 93

1 six points?
2    A.    It depends on which
3 department.
4    Q.    Okay. Who in that department?
5    A.    Which department?
6    Q.    Tell me throughout the fresh
7 plant, who's responsible for points?
8    A.    I know Vicki Ellis does it for
9 debone. I don't know who does it in evisc?
10    Q.    Does somebody in HR have the
11 responsibility in HR department for keeping
12 up with the points?
13    A.    No, ma'am.
14    Q.    That's done in the plant by
15 the supervisors?
16    A.    Yes, ma'am.
17    Q.    Is there anything in the
18 computer system that keeps up with points?
19    A.    No.
20    Q.    Look at Exhibit 3. Have you
21 had any develop -- any involvement in
22 developing this document?
23    A.    No, ma'am.

24 (Pages 90 to 93)

42f217cb-4461-468a-bcd3-d6610bf1ec7d

FREEDOM COURT REPORTING

Page 94

1    Q.   Do you have any responsibility
2  of letting the employees know the contents
3  of this document?
4    A.   No, ma'am.
5    Q.   Look at Exhibit Number 4.
6  It's a couple of pages -- three pages long.
7  Have you ever seen these documents?
8    A.   Not that I can recall.  I mean
9  I've seen these GMP things, but no, I've
10  never seen that.
11    Q.   The last page?
12    A.   No, ma'am.  I've never seen
13  that.
14    Q.   All right.  Look at Exhibit 5,
15  it's the attendance policy.  Did you have
16  any involvement in drafting the attendance
17  policy?
18    A.   Yes, ma'am.
19    Q.   What was your involvement?
20    A.   This is the attendance policy
21  we drafted.  Yeah, I drafted it.
22    Q.   You drafted this?
23    A.   I helped, yes.

Page 95

1    Q.   Who'd you help?
2    A.   We modeled this after our
3  Kentucky plant's attendance policy to try to
4  make it match the poultry -- for a poultry
5  division up there.
6    Q.   Who is we?
7    A.   Me and Jim Bice.
8    Q.   Is this document handed out to
9  employees or where -- How are employees made
10  aware of the contents of this document?
11    A.   During orientation.
12    Q.   Is it in part of the Exhibit
13  18?
14    A.   Here is an attendance policy
15  (indicating).
16    Q.   What page?
17    A.   Thirty-one.
18    Q.   Who's responsible for
19  deducting the point?  When it says you've
20  worked forty-five days with perfect
21  attendance, who takes the point off?
22    A.   They have a -- We have a
23  computer -- on the computer that it's put

Page 96

1  in, the date, and it calculates when the
2  forty-five days are to come off.  And if
3  they have perfect attendance by that date,
4  then it will come off.  Of course, if they
5  miss another day, then that one goes in and
6  a new forty-five day date is calculated.
7    Q.   Okay.  Who puts that in the
8  computer?
9    A.   Different supervisors.
10    Q.   Production supervisors?
11    A.   Yes, ma'am.
12    Q.   What is that program called,
13  do you know?
14    A.   I don't know.
15    Q.   Do you have any responsibility
16  for checking that program?
17    A.   No.  Not the program, no,
18  ma'am.
19    Q.   Or to make sure the
20  information is being put in the program?
21    A.   No.
22    Q.   Do employees complain to you
23  about the attendance policy -- the program?

Page 97

1    A.   Do what now?
2    Q.   Is that part of your
3  complaint -- part of your job duties, to
4  handle complaints about the attendance
5  program?
6    A.   Oh, yeah.
7    Q.   Do you ever get complaints?
8    A.   About attendance, them not
9  coming to work?
10    Q.   No.  From the employees about
11  the program, the attendance program?
12    A.   Oh, yeah.
13    Q.   If an employee thought they
14  were given a half point and shouldn't have
15  been, do you have the authority to change
16  that?
17    A.   Yes.
18    Q.   Is that something they would
19  have to file a grievance over, or is this
20  something they can handle outside of the
21  contract?
22    A.   They could come and talk to me
23  and we would handle it.

25  (Pages 94 to 97)

FREEDOM COURT REPORTING

Page 98

1    Q.    What records do you actually
2  keep in your job duties?
3    A.    I keep records for employee
4  referrals.
5    Q.    What do you mean employee
6  referrals?
7    A.    We have an employee referral
8  program.  If somebody refers you to work at
9  the plant, and they've worked there ninety
10  days, then they get a five-hundred-dollar
11  bonus.  I keep all those records.
12    Q.    Like a production worker,
13  somebody in debone could refer somebody to
14  work in evisc, and if the employee worked
15  the ninety days -- the new employee works
16  ninety days in evisc, that employee in
17  debone gets a five-hundred-dollar bonus; is
18  that what you're talking about?
19    A.    Right.  When an application is
20  filled out at the employment center, and
21  it's got a little place called referred by,
22  and if they put down there, Mary Smith
23  referred me to come out here and fill out an

Page 99

1  application, then if that employee does
2  work, completes their ninety days, then Mary
3  Smith gets the five-hundred-dollar bonus.
4    Q.    Okay.  What other records do
5  you keep in your job position?
6    A.    All current legal issue
7  documents, EEOC complaints and that kind of
8  thing.
9    Q.    Anything else?  Do you keep a
10  file on grievances?
11    A.    I do have a file on
12  grievances.
13    Q.    Anything else?
14    A.    Not that I can think of.
15    Q.    You said you didn't know what
16  the company record retention policy was.
17  What is your policy for keeping records?
18    A.    I don't throw anything away.
19    Q.    Have you reviewed your records
20  to see if there are any written complaints
21  by employees on not receiving full pay?
22    A.    Have I reviewed the records?
23    Q.    Yes.

Page 100

1    A.    No.
2    Q.    Have you reviewed the records
3  to see if anyone made a written complaint
4  for not getting paid for donning and
5  doffing?
6    A.    No.
7    Q.    Have you reviewed your records
8  to see if anybody's made a complaint for not
9  receiving pay for not getting their whole
10  break during the thirty minutes?
11    A.    No.
12    Q.    Has anyone asked you to go
13  through those records to see if there is any
14  such complaints?
15    A.    No.
16    Q.    How long have you been there?
17    A.    Seven years.
18    Q.    And you've got seven years
19  worth of records of employee complaints?
20    A.    I can't be sure.
21    Q.    Can you edit the employee's
22  time when you pull up the Kronos?
23    A.    No, I can't.

Page 101

1    Q.    Who can do that?
2    A.    The payroll clerks up in
3  payroll.
4    Q.    If you determine that an
5  employee was entitled to be paid for some
6  time they worked during their break, could
7  you tell payroll to pay them for that?
8    A.    Could I?
9    Q.    Yeah.  Do you have the
10  authority?
11    A.    Not to my knowledge.
12    Q.    Who has that authority?
13    A.    I don't know.
14    Q.    If an employee came to you and
15  said, hey, I had to work fifteen minutes of
16  my break, my morning break, my thirty-minute
17  unpaid break, and I don't think that's fair.
18  I think I should be paid for those fifteen
19  minutes.  Who would you have to get to make
20  the approval that they be paid for that?
21    A.    The supervisor,
22  superintendent.
23    Q.    So if an employee had a

26  (Pages 98 to 101)

FREEDOM COURT REPORTING

Page 102

1  complaint on their pay, would you have to
2  call their supervisor and that supervisor
3  would have to resolve the issue?
4      A.    I would have to do a pay
5  problem.
6      Q.    If the supervisor refused to
7  go along with your suggested resolution of
8  the pay problem, what would you do?
9      A.    I would probably find out
10  where the discrepancies would be:  Did they
11  not work those hours that they said they
12  did?  Why would we not pay them?  We have to
13  do a little investigation to see exactly
14  what the situation was.
15      Q.    Who would have the ultimate
16  decision-making authority on whether or not
17  the employee should receive the pay, if you
18  and the supervisor disagreed on it?
19      A.    I would bring it to probably
20  the plant manager.
21      Q.    Okay.  Do you attend the
22  monthly safety meetings?
23      A.    The majority of them.

Page 103

1      Q.    Have you ever heard any
2  reports given by the ergonomic team in these
3  monthly safety meetings?
4      A.    Yes.
5      Q.    Are you a part of that team?
6      A.    No, ma'am.
7      Q.    Do you know what -- Do you
8  ever review the rotation sheets?
9      A.    No, ma'am.
10      Q.    Do you know what's on those
11  rotation sheets?
12      A.    No, ma'am.
13      Q.    Have you ever seen the
14  rotation sheet?
15      A.    Not that I can remember.
16      Q.    Do you know who's responsible
17  for maintaining the rotation sheets?
18      A.    No, I don't.
19      Q.    Did you say you've been out on
20  the plant?
21      A.    Yes, ma'am.
22      Q.    Have you ever timed yourself
23  to see how long it takes to put on --

Page 104

1      A.    No, ma'am.
2      Q.    Do you know how cold the plant
3  is?
4      A.    Yes, it can be.
5      Q.    Is there a temperature it's
6  maintained at?
7      A.    I don't know that.
8      Q.    Do you handle -- I think you
9  said you handled EEOC charges?
10      A.    Yes, ma'am.
11      Q.    Do you handle any complaints
12  from the Department of Labor?  Is that part
13  of your responsibility?
14      A.    It would.
15      Q.    Okay.  Have you ever received
16  any DOL complaints?
17      A.    No, ma'am.
18      Q.    Do you handle any USDA
19  noncompliance issues?
20      A.    No, I don't.
21      Q.    And you said you handle legal
22  issues.  Is that like worker's comp claims
23  or EEOC charges?

Page 105

1      A.    Yeah.
2      Q.    What else?
3      A.    People filing suit for things,
4  employee issues.
5      Q.    Do you have any responsibility
6  for suspending employees, if somebody is put
7  on suspension?
8      A.    Responsibility?
9      Q.    Uh-huh.  Is that part of your
10  duties, to handle disciplinary actions and
11  suspensions for the employees?
12      A.    Yes, I can.
13      Q.    Is there somebody else in HR
14  that handles that on a daily basis, the
15  write-ups or suspensions, the progressive
16  discipline policy?
17          Is that something you do on a
18  day-to-day basis, or do you just do it if
19  there's a grievance filed?
20      A.    No.  I do it on a day-to-day
21  basis.
22      Q.    Are there certain conduct
23  violations that are an automatic suspension

27 (Pages 102 to 105)

FREEDOM COURT REPORTING

Page 106

1  for employees?
2      A.   Lock-out/tag-out violation
3  would be.
4      Q.   What's a lock-out/tag-out
5  violation?
6      A.   Locking out a piece of
7  equipment, like maintenance would do a lot,
8  so that it doesn't have electricity to it so
9  that it can't hurt them.
10     Q.   Anything else you can think
11 of?
12     A.   Automatic?
13     Q.   Yes.
14     A.   Smoking on a forklift, having
15 an altercation.
16     Q.   Anything else?
17     A.   Not that I can recall right
18 now.
19     Q.   Are there any conduct
20 violations that result in an automatic
21 termination?
22     A.   Physical altercations, sexual
23 harassment could be one, walking off the

Page 107

1  job. I don't know, I'd have to look at
2  the. . .
3      Q.   What would you have to look
4  at?
5      A.   Just the general practices,
6  what I would consider automatic, I guess.
7  Besides having a physical altercation,
8  workplace violence incidences, that would be
9  automatic.
10     Q.   Can employees be written up or
11 disciplined through the progressive
12 discipline process for not working?
13     A.   What do you mean not working?
14     Q.   Let's say an employee clocks
15 in and they just go sit in their car or the
16 break room and they don't report to the
17 line, can they be written up?
18     A.   Yes.
19     Q.   Can an employee be written up
20 for clocking in and then going home?
21     A.   He would be written up for
22 that, yes.
23     Q.   Could he be terminated for

Page 108

1  that?
2      A.   Absolutely.
3      Q.   Are you aware of whether
4  employees perform any ergonomic exercises?
5      A.   They did. I don't know if
6  they still do, but at a time they were done.
7      Q.   Do you know why?
8      A.   They did hand exercises for
9  ergonomic issues to -- I guess at the
10 beginning of the shift to warm up their
11 hands.
12     Q.   Do you know whether an
13 employee can be disciplined for being late
14 to the line?
15     A.   Yes.
16     Q.   Can be written up?
17     A.   Yes.
18     Q.   Do you know whether or not in
19 the orientation, employees are advised to
20 take mini breaks?
21          Look at Exhibit 17, I think.
22 Maybe I'm looking in the wrong exhibit.
23 Let's look at Exhibit 9. I gave you the

Page 109

1  wrong number, I apologize. The employee
2  manual, page fifty-two.
3          MR. ROSENTHAL: Page
4  fifty-two, Candis?
5          MS. MCGOWAN: Yeah, fifty-two.
6      A.   Okay.
7          MR. ROSENTHAL: She's there.
8      Q.   Are you there?
9      A.   Yes, ma'am.
10     Q.   All right. Look at the one,
11 two, three from the bottom, where it says:
12 Take mini breaks during the work, do you
13 know -- M-I-N-I -- what they're talking
14 about there?
15     A.   No. Let's see.
16          No. Huh-uh.
17     Q.   Have you ever sat in on this
18 part of the orientation where ergonomic
19 principles are discussed for new hires?
20     A.   No, ma'am.
21     Q.   If you will, look at Exhibit
22 18, page fifty-two. In the new policy, it
23 also still says: Take mini breaks.

28 (Pages 106 to 109)

FREEDOM COURT REPORTING

Page 110

1    A.    Okay.  Do what with it?
2    Q.    So you don't know anything
3  about the ergonomic principles that are
4  taught during orientation?
5    A.    I do not.
6    Q.    Who would have information
7  relating to that?
8    A.    I don't know.
9    Q.    Okay.  Look at Exhibit 13.
10   A.    (Witness complies.)
11   Q.    Have you ever seen this
12  document before?
13   A.    No.
14   Q.    Do you know what these are?
15   A.    No, I don't.
16   Q.    Look at Exhibit 14, which
17  contains two form letters from the DOL not
18  addressed to anyone.  Have you ever seen
19  these?
20   A.    Huh-uh.
21   Q.    You haven't?
22   A.    Huh-uh.  No.  Excuse me, no.
23   Q.    Have you ever seen any letters

Page 111

1  like -- from the DOL?
2    A.    No, I haven't.
3    Q.    Okay.  And let's look at
4  Exhibit 15, which is the Equity Group --
5  it's excerpts from the Equity Group payroll
6  processing manuals.
7          Have you ever looked at the
8  payroll processing manual?
9    A.    No, I haven't.
10   Q.    Look on page -- the second
11  page of Exhibit 15.  It contains, down at
12  the bottom, Bates E-695.
13         No flip back.  It contains
14  Bates E-695.
15   A.    Uh-huh.
16   Q.    When you pull up a screen on
17  an employee in Kronos, is this what it looks
18  like?
19   A.    No.  Huh-uh.
20   Q.    Have you ever seen records
21  from Kronos that looked like this?
22   A.    Like this?
23   Q.    Yes.

Page 112

1    A.    From Kronos?
2    Q.    Uh-huh.  I'm sorry, yes.
3    A.    This is the sheet of how it
4  comes out -- that if people miss a punch or
5  whatever, they write it in.  I don't know
6  where it comes from.
7    Q.    Okay.  Flip over to in that
8  exhibit the Bates containing E-700.  What is
9  this?
10   A.    It looks to be the same thing.
11   Q.    All right.  Flip over to the
12  next page, E-701, what is this?
13   A.    This bottom one is what I can
14  see.
15   Q.    Okay.  So this is what you see
16  if you go in the computer?
17   A.    That's what I can see.
18   Q.    So it just shows the in time
19  and out time?
20   A.    Yes, ma'am.
21   Q.    That middle column, that says:
22  Transfer line time ST.  Do you see that?
23   A.    Uh-huh.

Page 113

1    Q.    What does that mean?
2    A.    I don't know.
3    Q.    Does that mean line time
4  start?
5    A.    I don't know.
6    Q.    Or do you know if that means
7  that they stayed late on line time?
8    A.    I don't know what that means.
9    Q.    Do you know what any of the
10  codes in Kronos mean?
11   A.    Vacation.
12   Q.    Okay.  Anything else?
13   A.    I think there's one that's
14  holiday, and there's something for personal
15  day.  I can't -- I don't know what that is
16  right now.
17   Q.    So in looking at the bottom of
18  701, you say when you pull it up, you check
19  to see -- you go by these numbers here to
20  determine their in time and out time and
21  whether they've worked overtime?
22   A.    Right.  I can just look at
23  this sheet and see what this says.

29 (Pages 110 to 113)

FREEDOM COURT REPORTING

Page 114

1    Q.    Okay.  Do you get this
2  little -- these two little screens on the
3  bottom on the left inside where it says:
4  Account, or do you just get the top screen?
5    A.    I get the bottom two, too.
6    Q.    And it appears that the bottom
7  left hand shows you the total hours of
8  regular time and the total hours of
9  overtime?
10    A.    Yes, this does.
11    Q.    Okay.  Would yours show that
12  that you're looking at on an employee, if
13  you pull it up?
14    A.    Can't be for sure.
15    Q.    And the right-hand bottom, is
16  that the line time?
17    A.    I don't know what that is.
18    Q.    Okay.  Can you check to see if
19  the time on the computer has been signed off
20  and approved by a supervisor?
21    A.    I can't from this, huh-uh.
22    Q.    When you go on the computer,
23  can you check it to see if the time has been

Page 115

1  approved by a supervisor?
2    A.    No.
3    Q.    Do you know how production
4  workers are paid, whether they're paid for
5  all hours worked or line time or how they're
6  paid?
7        MR. ROSENTHAL:  Objection to
8  the form of the question.
9    A.    I don't know.
10    Q.    Or how their pay is
11  calculated?
12    A.    No, I don't.
13    Q.    Do you know if that's part of
14  the union contract?
15    A.    I don't understand the
16  calculated part.
17    Q.    Right.  Do you know whether
18  the method in which line production
19  employees are paid is part of the union
20  contract?
21    A.    I guess I don't understand the
22  question.
23    Q.    Do you know whether the method

Page 116

1  in which employees are paid that work on the
2  production line is part of the union
3  contract?
4    A.    Not to my knowledge.
5    Q.    Do you know who establishes
6  the method in which production employees are
7  paid?
8    A.    No.
9    Q.    Do you know what happened to
10  Jackie Davis' lawsuit?
11    A.    I don't know exactly what the
12  outcome was.  I -- I don't know exactly what
13  the outcome was, no.
14    Q.    And your response was that one
15  of the legal issues you were responsible for
16  handling?
17    A.    No.  Not at that time.
18    Q.    Who handled her?
19    A.    Who handled the legal?
20    Q.    Yes.  From HR.
21    A.    The HR manager at that time.
22    Q.    Who was that?
23    A.    James Davis.

Page 117

1    Q.    And I think you previously
2  told me that you and Greg Mills had not
3  discussed Jackie Davis' lawsuit?
4    A.    Not to my knowledge.
5        MS. MCGOWAN:  Can we take a
6  break?
7        (Recess taken.)
8    Q.    (BY MS. MCGOWAN):  Who is
9  Vicki Stallworth?  Do you know?
10    A.    I don't know who that is.
11    Q.    The bonuses you were talking
12  about, the new-hire bonus --
13    A.    Yes, ma'am.
14    Q.    -- let me ask you a few more
15  questions on that.
16        If an employee, a current
17  employee, refers you a new hire person, does
18  that current employee have to stay working
19  in order to get the bonus, or can they leave
20  and still get the bonus if the new hire
21  works out?
22    A.    Both have to be employed.
23    Q.    Both have to be employed?

30 (Pages 114 to 117)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

42f217cb-4461-468a-bcd3-d6610bf1ec7d

FREEDOM COURT REPORTING

Page 118

1     A.    Yes, ma'am.
2     Q.    And then both have to be
3  employed for ninety days? How long is the
4  requirement?
5     A.    The employee that usually
6  is -- that makes the referral is an employee
7  that already works there.
8     Q.    Right. But how long does the
9  new hire have to work before the bonus is
10  paid?
11     A.    Ninety days.
12     Q.    Is there a ninety-day
13  probationary period?
14     A.    Yes, ma'am.
15     Q.    Can the new hire have any
16  tardies or absences during that period?
17     A.    Sure.
18     Q.    Do you still get the bonus if
19  they make it through the probationary
20  period?
21           What are the rules to get it,
22  other than just work ninety days?
23     A.    If they're still employed at

Page 119

1  the end of their ninety days, you get the
2  referral.
3     Q.    Okay. Can you, as a current
4  employee, have any tardies or occurrences
5  during that -- are there any rules for what
6  you have to do other than still be employed
7  also?
8     A.    Just still be employed also.
9     Q.    How is the bonus paid? Is it
10  a one-time payment, are you paid over a
11  period of time? How is the
12  five-hundred-dollar bonus paid to the
13  employee, the referring employee?
14     A.    Just a one-time check.
15     Q.    Is it through payroll?
16     A.    Yes.
17     Q.    How often are employees paid?
18  Are they paid weekly?
19     A.    Weekly.
20     Q.    This stack of exhibits book
21  here, look at Exhibit 8.
22     A.    (Witness complies.)
23     Q.    Have you ever seen this new

Page 120

1  hire allergen awareness training?
2     A.    No, ma'am.
3     Q.    Next page, new hire HACCP
4  training, HACCP, have you ever seen that?
5     A.    No, ma'am.
6     Q.    And new hire past management
7  awareness, have you ever seen that?
8     A.    Not to my knowledge.
9     Q.    Exhibit 8, this is the
10  employee handbook. Do you have any
11  involvement in drafting the handbook?
12     A.    Yes, ma'am.
13     Q.    What is your involvement?
14     A.    I participated in putting it
15  together.
16     Q.    Okay. Who else participated
17  in putting it together?
18     A.    As I recall, Jim Bice, my
19  boss, would have been; there's some safety
20  things here, so the safety manager would
21  have contributed the safety parts; my
22  benefits administrator would have done
23  401(k) and health insurance and benefits.

Page 121

1     Q.    Do you know when this handbook
2  was put together?
3     A.    It was 2004 sometime. Spence
4  Jarnagin was the general manager here, so it
5  would have been since he came here.
6     Q.    Has it been updated since it
7  was put together in 2004?
8     A.    No, ma'am.
9     Q.    Is this the same employee
10  handbook that's still in use today?
11     A.    Yes, ma'am.
12     Q.    Look at -- This is not the
13  whole handbook, this is just excerpts from
14  it. If you will look down at the page that
15  is lettered, E-535, or actually, page
16  eighteen.
17     A.    Yes, ma'am.
18     Q.    Where did you get the
19  information for the next -- These appear to
20  be some kind of work rules?
21     A.    Yes, ma'am.
22     Q.    And they go over eighteen,
23  nineteen. Where did you get these work

31 (Pages 118 to 121)

FREEDOM COURT REPORTING

Page 122

1  rules?
2      A.    I don't recall.
3      Q.    Did you draft them or did
4  somebody provide these rules to you?
5      A.    I don't recall.
6      Q.    Look on page twenty-five.  Did
7  you draft the language on compensation and
8  overtime, or did someone else prepare this
9  language?
10     A.    I don't remember.
11     Q.    Did you have a form you used
12 to go by or a model such as you did the
13 attendance policy from another plant?
14     A.    I don't recall.
15     Q.    Who approved the handbook?
16     A.    That would have been the HR
17 complex manager, which is Jim Bice.
18     Q.    The different areas of the
19 plant provide general input such as like the
20 safety or the plant manager or different
21 management teams provide any information for
22 you to compile into the handbook?
23     A.    The only one I recall that did

Page 123

1  was Harry Wilson did the safety portion.  We
2  did not solicit throughout the plant for
3  people to input into this, no.
4      Q.    Who all was on the team that
5  drafted the handbook?  You and who else?
6      A.    I know Harry Wilson did the
7  safety portion; Jennifer Baker, who is the
8  benefits administrator, would have given the
9  information for the benefits portion; and I
10 don't recall anybody else that would have
11 any.
12     Q.    Going back to this bonus, the
13 referral for new-hire bonus, is that on the
14 paycheck where they get the one-time
15 payment, is that calculated as regular pay
16 or bonus pay or overtime pay?  How is it
17 designated?
18     A.    I don't know.
19     Q.    Do you know whether the
20 employees get taxes taken out of it or do
21 they get a 1099 form for it?
22     A.    I do not know.
23     Q.    Look at Exhibit 11.  Have you

Page 124

1  ever seen this document?
2      A.    Yes, ma'am.
3      Q.    What is this?
4      A.    It's a check sheet that
5  employees sign that they have reviewed
6  these --
7      Q.    -- areas?
8      A.    Yes.
9      Q.    And this is done during the
10 orientation, the new-hire orientation?
11     A.    As far as I know, yes, ma'am.
12     Q.    Do these go in employees'
13 personnel files, this form, this new-hire
14 check list?
15     A.    Yes, ma'am.
16     Q.    Do you know who the company
17 representative is that signed this?
18     A.    Celicia Ledbetter.
19     Q.    Who?
20     A.    Lisa Ledbetter.  Celicia
21 Ledbetter that signed this one, yes.
22     Q.    Spell Celicia for the Record.
23     A.    C-E-L-E-C-I-A.

Page 125

1      Q.    What is her position?
2      A.    At this time she is the -- one
3  of the interviewers in the employment
4  services.
5      Q.    What was she before?
6      A.    She conducted orientation.
7      Q.    Look at the next page, the
8  safety orientation.  Can you read the
9  company's rep there?
10     A.    Mariella Guillen.
11     Q.    Who is that?
12     A.    She was here years ago.
13     Q.    And she's no longer there?
14     A.    No, ma'am.
15     Q.    And it's dated 6/27/05?
16     A.    Yes, ma'am.
17     Q.    Is this something also that's
18 in the orientation?
19     A.    I'm not sure if this one is
20 still.
21     Q.    Okay.  And then let's look at
22 E -- the next page at the bottom has E-985,
23 the new-hire orientation agenda.  Do you

32  (Pages 122 to 125)

FREEDOM COURT REPORTING

Page 126

1  know what -- Is this a form that employees
2  have to sign at the orientation?
3       A.   I know there's an agenda at
4  the beginning of the book like this
5  (indicating), but -- but I don't know why
6  they would have to sign this one.
7       Q.   Okay.  And I think you told me
8  you sat in on the portion of the orientation
9  dealing with the union presentation?
10      A.   Yes, ma'am.
11      Q.   Do you sit in on every
12  new-hire orientation?
13      A.   I don't make all of them, no,
14  ma'am.
15      Q.   Do you designate someone else
16  to sit in for you when you don't make it?
17      A.   Yes, ma'am.
18      Q.   And the next page is a
19  document entitled seven-minute safety
20  trainer, it's two pages.  Have you ever seen
21  this document before?
22      A.   I don't know if I've seen this
23  particular one.  I've seen these

Page 128

1  a tape.  It says for QAACCP, GMP, SSOP,
2  SOPS, and animal welfare it says tape.  Have
3  you ever watched that tape?
4       A.   No, ma'am.
5       Q.   You don't know what's on it?
6       A.   No, ma'am.
7       Q.   Do you know what an SSOP is?
8       A.   No.
9       Q.   Do you know what an SOPS is?
10      A.   Some kind of operating
11  procedure.
12      Q.   All right.  Fair enough.
13           On page seventy-one of Exhibit
14  Number 9 --
15      A.   My seventy-one?
16      Q.   Yes.
17      A.   Okay.
18      Q.   And then look and see if -- I
19  might be on the wrong page.  I might be
20  looking at Exhibit Number --
21           What is climate awareness
22  throughout the facility?  Do you know?
23      A.   No, I do not.

Page 127

1  seven-minute safety trainer sheets, but I --
2       Q.   Where do you get seven-minute
3  safety trainer sheets?  Where have you seen
4  them?
5       A.   Well, I mean up here, I have
6  seen this -- the way this is written out
7  with this --
8       Q.   I mean, is this something
9  that's passed around in the HR department or
10  where did you see --
11      A.   No.  This was a safety
12  training that we either had at one time, an
13  outline.
14      Q.   All right.  Go back a page to
15  the agenda, and there is -- maybe it's not
16  on this one.  There's a video that's shown,
17  a new-hire video.  Have you ever watched the
18  new-hire video?
19      A.   No.
20      Q.   Okay.  Do you know what's
21  in -- discussed in the new-hire video?
22           Let's look at Exhibit Number
23  9.  Under the agenda from 1 to 1:30 there's

Page 129

1       Q.   Okay.  Do you -- Then above --
2  three above that, it says:  Donning and
3  appropriate use of PPE.  And then the next
4  one says:  Demonstration of donning and
5  appropriate use of PPE.
6           Do you know whether during
7  orientation employees are taught how to put
8  on the PPE?
9       A.   I do not.
10      Q.   Do you know what PPE is?
11      A.   Personal protective equipment.
12      Q.   Just so we're on the same
13  page.
14           How many of these new-hire
15  bonuses did you pay out last year?
16      A.   I do not know.
17      Q.   Were there a lot?
18      A.   There are a lot.
19      Q.   How long has this program been
20  in effect?
21      A.   A couple of years.
22      Q.   Have you ever looked at the
23  safety rep tape that's played or the safety

33  (Pages 126 to 129)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

42f217cb-4461-468a-bcd3-d6610bf1ec7d

FREEDOM COURT REPORTING

Page 130

1  representative tape that's done during the
2  new-hire orientation?
3      A.   No.
4      Q.   Have you looked at any tapes
5  that are shown during new-hire orientation?
6      A.   No, ma'am.
7      Q.   In your job, can you -- Let me
8  strike that.
9          In your job, do you have the
10 ultimate decision-making authority to
11 resolve a grievance, or do you have to go to
12 someone else higher?
13     A.   Yes, I can resolve a
14 grievance.
15     Q.   Are there some areas of the
16 contract where you can't resolve the
17 grievance without going above you to get
18 authority?
19     A.   I don't -- What area would
20 that be?
21     Q.   I'm asking you.  Are there any
22 areas?
23     A.   I don't know.

Page 131

1      Q.   Like if someone was
2  terminated, could you resolve that by
3  putting somebody back to work?
4      A.   Yes.
5      Q.   Are there any possible areas
6  where you would have to seek approval from
7  someone in order to resolve a grievance?
8          MR. ROSENTHAL:  Objection to
9  the form of the question.  You can answer.
10     A.   Okay.  What was it again?
11     Q.   Well, you said that part of
12 your job is to -- when the grievance got up
13 to the step it came to you, you were the
14 last step?
15     A.   Uh-huh.
16     Q.   Okay.  Do you have -- are
17 there any certain areas of the contract
18 where you have to get permission to resolve
19 it instead of just resolving it itself?
20         MR. ROSENTHAL:  Objection to
21 the form of the question.
22     A.   I don't know.
23     Q.   Have you ever had to seek

Page 132

1  permission to resolve a grievance?
2      A.   Yes.
3      Q.   Okay.  When and what was the
4  grievance?
5      A.   We had a grievance that --
6  it's been months ago.  We had a grievance
7  about a bunch of the employees were sent
8  home for the day for not doing their job, a
9  lot of bones on the line, I think that was
10 the situation.  And it was resolved to --
11 they grieved it up to the point, and we
12 agreed with the union to -- I think they
13 were sent home for four hours, and maybe we
14 resolved to pay them two back.  And I had to
15 get permission to be able to pay the two
16 hours on each employee.
17     Q.   Okay.  And from whom did you
18 obtain this permission?
19     A.   That would be Jim Bice.
20     Q.   Any other times where you've
21 obtained permission to resolve?
22     A.   Not that I can recall.
23     Q.   Are you aware of any video

Page 133

1  tapes or time studies done in your plant on
2  the issue of donning and doffing?
3      A.   There was one done a few
4  months back.
5      Q.   Who did the study?
6      A.   I don't know who it was.
7      Q.   Were you involved in it?
8      A.   No, I wasn't.
9      Q.   How were you made aware of it?
10     A.   We got the tapes and the tape
11 recordings for it.  They did it for a few
12 days.
13     Q.   Who got the tapes?
14     A.   Kesha Porter bought them.
15     Q.   What kind of tapes?
16     A.   Videotapes.
17     Q.   You actually purchased the
18 videotapes to use?
19     A.   Yes.
20     Q.   Who made the videotapes?
21     A.   We had a couple of folks in
22 the plant.
23     Q.   What folks?

34 (Pages 130 to 133)

FREEDOM COURT REPORTING

| Page 134 |
| --- |

1    A.    We had a safety manager.
2    Q.    Who was that?
3    A.    I think Scott Little.
4    Q.    Scott who?
5    A.    Little.
6    Q.    Okay.  And who else?
7    A.    Ricky Lewis.
8    Q.    What's Ricky's title?
9    A.    Back then he was the trainer.
10  He is now in production.
11    Q.    Who told you to buy the tapes?
12    A.    I didn't buy tapes.
13    Q.    Who told you to get the tapes?
14  You said you knew because we got the tapes.
15  Who told you --
16    A.    HR got the tapes.
17    Q.    Okay.  Did you instruct anyone
18  to get them?
19    A.    No, ma'am.
20    Q.    Do you know who did instruct
21  Kesha, is that her name?
22    A.    Kesha.
23    Q.    Who instructed Kesha to get

| Page 136 |
| --- |

1    A.    No, ma'am.
2    Q.    Do you conduct any audits of
3  any kind for Equity?
4    A.    No, ma'am.
5    Q.    Do you know where the tapes
6  are now?
7    A.    No, ma'am.
8    Q.    Earlier you said you've gone
9  into the plant and put on a smock to keep
10  your clothes clean?
11    A.    Yes, ma'am.
12    Q.    Is the plant wet?  Why would
13  you be keeping your clothes clean?
14    A.    Because there's water.
15    Q.    Where?
16    A.    On the floor.
17    Q.    Where else?
18    A.    There could be water that
19  drips.
20    Q.    Any other reason -- Any other
21  things that would make your clothes get
22  dirty?
23    A.    Not me, no.

| Page 135 |
| --- |

1  the tapes?
2    A.    We were asked to get -- I
3  don't recall who asked to get the tapes.
4    Q.    Other than getting the tapes,
5  did you have any other involvement in this
6  time study?
7    A.    No, ma'am.
8    Q.    Do you know the results of it?
9    A.    No, ma'am.
10    Q.    Did anyone ever tell you the
11  results of it?
12    A.    No, ma'am.
13    Q.    When you say a couple of
14  months ago, what do you mean by that?  Do
15  you know when?
16    A.    No, ma'am, I don't recall.
17    Q.    Has it been in 2008?
18    A.    I don't recall.
19    Q.    Do you know what was actually
20  studied or taped?
21    A.    No, ma'am, I don't.
22    Q.    Have you ever viewed the
23  tapes?

| Page 137 |
| --- |

1    Q.    Okay.
2         MS. MCGOWAN:  That's all.
3         MR. ROSENTHAL:  We're done.
4  (The deposition was concluded at 4:15 p.m.,
5  June 12th, 2008.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

35 (Pages 134 to 137)

FREEDOM COURT REPORTING

Page 138

1            REPORTER'S CERTIFICATE
2    STATE OF ALABAMA,
3    ELMORE COUNTY,
4        I, Sara Mahler, Certified Court
5    Reporter and Commissioner for the State of
6    Alabama at Large, do hereby certify that the
7    above and foregoing proceeding was taken
8    down by me by stenographic means, and that
9    the content herein was produced in
10   transcript form by computer aid under my
11   supervision, and that the foregoing
12   represents, to the best of my ability, a
13   true and correct transcript of the
14   proceedings occurring on said date and at
15   said time.
16        I further certify that I am neither
17   of kin nor of counsel to the parties to the
18   action; nor in any manner interested in the
19   result of said case.
20
21
22        _____
         Sara Mahler, CCR
23            ACCR #420

36 (Page 138)

42f217cb-4461-468a-bcd3-d6610bf1ec7d

# TAB 80

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


CASE NUMBER:  2:06-CV-01081-MEF-DRB


BETTY ANN BURKS,

et al.,

        Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

        Defendant.



BEFORE:

        Cynthia M. Noakes, Commissioner

        and Certified Court Reporter


            DEPOSITION TESTIMONY OF

                    GREG MILLS


            *****************************

Page 2

```
1        S T I P U L A T I O N

2

3        IT IS STIPULATED AND AGREED by and

4   between the parties through their respective

5   counsel, that the deposition of GREG MILLS may be

6   taken before Cynthia M. Noakes, Court Reporter,

7   at the Law Offices of WILLIAMS, POTTHOFF,

8   WILLIAMS & SMITH, 125 South Orange Avenue,

9   Eufaula, Alabama 36027, on the 11th day of June,

10  2008.

11       IT IS FURTHER STIPULATED AND AGREED

12  that the signature to and the reading of the

13  deposition by the witness is not waived, the

14  deposition to have the same force and effect as

15  if full compliance had been had with all laws and

16  rules of Court relating to the taking of

17  depositions.

18       IT IS FURTHER STIPULATED AND AGREED

19  that it shall not be necessary for any objections

20  to be made by counsel to any questions except as

21  to the form or leading questions, and that

22  counsel for the parties may make objections and

23  assign grounds at the time of the trial, or at
```

Page 3

```
1   the time said deposition is offered in evidence,

2   or prior thereto.

3        IT IS FURTHER STIPULATED AND AGREED

4   that the notice of filing of the deposition by

5   the Court Reporter is waived.

6

7

8

9

10

11

12

13

14

15

16

17  *****************************************

18

19

20

21

22

23
```

Page 4

```
1                INDEX

2   EXAMINATION BY:              PAGE NUMBER:

3   MR. WIGGINS                 12-227

4

5

6            EXHIBITS:

7   PLAINTIFFS'           PAGE NUMBER:

8   Plaintiffs' Exhibit No. 1       47

9   Plaintiffs' Exhibit No. 2       48

10  Plaintiffs' Exhibit No. 3       22

11  Plaintiffs' Exhibit No. 4       50

12  Plaintiffs' Exhibit No. 5       55

13  Plaintiffs' Exhibit No. 6       61

14  Plaintiffs' Exhibit No. 7       67

15  Plaintiffs' Exhibit No. 8       69

16  Plaintiffs' Exhibit No. 9       84

17  Plaintiffs' Exhibit No. 10

18  Plaintiffs' Exhibit No. 11      114

19  Plaintiffs' Exhibit No. 12      77

20  Plaintiffs' Exhibit No. 13      116

21  Plaintiffs' Exhibit No. 14      116

22  Plaintiffs' Exhibit No. 15      118

23  Plaintiffs' Exhibit No. 16      10
```

Page 5

```
1            INDEX (continued)

2

3   Plaintiffs' Exhibit No. 17      11

4   Plaintiffs' Exhibit No. 18      11

5   Plaintiffs' Exhibit No. 19      11

6   Plaintiffs' Exhibit No. 20      11

7   Plaintiffs' Exhibit No. 21      17

8   Plaintiffs' Exhibit No. 22      30

9   (All exhibits were retained

10  by Plaintiffs' attorneys)

11  Colloquy                227-232

12

13  Reporter's Certificate      233

14

15

16

17

18  **********************************************

19

20

21

22

23
```

2 (Pages 2 to 5)

FREEDOM COURT REPORTING

| Page 6 | Page 8 |
|---|---|
| 1        APPEARANCES | 1  a.m., GREG MILLS, witness in the above cause, for |
| 2 | 2  oral examination, whereupon the following |
| 3  ON BEHALF OF THE PLAINTIFFS: | 3  proceedings were had: |
| 4     MR. ROBERT L. WIGGINS, JR. | 4 |
| 5     MS. CANDIS A. MCGOWAN | 5      GREG MILLS, |
| 6     MR. JACOB A. KISER | 6  being first duly sworn, was examined and |
| 7     WIGGINS, CHILDS, | 7    testified as follows: |
| 8     QUINN & PANTAZIS, LLC | 8 |
| 9     ATTORNEYS AT LAW | 9     THE COURT REPORTER:  Usual |
| 10    The Kress Building | 10  stipulations? |
| 11    301 19th Street North | 11     MR. WIGGINS:  Yes. |
| 12    Birmingham, Alabama 35203 | 12     MR. ROSENTHAL:  Yes, except for reading |
| 13    (205) 314-0500 | 13  and signing. |
| 14 | 14     MR. WIGGINS:  All right. |
| 15    MR. ROBERT J. CAMP | 15     MR. ROSENTHAL:  Before we get started |
| 16    THE COCHRAN FIRM | 16  with the deposition, I just wanted to inform |
| 17    ATTORNEYS AT LAW | 17  Plaintiffs' counsel of the documents which we are |
| 18    505 North 20th Street | 18  producing today at their request during a |
| 19    Suite 825 | 19  conversation on Friday of last week. |
| 20    Birmingham, Alabama 35203 | 20    First would be various updated |
| 21 | 21  organizational charts, some of which -- and |
| 22  ************************* | 22  principally the fresh plant organizational chart |
| 23 | 23  -- was revised to be updated as of April 3, 2008. |

| Page 7 | Page 9 |
|---|---|
| 1     APPEARANCES (continued) | 1    We've also produced the most current Good |
| 2 | 2  Manufacturing Practices, which was revised as of |
| 3  ON BEHALF OF THE DEFENDANT: | 3  August 18 -- excuse me -- August 21, 2007.  And |
| 4     MR. HOWARD A. ROSENTHAL | 4  that would be 13 pages. |
| 5     MR. MALCOLM S. GOULD | 5    We're producing the current Employee |
| 6     PELINO & LENTZ | 6  Orientation Manual which updates the version which |
| 7     ATTORNEYS AT LAW | 7  we had previously produced. |
| 8    One Liberty Place | 8    We are producing redacted copies of the 2004 |
| 9    1650 Market Street | 9  contract proposals.  The top proposal in this |
| 10    Thirty-Second Floor | 10  packet are the proposals which were given by the |
| 11    Philadelphia, Pennsylvania 19103 | 11  union to the company; and then there were various |
| 12    (215) 665-1540 | 12  responses by the company to the union, which were |
| 13 | 13  revisions 1, 2, 3 and 4.  They redact everything |
| 14  ***************************** | 14  other than proposals relating to work clothing, |
| 15 | 15  supplies, and wages.  These were the written |
| 16    I, CYNTHIA M. NOAKES, a Certified | 16  documents which were produced during the 2004 |
| 17  Court Reporter of Eufaula, Alabama, acting as | 17  contract negotiations.  They don't include, |
| 18  Commissioner, certify that on this date, as | 18  obviously, any proposals which were made across |
| 19  provided by the Alabama Rules of Civil Procedure | 19  the table and not in writing. |
| 20  and the foregoing stipulation of counsel, there | 20    We've also produced, likewise, the 2008 |
| 21  came before me at the Law Offices of WILLIAMS, | 21  union contract proposals, redacted, to show those |
| 22  POTTHOFF, WILLIAMS & SMITH, 125 South Orange | 22  which relate to supplies, work clothing, and |
| 23  Avenue, Eufaula, Alabama 36027, beginning at 9:10 | 23  wages.  And then the company's various responses |

3 (Pages 6 to 9)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 10

1  to them during the course of the negotiations,
2  which were revisions 1, 2, 3, 4, and 5. And these
3  copies are for Plaintiffs.
4      MR. WIGGINS: Okay.
5      MS. MCGOWAN: On the union
6  negotiations, the proposals, you said they don't
7  include proposals made across the table? Were
8  they noted on there?
9      MR. ROSENTHAL: No. Those would be
10  just proposals which were made orally across the
11  table. There's no written document that reflects
12  them.
13      MR. WIGGINS: I'm going to mark all
14  these that he just gave us. All right. I'm going
15  to mark the updated organizational charts as of
16  April 3, 2008, that were just produced, as Exhibit
17  16.
18      (Plaintiffs' Exhibit No. 16 was
19      marked for identification and a
20      copy of the same is attached
21      hereto.)
22      MR. WIGGINS: The updated or revised
23  Good Manufacturing Practices policy revision dated

Page 11

1  August 18, 2007, is being marked as Exhibit 17.
2      (Plaintiffs' Exhibit No. 17 was
3      marked for identification and a
4      copy of the same is attached
5      hereto.)
6      MR. WIGGINS: The current Orientation
7  Manual is being marked as Exhibit 18.
8      (Plaintiffs' Exhibit No. 18 was
9      marked for identification and a
10      copy of the same is attached
11      hereto.)
12      MR. WIGGINS: The 2004 contract
13  proposals and response documents are Exhibit 19.
14      (Plaintiffs' Exhibit No. 19 was
15      marked for identification and a
16      copy of the same is attached
17      hereto.)
18      MR. WIGGINS: And the 2008 contract
19  proposals and responses will be Exhibit 20.
20      (Plaintiffs' Exhibit No. 20 was
21      marked for identification and a
22      copy of the same is attached
23      hereto.)

Page 12

1      MR. WIGGINS: Now, I've got Mr. Mill's
2  affidavit, so I'm not going to go into his
3  background. It's all clear in his affidavit, I
4  think.
5
6      EXAMINATION
7  BY MR. WIGGINS:
8  Q.   Let me show you the orientation manual that
9  was produced previously, Bates numbers E 40 to E
10  160; and I'll show you what you produced this
11  morning, Exhibit 18.
12      Are you able to tell us what's changed in
13  those documents?
14  A.   No, sir.
15  Q.   Who would be able to tell us that?
16  A.   HR department.
17  Q.   Who in the HR department?
18  A.   HR department. There's a lot of information
19  in these manuals. QA, HR. So the QA department
20  supervisor or a manager, or the HR director would
21  be the one to tell you the changes in these
22  manuals.
23  Q.   And what are their names?

Page 13

1  A.   Kathy Gilmore in HR, or Butch White in QA.
2  Q.   And what is Ms. Gilmore's title?
3  A.   HR manager.
4  Q.   And what is Mr. Whiting's (sic) title?
5  A.   QA manager.
6      MR. ROSENTHAL: Is it Wade or Whiting?
7      THE WITNESS: White.
8  Q.   White. I'm sorry. And he's QA manager, not
9  supervisor, correct?
10  A.   QA manager.
11  Q.   Okay. Anyone else involved in revising the
12  Employee Orientation Manual?
13  A.   Not to my knowledge.
14  Q.   The manual that you've produced is a bound
15  copy in pamphlet form, correct?
16  A.   Yes.
17  Q.   Is that the way it's given to the employees?
18  A.   Yes.
19  Q.   And at what point is this employee manual,
20  Exhibit 18, provided to the employees?
21  A.   To the best of my knowledge, when they're
22  hired.
23  Q.   What role do you play in employee

4 (Pages 10 to 13)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660
4a4efcd4-222a-4134-9214-747cf2d63865

Page 14

1  orientation or the use of the Employee Orientation
2  Manual?
3  A.  None.
4  Q.  Who is most knowledgeable about the employee
5  orientation and the use of the manual?
6  A.  Dante Rogers.
7  Q.  What is Dante Roger's job title?
8  A.  He's a QA manager, I do believe, and he's
9  over new hire orientation.
10  Q.  And is Ms. Gilmore, Mr. Rogers in the QA
11  shown on Exhibit 16?
12  A.  Yes.
13  Q.  All right.  What page?  This is the page
14  that has Jim Bice, Complex Human Resource Manager
15  at the top?
16  A.  Yes.
17  Q.  And it shows Dante Rogers as the human
18  resource manager, correct?
19  A.  Yes.
20  Q.  Now, you're calling him a QA manager.  Is
21  that the same thing?
22  A.  No.  Dante Rogers, HR manager; Butch White,
23  QA manager.

Page 15

1  Q.  Oh, I wrote it down wrong.  I misunderstood
2  you.
3     Now, I had asked you about Mr. White.  I'm
4  not seeing him on here.
5  A.  He's on QA.
6  Q.  Okay.
7  A.  Complex QA director is his title.
8  Q.  Now, what is the complex?
9  A.  The complex is both facilities, the fresh
10  and the further processing plants.
11  Q.  And you're the head of both plants?
12  A.  I'm the operation manager.
13  Q.  Are you shown in Exhibit 16?
14  A.  Yes.
15  Q.  Where are you at?
16  A.  On the front page -- on the second page.
17  You see Tim Esslinger, the general manager?
18  Q.  Yes.
19  A.  I'm under him as operations manager.
20  Q.  All right.  And is anyone under you?
21  A.  Yes.
22  Q.  Who is under you?
23  A.  It's on the second page.

Page 16

1      MR. GOULD:  It's the fourth page
2  actually, I believe.
3  Q.  All right.  I see you now on the fourth
4  page.  And is that a complete description of
5  everyone that reports to you?
6  A.  Yes.
7  Q.  And where is Mr. Esslinger located?
8      MR. ROSENTHAL:  On the organizational
9  charts?
10      MR. WIGGINS:  No.  Physically.
11  Q.  Where is his office?
12  A.  At the Eufaula complex.
13  Q.  Okay.  So Mr. White, as complex QA director
14  does not report to you?
15  A.  No, sir.
16  Q.  Is that right?
17  A.  Yes.
18  Q.  And the human resource director, Jim Bice,
19  does not report to you?
20  A.  Correct.
21  Q.  And therefore Kathy Gilmore does not report
22  to you?
23  A.  Correct.

Page 17

1  Q.  And Dante Rogers does not report to you?
2  A.  Correct.
3  Q.  So does anyone that reports to you have
4  anything to do with these orientation manuals?
5  A.  No, not as I'm aware of.
6  Q.  Now, you were designated for various topics
7  here today.  Are you aware of that?
8  A.  No.
9  Q.  Okay.  I'm going to show you the next
10  exhibit, 21.
11      (Plaintiffs' Exhibit No. 21 was
12      marked for identification and a
13      copy of the same is attached
14      hereto.)
15  Q.  This is the company's designation of
16  witnesses under a rule called Rule 30(b)(6), which
17  means that you have been designated to speak for
18  and to bind the corporation.
19     Have you seen this list of topics that you
20  have been designated for?
21      MR. ROSENTHAL:  I'm going to object to
22  the legal conclusion with respect to the impact of
23  a designation.  But you can answer the question.

5 (Pages 14 to 17)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 18

1   A.   No, I have not seen these.
2   Q.   Okay. Well, let's go over that real quick,
3   please. Look at topic No. 1. "The organizational
4   structure of Equity, including specifically any
5   mechanisms for oversight of individual plants by
6   corporate or regional managers."
7       You've been designated as the person
8   knowledgeable on that subject. Do you agree that
9   you are properly designated and have knowledge on
10  that subject?
11      MR. ROSENTHAL: Objection to the
12  request for a legal conclusion whether he was
13  properly designated. To the extent you have
14  knowledge of the subject, you can answer.
15  A.   I have knowledge of some of it, but not all
16  of it.
17  Q.   Two other people were designated for that
18  topic too.
19      Now let's look at topic No. 2 on Exhibit 21.
20  You were designated for the training portion of
21  Equity's policies and practices regarding the
22  maintenance of records of hours worked and wages
23  paid, and the training to inform employees and

Page 19

1   supervisors of these policies, and measures that
2   were taken to ensure compliance with these
3   policies.
4       What role do you play in that area of
5   training on that topic?
6   A.   None. I have people under me that do the
7   training; I don't do the training.
8   Q.   Okay. Who are they?
9   A.   There's different levels from supervisors
10  all the way up to shift managers, plant managers.
11  Q.   Okay. And take the organizational chart,
12  Exhibit 16, and tell me those persons.
13  A.   It could be any of these sheets.
14  Q.   The entire exhibit?
15  A.   According to what department and where they
16  work and what they're training on.
17  Q.   Okay. Which employees -- are you saying all
18  these employees shown here do training or are you
19  saying particular ones?
20  A.   All of them do training.
21  Q.   All right. But do they do training on
22  maintenance of records of hours worked and wages
23  paid?

Page 20

1   A.   Maintenance of records? Explain what you're
2   asking now.
3   Q.   Look at No. 2 there. Read No. 2 to yourself
4   to make sure you're on the same page with me.
5   A.   (Witness complies.)
6   Q.   Okay.
7   A.   They do time sheets and, you know, turn in
8   weekly daily time sheets. Supervisors and
9   superintendents do time sheets and turn those in
10  to accounting.
11  Q.   Okay.
12  A.   The payroll department.
13  Q.   All right. Just take a minute and read each
14  of the topics in Exhibit 21 that you've been
15  designated for, and tell me if you believe that
16  you do not have knowledge on any of those topics.
17      (The witness examines the
18      document.)
19  A.   I mean, on some of these I've got general
20  knowledge of, but not in detail on all these
21  items. You know, there's a lot of stuff here.
22  Some of it I know something about, but not all;
23  because I've got people under me that's

Page 21

1   responsible for this.
2   Q.   Okay. We'll get into that as we go along.
3   But you don't see any topics in Exhibit 21 that
4   you disagree with you being designated to speak
5   on, do you?
6   A.   I mean, when you're talking about the
7   plaintiffs on their required wear, I don't even
8   know the plaintiffs; and I don't know 1700
9   employees by name and where they work, so I don't
10  know what they're required to wear in the position
11  they're in. You know what I'm saying?
12  Q.   Uh-huh.
13  A.   So I don't have knowledge of that. I know
14  what positions, what is required to be worn in
15  that position, according to what they're doing.
16  But I don't know by plaintiff's name.
17  Q.   All right. Now, while you were looking at
18  that, I was looking at Exhibit 17, which is what's
19  called the revised GMP's; and it's considerably
20  more involved than the one we had before today.
21      Exhibit 17, is it in force as of today?
22      MR. ROSENTHAL: I'm going to object to
23  the extent to the premise of the question that

6 (Pages 18 to 21)

FREEDOM COURT REPORTING

Page 22

1  it's considerably more involved than the prior
2  Good Manufacturing Practices which were supplied,
3  which were multiple versions of the GMP's for each
4  of the plants. But you can answer the question.
5  A.  Would you repeat the question?
6      MR. ROSENTHAL: Is it in force today?
7  Q.  Yeah.
8  A.  Yes.
9  Q.  And has this Exhibit 17 been in force since
10 August 18, 2007?
11 A.  Yes.
12 Q.  And it doesn't bear your signature, does it?
13 A.  No.
14 Q.  All right. But it bear's your boss's
15 signature, correct, or a place for the signature,
16 correct?
17 A.  I don't see that.
18 Q.  Page 2 of my copy of Exhibit 17 says, at the
19 top, "Robin Stevens, Fresh Plant Manager." He
20 reports to you though, doesn't he?
21 A.  Correct.
22 Q.  All right. I brought the old exhibits that
23 have been previously produced. Look at Exhibit 3.

Page 23

1  A.  (Witness complies.)
2  Q.  Is this the version of the Good
3  Manufacturing Practices that were in force and
4  effect from October 2, 2006, to August 18, 2007?
5  A.  Yes. To the best of my knowledge, yes.
6  Q.  And look at page 2. That's your signature,
7  correct?
8  A.  Yes.
9  Q.  You signed it October 2, 2006, correct?
10 A.  Yes.
11 Q.  Do you know why, when it was revised in
12 August of 2007, it didn't call for your signature?
13 A.  No.
14 Q.  Okay. Look at page 3 of Exhibit 17.
15 A.  (Witness complies.)
16 Q.  Is that an accurate and complete list of the
17 revisions, dates, and type of revisions?
18 A.  To the best of my knowledge.
19 Q.  How long have you been with Equity Group?
20 A.  Since March of '04.
21 Q.  And what was your job history prior to that?
22 A.  I was with CP.
23 Q.  And what does CP stand for?

Page 24

1  A.  Charoen Pokphand.
2  Q.  And how long were you with them?
3  A.  Started September 1999.
4  Q.  And what were your jobs for CP?
5  A.  First job, I was maintenance manager; then I
6  was promoted in 2000 to plant manager; then I was
7  plant manager when Equity Group bought Charoen
8  Pokphand.
9  Q.  And when did that take place?
10 A.  When it was purchased?
11 Q.  Correct.
12 A.  I believe March of '04.
13 Q.  And when did you become complex manager?
14 A.  Operations manager.
15 Q.  Complex operations manager I think is your
16 title.
17 A.  I don't remember the date. It was sometime
18 October or November of '04.
19 Q.  Who did you replace?
20 A.  No one.
21 Q.  From 2000 to 2004 you said you were plant
22 manager. Of which plant?
23 A.  Fresh plant.

Page 25

1  Q.  To whom did you report?
2  A.  Lee Allen.
3  Q.  And what was his job?
4  A.  Complex manager.
5  Q.  So they created a new position called
6  complex operations manager sometime in late 2004?
7  A.  Yes.
8  Q.  Do you know why?
9  A.  No.
10 Q.  Now, looking at Exhibit 3 again, which you
11 said was the predecessor to Exhibit 17, it has 19
12 numbered paragraphs, correct?
13 A.  What are you talking about 19 paragraphs?
14 Q.  I'm sorry. 29 paragraphs. You've got
15 Exhibit 3 in front of you, correct?
16 A.  Uh-huh.
17 Q.  All right. It has six pages with 29
18 numbered paragraphs, correct?
19 A.  Yes.
20 Q.  All right. Now, looking at the revised
21 2007, Exhibit 17, it has 41 numbered paragraphs,
22 then a series of bullet point paragraphs, then it
23 looks like it picks up with some more numbered

7 (Pages 22 to 25)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 26

1 paragraphs; so I really don't know how many in
2 total.
3      But you would agree that this new policy has
4 many, many more paragraphs than the predecessor
5 policy, correct?
6      MR. ROSENTHAL: Objection to the extent
7 you're referring to P3 as the predecessor. This
8 P17 is a combination of GMP's for all the entire
9 complex plants. This is limited to the fresh
10 plant only. It is not correct to say that this is
11 the predecessor to this; this is one part of it.
12      MR. WIGGINS: All right. But I think
13 you're going to have to let the witness be the
14 witness.
15      MR. ROSENTHAL: Well, I'm objecting to
16 your question.
17      MR. WIGGINS: Well, he had already
18 answered that question.
19      MR. ROSENTHAL: No.
20      MR. WIGGINS: Well, the record will
21 show that. But still, I don't think that's a
22 proper objection. And I think the witness needs
23 to be the witness, not the lawyer.

Page 27

1      MR. ROSENTHAL: Well, I objected before
2 and you continued to try to refuse the witness by
3 referring to a document incorrectly, which is
4 improper under the rules.
5      MR. WIGGINS: Well, the rules say you
6 can object to the form. And I'm going to object
7 to speaking objections. If the witness answers
8 wrong and you need to redirect him, that's fine;
9 but I don't want you interrupting in the middle of
10 the deposition like that.
11      MR. ROSENTHAL: You don't set the
12 rules, Mr. Wiggins.
13      MR. WIGGINS: No, but I know the rules,
14 and I don't want to have to go to the judge about
15 them.
16 (BY MR. WIGGINS)
17 Q.   Did you play any role in this revision
18 that's Exhibit 17?
19 A.   No.
20 Q.   Do you know why it was revised?
21 A.   No.
22 Q.   Do you know how it was revised?
23 A.   No.

Page 28

1 Q.   But you would agree that it's longer, has
2 more paragraphs than Exhibit 3, correct?
3 A.   It has more paragraphs than Exhibit 3.
4 Q.   Do you know why?
5 A.   Because this covers slaughter, debone, and
6 further processing, as it states.
7 Q.   And what did Exhibit 3 cover?
8 A.   To the best of my knowledge, this only
9 covers slaughter/debone. It states "Fresh
10 Processing" on the cover sheet.
11 Q.   All right. Is there any part of Exhibit 17
12 that does not relate to slaughter, debone, and
13 further processing in the same way?
14      MR. ROSENTHAL: Object to the form. In
15 the same way?
16 Q.   Is there any part of Exhibit 17 which does
17 not apply to all three areas -- slaughter, debone,
18 and further processing -- in the same way?
19 A.   I don't know the answer to that.
20 Q.   All right. Well, given the length of this
21 one, I think I'm going to take a few minutes to
22 read it.
23      MR. WIGGINS: Take a break?

Page 29

1      MR. ROSENTHAL: It's your deposition.
2 Q.   While he's getting that copied, let me ask
3 you some other questions, and then we'll take a
4 break at that point.
5      Are employees required to process chicken or
6 produce poultry products in a way that does not
7 contaminate the product?
8 A.   Yes.
9 Q.   Is that one of their principal
10 responsibilities?
11 A.   Yes.
12 Q.   Are all employees required to do their
13 processing or production work in a manner that
14 produces uncontaminated chicken products?
15 A.   Yes.
16 Q.   These Good Manufacturing Practices that we
17 have in Exhibit 3 and Exhibit 17, the purpose of
18 them is for employees to be able to produce
19 uncontaminated poultry products, correct?
20 A.   Yes.
21 Q.   And that benefits the company so that it can
22 sell its products to its customers, correct?
23 A.   Yes. And it's a USDA regulation.

8 (Pages 26 to 29)

FREEDOM COURT REPORTING

Page 30

1 Q. Your customers are purchasing from you
2 uncontaminated poultry products, correct?
3 A. Yes.
4 Q. You represent to them that when they
5 purchase poultry products from your company, they
6 are receiving wholesome, uncontaminated products,
7 correct?
8 A. Yes.
9 Q. Now, I don't have a real good copy of this
10 map -- I suppose it's as good as you've got -- but
11 I want you to help me read it.
12     MR. WIGGINS: We'll mark this as
13 Exhibit 22.
14     (Plaintiffs' Exhibit No. 22 was
15     marked for identification and a
16     copy of the same is attached
17     hereto.)
18 Q. Which side do you read this from? This
19 side, I suppose. Show me the parking lot.
20     MR. ROSENTHAL: You'll have to explain
21 for the court reporter what you're pointing to.
22 Q. Let's take this red pen and mark the parking
23 lot for us.

Page 31

1 A. This is the parking lot that I'm marking in
2 red.
3 Q. All right.
4     MR. ROSENTHAL: For the record, Mr.
5 Mills marked three areas in red and designated
6 them "parking lot."
7 Q. And this bigger parking lot is for the fresh
8 plant?
9 A. Yes.
10 Q. And this second biggest parking lot is for
11 the further processing plant?
12 A. Yes.
13 Q. And what's this smallest parking lot for?
14 A. Admin parking lot.
15 Q. Okay. Now, in the fresh plant, where do
16 employees enter the plant?
17 A. They can enter at either end, the north or
18 south end of the further processing plant.
19 Q. All right. Put the word "entry."
20 A. (Witness complies.)
21 Q. All right. You put E-N-T for the two
22 entrances.
23     Are employees allowed to enter either door?

Page 32

1 A. Yes.
2 Q. And what's the first thing they come to as
3 they enter each door in the fresh plant?
4 A. A hallway leading to production or break
5 room areas.
6 Q. And is the break room listed on the map?
7 A. Yes. Debone break room listed, evis break
8 room listed, back dock break room right here.
9 Q. Back dock; it's not listed, is it?
10 A. I can't read it if it is.
11 Q. Well, write that on there for us.
12 A. (Witness complies.)
13 Q. Now, where do employees sanitize their boots
14 or shoes?
15 A. At the entrance of each processing area they
16 walk through a floor sanitizer.
17 Q. All right.
18 A. Any entrance into the building has floor
19 sanitizers you walk through nonstop.
20 Q. You've got two entries marked. Are there
21 others?
22 A. Any door leading from the outside. This
23 print is so small I can't designate every little

Page 33

1 door. But every door entering into the processing
2 area has a floor sanitizer that keeps the floor
3 wet with sanitizer.
4 Q. Okay. Show me where the other entrance
5 doors are.
6 A. I don't know if that's possible, as small as
7 this print is.
8     There's one in this area; there's one out of
9 this control room; there's one out of this
10 maintenance shop area; there's one in a doorway
11 over here that I cannot see on this print.
12     Every door leading into processing has a
13 floor sanitizer.
14 Q. Okay. Now, is there north, south, east, and
15 west on this map?
16 A. I do not see one.
17 Q. Do y'all -- how do you describe the plant?
18 Do you call it the north end or south end, or do
19 you have words that describe where you're at in
20 the plant?
21 A. Just departments.
22 Q. Okay. Tell me what the departments are.
23 A. Debone.

9 (Pages 30 to 33)

FREEDOM COURT REPORTING

Page 34

1  Q.  Write that down.
2  A.  (Witness complies.)
3  Q.  Okay.
4  A.  DSI, shipping, maintenance shop,
5  refrigeration room, control room.
6      This thing is so small I can't read it.
7  This is not right.  This is cooler.
8  Q.  What you had marked as maintenance is really
9  the cooler?
10 A.  This is the maintenance shop.
11 Q.  Okay.
12 A.  This is the refrigeration room; this is the
13 chiller room; this is the evis department; this is
14 the picking room; this is the shackling room; this
15 is the back dock, back dock/live receiving; this
16 is office areas right here in this area; this is
17 the evis break room right here in this open spot;
18 this is USDA.
19 Q.  Where's QA?
20 A.  QA office is right here; QA manager's office
21 is right here; plant manager is right here; my
22 office is right here; conference room, production
23 manager, production manager, production

Page 35

1  coordinator; this is debone break room; this is
2  the locker area in the break room; there's also a
3  locker area in this break room that I can't even
4  see where it's at it's so small.
5  Q.  Okay.
6  A.  This is the entrance for the office
7  personnel right here.
8  Q.  All right.  Where are the first line
9  supervisors' offices?
10 A.  It's not even shown on this print.  Right
11 here.
12 Q.  That's in the production area, correct?
13 A.  There's an office area right here, and then
14 there's a --
15 Q.  Let me stop you.  Is this in the production
16 area where these first line supervisors' offices
17 are?
18 A.  No.
19 Q.  Okay.  You've got to go outside the
20 production area to get the supervisors?
21 A.  Through this door right here, and there's a
22 door on each end that's going to lead to these
23 offices.

Page 36

1  Q.  Okay.  And does that door from the
2  supervisor's office into debone have a foot
3  sanitizer?
4  A.  No.
5  Q.  Okay.
6  A.  Just doors from the outside into the
7  processing plant.
8  Q.  All right.  Now, I interrupted you.  Where
9  are the other supervisors' offices?
10 A.  There's another supervisor office in this
11 area.  Honestly, this thing's so jumbled up, I
12 can't make out where it's at.  But right in this
13 area here is a supervisor's office.  I believe
14 it's in this corner right here.
15     And then offices here.  Production manager
16 is in this area.  Sanitation manager has an office
17 in this warehouse.  This has got offices in it
18 which are not drawn.
19 Q.  What's this called here?
20 A.  Warehouse.  And there's offices in here that
21 houses sanitation manager for this plant and
22 purchasing for this complex.
23     There's a maintenance manager's office in

Page 37

1  this area, a maintenance supervisor's office in
2  this area.
3  Q.  Okay.  And the evisceration department
4  supervisors' offices are where?
5  A.  Right here, this back corner right here.
6  Q.  All right.  Now, the production process goes
7  from live receiving down to debone?
8  A.  Yes.
9  Q.  All right.  Now, you had marked for us, but
10 let's get it in the record, where these foot
11 sanitizing activities are taking place.
12 A.  There's a number of them.  I don't know all
13 the exact locations, but I know it's a requirement
14 that they are on every entrance into the
15 production area on the inside.
16 Q.  That's a company requirement?
17 A.  No.
18 Q.  Whose requirement?
19 A.  USDA.
20 Q.  And the company has a policy that employees
21 must comply with USDA requirements, correct?
22 A.  Yes.
23 Q.  Let's see if we can get a verbal description

10 (Pages 34 to 37)

FREEDOM COURT REPORTING

Page 38

1  of where these places are.
2      On the debone end of the plant entrance, you
3  come down -- you come into the entry and exit
4  door, and you walk down a hall that runs parallel
5  to the debone department and the debone break
6  room, correct?
7  A.  Correct.
8  Q.  Then there's a main entrance there across
9  the hall from the debone break room that the
10 employees enter the production area, correct?
11 A.  Correct.
12 Q.  And there is a foot sanitation process at
13 that door, correct?
14 A.  Yes.
15 Q.  Employees entering the evisceration end of
16 the building and the live receiving end of the
17 building, when they come in that door, they come
18 down that same hall but from the other end of the
19 building, correct?
20 A.  Either end.  They can come in either end
21 they'd like.  They're not required for evis to
22 come in one end and debone to come in the other
23 end.  They can come in either end they'd like.

Page 39

1  Q.  Okay.  But down on the evisceration end
2  there is another entrance from the hall into the
3  production area that has a required boot
4  sanitation station, correct?
5  A.  Yes.
6  Q.  Now, you pointed us to some others back in
7  here.  Verbally tell us where you're going from
8  and to at the point that you have those boot
9  sanitation activities occurring.
10 A.  Best of my knowledge, and I'm not familiar
11 with all that, there is one coming out of the
12 control room into the evis department; there is a
13 foot sanitizer coming out of the maintenance shop
14 into the production area, and --
15 Q.  Which production area?
16 A.  Evis.  There is a foot sanitizer coming off
17 the shipping loading area onto the production
18 area.
19 Q.  Which production area?
20 A.  Debone.  Debone staging area.  And I'm sure
21 there's more, but I don't remember the other ones.
22 I don't remember where the rest of them are
23 located.

Page 40

1  Q.  Okay.  Do you know of any documents that
2  list them?
3  A.  Not as I'm aware of.
4  Q.  Now, describe your current boot sanitation
5  process.
6  A.  It is a unit mounted on the wall that takes
7  and blows chemicals on the floor; it keeps the
8  floor wet.  And all they do is walk across the
9  floor.
10 Q.  How long has that been the practice?
11 A.  I don't recall when we started that up.
12 Q.  Give me your best estimate.
13 A.  This is totally a guess:  three years.
14 Totally a guess.  I don't know.  It's been in a
15 while.
16 Q.  Who would know?
17 A.  I don't know the answer to that either.
18 Q.  Are there any documents that describe the
19 boot sanitation process that you've said you walk
20 across a wet floor?
21 A.  Not as I'm aware of.
22 Q.  Does an employee have to push any buttons?
23 A.  No.  They're on timers.  They come on

Page 41

1  automatic.
2  Q.  And are they motion-sensored or just pure
3  time?
4  A.  Pure time.
5  Q.  Now, describe your prior boot sanitation
6  process.
7  A.  We didn't have one prior to this.
8  Q.  All right.  I've heard described -- I wasn't
9  at the depositions, but I've had people tell me
10 some of the things that were said.  But there was
11 mention apparently of some boot sanitation process
12 where employees had to punch a button of some
13 type.  Are you familiar with that?
14     MR. ROSENTHAL:  Objection to the
15 reference that any employee said that at the
16 deposition.  You can answer.
17 A.  No, I'm not aware of that.  No employee has
18 to push a button on the boot sanitizer.
19 Q.  Does an employee have to do anything other
20 than walk across a wet floor?
21 A.  That's it.
22 Q.  And that's been the only process you've ever
23 had?

11 (Pages 38 to 41)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 42

1  A.  Yes.
2  Q.  Now, is an employee required to do anything,
3  other than enter the building and punch his clock,
4  before going into the production area?
5  A.  He's not required to.  He's required to put
6  on a hair net, beard net if he has a beard, and
7  earplugs.
8  Q.  All right.  But he's not required to do that
9  in the production area?
10  A.  No.
11  Q.  Is he required to do it before the employee
12  enters the production area?
13  A.  Yes.
14  Q.  All right.  Is that in writing?
15  A.  Not that I'm familiar with.  I'm not saying
16  it's not; I don't know.
17  Q.  Okay.  Now, where is the time card punch
18  clock?
19  A.  Just inside the doors at the break rooms.
20  There's a time clock right here that I'm aware of.
21  Q.  Put "TC" right there, so I can remember it
22  when I see it.
23  Okay.  And there's one in this area.  I

Page 43

1  don't remember which side of the door it's on.
2  Q.  All right.
3  A.  And I know there's one at the hallway right
4  here for maintenance.
5      Now, I'm not for sure on the picking and
6  receiving if there's one back there; I don't know,
7  because I'm not in that area that much.  But I
8  know these are here.  And there's also one in this
9  break room in that area right there, in the evis
10  break room.
11  Q.  The picking and receiving employees, they
12  enter these two main entrance doors that you've
13  shown us?
14  A.  They can enter either at this entrance, or
15  if they are live shacklers, they can enter at this
16  entrance, or they can enter through the
17  picking/receiving break room area.  Either or.
18  Q.  At the beginning of the day, they can come
19  in through the picking and receiving area?
20  A.  Yes.  If they work in that area.
21  Q.  And you think there's a time clock back
22  there?
23  A.  I don't know; I think.  I don't know.

Page 44

1  Q.  Okay.  So as I understand your testimony,
2  there is nothing that employees are required to do
3  before they enter the production area, other than
4  punch their clock?
5  A.  As I stated, hair nets, beard nets, and
6  earplugs before entering into the production area.
7  Q.  Okay.  What are they required to do upon
8  entry into the production area?
9  A.  Put on their smock, wash their hands before
10  going to the line.
11  Q.  Anything else?
12  A.  Arm guard if they're using knives or
13  scissors, after they enter into the production
14  area.
15  Q.  When you say "arm guard," you mean put it
16  on?
17  A.  Slide it over your arm.
18  Q.  Okay.  Anything else?
19  A.  That's all I'm aware of.
20  Q.  All right.  Now, where are the wash basins?
21  A.  Wash basins?  When you enter into debone,
22  they're in this area right here.  When you enter
23  into evis, they're in this area right here.  When

Page 45

1  you enter from the picking/receiving break room
2  area when you enter into production, they're right
3  on the wall when you go through the door.  There's
4  wash basins back here in this area.
5  Q.  What do you call that area?
6  A.  DSI area.  There's wash basins here.
7  There's wash basins in the evisceration department
8  on this wall here.  They're in a lot of locations.
9  That's the ones I remember at this time.
10  Q.  All right.  Now, the first one you told me
11  about, you're coming from the hall adjacent to the
12  break room into the debone department?
13  A.  Yes.
14  Q.  And the wash basin is adjacent to the entry
15  to the debone department?
16  A.  Right beside the entry.
17  Q.  How many stations or spigots do you have?
18  A.  I don't know the answer to that.
19  Q.  Give me an approximation.
20  A.  I don't know.
21  Q.  Are employees required to wash their hands
22  at that station?
23  A.  They are required to wash their hands before

12 (Pages 42 to 45)

FREEDOM COURT REPORTING

Page 46

1  going to the line, after entering the production
2  area.
3  Q.   And that's the only wash basin that they use
4  for that purpose?
5  A.   No.
6  Q.   All right.
7  A.   They've got wash basins in evis department;
8  they've got wash basins in debone department.  The
9  people that work in DSI can wash here before going
10 to their job.  The people in picking and receiving
11 can wash here before going to their job.
12 Q.   Okay.  Now, the evisceration sink you told
13 us about is right there as you come in that door
14 to that area?
15 A.   Yes.  Right in front of the door, yes.
16 Q.   Okay.  Where do the DSI employees enter into
17 the production area at the start of the day?
18 A.   I can't really answer where they enter.
19 They can enter here and walk across; they can
20 enter into the debone entrance and walk around;
21 they can enter either one of these areas and walk
22 to the DSI.  I can't tell you that all DSI enter
23 this area.  They're not required to enter no

Page 47

1  certain area.
2  Q.   All right.  Let me read that new exhibit you
3  brought me.  We'll take a break for a few minutes.
4  A.   Okay.
5       (A brief recess was taken.)
6  (BY MR. WIGGINS)
7  Q.   All right.  Let's take this book I gave you
8  and let's look at Exhibit 1.  This is called "New
9  Hire GMP Policy."
10      During what period of time was this in force
11 and effect?
12 A.   I can't answer that.
13 Q.   Is it currently in force or effect?
14 A.   Yes.
15 Q.   Give me your best estimate of how long it
16 has been in force and effect.
17 A.   I don't have a clue on this particular
18 policy exhibit.
19 Q.   Okay.  Let's go to -- Before I go to No. 2,
20 let me ask you this:  Does this New Hire GMP
21 Policy apply to all employees that are under you,
22 including the hourly employees in the two plants?
23      (The witness examines the

Page 48

1       document.)
2  A.   Yes.
3  Q.   And you took your time to read the document
4  before answering, correct?
5  A.   I scanned over it.
6  Q.   Okay.  Now let's go to Exhibit No. 2.  This
7  is called "Equity Group - Eufaula Division, LLC
8  Good Manufacturing Practices (GMP'S)," correct?
9  A.   Yes.
10 Q.   And is this currently in force and effect?
11      (The witness examines the
12      document.)
13 A.   Yes, to the best of my knowledge.
14 Q.   All right.  And we sat here while you took
15 your time to read that document also, correct?
16 A.   I scanned over it, yes.
17 Q.   And it's got a signature, Mary Allen.  Is
18 that an hourly employee, more than likely?
19 A.   I don't have a clue.  I don't know Mary
20 Allen.
21 Q.   Are employees required to sign this document
22 at some point in the process?
23 A.   I don't have an answer to that; I don't

Page 49

1  know.
2  Q.   All right.  Let's look back at the other
3  exhibit real quick.  It starts at page 4.  Do you
4  know why?
5  A.   No, I don't.
6  Q.   Let's go to Exhibit 3.  This is the Equity
7  Group Eufaula Good Manufacturing Practices for
8  fresh processing, correct?
9  A.   Yes.
10 Q.   And it says the issue date was March 15,
11 2004, correct?
12 A.   Yes.
13 Q.   Revised date, October 2, 2006?
14 A.   Yes.
15 Q.   And this is one you earlier identified that
16 you had signed.
17      When did Equity Group take over at this
18 plant, the fresh processing plant?
19 A.   In March of 2004, I believe.
20 Q.   So this was the very first one under Equity
21 Group's ownership, correct?
22 A.   I can't answer that.  I would think so, but
23 I don't know.

13 (Pages 46 to 49)

FREEDOM COURT REPORTING

Page 50

1  Q.    All right. Do you see any part of Exhibit 3
2  that is not currently in force and effect?
3             (The witness examines the
4             document.)
5  A.    To the best of my knowledge, briefly
6  scanning over it, I believe they're all in force
7  at this time.
8  Q.    And we sat here while you took time to read
9  through the document.
10            MR. ROSENTHAL: Objection. Not a point
11 in the question. You can answer.
12 A.    Well, I briefly scanned over it.
13 Q.    Well, we sat here; it appeared you read
14 every paragraph.
15 A.    I did not read every paragraph.
16 Q.    All right. Well, if you need to read every
17 paragraph to answer my next question, please do
18 so.
19            But as I understand your testimony, the
20 items listed in Exhibit 3 employees have been
21 required to comply with from March 2004 to
22 present, correct?
23 A.    Yes, to the best of my knowledge.

Page 51

1  Q.    Okay. Let's look at Exhibit 4. What is
2  this document, page 1, called "Correct Hand/Glove
3  Washing"?
4  A.    First time I've ever seen it. I don't know.
5  Q.    Does it accurately describe what the company
6  instructs employees to do in regard to hand/glove
7  washing?
8  A.    I can't answer that. First time I've ever
9  seen this document.
10 Q.    I understand that. But the six items listed
11 there, is that what employees are required to do
12 in washing hands and gloves?
13 A.    We do not measure the soap by a dime to see
14 if they're using a dime-size soap. I've never
15 known nobody doing that. We never time them to
16 see if they scrub for 10 seconds.
17 Q.    It doesn't say anything about timing, but go
18 ahead and finish your answer.
19 A.    It says, "Rubbing hands together for at
20 least 10 seconds..." We don't put a stopwatch on
21 them.
22 Q.    Do you attend the training that employees
23 receive in regard to sanitation?

Page 52

1  A.    No.
2  Q.    Are employees given training and instruction
3  in how to properly sanitize their hands and
4  gloves?
5  A.    I can't answer that. That's handled under
6  my management.
7  Q.    What is an SOP?
8  A.    Standard operating procedure.
9  Q.    Do you have a standard operating procedure
10 for hand/glove washing, other than Exhibit 4, page
11 1?
12            MR. ROSENTHAL: Objection. This
13 witness said he -- he didn't identify this as an
14 SOP. He said he's never seen it before.
15 A.    I can't answer that.
16            MR. ROSENTHAL: It appears by the
17 number it was produced by one of the employees.
18 Q.    But my question is: Do you have a standard
19 operating procedure?
20 A.    I can't answer that.
21 Q.    You don't know if there is one for
22 hand/glove washing?
23 A.    No, I don't.

Page 53

1  Q.    Do you know if there's one for boot
2  sanitation?
3  A.    No, I don't.
4  Q.    Look at Exhibit 4, page 2. This is called
5  "G.M.P.S." Do you know what that means?
6  A.    No.
7  Q.    But you do know what a GMP is, correct?
8  A.    Yes.
9  Q.    What is a GMP?
10 A.    Good manufacturing practice.
11 Q.    And that's the policies of the company; is
12 that correct?
13 A.    Yeah. That's the manufacturing practices.
14 Q.    Those are the practices employees are
15 required to follow?
16 A.    Yes.
17 Q.    All right. Now, do you see anything in
18 Exhibit 4, page 2, that employees have not been
19 required to do since March 2004?
20            (The witness examines the
21            document.)
22 A.    Would you repeat that question, please?
23 Q.    Is there any item on Exhibit 4, page 2,

14 (Pages 50 to 53)

FREEDOM COURT REPORTING

Page 54

1  called "G.M.P.S" that employees have not been
2  required to comply with since March 2004?
3  A.   Yes.
4  Q.   Which?
5  A.   First, this is the first time I've ever seen
6  this document.  We don't have maroon smocks; we
7  don't do fully cooked.  And I don't understand
8  this, "V-Megs/Combos/Totes must be washed out when
9  changing from one product to another."  I don't
10  know what that means.  Because we can put wings in
11  one combo and drumsticks in the combo.  But I've
12  never seen this G.M.P.S before.
13  Q.   Okay.  But the items listed there though
14  accurately reflect what employees are required to
15  do, except for those you just listed, correct?
16  A.   Says "No jewelry allowed."  We do allow a
17  wedding band as long as it doesn't have sets.
18  Q.   Anything else?
19  A.   "Floor person only does floor work, no work
20  on the line."  That's not a true statement.
21  Q.   Okay.  Now, what is a true statement in
22  regard to floor persons as to whether they work on
23  the line?

Page 55

1  A.   They can do whatever their supervisor asks
2  them to do, as long as they do the proper
3  procedure to do it.  I mean, if they work on the
4  floor and they change aprons and wash their hands,
5  they're allowed to work on the line.
6  Q.   Okay.
7  A.   This, "Water hoses (black for floor, clear
8  for machines)..." I've never seen that before.  I
9  have no idea where this document come from.  I've
10  never seen it at our plant.
11  Q.   I understand that.  Do you have a par fried
12  line?
13  A.   Yes.
14  Q.   Let's go to the next page of Exhibit 4.
15  This is E 739, which apparently means it's
16  produced by the company.  Do you recognize it?
17  A.   No, I'm not familiar with this.
18  Q.   All right.  Let's go to Exhibit 5.  This is
19  the attendance policy.  Are you familiar with that
20  document?
21      (The witness examines the
22       document.)
23  A.   I'm not that familiar with the attendance

Page 56

1  policy because I don't do attendance on hourly
2  personnel; but I know we do have an attendance
3  policy.  To state this is the attendance policy we
4  have in place, I can't do that.
5  Q.   Okay.  Let me refer you to one part of it
6  though.
7      It says, "Accumulation of six points will
8  result in voluntary separation from the company."
9  Is that a true statement for the two plants you
10  supervise?
11  A.   Yes.
12  Q.   What does it mean "voluntary separation"?
13  A.   They quit.
14  Q.   Okay.  And then it says, first bullet point,
15  "Arriving to work late and otherwise failing to be
16  ready to work at your designated start time equals
17  one-half point," correct?
18  A.   I believe that's correct, to the best of my
19  knowledge.
20  Q.   Is that a policy that's been followed since
21  Equity took over in March 2004?
22  A.   That was a policy that was negotiated in a
23  union contract, and we go by the union contract

Page 57

1  between Equity and RWDSU.  We go by the contract
2  agreement.
3  Q.   Okay.  But is this arriving to work late and
4  otherwise failing to be ready to work at your
5  designated start time equaling one-half point, is
6  that the practice followed since March 2004?
7  A.   I don't know since March 2004.  It's in
8  place today.  I don't remember if it went all the
9  way back to 2004.
10  Q.   Okay.  If an employee is one minute late,
11  can they be given a half point?
12  A.   Yes.
13  Q.   Does the company timekeeping system allow
14  you to identify when an employee is one minute
15  late?
16  A.   Yes.
17  Q.   And do you dock an employee's pay when
18  they're one minute late?
19  A.   It's according to where they work.  When you
20  say "dock their pay," you need to...
21  Q.   Is that one minute that they're late
22  subtracted from their pay?
23  A.   When you say "subtracted," what department

15  (Pages 54 to 57)

FREEDOM COURT REPORTING

Page 58

1  are you talking about? If they're on a scheduled
2  time and they get paid from point A to point B and
3  they're not there at point A, yes. But if they're
4  on a clock in/clock out, it will be their clock
5  in/clock out time.
6  Q.   And which departments are on scheduled time?
7  A.   When you say "scheduled," you mean from a
8  clock in to clock out, or are you talking about
9  from a standard starting time to a standard ending
10 time?
11 Q.   You used the words "scheduled time."
12 A.   Master card time. Is that what you're
13 referring to?
14 Q.   I don't know; I'm asking you. You used the
15 term "scheduled time." What did you mean by that?
16 A.   If you're scheduled to be there at 7 a.m.
17 and work until 3:30 p.m., that's scheduled.
18 Q.   Okay.
19 A.   And if they clock in at 7:01, they get paid
20 from 7:01 until.
21 Q.   All right. Now, is that different than
22 master card time?
23 A.   Master card is a scheduled time, per se.

Page 59

1  Q.   Is master card something that's swiped?
2  A.   Yes.
3  Q.   Where is the master card swiped?
4  A.   At either one of the Kronos time clocks.
5  Q.   That's the same time clock that the personal
6  time card is swiped?
7  A.   Yes.
8  Q.   Who swipes the master card?
9  A.   I don't know the answer to that. Either
10 supervisor, superintendent, production manager.
11 One of the managers.
12 Q.   Now, is an employee on a clock-in/clock-out
13 basis, is that something different than an
14 employee that's on a scheduled time basis?
15 A.   Yes.
16 Q.   What's the difference?
17 A.   The clock in and clock out is from when they
18 clock in until the end of their shift they clock
19 out.
20 Q.   Which employees are on a clock-in/clock-out
21 timekeeping system?
22 A.   I'm not familiar with every one of them. I
23 know maintenance is on the clock in/clock out.

Page 60

1  Q.   Is there a document that identifies which
2  jobs or employees are on a clock-in/clock-out
3  method?
4  A.   I don't know the answer to that.
5  Q.   Do you know if there's a document that lists
6  the jobs or employees that are on a scheduled time
7  method?
8  A.   I don't know the answer to that.
9  Q.   And what about the master card? Is there
10 anything that identifies which employees or jobs
11 are subject to a master card method?
12 A.   I don't know the answer to that. I don't do
13 payroll.
14 Q.   Are there any other methods of timekeeping
15 used for hourly employees, besides those three:
16 scheduled time, master card, and clock in/clock
17 out?
18 A.   Not as I'm aware of.
19 Q.   An employee that's on a master card method,
20 if he's one minute late, is that subtracted from
21 his pay time?
22 A.   Yes.
23 Q.   And, of course, an employee on a clock

Page 61

1  in/clock out, if they're a minute late, they would
2  have that minute subtracted also; is that correct?
3  A.   It would be in their clock in/clock out. It
4  would be calculated in their clock in to clock
5  out.
6  Q.   Okay. Let's look at Exhibit 6. Do you
7  recognize this document called "General Safety
8  #4"?
9  A.   No.
10 Q.   It was produced by the company as Bates
11 number 639. Read it. There's 17 sentences --
12 numbered sentences. And tell me is there anything
13 in there that has not been followed or required of
14 employees since March 2004.
15       (The witness examines the
16       document.)
17 A.   We don't require safety glasses. "You are
18 required to wear safety glasses and earplugs when
19 entering the process area."
20       We don't require safety glasses for all
21 employees of the complex.
22 Q.   Do you require them for any employees?
23 A.   Yes.

16 (Pages 58 to 61)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 62

1 Q. Which?
2 A. Maintenance.
3 Q. Any others?
4 A. Sanitation. And there may be some others
5 that I've not aware of.
6 Q. Would there be a document that would list
7 which jobs or employees are required to wear
8 safety glasses?
9 A. Not that I'm aware of.
10 Q. And No. 5, I guess, is the one you're
11 speaking of about safety glasses, right?
12 A. Yes.
13 Q. And that says, quote, You are required to
14 wear safety glasses and earplugs when entering the
15 process area.
16      The process area, that's the production
17 area?
18 A. Yes.
19 Q. Okay. Now, why would you require some
20 employees to wear safety glasses in the production
21 area and not others?
22 A. It's according to the job they do.
23 Q. Do you have job descriptions?

Page 63

1 A. Yes.
2 Q. Do you have job descriptions for hourly
3 jobs?
4 A. I don't know the answer to that.
5 Q. Do you have job descriptions for your job?
6 A. Yes.
7 Q. Do you have job descriptions for the
8 employees that report to you?
9 A. Yes, there are some generic job
10 descriptions.
11 Q. What do you mean by "generic"?
12 A. Generic is kind of broad. It's not saying
13 in the job description, you know, you get to work
14 at X number of time in the morning; you do this,
15 this, and this.
16      The job description is kind of generic on
17 what you need to handle in your area of
18 responsibility.
19 Q. Let's take you as an example. Is your job
20 description as complex operations manager
21 different than the job description of Mr. Stevens
22 as first processing plant manager?
23 A. I don't know that because I'm not that

Page 64

1 familiar with job descriptions. There are job
2 descriptions.
3 Q. You've never looked at the job descriptions
4 for the employees that report directly to you?
5 A. Yes, I've looked at them; I didn't memorize
6 them.
7 Q. This Exhibit 16 you produced today shows
8 five employees reporting to you, other than your
9 administrative assistant; is that right?
10 A. Yes.
11 Q. Do you know anything about the job
12 descriptions for those five people?
13 A. Not as they're written I don't know. I know
14 what their job is, but I don't know what their job
15 description says.
16 Q. Who is responsible for having job
17 descriptions or getting them written?
18 A. Job descriptions are normally written out of
19 our Huntsville office.
20 Q. Is that the home office?
21 A. That's the division office.
22 Q. All right. The head person here in the
23 Eufaula division is Mr. Esslinger; is that right?

Page 65

1 A. Correct.
2 Q. And who does he report to?
3 A. Tim Lawson.
4 Q. What is his job?
5 A. I don't know his correct title.
6 Q. Where is he located?
7 A. Huntsville, Alabama.
8 Q. And you called that a division office,
9 correct?
10 A. Yes.
11 Q. And what geographical territory does it
12 cover?
13 A. All poultry in the U.S.
14 Q. How many plants is that?
15 A. I honestly don't know the total correct
16 answer to that exactly.
17 Q. Give me your best estimate.
18 A. I'm guessing seven or eight total plants,
19 but that's a guess.
20 Q. All right. And what did you say the
21 fellow's name in Huntsville is? I didn't write it
22 down.
23 A. Tim Lawson.

17 (Pages 62 to 65)

FREEDOM COURT REPORTING

Page 66

1  Q.  Who does he report to?
2  A.  Keith Lewis.
3  Q.  What's his job?
4  A.  I don't know his exact job title.
5  Q.  Where is he located?
6  A.  Huntsville, Alabama.
7  Q.  And who does Mr. Lewis report to?
8  A.  He reports to Philadelphia.
9  Q.  Who?
10 A.  I believe his name is Jerry Dean.  I'm not
11 for sure.
12 Q.  Do you know his title?
13 A.  I sure don't.
14 Q.  What is in Philadelphia?
15 A.  Our corporate office.
16 Q.  All right.  Other than your job description,
17 are there any other documents that would describe
18 your duties and responsibilities?
19 A.  Not as I'm aware of.
20 Q.  Who would be knowledgeable as to whether
21 there are job descriptions for hourly employees?
22 A.  I can't really answer that.  I don't know.
23 Q.  The quality assurance department, does it

Page 67

1  have job descriptions?
2  A.  Can't answer that; I don't know.
3  Q.  Has there been any period of time that all
4  production employees have been required to wear
5  safety glasses?
6  A.  Yes.
7  Q.  What period was that?
8  A.  I don't know the dates.
9  Q.  Give me your best estimate.
10 A.  It's been -- we stopped everybody from
11 wearing them probably, a guess, a total guess, a
12 year ago.  And I don't know when we started.  I
13 don't have a clue.
14 Q.  At the time Equity Group took over in March
15 of 2004, were safety glasses required?
16 A.  I don't remember.
17 Q.  Let's look at Exhibit 7.  This is called
18 "New Hire Allergen Awareness Training."
19    Are you familiar with this document?
20 A.  No.
21 Q.  Who would be?
22 A.  Can't answer that; I don't have a clue.
23 Q.  Do you know what department this originates

Page 68

1  from?
2  A.  No.
3  Q.  Is there anything within that New Hire
4  Allergen Awareness Training that appears not to
5  apply to your two plants?
6  A.  I'm not familiar with it at all.
7  Q.  Okay.  I know you're not familiar with the
8  document, but the items listed, are you familiar
9  with allergen control programs at your two plants?
10 A.  No.
11 Q.  All right.  The next page of that Exhibit 7
12 is called "New Hire HACCP Training."  Who's in
13 charge of the HACCP program or policy?
14 A.  Butch White.  It falls under his umbrella.
15 Q.  And does this New Hire HACCP Training apply
16 to your two plants?
17 A.  Yes.
18 Q.  And has it applied at all times since March
19 of 2004?
20 A.  Yes.
21 Q.  The purpose of the -- well, let's first get
22 this identified.
23    HACCP stands for Hazard Analysis Critical

Page 69

1  Control Points, correct?
2  A.  Yes.
3  Q.  And the purpose of that Hazard Analysis
4  Critical Control Points Program is to prevent
5  contamination of poultry products, correct?
6  A.  Food control based on prevention, yes.
7  Q.  Now let's look at Exhibit 8.  I've not
8  produced all in Exhibit 8, the pages; but here's
9  the whole book if you want it of the employee
10 handbook.
11    Looking at the pages that I've excerpted out
12 of the employee handbook, have they been in full
13 force and effect since March of 2004?
14    MR. WIGGINS:  And for the record, those
15 excerpted are Exhibit 8.
16    (The witness examines the
17    document.)
18 A.  I don't know how long this has been in place
19 because I'm not familiar with this book, but it
20 looks like, just scanning over a few pages, this
21 is something we still do.  And I don't know how
22 long we've been following this.  Has this handbook
23 been changed?  I don't know.

18  (Pages 66 to 69)

FREEDOM COURT REPORTING

Page 70

1   Q.   All right.  The handbook we've been given,
2   is E 516 through 571.  And we weren't given a new
3   one today.
4       Do you know if there's ever been another
5   employee handbook besides this one that I'm
6   placing in front of you?
7   A.   I don't know.
8   Q.   Who would know that?
9   A.   HR is the one that hands these out and has
10  them printed.  I don't know.
11  Q.   Anyone in particular in charge of that in
12  HR?
13  A.   Not as I'm aware of.  I don't know.
14  Q.   Now, look at page 534.  It's called "Work
15  Rules and Regulations" in the employee handbook,
16  correct?  It's actually page 17 in the employee
17  handbook, but Bates numbered 534.  It got cut off
18  there.
19      Page 17, at the bottom, says "Work Rules and
20  Regulations," correct?
21  A.   That's what it says there.
22  Q.   And it says that you can be disciplined for
23  failing to follow these rules and regulations,

Page 71

1   correct?
2   A.   It says the company expects you to follow
3   them, yes.
4   Q.   All right.  And employees that fail to
5   follow these rules and regulations are subject to
6   discipline, correct?
7   A.   Uh-huh.
8   Q.   Is that right?
9   A.   Yes, sir.  That's what it says.
10  Q.   Okay.  Now, turning to the next page, look
11  at No. 11.  One item that employees are subject to
12  discipline or discharged for is, in No. 11,
13  "Failure to wear safety equipment and/or required
14  clothing/uniform," correct?
15  A.   Yes, that's what it says.
16  Q.   It also says, "In addition to any prescribed
17  discipline, an employee violating this policy may
18  be forced to leave the facility until the company
19  dress code is met," correct?
20  A.   Correct.
21  Q.   Does quality assurance monitor employees'
22  use of safety equipment and required
23  clothing/uniforms?

Page 72

1   A.   Quality assurance monitors that; supervisors
2   monitor that; superintendents monitor that.
3   Q.   Okay.  And does quality assurance have
4   employees at the start of a shift there at the
5   production room entrance to make sure employees
6   have their protective equipment on?
7   A.   I can't answer that.
8   Q.   Does anyone stand there at the door when
9   they come through to make sure people are properly
10  donning their protective gear and equipment and
11  sanitizing themselves?
12  A.   Not as I'm aware of.  But we don't sanitize
13  ourselves entering the room.
14  Q.   Okay.  No. 13 of that same rules and
15  regulations policy says that one item an employee
16  can be disciplined or discharged for is, quote,
17  Failure of an employee to be at his/her appointed
18  workstation and ready to work at his/her scheduled
19  starting time, correct?
20  A.   Correct.
21  Q.   And that's been in force and effect, to your
22  knowledge, since March 2004?
23  A.   Yes, as far as I can remember.

Page 73

1   Q.   And another item since March 2004 that
2   employees can be disciplined for is violation of
3   safety rules and/or policies, correct?
4   A.   Yes.
5   Q.   All right.  Now turn over to page 40 of the
6   employee handbook.
7   A.   (Witness complies.)
8   Q.   Are these the safety rules that are referred
9   to in No. 18 that you can be disciplined and
10  discharged for?  It's called "General Safety
11  Rules."
12      (The witness examines the
13      document.)
14  A.   To the best of my knowledge.
15  Q.   All right.  And when you sat there and read
16  through the General Safety Rules, you didn't
17  identify any that have not been required of
18  employees since March of 2004, did you?
19  A.   No.  On page 40.
20  Q.   Well, the safety rules are on page 40 to 42,
21  correct?
22  A.   I need to read 41 and 42.
23  Q.   Okay.

19  (Pages 70 to 73)

FREEDOM COURT REPORTING

Page 74

1      (The witness examines the
2      document.)
3  A.  This must be an old one because this has
4  changed.
5  Q.  What's changed?
6  A.  This says, "Wash hands and arms
7  thoroughly..."
8  Q.  Which number?
9  A.  No. 18. We don't wash arms. Our current
10  policy says to wash hands. I know that one's
11  changed.
12     Also, it says, "No equipment will be worn
13  outside of work areas." You can wear hair nets,
14  beard nets, earplugs outside of work areas. You
15  can't wear them outside, but you can wear them
16  outside of production areas.
17     It also states here that, "Boots are not to
18  be worn outside of plant." You can wear your
19  boots to and from work.
20     That's the changes I see at this point.
21  Q.  Okay. Now, looking at the cover of this
22  employee handbook from which those safety rules at
23  pages 40 to 42 come, it's called Keystone Foods

Page 75

1  Equity Group Eufaula Division Employee Handbook,
2  correct?
3  A.  Uh-huh.
4  Q.  Is that right?
5  A.  Yes.
6  Q.  So we know then that at some point in time
7  those rules you just listed as not currently being
8  followed were in force and effect, correct?
9  A.  We've never enforced no equipment to be
10  worn. We've always allowed hair nets, beard nets,
11  and earplugs to be worn outside the production
12  area. When they were wearing safety glasses, they
13  could wear them to and from work.
14     At one time, we were requiring them to put
15  boots on after they got to work and take them off
16  before they left.
17  Q.  What time period was that?
18  A.  I cannot answer that. I don't have a clue.
19  Q.  Can you tell us if it was more than a year
20  ago?
21  A.  I can't answer that. I do not have a clue.
22  Q.  Who would know?
23  A.  I can't answer that either.

Page 76

1  Q.  Is there a document that changed any part of
2  the employee handbook?
3  A.  I don't know that.
4  Q.  Is there a document that reflects any
5  non-enforcement of certain items in the employee
6  handbook?
7  A.  I don't know the answer to that.
8  Q.  All right. Now, identify the numbers in
9  pages 40 to 42, General Safety Rules, that you
10  were speaking of that you don't think are
11  currently in force.
12  A.  No. 18, No. 20. That's the changes I see.
13  Q.  Okay. Now, let's do No. 20 first. That
14  says, for the record, "No equipment will be worn
15  outside of work areas. Boots are not to be worn
16  outside of plant."
17     Now, you say that's a true statement except
18  for hair nets and earplugs and --
19  A.  Beard nets.
20  Q.  -- beard nets, correct?
21  A.  Correct. And safety glasses for the
22  employees that wear safety glasses.
23  Q.  But for all other equipment, they're not to

Page 77

1  be worn outside of the work area, correct?
2  A.  Yes. Back up and ask me that question
3  again. All other equipment?
4  Q.  Yes.
5  A.  Smocks are to be took off before exiting the
6  production area.
7  Q.  All right.
8  A.  And then their rubber gloves are took off
9  before exiting the production area, and put back
10  on after they get in the production area.
11  Q.  All right.
12  A.  Arm guards are put on normally after they
13  enter the production area. And if they wear
14  sleeves, they can put them on any time, the
15  production area or going to the production area.
16  Q.  Turn over to Exhibit 12, page 21. This is
17  the contract with the union effective March 1,
18  2004, to March 1, 2008.
19     There in Section 13.4, is that a complete
20  list of all the equipment that the employees are
21  provided?
22     MR. ROSENTHAL: What page did you
23  reference?

20  (Pages 74 to 77)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 78

1       MR. WIGGINS: 21.
2    A.    I'm looking at the wrong number.
3        This is a list of equipment that we issue to
4    new employees. And we've got this listed in our
5    union negotiations on when they can come back and
6    get replacement equipment. But not all employees
7    are required to get all this equipment.
8    Q.    All right. But the contract says, for the
9    record, in Section 13.4, "Supplies will be
10   furnished to new employees, where required, in
11   accordance with company procedures as follows..."
12   and then lists three smocks, arm guards, cutting
13   glove, hair net, beard net, blue gloves, cotton
14   gloves, earplugs, apron - heavy duty, and sleeves,
15   correct?
16   A.    Yes. In this contract, some of these was
17   changed. At some time, and I don't know what
18   time, we did not issue three smocks. They come in
19   and got a new, clean smock every day. They didn't
20   have smocks; they just come in and got one out of
21   the supply room.
22   Q.    Do you know when that began?
23   A.    No.

Page 79

1    Q.    Do you know any documents that would tell
2    us?
3    A.    No, I don't.
4    Q.    All right. Now, this list though that I
5    just read to you and that you have in front of you
6    from Section 13.4 of the collective bargaining
7    agreement, is that a complete list of the
8    equipment employees are furnished by the company?
9    A.    No.
10   Q.    What's missing?
11   A.    If we require safety glasses, they are also
12   issued by the company.
13   Q.    Okay. Anything else to make that a complete
14   list?
15   A.    I don't see boots on here.
16   Q.    Okay. Anything else?
17   A.    Not that I'm aware of.
18   Q.    So with the addition of boots and
19   safety glasses, Section 13.4 lists all the
20   equipment that employees are provided upon hire,
21   correct?
22   A.    Where required. As this states,
23   "...furnished to new employees, where required..."

Page 80

1    Not all employees get this -- got this. This is
2    changed, because this contract ended in March of
3    this year, I believe.
4    Q.    Okay. We'll get to your new contract. But
5    during the period of this contract, this was the
6    contractual agreement, correct?
7    A.    Yes. But "Supplies will be furnished to new
8    employees, where required..." I want to make that
9    clear, "...where required..."
10   Q.    Yeah, I understand. Is there any document
11   that tells us where it is required?
12   A.    Not that I'm aware of.
13   Q.    Are there any of these items in Section 13.4
14   that are not provided to debone employees --
15   employees in the debone department?
16   A.    Not that I'm aware of.
17   Q.    Are there any of these items in Section 13.4
18   of the collective bargaining agreement that are
19   not supplied to evisceration employees?
20   A.    Well, you've got positions that don't
21   require arm guards, don't require cutting gloves;
22   so saying all of debone, all of evis, there are
23   employees in those two departments that does not

Page 81

1    require all of these supplies.
2    Q.    Okay. Let's put aside arm guards and
3    cutting gloves. Are all the other items in
4    Section 13.4, including boots and safety glasses
5    -- no, leave off safety glasses. Let me start
6    over.
7        Other than arm guards, cutting gloves, and
8    safety glasses, are all the items in Section 13.4
9    supplied to hourly employees by the company in
10   both your plants, in all departments?
11   A.    No. Aprons are not.
12   Q.    Okay. Which employees receive aprons?
13   A.    I can't answer that. None of them are
14   required. That's up to them if they want to wear
15   them, as long as they've got their smock on.
16   Q.    We're going to get to that. I'm just trying
17   to get right now what they're provided.
18       Let's take debone department employees, for
19   example. Are they provided aprons?
20   A.    What position in debone?
21   Q.    First, are any employees in debone provided
22   aprons?
23   A.    They can get aprons if they'd like to.

21  (Pages 78 to 81)

FREEDOM COURT REPORTING

Page 82

1  Q.  Are there any employees that are prohibited
2  from getting aprons from the company?
3  A.  Not that I'm aware of.
4  Q.  Where do they get the aprons?
5  A.  Supply room.
6  Q.  Okay.  Do you furnish employees a standard
7  package of items at the beginning of each week?
8  A.  I honestly don't know how the supply room
9  and the management team handles that.  I don't
10 know how they do that.
11 Q.  Do you know who would know that?
12 A.  I sure don't.
13 Q.  Do you know if there are any standard
14 operating procedures or other documents that
15 describe how and when protective equipment is
16 issued?
17 A.  I'm not aware of that.  We go by the union
18 contract.
19 Q.  Okay.  Do you know what protective equipment
20 is provided to employees initially?
21 A.  It's according to the position the employee
22 holds.  All employees are required to wear
23 earplugs.

Page 83

1  Q.  Are all employees required to wear hair nets
2  and beard nets?
3  A.  Yes.
4  Q.  Are all employees required to wear smocks?
5  A.  No.
6  Q.  All employees in the production area are
7  required to wear smocks?
8  A.  Yes.
9  Q.  All right.  Let's look back at page 40 of
10 the Exhibit 8, the employee handbook.
11 A.  (Witness complies.)
12 Q.  One of the items for which an employee can
13 be disciplined or discharged is No. 3 of the
14 safety rules which says, "Personal protective
15 equipment, which is provided initially by the
16 company, must be worn," correct?
17 A.  Yes.
18 Q.  All right.  Now let's look at No. 18.  You
19 identified that as one you said is not fully
20 enforced.  I think what you told me is that No. 18
21 is an accurate statement of what employees are
22 required to perform subject to discharge or
23 discipline, except for washing of arms, correct?

Page 84

1  A.  Correct.
2  Q.  So then was there a period of time that you
3  did require washing of arms?
4  A.  I do not remember.  I don't know.
5  Q.  Who would know that?
6  A.  I don't know.
7  Q.  Your first line supervisor would probably
8  know that, wouldn't they?
9  A.  Should, I would say.  I don't know.  I can't
10 answer that.
11 Q.  All right.  But at all times since March of
12 2004, employees could be disciplined or discharged
13 for not washing hands thoroughly with soap and
14 water before and after using bathroom facilities,
15 correct?
16 A.  Yes.
17 Q.  Now let's go to Exhibit 9.  This is the
18 Employee Orientation Manual.  You brought a new
19 one that we marked earlier.
20     Page 1 is an agenda of a day of training or
21 orientation for new hires, correct?
22 A.  That's what it looks like.
23 Q.  All right.  And it says between 1:00 and

Page 85

1  1:30, the employees are shown a tape about the QA,
2  HACCP, GMP's, SSOPs, and animal welfare, correct?
3  A.  That's what it says.
4  Q.  Have you ever seen that tape?
5  A.  No.
6  Q.  Do you know what's covered in the tape?
7  A.  No.
8  Q.  Then, at 1:45, it says, among other things,
9  the employees are given training in ergonomics
10 presentation and exercises.  What does that mean?
11 A.  I have no idea.  I've never sat through a
12 new hire orientation for hourly associates.
13 Q.  Are you familiar with what ergonomic
14 exercises employees are trained to do?
15 A.  No.
16 Q.  Do you know anything about ergonomic
17 exercises at the two plants you supervise?
18 A.  No.
19 Q.  Has there been a period where employees do
20 calisthenics?
21 A.  What's calisthenics?  I don't understand.
22 Q.  Exercise.  Physical exercise.
23 A.  There has been some time when they did do

22 (Pages 82 to 85)

FREEDOM COURT REPORTING

Page 86

1  some exercise in the debone department alone.
2  Q.    What period of time?
3  A.    I don't know the answer to that.
4  Q.    What did they do?
5  A.    I don't know the answer to that.
6  Q.    Are there any documents that describe it?
7  A.    Not as I'm aware of. I don't know.
8  Q.    Are there any standard operating procedures
9  regarding that exercise?
10  A.    I don't know the answer to that.
11  Q.    All right. Then, at 3:00, the employees are
12  given training in several things, including PPE
13  use, correct?
14  A.    That's what this says.
15  Q.    And it says there's a tape on that subject.
16  Have you seen that tape?
17  A.    No. Never been through a new hire
18  orientation for hourly associates.
19  Q.    What about the safety representative that's
20  doing the training on the PPE? Do you know who
21  that is?
22  A.    I don't know who that is.
23  Q.    Now, PPE means personal protective

Page 87

1  equipment; is that correct?
2  A.    Yes.
3  Q.    And what is personal protective equipment?
4  What items?
5  A.    It's according to what we're talking about.
6  In this scenario, it was for safety; it's for
7  hazardous communications and material handling.
8  Q.    So in that context, what PPE exists?
9  A.    I don't know the answer to that. I've never
10  been through a new hire orientation.
11  Q.    All right. Do you know anything about this
12  hearing protection training that's at 3:45, listed
13  on this document?
14  A.    No. As I stated, I've never been through a
15  new hire orientation, so I don't know what goes
16  on.
17  Q.    You've never had any hearing protection
18  training?
19  A.    Yes, I have, but I've never been through
20  this.
21  Q.    Okay. Have you ever had any ergonomics
22  exercise training?
23  A.    No.

Page 88

1  Q.    Now, look through the items that I've
2  excerpted out of your Employee Orientation Manual,
3  in Exhibit 9, and tell me are there any of those
4  items that have not been in full force and effect
5  or the employees have not been required to comply
6  with since March of 2004.
7  A.    You're talking about these items?
8  Q.    Yes. Just those pages out of the
9  orientation manual that are in Exhibit 9.
10  A.    Well, I'm not familiar with the orientation
11  manual because, as I stated earlier, I've never
12  been through an orientation for hourly associates,
13  so I don't know what they do during that process.
14       If you'd like me to read these pages, I'll
15  be more than glad to, but I still don't know if I
16  can answer your question.
17  Q.    Okay. Well, put aside what they're told in
18  the orientation. Someone else will have to tell
19  us that, apparently.
20       But in terms of the operation of the two
21  plants on a day-to-day basis, are there any of
22  those items that are in Exhibit 9 that employees
23  have not been required to comply with since March

Page 89

1  2004?
2  A.    Okay. The first sheet, the attendance
3  policy, I'm not that familiar with the attendance
4  policy because I don't do attendance on hourly
5  associates. So to give you an answer on the first
6  page, I don't know because I don't do the
7  attendance.
8  Q.    Okay. Go to the next document, which is
9  "Further Processing GMP's."
10       Are there any of those items that employees
11  have not been required to comply with since March
12  of 2004? at any point in time since March of 2004.
13  A.    Looks like page 33, I believe we're doing
14  that on page 33.
15  Q.    All right. Look at page 34, which has just
16  a few more paragraphs.
17  A.    It looks like we are doing this on page 34
18  and 33.
19  Q.    Okay. So this Further Processing GMP's,
20  which lists 24 numbered sentences of requirements,
21  employees have been required to comply with those
22  items since March of 2004 at all points in time?
23  A.    To the best of my knowledge.

23  (Pages 86 to 89)

FREEDOM COURT REPORTING

Page 90

1  Q.   All right.  Let's go to the next document in
2  the orientation manual, Exhibit 9, which is Bates
3  number E 75, page 35 of the manual, called
4  "Quality Assurance."
5      Has this been in force and effect at all
6  times since March 2004?
7  A.   I can't answer that; I'm not over quality
8  assurance.
9  Q.   Looking at the items themselves, let's take
10  the first section called "Seven Principles of
11  HACCP."
12      Is that an accurate description of what the
13  company requires in term of identifying and
14  monitoring food safety hazards?
15  A.   I can't answer that because I'm not over
16  HACCP or quality assurance.
17  Q.   Okay.  Look at the second section called
18  "Standard Sanitation Operating Procedures" with an
19  acronym of "SSOPs."  Are you familiar with those?
20  A.   I'm familiar with what an SSOP is.  I'm not
21  familiar with this because I didn't write this
22  document and I'm not over this area.
23  Q.   Is there a standard sanitation operational

Page 91

1  procedure for each of those five items?
2  A.   I can't answer that.  I don't know.
3  Q.   Then the next section is called "Standard
4  Operational Procedures SOPs."  Is there a document
5  that has an SOP for each of those eight items?
6  A.   I can't answer that.  I don't know.
7  Q.   One of those items, No. 7, is "Washing hands
8  properly."  Have you ever seen an SOP on washing
9  hands properly?
10  A.   No, I haven't.
11  Q.   Who would know if there is an SOP on that
12  subject?
13  A.   I can't answer that.  I don't know.
14  Q.   Turn over to page 39 of the orientation
15  manual.
16  A.   (Witness complies.)
17  Q.   These items listed, the five bullet points,
18  have been required of employees since March of
19  2004?
20  A.   Yes.  We ask our people to do this, but I've
21  never seen this summary, per se, here.
22  Q.   It accurately summarizes what employees are
23  required to do since March of 2004?

Page 92

1  A.   Yes.
2  Q.   Let's turn to the next page in Exhibit 9,
3  which is page 40 of the operations (sic) manual.
4  And specifically No. 30, there at the top of the
5  page, says, "All employees will follow department
6  safety rules, policies and procedures.  Failure to
7  follow safety rules will result in disciplinary
8  action up to and including termination."
9      Has that always been the policy since March
10  of 2004?
11      MR. ROSENTHAL:  I'm going to object to
12  that term.  I think you referenced this as the
13  operations manual; I believe we're still in the
14  orientation manual.
15      MR. WIGGINS:  Okay.  I meant
16  orientation manual.
17  A.   I don't know about the orientation manual.
18  We do require people to follow our safety rules,
19  policies and procedures.
20  Q.   All right.  Turn to page 41 of the
21  orientation manual under "Sanitation Safety
22  Rules."
23  A.   (Witness complies.)

Page 93

1  Q.   It says, No. 2, "Always wear rain pant legs
2  outside the boot."  What does that mean?
3  A.   You wear your rain pants on the outside of
4  your boots where chemicals can't get in your
5  boots.
6  Q.   And does the company furnish the rain pants?
7  A.   Yes.
8  Q.   Who is that furnished to?
9  A.   Sanitation employees.
10  Q.   All right.  How many employees do you have
11  in sanitation?
12  A.   I don't know the exact number.
13  Q.   Are the employees required to wear their
14  rain pants when they're in the production area
15  doing the sanitation work?
16  A.   They wear them to home and from home if
17  they'd like.
18  Q.   But they're required to have them on in the
19  production area?
20  A.   Yes.
21  Q.   Okay.  Now look at the bottom of that page.
22  It's called, "Three Day Suspension Pending
23  Investigation/Final Notice."  It lists five bullet

24  (Pages 90 to 93)

FREEDOM COURT REPORTING

Page 94

1  points.
2      Is that an accurate description of what will
3  get a three-day suspension pending
4  investigation/final notice given to an employee
5  for each of those items?
6  A.    I don't know if that's accurate now with HR
7  what steps they follow in disciplinary action.  I
8  don't know if that is the steps they do follow at
9  this time.
10  Q.    Now let's look at the last bullet point.  It
11  is accurate since March 2004, isn't it, that you
12  can get a three-day suspension pending
13  investigation if you, quote, Failure to wear or
14  properly wear required personal protective
15  equipment, correct?
16  A.    That's what it says.
17  Q.    And that's been the practice?
18  A.    Can't answer that.
19  Q.    You don't get involved in disciplining
20  employees on a three-day suspension?
21  A.    No.
22  Q.    Who does?
23  A.    HR, human resources.

Page 95

1  Q.    Are they the decision maker as to whether an
2  employee will be put on a suspension?
3  A.    They are, with the employee's manager.
4  Q.    So if a first line supervisor saw an
5  employee not complying with the personal
6  protective equipment rules, would they have the
7  authority to discipline the employee themselves?
8  A.    All disciplinary action goes through HR
9  department, all suspensions.  And that's what we
10  were talking about here, three-day suspensions.
11  Q.    Okay.  The first line supervisor can
12  initiate the suspension, but it has to be approved
13  by human resources?
14  A.    Yeah.  They go up to HR and discuss what
15  happened, and they make a decision together.
16  Q.    The first line supervisor and the HR make a
17  joint decision?
18  A.    Yes.
19  Q.    Who in HR has responsibility for that?
20  A.    HR manager.
21  Q.    But what's the person's name?
22  Q.    What shift are you talking about?
23  Q.    Each shift.  Tell me their names.

Page 96

1  A.    You've got Kathy Gilmore can make that
2  decision; you've got Dante Rogers could make that
3  decision; you've got the one on night shift, and I
4  don't know his full name, Julio, can make that
5  decision; Jim Bice, as the complex QA manager, can
6  make that decision.
7      So there's several in HR that has the
8  ability to make that decision, along with the
9  management person.
10  Q.    All right.  Let's look at page 47 of the
11  orientation manual in Exhibit 9.  It's called "How
12  to Use Plugs."  This is referring to earplugs,
13  correct?
14  A.    I guess.  First time I've ever seen it.
15  Q.    All right.  But is this an accurate
16  statement of the company policy and practice --
17  A.    I can't answer that.
18  Q.    Well, I wasn't finished yet.
19  A.    Okay.
20  Q.    Since March of 2004, has it been a
21  requirement of employees to comply with the
22  following sentence:  "Your hands and plugs should
23  be clean before you put the plugs in your ears"?

Page 97

1  A.    I can't answer that because I don't never
2  see no one checking earplugs and ears to see if
3  they're clean -- or hands.  I'm sorry.
4  Q.    Do you have any reason to believe that this
5  statement in the orientation manual that your
6  hands and earplugs should be clean before you put
7  the plugs in your ears is not something that the
8  employees are trained to do?
9  A.    As I said, I've never been through a new
10  hire orientation, so I don't know what goes on in
11  a new hire orientation.  I don't know if they
12  train them.  I don't know.
13  Q.    I understand that.  But do you have any
14  reason to believe that this part of the
15  orientation manual is not in fact part of the
16  training employees are given?
17  A.    I don't know.
18  Q.    Okay.  Turn to page 51 of the orientation
19  manual.
20  A.    (Witness complies.)
21  Q.    It has "General PPE Information" at the top.
22  This document is called "Personal Protective
23  Equipment."

25  (Pages 94 to 97)

FREEDOM COURT REPORTING

Page 98

1     At the second bullet point, it lists this
2  requirement: "Keep PPE clean and sanitary."
3     Has that always been a requirement that
4  employees are expected to comply with since March
5  of 2004?
6  A.  I can't answer that on personal protective
7  equipment.  You would think they would like to;
8  it's their ears they're putting the earplugs in.
9  Q.   All right.  It defines here the personal
10  protective equipment in the following way; I want
11  to see if you agree with this way it defines it.
12  It says, quote, Personal protective equipment is
13  any piece of equipment, article of clothing, or
14  items deemed necessary for the health and safety
15  of employees, prevention of injuries, loss of life
16  or limb, or disease while employees perform their
17  daily job assignments as prescribed.
18     Do you agree with that?
19  A.   Yes.
20  Q.   What are those items?
21  A.   As in?
22  Q.   What items of personal protective equipment
23  exist at the two plants?

Page 99

1  A.   It's according to what you're doing.  I
2  mean, you're talking about production employees
3  that uses a -- I mean, give me a particular job or
4  a position, and I'll tell you what the PPE is for
5  that job.
6  Q.   Is there a document that tells us?
7  A.   No, not that I'm aware of.  I don't know.
8  Q.   Are you able to catalog for every job the
9  PPE that's required?
10  A.   Not that I'm aware of.
11  Q.   One item on this document, the Employee
12  Orientation Manual, says, at page 51, "Wash hands
13  before inserting earplugs."
14     Has that been a requirement of employees
15  since March of 2004?
16  A.   Not that I'm aware of.
17  Q.   Do you have any reason to believe that
18  that's something employees are not trained to do?
19  A.   I don't know.  I don't know what they're
20  trained in new hire orientation.
21  Q.   And then the next bullet point says, "Any
22  PPE other than that issued by Equity Group Eufaula
23  Division must be approved through the safety

Page 100

1  office."
2     Has that been a policy and practice followed
3  since March of 2004?
4  A.   I'm not aware of it.  I don't know.
5  Q.   Do you know if employees are allowed to wear
6  their own smocks?  Bring them from home and wear
7  their own?
8  A.   No, they're not allowed to wear their own
9  smocks.
10  Q.   Do you know of any items that employees are
11  allowed to furnish themselves as a substitute for
12  the ones that the company furnishes to them?
13  A.   Well, it states here that if they do, they
14  need to get it approved through the safety office.
15  This is talking about safety equipment, from what
16  I'm reading here.  Personal protective equipment
17  is not a smock.
18  Q.   You don't consider a smock part of the
19  personal protective equipment?
20  A.   No.  We're talking safety here.
21  Q.   All right.  Well, let's look back at the
22  list of items in the collective bargaining
23  agreement.  Look at Exhibit 12 again, page 21.

Page 101

1  A.   (Witness complies.)
2  Q.   Does the company consider hair nets and
3  beard net to be personal protective equipment?
4  A.   It doesn't state that here.
5  Q.   But does the company, in its operations,
6  consider hair nets and beard nets to be personal
7  protective equipment?
8  A.   Not that I'm aware of.
9  Q.   Does the company consider blue gloves to be
10  personal protective equipment?
11  A.   Not that I'm aware of.
12  Q.   Does the company consider cotton gloves to
13  be personal protective equipment?
14  A.   Not that I'm aware of.
15  Q.   Does the company consider aprons or heavy
16  duty aprons to be personal protective equipment?
17  A.   Not that I'm aware of.
18  Q.   What about sleeves?  Are they considered
19  personal protective equipment by the company?
20  A.   Not as I'm aware of.
21  Q.   And I think you've already said smocks are
22  not considered personal protective equipment,
23  correct?

26  (Pages 98 to 101)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 102

1    A.    Not for safety.
2    Q.    All right. I'm not sure what you mean.
3    You're saying smocks don't play any role in
4    safety?
5    A.    Correct. In human safety.
6    Q.    But are smocks considered to be personal
7    protective equipment?
8    A.    Not in my dictionary.
9    Q.    Okay. What about boots? Are they
10   considered personal protective equipment?
11   A.    Yes.
12   Q.    Safety glasses?
13   A.    Yes.
14   Q.    Arm guards?
15   A.    Yes.
16   Q.    Cutting gloves?
17   A.    Yes.
18   Q.    Okay. Anything else that's considered to be
19   personal protective equipment, other than arm
20   guards, cutting gloves, boots, and safety glasses?
21   A.    Earplugs.
22   Q.    Anything else?
23   A.    Not that I'm aware of, in a normal

Page 103

1    production job.
2    Q.    Okay. Now, going back to the page we were
3    on, page 51, at the bottom of that page in the
4    orientation manual, Exhibit 9, it's got a section
5    called "Ergonomics/Proper Lifting."
6         Read those items and tell me are those
7    things that employees are expected to comply with
8    since March of 2004.
9         (The witness examines the
10        document.)
11   A.    This is just a brief guideline to go by on
12   ergonomics. We don't require all our people to do
13   all this, measure 2 inches or do these procedures,
14   but it is a proper lifting for ergonomics that we
15   would like for our employees to practice. Do we
16   require it? Not that I'm aware of. I don't know.
17   Q.    Look at the bullet point that says, "Avoid
18   improperly fitting gloves. Gloves that do not fit
19   correctly can impede circulation and decrease the
20   sense of touch."
21        Do you agree with that?
22   A.    Yeah.
23   Q.    If an employee has his circulation impeded

Page 104

1    or his sense of touch decreased, that would affect
2    his ability to perform his job, correct?
3    A.    Yes.
4    Q.    How does the company make sure that the
5    gloves its dispensing to employees are properly
6    fitting?
7    A.    We have different sizes; they can get
8    whatever size they need.
9    Q.    Who determines that?
10   A.    The employee.
11   Q.    The supply room attendant hands them to them
12   or do they go in there and get them themselves?
13   A.    The supply room gives them whatever size
14   they need.
15   Q.    Okay. The next bullet point says, "Cold
16   temperatures can reduce the function of the nerves
17   and muscles. In cold temperatures, the fibers of
18   the muscles do not work smoothly, which increases
19   the risk of tearing fibers."
20        Do you agree with that?
21   A.    I guess. I mean, I'm not a doctor; I don't
22   know.
23   Q.    Do you agree that employees working in cold

Page 105

1    temperatures, that can adversely affect their
2    ability to perform their jobs in your two plants?
3    A.    Yes, without proper clothing.
4    Q.    And what areas of the plant have cold
5    temperatures?
6    A.    Cooler.
7    Q.    Any other areas?
8    A.    And the further processing plant, the
9    freezer.
10   Q.    What temperature are the chickens at during
11   the processing after slaughter?
12   A.    At what point?
13   Q.    Let's take before they go to the chiller.
14   A.    90 degrees.
15   Q.    And what about when they go past the
16   chiller, what are they at?
17   A.    40 degrees when they come out.
18   Q.    Is that the lowest they ever get?
19   A.    38 to 40. I mean, I don't know exactly
20   whatever temperature the birds are.
21   Q.    What is the temperature in the debone area?
22   A.    I don't know the answer to that. I'm
23   guessing -- and I shouldn't guess -- but 65, 68

27 (Pages 102 to 105)

| Page 106 |
|---|

1 degrees.
2 Q.   Are there any areas of the plant colder than
3 that?
4 A.   Cooler.
5 Q.   How cold is the cooler?
6 A.   28 to 36 degrees.
7 Q.   How many employees work in the cooler?
8 A.   When you say "work in the cooler," define
9 "work in the cooler."
10 Q.   Well, they're in the cooler enough to be
11 affected by the coldness.
12 A.   I still don't understand your question.
13 Q.   How many employees are going in and out of
14 the cooler on a regular basis?
15 A.   I don't know the answer to that, how many
16 there are.
17 Q.   Are there employees stationed so that they
18 have to go in the cooler as a regular part of
19 their job?
20 A.   Are they stationed in the cooler or they go
21 in and out of the cooler?
22 Q.   Stationed in a way that they go in and out
23 of the cooler frequently.

| Page 107 |
|---|

1 A.   We have employees that go in and out of the
2 cooler.
3 Q.   And how many of those employees do you have?
4 A.   I don't know the answer to that.
5 Q.   Which employees are they?
6 A.   Shipping employees, normally.  I mean, we
7 may have other employees go in and out, but
8 shipping is one.
9 Q.   And then this next bullet point says, "Take
10 mini breaks during work."  That's m-i-n-i.  "Take
11 mini breaks during work.  It is helpful to pause
12 frequently to flex and stretch.  This will improve
13 flexibility and improve blood-flow."
14     Is it permissible for employees to do that
15 while on paid time?
16 A.   We need to define "mini breaks."  If an
17 employee wants to, after a bird goes by, if they
18 work in a certain area, they can stop for a minute
19 and move.
20     I mean, I don't know the definition of this
21 question.
22 Q.   But you think up to a minute employees would
23 be within their rights to --

| Page 108 |
|---|

1 A.   It's according to what position they're
2 working in.
3 Q.   Do you know any positions that employees
4 would not be allowed to take mini breaks in order
5 to flex and stretch frequently?
6 A.   Define "mini breaks."  I don't know what
7 m-i-n-i, means, mini.  As in what's the time frame
8 of a mini break?
9 Q.   What would it be in your view?
10 A.   I don't know.  I mean, I don't really know
11 what your definition of a mini break is.
12 Q.   Would employees be considered to be in the
13 wrong if they took three to five minutes?
14 A.   Yes.
15 Q.   Would they be considered to be in the wrong
16 to take a full minute?
17 A.   According to what position they're in, where
18 they're at.
19 Q.   Which positions would employees have the
20 right to take a minute off to frequently flex and
21 stretch to improve flexibility and increase
22 blood-flow?
23 A.   There could be numbers of them; and I don't

| Page 109 |
|---|

1 know all of them off the top of my head.
2 Q.   All right.  Turn over to page 71 of the
3 orientation manual.
4     By the way, let me ask you this question
5 before we go to page 71:  If an employee took a
6 mini break during production time, would they
7 still be considered to be at work or working?
8 A.   It goes back to the definition of mini
9 break.
10 Q.   I mean, if an employee were flexing or
11 stretching in order to increase blood-flow, would
12 that be considered part of their work?
13 A.   It's according to the definition of mini
14 break.
15 Q.   Within whatever definition the company
16 recognizes, which you said you don't know what it
17 is, but within whatever the company considers a
18 mini break, is that considered to be work time?
19     MR. ROSENTHAL:  Objection to the form
20 of the question.  You can answer if you can.
21 A.   I don't know the answer to that question.
22 Q.   All right.  Let's go to page 71 of the
23 orientation manual, Exhibit 9.

28 (Pages 106 to 109)

FREEDOM COURT REPORTING

Page 110

1     This is called "Hazardous Communications,
2  Hazardous Materials, & Personal Protective
3  Equipment."
4     One of the bullet points says,
5  "Demonstration of donning and appropriate use of
6  required PPE."
7     Have you ever seen that demonstration by the
8  company as to how employees are supposed to don
9  their PPE?
10 A.  No, I have not.
11 Q.  Who provides that demonstration of proper
12 donning of PPE?
13 A.  I can't answer that.  Probably supervisors.
14 I don't know the answer to that.
15 Q.  Do you know if the company provides a
16 demonstration of proper donning of smocks, gloves,
17 aprons, or sleeves?
18 A.  I don't know the answer to that.
19 Q.  Let's go to page 80 of the orientation
20 manual.  It's called "Clean-Up and Safe
21 Housekeeping."
22    The first bullet point says, "After an
23 accident, the entire area must be cleaned with

Page 111

1  disinfectant."
2     Give me an example of what kind of accident
3  we're talking about there.
4  A.  I don't know.  I've never seen this before.
5  Q.  What type of event would occur in one of
6  your two plants that would require employees to
7  clean with disinfectant?
8  A.  If an employee gets cut, for example.
9  That's all I can think of because I'm not familiar
10 with this document.
11 Q.  If an employee, in that situation of being
12 cut and having to clean with disinfectant, is that
13 considered to be part of their work or their paid
14 time?
15 A.  Which employee are you talking about?
16 Q.  Any employee in your two plants.  If they
17 were -- During the period they're having to clean
18 with disinfectant, is that considered to be part
19 of their work and paid time?
20 A.  Yes.
21 Q.  All right.  Then it says, next bullet point
22 in Exhibit 9, page 80 of the orientation manual,
23 that, "Cleaning equipment must be disinfected."

Page 112

1     Is that required at the plant?
2  A.  I don't even know what that means.
3  Q.  Do you provide any disinfectants to clean
4  equipment?
5  A.  We have disinfectants that we clean the
6  plant with.
7  Q.  When employees clean equipment with
8  disinfectant, are they considered to be working?
9  A.  Yes.
10 Q.  Is that considered to be compensable time?
11 A.  Paid time?
12 Q.  Paid time.
13 A.  Yes.
14 Q.  Next page, 81, "Common Sense Rules" is the
15 heading, in the orientation manual.
16    Are each of these items practices followed
17 in your two plants?
18 A.  I can't answer that.  First time I ever seen
19 it.
20 Q.  But in terms of the practices followed in
21 your two plants, is it a rule that employees must,
22 quote, Wash hands and remove protective clothing
23 before eating, drinking, smoking, handling contact

Page 113

1  lenses, applying lip balm or cosmetics?
2  A.  Not that I'm aware of.
3  Q.  But you don't have any reason to believe
4  that this is not an item that employees are taught
5  to do in the orientation?
6  A.  As I said earlier, I don't know what they
7  teach them in orientation.  I don't know.
8  Q.  I know you don't know.  But do you have any
9  reason to suspect that this is not taught?
10    MR. ROSENTHAL:  Objection to the form
11 of the question.
12 A.  I don't know.
13 Q.  Let's go to page 83 of the orientation
14 manual called "Other Exposure Hazards."  It says
15 this to the employees:  "Always wear gloves and
16 protective apron or clothing."
17    Is that an accurate statement of what
18 employees have been required to do?
19 A.  I can't answer that, not on "explosion" of
20 hazardous.  I would think so on "explosion" of
21 hazard, but I don't know.  Exposure of hazards.  I
22 don't know.
23 Q.  Yeah.  You were saying "explosion," but the

29 (Pages 110 to 113)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

| Page 114 | Page 116 |
|---|---|
| 1 word -- let's get the record straight. | 1 smocks. That happened in this contract. I don't |
| 2 The wording at the top is "Other Exposure | 2 know the time frame. |
| 3 Hazards," correct? | 3 Q. Okay. Anything else? |
| 4 A. Yes. | 4 A. To the best of my knowledge, we've followed |
| 5 Q. What's an exposure hazard? | 5 everything else that's in the contract. |
| 6 A. I don't know. | 6 Q. Okay. I'm going to come back to one or two |
| 7 Q. All right. Let's look at page 91 of the | 7 of those items. Let me finish these documents |
| 8 Employee Orientation Manual, Exhibit 9 called | 8 first. |
| 9 "Good Manufacturing Practices (GMP'S)." | 9 Look at Exhibit 13. What is this? It's |
| 10 Have all of these items listed on this page | 10 called "Work Rules," but I can't figure out what |
| 11 been requirements that employees have been | 11 it is. |
| 12 required to comply with since March of 2004? | 12 A. I don't have a clue. |
| 13 (The witness examines the | 13 Q. Look at the first page of it and see if it |
| 14 document.) | 14 gives you any idea even remotely what it might be. |
| 15 A. The best of my knowledge. | 15 A. No, I have no idea. |
| 16 Q. Okay. Let's look at Exhibit 11, the last | 16 Q. Who would probably know something about what |
| 17 two pages which is called "7 Minute Safety | 17 this is? |
| 18 Training." | 18 A. I can't answer that. |
| 19 "Protect yourself with universal | 19 Q. All right. Let's look at Exhibit 14. There |
| 20 precautions." Trainer outline 4:30. | 20 are two letters here that were produced by the |
| 21 Are you familiar with this type of training | 21 company from the Department of Labor, but they're |
| 22 document? | 22 not addressed to Equity Group, or anybody really. |
| 23 A. No, I'm not. | 23 But one document has got a 2007 date, E 171 |

| Page 115 | Page 117 |
|---|---|
| 1 Q. Let's look at the contract. And if you need | 1 to 172; the other one has a 2002 date, E 167 and |
| 2 the full contract, I think we have it out here for | 2 168. |
| 3 you somewhere. | 3 Have you ever seen these before? |
| 4 MR. ROSENTHAL: If you need it, I have | 4 A. I'm not familiar with these documents. |
| 5 a copy of it. | 5 Q. Have you ever had any responsibility for |
| 6 Q. Do you know of any items within the | 6 keeping abreast of Department of Labor |
| 7 2004-2008 contract that were not in force or that | 7 requirements on overtime? |
| 8 were modified in some way? | 8 A. No. |
| 9 A. I'm not that familiar with the contract. I | 9 Q. Have you ever had any responsibility for |
| 10 don't remember it word for word. I'd have to look | 10 determining compliance with overtime rules or |
| 11 through it and see. | 11 regulations? |
| 12 Q. Well, let's take the pages that I've | 12 A. No. |
| 13 excerpted out here in Exhibit 12 in order to | 13 Q. Do you know anybody in the company who has |
| 14 narrow it down a little bit. These are the pages | 14 had responsibility for keeping abreast of overtime |
| 15 that look like they might be relevant to this | 15 requirements of the Department of Labor? |
| 16 case. | 16 A. I don't have a clue. I mean, I don't know. |
| 17 Tell me, on those pages in Exhibit 12, are | 17 Q. Do you know who made the decision not to pay |
| 18 there any parts that were not in force during the | 18 employees for donning, doffing, or sanitizing |
| 19 2004 to 2008 contract period? | 19 activities before their production line begins? |
| 20 A. These smocks, again, as stated earlier. | 20 MR. ROSENTHAL: Objection to the form |
| 21 Sometime during this contract we started | 21 of the question. You can answer. |
| 22 furnishing them smocks, and they pick them up at | 22 A. We're just following the union contract. |
| 23 the supply window. They was not issued three | 23 Everything was negotiated in the union contract, |

30 (Pages 114 to 117)

FREEDOM COURT REPORTING

---

Page 118

1  and that's what we go by.
2  Q.   But do you know who made the decision that
3  the company would not pay for donning, doffing, or
4  sanitizing time that occurs before the production
5  line commences?
6        MR. ROSENTHAL: Again, I object to the
7  form for the same reason.
8  A.   No.  We were just following the union
9  contract.
10 Q.   So then it wasn't your decision, obviously,
11 correct?
12 A.   No.  We just follow in the union contract
13 what we negotiated with the union.
14 Q.   Who do you think is the most knowledgeable
15 of the Department of Labor overtime requirements
16 or regulations?
17 A.   I can't answer that.
18 Q.   Do you know anybody who's knowledgeable?
19 A.   No.  I don't know who would be knowledgeable
20 of that.
21 Q.   Let's go to the last exhibit in the book,
22 Exhibit 15.  This is called "Equity Group Eufaula
23 Division Payroll Processing Manual."

---

Page 119

1        Do you use this?
2  A.   This manual?
3  Q.   Yes.  Or any parts of the manual that we
4  have there in that exhibit.  I excerpted out
5  certain pages.  I'm just asking you about these
6  pages.
7  A.   I don't know because I don't do time sheets.
8  I don't know what's being used.
9  Q.   Have you ever seen this manual before?
10 A.   No.
11 Q.   The whole manual?  This is the whole manual.
12 A.   No, I've never seen it.
13 Q.   This is not something that you use in your
14 work?
15 A.   No, I don't.
16 Q.   Does anybody under you use this manual?
17 A.   I can't answer that.
18 Q.   Let's look at page 1, which is E 695 of
19 Exhibit 15.  This is called a "Time Detail"
20 report, correct?
21 A.   Yes.
22 Q.   Do you use that type of document in your
23 work?

---

Page 120

1  A.   I don't.
2  Q.   Do you know how to read this document?
3  A.   No.  I don't use this document.
4  Q.   Okay.  But do you know how to read it?
5  A.   I could figure it out.  But, you know, I'm
6  not familiar with it because I don't use it.  I
7  don't have hourly associates reporting to me.
8  Q.   Okay.  Let's look at the next page, E 696.
9  Do you use this type of document or are you
10 knowledgeable of it?
11 A.   I don't use it.  I mean, I know what it is.
12 Q.   What is it?
13 A.   It just tells the positions and the payroll
14 department and the supervisor in that area is, you
15 know, what I get out of it.  I don't know what
16 else you could use it for.
17 Q.   Let's take the first line, for example.  It
18 says, Department 21A, Security; Supervisor, J.B.
19 Glass; Monday In/Out, and then it has an "E."
20      Do you know what that is telling?
21 A.   No.
22 Q.   All right.  Let's go to E 698 of Exhibit 15.
23 This is called "Editing."

---

Page 121

1        Do you edit time sheets?
2  A.   No.
3  Q.   And do you have any knowledge about the time
4  sheet editing process?
5  A.   No.
6  Q.   Who would be knowledgeable about the editing
7  of time sheets?
8  A.   I can't answer that.
9  Q.   We talked earlier about if an employee is
10 late by a minute, his payroll will be reduced by
11 that minute.  How does the company go about doing
12 that?
13 A.   The supervisor would make the changes on the
14 time sheets, and then payroll would make the
15 adjustments.
16 Q.   So the supervisor would have the punch-in
17 time, correct?
18 A.   Yes.  It would be on his time sheet.
19 Q.   And where does the supervisor get the
20 punch-in time from?
21 A.   Payroll department.
22 Q.   Is it on line where he can just dial in to
23 it?

31 (Pages 118 to 121)

FREEDOM COURT REPORTING

Page 122

1  A.  I don't know.
2  Q.  And what does he compare the punch-in time
3  to, to determine if someone is late?
4  A.  Master card time.  Start time/ending time,
5  according to what schedule he's on.
6  Q.  All right.  Master card time, is that the
7  same thing as line time?
8  A.  Yes, I would think so.
9  Q.  All right.  Let's look back at the
10 collective bargaining agreement, Exhibit 12.
11 Let's look at page 20 of the agreement, Section
12 12.5 called "Line Time."
13     It consists of this one sentence:  "All
14 employees will be paid according to the hours of
15 work indicated by the Master Line Time Card."
16 Correct?
17 A.  Yes, sir.
18 Q.  Now, you earlier told us though that that's
19 not true for all employees that are under the
20 collective bargaining agreement, correct?
21 A.  Correct.
22 Q.  Do you have a list of jobs or employees for
23 which it is not true that they will be paid

Page 123

1  according to the Master Line Time Card?
2  A.  I do not.
3  Q.  Can you name any such jobs?
4  A.  Floor personnel would be one.  I mean,
5  there's probably many, but I don't know them all.
6  Q.  Tell us the ones you do know.
7  A.  I honestly don't know.  I know floor
8  personnel wouldn't because they come early and
9  stay late.  They're on a different time than the
10 line card.  I don't know what employees are on
11 what time system, whether it be master card, clock
12 in to clock out, so I don't know.
13 Q.  If you were to attempt to determine that,
14 what documents would you want to look at?
15 A.  I would have to just do some research.  I
16 don't know what documents I'd look at because
17 right now I wouldn't know where to look.
18 Q.  Who would be the first person you would ask
19 because you would think they the most
20 knowledgeable?
21 A.  Payroll department.
22 Q.  Who in the payroll department?
23 A.  You've got Joe Preston who's the accountant

Page 124

1  which is over the payroll department.  I would ask
2  him who I needed to talk to, and he would send me
3  in the right direction.
4  Q.  All right.  Are there floor personnel in the
5  evisceration department?
6  A.  I would think so, yes.
7  Q.  Do you know how many?
8  A.  No.
9  Q.  Are there floor personnel in the debone
10 department?
11 A.  Yeah, I think so.
12 Q.  Is a floor person different than a setup
13 person?
14 A.  I don't know the answer to that.  I don't
15 know how they've got it staffed.
16     MR. WIGGINS:  Now, do you have his
17 affidavit that he can look at?
18     MR. ROSENTHAL:  I don't have an extra
19 copy of it.
20     MR. WIGGINS:  Okay.
21     MR. GOULD:  Would this be a good time
22 to take a break?
23     MR. WIGGINS:  Sure.

Page 125

1     (A lunch recess was taken.)
2  (BY MR. WIGGINS)
3  Q.  All right.  We're talking about the two
4  plants you had under you.  How many employees are
5  in each plant, hourly?
6  A.  A guess, 11-, 1200 total.  That's a guess.
7  Q.  And that's in both plants together?
8  A.  Yes.
9  Q.  And how many in the fresh plant?
10 A.  A guess, a thousand.
11 Q.  All right.  And are there any practices
12 different in the further processing plant from
13 those in the fresh plant?
14 A.  Yes.
15 Q.  All right.  And are there any practices on
16 donning, doffing, or sanitizing that are different
17 between the two plants?
18 A.  Yes.
19 Q.  What?
20 A.  Boot sanitation is not required at further
21 processing.
22 Q.  What is the McDonald's rule?
23 A.  On?

32  (Pages 122 to 125)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 126

1  Q.   I've just heard referred to the McDonald's
2  rule.  Do you know what that means?
3  A.   No, I don't.
4        MR. ROSENTHAL:  They don't use tomatoes
5  anymore.
6  Q.   Is McDonald's a customer?
7  A.   Yes.
8  Q.   And is it a customer of both plants, fresh
9  plant and further processing?
10 A.   The fresh plant feeds to further processing
11 plant.
12 Q.   Is McDonald's one of your bigger customers?
13 A.   Yes.
14 Q.   Is it your biggest customer?
15 A.   Yes.
16 Q.   And does it have certain sanitation
17 requirements for you to operate under?
18 A.   Yes.
19 Q.   What are they?
20 A.   I don't know all of them.  I don't know.
21 Q.   Tell me the ones you know.
22 A.   Pretty much what we went over today on
23 GMP's, SSOPs.  Just standard operating procedures.

Page 127

1  Q.   McDonald's requires all those things?
2  A.   They require us to produce safe food is
3  their requirements.
4  Q.   All right.  And all your GMP's are put
5  together in order to satisfy that requirement?
6  A.   Not all of them.
7  Q.   All right.  Are most of them for that
8  purpose?
9  A.   No, I wouldn't say most of them.  And I
10 don't know how many.
11 Q.   Okay.  Do you deal with McDonald's?
12 A.   No.
13 Q.   Does anybody under you deal with McDonald's?
14 A.   Nothing but produce product for them.
15 Q.   Who does interact with McDonald's, if
16 anyone, at the Eufaula Division?
17 A.   No one directly deals with McDonald's at
18 Eufaula Division.
19 Q.   Okay.  Who is your second biggest customer?
20 A.   I don't know the answer to that.
21 Q.   All right.  Does the company market chicken
22 products to the public itself?
23 A.   No.

Page 128

1  Q.   When you said there were 11- or 1200 hourly
2  employees at the two plants, are all those
3  employees subject to the collective bargaining
4  agreement?
5  A.   No.
6  Q.   How many are subject to the collective
7  bargaining agreement?
8  A.   I don't know the answer to that.
9  Q.   Which employees are not subject to the
10 collective bargaining agreement?
11 A.   QA department, maintenance department.
12 Q.   Does QA have hourly employees?
13 A.   Yes.
14 Q.   How many employees are in QA?
15 A.   I don't know the answer to that.
16 Q.   And QA stands for quality assurance?
17 A.   Quality assurance.
18 Q.   Does the quality assurance department
19 interact with McDonald's?
20 A.   Not directly with McDonald's, no.
21 Q.   Does McDonald's review and sign off on or
22 approve your GMP's on sanitation?
23 A.   Not at my location they don't.

Page 129

1  Q.   Do you know if they do that anywhere?
2  A.   I don't know that.
3  Q.   How many departments are in the fresh plant?
4  A.   I don't know.  When you say "department,"
5  job codes?  I don't know how many there are
6  totally.
7  Q.   Each department has a job code?
8  A.   Yes.
9  Q.   Well, we had identified various areas here.
10 Let me see if I can get the nomenclature down.
11       Evisceration, that's a department, correct?
12 A.   There could be two or three departments
13 within that department.  Evis is an area.
14 Q.   What departments are within the evisceration
15 department?
16 A.   You've got salvage.  I mean, I don't know
17 how they're all broke out.  I honestly don't.
18 You've got salvage; you've got line 1, line 2;
19 you've got rehang; you've got picking and
20 receiving; you've got live shacklers.
21       There's a lot of them, and I don't know all
22 the departments, how they're broke out.
23 Q.   Okay.  And what about evisceration?

33 (Pages 126 to 129)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 130

1 A. That's what I was talking about.
2 Q. I'm sorry. Debone. How many departments
3 are within debone?
4 A. I honestly don't know. Several.
5 Q. More than five?
6 A. I would say so. That's a guess.
7 Q. Are there any documents that would reflect
8 the areas or departments within the debone
9 department?
10 A. I don't know the answer to that. Payroll
11 may have something, but I don't know that. I
12 don't know.
13 Q. What areas in the production or processing
14 part of the plant are not a part of debone or
15 evisceration?
16 A. DSI is not a part of either.
17 Q. All right. Any others?
18 A. Shipping, QA, HACCP, maintenance. Those are
19 just a few I can name.
20 Q. How many employees are in HACCP?
21 A. I don't know the answer to that.
22 Q. And HACCP, that's the H-A-C-C-P; is that
23 what that is?

Page 131

1 A. Yes.
2 Q. Okay. And does it have hourly employees?
3 Did I ask you that?
4 A. Yes.
5 Q. And you don't know how many?
6 A. Huh-uh.
7 Q. Do you know approximately how many?
8 A. No.
9 Q. How many employees are in shipping?
10 A. I don't know the answer to that.
11 Q. Give me a ballpark.
12 A. It's a total guess: 30.
13 Q. And those are all hourly?
14 A. Yes.
15 Q. And DSI. How many employees are in DSI?
16 A. This is an estimate: I'm guessing 160.
17 That's a guess; I don't know.
18 Q. All right. What about the cooler employees?
19 Is that a department?
20 A. Shipping.
21 Q. Part of shipping? And tell me again what
22 DSI stands for.
23 A. I don't really know.

Page 132

1 Q. What do they do over there?
2 A. Cut meat with a water jet.
3 Q. The back dock, is that a department?
4 A. Picking and receiving.
5 Q. So that's part of the evisceration
6 department?
7 A. It's got a department of its own, but it
8 falls under the first processing or evisceration
9 department.
10 Q. Now, at the further processing plant, it
11 doesn't have an evisceration or debone?
12 A. No.
13 Q. What does it have?
14 A. You've got several areas, but I don't know
15 all those departments either, how the people are
16 laid out. But you've got a prep area; you've got
17 a laydown area; you've got packout area.
18 Q. Does McDonald's conduct on-site audits of
19 the plant?
20 A. McDonald's don't.
21 Q. Does someone do that for McDonald's?
22 A. Keystone has a group out of Philadelphia
23 that does audits.

Page 133

1 Q. Who is that?
2 A. Keystone.
3 Q. I know. But who? What persons?
4 A. I don't know all of them's names. They're
5 out of Philadelphia. I don't know.
6 Q. And Keystone is the corporation that you are
7 employed by; is that correct?
8 A. As far as I know. I hope so.
9 Q. What's the name of this area that does
10 audits of your plant?
11 A. Keystone. They're part of the company.
12 Q. I mean, is it a department? Does it have a
13 name?
14 A. Food safety group.
15 Q. Who is the head of that group?
16 A. Dane Bernard, I think. And I'm not for sure
17 of that.
18 Q. How often do they audit your food safety
19 standards, your practices?
20 A. This is a guess totally; I don't know:
21 annually. It's according to what part of it
22 you're talking about auditing.
23 Q. What do they audit?

34 (Pages 130 to 133)

FREEDOM COURT REPORTING

Page 134

1  A.   Sanitation; they audit animal welfare, pest
2  control.  Those are three that I know.  They may
3  audit more than that.
4  Q.   Is the donning, doffing, and sanitizing
5  activities done by employees with their gloves,
6  smocks, aprons, sleeves, that type of thing, is
7  that part of the sanitation audit?
8  A.   I don't know.  I don't remember.  I honestly
9  don't know.
10  Q.   Do you get a report on the results of the
11  audit?
12  A.   I don't know the answer to that.
13  Q.   Do you know if anybody at the plant
14  interacts with the food safety department more
15  than you?
16  A.   QA department.
17  Q.   But you don't know any outside group or
18  entity that audits or reviews your food safety
19  practices or your sanitation practices other than
20  USDA?
21  A.   Not that I'm aware of.  They may, but I'm
22  not aware of it.
23  Q.   Now, you told me the different areas that

Page 135

1  are in the plant.  Write them down for me on this
2  map that we have marked.  Write each of the
3  production areas down and show me where they're
4  at.
5  A.   Explain what you're wanting me to write
6  down.  I mean, like, parking lot, debone.
7  Q.   The production area.  Tell us where each
8  thing is.
9  A.   First off, this print is not up to date, so
10  whatever I write down won't be accurate because
11  the plant has been changed since whenever this
12  print was made.
13  Q.   When was it changed?
14  A.   It was back the first of this year, I
15  believe.
16  Q.   How was it changed?
17  A.   We added to it, put another line in.  This
18  plant is not nothing like what the plant is now.
19  Q.   Even the old part is not laid out the same
20  way?
21  A.   Not all of it.  Some of it is; some of it's
22  not.
23  Q.   All right.  Well, why don't you just take a

Page 136

1  sheet of paper and just draw further processing
2  for me roughly.
3  A.   I'm not good at drawing, sir.  I'm not a
4  draftsman.
5  Q.   Yeah.  Well, I understand that.
6  A.   Well, I'll just point them to you on this
7  piece of paper.
8  Q.   All right.
9  A.   There's one of these over here.
10  Q.   What is that?
11  A.   Fry line.
12  Q.   Okay.
13  A.   There's a marination room back here; there's
14  another spiral freezer sitting right here; another
15  packout area right here; forklift battery pallet
16  jack area right here has been added on;
17  refrigeration room has been added onto; and a
18  hydraulic room built on here.
19       That's most of the changes that we've made
20  in the plant.
21  Q.   How many hourly employees did you have
22  before the changes at the further processing
23  plant?

Page 137

1  A.   Total guess: 100.
2  Q.   And now you've got about 200?
3  A.   Yes.  And them are all ballpark figures.  I
4  do not know the exact numbers.
5  Q.   How many fry lines do you have?
6  A.   Two.
7  Q.   And before the change you had one?
8  A.   Yes.
9  Q.   How many marination do you have?
10  A.   Explain to me what you're asking.
11  Q.   You said you have a marination area over
12  here now.  Is that the only one you've got?
13  A.   The marination feeds the fry room.  Yes,
14  that's the only one we have.
15  Q.   How many spiral freezers do you have now?
16  A.   Two.
17  Q.   And you had one before the change?
18  A.   Yes.
19  Q.   You have two packout areas now?
20  A.   Yes.
21  Q.   And you had one before the change?
22  A.   Yes.
23  Q.   The forklift battery pallet jack area, did

35 (Pages 134 to 137)

FREEDOM COURT REPORTING

Page 138

1  you have one before the change?
2  A.    Yes.
3  Q.    And now you have two?
4  A.    No, we just have one.  We had to move this
5  one to put marination in it.
6  Q.    Okay.  And the refrigeration room.  You had
7  one before the change?
8  A.    Yes.
9  Q.    And how many do you have now?
10  A.    We've got one, but it's a lot larger.
11  Q.    Okay.  And the hydraulic area, did you have
12  that before the change?
13  A.    Yes.
14  Q.    Do you have two now or just a larger one?
15  A.    Just one.
16  Q.    Okay.  Now, what production areas do you
17  have in the further processing, other than fry
18  line, marination, spiral freezer, packout,
19  forklift battery, refrigeration, and hydraulic?
20  A.    Got a cooler and we've got a freezer.
21  Q.    Anything else?
22  A.    That's all I can remember.
23  Q.    All right.  Now, organizationally, are each

Page 139

1  of those considered a separate department?
2  A.    I don't know how the employees are charged
3  to what area.  I don't know that.  I don't know.
4  Q.    Do you have any administrative offices at
5  the further processing plant?
6  A.    Yes.
7  Q.    Where are they?
8  A.    Right here, these four offices.  There's an
9  office in the maintenance shop; there's an office
10  right here in the maintenance shop; there's an
11  office right here; there's a USDA office right
12  here; there's an office right here; there's an
13  office right here; all accounting offices is over
14  here; general manager's office is right here.
15  Q.    So is there an HR function in the further
16  processing plant?
17  A.    No.
18  Q.    Is there a QA function within that plant?
19  A.    Yes.
20  Q.    Where are they?
21  A.    Right in this area.
22  Q.    Okay.  And where do employees enter the
23  further processing plant?

Page 140

1  A.    Normally, right here.
2  Q.    Okay.  Just write "entry" right there.
3  A.    (Witness complies.)
4  Q.    And is that location of the entry the same
5  before and after the recent changes?
6  A.    Yes.  An entry here, got an entry right
7  here, maintenance and QA enters here, there's an
8  entrance, accounting/admin entrance here.
9  Q.    Now, which entrance does the production room
10  employees come through?
11  A.    Mainly right here.
12  Q.    And that's the one next to the picnic area?
13  A.    Yes.
14  Q.    Y'all have one picnic area for that plant?
15  A.    Yes.
16  Q.    And they come into a hall?
17  A.    Yes.
18  Q.    And the first thing they have there is a
19  break room?
20  A.    Yes.
21  Q.    Where's the supply room?
22  A.    Right there.
23  Q.    All right.  So that's down the hall from the

Page 141

1  break room, correct?
2  A.    Yes.
3  Q.    Where do you enter the production area?
4  A.    Right here.
5  Q.    All right.  So you come in the door by the
6  picnic area, you walk down a hall that runs
7  adjacent to the break room; and at the end of the
8  break room, you turn right into another hall that
9  leads into the entry door to the production area?
10  A.    Yes.
11  Q.    Now, where's the time clock?
12  A.    Right here, I believe.  Right in that
13  hallway, right on the break room wall, I think.
14  Q.    And you have no boot sanitation in this
15  plant; is that correct?
16  A.    No.
17  Q.    Is that correct?
18  A.    Correct.
19  Q.    Never have had any?
20  A.    Not as I'm aware of.
21  Q.    Where are the restrooms?
22  A.    I believe they're right here.
23  Q.    Across the hall from the break room?

36 (Pages 138 to 141)

FREEDOM COURT REPORTING

Page 142

1  A.  And right here.
2  Q.  Okay.
3  A.  It's hard to tell on this print.
4  Q.  Yeah, it is.  So there are no restrooms
5  within the production area in either plant,
6  correct?
7  A.  Correct.
8  Q.  There are no break rooms in the production
9  area in either plant?
10  A.  Correct.
11  Q.  Where is the nurse's station?
12  A.  Nurse's station?  I believe that's labeled
13  nurse's station.
14  Q.  And that serves both plants?
15  A.  Yes.
16  Q.  And it's, just for the record's sake, it
17  looks like it's a separate building; is that
18  right?
19  A.  Yes.
20  Q.  And it sits out by the parking lot?
21  A.  Yes.  Right off the sidewalk.
22  Q.  Right out front of the fresh processing
23  plant, correct?

Page 143

1  A.  Correct.
2  Q.  All right.  Employees are not allowed to
3  have candy, gum, food, drink, or anything of that
4  sort, in the production area; is that correct?
5  A.  Correct.
6  Q.  So employees have to leave the production
7  area to either get supplies from the supply room,
8  to go to the nurse's station, to go to bathroom,
9  to go to the QA office, correct?
10  A.  Correct.
11  Q.  Is that true of both plants?
12  A.  Yes.
13  Q.  All right.  Do you know how much time it
14  takes for employees to walk from the front door to
15  the time clock?
16  A.  No.
17  Q.  Do you know how long it takes employees to
18  walk from the supply room to the entry to the
19  production room?
20  A.  No.
21  Q.  Do you know how long it takes employees to
22  walk from the break room to the entry to the
23  production area?

Page 144

1  A.  No.
2  Q.  Do you know how long it takes employees to
3  walk from their station on the line back to the
4  bathroom?
5  A.  No.
6  Q.  Or to the break room?
7  A.  No.
8  Q.  Or to the QA department?
9  A.  No.
10  Q.  Do you know the amount of times it takes
11  employees to don or doff or sanitize their
12  protective gear or equipment?
13  A.  No.
14  Q.  Has the company ever studied any of the
15  amounts of time it takes to do any task related to
16  donning, doffing, or sanitizing protective gear or
17  equipment?
18  A.  Not that I'm aware of, but I don't know.
19  Q.  Has the company, or anyone on behalf of the
20  company, videotaped employees donning, doffing,
21  sanitizing, or walking time?
22  A.  Has the company -- are you talking about the
23  company officials?

Page 145

1  Q.  The company, or anybody acting on the
2  company's behalf, such as an outside consultant or
3  person.
4      Has anybody ever videotaped employees when
5  they are performing activities related to donning,
6  doffing, or sanitizing protective gear or
7  equipment, or walking from a supply room, break
8  room, or bathroom to their workstation?
9  A.  Yes.
10  Q.  When was that done?
11  A.  I don't know the answer to that.
12  Q.  Approximately when?
13  A.  I don't have a clue how to even guess.  I
14  don't remember.
15  Q.  Is it possible it was within the last year?
16  A.  It's possible, but I don't know the date.
17  Q.  Did you see them videotape?
18  A.  No, I did not see them videotape.
19  Q.  What's the source of your knowledge?
20  A.  Just that somebody come in and done a study
21  on how long it would take to don and doff.
22  Q.  And have you seen the results of the study?
23  A.  No, I have not.

37 (Pages 142 to 145)

FREEDOM COURT REPORTING

Page 146

1  Q.   Do you know any of the amounts of time that
2  were learned or determined?
3  A.   No.
4  Q.   Do you know who it is that did the
5  videotaping?
6  A.   No.
7  Q.   Did you assist in making arrangements for
8  the videotaping?
9  A.   No, I did not.
10 Q.   Have you watched the videotapes?
11 A.   No.
12 Q.   Have you seen any parts, pictures or
13 anything, produced from the videotapes?
14 A.   No.
15 Q.   Do you know anybody at the plant who has
16 been involved with the videotaping?
17 A.   Not directly I do not.
18 Q.   Who was in charge of supervising the
19 videotape process?
20 A.   I don't know.  I honestly don't know.
21 Q.   Why did you do the videotaping?
22 A.   I don't know that.
23 Q.   Have you ever made a determination that it

Page 147

1  is administratively impractical to keep up with
2  employees' donning, doffing, or sanitizing time?
3  A.   Repeat the question.
4  Q.   Have you ever made a determination that it's
5  administratively impractical to record or keep up
6  with the amount of time employees are spending
7  donning, doffing, or sanitizing protective gear or
8  equipment?
9        MR. ROSENTHAL:  Objection to the form
10 of the question.  You can answer.
11 A.   I don't know the answer.  I don't understand
12 the question.
13 Q.   Have you ever made a determination that
14 it's, from an administrative standpoint,
15 impractical for the company to track and record
16 and then pay for the amount of time it takes to
17 don or doff or sanitize protective gear or
18 equipment?
19       MR. ROSENTHAL:  Objection again to the
20 form of the question.
21 A.   Not that I'm aware of.  I really don't know.
22 Are you asking me have I made a decision not to
23 pay for donning and doffing, in simple terms?  Is

Page 148

1  that what you're asking?
2  Q.   No.  I think I asked you that earlier today.
3  But right now I'm just asking if you've made a
4  decision or made a determination that it's
5  administratively too difficult or impractical to
6  keep up with the amount of time employees
7  typically take to don, doff, or sanitize their
8  protective gear or equipment.
9        MR. ROSENTHAL:  Objection to the form
10 of the question.
11 A.   No, I haven't made that decision.
12 Q.   Do you know anybody who has?
13 A.   No.
14 Q.   Do you know anybody who has that as part of
15 their responsibility?
16 A.   Not that I'm aware of.
17 Q.   Did you participate in the decision to pay
18 three minutes for donning and doffing time?
19 A.   I was at the negotiating table when it was
20 negotiated between the company and RWDSU.
21 Q.   Other than sitting at the table, did you
22 participate in that decision, that three minutes
23 would be the amount of time the company would pay

Page 149

1  for donning and doffing clothes or equipment?
2  A.   As a group, that's what we negotiated as a
3  group.
4  Q.   Okay.  Yeah.  I'm going to get into the
5  negotiation in a minute.  But right now I'm trying
6  to figure out are you the decision maker.
7        Did you make the decision that three minutes
8  was the appropriate amount of time, or were you
9  just going along for the ride?
10 A.   As a group, we made the decision.
11 Q.   What role did you play in that decision?
12 A.   As a group member.
13 Q.   But you said you never tried to determine
14 the actual time it takes to do these activities,
15 correct?
16 A.   No, I have not.
17 Q.   Do you know anybody who has?
18 A.   No.
19 Q.   Do you know how they arrived at three
20 minutes?
21 A.   I get dressed and go out in the plant, and
22 it don't take me three minutes.
23 Q.   What do you put on?

38 (Pages 146 to 149)

FREEDOM COURT REPORTING

Page 150

1  A.    Smock, hair net, beard net, earplugs, boots.
2  Q.    You don't wear your boots during the regular
3  part of your day?
4  A.    No.
5  Q.    Now, do you know anybody who has made a
6  determination that three minutes is the actual
7  amount of time it takes to do donning/doffing of
8  protective gear or equipment?
9  A.    Not that I'm aware of.
10 Q.    Did you ever see any documents that
11 referenced three minutes as the amount of time to
12 be paid or negotiated for donning and doffing?
13 A.    No.
14 Q.    Did the union, to your knowledge, make any
15 time study or effort to determine the amount of
16 time it actually takes to don and doff?
17 A.    I can't answer that. Not to my knowledge,
18 but I don't know.
19 Q.    Who was in the group that you say was
20 involved in the negotiations that led to the
21 three-minute time period?
22 A.    It's listed in the contract. I don't
23 remember all the names, but it's on the contract.

Page 151

1  Q.    All right. Tell me what part your speaking
2  of.
3  A.    This is not a signed contract. It would be
4  one with signatures in it.
5  Q.    See if that's one.
6  A.    (Witness complies.)
7  Q.    Okay. Page 29 you're handing me, which is
8  Bates number E 6007. I don't see your name on
9  here. There you are. Okay.
10     So for the company it's Tim Esslinger, Jim
11 Bice, Greg Mills, and Kathy Gilmore?
12 A.    Yes.
13 Q.    Anyone else involved in that decision to
14 agree to three minutes?
15 A.    Just the ones on that list, and the union.
16 Q.    And the union members are listed to the left
17 of your name on page 29 of that exhibit?
18 A.    Yes.
19 Q.    Are all the union members employees of
20 Equity Food Group, except Henry Jenkins?
21 A.    Jerry Foster's not.
22 Q.    Okay. Have you had any administrative
23 difficulties since paying the three minutes?

Page 152

1  A.    Not as I'm aware of.
2  Q.    Have you ever looked into what other
3  companies do in terms of keeping up with the time
4  taken to don or doff protective gear or equipment
5  for pay purposes?
6  A.    No, I haven't.
7  Q.    Do you know anything at all that was
8  considered in deciding that three minutes would be
9  the appropriate amount of time to pay for donning
10 and doffing?
11 A.    Other than our own personal time for what it
12 takes for us to get dressed and walk out to the
13 plant. That's all I know. That's what I based my
14 ruling on.
15 Q.    What did the union propose as the
16 appropriate amount of time, prior to reaching the
17 final agreement?
18 A.    I can't remember. I can't answer that. I
19 don't know.
20 Q.    Now, we were given some documents this
21 morning, Exhibits 19 and 20, which had to do with
22 union proposals and company responses.
23     Do any of those documents reference the

Page 153

1  negotiations over the three minutes?
2  A.    I do not see anything in 19; I don't see
3  anything in Exhibit 20 either.
4  Q.    Okay. Is Spence Jernigan still with the
5  company?
6  A.    Yes.
7  Q.    What's his job now?
8  A.    I don't know his job title, but he's
9  director of HR.
10 Q.    Where is he located?
11 A.    Huntsville.
12 Q.    Did he play any role in the new contract
13 negotiations in 2008?
14 A.    No.
15 Q.    Is James Davis still with the company?
16 A.    No.
17 Q.    Where is he now?
18 A.    He's working for another firm in Eufaula.
19 Q.    And what's the name of it?
20 A.    I think Cooper Lighting, but I don't know.
21 Q.    It's not a poultry --
22 A.    No.
23 Q.    Why did he leave the company?

39 (Pages 150 to 153)

FREEDOM COURT REPORTING

Page 154

1  A.    Better benefits he said, and better
2  opportunity.
3  Q.    Now, when you signed the 2004 contract, you
4  signed it as plant manager, correct?
5  A.    Yes.
6  Q.    Were you in charge of both plants at that
7  time?
8  A.    No.
9  Q.    Did this contract apply to both plants, the
10  2004 contract?
11  A.    Yes.
12  Q.    It did?
13  A.    Yes.  All bargaining units.
14  Q.    Okay.  What employees in the further
15  processing plant are not subject to the collective
16  bargaining agreement?
17  A.    QA and maintenance.
18  Q.    Now, are employees rotated from job to job?
19  A.    Yes.
20  Q.    Are there any employees who are not subject
21  to rotation?
22  A.    Yes.
23  Q.    Hourly employees, I mean, production

Page 155

1  employees.  Are any of them not subject to
2  rotation?
3  A.    I don't know the answer to that.
4  Q.    Why do you rotate employees?
5  A.    Repetitive motion.
6  Q.    Is that a physical injury type thing?
7  A.    Yes.
8  Q.    What part of the body does it affect?
9  A.    Could be wrists, hands, arms.
10  Q.    How often do you rotate employees?
11  A.    I don't know the answer to that.
12  Q.    Are employees subject to rotation on a daily
13  basis?
14  A.    I don't know the answer to that.  People
15  under me does the rotation; I don't.  I don't get
16  involved in that.
17  Q.    Do you know of any documents that speak to
18  the issue of rotation?
19  A.    I don't.
20  Q.    How long have you been rotating employees?
21  A.    I don't know the time frame.
22  Q.    Are there documents that would show on a
23  particular day what a given employee would be

Page 156

1  performing, what job he would be performing?
2  A.    I don't know.  I don't know the answer to
3  that at this point.
4  Q.    Who do you think would be knowledgeable on
5  that subject?
6  A.    Supervisors or shift managers.
7  Q.    But employees, when they come to work in the
8  morning, don't know which job they're going to be
9  assigned?
10  A.    I don't know the answer to that.  I don't
11  know how they manage their people.
12  Q.    You said earlier that the company has
13  employees doing physical exercises in some areas,
14  correct?
15  A.    I don't remember saying that.
16  Q.    Well, I thought I remember you saying this
17  morning that the employees at some point in time
18  have done physical exercises during the day.
19  A.    They have at some point in time.
20  Q.    Are they doing that currently?
21  A.    I don't know the answer to that.
22  Q.    Were they doing that on paid or unpaid time?
23  A.    Paid.

Page 157

1  Q.    What part of the day were those exercises
2  being done?
3  A.    In the mornings, normally after they got on
4  their line.
5  Q.    And how long would they do the physical
6  exercises?
7  A.    I don't know the answer to that.
8  Q.    I think I asked you this, but I want to make
9  sure:  Do you know which departments did the
10  physical exercises?
11  A.    The best of my knowledge, debone was the
12  only department doing that.
13  Q.    And was it the whole department?
14  A.    I don't know the answer to that.
15  Q.    Did the company consider doing physical
16  exercises to be work?
17  A.    Yes.  They was on the clock.  It was after
18  the line was started, after they got on the line.
19  Q.    Are all activities that employees are paid
20  for considered work?
21  A.    Yes.
22  Q.    Now, you said you started with the company
23  September '99, correct?

40 (Pages 154 to 157)

FREEDOM COURT REPORTING

| Page 158 | Page 160 |
|---|---|
| 1  A.   I believe that's correct. | 1  A.   Tell me what you're talking about. |
| 2        MR. ROSENTHAL:  He said started with | 2  Q.   Were you involved in making any of the |
| 3  CP. | 3  decisions that went into the transition of |
| 4  Q.   CP in September of '99.  And were you | 4  ownership from CP to Equity Group? |
| 5  involved in the collective bargaining negotiations | 5  A.   No. |
| 6  while you were with CP? | 6  Q.   Were you involved in any of the decisions or |
| 7  A.   No. | 7  considerations that went into whether or not |
| 8  Q.   And the contract that CP had ran from 2000 | 8  Equity Group would follow the customs or practices |
| 9  to 2004; is that correct?  Or do you know? | 9  of CP? |
| 10  A.   I don't know. | 10  A.   No. |
| 11  Q.   How many employees are paid on a piece | 11  Q.   Do you have any knowledge on that subject? |
| 12  basis? | 12  A.   No. |
| 13  A.   None. | 13  Q.   Have you ever had any conversations with |
| 14  Q.   When did that cease? | 14  Jacqueline Davis about donning and doffing? |
| 15  A.   I don't recall the date. | 15  A.   She was in the negotiations. |
| 16  Q.   How many, when you were paying employees on | 16  Q.   Do you remember anything she said? |
| 17  a piece basis, did you have that you were doing | 17  A.   No, not her personally. |
| 18  that? | 18  Q.   Have you ever heard Jacqueline Davis say |
| 19  A.   I don't remember the number of employees. | 19  anything that touched on the subject of donning |
| 20  Q.   Which employees were paid on a piece basis? | 20  and doffing or pay for donning and doffing? |
| 21  A.   Tender sizing and thigh sizing. | 21  A.   No.  I read her depositions where -- |
| 22  Q.   How are they paid now? | 22  Q.   When did you do that? |
| 23  A.   That department no longer exists. | 23  A.   When this come up, I read everything about |

| Page 159 | Page 161 |
|---|---|
| 1  Q.   Now, you said earlier you didn't know if you | 1  donning and doffing that I knew.  And I knew that |
| 2  had any setup employees? | 2  she had filed a case against us, so I read her, |
| 3  A.   Correct. | 3  you know -- we reviewed her documents. |
| 4  Q.   Do you have any personal knowledge about the | 4  Q.   "We" being who? |
| 5  collective bargaining agreement while CP ran the | 5  A.   Myself, Kathy Gilmore. |
| 6  plant? | 6  Q.   All right.  So did you read her deposition |
| 7  A.   No, other than the handbook that we had to | 7  in this case or some other case? |
| 8  go by.  I don't recall what was in the union | 8  A.   I read one she made in another case. |
| 9  handbook.  I was not part of the negotiations. | 9  Q.   And that's when CP owned the plant? |
| 10  Q.   You're calling the handbook the contract? | 10  A.   I don't remember who owned it at the time. |
| 11  A.   I meant the contract.  Sorry. | 11  Q.   Do you remember anything you learned? |
| 12  Q.   Do you know who negotiated on behalf of the | 12  A.   There's some in my affidavit there about |
| 13  union when CP ran the plant and the collective | 13  what was in there about the Jackie Davis case |
| 14  bargaining was being negotiated? | 14  about the donning and doffing. |
| 15  A.   No, I don't. | 15  Q.   Yeah.  But I'm talking now about what you |
| 16  Q.   Do you know of any differences in the way CP | 16  learned when you read the deposition. |
| 17  paid employees and the way Equity Group pays | 17  A.   I learned that the judge didn't grant her |
| 18  employees? | 18  any donning and doffing pay. |
| 19  A.   No, I don't.  The same system we had then | 19  Q.   Okay.  Anything else? |
| 20  carried through all contracts. | 20  A.   No.  That was the main concern. |
| 21  Q.   Were you involved in any of the decision | 21  Q.   Do you know what Jacqueline Davis understood |
| 22  making that led Equity Group to take over the | 22  or said she understood about whether she could |
| 23  plant from CP? | 23  expect to be paid for donning and doffing |

41 (Pages 158 to 161)

FREEDOM COURT REPORTING

Page 162

1    activities while CP ran the plant?
2    A.    She wasn't expecting to be paid for it, as
3    far as I know.
4    Q.    But have you ever heard her express her
5    understanding?
6    A.    No, I have not.
7    Q.    Have you ever read anything in which she
8    expressed her understanding?
9    A.    I don't recall.
10   Q.    Have you ever read or heard anything that
11   indicated what Jacqueline Davis understood about
12   whether it's a well-known practice for CP to pay
13   only for time worked at the workstation?
14   A.    From what I read, that's what she understood
15   she got paid.  That it was understood that she got
16   paid for time worked at the workstation.
17   Q.    But you never heard her say that?
18   A.    I never heard her say that.
19   Q.    Do you know why CP decided to sell the
20   plant?
21   A.    I've heard rumors.
22   Q.    What did you hear?
23   A.    Nonprofit organization.

Page 163

1    Q.    Wasn't make any money?
2    A.    No money.
3          MR. ROSENTHAL:  It was a profit-making
4    organization that was not making profit.
5          MR. WIGGINS:  Right.
6    Q.    Have you ever heard Jacqueline Davis say
7    anything to Jenkins or Foster?
8          MR. ROSENTHAL:  Anything at all?
9    Q.    About donning and doffing.
10   A.    Not that I recall, but I'm sure she did in
11   the contract negotiations.
12   Q.    Now, Jenkins and Foster were the union
13   representatives, correct?
14   A.    Correct.
15   Q.    But did you ever hear Davis say anything to
16   Jenkins or Foster about donning and doffing; and
17   if so, what did you hear?
18   A.    I don't recall.
19   Q.    Do you handle grievances, union grievances?
20   A.    If they come up to my level.
21   Q.    What's your level?
22   A.    Operations manager.
23   Q.    Is that the fourth level? third? second?

Page 164

1    What is that?
2    A.    I don't remember.  I haven't seen a
3    grievance in years.
4    Q.    How many?
5    A.    I don't recall.
6    Q.    All right.  So you don't have any knowledge
7    about grievances until they reach your level,
8    correct.
9    A.    Correct.
10   Q.    Let's see if we can figure out what your
11   level is.  Look in this union contract.  Can you
12   find where it defines your level?
13   A.    Actually, I'm not even on here.  But I know
14   about them if it goes to the plant manager level.
15   We have a grievance if it gets to the step two.
16   If it gets to the plant manager, I'm made aware of
17   it.
18   Q.    Okay.
19   A.    If we ever have one.
20   Q.    But you have no knowledge of any grievances
21   that only went to the step one?
22   A.    No.
23   Q.    Who was the chief negotiator for the company

Page 165

1    in the collective bargaining in 2008?
2    A.    Howard Rosenthal.
3    Q.    All right.  And who was the chief negotiator
4    for the company in the collective bargaining in
5    2004?
6    A.    Howard.
7    Q.    Okay.  Were there any other attorneys
8    involved in either of the collective bargaining
9    years that went on, 2004 and 2008?
10   A.    Not that I'm aware of.
11   Q.    Now I may be assuming too much.  Has the
12   collective bargaining agreement ever been
13   negotiated, to your knowledge, except in 2004 and
14   2008?
15   A.    Not to my knowledge, no.
16   Q.    You haven't had any midterm or interim
17   negotiations?
18   A.    No, not to my knowledge.
19   Q.    Who was the chief negotiator for the union
20   in 2004?
21   A.    I would guess Henry Jenkins.
22   Q.    What about 2008?
23   A.    Same.

42 (Pages 162 to 165)

FREEDOM COURT REPORTING

Page 166

1  Q.  I'm showing you the new exhibit you gave me
2  this morning, Exhibit 17, called "Good
3  Manufacturing Practices."  Look at page 3.  Who is
4  Jretha Diggs?
5  A.  She was a QA supervisor, I believe.
6  Q.  Is she still with the company?
7  A.  No.
8  Q.  Do you know where she is now?
9  A.  No.
10  Q.  Do you know if she's in the Eufaula area?
11  A.  I don't have a clue.
12  Q.  And why did she leave the company?
13  A.  I don't know the answer to that.
14  Q.  Is she the same person as Jretha Thompson?
15  A.  Yes.
16  Q.  And it looks like she was still with the
17  company as of August 18, 2007, according to this
18  page, correct?
19  A.  Correct.
20  Q.  Who replaced her?
21  A.  I don't know the answer to that.
22  Q.  And what was her title?
23  A.  QA supervisor, I believe.

Page 167

1  Q.  And how long did she hold that job?
2  A.  I don't know the answer to that.
3  Q.  Was she with CP?
4  A.  I don't know the answer to that.
5  Q.  Look at page 4, under the title "Purpose."
6  It says, "The following GMP's were established to
7  minimize the introduction of bacteria,
8  contaminants, or foreign material into our
9  manufacturing environment and must be adhered to
10  by all team members and visitors while in
11  production areas including coolers, shipping, and
12  receiving docks."
13      Do you know of any other purpose for these
14  practices that are then listed in the policy?
15  A.  Not as I'm aware of.
16  Q.  Under "Responsibility" it says, "The Quality
17  Assurance Department primarily administers this
18  program."
19      How do they do that?
20  A.  I don't know.
21  Q.  Do you know of any recordkeeping they do in
22  terms of checking employees' donning, doffing, or
23  sanitizing practices?

Page 168

1  A.  No.  But I'm not that familiar with the QA.
2  They don't report to me.
3  Q.  When it uses the words "team members," what
4  does that mean?
5  A.  Everybody, I would guess.  I don't know.
6  Q.  That would include you?
7  A.  Every team member.  I don't know what the
8  definition of it is in this sentence.
9  Q.  But you don't divide employees into teams?
10  A.  No.
11  Q.  How many first line supervisors do you have
12  in debone?
13  A.  I don't remember off the top of my head.
14  It's in the flowchart or organizational chart.
15  Q.  Okay.  Now, look at the "Grounds" section,
16  page 4.  Do you see that section?
17  A.  Yes.
18  Q.  Has that always been the practice since
19  March of 2004?
20  A.  Yes.
21  Q.  And the purpose of that part of the GMP is
22  to prevent contamination of the poultry products?
23  A.  Not the grounds.  Grounds is to protect

Page 169

1  against insects.  Pest control.  That sort of
2  stuff that could lead into the plant:  rats
3  rodents, so forth, on the grounds.  Grounds is
4  outside perimeter, not the plant.
5  Q.  All right.  Let's go to the next page to the
6  "Plant Construction and Design" section.
7      It says, "Plant buildings and structure
8  shall be suitable in size, construction and design
9  to facilitate maintenance and sanitary operations
10  for food - manufacturing purposes."  Correct?
11  A.  Yes.
12  Q.  Now, have you always followed these
13  practices listed under "Plant Construction and
14  Design" at the two plants here in Eufaula, since
15  March of 2004?
16  A.  To the best of my knowledge.
17  Q.  And then under "General Requirements," do
18  you see any part of the general requirements that
19  have not always been required of employees since
20  March of 2004?
21      (The witness examines the
22      document.)
23  A.  I don't know if this goes all the way back

43 (Pages 166 to 169)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 170

1  to 2004; but to the best of my knowledge after
2  briefly reading it, these are the rules
3  that we follow today.
4  Q.  And sitting here watching you, you read
5  through all 41 items; is that right?
6  A.  I scanned through it.  I didn't read every
7  one of them word for word.
8  Q.  All right.  Let's look at No. 2.  It says,
9  "All team members and visitors must wash and
10 sanitize hands before starting work..."
11      That's always been a requirement, correct?
12 A.  Best of my knowledge.
13 Q.  And then it says, "All team members must
14 wash and sanitize hands after each absence from
15 the work area...," correct?
16 A.  Yes.
17 Q.  And that's always been a requirement,
18 correct?
19 A.  Best of my knowledge.
20 Q.  And what will cause absences from the work
21 area?
22 A.  If you leave and go to the break room, or
23 you go to the nurse's station, or you go to HR,

Page 171

1  QA, anywhere you go.
2  Q.  Restroom?
3  A.  Restroom, which it states up here.
4  Q.  And the reason for that rule No. 2 that you
5  must wash and sanitize hands after each absence
6  from the work area and before starting work is to
7  protect the poultry products from contamination,
8  correct?
9  A.  Yes.  You're handling food.
10 Q.  And that's the reason for the rule; is that
11 right?
12 A.  Correct.
13 Q.  Now, No. 4 says, "A solid (non-mesh) hair
14 net must be worn to contain the hair as completely
15 as possible."
16      That's always been the rule that employees
17 are required to follow?
18 A.  Not always, but it has been for the last
19 period of time.  I don't know how long.
20 Q.  Since March of 2004 at least?
21 A.  I would think, but I don't know that.
22 Q.  And No. 6 says, "A clean smock must be
23 obtained daily."

Page 172

1      That's been required since at least March of
2  2004, correct?
3  A.  No.
4  Q.  When did that first start?
5  A.  I don't know.
6  Q.  The next sentence of Rule 6 under General
7  Requirements says, "Smocks are to be changed
8  during the shift if needed."
9      Has that always been a rule?
10 A.  Yes.
11 Q.  And when will a change in smocks be needed?
12 A.  Only if they get contaminated.
13 Q.  And what would contaminate a smock?
14 A.  Wet, bloody, for example.
15 Q.  Are there any jobs in which employees never
16 get wet, bloody, or contaminated?
17 A.  Yes.
18 Q.  Which ones?
19 A.  QA, for example.  I don't know all the jobs
20 and what does and don't get contaminated or
21 bloody.
22 Q.  Okay.  The next sentence of Rule 6 of
23 General Requirements says, "Smocks must fasten or

Page 173

1  tie properly to cover street clothes.  Smocks may
2  not have sewn on buttons or an external upper
3  pocket."
4      Has that always been true since March of
5  2004?
6  A.  I can't answer that since March of 2004.
7  Q.  Why do you have a rule that the smocks must
8  fasten or tie properly to cover street clothes?
9  A.  To cover street clothes.
10 Q.  Is that to protect the poultry from
11 contamination by street clothes?
12 A.  Yes.  And to protect the clothing of the
13 employee.
14 Q.  All right.  "Smocks may not have sewn on
15 buttons."
16      What purpose does that serve?
17 A.  You don't want a button getting in your
18 product.
19 Q.  And can't have an external upper pocket.
20 What purpose does that serve?
21 A.  You don't want nothing in your pocket to
22 fall over in your product.
23 Q.  It would contaminate the product?

44 (Pages 170 to 173)

4a4efcd4-222a-4134-9214-747cf2d63865

Page 174

1   A.   Yes.
2   Q.   And then Rule 7 of General Requirements
3   says, "Smocks, hair nets, and beard nets must be
4   removed before exiting the facility."
5        And I believe you've already said that's
6   always been the rule?
7   A.   Yes.  Can't wear them outside.
8   Q.   Why?
9   A.   Contamination.
10  Q.   Of the poultry product?
11  A.   Yes.  Of the smock that's going back to the
12  poultry product.
13  Q.   Okay.  Then Rule 8 says, "Keep hands and
14  fingernails clean.  Keep fingernails properly
15  trimmed, and if fingernail polish or false
16  fingernails are worn, gloves must cover hands
17  while in any production area, including box rooms,
18  shipping/receiving, dry storage, product storage."
19       Has that always been the requirement that
20  employees are required to follow?
21  A.   I don't know about always.  It is today.
22  Q.   Do you know if that's been since March of
23  2004?

Page 175

1   A.   No, I don't.  I don't recall that far back.
2   Q.   Rule 10 of the General Requirements says,
3   "Clothing must be clean at the start of operation
4   and kept reasonably clean during operations."
5        Which clothing is that talking about?
6   A.   Smock.
7   Q.   Is it talking about the street clothes too?
8   A.   No.
9   Q.   Well, are you just repeating yourself in No.
10  10 from what you said in No. 6 about smocks?
11  A.   Looks that way.
12  Q.   Did you author these rules?  Did you have
13  any role in the authorship of these rules?
14  A.   No.
15  Q.   Rule 11 of the General Requirements says,
16  "Plastic sleeve covers will be worn to cover any
17  street clothes that extend beyond smock coverage
18  on the arms when handling product."
19       Is the purpose of that to prevent
20  contamination of the chicken product?
21  A.   And to cover your street clothes.
22  Q.   To prevent contamination?
23  A.   And to keep your street clothes from getting

Page 176

1   messed up.
2   Q.   And the company furnishes the plastic
3   sleeves to the employees?
4   A.   Yes, according to the union contract.
5   Q.   Do you know how often?
6   A.   No.  It's in the contract.
7   Q.   I believe that's the rule that you said part
8   of it you no longer follow, like the three smocks.
9        MR. ROSENTHAL:  Objection to the form
10  of the question.
11  Q.   When you say it's in the contract, are you
12  speaking of Section 13.4, page 21, of the
13  2004-2008 contract?
14  A.   See right there, sleeves?
15  Q.   Right.  But that's what you were referring
16  to is that 13.4 Section, correct?
17  A.   Referring to as this being in the contract?
18  Q.   In your last answer you said it was in the
19  contract.  Is that what you were referring to?
20  A.   Yes.  You said the company supplied them;
21  that's what I'm referring to.
22  Q.   Okay.  Rule 12 of the General Requirements
23  in Exhibit 17 says, "Maintain gloves used for

Page 177

1   handling food and food contact packaging supplies
2   intact and in a sanitary condition."
3        The purpose of that is to protect the
4   chicken from contamination, correct?
5   A.   Yes, and to cover your hands.
6   Q.   To cover your hands so your hands can't
7   touch the chicken, right?
8   A.   Or the chicken can't touch your hand, yeah.
9   Q.   Rule 13 says, "Gum, candy, cough drops, and
10  tobacco products are not permitted in any
11  production area."
12       Has that been a rule since at least March of
13  2004?
14  A.   Best of my knowledge.
15  Q.   Rule 14:  "Maintain lockers clean and free
16  of trash or soiled clothing."
17       Has that always been a rule?
18  A.   Yes, best of my knowledge.
19  Q.   Rule 15 says, "No food or beverages are
20  allowed in production areas and placing food in
21  lockers is highly discouraged unless there is no
22  other alternative and it must be properly sealed
23  and removed daily."

45  (Pages 174 to 177)

FREEDOM COURT REPORTING

Page 178

1    What's the purpose of that rule?
2  A.    Pests.
3  Q.    To keep down pests that would cause poultry
4  contamination?
5  A.    Yeah.  You don't want food or beverage in
6  your production area.
7  Q.    Because it might lead to the contamination
8  of the poultry?
9  A.    And it's a USDA requirement.
10  Q.    And the USDA requirement is put there in
11  order to protect poultry from contamination?
12  A.    I would think so, yes.
13  Q.    And then Rule 16 says, "Don't use hands or
14  equipment for practices which may result in
15  contamination of food products.  Such practices
16  include but are not limited to:  touching face,
17  wiping forehead; scratching head or body; placing
18  fingers on/or in mouth, nose, or ears."
19    Has that always been a rule?
20  A.    I can't answer that.  I don't know.  It is
21  today.
22  Q.    But the purpose of that rule is stated on
23  its face, correct, that it might result in

Page 179

1  contamination of food products?
2  A.    Yes.
3  Q.    And then Rule 17 says, "Avoid uncontrolled,
4  uncovered coughing or sneezing.  Sanitize hands
5  afterwards."
6    Has that always been a rule?
7  A.    I don't know the answer to that.
8  Q.    Now, the purpose of that rule is to protect
9  the poultry from contamination, correct?
10  A.    To keep from sneezing over the food that
11  somebody is going to eat.
12  Q.    Rule 24 says, "Any item that becomes
13  contaminated must be washed and sanitized before
14  being placed back into use.  Processing tools and
15  utensils are, but not limited to the following
16  items:  pens, calculators, thermometers,
17  clipboards, pans, edible totes, edible shovels,
18  earplugs, maintenance tools, etc."
19    Has that always been the rule since at least
20  March of 2004?
21  A.    I can't answer that since March of 2004.
22  It's a rule today.
23  Q.    And the reason for requiring that type of

Page 180

1  equipment to be kept free from contamination,
2  including the earplugs, is to prevent
3  contamination of the poultry products, correct?
4  A.    Contamination of the earplugs could
5  contaminate a human's ears.  You want to clean
6  them before you put them in your ears, I would
7  think.
8  Q.    For example, it says, "Any item that becomes
9  contaminated must be washed and sanitized..."  And
10  it gives examples like pens, calculators,
11  thermometers, clipboards, pans, etc.
12    You pay employees for that sanitation,
13  correct?
14  A.    Yes.
15  Q.    That's considered work?
16  A.    Yes.
17  Q.    Now, Rule 25 says, "Only approved footwear
18  shall be worn in the processing area to include
19  coolers, shipping, and receiving docks."
20    Is there any footwear approved other than
21  that which the company distributes to the
22  employees?
23  A.    Yes.

Page 181

1  Q.    The company does provide boots to employees,
2  correct?
3  A.    Yes.
4  Q.    Free of charge?
5  A.    Yes.
6  Q.    And why does it do that?
7  A.    Because it's required to wear washable
8  footwear, so we supply boots.
9  Q.    And is that to prevent contamination of the
10  poultry processing areas?
11  A.    It's a requirement by the USDA.
12  Q.    And the purpose of their requirement is to
13  prevent contamination of the poultry processing?
14  A.    I guess.  But as it states here, you can
15  also wear shoe covers.
16  Q.    Does the company furnish the shoe covers?
17  A.    We have them available.  They're not in the
18  contract, but they can buy them if they would
19  rather have the shoe covers than the rubber boots.
20  Q.    Well, the company pays for the rubber boots.
21  Does it pay for the shoe covers?
22  A.    Not as I'm aware of.
23  Q.    Do most employees wear the rubber boots?

46 (Pages 178 to 181)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

| Page 182 | Page 184 |
|---|---|

Page 182

1  A.  Yes.
2  Q.  It says, "Rubber boots are available at the
3  Supply and may be cut down..."
4      What does that mean, "cut down"?
5  A.  If you don't like them coming all the way up
6  to your knees, you can cut them off.  A lot of
7  employees do that.
8  Q.  These are boots that come all the way to
9  your knee if you don't cut them down?
10  A.  Yes.
11  Q.  Then it goes on to say, "...but cannot be
12  left where they are hanging loose or flapping
13  over.  Do not cut below the ankle."
14      Has that always been a rule?
15  A.  I can't answer that.  It's a practice we
16  have today.
17  Q.  What's the purpose of that rule about not
18  cutting your boots or letting them flap?
19  A.  Safety.  Safety for the employee.
20  Q.  And does it also have to do with sanitation?
21  A.  No.  It's for the safety of the employee.
22  Q.  Are the rubber boots provided for sanitary
23  purposes?

Page 184

1  A.  Yes.
2  Q.  Rule 35 talks about work stands, ergo
3  stands.  What are those?
4  A.  The stands they get up on to make their job
5  more ergonomically correct.
6  Q.  Where are they provided at?
7  A.  On the lines where the employees work.
8  Q.  Turn to page 11 of Exhibit 17.
9  A.  (Witness complies.)
10  Q.  Under "Sanitation Related" for "Slaughter,
11  Deboning, and Further Processing," Rule 2 says,
12  "Follow cleaning procedures as outlined in Company
13  Sanitation Master manual."
14      I haven't seen that master manual.  Are you
15  familiar with what it is?
16  A.  I know what it is; I don't know what's in
17  it.
18  Q.  Have you ever read it?
19  A.  No.
20  Q.  You don't use it at all?
21  A.  I don't.
22  Q.  Does the Company Sanitation Master manual
23  have anything in it related to donning, doffing,

Page 183

1  A.  They're provided because it's a USDA
2  regulation.
3  Q.  There's nothing in the union contract about
4  boots?
5  A.  Yes, it's in the union contract.
6  Q.  What does the union contract say about
7  boots?
8  A.  I don't recall.  We do furnish them.
9  Q.  Rule 34 says, "Only approved tools may be
10  used... Examples of non-approved tools:
11  pocketknives, fingernail clippers, etc. or any
12  tool with a wooden handle."
13      What's the purpose of that rule?
14  A.  Because the tools have to be cleanable,
15  sanitizable, and we furnish the tools.  We don't
16  want the employees to have to furnish tools.  We
17  furnish tools for the employees.
18  Q.  And that's so you can make sure you keep the
19  poultry processing area in a sanitary condition?
20  A.  So the tools meet the USDA requirements.
21  Q.  And the requirements of USDA are to ensure
22  the sanitary production of uncontaminated chicken
23  products?

Page 185

1  or sanitizing protective equipment?
2  A.  I don't know that.  I've never read it.
3      MR. WIGGINS:  Howard, we'd like to have
4  that sanitation master manual.
5      MR. ROSENTHAL:  We'll consider your
6  request.
7  Q.  Now, page 13 of this Exhibit 17 closes by
8  saying, "The above GMP's will be strictly
9  enforced."
10      Has that always been the case?
11  A.  No.  We have not strictly enforced them,
12  unfortunately.  They have things that went by that
13  we didn't take action on.  But to the best of our
14  ability, we strictly enforce them.
15  Q.  Have you ever been written up by USDA?
16  A.  Have I?
17  Q.  Or cited or anything like that?
18  A.  The company has, yes.
19  Q.  Have you ever been written up or cited about
20  donning and doffing?
21  A.  No.
22  Q.  What about sanitizing protective equipment?
23  A.  Not as I recall.

47 (Pages 182 to 185)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 186

1  Q.   Have you been written up about contaminated
2  poultry products?
3  A.   Yes.
4  Q.   How many times?
5  A.   I don't know the answer to that.
6  Q.   What was the cause of the contamination?
7  A.   Different ones. I don't recall all of it.
8  Q.   What does USDA call that type of write-up?
9  A.   NR.
10 Q.   And who's in charge of NRs?
11 A.   USDA.
12 Q.   What does NR mean?
13 A.   Noncompliance report.
14 Q.   Who's in charge at the company of NRs?
15 A.   Nobody at the company's in charge of it.
16 USDA's in charge of it. They write them and issue
17 them.
18 Q.   Okay. But who's responsible for responding
19 to the problem?
20 A.   It's according to who gets the NR.
21 Q.   I mean, is that a first class supervisor job
22 or --
23 A.   It entails the first line supervisor all the

Page 187

1  way up to the plant manager.
2  Q.   Does it involve quality assurance?
3  A.   Yes.
4  Q.   Safety department?
5  A.   It's according to what the NR was written
6  on.
7  Q.   Okay. And how long do you keep your NRs?
8  A.   I don't recall. They have to be kept on
9  site. I don't know.
10 Q.   Who's the recordkeeper for the NRs for the
11 company?
12 A.   Probably QA. I don't know the answer to
13 that.
14 Q.   Are they kept electronically?
15 A.   No, not as I'm aware of. I don't know.
16 Q.   And then the next sentence in the closing
17 paragraph of Exhibit 17, after listing all those
18 rules we went over, says, "Anyone failing to
19 comply with these procedures will be subject to
20 being corrected immediately, possible disciplinary
21 action up to and including termination." Correct?
22 A.   Yes.
23 Q.   Have you disciplined employees for improper

Page 188

1  donning and doffing?
2  A.   I haven't.
3  Q.   Has the company?
4  A.   I don't know the answer to that.
5  Q.   What about for improper sanitizing
6  protective gear or equipment?
7  A.   I don't know the answer to that.
8  Q.   But employees are subject to discipline and
9  discharge for improper donning and doffing or
10 sanitizing, correct?
11 A.   Yes, subject to it.
12 Q.   Do you remember any NRs that you received
13 about contaminated poultry products?
14 A.   I don't remember. I'm sure we have had
15 some, but I don't remember.
16 Q.   What are your duties and responsibilities as
17 complex operations manager?
18 A.   My duties and responsibilities are that both
19 plant managers report to me. And I deal with, as
20 the organizational chart states, the plant
21 managers, the maintenance complex manager, and the
22 sanitation managers on third shift. They report
23 to me. I'm also over the projects which falls up

Page 189

1  under the maintenance umbrella.
2  Q.   The company has a sanitation department,
3  correct?
4  A.   Correct.
5  Q.   And you said it comes in under third shift?
6  A.   Yes.
7  Q.   Do they have any employees on the first or
8  second shift?
9  A.   No.
10 Q.   Describe what the company does to sanitize
11 the production area on the third shift.
12 A.   They clean the production area.
13 Q.   How do they go about doing that?
14 A.   Wash it, scrub it, foam it, rinse it, and
15 then spray it down with sanitizer.
16 Q.   And does the USDA inspect it?
17 A.   Yes.
18 Q.   Does the USDA have to release it before you
19 can start up production?
20 A.   Yes.
21 Q.   Is that in writing?
22 A.   It's a USDA regulation.
23 Q.   I mean, the release every day. Is that

48 (Pages 186 to 189)

FREEDOM COURT REPORTING

| Page 190 | Page 192 |
|---|---|
| 1 recorded in some way as the time of day that you | 1 knives and arm guards, correct? |
| 2 were released? | 2 A. Yes. |
| 3 A. We know our down time. If we're not | 3 Q. And they're paid for that, correct? |
| 4 released by our normal start-up time, we know our | 4 A. Yes. |
| 5 down time. | 5 Q. And that's considered work? |
| 6 Q. What records show your down time? | 6 A. Correct. |
| 7 A. Production records. | 7 Q. If any employee is scheduled to be at work, |
| 8 Q. And employees get paid for that type of | 8 arrives at work, there's no work for him, he has |
| 9 sanitation activity? | 9 to wait, is he paid? |
| 10 A. Which employees are you talking about. | 10 A. Yes. |
| 11 Q. Your sanitation department. Employees are | 11 Q. Is there a rule on that? |
| 12 paid to sanitize the company's equipment? | 12 A. They're paid at their normal start time or |
| 13 A. Yes. | 13 their master card time, which starts at a certain |
| 14 Q. You also sanitize on lunch breaks, meal | 14 time every day and ends at a certain time. |
| 15 breaks? | 15 Q. And they're paid even though they're just |
| 16 A. No. | 16 sitting? |
| 17 Q. I thought y'all, during break periods, | 17 A. Exactly. |
| 18 you're setup or your floor persons have to | 18 Q. Doing nothing? |
| 19 resanitize. | 19 A. Correct. |
| 20 A. No. | 20 Q. That's still considered work that has got to |
| 21 Q. That's never been the case? | 21 be paid? |
| 22 A. Not sanitize, no. | 22 A. Correct. |
| 23 Q. Do they do anything during the break, while | 23 Q. That's always been the case? |

| Page 191 | Page 193 |
|---|---|
| 1 the normal production line employees are gone on | 1 A. Yes. |
| 2 break? | 2 Q. So the company -- |
| 3 A. Some areas are rinsed down. But they don't | 3 MR. WIGGINS: Strike that. |
| 4 sanitize. | 4 Q. Now, the sanitation department employees are |
| 5 Q. Okay. What's the difference between rinsing | 5 paid eight hours even if they work less, correct? |
| 6 down and sanitizing? | 6 A. Correct. |
| 7 A. Rinsing down and sanitizing. | 7 Q. What's the least amount of time you've known |
| 8 Q. Physically what's the difference? What are | 8 an employee to work and get paid for eight hours? |
| 9 you doing differently? | 9 A. I don't know exactly on times. I mean, I |
| 10 A. Taking a water hose and washing it down | 10 would guess five, six hours. |
| 11 would be rinsing it down. If you're sanitizing, | 11 Q. And is that typical that employees will |
| 12 you would be spraying sanitizer on it. | 12 spend five or six hours but get paid for eight? |
| 13 Q. What kind of sanitizer do you use? | 13 A. On sanitation, yes. |
| 14 A. Chlorine, Clorox. | 14 Q. And their time after five or six hours, |
| 15 Q. So you don't use any sanitizer except on the | 15 they're at home, correct? They've left the |
| 16 third shift, in terms of sanitizing the production | 16 building? |
| 17 area itself? | 17 A. Not necessarily. |
| 18 A. Unless we have a breakdown and maintenance | 18 Q. Well, employees are paid in the sanitation |
| 19 has to work on that piece of equipment. Then it | 19 department even though they've left the premises? |
| 20 has to be rinsed off and sanitized. | 20 A. Correct. |
| 21 Q. Who sanitizes knives or arm guards? | 21 Q. Even though they may be home? |
| 22 A. I don't know the answer to that. | 22 A. Correct. |
| 23 Q. But somebody is in charge of sanitizing the | 23 Q. Even though they may be in the bed asleep? |

49 (Pages 190 to 193)

FREEDOM COURT REPORTING

Page 194

1  A.  Correct.
2  Q.  They're still considered to be working on
3  paid time?
4  A.  They're paid eight hours a day, unless they
5  work over eight hours.
6  Q.  So the company does not require you to exert
7  yourself in order to be considered working,
8  correct?
9        MR. ROSENTHAL:  Objection to the form
10 of the question.  You can answer.
11 A.  I don't know the answer.  I don't know what
12 your question is.
13 Q.  Well, the company pays employees sometimes
14 when they're sleeping, sometimes when they're
15 sitting and doing nothing, correct?
16 A.  Correct.
17 Q.  Okay.  Now, in your affidavit you said, in
18 paragraph 16 -- Well, let's start at paragraph 14.
19     You said, "These production employees are
20 paid" -- Well, let's see which production
21 employees you're talking about.  Paragraph 11.
22     Let me show you a copy of your affidavit.
23 In paragraph 11 you're taking about employees in

Page 195

1  the production department of the fresh plant,
2  evisceration and debone, are generally paid under
3  a form of line time or master card time, correct?
4  A.  Correct.
5  Q.  And you then describe, in the next several
6  paragraphs, various things about these employees
7  that are subject to master card time or line time,
8  correct?
9  A.  Yes.
10 Q.  And then paragraph 14, about them you say
11 this: "These production employees are paid
12 together with hours worked before the start of
13 line time or after completion of line time on the
14 basis of the master card system."
15     Now, what type of activities are those that
16 you are describing that are before the start of
17 line time or after the completion of line time?
18 A.  I need to go back and read it all.  But what
19 it states here is if we have an employee to come
20 in early to set up or we ask them to stay late,
21 come in early or stay late, we pay them on the
22 outside of the master card time.  That time is
23 adjusted by the supervisor to the actual time

Page 196

1  worked.
2  Q.  Based on their personal time card?
3  A.  Yes.
4  Q.  All right.  Now --
5  A.  Anyone that's not falling within the window
6  of the master card.
7  Q.  Right.  Now, are there any jobs that that
8  type of before-line-time and after-line-time
9  activities is in regular part of their job?
10 A.  Yes.  There's some people that's not on the
11 master card system.
12 Q.  Even though they're subject to the
13 collective bargaining agreement?
14 A.  Correct.
15 Q.  And I think I asked you this earlier, but I
16 want to ask you one more time to make sure:  Are
17 you able to name those jobs?
18 A.  No, I'm not.
19 Q.  The only one you named earlier was the floor
20 person.
21 A.  Correct.  Setup people, floor person, could
22 be the same.
23 Q.  Now, you earlier said you didn't know

Page 197

1  anything about setup persons, but are you now
2  remembering?
3  A.  No.  I said it could be floor person or
4  setup person.
5  Q.  All right.  Is that two different kinds of
6  employees?
7  A.  I don't know.  I said "or."
8  Q.  Okay.  Do you know of any part of the
9  production area that does not have floor persons
10 or setup persons?
11 A.  No, I don't.
12 Q.  Do you know how many floor persons or setup
13 persons you have?
14 A.  No.
15 Q.  Is that a job that's rotated?
16 A.  I can't answer that.  I don't know.
17 Q.  Who would know that?
18 A.  Production supervisors.
19 Q.  Then the next paragraph, 15, refers to the
20 master card being swiped at the end of the shift.
21     Is there a master card swiped at the
22 beginning of a shift?
23 A.  Yes.

50 (Pages 194 to 197)

Page 198

1   Q.   Is the master card used --
2        MR. WIGGINS: I'm sorry. Strike that.
3   Q.   Is the master card swipe used for pay
4   purposes at the start of the day for any employee?
5   A.   For people that's on the master card, yes;
6   for people that's on the master card time.
7   Q.   The reason I ask is your paragraph 15 says,
8   "As employees are paid from the scheduled start
9   time, employees are required to be at their
10  workstations through the time when the master card
11  is swiped at the end of the shift when the last
12  bird to be processed passes the final
13  workstation."
14       Is that a true statement?
15  A.   Yes.
16  Q.   Has that always been true since March of
17  2004?
18  A.   I can't answer that. Best of my knowledge,
19  it has been.
20  Q.   Is there any document that describes a rule
21  or requirement that the master card be swiped only
22  after the last bird passes the final workstation?
23  A.   I don't know of a document. I'm not aware

Page 199

1   of one.
2   Q.   If an employee's scheduled work time is --
3   Well, let me ask you this: Give me an example.
4   Let's take debone. What's their scheduled start
5   time?
6   A.   Day shift?
7   Q.   Day shift.
8   A.   7:30.
9   Q.   If an employee's scheduled start time is
10  7:30 and the master card is swiped at 7:35, which
11  controls the pay of the employee?
12  A.   The master card would be swiped at 7:30.
13  Q.   Well, let's say that something prevents the
14  supervisor from getting back out to the break room
15  to swipe it.
16  A.   7:30.
17  Q.   So the scheduled time would control?
18  A.   Yes.
19  Q.   At the end of the day, what's the 7:30 shift
20  end time?
21  A.   4:30.
22  Q.   If the supervisor swipes the master card at
23  4:35, which controls? the scheduled time or the

Page 200

1   swipe time?
2   A.   It's according to the situation.
3   Q.   How does it vary?
4   A.   Normal, 99 percent of the time you've got to
5   walk on/walk off. They would be leaving. But if
6   we only run one shift, which we haven't done in
7   years, and they have to work until 4:35, they'll
8   get paid until 4:35.
9   Q.   They won't get paid until their clock-out
10  time person --
11  A.   No. They'll get paid by master card time,
12  which you said 4:35.
13  Q.   Okay. Now, if the master card is swiped at
14  4:25, what controls the pay?
15  A.   Going back to my answer, if we're only
16  running one shift that day and they get through at
17  4:25, they'll get paid at 4:25. As stated
18  earlier, when the last bird goes down the line is
19  when it's swiped. But on a normal basis, it's
20  7:30 to 4:30 on day shift.
21  Q.   How is it different on the evening shift?
22  A.   You run until you get finished. It starts
23  at 4:30 in debone and runs until you get finished.

Page 201

1   Q.   But the evening shift though, the start of
2   pay is on scheduled time?
3   A.   Yes. At 4:30.
4   Q.   And that's the scheduled time, correct?
5   A.   Correct.
6   Q.   If the master card is swiped at a time
7   different than 4:30, the 4:30 scheduled time still
8   controls the pay?
9   A.   Unless there's a reason why it was swiped
10  later.
11  Q.   Okay. Now, you mentioned something in your
12  affidavit about a three- to five-minute lag in one
13  area, in change over from one shift to the other?
14  A.   Yeah.
15  Q.   Do you recall that?
16  A.   Let me find it.
17  Q.   Says, "In debone, work is stopped for
18  approximately three to five minutes between
19  shifts."
20       Why is that?
21  A.   To gather up the knives and the metal
22  gloves, for them to have the other ones out for
23  the employees when they get out there.

51 (Pages 198 to 201)

FREEDOM COURT REPORTING

Page 202

1  Q.  Okay.  So in debone, after the last bird
2  passes the final station, the master card is
3  swiped for the first shift, day shift; is that
4  right?
5  A.  Correct.
6  Q.  And you said that normally is at 4:30?
7  A.  Normally.
8  Q.  All right.  You also said the evening shift,
9  their scheduled start time is 4:30?
10  A.  Correct.
11  Q.  So how does this three- to five minutes
12  work?
13  A.  There's no birds on the line at that time.
14  They're not actually working.  They're out there
15  but they're not working.
16  Q.  So this is like from 4:33 to 4:35?
17  A.  I can't give you a definite answer on what
18  time it is.  But it takes three to five minutes to
19  gather all the tools and put the new tools out
20  for the second shift to start.  So that's in
21  between day shift and the second shift.
22      They're out there but they're not actually
23  working on the line during that three to five

Page 203

1  minutes.
2  Q.  So are the debone employees getting paid for
3  that three to five minutes?
4  A.  Yes.
5  Q.  Are there records that will reflect this
6  down time of three to five minutes?
7  A.  No, not as I'm aware of.
8  Q.  Do you know of any documents that describe
9  this practice?
10  A.  Not as I'm aware of.
11  Q.  All the other areas, besides debone, you
12  just have a skip in the line; and second shift
13  steps up as the first shift steps off?
14  A.  Correct.
15  Q.  How much is the skip?
16  A.  I don't know the exact time amount of that.
17  It's short.  I don't know.
18  Q.  Is it as much as a minute?
19  A.  I don't know, as I stated.
20  Q.  What's the longest time, that you're aware
21  of, from the first station to the last station, in
22  terms of from the time a bird arrives at the first
23  station until it arrives at the last station?

Page 204

1  A.  What department are you talking about?
2  Q.  The longest.  Just pick what you think is
3  the longest.
4  A.  Evis is about ten minutes.  That's a guess;
5  I don't actually know.
6  Q.  What's a typical amount of time from the
7  first bird to the last?
8      MR. ROSENTHAL:  Objection to the form
9  of the question.
10  A.  In what area are you talking about?  What
11  plant are you talking about?
12  Q.  Well, let's do it this way:  What's the
13  shortest amount of time it takes a bird to travel
14  from the first station to the last station on a
15  given line?
16      MR. ROSENTHAL:  Objection to the form
17  of the question.  You can answer.
18  A.  I don't know how to answer because I don't
19  know what area you're talking about.
20  Q.  I'm hoping to talk about the shortest one.
21  A.  Which could be?
22  Q.  That's what I wanted you to tell me.
23  A.  The cone line is less than two minutes.  The

Page 205

1  rest of them, I really don't know.  I know evis is
2  approximately ten minutes.
3  Q.  Look at paragraph 31 of your affidavit.  It
4  says, "Before breaks or at the end of the day
5  employees may spend a brief amount of time rinsing
6  their work clothing."
7      Is that a requirement?
8  A.  It's according to if they've got on an apron
9  and there's nothing on it, no, they don't have to
10  rinse it.
11  Q.  How about their gloves and sleeves?
12  A.  It's a standard practice for them to rinse
13  them.
14  Q.  Where do they rinse?
15  A.  In the sinks, as they go out the plant.
16  Q.  What do they rinse it with?
17  A.  Soap and water.
18  Q.  Is that part of the process you require in
19  order to produce uncontaminated chicken products?
20  A.  I guess you could say that.
21  Q.  You don't want blood and guts and other
22  things building up on the aprons, sleeves, gloves,
23  and harboring or growing microorganisms, correct?

52  (Pages 202 to 205)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

| Page 206 | Page 208 |
|---|---|
| 1  A.   Correct. | 1  nets or beard net out of the production area |
| 2  Q.   And employees are reusing gloves, aprons, or | 2  during breaks, correct? |
| 3  sleeves the next day sometimes? | 3  A.   They can wear their hair nets and beard nets |
| 4  A.   Yes. | 4  outside the production area. |
| 5  Q.   And they're storing them in their lockers? | 5  Q.   How long has that been the case? |
| 6  A.   Yes. | 6  A.   I can't answer that.  As long as I can |
| 7  Q.   And the purpose of that rule that they have | 7  remember.  They can't wear them outside, but they |
| 8  to wash their aprons, gloves, and sleeves at the | 8  can wear them outside the production area. |
| 9  end of the day or on breaks is to prevent | 9  Q.   Employee breaks are automatically deducted |
| 10  contamination to the chicken, correct? | 10  through the computer payroll system rather than |
| 11  A.   Yes. | 11  through the use of a master card swipe, correct? |
| 12  Q.   And the wash basins, for that purpose, are | 12  A.   The best of my knowledge.  I don't know. |
| 13  in the production area, correct? | 13  Q.   Have you ever known a master card to be used |
| 14  A.   Yes. | 14  to determine breaks? |
| 15  Q.   Employees, at that point, still have on | 15  A.   No. |
| 16  their smocks, correct? | 16  Q.   Have you ever known a personal time card to |
| 17  A.   I can't answer that.  Some do; some don't. | 17  be used to determine breaks? |
| 18  I can't answer that. | 18  A.   Yeah.  I have known that. |
| 19  Q.   They don't -- The employees at the end of | 19  Q.   When? |
| 20  the day are required to put their smocks in a bin? | 20  A.   It's been several years ago, before I come |
| 21  A.   Correct. | 21  to work here.  But we used to clock in and out for |
| 22  Q.   The bin's outside of the production area? | 22  breaks. |
| 23  A.   Correct. | 23  Q.   Which company was that? |

| Page 207 | Page 209 |
|---|---|
| 1  Q.   So they still have their smocks with them | 1  A.   Wayne Farms. |
| 2  when they're cleaning their aprons, gloves, and | 2  Q.   But that was never a practice at CP? |
| 3  sleeves? | 3  A.   Not to the best of my knowledge. |
| 4  A.   Yes.  But they could have them off. | 4  Q.   And it's never been under Equity Group? |
| 5  Q.   I was thinking -- I need to read the rules, | 5  A.   Best of my knowledge it's hasn't been, no. |
| 6  and I don't have time to really, but I was | 6  Q.   Equity Group is not calculating the amount |
| 7  thinking though the rules say you had to take your | 7  of time employees actually spend on break free |
| 8  smock off after you left the production room.  Am | 8  from any responsibilities; it's simply deducting a |
| 9  I wrong in that? | 9  standard 30 minutes, correct? |
| 10  A.   Take the smock off before you leave the | 10  A.   Yes. |
| 11  production area.  At the end of the shift, they | 11  Q.   And the 30 minutes begins when the last |
| 12  take them off as they go out the door because | 12  chicken passes the last station on the line? |
| 13  they're not going to wear them back in. | 13  A.   No.  The 30 minutes begins when it passes |
| 14  Q.   Okay.  At breaks, employees are not allowed | 14  your station, whether you be the first or the |
| 15  to take their aprons and smocks outside the | 15  last. |
| 16  production area, correct? | 16  Q.   Is that in writing anywhere? |
| 17  A.   Correct.  They hang them on a rack that's | 17  A.   Not as I know of. |
| 18  supplied for them. | 18  Q.   Have you observed when employees are being |
| 19  Q.   And they're not allowed to take their gloves | 19  sent on break? |
| 20  or sleeves outside the production area either, are | 20  A.   I've seen employees leave the line as soon |
| 21  they? | 21  as the last bird passes them, and they follow |
| 22  A.   Correct. | 22  pursuit back in. |
| 23  Q.   And they're not allowed to take their hair | 23  Q.   Now, at the time the last bird passes their |

53 (Pages 206 to 209)

FREEDOM COURT REPORTING

| Page 210 |
|---|
| 1  station at break, they still have on their smock, |
| 2  apron, gloves, sleeves, earplugs, hair nets, beard |
| 3  nets, and boots; is that right? |
| 4  A.  Correct. |
| 5  Q.  Before they can leave the production area, |
| 6  they've got to doff all that? |
| 7  A.  No. |
| 8  Q.  Except for, I think you said, the hair net |
| 9  and the beard net? |
| 10  A.  And their boots and their earplugs. |
| 11  Q.  Okay.  But everything else they've got to |
| 12  doff after the break has begun? |
| 13  A.  After they leave the line. |
| 14  Q.  So they're doffing all of that on unpaid |
| 15  time, correct? |
| 16  A.  As far as I know.  But I've never put a |
| 17  stopwatch on it. |
| 18  Q.  Now, when an employee goes to the restroom |
| 19  while the line is running, they also have to doff |
| 20  everything, as you have already told us, before |
| 21  they can leave the production area, correct? |
| 22  A.  Correct. |
| 23  Q.  That's considered work time and they're paid |

| Page 211 |
|---|
| 1  for it, correct? |
| 2  A.  They get paid for that. |
| 3  Q.  They're exerting the same amount of effort |
| 4  to doff when they go to the restroom during the |
| 5  production line as they are when they doff on an |
| 6  unpaid break, correct? |
| 7      MR. ROSENTHAL:  Objection to the form |
| 8  of the question.  You can answer. |
| 9  A.  I would say so. |
| 10  Q.  And during the break, the employees are |
| 11  required to sanitize their hands, gloves, sleeves, |
| 12  aprons that they're using when they return -- |
| 13  before they return to the production area, or when |
| 14  they return to the production area? |
| 15  A.  When they return to the production room. |
| 16  Q.  They have to do that inside the production |
| 17  room at the sinks; is that right? |
| 18  A.  Correct. |
| 19  Q.  But their pay time doesn't begin until after |
| 20  that, when they return to the line and the |
| 21  chickens start coming again, correct? |
| 22  A.  No.  Their 30 minutes is up when they're |
| 23  called back to break.  And then they walk through |

| Page 212 |
|---|
| 1  the door and they start getting ready to go to the |
| 2  line. |
| 3  Q.  But an employee's break continues until he's |
| 4  back on the line working? |
| 5  A.  Not necessarily. |
| 6  Q.  I don't know if you might have an exception, |
| 7  but that's the standard situation, isn't it? |
| 8  A.  I don't know the answer to that.  I've never |
| 9  timed them. |
| 10  Q.  Well, an employee's unpaid time is from the |
| 11  time he peels off the production line until the |
| 12  time he's back on the production line.  That's |
| 13  supposed to be 30 minutes, correct? |
| 14  A.  He's got 30 minutes of unpaid breaks. |
| 15  Q.  And that 30 minutes he's required to be on |
| 16  the line at the commencement of it and back on the |
| 17  line at the end of it, correct? |
| 18  A.  Should be. |
| 19  Q.  And during that period he has had to doff |
| 20  all of his protective equipment, resanitize it, |
| 21  and redon it, correct? |
| 22  A.  Yeah. |
| 23  Q.  And all that's on unpaid time during the |

| Page 213 |
|---|
| 1  break? |
| 2  A.  Yes. |
| 3  Q.  But if he goes to the nurse's station or to |
| 4  the quality assurance office or to the restroom or |
| 5  to the supply room during the production line, he |
| 6  does the exact same amount of activities, but he's |
| 7  paid for that? |
| 8      MR. ROSENTHAL:  Objection to the form |
| 9  of the question. |
| 10  Q.  Correct? |
| 11  A.  Yes. |
| 12      MR. WIGGINS:  Let's take a break.  I'm |
| 13  about done. |
| 14      (A brief recess was taken.) |
| 15  (BY MR. WIGGINS) |
| 16  Q.  Employees rotate jobs when they come back |
| 17  from break too, don't they? |
| 18  A.  I can't answer that.  I don't know. |
| 19  Q.  You mentioned a HACCP plan.  That's a |
| 20  written document, correct? |
| 21  A.  Correct. |
| 22  Q.  You said it's required to be kept out on the |
| 23  floor, along with the sanitation master plan? |

54 (Pages 210 to 213)

FREEDOM COURT REPORTING

Page 214

1   A.   No. It's required to be kept on site. Not
2   on the floor, on site.
3   Q.   Okay. What's covered in the HACCP plan?
4   A.   HACCP plan is a government-regulated
5   program. And I don't know really the details.
6   But you have to go through the entire process and
7   list critical control points, CCPs as they are
8   called, and you have to follow that plan. It's a
9   plan that's mandated by USDA.
10  Q.   Okay. Now, looking at Exhibit 17, it's got
11  this P-20322 number right below the name of the
12  plant. Do you see that?
13  A.   Yes.
14  Q.   What does that stand for?
15  A.   That's the plant number. That's the number
16  that USDA issued that plant.
17  Q.   So USDA is treating slaughter, debone, and
18  further processing as one plant?
19  A.   Yes.
20  Q.   Has that always been the case?
21  A.   Here, yes.
22  Q.   In Eufaula?
23  A.   Yes.

Page 216

1   A.   Talking about this entire 17?
2   Q.   Yes.
3   A.   Some of it is USDA requirements; some of it
4   is our requirements.
5   Q.   But the items that you do to prevent
6   contamination of poultry product is because that's
7   a requirement of the USDA?
8        MR. ROSENTHAL: Objection to the form
9   of the question.
10  A.   The USDA, us as a company, both.
11  Q.   Both the company requirement and the USDA
12  requirement?
13  A.   Could be both. Could be.
14  Q.   All right. Now, as I understand -- And I've
15  never been in a chicken plant, so you tell me if
16  I've got a bad understanding -- the line is a
17  continuous production line, correct?
18  A.   Yes, most of them are.
19  Q.   It doesn't stop from when it goes from
20  evisceration to debone?
21  A.   Yes, it stops. There's no one line that
22  runs all the way through that facility.
23  Q.   Does the chicken on the --

Page 215

1   Q.   And what's that P number used for?
2   A.   That's our number that USDA -- that's our
3   name for USDA.
4   Q.   To track meat?
5   A.   Track meat. That's our number.
6   Q.   In other words, if poultry gets out in the
7   market and something's wrong with it, they can
8   track it back to you; is that the purpose?
9   A.   Yes. That number is on our labels of our
10  product.
11  Q.   Okay. And when I asked you the various
12  questions about whether the activities listed in
13  Exhibit 17, such as the donning, doffing, and the
14  sanitizing activities were for the purpose of
15  preventing contamination of chicken, that's a
16  requirement of the USDA, correct?
17       MR. ROSENTHAL: Objection to the form
18  of the question. It's not a summary of what the
19  witness said. But you can answer.
20  A.   I don't remember what's in 17 at this point.
21  But, you know, the USDA does have regulations.
22  Q.   That's 17, the one we went over for a good
23  bit after lunch.

Page 217

1   A.   The production flow starts here and goes to
2   here, but there's not no one line.
3   Q.   Okay. But for any one line, the flow
4   doesn't stop when it moves from evisceration to
5   debone, does it?
6   A.   No.
7   Q.   So you really couldn't stop for three to
8   five minutes in debone without stopping for three
9   to five minutes in evisceration, could you?
10  A.   Yes.
11  Q.   How would you do that?
12  A.   Combo the birds off. We've got a system
13  that will hold birds.
14  Q.   What do you mean by "combo the birds off"?
15  A.   Put them into a container.
16  Q.   Is that done every shift?
17  A.   Yeah. Do it every day to some degree. Some
18  days worse than others.
19  Q.   Are there days when you don't do that?
20  A.   If there is additional space on tables and
21  areas that we have for birds to stay, yes, we can
22  do that. We can stop for three minutes and not
23  shut down the entire plant.

55 (Pages 214 to 217)

Page 218

1  Q.  Now, in that three to five minutes, you said
2  that the employees are being paid on the evening
3  shift, even though there's no birds coming down
4  the line?
5  A.  Evening or day shift, whichever it falls in.
6  It could be half on each.  I don't know the answer
7  to that.  But they are being paid because it's
8  within their time frame at work.
9  Q.  So they're being paid -- Either or both of
10  the day shift and evening shift are being paid for
11  the three to five minutes that there is no
12  chickens on the line?
13  A.  Correct.
14  Q.  And that three to five minutes is obviously
15  not line time because there are no chickens on the
16  line, correct?
17  A.  Correct.
18  Q.  And that's handled in the same way you
19  handle the three minutes for donning and doffing?
20  A.  No.
21  Q.  You said you pay them three minutes?
22  A.  We pay them three minutes.
23  Q.  And the same thing on the three to five

Page 219

1  minutes on the shift changeover; you simply pay it
2  even though it's not line time, correct?
3  A.  Correct.  But the three minutes on donning
4  and doffing that we now pay is just added to their
5  normal ever how many hours they work that week.
6  Q.  And they normally work eight hours, correct?
7  A.  On day shift.
8  Q.  So they are now being paid eight hours and
9  three minutes?
10  A.  If they work an eight-hour shift that day,
11  they're getting paid eight hours and three
12  minutes, whatever the contract says.
13  Q.  And that's simply programmed into the
14  computer payroll system?
15  A.  Correct.
16  Q.  And that three minutes is not paid by any
17  master card swipe time?
18  A.  It's on their check as D&D or donning and
19  doffing or some way.  It's set up where it pays
20  that.  It's shown it on the bottom of their check.
21  Q.  Now, that three to five minutes in the
22  debone department between day shift and evening
23  shift, that's not on master card time either?

Page 220

1  A.  Yes, it is.
2  Q.  As I understand it, the evening shift swipes
3  and then -- I'm sorry.  Let me start over.
4      The day shift swipes three to five minutes
5  different than the evening shift swipes on the
6  master card?
7  A.  I don't know.  I don't know the answer to
8  that.  I wouldn't think so.  Our normal ending
9  time is at 4:30 on day shift; our normal start
10  time is at 4:30 on evening shift.
11  Q.  Is there any other time of day that you
12  combo the birds off the line?
13  A.  Sure.  Any time we have a breakdown we have
14  to combo them.
15  Q.  And combo-ing the birds off means that you
16  take the birds off the moving line, put them in
17  some storage container, keep them there for three
18  to five minutes, and then put them back on the
19  line, right?
20      MR. ROSENTHAL:  Objection.  You're
21  talking about the three to five minutes between
22  the shifts or at any time?
23      MR. WIGGINS:  Between the shifts.

Page 221

1  A.  We put them back on the line whenever we can
2  work them back in.
3  Q.  But that's extra work that you're having to
4  do that you wouldn't have to do if you left them
5  on a continuous line, correct?
6  A.  Correct.
7  Q.  And who's responsible for that extra work?
8  A.  The debone employees, or wherever it's at,
9  whatever department it's in any time we have a
10  mechanical breakdown.  So it could be evis.
11  Q.  Have you ever known any item to be
12  negotiated in the collective bargaining process
13  without having a written proposal from the union
14  or the company on that topic?
15  A.  I don't recall.  Not that I'm aware of.  I
16  don't recall.
17  Q.  Did the four people that signed the 2008
18  collective bargaining agreement have the authority
19  to agree to that three minutes to be paid for
20  donning and doffing by themselves, without getting
21  any higher approval?
22  A.  I don't know the answer to that.  Because
23  when the final decision was made, Huntsville was

56 (Pages 218 to 221)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 222

1  made aware of what we had come up with, and then
2  decided on it.
3  Q.   Had other Equity Group plants put in three
4  minutes for donning and doffing?
5  A.   I don't know.
6  Q.   Do you know who had the final authority to
7  agree to that three minutes?
8  A.   No.  The four that signed the contract, I
9  guess, with leadership from our attorney and our
10  Huntsville group involved in it.
11  Q.   Who in the Huntsville group?
12  A.   I don't know the answer to that.
13  Q.   Do you still have your copy of Exhibit 17
14  there?
15  A.   Here it is.
16  Q.   Turn to page 6.
17  A.   (Witness complies.)
18  Q.   Do you see at the top of the page, the end
19  of No. 3, it refers to Section 7.1, 7.2 of Codex
20  Alimentarius?
21  A.   Yeah, I see it.
22  Q.   What is that?
23  A.   I have no idea.  I don't know.

Page 223

1  Q.   Turn over to page 11.
2  A.   (Witness complies.)
3  Q.   No. 18.  It refers to a quality assurance
4  hold.  What is that?
5  A.   If for any reason product doesn't meet spec,
6  QA puts the product on hold and applies a QA hold
7  tag that states "QA Hold."
8  Q.   If you had employees on the line who had not
9  sanitized their hands, gloves, sleeves, or apron,
10  would it be subject to a quality assurance hold?
11  A.   I've never been made aware that anything's
12  been put on QA hold for not washing their hands.
13  Q.   First of all, are you knowledgeable of the
14  reasons for quality assurance holds?
15  A.   Some of them, not all of them.
16  Q.   What type of sanitation matters would cause
17  a quality assurance hold?
18  A.   If the plant's not clean.
19  Q.   What about the employees?  What if they're
20  not meeting sanitation requirements?
21  A.   I've never known of anything being put on
22  hold that the employee was dirty.
23      If the employee drops product on the floor

Page 224

1  and picks it up and puts it into a clean edible
2  tote, it's put on hold.
3  Q.   If an employee drops product on the floor
4  and touches it and doesn't resanitize his hands,
5  is it put on hold?
6  A.   Yes, can be.
7  Q.   And then it refers in the same paragraph to
8  a USDA hold.  What type of sanitation infraction
9  would cause a USDA hold?
10  A.   Same thing, if they catch you before QA
11  does.
12  Q.   You have USDA employees inspecting on every
13  part of the production process?
14  A.   Yes.
15  Q.   How many USDA employees do you have in your
16  fresh plant?
17  A.   A minimum of 11 per shift.
18  Q.   And do you have them in there during the
19  sanitation shift also?
20  A.   No.
21  Q.   That's just your two operating shifts?
22  A.   Two operating shifts.
23  Q.   Do you have USDA in during the sanitation

Page 225

1  shift?
2  A.   Part of it.
3  Q.   Which part?
4  A.   At the ending of the cleanup.
5  Q.   Do you keep records of your quality
6  assurance holds?
7  A.   I don't; QA does.
8  Q.   Do you know how long you keep those?
9  A.   No.
10  Q.   What about your USDA holds?  Do you keep
11  those for any period of time?
12  A.   No, I don't; USDA does.
13  Q.   I mean, does the company?
14  A.   If it does, QA keeps them.  I'm not aware of
15  it.  They may.
16  Q.   Top of page 12, it refers to posting a "Wash
17  Hands before Returning to Work" sign.  Has that
18  been done?
19  A.   I don't know the answer to that.
20  Q.   It says that's supposed to be in the
21  restrooms, correct?
22  A.   That's what it says.
23  Q.   Employees are required to wash and sanitize

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660
4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 226

1   their hands before leaving the restroom, correct?
2   A.   Correct.
3   Q.   They then can go either to the break room,
4   supply room, or outside, correct?
5   A.   Repeat your question.
6   Q.   After they have washed their hands in the
7   restroom, if they're still on break they can go on
8   outside, or to the supply room, or to the break
9   room, or anywhere they want to go, correct?
10  A.   Correct.
11  Q.   But when they enter the production area
12  again, they have to resanitize their hands a
13  second time, correct?
14  A.   Have to rewash their hands, correct.
15  Q.   And that's true on any type of leaving the
16  work area, whether it's on production line time or
17  on break time, correct?
18  A.   Correct.
19  Q.   Employees are not allowed to stay in the
20  production area during breaks, are they?
21  A.   Yeah, they can.  I mean, some do; some
22  don't.  Very few do.  But they can stay in there.
23  That's their choice.

Page 227

1   Q.   But you've already told us there's no food
2   or drink allowed.
3   A.   Correct.
4   Q.   And there's no bathrooms in there?
5   A.   No bathrooms.
6   Q.   Okay.  Thank you.
7        MR. ROSENTHAL:  I don't have any
8   questions for you.
9        MR. WIGGINS:  Howard, we want, in
10  addition to the sanitation manual we asked for, we
11  think that the SOPs of sanitation, boots, all
12  these SOPs that deal with donning, doffing,
13  sanitation, that type of thing are due to be
14  produced.
15       We'd like to have an updated layout of the
16  plant now that it's been revised, if you've got
17  one.  And we'd like to have HACCP plan.  Anything
18  else?
19       MS. MCGOWAN:  When we were having our
20  conversation, I kept saying, "Do we have this in
21  an electronic version?"  And y'all kept saying,
22  'We've produced everything."
23       MR. ROSENTHAL:  No, no.

Page 228

1        MS. MCGOWAN:  Well, for some reason we
2   had a communication problem.  So just so we're
3   clear, so there's no communication problem, we
4   want the Kronos information on electronic disk,
5   because you keep it, don't you?
6        MR. ROSENTHAL:  We don't have one.  The
7   Kronos information is in hard copy, and it's
8   available for you to review.
9        MS. MCGOWAN:  What are you using now?
10       MR. ROSENTHAL:  I've got the hard
11  copies.
12       MS. MCGOWAN:  I know.  But do you use
13  Kronos now?
14       MR. ROSENTHAL:  They're not something
15  which we can convert.  It's a specialized program.
16  We have the hard copies.  It's the only thing that
17  I'm aware of that I can give you, and we've made
18  them available since September.  And that's what
19  we told you.  We read right from the response.
20       MS. MCGOWAN:  Well, we can agree to
21  disagree what I understand and what you
22  understood, but --
23       MR. ROSENTHAL:  And those documents

Page 229

1   are --
2        MS. MCGOWAN:  You printed it off.  Do
3   they print it every day and dump it, or why is it
4   not available electronically?
5        MR. ROSENTHAL:  I can't answer that
6   question, Candis.  I can tell you what we have
7   available and what we've offered to make
8   available.  It's the same thing we've offered
9   since September.
10       I can't today find out what else will be
11  available when the first time we got a request was
12  today.
13       MS. MCGOWAN:  No, no.
14       MR. ROSENTHAL:  That's the first
15  request we had.  We were not asked for an
16  electronic copy from the time we responded to
17  discovery last September.  You asked about it last
18  Friday, and I told you what the answer was.
19       MR. WIGGINS:  Let me see if I
20  understand you, Howard.  Y'all have it on
21  electronic form, but you say it's a problem
22  converting it?
23       MR. ROSENTHAL:  I don't know that we

58 (Pages 226 to 229)

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

Page 230

1    have it for every employee going back as far as
2    March of 2004. And all I'm saying is I will have
3    some time after this week to determine what's
4    available and what we can make available and how
5    we can make it available.
6        MR. WIGGINS: Well, I hope it doesn't
7    come to this, but once we get these SOPs and these
8    other things I've listed, it could trigger some
9    questions of this witness.
10       MR. ROSENTHAL: Our position is very
11   simple: We produced responses to discovery in
12   September. The first time we were asked to
13   present witnesses was when we received the Notice
14   of Deposition. We objected to the Request For
15   Production; that's been ruled on.
16       So I'm not suggesting that you have a right
17   to bring anyone back.
18       MR. WIGGINS: Yeah, I understand you're
19   not. And I'm not taking a position on it until I
20   see the documents. But I do want to be clear
21   though that the documents that I've asked for --
22   and I don't know much about the Kronos thing --
23   but the documents I'd asked for I think were due

Page 231

1    under the original document production.
2        MR. ROSENTHAL: I disagree with that.
3    And at the close of this deposition, our position
4    is that you're done with this witness. I
5    understand you can take a different position.
6        As I said to Candis last week, we'll take
7    all requests under advisement and get the
8    documents to you to the extent that we can. It
9    won't happen this week.
10       MR. WIGGINS: I understand. And it may
11   be Much Ado About Nothing when we see them.
12       MR. ROSENTHAL: Even to the extent we
13   can locate them, I'm going to assume that whatever
14   you told the court reporter is the extent of what
15   you're asking for, and we'll see what we can do.
16       For example, I don't know that there's any
17   layout of the plant as it is currently; we'll
18   certainly look for that.
19       MR. WIGGINS: Well, the ones I listed
20   were just ones that showed up today. There may be
21   some that will show up with the next witness, I
22   don't know. But we can worry about that later. I
23   just wanted to tell you that it could trigger the

Page 232

1    need for further questions. Hopefully, it won't.
2        MR. ROSENTHAL: Okay.
3
4        (The deposition was concluded
5        at 4:30 p.m.)

Page 233

1        C E R T I F I C A T E
2
3    STATE OF ALABAMA
4    BARBOUR COUNTY
5
6        I hereby certify that the above and
7    foregoing deposition was taken down by me in
8    stenotype and the questions and answers thereto
9    were transcribed by means of computer-aided
10   transcription, and that the foregoing represents
11   a true and correct transcript of the testimony
12   given by said witness upon said hearing.
13       I further certify that I am neither of
14   counsel, nor kin to the parties to the action,
15   nor am I in anywise interested in the result of
16   said cause.
17
18
19       CYNTHIA M. NOAKES, Commissioner
20       Certified Court Reporter,
21       ACCR #327 - Expires 09/30/2008
22
23   Commission Expires 07/08/2009

59 (Pages 230 to 233)

# TAB 81

FREEDOM COURT REPORTING

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


CASE NUMBER:  2:06-CV-01081-MEF-DRB

BETTY ANN BURKS, ET AL.,

        Plaintiffs,

        vs.

EQUITY GROUP, EUFAULA DIVISION, L.L.C.,

        Defendant.


      S T I P U L A T I O N

        IT IS STIPULATED AND AGREED by and
between the parties through their respective
counsel, that the deposition of Joseph
Preston may be taken before Sara Mahler,
CCR, at the offices of Williams, Pothoff,
Williams & Smith, at 125 South Orange
Avenue, Eufaula, Alabama 36027, on the 12th
day of June, 2008.


       DEPOSITION OF JOSEPH PRESTON

FREEDOM COURT REPORTING

Page 2

1    IT IS FURTHER STIPULATED AND
2  AGREED that the signature to and the reading
3  of the deposition by the witness is not
4  waived, the deposition to have the same
5  force and effect as if full compliance had
6  been had with all laws and rules of Court
7  relating to the taking of depositions.
8    IT IS FURTHER STIPULATED AND
9  AGREED that it shall not be necessary for
10  any objections to be made by counsel to any
11  questions except as to form or leading
12  questions, and that counsel for the parties
13  may make objections and assign grounds at
14  the time of the trial, or at the time said
15  deposition is offered in evidence, or prior
16  thereto.
17    IT IS FURTHER STIPULATED AND
18  AGREED that the notice of filing of the
19  deposition by the Commissioner is waived.
20
21    * * * * * * * * * * * * *
22
23

Page 3

1    * * * * * * * * * * * * *
2    I N D E X
3    EXAMINATION
4    PAGE
5  By Ms. McGowan ..................... 6
6
7    PLAINTIFF'S EXHIBITS
8    PAGE
9  Exhibit 23 - Time edits ............ 10
10
11    (Exhibit Retained By Attorney)
12
13    * * * * * * * * * * * * *
14
15
16
17
18
19
20
21
22
23

Page 4

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3    MONTGOMERY DIVISION
4
5  CASE NUMBER: 2:06-CV-01081-MEF-DRB
6
7  BETTY ANN BURKS, ET AL.,
8    Plaintiffs,
9    vs.
10  EQUITY GROUP EUFAULA DIVISION, L.L.C.,
11    Defendant.
12
13  BEFORE:
14    SARA MAHLER, Commissioner.
15
16  APPEARANCES:
17    CANDIS A. MCGOWAN, ESQUIRE, of
18  WIGGINS, CHILDS, QUINN & PANTAZIS, 301
19  Nineteenth Street North, Birmingham, Alabama
20  35203, appearing on behalf of the
21  Plaintiffs.
22
23

Page 5

1  APPEARANCES: (Cont.)
2    JACOB A. KISER, ESQUIRE, of
3  WIGGINS, CHILDS, QUINN & PANTAZIS, 301
4  Nineteenth Street North, Birmingham, Alabama
5  35203, appearing on behalf of the
6  Plaintiffs.
7    ROBERT J. CAMP, ESQUIRE, of THE
8  COCHRAN FIRM, 505 North 20th Street, Suite
9  825, Birmingham, Alabama 35203, appearing on
10  behalf of the Plaintiffs.
11    HOWARD A. ROSENTHAL, ESQUIRE, of
12  PELINO & LENTZ, 1650 Market Street,
13  Thirty-Second Floor, Philadelphia,
14  Pennsylvania 19103, appearing on behalf of
15  the Defendant.
16    * * * * * *
17    I, SARA MAHLER, CCR, a Court
18  Reporter of Wetumpka, Alabama, acting as
19  Commissioner, certify that on this date, as
20  provided by the Federal Rules of Civil
21  Procedure and the foregoing stipulation of
22  counsel, there came before me at the offices
23  of Williams, Pothoff, Williams & Smith, 125

2 (Pages 2 to 5)

371ef939-b8db-4017-995b-f47fc7508720

FREEDOM COURT REPORTING

Page 6

1 South Orange Avenue, Eufaula, Alabama 36027,
2 beginning at 4:45 p.m., Joseph Preston,
3 witness in the above cause, for oral
4 examination, whereupon the following
5 proceedings were had:
6       JOSEPH PRESTON,
7 Being first duly sworn, was examined and
8 testified as follows:
9       COURT REPORTER:  Usual
10 stipulations?
11       MS. MCGOWAN: Yes.
12       MR. ROSENTHAL:  We'll reserve
13 reading and signing.
14       EXAMINATION
15 BY MS. MCGOWAN:
16     Q.  Would you state your name for
17 the Record, please.
18     A.  Full name?
19     Q.  Yes.
20     A.  Charles Joseph Preston.
21     Q.  Mr. Preston, where are you
22 employed?
23     A.  The Equity Group, Eufaula

Page 7

1 Division.
2     Q.  In what position?
3     A.  Controller.
4     Q.  How long have you been
5 employed with Equity Group, Eufaula
6 Division, as controller?
7     A.  Since August '04.
8     Q.  My name is Candis McGowan.
9 I'm going to be taking your deposition this
10 afternoon and asking you a series of
11 questions.
12       Have you ever had your
13 deposition taken before today?
14     A.  Yes.
15       On other matters, you mean?
16     Q.  Yes.
17     A.  Yes.
18     Q.  Do you understand that you
19 need to give a verbal response so the court
20 reporter can make a Record?
21     A.  Yes.
22     Q.  And not shake your head yes or
23 no?

Page 8

1     A.  Yes.
2     Q.  Can we have the agreement that
3 if you don't understand me, or my question,
4 you will ask me to repeat or rephrase the
5 question?
6     A.  I will.
7     Q.  Can we also have the agreement
8 that if you don't hear me, you will ask me
9 to repeat or rephrase the question?
10     A.  I will.
11     Q.  Can we further have an
12 agreement that if you don't ask me to
13 rephrase or repeat the question, that you
14 heard my question, you understand my
15 question, and you are giving me the best
16 possible answer to that question?
17     A.  Yes.
18     Q.  What did you do to prepare for
19 this deposition?
20     A.  I guess I don't understand the
21 question.
22     Q.  Did you do anything to prepare
23 for this deposition?

Page 9

1     A.  Basically, my preparation is
2 the job that I do.  I have discussed with
3 our attorneys.
4     Q.  Did you review any
5 documents -- I don't need to discuss what
6 you did with your attorney.  That's why I
7 cut you off.
8       Have you discussed your
9 deposition with anyone other than the
10 attorneys?
11     A.  No.
12     Q.  Did you review any documents?
13     A.  These time edits I reviewed.
14     Q.  You reviewed those?
15     A.  Yes.
16       (Whereupon, Plaintiff's
17       Exhibit No. 23 was marked
18       for identification.)
19     Q.  And we've marked those as
20 Plaintiff's Exhibit --
21     MR. ROSENTHAL: 23.
22     Q.  -- 23.  Is that -- When you
23 say you reviewed these time edits, are these

3 (Pages 6 to 9)

371ef939-b8db-4017-995b-f47fc7508720

# FREEDOM COURT REPORTING

|  | Page 10 |
|---|---|
| 1 | the time edits you reviewed (indicating)? |
| 2 | A.    Yes. |
| 3 | Q.    All right.  And this is -- |
| 4 | Tell me what these are, Plaintiff's Exhibit |
| 5 | 23 to your deposition. |
| 6 | A.    This is department 6OE, breast |
| 7 | deboning, second shift.  The top half |
| 8 | section of the front page is what we call |
| 9 | the master of the line time. |
| 10 | Q.    Okay.  Backup just a second. |
| 11 | Where do you see the department number? |
| 12 | A.    Right where it says:  Employee |
| 13 | 6OE. |
| 14 | Q.    Okay.  That's debone? |
| 15 | A.    Breast deboning, yes. |
| 16 | Q.    Does each department have a |
| 17 | number like 6OE? |
| 18 | A.    Yes. |
| 19 | Q.    So this is the master card |
| 20 | time? |
| 21 | A.    Correct.  The top half. |
| 22 | Q.    Are these records that you |
| 23 | produced -- these thirteen pages, what does |

|  | Page 11 |
|---|---|
| 1 | this thirteen-page document reflect? |
| 2 | A.    The top half is the master |
| 3 | card line time; after that are the |
| 4 | individual employees that are in that |
| 5 | department for that week. |
| 6 | Q.    And this is for the week of? |
| 7 | A.    Let's see.  June the 9th.  It |
| 8 | would have been the prior week. |
| 9 | Q.    Okay. |
| 10 | A.    The first week of June. |
| 11 | Q.    So there's a stamp on it that |
| 12 | says:  June 9th, 2008.  Do you know who put |
| 13 | that received stamp on here? |
| 14 | A.    Well, the computer -- When we |
| 15 | execute these documents, that's the date |
| 16 | they were executed. |
| 17 | Q.    I'm talking about the |
| 18 | receipt -- |
| 19 | A.    Okay.  This is the accounting |
| 20 | stamp when it comes back to us approved. |
| 21 | Q.    Who is M. Smith? |
| 22 | A.    That's a supervisor in that |
| 23 | department. |

|  | Page 12 |
|---|---|
| 1 | Q.    Supervisor in debone? |
| 2 | A.    Yes. |
| 3 | Q.    What is the process of these |
| 4 | records? |
| 5 | A.    Okay.  We have a time keeping |
| 6 | system that's called Kronos. |
| 7 | Q.    Yes. |
| 8 | A.    Our employees swipe their |
| 9 | badges when they come in, when they go out, |
| 10 | and that produces the records starting with |
| 11 | the bottom half with Jacqueline Cooper. |
| 12 | This is accumulated within our |
| 13 | system, and this is the one for the end of |
| 14 | the week.  So this accumulates all |
| 15 | information, including the master card time, |
| 16 | and at the end of the week we -- We produce |
| 17 | these every day for the supervisor's review, |
| 18 | but this is the one we actually pay from |
| 19 | that they approve, that they approved that |
| 20 | these times are correct. |
| 21 | Q.    Who is they? |
| 22 | A.    Supervisors, M. Smith. |
| 23 | Q.    Okay.  Other than what's the |

|  | Page 13 |
|---|---|
| 1 | Exhibits marked as 2- -- Exhibit 23, did you |
| 2 | review any other Kronos reports before -- to |
| 3 | decide which ones to bring to the |
| 4 | deposition? |
| 5 | A.    No. |
| 6 | Q.    Okay.  Where did you get this |
| 7 | report? |
| 8 | A.    From one of my payroll clerks. |
| 9 | Q.    Did she give you more than |
| 10 | just this report? |
| 11 | A.    I said:  I need a department, |
| 12 | deboning department, for our most current |
| 13 | week that would be indicative of a line time |
| 14 | department with the employees attached. |
| 15 | Q.    Okay.  When you said |
| 16 | indicative, what do you mean by that? |
| 17 | A.    Representative.  It didn't |
| 18 | matter which one it would be.  She -- |
| 19 | Q.    Who is she? |
| 20 | A.    Her name is Wakeela Glanton. |
| 21 | Q.    What's her title? |
| 22 | A.    Payroll clerk. |
| 23 | Q.    Why did you say debone? |

4 (Pages 10 to 13)

FREEDOM COURT REPORTING

Page 14

1     A.     Howard asked me to get a
2  deboning department time record.
3     Q.     This department number, how
4  many of these are in debone?  How many
5  reports like Exhibit 23 do you get for the
6  debone department per week?
7     A.     I don't know.
8     Q.     Is there more than one?
9     A.     Oh, sure.  We have time
10  reports on fifteen hundred employees.
11     Q.     I know.  But is it done by a
12  department like this?
13     A.     Yes.
14     Q.     Okay.  So is there like three
15  or four printouts like Exhibit 23 for
16  debone --
17     A.     We have.
18     Q.     -- per week?
19     A.     We have eight debone lines,
20  and each of those have two shifts, so we
21  would have -- on this particular area of the
22  plant, we would have sixteen.
23     Q.     Does this Exhibit 23 represent

Page 15

1  a shift -- a line and a shift in debone?
2     A.     Yes.
3     Q.     Okay.  Which shift, can you
4  tell?
5     A.     Two.
6     Q.     Second shift?
7     A.     Second.
8     Q.     And can you tell which line?
9     A.     No, I can't.
10     Q.     Is there a way for someone
11  else to tell which line it is?
12     A.     Sure.  Sure.
13     Q.     How would they tell?
14     A.     Well, I manage the payroll
15  department.  It comes under the controller's
16  office.  I have people that work with these
17  every day, and they can -- they are
18  obviously the ones that are directly
19  involved on a daily basis and know more
20  about -- this debone 1-2 means something,
21  but I can't say that it's line 1 and 2, or
22  it's line 1, and a sub -- the 2 is a sub off
23  of that.

Page 16

1     Q.     Look up here at the top of the
2  page --
3     A.     That says line 5 up there.
4     Q.     Would that be a way to tell?
5     A.     Sounds good, yes.  I would say
6  that would be a better description.  That
7  would be 6OE second shift, debone line 5.
8     Q.     Now --
9     A.     Thank you.
10     Q.     The master card time at the
11  top, it appears that it's an automatic start
12  up time of 4:30?
13     A.     (Witness nods head in the
14  affirmative.)
15     Q.     Is that preset in the computer
16  or does the --
17     A.     No, it's not preset.  That is
18  the scheduled walk-on/walk-off time for --
19  for first to second shift.  So first shift
20  always walks off at 4:30 and second shift
21  walks on.  That -- And the reason it's not
22  preset is because that can change.  So if we
23  change the production schedule for some

Page 17

1  reason, that could change.
2     Q.     Okay.  Look at the master card
3  at the top that's for this week of June 2nd
4  through June 6th.  There are no in punch
5  times except on the first day at 4:30.
6     A.     Right.
7     Q.     So is that just the scheduled
8  time every day for 4:30 for this week?
9     A.     It is 4:30 every day.
10          When I asked for these records
11  today and I looked at that and I said, why
12  is it only there once, okay?  We went
13  back -- We had an upgrade in the Kronos
14  program at the end of March.  And before the
15  upgrade, it showed up every day, 4:30, but
16  now it shows up once.
17     Q.     Is the supervisor actually
18  clocking in at 4:30 every day?
19     A.     No.  This is a set time every
20  day.
21     Q.     In the computer?
22     A.     No.  This is a set time every
23  day that my department -- my payroll

5 (Pages 14 to 17)

FREEDOM COURT REPORTING

Page 18

1  department keys in every day provided that
2  is still the start time.
3      Q.    So the supervisor doesn't have
4  to clock in at the beginning of the shift?
5      A.    That's right.
6      Q.    All right.  So it's a set
7  time --
8      A.    Yes.
9      Q.    -- to start the shift.  Is
10  that in every department on the production
11  line in debone?
12      A.    Yes.
13      Q.    How about evisc, is that in --
14  the start time every -- a set time in every
15  department?
16      A.    I'm not sure.
17      Q.    What about live hang, that
18  area?
19      A.    In the morning, there's a set
20  start time for live hang and evisc, okay?
21  similar to this being the 4:30 for debone,
22  okay?
23          I'm not sure if at the end of

Page 19

1  that shift it's a walk-on/walk-off like
2  deboning is or not.
3      Q.    Any other departments that are
4  production workers that have a set time?  We
5  talked about live hang, evisc, debone.  Am I
6  missing a department?
7      A.    Well, we have a lot of other
8  departments, okay, and I can't list those
9  for you through --
10      Q.    Do you know --
11      A.    -- memory.  Each one can be --
12  I mean, they can be the same as each other,
13  they can be different, depending on our
14  production.
15      Q.    But do you know any other
16  department in which production hourly
17  employees work that do not have a set start
18  time to begin -- start the shift?
19      A.    That do not have a set start
20  time?
21      Q.    Yes.
22      A.    I can't say that I do.
23      Q.    Do you know any employees that

Page 20

1  are paid on a clock-in/clock-out of their
2  personal clock time?
3      A.    We have employees like that.
4  I can't name any for you.
5      Q.    Do you know the job positions?
6      A.    No.
7      Q.    Who would know that?
8      A.    That information is within --
9  If I were in my office and somebody asked me
10  that question, I could go find out.  But I
11  can't do that from here.
12      Q.    What would you do to find out?
13      A.    Ask.
14      Q.    Who would you ask?
15      A.    I'd start with my payroll
16  manager.
17      Q.    And that is?
18      A.    Shauna Bouterse.
19      Q.    Spell that for the Record.
20      A.    B-O-U-T-E-R-S-E.
21      Q.    And Shauna, can you spell that
22  for the court reporter?
23      A.    S-H-A-U-N-A.

Page 21

1      Q.    Is it a fair statement that
2  the majority of the employees on the
3  production line, the hourly employees, are
4  paid from a preset start time, and then the
5  master card clock-out time?
6      A.    More than -- The majority of
7  the entire complex or the fresh plant?
8      Q.    Fresh plant.
9      A.    Okay.  I don't think I could
10  say.
11      Q.    Who could say?
12      A.    I could, if I had -- if I had
13  the --
14          MR. ROSENTHAL:  The question
15  was who could say?
16          THE WITNESS:  Who could say?
17      A.    I don't know.
18      Q.    You don't know who would know?
19      A.    No.
20      Q.    Could you research it to find
21  out?
22      A.    Yes.
23      Q.    What would you have to do to

6 (Pages 18 to 21)

FREEDOM COURT REPORTING

Page 22

1  research?
2      A.    Just know the question.
3      Q.    I mean to know which --
4  whether the majority of the employees are
5  paid in the fresh plant on a preset time to
6  master card clock out?
7      A.    Go to -- Go through the -- I
8  mean, we have so many employees and so many
9  managers and clerks and so on and so forth
10  that I know who to start with, and I
11  don't -- I would go to individuals and to
12  records until I was able to get to the
13  answer.
14      Q.    Has anyone -- Let me show you
15  what was marked as Plaintiff's Exhibit
16  Number 21.  Have you seen this document
17  before today?
18      A.    No.
19         Oh, excuse me.
20         THE WITNESS:  Can I ask you a
21  question?
22         MR. ROSENTHAL:  Let's step
23  outside.

Page 23

1         MS. MCGOWAN:  There's a
2  question on the table.
3         MR. ROSENTHAL:  I think it has
4  to do with whether there's a privilege that
5  can be asserted.
6      A.    I need to ask him a question
7  about this document.
8      Q.    Okay.  But my question is have
9  you seen this document before today?  That's
10  my question.  That's a yes or no.  I don't
11  think there's a privilege involved in that.
12         MR. ROSENTHAL:  We're stepping
13  outside.
14         MS. MCGOWAN:  Let the Record
15  reflect that there's a question on the
16  floor, and I think it's proper that I get a
17  yes or no before you go talk about
18  privilege.  I didn't ask anything about a
19  privilege; all I've asked is have you seen
20  it.  There's no privilege on the floor.
21         (Recess taken.)
22         MR. ROSENTHAL:  Can you read
23  the question back?

Page 24

1         (Requested portion of the
2         Record was read by the
3         Reporter.)
4      A.    I don't recall seeing this
5  document.
6      Q.    You don't recall it.
7      A.    (Witness shakes head in the
8  negative.)
9      Q.    You don't recall it?  Were you
10  informed that you were being put up as the
11  corporate representative on certain areas of
12  testimony?
13      A.    Could you repeat that, please?
14      Q.    Are you aware that you are
15  here today testifying as the representative
16  of Equity Foods for certain areas of
17  testimony?
18      A.    Yes.
19      Q.    And were you informed that you
20  would be knowledgeable about these areas of
21  testimony?
22      A.    Yes.
23      Q.    All right.  Let's look at

Page 25

1  Exhibit 21.  And you are being listed here
2  as knowledgeable about subject two.
3         MR. ROSENTHAL:  Objection to
4  the form of the question since it's limited
5  to particular parts of question two.  Area
6  two.
7      Q.    Look at area two.  It says:
8  That you are being designated as a
9  representative that is knowledgeable about
10  these areas as it relates to maintenance of
11  records.  Do you see area two?
12      A.    Yes.
13      Q.    Do you have any information or
14  knowledge about the maintenance of records
15  on Equity's policies and practices regarding
16  the maintenance of records of hours worked
17  and wages paid for nonexempt workers at the
18  chicken processing plant, including the
19  positions of persons involved in formulating
20  the policies; what training, if any, is
21  provided to inform employees and supervisors
22  of these policies; and what measures, if
23  any, are taken to ensure compliance to these

7 (Pages 22 to 25)

FREEDOM COURT REPORTING

Page 26

1  policies.
2          So you're being designated on
3  the maintenance of records.
4      A.   Okay.
5      Q.   All right.  How are the --
6  What is your understanding of how the
7  records are maintained on the hours worked
8  and wages paid, for nonexempt employees?  Is
9  there a written policy on how long records
10 are maintained?
11     A.   Yes.
12     Q.   What is that policy called?
13     A.   Seven years.
14     Q.   And where are these records
15 maintained?
16     A.   In a storage building on
17 the -- at the complex location.
18     Q.   And when you say complex
19 location, what do you mean by that?
20     A.   At our address, at 57 Melvin
21 Clark Road, Bakerhill.
22     Q.   Do you mean the complex that's
23 the fresh plant and the further processing

Page 27

1  plant?
2      A.   Yes.
3      Q.   Is there anything else in the
4  complex at that location?
5      A.   Yes.
6      Q.   What else?
7      A.   We have -- We have a waste
8  water and laboratory buildings.  We have a
9  live haul manager's building, employment
10 office, an HR building, and I believe that's
11 it.
12     Q.   Okay.  Are the records of the
13 hours worked and wages paid for the
14 nonexempt workers in the production plant,
15 either the further processing or the fresh
16 plant, are those maintained separately from
17 the other workers' records?
18     A.   No.
19     Q.   All right.  How are they all
20 maintained?
21     A.   They're maintained by week and
22 by month.
23     Q.   For all employees of the

Page 28

1  plant?
2      A.   Yes.
3      Q.   In what form are they
4  maintained?
5      A.   The form in Exhibit 23.
6      Q.   This is a weekly report?
7      A.   Yes.
8      Q.   23 is?  Is there a monthly
9  report done such as 23?
10     A.   No.
11     Q.   When you say maintained by
12 month, do you take all the reports from a
13 week and put them in some kind of monthly
14 document or a folder or what do you mean by
15 that?
16     A.   In a folder.
17     Q.   Okay.  Are these folders
18 labeled?
19     A.   Yes.
20     Q.   So if I wanted to go into the
21 storage room, I could pull a folder that
22 says the week of August 5, 2007?
23     A.   Yes.

Page 29

1      Q.   If that was -- Is it beginning
2  date or ending date for the week?
3      A.   I'm not sure.
4      Q.   Okay.  And that folder would
5  have these records, such as Exhibit 23, for
6  every job position that uses the Kronos time
7  at the plant or would it be for every
8  employee?
9      A.   Every employee.
10     Q.   Is every employee on the
11 Kronos system?
12     A.   No.
13     Q.   What employees are on the
14 Kronos system?
15     A.   I can't -- I couldn't answer
16 that.
17     Q.   Who could answer that?
18     A.   Someone in my department.
19     Q.   Are there any production
20 workers on the production line, the hourly
21 workers, that are not on the Kronos system?
22     A.   Not to my knowledge.
23     Q.   What other type reports would

371ef939-b8db-4017-995b-f47fc7508720

FREEDOM COURT REPORTING

Page 30

1  be in that week ending, other than a Kronos
2  report like this, in that weekly folder --
3  or monthly folder, I think is what you said?
4      A.    If they're not on the Kronos
5  system, it would be another form of
6  documentation to represent the time they
7  worked that week.
8      Q.    What kind of documentation?
9      A.    A time sheet of some sort.
10     Q.    Would these be manually done?
11     A.    Could be, yes.
12     Q.    Is there another payroll
13  system you use?
14     A.    No.
15     Q.    Does debone department on
16  second shift normally work overtime?
17           MR. ROSENTHAL:  Objection to
18  the form of the question.  You can answer.
19     Q.    You can answer.
20     A.    Restate the question, please.
21     Q.    Does the debone department on
22  second shift normally work overtime?
23     A.    I don't know.

Page 31

1      Q.    Okay.  Who would know?
2      A.    Someone in my department.
3      Q.    Do you review the time reports
4  to see which departments are working a lot
5  of overtime?
6      A.    No.
7      Q.    Who does that?
8      A.    Someone in my department.
9      Q.    Does anybody report to you
10  what departments are working overtime?
11     A.    Yes.
12     Q.    What person reports that to
13  you?
14     A.    It could be anyone in my
15  payroll department.
16     Q.    Is there, like, a weekly
17  meeting or monthly meeting where you discuss
18  what departments are working overtime with
19  the people in your department?
20     A.    No.
21     Q.    Is there a staff meeting where
22  they make these reports to you?
23     A.    No.

Page 32

1      Q.    Why would they be telling you
2  that a department is working overtime?
3      A.    It's a report that I requested
4  to be assembled and e-mailed to me weekly.
5      Q.    When did you make this
6  request?
7      A.    I don't know.
8      Q.    Has it been -- this request
9  been in effect for more than a year?
10     A.    Yes.
11     Q.    Two years?
12     A.    Yes.
13     Q.    Three years?
14     A.    Yes.
15     Q.    Four years?
16     A.    No.  I haven't been there four
17  years.
18     Q.    When you came on, did you make
19  this request?
20     A.    Yes.
21     Q.    So you get a weekly report
22  e-mailed to you on what departments are
23  working overtime?

Page 33

1      A.    Yes.
2      Q.    In reviewing these weekly
3  reports that are sent to you, is second
4  shift debone one of the departments that
5  usually has overtime?
6      A.    I don't know.
7      Q.    What departments -- Are there
8  any departments that usually have overtime?
9      A.    I can't answer without a
10  report in front of me.
11     Q.    So you're telling me that you
12  look at these reports every week, and
13  there's not one department that usually
14  triggers overtime, that comes up with having
15  overtime a lot more than other departments?
16     A.    No.
17     Q.    Do you recall any department
18  that usually has overtime?
19     A.    No.
20     Q.    What day of the week do you
21  get these reports e-mailed to you?
22     A.    Wednesday.
23     Q.    And today is Thursday;

9 (Pages 30 to 33)

FREEDOM COURT REPORTING

| Page 34 | Page 36 |
|---|---|
| 1  correct? | 1   A.   1969. |
| 2   A.   (Witness nods head in the | 2   Q.   Do you have your CPA? |
| 3  affirmative.) | 3   A.   No. |
| 4   Q.   Did you review a report | 4   Q.   Do you have any certification? |
| 5  yesterday? | 5   A.   No. |
| 6   A.   No. | 6   Q.   What are your duties or |
| 7   Q.   Have you reviewed a report | 7  responsibilities as comptroller? |
| 8  today? | 8   A.   The same duties that go with |
| 9   A.   No. | 9  any comptroller's job. |
| 10   Q.   When do you review the reports | 10   Q.   What are those duties? |
| 11  that are e-mailed to you on Wednesday? | 11   A.   To oversee the accounting. |
| 12   A.   Tuesday. | 12   Q.   Would it be an accurate |
| 13   Q.   You review them Tuesday?  The | 13  statement to say that you're pretty good |
| 14  following Tuesday? | 14  with numbers? |
| 15   A.   Yes. | 15   A.   Yes. |
| 16   Q.   You have them almost a week | 16   Q.   But you can't recall any |
| 17  before you review them? | 17  department that you looked at two days ago |
| 18   A.   Yes. | 18  that had overtime? |
| 19   Q.   All right.  On Tuesday of this | 19   A.   No. |
| 20  week, which was two days ago, did you review | 20   Q.   And what do you use this |
| 21  a report? | 21  information in overtime for? |
| 22   A.   Yes. | 22   A.   As a trend. |
| 23   Q.   Do you recall which | 23   Q.   What kind of trend? |

| Page 35 | Page 37 |
|---|---|
| 1  departments had overtime? | 1   A.   A overtime trend, graph. |
| 2   A.   No. | 2   Q.   Who prepares the overtime |
| 3   Q.   How many departments are in | 3  trend, graph? |
| 4  this report? | 4   A.   I do. |
| 5   A.   Several. | 5   Q.   When was the last graph that |
| 6   Q.   How many? | 6  you prepared? |
| 7   A.   I can't say. | 7   A.   Monday. |
| 8   Q.   How are they broken down?  By | 8   Q.   And how is the graph done?  Is |
| 9  departments? | 9  it reflected by department, or what does it |
| 10   A.   By name and number. | 10  reflect? |
| 11   Q.   Is this the whole complex? | 11   A.   No.  It's the total. |
| 12   A.   Yes. | 12   Q.   For the whole plant? |
| 13   Q.   Do you recall any department | 13   A.   Yes.  For the whole complex. |
| 14  in the fresh plant that had overtime? | 14   Q.   Whole complex.  And what is |
| 15   A.   No. | 15  the trend on the graph that you prepared |
| 16   Q.   Let's back up a little bit. | 16  Monday? |
| 17  What is your educational background? | 17   A.   I don't know how to answer |
| 18   A.   Bachelor's degree in | 18  that question. |
| 19  accounting. | 19   Q.   What does the graph reflect? |
| 20   Q.   From where? | 20   A.   I'm sorry, what was that |
| 21   A.   University of Kentucky. | 21  question? |
| 22   Q.   When did you receive your | 22   Q.   What does the graph reflect? |
| 23  bachelor's degree in accounting? | 23   A.   It reflects the actual |

10  (Pages 34 to 37)

371ef939-b8db-4017-995b-f47fc7508720

FREEDOM COURT REPORTING

Page 38

1  overtime by week of the total complex.
2      Q.    By week?
3      A.    (Witness nods head in the
4  affirmative.)
5      Q.    For what period of time?
6      A.    The graph is for one year.
7      Q.    The graph you prepared Monday,
8  what period of time was it?
9      A.    It would have been the current
10 year to date.
11     Q.    And what does the trend show
12 for the current year to date?
13     A.    It shows the weekly pattern of
14 the actual overtime.
15     Q.    And what was the -- What is
16 the weekly pattern in the graph you drew
17 Monday?
18     A.    There's not -- There's not
19 a -- There's not a trend.
20     Q.    What do you mean there's not a
21 trend?
22     A.    This graph are points in time
23 that show what each week standing by itself,

Page 39

1  connected, dots connected by a line that
2  shows the actual overtime for each week.
3      Q.    Does it show in hours or
4  dollars?
5      A.    Percent.
6      Q.    Percent of what?
7      A.    Percent overtime hours to
8  total hours -- to regular hours, excuse me.
9      Q.    Percent of overtime hours to
10 regular hours?
11     A.    Yes.
12     Q.    What do you mean by regular
13 hours?
14     A.    Regular hours would be those
15 not subject -- straight time hours.
16     Q.    Forty hours?
17     A.    Yes.  If that's what it is.
18     Q.    Does it vary from job to job
19 what the regular hours would be?
20     A.    Yes.
21     Q.    How is that reflected in your
22 graph?
23     A.    It's not.

Page 40

1      Q.    What do you do with this
2  graph?
3      A.    It's for management review.
4      Q.    What management?
5      A.    Staff, senior staff.
6      Q.    What senior staff?
7      A.    What is senior staff?
8      Q.    Correct.
9      A.    The individuals that report to
10 the general manager.
11     Q.    Give me the job titles of
12 these individuals.
13     A.    Controller, purchasing
14 manager, HR manager, operations manager, IT
15 manager, and administrative assistant.
16     Q.    What administrative assistant?
17     A.    The general manager's
18 administrative assistant.
19     Q.    Who's the general manager?
20     A.    Tim Esslinger.
21           Also present would be the two
22 plant managers and the complex maintenance
23 manager.

Page 41

1      Q.    The what?
2      A.    The complex maintenance
3  manager.
4      Q.    All right.  And you said these
5  graphs are given and used by the management
6  team?
7      A.    It's a report that I do, yes,
8  weekly.
9      Q.    Do you have a meeting to
10 discuss them weekly?
11     A.    No.
12     Q.    Do you just send it out to
13 them?
14     A.    The normal weekly staff
15 meeting.
16     Q.    Right.  So they're discussed
17 in the normal weekly staff meeting?
18     A.    Yes.
19     Q.    Why do you want to know what
20 the overtime trend is?
21     A.    It's a -- It's a reporting
22 factor that most businesses look at on some
23 routine basis.

11 (Pages 38 to 41)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

371ef939-b8db-4017-995b-f47fc7508720

FREEDOM COURT REPORTING

Page 42

1    Q.    Why?
2    A.    Why?
3    Q.    Yes.
4    A.    We want to know.
5    Q.    Why do you want to know?
6    A.    It's a measurement of some of
7 our costs.
8    Q.    And why are you measuring
9 these costs?
10    A.    Why do we measure our costs?
11    Q.    Of overtime, yes.
12    A.    It's just one of the factors
13 we look at -- we look at.
14    Q.    What other factors do you look
15 at?
16    A.    Anything to do with
17 performance or costs that happens to be
18 normal in our business.
19    Q.    What do you mean by normal?
20    A.    It's not different from any
21 other business, just costs and --
22 performance factors and costs.  Just like
23 any business.

Page 43

1    Q.    What do you mean by a factor
2 that's normal in your business?  What
3 factors are normal in your business?
4    A.    Income, expense, and profit.
5    Q.    Are you looking at the
6 overtime as to how it affects your profit?
7    A.    We're looking at it as a -- as
8 one of the measurements, one of the factors
9 that affects our business.
10    Q.    What other factors affect the
11 business?
12    A.    Anything to do with cost or
13 performance.
14    Q.    Have you brought any of these
15 graphs that reflect -- Let me back up.
16          Are there specific e-mails for
17 the overtime -- or in the e-mail you get, or
18 the report, are the reports broken down by
19 departments within the fresh plant, showing
20 the overtime by department?
21    A.    Yes.
22    Q.    Is it detailed by employee?
23    A.    No.

Page 44

1    Q.    Does it just show the hours
2 per department?
3    A.    No.
4    Q.    What does it show?
5    A.    The hours and the dollars
6 related to those hours.
7    Q.    Have you produced any of those
8 to the attorneys in this case, these reports
9 showing the hours?
10    A.    No.
11    Q.    Have you been asked by anyone
12 to go through and produce any records in
13 this case?
14          MR. ROSENTHAL:  You can answer
15 the question as to whether or not you've
16 been asked to produce records, yes or no.
17    A.    Yes.
18    Q.    Have you produced any records
19 in this case?
20    A.    Yes.
21    Q.    What records have you
22 produced?
23    A.    I can't answer that with a yes

Page 45

1 or no.
2    Q.    It's not a yes or no question.
3 What records have you produced?
4    A.    Earnings records.
5    Q.    When you say earnings records,
6 what kind of earnings records, earnings of
7 whom?
8    A.    For the individuals that have
9 been provided to me to provide the
10 information for.
11    Q.    Is this like copies of their
12 pay stubs, or their total yearly earnings
13 like W-2s, or what kind of documents?
14    A.    W-2s and earning statements.
15    Q.    Do these earning statements
16 show their actual clock-in and clock-out
17 times?
18    A.    No.
19    Q.    What records show employees
20 actual clock-in and clock-out times?
21    A.    Exhibit 23.
22    Q.    The Kronos reports?
23    A.    Yes.

12  (Pages 42 to 45)

FREEDOM COURT REPORTING

Page 46

1    Q.    Have you produced any Kronos
2  reports, other than Exhibit 23?
3    A.    No.
4    Q.    Have you been asked to gather
5  up and put together the Kronos reports so
6  they could be produced?
7    A.    No.
8    Q.    Where are the Kronos reports?
9    A.    In the storage buildings at 57
10 Melvin Clark Road.
11   Q.    When did you first become
12 aware that we wanted to see the Kronos
13 reports in this case?
14   A.    I'm not sure.
15   Q.    Okay.  Has it been a while or
16 just recently?
17   A.    Yes, it's been a while.
18   Q.    Now, this Exhibit 23, you said
19 this is the weekly reports.  Are there daily
20 reports?
21   A.    Yes.
22   Q.    Okay.  Tell me -- Describe
23 these daily reports.

Page 47

1    A.    They're just like the
2  weeklies.
3    Q.    They look just like this?
4    A.    Except it would have one day
5  on there, or two days or three days.
6    Q.    Let's start with the daily
7  report.  What's the process?
8    A.    The same as the weekly.
9  They're sent to the supervisors for their
10 review and approval.
11   Q.    Who sends it?
12   A.    My department, my payroll
13 department.
14   Q.    What does the supervisor do
15 when they get the report?
16   A.    They review it, make notes,
17 sign off, send it back.
18   Q.    And what does your department
19 do when they get it back?
20   A.    Go through it and make the
21 corrections that the supervisors have
22 indicated.
23   Q.    Where do they make the

Page 48

1  corrections?
2    A.    On the document.
3    Q.    Does anybody make the
4  corrections in the computer system?
5    A.    Yes.
6    Q.    Who does that?
7    A.    My payroll department.
8    Q.    Can supervisors make
9  corrections in the computer system?
10   A.    Yes.
11   Q.    Do they normally do that?
12   A.    Yes.
13   Q.    Who's ultimately responsible
14 for making the corrections in the computer
15 system?
16   A.    My payroll department.
17   Q.    Can the supervisors change the
18 start time for the department in the
19 computer system?
20   A.    No.
21   Q.    Who can do that?
22   A.    My payroll department.
23   Q.    What time of day do the

Page 49

1  supervisors get these daily times?
2    A.    Different times.
3    Q.    When you say different times,
4  how does it vary?
5    A.    It's based on the work hours
6  and the shift times and when they're
7  finished.
8    Q.    Is there a certain amount of
9  time when those shifts start that you try to
10 get the daily reports to them?
11   A.    Yes.
12   Q.    Tell me what that is.
13   A.    I don't know.
14   Q.    Who would know that?
15   A.    My payroll department.
16   Q.    When you say your payroll
17 department, is there a certain person or job
18 title?
19   A.    No.  I have three people in
20 the payroll department, so it could be any
21 of the three.
22   Q.    Who are the three people?
23   A.    Shauna Bouterse, Wakeela

13 (Pages 46 to 49)

FREEDOM COURT REPORTING

Page 50

1  Glanton, Denise Webster.
2     Q.    Spell Wakeela.
3     A.    W-A-K-E-E-L-A.
4     Q.    What was her last name,
5  Blanton?
6     A.    Glanton.
7     Q.    G-L --
8     A.    -- A-N-T-O-N.
9     Q.    And the third person?
10    A.    Denise Webster.
11    Q.    Do they -- What are their
12 titles?  What's Shauna's title?
13    A.    Payroll manager.
14    Q.    What's Wakeela's title?
15    A.    Payroll clerk.
16    Q.    And what's Denise's title?
17    A.    Payroll clerk.
18    Q.    How many employees report
19 directly to you?
20    A.    Fifteen.
21          That's wrong.  Four.
22    Q.    Four employees report directly
23 to you?

Page 51

1     A.    Yes.
2     Q.    What -- Does Shauna report
3  directly to you?
4     A.    Yes.
5     Q.    Does Wakeela report directly
6  to you?
7     A.    Shauna.
8     Q.    Other than Shauna, what
9  employees report directly to you?
10    A.    Their names?
11    Q.    Yes.  And title.
12    A.    John Fulford, live accounting
13 manager.
14    Q.    What accounting manager?
15    A.    Live
16          MR. ROSENTHAL:  Can you spell
17 his last name.
18    A.    F-U-L-F-O-R-D.
19          Dawn Cortner, fresh plant
20 accounting manager; Jeff Champion, further
21 plant accounting manager.
22          MR. KISER:  What was that last
23 name?

Page 52

1          THE WITNESS:  Champion.
2          MR. KISER:  First name?
3          THE WITNESS:  Jeff.
4     Q.    When you say live accounting
5  manager what does that mean?
6     A.    That's the portion of our
7  business that deals with the live chickens.
8     Q.    Going back to the daily
9  reports that the supervisors get, I asked
10 you if there was a set time that you tried
11 to get them -- like a certain amount of time
12 after the shift stopped.  Do you know what
13 that is?
14    A.    No.
15    Q.    Is that written -- Is that a
16 written policy?
17    A.    No.
18    Q.    Do you know who established
19 the policy?
20    A.    It's not a policy.
21    Q.    Who established the practice?
22    A.    It's a procedure.  Established
23 by my payroll department.

Page 53

1     Q.    Okay.  Was that -- You went to
2  work for Equity in '04?
3     A.    Uh-huh.
4     Q.    Was that procedure in effect
5  when you came in to work at Equity?
6     A.    There was a procedure in
7  place, yes.
8     Q.    Have you changed the procedure
9  since you've been there?
10    A.    I haven't, no.
11    Q.    Okay.  Has your payroll
12 department changed the procedure?
13    A.    Yes.
14    Q.    Okay.  How did it change?
15    A.    It changed based on shift --
16 the start -- the stop times and when they
17 can be made available to the supervisors.
18    Q.    How long does it take your
19 payroll department to get these reports
20 printed and done to make available for
21 payroll?
22    A.    I don't know.
23    Q.    Is it -- Do they get the

14 (Pages 50 to 53)

371ef939-b8db-4017-995b-f47fc7508720

Page 54

1  report from the day before, or do they get
2  them during the shift?
3      A.    At the end of the shift.
4      Q.    All right.  Are the employees
5  still on the line when they get their
6  reports?
7      A.    No.
8      Q.    Do the supervisors stay longer
9  than the employees on the line?
10     A.    I don't know.
11     Q.    Do they have to stay and
12 complete these reports before they can
13 leave?
14     A.    No.
15     Q.    Or how does that process work?
16     A.    They have to have them
17 completed and back to my department by a
18 certain time so that we can enter that day's
19 corrections and at the end of the week
20 compile the payroll for the total week.
21     Q.    And what is that certain time
22 that they have to have them completed and
23 back to your department?

Page 55

1      A.    I don't know.
2      Q.    If you don't know the actual
3  time, what is the procedure?  Is it the same
4  day?  Is it the next day, or is it three
5  weeks, or when is it?
6      A.    It's monitored by my payroll
7  department.
8      Q.    Do you know whether it's the
9  same day?
10     A.    It's every day.
11     Q.    Are they done on the same day
12 that the time's entered?  Are they given the
13 report at the end of the shift, and they
14 turn them back in the same day -- the next
15 day?
16     A.    It could be either.
17     Q.    How do you determine which one
18 it is?
19     A.    My department keeps up with
20 when they're turned in and if they meet the
21 deadlines that have been set.  That's part
22 of their job.
23     Q.    Part of whose job?

Page 56

1      A.    My payroll department.
2      Q.    What deadlines are you talking
3  about that have been set?
4      A.    In order for us to enter the
5  corrections, we have to have them by a
6  certain time.
7      Q.    And do you know what that
8  certain time is?
9      A.    No.
10     Q.    Who would know?
11     A.    My payroll department.
12     Q.    What hours does your payroll
13 department work?
14     A.    Eight to five.
15     Q.    Would these deadlines be
16 within eight to five?
17     A.    Yes.
18     Q.    If you were on first shift
19 debone, line 5, do you know what the
20 deadline would be to turn back in your
21 corrections to the payroll report?
22     A.    No.
23     Q.    Who would know that?

Page 57

1      A.    My payroll department.
2      Q.    Do you know what time second
3  shift runs for production?
4          MR. ROSENTHAL:  Which
5  department?
6          MS. MCGOWAN:  Any
7  department --
8      Q.    From the whole -- Do you know
9  what time any department on second shift
10 runs?
11     A.    I know that second shift
12 deboning starts at 4:30 as evidenced by this
13 document.
14     Q.    4:30 p.m.  Do you know what
15 time it gets off?
16     A.    No.
17     Q.    Do you know whether any of the
18 second shift departments start after your
19 payroll department leaves work for the day?
20     A.    No.
21     Q.    You don't know?
22     A.    (Witness shakes head in the
23 negative.)

15  (Pages 54 to 57)

371ef939-b8db-4017-995b-f47fc7508720

FREEDOM COURT REPORTING

Page 58

1    Q.    You know they don't or you
2  don't know?
3    A.    Repeat the question.
4    Q.    Do you know if any department
5  starts after five o'clock, after your
6  payroll department leaves at five?
7    A.    No.
8    Q.    You don't know?
9    A.    (Witness shakes head in the
10 negative.)
11   Q.    You have to be verbal.
12   A.    No.
13   Q.    How -- Do you know when the
14 debone department that starts at 4:30 gets
15 their report from your payroll department,
16 their daily report to add in?
17   A.    At the end of the shift.
18   Q.    Is there somebody in your
19 department to give it to them?
20   A.    It's set up in the computer to
21 send an e-mail at a certain time when the
22 shift is over.
23   Q.    So your payroll department

Page 59

1  doesn't actually print these out and hand
2  them in -- hand them to the second shift
3  supervisors?
4    A.    No.
5    Q.    Do they print them out and
6  hand them to the first shift supervisors?
7    A.    No.
8    Q.    So all of the supervisors go
9  into the computer and print these
10 themselves?
11   A.    Yes.
12   Q.    Do they receive an e-mail with
13 this information?
14   A.    Yes.
15   Q.    Does that e-mail tell them
16 when they have to get back?
17   A.    No.
18   Q.    How do they know when they're
19 due back?
20   A.    There is a procedure set down
21 in writing that has been distributed to the
22 supervisors.
23   Q.    That tells them when they must

Page 60

1  be returned?
2    A.    Yes.
3    Q.    Where is this procedure
4  located?
5    A.    It's in an e-mail.
6    Q.    From whom?
7    A.    Payroll manager.
8    Q.    Shauna?
9    A.    Yes.
10   Q.    And do you know what it says?
11   A.    No. Not without having it in
12 front of me.
13   Q.    Do you know the general
14 process?
15   A.    Yes. The general process is
16 to tell them what time the time sheets are
17 due back.
18   Q.    Do you have a general
19 understanding of what time of day that is?
20   A.    I have a general understanding
21 that we have a procedure that says what time
22 they must be turned back in.
23   Q.    Is that like they have to be

Page 61

1  in by noon, or they have to be in thirty
2  minutes before your shift starts, or do you
3  know what the general understanding?
4    A.    No, I don't know specifically.
5  I know the general understanding.
6    Q.    All right. Tell me what you
7  know the general understanding to mean.
8    A.    That there is a time -- There
9  is a deadline for them to be turned back in.
10   Q.    What happens if it's not
11 turned back in by the deadline?
12   A.    We -- They, my payroll
13 department, makes contact with the
14 supervisors.
15   Q.    How do they make contact?
16   A.    E-mail, radio, or telephone.
17   Q.    When you say they get e-mails,
18 are there computer terminals set up out in
19 the --
20   A.    Yes.
21   Q.    -- production line?
22   A.    No.
23   Q.    Where are the computer

16  (Pages 58 to 61)

# FREEDOM COURT REPORTING

Page 62

1  terminals?
2      A.    Offices at the production
3  plant.
4      Q.    Does each supervisor have an
5  office?
6      A.    No.
7      Q.    How do the supervisors --
8  where -- What computers do the supervisors
9  use to get these e-mails?
10      A.    I don't know.
11      Q.    If a supervisor doesn't submit
12  an edited report, is it assumed correct and
13  accepted?
14      A.    No.
15      Q.    Do the supervisors e-mail back
16  the changes or do they actually,
17  physically --
18      A.    Physically.
19      Q.    -- send them in writing and
20  turn them in?
21      A.    Yes.
22      Q.    How are they returned?
23      A.    They're physically handed back

Page 63

1  in.
2      Q.    Where do they hand them back
3  in?
4      A.    In the accounting office
5  payroll department.
6      Q.    Is there one person that's
7  responsible for receiving these?
8      A.    Three people.
9      Q.    They can hand them to any of
10  them?
11      A.    Yes.
12      Q.    Is there like an inbox they go
13  in?
14      A.    Yes.  We also have an inbox.
15      Q.    And where's that located?
16      A.    In the administrative break
17  room.
18      Q.    Where's administrative break
19  room?
20      A.    Physically?
21      Q.    Yes.
22      A.    In the same building with the
23  accounting department.

Page 64

1      Q.    Where's the accounting
2  department located?  Which building?
3      A.    The -- I don't know how to
4  describe it.
5      Q.    Why don't you look at a map.
6  Let me show you what we've marked previously
7  as Exhibit 22.
8      A.    Okay.  Here (indicating).
9      Q.    And you're looking at the
10  further processing building?
11      A.    This is the further processing
12  building (indicating).  This is the
13  accounting office right here (indicating).
14      Q.    Who all is located in the
15  accounting office besides the payroll
16  department?
17      A.    The other three managers and
18  their direct reports.
19      Q.    The other three managers that
20  report to you?
21      A.    Yes.
22      Q.    And you're also in that area?
23      A.    Yes.

Page 65

1      Q.    Okay.  And where is the
2  administrative break room?
3      A.    Right there (indicating).
4      Q.    Now, how long does it take to
5  implement the changes to the Kronos reports?
6      A.    The corrections?
7      Q.    Yes.
8      A.    It's done the next day.  I
9  don't know how long it takes.
10      Q.    Who actually performs the
11  corrections?
12      A.    Any of the three employees in
13  the payroll department.
14      Q.    If master card on Exhibit 23
15  shows that line 5 debone shift ended at 3:04
16  a.m., would that supervisor have to turn in
17  his corrections to this report before 3:04
18  a.m. or as soon as possible after 3:04 a.m.?
19      A.    After.
20      Q.    After?
21      A.    (Witness nods head in the
22  affirmative.)
23      Q.    Do you know how long after?

17 (Pages 62 to 65)

371ef939-b8db-4017-995b-f47fc7508720

FREEDOM COURT REPORTING

Page 66

1    A.    No.
2    Q.    Would that be in that e-mail?
3    A.    Yes.
4        MS. MCGOWAN: Howard, I
5    haven't seen that e-mail.
6        MR. ROSENTHAL: You haven't
7    requested it.
8        MS. MCGOWAN: We've asked for
9    all documents on how time is edited and
10   done.
11       MR. ROSENTHAL: I suggest you
12   go back and read the document that we --
13   that you requested, used at your request
14   before you make that statement.
15       Ms. McGowan, it hasn't been
16   requested. If you make a request now, we'll
17   consider it.
18   Q.    Is it your understanding that
19   this supervisor has to make corrections
20   before, if the shift ends at 3:04, they
21   leave the plant that day?
22   A.    I don't know.
23   Q.    Can you turn it in the next

Page 67

1    day when he returns at 4 -- when the second
2    shift begins at 4:30?
3    A.    I don't -- I don't know the
4    times in the e-mail without looking at it.
5    Q.    No. I'm just saying can he
6    wait and turn it in the next day when he
7    returns to work at the beginning of his
8    shift at 4:30 in the afternoon?
9    A.    Yes.
10   Q.    Why do you have the deadlines
11   established?
12   A.    So that we can process the
13   payroll in a timely manner.
14   Q.    How often is payroll
15   processed?
16   A.    Once a week.
17   Q.    What day does payroll --
18   A.    Tuesday.
19   Q.    Is it the day it's paid or the
20   day it's processed?
21   A.    Processed.
22   Q.    And is that for the week
23   before?

Page 68

1    A.    Yes.
2    Q.    And what is the cutoff date on
3    the week? The payroll period is from what
4    day to what day?
5    A.    It's from Sunday through
6    Saturday.
7    Q.    So the payroll that's
8    processed on Tuesday would be for the time
9    that ended the previous Saturday?
10   A.    Yes.
11   Q.    How many days a week does the
12   plant operate, the fresh plant?
13   A.    It's normally five.
14   Q.    Is that Monday through Friday?
15   A.    Yes.
16   Q.    Look at Exhibit 23. And on
17   the first page for Jacqueline Cooper, under
18   6/2/08, do you see that?
19   A.    Yes.
20   Q.    Does that reflect the first
21   number of the time she punched in, or is
22   that the master time?
23   A.    The time she clocked in.

Page 69

1    Q.    Is that her time she swiped
2    in?
3    A.    Yes.
4    Q.    What does VE stand for?
5    A.    I don't know.
6    Q.    You don't know?
7    A.    No.
8    Q.    Above -- Under the master
9    card, what does MP stand for?
10   A.    Master -- I don't know. I
11   don't know.
12   Q.    Who would know?
13   A.    My payroll department would.
14   Q.    Are there any policies,
15   written documents that tell you what these
16   things stand for?
17   A.    I don't know.
18   Q.    Have you ever reviewed any
19   written documents that describe the Kronos
20   report?
21   A.    No.
22   Q.    Have you ever seen any written
23   documents that describe the Kronos report?

18 (Pages 66 to 69)

FREEDOM COURT REPORTING

Page 70

1    A.    Yes.
2    Q.    Okay.  What have you seen?
3    A.    A manual.
4    Q.    What is this manual called?
5    A.    I don't know the name.
6    Q.    What's in this manual?
7    A.    Kronos information.
8    Q.    Do you know who prepared it?
9    A.    No.
10   Q.    Do you have a copy of it in
11   your office?
12   A.    No.
13   Q.    Where's this manual
14   maintained?
15   A.    In my payroll department.
16   Q.    Look at -- Let's go back to
17   the master card up at the top, on 6/2.  3:04
18   a.m., is that the time that the master card
19   was swiped out by the department supervisor?
20   A.    Yes.
21   Q.    And you look over at total
22   amount, and that's 9:34?
23   A.    Yes.

Page 71

1    Q.    Does that represent nine hours
2    and thirty-four minutes?
3    A.    Yes.
4    Q.    And at the bottom, it shows on
5    6/6, twenty-eight for the master card,
6    forty-six hours and fifty-two minutes worked
7    that week?
8    A.    Yes.
9    Q.    Now, does the computer
10   automatically deduct the one hour for the
11   two thirty-minute breaks?
12   A.    Yes.
13   Q.    So the supervisor is not
14   swiping in and out for the thirty-minute
15   breaks?
16   A.    That's correct.
17   Q.    Can a supervisor go in to the
18   system and change the swipe out time?
19   A.    No.
20   Q.    Who can change that?
21   A.    Payroll department.
22   Q.    Go down to the -- Ms. Cook.
23   Under the total amounts worked on the next

Page 72

1    to the last column on the right, do those
2    reflect the times from the master card swipe
3    and not the personal in and out swipe?
4    A.    Yes.
5    Q.    Do you -- can the payroll
6    department use the personal swipe in and out
7    time for any reason at all?
8    MR. ROSENTHAL:  For Jacqueline
9    Cooper?
10   A.    No.
11   Q.    For any employee?
12   A.    For Diane Holmes.
13   Q.    What page are you on?
14   A.    Page four.
15   Q.    All right.  And why are you
16   using Diane Holmes?
17   A.    The supervisor didn't know to
18   pay clock-out.
19   Q.    Okay.  Do you ever use
20   clock-in times for anything?
21   A.    Yes.
22   Q.    When?
23   A.    I don't have an example in

Page 73

1    that for that.  It would be the same thing.
2    Q.    Do you know of an example?
3    A.    No.
4    Q.    If an employee's late, do you
5    use clock-in or clock-out -- do you use the
6    clock-in time or master time?
7    A.    Clock-in.
8    Q.    So that would be an example of
9    when you would use the clock-in time for the
10   employee?
11   A.    Yes.
12   Q.    Is the computer set up to
13   recognize that, the computer Kronos system,
14   if an employee's late, or does the
15   supervisor have to physically denote -- do a
16   notation?
17   A.    If they swipe their card, the
18   computer will see it.
19   Q.    And pay them on the clock-in
20   time if that's late?
21   A.    Yes.
22   Q.    Is there a code flagging that?
23   A.    I don't know.

19 (Pages 70 to 73)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

371ef939-b8db-4017-995b-f47fc7508720

FREEDOM COURT REPORTING

Page 74

1    Q.    Can the Kronos system be set
2  to pay employees by their clock-in time?
3    A.    These employees?
4    Q.    Any employee.
5    A.    Yes.
6    Q.    Okay.  How would that be
7  achieved?
8    A.    By the pay rule.
9    Q.    Payroll can go in and set --
10   A.    Pay rule.
11   Q.    Pay rule?  What's pay rule?
12   A.    Pay rule means line time would
13  be a pay rule; clock-in and clock-out would
14  be pay rule; schedule would be pay rule.
15   Q.    So there are some pay rules
16  where employees are paid on the Kronos
17  system from clock-in to clock-out?
18   A.    If they are paid under that
19  pay rule.
20   Q.    Is it a hard process to change
21  in the computer to pay employees on the pay
22  rule from clock-in to clock-out?
23        Or is it just a code you have

Page 75

1  to put in for that employee?
2    A.    It's a code you have to put
3  in.
4    Q.    Who puts that code in?
5    A.    Human resources.
6    Q.    And the computer automatically
7  picks up that code and pays from clock-in to
8  clock-out?
9    A.    That's right.
10   Q.    Look at Exhibit Number 13.  Do
11  you know what these are?
12   A.    Work rules.
13   Q.    And what are --
14   A.    It's the same thing, it's pay
15  rule.  It's just a different name for them.
16   Q.    So you call them pay rules?
17   A.    Yeah.
18   Q.    So this would be the computer
19  where it sets in how the people are paid?
20   A.    Yes.
21   Q.    Explain number -- The first
22  page, the work rule, do you know what kind
23  of employee this is at the top?  It says two

Page 76

1  breaks, line time, do you know what that
2  means?
3    A.    That's just like Exhibit 23.
4    Q.    Okay.  So they're paid based
5  on a set time and the master card time?
6    A.    Yes.
7    Q.    The next one is two breaks,
8  minute to minute, what does that mean?
9    A.    Clock-in to clock-out.
10   Q.    Does HR determine what pay
11  rules apply?
12   A.    Yes.
13   Q.    Who in HR does that?
14   A.    I don't know.
15   Q.    Do you have any involvement?
16   A.    No.
17   Q.    Look at Exhibit -- back to 23.
18  Are all employees in debone line 5 paid the
19  same amount -- the forty-six point fifty-two
20  hours for this work week unless there was
21  some notation by the supervisor or they came
22  in late?
23   A.    Yes.

Page 77

1    Q.    How do you reflect the three
2  minutes that are being paid per day under
3  the new contract?
4    A.    It's reflected on their check
5  stub.
6    Q.    How is it reflected in these?
7    A.    No.
8    Q.    It's not on the Kronos?
9    A.    (Witness shakes head in the
10  negative.)
11   Q.    How is that added?
12   A.    To the check stub.
13   Q.    So after it's added to this
14  forty-six point -- forty-six minutes and
15  fifty-two --
16   A.    (Witness nods head in the
17  affirmative.)
18   Q.    Forty-six hours and fifty-two
19  minutes, I'm sorry.
20   A.    (Witness nods head in the
21  affirmative.)
22   Q.    Yes?
23   A.    Yes.

20 (Pages 74 to 77)

FREEDOM COURT REPORTING

Page 78

1    Q.    So after that, payroll
2  department would had an additional fifteen
3  minutes?
4    A.    The computer does it.
5    Q.    Computer would add an
6  additional fifteen minutes, if it's three
7  minutes a day for five days?
8    A.    Yes.  That's correct.
9    Q.    Did you have to do anything to
10 set up this three minutes in the computer?
11   A.    Me personally?
12   Q.    Yes.
13   A.    No.
14   Q.    Do you know who did that?
15   A.    Corporate.
16   Q.    What do you mean by corporate?
17   A.    The corporate office of our
18 parent company.
19   Q.    Where's that?
20   A.    West Conshohocken,
21 Pennsylvania.
22   Q.    And they went in and set
23 computers at that end?

Page 79

1    A.    Yes.
2    Q.    Is there an IT department that
3  did that?
4    A.    Yes.
5    Q.    Do you know if any other
6  plants pay an additional three minutes or
7  some kind of minutes for donning and
8  doffing?
9    A.    No, I don't.
10   Q.    Did you have any involvement
11 in the decision to pay additional time for
12 donning and doffing?
13   A.    No.
14   Q.    Did you have any involvement
15 in the union contract negotiations?
16   A.    No.
17   Q.    How did you learn that an
18 additional three minutes was being paid?
19   A.    By the notification of the
20 contract -- notification of the new
21 contract.
22   Q.    Who notified you?
23         You say the notification of

Page 80

1  the new contract, what do you mean by that?
2    A.    Once something like that would
3  happen, that would be a communication
4  between the general manager and the
5  controller.
6    Q.    Do you use that three minutes
7  in your overtime trend?
8    A.    No.
9    Q.    Are production workers
10 scheduled for forty hours a week, production
11 line workers?
12   A.    I'm not involved in that
13 process.
14   Q.    Are you aware of any that are
15 scheduled for less than forty hours per
16 week?
17   A.    I don't know.
18   Q.    Do you see that in your
19 reports that you're getting?
20   A.    No.
21   Q.    Have you had any decision --
22 or involvement in any decision on whether or
23 not to pay employees for the time they spent

Page 81

1  donning and doffing?
2    A.    No.
3    Q.    When I say donning and
4  doffing, do you understand what I'm talking
5  about?
6    A.    Yes.
7    Q.    Have you been asked to prepare
8  any cost analysis reports?
9    A.    No.
10   Q.    On paying for donning and
11 doffing?
12   A.    No.
13   Q.    The Kronos information that's
14 in these reports that shows the punch in and
15 punch out times for each employee, is that
16 maintained electronically also?
17   A.    Yes.
18   Q.    In what version?  Do you back
19 it up every day or how do you maintain it?
20   A.    We have -- Our Kronos version
21 currently is on the Internet, the web.
22   Q.    What do you mean by that?
23   A.    It's web based.  Prior to

21 (Pages 78 to 81)

371ef939-b8db-4017-995b-f47fc7508720

FREEDOM COURT REPORTING

Page 82

1  this -- And this happened in September of
2  '07. Prior to that, we maintained it on
3  local servers at our facility.
4      Q.    And then when you maintained
5  it on the local servers, did you back it
6  up --
7      A.    Yes.
8      Q.    -- this electronic data?
9      A.    Yes.
10     Q.    And what form of backup did
11 you use for the electronic data?
12     A.    I'm not qualified to speak to
13 that, because that's an IT department.
14     Q.    Somebody in IT was responsible
15 for backing this information up?
16     A.    Exactly. Yes.
17     Q.    Is this electronic information
18 also subject to the seven-year retention
19 policy, document retention policy?
20     A.    I'm not sure.
21     Q.    Do you know if the Kronos
22 information prior to September of '07 is
23 still available electronically?

Page 83

1      A.    Yes.
2      Q.    You do know or yes, it is?
3      A.    Yes, it is.
4      Q.    And who maintains this record?
5      A.    It's maintained on the servers
6  at our facility.
7      Q.    Now, since September of '07,
8  this information is maintained on the web.
9  Is it still accessible by your --
10     A.    Yes.
11     Q.    -- department?
12     A.    Yes.
13     Q.    If you wanted to go back and
14 research something on a clock-in and
15 clock-out time for an employee in October of
16 '07, could you go online and get it now?
17     A.    Yes.
18     Q.    Do you still, after September
19 of '07, do the daily reports and keep them
20 in a folder by month?
21     A.    Yes.
22     Q.    I mean a weekly report and
23 folder by month?

Page 84

1      A.    Yes.
2      Q.    Has anyone ever asked you to
3  review the weekly reports and determine how
4  much time employees have at the end of the
5  shift that's different -- the clock-out time
6  different from the master card?
7      A.    No.
8      Q.    Has anyone ever asked you to
9  do an analysis of how much it would cost the
10 company to pay for donning and doffing?
11     A.    No.
12     Q.    Were you asked to do an
13 analysis on cost for the company for the
14 three minutes before it was agreed to do
15 from the contract negotiations?
16     A.    No.
17     Q.    Were you aware that the
18 company was considering agreeing to pay for
19 some donning and doffing time prior to the
20 negotiations?
21     A.    Yes.
22     Q.    How did you become aware?
23     A.    At the weekly staff meeting.

Page 85

1      Q.    What was discussed at the
2  weekly staff meeting?
3      A.    Just that it was being
4  discussed.
5      Q.    Who told you that?
6      A.    I don't know.
7      Q.    Do you know when?
8      A.    No.
9      Q.    How many times was this
10 discussed in a weekly staff meeting?
11     A.    I don't know.
12     Q.    Was it just the once?
13     A.    No.
14     Q.    Did you make any comments on
15 whether the company should pay for it?
16     A.    No.
17     Q.    Do you recall anyone making
18 any comments in the --
19     A.    No.
20     Q.    When you say it was discussed,
21 was it just -- were you just informed of it
22 or was there an actual discussion among all
23 of the people in the staff meeting?

22 (Pages 82 to 85)

FREEDOM COURT REPORTING

Page 86

1     A.    Just general information.
2     Q.    Do you know who provided this
3 general information?
4     A.    No.
5     Q.    Who leads the weekly staff
6 meeting?
7     A.    General manager.
8     Q.    And that's Mr. --
9     A.    Tim Esslinger.
10    Q.    What information is maintained
11 or retrievable on the computer or other
12 electronic means about employees that work
13 for Equity?  What kind of employment
14 information is maintained?
15    A.    I have to hear that question
16 again.
17    Q.    What kind of -- Do you
18 maintain computer records on all employees
19 in addition to the Kronos system or is it
20 just the Kronos information?
21    A.    Yes, we do.
22    Q.    What kind of information is
23 maintained electronically?

Page 87

1     A.    Standard employee information
2 just like any company would.
3     Q.    I can promise you, my company
4 doesn't have electronic records on people,
5 so you need to tell me.
6           Do you keep like payroll
7 records -- I mean, employee log records or
8 what information does -- when you say
9 standard, what do you mean by standard?
10 What does Equity keep electronically?
11    A.    I can't begin to list
12 everything that we keep without having
13 something in front of me.  If you will ask
14 me and I know that we keep it, I'll be glad
15 to say.
16    Q.    In your job in the payroll
17 department, what information do you know
18 that they keep electronically on employees?
19    A.    Name, address, withholdings,
20 job code, department, pay rate, phone
21 number.  That's about all I can think of off
22 the top of my head.
23    Q.    Does it show the -- Do you

Page 88

1 keep total number of hours that they work
2 electronically?
3     A.    It's in there.
4     Q.    Is there any other program
5 that you're aware of other than the Kronos
6 that Equity uses that shows how many hours
7 an employee worked?
8     A.    Lawson.
9     Q.    Spell that?
10    A.    L-A-W-S-O-N.
11    Q.    And what is that program?
12    A.    What I just described to you,
13 what we just talked about.
14    Q.    So that's something different
15 than the clock-in/clock-out Kronos program?
16    A.    Yes.  This is only for time
17 keeping.
18    Q.    Kronos is only for time
19 keeping?
20    A.    Yes.
21    Q.    This other information is
22 stored through Lawson, and that's the name
23 of the program?

Page 89

1     A.    Yes.
2     Q.    Would the Lawson program also
3 prepare the W-2 forms, or is that prepared
4 by another program?
5     A.    I'm not sure.  That's done at
6 corporate.
7     Q.    Do you have any involvement in
8 preparing any work rules for employees or
9 policies for employees?
10    A.    No.
11    Q.    The hourly employees?
12    A.    (Witness shakes head in the
13 negative.)
14    Q.    Do you have any involvement in
15 employee orientation?
16    A.    No.
17    Q.    Do you have any involvement in
18 preparing the employee handbook?
19    A.    No.
20    Q.    Let me show you what was
21 marked as Exhibit 16.
22          MS. MCGOWAN:  Howard, do you
23 have that?

23 (Pages 86 to 89)

371ef939-b8db-4017-995b-f47fc7508720

FREEDOM COURT REPORTING

Page 90

1      MR. ROSENTHAL: The
2  organizational chart?
3      MS. MCGOWAN: Yes.
4      MR. ROSENTHAL: I don't have
5  an extra copy.
6      Q.   Look at Exhibit 16 and see if
7  you can find your organizational chart for
8  your department or where you are in those.
9      A.   Well, it's not in here --
10     Q.   Let me have you look at --
11     A.   -- other than right here
12  (indicating).
13     Q.   Okay. On the general
14  organization chart?
15     A.   Right.
16     Q.   It shows where you are a
17  direct report to Tim?
18     A.   Yes.
19     Q.   All right.
20     A.   But my organizational chart is
21  not in there.
22     Q.   Let me have you look at
23  Exhibit Number 10 and see if your

Page 91

1  organizational chart is in here.
2      A.   No.
3      Q.   Are you listed in the general
4  organizational chart in Exhibit 10?
5      A.   No.
6      Q.   You told me you had four
7  direct reports?
8      A.   Yes.
9      Q.   How many employees do you have
10  under your supervision?
11     A.   Fifteen.
12     Q.   Fifteen?
13     A.   (Witness nods head in the
14  affirmative.)
15     Q.   And other than the three
16  people in your payroll department you told
17  me about, and the three other managers that
18  report directly to you, what other job
19  classifications are under your supervision?
20     A.   Under their supervision?
21     Q.   Under your department. You
22  said fifteen, of those fifteen, tell me what
23  the other job classifications are.

Page 92

1      A.   Under John Fulford, the live
2  accounting manager, he has breeder clerk,
3  broiler clerk, receptionist, and feed clerk.
4      Q.   When you say clerk, are these
5  like --
6      A.   Salary, non-exempt.
7      Q.   What do they do, what kind of
8  work?
9      A.   Office work.
10     Q.   They're not out feeding?
11     A.   No.
12     Q.   These are, like, payroll
13  people?
14     A.   Yes.
15     Q.   Is this another payroll.
16     A.   Shauna has two pay clerks and
17  a fixed asset cash receivables clerk. Jeff
18  has a cost clerk and Dawn has a yield clerk
19  and three accounts payable clerks.
20     Q.   What does a yield clerk do?
21     A.   Calculates the dressed weight
22  from a live chicken.
23     Q.   How many pounds you're getting

Page 93

1  per bird?
2      A.   That's it.
3      Q.   You went to work for Equity in
4  '04. Where did you work prior to that?
5      A.   Three years prior to that was
6  with ConAgra Poultry.
7      Q.   Where?
8      A.   Canton, Georgia.
9      Q.   What job?
10     A.   Controller.
11     Q.   Why did you leave ConAgra?
12     A.   To come to Equity Group,
13  Eufaula.
14     Q.   Prior to ConAgra where -- Were
15  you always the controller?
16     A.   Uh-huh.
17     Q.   Prior to ConAgra, where were
18  you?
19     A.   Tyson Foods.
20     Q.   Where?
21     A.   Oxford, Alabama, and
22  Springdale, Arkansas.
23     Q.   When were you in Oxford?

24  (Pages 90 to 93)

371ef939-b8db-4017-995b-f47fc7508720

FREEDOM COURT REPORTING

Page 94

1    A.    Where in Oxford?
2    Q.    When?
3    A.    1975 to 1999.
4    Q.    What position?
5    A.    Manager of financial analysis
6    and then controller, those two positions.
7    Q.    To whom did you report as
8    controller?
9    A.    It was owned by Kentucky Fried
10   Chicken and Lane Processing, I reported to
11   the general manager.
12        When it was purchased by Tyson
13   Foods, then I reported to the finance
14   department in Springdale, Arkansas, the
15   corporate headquarters.
16   Q.    When were you at Springdale?
17   A.    1999 to 2001.
18   Q.    What position?
19   A.    I was the corporate grow-out
20   controller.
21   Q.    To whom did you report?
22   A.    Reported to the director of
23   operational accounting.

Page 95

1    Q.    Who was that?
2    A.    Ron Van Es, V-A-N E-S.
3    Q.    Is that one word?
4    A.    Two.
5    Q.    Why did you leave Tyson?
6    A.    For the job with ConAgra
7    Poultry in Canton, Georgia.
8    Q.    Prior to the Oxford, Alabama,
9    location, where did you work?
10   A.    I was at Kentucky Fried
11   Chicken in Louisville, Kentucky, for two
12   years prior to that.
13   Q.    What'd you do for them?
14   A.    I was a senior financial
15   analyst.
16   Q.    And prior to Kentucky Fried
17   Chicken?
18   A.    Three years with a CPA named
19   Touche Ross, that was in Louisville,
20   Kentucky.
21   Q.    Are you from Louisville?
22   A.    No. I'm from central
23   Kentucky.

Page 96

1    Q.    Do you have any relatives in
2    Alabama?
3    A.    I married someone from Alabama
4    when I came down -- when I moved to Alabama,
5    and so I have --
6    Q.    In-laws?
7    A.    -- those relatives.
8    Q.    What was your -- those
9    relatives last names?
10   A.    James, Gilmore. That's it.
11   Q.    Are you related to Kathy
12   Gilmore?
13   A.    No.
14   Q.    Are they located in this area,
15   the Eufaula area, the relatives in --
16   A.    Pell City.
17   Q.    Pell City?
18   A.    Yes.
19   Q.    Any located outside of the
20   Pell City area, any relatives in Alabama?
21   A.    There are some in Northport.
22   Q.    That's the Tuscaloosa area?
23   A.    My wife's aunts, if that's

Page 97

1    what you're talking about.
2    Q.    I want to make sure they would
3    not be on the jury if they're down here.
4    Are they all in north Alabama?
5    A.    Yes.
6        MS. MCGOWAN: Can we take a
7    break?
8        (Recess taken.)
9    Q.    (BY MS. MCGOWAN): Have you
10   had any training or seminars on the Fair
11   Labor Standards Act and requirements?
12   A.    No.
13   Q.    Have you had any training or
14   seminars on wage and hour loss?
15   A.    No.
16   Q.    Do managers in the fresh plant
17   or the further processing plant receive
18   bonuses for keeping their overtime hours
19   down?
20   A.    No.
21   Q.    Are you aware of any --
22   A.    Wait. I'm not aware of it if
23   they do.

25 (Pages 94 to 97)

371ef939-b8db-4017-995b-f47fc7508720

FREEDOM COURT REPORTING

Page 98

1    Q.    Does anybody use your
2  information on overtime hours to get
3  bonuses?
4    A.    Not to my knowledge.
5    Q.    Are you aware of any DOL,
6  Department of Labor, investigations or
7  inquiries at Equity for pay practices?
8    A.    No, I'm not.
9    Q.    Are you aware of any Social
10  Security mismatch letters that have come in?
11      MR. ROSENTHAL: Objection.
12  I'm going to direct the witness not to
13  answer. Nothing to do with this litigation.
14      MS. MCGOWAN: Well, we're in
15  discovery, and it could lead to relevant
16  information as to their record retention
17  information.
18      MR. ROSENTHAL: Bring it up to
19  the Judge.
20      MS. MCGOWAN: Unless there is
21  privilege, you have to answer.
22      MR. ROSENTHAL: I've directed
23  the witness not to answer. Bring it up with

Page 99

1  the Judge.
2    Q.    Okay. In the Kronos reports,
3  if you look at Exhibit Number 27 -- 23,
4  under the third line down, it says -- at the
5  very top left, it says: Time period query,
6  and then it has actual/adjusted. Do you
7  know what that means?
8    A.    I'm not finding that.
9    Q.    Right here (indicating), where
10  it says: Actual hours only. Do you know
11  what that means?
12    A.    No.
13    Q.    Do you know who would know
14  what that means?
15    A.    No, I wouldn't know who.
16      MS. MCGOWAN: Howard, in
17  response to your request that I look at the
18  request for productions to see if we've
19  requested those documents, it's our position
20  that number -- request number six would have
21  been the e-mail setting out the guidelines
22  for when these edits are due back would be
23  encompassed under request number six. We've

Page 100

1  asked for any practices or guidelines with
2  regards to edited payroll records.
3      And, also, I think when we
4  were talking about looking at the Kronos
5  reports, and you said you were going to
6  check into whether or not that could be done
7  electronically, whether we could get that if
8  you had anything, have you found out about
9  that?
10      MR. ROSENTHAL: No. I told
11  you I'd follow-up next week.
12      MS. MCGOWAN: What about when
13  can we go inspect the hard copies?
14      MR. ROSENTHAL: I'll have to
15  resolve that next week.
16      MS. MCGOWAN: Okay. They
17  wouldn't be available for inspection
18  tomorrow?
19      MR. ROSENTHAL: No.
20      MS. MCGOWAN: That's all I
21  have.
22  (The deposition was concluded at 7:00 p.m.,
23  June 12th, 2008.)

Page 101

1      REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  ELMORE COUNTY,
4      I, Sara Mahler, Certified Court
5  Reporter and Commissioner for the State of
6  Alabama at Large, do hereby certify that the
7  above and foregoing proceeding was taken
8  down by me by stenographic means, and that
9  the content herein was produced in
10  transcript form by computer aid under my
11  supervision, and that the foregoing
12  represents, to the best of my ability, a
13  true and correct transcript of the
14  proceedings occurring on said date and at
15  said time.
16      I further certify that I am neither
17  of kin nor of counsel to the parties to the
18  action; nor in any manner interested in the
19  result of said case.
20
21
22
                        _____
                        Sara Mahler, CCR
23                      ACCR #420

26  (Pages 98 to 101)

# TAB 82

# FREEDOM COURT REPORTING

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


CASE NUMBER: 2:06-CV-01081-MEF-DRB

BETTY ANN BURKS, ET AL.,

       Plaintiffs,

       vs.

EQUITY GROUP, EUFAULA DIVISION, L.L.C.,

       Defendant.


S T I P U L A T I O N

       IT IS STIPULATED AND AGREED by and
between the parties through their respective
counsel, that the deposition of Robin
Stevens may be taken before Sara Mahler,
CCR, at the offices of Williams, Pothoff,
Williams & Smith, at 125 South Orange
Avenue, Eufaula, Alabama 36027, on the 12th
day of June, 2008.


DEPOSITION OF ROBIN STEVENS

FREEDOM COURT REPORTING

Page 2

1        IT IS FURTHER STIPULATED AND
2    AGREED that the signature to and the reading
3    of the deposition by the witness is not
4    waived, the deposition to have the same
5    force and effect as if full compliance had
6    been had with all laws and rules of Court
7    relating to the taking of depositions.
8        IT IS FURTHER STIPULATED AND
9    AGREED that it shall not be necessary for
10   any objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17       IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20
21   * * * * * * * * * * * *
22
23

Page 3

1    * * * * * * * * * * * *
2              I N D E X
3            EXAMINATION
4                PAGE
5    By Ms. McGowan ...................... 7
6
7
8    (There Were No Exhibits Marked)
9
10
11   * * * * * * * * * * * *
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF ALABAMA
3            MONTGOMERY DIVISION
4
5    CASE NUMBER: 2:06-CV-01081-MEF-DRB
6
7    BETTY ANN BURKS, ET AL.,
8        Plaintiffs,
9        vs.
10   EQUITY GROUP EUFAULA DIVISION, L.L.C.,
11       Defendant.
12
13   BEFORE:
14       SARA MAHLER, Commissioner.
15
16   APPEARANCES:
17       CANDIS A. MCGOWAN, ESQUIRE, of
18   WIGGINS, CHILDS, QUINN & PANTAZIS, 301
19   Nineteenth Street North, Birmingham, Alabama
20   35203, appearing on behalf of the
21   Plaintiffs.
22
23

Page 5

1    APPEARANCES:  (Cont.)
2        JACOB A. KISER, ESQUIRE, of
3    WIGGINS, CHILDS, QUINN & PANTAZIS, 301
4    Nineteenth Street North, Birmingham, Alabama
5    35203, appearing on behalf of the
6    Plaintiffs.
7        ROBERT J. CAMP, ESQUIRE, of THE
8    COCHRAN FIRM, 505 North 20th Street, Suite
9    825, Birmingham, Alabama 35203, appearing on
10   behalf of the Plaintiffs.
11       HOWARD A. ROSENTHAL, ESQUIRE, of
12   PELINO & LENTZ, 1650 Market Street,
13   Thirty-Second Floor, Philadelphia,
14   Pennsylvania 19103, appearing on behalf of
15   the Defendant.
16
17       * * * * * *
18
19       I, SARA MAHLER, CCR, a Court
20   Reporter of Wetumpka, Alabama, acting as
21   Commissioner, certify that on this date, as
22   provided by the Federal Rules of Civil
23   Procedure and the foregoing stipulation of

2 (Pages 2 to 5)

FREEDOM COURT REPORTING

Page 6

1 counsel, there came before me at the offices
2 of Williams, Pothoff, Williams & Smith, 125
3 South Orange Avenue, Eufaula, Alabama 36027,
4 beginning at 8:30 a.m., Robin Stevens,
5 witness in the above cause, for oral
6 examination, whereupon the following
7 proceedings were had:
8         ROBIN STEVENS,
9 being first duly sworn, was examined and
10 testified as follows:
11         COURT REPORTER:   Usual
12 stipulations?
13         MS. MCGOWAN: Yes.
14         MR. ROSENTHAL:  We're going to
15 reserve reading and signing.
16         MS. MCGOWAN: Okay.  We may
17 have a -- for the summary judgment response,
18 it may be -- I don't think you will have
19 time to read and sign before we file the
20 transcript.
21         MR. ROSENTHAL:  I wouldn't
22 think so.
23         EXAMINATION

Page 7

1 BY MS. MCGOWAN:
2    Q.    State your name for the
3 Record, please.
4    A.    Robin Stevens.
5    Q.    And Robin, is that R-O-B-I-N?
6    A.    Correct.
7    Q.    S-T-E-V-E-N-S?
8    A.    Correct.
9    Q.    Give me your address, where do
10 you live?
11    A.    5479 County Road 3319, Troy,
12 Alabama 36079.
13    Q.    Where are you employed?
14    A.    Equity Group.
15    Q.    How long have you been with
16 Equity Group?
17    A.    Since September of '04.
18    Q.    What is your job position?
19    A.    Plant manager.
20    Q.    Which plant?
21    A.    Fresh plant.
22    Q.    And how do you define fresh
23 plant?

Page 8

1    A.    It's where we bring live birds
2 in, slaughter them, and take them through
3 the deboning process.
4    Q.    Some people refer to that as
5 the live kill plant?
6    A.    That would be a live kill
7 plant, yes, ma'am.
8    Q.    It's also been referred to as
9 a debone plant.  Is that a plant within your
10 plant, or is that just a department within
11 your plant, or is that a separate plant?
12    A.    That would be a department.
13    Q.    That was within your plant?
14    A.    Yes, ma'am.
15    Q.    And where is this plant
16 located?
17    A.    Baker Hill.
18    Q.    How long have you been the
19 plant manager?
20    A.    Since '05.  I don't remember
21 the month, but since '05.
22    Q.    Was it the middle of the year,
23 the first of the year?

Page 9

1         Do you remember about the
2 season, if that will help?
3    A.    I'm going to say sometime in
4 spring, maybe early summer, the best I can
5 recall.
6    Q.    You said you started in
7 September of '04 with Equity?
8    A.    I did.
9    Q.    What was your first position
10 in September of '04 when you first started?
11    A.    Quality assurance manager.
12    Q.    For which plant?
13    A.    At the time, it was both
14 plants, fresh and further processing.
15    Q.    When you say at the time, did
16 it change?
17    A.    No, ma'am, it didn't.  It
18 didn't change.
19    Q.    So you stayed the QA manager
20 for both the fresh plant and the further
21 processing plant from September until
22 when -- of '04 until when?
23    A.    Until I took over as plant

3 (Pages 6 to 9)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 10

1    manager.
2        Q.    Give me your educational
3    background.
4        A.    I have a BS degree in animal
5    and dairy science, Auburn University.
6        Q.    War Eagle. When did you
7    obtain your BS?
8        A.    1992.
9        Q.    What was your first job after
10   college?
11       A.    I worked for a temporary
12   agency.
13       Q.    What temporary agency and
14   where was it located?
15       A.    I don't recall the name, but
16   it was in Hartselle, Alabama.
17       Q.    Are you from Hartselle?
18       A.    I am from Decatur.
19       Q.    What did you do for the temp
20   agency?
21       A.    I worked at Wolverine Tube
22   Company in Decatur, Alabama.
23       Q.    What did you do for Wolverine

Page 11

1    Tube?
2        A.    Just a general laborer.
3        Q.    What do they make? Is it
4    steel tubes?
5        A.    Copper tubing.
6        Q.    How long did you work for
7    Wolverine Tube?
8        A.    I don't remember.
9        Q.    Was it a short time? A year,
10   longer?
11       A.    I want to say somewhere around
12   six months.
13       Q.    Was the whole time through the
14   temp agency or did you ever become a
15   permanent employee?
16       A.    It was through the temporary
17   agency.
18       Q.    Then what did you do after you
19   left Wolverine Tube?
20       A.    I went to work for Wayne
21   Farms.
22       Q.    Where?
23       A.    Decatur, Alabama.

Page 12

1        Q.    What position?
2        A.    Quality assurance supervisor.
3        Q.    Did you leave Wolverine Tube
4    on your own or were you asked to leave or
5    was there a layoff or anything? Why did you
6    leave Wolverine Tube?
7        A.    For the opportunity to get
8    into management, a salary position at Wayne
9    Farms.
10       Q.    When did you start Wayne
11   Farms?
12       A.    March of 1993.
13       Q.    How long were you with Wayne
14   Farms?
15       A.    Until January of 1997.
16       Q.    Did you hold the same position
17   the entire time?
18       A.    No.
19       Q.    Okay. Let's go through your
20   positions you held. Your first was QA
21   supervisor?
22       A.    Correct.
23       Q.    How many employees did you

Page 13

1    supervise?
2        A.    I don't recall the exact
3    number, but somewhere between fifteen and
4    twenty-five.
5        Q.    Were these all QA employees?
6        A.    Yes.
7        Q.    And when we say QA, we're
8    talking about quality assurance?
9        A.    Yes.
10       Q.    Just so the Record will be
11   clear.
12       A.    Okay.
13       Q.    How long were you the QA
14   supervisor?
15       A.    The best that I can remember,
16   I was a QA supervisor until the fall of '93.
17       Q.    Then what happened?
18       A.    I was promoted to quality
19   assurance manager.
20       Q.    And how long were you the
21   quality assurance manager for Wayne Farms?
22       A.    I was a QA manager until I
23   left the company in January of 1997.

4 (Pages 10 to 13)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 14

1    Q.    Why did you leave the company
2  in January of 1977?
3         MR. ROSENTHAL: '97.
4    Q.    '97, I'm sorry.
5    A.    I went to work for ConAgra
6  Foods.
7    Q.    Where?
8    A.    Enterprise, Alabama.
9    Q.    What position?
10   A.    Quality assurance manager.
11   Q.    Was this a lateral transfer?
12   A.    Yes.
13   Q.    Did you leave voluntarily from
14 Wayne Foods (sic)?
15   A.    Yes.
16   Q.    Who was your supervisor when
17 you left at Wayne -- your last supervisor at
18 Wayne Foods?  Or to whom did you report?
19   A.    Sandy Bishop.
20   Q.    What was Sandy Bishop's title?
21   A.    I don't recall her exact
22 title, but she was over the QA managers.
23 She worked in the corporate office.

Page 15

1    Q.    Where is the corporate office?
2    A.    Duluth, Georgia.
3    Q.    When you went to ConAgra Foods
4  in January of 1997 as the QA manager, to
5  whom did you report?
6    A.    Ted Simmons.
7    Q.    What was Ted Simmons' job?
8    A.    General manager.
9    Q.    Was there one plant or was it
10 a complex in Enterprise?  When you say he
11 was general manager, he was general manager
12 of what?
13   A.    One plant.
14   Q.    What kind of plant?
15   A.    Slaughter plant.
16   Q.    And I'm just assuming, and
17 that's probably bad, but Wayne Farms was a
18 slaughter plant also?
19   A.    Yes, ma'am.
20   Q.    How long were you with ConAgra
21 Foods in Enterprise?
22   A.    Summer of '04, I believe the
23 month was August.

Page 16

1    Q.    What happened then?
2    A.    Termination.
3    Q.    Why were you terminated?
4    A.    It was some general things.
5  At the time that I was terminated, I was a
6  plant -- I was operations manager of that
7  facility.
8    Q.    When you say general things,
9  can you give me more specific information?
10   A.    There was just some processing
11 inefficiencies and some goals that were not
12 met.
13   Q.    How long had you been
14 operations manager?
15   A.    At that time, approximately
16 two years.
17   Q.    What other positions did you
18 hold at ConAgra besides -- Let's just back
19 up.  You started as the QA manager in
20 January of '97?
21   A.    Correct.
22   Q.    How long were you QA manager
23 at ConAgra Foods in Enterprise?

Page 17

1    A.    I don't recall how long I was
2  the QA manager.
3    Q.    What was your next position
4  there?
5    A.    I was promoted to a second
6  processing manager.
7    Q.    Second processing, tell me
8  what that is at ConAgra Foods.
9    A.    ConAgra Foods was a fast food
10 operation where they took the birds and cut
11 them up into parts and sold them as fast
12 food parts to fast food stores.
13   Q.    Such as McDonald's or Burger
14 King and things like that?
15   A.    No, ma'am.  It would have been
16 Kentucky Fried Chicken or Popeye's or
17 Hardee's at the time.  And I was over both
18 shifts of that operation in those
19 departments.
20   Q.    How long were you the -- or
21 the further processing manager -- shift
22 manager, is that what you said?
23   A.    Second processing manager.

5 (Pages 14 to 17)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 18

1    Q.    Second processing manager.
2    A.    I don't recall when I was
3  promoted.
4    Q.    What was the next position?
5    A.    Went into the operations
6  manager.
7    Q.    In the organizational
8  structure for ConAgra Foods, was operations
9  manager over the general manager or how did
10  that work?
11    A.    No.  The general manager was
12  over the operations manager.
13    Q.    And then to whom did the
14  general manager report?
15    A.    I don't recall titles.  We
16  reported to someone in the corporate office.
17    Q.    The general manager was the
18  facilities manager or the plant manager?
19    A.    He was over the facility.
20    Q.    Then you went to work for
21  Equity?
22    A.    Yes.
23    Q.    I think we've already

Page 19

1  discussed your jobs with Equity.  Or have
2  you told me?
3         What was your first job with
4  Equity?
5    A.    QA manager.
6    Q.    And now you are the plant
7  manager?
8    A.    Yes.
9    Q.    Have you held any other
10  positions with Equity?
11    A.    Yes.
12    Q.    What others?
13    A.    I was promoted to complex QA
14  manager.
15    Q.    When were you complex QA
16  manager?
17    A.    The best that I can recall, I
18  think it was the fall of '04.
19    Q.    How long were you the complex
20  QA manager?
21    A.    Until I took over the position
22  as plant manager.
23    Q.    And that was since spring or

Page 20

1  early summer of '05?
2    A.    Yes.
3    Q.    When you say complex QA
4  manager, what do you mean by complex?
5    A.    I was responsible for the
6  quality assurance department in both
7  facilities, in both fresh processing and
8  further processing.
9    Q.    Now you just have
10  responsibility for the fresh processing?
11    A.    Yes.
12    Q.    Not further processing?
13    A.    Yes.
14    Q.    Who is the plant manager for
15  the further processing?
16    A.    Mike Cortner.
17    Q.    Mike who?
18    A.    Cortner.
19    Q.    Can you spell that?
20    A.    C-O-R-T-N-E-R.
21    Q.    To whom do you report as plant
22  manager?
23    A.    The operations manager.

Page 21

1    Q.    That's Greg Mills?
2    A.    Correct.
3    Q.    Let me backup just a little
4  bit because we just jumped into this
5  deposition.  I didn't ask you:  Have you
6  ever had your deposition taken before?
7    A.    No ma'am.
8    Q.    As you see, I'm asking you a
9  series of questions, and you're going to
10  need to give a verbal response so the court
11  reporter can make a Record.  And then in
12  everyday conversation we'll shake our heads
13  yes, or we'll say uh-huh.  But can you make
14  sure and say yes or no if that's the answer,
15  so the court reporter can make a Record?
16    A.    I will.
17    Q.    If at any point you don't hear
18  me because I tend to look down and talk
19  softly or if you don't understand what I
20  said, could you ask me to repeat or rephrase
21  the question?
22    A.    I will.
23    Q.    Can we have an understanding

6 (Pages 18 to 21)

# FREEDOM COURT REPORTING

Page 22

1 that if you don't ask me to repeat or
2 rephrase the question, that you heard my
3 question, you understand my question, and
4 you've given me the best possible answer to
5 that question?
6     A.   Yes.
7     Q.   What did you do to prepare for
8 this deposition?
9     A.   Nothing.
10     Q.   Did you review any documents?
11     A.   No.
12     Q.   Did you look at any documents?
13     A.   No.
14     Q.   Did you look at any other
15 employee's testimony?
16     A.   No.
17     Q.   Or deposition transcripts?
18     A.   No.
19     Q.   Do you know what this
20 lawsuit's about?
21     A.   Yes.
22     Q.   What is your understanding of
23 this lawsuit?

Page 23

1     A.   I don't have a very good
2 understanding about it. I know it's about
3 donning and doffing, that's all I know.
4     Q.   What about donning and
5 doffing? Do you know what the employees are
6 claiming or asking for with regards to
7 donning and doffing?
8     A.   No.
9     Q.   What is your under -- your
10 definition of donning and doffing?
11     A.   Putting on and taking off
12 clothing.
13     Q.   Have you been involved in any
14 union negotiations?
15     A.   No.
16     Q.   Not just at Equity, have you
17 been involved in any union negotiations at
18 any of the plants in which you've worked?
19     A.   No.
20     Q.   Have you attended any union
21 negotiations?
22     A.   No.
23     MS. MCGOWAN: Do you have

Page 24

1 another one he can look at while I --
2     MR. ROSENTHAL: P-16?
3     MS. MCGOWAN: Yes.
4     Q.   Let me show what you we marked
5 as Plaintiff's Exhibit 16, and this appears
6 to be an Equity Group, Eufaula Division,
7 organizational chart. Would you agree with
8 me on that?
9     A.   Yes.
10     Q.   And the first page, if I can
11 read, it's kind of dark, but is that your
12 name as the fresh plant manager at the top?
13     A.   Yes.
14     Q.   Okay. Is this how the fresh
15 plant is organized?
16     A.   Yes.
17     Q.   Okay. What departments are in
18 the fresh plant?
19     A.   First processing.
20     Q.   Which includes what?
21     A.   It's where the birds are
22 slaughtered, eviscerated, and inspected by
23 USDA.

Page 25

1     Q.   USDA is not an employee --
2 that's not -- those employees, they are not
3 employees of Equity, they're separate; is
4 that correct?
5     A.   Yes.
6     Q.   Anything -- Any other
7 functions done in first processing?
8     A.   No.
9     Q.   All right. How many shifts
10 are at the plant?
11     A.   Three.
12     Q.   What are those shifts?
13     A.   We have two processing shifts
14 and one sanitation shift.
15     Q.   What is the processing -- The
16 first processing shift, what are the hours
17 for that?
18     A.   Which department?
19     Q.   Is there like a general range?
20 Let me ask you this. If you are an
21 employee, it doesn't matter what department
22 you're in, but, like, first processing
23 shift, is it like -- does it go from a

7 (Pages 22 to 25)

32dfca94-3d46-40ea-bc43-060dcff911ff

## FREEDOM COURT REPORTING

1 certain time to a certain time, but it may
2 vary depending on what department you're in;
3 and then a second shift will start at
4 another time; or is sanitation in between
5 the two shifts? Or how does that work?
6         You said you've got two shifts
7 and a sanitation shift, is that -- is
8 sanitation between the shifts, or is that
9 after the second shift?
10        MR. ROSENTHAL: I'm going to
11 object to the form of the question because
12 I'm not sure -- I think you asked about six
13 questions there.
14        MS. MCGOWAN: I know.
15    Q.    Let me find out: Where is
16 sanitation shift? Is it between the two
17 shifts or is it after the two shifts?
18    A.    After.
19    Q.    Okay. What time does
20 sanitation shift start?
21    A.    When the second shift is
22 complete.
23    Q.    Is there generally a range

1 about when it should start? I know
2 sometimes you run over, but is it -- If you
3 work on sanitation shift, do you have an
4 idea about when you will report to work?
5    A.    They would start cleaning
6 first processing 11:30, twelve o'clock.
7    Q.    And that's p.m.?
8    A.    Yes.
9    Q.    11:30 p.m. If you are an
10 employee working on first shift, what is the
11 first department that begins working on
12 first shift?
13    A.    Live hang.
14    Q.    What would be the time you
15 would start on that shift?
16    A.    5:50.
17    Q.    What is the last department on
18 first shift?
19    A.    Which department?
20    Q.    The last -- Employees that
21 would be the last to leave the plant on
22 first shift?
23    A.    Their shift would end at 4:30.

1    Q.    So first shift runs anywhere
2 from 5:50 to 4:30, if everything operates
3 smoothly?
4    A.    Correct.
5    Q.    What time would second shift
6 begin, if everything's operating smoothly?
7    A.    4:30.
8    Q.    Would that be live hang?
9    A.    That would be deboning.
10    Q.    What departments operate on
11 second shift?
12    A.    Live hang, evisceration,
13 salvage.
14    Q.    The whole plant?
15    A.    The whole plant.
16    Q.    So when would second shift
17 live hang start?
18    A.    2:50 p.m.
19    Q.    Is that the first group of
20 employees that would report to second shift?
21    A.    Yes.
22    Q.    So second shift would range
23 between 2:50 and when? What's the last time

1 an employee would get off on the second
2 shift?
3    A.    When we're through processing
4 birds.
5    Q.    And is there an average time,
6 or a normal time, if everything's running
7 smoothly?
8    A.    Evisceration would get off at
9 eleven o'clock, which would be first
10 processing and deboning, two o'clock in the
11 morning.
12    Q.    So sanitation is doing
13 different departments at 11:30, while you
14 have the last departments of deboning and
15 evisceration operating on the second shift?
16    A.    Sanitation would be cleaning
17 first processing if it is finished, while
18 deboning will continue to operate.
19    Q.    What are the departments as
20 you say -- Let's go from the when the bird
21 enters the plant until it leaves the plant,
22 walk me through the departments. Of course
23 you have live hang.

8 (Pages 26 to 29)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 30

1    A.    You have live hang.
2    Q.    Is that the first department?
3    A.    Yes.
4    Q.    Okay.
5    A.    The next department would be
6  evisceration department, and then there's
7  the salvage department.  We have a paw room
8  department.  And then we have the deboning,
9  pack out, shipping, DSI.
10   Q.    What is DSI?
11   A.    It's a portioning department.
12 It is separate from the deboning department.
13   Q.    Any others?
14   A.    (Witness shakes head in the
15 negative.)
16   Q.    Is DSI before shipping and
17 pack out, in the line or is it -- where is
18 it in the line?
19   A.    It would be before shipping.
20   Q.    How many employees are
21 employed at the fresh plant facility, total,
22 all shifts?
23   A.    I don't know an exact number.

Page 31

1    Q.    Do you know how many employees
2  per shift?
3    A.    I don't know an exact number.
4    Q.    Do you know an approximate
5  number of total employees of all shifts?
6    A.    An approximate number would be
7  thirteen hundred.
8    Q.    That's all three shifts?
9    A.    That would be the two
10 processing shifts.
11   Q.    Approximately how many
12 sanitation shift employees?
13   A.    Eighty-five.
14   Q.    Looking at Exhibit 16, does
15 this accurately reflect the direct reports
16 to you?
17   A.    Yes.
18   Q.    All right.  How many direct
19 reports do you have?
20   A.    Five.
21   Q.    Tell me those.
22   A.    Sharon Bouyer.
23   Q.    Is she production coordinator?

Page 32

1    A.    Yes.
2    Q.    What does she do as production
3  coordinator?
4    A.    She schedules the plant on
5  what products to produce.  Bobby Barnett.
6    Q.    What does he do?
7    A.    Bobby's responsible for first
8  processing, both shifts.
9    Q.    All right.
10   A.    Russel Spivey.
11   Q.    And what does Russel Spivey
12 do?
13   A.    He's responsible for shipping.
14   Q.    All right.
15   A.    James Henderson.
16   Q.    What does James Henderson do?
17   A.    He's responsible for
18 transportation.  And Ricky Lewis.
19   Q.    What does Ricky do?
20   A.    He's responsible for debone
21 and DSI.
22   Q.    So he has dual departments?
23   A.    Yes.

Page 33

1    Q.    Are debone and DSI located
2  near each other?
3    A.    They're in the same building.
4    Q.    I've got a map here.  It's
5  kind of hard to read, but -- And we've
6  previously marked it as exhibit --
7         MR. ROSENTHAL: 22.
8         MS. MCGOWAN: Is it 22?  I
9  can't find the sticker on it.  There it is.
10   Q.    Can you tell me where DSI is,
11 if it's on here?
12   A.    Right here (indicating).
13   Q.    Can you write DSI, or is it
14 already on there?
15        MR. ROSENTHAL: It's already
16 there.
17   Q.    Right there?
18   A.    Yes.
19   Q.    Okay.  And you said it's in
20 the same building.  But debone is in the
21 same building with the rest of the fresh
22 kill or is it in a separate building?
23   A.    What I'm talking about is, we

9 (Pages 30 to 33)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 34

1  separate first processing from second
2  processing with a wall, and it's in the same
3  area.
4      Q.   Okay.  But debone, DSI, and
5  fresh kill are all in the same actual
6  physical building, they're just different
7  departments within the building, so that I'm
8  correct?
9      A.   Yes.
10     Q.   Okay.  All right.  Thanks.
11          In the organizational
12 structure, you have supervisors -- or
13 actually you have managers reporting to you.
14 What's the next level down?
15     A.   Superintendent.
16     Q.   And what does the
17 superintendent do?
18     A.   Responsible for specific
19 departments.
20     Q.   And then under the
21 superintendent, what do you have?
22     A.   Supervisors.
23     Q.   What do the supervisors do?

Page 35

1      A.   They're responsible for a
2  specific line or an area within that
3  department.
4      Q.   How many lines are there?
5      A.   What lines?
6      Q.   Are there different -- Does it
7  vary based on department?
8      A.   Yes.
9      Q.   All right.  And live -- And
10 the first part of the plant, you call that
11 first processing?
12     A.   Yes.
13     Q.   How many lines are in live
14 kill or live hanging?
15     A.   Just one.
16     Q.   Okay.  Then it goes into --
17 Walk me through the plant as chicken goes
18 through and walk me through the lines.
19          It goes from live hang to
20 where?
21     A.   Evisceration.
22     Q.   How many lines are in
23 evisceration?

Page 36

1      A.   Two.
2      Q.   Then it goes to salvage?
3      A.   Salvage is a department within
4  evisceration.
5      Q.   How many lines are in the paw
6  room department?
7      A.   There's no actual lines.  It's
8  where they pack out the paws.
9      Q.   And where does it go from
10 salvage or evisceration?
11     A.   To the chiller.
12     Q.   How many lines are in the
13 chiller?
14     A.   There's no lines.  It's two
15 chillers, water chillers.
16     Q.   Then it goes to where?
17     A.   Deboning.
18     Q.   How many lines are in
19 deboning?
20     A.   What specific lines?
21     Q.   Okay.  Tell me what's in
22 deboning.
23     A.   There's two overhead lines, to

Page 37

1  rehang.
2      Q.   To rehang?
3      A.   Yes.
4      Q.   Then what happens?
5      A.   With what part of the bird?
6      Q.   You tell me.  I want you to
7  describe what goes on as the bird goes
8  through.  I don't know.
9      A.   The bird is halved and the
10 front half drops off to a -- it feeds to the
11 debone line.
12     Q.   Is that a machine that halves
13 them?
14     A.   Yes.
15          There are eight debone lines.
16     Q.   Eight debone lines?
17     A.   Uh-huh.  And the rear half of
18 the bird stays on the line and goes to leg
19 quarter pack out.
20     Q.   How many lines are in the leg
21 quarter pack out?
22     A.   There's five areas for the
23 dark meat to drop off to be packaged.

10 (Pages 34 to 37)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 38

1    Q.    If it doesn't go on the
2  overhead, it stays on -- are there lines
3  that it stays on below?
4          When you say it stays on the
5  overhead, what do you call that in debone?
6  Is that where they put it on the cones or do
7  you use the cones?
8    A.    The birds are rehung out of
9  the chiller on a line.
10   Q.    Okay.  But I'm talking about
11  debone, how is it set up.  Explain that to
12  me.
13          You said there are eight
14  debone lines.
15   A.    The front half is placed on
16  the moving cones.
17   Q.    All right.  And pack out, are
18  there lines there or is it just a belt going
19  through?
20   A.    Again, you're going to have
21  to --
22   Q.    Tell me what's in pack out.
23  Are there departments within pack out?

Page 39

1    A.    Yes.
2    Q.    What departments are within
3  pack out?
4    A.    Leg quarter, wings, tenders.
5    Q.    Is that it?
6    A.    Uh-huh.  Yes.
7    Q.    And leg quarters, are there --
8  How many lines or areas are in leg quarter?
9    A.    Five.
10   Q.    Is it five lines?
11   A.    It's five bagging hoppers.
12   Q.    All right.  What about wings,
13  how many areas?
14   A.    Four.
15   Q.    And what are those?
16   A.    They're bagging hoppers as
17  well.
18   Q.    What about tenders?
19   A.    One belt.
20   Q.    One belt?
21   A.    (Witness nods head in the
22  affirmative.)
23   Q.    Within the plant, what -- is

Page 40

1  it the superintendent or the supervisor
2  that's responsible for editing employees'
3  time on a daily basis?
4    A.    Supervisors.
5    Q.    Supervisors?
6    A.    Uh-huh.
7    Q.    Do you have any responsibility
8  with regards to the editing of the time for
9  employees?
10   A.    I do not edit time sheets.
11   Q.    Do you review the daily time
12  information?
13   A.    No.
14   Q.    Do you review it weekly?
15   A.    No.
16   Q.    Do you review it monthly?
17   A.    No.
18   Q.    Do you review it ever?
19   A.    No.
20   Q.    Who is responsible for
21  reviewing the time information, time sheets
22  for employees?
23   A.    Supervisors.

Page 41

1    Q.    But above the supervisors, is
2  there anyone to look at their raw numbers?
3    A.    Accounting.
4    Q.    Who is head of accounting?
5    A.    Joe Preston.
6    Q.    Do you know how the time
7  system works at your plant?
8    A.    What specific part?
9    Q.    How the employees are paid.
10   A.    Paid off the Kronos system.
11   Q.    An employee comes to work in
12  the morning.  How do they make sure they're
13  accounted for and their time's going to be
14  paid?
15   A.    They need to clock in.
16   Q.    And where do they clock in?
17   A.    Time clocks.
18   Q.    Where are they located?
19   A.    Break rooms.
20   Q.    How many break rooms are
21  there?
22   A.    Three break rooms.  But the
23  time clocks are in deboning and first

11 (Pages 38 to 41)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 42

1  processing.
2      Q.    In the plant or in the break
3  rooms?
4      A.    In the break room.
5      Q.    There's a separate break room
6  for deboning?
7      A.    It's just what we call them.
8  They're in the same hallway.
9      Q.    Can employees use either break
10  room?
11      A.    Yes.
12      Q.    Are employees paid from their
13  punch-in time to their punch-out time?
14      A.    It depends on the employee.
15      Q.    Production line employees, are
16  they paid from punch-in to punch-out?
17      A.    If they are on a scheduled
18  time or clock-in/clock-out, they would be
19  paid from clock-in to clock-out.
20      Q.    What employees are on the
21  clock-in to clock-out?
22      A.    I don't know specifics.  But a
23  lead person could be setting up on a

Page 43

1  clock-in/clock-out.
2      Q.    And any other type jobs that
3  you know of that are on a clock-in to
4  clock-out?
5      A.    I don't know.
6      Q.    Who would know?
7      A.    The supervisors that do the
8  time sheets.
9      Q.    Who determines whether the
10  employee is on a clock-in to clock-out?  Who
11  makes that determination?
12      A.    Specific departments are set
13  up on master cards, but then a supervisor
14  would designate employees to be on a
15  clock-in/clock-out, if they were a setup
16  person or somebody that stayed late.
17      Q.    Are the setup persons or the
18  lead -- are they the same as the lead
19  person?
20      A.    Some of them could be, yes.
21      Q.    Are they covered by the
22  collective bargaining agreement?
23      A.    I don't know the details on

Page 44

1  bargaining agreement.
2      Q.    You don't know which employees
3  are covered?
4      A.    I don't know the specifics of
5  it.  I know there is a bargaining unit, but
6  I don't know the specifics of it.
7      Q.    You don't know what job
8  positions are covered by it?
9      A.    (Witness shakes head in the
10  negative.)
11      Q.    You have to say yes or no.
12      A.    No.  Not without looking at
13  it.
14      Q.    I thought we marked it in.
15  Let me show you what's been marked as
16  Exhibit 12, and that's part of those, which
17  is the union contract that's been provided
18  to us.
19      A.    Uh-huh.
20      Q.    I'm not sure it's all of it.
21  I think it's just parts of it.
22          MS. MCGOWAN:  Or is this the
23  whole thing, this one?

Page 45

1          MR. ROSENTHAL:  This is just
2  an excerpt.  This is the 2004 to 2008
3  contract.
4          MS. MCGOWAN:  I'm sorry.  Do
5  we have that one in?
6          MR. ROSENTHAL:  It was
7  produced.  I don't know if it was marked.
8      Q.    Well, do you know whether or
9  not the bargaining unit changed from the
10  2004 to the 2008 agreement?
11          MR. ROSENTHAL:  First, you
12  have to answer that question.  Do you know
13  whether there's been any changes in the
14  unit?
15      A.    There was changes in the pay.
16      Q.    I'm saying the unit.
17      A.    I don't know.
18      Q.    You don't know if people were
19  added or taken away from it?
20      A.    I don't know.
21      Q.    Okay.  Let me show you what
22  was previously marked in a deposition for
23  Jackie Davis as Defendant's Exhibit 4, and

12 (Pages 42 to 45)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 46

1  that is the current union contract. And
2  take a look at the coverage of the
3  bargaining unit and compare it and see if
4  there have been any changes, please, sir.
5      A.    (Witness complies.) There
6  hasn't been any changes.
7      Q.    You said you knew there was
8  changes to the pay. How did you know that?
9      A.    Because I reviewed those with
10 my supervisors.
11     Q.    Who's your supervisor?
12     A.    With my supervisors.
13     Q.    You reviewed them with your
14 supervisors?
15     A.    Uh-huh.
16     Q.    Who asked you to review it
17 with your supervisors?
18     A.    I don't recall if anyone asked
19 me to.
20     Q.    How did you learn that there
21 were changes to the pay?
22     A.    Because I knew that there was
23 a new contract negotiation, and I knew that

Page 47

1  it was supposed to change in March of this
2  year.
3      Q.    Okay. But how did you learn
4  of the actual changes?
5      A.    I don't recall if it was
6  verbally or a piece of paper. I don't
7  remember how it was told.
8      Q.    What did you learn were the
9  changes?
10     A.    There was an increase in the
11 starting wage rate.
12     Q.    What else?
13     A.    There was some changes in the
14 amount of supplies that were going to be
15 given to the employees.
16     Q.    Anything else that you went
17 over with your supervisors?
18     A.    I don't recall to the extent
19 of what all we went over.
20     Q.    Did you make notes?
21     A.    I don't recall making any
22 notes.
23     Q.    Did you have -- given them a

Page 48

1  handout about these are the new changes?
2      A.    Yeah. I had a signed copy of
3  the document.
4      Q.    Of the contract?
5      A.    Yeah. Yes.
6      Q.    Did you, like, have a sheet --
7  like, in addition to the contract saying:
8  Here are the changes to this contract, or
9  did you just give them all the new contract?
10     A.    I covered just what I thought
11 was necessary for them to cover -- them to
12 know about the contract, the supply changes
13 and the wage rate changes.
14     Q.    Okay. Anything else you
15 recall covering with them?
16     A.    Not that I recall.
17     Q.    Did you go over anything about
18 paying for donning and doffing?
19     A.    No.
20     Q.    Or time keeping?
21     A.    Not that I remember.
22     Q.    Can I get that one back,
23 please?

Page 49

1      A.    Uh-huh.
2      Q.    Are you aware of any other job
3  positions that are paid from clock-in to
4  clock-out other than maybe a lead person or
5  setup person?
6      A.    Not that I'm aware of.
7      Q.    Is there any reason why all
8  employees can't be paid from clock-in to
9  clock-out?
10     A.    Yes.
11     Q.    What is that reason?
12     A.    We pay them on line time.
13     Q.    But if you didn't use line
14 time, is there any reason that would
15 prohibit Equity from paying from clock-in to
16 clock-out?
17     A.    You have to keep a handle on
18 employees. If you paid them clock-in to
19 clock-out, some of them would maybe sitting
20 in the break room or out in their car, not
21 actually working.
22     Q.    You could write them up or
23 fire them if they weren't working, couldn't

13 (Pages 46 to 49)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 50

1 you?
2          MR. ROSENTHAL:  Objection to
3 the form of the question.  You're arguing
4 with the witness.  He answered your first
5 question.
6     Q.    Could you discipline them if
7 they were not working?
8          Let me make this -- restart
9 this.
10          If an employee is not working,
11 could you take disciplinary action against
12 them?
13    A.    At what time?
14    Q.    At any time.
15    A.    Repeat the question.
16    Q.    If an employee is not working,
17 can you take disciplinary action against
18 them?
19          MR. ROSENTHAL:  Object to the
20 form of the question.  You can answer if you
21 can.
22          MS. MCGOWAN:  What's wrong
23 with the form that question?

Page 51

1          MR. ROSENTHAL:  Any time means
2 twenty-four hours a day.  You're not
3 limiting it to reasons why this witness is
4 here, and you're not being specific.  He's
5 already said to you what time of day is it?
6          MS. MCGOWAN:  No.  And I
7 repeated the question.  I said if an
8 employee is not working, can you discipline
9 the employee?
10          MR. ROSENTHAL:  And I
11 objected.
12          MS. MCGOWAN:  There's nothing
13 about any time in that question.
14     Q.    If you have an employee that's
15 not working, can you take disciplinary
16 action against that employee?
17          MR. ROSENTHAL:  Are you
18 limiting it to after he's clocked in or
19 before he's clocked in?
20     Q.    After an employee clocks in,
21 if he's not working, can you take
22 disciplinary action against that employee?
23     A.    If they're not performing

Page 52

1 their job function on the floor, on their
2 job, if they're not performing their job, if
3 they leave the line without telling their
4 supervisor, and they come up abandoned their
5 job, yes, you can take disciplinary action.
6     Q.    All right.  If an employee is
7 doing things on their break time, when
8 they're away from the line, they're in
9 violation of company policy.  Can you
10 discipline that employee?
11          MR. ROSENTHAL:  Objection to
12 the form of the question.
13     Q.    You can answer.
14     A.    The thirty-minute break time
15 is their time.
16     Q.    During the thirty-minute break
17 time, do employees have to abide by company
18 policies?
19          MR. ROSENTHAL:  Objection to
20 the form of the question.
21     Q.    Conduct policies?
22          MR. ROSENTHAL:  Objection to
23 the form of the question.  You can answer if

Page 53

1 you can.
2     Q.    You can answer.
3     A.    Which policies?
4     Q.    Any conduct policies.
5     A.    What specific policies?
6     Q.    Can an employee drink during
7 their break time?
8     A.    Drink what?
9     Q.    Alcohol.
10     A.    No.
11     Q.    If an employee was drinking
12 alcohol during their break time, could you
13 discipline them?
14     A.    Alcoholic beverages are not
15 allowed on the company property.
16     Q.    My question is, if an employee
17 is drinking alcohol during their break time,
18 could you take disciplinary action against
19 them?
20     A.    I would take them to HR, yes.
21     Q.    An HR person --
22     A.    Yes.
23     Q.    -- does the discipline?

14 (Pages 50 to 53)

FREEDOM COURT REPORTING

Page 54

1    A.    Yes.
2    Q.    If an employee wears their PPE
3  out into the parking lot, can you discipline
4  them?
5         MR. ROSENTHAL:  Objection to
6  the form of the question.
7    Q.    If an employee wears any of
8  their PPE out into the parking lot during
9  their break, can you discipline them?
10         MR. ROSENTHAL:  Objection to
11  the form of the question.  You can answer if
12  you can.
13    Q.    He's not answering, you are.
14  The question is to you.  Can you --
15    A.    I know.
16    Q.    Can you answer that question?
17    A.    The employees are not allowed
18  to wear their equipment outside the
19  building.
20    Q.    If an employee does wear their
21  equipment outside of the building, can you
22  write them up?
23    A.    We would take the progressive

Page 55

1  discipline with them.
2    Q.    So you can discipline them;
3  correct?
4    A.    If they wear their hair net --
5  Personal protective equipment, to me, would
6  be an arm guard or a chained glove.
7    Q.    If an employee wears their
8  hair net out into the parking lot, can you
9  discipline them?
10    A.    We ask them to take it off.
11  And we would take the progressive discipline
12  and continue.
13    Q.    So you have control of the
14  employees through the progressive discipline
15  policy, if they're violating any of your
16  work rules or policies; is that correct?
17    A.    Repeat the question.
18    Q.    Equity Foods has control of
19  employees through the progressive
20  disciplining policy, if an employee violates
21  policies or work rules?
22    A.    Yes.
23    Q.    All right.  Any other reason,

Page 56

1  other than you wouldn't have control of
2  employees, that Equity could not pay
3  employees from punch-in to punch-out time?
4    A.    I don't understand the
5  question.
6    Q.    I asked you previously why
7  Equity -- was there any reason why Equity
8  couldn't pay employees from punch-in to
9  punch-out time, and you stated, well, you
10  couldn't keep control of the employees.
11  They may go out in the parking lot and not
12  work.
13         Is there any other reason why
14  Equity could not pay employees from their
15  punch-in or punch-out time or clock-in to
16  clock-out as you call it?
17    A.    Employees are set up on
18  specific departments, and they're paid
19  according to the pay scale and how that's
20  set up with accounting, so that's how
21  they're paid.
22    Q.    All right.  But could
23  accounting decide that they're going to set

Page 57

1  up debone employees to pay them from
2  clock-in to clock-out time?
3         MR. ROSENTHAL:  Objection to
4  the form of the question.  You can answer.
5    A.    No.
6    Q.    And why not?
7    A.    Because we set those rules.
8    Q.    Who sets those rules?
9    A.    We, as a company, set those
10  rules.
11    Q.    Okay.  Could the company
12  decide to change those rules and pay from
13  clock-in to clock-out time?
14         MR. ROSENTHAL:  Objection to
15  the form of the question.  You can answer.
16    A.    I don't know.
17    Q.    Who would have that authority
18  to change those rules?
19    A.    General manager.
20    Q.    And who is that?
21    A.    Tim Esslinger.
22    Q.    Who would have a list of all
23  the employees that are paid at your plant

15 (Pages 54 to 57)

FREEDOM COURT REPORTING

Page 58

1  from clock-in to clock-out?
2      A.    I don't know.  Not specific
3  employees names, I don't know.
4      Q.    Or departments?
5      A.    Accounting would have that.
6      Q.    In the morning when an
7  employee arrives to start a shift as a
8  processing employee, do they report to the
9  same position every day?
10     A.    Generally, yes.
11     Q.    What do you mean by generally
12  yes?
13     A.    They would report to the same
14  department, but within that department if
15  employees were absent, after we got
16  everything going, employees may be asked to
17  move to a different position on the line.
18     Q.    Are employees rotated on the
19  line on a daily basis?
20     A.    Which department?
21     Q.    In any of the processing
22  departments.
23     A.    Yes.

Page 59

1      Q.    Who makes the decision of
2  where they'll be working on the line that
3  day?
4      A.    Supervisors.
5      Q.    Why are employees rotated?
6      A.    We rotate them to try to take
7  care of them where they don't do the same --
8  use the same motion all the time.
9      Q.    Is it to cut down on injuries?
10     A.    It's to cut down on ergonomic
11  issues with the employees, try to take care
12  of them.
13     Q.    Like carpal tunnel syndrome?
14     A.    Yes.
15     Q.    And worker compensation claims
16  for the same?
17     A.    Cut down on carpal tunnel.
18     Q.    Do the employees rotate
19  throughout the day or is it just at the
20  beginning of the shift?
21     A.    I'm not that familiar with the
22  rotation schedules because I don't do those
23  every day.  I'm not that close to them.

Page 60

1      Q.    Who would know that?
2      A.    Supervisors.
3      Q.    If some of the employees
4  testified that they rotated when they came
5  back from shifts -- their two unpaid breaks,
6  would you dispute that testimony?
7          MR. ROSENTHAL:  Objection to
8  the form of the question.
9      Q.    You can answer.
10     A.    First off, an employee
11  wouldn't work two shifts.
12     Q.    I'm talking about -- Let me
13  back up.  Employees are entitled to two
14  thirty-minute unpaid breaks per shift; is
15  that correct?
16     A.    Correct.
17     Q.    All right.  And if an
18  employee -- If some of the employees have
19  previously testified in this case that when
20  they returned from their two thirty-minute
21  unpaid breaks, they were rotated to
22  different locations on the line, would you
23  have any reason to dispute that testimony?

Page 61

1          MR. ROSENTHAL:  Objection to
2  the form of the question and to the premise.
3  You can answer.
4      A.    I don't know.
5      Q.    Do you know of any policy or
6  written document that would dispute that
7  testimony?
8          MR. ROSENTHAL:  Objection to
9  the form of the question.  You can answer as
10  to any documents you're aware of.
11     A.    I don't know if there's a
12  document.
13     Q.    Are there any written
14  documents as to when employees are supposed
15  to be rotated?
16     A.    I don't know.
17     Q.    Who would know?
18     A.    I don't know.
19     Q.    Do you instruct the
20  supervisors to rotate the employees?
21     A.    I do not instruct them to
22  rotate employees.
23     Q.    Who does?

16  (Pages 58 to 61)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 62

1    A.    Superintendent would handle
2  all the job rotations.
3    Q.    Who lets the superintendent
4  know that they should instruct the
5  supervisors to rotate employees?
6    A.    I'm not involved in rotations.
7    Q.    Who would be involved in that?
8    A.    The superintendent and
9  supervisors would be involved in job
10  rotations.
11    Q.    But you're over the
12  superintendents?
13    A.    The processing managers report
14  to me.
15    Q.    So would the processing
16  managers be the person telling the
17  superintendents to make sure the employees
18  are being rotated?
19    A.    I don't get involved in
20  rotations.
21    Q.    I'm trying to find out who
22  does, other than the superintendent and
23  supervisors.

Page 63

1    A.    As far as I know the
2  supervisors handle the rotations.
3    Q.    Is there anybody above them
4  making sure that the superintendent and
5  supervisors are handling the rotations?
6    A.    There is an ergonomics team
7  that evaluates rotation sheets.
8    Q.    Rotation sheets?  What are
9  those?
10    A.    They audit them for proper
11  rotation.
12    Q.    What is a rotation sheet?
13    A.    I don't know.
14    Q.    Have you ever seen one?
15    A.    No.
16    Q.    Who maintains rotation sheets?
17    A.    I don't know.
18    Q.    Are these something that are
19  kept at the plant?
20    A.    I don't know where they're
21  kept.
22    Q.    How do you know about rotation
23  sheets?

Page 64

1    A.    Because I've -- They're
2  covered with the ergonomics safety team.
3  They cover them in a monthly meeting.  They
4  review them and they were done.
5    Q.    Who's on the ergonomics team?
6    A.    Bobby Barnett is the team
7  leader, and I'm not sure who's on the team.
8    Q.    What's Bobby Barnett's job?
9    A.    First processing manager.
10    Q.    Do you attend these monthly
11  safety meetings?
12    A.    I do.
13    Q.    All right.  Who else attends
14  them?
15    A.    Other managers.
16    Q.    Tell me who.
17    A.    Tim Esslinger, Jim Bice.
18    Q.    What's Jim Bice's title?
19    A.    Complex HR manager.  Butch
20  White.
21    Q.    Who's Butch White?
22    A.    Complex QA manager.
23    Q.    Who else?

Page 65

1    A.    Bobby Barnett.
2    Q.    He's the first and second
3  shift processing manager?
4    A.    He's first processing manager.
5    Q.    Okay.
6    A.    Ricky Lewis.
7    Q.    Who's Ricky Lewis?
8    A.    Processing manager for debone
9  and DSI.
10    Q.    All right.  Who else?
11    A.    Ken Edwards.
12    Q.    Who's Ken Edwards?
13    A.    Live operations manager.
14    Q.    Who else?
15    A.    Mike Cortner.
16    Q.    Mike who?
17    A.    Cortner.
18    Q.    What's his title?
19    A.    Further processing manager.
20    Q.    Who else?
21    A.    Robin Jones.
22    Q.    Who's Robin Jones?
23    A.    The administrative assistant.

17 (Pages 62 to 65)

FREEDOM COURT REPORTING

Page 66

1    Q.    To whom?
2    A.    Tim.
3    Q.    Who else?
4    A.    Carldon Grant, C-A-R-L-D-O-N,
5    Grant.
6    Q.    What is Carldon Grant's title?
7    A.    Live haul manager.  Billy
8    Kelly.
9    Q.    Who's Billy Kelly?
10   A.    Maintenance manager.  Terrence
11   Skinner.
12   Q.    Who's Terrence Skinner?
13   A.    He's the maintenance manager
14   as well.
15   Q.    Both are maintenance managers?
16   A.    Uh-huh.
17   Q.    Do they have different areas?
18   A.    Billy's in charge of further
19   plant, Terrence is in charge of fresh plant.
20   Q.    Anyone else?
21   A.    Reb Bludsworth.
22   Q.    Who?
23   A.    Reb Bludsworth.

Page 67

1    Q.    R-E-B?
2    A.    Uh-huh.
3    Q.    Bludsworth?
4    A.    B-L-U-D-S-W-O-R-T-H.
5    Q.    Who is that?
6    A.    Complex maintenance manager.
7    Q.    Anyone else?
8    A.    Harry Wilson, safety manager.
9    Q.    Anyone else?
10   A.    Jeanette Anglin.
11   Q.    Jeanette who?
12   A.    Anglin, A-N-G-L-I-N.
13   Q.    What's Jeanette's title?
14   A.    She's in charge of -- She's
15   the nurse.  She's head of all the -- I'm not
16   sure of her exact title.
17   Q.    Over all the plants?
18   A.    Yes.
19   Q.    Anyone else attend this
20   monthly meeting?
21   A.    There are some others from
22   other departments, but I don't recall their
23   names.

Page 68

1    Q.    Other than the ergonomic
2    reports or the rotation sheets, what else is
3    discussed in these monthly safety meetings?
4    A.    On-the-job, off-the-job
5    safety, safety audits, the first response,
6    and safety statistics.
7    Q.    When you say on-the-job,
8    off-the-job safety, what do you mean by
9    that?
10   A.    There are committees that do
11   different things to promote on-the-job
12   safety and off-the-job safety when people go
13   home.
14   Q.    When you're talking about
15   off-the-job safety, you mean from the time
16   they clock out until they leave the
17   facility?
18   A.    When they go home.
19   Q.    Like leave -- Like at their
20   home?
21   A.    At their home.
22   Q.    What area?
23   A.    We talk about topics depending

Page 69

1    on the season, could be heat-related safety
2    or swimming safety or boating safety, things
3    like that.
4    Q.    What are safety audits?
5    A.    Safety audits are performed by
6    supervisors and managers in a plant.
7    Q.    What are they auditing?
8    A.    Auditing the unsafe acts and
9    conditions of the plant, whether it's a
10   person doing something that's unsafe or
11   there's an unsafe condition in the plant.
12   Q.    What about first response,
13   what is that?
14   A.    They are made up of the HAZMAT
15   team.  So they go over what they've done for
16   the month, the previous month, and what
17   they've got in store for the next month.
18   Q.    Do you have monthly safety
19   meetings with the employees?
20   A.    I do not.
21   Q.    Does someone at the plant?
22   A.    Supervisors.
23   Q.    When are these held?

18 (Pages 66 to 69)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 70

1     A.    During operations.
2     Q.    What are safety statistics?
3     A.    Cover hours worked, cover any
4  accidents that may have happened for the
5  previous month, and look at recordables and
6  frequency rate.
7     Q.    Do you look at lost time?
8     A.    If there has been one, yes.
9     Q.    These rotation sheets, do they
10 give those out or a report from those
11 rotation sheets in these meetings?
12    A.    No.  They don't give those
13 out.
14    Q.    Do they give you a summary of
15 them?
16    A.    They give a summary of what's
17 been audited.
18    Q.    Do you know how often the
19 rotation sheets are completed?
20    A.    I do not.
21    Q.    Is it something that's done
22 daily or weekly by a supervisor?
23    A.    I don't look at them, so I

Page 71

1  don't know.
2     Q.    Anything else discussed in the
3  monthly meetings, safety meetings?
4     A.    Transportation.
5     Q.    With regards to?
6     A.    Just hours driven -- I'm sorry
7  miles driven and reviewing accidents.
8     Q.    Is that delivering the
9  product?
10    A.    No.  That would be delivering
11 feed or delivering live birds to the plant.
12    Q.    Where are your live birds
13 maintained?  Is that an operation by Equity,
14 or do you purchase them from farmers, or how
15 do you get your live birds?
16    A.    They're -- Contract growers
17 raise the birds.
18    Q.    Anything else discussed in
19 these safety meetings?
20    A.    There's a wellness committee.
21    Q.    What does the wellness
22 committee do?
23    A.    They have a monthly topic that

Page 72

1  they post on the bulletin board.  That's
2  just to try to help employees, whether it be
3  monitoring high blood pressure, things like
4  that.  I don't remember.
5     Q.    Can you recall anything else
6  we haven't already discussed?
7     A.    There's some other issues
8  discussed on the refrigeration side, but I
9  don't know exactly what they are.
10    Q.    Other than the rotation
11 sheets, are you aware of any other
12 documentation that would reflect the actual
13 rotation of the employees on the production
14 line?
15    A.    I'm not.
16    Q.    Would an employee's time
17 records reflect where they were actually
18 working?
19    A.    It would reflect the -- It
20 would reflect the department that they were
21 charged to; it would not reflect where they
22 were actually working.
23    Q.    Okay.  Are the employees

Page 73

1  rotated within the department that they're
2  assigned to, or are they moved to other
3  departments, if you know?
4     A.    They would be rotated within
5  the deboning department.
6     Q.    Any other department rotate?
7     A.    Evisceration, I believe.
8  Evisceration.
9     Q.    Are they the only two
10 departments, to your knowledge, that rotate
11 employees?
12    A.    As far as I'm aware, they are.
13    Q.    What are the policies of
14 Equity -- of Equity Group regarding personal
15 identification cards or clock-in cards for
16 your employees?  What are their requirements
17 with regards to when they report to work?
18       MR. ROSENTHAL:  Objection to
19 the form.  Several questions.  You can
20 answer if you can.
21    A.    You are going to have to get
22 more specific.
23    Q.    Do all employees have a

19 (Pages 70 to 73)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 74

1  personal identification card or an ID card
2  or badge?  How do they clock in?
3      A.    They have an employee badge.
4      Q.    What do they do with this
5  employee badge?
6      A.    They're supposed to use it to
7  clock in and clock out.
8      Q.    Is it used for anything else?
9      A.    To purchase their supplies.
10     Q.    Does it have a picture of them
11 on it?  What does it look like?
12     A.    Yes.
13     Q.    Yes, it has a picture?
14     A.    It has a picture.
15     Q.    Do they have to use it to
16 enter the plant?
17     A.    No.
18     Q.    Okay.  So are there any rules
19 with regards to when they can clock in?
20     A.    No.
21     Q.    Do you have like a ten-minute
22 rule, like they shouldn't clock ten
23 minutes before their shift or anything like

Page 75

1  that?
2      A.    No.
3      Q.    Is there anything that
4  prohibits Equity Food from establishing a
5  policy of when an employee can clock in?
6          MR. ROSENTHAL:  Objection to
7  the form of the question.  You can answer.
8      A.    Repeat the question.
9      Q.    Is there anything that
10 prohibits Equity Food from establishing a
11 policy of when an employee -- how soon an
12 employee can clock in before their shift
13 begins?
14         MR. ROSENTHAL:  Same
15 objection.  You can answer.
16     A.    I don't recall anything that
17 prohibits.  I -- I'm not -- I don't know.
18     Q.    Have you ever been in any
19 meetings where there have been any
20 discussions about establishing a policy with
21 regards to the time length before an
22 employee can check in?
23     A.    No.

Page 76

1      Q.    If an employee is assigned to
2  work on the evisc line, what time would it
3  start on first shift, that department?  In
4  the evisc department -- What time does the
5  first shift of the evisc department start?
6      A.    The live hang department
7  starts at ten till, and as the birds travel
8  through the process, it comes to eviscerate.
9      Q.    What's the first station after
10 the birds -- Is the chiller in that evisc
11 department or is it outside?
12     A.    It's the last stage of that
13 department.
14     Q.    What is the first position
15 outside of the chiller on the line?
16     A.    Which direction?
17     Q.    Is there more than one
18 direction?
19         MR. ROSENTHAL:  Both sides of
20 the chiller.
21     Q.    After you leave the chiller,
22 as the bird goes through the process, what's
23 the first position after?  Is it the chiller

Page 77

1  hanger?
2      A.    Rehang.
3      Q.    Rehang.  What department is
4  that in?
5      A.    It's in deboning.  But it is
6  rehang within the debone department.
7      Q.    What time does the person
8  working on the rehang in the debone have to
9  report to work on first shift?
10     A.    7:30.
11     Q.    Is that when that department
12 starts?
13     A.    When the workload gets there.
14 Depending on how the production is running.
15 If we have a breakdown, or something, the
16 workload may not get there.
17     Q.    Is that what time it's
18 scheduled to start?
19     A.    Scheduled time to start is
20 7:30.
21     Q.    Are people working as
22 rehangers in the debone department paid on
23 scheduled time or line time?

20 (Pages 74 to 77)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 78

1    A.    It should be a line time.
2    Q.    How does that operate?
3    A.    They are -- The master card of
4    the line time is swiped at the end of the
5    shift when the work is complete.
6    Q.    What about at the beginning of
7    the shift, how do they start it?
8    A.    The employees, they swipe in
9    whenever they get ready, as long as it's
10   before 7:30.
11   Q.    What if an employee swipes in
12   at 7:31, what happens?
13   A.    They would be late.
14   Q.    Are they deducted that one
15   minute of pay?
16   A.    I don't do the time sheets,
17   so --
18   Q.    Do you know, if an employee
19   swipes in after 7:30, are they paid from
20   7:30 or are they paid from when they swipe
21   in?
22   A.    If you were late, you'd be
23   paid from when you clock in.

Page 79

1    Q.    If an employee swipes in
2    before -- clocks in before 7:30, are they
3    paid from their clock in or are they paid
4    from the scheduled time of 7:30?
5    A.    It depends on how it's set up.
6    It depends on what department you're working
7    in.
8    Q.    What department --
9    A.    If you're scheduled to -- If
10   you're on a schedule, you could be paid from
11   that time until you clock out; but on line
12   time, it would be start and stop.
13   Q.    For the whole department?
14   When you say there would be start and stop,
15   what do you mean?
16   A.    There would be a master card
17   swiped at the end of that shift.
18   Q.    I'm focusing on the beginning.
19   A.    The employees clock in.
20   Q.    So employees are paid from
21   their clock-in time until the master card is
22   swiped at the end, if you're working on the
23   production line?

Page 80

1    A.    Not all employees.
2    Q.    Which employees are paid from
3    when they clock in until the master card is
4    swiped on the production line?
5    A.    Employees that are on the
6    master card time are paid from the scheduled
7    start time of that department.
8    Q.    Does each department have a
9    scheduled start time?
10   A.    The debone department starts
11   up at 7:30.
12   Q.    Are all -- The whole
13   department starts -- I think you said there
14   are different positions within the debone
15   department.  Does the whole -- Do all the
16   positions start at 7:30?  Is that the
17   scheduled start time?
18   A.    Yes.
19   Q.    What positions are within
20   debone department?  I know we've talked
21   about the rehangers, the chiller rehangers.
22   What other positions?
23   A.    For a deboning line?

Page 81

1    Q.    For the debone department.
2    I'm talking about the whole department, what
3    positions are there?
4    A.    There's a cone loader, there's
5    a shoulder cutter, breast inspector, tender
6    scorer.
7    Q.    Scorer, like you're scoring
8    something?
9    A.    Uh-huh.  Tender puller.
10   Q.    We've got a chiller rehanger,
11   a cone loader, a shoulder cutter, a breast
12   inspector, a tender scorer, a tender puller?
13   A.    There would be a line lead.
14   Q.    What's a line lead?
15   A.    They would --
16   Q.    Are they like a floor person?
17   A.    Well, you'd have floor persons
18   in the department, but they help take care
19   of the line, take care of the employees on
20   the line, relieve them to go to the
21   bathrooms, get their knives and scissors out
22   for them.
23        Then there's a skinner

21 (Pages 78 to 81)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 82

1  operator.
2      Q.    Anybody else in debone?
3      A.    There's some pallet jack
4  operators. That would be it for the
5  deboning line.
6      Q.    And everybody in that whole
7  department, their scheduled start time is
8  7:30?
9      A.    Yes.
10     Q.    Okay. And they're paid until
11 the master card is swiped at the end of the
12 shift? They go by the master card swipe;
13 correct?
14     A.    Correct. Yes.
15     Q.    Okay. And then at the
16 beginning of the shift, they're paid from
17 the scheduled time to start?
18     A.    From 7:30.
19     Q.    At 7:30.
20     MS. MCGOWAN: Let's take a
21 quick break.
22     (Recess taken.)
23     MS. MCGOWAN: We're back on

Page 83

1  the Record.
2      Q.    (BY MS. MCGOWAN:) Before we
3  left, we were talking about rotating
4  employees. In your meetings, the safety
5  meetings, do they -- you said they talk
6  about auditing the rotation sheets. Is
7  there anything else discussed with regards
8  to how the employees are rotated, other than
9  just the audit of the sheets?
10     A.    Not that I recall.
11     Q.    If you work in the debone
12 department, what are you required -- the
13 employees required to actually wear into the
14 department?
15     MR. ROSENTHAL: Objection to
16 the form of the question. You can answer.
17     A.    Which department?
18     Q.    Debone. Is that one
19 department?
20     A.    There's goings on in that room
21 we call the deboning, but there's other
22 goings on in there.
23     Q.    What other building?

Page 84

1      A.    There's pack out, wings,
2  tenders, those kind of things. But
3  employees need to wear -- Did you say --
4  repeat the question again.
5      Q.    What are employees required to
6  wear in the debone department?
7      A.    To go in, you need to put your
8  hair net on; beard net if you have facial
9  hair; ear plugs; a smock.
10     Q.    Anything else?
11     A.    That's to go in the -- To get
12 inside the debone area: Put your hair net
13 on, beard net on, ear plugs on, and go in
14 and put your smock on.
15     Q.    Is that a policy of Equity,
16 that you have to do that to go into the
17 area?
18     A.    Policy to?
19     Q.    You said, to go in the debone
20 area, you have to put your hair net, your
21 beard net, and ear plugs on, and then put
22 your smock on when you get in.
23     A.    Yes.

Page 85

1      Q.    Is that a written policy?
2      A.    I'm not sure if it's a written
3  policy.
4      Q.    Is it a company policy?
5      A.    It's a company policy.
6      Q.    Why does the company have that
7  policy?
8      A.    We had a lot of trouble
9  with -- The reason you put your smock on in
10 the room is because we had a lot of
11 employees going into the bathrooms with
12 their smocks on, and that's -- you can't do
13 that as far as USDA. All that's USDA
14 policies.
15     Q.    Can they wear their hair nets
16 into the rest room?
17     A.    No. They must take those off.
18 You can wear them outside the production
19 area into the break room. They must take
20 those off before they go in the bathroom,
21 hair nets and beard nets.
22     Q.    Can they wear ear plugs into
23 the rest room?

22 (Pages 82 to 85)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 86

1    A.    Most of them have them around
2  their neck.  They don't have them in their
3  ear, but around their neck.
4         They can wear their boots in
5  there as well.
6    Q.    Do they have to have boots on
7  to go on the production floor?
8    A.    Yes.
9    Q.    What does an employee have to
10 have on to go onto the production floor in
11 addition to -- Well, you said debone.  Is
12 debone considered the production floor?
13   A.    Yes.
14   Q.    So let's go over what an
15 employee must have on to go onto the
16 production floor.  You have to have a hair
17 net?
18   A.    Yes.
19   Q.    Beard net?
20   A.    Yes.
21   Q.    Ear plugs?
22   A.    Yes.
23   Q.    Boots?

Page 87

1    A.    Yes.
2    Q.    Anything else?
3    A.    No.
4    Q.    And once they get on to the
5  production floor, they put their smock on?
6    A.    Yes.
7    Q.    All right.  How many doors are
8  there on to the production floor?  Is there
9  one door or several doors?
10   A.    Are you talking about just the
11 deboning floor?
12   Q.    For the employees that --
13 let's start debone because that's a separate
14 department; right?
15   A.    Employees can go in different
16 entrances.
17   Q.    How many are there?
18   A.    There's three in the main
19 hallway.
20   Q.    The main hallway of debone
21 area?
22   A.    Uh-huh.
23   Q.    All right.  Where do the

Page 88

1  employees put on the smock once they enter
2  the production area?  Is there a certain
3  place they have to put the smock on?
4    A.    No.
5    Q.    Could you walk to the line
6  without it on?  Could you go up to the
7  tender line without a smock on?
8    A.    They put it on right inside
9  the door, there.
10   Q.    So they have to put it on once
11 they get right inside the door --
12   A.    Yeah.
13   Q.    -- the smock?
14         When I say it, they have to
15 put the smock on right when they come in the
16 door?
17   A.    When they get in the
18 production area, they put on their smock.
19   Q.    Is it one door right in or is
20 it double doors?
21   A.    There's double doors.
22   Q.    All right.  What do they do --
23 Are there any wash basins?  Do they have to

Page 89

1  wash when they come on the floor, or what do
2  they have to do before they put their smock
3  on?
4         MR. ROSENTHAL:  Object to the
5  form of the question.  You can answer.
6    Q.    If anything?
7    A.    There's hand wash stations
8  available.
9    Q.    All right.  If you are an
10 employee that worked on the tender puller
11 line, what would you do at the beginning of
12 the shift, once you start going into the
13 production area?  Tell me what an employee
14 would do.
15        MR. ROSENTHAL:  Objection to
16 the form of the question, but you can
17 answer.
18   Q.    With regards to this equipment
19 or these required items.
20   A.    After I got my supplies as I
21 was going to the production area, I'd put
22 on my hair net, beard net, ear plugs, have
23 my boots on, go through the foot sanitizers,

23  (Pages 86 to 89)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 90

1  continue on in, put my smock on, and wash my
2  hands, and head to the line.
3       Q.    Where is the foot sanitizer?
4       A.    In the floor, it sprays across
5  the floor entrance going into the production
6  area.
7       Q.    Is that in -- When you're
8  talking about the double doors, where would
9  it be with regard to the double doors?
10      A.    It would spray across the
11 threshold of the doors.
12      Q.    The first set or the second
13 set? Which doors?
14      A.    That would be my question to
15 you, which doors are you talking about?
16      Q.    Is it different? Do all the
17 doors have a foot sprayer?
18      A.    Where employees go through
19 production line, yes.
20      Q.    All right. How many doors are
21 there with the foot sprayers where employees
22 go to the production line?
23      A.    For --

Page 91

1       Q.    In the whole plant or just
2  debone? When you say four, what area?
3       A.    I say for --
4       Q.    For.
5       A.    For which area?
6       Q.    For deboning.
7       A.    For just deboning?
8       Q.    Yes.
9       A.    There would be three.
10      Q.    Three. But you said --
11 Earlier did you say there was four areas
12 where you could come into debone, or did you
13 tell me there was three?
14      A.    There was four areas -- Four
15 sanitizers, and the other one would be over
16 on evisceration side by live hang and the
17 rehang area, that way.
18      Q.    That's for the whole deboning
19 area or for the whole plant?
20      A.    That would be for the plant.
21 Generally, those deboning employees would go
22 through those three doors.
23      Q.    Okay. So for the whole plant,

Page 92

1  there are four area doors that have the
2  sanitizers that production employees can go
3  through?
4       A.    Yes.
5       Q.    Okay. Do all employees have
6  to wear the boots and go through the
7  sanitizers, production employees?
8       A.    Yes.
9       Q.    Can employees wear their boots
10 from home?
11      A.    Yes.
12      Q.    Do you ever observe employees
13 in the morning -- or maybe not the morning,
14 but the beginning of their shift reporting
15 to work and putting on their required items?
16      A.    I don't understand the
17 question.
18      Q.    Do you ever watch them?
19      A.    Do what?
20      Q.    Do you watch the employees
21 when they come into work at the beginning of
22 their shift when they're putting on these
23 required items?

Page 93

1       A.    No, I don't. I don't,
2  generally. I don't sit there and watch them
3  put on stuff, no, I don't.
4       Q.    Okay. Once an employee --
5  Where -- Do each of the four entrances have
6  the double-door thing that we talked about
7  that one of the debone areas have, or do any
8  of them go straight on to the production
9  floor?
10      A.    Are you talking about the foot
11 sanitizer?
12      Q.    Is the foot sanitizer on the
13 outside of the production door, or is it on
14 the inside?
15            And maybe I'm not making it
16 clear. You've talked about there being
17 double doors or double areas.
18      A.    Right.
19      Q.    Explain that. Is it like a
20 door where you go through and there's a
21 little area where you go through the foot
22 sanitizers, then you go through another door
23 to get to the production floor? Is that

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 94

1  what you're saying?
2      A.    You would go through the
3  double doors, and then there's -- there's
4  different setups for the different doors.
5      Q.    Okay.  That's what I'm trying
6  to find out.
7      A.    For the deboning area
8  production floor, there's a set of double
9  doors.  And when you go through that double
10  set, you could either go right or left.
11  There's a little vestibule, and there's
12  spray, sanitizer spraying across both of
13  those door openings.  The requirement is to
14  have visible foam there and spraying across
15  the entranceway.
16      Q.    Is that the actual -- You're
17  on then in the production area where the
18  spray is?
19      A.    Yes.
20      Q.    Then after they walk through
21  the spray, you said they put on their smock,
22  or do they already have it on when they walk
23  through the spray?

Page 95

1      A.    Some of them start putting it
2  on as they come through the doors.
3      Q.    All right.
4      A.    The first set of doors.
5      Q.    Then they -- After they do
6  that, what is the next thing an employee
7  does after they walk through the foot spray?
8      A.    It depends on which employee
9  and where they're going and what they're
10  going to wear when they go to the line or go
11  to a specific job in that deboning
12  department.
13      Q.    Are they all required to wash
14  their hands?
15      A.    That is a requirement, to wash
16  your hands.
17      Q.    Does that have to be done
18  before you report to the line?
19      A.    Yes.
20      Q.    And they have to use a
21  sanitizing soap to wash their hands?
22      A.    There is a soap.  I don't
23  know.

Page 96

1      Q.    The company provides the soap?
2      A.    Yes.
3      Q.    And it has whatever sanitation
4  in it?
5      A.    Whatever's in it, yes.
6      Q.    It's not like the soap -- It's
7  not like a floral-smelling soap you get at
8  Bath and Body Works.  It's like some soap
9  that the company puts in there for the
10  employees to use; correct?
11      A.    Yes.
12      Q.    Then after they wash their
13  hands, are they required to wash their
14  gloves?
15      A.    When I say you've got to wash
16  your hands, most of them have already got
17  their gloves on, and they wash their gloves
18  and head to the line.  Me, when I go in,
19  I've already got my stuff on, hit the sink,
20  wash my hands, and go on.  Because I don't
21  normally wear the gloves when I go in.
22      Q.    When do you have to wear
23  gloves?

Page 97

1      A.    When you're handling product.
2      Q.    Is that a requirement of Koch
3  Foods?
4      MR. ROSENTHAL:  Of what?
5      Q.    I'm sorry, of Equity.  I
6  called you Koch Foods.
7      A.    If you're going to handle
8  product, you need to wear the gloves.
9      Q.    That is a requirement of
10  Equity Foods?
11      A.    Yes.
12      Q.    What about -- Are there any
13  requirements with regards to wearing plastic
14  sleeves?
15      A.    To cover your street clothes,
16  if you've got them exposed working on the
17  debone line.  And that's there for the
18  employees, to keep themself dry.  They need
19  to be dry.
20      Q.    If you -- Are your smocks long
21  sleeve or short sleeve?
22      A.    They're three-quarter.
23      Q.    So if you had on a long sleeve

25 (Pages 94 to 97)

Page 98

1　shirt under your smock that stuck out past
2　the smock, are there any requirements with
3　regards to sleeves?
4　　　A.　You need to cover your street
5　clothes.
6　　　Q.　So you'd have to wear the
7　plastic sleeves to cover your street
8　clothes --
9　　　A.　Uh-huh.
10　　　Q.　-- if your street clothes
11　stuck out below the smock sleeve; is that
12　correct?
13　　　A.　Yes.
14　　　Q.　Is that a requirement of
15　Equity Foods?
16　　　A.　As far as I know it is, yes.
17　　　Q.　And that is to keep the
18　product uncontaminated by the street
19　clothes?
20　　　A.　Just to keep the street
21　clothes from coming in contact with the
22　product.
23　　　Q.　Which would contaminate the

Page 99

1　product, correct, if they came in contact?
2　　　A.　Contamination is a big word.
3　　　Q.　Is that a USDA requirement,
4　that the street clothes can't come in
5　contact with the product?
6　　　A.　That is something that they
7　monitor. I don't know how it's written in
8　their regulations, but they do monitor that.
9　　　Q.　They being USDA?
10　　　A.　Uh-huh.
11　　　Q.　If USDA finds employees at
12　Equity Group having their street clothes
13　come in contact with the product, what
14　happens?
15　　　　　MR. ROSENTHAL: Objection to
16　the form of the question. You can answer.
17　　　A.　I've never had anything happen
18　that's been brought to my attention.
19　　　Q.　What could happen?
20　　　A.　I don't know. We'd have to
21　ask them. I've never had that happen.
22　　　Q.　Does USDA, when they are
23　monitoring your production process, if they

Page 100

1　find your employees aren't washing their
2　hands before they touch the meat, what would
3　happen?
4　　　　　MR. ROSENTHAL: Objection to
5　the form of the question.
6　　　Q.　Or touching the product?
7　　　A.　They never said anything about
8　it.
9　　　Q.　I'm not asking if they ever
10　did, I'm asking what would happen if they
11　did find it.
12　　　　　MR. ROSENTHAL: Objection to
13　the form of the question.
14　　　A.　I don't know because I've
15　never encountered.
16　　　Q.　Why is USDA there?
17　　　A.　They monitor production.
18　　　Q.　If they don't like something
19　that they see in the production, what, if
20　anything, can they do?
21　　　　　MR. ROSENTHAL: Objection to
22　the form of the question.
23　　　A.　It depends on -- They have

Page 101

1　different actions that they take depending
2　on what's taking place.
3　　　Q.　What actions can they take?
4　　　A.　It depends on what's going on.
5　　　Q.　Right. Tell me what -- Give
6　me examples.
7　　　A.　Ask me a question and I'll
8　give you --
9　　　Q.　I said what actions can USDA
10　take?
11　　　A.　They could issue a
12　noncompliance report.
13　　　Q.　What's a noncompliance report?
14　　　A.　It's where they write the
15　deficiency down where something was done
16　wrong or some regulation wasn't met, and
17　then you'd have to answer that; or they
18　could shut your operation down.
19　　　Q.　Would employees' street
20　clothes touching the product be something
21　that would be subject to a noncompliance
22　report by USDA?
23　　　　　MR. ROSENTHAL: Objection to

26 (Pages 98 to 101)

FREEDOM COURT REPORTING

Page 102

1  the form of the question.
2      A.    I don't know.
3      Q.    Do you know what would be
4  subject to a noncompliance report of the
5  USDA?
6          MR. ROSENTHAL:  Objection.
7  You can answer.
8      A.    Line speed going faster than
9  you're supposed to in eviscerate.
10     Q.    Anything else?
11     A.    Not adhering to the HACCP
12 plans.
13     Q.    The what plans?
14         MR. ROSENTHAL:  HACCP.
15     Q.    What is that?
16     A.    Hazard Analysis Critical
17 Control Point plan.
18     Q.    What is covered by that plan?
19     A.    I don't know the detail of it.
20 There's a lot of stuff covered as far as the
21 HACCP program.  I don't know.  The
22 department handles that.
23     Q.    Do you know anything that's

Page 103

1  covered in the HACCP plan?
2      A.    There's critical control
3  points.
4      Q.    What are critical control
5  points?
6      A.    Control points that you have
7  to monitor throughout the facility and stay
8  within those guidelines set in the HACCP
9  plan.
10     Q.    Tell me what points are
11 monitored.
12     A.    One that I know of would be
13 fecal, no online fecal.
14     Q.    What's monitored with regards
15 to online fecal?
16     A.    You have to check product,
17 check a specific number of birds, at
18 specific intervals, and check for fecal
19 material; if it's there, if they find it,
20 they would issue a noncompliance report.
21     Q.    If an employee was not wearing
22 a smock in the plant, would that be subject
23 to a noncompliance report by USDA?

Page 104

1      A.    I've never had it happen.
2      Q.    My question is:  If an
3  employee was not wearing a smock on the
4  production floor, would that be an area that
5  would be subject to a noncompliance report
6  by the USDA?
7      A.    I guess it could.  I've never
8  had that happen.
9      Q.    If an employee was not wearing
10 a hair net on the production floor, is that
11 an area that could be subject to a
12 noncompliance report by the USDA?
13     A.    Yes.
14     Q.    Have you ever had that happen?
15     A.    No, I haven't.
16     Q.    What happens if the USDA tags
17 a bird?
18     A.    Depends on what it's tagged
19 for.
20     Q.    What does that mean, if they
21 tag a bird?
22         MR. ROSENTHAL:  Objection to
23 the form of the question.  You can answer.

Page 105

1      A.    If they retain it -- If they
2  retain that bird.
3      Q.    Why would -- What are areas
4  that they can tag it for, the bird, USDA?
5          That's not a good question.
6  Let me start over.
7          What are reasons that the USDA
8  can tag a bird?
9      A.    Sometimes they tag specific
10 birds because they want to evaluate them
11 more or they want to evaluate them with
12 their online inspectors.
13     Q.    Is food safety the top
14 priority for Equity Food?
15     A.    It is a top priority.
16     Q.    And the policies with regards
17 to how employees work on the line and handle
18 the product, does that go towards --
19 majority of it towards food safety?
20     A.    Yes.
21     Q.    The use of a hair net, does
22 that go towards -- by employees, does that
23 go towards food safety?

27 (Pages 102 to 105)

32dfca94-3d46-40ea-bc43-060dcff911ff

Page 106

1      A.    It's for food safety, yes.
2      Q.    The use of the smocks by the
3  employees, does that go towards food safety?
4      A.    Yes.
5      Q.    The use of the rubber gloves
6  by the employees, does that go to food
7  safety?
8      A.    It protects their hands and it
9  is for food safety, yes.
10      Q.    And the use of beard nets, is
11  that for food safety?
12      A.    Yes.
13      Q.    The use of the rubber boots,
14  is that for food safety?
15      A.    That's a requirement from
16  Russia. It's a Russian requirement for
17  USDA.
18      Q.    It's a Russian requirement for
19  USDA, is that a customer?
20      A.    It's -- We ship all of our
21  dark meat to Russia, and you have to adhere
22  to their requirements.  They require all
23  employees to wear rubber boots, pervious to

Page 107

1  water clinging to surface?
2      Q.    Is that for food safety
3  reasons for Russia?
4      A.    I don't know why they
5  implemented that program.
6      Q.    Prior to -- Well, let me back
7  up. Since you've been at the Equity plant,
8  have they always had the foam and rubber
9  boots requirement, or this Russian
10  requirement as you called it?
11      A.    They just changed
12  throughout -- There's been a lot of changes
13  for that requirement as far as what we were
14  forced to do by USDA there.
15      Q.    All right. Was there ever a
16  time when the employees had to punch a
17  button to get the sanitizers to work on the
18  boots, to your knowledge?
19      A.    No.  It's automatic.
20      Q.    Has it always been automatic
21  since you've been there?
22      A.    Yes.
23      Q.    Do you know whether, in the

Page 108

1  processing plant, if they ever had to push a
2  button?
3            MR. ROSENTHAL:  Objection to
4  the form of the question.
5      A.    I don't know.
6      Q.    Is the walking through the
7  foot sanitizer or the boot sanitizer the
8  first act of sanitizing the equipment that
9  the employees do when they walk on the
10  production floor?
11            MR. ROSENTHAL:  Objection to
12  the form of the question.
13      A.    That's the first sanitizing of
14  what the employee would be wearing, which is
15  their boots.
16      Q.    Okay.  And those boots are
17  required by USDA because of the Russian
18  requirement; correct?
19      A.    We have to adhere to that
20  policy, and that policy would require us to
21  wear rubber boots or a shoe cover to cover
22  up their regular shoe if they have it on.
23      Q.    Does USDA also require that

Page 109

1  they be sanitized, the rubber boot or the
2  rubber shoe cover?  Or does it just require
3  wearing the boots?
4      A.    I'm not sure how the policy
5  reads, but we've always had the sanitizers.
6  They were there when I got there.  I'm not
7  sure what the policy states.
8      Q.    You don't know who requires
9  the sanitizing of the rubber boots or rubber
10  shoe covers?
11      A.    Like I said, the sanitizers
12  are there and have been there.
13      Q.    My question is: Do you know
14  who requires that sanitizing of the rubber
15  boots or the shoe covers?
16      A.    Like I said, I'm sure it's
17  listed in the Russian requirements.  I just
18  haven't read it, and I don't know the
19  details of it.
20      Q.    Are you involved any in the
21  new-hire training?
22      A.    No.
23      Q.    Has USDA -- To your knowledge

28 (Pages 106 to 109)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 110

1  has USDA ever tagged Equity for
2  noncompliance on a finished product?
3      A.    What sort of finished product?
4      Q.    Any.  After it's gone through.
5      A.    Gone through what?
6      Q.    The whole processing, at the
7  end of the stage before it's packed up and
8  shipped out?
9      A.    They have applied a tag to
10  finished product, the answer would be yes.
11      Q.    Okay.  And what was that for?
12      A.    What I recall would be for
13  temperature.
14      Q.    Temperature of the product?
15      A.    Temperature of the product.
16      Q.    Are there requirements on the
17  temperature of the product?
18      A.    Yes.  Must be less than forty
19  degrees prior to shipment.
20      Q.    Prior to shipment?
21      A.    Uh-huh.
22      Q.    What is the temperature of the
23  product as it goes through -- after it comes

Page 111

1  out of the chiller?
2      A.    Birds exiting the chiller must
3  be below forty.  That's a requirement.
4      Q.    What is the temperature of
5  most of the birds that come out of your
6  chiller?  You said it must be below forty.
7  Is there an average temperature?
8      A.    The average temperature range
9  is between thirty-four and thirty-six.
10      Q.    Degrees?
11      A.    Uh-huh.
12      Q.    Is that throughout the whole
13  process of preparing the birds for shipping
14  and finishing?
15      A.    No.
16      Q.    All right.  After the chiller,
17  is that the average temperature, thirty-four
18  degrees to thirty-six degrees?
19      A.    After the chiller, after the
20  bird's come out of the chiller, yes, prior
21  to going to deboning.
22      Q.    In debone, what is the average
23  temperature once they get on the cone?

Page 112

1      A.    I haven't taken any
2  temperatures, I couldn't tell you.  The more
3  you handle the product in that environment,
4  it's going to heat up.  We apply
5  refrigerant, whether that's ice or CO2, to
6  bring the temperature back down, and once
7  the product is packed it goes to the cooler.
8      Q.    What is the goal temperature
9  that Equity tries to keep the product?
10      A.    Depends on what stage you're
11  at.
12      Q.    After the chiller portion?
13      A.    Obviously, you want to keep it
14  as cold as you can.  I don't know if there's
15  any set requirements.  As far as USDA
16  regulations, product can get up to
17  fifty-five degrees during processing.
18  Obviously, we want to keep it as cold as we
19  can.
20      Q.    Okay.  What is the temperature
21  in the plant after the -- Are there set --
22  Is there one temperature throughout the
23  plant or does it vary by department?

Page 113

1      A.    What area are you talking
2  about?
3      Q.    That's what I'm trying to find
4  out.  Does it vary by -- Does the
5  temperature in the plant vary by the
6  department?
7      A.    Departments within the debone
8  department would generally be the same
9  temperature.
10      Q.    Okay.  Live hanging is not air
11  conditioned, is it, or kept chilled?
12      A.    There is a unit there, but
13  it's not kept -- It's kept comfortable, but
14  it's not like you would be working in
15  deboning, it's not that cold.
16      Q.    What is the average
17  temperature in the debone department?
18      A.    I'm not sure.
19      Q.    Is it seventy degrees?  Below
20  that?
21          MR. ROSENTHAL:  Objection to
22  the form of the question.
23      A.    I haven't taken any

29  (Pages 110 to 113)

32dfca94-3d46-40ea-bc43-060dcff911ff

Page 114

1  temperatures. I don't know what temperature
2  it is.
3      Q.   You've walked in the plant,
4  haven't you?
5      A.   Sure.
6      Q.   Is it cold?
7      A.   No.
8      Q.   It's not the normal office
9  setting or what you would keep in your home
10 unless you like it freezing cold; correct?
11     A.   I don't know how you keep your
12 home.
13     Q.   Well, earlier we had to cut
14 the air up because everybody was cold in
15 here. Is it colder in the plant than we had
16 it in here?
17         MR. ROSENTHAL: Objection to
18 the form of the question. You can answer.
19     A.   Like I said, I've never taken
20 any temperatures. It's cool in the plant
21 and it's cold in the plant.
22     Q.   Are there any requirements on
23 how cold the plant has to be kept?

Page 115

1      A.   Not that I'm aware of.
2      Q.   Okay. Is the plant kept
3  colder than seventy degrees?
4         MR. ROSENTHAL: Objection to
5  the form.
6      A.   Like I said, I have never
7  taken any temperatures. I don't know.
8      Q.   Do you see workers wearing
9  coats to keep warm in the plant or long
10 sleeves -- not coats, but long sleeves to
11 keep warm in the plant?
12         MR. ROSENTHAL: Objection to
13 the form of the question.
14     A.   I've seen employees wear a
15 long sleeve. I don't know if it's a coat or
16 not. Normally when I see them, it's on the
17 floor.
18     Q.   The plant is kept below
19 seventy-two degrees, isn't it?
20     A.   I don't know. I don't take
21 any temperatures.
22     Q.   Is the plant kept below
23 seventy-five degrees?

Page 116

1         MR. ROSENTHAL: Objection to
2  the form of the question.
3      Q.   Is the plant kept cold enough
4  to prevent condensation from forming on the
5  ceiling and falling on the product?
6      A.   We do prevent condensation.
7  We keep refrigeration on and exhaust fans
8  running and try to make up air and try to
9  keep it comfortable and try to keep the
10 ceiling from sweating so we prevent
11 condensation.
12     Q.   How many times a week do you
13 walk in the plant on the production floor?
14     A.   Going in the plant daily, just
15 in and out of the plant.
16     Q.   And you don't have an estimate
17 as to what the temperature is in the plant,
18 on the production floor in debone?
19         MR. ROSENTHAL: Objection to
20 the form of the question.
21     A.   Like I said, I've never taken
22 any temperatures.
23     Q.   My question, do you have an

Page 117

1  estimate?
2         MR. ROSENTHAL: And he
3  answered that multiple times for you.
4         MS. MCGOWAN: No. He said he
5  hasn't taken temperatures. I'm asking if he
6  has an estimate.
7         MR. ROSENTHAL: He's answered
8  that question multiple times.
9      A.   It's comfortable in the plant.
10 I don't know what the temperature is.
11     Q.   What are cotton gloves for,
12 cotton liners, for the employees?
13     A.   They're there for if they need
14 them, warm. Most of them wear them under
15 their rubber gloves if they so choose.
16     Q.   Is that to keep their hands
17 warm?
18     A.   Could be, if they -- if that's
19 why they wanted them.
20     Q.   Has there been any discussion
21 in the safety meetings or by the ergonomic
22 team that employees -- about employees
23 wearing the cotton liners to help with

30 (Pages 114 to 117)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 118

1  circulation?
2      A.    I'm not involved in the
3  ergonomics committee.
4      Q.    No, sir.  My question is:  In
5  the safety meetings that you attend where
6  the ergonomic team makes a report, has there
7  been any discussion about the use of cotton
8  liners?
9      A.    I don't recall any.
10     Q.    Who can change an employee's
11 time reports if someone forgets to clock in
12 or clock out at the beginning or end of a
13 shift?
14     A.    The supervisors audit time
15 sheets and make the changes if necessary.
16     Q.    You said at the end of a
17 shift, the master card's swiped?
18     A.    Uh-huh.
19     Q.    Is that a physical swipe?
20     A.    Yes.
21     Q.    Where is that done by the --
22 Does the supervisor do that?
23     A.    The superintendents would

Page 119

1  handle that.  I don't know how they've got
2  it set up, whether they do it or they have a
3  supervisor do it.  Some of them do it
4  differently.
5      Q.    Which clock do they use to do
6  it?
7      A.    There's clocks in the break
8  room, there's a clock in the supply room.  I
9  don't know which clock they use to do it
10 with, unless they use a -- Any time clock
11 will.
12     Q.    Do you know when they -- Do
13 they swipe the clock at the end of the
14 shift?
15           MR. ROSENTHAL:  Objection to
16 the form of the question.
17     A.    Which shift?
18     Q.    You say that a supervisor goes
19 and swipes the master card at the end of a
20 shift.  Is there a policy about you do it
21 when the bird hits the first station in that
22 department or the last station or when do
23 they swipe the card?

Page 120

1           MR. ROSENTHAL:  Objection to
2  the form of the question.
3      A.    Which shift?
4      Q.    First shift.
5      A.    First shift, they would swipe
6  it when the work was done depending on the
7  department, 4:30, when the work's complete;
8  and the live hanging would be when they stop
9  hanging birds, and the next shift is coming
10 on.
11     Q.    What about second shift?
12     A.    They would swipe it when the
13 work was complete.  There's no set schedule
14 or time when they get off.
15     Q.    Sanitation is not on master
16 card are they, time?
17     A.    I'm not in charge of
18 sanitation, but I don't think they are on
19 master card.
20     Q.    When are employees required to
21 be on the line at the beginning of their
22 shift?
23     A.    At the beginning of the shift,

Page 121

1  they would need to be there to perform their
2  job that they're assigned to do.
3      Q.    At the scheduled time, the
4  scheduled start time?
5      A.    They need to be in there when
6  their workload hits their station.
7      Q.    Are they required to be fully
8  dressed with their required items and washed
9  and sanitized and ready to begin performing
10 when their scheduled shift starts, or can
11 they do that after 7:30 -- If you're
12 scheduled to start at 7:30, do you have to
13 be on the line ready to go at 7:30 or can
14 you be at the wash station washing your
15 hands at 7:30?
16     A.    You need to be inside the
17 production area, and if your workload is
18 there, you need to be there to perform your
19 tasks.
20     Q.    If you're being rotated, do
21 you have to know where you're going
22 beforehand?
23     A.    I'm not sure how the rotations

31 (Pages 118 to 121)

Page 122

1  take place. But, yeah, a supervisor would
2  tell employees where.
3      Q.   Do you know when employees are
4  told about the rotation?
5      A.   I don't.
6      Q.   What positions require a
7  cutting glove on the production line?
8      A.   That would be for the
9  employee's personal protection, if they were
10 using a knife or a scissor.
11     Q.   Any other equipment that's
12 required, if you're using a knife or
13 scissors?
14     A.   You would need to wear an arm
15 guard to protect your arm.
16     Q.   Is an arm guard different than
17 a sleeve?
18     A.   Yes.
19     Q.   Anything else?
20     A.   Of course you'd have on your
21 rubber gloves and the regular attire.
22     Q.   And the regular attire, we're
23 talking about the hair net, beard net,

Page 123

1  smock, ear plugs, rubber gloves, and boots
2  or shoe covers?
3      A.   Uh-huh. Yes.
4      Q.   Anything else you consider to
5  be regular attire?
6      A.   No.
7      Q.   When are aprons required?
8      A.   They're available for the
9  employees.
10     Q.   Are there any jobs that
11 require an apron?
12     A.   It's not required.
13     Q.   Why are they required for the
14 employees?
15     A.   They're there for the
16 employee, if they want to wear them.
17     Q.   Why would an employee want to
18 wear them?
19         MR. ROSENTHAL: Objection to
20 the form of the question. You can answer.
21     A.   Employees, if they were
22 getting wet, if they wanted to keep themself
23 from getting wet.

Page 124

1      Q.   What happens if an employee's
2  smock gets wet?
3      A.   They go get a dry one.
4      Q.   Do they have to change it? Is
5  that a requirement?
6      A.   It's not a requirement. If
7  they get damp, if they get heavily soiled,
8  they can change it.
9      Q.   Would an apron prevent a smock
10 from getting heavily soiled?
11     A.   It depends on what job you
12 were doing. I suppose it could.
13     Q.   What about chiller rehangers,
14 do they wear aprons? Have you observed them
15 wearing aprons?
16     A.   I've seen some wear them and
17 some not wear them.
18     Q.   Is that a job where the
19 employees get wet?
20     A.   I've hung birds there and I
21 don't get wet.
22     Q.   And you say you've hung birds.
23 How long have you worked the shift?

Page 125

1      A.   Probably the most would be a
2  couple of hours hanging birds.
3      Q.   Why were you hanging birds?
4      A.   Short of help.
5      Q.   And you didn't wear an apron?
6      A.   No. I don't ever wear an
7  apron.
8      Q.   Did you wear plastic sleeves?
9      A.   No.
10     Q.   Did you wear a smock?
11     A.   Yes.
12     Q.   Did you have on a long sleeve
13 shirt or a short sleeve?
14     A.   I don't recall.
15     Q.   If you'd have had on a long
16 sleeve shirt that stuck out from under your
17 smock, would you have had to put on the
18 plastic sleeves?
19     A.   If they were going to come in
20 contact with the product, I would have. But
21 your gloves come up and cover a portion of
22 your clothing as well.
23     Q.   Did you wear cotton liners?

32  (Pages 122 to 125)

# FREEDOM COURT REPORTING

Page 126

1    A.    I don't ever wear cotton
2  liners.
3    Q.    Do you know whether there have
4  been any time studies conducted in your
5  plant on how long it takes employees to put
6  on and sanitize this equipment at the
7  beginning of the shift?
8    A.    There was some video taken as
9  part of this litigation, but I wasn't
10  involved in that and don't know really what
11  it entails.  But as far as time studies,
12  that's all that I'm aware of.
13    Q.    Do you know who conducted the
14  video-taking?
15    A.    Malcolm, as part of -- I don't
16  know the other folks.
17    Q.    Do you know -- Have you ever
18  timed how long it takes to put on this
19  equipment and sanitize?
20    A.    No.
21    Q.    Do you know how long it takes
22  employees to put on the equipment and
23  sanitize at the beginning of a shift?

Page 127

1    A.    It don't take that long to do
2  it.  It don't take me long to go in, get
3  dressed and go in.
4    Q.    How long do you typically stay
5  on the plant floor when you go in?
6    A.    Depends on what the situation
7  is and what's happening.
8    Q.    Do you ever stay on it and
9  work a full eight-hour shift?
10    A.    Not generally.  I wouldn't be
11  on there eight hours.
12    Q.    Employees are entitled to two
13  breaks per day; is that correct?
14    A.    Two thirty-minute breaks, yes.
15    Q.    Are there any requirements
16  when they go on their break on what they can
17  wear outside the production floor?
18    A.    Are you talking about
19  production?  Are you talking about deboning,
20  inside where the processing --
21    Q.    Inside the plant.  Anywhere on
22  the production floor where you -- I think
23  you've got deboning and further processing

Page 128

1  on what's called the actual production
2  floor?
3        MR. ROSENTHAL:  Objection.
4  Further processing is a separate plant.
5        MS. MCGOWAN:  Okay.
6    Q.    When you say further
7  processing, are you talking about the other
8  plant or are you talking about a different
9  department within your plant?
10    A.    I'm talking about the other
11  plant.
12    Q.    Okay.  After debone, are there
13  other departments in your plant?
14    A.    There's a DSI department,
15  shipping department.
16    Q.    Are those departments
17  considered on the production floor, where
18  they have to put on the required items?
19    A.    DSI would be, yes.
20    Q.    Okay.  But not shipping?
21    A.    Shipping is part of the plant.
22  I mean, they're in and out of the production
23  floor.

Page 129

1    Q.    What do you consider the
2  production floor?
3    A.    Where the work is being done,
4  deboning and DSI, eviscerating, those areas.
5    Q.    Do you consider live hang part
6  of the production floor?
7    A.    If you're going to use that
8  terminology, it could be, yeah.
9    Q.    Is live hang through the doors
10  where you have to walk through the
11  sanitizer?
12    A.    There's two double doors down
13  by live hang that they go through.
14    Q.    Do they have to walk through a
15  sanitizer?
16    A.    I don't recall.  I believe
17  there's sanitizer down there.  I don't
18  recall.
19    Q.    If you're working in debone
20  and you want to go on break, or evisc and
21  you want to go on break, can you wear your
22  items outside of the production area?
23    A.    You can wear -- Obviously

33 (Pages 126 to 129)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 130

1  you've got your boots on and you can wear
2  your hair net and beard net and you have
3  your ear plugs on. You can wear those out
4  of the production floor into the hallways to
5  go to the break room.
6      Q.    Can you wear them in the break
7  room? Can you wear your smock in the break
8  room?
9      A.    You cannot wear your smock.
10 You leave that hanging on the production
11 floor.
12     Q.    What about your rubber gloves?
13     A.    Some employees take some of
14 that with them. Some employees leave the
15 smock hanging, some roll them up and take
16 them with them. Some leave their gloves,
17 some take them with them.
18     Q.    Can you wear your hair net to
19 the rest room?
20     A.    No.
21     Q.    Can you wear your hair net
22 outside?
23     A.    No.

Page 131

1      Q.    Is the only place you can wear
2  your hair net in the hall or the break room?
3      A.    You can wear it on the
4  production floor.
5      Q.    Outside the production floor.
6      A.    They wear them in the offices.
7      Q.    All right. Anywhere else in
8  the plant?
9      A.    Obviously, you have to have
10 them on to go to the box room.
11     Q.    I'm talking about off the
12 production floor. If you're on break, if
13 you're an employee on break, and you leave
14 the production floor, other than the break
15 room is there anywhere else -- and maybe the
16 office, is there anywhere else you can wear
17 your hair net?
18     A.    No.
19     Q.    And why is that? Why can't
20 they wear them outside?
21     A.    It's company requirement.
22     Q.    Why can't they wear them in
23 the rest room?

Page 132

1      A.    Company requirement.
2      Q.    And is it a company
3  requirement that you have to leave the smock
4  on the production floor?
5      A.    We have hooks available for
6  them to hang their smock on. But if there's
7  no hook available, they could take it with
8  them. We prefer them to leave it inside the
9  production area.
10     Q.    Is it a company requirement
11 they can't wear it in the break room?
12     A.    They cannot wear it in the
13 break room?
14     Q.    Yes. The smock?
15     A.    Yes.
16     Q.    And is it a company
17 requirement that they cannot wear their
18 smock in the rest room?
19     A.    Yes. They cannot wear it in
20 the rest room.
21     Q.    Are there any requirements by
22 the company with regards to returning to
23 their line or their position on the line

Page 133

1  after a break?
2          Can they just walk back in or
3  are there any requirements that they have to
4  do before they can return to the line?
5      A.    Obviously, they're going to go
6  through the foot sanitizer as they walk back
7  in; they've got the hair net, beard net on
8  as they walk back through the door; they've
9  got their ear plugs in; and they're going to
10 dress out, wash their hands, and wear their
11 gloves on, and go to the line.
12     Q.    They have to wash their hands
13 again before they return to the line?
14     A.    Yeah.
15     Q.    Are there any requirements
16 about when you have to wash your hands -- or
17 wash your gloves?
18     A.    Any requirements --
19     Q.    Any company requirements when
20 you must wash your gloves?
21     A.    They can wash them before
22 break or after break, depending on. I mean
23 there's no requirement that says you have to

34 (Pages 130 to 133)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 134

1  wash them before you go back to the line,
2  yes.
3      Q.    What about if they pick up a
4  piece of product off the floor?  Are there
5  any rules about that with regards to washing
6  gloves?
7      A.    We've got people that are
8  assigned to do those jobs, a floor person, a
9  condemn person.  And, yes, if a regular
10 employee were to pick up meat off the floor,
11 they should go wash their hands before they
12 go back to the line.
13     Q.    And that's a company
14 requirement?
15     A.    Yes.
16     Q.    Does Equity use any hand
17 sanitizer dips or glove dips?
18     A.    Not that I'm aware of.
19     Q.    Who is responsible for
20 supervising and monitoring the employees on
21 the production line on a day-to-day basis to
22 make sure they've got on their items and
23 have washed and sanitized their equipment?

Page 135

1          MR. ROSENTHAL:  Objection to
2  the form of the question.
3      A.    Supervisors are responsible
4  for their employees on their line.
5      Q.    Is there anyone responsible
6  for making sure all employees actually
7  sanitize their gloves before they go to the
8  line?
9      A.    Obviously, if we stand there
10 as management, they're going to do that.
11 But there's times I'm sure they don't
12 sanitize before they go back to the line.
13     Q.    Is there a management person
14 that's responsible for standing there?
15     A.    We don't do that all the time,
16 no, ma'am.
17     Q.    In your answer it seems to
18 indicate you do it sometimes.  Is there any
19 set time, you do do it?
20     A.    As far as we do what?
21     Q.    Stand there and make sure they
22 sanitize?
23     A.    It's not something -- We don't

Page 136

1  station a person there all the time.  But
2  there are times, yes, that we do stand there
3  and make sure employees are washing.
4      Q.    How do you decide when you
5  will stand there and make sure they're
6  washing?
7      A.    It just depends on -- I leave
8  it up to the supervisors, superintendents to
9  decide what they need to do.
10     Q.    Do you ever -- I mean, is
11 there like a --
12     A.    We think there's a big issue
13 or something, where people are not doing it,
14 then we'll stand there and make sure they go
15 through.
16     Q.    How do you find out if there's
17 an issue of people not monitoring -- or not
18 washing?
19     A.    Someone would normally tell
20 me, or we've got the QA department, hey,
21 we've got people not washing their hands.
22     Q.    What is the QA department's
23 responsibility?

Page 137

1      A.    It's a vast majority of
2  responsibilities, several things to do in
3  the plant.
4      Q.    All right.  What are those
5  things?
6      A.    It depends on the department.
7      Q.    With regards to production
8  line.
9      A.    Depends on what production
10 area.
11     Q.    Debone.
12     A.    Debone, QA would perform tasks
13 of checking the product to make sure that it
14 met product specifications as it was being
15 packaged.
16     Q.    What about evisc?  What's QA's
17 responsibility?  I'm sorry, did I interrupt
18 you?  Have you told me everything?
19     A.    There's other responsibilities
20 in deboning.
21     Q.    Tell me about those then.
22     A.    They monitor the floor
23 conditions, sanitary conditions, they

35 (Pages 134 to 137)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 138

1  monitor employees.
2      Q.   What do they monitor with
3  regards to the employees?
4      A.   Make sure the employees are
5  adhering to sanitary conditions and the
6  guidelines set.  They've got their hair net
7  on, beard net on, ear plugs in.  Monitor for
8  condensation.
9      Q.   How do they monitor for
10 condensation?
11     A.   Walk around and look for it.
12     Q.   Are you talking about on the
13 walls and ceilings?
14     A.   Uh-huh.
15     Q.   All right.  Anything else?
16     A.   I'm not over that department
17 now.  I'm sure there's a lot of other stuff
18 they do.
19     Q.   What about evisc department?
20     A.   They would do specific line
21 checks to make sure product was being
22 produced accordingly over there as well, and
23 then they would make -- do the same

Page 139

1  monitoring of the employees, monitor the
2  area for condensation, do specific checks
3  that are required by the U.S. government,
4  presentation, pre- and post-chill checks.
5  And also they would work in salvage
6  department and make sure that operation is
7  running right.
8          There's also some
9  temperatures, where they would need to be
10 taking temperatures, do paw checks and make
11 sure the paw system is operating efficiently
12 and correctly.
13     Q.   The salvage department, tell
14 me again what that does.
15     A.   If USDA, on a bird-by-bird
16 inspection, if they deem a bird salvageable,
17 which means there's an effective part that
18 needs to be removed, they would take that
19 bird off the evisceration line and send it
20 to salvage.  And then those employees in the
21 salvage department, depending on what's
22 wrong with that bird, what it was sent over
23 there for, they would cut it off or clean it

Page 140

1  up and get it ready for the chiller.  Then
2  it would be inspected and passed before it
3  would go into the chiller.
4      Q.   Are the employees in the
5  salvage department required to wear any
6  specific items?
7      A.   What specific items?
8      Q.   Do they have to wear a hair
9  net, beard net, smock, or can they work in
10 their street clothes, the salvage
11 department?
12     A.   They need to have those items
13 on, the hair net, beard net, smock, ear
14 plugs, they wear the rubber boots; if
15 they're going to use a knife or a scissor,
16 they need to have on a chain glove and an arm
17 guard.
18     Q.   Do they have to wear rubber
19 gloves?
20     A.   They would have on rubber
21 gloves, yes.
22     Q.   Can employees wear baseball
23 caps?

Page 141

1      A.   No.
2      Q.   What about safety glasses?
3      A.   It's not a requirement.  There
4  are some specific departments that we do
5  issue safety glasses to, but we issue them
6  and record them and take them up at the end
7  of the shift.
8      Q.   Did employees used to wear
9  safety glasses in the plant?
10     A.   Yes, they did.
11     Q.   When was that practice
12 eliminated?
13     A.   I don't recall the exact time
14 frame when it was eliminated.
15     Q.   Has it been within the last
16 year?
17     A.   I honestly can't remember.
18 It's not been that long ago, but I don't
19 recall.
20     Q.   Why was the practice
21 eliminated?
22     A.   It was company choice to pull
23 those off due to not being able to maintain

36  (Pages 138 to 141)

FREEDOM COURT REPORTING

Page 142

1  control of them and track them and keep them
2  out from getting into product. And so we
3  evaluated the process and decided that only
4  specific areas needed to wear safety
5  glasses, and the other areas didn't have to
6  wear them.
7      Q.   What areas needed safety
8  glasses?
9      A.   We've got them assigned to
10 live hang, they wear a safety goggle. And
11 then the safety goggles are also available
12 for folks who use high pressure hoses.
13     Q.   Any other areas?
14     A.   There's some in the QA
15 department, but not everyone wears them in
16 the QA department. I'm not sure of those
17 jobs.
18     Q.   Would the people using the
19 high pressure hoses be in sanitation?
20     A.   No, ma'am.
21     Q.   Who uses high pressure hoses?
22     A.   We would use them to clean up
23 the floor at break and stuff like that;

Page 143

1  break time production people would. Whether
2  be it a high pressure or medium pressure,
3  they're required to wear the goggles. And
4  then sanitation has always worn the safety
5  goggles.
6      Q.   During breaks, do you clean
7  the area while the -- When you say the
8  people during breaks, explain what's
9  happening cleaning with the hoses during
10 break.
11     A.   There's always general cleanup
12 going on, even while the operation is
13 running; we have people that are assigned to
14 keep the floor in order. And as employees
15 leave the line for breaks, there are people
16 assigned to take up the knives and scissors
17 if they're out and exchange those, and the
18 area's rinsed down and try to knock down the
19 bigger pieces of product, knock them down
20 off the machinery and get them into a drain
21 and cleanup the area before the employees
22 come back.
23     Q.   Are employees allowed to eat

Page 144

1  in the production area?
2      A.   No.
3      Q.   Are employees allowed to stay
4  on the production line area during the
5  break, if they're washing down the area?
6      A.   No. They need to go off the
7  production floor.
8      Q.   Look at what was marked as
9  Exhibit 17. Do you know what this is?
10     A.   It says good manufacturing
11 practices.
12     Q.   Have you ever seen this
13 document?
14     A.   Not before now.
15     Q.   Not before now?
16     A.   Not before today, no.
17     Q.   It's got a place for your
18 signature on it.
19     A.   It does.
20     Q.   Have you ever signed any such
21 similar document? Maybe not this one.
22     A.   I don't recall signing this
23 document, no.

Page 145

1          There's people that put these
2  things together. The QA department only
3  does it. I'm responsible, but I've never
4  signed it, that I recall.
5      Q.   And you've never seen it
6  before today?
7      A.   No.
8      Q.   No, you've never seen it?
9      A.   Not before today, no.
10     Q.   Okay. Let's look at the front
11 page of it, where it says P 20322 under
12 slaughter debone and further processing. Do
13 you see that number?
14     A.   (Witness nods head in the
15 affirmative.)
16     Q.   What is that number?
17     A.   P 20322?
18     Q.   Uh-huh.
19     A.   That's the plant number issued
20 by the USDA. That's the plant -- number of
21 the plant.
22     Q.   Does that include the whole
23 complex or just the first processing?

37 (Pages 142 to 145)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 146

1    A.    It includes the whole complex.
2    Q.    Including further processing
3  plant?
4    A.    Yes.
5    Q.    All right.  Take a moment and
6  flip through this, since you've never seen
7  it, because I want to ask you some questions
8  about it.
9    A.    (Witness complies.)
10    Q.    Have you had a chance to look
11  at it?
12    A.    I've scanned it.
13    Q.    All right.  In scanning
14  Plaintiff's Exhibit 17, do you know whether
15  these good manufacturing practices are in
16  effect at the plant today?
17    MR. ROSENTHAL:  Objection to
18  the form of the question.  You can answer.
19    A.    As I said, I've never seen the
20  document, so I --
21    Q.    What are GMPs, or good
22  manufacturing practices?
23    A.    Guidelines to follow when

Page 147

1  you're producing edible product.  I mean,
2  you need to.
3    Q.    Go ahead.  I didn't mean to
4  interrupt you.
5    A.    All companies set those
6  policies.  They're different for different
7  companies.
8    Q.    Does Equity have -- Can we
9  call them GMPs for short?
10    A.    Uh-huh.
11    Q.    Does Equity have GMPs?
12    A.    Yes.
13    Q.    All right.  Look at what was
14  previously marked as Exhibit Number 4 -- 3,
15  in this book here (indicating)?
16    A.    Tab 3?
17    Q.    Tab 3.
18    A.    Okay.
19    Q.    Are these the -- Have you ever
20  seen this document that's entitled Equity
21  Group, Eufaula Division, L.L.C., good
22  manufacturing practices, fresh processing,
23  with a revision date of 10/2/06?

Page 148

1    A.    I don't -- I don't recall
2  seeing the document.  No, I don't.
3    Q.    Have you ever seen any written
4  GMPs for the fresh product plant -- fresh
5  processing plant?
6    A.    I don't recall seeing any.
7    Q.    Are there written GMPs for
8  your plant?
9    MR. ROSENTHAL:  Objection to
10  the form of the question.
11    A.    There are policies that we
12  follow.  But like I said, I've never seen
13  either one of these.
14    Q.    All right.  What kind of
15  policies do you follow?  You said there are
16  policies that you follow.  Are they written
17  policies?
18    A.    I don't see the -- A lot of
19  time I don't see the written documentation.
20  I mean, I know through my years in the
21  business kind of what's allowed and what's
22  not allowed and what people should do.
23    Q.    Who's responsible for making

Page 149

1  sure there are written GMPs?
2    A.    QA department.
3    Q.    And the reason for GMPs again?
4  Why do you have them?
5    A.    They are good manufacturing
6  practices that you want to establish for
7  things -- rules you want to follow while
8  you're producing product to make sure you're
9  producing them safely and wholesome.
10    Q.    Is that so you have
11  noncontaminated product?
12    A.    Like, again, contamination is
13  a big word.  But, yeah, you don't want stuff
14  to end up in your product and get to a
15  customer.  And you don't want -- you want --
16  There's just certain rules you have to
17  follow.
18    Q.    All right.  Take a moment and
19  flip through these exhibits that have been
20  marked one through fifteen in this book and
21  see if there are any -- You said you don't
22  recognize that document, if there are any
23  GMPs that you do recognize?

38 (Pages 146 to 149)

Page 150

1     A.    Okay.
2     Q.    Or work rules relating to
3   GMPs?
4     A.    (Witness complies.)
5         I don't recognize anything
6   pertaining to the GMPs that I've seen.
7     Q.    Okay.  Are you aware of any
8   documents relating to GMPs that are not
9   in -- look and see if there are any here.
10   These documents or those?
11     A.    What other one?
12     Q.    That's not going to have any
13   GMPs in it.  Are you aware of -- Just so
14   I'm -- Just so your testimony's clear,
15   you've seen other documents relating to
16   GMPs, but you don't see any of those
17   documents here today?
18         MR. ROSENTHAL:  Object to the
19   form of the question.
20     Q.    Is that correct?
21     A.    No.  What I said was that all
22   companies develop GMPs, and I recall in my
23   past working on GMPs in other companies,

Page 151

1   things you learn throughout where you're
2   working is what I'm saying.  But I don't
3   recall seeing these documents.
4     Q.    I'm trying to find out while
5   you're working at Equity -- since you've
6   been working at Equity, have you seen any
7   written GMPs?
8     A.    I know they're posted.  But I
9   don't -- Like I said, I don't read them.  I
10   don't get down to the -- Go ahead.
11     Q.    Go ahead.  I didn't mean to
12   interrupt you.
13     A.    Go ahead.
14     Q.    Finish your answer.  I didn't
15   mean to interrupt you.
16         MR. ROSENTHAL:  I think his
17   answer's done.
18     A.    I'm done.
19     Q.    Look at Exhibit Number 2.
20   Have you ever seen a document like this?
21     A.    I don't recall ever seeing
22   this specific document, no.
23     Q.    Do you know whether employees

Page 152

1   are required to sign a document such as
2   Exhibit Number 2 when they come to work?
3     A.    Do I know this -- We have an
4   employee orientation manual.  I don't know
5   what's entailed in it, and I'm not involved
6   in orientation.
7     Q.    Who does the orientation?
8     A.    The human resource group.
9     Q.    Do you know who is responsible
10   for training the employees on the GMPs for
11   Equity?
12     A.    They get their initial
13   training in human resource, and then I'm
14   sure on the job, employees will learn from
15   their supervisors.  Like I said, I don't get
16   involved in these documents.
17     Q.    Do you get involved in any of
18   the training?
19     A.    I don't get involved in any of
20   the training either.
21     Q.    Look at Exhibit Number 1.
22   Have you had any involvement in new hire
23   GMP -- drafting new hire GMP policy?

Page 153

1     A.    No.
2     Q.    Since you've been at Equity,
3   have you had any involvement in drafting GMP
4   policy?
5     A.    Not that I can recall.
6     Q.    Since you've been at Equity,
7   have you had any involvement in drafting
8   work rules?
9     A.    Work rules?
10     Q.    Uh-huh.  For employees.
11     A.    I haven't been -- I'm sure
12   there's stuff we discuss verbally.  I don't
13   know how much written stuff has been done,
14   but as far as work rules, as far as changing
15   stuff on the floor.
16     Q.    With whom would you have these
17   discussions?
18     A.    Well, they would be different
19   things.  Like the amount of $CO_2$ we put on
20   product, that you change depending on what
21   season it is.  But as far as work rules as
22   far as --
23     Q.    For the employees.

39 (Pages 150 to 153)

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

Page 154

1       A.    -- as far as developing
2   procedures and other, it would be hands-on
3   and managing the people and verbally
4   communicating with them. That's pretty much
5   what takes place.
6       Q.    Are you involved in the
7   disciplinary process of employees --
8       A.    Yes.
9       Q.    -- in your position?
10      A.    Yes.
11      Q.    What's your involvement?
12      A.    If it makes it to me, then I'm
13  involved with normally HR, human resource,
14  the employee, and union representative. And
15  we decide what progressive discipline or
16  decide what needs to be done depending on
17  the situation. But they very seldom make it
18  to me. That's normally handled with the
19  supervisor and HR -- or superintendent.
20      Q.    Do you have an estimate of
21  about how many have been brought to you as
22  plant manager?
23      A.    I don't.

Page 155

1       Q.    Less than a dozen?
2       A.    I don't know exact. It could
3   be more than that, I don't remember. It's
4   not something I keep up with.
5       Q.    All right. Look at Exhibit
6   Number 13 and tell me if you know what
7   this -- if you've ever seen this document.
8       A.    No.
9       Q.    Do you know what this is?
10      A.    I really don't know what it
11  is.
12      Q.    Okay. Do you keep up with --
13  it looks like it says work rules, and it
14  looks like it's printed off the computer.
15  Is there some program that you're aware of
16  that provides this information?
17      A.    I do not know.
18      Q.    Do you have -- Do you ever use
19  the Kronos, K-R-O-N-O-S, time report? Do
20  you ever go into the computer and look at
21  any of that?
22      A.    I do not.
23      Q.    Have you reviewed the Kronos

Page 156

1   manual?
2       A.    I have not.
3       Q.    Look at Exhibit 14, which
4   appear to be -- and flip through 14.
5       There are two letters from
6   the -- form letters from the DOL. Have you
7   ever seen these documents?
8       A.    No.
9       Q.    All right. Look at Exhibit
10  Number 9. Have you ever seen this employee
11  orientation manual?
12      A.    I've seen the outside cover of
13  it but I've never looked through it.
14      Q.    Who's responsible for
15  preparing the employee orientation manual?
16      A.    The human resource department,
17  I assume takes care of all that.
18      Q.    Do you have any involvement in
19  orientation process for new hires?
20      A.    I do not.
21      Q.    Do you have any involvement in
22  hiring new hires?
23      A.    I do not.

Page 157

1       Q.    Look at page fifty-two of
2   Exhibit 9.
3       A.    (Witness complies.)
4       Q.    Under ergonomic principles,
5   three up from the bottom, the little bullet
6   points, it says: Take mini breaks during
7   work.
8       Do you know what they're
9   talking about there?
10      A.    I have no idea.
11      Q.    Do you know whether employees
12  take mini breaks during work?
13      A.    I don't know.
14      Q.    Scan through these ergonomic
15  principles and see if these are things that
16  are discussed during your safety minutes and
17  when the ergonomic team gives their report.
18      A.    (Witness complies.)
19      As I said earlier, the only
20  thing that's brought to my attention are the
21  rotation sheets and the number that they
22  audited. And I don't know what's discussed
23  in here.

40 (Pages 154 to 157)

# FREEDOM COURT REPORTING

Page 158

1  Q.  What's the goal of the audit
2  team?
3  A.  I don't know that we've ever
4  discussed a goal.  But I'm sure that the
5  more -- the higher the number, the better
6  we're going to be as far as taking care of
7  the employees.  I don't know that a goal has
8  ever been mentioned that I'm aware of.
9  Q.  When you say higher the
10 number, I don't know what you mean.  Can you
11 explain?
12 A.  That successfully rotate a
13 high percentage of employees.
14 Q.  Are you aware whether
15 employees actually do ergonomic exercises?
16 A.  We have done them in the past.
17 Q.  And why were they doing these
18 exercises in the past?
19 A.  To help the employee loosen
20 up, loosen up their hands and mainly their
21 shoulders before they begin work.
22 Q.  Were these exercises you did
23 in the past mandatory?

Page 159

1  A.  When we were doing them, yes.
2  But we lack in that area.  We don't do them
3  like we should.
4  Q.  And where were they conducted?
5  A.  Once the employees got on the
6  line or got in their area.  It's mainly just
7  before the debone lines.
8  Q.  Is this before the scheduled
9  shift of 7:30?
10 A.  No.
11 Q.  After 7:30?
12 A.  It would be after the employee
13 got on the line, yes.
14 Q.  Look at Exhibit 17, on page
15 eleven of thirteen, under sanitation
16 related --
17 A.  Uh-huh.
18 Q.  -- number four.  Read that,
19 please.
20 A.  (Witness complies.)  Okay.
21 Q.  The second sentence says:
22 Employees must wash and sanitize hands
23 before starting work after each absence from

Page 160

1  the work area, after visiting rest rooms,
2  and at any other times when hands have
3  become soiled or contaminated.
4  Is that practice in effect
5  today at Equity Group?
6  A.  It is in effect that employees
7  should wash their hands.  But as I stated
8  earlier, I'm sure there's some that do not
9  that we do not catch.
10 Q.  If you catch an employee not
11 washing their hand after visiting the rest
12 room and returning to the production floor,
13 could you use progressive discipline on that
14 employee?
15 A.  Yes.
16 Q.  Do you know what the speed of
17 the line is?
18 MR. ROSENTHAL:  Objection to
19 the form of the question.
20 A.  What line are you talking
21 about?
22 Q.  Let's say once in the evisc
23 department, what is that?  Is there a set

Page 161

1  speed to the line, how many birds per
2  minute?
3  A.  Generally, we try to run about
4  two hundred and forty birds per minute on
5  the kill line; when that branches off to the
6  evisc line, it's one twenty.  It fluctuates
7  throughout the day.
8  Q.  The evisc line is one hundred
9  and twenty birds per minute?
10 A.  One twenty and one twenty,
11 there's two of those.
12 Q.  What about in debone?  What is
13 the speed of the line in birds per minute?
14 A.  Some lines vary depending on
15 the tenure of the employee.  If you're on a
16 training line, it runs eight or ten birds a
17 minute, all the way up to if you're on a
18 seasoned line where you've got tenured
19 employees, it could get up to thirty-eight a
20 minute.
21 Q.  At the end of the shift, the
22 employees leave for the day, are they
23 required to sanitize any of their equipment

41 (Pages 158 to 161)

## 367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

32dfca94-3d46-40ea-bc43-060dcff911ff

Page 162

1  or items?
2      A.   I don't know that it's a
3  requirement. I see a lot of them clean up
4  at the end of the day. It needs to be clean
5  before they start the next morning. I'm
6  sure, again, there's some that get through
7  and don't wash up.
8      Q.   What do they do with their
9  smocks at the end of the day?
10     A.   They drop them in the clothes
11 bin just outside the double doors.
12     Q.   Can they take them home and
13 wash them?
14     A.   No.
15     Q.   If an employee is working in
16 debone, and they're going to be rotated, do
17 they have to have all of the -- like an arm
18 guard available once they get on the line,
19 have it with them in case they need to be
20 rotated to a position that has to -- that
21 uses knives and need an arm guard?
22         MR. ROSENTHAL: Objection to
23 the form of the question.

Page 163

1      A.   If an employee is going to
2  work on the debone line and they need a
3  knife or a scissor, they would have to wear
4  an arm guard.
5      Q.   Is that provided by their
6  supervisor or do they have to have it with
7  them when they get to the line?
8      A.   It's provided to them, the arm
9  guard.
10     Q.   That's something the company
11 keeps and hands out?
12     A.   It's at the supply window, and
13 they provide it for them.
14     Q.   No. No. I'm talking about --
15 I didn't make that clear.
16         If an employee is working on
17 the debone line and they're using knives,
18 they don't bring the knives to the line with
19 them, do they?
20     A.   The employee does not, no.
21     Q.   Those are put on the line by
22 either their supervisor or the setup person;
23 is that correct?

Page 164

1      A.   The knife and the chain glove
2  are there for that position, yes.
3      Q.   What about the arm guard? Is
4  that there with the knife and the chain
5  glove, or does the employee have to have
6  that with them when they report to the line?
7      A.   The employee has that with
8  them.
9      Q.   Did you ever see the results
10 of any of the videotape studies done?
11     A.   No.
12     Q.   Were you ever told by anyone
13 what the results of the videotape studies
14 were?
15     A.   No.
16         MS. MCGOWAN: Let me have a
17 quick five-minute break.
18         (Recess taken.)
19     Q.   (BY MS. MCGOWAN): Was there
20 ever a time that employees took home their
21 smocks and washed them?
22     A.   Yes.
23     Q.   When was that?

Page 165

1      A.   Prior to us going to our own
2  laundry service.
3      Q.   When did you go to your own
4  laundry service?
5      A.   I don't know the exact time.
6  But I know the contract is up for renewal
7  this year. I think it was a three-year
8  contract, so sometime in -- I don't really
9  know, sometime in '05, I assume. I don't
10 really recall.
11     Q.   Did you have any involvement
12 in making the decision to enter into the
13 laundry service contract?
14     A.   No.
15     Q.   Who made that decision?
16     A.   I really don't know who was
17 involved in all that.
18     Q.   Do you know why the decision
19 was made.
20     A.   The decision was made -- I do
21 know why. The decision was made to maintain
22 control over those smocks, as far as the
23 food safety aspect. Employees were taking

42 (Pages 162 to 165)

FREEDOM COURT REPORTING

Page 166

1  them and laundering them, and maybe they
2  were and maybe they wasn't and storing them
3  in their car. We wanted to give them a
4  fresh, clean smock every day before they
5  went onto the floor.
6      Q.   For good safety standards?
7      A.   Uh-huh.
8      Q.   Yes?
9      A.   Yes.
10     Q.   Do you know whether employees
11  ever have to return early from their break
12  time to find out where they're going to be
13  on the line, when they're rotating them from
14  position to position?
15     A.   I'm not aware of that, no.
16     Q.   Do you know when employees are
17  told with regards to break whether they'll
18  be rotated?
19     A.   Like I said, I'm not involved
20  in rotation, so I don't know how that's --
21  how that takes place.
22     Q.   All right. You keep saying HR
23  handles certain things. Who is HR? Who are

Page 167

1  you referring to when you say HR handles
2  something?
3      A.   I would be referring to the
4  department as a whole. But there's specific
5  people in that department.
6      Q.   Is there a HR department for
7  each plant or for the whole complex or how
8  does that work?
9      A.   There's one HR department for
10  both facilities, both fresh and the further
11  plant.
12     Q.   Okay. Who is Kathy Gilmore?
13     A.   She is the human resource
14  manager.
15     Q.   For the whole complex?
16     A.   Yes.
17     Q.   Okay. Does she have anything
18  to do with discipline?
19     A.   Yes.
20     Q.   What's her job with
21  discipline?
22     A.   She gets involved with
23  discipline if necessary to make sure we --

Page 168

1  supervisors adhere to the policy and
2  following the right procedures.
3      Q.   Who in HR does the employee
4  orientation?
5      A.   I don't know how that's done.
6      Q.   Okay. Do you know who in HR
7  does the informing the employees about these
8  GMPs?
9      A.   I don't know how that's
10  covered in the orientation, I don't know.
11     Q.   Who is Lisa Ledbetter?
12     A.   Lisa Ledbetter is a person
13  that works in -- I'm sorry. I don't know if
14  that's her name or not. I'm not sure who
15  Lisa Ledbetter is. I'm thinking if that was
16  her name or not, and I'm not sure. I don't
17  know.
18     Q.   Is there a manager named Lisa
19  in HR?
20         MR. KISER:  Is it Felicia?
21     A.   There is a Felicia, but I
22  don't know her last name.
23     Q.   And Felicia, what is her job?

Page 169

1      A.   To be honest with y'all, I
2  don't know if her name is Felicia or not. I
3  don't know. You're going to have to ask me
4  about somebody else, because I don't know.
5      Q.   I'm trying to find out what
6  this person does. Do you know what she
7  does?
8         MR. ROSENTHAL:  If you don't
9  know who she is --
10     A.   I don't.
11     Q.   All right. With regards to
12  the donning and doffing and sanitizing of
13  these items or protective gear, does it
14  differ any from department to department?
15     A.   Repeat that question one more
16  time.
17     Q.   With regards to the donning
18  and doffing or putting on at the beginning
19  of the shift and sanitizing and the taking
20  off and cleaning up, either during breaks or
21  at the end of the day, does that differ any
22  from department to department?
23         MR. ROSENTHAL:  Objection to

43 (Pages 166 to 169)

FREEDOM COURT REPORTING

Page 170

1  the form of the question.
2      Q.    In the production lines.
3      A.    On the deboning line,
4  generally, everybody does things virtually
5  the same as far as the way they put on and
6  take off their clothing. Evisceration
7  should be the same as well.
8          When I go in, I put mine on
9  the same way all the time, and it takes me
10 about thirty seconds, forty seconds, it's on
11 and I'm in the plant, my hands are washed,
12 and I'm on the line.
13     Q.    So everybody has to put on
14 this equipment and wash their hands to go in
15 the plant; correct?
16     A.    Not everybody would wear the
17 same equipment, no. You're going to have to
18 specify what you're talking about they're
19 putting on.
20     Q.    Well, there's basic equipment
21 everybody has to put on; correct?
22     MR. ROSENTHAL: Objection to
23 the form of the question.

Page 171

1      Q.    Basic items. You've got to
2  have your boots, your hair net, your beard
3  net, your ear plugs, and a smock?
4      A.    Correct.
5      Q.    And you have to wash your
6  hands or your gloves before you can get on
7  the line; correct -- or before you can go
8  through the plant?
9      A.    For -- There's maintenance
10 mechanics that don't wear gloves.
11     Q.    Do they have to wash their
12 hands when they enter the floor?
13     A.    They should wash their hands
14 before they enter the floor.
15     Q.    That's what I'm trying to find
16 out. Everybody has to do that before they
17 go on the floor?
18     A.    They should do that, yes.
19     Q.    And then if you're working
20 with a knife or scissors, you may add an arm
21 guard?
22     A.    You should have that with you
23 when you go through the door.

Page 172

1      Q.    Right. Do you have to
2  sanitize that arm guard?
3      A.    I'm sure when they're
4  washing -- I don't know if they sanitize
5  them or not.
6      Q.    Do you know whether they
7  sanitize their aprons?
8      A.    I don't know what they do with
9  their aprons.
10     Q.    Or their sleeves?
11     A.    They clean them up. I'm not
12 sure how -- I haven't watched to see how
13 they -- what they put on them to clean up.
14 I'm not sure if it's just water.
15     MS. MCGOWAN: That's all I
16 have.
17     MR. ROSENTHAL: I don't have
18 any, Robin.
19 (The deposition was concluded at 12:15 p.m.,
20 June 12th, 2008.)
21
22
23

Page 173

1          REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  ELMORE COUNTY,
4      I, Sara Mahler, Certified Court
5  Reporter and Commissioner for the State of
6  Alabama at Large, do hereby certify that the
7  above and foregoing proceeding was taken
8  down by me by stenographic means, and that
9  the content herein was produced in
10 transcript form by computer aid under my
11 supervision, and that the foregoing
12 represents, to the best of my ability, a
13 true and correct transcript of the
14 proceedings occurring on said date and at
15 said time.
16     I further certify that I am neither
17 of kin nor of counsel to the parties to the
18 action; nor in any manner interested in the
19 result of said case.
20
21
22
        _____
23        Sara Mahler, CCR
          ACCR #420

44 (Pages 170 to 173)