## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA - NORTHERN DIVISION

BETTY ANN BURKS, <u>et al.</u>,    :
                                  :
            Plaintiffs,           :
                                  :
        v.                        :    No. 2:06-CV-1081-MEF
                                  :
EQUITY GROUP EUFAULA              :
DIVISION, LLC,                    :
                                  :
            Defendant.            :

---

# MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DECERTIFY CLASS AND SEVER CLAIMS.

---

                            Howard A. Rosenthal
                            Gary D. Fry
                            Malcolm S. Gould
                              Attorneys for Equity Group
                              Eufaula Division, LLC

<u>OF COUNSEL</u>:
Gary D. Fry
Pelino & Lentz, P.C.
One Liberty Place
Thirty-Second Floor
1650 Market Street
Philadelphia, PA  19103
(215)665-1540


Joel P. Smith, Jr., Esquire
Williams, Pothoff, Williams
    & Smith, LLC
125 South Orange Avenue
Eufaula, Alabama 36027-1626
(334)687-5834

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . 3

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . 5

    A.   Poultry Processing Operations . . . . . . . . . . 5

        1.   Methods Of Compensation . . . . . . . . . . 7

        2.   Required Items Of Clothing . . . . . . . . . 9

    B.   Plaintiffs' Disparate Claims For Relief . . . . . . 10

    C.   Disparate Pay Practices . . . . . . . . . . . . . . 16

    D.   Disparate Union Status . . . . . . . . . . . . . . 19

    E.   Outside The Defined Class . . . . . . . . . . . . . 21

    F.   Widely Varying Items Of Sanitary Clothing . . . . . 23

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    A.   Plaintiffs Cannot Maintain This Action As A
        Collective Action Since They Have Failed To
        Demonstrate That They Are "Similarly Situated"
        Under Section 216(b) Of The FLSA . . . . . . . . . 26

        1.   Plaintiffs' Disparate Factual And Employment
             Settings . . . . . . . . . . . . . . . . . . 28

        2.   There Are Various, Differing Defenses
             Available To Defendant . . . . . . . . . . . 33

        3.   Fairness And Procedural Considerations
             Mandate Decertification . . . . . . . . . . 35

    B.   As Plaintiffs' Claims Are Improperly Joined,
        The Named Plaintiffs' Claims Should be Severed . . 37

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . 39

## TABLE OF AUTHORITIES

### CASES

Anderson v. Cagle's, Inc., 2005 U.S.Dist.LEXIS 41747
(M.D.Ga., December 8, 2005), aff'd, 488 F.3d 945 (11th
Cir. 2007), cert. denied, 128 S.Ct. 2902, 2008
U.S.LEXIS 4743 (June 9, 2008) . . . . . . . . . . . 2, 34, 39

Bayles v. American Medical Response of Colorado, Inc., 950
F.Supp. 1053 (D.Colo. 1996) . . . . . . . . . 28, 33, 36, 37

Black v. UnumProvident Corporation, 245 F.Supp.2d 194 (D.Me.
2003) . . . . . . . . . . . . . . . . . . . . . . . . . 28, 38

Brooks v. BellSouth Telecommunications, Inc., 164 F.R.D.
561 (N.D.Ala. 1995), aff'd without opinion, 114 F.3d 1202
(11th Cir. 1997) . . . . . . . . . . . . . . . . 26, 29, 33

DeAsencio v. Tyson Foods, Inc., 130 F.Supp.2d 660 (E.D.Pa.
2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Dybach v. State of Florida Dept. of Corrections, 942 F.2d
1562 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . 26

Grayson v. KMart Corporation, 849 F.Supp. 785 (N.D.Ga. 1994) 38

Harper v. Lovett's Buffet, Inc., 185 F.R.D. 358 (M.D.Ala.
1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Henderson v. AT&T Corporation, 918 F.Supp. 1059 (S.D. Tex.
1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Hipp v. Liberty National Life Insurance Co., 252 F.3d 1208
(11th Cir. 2001) . . . . . . . . . . . . . . . . . . . 1, 27

Hoffmann-La Roche, Inc. v. Sperling, 493 U.S. 165, 110 S.Ct.
482 (1989) . . . . . . . . . . . . . . . . . . . . . . . . 26

Lockhart v. Westinghouse Credit, 879 F.2d 43 (3d Cir. 1989),
overruled on other grounds as recognized by Starceski v.
Westinghouse Electric Corp., 54 F.3d 1089 (3d Cir. 1995) . . 26

Lusardi v. Xerox Corp., 118 F.R.D. 351 (D.N.J. 1987),
vacated in part  and modified in part on other grounds
by Lusardi v. Xerox Corp., 122 F.R.D. 463
(D.N.J. 1988) . . . . . . . . . . . . . . . . . . 28, 29, 32

Sheffield v. Orius Corp., 211 F.R.D. 411 (D.Or. 2002) . . . . 27

Stone v. First Union Corp., 203 F.R.D. 532
(S.D.Fla. 2001) . . . . . . . . . . . . . . . 17, 32, 33, 34

Stone v. First Union Corp., 216 F.R.D. 540 (S.D.Fla. 2003),
rev'd in part, 371 F.3d 1305 (11th Cir. 2004) . . . . . . . 27

<u>Thiessen v. General Electric Capital Corporation</u>, 996 F.Supp. 1071 (D.Kan. 1998) . . . . . . . . . . . . . 27, 28, 33, 35, 37

<u>Tucker v. Labor Leasing, Inc.</u>, 872 F.Supp. 941 (M.D.Fla. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

<u>Vaszlavik v. Storage Technology Corp.</u>, 175 F.R.D. 672 (D.Colo. 1997) . . . . . . . . . . . . . . . . . . . . . . 28

**<u>STATUTES</u>**

29 U.S.C. § 203(o) . . . . . . . . . . . . . . . . . . . 19

29 U.S.C. § 152(3) . . . . . . . . . . . . . . . . . . . 20

29 U.S.C. § 213(a)(6) . . . . . . . . . . . . . . . . 8, 20

29 U.S.C. § 216(b) . . . . . . . . . . . . . . . 1, 29, 35

<u>RULES</u>

Rule 20, F.R.C.P. . . . . . . . . . . . . . . . . . . . 38

Rule 20(a)(1), F.R.C.P. . . . . . . . . . . . . . . 37, 39

Rule 21, F.R.C.P. . . . . . . . . . . . . . . . . . . . 38

**INTRODUCTION.**

Plaintiffs, acting for themselves and on behalf of those allegedly similarly situated, initiated this action against Equity Group-Eufaula Division LLC ("Equity"), alleging violations of the Fair Labor Standards Act ("FLSA") for uncompensated time related to donning and doffing sanitary clothing.

On October 27, 2007, this Court conditionally certified this case to proceed as a collective action pursuant to 29 U.S.C. § 216(b), and granted Plaintiffs' Motion for Court Approved Notice. [See App., Tab 3 (Memorandum Opinion and Order).] In the Court-authorized Notice sent to present and former Equity employees, the class was defined as:

> "[a]ll similarly situated current and former hourly paid 1st and 2nd processing production employees, paid under a 'line time' or 'master time' system, or whose individual time clock punches were not the basis for hours worked, of EQUITY at any time within the past 3 years...." [See App., Tab 4 (Notice of Pending Fair Labor Standards Act Lawsuit).]

However, this Court adopted the two-tiered approach to certification under Section 216(b), as announced by the Eleventh Circuit in Hipp v. Liberty National Life Insurance Co., 252 F.3d 1208, 1218-19 (11th Cir. 2001). Hence, the Court properly noted that, "[b]ecause this determination is necessarily made at the early stages of litigation and the court has minimal evidence, this determination [of "similarly situated"] is made using a fairly lenient standard. Hipp, 252 F.3d at 1218." [App., Tab 3 (Memorandum Opinion and Order) at 2.]

The record, as fully developed, now demonstrates that the over 800 plaintiffs are not "similarly situated." Decertification is appropriate given the widely divergent pay practices between the departments within the putative class, including persons who are not paid on the basis of "line time" or "master time."[1]  Moreover, employees within the putative class have testified to (i) varying claims for relief <u>beyond</u> <u>and</u> <u>unrelated to</u> that encompassed by the donning and doffing claims set forth in the First Amended Complaint and (ii) widely varying items of sanitary clothing required to be worn.  Finally, the putative class contains plaintiffs who, by definition, are outside the class; are not covered by a collective bargaining agreement; or never even worked for Equity.

Although the class ostensibly is narrowly defined, it has become infected with plaintiffs asserting diverse claims for relief and other elements which clearly render the class members <u>not</u> similarly situated.  In lieu of policing the class, plaintiffs' counsel has accepted these disparate elements into the class and advocated on their behalf throughout the discovery process, including presenting them for deposition.  On these grounds, the Court should grant Equity's Motion to Decertify. Indeed, on the basis of a virtually identical factual record, the District Court, in <u>Anderson v. Cagle's, Inc.</u>, 2005 U.S.Dist.LEXIS 41747 (M.D.Ga., December 8, 2005), <u>aff'd</u>, 488 F.3d 945 (11th Cir. 2007), <u>cert. denied</u>, 128 S.Ct. 2902, 2008 U.S.LEXIS 4743 (June 9,

---

[1]For example, employees in the Sanitation Department are paid on an incentive-based pay system, that is, they are paid for eight hours regardless whether they actually work a full eight hours.  [App., Tab 7 (Stevens Affidavit), ¶ 14.]

-2-

2008)("Anderson"), granted the employer's motion to decertify in that donning and doffing case:

> "Where, as here, a tenuous second-stage class exists, it has been found that fairness and procedural considerations supported decertification of the class.... [A]s Defendants have demonstrated through extensive and contentious discovery, Plaintiffs are not 'similarly situated'.... Named Plaintiffs essentially employed by a single employer, based on the discovery before the Court, cannot fairly and adequately represent the variously assigned employees, the wide variety of work assignments and varied compensation structures affecting the purported class. Therefore, decertification is warranted." [App., Tab 8 (Order (3/31/05)) at 12.]

The Eleventh Circuit affirmed:  "the district court's decision to decertify the collective action based on the distinctions noted in its opinion does not constitute legal error" and "the district court did not abuse its discretion when it decertified the collective action."  488 F.3d at 954.

## PROCEDURAL BACKGROUND.

A total of 231 plaintiffs filed their Complaint on December 5, 2006.  On February 22, 2007, following the filing of Equity's Answer (denying all liability) to their Complaint, plaintiffs filed a Motion for Leave to File Amended Complaint, which was granted.  Plaintiffs' Amended Complaint was filed on March 14, 2007, to which Equity responded by denying all liability. Plaintiff's First Amended Complaint defined "[t]he potential class of 'opt-in' employees" as follows:

> "All current and former hourly 1st and 2nd processing employees of

-3-

> Defendant, paid under a master time
> compensation system in which
> individuals' time card punches are
> not the basis for starting and
> ending hours worked, who worked at
> the Baker Hill facility since
> **December 2, 2003,** and who were not
> paid for all the time spent
> performing compensable work-related
> tasks or legally compensable time,
> including, but not limited to
> authorized unpaid break times,
> donning and doffing times, washing
> activity times, time associated
> with passing through security check
> points and walking to changing
> areas and time walking to security
> and passing through security at the
> end of the day and walking times to
> and from break areas or donning and
> doffing areas, and including time
> compensable at regular hourly
> wages, as well as overtime pay for
> these employees." [App., Tab 1
> (First Amended Complaint), ¶ 16.][2]

On May 10, 2007, plaintiffs filed their Motion for an Order
Permitting Court Supervised Notice to Employees of Their Opt-In
Rights. [App., Tab 2.]  In their Motion, plaintiffs again made
clear that the potential class of opt-in employees was limited to
"1st and 2nd processing employees." [Id. at 6.]  In its October
24, 2007, Memorandum Opinion and Order granting plaintiffs'
Motion, this Court noted that "[t]he Plaintiffs seek to form a
class of all Equity Group Eufaula Division Baker Hill Plant
hourly 1st and 2nd processing production employees." [App.,
Tab 3 at 3.]  Accordingly, the Notice of Pending Fair Labor
Standards Act Lawsuit sent to potential opt-in employees
contained the following Court-approved language defining the
class:

---

[2]Equity's "1st and 2nd processing employees" work in the Evisceration
and Debone Departments of the Fresh Plant.

"IF YOU ARE OR WERE EMPLOYED, SINCE
MARCH 12, 2004, AS AN HOURLY PAID
1ST [EVISCERATION] OR 2ND [DEBONE]
PROCESSING PRODUCTION EMPLOYEE AT
EQUITY GROUP EUFAULA DIVISION, LLC,
IN BAKER HILL ALABAMA, AND PAID
ACCORDING TO 'LINE TIME', 'MASTER
TIME', or your individual time
clock punches were not the basis
for calculating your hours worked,
A COLLECTIVE ACTION LAWSUIT MAY
AFFECT YOUR RIGHTS."

**FACTUAL BACKGROUND.**

**A.    Poultry Processing Operations.**

Equity's poultry processing operations generally are organized into departments, each of which performs discrete functions either on the ultimate product (chicken meat) directly, such as evisceration (1st processing) and debone (2nd processing), or on a general plant-wide basis, such as Shipping, Quality Assurance and Sanitation.  Although subject to divergent pay and timekeeping practices, the putative opt-in plaintiff class is drawn from virtually every department and function performed at Equity's Eufaula facility.

In general, chicken meat processing at Equity is accomplished through the following departments:

- Live Receiving:  Live birds are unloaded from trailers and cages and hung on the processing line conveyer where they are immediately slaughtered. [App., Tab 7 (Stevens Affidavit), ¶ 7.]

- Evisceration (First Processing):  The slaughtered birds are defeathered, trimmed, eviscerated and inspected in preparation for chilling and further processing.  [Id.]

- Debone (Second Processing):  The poultry carcasses are skinned, deboned and reduced to various cuts in preparation for further processing at Equity or other facilities.  [Id.]

- **Further Processing ("Cook Plant")**: Chicken parts undergo various processes (*e.g.*, marination, breading, cooking, form cutting) in preparation for packaging and shipment to the customer. [Id.]

- **Pack-Off**: Product is boxed, wrapped, weighed and moved to shipping. [Id.]

The putative plaintiff class includes employees from each of these departments despite the Court's more limited Order.

Plant-wide operations are performed by three additional departments:

- **Sanitation**: A separate shift responsible for cleaning the entire facility in preparation for the resumption of poultry processing. [Id., ¶ 8.]

- **Quality Assurance**: Product is inspected for wholesomeness and conformity to customer specifications. [Id.]

- **Shipping**: Raw materials are received in refrigerated trailers and placed into refrigerated coolers and the process is reversed for finished product. [Id.]

Employees from each of these departments also have been joined in this action. In addition, there are plaintiffs from other departments and areas of the overall integrated operation, such as the Hatchery (Larry Bryer, Andrea Paige, Larry Thomas); Purchasing (Marcia Pritchett); Live Haul Trucking (Israel Hill, Jr., Willie Glenn); Janitorial (Janet Dunwoody, Laura Jones, Lorenzo Lewis, Rebecca Person); Knife Room (Marvin McElroy, Norma Ivory, Willie Smith); Environmental (William Horton); Cookplant Shipping (Darryl Bletcher, James Fenn, Anthony McKinnon, Michael Morris, Juanita Parham, Jeremiah Scott); Box Room (Courtney Jordan, Carter Hamm, Jeffery Strong, Jr.); Plant General (Edmund Chester, Evelyn Lampley, Nicholas Manuel, Cyril Market, Catherine Thompkins, Denise Williams, Vernie Williams, Hubert Davenport,

Albert Williams, Jr., George Davis, Joseph Davis, Archie
Guilford, Allen Holloway and Salvador Yepiz); and Paw Room
(Katherine Bennett, Sharon Billins, Alnisia Brinson, Billy Brown,
Lula Gordy, Shawtoca Hilton, Arnie Johnson, Cassandra Kennedy,
Antoine Louder, Felicia Russaw, Willie Turner, Shavonne
Williams).  [App., Tab 7 (Stevens Affidavit), ¶ 29.]

     1.  **Methods Of Compensation.**

    As noted, the overall pay practices vary among Equity's
various departments.  In general, the Evisceration and Debone
Departments are paid according to "line time," that is, time
actually worked measured from a specified start time, when the
first piece of product is scheduled to arrive at the first
position on that line, until the last piece of product actually
passes the first position on that line, less time for scheduled
breaks (for these employees, two 30 minute breaks).  [Id., ¶ 10.]
In addition, some production employees in these departments have
responsibility for set-up or related work before regular
production or work after regular production.  These employees are
paid from that start time, which is noted and recorded by line
supervisors in the "KRONOS" system.[3]  [Id., 11.]  If an employee
is asked to report early or stay late for work, that start time
or end time is recorded by the supervisor.  If an employee in
Evisceration or Debone reports late to work or leaves early, that
is also recorded by the supervisor, and the KRONOS clock-in or

---

[3]KRONOS is a computerized system used for recording time, attendance and
computing hours worked.  Production employees generally "swipe-in" or "swipe-
out" through the KRONOS system when they arrive at and leave the plant at one
of several KRONOS clocks located in the plant.  The KRONOS system generally is
used for recording attendance and, in conjunction with written entries
recorded by line supervisors, for computing hours worked by employees paid
according to "line time."  [App., Tab 7 (Stevens Affidavit), ¶ 12.]

clock-out time is used for that employee's start or end time. [App., Tab 44 (Preston Dep.) 73:4-7; App., Tab 39 (Mills Dep.) 121:9-18.]

Employees in the <u>Sanitation</u> <u>Department</u>, however, are compensated under an incentive-based pay system and paid for 8 hours daily, even if they work less than 8 hours.  If a <u>Sanitation</u> employee works more than 8 hours, he or she generally is paid overtime for any time over 8 hours, which is recorded by the supervisors.  Sanitation employees do not generally take "scheduled" breaks.  [App., Tab 7 (Stevens Affidavit), ¶¶ 14-15.]

Employees in the <u>Shipping</u> <u>Department</u> and <u>Quality</u> <u>Assurance</u> work set scheduled shifts, the hours of which are entered into the KRONOS system (subject to supervisory edits as may be required).  [<u>Id.</u>, ¶ 16.]

<u>Hatchery</u> employees are not even part of the production process, work at a different facility and are paid based on hours worked as recorded on individual time cards.[4]  [<u>Id.</u>]  <u>Truck</u> <u>drivers</u> and <u>office</u> <u>workers</u> are paid "clock-to-clock" or directly from the KRONOS system.  [<u>Id.</u>, ¶ 18.]

Although the production and sanitation employees are represented by the Retail and Wholesale Department Store Union, Alabama & Mid-South Council ("RWDSU") for purposes of collective bargaining, other "opt-in" plaintiffs, including hatchery workers, Quality Assurance, truck drivers and clerical, have no

---

[4]Hatchery employees ensure that the eggs laid at contract breeder farms are properly hatched and that the chicks are cared for until transported to a broiler farm where the birds are raised for slaughter. [App., Tab 7 (Stevens Affidavit), ¶ 9.]  As such, hatchery workers are not subject to the FLSA.  <u>See</u> 29 U.S.C. § 213(a)(6).

union representation and do not generally work at the processing plant. [<u>Id.</u>, ¶¶ 19-20.]

>    2.    **<u>Required Items Of Clothing</u>**.

The precise nature of an employee's job dictates what items of clothing may be required, if any at all. [<u>Id.</u>, ¶ 21.] Employees who work inside Equity's production facility only are required to wear a smock, hairnet/beardnet and ear protection. [<u>Id.</u>, ¶ 21.] In addition, production and sanitation employees are required to wear "non-slip" footwear of their choice, which can be worn to and from the plant. [<u>Id.</u>, ¶ 22.] Maintenance workers are required to wear steel-toed boots, as needed, which most wear to and from the plant. [<u>Id.</u>]

In addition to these items, production employees in the <u>Evisceration</u> and <u>Debone</u> <u>Departments</u> whose particular job requires the use of a knife are also required to wear plastic armguards and a steel mesh glove (which is distributed and put on while the employee is on the production line and being paid, and maintained and washed by Equity). [<u>Id.</u>, ¶ 23.] Employees who work in <u>Further</u> <u>Processing</u> and physically handle the chicken product are required to wear rubber gloves. [<u>Id.</u>, ¶ 24.] Optional clothing items are made available for the employees, if requested, and include blue plastic aprons and sleeves, cotton and heavy rubber gloves and safety glasses. [<u>Id.</u>, ¶ 25.]

Employees in the <u>Sanitation</u> <u>Department</u> (in addition to the smock, hair-beardnet and ear protection) are issued bump caps, rainsuits, heavy rubber gloves (if working with chemicals) and safety goggles. [<u>Id.</u>, ¶ 26.] They are paid for a guaranteed 8

hours even if they complete their work in less than 8 hours, or overtime if they work more than 8 hours.  [Id., ¶ 14.]

Employees in the Shipping Department (in addition to the smock, hair-beardnet and ear protection) are issued bump caps and safety goggles (although not always required to be worn), as well as cold weather gear as may be needed in a refrigerated environment.  [Id., ¶ 27.]  Hatchery employees are only required to wear non-slip shoes, but ear plugs are required in designated "high noise" areas.  [Id., ¶ 28.]

**B.**   **Plaintiffs' Disparate Claims For Relief.**

While plaintiffs' First Amended Complaint alleges only FLSA violations for uncompensated time related to donning and doffing sanitary clothing, discovery has revealed that numerous plaintiffs are asserting claims for allegedly uncompensated time which are not based on or in any way related to donning and doffing issues.

Numerous plaintiffs are asserting claims for actual production work performed on the production line.  Thus, plaintiff Caroline Turner claims she was not paid for actual production work on the "DSI" line:[5]

> "Q.  What's your understanding as to your claim in this lawsuit?
>
> "A.  It's back pay that we should have got and we didn't.
>
> "Q.  Back pay for doing what?
>
> "A.  For work and stuff that we did and we didn't get paid.

---

[5] DSI is a "portioning department" which is "separate from the deboning department."  [App., Tab 51 (Stevens Dep.) 30:10-12.]

"Q.  What work do you believe you
performed for which you weren't
paid?

"A.  Being on the line, being
working, and we're not getting paid
for it.

"Q.  Actual production work?

"A.  Right.

"Q.  Production work on the DSI
line?

"A.  Yes, sir.

"Q.  Putting the chicken up on the
belt?

"A.  Yes, sir.

"Q.  You believe that you were
doing that job for hours for which
you weren't paid?

"A.  Right."  [App., Tab 53 (C.
Turner Dep.) 13:10-14:6.]

Similarly, plaintiff Kendrick Lanan Spann testified:

"Q.  What is your understanding as
to what the lawsuit is about?

"A.  It's about back time."

              *   *   *

"Q.  Are there any particular
activities that you are claiming
you should have been paid for?

"A.  Overtime.

"Q.  And are you claiming that you
stayed late at work and you weren't
paid for that?

"A.  Yes.

"Q.  And what caused you to stay
late at work?

"A.  I worked on the rehang table;
you have to stay late to make

-11-

> combos and clean up and
> everything."  [App., Tab 50 (K.
> Spann Dep.) 10:16-18, 10:23-11:9.]

Plaintiff Ebone Morris was equally clear as to what she is
claiming:

> "Q.  Now, when you talk about these
> issues of wanting to get paid for
> time when you're working but not
> being paid, can you explain to me
> what you mean by that?
>
> "A.  When it's time for us to get
> off, we're still on the line
> working; they have already stopped
> our time, but we're still working.
>
> "Q.  Can you give me an example of
> what you mean by that?
>
> "A.  I'm still on the line working.
> Birds are still coming and we're
> still working, but they have
> already stopped our time.  They
> have already clocked us out."
> [App., Tab 41 (E. Morris Dep.)
> 12:4-16.]

Other employees testified to similar claims being asserted which
are wholly unrelated to donning and doffing.  [See, e.g., App.,
Tab 26 (P. Jones Dep.) 15:1-4 ("Q.  So your claim is that after
the master timecard was swiped, you were still required to be
working on the line?  A.  If you weren't finished, you were.");
App., Tab 38 (R. Merrill Dep.) 10:21-11:1 ("But I do different
jobs.  So if I'm doing different jobs, I should be getting paid
for those jobs because I was only assigned to one.").]

    Even in the face of plaintiffs' counsel's objection that
plaintiffs were giving only "a lay opinion" and that there may be
"other legal things" at issue that are not understood, it is
abundantly clear that plaintiffs themselves know precisely what
they are seeking:

"Q.  Do you have an understanding
of what it is that you, as a
plaintiff in this lawsuit, are
seeking to recover?

"A.  I guess being paid for the
time that I worked, like, overtime
or whatever and wasn't paid; like a
break.

"Q.  Can you describe for me what
you mean when you say you were
working overtime?

"A.  Well, a lot of time you would
work overtime and you didn't get
paid.

"MS. MCGOWAN: I'm going to object
that, you know, she's not a lawyer,
that this is a lay opinion.  She
can give you her best
understanding.  There may be other
legal things that she's entitled to
that she doesn't understand.

"MR. GOULD:  That's fine.  I
understand your objection."

                *   *   *

"Q.  ...What specific things are
you talking about when you're
saying that you worked overtime?

"A.  You know, like, worked like an
hour or two overtime or whatever;
and everybody else gone home and
you're still working, but you don't
get paid for it.  The shift is
over, but you're still working."
[App., Tab 9 (M. Allen Dep.) 53:10-
54:4, 54:14-20.]

[See also App., Tab 40 (S. Moore Dep.) 14:14-20, 15:17-16:4

(claiming recovery for unpaid work at debone wash station washing

product after the "master card" is swiped).]

     Some plaintiffs are asserting claims for preliminary or "set

up" time, work performed before actual production starts.  For

example, Marcus Rice testified as follows as to his claim as a

-13-

line leader on the "rehang" line:

> "A.  ...[T]he shift was supposed to
> start at 7:30.  Sometimes I got
> there earlier so I can set up all
> the departments that I had that I
> supposed to cover.  So sometimes I
> started early, but I don't think I
> got paid for it though."
>
>          *   *   *
>
> "Q.  You're telling me that you had
> to do certain job functions in
> order to prepare the rehang area
> for the start of production?
>
> "A.  Right.
>
> "Q.  And are you telling me that
> you weren't paid for those?
>
> "A.  No.
>
> "Q.  And is that part of your claim
> in this case?
>
> "A.  Right."  [App., Tab 46 (M.
> Rice Dep.) 12:6-11, 12:15-13:1.]

Similarly, plaintiff Monroe McCall is asserting a claim for
allegedly unpaid work he performed driving a "spotter" truck to
move loads of birds in the yard outside of the production
facility:

> "Q.  ...You say when you were a
> spotter you were out moving trucks
> around ten minutes before your
> start time, and you say you weren't
> paid for that?
>
> "A.  No.
>
> "Q.  Is that part of your claim in
> this lawsuit?
>
> "A.  Yes, that is a lot of it,
> too."  [App., Tab 36 (M. McCall
> Dep.) 27:14-20.]

Other plaintiffs are asserting claims for time spent

-14-

performing "exercises" designed to loosen up hands and
shoulders.[6]  For example, plaintiff Terrance Jackson testified to
mandatory participation in an "exercising program" where he "did
something with [his] hands and [his] shoulders and [his] neck,"
for which he is seeking compensation in this litigation:

> "Q.  ...Are you claiming in this
> case that you were not paid for
> those exercises, for the time it
> took you to do those exercises?
>
> "A.  Yes, sir.
>
> "Q.  And that's part of your claim
> in this case?
>
> "A.  Yes, sir."  [App., Tab 22 (T.
> Jackson Dep.) 36:14-21.]

Numerous other plaintiffs, under questioning by plaintiffs'
counsel, testified to these required, pre-production "exercises."
[See, e.g., App., Tab 28 (T. Kennedy Dep.) 34:5-12; App., Tab 48
(R. Shaw Dep.) 58:14-59:6; App., Tab 43 (M. Person Dep.) 48:19-
49:19; App., Tab 11 (P. Burks Dep.) 59:19-61:15; App., Tab 29
(S. Kincey Dep.) 45:5-20; App., Tab 35 (A. March Dep.) 50:14-
51:19.]

Plaintiff Evelyn Lampley testified to "exercises" led by her
supervisor (before production starts) in response to questions
posed by her counsel.  [App., Tab 30 (E. Lampley Dep.) 37:14-
38:9.]  When Lampley was asked by counsel for Equity whether
these "exercises" were part of her claim, plaintiffs' counsel

---

[6]Equity management representatives testified that, in the past,
employees on the debone lines performed mandatory exercises to "loosen up"
hands and shoulders, which exercises were performed "on the clock" and "after
the [production] line was started."  [App., Tab 39 (G. Mills Dep.) 157:8-18;
App., Tab 51 (R. Stevens Dep.) 158:17-21.]  Plaintiff Anthony March concurred,
testifying that the exercises were performed "while the birds are coming" and
after the master card was swiped.  [App., Tab 35 (A. March Dep.) 53:11-13.]

interrupted that <u>he</u> would "answer that for them" and stated: "[w]e do not know at this time, so we cannot answer as to whether we were making a claim for it." [<u>Id.</u> at 39:8-12.]

As only a sampling of the over 800 Equity plaintiffs were deposed, it can be reasonably assumed that many others in the putative class have claims for relief similar to these individuals, claims that are wholly divorced from and unrelated to the donning and doffing issues raised in the Amended Complaint and described in the conditional collective action certification. Accordingly, the class cannot be considered "similarly situated."

C.    <u>Disparate Pay Practices.</u>

There also exist widely divergent pay practices among the various departments ostensibly within the class, including persons who are not paid on the basis of line time.[7]  As noted, employees in the <u>Sanitation Department</u> are paid on an incentive-based pay system, <u>i.e.</u>, they are paid for eight hours regardless of whether they actually work a full eight hours.  [App., Tab 7 (Stevens Affidavit), ¶ 14.]    Nevertheless, a number of opt-in plaintiffs who have filed Consents to Join in this litigation are sanitation employees, including:  Danyel Brown, Shannon Burks, Kimberly Griffin, Talyia Jackson, Michael Johnson, Anthony Scott and Maurice Womack.  [<u>Id.</u>, ¶ 29.]

Other ostensible plaintiffs are paid on the basis of "clock in to clock out."  Thus, plaintiff Antonio Pearson worked in

---

[7]In some cases, line time and clock in-clock out methods of compensation may be <u>mixed</u>, as Fresh Plant Plant Manager Robin Stevens noted:  "Specific departments are set up on master cards, but then a supervisor would designate employees to be on a clock-in/clock-out, if they were a setup person or somebody stayed late."  [App., Tab 51 (Stevens Dep.) 43:9-16.]

shipping, loading and unloading boxed product from refrigerated trailers and moving it from the dock to coolers and back. [App., Tab 42 (A. Pearson Dep.) 9:7-10:5.] Pearson testified that he was paid from 8:30 a.m. to 5:30 p.m. on the basis of "clock in to clock out:"

> "Q.  What was your understanding as to how the company kept track of your time?
>
> "A.  By me clocking in and out."
>
>          *   *   *
>
> "Q.  ...Was it your understanding, Mr. Pearson, that the time for which you were paid was computed based on when you swiped in at 8:30 in the morning and then when you swiped out at 5:30 in the afternoon?
>
> "A.  Yes."
>
>          *   *   *
>
> "Q.  ...And were you told that?
>
> "A.  Yes."  [Id., 28:11-13, 28:20-29:6.][8]

Similarly, Samual A. Shabazz, another plaintiff, worked in shipping, loading product to and from cold storage and refrigerated trucks on the loading dock. [App., Tab 47 (S. Shabazz Dep.) 12:13-13:10, 15:1-15.] Shabazz' hours of work were from 12 midnight, when he swiped his timecard in, until 8:00 a.m., when he swiped out. [Id. at 14:15-9, 25:20-21.] According to Shabazz, he was paid on the basis of "clock in to clock out"

---

[8]Pearson also testified that he sanitized his boots _after_ he swiped in at 8:30 a.m. and _before_ he swiped out at 5:30 p.m. [App., Tab 42 (A. Pearson Dep.) 35:17-22.]

time.[9]  [Id. at 59:21-60:8.]

Although Pearson and Shabazz were the only plaintiffs who worked in Shipping that were deposed, a multitude of additional plaintiffs filing Consents to Join are or were employed in the Shipping Department, including Danny Chambers, Ulysses Dickey, Jr., Walter Ellis, Napoleon Glenn, Ray Glenn, Michael Johnson, Charlie Lohman, Nakia Lynn, Leon Lyons, James McCray, Tony Newman, Rodney Pugh, Traviston Rogers, Dornal Whigham, John Whigham, Charlie Wiggins and Don Williams.  [App., Tab 7 (Stevens Affidavit), ¶ 29.]

An additional group of plaintiffs (numbering at least 15) work now or formerly in Quality Assurance ("QA").  These employees are paid on the basis of their own individual time punches, as confirmed by plaintiff Larry Thomas, Jr.:

> "Q.  And in your job in QA, do you have an understanding as to how you are paid?  Are you paid from clock-in to clock out?
>
> "A.  Yes, sir."  [App., Tab 42 (L. Thomas Dep.) 9:7-10.]

Although Thomas testified that he was not asserting a claim for the period of time he worked in QA [id. at 10:23-11:8], plaintiffs' counsel (P. Mark Petro, Esquire) disagreed: "just for the record, there was some discussion about him being in the QA department and whether or not he's entitled to make a claim for donning and doffing. And I'm just saying we're not agreeing with

---

[9]Working in shipping, Shabazz did not wear any kind of plastic apron or sleeves, nor did he wear a chain glove, earplugs or bump cap.  [App., Tab 47 (S. Shabazz Dep.) 32:8-33:1.]  When he went on break, Shabazz did not have to wash his hands or otherwise use a wash station for any purpose.  [Id. at 54:21-55:1.]

you." [Id. at 29:4-9.]  Counsel for Equity then sought and

received confirmation of plaintiffs' position:

> "MR. GOULD:  So you're saying that
> despite his statement that he is
> not asserting a claim for the
> period of time that he's working in
> QA, despite that admission, you're
> claiming that you still are?
>
> "MR. PETRO:  Right." [Id. at 30:3-
> 8.][10]

The deponent then reversed himself and stated that he was, in

fact, asserting a claim "in this lawsuit for activities done

while you were working in a QA position?"  "Yes, sir."  [Id. at

31:9-11.]

Plaintiff Salintha Foster testified that one of the jobs she

held was that of a "pallet ticket writer" in the Evisceration

Department, responsible for printing out labels from the box room

and correctly labeling boxes of product.  [App., Tab 16

(S. Foster Dep.) 11:18-12:4.]  Foster was paid on a "clock in to

clock out" basis.  [Id. at 17:13-16.]

**D.    Disparate Union Status.**

One of Equity's primary defenses to plaintiffs' claims in

this case is Section 3(o) of the FLSA, 29 U.S.C. § 203(o), which

essentially excludes from compensation time spent "changing

clothes or washing" where the affected employees are covered by a

collective bargaining agreement.  Although _all_ of Equity's

---

[10]This exchange is telling and, in and of itself, demonstrates why
Equity's Motion to Decertify must be granted.  QA employees are not paid on
the basis of line time (nor are they deemed "production employees" under the
applicable labor agreements) and, hence, are clearly not within the class as
defined by the Court-approved Notice sent to present and former Equity
employees.  Nevertheless, despite this fact, QA employees (and other disparate
elements) have opted into this litigation and their claims are actively being
prosecuted by plaintiffs' counsel with full knowledge that they do not belong.

"production employees" are covered by a collective bargaining agreement, <u>not</u> <u>all</u> of the putative plaintiffs are included in the bargaining unit.  Specifically, "Quality Assurance" and "HACCP" positions are explicitly excluded from coverage in the applicable collective bargaining agreements.[11]  [<u>See</u> App., Tabs 5, 6 (Collective Bargaining Agreements effective 3/1/08-3/1/11 <u>and</u> 3/1/04-3/1/08); App., Tab 39 (Mills Dep.) 128:9-11.]

Two plaintiffs, Renata Fuller and Patricia Jones, testified that they were employed as HACCP techs during at least part of their time at the facility.  [App., Tab 17 (R. Fuller Dep.) 10:10-12; App., Tab 26 (P. Jones Dep.) 8:9-9:7.]  Additionally, plaintiffs Anthony Davis, Teresa Davis, Jerry Rumph and Sharon Womack are current HACCP techs.  [App., Tab 7 (Stevens Affidavit), ¶ 29.]  Moreover, a number of plaintiffs are Quality Assurance ("QA") employees, including Kimberly Adams, Tina Burnett, Shawanda Griffin, Jennifer Johnson, Marlana Johnson, Ashlee Jones, Sheila Jones, Shaleatha King, Bernadetta Lewis, Katrina Lynn, Dana McKinnes, Jeannette Porter, Johnnie Posey, Bobby Weems and Eric Williams.  [<u>Id.</u>, ¶ 29.]  All of these plaintiffs are excluded from coverage of the relevant collective bargaining agreements, giving rise to various, conflicting defenses.[12]

---

[11]"HACCP" is an acronym for Equity's Hazard Analysis Critical Control Point program, designed to prevent contamination of poultry products.  [App., Tab 39 (Mills Dep.) 68:21-69:6.]

[12]Additionally, hatchery workers, as "agricultural" employees, are excluded from coverage under the FLSA and, as "agricultural laborers" are excluded from coverage under the National Labor Relations Act.  <u>See</u> 29 U.S.C. § 213(a)(6) and 29 U.S.C. § 152(3).

**E.**   **Outside The Defined Class.**

Equity's Eufaula production facility is comprised of two separate processing plants -- the Fresh Plant and the Further Processing Plant.  [App., Tab 7 (Stevens Affidavit), ¶ 4.]  Live birds arrive at the Fresh Plant and are slaughtered in its First Processing ("Evisceration") Department and deboned in the Second Processing ("Debone") Department.  [App., Tab 1 (First Amended Complaint), ¶¶ 9-11; App., Tab 7 (Stevens Affidavit), ¶ 7.]  Plaintiffs made clear that the proposed FLSA class only includes former and current Equity "1st and 2nd processing employees," which limits the scope of the claims to the Fresh Plant:

> "Hourly processing employees primarily work in 1st processing where chickens are placed or hung on lines, killed, disemboweled, inspected, diseased parts are removed or trimmed, cleaned and chilled or 2nd processing where chickens after completing 1st processing are placed or hung on lines and are further processed, cut-up, marinated, deboned, weighed, sized, packed, loaded on trucks, etc. for delivery to plant customers."  [App., Tab 2 (Plaintiffs' Motion for an Order Permitted Court Supervised Notice at 6).][13]

Equity's DSI, Shipping, QA, HACCP and Maintenance Departments are not part of the Evisceration or Debone Departments, even to the extent that such employees work in the Fresh Plant.  [App., Tab 39 (Mills Dep.) 130:13-19.]

More critically, a review of the plaintiff class discloses

---

[13]See also App., Tab 4 (Notice of Pending Fair Labor Standards Act Lawsuit)("all similarly situated current and former hourly paid 1st and 2nd processing production employees....").

that counsel for plaintiffs accepted into the class (at least) over 45 plaintiffs who work in the Further Processing (or "Cook") Plant. Some of these plaintiffs have worked in the Cook Plant for a period of years [see, e.g., App., Tab 27 (A. Kennedy Dep.) 20:10-15], others for a lesser period of time. [See, e.g., App., Tab 45 (C. Reeves Dep.) 11:22-12:9; App., Tab 49 (R. Shorter Dep.) 17:5-9; App., Tab 13 (B. Darby Dep.) 9:18-10:3; App., Tab 20 (A. Ivery Dep.) 8:12-17.] Moreover, it is clear that these plaintiffs are asserting claims covering the time they worked in the Cook Plant. For example, plaintiff Coretta Reeves worked in the Cook Plant for over a year starting in 2003, left and then returned and worked for a period of two weeks in evisceration. Having worked for an additional period for Charoen Pokphand ("CP"), the prior owner of the facility,[14] Reeves is asserting claims for all three periods:

> "Q. It is your understanding that your claim relates to all three periods in which you worked?
>
> "A. Yes." [App., Tab 45 (C. Reeves Dep.) 13:18-21.]

Plaintiff Reeves illustrates an additional problem with the class as presently constituted -- it contains persons who worked for CP. Some of the plaintiffs worked only for CP -- and never for Equity:

> "Q. And at the time you stopped working at the plant, do you have an understanding of the name of the company that was employing you?
>
> "A. Charoen Pokphand." [App.,

---

[14]Equity acquired the assets of CP in March of 2004. [App., Tab 7 (Stevens Affidavit), ¶ 3.]

Tab 12 (L. Corbitt Dep.) 12:8-11.]

[See also App., Tab 24 (D. Johnson Dep.) 7:23-8:2 ("Q. ...you never worked for Equity, did you?  A.  No.").]  Others, like Reeves, worked at both facilities.  In any event, it is clear that these plaintiffs are actually asserting claims for periods of time when they worked for CP, despite the fact that the purported class is limited to persons employed by Equity.[15]

F.    **Widely Varying Items Of Sanitary Clothing.**

Employees in the putative class have testified to widely varying items of clothing which they wear.  As a general matter, production employees in the Fresh Plant are required to wear a smock, boots or shoe covers, a hairnet/beardnet and ear protection.  [App., Tab 7 (Stevens Affidavit), ¶ 21; App., Tab 41 (E. Morris Dep.) 28:8-14; App., Tab 18 (Glenn Dep.) 11:17-12:4; App., Tab 22 (T. Jackson Dep.) 13:13-19, 16:11-12; App., Tab 28 (T. Kennedy Dep.) 12:6-17; App., Tab 34 (Mahone Dep.) 14:12-20; App., Tab 31 (S. Lampley Dep.) 13:16-14:1.]  Only those employees whose particular jobs require the use of a knife are required to wear arm guards and steel mesh gloves.  [App., Tab 13 (Darby Dep.) 18:7-11; App., Tab 32 (F. Laseter Dep.) 22:11-21.] Optional clothing items made available for the convenience of the employees, if requested, include blue plastic aprons and sleeves, cotton gloves and safety glasses.  [App., Tab 7 (Stevens Affidavit), ¶ 25; App., Tab 15 (K. Ford Dep.) 17:19-22; App.,

---

[15]To emphasize again, work performed at Equity's Cook Plant or at CP is not encompassed within this class lawsuit -- as structured by plaintiffs themselves; yet, the plaintiffs asserting these claims are active participants in this proceeding and their interests are being advocated by their counsel, requiring decertification.

Tab 32 (F. Laseter Dep.) 20:8-21:20.]  The depositions of the plaintiffs reveal wide variances applicable to even the foregoing general practices:

- Plastic sleeves are optional: "[s]ome people wear sleeves and some don't."  [App., Tab 32 (F. Laseter Dep.) 20:11-13; see also App., Tab 23 (A. Johnson Dep.) 15:3-13; App., Tab 15 (K. Ford Dep.) 17:19-22.][16]

- HACCP techs in evisceration wear blue plastic aprons and sleeves but do not wear these items when working in the debone department.  [App., Tab 26 (P. Jones Dep.) 39:7-14; App., Tab 17 (R. Fuller Dep.) 20:12-19.]

- Some employees in "packout" do not wear cotton gloves or sleeves.  [App., Tab 21 (J. Jackson Dep.) 13:10-14:1.]

- Employees working at the "pallet ticket table" (where finished product is bagged, iced and placed on pallets) need not wear blue plastic gloves.  [App., Tab 54 (L. Warren Dep.) 13:5-11.]

- Employees in "live hang" have the option of wearing cotton sleeves for their convenience. [App., Tab 33 (C. Laster Dep.) 23:4-14.]

- Employees working in cold storage areas do not wear

---

[16]Indeed, within the class there are also widely varying and optional practices with respect to donning, washing and sanitizing.  For example, employees in "live hang" are not required to sanitize their boots before entering their work area.  [App., Tab 15 (K. Ford Dep.) 19:21-23.]  When returning from break, some production line employees do not wash their aprons, sleeves and gloves [App., Tab 25 (J. Johnson Dep.) 30:7-17; App., Tab 14 (L. Delbridge Dep.) 41:12-42:1]; in fact, some production employees do not wash at all when going to break or coming off break.  [App., Tab 37 (D. McNair Dep.) 48:1-12.]  Some production employees don their smock and apron while walking to their work stations.  [App., Tab 19 (A. Glover-Patrick Dep.) 24:18-25:2.]  Employees in the Box Room do not wash anything at break times.  [App., Tab 24 (D. Johnson Dep.) 22:9-15.]

aprons, sleeves, safety gloves
or ear plugs. [App., Tab 47
(S. Shabazz Dep.) 32:8-18.]

- Employees in the "Box Room"
  (where shipping boxes are made)
  wear only a smock, hair net and
  boots. [App., Tab 24
  (D. Johnson Dep.) 14:1-10.]

- Some employees in Shipping wear
  only their "regular clothes" on
  the job. [App., Tab 35
  (A. March Dep.) 18:23-19:6.]

Indeed, the plaintiffs are quite clear that employees may

wear some or all, or various combinations of clothing depending

on the nature of the department and specific tasks being

performed by (or the personal preference of) the employee:

"Q. From what you were able to
observe... did all the employees in
the debone department at Equity
wear these same items of clothing
at Equity?

"A. No, sir.

"Q. What did you observe?

"A. It -- it depended on what work
area they were working in. They
didn't have to have on all of
that." [App., Tab 10 (V. Avery
Dep.) 14:21-15:7.]

*   *   *

"Q. From what you were able to
observe in the two years you worked
there, did other employees with
other different kinds of jobs wear
different kinds of equipment?

"A. Yes." [App., Tab 42
(A. Pearson Dep.) 13:22-14:3.]

*   *   *

"Q. Does everybody in the debone
room wear these items?

-25-

"A.  No, sir.

"Q.  Do some employees wear
additional items depending on their
job?

"A.  Yes, sir."  [App., Tab 53
(C. Turner Dep.) 17:19-18:1.]

**A R G U M E N T**

**A.    Plaintiffs Cannot Maintain This Action As A Collective
Action Since They Have Failed To Demonstrate That They
Are "Similarly Situated" Under Section 216(b) Of The
FLSA.**

The two necessary requirements for maintaining a
representative action under the FLSA are that the class members
must be "similarly situated" and that each absent class member
file a consent to join the action.  29 U.S.C. § 216(b); Hoffmann-
La Roche, Inc. v. Sperling, 493 U.S. 165, 110 S.Ct. 482 (1989).
"The Eleventh Circuit requires a determination that persons are
similarly situated 'with respect to their job requirements and
with regard to their pay provisions' when deciding whether
persons are similarly situated under the FLSA."  Brooks v.
BellSouth Telecommunications, Inc., 164 F.R.D. 561, 568 (N.D.Ala.
1995), aff'd without opinion, 114 F.3d 1202 (11th Cir.
1997)(citing Dybach v. State of Florida Dept. of Corrections, 942
F.2d 1562, 1568 (11th Cir. 1991)).  Although the term "similarly
situated" is not defined by the statute, numerous courts have
construed the meaning of the term to require that plaintiffs be
"all (1) employed in the same corporate department, division and
location; (2) advance[ ] similar claims ... and (3) [seek]
substantially the same form of relief."  Lockhart v. Westinghouse
Credit, 879 F.2d 43, 51 (3d Cir. 1989), overruled on other
grounds as recognized by Starceski v. Westinghouse Electric

-26-

<u>Corp.</u>, 54 F.3d 1089, 1099, n.10 (3d Cir. 1995); <u>see also</u>

<u>DeAsencio v. Tyson Foods, Inc.</u>, 130 F.Supp.2d 660, 662 (E.D.Pa.

2001)("plaintiffs must: (1) be or have been employed in the same

corporate department, division and location; (2) have advanced

similar claims; and (3) have sought substantially the same form

of relief")(emphasis added).

Courts have also recognized that something more than gross

commonality is required to satisfy the "similarly situated"

requirement.  <u>See</u> <u>Sheffield v. Orius Corp.</u>, 211 F.R.D. 411, 413

(D.Or. 2002)("Putative class members must share more than a

common allegation that they were denied overtime or paid below

the minimum wage.  The class members must put forth a common

legal theory upon which each member is entitled to relief.").

When "[t]he proposed opt-in class ... includes individuals who

assert a variety of claims, many of which have not been asserted

by the representative Plaintiff," decertification of a § 216(b)

class is appropriate.  <u>Stone v. First Union Corp.</u>, 203 F.R.D.

532, 543 (S.D.Fla. 2001).[17]

At the second, post-discovery stage in Section 216(b)

collective action proceedings, as adopted by the Eleventh Circuit

in <u>Hipp v. Liberty National Life Insurance Co.</u>, <u>supra</u>, "courts

generally analyze the 'similarly situated' issue under a higher

standard...."  <u>Thiessen v. General Electric Capital Corporation</u>,

---

[17]The District Court in <u>Stone</u> decertified the class at the second stage
the <u>Hipp</u> two-tier analysis and the Eleventh Circuit denied plaintiffs'
petition for permission to appeal the decertification order.  Subsequently,
the <u>Stone</u> plaintiffs sought leave to amend their complaint in order to meet
the Section 216(b) certification standard and for leave to intervene.  The
District Court denied both motions but the Eleventh Circuit reversed the
intervention denial.  <u>See</u> <u>Stone v. First Union Corp.</u>, 216 F.R.D. 540 (S.D.Fla.
2003), <u>rev'd in part</u>, 371 F.3d 1305 (11th Cir. 2004).

996 F.Supp. 1071, 1080 (D.Kan. 1998); <u>see also</u> <u>Vaszlavik v.</u>
<u>Storage Technology Corp.</u>, 175 F.R.D. 672, 678 (D.Colo. 1997)("At
this second stage, although not specifically defined, the
'similarly situated' standard is higher."). At this second post-
discovery stage, the differences among the individual plaintiffs
are analyzed -- with the benefit of full discovery -- along with
other factors:

> "Most district courts analyzing the
> 'similarly situated' requirement at
> the post-discovery stage focus on
> three factors in determining
> whether plaintiffs are similarly
> situated: (1) the disparate factual
> and employment settings of the
> individual plaintiffs; (2) the
> various defenses available to
> defendant which appear to be
> individual to each plaintiff; and
> (3) fairness and procedural
> considerations." <u>Thiessen v.</u>
> <u>General Electric Capital</u>
> <u>Corporation</u>, <u>supra</u>, 996 F.Supp. at
> 1081.

<u>Accord</u> <u>Bayles v. American Medical Response of Colorado, Inc.</u>, 950
F.Supp. 1053, 1066 (D.Colo. 1996); <u>Brooks v. BellSouth</u>
<u>Telecommunications, Inc.</u>, <u>supra</u>, 164 F.R.D. at 568; <u>Lusardi v.</u>
<u>Xerox Corp.</u>, 118 F.R.D. 351, 359 (D.N.J. 1987), <u>vacated</u> <u>in</u> <u>part</u>
<u>and</u> <u>modified</u> <u>in</u> <u>part</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Lusardi v. Xerox Corp.</u>,
122 F.R.D. 463 (D.N.J. 1988). Analysis of these factors
demonstrates that plaintiffs here are not "similarly situated,"
within Equity's facility, and decertification of the class in
proper.

### 1.    Plaintiffs' Disparate Factual And Employment Settings.

This purported collective action must be decertified because

the proposed plaintiffs work or have worked for <u>different</u>
companies; work or have worked in a variety of <u>different</u>
departments and jobs with <u>different</u> supervisors and <u>different</u>
required items of clothing; and have asserted <u>different</u> claims
from those asserted by the named plaintiffs in the First Amended
Complaint.

In <u>Lusardi v. Xerox Corp.</u>, <u>supra</u>, the District Court
decertified a conditional class of salaried employees in an Age
Discrimination in Employment Act ("ADEA") case due to "[t]he
disparity and variety of individual situations."  118 F.R.D. at
357.[18]  As the District Court noted, "[t]he discovery ... reveals
a dramatic lack of similarity in age, salary, organization
employment, and geographic location by state and city."  <u>Id.</u> at
358.  On remand, the District Court again decided to decertify
the class:

> "The members of the proposed class
> come from different departments,
> groups, organizations, sub-
> organizations, units and local
> offices within the Xerox
> organization.  The opt-in
> plaintiffs performed different jobs
> at different geographic locations
> and were subject to different job
> actions concerning reductions in
> work force which occurred at
> various times as a result of
> various decisions by different
> supervisors made on a decentralized
> employee-by-employee basis.  This
> case should not continue in a class
> status."  122 F.R.D. at 465.

Similarly, in <u>Brooks v. BellSouth Telecommunications, Inc.</u>,
<u>supra</u>, the District Court denied conditional certification in an

---

[18]The ADEA incorporates the collective action enforcement provisions of
the FLSA as set forth at 29 U.S.C. § 216(b).

ADEA action for former management employees of defendant located
in all nine states where defendant operated:

> "The discovery to date has already
> demonstrated that the employees
> plaintiff proposes to notify are
> not similarly situated to the
> plaintiff.  As defendant points
> out, the [employees] cover all nine
> of the states in which defendant
> operates.  These employees would
> therefore be located within
> separate departments and under
> separate supervisors.
> Additionally, the [employees]
> represent a wide span in ages
> ranging from forty to seventy-five.
> Also, the involuntarily dismissed
> employees represent a variety of
> 'pay grades.'  Even at this stage,
> it is clear that any claims of the
> proposed opt-in plaintiffs would
> present disparate factual and
> employment settings."  164 F.R.D.
> at 569 (citations and footnote
> omitted).

In Harper v. Lovett's Buffet, Inc., 185 F.R.D. 358, 363
(M.D.Ala. 1999), servers at a Dothan, Alabama, chain restaurant
sued their employer for violations of the overtime and minimum
wage provisions of the FLSA.  While the District Court
conditionally certified a class of employees at defendant's
Dothan facility, it refused to extend it to "individual employees
who have worked at different restaurants, in different states,
for different managers, and, most likely, in quite different
working conditions."  Id. at 363.  See also Tucker v. Labor
Leasing, Inc., 872 F.Supp. 941 (M.D.Fla. 1994)(in FLSA action,
employees at truck terminals other than the terminal where named
plaintiffs worked were not shown to be "similarly situated" to
named plaintiffs as no evidence of similar job duties and
responsibilities or similar pay provisions was presented).

-30-

Here, the putative plaintiffs work in various facilities (i.e., fresh processing plant, further processing plant, hatchery), in a variety of different departments and jobs (i.e., live receiving, evisceration, debone, further processing, pack-off, sanitation and shipping) and under a variety of pay provisions (line cards, individual time cards and guaranteed hours).  See Anderson, supra, at 7 ("[t]here are no consistent or overall compensation methods between the various departments").  Moreover, all of the processing employees (debone, evisceration, live receiving, further processing, pack-out, sanitation and shipping), but not all of the plaintiffs, are covered by a collective bargaining agreement.  [See App., Tabs 5, 6 (2004 and 2008 Collective Bargaining Agreements).]

Moreover, beyond the basic required items of clothing consisting of smock, hair-beard net and ear protection, the precise nature of an employee's job dictates whether additional items of clothing are required, if any at all.  [See, generally, FACTUAL BACKGROUND, Part B(2), and F supra.]  Thus, production employees who work with knives are required to wear plastic arm guards and mesh gloves; hatchery employees only are required to wear non-slip shoes.

Finally, while some of the plaintiffs assert FLSA violations for uncompensated time related to donning and doffing sanitary clothing, discovery demonstrates that a sizeable percentage of plaintiffs are asserting claims for allegedly uncompensated time which are not based on any donning and doffing issue as set forth in the First Amended Complaint.  [See, generally, FACTUAL BACKGROUND, Part "B," supra.]  Thus, there are claims for

-31-

allegedly unpaid time related to "exercises" [App., Tab 22
(T. Jackson Dep.) 34:8-36:21]; allegedly uncompensated pre-
production time [App., Tab 46 (M. Rice Dep.) 12:2-13:1; App.,
Tab 36 (McCall Dep.) 26:19-27:6]; and, most predominant,
allegedly uncompensated production time on the line. [App.,
Tab 53 (C. Turner Dep.) 13:17-14:6; App., Tab 50 (K. Spann Dep.)
10:16-11:5; App., Tab 41 (E. Morris Dep.) 12:4-17; App., Tab 26
(P. Jones Dep.) 14:17-15:6; App., Tab 38 (R. Merrill Dep.) 10:6-
11:9; App., Tab 9 (M. Allen Dep.) 53:10-54:4, 54:14-20; App.,
Tab 40 (S. Moore Dep.) 14:14-20, 15:17-16:4.]   Clearly, these
individuals, representative of the whole collective group of
plaintiffs, allegedly "were subject to different job actions...
at various times as a result of various decisions by different
supervisors" and cannot be deemed "similarly situated." Lusardi
v. Xerox Corp., supra, 122 F.R.D. at 465.

        Because it is clear, based on a full discovery record, that
the plaintiffs' claims would present disparate factual and
employment settings, plaintiffs cannot maintain this action as a
collective action and the class should be decertified.  Indeed,
as the District Court held in Stone v. First Union Corp., supra,
in granting defendant's motion to decertify a putative ADEA class
of bank holding company employees:

> "Upon review, the Court finds that
> maintenance of an ADEA collective
> action involving Plaintiff Stone
> and all 160 opt-in plaintiffs is
> inappropriate under the facts of
> this case.  The proposed opt-in
> class mixes employees with
> different job titles and from all
> levels of the organization;
> includes individuals employed
> within different divisions of the

-32-

bank; <u>includes individuals who
assert a variety of claims, many of
which have not been asserted by the
representative Plaintiff</u>; and fails
to provide evidence of the
application of an overriding
discriminatory policy, practice, or
procedure.  Taken as a whole, the
factors set forth above... weigh
heavily in favor of decertifying
the subject class."  203 F.R.D. at
543 (emphasis added).[19]

### 2.    There Are Various, Differing Defenses Available To Defendant.

Certification under Section 216(b) also is improper in that
Equity will assert numerous individualized defenses with respect
to the varied claims of the opt-in plaintiffs.  Courts have
denied certification after discovery due to potential defenses
available to a defendant which cannot be addressed on a class-
wide basis.  <u>See</u>, <u>e.g.</u>, <u>Bayles v. American Medical Response of
Colorado, Inc.</u>, <u>supra</u>, 950 F.Supp. at 1067 (decertifying class in
FLSA action where case was "fraught with questions requiring
distinct proof as to individual plaintiffs" and employer's
defense "cannot be addressed on a class-wide basis"); <u>Brooks v.
BellSouth Telecommunications, Inc.</u>, <u>supra</u>, 164 F.R.D. at 569
(request for conditional class certification denied; "the court,
if plaintiff's suggested class were certified, would be faced
with numerous individualized defenses"); <u>see</u> <u>also</u> <u>Thiessen v.
General Electric Capital Corporation</u>, <u>supra</u>, 996 F.Supp. at 1084
("If defendants can truly convince the court that individual

---

[19]The disparity in the wage claims asserted by plaintiffs unrelated to
donning and doffing demonstrate the absence of "an overriding ... policy,
practice, or procedure," in the circumstances presented here, to warrant
proceeding to trial as a Section 216(b) class.  <u>See</u> <u>Stone v. First Union
Corp.</u>, <u>supra</u>, 203 F.R.D. at 550 ("[t]he class members have brought numerous
different types of claims....").

issues would predominate at trial, the contention that the opt-in plaintiffs are similarly situated would likely be largely eviscerated.").

Thus, Equity will assert individualized defenses as to those employees who are compensated on the basis of a wage guarantee (e.g., Sanitation employees) or who work "clock-to-clock" (e.g., QA, Shipping, hatchery workers).  Individualized defenses also will be asserted as to all employees who (for all or even a part of their employment period) were compensated by pay systems other than line time or while donning and doffing items of clothing worn by them, or who are not even subject to the FLSA.

Equity also will assert separate defenses as to each plaintiff who asserts a claim for "exercises" or working in live receiving or on the production line without, allegedly, receiving compensation for actual time worked (as opposed to doffing and donning), as many plaintiffs purport to do.  Clearly, any claim premised on uncompensated time which is unrelated to doffing and donning will require individualized inquiries into work practices and supervisory decisions which cannot be addressed on a class-wide basis.  See Stone v. First Union Corp., supra.

Finally, while Equity's Section 3(o) defense is applicable to all plaintiffs covered by a collective bargaining agreement, other, additional defenses may be asserted as to those plaintiffs excluded from coverage (Quality Assurance, HACCP, Hatchery).  This factor was deemed particularly significant by the Eleventh Circuit in affirming the District Court's decertification of the class in Anderson:

"Among the numerous distinctions,

-34-

we find particularly important
evidence that, unlike all of the
named plaintiffs, many of the opt-
in plaintiffs are not unionized.  A
key defense in this case, indeed
the very defense that resulted in
the district court granting summary
judgment in favor of CFJV, requires
the existence of a collective
bargaining agreement.  29 U.S.C.
§ 203(o).  Obviously... CFJV could
not raise this defense against the
non-union opt-in plaintiffs, a
point that clearly undermines the
appellants' contention that the
named plaintiffs could adequately
represent all of the opt-in
plaintiffs.  In addition, as a
practical matter, the availability
of defenses to some but not all of
the putative class members 'clearly
poses significant case management
concerns'."  488 F.3d at 954, n.8.

### 3.   Fairness And Procedural Considerations Mandate Decertification.

In <u>Thiessen v. General Electric Capital Corporation</u>, <u>supra</u>,

the District Court <u>provisionally</u> granted Section 216(b)

certification to an ADEA employee but invited a motion to

decertify in order to address the Court's "particular concerns"

as to the "disparate factual and employment settings" of the

class, the "various defenses available to defendants" and

"fairness and procedural considerations."  As to the latter

factor, the District Court warned:

"Finally, the court considers the
fairness and procedural aspects of
allowing this case to proceed as a
collective action under § 216(b).
<u>Specifically, the court is
concerned with coherently managing
a trial of the action and
presenting the evidence in a manner
that will not confuse the jury or
unduly prejudice any party.  If the
defendants actually do possess
substantial evidence of bona fide</u>

-35-

> <u>individualized defenses, the result</u>
> <u>may be such a mish-mash of highly</u>
> <u>detailed evidence that in a</u>
> <u>collective action both the</u>
> <u>defendants and the opt-in</u>
> <u>plaintiffs would run the risk of</u>
> <u>having any individualized</u>
> <u>consideration of the claims lost in</u>
> <u>the mire</u>.  There is simply a
> realistic limit on what a jury may
> reasonably be expected to absorb,
> retain and process -- and this case
> may be in danger of passing beyond
> that limit."  996 F.Supp. at 1084
> (emphasis added).

In <u>Bayles v. American Medical Response of Colorado</u>, <u>supra</u>, in decertifying a putative class of ambulance service employees in an FLSA action, the District Court warned of jury confusion and prejudice to the defendant were the case -- "fraught with questions requiring distinct proof as to individual plaintiffs" as well as defenses which "cannot be addressed on a class-wide basis" -- tried as a collective action:

> "In addition, there is a
> significant risk of prejudice to
> [defendant].  <u>Even if it were</u>
> <u>possible to proceed efficiently</u>
> <u>with this case as a collective</u>
> <u>action ... a jury would be</u>
> <u>instructed, as a matter of law,</u>
> <u>that all members of the plaintiff</u>
> <u>class (or subclass) are similarly</u>
> <u>situated.  [Defendant] would then</u>
> <u>be forced to argue to the jury that</u>
> <u>the plaintiffs, in effect, are not</u>
> <u>similarly situated, and some or all</u>
> <u>plaintiffs deserve no relief.  A</u>
> <u>jury is likely to be confused.</u>
> Indeed, a collective action is
> designed to permit the presentation
> of evidence regarding certain
> representative plaintiffs that will
> serve as evidence for the class as
> a whole.  <u>It is oxymoronic to use</u>
> <u>such a device in a case where proof</u>
> <u>regarding each individual plaintiff</u>
> <u>is required to show liability</u>."
> 950 F.Supp. 1065 (emphasis added).

-36-

Here, discovery demonstrates that discrete, individual issues abound, whether related to the plaintiffs' disparate factual and employment settings or the various separate and individualized defenses available to Equity.

As the District Courts instructed in <u>Thiessen v. General Electric Capital Corporation</u>, <u>supra</u>, and <u>Bayles v. American Medical Response of Colorado</u>, <u>supra</u>, individualized and varied claims as well as separate defenses lead to jury confusion and prejudice to the defendant in cases tried as § 216(b) collective actions.  Thus, Equity ought not be exposed to that prejudice through the "oxymoronic use" of the collective action in the circumstances of this case.

### B.   As Plaintiffs' Claims Are Improperly Joined, The Named Plaintiffs' Claims Should Be Severed.

In addition to decertifying the collective nature of this action, the Court should sever the named plaintiffs' claims and require that the severed plaintiffs proceed separately on those claims.  Rule 20(a)(1), F.R.C.P., provides:

> "(a) Persons Who May Join or Be Joined.
>
> "(1) <u>Plaintiffs</u>.  Persons may join in one action as plaintiffs if:
>
> "(A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> "(B) any question of law or fact common to all plaintiffs will arise in

the action."

Rule 21, F.R.C.P., provides the remedy for misjoinder of parties:

> "Misjoinder of parties is not a
> ground for dismissing an action.
> On motion or on its own, the court
> may at any time, on just terms, add
> or drop a party.  The court may
> also sever any claims against a
> party."[20]

Here, as more fully described above, plaintiffs' disparate claims for relief, asserted within disparate factual circumstances relative to pay practices and union status, demonstrate the lack of any common transaction or occurrence sufficient to comply with Rule 20(a)'s permissive joinder standards.  Further, claims for production work and "exercises" being made by some plaintiffs present questions of law or fact which are certainly not common to all plaintiffs.  Similarly, claims asserted by plaintiffs who are outside the defined class, but whose interests are actively being advocated in this litigation, fall without the scope of permissive joinder. Accordingly, these claims must be dropped or severed.  See, e.g., Black v. UnumProvident Corporation, 245 F.Supp.2d 194, 200 (D.Me. 2003) (In case involving class action against long-term disability insurance provider, court granted motion to sever: "[e]ach case is factually different and distinct, and relief for each Plaintiff depends on those wholly different factual scenarios."); Grayson v. KMart Corporation, 849 F.Supp. 785, 789

---

[20]The 2007 amendments to Rules 20 and 21, F.R.C.P., were intended "to make them more easily understood and to make style and terminology consistent throughout the rules.  These changes are intended to be stylistic only."  See Advisory Committee Notes.  Accordingly, case law construing the prior versions of these rules remains authoritative.

(N.D.Ga. 1994) (Where current and former employees brought age discrimination actions against employer, Court granted severance: "[t]he Court further finds that no common question of law or fact exists between the plaintiffs' cases, within the meaning of <u>Rule 20(a)</u>.... [E]ach demotion decision affecting the plaintiffs in these cases was a discrete act by the defendant.");[21] <u>Henderson v. AT&T Corporation</u>, 918 F.Supp. 1059, 1064 (S.D. Tex. 1996)(In sex discrimination case where "Plaintiffs' claims in fact are highly individualized, involving particularized questions about each Plaintiff's work history and job performance," the "Court concludes that a severance of at least some of the Plaintiffs' claims is required in the interests of justice."). For the same reasons that decertification is appropriate, the originally named plaintiffs' claims must be severed and they be required to proceed individually.

## CONCLUSION.

The District Court in <u>Anderson</u> concluded that "[t]he putative class is composed of disparate factual and employment settings and cannot continue as a collective action." [App., Tab 8 (Order 3/31/05) at 3.] Similarly here, as plaintiffs proffer a putative class composed of disparate factual and employment settings (as well as disparate claims for relief), which will be countered by Equity's individualized and separate defenses, this case cannot proceed as a collective action and the

---

[21]The <u>Grayson</u> Court also determined that severance was proper in part because of the "tremendous danger that one or two plaintiff's unique circumstances could bias the jury against defendant generally, thus, prejudicing defendant with respect to the other plaintiffs' claims." 849 F.Supp. at 790.

putative class should be decertified, and the named plaintiffs'
claims severed.


                                    /s/Gary D. Fry
                                    Howard A. Rosenthal
**OF COUNSEL**:                     Gary D. Fry
Pelino & Lentz, P.C.                Malcolm S. Gould
One Liberty Place         Attorneys for Equity Group
Thirty-Second Floor            Eufaula Division, LLC
1650 Market Street
Philadelphia, PA  19103
(215)665-1540

Joel P. Smith, Jr., Esquire
Williams, Pothoff, Williams
   & Smith, LLC
125 South Orange Avenue
Eufaula, Alabama 36027-1626
(334)687-5834

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA - NORTHERN DIVISION**

```
BETTY ANN BURKS, et al.,         :
                                 :
          Plaintiffs,            :
                                 :
      v.                         :    No. 2:06-CV-1081-MEF
                                 :
EQUITY GROUP EUFAULA             :
DIVISION LLC,                    :
                                 :
          Defendant.             :
```

## CERTIFICATE OF SERVICE

The undersigned counsel for Equity Group Eufaula Division LLC certifies that true and correct copies of the Motion to Decertify Class and Sever Claims and supporting Memorandum of Law in Support of Motion to Decertify Class and Sever Claims were filed and served electronically with the Clerk of Court and also was served by depositing true and correct copies in the United States Mail, first class postage prepaid, on August 1, 2008, and addressed as follows:

Robert J. Camp, Esquire
The Cochran Firm
505 North 20th Street
Suite 825
Birmingham, AL  35203
rcamp@cochranfirm.com

M. John Steensland, III, Esquire
Parkman, Adams & White
739 West Main Street
Dothan, AL  36301
parkman@graceba.net, jjsteensland@yahoo.com

Richard Martin Adams, Esquire
Parkman, Adams & White
505 North 20th Street
Suite 825
Birmingham, AL  35203
parkman@graceba.net

Samuel A. Cherry, Jr. Esquire
Cochran, Cherry, Givens, Smith, Lane
  & Taylor, P.C.
163 West Main Street
Dothan, AL  36301
scherry@cochranfirm.com, samcherry@cochranfirm.com

```
                    Joseph David Lane, Esquire
                    Cochran, Cherry, Givens, Smith, Lane
                      & Taylor, P.C.
                    163 West Main Street
                    Dothan, AL  36301
                    jlane@cochranfirm.com, jdavidlane@aol.com

                    Candis A. McGowan, Esquire
                    Wiggins Childs Quinn & Pantanis, P.C.
                    The Kress Building
                    301 North 19th Street
                    Birmingham, AL  35203-3204
                    CMcGowman@wcqp.com

                    Attorneys for Plaintiffs


                              /s/Gary D. Fry
                              Howard A. Rosenthal
                              Gary D. Fry
                              Malcolm S. Gould
OF COUNSEL:                       Attorneys for Equity Group
Pelino & Lentz, P.C.            Eufaula Division, LLC
One Liberty Place
Thirty-Second Floor
1650 Market Street
Philadelphia, PA  19103
(215)665-1540

Joel P. Smith, Jr., Esquire
Williams, Pothoff, Williams
    & Smith, LLC
125 South Orange Avenue
Eufaula, Alabama 36027-1626
(334)687-5834
```

**TAB 1**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA,
## MONTGOMERY DIVISION

| | | |
|---|---|---|
| BETTY ANN BURKS, MITCHELL | § | CIVIL ACTION NO. |
| BURKS, TEMEKIA CALLOWAY, | § | 2:06-cv-01081-MEF-DRB |
| MARIE CHITTY, BARBARA ANN | § | |
| DARBY, TRACY A. DAVIS, LAURIE T. | § | |
| DELBRIDGE, KENNETH FORD, | § | |
| ALVIN FORTE, TERESA GLENN, | § | |
| GLORIA GULLETTE, JIMMY | § | |
| HAMILTON, ANNIE IVERY, TINESHA | § | |
| S. JACKSON, ANNIE R. JOHNSON, | § | |
| FELICIA LASETER, CHRISTOPHER | § | |
| LASTER, ANTONIO LINDSEY, | § | |
| ANTHONY B. MARCH, MARY | § | |
| MARCH, MARK A. MARSH, MONROE | § | |
| MCCALL, CHANDRA MCCRAY, | § | |
| DOROTHY A. MCNAIR, DENISE | § | |
| MCCRAY MITCHELL, BENJAMIN | § | |
| PHILLIPS, MARCUS TERRELL RICE, | § | |
| ERVIN SMITH, KENDRICK LANAN | § | |
| SPANN, ANTHONY STREETER, | § | |
| MARINE TILLER, ALBERT L. | § | |
| WILLIAMS, JR., CHANDA YOUNG, | § | |
| MARY LEE ALLEN, PATSY ANGLIN, | § | |
| VIRGIINIA AVERY, CORA L. BAKER, | § | |
| LILLIE M. BANKS , MORRIS BANKS, | § | |
| TAJUANA BASKIN, TERESA A. | § | |
| BAXTER, ANNIE BEASLEY, JAMES C. | § | |
| BEDELL, KIMBERLY BEDELL, | § | |
| BETTY BIGGERS, KATINA BINION, | § | |
| TRACY BINION, DOROTHY A. | § | |
| BLACKMON, RENA BLACKMON, | § | |
| WILLIE MAE BLACKMON, MARCUS | § | |
| B. BLAIR, TASHEENA BONAPARTE, | § | |
| KAREN BOWENS, JEFFERY BROOKS, | § | |
| CHERANDA BROWN, DANYEL | § | |
| BROWN, LARRY BRYER, FELICIA | § | |
| BULLARD, PEARLINE BURKS, | § | |

SHANNON BURKS, SHARON I. BUSH,        §
BRENDA L. CALHOUN, MICHAEL            §
CANNON, ETHEL CARTER,                 §
VERNETTE CARTER, BRENDA               §
CHAMBERS, DASHAWN CLARK,              §
TOWANDER COLEMAN, LATOYA              §
CORBITT, MATTIE COTTON,               §
BERTHA L. CRAYTON, ANTHONY T.         §
CULVER, TIFFANY CUNNINGHAM,           §
LATONIA M. DAVIS, JOANN               §
DENNARD, CHERRY A. DEVOSE,            §
JENNIFER D. DIGGS, KAMILAH            §
DUKES, MICHELLE R. DUMAS,             §
KATRINA FAVORS, CHANDA L.             §
FERGUSON, REGINALD FLOYD,             §
SALINTHA FOSTER, SHERVONNE            §
FOSTER , NICHOLAS L. FREEMAN,         §
MARY LINDA FRYER, RENATA              §
FULLER, ELIZABETH GAINER,             §
CAMILLE A. GIPSON, CAROLYN            §
CLANTON, TANGELA D. GLENN,            §
WILLIE E. GLENN, ANNIE T.             §
GLOVER, PATRICK THOMAS                §
GOSHA, NAKEISHA GRAVES,               §
ALFONZO GREEN, SR., ANDREW            §
GRIFFIN, KIMBERLY GRIFFIN, MINA       §
L. GUICE, ROBERT A. HAMILTON,         §
BRIAN HANKS, JAMES HARRIS, JR.,       §
DENISE HARRIS WILSON, LARRY           §
HICKS, SHERWANDA HUMBERT,             §
WILLIE B. IVEY, ANDRE JACKSON,        §
JOHNNY L. JACKSON, TERRANCE           §
JASCKSON, MOLINDA J. JACOBS,          §
MONICA JAMES, ANNIE D. JENKINS,       §
LAWANDA JOHNS, BRENDA                 §
JOHNSON, CEDRIC D. JOHNSON,           §
DERINDA JOHNSON, EDGAR                §
JOHNSON, MICHAEL JOHNSON,             §
JENNIFER T. JOHNSON, NADINE           §
JOHNSON, TYWONDA D. JOHNSON,          §

2

**VANESSA JOHNSON, WILLIE** §
**JOHNSON, JR., BESSIE JONES,** §
**BETTY JONES, BOBBY JONES,** §
**LEMARIO JONES, LOTTIE JONES,** §
**PATRICIA JONES, COURTNEY** §
**JORDAN, CELICIA KELLEY,** §
**KENNETH W. KELLEY, ARLEEN** §
**KENNEDY, SHIRLEY KENNEDY,** §
**TRACY KENNEDY, STEVEN L.** §
**KINCEY, EVELYN LAMPLEY,** §
**SERENDA LAMPLEY, EMILY** §
**LASETER, MARY ANN LAWRENCE,** §
**EDDIE LEWIS, LORENZO J. LEWIS** §
**JR., BRENDA LIGHTNER SLATER,** §
**MARGIE B. LOHMAN, CHRISTINA E.** §
**LYNN, ATRAVOUS MAHONE,** §
**ELETHIA MARSHALL, REGINA** §
**MAYS, REGINA MAYS, DIANNE** §
**MCCLOUD, JOSEPH MCCOY,** §
**GERTHA R. MCRAE, ANTHONY** §
**MCKINNON, RENNA MERRILL,** §
**SHAKERIA L. MOORE, MICHAEL** §
**MORRIS, DOROTHY MULKEY, TONY** §
**NEWMAN, MARION NORRIS, KRISTA** §
**R. OLIVER, GWENDOLYN OWENS,** §
**ANDRE PAIGE, JENNIFER PARHAM,** §
**JUANITA JONES PARHAM, SHAUNTE** §
**PARKER, VALERIE ELAINE** §
**PARKER, SHARON D. PARKMAN,** §
**ANTONIO L. PEARSON, OZELLA** §
**PERSON, MARQUITA PERSON,** §
**JOHNNIE MAE POSEY, CORETTA Y.** §
**REEVES, DINA REEVES, SHEILA** §
**REEVES, CALVIN F. RICHARDSON,** §
**JR., DENISE RICHARDSON, LAURIE** §
**J. ROBINSON, MARGARET** §
**ROBINSON, MICHAEL ROBINSON,** §
**NETTIE J. RODGERS, RANDY** §
**RODGERS, EARL R. ROGERS,** §
**ANGELA RUMPH, DORIS SANDERS,** §

SAMUEL A. SHABAZZ, ROSE D.              §
SHAW, REBECCA H. SHORTER,               §
VIVIAN Y. SHORTER, GREGORY L.           §
SINQUEFIELD, SLOANE SMITH,              §
THERESEA Y. STARLING, TIFFANY           §
STARLING, RODERICK STREETER,            §
DESIREE STINSON, TERRANCE  T,           §
TENNILLE, BARBARA L. TEW,               §
HESTER M. THOMAS, LARRY                 §
THOMAS JR., TAMMY T. THOMAS,            §
TORA THOMAS, WANDA THOMAS ,             §
SHEMIECE THOMPKINS, LILLIAN             §
THOMPSON, BRANTLEY                      §
THORNTON, SHEREEKIA V.                  §
THORNTON, COURTNEY J.                   §
TOLBERT, CAROLYN A. TURNER,             §
DORSEL TURNER, ALLISON                  §
VAUGHN, ALFONZA WALKER,                 §
MARQUITA WALKER, EDNA L.                §
WALTON, LAKESHIA E. WARREN,             §
TARSHEKIA WARREN, DORNAL                §
WHIGHAM, JOHN WHIGHAM,                  §
PATRICIA WHIGHAM, GARY L.               §
WHITE, WENDY WHITE, BELINDA             §
WILLIAMS, BERTHA ANN                    §
WILLIAMS, BOBBY LEE                     §
WILLIAMS,JR., ELAINE WILLIAMS,          §
KELLI WILLIAMS, VERNIE                  §
WILLIAMS, WILLIE WILLIS, MARY           §
S. WRIGHT, BETTY J. YOUNG,              §
SANTIINIA YOUNG and SHAWANDA            §
YOUNG,                                  §
                                        §
        **Plaintiffs,**                 §
                                        §
**v.**                                  §

**EQUITY GROUP EUFAULA**      §
**DIVISION, LLC,**             §
                              §
   **Defendant.**             §

## FIRST AMENDED COMPLAINT

Plaintiffs, individually and on behalf of all others similarly situated

("Plaintiffs"), by and through their counsel, for their Complaint against

Defendant Equity Group, LLC., (collectively "Equity Group" or

"Defendant"), seek to recover for Equity Group's violations of the Fair

Labor Standards Act of 1938 (FLSA), 29 U.S.C. §§ 201 *et seq.*, and hereby

state and allege as follows:

## INTRODUCTION

1.      This is a representative action brought pursuant to FLSA §

216(b) by Plaintiffs on behalf of themselves and all other similarly situated

current and former production employees of Equity Group at its Baker Hill,

Alabama  facility, located in Barbour County, Alabama, for purposes of

obtaining relief under the FLSA for unpaid wages, unpaid overtime wages,

liquidated damages, costs, attorneys' fees, declaratory and/or injunctive

relief, and/or any such other relief the Court may deem appropriate.

2.      Equity Group operates a chicken processing plant in Baker Hill,

Alabama ("Baker Hill facility").  The complained of unlawful compensation

system at issue in this Complaint has affected Defendant's present and former hourly production employees at this location.

3.    In *IBP, Inc. v. Alvarez*, 126 S. Ct. 514 (2005), the United States Supreme Court unanimously affirmed a ruling that IBP's wage and hour policies – those at issue in this case – violated the Fair Labor Standards Act of 1938 ("FLSA").

4.    Equity Group uniformly denies hourly wages and overtime premium pay to its employees, by requiring them to perform "off the clock" work. Equity Group's deliberate failure to pay employees earned wages and overtime compensation violates federal law as set out in the Fair Labor Standards Act.

5.    Plaintiffs perform multiple tasks, but are all victims to the same illegal policy and practice of failing to pay workers for all time worked, including unpaid, but compensable break periods, unpaid hourly wage times and unpaid overtime premium wage times.

## JURISDICTION AND VENUE

6.    The FLSA authorizes court actions by private parties to recover damages for violation of the FLSA's wage and hour provisions. Jurisdiction over Plaintiffs' FLSA claims is based upon 29 U.S.C. § 216(b) and 28 U.S.C. §§ 1331-37.

7.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) and (c), because Equity Group does business in this district and a substantial part of the unlawful conduct giving rise to the claims occurred in this district.

## PARTIES

8.    Defendant, Equity Group, is a Delaware corporation with its principal place of business in Alabama.

9.    Plaintiffs are current and former Equity Group employees who work(ed) at the Equity Group's Baker Hill, Alabama facility within the last three years, dating back to **December 2, 2003**, and can be generally categorized herein as "First Processing" and "Second Processing" employees.

10.    First Processing generally includes those employees who work in an area of the plant where the product (chickens) is introduced into the plant and placed or hung on "the line" for killing, cleaning, disemboweling, and chilling.

11.    Second Processing generally includes those employees who work in an area of the plant where after the product has completed First Processing, it is further processed, prepared, cut-up, marinated, deboned,

weighed, sized, packed, loaded on trucks, etc. for delivery to plant customers.

12.    Plaintiffs listed herein who primarily work in First Processing include: Betty Ann Burks, Mitchell Burks, Temekia Calloway, Marie Chitty, Barbara Ann Darby, Tracy A. Davis , Laurie T. Delbridge, Kenneth Ford, Alvin Forte, Teresa Glenn, Gloria Gullete, Jimmy Hamilton, Annie Ivery, Tinesha S. Jackson, Annie R. Johnson, Felicia Laseter, Christopher Laster, Antonio Lindsey, Leon Lyons , Anthony B. March, Mary March, Mark A. Marsh, Monroe Mccall, Chandra McCray, Dorothy A. McNair, Denise McCray Mitchell, Benjamin Phillips, Marcus Terrell Rice, Ervin Smith, Kendrick Lanan Spann, Anthony Streeter, Marine Tiller, Albert L. Williams Jr. and Chanda Young.

13.    Plaintiffs listed herein who primarily work in Second Processing include:   Mary Lee Allen, Patsy Anglin, Virginia Avery, Cora L. Baker, Lillie M. Banks, Morris Banks, Tajuana Baskin, Teresa A. Baxter, Annie Beasley, James C. Bedell, Kimberly Bedell, Bettye Biggers, Katina Binion, Tracy Binion,  Dorothy A. Blackmon, Rena Blackmon, Willie Mae Blackmon, Marcus B. Blair, Tasheena Bonaparte, Karen Bowens , Jeffery Brooks, Cheranda Brown, Danyel Brown, Larry Bryer, Felicia Bullard , Pearline Burks, Shannon Burks, Sharon L. Bush, Brenda L. Calhoun,

8

Michael Cannon, Ethel Carter, Vernette Carter, Brenda Chambers, Dashawn

Clark, Towander Coleman, Latoya Corbitt, Mattie Cotton, Bertha L.

Crayton, Anthony T. Culver, Tiffany Cunningham, Latonia M. Davis, Joann

Dennard, Cherry A. Devose, Jennifer D. Diggs, Kamilah Dukes, Michelle G.

Dumas, Katrina Favors, Chanda L. Ferguson, Reginald Floyd, Salintha

Foster, Shervonne Foster, Nicholas L. Freeman, Mary Linda Fryer, Renalta

Fuller, Elizabeth Gainer, Camille A. Gipson, Carolyn Glanton, Tangela D.

Glenn, Willie E. Glenn, Annie T. Glover-Patrick, Thomas Gosha, Nakeisha

Graves, Alfonza Green, Sr., Andrew Griffin, Kimberly Griffin, Mina L.

Guice, Robert A. Hamilton, Brian Hanks , James Harris Jr., Denise Harris

Wilson, Larry Hicks, Sherwanda Humbert, Willie B. Ivey, Andre Jackson,

Johnny L. Jackson, Terrance Jackson, Molinda Jacobs, Monica James,

Annie D. Jenkins, Lawanda Johns, Brenda Johnson, Cedric D. Johnson,

Derinda Johnson, Edgar Johnson, Jennifer T. Johnson, Michael Johnson,

Nadine Johnson, Tywonda D. Johnson, Vanessa Johnson, Willie Johnson Jr.,

Bessie Jones, Betty Jones, Bobby Jones, Lemario Jones, Lottie Jones,

Patricia Jones, Courtney Jordan, Celicia Kelley, Kenneth W. Kelley, Arleen

Kennedy, Shirley Kennedy, Tracy Kennedy, Steven L. Kincey, Evelyn

Lampley, Serenda Lampley, Emily Laseter, Mary Ann Lawrence, Eddie

Lewis, Lorenzo J. Lewis Jr., Brenda Lightner Slater, Margie B. Lohman,

Christina E. Lynn, Artravous Mahone, Elethia Marshall, Regina Mays,

Dianne McCloud, Joseph Mccoy, Gertha R. Mcrae, Anthony Mckinnon,

Rena Merrill, Shakeria L. Moore, Michael Morris, Dorothy Mulkey, Tony

Newman, Marion Norris, Krista R. Oliver, Gwendolyn Owens , Andre

Paige, Jennifer Parham, Juanita Jones Parham, Shaunte Parker, Valerie

Elaine Parker, Sharon D. Parkman, Antonio L. Pearson, Ozella Person,

Marquita Person, Johnnie Mae Posey, Coretta Y. Reeves, Dina Reeves,

Sheila Reeves, Calvin F. Richardson, Jr., Denise Richardson, Laurie J.

Robinson, Margaret Robinson, Michael Robinson, Nettie J. Rodgers, Randy

Rogers, Earl R. Rogers, Angela Rumph, Doris Sanders, Samuel A. Shabazz,

Rose D. Shaw. Rebecca H. Shorter, Vivian Y. Shorter, Gregory L.

Sinquefield , Sloane Smith, Teresa Y. Starling, Tiffany Starling , Roderick

Streeter, Desiree Stinson, Terrance T. Tennille, Barbara L. Tew, Hester M.

Thomas, Larry Thomas Jr., Tammy T. Thomas. Tora Thomas, Wanda

Thomas, Shemiece Thomkins, Lillian Thompson, Brantley Thornton,

Shereekia V. Thornton, Courtney J. Tolbert, Carolyn A. Turner, Dorsel

Turner, Allison Vaughn, Alfonza Walker, Marquita Walker, Edna L.

Walton, Lakeisha E. Warren, Tarshekia Warren, Dornal Whigham, John

Whigham, Patricia Whigham, Gary L. White, Wendy White, Belinda

Williams, Bertha Ann Willaims, Bobby Lee Williams Jr., Elaine Williams,

10

Kelli Willaims, Vernie Williams, Willie Willis, Mary S. Wright, Betty J.

Young, Santinia Young and Shawanda Young.

14.    Plaintiffs are residents and domiciled in the State of Alabama.

Plaintiffs have concurrently filed their Consents to Become Party Plaintiffs

pursuant to 29 U.S.C. § 216(b).  See Exhibit A.

## GENERAL ALLEGATIONS

15.    As an integral and indispensable part of Plaintiffs' jobs,

Plaintiffs are required to pass through security when entering and leaving the

facility.  Plaintiffs' are required to have their employment status verified and

their arrival and departures documented as well as submit to searches of the

person and personal possessions.  Plaintiffs aver they are not compensated

for the time it takes security to clear them and allow them into the facility

and the compensable time afterwards prior to the commencement of

production.

16.    Plaintiffs go to a designated area to receive required clothing

and/or personal protective equipment (PPE) that is required for the work to

be performed.  The employees are required to don certain equipment before

moving into the production areas.  The employees are required to perform

washing activities associated with preparing for work in the production area.

And depending on whether the employee works in First Processing or

Second Processing, the employee may be required to acquire special tools

for the work to be performed.  During the course of this process, the

employee then must walk a significant distance to arrive at the respective

workstations on the line.

      17.     When Plaintiffs leave the line for unpaid breaks or at the end of

their shift, they again walk a considerable distance to their respective doffing

area where they remove their personal protective equipment, wash or

sanitize themselves, their personal protective equipment, sanitary clothing,

and/or equipment or tools and return various clothes, personal protective

equipment, equipment or tools to the proper areas.

      18.     Defendant Equity Group owns and operates poultry facilities in

Baker Hill, Alabama.  The unlawful compensation system at issue in the

Complaint has affected Defendant's former and present hourly production

employees at this location.

      19.     Under Equity Group's wage compensation system, Equity

Group pays Plaintiffs and others similarly situated employees only regularly

scheduled time that they are  on the production assembly line or in

production areas  under a system known as master time, master key, line

time or gang time, collectively referred to herein as "master time".

Conversely, as a matter of policy and practice, Equity Group does not pay its

hourly employees for required pre-production line and post-production line

activities that are necessary and integral to their overall employment

responsibilities, such as the time it takes to clear security, donning and

doffing protective and sanitary equipment, cleaning and sanitizing that

equipment as well as themselves, wait time associated with cleaning and

sanitizing that equipment as well as themselves after completion of the first

principal activity walking to and from security and the production line from

their locker or dressing area after already performing compensable

activities, and waiting in line to return required supplies, tools and other

equipment needed for line activities. In addition, Equity Group does not pay

its employees for time spent waiting at the line, prior to the line start up.

Plaintiffs are required to report to duty before the start of the master time

clock and required to continue work after the master time clock has stopped.

     20.    During the course of the day, Plaintiffs are provided unpaid

breaks requiring them to walk considerable distances where they remove

sanitary clothing and personal protection equipment for their break. The

remaining time allowed for the break is further shortened by the requirement

for the employee to wash and sanitize, don his or her sanitary clothing and

personal protection equipment and return to the workstation. Plaintiffs

assert these unpaid breaks are compensable. Alternatively if the total unpaid

break is not deemed compensable Plaintiffs allege they are owed compensation for the walk time prior to and after unpaid breaks, the time spent donning and doffing clothing and equipment pre and post break respectively, and the time spent washing and/or waiting to wash themselves and their equipment.

21.    Defendant deducts from Plaintiffs daily time worked, without regard for the actual time spent on break, two (2) uncompensated breaks of fixed duration.

22.    The time for which Plaintiffs and other similarly situated employees are paid is significantly less than the time they spend at work between the time they begin their integral, essential and indispensable work duties and the time they arrive at their workstations on the line.  The work time for which Plaintiffs are not paid include, but are not limited to:  (1) changing into the protective required work uniforms, sanitary clothing and protective safety equipment that can include, among other things (depending on the task and whether First or Second Processing):  ear plugs, smocks, work pants and shirts; safety jump suits; safety boots; hair nets; face nets; hard hats; aprons; belts with holsters and knifes; and hand and arm protections; and (2) walking to and from the security, changing areas, work

areas and break areas; washing activities; and (3) breaks that are effectively compensable .

23.    The walking time for which Plaintiffs are not paid occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity.

24.    The required protective work uniforms, sanitary clothing and protective safety equipment that Plaintiffs must wear, and for which they are not paid for donning and doffing times, is required by Equity Group and/or by government regulation.  Plaintiffs' jobs are dangerous and involve serious health and safety risks.  The circumstances of Plaintiffs' jobs, including vital considerations of health and hygiene, require them to wear the protective work uniforms, sanitary clothing and protective safety equipment.  These donning, doffing, washing activities, compensable unpaid breaks and walking duties all add up to a significant amount of time every day for which Plaintiffs and others similarly situated are not paid.

25.    In addition to depriving Plaintiffs and others similarly situated of hourly wages for compensable time pursuant to the FLSA, Defendant Equity Group's failure to accurately account for and report all compensable time worked by the Plaintiffs and others similarly situated, and has deprived

15

Plaintiffs and others similarly situated of what would otherwise be overtime pay, pursuant to the FLSA.

## COLLECTIVE ACTION ALLEGATIONS

26.    Plaintiffs bring Count I, the FLSA claim, as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b). In addition to the claims of individually named Plaintiffs, Plaintiffs bring this action as representatives of all similarly situated former and current employees of the Baker Hill facility.  The potential class of "opt-in" employees can be defined as:

> All current and former hourly 1st and 2nd processing employees of Defendant, paid under a master time compensation system in which individuals' time card punches are not the basis for starting and ending hours worked, who worked at the Baker Hill  facility since **December 2, 2003**, and who were not paid for all the time spent performing compensable work-related tasks or legally compensable time, including, but not limited to authorized unpaid break times, donning and doffing times, washing activity times, time associated with passing through security check points and walking to changing areas and time walking to security and passing through security at the end of the day and walking times to and from break areas or donning and doffing areas, and including time compensable at regular hourly wages, as well as overtime pay for these employees.

27.    The FLSA claims may be pursued by those who opt-in to this case, pursuant to 29 U.S.C. § 216(b).

28.    Plaintiffs, individually and on behalf of other similarly situated employees, seek relief on a collective basis challenging, among other FLSA violations, Defendant's practice of failing to accurately record all hours

16

worked and failing to pay employees for all hours worked, including overtime compensation.

29.    The number and identity of other Plaintiffs yet to opt-in and consent to be party Plaintiffs may be determined from the records of Defendant, and potential class members may easily and quickly be notified of the pendency of this action.

30.    On information and belief, the Baker Hill  facility employs approximately 500 hourly wage employees who potentially have FLSA claims similar to the claims set out herein.  Consequently, joinder of all collective action members in a single action is impracticable.

31.    Potential collective action members may be informed of the pendency of this class action through direct mail.

32.    There are questions of fact and law common to the class that predominates over any questions affecting only individual members.  The questions of law and fact common to the class arising from Defendant's actions include, without limitation, the following:

a) Whether Plaintiffs were compensated for time spent clearing security and time spent walking from security to their changing areas and from changing areas to security;

b) Whether the security activities at issue are integral or indispensable to Defendant's business activities;

17

c) Whether Plaintiffs were compensated for time spent donning and doffing clothing and protective gear, washing, and walking to and from their job posts;

d) Whether the donning, doffing and washing activities at issue are integral or indispensable to Defendant's business activities;

e) Whether Plaintiffs were entitled to compensation for time spent donning and doffing, washing activity time, and walking time to and from "the line";

f) Whether Plaintiffs' donning, doffing, washing activity, and walking time is integral and indispensable to their principal activities;

g) Whether Defendant failed to pay employees for unpaid breaks that were effectively compensable.

h) Whether Defendant's compensation policy and practice accurately accounts for the time Plaintiffs are actually working;

i) Whether Defendant's compensation policy and practice is illegal;

j) Whether Defendant had a policy and practice of willfully failing to record and compensate employees for all time worked; and

k) Whether Defendant failed to accurately record all compensable time, resulting in a failure to compensate Plaintiffs and other similarly situated employees of regular hourly wages and overtime pay, in violation of Defendant's policies and procedures and the mandate of the FLSA.

33.    The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness and equity, to

18

other available methods for the fair and efficient adjudication of the federal law claims.

34.    The Collective Action Representatives' claims are typical of those of the similarly situated employees in that these employees have been employed in the same or similar positions as the Collective Action Representatives and were subject to the same or similar unlawful practices as the Collective Action Representatives.

35.    A collective action is the appropriate method for the fair and efficient adjudication of this controversy.  Defendant has acted or refused to act on grounds generally applicable to the similarly situated current and former employees.  The presentation of separate actions by individual similarly situated current or former employees could create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant, and/or substantially impair or impede the ability of Collective Action members to protect their interests.

36.    The Collective Action Representatives are adequate representatives of the similarly situated current and former employees because they are employees of the same processing plant and their interests do not conflict with the interests of the other similarly situated current and former employees they seek to represent.  The interests of the members of

19

the class of employees will be fairly and adequately protected by the

Collective Action Representatives and their undersigned counsel, who have

extensive experience prosecuting complex class action lawsuits.

37.    Maintenance of this action as a collective action is a fair and

efficient method for the adjudication of this controversy.  It would be

impracticable and undesirable for each member of the collective action who

suffered harm to bring a separate action.  In addition, the maintenance of

separate actions would place a substantial and unnecessary burden on the

courts and could result in inconsistent adjudications, while a single

collective action can determine, with judicial economy, the rights of all

collective action members.

## COUNT I

### Violation of the Fair Labor Standards Act of 1938

### (Brought Against Defendant by All Individually-Named Plaintiffs and on Behalf of All Others Similarly Situated)

38.    Plaintiffs reassert and incorporate by reference paragraphs 1

through 37 as set forth above as if fully restated herein.

39.    At all time material herein, Plaintiffs have been entitled to the

rights, protections, and benefits provided under the FLSA, 29 U.S.C. § 201

*et. seq.*

40.    The individually named Plaintiffs and all similarly situated employees are victims of a uniform and facility-wide compensation policy and practice, in violation of the FLSA.

41.    Equity Group violated the FLSA by failing to account for all compensable time of its employees that resulted in a failure to pay Plaintiffs and others similarly situated for compensable hourly wages and overtime premium pay.

42.    Equity Group violated the FLSA by failing to pay for time donning and doffing essential required equipment, integral to the principle work activity.

43.    Equity Group failed to account for and pay for time walking to and from the line to break areas and/or donning and doffing areas.

44.    Equity Group failed to account for and pay for time spent clearing security and for time walking to and from security to donning and doffing areas.

45.    Equity Group failed to account for and pay for time allocated as unpaid breaks.  In the alternative, Equity Group failed to pay for walk time to and from unpaid  break areas, time spent donning and doffing on unpaid breaks, and washing activities associated with  breaks.

46.    In perpetrating these unlawful practices Equity Group has also willfully failed to keep accurate records for all of the time worked by its hourly employees.

47.    The FLSA regulates, among other things, the payment of overtime pay by employers whose employees are engaged in commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce.  29 U.S.C. § 207(a)(1).

48.    Equity Group was, and is, subject to the overtime pay requirements of the FLSA because it is an enterprise engaged in commerce and its employees are engaged in commerce.

49.    Section 13 of the FLSA, 29 U.S.C. § 213, exempts certain categories of employees from overtime pay obligations.  None of the FLSA exemptions apply to the Plaintiffs.  Accordingly, Plaintiffs must be paid overtime pay in accordance with the FLSA.

50.    Equity Group's failure to accurately record compensable work time was willfully perpetrated Equity Group has not acted in good faith nor with reasonable grounds to believe its actions and omissions were not a violation of the FLSA, and as a result thereof, Plaintiffs and other similarly situated employees are entitled to recover an award of liquidated damages in

22

an amount equal to the amount of unpaid hourly wages and overtime premium pay described above pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b). Alternatively, should the Court find Equity Group did not act willfully in failing to pay all hourly wages and overtime premium pay wages, Plaintiffs and all similarly situated employees are entitled to an award of prejudgment interest at the applicable legal rate.

51.    As a result of the aforesaid willful violations of the FLSA's overtime provisions, overtime compensation has been unlawfully withheld by Equity Group from Plaintiffs for which Equity Group is liable pursuant to 29 U.S.C. § 216(b).

52.    Plaintiffs and all similarly situated employees are entitled to damages equal to the mandated overtime premium pay within the three years preceding the filing of this Complaint, plus periods of equitable tolling, because Equity Group acted willfully and knew, or showed reckless disregard of whether, its conduct was prohibited by the FLSA.

53.    Pursuant to FLSA, 29 U.S.C. § 216(b), successful Plaintiffs are entitled to reimbursement of the costs and attorney's fees expended in successfully prosecuting an action for unpaid wages and overtime wages.

WHEREFORE, it is respectfully prayed that this Court grant to the Plaintiffs the following relief:

23

a) At the earliest possible time, issue an Order allowing Notice or issue such Court supervised Notice to all similarly situated current and former Equity Group's hourly employees (working at the Equity Group's Baker Hill location in the last three years) of this action and their rights to participate in this action. Such Notice shall inform all similarly situated current and qualified former employees of the pendency of this action, the nature of this action, and of their right to "opt in" to this action if they worked "off the clock" for times not paid, including time that may be paid at overtime rates.

b) Issue an Order, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, declaring that Defendant Equity Group's actions, as described in the Complaint, are unlawful and in violation of the FLSA and applicable regulations and are and were willful as defined in the FLSA;

c) Issue an Order directing and requiring Defendant Equity Group to pay Plaintiffs and all other similarly situated employees damages in the form of reimbursement for unpaid hourly and premium overtime wages (past and future) for all time spent

performing compensable work for which they were not paid
pursuant to the rate provided by the FLSA;

d) Issue an Order directing and requiring Defendant Equity Group
to pay Plaintiffs and all other similarly situated employees
liquidated damages pursuant to the FLSA in an amount equal
to, and in addition to the amount of wages and overtime wages
owed to them;

e) Issue and Order directing Defendant Equity Group to reimburse
Plaintiffs and other similarly situated employees for the costs
and attorneys fees expended in the course of litigating this
action, pre-judgment and post-judgment interest;

f) Provide Plaintiffs with such other and further relief, as the
Court deems just and equitable.

## <u>DEMAND FOR JURY TRIAL</u>

All Plaintiffs hereby request trial by jury of all issues triable by jury
under Alabama and federal law.

Dated: _____        Respectfully submitted,

                                **THE COCHRAN FIRM, P.C.**

                                /s/ Robert J. Camp
                                **ROBERT J. CAMP**
                                **BERNARD D. NOMBERG**
                                505 North 20th Street, Suite 825
                                Birmingham, AL 35203
                                (205) 930-6900 (Phone)
                                (205) 930-6910 (Fax)

        – and –

Samuel A. Cherry, Jr.
Lance H. Swanner
**THE COCHRAN FIRM, P.C.**
163 West Main Street
P. O. Box 927
Dothan, AL 36302
(334) 793-1555 (Phone)
(334) 793-8280 (Fax)

        – and –

Richard Celler
**MORGAN & MORGAN, P.A.**
284 South University Drive
Fort Lauderdale, FL 33324
(954) 318-0268 (Phone)
(954) 333-3515 (Fax)

                                ***Attorneys for Plaintiffs***

**TAB  2**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
MONTGOMERY DIVISION

| | | |
|---|---|---|
| **BETTY ANN BURKS, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **2:06-cv-01081-MEF-DRB** |
| | § | |
| **EQUITY GROUP EUFAULA** | § | |
| **DIVISION, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

PLAINTIFFS' MOTION FOR AN ORDER PERMITTING COURT
SUPERVISED NOTICE TO EMPLOYEES
OF THEIR OPT-IN RIGHTS AND
INCORPORATED MEMORANDUM OF LAW

Plaintiff, BETTY ANN BURKS, et al., ("Plaintiffs"), request the
entry of an Order permitting under court supervision, notice to all Defendant
EQUITY GROUP EUFAULA DIVISION, LLC's ("Equity Group" or
"Defendant") Baker Hill Plant hourly 1st and 2nd processing employees, as
defined in Plaintiffs' Complaint. As a result of Defendant's illegal pay
practices employees did not receive full payment for required pre-production
line and post-production line activities that are necessary, integral, and
indispensable to their overall employment responsibilities. In support of
these individuals' opt-in rights, Plaintiffs state as follows:

## MOTION FOR AN ORDER PERMITTING COURT SUPERVISED NOTICED
## TO EMPLOYEES OF THEIR OPT-IN RIGHTS

1.      Section 16(b) of the Fair Labor Standards Act of 1938 ("FLSA") provides, among other things, that an action to recover unpaid minimum wages or unpaid overtime compensation may be maintained against any employer in any federal or state court of competent jurisdiction by any one or more employees for and on behalf of himself or themselves and other employees similarly situated. See 29 U.S.C. § 216(b).

2.      As stated in Plaintiffs' Complaint, Plaintiffs are current or former 1st and 2nd processing employees authorized by the FLSA to sue in their own names on behalf of themselves individually and other employees similarly situated.  Plaintiffs are current and former 1st and 2nd processing employees of Defendant who have brought this action on behalf of all current and former similarly situated 1st and 2nd processing employees, employed at the Eufaula/Baker Hill Alabama Slaughter Plant, whose hours worked were recorded under a wage compensation system in which individual employee time clock punches are not the basis for starting and ending hours worked and within the last three (3) years did not receive full payment for required pre-production line and post-production line activities that are necessary, integral, and indispensable to their overall employment

2

responsibilities, such as donning and doffing protective and sanitary equipment, cleaning and sanitizing that equipment as well as themselves, wait time associated with cleaning and sanitizing equipment as well as themselves, walking to and from the production line from their locker or dressing area after already performing compensable activities, time deducted as unpaid breaks that due to walk time, donning, doffing, and wash times the unpaid breaks should be compensable, waiting in line to return required supplies, tools, and other equipment needed for line activities, time spent waiting at the line prior to the start of master time clock / scheduled time and time spent continuing work after the master time clock / scheduled time has stopped, and time spent clearing security at the beginning and end of the day.

3.     Plaintiffs know that their claims are typical of the claims of other former and current 1st and 2nd processing employees employed by Defendant, and typical of the claims of all members of the representative class described below.  *See* Affidavits of Plaintiffs at ¶¶ 5-9 attached as Exhibit 1; *See* Affidavits of Plaintiffs at ¶¶ 5-9 attached as Exhibit 2.

4.     The representative class consists of all current and former 1st and 2nd processing employees who worked for Defendant at any time within the last three (3) years, whose hours worked were recorded under a wage

3

compensation system in which individual employee time clock punches are not the basis for starting and ending hours worked but instead are recorded under a system known as line time, master time, master key, gang time, scheduled time, etc., collectively referred to herein as "master time", and who were subjected to Defendant's practice and policy of not paying for work described above and any overtime compensation for hours worked in excess of forty (40) as a result of this practice.

5.    As a result of such compensation practices, potential class members did not receive payment in full for the time set forth in ¶ 2.

6.    The one hundred and fifty four (154) named plaintiffs as well as one hundred and seventy eight (178) opt-in plaintiffs have filed Notices of Consent to Join.[1]

7.    Simply put, all other 1st and 2nd processing employees falling within the class described herein have the right to participate in this litigation.    And, although the class of current and former 1st and 2nd

---

[1] United States Magistrate Judge Frank Lynch, Jr., permitted notice to proceed stating that: "…the Affidavit of [a single opt-in Plaintiff] shows that at least one other co-worker desires to join the suit, thereby raising the Plaintiff's contention beyond one of pure speculation." Order on Plaintiff's Motion for an Order Permitting Court Supervised Notice to Employees of Their Opt-in Rights, *Larry Guerra v. Big Johnson Concrete Pumping, Inc.*, CASE NO.: 05-14237 (S.D. Fla. May 17, 2006). In a recent poultry case, Judge Inge Johnson conditionally certifying the class found, "… at this stage of the proceedings, the plaintiffs do not necessarily need to show a "unified policy, plan or scheme of discrimination to establish that the proposed class members are similarly situated." Order on Plaintiff's Motion for an Order Permitting Court Supervised Notice to Employees of Their Opt-in Rights, *Aguilar v. Pilgrim's Pride Corporation*, CASE NO.: CV-06-J-1673-NE (N.D. Ala. January 31, 2007). *See* Exhibit 4

4

processing employees is identified and certain, the individual members of the class cannot be completely identified absent access to Defendant's books and records.

WHEREFORE, Plaintiffs respectfully request that the Court permit and supervise notice, in English and Spanish, to all current and former 1st and 2nd processing employees whose hours worked were recorded under a wage compensation system in which individual employee time clock punches are not the basis for starting and ending hours worked and within the last three (3) years did not receive full payment for all hours worked as described in Plaintiffs' complaint.

## MEMORANDUM OF LAW

### A.    Introduction

The FLSA authorizes employees to bring an action individually and on behalf of others similarly situated. *See* 29 U.S.C. § 216(b).   The FLSA provides, in part, that:

> An action to recover the liability [for unpaid wages and overtime] may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and on behalf of himself or themselves and other similarly situated. *No employee shall be a party Plaintiff to any such action unless he gives his consent in writing to*

> *become such a party and such consent is filed in*
> *the court in which such action is brought.*

*See id.* (emphasis added).

As part of its processing operation, Equity Group employs hourly processing employees to provide labor to assist in the processing of live chickens. *See* Affidavits at ¶4, attached as Exhibits 1-2.

Hourly processing employees primarily work in 1st processing where chickens are placed or hung on lines, killed, disemboweled, inspected, diseased parts are removed or trimmed, cleaned and chilled or 2nd processing where chickens after completing 1st processing are placed or hung on lines and are further processed, cut-up, marinated, deboned, weighed, sized, packed, loaded on trucks, etc. for delivery to plant customers. *See* Affidavits at ¶5, attached as Exhibits 1-2.

Because the work performed is unskilled or at best in some instances semi-skilled, all work is similar in nature regardless of hourly employees' titles, supervisor or department. *Id.* All hourly employees are interchangeable and they are required to work open positions throughout the plant as production requirements dictate. *See id.* Therefore, employees do not have set job responsibilities and all employees within 1st or 2nd processing perform similar tasks and thus are alike.

Plaintiffs are current and former employees of Defendant. During their employment with Defendant, Plaintiffs were paid on an hourly basis. *See* Affidavits at ¶4, attached as Exhibits 1-2.

While employed by Defendant, Plaintiffs and other similarly situated 1st and 2nd processing employees regularly were not paid for all hours worked and those unpaid hours in excess of forty (40) hours per workweek during their employment with Defendant. *See* Affidavits of **1st processing employees,** at ¶4, ¶8, attached as Exhibit 1; *See* Affidavits of **2nd processing employees,** at ¶4, ¶8 attached as Exhibit 2.

Plaintiffs observed that Defendant paid all of their co-employees/1st and 2nd processing employees in the same regard. *See id.* at ¶8. Thus, as a result, Plaintiffs and other similarly situated 1st and 2nd processing employees did not receive compensation for all hours worked and overtime for unpaid hours worked over forty (40) each workweek. *See id.*

Plaintiffs assert that Defendant's above compensation policies violate the FLSA's overtime provisions requiring the payment for all hours worked and of time and one half overtime compensation for each hour worked over forty (40) in a workweek. That is, because Defendant failed to pay all hours worked and time and one half for each hour of overtime worked, Plaintiffs maintain that such compensation practices have adversely affected the rights

of each member of this collective action. Therefore, Plaintiffs seek authorization to facilitate notice to each of Defendant's 1st and 2nd processing employees who were subjected to the illegal pay practices described above at any time within the last three (3) years.

Plaintiffs further request that they be permitted to give such notice as approved by this Court to all such class members of their rights to opt-in to this case by executing an appropriate consent as required by Section 216(b) of the FLSA. Plaintiffs' affidavits, and the affidavits of additional "opt-in Plaintiffs"[2] who have joined this action since the time it was filed, attest that Defendant's other 1st and 2nd processing employees were subject to the same pay policy, plan and practice, had similar duties, were paid in the same manner, and thus, are similarly situated for purposes of facilitating notice under the FLSA. Plaintiffs furthermore attest that should this Court grant notice, additional Plaintiffs will come forward to participate. *See* Affidavits at ¶10, attached as Exhibits 1-2.

**B.    Applicable Standards For Collective Actions**

FLSA Rule 216(b) collective actions operate much differently than typical class action suits under Rule 23 of the Federal Rules of Civil Procedure. Under 29 U.S.C. § 216(b) of the FLSA, an employee belonging

---

[2] Since the inception of this litigation, numerous Plaintiffs have filed Opt-in Consents. See Court Document Numbers 10, 11, 12, 17, 27, 36, 37, and 39.

to a similarly situated class of Plaintiffs must "opt-in" to the class by filing a written consent with the Court in order to be bound by the outcome of the case. Without signing and filing such an express consent, employees are not bound by the outcome of the litigation. *See id.* This is the exact opposite of traditional Rule 23 class actions in which a Plaintiff initiating a class action automatically represents every member of the class that has not expressly "opted-out."

Because of this requirement to affirmatively opt-in and because the statute of limitation does not toll for the individual until he files his opts-in consent with the court, a delay in conditional certification, i.e. court supervised notice, prejudices putative class members and benefits Defendant. Plaintiffs respectfully submit, the longer it takes for the Court to issue notice the more likely large numbers of putative class members potentially will lose their right to join this litigation, or at best, retain their right to participate but suffer a reduction in back-pay damages. Case law, recognizing a fundamental difference between Rule 23 class actions and Rule 216(b) collective actions, has also interpreted the statutory sections as requiring all plaintiffs in a collective action under the FLSA to file written consents for statute of limitations purposes. Signed consents filed after the filing of the complaint do not relate back to the date the complaint was filed.

*Grayson v. K Mart Corp.*, 79 F.3d 1086 at 1106 (11th Cir. 1996); *O'Connell v. Champion Int'l Corp.*, 812 F.2nd 393 at 394 (8th Cir. 1987); *La Chapelle v. Owens Illinois, Inc.*, 513 F.2nd 286, 288, 289 (5th Cir. 1975).

## C.    The 11th Circuit and the Two – Tiered *Hipp* Analysis

The Eleventh Circuit utilizes a two-tiered approach to certification of an opt-in class pursuant to 29 U.S.C. § 216(b).  *See Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F .3d 1208, 1219 (11th Cir. 2001 ) (stating that the two-tiered approach "appears to be an effective tool for district courts to adopt in future cases").  Under this two-tiered approach, the court makes an initial determination, based <u>solely upon the pleadings and any affidavits</u>, whether notice of the action should be given to potential class members. *See id.* at 1218. Because the court has minimal evidence at this stage of the proceedings, this determination is made using a fairly lenient standard, and typically results in conditional certification of a representative class. *See id.* Thereafter, a second, more rigorous factual determination is made as to whether the potential opt-in Plaintiffs are similarly situated.[3] *See id.*

---

[3] Plaintiffs anticipate that Defendant will argue that Plaintiffs and their co-employees are somehow dissimilar or individual defenses apply and that conditional class certification would therefore be inappropriate.  However, the fact remains that such an argument regarding the factual nature of Plaintiffs' claims and Defendant's defenses thereto are irrelevant at this stage of the notification process.  Specifically, a factual analysis regarding the "individualized" nature of Plaintiffs' claims and Defendant's defenses is more appropriate *via* a Motion to Decertify at the conclusion of discovery, not at Stage I. *See Pendlebury v. Starbucks Coffee Co.*, 2005 WL 84500 * 3 (S.D. Fla. Jan. 3, 2005)

This two-tiered approach was utilized by the Middle District of Alabama in *Harper v. Lovett's Buffet Inc.*, 185 F.R.D 358 (M.D. Ala. 1999). The Court found it appropriate to conditionally certify a class of all hourly restaurant employees working at a Dothan restaurant after Plaintiffs presented fifteen (15) affidavits, twelve (12) signed by servers, one (1) signed by a cook, one (1) signed by a hostess and one (1) signed by a food preparation worker, where the affidavits showed they had all been subject to

---

(Marra, J.) (Judge Marra did not consider individualized defenses in permitting Stage I notification); *Cameron-Grant v. Maxim Healthcare Services., Inc.*, 347 F.3d 1240, 1243 (11th Cir. 2003) ("The first determination is made at the so-called "notice stage"….Because the Court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in a conditional certification of a representative class. The action proceeds as a representative action throughout discovery."); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996) ("We hold that section 216(b)'s "similarly situated" requirement is less stringent than that for joinder under Rule 20(a) or for separate trials under rule 42(b)."); *Felix De Asencio v. Tyson Foods, Inc.*,130 F.Supp.2d 660, 663 (E.D. Pa. 2001) ("While this information [submitted by Defendant] may play a more significant role after discovery and during an analysis of the second and final similarly situated tier, Plaintiffs have advanced sufficient evidence to meet their low burden at this first tier of the similarly situated question."); *see also Brown v. Money Tree Mortgage, Inc.*, 222 F.R.D. 676, 682 (D. Kan. 2004) ("[T]he court will examine the individual Plaintiffs' disparate factual and employment settings, as well as the various defenses available to the Defendant which appear to be individual to each Plaintiff, during the 'second stage' analysis after the close of discovery."); *Leuthold v. Destination America*, 224 F.R.D. 462, 468 (N.D. Cal. 2004) ("Defendants' arguments in their opposition brief focus on the more stringent second tier analysis and raise issues that may be more appropriately addressed on a motion for decertification after notice is given to the proposed class."); *Goldman v. Radioshack Corp.*, No. Civ.A. 2:03-CV-032, 2003 WL 21250571, at *8 (E.D.Pa. Apr. 16, 2003) ("A fact-specific inquiry is conducted only after discovery and a formal motion to decertify the class is brought by the Defendant."). Thus, setting Defendant's anticipated factual arguments aside for purposes of Plaintiff's Stage I Motion, Plaintiffs clearly have met their burden of proof on the "similarly situated" prong under *Hipp*.

the practice of managers clocking them out before work was completed resulting in possible violations of minimum wage and maximum hour provisions of the FLSA. *See id. at 363, 364, 365.* Citing *Grayson v. K Mart Corp.*, 79 F.3d at 1086, 1096, (11ᵗʰ Cir. 1996), the Court stated Plaintiffs bear the burden to establish that they are similarly situated. This burden, which is not heavy, may be met by detailed allegations supported by affidavits. *Id at 1097.* More recently two judges, Judge Coogler and Judge Johnson, in the Northern District of Alabama have granted conditional certification utilizing the *Hipp* Analysis. *See* Exhibit 3 - 5. Furthermore, the *Hipp* analysis has been used outside the 11ᵗʰ Circuit recently in the 4ᵗʰ Circuit where Judge Seymore granted notice in a national collective action against poultry giant, Gold Kist, Inc. *See* Exhibit 6

To that affect, in *Hoffman-La Roche, Inc. v. Sealing*, 110 S. Ct. 482 (1989), the Court ruled that not only did trial courts have authority to compel Defendant-employers to provide names and addresses of potential Plaintiffs through the pretrial discovery process, but that this authority also included sending court-authorized consent forms to potential Plaintiffs. *See id.* There, the Court addressed the issue of whether the district court may play any role on prescribing the terms and conditions of communication from the named Plaintiffs to the potential members of the class on whose behalf the

collective action has been brought. *See id.*  The Court determined that district courts have discretion in appropriate cases to implement 29 U.S.C. §216(b), by facilitating notice to potential Plaintiffs. *See id* at 486.  This authority arises from the Court's broad discretionary power to manage the process of joining multiple parties in an orderly manner. *See id.*

In addition to individual defenses, Plaintiffs anticipate Defendant may ask for an extensive period of time to conduct discovery in order to respond to this motion.  Plaintiffs respectfully oppose such a period for discovery because as stated above, at this initial stage, the conditional certification stage, the Court should base its decision underline(solely) on the pleadings and attached affidavits.  Defendant wishes to engage in prolonged discovery to attempt to draft a response that will decertify the class before the class even exists. Defendant's response to this motion will essentially be a motion to decertify. If unsuccessful they will attempt a second time to decertify the class after notice is given, discovery is complete and the class is certain.  This second bite at the apple is fundamentally unfair and it is not consistent with the two tiered certification process utilized by the 11th Circuit when addressing collective actions.  Defendants should not be allowed to decertify the class before the class exists.

There are questions of law or fact common to Defendant's other 1st and 2nd processing employees and the claims of the named Plaintiffs in the instant matter.   Indeed, Plaintiffs' claims are typical of the claims of the other individuals in their positions. For purposes of defining the "similarly situated class" pursuant to 29 U.S.C. § 216(b), Plaintiff need only demonstrate that the defined class is comprised of representatives who are similarly situated to Plaintiffs with regard to Defendant's <u>payroll practices and record keeping requirements</u>. *See* 29 U.S.C. § 216(b); *Dybach v. State of Fla. Dept. of Corrections*, 942 F.2d 1562 (11th Cir. 1991). There is no requirement of "strict symmetry" or "absolute identity"; rather potential class members must meet only a "sufficiently similar" standard. *Glass v. IDS Financial Services, Inc.*, 778 F. Supp. 1029, 1081 (D. Minn. 1991) (an allegation that a single decision, policy or plan precipitated the challenged action was sufficient to define the class).

Here, Defendant employed numerous 1st and 2nd processing employees in Baker Hill, Alabama.  At some point during the last three (3) years, each of these 1st and 2nd processing employees performed labor for Defendant which included assisting in the processing of chickens.    These 1st and 2nd processing employees were paid on an hourly basis, and regularly were not paid for all hours worked and worked more than forty

(40) hours per workweek.  As a result of this practice, Defendant regularly failed to pay their 1st and 2nd processing employees proper compensation owed as required by the FLSA.

Based upon the Complaint allegations and the above-referenced Affidavits, Plaintiffs have satisfied the applicable burden of persuasion that a colorable basis exists for determining that others similarly situated to Plaintiff exist.

## CONCLUSION

Here, a collective action is sought as the Defendant has acted or refused to act on grounds generally applicable to the class (Defendant's current and former 1st and 2nd processing employees who were subjected to Defendant's practice and policy of not paying all hours worked and overtime compensation for hours worked over forty (40) in a workweek), thereby making appropriate the same relief with respect to the class as a whole. Additionally, questions of law or fact common to all 1st and 2nd processing employees as described in the class definition predominate over any questions affecting only individual members. Thus, a collective action is superior to other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs seek authorization to provide: (1) the proposed "Notification" letter, attached as Exhibit A, to be sent to all similarly

15

situated employees; along with the (2) the proposed "Notice of Consent to Join" form, attached as Exhibit B, in English and Spanish, which similarly situated employees can complete, sign, and file in this matter.

Plaintiffs have met their burden to facilitate notice to potential class members under Eleventh Circuit precedent.    Accordingly, Plaintiffs respectfully request that notice be permitted and supervised and that notice be sent to all current and former 1st and 2nd processing as described in the class definition.

Dated: May 10, 2007                      Respectfully submitted,

                                         **/s ROBERT CAMP**
                                         ROBERT CAMP
                                         BERNARD NOMBERG
                                         **THE COCHRAN FIRM, P.C.**
                                         505 North 20th Street, Suite 825
                                         Birmingham, AL 35203
                                         Tel: 205-244-1115
                                         Fax: 205-244-1171

-and-

Samuel A. Cherry, Jr.
Lance H. Swanner
**THE COCHRAN FIRM, P.C.**
163 West Main Street
P. O. Box 927
Dothan, AL 36302
(334) 793-1555 (Phone)
(334) 793-8280 (Fax)

-and-

Richard B Celler
**MORGAN & MORGAN, P.A.**
284 South University Drive
Fort Lauderdale, FL 33324
(954) 318-0268 (Phone)
(954) 333-3515 (Fax)

-and-

James W. Parkman, III
Richard M. Adams
William C. White
PARKMAN, ADAMS & WHITE, LLC.
505 20TH Street North, Suite 825
Birmingham, Alabama 35203
(205) 244-1920-Phone
(205) 244-1171-Facsimile

-and-

Maurice John Steensland, III
PARKMAN, ADAMS & WHITE, LLC
739 West Main Street
Dothan, AL 36301
(334) 792-1900-Phone
(334) 712-1352-Facsimile

*Attorneys for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 10, 2007, I electronically filed the foregoing

Motion with the Clerk of the District Court using the CM/ECF system,

which sent notification of such filing to:


Samuel A. Cherry
**Attorney for Plaintiffs**
scherry@cochranfirm.com

Lance Harrison Swanner
**Attorney for Plaintiffs**
lswanner@cochranfirm.com

Bernard D. Nomberg
**Attorney for Plaintiffs**
bnomberg@cochranfirm.com

Richard B. Celler
**Attorney for Plaintiffs**
Richard@cellerlegal.com

Maurice John Steensland
**Attorney for Plaintiffs**
parkman@graceba.net

Richard Martin Adams
**Attorney for Plaintiffs**
Parkman@graceba.net

William C. White
**Attorney for Plaintiffs**
parkman@graceba.net

James W. Parkman, III
Attorney for Plaintiffs
parkman@graceba.net

Courtney Reilly Pothoff
Attorney for Defendant
cpotthoff@mindspring.com

Joel P. Smith, Jr.
Attorney for Defendant
joelpsmith@bellsouth.net

Gary D. Fry
Attorney for Defendant
gdfry@pelino.com

Howard A. Rosenthal
Attorney for Defendant
harosenthal@pelino.com

Malcolm S. Gould
Attorney for Defendant
msgould@pelino.com


/s/ Robert J. Camp
ROBERT J. CAMP

**TAB 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BETTY ANN BURKS, *et al.*, | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:06-cv-1081 MEF |
| | ) | |
| EQUITY GROUP EUFAULA | ) | (WO) |
| DIVISION LLC, | ) | |
| | ) | |
| DEFENDANT. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Plaintiffs' Motion for an Order Permitting Court Supervised Notice to Employees of Their Opt-In Rights (Doc # 40), filed May 10, 2007. This Court has carefully reviewed the evidence and arguments presented by the parties and finds that the Plaintiff's motion is due to be GRANTED.

The Plaintiffs in this case are current or former employees of Equity Group Eufaula Division ("Defendant") at the Eufaula/Baker Hill Alabama Slaughter Plant. Plaintiffs are suing the Defendant under the Fair Labor Standards Act of 1938 ("FLSA") seeking to recover unpaid wages or overtime compensation. *See* 29 U.S.C. § 216(b). Plaintiffs wishing to sue as a class under the FLSA must utilize the opt-in class mechanism provided in 29 U.S.C. § 216(b) instead of the opt-out class procedure provided in Fed. R. Civ. P. 23. *Cameron-Grant v. Maxim Healthcare Servs., Inc.*, 347 F.3d 1240, 1243 & n.2 (11th Cir. 2003) (citing *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208 (11th Cir. 2001)).

In order for a court to authorize the named plaintiff to provide notice to potential class

members of the collective action, the plaintiff has the burden to show a "reasonable basis" for their claim that collective action status is appropriate. *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1097 (11th Cir. 1996). The plaintiff must satisfy a two-pronged test: (1) that there are other employees of the employer who wish to opt-in, and (2) that these employees are "similarly situated." *Dybach v. State of Fla. Dept. of Corrections*, 942 F.2d 1562, 1567-68 (11th Cir. 1991). Because this determination is necessarily made at the early stages of litigation and the court has minimal evidence, this determination is made using a fairly lenient standard. *Hipp*, 252 F.3d at 1218. Furthermore, in order to satisfy the "similarly situated" requirement, plaintiffs "need show only that their positions are similar, not identical, to the positions held by the putative class members." *Id.* at 1217. "The 'similarly situated' requirement of § 216(b) is more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance). A unified policy, plan, or scheme . . . may not be required to satisfy the more liberal 'similarly situated' requirements of § 216(b)." *Id.* at 1219 (internal quotation marks and citations omitted).

Here, the Defendant does not oppose conditional certification of the class in order to allow the Plaintiffs to provide notice to potential class members. Moreover, the parties have already agreed on proposed notice and consent forms to be sent to these individuals. This Court has reviewed the record before it and finds that there is sufficient evidence of a reasonable basis to conditionally certify a class pursuant to 29 U.S.C. § 216(b). There is ample evidence in this case that other employees wish to opt-in to this case as Plaintiffs have

2

filed affidavits of 52 employees, and more than 180 current or former additional employees have filed notice of consent to join this suit since it was originally filed.

Furthermore, this Court finds that there is sufficient evidence that these employees are "similarly situated" for the purposes of conditional certification. The Plaintiffs seek to form a class of all Equity Group Eufaula Division Baker Hill Plant hourly 1st and 2nd processing production employees. The affidavits submitted by the Plaintiffs establish that these employees were all subject to the same compensation policies that are the subject of this suit. Specifically, the Plaintiffs claim that these employees were not compensated for alleged work-related activities including donning/doffing protective equipment, cleaning and sanitizing, and other activities. Consequently, the potential class of Plaintiffs all worked at the same plant, were subject to the same compensation system, with the same or similar job duties, and they seek damages for the same injuries under the same legal theory. Under these circumstances, conditional certification is appropriate. *See Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1270 (M.D. Ala. 2004) (Albritton, J.) ("[P]laintiff must make some rudimentary showing of commonality between the basis for his claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions."); *Bradford v. Bed Bath & Beyond, Inc.*, 184 F. Supp. 2d 1342, 1346-51 (N.D. Ga. 2002) (granting certification where "Plaintiffs have made substantial allegations, supported by evidence, that Defendant failed to comply with the FLSA by failing to pay overtime compensation to non-exempt employees on a class-wide basis.").

3

For the foregoing reasons, it is hereby ORDERED that:

(1) Plaintiffs' Motion for an Order Permitting Court Supervised Notice to Employees of Their Opt-In Rights (Doc # 40) is GRANTED, with respect to a class of all hourly paid 1st or 2nd processing production employees who have worked at Equity Group Eufaula Division, LLC, in Baker Hill, Alabama since March 12, 2004.

(2) The Defendant is ORDERED to furnish Plaintiffs with the names and addresses of all members of the conditionally certified class within 30 days from the date this order is entered.

(3) The proposed Notice of Pending Fair Labor Standards Act Lawsuit and Consent to Join Suit as Party Plaintiff, attached as Exhibits A and B to Docket # 45 are APPROVED and may be sent to the members of the conditionally certified class.

(4) Plaintiffs are hereby required to file all Consents to Join Suit as Party Plaintiff in this lawsuit on or before May 1, 2008.

DONE this 24th day of October, 2007.

_____/s/ Mark E. Fuller_____
CHIEF UNITED STATES DISTRICT JUDGE

4

**TAB 4**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA - NORTHERN DIVISION

BETTY ANN BURKS, et al.,                      :
                                              :
            Plaintiffs,                       :
                                              :
      v.                                      :      No. 2:06-CV-1081-MEF
                                              :
EQUITY GROUP EUFAULA                          :
DIVISION LLC,                                 :
                                              :
            Defendant.                        :

## NOTICE OF PENDING FAIR LABOR STANDARDS ACT LAWSUIT.

*This is a Court-Authorized Notice and is not a Solicitation from a Lawyer.
The Court Has Made No Finding as to the Merits of the Case at this Time*

IF YOU ARE OR WERE EMPLOYED, SINCE MARCH 12, 2004, AS AN HOURLY PAID 1ST OR 2ND PROCESSING PRODUCTION EMPLOYEE AT EQUITY GROUP EUFAULA DIVISION, LLC, IN BAKER HILL ALABAMA, AND PAID ACCORDING TO "LINE TIME", "MASTER TIME", or your individual time clock punches were not the basis for calculating your hours worked, A COLLECTIVE ACTION LAWSUIT MAY AFFECT YOUR RIGHTS.

BETTY ANN BURKS, et al., ("Plaintiffs"), current and former hourly paid 1st or 2nd processing production employees who were paid pursuant to "line time," "master key time," or whose individual time clock punches were not the basis for hours worked while employed with EQUITY GROUP EUFAULA DIVISION, LLC ("EQUITY") have sued EQUITY in federal court alleging that EQUITY improperly failed to pay them for all hours worked and overtime hours worked in excess of forty (40) during their employment with EQUITY.  As a result of these alleged practices, Plaintiffs maintain that they were unlawfully deprived of full and proper regular time and overtime compensation due to them under the FLSA.  The case name is, *Betty Ann Burks, et al., v. Equity Group Eufaula Division, LLC*, CIVIL ACTION NUMBER: 2:06-cv-01081-MEF-DRB.

Plaintiffs claim that they were paid on the basis of "line time", "master key time", or that their individual time clock punches were not the basis for hours worked and as a result they were not fully paid regular time or overtime for pre-production and post-production activities as well as activities during their shift, including putting on and taking off protective and sanitary equipment/clothing at the beginning and end of the work day, putting on and taking off protective and sanitary equipment/clothing during the shift at breaks, related washing/cleaning time at the beginning and end of the shift and during breaks, waiting time and time spent walking to and from the line at the beginning and end of the day as well as at breaks, and that unpaid breaks are compensable, due to putting on equipment/clothing, taking off equipment/clothing, walk time, and wash time that occurs while employees are on break.

The Court has permitted Plaintiffs to send Notice to all similarly situated current and former hourly paid 1st and 2nd processing production employees, paid under a "line

time" or "master time" system or whose individual time clock punches were not the basis for hours worked, of EQUITY at any time within the past 3 years, so that they may be permitted to consider whether to "opt-in" to, or join, this lawsuit to assert their similar legal rights.

· EQUITY contests the Plaintiffs' allegations in this lawsuit. EQUITY claims that it has acted in accordance with all legal and contractual requirements.

· The Court has not yet decided whether EQUITY has done anything wrong or whether this case will proceed to trial. There is no money available now and no guarantees that there will be. However, you have a choice to assert your legal rights in this case.

| YOUR LEGAL RIGHTS & OPTIONS | |
|---|---|
| Do Nothing | **Do Nothing, Lose Nothing (except resulting from the passage of time).** By doing nothing, you retain your legal rights to bring a separate suit against EQUITY (within the applicable statute of limitations period) for allegedly unpaid regular and overtime compensation, but will not share in any recovery in this case. |
| Ask to Be Included | **Complete Opt-in Consent Form.**<br>By "opting in" you gain the possibility of receiving money or benefits that may result from a trial or settlement, but you give up your right to separately sue EQUITY for the same legal claims brought in this lawsuit. If you choose to "opt-in" to this lawsuit, you may be required to participate in depositions and/or provide written responses in support of your claims. |

Your options are included in this Notice to Opt-in. If you wish to join in the lawsuit, you must complete the Opt-in Consent Form, place it in the enclosed self addressed stamped envelope and forward it to the attorneys designated in the Notice on or before _____, 2007. If you have any questions or concerns, please contact:

**ROBERT J. CAMP, Esquire**
**THE COCHRAN FIRM**
**PO BOX 927**
**DOTHAN, AL  36302**
**Tel: 1-800-THE-FIRM**
**Fax: 334-793-8280**
*Counsel for Plaintiffs*

**The law prohibits anyone from discriminating or retaliating against you for taking part in this case. If you believe that you have been penalized, disciplined, punished, threatened, intimidated, or discriminated against in any way as a result of your receiving this notification, your considering whether to complete and submit the Notice of Consent, or having submitted the Notice of Consent, you may contact THE COCHRAN FIRM at the number provided above.**

**TAB 5**

F I N A L - May 25, 2004

# AGREEMENT

## by and between

## EQUITY GROUP - EUFAULA DIVISION, LLC

## and the

## RETAIL, WHOLESALE AND DEPARTMENT STORE UNION AFL-CIO•CLC

## EFFECTIVE

## March 1, 2004

## to

## March 1, 2008

E 1

F I N A L - May 25, 2004

## TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| **ARTICLE 1 — RECOGNITION** | | |
| Section 1.1. | Recognition | 1 |
| **ARTICLE 2 — MANAGEMENT RIGHTS** | | 1 |
| Section 2.1. | Reserved | 1 |
| Section 2.2. | Discontinue Operations | 2 |
| Section 2.3. | Subcontracting | 2 |
| **ARTICLE 3 — SENIORITY** | | |
| Section 3.1. | Principle | 2 |
| Section 3.2. | New Employees | 3 |
| Section 3.3. | Discharge | 3 |
| Section 3.4. | Seniority Broken | 3 |
| Section 3.5. | Seniority Lists | 4 |
| **ARTICLE 4 — LEAVE OF ABSENCE** | | |
| Section 4.1. | Personal | 4 |
| Section 4.2. | Union Business | 4 |
| Section 4.3. | Applications | 5 |
| Section 4.4. | Extensions | 5 |
| Section 4.5. | Compensation | 5 |
| Section 4.6. | Return | 5 |
| Section 4.7. | Another Job | 5 |
| Section 4.8. | Funeral Leave | 5 |
| Section 4.9. | Jury Duty | 7 |
| Section 4.10. | Military Leave | 7 |
| Section 4.11. | Family and Medical Leave Act | 7 |
| **ARTICLE 5 — JOB VACANCIES** | | |
| Section 5.1. | Temporary Vacancy Defined | 7 |
| Section 5.2. | Permanent Vacancy Posted and Defined | 8 |
| Section 5.3. | Temporary Employees | 10 |
| **ARTICLE 6 — STEWARDS AND GRIEVANCE PROCEDURE** | | |
| Section 6.1. | Shop Stewards | 10 |
| Section 6.2. | Grievance Procedure | 10 |

E 2

F I N A L - May 25, 2004

|  |  | PAGE |
|---|---|---|
| Section 6.3. | Cost of Arbitration | 14 |
| Section 6.4. | Executive Board Authority | 14 |
| Section 6.5. | Presence of Stewards | 15 |
| **ARTICLE 7 - BULLETIN BOARDS** | | |
| Section 7.1. | Posting | 15 |
| **ARTICLE 8 - UNION VISITS** | | |
| Section 8.1. | Union Representation | 15 |
| **ARTICLE 9 - SAFETY AND HEALTH** | | |
| Section 9.1. | Occupational Safety and Health Act | 16 |
| Section 9.2. | Accidents, Injuries | 16 |
| Section 9.3. | Joint Safety Committee | 17 |
| **ARTICLE 10 - HOLIDAYS** | | |
| Section 10.1. | Holidays Defined | 17 |
| Section 10.2. | Celebration | 17 |
| Section 10.3. | Birthday Holiday | 18 |
| Section 10.4. | Personal Holiday | 18 |
| Section 10.5. | Qualifications for Holiday Pay | 18 |
| Section 10.6. | Hours Worked on a Holiday | 18 |
| Section 10.7. | Holiday in Vacation | 18 |
| **ARTICLE 11 - VACATIONS** | | |
| Section 11.1. | Length | 18 |
| Section 11.2. | Vacation Pay | 19 |
| Section 11.3. | Vacation Period | 19 |
| **ARTICLE 12 - HOURS OF WORK** | | |
| Section 12.1. | Work Schedule | 20 |
| Section 12.2. | Overtime Pay | 20 |
| Section 12.3. | Reporting Pay | 20 |
| Section 12.4. | Time Cards | 20 |
| Section 12.5. | Line Time | 20 |
| Section 12.6. | Extra Time | 20 |

E3

F I N A L - May 25, 2004

PAGE

ARTICLE 13 - MISCELLANEOUS

    Section 13.1.    Physical Examination    21

    Section 13.2.    Meal/Rest Periods    21

    Section 13.3.    Anti-Discrimination    21

    Section 13.4.    Supplies    21

    Section 13.5.    Discipline    22

    Section 13.6.    Orientation    23

ARTICLE 14 - WAGES

    Section 14.1.    Schedule A    23

    Section 14.2.    Pay Day    23

    Section 14.3.    Incentive Pay    24

ARTICLE 15 - NO STRIKE - NO LOCKOUT

    Section 15.1.    Prohibited Conduct    24

ARTICLE 16 - CHECK-OFF

    Section 16.1.    Collection of Dues and Remittance    24

    Section 16.2.    Check-Off Authorization Form    25

ARTICLE 17 - BENEFITS

    Section 17.1.    Employee Coverage    26

    Section 17.2.    Dependent Coverage    27

    Section 17.3.    Substitution of Coverage    27

ARTICLE 18 - SAVINGS CLAUSE

    Section 18.1.    Good Faith    27

    Section 18.2.    Separability    27

ARTICLE 19 - LENGTH OF AGREEMENT

    Section 19.1.    Duration    28

SCHEDULE A - PAY SCALES AND JOB CLASSIFICATIONS

INDEX

E 4

F I N A L – May 25, 2004.

<u>AGREEMENT</u>

This Agreement made and entered into this 12th day of May, 2004, by and between Equity Group-Eufaula Division, LLC, as to its Baker Hill, Alabama plant located at 57 Melvin Clark Drive, Eufaula, Alabama, 36027 and that plant only (hereinafter referred to as the "Company"), and the Retail, Wholesale and Department Store Union, AFL-CIO, and its Alabama & Mid-South RWDSU Council (hereinafter referred to as the "Union").

<u>ARTICLE 1 – RECOGNITION</u>

1.1   <u>Recognition</u>

A.   The Company hereby recognizes the Union as the exclusive bargaining agent for the following employees of the Company: all production employees and line leaders within Company excluding chicken catching crews, truck drivers, office clerical employees, Quality Assurance, HACCP, professional and exempt employees, supervisors, watchmen, guards, nurses, maintenance, refrigeration, contract employees and other employees as defined in the National Labor Relations Act as amended.

<u>ARTICLE 2 – MANAGEMENT RIGHTS</u>

2.1   <u>Reserved</u>

A.   The Company reserves all rights to the management and the direction of the workforce, including the right to establish reasonable shop rules and regulations; right to hire new employees from any source, transfer, promote, counsel, warn suspend or discharge for just cause, to retire employees; the right to maintain discipline, assign and reassign employees to jobs; to transfer employees from department to department; to re-classify, upgrade, downgrade to increase and decrease the workforce; to sub-contract work as deemed appropriate; to

E 5

schedule work hours and times, schedule breaks, schedule shift start and end times; to determine the days of the workweek; the right to determine job content and create new job classifications, to revise the content of existing jobs and to eliminate part or all of existing job classifications; to determine the product to be handled, produced, or processed; the scheduling of production and the methods, processes, and means of production or handling; and to remove employees from duty because of lack of work by voluntary means then according to seniority standing as herein provided or for other legitimate reasons, is vested exclusively in the Company, except as otherwise provided in this Agreement and provided that such action by the Company will not be used for the purpose of discrimination against any employee or the Union.

## 2.2  Discontinue Operations

A.   The Company reserves the unrestricted right to suspend or curtail the operation of the plant and to discontinue processes, products, and departments in whole or in part whenever in its judgment conditions warrant such suspension, curtailment, or discontinuance.

## 2.3  Subcontracting

A.   If the Company should subcontract any portion of its business, any displaced employees would be offered a position, by seniority, for which they are qualified.

## ARTICLE 3 - SENIORITY

## 3.1  Principle

A.   The principles of seniority shall prevail on a plant basis in regard to layoffs, recall, transfer or promotion to bid

E 6

positions.  In order to qualify for a bid position, the individual must satisfactorily perform the work (a skill equal to the normal standards of proficiency and quality established by other employees who perform the same work) or reach the required performance within ten (10) working days' time.  In the event the employee does not satisfactorily perform the work, the employee will be disqualified and the next most senior, qualified person will be assigned.  In extreme cases, the Company and a designated union representative may agree in writing to extend this time two (2) or more working days.

B.    When qualifications are substantially equal between two (2) or more employees, then seniority shall prevail.

3.2    **New Employees**

A.    Employees with less than ninety (90) calendar days of service shall be considered probationary and may be discharged at the sole discretion of the Company.

3.3    **Discharge**

A.    Employees having more than ninety (90) calendar days of service may be discharged for just cause and such discharge must be by written notice to the employee stating the reason for the discharge.  For the purpose of this section, "just cause" shall include but shall not be limited to: dishonesty; intoxication; violation of the Company's drug and alcohol policy; harassment policy or safety policies and procedures; assault; battery; fighting; damage or theft of property or product; and professional gambling.

3.4    **Seniority Broken**

A.    The seniority service record of an employee shall be

F I N A L - May 25, 2004

broken when the employee:

1.   quits, or is discharged for cause

2.   fails to return to work within two (2) consecutive
     working days after notification of recall

3.   has been absent for two (2) consecutive working
     days without notice to the Company

4.   has been laid off for a period of six (6) months

5.   has accepted a position with another company while
     on sick leave, layoff, or suspension

6.   fails to return to work due to a continuing
     disability or sickness for a period of six (6)
     months, with FMLA leave to run concurrently with
     any such period of disability or sickness to the
     extent available. Any period of disability or
     sickness must be supported by Company approved
     doctor's certificate stating that said employee
     would be capable of regular full-time work within
     six (6) months limitation described above.
     Further, following the expiration of any available
     FMLA leave, the employee is responsible for the
     cost of all medical benefits which must be paid to
     the Company in advance.

## 3.5   Seniority Lists

A.   The Company shall prepare a seniority list of all
employees during the months of January and July to which the
Union may object within thirty (30) working days. The list, when
or if adjusted, shall be final except as to new employees.

## ARTICLE 4 - LEAVE OF ABSENCE

### 4.1   Personal

A.   The Company will follow the provision of the Family
Medical Leave Act ("FMLA") as amended.

### 4.2   Union Business

A.   A Leave of Absence, not to exceed fourteen (14) working
days, will be granted to not more than three (3) employees at a
time, without loss of seniority, who have been elected or
designated to attend union conventions, schools or seminars.

-4-

E 8

F I N A L - May 25, 2004

Company sponsored benefit provisions may not be available through the Company during this period if Union provided benefits are available.   In the event benefits remain in force, the employee will be responsible for the total costs of benefits during the leave.

**4.3  Applications**

A.   All requests for leaves of absence must be made in writing and must be accompanied by appropriate supporting papers.

**4.4  Extensions**

A.   All leaves not covered under FMLA may be extended at the Company's discretion.

**4.5  Compensation**

A.   All leaves of absence will be granted without pay.

**4.6  Return**

A.   Employees on leaves in excess of fifteen (15) working days must give at least two (2) working days' notice of their intention to return to work and pass a drug screen upon return. Employees returning from medical leave, leaves defined under the Family Medical Leave Act and leaves specific to workers' compensation must present a doctor's release to the Personnel Department before beginning work.

**4.7  Another Job**

A.   A leave of absence will not be granted for an employee to take another job or to enter business for themselves.   Any leave of absence requested or granted under false pretenses shall be grounds for immediate discharge.

**4.8  Funeral Leave**

A.   An employee who suffers the death of a Member of the

F I N A L – May 25, 2004

Immediate Family shall be granted a leave of absence of up to three (3) working days. These three (3) days will be as follows: One (1) preparation day prior to the funeral; one (1) day for the day of the funeral; and one (1) day within the seven (7) calendar days after the funeral. A non-probationary employee shall receive line time for each scheduled working day missed to attend the funeral but not to exceed twenty-four (24) hours pay at their current rate in effect in the payroll week immediately preceding the week in which the funeral leave falls. The time so paid shall not be counted as hours worked. Proof of the funeral date and relationship will be required.

B.     "Members of the Immediate Family" shall mean the persons standing in only the following legitimate relationships to the employee:

1.  Mother
2.  Father
3.  Spouse
4.  Child
5.  Step-Child
6.  Sister
7.  Brother
8.  Current Step-Parent
9.  Grandparent

C.    In addition, a non-probationary employee may request up to a total of two additional days off, without pay, to be taken within the 7 days before or after the funeral of a Member of the Immediate Family as defined above subject to the approval of the Company.

D.    An employee who suffers the death of their current Mother-in-Law or current Father-in-law may receive eight (8) hours of paid leave of absence for the day of the funeral only. Paid leave shall be at the employee's current rate of pay in

-6-

E 10

F I N A L - May 25, 2004

effect in the payroll week immediately preceding the week in which the funeral leave falls.

### 4.9 Jury Duty

A.    Any employee that has to serve on jury duty shall receive paid leave for the hours which the employee otherwise would have worked and shall be reimbursed by the Company for the difference between the jury duty fee and department hours for the time lost from work, up to a maximum of ten (10) working days. The employee shall present proof of the jury service and the fee. If an employee is summoned for jury duty and subsequently released or was not required to serve a full day, the employee shall report immediately for work or be counted as absent and forfeit jury duty reimbursement.

### 4.10 Military Leave

A.    The Company will follow the current Universal Military Training Act.

### 4.11 Family and Medical Leave Act

A.    The Company will follow the current Family and Medical Leave Act as amended.

## ARTICLE 5 - JOB VACANCIES

### 5.1 Temporary Vacancy Defined

A.    Temporary vacancies shall be offered first to employees on duty within the department who can perform the work without training and shall be granted to the most senior volunteers.  If there are not sufficient volunteers, it shall be assigned to the most junior qualified employee within the department who can perform the work without training.

B.    If there is not an available employee within the

-7-                                    E 11

department who can perform the work without training, it shall be offered to employees on duty who can perform the work without training and shall be granted to the most senior available volunteers. If there is not sufficient volunteers, it shall be assigned to the most junior available qualified employee on duty who can perform the work without training. In cases where there is not one available who can perform the work without training, then the most junior available qualified employee who can do the work will be assigned. However, in cases of extreme emergency, any employee may be used to avoid loss of production until the above can be implemented in a reasonable time frame.

C.    Temporary vacancies to exist for a period of twenty (20) working days or more shall be posted, with the understanding that the successful bidder will remain on the temporary job until the employee returns to work or ceases employment and/or is terminated. If the employee returns to work, the employee on the temporary job will be assigned to available work and have the employee's bidding rights restored.

5.2  **Permanent Vacancy Posted and Defined**

A.    A permanent vacancy is a vacancy caused by a quit, discharge, transfer, or promotion of a non-probationary employee, or the establishment of a new premium job. When a permanent vacancy occurs in a premium pay job covered by this Agreement, the Human Resources Department shall post the premium job. The following steps shall be followed:

Step 1:    The premium job to be filled will be posted for three (3) working days. During this time, any qualified non-probationary employee may bid for the premium job. Within three

-8-

E 12

F I N A L - May 25, 2004

(3) working days, any qualified employee may bid for the premium

job by signing their name on the notice, except employees

      1.   with less than ninety (90)
           calendar days seniority; or

      2.   who are unable to meet the
           trial period because they are
           not actively working when
           assigned for the trial period;
           or

      3.   who are unable to physically
           perform the premium job when
           assigned, provided this clause
           does not conflict with any
           state or federal law; or

      4.   with a suspension in the last
           six (6) months

**Step 2:**

      1.   As soon as possible, but not to exceed
           fifteen (15) working days from the date of
           posting, the eligible, qualified senior
           bidder shall be assigned the premium job
           subject to the provisions of Article 3.1.

      2.   A successful bidder shall not be entitled to
           bid another premium job or shift change for
           six (6) months unless the employee's premium
           job has been eliminated within that period,
           nor shall the employee be entitled to return
           to employee's old job once it has been filled
           by another employee.

**Step 3:**

      1.   Once the employee has qualified for the
           employee's newly bid premium job, the
           employee's old premium job shall be posted in
           accordance with this Section.  An employee,
           however, will have the option of returning to
           the employee's old job at any time during the
           employee's first ten (10) working days on the
           new premium job.

      2.   After ten (10) working days, the employee's
           old premium job will be posted in accordance
           with this section.  In extreme cases, the
           Company and a designated union representative
           may agree, in writing, to extend this time
           two (2) or more working days.

E 13

### 5.3  Temporary Employees

A.   The Company may use temporary employees provided, however, that no regular employee will be displaced so long as consistent with the terms of this Article.

B.   If the Company engages temporary employees, such persons shall be deemed to be employees if they have been continuously engaged by the Company and working on a daily basis for 90 consecutive days.  After 90 days of continuous employment, such persons shall be deemed to be probationary employees and subject to all of the terms and conditions of this Agreement.

### ARTICLE 6 - STEWARDS AND GRIEVANCE PROCEDURE

### 6.1  Shop Stewards

A.   The Union may elect or appoint employees as shop stewards and chief stewards to handle grievances or disputes with the Company's designated representatives on Company time.  The Union will keep the Company advised as to the identity of the individual shop stewards and chief stewards in writing. Shop stewards and chief stewards must be employees of the Company in order to represent employees in the grievance procedure.

B.   The Company will not pay for time necessary to handle grievances, if handled outside the steward's line time.

### 6.2  Grievance Procedure

A.   Should any difference, dispute, or complaint arise over the interpretation or application of this Agreement, there shall be an earnest effort on the part of both parties to settle promptly in accordance with the following procedure.

B.   All grievances shall be settled using working days. Working days are defined as Monday through Friday, excluding

F I N A L - May 25, 2004

contractual holidays.

C.    Employees and/or stewards should talk to their immediate supervisor before going to Step 1 of the grievance procedure.

D.    Procedure:  The following steps shall be followed as to all grievances.  Once resolved at any step of this procedure, the grievance may not be refiled on behalf of the employee or the Union.

Step 1:  The Employee and/or steward must submit, on the grievance form, the matter to the shift manager within four (4) working days after the occurrence.  The shift manager must render a decision within four (4) working days, if not, the grievance automatically moves to Step 2.  Any grievance not presented within four (4) working days after the event shall be waived.

Step 2:  If a grievance is not settled in Step 1, it shall be presented in writing by the Union steward and/or employee to the plant manager.  If the grievance is not presented within three (3) working days after the first step answer, it will be considered null and void.  Management must answer in writing within three (3) working days, including a brief reason for any denial of the grievance.

Step 3:  If the grievance is not settled in Step 2, the grievance shall be submitted to the Human Resources Manager or designated representative, by submitting a written request to the Human Resources Manager, within five working days of the Step 2 answer.  If requested by the Union, the Human Resources Manager or representative shall set up a meeting with the steward filing

-11-                              E 15

F I N A L - May 25, 2004

the grievance, grievant, if requested by the Union, and the Union business agent to discuss the grievance at a time and place mutually agreeable to the parties within 10 working days of the submission by the Union to Step 3.  The Human Resources Manager or representative shall make a written reply to the grievance within five working days following the meeting or submission of the grievance to Step 3 if no meeting is sought by the Union.

Step 4 - Arbitration:

(a)  Selection of Arbitrator.  If a grievance is not settled in Step 3, it may be submitted to arbitration.  The Executive Board for the Union shall have the sole authority to determine whether or not the employee's grievance is qualified to be submitted to arbitration by the Union.  The request for arbitration shall be in writing and shall be made to the Company and the Federal Mediation and Conciliation Service (FMCS) within fifteen (15) working days of the Step 3 answer.  In the event the Union does not respond in writing within fifteen (15) working days, the grievance shall be considered settled in the Company's favor.  After a request has been made by the Union to the Company to submit a case to arbitration, the parties shall promptly meet for the purpose of selecting an arbitrator to hear a pending case.  In the event the parties hereto are unable to agree upon the selection of an arbitrator within ten (10) working days after receipt by the Company of a request to submit a case to arbitration, a joint request by the parties hereto shall be made to the FMCS to furnish a suggested list of names of seven (7) arbitrators from which list the parties shall select one (1) arbitrator.  Such selection shall be by agreement, if possible,

-12-

E 16

otherwise the parties alternately eliminate names from said list. The parties shall strike the arbitrator within seven (7) working days upon receipt of the panel.  After each party has eliminated the name of three (3) arbitrators from the list, the remaining one shall be accepted by both parties as the arbitrator to hear and decide the pending case.

      (b)  Arbitration Proceedings.  The fee of the Arbitrator, as well as any other arbitration fee, shall be borne equally by the Union and the Company except that the cost of the transcript of the arbitration proceeding, if one is deemed necessary by either party, shall be borne by the party requesting same.  The jurisdiction and authority of the Arbitrator and his opinion and award, which shall be final and binding upon the parties, shall be exclusively limited to disputes arising under the express terms of the Agreement.  The Arbitrator shall have no power to add to, subtract from, or modify any of the terms of this Agreement.  The Arbitrator shall not have the jurisdiction or authority to substitute his or her judgment or discretion for that of management.  The Arbitrator shall be limited to rendering an award which is remedial.  Any award of back pay by an Arbitrator shall be limited by the amount of wages the employee otherwise would have earned from his employment with the Company during the period involved less any compensation for personal services received from employment elsewhere, or unemployment compensation received, during the period in question.  No back pay shall be awarded for any period which the employee would have been laid off.  Under no circumstances shall an employee be made more than whole or receive back pay for a period of more than ten

-13-

E 17

working days prior to the initial filing of the grievance in writing. The Arbitrator shall not have authority to pass upon questions relating to his own jurisdiction and he shall not have authority to be empowered to affect, rule upon, or grant extension or renewal of this Agreement. Neither the violation of any provision of this Agreement nor the commission of any act constituting an unfair labor practice or otherwise made unlawful by any federal, state or local laws shall excuse employees, the Union, or the Company from their obligations under the provisions of this Article.

E. Time is of the essence, and the limits strictly observed by employees, the Union and the Company. The failure of an employee or the Union to process a grievance through any one of the foregoing steps, or to do so in a timely manner, shall prevent the grievance from being considered at a subsequent step. The failure of the Company to respond in a timely manner shall be deemed an approval of the grievance. The time limits specified in this Article only may be modified or extended by written agreement signed by an authorized official of the Company and the Union. No more than one (1) extension shall be granted for any one (1) grievance.

6.3  **Cost of Arbitration**

A. The expense of the arbitrator shall be split equally by the parties and the costs of the panel shall be paid by the requesting party.

6.4  **Executive Board Authority**

A. At any step in the grievance procedure, the Executive Board of the Local Union shall have the final authority, in

-14-                                    E 18

F I N A L - May 25, 2004

respect to any aggrieved employee covered by this Agreement, to decline to process a grievance, complaint, difficulty, or dispute further if in the judgment of the Executive Board such grievance lacks merit or lacks justification under the terms of this Agreement to the satisfaction of the Executive Board.

### 6.5 Presence of Stewards

A. An employee may request that a steward is present in any disciplinary action being administered to him and such request will be honored. The steward must be an employee of the Company.

## ARTICLE 7 - BULLETIN BOARDS

### 7.1 Posting

A. The Company shall provide the Union with a bulletin board for the posting of official Union notices. Such notices will be shown to the Plant Manager before posting. The Company and the Union agree that neither party will post political material within the plant.

## ARTICLE 8 - UNION VISITS

### 8.1 Union Representation

A. The Company shall admit to its premises two (2) union representatives who are employed by the Retail, Wholesale and Department Store Union, AFL-CIO, and its Alabama & Mid-South RWDSU Council, at any one time, who may visit inside the plant at reasonable hours. Notice of a visit shall require three (3) working days notice, in writing, to the Company. The Union shall notify the Company in writing who the representatives are by name and position with the Union. Changes in union representatives shall require three (3) working days' written notice to the

F I N A L - May 25, 2004

Company. Such visits shall not interfere with the Company's operation and shall be for the express purpose of contract administration and grievance investigation. Union officials shall not go into production areas of the plant without permission of management, which reserves the right to accompany Union officials. The Company and the Union agree that neither will hand out political material on Company premises.

## ARTICLE 9 - SAFETY AND HEALTH

### 9.1 Occupational Safety and Health Act

A.    The Company affirms its intention of complying with the provisions of the Occupational Safety and Health Act, and the Union agrees that it will support management in its efforts at compliance and general improvements of safety conditions. The Union further agrees to encourage its members to work safely and to follow the instructions of the Company in the proper care, use operation, protection, and maintenance of property, equipment, and vehicles.

### 9.2 Accidents, Injuries

A.    It shall be the responsibility of each individual employee to notify the employee's superior immediately of any accidents, injuries or defective equipment. An employee who is injured during working hours, while performing the employee's assigned work and who is physically unable to return to work on the shift as determined by medical opinion, shall be paid for the remainder of the employee's normal work shift for that day at the employee's regular basic hourly rate in an amount not to exceed eight (8) hours. Employees required by the doctor to return for further treatment of an on-the-job injury shall endeavor to make

E 20

F I N A L - May 25, 2004

all doctors' appointments during non-working hours.

### 9.3 Joint Safety Committee

A.    The Company and the Union shall establish a Joint Safety Committee consisting of two members appointed by the Company and two members appointed by the Union.  The function of the Joint Safety Committee shall be to review all safety regulations, and to promote health and safety education of the employees and to meet monthly on definitely established dates for the purpose of considering safety issues, inspecting the facilities as may be necessary and recommending measures for the elimination or control of conditions which may be unsafe or hazardous to the health and safety of other employees.  The Joint Safety Committee shall not discuss general grievances or otherwise consider disciplinary issues, nor shall it adopt rules or procedures.  This provision does not modify the Management Rights set forth in Article 2.

### ARTICLE 10 - HOLIDAYS

### 10.1 Holidays Defined

A.    All employees having established seniority shall receive eight (8) hours' pay at their regular rate of pay for the following holidays:

| | |
|---|---|
| New Year's Day | Thanksgiving Day |
| Martin Luther King Day | Christmas Eve Day |
| Memorial Day | Christmas Day |
| Fourth of July | Birthday Holiday |
| Labor Day | |

### 10.2 Celebration

A.    Holidays falling on Saturday will be observed on the preceding Friday, holidays falling on Sunday will be observed on Monday.

E 21

F I N A L - May 25, 2004

### 10.3 Birthday Holiday

A.    Employees providing two (2) weeks written notification prior to the Birthday Holiday shall receive eight (8) hours of pay at their regular rate of pay.

### 10.4 Personal Holiday

A.    In the second year of the Agreement, employees shall be eligible to schedule a Personal Day by providing two (2) weeks written notification prior to the Personal Day, which may be granted upon mutual agreement with the employee's supervisor on a first come, first serve basis.  The employee shall receive eight (8) hours of pay at their regular rate of pay for such Personal Day.

### 10.5 Qualifications for Holiday Pay

A.    Employees must work their scheduled shifts before and after the holiday, without a tardy or early leave, to receive benefits.

### 10.6 Hours Worked on a Holiday

A.    All hours worked on a designated holiday will be paid at straight time, in addition to holiday pay.

### 10.7 Holiday in Vacation

A.    If a holiday falls during an employee's vacation week, and provided all qualifications are met, the employee shall receive the employee's regular rate of pay for eight (8) hours, in addition to vacation pay.

### ARTICLE 11 - VACATIONS

### 11.1 Length

A.    Employees who qualify shall be entitled to the following paid vacations:

-18-

E 22

After one (1) year's seniority - one (1) week

After three (3) year's seniority - two (2) weeks

After ten (10) year's seniority - three (3) weeks

**11.2 Vacation Pay**

A.    At the beginning of their vacations, and only with two (2) weeks written notification prior to the first day of vacation time being requested, employees who have completed their first anniversary shall receive forty (40) hours of pay at their regular rate of pay, provided the employee has worked sixteen-hundred (1600) or more hours in the past anniversary year.

**11.3 Vacation Period**

A.    By December 1 of each year, plant management will distribute to all employees a vacation preference form on which each employee will indicate the employee's first, second and third choices.  Prior to January 1, a vacation schedule will be posted.  Preferences will be granted upon the basis of seniority, but in all cases the Company has the exclusive right to schedule, reschedule or postpone vacations based on business necessity. Once vacations are scheduled after January 1, no employee may bump another employee from their selected vacation slot. Employees having more than one (1) week earned vacation may take them on a staggered basis throughout the year.  Vacation may be split by weeks.  An employee may take up to ten (10) working days' vacation per year one (1) day at a time, provided that the employee requests approval from the employee's supervisor at least two (2) weeks in advance.  An employee requesting a one (1) day vacation on Friday will be required to work on Saturday following the one (1) day vacation, unless the one (1) day

E 23

F I N A L - May 25, 2004

vacation request has been made prior to the posting of weekend work.

## ARTICLE 12 - HOURS OF WORK

### 12.1 Work Schedule

A.   Work schedules for employees will vary in the Company. Operational demands may necessitate variations in starting and ending times, as well as variations in the total hours that may be scheduled each workday and workweek.

### 12.2 Overtime Pay

A.   Employees will be paid overtime pay at the rate of one and one half (1-1/2) times their regular rate of pay for hours actually worked in excess of forty (40) hours per week.

### 12.3 Reporting Pay

A.   All employees who report for work at the commencement of a scheduled shift without having been given reasonable notice of a change in schedule shall be given a minimum of four (4) hours' work, except in cases where work cannot be provided due to circumstances beyond the Company's control.

### 12.4 Time Cards

A.   Each employee will scan in the employee's own time card immediately before the commencement of the work period and immediately at the end of the work period.

### 12.5 Line Time

A.   All employees will be paid according to the hours of work indicated by the Master Line Time Card.

### 12.6 Extra Time

A.   Employees designated by their supervisor or superintendent to work beyond their scheduled time shall be

E 24

F I N A L - May 25, 2004

governed by their individual time card reports, which will be approved by management.

## ARTICLE 13 - MISCELLANEOUS

### 13.1 Physical Examination

A.   The Company will follow all applicable State, Federal and local laws for physical exams and drug screening as they relate to hiring, promotions, transfers, job assignments, near accidents, accidents and property damage.

### 13.2 Meal/Rest Periods

A.   Employees will receive two (2) thirty (30) minute non-paid meal/rest breaks each full work day.  In addition, where an employee is required to work more than 9 hours in any workday, except in the case of equipment or mechanical malfunctions or circumstances beyond the control of the Company, the employee shall be entitled to an additional 10 minute paid break to be scheduled by the Company, or to be paid for such break if not granted.

### 13.3 Anti-Discrimination

A.   The Company and Union agree each will comply with all Federal, State and Local anti-discrimination laws.

### 13.4 Supplies

A.   Supplies will be furnished to new employees, where required, in accordance with Company procedures as follows:

```
        -Smocks (3)
        -Arm Guards
        -Cutting Glove
        -Hair Net
        -Beard Net
        -Blue Gloves
        -Cotton Gloves
        -Ear Plugs
        -Apron - heavy duty
        -Sleeves
```

E 25

B.   Arm guards and cutting gloves are not provided to new employees assigned to Packout, Live Hang, Shipping and Sanitation.

C.   Employees are entitled to receive, on a weekly basis, Blue Gloves (cotton liners in Shipping), Hair Nets and Beard Nets.

D.   In addition, employees are entitled to receive, on the first Monday of each month, sleeves and ear plugs; and shall be entitled to receive one new smock and a heavy duty apron every 6 months as of January 1 and July 1 of each calendar year.   The employee must turn in one smock in order to receive a new one without charge.  If the plant is not operating on a scheduled replacement day, the replacement clothing will be distributed on the next work day that the plant is operating.

E.   Employees who are required by the Company to wear boots will be provided boots at that time and may obtain replacement boots as needed in the determination of the Company, provided, however, that the employee turns in the original boots.

F.   Except as noted, employees must purchase replacement supplies from the Company.

G.   The Plant Manager shall approve these supply procedures.  The Company reserves all rights to revise these procedures as necessary.

13.5 Discipline

A.   If an employee has not violated any Work Rules or General Safety Rules or incurred any discipline pursuant to the general progressive disciplinary system within 24 months, the last level of discipline shall be reduced to the next lower level

-22-                          E 26

F I N A L - May 25, 2004

of discipline and not be considered in future discipline under the Work Rules, General Safety Rules or general progressive disciplinary system.  Any remaining disciplinary levels shall be deemed reduced to the last lower level, one level at a time, if the employee does not violate any Work Rule or general safety Rule or incur any discipline under the general progressive disciplinary system every subsequent 12 months.  This provision does not modify the application of the Work Rules or the General Safety Rules or the applicable discipline which may be assessed for any violation, including the right to increase the disciplinary level depending on the severity of the violation or the employee's disciplinary history which is subject to consideration.

### 13.6 Orientation

A.    The Union shall be permitted to have a representative selected by the Union to address new employees at any formal orientation session.  If no Orientation is held, the Union representative shall have the opportunity to meet with each such new employee at least one week prior to the completion of the employee's probationary period.

## ARTICLE 14 - WAGES

### 14.1 Schedule A

A.    The Company shall pay its employees the amount of wages for the various classification set out in Schedule A attached hereto and made a part hereof.

### 14.2 Pay Day

A.    Checks will be distributed at the end of the shift on Friday unless changed by the Company.

E 27

F I N A L - May 25, 2004

### 14.3 Incentive Pay

A.    The Company reserves the right to establish, modify, add, or delete incentive programs, as they deem appropriate, as long as the change does not violate the provisions of Schedule A.

### ARTICLE 15 - NO STRIKE - NO LOCKOUT

### 15.1 Prohibited Conduct

A.    During the whole period this Agreement is in effect, the Company shall not lock out its employees and the Union shall not authorize or sanction any strike, stoppage, slowdown, or suspension of work against the Company.

### ARTICLE 16 - CHECK-OFF

### 16.1 Collection of Dues and Remittance

A.    The Company shall, for the term of this Agreement, deduct initiation fees as authorized and shall deduct union dues, arrears, assessments and/or fees in an amount certified by the Union from the weekly wages of employees covered by this Agreement who individually and voluntarily certify in writing authorization for such deduction, until revoked pursuant to the terms of the Check-Off Authorization set forth in Article 16.2. The Company shall promptly remit all sums deducted in this manner to the Secretary-Treasurer of Local union not later than the 15th of the next month.  The check off, however, is to apply only to such employees covered by this Agreement who authorize the Company in writing to so check-off.  The Union agrees to defend and hold the Company harmless against expenses, repayment, or losses for any demands, claims, disputes, or lawsuits by an employee arising in any manner out of or in connection with the check-off of any amount claimed by the Union to be due it or

E 28

having been paid it by or for any employee.

B.     The wording of this labor contract shall supercede and take precedence over all other language on the check-off/authorization card.

### 16.2 Check-Off Authorization Form

A.     The Company shall not deduct any monies from an employee's wages pursuant to Article 16.1 unless the Check-Off Authorization card executed by the employee conforms to the following form:

#### CHECK-OFF AUTHORIZATION

I, the undersigned employee of Equity Group-Eufaula Division, LLC (hereinafter referred to as the "Company") of my own free will and accord hereby authorize and direct the Company to deduct weekly ( ), monthly ( ), from my earnings the amount owed by me for membership dues to the Retail, Wholesale and Department Store Union, AFL-CIO, Alabama & Mid-South RWDSU Council, AFL-CIO (herein referred to as the "Union") irrespective of my membership in the Union and to transmit such amount to the Union no later than the end of the month following the month in which the deductions are made.  As of the date of this authorization, such dues are $           weekly ( ), bi-weekly ( ), monthly ( ).  However, the amount of membership dues may be changed pursuant to the provisions of the Constitution of the parent body of the Union namely, the Retail, Wholesale and Department Store Union, AFL-CIO, and in the event the Union shall notify the Company in writing of the amount of the dues as so changed and upon receipt of such notification, the Company is hereby authorized to deduct from my earnings the amount of the dues as so changed.

If for any reason I should become delinquent in the payment of my membership dues to the Union, I hereby further authorize and direct the Company to deduct, each pay period, from my earnings the amount of delinquent dues, as reported to the Company by the Union and in the amount reported to the Company by the Union until the total amount of delinquent dues is paid in full.

I hereby agree that neither the Company nor the Union shall be under any liability to me for the deduction of dues from my earnings in the manner described and set forth above and that maintaining my

FINAL - May 25, 2004

continuous good standing in the Union is my personal responsibility.

I reserve the right to revoke this authorization by giving individual written notice by registered-certified mail to the Company and to the Union either during ten (10) days immediately preceding any anniversary of the date shown below or during the ten (10) days immediately preceding the termination date of any collective bargaining agreement between the Company and the Union (whichever occurs sooner) which is applicable to me as an employee of the Company and unless or until revoked in the above stated manner, this authorization shall continue in full force and effect.

Dues and fees are not tax deductible as charitable contributions but may be tax deductible as business expense.

Print Name _____  Soc.Sec.No._____

Signature of employee_____

Address_____

_____  Date _____

### ARTICLE 17 - BENEFITS

**17.1 Employee Coverage**

Coverage for single employees will be provided as follows through Blue Cross Blue Shield of Alabama Low Option PPO, or its equivalent:

A.    Effective June 1, 2004, those employees completing their probationary period will be eligible for single employee coverage as provided in Blue Cross Blue Shield of Alabama Low Option PPO, or its equivalent.  Single employee coverage costs, including increases, will be paid by the Company, with the additional costs for spousal, dependent and family costs and increases to be paid by the employee.  Pending the effective date of such coverage, the present medical coverage will be continued.

B.    Employees completing 12 months of employment will be

-26-

E 30

F I N A L – May 25, 2004

eligible for the benefits described in Section 17.1.A plus
$125.00 per week accident and sickness benefits payable after 15
days of accident or illness for a period of 13 weeks as set forth
in the applicable insurance plan, to be paid for by the Company.

**17.2 Dependent Coverage**

A.    Employees may elect dependent coverage, and if so shall
be responsible for payment of the applicable premium.  This
coverage will be as set forth in Blue Cross Blue Shield of
Alabama Low Option PPO, or its equivalent.

**17.3 Substitution of Coverage**

A.    So long as coverage and service levels are maintained
without material change, the Company may alter insurance
providers or administrators with prior notification to and
opportunity for discussion with the Union.

**ARTICLE 18 – SAVINGS CLAUSE**

**18.1 Good Faith**

A.    The Company and the Union each acknowledge that this
Agreement has been reached as a result of good faith collective
bargaining by both parties hereto and it contains the entire
understanding between the parties and is to be strictly
construed.

**18.2 Separability**

A.    In the event any provision of this Agreement is held to
be in conflict with or violation of any state or federal statute
or other applicable law, administrative rule or regulation, such
decision shall not affect the validity of the remaining
provisions of the Agreement.  The parties further agree that they
will meet within thirty (30) days to renegotiate the provision or

-27-                          E 31

F I N A L — May 25, 2004

provisions of this Agreement held to be invalid.

## ARTICLE 19 — LENGTH OF AGREEMENT

### 19.1 Duration

A.    This Agreement shall become effective the 12th day of May, 2004 and shall remain in full force and effect until the 1st day of March, 2008, and shall remain in full force and effect for one (1) additional year thereafter unless terminated by either party by written notice to the other at least sixty (60) days prior to the 1st day of March, 2008.

THE RETAIL AND WHOLESALE DEPARTMENT
STORE UNION, SOUTHEAST COUNCIL,
DISTRICT COUNCIL OF THE UFCW,
AFL-CIO-CLC                                    EQUITY GROUP - EUFAULA DIVISION, LLC

Henry Jenkins,
International Vice President                    Spence Jarragin, General Manager

Jerry Foster, Representative                    James Davis, Human Resources Director

Jacqueline Davis                               Greg Mills, Plant Manager

Barbara Green

Kelvin Granger

Shekina Freeman

Joanne Bussey

-28-

E 32

F I N A L - May 25, 2004

## SCHEDULE A

### Section 1 - Pay Scales and Job Classifications

The following minimum base rates, effective as of the payroll week following the effective date, for all employees covered by this Agreement is as follows:

| Effective Date | 3/01/04 | 3/01/05 | 3/01/06 | 3/01/07 | |
|---|---|---|---|---|---|
| Hire Rate | 7.00 | 7.10 | 7.20 | 7.30 | } |
| 90 Calendar Days | 7.25 | 7.35 | 7.55 | 7.75 | }.15 |
| 1 Year | 8.00 | 8.25 | 8.50 | 8.85 | — |

### Section 2 - Premium Jobs

A. Effective as of the ratification of the Agreement, the following hourly premiums will be paid on these classifications after 90 calendar days:

Processing Plant

| | | |
|---|---|---|
| 1. | Knife Sharpener | 25¢ |
| 2. | Chiller Operator | 25¢ |
| 3. | Wash Station | 25¢ |
| 4. | Truck Spotter | 50¢ |
| 5. | Lift Driver | 50¢ |
| 6. | Fork Lift Operator | 50¢ |
| 7. | Pallet Jack Operator | 50¢ |
| 8. | Back-up Killer | 50¢ |
| 9. | USDA Insp/Helper | 50¢ |
| 10. | Mirror Trimmer | 50¢ |
| 11. | On-line Production Employees Using Knives and Scissors | 50¢ |
| 12. | Line Puller in Freezer | 50¢ |
| 13. | Line Leaders | 70¢ |
| 14. | Live Hanger | $1.00 |

-1-

E 33

F I N A L - May 25, 2004

B.    Effective beginning in the second year of the Agreement, the premium to be paid to Line Leaders shall be increased by 15¢ to 85¢.

### Section 3 - Starting/Probationary Rate

The starting rates for new or rehires will be the rate shown in Section 1 of Schedule A.  Employees completing the probationary period will receive the applicable increase.

### Section 4 - Regular Rate Defined

The regular rate of pay for computing vacation and holiday pay will consist of the employee's base rate plus any skill premium they receive.

### Section 5 - Shift Pay Differential

A premium of ten cents (10¢) per hour will be paid when a majority of the scheduled hours are worked on the 2nd or 3rd shift.  Effective beginning in the second year of the Agreement, the Shift Pay Differential premium shall be increased by 5¢ to 15¢ per hour.

### Section 6 - Eligibility for Premium Pay:  In order to qualify for premium pay the employee must:

1.    have completed 90 calendar days with the Company

2.    meet the production, skill and quality requirements of the premiums pay position

3.    work three (3) hours or more in the premium pay position during the workday

E 34

F I N A L - May 25, 2004

# I N D E X

| Title | Article/Section | Page |
|---|---|---|
| Accidents, Injuries | 9.2 | 16 |
| Another Job | 4.7 | 5 |
| Anti-Discrimination | 13.3 | 21 |
| Applications | 4.3 | 5 |
| Arbitration | 6.2 | 12 |
| Benefits | 17 | 26 |
| Benefits - Dependent Coverage | 17.2 | 27 |
| Benefits - Employee Coverage | 17.1 | 26 |
| Benefits - Substitution of Coverage | 17.3 | 27 |
| Bulletin Boards | 7 | 15 |
| Check-Off | 16 | 24 |
| Check-Off Authorization Form | 16.2 | 25 |
| Collection of Dues and Remittance | 16.1 | 24 |
| Compensation | 4.5 | 5 |
| Cost of Arbitration | 6.3 | 14 |
| Discharge | 3.3 | 3 |
| Discipline | 13.5 | 22 |
| Discontinue Operations | 2.2 | 2 |
| Duration | 19.1 | 28 |
| Employee Quits/Discharge | 3.4A | 3 |
| Executive Board Authority | 6.4 | 14 |
| Extensions | 4.4 | 5 |
| Extra Time | 12.6 | 20 |
| Family and Medical Leave Act | 4.11 | 7 |
| Funeral Leave | 4.8 | 5 |
| Good Faith | 18.1 | 27 |
| Grievance Procedure | 6.2 | 10 |
| Holiday - Celebration | 10.2 | 17 |
| Holiday - Birthday | 10.3 | 18 |
| Holiday in Vacation | 10.7 | 18 |

-1-

E 35

F I N A L - May 25, 2004

| Title | Article/Section | Page |
|---|---|---|
| Recognition | 1.1 | 1 |
| Reporting Pay | 12.3 | 20 |
| Return | 4.6 | 5 |
| Safety and Health | 9 | 16 |
| Savings Clause | 18 | 27 |
| Schedule A | 14.1 | 23 |
| Seniority Broken | 3.4 | 3 |
| Seniority | 3 | 2 |
| Seniority - Principle | 3.1 | 2 |
| Seniority Lists | 3.5 | 4 |
| Separability | 18.2 | 27 |
| Shop Stewards | 6.1 | 10 |
| Stewards and Grievance Procedure | 6 | 10 |
| Subcontracting | 2.3 | 2 |
| Supplies | 13.4 | 21 |
| Temporary Vacancy Defined | 5.1 | 7 |
| Temporary Employees | 5.3 | 10 |
| Time Cards | 12.4 | 20 |
| Union Visits | 8 | 15 |
| Union Business | 4.2 | 4 |
| Union Representation | 8.1 | 15 |
| Vacation Period | 11.3 | 19 |
| Vacation Pay | 11.2 | 19 |
| Vacations | 11 | 18 |
| Vacations - Length | 11.1 | 18 |
| Wages | 14 | 23 |
| Work Schedule | 12.1 | 20 |

-3-

E 36

**TAB 6**

# AGREEMENT

## by and between

## EQUITY GROUP - EUFAULA DIVISION, LLC

## and the

## RETAIL, WHOLESALE AND DEPARTMENT STORE UNION

### EFFECTIVE

### March 1, 2008

### to

### March 1, 2011

E 5975

F I N A L – APRIL 3, 2008

## TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| **ARTICLE 1 – RECOGNITION** | | |
| Section 1.1. | Recognition | 1 |
| **ARTICLE 2 – MANAGEMENT RIGHTS** | | 1 |
| Section 2.1. | Reserved | 1 |
| Section 2.2. | Discontinue Operations | 2 |
| Section 2.3. | Subcontracting | 2 |
| **ARTICLE 3 – SENIORITY** | | |
| Section 3.1. | Principle | 2 |
| Section 3.2. | New Employees | 3 |
| Section 3.3. | Discharge | 3 |
| Section 3.4. | Seniority Broken | 3 |
| Section 3.4.A. | Employee Quits/Discharge | 3 |
| Section 3.5. | Seniority Lists | 4 |
| **ARTICLE 4 – LEAVE OF ABSENCE** | | |
| Section 4.1. | Personal | 4 |
| Section 4.2. | Union Business | 4 |
| Section 4.3. | Applications | 5 |
| Section 4.4. | Extensions | 5 |
| Section 4.5. | Compensation | 5 |
| Section 4.6. | Return | 5 |
| Section 4.7. | Another Job | 5 |
| Section 4.8. | Funeral Leave | 5 |
| Section 4.9. | Jury Duty | 7 |
| Section 4.10. | Military Leave | 7 |
| Section 4.11. | Family and Medical Leave Act | 7 |
| **ARTICLE 5 – JOB VACANCIES** | | |
| Section 5.1. | Temporary Vacancy Defined | 8 |
| Section 5.2. | Permanent Vacancy Posted and Defined | 9 |
| Section 5.3. | Temporary Employees | 10 |
| **ARTICLE 6 – STEWARDS AND GRIEVANCE PROCEDURE** | | |
| Section 6.1. | Shop Stewards | 11 |

E 5976

F I N A L - APRIL 3, 2008

|  |  | PAGE |
|---|---|---|
| Section 6.2. | Grievance Procedure | 11 |
| Section 6.2.4. | Arbitration | 13 |
| Section 6.3. | Cost of Arbitration | 15 |
| Section 6.4. | Executive Board Authority | 15 |
| Section 6.5. | Presence of Stewards | 16 |

**ARTICLE 7 - BULLETIN BOARDS**

| Section 7.1. | Posting | 16 |
|---|---|---|

**ARTICLE 8 - UNION VISITS**

| Section 8.1. | Union Representation | 16 |
|---|---|---|

**ARTICLE 9 - SAFETY AND HEALTH**

| Section 9.1. | Occupational Safety and Health Act | 17 |
|---|---|---|
| Section 9.2. | Accidents, Injuries | 17 |
| Section 9.3. | Joint Safety Committee | 17 |

**ARTICLE 10 - HOLIDAYS**

| Section 10.1. | Holidays Defined | 18 |
|---|---|---|
| Section 10.2. | Celebration | 18 |
| Section 10.3. | Birthday Holiday | 18 |
| Section 10.4. | Personal Holiday | 19 |
| Section 10.5. | Qualifications for Holiday Pay | 19 |
| Section 10.6. | Hours Worked on a Holiday | 19 |
| Section 10.7. | Holiday in Vacation | 19 |

**ARTICLE 11 - VACATIONS**

| Section 11.1. | Length | 19 |
|---|---|---|
| Section 11.2. | Vacation Pay | 20 |
| Section 11.3. | Vacation Period | 20 |

**ARTICLE 12 - HOURS OF WORK**

| Section 12.1. | Work Schedule | 21 |
|---|---|---|
| Section 12.2. | Overtime Pay | 21 |
| Section 12.3. | Reporting Pay | 21 |
| Section 12.4. | Time Cards | 21 |

E 5977

|  | | PAGE |
|---|---|---|
| Section 12.5. | Line Time | 21 |
| Section 12.6. | Extra Time | 22 |
| **ARTICLE 13 - MISCELLANEOUS** | | |
| Section 13.1. | Physical Examination | 22 |
| Section 13.2. | Meal/Rest Periods | 22 |
| Section 13.3. | Anti-Discrimination | 22 |
| Section 13.4. | Supplies | 22 |
| Section 13.5. | Discipline | 24 |
| Section 13.6. | Orientation | 24 |
| **ARTICLE 14 - WAGES** | | |
| Section 14.1. | Schedule A | 24 |
| Section 14.2. | Pay Day | 25 |
| Section 14.3. | Incentive Pay | 25 |
| **ARTICLE 15 - NO STRIKE - NO LOCKOUT** | | |
| Section 15.1. | Prohibited Conduct | 25 |
| **ARTICLE 16 - CHECK-OFF** | | |
| Section 16.1. | Collection of Dues and Remittance | 25 |
| Section 16.2. | Check-Off Authorization Form | 26 |
| **ARTICLE 17 - BENEFITS** | | |
| Section 17.1. | Employee Coverage | 27 |
| Section 17.2. | Dependent Coverage | 28 |
| Section 17.3. | Substitution of Coverage | 28 |
| **ARTICLE 18 - SAVINGS CLAUSE** | | |
| Section 18.1. | Good Faith | 28 |
| Section 18.2. | Separability | 28 |
| **ARTICLE 19 - LENGTH OF AGREEMENT** | | |
| Section 19.1. | Duration | 28 |
| **SCHEDULE A - PAY SCALES AND JOB CLASSIFICATIONS** | | |
| **INDEX** | | |

E 5978

## AGREEMENT

This Agreement made and entered into this 29th day of February, 2008, by and between Equity Group-Eufaula Division, LLC, as to its Baker Hill, Alabama plant located at 57 Melvin Clark Drive, Eufaula, Alabama 36027 and that plant only (hereinafter referred to as the "Company"), and the Retail, Wholesale and Department Store Union, and its Alabama & Mid-South RWDSU Council (hereinafter referred to as the "Union").

### ARTICLE 1 – RECOGNITION

#### 1.1  Recognition

A.   The Company hereby recognizes the Union as the exclusive bargaining agent for the following employees of the Company: all production employees and line leaders within Company excluding chicken catching crews, truck drivers, office clerical employees, Quality Assurance, HACCP, professional and exempt employees, supervisors, watchmen, guards, nurses, maintenance, refrigeration, contract employees and other employees as defined in the National Labor Relations Act as amended.

### ARTICLE 2 – MANAGEMENT RIGHTS

#### 2.1  Reserved

A.   The Company reserves all rights to the management and the direction of the workforce, including the right to establish reasonable shop rules and regulations; right to hire new employees from any source, transfer, promote, counsel, warn suspend or discharge for just cause, to retire employees; the right to maintain discipline, assign and reassign employees to jobs; to transfer employees from department to department; to re-classify, upgrade, downgrade to increase and decrease the workforce; to sub-contract work as deemed appropriate; to

E 5979

schedule work hours and times, schedule breaks, schedule shift

start and end times; to determine the days of the workweek; the

right to determine job content and create new job

classifications, to revise the content of existing jobs and to

eliminate part or all of existing job classifications; to

determine the product to be handled, produced, or processed; the

scheduling of production and the methods, processes, and means of

production or handling; and to remove employees from duty because

of lack of work by voluntary means then according to seniority

standing as herein provided or for other legitimate reasons, is

vested exclusively in the Company, except as otherwise provided

in this Agreement and provided that such action by the Company

will not be used for the purpose of discrimination against any

employee or the Union.

### 2.2  Discontinue Operations

A.    The Company reserves the unrestricted right to suspend

or curtail the operation of the plant and to discontinue

processes, products, and departments in whole or in part whenever

in its judgment conditions warrant such suspension, curtailment,

or discontinuance.

### 2.3  Subcontracting

A.    If the Company should subcontract any portion of its

business, any displaced employees would be offered a position, by

seniority, for which they are qualified.

### ARTICLE 3 - SENIORITY

### 3.1  Principle

A.    The principles of seniority shall prevail on a plant

basis in regard to layoffs, recall, transfer or promotion to bid

E 5980

positions.  In order to qualify for a bid position, the
individual must satisfactorily perform the work (a skill equal to
the normal standards of proficiency and quality established by
other employees who perform the same work) or reach the required
performance within ten (10) working days' time.  In the event the
employee does not satisfactorily perform the work, the employee
will be disqualified and the next most senior, qualified person
will be assigned.  In extreme cases, the Company and a designated
union representative may agree in writing to extend this time two
(2) or more working days.

B.    When qualifications are substantially equal between two
(2) or more employees, then seniority shall prevail.

### 3.2  New Employees

A.    Employees with less than ninety (90) calendar days of
service shall be considered probationary and may be discharged at
the sole discretion of the Company.

### 3.3  Discharge

A.    Employees having more than ninety (90) calendar days of
service may be discharged for just cause and such discharge must
be by written notice to the employee stating the reason for the
discharge.  For the purpose of this section, "just cause" shall
include but shall not be limited to: dishonesty; intoxication;
violation of the Company's drug and alcohol policy; harassment
policy or safety policies and procedures; assault; battery;
fighting; damage or theft of property or product; and
professional gambling.

### 3.4  Seniority Broken

A.    The seniority service record of an employee shall be

-3-

E 5981

broken when the employee:

1.  quits, or is discharged for cause

2.  fails to return to work within two (2) consecutive
    working days after notification of recall

3.  has been absent for two (2) consecutive working
    days without notice to the Company

4.  has been laid off for a period of six (6) months

5.  has accepted a position with another company while
    on sick leave, layoff, or suspension

6.  fails to return to work due to a continuing
    disability or sickness for a period of six (6)
    months, with FMLA leave to run concurrently with
    any such period of disability or sickness to the
    extent available. Any period of disability or
    sickness must be supported by Company approved
    doctor's certificate stating that said employee
    would be capable of regular full-time work within
    six (6) months limitation described above.
    Further, following the expiration of any available
    FMLA leave, the employee is responsible for the
    cost of all medical benefits which must be paid to
    the Company in advance.

### 3.5  Seniority Lists

A.  The Company shall prepare a seniority list of all
employees during the months of January and July to which the
Union may object within thirty (30) working days. The list, when
or if adjusted, shall be final except as to new employees.

## ARTICLE 4 – LEAVE OF ABSENCE

### 4.1  Personal

A.  The Company will follow the provisions of the Family
Medical Leave Act ("FMLA") as amended.

### 4.2  Union Business

A.  A Leave of Absence, not to exceed fourteen (14) working
days, will be granted to not more than three (3) employees at a
time, without loss of seniority, who have been elected or
designated to attend union conventions, schools or seminars.

-4-

E 5982

Company sponsored benefit provisions may not be available through the Company during this period if Union provided benefits are available.  In the event benefits remain in force, the employee will be responsible for the total costs of benefits during the leave.

**4.3  Applications**

A.  All requests for leaves of absence must be made in writing and must be accompanied by appropriate supporting papers.

**4.4  Extensions**

A.  All leaves not covered under FMLA may be extended at the Company's discretion.

**4.5  Compensation**

A.  All leaves of absence will be granted without pay.

**4.6  Return**

A.  Employees on leaves in excess of fifteen (15) working days must give at least two (2) working days' notice of their intention to return to work and pass a drug screen upon return. Employees returning from medical leave, leaves defined under the Family Medical Leave Act and leaves specific to workers' compensation must present a doctor's release to the Personnel Department before beginning work.

**4.7  Another Job**

A.  A leave of absence will not be granted for an employee to take another job or to enter business for themselves.  Any leave of absence requested or granted under false pretenses shall be grounds for immediate discharge.

**4.8  Funeral Leave**

A.  An employee who suffers the death of a Member of the

E 5983

Immediate Family shall be granted a leave of absence of up to three (3) working days. These three (3) days will be as follows: One (1) preparation day prior to the funeral; one (1) day for the day of the funeral; and one (1) day within the seven (7) calendar days after the funeral. A non-probationary employee shall receive line time for each scheduled working day missed to attend the funeral but not to exceed twenty-four (24) hours pay at their current rate in effect in the payroll week immediately preceding the week in which the funeral leave falls. The time so paid shall not be counted as hours worked. Proof of the funeral date and relationship will be required.

B.    "Members of the Immediate Family" shall mean the persons standing in only the following legitimate relationships to the employee:

1.    Mother
2.    Father
3.    Spouse
4.    Child
5.    Step-Child
6.    Sister
7.    Brother
8.    Current Step-Parent
9.    Grandparent

C.    In addition, a non-probationary employee may request up to a total of two additional days off, without pay, to be taken within the 7 days before or after the funeral of a Member of the Immediate Family as defined above subject to the approval of the Company.

D.    An employee who suffers the death of their current Mother-in-Law or current Father-in-law may receive eight (8) hours of paid leave of absence for the day of the funeral only. Paid leave shall be at the employee's current rate of pay in

-6-

E 5984

effect in the payroll week immediately preceding the week in which the funeral leave falls.

### 4.9 Jury Duty

A.   Any employee that has to serve on jury duty shall receive paid leave for the hours which the employee otherwise would have worked and shall be reimbursed by the Company for the difference between the jury duty fee and department hours for the time lost from work, up to a maximum of ten (10) working days. The employee shall present proof of the jury service and the fee. If an employee is summoned for jury duty and subsequently released or was not required to serve a full day, the employee shall report immediately for work or be counted as absent and forfeit jury duty reimbursement.

### 4.10 Military Leave

A.   The Company will follow the current Universal Military Training and Service Act.

### 4.11 Family and Medical Leave Act

A.   The Company will follow the current Family and Medical Leave Act as amended.

B.   Following the expiration of an employee's probationary period, an employee with seniority whose FMLA leave has expired or who is not eligible for FMLA leave may request a medical leave of absence up to a maximum of 60 days for a non-occupational illness or injury otherwise subject to FMLA medical qualifications for the employee only, so long as supported by appropriate medical evidence in the discretion of the Company. The decision with respect to requests for medical leaves of absence pursuant to this Article is solely within the discretion

E 5985

of the Company both as to the reason for the leave, the length of the leave and the number of employees who can be approved for leave at any time. Employees must return to work from any such leave as of the date designated at the time when the leave is approved by the Company. Further, employees returning from medical leave must provide a medical release which indicates their availability to perform all essential elements of their job. Employees who are unable to return from medical leave as designated by the Company or at the expiration of the 60 day maximum leave shall forfeit their seniority and be terminated. Any leave granted by the Company pursuant to this Article shall be without pay or benefits.

### ARTICLE 5 - JOB VACANCIES

### 5.1  Temporary Vacancy Defined

A.  Temporary vacancies shall be offered first to employees on duty within the department who can perform the work without training and shall be granted to the most senior volunteers. If there are not sufficient volunteers, it shall be assigned to the most junior qualified employee within the department who can perform the work without training.

B.  If there is not an available employee within the department who can perform the work without training, it shall be offered to employees on duty who can perform the work without training and shall be granted to the most senior available volunteers. If there are not sufficient volunteers, it shall be assigned to the most junior available qualified employee on duty who can perform the work without training. In cases where there is not one available who can perform the work without training,

then the most junior available qualified employee who can do the work will be assigned. However, in cases of extreme emergency, any employee may be used to avoid loss of production until the above can be implemented in a reasonable time frame.

C. Temporary vacancies to exist for a period of twenty (20) working days or more shall be posted, with the understanding that the successful bidder will remain on the temporary job until the employee returns to work or ceases employment and/or is terminated. If the employee returns to work, the employee on the temporary job will be assigned to available work and have the employee's bidding rights restored.

### 5.2 Permanent Vacancy Posted and Defined

A. A permanent vacancy is a vacancy caused by a quit, discharge, transfer, or promotion of a non-probationary employee, or the establishment of a new premium job. When a permanent vacancy occurs in a premium pay job covered by this Agreement, the Human Resources Department shall post the premium job. The following steps shall be followed:

Step 1: The premium job to be filled will be posted for three (3) working days. During this time, any qualified non-probationary employee may bid for the premium job. Within three (3) working days, any qualified employee may bid for the premium job by signing their name on the notice, except employees

1. with less than ninety (90) calendar days seniority; or

2. who are unable to meet the trial period because they are not actively working when assigned for the trial period; or

3. who are unable to physically

-9-                          E 5987

F I N A L - APRIL 3, 2008

perform the premium job when
assigned, provided this clause
does not conflict with any
state or federal law; or

4.    with a suspension in the last
six (6) months

**Step 2:**

1.    As soon as possible, but not to exceed
fifteen (15) working days from the date of
posting, the eligible, qualified senior
bidder shall be assigned the premium job
subject to the provisions of Article 3.1.

2.    A successful bidder shall not be entitled to
bid another premium job or shift change for
six (6) months unless the employee's premium
job has been eliminated within that period,
nor shall the employee be entitled to return
to employee's old job once it has been filled
by another employee.

**Step 3:**

1.    Once the employee has qualified for the
employee's newly bid premium job, the
employee's old premium job shall be posted in
accordance with this Section.  An employee,
however, will have the option of returning to
the employee's old job at any time during the
employee's first ten (10) working days on the
new premium job.

2.    After ten (10) working days, the employee's
old premium job will be posted in accordance
with this section.  In extreme cases, the
Company and a designated union representative
may agree, in writing, to extend this time
two (2) or more working days.

**5.3  Temporary Employees**

A.    The Company may use temporary employees provided,

however, that no regular employee will be displaced so long as

consistent with the terms of this Article.

B.    If the Company engages temporary employees, such

persons shall be deemed to be employees if they have been

continuously engaged by the Company and working on a daily basis

-10-                    E 5988

for six months.  After six months of continuous employment, such persons shall be deemed to be probationary employees and subject to all of the terms and conditions of this Agreement.  The maximum number of temporary employees who may be hired pursuant to this provision at any time shall be 100.

### ARTICLE 6 - STEWARDS AND GRIEVANCE PROCEDURE

#### 6.1  Shop Stewards

A.   The Union may elect or appoint employees as shop stewards and chief stewards to handle grievances or disputes with the Company's designated representatives on Company time.  The Union will keep the Company advised as to the identity of the individual shop stewards and chief stewards in writing. Shop stewards and chief stewards must be employees of the Company in order to represent employees in the grievance procedure.

B.   The Company will not pay for time necessary to handle grievances, if handled outside the steward's line time.

#### 6.2  Grievance Procedure

A.   Should any difference, dispute, or complaint arise over the interpretation or application of this Agreement, there shall be an earnest effort on the part of both parties to settle promptly in accordance with the following procedure.

B.   All grievances shall be settled using working days. Working days are defined as Monday through Friday, excluding contractual holidays.

C.   Employees and/or stewards should talk to their immediate supervisor before going to Step 1 of the grievance procedure.

D.   Procedure:  The following steps shall be followed as to

E 5989

all grievances.  Once resolved at any step of this procedure, the grievance may not be refiled on behalf of the employee or the Union.

Step 1:  The Employee and/or steward must submit, on the grievance form, the matter to the shift manager within four (4) working days after the occurrence.  The shift manager must render a decision within four (4) working days, if not, the grievance automatically moves to Step 2.  Any grievance not presented within four (4) working days after the event shall be waived.

Step 2:  If a grievance is not settled in Step 1, it shall be presented in writing by the Union steward and/or employee to the plant manager.  If the grievance is not presented within three (3) working days after the first step answer, it will be considered null and void.  Management must answer in writing within three (3) working days, including a brief reason for any denial of the grievance.

Step 3:  If the grievance is not settled in Step 2, the grievance shall be submitted to the Human Resources Manager or designated representative, by submitting a written request to the Human Resources Manager, within five working days of the Step 2 answer.  If requested by the Union, the Human Resources Manager or representative shall set up a meeting with the steward filing the grievance, grievant, if requested by the Union, and the Union business agent to discuss the grievance at a time and place mutually agreeable to the parties within 10 working days of the submission by the Union to Step 3.  The Human Resources Manager or representative shall make a written reply to the grievance

E 5990

within five working days following the meeting or submission of
the grievance to Step 3 if no meeting is sought by the Union.

Step 4 - Arbitration:

(a)  Selection of Arbitrator.  If a grievance is not
settled in Step 3, it may be submitted to arbitration.  The
Executive Board for the Union shall have the sole authority to
determine whether or not the employee's grievance is qualified to
be submitted to arbitration by the Union.  The request for
arbitration shall be in writing and shall be made to the Company
and the Federal Mediation and Conciliation Service (FMCS) within
fifteen (15) working days of the Step 3 answer.  In the event the
Union does not respond in writing within fifteen (15) working
days, the grievance shall be considered settled in the Company's
favor.  After a request has been made by the Union to the Company
to submit a case to arbitration, the parties shall promptly meet
for the purpose of selecting an arbitrator to hear a pending
case.  In the event the parties hereto are unable to agree upon
the selection of an arbitrator within ten (10) working days after
receipt by the Company of a request to submit a case to
arbitration, a joint request by the parties hereto shall be made
to the FMCS to furnish a suggested list of names of seven (7)
arbitrators from which list the parties shall select one (1)
arbitrator.  Such selection shall be by agreement, if possible,
otherwise the parties alternately eliminate names from said list.
The parties shall strike the arbitrator within seven (7) working
days upon receipt of the panel.  After each party has eliminated
the name of three (3) arbitrators from the list, the remaining
one shall be accepted by both parties as the arbitrator to hear

-13-                          E 5991

and decide the pending case.

    (b)  Arbitration Proceedings.  The fee of the Arbitrator, as well as any other arbitration fee, shall be borne equally by the Union and the Company except that the cost of the transcript of the arbitration proceeding, if one is deemed necessary by either party, shall be borne by the party requesting same.  The jurisdiction and authority of the Arbitrator and his opinion and award, which shall be final and binding upon the parties, shall be exclusively limited to disputes arising under the express terms of the Agreement.  The Arbitrator shall have no power to add to, subtract from, or modify any of the terms of this Agreement.  The Arbitrator shall not have the jurisdiction or authority to substitute his or her judgment or discretion for that of management.  The Arbitrator shall be limited to rendering an award which is remedial.  Any award of back pay by an Arbitrator shall be limited by the amount of wages the employee otherwise would have earned from his employment with the Company during the period involved less any compensation for personal services received from employment elsewhere, or unemployment compensation received, during the period in question.  No back pay shall be awarded for any period which the employee would have been laid off.  Under no circumstances shall an employee be made more than whole or receive back pay for a period of more than ten working days prior to the initial filing of the grievance in writing.  The Arbitrator shall not have authority to pass upon questions relating to his own jurisdiction and he shall not have authority to be empowered to affect, rule upon, or grant extension or renewal of this Agreement.  Neither the violation of

-14-

any provision of this Agreement nor the commission of any act constituting an unfair labor practice or otherwise made unlawful by any federal, state or local laws shall excuse employees, the Union, or the Company from their obligations under the provisions of this Article.

E.    Time is of the essence, and the limits strictly observed by employees, the Union and the Company.  The failure of an employee or the Union to process a grievance through any one of the foregoing steps, or to do so in a timely manner, shall prevent the grievance from being considered at a subsequent step. The failure of the Company to respond in a timely manner shall be deemed an approval of the grievance.  The time limits specified in this Article only may be modified or extended by written agreement signed by an authorized official of the Company and the Union.  No more than one (1) extension shall be granted for any one (1) grievance.

### 6.3  Cost of Arbitration

A.    The expense of the arbitrator shall be split equally by the parties and the costs of the panel shall be paid by the requesting party.

### 6.4  Executive Board Authority

A.    At any step in the grievance procedure, the Executive Board of the Local Union shall have the final authority, in respect to any aggrieved employee covered by this Agreement, to decline to process a grievance, complaint, difficulty, or dispute further if in the judgment of the Executive Board such grievance lacks merit or lacks justification under the terms of this Agreement to the satisfaction of the Executive Board.

### 6.5  Presence of Stewards

A.    An employee may request that a steward is present in any disciplinary action being administered to him and such request will be honored.  The steward must be an employee of the Company.

## ARTICLE 7 – BULLETIN BOARDS

### 7.1  Posting

A.    The Company shall provide the Union with a bulletin board for the posting of official Union notices.  Such notices will be shown to the Plant Manager before posting.  The Company and the Union agree that neither party will post political material within the plant.

## ARTICLE 8 – UNION VISITS

### 8.1  Union Representation

A.    The Company shall admit to its premises two (2) union representatives who are employed by the Retail, Wholesale and Department Store Union, and its Alabama & Mid-South RWDSU Council, at any one time, who may visit inside the plant at reasonable hours.  Notice of a visit shall require three (3) working days notice, in writing, to the Company.  The Union shall notify the Company in writing who the representatives are by name and position with the Union.  Changes in union representatives shall require three (3) working days' written notice to the Company.  Such visits shall not interfere with the Company's operation and shall be for the express purpose of contract administration and grievance investigation.  Union officials shall not go into production areas of the plant without permission of management, which reserves the right to accompany

-16-                              E 5994

Union officials.  The Company and the Union agree that neither will hand out political material on Company premises.

## ARTICLE 9 – SAFETY AND HEALTH

### 9.1  Occupational Safety and Health Act

A.   The Company affirms its intention of complying with the provisions of the Occupational Safety and Health Act, and the Union agrees that it will support management in its efforts at compliance and general improvements of safety conditions.  The Union further agrees to encourage its members to work safely and to follow the instructions of the Company in the proper care, use operation, protection, and maintenance of property, equipment, and vehicles.

### 9.2  Accidents, Injuries

A.   It shall be the responsibility of each individual employee to notify the employee's superior immediately of any accidents, injuries or defective equipment.  An employee who is injured during working hours, while performing the employee's assigned work and who is physically unable to return to work on the shift as determined by medical opinion, shall be paid for the remainder of the employee's normal work shift for that day at the employee's regular basic hourly rate in an amount not to exceed eight (8) hours.  Employees required by the doctor to return for further treatment of an on-the-job injury shall endeavor to make all doctors' appointments during non-working hours.

### 9.3  Joint Safety Committee

A.   The Company and the Union shall establish a Joint Safety Committee consisting of two members appointed by the Company and two members appointed by the Union.  The function of

-17-

F I N A L - APRIL 3, 2008

the Joint Safety Committee shall be to review all safety
regulations, and to promote health and safety education of the
employees and to meet monthly on definitely established dates for
the purpose of considering safety issues, inspecting the
facilities as may be necessary and recommending measures for the
elimination or control of conditions which may be unsafe or
hazardous to the health and safety of other employees.  The Joint
Safety Committee shall not discuss general grievances or
otherwise consider disciplinary issues, nor shall it adopt rules
or procedures.  This provision does not modify the Management
Rights set forth in Article 2.

### ARTICLE 10 - HOLIDAYS

### 10.1 Holidays Defined

A.   All employees having established seniority shall
receive eight (8) hours' pay at their regular rate of pay for the
following holidays:

| | |
|---|---|
| New Year's Day | Thanksgiving Day |
| Martin Luther King Day | Christmas Eve Day |
| Memorial Day | Christmas Day |
| Fourth of July | Birthday Holiday |
| Labor Day | Personal Holiday |

### 10.2 Celebration

A.   Holidays falling on Saturday will be observed on the
preceding Friday, holidays falling on Sunday will be observed on
Monday.

### 10.3 Birthday Holiday

A.   Employees providing one week written notification prior
to the Birthday Holiday, subject to scheduling limitations based
upon operational requirements, shall receive eight (8) hours of
pay at their regular rate of pay.

E 5996

-18-

**10.4 Personal Holiday**

A.    Employees shall be eligible to schedule a Personal Day by providing one week written notification prior to the Personal Day, which may be granted upon mutual agreement with the employee's supervisor on a first come, first serve basis, subject to scheduling limitations based upon operational requirements. The employee shall receive eight (8) hours of pay at his or her regular rate of pay for such Personal Day.

**10.5 Qualifications for Holiday Pay**

A.    Employees must work their scheduled shifts before and after the holiday, without a tardy or early leave, to receive benefits.

**10.6 Hours Worked on a Holiday**

A.    All hours worked on a designated holiday will be paid at straight time, in addition to holiday pay.

**10.7 Holiday in Vacation**

A.    If a holiday falls during an employee's vacation week, and provided all qualifications are met, the employee shall receive the employee's regular rate of pay for eight (8) hours, in addition to vacation pay.

## ARTICLE 11 – VACATIONS

**11.1 Length**

A.    Employees who qualify shall be entitled to the following paid vacations:

> After one (1) year's seniority – one (1) week
>
> After three (3) year's seniority – two (2) weeks
>
> After ten (10) year's seniority – three (3) weeks

E 5997

F I N A L – APRIL 3, 2008

## 11.2 Vacation Pay

A.   At the beginning of their vacations, and only with two (2) weeks written notification prior to the first day of vacation time being requested, employees who have completed their first anniversary shall receive forty (40) hours of pay at their regular rate of pay, provided the employee has worked sixteen-hundred (1600) or more hours in the past anniversary year.

## 11.3 Vacation Period

A.   By December 1 of each year, plant management will distribute to all employees a vacation preference form on which each employee will indicate the employee's first, second and third choices.  Prior to January 1, a vacation schedule will be posted.  Preferences will be granted upon the basis of seniority, but in all cases the Company has the exclusive right to schedule, reschedule or postpone vacations based on business necessity. Once vacations are scheduled after January 1, no employee may bump another employee from their selected vacation slot. Employees having more than one (1) week earned vacation may take them on a staggered basis throughout the year.  Vacation may be split by weeks.  An employee may take up to ten (10) working days' vacation per year one (1) day at a time, provided that the employee requests approval from the employee's supervisor at least two (2) weeks in advance.  An employee requesting a one (1) day vacation on Friday will be required to work on Saturday following the one (1) day vacation, unless the one (1) day vacation request has been made prior to the posting of weekend work.

E 5998

## ARTICLE 12 – HOURS OF WORK

### 12.1 Work Schedule

A.    Work schedules for employees will vary in the Company. Operational demands may necessitate variations in starting and ending times, as well as variations in the total hours that may be scheduled each workday and workweek.

### 12.2 Overtime Pay

A.    Employees will be paid overtime pay at the rate of one and one half (1-1/2) times their regular rate of pay for hours actually worked in excess of forty (40) hours per week.

### 12.3 Reporting Pay

A.    All employees who report for work at the commencement of a scheduled shift without having been given reasonable notice of a change in schedule shall be given a minimum of four (4) hours' work, except in cases where work cannot be provided due to circumstances beyond the Company's control.

### 12.4 Time Cards

A.    Each employee will scan in the employee's own time card immediately before the commencement of the work period and immediately at the end of the work period.

### 12.5 Line Time

A.    All employees will be paid according to the hours of work indicated by the Master Line Time Card.

B.    All employees shall be paid an additional 3 minutes per day, at their regular rate, for clothes changing and cleaning time, in addition to any pay for hours worked.  Such payment shall be paid at the employee's normal hourly rate.

-21-

E 5999

### 12.6 Extra Time

A.    Employees designated by their supervisor or superintendent to work beyond their scheduled time shall be governed by their individual time card reports, which will be approved by management.

## ARTICLE 13 - MISCELLANEOUS

### 13.1 Physical Examination

A.    The Company will follow all applicable State, Federal and local laws for physical exams and drug screening as they relate to hiring, promotions, transfers, job assignments, near accidents, accidents and property damage.

### 13.2 Meal/Rest Periods

A.    Employees will receive two (2) thirty (30) minute non-paid meal/rest breaks each full work day.  In addition, where an employee is required to work more than 9 hours in any workday, except in the case of equipment or mechanical malfunctions or circumstances beyond the control of the Company, the employee shall be entitled to an additional 10 minute paid break to be scheduled by the Company, or to be paid for such break if not granted.

### 13.3 Anti-Discrimination

A.    The Company and Union agree each will comply with all Federal, State and Local anti-discrimination laws.

### 13.4 Supplies

A.    Supplies will be furnished to new employees, where required, in accordance with Company procedures as follows:

            -Smocks
            -Arm Guards
            -Cutting Glove
            -Hair Net

E 6000

-22-

```
-Beard Net
-Rubber (blue or green) Gloves
-Cotton Gloves
-Ear Plugs
-Apron - heavy duty
-Sleeves
```

B.   Arm guards and cutting gloves are not provided to new employees assigned to Packout, Live Hang, Shipping and Sanitation.

C.   Employees are entitled to receive, on a weekly basis, ear plugs and cotton liners.  Employees also will be entitled to receive three Hair Nets and Beard Nets, if necessary, per week as scheduled by the Company.  Employees are entitled to receive three pair of rubber gloves (blue or green) per week so long as the employee turns in the damaged or torn glove.

D.   In addition, employees are entitled to receive a pair of sleeves every 2 weeks and shall be entitled to receive one smock every day.  Employees shall be entitled to a heavy duty apron every 6 months as of January 1 and July 1 of each calendar year.  If the plant is not operating on a scheduled replacement day, the replacement clothing will be distributed on the next work day that the plant is operating.

E.   Employees who are required by the Company to wear boots will be provided boots at that time and may obtain replacement boots as needed in the determination of the Company, provided, however, that the employee turns in the original boots.

F.   Except as noted, employees must purchase replacement supplies from the Company.

G.   The Plant Manager may approve modifications to these supply procedures.  The Company reserves all rights to revise these procedures as necessary.

-23-                          E 6001

### 13.5 Discipline

A.    If an employee has not violated any Work Rules or General Safety Rules or incurred any discipline pursuant to the general progressive disciplinary system within 18 months, the last level of discipline shall be reduced to the next lower level of discipline and not be considered in future discipline under the Work Rules, General Safety Rules or general progressive disciplinary system.  Any remaining disciplinary levels shall be deemed reduced to the last lower level, one level at a time, if the employee does not violate any Work Rule or general safety Rule or incur any discipline under the general progressive disciplinary system every subsequent 6 months.  This provision does not modify the application of the Work Rules or the General Safety Rules or the applicable discipline which may be assessed for any violation, including the right to increase the disciplinary level depending on the severity of the violation or the employee's disciplinary history which is subject to consideration.

### 13.6 Orientation

A.    The Union shall be permitted to have a representative selected by the Union to address new employees at any formal orientation session.  If no Orientation is held, the Union representative shall have the opportunity to meet with each such new employee at least one week prior to the completion of the employee's probationary period.

### ARTICLE 14 - WAGES

### 14.1 Schedule A

A.    The Company shall pay its employees the amount of wages

for the various classification set out in Schedule A attached
hereto and made a part hereof.

**14.2 Pay Day**

A.    Checks will be distributed at the end of the shift on
Friday unless changed by the Company.

**14.3 Incentive Pay**

A.    The Company reserves the right to establish, modify,
add, or delete incentive programs, as they deem appropriate, as
long as the change does not violate the provisions of Schedule A.

## ARTICLE 15 – NO STRIKE – NO LOCKOUT

**15.1 Prohibited Conduct**

A.    During the whole period this Agreement is in effect,
the Company shall not lock out its employees and the Union shall
not authorize or sanction any strike, stoppage, slowdown, or
suspension of work against the Company.

## ARTICLE 16 – CHECK-OFF

**16.1 Collection of Dues and Remittance**

A.    The Company shall, for the term of this Agreement,
deduct initiation fees as authorized and shall deduct union dues,
arrears, assessments and/or fees in an amount certified by the
Union from the weekly wages of employees covered by this
Agreement who individually and voluntarily certify in writing
authorization for such deduction, until revoked pursuant to the
terms of the Check-Off Authorization set forth in Article 16.2.
The Company shall promptly remit all sums deducted in this manner
to the Secretary-Treasurer of Local union not later than the 15th
of the next month.  The check off, however, is to apply only to
such employees covered by this Agreement who authorize the

-25-                          E 6003

Company in writing to so check-off. The Union agrees to defend and hold the Company harmless against expenses, repayment, or losses for any demands, claims, disputes, or lawsuits by an employee arising in any manner out of or in connection with the check-off of any amount claimed by the Union to be due it or having been paid it by or for any employee.

B.   The wording of this labor contract shall supercede and take precedence over all other language on the check-off/authorization card.

### 16.2 Check-Off Authorization Form

A.   The Company shall not deduct any monies from an employee's wages pursuant to Article 16.1 unless the Check-Off Authorization card executed by the employee conforms to the following form:

CHECK-OFF AUTHORIZATION

I, the undersigned employee of Equity Group-Eufaula Division, LLC (hereinafter referred to as the "Company") of my own free will and accord hereby authorize and direct the Company to deduct weekly ( ), monthly ( ), from my earnings the amount owed by me for membership dues to the Retail, Wholesale and Department Store Union, Alabama & Mid-South RWDSU Council (herein referred to as the "Union") irrespective of my membership in the Union and to transmit such amount to the Union no later than the end of the month following the month in which the deductions are made. As of the date of this authorization, such dues are $ weekly ( ), bi-weekly ( ), monthly ( ). However, the amount of membership dues may be changed pursuant to the provisions of the Constitution of the parent body of the Union namely, the Retail, Wholesale and Department Store Union, and in the event the Union shall notify the Company in writing of the amount of the dues as so changed and upon receipt of such notification, the Company is hereby authorized to deduct from my earnings the amount of the dues as so changed.

If for any reason I should become delinquent in the payment of my membership dues to the Union, I hereby further authorize and direct the Company to

-26-

E 6004

F I N A L – APRIL 3, 2008

deduct, each pay period, from my earnings the amount of delinquent dues, as reported to the Company by the Union and in the amount reported to the Company by the Union until the total amount of delinquent dues is paid in full.

I hereby agree that neither the Company nor the Union shall be under any liability to me for the deduction of dues from my earnings in the manner described and set forth above and that maintaining my continuous good standing in the Union is my personal responsibility.

I reserve the right to revoke this authorization by giving individual written notice by registered-certified mail to the Company and to the Union either during ten (10) days immediately preceding any anniversary of the date shown below or during the ten (10) days immediately preceding the termination date of any collective bargaining agreement between the Company and the Union (whichever occurs sooner) which is applicable to me as an employee of the Company and unless or until revoked in the above stated manner, this authorization shall continue in full force and effect.

Dues and fees are not tax deductible as charitable contributions but may be tax deductible as business expense.

Print Name _____    Soc.Sec.No._____

Signature of employee_____

Address_____

_____    Date _____

## ARTICLE 17 – BENEFITS

### 17.1 Employee Coverage

Coverage for single employees will be provided as follows through Blue Cross Blue Shield of Alabama Low Option PPO, or its equivalent:

A.    Employees completing their probationary period will be eligible for single employee coverage as provided in Blue Cross Blue Shield of Alabama Low Option PPO, or its equivalent. Single employee coverage costs, including increases, will be paid by the

F I N A L - APRIL 3, 2008

Company, with the additional costs for spousal, dependent and family costs and increases to be paid by the employee.

B.   Employees completing 12 months of employment will be eligible for the benefits described in Section 17.1.A plus $125.00 per week accident and sickness benefits payable after 15 days of accident or illness for a period of 13 weeks as set forth in the applicable insurance plan, to be paid for by the Company.

### 17.2 Dependent Coverage

A.   Employees may elect dependent coverage, and if so shall be responsible for payment of the applicable premium.  This coverage will be as set forth in Blue Cross Blue Shield of Alabama Low Option PPO, or its equivalent.

### 17.3 Substitution of Coverage

A.   So long as coverage and service levels are maintained without material change, the Company may alter insurance providers or administrators with prior notification to and opportunity for discussion with the Union.

### ARTICLE 18 - SAVINGS CLAUSE

### 18.1 Good Faith

A.   The Company and the Union each acknowledge that this Agreement has been reached as a result of good faith collective bargaining by both parties hereto and it contains the entire understanding between the parties and is to be strictly construed.

### 18.2 Separability

A.   In the event any provision of this Agreement is held to be in conflict with or violation of any state or federal statute or other applicable law, administrative rule or regulation, such

-28-                         E 6006

F I N A L - APRIL 3, 2008

decision shall not affect the validity of the remaining provisions of the Agreement. The parties further agree that they will meet within thirty (30) days to renegotiate the provision or provisions of this Agreement held to be invalid.

### ARTICLE 19 - LENGTH OF AGREEMENT

**19.1 Duration**

A.    This Agreement shall become effective the 1st day of March, 2008 and shall remain in full force and effect until the 1st day of March, 2011, and shall remain in full force and effect for one (1) additional year thereafter unless terminated by either party by written notice to the other at least sixty (60) days prior to the 1st day of March, 2011.

RETAIL AND WHOLESALE DEPARTMENT STORE UNION, ALABAMA & MID-SOUTH COUNCIL

Henry Jenkins,
International Vice President

Jerry Foster, Representative

Jacqueline Davis

Sharon Brinson

Adrian Scovil

Kelvin Granger

Tim Smith

Ebone Morris

EQUITY GROUP - EUFAULA DIVISION, LLC

Tim Esslinger, General Manager

Jem Bigg, Human Resources Director

Greg Mills, Operations Manager

Kathy Gilmore, Assistant Human Resources Director

E 6007

-29-

Khodijah Culpepper

Sharon Jones

E 6008

F I N A L – APRIL 3, 2008

## SCHEDULE A

### Section 1 – Pay Scales and Job Classifications

The following minimum base rates, effective as of the payroll week following the effective date, for all employees covered by this Agreement are as follows:

| Effective Date | 3/01/08 | 3/01/09 | 3/01/10 |
|----------------|---------|---------|---------|
| Hire Rate | 8.60 | 9.00 | 9.25 |
| 90 Calendar Days | 9.45 | 9.70 | 9.95 |

The Company reserves the right to increase the starting wage rates across the board for all new hires upon 30 days prior notice to the Union.

### Section 2 – Premium Jobs

A.    Effective as of the ratification of the Agreement, the following minimum hourly premiums will be paid on these classifications after 90 calendar days:

Processing Plant

| | | |
|---|---|---|
| 1. | Knife Sharpener | 25¢ |
| 2. | Chiller Operator | 25¢ |
| 3. | Wash Station | 25¢ |
| 4. | Truck Spotter | 50¢ |
| 5. | Lift Driver | 50¢ |
| 6. | Fork Lift Operator | 50¢ |
| 7. | Pallet Jack Operator | 50¢ |
| 8. | Back-up Killer | 50¢ |
| 9. | USDA Insp/Helper | 50¢ |
| 10. | Mirror Trimmer | 50¢ |
| 11. | Palletizer | 50¢ |

-i-

E 6009

F I N A L – APRIL 3, 2008

| | | |
|---|---|---|
| 12. | On-line Production Employees Using Knives and Scissors | 55¢ |
| 13. | Line Leaders | $1.00 |
| 14. | Live Shackler | $1.50 |

Further Processing Plant

| | | |
|---|---|---|
| 1. | Blender/Tumbler Operator | 25¢ |
| 2. | Breader Operator | 25¢ |
| 3. | Pickup Technician | 25¢ |
| 4. | Bagger Operator | 25¢ |
| 5. | Batter Operator | 25¢ |
| 6. | Fryer Operator | 50¢ |

## Section 3 – Starting/Probationary Rate

The starting rates for new or rehires will be the rate shown in Section 1 of Schedule A.  Employees completing the probationary period will receive the applicable increase.

## Section 4 – Regular Rate Defined

The regular rate of pay for computing vacation and holiday pay will consist of the employee's base rate plus any skill premium they receive.

## Section 5 – Shift Pay Differential

A premium of twenty cents (20¢) per hour will be paid when a majority of the employee's scheduled hours are worked on the 2nd shift, and a premium of thirty cents (30¢) per hour will be paid when a majority of the employee's scheduled hours are worked on the 3d shift.

## Section 6 – Eligibility for Premium Pay:  In order to qualify for premium pay the employee must:

1.    have completed 90 calendar days with the Company

2.    meet the production, skill and quality

-ii-

E 6010

requirements of the premiums pay position

3.    work three (3) hours or more in the premium pay
      position during the workday

E 6011

F I N A L - APRIL 3, 2008

# I N D E X

| Title | Article/Section | Page |
|---|---|---|
| Accidents, Injuries | 9.2 | 17 |
| Another Job | 4.7 | 5 |
| Anti-Discrimination | 13.3 | 22 |
| Applications | 4.3 | 5 |
| Arbitration | 6.2.4 | 13 |
| Benefits | 17 | 27 |
| Benefits - Dependent Coverage | 17.2 | 28 |
| Benefits - Employee Coverage | 17.1 | 27 |
| Benefits - Substitution of Coverage | 17.3 | 28 |
| Birthday Holiday | 10.3 | 18 |
| Bulletin Boards | 7 | 16 |
| Check-Off | 16 | 25 |
| Check-Off Authorization Form | 16.2 | 26 |
| Clothes Changing and Cleaning Time | 12.5.B | 21 |
| Clothing | 13.4 | 22 |
| Collection of Dues and Remittance | 16.1 | 25 |
| Compensation | 4.5 | 5 |
| Cost of Arbitration | 6.3 | 15 |
| Discharge | 3.3 | 3 |
| Discipline | 13.5 | 24 |
| Discontinue Operations | 2.2 | 2 |
| Duration | 19.1 | 29 |
| Employee Quits/Discharge | 3.4A | 3 |
| Executive Board Authority | 6.4 | 15 |
| Extensions | 4.4 | 5 |
| Extra Time | 12.6 | 22 |
| Family and Medical Leave Act | 4.11 | 7 |
| Funeral Leave | 4.8 | 5 |
| Good Faith | 18.1 | 28 |

E 6012

| Title | Article/Section | Page |
|---|---|---|
| Grievance Procedure | 6.2 | 11 |
| Holiday - Celebration | 10.2 | 18 |
| Holiday - Birthday | 10.3 | 18 |
| Holiday in Vacation | 10.7 | 19 |
| Holiday - Personal | 10.4 | 19 |
| Holidays Defined | 10.1 | 18 |
| Holidays | 10 | 18 |
| Hours Worked on a Holiday | 10.6 | 19 |
| Hours of Work | 12 | 21 |
| Incentive Pay | 14.3 | 25 |
| Job Vacancies | 5 | 8 |
| Joint Safety Committee | 9.3 | 17 |
| Jury Duty | 4.9 | 7 |
| Leave of Absence - Personal | 4.1 | 4 |
| Leave of Absence | 4 | 4 |
| Length of Agreement | 19 | 29 |
| Line Time | 12.5 | 21 |
| Line Time - Payment | 12.5.B | 21 |
| Management Rights | 2 | 1 |
| Management Rights - Reserved | 2.1 | 1 |
| Meal/Rest Periods | 13.2 | 22 |
| Medical Leave of Absence | 4.11.B | 7 |
| Military Leave | 4.10 | 7 |
| Miscellaneous | 13 | 22 |
| New Employees | 3.2 | 3 |
| No Strike - No Lockout | 15 | 25 |
| Occupational Safety and Health Act | 9.1 | 17 |
| Orientation | 13.6 | 24 |
| Overtime Pay | 12.2 | 21 |
| Pay Scales and Job Classifications | Schedule A | |
| Pay Day | 14.2 | 25 |

E 6013

| Title | Article/Section | Page |
|---|---|---|
| Permanent Vacancy Posted and Defined | 5.2 | 9 |
| Personal Day | 10.4 | 19 |
| Physical Examination | 13.1 | 22 |
| Posting | 7.1 | 16 |
| Premium Jobs | Schedule A | |
| Premium Pay – Eligibility | Schedule A | |
| Presence of Stewards | 6.5 | 16 |
| Probationary Rate | Schedule A | |
| Prohibited Conduct | 15.1 | 25 |
| Qualifications for Holiday Pay | 10.5 | 19 |
| Recognition | 1.1 | 1 |
| Regular Rate | Schedule A | |
| Reporting Pay | 12.3 | 21 |
| Return | 4.6 | 5 |
| Safety and Health | 9 | 17 |
| Savings Clause | 18 | 28 |
| Schedule A | 14.1 | 24 |
| Seniority Broken | 3.4 | 3 |
| Seniority | 3 | 2 |
| Seniority – Principle | 3.1 | 2 |
| Seniority Lists | 3.5 | 4 |
| Separability | 18.2 | 28 |
| Shift Pay Differential | Schedule A | |
| Shop Stewards | 6.1 | 11 |
| Starting/Probationary Rate | Schedule A | |
| Stewards and Grievance Procedure | 6 | 11 |
| Subcontracting | 2.3 | 2 |
| Supplies | 13.4 | 22 |
| Temporary Vacancy Defined | 5.1 | 8 |
| Temporary Employees | 5.3 | 10 |
| Time Cards | 12.4 | 21 |

E 6014

| Title | Article/Section | Page |
|---|---|---|
| Union Visits | 8 | 16 |
| Union Business | 4.2 | 4 |
| Union Representation | 8.1 | 16 |
| Vacation Period | 11.3 | 20 |
| Vacation Pay | 11.2 | 20 |
| Vacations | 11 | 19 |
| Vacations – Length | 11.1 | 19 |
| Wages | 14 | 24 |
| Wages | Schedule A | |
| Work Schedule | 12.1 | 21 |

E 6015

**TAB  7**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA - NORTHERN DIVISION

BETTY ANN BURKS, et al.,        :
                                :
                Plaintiffs,     :
                                :
        v.                      :     Civil Action No. 2:06-CV-1081-MEF
                                :
EQUITY GROUP EUFAULA            :
DIVISION, LLC,                  :
                                :
                Defendant.      :

---

### AFFIDAVIT OF ROBIN STEVENS.

---

Robin Stevens, being first duly sworn according to law, states as follows:

1.    I am the Fresh Plant Manager for the poultry processing plant operated by Equity Group-Eufaula Division, LLC ("Equity"), located in Bakerhill, Alabama, which principally engages in the slaughtering, deboning and processing of chickens.

2.    I have been employed by Equity since September, 2004. I was the Quality Assurance Manager for the production facility from September, 2004 to mid-2005. I have been the Fresh Plant Manager at Equity since mid-2005.

3.    Charoen Pokphand (USA), Inc. ("CP") was the previous owner of this production plant. Equity purchased this facility from CP in March of 2004.

4.    Equity's production facility is comprised of two separate processing buildings -- the Fresh Plant and the Further Processing ("Cook") Plant.

5.    The Fresh Plant is where live birds arrive and are slaughtered and deboned.

6.    The Further Processing Plan is where chicken meat is

marinated, breaded, cooked or otherwise finished as specified by the customer.

   7.   In general, chicken meat processing at Equity is accomplished through the following departments:

- Live Receiving, where the live birds are unloaded from trailers and cages and hung on the processing line conveyer where they are immediately slaughtered.

- Evisceration, or First Processing, where the slaughtered birds are defeathered, trimmed, eviscerated and inspected in preparation for chilling and further processing.

- Debone, or Second Processing, where the poultry carcasses are skinned, deboned and reduced to various cuts in preparation for further processing at Equity or other facilities.

- Further Processing, or the "Cook Plant," where chicken parts undergo various processes, such as marination, breading, cooking and form cutting, in preparation for packaging and shipment to the customer.

- Pack-Off, where product is boxed, wrapped, weighed and moved to shipping.

   8.   Plant-wide operations are performed by three other departments:

- Sanitation, a separate shift responsible for cleaning the entire facility in preparation for the resumption of poultry processing.

-2-

- Quality Assurance, which inspects product for wholesomeness and conformity to customer specifications.
- Shipping, where raw materials are received in refrigerated trailers and placed into refrigerated coolers and the process is reversed for finished product.

9.   The Hatchery, which is located at a different facility, is where the eggs laid at contract breeder farms are properly hatched and the chicks are cared for until they are transported to broiler farms where the birds are raised for slaughter.

10.   Generally, the Evisceration and Debone Departments are paid according to "line time," the time actually worked measured from a specified start time, when the first piece of product is scheduled to arrive at the first position on that production line, until the last piece of product actually passes the first position on that line, less two 30 minute scheduled breaks.

11.   Some production employees in the Evisceration and Debone Departments have responsibility for set-up or related work before production starts or work after regular production.  These employees are paid from that start time, which is noted and recorded by line supervisors in the "KRONOS" system.

12.   KRONOS is a computerized system used for recording time, attendance and computing hours worked.  Production employees generally "swipe-in" or "swipe-out" through the KRONOS system upon arrival and departure from the plant at one of several KRONOS clocks.

13.   The KRONOS system generally is used for recording

-3-

attendance and, in conjunction with written entries recorded by line supervisors, for computing hours worked by employees paid according to "line time."

14. Sanitation employees are paid on an incentive-based system and are paid for 8 hours daily, even if they work less than 8 hours. If a Sanitation employee works more than 8 hours, he or she is paid overtime, which is recorded by the supervisors.

15. Sanitation employees do not generally take "scheduled" breaks.

16. Employees in Shipping and Quality Assurance work set scheduled shifts, the hours of which are entered into the KRONOS system, subject to supervisory edits as may be required.

17. Hatchery employees are paid for scheduled shifts based on hours worked as recorded on individual time cards.

18. Truck drivers and office workers are paid "clock-to-clock" or directly from the KRONOS system.

19. "Production" and Sanitation employees are represented by the Retail and Wholesale Department Store Union, Alabama & Mid-South Council, for purposes of collective bargaining.

20. Other Equity employees, including hatchery workers, Quality Assurance, truck drivers and clerical, have no union representation and some of these employees do not even work at the processing plant.

21. Employees who work inside Equity's production facility only are required to wear a smock, hairnet/beard net and ear protection. The precise nature of an employee's job dictates whether other items of clothing are required.

22. Production and sanitation employees are required to

-4-

wear "non-slip" footwear of their choice, which can be worn to and from the plant. Maintenance employees are required to wear steel-toed boots, as needed, which most wear to and from the plant.

23.  Production employees in the Evisceration and Debone Departments whose particular job requires the use of a knife are required to wear plastic armguards and a steel mesh glove. These items are distributed and put on while the employee is on the production line and being paid and these items are maintained and washed by Equity.

24.  Employees who work in Further Processing and physically handle chicken product are required to wear rubber gloves.

25.  Optional clothing items are made available for the employees, if requested, and include blue plastic aprons and sleeves, cotton and heavy rubber gloves and safety glasses.

26.  Sanitation employees (in addition to the smock, hairnet/beard net and ear protection) are issued bump caps, rainsuits, heavy rubber gloves (if working with chemicals) and safety goggles.

27.  Shipping Department employees (in addition to the smock, hairnet/beard net and ear protection) are issued bump caps and safety goggles (although not always required to be worn), as well as cold weather gear as may be needed in a refrigerated environment.

28.  Hatchery employees are only required to wear non-slip shoes, but ear plugs are required in designated "high noise" areas.

29.  Equity's Human Resources Department has identified the

-5-

current jobs held, or the last job held before termination of employment, at Equity for each of the plaintiffs involved in this proceeding. That information is contained on the spreadsheet attached hereto as Exhibit "A."

I declare under penalty of perjury that the facts set forth herein are true and correct.

Robin Stevens, Fresh Plant Manager

**TAB 8**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ALBANY DIVISION**

LESSIE ANDERSON, BURNICE CRETCHER    :
BRENDA GETER, BRENDA HARRIS, LISA    :
HILLMAN-JACKSON, DEXTER              :
JACKSON, ELLA LYONS, MATTIE          :
MEADOWS, DARLETTA WHITE, WANDA       :
COLEY, WILLIE FORD and DIANN         :
FREEMAN, on behalf of themselves and others :
similarly situated.                  :
           Plaintiffs,    :
v.                                   :     1:00-CV-166 (WLS)
                    :
CAGLE'S, INC., and CAGLE FOODS J.V., :
L.L.C.,                              :
                    :
           Defendants.    :
———————————————————    :

## ORDER

Presently pending before the Court are: Defendant Cagle Foods JV, LLC's Motion to

Decertify Class (Doc. No. 148); Defendant Cagle Foods JV, LLC's Motion to Sever Plaintiffs

(Doc. No. 149); and Defendant Cagle's Inc.'s Motion to Decertify and/or to Sever. (Doc. No.

151). Also, pending is Defendant's motion to compel and for sanctions. (Doc. No. 146).

Lastly, Plaintiffs have pending two motions to strike Defendants' rebuttal experts. (Tab 177,

179). For the reasons stated below, Defendants' Motions (Doc. Nos. 148, 149, 151) are

**GRANTED.** Defendants' motion to compel and for sanctions (Doc. No. 146) is **GRANTED.**

Plaintiffs' motions to strike (Doc. Nos. 177, 179) are **DENIED without prejudice.**

## I.    OVERVIEW

1

On July 11, 2002, the Court granted Plaintiffs' Motion to Facilitate Court Approved

Notice and conditionally certified the collective action under 29 U.S.C. § 216(b) of the Fair

Labor Standards Act ("FLSA") to recover allegedly unpaid hourly and overtime compensation

owed for donning and doffing various permutations of protective clothing/equipment required

for their jobs, removing of protective clothing/equipment prior to beginning lunch breaks and

denial of full breaks and lunch periods due to the requirement that Plaintiffs remain on the line,

after their break or lunch has started, until they have completed processing. Approximately

2200 employees or former employees of Defendants Cagle Foods JV, LLC ("Cagle Foods")

and Defendant Cagle's, Inc. ("Cagle's") filed consents to opt-in to this litigation.

## II. DISCUSSION

### A. Legal Standard

The traditional analysis for collective action treatment is divided into two stages. *See*

Hipp v. Liberty National Life Insurance Co., 252 F.3d 1208, 1218-19 (11th Cir. 2001). The

stage one determination is generally "made using a fairly lenient standard" because "the court

has minimal evidence." Cameron-Grant v. Maxim Healthcare Services, Inc., 347 F.3d 1240,

1243 (11th Cir. 2003). It is not until after discovery has been conducted, "when the court has

much more information on which to base its decision," that the court makes a factual

determination on the similarly situated question. *Id.* A defendant may move to decertify the

class if the evidence shows that the members of a conditionally certified class are not "similarly

situated." Harper v. Lovett's Buffet, Inc., 185 F.R.D. 358, 365 (M.D.Ala. 1999). In the second

stage, the Court requires a higher level of proof than for initial conditional certification.

Vaszlavik v. Storage Technology Corp., 175 F.R.D. 672, 678 (D.C.Colo. 1997). Because of the

2

heavier burden of proof for deciding whether the group is "similarly situated," the Eleventh Circuit has recognized that few actions will be certified at this stage. Hipp v. Liberty Nat. Life Ins. Co., 252 F.3d at 1218.

In deciding final certification, courts have emphasized that certification as a collective action should be based on a variety of factors. Thiessen v. General Electric Capital Corp., 996 F.Supp. 1071, 1081 (D.Kan. 1998). These factors include: (1) the factual and employment settings of the individuals plaintiff, (2) the different defenses to which the plaintiffs may be subject on an individual basis, and (3) the degree of fairness and procedural impact of certifying the action as a collective action. See Brooks v. BellSouth Telecomm., 164 F.R.D. 561, 568 (N.D.Ala. 1995).

**B.    Legal Analysis**

Defendants Cagle Foods and Cagle's move the Court to decertify the putative class. For the following reasons, the Court grants decertification because opt-in Plaintiffs are not "similarly-situated."

**i.    Employment Setting and Factual Situation**

The putative class is composed of disparate factual and employment settings and cannot continue as a collective action. In Brooks v. BellSouth Telecomm., 164 F.R.D. at 569, conditional certification was denied when extensive discovery clearly demonstrated that the proposed opt-in Plaintiffs would span separate facilities. Specifically, Cagle Foods and Cagle's maintained: (1) separate corporate and legal identities and locations, and (2) separate work forces.

*a.    Corporate and Legal Identities and Locations*

3

1.    <u>Cagle Foods</u>

Prior to 1993, Cagle's operated a poultry processing complex in northern Florida. Part of its operation included a small processing plant in Camilla, Georgia as well as multiple facilities in Georgia and Alabama. In March of 1993, Cagle's and Executive Holdings, L.P. ("Executive"), an entity related to one of Cagle's then existing major customers, Keystone Foods, LLC ("Keystone"), entered into a joint venture to produce chicken meat. The joint venture created an independent company, Cagle Foods, to operate the joint venture. Cagle Foods expanded the Camilla facility to include starting the integrated poultry processing complex, including a slaughtering and processing plant, a feed mill, a hatchery, live operations and numerous contract farming facilities. In April of 1995, Cagle Foods commenced operations at a newly constructed processing facility, primarily to process raw chicken product to Keystone for distribution to its major customer, McDonald's Restaurants. In the spring of 2002, the ownership structure of Cagle Foods changed when Cagle's interest was bought out by Executive and the name of the entity was changed to Equity Group-Georgia Division, LLC ("Equity-Georgia").[1] Cagle's no longer holds any ownership interest in Cagle Foods. Cagle Foods is a Delaware limited liability company which was and remains a privately traded stock company and does not publicly trade any stock or file any SEC reports.

Cagle Foods has a collective bargaining agreement with the union representing its employees, Retail, Wholesale and Department Store Union ("RWDSU") Local 938. Even during that period when Cagle's was a member of Cagle Foods, Cagle Foods' Complex

---

[1]    For purposes of discussion, the Court will continue to use the name "Cagle Foods."

4

Manager was the chief negotiator for Cagle Foods and needed to only obtain final approval from the Steering Committee for approval of the collective bargaining agreements. The members of the bargaining committee are only employees of Cagle's Foods.

2.    <u>Cagle's</u>

Since 1989, Cagle's has operated multiple poultry plants throughout Georgia and Alabama, including: Dalton, Forsyth, Macon, Pine Mountain Valley, Lovejoy, Bucknell, Perry and Atlanta, Georgia and Collinsville, Alabama as well as two facilities in Albany, Kentucky owned by a different company. Cagle's has its own hatchery and feed mill. Its live poultry operations, based in Dalton, Georgia, include facilities where: chicken carcasses are mechanically deboned and, cut-up chicken is marinated, breaded, frozen and packed. Cagle's is a Georgia corporation which is publicly traded with a corporate headquarters in Atlanta, Georgia. At all relevant times to this action, Cagle's has not identified Cagle Foods as a subsidiary nor has it otherwise been listed as one of Cagle's facilities, as evidenced by its 2001 Annual Report.

Most of the Cagle's poultry facilities do not have collective bargaining agreements with their employees. Although Cagle's Pine Mountain Valley and Macon plants have collective bargaining agreements with RWDSU, the agreements are separate and independent between the plants. Cagle Foods has never negotiated Cagle's collective bargaining agreements.

*b.*    ***Work Forces***

At all times relevant to this action, Cagle Foods and Cagle's have maintained separate and independent work forces.

1.    <u>Cagle Foods</u>

5

Nine of the twelve original Named Plaintiffs claim to be employed by Cagle Foods. There are opt-in Plaintiffs from the following departments or areas: Maintenance, Live Receiving, Evisceration, De-Bone, Further Processing, Pack-Off, Quality Assurance, Hatchery, Data Entry, Truck Driver, Live Haul, Live Operations and $CO_2$ Technician.

2.    Cagle's

At the time of the filing of the action, two Named Plaintiffs worked in the Macon, Georgia live processing facility, one in the saw line of the Day Pack department and one in the De-Bone department. No longer employed with Cagle's at the time of the filing of the action, one Named Plaintiff worked in the De-Bone department of the Pine Mountain Valley, Georgia live processing facility.

ii.    **Individual Defenses**

There are numerous and individualized defenses unique to each Defendant which cannot be addressed on a class-wide basis. Serious procedural concerns arise when the Court is faced with individual employees, such as those of Cagle Foods and Cagle's, who can assert individual defenses that would be too unruly to try as a sigle action before the Court. Thiessen v. General Electric Capital Corp., 996 F.Supp. at 1084. Specifically, those employers can assert individual defenses regarding differences in methods of compensation and required items of clothing.

a.    *Methods of Compensation*

At all times relevant to this action, Cagle Foods and Cagle's operate separate and independent methods of compensation. Moreover, whether considering Cagle Foods by itself or grouped with Cagle's multiple plants, there are divergent pay practices between some of the

6

departments in this case.

### 1.    Cagle Foods

There are no consistent or overall compensation methods between the various departments.   In the Evisceration and De-Bone departments, employees are paid for "line time," which is time that is measured from a specified "start time," i.e., when the first piece of product is scheduled to arrive at the first position on that line, until an "end time," i.e., when the last piece of product actually passes the first position on that line, less time for a fifteen minute paid rest break and a forty-five minute unpaid meal period.  If the employees have responsibilities such as set-up or related work before regular product start time or are asked to report early or stay late, then those employees are paid from the time they clock-in to the time they clock-out.

In the Sanitation department, employees are paid by a guaranteed, incentive-based pay system and paid for eight hours daily irrespective of whether they actually work for that period of time and are generally paid overtime for any time over eight hours.  Maintenance department employees are paid for a scheduled shift which is subject to supervisory edits.  Feed Mill and Hatchery department employees are paid for scheduled shifts based on hours worked as recorded on individual time cards.  Truck drivers and office workers are paid "clock-to-clock."

Since the joint venture was formed, all employees of the joint venture were and are employed and paid solely by Cagle Foods. Although the employees of the Evisceration, De-Bone, Sanitation and Maintenance departments are represented by RWDSU, the remaining opt-in plaintiffs have no union representation.

### 2.    Cagle's

7

In the Dalton, Georgia feed mill, employees are compensated based on individual time cards. In the Forsyth, Georgia feed mill, employees are compensated based on individual time cards. In the Macon, Georgia live processing facility, production employees are compensated by line cards[2] and are represented by RWDSU. In the Pine Mountain Valley, Georgia  live processing facility, production employees are compensated by line cards and are represented by RWDSU. Closed in March of 2001, the Lovejoy, Georgia processing facility employees were compensated based on individual time cards. Closed in August of 2000, the Bucknell, Georgia, processing facility employees were compensated based on individual time cards. In the Atlanta, Georgia, processing facility, employees are compensated based on both line cards and individual time cards. In the Collinsville, Alabama, processing facility, production employees are compensated based on individual time cards. In the Perry, Georgia, processing facility, production employees are also compensated based on individual time cards. Each plant sets its own shift start time and end time, as well as rest breaks and meal periods, with most facilities giving employees two paid rest breaks and a thirty minute unpaid meal period.

### b.    *Required Items of Clothing*

At all times relevant to this action, Cagle Foods and Cagle's have operated separate and independent operations and policies respecting time keeping and garments to be worn.

### 1.    Cagle Foods

Cagle Foods only requires employees who work inside the production facility to wear a smock, hairnet/beardnet and ear protection. Cagle Foods requires employees to obtain a fresh

---

[2]. "Line cars" are like punch cards that keep up with production of the employee on the line, hence the name.

8

smock at the plant each workday.

Depending on the precise nature of the job, additional items of clothing are required. Steel mesh gloves and plastic arm guards are required in the Evisceration and De-Bone departments which are put on while the employee are being paid. Rubber gloves are required in the Further Processing department and plastic aprons and safety glasses are optional clothing items which are worn while the employee is being paid. Bump caps, rain suits, heavy rubber gloves and safety glasses are required in the Sanitation department and the employees are paid by a guaranteed, incentive-based pay system. Bump caps and safety goggles are not always required to be worn in the Maintenance department. Depending on what specific tool or piece of equipment the employee is working with, the employee may be required to wear protective gloves, welding vests, goggles or some other protective clothing which is donned and doffed while on the clock. Ear protection and non-slip shoes are required to be worn in the Feed Mill department. In the Hatchery department employees are only required to wear non-slip shoes, bur ear protection may be required in certain designated areas.

2.    Cagle's

Most Cagle's employees are responsible for the care and maintenance of the their own required garments. In the Macon, Georgia, facility sanitation clothing is required to be on before the employees touch the product and the employees often put on and take off the equipment while walking to and from the line. Protective clothing/equipment ("PPE") is required to be on before performing tasks associated with the equipment. Employees who do not touch the product after slaughter can  don and doff PPE while on the clock. Production employees working more or less than scheduled are noted by the supervisor on a report and

9

employees are paid based on the changed time.  Maintenance employees are paid from "clock-to-clock" and no meal periods are deducted.  Sanitation employees are usually paid for an eight (8) hour day.

In the Pine Valley, Georgia facility, employees are required to wear smocks, ear protection and hairnets before entering the production floor.  PPE are required to be on before performing the task associated with the equipment.  Some employees can don and doff PPE as they walked to the line.  Any production employee working more or less than scheduled is noted by the supervisor on a report and the employee is paid for the changed time.  Maintenance employees are paid from "clock-to-clock" and no meal periods are deducted.  Sanitation employees are usually paid for an eight (8) hour day.

In the Lovejoy, Georgia facility,  the production employees are required to wear PPE and sanitation clothing before performing the task associated with the equipment.  Employees are required to be at their station at the start time, but are allowed to arrive fifteen (15) minutes late before any disciplinary action is taken.  All employees ended the day at the same time, but had to wait in line to punch out on their individual punch card.

In the Bucknell, Georgia facility, the production employees are required to wear PPE and sanitation clothing before performing the task associated with the equipment. Employees are required to be at their station at the start time, but are allowed to arrive five (5) minutes late before any disciplinary action is taken.  Any employee working more or less than his scheduled hours is paid accordingly, but the change is noted by a supervisor on a report.

In the Atlanta, Georgia facility, the production employees are required to wear PPE and sanitation clothing before performing  tasks associated with the equipment.  Employees are

10

required to be at their station at the start time, but are allowed to arrive five (5) minutes late before any disciplinary action is taken. Any employee working more or less than his scheduled hours is paid accordingly, but the change would is noted by a supervisor.

In the Collinsville, Alabama processing facility, production employees are required to wear smocks, ear protection and hairnets before entering the production floor. It is required that PPE be worn before working with the equipment. Some employees can don and doff PPE while on the clock. Other employees, not working on the production line, can don and doff PPE while on the clock and are not necessarily required to wear their PPE for their entire shift. Any production employee working more or less than the scheduled hours is paid accordingly, but the change is noted by a supervisor. Maintenance employees are paid from "clock-to-clock" and no meal periods are deducted. Sanitation employees are usually paid for an eight (8) hour day.

In the Perry, Georgia processing facility, production employees are required to don sanitation and PPE at the start of their shift. Other employees are expected to put on PPE before performing the task associated with the equipment; these employees can don and doff PPE while on the clock. Any production employee working more or less hours than scheduled is paid accordingly. The change, however, is noted by the supervisor on a report. Employees receive two thirty-five (35) minute breaks daily. Maintenance employees are paid from "clock-to-clock" and no meal periods are deducted. Sanitation employees are usually paid for an eight (8) hour day.

### iii.    Fairness and Procedural Concerns

Where, as here, a tenuous second-stage class exists, it has been found that fairness and

11

procedural considerations supported decertification of the class. *See* <u>Alexander v. Fulton County, Ga.</u>, 207 F.3d 1303, 1324 (11th Cir. 2000). Plaintiffs have alleged that Defendants, jointly and severally, violated the FLSA by failing to pay hourly and overtime compensation owed for donning and doffing various permutations of PPE on a class-wide basis. However, as Defendants have demonstrated through extensive and contentious discovery, Plaintiffs are not "similarly situated" and Defendants have not been shown to have acted jointly and severally in all relevant respects as alleged. Named Plaintiffs essentially employed by a single employer, based on the discovery before the Court, cannot fairly and adequately represent the variously assigned employees, the wide variety of work assignments and varied compensation structures affecting the purported class. Therefore, decertification is warranted.

## III.    DISCOVERY MOTIONS

Defendant has filed a motion to compel and for sanctions against the numerous opt-in Plaintiffs that have failed to engage in discovery. (Doc. No. 146, Exhibit). Over 100 opt-in Plaintiffs have utterly failed to engage in discovery, even after repeated attempts by Plaintiffs' attorneys to contact them.(Doc. No. 152). Defendants' motion has been pending since November 12, 2003, and none of the subject opt-in Plaintiffs have responded to the requested discovery. Therefore, the only appropriate sanction is to dismiss these Plaintiffs from the case. Therefore, Defendants' motion to compel and for sanctions (Doc. No. 146) is **GRANTED.**

Plaintiffs' have filed two motions to strike the testimony of Defendants' rebuttal experts. (Doc. Nos. 177, 179). As the motions are not relevant to the motions to decertify or to sever, the motions to strike (Doc. Nos. 177, 179) are **DENIED without prejudice.**

## III.    CONCLUSION

12

Defendant Cagle Foods JV, LLC' Motion to Decertify Class (Doc. No. 148); Defendant Cagle Foods JV, LLC's Motion to Sever (Doc. No. 149); and Defendant Cagle's Inc. Motion to Decertify and/or to Sever. (Doc. No. 151) should be, and hereby, are **GRANTED.** Defendants' motion to compel and for sanctions (Doc. No. 146) is **GRANTED.** Plaintiffs' motions to strike Defendants' rebuttal experts (Doc. Nos. 177, 179) are **DENIED without prejudice.**

SO ORDERED, this 31st day of March, 2005

W. LOUIS SANDS, CHIEF JUDGE
UNITED STATES DISTRICT COURT

13

TAB 9

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06-CV-1081-MEF


BETTY ANN BURKS,

et al.,

     Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

     Defendant.



BEFORE:

     Cynthia M. Noakes, Commissioner

     and Certified Court Reporter


DEPOSITION TESTIMONY OF

MARY LEE ALLEN


*****************************

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

0150db18-038a-4638-a6d7-2d18562dc4b9

2

STIPULATION

IT IS STIPULATED AND AGREED by and
between the parties through their respective
counsel, that the deposition of MARY LEE ALLEN
may be taken before Cynthia M. Noakes, Court
Reporter, at the Law Offices of WILLIAMS,
POTTHOFF, WILLIAMS & SMITH, 125 South Orange
Avenue, Eufaula, Alabama 36027, on the 21st day
of May, 2008.

IT IS FURTHER STIPULATED AND AGREED
that the signature to and the reading of the
deposition by the witness is waived, the
deposition to have the same force and effect as
if full compliance had been had with all laws and
rules of Court relating to the taking of
depositions.

IT IS FURTHER STIPULATED AND AGREED
that it shall not be necessary for any objections
to be made by counsel to any questions except as
to the form or leading questions, and that
counsel for the parties may make objections and
assign grounds at the time of the trial, or at

3

the time said deposition is offered in evidence,
or prior thereto.

IT IS FURTHER STIPULATED AND AGREED
that the notice of filing of the deposition by
the Court Reporter is waived.

*******************************************

4

INDEX

EXAMINATION BY:                    PAGE NUMBER:
MR. GOULD                          7-61

EXHIBITS:
(No exhibits were
submitted to said deposition.)

Reporter's Certificate              63

*******************************************

5

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:
     MS. CANDIS MCGOWAN
     MR. JACOB A. KISER
     WIGGINS, CHILDS,
     QUINN & PANTAZIS, LLC
     ATTORNEYS AT LAW
     The Kress Building
     301 Nineteenth Street North
     Birmingham, Alabama 35203
     (205) 314-0614

ON BEHALF OF THE DEFENDANT:
     MR. MALCOLM S. GOULD
     PELINO & LENTZ
     ATTORNEYS AT LAW
     One Liberty Place
     Thirty-Second Floor
     1650 Market Street
     Philadelphia, Pennsylvania 19103
     (215) 665-1540
*******************************

0150db18-038a-4638-a6d7-2d18562dc4b9

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

6

1       APPEARANCES (continued)

2

3    ALSO PRESENT:

4       Salintha Foster, Co-Plaintiff

5

6    ****************************************

7

8       I, CYNTHIA M. NOAKES, a Certified

9    Court Reporter of Eufaula, Alabama, acting as

10   Commissioner, certify that on this date, as

11   provided by the Alabama Rules of Civil Procedure

12   and the foregoing stipulation of counsel, there

13   came before me at the Law Offices of WILLIAMS,

14   POTTHOFF, WILLIAMS & SMITH, 125 South Orange

15   Avenue, Eufaula, Alabama 36027, beginning at

16   9:15 a.m., MARY LEE ALLEN, witness in the above

17   cause, for oral examination, whereupon the

18   following proceedings were had:

19

20       MARY LEE ALLEN,

21   being first duly sworn, was examined and

22       testified as follows:

23

7

1       THE COURT REPORTER:  Usual

2    stipulations?

3       MS. MCGOWAN:  Yes.

4       MR. GOULD:  (No response.)

5

6       EXAMINATION

7    BY MR. GOULD:

8    Q.  Good morning.  Could you please state your

9    name for the record?

10   A.  Mary Lee Allen.

11   Q.  All right.  Ms. Allen, my name is Malcolm

12   Gould.  I'm an attorney with the law firm of

13   Pelino & Lentz in Philadelphia.  I represent the

14   Defendant Equity Group Eufaula Division, LLC, in

15   this lawsuit.  You have opted-in to this lawsuit

16   as a plaintiff, and we're here today to take your

17   deposition.  Do you understand that?  Do you

18   understand why you are here today?

19   A.  Yes.

20   Q.  Okay.  There's a few rules to taking a

21   deposition.  I want to make sure that you listen

22   to the rules, because it will make the deposition

23   go much smoother.

8

1       As you can see, we have a court reporter

2    here who is taking down my questions and your

3    answers.  So I would ask that you wait until my

4    question is finished before you give an answer.

5    That way, we're not talking over each other.  It's

6    much easier for her to take it down.

7       If you don't understand a question I ask,

8    just ask me to repeat it; I'll be more than happy

9    to try and reword the question.  If you do answer

10   my question, I'm going to assume that you

11   understood it.  And you've given an oath today to

12   answer truthfully and to the best of your ability,

13   so that's why it's important if you don't

14   understand the question, you ask me to repeat it.

15       Do you understand those instructions?

16   A.  (Witness nods head.)

17       MS. MCGOWAN:  You need to answer out

18   loud.

19   Q.  The other part of the instruction is that

20   you need to keep your responses oral, a yes or a

21   no, instead of a nod of the head or an huh-uh or

22   an uh-huh.  It's difficult for the court reporter

23   to take down what that response means.

9

1       And if at any time you feel that you need a

2    break -- I don't anticipate that this deposition

3    will take so long that you'll need a break, but if

4    you do, just let me know.

5       Now, can you please state your whole home

6    address, please?

7    A.  P.O. Box 1292, Eufaula, Alabama 36027.

8    Q.  And do you have an actual street address?

9    A.  Yes.  I stay at Barbour Creeks.  I think

10   it's 150 Meadow Lane Drive, Apartment D-3.

11   Q.  And are you currently employed with Equity

12   Group Eufaula Division?

13   A.  No.

14   Q.  When did your employment cease?

15   A.  A year ago.

16   Q.  Okay.  Are you currently employed?

17   A.  No, sir.

18   Q.  Do you recall when you began working at

19   Equity Group?

20   A.  2006.  No, it was March 1st of 2006.

21   Q.  So you worked there for approximately a

22   year?

23   A.  11 months.

0150db18-038a-4638-a6d7-2d18562dc4b9

10

1    Q.   All right.  And what positions were you
2    employed in at the plant?
3    A.   Debone.
4    Q.   Did you work on the debone line?
5    A.   Yes.
6    Q.   And did you work on the debone line during
7    the entire time that you were employed at Equity
8    Group?
9    A.   I was moved around.
10   Q.   You were moved around to different positions
11   on the line?
12   A.   Yes.
13   Q.   Do you recall what the names of some of the
14   portions that you worked were?
15   A.   Leg quarters, breasts, pulling tenders, bone
16   sampling, loading the line.
17   Q.   When you say "loading the line," that's the
18   position at the very beginning of the line, where
19   you put the chickens on the cones?
20   A.   Yes.
21   Q.   How did you first find out about this
22   lawsuit?
23   A.   Could you repeat that again?

11

1    Q.   Sure.  You understand that you've joined in
2    this lawsuit as a plaintiff, correct?
3    A.   Yes.
4    Q.   Do you recall how you first learned about
5    this lawsuit?
6    A.   No.
7    Q.   Did you attend any sort of meeting where
8    this lawsuit was discussed?
9    A.   Could I ask a question?  You have to be more
10   specific because, like, big words that you use, I
11   don't understand that you're saying.  I don't
12   understand big words.  I'm a country person; I
13   don't understand the big words you're asking.
14   Q.   Okay.  Is there any particular word that I
15   asked that you didn't understand?
16   A.   I just don't understand how to answer a
17   question.  If it's like a big word I don't
18   understand, I'll just look at you; I can't answer.
19   Q.   Okay.  I'll try and use small words.
20        You understand that you are a plaintiff in
21   this lawsuit?
22   A.   Yes.
23   Q.   And you obviously somehow learned about the

12

1    lawsuit.
2    A.   Yes.
3    Q.   All right.  Do you recall how you learned
4    about the lawsuit?
5    A.   No.
6    Q.   All right.  Do you recall whether you
7    attended any meeting where this lawsuit was
8    discussed, where people talked about this lawsuit?
9    A.   Yes.
10   Q.   Can you —
11        MS. MCGOWAN:  I'm going to object if
12   it's with the attorneys, because that would be
13   covered by the attorney-client privilege.
14   Q.   Other than the meeting that you had this
15   morning with your attorney, did you attend any
16   group meetings, where there were multiple people
17   discussing this lawsuit?
18   A.   Yes.
19   Q.   All right.  And were there attorneys present
20   at that meeting?
21   A.   I don't know.
22   Q.   Can you describe for me what you remember
23   about this meeting?

13

1        MS. MCGOWAN:  I'm going to object
2    because I want to make sure that this wasn't a
3    group meeting with the attorneys and all the
4    parties, because it could have occurred before I
5    got in.  Can I go talk to her real quick, just to
6    make sure, because I don't want to waive the
7    attorney-client privilege.
8        MR. GOULD:  Sure.  Well, you can ask
9    her about that, but if there were people there who
10   are not plaintiffs, then —
11        MS. MCGOWAN:  Right.  And why don't you
12   ask her that.  And she may not know.  I mean, it
13   could have just been — I need to find out —
14        MR. GOULD:  If you want to step outside
15   and ask her about that, that's fine.
16        MS. MCGOWAN:  Yeah.  I just need to
17   make sure we're not waiving any attorney-client
18   privilege.
19        (A brief recess was taken.)
20        MS. MCGOWAN:  I'm going to assert
21   attorney-client privilege on these because these
22   were attorney-client meetings.  I checked with
23   Robert Camp.

0150db18-038a-4638-a6d7-2d18562dc4b9

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

14

1 (BY MR. GOULD)
2 Q.   During the time that you were employed at
3 Equity Group, can you describe for me --
4       MR. GOULD:  Strike that.
5 Q.   Were you required to wear any sort of
6 clothing or protective clothing?
7       MS. MCGOWAN:  Just for the record, I'm
8 going to have a standing objection to you calling
9 it clothing.  We say it's PPE.  But we can just
10 have that objection so I don't have to keep
11 interrupting you.
12 Q.   We'll call it whatever it is.  I'm not
13 asking you to draw a legal conclusion as to the
14 definition of "clothing."
15       Did you have to wear a smock?
16 A.   Yes.
17 Q.   Did you have to wear any other items of
18 clothing or equipment?
19 A.   Yes.
20 Q.   Can you describe for me what other items you
21 wore?
22 A.   Hair nets, earplugs, sleeves, gloves, cotton
23 liners, arm guard, apron, chain glove.

---

15

1 Q.   Did you have to wear any sort of footwear or
2 boots?
3 A.   Boots.
4 Q.   Could you wear your boots from home?
5 A.   No.  You have to wear company boots.
6 Q.   Could you put your boots on before coming
7 into the plant?  Could you wear your boots from
8 home?
9 A.   Yes.
10 Q.   Now, you indicated that you wore gloves.
11 Can you describe for me what kind of gloves you
12 had to wear?
13 A.   The cotton liners, they go next to your
14 skin; and then you put the blue gloves on top.
15 Q.   Okay.  So you wore cotton gloves and some
16 sort of rubber glove?
17 A.   Yes.
18 Q.   All right.  If you didn't wear a cotton
19 glove, would you have been disciplined by the
20 company?
21 A.   Yes.
22 Q.   So you believe you were required to wear the
23 cotton glove?

---

16

1 A.   Yes.
2 Q.   What about the rubber glove?  Do you believe
3 you were required to wear that?
4 A.   Yes.
5 Q.   And if you didn't wear the sleeves you're
6 talking about -- are they these blue plastic
7 sleeves; is that correct?
8 A.   Yes.
9 Q.   And you indicated that you also wore an
10 apron.  Is that a blue plastic apron?
11 A.   Yes.
12 Q.   Are you aware of anyone ever getting
13 disciplined, written up, for not wearing cotton
14 gloves?
15 A.   Yes.
16 Q.   Who was that?
17 A.   You know, like my coworkers on the line.
18 Q.   And you believe that they were written up
19 for not wearing cotton gloves?
20 A.   Yes.
21 Q.   Can you remember any specific individual,
22 any specific person who was written up for not
23 wearing cotton gloves?

---

17

1 A.   I don't remember.
2 Q.   Were you ever written up for not wearing
3 cotton gloves?
4 A.   Maybe, maybe not.  I can't be specific.
5 Q.   So you don't specifically remember any time
6 when you were written up for not wearing cotton
7 gloves; is that correct?
8 A.   I probably was written up.  What I'm saying,
9 I can't be for sure.
10 Q.   So you're not certain whether or not you
11 were.  You can't recall any specific time or
12 instance when you were written up?
13 A.   I know that it was brought to my attention
14 that, you know, I don't have on a cotton liner.
15 Like, you know, if my plastic glove, you know,
16 tore, I don't have on a cotton liner, and I would
17 have to go and get one.
18 Q.   Now, you talked about wearing a chain glove?
19 A.   Yes.
20 Q.   Is that something that you would have to
21 take home with you on a daily basis?
22 A.   Not the chain glove.
23 Q.   Is that something that was issued to you on

---

0150db18-038a-4638-a6d7-2d18562dc4b9

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

**18**

1    the debone line?
2    A.    Yes.
3    Q.    Every day?
4    A.    Yes.
5    Q.    You weren't required to take it home and
6    clean it?
7    A.    No.
8    Q.    You weren't required to take it and wash it
9    in between breaks; is that correct?
10    A.    No.
11    Q.    You would just take it off on the line,
12    someone would come along and collect it; and then
13    when you came back onto the line, you would get
14    another one; is that correct?
15    A.    Same one.
16    Q.    You mentioned an arm guard?
17    A.    Yes.
18    Q.    Can you describe what you mean by that for
19    me?
20    A.    It's a hard piece of plastic about that long
21    (indicating).  It sits on your arm, from here to
22    right about right here (indicating).
23    Q.    So it would cover essentially your wrist

**19**

1    part of your forearm; is that correct?
2    A.    Yes.
3    Q.    Did you have to wear that for every position
4    in which you worked on the debone line?
5    A.    If you were working with knives or scissors,
6    you must have it on.
7    Q.    And I believe you indicated sometimes you
8    worked in the position where you were loading the
9    line, putting the chickens onto the cones?
10    A.    Yes.
11    Q.    Did you have to wear an arm guard in that
12    position?
13    A.    No.
14    Q.    Did you have to wear a chain glove in that
15    position?
16    A.    No.
17    Q.    So there are positions on the debone lines
18    that don't use knives or scissors; is that
19    correct?
20    A.    Yes.
21    Q.    Are you a member of the union?  Or were you
22    a member of the union when you were employed at
23    Equity Group?

**20**

1    A.    Yes.
2    Q.    Do you recall what union that was?
3    A.    I think it was union rep.
4    Q.    Do you recall whether you had union dues
5    deducted from your paycheck?
6    A.    Yes.
7    Q.    Do you recall who any of the members of the
8    union committee, the bargaining committee were?
9    A.    Talking about the people?
10    Q.    Right.  Did you have union stewards?
11    A.    Yes.
12    Q.    People from the union who you could go and
13    talk to?
14    A.    Yes.
15    Q.    Who were actual employees at the plant?
16    A.    Yes.
17    Q.    Do you recall any of their names?
18    A.    I remember just one lady.
19    Q.    And who is that?
20    A.    Her name is Jackie Smith.
21    Q.    Did you ever attend any union meetings?
22    A.    If I got, like, wrote up, you know, they
23    would look in my file and call a union rep to be

**21**

1    present, you know.
2    Q.    Do you recall how many times you were
3    written up during the time that you were employed
4    at Equity Group?
5    A.    That would be depending on the situation,
6    you know, if I be written up or not.  You might
7    get a warning, you know.
8         I guess, just to be on the safe side, they
9    would have a union rep before anybody, you know,
10    would start talking or whatever.  I guess that was
11    their policy.
12    Q.    Do you recall any specific time that you
13    were written up or given a written warning?
14    A.    Yes.
15    Q.    Can you describe for me the circumstances of
16    that?
17    A.    Not being on the line quick enough --
18    getting to the line, you know.
19    Q.    So you were written up for not being on the
20    line when you had to be there; is that correct?
21    A.    Yes.
22    Q.    Can you describe for me that particular
23    situation?  Were you late to work?

0150db18-038a-4638-a6d7-2d18562dc4b9

22

1  A.  No, I don't be late to work.  It just be so
2  many people and everything be so packed, you can't
3  get to the area where you can suit up, you know.
4  Q.  And that was at the beginning of your shift?
5  A.  Yes.
6  Q.  Do you recall any other instances when you
7  were written up?
8  A.  Yes.  The line -- work been done start, and
9  I haven't got my supplies yet because the line
10  still be, you know, real long.
11  Q.  So you were written up for waiting in line?
12  A.  Yes.  A lot of people.
13  Q.  Was this at the beginning of your shift?
14  A.  Yes.
15  Q.  So you believe you were written up for, once
16  again, not being on the line when the line
17  started?
18  A.  Yes.  But can't help but be written up.  If
19  you ain't got your supplies, you can't go in
20  there.
21  Q.  At the beginning of a shift, were there some
22  things that you had to pick up on a daily basis?
23  A.  Probably earplugs, cotton liners, fresh

23

1  rubber gloves, maybe sleeves.
2  Q.  Those are things you had to pick up every
3  single day?
4  A.  You know, if it was torn or worn out or just
5  real filthy, you know.
6  Q.  So those are things that you would have to
7  replace if they became worn?
8  A.  Yes.
9  Q.  They were not things that you were required
10  to replace on a daily basis; is that correct?  You
11  could wear the rubber gloves, for example, for
12  more than one day?
13  A.  If they were very, very clean, you know.
14  Q.  What about the cotton liners?  You could
15  wear them on more than one day; is that correct?
16  A.  Sometimes; sometimes you couldn't.
17  Q.  What about your apron?
18  A.  The plastic one?
19  Q.  Yes.  Your blue plastic apron.  Is that
20  something that you had to pick up every day?
21  A.  No.
22  Q.  And what about the blue plastic sleeves.
23  Was that something that you had to pick up every

24

1  day?
2  A.  No.
3  Q.  So these were things that were issued to
4  you, and you could wear them on more than one day?
5  A.  Yes.  The plastic apron and the sleeves.
6  Q.  And you indicated that you wore a hair net;
7  is that correct?
8  A.  Yes.
9  Q.  Did you have to get a new hair net every
10  day?
11  A.  Sometimes I did.  Sometimes.
12  Q.  So you didn't have to get one every day.
13  Sometimes you would get a new hair net.
14  A.  But the majority of time, I did.
15  Q.  What was the process for getting a new hair
16  net?
17  A.  Well, like the meat that's come around, just
18  whatever the thing up in there with the birds on
19  it, you know, the blood and stuff drop on your
20  hair net and clothing.
21  Q.  Well, let me ask you what my question was.
22  What did you have to do to get the hair net, to
23  replace it?  To get it in the morning, at the

25

1  beginning of your shift?
2  A.  Just go to the supply -- the supply --
3  Q.  To the supply room? supply desks?
4  A.  Yes.
5  Q.  Right by the one entrance to the plant?
6  A.  Yes.
7  Q.  Now, you also indicated that you would wear
8  a smock?
9  A.  Yes.
10  Q.  Is that something that you would get a new
11  one on a daily basis?
12  A.  Not all the time.  Not all the time.
13  Talking about the white smock, right?
14  Q.  Yes, ma'am.
15  A.  Not all the time.
16  Q.  So sometimes you would wear the same smock?
17  A.  Yes.
18  Q.  More than one day?
19  A.  Yes.  Sometimes, you know, it was at a point
20  where you would take them home, you know, and wash
21  them or whatever.  I would, like, wash mine.  Then
22  they got to a place where they didn't allow us to
23  take them out of the plant, you know.

26

1  Q.  Okay.  So there was a time when you were
2  allowed to take your smock home?
3  A.  Yes.
4  Q.  And then there was a point in time when you
5  were no longer allowed to take your smock home?
6  A.  Yes.
7  Q.  And then you had to pick a new one up on a
8  daily basis?
9  A.  Yes.  If they have one.
10  Q.  So just so I'm clear, when you started
11  working at Equity, you believe that you were able
12  to take your smock home; is that correct?
13  A.  At one point you was.
14  Q.  Do you remember when it was that you were
15  allowed to, and then when that policy changed?
16  A.  I can't remember when the policy changed,
17  but I remember there was one point that we could
18  take them home and wash them.  You would take the
19  smock home and wash them and then bring them back
20  fresh the next morning, or whenever your shift
21  was.
22  Q.  Could you describe to me generally what you
23  would do at the beginning of your shift?

27

1  A.  At the beginning of the shift, depending on
2  where they put me at, you know.  I'd never know
3  where I was going to be working at, you know,
4  until they place everybody.
5      I might load the line; I might cut wing
6  tips; I might roll wings; I might pull breasts; I
7  might pull skin; I might pull tenders; I might
8  bone something; I might load the line, like I
9  said.
10  Q.  All right.  When you were arriving at the
11  plant, did you have to pass through any sort of
12  security?
13  A.  Well, you know, the -- what is it, the guard
14  shack?  You come through the guard shack.  You
15  know, you have to stop at the guard shack.  I
16  guess they, like, they look at your timecard to
17  make sure that you belong there.  Then they'll let
18  you on through.
19  Q.  So you're talking about at the driveway, at
20  the beginning of the driveway?
21  A.  No.  When you first come into the Equity
22  Group, that little guard shack, everybody would
23  have to stop there.  You couldn't just drive on

28

1  through.
2  Q.  And were there people who were issued
3  stickers or things to put on their car that would
4  show that they were employed at Equity Group?
5  A.  Well, this last time that I worked there,
6  they had where they put a sticker at your
7  beginning of your windshield or whatever, you
8  know.
9  Q.  And if the car had that sticker, it could
10  just drive through; is that correct?
11  A.  Yes, after they look at your card.  You have
12  to stop at the guard shack; they're going to look
13  at your ID card.
14  Q.  And then after that, you drive into the
15  parking lot; is that correct?
16  A.  Yes.
17  Q.  And then from the parking lot, you go into
18  the plant; is that correct?
19  A.  Yes.
20  Q.  At any time, from the time that you parked
21  in the parking lot until the time that you went
22  into the plant, did you have to go through any
23  sort of security gates, turnstiles, metal

29

1  detectors, anything like that?
2  A.  There's a certain way we have to enter the
3  building.  You couldn't just go in just any door
4  that you saw; it was certain specific entrance
5  that employees was allowed to come through.
6  Q.  So there were specific doors that you were
7  requested to use to enter the plant?
8  A.  Yes.  And to go back out.
9  Q.  But was there any sort of security system at
10  those doors?  Did you have to walk through any
11  turnstiles?  Do you know what a turnstile is?
12  A.  No.
13  Q.  Those things with the little bars that spin
14  as you walk through.
15  A.  No.
16  Q.  So there was none of those?
17  A.  No.
18  Q.  Were there metal detectors?
19  A.  No.
20  Q.  Was there a security guard stationed there
21  at the door that you had to show ID to enter?
22  A.  No.
23  Q.  Okay.  So once you would enter the door into

0150db18-038a-4638-a6d7-2d18562dc4b9

30

1  the plant, at the beginning of your shift, what's
2  the next thing that you would normally do?
3  A.   I would go get in line to get my supplies,
4  if I needed supplies.
5  Q.   Now, were there certain pieces of your
6  clothing or equipment that you would take home
7  with you on a daily basis?
8  A.   Like I said, at one point we could take our
9  smocks home and the cotton liners. I would wash
10 them, you know, and bring them back the next day
11 with me. And my sleeves and my apron, I would
12 take that home; and I would wash all that, you
13 know, and I would bring that back.
14    But, now, most of the time, like my blue
15 gloves, they would be torn or they're just real
16 filthy, you know. I would have to do away with
17 them and buy more, get more gloves, you know. You
18 know, when the shift is over, or I'd wait until I
19 come in the next door or whatever, and buy more.
20 Q.   And what about your plastic arm guard? Is
21 that something you would take home with you as
22 well?
23 A.   You would take that home at all times. Keep

31

1  up with that.
2  Q.   So if you had to pick up supplies, what
3  would you do after you picked up supplies?
4  A.   Well, if it's not time to get on the line, I
5  would go sit in the break area and just wait until
6  it's time for us to -- our shift to start, you
7  know.
8  Q.   And are there certain items of clothing or
9  equipment that you could put on before going out
10 onto the production area?
11 A.   Huh-uh.
12 Q.   And that's a no?
13 A.   No. Well, there was one point where you
14 could have your hair net on, you know. You could
15 have your hair net on and your earplugs.
16    But then it came to a point where you
17 couldn't put that on until you, like, get ready to
18 -- once you go -- it's like two separate doors.
19    There's a little booth you can get dressed
20 in right there. You could put your apron and your
21 earplugs on. And you could put your white coat
22 on, and then walk on in and finished getting
23 dressed.

32

1     But to just walk in there, you have to have
2  your hair net on and your earplugs on, and your
3  boots.
4  Q.   So to walk onto the production floor, you
5  had to have on hair net, earplugs, and boots?
6  A.   Yes. And you have to step into this little
7  pool thing for your boots to get sanitized or
8  whatever. And there be a machine that, I guess
9  every so often, it would spray out this type of
10 foam across your boots, and then you could walk on
11 in.
12 Q.   So you just have to walk through that on
13 your way in to the production floor; is that
14 correct?
15 A.   Yes. Walk in and out, you have to walk
16 through there.
17 Q.   So just so I'm clear, this area where
18 there's that sanitizer for your boots, you just
19 walk through it?
20 A.   You have to walk through it, in order to get
21 out.
22 Q.   There's no way to avoid it; you walk through
23 that area?

33

1  A.   Yeah, you have to walk through it.
2  Q.   It's not some special thing that you have to
3  do separately; is that correct?
4     MS. MCGOWAN:  I object to the form.
5  Q.   In order to sanitize your boots, you don't
6  have to go to some special area that you otherwise
7  would not have to go to on your way out to the
8  production floor; is that correct?
9  A.   I don't understand what you're saying.
10 Q.   Is there a separate part of the plant that
11 is a boot sanitizing area?
12 A.   The only one I ever saw was, like I told
13 you, entering into the -- coming in on the line,
14 it's right there, when you walk in through that
15 little door.
16 Q.   Right. I understand. So there's the
17 entryway to the production area?
18 A.   Yes.
19 Q.   And you just walk through that place where
20 the sanitizer is?
21 A.   You've got to walk through there, to get to
22 them other doors to start work or whatever.
23 Q.   And then after that, you would step onto the

0150db18-038a-4638-a6d7-2d18562dc4b9

34

1    production floor; is that correct, the production
2    area?
3    A.    Talking about the line?
4    Q.    Yes.
5    A.    After you get suited up.  You know, you've
6    got to go over to the sink area.  They have this,
7    like, big thing where, you know, you can hang your
8    -- you know, you can lay your items and get
9    dressed, you know.  Once you do that, then you
10   turn around and -- you're supposed to, like, wash
11   your hands, rinse your apron if it need it or
12   whatever, and then go to the line.
13   Q.    So once you walk through the door to the
14   production floor, there's an area where there were
15   racks and sinks?
16   A.    Yes.
17   Q.    There were these metal racks where you could
18   hang stuff?
19   A.    Yes.
20   Q.    And that's where you'd put on the rest of
21   your clothing or equipment; is that correct?
22   A.    Yes.  Sometimes.
23   Q.    With the exception of your metal glove --

35

1    your mesh glove?  If you were wearing a mesh
2    glove, would you put that on then or would you put
3    that on when you got to the line?
4    A.    What's a mesh glove?
5    Q.    Your chain glove.
6    A.    Oh.  You put the chain glove on depending on
7    what position they're going to put you at.  If
8    you're fixin' to work with knives and scissors,
9    they issue you a chain glove; but if not, you
10   don't get a chain glove.
11         See, like, if you're pulling tenders or
12   loading the line or bone sampling, you don't need
13   a chain glove; but anything else, you have to have
14   a chain glove because you're working with knives
15   and scissors.
16   Q.    And that glove would be issued to you at the
17   production line?
18   A.    Yes.  Or sometimes it would be issued at
19   this desk where the, like, line leaders stand
20   around, the supervisors.  It would be issued
21   there.  If not, once you go to your line, wherever
22   they place you -- they place you where they want
23   you to work; you just don't get on the line.

36

1         Then sometimes we would go and get on the
2    line, they might be already placed.  And they just
3    place you on the line where they want you to work
4    at.  And you would just pick your chain glove up
5    and put it on.  Because they know what size you
6    wear, you know.
7    Q.    And once you would walk onto the production
8    floor, do you have any idea how long it would take
9    you to put on your clothing or equipment?
10   A.    I'd say about 15 minutes, if I can get up
11   there to it.
12   Q.    15 minutes, from the time you step onto the
13   production floor until the time you have
14   everything on?
15   A.    Yes.  About 10 or 15 minutes, yes.
16   Q.    Did you work day shift or night shift?
17   A.    Both, day shift and night shift.  I worked
18   day shift at one point, then I transferred to
19   night shift.
20   Q.    So at the time your employment with Equity
21   Group ended, you were working night shift; is that
22   correct?
23   A.    Well, this very last time I was on nights.

37

1    Q.    Okay.
2    A.    This very last time I worked.
3    Q.    Were you employed at the plant on more than
4    one occasion?
5    A.    Yes.
6    Q.    How many different times were you employed
7    at the plant?
8    A.    If I'm not mistaken, I think five.  But I,
9    like, worked at the cook plant, the other
10   building, the cook plant.  And I only worked at
11   debone, I think, twice.
12         Like, the first time I worked at debone, I
13   didn't work, like, on the line; I was, like --
14   they was, like, doing leg quarters.  I was, like,
15   putting labels on the big bags, you know.  So I
16   didn't work on the line that specific time I
17   worked there.  I guess maybe because I was
18   pregnant, you know, whatever.
19   Q.    So there was a time -- just so I can
20   understand your employment history, the most
21   recent time that you worked at the plant, were you
22   on a debone line?
23   A.    Yes.

0150db18-038a-4638-a6d7-2d18562dc4b9

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

38

1   Q.   And then there was another time that you
2   were employed at the plant that you did not work
3   on the debone line; is that correct?
4   A.   Yes.
5   Q.   All right.  And do you have an idea of
6   during what times your other employment at the
7   plant was?
8   A.   Let me see.  I think 2000, 2001, maybe '-2,
9   '-3, something like that.  But like I said, I
10  worked there more than one time.  But I worked
11  from, like, from the back, you know.  I worked in
12  shipping; I worked in packing -- packout; I worked
13  in, what do you call it, lay down; I worked in
14  marination, box room.  I pretty much did it all.
15  Q.   Some of those positions are positions that
16  were in the cook plant; is that correct?
17  A.   Yes.  But once they saw how good, you know,
18  that I was, like, a fast worker, they would, like,
19  have me, like, load the line.  Because, you know,
20  they had, like, slabs of ribs or whatever.  You
21  know, they were like slabs of ribs, baby back ribs
22  or whatever.
23       I'd load the line with this great big old

39

1   combo.  The pallet jacks would bring this big old
2   combo; and I would have to bend over with this pan
3   and dip, you know, and pour it over; and it would,
4   like, slide up under the belt.
5   Q.   Yes.  And that was at one of the other times
6   that you were employed?
7   A.   Yes.  But I was at the cook plant.
8   Q.   But just during the time that you worked at
9   the flesh plant, where they do the evisceration
10  and the deboning, you believe that you were
11  employed there two different times?
12  A.   Talking about debone?
13  Q.   Yes.
14  A.   Yes.
15  Q.   And one time you worked packing leg quarters
16  into bags; is that correct?
17  A.   Huh-uh.  I would put the labels on there.
18  Q.   So there's a machine that would load them
19  into the bags, and then you would label them?
20  A.   I was, like, standing up there by the -- it
21  would be, like, close to the, like -- I guess they
22  would, like, use this little room for, like, where
23  the supervisors hang out; and I would be, like,

40

1   right outside the office.  There was this big
2   table.  And somebody would, like, bring a box of
3   the bags that's over there; and I would just put
4   labels on them, you know.  I guess because the
5   condition I was in, because I was way out there
6   when I started.
7   Q.   I understand.  During the time that you were
8   working on night shift in debone, what was your
9   normal scheduled shift?  Did you have a scheduled
10  start time?
11  A.   Yes.
12  Q.   What time would your shift normally start?
13  A.   Hold on just a second.  I'm trying to think.
14  They changed it up so much.  I think 4:30.  I
15  think the shift started at, like, 4:30.  You have
16  to be suited up and ready to work on the line at
17  4:30.
18  Q.   And that's 4:30 in the afternoon?
19  A.   Yes.  Like I said, if I was on nights.
20  Q.   Right.  I'm just asking you about that right
21  now.
22  A.   Okay.  4:30.
23  Q.   And was there a normal time that your shift

41

1   would end?
2   A.   No.  Wouldn't be no specific time.
3   Q.   Now, did you also work in debone on day
4   shift?
5   A.   Yes.
6   Q.   And do you recall what time your shift would
7   normally start then?
8   A.   On day shift, 7:00.  It was 7:00 or 7:30.
9   Q.   And was there a normal scheduled time when
10  the shift would end, on day shift?
11  A.   It was supposed to end at, I think, 3:30 or
12  4:00, but sometimes we would still be working
13  over.  And second shift couldn't come in yet,
14  because they would, like, still have us working or
15  whatever.
16       They would be already suited up, you know,
17  standing around ready to work, but day shift's
18  still going.  Because they want for us to get that
19  order out.  As long as that combo was up there
20  with meat in it, you're fixin' to work; you're not
21  fixin' to leave.  Even though second shift should
22  be able to take it over, most of the time they
23  would make us stay there and finish that combo.

42

1    THE COURT REPORTER: Are you saying
2  "combo"?
3    THE WITNESS: You know, the guys, they
4  come out with this pallet jack. It looks like the
5  size of the Jacuzzi. It's full of meat, birds or
6  whatever.
7  Q.  A big tub?
8  A.  Well, if you want to call it a tub. But
9  they call it a combo, so that's what I'm used to
10 saying.
11 Q.  It's like a big plastic container; is that
12 correct?
13 A.  Yes.
14 Q.  Now, during your time on the debone line,
15 would you get any breaks?
16 A.  Yes.
17 Q.  How many breaks a day did you get?
18 A.  Well, you get -- you're supposed to get a
19 30-minute break, but...
20 Q.  I'm just asking how many breaks would you
21 get during the course of the day?
22 A.  Two breaks. Two.
23 Q.  And how long were those breaks?

43

1  A.  Well, they're supposed to be 30 minutes.
2  Q.  And how would you know that it was time to
3  go out on break?
4  A.  Well, you know, there's a clock up on the
5  wall. Right there where the sink is, there's a
6  big clock up there. Or if you had on a clock
7  around your neck, or somebody work next to you or
8  if somebody was walking by, you would ask what
9  time it is.
10 Q.  So there were times that were normally
11 scheduled for break?
12 A.  Yes.
13 Q.  And how would you know that it was okay to
14 leave to go out on break? Would your line
15 supervisor release you, say, "It's time go out on
16 break"?
17 A.  Well, you would see the line breaking down.
18 You know, the guy that's loading the line, when
19 the cones come down, they would be empty; that
20 means they're breaking the line, so it's time for
21 a break.
22 Q.  So when the last chicken or piece of meat
23 reached your station and you finished with it,

44

1  that's how you knew it was okay for you to leave
2  for break?
3  A.  Yes. You could get, like, through with your
4  little work or whatever, then put your chain guard
5  back over in the bucket or hand it to the line
6  leader if he was standing there or whatever, and
7  then you could get undressed, wash up. First,
8  you've got to wash up, and then get undressed.
9  Then you could go to break. If you could get to
10 the sink. But a lot of times you couldn't get to
11 the sink. Break be already done started, you
12 know.
13 Q.  Can you describe for me what it is you would
14 do before going on break? You said that you would
15 drop off your chain glove; is that correct?
16 A.  Yes. If you was working with a chain glove,
17 you'd have to put it in the bucket. Like I said,
18 the line leader might be standing right there
19 beside you, or behind you, with the bucket.
20    Once that last little piece of meat come to
21 you and you do your part, then you can take the
22 chain guard off and put it in the bucket or lay it
23 on the table, whatever.

45

1  Q.  And then what would you do next?
2  A.  Walk over, like I said, if I could get to
3  the sink, and rinse off; rinse my apron off, and
4  take my stuff off and get undressed, and hang my
5  stuff up, and walk to the -- like I say, you've
6  got to walk through that water before you can get
7  out. But a lot of times you can't get out. You
8  know, it's so packed right there, you can't get
9  out. Like I said, break done started.
10 Q.  What items are you allowed to wear outside
11 of the production floor when you leave for break?
12 Can you wear your boots?
13 A.  Yes.
14 Q.  Can you wear your hair net?
15 A.  It was one point we could wear them in,
16 like, the break room. But you can't got out of the
17 -- it was one point you couldn't wear them
18 outside. There was one point you couldn't wear
19 your hair nets or earplugs outside, because they
20 was talking about, I guess, germs or whatever.
21 Q.  So if you decided to go outside of the
22 plant, you would have to take --
23 A.  Yes. You know, to your car or whatever.

0150db18-038a-4638-a6d7-2d18562dc4b9

46

1  Some people go out to the smoking area or
2  whatever.
3      There was one point you could wear them out
4  there. You know, didn't nobody say nothing. But
5  then it came to a point, I guess, about germs or
6  whatever, they stopped us from wearing the
7  earplugs and the hair net outside.
8  Q.  Outside. But you could wear them into the
9  break room; is that correct?
10 A.  You could wear them inside the break room at
11 one point, like I said.
12 Q.  What about the smock? Is that something
13 that you would have to take off before leaving the
14 production area?
15 A.  Yes.
16 Q.  What about the blue sleeves and the blue
17 apron?
18 A.  Yes, you would take that off and hang it up.
19 You know, wash it off and hang it up.
20 Q.  What about any of the cotton or rubber
21 gloves that you might be wearing?
22 A.  Well, you can't take them out with you.
23 Q.  So you would have to take those off before

47

1  leaving the production floor?
2  A.  Yes.
3  Q.  And approximately how long do you think that
4  it would take you to do that, to take off all
5  those items of clothing you had to take off before
6  leaving the production floor?
7  A.  Like I said, if I can get to the sink, it's
8  going to take me about 10 or 15 minutes. Like I
9  said, it's depending on where you're working at.
10 You cannot leave that work area until that bird
11 done came to you and you done did your part,
12 whether it's cutting shoulders or pulling skin,
13 take the fat off, or whatever.
14 Q.  I understand that. What I'm asking you
15 about is, after you do that, and you're starting
16 to take off the different items that you have to
17 take off before leaving the production floor, how
18 long does that take you?
19 A.  That's about 10 or 15 minutes.
20 Q.  And you said that you had two breaks; is
21 that correct?
22 A.  Yes.
23 Q.  And would you do the same thing before your

48

1  second break as well?
2  A.  Do the same thing? Talking about --
3  Q.  Take off the clothing or equipment again,
4  and --
5  A.  Everything applies the same, you know.
6  Rinse off, you know; take the stuff off, hang it
7  up properly.
8  Q.  So there's nothing different? I just want
9  to clarify. There's nothing different you'd do
10 before going out on your first break that you do
11 before going out on your second break?
12 A.  It would be the same.
13 Q.  And when you would get out to the break room
14 or to go outside, what would you normally do? Did
15 you have lunch, a meal?
16 A.  Yes. If I had -- if I had time and I could
17 get to the microwave -- you know, you have to get
18 in line -- I would warm up. But if not, if I
19 don't have time, I might can get a soda or get me
20 a bag of chips or something.
21 Q.  And then how would you know that it was time
22 to leave break and return to the production floor?
23 A.  Because they would start hollering. The

49

1  supervisor or the line leaders or whatever, they
2  would start hollering, "Let's go. Let's go. Get
3  to work. Get to work. Ándale!" I guess they'd
4  be hollering "Ándale!" for the Mexicans or
5  whatever, you know, to speed up or whatever. They
6  would come in the break room, you know, where we
7  at, and tell us, "Let's go." And you could be
8  just now got in there.
9      Everybody's supposed to go to break at the
10 same time, but that don't always be the case. You
11 know, everybody can't go to break at the same
12 time. You're supposed to but, like I said,
13 depends on what you're doing.
14     Break be done started and you still be out
15 on the line while everybody sitting there eating
16 or whatever.
17 Q.  Can you describe for me what you would do
18 when you would return from break?
19 A.  Well, like I say, walk in, rinse your boots
20 off, or whatever, go back in, wash your hands, put
21 your cotton liners on and put your plastic gloves
22 on, put your smock on.
23     But, like I said, before you come in there,

0150db18-038a-4638-a6d7-2d18562dc4b9

50

1   you have to have that hair net and them earplugs
2   already on. And you suit up, and then you rinse
3   your hands off again with the blue gloves, you
4   know, and your apron; and then you put your chain
5   glove back on and you get on the line, if you have
6   time. But if that line done started, you're
7   getting sent to the office or whatever. Or if you
8   didn't do it fast enough, they're yelling at you
9   telling you, "You need to speed up." You know,
10  you can only work so fast, putting on stuff like
11  that equipment, you know.
12  Q.   Now, in terms of when you were considered
13  late, were you considered late if you were --
14        MR. GOULD: Strike that.
15  Q.   Isn't it true that you would only be
16  considered late if you were not at your position
17  on the line when the piece of meat reached that
18  position on the line; is that correct?
19        MS. MCGOWAN: Object to the form.
20  Q.   Let's say, for example, you were pulling
21  tenders. Did you have to be at your position on
22  the line when the person who was loading the line
23  was putting the first bird on, or did you have to

51

1   be at your position on the line when the bird
2   reached the tender-pulling position on the line?
3   A.   When the person's up there that's loading
4   the line, everybody has to be in place. They want
5   you to be in place, but a lot of times you can't
6   be in place, because you're trying to get to the
7   area where you can suit up, if somebody ain't
8   stole your supplies.
9        If somebody's done stole your supplies, you
10  can't get on the line. You've got to go back to
11  the supply room, buy more supplies. Or they send
12  you to the office; they don't give you a chance or
13  whatever.
14  Q.   And I think you indicated that the process
15  of going out on break and coming back from break
16  is the same for both the first break and the
17  second break; is that correct?
18  A.   (No response.)
19  Q.   The things that you would do before you go
20  out on break and the things that you would
21  normally do when you're returning from break --
22  A.   You do it on the second break too.
23  Q.   -- they are the same for the first and

52

1   second break?
2   A.   Yes.
3   Q.   Okay. And what about at the end of your
4   shift? How do you know that it's time to leave
5   for the end of your shift? Is it the same thing
6   as with breaks, that once the last piece of
7   chicken passes your position, you know that it's
8   okay to leave?
9   A.   It depends on where you're at.
10  Q.   If you're working on the debone line?
11  A.   If you're on the debone line, it depends on
12  where you're at. Say I'm right here and the cones
13  is being emptied; as the cone be emptied, somebody
14  be stepping off the line, because they done did
15  what they're supposed to do to that meat. That
16  meat come on down to you. But if you bagged up
17  what meat already there, then you've got meat
18  coming down, you've got to do all that meat.
19        Sometimes the supervisor would come over or
20  the line leader would come and help out, you know.
21  Then again, the line leader might do it and just
22  let you go on to break, you know. Because they
23  know that you've done lost like 10 or 15 minutes

53

1   already, and you ain't going to have no break.
2   Then sometimes you have to just stand there and
3   finish doing what you've got to do. By the time
4   you unsuit, rinse off and go out there, you've
5   probably got five minutes, if you've even got that
6   much.
7   Q.   Now, what is your understanding of what this
8   lawsuit is about?
9   A.   (No response.)
10  Q.   Do you have an understanding of what it is
11  that you, as a plaintiff in this lawsuit, are
12  seeking to recover?
13  A.   I guess being paid for the time that I
14  worked, like, overtime or whatever and wasn't
15  paid; like break.
16  Q.   Can you describe for me what you mean when
17  you say you were working overtime?
18  A.   Well, a lot of time you would work overtime
19  and you didn't get paid.
20        MS. MCGOWAN: I'm going to interject
21  that, you know, she's not a lawyer, that this is a
22  lay opinion. She can give you her best
23  understanding. There may be other legal things

0150db18-038a-4638-a6d7-2d18562dc4b9

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

54

1  that she's entitled to that she doesn't
2  understand.
3      MR. GOULD: That's fine. I understand
4  your objection.
5  Q.  You can go ahead and answer the question.
6  A.  I forgot the question.
7  Q.  I asked you what you were seeking in this
8  lawsuit. And you said time that you were working
9  overtime and not paid, and break?
10  A.  Yes.
11  Q.  And so I'm asking you what you mean by
12  working overtime?
13  A.  Say what I mean?
14  Q.  Yeah. What specific things are you talking
15  about when you're saying that you worked overtime?
16  A.  You know, like, worked like an hour or two
17  overtime or whatever; and everybody else gone home
18  and you're still there working, but you don't get
19  paid for it. The shift is over, but you're still
20  working.
21  Q.  And you would do that when you were on the
22  debone line?
23  A.  Sometimes.

55

1  Q.  In what position?
2  A.  Whatever position they got you at. If they
3  needed you and you couldn't leave or whatever, you
4  couldn't leave. But like I said, the shift was
5  over. But you don't get paid for it.
6  Q.  Now, how regularly would you get paid when
7  you were working at Equity? Did you get paid
8  weekly?
9  A.  Yes.
10  Q.  And when you would get your paycheck, did
11  you look at your paycheck and check to see if you
12  felt it was accurate?
13  A.  Yes.
14  Q.  And do you recall any instance when you
15  looked at your paycheck and thought that you
16  should have been paid for overtime; and you went
17  to your supervisor or you went to some other
18  management-level person and asked why you weren't
19  paid overtime?
20  A.  Yes.
21  Q.  Do you remember any specific time that that
22  occurred?
23  A.  No, I don't remember any specific time. But

56

1  I know I have talked to my supervisor or went to
2  the head office and told them, you know, I wasn't
3  paid, that my check is not right.
4  Q.  And what happened then?
5  A.  They would be like, "Well, why your check is
6  not right?" They would, like, send you over to
7  the payroll clerk or whoever. It would be like a
8  big argument. They be like, "Well, you didn't
9  work overtime." I be like, "Oh, yes, I worked
10  overtime." But they don't pay you. They keep you
11  there to do the work, but they don't pay you, give
12  you your money.
13      And to make sure that you don't -- like I
14  said, they would work you overtime, but your
15  supervisor or line leader, they'll be done came
16  and got your card and swiped your card. You're
17  off the clock but you're still on the floor
18  working. They'll work you but don't want to pay
19  you.
20      Then a lot of times they don't come and get
21  your card. You're still working, and they tell
22  you, say, "Well, you're getting paid for
23  overtime." You get your check, and your check

57

1  don't be right.
2      Anybody that keep up with their hours, you
3  know, you know that your check is not right.
4  Q.  Did you ever keep any sort of written record
5  of times that you worked overtime that you thought
6  you were not properly paid for that time?
7  A.  Record?
8  Q.  Did you write it down? Let's say that you
9  thought that you worked two hours of overtime on
10  Tuesday. Did you check on Friday --
11  A.  Yes, I used to write mines down sometimes.
12  Q.  Did you give those records to your
13  supervisor or anybody?
14  A.  When I come in, I would, like, show my
15  supervisor or go up to the head office and I would
16  show them. I'd say, "My check is not right." But
17  still I wouldn't get paid for it. They'd be like,
18  "Well, you're right; you didn't get paid. Well
19  we'll have it on your check Friday." And when you
20  get your check, it still don't be on there.
21  Q.  Can you remember any specific instance where
22  this happened?
23  A.  Quite a few occasions. I can't just be

0150db18-038a-4638-a6d7-2d18562dc4b9

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

58

1  specific, you know.
2  Q.  Were there ever any instances when you
3  claimed that you hadn't been paid for overtime,
4  and you went and spoke to your supervisor or
5  somebody in payroll, and you were issued a check
6  for additional hours worked?
7  A.  I never got a check like that.  When they
8  see that I be done worked overtime they come and
9  give my an extra check, I never.
10    Only time I got a check, I think it was like
11  one time I think, like, you referred somebody to
12  that job.  It's like a bonus check or something.
13  I got that one time.
14  Q.  I understand.  Do you know whether you ever
15  had time added in to your next check, if there was
16  time for overtime that you claimed you worked and
17  then were paid for?
18  A.  Yeah, sometimes you would be paid.  They
19  would ask for, like, people would stay.  And I
20  guess they were going to be shorthanded on second
21  shift or whatever, they would ask, like, could you
22  come back at 7:00 or 5:30, or go take you a
23  ten-minutes break and come back and work, you

59

1  know.  And you'll work overtime for four hours or
2  whatever.
3  Q.  All right.  And were you paid for that?
4  A.  Sometimes.
5  Q.  When you were working night shift, what time
6  would you normally arrive at the plant?
7  A.  Talking about to be on the line or just
8  arrive?
9  Q.  What time would you -- did you drive
10  yourself?
11  A.  Yes.
12  Q.  What time would you --
13  A.  I would be there early.  I would be there
14  say, like -- I'd probably get there like 3:00 or
15  3:30.  That way I could go on and get my supplies
16  or whatever I needed, you know, before that line
17  get up there, you know.
18  Q.  All right.  And if you got there early, what
19  would you do after you got your supplies?
20  A.  I might just sit out.  You know, they have,
21  like, little tables outside.  I'll sit out there
22  or I'll sit in the break room, get me something to
23  snack on or whatever, or I'll go back to my car.

60

1    But like I say, you know, there's a certain
2  time you can clock in.  I would do that then.
3  Q.  Did you ever file any union grievances
4  during the time you were employed by Equity Group?
5  Did you ever go to your union rep and say, "I have
6  a complaint and I would like to file something"?
7  A.  I have went to, like, a supervisor, or a
8  supervisor that I see, you know.  Sometimes you
9  don't see your supervisor and you just see a
10  supervisor.  And I have complained on certain
11  things, yeah.
12  Q.  Do you recall whether you actually filed a
13  formal grievance through a union, through one of
14  your union stewards?
15  A.  I heard what you said, but I don't
16  understand what you mean.
17  Q.  Did you ever go to one of your union
18  representatives and ask them to look into or
19  pursue a particular complaint that you had?
20  A.  Talking about, like, walk up to a union rep
21  or whatever?
22  Q.  Right.
23  A.  Yes.

61

1  Q.  Who was that?
2  A.  Like I say, I know Jackie Smith; I know her
3  name.  But, like, the other people, I wouldn't
4  know their name.  But I would, like, ask, you
5  know, "Who is a union rep?"  And they would, like,
6  point them out, her or him, you know.  And you
7  would walk up to them, and they would ask can they
8  help you; what's the problem.
9  Q.  The last time that your employment ended
10  with Equity Group, were you terminated or did you
11  quit?
12  A.  Well, I say I was fired.  I say I was fired.
13  Pretty much fired, because they suspended me; and
14  I don't think it was right.
15  Q.  Was it for attendance reasons?
16  A.  What's that?
17  Q.  Absenteeism?
18  A.  No.
19  Q.  What was it for?
20  A.  I guess job performance.  You know, my hand.
21  My hand.
22  Q.  That's all the questions I have.  Thank you
23  for your time.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

62

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14     (The deposition was concluded.)
15
16
17
18
19
20
21
22
23
```

63

```
 1        C E R T I F I C A T E
 2
 3   STATE OF ALABAMA
 4   BARBOUR COUNTY
 5
 6        I hereby certify that the above and
 7   foregoing deposition was taken down by me in
 8   stenotype and the questions and answers thereto
 9   were transcribed by means of computer-aided
10   transcription, and that the foregoing represents
11   a true and correct transcript of the testimony
12   given by said witness upon said hearing.
13        I further certify that I am neither of
14   counsel, nor kin to the parties to the action,
15   nor am I in anywise interested in the result of
16   said cause.
17
18
19        CYNTHIA M. NOAKES, Commissioner
20        Certified Court Reporter,
21        ACCR #327 - Expires 09/30/2008
22
23        Commission Expires 07/08/2009
```

0150db18-038a-4638-a6d7-2d18562dc4b9

**TAB 10**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


BETTY ANN BURKS, et al.,

    Plaintiffs,


vs.  CIVIL ACTION 2:06-cv-01081-MEF-DRB


EQUITY GROUP EUFAULA DIVISION, LLC,

    Defendant.


\*    \*    \*    \*    \*    \*

DEPOSITION OF VIRGINIA AVERY, taken
pursuant to notice and stipulation on
behalf of the Defendant, at Williams,
Pothoff, Williams & Smith, 125 South
Orange Avenue, Eufaula, Alabama, before
Bridgette Mitchell, Shorthand Reporter
and Notary Public in and for the State
of Alabama at Large, on May 21, 2008,
commencing at 9:00 a.m.

**2**

1         APPEARANCES

2

3    FOR THE PLAINTIFFS:

4    Carl E. Underwood, III, Esquire

5    COCHRAN, CHERRY, GIVENS & SMITH

6    163 W. Main Street

7    Dothan, Alabama  36301

8

9    M. John Steensland, III, Esquire

10   PARKMAN, ADAMS & WHITE

11   739 West Main Street

12   Dothan, Alabama  36301

13

14   FOR THE DEFENDANT:

15   Gary D. Fry, Esquire

16   PELINO & LENTZ

17   One Liberty Place

18   Thirty-second Floor

19   Philadelphia, Pennsylvania  19103

20

21

22

23

**3**

1         STIPULATIONS

2         It is hereby stipulated and

3    agreed by and between counsel

4    representing the parties that the

5    deposition of VIRGINIA AVERY is taken

6    pursuant to notice and stipulation on

7    behalf of the Defendant; that all

8    formalities with respect to procedural

9    requirements are waived; that said

10   deposition may be taken before

11   Bridgette Mitchell, Shorthand Reporter

12   and Notary Public in and for the State

13   of Alabama at Large, without the

14   formality of a commission; that

15   objections to questions, other than

16   objections as to the form of the

17   questions, need not be made at this

18   time, but may be reserved for a ruling

19   at such time as the deposition may be

20   offered in evidence or used for any

21   other purpose as provided for by the

22   Civil Rules of Procedure for the State

23   of Alabama.

**4**

1         It is further stipulated and

2    agreed by and between counsel

3    representing the parties in this case

4    that the filing of the deposition of

5    VIRGINIA AVERY is hereby waived and

6    that said deposition may be introduced

7    at the trial of this case or used in

8    any other manner by either party hereto

9    provided for by the Statute, regardless

10   of the waiving of the filing of same.

11        It is further stipulated and

12   agreed by and between the parties

13   hereto and the witness that the

14   signature of the witness to this

15   deposition is hereby waived.

16

17            INDEX

18

19   EXAMINATION              Page

20   By Mr. Fry........................ 5

21   By Mr. Underwood.................. 53

22

23

**5**

1         COURT REPORTER: Usual

2    stipulations?

3         MR. UNDERWOOD:  That's fine

4    with me.

5         MR. FRY:  Sure.

6         VIRGINIA AVERY, having first

7    been duly sworn or affirmed to speak

8    the truth, the whole truth, and nothing

9    but the truth, testified as follows:

10            EXAMINATION

11   BY MR. FRY:

12   Q. Mrs. Avery, we just met, but for the

13   record my name is Gary Fry and I'm one

14   of the attorneys for Equity Group,

15   Eufaula Division, the plant over in

16   Baker Hill.  And we have asked you here

17   today to put certain questions to you

18   concerning a lawsuit in which you are a

19   party.  Have you -- against the

20   company.  Have you ever given a

21   deposition before?

22   A. No, sir.

23   Q. Let me just explain what we're going to

3e4538a9-4626-4792-abe6-e0f0d12c4392

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

6

1    do and give you a few guidelines. I'll
2    be asking the questions and you'll be
3    answering, and Bridgette, our court
4    reporter, will be taking down my
5    questions and your answers. If you
6    don't understand one of my questions,
7    please let me know and I'll try and
8    rephrase it so you will understand it.
9    If you don't hear something that I say,
10   let me know and I'll repeat it. The
11   only other guideline is I will wait
12   until you finish your answer to start
13   another question, and if you can wait
14   while -- until I finish my question so
15   we don't talk over each other so she
16   can get a clean record. Okay?
17   A. Yes, sir.
18   Q. What's your home address?
19   A. 14 Apartment Road, Georgetown, Georgia
20   39854.
21   Q. What is your date of birth?
22   A. April 27, 1972.
23   Q. Are you currently employed?

7

1    A. No, sir.
2    Q. Were you employed at one point at the
3    Equity facility in Baker Hill?
4    A. Yes, sir.
5    Q. And when were you so employed?
6    A. That was in 2005 at the Equity Group.
7    Q. Your employment started there in 2005
8    and finished in 2005?
9    A. Yes, sir.
10   Q. Do you recall when you started?
11   A. I started in the middle of the year.
12   Q. Around July, June?
13   A. I can't remember.
14   Q. Do you recall when your employment
15   ended?
16   A. I can't remember. I know it ended in
17   2005.
18   Q. For what reason did your employment end
19   at Equity?
20   A. I quit because I got too cold.
21   Q. What job did you hold while you were
22   employed at Equity?
23   A. In debone.

8

1    Q. What shift did you work?
2    A. I worked second shift.
3    Q. What were the hours of second shift?
4    A. From -- they rotated. One time they
5    were from six till four, then it went
6    to four to six. They rotated us.
7    Q. So at one point it was 6 p.m. to
8    4 a.m.?
9    A. Four that evening.
10   Q. What?
11   A. Six that morning, four that evening.
12   Q. Six a.m. till 4 p.m.?
13   A. Yes.
14   Q. And then it changed?
15   A. Yes.
16   Q. To what?
17   A. It was from 6 p.m. to 4 p.m. that
18   morning.
19   Q. Four a.m.?
20   A. Four a.m.
21   Q. Did you work in any other departments
22   while you were at Equity?
23   A. No, sir.

9

1    Q. Did you work any other shifts?
2    A. No -- yes, sir. I worked night shift.
3    I've been down there twice. I worked
4    night shift.
5    Q. And what were the hours for the night
6    shift?
7    A. They're from -- they're from ten
8    o'clock till -- I don't know what time
9    that morning we got out, but it's from
10   ten.
11   Q. And you had this job in the debone
12   department for the entire time you
13   worked at Equity?
14   A. Yes, because this department, it was in
15   debone also.
16   Q. Describe for me what you did.
17   A. I cut chicken.
18   Q. Who was your supervisor?
19   A. I can't remember her name.
20   Q. What was your rate of pay?
21   A. Can you rephrase that?
22   Q. How much did you make?
23   A. I made -- I started off at 6.35 an

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

10

1    hour.
2    Q. Pardon?
3    A. Six thirty-five an hour, I started off
4       with.
5    Q. Did you then get an increase?
6    A. In ninety days it went to 6.45.
7    Q. How many hours per week did you work?
8    A. We worked eight hours a day for a week.
9       It totalled forty hours.
10   Q. Forty hours per week?
11   A. Yes, sir.
12   Q. Monday through Friday?
13   A. Monday through Friday.
14   Q. Now, I am correct that you are a
15      plaintiff in this lawsuit?
16   A. Yes, sir.
17   Q. How did you first learn about the
18      lawsuit?
19   A. I heard it through some friends working
20      at the place with me.
21   Q. What did your friends tell you?
22   A. That, you know, where we were working,
23      they got a lawsuit against the chicken

11

1    plant where we didn't get paid.
2    Q. What is your understanding about what
3       the lawsuit is about?
4    A. Where we were working, didn't get paid
5       for.
6    Q. What work did you perform for which you
7       weren't paid?
8    A. The time I get there and clock in till
9       the time I leave.
10   Q. What work did you perform from the time
11      you clocked in until you clocked out
12      that you weren't paid for?
13   A. It'd take me thirty, forty minutes to
14      put on my PPE.
15   Q. Takes you thirty to forty minutes to
16      put it on?
17   A. During that day.
18   Q. That's just to put it on?
19   A. To put it on and take it off during the
20      day, the whole day.
21   Q. Have you ever been involved in any
22      other lawsuits?
23   A. Yes, sir.

12

1    Q. What kind of lawsuits?
2    A. Child support, car accident.
3    Q. Pardon?
4    A. Child --
5       MR. UNDERWOOD:  Go ahead and
6       break it down for him and tell him more
7       about child support and then --
8    A. Child support, get the money from my
9       children's father to pay me child
10      support.  And for my lawsuit, I was in
11      a car accident.
12   Q. During your employment at Equity, were
13      you a member of the union?
14   A. No, sir.
15   Q. I take it from your answer that you
16      never attended any union meetings?
17   A. No, sir.
18   Q. Did you review any documents to prepare
19      for this deposition?
20   A. No, sir.
21   Q. Did you speak with anyone about this
22      deposition except your attorneys?
23   A. No, sir.

13

1    Q. Can you identify for me the outer
2       garments, or PPE, as you described it,
3       that you wore on a daily basis while
4       you were working in the debone
5       department at Equity?
6    A. Yes, sir.  As I can remember, we wore a
7       smock, we wore a white liner, blue
8       gloves, arm guard, chain gloves, and
9       apron and boots.
10   Q. Okay.  A smock?
11   A. Smock.
12   Q. Blue gloves?
13   A. Blue gloves.  White liner.
14   Q. White?
15   A. Liner, white gloves, little white
16      gloves.
17   Q. White cotton gloves?
18   A. Yes, sir.
19   Q. An arm guard?
20   A. Sleeve, arm guard.
21   Q. And the plastic sleeves?
22   A. Yes.  And chain glove and your boots
23      and hair net, earplugs.

3e4538a9-4626-4792-abe6-e0f0d12c4392

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

14

1 Q. So let me run down the list to make
2 sure I have it accurately. You wore a
3 smock, white cotton gloves, blue
4 plastic gloves?
5 A. Yes.
6 Q. An arm guard and plastic sleeves?
7 A. Yes.
8 Q. Boots?
9 A. Yes.
10 Q. A hair net?
11 A. Yes.
12 Q. And earplugs?
13 A. Yes. And the apron.
14 Q. And an apron. Anything else?
15 A. That's it as far as my line.
16 Q. Which of these items were you required
17 to wear?
18 A. Everything.
19 Q. So none of these items were optional?
20 A. No.
21 Q. From what you were able to observe,
22 were all the employees in the -- did
23 all the employees in the debone

15

1 department at Equity wear these same
2 items of clothing at Equity?
3 A. No, sir.
4 Q. What did you observe?
5 A. It -- it depended on what work area
6 they were working in. They didn't have
7 to have on all of that.
8 Q. From what you were able to observe,
9 what employees were not -- what items
10 were some employees not required to
11 wear?
12 A. I really don't know because I didn't
13 work in all the departments.
14 Q. Were you ever disciplined in any way
15 for not wearing any of these items?
16 A. Yes, you been writ up.
17 Q. What were you written up for?
18 A. For not having your PPE, part of your
19 PPE.
20 Q. Were you written up?
21 A. Yes.
22 Q. What were you written up for?
23 A. Not having my hair net.

16

1 Q. Anything else?
2 A. That's it.
3 Q. Was it your understanding you would be
4 written up if you weren't wearing the
5 white cotton gloves?
6 A. Yes.
7 Q. And how did you come by that
8 understanding?
9 A. I know if I didn't have them, then I
10 have to be at work on time and have to
11 go to the supply area to get some.
12 Q. Who told you that each and every one of
13 these items was required for your job?
14 A. The -- the manager of the chicken
15 plant. I don't know his name.
16 Q. And when were you told that?
17 A. The day I got hired.
18 Q. Which of these items that you described
19 for me of PPE were issued to you by
20 Equity?
21 A. Everything.
22 Q. Everything?
23 A. Everything.

17

1 Q. Even the boots?
2 A. Even the boots.
3 Q. Which of these items that you
4 identified for me did you pick up on a
5 daily basis?
6 A. Every Monday of the week they give you
7 a hair net, earplugs, blue gloves, and
8 white liner.
9 Q. You got those every Monday?
10 A. Yes.
11 Q. When did you get the smock?
12 A. They give you three smocks when you
13 first get hired, and that's it.
14 Q. You got three smocks when you were
15 hired?
16 A. (Witness nods head.)
17 Q. And was it your responsibility to take
18 care of those -- that smock?
19 A. Yes, sir. Got to take them home, wash
20 them.
21 Q. Where did you get the blue plastic
22 sleeves?
23 A. You'd get them from the supply area.

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

3e4538a9-4626-4792-abe6-e0f0d12c4392

18

1  Q. When did you get those?
2  A. Every Monday.
3  Q. What about the arm guard?
4  A. The arm guard, you get that when you're
5     hired. You have to keep up with it.
6  Q. Pardon?
7  A. You get that when you first get hired.
8     You have to keep up with it.
9  Q. Keep it with you?
10 A. Yes, sir.
11 Q. Got the boots when you were hired?
12 A. Yes.
13 Q. What about the apron?
14 A. You got that when you first got hired,
15    too. They give you an apron once a
16    month.
17 Q. You were responsible for the apron?
18 A. Yes, sir.
19 Q. Which of these items that you
20    identified for me were you permitted to
21    wear from home?
22 A. When I was down there, you could wear
23    your boots from home, your hair net,

19

1     and your earplugs.
2  Q. When you were not at work at the plant,
3     where would these items be?
4  A. With me.
5  Q. All of them?
6  A. All of them.
7  Q. Did you have a locker at the plant?
8  A. Yes, you have a locker at the plant.
9  Q. What did you use the locker for?
10 A. Put your food in, your personal items,
11    what you bring to work.
12 Q. Did you put your boots, hair net and
13    earplugs on at home?
14 A. Yes.
15 Q. With respect to these other items that
16    you identified for me, can you tell me
17    where you put them on before you went
18    to work?
19 A. Put them on in the break room.
20 Q. So you put your smock on in the break
21    room?
22 A. Yes.
23 Q. Gloves?

20

1  A. Yes, sir.
2  Q. The plastic sleeves?
3  A. Yes, sir.
4  Q. You put the arm guards on in the break
5     room?
6  A. Yes.
7  Q. And your apron?
8  A. Yes, sir.
9  Q. What about the chain glove?
10 A. You put that on once you get on the
11    line. Your supervisor always keep the
12    chain glove.
13 Q. So the chain glove was at your
14    workstation on the line?
15 A. Yes.
16 Q. And you were not responsible for
17    maintaining the chain glove?
18 A. No, sir.
19 Q. So I take it from your response to my
20    last series of questions, that the time
21    you put all these items on was when you
22    were waiting for your shift to start in
23    the break room?

21

1  A. Yes, sir.
2  Q. Was it your understanding you're
3     required to put these items on in the
4     break room before you entered the
5     production floor?
6  A. Yes.
7  Q. Did your job require you to use a knife
8     or scissors?
9  A. Yes.
10 Q. And you would use these items to cut
11    the chickens?
12 A. Yes, sir.
13 Q. How did you obtain -- which was it, a
14    knife or a pair scissors?
15 A. You rotate. You probably use both of
16    them.
17 Q. And how did you obtain these implements
18    while you were at your workstation?
19 A. Repeat that.
20 Q. How did you get the knife and scissors?
21 A. From the line leader or your
22    supervisor.
23 Q. Were those items given to you while you

3e4538a9-4626-4792-abe6-e0f0d12c4392

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

22

1    were on the line?
2    A. Yes, sir.
3    Q. So it's my understanding you weren't
4       responsible to sharpen them or maintain
5       them?
6    A. No.
7    Q. Did you use any other tools or
8       equipment?
9    A. No, sir.
10   Q. Now, I believe you indicated to me that
11      you worked second shift and you started
12      at 6 a.m. in the morning?
13   A. Yes.
14   Q. And you deboned?
15   A. Yes.
16   Q. In 2005?
17   A. Yes.
18   Q. What time were you required to be on
19      the production line?
20   A. Had to be on the line at seven o'clock.
21   Q. At seven o'clock?
22   A. Supposed to be on the line at seven
23      o'clock.

23

1    Q. You told me your shift started at six.
2    A. Yes. It started -- shift -- because we
3       have to get there to get in the line
4       and get our smocks and our apron and
5       gloves and stuff if we don't have it.
6       We have to be on the line at seven
7       o'clock because we have to wash down
8       our apron and stuff.
9    Q. What time were you required to report
10      to the plant?
11   A. I can't remember what time we had to be
12      there.
13   Q. Well, if your line started at 7 a.m.,
14      did they give you a definite time that
15      you had to be there before then?
16   A. Yes. We had to be there before the
17      line get started.
18   Q. How much time before the line started?
19   A. We had to be there at seven o'clock.
20   Q. You just had to be on the line at seven
21      o'clock. Is that what you're saying?
22   A. Yes.
23   Q. What time did your shift end?

24

1    A. It depended on how many birds you had
2       to do.
3    Q. When you were working the -- you say
4       you worked the second shift in debone?
5    A. Yes. But I wasn't on the line. I was
6       on the tender belt.
7    Q. Pardon?
8    A. I was on the tender belt. I wasn't on
9       the line.
10      MR. UNDERWOOD: The tender
11      belt? Is that what you're saying?
12      THE WITNESS: Uh-huh.
13   Q. The tender belt. What did you do on
14      the tender belt?
15   A. We made tender, separate the tender.
16   Q. Did you work on the tender belt your
17      whole time there?
18   A. Yes.
19   Q. So your work on the tender belt line
20      started at 7 a.m.?
21   A. On first shift, 7 a.m.
22   Q. So you worked first shift debone?
23   A. Yes.

25

1    Q. And when you worked first shift debone
2       and your shift started at 7 a.m., what
3       time did the shift end?
4    A. It depended on how many birds -- how
5       many cuts of bird we have to do.
6       Sometimes it be 4:30 when we get off.
7    Q. If you only worked eight hours that
8       day, what time would the shift end?
9    A. I can't -- can't say I did time.
10   Q. Pardon?
11   A. I can't say I did time.
12   Q. How many breaks did you get during your
13      shift?
14   A. We get two breaks.
15   Q. How long was each break?
16   A. Thirty minutes.
17   Q. Where did you take your break?
18   A. In the work area or either outside.
19   Q. Pardon?
20   A. The break area or outside. They got a
21      break room inside and a break area
22      outside.
23   Q. What was the time of the first break

26

```
1     you took when you started at 7 a.m.?
2   A. I can't remember what time that we go
3     to break.
4   Q. Do you recall the time of the second
5     break?
6   A. I can't remember because it's been
7     three -- two years or three years I've
8     been down there, so I can't remember.
9   Q. And was it your understanding that your
10    breaks were unpaid?
11  A. Yes, sir.
12  Q. When it was time to go on break, what
13    signaled you that it was time?
14  A. They'll let you know it's time to go on
15    break.
16  Q. How did they let you know?
17  A. They'll holler break time.
18  Q. Who would holler?
19  A. The supervisor.
20  Q. And what would you do when they
21    hollered break?
22  A. You have to wait till the bird pass
23    your station before you go to break.
```

27

```
1   Q. You had to wait till the bird passed?
2   A. If you at the end of the line, you be
3     the last person to go to break.
4   Q. So some people got to go on break
5     quicker than others?
6   A. Yes.
7   Q. Because the bird passed their station
8     first?
9   A. Yes.
10  Q. What signaled to you the end of your
11    break time?
12  A. We had to keep up with our own time.
13    Everybody got to leave at the same
14    time.
15  Q. You had to keep your own -- track of
16    your own break time?
17  A. Yes.
18  Q. And what was your understanding as to
19    when you had to be back on the line?
20  A. When everybody else go back to the
21    line. Everybody got to be on the line
22    at the same time.
23  Q. At the same time?
```

28

```
1   A. Same time.
2   Q. And it didn't matter where the birds
3     were?
4   A. Didn't matter where the birds were.
5     Everybody had to be there at the same
6     time.
7   Q. Did you get a lunch break besides the
8     two breaks you just described for us?
9   A. No.
10  Q. You worked for Equity for what,
11    approximately four, five, or six
12    months? Is that accurate?
13  A. The total time, both times I was down
14    there, around about six months.
15  Q. In 2005?
16  A. Yes.
17  Q. And how much of that time did you work
18    on the tender belt, the whole time?
19  A. I worked three -- three months on the
20    tender belt.
21  Q. And when you weren't working on the
22    tender belt, where were you working?
23  A. I was in debone on the line.
```

29

```
1   Q. When you worked on the tender belt, was
2     your starting time always 6 a.m.?
3   A. No. I was on the night shift on the
4     tender belt.
5   Q. Pardon?
6   A. I was on the night shift on tender
7     belt.
8   Q. And what time did you start, 7 p.m.?
9   A. I was on third shift with tender belt.
10  Q. When you first started, were you on
11    tender belt or debone?
12  A. I was on tender belt when I first
13    started down there.
14  Q. And what time did your shift start?
15  A. 10:30.
16  Q. In the evening?
17  A. Ten at night.
18  Q. What time did you usually arrive at the
19    plant when you had a 10:30 start?
20  A. I would get there around about ten
21    o'clock.
22  Q. Describe for me, in as much detail as
23    you can, what you did from the time you
```

3e4538a9-4626-4792-abe6-e0f0d12c4392

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

30

1    arrived in the parking lot until you
2    started on the tender belt.
3    A. When I get there in the morning time, I
4    clock in.  If it be on a Monday, I
5    clock in, I go to the supply area and
6    get my everyday Monday stuff, I go back
7    to the break room, I put on all my PPE.
8    And about that time, it'd be time to go
9    in, and you have to go in and wash up
10   and get on the line.
11   Q. When you said you clocked in, you
12   swiped your -- your card in the Kronos
13   clock?
14   A. Yes.
15   Q. If it wasn't Monday, is it correct that
16   you had all these items with you?
17   A. Yes, sir.
18   Q. And with the exception of the boots,
19   the earplugs, and the hair net, you put
20   the rest of the PPE on in the break
21   room?
22   A. Yes, sir.
23   Q. How did you travel to and from the

31

1    plant?
2    A. My own vehicle.
3    Q. And when you entered the plant, were
4    you searched?
5    A. No.
6    Q. Were your personal possessions ever
7    searched?
8    A. No.
9    Q. Do you have a sticker for your car?
10   A. Yes.
11   Q. And you came in the gate past the
12   guard's shack?
13   A. Yes, sir.
14   Q. And he just waved you through when he
15   saw your sticker?
16   A. Yes, sir.
17   Q. In preparation for your work on the
18   tender belt, before you got to your
19   workstation, did you have to perform
20   any washing?
21   A. Yes, sir.  You have to wash up.
22   Q. What did you wash?
23   A. You have to wash your apron -- wash --

32

1    sanitize everything you have on.
2    Q. And why did you -- what was your
3    understanding as to why you had to do
4    that?
5    A. Keep bacteria away.
6    Q. And what items did you wash?
7    A. Your apron, your sleeve, and your blue
8    glove.
9    Q. Where did you do this washing?
10   A. At the sink, the sanitize area.
11   Q. Pardon?
12   A. At the sink, sanitize area.
13   Q. The sink in the -- on the production
14   floor?
15   A. In debone.
16   Q. What signaled when it was time for you
17   to walk onto the production floor?
18   A. Repeat that, now.
19   Q. How did you know when to go onto the
20   production floor?
21   A. Your supervisor and everybody get in
22   place.
23   Q. And from there you would proceed from

33

1    the break room to the production floor?
2    A. You go in there and they'll tell you
3    what position you're getting in.  They
4    have to line you up where they want you
5    to be.
6    Q. How long did it take you to walk from
7    the break room to the production floor?
8    A. It takes about five minutes from debone
9    break room to debone.
10   Q. Where is the debone break room in
11   relation to the production floor, the
12   debone production floor?
13   A. The areas are right across from each
14   other.
15   Q. But it took you five minutes to walk
16   it?
17   A. To walk in the door from the break
18   room.
19   Q. Why did it take you five minutes?
20   A. Because they're right in front of each
21   other.
22   Q. Because of the number of people?
23   A. They're right in front of each other.

3e4538a9-4626-4792-abe6-e0f0d12c4392

34

1    The break area in front of each other.
2    Q. It took you five minutes -- are you
3      telling me that it took you five
4      minutes because of the number of people
5      that were entering the production
6      floor?
7    A. No.
8    Q. Okay. Why did it take you five
9      minutes?
10   A. To get in the door, it takes you five
11     minutes from the debone area to the
12     break room.
13   Q. It's that far away?
14   A. Yes. Because you have to stand right
15     there to sanitize your boots.
16   Q. Tie your boots?
17   A. Sanitize your boots as you walk in the
18     door.
19   Q. How did you do that?
20   A. They got a puddle of water you have to
21     step in that sanitizes it.
22   Q. Don't you just walk through it?
23   A. You got to stand there.

35

1    Q. You've got to stand there. Once you
2      entered the production floor, you went
3      right to your position on the line?
4    A. You go to your supervisor and she'll
5      tell you what position you got to get
6      to.
7    Q. And then you went to that position and
8      started working?
9    A. Yes.
10   Q. Did this process that you just
11     described for me change at all when you
12     moved from the tender belt to the
13     debone line?
14   A. Yes, sir.
15   Q. How did it change?
16   A. Because you don't have to use knives on
17     the tender belt, depending what -- you
18     could be loading it or be back there
19     separating the tender.
20   Q. You didn't use knives on the tender
21     belt?
22   A. No, sir.
23   Q. Did you still -- were you still

36

1    required to wear the plastic arm
2      guards?
3    A. No, sir.
4    Q. When you went -- I think you told me
5      that you worked on the tender belt for
6      approximately three months?
7    A. Yes, sir.
8    Q. And then you went to the debone line?
9    A. After that I quit, and about a year I
10     went back. Then I went in debone.
11   Q. Well, let's backtrack a little bit. So
12     you worked at the plant on two
13     occasions?
14   A. Yes, sir.
15   Q. And were they both in 2005?
16   A. Yes, sir.
17   Q. So when did you first start your first
18     job at Equity?
19   A. I can't -- I can't remember.
20   Q. So you quit after three months on the
21     tender line?
22   A. Yes, sir.
23   Q. And how long were you not working at

37

1    Equity?
2    A. A year.
3    Q. A year. So did you start back in 2006?
4    A. I started -- I didn't work down there
5      in 2006. My last time down there was
6      in 2005.
7    Q. You still recall that you were out
8      of -- you weren't working at Equity for
9      a year between the two jobs?
10   A. The two jobs -- I wasn't working down
11     there a year.
12   Q. Pardon me?
13   A. The two jobs I was down there, end of
14     2004 to 2005.
15   Q. Once you went back to work for
16     Equity --
17   A. I went in 2005. The last time I went
18     down there, in 2005.
19   Q. So in 2005, you worked on the debone
20     line?
21   A. 2005, I worked in debone.
22   Q. And it was 2004 that you worked on --
23   A. On the tender belt.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

38

1  Q. -- the tender belt. When you went to
2     work in the debone line in 2005, did
3     you follow the same routine that you
4     described for me that you followed when
5     you were working the tender belt?
6  A. Yes.
7  Q. And were you given three smocks when
8     you started working?
9  A. Yes.
10 Q. And was it your responsibility to keep
11    those smocks clean?
12 A. Your responsibility.
13 Q. And did you don, put on, all those
14    items of PPE in the break room when you
15    worked on the debone line?
16 A. Yes.
17 Q. So you were permitted to wear your
18    smock and your apron before you got
19    onto the production floor?
20 A. Yes. Went out of the break room into
21    your work area. You have to put
22    everything on in the break room.
23 Q. How long did it take you to put these

39

1     items on in the break room?
2  A. To get fully dressed, it'd take me
3     about fifteen minutes.
4  Q. Tell me, in as much detail as you can,
5     what you did when you went on break.
6  A. I stay in line and warm my food up if I
7     eat that day.
8  Q. Take me from your workstation on the
9     tender belt to the break room. What
10    did you do?
11 A. When the bird, it pass, you go on
12    break. You've got to leave off that
13    line, go to the wash station and wash
14    your apron stuff up, then you take it
15    off; you hang it up. Then you go in
16    the break room or outside, wherever you
17    want to go.
18 Q. So you just washed your apron when you
19    were leaving?
20 A. Wash everything you have on, your
21    apron, your blue glove, your sleeve,
22    your arm guard.
23 Q. Well, when you worked in the tender

40

1     belt, you weren't wearing arm guards,
2     you told me?
3  A. Uh-uh.
4  Q. So you didn't have to wash them.
5  A. Uh-uh, because you didn't have to use
6     the arm guard in tender belt.
7  Q. So you washed the other items?
8  A. Yes.
9  Q. What items did you take off before you
10    left the production floor?
11 A. You have to take everything off except
12    your boot.
13 Q. So you took off the sleeves?
14 A. Yes.
15 Q. You took off the apron?
16 A. Yes.
17 Q. And you took off your smock?
18 A. Yes.
19 Q. And what did you do with these items?
20 A. I washed them. You have to hang them
21    up. They've got a rack in there to
22    hang it on.
23 Q. So you don't wash your smock?

41

1  A. Uh-uh.
2  Q. So you hung those items up and then
3     you -- you left?
4  A. Yes.
5  Q. So during your break you kept, of
6     course, your boots on?
7  A. Yes, sir.
8  Q. Your hair net?
9  A. Yes, sir.
10 Q. Your earplugs?
11 A. Yes, sir.
12 Q. What about your gloves?
13 A. You take your gloves off.
14 Q. And do you carry them with you?
15 A. No, sir.
16 Q. Where do you put them?
17 A. Tied up in your apron.
18 Q. How many wash stations were available
19    to you in the production floor?
20 A. There were three sinks.
21 Q. Pardon me?
22 A. Three sinks.
23 Q. Three sinks?

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

3e4538a9-4626-4792-abe6-e0f0d12c4392

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

**42**

1  A. (Witness nods head.)
2  Q. And how many people could use --
3  A. Three at a time.
4  Q. -- a sink?  Three at a time?
5  A. Three at a time.
6  Q. How many people worked -- were these
7    sinks just for the people that worked
8    on the tender line?
9  A. They're for everybody, the whole
10   debone, pack-out, tender belt.
11  Q. How many people worked in the debone
12   department?
13  A. Oh, I can't -- I don't know.
14  Q. What was the length of time between
15   when you were told to -- that it was
16   break time and you could leave your
17   workstation until you got into the
18   break room?
19  A. Now, repeat that.
20  Q. How much time passed from the time you
21   left your workstation till you got into
22   the break room?
23  A. I really don't know.  It depended on

**43**

1    whereabout you be at on the line.
2  Q. It would depend on what?
3  A. Whereabout you be on the line.
4  Q. Did everybody perform -- that you saw,
5    did everybody perform the same washing
6    activities that you did as they left --
7  A. Yes.
8  Q. -- when they went on break?
9  A. Yes.
10  Q. Once your break was over, tell me what
11   you did -- what you had to do from the
12   time that you got up from the break
13   room until you got to your position on
14   the line.
15  A. When the break is over, you go back in
16   there -- everybody go back in there.
17   You have to step back in the water,
18   sanitize your boot, then go back to get
19   your smock where you hung it up and you
20   put it on.  You get dressed and your
21   supervisor tell you whereabouts you
22   have to go on line.
23  Q. So you went back in and put on the

**44**

1    smock, the apron, and the sleeves,
2    plastic sleeves?
3  A. Yes.
4  Q. Now, when you went back to work for the
5    company in 2005 and you went on the
6    debone line, were things pretty much
7    the same as you've described them to
8    me?
9  A. It's the same.
10  Q. The only difference being that now you
11   wore the plastic arm guards?
12  A. Yes.
13  Q. And you had to wash those when you left
14   the break room?
15  A. Yes, sir.
16  Q. Describe for me now what you did at the
17   end of your shift.
18  A. At the end of the shift, after you
19   get -- after the last bird pass by you,
20   you wash up everything again and you
21   take everything off in the break
22   room -- in the debone area, and you go
23   out there in debone and you clock out.

**45**

1  Q. So you took everything off in the -- on
2    the production floor?
3  A. Everything except your shoes and your
4    hair net and your earplug.  Everything
5    else you would take off in there after
6    you done wash it and sanitize it,
7    because if you let chicken stuff stay
8    on there, it will get dry.
9  Q. So at the end of the day, you washed
10   your apron?
11  A. Yes.
12  Q. You washed your plastic sleeves?
13  A. Yes.
14  Q. You washed your plastic sleeve guards
15   when you were working on the debone
16   line?
17  A. Yes.
18  Q. What did you do with the smock?
19  A. Take it home to wash it.
20  Q. Did you have to clock out?
21  A. Yeah, you have to clock out.
22  Q. How much time did it take you from when
23   you were told you could leave your

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

3e4538a9-4626-4792-abe6-e0f0d12c4392

46

1    workstation till you left the plant?
2    A. I don't know.
3    Q. How much time did it take you, do you
4       recall, to take off the smock and --
5    A. It took about fifteen minutes.
6    Q. It takes fifteen minutes to take --
7    A. It takes about fifteen --
8    Q. -- that stuff off?  Is that right?
9       You've got -- let's not -- let me get
10      my question out and I'll let you answer
11      it.  Okay?
12          At the end of the day, when you're
13      in the production floor and you've left
14      your workstation, how much time did it
15      take you to take off your smock, your
16      apron, your plastic sleeve guards, and
17      the plastic sleeves?
18   A. It takes about fifteen minutes to take
19      everything off.
20   Q. Fifteen minutes.  What is your
21      understanding, Ms. Avery, as to how the
22      company keeps track or kept track of
23      the amount of time that you worked?

47

1    A. Your timecard.
2    Q. Your timecard?
3    A. Uh-huh.
4    Q. And at the time you worked at Equity,
5       what was your understanding of the
6       time -- when did the time start for
7       which you were paid?
8    A. Now, repeat that.
9    Q. Yeah.  That was not a good question.
10      Let me try again.
11          What is your understanding of when
12      the time started for which you were
13      supposed to be paid?
14   A. You get paid every week.
15   Q. No.  Each day.  When did the clock
16      start ticking as to when you should
17      have gotten paid?
18   A. The time you clock in.
19   Q. And was it your understanding, then,
20      that the time for which you were
21      stopped being paid was when you clocked
22      out?
23   A. Yes.

48

1    Q. And who, if anyone, ever told you that?
2    A. They tell you when you first get hired,
3       when you clock in and get started, you
4       get paid when you hit the clock.  And
5       you get -- aren't paid when you clock
6       out.
7    Q. And do you recall who told you that
8       when you first started?
9    A. No, I can't remember who told me when I
10      got hired.  There be so many people in
11      and out of there.
12   Q. How often were you paid?
13   A. Paid every week.
14   Q. When you received your check, did you
15      review the payroll information on it?
16   A. No.
17   Q. Pardon?
18   A. No, sir.
19   Q. Did you have any reason to think that
20      the paychecks that you got were in
21      inaccurate?
22   A. No, sir.
23   Q. So you never complained to a supervisor

49

1    or anyone else that you thought your
2    check was short?
3    A. No, sir.
4    Q. Did you keep track of the hours you
5       worked each day yourself?
6    A. Yes, sir.
7    Q. How did you do that?
8    A. I know what time I clock in and I know
9       what time I clock out.
10   Q. Did you make a note of that?
11   A. No, sir.
12   Q. It was just what appeared on your
13      time -- on the clock when you clocked
14      in?
15   A. No.  I can remember what time I clocked
16      in and when I clocked out.
17   Q. What time did you usually clock in when
18      you worked debone?
19   A. I can't say because it be -- sometime
20      it be more people in front of you when
21      you get there to clock in.  But they
22      only have one time clock in the break
23      room.

3e4538a9-4626-4792-abe6-e0f0d12c4392

50

1  Q. What shift did you work on debone?
2  A. I worked the first shift on debone.
3  Q. And what were the hours of first shift?
4  A. From 7:30 to 4:30.
5  Q. Was that 7:30 in the morning until
6     4:30?
7  A. Yes, sir.
8  Q. And when you started that 7:30 shift,
9     what time would you usually show up at
10    the plant?
11 A. Around seven o'clock.
12 Q. I take it from your last answer that
13    you've never kept any sort of diary or
14    notes as to -- or any other document
15    showing what you believe to be the
16    hours that you worked at the company?
17 A. No, sir.
18 Q. Do you know of anyone who did?
19 A. No, sir.
20 Q. Have you made any calculations as to
21    the time that you believe that you
22    worked that you weren't paid for?
23 A. No, sir.

51

1  Q. During both times that you worked at
2     Equity, were you ever asked or required
3     to stay and work overtime?
4  A. No, sir.
5  Q. So you told me that you were not a
6     union member, so I take it you never
7     filed any grievance with the union with
8     respect to --
9  A. No.
10 Q. -- any pay issues?
11 A. No, sir.
12 Q. Did you otherwise complain to anybody
13    about your pay?
14 A. No, sir.
15 Q. And with the exception of this lawsuit,
16    I gather that you've never filed any
17    claim with the department of labor or
18    any other governmental agency with
19    respect to your pay?
20 A. Can you repeat that?  I don't
21    understand that.
22 Q. Okay.  With respect to your
23    participation in this lawsuit, have you

52

1     ever filed any other complaints with
2     respect to the -- your allegations that
3     you weren't paid properly at Equity
4     with any other --
5  A. No, sir.
6  Q. -- government agency?
7  A. No, sir.
8  Q. I think you told me that you were
9     written up once because you weren't
10    wearing an item of clothing; is that
11    correct?
12 A. Yes.
13 Q. Is that the only time you were ever
14    subject to any discipline?
15 A. When I don't come to work, I skip a
16    day, I get writ up; or I leave early, I
17    get writ up; or come on the line late,
18    I get writ up.
19 Q. How many times did you leave -- were
20    you late that you got written up for?
21 A. I can't remember.
22 Q. More than once?
23 A. I don't know.

53

1  Q. More than five times?
2  A. I don't know.
3  Q. Were you -- you said you were written
4     up for leaving early?
5  A. Yes.
6  Q. How many times were you written up for
7     it?
8  A. I don't know.
9  Q. We're just about finished.
10       (Brief pause)
11 Q. Thank you.
12       MR. FRY:  That's all I have.
13       MR. UNDERWOOD:  Let's take a
14    quick break.
15       (Short recess)
16       EXAMINATION
17 BY MR. UNDERWOOD:
18 Q. During questions by defense counsel,
19    there were some times you mentioned
20    some of the items you were taking off.
21    You didn't mention gloves.  You had to
22    take those off at every break and put
23    them back on when you went back on the

3e4538a9-4626-4792-abe6-e0f0d12c4392

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

54

1      line; is that correct?
2    A. Yes.
3    Q. What about liners, did you do that with
4      liners as well?
5    A. Yes.
6    Q. Okay.  And the boots and the earplugs
7      and the hair net that you said
8      sometimes you wore from the house,
9      those were required for your job;
10     right?
11   A. Yeah, they were required.
12   Q. You could not go on the line without
13     those items --
14   A. No.
15   Q. -- on; is that correct?
16   A. Yes, that's correct.
17   Q. And if you did go on without those
18     items on, you would be written up?
19   A. Yes.
20       MR. UNDERWOOD:  That's all I
21     have.
22     (The deposition of Virginia Avery
23     concluded at 9:55 a.m. on May 21, 2008)

55

1        * * * * * * * * * *
2        REPORTER'S CERTIFICATE
3        * * * * * * * * * *
4      STATE OF ALABAMA
5      COUNTY OF MONTGOMERY
6        I do hereby certify that the above
7      and foregoing transcript was taken down
8      by me in stenotype, and the questions
9      and answers thereto were transcribed by
10     means of computer-aided transcription,
11     and that the foregoing represents a
12     true and correct transcript of the
13     testimony given by said witness.
14       I further certify that I am neither
15     of counsel, nor any relation to the
16     parties to the action, nor am I anywise
17     interested in the result of said case.
18
19
20
21     _____
       Bridgette W. Mitchell,
       Certified Court Reporter and
22     Commissioner for the State of
       Alabama at Large
23     ACCR No. 231 - Expires 9/30/08
       MY COMMISSION EXPIRES 1/25/2010

**TAB 11**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


NO.:  2:06-CV-1081-MEF


BETTY ANN BURKS, et al.,

      Plaintiff(s),

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

      Defendant(s).



DEPOSITION OF

PEARLINE BURKS

      JOB NO. 1101-58505



BEFORE:   Victoria M. Castillo

          Certified Court Reporter and

          Notary Public

          ACCR# 17, Expires 9/30/2008

**2**

1    In accordance with Rule 5(d) of
2    The Alabama Rules of Civil Procedure, as Amended,
3    effective May 15, 1988, I, Victoria M. Castillo, am
4    hereby delivering to HOWARD A. ROSENTHAL, ESQ. the
5    original transcript of the oral testimony taken on
6    the 23rd day of May, 2008, along with exhibits.
7        Please be advised that this is
8    the same and not retained by the Court Reporter,
9    nor filed with the Court.
10
11    S T I P U L A T I O N
12
13        IT IS STIPULATED AND AGREED, by
14    and between the parties through their respective
15    counsel, that the deposition of PEARLINE BURKS may
16    be taken before Victoria M. Castillo, Commissioner,
17    at WILLIAMS, POTTHOFF, WILLIAMS & SMITH, 125 South
18    Orange Avenue, Eufaula, Alabama 36027 on the 23rd
19    day of May, 2008.
20        IT IS FURTHER STIPULATED AND
21    AGREED that the signature to and the reading of the
22    deposition by the witness is waived, the deposition
23    is said to have the same force and effect as if

**3**

1    full compliance had been had with all laws and
2    rules of Court relating to the taking of
3    depositions.
4        IT IS FURTHER STIPULATED AND
5    AGREED that it shall not be necessary for any
6    objections to be made by counsel to any questions,
7    except as to form or leading questions, and that
8    counsel for the parties may make objections and
9    assign grounds at the time of trial, or at the time
10    said deposition is offered in evidence, or prior
11    thereto.
12        IT IS FURTHER STIPULATED AND
13    AGREED that notice of filing of the deposition by
14    the Commissioner is waived.
15
16
17
18
19
20
21
22
23

**4**

1    I N D E X
2
3    EXAMINATION BY:            PAGE NUMBER:
4    Mr. Fry                        6
5    Mr. Steensland                52
6
7    EXHIBITS:                  PAGE NUMBER:
8    P. Burks Exhibit 1            45
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**5**

1    A P P E A R A N C E S
2
3    FOR THE PLAINTIFF(S):
4        M. John Steensland, III, Esq.
5        PARKMAN, ADAMS & WHITE
6        739 West Main Street
7        Dothan, Alabama 36301
8
9    FOR EQUITY GROUP EUFAULA DIVISION
10        Gary D. Fry, Esq.
11        Pelino & Lentz
12        One Liberty Place
13        Thirty-Second Floor
14        1650 Market Street
15        Philadelphia, Pennsylvania 19103
16
17    ********************
18
19        I, Victoria M. Castillo, a Court
20    Reporter of Montgomery, Alabama, acting as
21    Commissioner, certify that on this date, as
22    provided by the Alabama Rules of Civil Procedure
23    and the foregoing stipulation of counsel, there

2f123edd-1e1f-4947-b4d5-1727822fdcf1

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

**6**

1  came before me at WILLIAMS, POTTHOFF, WILLIAMS &
2  SMITH, 125 South Orange Avenue, Eufaula, Alabama
3  36027, commencing at 9:47 a.m., PEARLINE BURKS, in
4  the above cause, for oral examination, whereupon
5  the following proceedings were had:
6
7         PEARLINE BURKS,
8    being first duly sworn, was examined and
9       testified as follows:
10
11  EXAMINATION BY MR. FRY:
12    Q.  Good morning, Ms. Burks.  How are
13  you?
14    A.  Fine.  How are you?
15    Q.  Good.  My name is Gary Fry.  I'm one
16  of the lawyers that's representing Equity Group
17  Eufaula, the folks that run the poultry plant out
18  in Baker Hill.
19    A.  Yes, sir.
20    Q.  And we've asked you to come today to
21  put some questions to you concerning the
22  allegations that have been made in a lawsuit which
23  you and some other folks have brought against

**7**

1  Equity.
2    A.  Yes, sir.
3    Q.  Have you ever been deposed before?
4    A.  No, sir.
5    Q.  It's a pretty simple procedure.  I
6  will ask you some questions, and you will be giving
7  me some answers and Victoria, who is our court
8  reporter, will be taking down what we say.  If you
9  don't understand my question, please let me know,
10  and I will try and rephrase it so hopefully you
11  will understand it.
12    A.  Yes, sir.
13    Q.  If you don't hear anything I say, let
14  me know, and I will repeat it.
15    A.  Okay.
16    Q.  She can only take down one of us at a
17  time, so let's not try and talk over one another.
18  Okay?
19    A.  Yes, sir.
20    Q.  And the last request I have is:  Any
21  answer that you give, make it verbal, because she
22  can't take down a shake or a nod of a head or an
23  um, or an huh-uh.  Okay?

**8**

1    A.  Yes, sir.
2    Q.  I know we all do it.  I do it too,
3  but we can't do it for this purpose.  What's your
4  home address?
5    A.  119 North Gay Street, Cusper(sic),
6  Georgia.
7    Q.  And what is your date of birth?
8    A.  12, 5th day, '56.
9    Q.  Are you currently employed?
10    A.  Yes.
11    Q.  And by whom?
12    A.  Equity Group.
13    Q.  How long have you worked for Equity?
14    A.  Four years.
15    Q.  Four years?
16    A.  Uh-huh.
17    Q.  When did you start?
18    A.  I have to count back four years ago.
19  I think I started 2002, I believe.
20    Q.  Okay.  So that would give you six
21  years?
22    A.  Yes.
23    Q.  So when you started the plant was

**9**

1  operated by CP?
2    A.  Yes, it was.
3    Q.  And that's Charoen Pokphand?
4    A.  Yes.
5    Q.  What is your current job at the
6  company?
7    A.  I work in debone.
8    Q.  On the line?
9    A.  Yes, sir.
10    Q.  How long have you worked on the
11  debone line?
12    A.  Three years.
13    Q.  What did you do before that?
14    A.  I worked as a bone checker.
15    Q.  How long did you do that job?
16    A.  Two years.
17    Q.  Any other jobs?
18    A.  I worked in pack-out.
19    Q.  Pack-out?
20    A.  Yes.
21    Q.  For how long?
22    A.  A year.
23    Q.  So when Equity took over in 2004, you

2f123edd-1e1f-4947-b4d5-1727822fdcf1

10

1  were a bone checker?
2     A.   Yes.
3     Q.   What shift do you work now?
4     A.   First shift.
5     Q.   Have you always worked first shift?
6     A.   Yes, I have.
7     Q.   What do you do in the debone line?
8     A.   I cut chicken.
9     Q.   And do you rotate positions on the
10 line with the other people in the line?
11    A.   Yes, sir.
12    Q.   How many times per day?
13    A.   Three times.
14    Q.   What did you do as a bone checker?
15    A.   I check the breast meat, check for
16 the bones.
17    Q.   And what did you do in pack-out?
18    A.   They pack the chicken in boxes, just
19 on just line, putting the product in the boxes.
20    Q.   When you were doing that, the product
21 was already packaged in plastic?
22    A.   No, we hold the boxes and let the
23 product come down in it.

11

1     Q.   Where did you perform that job?
2     A.   Where did I perform that job, sir?
3     Q.   Yes.
4     A.   I don't quite understand what you are
5  asking.
6     Q.   Okay.  Was the pack-out location in
7  the same building that debone and evisceration is
8  in?
9     A.   Yes, it is.
10    Q.   Who is your current supervisor?
11    A.   As of now, I don't know, sir.
12    Q.   Can you recall --
13    A.   Tracie -- well, it was Tracie.
14    Q.   Your debone supervisor?
15    A.   Yes, sir.
16    Q.   What is your current rate of pay?
17    A.   As of right now, sir?
18    Q.   Yes, ma'am.
19    A.   $10 an hour.
20    Q.   And when you started, what was it?
21    A.   It was $8.45, I believe.
22    Q.   How many hours a week do you work?
23    A.   Forty.

12

1     Q.   Monday through Friday?
2     A.   Yes, sir.
3     Q.   Have we identified all of the jobs
4  that you have performed at the poultry facility at
5  Baker Hill?
6     A.   Yes, sir.
7     Q.   Are you a member of the Union?
8     A.   Yes, sir.
9     Q.   And for how long have you been in the
10 Union?
11    A.   About a year.
12    Q.   Have you ever been a steward?
13    A.   No, sir.
14    Q.   Have you ever been on the negotiating
15 committee?
16    A.   No, sir.
17    Q.   Have you ever attended any Union
18 meetings?
19    A.   No, sir.
20    Q.   Am I correct that you are a party to
21 this lawsuit?
22    A.   Yes, sir.
23    Q.   How did you find out about the

13

1  lawsuit?
2     A.   I can't explain it, sir, because I
3  all I know is we received some papers.
4     Q.   From the lawyers?
5     A.   Yes, sir.
6     Q.   Did you have any conversations about
7  the lawsuit with your coworkers?
8     A.   No, sir.
9     Q.   Have you ever attended any meetings
10 that the lawsuit was discussed?
11    A.   No, sir.
12    Q.   What is your understanding as to what
13 claim you have in this lawsuit?
14         MR. STEENSLAND:  Objection.
15 Calls for a legal question.
16         MR. FRY:  You can answer.
17    A.   Getting paid for the hours that I
18 worked for PPE -- I mean, PPE for the hours that I
19 worked.
20    Q.   (Mr. Fry)  What's PPE?
21    A.   The supplies, taking time to put on
22 the supplies, wash them up, take them off.
23    Q.   How did you come to that

2f123edd-1e1f-4947-b4d5-1727822fdcf1

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

14

1  understanding that that was your claim?
2      A.    From the time it take me to put on my
3  equipment and the time it take me to take it off.
4      Q.    Have you ever been involved in any
5  other lawsuits?
6      A.    No, sir.
7      Q.    Did you review any documents to
8  prepare for coming here today?
9      A.    No.
10     Q.    Did you speak with anyone about your
11 deposition?
12     A.    No, sir.
13     Q.    Now, you mentioned supplies. Can you
14 tell me what supplies you were referring to that
15 you use when you work?
16     A.    Okay. That is the smock, the apron,
17 the gloves, the cotton liners, and the boots.
18     Q.    Anything else?
19     A.    And the cutting glove.
20     Q.    The mesh glove?
21     A.    Yes.
22     Q.    Anything else?
23     A.    No, sir.

15

1      Q.    We have the smock, the apron, the
2  gloves, and the liners, the boots --
3      A.    And the hair nets.
4      Q.    The boots, the mesh glove -- and now
5  the hair net?
6      A.    Yes, sir.
7      Q.    Anything else?
8      A.    No, sir.
9      Q.    These are the items that you wear on
10 the debone line?
11     A.    Yes.
12     Q.    Did you wear the same items when you
13 were a bone checker?
14     A.    Yes, I did.
15     Q.    What about when you worked pack-out?
16     A.    Yes, sir.
17     Q.    Same items?
18     A.    Same items.
19     Q.    Which of these items that you have
20 identified for me are you required to wear?
21     A.    The hair net, the boots, the cutting
22 gloves, the liners, the apron.
23     Q.    And the smock?

16

1      A.    And the smock.
2      Q.    So you are required to wear all these
3  items?
4      A.    All those items.
5      Q.    Was that true for each of your prior
6  jobs as a bone checker and in pack-out?
7      A.    Yes, it was.
8      Q.    Do all employees that, as you have
9  been able to observe in the debone area, do they
10 all wear the same stuff?
11     A.    Yes, sir.
12     Q.    There is no variation at all?
13     A.    No, sir.
14     Q.    Is it your understanding that you
15 will be written up if you don't wear any of this?
16     A.    Yes, we will.
17     Q.    And who told you that?
18     A.    My supervisor.
19     Q.    And was that true of your two prior
20 jobs at the plant?
21     A.    Yes, sir.
22     Q.    Did all the folks in pack-out wear
23 the identical same things?

17

1      A.    Yes, sir.
2      Q.    Which of these items that you have
3  identified for me are given to you by the company?
4      A.    Gloves are once a month.
5      Q.    Pardon?
6      A.    The gloves are given once a month for
7  free. The rest we have to pay for.
8      Q.    But you get them all from the
9  company?
10     A.    Yes, I do.
11     Q.    You have to pay for your smock?
12     A.    We don't pay for the smock. We pay
13 for the apron, sleeves, and gloves, and stuff like
14 that, just the material that we take home.
15     Q.    Have you always had to pay for those
16 items?
17     A.    Yes, I have.
18     Q.    Which of these items do you pick up
19 on a daily basis?
20     A.    The gloves -- the liners and the
21 plastic gloves.
22     Q.    Anything else?
23     A.    No, sir.

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

2f123edd-1e1f-4947-b4d5-1727822fdcf1

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

**18**

1   Q.   What about a smock?
2   A.   The smock is given free.
3   Q.   On a daily basis?
4   A.   On a daily basis we have to change
5   the smock.
6   Q.   Where do you pick these items up?
7   A.   The supply room.
8   Q.   And you pick them up after you arrive
9   for work in the morning?
10  A.   Yes, sir.
11  Q.   What are the hours of the first
12  shift?
13  A.   Eight hours, from 7:30 to 4:30.
14  Q.   And have you worked those same hours
15  throughout your whole six years at Equity?
16  A.   Yes, I have.
17  Q.   Which of these items, if any, can you
18  wear from home?
19  A.   The boots.
20  Q.   Do you have a locker at the plant?
21  A.   No, I doesn't, sir.
22  Q.   Do you take the apron home with you
23  at night?

**19**

1   A.   Yes, sir.
2   Q.   These items now that you have
3   identified for me, these items of supplies, where
4   do you put them on before you start working?
5   A.   Once we get inside the area where we
6   work at.
7   Q.   Once you get into the --
8   A.   Debone area.
9   Q.   -- the debone production floor?
10  A.   Yes, sir.
11  Q.   How soon before 7:30 do you go into
12  the debone production area to put these items on?
13  A.   Go in there about 7:25.
14  Q.   So it takes you about five minutes to
15  put this stuff on?
16  A.   It's from five to 15 minutes,
17  depending on how many people is in there.
18  Q.   Explain that to me.
19  A.   Of course there is a lot of us. We
20  all have to get up there to the line to put them
21  on, to the station where they have us to put them
22  on at, so you can wash them. Once you put them on,
23  you have to wash them.

**20**

1   Q.   So if you enter the production area
2   at 7:25 and it takes you 15 minutes, you are not
3   going to be on time, are you?
4   A.   That depends on whether the line is
5   running because it is so many of us going in at
6   once, that's in about 7:25.
7   Q.   So you all go in at 7:25?
8   A.   Well, it's so many of us, it might be
9   7:25 before you get to the door from the people
10  that is coming in.
11  Q.   How long does it take you to put this
12  stuff on?
13  A.   It takes me from about from five to
14  ten minutes.
15  Q.   Five to ten minutes to put on a smock
16  and an apron?
17  A.   Yes, we have to be quick.
18  Q.   Well, what do you have to do to put
19  the smock on?
20  A.   Okay.  You got to put the smock on,
21  tie it up, then put your apron on, then your
22  sleeves, your gloves, and everything, and get to
23  the wash sink to wash off before we get over to the

**21**

1   line.
2   Q.   We are just talking about putting it
3   on now.
4   A.   The smock?
5   Q.   You mentioned the sleeves.  Is that
6   another item that you --
7   A.   Yes, sir.  I'm sorry, I forgot about
8   the sleeve.
9   Q.   It's no problem.  How long does it
10  take you just to put the items on?
11  A.   It takes me from five to ten minutes
12  to put them on.
13  Q.   It takes you as long as ten minutes
14  to put on a smock, an apron, and sleeves, and
15  gloves?
16  A.   Yes, sir.  It's a lot to put on once
17  you start putting it on and tying it up.  You just
18  don't put it on and fasten it up, sir.
19  Q.   Is it hard to tie, your apron?
20  A.   You tie it in the back.
21  Q.   Is that difficult?
22  A.   Yes, it is, unless you standing
23  around a lot of people.

---

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

22

1    Q.    Is it difficult to button your smock?
2    A.    We don't button our smock. We have
3  to tie it up too in the back.
4    Q.    Is it difficult?
5    A.    Yes, sir.
6    Q.    Is it difficult to put on your liners
7  and your gloves?
8    A.    Yes, sir, especially when trying to
9  get them all on your hand. We have more than one
10  glove on -- yes, to put them up on your arm.
11    Q.    Is it difficult to put on those
12  sleeves?
13    A.    Yes, sir, they are, because you got
14  to pull them all the way up there.
15    Q.    Is that hard?
16    A.    Yes, sir, when you trying to get them
17  up there and get on the line.
18    Q.    I assume that your job now in the
19  debone line requires you to use a knife or
20  scissors?
21    A.    Yes, sir.
22    Q.    You use both those items?
23    A.    Yes, sir, I do.

23

1    Q.    And are they provided to you on the
2  line?
3    A.    Yes, sir.
4    Q.    And is the mesh glove provided to you
5  on the line?
6    A.    Yes, it is, sir.
7    Q.    You don't have to do anything to get
8  those items, do you?
9    A.    No, sir.
10    Q.    And after your shift ends, you don't
11  have to do anything to get rid of them, do you?
12    A.    No, sir.
13    Q.    And you don't have to maintain them
14  or sharpen them, do you?
15    A.    No, sir.
16    Q.    Did you use a knife when you were a
17  bone checker?
18    A.    No, sir.
19    Q.    So you didn't have a mesh glove at
20  that point?
21    A.    No, sir.
22    Q.    So there are some people that have
23  jobs in the debone area that they don't have to

24

1  wear all those items that you identified for me?
2    A.    No, sir. No, the only thing they
3  don't have to wear, sir, is the cutting gloves and
4  stuff.
5    Q.    What other stuff?
6    A.    Well, they don't have to wear the
7  cutting gloves; they don't have -- some don't even
8  have to wear the protective material we have on,
9  but they still wear everything that we wear because
10  it is required.
11    Q.    But some items are not required
12  depending on the job; is that correct?
13    A.    Yes, sir.
14    Q.    When you were at pack-out, you didn't
15  have to wear or use a knife, did you?
16    A.    No, sir.
17    Q.    And you didn't use a glove at that
18  point when you were working that job?
19    A.    Only the cotton liners and the blue
20  gloves. We have to use those.
21    Q.    I'm talking about when you were
22  working pack-out, you didn't have to wear those
23  items, did you?

25

1    A.    Yes, sir, I did.
2    Q.    When you working pack-out?
3    A.    When you working pack-out, you got to
4  have your sleeves on, and your cotton liners, and
5  your gloves on, and your apron.
6    Q.    Right. When you worked pack-out, you
7  did not have to use a knife, correct?
8    A.    No, sir, we didn't.
9    Q.    And you didn't have to use a mesh
10  glove?
11    A.    No, sir.
12    Q.    And you did have to wear a plastic
13  arm guard?
14    A.    No, sir.
15    Q.    On the debone line, besides a knife
16  or scissors, did you use any other tools or
17  equipment?
18    A.    No, sir.
19    Q.    When you worked as a bone checker,
20  did you have to use any tools?
21    A.    No, sir.
22    Q.    What about when you worked pack-out?
23    A.    No, sir.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

26

```
1    Q.    How many breaks do you get during
2  your shift?
3    A.    Three -- well, really it's two --
4  really it would be two.
5    Q.    Two breaks?
6    A.    Yes, sir.
7    Q.    And how long are the breaks?
8    A.    Supposed to be 30 minutes.
9    Q.    Did you get two 30-minute breaks when
10 you worked as a bone checker?
11   A.    Yes, sir.
12   Q.    Did you get the same breaks when you
13 were working pack-out?
14   A.    Yes, sir.
15   Q.    How do you know when it is time to
16 take your break?
17   A.    Well, when you look up the line and
18 see the line is stopping.
19   Q.    And is it true that some people in
20 the debone line leave for break before others?
21   A.    Yes, sir.
22   Q.    Because you are not allowed to leave
23 until the last bird passes your position?
```

27

```
1    A.    Yes, sir.
2    Q.    And when you were a bone checker, is
3  it true that you were pretty much the last person
4  to leave the line on break?
5    A.    Yes, sir.
6    Q.    Because you are at the end of the
7  line?
8    A.    Yes, sir.
9    Q.    What about pack-out, how did you know
10 when to take your break when you were working
11 pack-out?
12   A.    When the last piece of chicken come
13 down.
14   Q.    Now that you're on the debone line,
15 how do you know when it's time to end your break
16 and go back to work?
17   A.    Well, we know what time we supposed
18 to be back in there, so we all get up and go at the
19 same time.
20   Q.    When is your first break after your
21 7:30 start time?
22   A.    10:12.
23   Q.    10:12?
```

28

```
1    A.    Uh-huh.
2    Q.    And then that break lasts until when?
3    A.    We be back in there around about --
4  sir, I don't quite know because all I know I get up
5  and just -- I really don't look at the clock, sir.
6    Q.    You don't?
7    A.    No, sir, I never do.  I just know
8  what time I got to get up in there and just go back
9  in and then go to work.
10   Q.    You say you know what time you got to
11 get in there.  What time do you have to be in
12 there?
13   A.    If it's at 10:12, we back in there by
14 like eleven -- not quite eleven, sir, because I go
15 in there early sometimes.
16   Q.    Do you drive to work?
17   A.    Yes, I do.
18   Q.    Do you have to pass through security?
19   A.    Yes, sir.
20   Q.    And what does that entail?
21   A.    The gate, at the security gate.
22   Q.    And what do you have to do there?
23   A.    Really nothing.
```

29

```
1    Q.    You just drive through?
2    A.    Yes, sir, if you got a sticker on
3  your car.
4    Q.    And do you have a sticker on your
5  car?
6    A.    Yes, I do, sir.
7    Q.    Have you ever been searched?
8    A.    No, sir.
9    Q.    Have you ever been searched coming
10 out of work?
11   A.    No, sir, I haven't.
12   Q.    At the end of the day when you go by
13 that security shack, you can just drive right by
14 it, correct?
15   A.    Yes, sir.
16   Q.    What time do you try and get to the
17 plant in the morning?
18   A.    Around about seven o'clock.
19   Q.    And has that been true of you
20 throughout the time you've worked at the plant?
21   A.    Yes, sir.
22   Q.    Tell me what you do from 7 a.m. until
23 you start working at 7:30.
```

30

1    A.    I go and get my supplies, and I go
2    back to the break room, and I wait to go to work.
3    Q.    And what --
4    A.    I wait to go to work.
5    Q.    When do you clock in?
6    A.    I clock in at 7:15.
7    Q.    And do you do that in the break room?
8    A.    Yes, sir, I do.
9    Q.    So you go get your supplies before
10   you clock in?
11   A.    Yes, sir.
12   Q.    How long does it take you to get your
13   supplies?
14   A.    Depending on how long the line is,
15   sir.
16   Q.    What's the longest you've ever
17   waited?
18   A.    I have waited that bad, about a
19   whole.
20   Q.    Pardon?
21   A.    I wait a whole hour, depending on how
22   long the line is.
23   Q.    You have waited at the supply --

31

1    A.    About an hour.
2    Q.    -- room for a whole hour?
3    A.    For, yes, the whole hour because the
4    line will get longer.
5    Q.    And how many times have you waited a
6    whole hour?
7    A.    It mostly come on Mondays.
8    Q.    On Mondays?
9    A.    Yes, sir.
10   Q.    So do you come early on Mondays?
11   A.    Yes, sir, I do.
12   Q.    What time do you get there on
13   Mondays?
14   A.    I get there around about six o'clock.
15   Q.    Is there an hour wait at the supply
16   line every Monday?
17   A.    Yes, sir, it is.
18   Q.    How long do you have to wait in the
19   break room before it's time for you to go in and
20   start working?
21   A.    About 10 or 15 minutes.
22   Q.    You're not required to go get any
23   tools --

32

1    A.    No, sir.
2    Q.    -- before you start work?
3    A.    No, sir.
4    Q.    How long does it take you to walk
5    from the break room to the production area?
6    A.    About five minutes.
7    Q.    It's a five-minute walk?
8    A.    About -- from I would say about --
9    not quite five minutes.
10   Q.    How far is it?
11   A.    It's from the break room -- it's from
12   like from here to right there.  Like I said, we
13   have a line, a group of people going in.
14   Q.    I know, but that doesn't affect the
15   amount of distance, correct?
16   A.    Okay.  It's about -- not quite a
17   minute walk, you know.
18   Q.    It's right across the hall from the
19   break room, isn't it?
20   A.    Yes, sir, it is.
21   Q.    And the first thing you have to do
22   when you go to go into the production doors, you go
23   through two double doors --

33

1    A.    Yes, we do.
2    Q.    You have to wait.  You let me finish
3    my question.  You go through the initial double
4    doors and you go through a foot bath?
5    A.    Yes, sir.
6    Q.    Do you have to stop there?
7    A.    Yes, sir.
8    Q.    How long are you in that foot bath?
9    A.    About a minute.
10   Q.    And then you go through the double
11   doors into the production area?
12   A.    Yes, sir.
13   Q.    And that's when you put on your
14   supplies?
15   A.    Yes, sir.
16   Q.    And the procedure that you have
17   described for me that you do now that you are
18   working the debone line in the morning, your
19   arrival time, and what you do afterwards, is that
20   what pretty much what you did when you worked as a
21   bone checker?
22   A.    No, sir.
23   Q.    What was different when you worked as

2f123edd-1e1f-4947-b4d5-1727822fdcf1

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

34

1  a bone checker?
2      A.   The differences when I worked as a
3  bone checker.  Okay.  Sir, I didn't have to put on
4  all that stuff that they require, like, the chain
5  gloves, and everything like that.  I only walked up
6  there and stood at the end of the line.
7      Q.   So on a bone checker you didn't have
8  to put on so much stuff, correct?
9      A.   Not the cutting gloves and the arm
10  guard and stuff like that.
11      Q.   Well, were there -- is there other
12  stuff?
13      A.   No, sir, just the regular stuff to
14  put to on.
15      Q.   So the only difference in the routine
16  that you described for me -- the routine being what
17  you did from the time you arrived until you started
18  to work -- the only difference between what you do
19  now and what you did when you were a bone checker
20  is when you were a bone checker you didn't use the
21  arm guard and the mesh glove; is that correct?
22      A.   Yes, sir.
23      Q.   Again with reference to when you

35

1  worked in pack-out, did your morning routine
2  progress pretty much as you have described it to
3  me?
4      A.   Yes, sir.
5      Q.   Was anything different about it when
6  you worked in pack-out?
7      A.   No, sir.
8      Q.   Describe for me now what you need to
9  do to go on break in terms of your supplies.
10      A.   To go on break?
11      Q.   Yes, ma'am.
12      A.   I don't quite understand what you're
13  saying, sir.
14      Q.   You can't go into the break room with
15  your supplies on, can you?
16      A.   No, sir.
17      Q.   What do you have to do from the time
18  you leave your position on the debone line until
19  you get to the break room?
20      A.   Yes, sir.  We have to go get off the
21  line, go up there to the wash station, wash it off,
22  and take it off.
23      Q.   Then what do you do?

36

1      A.   Hang it on the stand that they have
2  for us, and then we go to break.
3      Q.   How long does that process take?
4      A.   Well, it takes me 15 minutes to get
5  off mine.
6      Q.   At every break period?
7      A.   Yes, because I be at the end of the
8  line.
9      Q.   Do all of the debone folks wash
10  before they leave the debone area?
11      A.   Yes, sir.
12      Q.   Describe for me now what you need to
13  do to get back to work after your break is over.
14      A.   I need to leave the break room, go
15  back into the area where I work at, put on all my
16  protective material I am supposed to put on, wash
17  it off, and then get on the line.
18      Q.   How long does that take you?
19      A.   Right about ten minutes.
20      Q.   Ten minutes?
21      A.   Yes, sir.
22      Q.   How much time do you spend in the
23  break room?

37

1      A.   What do I spend in the break room,
2  sir?  I don't understand what you mean by that.
3      Q.   Do you get a full 30-minute break?
4      A.   No, sir, because we have to get
5  everything --
6      Q.   How long is your break?
7      A.   Our break is supposed to be 30
8  minutes.
9      Q.   How long do you actually get?
10      A.   Well, I actually get around about 20.
11      Q.   So you told me that when it's time to
12  go on break, you spend 15 minutes getting to the
13  break room?
14      A.   Yes, sir.
15      Q.   Then you spend 20 minutes in the
16  break room?
17      A.   Yes, sir.
18      Q.   And then it takes you ten minutes to
19  get back on the line?
20      A.   Yes, sir.
21      Q.   That's 45 minutes?
22      A.   Yes, sir.
23      Q.   And does it typically take you about

2f123edd-1e1f-4947-b4d5-1727822fdcf1

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

38

1    45 minutes to do that?
2        A.    Yes, sir.  If you are at the end of
3    the line, you are going to be the last one that get
4    back in trying to get your stuff on.
5        Q.    So your break and everything that's
6    connected with it takes generally about 45 minutes?
7        A.    Yes, sir, it does.
8        Q.    So when you told me that on your
9    first break when you leave about 10:12, you have to
10   be back around eleven o'clock, correct?
11       A.    Yes, sir.
12       Q.    And does that same time structure
13   apply to the second break as well?
14       A.    Yes, it does, sir.
15       Q.    This routine that you have described
16   for me that you do when you go on break and come
17   off break, was that pretty much the same routine
18   that you followed when you were a bone checker?
19       A.    Yes, it is.
20       Q.    And did this same routine apply when
21   you were in pack-out?
22       A.    Yes, it does.
23       Q.    If you would now, would you take me

39

1    through what you need to do at the end of the day
2    to leave the plant from the time the product stops
3    coming to your workstation to when you exit the
4    plant?
5        A.    Okay.  I don't quite understand what
6    you're saying, sir.
7        Q.    What do you have to do to leave?  The
8    chicken stops coming, you have to take some things
9    off, you have to go certain places, don't you?
10       A.    Yes, sir.
11       Q.    Tell me what you do.
12       A.    I go to the wash station, wash off my
13   supplies, take it off, and leave out the double
14   doors to the break room, and clock out.
15       Q.    How long does that process take?
16       A.    About 15 minutes.
17       Q.    What do you do with the smock?
18       A.    The smock go back into the -- go back
19   to the plant.  They have a bin set right beside the
20   wall.
21       Q.    Do you discard any other items on a
22   daily basis?
23       A.    Depends on how good shape it's in.

40

1    My gloves, I mostly have to discard them because
2    they might have a hole in them.
3        Q.    Ms. Burks, what is your understanding
4    of how the company keeps track of your time in
5    order to pay you?
6        A.    I don't quite understand what you're
7    saying.
8        Q.    You're paid for an eight-hour day.
9    Is that your understanding?
10       A.    Yes, sir.
11       Q.    And do you have any understanding as
12   to how the company keeps track of that time?
13       A.    Time cards -- our time cards.
14       Q.    What time card are you referring to?
15       A.    The one that we clock in with.
16       Q.    Have you ever heard the phrase Master
17   Card?
18       A.    Yes, I have.
19       Q.    And does it have any meaning to you?
20       A.    Sir, I only know that the supervisor
21   have that.
22       Q.    And what's your understanding of what
23   the Master Card is?

41

1        A.    They clock you out and tell what time
2    you clock out.
3        Q.    Are you paid on the basis of Master
4    Card time?
5        A.    No, I'm not.
6        Q.    You are paid on the basis of when you
7    clock in, is that your understanding?
8        A.    Yes, that is my understanding, sir.
9        Q.    Have you ever had occasion to
10   complain to your supervisor about your paycheck?
11       A.    No, I haven't.
12       Q.    Do you get paid on a weekly basis?
13       A.    Yes, sir.
14       Q.    Do you check the payroll information
15   that's on the stub?
16       A.    Yes, I do, sir.
17       Q.    Going back a little bit -- the
18   routine that you describe for me that you follow at
19   the end of the day to leave the plant, do you
20   recall that?
21       A.    Yes, sir.
22       Q.    Was that the same as you followed
23   when you were a bone checker?

42

1     A.    Yes, sir.
2     Q.    And was it the same as when you were
3   working pack-out?
4     A.    Yes, sir.
5     Q.    Do you keep track of the hours that
6   you work each day?
7     A.    Yes, sir, I do.
8     Q.    How do you do that?
9     A.    I write it down.
10     Q.    You write it down?
11     A.    Yes, sir.
12     Q.    Where do you write it down?
13     A.    On my notepad in my break room.
14     Q.    Do you keep those records?
15     A.    Yes, sir, I do.
16     Q.    And how many of them do you have?
17     A.    I should have quite a few of them by
18   now.
19     Q.    Did your lawyer ask that you produce
20   those records to him?
21     A.    No, sir.
22     Q.    And how long have you been keeping
23   these records?

43

1     A.    About two years.
2     Q.    And why did you start keeping these
3   records?
4     A.    I just keep them, sir.
5     Q.    Explain to me what your records show.
6     A.    The hours that I work.
7     Q.    Based on what?
8     A.    From the time it take me to get in
9   there, get off the line, and clock back out.
10     MR. FRY:  John, I would ask that
11   you produce those records to us.
12     MR. STEENSLAND:  I don't think
13   that would be a problem.  Maybe when we get done
14   here, I can take it up with you.  I don't think
15   that would be a problem.
16     MR. FRY:  I don't anticipate that
17   would be a problem.  I was just making a request.
18   Thank you.
19     Q.    (Mr. Fry)  Do you know of anyone else
20   that keeps similar records of the hours?
21     A.    No, I don't.
22     Q.    Have you made any calculations as to
23   the amount of money which you think you are owed in

44

1   this lawsuit?
2     A.    No, I haven't.
3     Q.    In any of your jobs, were you ever
4   asked to work overtime?
5     A.    Yes, I was.
6     Q.    And when that occurred, were you paid
7   time-and-a-half for that time?
8     A.    Yes, sir.
9     Q.    Have you ever had any complaints
10   about how your overtime was computed?
11     A.    No, sir.
12     Q.    Have you ever filed a grievance with
13   the Union over any pay issue?
14     A.    No, I haven't.
15     Q.    Have you ever filed any grievance
16   with the Union?
17     A.    No.
18     Q.    Do you know of anyone who has ever
19   filed a grievance with the Union over any pay
20   issue?
21     A.    No, sir.
22     Q.    Have you ever been disciplined?
23     A.    No, sir.

45

1     Q.    We are almost done.
2     MR. FRY:  Could we mark this P.
3   Burks Exhibit 1, because there is more than one
4   Burks.
5       (WHEREUPON, a document was marked
6       as P. Burks Exhibit 1 and is
7       attached to the original
8       transcript.)
9     Q.    (Mr. Fry)  Ms. Burks, I am showing
10   you a document now that we have marked as P. Burks
11   Exhibit 1, and it is a document that's headed
12   Declaration, and under Paragraph 1 is your name, is
13   it not?
14     A.    Yes, sir.
15     Q.    Can you take a minute and review this
16   for me, and let me know when you have reviewed it?
17   I just have a few questions.  It won't take long.
18       (Plaintiff reviews P. Burks
19       exhibit 1.)
20     Q.    (Mr. Fry)  Okay.  Ms. Burks, is that
21   your signature on Page 3?
22     A.    Yes, sir.
23     Q.    Do you recall signing this document?

2f123edd-1e1f-4947-b4d5-1727822fdcf1

46

1      A.    Yes, sir.
2      Q.    And do you recall reading it before
3  you signed it?
4      A.    Yes, sir.
5      Q.    And when you read it, did everything
6  appear accurate to you?
7      A.    Yes, sir.
8      Q.    Do you know who prepared the
9  document?
10     A.    No, sir.
11     Q.    Do you recall when you signed it?
12  It's dated 24 February of 2007.
13     A.    Yes, sir.
14     Q.    Is that about the time you signed it?
15     A.    Yes, sir.
16     Q.    Where did you sign it?
17     A.    I can't quite remember right now,
18  sir.
19     Q.    And you don't recall who presented it
20  to you?
21     A.    Not at this time, sir.
22     Q.    I'd like to refer you first to
23  Paragraph 6 of the document.  It's on the first

47

1  page.
2      A.    Yes, sir.
3      Q.    And if you follow along with me.  I'm
4  going to read a portion of it, and we're going to
5  start at the beginning.  Quote, during my entire
6  employment with Defendant, I was not fully paid for
7  pre-production line and post-production line
8  activities that are necessary, integral, and
9  indispensable to my payroll employment
10  responsibilities, closed quote.  Did I read that
11  correctly?
12     A.    Yes, sir.
13           MR. STEENSLAND:  I am sorry,
14  "payroll", are you talking about overall?
15           MR. FRY:  Yes, overall.  Good
16  job.
17     Q.    (Mr. Fry)  And then the next sentence
18  starts:  Such as the time it takes to clear
19  security.  Do you see that?
20     A.    Okay.  I'm looking for that.
21     Q.    Very last line.
22     A.    Yes.  Okay, sir.
23     Q.    You are not making any claim in this

48

1  case for time to clear security, are you?
2      A.    No.
3           MR. STEENSLAND:  Objection.
4  Calls for a legal question.
5      Q.    (Mr. Fry)  Are you?
6           MR. STEENSLAND:  You can answer.
7      A.    No, sir.
8      Q.    (Mr. Fry)  Did you point out to
9  whoever gave you this document that this was
10  inaccurate?
11     A.    Not at this time, sir.  I don't
12  understand that.
13     Q.    Well, let me ask it this way.  In
14  this Declaration, which you say you reviewed and
15  you signed, you say in Paragraph 6 that you weren't
16  fully compensated for time, and part of that time
17  was the time it took to clear security.  And if you
18  go to the very end of the paragraph, you have
19  declared that you're claiming time for clearing
20  security at the end of the day, at the very end of
21  Paragraph 6.  Do you see that?
22     A.    Yes, sir, I see that.
23     Q.    You told me previously that you don't

49

1  expend any time clearing security, you just drive
2  on and off, correct?
3      A.    Yes, sir.
4      Q.    So you are not making a claim for
5  that time, are you?
6      A.    No, sir, I'm not.
7      Q.    And did you point that out to whoever
8  gave you this Declaration to sign?
9      A.    No, sir, I didn't.
10     Q.    Turn, if you would, to Page 2, and
11  I'm still on Paragraph 6, and if you go five lines
12  up from the end of that paragraph -- are you with
13  me?
14     A.    Yes, sir, I am.
15     Q.    Where the Declaration reads, quote,
16  waiting in line to return required supplies, tools,
17  and other equipment needed for line activities,
18  closed quote.  Do you see that?
19     A.    Yes, I see that.
20     Q.    Do you ever wait in line to return
21  any tools or supplies?
22     A.    No, sir, I don't.
23     Q.    You are not making a claim for that

50

1    in this case, are you?
2       A.   No, sir.
3       Q.   Did you point that out to the person
4    who gave you this Declaration?
5       A.   No, sir.
6       Q.   Is there any reason why you didn't?
7       A.   I didn't understand it, sir.
8       Q.   Didn't understand what?
9       A.   What you -- did I point it out to
10   this, tell them?
11      Q.   Yes, that that was inaccurate.
12      A.   No, sir, I didn't.
13      Q.   Is there any reason why you didn't?
14      A.   No, sir, I didn't.
15      Q.   Turn, if you would, now to Paragraph
16   10. And I would like you to refer to the second
17   full sentence in that paragraph, and I will read
18   it. Quote, numerous employees have expressed their
19   desire to join this litigation, but have not done
20   so to date because of fear of retaliation by
21   Defendant and its managers, period, closed quote.
22   Did I read that correctly?
23      A.   Yes, sir.

51

1       Q.   How many employees are you aware of
2    have not joined this lawsuit because they fear
3    retaliation from the company?
4       A.   I don't know any, sir.
5       Q.   Did you point that out to the person
6    who gave you this Declaration to sign?
7       A.   No, sir.
8       Q.   Is there any reason why you didn't?
9       A.   No, sir.
10      Q.   The last sentence in Paragraph 10
11   reads. Quote, to that end, Defendant and its
12   managers have attempted to discourage and/or
13   intimidate my coworkers from joining this lawsuit
14   by issuing both expressed and implied threats
15   involving job security, period, closed quote. Did
16   I read that correctly?
17      A.   Yes, sir.
18      Q.   Do you know of any coworkers who have
19   been threatened with loss of their job if they join
20   this lawsuit?
21      A.   No, sir.
22      Q.   Do you know of any of your coworkers
23   who were discouraged or in any way threatened or

52

1    intimidated about joining this lawsuit?
2       A.   No, sir.
3       Q.   Did you point it out to the person
4    who gave you this Declaration that that was
5    inaccurate?
6       A.   No, sir.
7       Q.   Is there any reason why you didn't?
8       A.   No, sir.
9            MR. FRY:  I have no further
10   questions.  Thank you.
11           MR. STEENSLAND:  Ms. Burks, I
12   have a few questions.
13
14   EXAMINATION BY MR. STEENSLAND:
15      Q.   Have you ever heard the term Personal
16   Protective Equipment -- or PPE, as it's sometimes
17   referred?
18      A.   Yes, sir.
19      Q.   When you were discussing the list of,
20   I believe Mr. Fry referred to them as supplies, you
21   named a few things. Could you please name the
22   things that you consider part of the PPE as you
23   understand it?

53

1            MR. FRY:  I'd just like to
2    object.  I used the word supplies because she did.
3            MR. STEENSLAND:  Maybe you both
4    used the word supplies.
5       Q.   (Mr. Steensland)  But you are
6    familiar with PPE, or that term?
7       A.   Yes, sir.
8       Q.   Could you please tell us what you
9    consider to be part of PPE?
10      A.   The hair net, the cutting gloves, the
11   cutting liners, the blue gloves, the apron, the
12   sleeves and the arm guard.
13      Q.   Is there a smock, is that --
14      A.   Yes.
15      Q.   How about boots?
16      A.   And the boots.
17      Q.   Ear plugs, you have to wear ear
18   plugs?
19      A.   Yes, I do.
20      Q.   Are all those that you listed, are
21   those considered part of PPE?
22      A.   Yes, it is.
23      Q.   In talking with Mr. Fry, you talked

54

1  about your two break periods. Do you remember
2  that?
3      A.   Yes, I do.
4      Q.   You said they are each 30 minutes
5  long?
6      A.   Yes, sir.
7      Q.   But you said that sometimes, or you
8  made reference to it taking up to 45 minutes from
9  the start of the break until you got back to the
10  line?
11      A.   Yes, sir.
12      Q.   That means you are late every time
13  from break?
14      A.   I said that, sir, because I usually
15  get in earlier. Some of them might not get back at
16  that time because it's -- once we get in there,
17  it's just enough room for a few people to get ready
18  right quick and get on the line.
19      Q.   What about do you work on the back of
20  the line or the front of the line?
21      A.   I work on the back of the line.
22      Q.   Okay. So you are one of the last
23  ones to leave for break?

55

1      A.   Yes, sir.
2      Q.   Breaks are 30 minutes?
3      A.   Yes, sir.
4      Q.   From when you leave the line when the
5  break starts if you are not back in 30 minutes,
6  what happens?
7      A.   You get wrote up.
8      Q.   Are you saying it always takes you 45
9  minutes to complete your break?
10      A.   No, it doesn't.
11      Q.   So you are you able to get the gear
12  off to leave for break, put the gear back on coming
13  back from the break, and get to your line within 30
14  minutes?
15      A.   Yes, we have to be in there on the
16  line when the line starts, sir.
17      Q.   When you first get to the plant in
18  the morning before you can put on your PPE, do you
19  have to sanitize your boots?
20      A.   Yes, we do.
21      Q.   Before we leave you clock out at the
22  end of the shift. Did you testify to that?
23      A.   Yes, sir.

56

1      Q.   What's the last thing that you do
2  before you swipe your card or clock out?
3      A.   You have to take the PPEs off.
4      Q.   And what's the last -- is there a
5  bin, I think -- or I can't remember how you
6  referred to it -- as a bin or a buggy?
7      A.   A bin they have they put the smocks
8  in.
9      Q.   Is that the last thing you do before
10  you --
11      A.   Leave the plant.
12      Q.   -- before you swipe your card to
13  clock?
14      A.   Yes.
15      Q.   In the time that you have worked for
16  Equity, you've worked for about three years on
17  debone. Did I hear you right?
18      A.   Right.
19      Q.   At any point in time were you
20  required to take your smock home?
21      A.   Yes, we was.
22      Q.   How did you get your smock? Did the
23  company issue them to you?

57

1      A.   We bought the smocks.
2      Q.   How many did you have at that point
3  in time?
4      A.   We had five.
5      Q.   And when you took them home with you,
6  what did you have to do with them?
7      A.   We have to wash them.
8      Q.   What happens if you didn't wash them?
9      A.   You couldn't wear them. They have an
10  odor to them, sir.
11          MR. FRY: I'm sorry I missed
12  that.
13      Q.   (Mr. Steensland) Did you say they
14  had an odor to them?
15      A.   Yes, they do, from the product.
16      Q.   Do you remember how long of a time
17  period it was that you had to take the smock home
18  with you and wash them while you worked for Equity
19  Group?
20      A.   No, sir, I can't recall.
21      Q.   But there was a period of time when
22  you had to do that?
23      A.   Yes, sir.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

58

1    Q.    Did that procedure change at some
2    point in time?
3    A.    Yes, sir, it did.
4    Q.    What happened then?
5    A.    They started washing them, and we
6    received them as we come to the plant before we go
7    in the room.
8    Q.    During that same period of time we
9    are discussing while you are working for Equity
10   Group, was there a point in time you could not wear
11   your boots out of the plant and wear them home?
12   A.    Yes, sir.
13   Q.    And what did you have to do during
14   that period of time that was required of you?
15   A.    Well, you put them on before you
16   leave the plant inside.  And before you come in you
17   got to take them off before you go outside, and
18   when you come in, you put them on when you get in
19   the plant.
20   Q.    At some point in time, did that
21   procedure change?
22   A.    Yes, sir, it did.
23   Q.    How long was it, if you can recall,

59

1    was it that you could not wear them outside the
2    plant, the boots?
3    A.    I can't quite say, sir.
4    Q.    When the procedure changed, what
5    about it changed, they allowed you to wear them
6    outside?
7    A.    Yes, sir, you wear your boots
8    outside.
9    Q.    Is that how you wear them now?
10   A.    Yes, sir.
11   Q.    I know we discussed with you leave
12   from break.  When you are coming back from break,
13   did everybody have to be back on the line at the
14   same time?
15   A.    Yes, sir.
16   Q.    You couldn't get back there just
17   before the chicken got to your part of the line?
18   A.    No, sir, you got wrote up.
19   Q.    At any point in time when you worked
20   on the line, had you ever been instructed to do any
21   stretching or exercising?
22   A.    Yes, sir.
23   Q.    Who tells you to do that?

60

1    A.    The line leader.
2    Q.    And would it be everybody in your
3    group or department or section that is doing these
4    exercises or stretching?
5    A.    Everyone in my department.
6    Q.    Can you describe -- obviously you
7    can't show it because the court reporter can't take
8    that down -- can you kind of describe what those
9    stretches or exercises are the best you can?
10   A.    Yes, sir, it's with your hand, using
11   your hand, working your fingers.
12   Q.    Squeezing them in and out?
13   A.    Yes, like that.  But squeezing your
14   hand out like that, and then you do the hand
15   backward.
16   Q.    Pulling them back?
17   A.    Yes, sir.
18   Q.    Anything with your arms or --
19   A.    Yes, sir.
20   Q.    -- bending over or anything?
21   A.    Yes, sir, we have to.
22   Q.    Arm circles?
23   A.    Yes, rotate your arms.

61

1    Q.    So there are several exercises you
2    have to do?
3    A.    Yes, sir.
4    Q.    What happens if you just chose not to
5    do them?
6    A.    You get wrote up.
7    Q.    And you are not doing these while the
8    chickens are passing by you, are you?
9    A.    No, sir, that's when you first come
10   in, sir.
11   Q.    And the shift starts at 7:30?
12   A.    Yes, sir.
13   Q.    Are there times when you had to do
14   them before 7:30, these exercises?
15   A.    No, sir, not that I know of.
16   Q.    Not that you can recall?
17   A.    No, sir.
18   Q.    Mr. Fry talked about some items that
19   were required for certain people that worked with
20   scissors or knives.  Do you remember that?
21   A.    Yes, sir.
22   Q.    And you mentioned some type of mesh
23   gloves or cutting gloves and an arm shield?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

62

1    A.    Yes, sir.
2    Q.    Other than that, is everything that
3    those employees working on those jobs wore the same
4    as yours?
5    A.    No, sir.  The ones that work in
6    pack-out doesn't have to wear all those.
7    Q.    What about on the line in debone?
8    A.    Debone we have to wear it.  Debone
9    wears.
10    Q.    The people that still have to wear
11    those mesh gloves or arm guards, do they still have
12    to take the rest of the items they wore off and
13    wash them down before they went to break?
14    A.    Yes, sir.
15    Q.    And before they came back?
16    A.    Yes, sir.
17    Q.    Before they left for the day?
18    A.    Yes, sir.
19    Q.    They worked the same shift as you
20    did?
21    A.    Yes, sir.
22        MR. STEENSLAND:  Nothing
23    further.

63

1        MR. FRY:  I have nothing
2    further.  Thank you very much.
3            10:49 a.m.
4        ************************
5        FURTHER DEPONENT SAITH NOT
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

64

1            CERTIFICATE
2
3    STATE OF ALABAMA
4    AT LARGE
5
6        I hereby certify that the above
7    and foregoing deposition was taken down by me in
8    stenotype and the questions and answers thereto
9    were transcribed by means of computer-aided
10    transcription and that the foregoing represents a
11    true and correct transcript of the testimony given
12    by said witness upon said deposition.
13        I further certify that I am
14    neither of counsel nor of kin to the parties to the
15    action, nor am I in anywise interested in the
16    result of said cause.
17
18
19
20
21
22    Victoria M. Castillo, Certified Court Reporter
      ACCR# 17, Expires 9/30/2008
23    Commissioner and Notary Public

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

2f123edd-1e1f-4947-b4d5-1727822fdcf1

**TAB 12**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06-CV-1081-MEF


BETTY ANN BURKS,

et al.,

        Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

        Defendant.



BEFORE:

        Cynthia M. Noakes, Commissioner

        and Certified Court Reporter


        DEPOSITION TESTIMONY OF

            LATOYA CORBITT


        * * * * * * * * * * * * * * * * * * * * * * * * * * * *

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

2

1      S T I P U L A T I O N

2          IT IS STIPULATED AND AGREED by and

3      between the parties through their respective

4      counsel, that the deposition of LATOYA CORBITT

5      may be taken before Cynthia M. Noakes, Court

6      Reporter, at the Law Offices of WILLIAMS,

7      POTTHOFF, WILLIAMS & SMITH, 125 South Orange

8      Avenue, Eufaula, Alabama 36027, on the 22nd day

9      of May, 2008.

10         IT IS FURTHER STIPULATED AND AGREED

11     that the signature to and the reading of the

12     deposition by the witness is waived, the

13     deposition to have the same force and effect as

14     if full compliance had been had with all laws and

15     rules of Court relating to the taking of

16     depositions.

17         IT IS FURTHER STIPULATED AND AGREED

18     that it shall not be necessary for any objections

19     to be made by counsel to any questions except as

20     to the form or leading questions, and that

21     counsel for the parties may make objections and

22     assign grounds at the time of the trial, or at

23

3

1      the time said deposition is offered in evidence,

2      or prior thereto.

3          IT IS FURTHER STIPULATED AND AGREED

4      that the notice of filing of the deposition by

5      the Court Reporter is waived.

6

7

8

9

10

11

12

13

14

15

16

17     *****************************************

18

19

20

21

22

23

4

1                    INDEX

2      EXAMINATION BY:              PAGE NUMBER:

3      MR. GOULD                    6-30

4      MR. CAMP                     30

5

6      EXHIBITS:

7      (No exhibits were

8      submitted to said deposition.)

9

10     Reporter's Certificate        31

11

12

13

14

15

16

17

18

19

20     *****************************************

21

22

23

5

1                 APPEARANCES

2

3      ON BEHALF OF THE PLAINTIFFS:

4          MR. ROBERT J. CAMP

5          THE COCHRAN FIRM, P.C.

6          ATTORNEYS AT LAW

7          505 North 20th Street

8          Suite 825

9          Birmingham, Alabama 35203

10         (205) 244-1115

11

12     ON BEHALF OF THE DEFENDANT:

13         MR. MALCOLM S. GOULD

14         PELINO & LENTZ

15         ATTORNEYS AT LAW

16         One Liberty Place

17         Thirty-Second Floor

18         1650 Market Street

19         Philadelphia, Pennsylvania 19103

20         (215) 665-1540

21

22     *****************************

23

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

29b07d5b-a0c2-4b4b-a6f9-865fb5013a7b

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

**6**

1  I, CYNTHIA M. NOAKES, a Certified
2  Court Reporter of Eufaula, Alabama, acting as
3  Commissioner, certify that on this date, as
4  provided by the Alabama Rules of Civil Procedure
5  and the foregoing stipulation of counsel, there
6  came before me at the Law Offices of WILLIAMS,
7  POTTHOFF, WILLIAMS & SMITH, 125 South Orange
8  Avenue, Eufaula, Alabama 36027, beginning at
9  1:30 p.m., LATOYA CORBITT, witness in the above
10  cause, for oral examination, whereupon the
11  following proceedings were had:
12
13      LATOYA CORBITT,
14  being first duly sworn, was examined and
15      testified as follows:
16
17      THE COURT REPORTER:  Usual
18  stipulations?
19      MR. CAMP:  Yes.
20      MR. GOULD:  Yes.
21
22      EXAMINATION
23  BY MR. GOULD:

---

**7**

1  Q.  Good afternoon, ma'am.
2  A.  Good afternoon.
3  Q.  My name is Malcolm Gould.  I'm an attorney
4  from the law firm of Pelino & Lentz in
5  Philadelphia.  I represent Equity Group Eufaula
6  Division, LLC, in a lawsuit filed in Federal Court
7  in the Middle District of Alabama.  You are a
8  plaintiff in that lawsuit, and we're here today to
9  take your deposition.
10      Now, I'm going to give you a few ground
11  rules for the deposition that hopefully will make
12  it move more smoothly.
13      As you can see, we have a court reporter
14  here who is going to take down my questions and
15  your answers.  For that reason, I'd ask that you
16  keep all of your answers verbal.  Say yes or no
17  instead of nodding your head or shrugging your
18  shoulders or saying uh-huh or huh-uh.  It will
19  make it easier for her to take down what your
20  answers to my questions are.
21      I'd also ask that you wait until I finish my
22  question before you give your answer.  That will
23  make her job easier when we're not talking over

---

**8**

1  each other; and it will also make sure that you
2  hear my full question before you give your answer.
3  A.  Yes, sir.
4  Q.  If, during the course of the deposition, I
5  ask a question and you don't understand my
6  question, just let me know.  I'll either repeat
7  the question or try and ask the question a
8  different way so it's not so confusing.
9      If, during the course of the deposition, you
10  just don't know or don't remember an answer, "I
11  don't know" or "I don't remember" is an acceptable
12  answer.  I'd much rather you do that than try and
13  guess.  Okay?
14  A.  Okay.
15  Q.  Ma'am, could you please state your full name
16  for the record?
17  A.  Latoya Monique Corbitt.
18  Q.  And are you currently employed?
19  A.  No, sir.
20  Q.  Ms. Corbitt, what is your home address?
21  A.  P.O. Box 801, Fort Gaines, Georgia 39851.
22  Q.  Is that your street address?
23  A.  310 Jackson Street.

---

**9**

1  Q.  Ms. Corbitt, when was the last time you
2  worked at the chicken processing plant over in
3  Baker Hill?
4  A.  It was '03 to '04.
5  Q.  Do you remember when in 2004 you stopped
6  working at the plant?
7  A.  In January.
8      MR. CAMP:  When did Equity Group buy --
9  did you say March was when Equity bought CP?
10      MR. GOULD:  It was in February.
11  February or March of 2004.
12      MR. CAMP:  And Equity Group didn't take
13  on any of the liabilities of CP?
14      MR. GOULD:  I'm not certain.  I can't
15  testify as to that, if you're asking me to
16  testify.
17      MR. CAMP:  Well, I'm just wondering if
18  Equity took over the liabilities or if it was an
19  asset transfer or what was the deal.  Because
20  y'all have been asking questions about CP and then
21  questions about Equity Group, and so I'm wondering
22  what the relationship is there.
23      MR. GOULD:  My understanding is that it

---

10

1  was a simple asset purchase so liabilities were
2  not transferred.
3      To the extent that we're asking questions
4  about CP, it is discovery. It may or may not lead
5  to the discovery of admissible evidence, but what
6  we can ask about in discovery may very well go
7  beyond what --
8      MR. CAMP: Sure. I'm not --
9      MR. GOULD: -- any liability is.
10     MR. CAMP: And I'm not disputing that.
11  I was just wondering if you have seen the purchase
12  agreement. Because we haven't had a copy of it.
13  And y'all represented that y'all bought it and
14  that there was no liability for CP. And I just
15  want to make sure, since we've got plaintiffs here
16  that worked for CP and possibly not for Equity.
17     MR. GOULD: My understanding -- and I
18  have not looked at the purchase agreement
19  recently, however, I know it's an asset purchase
20  agreement -- is that that there is no assumed
21  liabilities before the closing date, unless they
22  were ones that were specifically listed on some
23  sort of schedule; which, once again, I cannot

11

1  definitively answer one way or the other.
2      MR. CAMP: Okay.
3      MR. GOULD: I will tell you that I
4  believe Ms. Corbitt did actually work at the plant
5  past January of 2004.
6      MR. CAMP: Okay. That's good.
7      MR. GOULD: And I think even on her
8  consent, she indicated that -- oh, no. On her
9  consent she indicated that she worked through
10  January of 2004.
11     MR. CAMP: Do you have the record
12  there? I mean, do you actually know the day she
13  worked?
14     MR. GOULD: According to our records,
15  it looks like she worked there until May of 2004.
16  That's, at least, when the termination was
17  recorded. She may not have worked there after
18  that date. Once again, I can't tell you one way
19  or another what happened with that.
20     MR. CAMP: Okay.
21  (BY MR. GOULD)
22  Q.  But you were understanding that you did not
23  work at the plant after January of 2004?

12

1  A.  Uh-huh.
2  Q.  Yes?
3  A.  Yes, sir.
4  Q.  During the time that you worked at the
5  plant, what's your understanding of the company,
6  the name of the company that was employing you?
7  A.  Charoen Pokphand.
8  Q.  And at the time you stopped working at the
9  plant, do you have an understanding of the name of
10  the company that was employing you?
11  A.  Charoen Pokphand.
12  Q.  During the time that you worked at the
13  plant, were you a member of the union?
14  A.  No, sir.
15  Q.  Did you ever attend any union meetings while
16  you were employed at the plant?
17  A.  No, sir.
18  Q.  During the time that you worked at the
19  plant, at the time of the end of your employment,
20  what department or position were you working in?
21  A.  In debone.
22  Q.  Were you working on the debone line?
23  A.  Yes, debone line.

13

1  Q.  Did you work on a debone line the entire
2  time you were employed at the plant?
3  A.  Yes, sir.
4  Q.  How did you first learn about this lawsuit?
5  A.  Someone had told me that worked out here and
6  gave me the number to call.
7  Q.  Do you remember who that was?
8  A.  No, sir.
9  Q.  So they gave you a phone number to call to
10  sign up for the lawsuit?
11  A.  Yes, sir.
12  Q.  And what is your understanding as to what
13  your claims in this lawsuit are?
14  A.  To get all the hours that I worked from the
15  time that I was there until the time I left.
16  Q.  When you stopped working at the plant in
17  2004, did you quit or were you fired?
18  A.  I quit.
19  Q.  And what was the reason that you left the
20  plant?
21  A.  For some CNA classes.
22  Q.  So you stopped your job to go to school?
23  A.  Yes, sir.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

14

1   Q.   Since you became a plaintiff in this
2   lawsuit, other than discussions with your
3   attorney, have you discussed this lawsuit with
4   anybody else?
5   A.   No.
6   Q.   Have you attended any group meetings where
7   the lawsuit was discussed, once again, where your
8   attorneys were not present?
9   A.   No.
10  Q.   Have you attended any group meetings at all
11  where this lawsuit has been discussed?
12  A.   No.
13  Q.   In preparation for your deposition today,
14  did you meet with your attorneys?
15  A.   Yes.
16  Q.   When did you meet with your attorneys?
17  A.   When I got here this morning.
18  Q.   Okay.  Other than meeting with your
19  attorneys today, did you meet with them any other
20  time to prepare for your deposition?
21  A.   The other day.
22  Q.   Another day this week?
23  A.   Yes, sir.

15

1   Q.   Do you know whether there was anybody at the
2   meeting the other day this week, other than your
3   attorneys and plaintiffs in this lawsuit?
4   A.   No.
5   Q.   Did you bring anyone with you to the
6   meeting?
7   A.   No.
8   Q.   During the time that you worked on the
9   debone line, were there any items of clothing or
10  equipment that you had to wear when you were out
11  on the production floor?
12  A.   Yes.
13  Q.   What were those items?
14  A.   Hair net, earplugs, gloves, smock, boots,
15  and the arm guard.
16  Q.   Did you have to wear an apron?  A plastic
17  apron?
18  A.   Yeah, the smock.
19  Q.   And did you also have to wear like a white
20  cloth smock?
21  A.   Yes.
22  Q.   And did you have to wear blue plastic
23  sleeves?

16

1   A.   Yeah.
2   Q.   Was there anything else you can think of?
3   A.   No, sir.
4   Q.   Did you work one particular shift when you
5   worked at the plant?
6   A.   Yes, sir.  The third.
7   Q.   What time did that shift start?
8   A.   Eleven to seven.
9        MR. CAMP:  Can you give me one minute?
10       MR. GOULD:  Sure.
11       (A brief recess was taken.)
12  (BY MR. GOULD)
13  Q.   So 11 p.m. to 7 a.m.?
14  A.   Yes, sir.
15  Q.   And was that the same shift you worked the
16  entire time you worked at the plant?
17  A.   Yes, sir.
18  Q.   And during the time that you worked at the
19  plant, would you normally drive yourself to work?
20  A.   No.  It was a van that picked up workers.
21  Q.   A van that was organized by the company?
22  A.   No.
23  Q.   Who was it organized by?

17

1   A.   I forgot the people's name.  I done forgot;
2   it's been so long ago.
3   Q.   Did you pay to ride on the van?
4   A.   Yes.
5   Q.   When you would arrive at the plant, did you
6   have to go through any sort of security?
7   A.   Just the gate and that was all.
8   Q.   So you would just have to drive past the
9   gate at the guard shack on the driveway?
10  A.   Yes, sir.
11  Q.   Was there any security that you had to clear
12  inside the plant?  Any sort of metal detectors or
13  turnstiles?
14  A.   No, sir.
15  Q.   You could just walk into the door of the
16  plant?
17  A.   Yes, sir.
18  Q.   Can you describe for me what you would do
19  when you first entered the plant?
20  A.   We'd get there, we'd get the supplies we
21  needed, sit around in the break room, whatever;
22  and when it's time to go to work, we would wash
23  down and get dressed and have to be on the line by

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

18

1   the time it start running.
2   Q.   Okay.  Let me try and break that down a
3   little bit.  During the time that you were working
4   at the plant, could you wear your boots in from
5   the parking lot?
6   A.   Yes, sir.
7   Q.   And that was the same during the entire time
8   you worked at the plant?
9   A.   Yes, sir.
10  Q.   And would you normally wear your boots in?
11  A.   Yes, sir.
12  Q.   And then you would enter into the plant
13  through the plant doors into the building?
14  A.   Yes.
15  Q.   And what's the very next thing you would do?
16  A.   Just like I said, just get the equipment I
17  needed, sit down, wait until it's time to go to
18  work; and when it's time to go, wash down and get
19  dressed for work and have to be ready and prepared
20  to work by the time they start running the lines.
21  Q.   Now, you said you would pick up supplies; is
22  that correct?
23  A.   Uh-huh.

19

1   Q.   Where would you get your supplies?
2   A.   From the supply room.
3   Q.   And what supplies would you get from there?
4   A.   Whatever we needed.
5   Q.   Were there things that you would have to get
6   every day at the supply room?
7   A.   Yeah.  Like hair nets and earplugs and
8   stuff, and gloves.
9   Q.   Were you allowed to take your smocks home
10  with you?
11  A.   Yes.
12  Q.   And were you responsible for washing your
13  smock and bringing a smock with you when you
14  reported to work?
15  A.   Uh-huh.
16  Q.   Is that a yes?
17  A.   Yes.
18  Q.   Now, in terms of gloves, what kind of gloves
19  did you wear?
20  A.   I can't think of the name because it's been
21  so long since I worked out there.
22  Q.   Were they rubber gloves?
23  A.   Yeah.  Those, and the cotton gloves that

20

1   goes up under the blue.
2   Q.   Would you be able to wear them more than one
3   day?
4   A.   Yes.
5   Q.   Would you take your cotton gloves home with
6   you at the end of the day and wash them?
7   A.   Yes, sir.
8   Q.   And with the rubber gloves, would you need
9   to get new rubber gloves every day?
10  A.   Yes, sir.
11  Q.   So you would get new rubber gloves every
12  single day?
13  A.   Yes.
14  Q.   And then after you got whatever supplies you
15  needed, what would you do next?
16  A.   Like I said before --
17  Q.   Well, would you go into the break room?
18  A.   Yes.
19  Q.   And what would you do there?
20  A.   Wait until it was time to go to work.
21  Q.   Would you clock in at some point in time?
22  A.   Yes.
23  Q.   When would you clock in?

21

1   A.   When I got there.
2   Q.   After you went to the supply desk?
3   A.   No, before.
4   Q.   So you would go to the break room first and
5   clock in?
6   A.   Yes.
7   Q.   And then you would go to the supply desk?
8   A.   Yes.
9   Q.   All right.  Then you would go back into the
10  break room after going to the supply desk and you
11  would sit and wait?  Is that what you said you
12  would do?
13  A.   It depends on how long the line is, because
14  you have to wait.
15  Q.   The line where?
16  A.   At the supply room.
17  Q.   And at what time would you make your way to
18  the production floor?
19  A.   Before 11, before it's time to go to work.
20  Q.   Would there be a particular time you would
21  normally leave the break room?
22  A.   About five minutes 'til, so you can go on
23  and get set up and stuff.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

22

1   Q.   And as you were sitting in the break room,
2   what items would you be wearing, if any?
3   A.   Just the hair net and the earplugs.
4   Q.   And your boots?
5   A.   Yeah and the boots.
6   Q.   All right. After you left the break room
7   and made your way towards the production floor,
8   what would you do next?
9   A.   Just like I said, just wait until it feels
10  time to go to work. That's all.
11  Q.   I asked you what you would do when you left
12  the break room and would walk through the
13  production doors.
14  A.   Get set up, washed down and all that, and
15  just get prepared. Put on your PPE and just go to
16  work.
17  Q.   Approximately how long would it take you
18  from the time you walk through the production
19  doors to the time you got to your place on the
20  line?
21  A.   I'm not for sure.
22  Q.   Were you normally at your spot on the line
23  in time for when the line started?

23

1   A.   Yes.
2   Q.   And you normally left the break room around
3   five minutes before 11; is that correct?
4   A.   Yes.
5   Q.   Did you get any breaks during the time that
6   you were employed at the plant?
7   A.   Yes.
8   Q.   And how many breaks would you get in a
9   normal day?
10  A.   Two.
11  Q.   And how long were the breaks?
12  A.   15- and a 30-minute break.
13  Q.   Do you know whether those breaks were paid
14  or unpaid?
15  A.   Unpaid.
16  Q.   And did your 15-minute break come first and
17  then your 30-minute break came after that?
18  A.   Yes.
19  Q.   How would you know when it was time for you
20  to leave the break room for your 15-minute break?
21  A.   Everybody would start leaving. And we'll
22  have to wait until the chickens come down the
23  line, and we'll be able to leave.

24

1   Q.   So once the chicken passed whatever position
2   you were at on the line, you could then leave?
3   A.   Yes.
4   Q.   And what would you do after the chicken
5   passed your position on the line?
6   A.   Go wash down and hang up all the equipment
7   and go to the break room.
8   Q.   Now, approximately how long would it take
9   you from the time that the last bird passed you on
10  the line until the time that you were able to go
11  out to the hallway and go into the break room?
12  A.   Say about seven, eight minutes.
13  Q.   Once you passed through the doors of the
14  production area, would you normally go into the
15  break room?
16  A.   No. I'd get supplies I needed, if I needed
17  any.
18  Q.   During your break?
19  A.   No.
20  Q.   That's what I'm talking about here. I asked
21  you what you would do before you left for break.
22       After you did those things you mentioned,
23  what would you do next?

25

1   A.   Just sit down for a break until it was time
2   to go back.
3   Q.   All right. Now, for your 15-minute break,
4   how long would you normally sit down in the break
5   room?
6   A.   Probably a good five minutes.
7   Q.   How would you know when it was time to
8   return from break?
9   A.   Everybody would start getting up and going
10  back to work.
11  Q.   Can you describe for me what you would do
12  when you returned from break?
13  A.   Go back, wash down, put on the equipment,
14  and have to be back on the line before it started
15  back up. That's all.
16  Q.   So can you estimate how long it would take
17  you to do all those things from the time that you
18  entered the production doors until the time that
19  you got back on the line?
20  A.   No.
21  Q.   So you're not sure how long it took you to
22  come back from break and get onto the line?
23  A.   No.

29b07d5b-a0c2-4b4b-a6f9-865fb5013a7b

26

1   Q.  And would that also be true for your second
2 break, your 30-minute break? You're not sure how
3 long it would take you to get back from the break
4 room onto your position on the line?
5   A.  No, sir.
6   Q.  No, you're not sure or no, that's not true?
7   A.  I'm not sure.
8   Q.  What about leaving for break for your second
9 break? Were the things you would do leaving for
10 your second break be the same things you would do
11 leaving for your first break?
12   A.  Yes, sir.
13   Q.  And the amount of time it would take, was it
14 the same?
15   A.  No.
16   Q.  It would take a different amount of time
17 leaving for your second break than it would
18 leaving for your first break?
19   A.  Yeah.
20   Q.  Can you explain to me what you would do when
21 you were leaving for your second break?
22   A.  I would just have to wait until the chickens
23 come down and then leave and just go on to break.

27

1   Q.  When you left the line, your position on the
2 line, what would you do? What's the next
3 step you would take?
4   A.  I would wash down, take my supplies off, and
5 go and sit down and try to eat. That's all.
6   Q.  Approximately how long would it take you
7 from the time you left your spot on the line until
8 the time you left the production doors?
9   A.  I don't know. I'm not for sure.
10   Q.  During the time you were working on the
11 debone line, would you rotate between different
12 positions?
13   A.  Sometimes.
14   Q.  And when would you rotate?
15   A.  Not very often.
16   Q.  Would you normally go to a different
17 position when you returned from a break?
18   A.  No. I always be at my same spot at the end.
19   Q.  So you would report to one position on the
20 line at the start of your shift; is that correct?
21   A.  Uh-huh.
22   Q.  Then would you still be at the same position
23 when you left for your first break?

28

1   A.  Yes.
2   Q.  Then when you returned from your first break
3 would you go to your same position?
4   A.  Yes.
5   Q.  And would you still be at that same position
6 when you left for your second break?
7   A.  Yes.
8   Q.  And when you returned from your second break
9 would you go to the same position or a different
10 position?
11   A.  The same.
12   Q.  So during the course of a day you would stay
13 at the same position the entire day?
14   A.  Yeah, just about.
15   Q.  Did your shift have a scheduled end time?
16   A.  What you mean by that, sir?
17   Q.  Would your shift normally end at the same
18 time every day?
19   A.  Yes.
20   Q.  And the same as when you were leaving for
21 breaks, you could leave at the end of your shift
22 once the chicken reached your spot on the line?
23   A.  Yes.

29

1   Q.  Can you describe for me what you would do at
2 the end of your shift, before you left the
3 production floor?
4   A.  Wait for the chicken to come down and leave,
5 go up, wash down, and just leave out. That's all.
6   Q.  So you would rinse or wash off your apron
7 and gloves and sleeves; is that right?
8   A.  Yes.
9   Q.  And then you would take your items off; is
10 that correct?
11   A.  Yes.
12   Q.  Would your boots still be on?
13   A.  Yes.
14   Q.  And you would take off those items and you
15 would exit the floor?
16   A.  Yes, sir.
17   Q.  And then would you go someplace to clock
18 out?
19   A.  Yes, sir. To the break room.
20   Q.  And would you wear your boots home?
21   A.  Yes.
22   Q.  Do you have an idea as to how long it would
23 take you from the time you left your spot on the

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

30

1    line to the time you exited the production floor?
2    A.   No.
3    Q.   Those are all the questions I have.
4    BY MR. CAMP:
5    Q.   Do you know if you've ever received a
6    paycheck from Equity Group?
7    A.   No, sir.
8    Q.   No, you've never received one or no, you
9    don't know?
10    A.   I never have.
11    Q.   That's it.
12         MR. GOULD:  I have no other questions.
13
14    (The deposition was concluded.)
15
16
17
18
19
20
21
22
23

31

1         C E R T I F I C A T E
2
3    STATE OF ALABAMA
4    BARBOUR COUNTY
5
6         I hereby certify that the above and
7    foregoing deposition was taken down by me in
8    stenotype and the questions and answers thereto
9    were transcribed by means of computer-aided
10    transcription, and that the foregoing represents
11    a true and correct transcript of the testimony
12    given by said witness upon said hearing.
13         I further certify that I am neither of
14    counsel, nor kin to the parties to the action,
15    nor am I in anywise interested in the result of
16    said cause.
17
18
19         CYNTHIA M. NOAKES, Commissioner
20         Certified Court Reporter,
21         ACCR #327 - Expires 09/30/2008
22
23    Commission Expires 07/08/2009

29b07d5b-a0c2-4b4b-a6f9-865fb5013a7b

**TAB 13**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


BETTY ANN BURKS, et al.,

    Plaintiffs,


vs.  CIVIL ACTION 2:06-cv-01081-MEF-DRB


EQUITY GROUP EUFAULA DIVISION, LLC,

    Defendant.


\*   \*   \*   \*   \*   \*

    DEPOSITION OF BARBARA ANN DARBY,
taken pursuant to notice and
stipulation on behalf of the Defendant,
at Williams, Pothoff, Williams & Smith,
125 South Orange Avenue, Eufaula,
Alabama, before Bridgette Mitchell,
Shorthand Reporter and Notary Public in
and for the State of Alabama at Large,
on May 21, 2008, commencing at
11:12 a.m.

2

```
1              APPEARANCES
2
3   FOR THE PLAINTIFFS:
4   Carl E. Underwood, III, Esquire
5   COCHRAN, CHERRY, GIVENS & SMITH
6   163 W. Main Street
7   Dothan, Alabama 36301
8
9   M. John Steensland, III, Esquire
10  PARKMAN, ADAMS & WHITE
11  739 West Main Street
12  Dothan, Alabama 36301
13
14  FOR THE DEFENDANT:
15  Gary D. Fry, Esquire
16  PELINO & LENTZ
17  One Liberty Place
18  Thirty-second Floor
19  Philadelphia, Pennsylvania 19103
20
21
22
23
```

4

```
1          It is further stipulated and
2   agreed by and between counsel
3   representing the parties in this case
4   that the filing of the deposition of
5   BARBARA ANN DARBY is hereby waived and
6   that said deposition may be introduced
7   at the trial of this case or used in
8   any other manner by either party hereto
9   provided for by the Statute, regardless
10  of the waiving of the filing of same.
11         It is further stipulated and
12  agreed by and between the parties
13  hereto and the witness that the
14  signature of the witness to this
15  deposition is hereby waived.
16
17              INDEX
18
19  EXAMINATION              Page
20  By Mr. Fry....................... 5
21
22
23
```

3

```
1             STIPULATIONS
2          It is hereby stipulated and
3   agreed by and between counsel
4   representing the parties that the
5   deposition of BARBARA ANN DARBY is
6   taken pursuant to notice and
7   stipulation on behalf of the Defendant;
8   that all formalities with respect to
9   procedural requirements are waived;
10  that said deposition may be taken
11  before Bridgette Mitchell, Shorthand
12  Reporter and Notary Public in and for
13  the State of Alabama at Large, without
14  the formality of a commission; that
15  objections to questions, other than
16  objections as to the form of the
17  questions, need not be made at this
18  time, but may be reserved for a ruling
19  at such time as the deposition may be
20  offered in evidence or used for any
21  other purpose as provided for by the
22  Civil Rules of Procedure for the State
23  of Alabama.
```

5

```
1          BARBARA ANN DARBY, having first
2   been duly sworn or affirmed to speak
3   the truth, the whole truth, and nothing
4   but the truth, testified as follows:
5             EXAMINATION
6   BY MR. FRY:
7   Q. Good morning, Ms. Darby. I just
8      introduced myself to you, but, again,
9      my name is Gary Fry and I'm one of the
10     lawyers representing Equity Group
11     Eufaula, the folks that operate the
12     plant out in Baker Hill.
13  A. Yes, sir.
14  Q. And we have asked you here today to put
15     some questions to you concerning a
16     lawsuit which you and some other folks
17     have brought against the company. Have
18     you ever been deposed before?
19  A. No, sir.
20  Q. It's fairly painless. I will be asking
21     the questions and you will be giving me
22     your answers. Bridgette, our court
23     reporter, will be taking down my
```

598ce31c-f506-4922-aade-08f99183962c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

6

1  questions and your answers. If you
2  don't understand one of my questions or
3  you don't hear it, let me know and I'll
4  repeat it or rephrase it so that you
5  will understand it. Okay?
6  A. Yes, sir.
7  Q. And the only other thing I would ask is
8  that we don't talk over each other at
9  the same time, because she can only
10 take us down one at a time. And I
11 would ask that any answer that you give
12 be verbal, because she can't record a
13 nod or the shake of the head. Okay?
14 A. Okay.
15 Q. What's your home address?
16 A. 14 Cedar Street, Apartment 403,
17 Clayton, Alabama.
18 Q. What is your date of birth?
19 A. 9/22/1958.
20 Q. Are you currently employed?
21 A. Yes, I am.
22 Q. And by whom?
23 A. Equity.

7

1  Q. How long have you been employed by
2  Equity?
3  A. Since the company took over Charoen.
4  Q. Okay. So Charoen -- I'm going to refer
5  to Charoen as CP.
6  A. Okay.
7  Q. Is that okay?
8  A. Okay.
9  Q. So you worked for Charoen, or CP --
10 A. Yes.
11 Q. -- before? And then when Equity took
12 over, you stayed?
13 A. Yes.
14 Q. When did you first start working at the
15 Baker Hill plant?
16 A. July 31, 2000.
17 Q. And have you worked continuously at
18 that location since then?
19 A. Yes.
20 Q. What's your current job at Equity?
21 A. Line leader in evisceration.
22 Q. How long have you had that position?
23 A. I don't really know.

8

1  Q. Okay. Let's -- have you worked other
2  jobs at the facility?
3  A. Yes, I have.
4  Q. Can you describe for me what other jobs
5  you've worked there? And if you can,
6  tell me at the time who owned the
7  plant, CP or Equity.
8  A. Can you rephrase your -- can you -- I
9  don't really understand what you're
10 saying.
11 Q. Okay. Sure. Let's go back to the CP
12 period.
13 A. Okay.
14 Q. When you first started working for CP
15 in July of 2000, what did you do?
16 A. QA.
17 Q. Quality assurance?
18 A. Yes.
19 Q. How long did you work in QA for CP?
20 A. Until --
21 Q. Pardon?
22 A. Until the -- until the company changed
23 hands.

9

1  Q. Okay. So the whole time you were
2  working for CP, you worked in QA?
3  A. Yes.
4  Q. And when Equity took over, did you
5  continue in quality assurance?
6  A. No.
7  Q. What was the first job you had once
8  Equity took over?
9  A. USDA helper.
10 Q. And how long did you work as a USDA
11 helper?
12 A. Until I became line leader.
13 Q. Okay. And you don't know how long that
14 was?
15     (No immediate response given.)
16 Q. Okay. That's --
17 A. No, I'm not -- I'm not positive.
18 Q. Sure. Throughout this -- the whole
19 time that you've worked at the plant,
20 no matter who owned it, you worked in
21 the evisceration department?
22 A. Before I worked at the cook plant, then
23 I came to the raw plant.

10

1  Q. When you worked for quality assurance,
2     you were in the cook plant?
3  A. Cook plant.
4  Q. Okay. But after -- when you became a
5     USDA helper, you were in the
6     evisceration department?
7  A. Yes, I was.
8  Q. All of my questions are going to be
9     directed for the time period when you
10    were working for Equity and you were
11    working in the evisceration department.
12    Okay?
13 A. Yes, sir.
14 Q. What shift or shifts have you worked?
15 A. Second.
16 Q. You've worked the second shift your
17    whole time?
18 A. That's it.
19 Q. And what are the hours of the second
20    shift?
21 A. Three to twelve or three to whenever.
22 Q. Three p.m.?
23 A. Three p.m. to 12a or whenever.

11

1  Q. To midnight or whenever?
2  A. Yes.
3  Q. And that was the only shift you have
4     ever worked?
5  A. In evisceration, yes.
6  Q. What did you do as a USDA helper?
7  A. The job is to mark the birds that the
8     USDA deems air sack, IP, throw away
9     birds, contaminated or condemned, mark
10    legs. That's about it.
11 Q. So basically you -- you mark and
12    dispose of the bad birds as identified
13    by the USDA representatives?
14 A. Yes.
15 Q. What do you do in your current job as a
16    line leader?
17 A. I supervise the other USDA trimmers
18    that's on the line, making the schedule
19    as to the rotation, giving bathroom
20    breaks, filling in in positions when we
21    have nobody to fill in that position,
22    making sure our area is clean and taken
23    care of.

12

1  Q. Who was your supervisor when you were a
2     USDA helper?
3  A. Johnny Moore.
4  Q. And once you became a line leader,
5     who's your supervisor?
6  A. Johnny Moore was my line leader. He's
7     no longer there. Leon Bowen -- Bowen
8     is my line leader now.
9  Q. Goldman?
10 A. B-O-W-E-N, Bowen.
11 Q. Bowen. When you were a USDA helper, do
12    you recall what your hourly rate of pay
13    was?
14 A. Sir, it -- it varied from year to year.
15 Q. If you don't recall, that's fine.
16 A. I mean, the question is vague because
17    you're not saying when I started or
18    you're saying when I completed.
19 Q. What was it when you started?
20 A. Oh, when I started it was 8.25.
21 Q. And when you finished being a USDA
22    trimmer, what was it?
23 A. Nine sixty-five.

13

1  Q. And when you started as a line leader,
2     what was your hourly rate?
3  A. It's 10.85.
4  Q. And has it remained the same since or
5     has it gone up?
6  A. I guess the same.
7  Q. So you're making -- currently, you're
8     making 10.85 an hour?
9  A. Yes.
10 Q. Now, just to make sure, you've never
11    worked any other jobs for Equity other
12    than what you've described for me;
13    correct?
14 A. Just in evisceration.
15 Q. Just those jobs you've just described
16    for me, those are the only jobs --
17 A. I mean, we do a rotation, so the other
18    jobs in that rotation I've done.
19 Q. Sure.
20 A. You know, but -- but besides on the
21    line and the line leader, that's it,
22    sir.
23 Q. Now, you are a plaintiff in this

598ce31c-f506-4922-aade-08f99183962c

14

1    action; correct? You're in the
2    lawsuit; you're a party in the lawsuit.
3    A. Yes, sir.
4    Q. How did you come to learn about this
5    case?
6        (No immediate response given.)
7    Q. How did you find out about it?
8    A. I don't really remember. I really
9    don't. I don't really remember.
10   Q. Do you have an understanding as to what
11   your claim is?
12   A. Sir, if -- for my layman's, it's that
13   my overtime -- I've not been paid my
14   proper overtime hours or for my proper
15   hours. From my limited knowledge,
16   that's what I feel like.
17   Q. What overtime work have you -- did
18   you -- have you not been paid for?
19   A. We are paid from three o'clock till the
20   time that evis is finished, but we're
21   not paid before because we have to put
22   on our PPEs, we have to get our
23   supplies. We've not been paid for that

15

1    time which, you know ...
2    Q. What's PPEs?
3    A. Personal protection equipment.
4    Q. And what supplies do you have to get
5    that you're not paid for?
6    A. The personal protective equipment --
7    hair nets, earplugs, smocks, gloves,
8    liners, aprons.
9    Q. Have you ever been involved in any
10   other lawsuits against any employers?
11   A. No, sir.
12   Q. Are you a member of the union?
13   A. No, sir.
14   Q. Have you ever been a member of the
15   union at the Baker Hill plant?
16   A. No, sir.
17   Q. Are you aware that production employees
18   are represented by a union in that
19   plant?
20   A. Yes, sir.
21   Q. And what do you know about that?
22   A. I know that the union is supposed to
23   represent the rights of the employees

16

1    there.
2    Q. Were you given an opportunity to join
3    the union?
4    A. Yes, sir, I was.
5    Q. And you turned it down?
6    A. Yes, sir.
7    Q. So I take it you've never attended any
8    union meetings?
9    A. No, sir.
10   Q. Did you review any papers before you
11   came here today in preparation for this
12   deposition?
13   A. No, sir.
14   Q. Besides your lawyers, did you talk with
15   anybody about coming here today?
16   A. No.
17   Q. When you were a USDA helper, what items
18   of PPE did you wear on a daily basis?
19   A. Hair net, earplugs, arm guard, gloves,
20   apron, smock, boots, and goggles, which
21   are no longer worn.
22   Q. Anything else?
23   A. No, sir.

17

1    Q. Hair net, earplugs, arm guards, gloves,
2    apron, smock, boots, and goggles.
3    That's it?
4    A. Yes, sir.
5    Q. Which of those items, to your
6    understanding, were you required to
7    wear when you were a USDA trimmer?
8    A. All of them.
9    Q. And how did you learn that you were
10   required to wear all of them? Who told
11   you?
12   A. Supervisor.
13   Q. When you became a line leader, did you
14   have to wear the same things?
15   A. Yes, sir.
16   Q. Every single one of them?
17   A. Yes, sir.
18   Q. From what you were able to observe in
19   the evisceration department, did all
20   the employees at that -- in that
21   production floor wear all of these
22   items?
23   A. I really -- I -- sir, I really can't

598ce31c-f506-4922-aade-08f99183962c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

18

1    tell you that. I -- I really can't.
2    There are different positions in that
3    area. You have floor people. You have
4    rehangers. You have salvage workers.
5    So some might wear more, some might
6    wear less.
7    Q. From what you were able to observe, do
8    those employees that don't work with
9    knives have to wear, say, the arm --
10   plastic arm guards?
11   A. No, sir.
12   Q. Are you aware of any instance where an
13   employee was disciplined for not
14   wearing the proper item of PPE?
15   A. Sir, I really can't say.
16   Q. You don't know?
17   A. I really can't say. No, I really -- I
18   really can't say.
19   Q. When you were working as a USDA
20   trimmer, did you work with a knife?
21   A. Yes, sir.
22   Q. All the time?
23   A. Yes, sir.

19

1    Q. And when you became a line leader and
2    continuing to the present, do you work
3    with a knife?
4    A. Yes, sir, I do.
5    Q. All the time?
6    A. Not all the time.
7    Q. What portion of your job does not
8    require the use of a knife?
9    A. My paperwork.
10   Q. Which of these items that you have
11   identified for me of PPE are issued to
12   you by Equity?
13   A. All.
14   Q. All of them?
15   A. (Witness nods head.)
16   Q. Even the boots?
17   A. Yes, sir.
18   Q. Is it your understanding that you are
19   required to use the boots that Equity
20   gives you?
21   A. Yes.
22   Q. You can't wear your boots from home,
23   any -- any boots that you buy

20

1    privately?
2    A. No, sir.
3    Q. That's your understanding?
4    A. That's my understanding.
5    Q. Which of these items that you've
6    identified for me do you pick up on a
7    daily basis?
8    A. Gloves.
9    Q. Anything else?
10   A. Hair net, smock.
11   Q. That's it?
12   A. (Witness nods head.)
13   Q. So on a daily basis, you get new gloves
14   and a new hair net and a new smock?
15   A. Yes, sir.
16   Q. And how long has that been your
17   experience at this plant? How long
18   have you been picking that stuff up
19   daily?
20   A. Since I came to the plant.
21   Q. Since you came -- even before -- even
22   when it was CP?
23   A. Yes, sir.

21

1    Q. Is it your understanding that all the
2    other employees in evis pick up these
3    same three items on a daily basis?
4    A. Yes, sir.
5    Q. Were you ever told that you were
6    required to take your smock home at the
7    end of the day and wash it?
8    A. Not from Equity. But when it was CP,
9    we were issued three smocks and it was
10   our responsibility to keep them clean.
11   Q. But once it became Equity, you got a
12   new smock every day?
13   A. Yes, sir.
14   Q. Where do you pick up your gloves, your
15   hair net, and your smock?
16   A. At the supply window.
17   Q. And you do that first thing in the
18   morning?
19   A. No. I work -- I work -- I work 3p.
20   Q. You do that in the afternoon when you
21   get to work?
22   A. Yes, sir.
23   Q. What items are you permitted to wear

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

22

1    from home, if any?
2    A. You're permitted to wear the boots now
3       from home, but that -- that has changed
4       twice. But no other items can go
5       outside the plant.
6    Q. You say it's changed twice. Can you
7       explain that to me?
8    A. You -- when they first came, you were
9       allowed to wear your boots outside.
10   Q. That's Equity?
11   A. Equity.
12   Q. When Equity first came?
13   A. Right. You were allowed to wear your
14      boots outside. Then they changed it to
15      you had to remove your boots before you
16      went outside. But since they put the
17      sanitizers in, you are now able to wear
18      them outside again.
19   Q. And the sanitizers are located in that
20      little room before you enter the
21      production area; is that correct?
22   A. Yes, sir.
23   Q. And when did they put the sanitizers

23

1    in?
2    A. I'm not quite sure when they put them
3       in. I'm not sure.
4    Q. Has it been over a year?
5    A. Yes.
6    Q. Has it been two years?
7    A. I'm not quite sure.
8    Q. The items that you don't pick up on a
9       daily basis and that you don't take
10      home, what do you do with them when
11      you're not --
12   A. You're issued a locker.
13   Q. And what do you keep in your locker?
14   A. You -- your arm guard, you know, some
15      of your -- your personal items, if you
16      have them, your apron. That's about
17      it.
18   Q. Plastic sleeves?
19   A. If you use them. But the arm guard --
20      we don't use the plastic sleeves. We
21      use an arm guard.
22   Q. Oh, you don't use the plastic sleeves?
23   A. No, sir. I said the arm guard.

24

1    Q. You use the hard plastic arm guards?
2    A. Yes, sir.
3    Q. Do some people use plastic sleeves?
4    A. Yes, sir.
5    Q. And is that pretty much left up to you,
6       whether you put on the plastic sleeves?
7    A. Yes, sir.
8    Q. Some employees wear plastic sleeves,
9       some don't?
10   A. Yes, sir.
11   Q. When you arrive for work in the -- in
12      the afternoon to start your shift,
13      where do you put on each of these items
14      of clothing? Your boots you already
15      have on; correct?
16   A. Yes, sir.
17   Q. Where do you put on the smock?
18   A. On the production floor.
19   Q. What about your gloves?
20   A. On the production floor.
21   Q. The apron?
22   A. On the production floor.
23   Q. Your arm guards?

25

1    A. On the production floor.
2    Q. Do you put anything else on when -- on
3       the production floor besides the
4       smocks, gloves, apron, and arm guards?
5    A. Safety glasses when we had to wear
6       them. Nothing else.
7    Q. Your hair net and your ear
8       protection --
9    A. -- Go on before you enter production.
10   Q. You put those on in the break room
11      before you come in?
12   A. In the break room or in the hallway.
13   Q. And I take it that since you put
14      this -- these items on on the
15      production floor, the time you put them
16      on is not until you actually enter the
17      production floor for the start of the
18      work; is that correct?
19   A. Sir, the start of the work is when you
20      get on the line.
21   Q. Right. But you don't enter the
22      production floor until it's time or
23      almost time to get on the line;

598ce31c-f506-4922-aade-08f99183962c

26

1    correct?
2    A. Correct.
3    Q. I mean, you don't go into the
4      production floor and put these items on
5      and then leave?
6    A. No, sir.
7    Q. You're not allowed to do that, are you?
8    A. No, sir.
9    Q. In fact, you're not allowed at all, am
10     I right, to wear your smock, your
11     apron, and those things outside the
12     production floor?
13   A. No, sir.
14   Q. That's prohibited; correct?
15   A. Right.
16   Q. And I think you told me you use a
17     knife?
18   A. Yes, sir.
19   Q. Do you use scissors?
20   A. Yes, sir.
21   Q. And what do you use these items for?
22   A. Cutting the chickens, cutting the legs,
23     opening a chicken if they're not open.

27

1    Q. When you were a USDA helper, what did
2      you -- what was your responsibility for
3      cutting?
4    A. The -- marking the legs, marking the
5      birds that are going to salvage.
6    Q. And you -- you cut them to mark them?
7    A. Yes. Down the front, down the back,
8      and across the back.
9    Q. How do you get the knife and the
10     scissors that you use?
11   A. The line leaders put them on the line.
12     We get them from the tool room.
13   Q. So you're responsible as a line leader
14     to get them for the other employees?
15   A. I'm -- it's one of -- one of the -- I'm
16     one of the ones responsible for it.
17   Q. When you were a USDA trimmer, how would
18     you get the knife and the scissors?
19   A. They would already be on the same
20     counter.
21   Q. And you didn't have to go get them when
22     you were a trimmer?
23   A. No, sir.

28

1    Q. Do you use any other tools or
2      equipment?
3    A. A hose.
4    Q. Okay. So I think you told me that your
5      shift starts at three o'clock.
6    A. Yes, sir.
7    Q. And is it your understanding that you
8      are required to be on the production
9      floor at three o'clock?
10   A. You're supposed -- excuse me. You're
11     to be in your work area, your
12     workstation, at your workstation, at
13     three o'clock.
14   Q. Ready to go?
15   A. Ready to go.
16   Q. How many minutes before three o'clock
17     do you enter the production floor?
18   A. Ten.
19   Q. How do you know it's ten?
20   A. Because my -- my -- as a line leader,
21     I'm required to be there before the
22     others --
23     (Phone interruption)

29

1    A. I'm required to be there before the
2      people on the line so that I can go get
3      the tools, get the clipboards and
4      everything. It -- it takes me -- by my
5      watch, takes me that long to get myself
6      together to come in.
7    Q. Okay. So you go on ten minutes
8      beforehand to -- to get the equipment
9      for the other folks?
10   A. Ten minutes before my -- before I
11     start. I start -- really, at 2:30 I
12     start.
13   Q. You start?
14   A. The line starts at three o'clock.
15   Q. The lines starts --
16   A. I start --
17   Q. Okay.
18   A. -- as a line leader.
19   Q. Okay.
20   A. A line leader. When I was a USDA
21     helper, I started at three o'clock.
22   Q. Okay. When you were a USDA helper and
23     you started at three o'clock, how many

598ce31c-f506-4922-aade-08f99183962c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

30

1    minutes before three o'clock would you
2    enter the production floor?
3  A. It varied.
4  Q. From what to what?
5  A. Could be ten to fifteen minutes.
6  Q. And now that you're a line leader and
7    you go in at 2:30 and start doing this
8    prep for the other people that are on
9    the line, when do those employees come
10   in onto the production floor?
11  A. It varies with each one of them. Some
12   of them are in there at fifteen minutes
13   before time. Some of them are there
14   five minutes before time. It varies
15   with the person.
16  Q. And why does it vary from the person,
17   to your observation?
18  A. They're different, you know. They're
19   different people, you know.
20  Q. Some people --
21  A. What takes one longer to do doesn't
22   take one as long to do.
23  Q. Some people can put on the stuff, the

31

1    PPE that they have to put on, on the
2    production floor faster than others; is
3    that correct?
4  A. And some people just come in and talk
5   before they get on the clock. It just
6   varies and it depends on the person.
7  Q. So some people come on beforehand, put
8   their stuff on, and then just stand
9   around and talk?
10  A. Yes.
11  Q. How many breaks do you get now as a
12   line leader?
13  A. Two.
14  Q. And how long are those breaks?
15  A. They're supposed to be thirty-minute
16   breaks.
17  Q. You say they're supposed to be
18   thirty-minute breaks. I assume you're
19   going to tell me you don't get the full
20   thirty minutes; is that correct?
21  A. Not usually, no.
22  Q. Sometimes you do?
23  A. Sometimes I do.

32

1  Q. And is that true for everybody in the
2   plant, as far as what you observed?
3  A. I really couldn't say. I really
4   couldn't.
5  Q. What's the -- what causes you to get
6   the full thirty minutes as opposed to
7   something less?
8  A. It's according to where I'm working at
9   that day, if I'm on the line or if I'm
10   on the floor. It's according to where
11   I'm working at that particular time.
12  Q. If you're on the floor, do you get the
13   full thirty minutes or do you get less?
14  A. If I'm on the floor, I'll probably --
15   I'll get the full.
16  Q. If you're on the line, you get less?
17  A. Yes.
18  Q. Why is that?
19  A. Because the way the line runs. The
20   line runs -- what is it, clockwise?
21  Q. Uh-huh.
22  A. So the person that's on the -- the
23   farthest stand goes first, the first

33

1    person on the lower stand goes last,
2    but that's the person that's got to
3    rotate back to the first stand. So the
4    person on the end that has to go back
5    to the first stand is not getting as
6    much break time as the person that's,
7    you know, on the first stand and it's
8    rotating down.
9  Q. So some people go on break before
10   others; is that what you're telling me?
11  A. As the line goes down.
12  Q. How do you -- how do you know, or how
13   does the line know, that it's time to
14   take a break?
15  A. There's no more birds.
16  Q. Do you, as a line leader, go up and
17   down the line saying --
18  A. No.
19  Q. -- anything? Okay. When break is
20   over, you're in the break room, what
21   tells you to go back to work?
22  A. Nothing tells you to go back.
23  Q. People just look at the clock?

34

1  A. Yes.
2  Q. There's no bell or anything?
3  A. No.
4  Q. And do some people go back -- or are
5     some people required to go back before
6     others because the birds will get there
7     first?
8  A. The hangers and live hang have to be
9     there first. The rehangers that we
10    have have to be back before the -- open
11    cut has to be back before the trimmers.
12    So it's like a --
13 Q. So it's staggered. They come back
14    staggered?
15 A. As you go down the line.
16 Q. And they -- so they go for breaks
17    staggered and they come back from
18    breaks staggered?
19 A. Yes.
20 Q. I want you to take me through a typical
21    day. Now -- well, let's start with
22    when you were a USDA trimmer. Tell me
23    what you do from the time you arrive at

35

1     the plant to when you actually start
2     your work, or what you did when you
3     were a USDA trimmer.
4  A. Enter the break room, clock in, put
5     down my bag if I'm toting one. If not,
6     I go to the supply window, pick up my
7     supplies, put on my hair net, earplugs,
8     go into the production area.
9  Q. Now, that's what you did when you were
10    a USDA trimmer?
11 A. Yes.
12 Q. And you were required, at that time, to
13    start work at three o'clock?
14 A. Yes, sir.
15 Q. What time would you usually arrive at
16    the plant when you were a USDA trimmer?
17 A. Two forty-five.
18 Q. Did you have to clear any kind of
19    security when you were a USDA trimmer?
20 A. At the gate. You have to come through
21    the gate.
22 Q. Did you have a sticker for your car?
23 A. Yes.

36

1  Q. And would the guard just wave you on if
2     he saw your sticker?
3  A. Yes.
4  Q. Were you ever searched?
5  A. No, sir.
6  Q. Were any of your personal belongings
7     ever searched?
8  A. No, sir.
9  Q. When you were a USDA trimmer and you
10    would show up at fifteen minutes before
11    your start time, were people that
12    started the same time that you started,
13    were some of those people already
14    there?
15 A. Yes, sir.
16 Q. And did some people that you worked
17    with come after that?
18 A. Yes, sir.
19 Q. Did people sort of -- do people, or did
20    people at that point in time, stand
21    around in the break room and talk for a
22    while if they had any time, use the
23    vending machines?

37

1  A. Some people.
2  Q. Now, when you were a USDA trimmer and
3     you started at three o'clock, what time
4     would you walk onto the production
5     floor usually?
6  A. I -- I can't really tell you a time.
7  Q. Was it five minutes before, two minutes
8     before, or did it vary?
9  A. Maybe ten minutes before.
10 Q. It took you ten minutes to put on the
11    stuff that you had to put on?
12 A. No. It took me five to ten minutes to
13    get it sometimes. There's sometimes a
14    line at the supply window.
15 Q. Okay. But we're -- we're not at the
16    supply window now. Now we're at the
17    point in time where it's almost
18    three o'clock and you've gotten your
19    supplies and you're in the break room
20    and you know your shift starts at
21    three o'clock. Okay?
22 A. Okay.
23 Q. How many minutes before three o'clock,

598ce31c-f506-4922-aade-08f99183962c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

38

1    to your best estimate, would you walk
2    into the production floor?
3            MR. UNDERWOOD: You're talking
4    about before she goes to the line?
5            MR. FRY: Yes.
6            MR. UNDERWOOD: Okay.
7    Q. Before you go on the line.
8    A. I -- I can't really say. It varied.
9    Q. From what to what?
10           MR. UNDERWOOD: If you know.
11   A. I'm not sure.
12   Q. Okay. How long did it -- how long did
13   it take you to walk from the evis break
14   room onto the production floor?
15   A. I have no idea.
16   Q. How close -- are you done?
17   A. Okay.
18   Q. How close is the evis break room from
19   the production floor?
20           (No immediate response given.)
21   Q. Isn't it right across the hallway?
22   A. That's the evis break room, yes, sir.
23   Q. That's what we're talking about.

---

39

1    A. Okay.
2    Q. That's where you have worked; correct?
3    A. In evis.
4    Q. Yeah.
5    A. But the lockers are in debone break
6    room, so there's a distance. So, you
7    know, if you're coming from your
8    locker, there's a difference in it.
9    Q. Okay. You mentioned waiting at the
10   supply line when you come to work and
11   you have to pick up your smock, hair
12   net, and gloves. How long does it
13   typically take you to wait in line?
14   A. Five to ten minutes.
15   Q. And then you walk from there to where?
16   Where do you go from the supply room?
17   A. If I haven't gotten my things out of my
18   locker, I go to debone break room to go
19   to my locker and get the things that I
20   don't have to pick up that day. That's
21   my apron, my arm guard. I go get them.
22   Q. And then where do you go?
23   A. Then I go to the production floor.

---

40

1    Q. And how long does that take you from
2    the time you enter the plant till you
3    get on -- go onto the production floor?
4    A. Sir, I don't -- I don't know.
5    Q. Okay.
6    A. I don't know.
7    Q. Do you ever go to the break room before
8    you go onto the production floor?
9    A. I'm coming out of the break room.
10   Q. Okay. You -- you go from the -- you
11   pick up your supplies and you go to the
12   break room?
13   A. Right.
14   Q. What do you do in the break room?
15   A. I go to my locker.
16           (Phone interruption.)
17   Q. Your locker is in the break room?
18   A. Yes, sir.
19   Q. Once you retrieve your items from the
20   locker, what do you do?
21   A. I walk back up the hall to the
22   production area.
23   Q. So you time it so that you get there in

---

41

1    time to just pick everything up and
2    walk into the production area?
3    A. Pretty much.
4    Q. Do some employees stick around in the
5    break room for a while after they
6    arrive?
7    A. Yes.
8    Q. Are you required to perform any washing
9    of anything prior to the start of
10   production or were you? Pardon me.
11   We're still talking about the time when
12   you were a USDA trimmer. Were you
13   required to do any washing before you
14   actually started your work in the
15   afternoon?
16   A. Yes. You are required to wash your
17   apron off, your gloves. It's a
18   requirement to wash your hands before
19   you put the gloves on if you're -- you
20   know, that -- that was a requirement.
21   Q. Once you got onto the production floor
22   as a USDA helper and you had to put on
23   your smock and the other items, can you

---

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

42

1    estimate for me how long it took you to
2    put that stuff on?
3    A. Estimate maybe eight to ten minutes.
4    Q. So you have -- you already have your --
5    had your hair net on. You had your
6    earplugs on and you had your boots on.
7    So you had to put on your smock and
8    your apron and your plastic arm guards;
9    correct?
10   A. And your gloves.
11   Q. And your gloves?
12   A. And your liners. Well, your liners and
13   your gloves.
14   Q. And that took you eight to ten minutes?
15   A. You have to put them on and tie them.
16   Sometimes you have to roll the sleeves
17   up.
18       MR. UNDERWOOD: He just asked
19   you did that take you eight to ten
20   minutes. That's a yes or no.
21       THE WITNESS: Oh, I'm sorry.
22   A. Yes.
23       THE WITNESS: Sorry.

---

43

1        MR. UNDERWOOD: That's okay.
2    Q. From what you are able to observe, do
3    some -- could some employees do it
4    quicker?
5        MR. UNDERWOOD: Object to the
6    form.
7    A. I -- I really can't say.
8    Q. You don't have any observation of how
9    other people do it or how long it takes
10   them?
11   A. No, sir.
12   Q. Let's now shift to your current
13   position as line leader. From the time
14   you arrive at the plant, I assume
15   everything -- that the initial things
16   we talked about of clearing security is
17   the same?
18   A. Yes, sir.
19   Q. You're not searched in any way?
20   A. No, sir.
21   Q. When you -- then you come in and you
22   clock in?
23   A. Yes, sir.

---

44

1    Q. And then you go to the supply --
2    A. Yes, sir.
3    Q. -- area. Now, you told me that now
4    that you're a line leader, that you
5    actually start working at 2:30?
6    A. Yes, sir.
7    Q. So what time do you arrive at the
8    plant?
9    A. Two-fifteen, 2:20.
10   Q. And once you get into the plant, you
11   swipe in; correct?
12   A. Yes, sir.
13   Q. And then you go to the supply area and
14   pick up supplies?
15   A. Yes, sir.
16   Q. Now that you're a line leader and you
17   come earlier than you did before, is
18   there a line at the supply ---
19   A. No, sir.
20   Q. There's no line now?
21   A. No.
22   Q. So you pick that stuff up and then
23   where do you go?

---

45

1    A. I go to the evis floor, evis production
2    area.
3    Q. To go to your locker first?
4    A. No.
5    Q. Why not?
6    A. Because I don't have to -- I don't use
7    the apron when I first get there now.
8    I don't have to put on the apron or the
9    gloves when I first get in now.
10   Q. What do you have to put on when you
11   first get in?
12   A. Hair net, earplugs, and then going to
13   production area, the -- my smock.
14   Q. And then tell me what you do. You
15   start your picking up knives for
16   everybody?
17   A. Then you have to go to the knife room
18   and retrieve the knives. The -- the --
19   we have a tool box in which we put our
20   knives and chain gloves in. And we
21   bring them from over on the other side
22   of debone back over to evis. We count
23   them, make sure everything's there.

---

46

1    Then we proceed to put the knives or
2    scissors out on the line. We then go
3    into the office, the evisceration
4    office, and pick up our clipboards and
5    our production paperwork for that day
6    and bring them out to the floor.
7    Q. Then what happens?
8    A. Then we do an attendance as people come
9    in. We do the attendance sheet. And
10   then we wait for the line -- for the --
11   Q. Now, these activities that you've been
12   describing for me -- picking up the
13   knives, picking up your paperwork,
14   taking attendance -- are you paid for
15   that? Is it your understanding that
16   you're paid for that?
17   A. Yes, sir.
18   Q. And that -- that time that you spend is
19   not part of your claim in this lawsuit;
20   is that correct?
21   A. No, sir.
22   Q. Is that correct?
23   A. Yes, sir.

47

1    Q. Okay. Now, you say you only put a
2    smock on when you come to work now?
3    A. Yes, sir.
4    Q. Do you put anything on during the
5    course of the work day, anything else?
6    A. I do. I put on gloves and I will have
7    to put on an apron later if I have to
8    work on the line.
9    Q. But the only additional piece of -- of
10   items that you put on are gloves unless
11   you have to go on the line and
12   substitute for somebody; correct?
13   A. Yes, sir.
14   Q. So the only thing you really put on
15   when you go into the production floor
16   in the morning is a smock; is that
17   correct?
18   A. Yes. That I don't already have on,
19   yes, sir.
20   Q. And how long does that take you to put
21   on, a few seconds?
22   A. I've never timed it, sir.
23   Q. Can you put it on while you're walking?

48

1    A. I can't.
2    Q. You can't?
3    A. I can't.
4    Q. Doesn't take very long, though, does
5    it?
6    A. No, sir.
7    Q. Tell me what you need to do when it's
8    time for a break. Do you take -- let
9    me ask -- let's start with this. Do
10   you take a break -- as line leader, do
11   you take a break at the same time as
12   the line employees take it?
13   A. Sometimes.
14   Q. And when you do not take it at the same
15   time, why not?
16   A. Because I have to wash down the evis
17   floor during the break.
18   Q. And do you have to do that at every
19   single break?
20   A. Sometimes, sir, yes, I do.
21   Q. So that's part of your normal job?
22   A. Yes. When we're short of help, yes,
23   sir.

49

1    Q. And are you paid for that?
2    A. Yes, sir.
3    Q. When you don't have to wash down the
4    evis floor and you go on break with
5    everybody else, tell me what you do.
6    A. When I go on break?
7    Q. Yeah. Take me from the evis production
8    floor to the break room or wherever you
9    go for your break.
10   A. I remove my smock, gloves, arm guard if
11   I have on one, put them in the proper
12   place on the rack, proceed out the
13   production door, remove my hair net and
14   earplugs once I get outside. Then if
15   it -- go to whatever break room or
16   where I decide to eat at.
17   Q. How long does it take you to take the
18   smock and the arm guards off?
19   A. Sir, I have no idea.
20   Q. You said you take your plastic sleeves
21   off?
22   A. Arm guard.
23   Q. Arm guard. You only wear those if

598ce31c-f506-4922-aade-08f99183962c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

50

1    you're filling for someone; correct?
2    A. The arm guard, yes, sir.
3    Q. How often during a typical day are you
4       required to fill in on the actual evis
5       line for someone?  Does it happen every
6       day?
7    A. Yes, sir.
8    Q. And when you do that, is it for a brief
9       period of time or are you there for the
10      duration?
11   A. Sometimes for a brief period of time.
12      Sometimes it's for longer periods.
13   Q. Before you leave the evis room, do you
14      wash any of your PPE while on break?
15   A. If I have on an apron, I wash it down
16      to get the fat or chicken debris off of
17      it.  My gloves, I wash.
18   Q. But if you -- if you haven't had to
19      take a position on the line during that
20      period, then you don't have to do that
21      washing, do you?
22   A. No, sir.
23   Q. You can just take your smock off and

51

1    leave?
2    A. Yes, sir.
3    Q. Can you estimate the length of time
4       that expires from when it's time for
5       you to go on your break to when you
6       enter the break room when all you have
7       to do is take your smock off?
8    A. No, sir.
9    Q. Less than a minute?
10   A. Sir, I --
11   Q. You don't know?
12   A. I don't know.
13   Q. How far do you have to walk from the
14      production floor to the break room?
15   A. It's according to what break room you
16      go to, sir.
17   Q. Okay.  Do you have different break
18      rooms you can go to?
19   A. There -- there are two break rooms.
20   Q. For evis?
21   A. Evis -- evis workers can go to debone
22      break room.
23   Q. Oh, they can?

52

1    A. Yes, sir.
2    Q. So it's your choice?
3    A. Yes, sir.  As I stated, the lockers are
4       in debone break room.
5    Q. Take me the reverse now.  It's time --
6       you're a line leader.  Break is over.
7       What do you do?
8    A. I come back in, put my hair net and
9       earplugs on before I come back in, put
10      my smock on, go through, check the
11      line, make sure it's clean, make sure
12      all tools are where they're supposed to
13      be, and that's basically ...
14   Q. Do you typically take your hair net off
15      during break?
16   A. Yes, sir.
17   Q. When you were a USDA helper, what did
18      you have -- did you have to do any
19      additional things when you went off
20      break back onto production?
21   A. Such as, sir?  I'm not understanding
22      what you're talking about.
23   Q. Well, now you go from the break room

53

1    into the production floor, put on your
2    smock, and then check the line;
3    correct?
4    A. (Witness nods head.)
5    Q. When you were a USDA trimmer, helper,
6       did you do any other additional steps
7       when you were coming off break?
8    A. Other than put on additional
9       protective, no, sir.
10   Q. And when you were coming off break as a
11      USDA helper, how long would it take you
12      to put on the smock, the apron, and the
13      arm guards?
14   A. I've never timed it, so I really don't
15      know, sir.
16   Q. Okay.  Let's go to the end of the
17      shift.  When you were a USDA trimmer,
18      describe for me what you had to do at
19      the end of the day when your work was
20      done and you're still in the production
21      line, what you did from the time --
22      from that time until when you got into
23      your car.

54

1    A. You come off the line, remove the chain
2       glove, put your clipboard down, proceed
3       over to take off your PPEs. Most of
4       them wash them off before they take
5       them out so they'll be -- the apron
6       would be clean the next day or
7       whatever. Take your smock and liners
8       and put them in the area for them.
9    Q. When you say "put them in the area for
10      them," what do you mean, put them in
11      the locker?
12   A. No. Your smock goes in a -- for dirty
13      smocks.
14   Q. In a dumpster?
15   A. Yeah, for dirty smocks.
16   Q. So when you were a USDA trimmer, you
17      took all the stuff off on the
18      production floor?
19   A. Except the hair net and earplugs.
20   Q. And as you were walking -- and you
21      washed it off before you took it off?
22   A. Right.
23   Q. And then you took it off and you exited

55

1       and you went into the break room where
2       your locker is -- was?
3    A. You --
4    Q. In the little --
5    A. -- dispose of the smock first.
6    Q. And along the way you threw the smock
7       in the dumpster?
8    A. (Witness nods head.)
9    Q. And then you put your stuff in your
10      locker?
11   A. Yes, sir.
12   Q. And then you cart it out?
13   A. Yes, sir.
14   Q. And you walked out?
15   A. Yes, sir.
16   Q. Can you put an estimate on the amount
17      of time it took you to do it from the
18      time you left the line until you walked
19      out the door?
20   A. No, sir.
21   Q. Okay. Now that you are a line leader,
22      tell me about what you do at the end of
23      the work day.

56

1    A. At the end of production, I have my
2       paperwork to finish, so I proceed to
3       pick up the clipboards or the tools.
4       It depends on what day it is and
5       whether it's my time to do it or not.
6       If it's my day to do the paperwork, I
7       proceed to the back with the clipboards
8       and I tally up all the paperwork and
9       turn it in, make sure everything is put
10      up.
11   Q. The paperwork and the tools that you --
12      that you -- what you do with respect to
13      the tools at the end of the day, is it
14      your understanding that you are paid
15      for that time?
16   A. Yes, sir.
17   Q. And that's not part of this lawsuit, is
18      it?
19   A. No, sir.
20   Q. After you're done with your paperwork
21      and the tools, what do you do?
22   A. I remove my smock and I go home.
23   Q. That's all you have to do, throw your

57

1       smock in the dumpster and leave?
2    A. And clock out, remove my hair net.
3    Q. As a line leader now, what is your
4       understanding of how Equity keeps track
5       of the hours you work?
6    A. If a line leader is -- I'm not really
7       sure, not really.
8    Q. Did you ever ask?
9    A. I was given a set time to be there.
10   Q. And what's the set time?
11   A. Two-thirty.
12   Q. Two-thirty. And is it your
13      understanding that you're paid from
14      2:30 on?
15   A. Yes, sir.
16   Q. Until when?
17   A. Until clock out.
18   Q. When you say --
19   A. Until I clock out.
20   Q. Until you clock out?
21   A. Yes, sir.
22   Q. And do you have any reason to believe
23      that that's inaccurate, that being that

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

58

1    you are paid from 2:30 in the afternoon
2    until you swipe out at the end of the
3    day?
4    A. No, sir.
5    Q. You -- that's how you are paid? That's
6    your understanding?
7    A. To my knowledge, sir. Yes, sir.
8    Q. And after you clock out at the end of
9    the day, you don't have any -- you
10   don't spend any time putting things
11   off -- taking things off or putting
12   things on, do you?
13   A. No, sir.
14   Q. You've already clocked out; you're
15   gone?
16   A. Yes, sir.
17   Q. And have you ever had occasion to
18   complain about the pay you've gotten?
19   Did you ever think you were shorted on
20   your check?
21   A. Yes, sir.
22   Q. And did you bring that to the attention
23   of the payroll folks?

---

59

1    A. My supervisor, sir.
2    Q. And what happened?
3    A. He fixed it. He straightened it out.
4    Q. Was it just an error somewhere in
5    payroll, to your understanding?
6    A. To my understanding.
7    Q. Is that the only time that happened?
8    A. It used to happen quite frequently, but
9    not lately.
10   Q. But when you get your check, you -- do
11   you review the payroll information --
12   A. Yes, sir.
13   Q. Have you ever kept any kind of diary or
14   notes or anything, any document, that
15   shows what you believe to be the hours
16   that you're claiming in this lawsuit
17   that you haven't been paid for?
18   A. No, sir.
19   Q. Do you know anybody that did?
20   A. No, sir.
21   Q. So you've never made any calculations
22   of any time as to which you worked but
23   weren't paid for?

---

60

1    A. No, sir.
2    Q. Have you ever been asked or required to
3    stay late and work overtime?
4    A. Yes, sir.
5    Q. And when this occurred, were you paid
6    time and a half for that overtime, to
7    your knowledge?
8    A. Yes, sir.
9    Q. Have you ever had any complaints about
10   your overtime pay computation?
11   A. I don't --
12   Q. Pardon?
13   A. I'm not understanding what you're
14   saying.
15   Q. Did you ever have any complaints about
16   the overtime pay you got? Did you ever
17   think you were shorted?
18   A. No, sir.
19   Q. Have you ever complained to any of your
20   supervisors about any pay issues?
21        MR. UNDERWOOD: Other than what
22   she's already testified to about the
23   hours?

---

61

1    Q. Yes, other than what you've testified
2    to, the one time that you thought that
3    your check was in error.
4    A. No, sir.
5    Q. Who's Jackie Davis?
6    A. A union representative.
7    Q. And what about Kevin Granger? Is he
8    also a union representative?
9    A. Yes, sir.
10   Q. And Susie Wright?
11   A. Yes, sir.
12   Q. And how are you familiar with these
13   folks?
14   A. How am I -- I knew Jackie Davis before
15   I came to the plant. Susie Wright and
16   I are line leaders in evis together.
17   Kevin Granger, I've met him in passing.
18   Q. You're not in the union?
19   A. No, sir.
20   Q. Have you ever talked to Jackie Davis,
21   Kevin Granger, or Susie Wright
22   concerning the claims and issues
23   relative to this lawsuit?

---

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

62

1  A. No, sir.
2  Q. You have never complained to any
3     supervisor about any pay issues, have
4     you?
5  A. Other than the one time.
6  Q. Except the one time.  And have you ever
7     filed a claim with the department of
8     labor over any wage claims?
9  A. No, sir.
10 Q. Have you ever been disciplined with
11    respect to your job at Equity?
12       (No immediate response given.)
13 Q. Have you ever been written up for
14    anything?
15 A. Yes, sir.
16 Q. What for?
17 A. I'm not sure how to put it.  I fell and
18    hurt my leg and I was wrote up for not
19    using the appropriate handrail.
20 Q. Okay.  Is that the only time?
21 A. I was written up for my job performance
22    for not cutting a head off a chicken
23    when I was on the production line when

63

1     I was a helper.  I was written up one
2     other time for failure to complete my
3     job as a line leader.  I did not mark
4     somebody present because I didn't know
5     they was here, so I was written up
6     because that was part of my job.
7  Q. Is that all?
8  A. That's it.
9  Q. Okay.  I might have asked you in the
10    beginning, but during the course of our
11    talk here, has it refreshed your memory
12    or recollection as to when you moved
13    from a USDA trimmer to a line leader?
14 A. No, sir.
15 Q. Has it been in the last year?
16 A. Yes, sir.
17 Q. All right.
18       MR. FRY:  That's all.  Thank
19    you.
20       MR. UNDERWOOD:  I don't have
21    any follow-up.
22    (The deposition of Barbara Ann Darby
23    concluded at 12:25 p.m. on 5/21/08.)

64

1        * * * * * * * * * *
2        REPORTER'S CERTIFICATE
3        * * * * * * * * * *
4     STATE OF ALABAMA
5     COUNTY OF MONTGOMERY
6        I do hereby certify that the above
7     and foregoing transcript was taken down
8     by me in stenotype, and the questions
9     and answers thereto were transcribed by
10    means of computer-aided transcription,
11    and that the foregoing represents a
12    true and correct transcript of the
13    testimony given by said witness.
14       I further certify that I am neither
15    of counsel, nor any relation to the
16    parties to the action, nor am I anywise
17    interested in the result of said case.
18
19
20
21    Bridgette W. Mitchell,
      Certified Court Reporter and
22    Commissioner for the State of
      Alabama at Large
23    ACCR No. 231 - Expires 9/30/08
      MY COMMISSION EXPIRES 1/25/2010

**TAB 14**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


BETTY ANN BURKS, et al.,

    Plaintiffs,


vs.  CIVIL ACTION 2:06-cv-01081-MEF-DRB


EQUITY GROUP EUFAULA DIVISION, LLC,

    Defendant.


\*    \*    \*    \*    \*    \*

DEPOSITION OF LAURIE DELBRIDGE,
taken pursuant to notice and
stipulation on behalf of the Defendant,
at Williams, Pothoff, Williams & Smith,
125 South Orange Avenue, Eufaula,
Alabama, before Bridgette Mitchell,
Shorthand Reporter and Notary Public in
and for the State of Alabama at Large,
on May 21, 2008, commencing at
10:00 a.m.

**2**

1          APPEARANCES
2
3   FOR THE PLAINTIFFS:
4   Carl E. Underwood, III, Esquire
5   COCHRAN, CHERRY, GIVENS & SMITH
6   163 W. Main Street
7   Dothan, Alabama 36301
8
9   M. John Steensland, III, Esquire
10   PARKMAN, ADAMS & WHITE
11   739 West Main Street
12   Dothan, Alabama 36301
13
14   FOR THE DEFENDANT:
15   Gary D. Fry, Esquire
16   PELINO & LENTZ
17   One Liberty Place
18   Thirty-second Floor
19   Philadelphia, Pennsylvania 19103
20
21
22
23

**3**

1         STIPULATIONS
2     It is hereby stipulated and
3 agreed by and between counsel
4 representing the parties that the
5 deposition of LAURIE DELBRIDGE is taken
6 pursuant to notice and stipulation on
7 behalf of the Defendant; that all
8 formalities with respect to procedural
9 requirements are waived; that said
10 deposition may be taken before
11 Bridgette Mitchell, Shorthand Reporter
12 and Notary Public in and for the State
13 of Alabama at Large, without the
14 formality of a commission; that
15 objections to questions, other than
16 objections as to the form of the
17 questions, need not be made at this
18 time, but may be reserved for a ruling
19 at such time as the deposition may be
20 offered in evidence or used for any
21 other purpose as provided for by the
22 Civil Rules of Procedure for the State
23 of Alabama.

**4**

1     It is further stipulated and
2 agreed by and between counsel
3 representing the parties in this case
4 that the filing of the deposition of
5 LAURIE DELBRIDGE is hereby waived and
6 that said deposition may be introduced
7 at the trial of this case or used in
8 any other manner by either party hereto
9 provided for by the Statute, regardless
10 of the waiving of the filing of same.
11     It is further stipulated and
12 agreed by and between the parties
13 hereto and the witness that the
14 signature of the witness to this
15 deposition is hereby waived.
16
17          INDEX
18
19 EXAMINATION          Page
20 By Mr. Fry........................ 5
21
22 EXHIBIT          Page
23 DX-1   Response interrogatories   49

**5**

1     LAURIE DELBRIDGE, having first
2 been duly sworn or affirmed to speak
3 the truth, the whole truth, and nothing
4 but the truth, testified as follows:
5         EXAMINATION
6 BY MR. FRY:
7 Q. Laurie Delbridge; right?
8 A. Yes, sir.
9 Q. Ms. Delbridge, my name, as you know, is
10     Gary Fry. I'm one of the lawyers
11     representing Equity Group Eufaula in
12     connection with a lawsuit which you and
13     some other folks have brought against
14     the company. And we have asked you
15     here today to put certain questions to
16     you concerning your allegations in that
17     lawsuit. Have you ever given a
18     deposition before?
19 A. No, sir.
20 Q. Let me briefly explain what we're going
21     to do and explain or ask that you
22     follow a few guidelines. I'll be
23     asking the questions and Bridgette, our

b6eb291c-e036-4331-8a0d-453d7f3f7000

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

6

1    court reporter, will be taking down
2    your answers.  If you don't understand
3    one of my questions, let me know and
4    I'll try and rephrase it.  If you don't
5    hear one of my questions, let me know
6    and I'll repeat it.  I will try not to
7    speak over you and I ask that you try
8    not to speak over me during our
9    dialogue here so the court reporter --
10   because the court reporter can't take
11   us both down at once.  Okay?
12   A. Okay.
13   Q. So let's see if we can get a clean
14     record in that respect.  What is your
15     home address?
16   A. My home address is 426 East Troy
17     Street, but I was living at 569 Highway
18     239.  That's where I receive my mail
19     at.
20   Q. And what town?
21   A. In Union Springs.
22   Q. What's your date of birth?
23   A. 04/15/77.

7

1    Q. Are you currently employed?
2    A. Yes.
3    Q. By who?
4    A. Wal-Mart Distribution Center.
5    Q. Were you at one time employed by the
6      Equity plant in Baker Hill?
7    A. Yes, sir.
8    Q. What was the period of your employment?
9    A. '03 to '06.
10   Q. And for what reason did your employment
11     end in 2006?
12   A. I got fired.
13   Q. Why were you fired?
14   A. Point system.
15   Q. Pardon?
16   A. Point system.
17   Q. The point system.  And are you
18     referring to the attendance system?  Is
19     that the point system you're referring
20     to?
21   A. Yes, sir.
22   Q. When did you start in '03?  Do you
23     recall?

8

1    A. No, sir.
2    Q. Do you recall when you were terminated
3      in '06?
4    A. No, sir.
5    Q. During the time that you were employed
6      at the Equity plant, what department
7      did you work in?
8    A. Evis.
9    Q. Did you work in any other department
10     during those three years?
11   A. No, sir.
12   Q. What shift did you work in the
13     evisceration department?
14   A. On the morning shift.
15   Q. What were your hours?
16   A. I don't know.  I can't remember.
17   Q. Did you work any other shifts in the
18     evisceration department?
19   A. No, sir.
20   Q. So you worked the morning shift in evis
21     for the entire three years, approximate
22     three years, that you worked at the
23     plant?

9

1    A. Yes, sir.
2    Q. And what did you do?
3    A. I was a trimmer and a shift leader.
4    Q. Trimmer and shift leader?
5    A. A lead person.
6    Q. Lead person.  What did you do as a
7      trimmer?
8    A. Trimmer cut back parts off chicken and
9      marked bad chicken.
10   Q. What did you do as a lead person?
11   A. I rotated.
12   Q. When you say you rotated, am I correct
13     in assuming that you filled in when
14     people were absent?
15   A. Yes, sir.
16   Q. Do you recall who your supervisor was?
17   A. Yvonnia Prugh and Dick Green.
18   Q. What was your rate of pay?
19   A. I can't remember.
20   Q. How many hours per week did you work?
21   A. Can't remember that either.
22   Q. But your shift, as you recall, started
23     sometime in the morning, early morning?

b6eb291c-e036-4331-8a0d-453d7f3f7000

10

1  A. Yes.
2  Q. And am I correct that it ended in,
3     say, early afternoon, mid afternoon?
4  A. Say mid.
5  Q. Mid afternoon?
6  A. Mid afternoon.
7  Q. And besides working as a trimmer and a
8     lead person in the evis department on
9     the morning shift, you had no other
10    jobs at Equity during those three years
11    that you worked there; is that correct?
12 A. Can you repeat the question?
13 Q. Sure. Besides your employment as a
14    trimmer and a lead person in the
15    morning shift in the evisceration
16    department, am I correct that you had
17    no other jobs in the plant during the
18    time you worked there?
19 A. No, sir.
20 Q. Is that correct, you didn't have any
21    other jobs, or you did have other jobs?
22 A. I didn't have other jobs.
23 Q. You did not have other jobs. Those are

11

1     the only jobs you did?
2  A. Trimmer and -- and shift leader, yes,
3     sir.
4  Q. Now, you are a plaintiff in this
5     lawsuit; correct?
6  A. Yes, sir.
7  Q. And what's your understanding of what
8     this lawsuit is about?
9  A. Can you repeat that?
10 Q. How did you first learn about the
11    lawsuit?
12 A. A friend.
13 Q. And what did the friend tell you?
14 A. I can't recall everything that was
15    said, though.
16 Q. Well, do you recall anything of what he
17    told you?
18 A. Not really.
19 Q. What do you think this lawsuit is
20    about?
21 A. Earned all that hours that I worked at
22    the company.
23 Q. Pardon?

12

1  A. Earning all the hours that I worked
2     with the company.
3  Q. What do you mean by that?
4  A. All the hours that I worked with the
5     company.
6  Q. What about all those hours?
7  A. I don't understand what you're saying.
8  Q. What's your claim in this lawsuit?
9  A. All the hours that I earned with the
10    company.
11 Q. Let me see if I can -- if I understand
12    you correctly. Are you claiming that
13    you worked hours that you weren't paid
14    for? Is that your claim?
15 A. Yes, sir.
16 Q. So you performed work -- your claim is
17    that you performed work for the company
18    for which you were not paid; is that
19    correct?
20 A. Yes, sir.
21 Q. Describe for me what work you performed
22    for the company for which you think you
23    were not paid.

13

1  A. Putting on my PPE.
2  Q. What's PPE?
3  A. Personal protective equipment.
4  Q. Have you ever been involved in any
5     other lawsuits?
6  A. Yes.
7  Q. And what were those suits about?
8  A. Credit -- credit with Rent-A-Center --
9     not Rent-A-Center. Rent-N-Roll.
10 Q. Is that the only one?
11 A. That I can recall right now.
12 Q. When you started in 2003, am I correct
13    that the owner of the plant was CP? Do
14    you know what I mean when I say CP?
15 A. No, sir.
16 Q. Okay. I'm not sure I can pronounce it
17    correctly.
18    MR. FRY: Has anyone here ever
19    pronounced it?
20    MR. UNDERWOOD: No.
21    Q. Charoen Pokphand. Does that ring a
22    bell?
23 A. Yes, sir.

b6eb291c-e036-4331-8a0d-453d7f3f7000

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

14

1  Q. So when you started in '03, that's --
2     Charoen Pokphand is what I refer to
3     when I say CP. Am I correct when you
4     started at the plant, you were working
5     for CP?
6  A. Yes, sir.
7  Q. And at some point in time, about a year
8     later, the company changed hands and
9     Equity came in; is that correct?
10 A. Yes, sir.
11 Q. Did you notice any changes in how
12    things were done when Equity took over
13    from CP in what you could observe from
14    doing your job?
15 A. No, sir.
16 Q. When you worked for CP, were you a
17    member of the union?
18 A. No, sir, not that I can recall.
19 Q. What about when Equity took over, did
20    you become a member of the union?
21 A. I don't recall.
22 Q. So you have no -- strike that. You
23    don't believe you were a member of the

15

1     union?
2  A. I can't recall. I can't recall that.
3  Q. Are you aware that the production folks
4     at the plant are represented by the
5     retail, wholesale, and department store
6     union?
7  A. Can you rephrase that?
8  Q. Are you aware that the production folks
9     that work at the plant are represented
10    by a union?
11 A. No, I don't know that.
12 Q. So I take it you never attended any
13    union meetings, either when CP had the
14    plant or afterwards?
15 A. No, sir.
16 Q. Did you review any documents in
17    preparation for this deposition?
18 A. I don't know. I don't know.
19 Q. You don't know?
20 A. (Witness shakes head.)
21       MR. UNDERWOOD: He's just
22    asking did you look at any paperwork to
23    get ready for this deposition.

16

1  A. Oh, yes, sir.
2  Q. What did you look at?
3  A. I don't know what documents, but I
4     looked at documents.
5  Q. What do you recall about the documents
6     that you looked at?
7  A. I don't know.
8  Q. Did you look at the Complaint that was
9     filed in this case?
10 A. I don't know.
11 Q. You don't recall anything about any of
12    the papers you looked at before you
13    came here in connection with this
14    proceeding?
15 A. No.
16       MR. UNDERWOOD: Just for the
17    record, the only things, my
18    understanding, they would review --
19    and I've been involved in some of the
20    prep -- is their interrogatories and
21    their declaration and nothing else.
22       MR. FRY: Okay. Thank you.
23       MR. UNDERWOOD: Sure.

17

1  Q. (By Mr. Fry) Did you speak with anybody
2     about coming here today except your
3     lawyers?
4  A. No, sir.
5  Q. Ms. Delbridge, I would like for you to
6     now identify for me what items of PPE,
7     as you phrased it, you wore on a daily
8     basis when you were working at CP.
9  A. Hair net, earplugs, smocks, apron,
10    sleeve, gloves, chain gloves, boots,
11    arm guard. That's all I recall right
12    now.
13 Q. After Equity took over, did you wear
14    those same items of PPE?
15 A. Yes, sir.
16 Q. So let me read the list and make sure
17    we've got it complete. You wore a hair
18    net, earplugs, smock, apron, sleeves --
19    were those the blue sleeves, plastic
20    sleeves?
21 A. Yes.
22 Q. -- gloves. Rubber gloves?
23 A. Rubber gloves, yes.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

18

1  Q. Did you wear white cotton gloves
2     underneath?
3  A. Yes.
4  Q. A chain glove?
5  A. Yes.
6  Q. Boots and an arm guard -- arm guards?
7  A. Arm guard, yes, sir.
8  Q. Which of those items were you required
9     to wear on the job?
10  A. All of them.
11  Q. None of them were optional?  Is that
12     your understanding?
13  A. Not that I recall.
14  Q. Could you be written up for not wearing
15     any one of those items?
16  A. Yes, sir.
17  Q. And how did you get that understanding?
18     Who told you all these items were
19     required?
20  A. Supervisor.
21  Q. And when were you told, when you
22     started?
23  A. Yes, sir.

19

1  Q. And when Equity took over, were you
2     told that each and every one of these
3     items were required to be worn while
4     you were performing your job in the
5     evisceration department?
6  A. Yes, sir.
7  Q. From what you were able to observe in
8     the evisceration department, did every
9     single employee in there wear all of
10     these items?
11  A. Yes, sir.  That I can recall, yes.
12  Q. I want to refer now just to the period
13     of time from 2004 on when you worked --
14     when the plant was operated by Equity.
15     Which of these items that you have
16     listed for me were issued to you by the
17     company?
18  A. All of them.
19  Q. Including the boots?
20  A. Yes, sir.
21  Q. Were you told you could wear your own
22     boots if you so wished, that you didn't
23     have to wear the boots that the company

20

1     would issue to you?
2  A. I don't know.  I don't know that.
3  Q. During the period of time that you
4     worked there that the plant was
5     operated by CP, did you receive all of
6     these items from CP?
7  A. Yes, sir.
8  Q. Which of these items that you described
9     for me did you pick up on a daily
10     basis, if any?
11  A. Can you rephrase that?
12  Q. Sure.  You say each of these items was
13     issued to you by the company, be it CP
14     or Equity; correct?
15  A. Yes.
16  Q. When did you get them?  Did you get
17     them on a daily basis, a weekly basis?
18  A. Maybe twice a day.
19  Q. Twice a day?
20  A. Not twice a day, but twice out of the
21     week.
22  Q. Twice a week.  So --
23  A. Every -- every other day.

21

1  Q. Every other day?
2  A. Uh-huh.
3  Q. You would be issued new -- each of the
4     items you identified for me, every
5     other day you would get a replacement?
6  A. If we wanted to.
7  Q. Where would these items be issued to
8     you?
9  A. At the supply room.
10  Q. Could you wear any of these things from
11     home?
12  A. I didn't.
13  Q. Could you?  Were you told -- were you
14     ever told that you could wear them from
15     home?
16  A. I don't -- I don't know.
17  Q. You don't know?
18  A. No.
19  Q. What about your boots, you wore them
20     from home?
21  A. Yes, sir, the boots.
22  Q. What about your ear protection?
23  A. No, sir.

b6eb291c-e036-4331-8a0d-453d7f3f7000

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

22

1 Q. When you were not at work, where did
2   you store these items? Or did you take
3   them with you?
4 A. After two days, I would change mine. I
5   would throw them away.
6 Q. Well, after day one, when you left
7   work, did you take all these items with
8   you?
9 A. Take them home.
10 Q. Including the smock?
11 A. Yes, sir.
12 Q. Were you responsible for washing the
13   smock?
14 A. Yes, sir.
15 Q. And who told you that?
16 A. You had to wear a clean one. It had to
17   be sanitized, clean.
18 Q. Is it your testimony you did not
19   receive a new smock every day?
20 A. No, sir.
21 Q. You got one every other day?
22 A. Every other day.
23 Q. So did you wash your smock every night?

23

1 A. Yes, sir.
2 Q. These items that you have described for
3   me, can you tell me where you put them
4   on at the start of your work day?
5   Where did you put on each of these
6   items of clothing?
7 A. Inside evis.
8 Q. What do you mean "inside evis"?
9 A. At the start of where you hang your
10   equipment at.
11 Q. Let's go about it this way. When the
12   company was operated by Equity and you
13   were working there, when you went to
14   work in the morning in the evisceration
15   department, where did you put on your
16   smock?
17 A. When you walk in.
18 Q. Walk in where?
19 A. In evis.
20 Q. Onto the production floor?
21 A. Yes, sir.
22 Q. So when you went on -- so you didn't
23   put it on before you went onto the

24

1   production floor. Is that what you're
2   saying?
3 A. Yes, sir.
4 Q. Where did you put on the plastic apron?
5 A. On the production floor.
6 Q. Where did you put on the plastic
7   sleeves?
8 A. On the production floor.
9 Q. Where did you put on the plastic arm
10   guards?
11 A. On the production floor.
12 Q. What about the cotton gloves and the
13   rubber gloves?
14 A. On the production floor.
15 Q. Where did you put on your boots?
16 A. At home or either in the break room.
17 Q. What about your hair net?
18 A. In the break room.
19 Q. And the same for the earplugs, you put
20   those on in the break room?
21 A. Yes, sir.
22 Q. So with the exception of the boots, the
23   hair net, and the earplugs, you put

25

1   everything else on when you went onto
2   the production floor in evis; correct?
3 A. Yes, sir.
4 Q. Did your job require you to use a knife
5   or scissors?
6 A. Yes, sir.
7 Q. And how did you get those things to
8   use?
9 A. It would be at the work area.
10 Q. Were they supplied to you by your
11   supervisor at your workstation?
12 A. Yes, sir.
13 Q. It wasn't your job to keep those things
14   sharpened or maintained, was it?
15 A. When I was a shift leader, a lead
16   person, I had to take them to the knife
17   room. I didn't sharpen them, though.
18 Q. Did you use a knife and scissors?
19 A. Yes, sir.
20 Q. Did you use any other types of
21   equipment?
22 A. No, sir, not that I can recall.
23 Q. Now, I think you told me at the outset

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

26

1    that you can't recall what time your
2    shift started, only it was in the
3    morning sometime; is that correct?
4    A. Yes, sir.
5    Q. Were you required to be at your
6    workstation on the production line at
7    the start of whatever time that was
8    that your shift started?
9    A. Yes, sir.
10   Q. How many breaks did you get during your
11   shift? And we're talking now about
12   when Equity owned the plant.
13   A. Two.
14   Q. Incidentally, let's go back to when CP
15   owned the plant. At that point in
16   time, did you put on your smock, apron,
17   sleeves and so forth when you entered
18   the production floor?
19   A. Yes, sir.
20   Q. How long is each of the breaks that you
21   had?
22   A. It was supposed to be thirty minutes,
23   but I only got maybe twenty.

---

27

1    Q. And how do you know you only got twenty
2    out of the thirty-minute break?
3    A. I had to walk to the station, take my
4    equipment off, sanitize them, and go to
5    break.
6    Q. Did you ever time how long it took you
7    to do this?
8    A. No, sir.
9    Q. Where did you take your break?
10   A. In the break room.
11   Q. Do you recall when you took your first
12   break of the day? Was it sometime in
13   the morning?
14   A. Yes, sir.
15   Q. After you had worked for a couple of
16   hours?
17   A. Yes, sir.
18   Q. And what about the second break, do you
19   recall when that was?
20   A. Lunchtime.
21   Q. So you considered the second break your
22   lunchtime?
23   A. Yes, sir.

---

28

1    Q. And after that, did you get any other
2    breaks?
3    A. No, sir.
4    Q. And is that true for both the CP period
5    and the Equity period?
6    A. Yes, sir.
7    Q. How did you know it was time to take
8    your break?
9    A. When the last chicken come around.
10   Q. Would your supervisor tell you, Break
11   time's coming up; you can leave as soon
12   as the last bird passes your position?
13   Was it something like that happened?
14   A. Yes, sir.
15   Q. So am I correct in assuming that some
16   people left before other people,
17   depending on where the birds were?
18   A. Yes, sir.
19   Q. When you come back on break, did it
20   happen in the reverse, some people had
21   to come back first because the birds
22   got there first?
23   A. Yes, sir.

---

29

1    Q. When you were in the break room and it
2    was time for the break to be over, how
3    did you know that it was time to go
4    back to the production floor?
5    A. I was told that we had to be on the
6    line five minutes before the break come
7    around.
8    Q. And who told you that?
9    A. Supervisor, so we won't be late.
10   Q. But some people went back first because
11   the bird got there first; is that
12   correct?
13   A. Yes, sir.
14   Q. How soon, do you recall, that you
15   usually arrived at the plant before
16   your shift actually started?
17   A. Twenty minutes.
18   Q. Describe for me what you did during
19   those twenty minutes. From the time
20   that you drove in until you stepped up
21   onto your workstation, what did you do?
22   A. Go get my equipment, use the bathroom.
23   That's all I remember right now.

---

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

30

1    Q. You didn't have to get the equipment
2       every day, did you?
3    A. No, sir.
4    Q. So on those days that you didn't have
5       to go get your equipment, you brought
6       it with you from home; is that correct?
7    A. Yes, sir.
8    Q. And did you just go to the break room
9       and wait on those days?
10   A. I will sanitize it.
11   Q. Well, am I correct that you sanitized
12      it once you entered the production
13      floor?
14   A. Yes, sir.
15   Q. On those days when you didn't have to
16      pick up any equipment after you entered
17      the plant, did you go to the break
18      room?
19   A. Yes, sir.
20   Q. And what did you do there?
21   A. When I didn't have to get my equipment,
22      I'll come about ten minutes -- ten
23      minutes to the time I have to be there,

31

1       be on the line.
2    Q. On those days when you didn't have to
3       pick up any new equipment, what did you
4       do?
5    A. Go to the break room.
6    Q. And what did you do in the break room?
7    A. Wait until time to go in.
8    Q. Did you have to clear any security when
9       you came into the plant?
10   A. I don't understand the question.
11   Q. Were you searched when you entered the
12      plant?
13   A. No, sir.
14   Q. Were any of your personal possessions
15      searched when you entered the plant?
16   A. No, sir.
17   Q. Is it fair to say -- did you have a
18      sticker for your car?
19   A. Yes, sir.
20   Q. And is it fair to say that when you
21      drove onto the property, if the guard
22      in the guard shack saw your sticker, he
23      would just wave you on?

32

1    A. Yes, sir.
2    Q. Once you parked your car and you walked
3       in, did you swipe in?
4    A. Yes, sir.
5    Q. On those days when you did have to pick
6       up new equipment, you had to go to the
7       supply room; correct?
8    A. Yes, sir.
9    Q. How long did that take, to pick up the
10      new stuff?
11   A. I don't know.
12   Q. I don't need a precise answer. Can you
13      estimate it?
14   A. No, sir.
15   Q. Was there a line there?
16   A. Yes, sir.
17   Q. How big of a line?
18   A. I don't know how big the line was.
19   Q. Pardon?
20   A. I don't know how big the line was.
21   Q. Okay. Prior to the time that your
22      shift actually started, when you
23      started working on the birds, when --

33

1       how much time before that did you
2       actually go onto the production floor?
3    A. I don't know. I don't know.
4    Q. How long did it take you to travel from
5       the break room to the production floor?
6    A. I don't know.
7    Q. It's right across the hall, isn't it,
8       the evis break room from the evis
9       department?
10   A. Yes, sir.
11   Q. How did you know it was time to leave
12      the break room when you first got there
13      in the morning to go to your
14      workstation?
15   A. Had to be on the line at five
16      minutes -- five minutes till the time.
17   Q. So you just watched the clock?
18   A. Yes, sir.
19   Q. Tell me what you did from the time you
20      left the break room until you got to
21      your workstation.
22   A. When I got in the production area, I
23      put on my equipment.

b6eb291c-e036-4331-8a0d-453d7f3f7000

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

34

1  Q. Once you got into the -- onto the
2     production floor, how long did it take
3     you to put on this equipment?
4  A. I don't know.
5  Q. Could you put it on while you were
6     walking?
7  A. No, sir.
8  Q. Did some people put it on while they
9     were walking?
10 A. No, sir, not that -- I mean, no, sir,
11    not that I recall.
12 Q. Well, explain to me how you put it on.
13 A. I would stand at the -- where we hang
14    it at and put it on right there.
15 Q. So you had hangers?
16 A. Yes, sir.
17 Q. And you stood at the hanger and put it
18    on?
19 A. Yes, sir, at the table.
20 Q. Pardon?
21 A. They had a table right there, too.
22 Q. Did you have to wait to get a hanger?
23 A. No, sir.

35

1  Q. And you don't know how long it took you
2     to put this stuff on?
3  A. No, sir.
4  Q. One minute, two minutes?
5  A. I don't know.
6  Q. Did it take you as long as fifteen
7     minutes?
8  A. I don't know.
9  Q. You have no estimate whatsoever?
10 A. No, sir.
11 Q. Before you stepped up -- and we're
12    still talking about the period of time
13    in the morning when you started your
14    shift -- were you required to perform
15    any washing activities before you
16    stepped up onto the line?
17 A. Yes, sir.
18 Q. What did you wash?
19 A. My apron, my gloves, and my boots.
20 Q. And how long -- describe for me what
21    you did.
22 A. Used soap and washed the gloves off,
23    apron, and sprayed sanitizer water on

36

1     the boots.
2  Q. Were the boots sanitized as you walked
3     in or did you have to do that
4     separately somehow?
5  A. I know before I left they put a -- I
6     don't know what you call it -- a thing
7     where they spray the sanitizer, but
8     they wasn't doing it at first, when I
9     first got there.
10 Q. Did this happen when Equity had the
11    plant?
12 A. Not when they first got it.
13 Q. But sometime after that, they put it in
14    this system where -- and am I correct
15    that all you had to do is walk through
16    the area and your boots would be
17    sanitized? Was that your
18    understanding?
19 A. The stuff would come out the little
20    pipe.
21 Q. You didn't have to stop, did you?
22 A. Yeah. If you want to get it all over
23    your boot. I mean . . .

37

1  Q. You did have to stop?
2  A. Uh-huh.
3  Q. And how long did that take?
4  A. I don't know how long it took.
5  Q. Few seconds?
6  A. I don't know.
7  Q. You don't know?
8  A. Uh-uh.
9  Q. I think you answered this. I apologize
10    if you did. But you don't recall how
11    long it took you to walk from the break
12    room to the evisceration production
13    floor; is that correct?
14 A. No, sir.
15 Q. You do not recall?
16 A. Oh, no, I don't recall.
17 Q. Did you have lockers for use while you
18    were working at -- when the plant was
19    owned by Equity?
20 A. Yes, sir.
21 Q. And what did you use the lockers for?
22 A. To put the equipment in. We didn't
23    have lockers at first.

b6eb291c-e036-4331-8a0d-453d7f3f7000

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

38

1  Q. When did you get lockers?
2  A. I don't -- I don't know when, but we
3     didn't have them at first.
4  Q. Did you have them when CP operated the
5     plant?
6  A. No, sir.
7  Q. So can I assume that the lockers were
8     put in when Equity took over?
9  A. Yes, sir, but not at first.
10 Q. Okay.  You say you stored equipment in
11    the lockers?
12 A. Yes, sir.
13 Q. What equipment did you store?
14 A. My gloves and -- my cotton gloves.
15 Q. What else, if anything?
16 A. That's it.
17 Q. So you just used your locker to put the
18    cotton gloves in?
19 A. That's it.
20 Q. Take me through now what you did when
21    it was your break time from the time
22    you left your workstation till you got
23    to the break room.

39

1  A. I walked to the sanitizer station,
2     washed down.
3  Q. What did you wash?
4  A. My apron, my hands, my gloves, my
5     boots -- I sprayed my boots off -- and
6     walked to the hanging thing and hang my
7     stuff up.
8  Q. And what did you hang up?
9  A. My apron, smock, gloves.  That's --
10    that's it that I can remember.
11 Q. Did you hang up your sleeves?
12 A. Sleeves.
13 Q. Did you hang up your plastic arm
14    guards?
15 A. Yes.
16 Q. Was it your understanding that you were
17    not permitted to wear your smock out of
18    the production floor area?
19 A. Yes, sir.
20 Q. And was it your understanding that you
21    were not permitted to wear your apron
22    and the sleeves outside of the
23    production area?

40

1  A. Yes, sir.
2  Q. So I gather that when you went into the
3     break room, you kept your boots on and
4     your hair net and your earplugs?
5  A. Yes, sir.
6  Q. How many wash stations were available
7     to you on the evisceration production
8     floor?
9  A. One.
10 Q. One for the whole department?
11 A. It was, like, doubled.
12 Q. How many people could use the wash
13    station at once?
14 A. Say about three.
15 Q. Can you estimate to me the amount of
16    time it took from the time you left
17    your workstation on break to get to the
18    break room?
19 A. No, sir.
20 Q. No estimation at all?
21 A. No, sir.
22 Q. Did all the employees that you were
23    able to observe wash their plastic

41

1     apron and sleeves off before they left
2     for break?
3  A. Yes, sir.
4  Q. Was that a requirement?
5  A. Yes, sir.
6  Q. And how were these requirements as to
7     what you were to wear on and off the
8     production floor and the washing and so
9     forth, how were these requirements
10    communicated to you?
11 A. From the supervisor.
12 Q. Okay.  Let's do the process in reverse.
13    Now take me from the break room back to
14    your workstation.  Tell me what you did
15    when the break was over, what you had
16    to do to get back to your workstation.
17 A. Go to the production floor, put my
18    equipment on, and walk to the station.
19 Q. When you went back from break, you
20    didn't have to wash your equipment
21    again, did you?
22 A. If you wanted to, you could.
23 Q. But it wasn't a requirement?

b6eb291c-e036-4331-8a0d-453d7f3f7000

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

42

1  A. No.
2  Q. Can you estimate to me the amount of
3     time it took from the time you left the
4     break room to when you were at your
5     workstation following the end of your
6     break?
7  A. No, sir.
8  Q. You don't have any estimate whatsoever?
9  A. No, sir.
10 Q. Let's go to the end of the shift now.
11    Take me from what you did from the time
12    your shift ends, or ended, until you
13    left the plant. What did you do?
14 A. Have to wait in line.
15 Q. What line were you waiting in?
16 A. At the wash station. Wash my gloves
17    off, wash my apron off, spray my boots
18    off, take my stuff off, and put my
19    gloves in the locker. And I take
20    everything else home with me and wash
21    it in the wash machine.
22 Q. So you took the smock home and washed
23    it?

43

1  A. (Witness nods head.)
2  Q. Correct?
3  A. Yes.
4  Q. You have to say yes. She can't take
5     down a shake of the head. Sorry.
6  A. Yes, sir.
7  Q. So you take the smock home to wash;
8     correct?
9  A. Yes, sir.
10 Q. And you took the plastic sleeves home
11    to wash?
12 A. Yes, sir.
13 Q. And the plastic arm guards?
14 A. Yes, sir.
15 Q. Did you do this during the CP period
16    and the Equity period?
17 A. Yes, sir.
18 Q. And then did you clock out?
19 A. Yes, sir.
20 Q. How long would it take you from the
21    time you stepped off your workstation
22    to when you walked out the door?
23 A. I don't know.

44

1  Q. You cannot estimate it at all?
2  A. No, sir.
3  Q. What is your understanding as to how
4     the company kept track of the hours you
5     worked during the time you worked there
6     for Equity?
7  A. By a card they had.
8  Q. Pardon?
9  A. A card they had to swipe.
10 Q. Did you say a card they had?
11 A. Yes, sir.
12 Q. Who's "they"?
13 A. Supervisors.
14 Q. And what would the supervisor do with
15    the card?
16 A. They would swipe it.
17 Q. And what did that indicate to you?
18 A. The time you was in and time you was
19    out.
20 Q. And was it your understanding that you
21    were to be paid for the time you worked
22    between when the supervisor started --
23 A. Yes, sir.

45

1  Q. -- by swiping his card?
2  A. Yes, sir.
3  Q. And what was your understanding as to
4     when the time ended for which you were
5     to be paid? Did the supervisor swipe
6     his card again?
7  A. Yes, sir.
8  Q. And you understood that that was the
9     end of the time that you were to be
10    paid?
11 A. Yes, sir.
12 Q. How did you have this understanding?
13 A. When I became a shift leader, I seen
14    the card.
15 Q. And did you talk to anybody about what
16    you were seeing?
17 A. No, sir.
18 Q. You just assumed that that was the
19    start of when you were to be paid and
20    the finish?
21 A. Yes, sir.
22 Q. During the period that you worked there
23    for either CP or Equity, did you ever

b6eb291c-e036-4331-8a0d-453d7f3f7000

46

1    go to your supervisor or the payroll
2    department to complain about any errors
3    you thought were in your checks?
4    A. No, sir.
5    Q. How often were you paid?
6    A. Every week.
7    Q. When you got your paycheck, did you
8    take a look -- did your paycheck have a
9    stub on it that had the hours worked?
10   A. Yes, sir.
11   Q. Did you review that information when
12   you got your paycheck?
13   A. Yes, sir.
14   Q. At any time when you worked for CP or
15   Equity, did you have reason to think
16   that, hey, the paychecks that were
17   issued to you were inaccurate?
18   A. No, sir.
19   Q. Did you keep track of the hours you
20   worked every day, personally?
21   A. No, sir.
22   Q. During the time that you worked at
23   either -- when the plant was either

47

1    owned by Equity or CP, did you ever
2    keep any kind of diary or a notebook or
3    notes showing what you believed to be
4    the hours that you worked?
5    A. No, sir.
6    Q. Do you know of anyone that you worked
7    with that did keep any such records?
8    A. No, sir.
9    Q. Have you made any calculations as to
10   the time that you think you worked but
11   you weren't paid for?
12   A. No, sir.
13   Q. During the time that you were working
14   at the plant, again, either when it was
15   owned by CP or Equity, were you ever
16   required or were you ever asked to work
17   overtime?
18   A. Yes, sir.
19   Q. And when this occurred, were you paid
20   for the overtime?
21   A. Yes, sir, I was paid.
22   Q. Pardon?
23   A. Yes, sir.

48

1    Q. And were you paid time and a half for
2    that overtime?
3    A. I don't really know.
4    Q. Did you ever have any complaints about
5    the overtime pay that you got or how it
6    was computed?
7    A. No, sir.
8    Q. Have you ever filed a grievance with
9    the union about any pay issues?
10   A. No, sir.
11   Q. You indicated when we started, when I
12   asked you some questions about the
13   union, you don't recollect whether you
14   were a member of the union. Do you
15   recall that?
16   A. Yes, sir.
17   Q. I have --
18       MR. FRY: John, I don't feel
19   compelled to mark this as an exhibit.
20   I just have a question off of it. If
21   you would like me to mark it as an
22   exhibit, I will. It's her responses to
23   interrogatories.

49

1        MR. STEENSLAND: No. As long
2    as she can look at it, that's fine.
3        MR. FRY: She can look at it.
4    Q. Ms. Delbridge --
5        MR. FRY: Actually, why don't
6    we go ahead and mark it.
7        (Defendant's Exhibit 1 was
8        marked for identification.)
9    Q. Ms. Delbridge, I'm showing you what --
10   a document that we marked as Delbridge
11   Exhibit 1, and it is a copy of your
12   responses to some interrogatories that
13   the company served on your lawyers.
14   And just let me ask you to flip to the
15   last page. And is that your signature
16   there at the bottom?
17   A. Yes, sir.
18   Q. Take a minute and look through this
19   document.
20       (Witness reviews document.)
21   Q. Have you seen this document before?
22   A. Yes, sir.
23   Q. Do you recollect reviewing it before

b6eb291c-e036-4331-8a0d-453d7f3f7000

50

1  you signed the last page?
2  A. Yes, sir.
3  Q. And do you recollect that everything
4     was accurate when you reviewed it?
5  A. Yes, sir.
6  Q. I just want to refer you to only one
7     question, and that is Interrogatory
8     No. 15. It's on page 9. And that
9     interrogatory requested you to identify
10    each and every individual who
11    represents employees at the plant for
12    purposes of collective bargaining,
13    including the union which represents
14    those employees, and it goes on. Do
15    you see that?
16 A. Yes, sir.
17 Q. And in your response, we see, quote,
18    Plaintiff does remember the union
19    representative Jackie Davis who
20    represented the employees at the plant
21    for purposes of collective bargaining,
22    close quote. Do you see that?
23 A. Yes, sir.

51

1  Q. Does that refresh your recollection
2     that there was a union present in this
3     plant?
4  A. Yes, sir.
5  Q. And let me ask you again, were you a
6     member of the union, to your knowledge?
7  A. I can't remember if I was.
8  Q. You don't remember?
9  A. No.
10 Q. How did you know that Jackie Davis was
11    a union remember?
12 A. An employee told me.
13 Q. When did an employee tell you that?
14 A. I can't remember when, but . . .
15 Q. Was it when you were working there?
16 A. Yes, sir.
17 Q. To your -- were you aware of a lawsuit
18    that was brought on behalf of Jackie
19    Davis and another person against CP?
20 A. No, sir.
21 Q. You have no knowledge of that?
22 A. No, sir.
23 Q. You told me, I think, earlier in this

52

1  deposition that you used a chain
2  glove --
3  A. Yes, sir.
4  Q. -- in your job in the evis department.
5     How did you obtain that each day?
6  A. They would collect them.
7  Q. How did you get it in the day? When
8     you started the day, how would it be
9     provided to you?
10 A. The shift -- the shift leader or the
11    supervisor gave it to us.
12 Q. Did they give it to you while you were
13    on the line?
14 A. Yes, sir.
15 Q. And then they would collect them when
16    you were leaving the line?
17 A. Yes, sir.
18 Q. So you weren't responsible in any way
19    for maintaining that chain glove?
20 A. No, sir.
21 Q. During the time that you -- the whole
22    time you worked at the plant, did you
23    ever complain to any supervisor about

53

1  any pay issues?
2  A. No, sir.
3  Q. Have you ever filed any claim with the
4     department of labor, the U.S.
5     Department of Labor, or any other
6     governmental agency with respect to any
7     wage claim in connection with your
8     employment at CP or Equity?
9  A. Not that I can think of.
10 Q. I understand that you were ultimately
11    terminated for violations of the point
12    or attendance system. Besides that,
13    were you ever subject to any other
14    disciplinary action by either CP or
15    Equity?
16 A. No, sir, that I can think.
17 Q. Thank you.
18       MR. FRY: That's all I have.
19       MR. UNDERWOOD: All right.
20    That's it.
21 (The deposition of Laurie Delbridge
22    concluded at 11:08 a.m. on May 21,
23    2008.)

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

54

```
1       * * * * * * * * * *
2         REPORTER'S CERTIFICATE
3       * * * * * * * * * *
4       STATE OF ALABAMA
5       COUNTY OF MONTGOMERY
6          I do hereby certify that the above
7       and foregoing transcript was taken down
8       by me in stenotype, and the questions
9       and answers thereto were transcribed by
10      means of computer-aided transcription,
11      and that the foregoing represents a
12      true and correct transcript of the
13      testimony given by said witness.
14         I further certify that I am neither
15      of counsel, nor any relation to the
16      parties to the action, nor am I anywise
17      interested in the result of said case.
18
19
20

21      Bridgette W. Mitchell,
        Certified Court Reporter and
22      Commissioner for the State of
        Alabama at Large
23      ACCR No. 231 - Expires 9/30/08
        MY COMMISSION EXPIRES 1/25/2010
```

b6eb291c-e036-4331-8a0d-453d7f3f7000

**TAB 15**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


BETTY ANN BURKS, et al.,

     Plaintiffs,


vs.  CIVIL ACTION 2:06-cv-01081-MEF-DRB


EQUITY GROUP EUFAULA DIVISION, LLC,

     Defendant.


*    *    *    *    *    *

DEPOSITION OF KENNETH FORD, taken
pursuant to notice and stipulation on
behalf of the Defendant, at Williams,
Pothoff, Williams & Smith, 125 South
Orange Avenue, Eufaula, Alabama, before
Bridgette Mitchell, Shorthand Reporter
and Notary Public in and for the State
of Alabama at Large, on May 21, 2008,
commencing at 3:25 p.m.

e4251f92-7b79-4a64-bed1-17bbc1848bc1

**2**

APPEARANCES

FOR THE PLAINTIFFS:
Carl E. Underwood, III, Esquire
COCHRAN, CHERRY, GIVENS & SMITH
163 W. Main Street
Dothan, Alabama 36301

FOR THE DEFENDANT:
Gary D. Fry, Esquire
PELINO & LENTZ
One Liberty Place
Thirty-second Floor
Philadelphia, Pennsylvania 19103

**3**

STIPULATIONS
It is hereby stipulated and
agreed by and between counsel
representing the parties that the
deposition of KENNETH FORD is taken
pursuant to notice and stipulation on
behalf of the Defendant; that all
formalities with respect to procedural
requirements are waived; that said
deposition may be taken before
Bridgette Mitchell, Shorthand Reporter
and Notary Public in and for the State
of Alabama at Large, without the
formality of a commission; that
objections to questions, other than
objections as to the form of the
questions, need not be made at this
time, but may be reserved for a ruling
at such time as the deposition may be
offered in evidence or used for any
other purpose as provided for by the
Civil Rules of Procedure for the State
of Alabama.

**4**

It is further stipulated and
agreed by and between counsel
representing the parties in this case
that the filing of the deposition of
KENNETH FORD is hereby waived and that
said deposition may be introduced at
the trial of this case or used in any
other manner by either party hereto
provided for by the Statute, regardless
of the waiving of the filing of same.
It is further stipulated and
agreed by and between the parties
hereto and the witness that the
signature of the witness to this
deposition is hereby waived.

INDEX

EXAMINATION                          Page
By Mr. Fry........................ 5

EXHIBIT                    Page
DX-1    Declaration        13

**5**

KENNETH FORD, having first been
duly sworn or affirmed to speak the
truth, the whole truth, and nothing but
the truth, testified as follows:
EXAMINATION
BY MR. FRY:
Q. Mr. Ford, you sat through Ms. Glenn's
deposition we just held; correct?
A. Right.
Q. And did you hear my instructions to
her?
A. I did.
Q. And did you understand them?
A. I did.
Q. And are they okay with you?
A. Yes.
Q. Okay. We can save some time. What's
your home address?
A. 20 Stevens Road, Clayton, Alabama.
Q. And your date of birth?
A. Fourth month, 27th day, '63.
Q. Are you currently employed?
A. I am.

e4251f92-7b79-4a64-bed1-17bbc1848bc1

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

6

1   Q. By whom?
2   A. Equity.
3   Q. How long have you been employed by
4      Equity?
5   A. I was employed with them March the 9th
6      of 2001.
7   Q. So you were employed at the Baker Hill
8      plant when CP ran it?
9   A. Right.
10  Q. And have you been employed continuously
11     since then at that plant?
12  A. I have.
13  Q. What is your current job at the plant?
14  A. I am what they call certified as a
15     back-up killer.
16  Q. Back-up killer?
17  A. Right.
18  Q. How long have you had that job?
19  A. Ever since I've been employed with
20     them.
21  Q. So you've been a back-up killer since
22     March of '01?
23  A. Right.

---

7

1   Q. Through CP and Equity? That's all you
2      ever did there? You work as a back-up
3      killer?
4   A. Well, they rotated us out to -- from
5      back-up killer to live hanger, and I've
6      hung birds also.
7   Q. Okay. So you're also in live hang?
8   A. Right.
9   Q. Now, were there certain periods of time
10     that you did live hang only?
11  A. Only when they were short-handed.
12  Q. Okay. So generally you were a back-up
13     killer, and when they were short handed
14     you did live hang?
15  A. Right.
16  Q. And can you put any estimation on the
17     amount of time over this seven-year
18     period that you might have been doing
19     live hang?
20  A. I cannot.
21  Q. Was it a small percentage or a big
22     percentage or half and half?
23  A. Well, I can tell you that -- the only

---

8

1      thing I can tell you is I hung birds
2      when they needed me to. When I was
3      approached by my supervisor and asked
4      to go to live hanger and asked to
5      rotate out, that's wat I did so ...
6   Q. Okay. How often does that happen?
7   A. That was pretty frequently at one
8      point.
9   Q. Was it earlier that it was more
10     frequent?
11  A. It was pretty frequent. Like I said,
12     when they're short of hangers, that's
13     when I was asked to do so. That's when
14     I did the job -- I performed the job.
15  Q. Have you worked different shifts?
16  A. Only first shift.
17  Q. Only first shift?
18  A. Only first shift.
19  Q. And what are your hours?
20  A. From -- I have to clock in at 5:30, and
21     ten minutes to six we have to be on the
22     line dressed and ready to work.
23  Q. So you -- when you say you clock in,

---

9

1      you swipe in?
2   A. Swipe in at 5:30, swipe my timecard.
3   Q. And you're required to be on the line
4      at 5:50?
5   A. Right.
6   Q. And is that for the back-up killing
7      position?
8   A. Back-up killer.
9   Q. What about live hang?
10  A. Like I said, only when they asked for
11     my assistance in live hang is the only
12     time I performed that duty.
13  Q. Were there days when you started live
14     hang, started working in live hang?
15  A. Yes, it was.
16  Q. And was it the same time frame? You
17     had -- you clocked in at 5:30 and you
18     had to be on the line at 5:50?
19  A. Uh-huh. (Witness nods head.)
20  Q. And you worked no other shifts?
21  A. No other shifts.
22  Q. I take it as a back-up killer, you did
23     what the job description says, you --

---

e4251f92-7b79-4a64-bed1-17bbc1848bc1

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

**10**

1  A. Back-up kill.
2  Q. If the machine didn't do it, you had to
3    do it?
4  A. That's what I did.
5  Q. And live hang, you took the birds and
6    hung them?
7  A. Hang them by their feet.
8  Q. And who was your supervisor for these
9    positions?
10 A. Dee Green.
11 Q. Pardon?
12 A. Dee Green.
13 Q. Dave?
14 A. Dee Green. You want to know my present
15   supervisor or the supervisor that I had
16   when I first started?
17 Q. No. Who's your present supervisor?
18 A. James McElroy.
19 Q. And how long has he been your
20   supervisor?
21 A. Oh, I would say two to three months.
22 Q. And who was your supervisor before
23   that?

**11**

1  A. Dee Green.
2  Q. Dee?
3  A. Dee Green.
4  Q. And how long was -- is it Mr. Green or
5    Ms. --
6  A. This is a lady.
7  Q. Lady, Dee. How long was Ms. Green your
8    supervisor?
9  A. Oh, she was my -- she was my supervisor
10   for, like, five years.
11 Q. And what's your present rate of pay?
12 A. My present rate of pay at this moment?
13 Q. Yeah.
14 A. I make 10 -- 10.95 at this present
15   time.
16 Q. And when you started, how much did you
17   make?
18 A. I started out making 6.38.
19 Q. Now, you are a -- you have a claim in
20   this lawsuit?
21 A. I do.
22 Q. And how did you first learn about this
23   lawsuit?

**12**

1  A. I learned it through -- from my
2    coworkers, fellow employees around the
3    plant.
4  Q. And what did they tell you?
5  A. What I heard was -- is that the poultry
6    plants in the southeastern district
7    area was -- was being sued for under --
8    under wages.
9  Q. And then you signed an opt-in sheet?
10 A. Do what, now?
11 Q. You signed a sheet to join in; is that
12   correct?
13 A. Uh-huh. Yes.
14 Q. On the basis of what you had heard?
15 A. Yes.
16 Q. And what's your understanding of what
17   your claim is?
18 A. My claim is -- is not being paid for my
19   proper hours such as my break -- my
20   break period when I -- when I was
21   relieved from the work area to go to
22   break and when I -- also when I come
23   back from break, go back to work.

**13**

1  Q. Are you a member of the union?
2  A. I am not.
3     (Defendant's Exhibit 1 was marked
4      for identification.)
5  Q. Mr. Ford, we're showing you a document
6    which we've marked as Exhibit Ford 1,
7    and it's headed declaration. And it
8    appears to be a declaration that you
9    made. Would you take a minute and
10   review the form for me, please?
11    (Witness reviews document.)
12 Q. Okay?
13 A. All right. Okay.
14 Q. Okay. Is that your signature on page 3
15   of this declaration, Mr. Ford?
16 A. It is.
17 Q. And do you recall signing this
18   document?
19 A. I don't.
20 Q. Do you -- well, I assume since you
21   don't recall signing it, you don't
22   recall reading it?
23 A. I -- I don't recall signing it.

---

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

14

1   Q. Do you recall reading it?
2   A. At this present time, I don't.
3   Q. You did not prepare this declaration,
4      did you?
5   A. No.
6   Q. Let me refer you to paragraph 10 of
7      your declaration. And I just want to
8      read it into the record and then I have
9      just a couple of questions about it.
10     Paragraph 10 of your declaration dated
11     February 23, 2007, reads as follows:  I
12     personally am aware that other and
13     additional current and former hourly
14     processing employees will join this
15     litigation if they are given notice of
16     it and an opportunity to join it,
17     period. Numerous employees have
18     expressed their desire to join this
19     litigation but have not done so to date
20     because of fear of retaliation by
21     defendant and its managers, period.  To
22     that end, defendant and its managers
23     have attempted to discourage and/or

---

15

1      intimidate my coworkers from joining
2      this lawsuit by issuing both expressed
3      and implied threats involving job
4      security, period.  Have I read it
5      correctly?
6   A. Yes.
7   Q. This declaration in this paragraph
8      states that numerous employees have
9      expressed their desire to join this
10     litigation but have not done so to date
11     because of fear of retaliation by
12     defendant and its managers.  Do you
13     know of such employees?
14  A. I don't.
15  Q. You do not?
16  A. I don't.
17  Q. This declaration also reads that the
18     defendant, and that's Equity, and its
19     managers have attempted to discourage
20     or intimidate your coworkers from
21     joining this lawsuit by issuing both
22     express and implied threats involving
23     job security.  Do you know of any such

---

16

1      intimidation or discouragement or
2      threat?
3   A. I don't.
4   Q. Did you review any papers before you
5      came here today?
6   A. Repeat that, sir.  I didn't quite
7      understand.
8   Q. In preparation for coming here today,
9      did you look at any papers, documents?
10  A. I did not.
11  Q. And you don't recall ever seeing this
12     before?
13  A. I can't recall at this time.
14  Q. Did you speak with anyone concerning
15     your appearance here today besides your
16     attorneys?
17  A. I did not.
18  Q. As a back-up killer, what sort of items
19     of clothing or equipment do you wear?
20  A. Hair net, beard net, safety goggles,
21     arm guard, chain knit gloves, cotton
22     liners, rubber gloves, apron, rubber
23     boots.

---

17

1   Q. Okay.  I think I missed one in there.
2      Let me go down the list.  Hair net,
3      beard net, goggles, glove liners and
4      gloves?
5   A. Uh-huh.
6   Q. And apron?
7   A. Uh-huh.
8   Q. And boots?
9   A. Right.
10  Q. Anything else?
11  A. Earplugs.
12  Q. Earplugs.  Anything else?
13  A. Not that I can recollect.
14  Q. Okay.  You're not required to wear a
15     smock?
16  A. Yes, I do.
17  Q. You do wear a smock?
18  A. I do wear the smock.
19  Q. You don't wear the plastic sleeves?
20  A. I -- I can, but I don't.
21  Q. It's up to you?
22  A. It's up to me to wear that.
23  Q. Are any of these other items optional

---

18

1    to you?
2    A. No. That stuff, your PPE equipment,
3        you have to have.
4    Q. Everything that you listed to me,
5        you -- you're required to --
6    A. You're required to wear that.
7    Q. But you have the option to wear the
8        plastic sleeves?
9    A. Right.
10   Q. Do you wear these same items of
11       equipment and outerwear when you do
12       live hang?
13   A. I wear everything but the chain knit
14       glove.
15   Q. And when you do live hang, is it your
16       understanding that everything that you
17       wear is required?
18   A. Correct.
19   Q. Which of these items are issued to you
20       by the company?
21   A. Well, I get all of them from the supply
22       area where we pick up our supplies at.
23   Q. What about the boots?

19

1    A. The boots? The boots I purchase from
2        them also.
3    Q. Which of these items do you get on a
4        daily basis?
5    A. Rubber gloves, glove liners, beard
6        nets, hair nets.
7    Q. Those are the only things you get on a
8        daily basis?
9    A. Right.
10   Q. How often do you get your smock?
11   A. I get the smock on a daily basis.
12       Excuse me.
13   Q. No problem. What about the apron?
14   A. I sanitize my apron and use it over
15       repeatedly.
16   Q. Can you wear any of these things from
17       home?
18   A. You can wear your boots, but you have
19       to sanitize them before you enter your
20       work area.
21   Q. Do you have to sanitize your boots
22       before you go into live hang?
23   A. No, you don't.

20

1    Q. When you aren't working, where do you
2        store these items?
3    A. They have a rack up on the wall which
4        you use to hang your items. They put
5        racks up on the wall.
6    Q. In what area?
7    A. In -- in the -- in the kill floor area
8        where I work, and they have also in
9        live hanging area.
10   Q. Is the -- your job as a back-up killer,
11       is that considered part of the
12       evisceration department, if you know?
13   A. No, it's not.
14   Q. It's part -- what department do you
15       work in?
16   A. I work on the -- well, let me rephrase
17       that. I don't know whether they
18       consider that as a part of the
19       evisceration area or not. I know I --
20       I perform the job of back-up killer and
21       live hanger.
22   Q. But you keep your apron and -- do you
23       use the plastic guards?

21

1    A. I do, the arm guard. Did I not mention
2        that?
3    Q. I think you might have. I may have
4        neglected to write it down. The apron
5        and the arm guards, where do you keep
6        them?
7    A. I hang them on the wall when I'm --
8        when I'm not wearing them.
9    Q. So you don't have a locker?
10   A. They issued us a locker, but I -- I
11       have a bag, a grip, that I carry to
12       work every day and, like I said, I hang
13       them in the break room on the -- on
14       the -- we have a rack that we hang the
15       stuff on.
16   Q. Now, your -- your job as a back-up
17       killer, you have to use a knife;
18       correct?
19   A. Correct.
20   Q. And that's why you use the safety --
21       the arm guards.
22   A. Arm guard and the chain knit glove.
23   Q. And the glove. When you do live hang,

e4251f92-7b79-4a64-bed1-17bbc1848bc1

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

22

1    you use the guards because the chickens
2    can claw you?
3    A. Right.  I use the -- the guards to
4    protect my arms.
5    Q. But you don't use the chain glove?
6    A. Don't use the chain glove.
7    Q. Do you use any other tools or equipment
8    in performing your jobs as back-up
9    killer or live hanger?
10   A. I don't.
11   Q. Where do you put on the smock, the
12   apron, and the guards and the other
13   things that you put on in the morning?
14   A. Well, we have what they call live
15   hanging break room, and that's where I
16   put on my working gear at, my PPE
17   equipment.
18   Q. When you have to go to the supply room
19   to pick up some of these items in the
20   morning, is there a line?
21   A. Usually, it is.
22   Q. And how long do you typically have to
23   wait?

23

1    A. It just depends on how many people is
2    in front of you when you get there.
3    Q. Do you usually get there before --
4    strike that.
5    Do you start -- when you work live
6    hang, do you usually start before the
7    evisceration people start because
8    you're the first guy in the line?
9    A. Yes, you have to start before they
10   start.
11   Q. So you have to be ready before they go;
12   correct?
13   A. Correct.
14   Q. So you put your smock on in the live
15   hang break room?
16   A. Correct.
17   Q. And that's where you put the apron on?
18   A. Correct.
19   Q. And the gloves?
20   A. Correct.
21   Q. And all that other stuff?
22   A. Correct.
23   Q. And when do you put this stuff on?

24

1    A. When do I put it on?
2    Q. Yeah.
3    A. Before I -- before I attempt to do my
4    job.
5    Q. Can you -- are you familiar with any of
6    the routines with regards to what goes
7    on in evisceration and debone?
8    A. I know some of the things that go on.
9    I'm familiar with some of the things
10   that go on over there.
11   Q. Are you familiar with the fact that
12   they cannot put on their smock, for
13   instance, in their break rooms?
14   A. I -- I couldn't say because I don't --
15   I don't work in that area.
16   Q. But you are permitted to put your smock
17   and your apron and everything else on
18   in your break room?
19   A. I am.
20   Q. Okay.  And when do you do that?
21   A. Before I get ready to perform my job.
22   Q. And do you do it right before you start
23   working on the line or do you do it

25

1    when you first get to work and then sit
2    around or, you know, can you give me a
3    time frame?
4    A. I cannot give you a time frame.
5    Q. Okay.  Now, your shift starts at 5:30?
6    A. Right.  I swipe in at 5:30.
7    Q. And you're supposed to be on the line
8    at 5:30?
9    A. I'm supposed to -- I swipe in at 5:30.
10   I've got to be on the job site at 5:30.
11   At ten minutes to six, I have to be in
12   my designated work area on the line
13   getting ready to kill birds.
14   Q. What do you do from 5:30 to 5:50?
15   A. 5:30 to 5:50?  By that time I'm walking
16   from the area where I pick up my
17   supplies at, got to walk to my
18   designated work area.
19   Q. Okay.  We'll get to that in a second.
20   How many breaks do you get a day?
21   A. Get two.
22   Q. For how long?
23   A. Thirty-minute break.  Two thirty-minute

e4251f92-7b79-4a64-bed1-17bbc1848bc1

26

1    breaks a day.
2    Q. And it's your understanding your breaks
3    are not paid?
4    A. Excuse me?
5    Q. Your breaks are unpaid?
6    A. Well, we don't -- if that's what you
7    mean, we don't clock out to go to
8    break.
9    Q. What's your understanding as to whether
10    or not you're paid for your breaks?
11    A. Excuse me. Could you repeat that?
12    Q. Your understanding, do you believe to
13    be -- that you are paid for your
14    breaks?
15    A. Well, like I say, I know I get thirty
16    minutes for a break and I -- I do forty
17    hours a week.
18    Q. Okay. How do you know when it's time
19    for you to take a break?
20    A. With my position, the job that I
21    perform, when the birds coming from --
22    stop coming from down in the basement
23    to me, then I know it's time to go to

27

1    break.
2    Q. Okay. That's when you're working the
3    killer, back-up killer position?
4    A. Back-up killer.
5    Q. When you're working live hang, how do
6    you know it's time to go on break?
7    A. The line leader lets us know that it's
8    time to go to break.
9    Q. Since you're the first -- nothing can
10    happen without you putting those birds
11    on the hook. You can go to break
12    whenever your line leader tells you to;
13    correct?
14    A. Correct.
15    Q. And how do you know it's time to go
16    back to work?
17    A. By watching the clock on the wall.
18    Q. What time do you usually arrive at the
19    plant in the morning?
20    A. What time do I usually arrive at the
21    plant?
22    Q. Yeah.
23    A. Sometimes I try to get -- well, I try

28

1    to be there at 5:30. Sometimes it
2    might be 5:32 or 5:35.
3    Q. And that's what time you drive in the
4    parking lot?
5    A. That's -- that's not what time I drive
6    in the parking lot, but that's the time
7    I'm supposed to be clocked in on my --
8    I swipe in at 5:30.
9    Q. And where do you swipe in at?
10    A. At the time clock in -- in the break
11    room.
12    Q. In order to get into the plant, do you
13    have to clear any security?
14    A. Well, we come through the gates at the
15    entrance of the plant.
16    Q. Do you have to stop?
17    A. No. We got a decal, a parking decal,
18    on the car, the windshield of the car
19    in the corner. And they look and see
20    the decal and know you're employed with
21    Equity, you go in.
22    Q. When you leave at the end of the day,
23    do you have to pass through any

29

1    security?
2    A. Well, they -- they got -- like I said,
3    they got -- they got a security at the
4    guard shack.
5    Q. But you don't have to do any waiting
6    there, do you?
7    A. No.
8    Q. Have you ever been searched?
9    A. I have.
10    Q. And describe that for me.
11    A. Well, when I was leaving the premises
12    one day, they stopped and asked me
13    could they look in my truck, look
14    behind the seat and stuff under the
15    seat and in the back, in the bed of the
16    truck.
17    Q. Did that happen just once?
18    A. That I can recall. Once that I can
19    recall.
20    Q. You're not routinely searched when you
21    come on or when you leave the premises?
22    A. I am not.
23    Q. And you don't spend any time stopping

e4251f92-7b79-4a64-bed1-17bbc1848bc1

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

**30**

1  to be searched or to pass through any
2  security?
3  A. I don't.
4  Q. So any reference in this declaration
5  that you signed for claims for the time
6  it takes to pass through security or
7  clear security at the end of the day,
8  that's not accurate, is it?
9  A. Like I said, I don't recollect being
10 searched but one time. I was stopped
11 and searched one time.
12     (Short recess)
13 Q. So you don't spend -- just to get back
14 on track here, Mr. Ford, you don't
15 spend any time passing through
16 security?
17 A. No. They don't stop and check us.
18 They don't stop and check us.
19 Q. And so as far as you're concerned,
20 there's no claim in this lawsuit for
21 security, as far as you know?
22 A. Well, myself, I say I haven't been
23 checked. I cannot speak for others.

---

**31**

1  Q. Okay. After you go through the gate
2  and you park, you go -- do you go to
3  the supply room?
4  A. I go through the double doors and go to
5  the room where we pick up our -- our
6  stuff that we wear.
7  Q. At the supply desk?
8  A. Supply desk, yeah.
9  Q. Is that where you go first?
10 A. To the time clock first.
11 Q. Time clock first?
12 A. Swipe in. Then to the supply window.
13 Q. And I think you testified there may be
14 a line there.
15 A. It -- it all depends. Sometimes it be
16 two or three ahead of us. Sometimes it
17 may be six or seven.
18 Q. Does the line move fairly quickly or
19 not?
20 A. You -- you got a waiting period.
21 Q. How long?
22 A. I can't put a time frame on it because,
23 like I say, it -- it just all depends

---

**32**

1  on who they got doing the windows.
2  Some -- some of them hand out supplies
3  faster than others. It just all
4  depends on who they got working.
5  Q. Okay. After you pick up your supplies,
6  where do you go?
7  A. I -- I walk -- I walk to my work area.
8  Q. Do you actually go to the kill area?
9  A. I go to what we call live hanging break
10 room.
11 Q. Oh, you go to the break room?
12 A. Right.
13 Q. Once you get to the break room, what do
14 you do?
15 A. That's where I get dressed at. I put
16 on my PPE.
17 Q. And how long does it take you to put
18 that on in the break room?
19 A. I -- I couldn't say. I couldn't put a
20 time frame on it.
21 Q. And then what do you do?
22 A. After I put on my equipment, I go to my
23 work area, go to the line.

---

**33**

1  Q. Do you ever -- after you put your --
2  your stuff on in the live hang break
3  room, do you -- is it time always to go
4  right to your work area or do you have
5  any down time you can wait?
6  A. Most of the time, by the time I get
7  dressed it's time for me to go to work.
8  Q. Okay. And --
9  A. See, the --
10 Q. After you get dressed, you go
11 immediately -- when you're doing
12 back-up kill, after you get dressed in
13 the live hang break room, how far of a
14 walk is it to your workstation?
15 A. It's -- it's not that far.
16 Q. And when you get there, how long do you
17 have to wait until the first bird
18 comes?
19 A. I couldn't put a time frame on it. I
20 couldn't say.
21 Q. When you're doing live hang, how long
22 does it take you to walk from the live
23 hang break room to where you do your

---

e4251f92-7b79-4a64-bed1-17bbc1848bc1

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

34

1    job?
2    A. To be honest with you, I've never timed
3    it.
4    Q. Okay.
5    A. So I -- I couldn't tell you that.
6    Q. Now, before you actually perform your
7    job as a back-up killer, do you have to
8    do any washing?
9    A. No, I don't.  Not as a back-up killer,
10   I don't.
11   Q. And you don't have to do any washing
12   when you're doing live hang, do you?
13   A. No, I don't.
14   Q. I might have just asked you this, but
15   I've asked so many people this today
16   I'm going to ask it again.  How long
17   does it take you to put on this PPE?
18   A. I -- I can't put a time frame on it
19   because I haven't timed myself.
20   Q. Fair enough.  Now, when it's time for
21   you to go on your break, what do you
22   do --
23   A. I --

---

35

1    Q. -- when you're doing back-up kill?
2    A. I got to wait until the birds stop
3    coming.  Then I take off my stuff, wash
4    it up, and hang it on the wall.
5    Q. Where do you hang it?
6    A. On the wall on the rack that I told you
7    they have for us.  I hang it on -- on
8    the rack.
9    Q. In the live hang break room?
10   A. And on the kill floor.
11   Q. On the kill floor, right there?
12   A. In the kill room where I work at.
13   Q. Is there any wait time to wash?
14   A. Like I said, when the birds stop
15   coming.  I got to wait until the birds
16   stop coming.
17   Q. Right.
18   A. Then when the birds -- all the birds go
19   through, then I undress, wash up my
20   stuff, and put it on a rack so I --
21   when we start back up, I get it off the
22   rack, re-dress, get ready, prepare for
23   work again.

---

36

1    Q. How long -- and after you wash off and
2    take the stuff off, do you go to the
3    live hang break room?
4    A. I do.
5    Q. And can you tell me how much time it
6    takes for you after the last bird goes
7    by to get to the break room?
8    A. Oh, I couldn't give you a time frame on
9    that.  Like I said, I haven't -- I
10   don't time myself when I'm doing these
11   things.  I just get undressed and do
12   what I got to do, you know.
13   Q. The knife that you use in -- as a
14   back-up killer, where do you get that?
15   A. Oh, I have to go -- I have to go -- I
16   have to go through the evis, double
17   doors right there where evis and live
18   hang -- I go into there.  Most of the
19   time one of the line leaders will be
20   done washed them up and put them in a
21   tray there and I go pick them up and
22   bring them to my line, to my work area.
23   Q. And when do you do that?

---

37

1    A. Excuse me?
2    Q. When do you do that?
3    A. When I return from break.  And I also
4    do that in the morning time.  I get my
5    utensils and bring them to my -- to my
6    work area.
7    Q. Okay.  When you go on break, what do
8    you do with the knife?
9    A. I have to wash them up, wash them up
10   and make sure the line leader get them,
11   put them on a tray where she can get
12   them.
13   Q. Tell me what you do when you come off
14   break.
15   A. When I come off break?
16   Q. Yes, sir.
17   A. I come off break, I go to my work area,
18   suit up, get my stuff off the rack and
19   stuff and suit up.  And by the time I
20   get suited up, most of the time the
21   birds is coming, so I don't have any
22   time to lag around; the birds be there.
23   Q. And, again, can you give me any time

---

e4251f92-7b79-4a64-bed1-17bbc1848bc1

38

1    estimate of how long it takes you to go
2    from your break back to killing
3    chickens?
4    A. I haven't timed it. Being honest --
5    just being honest, I -- I haven't timed
6    it.
7    Q. Okay. Tell me what you do at the end
8    of the day. What do you have to do to
9    get out of the plant?
10   A. Okay. What I do to get out of the
11   plant, I wait until the birds stop
12   coming, I undress, wash my stuff up --
13   wash my stuff up, get it, wash up my
14   tools and stuff, make sure -- again,
15   make sure the line leader gets that --
16   those tools and utensils because I'm
17   responsible for them.
18   Q. Do you ever have any wait time doing
19   that?
20   A. Any wait time?
21   Q. Wait, waiting time.
22   A. Uh-uh. Most of the time I'm -- I'm --
23   I can get the -- one of the hose and

39

1    wash up my utensils because by that
2    time the relief man done came in.
3    Q. In this declaration that was prepared,
4    in paragraph 7 on page 2, about five
5    lines up from the end of paragraph 6,
6    you see --
7    A. I see 7.
8    Q. See where it says waiting in line to
9    return required supplies, tools, and
10   other equipment needed for line
11   activities? Do you see that?
12   A. Uh-huh.
13   Q. Do you ever have to do that?
14   A. I -- like I said, I get off the line, I
15   get the water hose and I wash up my
16   utensils, my knives and stuff that I
17   use, my gloves and stuff. And then I
18   have to carry it to the double doors
19   where -- like I say, where evis and
20   kill room join at. And I -- I either
21   give -- either then she's waiting for
22   it or either I sit it there where she
23   can get it.

40

1    Q. But you don't have to wait to do that,
2    do you? You're not waiting in line to
3    do that, are you?
4    A. Not -- not that, no.
5    Q. What do you do with your smock and your
6    hair net at the end of the day?
7    A. My hair net and all, that's not
8    reusable. It goes in the garbage can.
9    It goes in the garbage can. The smock,
10   I take it back. When I go swipe the
11   clock, they've got a big bin sitting
12   there you put the dirty laundry in.
13   Q. Can you estimate for me the amount of
14   time it takes at the end of the day
15   once the bird passes you till -- from
16   that time till when you leave the
17   plant?
18   A. I -- I haven't timed it. I haven't
19   timed it. So if I tell you that it
20   takes me a certain amount of time, I'd
21   be lying to you.
22   Q. It would be a guess. Is that -- is it
23   fair to say you would be guessing?

41

1    A. However you want to put it, guessing --
2    Q. How would you put it?
3    A. -- speculating or whatever you want to
4    call it.
5    Q. All right. What is your understanding,
6    Mr. Ford, as to how the company keeps
7    track of your time for pay purposes?
8    A. What is -- what is my understanding?
9    Could you repeat that, because I didn't
10   quite --
11   Q. Yeah. What's your understanding of how
12   the company keeps track of your time
13   for purposes of paying you?
14   A. My understanding is by the timecard we
15   swipe.
16   Q. The timecard you swipe in in the
17   morning?
18   A. Right.
19   Q. And the timecard you swipe when you
20   leave --
21   A. Right.
22   Q. -- at the end of the day?
23   A. Right.

e4251f92-7b79-4a64-bed1-17bbc1848bc1

42

1   Q. Have you ever had occasion to go to
2      your supervisor or the payroll
3      department to complain about your
4      paycheck?
5   A. I have went to my supervisor before.
6   Q. About a pay problem?
7   A. Yes.
8   Q. And how many times have you done that?
9   A. I've done that numerous times when my
10     hours be -- my hourly -- my hourly
11     hours be wrong on my check.
12  Q. And did your supervisor take care of
13     the problem?
14  A. Correct.
15  Q. Prior to this lawsuit that you're
16     involved in, have you ever made any
17     complaints about the time you're
18     claiming here?
19  A. Not that I can recall.
20  Q. Do you -- strike that. When you're
21     doing live hang, what do you have to do
22     to go on break?
23  A. Once the line leader tells us that it's

43

1      time to go to break, I undress, hang my
2      stuff on the rack, wash my boots off,
3      and go to break.
4   Q. So you don't have to wash any of the --
5   A. No, I don't. Uh-uh.
6   Q. And when you come back, you just have
7      to put it on. There's no washing
8      involved?
9   A. No, no washing.
10  Q. And at the end of the day, you just
11     have to take it off?
12  A. Take it off. And if you -- you know,
13     you got something that you can reuse,
14     such as your apron, you wash it off if
15     you want to.
16  Q. You don't have to?
17  A. You don't have to. You wash it off if
18     you want to or you reuse it or either
19     you can get new supplies.
20  Q. Is it fair to say that you get out of
21     the plant quicker at the end of the day
22     when you're doing live hang than when
23     you're doing back-up killing?

44

1   A. I couldn't say.
2   Q. You can't say?
3   A. Can't say.
4   Q. Okay. Have you kept any kind of a
5      notebook or diary in which you --
6   A. No.
7   Q. -- show how many hours that you've
8      worked at the plant for which you think
9      you weren't paid?
10  A. No.
11  Q. So you haven't made any calculations
12     with respect to the claim you're making
13     in this case?
14  A. Excuse me? Repeat that.
15  Q. Have you made any calculations about
16     the amount of money you think you're
17     owed in this case?
18  A. I haven't.
19  Q. You have not?
20  A. (Witness shakes head.)
21  Q. You have to say.
22  A. I said I haven't.
23  Q. Haven't. Okay. Have you ever worked

45

1      overtime?
2   A. I have.
3   Q. And you get paid time and a half for
4      those hours?
5   A. I got paid for my hourly work. I can't
6      say whether it was time and a half or
7      not, but I got paid for my hourly work.
8   Q. Okay. Have you ever had any complaints
9      about your overtime compensation, how
10     they computed it?
11  A. No.
12  Q. Have you ever been disciplined at
13     Equity? Have you ever been written up
14     for any --
15  A. Yes. Yes, I have been written up.
16  Q. What have you been written up for, what
17     kinds of things?
18  A. I -- I have been written up for no --
19     might lose a utensil, something like
20     that, a knife. One of the knives that
21     we cut with come up missing and you
22     can't give an account of it. I've been
23     written up for that.

e4251f92-7b79-4a64-bed1-17bbc1848bc1

46

1    Q. Anything else?
2    A. Basically, that's all I can think of.
3    Q. That's all I have.  Thank you.
4    A. Thank you.
5
6       (The deposition of Kenneth Ford
7       concluded at 4:22 p.m. on May 21,
8       2008.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

47

1          * * * * * * * * * *
2          REPORTER'S  CERTIFICATE
3          * * * * * * * * * *
4       STATE OF ALABAMA
5       COUNTY OF MONTGOMERY
6          I do hereby certify that the above
7       and foregoing transcript was taken down
8       by me in stenotype, and the questions
9       and answers thereto were transcribed by
10      means of computer-aided transcription,
11      and that the foregoing represents a
12      true and correct transcript of the
13      testimony given by said witness.
14          I further certify that I am neither
15      of counsel, nor any relation to the
16      parties to the action, nor am I anywise
17      interested in the result of said case.
18
19
20
21      _____
        Bridgette W. Mitchell,
        Certified Court Reporter and
22      Commissioner for the State of
        Alabama at Large
23      ACCR No. 231 - Expires 9/30/08
        MY COMMISSION EXPIRES 1/25/2010

e4251f92-7b79-4a64-bed1-17bbc1848bc1

**TAB 16**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06-CV-1081-MEF


BETTY ANN BURKS,

et al.,

     Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

     Defendant.



BEFORE:

     Cynthia M. Noakes, Commissioner

     and Certified Court Reporter


DEPOSITION TESTIMONY OF

SALINTHA FOSTER


*****************************

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

b2649244-aebe-4d1b-beaa-060c021f6f30

**2**

1    STIPULATION

2

3         IT IS STIPULATED AND AGREED by and

4    between the parties through their respective

5    counsel, that the deposition of SALINTHA FOSTER

6    may be taken before Cynthia M. Noakes, Court

7    Reporter, at the Law Offices of WILLIAMS,

8    POTTHOFF, WILLIAMS & SMITH, 125 South Orange

9    Avenue, Eufaula, Alabama 36027, on the 21st day

10   of May, 2008.

11        IT IS FURTHER STIPULATED AND AGREED

12   that the signature to and the reading of the

13   deposition by the witness is waived, the

14   deposition to have the same force and effect as

15   if full compliance had been had with all laws and

16   rules of Court relating to the taking of

17   depositions.

18        IT IS FURTHER STIPULATED AND AGREED

19   that it shall not be necessary for any objections

20   to be made by counsel to any questions except as

21   to the form or leading questions, and that

22   counsel for the parties may make objections and

23   assign grounds at the time of the trial, or at

**3**

1    the time said deposition is offered in evidence,

2    or prior thereto.

3         IT IS FURTHER STIPULATED AND AGREED

4    that the notice of filing of the deposition by

5    the Court Reporter is waived.

6

7

8

9

10

11

12

13

14

15

16

17   *****************************************

18

19

20

21

22

23

**4**

1              INDEX

2    EXAMINATION BY:          PAGE NUMBER:

3    MR. GOULD                6-36

4    MR. CAMP                 36-38

5

6    EXHIBITS:

7    (No exhibits were

8    submitted to said deposition.)

9

10   Reporter's Certificate        39

11

12

13

14

15

16

17

18

19

20

21   *****************************************

22

23

**5**

1           APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFFS:

4        MR. ROBERT J. CAMP

5        THE COCHRAN FIRM, P.C.

6        ATTORNEYS AT LAW

7        505 North 20th Street

8        Suite 825

9        Birmingham, Alabama 35203

10       (205) 244-1115

11

12   ON BEHALF OF THE DEFENDANT:

13       MR. MALCOLM S. GOULD

14       PELINO & LENTZ

15       ATTORNEYS AT LAW

16       One Liberty Place

17       Thirty-Second Floor

18       1650 Market Street

19       Philadelphia, Pennsylvania 19103

20       (215) 665-1540

21

22

23   *****************************************

b2649244-eebe-4d1b-beaa-060c021f6f30

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

6

1     I, CYNTHIA M. NOAKES, a Certified
2   Court Reporter of Eufaula, Alabama, acting as
3   Commissioner, certify that on this date, as
4   provided by the Alabama Rules of Civil Procedure
5   and the foregoing stipulation of counsel, there
6   came before me at the Law Offices of WILLIAMS,
7   POTTHOFF, WILLIAMS & SMITH, 125 South Orange
8   Avenue, Eufaula, Alabama 36027, beginning at
9   2:10 p.m., SALINTHA FOSTER, witness in the above
10   cause, for oral examination, whereupon the
11   following proceedings were had:
12
13          SALINTHA FOSTER,
14     being first duly sworn, was examined and
15          testified as follows:
16
17          THE COURT REPORTER: Usual
18   stipulations?
19     MR. CAMP: Yes.
20     MR. GOULD: Yes.
21
22          EXAMINATION
23   BY MR. GOULD:

7

1     Q.   Good afternoon, Ms. Foster.
2     A.   Good afternoon.
3     Q.   My name is Malcolm Gould. I'm an attorney
4   with the law firm of Pelino & Lentz in
5   Philadelphia. I represent Equity Group Eufaula
6   Division, LLC, in a lawsuit filed in Federal Court
7   in the Middle District of Alabama.
8          We're here to take your deposition today.
9   I've got a few ground rules for the deposition
10   that will make it run a little bit more smoothly,
11   I hope.
12          As you see, we have a court reporter here.
13   She's going to take down my questions and your
14   answers. Because of that, I would ask that you
15   keep all of your answers verbal and say yes or no
16   instead of nodding or shaking your head. I can
17   see it and I know what you mean, but when she
18   prints out a transcript of the deposition, she
19   can't really print out a nod of the head or a
20   shrug of the shoulders.
21          You've given an oath today to answer
22   truthfully to the best of your ability. If I ask
23   a question and you don't understand it, please ask

8

1   me to repeat it or reword it, and I'll do what I
2   can to try and state the question in a way that
3   you'll understand. If you do answer the question,
4   I'm going to assume that you understood it and
5   have answered it truthfully and to the best of
6   your ability. Okay?
7     A.   Yes.
8     Q.   And I don't imagine that this deposition
9   will take very long, but if you feel you need to
10   take a break, just let me know; it's not a
11   problem.
12          Ms. Foster, can you state your full name for
13   the record, please?
14     A.   Salintha Ashley Foster.
15     Q.   And what's your home address?
16     A.   79 King Road, Troy, Alabama 36081.
17     Q.   Ms. Foster, are you currently employed?
18     A.   Yes.
19     Q.   Where do you work?
20     A.   At McDonald's.
21     Q.   How long have you worked there?
22     A.   For the last three months. Well, since
23   February 19th, to be exact.

9

1     Q.   Were you employed at the chicken processing
2   plant out in Baker Hill, Alabama?
3     A.   Yes.
4     Q.   And when was the last day that you worked
5   there?
6     A.   I can't remember.
7     Q.   Okay. How long ago?
8     A.   It was in 2003 or '-4. I can't remember the
9   date.
10     Q.   Okay. So it's been several years since
11   you've worked there?
12     A.   Yes.
13     Q.   Now, when you worked there, do you remember
14   the name of the company that was owning or
15   operating the plant, the name that was on your
16   paychecks?
17     A.   I can't remember.
18     Q.   How long did you work at that plant?
19     A.   I think like seven or eight months.
20     Q.   What department or position did you work in?
21     A.   I had different positions. I've worked
22   debone; I've worked packing; I was a pallet ticket
23   writer; and I also worked evis.

b2649244-eebe-4d1b-beaa-060c021f6f30

10

1  Q.  So you were a pallet ticket writer?
2  A.  Uh-huh.
3  Q.  Did you work day shift or night shift?
4  A.  Night.
5  Q.  For each of those positions?
6  A.  Yes.
7  Q.  Do you recall around what time of the year
8  in 2003 or 2004 you stopped working at the plant?
9  Was it winter? spring?
10  A.  I can't remember.
11  Q.  Okay.  You understand that you are a
12  plaintiff in this lawsuit?
13  A.  Yes.
14  Q.  Now, Ms. Foster, what is your understanding
15  of what the lawsuit is about?
16  A.  To pay for any time that I was working and
17  didn't get paid for it.
18  Q.  Can you think of any specific examples of
19  time you think you were working and were not paid
20  for it?
21  A.  Getting dressed.  You know, putting on the
22  equipment for safety issues to perform my job.
23  And we didn't get credit for it.  Or when it was

11

1  time for us to go on breaks, and we have to clean
2  everything off before going to break; but yet it
3  was our break time, and we didn't get that break
4  time because we had to clean the materials first.
5  Q.  Anything else?
6  A.  I guess that's it.
7  Q.  When you worked in debone, what position did
8  you work in?
9  A.  I was pulling tenders and cutting the tips
10  off the tenders.
11  Q.  So it was on one of the debone lines?
12  A.  Uh-huh.
13  Q.  When you worked in evis, what position did
14  you work in?
15  A.  Pulling livers.
16  Q.  You also worked in packout; is that correct?
17  A.  Uh-huh.
18  Q.  And then you were also a pallet ticket
19  writer?
20  A.  Correct.
21  Q.  Where was that located?
22  A.  It's in the evis division also.
23  Q.  And what were the job responsibilities for

12

1  that job?
2  A.  Go upstairs in the box room, get the labels
3  printed out, come back down and put them on the
4  correct boxes.
5  Q.  What position were you in when your
6  employment ended?
7  A.  The tenders.
8  Q.  Okay.  Working on the debone line?
9  A.  Uh-huh.  Yes.
10  Q.  Which of those positions did you work in
11  longest?
12  A.  It's sort of like a tie between the pallet
13  ticket and evis.
14  Q.  How did you first find out about this
15  lawsuit?
16  A.  I don't remember.
17  Q.  Did somebody talk to you and tell you to
18  sign up for the lawsuit?
19  A.  If I'm not mistaken, yes.
20  Q.  And who was that?
21  A.  I don't recall who.
22  Q.  Did you go to any sort of group meeting
23  where this lawsuit was discussed?

13

1  A.  No.
2  Q.  Other than sitting here today and talking
3  with your attorneys, or any other times you may
4  have met with your attorneys, have you discussed
5  this lawsuit with anybody else?
6  A.  No.
7  Q.  As a pallet ticket writer, were there any
8  items of clothing or equipment that you had to
9  wear when you went out onto the production floor?
10  A.  Yes.
11  Q.  Can you list those for me, please?
12  A.  My smock, my hat, the hair net, cotton
13  liners, and the mask.
14  Q.  You're saying mask.  What kind of mask was
15  it?
16  A.  The thing to cover up.
17  Q.  Like these fabric masks?
18  A.  It was a hard mask.
19  Q.  Like plastic?
20  A.  It wasn't plastic; it was paper.
21  Q.  It wasn't like a big respirator or anything
22  like that?
23  A.  No.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

14

1  Q.  You said you had to wear a hat?
2  A.  Uh-huh.  It was the hard white hat.
3  Q.  Like the bump cap?
4  A.  Uh-huh.  And the boots.
5  Q.  In that position, you worked with the evis
6  department; is that correct?  Did you work on that
7  same schedule?
8  A.  The pallet ticket was for the debone side.
9  It was for packers.
10  Q.  All right.  So then as a pallet ticker
11  writer, you wore a smock, hat, hair net, cotton
12  gloves, a mask, and boots.  Is that everything?
13  A.  Yes.
14  Q.  Could you wear the boots from home if you
15  wanted?
16  A.  Yes.
17  Q.  Were there any of those other items that you
18  could wear into the plant from outside, like from
19  the parking lot?
20  A.  No.  Oh, I forgot my earplugs.
21  Q.  Earplugs.  When you worked in packout, what
22  items did you have to wear?
23  A.  My hat, my cotton liners, the blue gloves,

15

1  the sleeves, the apron, my smock, boots, the
2  earplugs, the mask.  And that's it.
3  Q.  When you were pulling livers on evis, what
4  items did you have to wear when you were out on
5  the production floor?
6  A.  Smock, apron, hair net thing, and my hat,
7  the gloves, the blue sleeves, and cotton liners.
8  Q.  Earplugs?  Did you have to wear earplugs
9  there as well?
10  A.  I didn't.  I didn't wear earplugs in that
11  part.
12  Q.  When you worked on the debone line, what
13  items did you have to wear when you were out on
14  the production floor?
15  A.  I wore my smock, hat, the hair thing -- I
16  can't remember the name.
17  Q.  Hair net?
18  A.  Yeah, hair net.  And my cotton liners, my
19  gloves.  What do you call the wire gloves?
20  Q.  Like the steel mesh gloves?
21  A.  Yeah.  The ones that keep you from cutting
22  yourself, that.  The blue sleeves, and this little
23  hard thing (indicating).

16

1  Q.  An arm guard?
2  A.  Yeah.  The arm guard, boots, smock, and an
3  apron, earplugs.
4  Q.  All right.  I want to take you through what
5  you would do on a daily basis in at least some of
6  these positions if not all of them.
7      In terms of as a pallet ticket writer, when
8  you would arrive at the plant, would you be
9  wearing your boots?
10  A.  Yes.
11  Q.  When you would come through the doors into
12  the plant, what would you do next?
13  A.  Clock in, go inside the plant, put on the
14  rest of my materials, and find out from my
15  supervisor where the last crew stopped at with the
16  pallet tickets, go upstairs and get more tickets
17  to label the boxes, and start labeling.
18  Q.  Now, where was the area where you would work
19  labeling these pallets or these boxes?
20  A.  In front of the little supervisor's lounge.
21  Q.  Okay.  It was back by the shipping area; is
22  that right?
23  A.  Yes.

17

1  Q.  In that particular position, do you recall
2  the basis on which you were paid, start time and
3  end time, were calculated?
4  A.  Say that again.
5  Q.  All right.  As a pallet ticketer, do you
6  know what time you started getting paid?
7  A.  No.
8  Q.  Do you know if you were paid from clock-in
9  to clock-out?
10  A.  That's when I was supposed to have been paid
11  for, but there was plenty of times my check was
12  not right; but nothing was done about it.
13  Q.  So it's your understanding that as a pallet
14  ticket writer, that you were supposed to be paid
15  from clock-in to clock-out?
16  A.  Yes.
17  Q.  Did you have a certain fixed shift you were
18  supposed to work, like a scheduled shift?
19  A.  Yeah.  Just the third shift.  But we never
20  got -- you always make it there on time but never
21  leave on time.
22  Q.  All right.  When you would go out onto the
23  production floor, are there any particular items

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

18

1  that you would be wearing when you walked onto the
2  floor? Would you be wearing your boots?
3  A.  Can you rephrase that question?
4  Q.  Sure. Were there some items that you were
5  allowed to put on outside of the production area?
6  A.  I didn't.
7  Q.  I think you indicated that you wore your
8  boots from home?
9  A.  That's the only thing is my boots.
10  Q.  Okay. Then you walked onto the production
11  floor and you would put everything else on?
12  A.  Yes.
13  Q.  So you would put on your hair net then?
14  A.  Yes.
15  Q.  If you wanted to, could you put your hair
16  net on before?
17  A.  I wasn't told that.
18  Q.  Could you wear your hair net in the break
19  room?
20  A.  I think so, yes.
21  Q.  And then when you got out onto the
22  production floor you would put the rest of your
23  items on?

19

1  A.  Correct.
2  Q.  Approximately how long would that take?
3  A.  Maybe 15 minutes.
4  Q.  So it would take you 15 minutes to put on
5  your smock, your hat, hair net, cotton gloves,
6  paper mask, and earplugs?
7  A.  Not for the pallet ticket, no.
8  Q.  So it wouldn't take you that long in that
9  position, or those weren't the items that you wore
10  as a pallet ticket writer?
11  A.  Those are the things that I wore for the
12  pallet ticket writer, but it didn't take 15
13  minutes for the pallet ticket.
14  Q.  How long did it take you in that position?
15  A.  Maybe eight minutes, at the most. It
16  depends on if you have any space.
17  Q.  Okay. Depending on how many other people
18  were trying to put on their clothes or equipment
19  at the same time?
20  A.  Correct.
21  Q.  And did you get any breaks as the pallet
22  ticket writer?
23  A.  Yes.

20

1  Q.  And how many breaks did you get?
2  A.  Two.
3  Q.  And how long were they?
4  A.  They were supposed to be 30 minutes, but I
5  never got that. I had to go on break when the
6  supervisor said you could go.
7  Q.  So your supervisors would release you when
8  it was time to go on break?
9  A.  Yes.
10  Q.  And would they tell you to come back at a
11  certain time, or would they just say, "It's time;
12  go on break"?
13  A.  Well, if I'm not mistaken, I think the break
14  started at 10:50. And you had by 11:15, I think,
15  to be back. But you would never get out the door
16  at 10:50. Sometimes it was 11:05 before you would
17  even get out the door.
18  Q.  And when you would leave your spot on the
19  line to go to break, can you tell me what you
20  would do?
21  A.  When I was on the line?
22  Q.  I'm sorry. When you were working in this --
23  all the questions I'm asking right now are about

21

1  pallet ticket writer.
2  A.  Before I could go on break, I'd have to have
3  the next package of labels downstairs ready for
4  when I come back off of break. And whatever else
5  the supervisor told me to have ready.
6  Q.  Okay. So you would have to get labels
7  before you could leave?
8  A.  Yes.
9  Q.  And then what would you do after that?
10  A.  After I'd get done with that, I'd wait on
11  him to tell me whether I could go to break or not.
12  Q.  And then that would be when your break would
13  start?
14  A.  Yes.
15  Q.  And then what would you do?
16  A.  Come back when everybody else was coming
17  back. If not, you would get wrote up.
18  Q.  What would you do before leaving the
19  production area to go out into the break area?
20  A.  In the production area?
21  Q.  Right.
22  A.  Still talking about pallet ticket?
23  Q.  Yes, ma'am.

b2649244-eebe-4d1b-beaa-060c021f6f30

22

1    A.   I'd take off my smock and everything else.
2    I don't think I took off my hair net and earplugs.
3    And then I'd go out.
4    Q.   And you would still wear your boots?
5    A.   Yes.
6    Q.   Approximately how long would it take you to
7    take those items off?
8    A.   I don't remember.
9    Q.   And then how would you know when it was time
10   to come back from break?
11   A.   Because the supervisors would let you know.
12   Q.   So your particular supervisor would tell
13   you?
14   A.   He hollers at everybody.
15   Q.   So does my boss. So they would let you know
16   that it was time to come back?
17   A.   Yes.
18   Q.   And then what would you do?
19   A.   If I'm finished with my break, or if I'm
20   not, I'd throw it in the trash and go back on the
21   floor.
22   Q.   So when you were on break, would you get
23   something to eat?

23

1    A.   Yes.
2    Q.   And then when it was time to return to the
3    production area, you would leave the break area,
4    walk back through the doors to the production
5    area; is that correct?
6    A.   Well, I was outside. I didn't go in the
7    break room.
8    Q.   So you would come back inside and go back to
9    the production area, correct?
10   A.   Correct.
11   Q.   What would you do then?
12   A.   Wash my hands and get my materials and put
13   them back on and get back to labeling.
14   Q.   How long would it take you to wash your
15   materials and get them back on? Once again, we're
16   still talking about the pallet ticket writer
17   position.
18       MR. CAMP: Could you repeat the
19   question?
20       MR. GOULD: Sure. I asked her how long
21   it would take her to put her items back on and
22   wash them, when she was returning from break as a
23   pallet ticket writer.

24

1    A.   Maybe a couple of minutes. Because I would
2    only have to wash my gloves. Everything else is
3    dry.
4    Q.   Now, during the time that you were a pallet
5    ticket writer, did you ever time yourself on how
6    long it took you to put your items on or take them
7    off?
8    A.   No.
9    Q.   So these are just estimates that you are
10   giving me?
11   A.   Yes.
12   Q.   And would you do the same thing before and
13   after your second break?
14   A.   Yes.
15   Q.   There wasn't any real difference between
16   what you would do before and after the first break
17   and what you would do before and after the second
18   break?
19   A.   Correct.
20   Q.   Okay. Now did you have a scheduled end time
21   for your shift as a pallet ticket writer?
22   A.   No.
23   Q.   All right. You would just work until your

25

1    supervisor told you you were released?
2    A.   Yes. I'd be released by the next pallet
3    ticket writer.
4    Q.   Okay. So you couldn't leave until the next
5    pallet ticket writer was there?
6    A.   Correct.
7    Q.   Now, if you were working night shift, was
8    there somebody who came in and worked from the end
9    of night shift to the beginning of day shift, in
10   your area as a pallet ticket writer?
11   A.   Say that again.
12   Q.   You said that you had to be relieved by
13   another pallet ticket writer?
14   A.   Uh-huh.
15   Q.   And I believe you told me that you were
16   working night shift?
17   A.   Yes.
18   Q.   Wasn't there a sanitation shift that came
19   after night shift?
20   A.   I don't remember.
21   Q.   Do you know whether the particular area in
22   which you were working just continued to work 24
23   hours?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

26

1   A.   I don't remember.  The only thing I
2   remember, I remember the lady's name that used to
3   relieve me, and her name was Dana.
4   Q.   At the end of your shift as a pallet ticket
5   writer, can you explain to me what you would do
6   after you were released but before you left the
7   production floor?
8   A.   After I was released?
9   Q.   Yeah.  After your supervisor said, "Your
10  shift's over; it's time to go," or this person
11  came and relieved you.
12  A.   I took the gloves off, washed them, put them
13  in a plastic bag, clocked out, and go home.
14  Q.   Did you also take off the other items that
15  you were wearing?
16  A.   Well, the smock.  And I'd take the hair net
17  and the earplugs and put them in the trash.
18  Q.   Okay.  Would you take the smock home with
19  you?
20  A.   Yes.  And wash it.
21  Q.   Approximately how long would it take you to
22  take those items off and to wash?
23  A.   I don't know; I didn't time it.

27

1   Q.   You're not sure?
2   A.   At that time of the morning, I be ready to
3   go home.
4   Q.   I understand.  Now, during the time that you
5   were working in packout, can you just briefly
6   describe for me what that particular position
7   does?
8   A.   You're standing up on this metal stairs
9   thing and you're throwing meat into a weigher.
10  And the weigher puts it into the bag.  And after
11  the bag is sealed, they put it into a box.
12  Q.   And which job were you doing?
13  A.   I was pulling the meat off of the scale
14  thing and putting it into -- pushing the meat into
15  the scale so it could be bagged.
16  Q.   So the meat was coming along on a belt?
17  A.   Well, it wasn't on a belt; it was like a
18  combo poured into the machine and it was just
19  dropping.  It would drop it.
20  Q.   Right.  All right.  And then you would just
21  make sure that the weight was proper?
22  A.   Correct.
23  Q.   And then once the weight was proper, you

28

1   would send it to be put into a bag; and from the
2   bag, it was be boxed?
3   A.   I think it's like five or six pieces of
4   meat; and it drops the meat down into a bag.  And
5   just keep doing the same thing over and over.
6   Q.   And then in that position I believe you
7   indicated that -- did you also have to wear a mask
8   in that position?
9   A.   Yes.
10  Q.   And you also had to wear gloves and an
11  apron; is that correct?
12  A.   Yes.
13  Q.   Did you still wear cotton gloves?
14  A.   Yes.
15  Q.   So you wear the same things you did as a
16  pallet ticket writer, plus the blue gloves and an
17  apron?
18  A.   Correct.
19  Q.   Did you wear sleeves?
20  A.   Yes.
21  Q.   Were any of those items optional, or not
22  required?  Would you have been disciplined if you
23  failed to wear some of those items?

29

1   A.   I'm pretty sure, because my supervisor told
2   me I had to have it on.
3   Q.   So the sleeves, you believe that they were
4   required?
5   A.   Yes.
6   Q.   The apron, you believe that was required?
7   A.   Yes.  For sanitary reasons.
8   Q.   And you still wore cotton gloves on that
9   position?
10  A.   Correct.
11  Q.   Were they required?
12  A.   If you didn't want your fingers to freeze
13  off.
14  Q.   Is it safe to say that when you would start
15  your shift in that particular position, you were
16  still wearing the same things when you walked out
17  onto the production floor?  You would still be
18  wearing the boots and hair net?
19  A.   Uh-huh.
20  Q.   And then once you got on the production
21  floor, you would put on the other items?
22  A.   Yes.
23       MR. CAMP:  Object to the form.  I'm

b2649244-eebe-4d1b-beaa-060c021f6f30

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

30

1  confused on that one.
2  A.  Say that again.
3  Q.  Let's just talk about the beginning of your
4  shift, when you were working in packout.
5  A.  Okay.
6  Q.  Were there any items that you would be
7  wearing before you stepped out onto the production
8  floor?
9  A.  You have to have all your equipment on
10 before you can get onto the floor where the food
11 is.
12 Q.  Right.  You would have to -- you would leave
13 the hallway and step onto -- go through the doors
14 into the production area where all the machines
15 are, correct?
16 A.  Right.
17 Q.  So when you would go through the doors into
18 the production area, would you have your boots on?
19 A.  Yes.
20 Q.  Would you have your hair net on?
21 A.  Sometimes.
22 Q.  Would you have your smock on?
23 A.  No.

31

1  Q.  So you would have to put on your other items
2  once you walked through the doors into the
3  production area?
4  A.  Correct.
5  Q.  And can you tell me how long it took you to
6  put those items on?
7  A.  Maybe 15 minutes.
8  Q.  And did you have to wash or rinse any items
9  at the beginning of your shift?
10 A.  The only thing is my boots.
11 Q.  And you would walk through the area where
12 there was that --
13 A.  And sanitize my plastic gloves.
14 Q.  Okay.  Let me finish my question.
15 A.  Okay.
16 Q.  With your boots, did you just walk through
17 an area where there was sanitizer sitting in a
18 pool?
19 A.  No.
20 Q.  What would you do?
21 A.  I went in on the other side, where they had
22 a water hose, and I just hosed my boots down.
23 Q.  Is that something that you chose to do, or

32

1  is that something that everybody did?
2  A.  It's just something that some people did.
3  Q.  All right.
4  A.  You had an option.
5  Q.  And then the packout area, how long --
6      MR. GOULD:  Strike that.
7  Q.  The packout area, did you have any breaks?
8  A.  Yes.  The same two breaks.
9  Q.  Both half an hour, scheduled to be half an
10 hour?
11 A.  Yes.
12 Q.  And in that area, how would you know when it
13 was time to go out on break?
14 A.  When your supervisor let you know.  The
15 supervisor or line leader.
16 Q.  And can you go through with me what you
17 would do between the time that your supervisor
18 released you and the time you were leaving the
19 floor to go out on break?
20 A.  I would wash all my plastic blue stuff down,
21 hang it up, and go outside.
22 Q.  Approximately how long would that take?
23 A.  Maybe ten minutes, at the most, to wash

33

1  everything down and hang it up.
2  Q.  And then how would you know it was time to
3  return from break?
4  A.  Supervisor or line leader would let you
5  know.
6  Q.  Approximately how long would you be in the
7  break room?
8  A.  I didn't go in the break room; I went
9  outside.
10 Q.  How long would you be outside?
11 A.  Different times.  It was never 30 minutes
12 though.
13 Q.  Do you have an idea as to how long it was?
14 A.  I don't recall.
15 Q.  All right.
16 A.  But I know it wasn't 30 minutes, because I
17 was always complaining.
18 Q.  And when it was time to return from break,
19 what would you do?
20 A.  I'd go back in, I put my materials back on,
21 I'd wash off whatever I didn't get off before
22 going outside, and get back on the stairs where I
23 packout at.

b2649244-eebe-4d1b-beaa-060c021f6f30

34

1  Q.  So you would wash both before going out on
2  break and when you came back?
3  A.  Wash whatever I didn't get off before going
4  outside.
5  Q.  Approximately how long would it take you to
6  do those activities?
7  A.  Maybe another ten minutes.
8  Q.  And is that the same with your second break?
9  A.  Yes.
10  Q.  Both before and after?
11  A.  Yes.
12  Q.  Were you a member of the union when you
13  worked at the plant?
14  A.  No.
15  Q.  Did you have an understanding as to how your
16  hours worked were calculated when you were working
17  in packout?
18  A.  Yes.
19  Q.  And how was that calculated?
20  A.  We were paid by the hour, or we were
21  supposed to be paid by the hour. And if I'm not
22  mistaken, you would get a raise according to
23  production, if you was making production.

35

1  Q.  But did you know how the actual hours for
2  which you were paid were calculated? You told me
3  about your wage rate. How about the hours for
4  which you were paid? How were those calculated
5  when you were in packout?
6  A.  I don't recall.
7  Q.  During the time that you were employed at
8  the plant, were you ever written up or
9  reprimanded?
10  A.  Can you repeat that?
11  Q.  Sure. During the time that you were working
12  at the plant, were you ever written up for any
13  reason or given some sort of written reprimand?
14  A.  Getting on the line late. That's the only
15  thing I can think of getting wrote up for.
16  Anything else, I don't remember it.
17  Q.  Were there times that you were written up
18  for getting on the line late that you had arrived
19  late to work?
20  A.  No.
21  Q.  Were you ever written up for any sort of
22  attendance reasons?
23  A.  No.

36

1  Q.  Were you terminated or did you quit?
2  A.  I quit.
3  Q.  I think those are the only questions I'm
4  going to have for you this afternoon. I
5  appreciate your time. Mr. Camp may have some
6  questions.
7       MR. CAMP: Yeah. Hold on one second.
8       (A brief recess was taken.)
9  BY MR. CAMP:
10  Q.  When you were the pallet ticket writer, you
11  said you were paid clock-in to clock-out. What
12  time were you supposed to be at work?
13  A.  I usually got there around three-something
14  in the afternoon and didn't leave until maybe four
15  o'clock the next morning.
16  Q.  Okay. That's what time you got there. What
17  time were you required to be at work?
18  A.  I think it was four until, I want to say
19  twelve; but I can't remember.
20  Q.  Four in the afternoon until twelve o'clock
21  at night?
22  A.  Uh-huh.
23  Q.  Okay. And what time did you say you would

37

1  get to the plant?
2  A.  I got there around three. 3:30 or 3:00.
3  Q.  When would you clock in?
4  A.  I'd clock in maybe ten minutes before I
5  would get ready to get on the floor.
6  Q.  So ten minutes before four o'clock?
7  A.  Sometimes. And sometimes earlier.
8  Q.  Were you paid from 3:50 or were you paid
9  from four o'clock?
10  A.  From four o'clock, no matter when I clocked
11  in.
12  Q.  So when you say you were paid from clock-in
13  to clock-out --
14  A.  No. They get you from four o'clock to
15  whatever time you were supposed to have been off.
16  Q.  Okay.
17  A.  Anything extra, they don't give it to you.
18  You just work it for nothing.
19  Q.  Were you allowed to wear your hair net
20  outside, outside of the production facility, like
21  outdoors?
22  A.  If I'm not mistaken, I think I had to take
23  it off. And I used to stick it in my pocket, if

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

38

1  I'm not mistaken.  I really can't remember.
2  Q.   And just to clarify, did you say that you
3  had to wash your smock at home?
4  A.   Yes.
5  Q.   You were responsible for washing your smock
6  at the house?
7  A.   Yes.
8  Q.   Okay.  That's all I have.
9      MR. GOULD:  That's fine.  I have no
10  other questions.  Thank you.
11
12      (The deposition was concluded.)
13
14
15
16
17
18
19
20
21
22
23

39

1      C E R T I F I C A T E
2
3  STATE OF ALABAMA
4  BARBOUR COUNTY
5
6      I hereby certify that the above and
7  foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10  transcription, and that the foregoing represents
11  a true and correct transcript of the testimony
12  given by said witness upon said hearing.
13      I further certify that I am neither of
14  counsel, nor kin to the parties to the action,
15  nor am I in anywise interested in the result of
16  said cause.
17
18
19      CYNTHIA M. NOAKES, Commissioner
20      Certified Court Reporter,
21      ACCR #327 - Expires 09/30/2008
22
23      Commission Expires 07/08/2009

b2649244-eebe-4d1b-beaa-060c021f6f30

**TAB 17**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06-CV-1081-MEF


BETTY ANN BURKS,

et al.,

     Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

     Defendant.



BEFORE:

     Cynthia M. Noakes, Commissioner

     and Certified Court Reporter


DEPOSITION TESTIMONY OF

RENATA FULLER


* * * * * * * * * * * * * * * * * * * * * * * * * * *

376d0f55-9c6e-4888-bcc3-d937d6885ff6

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

2

```
1        STIPULATION
2
3            IT IS STIPULATED AND AGREED by and
4    between the parties through their respective
5    counsel, that the deposition of RENATA FULLER may
6    be taken before Cynthia M. Noakes, Court
7    Reporter, at the Law Offices of WILLIAMS,
8    POTTHOFF, WILLIAMS & SMITH, 125 South Orange
9    Avenue, Eufaula, Alabama 36027, on the 21st day
10   of May, 2008.
11           IT IS FURTHER STIPULATED AND AGREED
12   that the signature to and the reading of the
13   deposition by the witness is waived, the
14   deposition to have the same force and effect as
15   if full compliance had been had with all laws and
16   rules of Court relating to the taking of
17   depositions.
18           IT IS FURTHER STIPULATED AND AGREED
19   that it shall not be necessary for any objections
20   to be made by counsel to any questions except as
21   to the form or leading questions, and that
22   counsel for the parties may make objections and
23   assign grounds at the time of the trial, or at
```

3

```
1    the time said deposition is offered in evidence,
2    or prior thereto.
3            IT IS FURTHER STIPULATED AND AGREED
4    that the notice of filing of the deposition by
5    the Court Reporter is waived.
6
7
8
9
10
11
12
13
14
15
16
17   *******************************************
18
19
20
21
22
23
```

4

```
1              INDEX
2    EXAMINATION BY:             PAGE NUMBER:
3    MR. GOULD                   6-30
4    MR. STEENSLAND              30-31
5
6
7    EXHIBITS:
8    (No exhibits were
9    submitted to said deposition.)
10
11   Reporter's Certificate      32
12
13
14
15
16
17
18
19
20   *******************************************
21
22
23
```

5

```
1            APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFFS:
4        M. JOHN STEENSLAND, III
5        PARKMAN, ADAMS & WHITE
6        ATTORNEYS AT LAW
7        739 West Main Street
8        Dothan, Alabama 36301
9        (334) 792-1900
10
11   ON BEHALF OF THE DEFENDANT:
12        MR. MALCOLM S. GOULD
13        PELINO & LENTZ
14        ATTORNEYS AT LAW
15        One Liberty Place
16        Thirty-Second Floor
17        1650 Market Street
18        Philadelphia, Pennsylvania 19103
19        (215) 665-1540
20
21
22   *******************************
23
```

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

376d0f55-9c6e-4888-bcc3-d937d6885ff6

6

1    I, CYNTHIA M. NOAKES, a Certified
2    Court Reporter of Eufaula, Alabama, acting as
3    Commissioner, certify that on this date, as
4    provided by the Alabama Rules of Civil Procedure
5    and the foregoing stipulation of counsel, there
6    came before me at the Law Offices of WILLIAMS,
7    POTTHOFF, WILLIAMS & SMITH, 125 South Orange
8    Avenue, Eufaula, Alabama 36027, beginning at
9    1:35 p.m., RENATA FULLER, witness in the above
10    cause, for oral examination, whereupon the
11    following proceedings were had:
12
13        RENATA FULLER,
14    being first duly sworn, was examined and
15        testified as follows:
16
17        THE COURT REPORTER:  Usual
18    stipulations?
19        MR. STEENSLAND:  Yes.
20        MR. GOULD:  Yes.
21
22        EXAMINATION
23    BY MR. GOULD:

7

1    Q.    Good afternoon, Ms. Fuller.
2    A.    Good afternoon.
3    Q.    My name is Malcolm Gould.  I'm an attorney
4    with the law firm of Pelino & Lentz in
5    Philadelphia.  We represent Equity Group Eufaula
6    Division, LLC, in litigation filed in Federal
7    Court in the Middle District of Alabama.  We're
8    here today to take your deposition.
9        You understand that you are a plaintiff in
10    this case?
11    A.    (Witness nods head.)
12    Q.    Yes?
13    A.    Yes.
14    Q.    Okay.  I should always give the rules before
15    I start asking questions.
16    A.    I'm sorry.
17    Q.    That's okay.  We're here taking your
18    deposition today.  As you can see, we have a court
19    reporter here.  She's going to take down my
20    questions and your answers.  Because of that, I
21    ask that you keep all of your responses verbal.
22    When she's taking down your responses, she really
23    can't take down a nod of the head of a shrug of

8

1    the shoulders or something like that.  I would
2    also ask that you wait until I finish my question
3    before you give your answer.  That makes it much
4    easier for her to take down our question and
5    answer.  It also makes sure that you hear my
6    entire question before you give your answer.
7    Okay?
8    A.    Yes, sir.
9    Q.    Now, you've given an oath to answer
10    truthfully to the best of your ability today.  If
11    I ask a question and you don't understand it, just
12    let me know.  I'll be happy to repeat the question
13    or try and ask the question in a different way.
14    If you do answer the question, I'm going to assume
15    that you understood the question and that you are
16    answering it truthfully to the best of your
17    ability.  Okay?
18    A.    Okay.
19    Q.    There may be instances when your counsel may
20    raise objections.  I would ask that you let him
21    finish speaking before you give any answer or say
22    anything.  Okay?
23    A.    Okay.

9

1    Q.    Can you state your full name for the record?
2    A.    My name is Renata Monique Fuller.
3    Q.    Ms. Fuller what is your current home
4    address?
5    A.    4003 Maple Circle, Columbus, Georgia.
6    Q.    Ms. Fuller, you understand that you are a
7    plaintiff in this litigation, correct?
8    A.    Yes.
9    Q.    Can you explain to me what your
10    understanding of this lawsuit is?
11    A.    That we're here to get paid for the job that
12    we're doing -- get paid for the hours we was
13    working, to get paid for those.
14    Q.    All right.  And what does that include?
15    A.    The work that we was doing, the time that we
16    worked and the time that we finished.
17    Q.    Are you currently employed?
18    A.    No.
19    Q.    When did you last work at Equity Group?
20    A.    2004.
21    Q.    How long did you work there?
22    A.    Three years.
23    Q.    And when you first started working at the

376d0f55-9c6e-4888-bcc3-d937d6885ff6

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

10

```
1   plant, who was it owned by?  Was it Equity Group
2   or was it --
3   A.   No, sir.  It was Charoen Pokphand.
4   Q.   Okay.  Do you know when in 2004 you stopped
5   working at the plant?
6   A.   No, sir, not exactly.
7   Q.   Had the name on the front of the plant been
8   changed to Equity Group by the time you left?
9   A.   I'm not sure.
10  Q.   At the time you left the plant, in what
11  department or position were you working?
12  A.   I was a HACCP tech.
13       MR. STEENSLAND:  What was that?
14       THE WITNESS:  A HACCP tech.
15  Q.   Can you spell that?
16  A.   H-A-C-C-P.
17  Q.   And what was the -- what are the job
18  responsibilities of that position?
19  A.   To walk around and observe, to make sure
20  that everybody wear their proper gears, and to
21  test to make sure the chickens are coming through
22  from them, no feces, stuff like that.
23  Q.   Did you do that throughout the entire plant
```

12

```
1   Q.   How long did you work in that position at
2   the plant?
3   A.   (No response.)
4   Q.   More than year?
5   A.   Yes.
6   Q.   Were you a member of the union when you
7   worked at the plant?
8   A.   No, sir.
9   Q.   Now, this particular position was not a
10  union-eligible position; is that correct?
11  A.   I'm not sure.
12  Q.   In that position, I'm just going to call it
13  a tech so that I don't butcher it every time I say
14  it.  Okay?
15  A.   Okay.
16  Q.   In your position as a tech, were you
17  required to wear any sort of items or clothing or
18  equipment to go out on the production floor?
19  A.   Yes.
20  Q.   And what were those items?
21  A.   Hair net, earplugs, smock, rubber boots.  It
22  was some more, but I can't remember because I did
23  different things.
```

11

```
1   or just in one particular part of the plant?
2   A.   Throughout debone and evis.
3   Q.   Throughout what they would call the fresh
4   plant; is that right?  You didn't go into the
5   further processing side of the plant, did you?
6   A.   I'm not understanding what you're asking me.
7   Q.   Okay.  Are you aware that there was a
8   further processing operation, a cook plant at that
9   location?
10  A.   Yes.
11  Q.   Did you go -- as part of your job
12  responsibilities, did you go into that part of the
13  plant?
14  A.   No.
15  Q.   Okay.  Do you have any understanding as to
16  the basis on which you were paid as a HACCP tech?
17  A.   I'm not sure.
18  Q.   Do you know whether you were paid on the
19  basis of line time, whether you were clocked in,
20  clocked out; do you have any understanding?
21  A.   No, sir.
22  Q.   How long were you in that position before --
23       MR. GOULD:  Strike that.
```

13

```
1   Q.   Did you have to wear any sort of the gloves?
2   A.   Yes.
3   Q.   And what kind of gloves did you have to
4   wear?
5   A.   Some blue rubber gloves.
6   Q.   Anything else?
7   A.   Not that I can remember.
8   Q.   Did you have to wear any sort of helmet or
9   bump cap?
10  A.   I can't remember.
11  Q.   Were there any of these items that you could
12  wear into the plant from the parking lot?
13  A.   (No response.)
14  Q.   Could you wear your boots from home?
15  A.   Yes.
16  Q.   Anything else?
17  A.   Hair net, earplugs.  That's about all I can
18  remember.
19  Q.   When you would arrive at the plant, did you
20  have to clear any sort of security?
21  A.   Could you rephrase that for me?
22  Q.   Sure.  Would you drive yourself to work?
23  A.   Yes.
```

376d0f55-9c6e-4888-bcc3-d937d6885ff6

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

14

1  Q.  When you came up the driveway to go into the
2  parking lot, there was a guard booth, correct?
3  A.  Yes.
4  Q.  And did you have to submit to any kind of
5  search or anything like that to get into the
6  plant?
7  A.  No.
8  Q.  Did you have a sticker or some sort of decal
9  on your car?
10  A.  Yes.  Just had to show ID.
11  Q.  Okay.  And then after you pulled into the
12  parking lot, did you have to go through any other
13  kind of security?
14  A.  No.
15  Q.  No metal detectors or turnstiles or anything
16  like that?
17  A.  No, sir.
18  Q.  Once you would enter the building, what
19  would you do next?
20  A.  I would go to supply and get my supplies,
21  then wait to clock in.
22  Q.  Which shift were you working?
23  A.  Both.

15

1  Q.  When you -- right before you left the
2  company?
3  A.  Night.
4  Q.  And what were your hours?  Did you have a
5  scheduled start time?
6  A.  No.
7  Q.  How would you know when to come in to work?
8  A.  They would call for us to come in a little
9  earlier.
10  Q.  So a supervisor would call you and ask you
11  to come in at a particular time?
12  A.  Yes.  If we're not scheduled to work at two.
13  Q.  What if you were scheduled to work?
14  A.  If I was scheduled to work at two, I would
15  be there.
16  Q.  So there was some sort of schedule?
17  A.  Yes.
18  Q.  Was it different every week?
19  A.  Not every week.  It was different because we
20  had to switch out.
21  Q.  Okay.  Now, what supplies would you pick up
22  at the supply counter?
23  A.  Hair net, earplugs, smock, gloves, cotton

16

1  gloves, things that I needed.
2  Q.  And would you have to get new ones every
3  day?
4  A.  If my old ones was torn.
5  Q.  Okay.  So with the gloves, you might not
6  have to get new gloves every day; is that correct?
7  A.  Yes.
8  Q.  Now, are those things that you would carry
9  home with you, and you would carry them back into
10  the plant, your gloves?
11  A.  Yes.
12  Q.  And what about your boots?  Would you
13  normally wear them in from the parking lot?
14  A.  Yes.
15  Q.  And what about the smock?  Is that something
16  you would have to get new every day?
17  A.  No.
18  Q.  So you could take the smock home and wash it
19  and bring it back in?
20  A.  Yes.
21  Q.  What about the hair net?  Would you get a
22  new one every day?
23  A.  No.

17

1  Q.  Was that also something you would carry home
2  with you, and then carry back into work the next
3  day?
4  A.  Yes.
5  Q.  So all of those items at the end of your
6  shift, you would take them home with you, and then
7  bring them back with you the next day at the start
8  of your shift?
9  A.  Yes.
10  Q.  And if you decided that you needed to
11  replace them, when you first got to the plant, you
12  would replace those items?
13  A.  Yes.
14  Q.  Before going out onto the production floor,
15  were there particular items that you could put on?
16  In other words, in the break room or in the
17  hallway outside of the production area, were there
18  items that you could put on?
19  A.  Yes.
20  Q.  Obviously, if you could wear your boots from
21  home, you could have your boots on before you went
22  in; is that correct?
23  A.  Yes.

**18**

1  Q.  Could you also have your hair net and
2  earplugs in before you went onto the production
3  floor?
4  A.  Yes.
5  Q.  What about your smock?
6  A.  No.
7  Q.  So you had to wait until you went onto the
8  production floor before you put on your smock?
9  A.  Yes.
10  Q.  Were there any other items that you were
11  allowed to have on before you went onto the
12  production floor?
13  A.  I can't remember at this time.
14  Q.  When would you normally clock in? after you
15  went to the supply counter or before?
16  A.  It was after.
17  Q.  You would go into one of the break rooms and
18  clock in?
19  A.  Yes.
20  Q.  There were time clocks in there that you
21  could swipe?
22  A.  Yes.
23  Q.  And then after that, sometime after that,

**19**

1  you would go out onto the production floor?
2  A.  Yes.
3  Q.  Now, could you basically go on whenever you
4  wanted?  You didn't have a particular group or
5  line that you had to go on with?
6  A.  No.
7  Q.  So you could go on whenever you were ready
8  to start; is that correct?
9  A.  Yes.
10  Q.  Do you know whether you were paid from your
11  clock-in time?
12  A.  I don't know.
13  Q.  Once you walked through the doors to go onto
14  the production floor, what would you do next?
15  A.  I would sanitize what I have on.
16  Q.  And what would you have on?  At that point
17  in time, would you have anything on other than
18  your boots and hair net and earplugs?
19  A.  Excuse me?
20  Q.  When you walked out onto the production
21  floor, at that point in time you would have on
22  your hair net, earplugs, and your boots; is that
23  correct?

**20**

1  A.  Correct.
2  Q.  And you had to put on your smock; is that
3  correct?
4  A.  Yes.
5  Q.  And your gloves?
6  A.  Yes.
7  Q.  Anything else?
8  A.  An apron, arm guards, sleeves.
9  Q.  And did you wear that in connection with
10  your position as a tech?
11  A.  No.
12  Q.  All right.  So right now I'm just asking
13  about your position as the tech.
14  A.  Okay.
15  Q.  So did you have to wear an arm guard or
16  sleeves in your position as a tech?
17  A.  No.
18  Q.  What about an apron?
19  A.  No.
20  Q.  So you just had to put on your smock and
21  your gloves?
22  A.  Yes.  No.
23  Q.  No?  What else?

**21**

1  A.  Hair net, earplugs.
2  Q.  Right.  When you got onto the production
3  floor, you just would have to put on a smock and
4  gloves, correct?
5  A.  Yes.
6  Q.  Approximately how long would it take you to
7  do that?
8  A.  About five minutes.
9  Q.  It would take you five minutes to put on a
10  smock and gloves?
11  A.  About.
12  Q.  And then what would you do next?
13  A.  Start inspection.
14  Q.  Would you have to wash your gloves or wash
15  your hands or anything like that?
16  A.  Yes.
17  Q.  So was that included within the five minute
18  estimate that you just gave me, or was that
19  separate?
20  A.  That's separate.
21  Q.  How long would it take you to wash your
22  hands or your gloves at the beginning of your
23  shift?

22

1   A.   It depends.
2   Q.   Depended on what?
3   A.   The people.
4   Q.   Depended on whether there were people
5   already there at the sink?
6   A.   Yes.
7   Q.   And then you didn't actually have a
8   production line that you had to go to; you just
9   roamed the floor; is that correct?
10  A.   I worked on a production line; but at the
11  time, when my last day working, I was a HACCP
12  tech. But I worked on a production line.
13  Q.   Right. I'm just talking about in your
14  position as a tech.
15  A.   No.
16  Q.   Because you told me that you were in that
17  position as a tech for at least a year before you
18  left, correct?
19  A.   Yes.
20  Q.   So that's the only position I'm really
21  concerned about right now.
22  A.   What was the question again?
23  Q.   Did you work on a production line or did you

23

1   just roam the floor?
2   A.   I worked in the chiller.
3   Q.   Where is that? Is that kind of in between
4   evis and debone?
5   A.   Yes.
6   Q.   And that's where you would check to make
7   sure that the birds that were coming through were
8   clean?
9   A.   Yes.
10  Q.   And then did you get any breaks during a
11  normal shift? Did you get to take a break?
12  A.   Yes.
13  Q.   How many breaks did you get?
14  A.   Working in the chiller, I got, like, one
15  break.
16  Q.   And how long would you normally work? How
17  long was a shift?
18  A.   It depends on what time they let you off.
19  Q.   Was your schedule directly dependent on what
20  the production departments were doing, or was your
21  schedule basically determined within your own
22  department, if you know?
23  A.   (No response.)

24

1   Q.   Do you understand what I'm saying? You're
2   looking at me funny.
3   A.   No, I don't.
4   Q.   How long would your break normally be?
5   A.   15 minutes.
6   Q.   So you could get a single 15-minute break
7   over the course of your shift?
8   A.   I'd get two 15-minute breaks.
9   Q.   All right. Before going out on your
10  break --
11       MR. GOULD: Strike that.
12  Q.   Would you know that it was time to go
13  out on break?
14  A.   I was given a relief person.
15  Q.   Somebody else from your group or your
16  department?
17  A.   Yes.
18  Q.   And they'd say, "It's time to go on break"?
19  A.   Yes.
20  Q.   Would they tell you what time you had to be
21  back from break?
22  A.   Yes.
23  Q.   How long would that be?

25

1   A.   (No response.)
2   Q.   Did they say, "You have to be back in 15
3   minutes," or did they say, "You have to be back in
4   20 minutes," or did they say whether you had to be
5   back at a certain time?
6   A.   They would give me a certain time to be
7   back.
8   Q.   And once they told you that you were
9   released for break, what would you do next?
10  A.   Go sanitize my gloves, take them off, hang
11  them up, then go to break.
12  Q.   And you would take off your smock as well?
13  A.   Yes.
14  Q.   You could keep on your hair net and
15  earplugs?
16  A.   Yes.
17  Q.   And your boots?
18  A.   Yes.
19  Q.   How long would it take you to do that, to
20  take off and wash your gloves and your smock,
21  anything that you had to take off before going out
22  on break?
23  A.   I'm not sure, because the sink was on the

376d0f55-9c6e-4888-bcc3-d937d6885ff6

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

26

1  opposite side. We had to go to a sink.
2  Q.  And how would you know when it was time to
3  come back from break? You would just watch the
4  clock; is that right?
5  A.  Yes.
6  Q.  And when it got close to time, that's when
7  you would come back?
8  A.  Yes.
9  Q.  How long before you were supposed to return
10 from break would you leave?
11 A.  About five minutes earlier.
12 Q.  And what all did you do?
13 A.  I would go to the bathroom, then come on
14 back in.
15 Q.  You would come back onto the production
16 floor?
17 A.  Yes.
18 Q.  And you would put your smock back on and
19 your gloves back on?
20 A.  And sanitize, and go back to my original
21 spot.
22 Q.  And how long would it take you to do that?
23 A.  I'm not sure.

27

1  Q.  What about at the end of your shift? What
2  would you do then? How did you know that your
3  shift was over? Did you have a scheduled shift?
4  Would someone tell you it was time to leave, that
5  your shift was over?
6  A.  It was scheduled, but I didn't get the
7  chance to leave until all the chicken was out of the
8  chiller.
9  Q.  Okay. So there would be a point in time
10 when the chicken would be out of the chiller, and
11 that's when you knew it was okay for you to leave?
12 A.  Yes.
13 Q.  And then what would you do when the last
14 chicken cleared the chiller?
15 A.  Take off my gloves after I washed, take them
16 off, dry them, go turn all my paperwork in.
17 Q.  And then would you take off your smock?
18 A.  Yes.
19 Q.  Where would you turn in your paperwork? Was
20 it on the production floor?
21 A.  No.
22 Q.  It was in the office?
23 A.  It was in the office.

28

1  Q.  Off of the hallway?
2  A.  Yes.
3  Q.  And there's a hallway off of the production
4  floor, right?
5  A.  Yes.
6  Q.  And then there's offices off of that
7  hallway?
8  A.  Yes.
9  Q.  And that's where you would turn in your
10 paperwork?
11 A.  Yes.
12 Q.  And after that, you would clock out?
13 A.  Yes.
14 Q.  Do you know whether you were paid until your
15 clock-out time in that position as a tech?
16 A.  I don't know.
17 Q.  Would you ever review your paycheck and look
18 at the hours that you were being paid for to
19 determine whether or not you were being paid the
20 hours you thought you had worked?
21 A.  No.
22 Q.  Did you ever raise any sort of complaint
23 with your supervisor, during the time you were a

29

1  tech, about the hours for which you were paid?
2  A.  I can't remember.
3  Q.  Do you recall raising any issues, during the
4  time that you were a tech, with anybody at the
5  plant over the hours for which you were paid?
6  A.  I can't remember.
7  Q.  How did you learn about this lawsuit?
8  A.  Excuse me?
9  Q.  How did you learn about this lawsuit?
10 A.  There was a letter sent to -- sent out.
11 Q.  So you got a letter. And was there a form
12 to fill out if you wanted to join?
13 A.  Yes.
14 Q.  And that's how you learned about the
15 lawsuit?
16 A.  Yes.
17 Q.  And have you -- other than with your
18 attorneys, have you discussed the lawsuit with
19 anybody else?
20 A.  No.
21 Q.  Have you ever attended any meetings where
22 the lawsuit was discussed?
23 A.  I don't know.

376d0f55-9c6e-4888-bcc3-d937d6885ff6

30

1   Q.   Okay. I think those are the only questions
2   I have for you. Thank you very much.
3   A.   You're welcome. Thank you.
4         MR. STEENSLAND: Just a couple.
5   BY MR. STEENSLAND:
6   Q.   You mentioned you worked on the production
7   line?
8   A.   Yes.
9   Q.   How long did you work on the production
10  line?
11  A.   I can't remember.
12  Q.   And that's different from your job as a
13  tech?
14  A.   Yes.
15  Q.   Have you ever heard of the term "PPE" or
16  personal protective equipment?
17  A.   Yes.
18  Q.   Would you please tell us what items you
19  consider part of the personal protective
20  equipment?
21  A.   The earplugs, the arm guard, the gloves, the
22  chain gloves, the hair nets. Basically everything
23  that we had to wear.

31

1   Q.   Boots?
2   A.   Yes.
3   Q.   Earplugs?
4   A.   (Witness nods head.)
5   Q.   Anything we've left out?
6   A.   I can't remember.
7   Q.   Nothing further. Thank you.
8
9         (The deposition was concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23

32

1         C E R T I F I C A T E
2
3   STATE OF ALABAMA
4   BARBOUR COUNTY
5
6         I hereby certify that the above and
7   foregoing deposition was taken down by me in
8   stenotype and the questions and answers thereto
9   were transcribed by means of computer-aided
10  transcription, and that the foregoing represents
11  a true and correct transcript of the testimony
12  given by said witness upon said hearing.
13        I further certify that I am neither of
14  counsel, nor kin to the parties to the action,
15  nor am I in anywise interested in the result of
16  said cause.
17
18
19        CYNTHIA M. NOAKES, Commissioner
20        Certified Court Reporter,
21        ACCR #327 - Expires 09/30/2008
22
23        Commission Expires 07/08/2009

376d0f55-9c6e-4888-bcc3-d937d6885ff6

**TAB 18**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


BETTY ANN BURKS, et al.,

    Plaintiffs,


vs.  CIVIL ACTION 2:06-cv-01081-MEF-DRB


EQUITY GROUP EUFAULA DIVISION, LLC,

    Defendant.


\*    \*    \*    \*    \*    \*

DEPOSITION OF TANGELA GLENN, taken
pursuant to notice and stipulation on
behalf of the Defendant, at Williams,
Pothoff, Williams & Smith, 125 South
Orange Avenue, Eufaula, Alabama, before
Bridgette Mitchell, Shorthand Reporter
and Notary Public in and for the State
of Alabama at Large, on May 21, 2008,
commencing at 2:50 p.m.

e05b2b3f-a771-4c40-91fd-ae49148ac72a

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

2

1    APPEARANCES
2
3    FOR THE PLAINTIFFS:
4    Carl E. Underwood, III, Esquire
5    COCHRAN, CHERRY, GIVENS & SMITH
6    163 W. Main Street
7    Dothan, Alabama 36301
8
9    Jacob A. Kiser, Esquire
10    WIGGINS, CHILDS, QUINN & PANTAZIS
11    The Kress Building
12    301 Nineteenth Street North
13    Birmingham, Alabama 35203
14
15    FOR THE DEFENDANT:
16    Gary D. Fry, Esquire
17    PELINO & LENTZ
18    One Liberty Place
19    Thirty-second Floor
20    Philadelphia, Pennsylvania 19103
21
22    ALSO PRESENT:
23    Kenneth Ford

3

1    STIPULATIONS
2        It is hereby stipulated and
3    agreed by and between counsel
4    representing the parties that the
5    deposition of TANGELA GLENN is taken
6    pursuant to notice and stipulation on
7    behalf of the Defendant; that all
8    formalities with respect to procedural
9    requirements are waived; that said
10    deposition may be taken before
11    Bridgette Mitchell, Shorthand Reporter
12    and Notary Public in and for the State
13    of Alabama at Large, without the
14    formality of a commission; that
15    objections to questions, other than
16    objections as to the form of the
17    questions, need not be made at this
18    time, but may be reserved for a ruling
19    at such time as the deposition may be
20    offered in evidence or used for any
21    other purpose as provided for by the
22    Civil Rules of Procedure for the State
23    of Alabama.

4

1        It is further stipulated and
2    agreed by and between counsel
3    representing the parties in this case
4    that the filing of the deposition of
5    TANGELA GLENN is hereby waived and that
6    said deposition may be introduced at
7    the trial of this case or used in any
8    other manner by either party hereto
9    provided for by the Statute, regardless
10    of the waiving of the filing of same.
11        It is further stipulated and
12    agreed by and between the parties
13    hereto and the witness that the
14    signature of the witness to this
15    deposition is hereby waived.
16
17        INDEX
18
19    EXAMINATION                    Page
20    By Mr. Fry........................ 5
21
22
23

5

1        TANGELA GLENN, having first
2    been duly sworn or affirmed to speak
3    the truth, the whole truth, and nothing
4    but the truth, testified as follows:
5        EXAMINATION
6    BY MR. FRY:
7    Q. Ms. Glenn, my name is Gary Fry. I'm
8        one of the lawyers representing Equity
9        Group Eufaula in connection with a
10        lawsuit which you and a bunch of other
11        folks have brought with respect to your
12        employment there. Have you ever given
13        a deposition before?
14    A. No.
15    Q. Let me briefly explain what's going to
16        happen. I'm going to be asking
17        questions which you will answer.
18        Bridgette, our court reporter, will
19        take down what we say. If you don't
20        understand a question that I ask you,
21        please let me know and I'll try and
22        rephrase it so you will understand. If
23        you don't hear a question that I ask or

e05b2b3f-a771-4c40-91fd-ae49148ac72a

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

6

1  any portion of it, let me know and I'll
2  repeat it. The only thing that I do
3  ask is let's not speak over one another
4  because that makes it difficult for the
5  court reporter. And so if you can wait
6  until I get my question out, even if
7  you anticipate what I'm going to say,
8  and I'll let you complete your answer,
9  we'll get a clean record here. And,
10 also, you need to verbalize your
11 answer. You can't nod or shake your
12 head. Okay?
13 A. Okay.
14 Q. What's your home address?
15 A. 1529 County Road 20, Clayton, Alabama
16    36616.
17 Q. And your date of birth?
18 A. August 18, 1976.
19 Q. Are you currently employed?
20 A. No.
21 Q. At one point you were employed by
22    Equity?
23 A. Yes.

7

1  Q. And when did you work for the company?
2  A. May of 2005 till January 2006.
3  Q. And for what reason did your employment
4    end?
5  A. Pointing out.
6  Q. Pardon?
7  A. I was pointed out.
8  Q. And can I assume that you were
9    terminated because of violation of the
10   attendance policy?
11 A. Yes.
12 Q. During that period of time that you
13   worked for Equity, what department did
14   you work in?
15 A. Debone.
16 Q. What shift?
17 A. First.
18 Q. And what were your hours?
19 A. From 7:30 to 4:30.
20 Q. Seven-thirty a.m.?
21 A. Yes, sir, to 4:30 p.m.
22 Q. Did you work any other shifts?
23 A. No, sir.

8

1  Q. And did you work any other jobs during
2    the time you worked for Equity?
3  A. No, sir.
4  Q. And what did you do in debone?
5  A. I was a bone sampler.
6  Q. Pardon?
7  A. Bone sampler.
8  Q. And what did you do as a bone sampler?
9  A. We stood at the end of the line and as
10   the breast meat came down, we checked
11   it for bones.
12 Q. And how did you do that, with your --
13   with your hands?
14 A. Yes, sir.
15 Q. Did you work with a knife?
16 A. No, sir.
17 Q. Did you work with scissors?
18 A. No, sir.
19 Q. And that's the only job you had while
20   you were with the company?
21 A. Yes, sir.
22 Q. And who was your supervisor?
23 A. Vera Marshall.

9

1  Q. Vera Marshall?
2  A. Yes, sir.
3  Q. What was your rate of pay?
4  A. I started out at 7.15; 7.40 when it
5    ended.
6  Q. How many hours a week did you work?
7  A. Forty.
8  Q. What's your understanding of what your
9    claim is in this lawsuit?
10 A. I'm underpaid.
11 Q. Underpaid for what?
12 A. For hours worked.
13 Q. And what is your understanding of the
14   work you performed that you weren't
15   paid for?
16 A. Well, I'm entitled to be paid for hours
17   that were worked.
18 Q. And you believe there were hours that
19   you worked for which you weren't paid?
20 A. Yes, sir.
21 Q. And what work did you do during that
22   time period for which you believe you
23   weren't paid?

e05b2b3f-a771-4c40-91fd-ae49148ac72a

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

10

1  A. Well, during the process of -- at the
2     beginning of the shift when you had to
3     get dressed and at -- during the breaks
4     and the end of the shift when you had
5     to undress and wash up and stuff.
6  Q. Just the beginning and the end of the
7     shift?
8  A. And during breaks.
9  Q. And how did you get that understanding
10    of the claim?
11 A. Well, at the start of the shift when
12    you have to go in, we would have to go
13    through the double doors. We would
14    have to stop and sanitize our boots,
15    and then we have to stop again to get
16    dressed; and then during break, we have
17    to do the same thing and wash up and
18    stuff.
19 Q. How did you hear about the lawsuit?
20 A. Through an ad.
21 Q. And did you talk to folks about it?
22 A. No, sir.
23 Q. When did you see the ad?

11

1  A. It was a flyer that -- I was in some
2     store and someone gave me a paper with
3     it on there.
4  Q. Did you hear about it after your
5     employment had ended?
6  A. Yes, sir.
7  Q. When you were employed at Equity, were
8     you a member of the union?
9  A. No, sir.
10 Q. Did you review any documents to prepare
11    for this deposition?
12 A. No.
13 Q. Did you speak with anyone with respect
14    to this deposition besides your
15    lawyers?
16 A. No, sir.
17 Q. Can you identify for me the items of
18    clothing and equipment that you wore on
19    a daily basis when you worked as a bone
20    sampler in the debone department in
21    2005 through '6?
22 A. Okay. We have hair nets, earplugs,
23    safety glasses. We had the inside

12

1     liners of the gloves and we had the
2     rubber gloves. We had the smocks,
3     aprons, arm sleeves and rubber boots,
4     earplugs.
5  Q. You got those.
6  A. Okay.
7  Q. So let me run down the list and make
8     sure we have them. Hair net?
9  A. Uh-huh.
10 Q. The earplugs, glasses, liners and
11    gloves, the smock, the apron, the arm
12    sleeves, and boots?
13 A. Yes.
14 Q. Is that correct?
15 A. Yes, sir.
16 Q. Anything else?
17 A. Not that I can remember.
18 Q. You weren't required to wear plastic
19    arm guards, were you?
20 A. No, sir.
21 Q. Were you -- were you required to wear
22    each of these other items?
23 A. Yes, sir.

13

1  Q. And did somebody tell you you were
2     required to wear them?
3  A. Yes, sir.
4  Q. And who told you that?
5  A. I was just told by a supervisor that's
6     what we had to wear.
7  Q. And it was your understanding you were
8     required to wear the arm sleeves?
9  A. Yes, sir.
10 Q. Did everybody that you could observe in
11    the debone department wear all these
12    items of equipment?
13 A. Yes, sir.
14 Q. Which of these items that you have
15    identified were issued to you by the
16    company?
17 A. Well, all of them we would get, like,
18    on a Monday until, like, we worked
19    till -- I would say, like, if my gloves
20    got torn or we lost something, we would
21    have to go and replace it, and then it
22    would be deducted from our paycheck
23    every week.

e05b2b3f-a771-4c40-91fd-ae49148ac72a

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

14

1   Q. So did you get everything from the
2      company that you wore?
3   A. Yes, sir.
4   Q. Including the boots?
5   A. Yes, sir.
6   Q. And which of these items that you
7      identified did you get on a daily
8      basis?
9   A. On a daily basis, I probably would get
10     gloves. That's about all, because
11     pretty much everything else would kind
12     of hold up for a couple of days until
13     it was time to get the free supplies.
14  Q. What about a smock?
15  A. Well, the smock we got on a daily basis
16     because we had to leave them to be
17     cleaned.
18  Q. What about a hair net?
19  A. Hair net, well, we'd probably get two
20     or three at the beginning of the week,
21     so those were good for a couple of
22     days.
23  Q. And what, if any, of these items could

15

1      you wear from home?
2   A. We have to put it on at the plant.
3      Well, we -- we could wear our boots
4      from home, but we have to sanitize them
5      before we go onto the floor.
6   Q. When you weren't on the job at the
7      plant, where were these items stored?
8   A. There was lockers on -- in the break
9      room area and the bathrooms and stuff
10     there was lockers.
11  Q. Where did you put on each of these
12     items before you started your actual
13     work?
14  A. Over by the -- the rack where you get
15     dressed at.
16  Q. Is that the wash rack --
17  A. Well, it's right beside -- right there
18     beside the wash rack.
19  Q. And is the -- is that area within the
20     debone production floor?
21  A. Yes, sir.
22  Q. So am I correct that you were required
23     to put on your smock on the production

16

1      floor?
2   A. We had to be on the production floor.
3   Q. And the plastic apron you had to put on
4      on the production floor?
5   A. Yes, sir.
6   Q. And the plastic sleeves you had to put
7      on on the production floor?
8   A. Yes, sir.
9   Q. And does the same hold true for the
10     cotton liners and the rubber gloves?
11  A. Yes, sir.
12  Q. The hair net you could put on before
13     you entered the --
14  A. Yes.
15  Q. -- production floor?
16  A. Uh-huh.
17  Q. And the boots you could wear from home?
18  A. Yes, sir.
19  Q. And the earplugs you could put on at
20     any time; correct?
21  A. Before you got on -- well, before you
22     went to your line for the day.
23  Q. So am I correct that because you were

17

1      required to put most of these items on
2      when you were in the production floor,
3      that you did not put them on until you
4      actually entered the production floor;
5      correct?
6   A. Yes, sir.
7   Q. Could you put these items on while you
8      were working in the production room?
9   A. No, sir.
10  Q. You stood and put them on?
11  A. Yes, sir.
12  Q. And you did not use a knife or scissors
13     with your job?
14  A. No.
15  Q. And did you use any other tools or
16     equipment?
17  A. Well, no other than a scale to weigh
18     fat from the meat.
19  Q. Your shift started at 7:30 a.m.?
20  A. Yes, sir.
21  Q. And you were required to be on the
22     production floor at the bone sampler
23     site at that time?

e05b2b3f-a771-4c40-91fd-ae49148ac72a

18

1  A. Yes, sir.
2  Q. And your shift ended at 4:30 p.m.?
3  A. Yes, sir.
4  Q. And how many breaks did you get?
5  A. Two.
6  Q. How long were they?
7  A. Thirty minutes.
8  Q. Were those breaks unpaid?
9  A. Well, we didn't have to clock out for
10  them, so we should have been paid.
11  Q. What's your understanding of whether
12  they were paid or not?
13  A. No, sir.
14  Q. They were not paid?
15  A. No, sir.
16  Q. Where did you usually take your breaks?
17  A. Down in the break area.
18  Q. The debone break room?
19  A. It was down -- I think it was the evis
20  break room.
21  Q. Did you have a choice?
22  A. Not that I know of.
23  Q. There are two break rooms, are there

19

1  not?
2  A. Yes, sir.
3  Q. There's an evis break room and a debone
4  break room; correct?
5  A. Yes.
6  Q. And the evis break room is across the
7  hall from the evis department?
8  A. Yes, sir.
9  Q. And the debone break room is across the
10  hall from the deboning department?
11  A. Yes, sir.
12  Q. And did you have a choice to either go
13  to the evis break room or the debone
14  break room?
15  A. Oh, you had a choice. You could have
16  went to either one, but it was like the
17  debone break room, it would be full of
18  people from evis and people on the
19  phone. So it was, like, some in both
20  break rooms.
21  Q. But you had your choice?
22  A. Yes, sir.
23  Q. How did you know it was time to take

20

1  your break?
2  A. Because when it's time for the break,
3  the line leader, the supervisor, let
4  their people know whoever is cutting,
5  either loading the birds onto the line,
6  and one at a time they would start
7  coming off the line and --
8  Q. So they would come off the line in a
9  staggered fashion?
10  A. Well, yes, sir. And then I would have
11  to wait. As a bone sampler, I have to
12  wait at the end of the line until the
13  last piece of meat comes through.
14  Q. After your break was over, did you have
15  to go back when the -- when the other
16  people went back?
17  A. Yes, because I had to be in my position
18  before the meat got there.
19  Q. But you didn't have to be -- you were
20  at sort of the end of the line, weren't
21  you?
22  A. Yes. I would be the last one to leave
23  off the line.

21

1  Q. But you -- you didn't -- you only had
2  to be at your position on the line at
3  the end when the meat got there, didn't
4  you, after break?
5  A. Yes. I had to be there before the meat
6  got there.
7  Q. Well, you had to be there when the meat
8  got there; correct?
9  A. Before.
10  Q. How much time before?
11  A. Probably -- probably about two, three
12  minutes before the meat got there,
13  because if the meat would have came
14  down and I wasn't there and there was a
15  bone in the meat, then I could have
16  been written up.
17  Q. I understand that. But you had to be
18  there when the meat got there; correct?
19  A. Well, we -- we was told by our
20  supervisor we had to be there before
21  the meat got there.
22  Q. Did the people come back from break in
23  a staggered fashion?

22

1    A. Well, on the line that I was on, some
2       was there in their position on time and
3       some wasn't.
4    Q. But the people who were towards the end
5       of the line, they didn't have to come
6       back when the people came back that
7       were at the beginning of the line, did
8       they?
9    A. Everyone should have been back at the
10      same time.
11   Q. But that didn't work -- it didn't work
12      that way, did it?
13   A. No, sir.
14   Q. What time did you usually arrive at the
15      plant?
16   A. Around seven o'clock.
17   Q. Did you have to clear security to get
18      onto the property?
19   A. Well, we had a -- when I was there, we
20      had the little stickers on the car and
21      when they see the sticker they know
22      you're good and you can go on through.
23   Q. Were you ever searched?

23

1    A. No, sir.
2    Q. Were any of your personal possessions
3       ever searched?
4    A. No, sir.
5    Q. Take me through what you did after you
6       parked your car.
7    A. After I parked my car, I would go in
8       and I would clock in. And after I
9       clock in, I will go and -- to my locker
10      and get my supplies. If I needed
11      something, I would go to the supply
12      room and wait in line to get those.
13      And then probably about -- I'd say
14      probably about 7:20, I would go and --
15      go -- if the floor had been released to
16      go onto the production floor, I would
17      go in and I would stop and sanitize my
18      boots, and then I go to the wash area
19      and we get dressed and we'll wash up
20      and I'll get in my position.
21   Q. When you say "when the floor was
22      released to go into the production
23      floor," what do you mean by that?

24

1    A. Well, sometimes the people that --
2       sanitation comes in at night, and
3       sometimes they have the floor ready to
4       go in there but they have to inspect
5       the floor and make sure that the
6       machines and everything is clean before
7       we can go in and do our job. And then
8       sometimes -- I will say probably
9       something in evis done went wrong and
10      we don't have any work to do so we
11      can't go onto the floor until, you
12      know, it's been released to go onto it.
13   Q. So sometimes you were told you weren't
14      permitted to go on the floor yet?
15   A. Yes, sir.
16   Q. How often did you have to wait in line
17      to get your supplies?
18   A. Well, it all depends. Sometimes the
19      line be real long and sometimes it
20      don't. So at the most, probably about
21      ten minutes.
22   Q. At the most, you waited ten minutes?
23   A. Yes, sir. It depends on who all in

25

1       front of you and what all they have to
2       get.
3    Q. And how long did that happen -- I mean
4       how often did that happen in a week?
5    A. Well, I tried not to get in line that
6       regular. I tried to keep -- you know,
7       keep my stuff that I needed, supplies
8       and stuff, so I didn't really -- I
9       wasn't a regular person in line to get
10      supplies.
11   Q. Well, if you -- if you got there at
12      seven o'clock and you didn't need to
13      get supplies, what did you do before
14      you went out on the production floor?
15   A. I would sit in the break room until
16      about 7:25. We had to wait at least
17      five minutes before 7:30 before we
18      could swipe -- clock in. So I would
19      just sit there until it's time to go
20      in. And then if it's not -- if they
21      say we can't go in, then we'd probably,
22      you know, just wait around in the
23      hallway or either we'd go back to the

e05b2b3f-a771-4c40-91fd-ae49148ac72a

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

26

1    break room and sit down until they
2    released us to go to work.
3    Q. So you swiped in right before you went
4       onto the production floor?
5    A. Probably five minutes before. Okay.
6       Like, if I have to be there at 7:30, by
7       7:25 we -- we're -- we're allowed to
8       clock in then.
9    Q. So you weren't allowed to clock in
10      before 7:25?
11   A. No, sir.
12   Q. And when you went to the -- if you
13      didn't have to pick up anything at the
14      supply desk and you said you went to
15      the break room, what did you do in the
16      break room?
17   A. I was just there in the break room
18      until it was time to go.
19   Q. What did you do?
20   A. I'd sit there and probably talk to
21      other people.
22   Q. There were other people in there?
23   A. Uh-huh. (Witness nods head.)

27

1    Q. Eating?
2    A. Some was eating and some was just
3       sitting there waiting to go to work.
4    Q. Did some people arrive at the plant
5       after you had gotten there?
6    A. Most likely it would have been.
7    Q. I mean, you came at seven o'clock --
8    A. I tried --
9    Q. -- pretty much every day.
10   A. Well, just about. If I had to ride
11      with someone or something like that or
12      somebody had to bring me.
13   Q. From what you could see, did some
14      people arrive later than that?
15   A. Yes, sir, because there had been people
16      that been late, late for work.
17   Q. But you had some time to wait in the
18      break room before the shift started;
19      correct?
20   A. Uh-huh.
21   Q. So you didn't have to get there at
22      seven o'clock in order to be at your
23      workstation on time, did you?

28

1    A. No, I didn't have to because I didn't
2       have to be at my workstation until
3       seven -- probably 7:30.
4    Q. Approximately what time did you
5       leave -- try to leave the break room to
6       go onto the production floor?
7    A. Well, on the mornings that I knew that
8       we could get in there, like if I go
9       down there and there ain't nobody
10      saying there's no problem or
11      anything -- so if I have to be on my
12      line by 7:30, I should try to leave
13      probably about 7:20, somewhere -- a
14      couple minutes to give me time to get
15      in there and you, know, do what I've
16      got to do to get on line.
17   Q. And sometimes you -- so that gave you
18      ten minutes?
19   A. Yes, sir.
20   Q. And did sometimes -- were there times
21      when you didn't leave yourself ten
22      minutes or you didn't have ten minutes,
23      you had less time?

29

1    A. Well, sure. There -- there have been
2       times, you know, I probably rushed and,
3       you know, I probably was a little late
4       getting on my line.
5    Q. Were you ever late that product started
6       to come off and you weren't there?
7    A. Yes, sir, there was a time that I
8       was -- yes.
9    Q. How long did it take you to walk from
10      your break area to your workstation --
11      into the debone room?
12   A. About three to four minutes.
13   Q. Did you ever time it?
14   A. No, sir, I didn't time it.
15   Q. Now, once you entered the production
16      floor, you had to put on your smock,
17      your apron, and your -- your sleeves;
18      correct?
19   A. And my gloves and liner.
20   Q. And approximately how many minutes did
21      it take you to put those items on?
22   A. Probably five, six minutes, somewhere
23      around in there.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

30

1  Q. Did it take some people longer than
2     that?
3  A. It could have.  It all depends on what
4     time they decide to come in and what
5     all -- because some probably come in
6     and get right on it and some probably
7     wouldn't.
8  Q. So some people --
9  A. But I always tried to go and get in my
10    position like I'm supposed to.
11 Q. So some people could do it quicker?
12 A. Some probably could.
13 Q. Did some people wait until the last
14    minute to try and get in there?
15    MR. UNDERWOOD:  And don't
16    speculate.  Just if you know.
17 Q. If you know, if you saw.
18 A. I -- not that I know of.
19 Q. What did you have to do to go on break?
20 A. Well, before I went on break, I had to
21    wait until the last piece of meat came
22    down the belt and then I would have to
23    go and wash up my gloves and -- I'd

31

1     clean and I'd wash my apron off.  Then
2     I have to take all that off and hang it
3     up before I go to break.  And before we
4     go to break, we have to also stop by
5     and sanitize our boots before we go out
6     in the hallway.
7  Q. Stop and what?
8  A. Sanitize our boots before we go out in
9     the hallway.
10 Q. And can you estimate for me how many
11    minutes this process took?
12 A. Well, probably about six or seven
13    minutes, because you have people in
14    front of you still in there.
15 Q. Were you ever the first one there?
16 A. To the wash station?
17 Q. Yeah.
18 A. No, sir, because I was the last one to
19    leave the line.
20 Q. And you took everything off except your
21    hair net, your earplugs, and your
22    boots?
23 A. Yes, sir.

32

1  Q. And you hung it up?
2  A. Yes, sir.
3  Q. After you washed it?
4  A. Yes, after I washed it, hang it up.
5  Q. As best you were able to observe, did
6     everybody wash off before they left the
7     room before they took off their aprons
8     and so forth?
9  A. As far as I can remember.  I can't just
10    recall everyone doing that because
11    there's some times, you know, some of
12    them -- like the line, the people that
13    work on the line, they'll probably just
14    run over there and they'll probably
15    just wash it off and just take -- wash
16    off their gloves and they won't clean
17    the apron and stuff, just hang it up,
18    because I guess they be in a hurry to
19    get to break because they be wanting
20    their whole breaks.
21 Q. So not everybody washed off the way you
22    did?
23 A. No, sir.

33

1  Q. Tell me what you did when you came off
2     break.  How did you know it was time
3     for you to go back to work?
4  A. Oh, because when I go -- when I go to
5     break, I look at the clock and see what
6     time it is because I know what time
7     that I should be back in my position.
8     And so I will leave probably about five
9     or six minutes before the break is over
10    with so that I'd have time to sanitize
11    my boots and wash and get all my
12    supplies back on and wash up and get
13    back on line.
14 Q. Did some people on the debone line go
15    back to -- go off break before you?
16 A. On -- go off break before me?
17 Q. Yes.
18 A. Well, everybody was gone before I was.
19    Because I was the bone sampler, I was
20    at the end of the line so I was the
21    last one to leave off the line.
22 Q. So you didn't have to be back at the
23    same time the other people were?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

34

1    A. Yes, sir.
2    Q. Okay. At the end of the day, what did
3        you do?
4    A. At the end of the day, I would still
5        have to wait until the last piece of
6        meat comes down the belt. And then
7        after that's done, I will finish up my
8        paperwork and then I would have to go
9        and wash -- wash myself down, my gloves
10       and my apron and stuff and I takes it
11       off, take my smock off, and we would --
12       sanitize my boots and go out. And then
13       we have to put our aprons -- not our
14       aprons, but our smocks in a hamper
15       outside for the company to clean them.
16       And I would go on to the break room and
17       clock out.
18   Q. And how long do you estimate that
19       process took you?
20   A. Five or six minutes.
21   Q. What was your understanding of when the
22       time started for which you were to be
23       paid?

35

1    A. From 7:30 a.m.
2    Q. And what was your understanding of the
3        time for which you were to be paid
4        stopped?
5    A. Well, I assume that I would be paid
6        till the time that I clocked out,
7        whatever that is.
8    Q. When you swiped out at the end?
9    A. Yes, sir. But it was always -- I was
10       always paid until 4:30.
11   Q. Did you ever have occasion to complain
12       to your supervisor about your paycheck?
13   A. No, sir.
14   Q. Did you keep any kind of diary,
15       notebook, or notes showing what you
16       believe to be the hours that you
17       worked?
18   A. No, sir.
19   Q. Did you -- do you know of anyone who
20       did?
21   A. No, sir.
22   Q. You said early on that you have a claim
23       here for unpaid hours.

36

1    A. Uh-huh.
2    Q. Did you or have you ever made any
3        calculations as to the time you worked
4        for which you weren't paid?
5    A. No, sir.
6    Q. Did you ever work any overtime?
7    A. I think there was times that we had to
8        work -- on some weekends we had to
9        work.
10   Q. Were you paid time and a half for that?
11   A. Yes, sir.
12   Q. And did you ever have any complaints
13       about your overtime pay computation?
14   A. No, sir.
15   Q. Besides the problem that you had with
16       attendance at the end when you were
17       terminated for the point policy, were
18       you ever written up for anything?
19   A. No, sir.
20       MR. FRY: That's all.
21       MR. UNDERWOOD: No follow-up.
22   (The deposition of Tangela Glenn
23   concluded at 3:20 p.m. on 5/21/08.)

37

1        * * * * * * * * * *
2        REPORTER'S CERTIFICATE
3        * * * * * * * * * *
4    STATE OF ALABAMA
5    COUNTY OF MONTGOMERY
6        I do hereby certify that the above
7    and foregoing transcript was taken down
8    by me in stenotype, and the questions
9    and answers thereto were transcribed by
10   means of computer-aided transcription,
11   and that the foregoing represents a
12   true and correct transcript of the
13   testimony given by said witness.
14       I further certify that I am neither
15   of counsel, nor any relation to the
16   parties to the action, nor am I anywise
17   interested in the result of said case.
18
19
20
21   Bridgette W. Mitchell,
     Certified Court Reporter and
22   Commissioner for the State of
     Alabama at Large
23   ACCR No. 231 - Expires 9/30/08
     MY COMMISSION EXPIRES 1/25/2010

**TAB 19**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


BETTY ANN BURKS, et al.,

    Plaintiffs,


vs.  CIVIL ACTION 2:06-cv-01081-MEF-DRB


EQUITY GROUP EUFAULA DIVISION, LLC,

    Defendant.


\*   \*   \*   \*   \*   \*

    DEPOSITION OF ANNIE GLOVER-PATRICK,

taken pursuant to notice and

stipulation on behalf of the Defendant,

at Williams, Pothoff, Williams & Smith,

125 South Orange Avenue, Eufaula,

Alabama, before Bridgette Mitchell,

Shorthand Reporter and Notary Public in

and for the State of Alabama at Large,

on May 21, 2008, commencing at

12:47 p.m.

671c3998-6d0a-4ccc-8bf1-f75108ad5e86

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

2

```
1        APPEARANCES
2
3   FOR THE PLAINTIFFS:
4   Carl E. Underwood, III, Esquire
5   COCHRAN, CHERRY, GIVENS & SMITH
6   163 W. Main Street
7   Dothan, Alabama  36301
8
9   Robert Joseph Camp, Esquire
10  THE COCHRAN FIRM
11  505 20th Street North
12  Suite 825
13  Birmingham, Alabama  35203
14
15  FOR THE DEFENDANT:
16  Gary D. Fry, Esquire
17  PELINO & LENTZ
18  One Liberty Place
19  Thirty-second Floor
20  Philadelphia, Pennsylvania  19103
21
22  ALSO PRESENT:
23  Felicia Laseter
```

4

```
1         It is further stipulated and
2   agreed by and between counsel
3   representing the parties in this case
4   that the filing of the deposition of
5   ANNIE GLOVER-PATRICK is hereby waived
6   and that said deposition may be
7   introduced at the trial of this case or
8   used in any other manner by either
9   party hereto provided for by the
10  Statute, regardless of the waiving of
11  the filing of same.
12        It is further stipulated and
13  agreed by and between the parties
14  hereto and the witness that the
15  signature of the witness to this
16  deposition is hereby waived.
17
18             INDEX
19
20  EXAMINATION              Page
21  By Mr. Fry........................ 5
22  By Mr. Underwood................. 57
23  By Mr. Fry........................ 60
```

3

```
1         STIPULATIONS
2       It is hereby stipulated and
3   agreed by and between counsel
4   representing the parties that the
5   deposition of ANNIE GLOVER-PATRICK is
6   taken pursuant to notice and
7   stipulation on behalf of the Defendant;
8   that all formalities with respect to
9   procedural requirements are waived;
10  that said deposition may be taken
11  before Bridgette Mitchell, Shorthand
12  Reporter and Notary Public in and for
13  the State of Alabama at Large, without
14  the formality of a commission; that
15  objections to questions, other than
16  objections as to the form of the
17  questions, need not be made at this
18  time, but may be reserved for a ruling
19  at such time as the deposition may be
20  offered in evidence or used for any
21  other purpose as provided for by the
22  Civil Rules of Procedure for the State
23  of Alabama.
```

5

```
1         ANNIE GLOVER-PATRICK, having
2   first been duly sworn or affirmed to
3   speak the truth, the whole truth, and
4   nothing but the truth, testified as
5   follows:
6             EXAMINATION
7   BY MR. FRY:
8   Q. Ms. Glover-Patrick --
9   A. You can say Patrick.  That would be
10     fine.
11  Q. Ms. Patrick?  Good.  My name is Gary
12     Fry and I'm one of the lawyers for
13     Equity Group Eufaula that operates the
14     plant up in Baker Hill.  And we've
15     asked you here today to put certain
16     questions to you with respect to a
17     lawsuit as to which you and a bunch of
18     other folks are a party.  Have you ever
19     been deposed before?
20  A. Been to who?
21  Q. Have you ever been in a deposition
22     before?
23  A. No.
```

**6**

1  Q. Let me just explain it briefly. It's
2  pretty simple. I'll be asking the
3  questions. You'll be providing the
4  answers. Bridgette, the court
5  reporter, will be taking down what I
6  say and what you say. If you don't
7  understand anything that I say or my
8  question, let me know and I'll try to
9  rephrase it so you will understand it.
10  If you don't hear anything or something
11  or a portion of what I say, let me know
12  and I'll repeat it.
13  A. Okay.
14  Q. If you answer a question, I will assume
15  that you heard and understood it and
16  answered truthfully. Only two
17  guidelines: I won't talk over you and
18  please don't talk over me so she can
19  get a clean record. Okay?
20  A. All right.
21  Q. And your answers must be verbal. She
22  can't take down a nod of the head or a
23  shake.

**7**

1  A. Okay.
2  Q. Okay?
3  A. Okay.
4  Q. What's your home address?
5  A. Post Office Box 68, Clayton, Alabama.
6  Q. And your date of birth?
7  A. 2/1/49.
8  Q. Are you currently employed?
9  A. I am.
10  Q. By whom?
11  A. Keystone -- Equity/Keystone.
12  Q. How long have you worked at the Baker
13  Hill facility?
14  A. Almost five years. January of next
15  year will be five years.
16  Q. So that takes us back to 2004?
17  A. Yes.
18  Q. So when you started there, that plant
19  was operated by Charoen Pokphand?
20  A. Yes.
21  Q. What is your current job at Equity?
22  A. You mean right now?
23  Q. Yes, ma'am.

**8**

1  A. Right now I do supply because of my
2  wrist.
3  Q. You hurt your wrist while on the job?
4  A. I did.
5  Q. And how long have you been working in
6  supply?
7  A. Ever since last year, in July.
8  Q. So from July of '07, you've been in
9  supply?
10  A. Yes.
11  Q. Prior to hurting your wrist, what job
12  did you have there?
13  A. DSI.
14  Q. And how long were you working DSI?
15  A. About a year and a half.
16  Q. So that would take us back into early
17  2006?
18  A. Yes.
19  Q. And prior to working on DSI, what did
20  you do?
21  A. Pack-out.
22  Q. And can you give me the dates when you
23  worked pack-out?

**9**

1  A. I don't remember.
2  Q. Do you know for how long you worked in
3  pack-out?
4  A. It could -- I really don't remember. I
5  really don't, you know, because they
6  move you here, you work right here,
7  pack-out might be work right here, it
8  could be wings right here. It's just
9  little departments. So I really can't
10  say.
11  Q. When you first started working at Baker
12  Hill for CP, what did you do?
13  A. I did evis, over there cutting wings.
14  Q. How long did you do that?
15  A. For about nine months to a year.
16  Q. And do you recall what job you went to
17  after you left evis?
18  A. Pack-out.
19  Q. So you went to pack-out?
20  A. Yes.
21  Q. You've never worked in the debone
22  department?
23  A. No.

671c3998-6d0a-4ccc-8bf1-f75108ad5e86

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

10

1  Q. What shift do you currently work?
2  A. Second shift.
3  Q. And what are the hours?
4  A. I'm doing from 2:30 now until 11:30 or
5     12:30.
6  Q. What shift did you work when you were
7     working DSI?
8  A. Same shift.
9  Q. Same? What about pack-out?
10 A. I was on day shift.
11 Q. And what were your hours there?
12 A. From 7:30 until 4:30.
13 Q. Pardon?
14 A. I think it was 7:30 to 4:30.
15 Q. Four-thirty? And do you recall what
16    shift you worked in evis for CP?
17 A. What time did we go in? I can't
18    remember. I think it was, like, from
19    six -- it -- I can't remember back that
20    far.
21 Q. Okay.
22 A. I can't remember. But it was day
23    shift.

11

1  Q. Have we exhausted all the jobs that you
2     performed at the plant --
3  A. Sure.
4  Q. -- to your memory?
5  A. (Witness nods head.)
6  Q. Okay.
7  A. Yes.
8  Q. Now, you are a plaintiff. You have a
9     claim in this lawsuit; is that --
10 A. I do.
11 Q. -- correct? And how did you first
12    learn about the case?
13 A. The television and people talking about
14    it.
15 Q. And what did you learn from the
16    television?
17 A. That they were asking people that -- who
18    had worked at the poultry plant to get
19    in touch with the Cochran firm.
20 Q. That what?
21 A. To get in touch with the Cochran firm.
22 Q. And what did you learn from talking
23    with people about this case?

12

1  A. I didn't talk to a whole lot -- I
2     didn't talk to really anybody about it.
3     I just heard -- you know how people get
4     around and start talking? You know,
5     just talk.
6  Q. What do you recall hearing?
7  A. Nothing too much, because when I --
8     when people start talking, if it don't
9     concern me, I just keep walking. I
10    just hear them talking.
11 Q. What's your understanding of what the
12    case is about?
13 A. About paying us wages, back wages.
14 Q. You believe you have a claim for back
15    wages?
16 A. I do.
17 Q. And what is the basis of your claim for
18    back wages?
19 A. Don't understand what you're talking
20    about.
21 Q. Why do you feel you have a claim?
22 A. Why do I feel that I have a -- I,
23    myself?

13

1  Q. Just you.
2  A. Because I don't feel that they was
3     paying us from the time that we was
4     being undressed, putting our aprons and
5     things back on and getting back in on
6     time, and the lunch breaks and all
7     that, you know, that was taken from us.
8  Q. Now, you've worked supply for almost
9     the last year; correct?
10 A. Yes.
11 Q. And what are you required to wear as an
12    employee in the supply room?
13 A. My clothes.
14 Q. You're required to wear a smock?
15 A. No.
16 Q. You required to wear anything?
17 A. Just my clothes.
18 Q. Just your clothes?
19 A. Yes.
20 Q. Do you have any claim for any unpaid
21    wages for the time you worked in
22    supply?
23 A. No, because I haven't been on the floor

14

1      working supply.
2      Q. Are you a member of the union?
3      A. I am now.
4      Q. And that's the retail, wholesale, and
5         department store union?
6      A. I don't know.
7      Q. You don't know?
8      A. No.
9      Q. When did you join?
10     A. A week ago.
11     Q. So as a new member, you didn't go to
12        any --
13     A. Meetings?
14     Q. -- union -- you haven't been to any
15        union meetings?
16     A. No, I have not.
17     Q. Have you talked to any of the union
18        reps concerning this lawsuit?
19     A. No.
20     Q. Did you review any papers to prepare
21        for this deposition?
22     A. No.
23     Q. Besides your lawyers, did you talk with

15

1      anybody about it?
2      A. No.
3      Q. When you worked in DSI, tell me what
4         you wore every day on the job.
5      A. When I got ready to get in the plant?
6      Q. What you --
7      A. My clothes?
8      Q. What you had to wear.
9      A. Okay. I have on my clothes. I put on
10        my -- my smock, the white smock, a blue
11        apron, hair net, earplugs, arm sleeves.
12        We didn't use knives and scissors back
13        there. Only way we use knives and
14        scissors, if we worked somewhere else.
15        We didn't use those back there.
16     Q. So you wore a smock, an apron, a hair
17        net, earplugs, and arm sleeves?
18     A. Yes.
19     Q. Those are the plastic arm sleeves?
20     A. Yes.
21     Q. Were you required to wear any type of
22        shoes or boots?
23     A. Boots. Yes, have to wear boots.

16

1      Q. Which of those items, to your
2         understanding, were you required to
3         wear?
4      A. All of them.
5      Q. Did you wear gloves?
6      A. Yes.
7      Q. What kind of gloves?
8      A. We wore two pair. We wore the cotton
9         liners and the blue gloves.
10     Q. You did not work with a knife or
11        scissors when you worked in DSI?
12     A. No.
13     Q. How many people worked with you in DSI?
14     A. There's quite a few back there.
15        Maybe -- back then, maybe one, two,
16        three lines. Can't say, because it
17        was, like, three lines, you know.
18     Q. Okay. Did everybody that worked in DSI
19        wear these same items of equipment?
20     A. Everybody.
21     Q. Which of these items that you've
22        identified for me were issued to you by
23        the company?

17

1      A. All of them.
2      Q. All of them?
3      A. That you -- on that paper.
4      Q. Pardon?
5      A. All of those that I just named out.
6      Q. Which of those items did you get on or
7         pick up on a daily basis?
8      A. We have to change our -- on a daily
9         basis? Our hair nets, the blue gloves,
10        and that was it.
11     Q. What about smocks?
12     A. Oh, the white smocks, we have to change
13        them every day.
14     Q. So you're permitted -- you were
15        permitted when you worked in DSI to
16        wear your footwear and your hair net
17        and your earplugs from home?
18     A. No.
19     Q. Were you permitted to wear anything
20        from home?
21     A. No.
22     Q. Not even your boots?
23     A. Oh, we could wear our boots.

671c3998-6d0a-4ccc-8bf1-f75108ad5e86

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

18

1  Q. Were you permitted to wear boots of
2    your choice?
3  A. No. We had to wear the boots through
4    the company.
5  Q. These items that you picked up every
6    day -- the smock, the gloves, and the
7    hair net -- you picked those up at the
8    supply room?
9  A. Yes.
10  Q. At the start of your shift?
11  A. Yes.
12  Q. And did you go there first thing after
13    you came to the plant?
14  A. To go pick up our supply?
15  Q. Yes, ma'am.
16  A. Yes.
17  Q. And how long did it take you to pick up
18    your stuff?
19  A. It's according to how long the line is.
20    You know, if we all get there, it takes
21    us -- if the line's short, you just go
22    get them and go. But it's just
23    according to how long the line is. You

19

1    never know.
2  Q. Never know?
3  A. No.
4  Q. It's different from day to day?
5  A. It is.
6  Q. And now that you work in supply, you
7    get to see the line -- how the line
8    develops every day; correct?
9  A. I do.
10  Q. And is that the basis for your
11    testimony that it varies from day to
12    day; sometimes there's lines and
13    sometimes there's not?
14  A. Monday is the worst day of all.
15    Everybody mostly on Monday.
16  Q. What about Tuesday through Friday?
17  A. Well, it's -- it's not as long as it is
18    on Monday.
19  Q. And how long as -- from working in
20    supply, how long does it take you on
21    Mondays to get everybody --
22  A. I'm not -- I'm not the only one in
23    there.

20

1  Q. Well, how long does it take the line to
2    go through?
3       MR. UNDERWOOD: If you know.
4  Q. If you know.
5       THE WITNESS: I can't hear you.
6       MR. UNDERWOOD: I said if you
7    know. I mean, don't be guessing.
8  A. That's what I'm saying, I don't know.
9  Q. What about Tuesday through Friday?
10       (No immediate response given.)
11  Q. If you don't know, you don't know.
12    That's --
13  A. I don't know.
14  Q. Okay. Now, going back to when you
15    worked in DSI for the year and a half,
16    from '06 to '07. Where did you put on
17    these items that you just identified
18    for me that you had to wear?
19  A. We have to go -- when we go through the
20    double door into the -- out there where
21    the meats are.
22  Q. Into the production area?
23  A. Yes.

21

1  Q. So you had to put on your smock in the
2    production area?
3  A. Yes. We're supposed to dress there.
4  Q. You didn't have to put your boots on
5    there; right?
6  A. We had our boots on.
7  Q. Right. What about your hair net?
8  A. We're putting it on, too.
9  Q. That was already on?
10  A. We have them on, too.
11  Q. And your earplugs?
12  A. We put them on when we get through the
13    double door.
14  Q. You put everything on except your boots
15    when you get through the double --
16  A. The boots are already on your foot.
17  Q. You have to listen to my question. Is
18    it your testimony that with the
19    exception of your boots, when you
20    worked in DSI, you put everything on
21    when you went onto the production
22    floor?
23  A. Yes. We had to put it on when we go on

671c3998-6d0a-4ccc-8bf1-f75108ad5e86

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

22

1    the floor.
2    Q. And is it true that you weren't allowed
3      to wear your apron and the smock and
4      the arm sleeves outside of the
5      production floor?
6    A. It's true.
7    Q. When you entered the production floor,
8      tell me what you did by way of putting
9      these various items on.
10   A. Excuse me? I don't understand what you
11     mean.
12       MR. UNDERWOOD: Object to form.
13     What she did besides put the items on?
14       MR. FRY: Good point. Let me
15     rephrase it.
16   Q. (By Mr. Fry) Describe for me how you
17     would put on these items of PPE, or
18     clothing, once you entered the double
19     doors.
20   A. So you said when I get on the floor how
21     do I dress?
22   Q. Yes.
23   A. I put my smock on; then we put the blue

23

1    apron on; then we put the white liners
2      on, cotton liners; then we put the blue
3      gloves on; then we have to put the
4      sleeves on top of that.
5    Q. And do you put --
6    A. And your earplugs and your hair net.
7      Excuse me.
8    Q. Sorry to interrupt. I don't want to
9      interrupt. Do you do any of this
10     putting-on while you're walking?
11   A. To our jobs?
12   Q. Yes, ma'am.
13   A. We are supposed to be fully dressed
14     when we get to our job.
15   Q. And how far do you have to walk from
16     the entry to the production floor to
17     the DSI area?
18   A. I don't know how far it is. I never
19     measured walking.
20   Q. Is it a minute walk, a thirty-second
21     walk?
22   A. I really don't know. I never have
23     thought about that. I don't know.

24

1    Q. While you're making that walk, are you
2      able to put things on?
3    A. When we get there -- we are supposed to
4      be dressed when we get on the line.
5    Q. Listen to my question. Just answer my
6      question.
7    A. Okay.
8    Q. When you're walking from the double
9      door to the DSI area, while you're
10     walking, are you able to put on any of
11     these items?
12   A. By walking? That's what you're asking?
13   Q. While you're walking.
14   A. I don't know.
15   Q. Do you do it?
16   A. When I get there, I try to be almost
17     dressed when I get almost to the line.
18   Q. And my question is, while you're
19     getting there, while you're walking
20     through the production area, are you
21     putting on your smock? Are you putting
22     on your apron?
23   A. Yes, I have did it before.

25

1    Q. While you're walking?
2    A. Yes.
3    Q. And do other people do it as well?
4    A. I don't be watching other people. I
5      just be trying to get there myself,
6      sir.
7    Q. That's fair enough. You told me that
8      by the time you arrived at the DSI
9      workstation, you had to be fully
10     dressed. And during the year and a
11     half that you worked at DSI, do you
12     recall what time you had to be there
13     for the second shift?
14       MR. UNDERWOOD: In the plant or
15     on --
16       MR. FRY: In the plant at her
17     workstation.
18       MR. UNDERWOOD: Okay. On the
19     line?
20       MR. FRY: On the line.
21       MR. UNDERWOOD: Okay.
22   A. We had to be there on the line by 4:25,
23     before 4:30, give the other shift time

26

1   to change. We got to be ready to get
2   on the line.
3   Q. How many minutes before 4:25 would you
4     go through those double doors?
5   A. We try to get in there about 4:20 so we
6     can be ready. Let me speak for myself.
7     I try to be in there. That's the way
8     to do it.
9   Q. That's all I want.
10  A. Okay.
11  Q. If I want your observations on other
12    people, if you have any, I'll try and
13    ask them that way.
14  A. Speak for myself.
15  Q. But I want just what you can recollect.
16  A. Okay.
17  Q. We're still on DSI. How many breaks
18    did you get during that shift?
19  A. Two.
20  Q. And how long were the breaks?
21  A. They're supposed to be thirty minutes.
22  Q. When you say that they were supposed to
23    be, you're saying they weren't?

27

1   A. To me, it wasn't.
2   Q. And why do you say that?
3   A. Because we have to pull off our
4     equipment. Okay. That takes time to
5     pull off and hang it up on the thing
6     because we're back there putting them
7     on the rack and stuff. Then by the
8     time we walk back there in DSI and get
9     to the break room, part of the time is
10    gone.
11  Q. How long do you estimate it took you
12    to put on this equipment when you
13    entered -- from the time you entered
14    the double doors, if you know?
15  A. I don't know.
16  Q. You never timed it?
17  A. I don't time it. I know -- I don't
18    time it.
19  Q. Where do you take your break?
20  A. In the break area.
21  Q. The --
22  A. Debone or either break room. There's
23    two other break rooms.

28

1   Q. You have your choice?
2   A. Yes.
3   Q. And do you know the time of the breaks?
4   A. Seven-twenty to ten minutes to eight.
5   Q. And how do you know it's time for you
6     to go on your break?
7   A. Because we look at the clock. They let
8     us know it's time to go.
9   Q. So the timing of your break doesn't
10    depend on the status of the product?
11  A. We have to -- they let us know -- like,
12    the meat is falling. They'll stop the
13    meat from running. The line is clear.
14    Everything have to be off the line
15    before we can leave, everything. No
16    meat.
17  Q. And when you did DSI, what did you
18    actually do?
19  A. Different jobs.
20  Q. And what was the purpose of the DSI
21    operation? What did you do to the
22    meat?
23  A. They would enter the combo and it would

29

1   come down on the belt and they have to
2   straighten it out. My job? That's
3   what I'm saying. I had different jobs.
4   Q. Okay.
5   A. I just can't say -- I did different
6     things. And at the end of the line of
7     the combo, I can't move until all the
8     meat fall into the combo.
9   Q. So you go on break based on the clock?
10  A. Yes.
11  Q. And does everybody start the break at
12    the same time?
13  A. Mostly, yes.
14  Q. And I'm talking about when you were in
15    DSI.
16  A. Yes.
17  Q. And then you go to one of the break
18    rooms, the break room of your choice;
19    correct?
20  A. Yes.
21  Q. And how do you know when it's time to
22    come back?
23  A. Because we're looking at the clock.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

30

1  Q. And everybody comes back at the same
2     time?
3  A. Yes.
4  Q. How long did you work on pack-out?
5  A. I don't remember.
6  Q. What sort of clothing, if any, did you
7     have to wear in pack-out?
8  A. Same.
9  Q. You had to wear a smock?
10 A. Yes.  Smock, apron, gloves -- both
11    gloves, the cotton liners and blue
12    gloves, and your sleeves, boots.
13 Q. What did you do in pack-out?
14 A. Pack meat in boxes.
15 Q. And it was your understanding that all
16    those items were required when you
17    worked in pack-out?
18 A. Yes.
19 Q. And did the same routine of picking up
20    the certain items daily apply when you
21    worked pack-out, you picked up the same
22    things -- the smock, the gloves, and
23    the hair net -- daily?

31

1  A. If you didn't need -- the smock, yes,
2     we picked up daily; the hair net, yes.
3  Q. And as a pack-out worker, did you have
4     to show up at the same time as the
5     production people did to work?
6  A. Yes.
7  Q. And did the same situation exist then
8     with respect to the lines at the
9     supply?
10 A. Excuse me?
11 Q. When you were working pack-out, did the
12    same situation apply with respect to
13    lines when they picked up items of
14    equipment at the supply desk -- some
15    days it was a long line, some days it
16    wasn't?
17 A. Yes.
18 Q. Did you get two breaks when you worked
19    in pack-out?
20 A. Yes.
21 Q. Same as you did in DSI?
22 A. Yes.
23 Q. And how did you know to take your break

32

1     in pack-out?
2  A. Same way, the clock.
3  Q. Now, when you worked for CP and evis,
4     what items of clothing did you wear?
5  A. We got a smock, we got the apron, we
6     got the sleeve, gloves, cotton liners.
7     I had to have a sleeve -- I mean an arm
8     guard.  I used scissors and knives at
9     that time.
10 Q. And you got all those things from the
11    company?
12 A. That's with the company, yes.
13 Q. And you worked with a knife and
14    scissors?
15 A. I did.
16 Q. And you got those while you were on the
17    line?
18 A. They gave them to us.  They would issue
19    them to us.
20 Q. You didn't have to go get them?
21 A. No.  They would issue them to us.
22 Q. And when you were working in evis for
23    CP -- strike that and let me ask you

33

1     this.  Did you get a smock daily when
2     you worked for CP?
3  A. Yes.
4  Q. And you had to turn it in daily?
5  A. Yes.
6  Q. And did you put on all these items on
7     the production floor the same as you
8     did at DSI?
9  A. Yes.
10 Q. And was it also true that you weren't
11    permitted to wear your smock and your
12    apron and those kinds of things outside
13    the production floor?
14 A. True.
15 Q. I want you to describe for me now what
16    you do or what you have done over the
17    years when you were working in DSI,
18    pack-out, and evis from the time you
19    drove onto the property until you got
20    to your workstation.
21 A. Excuse me?
22 Q. Can you take me through what you did
23    each day when you arrived at work?

671c3998-6d0a-4ccc-8bf1-f75108ad5e86

34

1   A. I don't understand what you're saying.
2      When I leave from home?
3   Q. Yes.
4   A. And come to work?
5   Q. Yes.
6   A. What do I do?
7   Q. What do you do from the time you drive
8      on until you walk onto that
9      workstation?
10       THE WITNESS: What is he
11      saying? I don't understand.
12  Q. Let's do it this way. We'll do it this
13      way. You drive into the plant.
14  A. Okay.
15  Q. You have a sticker for your car?
16  A. I do, yes.
17  Q. And the guard shack, the guy in the
18      guard shack, just waves you in?
19  A. Yes.
20  Q. You're not searched?
21  A. No.
22  Q. None of your possessions are searched?
23  A. No.

35

1   Q. You park your car?
2   A. Yes.
3   Q. You go from your car to the supply?
4   A. Yes.
5   Q. First thing?
6   A. Well, no. If you got to go to the
7      ladies' room and everything, you go do
8      that.
9   Q. Okay. But if you don't have to do
10      anything like that for your personal --
11      anything personal, do you generally go
12      to the supply desk?
13  A. Go get my supplies.
14  Q. Okay. And then where do you go?
15  A. Go sit until it's time to go to work.
16  Q. Pardon?
17  A. Go sit in the break area until time to
18      get ready to go to work.
19  Q. So you go from the supply desk to the
20      break room and you wait until it's time
21      to go to work?
22  A. Yes.
23  Q. And how long do you typically wait in

36

1      the break room?
2   A. Well, if I get there at, what, 4:15,
3      you don't have but just five minutes to
4      go get your smock and stuff and it's
5      time to get on the line, go through the
6      double doors.
7   Q. When, generally, do you try to arrive
8      at the plant -- how many minutes before
9      your shift starts?
10  A. About thirty minutes. That's what
11      you're asking, about what time do I
12      arrive at the plant, period?
13  Q. Yeah.
14  A. About thirty minutes earlier.
15  Q. Okay. Are people -- from what you've
16      been able to observe, do people arrive
17      after you're there?
18  A. Yes.
19  Q. And from what you have observed, have
20      people arrived before you got there?
21  A. I guess. I mean . . .
22  Q. People that you work with.
23  A. I'm the type of person -- I'm speaking

37

1      for me -- when I go there, I do what I
2      got to do and I mind my business.
3      That's me. That's just the way I've
4      been.
5   Q. When you go to the break room to wait
6      until it's time to go in the production
7      floor, are there other people in there?
8   A. Yes.
9   Q. What are they doing?
10       (No immediate response given.)
11  Q. Are they talking?
12  A. Yes, I guess they are.
13  Q. Well, you see them, don't you?
14  A. I mostly have my books and stuff,
15      reading them.
16  Q. So you --
17  A. Until it's time for me to go to work.
18  Q. Some people read?
19  A. No. I said me.
20  Q. Okay. You read?
21  A. Yes.
22  Q. Do you use the vending machine?
23  A. No. I mostly have my own snacks and

671c3998-6d0a-4ccc-8bf1-f75108ad5e86

38

1    stuff.
2    Q. Sometimes you eat a snack while you're
3    waiting?
4    A. Maybe get a pop.
5    Q. Okay. Now, at some point, you swipe in
6    a Kronos card?
7    A. Timecard?
8    Q. Yes.
9    A. Yeah.
10   Q. When do you do that?
11   A. About 4:10, 4:15.
12   Q. And where do you swipe? Where is
13   the --
14   A. Right there where you go in the double
15   door. It's on the wall.
16   Q. So you swipe right before you go onto
17   the production floor?
18   A. No. It's in the break area.
19   Q. It's in the break area?
20   A. Yes.
21   Q. When do you generally swipe in? Is it
22   before you pick up your equipment or
23   after?

39

1    A. After.
2    Q. So continuing on, you're in the break
3    room; you have your smock and all the
4    other things you need to put on. Do
5    you have your hair net on?
6    A. (Witness shakes head.)
7    Q. You don't have anything on except your
8    boots?
9    A. You can put hair net on, but I don't
10   put mine on right then until I get
11   ready to go out, ready to go inside.
12   Okay?
13   Q. And approximately how many minutes
14   before the start of work do you go in
15   those double doors?
16   A. Five minutes. We have to be, you
17   know . . .
18   Q. And did you usually go in five minutes
19   for each of the jobs we're talking
20   about -- the DSI, the pack-out, and the
21   evis?
22   A. I can't remember all those times.
23   Q. Okay. That's fair enough. The five

40

1    minutes you recollect was the time you
2    entered the double doors when you were
3    working in DSI?
4    A. Yes. DSI because you have to get time
5    to get in there and get dressed.
6    Q. Do you have to -- when you're working
7    for DSI, did you have to wash anything
8    before you started --
9    A. You wash your hands. We're supposed to
10   wash our hands and take the water and
11   rinse down our aprons.
12   Q. And where do you do that?
13   A. At the wash station.
14   Q. Anything else?
15   A. No.
16   Q. How long does that take?
17   A. It's according how many people is
18   there, everybody trying to do it, get
19   ready.
20   Q. Can you estimate for me how long it
21   takes for you to walk from your break
22   area to the DSI station when you worked
23   in DSI?

41

1    A. No, I can't estimate that.
2    Q. When you worked in DSI, did you
3    generally, in the beginning of the work
4    day, go to the debone break room?
5    A. Go to it?
6    Q. Yeah.
7    A. Debone break room?
8    Q. Yes, ma'am.
9    A. That's where we break at, debone break
10   room.
11   Q. Did you tell me that you had an option
12   of break rooms?
13   A. Yes.
14   Q. Did you --
15   A. Evis or debone.
16   Q. And the debone break room is right
17   across the hall from the --
18   A. Coming out the double doors where I
19   work at, yes.
20   Q. Were lockers made available to you?
21   A. When I first started, yes.
22   Q. And what did you use the lockers for?
23   A. Your purse or whatever -- your personal

671c3998-6d0a-4ccc-8bf1-f75108ad5e86

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

42

1    belongings.
2    Q. Tell me now what you had to do in terms
3       of taking things off to get from your
4       DSI workstation to the break room.
5    A. What did I have to take off before I
6       get to the break room?
7    Q. Yes, ma'am.
8    A. I had to take my apron, my sleeves, my
9       smock.
10   Q. And did you do this while you were
11      walking to the --
12   A. No. I took it off back at --
13   Q. Where did you take it off?
14   A. And hang it up inside the -- the -- out
15      where we work at.
16   Q. On the hangers?
17   A. On racks.
18   Q. So how did you do it? Did you walk
19      fully clothed over to the hangers and
20      stop there and take it off?
21   A. Yes, because we can't walk from the
22      machines taking it off because we'll
23      contaminate it. We have to wait till

43

1    we get to the racks.
2    Q. You have to wash it off first? You
3       have to walk over to the wash stations
4       and then you can take it off?
5    A. Yes.
6    Q. Then you can go to the break room?
7    A. Yes.
8    Q. How long did that process take you?
9    A. I don't know. Can't answer that.
10   Q. Was everybody required to wash off
11      before they left for a break?
12   A. I have to just speak for me.
13   Q. Okay. You don't know?
14   A. I'm trying to explain. I have to just
15      speak for me, sir. I always wash off
16      because I be full of meat. Understand
17      what I'm saying? If you work up there
18      on the top, all the little pieces of
19      meat come down on you, so I have wash
20      from my -- you know, wash my apron off.
21   Q. But it was your understanding that
22      you -- if you had meat on you, you had
23      to wash it off?

44

1    A. Yes.
2    Q. Now, when you were working in pack-out,
3       you didn't have to do that when you
4       left for break, did you?
5    A. Yes. We had to wash them off. You
6       have to wash them off anyway because
7       that meat be coming on the aprons and
8       stuff.
9    Q. And where did the -- how did you get
10      meat on your aprons when you were
11      working in pack-out?
12   A. Because the little pieces of meat
13      coming off the belt and stuff, when you
14      put that meat into boxes and stuff, it
15      gets on your apron and stuff.
16   Q. And you followed the same procedure
17      when you left the line when you were
18      working in evis for CP?
19   A. Yes.
20   Q. Have you ever timed how much time you
21      actually had for break, how much free
22      time you had in the break room?
23   A. How much free time I had in the break

45

1    room?
2    Q. Yeah.
3    A. Of my free time?
4    Q. Yeah.
5       MR. UNDERWOOD: Excuse me.
6    Object to the form. By "free time," do
7    you mean after she's donned her --
8    taken off all her stuff and went in
9    there and before she puts back on her
10   PPE? Is that what you consider free
11   time?
12      MR. FRY: Yeah.
13   Q. I think you testified that you were
14      supposed to get a thirty-minute break
15      period but sometimes you didn't. Have
16      you ever timed exactly how much time
17      you had in the break room that you
18      considered break time?
19      THE WITNESS: I don't
20   understand what he's talking about,
21   sir.
22      MR. UNDERWOOD: He's asking --
23   you said you had to take off your PPE,

671c3998-6d0a-4ccc-8bf1-f75108ad5e86

46

1  go to break, then put your PPE back on.
2  Have you ever timed that amount of time
3  that you had between the time you took
4  it off and the time you put it back on?
5      THE WITNESS: Well, he asked me
6  the time -- about the thirty minutes.
7      MR. UNDERWOOD: Yeah. How much
8  of that time -- have you ever timed how
9  much of that time you had left between
10 the time you take your thing off, go to
11 break, and then you have to go back and
12 put it on? Have you ever timed how
13 much time you actually have?
14 A. I have. I have looked at the clock.
15 Q. And how much time is it?
16 A. I think it's, what, about eight, ten
17 minutes sometimes.
18 Q. Only eight or ten minutes?
19 A. Yeah, because that's -- that's half --
20 that's some of your break anyway, you
21 know? Okay. Just say thirty minutes
22 right now. I've got to get -- I'm
23 speaking for myself. Thirty minutes I

47

1  got to get up and go to break. Okay?
2  I got to take all this off. That's
3  taking time right there, our break,
4  right there. Okay. Then by the time I
5  take it off and walk from there to the
6  break area -- and everybody's trying to
7  get lunch, that's our time. We're
8  trying to get in and out. Then back in
9  there, putting it back on. You
10 understand what I'm saying? So I --
11 what, it's ten minutes of our break
12 gone.
13 Q. So your testimony is you only get ten
14 minutes out of that thirty?
15 A. No.
16 Q. What is your testimony? How much time
17 do you have in the break room?
18 A. I don't know because -- Jesus have
19 mercy. I'm getting confused of what
20 you're saying, because you're asking me
21 about how much time do I have in the
22 break room actually?
23 Q. Yeah.

48

1  A. That's what you're saying? I say
2  twenty minutes in there, you know,
3  twenty, twenty-five minutes, something
4  like that, because once you get in and
5  out, getting that stuff on -- me,
6  that's what I'm saying. Okay? -- it
7  might be more, it might be less. Okay?
8  I don't actually sit down and time it,
9  because you don't have time to look at
10 the clock.
11 Q. So it varies for you?
12 A. Everybody is different. I can only say
13 for me. I'm the type of person I just
14 try to go and do what I got to do. I
15 can't speak for everybody because we're
16 all there in a huddle --
17 Q. Okay.
18 A. -- you know, and say there's fifteen
19 people right here at the door trying to
20 get out. We're all in a huddle.
21 That's all I can say. Maybe I'm not --
22     MR. UNDERWOOD: Don't keep
23 rambling on. You finished answering

49

1  his question. That's all right.
2      MR. FRY: Well, she's finished
3  when she thinks she's finished.
4      THE WITNESS: I can't hear what
5  he's saying because --
6      MR. UNDERWOOD: Okay. If you
7  can't hear him, say you can't hear him.
8      THE WITNESS: Okay. I'm sorry.
9      MR. UNDERWOOD: Do you have a
10 hard time hearing?
11     THE WITNESS: Yes.
12     MR. UNDERWOOD: He'll be glad
13 to speak up for you. He's a little
14 bit -- I'm kind of loud.
15 Q. (By Mr. Fry) Tell me now what you do at
16 the end of the day when you were
17 working in DSI. What did you have to
18 do to leave the plant?
19 A. I don't understand what you're saying.
20 What did I --
21 Q. Okay. Let's go -- we'll go about it
22 step by step. You're working in DSI.
23 Okay? The meat stops coming, the shift

671c3998-6d0a-4ccc-8bf1-f75108ad5e86

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

50

1    is over. Okay? You with me?
2    A. I'm listening.
3    Q. What do you do first?
4    A. I clean my equipment off.
5    Q. Do you walk to the --
6    A. Walk from the machines to the wash
7      station.
8    Q. And then you wash?
9    A. Wash my aprons.
10   Q. Wash your aprons and the sleeves?
11   A. Yes.
12   Q. And then you take them off?
13   A. Yes.
14   Q. And what do you do with them?
15   A. Fold them up -- wipe them off, fold
16     them up, and take them with us.
17   Q. What do you do with the smock?
18   A. We put them out in the hallway.
19   Q. You dispose of the smock every day;
20     correct?
21   A. Yes. I have to get a new one.
22   Q. And then what do you do?
23   A. Clock out and go home at the end of the

51

1    day.
2    Q. How long does it take you from the time
3      you leave your workstation till you
4      walk out the door?
5    A. I don't know.
6    Q. What's your understanding of how the
7      company keeps track of the time that
8      you work, or that you worked when you
9      were in DSI, pack-out, and evis?
10   A. How do they keep up with the time?
11   Q. Yes, ma'am.
12   A. By us clocking in and out. That's what
13     you're asking me?
14   Q. I'm asking you for your understanding.
15   A. By the clock.
16   Q. By what clock, your clock when you
17     swiped in?
18   A. Yes.
19   Q. Have you ever had occasion to complain
20     to a supervisor that you didn't think
21     your pay was right?
22   A. Yes.
23   Q. And was that in connection with the

52

1    claims you're making here in this
2    lawsuit?
3    A. Explain what you're saying.
4    Q. Describe for me the time when you
5      complained to your supervisor that you
6      didn't think your pay was right.
7    A. When I get paid, about my check?
8    Q. Yes.
9         (Brief pause)
10   Q. You just told me that you complained to
11     your supervisor about your pay.
12   A. Okay.
13   Q. What was your complaint?
14   A. That my hours was wrong or they didn't
15     pay me the right amount for my time.
16   Q. And was this on one occasion or more
17     than one occasion?
18   A. Several occasions.
19   Q. And what happened?
20   A. They said they will try to -- they will
21     get it right for me.
22   Q. Did they get it right for you?
23   A. Yes and no. They're working on one

53

1    now.
2    Q. Pardon?
3    A. Yes and no.
4    Q. Okay. Sometimes they got it and --
5    A. Yes.
6    Q. -- they adjusted, they gave you more
7      money?
8    A. They paid the money they owed me.
9    Q. And sometimes there was not -- they
10     claimed there was not a mistake; is
11     that correct?
12   A. They have.
13   Q. I take it when you get your check, you
14     review the payroll information that's
15     on the stub?
16   A. I do.
17   Q. Do you keep track of your hours on a
18     daily basis?
19   A. You mean from each day?
20   Q. Yes.
21   A. That I clock in?
22   Q. Yeah.
23   A. I do.

671c3998-6d0a-4ccc-8bf1-f75108ad5e86

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

54

1  Q. And how do you do that?
2  A. From the time I clock in till the time
3    I clock out.
4  Q. Do you write it down?
5  A. No.
6  Q. Have you ever kept any kind of diary or
7    notes or anything showing what you
8    believe to be the hours that you worked
9    at Equity or CP?
10 A. I have.
11 Q. And in what form was that kept?
12 A. On a little booklet. And then I would
13   show to my supervisor.
14 Q. And do you still have this booklet?
15 A. No.
16 Q. What did you do with it?
17 A. Once I show it to them, they get it
18   straightened out, I don't need it.
19 Q. And what sort of information did you
20   record in the booklet?
21 A. My hours.
22 Q. Do you keep one now?
23 A. No.

55

1  Q. Why did you stop?
2    (Brief pause)
3  A. You waiting on --
4  Q. I'm waiting on the answer.
5  A. I just stopped.
6  Q. Do you know of any other employees that
7    keep such a record?
8  A. No.
9  Q. Have you made any calculations of the
10   amount of time which you claim you
11   worked that you weren't paid for that
12   you're claiming in this lawsuit?
13 A. Explain it to me.
14   THE WITNESS: Can he explain it
15 to me?
16   MR. UNDERWOOD: He just wants
17 to know if you've ever added up time
18 you're claiming that you're owed for.
19 Have you ever sat down and written it
20 down or tried to calculate it?
21   THE WITNESS: Not following
22 you.
23 Q. (By Mr. Fry) You told me when we

56

1    started that you believe you have a
2    claim for time worked that you weren't
3    paid for.
4  A. Oh.
5  Q. You recall that?
6  A. Yes.
7  Q. Have you ever sat down and calculated
8    how much pay you think you're owed?
9  A. I have not.
10 Q. Have you ever been asked or required to
11   work overtime?
12 A. I have.
13 Q. And when this occurred, were you paid
14   for that overtime?
15 A. Yes.
16 Q. Time and a half?
17 A. Yes.
18 Q. During the time that you worked at the
19   Baker Hill facility, either under CP or
20   Equity, have you ever been disciplined
21   for anything?
22 A. No.
23   MR. FRY: No further questions.

57

1    MR. UNDERWOOD: Okay. Let's
2  take a quick break.
3    (Short recess)
4    EXAMINATION
5  BY MR. UNDERWOOD:
6  Q. I've got just a few follow-up with you.
7    All right. Just to clarify, when you
8    went to break, you would have to take
9    off your gloves -- your two-layers
10   gloves. I noticed you didn't mention
11   that a couple of times. You had to
12   take off your blue rubber gloves and
13   your cotton liners; is that correct?
14 A. Right.
15 Q. Had to put those on before you came
16   back on the line; is that correct?
17 A. That's correct.
18 Q. And when you left for the day, you had
19   to take them off?
20 A. Correct.
21 Q. When you came in for the day, you had
22   to put them on?
23 A. Correct.

671c3998-6d0a-4ccc-8bf1-f75108ad5e86

58

1  Q. And when you're talking about going
2     through double doors, you're not
3     talking about double folding doors like
4     this (indicating). You're talking
5     about there's a door here and door here
6     (indicating), right, two doors you have
7     to go through?
8  A. Right.
9  Q. And when you come into that double door
10    there -- actually, between those two
11    doors is where you dress, is that
12    right, you have to have on your smock
13    and your hair net?
14 A. Right.
15 Q. And then when you come through that
16    last door, you have to also sanitize
17    your boots right there; is that
18    correct?
19 A. Yes.
20 Q. And that's by stepping in a liquid pool
21    that sanitizes your boots?
22 A. Yes.
23 Q. Okay. Now, what time did you say --

59

1     like when you worked DSI, what time did
2     the shift start?
3  A. Four-thirty.
4  Q. Okay. Now, you've talked about being
5     paid when you clocked in. But say if
6     you came in and clocked in at 4:10 and
7     your shift started at 4:30, you didn't
8     get paid until 4:30; is that accurate?
9  A. Exactly.
10 Q. And you mentioned about you clocking in
11    after you picked up your equipment. I
12    want to check and see if that's
13    accurate, because in order to do
14    that -- am I correct? -- you'd have to
15    walk way out of the plant, get your
16    equipment, and then walk way back up
17    and clock in?
18 A. Uh-huh.
19 Q. Didn't you actually clock in before you
20    got your equipment?
21 A. When I come in, clock at the clock, go
22    and pick up my supplies.
23 Q. So you would clock in before you picked

60

1     up your supplies?
2  A. Yeah.
3        MR. UNDERWOOD: Anything else,
4     Robert?
5        MR. CAMP: No.
6        EXAMINATION
7  BY MR. FRY:
8  Q. Explain to me these double doors that
9     your lawyer just reminded you of.
10 A. Okay. This is -- when you come through
11    the -- coming into the plant, you're
12    coming in a double door. Right?
13    You're going down a hallway. Okay.
14    When we get ready to go inside where
15    the meats and stuff is, this is one
16    door. Okay? Then you wash your boots
17    off out there. Then you go through
18    another double door --
19 Q. Right.
20 A. -- to get inside the plant.
21 Q. And what --
22 A. Those are double doors.
23 Q. And when do you put on your smock and

61

1     your apron and so forth?
2  A. You can put your smock on in the door
3     where you wash your boot, but we don't
4     do it mostly. But we do -- half of
5     them do it, now. But then when you go
6     through the double doors, you put
7     everything else on.
8  Q. So there's an area you walk through
9     between the hallway and the production
10    floor where the boots are sanitized?
11 A. Yes.
12 Q. And once you get onto the production
13    floor, you generally -- that's when you
14    start donning all of your stuff?
15 A. Yes.
16 Q. Thank you.
17       MR. UNDERWOOD: That's good.
18
19    (The deposition of Annie Glover-Patrick
20    concluded at 1:47 p.m. on May 21,
21    2008.)
22
23

671c3998-6d0a-4ccc-8bf1-f75108ad5e86

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

62

```
1          * * * * * * * * * *
2            REPORTER'S CERTIFICATE
3          * * * * * * * * * *
4      STATE OF ALABAMA
5      COUNTY OF MONTGOMERY
6          I do hereby certify that the above
7      and foregoing transcript was taken down
8      by me in stenotype, and the questions
9      and answers thereto were transcribed by
10     means of computer-aided transcription,
11     and that the foregoing represents a
12     true and correct transcript of the
13     testimony given by said witness.
14         I further certify that I am neither
15     of counsel, nor any relation to the
16     parties to the action, nor am I anywise
17     interested in the result of said case.
18
19
20
21     Bridgette W. Mitchell,
       Certified Court Reporter and
22     Commissioner for the State of
       Alabama at Large
23     ACCR No. 231 - Expires 9/30/08
       MY COMMISSION EXPIRES 1/25/2010
```

671c3998-6d0a-4ccc-8bf1-f75108ad5e86

**TAB 20**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06-CV-1081-MEF


BETTY ANN BURKS,

et al.,

        Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

        Defendant.



BEFORE:

        Cynthia M. Noakes, Commissioner

        and Certified Court Reporter


            DEPOSITION TESTIMONY OF

                    ANNIE IVERY


            ***************************

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

5700d8d3-61cb-4fa3-8d85-62f329257c60

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

2

1       STIPULATION

2

3           IT IS STIPULATED AND AGREED by and

4    between the parties through their respective

5    counsel, that the deposition of ANNIE IVERY may

6    be taken before Cynthia M. Noakes, Court

7    Reporter, at the Law Offices of WILLIAMS,

8    POTTHOFF, WILLIAMS & SMITH, 125 South Orange

9    Avenue, Eufaula, Alabama 36027, on the 23rd day

10   of May, 2008.

11          IT IS FURTHER STIPULATED AND AGREED

12   that the signature to and the reading of the

13   deposition by the witness is waived, the

14   deposition to have the same force and effect as

15   if full compliance had been had with all laws and

16   rules of Court relating to the taking of

17   depositions.

18          IT IS FURTHER STIPULATED AND AGREED

19   that it shall not be necessary for any objections

20   to be made by counsel to any questions except as

21   to the form or leading questions, and that

22   counsel for the parties may make objections and

23   assign grounds at the time of the trial, or at

---

3

1    the time said deposition is offered in evidence,

2    or prior thereto.

3           IT IS FURTHER STIPULATED AND AGREED

4    that the notice of filing of the deposition by

5    the Court Reporter is waived.

6

7

8

9

10

11

12

13

14

15

16

17   *******************************************

18

19

20

21

22

23

---

4

1                   INDEX

2    EXAMINATION BY:              PAGE NUMBER:

3    MR. GOULD                    6-34

4

5    EXHIBITS:

6    (No exhibits were

7    submitted to said deposition.)

8

9    Reporter's Certificate            35

10

11

12

13

14

15

16

17

18

19

20   *******************************************

21

22

23

---

5

1                APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFFS:

4        MR. P. MARK PETRO

5        SCHREIBER & PETRO, PC

6        ATTORNEYS AT LAW

7        Two Metroplex Drive

8        Suite 250

9        Birmingham, Alabama 35209

10       (205) 871-5080

11

12   ON BEHALF OF THE DEFENDANT:

13       MR. MALCOLM S. GOULD

14       PELINO & LENTZ

15       ATTORNEYS AT LAW

16       One Liberty Place

17       Thirty-Second Floor

18       Philadelphia, Pennsylvania 19103

19       (215) 665-1540

20

21   *******************************************

22

23

---

5700d8d3-61cb-4fa3-8d85-62f329257c60

6

1    I, CYNTHIA M. NOAKES, a Certified
2    Court Reporter of Eufaula, Alabama, acting as
3    Commissioner, certify that on this date, as
4    provided by the Alabama Rules of Civil Procedure
5    and the foregoing stipulation of counsel, there
6    came before me at the Law Offices of WILLIAMS,
7    POTTHOFF, WILLIAMS & SMITH, 125 South Orange
8    Avenue, Eufaula, Alabama 36027, beginning at
9    2:15 p.m., ANNIE IVERY, witness in the above
10   cause, for oral examination, whereupon the
11   following proceedings were had:
12
13          ANNIE IVERY,
14   being first duly sworn, was examined and
15          testified as follows:
16
17          THE COURT REPORTER: Usual
18   stipulations?
19          MR. PETRO: Yes.
20          MR. GOULD: Yes.
21
22          EXAMINATION
23   BY MR. GOULD:

7

1    Q.   Can you please state your full name?
2    A.   Annie G. Ivery.
3    Q.   And, Ms. Ivery, you are a plaintiff in a
4    lawsuit in the Federal Court in the Middle
5    District of Alabama. We're here to take your
6    deposition today.
7        You sat in on a previous deposition. As you
8    know, my name is Malcolm Gould. I represent
9    Equity Group Eufaula Division in that lawsuit.
10       We're going to take your deposition. You
11   see that we have a court reporter here. Now, did
12   you hear the instructions I gave during the last
13   deposition?
14   A.   Yes.
15   Q.   All right. I'd ask that you keep all of
16   your responses verbal and, as much as you can, I
17   would ask that you wait until I finish my question
18   before you give your answer.
19       Do you understand those instructions?
20   A.   Yes.
21   Q.   Ms. Ivery, what is your home address?
22   A.   20 Mellion Road, Pittsview, Alabama.
23   Q.   Are you currently employed?

8

1    A.   Yes, I am.
2    Q.   And where do you work?
3    A.   At another processing plant named AlaTrade
4    in Phenix City, Alabama.
5    Q.   Did you at one time work at the chicken
6    processing plant in Baker Hill?
7    A.   Yes, I did.
8    Q.   When was the last time you worked there?
9    A.   About two years ago.
10   Q.   How long did you work there?
11   A.   Two years.
12   Q.   And when you left the chicken plant, what
13   position were you working in?
14   A.   I was working in the further processing cook
15   plant, but I started off in debone.
16   Q.   How long did you work in the cook plant?
17   A.   One year.
18   Q.   And how long did you work in debone?
19   A.   One year.
20   Q.   Did you work on a debone line?
21   A.   Yes.
22   Q.   And did you work on a debone line during the
23   entire time that you worked in debone?

9

1    A.   Yes.
2    Q.   For purposes of the deposition today, I'm
3    only going to be asking you questions about the
4    time you worked in debone. Okay?
5    A.   Okay.
6    Q.   So it was approximately three years ago that
7    you worked in debone?
8    A.   It was '05.
9    Q.   During the time that you worked at the
10   plant, were you a member of the union?
11   A.   Yes.
12   Q.   You had money taken out of your check every
13   week for union dues?
14   A.   Yes.
15   Q.   Did you ever attend any union meetings?
16   A.   Once.
17   Q.   Were there any —
18          MR. GOULD: Strike that.
19   Q.   Do you have any recollection or memory as to
20   what was discussed at that union meeting?
21   A.   I can't remember.
22   Q.   Do you recall the names of any of the people
23   who were your union stewards during the time that

5700d8d3-61cb-4fa3-8d85-62f329257c60

10

1  you worked at the plant?
2  A.  Well, I can call one.  Sharon Jones.
3  Q.  And was she a steward who worked with you in
4  the fresh plant or in the cook plant?
5  A.  Fresh plant.
6  Q.  And when you left the plant in Baker Hill,
7  do you recall the name of the company that owned
8  the plant?
9  A.  Before?
10  Q.  When you left the plant in 2005.  Is that
11  when you stopped working there?
12  A.  No, that's when I started working there.
13  Q.  You started working there in 2005?
14  A.  Right.
15  Q.  And you worked there until 2007 or 2006?
16  A.  I'm sorry.  You got it right.  That's the
17  last time I worked, 2005.  You were right.
18  Q.  So you stopped working there in 2005?
19  A.  Yeah.
20  Q.  And do you recall when you started working
21  there?
22  A.  No.
23  Q.  When you started working at the plant, what

11

1  was the name of the company that was on your
2  paychecks?
3  A.  Keystone Equity Group.
4  Q.  So during the time that you worked at the
5  plant it was owned by the same company the entire
6  time?
7  A.  Right, yes.
8  Q.  Ma'am, how did you first learn about this
9  lawsuit?
10  A.  Through a friend.
11  Q.  And who was that?
12  A.  Ruby Streeter.
13  Q.  And what did she tell you about the lawsuit?
14  A.  She just told me that they had a lawsuit
15  going on for Keystone, and if you worked there
16  within the last three years, you qualified for it.
17  So I took it upon myself to go ahead and go
18  through the process of it.
19  Q.  Okay.  Did she give you a phone number or an
20  address?
21  A.  She gave me a phone number for The Cochran
22  Firm.
23  Q.  And you called The Cochran Firm?

12

1  A.  Right.
2  Q.  Now, other than meeting with any lawyers
3  today, have you attended any meetings where this
4  lawsuit was discussed?
5  A.  At the Econo Lodge, at the hotel.
6  Q.  And when was that?
7  A.  That was about a couple of months ago.  Not
8  more than a year ago.
9  Q.  And were there attorneys present at that
10  meeting?
11  A.  Yes.
12  Q.  Did you take anyone with you to that
13  meeting?
14  A.  Yes.
15  Q.  Who did you take with you?
16  A.  My husband.
17  Q.  And what is your husband's name?
18  A.  Johnny Mellion.
19  Q.  And is he also a plaintiff in this lawsuit?
20  A.  No.
21  Q.  Okay.  Now, do you recall anything that was
22  discussed at this meeting?
23       MR. PETRO:  Anything that was told her

13

1  by her lawyers --
2       MR. GOULD:  I'm asking if she recalls
3  anything that was discussed at the meeting.
4       MR. PETRO:  Anything your lawyers told
5  you is privileged.  You don't have to disclose
6  that.
7  Q.  Was your husband with you?  Did he go into
8  this meeting with you?
9  A.  Yes.
10       MR. GOULD:  Well, if there were other
11  people present who are not plaintiffs in the
12  lawsuit, then the privilege is waived.
13       MR. PETRO:  Then I think you can ask
14  him; but I don't think she has to answer you what
15  her lawyers told her.
16       MR. GOULD:  Are you directing the
17  client not to answer any questions that I ask her
18  about that meeting?
19       MR. PETRO:  Anything her lawyer has
20  told her --
21       Any communications you've had with your
22  lawyer you do not have to tell him about.
23       THE WITNESS:  Okay.

5700d8d3-61cb-4fa3-8d85-62f329257c60

14

1  Q.  Now, when you attended this meeting at the
2  Econo Lodge, did your husband go into the meeting?
3  A.  Well, he went into the room, yes.
4  Q.  And did he stay there during the meeting?
5  A.  Yes.
6  Q.  And he sat there through the entire meeting?
7  A.  Yes.
8      MR. GOULD:  Now, Counsel, are you still
9  going to maintain that the privilege prevents me
10 from asking her about anything that was discussed
11 in that meeting?
12     MR. PETRO:  Yes.
13     MR. GOULD:  Can you mark that spot in
14 the transcript, please?
15     (Mr. Gould requested that this
16     portion of colloquy be "marked"
17     as discussed.)
18 Q.  Other than attending the meeting at the
19 Econo Lodge, have you attended any other meetings
20 where this lawsuit was discussed?
21 A.  No, sir.
22 Q.  That's the only one?
23 A.  Yes.

15

1  Q.  All right, ma'am.  During the time that you
2  worked on the debone line, were there any items of
3  clothing or equipment that you had to wear when
4  you were out on the production floor?
5  A.  Yes.
6  Q.  And can you describe these for me?
7  A.  We had to wear several items of equipment
8  which consisted of a hair net, earplugs, safety
9  glasses, smocks, apron, sleeves, cutting glove,
10 arm guard, boots.  Did I say apron?
11 Q.  Yes, you did.
12 A.  Okay.
13 Q.  And during that time that you were employed
14 at the plant, could you wear your boots outside of
15 the plant?
16 A.  Yes.
17 Q.  You could wear them from home if you wanted?
18 A.  Yes.
19 Q.  Were there any other items that you could
20 wear from home if you wanted?
21 A.  No.
22 Q.  Now, during the time that you were working
23 in debone, could you take your smock home with

16

1  you?
2  A.  No, not at that time.
3  Q.  So you had to leave that at the plant?
4  A.  Yes.
5  Q.  There was a bin where you would dispose of
6  it at the end of your shift?
7  A.  Yes.
8  Q.  Ma'am, would you normally drive yourself to
9  work?
10 A.  Yes.
11 Q.  When you would arrive at the plant was there
12 any sort of security that you would have to go
13 through?
14 A.  Yes.
15 Q.  Can you describe that for me?
16 A.  Well, you would have to get, at the time --
17 well, when you get employed, they are required to
18 give you a sticker for your car.  And to enter the
19 plant you would have to present that sticker.
20     If you're riding with somebody else you
21 would have to show your badge with your number on
22 it.  And you would just have to wait to go through
23 the security gate.

17

1  Q.  You didn't have to have your car searched or
2  anything like that?
3  A.  No.
4  Q.  After you would get past that and park in
5  the parking lot, was there any other security that
6  you would have to clear to get into the plant?
7  A.  No.
8  Q.  You could just walk right in?
9  A.  Yes.
10 Q.  Can you describe for me what you would do as
11 you first entered the plant?
12 A.  Okay.  When you first entered the plant you
13 go -- well, when you enter the break room you
14 clock in.  Then you get your equipment.  After you
15 get your equipment, you suit up.  Then you go on
16 the floor.
17     But before you enter the floor you would
18 have to wash your hands and sanitize everything.
19 You're going to have to go through with your boots
20 before you enter going onto the floor.
21 Q.  So when you would first enter the building
22 would you be wearing your boots?
23 A.  Yes.

5700d8d3-61cb-4fa3-8d85-62f329257c60

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

18

1  Q.  And after you walked through the doors, what
2  would be the next thing you would do?
3  A.  You would have to sanitize your boots.
4  Q.  Would you clock in before you sanitized your
5  boots?
6  A.  No.
7  Q.  Where would you sanitize your boots?
8  A.  Yes, yes, yes. I'm sorry. You would have
9  to clock in first before you even entered the
10  floor.
11  Q.  Okay. So where would you clock in?
12  A.  In the break room.
13  Q.  And which break room would you use to clock
14  in?
15  A.  The first break room when you entered the
16  building.
17  Q.  Was that the bigger one or the smaller one?
18  A.  The bigger one. Both of them have a time
19  clock there.
20  Q.  All right. So that would be the debone
21  break room?
22  A.  Right.
23  Q.  And you would clock in there. Would you be

19

1  carrying any of your items of clothing or
2  equipment with you?
3  A.  No. After you clock in, then you go to the
4  supply room and you purchase your supplies.
5  Q.  So every day you would get an entire new set
6  of supplies?
7  A.  Yes.
8  Q.  So every day you would get a new apron?
9  A.  Yes.
10  Q.  Every day you would get new sleeves?
11  A.  Yes.
12  Q.  Was that something that you were required to
13  do every day?
14  A.  Yes.
15  Q.  Every day you would get a new arm guard?
16  A.  No. You would get one arm guard. And if
17  you lose that one, you would have to buy the next
18  one.
19  Q.  And you wouldn't have to get new boots every
20  day, right?
21  A.  No.
22  Q.  Can you describe for me the apron that you
23  would wear?

20

1  A.  The apron is a plastic shield that covers
2  your smock which ties from the back.
3  Q.  Was it one of these blue plastic aprons?
4  A.  Right.
5  Q.  And you're telling me that you went to the
6  supply room and you got a new plastic apron every
7  single day that you would work at the plant?
8  A.  Yes.
9  Q.  You would never reuse it?
10  A.  It's optional.
11  Q.  So you weren't required to get a new apron
12  every day; you could have reused your existing
13  apron; is that correct?
14  A.  Yes.
15  Q.  As long as it wasn't damaged you could reuse
16  the apron?
17  A.  Right. And it depends on the job that you
18  do. Most of the time you would mess it up so bad
19  that you would have to get a new one every day.
20  Q.  And the sleeves? Could you reuse the
21  sleeves if you wanted to?
22  A.  You could.
23  Q.  And same thing with the gloves?

21

1  A.  Well, they really want you to get new gloves
2  every day.
3  Q.  Now, you told me you used a cutting glove;
4  is that correct?
5  A.  Yes.
6  Q.  Is that something that you would have to get
7  at the supply room?
8  A.  Yes.
9  Q.  What was this cutting glove like?
10  A.  It's not like a regular glove; it's, like,
11  tighter than a regular glove, and it's for
12  cutting. And most of the time if you're on debone
13  you can get that or a chain glove. But the chain
14  glove you cannot take, but the cutting glove you
15  can.
16  Q.  So after you would gather your items at the
17  supply desk, what would you do next?
18  A.  You would suit up, you would go through the
19  -- I keep getting break room, but not the break
20  room. You would go to the floor and suit up.
21  Q.  Okay. So you would clock in, go to the
22  supply desk, and then go right out to the floor?
23  A.  Yes.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

22

1   Q.   What shift did you work when you were
2   working debone?
3   A.   Second.
4   Q.   Night shift?
5   A.   Right.
6   Q.   What time would that shift normally start?
7   A.   From three to twelve or from 3:30 to 12:30.
8   Q.   And that's while you were working in debone?
9   A.   Yes.  That shift that I gave you, that's on
10  the cook plant.  Debone was from four to twelve.
11  Q.   That's what I thought.
12  A.   I'm sorry.
13  Q.   That's okay.  So when you were working in
14  the debone area, your shift would start at four?
15  A.   Yes.
16  Q.   And it would normally end at twelve?
17  A.   Yes.
18  Q.   What time would you normally arrive at the
19  plant when you were working in debone?
20  A.   I would arrive, like, between 3:30 and --
21  but we don't have to be on line until four.  So
22  basically 3:30 until four.
23  Q.   So when it was time for you to go out onto

23

1   the production floor, can you describe for me what
2   you would do?
3   A.   Okay.  You would walk through the double
4   doors; you would turn to your station, whichever
5   side your station is on.  You could turn left and
6   that's the debone line; and if you go right,
7   that's DSI.
8       You walk through the double doors, you
9   sanitize your boots, go to the wash area and wash
10  up, and you would go to your line.
11  Q.   Would you put on your items of clothing or
12  equipment after you walked through the double
13  doors?
14  A.   No.
15  Q.   What would you do right after you walked
16  through the double doors?
17  A.   You would go to the station and suit up.
18  Q.   When you say "suit up," what do you mean.
19  A.   You put on all your equipment that's
20  required.
21  Q.   So would you already be wearing your boots?
22  A.   Yes.
23  Q.   And would you already be wearing your hair

24

1   net?
2   A.   No.
3   Q.   So you would put your hair net on then?
4   A.   No.  You have to have your hair net on
5   before you enter the double doors.  Once upon a
6   time you didn't, but it was required when I was
7   working there.  You have to have your hair net on.
8   Q.   Okay.  Then you would put on your other
9   items once you passed through the double doors and
10  you were out on the production floor?
11  A.   Yes.
12  Q.   And then what would you do after you put on
13  all of your items?
14  A.   Report to your station and perform your job
15  duty.
16  Q.   Approximately how long would it take you
17  from the time that you passed through the
18  production doors to the time that you got to your
19  station?
20  A.   I would estimate at least five minutes.
21  Q.   Now, when you worked on the debone line, did
22  you work with a knife?
23  A.   Yes.

25

1   Q.   Would you have to go to some sort of room to
2   get your knife?
3   A.   No.  The supervisor would have to issue it
4   to you.
5   Q.   Would you get that at the line?
6   A.   Yes.
7   Q.   Your supervisor would bring it to you?
8   A.   Yes.
9   Q.   During the course of your shift, would you
10  get any breaks?
11  A.   Yes.
12  Q.   How many breaks would you get?
13  A.   Two.
14  Q.   How long were your breaks?
15  A.   30 minutes.
16  Q.   And how would you know when you were
17  relieved to go to break?
18  A.   Because you can't leave the line until the
19  last cone with the meat on it is finished.  Once
20  the last cone that has meat on it is finished,
21  then you are required to leave.  Other than that,
22  you cannot leave before the line is finished.
23  Q.   So you would have to wait until the last

5700d8d3-61cb-4fa3-8d85-62f329257c60

26

1  cone with meat on it passed your station?
2  A.   Right.
3  Q.   But once the last cone with meat on it
4  passed your station, you could leave; is that
5  correct?
6  A.   Yes.
7  Q.   So if you were at the front of the line, as
8  long as that cone had passed your station, you
9  could leave, even if the cones were still going to
10 the back of the line; is that correct?
11 A.   It would depend on the supervisor that you
12 have.
13 Q.   So would the supervisor have to release you
14 for break or would you just be able to leave when
15 the chicken passed your position?
16 A.   Everybody's break is at the same time, so
17 you can't leave -- that's why I said it depends on
18 the supervisor.
19     If the cone has passed you, they can let you
20 leave, but you're still going to go at the same
21 time.  The break is still at the same time.
22 Q.   And can you describe for me what you would
23 do when you would leave the line?

27

1  A.   Okay.  You would go to the wash area, wash
2  up, and then take off all of your equipment; and
3  after you take off all of your equipment, then you
4  go to the break room.
5  Q.   How long would it take you from the time
6  that you left the line until the time you would
7  exit the production floor?
8  A.   From the time you leave the line?  I would
9  say about five minutes.
10 Q.   Now, you told me that you would wash up; is
11 that correct?
12 A.   Yeah.
13 Q.   Can you describe for me --
14 A.   After you've been working with raw meat, you
15 don't want to just leave and go out off the floor
16 to the break room, so you would wash first.
17 Q.   And what would you wash?
18 A.   Wash your hands, your gloves -- well, you
19 would wash your gloves before you take them off so
20 that you won't have any raw particles on your
21 gloves.
22 Q.   So you're talking about washing your hands
23 with your gloves on?

28

1  A.   Yes.
2  Q.   And would you wipe off your sleeves?
3  A.   I would.
4  Q.   Anything else?
5  A.   No.
6  Q.   What about your apron?
7  A.   You can wash the apron because raw meat is
8  constantly being on you all day because you were
9  constantly cutting.
10 Q.   Were you required to wash off your apron
11 before you went out on break?
12 A.   It doesn't require it, but, I mean, if you
13 want -- if you want to do it cleanly.  It's up to
14 you; it's not required.
15 Q.   All right.  Approximately how long would you
16 spend washing up?
17 A.   At least five minutes.  And then some people
18 -- some people might take longer.  But I would
19 estimate five minutes, because you have to put all
20 this stuff back on, everything.  From the time
21 that you got there from the beginning, you have to
22 put it all back on.
23 Q.   I'm just talking about when you would leave

29

1  for break.  And I believe you told me that it
2  would take about five minutes from the time you
3  left your work station to the time you left the
4  production floor; is that correct?
5  A.   When you suit up?
6  Q.   No.  When you're leaving from break,
7  approximately how long would it take you from the
8  time you left your position on the line until you
9  left the production floor and were out into the
10 hallway?
11 A.   Five minutes.
12 Q.   Approximately how much of that time would
13 you spend washing up?
14 A.   At least two minutes.
15 Q.   How long would you spend taking off your
16 smock?
17 A.   I can't say.
18 Q.   How long would it take you to take off your
19 gloves?
20 A.   I can't say.  Everything is different time.
21 I mean, I can't estimate the time.
22 Q.   And would you do the same thing when you
23 were leaving for your second break?

5700d8d3-61cb-4fa3-8d85-62f329257c60

30

1    A.   Everything is the same.
2    Q.   What would you do when you would leave the
3    production floor for break?  When you would get
4    out into the hallway, what would you do next?
5    A.   Before I leave -- you mean, before I leave
6    to enter -- I mean, before I leave the job site to
7    leave the hallway?  Before I enter the doors going
8    out?
9    Q.   Okay.  What would you do then?
10   A.   When I'm going to break what would I do
11   before I --
12   Q.   After you leave the production floor -- I
13   had asked you what would you do before you would
14   leave the production floor and how long that would
15   take you.
16   A.   I would take off all my equipment.
17   Q.   Right, right.  You've told me that.  After
18   you've done that and you're leaving through the
19   double doors to go out to break, what would you do
20   next?  That's what I'm asking you now.
21   A.   I would eat my lunch.
22   Q.   So you would go to the break room?
23   A.   Right.  I would go to the break room and eat

31

1    my lunch.
2    Q.   And how long would you be in the break room?
3    A.   We only have a 30-minute break; so I would
4    estimate it to be about 15 minutes, because we
5    have to put the same thing on that we took off.
6    Q.   Can you describe for me what you would do
7    when you would return from break?
8    A.   Okay.  I would enter the double doors,
9    sanitize my boots and go through the double doors
10   and suit up, put on all my equipment to perform my
11   job duty.
12   Q.   How would you know that it was time to
13   return from break?
14   A.   Because they have a clock in the break room,
15   a time clock.  You can look at the time clock and
16   it's going to show you the time.  And you already
17   know what time you have to return back to work.
18   Q.   And approximately how long would it take you
19   from the time you passed through the double doors
20   until the time you got back to your position on
21   the line?
22   A.   At least five minutes.
23   Q.   Did you ever time yourself with a stopwatch

32

1    or anything like that?
2    A.   No.
3    Q.   And that would be the same when you would
4    return from your second break?
5    A.   Yes.
6    Q.   At the end of your shift how would you know
7    that you were released to leave?
8    A.   Because you cannot leave unless the last
9    cone is finished with the meat on it.
10   Q.   All right.  And then would you be released
11   by your supervisor, or would you be able to leave
12   when the last cone passed you?
13   A.   You would have to be released by your
14   supervisor.
15   Q.   What would you do then?
16   A.   I would go to the wash area and wash up and
17   take off all the equipment and then leave.
18   Q.   So you would leave the line and you would go
19   to the sink again; is that right?
20   A.   Yes.
21   Q.   And you would wash up?
22   A.   Yes.
23   Q.   Is that the same as you have described for

33

1    me before?
2    A.   Yes.  But that's optional too because you're
3    going home.
4    Q.   Okay.  And then after you would wash up,
5    would you take off your items?
6    A.   Yes.
7    Q.   And what items would you take off inside the
8    production area?
9    A.   All of the items except your boots.
10   Q.   Okay.  And then would you exit the
11   production area after you took off your items?
12   A.   No.
13   Q.   What would you do then?
14   A.   Leave the building.
15   Q.   So you would leave the production area then?
16   A.   Yes.
17   Q.   You would go out through the double doors?
18   A.   Yes, sir.
19   Q.   Would you get rid of your smock?
20   A.   You would have to leave your smock in a bin.
21   Q.   And would you clock out?
22   A.   Yes.
23   Q.   Was the bin on the way to where you would

5700d8d3-61cb-4fa3-8d85-62f329257c60

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

34

1    clock out?
2    A.   Yes.
3    Q.   And you would clock out in the debone break
4    room?
5    A.   Yes.
6    Q.   And after that you would leave?
7    A.   Yes.
8    Q.   Okay.
9         MR. GOULD:  Can we stop for a second?
10   I need to check one thing.
11        MR. PETRO:  Okay.
12        (A brief recess was taken.)
13        MR. GOULD:  I'm done.
14        MR. PETRO:  No questions.
15
16      (The deposition was concluded.)
17
18
19
20
21
22
23

35

1        C E R T I F I C A T E
2
3    STATE OF ALABAMA
4    BARBOUR COUNTY
5
6        I hereby certify that the above and
7    foregoing deposition was taken down by me in
8    stenotype and the questions and answers thereto
9    were transcribed by means of computer-aided
10   transcription, and that the foregoing represents
11   a true and correct transcript of the testimony
12   given by said witness upon said hearing.
13       I further certify that I am neither of
14   counsel, nor kin to the parties to the action,
15   nor am I in anywise interested in the result of
16   said cause.
17
18
19        CYNTHIA M. NOAKES, Commissioner
20        Certified Court Reporter,
21        ACCR #327 - Expires 09/30/2008
22
23        Commission Expires 07/08/2009

**TAB 21**

MERRILL LEGAL SOLUTIONS

Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06-CV-1081-MEF


BETTY ANN BURKS,

et al.,

     Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

     Defendant.


BEFORE:

     Cynthia M. Noakes, Commissioner

     and Certified Court Reporter


DEPOSITION TESTIMONY OF

JOHNNY L. JACKSON


*****************************

2

1    S T I P U L A T I O N

2        IT IS STIPULATED AND AGREED by and

3    between the parties through their respective

4    counsel, that the deposition of JOHNNY L. JACKSON

5    may be taken before Cynthia M. Noakes, Court

6    Reporter, at the Law Offices of WILLIAMS,

7    POTTHOFF, WILLIAMS & SMITH, 125 South Orange

8    Avenue, Eufaula, Alabama 36027, on the 21st day

9    of May, 2008.

10       IT IS FURTHER STIPULATED AND AGREED

11   that the signature to and the reading of the

12   deposition by the witness is waived, the

13   deposition to have the same force and effect as

14   if full compliance had been had with all laws and

15   rules of Court relating to the taking of

16   depositions.

17       IT IS FURTHER STIPULATED AND AGREED

18   that it shall not be necessary for any objections

19   to be made by counsel to any questions except as

20   to the form or leading questions, and that

21   counsel for the parties may make objections and

22   assign grounds at the time of the trial, or at

3

1    the time said deposition is offered in evidence,

2    or prior thereto.

3        IT IS FURTHER STIPULATED AND AGREED

4    that the notice of filing of the deposition by

5    the Court Reporter is waived.

6

7

8

9

10

11

12

13

14

15

16

17   *******************************************

18

19

20

21

22

23

4

1            INDEX

2    EXAMINATION BY:          PAGE NUMBER:

3    MR. GOULD                6-35

4    MR. CAMP                 35-37

5

6    EXHIBITS:

7    (No exhibits were

8    submitted to said deposition.)

9

10   Reporter's Certificate          38

11

12

13

14

15

16

17

18

19   *******************************************

20

21

22

23

5

1

2          APPEARANCES

3    ON BEHALF OF THE PLAINTIFFS:

4        MR. ROBERT J. CAMP

5        THE COCHRAN FIRM, P.C.

6        ATTORNEYS AT LAW

7        505 North 20th Street

8        Suite 825

9        Birmingham, Alabama 35203

10       (205) 244-1115

11

12   ON BEHALF OF THE DEFENDANT:

13       MR. MALCOLM S. GOULD

14       PELINO & LENTZ

15       ATTORNEYS AT LAW

16       One Liberty Place

17       Thirty-Second Floor

18       1650 Market Street

19       Philadelphia, Pennsylvania 19103

20       (215) 665-1540

21

22   *****************************

23

2433dff4-df52-4d14-98d1-51172cf02d5d

6

1    I, CYNTHIA M. NOAKES, a Certified
2    Court Reporter of Eufaula, Alabama, acting as
3    Commissioner, certify that on this date, as
4    provided by the Alabama Rules of Civil Procedure
5    and the foregoing stipulation of counsel, there
6    came before me at the Law Offices of WILLIAMS,
7    POTTHOFF, WILLIAMS & SMITH, 125 South Orange
8    Avenue, Eufaula, Alabama 36027, beginning at
9    4:20 p.m., JOHNNY L. JACKSON, witness in the above
10   cause, for oral examination, whereupon the
11   following proceedings were had:
12
13       JOHNNY L. JACKSON,
14   being first duly sworn, was examined and
15       testified as follows:
16
17       THE COURT REPORTER: Usual
18   stipulations?
19   MR. CAMP: Yes.
20   MR. GOULD: Yes.
21
22       EXAMINATION
23   BY MR. GOULD:

7

1    Q.  Good afternoon, Mr. Jackson. My name is
2    Malcolm Gould. I'm an attorney from the law firm
3    of Pelino & Lentz in Philadelphia. I represent
4    Equity Group Eufaula Division, LLC, in a lawsuit
5    that's been filed in Federal Court in the Middle
6    District of Alabama. You are a plaintiff in that
7    case. We're here today to take your deposition.
8        As you can see, we have a court reporter
9    here who's taking down my questions and your
10   answers. Because of that, I would ask that you
11   keep all of your answers verbal, instead of a nod
12   of the head or a shake of the head or a shrug of
13   the shoulders. She can't really take that down
14   and put it on the transcript, so I'd ask that you
15   keep all of your answers verbal.
16   A.  Yes, sir.
17   Q.  If I ask a question and you don't understand
18   it, feel free to ask me to repeat it or rephrase
19   it, and I'll try to repeat the question or ask the
20   question in a different way so that it's able to
21   be understood.
22       If you do answer my question, I'm going to
23   assume that you understood it and that you're

8

1    answering truthfully to the best of your ability.
2    Okay?
3    A.  Yes, sir.
4    Q.  All right. Now, can you state your full
5    name for the record, please?
6    A.  Johnny L. Jackson.
7    Q.  And, Mr. Jackson, what is your home address?
8    A.  242 Kaigler Road, Georgetown, Georgia.
9    Q.  Now, Mr. Jackson, you understand that you
10   are a plaintiff in this lawsuit?
11   A.  Yes.
12   Q.  What is your understanding of what the
13   lawsuit is about?
14   A.  For wages -- I mean, for working for hours
15   and not getting paid for it. I feel like I worked
16   40 hours and I didn't get paid for them.
17   Q.  Did you say four hours?
18   A.  Forty.
19   Q.  Forty hours?
20   A.  Yes.
21   Q.  Forty hours total?
22   A.  Yes.
23   Q.  And can you explain to me what you mean by

9

1    that forty hours that you were not paid for?
2    A.  I mean, I would say -- I don't understand
3    what you're saying. Could you repeat?
4    Q.  Okay. You told me that it was your
5    understanding that the lawsuit was about wages; is
6    that correct?
7    A.  Right.
8    Q.  And that there were 40 hours that you were
9    not paid for?
10   A.  No, I didn't say 40 hours I wasn't paid for.
11   I said I worked 40 hours but I wasn't getting paid
12   for the whole 40 hours.
13   Q.  Okay. I understand. So you're saying you
14   worked 40 hours but were not paid for 40 hours?
15   A.  Right.
16   Q.  Every week?
17   A.  Yes.
18   Q.  Are you currently employed at the chicken
19   processing plant?
20   A.  No, sir.
21   Q.  When was the last time that you worked at
22   the plant?
23   A.  It was '04.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

10

1  Q.  And how long did you work at the plant?
2  A.  I worked at the plant 90 days.
3  Q.  Can you explain to me what you mean when you
4  say that you worked 40 hours but you weren't paid
5  for it?
6  A.  For the time it takes to put on the PPE, I
7  mean, I'm losing time at lunch and I'm losing time
8  for break, which I'm supposed to get paid for.
9  Q.  Now, Mr. Jackson, how did you first find out
10 about this lawsuit?
11 A.  Through friends.
12 Q.  And what did they tell you about the
13 lawsuit?
14 A.  That it was a lawsuit for not getting paid
15 for the time you were working for.
16 Q.  Do you remember who it was that told you
17 about the lawsuit?
18 A.  No, I can't remember.
19 Q.  Have you discussed the lawsuit with anyone
20 other than your attorneys?
21 A.  No, sir.
22 Q.  You say that you were employed at the plant
23 for 90 days?

11

1  A.  Yes, sir.
2  Q.  Were you in the same position during that
3  entire 90-day period?
4  A.  Yes.
5  Q.  And where were you employed, in what area?
6  A.  I was working in what they call packout.
7  Q.  And you worked in packout during the whole
8  time that you were employed at the plant; is that
9  correct?
10 A.  Yes, I was in packout.
11 Q.  Did you work in any other positions?
12 A.  No, sir.
13 Q.  Can you describe for me what you recall
14 about what the job responsibilities of packout
15 included?
16 A.  Well, packout consists of mainly when the
17 chickens come out and were being processed, and
18 they drop off in a big drum; and we have bags that
19 we set up under the machine, and we catch so many
20 and fill them up and tie them up and then box them
21 up and put them on a pallet and label them, and
22 then they're ready to go.
23 Q.  Okay.  Did you do any one particular job in

12

1  the packout area?
2  A.  No.  I would be doing catching/bagging one
3  day, and maybe the next day I would be putting the
4  bags in boxes, and the next day I might be putting
5  them on the pallet.
6  Q.  All right.  In connection with your work in
7  packout, were there any items of clothing or
8  equipment that you were required to wear when you
9  were out on the production floor?
10 A.  Just the PPE clothes that was required for
11 me in my department.
12 Q.  Can you list what those items were?
13 A.  Yes.  It was gloves, it was smocks, hair
14 nets.  And at the time I had a beard, so I had to
15 wear a beard net.  Rubber boots and earplugs.  And
16 at the time, we had to wear safety glasses.
17 Q.  Out of any of those items you just listed
18 for me, were there any that you could wear from
19 home to the plant?
20 A.  Your boots.
21 Q.  And during the entire time you were employed
22 at the plant, is that something that you were able
23 to do?

13

1  A.  Yes.
2  Q.  What about your smock?  Was that something
3  that you could take home with you?
4  A.  Yes.
5  Q.  Was that something that you were supposed to
6  do, take it home and wash it?
7  A.  Well, it wasn't mandatory because you would
8  get a new one every day.  You would just turn the
9  old one in and get a new one every day.
10 Q.  Okay.  These other items that you've listed
11 for me, your gloves, can you describe for me what
12 kind of gloves they were that you wore?
13 A.  I wore the rubber gloves, the long rubber
14 gloves.
15 Q.  Did you wear any other gloves?
16 A.  No.
17 Q.  Did you wear any cotton gloves?
18 A.  No.
19 Q.  Did you wear an apron or sleeves?
20 A.  Yes.
21 Q.  So you wore an apron?
22 A.  Yes.
23 Q.  Did you wear the plastic sleeves?

14

1   A.   No. The gloves were -- they came up to
2   here. That was the main thing we needed in my
3   department.
4   Q.   Okay. How many of those items would you
5   normally take home with you at the end of the day?
6   A.   Maybe two.
7   Q.   All right. Did you have a locker at the
8   plant?
9   A.   No, sir.
10  Q.   Would you take your safety glasses home with
11  you?
12  A.   No, I wouldn't take my safety glasses.
13  Q.   What would you do with them?
14  A.   My friend had a locker and I would share his
15  locker. But I never did receive a locker.
16  Q.   So you would leave them in a locker?
17  A.   Right.
18  Q.   Your friend's locker?
19  A.   Right.
20  Q.   What about the apron?
21  A.   No.
22  Q.   Was that something that you would leave in
23  the locker?

15

1   A.   No. That's something that we would turn in.
2   Q.   The blue apron?
3   A.   I didn't wear the blue; I had the white
4   apron. Different departments had different
5   things.
6   Q.   So you had like a white paper apron?
7   A.   That you would tie in the back.
8   Q.   And that was something that you could throw
9   away?
10  A.   Right. And get a new one every day.
11  Q.   And the rubber gloves, is that something
12  that you could take home at the end of the day?
13  A.   You could, yeah.
14  Q.   Did you do that or did you leave them in
15  your locker?
16  A.   No I left them in the locker. I didn't take
17  them home.
18  Q.   And the hair net and beard net?
19  A.   I threw that away.
20  Q.   And I think you said the boots you could
21  wear to and from work?
22  A.   Right.
23  Q.   Is that what you did?

16

1   A.   Yes.
2   Q.   And earplugs?
3   A.   I took them home with me too.
4   Q.   Okay. And that was the same during the time
5   you were employed at the plant?
6   A.   Yes, sir.
7   Q.   When you were employed at the plant, were
8   you a member of the union?
9   A.   No, sir.
10  Q.   You didn't have any deductions from your
11  paycheck for union dues?
12  A.   No, sir.
13  Q.   Did you ever attend any union meetings?
14  A.   No, sir.
15  Q.   All right. When you would report to the
16  plant, would you drive yourself to work?
17  A.   Mostly we carpooled.
18  Q.   Was there some sort of security that you had
19  to clear when you were getting to the plant?
20  A.   No, sir.
21  Q.   Was there a guard shack in the driveway?
22  A.   At the time, there wasn't a guard shack.
23  Well, at the front it was; but once you got in the

17

1   plant, there wasn't nothing there.
2   Q.   So there were no metal detectors or
3   turnstiles or anything like that?
4   A.   No, sir.
5   Q.   Once you got into the parking lot, you could
6   just walk into the plant?
7   A.   Right.
8   Q.   When you would get into the parking lot and
9   walk into the building, what is the next thing you
10  would do after that?
11  A.   I would clock in.
12  Q.   And where would you clock in?
13  A.   It would be in the break room area.
14  Q.   In the debone break room or the evis break
15  room?
16  A.   Well, debone break room. I didn't work in
17  the other department.
18  Q.   Were you working day shift or night shift?
19  A.   Day.
20  Q.   And did you work day shift the entire time
21  you were there?
22  A.   Yes.
23  Q.   What time did your shift normally start?

2433dff4-df52-4d14-98d1-51172cf02d5d

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

18

1  A.  Seven.
2  Q.  And did it have a scheduled end time?
3  A.  At 3:30.
4  Q.  What time would you normally arrive at the
5  plant?
6  A.  Maybe 6:30.
7  Q.  And when would you normally clock in?
8  A.  I would clock in maybe 6:35.
9  Q.  And then after you would clock in, what
10  would you do next?
11  A.  I would have to get in line to get my PPE
12  equipment I needed to start the shift off with.
13  Q.  What items would you be waiting in line for?
14  A.  Smock, my beard net, my apron; and that
15  would be the main things because I had everything
16  else.
17  Q.  And after you picked up those items, what
18  would you do next?
19  A.  I would enter the work area and have my
20  boots sanitized as soon as you hit the door.
21  Q.  Can you describe for me that process, that
22  sanitizing?
23  A.  Well, once you enter the double doors, the

19

1  work area, there's a double door there where it
2  has a gun with spray with foam in it.  You take
3  and push a button and it sanitizes your boots, and
4  it dries them too.
5  Q.  Did you have to push the button every time
6  you entered?
7  A.  Yes.
8  Q.  You personally did that?
9  A.  Yes.
10  Q.  And how did it work?  Was it like a washing
11  machine or?
12  A.  It was like a sprayer at a car wash.
13  Q.  What did it do?
14  A.  It put out a lot of foam, and I reckon it
15  would dry itself.  The foam would evaporate.  And
16  sanitize it like that.
17  Q.  So did you just have to step into the foam?
18  A.  No.  You have to step in the area where the
19  drain is, and you push the button and you spray
20  your boots down.  And once you hang it up, it goes
21  off automatically itself.
22  Q.  And what would you do next?
23  A.  I would enter the second two doors, and I

20

1  would have go down a piece.  And that's when I
2  started putting on the other equipment I needed to
3  start the shift with.
4  Q.  Approximately how long would that take you?
5  A.  I would say 15 minutes.  It depends on what
6  time I can get in there.
7  Q.  Can you describe for me what you would do
8  during that 15 minutes?
9  A.  I would -- after I sanitized my boots, I
10  would get my earplugs and get my goggles, put my
11  smock on, put all my stuff on around my mouth for
12  my hair features, put my gloves on, and I'd get
13  ready to go to my department in my area.  But you
14  have to have all that on.
15  Q.  Would you rinse or wash anything?
16  A.  No, sir.
17  Q.  And then after you finished that, you would
18  go to your position on the line?
19  A.  Yes.
20  Q.  And would you get any breaks during the
21  course of the day?
22  A.  Yes.
23  Q.  How many breaks would you get?

21

1  A.  I would get two 15-minute breaks and a
2  30-minute break.
3  Q.  Do you remember what time those breaks would
4  be?
5  A.  Not exactly.  I would say in the morning
6  maybe.  It would be different times that they took
7  different breaks.  I would say mine would probably
8  start at 9:30 to 9:45.
9  Q.  So would you have a 15-minute break, then a
10  30-minute break, then a 15-minute break?
11  A.  Yes.
12  Q.  And would you do the same things before you
13  went out on each of those breaks, and then do the
14  same things when you returned from each of those
15  breaks?
16  A.  It would depend on what area I was in.  Some
17  days I might have time to do the same things,
18  sometimes I might not.
19  Q.  Okay.  I thought you told me before that you
20  worked in packout the entire time you were there?
21  A.  It's different areas of packout.
22  Q.  So different positions within the area of
23  packout?

2433dff4-df52-4d14-98d1-51172cf02d5d

22

1   A.   Different positions.
2   Q.   I understand. Generally, before you would
3   leave to go out on break, how would you know it
4   was time to take your break?
5   A.   Well, the supervisor, when I first started,
6   they gave us a time for our area we was working
7   in. And she told me that I would take break at
8   9:30 to 9:45.
9   Q.   And when it was time for you to go out on
10  break, what would you do?
11  A.   Well, I would have to, if I'm running the
12  machine, I'm the operator, I would have to turn
13  the machine to make sure nothing was running off.
14  And then I have to go to my station where you have
15  to take all your stuff off before you go outside.
16  And it depends on where I was at, you know.
17  Q.   Okay. When you say you had to take your
18  stuff off, can you describe for me what it is you
19  would do?
20  A.   I would have to take my gloves off, my smock
21  off, I would take my beard mask off; and I would
22  have to hang it up on the rack, put it in a
23  designated place where I could find it when I got

23

1   back. That's mostly what I had to do.
2   Q.   Did you have to rinse or wash anything off?
3   A.   No. Depends on if I was in -- if I was
4   catching that day, I would have to rinse my blue
5   gloves off, because it gets contaminated.
6   Q.   So some days, before going on break, you
7   would have to rinse off your gloves, and then
8   other days you wouldn't?
9   A.   Depending on the department that I was --
10  the position I was doing that day.
11  Q.   Approximately how long would it take you to
12  do those tasks before you went out on break?
13  A.   If I was the operator that day, it would
14  take me at least a good seven to eight minutes.
15  That's after the break starts.
16  Q.   And would that be the same for your
17  15-minute breaks and your 30-minute breaks?
18  A.   Yes.
19  Q.   And the amount of time would be about the
20  same?
21  A.   It would depend what area I was in.
22  Sometimes I might be closer to the break room,
23  sometimes I might be farther.

24

1   Q.   Well, this estimate of seven to eight
2   minutes, is that for any position within packout?
3   A.   I would say when I was operator.
4   Q.   And that's when you were operating the
5   machine that drops the chicken into the bags?
6   A.   Right.
7   Q.   And that's when you would have to wash off
8   your gloves?
9   A.   Right.
10  Q.   So there were times when you didn't have to
11  wash off your gloves?
12  A.   Right.
13  Q.   And did that take less time before you went
14  out on break?
15  A.   Right.
16  Q.   Because you didn't have to rinse off your
17  gloves?
18  A.   Right.
19  Q.   And how long would it take on those days?
20  A.   I'd say maybe five minutes.
21  Q.   Assuming you were working in the same
22  position before each break, would the amount of
23  time it would take you to do whatever you needed

25

1   to do before you could go out on break be the
2   same?
3        MR. CAMP:  Form. Say that again.
4   Q.   Assuming you were working in the same
5   position before you went out on break, would it
6   take you the same amount of time to do these tasks
7   that you've told me you did before going out on
8   break, any break, regardless whether it was a 15-
9   or 30-minute break?
10  A.   Sometimes it would probably take longer.
11  Q.   What I'm trying to get at here is whether
12  there was something you would do before your
13  30-minute break or something different you would
14  do before your 15-minute break, so I know if I
15  need to ask you questions about that. If it was
16  all generally the same, then I don't need to ask
17  you what you did before each of those breaks.
18  That's all I'm trying to understand. I'm not
19  trying to trick you.
20       Would you generally do the same thing before
21  leaving for your 15-minute break, your 30-minute
22  break, and your second 15-minute break?
23  A.   Yes.

26

1  Q.  Okay.  Now, when you would return from
2  break, how would you know it was time to go back
3  out onto the floor?
4  A.  Well, since I didn't wear a watch, I was
5  always around somebody that had a watch.  I could
6  check the time, you know.  Or I could walk inside
7  the building and look at the clock.
8  Q.  Would you normally go outside for your
9  break?
10  A.  I'd normally go outside and smoke.
11  Q.  Were there any items that you could keep on
12  when you left the production floor to go out on
13  break?
14  A.  I could keep my smock on.
15  Q.  You could keep your smock on?
16  A.  I mean, my hair net.
17  Q.  Could you keep your boots on?
18  A.  Yeah, I could keep my boots on.
19  Q.  And if you went outside could you keep your
20  boots on?
21  A.  Yes, sir.
22  Q.  And if you went outside could you keep your
23  hair net on?

27

1  A.  Yes, sir.
2  Q.  When it was time for you to go back out onto
3  the production floor, can you tell me what you
4  would do between the time you entered the
5  production area and the time you got back into
6  your spot on the line?
7  A.  I don't understand the question.
8  Q.  Okay.  That's fine.  I'll ask it
9  differently.
10      When you were returning from break, you
11  would walk back into the production area, correct?
12  A.  Right.
13  Q.  And at that time, you were wearing your
14  boots and your hair net?
15  A.  Right.
16  Q.  After you walked into the production area,
17  what's the first thing you would do?
18  A.  I would probably sanitize my boots first.
19  And then I would walk toward where my apron and
20  stuff be at.
21  Q.  Okay.  And would you put your items of
22  clothing or equipment back on?
23  A.  Yes.

28

1  Q.  And would you wash or rinse anything?
2  A.  Nothing but my boots probably.
3  Q.  And approximately how long would it take you
4  to do all of those things, from the time you
5  entered through the production door?
6  A.  Maybe, I would say, five to six minutes.
7  Q.  And that would be the same when you were
8  returning from each of your breaks?
9  A.  Yes.
10  Q.  Would it normally take about that same time?
11  A.  Right.
12  Q.  And you normally would do the same things?
13  A.  I normally would do the same things.
14  Q.  Did you ever actually time yourself on how
15  long it would take you to do each of those tasks
16  when you were returning from break?
17  A.  No, sir.
18  Q.  Did you ever actually time yourself on how
19  long you were taking to do each of those tasks
20  when you were going out on break?
21  A.  No, sir.
22  Q.  So you're giving me estimates; is that
23  correct?

29

1  A.  Yes.
2  Q.  When it was the end of your shift, how would
3  you know that your shift was done?  Did you have a
4  scheduled end time?
5  A.  They had a buzzer for the end of the shift
6  that would go off.
7  Q.  And when would you be able to leave?
8  A.  I would be able to leave -- well, my
9  scheduled time was at 3:30 to leave.
10  Q.  Could you leave at 3:30?  Could you leave
11  your spot on the line at 3:30?
12  A.  Sometimes I could; sometimes I couldn't.
13  Q.  What would happen when there were times when
14  you couldn't leave the line?
15  A.  When I was operating the machine.
16  Q.  Why would you have to wait?
17  A.  Because I would have to wait for somebody to
18  come in on second shift to be on my space.  If he
19  was there, I wouldn't have to shut it down; but if
20  he's not there, I would have to wait until he'd
21  get there or shut the machine down.
22  Q.  I understand.  Did you ever --
23      MR. GOULD: Strike that.

2433dff4-df52-4d14-98d1-51172cf02d5d

30

1  Q.  Do you know, if you had to stay past 3:30,
2  whether you were paid for that time?
3  A.  I never was scheduled to work past 3:30.
4  Q.  Right.  But I think you told me there were
5  times when you had to stay past 3:30?
6  A.  Right.
7  Q.  Do you know whether you were paid for that
8  time?
9  A.  I don't think I was paid for it.
10  Q.  Did you ever check your paycheck to see
11  whether you had been paid for any extra time?
12  A.  Yes.
13  Q.  Did you check to see?
14  A.  I noticed there wasn't anything over 40
15  hours.
16  Q.  Did you ever talk to a supervisor or
17  somebody in payroll?
18  A.  I mentioned it to a couple people, and they
19  felt the same way I did.
20  Q.  When you say you mentioned it to a couple
21  people, was it a supervisor or someone in payroll,
22  or was it just another employee?
23  A.  Just another employee.

31

1  Q.  My question to you was whether you ever
2  discussed this with a supervisor or someone in
3  payroll, someone at a management level.
4  A.  No, sir.
5  Q.  Now, at the end of the shift when you were
6  leaving your spot in the packout area, can you
7  describe for me what you would do before you
8  exited the production floor?
9  A.  I would have to take off my aprons and my
10  masks.  And at that time, I could take my earplugs
11  off.  And I would exit and go to the car.
12  Q.  Now, you said you would take off your mask?
13  A.  For my facial hair.
14  Q.  Your beard net?
15  A.  Yes.
16  Q.  And how long do you estimate it would take
17  you to do all of those things?
18  A.  About five, six minutes.
19  Q.  Did you ever actually time yourself doing
20  those activities at the end of your shift?
21  A.  No, sir.
22  Q.  So that would be an estimate?
23  A.  Yes, sir.

32

1  Q.  And then after you would exit the production
2  floor, what would you do next?
3  A.  I would have to go to the break area where
4  you clock out at, and then wait in line.
5  Q.  Would you get rid of your smock after you
6  exited the production area?
7  A.  Right.  The basket be across from you before
8  you go in the break area.
9  Q.  So it's on your way from the production area
10  to the break room?
11  A.  Right.  You just drop it in the basket.
12  Q.  And then after you clocked out, would you
13  normally leave?
14  A.  Yes.
15  Q.  Now, you indicated that there were times you
16  believe you should have been paid that you stayed
17  past 3:30; is that correct?
18  A.  Yes.
19  Q.  Is that part of what you are seeking in this
20  lawsuit?
21  A.  Yes, sir.
22  Q.  Did you keep any record or documentation of
23  the times that you believe you stayed late on the

33

1  line and weren't paid for that time?
2  A.  No, sir.
3  Q.  Do you have any estimate of how often that
4  happened?
5  A.  I would say maybe twice a week.
6  Q.  And you were there for 90 days; roughly
7  three months, correct?
8  A.  Right.
9  Q.  And on average, how long do you estimate
10  that you stayed on the line after 3:30?
11  A.  I would say five to six minutes.  Because
12  after five minutes, I'm going to shut it down
13  anyway if he don't be there to take my place.
14  Q.  So after five or six minutes, if you weren't
15  relieved, you would turn the machine off?
16  A.  Right.
17  Q.  Would you have to ask your supervisor if you
18  could do that?
19  A.  No, sir.
20  Q.  You would just do it?
21  A.  Well, I had permission to do it.
22  Q.  I understand.  So your supervisor had told
23  you previously that if you weren't relieved in

2433dff4-df52-4d14-98d1-51172cf02d5d

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

34

1   five to six minutes --
2   A.   Shut it down.
3   Q.   -- just to shut it down.  Okay.  I
4   understand.  What's your understanding as to the
5   time for which you were actually paid?  Do you
6   have an understanding how the company calculated
7   the hours for which you were paid?
8   A.   No.  I don't know who handled payroll.  I
9   don't know that.
10  Q.   You got paid weekly while you were working
11  there, correct?
12  A.   Yes.
13  Q.   Was there any difference between the hours
14  for which you were paid each week, or were you
15  paid for the exact same number of hours each week?
16  A.   The exact same.
17  Q.   And how many were there?
18  A.   Forty.
19  Q.   So you were paid 40 hours each week, unless
20  you worked on the weekend?
21  A.   Yes, sir.
22  Q.   Were there ever any times you were asked to
23  stay late?

35

1   A.   No, sir.
2   Q.   I think those are all the questions I have
3   for you.  Thank you very much for your time.
4       MR. CAMP:  I've got a few questions.
5   BY MR. CAMP:
6   Q.   You said you sanitized your boots before
7   you'd go into production?
8   A.   Yes, sir.
9   Q.   You walked through the door?
10  A.   Yes.
11  Q.   You pushed a button.  You indicated -- I was
12  watching you as you described what you did.  You
13  kind of indicated that you would spray your boots
14  down.  Did I misinterpret that?  How did you get
15  the foam on your boots?
16  A.   It was like what you use at a car wash.
17  Q.   Like a pressure washer?
18  A.   Yes, something like that.
19  Q.   So you would grab a hose with a nozzle on
20  it, push the button --
21  A.   And the foam would come out.
22  Q.   And then you could go into production?
23  A.   Yes.

36

1   Q.   Did you have to do that every time before
2   you went into production?
3   A.   I did.
4   Q.   Did you do that when you came back from your
5   breaks to go into production?
6   A.   Yes.
7   Q.   The 15-minute break, the 30, and the
8   15-minute break?
9   A.   Yes, sir.
10  Q.   The last thing you did before clocking out
11  at the end of the day was deposit your smock in a
12  combo of some sort?
13  A.   Yes.
14  Q.   Could you wear your smocks outside?
15  A.   No, sir.
16  Q.   You said that you had permission to shut
17  down your machine if your replacement wasn't there
18  within five minutes after 3:30?
19  A.   Yes.
20  Q.   How did you get that permission?
21  A.   From my supervisor.
22  Q.   So he knew you were staying after?
23  A.   Yes.

37

1   Q.   And you're claiming -- in this lawsuit, is
2   your claim that you expect to be paid for all
3   hours that you worked?
4   A.   Yes, sir.
5   Q.   That will be it.
6       MR. GOULD:  I have nothing else.  Thank
7   you.
8
9       (The deposition was concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23

2433dff4-df52-4d14-98d1-51172cf02d5d

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

38

```
1          C E R T I F I C A T E
2
3    STATE OF ALABAMA
4    BARBOUR COUNTY
5
6        I hereby certify that the above and
7    foregoing deposition was taken down by me in
8    stenotype and the questions and answers thereto
9    were transcribed by means of computer-aided
10   transcription, and that the foregoing represents
11   a true and correct transcript of the testimony
12   given by said witness upon said hearing.
13       I further certify that I am neither of
14   counsel, nor kin to the parties to the action,
15   nor am I in anywise interested in the result of
16   said cause.
17
18
19       CYNTHIA M. NOAKES, Commissioner
20       Certified Court Reporter,
21       ACCR #327 - Expires 09/30/2008
22
23       Commission Expires 07/08/2009
```

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

2433dff4-df52-4d14-98d1-51172cf02d5d

**TAB  22**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


BETTY ANN BURKS, et al.,

    Plaintiffs,


vs.  CIVIL ACTION 2:06-cv-01081-MEF-DRB


EQUITY GROUP EUFAULA DIVISION, LLC,

    Defendant.


\*    \*    \*    \*    \*    \*

    DEPOSITION OF TERRANCE JACKSON,

taken pursuant to notice and

stipulation on behalf of the Defendant,

at Williams, Pothoff, Williams & Smith,

125 South Orange Avenue, Eufaula,

Alabama, before Bridgette Mitchell,

Shorthand Reporter and Notary Public in

and for the State of Alabama at Large,

on May 21, 2008, commencing at

5:50 p.m.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

2

```
 1                 APPEARANCES
 2
 3
 4
 5   FOR THE PLAINTIFFS:
 6   Carl E. Underwood, III, Esquire
 7   COCHRAN, CHERRY, GIVENS & SMITH
 8   163 W. Main Street
 9   Dothan, Alabama  36301
10
11
12   FOR THE DEFENDANT:
13   Gary D. Fry, Esquire
14   PELINO & LENTZ
15   One Liberty Place
16   Thirty-second Floor
17   Philadelphia, Pennsylvania  19103
18
19
20
21
22
23
```

3

```
 1                 STIPULATIONS
 2        It is hereby stipulated and
 3   agreed by and between counsel
 4   representing the parties that the
 5   deposition of TERRANCE JACKSON is taken
 6   pursuant to notice and stipulation on
 7   behalf of the Defendant; that all
 8   formalities with respect to procedural
 9   requirements are waived; that said
10   deposition may be taken before
11   Bridgette Mitchell, Shorthand Reporter
12   and Notary Public in and for the State
13   of Alabama at Large, without the
14   formality of a commission; that
15   objections to questions, other than
16   objections as to the form of the
17   questions, need not be made at this
18   time, but may be reserved for a ruling
19   at such time as the deposition may be
20   offered in evidence or used for any
21   other purpose as provided for by the
22   Civil Rules of Procedure for the State
23   of Alabama.
```

4

```
 1        It is further stipulated and
 2   agreed by and between counsel
 3   representing the parties in this case
 4   that the filing of the deposition of
 5   TERRANCE JACKSON is hereby waived and
 6   that said deposition may be introduced
 7   at the trial of this case or used in
 8   any other manner by either party hereto
 9   provided for by the Statute, regardless
10   of the waiving of the filing of same.
11        It is further stipulated and
12   agreed by and between the parties
13   hereto and the witness that the
14   signature of the witness to this
15   deposition is hereby waived.
16
17                 INDEX
18
19   EXAMINATION                  Page
20   By Mr. Fry....................... 5
21
22
23
```

5

```
 1        TERRANCE JACKSON, having first
 2   been duly sworn or affirmed to speak
 3   the truth, the whole truth, and nothing
 4   but the truth, testified as follows:
 5             EXAMINATION
 6   BY MR. FRY:
 7   Q. Mr. Jackson, I've already introduced
 8      myself to you.  I'm Gary Fry.  I'm one
 9      of the lawyers for Equity Group
10      Eufaula, the folks that operate the
11      plant over in Baker Hill.  And we've
12      asked you here today to put certain
13      questions to you with respect to a
14      lawsuit which you and some other folks
15      have brought against the company.
16   A. Yes.
17   Q. Have you ever been in a deposition
18      before?
19   A. No, sir.
20   Q. Okay.  The procedure is very simple.  I
21      ask the questions and you supply the
22      answers and Bridgette, our court
23      reporter, will take down what we both
```

3c918f00-13d1-4f24-a931-c7f60164b0c7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

6

1    say. If at any time you don't
2    understand one of my questions, it's
3    important that you let me know that so
4    I can try and rephrase it so you will
5    understand it. Okay?
6    A. Yes, sir.
7    Q. And the same goes for if you don't hear
8    something or don't think you hear
9    something that I'm saying. Let me know
10   and I'll repeat it and hopefully you'll
11   understand it then. Okay?
12   A. Yes, sir.
13   Q. And in order that she can get down a
14   record, she can't take what we're
15   saying down if we're talking at the
16   same time. She can't take it down. So
17   if you wait until I get my question
18   done before answering and I'll wait
19   until your answer is finished before I
20   go to the next question, we can have a
21   pretty much clear record. Okay?
22   A. Yes, sir.
23   Q. And the last thing is, whatever answer

7

1    you give, it's got to be verbal. You
2    can't shake your head or nod or
3    gesture. Okay?
4    A. Yes, sir.
5    Q. All right. What's your home address?
6    A. P.O. Box 41, Midway, Alabama.
7    Q. What's your date of birth?
8    A. May the 29th, 1980.
9    Q. Are you currently employed?
10   A. Yes, sir.
11   Q. By whom?
12   A. Halla Climate Systems in Shorter,
13   Alabama.
14   Q. Did you say Holland?
15   A. Halla.
16   Q. Halla. How do you spell that?
17   A. H-A-L-L-A.
18   Q. At some point in time you did work for
19   the Equity plant?
20   A. Yes, sir.
21   Q. And what period of time did you work
22   for that facility?
23   A. January of '04 to July '05.

8

1    Q. So am I correct that when you first
2    started there, the plant was operated
3    by CP?
4    A. Yes, sir.
5    Q. And sometime in '04 Equity took it
6    over; correct?
7    A. I don't know.
8    Q. You don't recollect?
9    A. No. I don't know.
10   Q. But when you finished your employment
11   there, Equity was running the place?
12   A. Yes, sir.
13   Q. And for what reason did your employment
14   at that plant end?
15   A. I found another job.
16   Q. When you first started to work for CP,
17   what job were you doing?
18   A. Debone.
19   Q. Did you continue doing debone?
20   A. Yes, sir.
21   Q. Did you -- for the whole time you
22   worked at that facility, were you in
23   the debone department?

9

1    A. Yes, sir.
2    Q. What shift?
3    A. First shift, morning shift.
4    Q. What were your hours?
5    A. Seven-thirty to three.
6    Q. What did you do in the debone
7    department?
8    A. I was a shoulder cutter, a skin puller,
9    a bone inspector.
10   Q. So you had a variety of jobs?
11   A. Yes, sir.
12   Q. Did you rotate on the line?
13   A. Yes, sir.
14   Q. So you did shoulder cutting and the
15   other jobs that you mentioned in the
16   rotation?
17   A. Yes, sir.
18   Q. And was it typical that you would
19   rotate through these positions during
20   each day?
21   A. Yes, sir.
22   Q. Do you recall who your supervisors were
23   when you were working there?

3c918f00-13d1-4f24-a931-c7f60164b0c7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

**10**

1  A. No, sir. I forgot their name.
2  Q. Okay. What was your rate of pay?
3  A. It's been so long ago, I forgot, sir.
4  Q. Okay. How many hours per day did you
5     work?
6  A. Really don't know.
7  Q. How many days a week did you work?
8  A. Five.
9  Q. Five? Monday through Friday?
10 A. Yes, sir.
11 Q. Did you perform any other jobs at that
12    plant during the year and a half you
13    worked there?
14 A. No, sir.
15 Q. Were you a member of the union while
16    you were there?
17 A. Yes, sir.
18 Q. Did you hold any positions with the
19    union?
20 A. No, sir.
21 Q. Were you ever a member of the union's
22    negotiating committee?
23 A. No, sir.

**11**

1  Q. Did you ever attend any union meetings?
2  A. No, sir.
3  Q. Did you ever discuss with your fellow
4     employees the claims that you're
5     bringing here?
6  A. No, sir.
7  Q. How did you find out about this
8     lawsuit?
9  A. A friend.
10 Q. And what did your friend tell you?
11 A. The guy told me to get -- he gave me a
12    number and told me to give them a call
13    and then it went from there.
14 Q. And what was the number that he gave
15    you?
16 A. I don't remember, sir.
17 Q. Was it the lawyers?
18 A. Yes.
19 Q. What's your understanding of what your
20    claim is in this case?
21 A. I don't understand. Can you repeat
22    that, sir?
23 Q. Yeah. You're -- you have brought a

**12**

1     claim against Equity; correct?
2  A. Yes.
3  Q. And what's the basis of your claim?
4  A. I don't understand, sir.
5  Q. Do you have any idea what you're making
6     a claim for?
7  A. Yes, sir.
8  Q. What?
9  A. Lost wages.
10 Q. And what work did you perform for which
11    you weren't paid that you're seeking
12    wages?
13 A. Sir? Can you repeat that, sir?
14 Q. Sure. Your claim is for lost wages.
15    I'm trying to get a handle on what your
16    claim is. I assume that you're -- you
17    believe that you performed work for
18    which you weren't paid?
19 A. Yes.
20 Q. And what work did you perform for which
21    you weren't paid?
22 A. My breaks.
23 Q. Your breaks. What about your breaks?

**13**

1  A. I believe I wasn't getting my whole
2     thirty minutes, sir.
3  Q. Okay. Anything else?
4  A. That would be all, sir.
5  Q. Pardon?
6  A. No, sir.
7  Q. Did you review any documents in
8     preparing to come here today?
9  A. No, sir.
10 Q. Did you speak with anybody about your
11    deposition except your lawyer?
12 A. No, sir.
13 Q. Can you identify for me the items of
14    clothing or gear that you wore when you
15    were working on the debone line?
16 A. Yes, sir. A smock, apron, rubber
17    gloves, cotton gloves, hair net, beard
18    net, earplugs, a chain, hand chains,
19    and arm guard.
20 Q. I'm sorry. After the beard net, you --
21    chains?
22 A. Chain glove.
23 Q. Chain glove. And what else?

---

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

**14**

1  A. You got the earplugs?
2  Q. Earplugs. Anything else?
3  A. Can you read --
4  Q. Sure. Let me read off what you gave
5     me. Smock, apron, gloves, both white
6     and rubber, hair net, beard net, a
7     chain glove, and earplugs.
8  A. Yeah. And -- and an arm guard.
9  Q. Arm guards?
10 A. Yeah.
11 Q. On both arms?
12 A. Just one arm.
13 Q. Pardon?
14 A. Just one arm.
15 Q. Just one arm. Did you wear plastic
16    sleeves?
17 A. Yes, sir. Yes, the little plastic
18    sleeves. I forgot about them.
19 Q. Anything else?
20 A. No, sir.
21 Q. Which of these items were you required
22    to wear?
23 A. All of them.

---

**15**

1  Q. And how did you come to that
2     understanding?
3  A. I got wrote up for an arm guard, and
4     when I went in the office, they told me
5     I must wear all -- all that equipment.
6  Q. Was it your understanding that you
7     would be written up if you didn't wear
8     the plastic sleeves?
9  A. No, sir. No, sir.
10 Q. What?
11 A. The only thing they told me I have to
12    wear was my equipment.
13 Q. Okay. From what you were able to
14    observe in the debone room, did the
15    other employees in there wear all this
16    stuff?
17 A. Yes, sir.
18 Q. Which of these items was issued to you
19    by the company, either CP or Equity?
20 A. All of it.
21 Q. All of it? Which of these items did
22    you pick up on a daily basis?
23 A. I really can't tell you, sir, because

---

**16**

1  it was different things I would go get
2  every day.
3  Q. And do you recall what they were?
4  A. No, sir.
5  Q. Which of these items that you've
6     identified for me could you wear from
7     your home?
8  A. None of it, really.
9  Q. Pardon?
10 A. None of it, really.
11 Q. What about your boots?
12 A. Oh, yes. I forgot about them. Oh, no,
13    I couldn't wear the boots from home
14    because they -- as my understanding
15    was, you had to leave them at the job.
16 Q. The boots?
17 A. Yes, sir.
18 Q. That was your understanding?
19 A. Yes.
20 Q. Did you have a locker at the plant?
21 A. Yes, sir.
22 Q. And what did you use the locker for?
23 A. For my boots.

---

**17**

1  Q. Anything else?
2  A. No, sir.
3  Q. Where did you keep the plastic arm
4     guard?
5  A. I carried that home.
6  Q. Took it home?
7  A. Yeah.
8  Q. What about your apron?
9  A. Carried it home.
10 Q. And the plastic sleeves?
11 A. Carried it home.
12 Q. And were you permitted to keep them in
13    your locker if you wished?
14 A. I don't -- I don't know.
15 Q. Did you ever see that other employees
16    kept those items in their lockers?
17 A. I really don't recall, sir.
18 Q. Do you recollect there being any
19    differences in the way you did your job
20    in any fashion after Equity took over
21    from CP?
22 A. I really don't understand your
23    question.

---

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

3c918f00-13d1-4f24-a931-c7f60164b0c7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

18

1   Q. Okay. At some point CP left and Equity
2      took over the plant. Did the manner in
3      which you performed your job change in
4      any way when that happened?
5   A. I don't remember.
6   Q. When you reported for work in the
7      morning, where did you put your smock
8      on?
9   A. On the inside. On the inside of the
10     debone.
11  Q. In the production room?
12  A. In the production room.
13  Q. Where did you put on your plastic
14     apron?
15  A. In the production room.
16  Q. Where did you put on the plastic
17     sleeves?
18  A. In the production room.
19  Q. And the plastic arm guards?
20  A. Production room.
21  Q. And your cotton and rubber gloves?
22  A. Production room.
23  Q. And the -- am I correct that the boots,

19

1      the hair net and the beard net and
2      earplugs you were permitted to put on
3      before you entered the production room?
4   A. Yes, sir.
5   Q. And those items that you put on in the
6      production room you were not permitted
7      to wear outside of the production room;
8      is that correct?
9   A. Repeat that question again.
10  Q. Sure. Those things that you put on in
11     the debone production room, you weren't
12     allowed to wear those outside that
13     room, were you?
14  A. No, sir.
15  Q. So am I correct in assuming that you
16     only put the smock, the apron, the
17     gloves and those items on -- you only
18     put those on after you entered the
19     production room?
20  A. Yes, sir.
21  Q. At the start of the shift?
22  A. Yes, sir.
23  Q. Now, you used a knife?

20

1   A. Yes, sir.
2   Q. And did you use scissors?
3   A. Yes, sir.
4   Q. And how did you obtain these items each
5      day?
6   A. I don't understand your question, sir.
7   Q. Let me -- am I correct that the
8      supervisor gave you -- the line leader
9      gave you the knives you needed and the
10     scissors you needed?
11  A. Yes, sir.
12  Q. You didn't have to go anywhere to pick
13     them up?
14  A. No, sir.
15  Q. And you didn't have to sharpen them?
16  A. No, sir.
17  Q. And you didn't have to maintain them in
18     any way?
19  A. No, sir.
20  Q. Did you use any other tools or
21     equipment while you were working in the
22     debone department?
23  A. No, sir.

21

1   Q. Now, you testified that your shift
2      started at 7:30 a.m.?
3   A. Yes, sir.
4   Q. And were you required to be on the
5      production line at 7:30 a.m.?
6   A. Yes, sir.
7   Q. And you were required to be fully
8      clothed to perform your job at
9      7:30 a.m.?
10  A. Yes, sir.
11  Q. How many breaks did you get during the
12     day?
13  A. Two.
14  Q. How long was each break?
15  A. I really couldn't tell you about my
16     breaks because I really don't know.
17  Q. Do you recall how long they were
18     supposed to be?
19  A. Thirty minutes.
20  Q. Thirty minutes. And I take it from
21     what you're suggesting, that your
22     breaks -- your experience was your
23     breaks were less than thirty minutes?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

22

1   A. Yes, sir.
2   Q. And how much time did you have to spend
3      in the break room?
4   A. Twenty minutes.
5   Q. Twenty minutes. Where did you take
6      your break?
7   A. In the break room.
8   Q. The debone break room?
9   A. They have, like, this -- two break
10     rooms, so I don't know. The debone or
11     evis break room.
12  Q. Did you have the option to go to either
13     one?
14  A. Yes, sir.
15  Q. And which break room did you normally
16     go to?
17  A. Right across from the debone.
18  Q. So you went to the debone break room?
19  A. Yes.
20  Q. Which is right across the hall from the
21     production area; correct?
22  A. Yes, sir.
23  Q. How did you know it was time to go on

---

23

1      break?
2   A. The line leader called break.
3   Q. But you weren't permitted to actually
4      go -- leave the line until the last
5      bird passed your position; right?
6   A. Yes, sir.
7   Q. And if you were at the beginning of the
8      line, you could leave before the people
9      at the end of the line; correct?
10  A. Yes, sir.
11  Q. So some people in your department,
12     depending where they were in the line,
13     started their break before others?
14  A. Yes, sir.
15  Q. How did you know that the break time
16     has ended?
17  A. I look at the clock.
18  Q. You look at the clock?
19  A. Yeah.
20  Q. Did everybody go back to break at the
21     same time?
22      MR. UNDERWOOD: You said did
23  everybody go back to break at the same

---

24

1      time.
2       MR. FRY: From the break at the
3   same time.
4       MR. UNDERWOOD: From break at
5   the same time.
6   A. I really don't know.
7   Q. Did some people, depending on where
8      they were in the line, did they go to
9      -- return from break sooner than those
10     at the end of the line?
11  A. I don't know.
12  Q. Well, on the days that you recall going
13     back from break, were there days when
14     you were one of the first ones there?
15  A. No, sir.
16  Q. Were there days when you were one of
17     the last ones to go back to the line?
18  A. Uh-uh. No, sir.
19  Q. You were always in the middle? You
20     don't remember?
21  A. No, I don't remember that.
22  Q. How did you get to the plant? Did you
23     drive?

---

25

1   A. Yes, sir.
2   Q. And what time would you typically
3      arrive at the plant?
4   A. I don't know, sir.
5   Q. How many -- your shift started at 7:30?
6   A. Yes, sir.
7   Q. How many minutes before that shift
8      started would you try and be at the
9      plant?
10  A. At least twenty.
11  Q. Did you have to clear any security to
12     get into the plant?
13  A. Yes, sir.
14  Q. What did you do?
15  A. I had to drive -- they had the little
16     guard shack and they have, like, I.D.
17     badges in the car.
18  Q. Did you have to stop at the guard
19     shack?
20  A. Some days.
21  Q. Did you have a sticker for your car?
22  A. Yes, sir.
23  Q. If you had a sticker on the car, could

---

26

1    you just drive through?
2    A. Like I said, some days, because some
3    vehicles -- some vehicles don't have it
4    so the line be stopped.
5    Q. Okay. But on those days, if they
6    didn't stop anybody in front of you,
7    you could just drive right on?
8    A. Yes, sir.
9    Q. Were you ever personally searched?
10   A. No, sir.
11   Q. Were you -- at any time, were your
12   personal possessions searched?
13   A. No, sir.
14   Q. When you drove out at night, did you
15   have to clear security in any way?
16   A. No, sir.
17   Q. Were you required to go and obtain any
18   special tools for the work that you did
19   on the debone line?
20   A. No, sir.
21   Q. You wore a chain mesh glove?
22   A. Yes, sir.
23   Q. And how was that provided to you?

27

1    A. Through the company. The team leaders
2    provided them for us.
3    Q. Did the team leaders provide you with
4    the mesh glove?
5    A. Yes, sir.
6    Q. And were you provided with the glove
7    while you were at the line?
8    A. Yes, sir.
9    Q. And did the team leader take it from
10   you at the end of the day?
11   A. Each time I -- when we went to break.
12   Q. He took it from you each time you went
13   to break?
14   A. Yes, sir.
15   Q. You didn't have to clean that?
16   A. No, sir.
17   Q. After you parked your car and got out
18   and you went in the plant, tell me what
19   you did.
20   A. I don't remember, sir.
21   Q. Okay. Let me see if I can refresh your
22   memory. Did you go to the supply desk?
23   A. Some days.

28

1    Q. How many days during the week would you
2    have to go there?
3    A. I don't remember, sir.
4    Q. Wouldn't you have to go there every day
5    to pick up a smock?
6    A. No, sir.
7    Q. Why not?
8    A. Because they -- we take our smocks
9    home.
10   Q. Oh, you took your smocks home?
11   A. Yes.
12   Q. And what did you do with them at home?
13   A. Wash them.
14   Q. And was that a requirement that you had
15   to do?
16   A. They had to be clean, yes, sir.
17   Q. And did that -- did you take your smock
18   home the whole time you worked at the
19   plant?
20   A. Yes, sir.
21   Q. So there were some days when you did
22   not have to go to the supply room?
23   A. Yes, sir.

29

1    Q. Okay. On those days when you didn't
2    have to go to the supply room, once you
3    got up to the door to go in, what did
4    you do? Where did you go?
5    A. Well, probably go get my boots.
6    Q. Where were your boots?
7    A. In the lockers.
8    Q. Okay. Then what would you do?
9    A. Probably go to the debone doors. They
10   open up -- because they open up at a
11   certain time.
12   Q. And what time did the debone doors open
13   up?
14   A. I don't remember. I can't recall.
15   Q. Well, if you got there at seven o'clock
16   and your work started at 7:30, you had
17   a half hour; correct?
18   A. Yes, sir.
19   Q. And if you didn't have to go to the
20   supply room, all you had to do is get
21   your boots and put your boots on?
22   A. Yeah.
23   Q. What did you do with the rest of the

3c918f00-13d1-4f24-a931-c7f60164b0c7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

30

1    time?
2    A. I really can't answer that question
3      because I don't remember, sir.
4    Q. Okay. Did you go to the break room?
5    A. Yes. The locker was in the break room.
6    Q. Okay. Did you hang out in that break
7      room?
8    A. Not really, sir. I'm going to say no.
9    Q. Did you see other people hanging out in
10     there?
11   A. Yes.
12   Q. Did you see people eating in there?
13   A. I don't remember.
14   Q. Did you see people using the vending
15     machines in there?
16   A. I don't recall, sir.
17   Q. Okay. After you put your shoes on,
18     what do you do?
19   A. I go outside and wait for the doors --
20     because they have two supervisors, I
21     guess, sometimes because of the cleanup
22     crew. And so if the cleanup crew is
23     not really fully -- the line's not

31

1    clean, so we have to wait until someone
2      come in, I guess, from -- I guess you
3      can say -- I don't know what you call
4      them people, but they have to come in
5      and say, okay, this line is clean, so
6      it's time to go to work.
7    Q. How often did that happen, that the
8      room wasn't ready for you?
9    A. I can't recall, but I know that
10     happened on several occasions.
11   Q. On those days when that did not happen,
12     when the room was ready for you, what
13     did you do after you put your shoes on?
14   A. You go hang -- go in the hallway and
15     wait, sit on the side and wait until
16     they open up the doors.
17   Q. You just sat there and waited?
18   A. Yes.
19   Q. And while you were waiting there, did
20     other employees come to work?
21   A. Yes, sir.
22   Q. So other employees arrived to go to
23     work after you got there, is that fair,

32

1    people you worked with?
2    A. I don't recall.
3    Q. Well, let me ask you this. You tried
4      to get there around seven?
5    A. Yes, sir.
6    Q. Did some people try to get there -- did
7      some people, did you observe, arrive
8      after seven?
9    A. Yes, sir.
10   Q. And did you observe some people
11     arriving before seven?
12   A. I can't observe the people coming
13     before seven.
14   Q. Well, were there people there when you
15     got there?
16   A. Yes, sir.
17   Q. People that you worked with?
18   A. Yes, sir.
19   Q. So some people came earlier than you?
20   A. Yes, sir.
21   Q. And some people came later than you?
22   A. Yes, sir.
23   Q. If your shift started at 7:30, what

33

1    time do you recall, generally, going
2      into the debone production floor?
3    A. I can't recall, sir.
4    Q. Approximately how many minutes before
5      7:30 would you walk into that
6      production floor?
7    A. About fifteen minutes.
8    Q. Fifteen minutes? And as I understand
9      it, to get into that production floor,
10     you had to go through two sets of
11     double doors?
12   A. Yes, sir.
13   Q. And in the middle was a room where your
14     boots were sanitized?
15   A. Yes, sir.
16   Q. And how were the boots sanitized?
17   A. I don't remember, sir. The only thing
18     I know, little foam was coming out. I
19     don't know whether anybody was
20     operating it.
21   Q. Did you have to wait in that -- in that
22     boot sanitary -- sanitizing room?
23   A. I don't -- I don't remember.

3c918f00-13d1-4f24-a931-c7f60164b0c7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

34

1  Q. Once you got into the debone production
2     room floor in the morning, you put on
3     your smock, your apron, and those other
4     items; correct?
5  A. Yes, sir.
6  Q. And how long did that take you?
7  A. Five -- I'd say about five minutes.
8  Q. Five minutes. And then you would go to
9     the line and start to work?
10 A. No. I think they had an exercising
11    program.
12 Q. An exercising program?
13 A. Yes.
14 Q. And what was the exercising program?
15 A. Exercise your -- your hand.
16 Q. Describe for me what you did.
17 A. They had, like, a little -- you did
18    something with your hands and your
19    shoulders and your neck.
20 Q. Show me what they made you do.
21 A. Something like this and rotate your
22    neck (indicating).
23 Q. So they had you do that after you had

35

1     put on all your stuff?
2  A. Yes, sir.
3  Q. And did you have to do those exercises
4     throughout the whole time you were
5     there?
6  A. No, sir.
7  Q. Those exercises were done when you
8     first started; is that fair to say?
9  A. No, sir. It was, like, in -- I'd say
10    in between. I'd say at least about six
11    or seven months after I started.
12 Q. Okay. At some point during your
13    employment, you -- you had to -- they
14    started this exercise program?
15 A. Yes, sir.
16 Q. And were you required to participate?
17 A. Yes, sir.
18 Q. And how long did it last?
19 A. It would last a while.
20 Q. Pardon?
21 A. Until I left. While I was still
22    working, it was still going.
23 Q. And how long each workday would you do

36

1     these exercises?
2  A. Every day, five days a week.
3  Q. Okay. How long did the exercises take
4     each day?
5  A. I don't -- I don't -- I can't recall.
6  Q. Are you claiming money for the time
7     that you were required to do these
8     exercises in this case?
9  A. Can you approximately tell me what are
10    you trying to say?
11 Q. Pardon me?
12 A. Can you repeat that question? I don't
13    understand what you're asking.
14 Q. Sure. Are you claiming in this case
15    that you were not paid for those
16    exercises, for the time it took you to
17    do those exercises?
18 A. Yes, sir.
19 Q. And that's part of your claim in this
20    case?
21 A. Yes, sir.
22 Q. Tell me what you did when it was time
23    for you to go on your break.

37

1  A. Wait until the last bird get to my --
2     where I'm at. Then I leave, wash up,
3     take all my equipment off except my
4     hair net, beard net, and earplugs.
5  Q. And then hang it up?
6  A. Yes, sir.
7  Q. And then go to the break room?
8  A. Yes.
9  Q. And how long did that process take you?
10 A. Five minutes.
11 Q. From what you were able to observe, did
12    all the employees wash off when they
13    left the debone room when they started
14    the break?
15 A. Well, I'd say yes.
16 Q. Pardon?
17 A. Yes.
18 Q. Let's do the reverse process now. When
19    it was time to go back to work after
20    the break was over, tell me what you
21    had to do.
22 A. Go back -- go back in, put your smock,
23    your apron, your gloves, your sleeves,

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

38

1    and your arm guard -- the knife guard.
2    Q. Did that take you about the same time?
3    A. Yes, because you had to resanitize them
4      back all, too.
5    Q. Did that process take you about the
6      same time it took as you -- as the time
7      that it took when you left to go on
8      break?
9         (No immediate response given.)
10   Q. Let me put it this way. You told me it
11     took you -- to get off your
12     workstation, to wash everything, and
13     hang it up and leave, it took you about
14     five minutes when you were going on
15     break. Did it take about the same
16     amount of time when you went back to
17     work to put it back on?
18   A. Well, can I say this here, sir? From
19     what my understanding was, that I'm
20     saying that it took at least five
21     minutes for me to clean my -- my -- my
22     equipment and take them off.
23   Q. Right.

---

39

1    A. Yeah.
2    Q. Now I'm asking you how long -- how much
3      time did you take to put the stuff back
4      on after break?
5    A. Oh, I don't know.
6    Q. You don't know?
7    A. No.
8    Q. And did you have to wash it again?
9    A. Yes, sir.
10   Q. At the end of the day, what did you do?
11   A. Same process, wait until the last bird,
12     or whatever you say, leave. Then I go
13     clean off my equipment.
14   Q. And then you took it off?
15   A. Yes, sir. I'd take it off and go
16     outside.
17   Q. And then just -- just go home?
18   A. Yeah. Well, I go and take my boots off
19     and put them in my locker.
20   Q. And how long did that process take you?
21   A. I don't know, sir.
22   Q. What was your understanding of how the
23     company kept track of the hours that

---

40

1      you worked?
2    A. I don't know, sir. I just clock in,
3      but I really don't know how they --
4    Q. So when you came to work every day, you
5      swiped your card in?
6    A. Yeah.
7    Q. And when you left at night, you swiped
8      your card?
9    A. Yes.
10   Q. Is that the first thing you did when
11     you got in the plant in the morning?
12   A. No, sir.
13   Q. You did other things before you swiped
14     in?
15   A. Yes, sir.
16   Q. When did you swipe in?
17   A. When I put my boots on.
18   Q. Were you permitted to swipe in any
19     earlier?
20   A. I don't know, sir. Well, I swiped in
21     earlier sometimes.
22   Q. And when did you swipe out at the end
23     of the day?

---

41

1    A. When I leave out of the debone area.
2    Q. Did you swipe out before you took your
3      boots off?
4    A. That's -- repeat the question again.
5    Q. Did you swipe out before or after you
6      took your boots off?
7    A. Before.
8    Q. Did you ever have occasion to complain
9      to any supervisor about your payroll
10     check?
11   A. No, sir.
12   Q. Did you keep track on a daily basis of
13     the hours that you worked there?
14   A. No, sir.
15   Q. Did you keep any kind of diary or notes
16     as to the actual hours that you believe
17     that you worked there that -- for which
18     you were not paid?
19   A. No.
20   Q. Have you made any calculations with
21     respect to how much you believe you're
22     owed in this lawsuit?
23   A. No, sir.

---

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

42

1  Q. Were you ever asked to stay and work
2     overtime?
3  A. Yes, sir.
4  Q. And were you paid time and a half for
5     that time?
6  A. I really couldn't tell it on my check,
7     to be honest with you, sir.
8  Q. Did you look?
9  A. Yes. But -- yes. Yes, I was paid --
10    yes, I was paid time and a half.
11 Q. So you never had any complaints about
12    your overtime and how it was computed?
13 A. No, sir.
14 Q. Did you ever file any grievances with
15    the union with respect to any pay
16    issues?
17 A. No, sir.
18 Q. Did you ever file any grievances at all
19    with the union?
20 A. I don't -- I don't recall.
21 Q. Do you know what I'm referring to?
22 A. Yes, sir.
23 Q. Okay. You don't recall filing any

---

44

1  A. Being late to the line.
2  Q. And how many times?
3  A. I don't recall, but I have got
4     suspended.
5  Q. You were suspended?
6  A. Yes, sir.
7  Q. How many times?
8  A. One.
9  Q. Once?
10 A. Yeah.
11 Q. Okay. Thank you.
12       MR. FRY: No further questions.
13
14 (The deposition of Terrance Jackson
15 concluded at 5:50 p.m. on May 21,
16 2008.)
17
18
19
20
21
22
23

---

43

1     grievances?
2  A. No, sir.
3  Q. Did you ever otherwise complain to
4     anybody with respect to any pay issues?
5  A. No, sir.
6  Q. Before this lawsuit, I mean.
7  A. No, sir.
8  Q. And I take it you've never filed any
9     claims with the department of labor or
10    any other government agency with
11    respect to any pay issues?
12 A. I don't understand your question.
13 Q. You never made any other -- besides the
14    claim that you're making here in this
15    case, have you ever filed any other
16    claims with the government with respect
17    to the issues that you're raising here?
18 A. No, sir.
19 Q. When you were working at the Baker Hill
20    facility, either for CP or Equity, were
21    you ever disciplined?
22 A. Yes, sir.
23 Q. What for?

---

45

            * * * * * * * * * *
              REPORTER'S CERTIFICATE
            * * * * * * * * * *
        STATE OF ALABAMA
        COUNTY OF MONTGOMERY
          I do hereby certify that the above
        and foregoing transcript was taken down
        by me in stenotype, and the questions
        and answers thereto were transcribed by
        means of computer-aided transcription,
        and that the foregoing represents a
        true and correct transcript of the
        testimony given by said witness.
          I further certify that I am neither
        of counsel, nor any relation to the
        parties to the action, nor am I anywise
        interested in the result of said case.


        _____
        Bridgette W. Mitchell,
        Certified Court Reporter and
        Commissioner for the State of
        Alabama at Large
        ACCR No. 231 - Expires 9/30/08
        MY COMMISSION EXPIRES 1/25/2010

**TAB 23**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06-CV-1081-MEF


BETTY ANN BURKS,

et al.,

　　　Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

　　　Defendant.



BEFORE:

　　　Cynthia M. Noakes, Commissioner

　　　and Certified Court Reporter


DEPOSITION TESTIMONY OF

ANNIE R. JOHNSON


*****************************

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

```
                                          2
```

## STIPULATION

1
2
3    IT IS STIPULATED AND AGREED by and
4 between the parties through their respective
5 counsel, that the deposition of ANNIE R. JOHNSON
6 may be taken before Cynthia M. Noakes, Court
7 Reporter, at the Law Offices of WILLIAMS,
8 POTTHOFF, WILLIAMS & SMITH, 125 South Orange
9 Avenue, Eufaula, Alabama 36027, on the 21st day
10 of May, 2008.
11    IT IS FURTHER STIPULATED AND AGREED
12 that the signature to and the reading of the
13 deposition by the witness is waived, the
14 deposition to have the same force and effect as
15 if full compliance had been had with all laws and
16 rules of Court relating to the taking of
17 depositions.
18    IT IS FURTHER STIPULATED AND AGREED
19 that it shall not be necessary for any objections
20 to be made by counsel to any questions except as
21 to the form or leading questions, and that
22 counsel for the parties may make objections and
23 assign grounds at the time of the trial, or at

```
                                          3
```

1 the time said deposition is offered in evidence,
2 or prior thereto.
3    IT IS FURTHER STIPULATED AND AGREED
4 that the notice of filing of the deposition by
5 the Court Reporter is waived.
6
7
8
9
10
11
12
13
14
15
16
17 ******************************************
18
19
20
21
22
23

```
                                          4
```

INDEX

1
2 EXAMINATION BY:              PAGE NUMBER:
3 MR. GOULD                    6-40
4 MR. UNDERWOOD                        40
5
6 EXHIBITS:
7 (No exhibits were submitted
8 to said deposition.)
9
10 Reporter's Certificate          41
11
12
13
14
15
16
17
18
19 ******************************************
20
21
22
23

```
                                          5
```

APPEARANCES

1
2
3 ON BEHALF OF THE PLAINTIFFS:
4    MR. CARL E. UNDERWOOD, III
5    THE COCHRAN FIRM, P.C.
6    ATTORNEYS AT LAW
7    163 West Main Street
8    Dothan, Alabama 36301
9    (334) 793-1555
10
11 ON BEHALF OF THE DEFENDANT:
12    MR. MALCOLM S. GOULD
13    PELINO & LENTZ
14    ATTORNEYS AT LAW
15    One Liberty Place
16    Thirty-Second Floor
17    1650 Market Street
18    Philadelphia, Pennsylvania 19103
19    (215) 665-1540
20
21
22 *****************************
23

ef59dbbf-12da-44f4-9ceb-2877f99dc9c7

**6**

1    I, CYNTHIA M. NOAKES, a Certified
2  Court Reporter of Eufaula, Alabama, acting as
3  Commissioner, certify that on this date, as
4  provided by the Alabama Rules of Civil Procedure
5  and the foregoing stipulation of counsel, there
6  came before me at the Law Offices of WILLIAMS,
7  POTTHOFF, WILLIAMS & SMITH, 125 South Orange
8  Avenue, Eufaula, Alabama 36027, beginning at
9  5:10 p.m., ANNIE R. JOHNSON, witness in the above
10 cause, for oral examination, whereupon the
11 following proceedings were had:
12
13    ANNIE R. JOHNSON,
14  being first duly sworn, was examined and
15    testified as follows:
16
17    THE COURT REPORTER:  Usual
18 stipulations?
19    MR. UNDERWOOD:  Yes.
20    MR. GOULD:  Yes.
21
22    EXAMINATION
23 BY MR. GOULD:

**7**

1  Q.  Good afternoon, Ms. Johnson.
2  A.  Hi.
3  Q.  My name is Malcolm Gould.  I'm an attorney
4  with the law firm of Pelino & Lentz in
5  Philadelphia.  We represent the Defendant Equity
6  Group Eufaula Division, LLC, in a lawsuit filed in
7  Federal Court in the Middle District of Alabama.
8    We're here to take your deposition today.
9  You're a plaintiff in this lawsuit.  I'm going to
10 give you some ground rules that we're going to
11 follow during this deposition.
12    As you can see, we have a court reporter
13 here.  She's going to take down my questions and
14 your answers.  I'd ask that, for that reason, you
15 keep all of your answers verbal, instead of
16 nodding your head or shaking your head or
17 something like that.  It's difficult for her to
18 take down physical gestures as opposed to verbal
19 responses.
20 A.  Okay.
21 Q.  I would also ask that you wait until I
22 finish my question before you give your answer.
23 That way it makes it easier for her if we're not

**8**

1  talking over each other.  In addition, it means
2  that you will hear my whole question before you
3  give your answer.  Okay?
4  A.  Okay.
5  Q.  Now, if I ask a question and you don't
6  understand, which is more than likely to happen
7  the way I ask questions, just let me know.  I'll
8  repeat the question or I'll try and ask the
9  question in a different way so that it's not
10 confusing to you.
11 A.  Okay.
12 Q.  If, during the course of the deposition, you
13 don't know or don't remember something, "I don't
14 know" or "I don't remember" is an acceptable
15 answer.  I'd much rather you say that than just
16 try and guess at something.
17 A.  Okay.
18 Q.  And I don't anticipate that the deposition
19 will take that long, but if for some reason you
20 feel you need to take a break, that's fine.  Just
21 let me know and we can stop and you can take a
22 break.
23 A.  Okay.

**9**

1  Q.  Can you please state your full name for the
2  record, please?
3  A.  Annie Ruth Johnson.
4  Q.  Ms. Johnson, what's your home address?
5  A.  1255 North Eufaula Avenue.
6  Q.  And that's here in Eufaula?
7  A.  Yes.  Lot 99-A.
8  Q.  And are you currently employed, ma'am?
9  A.  Yes.
10 Q.  And where are employed?
11 A.  With Equity, Baker Hill.
12 Q.  Okay.  How long have you worked there?
13 A.  Three years and about seven months.
14 Q.  And what is your current position there?
15 A.  I work in evis salvage department.
16 Q.  And how long have you been in that
17 particular position?
18 A.  Well, for that long.
19 Q.  Okay.  Since you've been hired, you've
20 worked in the evis salvage area?
21 A.  Yes.
22 Q.  Do you only work in the salvage area or do
23 you work in other positions in evis as well?

ef59dbbf-12da-44f4-9ceb-2877f99dc9c7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

10

1   A.   Yes, I do.
2   Q.   So you rotate between other positions?
3   A.   Yes.
4   Q.   All the positions you rotate between,
5   they're still in the evisceration area?
6   A.   Yes.
7   Q.   You don't rotate into any debone positions?
8   A.   No, I don't.
9   Q.   Okay.  Ma'am, what is your understanding as
10  to what this lawsuit is about?
11  A.   About wages that I've earned and not been
12  paid for.
13  Q.   Can you describe for me instances in which
14  you think you've earned wages and not been paid
15  for them?  What are some examples of the things
16  you think you should have been paid for but were
17  not paid for?
18  A.   Well, putting on and take off my PPE.
19  Q.   Anything else?
20  A.   That's the only thing that I can recall at
21  the moment.
22  Q.   You're not asserting any claims that you
23  worked shifts for which you weren't paid for, or

11

1   there's weeks that you worked that you weren't
2   paid for, anything like that?
3   A.   Not that I can recall.
4   Q.   How did you first learn of this lawsuit?
5   A.   Other people talking about it, discussing
6   it.
7   Q.   All right.  Do you remember who?
8   A.   No, I don't.
9   Q.   Was it anyone specifically talking to you?
10  A.   No.
11  Q.   No one specifically telling you that you
12  should sign up for this lawsuit?
13  A.   No.
14  Q.   Have you ever been a party in any litigation
15  before in any other lawsuits?
16  A.   Yes, I have.
17  Q.   And what lawsuit was that?
18  A.   Divorce.
19  Q.   Other than that divorce proceeding, have you
20  been a party in any other lawsuits?
21  A.   I'm sure that I have, but I can't recall at
22  the moment.
23  Q.   Have you ever been a plaintiff in a lawsuit

12

1   where you have sued somebody else, other than this
2   divorce case?
3   A.   No, I haven't.
4   Q.   Have you ever been sued by anybody else
5   before?
6   A.   Yes, I have.
7   Q.   And can you describe the circumstances of
8   that to me?
9        MR. UNDERWOOD:  Was it over a debt?
10       THE WITNESS:  Yes.
11       MR. UNDERWOOD:  Okay.  Tell him about
12  it.
13  A.   Auto accident.
14  Q.   Okay.  Someone sued you claiming that you
15  injured them in an auto accident?
16  A.   No.  Explain that to me further.
17  Q.   If you'll just tell me generally what the
18  lawsuit was about.  We don't have to get into a
19  lot of specifics.
20  A.   I know, but I'm not quite sure.
21  Q.   Well, if you don't know what the lawsuit was
22  about.  I mean, was it related to an auto
23  accident?

13

1   A.   Yes.
2        MR. UNDERWOOD:  Were you suing them or
3   were they suing you?
4        THE WITNESS:  Well, I'm not sure if
5   they sued me.  I mean, I know my insurance paid.
6        MR. UNDERWOOD:  So you were in an auto
7   accident; it was your fault, and then your
8   insurance paid somebody?
9        THE WITNESS:  Yes.
10       MR. UNDERWOOD:  But you're not sure if
11  you got sued?
12       THE WITNESS:  Right.
13       MR. GOULD:  Okay.  That's fine.
14       MR. UNDERWOOD:  Yeah, that's all it is.
15  And he's got a right to get to that in discovery.
16  (BY MR. GOULD)
17  Q.   Are there any other instances that you can
18  think of that you've been involved in a lawsuit?
19  A.   Not that I can think of.
20  Q.   I mean, there's a difference between an
21  insurance claim and a lawsuit.  If you've ever
22  been sued, you would probably know about it.
23       MR. UNDERWOOD:  Yeah.  The sheriff

ef59dbbf-12da-44f4-9ceb-2877f99dc9c7

14

1  would come to your door with some papers.
2  Q.  Other than meeting with your attorneys to
3  prepare for your deposition today, have you met
4  with anybody to discuss this lawsuit?
5  A.  No.
6  Q.  Have you attended any sort of group meetings
7  where this lawsuit was discussed?  Once again, not
8  meetings with your attorneys.
9  A.  No.
10  Q.  Are you a member of the union?
11  A.  No, I'm not.
12  Q.  And have you ever been a member of the union
13  during your employment at Equity Group?
14  A.  No.
15  Q.  I'm going to ask you some questions about
16  some of the issues that have been raised in this
17  lawsuit.
18      In terms of the position in which you work
19  at Equity, are there any items of clothing or
20  equipment that you have to wear when you are out
21  on the production floor?
22  A.  My PPE that I have to wear are boots,
23  earplugs, hair nets, cloth gloves, rubber gloves,

15

1  arm guards, chain glove, smock, apron.  If I left
2  anything out, it's because I'm nervous.
3  Q.  There's nothing to be nervous about.  Do you
4  wear any plastic sleeves?
5  A.  In my department, no.  In what I do, no.
6  But I can.
7  Q.  When you rotate between positions, is there
8  ever a position where you have to wear the plastic
9  sleeves?
10  A.  Yes.
11  Q.  Now, are you required to wear them or is it
12  just something that you can wear if you want to?
13  A.  In evis, if I want to.
14  Q.  Now, do you work anywhere outside of evis?
15  A.  No.
16  Q.  So you've only worked in evis; is that
17  correct?
18  A.  Yes.
19  Q.  So when you say, "In evis," it's not like
20  you worked somewhere else, right?
21  A.  No.  Like, if I worked in debone.
22  Q.  Okay.  Well, I'm just talking about you.  I
23  know other people wear other things.  So you could

16

1  wear the sleeves if you wanted to, but you're not
2  required to; is that correct?
3  A.  Yes.
4  Q.  And you indicated that you wear boots; is
5  that correct?
6  A.  Yes.
7  Q.  Can you wear the boots from home?
8  A.  Yes, I can.
9  Q.  Do you normally wear the boots from home?
10  A.  No, I don't.
11  Q.  But that's your choice?
12  A.  Yes.
13  Q.  And you could wear them if you wanted to?
14  A.  Yes.
15  Q.  Are there any other items that you
16  identified for me that you can wear from home?
17  A.  No.
18  Q.  Okay.  Now, during the time you've been
19  employed at Equity, have you always been able to
20  wear your boots from home if you wanted?
21  A.  No.
22  Q.  So there was a time when you couldn't wear
23  your boots from home?

17

1  A.  Yes.
2  Q.  Do you remember when that was?
3  A.  No, I'm not quite sure.
4  Q.  When you first started at Equity Group,
5  could you wear your boots from home?
6  A.  No, I couldn't.
7  Q.  So at some point in time, something happened
8  and there was a change made and you were able to
9  wear your boots from home; is that correct?
10  A.  Yes.
11  Q.  But you don't remember when that was?
12  A.  Not quite.
13  Q.  Was it more than a year ago? more than two
14  years ago?
15  A.  (No response.)
16  Q.  You said you've been there for three years,
17  seven months.  Was it shortly after you started?
18  A.  (No response.)
19  Q.  I mean, if you don't know, you don't know.
20  That's okay.
21  A.  I don't know.
22  Q.  Like I said, I don't want you to guess.
23  Ma'am, when you arrive at the plant -- do you

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

18

1   drive yourself to work?
2   A.   Yes.
3   Q.   Is there any sort of security that you have
4   to clear when you get to the plant?
5   A.   No.
6   Q.   Is there a guard house at the entrance?
7   A.   Yes.
8   Q.   And do you have to stop and have your car
9   searched or anything like that?
10  A.   No.
11  Q.   Do you have a sticker on your car?
12  A.   Yes.
13  Q.   And as long as you have that sticker, you
14  can drive through?
15  A.   Yes.
16  Q.   Once you come into the parking lot, is there
17  any other security that you have to go through
18  before you enter the production area?
19  A.   No.
20  Q.   There's no metal detectors or turnstiles or
21  anything like that?
22  A.   No.
23  Q.   When you arrive at the plant and you enter

19

1   the building, what's the first thing you do?
2   A.   I go to my locker.
3   Q.   What do you do there?
4   A.   I take out things that I need for my work
5   area, sit down for a few minutes, and then I clock
6   in. And then I go get my other supplies from the
7   supply room.
8   Q.   Okay.  Now, do you keep any of these items
9   of clothing or equipment in your locker?
10  A.   Yes, I do.
11  Q.   What do you keep in your locker?
12  A.   My boots, my apron, and my arm guard.
13  Q.   Now, do you ever take any of those items
14  home with you to wash them or anything like that?
15  A.   No.
16  Q.   Okay.  Now, you could take those items home
17  with you if you wanted, correct?
18  A.   Yes.
19  Q.   You still couldn't wear them into the plant
20  from home, correct?
21  A.   No.
22  Q.   But you could take them with you?
23  A.   Yes.

20

1   Q.   So after you go to your locker, you said you
2   sit down for a minute or two; is that correct?
3   A.   Yes.
4   Q.   And what do you normally do?  I mean, just
5   having a drink or just sitting down relaxing?
6   A.   Yes.
7   Q.   And then you indicated, I believe, that you
8   would go to the supply room next; is that correct?
9   A.   No.  I clock in, then I go to the supply
10  room.
11  Q.   Okay.  Now, where is your locker located?
12  A.   In debone break room.
13  Q.   And where is the time clock located?
14  A.   Right at the beginning in the break room,
15  right at the door.
16  Q.   So it's located at the entrance to the
17  debone break room?
18  A.   Yes.
19  Q.   So you'll clock in, and then you'll go over
20  to the supply desk to get some items; is that
21  correct?
22  A.   Yes.
23  Q.   What items will you get at the supply desk?

21

1   A.   Cotton liners, rubber gloves, hair net,
2   earplugs, apron.
3   Q.   Okay.  Now, are those things that you will
4   get every day?  Were you getting the apron every
5   day? a new apron every day?
6   A.   No.
7   Q.   What about rubber gloves?  Will you get new
8   rubber gloves every day?
9   A.   I myself prefer new ones every day.
10  Q.   That's not something you're required to do;
11  is that correct?
12  A.   No.
13  Q.   If you wanted to use rubber gloves for three
14  or four days, assuming that they were still in
15  good condition, you could do that; is that
16  correct?
17  A.   For me, I don't prefer that.
18  Q.   So that's your choice to get new gloves
19  every day?
20  A.   Yes.
21  Q.   And do you turn in the old gloves and get
22  new ones?
23  A.   Throw them away.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

22

1  Q.  What about cotton gloves? Do you get new
2  cotton gloves every day?
3  A.  Yes.
4  Q.  Cotton gloves are something that you could
5  reuse if you wanted; is that correct?
6  A.  No.
7  Q.  No? Is it something you are required to get
8  new every day?
9  A.  For me, yes.
10  Q.  Okay.  And you get new earplugs and hair net
11  every day; is that correct?
12  A.  New hair net, not earplugs.
13  Q.  Okay.  So you may use earplugs more than one
14  time?
15  A.  Yes.
16  Q.  More than one day?
17  A.  Yes.
18  Q.  Then after you get those items at the supply
19  desk, what do you do next?
20  A.  I go into evis work area.
21  Q.  So at that stage, are you already wearing
22  your boots?
23  A.  Yes.

23

1  Q.  When do you put your boots on?
2  A.  In the break room.
3  Q.  Do you put them on before you clock in or
4  after?
5  A.  Before I clock in.
6  Q.  Do you put on any other items before you
7  clock in?
8  A.  My earplugs.
9  Q.  Okay.  And then you clock in; you go to the
10  supply desk; and then you head into the production
11  area; is that correct?
12  A.  Yes.
13  Q.  What do you do when you're entering the
14  production area?  What's the first thing you do?
15  A.  Well, before I get into the production area,
16  I put on my hair net.  I enter the production
17  area, make sure my boots are clean, and then go to
18  my left to the rack where you hang smocks; put my
19  smock and apron on.
20  Q.  So when you walk into the production area,
21  there's metal racks where you can hang your items?
22  A.  Yes.
23  Q.  And you hang your items on those racks?

24

1  A.  Yes.
2  Q.  And then you put on your smock and you put
3  on your apron?
4  A.  Uh-huh.
5  Q.  And do you put your gloves on there?
6  A.  Yes.  My liners and my gloves.
7  Q.  All right.  Now, you don't put your chain
8  glove on there; is that correct?
9  A.  No, I don't.
10  Q.  Are you responsible for maintaining or
11  washing your chain glove?
12  A.  No, I'm not.
13  Q.  Where do you get your chain glove?
14  A.  When I get to my production area.
15  Q.  And there's an area where the gloves are
16  kept; is that correct?
17  A.  Yes.
18  Q.  And what about knives?  You don't have to
19  maintain or sharpen knives, do you?
20  A.  No, I don't.
21  Q.  Same thing with scissors?  You don't have to
22  sharpen or maintain scissors, do you?
23  A.  No, I don't.

25

1  Q.  From the time you walk through the
2  production door from the time that you're finished
3  putting your items of clothing or equipment on,
4  how long does that take you?
5  A.  In the morning?
6  Q.  Yes, ma'am.  I'm talking about at the
7  beginning of your shift.
8  A.  At the beginning of my shift, assuming that
9  I have to be in my work area about five minutes
10  'til, so probably about 10, 12 minutes.
11  Q.  So it takes you 10 to 12 minutes to put on
12  your apron, your smock, your gloves, and that's
13  it, right?
14  A.  Well, it takes me 10 to 12 minutes to put on
15  everything except for my chain glove and get to my
16  work area.
17  Q.  So you're including the time it takes you to
18  walk to your work area in that 10 to 12 minutes?
19  A.  Yes.
20  Q.  How far is your work area?  Where do you
21  normally start in the morning? in the salvage
22  area?
23  A.  Yes.

ef59dbbf-12da-44f4-9ceb-2877f99dc9c7

26

1    Q.   And the salvage area is in what I call the
2    back left corner of evis, if you're walking
3    through the production doors; is that correct?
4    A.   If you're walking through the production
5    doors, you go straight back.
6    Q.   Right.  And the actual entrance is almost in
7    the corner of the evis area; is that right?
8    A.   No.
9    Q.   No?  Okay.
10   A.   The entrance is right there, and you just go
11   straight down to salvage area.
12   Q.   Okay.  And then the evis lines, when you
13   walk in the door, are off to your right; is that
14   correct?
15   A.   Yes.
16   Q.   How far away is it from the front door to
17   the salvage area, approximately?
18   A.   I'm not sure.  I can't say.
19   Q.   Would you say it's -- well, is it less than
20   a mile away?
21   A.   Yes.
22   Q.   All right.  Is it maybe 20 or 30 yards away?
23   A.   How far is 20 or 30 yards?

27

1    Q.   Well, if you're not sure, you're not sure.
2    A.   I'm not sure.
3    Q.   And you normally start your shift in the
4    salvage area; is that correct, the evis salvage
5    area?
6    A.   Well, I normally start my shift when I walk
7    through the double doors to put on my PPE.
8    Q.   That's fine.  I'm not asking you to answer
9    some legal issue; I'm asking about your position
10   in evis, where you start your day.
11   A.   Yes, in salvage.
12   Q.   And in that particular area, you work with a
13   knife; is that correct?
14   A.   A knife, yes.
15   Q.   And do you also work with scissors?
16   A.   Yes, sir.
17   Q.   Are there any other items that you work with
18   back there, any other cutting tools?
19   A.   No.
20   Q.   Now, how long will you work in that
21   particular area?  Do you normally work in that
22   particular area until your first break?
23   A.   Yes.

28

1    Q.   So you won't rotate into a different
2    position in evis before your first break; is that
3    correct?
4    A.   No.
5    Q.   No, that's not correct or no, you won't
6    rotate?
7    A.   No, I won't rotate.
8    Q.   That was a bad question.  That's my fault.
9    So you'll stay in that evis salvage area until
10   your first break.  How do you know when it's time
11   to go on break?
12   A.   My line leader.
13   Q.   So she'll tell you when it's time go on
14   break?
15   A.   Yes.
16   Q.   Does she tell you when you have to be back,
17   or does she just tell you it's time to go on
18   break?
19   A.   She says, "It's time to go on break."
20   Q.   How long is your first break?
21   A.   It's supposed to be 30 minutes.
22   Q.   How many breaks do you get over the course
23   of a day?

29

1    A.   Two.
2    Q.   Are they both the same length?
3    A.   Yes.
4    Q.   So after your supervisor tells you that it's
5    time to go on break, can you describe for me what
6    you do next before you exit the production area?
7    A.   Yes.  I pull my chain glove off and take it
8    to where it's supposed to be.  Then I walk up to
9    the sink, wash my apron and gloves and dry them
10   off.  Then I go over to the rack, take off my
11   apron and my smock, my gloves, and hang them up.
12   Q.   Do you also take off your arm guard?
13   A.   Yes, wash it.  Then I go over to the sink,
14   take off everything, and pretty much take the
15   dirty smock and throw it in the hamper outside.
16   And then I go to break.
17   Q.   So you'll get a new smock after your break,
18   before you return?
19   A.   Yes.
20   Q.   Is that something you're required to do or
21   is that something you do out of your own personal
22   preference?
23   A.   That's something I do.

ef59dbbf-12da-44f4-9ceb-2877f99dc9c7

30

1 Q. You could wear the same smock all day
2 throughout your shift if you wanted; is that
3 correct?
4 A. Yes.
5 Q. Now, approximately how much time does it
6 take you, from the time you leave your position to
7 go on break until the time you exit the production
8 doors?
9 A. I'd say about ten minutes.
10 Q. Now, have you ever actually timed yourself
11 on how long it takes you to do these tasks before
12 going out on break?
13 A. No.
14 Q. So when you tell me ten minutes, you're
15 giving me an estimate of what you think it takes
16 you to do that?
17 A. When I get in the break room and look at the
18 clock, I have about, like, 20 minutes for my
19 break.
20 Q. Will you do anything else before you go to
21 the break room? Do you go to the bathroom
22 sometimes?
23 A. No.

31

1 Q. No? When you get to the break room, what do
2 you normally do?
3 A. Get a bag of chips and a pop.
4 Q. So you'll get something to eat or drink?
5 A. Yes.
6 Q. And do you socialize with other employees?
7 A. Yes.
8 Q. And how do you know when it's time to return
9 to the production floor?
10 A. Clock.
11 Q. So you have an idea of what time it was that
12 you left for break; and by looking at the clock,
13 you estimate what time you have to return to the
14 production floor; is that correct?
15 A. Yes.
16 Q. Can you describe for me what you do when
17 you're leaving the break room to go back to the
18 production area?
19 A. Yes. First, I go to the bathroom. And you
20 have to take off your hair net and everything
21 before you go in. I come out, put my hair net and
22 earplugs back on, go to the supply closet and get
23 a smock; and then I go back into my production

32

1 area, well, back into evis, go to the rack, put on
2 my supplies, and then walk back to the production
3 area. Well, wash first, make sure my apron and
4 gloves and everything are clean, and then I go
5 back to the production area.
6 Q. I thought you said that you washed your
7 apron and gloves before you went on break; is that
8 correct?
9 A. Yes.
10 Q. And you wash them again when you come back
11 from break?
12 A. Yes.
13 Q. Is that something you're required to do?
14 A. I just try to make sure there's not any meat
15 or anything on it.
16 Q. Well, don't you do that before you go out on
17 break?
18 A. Yes.
19 Q. All right. From the time you leave the
20 break room, not including the time you go to the
21 bathroom, how much time do you estimate it takes
22 you to go get your smock and go out to the
23 production floor, get your items back on and get

33

1 to your spot on the production line?
2 A. Probably about ten minutes.
3 Q. Once again, have you ever timed yourself
4 doing that?
5 A. No.
6 Q. And are these events similar to what you'll
7 do with your second break? Before you go out on
8 your second break and then return from your second
9 break, you'll do the same things; is that correct?
10 A. Yes.
11 Q. You don't do anything significantly
12 different?
13 A. Yes.
14 Q. And you estimate that it would take the same
15 amount of time to do those things before and after
16 your second break?
17 A. Yes.
18 Q. Now, when you return from your first break,
19 do you go to the same area on the production
20 floor? Do you go back into the evis salvage or do
21 you go to a different position?
22 A. I go back to salvage.
23 Q. Will you stay there for the entire time

ef59dbbf-12da-44f4-9ceb-2877f99dc9c7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

34

1  until your next break?
2  A.   Yes. But we have different positions.
3  Q.   Okay. So you'll have different positions
4  within the salvage area?
5  A.   Yes.
6  Q.   When you start in the salvage area, what job
7  are you normally doing at the beginning of your
8  shift?
9  A.   It depends on what the line leader tells me
10 to do.
11 Q.   Okay. So you could be assigned to a
12 different position on a different day to start
13 your shift?
14 A.   Yes.
15 Q.   And then when you return from your break,
16 you go to a different position but still within
17 that same salvage area?
18 A.   Yes.
19 Q.   Can you describe for me what the different
20 positions are within the salvage area?
21 A.   You have a position where you're using the
22 scissors and you have a position where you're
23 using a knife.

---

35

1  Q.   Okay. Just those two positions?
2  A.   Yes. And when I say rotate to another spot,
3  it's like on the evis, on the line.
4  Q.   Okay. And when will you do that, when you
5  rotate to a spot on the evis line?
6  A.   It depends on the day.
7  Q.   Okay. So some days you'll rotate to a spot
8  on the evis line, but it's not always the same
9  spot; is that what you're saying?
10 A.   I mean, it's the same spot, but just
11 different days.
12 Q.   All right. So do you go to the same spot on
13 the evis line every day? If I'm -- if I recall
14 the evis line properly, there's a spot where you
15 have someone who is rehanging chickens, and then
16 they go down the line; and then there's different
17 tables or stations along the evis line. There may
18 be four or five different table stations, along
19 the evis line. And then there's a couple spots in
20 between where the birds are rehung and the tables
21 are. Does that seem pretty accurate?
22 A.   Well, not where I go. I cut the wings.
23 Q.   Okay. And is that the position that you

---

36

1  will go to when you rotate after your second
2  break?
3  A.   It's either -- yes.
4  Q.   And that's the same position that you
5  normally go to every day?
6     I'm just trying to get an understanding as
7  to whether you go to a particular position on the
8  evis line that you go to as part of your rotation,
9  or you could go to any position on the evis line.
10 A.   It's that position.
11 Q.   Okay. And then do you go from that position
12 -- is that where your shift ends? or do you go
13 back to the salvage area?
14 A.   It depends on when I rotate to that. If I
15 rotate in the morning or after lunch.
16 Q.   Okay. So you may not always rotate to that
17 particular position after your second break; you
18 may rotate to that position after your first
19 break?
20 A.   Yes.
21 Q.   Okay. I understand. So you're not
22 necessarily always ending your shift at the same
23 position every day; is that correct?

---

37

1  A.   No, I'm not.
2  Q.   Okay. In each of those positions, do you
3  still wear this same clothing or equipment?
4  A.   Yes.
5  Q.   And you still wear your arm guard and a mesh
6  glove on each of those positions?
7  A.   All of my PPE I'm still wearing.
8  Q.   Okay. Can you describe for me what you do
9  at the end of your shift? How do you know that
10 your shift is over?
11 A.   Usually the line leader lets us know that
12 our shift is over.
13 Q.   Is there -- now, you work on day shift,
14 correct?
15 A.   Yes.
16 Q.   Do you normally have a scheduled end time?
17 A.   Yes.
18 Q.   And what time is that?
19 A.   Three o'clock.
20 Q.   And is there someone who then comes on and
21 replaces you, takes your spot on the evis line at
22 that time?
23 A.   Usually.

---

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

38

1  Q.  Unless they're not there or someone's not
2  showing up?
3  A.  Yes.
4  Q.  Okay.  Then are there times --
5      MR. GOULD:  Well, strike that.
6  Q.  Even when you're working back in the evis
7  salvage area, is that a walk-on/walk-off type of
8  relationship as well?
9  A.  Yes.
10  Q.  So you wait for somebody to come on and
11  relieve you?
12  A.  Yes.
13  Q.  Are there times when you just leave without
14  someone relieving you, where your supervisor would
15  say, "Okay.  End of shift; you can leave"?
16  A.  Yes.
17  Q.  Can you describe for me what it is you do at
18  the end of shift, from the time you leave your
19  position until the time you leave the production
20  floor?
21  A.  Yes.  I take off my chain glove; I walk up
22  to the sink, wash my apron, wash my gloves --
23  well, throw away my gloves.

39

1  Q.  Well, do you wash them or throw them away?
2  A.  I throw them away.
3  Q.  Okay.
4  A.  I take off my apron, fold it, wash my arm
5  guard; I take off my smock, and head out.
6  Q.  All right.  And approximately how long do
7  you think it takes you to do all of that?
8  A.  Probably about 10 minutes.
9  Q.  And then what do you do once you leave the
10  production area?
11  A.  I put my smock in the bin, and I go to the
12  debone break room and go to my locker, take off my
13  boots and retrieve my stuff out of my locker, put
14  my boots in, put my arm guard and apron in, and
15  then I'm pretty much ready to clock out.
16  Q.  Sometimes will you wait around and have
17  something to eat?
18  A.  No.
19  Q.  So when your shift is over, you're ready to
20  leave?
21  A.  Yes.
22  Q.  I understand.  Now, have you ever raised a
23  complaint with your supervisor or payroll or

40

1  someone in management about the fact that you
2  don't believe you're being paid for all the time
3  you're working?
4  A.  No.
5  Q.  I think those are all the questions I have
6  for you, ma'am.  Thank you very much.
7  BY MR. UNDERWOOD:
8  Q.  During your times when you're changing in
9  and out of your PPE, have your supervisors ever
10  observed you doing that?
11  A.  Yes, they do.  They're watching.
12  Q.  Okay.  That's all I've got.
13
14      (The deposition was concluded.)
15
16
17
18
19
20
21
22
23

41

C E R T I F I C A T E

STATE OF ALABAMA
BARBOUR COUNTY

        I hereby certify that the above and
foregoing deposition was taken down by me in
stenotype and the questions and answers thereto
were transcribed by means of computer-aided
transcription, and that the foregoing represents
a true and correct transcript of the testimony
given by said witness upon said hearing.
        I further certify that I am neither of
counsel, nor kin to the parties to the action,
nor am I in anywise interested in the result of
said cause.


        CYNTHIA M. NOAKES, Commissioner
        Certified Court Reporter,
        ACCR #327 - Expires 09/30/2008

        Commission Expires 07/08/2009

**TAB 24**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


BETTY ANN BURKS, et al.,

    Plaintiffs,


vs.  CIVIL ACTION 2:06-cv-01081-MEF-DRB


EQUITY GROUP EUFAULA DIVISION, LLC,

    Defendant.


       *   *   *   *   *   *

    DEPOSITION OF DERINDA JOHNSON,

taken pursuant to notice and

stipulation on behalf of the Defendant,

at Williams, Pothoff, Williams & Smith,

125 South Orange Avenue, Eufaula,

Alabama, before Bridgette Mitchell,

Shorthand Reporter and Notary Public in

and for the State of Alabama at Large,

on May 21, 2008, commencing at

5:10 p.m.

295b597e-6466-4241-b819-9297c880324c

**2**

APPEARANCES

FOR THE PLAINTIFFS:
Carl E. Underwood, III, Esquire
COCHRAN, CHERRY, GIVENS & SMITH
163 W. Main Street
Dothan, Alabama 36301

Jacob A. Kiser, Esquire
WIGGINS, CHILDS, QUIN & PANTAZIS
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203

FOR THE DEFENDANT:
Gary D. Fry, Esquire
PELINO & LENTZ
One Liberty Place
Thirty-second Floor
Philadelphia, Pennsylvania 19103

**4**

1  It is further stipulated and
2  agreed by and between counsel
3  representing the parties in this case
4  that the filing of the deposition of
5  DERINDA JOHNSON is hereby waived and
6  that said deposition may be introduced
7  at the trial of this case or used in
8  any other manner by either party hereto
9  provided for by the Statute, regardless
10  of the waiving of the filing of same.
11      It is further stipulated and
12  agreed by and between the parties
13  hereto and the witness that the
14  signature of the witness to this
15  deposition is hereby waived.
16
17          INDEX
18
19  EXAMINATION              Page
20  By Mr. Fry....................... 5
21
22
23

**3**

STIPULATIONS

1      It is hereby stipulated and
2  agreed by and between counsel
3  representing the parties that the
4  deposition of DERINDA JOHNSON is taken
5  pursuant to notice and stipulation on
6  behalf of the Defendant; that all
7  formalities with respect to procedural
8  requirements are waived; that said
9  deposition may be taken before
10  Bridgette Mitchell, Shorthand Reporter
11  and Notary Public in and for the State
12  of Alabama at Large, without the
13  formality of a commission; that
14  objections to questions, other than
15  objections as to the form of the
16  questions, need not be made at this
17  time, but may be reserved for a ruling
18  at such time as the deposition may be
19  offered in evidence or used for any
20  other purpose as provided for by the
21  Civil Rules of Procedure for the State
22  of Alabama.

**5**

1      DERINDA JOHNSON, having first
2  been duly sworn or affirmed to speak
3  the truth, the whole truth, and nothing
4  but the truth, testified as follows:
5          EXAMINATION
6  BY MR. FRY:
7  Q. Ms. Johnson?
8  A. Yes.
9  Q. You were in the room when we took the
10    last deposition; correct?
11  A. Yes.
12  Q. And do you recall my instructions and
13    little speech that I made in the
14    beginning?
15  A. Your instructions?
16  Q. What?
17  A. Your instructions?
18  Q. Yeah. Do you want me to say -- shall I
19    do it again?
20  A. No, you don't have to. I can -- I can
21    pick it up.
22  Q. As you may recall, I'm one of the
23    lawyers for the company. And we've

295b597e-6466-4241-b819-9297c880324c

6

1    asked you here to put certain questions
2    to you about a lawsuit that --
3    A. Yes.
4    Q. -- you and some other folks brought.  I
5    represent Equity Group Eufaula.
6    A. Okay.
7    Q. And have you ever been deposed before?
8    A. No.
9    Q. And you saw what happened during the
10   last deposition.  I ask questions and
11   the witness answers and Bridgette takes
12   down everything we say.
13   A. Yes.
14   Q. Okay?
15   A. Uh-huh.
16   Q. All right.  Now we're going.
17   A. Okay.
18   Q. Now, you recall that I would like very
19   much if you and I don't talk over one
20   another and that whatever answers you
21   give be verbal as opposed to a shaking
22   and nodding of the head.
23   A. Yes.

7

1    Q. Okay?
2    A. Okay.
3    Q. All right.  We're good to go.  Are you
4    currently employed?
5    A. No.
6    Q. Okay.  And what's your home address?
7    A. 151 April Street, Union Springs,
8    Alabama.
9    Q. And what's your date of birth?
10   A. November 16, 1977.
11   Q. I assume that at one point in time you
12   worked at Equity?
13   A. Yes.
14   Q. And for what period of time?
15   A. I think January '02 to, like, February
16   '03.
17   Q. January of '02 to February of '03?
18   A. Uh-huh.
19   Q. So during the time you worked there,
20   the plant was owned by CP?
21   A. Yeah.
22   Q. Equity took it over sometime in 2004.
23   So knowing that, you never worked for

8

1    Equity, did you?
2    A. No.
3    Q. And you were last employed by CP in
4    February of '03?
5    A. Yes.
6    Q. What job did you do for CP?
7    A. It varied.  Pack-out, debone.
8    Q. Were you ever a box-room employee?
9    A. Yes.  That was the same as pack-out,
10   but yeah.
11   Q. Pardon?
12   A. Yeah, box room.  All of that.  Yeah.
13   Q. Can you put any time frame in which you
14   worked these various jobs for CP?
15   A. I don't understand.
16   Q. You worked for CP a little over a year?
17   A. Yeah.
18   Q. During that year time, what was the
19   first job you had there?
20   A. The box room.
21   Q. The box room?
22   A. Uh-huh.
23   Q. And how long did you work in the box

9

1    room?
2    A. Till almost the end.  And then if they
3    needed me somewhere else, they'll come
4    get me, like that.  That's how I did
5    it.
6    Q. So is it fair to say that almost all of
7    your time was spent in the box room
8    when you worked for CP?
9    A. Yeah.
10   Q. And for what reason did your employment
11   end at CP?
12   A. Just look for another job.
13   Q. How many days did you work, say, in the
14   debone line?
15   A. It was some weeks.
16   Q. Some weeks?
17   A. Uh-huh.
18   Q. What about pack-out?
19   A. Same.
20   Q. And that was towards the end of the
21   time --
22   A. Yeah.
23   Q. -- you worked there?  What shift did

295b597e-6466-4241-b819-9297c880324c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

10

1    you work?
2    A. Second.  It was eleven to seven.
3    Q. Pardon?
4    A. I think it was eleven to seven.
5    Q. Eleven to seven?
6    A. Uh-huh.  (Witness nods head.)
7    Q. Is that 11 p.m.?
8    A. Yeah.
9    Q. What did you do in the box room?
10   A. Make boxes, send them down the chute.
11   Q. Very good.  And in pack-out, what did
12      you do?
13   A. Bag, bag chicken and weigh it.
14   Q. What?
15   A. Bag chicken, weigh it, box.
16   Q. And then put it in boxes?
17   A. Uh-huh.  (Witness nods head.)
18   Q. And what about debone?
19   A. Cut -- cut wings.
20   Q. Cut wings?
21   A. Uh-huh.
22   Q. How many hours per week did you work?
23   A. Per week?

---

11

1    Q. Yeah.
2    A. Was it forty?  Forty-eight hours;
3       right?
4    Q. I'm asking you.  Did you work eight
5       hours a day?
6    A. Yeah, eight hours a day.
7    Q. And you worked five days a week?
8    A. Right.
9    Q. Monday through Friday?
10   A. Monday through Friday.
11   Q. When you worked at CP, were you a
12      member of the union?
13   A. No.
14   Q. And how did you find out about this
15      lawsuit?
16   A. Just heard it through the TV or someone
17      was talking about it.
18   Q. And what was your -- what is your
19      understanding of the claim that you
20      have brought?
21   A. It was, like, for lost wages off the
22      last three years, if someone had worked
23      the last three years.

---

12

1    Q. What wages do you feel that you weren't
2       paid to which you are entitled?
3    A. The wages, like, from time, like, break
4       time -- well, not on break time.
5       Getting off the line to putting your
6       stuff on and stuff like that.
7    Q. And how did you come to that
8       understanding?
9    A. All I could figure.
10   Q. Sorry?
11   A. It's all I could figure.
12         MR. KISER:  You have to speak
13      up.
14   A. That's all I can -- just from break
15      time, from time I put my stuff on to
16      the time I take it off.
17   Q. Did you come to understand that you
18      might have a claim by talking with
19      other people?  And I'm not interested
20      in what you talked with the lawyers
21      about.
22   A. Well, yeah.  I work.
23   Q. Did you talk with coworkers?

---

13

1    A. No.
2    Q. Did you tell me that you heard from
3       friends about the lawsuit?
4    A. Yeah.
5    Q. And what did they tell you?
6    A. They had a lawsuit.
7    Q. Did they tell you that they had a claim
8       for break time?
9    A. They just told me they had for back
10      wages, wasn't getting -- wasn't getting
11      paid for how much they worked.  They
12      weren't getting the correct amount of
13      money.
14   Q. And when did you find out that the
15      claim related to the break time?
16   A. Well, I just figured it myself.
17   Q. Okay.  Did you review any papers before
18      you came here?
19   A. No.
20   Q. Did you speak with anyone besides the
21      lawyers?
22   A. No.
23   Q. When you worked in pack-out -- strike

---

295b597e-6466-4241-b819-9297c880324c

14

1    that. When you worked in the box room
2    for CP, what items of outer garments,
3    clothing, PPE, whatever anybody wants
4    to call it, what items were -- did you
5    wear every day?
6    A. Nothing but my smock, hair net, boots,
7    and that's it.
8    Q. Smock, hair net and boots? That's all
9    you wore when you --
10   A. That's all I -- yeah.
11   Q. -- were making boxes?
12   A. Uh-huh. (Witness nods head.)
13   Q. And what about when you were doing
14   pack-out, what did you wear?
15   A. All the PPE equipment, all --
16   everything that we were supposed to
17   wear.
18   Q. What's PPE?
19   A. The equipment you're supposed to wear.
20   Q. And what was it? What did you wear?
21   A. Different -- well, smock, the apron,
22   the sleeves, the gloves, hair net,
23   earplugs, boots. All I can . . .

16

1    A. When they needed help doing other
2    things, that's what I had to do.
3    Q. Would you characterize it as a little,
4    small amount of time that you worked in
5    the pack-out?
6    A. About -- probably a month or so.
7    Q. A month?
8    A. Probably about a month or so.
9    Q. A month. And approximately how much
10   time did you spend on the debone line?
11   A. Probably just a couple of weeks.
12   Q. Now, when you worked in the box room
13   for CP, the smock that you wore, the
14   hair net, and the boots, were they
15   provided to you by CP?
16   A. Yes.
17   Q. And could you wear any of those items
18   from home?
19   A. No.
20   Q. Not even the boots?
21   A. Oh, yeah, the boots.
22   Q. Okay. You could wear the boots from
23   home?

15

1    Q. You didn't wear the plastic sleeves,
2    the hard plastic guards, did you?
3    A. No.
4    Q. And what about when you went on the
5    deboning line, what did you wear?
6    A. All of that and the -- the guard and
7    the -- yeah.
8    Q. Yeah what?
9    A. All of that. All of the required.
10   Q. Which of these items in these jobs was
11   it your understanding were -- you were
12   required to wear?
13   A. For whatever was called for that job,
14   that attire, the smock, the apron,
15   whatever the job would require. I had
16   three different jobs, so I had
17   different things.
18   Q. Am I correct that you told me that for
19   that year that you worked at CP, you
20   spent most of your time in the box
21   room?
22   A. Right.
23   Q. And was that a little amount of time?

17

1    A. Yeah.
2    Q. What about your hair net?
3    A. No.
4    Q. Okay. When you worked in pack-out,
5    those items that you described for me
6    that you wore -- the smock, the apron,
7    the sleeves, the gloves -- were they
8    provided by CP?
9    A. Uh-huh.
10   Q. And could you wear the boots from home
11   as well?
12   A. Yes.
13   Q. And the same question for when you --
14   those weeks you worked on the debone
15   line, you got everything that you wore
16   from CP?
17   A. Uh-huh.
18   Q. But you could wear your boots from
19   home?
20   A. Yeah.
21   Q. When you worked in the box room and you
22   wore the smock, the hair net, and the
23   boots, which of those items -- I assume

295b597e-6466-4241-b819-9297c880324c

18

1    the boots you didn't get daily?
2    A. No.
3    Q. Did you get a smock every day?
4    A. Uh-huh. (Witness nods head.)
5    Q. And did you get a hair net every day?
6    A. Yeah.
7    Q. And when you worked pack-out, what
8        items did you get every day?
9    A. The same. Well, everything that I
10       said -- all the equipment, the apron
11       and all.
12   Q. Did you get an apron every day --
13   A. Yeah.
14   Q. -- when you worked pack-out?
15   A. Yeah, every day. Well, no, not every
16       day, because I took it home, you know.
17       Not no apron. Just a smock every day.
18   Q. You got a smock and hair net?
19   A. Probably a hair net, yeah.
20   Q. And gloves every day?
21   A. Yeah.
22   Q. And you got those same items every day
23       when you worked those weeks in debone?

19

1    A. Debone, yeah.
2    Q. Now, when you worked in the box room,
3        you didn't have to use a knife or
4        anything, did you?
5    A. No.
6    Q. Tell me about your day in the box room.
7    A. Just make boxes all day.
8    Q. And what time did you have to report
9        for work? You started -- your shift
10       started at 11 a.m.?
11   A. Uh-uh. 11 p.m.
12   Q. Or 11 p.m. I'm sorry. What time did
13       you report to the plant?
14   A. I probably got there, like, ten minutes
15       before time we go in.
16   Q. Ten minutes?
17   A. Yeah, before time to go.
18   Q. Did you have to clear security when you
19       got there?
20   A. No.
21   Q. And you left your car and you went and
22       picked up your smock and your hair net
23       and you just went right up to the box

20

1    room?
2    A. Right.
3    Q. And started work?
4    A. (Witness nods head.)
5    Q. And how many breaks did you get?
6    A. Two.
7    Q. And how long were the breaks?
8    A. Thirty minutes each.
9    Q. And where did you take your breaks?
10   A. In the break room.
11   Q. Which break room?
12   A. The same as -- the same break room as
13       everyone else.
14   Q. Okay.
15   A. We had the same.
16   Q. There was -- or there is a debone break
17       room. There's --
18   A. The debone break room, yes.
19   Q. Okay. There's an evisceration break
20       room.
21   A. Oh, the debone.
22   Q. You went to the debone?
23   A. Yeah. There's where the boxes was

21

1    made, in the debone area.
2    Q. How did you know when it was time for
3        you to take your break when you worked
4        in the box room?
5    A. My -- my supervisor will tell me --
6        tell us it's time for break.
7    Q. Were you allowed to wear your smock to
8        the break room?
9    A. No.
10   Q. What did you do with it?
11   A. Have to take it off and hang it with
12       everyone else.
13   Q. And where would you hang it?
14   A. In the -- down in the -- down where you
15       hang the -- hang them up at with the
16       debone people.
17   Q. Where was the box room located in
18       relationship to the debone production
19       floor?
20   A. Just upstairs. The debone is all in
21       one room and the debone is -- well, the
22       box room is upstairs from the debone
23       floor.

295b597e-6466-4241-b819-9297c880324c

22

1  Q. So when it was time for you to go on
2     break, you just came down from the
3     second floor?
4  A. Well, let me say this. It's -- okay.
5     It's the pack-out area and debone area
6     on this side. So you walk through the
7     pack-out area to go upstairs to the box
8     room.
9  Q. So when it was time for you to go on
10    break, you came downstairs, walked
11    over, hung up your smock, and went
12    right to the debone break room?
13 A. Yes.
14 Q. You didn't have to wash or anything?
15 A. No.
16 Q. And you didn't have to wait for
17    anything?
18 A. Not then.
19 Q. Okay. And is it fair to say that you
20    got pretty much all of your thirty
21    minutes when you worked in the box room
22    when you went on break?
23 A. Yes.

23

1  Q. And when you came back, you just walked
2     in the debone production floor, picked
3     up your smock, and went up --
4  A. And go up.
5  Q. -- to the second floor?
6  A. Yes.
7  Q. You didn't have to wait or wash or do
8     anything?
9  A. No.
10 Q. When you were working in the box room,
11    you picked up a smock daily --
12 A. Yeah.
13 Q. -- at the supply desk?
14 A. Uh-huh. (Witness nods head.)
15 Q. Did you have to wait in line?
16 A. Yes.
17 Q. How long did you have to wait?
18 A. Probably ten, five -- probably, say,
19    ten.
20 Q. Pardon?
21 A. About ten minutes.
22 Q. Every day?
23 A. Yeah.

24

1  Q. When you worked for a month in
2     pack-out, what time did you usually get
3     to the plant?
4  A. The same.
5  Q. Ten minutes before?
6  A. Yeah.
7  Q. And you went and picked up your smock
8     and hair net?
9  A. Yes.
10 Q. And then what did you do?
11 A. Sat down until time to go in.
12 Q. Pardon?
13 A. I sat down until time to go in.
14 Q. And then you would go in to the
15    production floor and put on your stuff?
16 A. Yes.
17 Q. Once you started putting on your stuff,
18    can you estimate for me how long it
19    took to put it on?
20 A. I'd say, like -- I'd say, like, fifteen
21    minutes.
22 Q. Fifteen minutes?
23 A. Uh-huh.

25

1  Q. When you were working pack-out when you
2     went onto the floor in the morning, did
3     you have to wash off anything?
4  A. Yes.
5  Q. What did you wash off?
6  A. The apron.
7  Q. The apron?
8  A. Gloves.
9  Q. Your shift started at 11 p.m. when you
10    were in the pack-out area; correct?
11 A. Uh-huh.
12 Q. And how many minutes before 11 p.m.
13    would you go onto the debone -- the
14    floor to go to the pack-out area?
15 A. Could you repeat it?
16 Q. Sure. Pack-out is sort of next to the
17    debone area, is it not?
18 A. Yes.
19 Q. You had to be at your position in the
20    pack-out area ready to work at 11 p.m.;
21    correct?
22 A. Uh-huh.
23 Q. And you told me that after you picked

295b597e-6466-4241-b819-9297c880324c

26

1 up your stuff at the supply desk, you
2 would go to the break room and wait
3 until it was time for you to go on the
4 floor; correct?
5 A. Yes.
6 Q. If you had to be at your workstation at
7 eleven o'clock in the evening, what
8 time would you leave the break room to
9 go into the debone area to go to
10 pack-out?
11 A. Five -- probably five minutes.
12 Q. Five minutes?
13 A. Uh-huh.
14 Q. Now, staying with when you worked for
15 the month in pack-out, how did you know
16 it was time to take your break?
17 A. My supervisor would tell me.
18 Q. And tell me what you had to do to get
19 from your area back out to the break
20 room.
21 A. Take off -- take off my supplies. Take
22 off my supplies.
23 Q. Okay. You took off the apron?

27

1 A. Yes. Everything.
2 Q. Before you took it off, did you wash
3 it?
4 A. From pack-out? Yeah, rinse down.
5 Q. You had to rinse down?
6 A. Uh-huh.
7 Q. Did you have to wait to rinse?
8 A. Yes, because there be a line.
9 Q. How long?
10 A. Like, say, ten minutes.
11 Q. You had to wait ten minutes?
12 A. Yeah, because everybody be in line.
13 Q. And then you rinsed and you took off
14 the apron?
15 A. Yes.
16 Q. And you took off the smock?
17 A. Uh-huh.
18 Q. And you took off the sleeves?
19 A. Yes.
20 Q. And then you --
21 A. Gloves.
22 Q. And the gloves?
23 A. Uh-huh.

28

1 Q. And then you walked into the break room
2 and took your break?
3 A. Yes.
4 Q. And your break period was thirty
5 minutes?
6 A. Yes.
7 Q. How much of that thirty minutes did you
8 spend in the break room?
9 A. Probably, like, twenty minutes.
10 Q. Twenty minutes?
11 A. Uh-huh.
12 Q. Now, how did you know when it was time
13 to go back to work in the pack-out
14 area?
15 A. You see everybody else getting up.
16 Q. Saw everybody else get up. Okay. And
17 so you -- what did you have to do to
18 get back on the line?
19 A. Put my stuff back on.
20 Q. Did you have to wash it again?
21 A. Rinse it again and get back on the
22 line.
23 Q. And how long did that process take you?

29

1 A. Say ten minutes, fifteen.
2 Q. Ten or fifteen minutes from the time
3 you left the break room until you're
4 ready to work?
5 A. Uh-huh. (Witness nods head.)
6 Q. At the end of the -- at the end of the
7 day, the pack-out, did you just repeat
8 what you did when you went on break
9 except you threw your smock in the bin?
10 A. Yeah.
11 Q. But you washed down your --
12 A. Rinse it off.
13 Q. -- apron and the sleeves and you folded
14 them up and took them with you?
15 A. Took them with me.
16 Q. Did you store them in a locker while
17 you were there?
18 A. No.
19 Q. You took them home?
20 A. (Witness nods head.)
21 Q. And how long would it take you from the
22 time the shift ended until you left the
23 plant? How long did it take you to

295b597e-6466-4241-b819-9297c880324c

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

34

1   A. I want to say ten minutes.
2   Q. Ten minutes?
3   A. (Witness nods head.)
4   Q. And at the end of the shift when you
5      worked -- those weeks you worked
6      debone, did you follow the same routine
7      as you did when you were working
8      pack-out in terms of washing down?
9   A. Yes.
10  Q. Getting rid of the smock?
11  A. Yes.
12  Q. Storing your -- or taking your sleeves
13     and your apron home?
14  A. Yes.
15  Q. And when you were on the debone line,
16     approximately how long would it take
17     you to do that process, go through that
18     process?
19  A. Meaning to take it off? Ten minutes.
20     About ten minutes.
21  Q. Do you know how the company kept track
22     of your hours while you were working
23     for CP?

---

36

1   Q. Do you know anybody that did?
2   A. No.
3   Q. Have you made any calculations of the
4      amount of money that you think you are
5      owed in this lawsuit?
6   A. No.
7   Q. During the year that you worked at CP,
8      did you ever work any overtime?
9   A. No.
10  Q. During the time that you worked for CP,
11     did you ever receive any disciplinary
12     notices?
13  A. No.
14  Q. Thank you. That's all I have.
15  A. Okay. Thank you.
16
17     (The deposition of Derinda Johnson
18     concluded at 5:40 p.m. on May 21,
19     2008.)
20
21
22
23

---

35

1   A. Time clock.
2   Q. What time clock?
3   A. In the break room.
4   Q. The time clock you punched?
5   A. Yeah.
6   Q. In all three jobs that you did for CP,
7      did you clock in and clock out with the
8      time -- with a time card every day?
9   A. Yes.
10  Q. And was that time clock located in the
11     break room?
12  A. Uh-huh. Yes.
13  Q. And you thought that's how the company
14     kept track of your hours worked?
15  A. Yes.
16  Q. Did you ever complain to any supervisor
17     about any problems with your paycheck?
18  A. No.
19  Q. When you were working there, did you
20     keep any record, any notes or diary of
21     any kind, in which you recorded the
22     number of hours you were working?
23  A. No.

---

37

*  *  *  *  *  *  *  *  *  *
2      REPORTER'S CERTIFICATE
3   *  *  *  *  *  *  *  *  *  *
4   STATE OF ALABAMA
5   COUNTY OF MONTGOMERY
6      I do hereby certify that the above
7   and foregoing transcript was taken down
8   by me in stenotype, and the questions
9   and answers thereto were transcribed by
10  means of computer-aided transcription,
11  and that the foregoing represents a
12  true and correct transcript of the
13  testimony given by said witness.
14     I further certify that I am neither
15  of counsel, nor any relation to the
16  parties to the action, nor am I anywise
17  interested in the result of said case.
18
19
20
21     Bridgette W. Mitchell,
       Certified Court Reporter and
22     Commissioner for the State of
       Alabama at Large
23     ACCR No. 231 - Expires 9/30/08
       MY COMMISSION EXPIRES 1/25/2010

---

295b597e-6466-4241-b819-9297c880324c

**TAB   25**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


BETTY ANN BURKS, et al.,

    Plaintiffs,


vs.  CIVIL ACTION 2:06-cv-01081-MEF-DRB


EQUITY GROUP EUFAULA DIVISION, LLC,

    Defendant.


*    *    *    *    *    *

DEPOSITION OF JENNIFER JOHNSON,
taken pursuant to notice and
stipulation on behalf of the Defendant,
at Williams, Pothoff, Williams & Smith,
125 South Orange Avenue, Eufaula,
Alabama, before Bridgette Mitchell,
Shorthand Reporter and Notary Public in
and for the State of Alabama at Large,
on May 21, 2008, commencing at
4:25 p.m.

97188461-e2c0-48d2-bc48-ef59f00b5b58

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

2

1    APPEARANCES
2
3    FOR THE PLAINTIFFS:
4    Carl E. Underwood, III, Esquire
5    COCHRAN, CHERRY, GIVENS & SMITH
6    163 W. Main Street
7    Dothan, Alabama 36301
8
9    Jacob A. Kiser, Esquire
10   WIGGINS, CHILDS, QUINN & PANTAZIS
11   The Kress Building
12   301 Nineteenth Street North
13   Birmingham, Alabama 35203
14
15   FOR THE DEFENDANT:
16   Gary D. Fry, Esquire
17   PELINO & LENTZ
18   One Liberty Place
19   Thirty-second Floor
20   Philadelphia, Pennsylvania 19103
21
22   ALSO PRESENT:
23   Annie Johnson, Derinda Johnson

3

1         STIPULATIONS
2         It is hereby stipulated and
3    agreed by and between counsel
4    representing the parties that the
5    deposition of JENNIFER JOHNSON is taken
6    pursuant to notice and stipulation on
7    behalf of the Defendant; that all
8    formalities with respect to procedural
9    requirements are waived; that said
10   deposition may be taken before
11   Bridgette Mitchell, Shorthand Reporter
12   and Notary Public in and for the State
13   of Alabama at Large, without the
14   formality of a commission; that
15   objections to questions, other than
16   objections as to the form of the
17   questions, need not be made at this
18   time, but may be reserved for a ruling
19   at such time as the deposition may be
20   offered in evidence or used for any
21   other purpose as provided for by the
22   Civil Rules of Procedure for the State
23   of Alabama.

4

1         It is further stipulated and
2    agreed by and between counsel
3    representing the parties in this case
4    that the filing of the deposition of
5    JENNIFER JOHNSON is hereby waived and
6    that said deposition may be introduced
7    at the trial of this case or used in
8    any other manner by either party hereto
9    provided for by the Statute, regardless
10   of the waiving of the filing of same.
11        It is further stipulated and
12   agreed by and between the parties
13   hereto and the witness that the
14   signature of the witness to this
15   deposition is hereby waived.
16
17        INDEX
18
19   EXAMINATION                    Page
20   By Mr. Fry........................ 5
21
22
23

5

1         JENNIFER JOHNSON, having first
2    been duly sworn or affirmed to speak
3    the truth, the whole truth, and nothing
4    but the truth, testified as follows:
5         EXAMINATION
6    BY MR. FRY:
7    Q. Ms. Johnson, you haven't sat in this
8       room, have you, on any of these
9       depositions?
10   A. No, sir.
11   Q. Okay. My name is Gary Fry. I'm one of
12      the lawyers for Equity Group Eufaula.
13      And we have asked you here today to put
14      certain questions to you concerning a
15      lawsuit, which you and some others have
16      brought against the company. Have you
17      ever been deposed before?
18   A. No, sir.
19   Q. Okay. Let me -- I'm sure this has been
20      explained to you by your lawyers, but
21      just let me say a few things to you
22      about the process. I'm going to be
23      asking questions and you'll be

97188461-e2c0-48d2-bc48-ef59f00b5b58

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

**6**

1  providing answers and Bridgette, our
2  court reporter, will be taking down
3  what we say.  If you don't understand
4  one of my questions, it's important for
5  you to let me know that so that I can
6  repeat it or rephrase it in a way which
7  you will understand it.  And if you
8  don't hear one of my questions or any
9  part of it, it's also important that
10  you let me know that so I can repeat it
11  so that whenever you do answer, we all
12  know that you heard and understood the
13  question.  Okay?
14  A. Yes, sir.
15  Q. And the only other instructions that I
16  have are that you verbalize your
17  answers as opposed to shaking or
18  nodding your head.  Okay?
19  A. Yes, sir.
20  Q. And that we don't speak overtop of one
21  another.
22  A. Yes, sir.
23  Q. Try not to anticipate my question and

**7**

1  start to answer it before I'm done, and
2  I'll do my best not to interrupt you
3  while you're talking and so she can
4  take it all down.  Okay?
5  A. Yes, sir.
6  Q. What's your home address?
7  A. 516 North Street, Cuthbert, Georgia.
8  Q. And your date of birth?
9  A. 2/24/63.
10  Q. And are you currently employed?
11  A. Yes.
12  Q. By whom?
13  A. Beaulieu of America.
14  Q. And where is that located?
15  A. It's in Eufaula.
16  Q. Now, I assume that at some point in
17  time you were employed at the Equity
18  plant in Baker Hill?
19  A. Yes, sir.
20  Q. And when were you employed at that
21  plant?
22  A. November '04 to -- through February of
23  '05.

**8**

1  Q. So you were there just for about four
2  months?
3  A. No. I'm sorry. No. I was there a
4  year.
5  Q. A year. So from -- do you think it --
6  A. It was '06. I'm sorry.
7  Q. '06. Okay. No problem. And what was
8  the reason that you left that
9  employment?
10  A. Up mobility.
11  Q. You wanted a better job?
12  A. Better job, yeah.
13  Q. During that year that you -- little
14  over a year that you worked at Equity,
15  what job did you do?
16  A. Well, I was on the debone line.
17  Q. Were you on the debone line the entire
18  time?
19  A. Yes, sir.
20  Q. What shift did you work?
21  A. I worked the first shift.
22  Q. Did you work the first shift the entire
23  time you were working there?

**9**

1  A. Yeah. Yes, sir.
2  Q. What were your hours on the first
3  shift?
4  A. From 7:30 to 4:30.
5  Q. That's 7:30 a.m. to 4:30 p.m.?
6  A. P.m.
7  Q. Is that the only shift you ever worked?
8  A. Yes, sir, when I went back.
9  Q. What did you do on the debone line?
10  A. Well, different parts of the chicken,
11  cut, debone thighs, wings and anything
12  on the debone line.
13  Q. And did you rotate among the positions
14  on --
15  A. Yeah.
16  Q. -- the line?
17  A. Yeah, I rotated three times a day.
18  Q. During the time you were employed at
19  Equity, were you a member of the union?
20  A. No, sir.
21  Q. How did you hear about the lawsuit?
22  A. A friend.
23  Q. And what did the friend tell you about

97188461-e2c0-48d2-bc48-ef59f00b5b58

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

10

1    it?
2    A. She just said that they had a lawsuit
3        against the chicken plant and if I
4        worked there, I need to see about it.
5    Q. Did you do any follow-up investigation
6        as to what the case was about?
7    A. Yeah.  I followed up on it and then I
8        also heard it on the TV.
9    Q. And what is your understanding as to
10       what your claim is in this lawsuit?
11   A. To get paid for the time that I was
12       there.
13   Q. So I take it that you believe that you
14       were there for periods for which you
15       were not paid?
16   A. Yes.
17   Q. And that you did work for which you
18       were not paid; is that correct?
19   A. Yes.
20   Q. What work did you do for which you were
21       not paid?
22   A. Well, the -- the break time, it wasn't
23       long enough.

11

1    Q. Anything else?
2    A. I can't remember.  I mean, I don't
3        recall or remember --
4    Q. Okay.
5    A. -- at this time.
6    Q. Have you ever been involved in any
7        other lawsuits?
8    A. No.  I don't recall.
9    Q. Did you review any documents in
10       preparation for coming here today?
11   A. I don't understand.
12   Q. Did you look at any papers to prepare
13       yourself to come here to be deposed
14       today?
15   A. Oh, no, sir.
16   Q. Did you talk with anyone about coming
17       here today except your lawyers?
18   A. No, sir.
19   Q. Now, can you identify for me what --
20       those articles of clothing that you
21       wore on the debone line when you worked
22       at Equity?
23   A. Yes.  A smock, apron, sleeves, cotton

12

1        gloves, rubber gloves, hair nets,
2        earplugs, boots, and glasses.
3    Q. Goggles?
4    A. Goggles, yes.
5    Q. Anything else?
6    A. No, that's it.
7            MR. KISER:  I don't know if
8        they mentioned it earlier, but we're
9        going to have a standing objection that
10       it's not -- on the definition of
11       whether it's clothing or PPE or how we
12       refer to it.  So that's --
13           MR. FRY::  We can call it
14       anything we want.
15           MR. KISER:  Anything we want.
16           MR. FRY::  Everybody knows what
17       we're talking about.
18   Q. Which of these items, to your
19       understanding, were you required to
20       wear?
21   A. I was required to wear all of them.
22   Q. And who told you that?
23   A. Well, that was in our -- when I got

13

1        hired, that's what I was told and they
2        issued them out to us.
3    Q. Did you go through an orientation
4        meeting when you were hired?
5    A. Yes.
6    Q. And were you given a handbook?
7    A. Yes, I was.
8    Q. From what you were able to observe in
9        the debone loom, did the other
10       employees wear everything that you've
11       just identified?
12   A. Correct.
13   Q. Including the plastic sleeves?
14   A. Yeah, sleeves.  Yeah.
15   Q. Which of these items that you have
16       identified for me were given to you to
17       use by Equity?
18   A. You mean -- all of them was given to us
19       by Equity.
20   Q. And which of these items that you
21       identified for me did you pick up on a
22       daily basis?
23   A. The hair nets.  The cotton gloves or

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

**14**

1    rubber gloves, if you needed them. But
2    that's -- them.
3    Q. What about the smock?
4    A. Oh, yeah, smocks also. I'm sorry.
5    Q. And where did you pick up these items?
6    A. At the supply room.
7    Q. And when did you pick them up?
8    A. As soon as I have -- as soon as I got
9        to work.
10   Q. Did you have to wait in line at the
11       supply --
12   A. Yes.
13   Q. -- room?
14   A. Yes, sir.
15   Q. How long would you have to wait, if you
16       had to guess, estimate? You don't need
17       to guess.
18   A. About --
19           MR. KISER: Yeah, don't guess.
20   A. Fifteen minutes.
21   Q. Is that an average?
22   A. Yes, sir.
23   Q. So you had to wait fifteen minutes

---

**15**

1    every day to pick up the stuff?
2    A. Yes, sir.
3    Q. Which of these items which you have
4        identified for me were you able to wear
5        from home?
6    A. Wear from home?
7    Q. Yes.
8    A. The boots.
9    Q. Just the boots?
10   A. Well, I had to wear the earplugs and
11       the hair net.
12   Q. Could you wear those from home?
13   A. Yeah.
14   Q. The things that you didn't take home,
15       boots and -- the things that you
16       couldn't wear from home, the things
17       that stayed in the plant, where did you
18       put them when you weren't working?
19   A. Well, the smocks, we put them in a bin
20       every day.
21   Q. Okay.
22   A. They had a bin outside where you could
23       put the smocks at the end of the day.

---

**16**

1    Q. What about your apron and the sleeves?
2    A. The apron and the sleeves you could
3        take home, wash them and take them --
4        take them home.
5    Q. Is that what you did?
6    A. Yeah.
7    Q. Did they give you a locker you could
8        have put them in?
9    A. Yeah, but -- yeah.
10   Q. So you had --
11   A. But I -- I'd rather take mine home and
12       wash them.
13   Q. So you had a choice, keep them there or
14       take them home?
15   A. Yes.
16   Q. When you went to work in the debone
17       floor on the first shift during the
18       time you worked at Equity, where did
19       you put on the smock?
20   A. In the debone area.
21   Q. On the production floor?
22   A. Oh, no. They had a rack. You come in
23       the double doors. You go to the right

---

**17**

1    or left. They had a rack.
2    Q. It was in the same room that the line
3        was in?
4    A. It's in the same area, the same room.
5    Q. And is that where you put on the
6        plastic apron?
7    A. Plastic apron, yeah.
8    Q. And the plastic sleeves as well?
9    A. Yes, sir.
10   Q. And is that where you put on your
11       cotton gloves and the liners?
12   A. Yes, sir.
13   Q. Now, when you went into the production
14       floor, before you put these items on,
15       you already had your boots and your
16       hair net and your ear covering in; is
17       that correct?
18   A. Correct.
19   Q. And was it true when you were working
20       there that you were not permitted to
21       wear your smock, your apron, and your
22       sleeves outside of the production area?
23   A. Correct.

---

97188461-e2c0-48d2-bc48-ef59f00b5b58

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

18

1    Q. And when did you put these items on?
2    A. When I entered -- when I entered the
3       debone section.
4    Q. And how soon before you actually
5       started cutting the chickens would you
6       put these items on?
7    A. Could you repeat -- I mean, could
8       you -- I don't understand what you
9       said.
10   Q. Okay. You've told us that you put the
11      smock and the apron and the sleeves on
12      in the debone area; correct?
13   A. Correct.
14   Q. And you put them on by the racks that
15      are in the debone area; is that
16      correct?
17   A. Correct.
18   Q. And did you put any of this stuff on
19      while you were walking to the line?
20   A. No.
21   Q. Okay. Now, my question is, how soon
22      after you put these items on did you
23      start cutting chickens?

19

1    A. I would say about fifteen minutes
2       later.
3    Q. Fifteen minutes later?
4    A. Yeah.
5    Q. And what would you do during that
6       fifteen-minute time?
7    A. I would stand on the line. You had to
8       wait for every -- other people to get
9       to the line.
10   Q. So you were standing on the line for
11      fifteen minutes without doing anything?
12   A. Yeah.
13   Q. And you were waiting for other people
14      to get there to their --
15   A. Yeah.
16   Q. -- position -- to their job post. Is
17      that what you're saying?
18   A. Yeah.
19   Q. Were you considered to be an early
20      employee and the others -- were the --
21      were the others considered late?
22   A. No. I wasn't early. I would just, you
23      know, go in, put on this, go stand up.

20

1    Q. Was it your understanding that you were
2       required to stand there for fifteen
3       minutes without doing anything?
4    A. I don't understand.
5    Q. Well, you say you put the -- your smock
6       and everything on in the production
7       room and then you went to the line and
8       you stood there for fifteen minutes
9       without doing anything. Was it your
10      understanding that you were required to
11      do that?
12   A. Well, I don't know.
13   Q. You don't know?
14   A. No.
15   Q. I mean, could you have waited a little
16      longer in going to go into the
17      production room and put the smock and
18      other items on and then go right up to
19      the line and have chickens come down a
20      minute later? Could you have done
21      that?
22   A. Could you repeat the question? I'm
23      sorry.

21

1    Q. I think we can get it better in another
2       way. We'll get back to it. Did you
3       use a knife in your job on the debone
4       line?
5    A. Sometimes, yeah.
6    Q. And you used a knife to cut the
7       chicken; correct?
8    A. Yes.
9    Q. And how did you get the knife when you
10      had to use it?
11   A. The -- it would be on the line when we
12      get there.
13   Q. You wouldn't have to go anywhere to get
14      it?
15   A. No.
16   Q. It would be right there at your
17      workstation?
18   A. Yes.
19   Q. And you weren't responsible for
20      maintaining the knife, were you,
21      sharpening it and that sort of thing?
22   A. No, sir.
23   Q. Besides a knife, did you use any other

97188461-e2c0-48d2-bc48-ef59f00b5b58

22

1    tools?
2    A. Scissors. Scissors.
3    Q. And were the scissors provided to you
4       while you were on the line?
5    A. Yes.
6    Q. I think you told me that your shift
7       started at 7:30 in the morning.
8    A. Yeah.
9    Q. And was it your understanding that you
10      were required to be at your workstation
11      on the line at 7:30?
12   A. Yeah, or before. Yeah.
13   Q. How many minutes before 7:30 did you
14      enter the production area?
15   A. About 7:20, something like that.
16   Q. Seven-twenty?
17   A. Yeah.
18   Q. How many breaks did you get during the
19      day?
20   A. Two.
21   Q. And how long were the breaks?
22   A. It was thirty minutes.
23   Q. How did you know it was time to go on

23

1    break?
2    A. Well, everybody was -- started leaving
3       the line or something -- started
4       leaving the line, so then everybody
5       started leaving the line and would go
6       out.
7    Q. So you knew it was time for your break
8       when everybody else started to leave?
9    A. Yeah, when they started leaving the
10      line and then it was coming down to me,
11      everybody would leave, go out.
12   Q. Am I correct that you were not
13      permitted to leave until the last bird
14      passed your station?
15   A. Correct.
16   Q. So if you were at the beginning of the
17      line, you were permitted to go on break
18      before the people at the end of the
19      line; is that correct?
20   A. Correct.
21   Q. And when you came back from the break,
22      did it happen the reverse way, that if
23      you were at the beginning of the line

24

1    you had to be there first?
2    A. Yes.
3    Q. And the people that were at the end of
4       the line, they could come back a little
5       later? Did that happen?
6    A. No.
7    Q. Everybody came back at once?
8    A. Yeah.
9    Q. Is that what your testimony is?
10   A. (Witness nods head.)
11   Q. You have to --
12   A. Oh, I'm sorry. Yeah, everybody was
13      there.
14   Q. What time did you usually arrive on the
15      property of the company? What time did
16      you drive in? Did you drive to work?
17   A. Yes.
18   Q. And what time did you usually try to
19      get there?
20   A. I usually get there about -- about
21      seven.
22   Q. Seven?
23   A. Yes.

25

1    Q. Did you have to clear any security to
2       get into the building?
3    A. No, sir.
4    Q. Tell me what you did from the time you
5       got out of your car until you got to
6       your workstation.
7    A. Well, get all my stuff out of the car,
8       go in the break room, go to the locker,
9       get all the stuff out of there, go up
10      to the -- what do you call it? -- the
11      supply room and get my supplies, go
12      back to the break room and get my other
13      stuff.
14   Q. What stuff did you get out of your
15      locker?
16   A. My -- my boots. If I didn't take them
17      home, I'll get my boots out and put my
18      bag in -- in the -- in the break -- in
19      the locker and go and get my -- the
20      stuff for what I needed to go on the
21      line.
22   Q. And then what did you do?
23   A. Then after I get my stuff from the

26

1  line, I'll go back to the break room
2  and try to find me something to eat
3  before I go on the line.  Then go on
4  the line -- after I eat, I go on the
5  line -- get ready to go on the line, go
6  in -- go inside the production area so
7  I can get ready to get on the line.
8  Q. So you -- before you went into the
9  production area after you got your
10  supplies, you went to the break room
11  and had something to eat?
12  A. Yeah.
13  Q. And were there other people in there
14  eating?
15  A. Yeah.
16  Q. And talking and doing other things?
17  A. Yes.
18  Q. How much time would you normally have
19  to wait in the break room before you
20  had to go out into the production
21  floor?
22  A. Probably about -- about ten minutes.
23  Q. And what time did you usually try and

27

1  go from the break room into the
2  production floor?
3  A. Well, I tried to get there about twenty
4  after.
5  Q. Twenty after, so 7:20?
6  A. Yes.
7  Q. And then once you got -- went to the
8  production -- or once you got into the
9  department, that's when you put on your
10  smock, your apron --
11  A. Everything.
12  Q. -- and your sleeves?
13  A. Yes.
14  Q. And were you required to perform any
15  washing of anything at the start of the
16  day?
17  A. No.
18  Q. How long do you recall it taking you to
19  walk from the break room into the
20  production room?
21  A. From the break room to the production
22  room?  Shouldn't be no more than
23  about -- about three -- five minutes or

28

1  three minutes to walk from here to the
2  break room.
3  Q. The break room is right across the hall
4  from the production floor; correct?
5  A. Yeah.  It shouldn't take you that long
6  to get --
7  Q. It doesn't take very long, does it?
8  A. Yeah.
9  Q. And to get into the production floor,
10  you had to go through a foot bath?
11  A. Yeah.
12  Q. Once you got into the production floor,
13  how long did it take you to put on your
14  smock and apron and sleeves?
15  A. To put all of it on?
16  Q. Yeah.
17  A. I'd say about fifteen minutes.
18  Q. Fifteen minutes?
19  A. Because you have to -- yeah, about
20  fifteen minutes.
21  Q. Tell me, now, what you had to do when
22  it was time for you to take your break.
23  What did you have to wash and/or take

29

1  off before you were permitted to leave
2  the area?
3  A. Well, wash your -- go over to the sink,
4  wash your -- wash -- you know, you're
5  covered in all this stuff.  You have to
6  just wash it off and clean yourself up
7  before and -- clean yourself up with --
8  clean it off or you just brush it off,
9  you know, make sure it ain't all mushy,
10  and go to the stand and take it all
11  off, start taking it all off after you
12  done washed it all off you.
13  Q. How long did it take you to wash it off
14  and then take the items off?
15  A. About fifteen minutes, I reckon.
16  Q. Fifteen minutes?
17  A. Yeah.
18  Q. And then you could go to the break
19  room?
20  A. Yes.
21  Q. What items did you keep on when you
22  went to the break room?
23  A. The -- the -- your boots, your

30

1 earplugs, and your hair net.
2 Q. From what you were able to observe, did
3   all of the employees in the debone room
4   wash off before they took off their
5   aprons?
6 A. Yeah. Yes, sir.
7 Q. Let's go the reverse way now. What did
8   you have to do when your break time was
9   over to get back on the line?
10 A. Go in, put -- put everything back on,
11   and try to get to the line. You had to
12   put it all back on -- smock, apron,
13   sleeves, gloves, cotton gloves,
14   everything. You had to put it back on,
15   try to get to the line.
16 Q. Did you have to wash it again?
17 A. No.
18 Q. And approximately how much time did it
19   take you to put the stuff back on?
20 A. I'd say about ten minutes.
21 Q. How much time do you recall that you
22   had to spend in the break room?
23 A. About fifteen minutes.

31

1 Q. Now, at the end of the day when you're
2   done, describe for me what you had to
3   do to get out of the plant in terms of
4   cleaning up.
5 A. Washing off. Wash your smocks and
6   stuff off. You would wash the apron
7   off and the sleeves off and the gloves
8   and you go to -- to the rack and take
9   them off. I would fold them up and
10   take them on outside. I'd ball them
11   up -- I'd ball them up and take them on
12   outside and put them in -- throw the
13   smock over in the bin and get the -- my
14   sleeves and apron and take it home with
15   me.
16 Q. How long did that process take you?
17 A. That was about fifteen minutes.
18 Q. Fifteen minutes?
19 A. Uh-huh.
20 Q. What is -- Ms. Johnson, what is your
21   understanding of how the company keeps
22   track of the time which you worked?
23 A. Time clock.

32

1 Q. Pardon?
2 A. A time clock.
3 Q. The time clock?
4 A. Time clock.
5 Q. What was your understanding as to when
6   the time started for which you were to
7   be paid?
8 A. I don't know.
9 Q. And do you have any understanding as to
10   when the time stopped, when you stopped
11   being paid?
12 A. No, I don't.
13 Q. Did you ever complain to any of your
14   supervisors about your pay?
15 A. No.
16 Q. Were you paid every week?
17 A. Yes, sir.
18 Q. And did you -- when you got your check,
19   did you look at the payroll information
20   that was provided on the stub?
21 A. Yes, sir.
22 Q. And did you ever have any reason to
23   think that those paychecks were

33

1 inaccurate?
2 A. I don't know.
3 Q. When you were at Equity, did you keep
4   any kind of diary or notes or other
5   document that showed the amount of time
6   that you believe that you had worked
7   for each day?
8 A. No, sir.
9 Q. Do you know anyone who did?
10 A. No, sir.
11 Q. Have you made any calculations or come
12   up with any numbers as to the amount of
13   money you think you're owed in this
14   case?
15 A. No, sir.
16 Q. During the time that you worked there,
17   were you ever asked or required to work
18   overtime?
19 A. No, sir.
20 Q. You never worked overtime?
21 A. I don't know, sir.
22     MR. KISER: Do you understand
23   what he's asking about overtime? I

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

34

1      mean, as far as the --
2           THE WITNESS: No, sir.
3    Q. Were you ever asked to -- did you work,
4      basically, an eight-hour day? Is it
5      your understanding you were paid --
6    A. Yes.
7    Q. -- for an eight-hour day?
8    A. Yes, sir.
9    Q. Were you ever asked to stay later and
10     work more than eight hours?
11   A. No. Just -- well, just once. Once.
12   Q. Once you were asked to work later
13     because there was more work to do?
14   A. Yes, once.
15   Q. And were you paid overtime for that, if
16     you know?
17   A. Yes, sir.
18   Q. You were?
19   A. Yeah.
20   Q. During the time that you worked at
21     Equity, were you ever written up for
22     any rule infractions?
23   A. Yes, sir.

35

1    Q. And what were you written up for?
2    A. Being late to the line.
3    Q. How many times?
4    A. I think twice. Twice.
5    Q. Anything else?
6    A. That's it.
7    Q. That's all. Thank you.
8
9      (The deposition of Jennifer Johnson
10     concluded at 5:02 p.m. on May 21,
11     2008.)
12
13
14
15
16
17
18
19
20
21
22
23

36

1           * * * * * * * * * *
2        REPORTER'S CERTIFICATE
3           * * * * * * * * * *
4    STATE OF ALABAMA
5    COUNTY OF MONTGOMERY
6      I do hereby certify that the above
7    and foregoing transcript was taken down
8    by me in stenotype, and the questions
9    and answers thereto were transcribed by
10   means of computer-aided transcription,
11   and that the foregoing represents a
12   true and correct transcript of the
13   testimony given by said witness.
14     I further certify that I am neither
15   of counsel, nor any relation to the
16   parties to the action, nor am I anywise
17   interested in the result of said case.
18
19
                    _____
20   Bridgette W. Mitchell,
     Certified Court Reporter and
21   Commissioner for the State of
     Alabama at Large
22   ACCR No. 231 - Expires 9/30/08
     MY COMMISSION EXPIRES 1/25/2010
23

**TAB 26**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


BETTY ANN BURKS, et al.,

    Plaintiffs,


vs.  CIVIL ACTION 2:06-cv-01081-MEF-DRB


EQUITY GROUP EUFAULA DIVISION, LLC,

    Defendant.


\*    \*    \*    \*    \*    \*

    DEPOSITION OF PATRICIA JONES, taken
pursuant to notice and stipulation on
behalf of the Defendant, at Williams,
Pothoff, Williams & Smith, 125 South
Orange Avenue, Eufaula, Alabama, before
Bridgette Mitchell, Shorthand Reporter
and Notary Public in and for the State
of Alabama at Large, on May 21, 2008,
commencing at 6:35 p.m.

2

APPEARANCES

FOR THE PLAINTIFFS:
Jacob A. Kiser, Esquire
WIGGINS, CHILDS, QUINN & PANTAZIS
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203


FOR THE DEFENDANT:
Gary D. Fry, Esquire
PELINO & LENTZ
One Liberty Place
Thirty-second Floor
Philadelphia, Pennsylvania 19103

3

STIPULATIONS
      It is hereby stipulated and
agreed by and between counsel
representing the parties that the
deposition of PATRICIA JONES is taken
pursuant to notice and stipulation on
behalf of the Defendant; that all
formalities with respect to procedural
requirements are waived; that said
deposition may be taken before
Bridgette Mitchell, Shorthand Reporter
and Notary Public in and for the State
of Alabama at Large, without the
formality of a commission; that
objections to questions, other than
objections as to the form of the
questions, need not be made at this
time, but may be reserved for a ruling
at such time as the deposition may be
offered in evidence or used for any
other purpose as provided for by the
Civil Rules of Procedure for the State
of Alabama.

4

      It is further stipulated and
agreed by and between counsel
representing the parties in this case
that the filing of the deposition of
PATRICIA JONES is hereby waived and
that said deposition may be introduced
at the trial of this case or used in
any other manner by either party hereto
provided for by the Statute, regardless
of the waiving of the filing of same.
      It is further stipulated and
agreed by and between the parties
hereto and the witness that the
signature of the witness to this
deposition is hereby waived.

INDEX

EXAMINATION                      Page
By Mr. Fry........................ 5

5

      PATRICIA JONES, having first been
duly sworn or affirmed to speak the
truth, the whole truth, and nothing but
the truth, testified as follows:
      EXAMINATION
BY MR. FRY:
Q. Ms. Jones, my name is Gary Fry. I'm
   one of the lawyers for Equity Group
   Eufaula in connection with a lawsuit
   that you and a bunch of other folks
   have brought against it. And we have
   asked you to come here today to answer
   some questions for us with respect to
   that lawsuit.
A. Okay.
Q. Have you ever been deposed before?
A. No.
Q. Okay. It's pretty simple. I'll ask
   the questions; you'll supply the
   answers; and Bridgette, the court
   reporter, will take down what we both
   say.
A. Okay.

2066f89d-0ef4-4d6c-b80d-12b782fbd3b3

6

1  Q. If you don't understand my question,
2     it's important that you let me know
3     that so I can rephrase it so you will
4     understand it, hopefully.
5  A. Okay.
6  Q. If you don't hear my question or you
7     don't hear a portion of it, let me know
8     and I'll repeat it.
9  A. Okay.
10 Q. If you answer any question, I will
11    assume that you understood and heard
12    and answered appropriately. Any answer
13    that you give must be verbal because --
14 A. Okay.
15 Q. -- she can't take down nods of the
16    head. Okay? And last -- the last rule
17    is that we shouldn't talk over one
18    another --
19 A. Okay.
20 Q. -- because she can only -- she can only
21    take down one of us at a time. Okay?
22 A. Okay.
23 Q. What's your home address?

7

1  A. P.O. Box 1361.
2  Q. What --
3  A. You want the physical address? 311
4     Gambridge Road.
5  Q. What town?
6  A. Eufaula.
7  Q. Eufaula. What's your date of birth?
8  A. July 5, 1961.
9  Q. Are you currently employed?
10 A. Yes.
11 Q. By whom?
12 A. Crowne Healthcare.
13 Q. At one point in time, you worked at the
14    Equity plant in Baker Hill?
15 A. Yes.
16 Q. And what period of time did you work
17    there?
18 A. April 2003 to November 2005.
19 Q. So during that period, you worked for
20    both CP and Equity?
21 A. They was getting ready to change over
22    when I first started.
23 Q. Pardon?

8

1  A. They were getting ready to change over
2     when I first started.
3  Q. When you first started to work out
4     there for CP, what job did you do?
5  A. Bone sampler.
6  Q. And how long did you do that job?
7  A. I'm not quite sure. Maybe -- maybe
8     close to a year.
9  Q. And what did you do after being a bone
10    sampler?
11 A. I was in HACCP.
12 Q. Sorry?
13 A. HACCP. It's part of QC, but it's a
14    HACCP team.
15 Q. Okay. Explain that to me. What did
16    you do?
17 A. We would have to go through and check
18    and make sure that everybody was
19    wearing the proper equipment that --
20    the PPE that we had to wear, the
21    earplugs, gloves, beard net, make sure
22    that everybody had on what they were
23    supposed to, no meat on the floor, you

9

1     know, over-excessive amount of meat on
2     the floor, checked different areas in
3     the plant.
4  Q. So you were a safety inspector?
5  A. Yeah.
6  Q. Is that fair to say?
7  A. I guess.
8  Q. After you -- after you were a bone
9     sampler and you went to work for --
10 A. HACCP.
11 Q. -- HACC --
12 A. HACCP.
13 Q. HACCP, H-A-S-I-P?
14 A. Uh-uh. H-A-C-C-P.
15 Q. H-A-C-C-P. And that's -- do you know
16    what those letters stand for?
17 A. Hazardous control -- I can't remember.
18 Q. Okay.
19 A. I know it, but I can't remember.
20 Q. Let's just call you a safety person.
21    Okay?
22 A. Okay.
23 Q. How long did you work as a safety

2066f89d-0ef4-4d6c-b80d-12b782fbd3b3

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

10

1    person?
2    A. I can't -- I can't remember. It was --
3       maybe I did half and half from the time
4       that I was there.
5    Q. Okay. You were there from April of '03
6       to November of '05. That's about a
7       year and a half?
8    A. Uh-huh. (Witness nods head.)
9    Q. And --
10   A. And -- I'm not -- I'm not sure.
11   Q. When you were working as a HACCP
12      person, on what basis were you paid?
13   A. I don't understand.
14   Q. Well, were you paid on the basis of a
15      time clock or were you paid a flat rate
16      for eight hours?
17   A. Time clock.
18   Q. Time clock. Was it the same kind of
19      arrangement that you were paid when you
20      were a bone sampler?
21   A. Yes.
22   Q. And are those the only two jobs that
23      you worked at the plant?

11

1    A. Yes.
2    Q. What shift did you work?
3    A. First.
4    Q. The whole time?
5    A. Yes.
6    Q. What did you do as a bone sampler?
7    A. We would stand on the line. They
8       had -- like, each line had a little
9       table set up and you have a person on
10      each side and the meat rolls down. You
11      had to catch it and take it out and put
12      it on a pan and pick it up and search
13      it for bones.
14   Q. And what was your rate of pay as a bone
15      sampler?
16   A. When I -- when I started, I think it
17      was, like, six -- six something. It
18      was, like, maybe six ninety-five,
19      something like that. I'm not quite
20      sure. I can't quite remember.
21   Q. What were you making at the end when
22      you were working for HACCP?
23   A. Eight -- eight sixty-five -- eight

12

1    seventy-five. It was eight something,
2    eight sixty-five or eight seventy-five.
3    Q. And for what reason did you leave your
4       employment out at the Equity plant?
5    A. It was so far out and my mom had
6       dementia, so I wanted to be in town so
7       I could get to her quicker.
8    Q. When you were working there, were you a
9       member of the union?
10   A. Well, I joined and they started taking
11      it out of my check, but then they said
12      that bone samplers couldn't be union or
13      part of the union.
14   Q. So were you ever a part of the union
15      there?
16   A. Well, I paid a couple of payments, but
17      they said that we couldn't be part of
18      it, so they stopped taking it.
19   Q. So you never attended any union
20      meetings?
21   A. Yeah.
22   Q. You did attend? How many?
23   A. About three.

13

1    Q. Now, you're a -- when were those union
2       meetings? Do you recall?
3    A. I can't remember. I know -- because we
4       had them at the Comfort Suites, but I
5       can't just remember particular dates.
6    Q. Was it towards the beginning of your
7       employment?
8    A. Beginning.
9    Q. Was it while you were -- CP had the
10      place?
11   A. Uh-uh. (Witness shakes head.)
12   Q. Equity had it?
13   A. Yeah.
14   Q. Now, you're a party to this lawsuit;
15      correct?
16   A. Yes.
17   Q. And how did you find out about the
18      suit?
19   A. A friend of mine sent me a paper with
20      the phone number on it saying that they
21      was taking Equity Group to court.
22   Q. And whose phone number was that? Was
23      that the lawyers?

2066f89d-0ef4-4d6c-b80d-12b782fbd3b3

14

1    A. Uh-huh.  It had Johnny Cochran.
2    Q. And did that paper tell you what the
3       lawsuit was about?
4    A. Uh-huh. (Witness nods head.)
5    Q. And what do you recall the paper
6       saying?
7    A. I can't remember exactly what it was
8       saying.
9    Q. What is your understanding about what
10      this lawsuit is about?
11   A. That wages was -- well, not the wages
12      but the time was unfair, you know, that
13      they wasn't -- to my understanding, it
14      was saying that the time that we
15      worked, we wasn't getting paid for the
16      full time.
17   Q. What's your understanding of the work
18      that you did which you weren't paid
19      for?
20   A. Still being on the line and being
21      clocked out by the master clock, still
22      back working and then the supervisor
23      clocking you out with the master clock.

15

1    Q. So your claim is that after the master
2       timecard was swiped, you were still
3       required to be working on the line?
4    A. If you weren't finished, you were.
5    Q. And is that your claim in this lawsuit?
6    A. Uh-huh. (Witness nods head.)
7    Q. As a bone sampler, you were at the very
8       tail end of the line, weren't you?
9    A. (Witness nods head.) Uh-huh.
10   Q. So you never got to leave until the
11      last chicken came by you; correct?
12   A. Uh-huh. (Witness nods head.)
13   Q. So you were always there on the job
14      when the timecard -- master card was
15      swiped?
16   A. Yeah.
17   Q. And that's your claim?
18   A. Yes, sir.
19   Q. At any of the union meetings, was there
20      any discussion about your problem?
21   A. I can't remember.
22   Q. Do you recall at any of the union
23      meetings that you attended any

16

1       discussion about any wage-and-hour
2       issues?
3    A. Yes.
4    Q. And what do you recall?
5    A. That -- the first one I attended, that
6       they was -- they was complaining about
7       the pay, that, you know -- I'm getting
8       confused.
9    Q. Take your time.
10      MR. KISER:  Take your time.
11   A. Okay.  It was that they were saying
12      that we should have been paid more.
13      This is before the raises came into
14      play.
15   Q. And why were -- other employees were
16      saying they should be paid more?
17   A. Uh-huh.
18   Q. And why did they think they should be
19      paid more?  What was discussed at the
20      union meeting?
21   A. That's been so long ago.  I really
22      can't --
23      MR. KISER:  Don't guess.

17

1    A. I can't remember.
2    Q. But you recall discussions about wages
3       and hours?
4    A. Yeah.
5    Q. Did that occur at just one meeting?
6    A. I only attended three.  I think it was
7       the first one that I went to.
8    Q. And was there any discussion about
9       wage-and-hour problems at any of the
10      other meetings?
11   A. Not that I can recall.
12   Q. Did you review any papers to prepare
13      for your appearance here today?
14   A. No.
15   Q. Did you talk to anybody about your
16      deposition, besides your lawyers?
17   A. No.
18   Q. When you were working as a bone
19      sampler, what items of clothing and
20      equipment did you wear every day on the
21      line?
22   A. Hair net, earplugs, safety glasses,
23      cloth gloves, the outer gloves, the

2066f89d-0ef4-4d6c-b80d-12b782fbd3b3

18

1    sleeves, smock, and apron.
2    Q. So you listed a hair net, earplugs,
3       glasses, gloves, sleeves, a smock, and
4       an apron?
5    A. Uh-huh. And boots.
6    Q. And boots. Which of these items, to
7       your understanding, were you required
8       to wear?
9    A. All of them.
10   Q. All of them?
11   A. (Witness nods head.)
12   Q. When you went to work in the HACCP
13      program, what did you wear?
14   A. Same thing.
15   Q. The same thing?
16   A. (Witness nods head.)
17   Q. You had to wear an apron?
18   A. (Witness nods head.)
19   Q. And sleeves?
20   A. Uh-huh. (Witness nods head.)
21      MR. KISER: Make sure not to
22      nod your head, and say yes or no.
23   Q. As you were able to observe in the

19

1    debone production room, did all the
2    employees wear the identical same items
3    that you identified?
4    A. Yes.
5    Q. There was no variation at all?
6    A. No.
7    Q. Didn't some employees wear plastic arm
8       guards?
9    A. Yeah.
10   Q. And those were the employees that
11      worked with knives?
12   A. Yes, sir.
13   Q. And you didn't work with knives, so you
14      didn't have to wear one?
15   A. No.
16   Q. Can you recall any other variations in
17      the items worn by the employees?
18   A. Not right offhand.
19   Q. Did some employees choose not to wear
20      these plastic sleeves?
21   A. Not many. Not that I can recall.
22   Q. You can't recall any at all?
23   A. (Witness shakes head.)

20

1    Q. Am I correct that each of these items
2       that you have identified were issued to
3       you by the company?
4    A. Only on Mondays.
5    Q. But let's --
6    A. Yes, sir.
7    Q. We'll get to that in a second. But you
8       got all these items from the company?
9    A. Yes, sir.
10   Q. Including the boots?
11   A. Yes, sir.
12   Q. And you got all these things -- whether
13      it was CP or Equity, you got the items
14      that you wore from your employer?
15   A. Yes.
16   Q. And which of these items did you pick
17      up on an everyday basis?
18   A. Hair net.
19   Q. Anything else?
20   A. (Witness shakes head.)
21   Q. What about a smock?
22   A. Yes. Toward the end, yes. Yes, sir.
23   Q. Just towards the end or the whole time?

21

1    A. When I first started, we had to take
2       them home.
3    Q. And when did the change occur?
4    A. In 2005.
5    Q. It was after Equity took over?
6    A. Yes, sir.
7    Q. So after Equity took over, every day
8       you picked up a hair net and a smock;
9       correct?
10   A. No.
11      MR. KISER: Do you understand
12      what he --
13      THE WITNESS: I understand what
14      he's saying.
15   A. But not when they first took over.
16   Q. Okay. At some point after that --
17   A. After they was --
18   Q. -- you started picking up on a daily
19      basis at the supply room a smock and a
20      hair net and anything else?
21   A. That was it.
22   Q. Could you wear any of these things that
23      you wore from home?

2066f89d-0ef4-4d6c-b80d-12b782fbd3b3

22

1 A. No.
2 Q. Except the boots. Could you wear the
3   boots from home?
4 A. Yes.
5 Q. Did you?
6 A. No. I used the shoe covers.
7 Q. Now, when you were working as a bone
8   sampler, when you got to the plant in
9   the morning, where would you put your
10   smock on?
11 A. Inside the debone.
12 Q. And where would you put the plastic
13   apron on?
14 A. Inside debone.
15 Q. The plastic sleeves?
16 A. In debone.
17 Q. The cotton and rubber gloves?
18 A. In debone.
19 Q. And the other items that you wore, your
20   boots and your hair net and your
21   earplugs, do you put them on before you
22   went into debone?
23 A. Yes.

23

1 Q. And when you went to work for HACCP,
2   did you put them on when you went onto
3   the floor?
4 A. Yes.
5 Q. The exact same way?
6 A. Yes.
7 Q. You didn't use a knife?
8 A. No.
9 Q. Do you use any other tools or
10   equipment?
11 A. No.
12 Q. What time did the first shift start?
13 A. Seven-thirty.
14 Q. And what time did it end?
15 A. Four-thirty.
16 Q. And I assume you were required to be on
17   the production line when you were
18   working as a bone sampler at 7:30?
19 A. Yes.
20 Q. When you went to work for HACCP, what
21   time were you required to be in the
22   production line or in the room?
23 A. Same time.

24

1 Q. And when you were doing the HACCP work,
2   am I correct that you toured the
3   facility and looked to make sure that
4   people were wearing the appropriate
5   attire?
6 A. Uh-huh.
7 Q. And looked to see that they were --
8   that there was no excess meat on the
9   floor or slippery spots? Is that the
10   kind of thing you did?
11 A. Yes.
12 Q. And did you have the power to write
13   people up for equipment violations?
14 A. Yes.
15 Q. And did you, on occasion, do that?
16 A. Yes.
17 Q. What sort of equipment violations did
18   you write people up for?
19 A. Mostly it was the beard net and chewing
20   gum. Sometimes they wouldn't have
21   their guard on when they'd be cutting.
22 Q. Did you ever write anyone up for not
23   wearing the plastic sleeves?

25

1 A. No. Most everybody wore those. No.
2 Q. You said "mostly." Were there some
3   people that didn't?
4 A. I can't recall.
5 Q. Did your HACCP shift end at 4:30, too?
6 A. No.
7 Q. When did that end?
8 A. Three, because we had to be there at
9   six with HACCP to inspect.
10 Q. So when you went to work for HACCP,
11   your hours were six to three?
12 A. Six to three.
13 Q. Okay.
14 A. Three or three-thirty, one of them.
15 Q. How many breaks did you get during your
16   shift?
17 A. Two.
18 Q. And did you get two when you worked
19   both jobs?
20 A. Yes.
21 Q. And how long were those breaks?
22 A. Set for thirty minutes.
23 Q. And did you get the full thirty

2066f89d-0ef4-4d6c-b80d-12b782fbd3b3

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

26

1    minutes, generally?
2    A. No.
3    Q. Why not?
4    A. We had to undress.
5    Q. Did you have to undress when you worked
6    both jobs?
7    A. Yes.
8    Q. How much time did you have in the break
9    room?
10   A. About fifteen minutes.
11   Q. When you were a bone sampler, how would
12   you know when it was time to take your
13   break?
14   A. They had clocks in there. And then
15   bone sampler, you can't leave off the
16   line until your meat finish running
17   down. So when you get the last piece
18   of meat, last breast or whatever you
19   got, you know you can go on break.
20   Q. And you were always the last one?
21   A. No, depending on what line I was on.
22   We switched lines. You got one, two,
23   three, four. So we will start at one,

27

1    then we'll be switching probably about
2    every week or every other day or
3    something like that.
4    Q. But whatever line you were on, were you
5    always the bone sampler?
6    A. Uh-huh. (Witness nods head.)
7    Q. So that particular line, were you
8    always the last one to leave?
9    A. It still depends on the line, because
10   one and two might stop first. They
11   might -- their meat probably run out
12   first, then three and four, five and
13   six, and then last two lines, you know,
14   whoever on the last two lines.
15   Q. But in whatever line you were working
16   on, if you --
17   A. I'd be the last one off that line.
18   Q. You would be the last one off of that
19   line. Okay. And how did you know when
20   it was time to go back to work from
21   break?
22   A. The clock. And everybody start going
23   back.

28

1    Q. Because you were the last one to leave
2    your line to go on break, were you
3    permitted some extra time to come back
4    from break because the meat had to
5    start up at the head of the line?
6    A. No.
7    Q. You had to go back along with everybody
8    else?
9    A. Yes.
10   Q. When you worked debone and your shift
11   started at 7:30, what time would you
12   usually arrive at the plant?
13   A. I' probably get there about a quarter
14   till.
15   Q. Pardon?
16   A. A quarter to -- about a quarter till --
17   like fifteen after, fifteen minutes
18   after seven.
19   Q. So you would get there at 7:15?
20   A. Uh-huh. (Witness nods head.)
21   Q. Did you have to pass through security
22   to get into the plant?
23   A. At the guard shack.

29

1    Q. Okay. Did you have a sticker for your
2    car?
3    A. No. I never got the sticker. I
4    always -- we had to have our badge.
5    Q. And you just waved your badge and the
6    guard would let you through?
7    A. Yeah.
8    Q. Is that how it worked?
9    A. (Witness nods head.)
10   Q. And when you left at night, did you
11   have to go through security?
12   A. (Witness shakes head.) Uh-huh.
13   Q. And were you ever searched when you
14   entered the plant?
15   A. No.
16   Q. Were your personal possessions ever
17   searched?
18   A. No.
19   Q. Tell me what you did when you worked
20   debone once you got into the parking
21   lot. Where did you go from there?
22   A. Put my stuff in my locker, probably
23   clock in, go stand in line to wait to

30

1    get whatever I needed for the day.
2    Q. You would stand in line at the
3    supply --
4    A. Uh-huh.
5    Q. -- shed?
6    A. (Witness nods head.)
7    Q. Or whatever you called it?
8    A. At the supply room.
9    Q. Supply room. And how long would the
10   wait be?
11   A. I don't know. It varied.
12   Q. What was the longest you can ever
13   recall waiting there?
14       MR. KISER: Don't guess.
15   A. I can't -- I can't say.
16   Q. And after you picked up your supplies
17   at the supply room, where did you go?
18   A. On the floor.
19   Q. You went directly to the floor?
20   A. (Witness nods head.)
21   Q. Your shift started at 7:30.
22   Approximately what time would you walk
23   onto the floor?

31

1    A. I can't say. Maybe -- okay. We get
2    in -- sometimes maybe five minutes
3    before.
4    Q. And --
5    A. About.
6    Q. Seven twenty-five?
7    A. Something like that, yes.
8    Q. And when you went on the floor, that's
9    the time when you put on your smock and
10   your apron and your sleeves?
11   A. Uh-huh. (Witness nods head.)
12   Q. And then you were ready to work at
13   7:30?
14   A. Yes.
15   Q. So it took you about five minutes to
16   put that stuff on?
17   A. Yeah, five to seven, as long as we was
18   in there.
19   Q. Did you have to do any washing when you
20   went through this process of putting
21   the stuff on? Did you have to rinse it
22   off?
23   A. No.

32

1    Q. Okay. Now, when it came time for your
2    first break, tell me what you did.
3    A. I'd stand on the line until my last
4    sample was done and I go and take off
5    my apron, my smock, my sleeve, my
6    glove, and then I go to break.
7    Q. How long would that process take?
8    A. We had to go wash up, you know, because
9    it'd be greasy. You had to go to the
10   sink and wash your hands, get all the
11   grease off of you, dry them up, and
12   then go. I'd say anywhere from seven
13   to ten minutes.
14   Q. Did everybody wash before leaving to go
15   on break?
16   A. Yes.
17   Q. Tell me what you did now in reverse
18   when it was time to go off your break.
19   A. Go back, go through the sanitizer,
20   sanitize my boots.
21   Q. For your boots?
22   A. Uh-huh. Go back to the spot that I
23   hung my stuff and I get the smock, the

33

1    apron, the glove, and a sleeve, put
2    them on, safety glasses, put earplugs
3    back in.
4    Q. How long would that process take you?
5    A. About seven -- seven minutes or more.
6    Q. How much time did you spend in the
7    break room on your break?
8    A. Maybe, about, ten minutes, about
9    five -- five minutes before I go head
10   back to the -- to the room, because
11   everybody be in there and you might not
12   can get up to get your stuff. So you
13   probably be in the line to get back up
14   to the rack to get your protective
15   gear.
16   Q. Let me ask it this way. How much time
17   did you actually have in the break room
18   on your break? You were supposed to
19   get thirty minutes. How much do you
20   recall spending?
21   A. Maybe fifteen.
22   Q. Fifteen. Okay. Now, at the end of
23   your shift, tell me what you did.

2066f89d-0ef4-4d6c-b80d-12b782fbd3b3

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

34

1   A. Waited for my sample to end, take
2       off -- go take my stuff off, wash it up
3       so it wouldn't be greasy, because I
4       used the glove.  Take my smock off, my
5       apron, my sleeves, and my gloves.
6   Q. And what would you do with all that
7       stuff?
8   A. We -- toward the end, we was putting
9       the apron in a -- in a hamper so they
10      could wash it.  And the other stuff, I
11      would -- if I was going to use it
12      again, I would keep it; if I wasn't, I
13      would just throw it away.
14  Q. What would you do with the apron and
15      the sleeves?
16  A. I had to wash them up if I was going to
17      use them the next day if they weren't
18      tore or anything.  I have to wash all
19      the grease off of them and clean them
20      up and dry them so I could use them the
21      next day.
22  Q. And then you would clock out?
23  A. (Witness nods head.)

35

1   Q. And leave?
2   A. Uh-huh.  (Witness nods head.)
3   Q. Now, when you started the HACCP job,
4       your work started at 6 a.m.; correct?
5   A. Yes.
6   Q. And what time would you arrive at the
7       plant?
8   A. About a quarter till.
9   Q. And would you go to the supply room?
10  A. Not right off.
11  Q. What would you do right off?
12  A. I would have to go to the -- to the --
13      out in debone and inspect, you know,
14      because I mostly -- I just had to have
15      the hair net and the smock when I --
16      when I go to do the inspection and make
17      sure it's been sanitized good.  I'll
18      just have to have the coat, the smock,
19      and the hair net.
20  Q. So did you have to pick those items up
21      at supply?
22  A. Well, we would -- toward the end, they
23      would be -- yeah.  Yes, sir.

36

1   Q. The whole time?
2   A. Uh-huh.  (Witness nods head.)
3   Q. And was there a line at a quarter to
4       six in the morning?
5   A. Sometimes.
6   Q. Sometimes.  So you put your smock on
7       and your hair net and you went right
8       out on the floor and started inspecting
9       to see that the sanitation people had
10      done their job properly; is that
11      correct?
12  A. Yes.
13  Q. So you pretty much walked right onto
14      the floor; is that fair to say?
15  A. At -- before the -- just to inspect,
16      yes.
17  Q. Before the what?
18  A. Just to inspect.
19  Q. Okay.  And after you did that, then
20      what did you do?
21  A. After I finished inspecting, I had
22      to -- if we had to write anything up, I
23      would write it up, go back and take off

37

1       my smock and hang it up.  And then I go
2       get my stuff ready to start out on the
3       floor for the day.
4   Q. And is it your understanding you were
5       paid for all these activities you just
6       described for me?
7   A. Well, it -- we had to go -- I don't
8       know if she had clocked us in or not,
9       but we clocked ourself in.  But she
10      didn't clock us in until a certain
11      time.
12  Q. Well, the activities that you've been
13      describing for me that you performed
14      when you first got to the plant in the
15      HACCP job, you told me that you put
16      your smock and your hair net on and you
17      went out onto the floor because that's
18      all you needed and you inspected the
19      production floor to make sure that the
20      sanitation people had done their job
21      properly; correct?
22  A. Uh-huh.  (Witness nods head.)
23  Q. Were you paid for that time?

2066f89d-0ef4-4d6c-b80d-12b782fbd3b3

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

38

1   A. I don't know, because we had to be out
2     there before six. We had to be out
3     before six and she didn't clock us in
4     until six.
5   Q. Were you inspecting the floor before
6     six?
7   A. We had to be on the floor at six.
8   Q. Okay. And that's when you started
9     inspecting the floor?
10   A. Uh-huh. (Witness nods head.)
11   Q. And my question is, do you know whether
12     you were paid for that time?
13   A. I don't know.
14   Q. Okay. And after you inspected the
15     floor, you had to do some paperwork?
16   A. Yes.
17   Q. Were you paid for that time?
18   A. Yeah, we were being paid during that
19     time, I know.
20   Q. Are any of those activities that you
21     just described for me, inspecting the
22     floor or the paperwork, those things
23     that you did in HACCP before actual

39

1     production started, are you making any
2     claim for unpaid wages for those
3     activities in this case?
4   A. I don't know.
5   Q. You don't know?
6   A. (Witness shakes head.)
7   Q. So when you're working the HACCP job,
8     at some point, as I understand it, you
9     are required to, in addition to the
10     smock which you already have on, you
11     are required to put on your apron and
12     sleeves?
13   A. Only -- only if I was on the evis side,
14     not on the debone side.
15   Q. Okay. So when you were working on the
16     debone side for HACCP from six to
17     three, is the only thing you were
18     required to wear was the smock and the
19     hair net?
20   A. Well, I would put the gloves on.
21   Q. And the gloves?
22   A. Uh-huh.
23   Q. Those were the only things you were

40

1     required to wear?
2   A. Uh-huh. (Witness nods head.)
3   Q. And were you required to wear the
4     gloves or did you just wear them
5     because it was cold in there?
6   A. It was -- it was cold and then certain
7     things you couldn't touch without the
8     gloves on.
9   Q. Now, when you were working the HACCP
10     job and you went over to the evis side,
11     did you have to put on additional --
12   A. We had to put everything on on that
13     side.
14   Q. And did that occur sometime during the
15     work day between six and three?
16   A. Yes.
17   Q. And you were on the clock when you put
18     that stuff on?
19   A. Yes.
20   Q. You were paid for donning that stuff;
21     correct?
22   A. Well, no. I didn't have to -- I would
23     do one side a day. Either I was

41

1     working on debone or either I was
2     working on evis.
3   Q. So you didn't split sides?
4   A. No.
5   Q. Okay.
6   A. Unless, you know, it was a problem that
7     came up.
8   Q. So when you were working HACCP and you
9     were due to do the evis side, you would
10     still come at 6 a.m.?
11   A. Uh-huh. (Witness nods head.)
12   Q. And would you still go out and -- in
13     your smock only and inspect the
14     sanitation job?
15   A. Some days, yes.
16   Q. And then at some -- and then you would
17     do some paperwork?
18   A. Yes.
19   Q. And at some point after that, you put
20     on the apron and the sleeves?
21   A. Uh-huh. (Witness nods head.)
22   Q. Now, the inspections that you did on
23     the evis floor and the paperwork, were

2066f89d-0ef4-4d6c-b80d-12b782fbd3b3

42

1    you paid for that?
2    A. Yes.
3    Q. You were paid for that?
4    A. Wait. The paperwork on the evis side?
5    Q. Yes.
6    A. Yes.
7    Q. So that's not part of this claim?
8    A. No. Evis, you only -- the evis side,
9       you -- I don't know. I'm getting
10      confused.
11         MR. KISER: Make sure you
12      understand the question before you --
13   A. I don't quite understand.
14         MR. KISER: If you don't, he'll
15      be more than happy to --
16         THE WITNESS: Okay.
17   Q. Just tell me if you don't understand my
18      question.
19   A. I didn't quite understand.
20   Q. Okay. When you showed up at the plant
21      at a quarter to six on those mornings
22      when you knew you were going to be
23      assigned the HACCP job on the

43

1    evisceration side -- okay?
2    A. Uh-huh.
3    Q. -- am I correct that you got your smock
4       and you inspected the sanitation job
5       that was done the night before?
6    A. Uh-huh. I always had to inspect
7       debone, the debone side. I never had
8       to inspect the evis, because they
9       inspected it at five.
10   Q. Okay. So you didn't have to inspect
11      evis?
12   A. I didn't have to inspect the
13      evisceration side, because they started
14      up at six.
15   Q. Okay. So tell me what you did when you
16      knew you were going to work HACCP on
17      the evis side.
18   A. I still had to come in and inspect --
19      inspect debone. I couldn't start on
20      the evisceration side until 7:30.
21   Q. Okay. So when -- at 7:30, when you
22      went to the evis side to start the
23      HACCP work there, that's the point when

44

1    you had to put on the additional outer
2    garments?
3    A. Uh-huh. (Witness nods head.)
4    Q. And were you paid -- were you on the
5       clock at that point in time?
6    A. I was on the clock, because I'm coming
7       from debone.
8    Q. Okay. So that's not part of this case?
9    A. No.
10   Q. Okay. When you were working the HACCP
11      job, how did you know when it was time
12      to go on break?
13   A. Everybody went at the same time.
14   Q. But you didn't have to wait around for
15      any meat to finish or anything, did
16      you?
17   A. No. Only if I was checking on the
18      line.
19   Q. Yeah. Okay. So when you're working
20      HACCP and you're in the debone side,
21      you just have to take off your smock
22      and leave; correct?
23   A. No.

45

1    Q. What do you have to do?
2    A. I -- I would have on everything because
3       I was on this side. I would have to
4       take the birds off the line. You have
5       to take ten birds off the line and
6       inspect.
7    Q. Okay.
8    A. So I would have to put everything on
9       over there.
10   Q. When did you -- okay. This is --
11      you're working the HACCP job now;
12      correct?
13   A. Uh-huh. (Witness nods head.)
14   Q. And when during the day did you put
15      everything on?
16   A. After I finish inspecting for debone to
17      come in, I would come over on the
18      evisceration side and suit up with
19      everything.
20   Q. Okay. And so you would go from your
21      first break from the evis side?
22   A. Uh-huh. (Witness nods head.)
23   Q. And did you do that every day?

2066f89d-0ef4-4d6c-b80d-12b782fbd3b3

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

46

1  A. No. It varied. We would have to be in
2    different places.
3  Q. So if you were on the debone side and
4    it was break time, as I understand it,
5    all you had on was a smock?
6  A. A smock and gloves.
7  Q. And gloves. Okay. And so you just
8    took those off and went?
9  A. Yes.
10  Q. And how long did that take?
11  A. That --
12  Q. Didn't take very long, did it?
13  A. Uh-uh. (Witness shakes head.)
14  Q. And coming back, you just had to put it
15    on?
16  A. Uh-huh, I just had to put it on.
17  Q. And could you put your smock on and
18    take it off while you were walking?
19  A. Yes.
20  Q. Now, if you went on break when you were
21    in the evis side doing the HACCP job,
22    you had to wash the extra things you
23    had on and hang them up and you had to

47

1    put them back on when you came back;
2    correct?
3  A. Yes.
4  Q. Okay. At the end of the day when you
5    were working the HACCP job, what did
6    you do?
7  A. On the evisceration side?
8  Q. Let's start on the debone side. Did
9    sometimes you finish up on the debone
10    side when you were working the HACCP
11    side?
12  A. (Witness nods head.)
13  Q. What did you have to do?
14  A. Just finish up my paperwork.
15  Q. And did you -- and what time would you
16    usually finish that up?
17  A. Probably about -- sometimes ten after,
18    fifteen after. Sometimes ten after,
19    ten minutes or fifteen minutes after
20    the time.
21  Q. After three?
22  A. Uh-huh.
23  Q. And were you paid for doing that

48

1    paperwork?
2  A. I -- I don't know.
3  Q. And is that part of your claim in this
4    case?
5  A. I can't say that, because I'm not sure
6    whether we was being clocked out with
7    the master card in HACCP like we was in
8    debone. I'm not sure.
9  Q. Okay. That was my next question, I
10    think. When you were working HACCP,
11    you don't know whether you were being
12    paid on the basis of line time, master
13    card, do you?
14  A. No, I don't know that.
15  Q. Did you ever ask?
16  A. No.
17  Q. But you knew when you were working
18    debone as a bone sampler that you were
19    being paid on the basis of the master
20    card?
21  A. Yes.
22  Q. And you don't know whether that carried
23    over into HACCP?

49

1  A. No, I don't.
2  Q. Did you ever have occasion to complain
3    to anybody at payroll or one of your
4    supervisors about any of your
5    paychecks?
6  A. The supervisor.
7  Q. Okay. And what was the nature of the
8    problem?
9  A. I was asking her why, if we stayed
10    back, that we were getting -- you know,
11    that our time wasn't showing that we
12    was back there longer than just 4:30.
13  Q. Okay. So you were making a complaint
14    because you were still working on the
15    line when they swept the master card at
16    4:30?
17  A. Uh-huh.
18  Q. And that's part of your claim in this
19    case?
20  A. Yes.
21  Q. And is that the only complaint that
22    you've made?
23  A. And to one of the union reps. I can't

2066f89d-0ef4-4d6c-b80d-12b782fbd3b3

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

50

1    remember her name.
2    Q. You complained to the union about the
3       same thing?
4    A. Uh-huh. (Witness nods head.)
5    Q. And when did you make this complaint?
6    A. It was soon after I had started. Had
7       to be in May of '03.
8    Q. Did you keep any record of the actual
9       hours you thought you worked while you
10      were there at that plant?
11   A. No.
12   Q. You never kept any diary or any --
13   A. No.
14   Q. -- notes as to your hours?
15   A. No.
16   Q. Do you know of anybody that did?
17   A. No.
18   Q. Have you made any calculations with
19      respect to the amount of money you
20      think you are owed in this lawsuit?
21   A. No.
22   Q. When you were working as a bone
23      sampler, were you ever asked or

---

51

1    required to work overtime?
2    A. Only on Saturdays.
3    Q. Just Saturdays?
4    A. (Witness nods head.)
5    Q. And when you worked overtime, were you
6       paid time and a half?
7    A. Yes.
8    Q. Were you ever asked to work overtime
9       when you worked the HACCP job?
10   A. Saturdays.
11   Q. And were you paid overtime for that?
12   A. Yes.
13   Q. You never had any problem or any
14      complaints about how your overtime pay
15      was computed?
16   A. No.
17   Q. Did you file -- ever file a formal
18      grievance with the union with respect
19      to any pay issue?
20   A. No.
21   Q. While you were working there, were you
22      ever disciplined for anything?
23   A. Yeah. For not being on the line on

---

52

1    time.
2    Q. And how many times were you disciplined
3       for that?
4    A. Maybe once or twice.
5    Q. And that once or twice when you were
6       there, what was the circumstances?
7    A. Trying to get in the bathroom.
8    Q. Okay. But, I mean, was -- had the
9       product reached your workstation and
10      you weren't there?
11   A. I don't think it had. It just -- if
12      you're out past the -- the time, she'll
13      say -- you know, she'll tell you you
14      need to get back in the room because
15      the meat's going to start up.
16       MR. FRY: Okay. No further
17   questions.
18
19   (The deposition of Patricia Jones
20   concluded at 7:25 p.m. on May 21,
21   2008.)
22
23

---

53

1          * * * * * * * * * *
2          REPORTER'S CERTIFICATE
3          * * * * * * * * * *
4    STATE OF ALABAMA
5    COUNTY OF MONTGOMERY
6       I do hereby certify that the above
7    and foregoing transcript was taken down
8    by me in stenotype, and the questions
9    and answers thereto were transcribed by
10   means of computer-aided transcription,
11   and that the foregoing represents a
12   true and correct transcript of the
13   testimony given by said witness.
14      I further certify that I am neither
15   of counsel, nor any relation to the
16   parties to the action, nor am I anywise
17   interested in the result of said case.
18
19
20
21   _____
     Bridgette W. Mitchell,
     Certified Court Reporter and
22   Commissioner for the State of
     Alabama at Large
23   ACCR No. 231 - Expires 9/30/08
     MY COMMISSION EXPIRES 1/25/2010

---

2066f89d-0ef4-4d6c-b80d-12b782fbd3b3

**TAB  27**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06-CV-1081-MEF


BETTY ANN BURKS,

et al.,

        Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

        Defendant.



BEFORE:

        Cynthia M. Noakes, Commissioner

        and Certified Court Reporter


        DEPOSITION TESTIMONY OF

        ARLEEN KENNEDY


        ****************************

386ca63d-5494-44c1-953b-f62cfea1de03

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

**2**

1      S T I P U L A T I O N

2

3          IT IS STIPULATED AND AGREED by and

4   between the parties through their respective

5   counsel, that the deposition of ARLEEN KENNEDY

6   may be taken before Cynthia M. Noakes, Court

7   Reporter, at the Law Offices of WILLIAMS,

8   POTTHOFF, WILLIAMS & SMITH, 125 South Orange

9   Avenue, Eufaula, Alabama 36027, on the 21st day

10  of May, 2008.

11         IT IS FURTHER STIPULATED AND AGREED

12  that the signature to and the reading of the

13  deposition by the witness is waived, the

14  deposition to have the same force and effect as

15  if full compliance had been had with all laws and

16  rules of Court relating to the taking of

17  depositions.

18         IT IS FURTHER STIPULATED AND AGREED

19  that it shall not be necessary for any objections

20  to be made by counsel to any questions except as

21  to the form or leading questions, and that

22  counsel for the parties may make objections and

23  assign grounds at the time of the trial, or at

---

**3**

1   the time said deposition is offered in evidence,

2   or prior thereto.

3          IT IS FURTHER STIPULATED AND AGREED

4   that the notice of filing of the deposition by

5   the Court Reporter is waived.

6

7

8

9

10

11

12

13

14

15

16

17  *****************************************

18

19

20

21

22

23

---

**4**

1              INDEX

2   EXAMINATION BY:              PAGE NUMBER:

3   MR. GOULD                    6-46

4   MR. CAMP                     46-52

5

6   EXHIBITS:

7   Defendant's Exhibit No. 1         41

8   (Four-page Declaration)

9   Reporter's Certificate            53

10

11

12

13

14

15

16

17

18

19

20  *****************************************

21

22

23

---

**5**

1              APPEARANCES

2

3   ON BEHALF OF THE PLAINTIFFS:

4       MR. ROBERT J. CAMP

5       THE COCHRAN FIRM, P.C.

6       ATTORNEYS AT LAW

7       505 North 20th Street

8       Suite 825

9       Birmingham, Alabama 35203

10      (205) 244-1115

11

12  ON BEHALF OF THE DEFENDANT:

13      MR. MALCOLM S. GOULD

14      PELINO & LENTZ

15      ATTORNEYS AT LAW

16      One Liberty Place

17      Thirty-Second Floor

18      1650 Market Street

19      Philadelphia, Pennsylvania 19103

20      (215) 665-1540

21

22

23  *****************************************

---

386ca63d-5494-44c1-953b-f62cfea1de03

6

1
2          I, CYNTHIA M. NOAKES, a Certified
3    Court Reporter of Eufaula, Alabama, acting as
4    Commissioner, certify that on this date, as
5    provided by the Alabama Rules of Civil Procedure
6    and the foregoing stipulation of counsel, there
7    came before me at the Law Offices of WILLIAMS,
8    POTTHOFF, WILLIAMS & SMITH, 125 South Orange
9    Avenue, Eufaula, Alabama 36027, beginning at
10   6 p.m., ARLEEN KENNEDY, witness in the above
11   cause, for oral examination, whereupon the
12   following proceedings were had:
13
14          ARLEEN KENNEDY,
15     being first duly sworn, was examined and
16          testified as follows:
17
18          THE COURT REPORTER:  Usual
19   stipulations?
20          MR. CAMP:  Yes.
21          MR. GOULD:  Yes.
22
23          EXAMINATION

7

1    BY MR. GOULD:
2    Q.   Good afternoon, Ms. Kennedy.  My name is
3    Malcolm Gould.  I'm an attorney with the law firm
4    of Pelino & Lentz in Philadelphia.  I represent
5    Equity Group Eufaula Division, LLC, in a lawsuit
6    filed in the Middle District of Alabama in Federal
7    Court.  You are a plaintiff in that lawsuit.  I'm
8    here to take your deposition today.
9          As you can see, we have a court reporter
10   here.  I'm going to give you a few ground rules
11   that will help her take down my questions and your
12   answers.
13         First, I would ask that you keep all of your
14   answers verbal.  Say a yes or no instead of a nod
15   of the head or a shake of the head, or instead of
16   a huh-uh or an uh-huh or something like that.
17         I would ask that you wait until I finish my
18   question before you give your answer.  It will
19   make it easier for her to take it down if we're
20   not talking over each other.  It will also allow
21   you to hear my whole question before you give your
22   answer.
23         Now if I ask a question and you don't

8

1    understand what I'm asking, feel free to let me
2    know and I'll try to either repeat the question or
3    ask the question in a different way.  Okay?
4    A.   Yes.
5    Q.   Now, if I ask a question and you don't know
6    the answer, "I don't know" is an acceptable
7    answer.  I'd rather you say "I don't know" or "I
8    don't remember" rather than trying to guess.
9          I don't believe that the deposition will
10   take long, but if you feel that you need to take a
11   break, just let me know and you can certainly take
12   a break.  Okay?
13   A.   Yes.
14   Q.   Now, can you state your full name for the
15   record, please?
16   A.   My name is Arleen Kennedy.
17   Q.   And, Ms. Kennedy, what is your home address?
18   A.   2111 Randolph Avenue, Eufaula, Alabama
19   36027.
20   Q.   Ma'am, are you currently employed?
21   A.   Yes.
22   Q.   Where were you employed?
23   A.   Keystone Equity Group Division.

9

1    Q.   So you work out at the plant out in Baker
2    Hill?
3    A.   Yes.
4    Q.   And how long have you worked there?
5    A.   July will be eight years.
6    Q.   Now, during the time you've been employed,
7    has it always been Equity Group Eufaula Division?
8    A.   No.
9    Q.   So there's a time before that when the plant
10   was owned by a different company; is that correct?
11   A.   Yes.
12   Q.   Do you remember the name of that company?
13   A.   Charoen Pokphand.
14   Q.   I'm just going to call them CP.
15   A.   Yes.
16   Q.   So I don't have to keep repeating that all
17   the time.
18         What is your current position in which you
19   are employed at the plant?
20   A.   Now I do packout.
21   Q.   I'm sorry.  Can you repeat that?
22   A.   Packout.
23   Q.   And how long have you worked in packout?

386ca63d-5494-44c1-953b-f62cfea1de03

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

10

1   A.   About three years.
2   Q.   And where did you work before you worked in
3   packout?
4   A.   Debone.
5   Q.   And did you work on a debone line?
6   A.   Yes.
7   Q.   And how long did you work on the debone
8   line?
9   A.   Over two years.
10  Q.   And in what position did you work before
11  that?
12  A.   I used to be at the cook plant.
13  Q.   Okay.  And how long did you work in the cook
14  plant?
15  A.   About three years.
16  Q.   Well, that adds up to eight, so I think
17  we've got it all covered.
18       Ma'am, are you a member of the union?
19  A.   No.
20  Q.   During the time you've been employed by
21  Equity Group, have you ever been a member of the
22  union?
23  A.   I used to be.

11

1   Q.   When did you stop being a member of the
2   union?
3   A.   It's been over two years ago.
4   Q.   Is there a particular reason why you stopped
5   your membership in the union?
6   A.   I had left and came back.
7   Q.   I'm sorry?
8   A.   One time they closed down; and I came back,
9   started back over again.
10  Q.   Okay.  I understand.
11  A.   I didn't join it back.  Never joined it
12  back.
13       MR. CAMP:  Do you understand?  They had
14  closed down the cook plant.  She was a union
15  member; and when she came back from that, she
16  never reupped.
17       MR. GOULD:  I understand.
18  Q.   So that was like five years ago?
19  A.   Yeah, been like three or four years ago.
20  Q.   So that was before you worked on the debone
21  line and before you worked in packout; is that
22  correct?
23  A.   Yeah.

12

1   Q.   Were you a member of the union when CP owned
2   the plant?
3   A.   Yes.
4   Q.   And were you still a member of the union
5   when Equity Group purchased the plant?
6   A.   I don't think so.
7        MR. CAMP:  You don't have to guess.
8   Q.   Right.  If it was five years ago, then it
9   probably was not.
10  A.   I don't know.  I forgot.
11  Q.   That's fine.  During the time that you were
12  a member of the union, did you ever attend any
13  union meetings?
14  A.   Every now and then I would, sometimes.
15  Q.   During the time you were a member of the
16  union, do you recall who any of the union stewards
17  or representatives were?
18  A.   I never had no problem.  I didn't have to go
19  to them for nothing.  Never had no problem.
20  Q.   I understand.  What is your understanding
21  about what this lawsuit is about?
22  A.   Some.
23  Q.   All right.  Can you describe for me what

13

1   your understanding is?
2   A.   They didn't pay us no money.  We were
3   underpaid.
4   Q.   When you say you were underpaid, you mean
5   you're not being paid a high enough hourly rate or
6   do you mean you're not being paid for the time
7   that you work?
8   A.   Like, work.  We don't get paid for work
9   hours that we're not getting paid.  We don't get
10  40 hours.  We're supposed to get overtime.  We
11  don't get paid right.  Like 7.15.  No one's paying
12  us right, really.  We should be making more money
13  than what we're making.
14  Q.   Just to make sure I understand, you're
15  saying then that part of your problem is that --
16       MR. GOULD:  Strike that.
17  Q.   Are you saying that part of your claim is
18  that the hourly rate is too low?
19  A.   I don't know.
20  Q.   Okay.  I'm just trying to understand exactly
21  what it was that you were explaining there.
22       Is part of your claim that you are not being
23  paid for time that you work?

386ca63d-5494-44c1-953b-f62cfea1de03

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

**14**

1  A.  I don't know.
2  Q.  Can you describe for me how you learned
3  about this lawsuit?
4  A.  I heard about it -- a friend told me.  And I
5  got a piece of paper and I called the firm in
6  Dothan.  And I started attending the meetings and
7  stuff.
8  Q.  So you said a friend gave you the number.
9  Do you know where they got that number?
10  A.  I don't know where she got it from.  She
11  just gave it to me, and I called.
12  Q.  And then you said you started attending
13  meetings?
14  A.  Like, when they would meet up here in
15  Eufaula.  I forgot the name of that place.  I've
16  been there about two or three times signing
17  papers.
18        MR. CAMP:  Yeah.  We're probably
19  getting real close to attorney-client, signing
20  declarations and what not.
21  Q.  When you would attend these meetings, was it
22  just the attorneys and plaintiffs?
23  A.  Yeah.

---

**15**

1  Q.  Do you know whether there were other people
2  who were not plaintiffs in the case who attended
3  those meetings?
4  A.  No.
5  Q.  So these were not solicitation meetings; is
6  that correct?  They weren't meetings:  "Come here
7  and we'll tell you how you can sign up for a
8  lawsuit"?
9  A.  No.
10  Q.  They were meetings for people who were
11  already involved in the lawsuit?
12  A.  Yes.
13  Q.  All right.  That's all I need to know.  Now,
14  other than meetings that you may have had with
15  your attorneys, have you attended any other
16  meetings where this lawsuit had been discussed?
17  A.  No.
18  Q.  Have you attended any other meetings where
19  the issues raised in this lawsuit have been
20  discussed?
21  A.  No.
22  Q.  Other than this friend who gave you the
23  phone number for the lawsuit, have you discussed

---

**16**

1  this lawsuit with anybody else?
2  A.  No.
3  Q.  And other than meeting with your attorneys
4  this morning, have you met with anybody else to
5  discuss your deposition today?
6  A.  No.
7  Q.  And I want to go back and ask you a little
8  bit more about your understanding of the lawsuit,
9  just so I make sure that I don't miss any issues
10  that you may be raising here.
11        Can you describe for me any activities for
12  which you believe you should be paid that you have
13  not been paid?
14  A.  I thought we wasn't getting paid right, I
15  don't think.
16  Q.  Okay.  Can you describe for me how you
17  haven't been getting paid right?
18  A.  To, like, on our break time.
19  Q.  Okay.  Other than issues related to your
20  break time, is there anything else?
21  A.  Just not getting paid right.  Just not
22  getting paid right.  I don't think I'm not getting
23  paid right.  A lot of issues.

---

**17**

1  Q.  Okay.  Well, you've given me one so far,
2  which is an issue relating to break time.
3        Can you give me examples of the other issues
4  that you are raising in this litigation?
5  A.  I think we should make more money than what
6  we do.
7  Q.  All right.  You're talking about --
8  A.  I ain't got nothing to say about that.
9  Q.  So then you're talking about your hourly
10  rate, what you're paid for each hour that you
11  work; is that --
12  A.  Everybody says they're underpaying us, so I
13  can't really say.
14  Q.  Can you think of any other specific examples
15  of things that you believe you should be paid more
16  for?
17  A.  I could think about this, because people
18  been coming in making the same thing I make after
19  90 days.  That's not right.  How can you make the
20  same thing in 90 days?  I been there almost eight
21  years.  You know, it ain't right.
22  Q.  So part of your problem is that after people
23  have finished their probationary period, they are

---

18

1 making the same hourly wage as you are?
2 A.  Yes.  I don't think that's not fair.
3 Q.  With regards to this issue about the hourly
4 rates, have you ever raised this with a supervisor
5 or discussed it with somebody in management?
6 A.  No.
7 Q.  You've just discussed this with other
8 employees; is that correct? or have you not
9 discussed it with anyone?
10 A.  I don't discuss it.
11 Q.  What about this issue about break time?
12 Have you discussed that with your supervisor or
13 someone in management?
14 A.  No.
15 Q.  Have you discussed it with anybody other
16 than your attorney?
17 A.  No.
18 Q.  And when you say that you have issues about
19 break time, can you describe for me exactly what
20 your problem is related to break time?
21 A.  They give you a 30-minute break.  By the
22 time you sanitize and wash down, you've spent
23 about ten minutes of your break taking stuff off.

19

1 You spend most of your time taking stuff off on
2 your break.  You don't have time for lunch.
3 That's what I'm talking about.  I don't have
4 anything else to say about that.
5 Q.  I'm going to ask you some questions about
6 your work in the packout area right now.
7    In terms of your position in packout, are
8 there any items of clothing or equipment that you
9 have to wear when you are out on the production
10 floor?
11 A.  Yeah.  You have to wear hair nets, earplugs,
12 liners, rubber gloves, sleeves, the smock, and you
13 have to wear boots.
14 Q.  Do you have to wear an apron?
15 A.  Over in packout, not the apron.  I work in
16 packout.
17 Q.  So you don't have to wear an apron in
18 packout?
19 A.  No.
20 Q.  You could wear an apron if you wanted to; is
21 that correct?
22 A.  You don't need to.  That's laydown.  I'm in
23 packout.

20

1    MR. CAMP:  Are you in packout at the
2 slaughter plant or at the cook plant?
3    THE WITNESS:  I got transferred.  I'm
4 not in debone no more.
5    MR. GOULD:  You know, that's a good
6 question.  I should have --
7    THE WITNESS:  'Cause, see, I
8 transferred.  I used to be in debone; I'm not in
9 debone anymore.  I transferred to packout.
10 Q.  Okay.  So are you working in packout in the
11 fresh plant or in the cook plant?
12 A.  I'm in the cook plant.  I transferred.
13 Q.  Okay.  So for the past three years, you've
14 been working in the cook plant?
15 A.  Yeah.  Last two years.
16 Q.  All right.
17    MR. GOULD:  Thank you for your help on
18 that.
19 A.  I transferred.
20 Q.  Okay.  I apologize.
21 A.  I ain't been in debone for two or three
22 years.  I transferred.
23 Q.  Okay.  So you work in the cook plant now?

21

1 A.  Now I do.
2 Q.  But prior to that, you worked in debone for
3 a period of time?
4 A.  Yeah, a couple of years.  And then all this
5 stuff changed.
6 Q.  Okay.  Well, then I'm going to stop asking
7 you questions about packout, because I'm only
8 concerned about the positions in which you worked
9 in the fresh plant.
10 A.  Okay.
11 Q.  So then just so I'm clear, when you were
12 talking about your issue with the wage and that
13 someone who works 90 days is getting paid the same
14 as you, did that also apply to the time that you
15 were working in debone, that concern?
16 A.  No.  They didn't start doing that, not too
17 long ago.
18 Q.  Okay.  Now, the issue about that related to
19 having to put on or take stuff on before and after
20 breaks, does that also apply to your time that you
21 were working in debone?
22 A.  Yes.
23 Q.  Now, I believe you told me that when you

386ca63d-5494-44c1-953b-f62cfea1de03

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

22

1    worked in debone, you worked on one of the debone
2    lines; is that correct?
3    A.   Yes.  Line 4.
4    Q.   And you worked on the debone line for
5    approximately three years; is that correct?
6    A.   Yes.
7    Q.   Two and a half to three years?
8    A.   Yes.  I think it was about three I worked
9    over there doing that.
10   Q.   So somewhere between two and three years?
11   A.   Yes.
12   Q.   Now, during the time that you were working
13   on the debone line, did you have items of clothing
14   or equipment that you had to wear when you were
15   out on the production floor?
16   A.   Yes.
17   Q.   And can you list those for me, please?
18   A.   Hair nets, earplugs, sleeves, liners, cotton
19   gloves, chain gloves, and you had to have boots
20   on, and a smock, plastic apron, and you could wear
21   shoe covers.
22   Q.   So when you say shoe covers, is that
23   something you could wear over your shoes?

---

23

1    A.   You could wear tennis shoes and have a shoe
2    cover over it.
3    Q.   It's kind of like a rubber boot that goes
4    over your shoe?
5    A.   Yes.
6    Q.   Now, during the time --
7    A.   And an arm guard.
8    Q.   All right.  That's a hard plastic arm guard?
9    A.   Yes.
10   Q.   Now, during the time that you were working
11   in debone, could you wear your boots from home?
12   A.   They stopped that.  They wouldn't let you
13   wear them outside.
14   Q.   Did that happen while you were working on
15   the debone line?
16   A.   Yes.
17   Q.   During the time that you were working on the
18   debone line, were you able to wear your boots
19   outside?
20   A.   They stopped us from wearing our boots
21   outside.
22        MR. CAMP:  They stopped you from
23   wearing your boots outside?

---

24

1         THE WITNESS:  You couldn't wear them
2    outside.  They stopped us from wearing them
3    outside.
4    Q.   Was there a time, during the time you were
5    working in debone, that you were able to wear your
6    boots outside?
7    A.   At first they did.  They stopped us from
8    wearing them like that.  We couldn't wear them
9    outside.
10   Q.   So when you first started on debone, you
11   could wear your boots outside; and then there was
12   a point in time where you were not allowed to wear
13   your boots outside; is that correct?
14   A.   Yes.  They stopped it.
15   Q.   And then was there a period of time again
16   that you were able to wear your boots outside?
17   A.   I don't know about now, because I'm not over
18   there.  I can just say about when I was over
19   there.  I can't say, because I'm not over there no
20   more.
21   Q.   Now, other questions I'm going to ask you
22   right now are just about debone.  Unless I tell
23   you differently, you can just assume that every

---

25

1    question I ask you is about the debone work.
2    Okay?
3    A.   All right.
4    Q.   When you would show up at the plant, would
5    you drive yourself to work?
6    A.   Yes, I would drive myself.
7    Q.   And did you have to clear any sort of
8    security to enter the plant?
9    A.   Yes.  There was security there every
10   morning.
11   Q.   Was there a guard house on the driveway to
12   the plant?
13   A.   Security in the gate.  Security always on
14   duty 24 hours a day.
15   Q.   Would you have to stop and have your car
16   searched or anything like that?
17   A.   If you got that sticker on the windshield,
18   you go right through the gate; if you ain't got
19   that sticker, they give you a pass.
20   Q.   So if you have a sticker on your car, you
21   can just drive right through?
22   A.   Just go on through.
23   Q.   Was there any other security you had to

---

386ca63d-5494-44c1-953b-f62cfea1de03

26

1  clear, like metal detectors or turnstiles or
2  anything like that?
3  A.  No.
4  Q.  When you would walk into the building, what
5  was the first thing you would normally do?
6  A.  I'd put on my hair net.
7  Q.  Would you have your hair net with you or
8  would you have to go and get it?
9  A.  They stopped wearing that outside too.  You
10  had to go get your hair net every day.  I had to
11  change my hair net every morning.
12  Q.  So when you first walked into the building,
13  would you have any of your work clothing or
14  equipment with you?  Would you be carrying it with
15  you?
16  A.  Yes.  Because at first, we had to wash our
17  smocks.  Take them home and wash them.  But now,
18  they wash them now.
19  Q.  So during the time that you were working on
20  the debone line were you supposed to take your
21  smock home and wash it?
22  A.  I used to have to wash it myself.
23  Q.  And during the time that you were working on

27

1  the debone line, did that change, where you would
2  get a new one every day?
3  A.  I always had to wash my own smock.
4  Q.  So during the entire time you were on the
5  debone line, you were responsible for washing your
6  own smock?
7  A.  Yeah.  I washed it my own self, yes.
8  Q.  Were there any other items that you would
9  carry with you into the plant?
10  A.  I used to have my boots.  Sometimes my boots
11  would be in the locker.  I had my boots, my apron,
12  and my smock, and my gloves.
13  Q.  What about your arm guard?
14  A.  Yeah, my arm guard too.
15  Q.  So is it fair to say that at the end of your
16  shift, you would normally carry all of your --
17  A.  Take it home and wash it every day -- every
18  night.
19  Q.  And that was the same during the entire time
20  you were working in the debone area?
21  A.  The entire time.  I washed my own smocks
22  when I was over there.  I have washed them every
23  day.

28

1  Q.  And the same with you carrying all your
2  stuff home with you after your shift?
3  A.  Yeah.  In my bag, yes.
4  Q.  Which shift did you work when you were
5  working in debone?
6  A.  I worked first shift.
7  Q.  Is that day shift?
8  A.  Yeah.  First.  Day shift.
9  Q.  What time would your shift normally start?
10  A.  7:30 to 4:30.
11      MR. CAMP:  When you get a chance, can I
12  take, like, three minutes?
13      MR. GOULD:  Absolutely.  We can do it
14  right now.
15      (A brief recess was taken.)
16  (BY MR. GOULD)
17  Q.  What time would you normally arrive at the
18  plant, prior to your shift?
19  A.  Different times.  It varies.
20  Q.  Now, I think that we started discussing what
21  you would do when you got to the plant.  There
22  were some things that you carried home with you
23  and that you would be carrying back into the

29

1  plant?
2  A.  My smock and stuff, apron, gloves, boots.
3  Q.  What would you do after you entered the
4  plant?  Would you go to the supply room first?
5  Would you go to the break room first?  Would you
6  clock in?
7  A.  I'd clock in first.
8  Q.  And where would you clock in?
9  A.  In the break room.
10  Q.  In the debone break room?
11  A.  Yes.
12  Q.  And did you have a locker?
13  A.  Yes.  I went to my locker too.
14  Q.  Was your locker in the debone break room?
15  A.  It was next to the break room.  They had a
16  locker room there.
17  Q.  It was attached to the break room; is that
18  correct?
19  A.  Yeah.  It wasn't far, like a high school,
20  like.
21  Q.  Not far?  So you would clock in, and then
22  would you go to your locker?
23  A.  Yes.

386ca63d-5494-44c1-953b-f62cfea1de03

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

30

1    Q.   And what would you do next?
2    A.   Go to get my supplies.
3    Q.   So after that, you would go to the supply
4    room. And what would you get there?
5    A.   Whatever I needed. Hair nets, if I need
6    some, gloves, stuff like that.
7    Q.   Is there anything that you would pick up on
8    a daily basis every day?
9    A.   Hair nets.
10   Q.   Other than that, you would pick up new items
11   if the old ones were worn?
12   A.   I'd get gloves and a hair net about every
13   day. I would get hair nets every day.
14   Q.   What about your apron?
15   A.   Not an apron every day.
16   Q.   What about your plastic sleeves? Would you
17   replace those every day?
18   A.   No. I washed them. I don't replace them
19   every day; I washed them. But the white smock, I
20   washed it every day. I don't replace the plastic
21   apron every day, but I washed it every day. Same
22   thing with the gloves. I washed them every day.
23   Q.   And then after you would go to the supply

---

31

1    room, what would you do next?
2    A.   I would go on the floor and start getting
3    dressed.
4    Q.   Now, would you already be wearing any of
5    your items of clothing or equipment?
6    A.   No. You had your hair net on. You get
7    dressed on the floor.
8    Q.   Would you have your boots or your shoe
9    covers on?
10   A.   Boots and your hair nets on.
11   Q.   And then after you would pass through the
12   doors, what would you do next?
13   A.   Sanitize.
14   Q.   Can you describe for me how you would do
15   that?
16   A.   Automatic things. Automatic sanitize; it
17   cleans your boots.
18   Q.   Can you explain for me how this automatic
19   sanitizer worked?
20   A.   You walk in; they had somebody to spray your
21   boots for you.
22   Q.   So did you have to grab something to
23   sanitize your boots?

---

32

1    A.   No.
2    Q.   So it would spray it onto the floor and you
3    would step into it?
4    A.   Somebody would do it, or the thing would do
5    it. They had an automatic sanitizer thing.
6    Somebody would spray it.
7    Q.   So when you said someone would spray it, can
8    you describe how that worked?
9    A.   They had a plastic container thing they
10   sprayed it out of. I've done forgot. It's been a
11   while. I know you sanitize. I really don't
12   remember.
13   Q.   But you don't exactly remember?
14   A.   I know we had to be sanitized down. I know
15   that.
16   Q.   But do you remember how it actually worked?
17   Was it like a foam? Was that what it was?
18   A.   Yeah. It was a foam, yeah.
19   Q.   Was there something that you would grab and
20   spray down, or was there something that would be
21   sitting in an area on the floor and you would walk
22   through it?
23   A.   Yes. Something on the floor. I done forgot

---

33

1    how it went, but I know it would be sanitized.
2    It's been a while since I worked in that area.
3    Q.   Okay. And then what would you do after
4    that?
5    A.   Start getting dressed.
6    Q.   And can you describe for me exactly what it
7    is you would do in connection with getting
8    dressed, getting ready to go on your spot on the
9    line?
10   A.   I put my apron, smock on, the plastic. I
11   put my liners on and plastic gloves on, my sleeves
12   on, and be ready to go.
13   Q.   Would you have to wash and rinse anything?
14   A.   Wash your hands, yeah.
15   Q.   You say wash your hands?
16   A.   You would already have your gloves on.
17   After I put my stuff on, I would wash my hands
18   before I went on the line.
19   Q.   Approximately how long would it take you
20   before you stepped through the production doors?
21   A.   It varies. Peoples be in there; be so
22   crowded in there. I never did time it.
23   Q.   Now, you've also indicated that you wore a

---

2100   Third Avenue North, Suite 960   *   Birmingham, AL   35203
1-800-888-DEPO   or   205-251-4200

386ca63d-5494-44c1-953b-f62cfea1de03

34

1  chain glove; is that correct?
2  A.  Yeah.  They give you one when you go on the
3  line.  The line leader issue you a chain glove
4  out.  And they give you a number.  If you lose it,
5  you get wrote up and sent home.
6  Q.  Were you responsible for getting a knife?
7  A.  Yes.  On your line.  It depends on what
8  position you do once you get on the line.
9  Q.  So it's possible that you would need a knife
10 or scissors?
11 A.  Yeah.  You're going to need one of them.
12 Q.  But those would be brought to the line as
13 well?
14 A.  Yes.
15 Q.  You weren't responsible for taking that home
16 and cleaning it or anything?
17 A.  No.  The line leader did that.
18 Q.  Now, did you get any breaks during the
19 course of your day?
20 A.  Got two breaks.  Two 30-minute breaks.
21 Q.  Was that the same throughout the time that
22 you worked in debone?
23 A.  Yes.

35

1  Q.  Do you recall approximately at what times
2  the breaks would occur?
3  A.  Different times.  They done changed it now.
4  When I was over there, everybody went at the same
5  time.  30 minutes.  It's done changed now.
6  Q.  When you say everybody went at the same
7  time, you mean they would release all the debone
8  at one time to go on break?
9  A.  Yeah.  All at one time.
10 Q.  How would you know when you were able to go
11 out on break?
12 A.  Because when the line leader stopped -- when
13 you finished the meat, we stopped, and you go to
14 the break.  If you be on the end of the line, you
15 would be the last one to go.  You didn't get no
16 break because by the time you get to the sink and
17 wash your hands, you have like 15 minutes to eat,
18 by the time you wash down.
19 Q.  So I believe that you were saying that you
20 could leave for break when the last bird passed
21 your station?
22 A.  Right.  When you work in your area, you
23 cannot go until you finish your area.

36

1  Q.  And then can you describe for me what you
2  would do after that point, when the last bird
3  passed whichever station you were working on?
4  A.  You had to wash down, hang your stuff up in
5  there.  Hang your clothes up.  Take them off and
6  go to the break room, whatever.
7  Q.  You could keep your boots on?
8  A.  You could keep your boots on, but you
9  couldn't go outside with them on.  You had to pull
10 them off if you go out the door.
11 Q.  But you could go into the break room with
12 them on?
13 A.  Yeah.
14 Q.  Now, approximately how long did it take you
15 to wash down and take off the items of clothing or
16 equipment when you were heading out for break?
17 A.  Like I told you, you don't have but about 20
18 minutes to eat, really.  No more than 20 minutes.
19 Q.  So you believe it would take you around 10
20 minutes to get out?
21 A.  Five minutes to put on, five minute to take
22 off.  Like I told you.
23 Q.  Five minutes to get out to break?

37

1  A.  Yes.
2  Q.  And then you would stay in the break room
3  for about 20 minutes?
4  A.  If that long.  I was on the line.  Used to,
5  I be the last one to leave the line.  I didn't
6  have that long.
7  Q.  When you were working in the debone line,
8  you would rotate positions; isn't that right?
9  A.  Rotate.
10 Q.  So if you started at one position, would you
11 rotate when you came back from break to a
12 different position?
13 A.  Yes.
14 Q.  And then you would go on break and rotate to
15 another position?
16 A.  Rotate three times a day.
17 Q.  All right.  So just so I'm clear, you're
18 saying it would take you about five minutes to be
19 able to get out to the break room; is that
20 correct?
21 A.  Like I say, approximately you had 20 minutes
22 to eat.  I never did look at the clock timing it.
23 I know approximately 15 to 20 minutes to eat.

386ca63d-5494-44c1-953b-f62cfea1de03

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

38

1  Putting on and off, I have never really did watch
2  it in there on the debone floor.
3  Q.   Was that the same for your second break?
4  A.   Same thing. 30-minute break.
5  Q.   And about the same thing going to and coming
6  back?
7  A.   Yes, same thing. You better get there on
8  time or they would write you up.
9  Q.   Can you describe for me what would happen at
10 the end of your shift? How would you know that
11 your shift was over? Would it be the same thing?
12 A.   When the last thing get to you, go wash down
13 and get out of there. Make sure you leave your
14 tools in front of you. The line leader would pick
15 them up. She had a little container to put them
16 in.
17 Q.   So you would leave your chain glove and your
18 knife or your scissors at the line?
19 A.   Yeah. They would pick it up.
20 Q.   So you didn't have to wash those; is that
21 correct?
22 A.   No. No. The line leader did it.
23 Q.   Can you describe what you would do when you

39

1  left the line at the end of your shift?
2  A.   The line leader picked your stuff up. Then
3  you washed down.
4  Q.   So can you describe what it is you would do?
5  A.   Yeah. I sanitized my smock and stuff. When
6  I got home, I washed it because the thing would be
7  so greasy.
8  Q.   I understand. So at the end of your shift,
9  you would leave the line and you would rinse off
10 your apron and your gloves; is that correct, and
11 your sleeves?
12 A.   When I'd leave the line, I would wash down
13 my apron and gloves.
14 Q.   And what about your sleeves?
15 A.   Yes, I'd wash them down.
16 Q.   And then what would you do when you were
17 finished with that?
18 A.   I sanitized my boots. When I'd get home,
19 I'd wash it.
20 Q.   Okay. Now, after you finished rinsing down
21 your apron and your gloves and your sleeves, would
22 you then take them off?
23 A.   Yes.

40

1  Q.   And what about your plastic arm guard?
2  A.   Take it home and wash it. I have washed it
3  down in the sink, but I'd wash it again though.
4  Q.   And you would take those items off and --
5  A.   Put them in a bag, take them home and wash
6  them every night.
7  Q.   What would you do with your smock?
8  A.   I took it home and washed it.
9  Q.   You would take off your smock in the
10 production area as well?
11 A.   Yeah, you take it off in there.
12 Q.   What about your boots -- your shoe covers?
13 A.   You have to wear boots. You keep them on.
14 You keep the boots on in the production area. You
15 pull them off in the locker room. You keep them
16 on until you get in the locker room. You can't
17 wear them outside.
18 Q.   Now, approximately how long would it take
19 you, from the time you left the line until the
20 time you left the production floor, to do those
21 tasks?
22 A.   I don't know. I never did time it. I can't
23 really say. I didn't have a watch on. I didn't

41

1  time it, so I really can't tell. I never did time
2  it.
3  Q.   Then after you left the production floor,
4  what would you do next?
5  A.   I'd go to my locker.
6  Q.   Okay. And you would take off your boots?
7  A.   Uh-huh. And put my tennis shoes on, put
8  them in a plastic bag. Took them home and washed
9  them. Clocked out and went home.
10 Q.   Now, do you have an understanding as to,
11 while you were working in debone, how the number
12 of hours for which you were paid, how that was
13 calculated?
14 A.   What you say now?
15 Q.   Do you have an understanding as to how your
16 hours worked were calculated? How they came up
17 with the hours worked for you that they paid you
18 for?
19 A.   No.
20      (Defendant's Exhibit No. 1 was
21      marked for identification and a
22      copy of the same is attached
23      hereto.)

386ca63d-5494-44c1-953b-f62cfea1de03

42

1  Q.  Ms. Kennedy, I'm going to show you what's
2  been marked as Exhibit 1 to your deposition.  For
3  purposes of identification, it's a four-page
4  document titled "Declaration" at the top.
5      You can take a second to look at this, and
6  then tell me if you recognize it.
7          (The witness examines the
8          document.)
9  Q.  Ma'am, is that your signature on page 3 of
10 the document?
11 A.  Yes.
12 Q.  Do you remember being presented with this
13 Declaration and signing it?
14 A.  Yes.
15 Q.  I want to ask you a few questions about it.
16 On page 2, there's a paragraph No. 7.  Do you see
17 that number 7, about the middle of the page?
18 A.  Uh-huh.
19 Q.  In there, there is a discussion as to how
20 hours worked were recorded.  I believe it states
21 in there that, "...hours worked are recorded under
22 a system known as line time, master time, master
23 key, gang time, etc., (generally referred to as

43

1  'master time')."
2      Does that have any particular meaning to
3  you?  Do you understand what that means?
4  A.  Just saying that -- what you say, now?
5  Q.  I'm just reading from your Declaration here
6  in paragraph 7.  Right in the middle of paragraph
7  7, do you see where it says, "Instead..."?
8  A.  Oh, okay.  You say what do it mean to me?
9  Q.  Yes, ma'am.  Did you understand what this
10 meant when you signed it?
11 A.  Saying, like, we still be working, and
12 master time, before we get through working, they
13 swipe the master time clock, and we're still
14 working.  We be working late and we didn't get
15 paid for it.  That's what about that.
16 Q.  So is that what you were talking about, that
17 you were still working after you stopped being
18 paid?
19 A.  Yeah.  We used to work late and we didn't
20 get paid for it.  Because at that time, they
21 swiped a master clock; and we was still working
22 and they wasn't paying us.
23 Q.  Ms. Kennedy, before you signed this, were

44

1  you given a draft of it?  Did you review it and
2  give any comments back on this particular
3  document?
4  A.  Give any comments back?
5  Q.  This document, is this just something that
6  was presented to you and you signed?
7  A.  Uh-huh.
8  Q.  Or was something given to you, you read it
9  over, and you said, "Well, this might not be
10 right; this needs to be changed"?  Did you provide
11 any revisions to it?
12 A.  No.
13 Q.  This was just something that was provided to
14 you?
15 A.  I read it and signed it, yes.
16 Q.  So this is not something that you prepared
17 yourself; is that correct?
18 A.  No.
19 Q.  Can you turn to page 3 of that document,
20 ma'am?
21 A.  (Witness complies.)
22 Q.  I'd like you to look at paragraph No. 10.
23 And that Declaration makes several statements in

45

1  paragraph No. 10, but I want to ask you some
2  questions, first of all, about the last sentence
3  in paragraph No. 10.
4      It states, "To that end, Defendant and its
5  managers have attempted to discourage and/or
6  intimidate my coworkers from joining this lawsuit
7  by issuing both express and implied threats
8  involving job security."
9      Did you read that before you signed this
10 document?
11 A.  Yeah, I read it.
12 Q.  Can you describe for me any knowledge you
13 have of anyone attempting to discourage or
14 intimidate coworkers from joining this lawsuit by
15 issuing both express and implied threats involving
16 job security?
17 A.  No.  Ain't nobody never said nothing to me
18 about this lawsuit.  I ain't had no problem with
19 my job about that.  I ain't had a problem, not so
20 far.
21 Q.  All right.  Are you aware of any instances
22 where any other employees have indicated to you
23 that someone stated to them that their job

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

46

1    security could be at issue if they joined this
2    lawsuit?
3    A.   No.
4    Q.   So is it correct then that you have no
5    knowledge as to any statements by anyone employed
6    at Equity Group that have attempted to discourage
7    or intimidate your coworkers from joining this
8    lawsuit; is that correct?
9    A.   No.  I ain't heard nobody say nothing about
10   that.
11   Q.   All right.  That's all the questions I have
12   for you.  Thank you, ma'am.
13        MR. CAMP:  I'm going to ask a couple of
14   questions.
15   BY MR. CAMP:
16   Q.   You said a friend gave you a phone number,
17   and you called the firm?
18   A.   Yes.
19   Q.   And did you describe to the firm what your
20   complaints were at that time related to the
21   lawsuit?
22   A.   I told them, said we were underpaid.
23   Q.   And did you understand that this law firm

---

47

1    seeks to get you pay for all hours that you work?
2    A.   Yeah.
3    Q.   And the issues related to the wage
4    complaints, the 90-day issue and what not that we
5    discussed related to the cook plant or while you
6    were at the cook plant, you understand that this
7    lawsuit has nothing to do with that?
8    A.   Yes.
9    Q.   Let me just go through -- tell me if I get
10   the series wrong.
11        You would come in; you would clock in -- and
12   say yes after.  I'll pause, and you tell me if I'm
13   right or wrong, yes or no.
14   A.   Okay.
15   Q.   You would come in in the morning and clock
16   in?
17   A.   Yes.
18   Q.   You would then go and obtain your equipment
19   your personal protective equipment, whatever you
20   needed for the day to wear?
21   A.   Yeah.  I clock in, then I go to my locker
22   and put my lunch and stuff in there.  Yeah.
23   Q.   Okay.  You would then go out to the

---

48

1    production plant?
2    A.   I would go to the supply room.
3    Q.   Okay.  Is that where you would get --
4    A.   Gloves and stuff, hair nets.
5    Q.   Okay.  Still gathering up the stuff that you
6    need to wear for the day?
7    A.   Yes.
8    Q.   You would then go out to production through
9    the double doors?
10   A.   Yeah.  You have to be dressed when you go in
11   there.
12   Q.   Okay.
13   A.   No.  You had to wear your hair nets through
14   the double doors and your boots, but you get
15   dressed on the production floor.
16   Q.   So when you went through the double doors,
17   you said you had to sanitize your boots?
18   A.   Yes.
19   Q.   You said it was an automatic sanitizer?
20   A.   Yes.  Something to spray you.  You pass by,
21   they spray your boots.
22   Q.   Was it -- was the sanitizer set up where
23   there were like spray nozzles that would spray

---

49

1    towards your boots and on your boots?
2    A.   Yeah.  You pass by, it would spray your
3    boots.
4    Q.   You would have to pass by it and it would
5    start to spray?
6    A.   Yes.
7    Q.   It wasn't constantly spraying?
8    A.   No.
9    Q.   Okay.  Did you have to stop or could you
10   just walk right through it?  What was the
11   procedure for getting the boots sanitized?
12   A.   You pass by, stop for a minute, and it would
13   spray your boots.  You pass by it.
14   Q.   Then you would go out the next door?
15   A.   Yeah.
16   Q.   And then you would put everything on?
17   A.   Yes.
18   Q.   Did you wash anything at that point?
19   A.   You wash your hands with soap, sanitize your
20   hands.
21   Q.   Would that be the rubber gloves?
22   A.   Rubber gloves, yeah.
23   Q.   And then you would --

---

386ca63d-5494-44c1-953b-f62cfea1de03

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

50

1   A.   Go to the line.
2   Q.   -- go to line?
3   A.   Yeah.
4   Q.   And then on breaks, you would reverse?  You
5   would take the items off?
6   A.   Yes.
7   Q.   Everything but your boots and your hair net?
8   A.   Yes.
9   Q.   Would you sanitize -- would you wash
10  anything at that point, your apron or gloves or
11  anything?
12  A.   Yeah.  You wash your apron and stuff off.
13  Apron and gloves, arm guard, all that, wash it
14  off.
15  Q.   And then you would go to break?
16  A.   Yes.
17  Q.   Then you would come off of break.  You would
18  go back through the boot sanitizer?
19  A.   Yes.
20  Q.   Same procedure?
21  A.   Yes.
22  Q.   Put the items back on, just like you did in
23  the morning?

---

51

1   A.   Yes.
2   Q.   Would you wash it again?
3   A.   Yes.  You've got to sanitize it down at the
4   line, wash your hands.
5   Q.   And then you would walk back out to the
6   line?
7   A.   Yes.
8   Q.   And it was like that on both breaks?
9   A.   Both breaks.
10  Q.   At the end of the day, you would leave the
11  line; you would take everything off?
12  A.   Yes.
13  Q.   Would you sanitize those items, wash those
14  items?
15  A.   Yes.
16  Q.   You would walk out the double doors?
17  A.   Yes.
18  Q.   And you've got to take your --
19  A.   Hair net.  Take your boots off.  When you
20  get out of processing.  You have to take your
21  boots off when you go out the door.
22  Q.   Okay.  But the smock you took home?  You
23  didn't deposit the smock somewhere?

---

52

1   A.   No.  I had to take them home and wash them.
2   Q.   Okay.  And you would take it home and you
3   would wash it?
4   A.   Wash them.
5   Q.   That's it.
6       MR. GOULD:  I don't have anything else.
7   That's fine.
8
9       (The deposition was concluded.)

---

53

1       C E R T I F I C A T E
2
3   STATE OF ALABAMA
4   BARBOUR COUNTY
5
6       I hereby certify that the above and
7   foregoing deposition was taken down by me in
8   stenotype and the questions and answers thereto
9   were transcribed by means of computer-aided
10  transcription, and that the foregoing represents
11  a true and correct transcript of the testimony
12  given by said witness upon said hearing.
13      I further certify that I am neither of
14  counsel, nor kin to the parties to the action,
15  nor am I in anywise interested in the result of
16  said cause.
17
18
19      CYNTHIA M. NOAKES, Commissioner
20      Certified Court Reporter,
21      ACCR #327 - Expires 09/30/2008
22
23      Commission Expires 07/08/2009

---

**TAB 28**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:   2:06-CV-1081-MEF


BETTY ANN BURKS,

et al.,

    Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

    Defendant.



BEFORE:

    Cynthia M. Noakes, Commissioner

    and Certified Court Reporter


DEPOSITION TESTIMONY OF

TRACY LEONARD KENNEDY


*****************************

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

**2**

1    STIPULATION

2

3        IT IS STIPULATED AND AGREED by and

4    between the parties through their respective

5    counsel, that the deposition of TRACY LEONARD

6    KENNEDY may be taken before Cynthia M. Noakes,

7    Court Reporter, at the Law Offices of WILLIAMS,

8    POTTHOFF, WILLIAMS & SMITH, 125 South Orange

9    Avenue, Eufaula, Alabama 36027, on the 22nd day

10   of May, 2008.

11       IT IS FURTHER STIPULATED AND AGREED

12   that the signature to and the reading of the

13   deposition by the witness is waived, the

14   deposition to have the same force and effect as

15   if full compliance had been had with all laws and

16   rules of Court relating to the taking of

17   depositions.

18       IT IS FURTHER STIPULATED AND AGREED

19   that it shall not be necessary for any objections

20   to be made by counsel to any questions except as

21   to the form or leading questions, and that

22   counsel for the parties may make objections and

23   assign grounds at the time of the trial, or at

**3**

1    the time said deposition is offered in evidence,

2    or prior thereto.

3        IT IS FURTHER STIPULATED AND AGREED

4    that the notice of filing of the deposition by

5    the Court Reporter is waived.

6

7

8

9

10

11

12

13

14

15

16

17   *******************************************

18

19

20

21

22

23

**4**

1        INDEX

2    EXAMINATION BY:        PAGE NUMBER:

3    MR. GOULD              6-34, 34-35

4    MR. KISER                  34, 35

5

6    EXHIBITS:

7    (No exhibits were

8    submitted to said deposition.)

9

10   Reporter's Certificate        36

11

12

13

14

15

16

17

18

19

20   *******************************************

21

22

23

**5**

1        APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFFS:

4        MR. JACOB A. KISER

5        WIGGINS, CHILDS,

6        QUINN & PANTAZIS, LLC

7        ATTORNEYS AT LAW

8        The Kress Building

9        301 Nineteenth Street North

10       Birmingham, Alabama 35203

11       (205) 314-0614

12

13   ON BEHALF OF THE DEFENDANT:

14       MR. MALCOLM S. GOULD

15       PELINO & LENTZ

16       ATTORNEYS AT LAW

17       One Liberty Place

18       Thirty-Second Floor

19       1650 Market Street

20       Philadelphia, Pennsylvania 19103

21       (215) 665-1540

22

23   *****************************

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

88aa7c54-ce46-4919-b95c-2004e608d38d

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

6

1       I, CYNTHIA M. NOAKES, a Certified
2   Court Reporter of Eufaula, Alabama, acting as
3   Commissioner, certify that on this date, as
4   provided by the Alabama Rules of Civil Procedure
5   and the foregoing stipulation of counsel, there
6   came before me at the Law Offices of WILLIAMS,
7   POTTHOFF, WILLIAMS & SMITH, 125 South Orange
8   Avenue, Eufaula, Alabama 36027, beginning at
9   9:15 a.m., TRACY LEONARD KENNEDY, witness in the
10  above cause, for oral examination, whereupon the
11  following proceedings were had:
12
13      TRACY LEONARD KENNEDY,
14  being first duly sworn, was examined and
15      testified as follows:
16
17      THE COURT REPORTER:  Usual
18  stipulations?
19      MR. KISER:  Yes.
20      MR. GOULD:  Yes.
21
22      EXAMINATION
23  BY MR. GOULD:

---

7

1   Q.   Good morning, Mr. Kennedy.
2   A.   Good morning.
3   Q.   My name is Malcolm Gould. I'm an attorney
4   from the law firm of Pelino & Lentz in
5   Philadelphia. I represent the Defendant Equity
6   Group Eufaula Division, LLC, in a lawsuit that's
7   been filed in the Federal Court in the Middle of
8   Alabama. You're a plaintiff in that case, and
9   we're here to take your deposition today.
10      There are a few ground rules for the
11  deposition that will hopefully make it run a
12  little smoother.
13      As you can see, we have a court reporter
14  here. She's taking down my questions and your
15  answers, so I would ask that you keep all of your
16  responses verbal and say yes or no, instead of
17  nodding your head or shaking your head. That way,
18  she can take down your responses. It's difficult
19  for her to take down a nonverbal response.
20      I would also ask that you wait until I
21  finish my question before you give your answer.
22  That will make it easier for her to take down my
23  question and your answer. That way you also hear

---

8

1   my whole question before you give your answer.
2   Okay?
3   A.   Okay.
4   Q.   Now, if at any time I ask a question and you
5   don't understand what I've asked, just ask me to
6   repeat the question or ask it again, and I'll try
7   and phrase the question in a way that maybe isn't
8   so confusing.
9       If, during the course of the deposition, you
10  just don't know the answer to a question, it's
11  perfectly acceptable to say "I don't know" or "I
12  don't remember." I'd much rather you do that than
13  just try and guess. Okay?
14  A.   Okay.
15  Q.   And I don't anticipate that the deposition
16  will take long, but if you feel you need a break,
17  just let me know and we can take a break.
18  A.   Yes, sir.
19  Q.   Can you state your full name for the record,
20  please?
21  A.   Tracy Leonard Kennedy.
22  Q.   And, Mr. Kennedy, what's your home address?
23  A.   8 Lonnie Wilson Road.

---

9

1   Q.   And that's here in Eufaula?
2   A.   Clayton.
3   Q.   Okay. And are you currently employed, Mr.
4   Kennedy?
5   A.   (No response.)
6   Q.   Are you employed? Do you have a job?
7   A.   Yes.
8   Q.   And where do you work?
9   A.   At the plant.
10  Q.   Okay. So you still work at the plant in
11  Baker Hill?
12  A.   Yes.
13  Q.   And what position do you work in?
14  A.   Debone.
15  Q.   Do you work on one of the debone lines?
16  A.   Yes.
17  Q.   And how long have you worked at the plant?
18  A.   Going on three years.
19  Q.   And have you worked on the debone line that
20  entire time?
21  A.   Yes.
22  Q.   And have you worked there continuously
23  throughout that three-year period? You've worked

---

88aa7c54-ce46-4919-b95c-2004e608d38d

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

10

1   there the whole time?
2   A.  Yes, sir.
3   Q.  Now, Mr. Kennedy, how did you first find out
4   about this lawsuit?
5   A.  I don't remember.
6   Q.  Okay.  Have you attended any meetings, other
7   than meetings with your attorneys, where people
8   have discussed this lawsuit?
9   A.  No, sir.
10  Q.  Other than meetings with your attorneys,
11  have you discussed this lawsuit with anybody else?
12  A.  No, sir.
13  Q.  Sir, are you a member of the union?
14  A.  Yes.
15  Q.  Do you know which union that is?
16  A.  No, sir.
17  Q.  Do you have money taken out of your paycheck
18  each week for union dues?
19  A.  Yes.
20  Q.  Do you ever attend union meetings?
21  A.  No, sir.
22  Q.  Are you aware of the names of any of the
23  people who are your union stewards or your union

11

1   representatives?
2   A.  Yes.
3   Q.  And whose names do you know?
4   A.  I can't call his name off the top right now.
5   Q.  All right.  You would recognize them if you
6   saw them, but you're not sure what their names
7   are?
8   A.  Yes.
9   Q.  Okay.  Mr. Kennedy, have you ever been
10  involved in a lawsuit before?
11  A.  No, sir.
12  Q.  And, Mr. Kennedy, where did you work
13  immediately before you started working at the
14  plant in Baker Hill?
15  A.  I was helping my uncle.
16  Q.  And what sort of work was that?
17  A.  He had concrete.
18  Q.  Some sort of construction business?
19  A.  Yes.
20  Q.  Now, in connection with your work at the
21  plant in Baker Hill on the debone line, are there
22  any items of clothing or equipment that you have
23  to wear when you're out on the production floor?

12

1        MR. KISER:  We're going to have a
2   standard objection to PPE as clothing.  You can
3   answer the question.
4   A.  Yes.
5   Q.  Can you identify those items for me?
6   A.  Chain glove, cotton liners, rubber gloves,
7   the arm guard, the apron, the sleeves, the
8   earplugs, the hair net, beard net, boots, and the
9   white coat thing.
10  Q.  The smock?
11  A.  Uh-huh.
12  Q.  And do you wear all of those items every
13  day?
14  A.  Yes.
15  Q.  Are you allowed to wear your boots from
16  home?
17  A.  Yes, sir.
18  Q.  During the time you've been employed at the
19  plant, has that been the case during the entire
20  time you've been employed?  Have you always been
21  able to wear your boots from home?
22  A.  Yes.
23  Q.  Is there anything else that you can wear

13

1   from home, out of those items you've identified
2   for me?
3   A.  Just the boots.
4   Q.  Do you normally drive yourself to work?
5   A.  Yes.
6   Q.  When you arrive at the plant, is there any
7   sort of security that you have to clear?
8   A.  You've got to -- if you ain't got the
9   sticker on your car, you've got to stop at the
10  guard shack, and they give you a little card to
11  get through.
12  Q.  You have to show your employee pass and they
13  will let you get through, if you don't have a
14  sticker on your car?
15  A.  Yes.
16  Q.  Other than that, after you pull into the
17  parking lot, is there any other security you have
18  to go through?
19  A.  There will be some walking around checking
20  the area.
21  Q.  So there's a security force that polices the
22  area; is that what you're saying?
23  A.  Uh-huh.

88aa7c54-ce46-4919-b95c-2004e608d38d

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

**14**

1  Q.  But you don't have to go through any metal
2  detectors or turnstiles or anything like that?
3  A.  No, sir.
4  Q.  Are you aware if, under your current union
5  contract, whether you are paid any time for
6  putting on or taking off or washing any of your
7  items of clothing or equipment that you identified
8  for me?
9  A.  I don't know.
10  Q.  Okay.  Mr. Kennedy, after you park in the
11  parking lot and then enter the building, can you
12  describe for me what you would normally do?
13  A.  I clock in.  Then I go get my -- the white
14  thing.
15  Q.  The smock?
16  A.  Uh-huh.
17  Q.  And where do you get that?
18  A.  Down the hall.
19  Q.  All right.  Is there a supply counter?
20  A.  Uh-huh.
21  Q.  And that's where you get it?
22  A.  Yes.
23  Q.  What shift are you working right now?

---

**15**

1  A.  First.
2  Q.  Day shift?
3  A.  Uh-huh.
4  Q.  That's yes?
5  A.  Yes.
6  Q.  And have you worked day shift the entire
7  time you've worked at the plant?
8  A.  Yes.
9  Q.  What time does your shift start?
10  A.  7:30.
11  Q.  7:30 in the morning?
12  A.  Yes.
13  Q.  And do you have a scheduled end time for
14  your shift?
15  A.  4:30.
16  Q.  What time do you normally arrive at the
17  plant, park in the parking lot?
18  A.  About 6:40.
19  Q.  And do you normally go right into the
20  building?
21  A.  Yes.
22  Q.  All right.  Now, I think you indicated to me
23  that when you get into the plant, you'll clock in

---

**16**

1  and get a smock; is that correct?
2  A.  Yes.
3  Q.  When you enter the plant, are you carrying
4  any of your other items of clothing or equipment
5  with you?
6  A.  Yes.
7  Q.  What items are you normally carrying in with
8  you?
9  A.  Apron and arm guard and rubber gloves and
10  cotton liners and hair net and beard net and
11  earplugs.
12  Q.  So pretty much everything except your smock?
13  A.  And chain glove.
14  Q.  And you get your chain glove out on the
15  line; is that correct?
16  A.  Yes.
17  Q.  And after you clock in and then get your
18  smock, what do you normally do next?
19  A.  Go to the machine and get me something to
20  eat on.
21  Q.  So you go into the break room?
22  A.  Yes.
23  Q.  And that's right around the corner from the

---

**17**

1  supply room; is that correct?
2  A.  The break room is before you get to the...
3  Q.  Okay.  I guess that depends on which door
4  you use to enter the plant, correct?
5  A.  Yes.
6  Q.  Okay.  And then you'll sit down and have
7  something to eat before your shift starts?
8  A.  Yes.
9  Q.  What do you do after you've had something to
10  eat?  What do you do after you've finished having
11  your snack or your meal?
12  A.  Wait until it's time to go in.
13  Q.  What time do you normally head into the
14  production area?
15  A.  About 7:25.
16  Q.  And can you describe for me what it is you
17  do when you leave the break room to head towards
18  the production area, and then once you enter the
19  production area?
20  A.  You open up the door, then you've got to
21  walk through that stuff; then they've got little
22  bitty things that you put your stuff when you get
23  ready to put it on; then you've got to put all the

---

18

1  stuff on; then you go over to the sink and wash
2  everything.  Then you go to the line; then get the
3  chain glove and put it on.
4  Q.  Okay.  So you said you would open the door
5  and walk through the stuff.  Is that that foam
6  that's sitting on the floor?
7  A.  Yes.
8  Q.  And then you said you enter in.  And there's
9  an area where you can put your clothes or
10 equipment on; is that correct?
11 A.  Yes.
12 Q.  There's an area where there's some racks,
13 and you can hang your stuff on there if you want
14 to?
15 A.  Yes.
16 Q.  And that's where you put on your smock,
17 apron, your gloves.  Did you say you wore sleeves?
18 A.  Yes.
19 Q.  And you put on your sleeves there too; is
20 that correct?
21 A.  Yes.
22 Q.  Have you put on your hair net before you
23 entered the doors of the production area?

19

1  A.  No, sir.
2  Q.  You normally put that on as you're going
3  through?
4  A.  You have to put that on when you get inside.
5  Q.  So you put on your hair net and beard net
6  before you go through the doors of the production
7  area; is that correct?
8  A.  Yes.
9  Q.  And then you said that you wash or rinse
10 something down; is that correct?
11 A.  Your apron and gloves and sleeves.
12 Q.  And do you also put on your plastic arm
13 guard at that time?
14 A.  Yes.
15 Q.  And do you put that on after you rinse off
16 your gloves and apron and sleeves?
17 A.  Yes.
18 Q.  And how long does it take you to put on and
19 rinse or wash those items?
20 A.  About four to six minutes.
21 Q.  Four to six?
22 A.  Yes.
23 Q.  And then you head over to your spot on the

20

1  line?
2  A.  Yes.
3  Q.  Now, during the course of a day, you'll
4  rotate between several positions on the debone
5  line; is that correct?
6  A.  Yes.
7  Q.  Do you have a set rotation that you do every
8  day, or do you work different positions on the
9  line on different days?
10 A.  (No response.)
11 Q.  When you start your shift, will you normally
12 start at the same spot on the line every day?
13 A.  No, sir.
14 Q.  Is it fair to say that you could work any
15 position on the debone line on a given day,
16 regardless of whether you start there or you
17 rotate there later in the day?
18 A.  I don't understand.
19 Q.  Okay.  That's fine.  I'll try and ask it in
20 a different way.
21    During the course of one particular day's
22 work, I think you indicated to me that you would
23 rotate between several different positions; is

21

1  that correct?
2  A.  Yes.
3  Q.  How many different positions will you work
4  in just one day?
5  A.  Two.
6  Q.  Okay.  So you would start at one position at
7  the beginning of your shift; is that correct?
8  A.  Yes.
9  Q.  And then would you stay in that position
10 until you returned from a break?
11 A.  No, sir.
12 Q.  Okay.  So you might change position before
13 break?
14 A.  Not before break, at the break.
15 Q.  Okay.  So you would go out on break; then
16 when you came back from break, would you go to the
17 same position on the line or a different position
18 on the line?
19 A.  Different.
20 Q.  And then would you stay in that position
21 until you had your next break?
22 A.  Yes.
23 Q.  And then when you returned from that break,

88aa7c54-ce46-4919-b95c-2004e608d38d

22

1  would you go to the position that was the same as
2  one of the first two that you worked, or a
3  different position?
4  A.  The same.
5  Q.  So you might go back to the first position
6  that you worked?
7  A.  Yes.
8  Q.  And is that what you would normally do on
9  any given day?
10  A.  Yes.
11  Q.  So you'll end at the same position where you
12  started?
13  A.  Yes.
14  Q.  Am I correct that you have two breaks during
15  the course of a shift?
16  A.  Yes.
17  Q.  And how long are those breaks?
18  A.  30 minutes.
19  Q.  Do they normally occur at some sort of
20  scheduled time?  Do they occur at the same time
21  every day?
22  A.  Yes.
23  Q.  And what time are your breaks?

23

1  A.  One's 10:15 and the other one is 1:15.
2  Q.  And how do you know when it's time to go out
3  on break?
4  A.  Look down the line.
5  Q.  So the birds stop coming down the line
6  before your break?
7  A.  They quit loading the line.
8  Q.  Okay.  So they'll stop putting chickens on
9  the cones that run down the debone line?
10  A.  Yes.
11  Q.  And then once that last bird reaches your
12  place on the line and you've done your last cut or
13  your last pull, or whatever you may be doing, you
14  can leave for break?
15  A.  Yes.
16  Q.  And can you describe for me what you do once
17  you leave your position on the line, before you
18  exit the production doors?
19  A.  I take the chain glove off.  And I have to
20  give the knife to the line leader, put it in the
21  little bucket.  Then we go out to the wash area.
22  And we've got to wash the apron and the sleeves
23  and gloves.  Then we walk from there, walk over

24

1  there against the wall, take all my stuff off and
2  hang it up.
3  Q.  Okay.  So you are not responsible for
4  cleaning or washing off your chain glove or your
5  knife; is that correct?
6  A.  Yes.
7  Q.  Someone will come around and collect those
8  on the line?
9  A.  Yes.
10  Q.  So then you said that you'll walk over to
11  wash or rinse off your gloves and your sleeves and
12  your apron; is that correct?
13  A.  Yes.
14  Q.  And then after that, you will go to the spot
15  where there are those racks, and then you will
16  take those items off?
17  A.  Yes.
18  Q.  What items are you allowed to wear outside
19  of the production floor?
20  A.  Just the boots and the hair net and the
21  beard net, if you ain't going outside.  If you're
22  going outside, you have to take everything off
23  except the boots.

25

1  Q.  So before you leave the production floor,
2  you'll take off your rubber gloves and your cloth
3  gloves; is that correct?
4  A.  Yes.
5  Q.  And you'll take off your apron and your
6  smock; is that correct?
7  A.  Yes.
8  Q.  And you'll take off your plastic sleeves?
9  A.  Yes.
10  Q.  Is there anything else I'm missing?
11  A.  Arm guard.
12  Q.  And you'll take off your hard plastic arm
13  guard as well?
14  A.  Yes.
15  Q.  And you'll put them all on some spot on the
16  rack?
17  A.  Yes.
18  Q.  And then you'll head out for break?
19  A.  Yes.
20  Q.  Approximately how long does it take you to
21  do all of that?
22  A.  From four to six minutes.
23  Q.  And then do you normally go into the break

88aa7c54-ce46-4919-b95c-2004e608d38d

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

26

1   room, or do you normally go outside?
2   A.   In the break room.
3   Q.   And what do you do when you're in the break
4   room?
5   A.   Wait in line to get something at the
6   machine.
7   Q.   So you'll get something to eat, something to
8   drink?
9   A.   Yes.
10  Q.   Do you socialize, talk with any of your
11  coworkers?
12  A.   Outside, after I be done got whatever I'm
13  going to get to eat.
14  Q.   Okay.  How do you know when it's time to
15  return from break?
16  A.   (No response.)
17  Q.   How do you know when it's time to leave
18  break and go back out to the line?
19  A.   We've got a clock on the wall.
20  Q.   Okay.  Now, what is your understanding as to
21  when you have to be back on the line?  What time
22  do you have to be back on the line?
23  A.   10:45.

27

1   Q.   And that's for your first break?
2   A.   Yes.
3   Q.   Can you describe for me what you will do
4   when you're heading back from break, from the time
5   you enter through the production doors?
6   A.   You have to walk back through the double
7   doors, walk through that stuff again; then you've
8   got to go over there where you hung your stuff up
9   at, put all that back on; then you go back to the
10  sink and wash back off.
11  Q.   And then you go to your position on the
12  line?
13  A.   Yes.
14  Q.   And get your chain glove?
15  A.   It all depends.  If I'm on the line, I ain't
16  got to have the chain glove; but when we're
17  cutting meat, I have to use the chain glove.
18  Q.   So you'll get your chain glove?  I'm just
19  trying to figure out when you'll get your chain
20  glove again.
21       You told me that you will take it off, put
22  it into a bucket, and the line leader will take it
23  up; is that correct?

28

1   A.   Yes.
2   Q.   When do you get your chain glove back?
3   A.   When you go in on the line, there's a table,
4   and they have them all spread out on the table
5   there.
6   Q.   So you can grab your chain glove there?
7   A.   Uh-huh.
8   Q.   How long does it take you, approximately, to
9   do all the activities you told me?  Again, walking
10  through the foam, putting on your items, rinsing
11  them off, and getting your chain glove, and
12  walking back to the line?
13  A.   About four to six minutes, if there ain't a
14  lot of folks that went in before you.  Because
15  you've got to wait for them to get out of the way,
16  and then you've got to get up there and get your
17  stuff.
18  Q.   So that's why you're telling me it could
19  take four to six minutes?  It could be at the
20  short end if there's not a lot of people, and it
21  could be at the high end if there are a lot of
22  people; is that what you're saying?
23  A.   Yes.

29

1   Q.   Is the procedure the same for your second
2   break?
3   A.   Yes.
4   Q.   You'll do the same thing before and after
5   your first break and before and after your second
6   break?
7   A.   Yes.
8   Q.   There's no real difference between the two?
9   A.   Yes.
10  Q.   Is that what you're saying?
11  A.   Yes.
12  Q.   And can you describe for me how you know
13  it's the end of your shift?
14  A.   When they stop loading the line.
15  Q.   Okay.  So it would be similar to what
16  happens before your breaks?  The birds will stop
17  coming down the line at a certain time?
18  A.   Yes.
19  Q.   And then once that last bird passes your
20  spot on the line, you're free to go?
21  A.   Yes.
22  Q.   And you'll take off your chain glove, and
23  leave your knife, again, with the line leader; is

88aa7c54-ce46-4919-b95c-2004e608d38d

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

30

1   that correct?
2   A.   Yes.
3   Q.   Can you describe for me what you do at the
4   end of your shift, from that point when you're
5   leaving the line, before you pass through the
6   production doors?
7   A.   You've got to go back, wash your stuff off.
8   Then sometimes you have to wait a little longer,
9   because second shift be coming in and they be up
10  there at the sink washing off too.
11  Q.   Okay.  And then you'll take off your items
12  again?
13  A.   Yes.
14  Q.   But you'll still keep your boots on; is that
15  correct?
16  A.   Yes.
17  Q.   And you'll still have your hair net and
18  beard net on while you're out there on the
19  production floor; is that correct?
20  A.   Yes.
21  Q.   And approximately how long do you estimate
22  it takes you to do those activities at the end of
23  your shift?

---

31

1   A.   Between four and six minutes.
2   Q.   And then what do you do after you leave the
3   production floor?
4   A.   We be done took everything off.  Then the
5   white thing, you take that off.  You've got to
6   throw that -- they've got some big old baskets you
7   put the white thing in.  Then you go back in the
8   break room and get in a line and get ready to
9   clock out.
10  Q.   So there's a bin where you can throw your
11  smock?
12  A.   Uh-huh.
13  Q.   Is that yes?
14  A.   Yes.
15  Q.   Thank you.  And the bin, is that right next
16  to the doors to the break room?
17  A.   Yes.
18  Q.   And then the clock where you clock out is
19  inside the break room?
20  A.   Yes.
21  Q.   And at the end of your shift, do you
22  normally take all of your other items, other than
23  the smock, home with you?

---

32

1   A.   Yes.
2   Q.   So you'll take home with you your gloves,
3   your arm guard, your apron, your hair net, beard
4   net, and earplugs?
5   A.   Yes.  Except the chain glove.
6   Q.   Right.  I think you told me you leave that
7   on the line with the line leader; is that correct?
8   A.   Yes.
9   Q.   And has this procedure been the same for the
10  entire time you've been employed at the plant?
11  A.   Yes.
12  Q.   Mr. Kennedy, do you have an understanding as
13  to how the hours worked for which you are paid,
14  how that is calculated?
15  A.   No, sir.
16  Q.   You get paid on a weekly basis; is that
17  correct?
18  A.   Yes.
19  Q.   And it's been that way the entire time
20  you've been working at the plant?
21  A.   Yes.
22  Q.   And when you get your paycheck, do you look
23  at it to see if it reflects the hours that you

---

33

1   worked?
2   A.   Yes.
3   Q.   Has there ever been an occasion where you
4   have complained to your supervisor or someone in
5   payroll or somebody in management that your
6   paycheck didn't properly reflect the hours for
7   which you had worked?
8   A.   One time, when I had worked overtime.  But
9   they put it on the next check.
10  Q.   Okay.  So there was a time when you worked
11  overtime that it hadn't been paid into your check,
12  and you complained about it?
13  A.   Yes.
14  Q.   And then they agreed that there was a
15  mistake and they put that in your next paycheck?
16  A.   Yes.
17  Q.   And that was just one time?
18  A.   Yes.
19  Q.   Have there been any other occasions when
20  you've complained to your supervisor or somebody
21  in payroll or somebody in management about the
22  amount of time for which you were paid?
23  A.   No, sir.

---

88aa7c54-ce46-4919-b95c-2004e608d38d

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

34

1  Q.  I think those are all the questions I have
2  for you, Mr. Kennedy.
3        MR. KISER:  I have one question.
4  BY MR. KISER:
5  Q.  Have you ever been required to do any
6  stretching before your — after you've got all
7  your stuff on and you're at the line, have you
8  ever been required to do calisthenics, stretching,
9  while you were out there?
10  A.  Yes, we had to do exercise.
11  Q.  Is this before the chickens start coming
12  down the line?
13  A.  Yes.
14  Q.  Who requires you to do that?
15  A.  The line leader.
16  Q.  And she or he leads you in that?
17  A.  Yes.
18  Q.  That's all I have.
19  BY MR. GOULD:
20  Q.  What time do you normally do those exercises
21  or stretches?
22  A.  After we put everything on.
23  Q.  Okay.  Do you know whether it is at 7:30 or

35

1  7:35 or 7:25?  Do you have an idea as to when it
2  is when you start those stretches?
3  A.  It would be after 7:30.
4  Q.  Okay.  That's all I have.  Thank you.
5  BY MR. KISER:
6  Q.  Is it before the chickens come down the
7  line, before y'all start working for the day?
8  A.  Sometimes they already be.
9  Q.  So the chickens are coming, and y'all are
10  having to do stretches?
11  A.  Sometimes it would be some in the bin.  Then
12  they'll tell us to, you know, do all that right
13  there and do your exercise.  Then you have to do
14  that, and we start loading the line.
15  Q.  Thank you.
16        MR. GOULD:  That's all.
17
18      (The deposition was concluded.)
19
20
21
22
23

36

1              C E R T I F I C A T E
2
3  STATE OF ALABAMA
4  BARBOUR COUNTY
5
6        I hereby certify that the above and
7  foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10  transcription, and that the foregoing represents
11  a true and correct transcript of the testimony
12  given by said witness upon said hearing.
13        I further certify that I am neither of
14  counsel, nor kin to the parties to the action,
15  nor am I in anywise interested in the result of
16  said cause.
17
18
19        CYNTHIA M. NOAKES, Commissioner
20        Certified Court Reporter,
21        ACCR #327 - Expires 09/30/2008
22
23        Commission Expires 07/08/2009

88aa7c54-ce46-4919-b95c-2004e608d38d

**TAB 29**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


NO.:  2:06-CV-1081-MEF


BETTY ANN BURKS, et al.,

        Plaintiff(s),

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

        Defendant(s).


                    DEPOSITION OF

                    STEVEN KINCEY

                        JOB NO. 1101-58403



BEFORE:    Victoria M. Castillo

           Certified Court Reporter and

           Notary Public

           ACCR# 17, Expires 9/30/2008

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

2

1    In accordance with Rule 5(d) of
2    The Alabama Rules of Civil Procedure, as Amended,
3    effective May 15, 1988, I, Victoria M. Castillo, am
4    hereby delivering to HOWARD A. ROSENTHAL, ESQ. the
5    original transcript of the oral testimony taken on
6    the 22nd day of May, 2008, along with exhibits.
7        Please be advised that this is
8    the same and not retained by the Court Reporter,
9    nor filed with the Court.
10
11      S T I P U L A T I O N
12
13        IT IS STIPULATED AND AGREED, by
14   and between the parties through their respective
15   counsel, that the deposition of STEVEN KINCEY may
16   be taken before Victoria M. Castillo, Commissioner,
17   at WILLIAMS, POTTHOFF, WILLIAMS & SMITH, 125 South
18   Orange Avenue, Eufaula, Alabama 36027 on the 22nd
19   day of May, 2008.
20        IT IS FURTHER STIPULATED AND
21   AGREED that the signature to and the reading of the
22   deposition by the witness is waived, the deposition
23   is said to have the same force and effect as if

3

1    full compliance had been had with all laws and
2    rules of Court relating to the taking of
3    depositions.
4        IT IS FURTHER STIPULATED AND
5    AGREED that it shall not be necessary for any
6    objections to be made by counsel to any questions,
7    except as to form or leading questions, and that
8    counsel for the parties may make objections and
9    assign grounds at the time of trial, or at the time
10   said deposition is offered in evidence, or prior
11   thereto.
12        IT IS FURTHER STIPULATED AND
13   AGREED that notice of filing of the deposition by
14   the Commissioner is waived.
15
16
17
18
19
20
21
22
23

4

1          I N D E X
2
3    EXAMINATION BY:            PAGE NUMBER:
4    Mr. Fry              6, 45
5    Mr. Underwood             45
6
7    EXHIBITS:            PAGE NUMBER:
8    (No Exhibits Were Marked)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

5

1          A P P E A R A N C E S
2
3    FOR THE PLAINTIFF(S):
4        Carl E. Underwood, III, Esq.
5        THE COCHRAN FIRM
6        163 West Main Street
7        Dothan, Alabama 36302
8
9        P. Mark Petro, Esq.
10       SCHREIBER & PETRO
11       Two Metroplex Drive
12       Suite 250
13       Birmingham, Alabama 35209
14
15   FOR EQUITY GROUP EUFAULA DIVISION
16       Gary D. Fry, Esq.
17       Pelino & Lentz
18       One Liberty Place
19       Thirty-Second Floor
20       1650 Market Street
21       Philadelphia, Pennsylvania 19103
22
23       **********************

c9595e69-41c8-4619-8234-c5746fda8603

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

6

1
2          I, Victoria M. Castillo, a Court
3    Reporter of Montgomery, Alabama, acting as
4    Commissioner, certify that on this date, as
5    provided by the Alabama Rules of Civil Procedure
6    and the foregoing stipulation of counsel, there
7    came before me at WILLIAMS, POTTHOFF, WILLIAMS &
8    SMITH, 125 South Orange Avenue, Eufaula, Alabama
9    36027, commencing at 10:04 a.m., STEVEN KINCEY, in
10   the above cause, for oral examination, whereupon
11   the following proceedings were had:
12
13          STEVEN KINCEY,
14     being first duly sworn, was examined and
15         testified as follows:
16
17          COURT REPORTER: Usual
18   stipulations?
19          MR. FRY: Yes.
20
21   EXAMINATION BY MR. FRY:
22     Q.   My name is Gary Fry, and I'm an
23   attorney. I represent Equity Group Eufaula, the

7

1    folks that run the plant out in Baker Hill. We've
2    asked you here today to put some questions to you
3    concerning a lawsuit that you and some other folks
4    have brought against the company. Have you ever
5    been deposed before?
6      A.   This.
7      Q.   Yes, have you ever done this before?
8      A.   No.
9      Q.   This is called a deposition. Let me
10   just briefly explain to you. I'll be asking the
11   questions, and you will be supplying the answers,
12   and our court reporter, Victoria, will be taking
13   down what we both say. If you don't understand one
14   of my questions, it's important that you let me
15   know so that I can rephrase it -- hopefully in a
16   manner in which you will understand it. If you
17   don't hear anything I say, let me know that as well
18   and I will repeat it. My only request is that you
19   keep your answers to my questions verbal so
20   Victoria can take down your answers -- she can't do
21   the shake or the nod of the head -- and try not to
22   anticipate my questions and talk over me, and I
23   will try not to interrupt you while you're

8

1    answering, so we don't talk over one another.
2    Okay?
3      A.   Okay.
4      Q.   Where do you live?
5      A.   209 East Alabama Street, Abbeville.
6      Q.   What state?
7      A.   Alabama -- 36310.
8      Q.   Thank you. What's your date of
9    birth?
10     A.   8/3/73.
11     Q.   Are you currently employed?
12     A.   Yes, I am.
13     Q.   By whom?
14     A.   Henry County Health and Rehab.
15     Q.   I assume at one point in time you
16   were employed by the Equity plant in Baker Hill?
17     A.   Yes, I was.
18     Q.   And for what period of time?
19     A.   The year -- I'm not to be exact --
20   but it was like in '05, '07.
21     Q.   From approximately 2005 to '07?
22     A.   No, I'm saying in between -- I don't
23   know exactly the dates, you know, the year.

9

1      Q.   But you worked sometime out there
2    between those two years, is that what you're
3    saying?
4      A.   Uh-huh.
5      Q.   And for what length of time did you
6    work there?
7      A.   About five months.
8      Q.   What did you do?
9      A.   Well, I started out in debone on the
10   line.
11     Q.   How long did you perform that job?
12     A.   I stayed on there for about a month.
13     Q.   Then what did you do?
14     A.   Squeegee.
15     Q.   Pardon?
16     A.   Squeegee -- I cleaned the floors.
17     Q.   How long did you do that?
18     A.   For the rest of the period of time I
19   was there.
20     Q.   Why did you leave that job?
21     A.   I had missed too many days.
22     Q.   So you were terminated for violation
23   of the point policy?

c9595e69-41c8-4619-8234-c5746fda8603

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

**10**

1    A.    Right.

2    Q.    What shift did you work?

3    A.    Day shift.

4    Q.    What were your hours?

5    A.    We worked from three to whatever time

6    we got off.

7    Q.    Did those hours apply to you whether

8    you were working on the debone line or cleaning the

9    floors?

10    A.    Well, I had to stay longer if I was

11    cleaning the floors.

12    Q.    Your floor-cleaning job, was that

13    during the time that production was ongoing in the

14    debone department?

15    A.    Before, during, and after.

16    Q.    Did you perform that job in the

17    debone department floor?

18    A.    Right.

19    Q.    Did you work any other shifts while

20    you were there?

21    A.    Huh-uh.

22    Q.    Tell me what you did for the one

23    month that you worked on the debone line.

---

**11**

1    A.    I started out cutting shoulders, and

2    then you rotate to like the wings and pulling the

3    tenders and the skin.

4    Q.    So you rotated on the line?

5    A.    Right.

6    Q.    Did you rotate on the line every day?

7    A.    Yes.

8    Q.    How many times per day would you

9    rotate?

10    A.    Three to four.

11    Q.    What caused you to move from the

12    debone line to the floor?

13    A.    My hands had started hurting.

14    Q.    From the cold?

15    A.    From the cold and handling the

16    knives.

17    Q.    Who was your supervisor in the debone

18    line?

19    A.    What was his name -- I can't think of

20    his name.

21    Q.    Who supervised you on the

22    floor-cleaning job?

23    A.    The same guy, I think.

---

**12**

1    Q.    Same guy?

2    A.    Yes.

3    Q.    What was your rate of pay?

4    A.    That I don't remember. I think it

5    was no more than $7.50.

6    Q.    How many hours a day did you work

7    generally?

8    A.    Well, that's hard to say because we

9    supposed to got off at a certain time, but if we

10    had to work over like one, two, that's what we

11    had to do. So 40-plus hours every week.

12    Q.    Monday through Friday?

13    A.    Uh-huh -- sometimes on Saturday if

14    needed.

15    Q.    When you worked overtime, did you get

16    paid time-and-a-half?

17    A.    Yes.

18    Q.    Did you ever have any problems with

19    the overtime computations?

20    A.    A couple of times I did.

21    Q.    And what did you do when you had

22    those problems?

23    A.    I went to the office.

---

**13**

1    Q.    And what happened?

2    A.    They corrected them.

3    Q.    During the period that you were

4    working at the Equity plant were you a member of

5    the Union?

6    A.    No.

7    Q.    You understand that you have a claim

8    in this lawsuit?

9    A.    Right.

10    Q.    And what's your understanding of the

11    nature of your claim?

12    A.    Hours worked and not paid for -- not

13    getting paid for the hours worked.

14    Q.    What work do you feel that you

15    performed for which you weren't paid?

16    A.    Honestly?

17    Q.    Yes, you have to be honest.

18    A.    To me, personally I believe we was

19    underpaid.

20    Q.    Underpaid for everything?

21    A.    Right.

22        MR. UNDERWOOD: He's particularly

23    asking you about the lawsuit though. That's not

---

14

1  what the lawsuit is about.
2      Q.   (Mr. Fry) I want to know what is
3  your understanding of what the lawsuit is about.
4      A.   I was just telling you the
5  understanding of the pay, period.
6      Q.   Let's get to the lawsuit.
7      A.   Okay.
8      Q.   What do you think your claim for is
9  here?
10     A.   Hours worked and not getting paid.
11     Q.   What work did you perform for which
12 you weren't paid, if any?
13     A.   The time it took for me to take off
14 my equipment and stuff, and I didn't get paid for
15 that.
16     Q.   Anything else?
17     A.   That's it.
18     Q.   How did you come across that
19 understanding?
20     A.   Well, there was discussion going on
21 when I was working there of people complaining to
22 the office about that.
23     Q.   How do you know that?

15

1      A.   Because I went up there and I was one
2  of the ones that complained.
3      Q.   You complained?
4      A.   Yes.
5      Q.   You complained to the office about
6  not being paid for putting on and taking off your
7  clothes?
8      A.   Right.
9      Q.   And who did you complain --
10     A.   PPEs.
11     Q.   Who did you complain to?
12     A.   We complained to the Resource people.
13     Q.   Do you recall when you did that?
14     A.   No, because, you know, we did it more
15 than one time.
16     Q.   Were those oral or written
17 complaints?
18     A.   Oral.
19     Q.   Do you know whether anybody ever
20 complained to the Union?
21     A.   Not that -- I don't know. I wasn't
22 part of the Union, so I don't know.
23     Q.   Did you speak with anybody concerning

16

1  your appearance here today for your deposition
2  besides your lawyers?
3      A.   No.
4      Q.   Did you review any papers in
5  preparation for coming here?
6      A.   No.
7      Q.   Let's get to the clothing you just
8  referred to. Tell me what items of clothing you
9  wore --
10     A.   You mean the PPEs?
11     Q.   PPEs.
12     A.   Ear plugs.
13     Q.   Let's start -- like let me finish my
14 question. I want you to identify for me the
15 clothing -- or as you put it, the PPE -- that you
16 wore, and let's start with your floor-cleaning
17 job. What were you putting on every day to perform
18 that job?
19     A.   Boots, aprons, smocks, cotton liners,
20 rubber gloves, and protective eye wear, and ear
21 plugs.
22     Q.   Boots, apron, a smock, glove liner,
23 plastic gloves, and eye wear?

17

1      A.   Yes -- and sleeves.
2      Q.   Anything else?
3      A.   That's it for the squeegee job.
4      Q.   What about a hair net?
5      A.   Yes, hair net too. I'm sorry.
6      Q.   Which of these items did you wear
7  when you worked on the debone line?
8      A.   All those plus an arm guard and a
9  chain glove.
10     Q.   Which of these items were you
11 required to wear, that you identified for me that
12 you wore when you were cleaning the floor?
13     A.   All, except for the arm guard and the
14 cutting glove.
15     Q.   Was it your understanding that you
16 were required to wear, for example, the plastic
17 sleeves?
18     A.   Yes.
19     Q.   What were the plastic sleeves for?
20     A.   For not getting wet, and stuff like
21 that, and protecting your arms.
22     Q.   From what you were able to observe in
23 the debone room, did everybody that worked in there

c9595e69-41c8-4619-8234-c5746fda8603

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

18

1 wear these exact same items?
2    A.    Yes.
3    Q.    You didn't see any variation at all?
4    A.    No -- when you say "variation", what
5 do you mean?
6    Q.    Did you see some people that did not
7 wear the sleeves?
8    A.    Well, some of them didn't.
9    Q.    Some of them?
10    A.    Didn't.
11    Q.    Did not?
12    A.    Yes.
13    Q.    Did anyone ever tell you that the
14 sleeves were optional?
15    A.    No.
16    Q.    Which of these items that you have
17 identified for me were given to you by the plant --
18    A.    You mean given that you didn't have
19 to pay for or --
20    Q.    Issued to you?
21    A.    That you didn't have to pay for or
22 you had to pay for?
23    Q.    Yes.

19

1    A.    All of them were given to you.
2    Q.    What did you have to pay for?
3    A.    You had to pay for your boots; and if
4 you lost your smock, you had to pay for your smock;
5 and your ear plugs; your glasses, if you lost them;
6 and your arm guard; and your cutting glove if you
7 didn't turn it in.
8    Q.    When you worked there, were you
9 permitted to wear your boots from home?
10    A.    At first I wasn't, and then later on
11 you could.
12    Q.    Did you have to wear the company
13 boots, or could you wear boots that you purchased?
14    A.    Company boots.
15    Q.    You had to wear the company boots?
16    A.    Right.
17    Q.    Which of these items that you have
18 identified for me did you pick up on a daily basis?
19    A.    The smocks, and ear plugs if you
20 didn't have them.
21    Q.    What about the hair net?
22    A.    Yes. I'm sorry -- and if you had a
23 beard, you had to wear a beard net.

20

1    Q.    Did you have a beard when you were
2 working there?
3    A.    Yes, I did.
4    Q.    Which of these items could you wear
5 from home?
6    A.    Nothing but the boots.
7    Q.    Just the boots?
8    A.    Uh-huh.
9    Q.    What about the ear plugs?
10    A.    No. And your glasses, you could wear
11 your glasses if you wanted to.
12    Q.    When you were not working there at
13 the plant, what did you do with these items?
14    A.    You -- if you --
15    Q.    The items that you didn't turn in or
16 discard daily?
17    A.    You had to keep them in your locker
18 or take them home with you.
19    Q.    What did you do?
20    A.    I took them home.
21    Q.    When you were working as a floor
22 cleaner at the plant, where did you put on each of
23 these items that you identified for me?

21

1    A.    You had to put them on at work --
2 this thing that you hang them on when you go to
3 break, you had to put them on right there. It's
4 not a coat rack, but it's a rack that you hang
5 everything up on.
6    Q.    Where is this rack located?
7    A.    Right before you go in or come out
8 the double doors.
9    Q.    And the area is located on the
10 production floor?
11    A.    Right.
12    Q.    That's where you put on your apron,
13 your smock, your gloves and the liner, and the
14 sleeves?
15    A.    Right.
16    Q.    When did you put this stuff on?
17    A.    You mean before -- when you first got
18 to work?
19    Q.    Yes. When you first got to work,
20 when did you put it on?
21    A.    You put it on before you go to the
22 line.
23    Q.    When you were working as a floor

c9595e69-41c8-4619-8234-c5746fda8603

22

1   cleaner, you didn't go to a line, did you?
2       A.   Well, I'm saying you working right
3   there on the line.  You just on the floor.
4       Q.   Okay.  What time did your shift
5   start?
6       A.   Three.
7       Q.   Pardon?
8       A.   Three.
9       Q.   3 p.m.
10      A.   Uh-huh.
11      Q.   You worked second shift?
12      A.   Uh-huh.
13      Q.   It was your understanding you were
14  required to be on the production floor at 3 p.m.,
15  ready to go?
16      A.   Right.
17      Q.   How soon before 3 p.m. would you go
18  into the debone floor and put on this stuff?
19      A.   While I was working as a squeegee?
20      Q.   Yes, sir.
21      A.   Sometimes I would go in like ten
22  minutes before to make sure I had everything.
23  Because when I was coming in, the first shift was

23

1   working, so I had to go in and make sure everything
2   was ready for when my line came in.
3       Q.   When you were working on the debone
4   line, you used a knife, correct?
5       A.   Correct.
6       Q.   Did you use scissors as well?
7       A.   Yes.
8       Q.   How did you get those items?
9       A.   They would be on the line when you
10  got there.
11      Q.   You didn't have any responsibility
12  for going some place to pick them up?
13      A.   No.
14      Q.   Or to take them off when you're done
15  with them?
16      A.   No.
17      Q.   And you didn't have any
18  responsibility for sharpening those items, did you?
19      A.   No.
20      Q.   That was all taken care of by the
21  line leader?
22      A.   Right.
23      Q.   In connection with your job as a

24

1   floor cleaner, did you have to go retrieve any
2   other implements?
3       A.   Yes.
4       Q.   What did you have to get?
5       A.   I had to go get the squeegee.
6       Q.   And where did you get that?
7       A.   Upstairs in the box room.
8       Q.   When did you have to get that?
9       A.   I had to get that before I started
10  work.
11      Q.   What time was your shift scheduled to
12  end?
13      A.   It was scheduled to end from three to
14  eleven.
15      Q.   Eleven?
16      A.   Uh-huh.
17      Q.   How many breaks did you get during
18  the day when you worked as a floor cleaner?
19      A.   Breaks -- two.
20      Q.   Did you get two breaks as well when
21  you were on the debone line?
22      A.   Right.
23      Q.   Did you go with the debone line folks

25

1   on their break whenever they took their break when
2   you were cleaning floor?
3       A.   No, I had to stay and wash the floor
4   down before I left.
5       Q.   These were 30-minute breaks?
6       A.   Right.
7       Q.   Where did you take --
8       A.   The lunch breaks were 30 minutes.
9   The other breaks were 15 minutes.
10      Q.   How many breaks did you get in a day?
11      A.   We got two 15-minute breaks and one
12  lunch break.
13      Q.   How long was the lunch break?
14      A.   30 minutes.
15      Q.   Were any of these breaks paid?
16      A.   Paid, you mean --
17      Q.   Were you paid for the time for any of
18  these breaks to your understanding?
19      A.   I guess we were.  We supposed to have
20  been.
21      Q.   When you were a floor cleaner, when
22  after your 3 p.m. start did the first break occur?
23      A.   Somewhere around about six.

c9595e69-41c8-4619-8234-c5746fda8603

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

26

1    Q.    And was that a 15-minute break?
2    A.    Right.
3    Q.    When was the next break?
4    A.    Like two hours -- two hours and a
5    half after that, which was the lunch break.
6    Q.    About 8:30?
7    A.    Right.
8    Q.    When was the second 15-minute break?
9    A.    Around 9:30.
10   Q.    And that was a 15-minute break?
11   A.    Right.
12   Q.    How did you know when it was time to
13   go on break?
14   A.    They would say "break time".
15   Q.    Who would say?
16   A.    The line leaders.
17   Q.    Did the folks on the debone line, did
18   they also get the two 15-minute breaks and the
19   30-minute lunch break?
20   A.    Yes, I believe they did.
21   Q.    When the line leader said it was time
22   to go on break, you said you couldn't go at that
23   particular time, you had to clean up before you

---

27

1    went?
2    A.    Right.
3    Q.    And then you went on your break?
4    A.    Right.
5    Q.    When did you have to return from
6    break?
7    A.    Within 15 minutes. From the time I
8    left until 15 minutes, and I had to be back in
9    there.
10   Q.    Did the same routine apply at lunch?
11   A.    Right.
12   Q.    You stayed a little bit afterwards?
13   A.    Yes.
14   Q.    And you had to come back 30 minutes
15   after you went on break?
16   A.    Yes.
17   Q.    When you were working there, did you
18   drive to the plant every day?
19   A.    I rode with someone.
20   Q.    About what time would you get to the
21   plant?
22   A.    We would get there sometimes two,
23   sometimes 2:30.

---

28

1    Q.    So sometimes you arrived an hour
2    beforehand?
3    A.    Right.
4    Q.    Why would you do that?
5    A.    Just to be there so I can sit and
6    talk to my friends before I go to work.
7    Q.    In order to get into the plant, did
8    you have to clear security?
9    A.    At the front gate, yes. The very
10   first gate before you go in, yes.
11   Q.    What did you do have to do clear
12   security?
13   A.    You had to have proof that you work
14   there, like the parking things.
15   Q.    Did your ride have a parking sticker?
16   A.    Yes.
17   Q.    And was he able to just drive on to
18   the property with that sticker?
19   A.    If they seen it, they didn't stop
20   you. They just let you go.
21   Q.    Have you ever been personally
22   searched before you entered the plant?
23   A.    Not personally, but cars -- I have

---

29

1    been in a car that got searched.
2    Q.    How many times?
3    A.    Altogether -- the car that I was
4    in -- maybe three, four times.
5    Q.    But have you ever been personally
6    searched?
7    A.    No.
8    Q.    Have any of your possessions ever
9    been searched?
10   A.    No.
11   Q.    When you left at the end of the day,
12   were you ever personally searched?
13   A.    No.
14   Q.    Were you stopped on the way out in
15   the car you were riding with ever at the end of the
16   day?
17   A.    Was the car searched, or was the
18   people in the car searched?
19   Q.    Either.
20   A.    The car was searched.
21   Q.    How many times?
22   A.    Three to four times.
23   Q.    So it happened when they left at the

---

c9595e69-41c8-4619-8234-c5746fda8603

30

1  end of the day?
2      A.   Right.
3      Q.   Describe for me now what you did
4  routinely when you arrived at the plant when you
5  were working as a floor cleaner?
6      A.   I get to work, I clock in, get ready
7  to go to work, get inside, walk through the
8  sanitizing for the boots, put my
9  PPEs on, go to the sink, wash everything -- and if
10  the thing wasn't there for the boots, you had to
11  wash the boots yourself -- and then go get my
12  squeegee and start work.
13     Q.   Let's back up.  You got out of the
14  car you arrived in, and you went into the plant.
15  What is the first thing you did when you got into
16  the plant?
17     A.   I went and clocked in.
18     Q.   Then what did you do?
19     A.   Put my stuff away, and then got
20  everything that I needed and went to work.
21     Q.   When you say "you got everything you
22  needed" what did you mean?
23     A.   My PPEs -- if you didn't have your

31

1  ear plugs or something, you had to go to the supply
2  room and get some before you could enter the
3  production room.
4      Q.   Didn't you have to go to supply to
5  pick up a smock anyway?
6      A.   When they was cleaning them, yes.
7      Q.   And for the time you were there, did
8  you ever have to clean the smock?
9      A.   Yes.
10     Q.   For how long?
11     A.   It wasn't that long because a lot of
12  people was not cleaning them, so they just took it
13  upon themselves to clean them.
14     Q.   When that changeover occurred then,
15  you had to report and pick up a smock every day?
16     A.   Yes.
17     Q.   How long did that take?
18     A.   Honestly, it depended on what time
19  you got to work.  That is why sometimes that is why
20  I used to get there early.
21     Q.   How long would it take you?  What was
22  the longest time it ever took you to get a smock?
23     A.   30 to 45 minutes.

32

1      Q.   And from what you were able to
2  observe, what took you 30 to 45 minutes to get a
3  smock?
4      A.   The people, and plus it wasn't but
5  one person working in supply.
6      Q.   Describe for me what you observed.
7  How would people get smocks?
8      A.   You would stand in line, and when
9  it's your turn, you show your badge, they write it
10  down, you tell them what size you need, and that
11  was it -- whatever -- if you needed more than that,
12  you get it while you was up there.
13     Q.   How many times did you wait 30 or 45
14  minutes to get a smock?
15     A.   Three to four times at least -- and
16  that's not the whole time I was there.  I'm just
17  saying sometimes in a week.
18     Q.   What's the shortest time you ever
19  waited there?
20     A.   About five, ten minutes.
21     Q.   After you pick up your smock and any
22  other items you needed, what did you do?
23     A.   Go in, get dressed, and go to work.

33

1      Q.   Well, did you go to the break room?
2      A.   No.
3      Q.   You never went to the break room?
4      A.   No.
5      Q.   What about the times when you arrived
6  at two o'clock?
7      A.   Of course I did because I was there
8  early.
9      Q.   So when you came early, you went to
10  the break room before you actually went into the
11  production floor?
12     A.   Right.
13     Q.   How often would you do that?
14     A.   Sometimes three, four times a week,
15  depending on if I got there early.
16     Q.   And what would you do in the break
17  room?
18     A.   Sit down and eat something.
19     Q.   Talk?
20     A.   Yes, while I'm eating.
21     Q.   Were there other folks in there?
22     A.   Yes.
23     Q.   Doing the same thing?

c9595e69-41c8-4619-8234-c5746fda8603

34

1    A.   Yes.
2    Q.   Your shift started at 3 p.m.?
3    A.   Right.
4    Q.   What time would you leave the break
5   room to go in for purposes of working that shift?
6    A.   Me, personally, I usually go about 15
7   minutes.
8    Q.   Tell me what you did when you entered
9   the production floor.  Wait, let's go back.  You
10  mentioned a foot bath.
11    A.   Right.
12    Q.   You had to go through double doors,
13  and then there was a little area there where your
14  shoes were decontaminated or sanitized?
15    A.   Yes.
16    Q.   And did you have to stop there?
17    A.   No, you just walk through.
18    Q.   And then you went through two other
19  double doors?
20    A.   Yes.
21    Q.   And then what did you do?
22    A.   Put on your smock, everything that
23  you needed, and then you go to the wash area and

35

1   wash up.
2    Q.   Once you were on the production
3   floor, how long did it take you to put on your
4   smock, your apron, and your sleeves?
5    A.   Just off the top of my head,
6   probably -- just to put them on without before I
7   cleaned them -- probably about five, six minutes.
8    Q.   And then how long did it take you to
9   clean them?
10    A.   Depending on how many people was at
11  the sink.
12    Q.   If you were the first person at the
13  sink, how long would it take you?
14    A.   Two to three minutes.
15    Q.   What would you do?
16    A.   Get soap, wash your hands, soap them
17  up, and then rinse them off.
18    Q.   How many sinks were available in the
19  debone production floor?
20    A.   It was two sinks, but they were like
21  maybe about half the size of this table, and then
22  there was another one on the other side.
23    Q.   Were those the only sinks on that

36

1   production floor?
2    A.   In that corner, yes.
3    Q.   But in another corner were there
4   other sinks?
5    A.   No, not in debone.
6    Q.   Tell me now what you had to do when
7   it was time for you to go on break and you're to
8   clean the floor.
9    A.   When it's time for me to go to
10  break?
11    Q.   Yes, sir.
12    A.   I have to make sure the floor is
13  squeegee -- when I wash it down, I have to make
14  sure there's no water, in case when they come back,
15  they don't slip and fall, and then I go wash my
16  stuff, take it off -- I am sorry, not my stuff --
17  my PPEs, wash it, take it off, and then go
18  outside.
19        MR. FRY:  You're a good student.
20        MR. UNDERWOOD:  Object to the
21  statement by the attorney.
22    Q.   (Mr. Fry)  How long would it take you
23  to clean up the floor after the other folks went on

37

1   break?
2    A.   Sometimes probably about 15 to 20
3   minutes.
4    Q.   And then you went on your break?
5    A.   Right, yes.
6    Q.   For 15 minutes?
7    A.   Yes.
8    Q.   After you're done cleaning up after
9   everyone left, you went over and washed down?
10    A.   Yes.
11    Q.   And took your stuff off and went on
12  break?
13    A.   Yes.
14    Q.   By the time you got over there, were
15  there any other folks that you had to wait on to
16  wash down?
17    A.   Yes.
18    Q.   There were still people there after
19  20 minutes?
20    A.   Yes.
21    Q.   You're sure about that?
22    A.   Yes, I'm positive.  Because you got
23  the whole debone area washing up at two sinks, and

c9595e69-41c8-4619-8234-c5748fda8603

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

38

1 there might be 50 people in there.
2    Q.   How long do you estimate it took you
3 from the time you finished mopping up until you got
4 to go into the break room?
5    A.   Probably seven, eight minutes.
6    Q.   How far of a walk is it between the
7 debone break room and the production floor?
8    A.   It's not that far.
9    Q.   It's right across the hallway, right?
10    A.   Yes.
11    Q.   Okay.  At the end of your break, what
12 did you do to get back into the production floor?
13    A.   Walk through the double doors, boot
14 sanitation, go to the rack, put your stuff on, your
15 PPEs, go wash them, get back on the line.
16    Q.   How long would that process take you?
17    A.   Well, me because I was on the floor,
18 it wouldn't take me as long as it takes them
19 because I go to break after them.  So when I get
20 back on, they already at work.
21    Q.   So how long did it take you?
22    A.   About five to seven minutes.
23    Q.   Tell me what you did at the end of

39

1 the day in order to leave, whenever that was.
2    A.   We go to the sink, wash PPEs, go take
3 them off at the thing -- because you couldn't walk
4 out in the hallway with them on -- and put the
5 smock in the thing, and just go.
6    Q.   How long did that process take you?
7    A.   Me, that process didn't take me that
8 long because everybody was gone by then.
9    Q.   Approximately how long did that take
10 you?
11    A.   Three to four minutes.
12    Q.   After production ended you had to
13 stay around and clean up, correct?
14    A.   Yes.
15    Q.   Was it your understanding that you
16 were paid for that time when you were working
17 there?
18    A.   Yes.
19    Q.   That's not part of your claim here,
20 is it -- or is it?
21    A.   No.
22    Q.   It's not?
23    A.   No.

40

1    Q.   What was your understanding as to how
2 the company kept track of the hours that you worked
3 when you were there?
4    A.   By the time clock.
5    Q.   The time clock that you swiped?
6    A.   Right.
7    Q.   And you swiped in in the
8 mid-afternoon, and you swiped out at night when you
9 left?
10    A.   Yes.  Unless there was something
11 wrong with the clock.
12    Q.   What was your understanding as to the
13 time for which you were to be paid?
14    A.   From three until the time I got off.
15    Q.   Whenever you worked overtime, was it
16 your understanding you were paid until you clocked
17 out?
18    A.   Yes.  Unless if you got off at eleven
19 and you stayed there until 11:30, 11:45 and then
20 you clocked out, no.
21    Q.   Okay.  Who kept track of your
22 overtime?
23    A.   The supervisor.

41

1    Q.   And to your knowledge, he would keep
2 track of that manually?
3    A.   Yes, as well as the time clock.
4    Q.   I think you told me early on that you
5 complained at least once about some overtime pay?
6    A.   No, just pay, period.  I was missing
7 a couple of hours on my check.
8    Q.   Is that the only time you ever
9 complained to a supervisor about any pay problems?
10    MR. UNDERWOOD:  Other than his
11 testimony that he complained about not getting paid
12 for the PPEs getting taken off.
13    THE DEPONENT:  I am assuming that
14 is what he is talking about.
15    MR. FRY:  Yes, I am not talking
16 about the claims here.  I know you made
17 complaints.  You testified to that.
18    A.   Other than missing time -- hours on
19 my check, other than for the PPEs, huh-uh.
20    Q.   (Mr. Fry)  When you were there, did
21 you keep track of your time in any fashion?
22    A.   I tried to the best of my knowledge.
23 You know, sometimes your mind --

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

42

1    Q.    Just in your head -- you didn't make
2    any notes?
3    A.    Well, I wrote it down.
4    Q.    You wrote it down?
5    A.    Uh-huh.
6    Q.    Did you keep notes?
7    A.    Right, how many hours I worked that
8    day.
9    Q.    You didn't keep those notes, did you?
10   A.    No.  After I got my check and it was
11   right, I threw them away.
12   Q.    Okay.  Have you made any kind of
13   calculations as to the time you worked for which
14   you believed you should have been paid that you
15   weren't that you're claiming in this case?
16   A.    Say that again.
17   Q.    Yes.  That was a dumb question,
18   wasn't it?  Do you have any calculations, have you
19   made any calculations as to how much you think you
20   are owed in this lawsuit?
21   A.    No, I have not.
22   Q.    With the exception of the point
23   policy for which you were terminated, were you ever

---

43

1    written up for anything while you were there?
2    A.    Written up, no.
3    Q.    You worked on the debone line for
4    approximately a month?
5    A.    Yes.
6    Q.    When it was time for you to go on
7    break when you were working on the debone line, how
8    did that work?
9    A.    They would say "break time", and
10   depending on what part of the line you was on -- if
11   you was at the front of the line, you couldn't
12   leave off the line until the last bird goes past
13   you, then so forth on down the line, then you went
14   and washed your PPEs, went and took them off, and
15   went to break.
16   Q.    So the people left the line in a
17   staggered fashion?
18   A.    Right.  First there's the people that
19   loads the line, they go to break first.  Then the
20   shoulder cutters.  When the last bird passes them,
21   they go.  Then the wing cutters.  When the last
22   bird passes that person, that person, they go.
23   Then the tenders and the skin, and then the frames

---

44

1    at the end.
2    Q.    When you return from break, did the
3    people that were first in line, did they generally
4    show up first?
5    A.    Right.
6    Q.    And the people towards the end of the
7    line, they came in a little later?
8    A.    Yes.
9    Q.    So you went on break in a staggered
10   fashion, and you returned from the break in the
11   staggered fashion?
12   A.    When you return from break, if you
13   wanted to get on line ahead of time before the bird
14   gets to you, yes, you can get on like that.
15   Q.    But people return at different times?
16   A.    Yes.
17         MR. FRY:  Thank you.  That's all
18   I have.
19         MR. UNDERWOOD:  Take a quick
20   break.
21              10:40 a.m.
22              (Short break.)
23              10:41 a.m.

---

45

1         MR. UNDERWOOD:  Quick follow-up
2    here.
3
4    EXAMINATION BY MR. UNDERWOOD:
5    Q.    Did you ever have to do any exercises
6    before you went on the line in debone?
7    A.    When I first started, they did.  But
8    soon after that, they didn't do them anymore.
9    Q.    Just briefly tell me what you-all had
10   to do on the exercises.
11   A.    Do stretch and work your fingers and
12   your neck, you know, and your wrists.
13   Q.    And this is after you were fully
14   suited in your PPEs?
15   A.    Yes.
16   Q.    And were these exercises, were they
17   led by a supervisor or a line leader?
18   A.    Depending on if the supervisor was in
19   production.  If he wasn't, then the line leader led
20   it.
21         MR. UNDERWOOD:  That's all.
22
23   EXAMINATION BY MR. FRY:

---

c9595e69-41c8-4619-8234-c5746fda8603

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

46

1    Q.    How long did you spend exercising?
2    A.    It wasn't a long process, you know,
3  like, you know.
4    Q.    A minute, two minutes?
5         MR. UNDERWOOD: If you know.
6    A.    No more than two.
7    Q.    (Mr. Fry)  And what were you told was
8  the purpose of the exercises?
9    A.    So your hands wouldn't get stiff, and
10  you know, work the muscles, loosen the muscles up
11  before you start.
12    Q.    And you did these exercises when you
13  were on the debone line?
14    A.    Yes.
15    Q.    Did you do these from the time you
16  started on the debone line?
17    A.    Explain what you are saying.
18    Q.    When you first went on the debone
19  line, is that when you did the exercises?
20    A.    Right.  They started doing them.  And
21  soon after that, they stopped.
22    Q.    What did they tell you about them
23  when they started them?  What did they tell you

47

1  about the exercises?
2    A.    They were for so you didn't have any
3  injuries and stuff like that.
4    Q.    And who told you that?
5    A.    The line leaders.
6    Q.    What did they tell you when they
7  stopped them?
8    A.    They didn't tell anything.  They went
9  in, and we didn't do them anymore.
10         MR. FRY:  Okay.  Thank you.
11         10:42 a.m.
12  ***********************
13         FURTHER DEPONENT SAITH NOT
14
15
16
17
18
19
20
21
22
23

48

1                  CERTIFICATE
2
3  STATE OF ALABAMA
4  AT LARGE
5
6         I hereby certify that the above
7  and foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10  transcription and that the foregoing represents a
11  true and correct transcript of the testimony given
12  by said witness upon said deposition.
13         I further certify that I am
14  neither of counsel nor of kin to the parties to the
15  action, nor am I in anywise interested in the
16  result of said cause.
17
18
19
20
21
22    _____
     Victoria M. Castillo, Certified Court Reporter
     ACCR# 17, Expires 9/30/2008
23   Commissioner and Notary Public

**TAB 30**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


NO.:  2:06-CV-1081-MEF


BETTY ANN BURKS, et al.,

        Plaintiff(s),

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

        Defendant(s).



                        DEPOSITION OF

                        EVELYN LAMPLEY

                            JOB NO. 1101-58403



BEFORE:    Victoria M. Castillo

           Certified Court Reporter and

           Notary Public

           ACCR# 17, Expires 9/30/2008

871c0a9b-5b94-47b1-9e25-b4c2e98ef446

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

**2**

1       In accordance with Rule 5(d) of
2 The Alabama Rules of Civil Procedure, as Amended,
3 effective May 15, 1988, I, Victoria M. Castillo, am
4 hereby delivering to HOWARD A. ROSENTHAL, ESQ. the
5 original transcript of the oral testimony taken on
6 the 22nd day of May, 2008, along with exhibits.
7       Please be advised that this is
8 the same and not retained by the Court Reporter,
9 nor filed with the Court.
10
11     S T I P U L A T I O N
12
13       IT IS STIPULATED AND AGREED, by
14 and between the parties through their respective
15 counsel, that the deposition of EVELYN LAMPLEY may
16 be taken before Victoria M. Castillo, Commissioner,
17 at WILLIAMS, POTTHOFF, WILLIAMS & SMITH, 125 South
18 Orange Avenue, Eufaula, Alabama 36027 on the 22nd
19 day of May, 2008.
20       IT IS FURTHER STIPULATED AND
21 AGREED that the signature to and the reading of the
22 deposition by the witness is waived, the deposition
23 is said to have the same force and effect as if

**3**

1 full compliance had been had with all laws and
2 rules of Court relating to the taking of
3 depositions.
4       IT IS FURTHER STIPULATED AND
5 AGREED that it shall not be necessary for any
6 objections to be made by counsel to any questions,
7 except as to form or leading questions, and that
8 counsel for the parties may make objections and
9 assign grounds at the time of trial, or at the time
10 said deposition is offered in evidence, or prior
11 thereto.
12       IT IS FURTHER STIPULATED AND
13 AGREED that notice of filing of the deposition by
14 the Commissioner is waived.
15
16
17
18
19
20
21
22
23

**4**

1       I N D E X
2
3 EXAMINATION BY:       PAGE NUMBER:
4 Mr. Fry       6, 38
5 Mr. Underwood       35
6
7 EXHIBITS:       PAGE NUMBER:
8 Lampley Exhibit 1       32
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**5**

1     A P P E A R A N C E S
2
3 FOR THE PLAINTIFF(S):
4    Carl E. Underwood, III, Esq.
5    THE COCHRAN FIRM
6    163 West Main Street
7    Dothan, Alabama 36302
8
9 FOR EQUITY GROUP EUFAULA DIVISION
10    Gary D. Fry, Esq.
11    Pelino & Lentz
12    One Liberty Place
13    Thirty-Second Floor
14    1650 Market Street
15    Philadelphia, Pennsylvania 19103
16
17    ********************
18
19    I, Victoria M. Castillo, a Court
20 Reporter of Montgomery, Alabama, acting as
21 Commissioner, certify that on this date, as
22 provided by the Alabama Rules of Civil Procedure
23 and the foregoing stipulation of counsel, there

871c0a9b-5b94-47b1-9e25-b4c2e98ef446

6

1  came before me at WILLIAMS, POTTHOFF, WILLIAMS &
2  SMITH, 125 South Orange Avenue, Eufaula, Alabama
3  36027, commencing at 9:13 a.m., EVELYN LAMPLEY, in
4  the above cause, for oral examination, whereupon
5  the following proceedings were had:
6
7             EVELYN LAMPLEY,
8       being first duly sworn, was examined and
9           testified as follows:
10
11         COURT REPORTER:  Usual
12  stipulations?
13         MR. UNDERWOOD:  Yes.
14         MR. FRY:  Yes.
15
16  EXAMINATION BY MR. FRY:
17   Q.   Good morning, Ms. Lampley.
18   A.   Good morning.
19   Q.   I am one of the lawyers representing
20  Equity Group Eufaula -- the folks that run the
21  plant up here in Baker Hill -- and we have asked
22  you to come here today to put certain questions to
23  you concerning a lawsuit which you and some other

7

1  folks have brought against the company.  Have you
2  ever given a deposition before?
3   A.   No.
4   Q.   Okay.  The procedure is fairly
5  simple.  I will ask the questions, and you will
6  give me the answers.  Victoria, the court reporter
7  here, will be taking down what we both say.  If you
8  don't understand one of my questions, it's
9  important that you let me know that, so that I can
10  rephrase it so you will understand it.  Okay?
11   A.   Yes, sir.
12   Q.   And if you don't hear my question or
13  you don't hear all of it, please let me know and I
14  will repeat it.  And the only other rules are your
15  answers should be verbal as opposed to a nod or a
16  shake of the head, and we shouldn't talk over one
17  another.  Don't anticipate my question, and I will
18  not break it into when you're answering.  Okay?
19   A.   Yes, sir.
20   Q.   What's your home address?
21   A.   86 McGivary Road, Louisville,
22  Alabama.
23   Q.   And what is your date of birth?

8

1   A.   November 23rd, 1952.
2   Q.   Are you currently employed?
3   A.   Yes.
4   Q.   By whom?
5   A.   Equity Group.
6   Q.   How long have you worked at Equity?
7   A.   This year in August will be ten
8  years.
9   Q.   So you started at the Baker Hill
10  plant in August of 1998?
11   A.   Yes.
12   Q.   When you started at the plant, was it
13  being operated by CP?
14   A.   Yes.
15   Q.   And do you recall about when Equity
16  took over the operation of the plant?
17   A.   No.
18   Q.   I would like you now to take me
19  through the jobs that you've had at the plant since
20  you've been there?
21   A.   Debone line, or either pull breasts,
22  pull tenders, or clip tenders.  That's it for
23  debone.

9

1   Q.   You are presently working at the
2  debone department?
3   A.   Wash station now.
4   Q.   Pardon?
5   A.   Wash station.
6   Q.   You are presently working at a wash
7  station?
8   A.   Uh-huh.
9   Q.   And what do you do there?
10   A.   Wash chickens.
11   Q.   How long have you had that job?
12   A.   About a year and a half.
13   Q.   What did you do before you got the
14  wash job?
15   A.   I was on the debone line.
16   Q.   How long had you been on the debone
17  line?
18   A.   From since I had been out there.
19   Q.   From the beginning, right?
20   A.   Uh-huh.
21   Q.   What shift do you currently work?
22   A.   I work first shift.
23   Q.   How long have you worked the first

871c0a9b-5b94-47b1-9e25-b4c2e98ef446

10

1  shift?
2       A.   Since I've been out there.
3       Q.   For ten years?
4       A.   Yes.
5       Q.   Who is your present supervisor?
6       A.   Sampson Reeves.
7       Q.   What is your present rate of pay?
8       A.   $9.95.
9       Q.   How many hours per week do you
10  normally work?
11      A.   Forty.
12      Q.   Is that for five days a week?
13      A.   Yes.
14      Q.   You understand that you are a party
15  to this lawsuit?
16      A.   Yes.
17      Q.   What's your understanding about what
18  your claim is?
19      A.   Get paid for minutes that we didn't
20  get paid for.
21      Q.   What do you believe you did that you
22  have not been paid for?
23      A.   Pulling off clothes and putting them

11

1  back on.
2       Q.   How did you come to have that
3  understanding?
4       A.   We just wasn't getting our 30
5  minutes.
6       Q.   Are you referring to the break period
7  now?
8       A.   Yes.
9       Q.   How did you find out about the
10  lawsuit?
11      A.   Flyers.
12      Q.   Did you talk to your coworkers about
13  it?
14      A.   No.
15      Q.   Have you ever been involved in any
16  other lawsuits with reference to the plant in Baker
17  Hill?
18      A.   No.
19      Q.   Are you a member of the Union?
20      A.   No.
21      Q.   So I gather that you've never
22  attended any Union meetings?
23      A.   No.

12

1       Q.   Did you review any documents to
2  prepare for your appearance here today?
3       A.   No.
4       Q.   Did you speak with anybody about your
5  appearance here today besides your attorneys?
6       A.   No.
7       Q.   Your current position is as a
8  washer -- is that what you're called?
9       A.   Yes.
10      Q.   Is that in the debone department?
11      A.   Yes.
12      Q.   Can you identify for me the articles
13  of clothing that you wear every day in performing
14  that job?
15      A.   Yes.  Hair net, ear plugs, brown
16  lining gloves, chain glove, sleeves, and the blue
17  gloves on top of that.
18      Q.   Anything else?
19      A.   No.
20      Q.   What about a smock?
21      A.   Yes, smocks.
22      Q.   Do you use a knife as a washer?
23      A.   We use scissors, yes, sir.

13

1       Q.   Scissors?
2       A.   Scissors, yes, sir.
3       Q.   You wear boots?
4       A.   Yes.
5       Q.   Which of these items to your
6  understanding are you required to wear?
7       A.   All of them.
8       Q.   From what you have been able to
9  observe in the debone department, are all the
10  employees in there clothed in the same way?
11      A.   Yes.
12      Q.   Which of the items that you have
13  identified for me are issued to you by the company?
14      A.   All of them.
15      Q.   Which of those items do you pick up
16  on a daily basis?
17      A.   The smocks.
18      Q.   Anything else?
19      A.   Well, we get issues three times a
20  week of the gloves.
21      Q.   Are you permitted to wear any of
22  these items from your home?
23      A.   No, no more than boots.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

14

1  Q.  Pardon?
2  A.  No more than your boots.
3  Q.  Just your boots?
4  A.  Yes.
5  Q.  Do you wear boots that were issued to
6  you by the company?
7  A.  Yes.
8  Q.  To your understanding are you
9  permitted to use your own boots?
10  A.  No.
11  Q.  You're not?
12  A.  No.
13  Q.  When you are not in the plant, where
14  do you keep these items that you just identified
15  for me?
16  A.  On the rack.
17  Q.  Overnight?
18  A.  No, we take them home -- all but the
19  smocks.
20  Q.  You take everything home except the
21  smocks?
22  A.  We leave them in our locker.
23  Q.  And what do you do?  Do you take

15

1  those items home, or do you leave them in your
2  locker?
3  A.  I mostly just leave my boots there.
4  Q.  When you were working on the debone
5  line, did you wear the same items that you just
6  identified for me?
7  A.  Yes.
8  Q.  Did you wear anything else?
9  A.  No.
10  Q.  What are the hours of the first shift
11  at the plant?
12  A.  Eight hours a day.
13  Q.  And what time do you start?
14  A.  7:30.
15  Q.  What time do you finish?
16  A.  4:30.
17  Q.  I want you to tell me now where you
18  put these items on that you just described for me
19  that you wear in connection with your job.
20  A.  Inside debone.
21  Q.  Inside the production floor?
22  A.  Yes.
23  Q.  Are you required to put them on

16

1  inside the production floor?
2  A.  Yes.
3  Q.  Do you put all of those items on
4  inside the production floor?
5  A.  No.  The ear plugs and the hair net,
6  that go on before you go inside.
7  Q.  When do you put these items on?
8  A.  Every morning.
9  Q.  I mean, when in relationship to when
10  your job starts?
11  A.  When we go on the inside.
12  Q.  And does your production shift start
13  at 7:30?
14  A.  Sometimes.
15  Q.  If it doesn't start at 7:30, when
16  might it start?
17  A.  Well, sometimes they will be still
18  cleaning up.
19  Q.  So the sanitation people might not be
20  finished?
21  A.  Right.
22  Q.  So you're delayed a little bit?
23  A.  Right.

17

1  Q.  The scissors that you use, how are
2  they provided to you?
3  A.  Supervisor.
4  Q.  When are they provided to you?
5  A.  Mornings.
6  Q.  Are they given to you when you're on
7  the line?
8  A.  We get them before we get on the
9  line.
10  Q.  Do you get them in the production
11  floor?
12  A.  Yes.
13  Q.  You don't have to go to a supply shed
14  to pick them up, do you?
15  A.  No.
16  Q.  They are provided to you by a line
17  leader?
18  A.  Yes.
19  Q.  Do you use anything else in
20  connection with your job?
21  A.  No.
22  Q.  How many breaks do you get during the
23  day?

18

1   A.   Two.
2   Q.   How long are each of the breaks?
3   A.   Supposed to be 30 minutes -- 30.
4   Q.   Where do you take your break?
5   A.   Where?
6   Q.   Yes, ma'am.
7   A.   I don't understand.
8   Q.   When it's time for you to take your
9   break, do you go to the debone break room?
10  A.   Yes.
11  Q.   That's where you take your break?
12  A.   Yes.
13  Q.   And where is that located in
14  relationship to where you perform your job in the
15  debone room?
16  A.   Outside where you go in at.
17  Q.   It's right across the hall?
18  A.   Yes.
19  Q.   What times during the shift do you
20  take your breaks?
21  A.   10:15 and 1:15.
22  Q.   Is it your understanding that the
23  break time is unpaid time?

19

1   A.   Yes.
2   Q.   How do you know when it's time for
3   you to take your break?
4   A.   They will call "break".
5   Q.   Does the line leader call "break"?
6   A.   Yes.
7   Q.   As soon as the line leader calls
8   "break", are you permitted to leave your
9   workstation?
10  A.   Yes.
11  Q.   You don't have to wait for the
12  chicken to stop coming to you?
13  A.   No, I have to cover them up.
14  Q.   When you were working on the debone
15  line and it was break time, am I correct that you
16  had to wait until the last chicken passed your
17  position before you could take the break?
18  A.   Yes.
19  Q.   How do you know that your break time
20  is finished and it's time to go back onto the
21  production floor?
22  A.   You have to look at the clock.
23  Q.   How soon do you go back in before

20

1   your scheduled start-up time again?
2   A.   Rephrase that, please.
3   Q.   Sure.  That was a dumb question.
4   You're right.  I agree with you.  Let me rephrase
5   that.  Your first break is at 10:15?
6   A.   Yes.
7   Q.   And it's a 30-minute break?
8   A.   Yes.
9   Q.   So I assume then that your break is
10  supposed to end at 10:45?
11  A.   Right.
12  Q.   How soon before 10:45 do you go back
13  into the production floor?
14  A.   We have to be on the floor, back in
15  by then.
16  Q.   So it takes you a little bit of time
17  to get there, correct?
18  A.   Yes.
19  Q.   How soon do you leave the break room
20  to get to your position on the production line?
21  A.   About five or six minutes.
22  Q.   Do you drive to the plant each day?
23  A.   No, I don't.

21

1   Q.   You get a ride?
2   A.   Yes.
3   Q.   What time do you usually get to the
4   plant?
5   A.   Sometimes seven, 7:15.
6   Q.   The car that you ride in, is it
7   stopped at the security shack?
8   A.   It was, but they got a permit, a
9   sticker.
10  Q.   So it has a sticker on there?
11  A.   Yes.
12  Q.   And because it has a sticker, the
13  guard in the guard shack just lets the driver into
14  the plant area, correct?
15  A.   Right.
16  Q.   At the end of the day when you leave,
17  you don't have to stop at all, do you?
18  A.   No.
19  Q.   Have you ever been searched before
20  you enter the plant?
21  A.   No.
22  Q.   Have your personal possessions ever
23  been searched before you went into the plant?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

22

1    A.    No.
2    Q.    How about when you left the plant at
3    the end of the day, have you ever been searched?
4    A.    No.
5    Q.    What I'd like for you to describe for
6    me now, Ms. Lampley, is what you do after your ride
7    parks the car and you go into the plant. Take me
8    through what you do before you actually start
9    performing your work.
10    A.    I clock in, then I go get me a smock.
11    Q.    When you go to get your smock, you go
12    to the supply room?
13    A.    Yes, yes.
14    Q.    Do you have to wait to get your
15    smock?
16    A.    We be in lines.
17    Q.    How quickly do the lines pass
18    through?
19    A.    Not long.
20    Q.    Not long?
21    A.    No.
22    Q.    After you pick up your smock, where
23    do you go?

23

1    A.    Sit down and get all my stuff
2    together.
3    Q.    Where do you do that?
4    A.    Inside the debone break room.
5    Q.    What do you put on?
6    A.    I can't put nothing on in there but
7    my hair net and plugs.
8    Q.    And your boots?
9    A.    Yes, I mostly already have them on.
10    Q.    So once you go into the break room,
11    what do you do?
12    A.    I sit down and get my stuff out my
13    bag and put it in the locker.
14    Q.    Then what do you do?
15    A.    Sit back down until it's time to go
16    in.
17    Q.    And how much time do you usually sit
18    there in the morning before it's time to go in?
19    A.    Sometimes ten minutes.
20    Q.    While you're sitting there, do you
21    see some people coming into the break room that
22    work with you that arrived at the plant after you?
23    A.    Yes.

24

1    Q.    Approximately what time do you leave
2    the break room to go into the debone production
3    floor?
4    A.    Five, six minutes.
5    Q.    Five or six minutes before the start
6    of the shift -- so it's about 7:25, 7:24?
7    A.    Yes.
8    Q.    Tell me what you do when you go into
9    the production floor. First off, you have to go
10    through a foot bath?
11    A.    Yes.
12    Q.    And you walk through that?
13    A.    Yes.
14    Q.    And then you walk through two double
15    doors, and the foot bath is in the middle?
16    A.    Yes.
17    Q.    So you walk through those doors, and
18    you get into the production floor. Tell me what
19    you do then.
20    A.    Put my stuff on.
21    Q.    You put your smock, your apron, your
22    sleeves, and your gloves on?
23    A.    Yes.

25

1    Q.    How long does it take you to walk
2    from the break room into the production room floor?
3    A.    It's about a minute and a half.
4    Q.    It's right across the hallway, isn't
5    it?
6    A.    Yes.
7    Q.    Before you go to your workstation,
8    are you required to do any washing?
9    A.    Washing of what, sir?
10    Q.    Well, I don't know. I'm asking you.
11    After you put your stuff on, do you have to wash
12    it?
13    A.    Yes. We have to wash up, yes.
14    Q.    How long does that take?
15    A.    Probably about a minute or two.
16    Q.    How long does it take you to put the
17    smock, the apron, and the sleeves on?
18    A.    About five, six minutes.
19    Q.    Tell me what you need to do when it's
20    time for you to go on break.
21    A.    Wash off and put -- we put the
22    scissors up.
23    Q.    Where do you put the scissors?

871c0a9b-5b94-47b1-9e25-b4c2e98ef446

**26**

1  A.  In a little tool box like.
2  Q.  And where is that tool box located?
3  A.  Just a couple of -- just right on the
4  side.
5  Q.  Right where you work?
6  A.  Uh-huh.
7  Q.  Okay, you wash off. What do you do
8  then?
9  A.  Pull our clothes off.
10  Q.  Then what do you do?
11  A.  Go in for break.
12  Q.  How long does it take you to walk
13  over, wash off, take your clothes off -- or take
14  your outer garments off, and go into the break
15  room?
16  A.  A good three, four minutes.
17  Q.  Am I correct that you take all of the
18  items that you describe for me off except your hair
19  net, your ear plugs, and your boots?
20  A.  Right.
21  Q.  When you worked on the debone line,
22  did you follow pretty much the same procedure when
23  you left for break?

**27**

1  A.  Yes.
2  Q.  Take me now through the reverse
3  procedure. Your break is over now and it's time to
4  go back to work. Tell me what you do.
5  A.  Put our clothes back on, wash them,
6  and start working.
7  Q.  How long does that take you?
8  A.  Just a couple of minutes.
9  Q.  Describe for me now what you do at
10  the end of the shift when it's time for you to
11  leave.
12  A.  We pull our stuff off to be ready to
13  go home.
14  Q.  What do you do with the scissors?
15  A.  We put them back in our tote.
16  Q.  Does the line leader pick up the
17  scissors?
18  A.  No, we take them in there and put
19  them in there ourselves.
20  Q.  Where do you put the scissors?
21  A.  In the tote.
22  Q.  And where is that located?
23  A.  Right next to us.

**28**

1  Q.  Right at your workstation?
2  A.  Yes.
3  Q.  So you put the scissors in the tote
4  and you go wash off?
5  A.  Yes.
6  Q.  Then you take off the apron, the
7  smock, and the sleeves?
8  A.  Yes.
9  Q.  What do you do with them?
10  A.  Do with what?
11  Q.  What do you do with the apron and
12  sleeves?
13  A.  I take them home.
14  Q.  What do you do with the smock?
15  A.  We throw it in the basket out in the
16  hall.
17  Q.  After you throw the smock in the
18  basket, what do you do?
19  A.  Go in and get in line to clock out.
20  Q.  How long approximately does it take
21  you to clock out after you leave your workstation?
22  A.  Depends on how many people is in
23  line.

**29**

1  Q.  Can you put an estimate on the amount
2  of time it takes you?
3  A.  No.
4  Q.  Ms. Lampley, what is your
5  understanding as to how Equity keeps track of the
6  hours that you work?
7  A.  We clock out, clock in.
8  Q.  That's your --
9  A.  And they see if everybody is there on
10  paper every day.
11  Q.  Pardon?
12  A.  They got a sheet and they see that
13  everybody is there.
14  Q.  What is your understanding of when
15  the time starts for which you are to be paid?
16  A.  Pardon me?
17  Q.  What's your understanding as to when
18  you're supposed to start being paid?
19  A.  7:30.
20  Q.  Is it your understanding that you're
21  to stop being paid at 4:30?
22  A.  Yes.
23  Q.  Have you ever had occasion to go to a

871c0a9b-5b94-47b1-9e25-b4c2e98ef446

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

30

1  supervisor or to payroll and complain about what
2  you thought that your check was short?
3      A.   No.
4      Q.   Do you receive a payroll check every
5  week?
6      A.   Yes.
7      Q.   And do you look at the payroll
8  information that's included on the stub?
9      A.   Yes.
10     Q.   Do you keep track of the hours that
11  you work?
12     A.   Yes.
13     Q.   And how do you do that?
14     A.   I know what time I -- how many hours
15  I be there a day.
16     Q.   Do you keep notes of --
17     A.   No.
18     Q.   You don't keep a note or a diary or
19  anything as to how many hours you work in a day?
20     A.   No.
21     Q.   Do you know of anyone who does?
22     A.   No.
23     Q.   Have you made any kind of

---

31

1  calculations as to the time worked for which you
2  believe you should be paid in this lawsuit?
3      A.   No.
4      Q.   Have you ever been asked or required
5  to work overtime?
6      A.   Yes.
7      Q.   And when that occurs, are you paid
8  time-and-a-half to your knowledge?
9      A.   Yes.
10     Q.   Have you ever had any complaints
11  about how your overtime pay is calculated?
12     A.   No.
13     Q.   Have you ever complained to any
14  supervisor about any pay issues since you've been
15  working out at Baker Hill?
16     A.   No.
17     Q.   Over the time that you've worked
18  there, have you ever been written up for any
19  infraction, work rule infraction?
20     A.   No more than about a bone.  That's
21  been four or five years ago.
22         MR. FRY:  Let's mark this as
23  Lampley Exhibit 1.

---

32

1          (WHEREUPON, a document was
2          marked as Lampley Exhibit 1 and
3          is attached to the original
4          transcript.)
5      Q.   (Mr. Fry)  Ms. Lampley, I am showing
6  you a document that's marked Lampley Exhibit 1, and
7  it's titled Declaration.  And would you take a
8  minute and look at that for me, please?
9      A.   Okay.
10     Q.   And when you're through reviewing
11  it -- I just have a few questions about it -- just
12  let me know -- okay?
13         9:45 a.m.
14         (Plaintiff reviews Lampley
15          Exhibit 1.)
16         9:47 a.m.
17     Q.   (Mr. Fry)  Finished?
18     A.   Uh-huh.
19     Q.   Is that your signature on Page 3?
20     A.   Yes.
21     Q.   Do you recall signing this document?
22     A.   Yes.
23     Q.   Do you recall reading it before you

---

33

1  signed it?
2      A.   Yes.
3      Q.   And when you read it, did everything
4  appear accurate to you?
5      A.   Yes, sir.
6      Q.   I want to refer you to Paragraph 10,
7  which is on Page 3.  And the second sentence in
8  Paragraph 10 reads, quote, numerous employees have
9  expressed their desire to join this litigation but
10  have not done so to date because of fear of
11  retaliation by Defendant and its managers, period,
12  closed quote.  Did I read that correctly?  Do you
13  see it?
14     A.   Yes, I see it.
15     Q.   What information do you have about
16  the information that's contained in that sentence?
17  Do you have any?
18     A.   No.
19     Q.   The last sentence in Paragraph 10
20  reads, quote, to that end, Defendants and its
21  managers have attempted to discourage and/or
22  intimidate my coworkers from joining this lawsuit
23  by issuing both expressed and implied threats

---

871c0a9b-5b94-47b1-9e25-b4c2e98ef446

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

34

1   involving job security, period, end quote. Have I
2   read that correctly? Do you see it?
3        A.   Yes, I see it.
4        Q.   Do you know of any coworkers that
5   were threatened about joining this lawsuit?
6        A.   No.
7        Q.   When you read that paragraph before
8   you signed it, did you tell anybody it wasn't
9   accurate? You have to verbalize. Ms. Lampley, do
10  you have any information about any of the
11  allegations in Paragraph 10?
12       A.   No.
13       Q.   When you were asked to sign this
14  Declaration, did you tell the person that asked you
15  to sign it that you had no such information?
16       A.   No.
17       Q.   Who was the person that asked you to
18  sign this Declaration?
19       A.   I don't know.
20       Q.   You don't remember?
21       A.   No, sir.
22       Q.   Was it one of the lawyers?
23            MR. UNDERWOOD: I think she said

---

35

1   she just didn't know. Is that right?
2        A.   I don't know.
3        Q.   (Mr. Fry) Where did you sign it, do
4   you recall?
5        A.   No.
6        Q.   But do you recall that you signed it
7   on or about February 24 of 2007?
8        A.   Yes.
9            MR. FRY: Thank you. That's all
10  I have.
11           MR. UNDERWOOD: I've got just
12  some follow-ups I want to ask you.
13
14  EXAMINATION BY MR. UNDERWOOD:
15       Q.   The clothes you were talking about
16  you had to put on when you come in and take on and
17  off at breaks, you ever heard that called PPE?
18       A.   Yes.
19       Q.   That's what it's actually called,
20  right?
21       A.   Yes.
22       Q.   When you're changing in and out of
23  those clothes at your break, have your supervisors

---

36

1   ever observed you doing that?
2        A.   Yes.
3        Q.   Have they observed you very often
4   doing that?
5        A.   Yes.
6        Q.   When you go in and out of the debone,
7   when you worked in debone, you had to decontaminate
8   or sanitize your boots every time; is that correct?
9        A.   Yes.
10       Q.   You'd have to stop in the hallway
11  there, step in that thing, and you'd have to press
12  a button to spray the stuff in there. Is that yes?
13       A.   Yes.
14       Q.   And you had to do that when you went
15  out?
16       A.   Yes.
17       Q.   And when you came back in?
18       A.   Yes.
19       Q.   And you had to physically stop to
20  press that button; is that accurate?
21       A.   Yes.
22       Q.   I know you've testified that you
23  carry your boots home now, right?

---

37

1        A.   Yes.
2        Q.   There was a time period where you
3   were not allowed to carry your boots home; is that
4   accurate?
5        A.   Yes.
6        Q.   Let me ask you this -- up until about
7   a year and a half ago you could not carry your
8   boots home; is that right?
9        A.   Yes.
10       Q.   And in the ten years you've been
11  employed there, up until a year and half ago you
12  could not carry your boots home; is that right?
13       A.   Right.
14       Q.   Before you go on the line, do you-all
15  perform any type exercises?
16       A.   Yes.
17       Q.   And it's everybody on the line?
18       A.   Yes.
19       Q.   And you-all are led by your line
20  leader or a supervisor?
21       A.   Supervisor.
22       Q.   Supervisor leads you in these
23  exercises?

---

871c0a9b-5b94-47b1-9e25-b4c2e98ef446

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

**38**

1    A.    Yes.
2    Q.    And it's some stretching -- and just
3 sort of show what you do.  You do your neck?
4    A.    Neck, and then you --
5    Q.    Your arms?
6    A.    Then you do --
7    Q.    All right.  And that's before you get
8 on the line?
9    A.    Yes.
10          MR. UNDERWOOD:  That's all I
11 have.
12          MR. FRY:  Just a few questions.
13
14 EXAMINATION BY MR. FRY:
15    Q.    When you go into the area where your
16 boots are sanitized now, do you have to stop?
17    A.    You walk through.
18    Q.    You just walk through, don't you?
19    A.    Yes.
20    Q.    Now you don't have to stop, do you?
21    A.    Wherever they cut it -- they leave
22 water in there that's soapy.
23    Q.    You can just walk through now?

---

**39**

1    A.    Yes.
2    Q.    You don't have to stop?
3    A.    Sometimes.  Sometimes you have to
4 stop, and sometimes you just go on.
5    Q.    These exercises that you do before
6 the work starts, is that part of your claim in this
7 lawsuit?
8          MR. UNDERWOOD:  I'm going to
9 answer that for them.  That's a legal opinion, and
10 it depends on whether they have been paid for that
11 or not.  We do not know at this time, so we cannot
12 answer as to whether we were making a claim for it.
13    Q.    (Mr. Fry)  Do you know whether you're
14 paid for those exercises?
15    A.    No.
16    Q.    How long have you been doing the
17 exercises?
18    A.    They've been doing it for the last
19 two years.
20    Q.    Constantly, every day?
21    A.    Yes.
22          MR. FRY:  Okay.
23          MR. UNDERWOOD:  All right.

---

**40**

1                9:55 a.m.
2          ************************
3          FURTHER DEPONENT SAITH NOT

---

**41**

1                CERTIFICATE
2
3 STATE OF ALABAMA
4 AT LARGE
5
6          I hereby certify that the above
7 and foregoing deposition was taken down by me in
8 stenotype and the questions and answers thereto
9 were transcribed by means of computer-aided
10 transcription and that the foregoing represents a
11 true and correct transcript of the testimony given
12 by said witness upon said deposition.
13          I further certify that I am
14 neither of counsel nor of kin to the parties to the
15 action, nor am I in anywise interested in the
16 result of said cause.
17
18
19
20
21
22 Victoria M. Castillo, Certified Court Reporter
   ACCR# 17, Expires 9/30/2008
23 Commissioner and Notary Public

---

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

**TAB 31**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06-CV-1081-MEF


BETTY ANN BURKS,

et al.,

     Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

     Defendant.



BEFORE:

     Cynthia M. Noakes, Commissioner

     and Certified Court Reporter


DEPOSITION TESTIMONY OF

SERENDA LAMPLEY


*************************

0ac82ccf-ddbf-4895-9f21-4061e10d5ce8

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

2

1    STIPULATION

2

3        IT IS STIPULATED AND AGREED by and

4    between the parties through their respective

5    counsel, that the deposition of SERENDA LAMPLEY

6    may be taken before Cynthia M. Noakes, Court

7    Reporter, at the Law Offices of WILLIAMS,

8    POTTHOFF, WILLIAMS & SMITH, 125 South Orange

9    Avenue, Eufaula, Alabama 36027, on the 22nd day

10   of May, 2008.

11       IT IS FURTHER STIPULATED AND AGREED

12   that the signature to and the reading of the

13   deposition by the witness is waived, the

14   deposition to have the same force and effect as

15   if full compliance had been had with all laws and

16   rules of Court relating to the taking of

17   depositions.

18       IT IS FURTHER STIPULATED AND AGREED

19   that it shall not be necessary for any objections

20   to be made by counsel to any questions except as

21   to the form or leading questions, and that

22   counsel for the parties may make objections and

23   assign grounds at the time of the trial, or at

3

1    the time said deposition is offered in evidence,

2    or prior thereto.

3        IT IS FURTHER STIPULATED AND AGREED

4    that the notice of filing of the deposition by

5    the Court Reporter is waived.

6

7

8

9

10

11

12

13

14

15

16

17   *****************************************

18

19

20

21

22

23

4

1    INDEX

2    EXAMINATION BY:              PAGE NUMBER:

3    MR. GOULD                    6-31

4    MR. KISER                    31

5

6    EXHIBITS:

7    (No exhibits were

8    submitted to said deposition.)

9

10   Reporter's Certificate       32

11

12

13

14

15

16

17

18

19

20   *****************************************

21

22

23

5

1    APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFFS:

4        MR. JACOB A. KISER

5        WIGGINS, CHILDS,

6        QUINN & PANTAZIS, LLC

7        ATTORNEYS AT LAW

8        The Kress Building

9        301 Nineteenth Street North

10       Birmingham, Alabama 35203

11       (205) 314-0614

12

13   ON BEHALF OF THE DEFENDANT:

14       MR. MALCOLM S. GOULD

15       PELINO & LENTZ

16       ATTORNEYS AT LAW

17       One Liberty Place

18       Thirty-Second Floor

19       1650 Market Street

20       Philadelphia, Pennsylvania 19103

21       (215) 665-1540

22

23   *****************************************

6

1     I, CYNTHIA M. NOAKES, a Certified
2  Court Reporter of Eufaula, Alabama, acting as
3  Commissioner, certify that on this date, as
4  provided by the Alabama Rules of Civil Procedure
5  and the foregoing stipulation of counsel, there
6  came before me at the Law Offices of WILLIAMS,
7  POTTHOFF, WILLIAMS & SMITH, 125 South Orange
8  Avenue, Eufaula, Alabama 36027, beginning at
9  11:55 a.m., SERENDA LAMPLEY, witness in the above
10 cause, for oral examination, whereupon the
11 following proceedings were had:
12
13        SERENDA LAMPLEY,
14  being first duly sworn, was examined and
15       testified as follows:
16
17        THE COURT REPORTER:  Usual
18  stipulations?
19     MR. KISER:  Yes.
20     MR. GOULD:  Yes.
21
22        EXAMINATION
23  BY MR. GOULD:

7

1     Q.  Good morning, Ms. Lampley.
2     A.  Good morning.
3     Q.  My name is Malcolm Gould.  I'm an attorney
4  from the law firm of Pelino & Lentz in
5  Philadelphia.  I represent Equity Group Eufaula
6  Division, LLC, in a lawsuit that's been filed in
7  Federal Court in the Middle District of Alabama.
8  You are a plaintiff in that lawsuit, and we're
9  here today to take your deposition.
10     As you can see, we have a court reporter
11  here.  She's going to take down my questions and
12  your answers.  Because of that, I would ask that
13  you keep all of your answers verbal, yes or no,
14  instead of a nod of the head or a shaking of the
15  head or instead of an uh-huh or huh-uh.  It will
16  make it easier for her to make a record of our
17  dialogue.
18     A.  Okay.
19     Q.  I would also ask that you wait until I
20  finish my question before you give your answer.
21  That way we're not talking over each other, and,
22  once again, it makes the court reporter's job a
23  little easier.  It also means that you'll hear my

8

1  whole question before answering.
2     If I ask a question and you don't understand
3  it, just let me know and I'll try and repeat the
4  question or ask the question in a different way so
5  that it's not so confusing.
6     I don't anticipate that the deposition will
7  take long; but if you feel you need to take a
8  break, just let me know; it's not a problem.
9     A.  Okay.
10     Q.  Do you understand those instructions?
11     A.  Yes.
12     Q.  Could you state your full name for the
13  record, please?
14     A.  Serenda Lampley.
15     Q.  And, Ms. Lampley, what is your home address?
16     A.  P.O. Box 51, Louisville, Alabama 36048.
17     Q.  Is that also your street address?
18     A.  No.
19     Q.  Could you provide your street address,
20  please?
21     A.  Highway 130.  The number is 104.
22     Q.  Okay.  Thank you.  And are you currently
23  employed, Ms. Lampley?

9

1     A.  Yes.
2     Q.  And where do you work?
3     A.  Equity Group.
4     Q.  And how long have you worked there?
5     A.  Four years.
6     Q.  And in what position do you work?
7     A.  Bone sampler.
8     Q.  That's on the debone line; is that correct?
9     A.  Yes.
10     Q.  During the four years you've been employed
11  at the plant, have you always worked on the debone
12  line?
13     A.  Yes.
14     Q.  Now, in your work as a bone sampler on the
15  debone line, will you also rotate positions
16  throughout your shift?
17     A.  No.
18     Q.  So you stay in the bone sampling position
19  for the entire nine-hour shift?
20     A.  Yes.
21     Q.  Which shift do you work?
22     A.  First.
23     Q.  So you work day shift; is that correct?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

10

1    A.   Yes.
2    Q.   What time does your shift start?
3    A.   7:30.
4    Q.   And do you have a scheduled end time?
5    A.   4:30.
6         MR. KISER:  Can we go off the record
7    for a minute?
8         MR. GOULD:  Sure.
9         (An off-the-record discussion
10        was held.)
11   (BY MR. GOULD)
12   Q.   And have you always worked day shift?
13   A.   Yes.
14   Q.   Have you worked any other positions in
15   debone during the four years you've been working
16   at the plant?
17   A.   No.
18   Q.   So you've been a bone sampler for the entire
19   four years?
20   A.   Yes.
21   Q.   Now, you understand that you are a plaintiff
22   in this lawsuit, correct?
23   A.   Yes.

11

1    Q.   What is your understanding as to what the
2    lawsuit is about?
3    A.   I don't know.
4         MR. KISER:  Object to the form.  You
5    can answer it.  Do you understand what he's asking
6    you?
7    A.   I mean, I don't understand the question.
8    Q.   Sure.  Do you have any understanding as to
9    the claims that you are asserting as a plaintiff
10   in this lawsuit?
11   A.   (No response.)
12   Q.   What do you think lawsuit is about?
13   A.   It's about the PPE, the time.
14   Q.   So you believe that the lawsuit is about
15   time spent putting on or taking off clothing or
16   equipment or whatever it may be?
17   A.   Equipment.
18   Q.   Is there anything else that you believe is
19   involved in the lawsuit?
20   A.   I don't know.  I mean, I don't know what
21   else is involved.
22   Q.   Throughout the deposition, "I don't know" is
23   an acceptable answer.  I would much rather that if

12

1    I ask you a question and you don't know the answer
2    you would just say you don't know or you don't
3    remember than having you try and guess.
4         MR. KISER:  He doesn't want you
5    guessing, and you don't want to guess.
6         THE WITNESS:  Okay.
7    Q.   Ma'am, how did you first find out about the
8    lawsuit?
9    A.   I got a phone number at the job.  It was a
10   1-800 number, and I called.
11   Q.   And is that the number for a law firm?
12   A.   Yes.
13   Q.   Where did you get the number from?
14   A.   Another employee.
15   Q.   And who was that?
16   A.   The name.
17   Q.   Yes, ma'am.
18   A.   Gertha McCrae.
19   Q.   And did he tell you anything about the
20   lawsuit?
21   A.   No.
22   Q.   He just gave you a phone number and said
23   call this number?

13

1    A.   Yes.
2    Q.   He didn't say there was a lawsuit against
3    the company?
4    A.   Yeah, he said there was a lawsuit.
5    Q.   Did he tell you what the lawsuit was about?
6    A.   No.
7    Q.   During the time that you've been employed at
8    the plant, have you ever been a member of the
9    union?
10   A.   No.
11   Q.   You don't have any money taken out of your
12   paycheck weekly for union dues?
13   A.   No.
14   Q.   Have you ever attended any union meetings?
15   A.   No.
16   Q.   Ma'am, as a bone sampler, are there items of
17   clothing or equipment that you have to wear when
18   you're out on the production floor?
19        MR. KISER:  Standard objection, PPE.
20   You can answer.
21   A.   Yes.
22   Q.   Could you list those for me, please?
23   A.   Earplugs, hair net, gloves, sleeves, boots,

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

14

1    apron, smock.
2    Q.   Does the position of bone sampler require
3    you to use a knife or scissors?
4    A.   No.
5    Q.   So you don't have to wear a hard plastic arm
6    guard?
7    A.   No.
8    Q.   And you don't have to wear a chain metal
9    glove?
10   A.   No.
11   Q.   During the time that you've been employed at
12   the plant, are there any of those items that you
13   have been able to wear from home?
14   A.   No.
15   Q.   Can you wear your boots from home?
16   A.   Yeah, we can, but I don't wear mine from
17   home.
18   Q.   But if you wanted to, you could?
19   A.   Yes.
20   Q.   And has that been the policy throughout the
21   time you've been employed at the plant?
22   A.   Yes.
23   Q.   Ma'am, do you normally drive yourself to

15

1    work?
2    A.   Yes.
3    Q.   When you arrive at the plant, is there any
4    security that you have to clear?
5    A.   No.
6    Q.   Is there a guard shack on the driveway?
7    A.   Yes.
8    Q.   Do you have to stop at security and have
9    your car searched?
10   A.   No.
11   Q.   You have a sticker or decal for your car; is
12   that correct?
13   A.   Yes.
14   Q.   And as long as you have that sticker, you
15   can drive through?
16   A.   Yes.
17   Q.   And once you park in the parking lot, is
18   there any other security that you need to go
19   through?
20   A.   No.
21   Q.   There's no metal detectors or turnstiles?
22   A.   No.
23   Q.   You can just walk right into the plant?

16

1    A.   Yes.
2    Q.   Ma'am, once you arrive in the parking lot
3    and you walk into the building, can you tell me
4    what you normally do in the course of the day,
5    before going out onto the production floor?
6    A.   I go through the double doors and stop at
7    the -- there's a sanitizer for your boots.  I stop
8    there and mash the button and sanitize my boots.
9    Then I go through the double doors.  Then I put on
10   my hair net, my earplugs, all my PPE.  I just put
11   on hair nets, earplugs, gloves.  After I get all
12   that stuff on, then I have to go sanitize all of
13   it.
14   Q.   Okay.  When you first walk through the door
15   into the building, are you wearing your boots?
16   A.   No.
17   Q.   Do you put your boots on before you go onto
18   the production floor?
19   A.   Yes.
20   Q.   Where do you do that?
21   A.   In the break room.
22   Q.   Do you clock in?
23   A.   Yes.

17

1    Q.   Where do you normally clock in?
2    A.   In the break room.
3    Q.   Which break room do you go to?
4    A.   The debone break room.
5    Q.   Do you have a locker there?
6    A.   No.
7    Q.   So when you enter the break room, do you
8    normally clock in first?
9    A.   Yes.
10   Q.   And then you put on your boots?
11   A.   Yes.
12   Q.   What time do you normally arrive at the
13   plant?
14   A.   Seven o'clock.
15   Q.   So after you arrive at the plant and you
16   clock in and put on your boots, what do you do
17   next?
18   A.   I wait for -- wait until 7:25.
19   Q.   Then what do you do at 7:25?
20   A.   Then I go into the door to sanitize my
21   boots.
22   Q.   And how do you sanitize your boots?
23   A.   There' a button up there.  You mash the

0ac82ccf-ddbf-4895-9f21-4061e10d5ce8

18

1  button for the foam to come out and sanitize the
2  boots.
3  Q.  So you walk through the foam?
4  A.  Yeah. Turn your feet from side to side.
5  Q.  And it puts out some sort of foam on the
6  floor; is that right?
7  A.  Yes.
8  Q.  And then what do you do next?
9  A.  Then I go in the double doors. After I
10  sanitize my boots, I put my hair net on. Then I
11  go through the double doors, put on my earplugs,
12  smock, apron, gloves. And then I go over to the
13  sink and sanitize the gloves and the apron.
14  Q.  And when you say you sanitize them, what do
15  you do?
16  A.  I wash them with soap and water over there.
17  Q.  Okay. And how long does it take you to do
18  that, from the time you start walking through the
19  double doors until the time you get to your
20  position on the line?
21  A.  About 10 minutes.
22  Q.  And what time does your shift start?
23  A.  7:30.

19

1  Q.  Are you normally late for the start of your
2  shift?
3  A.  No.
4  Q.  Because you said to me that you wait until
5  7:25 and then you head out to the floor to start
6  doing all those activities. But then you told me
7  it takes ten minutes to do it.
8  A.  Yes.
9  Q.  So you don't have to be on the line at 7:30?
10  A.  Yes.
11  Q.  And you normally leave the break room at
12  7:25?
13  A.  Yes. Because the sanitation people be
14  standing there. We can't go in.
15  Q.  So you can't go in much earlier because they
16  are taking care of the machinery, correct?
17  A.  Yes.
18  Q.  Now, are you normally at your spot on the
19  line in time for the line to start?
20  A.  Yes.
21  Q.  You're normally at your spot on the line by
22  7:30?
23  A.  Yes.

20

1  Q.  Now, where on the actual debone line does
2  the bone sampler position sit? Is that toward the
3  end of the line?
4  A.  It is.
5  Q.  Can you describe for me what you do as a
6  bone sampler?
7  A.  The meat is running on the conveyor belt.
8  We have to get ten pieces off to put in our pan.
9  We check each piece for a bone and put it back on
10  the belt.
11  Q.  So you're kind of a quality control type of
12  position; is that right?
13  A.  Yes.
14  Q.  You're making sure there's no bones in the
15  meat?
16  A.  Yes.
17  Q.  So you're not actually sampling bones;
18  you're sampling meat to make sure there are no
19  bones in there?
20  A.  Yes.
21  Q.  Now, do you get any breaks during the course
22  of your shift?
23  A.  Yes.

21

1  Q.  How many breaks do you get?
2  A.  Two.
3  Q.  How long are those breaks?
4  A.  30 minutes.
5  Q.  Now, how do you know when you are cleared to
6  leave for break or you are allowed to leave for
7  break?
8  A.  When the last piece of meat reaches my
9  station.
10  Q.  And after that last piece of meat reaches
11  your position, you know that it's okay for you to
12  leave and do whatever you need to do to get ready
13  for break; is that correct?
14  A.  Yes.
15  Q.  Can you describe for me what you do from
16  that point, after the last piece of meat passes
17  your station to the time you pass through the
18  production doors?
19  A.  I don't understand.
20  Q.  Yes, ma'am. Can you tell me what you do
21  after that last piece of meat passes your station
22  until the time you go through the production doors
23  into the hallway?

22

1   A.   Okay.  We have to clean up our station
2   before we leave.  Then I go over to the sink, take
3   off all my equipment -- I sanitize it first, and
4   then I take it all off and hang it up.
5   Q.   What do you have to do to clean up your
6   station?
7   A.   We have to wash.  Wipe the pan out that we
8   put the product in.  We have to wipe that out and
9   wipe the water and stuff off the station.
10  Q.   Is it kind of like a table?  Is that where
11  you sit?
12  A.   Yeah, it's a table.
13  Q.   And then you said that you would sanitize
14  your --
15  A.   Equipment.
16  Q.   Which items would you do that for?
17  A.   The gloves and the apron.
18  Q.   And when you say "sanitize," you mean you
19  wash it with soap and water?
20  A.   Yes.
21  Q.   Just like you were washing your hands?
22  A.   Yes.
23  Q.   And then you would take your items off?

23

1   A.   Yes.
2   Q.   Are there any items that you can wear off of
3   the production floor out into the hallway?
4   A.   Yes.  I have to sanitize the boots before I
5   walk out the door.
6   Q.   Okay.  And what about your hair net?
7   A.   I can wear it out, but not outside.
8   Q.   Okay.  So if you choose to go outside, then
9   you have to take your hair net off?
10  A.   Yes.
11  Q.   And your earplugs?  I guess if you really
12  wanted to, you could wear them in the break room;
13  is that correct?
14  A.   Yes.
15  Q.   And how long does it take you from the time
16  that the last piece of meat passes your station
17  until the time you walk out through the double
18  doors?
19  A.   Ten minutes.
20  Q.   Do your breaks normally happen at scheduled
21  times throughout the day?  They happen at the same
22  time every day?
23  A.   Yes.

24

1   Q.   What time are your breaks?
2   A.   10:15 and 1:15.
3   Q.   Before you leave for your second break, do
4   you do anything different than what you do for
5   your first break?
6   A.   No.
7   Q.   Basically the same thing?
8   A.   Same.
9   Q.   Is that true for when you return from break
10  as well?
11  A.   Yes.
12  Q.   Basically the same thing?
13  A.   Yes.
14  Q.   Do you normally take your break in the break
15  room or outside?
16  A.   Break room.
17  Q.   Once you get into the break room, what do
18  you do next?
19  A.   I heat up my food that I have or I buy
20  something out of the machine.
21  Q.   And how do you know when it's time to return
22  from break to the production floor?
23  A.   We watch the clock.  We have to go back at

25

1   10:45.
2   Q.   Now, ma'am, your position is at the end of
3   the line, correct?
4   A.   Yes.
5   Q.   In terms of when you are returning from
6   break, when would you be considered late?
7        MR. KISER:  Object to the form.
8   Q.   Based on your experience working at the
9   plant, would you be considered late if the first
10  piece of chicken is put down at the cone line and
11  you're not at your position, or would you be
12  considered late when the first piece of meat
13  reaches your station and you are not on the line?
14  A.   When the first piece of meat reaches my
15  station.
16  Q.   So there's a little bit of time between time
17  the meat is first placed on the line at the
18  beginning on the cone and the time it reaches your
19  station; is that correct?
20       MR. KISER:  Object to the form.
21  Q.   There's sort of like a conveyor system that
22  takes the birds from the beginning of the debone
23  line back to your position; is that correct?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

26

1   A.   Yes.
2   Q.   And at the beginning of the line, somebody
3   puts the bird on these cones that move back
4   towards the back of the line; is that correct?
5   A.   Yes.
6   Q.   And so there's some time before the meat
7   from that bird reaches the end of the line where
8   you have your station; is that correct?
9   A.   Yes.
10  Q.   Can you describe for me what you'll do when
11  you leave the break room and you're returning to
12  your position on the line?
13  A.   I leave the break room and I come to the
14  double doors and I put my hair net on. Then I
15  come in; I stop, sanitize my boots, and then I go
16  in, put my earplugs in, and I put on all my
17  protective equipment. Then I wash them down, wash
18  everything down. Then I go to the line.
19  Q.   And approximately how long does it take you
20  from the time you hit the production doors until
21  the time you get to your spot on the line?
22  A.   About ten minutes.
23  Q.   What time do you normally leave the break

27

1   room to head back to the line at your first break?
2   A.   About 10:35.
3   Q.   Now, when you leave the break room, do you
4   go to the bathroom, or do you normally head
5   straight to the production doors?
6   A.   I just go to the production doors.
7   Q.   If, during the course of your shift, you
8   need to go to the bathroom, do you have to clock
9   out?
10  A.   No.
11  Q.   You just ask for a bathroom break?
12  A.   Yes.
13  Q.   When you return from your second break, do
14  you do basically the same thing as you do when you
15  return from your first break?
16  A.   Yes.
17  Q.   Okay. Now, ma'am, I believe you indicated
18  that you have a scheduled end time for your shift
19  of 4:30; is that correct?
20  A.   Yes.
21  Q.   How do you know when you are released and
22  you're able to leave the line at the end of your
23  shift?

28

1   A.   When the last piece of meat reaches my
2   station.
3   Q.   So they stop production in the debone area
4   for a period of time at the end of your shift and
5   before the second shift starts up; is that
6   correct?
7   A.   I don't understand, sir.
8   Q.   The machinery -- there's no more chickens
9   coming in the machine; is that correct?
10  A.   Talking about when I'm getting ready to
11  leave?
12  Q.   Yes, ma'am.
13  A.   Yes.
14  Q.   Can you describe for me what you do at the
15  end of the shift, after the last piece of meat
16  passes your station?
17  A.   I clean up my station. Then I go over there
18  and take -- go over and sanitize my equipment.
19  Then I take it off, hang it up and fold it up.
20  Then I go to the double doors, sanitize my boots.
21  Then I throw the smock into a basket on the
22  outside of the door.
23  Q.   Then what do you do after that?

29

1   A.   I go and clock out.
2   Q.   Do you take your boots off after that?
3   A.   Yes.
4   Q.   Approximately how long does it take you from
5   the time the last piece of meat reaches you on the
6   line to the time you leave the production floor?
7   A.   How long it takes me?
8   Q.   Yes, ma'am. From at the end of your shift,
9   at the time that last piece of meat passes your
10  station until the time you leave the production
11  floor?
12  A.   About ten minutes.
13  Q.   Now, ma'am, have you ever actually timed
14  yourself on the amount of time it takes you at the
15  end of your shift from the time you leave your
16  station until the time you exit the production
17  floor? Have you actually timed it?
18  A.   No.
19  Q.   So you're estimating that it takes about ten
20  minutes; is that correct?
21  A.   It's about ten minutes.
22  Q.   Now, do you have any understanding as to how
23  the actual hours for which you are paid are

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

0ac82ccf-ddbf-4895-9f21-4061e10d5ce8

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

30

1   calculated?
2   A.   How they are calculated?
3   Q.   Yes, ma'am.  Do you want me to repeat the
4   question?
5   A.   Yes.
6   Q.   You get paid on a weekly basis, correct?
7   A.   Yes.
8   Q.   And when you get your paycheck, there's a
9   certain number of hours for which you are paid,
10  correct?
11  A.   Yes.
12  Q.   And do you have any idea how the number of
13  hours for which you are paid, how that number is
14  calculated? how the company comes up with that
15  number?
16  A.   No, I don't know.
17  Q.   Have you ever had an instance where you
18  received your paycheck and you looked at it and
19  you didn't feel that the number of hours paid were
20  correct?
21  A.   No.
22  Q.   Have you ever had any instance where you got
23  your paycheck and you went and complained to

31

1   either your supervisor or someone in payroll or
2   someone in management that the paycheck was not
3   paying you for the hours worked?
4   A.   No.
5   Q.   I think those are the only questions I have
6   for you, ma'am.  Thank you.
7   BY MR. KISER:
8   Q.   Ms. Lampley, what would happen to you if you
9   weren't back on the line when coming back from
10  break?  I guess you said your first one was 10:45?
11  A.   Yes.
12  Q.   What would happen if you weren't back on the
13  line at 10:45?
14  A.   I would get written up.
15  Q.   No further questions.
16       MR. GOULD:  That's fine.
17
18       (The deposition was concluded.)
19
20
21
22
23

32

1           C E R T I F I C A T E
2
3   STATE OF ALABAMA
4   BARBOUR COUNTY
5
6        I hereby certify that the above and
7   foregoing deposition was taken down by me in
8   stenotype and the questions and answers thereto
9   were transcribed by means of computer-aided
10  transcription, and that the foregoing represents
11  a true and correct transcript of the testimony
12  given by said witness upon said hearing.
13       I further certify that I am neither of
14  counsel, nor kin to the parties to the action,
15  nor am I in anywise interested in the result of
16  said cause.
17
18
19       CYNTHIA M. NOAKES, Commissioner
20       Certified Court Reporter,
21       ACCR #327 - Expires 09/30/2008
22
23       Commission Expires 07/08/2009

**TAB 32**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


BETTY ANN BURKS, et al.,

    Plaintiffs,


vs.  CIVIL ACTION 2:06-cv-01081-MEF-DRB


EQUITY GROUP EUFAULA DIVISION, LLC,

    Defendant.


\*   \*   \*   \*   \*   \*

    DEPOSITION OF FELICIA LASETER,

taken pursuant to notice and

stipulation on behalf of the Defendant,

at Williams, Pothoff, Williams & Smith,

125 South Orange Avenue, Eufaula,

Alabama, before Bridgette Mitchell,

Shorthand Reporter and Notary Public in

and for the State of Alabama at Large,

on May 21, 2008, commencing at

2:00 p.m.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

**2**

1          APPEARANCES
2
3
4   FOR THE PLAINTIFFS:
5   Carl E. Underwood, III, Esquire
6   COCHRAN, CHERRY, GIVENS & SMITH
7   163 W. Main Street
8   Dothan, Alabama 36301
9
10   FOR THE DEFENDANT:
11
12   Gary D. Fry, Esquire
13   PELINO & LENTZ
14   One Liberty Place
15   Thirty-second Floor
16   Philadelphia, Pennsylvania 19103
17
18
19   ALSO PRESENT:
20   Linda Jacobs
21   Gloria Gullette
22
23

**3**

1         STIPULATIONS
2    It is hereby stipulated and
3 agreed by and between counsel
4 representing the parties that the
5 deposition of FELICIA LASETER is taken
6 pursuant to notice and stipulation on
7 behalf of the Defendant; that all
8 formalities with respect to procedural
9 requirements are waived; that said
10 deposition may be taken before
11 Bridgette Mitchell, Shorthand Reporter
12 and Notary Public in and for the State
13 of Alabama at Large, without the
14 formality of a commission; that
15 objections to questions, other than
16 objections as to the form of the
17 questions, need not be made at this
18 time, but may be reserved for a ruling
19 at such time as the deposition may be
20 offered in evidence or used for any
21 other purpose as provided for by the
22 Civil Rules of Procedure for the State
23 of Alabama.

**4**

1    It is further stipulated and
2 agreed by and between counsel
3 representing the parties in this case
4 that the filing of the deposition of
5 FELICIA LASETER is hereby waived and
6 that said deposition may be introduced
7 at the trial of this case or used in
8 any other manner by either party hereto
9 provided for by the Statute, regardless
10 of the waiving of the filing of same.
11    It is further stipulated and
12 agreed by and between the parties
13 hereto and the witness that the
14 signature of the witness to this
15 deposition is hereby waived.
16
17         INDEX
18
19 EXAMINATION        Page
20 By Mr. Fry........................ 5
21 By Mr. Underwood................. 50
22 By Mr. Fry........................ 52
23

**5**

1    FELICIA LASETER, having first
2 been duly sworn or affirmed to speak
3 the truth, the whole truth, and nothing
4 but the truth, testified as follows:
5       EXAMINATION
6 BY MR. FRY:
7 Q. Ms. Laseter, you sat through the
8    deposition of the prior witness?
9 A. Yes.
10 Q. And did you hear the instructions that
11    I gave her?
12 A. Yes.
13 Q. And did you understand them?
14 A. Yes.
15 Q. And do you understand that those same
16    instructions apply to you?
17 A. Yes.
18 Q. What is your date of birth?
19 A. 1/27/1976.
20 Q. And where do you live?
21 A. 915 Stewart Street, Apartment F2, Pecan
22    Lane.
23 Q. What town?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

6

1    A. Eufaula, Alabama.
2    Q. And are you currently employed?
3    A. Yes. Keystone.
4    Q. How long have you worked for --
5    A. Eight years.
6        MR. UNDERWOOD: Hold on just a
7    minute. Slow down a little bit and let
8    him finish. You're jumping over his
9    question and it makes it hard for her
10   to take it down.
11       THE WITNESS: Okay.
12       MR. UNDERWOOD: Let him get a
13   clean-cut finish with his sentence and
14   then you answer it. Okay? It's okay.
15   A lot of people do that.
16   Q. (By Mr. Fry) So you've worked at the
17   plant for eight years?
18   A. Yes.
19   Q. So you started there about 2000?
20   A. Uh-huh.
21   Q. And when you started, the plant was
22   operated by CP?
23   A. Yes.

7

1    Q. What was the first job you had in the
2    plant?
3    A. Working on the line.
4    Q. What line?
5    A. In debone.
6    Q. And how long did you work in the debone
7    line for CP?
8    A. I don't remember. But after that, I
9    was a line leader.
10   Q. Do you recall when you became a line
11   leader?
12   A. Probably about -- I can't say.
13   Q. Was it while CP operated the plant or
14   was it after Keystone took over?
15   A. Yes. CP.
16   Q. And what was the next job you held?
17   A. I got off the line from being a line
18   leader and went back to the line.
19   Q. The debone line?
20   A. Yes.
21   Q. And when did that happen?
22   A. About seven or eight months later --
23   seven or eight months later, six,

8

1    something like that.
2    Q. Was CP still running the place?
3    A. Yes.
4    Q. What was your next job?
5    A. I got back on the line, started
6    deboning again.
7    Q. Yeah.
8    A. The next job after that, I went to
9    evis.
10   Q. When did you go to evis?
11   A. I can't remember.
12   Q. Did CP still own the place?
13   A. Yes.
14   Q. What was the next job you had?
15   A. Over in salvage.
16   Q. Salvage is in the evisceration
17   department?
18   A. Yes, it is. Evis and salvage, they're
19   together, but it's different -- under
20   different departments, different codes.
21   Q. And was CP still running the place?
22   A. Yeah. But Keystone had -- they was
23   taking over then.

9

1    Q. So that would have been around 2004?
2    A. Yes.
3    Q. Since Keystone has taken over, what
4    jobs have you had?
5    A. Evis -- evisceration, a trimmer on the
6    line, and then back to salvage, because
7    they rotate me around since I know how
8    to do all the jobs in there just about.
9    Q. What's your current job?
10   A. Really, I mean, evis, but wherever they
11   need me when they be short-handed, by
12   me knowing how to run the jobs.
13   Q. So you work all -- a lot of jobs in the
14   evisceration department?
15   A. Yes.
16   Q. And you've done that since Keystone
17   took over?
18   A. Yes.
19   Q. What shift do you currently work?
20   A. Six to three, first shift.
21   Q. How long have you worked that shift?
22   A. About three years now, three going on
23   four, like that.

89a40d03-3ea2-4a64-8583-af0eaa1fa3ed

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

10

1  Q. Who's your supervisor currently?
2  A. Well, you know, James, I guess.
3  Q. James who?
4  A. James McElroy.
5  Q. Have we gone through all the jobs that
6     you've had in that plant that you can
7     remember?
8  A. Yes.
9  Q. But you're currently not a line leader?
10 A. No.
11 Q. How did you learn about this lawsuit?
12 A. I heard other people talking about it
13    and seen it on TV.
14 Q. And what did you hear about people
15    talking about it? What did they --
16 A. Underpay in wages and --
17 Q. Pardon?
18 A. Underpay in wages and you're not
19    getting enough time on your breaks.
20 Q. So you believe you have a claim for
21    underpaid wages?
22 A. Yes.
23 Q. And --

11

1  A. I mean, well, let me start over. Go
2     ahead. You finish first. I'm sorry.
3  Q. For what work do you believe you
4     weren't paid?
5  A. Breaks. You don't get enough time on
6     breaks.
7  Q. Your breaks are thirty minutes?
8  A. Yes. Supposed to be.
9  Q. And how long, in your experience, have
10    your breaks been?
11 A. Probably about twenty-five minutes,
12    twenty sometimes.
13 Q. Besides breaks, do you have any other
14    claims for unpaid time?
15 A. No.
16 Q. Do you belong to the union?
17 A. I'm a union rep.
18 Q. How long have you been a union rep?
19 A. I became a union rep about a year and a
20    half now, I think. It's going to be,
21    like, a year and a half.
22 Q. Year and a half. So you're a steward?
23 A. Yes.

12

1  Q. You've been a steward for a year and a
2     half?
3  A. Yes.
4  Q. How long have you been in the union
5     altogether?
6  A. It was some years, because I had got
7     out and then I had got right back in,
8     so I really can't say.
9  Q. Have you been a steward before?
10 A. No.
11 Q. So this last year and a half is the
12    only time you've been a steward?
13 A. Yes.
14 Q. During any time that you have been a
15    member of the union -- and that's the
16    retail, wholesale and department store
17    union?
18 A. The union with the company?
19 Q. Yeah.
20 A. Yes.
21 Q. During the entire time that you have
22    been in the union, have you attended
23    union meetings?

13

1  A. Yes.
2  Q. Approximately how many?
3  A. Two to three.
4  Q. Have you ever discussed or have you
5     ever heard discussions in the union
6     meetings the claims that are relevant
7     to this lawsuit, about wages and hours?
8  A. No.
9  Q. Have you ever been on a union
10    negotiating committee?
11 A. No.
12 Q. Has any of the union rank and file ever
13    come to you in your position as a
14    steward and complained about their
15    pay --
16 A. Yes.
17 Q. -- about the kinds of claims that you
18    think you have here for unpaid break
19    time?
20 A. No, not this right here. Wait a
21    minute. Repeat that again, please.
22 Q. Okay. Since the time you've been a
23    union steward, have you heard claims or

89a40d03-3ea2-4a64-8583-af0eaa1fa3ed

14

1    complaints from other union members
2    that they haven't been paid properly?
3    A. Yes. As check-wise?
4    Q. Pardon?
5    A. As their paycheck-wise; right?
6    Q. Yes, ma'am.
7    A. Yes. About their raises wasn't on
8    their check.
9    Q. And have you gotten those resolved?
10   A. Yes.
11   Q. Have you ever had any problems with
12   resolving those problems?
13   A. It took some weeks to get it cleared
14   up, but they got it straight.
15   Q. But you've never been contacted by
16   anybody in the plant concerning the
17   claims that you're bringing in this
18   lawsuit?
19   A. No.
20   Q. And you've never discussed these claims
21   in any union meetings?
22   A. No.
23   Q. Have you discussed them with any other

15

1    union reps?
2    A. No.
3    Q. Did you review any papers before you
4    came here today?
5    A. No.
6    Q. Did you talk with anybody besides your
7    lawyers?
8    A. No. I only talked to Jackie Davis, the
9    chief of the union, and asked was we
10   going to get a point for coming. That
11   was it.
12   Q. Did you ever talk with Jackie Davis
13   about the claims raised in this
14   lawsuit?
15   A. No.
16   Q. Were you aware that Jackie Davis
17   brought similar claims when she was
18   working for CP?
19   A. She probably did, but I can't recall
20   it.
21   Q. You don't recall talking with her about
22   that?
23   A. Not when CP or whatever . . .

16

1    Q. Okay. Can you identify for me the
2    items of equipment, outer garments,
3    that you wear when you --
4    A. You have --
5    Q. -- work -- you have to wait until I
6    finish my question.
7        MR. UNDERWOOD: Wait until he's
8    finished. That's fine.
9    Q. Identify for me the items of clothing
10   and outer garments that you wear when
11   you're working in the evisceration
12   department.
13   A. Yes.
14   Q. What are they?
15   A. You have to wear your blue gloves, your
16   cotton liners; you have to wear your
17   arm guard; you have to wear your apron,
18   your smock, your hair net, and your
19   earplugs. You already have your
20   earplugs on when you come in the door.
21   Q. You have to slow down. She can't get
22   it down.
23       MR. UNDERWOOD: She can't get

17

1    it all. When you say it so fast, it's
2    going to be hard for her to get it
3    down.
4    Q. Start again. Let's do it slowly.
5    A. Okay. You have to have -- when you
6    walk in the doors, your earplugs and
7    hair nets already be on. You have to
8    have your blue gloves, your cotton
9    liners, your arm guard, your smock, and
10   your apron on when you walk through the
11   doors. And you also have to have on
12   your boots. You're going to have them
13   on regardless anyway.
14   Q. When you say you have to have them on
15   when you walk through the doors, what
16   doors are you talking about?
17   A. You're going to have your boots on when
18   you come through the double doors.
19   You're not going to go in there
20   barefooted.
21   Q. Right. But you -- I thought I heard
22   you say that you had to have these
23   other things on when you came through

89a40d03-3ea2-4a64-8583-af0eaa1fa3ed

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

18

1    the doors?
2    A. Yeah.  You have to have your hair nets
3       when you're first walking in there.
4       You're going to have your earplugs on
5       and your hair nets because you can't go
6       in there without your hair net on.  If
7       you do, USDA is going to write you up.
8    Q. But you don't have your smock on yet?
9    A. No.
10   Q. And then you don't have any of those
11      other items on yet, do you?
12   A. No.  But you're going to have your
13      smock on before you get to the
14      processing down there where the meat
15      and stuff is processed in there because
16      that's your -- you're going to have an
17      apron on.
18   Q. Okay.  So we have the gloves and the
19      liners, the arm guards, your earplugs,
20      the smock, and the apron.  Anything
21      else?
22   A. Repeat that again what you said.
23   Q. You identified for me the gloves and

19

1    the liners?
2    A. Yes.
3    Q. The arm guards?
4    A. Yes.
5    Q. The earplugs?
6    A. Yes.
7    Q. The hair net?
8    A. Yes.
9    Q. The boots?
10   A. Yes.
11   Q. The smock?
12   A. Yes.
13   Q. And the apron?
14   A. Yes.
15   Q. Is there anything else that you wear
16      when you work in the evisceration
17      department?
18   A. You wear your chain glove when you get
19      down there.  You get it before you
20      start cutting.
21   Q. But that's already waiting for you on
22      the line?
23   A. No, it's not waiting for you.  You have

20

1    to go and get it.
2    Q. Where do you have to go to get it?
3    A. Over there where the line leader keep
4       all the equipment at and everybody have
5       to get their own chain glove.
6    Q. You get it from the line leader?
7    A. Yes.
8    Q. What about plastic sleeves, do you wear
9       them?
10   A. No, I don't wear plastic sleeves.
11   Q. Do some people wear plastic sleeves?
12   A. Some people wear sleeves and some
13      don't.
14   Q. So not all of these items are required;
15      is that correct?
16   A. Depending on where you work at, it is.
17   Q. Are plastic sleeves required anywhere,
18      to your knowledge?
19   A. I don't know.  Not for me, it's not,
20      because I don't have to wear them.
21   Q. So is it fair to say that employees in
22      the evisceration department wear
23      different items of gear and clothing

21

1    depending on the particular job they
2    have?
3    A. Yeah, because if you work a department,
4       if it's cold in there, you're going to
5       have to put on extra clothes to keep
6       warm.
7    Q. I'm just talking about the people
8       working in the evisceration production
9       floor.  Did people in the production
10      floor wear different items of clothing
11      and gear depending on their jobs?
12          MR. UNDERWOOD:  If you know.
13   A. I don't know.
14   Q. You could wear plastic sleeves if you
15      wanted to; correct?
16   A. Yes.
17   Q. To keep the water off --
18   A. Yes.
19   Q. So that's optional for you?
20   A. Yes.
21   Q. Is the other stuff all required?
22   A. Yes.
23   Q. Which of these items are issued to you

89a40d03-3ea2-4a64-8583-af0eaa1fa3ed

22

1    by the company?
2    A. You mean what do they give us?
3    Q. Yes, ma'am.
4    A. Like, as free?
5    Q. What do they provide to you to wear?
6    A. They provide the stuff that you have to
7       get out of the supply -- your smock,
8       your apron, your sleeves, and your arm
9       guard, if you forget it, and your
10      gloves and your cotton liners.
11   Q. If you use a knife -- or if you don't
12      use a knife, are you required to use
13      arm guards?
14   A. If you don't use a knife, you don't
15      have to wear an arm guard.
16   Q. And are there some jobs that you have
17      had where you did not use a knife?
18   A. Yes.
19   Q. And you didn't wear arm guards for
20      those jobs?
21   A. Yes.
22   Q. And I take it, from what I've heard,
23      that you pick up a smock, a hair net,

23

1    and gloves on a daily basis?
2    A. Well, I pick up a smock three times a
3       day because I don't like to get dirty
4       and nasty.
5    Q. But at least on a daily basis --
6    A. Yes.
7    Q. -- you can pick up a smock; correct?
8    A. Yes.
9    Q. You can request a smock any time during
10      the day?
11   A. Yes.
12   Q. And you pick these items up at the
13      supply desk?
14   A. Yes.
15   Q. Do you wear anything from home that's
16      required on the line?
17   A. No.
18   Q. What about your boots?
19   A. Well, I change shoes sometimes and
20      sometimes I wear them to work and
21      sometimes I don't.
22   Q. And do you wear boots that are provided
23      to you by the company?

24

1    A. Yes.
2    Q. Do some people wear boots that they
3       provide for themselves?
4    A. I don't know.  I can't say.
5    Q. When do you put on your smock before
6       the start of your shift?
7    A. Say what, now?
8    Q. When do you put on your smock at the
9       start of your shift?
10   A. When do I put it on?
11   Q. Yes.
12   A. When I come in evis.
13   Q. When you enter the production floor?
14   A. That smock has to be on before you get
15      to the production floor.
16   Q. So you're permitted to put it on
17      outside the production floor?
18   A. Yes.
19   Q. And where do you put it on?
20   A. It's a rack that everybody hang their
21      clothes up and you get dressed right
22      there.
23   Q. And where is the rack?

25

1    A. When you first walk in the door right
2       there on the left-hand side.
3    Q. So it's on the production floor, isn't
4       it?
5    A. Yeah.
6    Q. So you put your smock on in the
7       production floor?
8    A. No.  The production floor is where the
9       meat come at; right?  I don't put my
10      smock on there, because you'll get
11      wrote up if you're not dressed when you
12      come into the double doors.  You have
13      to put your smock on when you're
14      standing right there where everybody
15      gets dressed at.  You can't put -- you
16      don't come in the plant without a
17      smock; you're going to get wrote up for
18      it.  USDA catch it, you can get in
19      trouble for it and get wrote up.
20   Q. You put your smock on in the same room
21      that you do your work, don't you?
22   A. Put my smock on in the same room where
23      I do my work at?  Yeah.  I mean,

89a40d03-3ea2-4a64-8583-af0eaa1fa3ed

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

26

1   it's -- where you work at is around
2   you, but not where you're, like,
3   cutting up in the area where you're
4   working at, no, I don't.
5   Q. You're not allowed to wear your smock
6   out of the evisceration room, are you?
7   A. No.
8   Q. You have to put it on in the
9   evisceration room, don't you?
10  A. Yes.
11  Q. And you have to put the plastic apron
12  on in the evisceration --
13  A. Right.
14  Q. -- room, don't you?  And the plastic
15  sleeves, if you wear them, you put them
16  on --
17  A. Yes.
18  Q. -- in the evisceration room, don't you?
19  You have to wait until I'm done.  Okay?
20  We'll get done a lot quicker.  You have
21  to put on your plastic arm guards in
22  the evisceration room; correct?
23  A. Yes.

---

27

1   Q. You put on your cotton gloves and the
2   rubber gloves in the evisceration room?
3   A. Yes.
4   Q. You wear -- you can put your boots on
5   before you get there; right?
6   A. Yes.
7   Q. And you put your hair net on before you
8   get there; right?
9   A. Yes.
10  Q. Where do you put your hair net on?
11  A. I put my hair net on in the break room.
12  Q. And where do you put your earplugs on?
13  A. I put them on first before I get --
14  well, in the break room also with my
15  hair net.
16  Q. Now, you use a knife for some of the
17  positions you work in evisceration?
18  A. Yes.
19  Q. Do you use scissors?
20  A. Yes.
21  Q. And you obtain these items from the
22  line leader?
23  A. Yes.

---

28

1   Q. Or are they already waiting for you at
2   your workstation?
3   A. It depends.  If you're rushing, it's
4   not going to be there; then sometimes
5   it will and sometimes it won't.
6   Q. And the mesh gloves, where do you get
7   those, again?
8   A. Say what, now?
9   Q. The mesh gloves.
10  A. The mesh gloves?
11  Q. Do you wear a mesh glove?
12  A. A chain glove.
13  Q. A chain glove.  I'm sorry.  Chain
14  gloves.  Do you wear those for every
15  job that you have done in evis?
16  A. Yes.
17  Q. Do you use any other tools or
18  equipment?
19  A. Yes.
20  Q. What else?
21  A. Oh, no.  I'm sorry.  Just knives and
22  scissors.
23  Q. And for the last three or four years,

---

29

1   since Equity has taken over, your shift
2   starts at 6 a.m.; is that correct?
3   A. It starts at six.  You have to be there
4   five minutes till on the floor.
5   Q. My question is, it starts at 6 a.m. --
6   A. Yes.
7   Q. -- in the morning?
8   A. Yes, sir.
9   Q. And you are required to be at your
10  position on the production floor at
11  6 a.m.?
12  A. Five minutes till.
13  Q. Five minutes before?
14  A. Uh-huh.
15  Q. So where are you supposed to be five
16  minutes before, at your line position?
17  A. At your spot on the floor.
18  Q. Whether there are birds there or not?
19  A. Yes.
20  Q. And who told you that?
21  A. The supervisor said it.
22  Q. That's Mr. McElroy?
23  A. Yes.  But we've done had so many

---

30

1  supervisors, I don't know which one's
2  which, or whatever.  I don't know which
3  one.  I guess it's James or either Neal
4  or Charles.  I don't know.
5  Q. And your shift ends at 3 p.m.?
6  A. Yes, supposed to.
7  Q. Sometimes you work overtime?
8  A. Yeah.  They got stuff you got to --
9  yes.
10 Q. And you told me you get two thirty-
11 minute breaks, or they're supposed to
12 be thirty minutes?
13 A. Supposed to be.
14 Q. And where do you take your break?
15 A. In debone break room.
16 Q. And do you have your choice of taking
17 it in the debone break room or the evis
18 break room?
19 A. Yes.
20 Q. How do you know it's time to go on your
21 break?
22 A. She'll say "break."
23 Q. Pardon?

31

1  A. She'll say "break."  The line leader
2  say "break" when it's time to go to
3  break.
4  Q. You can't go to break if there's birds
5  in front of you, though, can you?
6  A. If they catch you and she said go to
7  break, you can go to break and they'll
8  catch them.  But if you're working on
9  the line, if the bird is not past your
10 spot right there, the bird haven't came
11 down yet, you can't go to break because
12 you just can't walk off the line.  If
13 you walk off your line, you're just
14 going to be leaving your job.
15 Q. So if you're not working on the line,
16 you go to break.  If you're in salvage,
17 for instance -- and you work salvage
18 still occasionally?  Do you?
19 A. Yes.
20 Q. If you were working salvage, you can go
21 to break when your supervisor tells you
22 to; correct?
23 A. Line leader.

32

1  Q. Your line leader.  But if you're on a
2  line, you only go to break -- am I
3  correct? -- when the last bird passes
4  you?
5  A. Right.
6  Q. So people farther on down the line go
7  to break before you?
8  A. Yes.
9  Q. And when you come back from break, do
10 some people have to be there before
11 others because the birds get there
12 first?
13 A. It depends on how many birds are there.
14 Q. Does that happen sometimes?
15 A. Yes.
16 Q. What time do you usually arrive at the
17 plant in the morning?
18 A. Different times.
19 Q. What do you mean by "different times"?
20 A. Sometimes I'll be early and sometimes I
21 don't.
22 Q. Okay.  If you're early, when do you
23 arrive?

33

1  A. Sometimes by, like, 5:30.
2  Q. And if you don't come early, when do
3  you get there?
4  A. Five forty-five.
5  Q. So whether you arrive early or later,
6  you still have enough time to get on
7  the line; correct?
8  A. Yes.
9  Q. Do you have to clear any security at
10 the plant?
11 A. Rephrase that.
12 Q. When you drive in, do you have to stop?
13 A. No.
14 Q. Do you have a sticker on --
15 A. Yes.
16 Q. -- your car?  They just wave you
17 through?
18 A. You got a sticker where he can see the
19 sticker on your car.
20 Q. They just wave you on?
21 A. I don't know about wave, just --
22 Q. You just go in?  You're not stopped?
23 A. No.

89a40d03-3ea2-4a64-8583-af0eaa1fa3ed

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

34

1   Q. You're not searched?
2   A. No.
3   Q. None of your possessions are --
4   A. No.
5   Q. -- searched? None of your possessions
6      are searched?
7   A. No.
8   Q. Once you park your car in the parking
9      lot, where do you go?
10   A. I go into the building.
11   Q. And when you enter the building, where
12      do you go?
13   A. Sometimes to the bathroom and then go
14      put my bags in my locker and get my
15      supplies.
16   Q. So you go to your locker first?
17   A. No. I go to the bathroom first. It
18      all depends.
19   Q. All right. And then you go get
20      supplies?
21   A. No. I go to my locker and then go get
22      supplies that I need.
23   Q. And you pick up a smock --

35

1   A. Yes.
2   Q. -- hair net and gloves at supply?
3   A. Yes.
4   Q. And how long is your wait at supply to
5      pick these things up, if at all?
6   A. It all depends. Sometimes you move
7      fast; sometimes it moves slow.
8   Q. After you pick up your supplies, where
9      do you go?
10   A. Getting ready for the line.
11   Q. What do you do to get ready for the
12      line?
13   A. I'm going to go into the doors to get
14      dressed.
15   Q. So you pick up your supplies and go
16      immediately onto the production floor?
17   A. Yes.
18   Q. And you're supposed to be on the
19      production floor five minutes
20      beforehand?
21   A. Yes.
22   Q. So if you start at six o'clock, when do
23      you usually go through those doors?

36

1   A. Starts at six o'clock. Sometimes I go
2      early; sometimes I won't.
3   Q. When you go early, what time do you
4      enter those production doors?
5   A. Sometimes I'll be in there, like,
6      fifteen minutes till sometimes.
7   Q. And what do you do during those fifteen
8      minutes?
9   A. I'm getting my stuff on, what I need to
10      do, and make sure everything is on.
11   Q. When you don't go in early, when do you
12      go onto the production floor?
13   A. When I don't go in early, when --
14   Q. Yes.
15   A. -- do I go to the floor?
16   Q. Yes.
17   A. The regular time.
18   Q. And what's the regular time?
19   A. Five minutes till.
20   Q. And do you still have time to put on
21      the stuff?
22   A. Yes.
23   Q. Before you take your position on the

37

1      line after you're dressed, are you
2      required to perform any washing
3      activities?
4   A. You're supposed to wash all -- when
5      you're getting ready to come in the
6      door after you're dressed, you're
7      supposed to wash off, sanitize down,
8      soap and water.
9   Q. How long does that take?
10   A. Probably about five minutes or
11      whatever.
12   Q. Five minutes? What do you do in those
13      five minutes?
14   A. You're putting soap on and you're
15      washing down.
16   Q. It takes you five minutes?
17   A. It's only four people up -- four hoses
18      up there. Everybody got to wash off.
19   Q. So part of that time is waiting time?
20   A. Yes.
21   Q. But once you start actually washing
22      yourself down, how long does that take?
23   A. I don't know.

89a40d03-3ea2-4a64-8583-af0eaa1fa3ed

38

1  Q. A minute?
2       MR. UNDERWOOD: Objection.
3    Asked and answered. She said she
4    didn't know.
5  Q. You can answer.
6       MR. UNDERWOOD: You can answer,
7    though, if you know.
8  Q. You don't know?
9  A. No.
10 Q. How long of a walk is it from the
11   debone break room to the doors to enter
12   the evisceration department?
13 A. Repeat again, please.
14 Q. How long of a walk is it from the
15   debone break room to the entryway to
16   the evisceration department?
17 A. Five or six -- five or six minutes,
18   something like that.
19 Q. Five or six minutes?
20 A. Five or six, seven, I guess.
21 Q. You have a five-minute or seven-minute
22   walk from the break room to the entry
23   doors?

39

1  A. Something like that, about five or
2    seven.
3  Q. Did you ever time it?
4  A. Not really.
5  Q. Once you get onto the production floor,
6    how long does it take you to put on
7    your smock, apron, and sleeves?
8  A. I don't know.
9  Q. Once it's time to go on break, tell me
10   what you do from the time you're told
11   or you're able to go on break until you
12   get into the break room.
13 A. Say what, now?
14 Q. It's time for you to go on break.
15   Okay? What do you do? You have to
16   take --
17 A. Well --
18 Q. -- some things off; correct?
19 A. Yeah. You have to get undressed.
20 Q. Explain to me what you do.
21 A. You're going to break, you have to wash
22   down. When you go on a break, you get
23   all the chicken off of you and hang

40

1    your stuff up on the line where it need
2    to go and then you go on to break.
3  Q. What do you take off?
4  A. I take everything I'm supposed to take
5    off -- my arm guard, my gloves, and my
6    cotton liners, my smock, and my apron
7    and my chain glove.
8  Q. And you wash it off and then you take
9    it off and then you proceed to the
10   break room?
11 A. Yes.
12 Q. Can you estimate the amount of time it
13   takes you to walk to the wash stand,
14   wash this stuff off, take it off, and
15   leave?
16 A. I really haven't timed it.
17 Q. Do all the employees that you can
18   observe wash before leaving the
19   production floor?
20 A. I don't try watching nobody else.
21 Q. You don't know?
22 A. (Witness shakes head.)
23      MR. UNDERWOOD: That's no?

41

1       THE WITNESS: No.
2       MR. UNDERWOOD: We've got to
3    answer out loud.
4  A. No.
5  Q. Okay. Let's go -- take me through the
6    reverse procedure. You're on break,
7    it's time to go back on. How do you
8    know when your break is over?
9  A. You look at the clock.
10 Q. You just do it by looking at the clock?
11 A. You only get thirty minutes. But
12   sometimes it's not the whole thirty
13   minutes.
14 Q. So you leave the break area and you
15   walk to the evisceration doors and you
16   go in and you put the stuff on again.
17   You don't have to wash it now, do you?
18 A. Yes.
19 Q. You wash it a second time?
20 A. Yes.
21 Q. And what's the reason for that, if you
22   know?
23 A. I don't know. But you just have to do

89a40d03-3ea2-4a64-8583-af0eaa1fa3ed

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

42

1     it, wash it again.
2   Q. Who told you you had to wash it again?
3   A. You've got QAs.  You've got to wash
4     down before you come in.
5   Q. Well, my question is -- you're going
6     back from break; you enter the evis
7     room.  Okay?  Before you left to go on
8     break, you washed yourself all down.
9     You went on break.  Now you're coming
10     back and you're putting on your smock
11     and your apron and your guards again.
12     And you're telling me you have to wash
13     them again?
14   A. Yes.
15   Q. How long does that take you?
16   A. I don't know.
17   Q. Tell me what you do at the end of the
18     day when it's time to go home.
19   A. I get ready to leave and wash off again
20     when it's time to go and clean off my
21     stuff.
22   Q. You leave your workstation, you walk to
23     the wash stand; correct?

---

43

1   A. Yes.
2   Q. You wash yourself off?
3   A. Yes.
4   Q. And then you take off the apron, the
5     smock, and the guards?
6   Q. And what do you do with the apron and
7     the guards?
8   A. I'm going to take it to my locker when
9     I finish washing it off.
10   Q. What do you do with the smock?
11   A. I put it in the little thing they got
12     outside, the hamper or whatever.
13   Q. What about the hair net?
14   A. Put it in the trash.
15   Q. And the gloves?
16   A. Trash.
17   Q. And after you put these items in the
18     trash, what do you do?
19   A. I'm going to clock out.
20   Q. Do you go to your locker first?
21   A. Yes.
22   Q. And do you store the apron and the
23     plastic guards in your locker?

---

44

1   A. Yes.
2   Q. You don't have to take anything home?
3   A. No.
4   Q. Have you ever had to take anything home
5     to wash?
6   A. No.
7   Q. And then you clock out and leave?
8   A. Yes.
9   Q. Do you have an understanding as to how
10     the company keeps track of your time?
11   A. Yes.
12   Q. And what is your understanding?
13   A. Master time.
14   Q. What's master time?
15   A. Master card is what they swipe.
16   Q. Who's "they"?
17   A. Supervisors.
18   Q. And how did you come upon this
19     understanding of master time as the way
20     you're paid?
21   A. Line leader.
22   Q. Did you talk to the line leader about
23     it?

---

45

1   A. No.  I was a line leader.
2   Q. You were a line leader, so you knew
3     how --
4   A. Yes.
5   Q. -- it works?  And has it been your
6     understanding since you worked there
7     that you were paid from the time the
8     line leader swipes the card --
9   A. Yes.
10   Q. -- until he -- wait.  Has it been your
11     understanding since you've worked at
12     the plant --
13   A. Yes.
14   Q. -- that --
15       MR. UNDERWOOD:  Calm down.
16     It's okay.
17   Q. Has it been your understanding since
18     you worked at the plant that you are
19     paid for the time that you worked
20     between when the line leader swipes the
21     card in and when he swipes it out?  Is
22     that your understanding?
23   A. Yes.

---

89a40d03-3ea2-4a64-8583-af0eaa1fa3ed

46

1  Q. Have you ever complained to your
2     supervisor about your paycheck?
3  A. Yes.
4  Q. And what was the problem that you
5     complained about?
6  A. When I haven't had my hours on my
7     check, vacation pay, or a holiday, a
8     misprint, I guess.
9  Q. And has the supervisor managed to take
10    care of the problem?
11 A. Yes.
12 Q. Has he taken care of the problem each
13    time it happened?
14 A. Yes.
15 Q. Have you ever kept any kind of a diary
16    or notebook or notes documenting what
17    you believe to be the hours that you
18    worked at Equity for which you weren't
19    paid?
20 A. No.
21 Q. Have you made any calculations as to
22    the time that you worked but you
23    weren't paid for that you're claiming

47

1     here in this lawsuit?
2  A. No.
3  Q. Have you ever worked overtime?
4  A. Yes.
5  Q. Do you get paid time and a half for
6     overtime?
7  A. Yes.
8  Q. Have you ever filed a grievance with
9     the union about any pay issues?
10 A. Yes.
11 Q. And what was the nature of the
12    grievance?
13 A. When you get paid, if your check was
14    wrong -- like they gave us a raise, but
15    some got it and some didn't and it was
16    supposed to be on your check and it
17    wasn't.
18 Q. So you filed a union grievance?
19 A. Oh, what do you mean?
20 Q. I don't mean a complaint with HR.
21 A. Okay.
22 Q. You know, filing a grievance with the
23    union. Have you ever filed a grievance

48

1     with the union?
2  A. Okay. You're talking about, like,
3     agreement?
4  Q. Over the labor agreement, yes.
5  A. Uh-uh.
6  Q. You haven't?
7  A. I don't understand that.
8  Q. Do you understand as a union steward
9     that if an employee believes that he
10    has been treated in a fashion that's
11    not consistent with the labor
12    agreement, that he can file a grievance
13    with the union?
14 A. Okay. Now, I understand that. Yeah.
15 Q. Have you ever filed such --
16 A. No.
17 Q. -- grievance? Has anyone filed a
18    grievance through you with respect to
19    any pay issues?
20 A. No.
21 Q. During the time that you've worked at
22    the Baker Hill facility, have you ever
23    been disciplined for anything?

49

1  A. Example like as for what?
2  Q. Have you ever been written up for
3     anything?
4  A. Yes.
5  Q. What have you been written up for?
6  A. Like, birds on the table and --
7  Q. Pardon?
8  A. Birds. When you work in your area,
9     like they're on a table. It was, like,
10    a counseling. And then the next step
11    will be, like, a written warning,
12    whatever. You have to follow the
13    procedure they go in.
14 Q. Anything else?
15 A. On the line for job performance, so
16    they say. A lot of other stuff I can't
17    recall.
18 Q. A lot of other stuff?
19 A. Yeah.
20 Q. And you've never filed a grievance
21    disputing any of these?
22 A. I mean, it ain't --
23    MR. UNDERWOOD: Just answer --

89a40d03-3ea2-4a64-8583-af0eaa1fa3ed

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

50

1    A. No.
2    Q. Thank you.
3        MR. FRY:  I don't have any more
4    questions.
5        MR. UNDERWOOD:  I've just got a
6    few follow-ups.
7            EXAMINATION
8    BY MR. UNDERWOOD:
9    Q. Now, when you come in in the morning,
10   you have to put on all your PP
11   equipment that you testified to?
12   A. Yes.
13   Q. And you're not getting paid on master
14   time for that; is that correct?
15   A. What?
16   Q. You put that on before you go on the
17   line; is that right?
18   A. Yes.
19   Q. Okay.  And you don't get paid until you
20   go on the line; is that right?
21   A. Yes.
22   Q. And when you leave in the afternoon,
23   when you go off the line, you're not

---

51

1    getting paid; is that right?
2    A. No.
3    Q. And you have to go and take off all
4    your PPE after that; is that correct?
5    A. Yes.
6    Q. Okay.  And that is a part of your claim
7    sitting here today; is that correct?
8    A. Yes.
9    Q. Okay.  And you cannot go onto the
10   production floor without your hair net
11   and plugs; right?
12   A. Yes.
13   Q. You have to have those on before you
14   enter the production facility?
15   A. Yes.
16   Q. And you also have to stop at some
17   point -- is it before or in between
18   those double doors to sanitize your
19   boots?
20   A. When you're coming in, it's before,
21   because the sanitizer is right there.
22   When you walk in the door, you have to
23   mash the button and sanitize your boots

---

52

1    off.
2    Q. All right.
3        MR. UNDERWOOD:  That's all I've
4    got.
5            EXAMINATION
6    BY MR. FRY:
7    Q. You don't have to stop now when you
8    walk through to have your boots
9    sanitized, do you?
10   A. Yes.  If you don't have the stuff off
11   there on the floor, you have to mash
12   the button' you have to stop and
13   sanitize your boots in the little white
14   stuff, whatever you call it, out there.
15   Q. Okay.
16
17   (The deposition of Felicia Laseter
18   concluded at 2:39 p.m. on May 21,
19   2008.)
20
21
22
23

---

53

1        * * * * * * * * * *
2        REPORTER'S  CERTIFICATE
3        * * * * * * * * * *
4    STATE OF ALABAMA
5    COUNTY OF MONTGOMERY
6        I do hereby certify that the above
7    and foregoing transcript was taken down
8    by me in stenotype, and the questions
9    and answers thereto were transcribed by
10   means of computer-aided transcription,
11   and that the foregoing represents a
12   true and correct transcript of the
13   testimony given by said witness.
14       I further certify that I am neither
15   of counsel, nor any relation to the
16   parties to the action, nor am I anywise
17   interested in the result of said case.
18
19
20
                        _____
21   Bridgette W. Mitchell,
     Certified Court Reporter and
22   Commissioner for the State of
     Alabama at Large
23   ACCR No. 231 - Expires 9/30/08
     MY COMMISSION EXPIRES 1/25/2010

---

89a40d03-3ea2-4a64-8583-af0eaa1fa3ed

**TAB 33**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


NO.: 2:06-CV-1081-MEF


BETTY ANN BURKS, et al.,

       Plaintiff(s),

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

       Defendant(s).



DEPOSITION OF

CHRISTOPHER LASTER

       JOB NO. 1101-58403



BEFORE:   Victoria M. Castillo

           Certified Court Reporter and

           Notary Public

           ACCR# 17, Expires 9/30/2008

bf5974fe-853b-4458-a3db-c1c49e2b1845

**2**

1    In accordance with Rule 5(d) of
2    The Alabama Rules of Civil Procedure, as Amended,
3    effective May 15, 1988, I, Victoria M. Castillo, am
4    hereby delivering to HOWARD A. ROSENTHAL, ESQ. the
5    original transcript of the oral testimony taken on
6    the 22nd day of May, 2008, along with exhibits.
7         Please be advised that this is
8    the same and not retained by the Court Reporter,
9    nor filed with the Court.
10
11    S T I P U L A T I O N
12
13        IT IS STIPULATED AND AGREED, by
14    and between the parties through their respective
15    counsel, that the deposition of CHRISTOPHER LASTER
16    may be taken before Victoria M. Castillo,
17    Commissioner, at WILLIAMS, POTTHOFF, WILLIAMS &
18    SMITH, 125 South Orange Avenue, Eufaula, Alabama
19    36027 on the 22nd day of May, 2008.
20        IT IS FURTHER STIPULATED AND
21    AGREED that the signature to and the reading of the
22    deposition by the witness is waived, the deposition
23    is said to have the same force and effect as if

**3**

1    full compliance had been had with all laws and
2    rules of Court relating to the taking of
3    depositions.
4         IT IS FURTHER STIPULATED AND
5    AGREED that it shall not be necessary for any
6    objections to be made by counsel to any questions,
7    except as to form or leading questions, and that
8    counsel for the parties may make objections and
9    assign grounds at the time of trial, or at the time
10    said deposition is offered in evidence, or prior
11    thereto.
12        IT IS FURTHER STIPULATED AND
13    AGREED that notice of filing of the deposition by
14    the Commissioner is waived.
15
16
17
18
19
20
21
22
23

**4**

1                   I N D E X
2
3    EXAMINATION BY:              PAGE NUMBER:
4    Mr. Fry                      7, 59
5    Mr. Underwood                48, 69
6
7    EXHIBITS:              PAGE NUMBER:
8    (No Exhibits Were Marked)
9

**5**

1              A P P E A R A N C E S
2
3    FOR THE PLAINTIFF(S):
4       Carl E. Underwood, III, Esq.
5       THE COCHRAN FIRM
6       163 West Main Street
7       Dothan, Alabama 36302
8
9       Robert J. Camp, Esq.
10      THE COCHRAN FIRM
11      505 North 20th Street
12      Suite 825
13      Birmingham, Alabama 35203
14
15      M. John Steensland, III, Esq.
16      PARKMAN, ADAMS & WHITE
17      739 West Main Street
18      Dothan, Alabama 36301
19
20    FOR EQUITY GROUP EUFAULA DIVISION
21      Gary D. Fry, Esq.
22      Pelino & Lentz
23      One Liberty Place

6

1    Thirty-Second Floor
2    1650 Market Street
3    Philadelphia, Pennsylvania 19103
4
5    **********************
6
7        I, Victoria M. Castillo, a Court
8    Reporter of Montgomery, Alabama, acting as
9    Commissioner, certify that on this date, as
10   provided by the Alabama Rules of Civil Procedure
11   and the foregoing stipulation of counsel, there
12   came before me at WILLIAMS, POTTHOFF, WILLIAMS &
13   SMITH, 125 South Orange Avenue, Eufaula, Alabama
14   36027, commencing at 11:51 a.m., CHRISTOPHER
15   LASTER, in the above cause, for oral examination,
16   whereupon the following proceedings were had:
17
18        CHRISTOPHER LASTER,
19   being first duly sworn, was examined and
20       testified as follows:
21
22        COURT REPORTER:  Usual
23   stipulations?

7

1        MR. UNDERWOOD:  Yes.
2        MR. FRY:  Yes.
3
4    EXAMINATION BY MR. FRY:
5    Q.    Mr. Laster, is it?
6    A.    Yes.
7    Q.    My name is Gary Fry.  I'm one of the
8    lawyers for Equity Group Eufaula, the folks that
9    operate the poultry plant out in Baker Hill, and
10   we've asked you to come here today to put some
11   questions to you concerning a lawsuit that you and
12   some others have filed against the company.
13   A.    Yes, sir.
14   Q.    Have you ever been deposed before?
15   A.    No, sir.
16   Q.    I'm sure your lawyers have probably
17   told you what's going to happen, but let me give
18   you a few brief guidelines.  I'm going to be asking
19   the questions, and you will be giving me the
20   answers, and Victoria is the court reporter, and
21   she will be taking down what we say.  If you don't
22   understand one of my questions, it's important for
23   you to let me know that so that I can rephrase it

8

1    so you can understand it.  If you don't hear
2    anything I say, let me know and I will repeat it.
3    Let's not try and talk over one another because she
4    can only record one of us at a time.  Okay?
5    A.    Yes, sir.
6    Q.    And last thing -- any answer that you
7    give needs to be verbal, as opposed to a nod or a
8    shake of the head.  Okay?
9    A.    Yes.
10   Q.    Where do you live?
11   A.    8525 County Road 54 West, Clopton,
12   Alabama.
13   Q.    And what's your date of birth?
14   A.    3/12/66.
15   Q.    Are you currently employed?
16   A.    Yes, sir.
17   Q.    By whom?
18   A.    Equity Group.
19   Q.    How long have you worked for Equity?
20   A.    Six years.
21   Q.    So you started in 2002?
22   A.    Yes, sir.
23   Q.    And at that time CP was running the

9

1    place?
2    A.    Yes, sir.
3    Q.    What's your current job at Equity?
4    A.    Well, wherever they need help at,
5    because I work live hang, back dock, kill room,
6    sometimes the evis.  So basically I'm supposed to
7    start up in the kill room setting the pickers.  I
8    come in supposed to start up in the picking room,
9    kill room -- same thing.
10   Q.    So is it fair to say you're a
11   floater?
12   A.    Yes, you can say that.
13   Q.    How long have you been a floater?
14   A.    Well, I can't really say, but it's
15   been ever since I became a line leader and learned
16   the job that's in there -- learned the job.  As I
17   learned the job, that's when they started floating
18   me around for people to have help.
19   Q.    Are you currently a line leader?
20   A.    No, sir.
21   Q.    When you work in evis, for example,
22   are you assigned there to work on for a full day,
23   or a full week, or a month, or do you go in there

10

1   for a few hours, or how does that work?
2       A.   Well, however long they need me in
3   there.  If they need me to help them catch up on
4   this, I help them catch up on that -- then I go
5   back to the kill room until I help them with that,
6   then I go back to the kill room.
7       Q.   If you had to estimate the amount of
8   time that you spend in the evisceration production
9   floor, how much time would that be?
10      A.   Well, I can't say because I don't
11  keep up time.  I just go in there and do my job,
12  and the only time I be looking for is break time.
13      Q.   How often do you work in evis?
14      A.   It's not often, but it's just when
15  they need help.
16      Q.   Well, when you say it's not often, is
17  it once a week?
18      A.   You can say once a week.
19      Q.   And that would be a portion of one
20  day during that week?
21      A.   You can't say because you don't
22  really know when you're going -- I mean, actually
23  how long it's going to be.  It might be all day, it

11

1   might not be.  So you go in there and do what your
2   supervisor asks you to do.
3       Q.   So when you say it's not often you
4   work in evis, can I assume that most of your job
5   responsibilities are centered on the kill room, the
6   back dock, and live hang?
7       A.   Yes, sir.
8       Q.   And has that been for the entire six
9   years you've been there?
10      A.   I started off at the back dock, then
11  I moved to the live hang, then I moved to the kill
12  room.  So I've been going backward and forward
13  after I learned everything, helping out where they
14  need help at.
15      Q.   On those times when you are told to
16  go work in evis, what do you do?
17      A.   Well, I might have to help them catch
18  up throwing birds up on the rehanger table.  When
19  the line stop and the birds pile up, I might have
20  to just go in there and help them throw birds back
21  up on the rehang table.
22      Q.   Do you ever get on the evis line and
23  do the work of the production workers on the line?

12

1       A.   I have done it, but I -- lately --
2       Q.   How often does that happen?
3       A.   When I was in training, I got on the
4   line to learn the job.  So I had to get on the
5   line to learn the job.  So it was like two or three
6   times a week when I did it just to learn to job.
7   Until I caught on and learned how to do it, then I
8   stopped.
9       Q.   What do you do in the kill room?
10      A.   I come in in the morning to set the
11  pickers, make sure the birds being picked right,
12  scalding temperature right, make sure that birds
13  not dropping off in the drain, keep the kill room
14  floor clean, and if I have to relieve one of the
15  back-up killers from if they have to go to the
16  bathroom or whatever -- whatever they need, if they
17  ever go out, I have to go in and help cut back-up
18  kill, cut birds, and stuff like that.
19      Q.   What do you do in the back dock?
20      A.   Drive forklift, spotter truck, and
21  dump -- whatever one they need me to do.
22      Q.   You drive a forklift?
23      A.   Spotter truck?

13

1       Q.   Spider?
2       A.   Spotter.
3       Q.   And what else?
4       A.   Dump birds.
5       Q.   What do you mean "dump birds"?
6       A.   Well, the forklift driver put the
7   birds up on the dock, and they dump them to go down
8   in live hang.
9       Q.   What's the spotter lift?
10      A.   Spotter truck is where you bring the
11  trailers up so the birds can be dumped, so the
12  forklift driver can unload the trailer.
13      Q.   When you dump birds, you dump them
14  into the live hang area?
15      A.   You dump on a belt to go into the
16  live hang area.
17      Q.   When you work in the live hang area,
18  what do you do?
19      A.   You hang birds.
20      Q.   Have we gone over basically
21  everything that you do as a floater -- evis, kill
22  room, back dock, and live hang?
23      A.   Yes, sir.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

14

1    Q.    You told me that you don't work in
2    evis very often.
3    A.    No.
4    Q.    With respect to the kill room, the
5    back dock, and the live hang, which of those areas
6    do you spend most of your time in?
7    A.    In the kill room.
8    Q.    What area do you spend the next most
9    amount of time in?
10   A.    Lately been on the back dock.
11   Q.    Can you move around within these
12   three positions in one day?
13   A.    Well, it depends. If somebody
14   leaves -- mostly on the back dock. If somebody
15   leave, they don't have nobody else to do it on the
16   back dock. They got somebody in live hang, but
17   they need everybody in live hang, so most of the
18   time if somebody leave I go to the back dock. Now
19   live hang, most of the time they will get somebody
20   from off the evis floor to take them up there and
21   let them hang birds in live hang. I will go to the
22   back dock. If the guy on the spotter truck is not
23   there, I go take the spotter truck driver. If the

15

1    dumper is not there, I take the dumper. If the
2    lift driver ain't there, I take the lift driver.
3    It depends on whichever one that have to leave or
4    go or whatever.
5    Q.    So are there days when you can float
6    among all three of these positions?
7    A.    It can happen.
8    Q.    It is more often that you spend most
9    of your day in one of these three areas?
10   A.    Repeat the question for me.
11   Q.    Sure. Does it happen more frequently
12   that you spend all of your time in one of these
13   three areas all day?
14   A.    I spend most of my time in the kill
15   room, and then like I said, if I have to, then I
16   move. If they come tell me that somebody got to
17   leave, I move.
18   Q.    What shift do you work?
19   A.    First.
20   Q.    And what are your hours?
21   A.    Coming from 5:30 to three.
22   Q.    And who is your supervisor?
23   A.    Right now they got a supervisor

16

1    trainee down there. It's Neil -- what's Neil's
2    last name? I can't think of his last name, but he
3    just came, and he's really -- he just come down to
4    live hang, and he's my supervisor. But James
5    McElroy been the supervisor over me before he came.
6    Q.    What department are you slotted into,
7    if you know?
8    A.    They call it -- by the code it's 6-KD
9    by the code of the plant it's 6-KD, and that's
10   considered live hang.
11   Q.    You work eight hours a day?
12   A.    Like I said, I come in from -- it's
13   like eight-and-a-half hours a day.
14   Q.    How many days a week do you work?
15   A.    Five days, and sometimes six when
16   they have us to work.
17   Q.    When you first started working out
18   there, CP ran the plant?
19   A.    Yes, sir.
20   Q.    And did you do this same function?
21   A.    No, sir. I first started out -- like
22   I told you -- I first started out -- I started out
23   on the back dock, and I moved to live hang when CP

17

1    was working then. But when Keystone took over, I
2    had already learned all the jobs, and I started
3    rotating.
4    Q.    Have we gone over all of the jobs
5    that you have had out there at that facility?
6    A.    I had the supervisor trainee job.
7    That's the job I had.
8    Q.    When did you do that?
9    A.    It's been about six or seven months
10   that I did it, so it's just recently about a month
11   ago that I turned the job down.
12   Q.    So you were a supervisor trainee, and
13   you ultimately turned the job down?
14   A.    Yes.
15   Q.    Are you a member of the Union?
16   A.    Yes.
17   Q.    How long have you been a member of
18   the Union?
19   A.    About three years.
20   Q.    Have you ever been a steward?
21   A.    No, sir.
22   Q.    Have you ever been on any negotiating
23   committee?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

18

1    A.    No, sir.
2    Q.    Have you attended any Union meetings?
3    A.    No, sir.
4    Q.    You understand that you are a
5    plaintiff in this lawsuit?
6    A.    Yes, sir.
7    Q.    How did you hear about the suit?
8    A.    Through friends.
9    Q.    What do your friends tell you?
10    A.    Basically just said that have you
11   heard anything about the lawsuit going against the
12   Keystone? I said no. And they just told me that
13   it was taking — we had to go see somebody. I
14   can't remember who it was, but they had to go see
15   somebody about it. And I went and talked to them.
16   I had to call the Cochran Firm -- that's who I had
17   to call to talk to them about it. And it started
18   from there.
19    Q.    Did you discuss the suit with your
20   coworkers?
21    A.    No more than what they was saying, no
22   more than what I had heard.
23    Q.    What did you hear about the suit?

19

1    A.    Just heard that they was suing for
2    time that you started work, time you had to put on
3    your PPE, and everything from there until the time
4    you get off.
5    Q.    What's your understanding of your
6    claim?
7    A.    The understanding is that I want to
8    get paid for the time that I was there from the
9    time I started work, from the time you start
10   putting your PPE, to the time you get off and
11   taking off your PPE and you still on the clock. As
12   long as you still on the clock, you need to get
13   paid for it.
14    Q.    What's your understanding of the time
15   for which you weren't paid that you think you
16   should be paid?
17    A.    From putting on and taking off your
18   PPE, from the time you have to come back earlier so
19   that you can get on your line, because everybody
20   get off at different times. The lines -- you don't
21   actually get off at the same time, but everybody
22   has to be back at the same time.
23    Q.    What's PPE?

20

1    A.    Personal Protective Equipment.
2    Q.    Let's start with the kill room. When
3    you work in the kill room, what PPE do you wear?
4    A.    Your ear plugs; you have to wear your
5    apron -- you wear your apron; you wear your -- you
6    have to have your hair net, beard net on, your
7    smock, you have to have on, your rubber boots --
8    and I said hair net and beard net, right?
9    Q.    Yes, sir.
10    A.    And that's it.
11    Q.    Let me review the list to make sure
12   we got everything. You wear ear plugs; you wear an
13   apron; you wear a smock; you wear boots; you wear a
14   hair net, and a beard net?
15    A.    Yes, sir.
16    Q.    And you wear those things when you
17   are in the kill room?
18    A.    Yes, sir.
19    Q.    Do you wear anything else?
20    A.    No, sir. I don't have to wear safety
21   glasses because I have my glasses, but I have to
22   make sure I have to keep up with them. Because if
23   you don't, you get wrote up if you lose anything

21

1    and don't report it.
2    Q.    Is it your understanding you are
3    required to wear each and every one of those items
4    when you are working in the kill room?
5    A.    Yes, sir.
6    Q.    Do you wear any PPE, as you put it,
7    when you are working on the back dock?
8    A.    Well, you have to wear your safety
9    glasses, which I don't have to wear; you wear your
10   smock; you still wear your apron because of fecal
11   or whatever; and you wear your rubber gloves; your
12   ear plugs. Basically the same thing that I wear on
13   the inside, I wear on the outside.
14    Q.    You didn't tell me that you wear
15   gloves when you work in the kill room?
16    A.    Well, I wear cotton liners and rubber
17   gloves.
18    Q.    So when you are working in the kill
19   room you wear the white liners and the rubber
20   gloves?
21    A.    Yes, sir.
22    Q.    When you're working on the back dock,
23   you wear goggles?

22

1    A.    I don't wear goggle because I have my
2  glasses. I don't have to wear goggles.
3    Q.    You don't have to wear goggles at
4  all, even when you are working on the dock?
5    A.    Huh-uh.
6    Q.    You wear a smock, the apron, the
7  white gloves, the rubber gloves, the ear plugs.
8  Anything else?
9    A.    That's it. You don't have to wear
10 your beard net and your hair net. They don't want
11 you to wear them on the outside.
12   Q.    Is it your understanding that each of
13 those items are required when you are working in
14 the back dock?
15   A.    Yes, sir.
16   Q.    What do you wear when you are working
17 live hang?
18   A.    You wear cotton liners, rubber
19 gloves -- or either you can wear your shackling
20 gloves, sleeves. You wear the plastic sleeve; you
21 wear hair net; beard net; and you have to wear your
22 safety glasses if you don't wear glasses. You wear
23 your rubber boots; you wear your apron, or a smock,

23

1  whichever one you wear; and hair net and beard
2  net. Did I mention that?
3    Q.    You got those.
4    A.    Hair net, beard net, the smock,
5  cotton liners, rubber gloves -- either your
6  shackling gloves, and they got some cotton
7  sleeves. You can wear them, too.
8    Q.    You have to wear them?
9    A.    Well, you don't have to, but you wear
10 them. A lot of people wear them because if you
11 don't, it will break you out in a rash if you
12 don't.
13   Q.    But they are optional?
14   A.    Yes.
15   Q.    So in live hang you wear the white
16 and plastic gloves, you wear the sleeves, hair net,
17 beard net, boots, apron, and a smock?
18   A.    Yes.
19   Q.    Anything else?
20   A.    Your ear plugs.
21   Q.    When you're working in the kill room,
22 how many other employees are working in there with
23 you?

24

1    A.    You got three guys back-up killing --
2  you got two back-up killing; you got one on the
3  other side in the blood tank to catch birds that go
4  by that haven't had their throat cut; and me.
5  That's maybe four in all.
6    Q.    When you are working on the back
7  dock, how many other people are working out there
8  with you?
9    A.    Three people in all.
10   Q.    And what about live hang?
11   A.    It varies. You can have -- you might
12 have 17; you might have 16; you might have 12. It
13 depends on how many people come into work.
14   Q.    And they are all engaged in live
15 hanging?
16   A.    Yes, sir.
17   Q.    And that's just what the word means,
18 do you hang the birds on the --
19   A.    The shackle.
20   Q.    The shackles?
21   A.    Yes. They'd rather call it live
22 shackling.
23   Q.    Am I correct that all of these items

25

1  that you have identified for me and all three jobs
2  are issued to you by Equity?
3    A.    Well, you get it the first day.
4  Monday you get your apron -- free apron. You get
5  free rubber gloves; you get three hair nets; three
6  beard nets. That's for the week. Anything else
7  you get after that you have to pay for it. Unless
8  you working in live hang. Other than that,
9  anywhere else you got to pay for it. They give it
10 to you. And if you use all three of your hair nets
11 that same day, if you go back up there and get
12 another hair net, you have to pay for it. And
13 cotton liners, they don't give you them free. You
14 have to go pay for cotton liners whenever you have
15 to go get cotton liners. Rubber gloves, they give
16 you one pair. But if you go back, if you tear a
17 hole in them the same day, you go back, you still
18 have to pay for them. They don't give you nothing
19 like that.
20   Q.    So you get the apron, the gloves, the
21 liners, the hair net, the beard net, you get those
22 on Monday?
23   A.    And sleeves, you get them free on

bf5974fe-853b-4458-a3db-c1c49e2b1845

26

1   Monday.
2       Q.   And you also get a smock, don't you?
3       A.   You got to get a smock.
4       Q.   You get a smock every day, right?
5       A.   You get a smock every day.
6       Q.   What boots do you wear on these jobs?
7       A.   Rubber boots.
8       Q.   Did you get those from the company?
9       A.   Yes.
10      Q.   Are you required to get those boots
11  from the company?
12      A.   Yes, sir.  You can get them, but if
13  they -- if they clean up the locker and you have
14  your boots in your locker and they throw -- whoever
15  they got take your boots out and throw your boots
16  away, you got to turn around and buy your boots.
17  They won't give you a pair if somebody throw your
18  boots away.  They have people that come in and
19  clean up the lockers on Fridays so they can spray.
20  And if you happen to leave your lock on that locker
21  or haven't cleaned your locker out, they going to
22  cut your lock and take your boots out -- whatever
23  in your locker, and throw it away.  If it's your

27

1   apron, whatever you got left in there, they throw
2   it all away.  Then you got to turn around and pay
3   for it.  You got to pay for all that stuff, and
4   they be the one to throw it away.
5       Q.   If you leave it in your locker on
6   Friday?
7       A.   If they leave it in the locker.
8       Q.   And that's because they sanitize the
9   lockers over the weekend, correct?
10      A.   Yes.
11      Q.   And you're told to remove everything
12  from the your lockers on Friday, correct?
13      A.   Yes.
14      Q.   Are you permitted to purchase your
15  own boots for work?
16      A.   Meaning?
17          MR. UNDERWOOD:  From the company
18  or somebody else?
19      Q.   (Mr. Fry)  From somebody else?
20      A.   No.
21      Q.   You're not?
22      A.   You can't wear nothing but boots that
23  they supply you.

28

1       Q.   Which of these items that you have
2   described for me are you permitted to wear from
3   home?
4       A.   You can't wear none of them coming
5   from home.  Only time you can put that equipment on
6   is when you coming into work.  You can wear your
7   boots home, but you can't wear none of the other
8   stuff.
9       Q.   You made reference to a locker.  I
10  assume you store your things in a locker?
11      A.   No, I take my boots home with me.
12      Q.   What about the things that you get on
13  Monday -- the apron, the gloves, the sleeves, what
14  do you do with those?
15      A.   I throw it away.
16      Q.   Pardon?
17      A.   I throw it away.  See, I work in the
18  blood.  When I work with the blood, that blood and
19  hot water, the gloves really don't last long, and
20  the cotton liners get wet.  Other than that, I just
21  throw it away and get new stuff.
22      Q.   You throw it away after every day?
23      A.   After every day we get through

29

1   working.
2       Q.   So you get a new set of PPE every
3   single day?
4       A.   Not every single day -- when I need
5   it.  If I can spare my gloves or I can spare my
6   cotton liners, or whatever, I usually take them
7   back and get them.  But whatever I need for that
8   next day, I get it.
9       Q.   So you don't throw it away every day?
10      A.   Not all of it.  Sometimes I throw all
11  of it away and sometimes I throw some of it away.
12  Depends on what I can spare.
13      Q.   The employees that work in the kill
14  room, the back dock, and live hang, are they all
15  considered to be employees of the live hang
16  department?
17      A.   Well, if you in evis, you are
18  considered as a live hang employee because if they
19  need you there, if you have to go down, you will go
20  down there.  They will send you down there.  So you
21  really -- if wherever they need help in live hang,
22  if you got to be plucked off the floor in evis and
23  sent to the live hang, that's where you will be

bf5974fe-853b-4458-a3db-c1c49e2b1845

30

1  sent.
2      Q.    You told me that you are considered
3  to be an employee of the live hang department?
4      A.    That's the department code that they
5  got me under.
6      Q.    Are all of the employees that work in
7  the kill room, the back dock, and the live hang
8  area coded to the live hang department?
9      A.    6-KD.
10      Q.    Do you have your own break room?
11      A.    They have a live hang break room,
12  yes.
13      Q.    Do you use it?
14      A.    Well, sometimes.
15      Q.    And the live hang break room is
16  separate from the evis break room?
17      A.    Yes, sir.
18      Q.    And it's separate from the debone
19  break room?
20      A.    Yes, sir.
21      Q.    So the live hang break room is for
22  the live hang folks?
23      A.    Yes, sir.

31

1      Q.    And is it also for the back dock
2  folks?
3      A.    Basically you can take your break
4  wherever you want to take it. A lot of times the
5  snack machines don't work back in the back dock, so
6  you have to go to the other break room. Depends on
7  what you want.
8      Q.    Where do you take your breaks?
9      A.    Like I said, if I go in the debone --
10  if I go into the live hang break room if they ain't
11  got what I need to eat or what I want to snack on,
12  I go around to the evis break room. Like I said, a
13  lot of times the machines be broke down. They take
14  your money, or either before you put your money in
15  there somebody tell you that it's taking your
16  money, so you have to go around to the break room.
17      Q.    How often do you do that?
18      A.    Well, I can't say because I don't
19  know how many times the machines be broke. A lot
20  of times I go down to the debone break room because
21  they got Hardee's. A place comes in and sells food
22  there.
23      Q.    So you go to wherever you want to to

32

1  get food or wherever else you need, right?
2      A.    I go there -- if the machine is
3  broke, I go there. But other than that, the
4  quickest place I can get to to eat because you
5  don't have as much time as it is.
6      Q.    It's up to you, right?
7      A.    Basically.
8      Q.    How many breaks do you get a day?
9      A.    Two.
10      Q.    Do you get two breaks whether you're
11  working in kill, back dock, or live hang?
12      A.    Yes, sir.
13      Q.    How long are the breaks?
14      A.    30 minutes.
15      Q.    Where do you take your breaks, any
16  break room you want?
17      A.    I take it anywhere I want to, if the
18  machines are working, anywhere I want to go at.
19      Q.    Do you drive to the plant?
20      A.    Yes.
21      Q.    What time do you generally arrive at
22  the plant?
23      A.    About 5:10.

33

1      Q.    Do you have to clear security?
2      A.    As long as you got a sticker on -- a
3  decal on your car, all you do is ride on through.
4      Q.    Have you ever been searched?
5      A.    No, sir.
6      Q.    What about when you leave, can you
7  just drive off?
8      A.    Yes, sir.
9      Q.    Have you ever been searched when you
10  drive off?
11      A.    No, sir.
12      Q.    Tell me what you do when you get
13  there in the morning at five o'clock.
14      A.    First thing I do is get out my car,
15  go in, clock in, go to the --
16      Q.    Where do you clock in?
17      A.    I clock it in the evisceration break
18  room -- and come around, go to my supply, get my
19  supplies, go around to the back, have to walk back
20  around to the back way to the go to the kill
21  room -- I mean, live hang break room, then go back
22  there and put my stuff on. Once I get my stuff on,
23  I have to go in --

bf5974fe-853b-4458-a3db-c1c49e2b1845

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

34

1   Q.   Where do you put your stuff on?
2   A.   In the break room.
3   Q.   How long does it take you to put the
4   stuff on?
5   A.   About seven or eight minutes.
6   Q.   Then what do you do?
7   A.   Then I go in and check to make sure
8   if they release the kill room yet. If they haven't
9   released the kill room yet, then I have to wait
10  until they release it. Then I start setting the
11  pickers once it's been released.
12  Q.   You mean the people that worked on
13  the prior shift, is that what you're saying?
14  A.   What I'm saying is Sanitation has to
15  clean it. If Sanitation done cleaned it, then you
16  got USDA come in and inspect it. If they find
17  something wrong, then they won't release it. I
18  have to wait around until they release it, then I
19  go in and set the pickers.
20  Q.   What time do you leave the live hang
21  break room?
22  A.   What time do you mean I leave the
23  break room?

35

1   Q.   After it takes you a few minutes to
2   put your stuff on and your shift starts at 5:30, is
3   that when you start doing your work?
4        MR. UNDERWOOD: Object to the
5   form. That assumes he leaves the same time every
6   day.
7        THE DEPONENT: No, I don't leave
8   --
9        MR. FRY: Leave where?
10       MR. UNDERWOOD: The break room.
11  You asked him what time he leaves the break room.
12  You're making an assumption that he --
13  Q.   (Mr. Fry) What time do you leave the
14  break room in the morning?
15  A.   I don't really know. All I know is I
16  have to be in -- I go in before the time I have to
17  start because I have to make sure that they
18  release -- they supposed to release the kill room
19  at least 20 minutes after. And I go in and make
20  sure so when I go in there and start doing what I
21  have to do.
22  Q.   So you have to go in and make sure
23  that Sanitation has done its job and the room has

36

1   been released for production?
2   A.   Well, I'm just making sure that the
3   USDA has released it. Not Sanitation, just USDA.
4   Q.   Then what do you do?
5   A.   Start setting the pickers. I have to
6   make sure the pickers, scalders, and everything,
7   the temperature is right for the birds, and make
8   sure that everything is right for them to pick.
9   Q.   And then what do you do?
10  A.   Then I wait for the birds to come
11  through. When the birds come through, I reset the
12  pickers if they not adjusted right.
13  Q.   When you go in and you do this
14  preliminary work, check the pickers and check the
15  room to make sure it's being released by USDA, is
16  it your understanding you are paid for that time,
17  or not?
18  A.   My time don't start until 5:30. And
19  I get paid from 5:30 until three o'clock. But the
20  time I go in there, I go in there to check it and
21  make sure that everything is all right so I can
22  start to work.
23  Q.   So you --

37

1   A.   And sometimes USDA may not start --
2   they may not release it right then. And they might
3   not release them until 5:30. They may release them
4   before. You can't never say what time they are
5   going to release. Sometimes they don't even check.
6   Q.   What time do you check to see whether
7   USDA has released the room?
8   A.   I say I walk in and check -- I don't
9   really look at the clock. As soon as I get through
10  putting on my PPE, I go in and check to see. So I
11  don't really look at the clock to see what time.
12  It might be about 25 after, you know, five minutes
13  before I have to go start to work.
14  Q.   Are you making a claim in this
15  lawsuit for any of the time that you use to check
16  the room to see if it's been released, or you are
17  checking the pickers?
18  A.   From the time I come in to the time I
19  start putting on my PPE and going into work and to
20  the time I get off, that's what I want to get paid
21  for.
22  Q.   So your answer is: Yes, you are?
23  A.   Yes.

38

1    Q.    So you don't believe you're being
2  paid when you're checking out the room?
3    A.    No, sir. Because I am going in
4  before I check the room, before my time actually
5  starts.
6    Q.    And you want to be paid for that time
7  in this case?
8    A.    Yes, sir.
9    Q.    And you want to be paid for the time
10  when you're checking the pickers as well?
11    A.    When I do the pickers, my time has
12  started then.
13    Q.    It's already started?
14    A.    It's already started. I'm not
15  checking them. I am setting them.
16    Q.    And that only happens after 5:30?
17    A.    After 5:30.
18    Q.    But you're making a claim for some
19  pre-shift checking that you have to do of the room?
20    A.    It's from the time I come in and
21  start putting the stuff on going in -- from the
22  time I start doing all that, to the time I leave.
23    Q.    Tell me what you do in the beginning

39

1  of the day when you come in and you're going to be
2  working on the back dock.
3    A.    When I come in for the back dock -- I
4  don't know when I have to work on the back dock.
5  Everything I have to do is when I come in is first
6  set the pickers. That's my first job out of all of
7  it. Then if somebody is not coming in, then they
8  will come and tell me -- Chris, you got to work on
9  the back dock.
10    Q.    So is it fair to say that almost
11  every morning when you come to work you start out
12  doing what you do in the kill department?
13    A.    Yes, sir.
14    Q.    And you put on the items of clothing,
15  or PPE as you put it, that you described for me?
16    A.    Yes, sir.
17    Q.    And then later it may happen during
18  the day that you go to work on the back dock?
19    A.    Yes, sir.
20    Q.    And what about live hang, are there
21  some days when you know when you come in you're
22  going to start at live hang?
23    A.    No.

40

1    Q.    So every day you come to work you
2  start in the kill department, and you may
3  transition out to one of those other two areas; is
4  that correct?
5    A.    Yes, sir.
6    Q.    When you're working in the kill room,
7  or the back dock, or live hang, how do you know
8  when it's time for you to go on your first break?
9    A.    Well, the guys at live hang, their
10  line leader lets them know by hitting on the wall.
11  That's how they go to break. I have my stopwatch
12  what I look at. See, I don't go to break with them
13  because I have to wash down, too. I wash down and
14  everything. So I go to break by my clock.
15  Whatever time I get through washing down, then
16  that's when I go. Most of the time it be at nine
17  o'clock when they come back. Whatever time they
18  come back, then I go to break.
19    Q.    Tell me what you have to do to go on
20  break.
21    A.    When I go to break, I go to the wall,
22  take off my PPE, everything I have to take off.
23  Then I go to -- from there, goes into the -- hang

41

1  it up. After I hang it up, I go to the live hang
2  break room, wash down, because I have blood all
3  over me, so I have to get the blood off of me and
4  make sure ain't none up under my fingers or
5  whatever. And then I leave from there, I go to the
6  break room. The break room is right there with the
7  bathroom. I come in, and if there's something in
8  the machine that I want, I get it. But if the
9  machine is not working, then I have to move
10  further.
11         MR. UNDERWOOD: He just asked you
12  what you did before you went to the break. You are
13  going into the break now. Let him handle it.
14         MR. FRY: Go ahead. Keep going.
15         MR. UNDERWOOD: We don't want you
16  to ramble. We just want you to answer what he
17  asks.
18         THE DEPONENT: He said what I do.
19         MR. UNDERWOOD: He said what do
20  you do before you go to break.
21         MR. FRY: You are doing fine.
22  Just keep going.
23         MR. UNDERWOOD: Let him ask his

bf5974fe-853b-4458-a3db-c1c49e2b1845

42

1    questions.
2        Q.    (Mr. Fry)  You are in the break room.
3    What do you do?  If there are not machines
4    available or they are not working, you go somewhere
5    else, right?  How much time do you spend either in
6    the break room or looking for food in other break
7    rooms?
8        A.    You already know what you want.  They
9    don't sell but chicken, so you go.
10            MR. UNDERWOOD:  Ain't that the
11    truth.
12            MR. FRY:  That's shocking.
13        Q.    (Mr. Fry)  Your break is over and you
14    got to be back, tell me what you do.
15        A.    You have to come back early because
16    you have to put on your PPE.  Once you come back
17    from break, put on your PPE, get ready for work.
18        Q.    And do you have to wash it?
19        A.    Well, your boots -- you sanitize your
20    boots.  You wash it if you have to.  Most of the
21    time you wash is when you leave or whatever,
22    whichever the case may be.  You have to wash it or
23    you didn't wash before you came to break or you

43

1    wash it before you came to break, whichever.
2        Q.    So you have your choice, you can wash
3    it either when you leave for break or when you come
4    back from break?
5        A.    You can wash it both times if you
6    want.
7        Q.    Or both times?
8        A.    Yes.
9        Q.    But you don't have to wash it both
10    times?
11        A.    It's up to you.  Your boots you have
12    to wash both times when you come in or out.
13        Q.    When you're working on the back dock
14    and it's break time, do you have to wash when you
15    go on break from that job?
16        A.    Yes.  Depends on what part you want
17    to work in -- if you're working on the spotter
18    truck, forklift drive -- which one you talking
19    about?
20        Q.    Let's talk about when you're working
21    on the forklift, do you have to wash off when you
22    go on break?
23        A.    It depends on what you are doing.

44

1    You might have to get out of the forklift and take
2    a bird out the cage, and you get fecal on your
3    boots, they don't want you tracking it inside the
4    thing, so you have to wash your boots.
5        Q.    So what you're telling me is:
6    Depending on what particular task you're performing
7    on the back dock, you may or may not have to do any
8    number of things to go on break, correct?
9        A.    Correct.
10        Q.    It's always different, correct?  And
11    you don't do the same thing consistently?  Depends
12    what vehicle or equipment you are operating?
13        A.    Yes, sir.
14        Q.    It's the end of the day.  Tell me
15    what you have to do to leave the plant.
16        A.    Wash down, make sure that you have it
17    decent for the next shift to come in.  When you get
18    decent, get all that straightened out in the kill
19    room, wherever you at, then you go, you take off
20    your PPE, you wash it down.  If you want to save
21    some of it, you save some of it.  If you don't, you
22    throw it away, and everything.  And what you keep
23    you wash it off and take it home with you.  Or if

45

1    you got a locker, put it in your locker.  One of
2    the two, whichever one you want to do -- take it
3    home with you or put it in your locker.  But you
4    can't wear it outside.
5        Q.    How long does it take you to wash it
6    and take it off?
7        A.    About seven or eight minutes.
8        Q.    And then what do you do?
9        A.    After I wash it or?
10        Q.    Yes, after you have washed it and
11    taken it off.
12        A.    After you wash it and take it off, I
13    go into the -- wash down, get stuff off of me, and
14    then I go clock out.
15        Q.    Do you have any understanding, or
16    what's your understanding as to the basis of which
17    you're paid?  How does the company keep track of
18    the time for which you are paid?
19        A.    Just by your time card, your clock-in
20    and clock-out time.  And after -- the clock-out,
21    clock-in time.  Then your supervisor has a Master
22    Card.  Your supervisor goes in, regardless if you
23    are working or not, at 2:50 or three o'clock --

bf5974fe-853b-4458-a3db-c1c49e2b1845

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

46

1    whatever time they got for your Master Card -- they
2    clock it out then. If you still on the clock
3    washing down and clean it up, it don't matter
4    because 2:50 is -- your time cuts off at that time
5    -- with live hang time cut off at that time.
6        Q.    So as a member of the live hang
7    department, you are compensated on the basis of
8    live time, the Master Card? Is that your
9    understanding?
10       A.    My clock-out time is different, so at
11   three o'clock my time clock cuts off. When I clock
12   out at three o'clock, they pay me for the three
13   o'clock, but live hang is 2:50 their time. My time
14   is three o'clock. But when they get their time
15   sheets, you have to write on your time sheet "paid
16   to clock out hours", because that's the time I'm
17   on, because I am not the same time. They 6-KD us
18   from 5:50 in the morning to 2:50, so they have to
19   write "pay the clock-out time" because my time is
20   not set the same as theirs. But I am 6-KD still.
21       Q.    Did you review any documents before
22   you came here to today to prepare yourself?
23       A.    No, sir.

---

47

1        Q.    Did you talk to anybody besides your
2    lawyers?
3        A.    No, sir.
4        Q.    Have you kept track of the time that
5    you've worked there for which you feel you should
6    have been paid, but you weren't?
7        A.    No, sir.
8        Q.    Have you made any calculations as to
9    the time that you worked there for which you feel
10   that you should be paid?
11       A.    No, sir.
12       Q.    Have you on occasion been asked to
13   work overtime?
14       A.    Yes, sir.
15       Q.    When you work overtime, are you paid
16   time-and-a-half?
17       A.    Yes, sir.
18       Q.    Have you ever had any complaints
19   about your overtime compensation?
20       A.    What you mean, by the company?
21       Q.    Yes. Have you ever had any
22   complaints about how your overtime pay was
23   computed?

---

48

1        A.    No, sir.
2        Q.    Have you ever complained to any
3    supervisor or to payroll about any payroll issues?
4        A.    Yes, sir.
5        Q.    And when was that?
6        A.    I can't remember when it was, but
7    it's just that I was short a couple of hours on my
8    check, and I --
9        Q.    Did they take care of it?
10       A.    They took care of it.
11           MR. FRY:  That's all I have.
12   Thank you.
13           MR. UNDERWOOD: Let's talk out
14   here a minute.
15           12:38 p.m.
16           (Short break.)
17           12:42 p.m.
18           MR. UNDERWOOD: All right. I've
19   got some follow-up for you.
20
21   EXAMINATION BY MR. UNDERWOOD:
22       Q.    When you were testifying for defense
23   counsel, you mentioned that you were a supervisor

---

49

1    trainee; is that right?
2        A.    Yes, sir.
3        Q.    Tell me a little bit about what
4    training that you received in regard to supervision
5    out there. Tell me in particular did you receive
6    any training related to the Master Card?
7        A.    Yes. Every evening when 2:50 came,
8    you had to clock it right on 2:50 every evening.
9        Q.    What about the start time, did you
10   have to clock the start time in the morning?
11       A.    No, we did have to start -- the
12   clock-in time, we didn't have to do that. The only
13   time we clocked-out the Master Card was when in the
14   evening time, time we get off.
15       Q.    And you clocked the people out at
16   2:50 regardless of whether they were still talking
17   off their PPEs?
18       A.    That's what I was supposed to do,
19   2:50.
20       Q.    And regardless of whether they were
21   still actually doing work in the plant, you clocked
22   them out at 2:50; is that right?
23       A.    Everybody at 2:50.

---

50

1    Q.    How did they get clocked-in in the
2   morning?
3    A.    They used their own card. Everybody
4   is issued a time card, and they clocked their own
5   self in.
6    Q.    How is that different than the
7   attendance card if the individual clocked their
8   self in? Do you know the difference?
9    A.    What happened is every day you check
10  your time sheet. When they clock in, they clock
11  in. When you go down the time sheets and you check
12  and see if they are clocked-in a minute late or so
13  many minutes late or early or whatever.
14   Q.    So what I'm understanding is as a
15  supervisor, what you would do is check the sheet
16  and see if they have clocked-in, and if they
17  clocked-in early, they still only got their time on
18  the line, right?
19   A.    They got the time 5:50. They have it
20  set up where on the top of your paper you got the
21  Master Card time, and the Master Card time is 5:50
22  to 2:50. It's all the way down the sheet for the
23  whole week. It lets you know.

51

1    Q.    So the start time was automatic
2   unless you looked at the sheet and they were a
3   minute late, then they had a problem, didn't they?
4    A.    They got a minute took off for their
5   time.
6    Q.    But if they went to work a minute
7   early, they didn't get credit for that, right?
8    A.    Yes.
9        MR. FRY: Objection.
10   Q.    (Mr. Underwood) Did you learn about
11  any rules in your training as a supervisor in
12  regard to safety?
13   A.    Everybody must wear their PPE at all
14  times when you are in your work area. If you get
15  caught without wearing your safety glasses or
16  anything that's PPE that was supposed to be worn,
17  you get wrote up.
18   Q.    And if you get written up, what
19  ramification, or what does that cause to happen to
20  the employee?
21   A.    They get a write-up sheet, and it has
22  different sections in it, and it can cause you to
23  get fired. You got your final warning, and then if

52

1   I'm not mistaken, it's verbal warning, written
2   warning, one-day suspension, three-day suspension,
3   even up to termination. So that's a follow-up of
4   write-up that you get for each time that you don't
5   have your -- it's basically anything you do, you
6   have that decision to be wrote up, and it will
7   cause you to be terminated for it.
8    Q.    If you get enough of these write-ups
9   for not wearing your proper PPEs, can you get
10  suspended for that?
11   A.    The first time you get suspended is a
12  one-day suspension, and then after the one-day, you
13  can get three-days suspension pending, and then
14  after that it's up to the supervisor if they want
15  to terminate you, but it's termination on the
16  paper.
17   Q.    Is there anything that you learn in
18  your supervisor training about how, if at all, the
19  supervisors were to check to see if the employees
20  were wearing the proper PPE?
21   A.    They walk around, and if they see you
22  not wearing your ear plugs or whatever, they can
23  write you up for that. If they ask you to let them

53

1   look at your boots and your boots are slick, they
2   can write you up for that and tell you you need to
3   go get some more boots. You don't have to pay for
4   them, but you will get written up for it.
5    Q.    If their walking around the plant and
6   if an employee is not wearing proper PPE, they can
7   get written up on the spot?
8    A.    They can get written up on the spot.
9   They have people walking around doing that,
10  checking for safety, making sure that everybody has
11  their safety equipment, PPE on.
12   Q.    And you-all are required if you are
13  in the production area, you have to have your hair
14  net on; is that right?
15   A.    It's a must. Hair net or beard net
16  -- man or woman -- if you have facial hair, you got
17  to have a beard net on.
18   Q.    If you don't have it on, the hair net
19  or the beard net, you get written up; is that
20  accurate?
21   A.    Yes, sir.
22   Q.    What about your gloves?
23   A.    Gloves is not necessarily being

bf5974fe-853b-4458-a3db-c1c49e2b1845

54

1 written up, but they will ask you to put them on.
2 If you are handling the product, they want you to
3 have gloves on.
4     Q. Can you get written up for not
5 wearing gloves?
6     A. It depends on your supervisor.
7     Q. But that's an option that you can get
8 written up?
9     A. Yes.
10     Q. Is there anybody there that can write
11 you up in the plant other than your supervisor?
12     A. If I am not mistaken, your QAs and
13 your HASA(sic). Scott comes in -- Scott Little,
14 he's a safety trainer -- Scott Little and Harriet
15 Wilson, they come through the plant and walk all
16 outside checking to make sure everything is safe,
17 and they can write you up.
18     Q. And they can write you up for not
19 wearing the proper PPE?
20     A. PPE.
21     Q. All right. Now in your training as a
22 supervisor you had the opportunity to observe other
23 areas of the plant; is that right?

55

1     A. Yes, sir.
2     Q. When you were observing the other
3 areas of the plant and when you are working in your
4 area in live kill, have you ever observed other
5 employees rotate to other areas if they were
6 needed?
7     A. Yes, they have to work -- I had a lot
8 of them have to come from evis. I had some come
9 from debone. If they were shorthanded in live
10 hang, you tell your superintendent. Your
11 superintendent would get in touch with your shift
12 manager, and he would call and tell Vickie Whitley,
13 or anybody, whoever that had spare people, to send
14 them over there -- they need help in live hang.
15 Basically that's where it be at mostly, in live
16 hang.
17     Q. Would the rotation be based on
18 production needs, would that be right?
19     A. Yes, sir.
20     Q. I know that defense counsel referred
21 to your job title as a potential floater, but
22 that's not actually your job title, is it?
23     MR. FRY: Objection. I didn't

56

1 refer to his job title as floater, Carl, and you
2 know it. I said it is fair to characterize what
3 you do as a floater.
4     MR. UNDERWOOD: Let me rephrase
5 that.
6     Q. (Mr. Underwood) You are not a
7 floater, are you?
8     A. No, sir.
9     Q. That's not your job title, is it?
10     A. No, sir.
11     Q. And actually you don't float to
12 another area, it's actually a rotation to per what
13 the plant needs for production; is that correct?
14     A. Yes, sir.
15     MR. FRY: Objection.
16     Q. (Mr. Underwood) And you talked about
17 being able to wear your boots home currently; is
18 that right?
19     A. Yes, sir.
20     Q. You haven't always been able to wear
21 those boots home, have you?
22     A. No, sir.
23     Q. Didn't that start about the last

57

1 year, year and a half?
2     A. Yes, sir.
3     Q. And before that you could not wear
4 those boots home?
5     A. No, sir.
6     Q. You talked about when you go on your
7 break about washing your apron; is that right?
8     A. Yes, sir.
9     Q. And you state if you wash it before,
10 you might not wash it when you come back?
11     A. Yes, sir.
12     Q. However, has there ever been occasion
13 where you have washed it and then come back and
14 noticed something on it and washed it again?
15     A. You have to wash it. Sometimes when
16 you wash it down, blood might splatter on your
17 apron, and then you have to wash it off again
18 before you put it on.
19     Q. And that would be required; is that
20 accurate?
21     A. Yes, sir.
22     Q. In your training when you were in
23 supervisor training, did you have some training in

bf5974fe-853b-4458-a3db-c1c49e2b1845

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

58

1  quality control?
2      A.  I have worked with quality control,
3  with HASA(sic).  I worked with HASA(sic).
4      Q.  Did you have any training on what was
5  required for the employees to wear to protect the
6  product?
7      A.  You have to wear your safety gloves,
8  your gloves.  Any time you touch the product, you
9  have to have gloves on.  Inspect it, wash it off --
10 whatever you needed to do to make the product clean
11 so it can get out, so they can it.
12     Q.  I know you mentioned that you did
13 your boots, you sanitized them coming out of break?
14     A.  In and out.
15     Q.  Do you sanitize your boots at the
16 beginning of the day as well?
17     A.  Yes, sir.
18     Q.  Do you sanitize them at the end of
19 the day?
20     A.  Yes, sir.
21     Q.  You mentioned in your testimony to
22 defense counsel that if you don't wear your cloth
23 sleeves, you will get a rash; is that accurate?

59

1      A.  Well, what it does it -- some people
2  wear them, some people used to wear them.  But what
3  it does -- in live hang -- that is where they do it
4  -- they put it on because the sweat and the heat
5  from the sleeves, the plastic sleeves they put on,
6  they cause some people to have a rash.  Some
7  people's skin is different than others, and it
8  causes them to break out in rashes on their arms
9  and stuff.
10     Q.  In your activity in training and in
11 your experience with HASA(sic) and quality control,
12 could they write-up for not wearing your PPE?
13     A.  Yes, sir.
14     Q.  Okay.
15         MR. UNDERWOOD:  That's all I
16 have.
17         MR. FRY:  Just a few, Mr. Laster.
18
19 EXAMINATION BY MR. FRY:
20     Q.  How long was your supervisory
21 training period?
22     A.  Anywhere from six to seven months.
23     Q.  And did you complete the entire

60

1  period?
2      A.  Yes, sir.  I was offered the
3  supervisor job.
4      Q.  And why did you turn it down?
5      A.  The pay.
6      Q.  Now, you indicated that in response
7  to one of Mr. Underwood's questions -- I forget
8  what exactly it was, but I heard you say that
9  gloves are not necessary.  Do you recall that?
10     A.  Cotton liners.
11     Q.  Cotton liners.  So when you were
12 going through your supervisory training and you
13 were instructed about PPE, there was --
14         COURT REPORTER:  Could we hold on
15 for just a minute?  I am having an issue with my
16 software.
17         12:51 p.m.
18         (Short break.)
19         12:54 p.m.
20     Q.  (Mr. Fry)  So it depends on the job,
21 there are certain items which are required,
22 required items of PPE, correct?
23     A.  Yes, sir.

61

1      Q.  And there are certain other items
2  that are optional?
3      A.  Yes, sir.
4      Q.  Depending on the job?
5      A.  Just basically the cotton liners, and
6  like you said certain materials that's optional if
7  you want to.
8      Q.  And the sleeves are optional to you,
9  are they not?
10     A.  Well, I put them on because of the
11 blood and stuff on me.
12     Q.  But they are optional, are they not?
13     A.  Yes, sir.
14     Q.  And people who are not using knives
15 are not required to wear plastic arm guards, are
16 they?
17     A.  They have to have the arm guards.
18     Q.  If they have --
19     A.  If they use -- anybody using knives
20 or scissors requires an arm guard.  You got to have
21 an arm guard and a chain glove on at all times.
22     Q.  Listen to my question.  People who
23 are not handling knives, people who are not

bf5974fe-853b-4458-a3db-c1c49e2b1845

62

1  handling scissors, they are not required to wear
2  the arm guards, are they?
3      A.   No, sir.
4      Q.   When you are out driving a forklift
5  in the back area, when you are on the back dock,
6  you are not required to wear certain items, are
7  you?
8      A.   Yes, sir.
9      Q.   What items aren't you required to
10 wear?
11     A.   Depends on your person.  Some people
12 like to wear their smocks while they're in the
13 lift, they like to wear the gloves, their cotton
14 liners.
15     It's up to you in that particular
16 position, correct?  So it varies from position to
17 position over the plant, correct?
18     A.   Yes, sir.
19     Q.   You were asked some questions about
20 what you were taught about writing up employees.
21 Were you told that every single instance of an
22 employee not having an ear plug in you should write
23 them up?

63

1      A.   Well, first you warn them.  And once
2  you warn them, if you catch them again, then you
3  write them up.
4      Q.   So there's a warning?
5      A.   It's up to you if you want to warn
6  them or not.  You can write them up on the spot or
7  you can warn them.  It's up to you.
8      Q.   He asked you some questions about the
9  Master Card instructions that you received, and he
10 asked you at the end of the day when the supervisor
11 swipes the Master Card about what was going on on
12 the production line.  Do you recall that?
13     A.   Yes.
14     Q.   And I think he asked you -- isn't it
15 true that at that point in time people were still
16 working when the Master Card was swiped.  Is that
17 correct?
18     A.   They still doing their PPE is what
19 they are doing.  When you swipe your card, they
20 still doing the PPE.  And basically it's up to you
21 to know where your work is at.  If you swipe that
22 card, they doing -- it's 2:50.  They just now
23 walking off the line.

64

1      Q.   So you swipe the card at 2:50, they
2  are walking off the line, and they are in the
3  process of taking off their PPE, correct?
4          MR. UNDERWOOD:  I'm going to
5  object to that.  He did not state that.
6          MR. FRY:  I'm asking him if it's
7  correct.
8          MR. UNDERWOOD:  Okay.
9      Q.   (Mr. Fry)  When the supervisor swipes
10 his card at 2:55 --
11     A.   2:50.
12     Q.   What's going on on the line?
13     A.   At 2:50 they get off the line, they
14 go out, take off their PPE and wash down, and go
15 clock out.
16     Q.   When you receive that instruction and
17 you were -- you were observing this, correct?
18     A.   No.  Once I clocked them out, I had
19 to go to paperwork.
20     Q.   No, no.  He asked you whether you saw
21 this.  He asked you in your supervisory training
22 whether you were instructed as part of your
23 training on swiping the Master Card.  Did you

65

1  receive instructions on that?
2      A.   Yes, sir.
3      Q.   And did you actually stand there at
4  2:50 when the Master Card was swiped?
5      A.   Yes, sir.
6      Q.   And where were you when that
7  happened?
8      A.   Where was I at?
9      Q.   What department were you in?
10     A.   I was in the evis break room.
11     Q.   You were in the evis break room?
12     A.   Yes.
13     Q.   And that's where the Master Card is
14 swiped?
15     A.   Yes.  Right now they changed it.
16 It's not in there.  It's in the -- well, the time
17 when I was doing it, it was in the break room.
18     Q.   I want to focus my questions on that
19 period of time when you received supervisory
20 training, that period of time that Mr. Underwood
21 was questioning you about.
22     A.   All right.
23     Q.   You received training on Master Card

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

66

1  procedures, correct?
2      A.   Well, what I was told was at 2:50,
3  always clock the time card off at 2:50.
4      Q.   Okay. That's what you were told. He
5  asked you what you observed, I believe.
6          MR. UNDERWOOD: I don't think I
7  did.
8      Q.   (Mr. Fry) Okay. So you were simply
9  receiving oral instructions on the Master Card
10 swiping; is that correct?
11     A.   When I first took the job, they told
12 me to make sure that you clock the time card out at
13 2:50.
14     Q.   When you receive that instruction,
15 you were not cognizant, you weren't aware of what
16 was going on on the production line, were you,
17 because you weren't actually swiping the card?
18         MR. UNDERWOOD: Object to the
19 form. He has already testified from previous
20 experience he knows what's going on on the
21 production line because he's been involved in it.
22     Q.   (Mr. Fry) Answer my question now.
23 When you were receiving the supervisory training

67

1  instruction and you were told that at 2:50 the
2  Master Card is swiped, you weren't on an actual
3  line observing what was happening, were you?
4      A.   What you saying on the line? What
5  you saying where I was working at?
6      Q.   Yes.
7      A.   I went and swiped the card out at
8  2:50 and walked back down. You could see them
9  coming out of live hang.
10     Q.   Where did you receive this
11 instruction?
12     A.   In the evis office.
13     Q.   The Master Card instruction that you
14 received was in the evis office?
15     A.   Well, the instruction I was told by
16 another supervisor to make sure is that you clock
17 out at 2:50 because if you don't do that, then you
18 can get wrote up for it.
19     Q.   You were instructed that that was the
20 proper procedure, correct?
21     A.   Yes, sir.
22     Q.   And you received this in an office?
23     A.   Yes, sir.

68

1      Q.   When you were receiving this
2  instruction, you weren't out at the card swipe
3  location, were you?
4      A.   This was earlier during while
5  production was running.
6      Q.   When you were receiving the
7  instruction, did you ever go with the supervisor at
8  the end of the day when he swiped the Master Card?
9      A.   I had my own Master Card. They
10 swiped out a different time than I swiped out. I
11 was the first one to have to swipe out.
12     Q.   When were you swiping the Master
13 Card?
14     A.   At 2:50.
15     Q.   At 2:50?
16     A.   Yes, sir.
17     Q.   For what department?
18     A.   6-KD.
19     Q.   And where was the location that you
20 swiped that card at?
21     A.   Evis break room.
22     Q.   From the evis break room, what can
23 you observe of what's going on out in the live

69

1  hang, or the kill room, anything?
2      A.   Once you swipe it, you don't see
3  nothing. But when you walk right out the back
4  door, it's right there. That's where they come out
5  at, the back door back there. So the same door you
6  come in -- you up there before they even leave. So
7  you go swipe the card -- you be there before 2:50
8  to make sure that you clock in and out, and then
9  you walk right out. Then you can see everybody
10 coming out as you walk through the door.
11         MR. FRY: That's all. Thanks.
12         MR. UNDERWOOD: Just one
13 question.
14
15 EXAMINATION BY MR. UNDERWOOD:
16     Q.   When you observed them after you
17 swiped them out and you saw the live kill employees
18 coming to the door, were they still in their PPE?
19     A.   They come out with their PPE off, and
20 then they take it off on the outside.
21         1:02 p.m.
22 ***********************
23         FURTHER DEPONENT SAITH NOT

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

70

```
1              CERTIFICATE
2
3    STATE OF ALABAMA
4    AT LARGE
5
6          I hereby certify that the above
7    and foregoing deposition was taken down by me in
8    stenotype and the questions and answers thereto
9    were transcribed by means of computer-aided
10   transcription and that the foregoing represents a
11   true and correct transcript of the testimony given
12   by said witness upon said deposition.
13         I further certify that I am
14   neither of counsel nor of kin to the parties to the
15   action, nor am I in anywise interested in the
16   result of said cause.
17
18
19
20
21
                    _____
22   Victoria M. Castillo, Certified Court Reporter
     ACCR# 17, Expires 9/30/2008
23   Commissioner and Notary Public
```

**TAB  34**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06-CV-1081-MEF


BETTY ANN BURKS,

et al.,

     Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

     Defendant.



BEFORE:

     Cynthia M. Noakes, Commissioner

     and Certified Court Reporter


DEPOSITION TESTIMONY OF

ARTAVOUS MAHONE


* * * * * * * * * * * * * * * * * * * * * * * * * *

a8519537-30e5-4a3d-8f13-f3e2b215d922

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

**2**

1  S T I P U L A T I O N

2

3        IT IS STIPULATED AND AGREED by and

4  between the parties through their respective

5  counsel, that the deposition of ARTAVOUS MAHONE

6  may be taken before Cynthia M. Noakes, Court

7  Reporter, at the Law Offices of WILLIAMS,

8  POTTHOFF, WILLIAMS & SMITH, 125 South Orange

9  Avenue, Eufaula, Alabama 36027, on the 22nd day

10  of May, 2008.

11        IT IS FURTHER STIPULATED AND AGREED

12  that the signature to and the reading of the

13  deposition by the witness is waived, the

14  deposition to have the same force and effect as

15  if full compliance had been had with all laws and

16  rules of Court relating to the taking of

17  depositions.

18        IT IS FURTHER STIPULATED AND AGREED

19  that it shall not be necessary for any objections

20  to be made by counsel to any questions except as

21  to the form or leading questions, and that

22  counsel for the parties may make objections and

23  assign grounds at the time of the trial, or at

---

**3**

1  the time said deposition is offered in evidence,

2  or prior thereto.

3        IT IS FURTHER STIPULATED AND AGREED

4  that the notice of filing of the deposition by

5  the Court Reporter is waived.

6

7

8

9

10

11

12

13

14

15

16

17  *****************************************

18

19

20

21

22

23

---

**4**

1                    INDEX

2  EXAMINATION BY:              PAGE NUMBER:

3  MR. GOULD                    6-34

4  MR. CAMP                     34-37

5

6  EXHIBITS:

7  (No exhibits were

8  submitted to said deposition.)

9

10  Reporter's Certificate       38

11

12

13

14

15

16

17

18

19

20  *****************************************

21

22

23

---

**5**

1                 APPEARANCES

2

3  ON BEHALF OF THE PLAINTIFFS:

4        MR. ROBERT J. CAMP

5        THE COCHRAN FIRM, P.C.

6        ATTORNEYS AT LAW

7        505 North 20th Street

8        Suite 825

9        Birmingham, Alabama 35203

10        (205)244-1115

11

12  ON BEHALF OF THE DEFENDANT:

13        MR. MALCOLM S. GOULD

14        PELINO & LENTZ

15        ATTORNEYS AT LAW

16        One Liberty Place

17        Thirty-Second Floor

18        1650 Market Street

19        Philadelphia, Pennsylvania 19103

20        (215) 665-1540

21

22

23  *****************************

---

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

6

1    I, CYNTHIA M. NOAKES, a Certified
2    Court Reporter of Eufaula, Alabama, acting as
3    Commissioner, certify that on this date, as
4    provided by the Alabama Rules of Civil Procedure
5    and the foregoing stipulation of counsel, there
6    came before me at the Law Offices of WILLIAMS,
7    POTTHOFF, WILLIAMS & SMITH, 125 South Orange
8    Avenue, Eufaula, Alabama 36027, beginning at
9    10:55 a.m., ARTAVOUS MAHONE, witness in the above
10   cause, for oral examination, whereupon the
11   following proceedings were had:
12
13           ARTAVOUS MAHONE,
14   being first duly sworn, was examined and
15        testified as follows:
16
17        THE COURT REPORTER:  Usual
18   stipulations?
19        MR. CAMP:  Yes.
20        MR. GOULD:  Yes.
21
22           EXAMINATION
23   BY MR. GOULD:

7

1    Q.    Good morning, Mr. Mahone.  My name is
2    Malcolm Gould.  I'm an attorney from the law firm
3    of Pelino & Lentz in Philadelphia.  We represent
4    Equity Group Eufaula Division, LLC, in a lawsuit
5    filed in Federal Court in the Middle District of
6    Alabama.  You are a plaintiff in that lawsuit and
7    we're here today to take your deposition.  I'm
8    going to ask you questions, and hopefully you're
9    going to have answers for my questions.
10        As you can see, we have a court reporter
11   here.  She's going to take down my questions and
12   your answers.  For that reason, I would ask that
13   you keep all of your responses verbal.  If you'll
14   say yes or no instead of nodding your head or
15   shaking your head, or instead of an uh-huh or a
16   huh-uh, things should move a bit little more
17   smoothly.
18        I would also ask that you wait until I
19   finish my question before you start your answer.
20   That way we're not talking over each other.  It's
21   much easier for the court reporter to take
22   everything down.
23        If, during the course of the deposition, I

8

1    ask a question and you don't understand what I'm
2    asking or you don't understand the question, just
3    let me know; I'll repeat the question or try and
4    ask the question differently so it's not
5    confusing.
6        I don't anticipate that the deposition will
7    take long; but if for any reason you feel you need
8    to take a break, just let me know and we can
9    certainly take a break.  Okay?
10   A.    Okay.
11   Q.    Can you please state your full name for the
12   record?
13   A.    Artavous Jermaine Mahone.
14   Q.    And, Mr. Mahone, what is your home address?
15   A.    430 Thompson Street, Union Springs, Alabama.
16   Q.    Mr. Mahone, are you currently employed?
17   A.    No.
18   Q.    Did you previously work at the processing
19   plant in Baker Hill, Alabama?
20   A.    No.
21   Q.    Have you worked for Equity Group Eufaula
22   Division at the chicken processing plant?
23   A.    Yes.

9

1    Q.    The one that's over in Baker Hill?
2    A.    Yes.
3    Q.    And when was the last time you worked there?
4    A.    It was in 2007.
5    Q.    Do you know what month?
6    A.    No.
7    Q.    And how long did you work at the plant?
8    A.    About six months.
9    Q.    In what position did you work?
10   A.    In DSI.
11   Q.    Did you work in that particular position the
12   entire time you were employed at the plant?
13   A.    No.
14   Q.    What other positions did you work in?
15   A.    I was in packout and debone and in the box
16   room.
17   Q.    When you say you worked in debone, did you
18   work on one of the debone lines?
19   A.    No.
20   Q.    Where did you work?
21   A.    Packing it once it come off the line.
22   Q.    Where were you employed right before you
23   worked at the chicken processing plant?  Or were

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

10

1  you employed?
2  A.  Yeah, but I can't remember.
3  Q.  Okay.  Now, you understand that you are a
4  plaintiff in this lawsuit, correct?
5  A.  Yes.
6  Q.  What is your understanding as to what the
7  lawsuit is about?
8  A.  What is my understanding?
9  Q.  Yes, sir.
10  A.  It's going to be not getting paid for the
11  hours that we put in, all the hours that we
12  worked.
13  Q.  Can you give me some examples of time that
14  you feel you worked for which you were not paid?
15  A.  When we'd get ready to put on our equipment
16  and getting on the line.
17  Q.  Anything else?
18  A.  No.
19  Q.  So your understanding is that this lawsuit
20  is about time spent putting on and taking off
21  equipment; is that correct?
22  A.  Yes.
23  Q.  Are there any other claims that you believe

11

1  you are asserting in this lawsuit?
2  A.  Not besides not getting paid for the hours
3  that we worked.
4  Q.  During the time that you worked at the
5  plant, what shift did you work?
6  A.  Second.
7  Q.  That would be night shift?
8  A.  Yes.
9  Q.  And did you work that shift the entire time
10  you were employed at the plant?
11  A.  Yes.
12  Q.  Did you have a scheduled start time?
13  A.  Yes.
14  Q.  And what was that?
15  A.  4:15.
16  Q.  And was that the same for each of the
17  different positions that you worked?
18  A.  Yes.
19  Q.  Did you have a scheduled end time?
20  A.  No.
21  Q.  So you would just work until the production
22  was done for that day?
23  A.  Yes.

12

1  Q.  During the time that you were at the plant,
2  were you a member of the union?
3  A.  Not that I can recall.
4  Q.  Did you ever attend any union meetings?
5  A.  No.
6  Q.  Other than meeting with your attorneys, have
7  you ever attended any meetings where the claims in
8  this lawsuit were discussed?
9  A.  Repeat that.
10  Q.  Other than meeting with your attorneys, have
11  you ever attended any meetings where this lawsuit
12  or the claims in this lawsuit were discussed?
13  A.  No.
14  Q.  When your employment ended with the chicken
15  processing plant, were you terminated or did you
16  resign?
17  A.  I resigned.
18  Q.  And what was the reason for your
19  resignation?
20  A.  To get a better job.
21  Q.  Okay.  I'm going to ask you some questions
22  about some of the different positions in which you
23  worked.  And unless I tell you differently, we're

13

1  just going to talk about one position at a time.
2  So the first thing I'd like to ask you about is
3  your employment in DSI.
4      How long did you work in DSI?
5  A.  I worked in DSI the whole time I was there.
6  Q.  Now, you also indicated that you worked in
7  packout?
8  A.  Yes.
9  Q.  How often would you work in packout?
10  A.  Two, three days out of a week.
11  Q.  And you also indicated that you would work
12  in the box room; is that correct?
13  A.  Yes.
14  Q.  How long did you work in the box room?
15  A.  A day out of the week.
16  Q.  And you also indicated that you would work
17  on the debone line packing up the meat; is that
18  correct?
19  A.  Yes.
20  Q.  And how often would you do that?
21  A.  Like, a day out of a week.
22  Q.  And how often would you work on DSI?
23  A.  It's like, with DSI, somebody like the

a8519537-30e5-4a3d-8f13-f3e2b215d922

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

14

1  packout and the debone, if someone's not coming to
2  work, they'd move me to their position. So I
3  can't just tell you like that.
4  Q.   So you would normally work in DSI unless
5  they needed you on another position?
6  A.   Yes.
7  Q.   Now, your working on the debone line, did
8  that involve the use of a knife?
9  A.   No.
10  Q.   Or did you use scissors?
11  A.   No.
12  Q.   Okay. During the time that you were
13  employed at the plant, did you have to wear any
14  items of clothing or equipment while you were out
15  on the production floor?
16  A.   Equipment.
17  Q.   Okay. Can you list those for me, please?
18  A.   Apron, smock, sleeves, your cotton liners,
19  your plastic gloves, earplugs, hair net and mask,
20  boots.
21  Q.   Did you have to wear a hard plastic arm
22  guard?
23  A.   No.

15

1  Q.   Did you have to wear safety glasses?
2  A.   Yes.
3  Q.   Now, you indicated that you wore a mask; is
4  that correct?
5  A.   Yes.
6  Q.   Can you describe that mask for me?
7  A.   It's a long string, like a rubber band; you
8  just put it on your face.
9  Q.   It was like some sort of paper or felt?
10  A.   It covers your nose down to your chin.
11  Q.   It was made out of paper or felt material?
12  A.   Yes, paper.
13  Q.   Did you have to wear that mask in each of
14  the positions in which you worked?
15  A.   Yes.
16  Q.   All right. And did you wear each of these
17  items that you've listed for me in each position
18  in which you worked?
19  A.   Yes.
20  Q.   Did you also have to wear a beard net?
21  A.   That's why I wore the mask.
22  Q.   Okay. So you wore a mask instead of a beard
23  net?

16

1  A.   Yes.
2  Q.   Did you normally drive yourself to work?
3  A.   Yes.
4  Q.   When you were arriving at the plant, did you
5  have to clear any security?
6  A.   Yes.
7  Q.   Can you describe that for me?
8  A.   Well, it was not clearing security. Just,
9  if you didn't have a sticker in your window, they
10  would give you this card to hang up. Then you
11  would go and park. But I had a sticker, so I
12  could just drive straight through.
13  Q.   So as long as you had your sticker, you
14  didn't have to stop at the security gate?
15  A.   Right. And if you didn't, you had to stop.
16  Q.   After you would park in the parking lot, was
17  there any other security that you had to clear
18  before entering the plant?
19  A.   No.
20  Q.   There were no metal detectors or turnstiles?
21  A.   No.
22  Q.   Now, during the time that you worked at the
23  plant, were you able to wear your boots from home

17

1  if you chose?
2  A.   Yes.
3  Q.   And you could wear your boots outside?
4  A.   Yes.
5  Q.   During the time that you worked at the
6  plant, would you take items home with you at the
7  end of your shift and then bring them back at the
8  beginning of your shift?
9  A.   Your equipment. Because you done bought it,
10  so you're going take it home with you.
11  Q.   So would you take all of the items that you
12  listed for me previously, would you take them home
13  with you?
14  A.   Yes.
15  Q.   Are there some items that you would replace
16  each day?
17  A.   The plastic gloves.
18  Q.   Once you arrived at the plant and you
19  entered the building, can you describe for me what
20  you would normally do?
21  A.   You would go in and you would go to the
22  supply room or the supply line and wait in line
23  and get some material. And then you go and clock

a8519537-30e5-4a3d-8f13-f3e2b215d922

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

18

1  in and go to the back and get ready to put your
2  equipment on.
3  Q.  At what time would you normally arrive at
4  the plant?
5  A.  3:30.
6  Q.  Did you normally arrive at the same time
7  every day?
8  A.  Yes.
9  Q.  Now, I think you indicated that when you
10 entered the plant you would first go to the supply
11 room; is that correct?
12 A.  Yes.
13 Q.  And would you go to the supply room every
14 day?
15 A.  Yes.
16 Q.  And what would you get at the supply room?
17 A.  If you need an apron, you get an apron; you
18 need gloves, you get gloves.  But every day you've
19 got to go get the cotton liners.  So regardless,
20 you're going to get in that line.
21 Q.  Did you have to get a smock at the supply
22 room?
23 A.  Yes.

19

1  Q.  And you said you would get cotton liners
2  every day?
3  A.  Yes.
4  Q.  And then other items you would get if you
5  needed new ones?
6  A.  Yeah.  You would buy them.
7  Q.  Would you get a new apron every day?
8  A.  No.
9  Q.  Would you get new rubber gloves every day?
10 A.  Yes.
11 Q.  And after you went to the supply room, I
12 think you said that you would go and clock in; is
13 that correct?
14 A.  Yes.
15 Q.  Where would you clock in?
16 A.  In the break room.
17 Q.  Which break room?
18 A.  Which break room?
19 Q.  There's more than one break room at the
20 plant, isn't there?
21 A.  There's two.  But one's supposed to be for
22 the supervisors, so there's one.
23 Q.  Was it a big break room, the main break

20

1  room; is that where you would clock in?
2  A.  It's big; but it ain't big for real, because
3  you've got over a thousand people in there.
4  Q.  Then after you would clock in, what would
5  you do?
6  A.  Go to the back and get ready to put that
7  equipment on so you could try to get on the line
8  on time.
9  Q.  Would you be wearing your boots already?
10 A.  Yes.
11 Q.  Would you wear your boots in from the
12 parking lot?
13 A.  Put them on in the break room.
14 Q.  Would you do that before or after you
15 clocked in?
16 A.  When I clocked in.
17 Q.  So is that after you clocked in or before
18 you clocked in?
19 A.  When I clocked in.
20 Q.  So you would put on your boots and clock in
21 at the same time?
22 A.  No.  You said:  When did you put on your
23 boots? before or after you clocked in?

21

1     You clock in first, put your boots on, then
2  get your equipment and go to the back.
3  Q.  So you would put them on after you clocked
4  in?
5  A.  That's what I said, after I clocked in.
6  Q.  Did you observe other people who would wear
7  their boots in from the parking lot?
8  A.  No.
9  Q.  Are there any other items, other than your
10 boots, that you could put on before you went out
11 onto the production floor?
12 A.  Your hair net and mask and your beard net
13 and earplugs and your glasses.
14 Q.  Can you describe for me at the beginning of
15 your shift what you would do once you entered the
16 production area?
17 A.  Put your equipment on and sanitize it down
18 and go to the line.
19 Q.  So you would pass through the double doors;
20 is that correct?
21 A.  Yes.
22 Q.  And what would you do next?
23 A.  When you get through the double doors,

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

22

1  you're in the plant and you're getting ready to
2  put your equipment on.
3  Q.  Was there a particular spot where you would
4  put your equipment on?
5  A.  Everybody had to put it on in the same spot.
6  Q.  And can you describe for me then what you
7  would do?
8  A.  You would go stand in line and wait to be
9  sanitized down and go get on the line.
10  Q.  Would you put on your smock inside the
11  production area?
12  A.  Yes.
13  Q.  Would you put your apron on inside the
14  production area?
15  A.  Yes.
16  Q.  How about your sleeves?
17  A.  You're going to put on everything in there.
18  Q.  So all the items that you identified for me
19  you would put on inside the production area, with
20  the exception of your boots and your hair net and
21  mask or beard net; is that correct?
22  A.  Safety glasses and earplugs.
23  Q.  Would you put them on before you entered the

23

1  production area?
2  A.  You can, but I put it on once I got in
3  there.
4  Q.  And then you indicated that you would rinse
5  or wash off your --
6  A.  Sanitize your equipment down.
7  Q.  So you would do your apron and your gloves;
8  is that correct, and your sleeves?
9  A.  And your boots.
10  Q.  And then you would go to whatever position
11  you were working on that day?
12  A.  After you get sanitized down.
13  Q.  Approximately how long would it take you
14  from the time you passed through the production
15  doors until the time that you got to your spot on
16  the line?
17  A.  That's, what, putting on your equipment and
18  sanitize down?
19  Q.  Yes, sir.
20  A.  Seven to ten minutes.
21  Q.  And then once you would get out to your
22  position on the line, did you have to get a chain
23  glove or knife or scissors or any sort of cutting

24

1  instrument?
2  A.  No.
3  Q.  Did you get any breaks during the course of
4  your shift?
5  A.  Yes.
6  Q.  How many breaks would you get?
7  A.  Two.
8  Q.  Did they occur at scheduled times during the
9  shift?
10  A.  Every day, yes.
11  Q.  Do you recall what times?
12  A.  No.
13  Q.  Do you recall how long they were?
14  A.  30 minutes apiece.
15  Q.  And was that the same during the entire time
16  you worked at the plant?
17  A.  Yes.
18  Q.  How would you know when it was time to leave
19  for break?
20  A.  They'll stop running meat.  And you go get
21  off the line -- well, as soon as they stop running
22  meat, your 30 minutes has started.  So you go up
23  to the front, sanitize down, take your stuff off,

25

1  hang it up, clean your boots off, and go back to
2  the break room.
3  Q.  So you would know when it was time to go on
4  break because the meat would stop coming to your
5  position wherever you were working; is that
6  correct?
7  A.  Yes.
8  Q.  Can you describe for me what you would do
9  then?
10  A.  What would you do when what?
11  Q.  Right after the meat reaches your position
12  and you're ready to go out on break, what do you
13  do next?
14  A.  You're talking about once all the meat is
15  gone and you get ready to go on break?
16  Q.  Yes, sir.
17  A.  You go to the front, sanitize down, take
18  your stuff off, hang it up, clean your boots off,
19  and go to the break room or go out the door.
20  Q.  Are there any items that you would not take
21  off?
22  A.  Your boots.
23  Q.  Okay.  Could you keep your hair net or your

a8519537-30e5-4a3d-8f13-f3e2b215d922

26

1  beard net on?
2  A.  Yes.
3  Q.  What about your safety glasses?
4  A.  I guess.
5  Q.  Approximately how long would it take you
6  from the time you left your position on the line
7  to the time you exited the production floor?
8  A.  The same seven to ten minutes.
9  Q.  And what would you do after you left the
10  production floor?
11  A.  Exit and go on to the toilet or break room.
12  Q.  Would you normally stay in the break room or
13  would you go outside?
14  A.  I'd go out the door or go in the break room.
15  Q.  That's fine.  I just wanted to know whether
16  you went to the break room or whether you went
17  outside instead?
18  A.  It don't matter where you go; but once you
19  get there, you don't have more than 15 minutes to
20  be there no ways.
21  Q.  So when you got out to the break room, what
22  would you normally do?
23  A.  Use the bathroom, buy a soda, head back to

27

1  get equipped back up.
2  Q.  How would you know when it was time to
3  return from break?
4  A.  Because they stop running the meat, let's
5  say, at seven o'clock, and take you ten minutes
6  out of there; you know, you've got 20 minutes
7  left.  You know it's going to take you the same
8  ten minutes to get suited back up.  The time
9  starts when the meat stops; it don't start when
10  you get in the break room.
11  Q.  So is there anyone who would tell you what
12  time you had to be back from break?
13  A.  No.  Because once the meat stop running, you
14  look at the clock.
15  Q.  Can you describe for me what you would do
16  when you returned from break, when you were going
17  back through the production doors?
18  A.  Go back through the door, clean your boots
19  off, you put your equipment back on, you stand
20  back in line to sanitize that down, then you go
21  back to the line.
22  Q.  Approximately how long would it take you
23  from the time you passed through the production

28

1  doors to the time you got back to the line?
2  A.  Seven to ten minutes.
3  Q.  During the time you were employed at the
4  plant, were you ever written up for being late?
5  A.  Not that I can recall, no.
6  Q.  Do you recall being written up for any
7  reason?
8  A.  No.
9  Q.  Would you repeat that same process before
10  and after your second break?  You would do the
11  same things?
12  A.  Yeah.
13  Q.  There's no big difference between what you
14  would do for your first break and what you would
15  do for the second break?
16  A.  No difference at all.
17  Q.  How would you know when it was the end of
18  your shift?
19  A.  The meat going to stop running and your
20  supervisor will tell you you can go.
21  Q.  Now, what time would that normally happen?
22  A.  I mean, regardless, you're going to be there
23  for your eight hours.  You're going to be there

29

1  over your eight hours, so...
2  Q.  So you were working night shift, correct?
3  A.  Yes.
4  Q.  So you didn't necessarily have a set end
5  time?
6  A.  No.
7  Q.  So you had to wait until the meat finished
8  coming to your spot.  Did you also have to wait
9  for your supervisor to release you?
10  A.  No.  Because when the meat's getting ready
11  to stop running, your supervisor will come to you
12  and let you know that's all.
13  Q.  Now, could you explain to me what you would
14  do at the end of your shift, after the meat stops
15  coming and you're able to leave your position and
16  get ready to leave?
17  A.  Go back and sanitize down and take the stuff
18  off and walk to the door and clean your boots
19  again.  Then you go, and right by the break room
20  door is a basket or something where you would
21  throw your cotton liner and your smock in there.
22  And you go and you clock out.
23  Q.  Approximately how long would it take you

30

1    from the time you left your position on the line
2    to the time you exited the production floor?
3    A.    Back toward the break room?
4    Q.    Yes, sir.
5    A.    Seven to ten minutes.
6    Q.    Now, did you ever time yourself for the
7    amount of time it would take you to leave the line
8    and get out through the production door?
9    A.    Talking about after the fact you sanitized
10   down and hang your stuff up?
11   Q.    Right.  Did you ever actually time yourself?
12   A.    You're talking about, what, getting off of
13   break or something?
14   Q.    Yes, sir.
15   A.    Yeah.  Because you're going to look at the
16   clock before you leave out of there to know what's
17   your remaining time to be back in there.
18   Q.    What's your understanding as to how the
19   number of hours for which you were paid, how that
20   number was calculated?
21   A.    What do I understand about it?
22   Q.    Yes, sir.
23   A.    Break it down for me.

31

1    Q.    Okay.  Do you have any sort of understanding
2    as to how the hours for which you were paid by the
3    company were calculated?
4    A.    Through master card.
5    Q.    And what is your understanding as to what
6    the master card was?
7    A.    It clocks you in and it clocks you out.
8    Q.    So you weren't paid from the time you
9    clocked in until the time you clocked out; is that
10   correct?
11   A.    Yes.
12   Q.    That's your understanding?
13   A.    Yes.
14   Q.    And you were paid some different time?
15   A.    Yes.
16   Q.    During the time that you were working at the
17   plant, you would get paid weekly; is that correct?
18   A.    Yes.
19   Q.    Did you ever have an instance where you got
20   a paycheck and you looked at the hours for which
21   you were paid and you went and complained to a
22   supervisor or someone in payroll or someone in
23   management that you hadn't been paid for all the

32

1    hours that you worked?
2    A.    Yes.
3    Q.    When did that happen?
4    A.    It was after 90 days, because you're
5    supposed to get a raise after 90 days.  But I
6    didn't get mine for, like, probably three weeks
7    after.
8    Q.    So when you went and complained, you were
9    complaining about the hourly rate that you were
10   being paid, your wage rate; is that correct?
11   A.    Yes.
12   Q.    What about the actual number of hours
13   worked?  Did you ever complain about that?
14   A.    Yes.
15   Q.    And who did you complain to?
16   A.    I do not remember his name, but he's, like,
17   the manager over the whole plant.
18   Q.    And how many times did that happen?
19   A.    I went to him, it was two days in a row.
20   Q.    And what was your complaint?
21   A.    That they messed my check all the way up.
22   Q.    Okay.  And that was -- was that also related
23   to this raise that you were supposed to get after

33

1    90 days?
2    A.    No.  It was two different incidents.
3    Q.    Okay.  What was this incident where you
4    claimed that they messed up your check?  Can you
5    explain?
6    A.    What I was telling you:  You don't have a
7    cutoff time to get off.  You know, you been down,
8    let's say, 50 hours; but the check had, like, 38
9    on it or something like that.
10   Q.    So you believe that you were not paid for
11   all the hours you were at the plant?
12   A.    No.  I don't believe that; I know that.
13   Q.    And what happened after you raised your
14   complaint?
15   A.    After those first -- because he told me that
16   evening he was going to reprint a check.  So I had
17   to go back to him the following day.  The third
18   day, that's when I got it.
19   Q.    So you complained that you weren't properly
20   paid for your hours, and you eventually got a
21   check for those hours; is that correct?
22   A.    Yes.
23   Q.    Were there ever any other instances where

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

34

1  you complained about the amount of hours for which
2  you were paid?
3  A.  No.
4  Q.  Those are all the questions I have for you.
5  Thank you. I'm sure Mr. Camp has a few.
6  BY MR. CAMP:
7  Q.  You said you worked in DSI, packout, debone,
8  and box room; but you primarily worked out of DSI,
9  but that you would move to other positions as they
10  needed; you is that correct?
11  A.  Yes.
12  Q.  Did you see that other employees had to do
13  the same thing, that they would move to other
14  positions throughout the plant, depending on if
15  there was a shortage of labor or whatever the
16  reason may be?
17  A.  Yes.
18  Q.  Do you understand that this lawsuit is
19  seeking to compensate you for all hours worked?
20  A.  Yes.
21  Q.  That this lawsuit has nothing to do with the
22  two complaints that you made, one to the plant
23  manager -- the two to the plant manager -- and

35

1  whoever the other individual was?
2  A.  Yes.
3  Q.  Did you say your shift started at 4:15?
4  A.  Yes.
5  Q.  And you would arrive around 3:30?
6  A.  Yes.
7  Q.  Could you clock in at 3:30?
8  A.  You could clock in at 3:30, but you're not
9  supposed to clock in at 3:30.
10  Q.  When were you supposed to clock in?
11  A.  I believe, four.
12  Q.  So within 15 minutes of your shift start
13  time?
14  A.  Yes.  You had to be there early so you could
15  get your stuff out of the equipment line, and
16  you've got to be there early to put stuff on to
17  get on the line.
18  Q.  You may have mentioned this and I missed it,
19  but were you allowed to wear your boots outside?
20  A.  Yes.
21  Q.  Okay.  You said that you would put your
22  boots on in the break room?
23  A.  Yes.

36

1  Q.  Why did you put your boots on in the break
2  room?
3  A.  Because they had lockers in the break room.
4  You put your shoes in the locker and take your
5  boots out and put them on.
6  Q.  So would your wear your boots from the
7  house?
8  A.  No.
9  Q.  You would leave your boots at the plant?
10  A.  I'd leave them at the plant or take them
11  with me.  But I wouldn't just wear them out
12  because them boots were uncomfortable.
13  Q.  When you were putting items on and
14  sanitizing your boots and washing equipment at the
15  beginning of the day and on breaks and at the end
16  of the day, did supervisors -- were there
17  supervisors around in the plant?  Were there
18  supervisors that would have known that y'all were
19  doing this work?
20        MR. GOULD:  I object to the form of the
21  question.
22  A.  Repeat that one more time for me.
23  Q.  Did your supervisor, did -- was there

37

1  supervision in the plant that knew that you were
2  washing your apron and washing your gloves and
3  sanitizing your boots?
4  A.  Yes.
5  Q.  Could you wear your hair net outside?
6  A.  Yes.
7  Q.  That's it.
8        MR. GOULD:  I have no other questions.
9
10        (The deposition was concluded.)
11
12
13
14
15
16
17
18
19
20
21
22
23

a8519537-30e5-4a3d-8f13-f3e2b215d922

```
                                            38
1          C E R T I F I C A T E
2
3    STATE OF ALABAMA
4    BARBOUR COUNTY
5
6          I hereby certify that the above and
7    foregoing deposition was taken down by me in
8    stenotype and the questions and answers thereto
9    were transcribed by means of computer-aided
10   transcription, and that the foregoing represents
11   a true and correct transcript of the testimony
12   given by said witness upon said hearing.
13         I further certify that I am neither of
14   counsel, nor kin to the parties to the action,
15   nor am I in anywise interested in the result of
16   said cause.
17
18
19         CYNTHIA M. NOAKES, Commissioner
20         Certified Court Reporter,
21         ACCR #327 - Expires 09/30/2008
22
23         Commission Expires 07/08/2009
```

**TAB 35**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


NO.:  2:06-CV-1081-MEF


BETTY ANN BURKS, et al.,

      Plaintiff(s),

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

      Defendant(s).


               DEPOSITION OF

               ANTHONY MARCH

                    JOB NO. 1101-58403


BEFORE:    Victoria M. Castillo

            Certified Court Reporter and

            Notary Public

            ACCR# 17, Expires 9/30/2008

2

1    In accordance with Rule 5(d) of
2    The Alabama Rules of Civil Procedure, as Amended,
3    effective May 15, 1988, I, Victoria M. Castillo, am
4    hereby delivering to HOWARD A. ROSENTHAL, ESQ. the
5    original transcript of the oral testimony taken on
6    the 22nd day of May, 2008, along with exhibits.
7         Please be advised that this is
8    the same and not retained by the Court Reporter,
9    nor filed with the Court.
10
11    S T I P U L A T I O N
12
13         IT IS STIPULATED AND AGREED, by
14    and between the parties through their respective
15    counsel, that the deposition of ANTHONY MARCH may
16    be taken before Victoria M. Castillo, Commissioner,
17    at WILLIAMS, POTTHOFF, WILLIAMS & SMITH, 125 South
18    Orange Avenue, Eufaula, Alabama 36027 on the 22nd
19    day of May, 2008.
20         IT IS FURTHER STIPULATED AND
21    AGREED that the signature to and the reading of the
22    deposition by the witness is waived, the deposition
23    is said to have the same force and effect as if

3

1    full compliance had been had with all laws and
2    rules of Court relating to the taking of
3    depositions.
4         IT IS FURTHER STIPULATED AND
5    AGREED that it shall not be necessary for any
6    objections to be made by counsel to any questions,
7    except as to form or leading questions, and that
8    counsel for the parties may make objections and
9    assign grounds at the time of trial, or at the time
10    said deposition is offered in evidence, or prior
11    thereto.
12         IT IS FURTHER STIPULATED AND
13    AGREED that notice of filing of the deposition by
14    the Commissioner is waived.
15
16
17
18
19
20
21
22
23

4

1         I N D E X
2
3    EXAMINATION BY:              PAGE NUMBER:
4    Mr. Fry                     6, 52, 56
5    Mr. Steensland              46, 54
6
7    EXHIBITS:                   PAGE NUMBER:
8    (No Exhibits Were Marked)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

5

1         A P P E A R A N C E S
2
3    FOR THE PLAINTIFF(S):
4       M. John Steensland, III, Esq.
5       PARKMAN, ADAMS & WHITE
6       739 West Main Street
7       Dothan, Alabama 36301
8
9    FOR EQUITY GROUP EUFAULA DIVISION
10       Gary D. Fry, Esq.
11       Pelino & Lentz
12       One Liberty Place
13       Thirty-Second Floor
14       1650 Market Street
15       Philadelphia, Pennsylvania 19103
16
17       ********************
18
19         I, Victoria M. Castillo, a Court
20    Reporter of Montgomery, Alabama, acting as
21    Commissioner, certify that on this date, as
22    provided by the Alabama Rules of Civil Procedure
23    and the foregoing stipulation of counsel, there

a99cb856-41ee-4558-8781-949fd1a544a1

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

6

1  came before me at WILLIAMS, POTTHOFF, WILLIAMS &
2  SMITH, 125 South Orange Avenue, Eufaula, Alabama
3  36027, commencing at 10:51 a.m., ANTHONY MARCH, in
4  the above cause, for oral examination, whereupon
5  the following proceedings were had:
6
7          ANTHONY MARCH,
8      being first duly sworn, was examined and
9          testified as follows:
10
11         COURT REPORTER: Usual
12  stipulations?
13         MR. FRY: Yes.
14         MR. STEENSLAND: That's fine.
15
16  EXAMINATION BY MR. FRY:
17     Q.   Mr. March, my name is Gary Fry, and
18  I'm an attorney, and I am representing Equity Group
19  Eufaula Division in connection with a lawsuit that
20  you and some other folks have brought against the
21  company. And we have asked you to come here today
22  to answer some questions that we have concerning
23  your claims in that lawsuit. Have you ever given a

7

1  deposition before?
2     A.   No, sir.
3     Q.   It's fairly simple. I will be asking
4  the questions, you will be giving me the answers,
5  and Victoria, the court reporter, will be taking
6  down what we say. If you don't understand my
7  question, it's important that you let me know that
8  so that I can rephrase it so you will understand
9  it. Okay?
10    A.   Okay.
11    Q.   And if you don't hear any one of my
12  questions or any part of it, let me know and I will
13  repeat it. Any answer that you give please make it
14  a verbal answer as opposed to a nodding or a
15  shaking of the head. Okay?
16    A.   Yes.
17    Q.   We'll get in the rhythm here. And
18  try not to talk over me and I will try not to talk
19  over you because it makes it a lot easier on the
20  court reporter. Okay?
21    A.   Okay.
22    Q.   Where do you live?
23    A.   22 Stevenson Road.

8

1     Q.   And where is that?
2     A.   In Clayton, Alabama.
3     Q.   And what is your date of birth?
4     A.   August 1st, 1974.
5     Q.   Are you currently employed?
6     A.   Yes.
7     Q.   By whom?
8     A.   Equity.
9     Q.   How long have you been working at
10  Equity?
11    A.   Since 2001.
12    Q.   So when you started, CP was running
13  the place, right?
14    A.   Yes.
15    Q.   What is your current job at the
16  Equity plant?
17    A.   My job now?
18    Q.   Yes, sir.
19    A.   I'm a line leader now.
20    Q.   In what department?
21    A.   Debone.
22    Q.   How long have you had that position?
23    A.   About three years.

9

1     Q.   Prior to being a line leader, what
2  did you do?
3     A.   Well, I mostly over a couple guys
4  hanging rehang, at the rehang table, hang birds.
5     Q.   What department was that in?
6     A.   Debone.
7     Q.   How long did you work as a hanger --
8  or is that the title of your job, a hanger?
9     A.   Yes. Rehang, yes.
10    Q.   How long did you work rehang?
11    A.   Well, I've been back and forth. So
12  I've been doing rehang about three years.
13    Q.   So during the time you've been a line
14  leader, you've also done rehang?
15    A.   Yes.
16    Q.   Have you had any other jobs out
17  there?
18    A.   Shipping.
19    Q.   When did you work in shipping?
20    A.   In 2004 and 2005.
21    Q.   What did you do before you were in
22  shipping?
23    A.   At rehang again.

10

1    Q.    And take me back. How long before
2 you working rehang then?
3    A.    When I first started in 2001.
4    Q.    So from the date that you first
5 started working for CP, you started on rehang, and
6 you worked there for about three years, and then
7 you went to shipping?
8    A.    Yes.
9    Q.    And you worked in shipping for a
10 year?
11    A.    And I got transferred again.
12    Q.    And you got back to rehanging, and
13 you remain a line leader?
14    A.    Yes.
15    Q.    Have you performed any other jobs out
16 there at that location?
17    A.    No, sir.
18    Q.    Over the last three years as a line
19 leader and working in rehang, what shift have you
20 worked?
21    A.    First.
22    Q.    And what are the hours of first
23 shift?

11

1    A.    Seven until.
2    Q.    Pardon?
3    A.    Seven until.
4    Q.    Seven until you're done?
5    A.    Yes.
6    Q.    That's 7 a.m.?
7    A.    Yes, sir.
8    Q.    When you worked in shipping, what
9 shift did you work?
10    A.    First, eight to 5:30.
11    Q.    That's 8 a.m.?
12    A.    Yes, sir.
13    Q.    Going back to when you started and
14 those years you worked rehang, what shift did you
15 work then?
16    A.    7:30 to 4:30.
17    Q.    So you've always worked the first
18 shift?
19    A.    Yes, sir.
20    Q.    Describe for me what your job duties
21 are as a debone line leader.
22    A.    Make sure all the birds is hung
23 correctly, make sure the line is full before they

12

1 get processed, get cut up, because that's my job.
2    Q.    What do you do as a rehanger?
3    A.    Like if my guy had to go to the
4 bathroom, I take their spot to relieve them to go
5 to the bathroom, or something like that.
6    Q.    On the line?
7    A.    Yes.
8    Q.    Is that the function of the rehang
9 position, to fill in when people have to leave the
10 line?
11    A.    Yes.
12    Q.    What did you do in shipping?
13    A.    Well, I was condemned then. I had to
14 make sure all the trash was dumped back there in
15 the back, and forklift in shipping.
16    Q.    So where did you work when you did
17 the shipping job?
18    A.    Out there, outside.
19    Q.    Outside?
20    A.    Yes.
21    Q.    So you were out where they ship the
22 product out on trucks?
23    A.    Yes, I was out in that area.

13

1    Q.    Out in the dock area?
2    A.    Yes. They call that condemned. I
3 was working with -- like if the birds is no good,
4 they bring them out to me, and I have to go dump
5 the combo onto a truck when I'm working back there.
6    Q.    So your job in shipping was to
7 dispose of the condemned birds?
8    A.    Yes.
9    Q.    You weren't shipping out a packaged
10 product?
11    A.    No, sir.
12    Q.    You were just doing the condemned
13 work?
14    A.    Yes, sir.
15    Q.    What's your current rate of pay?
16    A.    Pay then?
17    Q.    Pardon?
18    A.    Paid now?
19    Q.    Yes, sir.
20    A.    Now it's $10.45.
21    Q.    And who is your supervisor?
22    A.    Sampson Reeves.
23    Q.    At the present time approximately how

14

1   many hours a day do you work?
2       A.   Now?
3       Q.   Yes, sir.
4       A.   Well, I be there at seven, sometimes
5   I get off about five, 5:30. It depends on what I
6   got to do. Sometimes a chain glove might come
7   missing, and all the supervisors in the line, they
8   got to stay until the chain glove get found.
9       Q.   Do you work five days a week?
10      A.   Yes, sir.
11      Q.   Sometimes overtime?
12      A.   Yes. Sometimes work on Saturday.
13      Q.   In connection with your duties as a
14  line leader, are you responsible for doing
15  paperwork as well?
16      A.   Yes, sir.
17      Q.   And do you do that before and after
18  the shift?
19      A.   During.
20      Q.   Have you covered all of the jobs that
21  you've ever had in the Baker Hill plant?
22      A.   Yes.
23      Q.   Are you a member of the Union?

15

1       A.   Yes.
2       Q.   How long have you been a member of
3   the Union?
4       A.   Ever since I've been there.
5       Q.   Have you ever been a Union steward?
6       A.   No, sir.
7       Q.   You've had no position in the Union?
8       A.   No, sir.
9       Q.   Have you ever been on any of the
10  Union negotiating committees?
11      A.   No, I haven't.
12      Q.   You're a plaintiff in this lawsuit,
13  is that your understanding? You have a claim,
14  correct?
15      A.   Yes, sir.
16      Q.   And how did you learn about the case?
17      A.   Well, they -- an employee had told me
18  about it, and I called and they sent me a letter --
19  a form or something in the mail, and I filled it
20  out.
21      Q.   A lawyer sent you the form?
22      A.   Yes.
23      Q.   And what did the employee tell you

16

1   about the case?
2       A.   Said that we ain't get paid for our
3   hours and breaks and stuff like that.
4       Q.   Did you agree with him?
5       A.   Yes. Because it take you a long
6   time -- take you a few minutes to take all your
7   PPEs off.
8       Q.   What's your understanding of the
9   claim that you have in this case?
10      A.   Well, when we get there, it takes ten
11  minutes to be in the line. Then you have to wash
12  your boots, sanitize, all that. And you can't get
13  in all at one time because so many folks be there
14  tied up, so it takes us time to get to the line.
15      Q.   How long has this condition that you
16  just described existed out there?
17      A.   Since I've been there.
18      Q.   As a member of the Union have you
19  been to Union meetings?
20      A.   No, I ain't never been to no Union
21  meetings.
22      Q.   You've never been to any Union
23  meetings?

17

1       A.   No, sir. But I'm in the Union, but I
2   ain't never been to the meetings.
3       Q.   These issues that you have described
4   to me that are part of your claim, have you ever
5   discussed them with any of your Union
6   representatives?
7       A.   No, sir.
8       Q.   Never?
9       A.   No, sir.
10      Q.   Did you review any papers in
11  preparation for coming here?
12      A.   Yes.
13      Q.   What did you review?
14      A.   No, I ain't get no papers -- nothing
15  but what you-all sent me.
16      Q.   Pardon?
17      A.   Nothing but the paper I got in the
18  mail that you-all sent me to come up here is the
19  only thing I got.
20      Q.   Just the letter you got from your
21  lawyer telling you to come here?
22      A.   Yes.
23      Q.   Besides your lawyers, did you speak

a99cb856-41ee-4558-8781-949fd1a544a1

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

18

1  with anybody about your appearance here today?
2      A.   No, sir.
3      Q.   Mr. March, now I'd like for you to
4  identify for me those items of clothing or gear
5  that you wear on the job since you've been a line
6  leader and a rehanger?
7      A.   A smock, sleeves, cotton liners,
8  rubber gloves, ear plugs, beard net, hair net, and
9  apron.
10     Q.   And boots?
11     A.   Yes.
12     Q.   Anything else?
13     A.   That's it.
14     Q.   And did you wear each of those items
15  during the early years when you worked for CP as
16  well?
17     A.   Well, only until I got back there in
18  shipping, I didn't.
19     Q.   We are going to get to that in
20  minute.  When you worked in rehang for CP, did you
21  wear pretty much the same thing?
22     A.   Yes, sir.
23     Q.   What did you wear when for that year

19

1  you were doing the shipping job?
2      A.   My regular clothes.
3      Q.   You didn't have to wear anything
4  other than your regular clothes?
5      A.   No, sir, nothing but some boots,
6  that's it.
7      Q.   Which of those items that you
8  described for me that you now put on, which of
9  those to your understanding are required?
10     A.   My boots, apron, ear plugs, beard
11  net, hair net -- and my apron.  I still wear all
12  that.
13     Q.   And smock?
14     A.   That's right.
15     Q.   That's required?
16     A.   Yes, sir.
17     Q.   Are the plastic sleeves required?
18     A.   Yes, now they do because they don't
19  want nobody -- some folks might be allergic to it
20  on the skin, so they put them on to cover the skin
21  up, but they are still required to wear them.
22     Q.   They are still required to wear the
23  plastic sleeves, everybody?

20

1      A.   Yes, sir.
2      Q.   So everybody in the debone department
3  to your understanding wears all these items?
4      A.   Yes, sir.
5      Q.   Which of these items are issued to
6  you by the company?
7      A.   Well, we pay for everything, so
8  mostly like if your boots wear down, the bottom of
9  them, they replace that.  They give that to you.
10     Q.   You say you pay for everything?
11     A.   Yes.
12     Q.   What do you mean by that?
13     A.   Like for your hair nets, or something
14  like that, you pay for it.  They get your card and
15  they swipe it.
16     Q.   You have to pay for that?
17     A.   Yes.
18     Q.   How much does that cost you --
19     A.   I think a beard net about a penny
20  and --
21     Q.   Pardon?
22     A.   I think a beard net is about a penny;
23  then aprons, they probably about a

21

1  dollar-something; and then you got your ear plugs.
2  That's like 30-something cents; sleeve's that's
3  about 60-something cents.
4      Q.   Do you have to pay for each of these
5  items in order to work there?
6      A.   Yes.
7      Q.   What about the smock?
8      A.   You ain't pay for that.  They turn
9  those back in, and they go to a place and they
10  clean them.
11     Q.   How do you pay for these items?
12     A.   With your time card.  They come out
13  your check.
14     Q.   How often do you pay for them?
15     A.   Every day you need them.
16     Q.   Which of these items that you
17  identified for me do you pick up on a daily basis?
18     A.   Hair net, beard net, apron -- all
19  that.
20     Q.   You pick up an apron every day?
21     A.   Yes.
22     Q.   How about a smock?
23     A.   They just give it to me.  I get that

22

1  every day, too.
2      Q.    Which, if any, of these items are you
3  permitted to wear from home?
4      A.    None.  None but your boots.
5      Q.    Just your boots?
6      A.    Yes.
7      Q.    Do you have a locker at the plant?
8      A.    No.
9      Q.    You don't.  So the items that you
10  don't turn in at the end of the day you take home
11  with you?
12      A.    Most of it, I throw mine away because
13  it don't do no good to keep it because blood be on
14  it or something like that.  I just throw it away.
15      Q.    Do you just throw your apron away
16  every day?
17      A.    Apron, yes.
18      Q.    You do, you throw it away every day?
19      A.    Yes, because it be stinking and stuff
20  like that.  I just throw it away.
21      Q.    Do you throw the plastic sleeves away
22  every day?
23      A.    Yes.

23

1      Q.    Not everybody does that though, do
2  they?
3      A.    I don't think so.
4      Q.    These items that you have identified
5  for me, where do you put them on at the beginning
6  of the shift in the morning?
7      A.    When I walk in the debone door.
8      Q.    And the shift starts at 7:30?
9      A.    Yes, sir.
10      Q.    What time do you walk into the debone
11  room?
12      A.    I be there at seven.
13      Q.    Why are you there at seven?
14      A.    I got to go in and set up, set up
15  everything.
16      Q.    So what time do you enter the
17  production floor?
18      A.    I be there -- I got to be in there
19  about 6:15 -- not 6:15, but about 6:50 I walk in
20  there.
21      Q.    And that's when you put on the smock,
22  the sleeves, the apron?
23      A.    Yes, sir.

24

1      Q.    And you already have your boots and
2  your hair net, and your beard net, and your ear
3  plugs?
4      A.    Yes, sir.
5      Q.    So you put these on right before
6  seven o'clock, right before you start your set-up
7  procedures?
8      A.    Yes, when I walk in the door.
9      Q.    How long does it take you to put this
10  stuff on?
11      A.    Ten minutes.
12      Q.    Ten minutes?
13      A.    Yes, because I got to wash my boots
14  and all that.  I got to wash my boots time I get in
15  there.  That's the first thing I do.  Then I put my
16  smock on, apron, on all that stuff on.
17      Q.    To wash your boots you walk through a
18  pair of double doors, right?
19      A.    Yes.
20      Q.    And then there is a sanitizing --
21      A.    Yes.  You got to mash a button so it
22  will come on.
23      Q.    You still have to press the button?

25

1      A.    Yes, sir.
2      Q.    And how long do you have to stay in
3  there?
4      A.    I don't know how long it be because I
5  haven't really timed it.
6      Q.    It's not too long, is it?
7      A.    Not too long.
8      Q.    And then you go through two double
9  doors?
10      A.    Yes.  And then you got to go wash the
11  smock and the sleeves off, and the gloves, you got
12  to wash that off.
13      Q.    I think you just told me, but let me
14  ask it again.  How long does it take you to put
15  this stuff on?
16      A.    About ten minutes at the most.
17      Q.    Does your job require you to use a
18  knife or scissors?
19      A.    No, sir.
20      Q.    How many breaks do you get?
21      A.    Two.
22      Q.    And how long are the breaks?
23      A.    Thirty.

a99cb856-41ee-4558-8781-949fd1a544a1

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

26

1    Q.    And where do you take your break?
2    A.    Outside.
3    Q.    Outside the building?
4    A.    Yes, sir.
5    Q.    What time is the first break?
6    A.    I take mine at eleven, 11:15.
7    Q.    11:15?
8    A.    Yes, sir.  Until about twelve, 12:15
9    -- wait.
10   Q.    No, that's an hour.
11   A.    My bad, I'm sorry.
12   Q.    That's okay.  Take your time.
13   A.    About 11:40.
14   Q.    When is the second break scheduled
15   then?
16   A.    About three, 3:30.
17   Q.    And that's a 30-minute bleak?
18   A.    Yes, sir.
19   Q.    Are you the guy as the line leader
20   that tells your line when it's time for them to go
21   on break?
22   A.    Yes, now I do.
23   Q.    And you have done that for the past

27

1    three years?
2    A.    Yes, sir.
3    Q.    How do you know when it's time for
4    your line to go on break?
5    A.    My supervisor let me know, and I tell
6    them.
7    Q.    Am I correct that when it's time to
8    go on break that the people in the line can't leave
9    their position until the last bird passes it?
10   A.    Yes.
11   Q.    So that means some people go on break
12   first before others?
13   A.    Yes.
14   Q.    What signals the end of the break
15   period and the time to go back to work?
16   A.    Well, I guess everybody pretty much
17   knows what time to come back, so they come back
18   when it's time for them to come back.  They got a
19   watch -- a clock in the break room.  They pretty
20   much come back on their own.
21   Q.    What time are they supposed to come
22   back?
23   A.    They take break at 10:15.  They come

28

1    back at 10:45.
2    Q.    Let me ask this question -- are they
3    supposed to be back at a particular time, or are
4    they okay as long as they get there when the bird
5    gets to their position?
6    A.    At a particular time.
7    Q.    Do they come back in a staggered
8    fashion?
9    A.    Some of them be late because they
10   have to wait in line to put their smocks on and
11   stuff, so most of them be late.
12   Q.    Do you drive to the plant each
13   morning?
14   A.    No, sir.
15   Q.    You get a ride?
16   A.    Yes, sir.
17   Q.    What time do you usually get to the
18   plant?
19   A.    Well, my ride be running, so
20   sometimes I get there late.  Sometimes I be there
21   on time.  So it be sometimes about seven, 7:15 when
22   I get there.
23   Q.    If you're there at 7:15, you're late,

29

1    right?
2    A.    Yes, sir.
3    Q.    When you're not late, what time do
4    you usually like to get there?
5    A.    Seven o'clock on the dot.
6    Q.    Seven o'clock on the dot?
7    A.    Yes.
8    Q.    Do you have to pass through any
9    security to get into the plant?
10   A.    Yes, sir.
11   Q.    What security?
12   A.    They have to write you a little card
13   out for your car or something like that.  If you
14   don't have no sticker on your car, you have to wait
15   in line.  And that be a good little minute.
16   Q.    The person that you drive with, does
17   he have a sticker on his car?
18   A.    No, it be my wife bringing me.
19   Q.    Your wife brings you?
20   A.    Yes.
21   Q.    And does she drop you off?
22   A.    Yes, sir.
23   Q.    And what do you do, go up to the

30

1   guard shack and flash your badge?
2       A.   Yes.  And they give her a little
3   badge so she can come on in.
4       Q.   Is that the only security you got to
5   pass?
6       A.   Yes, sir.
7       Q.   At the end of the day, does your wife
8   come and pick you up?
9       A.   No, I catch me another ride home.  I
10  catch me an employee ride with them.
11      Q.   Do you have to clear any security on
12  your way out?
13      A.   Yes, sir.
14      Q.   What do you do?
15      A.   Well, sometimes if the driver I ride
16  with, sometimes they ain't got no sticker on their
17  car, and they have a little badge, and they have to
18  stop and give it to them.
19      Q.   But as long as they have a badge,
20  they can just show their badge when they leave?
21      A.   Yes, sir.
22      Q.   Have you ever been searched to get
23  into the plant?

31

1       A.   No, sir.
2       Q.   Have your belongings ever been
3   searched to get into the plant?
4       A.   No, sir.
5       Q.   How about leaving the plant, have you
6   ever been searched?
7       A.   No, sir.
8       Q.   You testified that you like to get
9   there right at seven on the dot.  Tell me what you
10  do when you get there, when your wife drops you
11  off.
12      A.   Well, I have to wait in line to get
13  my PPEs.  I have to wait in line to get all that.
14  Sometimes when I get there, there still be a line,
15  so it takes me about five, ten minutes to wait in
16  line because the line be so long.
17      Q.   So a lot of people are there at seven
18  o'clock, is that what you're telling me?  The
19  production people get there a half hour beforehand?
20      A.   Yes, sir.
21      Q.   How long have you had to wait in
22  line?  What's the longest time?
23      A.   Ten minutes.

32

1       Q.   What's the shortest time?
2       A.   About six -- about five, six minutes.
3       Q.   And you've never been able to just
4   walk up there and get your smock?
5       A.   No, sir.
6       Q.   Never once?
7       A.   Every time I -- just bad luck I
8   guess.
9       Q.   After you pick up your smock, what do
10  you do?
11      A.   Go on and sanitize my foots on my
12  boots, and then throw my smock on and all that, and
13  then wash all that down.  That's a good another ten
14  minutes, and then go in there and get my stuff set
15  up.
16      Q.   And you have to do certain functions
17  in order to set up the line, correct?
18      A.   Yes, sir.
19      Q.   And that's what you're supposed to be
20  doing from seven o'clock to 7:30?
21      A.   Yes, sir.
22      Q.   Are you paid for that time?
23      A.   Until I walk in there, yes.  Until I

33

1   walk up into the doors, I get paid, yes.  Supposed
2   to.  As far as my knowledge, I'm supposed to.
3       Q.   I'm sorry, I --
4       A.   I said as far as my knowledge, I'm
5   supposed to.
6       Q.   What's your understanding as to how
7   the company keeps track of your time?
8       A.   My supervisor got a Master Card, and
9   when he swipe that Master Card, that's when
10  everybody's time is supposed to start.
11      Q.   Well, that's for everybody on the
12  line as well, correct?
13      A.   Yes, sir.
14      Q.   My question is:  As a line leader,
15  you have certain set-up responsibilities, correct?
16      A.   Yes, sir.
17      Q.   And you perform them before the line
18  employees get there, correct?
19      A.   Yes, sir.
20      Q.   Are you paid for that?
21      A.   Yes.  I'm supposed to be paid for it,
22  yes, sir.
23      Q.   How is that time kept?

a99cb856-41ee-4558-8781-949fd1a544a1

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

34

1      A.    Well, my supervisor, he must keep up
2  with the time.
3      Q.    Do you know how he keeps it?
4      A.    On a time sheet. It prints it up
5  everybody's time on the time sheet.
6      Q.    So you're not really paid on the
7  basis of Master Card time, are you?
8      A.    I don't know. I think so.
9      Q.    Well, you get paid for the set-up
10  time at the beginning, correct?
11      A.    Yes, sir.
12      Q.    And at the end of the shift, do you
13  have paperwork and other things that you need to do
14  after the other people leave the line?
15      A.    Yes, sir. I have to watch my chain
16  gloves, something like that, that people have. So
17  I'm sort of like a check person, too. So I have to
18  watch the chain gloves.
19      Q.    Is it your understanding that you are
20  paid for that time as well if that follows the end
21  of the shift?
22      A.    Yes, sir.
23      Q.    And your supervisor keeps track of

---

35

1  that time that you spend at the end of the shift as
2  a line leader doing your job?
3      A.    Yes, sir.
4      Q.    That's not part of your claim in this
5  lawsuit, is it?
6      A.    No, sir.
7      Q.    Do you go directly from the supply
8  room into the production floor generally when you
9  get there in the morning?
10      A.    Yes, sir.
11      Q.    And then you put on your PPE?
12      A.    Yes, sir.
13      Q.    Correct?
14      A.    Yes, sir.
15      Q.    How long did you say it takes you to
16  put that on?
17      A.    About ten minutes.
18      Q.    Tell me what you do now when it's
19  time to go on break.
20      A.    Well, I have to wash the floor down.
21  When everybody go to break, I have to wash down,
22  make sure the line is clean, all this stuff.
23      Q.    You use a hose for that?

---

36

1      A.    Yes, sir.
2      Q.    So you tell the people on the line
3  it's time for them to go to break, and you stay,
4  and you wash down the floor?
5      A.    Yes, sir.
6      Q.    And how long does that take you?
7      A.    15 minutes.
8      Q.    And are you paid for that time?
9      A.    I just get paid when I'm on the
10  clock.
11      Q.    Pardon?
12      A.    Just for time I'm in there.
13      Q.    Is it your understanding you're paid
14  for that time?
15      A.    Yes, sir.
16      Q.    And because you have to stay 15
17  minutes to wash the floor, is it your understanding
18  you still are entitled to your 30-minute break?
19      A.    Yes.
20      Q.    After you're finished washing down
21  the floor, tell me what you need to do in order to
22  go on break.
23      A.    Well, I have to wait until everybody

---

37

1  comes back on the line, get my line started up.
2  And when I get that straight, then I go to break.
3      Q.    Who serves as a line leader then when
4  you're not there?
5      A.    My supervisor.
6      Q.    So then you go on break, and how
7  long -- you have a 30-minute break?
8      A.    Yes, sir.
9      Q.    And you take it outside?
10      A.    Yes, sir.
11      Q.    And how much of that 30 minutes do
12  you actually get for a break?
13      A.    About 20.
14      Q.    What happens when it's time for you
15  to go back to work?
16      A.    I have to go back and do the same
17  routine again.
18      Q.    Explain to me what that is.
19      A.    Sanitize my boots, and wash my apron
20  back off, and start back up.
21      Q.    How long does that process take?
22      A.    Another ten minutes.
23      Q.    You don't have to wait on anybody at

---

a99cb856-41ee-4558-8781-949fd1a544a1

38

1  the wash stands, either when you go on break or
2  when you come back from break, do you?
3      A.   Not all the time I don't.
4      Q.   Because the people have already left
5  or they have already come back, correct?
6      A.   Yes.  Sometimes a different area be
7  in there like DSI.  They come from break the same
8  time I do, so it still be almost the same wait, but
9  a little different.
10     Q.   Let me ask you some questions about
11 the end of the shift.  The shift ends approximately
12 when, the production shift?
13     A.   4:30.
14     Q.   And the people in the line, they
15 leave, correct?
16     A.   Yes.
17     Q.   And you have to stay after and you
18 wash down the floor?
19     A.   No, I have to -- when they leave, I
20 have to make sure all the paper and all the
21 stuff -- like they throw paper and stuff on the
22 ground or something.  I have to go back and pick
23 that up, and then wash my chain gloves, turn all

39

1  the paperwork in, all this stuff.
2      Q.   At the end of the first shift, am I
3  correct that the second shift employees step right
4  up as soon as the first shift employees step down?
5      A.   Yes.
6      Q.   So there is no lapse of time there?
7      A.   No, sir.
8      Q.   And you have to account for the chain
9  gloves?
10     A.   Yes.
11     Q.   And what about the knives?
12     A.   I don't use knives.  I just have two
13 scissors.  That's it.
14     Q.   Are you responsible in any way for
15 the knives that the employees on the line use?
16     A.   Well, there's more -- there's
17 different line leaders.  I am just responsible for
18 what I have.
19     Q.   So after your people leave, what do
20 you do?  What functions do you have to do before
21 it's time for you to leave?
22     A.   Make sure my floor -- make sure all
23 the paper picked up and all the chain gloves and

40

1  scissors checked out.
2      Q.   And then what do you do?
3      A.   Then I turn my paperwork in, and if I
4  ain't got anything else to do, I leave.
5      Q.   Do you turn the paperwork in after
6  you wash off and undress or before?
7      A.   After.
8      Q.   So after you wash, then you go turn
9  in your paperwork?
10     A.   Yes.
11     Q.   How long does that process take you
12 from the time the line employees leave until you
13 walk out the door?
14     A.   Not long, because when I get ready to
15 leave I just throw everything away, so not long
16 because I am up in there waiting when I get ready
17 to leave.  So everybody pretty much be out the way
18 when I get ready to leave.
19     Q.   About how much time does it take you
20 to do what you need to do to get out of the plant?
21     A.   From the time I leave the plant to
22 turn all the paperwork in?
23     Q.   Yes, sir.

41

1      A.   About 20 minutes to do all that.
2      Q.   We talked a little bit about this,
3  but I want to make sure that I'm clear, that I
4  understand what your understanding is.  As a line
5  leader, what is your understanding as to how the
6  company keeps track of the hours that you work for
7  which you're going to be paid?
8          MR. STEENSLAND:  Objection.
9  Asked and answered.
10         MR. FRY:  You can answer.
11         MR. STEENSLAND:  Go ahead.
12     A.   Supposed to be a Master Card.  That's
13 how.  And there is supposed to be a time sheet to
14 keep up with everybody's time.
15     Q.   (Mr. Fry)  Let me see if I understand
16 it.  You believe that you are compensated for your
17 time on the basis of the time that's computed by
18 the Master Card time plus the additional time that
19 you put in as a line leader before and after the
20 production occurs, and that time is kept by your
21 supervisor; is that correct?
22         MR. STEENSLAND:  Object to the
23 form.  You can answer.

a99cb856-41ee-4558-8781-949fd1a544a1

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

42

1    A.    Yes.
2    Q.    (Mr. Fry)  Did you understand it?
3          THE DEPONENT:  Repeat that again.
4          MR. FRY:  That was a good
5    objection.  Let me break that down.
6    A.    You kind of lost me then.
7    Q.    (Mr. Fry)  You believe you're
8    compensated first on the basis of line time, Master
9    Card time, correct?
10   A.    Yes.
11   Q.    In addition to that time, you are
12   also paid for the set-up duties that you do before
13   the production shift and the various things that
14   you need to do at the end of the shift as a line
15   leader, correct?
16   A.    And it's supposed to be all set on
17   the same thing, on the same payroll.
18   Q.    The same payroll as what?
19   A.    Well, all it supposed to be added
20   together on the payroll sheet, on the time sheet.
21   Q.    On a normal working day do you get
22   paid the same amount for the same amount of hours
23   as a production employee, or do you get paid more

43

1    because you're a line leader and you put in a
2    little extra time?
3    A.    Because I'm a line leader.
4    Q.    You get more?
5    A.    Yes.
6    Q.    Just briefly, when you were working
7    in shipping, you didn't have any wear any clothes
8    you told me, correct?
9    A.    Yes, sir.
10   Q.    Did you get two 30-minute breaks
11   then, too?
12   A.    Yes.
13   Q.    Where did you take those breaks?
14   A.    Out front.
15   Q.    And you didn't have to do any taking
16   anything off or putting anything back on going to
17   and from any of those breaks, correct?
18   A.    No, sir.
19   Q.    Have you ever complained to your
20   supervisor about any pay issues?
21   A.    Yes, a few times.  Sometimes my check
22   ain't be right.
23   Q.    Has your supervisor taken care of the

44

1    problem?
2    A.    Sometimes my supervisor, he forgets
3    sometimes.  So sometimes he don't do it.
4    Q.    Is it sooner or later taken care of?
5    A.    On down the line maybe, yes.
6    Q.    I'm not talking about the claims in
7    this case.  I'm talking about other normal payroll
8    problems.  Have you ever had any problems with
9    that?
10   A.    Yes.  Sometimes I cash out a vacation
11   day, or something like that, and they don't give it
12   to me sometimes.
13   Q.    Do you get it soon --
14   A.    Yes.
15   Q.    Ultimately you get it?
16   A.    Yes.  If I keep on complaining about
17   it, yes.
18   Q.    Do you personally keep track of the
19   amount of hours that you work at the plant in any
20   way?
21   A.    No, I don't keep up with them.
22   Q.    Have you made any calculations as to
23   the amount of money you think you're owed in this

45

1    lawsuit?
2    A.    No, sir.
3    Q.    When you work overtime -- I think you
4    told me you work overtime, sometimes on Saturdays?
5    A.    Yes, sir.
6    Q.    Do you get paid time-and-a-half?
7    A.    Yes.
8    Q.    Have you ever had any complaints
9    about how your overtime pay is computed?
10   A.    No, sir.
11   Q.    Have you ever filed any grievances
12   with the Union?
13   A.    No, sir.
14   Q.    Have you ever been subject to any
15   disciplinary action?
16   A.    Like been suspended or something like
17   that?
18   Q.    Yes.
19   A.    No, I just got wrote up a couple of
20   times.  I ain't got suspended.
21   Q.    What did you get written up for?
22   A.    Something my supervisor told me to
23   do, but I ain't did it, but just something simple.

46

1    MR. FRY:  Thank you.  That's all
2  I have.
3    MR. STEENSLAND:  Can we go off
4  the record for a second?
5    11:32 a.m.
6    (Short break.)
7    11:33 a.m.
8    MR. STEENSLAND:  I just have a
9  few questions.
10
11  EXAMINATION BY MR. STEENSLAND:
12    Q.   Mr. Fry talked about sanitizing your
13  boots some --
14    A.   Yes, sir.
15    Q.   -- and washing some equipment.  Did
16  you have to sanitize your boots when you got to
17  work?
18    A.   Well, when you get to work, you go
19  get your supplies.  Then the time you walk into the
20  double doors, then you sanitize before you walk
21  into the processing plant.
22    Q.   What about when you began your first
23  break of the day.  You talked about two breaks.

47

1  Your first break of the day, do you have to
2  sanitize your boots before you leave the processing
3  area?
4    A.   Yes, when you leave and come back.
5    Q.   And come back from both breaks?
6    A.   Yes.
7    Q.   Do you do your paperwork on the
8  production floor?
9    A.   Yes.
10    Q.   Do you do your paperwork before or
11  after washing and sanitizing everything?
12    A.   Mostly when I have time in that
13  space, I do it then.
14    Q.   So at the end of the day before you
15  leave the floor, do you have to sanitize your
16  boots?
17    A.   Yes.
18    Q.   Do you have to wash the other gear --
19  I think it was referred to -- down?
20    A.   Yes, sometimes I do.  Sometimes I
21  throw it away.
22    Q.   I believe it's been referred to as
23  gear.  Have you ever heard of the term PPE?

48

1    A.   Yes, sir.
2    Q.   Could you please tell us -- I believe
3  you've listed something referred to as "gear" --
4  could you please list what you refer to as PPE?
5    A.   Ear plugs, hair net, beard net,
6  sleeves, apron, smock.  That's about it.
7    Q.   Boots?
8    A.   Yes.
9    Q.   When you're reporting to work before
10  work -- we talked about the boots -- but all of the
11  other PPE, do you have to wash or sanitize that
12  before you go on the production floor -- or before
13  you go to the line, I should say?
14    A.   Yes.
15    Q.   Before you start your break, do you
16  have to wash or sanitize all of that equipment?
17    A.   You are supposed to, yes.
18    Q.   What happens if you don't do it?
19    A.   They try to write you up.
20    Q.   What about when you come back from
21  break, do you have to sanitize or wash that
22  equipment also?
23    A.   Yes.  They want to make sure it's

49

1  clean.  Sometimes they stand right there and watch
2  you.
3    Q.   What happens if you don't sanitize
4  it?
5    A.   They try to write you up.
6    Q.   Then at the end of the shift before
7  you're leaving for the day, not only your boots,
8  but do you have to wash down this other equipment
9  that you've listed?
10    A.   Well, sometimes I do.  Sometimes I
11  just throw it away.
12    Q.   You mentioned you throw it away?
13    A.   Yes.
14    Q.   The last thing you do before you
15  leave, what do you have to do?
16    A.   Make sure I got all my chain gloves
17  and scissors before I get ready to leave and my
18  paperwork.  Make sure my paperwork is right and
19  turn it in.
20    Q.   What about your smock, what do you do
21  with your smock?
22    A.   The smock be outside the door.  I
23  just throw it in there, and people come around and

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

50

1    pick it up, and carry it to another plant and wash
2    them.
3        Q.    Outside what door?
4        A.    The double doors when you first walk
5    out the processing plant.
6        Q.    Where do you do your paperwork?
7        A.    Sometimes on the floor -- when I get
8    ready to leave?
9        Q.    Yes.
10       A.    In the office.
11       Q.    Do you have your smock on at that
12   point in time?
13       A.    No.
14       Q.    Have you ever been told to, or
15   ordered to do any type of exercise or stretching
16   before working on the line?
17       A.    Yes, we do it occasionally.
18       Q.    Who when you say "occasionally", why
19   is it occasionally?
20       A.    Sometimes my supervisor don't do it,
21   and then the only time they do it, like his
22   supervisor get on to him, and he will make us do
23   it.

51

1        Q.    And when you say "do it", what do you
2    mean by "do it", does he instruct you-all to do it?
3        A.    Yes, he instructs.
4        Q.    What does it involve, is a better
5    question?
6        A.    Hands moving like this, and then put
7    his fingers -- because we be hanging birds -- where
8    I work at, we hanging birds and sometimes folks be
9    complaining about their wrists, and we do exercises
10   to keep us from hurting our wrists.
11       Q.    Is it just you, or everybody that's
12   working that shift in that area?
13       A.    Just my area.
14       Q.    But is it everybody that's in your
15   area?
16       A.    Yes.
17       Q.    What happens if you don't do it if
18   the supervisor tells you to?
19       A.    He want to try and write you up.
20       Q.    Are you asking in this lawsuit to be
21   paid for all the hours that you've worked there for
22   the company?
23       MR. FRY:  Objection.

52

1        MR. STEENSLAND:  You can answer.
2        A.    Repeat that again.
3        Q.    (Mr. Steensland)  Are you asking in
4    this lawsuit to be paid for all the hours that you
5    have worked for the Equity company?
6        MR. FRY:  Objection.
7        A.    No.
8        Q.    (Mr. Steensland)  You don't want to
9    be paid for all your hours that you've worked?
10       A.    Yes, I do.
11       MR. STEENSLAND:  Nothing further.
12       MR. FRY:  Just a few questions,
13   Mr. March.
14
15   EXAMINATION BY MR. FRY:
16       Q.    These exercises that are done, are
17   they done every day?
18       A.    Well, I ain't going to tell -- most
19   of the time, yes, we do.  But sometimes they want
20   to start real quick, so sometimes we skip it.
21       Q.    When are these exercises done?
22       A.    When they first start up, before we
23   start up.

53

1        Q.    I want to be a little more clear as
2    to when they are done.  Are they done while the
3    employees are standing at their workstations?
4        A.    Yes.
5        Q.    So they are done while they are on
6    the line?
7        A.    At a time -- see, we get the first
8    birds, and they have a little time -- the birds
9    come from another side, and then before they pile
10   up, they do it then.
11       Q.    So they are doing the exercises while
12   the birds are coming?
13       A.    Yes.
14       Q.    And who swipes the Master Card?
15       A.    My supervisor.
16       Q.    Are those exercises performed before
17   or after the Master Card is swiped?
18       A.    After.
19       Q.    The PPE that we've been talking
20   about -- that stuff you wear -- you told me at the
21   outset that the apron and the sleeves you throw
22   away.  Do you throw them away every day?
23       A.    Not every day.  I might keep them

a99cb856-41ee-4558-8781-949fd1a544a1

54

1  every now and then. I don't throw them every day.
2  I might keep them.
3      Q.   Where do you throw them when you
4  throw them away?
5      A.   In the trash can.
6      Q.   Where is the trash can located?
7      A.   Inside debone.
8      Q.   So on those days when you do throw
9  them away at the end of the day, you don't stop to
10 wash them off before you do that, do you?
11     A.   No.
12     Q.   You just take them off and throw
13 them, and leave, don't you?
14     A.   Right.
15         MR. FRY: Thank you.
16         MR. STEENSLAND: A couple of,
17 briefly, before I forget.
18
19 EXAMINATION BY MR. STEENSLAND:
20     Q.   Currently right now who provides you
21 with a smock?
22     A.   The plant.
23     Q.   Do they provide you with a new one

55

1  every day?
2      A.   Yes.
3      Q.   At some point in time in the past
4  when you worked there at the plant, did you take
5  the smock home?
6      A.   Yes.
7      Q.   Did they issue one smock, more than
8  one smock?
9      A.   Well, when I first started working
10 there, they issued three smocks. And I used to
11 carry them home, wash them, bring them back. They
12 were yours.
13     Q.   If you didn't carry them home and
14 wash them, what would happen to you the next day?
15     A.   It would be kind of dingy. They
16 probably want to send you home or write you up, or
17 something like that.
18     Q.   At what point in time, if you can
19 recall, did the company start issuing you a new
20 smock every day there on the company property, if
21 you can recall?
22     A.   I don't remember right now.
23     Q.   Was there a point in time when the

56

1  company began issuing you a smock at the company,
2  or at the plant?
3      A.   Yes.
4      Q.   From there forward you did not have
5  to take a smock home and wash it?
6      A.   No, sir.
7      Q.   Before that you did?
8      A.   Yes, sir.
9         MR. STEENSLAND: Nothing further.
10        MR. FRY: Just let me see if I
11 can follow up.
12
13 EXAMINATION BY MR. FRY:
14     Q.   You worked in shipping to 2005,
15 correct?
16     A.   Yes.
17     Q.   Since you worked at shipping, was
18 there any period of time when you had to take your
19 smock home to wash it?
20     A.   Not then I didn't, because I ain't
21 had one then -- not in 2005, I didn't.
22     Q.   Pardon?
23     A.   I didn't have none in 2005. When I

57

1  worked back there in shipping, I didn't.
2      Q.   I know that. But when you stopped
3  working in shipping in 2005 and you went back to
4  debone, was there a period of time after you worked
5  in shipping that you had to wash smocks?
6      A.   I don't think so.
7      Q.   So that would mean that the
8  changeover occurred sometime while you were working
9  in shipping or before, correct?
10     A.   Yes, sir.
11        MR. FRY: Thanks.
12        MR. STEENSLAND: I think that's
13 it.
14        11:44 a.m.
15    *************************
16        FURTHER DEPONENT SAITH NOT
17
18
19
20
21
22
23

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

58

1                    CERTIFICATE
2
3    STATE OF ALABAMA
4    AT LARGE
5
6            I hereby certify that the above
7    and foregoing deposition was taken down by me in
8    stenotype and the questions and answers thereto
9    were transcribed by means of computer-aided
10   transcription and that the foregoing represents a
11   true and correct transcript of the testimony given
12   by said witness upon said deposition.
13           I further certify that I am
14   neither of counsel nor of kin to the parties to the
15   action, nor am I in anywise interested in the
16   result of said cause.
17
18
19
20
21
22   Victoria M. Castillo, Certified Court Reporter
     ACCR# 17, Expires 9/30/2008
23   Commissioner and Notary Public

**TAB 36**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


NO.:  2:06-CV-1081-MEF


BETTY ANN BURKS, et al.,

          Plaintiff(s),

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

          Defendant(s).




                         DEPOSITION OF

                         MONROE McCALL

                              JOB NO. 1101-58505




BEFORE:    Victoria M. Castillo

           Certified Court Reporter and

           Notary Public

           ACCR# 17, Expires 9/30/2008

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

2

1   In accordance with Rule 5(d) of
2   The Alabama Rules of Civil Procedure, as Amended,
3   effective May 15, 1988, I, Victoria M. Castillo, am
4   hereby delivering to HOWARD A. ROSENTHAL, ESQ. the
5   original transcript of the oral testimony taken on
6   the 23rd day of May, 2008, along with exhibits.
7         Please be advised that this is
8   the same and not retained by the Court Reporter,
9   nor filed with the Court.
10
11   S T I P U L A T I O N
12
13       IT IS STIPULATED AND AGREED, by
14   and between the parties through their respective
15   counsel, that the deposition of MONROE McCALL may
16   be taken before Victoria M. Castillo, Commissioner,
17   at WILLIAMS, POTTHOFF, WILLIAMS & SMITH, 125 South
18   Orange Avenue, Eufaula, Alabama 36027 on the 23rd
19   day of May, 2008.
20       IT IS FURTHER STIPULATED AND
21   AGREED that the signature to and the reading of the
22   deposition by the witness is waived, the deposition
23   is said to have the same force and effect as if

3

1   full compliance had been had with all laws and
2   rules of Court relating to the taking of
3   depositions.
4       IT IS FURTHER STIPULATED AND
5   AGREED that it shall not be necessary for any
6   objections to be made by counsel to any questions,
7   except as to form or leading questions, and that
8   counsel for the parties may make objections and
9   assign grounds at the time of trial, or at the time
10   said deposition is offered in evidence, or prior
11   thereto.
12       IT IS FURTHER STIPULATED AND
13   AGREED that notice of filing of the deposition by
14   the Commissioner is waived.
15
16
17
18
19
20
21
22
23

4

INDEX

EXAMINATION BY:              PAGE NUMBER:
Mr. Fry                          6
Mr. Steensland                   40

EXHIBITS:                    PAGE NUMBER:
(No Exhibits Were Marked.)

5

A P P E A R A N C E S

FOR THE PLAINTIFF(S):
    M. John Steensland, III, Esq.
    PARKMAN, ADAMS & WHITE
    739 West Main Street
    Dothan, Alabama 36301

FOR EQUITY GROUP EUFAULA DIVISION
    Gary D. Fry, Esq.
    Pelino & Lentz
    One Liberty Place
    Thirty-Second Floor
    1650 Market Street
    Philadelphia, Pennsylvania 19103

    *********************

    I, Victoria M. Castillo, a Court
Reporter of Montgomery, Alabama, acting as
Commissioner, certify that on this date, as
provided by the Alabama Rules of Civil Procedure
and the foregoing stipulation of counsel, there

1f94db86-06be-439f-b205-b9227c7d734e

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

6

1  came before me at WILLIAMS, POTTHOFF, WILLIAMS &
2  SMITH, 125 South Orange Avenue, Eufaula, Alabama
3  36027, commencing at 2:32 p.m., MONROE McCALL, in
4  the above cause, for oral examination, whereupon
5  the following proceedings were had:
6
7              MONROE McCALL,
8      being first duly sworn, was examined and
9          testified as follows:
10
11  EXAMINATION BY MR. FRY:
12      Q.    Mr. McCall?
13      A.    Yes.
14      Q.    My name is Gary Fry, and I'm one of
15  the lawyers representing Equity Group Eufaula.
16      A.    All right.
17      Q.    The folks that run that poultry plant
18  in Baker Hill.
19      A.    Yes.
20      Q.    And we have requested your presence
21  here today to ask you some questions concerning the
22  claims you and some other folks have made in a
23  lawsuit filed against the company.

7

1      A.    Yes.
2      Q.    Have you ever been deposed before?
3  Have you ever done this before?
4      A.    No.
5      Q.    It's fairly simple.  I ask the
6  questions, and you will be giving me some answers,
7  and Victoria is our court reporter.  She will be
8  taking down whatever we say.
9      A.    Yes.
10      Q.    If you don't understand my question,
11  please let me know and I will try and rephrase it
12  so that you will understand it.
13      A.    Okay.
14      Q.    If you don't hear anything that I
15  say, let me know and I will repeat it.
16      A.    Yes, I am kind of a little hard of
17  hearing sometimes.
18      Q.    Okay.  So I will try and keep my
19  voice up but if you don't hear anything, let me
20  know.
21      A.    Okay.
22      Q.    She can only take down one of us
23  talking at once.  She can't do it when we're

8

1  talking over one another.  So if we try and avoid
2  that, it will make her job a little easier.  Okay?
3      A.    Okay.
4      Q.    And finally, she can't take down the
5  nod of a head or a shake, so your answers, please
6  make them verbal -- yes, no, or an explanation.
7  Okay?
8      A.    Yes.
9      Q.    What's your home address?
10      A.    2093 County Road 43.
11      Q.    What town?
12      A.    I was going to get to that, but
13  that's what goes first, 2093 -- and it's Clayton.
14      Q.    Clayton?
15      A.    Clayton, Alabama.
16      Q.    What's your date of birth?
17      A.    March 21st, 1941.
18      Q.    Where do you work?
19      A.    Well, right now I'm just part-time,
20  working a little at Paragon.
21      Q.    At some point in time you worked at
22  the poultry plant that's the subject of this case,
23  right?

9

1      A.    Yes.
2      Q.    When did you work there?
3      A.    I left -- they terminated me about
4  two years ago, but I worked five-and-a-half years
5  there.
6      Q.    So you were terminated in 2006?
7      A.    Yes.
8      Q.    And if you worked there for five
9  years, you started about 2001?
10      A.    Yes, I think that would be right.
11      Q.    So when you started there, CP was
12  running the factory?
13      A.    Yes.
14      Q.    And then at some point Equity took
15  over, correct?
16      A.    Yes.
17      Q.    And for what reason were you
18  terminated?
19      A.    I had a problem with my shoulder.  I
20  had a rotator cuff redone, and after about six
21  months, they told me I couldn't no longer work
22  there because my insurance ran out, and they
23  couldn't pay me no longer, and they terminated me.

1f94db86-06be-439f-b205-b9227c7d734e

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

10

1    Q.    What was the last job that you had at
2    the plant?
3    A.    They call it the dumper.  What it is
4    is dumping chickens on the belt out there, cages,
5    live birds.  But the job was called live hanging.
6    That was my title, live hanging.
7    Q.    How long did you work that job?
8    A.    Live hanging?
9    Q.    Yes, sir.
10   A.    It's kind of hard to just say exactly
11   how long it was, but I know between the — first I
12   started on the truck.  I was what you call a
13   spotter, spotting the trailers.  That was the first
14   job I worked, and then the guy that they had
15   already terminated, they called him back and they
16   put him back on the truck, and they give me the
17   dumper.
18   Q.    So is it fair to say that the whole
19   time you worked on that plant you were working in
20   live hang or out driving trucks around in the yard?
21   A.    Right.  I was outside all the time.
22   Q.    You were outside all the time?
23   A.    Right.

---

11

1    Q.    You never worked inside the plant at
2    all?
3    A.    Well, I worked in the kill room for
4    about a couple of days.
5    Q.    Just a couple of days?
6    A.    Yes.
7    Q.    What did you do there?
8    A.    I was washing down the floor.
9    Q.    But you never worked on any of the
10   production lines?
11   A.    Yes.  One time when I got my knees
12   hurt, they put me in there, what they call light
13   duty.
14   Q.    And how long were you on light duty?
15   A.    About two weeks.
16   Q.    And where did you work, which room?
17   A.    They call it SI-something.
18   Q.    DSI?
19   A.    Yes.
20   Q.    That was your light duty job?
21   A.    Yes.
22   Q.    What shift did you work when you
23   worked in live hang?

---

12

1    A.    All days.  I worked all days.
2    Q.    What hour did you start?
3    A.    Start ten minutes after six — ten
4    minutes after six.
5    Q.    In the morning?
6    A.    Yes.
7    Q.    And when did you finish?
8    A.    Ten minutes until three.
9    Q.    Who was your supervisor?
10   A.    Well, I went through so many.
11   Q.    Who was your last one you remember?
12   A.    Dee Green.
13   Q.    Did you work 40 hours a week?
14   A.    Yes.
15   Q.    Monday through Friday?
16   A.    Yes.  Some Saturdays.
17   Q.    How did you come to learn about this
18   lawsuit?
19   A.    Got a letter.
20   Q.    From the lawyers?
21   A.    Yes.
22   Q.    Have you ever talked about the
23   lawsuit with any of your coworkers, former

---

13

1    coworkers?
2    A.    No.
3    Q.    Have you ever attended any meetings?
4    A.    For this?
5    Q.    For this.
6    A.    No.
7    Q.    Were you a member of the Union?
8    A.    Yes.
9    Q.    Did you ever have any position with
10   the Union?
11   A.    No.
12   Q.    You were never a steward or on the
13   negotiating committee?
14   A.    No.
15   Q.    Did you ever attend any Union
16   meetings?
17   A.    No.  To tell you the truth, I never
18   did.
19   Q.    What is your understanding of what
20   you're claiming in this lawsuit?
21         MR. STEENSLAND:  Objection.  You
22   may answer.
23   A.    On the count of working through

---

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

14

1    breaks.
2        Q.    (Mr. Fry)  When you were in live
3    hang?
4        A.    Yes.
5        Q.    And how did you get that
6    understanding?
7        A.    Well, we -- all our equipment had
8    taken about five minutes to get it on before break
9    and five minutes afterward.
10       Q.    What equipment did you wear?
11       A.    We wore hair nets, safety glasses,
12   ear plugs, and masks, wore a smock, plastic apron;
13   we wore cloth gloves, plastic gloves over them,
14   wore sleeveless -- what you put up on your arm,
15   sleeveless -- wore rubber boots.
16       Q.    Anything else?
17       A.    I think I covered all of it.
18       Q.    Let me go down the list and make sure
19   we got it all -- hair net?
20       A.    Right.
21       Q.    Safety glasses?
22       A.    Right.
23       Q.    Ear plugs?

---

15

1        A.    Right.
2        Q.    Mask?
3        A.    Right.
4        Q.    Was that a --
5        A.    Yes, go over your nose and your
6    mouth.
7        Q.    Because as a live hang, you are
8    working with a lot of chickens and you get a lot of
9    dust and chicken stuff.  That's why you wore those?
10       A.    Yes, that's why we wore them outside.
11       Q.    Smock?
12       A.    Yes.
13       Q.    Apron?
14       A.    Right.
15       Q.    Cloth gloves?
16       A.    Right.
17       Q.    Sleeves?
18       A.    Right.
19       Q.    And boots?
20       A.    Plastic gloves, too.
21       Q.    Anything else?
22       A.    That's it.
23       Q.    And you put this stuff on when you

---

16

1    were working as a dumper?
2        A.    Yes, you put it on before you start
3    work.
4        Q.    When you were working as a spotter,
5    which of these items of clothing did you wear?
6        A.    I wore all that equipment, except the
7    gloves -- I mean, the sleeveless.
8        Q.    When you were working as a spotter,
9    all your work was outside?
10       A.    Yes.
11       Q.    You still had to wear the smock?
12       A.    Yes, that was their rule.
13       Q.    And the hair net?
14       A.    Yes.
15       Q.    And the glasses?
16       A.    Right.
17       Q.    And the ear plugs?
18       A.    Right.
19       Q.    And the apron?
20       A.    Right.
21       Q.    Was it your understanding on both
22   these jobs -- the spotter job and the dumper job --
23   that you were required to wear all of these items?

---

17

1        A.    Yes, they had us to wear them.  That
2    was their issues, not ours.  It was wear them or
3    leave the job.
4        Q.    Did you get all of these items from
5    the company?
6        A.    Yes, we had to pay for some of them.
7    Yes, they all came from the company.
8        Q.    When would you have to pay for them?
9        A.    We pay for them -- they come out of
10   your check.
11       Q.    Did you have to pay for them every
12   time you got new ones?
13       A.    Yes.  If you got new ones, you did.
14       Q.    Could you wear any of these things
15   from home?
16       A.    Wear them from home?
17       Q.    Yes.
18       A.    What you mean, put them on before you
19   leave home?
20       Q.    Yes, sir.
21       A.    No, you didn't want to put them
22   things on before you leave home.
23       Q.    What about your boots?

---

1f94db86-06be-439f-b205-b9227c7d734e

18

1    A.    Yes, I usually put my boots on.
2    Q.    What about your glasses, could you
3  bring those from home?
4    A.    Yes.
5    Q.    And what about your ear plugs?
6    A.    Put them on at work.
7    Q.    Some of these things you picked up
8  every day from the supply room; is that correct?
9    A.    Yes.
10    Q.    Which ones?
11    A.    The mask -- and gloves about every
12  day, too -- and smock.  Just about picked up
13  everything except your boots.
14    Q.    Where did you put this stuff on in
15  the mornings before you started to work?
16    A.    Put it on in the break room before
17  you start work.
18    Q.    What break room?
19    A.    The one -- they had two break rooms.
20  They had a live hang break room.  That's where I
21  put mine on at.
22    Q.    And how close was the live hang break
23  room to where you did your job as a dumper?

19

1    A.    Probably about 300 foot.
2    Q.    Did you use a knife for any of the
3  jobs you did?
4    A.    Do what now?
5    Q.    A knife?
6    A.    No, I didn't have to use a knife.
7  Yes, we wore hard hats, too.  I forgot about that.
8  Sorry about that.
9    Q.    Could you wear those from home?
10    A.    No, I didn't want to wear that thing
11  from home, too heavy.  Didn't want to wear it at
12  work.
13    Q.    Your start time was 6:10 a.m.?
14    A.    Six or five.  I am trying to remember
15  whether it was five or ten -- I mean, six.  I know
16  we got off ten minutes to three, and we had an hour
17  -- we had two breaks was 30 minutes.
18    Q.    Well, let's, for purposes of our
19  discussion here, let's assume that your reporting
20  time was 6:10 -- or that's when you had to start
21  work.  Okay?
22    A.    Okay.
23    Q.    What time would you get to work, what

20

1  time would you get to the plant?
2    A.    I always got there 20 minutes 'til,
3  but like I say I'm confused on which one that I
4  started at -- let's see.  Yes, it was ten minutes
5  after six when we started.  You are kind of
6  confusing me.
7        MR. STEENSLAND:  Take your time.
8    A.    You are kind of confusing me.  But I
9  know he wanted us to clock in 20 minutes before
10  time to go to work, and we had to come from the --
11  what is the name of the other break room.  The
12  clock was in one break room, and we had to go all
13  the way across to another break room and put on
14  everything we had to put on and sit there and wait.
15    Q.    (Mr. Fry)  You said "he wanted us to
16  clock in 20 minutes before", who was that?
17    A.    One of the supervisors, Bobby Dunny.
18    Q.    He told you that he wanted you to
19  clock in 20 minutes before 6:10.  So he wanted you
20  to clock in at 5:50?
21    A.    Yes, to get from one break room to
22  the other and put on all your equipment.
23    Q.    So what time did you usually drive

21

1  onto the plant?
2    A.    I get there at 5:30 in the morning.
3    Q.    So you got there 20 minutes before
4  you had to clock in?
5    A.    Yes.
6    Q.    Did you have to clear any security?
7    A.    No.
8    Q.    Did you have to clear any security
9  when you left at the end of the day?
10    A.    Security, what do you mean?
11    Q.    Did you have to go through -- were
12  your searched?
13    A.    No, I never was searched, unless I
14  bought chicken or something.
15    Q.    Did they stop your car and search it
16  on your way out?
17    A.    No.
18    Q.    On your way in?
19    A.    No.
20    Q.    That's what I mean by clearing
21  security.  You never had to do any of that?
22    A.    No, they never bothered me.
23    Q.    Tell me what you did after you

1f94db86-06be-439f-b205-b9227c7d734e

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

22

1  arrived at the plant at 5:30 a.m.
2      A.   Just sat there until time --
3      Q.   Pardon?
4      A.   Sit there on the banks until the time
5  that they wanted us to clock in.  I was always a
6  person to leave on time in case something happened,
7  still got to work on time.
8      Q.   So where would you sit?
9      A.   In the break room.
10     Q.   So you would go from your car to the
11 break room?
12     A.   Yes.
13     Q.   And how long would you sit there?
14     A.   Mostly about ten minutes, or
15 something like that, before time to clock in, 15,
16 just depending on what time I got there.
17     Q.   And where would you clock in then?
18     A.   In that break room.
19     Q.   The live hang break room?
20     A.   No, it was -- it wasn't debone.  It
21 was three break rooms.
22     Q.   Evis?
23     A.   Evis break room was what we called

23

1  it.
2      Q.   After you clocked in at 5:50, what
3  did you do?
4      A.   Walked from that break room over to
5  live hang break room.
6      Q.   And then what did you do?
7      A.   Put on my equipment.
8      Q.   At some point in this process you
9  went to the supply room, right?
10     A.   Yes, when I first got there.
11     Q.   When you first got there?
12     A.   Yes.  When you walk through the door,
13 you get your supplies.
14     Q.   Did you ever have to wait in line?
15     A.   Not at the time that we went in, we
16 didn't have to wait in too long because it wasn't
17 but just a few starting at the time.  When I worked
18 in debone, yes, we had to wait in line a long time.
19     Q.   And how long again did you work in
20 debone?
21     A.   About two weeks.
22     Q.   And did you wear any different
23 equipment when you worked in debone?

24

1      A.   No.
2      Q.   You wore the same things?
3      A.   Yes.
4      Q.   So you clocked in at 5:50.  What did
5  you do after you clocked in?
6      A.   Went to the live hanging break room.
7      Q.   And what did you do then?
8      A.   Put my equipment on.
9      Q.   And then what did you do?
10     A.   Wait until time to go to work, and
11 then walked out to the dump, or the truck,
12 whichever one I was running.
13     Q.   How much of a wait time did you have
14 in the live hang break room after you put your
15 stuff on?
16     A.   About ten minutes most of the time.
17 They want us to put it on and be ready to get on
18 the line.  If you didn't, you got a good fussing
19 up.
20     Q.   How long did it take you to put this
21 stuff on?
22     A.   About five minutes.
23     Q.   Once you put this stuff on, did you

25

1  have to wash it off?
2      A.   Not when you first put it on because
3  it's already clean.
4      Q.   So then at 6:10 you went out on the
5  line?
6      A.   Right.
7      Q.   And you started dumping --
8      A.   No, you went to the line before 6:10.
9  You went out there at least five minutes before
10 time.
11     Q.   What did you do when you got there?
12     A.   Just stand there and be ready.
13     Q.   When you were dumping birds, weren't
14 you sort of the first guy in the operation?
15 Nothing could happen until you started dumping
16 birds?
17     A.   Right.
18     Q.   So tell me how your job typically
19 started.  Where did you go when you were dumping
20 birds?
21     A.   I had to go upstairs.  The dumping
22 line was upstairs.  You go up there and you get one
23 load ready, and you dump one in there and have it

1f94db86-06be-439f-b205-b9227c7d734e

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

26

1  ready. No sooner than that line start up -- when
2  that belt get to moving, they want them birds on
3  that belt.
4      Q.   So at 6:10 did you immediately start
5  to work?
6      A.   Yes, you be working at 6:10 unless
7  something was broke down or either they hadn't
8  finished cleaning up or something, but they still
9  paid us for that.
10     Q.   They did?
11     A.   Yes, we got paid that. If it was
12 starting time and we was on the line, we got paid
13 for that.
14     Q.   When you were working as a spotter,
15 how would your day start after you put your stuff
16 on? What did you do then?
17     A.   I would go to the trunk and go get a
18 load of birds.
19     Q.   So right at 6:10 you just started
20 going to get the birds?
21     A.   I usually be done started before then
22 when I was driving the spotter truck because they
23 want you to have them under the shed. You had to

27

1  pull one load in, you had to back one in, so you
2  usually start about ten minutes earlier to get them
3  birds in there.
4      Q.   Do you get paid for that ten minutes?
5      A.   No, they didn't pay you nothing for
6  it.
7      Q.   Are you sure?
8      A.   Yes, I didn't never make but 40 hours
9  a week.
10     Q.   You told me you got two breaks for 30
11 minutes?
12     A.   Right.
13     Q.   Let me back up and ask you one
14 question. You say when you were a spotter you were
15 out moving trucks around ten minutes before your
16 start time, and you say you weren't paid for that?
17     A.   No.
18     Q.   Is that part of your claim in this
19 lawsuit?
20     A.   Yes, that is a lot of it, too.
21     Q.   When did you take your first break?
22     A.   8:15, if I am not wrong.
23     Q.   8:15 a.m.?

28

1      A.   Right.
2      Q.   And how would you know it was time to
3  take a break? Was it just a matter of looking at
4  the clock?
5      A.   No, we didn't have no clock. They
6  went by time clock. They shut the line down.
7      Q.   How would you know it was break time?
8      A.   Well, I always watch my watch, and
9  then it was getting close, it was getting close.
10 But you wasn't going to leave that line until they
11 shut it down.
12     Q.   Were you permitted to wear a watch?
13     A.   No, I wasn't permitted to wear a
14 watch. I just wore a watch because I wanted to.
15 They couldn't keep me from wearing my watch.
16     Q.   So at 8:15 it was time to take your
17 break?
18     A.   Right.
19     Q.   What would you do?
20     A.   I'd have to take off everything, take
21 about five minutes to get to the break room.
22     Q.   Where would you take it off, in the
23 work room?

29

1      A.   No, they did like you to take it up
2  there once you done wore it. You had to take it
3  off at your station.
4      Q.   At your workstation?
5      A.   Yes.
6      Q.   So right where you are working, that
7  is where you took it off?
8      A.   Right.
9      Q.   And you didn't have to wash anything?
10     A.   Not until the afternoon.
11     Q.   It took you five minutes to take your
12 stuff off?
13     A.   Yes, about five minutes to take it
14 off and get to the break room.
15     Q.   Let's break that down a little bit.
16 How far away was your break room?
17     A.   About 300 feet.
18     Q.   300 feet, that's 100 yards?
19     A.   I don't know, whatever 300 feet is.
20     Q.   Last I looked, I thought it was about
21 100 yards. So it took you five minutes to take the
22 stuff off and get to the break room, right?
23     A.   Yes, about five minutes.

1f94db86-06be-439f-b205-b9227c7d734e

30

1    Q.    Within that five minutes, how much
2    time did it take you to take off the smock and the
3    apron, and that sort of stuff?
4    A.    I didn't keep up with all that.  I
5    just kept up with the time that it took me to
6    undress and get to the break room.  I know we
7    didn't never get about a 20-minute break.  That's
8    about all we got out of the 30 minutes.  The two
9    30-minute breaks we got about 20 minutes out of
10   each one of them.
11   Q.    But taking that stuff off took a
12   period of time less than five minutes, correct?
13   A.    It took about five minutes to get it
14   off and get to the break room.
15   Q.    I am trying to divide those two
16   things.  You took the stuff off before you began
17   your walk to the break room, right?
18   A.    Right.
19   Q.    I am trying to figure out how much
20   time it took you to take the stuff off.
21   A.    I couldn't tell you that.  I didn't
22   keep up with all of that.  But I always kept up
23   with about how long it would take me to get out of

31

1    that stuff and get to the break room.
2    Q.    Did it take you longer to undress or
3    longer to walk to the break room?
4    A.    Longer to undress.
5    Q.    Longer to undress?
6    A.    Yes.
7    Q.    For part of that five minutes you
8    were undressing?
9    A.    Right.
10   Q.    And for part of that five minutes,
11   you were walking to the break room, right?
12   A.    Right.
13   Q.    And you reversed the process when you
14   came back from break?
15   A.    Right, you walked back from the break
16   room.  Then you dress after you get back.
17   Q.    And both walking and then dressing
18   took you about five minutes?
19   A.    Well, it took about five minutes, but
20   you had to be on the line before time and be
21   dressed.  Because if you didn't, they will write
22   you up.
23   Q.    You didn't have to do any washing

32

1    when you put the stuff back on?
2    A.    No.
3    Q.    Tell me what you did at the end of
4    the shift when it was time to go home.
5    A.    The last very end?
6    Q.    Yes, sir.
7    A.    You go downstairs and take a water
8    hose and wash your boots off, wash your apron off,
9    then you had to take all that stuff off and fold it
10   up, put it in a bag.  At one time we was taking it
11   home and washing it ourselves, and then all of a
12   sudden they started to give us one every morning.
13   But that didn't last very long.  They finally quit
14   that.  You had to go back to taking it home and
15   washing it yourself.
16   Q.    And when did that policy change take
17   place, do you recall?
18   A.    It started with Equity Group, and
19   they changed it back.  CP you always had to take it
20   home and wash it.
21   Q.    And it's your recollection that at
22   Equity they started issuing smocks every day?
23   A.    Right.

33

1    Q.    And then they went back to the other
2    policy?
3    A.    Yes.
4    Q.    Do you know when this happened?
5    MR. STEENSLAND: I object.  I
6    think that mischaracterized what he said.
7    MR. FRY:  Okay.  Let me ask it
8    again.
9    Q.    (Mr. Fry) I think you told me that
10   with CP you always had to take the smocks home,
11   right?
12   A.    Right.
13   Q.    And at some point when you went to
14   work for Equity they started issuing you smocks
15   every day?
16   A.    They did for for a little while.  It
17   didn't last too long.
18   Q.    And then they switched back to the
19   policy that you had with CP where you had to take
20   it home all the time?
21   A.    Right.  We did, yes.  Now on some of
22   them, they didn't.  But on the back dock back there
23   we had to take it home and wash it.  Because they

1f94db86-06be-439f-b205-b9227c7d734e

34

1   didn't let us put our smocks in the bath with the
2   raw meat, or whatever you call it, inside. So they
3   wouldn't let us let it in there.
4       Q.   I forgot where we were in the process
5   of you getting out of the plant.
6       A.   Do what now?
7       Q.   You washed your boots off with a
8   hose?
9       A.   Right.
10      Q.   And you undressed, you took your
11  smock off and your apron, and so forth, and what
12  did you do with all those items?
13      A.   What did I do with them?
14      Q.   Yes, sir.
15      A.   I put them in a bag after we started
16  where we had to start taking them back home, put
17  them in a bag.
18      Q.   And then what would you do?
19      A.   Take them home with me.
20      Q.   Did you clock out?
21      A.   Yes. I went in and washed up, washed
22  my hands and gloves and all that stuff off, and
23  then I went and clocked out.

35

1       Q.   And you clocked out in the live hang
2   break room?
3       A.   No, there wasn't no clock in there.
4       Q.   In the evis room, you told me I think
5   that's were you clocked out?
6       A.   Yes.
7       Q.   How much time did this process take?
8       A.   In the afternoon it probably took a
9   little longer because you had more to do.
10      Q.   About how long?
11      A.   I'd say six, seven minutes in the
12  afternoon.
13      Q.   At any point during the day, did you
14  have you walk through a foot bath to sanitize your
15  boots?
16      A.   No, I didn't.
17      Q.   What was your understanding as to how
18  the company kept track of your time for purposes of
19  paying you?
20      A.   Well, they used -- we used a time
21  card. If we was late getting off, they had a
22  Master Card that they'd swipe everybody out.
23      Q.   So explain that to me. I'm not sure

36

1   I understand what your understanding is.
2       A.   Everybody had a time card. You swipe
3   that time card. But if you was -- if you had
4   worked over, they was already swiped you out before
5   you get to the time clock. So they had what you
6   call a Master Card, and they swipe everybody out at
7   the same time.
8       Q.   So it was your understanding that
9   your hours worked for pay purposes were determined
10  by the Master Card?
11      A.   Right.
12      Q.   As a member of the Union, did you
13  have an opportunity to look at the labor agreement?
14      A.   Well, I guess you could have, but I
15  didn't never get into it.
16      Q.   Did they give you a copy of the
17  agreement?
18      A.   Yes, we had a handbook.
19      Q.   I'm not talking about the employee
20  handbook, I'm talking about the labor agreement.
21      A.   No.
22      Q.   You didn't get it, you never saw it?
23      A.   No, I never saw it.

37

1            THE DEPONENT: Can I take a break
2   and go to the bathroom?
3            MR. FRY: Yes, you may.
4            3:05 p.m.
5            (Short break.)
6            3:07 p.m.
7       Q.   (Mr. Fry) Did you ever have any
8   complaints about your checks, the payroll checks
9   that you got every week?
10      A.   Every once in an occasion, they would
11  short us an hour, but if you told them -- or 30
12  minutes or something -- they would correct it.
13      Q.   So whatever problems you had with
14  your pay you took it to your supervisor, and they
15  would correct it?
16      A.   And they would correct it, yes.
17      Q.   Did you work overtime on occasion?
18      A.   Every once in an occasion, yes.
19      Q.   Were you paid time-and-a-half for
20  that?
21      A.   Yes.
22      Q.   Did you ever have any problem with
23  how they computed your overtime pay?

1f94db86-06be-439f-b205-b9227c7d734e

38

1    A.    No.
2    Q.    Have you made any calculations as to
3  how much time you think that you are to be paid for
4  that is your claim in this case?
5    A.    No, I ain't that good.
6    Q.    Did you ever file any grievances with
7  the Union?
8    A.    No.
9    Q.    Did you ever complain to any of the
10  Union reps that you weren't being paid for the time
11  you were moving those trucks around in the yard, or
12  you weren't being paid for the time that you're
13  claiming for putting on and taking off your
14  equipment?
15    A.    No, I never did complain about that.
16    Q.    Were you ever written up for any
17  disciplinary infraction?
18    A.    Yes, one or two times.  I am trying
19  to think what that was.  One of them was one time I
20  backed up and backed a truck against another
21  trailer, and they claimed it was -- I should have
22  pulled it up or told them or something, and I
23  didn't, and I left it like that, and they wrote me

39

1  up on that one.
2    Q.    You described for me what you did
3  when you came in in the morning, what you did on
4  your breaks, and what you did at the end of the
5  day.  Did that same routine pretty much apply for
6  both jobs you had as a dumper and a spotter?
7    A.    All except the spotter truck.  It was
8  different on it because you done more time in the
9  morning -- and in the afternoon, too, because a lot
10  of times what they would do, they would want --
11  like if we like two or three cages from unloading
12  that truck in the afternoon, they wanted to get all
13  them cages on the truck, well, they could count
14  that truck.  They went by how many trucks they did
15  per day.  And it might be sometimes 10 minutes or
16  15 minutes after I got supposed to been getting off
17  before I got to the clock.
18    Q.    And are you making a claim for that
19  time in this case?
20    MR. STEENSLAND:  Objection.  You
21  can answer.
22    A.    Yes.
23    MR. FRY:  That's all I have.

40

1  Thank you.
2    MR. STEENSLAND:  I have a
3  question or two, Mr. McCall.
4
5  EXAMINATION BY MR. STEENSLAND:
6    Q.    Are you asking in this suit to be
7  paid for all the hours that you have worked for
8  Equity Group?
9    A.    Yes, sir.
10    Q.    From the time you get there to the
11  time you leave?
12    A.    Yes, sir.
13    MR. STEENSLAND:  Nothing further.
14    MR. FRY:  Thank you.
15    3:11 p.m.
16  ***********************
17  FURTHER DEPONENT SAITH NOT
18
19
20
21
22
23

41

1    CERTIFICATE
2
3  STATE OF ALABAMA
4  AT LARGE
5
6    I hereby certify that the above
7  and foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10  transcription and that the foregoing represents a
11  true and correct transcript of the testimony given
12  by said witness upon said deposition.
13    I further certify that I am
14  neither of counsel nor of kin to the parties to the
15  action, nor am I in anywise interested in the
16  result of said cause.
17
18
19
20
21
22  Victoria M. Castillo, Certified Court Reporter
    ACCR# 17, Expires 9/30/2008
23  Commissioner and Notary Public

1f94db86-06be-439f-b205-b9227c7d734e

**TAB 37**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06-CV-1081-MEF


BETTY ANN BURKS,

et al.,

     Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

     Defendant.



BEFORE:

     Cynthia M. Noakes, Commissioner

     and Certified Court Reporter


DEPOSITION TESTIMONY OF

DOROTHY A. MCNAIR


*****************************

3ac9d390-bca3-4c95-8c49-b74823a86340

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

2

```
1    S T I P U L A T I O N
2
3        IT IS STIPULATED AND AGREED by and
4    between the parties through their respective
5    counsel, that the deposition of DOROTHY A. MCNAIR
6    may be taken before Cynthia M. Noakes, Court
7    Reporter, at the Law Offices of WILLIAMS,
8    POTTHOFF, WILLIAMS & SMITH, 125 South Orange
9    Avenue, Eufaula, Alabama 36027, on the 22nd day
10   of May, 2008.
11       IT IS FURTHER STIPULATED AND AGREED
12   that the signature to and the reading of the
13   deposition by the witness is waived, the
14   deposition to have the same force and effect as
15   if full compliance had been had with all laws and
16   rules of Court relating to the taking of
17   depositions.
18       IT IS FURTHER STIPULATED AND AGREED
19   that it shall not be necessary for any objections
20   to be made by counsel to any questions except as
21   to the form or leading questions, and that
22   counsel for the parties may make objections and
23   assign grounds at the time of the trial, or at
```

4

```
1              INDEX
2    EXAMINATION BY:           PAGE NUMBER:
3    MR. GOULD                 6-45
4    MR. CAMP                  45-51
5
6    EXHIBITS:
7    (No exhibits were
8    submitted to said deposition.)
9
10   Reporter's Certificate        53
11
12
13
14
15
16
17
18
19
20   *******************************************
21
22
23
```

3

```
1    the time said deposition is offered in evidence,
2    or prior thereto.
3        IT IS FURTHER STIPULATED AND AGREED
4    that the notice of filing of the deposition by
5    the Court Reporter is waived.
6
7
8
9
10
11
12
13
14
15
16
17   *******************************************
18
19
20
21
22
23
```

5

```
1              APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFFS:
4        MR. ROBERT J. CAMP
5        THE COCHRAN FIRM, P.C.
6        ATTORNEYS AT LAW
7        505 North 20th Street
8        Suite 825
9        Birmingham, Alabama 35203
10       (205) 244-1115
11
12   ON BEHALF OF THE DEFENDANT:
13       MR. MALCOLM S. GOULD
14       PELINO & LENTZ
15       ATTORNEYS AT LAW
16       One Liberty Place
17       Thirty-Second Floor
18       1650 Market Street
19       Philadelphia, Pennsylvania 19103
20       (215) 665-1540
21
22   *******************************
23
```

3ac9d390-bca3-4c95-8c49-b74823a86340

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

**6**

1  I, CYNTHIA M. NOAKES, a Certified
2  Court Reporter of Eufaula, Alabama, acting as
3  Commissioner, certify that on this date, as
4  provided by the Alabama Rules of Civil Procedure
5  and the foregoing stipulation of counsel, there
6  came before me at the Law Offices of WILLIAMS,
7  POTTHOFF, WILLIAMS & SMITH, 125 South Orange
8  Avenue, Eufaula, Alabama 36027, beginning at
9  2:10 p.m., DOROTHY A. MCNAIR, witness in the above
10 cause, for oral examination, whereupon the
11 following proceedings were had:
12
13      DOROTHY A. MCNAIR,
14 being first duly sworn, was examined and
15      testified as follows:
16
17      THE COURT REPORTER:  Usual
18 stipulations?
19      MR. CAMP:  Yes.
20      MR. GOULD:  Yes.
21
22      EXAMINATION
23 BY MR. GOULD:

**7**

1  Q.  Good afternoon, Ms. McNair.  My name is
2  Malcolm Gould.  I'm an attorney with the law firm
3  of Pelino & Lentz in Philadelphia.  I represent
4  Equity Group Eufaula Division, LLC, in a lawsuit
5  that's been filed in Federal Court in the Middle
6  District of Alabama.  You are named as a plaintiff
7  in this lawsuit, and we're here today to take your
8  deposition.
9      I'm going to give you a few ground rules for
10 the deposition that will hopefully help it move a
11 little bit more smoothly.
12     As you can see, we have a court reporter
13 here.  She's going to take down my questions and
14 your answers.  Because of that, I would ask that
15 you keep all of your answers verbal.  Just say yes
16 or no instead of nodding your head or shrugging
17 your shoulders or saying huh-uh or uh-huh; it will
18 make it easier for her to take down what your
19 answers are to my questions.
20     I would also ask that you wait until I
21 finish my question before you give your answer.
22 It's easier for her when we're not talking over
23 each other.  It also means that you will hear my

**8**

1  full question before you give your answer.
2      If I ask a question and you're not certain
3  about what I mean or your don't understand the
4  question, just let me know and I'll repeat the
5  question or try and ask it a different way so it's
6  not so confusing.
7      If at any point you feel you need to take a
8  break, just let me know.  If you do answer my
9  question, I'm going to assume that you understood
10 my question and that you are answering it
11 truthfully and to the best of your ability.  Okay?
12 A.  Okay.
13 Q.  Can you please state your full name for the
14 record?
15 A.  Dorothy Ann McNair.
16 Q.  Now, have you been known by any other names?
17 Do you have a maiden name or any other name that
18 you go by?
19 A.  No.
20 Q.  Have you ever worked at the processing plant
21 in Baker Hill, Alabama?
22 A.  Yes.
23 Q.  Have you ever worked at the plant in Baker

**9**

1  Hill, Alabama, during the time that it was owned
2  by Equity Group?
3  A.  Yes.
4  Q.  When was the last time you worked at the
5  processing plant?
6  A.  When it was named Equity Group.
7  Q.  Do you have an idea as to what year it was?
8  A.  No.
9      MR. CAMP:  Do you have a record of her?
10 You asked that like you don't have a record.
11     MR. GOULD:  They have no record of her.
12     MR. CAMP:  Would you like for me to
13 hold off on this one and let's see if I can get a
14 Social.  If you'd asked me for a Social or
15 something, I could have helped you find her.
16     MR. GOULD:  I understand.
17 Q.  Do you have a Social Security number?
18 A.  Yes.
19 Q.  Can you provide that to me, please?
20 A.  Yes.
21 Q.  What is it?
22 A.  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.
23 Q.  How long did you work at the plant?

3ac9d390-bca3-4c95-8c49-b74823a86340

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

10

1   A.   About eight months.
2   Q.   And in what department did you work?
3   A.   Evis.
4   Q.   And do you have an idea as to when you
5   started working at the plant?
6   A.   I don't remember.
7   Q.   During the time that you worked at the
8   plant, were you employed in the evisceration
9   department the entire time?
10  A.   Yes.
11  Q.   During the time you worked at the plant,
12  were you a member of the union?
13  A.   No.
14  Q.   You understand that you are a plaintiff in
15  this lawsuit, correct?
16  A.   Yes.
17  Q.   And what's your understanding as to the
18  claims that you are asserting in this lawsuit?
19  A.   Get paid for my wages that I wasn't -- that
20  I -- getting paid for my wages that I wasn't --
21  excuse me -- for my money that I needed for the
22  time that I was working that I wasn't getting paid
23  for.

11

1   Q.   So your claim is for hours you worked that
2   you weren't paid for; is that correct?
3   A.   Yes. Hours I worked that I wasn't paid for.
4   Q.   Can you give me an example of some of the
5   hours that you claim you worked but were not paid
6   for?
7   A.   No.
8   Q.   When you say that there was time you worked
9   and you weren't paid for it, what sort of
10  activities were you doing that you claim that
11  those activities were not paid?
12  A.   When I was putting on my PPE equipment.
13  Q.   Now, what do you mean when you say "PPE
14  equipment"? Do you know what PPE stands for?
15  A.   My protective gear that I had to wear.
16  Q.   Did you work a particular position in the
17  evisceration department?
18  A.   Yes.
19  Q.   What position did you work in?
20  A.   As a trimmer.
21  Q.   Can you say that again? What kind of --
22  A.   Trimmer.
23  Q.   Oh, as a trimmer. I'm sorry. I

12

1   misunderstood you. Can you describe for me what
2   you did in that job?
3   A.   Yes. I had to take the birds off and -- as
4   she called the birds, I had to take them off and
5   hang them on the rack behind me.
6   Q.   Is that what -- the USDA would pull birds
7   off the line; is that correct?
8   A.   No. I'd pull the birds off. She would call
9   them.
10  Q.   So one of the USDA people would point to a
11  bird?
12  A.   No, she wouldn't point to the bird; she'd
13  just call them out, like, "gall," and then I'd
14  take them off the line.
15  Q.   And there were different colors on the
16  hangers that were holding the birds, and that's
17  how you would know which one?
18  A.   No.
19  Q.   How would you know which one?
20  A.   I was trained.
21  Q.   So you could tell from looking which bird
22  she was talking about?
23  A.   Yes.

13

1   Q.   And is that the only job that you worked in
2   the evisceration department?
3   A.   No.
4   Q.   During the course of your shift, would you
5   rotate between different positions?
6   A.   Yes.
7   Q.   And how many times a day would you rotate?
8   A.   I don't remember.
9   Q.   Would you normally rotate to a different
10  position when you returned from a break?
11  A.   No. I don't remember.
12  Q.   Ms. McNair, how did you first find out about
13  this lawsuit?
14  A.   I received a letter.
15  Q.   You received a letter in the mail?
16  A.   Yes.
17  Q.   And it had a form with it that you could
18  fill out?
19  A.   No.
20  Q.   No? You just received a solicitation in the
21  mail, "We have a lawsuit. Would you like to
22  join?"
23        MR. CAMP: Objection.

3ac9d390-bca3-4c95-8c49-b74823a86340

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

14

1   A.  No.
2   Q.  Do you recall who the letter was from?
3   A.  No.
4   Q.  Did you keep a copy of it?
5   A.  I don't keep up with mail. I just read it
6   and --
7   Q.  So you received this letter, and then what
8   did you do? Was there a phone number to call?
9   A.  Yes.
10  Q.  And do you remember what the phone number
11  was for or who the phone number was for?
12  A.  I guess the number was for me. They sent it
13  to me.
14  Q.  No, the phone number. You said there was a
15  phone number in the letter; is that correct?
16  A.  Yes.
17  Q.  And did you call that phone number?
18  A.  Yes.
19  Q.  And you told whoever picked up the phone
20  that you wanted to join in this lawsuit; is that
21  correct?
22  A.  No. I answered some questions that they
23  asked me.

15

1   Q.  Do you know where whoever sent you this
2   letter got your name?
3   A.  No.
4   Q.  Did they tell you?
5   A.  No.
6   Q.  Other than this letter you received in the
7   mail, have you had discussions with people other
8   than your attorneys that relate to this lawsuit?
9   A.  No.
10  Q.  Have you attended any group meetings where
11  this lawsuit was discussed?
12  A.  Yes.
13  Q.  And do you recall when those meetings were?
14  A.  I don't remember.
15  Q.  Did you attend a meeting this week?
16  A.  Yes.
17  Q.  And was that a meeting with your lawyers?
18  A.  Yes.
19  Q.  Did you bring anyone with you to the
20  meeting?
21  A.  No.
22  Q.  Other than you and your lawyers, do you have
23  an idea as to who else was in attendance at this

16

1   meeting?
2   A.  No.
3   Q.  Was there a sign-in sheet? Were you asked
4   to sign in?
5   A.  Yes.
6   Q.  During the time that you were employed out
7   in the evisceration department, were there any
8   items of clothing or equipment that you had to
9   wear when you were out on the production floor?
10  A.  No. We had to wear the PPE equipment, the
11  safety equipment.
12  Q.  So there were pieces of clothing or
13  equipment that you had to wear?
14  A.  Equipment, yes; clothing, no.
15  Q.  I'm not going to ask you for a legal
16  definition of what is clothing or what is not
17  clothing.
18      MR. CAMP:  I think she can tell what
19  clothing is versus what clothing isn't.
20  Q.  Can you list for me what items you would
21  wear when you were out on the production floor?
22  A.  No clothing. I can list the equipment.
23  Q.  I said items. You can call it equipment,

17

1   clothing, whatever you want. It doesn't matter to
2   me.
3       Can you list the items that you wore when
4   you were out on the production floor?
5   A.  We wore gloves, goggles, the arm guard, the
6   chain glove, your earplugs, and the net on the
7   hair.
8   Q.  And is that everything?
9   A.  And your beard thing if you've got facial
10  hair.
11  Q.  Gloves, goggles, the arm guard, chain glove,
12  and earplugs, and hair net?
13  A.  And arm sleeves and the apron and cotton
14  gloves and rubber gloves.
15  Q.  And are these all things that you wore when
16  you were out on the evis line?
17  A.  Yes.
18  Q.  And in your job as a trimmer, were you
19  required to use scissors or a knife?
20  A.  Yes.
21  Q.  Which one? or both?
22  A.  Both.
23  Q.  Did you work any particular shift?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

18

1   A.   Morning.
2   Q.   Did you have a particular start time?
3   A.   At six o'clock we had to be on the line.
4   Q.   6 a.m.?
5   A.   Yes.
6   Q.   And did you have a scheduled time when your
7   shift was to end?
8   A.   At three.
9   Q.   3 p.m.?
10  A.   In the evening.
11  Q.   During the course of your shift, did you
12  have any breaks?
13  A.   Yes.
14  Q.   And did those breaks normally occur at the
15  same time every shift?
16  A.   Yes.
17  Q.   And how many breaks did you get?
18  A.   Two.
19  Q.   And how long were your breaks?
20  A.   15 minutes.
21  Q.   You had two 15-minute breaks?
22  A.   Uh-huh.
23  Q.   And did those breaks normally occur at the

19

1   same time each shift?
2   A.   Yes.
3   Q.   When was your first break, if you remember?
4   A.   I don't remember.
5   Q.   Do you remember when your second break was?
6   A.   I don't know the exact time.
7   Q.   Now, during the time that you were employed
8   at the plant, would you normally drive yourself to
9   work?
10  A.   Yes.
11  Q.   When you arrived at the plant, was there any
12  sort of security that you had to clear?
13  A.   Yes.
14  Q.   Can you describe that for me?
15  A.   You had to show a badge.
16  Q.   Was there a guard shack on the driveway to
17  the plant?
18  A.   Yes.
19  Q.   And did you have, like, a sticker for your
20  car?
21  A.   Yes.
22  Q.   If you had that sticker, could you just
23  drive through the gate?

20

1   A.   Sometimes they would let you through and
2   sometimes you had to show your — they would stop
3   you and you had to show your badge.
4   Q.   Your employee identification?
5   A.   Uh-huh.
6   Q.   After you would pull into the parking lot
7   after getting past the gate, was there any other
8   security that you had to clear?
9   A.   No.
10  Q.   Once you would park in the parking lot,
11  would you normally go straight into the building?
12  A.   Yes.
13  Q.   Can you describe for me what you would do
14  once you entered the building?  What's the very
15  next thing you would do?
16  A.   Well, if I needed equipment and stuff, I
17  would go to supply and get in line so I could get
18  it, my supplies.
19  Q.   Now, during the time that you were employed
20  at the plant, did you have to wear boots?
21  A.   Yes.
22  Q.   Were you allowed to wear those boots from
23  home?

21

1   A.   No.  They supplied boots.
2   Q.   Okay.  Could you actually physically wear
3   those boots outside of the plant?
4   A.   No.
5   Q.   So you indicated that you would go and pick
6   up supplies; is that correct?
7   A.   Yes.
8   Q.   Where would you get your supplies?
9   A.   From the supply room.
10  Q.   What sort of supplies would you get at the
11  supply room?
12  A.   The ones that I needed for work.
13  Q.   Would they be any of these items in the list
14  of things that you previously gave to me?
15  A.   Yes.
16  Q.   Was there anything that you would pick up
17  every single day?
18  A.   Apron.  There's several things.  It depended
19  on what I didn't have.
20  Q.   Would you need to get a new apron every day?
21  A.   Yes.
22  Q.   What did the apron look like?
23  A.   It was blue plastic.

3ac9d390-bca3-4c95-8c49-b74823a86340

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

22

1    Q.   So you wore a blue plastic apron; and you
2    would get a new blue plastic apron every single
3    day?
4    A.   Yes.
5    Q.   Were you required to get a new apron every
6    day or could you reuse the apron if you wanted?
7    A.   I just liked to get a new one for sanitized
8    purposes.
9    Q.   Did you observe other employees at the plant
10   who did not get a new apron every day.
11   A.   No.  I was just concerned about myself and
12   my equipment.
13   Q.   After you would pick up whatever supplies
14   that you needed, what would you do next?
15   A.   I would go back to the break room until time
16   to go on the line.  Because I would get there
17   early and get my supplies.
18   Q.   What time would you normally arrive at the
19   plant?
20   A.   I'd say about 5:20.
21   Q.   What time would you clock in?
22   A.   At six.  Not six, but about five -- I'd say
23   about 5:30.

23

1    Q.   So would you clock in before getting your
2    supplies or after getting your supplies?
3    A.   I would get my supplies first before I
4    clocked in.
5    Q.   All right.  And then you would go into the
6    break room.  Would you normally clock in when you
7    first got into the break room, after getting your
8    supplies?
9    A.   I would get my supplies first, then go to
10   the break room; then at 5:30 I would clock in.
11   Q.   What would you do while you were sitting in
12   the break room waiting for the start of your
13   shift?
14   A.   Talking.
15   Q.   So you would socialize with other employees?
16   A.   Yes.
17   Q.   Would you put any of your items of equipment
18   or clothing on while you were in the break room?
19   A.   No.
20   Q.   Would you put on your boots at some point in
21   time before the start of your shift?
22   A.   Well, I would put on all my stuff when I'd
23   get in the work area, before I'd get on the line.

24

1    Q.   Did you wear boots or did you wear shoe
2    covers?
3    A.   Boots.
4    Q.   Would you show up to work in your boots?
5    A.   No.
6    Q.   So you would put on your boots when you got
7    to work?
8    A.   Yeah.  After I got to work.
9    Q.   Where would you keep your boots?  Would you
10   take them home with you at the end of the shift or
11   did you keep them at the plant?
12   A.   I kept them in my locker.
13   Q.   Was your locker in the break room?
14   A.   Yes.
15   Q.   In the evis break room?
16   A.   Yes.
17   Q.   Would you put on your boots while you were
18   sitting in the break room waiting for the start of
19   your shift?
20   A.   Yes.
21   Q.   So you would put your boots on before you
22   went out onto the production floor, correct?
23   A.   Yes.

25

1    Q.   Would you put on any other items before you
2    went out onto the production floor?
3    A.   No.
4    Q.   When would you put on your hair net?
5    A.   As I'm entered into...
6    Q.   So you would do that while you were walking
7    out onto the production floor?
8    A.   Uh-huh.
9    Q.   Is that yes?
10   A.   Yes.
11   Q.   All right.  Approximately what time would
12   you leave the break room to go out to the
13   production floor?
14   A.   I can't estimate.
15   Q.   Would you look at the clock to determine
16   what time you should go out to the production
17   floor?
18   A.   No.
19   Q.   Well, your shift, I think you indicated,
20   started at six; is that correct?
21   A.   I have to be on the line at six.
22   Q.   So would you look at the clock to make sure
23   that you were going out to the production area

3ac9d390-bca3-4c95-8c49-b74823a86340

26

1  before six?
2  A.  Normally I would ask somebody what time it
3  is.
4  Q.  All right.  And was there a particular time
5  before six that you would head out to the
6  production floor?
7  A.  I don't understand that.
8  Q.  You said you might ask somebody what time it
9  was.  Was that because you had a particular time
10  when you would head out to the floor?  In other
11  words, would you normally head out there at 5:30
12  or 5:55?  Was there a particular time that you
13  would normally go out onto the production floor?
14  A.  Yes.  I had to go out time enough to put my
15  gear on.
16  Q.  Would you normally head out at the same time
17  every day?
18  A.  Yes.
19  Q.  Do you know what time that was?
20  A.  I don't recall.
21  Q.  So when you would leave the break room going
22  out to the production floor, you would already
23  have your boots on, correct?

27

1  A.  Yes.
2  Q.  And then you would get up to the double
3  doors that go out to the production floor,
4  correct?
5  A.  Do what now?
6  Q.  As you were leaving the break room, there
7  are double doors through which you would enter
8  onto the production floor; is that correct?
9  A.  Yes.
10  Q.  What was the next thing you would do after
11  you passed through the double doors?
12  A.  I would put my net on before I entered.
13  Q.  And then what was the next thing you would
14  do?
15  A.  I would put the rest of my gear on.
16  Q.  So you would pass into the production area
17  and put your gear on; is that correct?
18  A.  I'd come through the double doors.  And
19  there's a section where the hangers be where you
20  can put your stuff up there so you can put it on.
21  Q.  So there were racks inside the door; is that
22  correct?
23  A.  Uh-huh.

28

1  Q.  Were there also sinks there?
2  A.  On the side.
3  Q.  And that's where you would put on your other
4  items?
5  A.  Yes.
6  Q.  Would you put on all of your items first or
7  would you do something else?  You indicated you
8  came in through the double doors and you would go
9  to start putting on your equipment; is that
10  correct?
11  A.  My PPE equipment.  I would put that on.
12  Q.  And then what would you do after you put
13  that on?
14  A.  I would get on line.
15  Q.  Approximately how long would it take you to
16  put on your various pieces of equipment before you
17  head out to the line?
18  A.  I couldn't give you a certain time.  Each
19  item, I couldn't do that.
20  Q.  How long would it take you to put on all of
21  it?
22  A.  I couldn't say.
23  Q.  Now, was there a particular position on the

29

1  line that you would start your shift?  Would you
2  start your shift at that trimmer position?
3  A.  Yes.
4  Q.  And where was that located on the evis line?
5  Was that towards the front of the line or was that
6  towards the end of the line?
7  A.  Well, if you look at it coming in, I was the
8  first one.  If you're on the right-hand side, I
9  was the first one.
10  Q.  All right.  So you were actually then
11  towards the back end of the evis line; is that
12  correct?
13  A.  No.  I was at the front, because it would be
14  on the right-hand side.
15  Q.  Okay.  I understand what you're saying.
16  A.  Coming into the double doors.
17  Q.  And what is your understanding as to what
18  time you had to be on the line?
19  A.  Six o'clock.
20  Q.  During the course of the shift, you said you
21  got two breaks; is that correct?
22  A.  Yes.
23  Q.  How would you know when it was time to go

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

30

1  out on break?
2  A.  They would let you know.
3  Q.  The supervisor would tell you it was time go
4  on break?
5  A.  Yes.
6  Q.  And would somebody come on and relieve you
7  at your position?
8  A.  No.
9  Q.  Would birds stop coming down the line?
10  A.  Yes.
11  Q.  And once the last bird passed your position
12  on the line, you could go out on break?
13  A.  Yes.
14  Q.  And can you describe for me what you would
15  do after the last bird passed your position on the
16  line?
17  A.  I would wash my hands and pass my hand
18  glove.  The chain glove, I had to put it in —
19  somebody would come around and I would drop it in
20  the pan, because they would take them up.
21  Q.  So someone would pick up your chain glove at
22  your position on the line?
23  A.  Yes.  They would come by and you would drop

31

1  it in the pan that they had.
2  Q.  Were the chain gloves provided to you out on
3  the production floor as well?
4  A.  Yes.
5  Q.  Was there a station where you would pick it
6  up on your way to your position on the line?
7  A.  Yes.
8  Q.  A table or something that they laid them out
9  on?
10  A.  Yes.
11  Q.  And I believe you said you worked with a
12  knife and scissors; is that correct?
13  A.  Yes.
14  Q.  Were you responsible for getting your knife
15  at the beginning of the shift?
16  A.  No.  Someone would come around and bring
17  them.
18  Q.  And the same thing with the scissors?
19  A.  Yes.
20  Q.  And you weren't responsible for going to a
21  knife room or something like that to pick up your
22  knife and scissors?
23  A.  No.

32

1  Q.  So after you've dropped off your chain glove
2  when you were getting off of the line, what would
3  you do next when you were going out on break?
4  A.  I would wash my hands, and then I would go
5  and take my PPE equipment off and go to break.
6  Q.  Approximately how long would it take you
7  from the time you stepped off of the line to the
8  time you left the production floor?
9  A.  I can't estimate that.
10  Q.  And how long was that break?
11  A.  15 minutes.
12  Q.  And how would you know when it was time to
13  come back from break?
14  A.  I would ask someone what time it is.
15  Q.  And what would you normally do when you got
16  out to the break room?
17  A.  Talk.
18  Q.  Socialize; is that right?
19  A.  I would conversate, talk.
20  Q.  All right.  Would you get anything to eat or
21  anything to drink?
22  A.  Sometimes I did; sometimes I didn't.
23  Q.  And then when it was time for you to come

33

1  back from break, what would you do between the
2  time that you would leave the break room and get
3  back to your position on the line?
4  A.  What you mean?
5  Q.  Well, you said that you would ask people
6  what time it was so you could keep track of the
7  time, correct?
8  A.  Yes.
9  Q.  There would come a point in time where you
10  decided you had to come back from break; is that
11  correct?
12  A.  Yes.
13  Q.  Do you know what time your break normally
14  started?
15  A.  No.
16  Q.  Do you know what time you would normally
17  leave the break room?
18  A.  I can't recall.
19  Q.  What would you do after you left the break
20  room to return from break?
21  A.  I'd do all that again, put on my PPE; then I
22  would go back to my work area and work.
23  Q.  What items would you be wearing?  Would you

3ac9d390-bca3-4c95-8c49-b74823a86340

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

34

1  be wearing your boots?
2  A.  Yes.
3  Q.  What about your hair net?  Would you be
4  wearing your hair net?
5  A.  When I enter the doors, I put my hair net
6  on.
7  Q.  You might take your hair net off when you
8  went out to the break room; is that correct?
9  A.  Talking about when I go out?
10  Q.  Yes, ma'am.  When you went out to break.
11  A.  Yes.
12  Q.  Could you wear your hair net in the break
13  room if you wanted?
14  A.  No.
15  Q.  Where would you normally take your break? in
16  the break room or outside?
17  A.  Sometimes I'd go outside; sometimes I'd go
18  in the break room.
19  Q.  If you stayed inside, could you keep your
20  hair net on?
21  A.  I always took mine off.
22  Q.  If you went outside, could you keep your
23  boots on?

35

1  A.  No.
2  Q.  You would have to take your boots off,
3  during the time that you worked at the plant?
4  A.  Yes.
5  Q.  But if you stayed inside, you could keep
6  them on?
7  A.  Inside where?
8  Q.  If you stayed inside the plant, could you
9  keep your boots on?
10  A.  Yeah, as long as you was inside the break
11  room.
12  Q.  And you indicated you would go back out to
13  the production floor and you would put your stuff
14  back on; is that correct?
15  A.  I'd put on my PPE equipment, yes.
16  Q.  Can you describe for me exactly what you
17  would do as you passed through the doors to go
18  back onto the production floor?
19  A.  I would put my hair net back on; and then
20  when I get in there, I'd go to the rack and get my
21  gear and I'd put it back on and go to the line.
22  Q.  And other than putting your items of
23  equipment or clothing back on, would you do

36

1  anything else?
2  A.  We didn't put no clothing on; just the PPE
3  equipment.
4  Q.  I'll call it PPE if that's what you want to
5  call it.  It makes no difference to me.
6  A.  That's what it was.
7  Q.  Would you put on your gloves?
8  A.  I would put all my equipment on after I get
9  back in there from break.
10  Q.  So you would put on your gloves; is that
11  correct?
12  A.  Cotton gloves and rubber gloves and chain
13  glove when they come back through.  When I get on
14  the line, they will come through and give me my
15  chain glove; then I'd put it back on.
16  Q.  So you wouldn't put on your chain glove when
17  you passed through the doors; you would get it on
18  the line; is that correct?
19  A.  Right.
20  Q.  Would you put your smock back on?
21  A.  Yes.  And the apron, the sleeves and
22  everything, after I get back in there from break.
23  Q.  All right.  When you returned from break,

37

1  would you go back to the trimmer position?
2  A.  Yes.
3  Q.  So you wouldn't go to a different position
4  on the line?
5  A.  It all depends.  Sometimes they'll switch
6  out; sometimes they don't.
7  Q.  So sometimes you might go to a different
8  position?
9  A.  Yeah, sometimes; sometimes not.
10  Q.  And in terms of what you would do before and
11  after your first break, was it pretty much the
12  same as what you would do before and after your
13  second break?
14  A.  Yes, about the same.
15  Q.  And it would take about the same amount of
16  time before and after your first and second break?
17  A.  Yes.
18  Q.  Now, when you returned from your second
19  break, would you go to a different position on the
20  line than you were stationed before your second
21  break?
22  A.  No.  It all depends.  Sometimes they would
23  switch you out; sometimes they wouldn't.

38

1   Q.   Did you have a scheduled end time for your
2   shift?
3   A.   Three o'clock.
4   Q.   How would you know when you were able to
5   leave the line at the end of your shift?
6   A.   A buzzer would go off.
7   Q.   Would birds stop coming down the line again?
8   A.   Yeah. I'd have to wait until the last bird
9   passed me, and then I have to -- somebody be
10  waiting there. The other shift, they be waiting
11  to take my spot. And I can't get down off the
12  line until somebody is there to relieve me.
13  Q.   So it's a walk-on/walk-off type of deal?
14  Somebody else would walk on to take your position
15  and you would walk off; is that correct?
16  A.   Yeah, after they relieve me. If nobody
17  don't come to relieve you, then you have to stay
18  there until the supervisor gets somebody to take
19  your place.
20  Q.   Do you know whether or not you would be paid
21  for that time if you had to stay and wait?
22  A.   No, I don't know.
23  Q.   Was there ever a time where you had to wait

39

1   for someone to relieve you, and afterwards, you
2   complained to your supervisor that you weren't
3   being paid for that time?
4   A.   Yes.
5   Q.   How often did that happen?
6   A.   Pretty regular.
7   Q.   That you would complain to your supervisor?
8   A.   Yes.
9   Q.   Who was your supervisor?
10  A.   Bobby Burnett.
11  Q.   And what did he do or say?
12  A.   He said he had to look over the whatcha call
13  it and see why the time wasn't right.
14  Q.   All right. So you would get your paycheck,
15  you would see it, you would believe that your
16  weren't paid properly, and you would complain to
17  him?
18  A.   Yes.
19  Q.   And were you ever paid for that extra time?
20  A.   No.
21  Q.   So any time you complained, you were not
22  paid?
23  A.   No.

40

1   Q.   You never -- did you talk to anyone other
2   than your supervisor about it?
3   A.   No. I just talked to him. I figured that's
4   who I needed to talk to.
5   Q.   And is this part of what you are claiming in
6   this lawsuit, this time?
7   A.   Yes. And not getting paid the money I've
8   worked for the hours I worked.
9   Q.   After somebody came to the line to relieve
10  you, what would you do after you left the line but
11  before you left the production area?
12  A.   After I left the line?
13  Q.   Yes, ma'am.
14  A.   Well, I would reach over and wash my hands,
15  and then I would give them the chain glove; take
16  it off and give it to the next person that's
17  taking my place. And I had to turn in the knives
18  and the scissors because we had to turn that in
19  each day.
20  Q.   And would someone come around to collect the
21  knife and scissors?
22  A.   Yes.
23  Q.   And then what would you do after that?

41

1   A.   I would get down off the line and I would
2   take my equipment off.
3   Q.   So you would take off your apron; is that
4   correct?
5   A.   Yes.
6   Q.   Your gloves and your sleeves?
7   A.   My cotton gloves and my rubber gloves, I
8   would take them off, and my sleeves and my arm
9   guard and my hair net and all.
10  Q.   And then you would leave the production
11  area?
12  A.   Yeah. I would leave the area over there
13  where we have all the equipment hanging.
14  Q.   Would you still be wearing your boots?
15  A.   No. I would take my boots off when I got
16  ready to -- sometimes I would take them off in
17  there. Sometimes I'd go out and just take them
18  off in the break room.
19  Q.   But you would keep your boots on while you
20  were still inside the actual production area,
21  inside the double doors where all the machines
22  were? You wouldn't take your boots off in that
23  area, would you?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

42

1   A.   Sometimes I did.
2   Q.   Wouldn't your feet get wet?
3   A.   Yes.
4   Q.   Were you supposed to take your boots off
5   inside the production area?
6   A.   No.  After you go -- after you get through
7   pulling your stuff off over in that area where you
8   hang the stuff at, you go through the double
9   doors.  It's like a little section closed off from
10  the work area.  And I'd take them off right there.
11  Q.   Approximately how long would it take you
12  from the time you left the line at the end of your
13  shift to the time that you exited the production
14  area through those double doors?
15  A.   I can't say.
16  Q.   And after you exited the production area
17  through the double doors, what would you do next?
18  A.   After I what now?
19  Q.   After you left the production area, you've
20  exited through those double doors into the
21  hallway, what would you do next?
22  A.   I would go to the break room.  Talking about
23  on the way home?

43

1   Q.   Yes, ma'am.
2   A.   I would go to the break room and I would get
3   my stuff out of my locker and stuff, use the
4   bathroom if I have to use it, and I would clock
5   out.
6   Q.   Now, at the time you worked at the plant,
7   did you take your smock home with you?
8   A.   No.
9   Q.   Was there a bin where you would throw your
10  smock when you were done with it?
11  A.   Yes.
12  Q.   So you didn't have to take your smock home
13  and wash it; is that right?
14  A.   No.  I would get an apron every morning.
15  Q.   All right.  Now, if I say "smock," does that
16  mean something different to you than an apron?
17  A.   I called it an apron.
18  Q.   Okay.  Did you wear like a white smock every
19  day?
20  A.   Oh, you're talking about the coat.  Jacket I
21  call it.
22  Q.   Okay.
23  A.   That's why you threw me off when you said

44

1   that.  Yeah, we had to wash it.
2   Q.   You would take that home and wash it?
3   A.   Yes.
4   Q.   Now, do you have an understanding as to how,
5   when the time for which the company was actually
6   paying you, when that started?
7   A.   From six to three.
8   Q.   Do you have an --
9        MR. GOULD:  Strike that.
10  Q.   So you believe that you were paid from six
11  to three?
12  A.   Uh-huh.
13  Q.   And that time was fixed; is that correct?
14  A.   Yes.
15  Q.   So you weren't paid from the time you swiped
16  in to the time you swiped out; is that correct?
17  A.   Well, we had to be swiped with a master
18  card.  The supervisor used a master card to swipe
19  you in.
20  Q.   And where would these supervisors swipe the
21  master card?  Do you know?
22  A.   No.
23  Q.   Did you ever watch the supervisor swipe the

45

1   master card?
2   A.   No.
3   Q.   And at the end of a shift, is it your
4   understanding that the supervisor would swipe a
5   master card as well?  Is that what you're saying?
6   A.   I don't know.
7   Q.   But you weren't paid from the time you
8   clocked in until the time you swiped out; is that
9   correct?
10  A.   I was paid for eight hours of work.
11  Q.   I don't think there's any more questions I
12  have for you, ma'am.
13  A.   Okay.
14       MR. CAMP:  I've got a few.
15  BY MR. CAMP:
16  Q.   You said that you rotated, that you would
17  rotate occasionally?
18  A.   Yes.
19  Q.   How often would you do that?  Would that be
20  daily?  Would you rotate within other positions
21  within evis daily?
22  A.   Yes.
23  Q.   How many different positions would you

## 46

1  rotate into?
2  A.  It would depend on where they wanted you.
3  Q.  Where who wanted you?
4  A.  The supervisor.  Where you were needed.
5  Q.  Do you know why they would need you
6  somewhere else at some point?  Did they tell you
7  why they were moving you, or did they just move
8  you?
9  A.  They would just move you.
10  Q.  So have you worked every position in evis?
11  A.  No, not every.
12  Q.  How many positions would you think?
13  A.  Three.
14  Q.  And you said that you can't wear your boots
15  outside?
16  A.  Uh-huh.
17  Q.  So you would have to take those off at the
18  end of the day before going home?
19  A.  Yes.
20  Q.  And you would have to put those on inside
21  the plant at the beginning of the day?
22  A.  Yes.
23  Q.  Did you ever have to sanitize those boots in

## 47

1  any way, clean them before going into production?
2  A.  (No response.)
3  Q.  A foot bath or anything like that?
4  A.  No.
5  Q.  You could just put them on and walk out into
6  the plant?
7  A.  Yes.
8  Q.  Did you ever wash any of your PPE?
9  A.  Yes.
10  Q.  What articles would you wash?  What items
11  would you wash?
12  A.  My hand guard and my sleeves.  I washed them
13  off before I, you know...
14  Q.  The hand guard is the hard one?
15  A.  Yeah.
16  Q.  And then you would wash the sleeves?
17  A.  Uh-huh.
18  Q.  You wore rubber gloves?
19  A.  Yes.
20  Q.  Did you wash those?
21  A.  No.  I'd throw those away.
22  Q.  And obtain new ones the next day?
23  A.  Yes.

## 48

1  Q.  How often did you have to wash the items
2  that you did wash?  Would you do it at the
3  beginning of the day?
4  A.  Yes.
5  Q.  On breaks?
6  A.  No.
7  Q.  Not at the end of the break?  Before you
8  went into the break room would you wash it?
9  A.  No.
10  Q.  Okay.  And when you came back from the break
11  room would you wash it?
12  A.  No, because I would hang them up.
13  Q.  Okay.  And at the end of the day would you
14  wash them before going home?
15  A.  Yes, I would wash them off.
16  Q.  Right.  You said a buzzer told you when the
17  shift was over?
18  A.  A buzzer would sound.  You know, it would
19  make a noise.  It was an alarm or whatever.  It
20  would go "beeeeeep," like that there.  Then the
21  line would stop.
22  Q.  So the buzzer would go off and you would
23  wait for the —

## 49

1  A.  The relief person.
2  Q.  The relief person.  Was this before you went
3  and took off all your clothing?
4  A.  Yes, that's before.
5  Q.  Or PPE.  Sorry.
6  A.  It's not clothing.
7  Q.  And you washed your stuff.  This buzzer goes
8  off before that, correct?
9  A.  Yes.
10  Q.  You said a lady comes around and collects
11  your knives or scissors?  Did you say that?
12  A.  Someone would come around.  It don't
13  necessarily be a lady.  Sometimes it's a woman;
14  sometimes it's a man.
15  Q.  They would collect it in what?
16  A.  It's a pan, like.
17  Q.  Does that happen after the buzzer?
18  A.  Yeah.  After the buzzer sounds and the
19  person come relieves me, then they would come
20  around.
21  Q.  And so you'd wait there?
22  A.  Until they come around to in front of my
23  booth, and then I have to drop it in the pan.

3ac9d390-bca3-4c95-8c49-b74823a86340

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

50

1    Q.   And then you would walk --
2    A.   I'll wash my hands, and then I would walk
3    down off the stand.  And then the relief person,
4    she would get up, and they would give her her
5    knife.
6    Q.   Do you have your gloves on when you wash
7    your hands?
8    A.   No.  I have to take off the chain glove.
9    Q.   So you said you wash your hands.  What are
10   you washing?
11   A.   The gloves will be on.  The chain glove will
12   be off.  I hand that to them.  Then the rubber
13   gloves, I'll have them on.  And I'll just reach up
14   and wash, like that (demonstrating).
15   Q.   So you're not washing your hands; you're
16   washing the rubber gloves?
17   A.   Yes.
18   Q.   And then you would walk --
19   A.   I'd walk to the area to take my PPE
20   equipment off.
21   Q.   And then you would wash your apron?
22   A.   Uh-huh.
23   Q.   And your sleeves?

51

1    A.   Yeah.
2    Q.   You would go out the double doors?
3    A.   Yes.
4    Q.   And you would have to take off your boots?
5    A.   Yes.
6    Q.   You could take your smock home; is that what
7    we said?
8    A.   Yes.
9    Q.   And then --
10   A.   I would wash that.
11   Q.   You would wash that at the house?
12   A.   Yes.
13   Q.   Okay.  You don't remember what year --
14   A.   No, I don't remember.
15   Q.   Do you have a nickname?
16   A.   Several.
17   Q.   Are they nicknames you can tell us?
18   A.   Dee.
19   Q.   Dee?
20   A.   I have that tattooed on me.
21   Q.   Okay.  We'll just have to work to try to
22   find you.
23   A.   Okay.

52

1    Q.   That's all I have.
2         MR. GOULD:  I don't have any other
3    questions.  Thank you for your time.
4
5         (The deposition was concluded.)

53

1              C E R T I F I C A T E
2
3    STATE OF ALABAMA
4    BARBOUR COUNTY
5
6         I hereby certify that the above and
7    foregoing deposition was taken down by me in
8    stenotype and the questions and answers thereto
9    were transcribed by means of computer-aided
10   transcription, and that the foregoing represents
11   a true and correct transcript of the testimony
12   given by said witness upon said hearing.
13        I further certify that I am neither of
14   counsel, nor kin to the parties to the action,
15   nor am I in anywise interested in the result of
16   said cause.
17
18
19        CYNTHIA M. NOAKES, Commissioner
20        Certified Court Reporter,
21        ACCR #327 - Expires 09/30/2008
22
23        Commission Expires 07/08/2009

**TAB 38**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


NO.:  2:06-CV-1081-MEF


BETTY ANN BURKS, et al.,

      Plaintiff(s),

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

      Defendant(s).



DEPOSITION OF

RENNA MERRILL

      JOB NO. 1101-58403



BEFORE:    Victoria M. Castillo

          Certified Court Reporter and

          Notary Public

          ACCR# 17, Expires 9/30/2008

c449b5bc-7ba1-4a11-b670-249edce92ef7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

**2**

1    In accordance with Rule 5(d) of
2    The Alabama Rules of Civil Procedure, as Amended,
3    effective May 15, 1988, I, Victoria M. Castillo, am
4    hereby delivering to HOWARD A. ROSENTHAL, ESQ. the
5    original transcript of the oral testimony taken on
6    the 22nd day of May, 2008, along with exhibits.
7        Please be advised that this is
8    the same and not retained by the Court Reporter,
9    nor filed with the Court.
10
11       S T I P U L A T I O N
12
13       IT IS STIPULATED AND AGREED, by
14   and between the parties through their respective
15   counsel, that the deposition of RENNA MERRILL may
16   be taken before Victoria M. Castillo, Commissioner,
17   at WILLIAMS, POTTHOFF, WILLIAMS & SMITH, 125 South
18   Orange Avenue, Eufaula, Alabama 36027 on the 22nd
19   day of May, 2008.
20       IT IS FURTHER STIPULATED AND
21   AGREED that the signature to and the reading of the
22   deposition by the witness is waived, the deposition
23   is said to have the same force and effect as if

**4**

1        I N D E X
2
3    EXAMINATION BY:           PAGE NUMBER:
4    Mr. Fry                      6, 30
5    Mr. Underwood                   29
6
7    EXHIBITS:                 PAGE NUMBER:
8    Merrill Exhibit 1               25
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**3**

1    full compliance had been had with all laws and
2    rules of Court relating to the taking of
3    depositions.
4        IT IS FURTHER STIPULATED AND
5    AGREED that it shall not be necessary for any
6    objections to be made by counsel to any questions,
7    except as to form or leading questions, and that
8    counsel for the parties may make objections and
9    assign grounds at the time of trial, or at the time
10   said deposition is offered in evidence, or prior
11   thereto.
12       IT IS FURTHER STIPULATED AND
13   AGREED that notice of filing of the deposition by
14   the Commissioner is waived.
15
16
17
18
19
20
21
22
23

**5**

1        A P P E A R A N C E S
2
3    FOR THE PLAINTIFF(S):
4        Carl E. Underwood, III, Esq.
5        THE COCHRAN FIRM
6        163 West Main Street
7        Dothan, Alabama 36302
8
9        M. John Steensland, III, Esq.
10       PARKMAN, ADAMS & WHITE
11       739 West Main Street
12       Dothan, Alabama 36301
13
14   FOR EQUITY GROUP EUFAULA DIVISION
15       Gary D. Fry, Esq.
16       Pelino & Lentz
17       One Liberty Place
18       Thirty-Second Floor
19       1650 Market Street
20       Philadelphia, Pennsylvania 19103
21
22       **********************
23

6

1          I, Victoria M. Castillo, a Court
2    Reporter of Montgomery, Alabama, acting as
3    Commissioner, certify that on this date, as
4    provided by the Alabama Rules of Civil Procedure
5    and the foregoing stipulation of counsel, there
6    came before me at WILLIAMS, POTTHOFF, WILLIAMS &
7    SMITH, 125 South Orange Avenue, Eufaula, Alabama
8    36027, commencing at 3:19 p.m., RENNA MERRILL, in
9    the above cause, for oral examination, whereupon
10   the following proceedings were had:
11
12          RENNA MERRILL,
13      being first duly sworn, was examined and
14          testified as follows:
15
16   EXAMINATION BY MR. FRY:
17      Q.   Good afternoon, Ms. Merrill.  How are
18   you?
19      A.   A little hungry.
20      Q.   My name is Gary Fry.  I am one of the
21   lawyers representing Equity Group Eufaula, the
22   folks that operate the plant in Baker Hill, and we
23   have asked you to come here today to put some

7

1    questions to you concerning a lawsuit which you and
2    some other folks have filed against the company.
3    Have you ever been in a deposition before?
4       A.   No.
5       Q.   Briefly, I'm going to be asking you
6    some questions, and you will be giving me some
7    answers, and Victoria, our court reporter, will be
8    taking down what we say.  If you don't understand
9    any of my questions, please let me know and I will
10   try and rephrase it so you will understand it.  All
11   right?
12      A.   Okay.
13      Q.   If you don't hear anything I say,
14   similarly, let me know and I will repeat it.  If
15   you answer a question, I will assume that you heard
16   it and understood it and answered truthfully.
17   Okay?
18      A.   Uh-huh.
19      Q.   The only other requests that I have
20   are that you -- in response to any question I have,
21   make it a verbal response and don't nod or shake
22   your head because she can't take that down, and
23   let's not try and talk over one another.  Okay?

8

1       A.   Yes.
2       Q.   What's your home address?
3       A.   79 County Road 36, Eufaula, Alabama.
4       Q.   What's your date of birth?
5       A.   11/30/47.
6       Q.   Are you presently employed?
7       A.   Yes.
8       Q.   By whom?
9       A.   Keystone, Equity Group.
10      Q.   How long have you worked for Equity?
11      A.   Be ten years August 6th.
12      Q.   So you started in 1998?
13      A.   Yes.
14      Q.   When you started, the plant was run
15   by CP, correct?
16      A.   Yes.
17      Q.   What's your present job at the plant?
18      A.   Debone.
19      Q.   Do you work on the debone line?
20      A.   Yes.
21      Q.   What shift?
22      A.   First shift.
23      Q.   What are your hours, when do you

9

1    start?
2       A.   7:30.
3       Q.   Until when?
4       A.   4:30.
5       Q.   That's 7:30 a.m. to 4:30 p.m.
6       A.   Yes.
7       Q.   What do you do in the debone line?
8       A.   Put the meat through the skinner.
9       Q.   You do any other jobs on the line?
10      A.   Check the breast meat.
11      Q.   How long have you worked on the
12   debone line?
13      A.   Ten years.
14      Q.   That's the only job you've ever had
15   at the plant?
16      A.   Yes.
17      Q.   Who is your supervisor?
18      A.   Shawn.
19      Q.   Pardon?
20      A.   Shawn.
21      Q.   Do you know Shawn's last name?
22      A.   No.
23      Q.   What's your present rate of pay?

c449b5bc-7ba1-4a11-b670-249edce92ef7

10

1    A.    $10 an hour.
2    Q.    How many hours do you work a week?
3    A.    Forty.
4    Q.    Monday through Friday?
5    A.    Yes, sometimes Saturdays.
6    Q.    What's your understanding of what
7    your claim is in this lawsuit?
8    A.    To get what is due my money, to get
9    what is due to me.
10   Q.    Can you expand on that a little bit?
11   A.    For the hours that I put in.
12   Q.    I take it from what you're trying to
13   tell me that you believe you've worked some hours
14   for which you weren't paid; is that correct?
15   A.    Yes.
16   Q.    And what were you doing during this
17   time for which you weren't paid?
18   A.    Working the debone.  I worked like in
19   the combos.  I work trim table -- not the trim
20   table, the -- what they call it -- the other thing,
21   the -- I can't think of the name of it now.  But I
22   do different jobs.  So if I'm doing different jobs,
23   I should be getting paid for those jobs because I

11

1    was only assigned to one.
2    Q.    You have a claim for doing these
3    other jobs, is that what you're telling me?
4    A.    No, for what I worked for.  That was
5    my thing is what I worked for.
6    Q.    I'm trying to get a grasp on what
7    work you did which you believe you weren't paid
8    for.  Can you explain that to me?
9    A.    No.
10   Q.    How did you hear about the lawsuit?
11   A.    I got a letter in the mail.
12   Q.    From whom?
13   A.    The Cochran Law Firm.
14   Q.    Did you talk about the lawsuit with
15   anyone besides the lawyers?
16   A.    No.
17   Q.    Are you a member of the Union?
18   A.    No.
19   Q.    Did you review any papers or
20   documents in preparation for coming here today?
21   A.    No.
22   Q.    Did you speak with anybody about your
23   deposition besides your lawyers?

12

1    A.    No.
2    Q.    Can you identify for me now the items
3    of clothing or equipment that you wear on your job
4    in the debone department?
5    A.    Hair net, smock, apron, sleeves,
6    cotton liners, and blue gloves, and black boots.
7    Q.    So let me see if I have the list.
8    Hair net, smock, apron, sleeves -- those are the
9    blue plastic sleeves?
10   A.    Yes.
11   Q.    Gloves and liners?
12   A.    Yes.
13   Q.    And boots?
14   A.    Yes.
15   Q.    Anything else?
16   A.    No.
17   Q.    Which of these items do you believe
18   you are required to wear?
19   A.    All of them.
20   Q.    Does everybody in the debone
21   department wear the identical same things you wear?
22   A.    Yes.
23   Q.    All the time?

13

1    A.    Yes.
2    Q.    Am I correct that each of these items
3    that you identified are issued to you by the
4    company?
5    A.    Yes.
6    Q.    Which of these items do you get on a
7    daily basis?
8    A.    Cotton liners, sleeves, blue gloves,
9    hair nets.
10   Q.    What about a smock?
11   A.    And a smock.
12   Q.    When do you put these items on?
13   A.    Inside debone.
14   Q.    That's where.  When do you put them
15   on?
16   A.    Before you go on the floor.
17   Q.    You mean before you go to your
18   workstation?
19   A.    Yes.
20   Q.    When you put them on, am I correct
21   that you put them on when you are on the production
22   floor?
23   A.    Right.

c449b5bc-7ba1-4a11-b670-249edce92ef7

14

1    Q.    And you are supposed to be on your
2  line, ready to go at 7:30, correct?
3    A.    Yes.
4    Q.    What time do you enter the production
5  floor in order to put these items on?
6    A.    7:30.
7    Q.    How long does it take you to put them
8  on?
9    A.    About eight minutes.
10    Q.    So you're not going to the production
11  floor until 7:30, and then you take eight minutes
12  to put them on?
13    A.    Yes.
14    Q.    And you're still there at the line
15  when the birds start coming through?
16    A.    Yes. Sometimes they are a little
17  late, but you have to be on the line.
18    Q.    Does your job require you to use a
19  knife or scissors?
20    A.    No.
21    Q.    Do you use any other tools or
22  equipment?
23    A.    No.

15

1    Q.    How many breaks do you get during
2  your shift?
3    A.    Two.
4    Q.    And how long are they?
5    A.    Well, I really don't have a clock, so
6  I will say about 20 minutes.
7    Q.    Where do you take your breaks?
8    A.    In the break area.
9    Q.    The debone break room?
10    A.    Yes.
11    Q.    Are your breaks paid?
12    A.    No.
13    Q.    How do you know when it's time for
14  you to take your break, your first break?
15    A.    I see the line going down.
16    Q.    And you can leave whenever you see
17  them leaving?
18    A.    No, because I have to wait for the
19  last piece of meat to come past me.
20    Q.    You're at the end of the line?
21    A.    Yes.
22    Q.    At the very end?
23    A.    Not at the very end because there's a

16

1  bone checker at the end. But as far as the line,
2  I'm at the very end. There's a bone checker after
3  me.
4    Q.    If when you start at 7:30, when you
5  start at 7:30, when is the time of your first
6  break?
7    A.    10:15.
8    Q.    Do you rotate on that line during the
9  day?
10    A.    No.
11    Q.    So you're one of the last persons to
12  leave the line to go to break?
13    A.    Yes.
14    Q.    And what do you have to do to go on
15  break, what do you have to take off?
16    A.    Smock, apron, sleeves, blue gloves,
17  cotton liners.
18    Q.    Do you have to wash them before you
19  take them off?
20    A.    Yes.
21    Q.    When you first put them on when you
22  entered at 7:30, do you wash them?
23    A.    Yes.

17

1    Q.    How long does it take you to wash
2  those items and take them off?
3    A.    About eight minutes.
4    Q.    When do you know it's time to go back
5  to work?
6    A.    When you see everybody else go in.
7    Q.    Take me through what you do when you
8  go back into the --
9    A.    When you go in, you go in like a
10  little room. You have to walk through the foam
11  with your boots on, and you are going to put your
12  smock and apron and your PPE back on, and then you
13  go to the sink and wash them.
14    Q.    How long does that take you?
15    A.    About eight minutes.
16    Q.    How do you get to the plant each day?
17    A.    I drive.
18    Q.    And what time do you usually try and
19  get there?
20    A.    About 6:30.
21    Q.    An hour before your shift?
22    A.    Yes.
23    Q.    Are you required to get there an hour

c449b5bc-7ba1-4a11-b670-249edce92ef7

18

```
 1   before your shift?
 2        A.   No.
 3        Q.   You just do it?
 4        A.   Just do it.
 5        Q.   Do you have to clear security to get
 6   into the property?
 7        A.   Yes.
 8        Q.   What do you have to do?
 9        A.   Show a picture ID.
10        Q.   Do you have a sticker for your car?
11        A.   Yes.  I don't have a sticker, I
12   have -- they give you like a little card for your
13   window.
14        Q.   You just show the guy in the guard
15   shack your card?
16        A.   Your picture ID, and they give you
17   the card -- write your name down and give you a
18   card.
19        Q.   Have you ever been searched in order
20   to get into the plant?
21        A.   No.
22        Q.   Have you been searched when you left
23   the plant?
```

19

```
 1        A.   No.
 2        Q.   Do you have to stop when you leave
 3   the plant?
 4        A.   To turn the ID back in.
 5        Q.   To your knowledge if you would get a
 6   sticker for your car, would they just wave you
 7   through?
 8        A.   Yes.
 9        Q.   Is there some reason why you haven't
10   done that?
11        A.   You don't have to time to go over
12   there.  You have to go over to HR to get it.  You
13   have to go to another building.
14        Q.   And you just don't haven't done it?
15        A.   No, I just don't have the time.  I
16   don't have enough time to get over there.
17        Q.   Once you arrived at the plant at
18   6:30, take me through what you do for the next
19   hour?
20        A.   Sit outside and wait until it's time
21   to go to work.  I clock in and just sit outside.
22        Q.   Well, you have to go to supply, don't
23   you?
```

20

```
 1        A.   Yes.
 2        Q.   Can you go to the supply room as
 3   early as 6:30?
 4        A.   Yes.
 5        Q.   So there is no line at 6:30, is
 6   there?
 7        A.   No, not at 6:30.
 8        Q.   Once you clock in and go to supply,
 9   then you just go and sit until 7:30 when you go
10   into the production floor?
11        A.   Yes.
12        Q.   What do you do at the end of the
13   day?  Take me through the steps that you take from
14   the time you are allowed to leave the production
15   line to when you exit the building.  What do you
16   do?
17        A.   Get in my car and go home.
18        Q.   Let's break that down a little bit.
19   I take it that you're still towards the tail-end of
20   the production line?
21        A.   Yes.
22        Q.   So you're one of the last ones to
23   leave?
```

21

```
 1        A.   Yes.
 2        Q.   And you go over and you wash down?
 3        A.   I take all my stuff off -- well, I
 4   don't wash it down in the evening.
 5        Q.   You don't, why not?
 6        A.   Because I am taking it home.  I take
 7   it home to wash it.
 8        Q.   So you just take it off and leave?
 9        A.   Yes.
10        Q.   How long does that take you?
11        A.   It takes about five minutes by the
12   time I go up the steps.
13        Q.   And what steps, what do you go up?
14        A.   Because where I'm working at you have
15   to go up steps and go down some steps, and then go
16   out.
17        Q.   How far of a walk is it from your
18   workstation until you exit the production floor in
19   debone, if you know?
20        A.   I don't know.
21        Q.   How far is the walk from the debone
22   break room to the debone production floor?
23        A.   I don't know.  I really don't know.
```

c449b5bc-7ba1-4a11-b670-249edce92ef7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

22

1    Q.    It's located right across the hall
2    from it, though, isn't it?
3    A.    Yes.
4    Q.    It's not very far, is it?
5    A.    No.
6    Q.    Have you ever heard the phrase line
7    time?
8    A.    Yes.
9    Q.    Does it have any meaning to you?
10   A.    I don't understand what you're
11   talking about.
12   Q.    Okay.  What about Master Card?
13   A.    Yes.
14   Q.    What does that mean to you?
15   A.    That's a card that they hit the clock
16   before you come out.
17   Q.    Is it your understanding that you're
18   paid on the basis of Master Card time?
19   A.    Yes.
20   Q.    Do you have any understanding as to
21   how that Master Card time works?
22   A.    Not really, no.  All I know you —
23   it's still in the production area, and they just

23

1    hit the Master Card.  I have seen it, the Master
2    Card.  And I know she go in there and swipe it.
3    Q.    Are you in a position to be able to
4    see when she swipes the Master Card?
5    A.    If I'm in the break room.
6    Q.    When you say "she", is that your
7    supervisor?
8    A.    No.
9    Q.    Who swipes the Master Card to end the
10   day?
11   A.    I think she's the assistant
12   superintendent.
13   Q.    And sometimes you are in the break
14   room when you see them swipe the Master Card?
15   A.    We are on line to clock out.
16   Q.    And that's when you see her swipe the
17   Master Card?  Have you ever had occasion to
18   complain to any of your supervisors or to payroll
19   about any errors in your paycheck?
20   A.    No.
21   Q.    Do you keep track of the hours you
22   work there?
23   A.    Yes.

24

1    Q.    How do you do that?
2    A.    I add it up.
3    Q.    Do you keep notes?
4    A.    Yes.
5    Q.    Do you have any of those notes?
6    A.    No.
7    Q.    What do you do with them?
8    A.    Scribble down on paper.
9    Q.    Do you keep it weekly?
10   A.    No, just sometimes.
11   Q.    And on those occasions that you keep
12   those notes, why do you do it?
13   A.    Especially if I leave early.
14   Q.    Pardon?
15   A.    When I leave early, I like to keep up
16   with my own hours.
17   Q.    You leave early sometimes?
18   A.    Yes.
19   Q.    And the company has no problem with
20   you leaving early?
21   A.    No, I'm a diabetic.
22   Q.    But other than those little notes
23   that you just described, you've never kept any sort

25

1    of diary or notebook with respect to what you've
2    done there and the hours you've worked?
3    A.    No.
4    Q.    Have you made any calculations with
5    respect to what you think you're owed in this
6    lawsuit?
7    A.    No.
8    Q.    When you work on Saturdays, are you
9    paid overtime at time-and-a-half?
10   A.    Yes.
11   Q.    Have you ever had any complaints
12   about your overtime and how it was computed?
13   A.    No.
14   Q.    Have you ever been disciplined for
15   any rule infraction?
16   A.    No.
17         MR. FRY:  Can we mark this
18   Merrill Exhibit 1?
19         (WHEREUPON, a document was marked
20         as Merrill Exhibit 1 and is
21         attached to the original
22         transcript.)
23   Q.    (Mr. Fry)  Ms. Merrill, I'm showing

c449b5bc-7ba1-4a11-b670-249edce92ef7

26

1  you a document which we have marked as Merrill
2  Exhibit 1, which is a document that's captioned
3  Declaration, and your name is printed in the
4  Paragraph No. 1. Would you take a minute and look
5  at this for me and let me know when you are
6  finished?
7         (Plaintiff reviews Merrill
8         Exhibit 1.)
9         MR. UNDERWOOD: Have you looked
10 at it?
11        THE DEPONENT: Uh-huh.
12        MR. UNDERWOOD: She's ready.
13 Q.   (Mr. Fry) Ms. Merrill, is that your
14 signature on Page 3?
15 A.   Yes.
16 Q.   Do you recall signing this document?
17 A.   No.
18 Q.   Do you recall ever reading this
19 document?
20 A.   No.
21 Q.   You didn't prepare it, I gather?
22 A.   No.
23 Q.   Do you know who did?

27

1  A.   No.
2  Q.   The only questions I have relate to
3  Paragraph 10. Do you have it in front of you?
4  A.   Yes.
5  Q.   I am going to read the second full
6  sentence. Quote, numerous employees have expressed
7  their desire to join this litigation, but have not
8  done so to date because of fear of retaliation by
9  Defendant and its managers, closed quote. Do you
10 see that?
11 A.   Paragraph 10?
12 Q.   Yes, ma'am.
13        MR. UNDERWOOD: That's it right
14 there.
15 A.   Okay.
16 Q.   (Mr. Fry) Do you see the sentence?
17 A.   Uh-huh.
18 Q.   You have to say yes or no?
19 A.   Yes.
20 Q.   Do you have any information about
21 that allegation?
22 A.   No.
23 Q.   Do you know of any -- any employees

28

1  who have refused to join this litigation because of
2  fear of retaliation?
3  A.   No.
4  Q.   The second sentence in that paragraph
5  reads -- to that end, Defendant and its managers
6  have attempted to discourage and/or intimidate my
7  coworkers from joining this lawsuit by issuing both
8  expressed and implied threats involving job
9  security, period, closed quote. Do you see that?
10 A.   Yes.
11 Q.   Do you have any information about
12 that allegation?
13 A.   No.
14 Q.   Do you know any of your coworkers who
15 have been threatened if they join this lawsuit?
16 A.   No.
17 Q.   Do you know of any managers at Equity
18 who have attempted to discourage or intimidate any
19 of your coworkers with respect to this lawsuit?
20 A.   No.
21 Q.   Have you been intimidated or
22 discouraged in any way by anybody at Equity to join
23 this lawsuit?

29

1  A.   No.
2  Q.   Do you know where this document came
3  from?
4  A.   No.
5         MR. FRY: Thank you.
6         MR. UNDERWOOD: Are you through
7  with her?
8         MR. FRY: Yes.
9
10 EXAMINATION BY MR. UNDERWOOD:
11 Q.   Ms. Merrill, your start time is 7:30,
12 right, you have to be on the line at 7:30?
13 A.   Yes.
14 Q.   The birds are rolling at 7:30, right?
15 A.   Yes.
16 Q.   And if you've not on the line at
17 7:30, you are going to get written up, aren't you?
18 A.   Yes.
19 Q.   So when you testified a while ago
20 that you were putting on your PPE at 7:30, that's
21 not accurate, is it? You are actually putting it
22 on a little bit before 7:30?
23 A.   Before 7:30.

c449b5bc-7ba1-4a11-b670-249edce92ef7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

30

1    Q.    And you don't get paid until you walk
2    on that line at 7:30; is that right?
3    A.    Right.
4    Q.    So the time that you're putting on
5    that PPE you're not getting paid for?
6    A.    No.
7    Q.    And that's what you're here claiming
8    in this lawsuit, isn't it?
9    A.    Yes.
10            MR. FRY:  Objection.
11    Q.    (Mr. Underwood)  Let me rephrase that
12    then.  Are you claiming in this lawsuit the time
13    that we just talked about that you didn't get paid
14    for putting on your PPE?
15    A.    Yes.
16            MR. UNDERWOOD:  That's all I
17    have.
18
19    EXAMINATION BY MR. FRY:
20    Q.    Ms. Merrill, now that your lawyer has
21    told you what your claim is --
22            MR. UNDERWOOD:  Object to the
23    form.  Now he's making obtuse statements.  Let's go

31

1    ahead.
2            MR. FRY:  Just let me finish my
3    question.  Then you can object.
4            MR. UNDERWOOD:  When you ask a
5    question, I will let you finish it.  When you want
6    to make a statement, I will make my objection.
7    Q.    (Mr. Fry)  Ms. Merrill, now that your
8    lawyer has told you what the claim is --
9            MR. UNDERWOOD:  Object to the
10    form of the question.
11    Q.    (Mr. Fry)  -- let me ask you, when
12    did you realize that that was what your claim is?
13    A.    I don't understand your statement.
14    Q.    When did you realize, or when did
15    you come to the knowledge, that your claim in this
16    case was for the time that you took to put on and
17    take off your PPE?
18    A.    I still don't understand what you are
19    saying.
20    Q.    You just answered your lawyer's
21    question that your claim here involves a claim for
22    the time you spent putting on and taking off your
23    PPE, correct?

32

1    A.    Yes.
2    Q.    When did you come to that realization
3    that that is what your claim is?
4    A.    It would still be the realization
5    that I don't get paid -- I want to get paid for my
6    time for putting on and taking off.
7    Q.    In response to your lawyer's
8    question, again, you said now that -- you enter the
9    production floor a little bit before 7:30 to put on
10    your PPE?
11    A.    Yes.
12    Q.    How many minutes before do you go on
13    the floor?
14    A.    You have to go -- I go on the floor
15    at least about five minutes before I put on the
16    PPE.
17    Q.    So it takes you about five minutes to
18    put it on; is that correct?
19    A.    To get to where you have to put it on
20    at.
21    Q.    Let me --
22    A.    You have to walk to the hangers.
23    Q.    You're in the debone break room.

33

1    Okay?
2    A.    Uh-huh.
3    Q.    What time do you enter the debone
4    production floor in order to get ready for your
5    7:30 shift?
6    A.    About five minutes before 7:30 I have
7    to go in.
8            MR. FRY:  Thank you.
9            MR. UNDERWOOD:  Is that it?
10            MR. FRY:  Yes.
11            MR. UNDERWOOD:  You are good to
12    go.
13            3:50 p.m.
14    ************************
15    FURTHER DEPONENT SAITH NOT
16
17
18
19
20
21
22
23

c449b5bc-7ba1-4a11-b670-249edce92ef7

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

34

```
1              CERTIFICATE
2
3   STATE OF ALABAMA
4   AT LARGE
5
6          I hereby certify that the above
7   and foregoing deposition was taken down by me in
8   stenotype and the questions and answers thereto
9   were transcribed by means of computer-aided
10  transcription and that the foregoing represents a
11  true and correct transcript of the testimony given
12  by said witness upon said deposition.
13         I further certify that I am
14  neither of counsel nor of kin to the parties to the
15  action, nor am I in anywise interested in the
16  result of said cause.
17
18
19
20
21
    _____
22  Victoria M. Castillo, Certified Court Reporter
    ACCR# 17, Expires 9/30/2008
23  Commissioner and Notary Public
```

c449b5bc-7ba1-4a11-b670-249edce92ef7

**TAB 39**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


CASE NUMBER:  2:06-CV-01081-MEF-DRB


BETTY ANN BURKS,

et al.,

     Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

     Defendant.


BEFORE:

     Cynthia M. Noakes, Commissioner

     and Certified Court Reporter


DEPOSITION TESTIMONY OF

GREG MILLS


* * * * * * * * * * * * * * * * * * * * * * * * * * * *

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

**2**

1         S T I P U L A T I O N

2

3         IT IS STIPULATED AND AGREED by and

4    between the parties through their respective

5    counsel, that the deposition of GREG MILLS may be

6    taken before Cynthia M. Noakes, Court Reporter,

7    at the Law Offices of WILLIAMS, POTTHOFF,

8    WILLIAMS & SMITH, 125 South Orange Avenue,

9    Eufaula, Alabama 36027, on the 11th day of June,

10   2008.

11        IT IS FURTHER STIPULATED AND AGREED

12   that the signature to and the reading of the

13   deposition by the witness is not waived, the

14   deposition to have the same force and effect as

15   if full compliance had been had with all laws and

16   rules of Court relating to the taking of

17   depositions.

18        IT IS FURTHER STIPULATED AND AGREED

19   that it shall not be necessary for any objections

20   to be made by counsel to any questions except as

21   to the form or leading questions, and that

22   counsel for the parties may make objections and

23   assign grounds at the time of the trial, or at

**3**

1    the time said deposition is offered in evidence,

2    or prior thereto.

3         IT IS FURTHER STIPULATED AND AGREED

4    that the notice of filing of the deposition by

5    the Court Reporter is waived.

6

7

8

9

10

11

12

13

14

15

16

17   *****************************************

18

19

20

21

22

23

**4**

1                    INDEX

2    EXAMINATION BY:          PAGE NUMBER:

3    MR. WIGGINS              12-227

4

5

6              EXHIBITS:

7    PLAINTIFFS'         PAGE NUMBER:

8    Plaintiffs' Exhibit No. 1        47

9    Plaintiffs' Exhibit No. 2        48

10   Plaintiffs' Exhibit No. 3        22

11   Plaintiffs' Exhibit No. 4        50

12   Plaintiffs' Exhibit No. 5        55

13   Plaintiffs' Exhibit No. 6        61

14   Plaintiffs' Exhibit No. 7        67

15   Plaintiffs' Exhibit No. 8        69

16   Plaintiffs' Exhibit No. 9        84

17   Plaintiffs' Exhibit No. 10

18   Plaintiffs' Exhibit No. 11       114

19   Plaintiffs' Exhibit No. 12       77

20   Plaintiffs' Exhibit No. 13       116

21   Plaintiffs' Exhibit No. 14       116

22   Plaintiffs' Exhibit No. 15       118

23   Plaintiffs' Exhibit No. 16       10

**5**

1              INDEX (continued)

2

3    Plaintiffs' Exhibit No. 17       11

4    Plaintiffs' Exhibit No. 18       11

5    Plaintiffs' Exhibit No. 19       11

6    Plaintiffs' Exhibit No. 20       11

7    Plaintiffs' Exhibit No. 21       17

8    Plaintiffs' Exhibit No. 22       30

9    (All exhibits were retained

10   by Plaintiffs' attorneys)

11   Colloquy                 227-232

12

13   Reporter's Certificate       233

14

15

16

17

18   *****************************************

19

20

21

22

23

6

```
1           APPEARANCES
2
3   ON BEHALF OF THE PLAINTIFFS:
4       MR. ROBERT L. WIGGINS, JR.
5       MS. CANDIS A. MCGOWAN
6       MR. JACOB A. KISER
7       WIGGINS, CHILDS,
8       QUINN & PANTAZIS, LLC
9       ATTORNEYS AT LAW
10      The Kress Building
11      301 19th Street North
12      Birmingham, Alabama 35203
13      (205) 314-0500
14
15      MR. ROBERT J. CAMP
16      THE COCHRAN FIRM
17      ATTORNEYS AT LAW
18      505 North 20th Street
19      Suite 825
20      Birmingham, Alabama 35203
21
22   **************************
23
```

7

```
1       APPEARANCES (continued)
2
3   ON BEHALF OF THE DEFENDANT:
4       MR. HOWARD A. ROSENTHAL
5       MR. MALCOLM S. GOULD
6       PELINO & LENTZ
7       ATTORNEYS AT LAW
8       One Liberty Place
9       1650 Market Street
10      Thirty-Second Floor
11      Philadelphia, Pennsylvania 19103
12      (215) 665-1540
13
14   *****************************
15
16      I, CYNTHIA M. NOAKES, a Certified
17   Court Reporter of Eufaula, Alabama, acting as
18   Commissioner, certify that on this date, as
19   provided by the Alabama Rules of Civil Procedure
20   and the foregoing stipulation of counsel, there
21   came before me at the Law Offices of WILLIAMS,
22   POTTHOFF, WILLIAMS & SMITH, 125 South Orange
23   Avenue, Eufaula, Alabama 36027, beginning at 9:10
```

8

```
1   a.m., GREG MILLS, witness in the above cause, for
2   oral examination, whereupon the following
3   proceedings were had:
4
5           GREG MILLS,
6   being first duly sworn, was examined and
7       testified as follows:
8
9       THE COURT REPORTER:  Usual
10  stipulations?
11      MR. WIGGINS:  Yes.
12      MR. ROSENTHAL:  Yes, except for reading
13  and signing.
14      MR. WIGGINS:  All right.
15      MR. ROSENTHAL:  Before we get started
16  with the deposition, I just wanted to inform
17  Plaintiffs' counsel of the documents which we are
18  producing today at their request during a
19  conversation on Friday of last week.
20      First would be various updated
21  organizational charts, some of which -- and
22  principally the fresh plant organizational chart
23  -- was revised to be updated as of April 3, 2008.
```

9

```
1       We've also produced the most current Good
2   Manufacturing Practices, which was revised as of
3   August 18 -- excuse me -- August 21, 2007.  And
4   that would be 13 pages.
5       We're producing the current Employee
6   Orientation Manual which updates the version which
7   we had previously produced.
8       We are producing redacted copies of the 2004
9   contract proposals.  The top proposal in this
10  packet are the proposals which were given by the
11  union to the company; and then there were various
12  responses by the company to the union, which were
13  revisions 1, 2, 3 and 4.  They redact everything
14  other than proposals relating to work clothing,
15  supplies, and wages.  These were the written
16  documents which were produced during the 2004
17  contract negotiations.  They don't include,
18  obviously, any proposals which were made across
19  the table and not in writing.
20      We've also produced, likewise, the 2008
21  union contract proposals, redacted, to show those
22  which relate to supplies, work clothing, and
23  wages.  And then the company's various responses
```

FREEDOM COURT REPORTING

10

1    to them during the course of the negotiations,
2    which were revisions 1, 2, 3, 4, and 5. And these
3    copies are for Plaintiffs.
4        MR. WIGGINS: Okay.
5        MS. MCGOWAN: On the union
6    negotiations, the proposals, you said they don't
7    include proposals made across the table? Were
8    they noted on there?
9        MR. ROSENTHAL: No. Those would be
10   just proposals which were made orally across the
11   table. There's no written document that reflects
12   them.
13       MR. WIGGINS: I'm going to mark all
14   these that he just gave us. All right. I'm going
15   to mark the updated organizational charts as of
16   April 3, 2008, that were just produced, as Exhibit
17   16.
18       (Plaintiffs' Exhibit No. 16 was
19       marked for identification and a
20       copy of the same is attached
21       hereto.)
22       MR. WIGGINS: The updated or revised
23   Good Manufacturing Practices policy revision dated

11

1    August 18, 2007, is being marked as Exhibit 17.
2        (Plaintiffs' Exhibit No. 17 was
3        marked for identification and a
4        copy of the same is attached
5        hereto.)
6        MR. WIGGINS: The current Orientation
7    Manual is being marked as Exhibit 18.
8        (Plaintiffs' Exhibit No. 18 was
9        marked for identification and a
10       copy of the same is attached
11       hereto.)
12       MR. WIGGINS: The 2004 contract
13   proposals and response documents are Exhibit 19.
14       (Plaintiffs' Exhibit No. 19 was
15       marked for identification and a
16       copy of the same is attached
17       hereto.)
18       MR. WIGGINS: And the 2008 contract
19   proposals and responses will be Exhibit 20.
20       (Plaintiffs' Exhibit No. 20 was
21       marked for identification and a
22       copy of the same is attached
23       hereto.)

12

1        MR. WIGGINS: Now, I've got Mr. Mill's
2    affidavit, so I'm not going to go into his
3    background. It's all clear in his affidavit, I
4    think.
5
6        EXAMINATION
7    BY MR. WIGGINS:
8    Q.   Let me show you the orientation manual that
9    was produced previously, Bates numbers E 40 to E
10   160; and I'll show you what you produced this
11   morning, Exhibit 18.
12       Are you able to tell us what's changed in
13   those documents?
14   A.   No, sir.
15   Q.   Who would be able to tell us that?
16   A.   HR department.
17   Q.   Who in the HR department?
18   A.   HR department. There's a lot of information
19   in these manuals. QA, HR. So the QA department
20   supervisor or a manager, or the HR director would
21   be the one to tell you the changes in these
22   manuals.
23   Q.   And what are their names?

13

1    A.   Kathy Gilmore in HR, or Butch White in QA.
2    Q.   And what is Ms. Gilmore's title?
3    A.   HR manager.
4    Q.   And what is Mr. Whiting's (sic) title?
5    A.   QA manager.
6        MR. ROSENTHAL: Is it Wade or Whiting?
7        THE WITNESS: White.
8    Q.   White. I'm sorry. And he's QA manager, not
9    supervisor, correct?
10   A.   QA manager.
11   Q.   Okay. Anyone else involved in revising the
12   Employee Orientation Manual?
13   A.   Not to my knowledge.
14   Q.   The manual that you've produced is a bound
15   copy in pamphlet form, correct?
16   A.   Yes.
17   Q.   Is that the way it's given to the employees?
18   A.   Yes.
19   Q.   And at what point is this employee manual,
20   Exhibit 18, provided to the employees?
21   A.   To the best of my knowledge, when they're
22   hired.
23   Q.   What role do you play in employee

FREEDOM COURT REPORTING

14

1  orientation or the use of the Employee Orientation
2  Manual?
3  A.   None.
4  Q.   Who is most knowledgeable about the employee
5  orientation and the use of the manual?
6  A.   Dante Rogers.
7  Q.   What is Dante Roger's job title?
8  A.   He's a QA manager, I do believe, and he's
9  over new hire orientation.
10 Q.   And is Ms. Gilmore, Mr. Rogers in the QA
11 shown on Exhibit 16?
12 A.   Yes.
13 Q.   All right.  What page?  This is the page
14 that has Jim Bice, Complex Human Resource Manager
15 at the top?
16 A.   Yes.
17 Q.   And it shows Dante Rogers as the human
18 resource manager, correct?
19 A.   Yes.
20 Q.   Now, you're calling him a QA manager.  Is
21 that the same thing?
22 A.   No.  Dante Rogers, HR manager; Butch White,
23 QA manager.

15

1  Q.   Oh, I wrote it down wrong.  I misunderstood
2  you.
3      Now, I had asked you about Mr. White.  I'm
4  not seeing him on here.
5  A.   He's on QA.
6  Q.   Okay.
7  A.   Complex QA director is his title.
8  Q.   Now, what is the complex?
9  A.   The complex is both facilities, the fresh
10 and the further processing plants.
11 Q.   And you're the head of both plants?
12 A.   I'm the operation manager.
13 Q.   Are you shown in Exhibit 16?
14 A.   Yes.
15 Q.   Where are you at?
16 A.   On the front page -- on the second page.
17 You see Tim Esslinger, the general manager?
18 Q.   Yes.
19 A.   I'm under him as operations manager.
20 Q.   All right.  And is anyone under you?
21 A.   Yes.
22 Q.   Who is under you?
23 A.   It's on the second page.

16

1      MR. GOULD:  It's the fourth page
2  actually, I believe.
3  Q.   All right.  I see you now on the fourth
4  page.  And is that a complete description of
5  everyone that reports to you?
6  A.   Yes.
7  Q.   And where is Mr. Esslinger located?
8      MR. ROSENTHAL:  On the organizational
9  charts?
10     MR. WIGGINS:  No.  Physically.
11 Q.   Where is his office?
12 A.   At the Eufaula complex.
13 Q.   Okay.  So Mr. White, as complex QA director
14 does not report to you?
15 A.   No, sir.
16 Q.   Is that right?
17 A.   Yes.
18 Q.   And the human resource director, Jim Bice,
19 does not report to you?
20 A.   Correct.
21 Q.   And therefore Kathy Gilmore does not report
22 to you?
23 A.   Correct.

17

1  Q.   And Dante Rogers does not report to you?
2  A.   Correct.
3  Q.   So does anyone that reports to you have
4  anything to do with these orientation manuals?
5  A.   No, not as I'm aware of.
6  Q.   Now, you were designated for various topics
7  here today.  Are you aware of that?
8  A.   No.
9  Q.   Okay.  I'm going to show you the next
10 exhibit, 21.
11     (Plaintiffs' Exhibit No. 21 was
12     marked for identification and a
13     copy of the same is attached
14     hereto.)
15 Q.   This is the company's designation of
16 witnesses under a rule called Rule 30(b)(6), which
17 means that you have been designated to speak for
18 and to bind the corporation.
19     Have you seen this list of topics that you
20 have been designated for?
21     MR. ROSENTHAL:  I'm going to object to
22 the legal conclusion with respect to the impact of
23 a designation.  But you can answer the question.

FREEDOM COURT REPORTING

18

1    A.    No, I have not seen these.
2    Q.    Okay.  Well, let's go over that real quick,
3    please.  Look at topic No. 1.  "The organizational
4    structure of Equity, including specifically any
5    mechanisms for oversight of individual plants by
6    corporate or regional managers."
7          You've been designated as the person
8    knowledgeable on that subject.  Do you agree that
9    you are properly designated and have knowledge on
10   that subject?
11         MR. ROSENTHAL:  Objection to the
12   request for a legal conclusion whether he was
13   properly designated.  To the extent you have
14   knowledge of the subject, you can answer.
15   A.    I have knowledge of some of it, but not all
16   of it.
17   Q.    Two other people were designated for that
18   topic too.
19         Now let's look at topic No. 2 on Exhibit 21.
20   You were designated for the training portion of
21   Equity's policies and practices regarding the
22   maintenance of records of hours worked and wages
23   paid, and the training to inform employees and

19

1    supervisors of these policies, and measures that
2    were taken to ensure compliance with these
3    policies.
4          What role do you play in that area of
5    training on that topic?
6    A.    None.  I have people under me that do the
7    training; I don't do the training.
8    Q.    Okay.  Who are they?
9    A.    There's different levels from supervisors
10   all the way up to shift managers, plant managers.
11   Q.    Okay.  And take the organizational chart,
12   Exhibit 16, and tell me those persons.
13   A.    It could be any of these sheets.
14   Q.    The entire exhibit?
15   A.    According to what department and where they
16   work and what they're training on.
17   Q.    Okay.  Which employees -- are you saying all
18   these employees shown here do training or are you
19   saying particular ones?
20   A.    All of them do training.
21   Q.    All right.  But do they do training on
22   maintenance of records of hours worked and wages
23   paid?

20

1    A.    Maintenance of records?  Explain what you're
2    asking now.
3    Q.    Look at No. 2 there.  Read No. 2 to yourself
4    to make sure you're on the same page with me.
5    A.    (Witness complies.)
6    Q.    Okay.
7    A.    They do time sheets and, you know, turn in
8    weekly daily time sheets.  Supervisors and
9    superintendents do time sheets and turn those in
10   to accounting.
11   Q.    Okay.
12   A.    The payroll department.
13   Q.    All right.  Just take a minute and read each
14   of the topics in Exhibit 21 that you've been
15   designated for, and tell me if you believe that
16   you do not have knowledge on any of those topics.
17         (The witness examines the
18         document.)
19   A.    I mean, on some of these I've got general
20   knowledge of, but not in detail on all these
21   items.  You know, there's a lot of stuff here.
22   Some of it I know something about, but not all;
23   because I've got people under me that's

21

1    responsible for this.
2    Q.    Okay.  We'll get into that as we go along.
3    But you don't see any topics in Exhibit 21 that
4    you disagree with you being designated to speak
5    on, do you?
6    A.    I mean, when you're talking about the
7    plaintiffs on their required wear, I don't even
8    know the plaintiffs; and I don't know 1700
9    employees by name and where they work, so I don't
10   know what they're required to wear in the position
11   they're in.  You know what I'm saying?
12   Q.    Uh-huh.
13   A.    So I don't have knowledge of that.  I know
14   what positions, what is required to be worn in
15   that position, according to what they're doing.
16   But I don't know by plaintiff's name.
17   Q.    All right.  Now, while you were looking at
18   that, I was looking at Exhibit 17, which is what's
19   called the revised GMP's; and it's considerably
20   more involved than the one we had before today.
21   Exhibit 17, is it in force as of today?
22         MR. ROSENTHAL:  I'm going to object to
23   the extent to the premise of the question that

22

1    it's considerably more involved than the prior
2    Good Manufacturing Practices which were supplied,
3    which were multiple versions of the GMP's for each
4    of the plants.  But you can answer the question.
5    A.    Would you repeat the question?
6           MR. ROSENTHAL:  Is it in force today?
7    Q.    Yeah.
8    A.    Yes.
9    Q.    And has this Exhibit 17 been in force since
10   August 18, 2007?
11   A.    Yes.
12   Q.    And it doesn't bear your signature, does it?
13   A.    No.
14   Q.    All right.  But it bear's your boss's
15   signature, correct, or a place for the signature,
16   correct?
17   A.    I don't see that.
18   Q.    Page 2 of my copy of Exhibit 17 says, at the
19   top, "Robin Stevens, Fresh Plant Manager."  He
20   reports to you though, doesn't he?
21   A.    Correct.
22   Q.    All right.  I brought the old exhibits that
23   have been previously produced.  Look at Exhibit 3.

23

1    A.    (Witness complies.)
2    Q.    Is this the version of the Good
3    Manufacturing Practices that were in force and
4    effect from October 2, 2006, to August 18, 2007?
5    A.    Yes.  To the best of my knowledge, yes.
6    Q.    And look at page 2.  That's your signature,
7    correct?
8    A.    Yes.
9    Q.    You signed it October 2, 2006, correct?
10   A.    Yes.
11   Q.    Do you know why, when it was revised in
12   August of 2007, it didn't call for your signature?
13   A.    No.
14   Q.    Okay.  Look at page 3 of Exhibit 17.
15   A.    (Witness complies.)
16   Q.    Is that an accurate and complete list of the
17   revisions, dates, and type of revisions?
18   A.    To the best of my knowledge.
19   Q.    How long have you been with Equity Group?
20   A.    Since March of '04.
21   Q.    And what was your job history prior to that?
22   A.    I was with CP.
23   Q.    And what does CP stand for?

24

1    A.    Charoen Pokphand.
2    Q.    And how long were you with them?
3    A.    Started September 1999.
4    Q.    And what were your jobs for CP?
5    A.    First job, I was maintenance manager; then I
6    was promoted in 2000 to plant manager; then I was
7    plant manager when Equity Group bought Charoen
8    Pokphand.
9    Q.    And when did that take place?
10   A.    When it was purchased?
11   Q.    Correct.
12   A.    I believe March of '04.
13   Q.    And when did you become complex manager?
14   A.    Operations manager.
15   Q.    Complex operations manager I think is your
16   title.
17   A.    I don't remember the date.  It was sometime
18   October or November of '04.
19   Q.    Who did you replace?
20   A.    No one.
21   Q.    From 2000 to 2004 you said you were plant
22   manager.  Of which plant?
23   A.    Fresh plant.

25

1    Q.    To whom did you report?
2    A.    Lee Allen.
3    Q.    And what was his job?
4    A.    Complex manager.
5    Q.    So they created a new position called
6    complex operations manager sometime in late 2004?
7    A.    Yes.
8    Q.    Do you know why?
9    A.    No.
10   Q.    Now, looking at Exhibit 3 again, which you
11   said was the predecessor to Exhibit 17, it has 19
12   numbered paragraphs, correct?
13   A.    What are you talking about 19 paragraphs?
14   Q.    I'm sorry.  29 paragraphs.  You've got
15   Exhibit 3 in front of you, correct?
16   A.    Uh-huh.
17   Q.    All right.  It has six pages with 29
18   numbered paragraphs, correct?
19   A.    Yes.
20   Q.    All right.  Now, looking at the revised
21   2007, Exhibit 17, it has 41 numbered paragraphs,
22   then a series of bullet point paragraphs, then it
23   looks like it picks up with some more numbered

FREEDOM COURT REPORTING

26

1    paragraphs; so I really don't know how many in
2    total.
3         But you would agree that this new policy has
4    many, many more paragraphs than the predecessor
5    policy, correct?
6         MR. ROSENTHAL:  Objection to the extent
7    you're referring to P3 as the predecessor.  This
8    P17 is a combination of GMP's for all the entire
9    complex plants.  This is limited to the fresh
10   plant only.  It is not correct to say that this is
11   the predecessor to this; this is one part of it.
12        MR. WIGGINS:  All right.  But I think
13   you're going to have to let the witness be the
14   witness.
15        MR. ROSENTHAL:  Well, I'm objecting to
16   your question.
17        MR. WIGGINS:  Well, he had already
18   answered that question.
19        MR. ROSENTHAL:  No.
20        MR. WIGGINS:  Well, the record will
21   show that.  But still, I don't think that's a
22   proper objection.  And I think the witness needs
23   to be the witness, not the lawyer.

27

1         MR. ROSENTHAL:  Well, I objected before
2    and you continued to try to refuse the witness by
3    referring to a document incorrectly, which is
4    improper under the rules.
5         MR. WIGGINS:  Well, the rules say you
6    can object to the form.  And I'm going to object
7    to speaking objections.  If the witness answers
8    wrong and you need to redirect him, that's fine;
9    but I don't want you interrupting in the middle of
10   the deposition like that.
11        MR. ROSENTHAL:  You don't set the
12   rules, Mr. Wiggins.
13        MR. WIGGINS:  No, but I know the rules,
14   and I don't want to have to go to the judge about
15   them.
16   (BY MR. WIGGINS)
17   Q.  Did you play any role in this revision
18   that's Exhibit 17?
19   A.  No.
20   Q.  Do you know why it was revised?
21   A.  No.
22   Q.  Do you know how it was revised?
23   A.  No.

28

1    Q.  But you would agree that it's longer, has
2    more paragraphs than Exhibit 3, correct?
3    A.  It has more paragraphs than Exhibit 3.
4    Q.  Do you know why?
5    A.  Because this covers slaughter, debone, and
6    further processing, as it states.
7    Q.  And what did Exhibit 3 cover?
8    A.  To the best of my knowledge, this only
9    covers slaughter/debone.  It states "Fresh
10   Processing" on the cover sheet.
11   Q.  All right.  Is there any part of Exhibit 17
12   that does not relate to slaughter, debone, and
13   further processing in the same way?
14        MR. ROSENTHAL:  Object to the form.  In
15   the same way?
16   Q.  Is there any part of Exhibit 17 which does
17   not apply to all three areas -- slaughter, debone,
18   and further processing -- in the same way?
19   A.  I don't know the answer to that.
20   Q.  All right.  Well, given the length of this
21   one, I think I'm going to take a few minutes to
22   read it.
23        MR. WIGGINS:  Take a break?

29

1         MR. ROSENTHAL:  It's your deposition.
2    Q.  While he's getting that copied, let me ask
3    you some other questions, and then we'll take a
4    break at that point.
5         Are employees required to process chicken or
6    produce poultry products in a way that does not
7    contaminate the product?
8    A.  Yes.
9    Q.  Is that one of their principal
10   responsibilities?
11   A.  Yes.
12   Q.  Are all employees required to do their
13   processing or production work in a manner that
14   produces uncontaminated chicken products?
15   A.  Yes.
16   Q.  These Good Manufacturing Practices that we
17   have in Exhibit 3 and Exhibit 17, the purpose of
18   them is for employees to be able to produce
19   uncontaminated poultry products, correct?
20   A.  Yes.
21   Q.  And that benefits the company so that it can
22   sell its products to its customers, correct?
23   A.  Yes.  And it's a USDA regulation.

FREEDOM COURT REPORTING

30

1  Q.   Your customers are purchasing from you
2  uncontaminated poultry products, correct?
3  A.   Yes.
4  Q.   You represent to them that when they
5  purchase poultry products from your company, they
6  are receiving wholesome, uncontaminated products,
7  correct?
8  A.   Yes.
9  Q.   Now, I don't have a real good copy of this
10  map -- I suppose it's as good as you've got -- but
11  I want you to help me read it.
12       MR. WIGGINS:  We'll mark this as
13  Exhibit 22.
14       (Plaintiffs' Exhibit No. 22 was
15       marked for identification and a
16       copy of the same is attached
17       hereto.)
18  Q.   Which side do you read this from?  This
19  side, I suppose.  Show me the parking lot.
20       MR. ROSENTHAL:  You'll have to explain
21  for the court reporter what you're pointing to.
22  Q.   Let's take this red pen and mark the parking
23  lot for us.

31

1  A.   This is the parking lot that I'm marking in
2  red.
3  Q.   All right.
4       MR. ROSENTHAL:  For the record, Mr.
5  Mills marked three areas in red and designated
6  them "parking lot."
7  Q.   And this bigger parking lot is for the fresh
8  plant?
9  A.   Yes.
10  Q.   And this second biggest parking lot is for
11  the further processing plant?
12  A.   Yes.
13  Q.   And what's this smallest parking lot for?
14  A.   Admin parking lot.
15  Q.   Okay.  Now, in the fresh plant, where do
16  employees enter the plant?
17  A.   They can enter at either end, the north or
18  south end of the further processing plant.
19  Q.   All right.  Put the word "entry."
20  A.   (Witness complies.)
21  Q.   All right.  You put E-N-T for the two
22  entrances.
23       Are employees allowed to enter either door?

32

1  A.   Yes.
2  Q.   And what's the first thing they come to as
3  they enter each door in the fresh plant?
4  A.   A hallway leading to production or break
5  room areas.
6  Q.   And is the break room listed on the map?
7  A.   Yes.  Debone break room listed, evis break
8  room listed, back dock break room right here.
9  Q.   Back dock; it's not listed, is it?
10  A.   I can't read it if it is.
11  Q.   Well, write that on there for us.
12  A.   (Witness complies.)
13  Q.   Now, where do employees sanitize their boots
14  or shoes?
15  A.   At the entrance of each processing area they
16  walk through a floor sanitizer.
17  Q.   All right.
18  A.   Any entrance into the building has floor
19  sanitizers you walk through nonstop.
20  Q.   You've got two entries marked.  Are there
21  others?
22  A.   Any door leading from the outside.  This
23  print is so small I can't designate every little

33

1  door.  But every door entering into the processing
2  area has a floor sanitizer that keeps the floor
3  wet with sanitizer.
4  Q.   Okay.  Show me where the other entrance
5  doors are.
6  A.   I don't know if that's possible, as small as
7  this print is.
8       There's one in this area; there's one out of
9  this control room; there's one out of this
10  maintenance shop area; there's one in a doorway
11  over here that I cannot see on this print.
12       Every door leading into processing has a
13  floor sanitizer.
14  Q.   Okay.  Now, is there north, south, east, and
15  west on this map?
16  A.   I do not see one.
17  Q.   Do y'all -- how do you describe the plant?
18  Do you call it the north end or south end, or do
19  you have words that describe where you're at in
20  the plant?
21  A.   Just departments.
22  Q.   Okay.  Tell me what the departments are.
23  A.   Debone.

FREEDOM COURT REPORTING

34

1  Q.  Write that down.
2  A.  (Witness complies.)
3  Q.  Okay.
4  A.  DSI, shipping, maintenance shop,
5  refrigeration room, control room.
6      This thing is so small I can't read it.
7  This is not right.  This is cooler.
8  Q.  What you had marked as maintenance is really
9  the cooler?
10  A.  This is the maintenance shop.
11  Q.  Okay.
12  A.  This is the refrigeration room; this is the
13  chiller room; this is the evis department; this is
14  the picking room; this is the shackling room; this
15  is the back dock, back dock/live receiving; this
16  is office areas right here in this area; this is
17  the evis break room right here in this open spot;
18  this is USDA.
19  Q.  Where's QA?
20  A.  QA office is right here; QA manager's office
21  is right here; plant manager is right here; my
22  office is right here; conference room, production
23  manager, production manager, production

35

1  coordinator; this is debone break room; this is
2  the locker area in the break room; there's also a
3  locker area in this break room that I can't even
4  see where it's at it's so small.
5  Q.  Okay.
6  A.  This is the entrance for the office
7  personnel right here.
8  Q.  All right.  Where are the first line
9  supervisors' offices?
10  A.  It's not even shown on this print.  Right
11  here.
12  Q.  That's in the production area, correct?
13  A.  There's an office area right here, and then
14  there's a --
15  Q.  Let me stop you.  Is this in the production
16  area where these first line supervisors' offices
17  are?
18  A.  No.
19  Q.  Okay.  You've got to go outside the
20  production area to get the supervisors?
21  A.  Through this door right here, and there's a
22  door on each end that's going to lead to these
23  offices.

36

1  Q.  Okay.  And does that door from the
2  supervisor's office into debone have a foot
3  sanitizer?
4  A.  No.
5  Q.  Okay.
6  A.  Just doors from the outside into the
7  processing plant.
8  Q.  All right.  Now, I interrupted you.  Where
9  are the other supervisors' offices?
10  A.  There's another supervisor office in this
11  area.  Honestly, this thing's so jumbled up, I
12  can't make out where it's at.  But right in this
13  area here is a supervisor's office.  I believe
14  it's in this corner right here.
15      And then offices here.  Production manager
16  is in this area.  Sanitation manager has an office
17  in this warehouse.  This has got offices in it
18  which are not drawn.
19  Q.  What's this called here?
20  A.  Warehouse.  And there's offices in here that
21  houses sanitation manager for this plant and
22  purchasing for this complex.
23      There's a maintenance manager's office in

37

1  this area, a maintenance supervisor's office in
2  this area.
3  Q.  Okay.  And the evisceration department
4  supervisors' offices are where?
5  A.  Right here, this back corner right here.
6  Q.  All right.  Now, the production process goes
7  from live receiving down to debone?
8  A.  Yes.
9  Q.  All right.  Now, you had marked for us, but
10  let's get it in the record, where these foot
11  sanitizing activities are taking place.
12  A.  There's a number of them.  I don't know all
13  the exact locations, but I know it's a requirement
14  that they are on every entrance into the
15  production area on the inside.
16  Q.  That's a company requirement?
17  A.  No.
18  Q.  Whose requirement?
19  A.  USDA.
20  Q.  And the company has a policy that employees
21  must comply with USDA requirements, correct?
22  A.  Yes.
23  Q.  Let's see if we can get a verbal description

38

1  of where these places are.
2      On the debone end of the plant entrance, you
3  come down -- you come into the entry and exit
4  door, and you walk down a hall that runs parallel
5  to the debone department and the debone break
6  room, correct?
7  A.  Correct.
8  Q.  Then there's a main entrance there across
9  the hall from the debone break room that the
10  employees enter the production area, correct?
11  A.  Correct.
12  Q.  And there is a foot sanitation process at
13  that door, correct?
14  A.  Yes.
15  Q.  Employees entering the evisceration end of
16  the building and the live receiving end of the
17  building, when they come in that door, they come
18  down that same hall but from the other end of the
19  building, correct?
20  A.  Either end.  They can come in either end
21  they'd like.  They're not required for evis to
22  come in one end and debone to come in the other
23  end.  They can come in either end they'd like.

39

1  Q.  Okay.  But down on the evisceration end
2  there is another entrance from the hall into the
3  production area that has a required boot
4  sanitation station, correct?
5  A.  Yes.
6  Q.  Now, you pointed us to some others back in
7  here.  Verbally tell us where you're going from
8  and to at the point that you have those boot
9  sanitation activities occurring.
10  A.  Best of my knowledge, and I'm not familiar
11  with all that, there is one coming out of the
12  control room into the evis department; there is a
13  foot sanitizer coming out of the maintenance shop
14  into the production area, and --
15  Q.  Which production area?
16  A.  Evis.  There is a foot sanitizer coming off
17  the shipping loading area onto the production
18  area.
19  Q.  Which production area?
20  A.  Debone.  Debone staging area.  And I'm sure
21  there's more, but I don't remember the other ones.
22  I don't remember where the rest of them are
23  located.

40

1  Q.  Okay.  Do you know of any documents that
2  list them?
3  A.  Not as I'm aware of.
4  Q.  Now, describe your current boot sanitation
5  process.
6  A.  It is a unit mounted on the wall that takes
7  and blows chemicals on the floor; it keeps the
8  floor wet.  And all they do is walk across the
9  floor.
10  Q.  How long has that been the practice?
11  A.  I don't recall when we started that up.
12  Q.  Give me your best estimate.
13  A.  This is totally a guess: three years.
14  Totally a guess.  I don't know.  It's been in a
15  while.
16  Q.  Who would know?
17  A.  I don't know the answer to that either.
18  Q.  Are there any documents that describe the
19  boot sanitation process that you've said you walk
20  across a wet floor?
21  A.  Not as I'm aware of.
22  Q.  Does an employee have to push any buttons?
23  A.  No.  They're on timers.  They come on

41

1  automatic.
2  Q.  And are they motion-sensored or just pure
3  time?
4  A.  Pure time.
5  Q.  Now, describe your prior boot sanitation
6  process.
7  A.  We didn't have one prior to this.
8  Q.  All right.  I've heard described -- I wasn't
9  at the depositions, but I've had people tell me
10  some of the things that were said.  But there was
11  mention apparently of some boot sanitation process
12  where employees had to punch a button of some
13  type.  Are you familiar with that?
14      MR. ROSENTHAL:  Objection to the
15  reference that any employee said that at the
16  deposition.  You can answer.
17  A.  No, I'm not aware of that.  No employee has
18  to push a button on the boot sanitizer.
19  Q.  Does an employee have to do anything other
20  than walk across a wet floor?
21  A.  That's it.
22  Q.  And that's been the only process you've ever
23  had?

42

1   A.   Yes.
2   Q.   Now, is an employee required to do anything,
3   other than enter the building and punch his clock,
4   before going into the production area?
5   A.   He's not required to.  He's required to put
6   on a hair net, beard net if he has a beard, and
7   earplugs.
8   Q.   All right.  But he's not required to do that
9   in the production area?
10  A.   No.
11  Q.   Is he required to do it before the employee
12  enters the production area?
13  A.   Yes.
14  Q.   All right.  Is that in writing?
15  A.   Not that I'm familiar with.  I'm not saying
16  it's not; I don't know.
17  Q.   Okay.  Now, where is the time card punch
18  clock?
19  A.   Just inside the doors at the break rooms.
20  There's a time clock right here that I'm aware of.
21  Q.   Put "TC" right there, so I can remember it
22  when I see it.
23  A.   Okay.  And there's one in this area.  I

43

1   don't remember which side of the door it's on.
2   Q.   All right.
3   A.   And I know there's one at the hallway right
4   here for maintenance.
5        Now, I'm not for sure on the picking and
6   receiving if there's one back there; I don't know,
7   because I'm not in that area that much.  But I
8   know these are here.  And there's also one in this
9   break room in that area right there, in the evis
10  break room.
11  Q.   The picking and receiving employees, they
12  enter these two main entrance doors that you've
13  shown us?
14  A.   They can enter either at this entrance, or
15  if they are live shacklers, they can enter at this
16  entrance, or they can enter through the
17  picking/receiving break room area.  Either or.
18  Q.   At the beginning of the day, they can come
19  in through the picking and receiving area?
20  A.   Yes.  If they work in that area.
21  Q.   And you think there's a time clock back
22  there?
23  A.   I don't know; I think.  I don't know.

44

1   Q.   Okay.  So as I understand your testimony,
2   there is nothing that employees are required to do
3   before they enter the production area, other than
4   punch their clock?
5   A.   As I stated, hair nets, beard nets, and
6   earplugs before entering into the production area.
7   Q.   Okay.  What are they required to do upon
8   entry into the production area?
9   A.   Put on their smock, wash their hands before
10  going to the line.
11  Q.   Anything else?
12  A.   Arm guard if they're using knives or
13  scissors, after they enter into the production
14  area.
15  Q.   When you say "arm guard," you mean put it
16  on?
17  A.   Slide it over your arm.
18  Q.   Okay.  Anything else?
19  A.   That's all I'm aware of.
20  Q.   All right.  Now, where are the wash basins?
21  A.   Wash basins?  When you enter into debone,
22  they're in this area right here.  When you enter
23  into evis, they're in this area right here.  When

45

1   you enter from the picking/receiving break room
2   area when you enter into production, they're right
3   on the wall when you go through the door.  There's
4   wash basins back here in this area.
5   Q.   What do you call that area?
6   A.   DSI area.  There's wash basins here.
7   There's wash basins in the evisceration department
8   on this wall here.  They're in a lot of locations.
9   That's the ones I remember at this time.
10  Q.   All right.  Now, the first one you told me
11  about, you're coming from the hall adjacent to the
12  break room into the debone department?
13  A.   Yes.
14  Q.   And the wash basin is adjacent to the entry
15  to the debone department?
16  A.   Right beside the entry.
17  Q.   How many stations or spigots do you have?
18  A.   I don't know the answer to that.
19  Q.   Give me an approximation.
20  A.   I don't know.
21  Q.   Are employees required to wash their hands
22  at that station?
23  A.   They are required to wash their hands before

FREEDOM COURT REPORTING

46

1 going to the line, after entering the production
2 area.
3 Q. And that's the only wash basin that they use
4 for that purpose?
5 A. No.
6 Q. All right.
7 A. They've got wash basins in evis department;
8 they've got wash basins in debone department. The
9 people that work in DSI can wash here before going
10 to their job. The people in picking and receiving
11 can wash here before going to their job.
12 Q. Okay. Now, the evisceration sink you told
13 us about is right there as you come in that door
14 to that area?
15 A. Yes. Right in front of the door, yes.
16 Q. Okay. Where do the DSI employees enter into
17 the production area at the start of the day?
18 A. I can't really answer where they enter.
19 They can enter here and walk across; they can
20 enter into the debone entrance and walk around;
21 they can enter either one of these areas and walk
22 to the DSI. I can't tell you that all DSI enter
23 this area. They're not required to enter no

47

1 certain area.
2 Q. All right. Let me read that new exhibit you
3 brought me. We'll take a break for a few minutes.
4 A. Okay.
5     (A brief recess was taken.)
6 (BY MR. WIGGINS)
7 Q. All right. Let's take this book I gave you
8 and let's look at Exhibit 1. This is called "New
9 Hire GMP Policy."
10     During what period of time was this in force
11 and effect?
12 A. I can't answer that.
13 Q. Is it currently in force or effect?
14 A. Yes.
15 Q. Give me your best estimate of how long it
16 has been in force and effect.
17 A. I don't have a clue on this particular
18 policy exhibit.
19 Q. Okay. Let's go to -- Before I go to No. 2,
20 let me ask you this: Does this New Hire GMP
21 Policy apply to all employees that are under you,
22 including the hourly employees in the two plants?
23     (The witness examines the

48

1     document.)
2 A. Yes.
3 Q. And you took your time to read the document
4 before answering, correct?
5 A. I scanned over it.
6 Q. Okay. Now let's go to Exhibit No. 2. This
7 is called "Equity Group - Eufaula Division, LLC
8 Good Manufacturing Practices (GMP'S)," correct?
9 A. Yes.
10 Q. And is this currently in force and effect?
11     (The witness examines the
12     document.)
13 A. Yes, to the best of my knowledge.
14 Q. All right. And we sat here while you took
15 your time to read that document also, correct?
16 A. I scanned over it, yes.
17 Q. And it's got a signature, Mary Allen. Is
18 that an hourly employee, more than likely?
19 A. I don't have a clue. I don't know Mary
20 Allen.
21 Q. Are employees required to sign this document
22 at some point in the process?
23 A. I don't have an answer to that; I don't

49

1 know.
2 Q. All right. Let's look back at the other
3 exhibit real quick. It starts at page 4. Do you
4 know why?
5 A. No, I don't.
6 Q. Let's go to Exhibit 3. This is the Equity
7 Group Eufaula Good Manufacturing Practices for
8 fresh processing, correct?
9 A. Yes.
10 Q. And it says the issue date was March 15,
11 2004, correct?
12 A. Yes.
13 Q. Revised date, October 2, 2006?
14 A. Yes.
15 Q. And this is one you earlier identified that
16 you had signed.
17     When did Equity Group take over at this
18 plant, the fresh processing plant?
19 A. In March of 2004, I believe.
20 Q. So this was the very first one under Equity
21 Group's ownership, correct?
22 A. I can't answer that. I would think so, but
23 I don't know.

FREEDOM COURT REPORTING

50

1  Q.  All right.  Do you see any part of Exhibit 3
2  that is not currently in force and effect?
3       (The witness examines the
4            document.)
5  A.  To the best of my knowledge, briefly
6  scanning over it, I believe they're all in force
7  at this time.
8  Q.  And we sat here while you took time to read
9  through the document.
10      MR. ROSENTHAL:  Objection.  Not a point
11 in the question.  You can answer.
12 A.  Well, I briefly scanned over it.
13 Q.  Well, we sat here; it appeared you read
14 every paragraph.
15 A.  I did not read every paragraph.
16 Q.  All right.  Well, if you need to read every
17 paragraph to answer my next question, please do
18 so.
19      But as I understand your testimony, the
20 items listed in Exhibit 3 employees have been
21 required to comply with from March 2004 to
22 present, correct?
23 A.  Yes, to the best of my knowledge.

51

1  Q.  Okay.  Let's look at Exhibit 4.  What is
2  this document, page 1, called "Correct Hand/Glove
3  Washing"?
4  A.  First time I've ever seen it.  I don't know.
5  Q.  Does it accurately describe what the company
6  instructs employees to do in regard to hand/glove
7  washing?
8  A.  I can't answer that.  First time I've ever
9  seen this document.
10 Q.  I understand that.  But the six items listed
11 there, is that what employees are required to do
12 in washing hands and gloves?
13 A.  We do not measure the soap by a dime to see
14 if they're using a dime-size soap.  I've never
15 known nobody doing that.  We never time them to
16 see if they scrub for 10 seconds.
17 Q.  It doesn't say anything about timing, but go
18 ahead and finish your answer.
19 A.  It says, "Rubbing hands together for at
20 least 10 seconds..."  We don't put a stopwatch on
21 them.
22 Q.  Do you attend the training that employees
23 receive in regard to sanitation?

52

1  A.  No.
2  Q.  Are employees given training and instruction
3  in how to properly sanitize their hands and
4  gloves?
5  A.  I can't answer that.  That's handled under
6  my management.
7  Q.  What is an SOP?
8  A.  Standard operating procedure.
9  Q.  Do you have a standard operating procedure
10 for hand/glove washing, other than Exhibit 4, page
11 1?
12      MR. ROSENTHAL:  Objection.  This
13 witness said he -- he didn't identify this as an
14 SOP.  He said he's never seen it before.
15 A.  I can't answer that.
16      MR. ROSENTHAL:  It appears by the
17 number it was produced by one of the employees.
18 Q.  But my question is:  Do you have a standard
19 operating procedure?
20 A.  I can't answer that.
21 Q.  You don't know if there is one for
22 hand/glove washing?
23 A.  No, I don't.

53

1  Q.  Do you know if there's one for boot
2  sanitation?
3  A.  No, I don't.
4  Q.  Look at Exhibit 4, page 2.  This is called
5  "G.M.P.S."  Do you know what that means?
6  A.  No.
7  Q.  But you do know what a GMP is, correct?
8  A.  Yes.
9  Q.  What is a GMP?
10 A.  Good manufacturing practice.
11 Q.  And that's the policies of the company; is
12 that correct?
13 A.  Yeah.  That's the manufacturing practices.
14 Q.  Those are the practices employees are
15 required to follow?
16 A.  Yes.
17 Q.  All right.  Now, do you see anything in
18 Exhibit 4, page 2, that employees have not been
19 required to do since March 2004?
20      (The witness examines the
21            document.)
22 A.  Would you repeat that question, please?
23 Q.  Is there any item on Exhibit 4, page 2,

54

1  called "G.M.P.S" that employees have not been
2  required to comply with since March 2004?
3  A.  Yes.
4  Q.  Which?
5  A.  First, this is the first time I've ever seen
6  this document.  We don't have maroon smocks; we
7  don't do fully cooked.  And I don't understand
8  this, "V-Megs/Combos/Totes must be washed out when
9  changing from one product to another."  I don't
10  know what that means.  Because we can put wings in
11  one combo and drumsticks in the combo.  But I've
12  never seen this G.M.P.S before.
13  Q.  Okay.  But the items listed there though
14  accurately reflect what employees are required to
15  do, except for those you just listed, correct?
16  A.  Says "No jewelry allowed."  We do allow a
17  wedding band as long as it doesn't have sets.
18  Q.  Anything else?
19  A.  "Floor person only does floor work, no work
20  on the line."  That's not a true statement.
21  Q.  Okay.  Now, what is a true statement in
22  regard to floor persons as to whether they work on
23  the line?

55

1  A.  They can do whatever their supervisor asks
2  them to do, as long as they do the proper
3  procedure to do it.  I mean, if they work on the
4  floor they change aprons and wash their hands,
5  they're allowed to work on the line.
6  Q.  Okay.
7  A.  This, "Water hoses (black for floor, clear
8  for machines)..."  I've never seen that before.  I
9  have no idea where this document come from.  I've
10  never seen it at our plant.
11  Q.  I understand that.  Do you have a par fried
12  line?
13  A.  Yes.
14  Q.  Let's go to the next page of Exhibit 4.
15  This is E 739, which apparently means it's
16  produced by the company.  Do you recognize it?
17  A.  No, I'm not familiar with this.
18  Q.  All right.  Let's go to Exhibit 5.  This is
19  the attendance policy.  Are you familiar with that
20  document?
21      (The witness examines the
22      document.)
23  A.  I'm not that familiar with the attendance

56

1  policy because I don't do attendance on hourly
2  personnel; but I know we do have an attendance
3  policy.  To state this is the attendance policy we
4  have in place, I can't do that.
5  Q.  Okay.  Let me refer you to one part of it
6  though.
7      It says, "Accumulation of six points will
8  result in voluntary separation from the company."
9  Is that a true statement for the two plants you
10  supervise?
11  A.  Yes.
12  Q.  What does it mean "voluntary separation"?
13  A.  They quit.
14  Q.  Okay.  And then it says, first bullet point,
15  "Arriving to work late and otherwise failing to be
16  ready to work at your designated start time equals
17  one-half point," correct?
18  A.  I believe that's correct, to the best of my
19  knowledge.
20  Q.  Is that a policy that's been followed since
21  Equity took over in March 2004?
22  A.  That was a policy that was negotiated in a
23  union contract, and we go by the union contract

57

1  between Equity and RWDSU.  We go by the contract
2  agreement.
3  Q.  Okay.  But is this arriving to work late and
4  otherwise failing to be ready to work at your
5  designated start time equaling one-half point, is
6  that the practice followed since March 2004?
7  A.  I don't know since March 2004.  It's in
8  place today.  I don't remember if it went all the
9  way back to 2004.
10  Q.  Okay.  If an employee is one minute late,
11  can they be given a half point?
12  A.  Yes.
13  Q.  Does the company timekeeping system allow
14  you to identify when an employee is one minute
15  late?
16  A.  Yes.
17  Q.  And do you dock an employee's pay when
18  they're one minute late?
19  A.  It's according to where they work.  When you
20  say "dock their pay," you need to...
21  Q.  Is that one minute that they're late
22  subtracted from their pay?
23  A.  When you say "subtracted," what department

FREEDOM COURT REPORTING

58

1  are you talking about? If they're on a scheduled
2  time and they get paid from point A to point B and
3  they're not there at point A, yes. But if they're
4  on a clock in/clock out, it will be their clock
5  in/clock out time.
6      Q.  And which departments are on scheduled time?
7      A.  When you say "scheduled," you mean from a
8  clock in to clock out, or are you talking about
9  from a standard starting time to a standard ending
10  time?
11     Q.  You used the words "scheduled time."
12     A.  Master card time. Is that what you're
13  referring to?
14     Q.  I don't know; I'm asking you. You used the
15  term "scheduled time." What did you mean by that?
16     A.  If you're scheduled to be there at 7 a.m.
17  and work until 3:30 p.m., that's scheduled.
18     Q.  Okay.
19     A.  And if they clock in at 7:01, they get paid
20  from 7:01 until.
21     Q.  All right. Now, is that different than
22  master card time?
23     A.  Master card is a scheduled time, per se.

59

1      Q.  Is master card something that's swiped?
2      A.  Yes.
3      Q.  Where is the master card swiped?
4      A.  At either one of the Kronos time clocks.
5      Q.  That's the same time clock that the personal
6  time card is swiped?
7      A.  Yes.
8      Q.  Who swipes the master card?
9      A.  I don't know the answer to that. Either
10  supervisor, superintendent, production manager.
11  One of the managers.
12     Q.  Now, is an employee on a clock-in/clock-out
13  basis, is that something different than an
14  employee that's on a scheduled time basis?
15     A.  Yes.
16     Q.  What's the difference?
17     A.  The clock in and clock out is from when they
18  clock in until the end of their shift they clock
19  out.
20     Q.  Which employees are on a clock-in/clock-out
21  timekeeping system?
22     A.  I'm not familiar with every one of them. I
23  know maintenance is on the clock in/clock out.

60

1      Q.  Is there a document that identifies which
2  jobs or employees are on a clock-in/clock-out
3  method?
4      A.  I don't know the answer to that.
5      Q.  Do you know if there's a document that lists
6  the jobs or employees that are on a scheduled time
7  method?
8      A.  I don't know the answer to that.
9      Q.  And what about the master card? Is there
10  anything that identifies which employees or jobs
11  are subject to a master card method?
12     A.  I don't know the answer to that. I don't do
13  payroll.
14     Q.  Are there any other methods of timekeeping
15  used for hourly employees, besides those three:
16  scheduled time, master card, and clock in/clock
17  out?
18     A.  Not as I'm aware of.
19     Q.  An employee that's on a master card method,
20  if he's one minute late, is that subtracted from
21  his pay time?
22     A.  Yes.
23     Q.  And, of course, an employee on a clock

61

1  in/clock out, if they're a minute late, they would
2  have that minute subtracted also; is that correct?
3      A.  It would be in their clock in/clock out. It
4  would be calculated in their clock in to clock
5  out.
6      Q.  Okay. Let's look at Exhibit 6. Do you
7  recognize this document called "General Safety
8  #4"?
9      A.  No.
10     Q.  It was produced by the company as Bates
11  number 639. Read it. There's 17 sentences --
12  numbered sentences. And tell me is there anything
13  in there that has not been followed or required of
14  employees since March 2004.
15         (The witness examines the
16         document.)
17     A.  We don't require safety glasses. "You are
18  required to wear safety glasses and earplugs when
19  entering the process area."
20         We don't require safety glasses for all
21  employees of the complex.
22     Q.  Do you require them for any employees?
23     A.  Yes.

FREEDOM COURT REPORTING

62

1  Q.  Which?
2  A.  Maintenance.
3  Q.  Any others?
4  A.  Sanitation.  And there may be some others
5  that I've not aware of.
6  Q.  Would there be a document that would list
7  which jobs or employees are required to wear
8  safety glasses?
9  A.  Not that I'm aware of.
10  Q.  And No. 5, I guess, is the one you're
11  speaking of about safety glasses, right?
12  A.  Yes.
13  Q.  And that says, quote, You are required to
14  wear safety glasses and earplugs when entering the
15  process area.
16      The process area, that's the production
17  area?
18  A.  Yes.
19  Q.  Okay.  Now, why would you require some
20  employees to wear safety glasses in the production
21  area and not others?
22  A.  It's according to the job they do.
23  Q.  Do you have job descriptions?

63

1  A.  Yes.
2  Q.  Do you have job descriptions for hourly
3  jobs?
4  A.  I don't know the answer to that.
5  Q.  Do you have job descriptions for your job?
6  A.  Yes.
7  Q.  Do you have job descriptions for the
8  employees that report to you?
9  A.  Yes, there are some generic job
10  descriptions.
11  Q.  What do you mean by "generic"?
12  A.  Generic is kind of broad.  It's not saying
13  in the job description, you know, you get to work
14  at X number of time in the morning; you do this,
15  this, and this.
16      The job description is kind of generic on
17  what you need to handle in your area of
18  responsibility.
19  Q.  Let's take you as an example.  Is your job
20  description as complex operations manager
21  different than the job description of Mr. Stevens
22  as first processing plant manager?
23  A.  I don't know that because I'm not that

64

1  familiar with job descriptions.  There are job
2  descriptions.
3  Q.  You've never looked at the job descriptions
4  for the employees that report directly to you?
5  A.  Yes, I've looked at them; I didn't memorize
6  them.
7  Q.  This Exhibit 16 you produced today shows
8  five employees reporting to you, other than your
9  administrative assistant; is that right?
10  A.  Yes.
11  Q.  Do you know anything about the job
12  descriptions for those five people?
13  A.  Not as they're written I don't know.  I know
14  what their job is, but I don't know what their job
15  description says.
16  Q.  Who is responsible for having job
17  descriptions or getting them written?
18  A.  Job descriptions are normally written out of
19  our Huntsville office.
20  Q.  Is that the home office?
21  A.  That's the division office.
22  Q.  All right.  The head person here in the
23  Eufaula division is Mr. Esslinger; is that right?

65

1  A.  Correct.
2  Q.  And who does he report to?
3  A.  Tim Lawson.
4  Q.  What is his job?
5  A.  I don't know his correct title.
6  Q.  Where is he located?
7  A.  Huntsville, Alabama.
8  Q.  And you called that a division office,
9  correct?
10  A.  Yes.
11  Q.  And what geographical territory does it
12  cover?
13  A.  All poultry in the U.S.
14  Q.  How many plants is that?
15  A.  I honestly don't know the total correct
16  answer to that exactly.
17  Q.  Give me your best estimate.
18  A.  I'm guessing seven or eight total plants,
19  but that's a guess.
20  Q.  All right.  And what did you say the
21  fellow's name in Huntsville is?  I didn't write it
22  down.
23  A.  Tim Lawson.

66

1  Q.  Who does he report to?
2  A.  Keith Lewis.
3  Q.  What's his job?
4  A.  I don't know his exact job title.
5  Q.  Where is he located?
6  A.  Huntsville, Alabama.
7  Q.  And who does Mr. Lewis report to?
8  A.  He reports to Philadelphia.
9  Q.  Who?
10 A.  I believe his name is Jerry Dean. I'm not
11 for sure.
12 Q.  Do you know his title?
13 A.  I sure don't.
14 Q.  What is in Philadelphia?
15 A.  Our corporate office.
16 Q.  All right. Other than your job description,
17 are there any other documents that would describe
18 your duties and responsibilities?
19 A.  Not as I'm aware of.
20 Q.  Who would be knowledgeable as to whether
21 there are job descriptions for hourly employees?
22 A.  I can't really answer that. I don't know.
23 Q.  The quality assurance department, does it

67

1  have job descriptions?
2  A.  Can't answer that; I don't know.
3  Q.  Has there been any period of time that all
4  production employees have been required to wear
5  safety glasses?
6  A.  Yes.
7  Q.  What period was that?
8  A.  I don't know the dates.
9  Q.  Give me your best estimate.
10 A.  It's been -- we stopped everybody from
11 wearing them probably, a guess, a total guess, a
12 year ago. And I don't know when we started. I
13 don't have a clue.
14 Q.  At the time Equity Group took over in March
15 of 2004, were safety glasses required?
16 A.  I don't remember.
17 Q.  Let's look at Exhibit 7. This is called
18 "New Hire Allergen Awareness Training."
19     Are you familiar with this document?
20 A.  No.
21 Q.  Who would be?
22 A.  Can't answer that; I don't have a clue.
23 Q.  Do you know what department this originates

68

1  from?
2  A.  No.
3  Q.  Is there anything within that New Hire
4  Allergen Awareness Training that appears not to
5  apply to your two plants?
6  A.  I'm not familiar with it at all.
7  Q.  Okay. I know you're not familiar with the
8  document, but the items listed, are you familiar
9  with allergen control programs at your two plants?
10 A.  No.
11 Q.  All right. The next page of that Exhibit 7
12 is called "New Hire HACCP Training." Who's in
13 charge of the HACCP program or policy?
14 A.  Butch White. It falls under his umbrella.
15 Q.  And does this New Hire HACCP Training apply
16 to your two plants?
17 A.  Yes.
18 Q.  And has it applied at all times since March
19 of 2004?
20 A.  Yes.
21 Q.  The purpose of the -- well, let's first get
22 this identified.
23     HACCP stands for Hazard Analysis Critical

69

1  Control Points, correct?
2  A.  Yes.
3  Q.  And the purpose of that Hazard Analysis
4  Critical Control Points Program is to prevent
5  contamination of poultry products, correct?
6  A.  Food control based on prevention, yes.
7  Q.  Now let's look at Exhibit 8. I've not
8  produced all in Exhibit 8, the pages; but here's
9  the whole book if you want it of the employee
10 handbook.
11     Looking at the pages that I've excerpted out
12 of the employee handbook, have they been in full
13 force and effect since March of 2004?
14     MR. WIGGINS: And for the record, those
15 excerpted are Exhibit 8.
16     (The witness examines the
17     document.)
18 A.  I don't know how long this has been in place
19 because I'm not familiar with this book, but it
20 looks like, just scanning over a few pages, this
21 is something we still do. And I don't know how
22 long we've been following this. Has this handbook
23 been changed? I don't know.

FREEDOM COURT REPORTING

70

1    Q.  All right. The handbook we've been given,
2  is E 516 through 571. And we weren't given a new
3  one today.
4      Do you know if there's ever been another
5  employee handbook besides this one that I'm
6  placing in front of you?
7    A.  I don't know.
8    Q.  Who would know that?
9    A.  HR is the one that hands these out and has
10  them printed. I don't know.
11    Q.  Anyone in particular in charge of that in
12  HR?
13    A.  Not as I'm aware of. I don't know.
14    Q.  Now, look at page 534. It's called "Work
15  Rules and Regulations" in the employee handbook,
16  correct? It's actually page 17 in the employee
17  handbook, but Bates numbered 534. It got cut off
18  there.
19      Page 17, at the bottom, says "Work Rules and
20  Regulations," correct?
21    A.  That's what it says there.
22    Q.  And it says that you can be disciplined for
23  failing to follow these rules and regulations,

71

1  correct?
2    A.  It says the company expects you to follow
3  them, yes.
4    Q.  All right. And employees that fail to
5  follow these rules and regulations are subject to
6  discipline, correct?
7    A.  Uh-huh.
8    Q.  Is that right?
9    A.  Yes, sir. That's what it says.
10    Q.  Okay. Now, turning to the next page, look
11  at No. 11. One item that employees are subject to
12  discipline or discharged for is, in No. 11,
13  "Failure to wear safety equipment and/or required
14  clothing/uniform," correct?
15    A.  Yes, that's what it says.
16    Q.  It also says, "In addition to any prescribed
17  discipline, an employee violating this policy may
18  be forced to leave the facility until the company
19  dress code is met," correct?
20    A.  Correct.
21    Q.  Does quality assurance monitor employees'
22  use of safety equipment and required
23  clothing/uniforms?

72

1    A.  Quality assurance monitors that; supervisors
2  monitor that; superintendents monitor that.
3    Q.  Okay. And does quality assurance have
4  employees at the start of a shift there at the
5  production room entrance to make sure employees
6  have their protective equipment on?
7    A.  I can't answer that.
8    Q.  Does anyone stand there at the door when
9  they come through to make sure people are properly
10  donning their protective gear and equipment and
11  sanitizing themselves?
12    A.  Not as I'm aware of. But we don't sanitize
13  ourselves entering the room.
14    Q.  Okay. No. 13 of that same rules and
15  regulations policy says that one item an employee
16  can be disciplined or discharged for is, quote,
17  Failure of an employee to be at his/her appointed
18  workstation and ready to work at his/her scheduled
19  starting time, correct?
20    A.  Correct.
21    Q.  And that's been in force and effect, to your
22  knowledge, since March 2004?
23    A.  Yes, as far as I can remember.

73

1    Q.  And another item since March 2004 that
2  employees can be disciplined for is violation of
3  safety rules and/or policies, correct?
4    A.  Yes.
5    Q.  All right. Now turn over to page 40 of the
6  employee handbook.
7    A.  (Witness complies.)
8    Q.  Are these the safety rules that are referred
9  to in No. 18 that you can be disciplined and
10  discharged for? It's called "General Safety
11  Rules."
12      (The witness examines the
13      document.)
14    A.  To the best of my knowledge.
15    Q.  All right. And when you sat there and read
16  through the General Safety Rules, you didn't
17  identify any that have not been required of
18  employees since March of 2004, did you?
19    A.  No. On page 40.
20    Q.  Well, the safety rules are on page 40 to 42,
21  correct?
22    A.  I need to read 41 and 42.
23    Q.  Okay.

FREEDOM COURT REPORTING

74

1      (The witness examines the
2      document.)
3    A.   This must be an old one because this has
4    changed.
5    Q.   What's changed?
6    A.   This says, "Wash hands and arms
7    thoroughly..."
8    Q.   Which number?
9    A.   No. 18. We don't wash arms. Our current
10   policy says to wash hands. I know that one's
11   changed.
12      Also, it says, "No equipment will be worn
13   outside of work areas." You can wear hair nets,
14   beard nets, earplugs outside of work areas. You
15   can't wear them outside, but you can wear them
16   outside of production areas.
17      It also states here that, "Boots are not to
18   be worn outside of plant." You can wear your
19   boots to and from work.
20      That's the changes I see at this point.
21   Q.   Okay. Now, looking at the cover of this
22   employee handbook from which those safety rules at
23   pages 40 to 42 come, it's called Keystone Foods

75

1    Equity Group Eufaula Division Employee Handbook,
2    correct?
3    A.   Uh-huh.
4    Q.   Is that right?
5    A.   Yes.
6    Q.   So we know then that at some point in time
7    those rules you just listed as not currently being
8    followed were in force and effect, correct?
9    A.   We've never enforced no equipment to be
10   worn. We've always allowed hair nets, beard nets,
11   and earplugs to be worn outside the production
12   area. When they were wearing safety glasses, they
13   could wear them to and from work.
14      At one time, we were requiring them to put
15   boots on after they got to work and take them off
16   before they left.
17   Q.   What time period was that?
18   A.   I cannot answer that. I don't have a clue.
19   Q.   Can you tell us if it was more than a year
20   ago?
21   A.   I can't answer that. I do not have a clue.
22   Q.   Who would know?
23   A.   I can't answer that either.

76

1    Q.   Is there a document that changed any part of
2    the employee handbook?
3    A.   I don't know that.
4    Q.   Is there a document that reflects any
5    non-enforcement of certain items in the employee
6    handbook?
7    A.   I don't know the answer to that.
8    Q.   All right. Now, identify the numbers in
9    pages 40 to 42, General Safety Rules, that you
10   were speaking of that you don't think are
11   currently in force.
12   A.   No. 18, No. 20. That's the changes I see.
13   Q.   Okay. Now, let's do No. 20 first. That
14   says, for the record, "No equipment will be worn
15   outside of work areas. Boots are not to be worn
16   outside of plant."
17      Now, you say that's a true statement except
18   for hair nets and earplugs and --
19   A.   Beard nets.
20   Q.   -- beard nets, correct?
21   A.   Correct. And safety glasses for the
22   employees that wear safety glasses.
23   Q.   But for all other equipment, they're not to

77

1    be worn outside of the work area, correct?
2    A.   Yes. Back up and ask me that question
3    again. All other equipment?
4    Q.   Yes.
5    A.   Smocks are to be took off before exiting the
6    production area.
7    Q.   All right.
8    A.   And then their rubber gloves are took off
9    before exiting the production area, and put back
10   on after they get in the production area.
11   Q.   All right.
12   A.   Arm guards are put on normally after they
13   enter the production area. And if they wear
14   sleeves, they can put them on any time, the
15   production area or going to the production area.
16   Q.   Turn over to Exhibit 12, page 21. This is
17   the contract with the union effective March 1,
18   2004, to March 1, 2008.
19      There in Section 13.4, is that a complete
20   list of all the equipment that the employees are
21   provided?
22      MR. ROSENTHAL: What page did you
23   reference?

78

1       MR. WIGGINS: 21.
2    A.   I'm looking at the wrong number.
3       This is a list of equipment that we issue to
4    new employees. And we've got this listed in our
5    union negotiations on when they can come back and
6    get replacement equipment. But not all employees
7    are required to get all this equipment.
8    Q.   All right. But the contract says, for the
9    record, in Section 13.4, "Supplies will be
10   furnished to new employees, where required, in
11   accordance with company procedures as follows..."
12   and then lists three smocks, arm guards, cutting
13   glove, hair net, beard net, blue gloves, cotton
14   gloves, earplugs, apron - heavy duty, and sleeves,
15   correct?
16   A.   Yes. In this contract, some of these was
17   changed. At some time, and I don't know what
18   time, we did not issue three smocks. They come in
19   and got a new, clean smock every day. They didn't
20   have smocks; they just come in and got one out of
21   the supply room.
22   Q.   Do you know when that began?
23   A.   No.

79

1    Q.   Do you know any documents that would tell
2    us?
3    A.   No, I don't.
4    Q.   All right. Now, this list though that I
5    just read to you and that you have in front of you
6    from Section 13.4 of the collective bargaining
7    agreement, is that a complete list of the
8    equipment employees are furnished by the company?
9    A.   No.
10   Q.   What's missing?
11   A.   If we require safety glasses, they are also
12   issued by the company.
13   Q.   Okay. Anything else to make that a complete
14   list?
15   A.   I don't see boots on here.
16   Q.   Okay. Anything else?
17   A.   Not that I'm aware of.
18   Q.   Okay. So with the addition of boots and
19   safety glasses, Section 13.4 lists all the
20   equipment that employees are provided upon hire,
21   correct?
22   A.   Where required. As this states,
23   "...furnished to new employees, where required..."

80

1    Not all employees get this -- got this. This is
2    changed, because this contract ended in March of
3    this year, I believe.
4    Q.   Okay. We'll get to your new contract. But
5    during the period of this contract, this was the
6    contractual agreement, correct?
7    A.   Yes. But "Supplies will be furnished to new
8    employees, where required..." I want to make that
9    clear, "...where required..."
10   Q.   Yeah, I understand. Is there any document
11   that tells us where it is required?
12   A.   Not that I'm aware of.
13   Q.   Are there any of these items in Section 13.4
14   that are not provided to debone employees --
15   employees in the debone department?
16   A.   Not that I'm aware of.
17   Q.   Are there any of these items in Section 13.4
18   of the collective bargaining agreement that are
19   not supplied to evisceration employees?
20   A.   Well, you've got positions that don't
21   require arm guards, don't require cutting gloves;
22   so saying all of debone, all of evis, there are
23   employees in those two departments that does not

81

1    require all of these supplies.
2    Q.   Okay. Let's put aside arm guards and
3    cutting gloves. Are all the other items in
4    Section 13.4, including boots and safety glasses
5    -- no, leave off safety glasses. Let me start
6    over.
7       Other than arm guards, cutting gloves, and
8    safety glasses, are all the items in Section 13.4
9    supplied to hourly employees by the company in
10   both your plants, in all departments?
11   A.   No. Aprons are not.
12   Q.   Okay. Which employees receive aprons?
13   A.   I can't answer that. None of them are
14   required. That's up to them if they want to wear
15   them, as long as they've got their smock on.
16   Q.   We're going to get to that. I'm just trying
17   to get right now what they're provided.
18      Let's take debone department employees, for
19   example. Are they provided aprons?
20   A.   What position in debone?
21   Q.   First, are any employees in debone provided
22   aprons?
23   A.   They can get aprons if they'd like to.

82

1    Q.    Are there any employees that are prohibited
2    from getting aprons from the company?
3    A.    Not that I'm aware of.
4    Q.    Where do they get the aprons?
5    A.    Supply room.
6    Q.    Okay.  Do you furnish employees a standard
7    package of items at the beginning of each week?
8    A.    I honestly don't know how the supply room
9    and the management team handles that.  I don't
10   know how they do that.
11   Q.    Do you know who would know that?
12   A.    I sure don't.
13   Q.    Do you know if there are any standard
14   operating procedures or other documents that
15   describe how and when protective equipment is
16   issued?
17   A.    I'm not aware of that.  We go by the union
18   contract.
19   Q.    Okay.  Do you know what protective equipment
20   is provided to employees initially?
21   A.    It's according to the position the employee
22   holds.  All employees are required to wear
23   earplugs.

83

1    Q.    Are all employees required to wear hair nets
2    and beard nets?
3    A.    Yes.
4    Q.    Are all employees required to wear smocks?
5    A.    No.
6    Q.    All employees in the production area are
7    required to wear smocks?
8    A.    Yes.
9    Q.    All right.  Let's look back at page 40 of
10   the Exhibit 8, the employee handbook.
11   A.    (Witness complies.)
12   Q.    One of the items for which an employee can
13   be disciplined or discharged is No. 3 of the
14   safety rules which says, "Personal protective
15   equipment, which is provided initially by the
16   company, must be worn," correct?
17   A.    Yes.
18   Q.    All right.  Now let's look at No. 18.  You
19   identified that as one you said is not fully
20   enforced.  I think what you told me is that No. 18
21   is an accurate statement of what employees are
22   required to perform subject to discharge or
23   discipline, except for washing of arms, correct?

84

1    A.    Correct.
2    Q.    So then was there a period of time that you
3    did require washing of arms?
4    A.    I do not remember.  I don't know.
5    Q.    Who would know that?
6    A.    I don't know.
7    Q.    Your first line supervisor would probably
8    know that, wouldn't they?
9    A.    Should, I would say.  I don't know.  I can't
10   answer that.
11   Q.    All right.  But at all times since March of
12   2004, employees could be disciplined or discharged
13   for not washing hands thoroughly with soap and
14   water before and after using bathroom facilities,
15   correct?
16   A.    Yes.
17   Q.    Now let's go to Exhibit 9.  This is the
18   Employee Orientation Manual.  You brought a new
19   one that we marked earlier.
20        Page 1 is an agenda of a day of training or
21   orientation for new hires, correct?
22   A.    That's what it looks like.
23   Q.    All right.  And it says between 1:00 and

85

1    1:30, the employees are shown a tape about the QA,
2    HACCP, GMP's, SSOPs, and animal welfare, correct?
3    A.    That's what it says.
4    Q.    Have you ever seen that tape?
5    A.    No.
6    Q.    Do you know what's covered in the tape?
7    A.    No.
8    Q.    Then, at 1:45, it says, among other things,
9    the employees are given training in ergonomics
10   presentation and exercises.  What does that mean?
11   A.    I have no idea.  I've never sat through a
12   new hire orientation for hourly associates.
13   Q.    Are you familiar with what ergonomic
14   exercises employees are trained to do?
15   A.    No.
16   Q.    Do you know anything about ergonomic
17   exercises at the two plants you supervise?
18   A.    No.
19   Q.    Has there been a period where employees do
20   calisthenics?
21   A.    What's calisthenics?  I don't understand.
22   Q.    Exercise.  Physical exercise.
23   A.    There has been some time when they did do

4a4efcd4-222a-4134-9214-747cf2d63865

86

1    some exercise in the debone department alone.
2    Q.   What period of time?
3    A.   I don't know the answer to that.
4    Q.   What did they do?
5    A.   I don't know the answer to that.
6    Q.   Are there any documents that describe it?
7    A.   Not as I'm aware of. I don't know.
8    Q.   Are there any standard operating procedures
9    regarding that exercise?
10   A.   I don't know the answer to that.
11   Q.   All right. Then, at 3:00, the employees are
12   given training in several things, including PPE
13   use, correct?
14   A.   That's what this says.
15   Q.   And it says there's a tape on that subject.
16   Have you seen that tape?
17   A.   No. Never been through a new hire
18   orientation for hourly associates.
19   Q.   What about the safety representative that's
20   doing the training on the PPE? Do you know who
21   that is?
22   A.   I don't know who that is.
23   Q.   Now, PPE means personal protective

87

1    equipment; is that correct?
2    A.   Yes.
3    Q.   And what is personal protective equipment?
4    What items?
5    A.   It's according to what we're talking about.
6    In this scenario, it was for safety; it's for
7    hazardous communications and material handling.
8    Q.   So in that context, what PPE exists?
9    A.   I don't know the answer to that. I've never
10   been through a new hire orientation.
11   Q.   All right. Do you know anything about this
12   hearing protection training that's at 3:45, listed
13   on this document?
14   A.   No. As I stated, I've never been through a
15   new hire orientation, so I don't know what goes
16   on.
17   Q.   You've never had any hearing protection
18   training?
19   A.   Yes, I have, but I've never been through
20   this.
21   Q.   Okay. Have you ever had any ergonomics
22   exercise training?
23   A.   No.

88

1    Q.   Now, look through the items that I've
2    excerpted out of your Employee Orientation Manual,
3    in Exhibit 9, and tell me are there any of those
4    items that have not been in full force and effect
5    or the employees have not been required to comply
6    with since March of 2004.
7    A.   You're talking about these items?
8    Q.   Yes. Just those pages out of the
9    orientation manual that are in Exhibit 9.
10   A.   Well, I'm not familiar with the orientation
11   manual because, as I stated earlier, I've never
12   been through an orientation for hourly associates,
13   so I don't know what they do during that process.
14       If you'd like me to read these pages, I'll
15   be more than glad to, but I still don't know if I
16   can answer your question.
17   Q.   Okay. Well, put aside what they're told in
18   the orientation. Someone else will have to tell
19   us that, apparently.
20       But in terms of the operation of the two
21   plants on a day-to-day basis, are there any of
22   those items that are in Exhibit 9 that employees
23   have not been required to comply with since March

89

1    2004?
2    A.   Okay. The first sheet, the attendance
3    policy, I'm not that familiar with the attendance
4    policy because I don't do attendance on hourly
5    associates. So to give you an answer on the first
6    page, I don't know because I don't do the
7    attendance.
8    Q.   Okay. Go to the next document, which is
9    "Further Processing GMP's."
10       Are there any of those items that employees
11   have not been required to comply with since March
12   of 2004? at any point in time since March of 2004.
13   A.   Looks like page 33, I believe we're doing
14   that on page 33.
15   Q.   All right. Look at page 34, which has just
16   a few more paragraphs.
17   A.   It looks like we are doing this on page 34
18   and 33.
19   Q.   Okay. So this Further Processing GMP's,
20   which lists 24 numbered sentences of requirements,
21   employees have been required to comply with those
22   items since March of 2004 at all points in time?
23   A.   To the best of my knowledge.

FREEDOM COURT REPORTING

90

1    Q.   All right.  Let's go to the next document in
2  the orientation manual, Exhibit 9, which is Bates
3  number E 75, page 35 of the manual, called
4  "Quality Assurance."
5       Has this been in force and effect at all
6  times since March 2004?
7  A.   I can't answer that; I'm not over quality
8  assurance.
9  Q.   Looking at the items themselves, let's take
10 the first section called "Seven Principles of
11 HACCP."
12      Is that an accurate description of what the
13 company requires in term of identifying and
14 monitoring food safety hazards?
15 A.   I can't answer that because I'm not over
16 HACCP or quality assurance.
17 Q.   Okay.  Look at the second section called
18 "Standard Sanitation Operating Procedures" with an
19 acronym of "SSOPs."  Are you familiar with those?
20 A.   I'm familiar with what an SSOP is.  I'm not
21 familiar with this because I didn't write this
22 document and I'm not over this area.
23 Q.   Is there a standard sanitation operational

91

1  procedure for each of those five items?
2  A.   I can't answer that.  I don't know.
3  Q.   Then the next section is called "Standard
4  Operational Procedures SOPs."  Is there a document
5  that has an SOP for each of those eight items?
6  A.   I can't answer that.  I don't know.
7  Q.   One of those items, No. 7, is "Washing hands
8  properly."  Have you ever seen an SOP on washing
9  hands properly?
10 A.   No, I haven't.
11 Q.   Who would know if there is an SOP on that
12 subject?
13 A.   I can't answer that.  I don't know.
14 Q.   Turn over to page 39 of the orientation
15 manual.
16 A.   (Witness complies.)
17 Q.   These items listed, the five bullet points,
18 have been required of employees since March of
19 2004?
20 A.   Yes.  We ask our people to do this, but I've
21 never seen this summary, per se, here.
22 Q.   It accurately summarizes what employees are
23 required to do since March of 2004?

92

1  A.   Yes.
2  Q.   Let's turn to the next page in Exhibit 9,
3  which is page 40 of the operations (sic) manual.
4  And specifically No. 30, there at the top of the
5  page, says, "All employees will follow department
6  safety rules, policies and procedures.  Failure to
7  follow safety rules will result in disciplinary
8  action up to and including termination."
9       Has that always been the policy since March
10 of 2004?
11      MR. ROSENTHAL:  I'm going to object to
12 that term.  I think you referenced this as the
13 operations manual; I believe we're still in the
14 orientation manual.
15      MR. WIGGINS:  Okay.  I meant
16 orientation manual.
17 A.   I don't know about the orientation manual.
18 We do require people to follow our safety rules,
19 policies and procedures.
20 Q.   All right.  Turn to page 41 of the
21 orientation manual under "Sanitation Safety
22 Rules."
23 A.   (Witness complies.)

93

1  Q.   It says, No. 2, "Always wear rain pant legs
2  outside the boot."  What does that mean?
3  A.   You wear your rain pants on the outside of
4  your boots where chemicals can't get in your
5  boots.
6  Q.   And does the company furnish the rain pants?
7  A.   Yes.
8  Q.   Who is that furnished to?
9  A.   Sanitation employees.
10 Q.   All right.  How many employees do you have
11 in sanitation?
12 A.   I don't know the exact number.
13 Q.   Are the employees required to wear their
14 rain pants when they're in the production area
15 doing the sanitation work?
16 A.   They wear them to home and from home if
17 they'd like.
18 Q.   But they're required to have them on in the
19 production area?
20 A.   Yes.
21 Q.   Okay.  Now look at the bottom of that page.
22 It's called, "Three Day Suspension Pending
23 Investigation/Final Notice."  It lists five bullet

94

1  points.
2      Is that an accurate description of what will
3  get a three-day suspension pending
4  investigation/final notice given to an employee
5  for each of those items?
6  A.  I don't know if that's accurate now with HR
7  what steps they follow in disciplinary action.  I
8  don't know if that is the steps they do follow at
9  this time.
10  Q.  Now let's look at the last bullet point.  It
11  is accurate since March 2004, isn't it, that you
12  can get a three-day suspension pending
13  investigation if you, quote, Failure to wear or
14  properly wear required personal protective
15  equipment, correct?
16  A.  That's what it says.
17  Q.  And that's been the practice?
18  A.  Can't answer that.
19  Q.  You don't get involved in disciplining
20  employees on a three-day suspension?
21  A.  No.
22  Q.  Who does?
23  A.  HR, human resources.

95

1  Q.  Are they the decision maker as to whether an
2  employee will be put on a suspension?
3  A.  They are, with the employee's manager.
4  Q.  So if a first line supervisor saw an
5  employee not complying with the personal
6  protective equipment rules, would they have the
7  authority to discipline the employee themselves?
8  A.  All disciplinary action goes through HR
9  department, all suspensions.  And that's what we
10  were talking about here, three-day suspensions.
11  Q.  Okay.  The first line supervisor can
12  initiate the suspension, but it has to be approved
13  by human resources?
14  A.  Yeah.  They go up to HR and discuss what
15  happened, and they make a decision together.
16  Q.  The first line supervisor and the HR make a
17  joint decision?
18  A.  Yes.
19  Q.  Who in HR has responsibility for that?
20  A.  HR manager.
21  Q.  But what's the person's name?
22  A.  What shift are you talking about?
23  Q.  Each shift.  Tell me their names.

96

1  A.  You've got Kathy Gilmore can make that
2  decision; you've got Dante Rogers could make that
3  decision; you've got the one on night shift, and I
4  don't know his full name, Julio, can make that
5  decision; Jim Bice, as the complex QA manager, can
6  make that decision.
7      So there's several in HR that has the
8  ability to make that decision, along with the
9  management person.
10  Q.  All right.  Let's look at page 47 of the
11  orientation manual in Exhibit 9.  It's called "How
12  to Use Plugs."  This is referring to earplugs,
13  correct?
14  A.  I guess.  First time I've ever seen it.
15  Q.  All right.  But is this an accurate
16  statement of the company policy and practice --
17  A.  I can't answer that.
18  Q.  Well, I wasn't finished yet.
19  A.  Okay.
20  Q.  Since March of 2004, has it been a
21  requirement of employees to comply with the
22  following sentence: "Your hands and plugs should
23  be clean before you put the plugs in your ears"?

97

1  A.  I can't answer that because I don't never
2  see no one checking earplugs and ears to see if
3  they're clean -- or hands.  I'm sorry.
4  Q.  Do you have any reason to believe that this
5  statement in the orientation manual that your
6  hands and earplugs should be clean before you put
7  the plugs in your ears is not something that the
8  employees are trained to do?
9  A.  As I said, I've never been through a new
10  hire orientation, so I don't know what goes on in
11  a new hire orientation.  I don't know if they
12  train them.  I don't know.
13  Q.  I understand that.  But do you have any
14  reason to believe that this part of the
15  orientation manual is not in fact part of the
16  training employees are given?
17  A.  I don't know.
18  Q.  Okay.  Turn to page 51 of the orientation
19  manual.
20  A.  (Witness complies.)
21  Q.  It has "General PPE Information" at the top.
22  This document is called "Personal Protective
23  Equipment."

FREEDOM COURT REPORTING

98

1       At the second bullet point, it lists this
2   requirement: "Keep PPE clean and sanitary."
3       Has that always been a requirement that
4   employees are expected to comply with since March
5   of 2004?
6   A.   I can't answer that on personal protective
7   equipment.  You would think they would like to;
8   it's their ears they're putting the earplugs in.
9   Q.   All right.  It defines here the personal
10  protective equipment in the following way; I want
11  to see if you agree with this way it defines it.
12  It says, quote, Personal protective equipment is
13  any piece of equipment, article of clothing, or
14  items deemed necessary for the health and safety
15  of employees, prevention of injuries, loss of life
16  or limb, or disease while employees perform their
17  daily job assignments as prescribed.
18      Do you agree with that?
19  A.   Yes.
20  Q.   What are those items?
21  A.   As in?
22  Q.   What items of personal protective equipment
23  exist at the two plants?

99

1   A.   It's according to what you're doing.  I
2   mean, you're talking about production employees
3   that uses a -- I mean, give me a particular job or
4   a position, and I'll tell you what the PPE is for
5   that job.
6   Q.   Is there a document that tells us?
7   A.   No, not that I'm aware of.  I don't know.
8   Q.   Are you able to catalog for every job the
9   PPE that's required?
10  A.   Not that I'm aware of.
11  Q.   One item on this document, the Employee
12  Orientation Manual, says, at page 51, "Wash hands
13  before inserting earplugs."
14      Has that been a requirement of employees
15  since March of 2004?
16  A.   Not that I'm aware of.
17  Q.   Do you have any reason to believe that
18  that's something employees are not trained to do?
19  A.   I don't know.  I don't know what they're
20  trained in new hire orientation.
21  Q.   And then the next bullet point says, "Any
22  PPE other than that issued by Equity Group Eufaula
23  Division must be approved through the safety

100

1   office."
2       Has that been a policy and practice followed
3   since March of 2004?
4   A.   I'm not aware of it.  I don't know.
5   Q.   Do you know if employees are allowed to wear
6   their own smocks?  Bring them from home and wear
7   their own?
8   A.   No, they're not allowed to wear their own
9   smocks.
10  Q.   Do you know of any items that employees are
11  allowed to furnish themselves as a substitute for
12  the ones that the company furnishes to them?
13  A.   Well, it states here that if they do, they
14  need to get it approved through the safety office.
15  This is talking about safety equipment, from what
16  I'm reading here.  Personal protective equipment
17  is not a smock.
18  Q.   You don't consider a smock part of the
19  personal protective equipment?
20  A.   No.  We're talking safety here.
21  Q.   All right.  Well, let's look back at the
22  list of items in the collective bargaining
23  agreement.  Look at Exhibit 12 again, page 21.

101

1   A.   (Witness complies.)
2   Q.   Does the company consider hair nets and
3   beard net to be personal protective equipment?
4   A.   It doesn't state that here.
5   Q.   But does the company, in its operations,
6   consider hair nets and beard nets to be personal
7   protective equipment?
8   A.   Not that I'm aware of.
9   Q.   Does the company consider blue gloves to be
10  personal protective equipment?
11  A.   Not that I'm aware of.
12  Q.   Does the company consider cotton gloves to
13  be personal protective equipment?
14  A.   Not that I'm aware of.
15  Q.   Does the company consider aprons or heavy
16  duty aprons to be personal protective equipment?
17  A.   Not that I'm aware of.
18  Q.   What about sleeves?  Are they considered
19  personal protective equipment by the company?
20  A.   Not as I'm aware of.
21  Q.   And I think you've already said smocks are
22  not considered personal protective equipment,
23  correct?

FREEDOM COURT REPORTING

102

1    A.   Not for safety.
2    Q.   All right. I'm not sure what you mean.
3    You're saying smocks don't play any role in
4    safety?
5    A.   Correct. In human safety.
6    Q.   But are smocks considered to be personal
7    protective equipment?
8    A.   Not in my dictionary.
9    Q.   Okay. What about boots? Are they
10   considered personal protective equipment?
11   A.   Yes.
12   Q.   Safety glasses?
13   A.   Yes.
14   Q.   Arm guards?
15   A.   Yes.
16   Q.   Cutting gloves?
17   A.   Yes.
18   Q.   Okay. Anything else that's considered to be
19   personal protective equipment, other than arm
20   guards, cutting gloves, boots, and safety glasses?
21   A.   Earplugs.
22   Q.   Anything else?
23   A.   Not that I'm aware of, in a normal

103

1    production job.
2    Q.   Okay. Now, going back to the page we were
3    on, page 51, at the bottom of that page in the
4    orientation manual, Exhibit 9, it's got a section
5    called "Ergonomics/Proper Lifting."
6         Read those items and tell me are those
7    things that employees are expected to comply with
8    since March of 2004.
9         (The witness examines the
10        document.)
11   A.   This is just a brief guideline to go by on
12   ergonomics. We don't require all our people to do
13   all this, measure 2 inches or do these procedures,
14   but it is a proper lifting for ergonomics that we
15   would like for our employees to practice. Do we
16   require it? Not that I'm aware of. I don't know.
17   Q.   Look at the bullet point that says, "Avoid
18   improperly fitting gloves. Gloves that do not fit
19   correctly can impede circulation and decrease the
20   sense of touch."
21        Do you agree with that?
22   A.   Yeah.
23   Q.   If an employee has his circulation impeded

104

1    or his sense of touch decreased, that would affect
2    his ability to perform his job, correct?
3    A.   Yes.
4    Q.   How does the company make sure that the
5    gloves its dispensing to employees are properly
6    fitting?
7    A.   We have different sizes; they can get
8    whatever size they need.
9    Q.   Who determines that?
10   A.   The employee.
11   Q.   The supply room attendant hands them to them
12   or do they go in there and get them themselves?
13   A.   The supply room gives them whatever size
14   they need.
15   Q.   Okay. The next bullet point says, "Cold
16   temperatures can reduce the function of the nerves
17   and muscles. In cold temperatures, the fibers of
18   the muscles do not work smoothly, which increases
19   the risk of tearing fibers."
20        Do you agree with that?
21   A.   I guess. I mean, I'm not a doctor; I don't
22   know.
23   Q.   Do you agree that employees working in cold

105

1    temperatures, that can adversely affect their
2    ability to perform their jobs in your two plants?
3    A.   Yes, without proper clothing.
4    Q.   And what areas of the plant have cold
5    temperatures?
6    A.   Cooler.
7    Q.   Any other areas?
8    A.   And the further processing plant, the
9    freezer.
10   Q.   What temperature are the chickens at during
11   the processing after slaughter?
12   A.   At what point?
13   Q.   Let's take before they go to the chiller.
14   A.   90 degrees.
15   Q.   And what about when they go past the
16   chiller, what are they at?
17   A.   40 degrees when they come out.
18   Q.   Is that the lowest they ever get?
19   A.   38 to 40. I mean, I don't know exactly
20   whatever temperature the birds are.
21   Q.   What is the temperature in the debone area?
22   A.   I don't know the answer to that. I'm
23   guessing -- and I shouldn't guess -- but 65, 68

FREEDOM COURT REPORTING

106

1  degrees.
2  Q.  Are there any areas of the plant colder than
3  that?
4  A.  Cooler.
5  Q.  How cold is the cooler?
6  A.  28 to 36 degrees.
7  Q.  How many employees work in the cooler?
8  A.  When you say "work in the cooler," define
9  "work in the cooler."
10 Q.  Well, they're in the cooler enough to be
11 affected by the coldness.
12 A.  I still don't understand your question.
13 Q.  How many employees are going in and out of
14 the cooler on a regular basis?
15 A.  I don't know the answer to that, how many
16 there are.
17 Q.  Are there employees stationed so that they
18 have to go in the cooler as a regular part of
19 their job?
20 A.  Are they stationed in the cooler or they go
21 in and out of the cooler?
22 Q.  Stationed in a way that they go in and out
23 of the cooler frequently.

107

1  A.  We have employees that go in and out of the
2  cooler.
3  Q.  And how many of those employees do you have?
4  A.  I don't know the answer to that.
5  Q.  Which employees are they?
6  A.  Shipping employees, normally.  I mean, we
7  may have other employees go in and out, but
8  shipping is one.
9  Q.  And then this next bullet point says, "Take
10 mini breaks during work."  That's m-i-n-i.  "Take
11 mini breaks during work.  It is helpful to pause
12 frequently to flex and stretch.  This will improve
13 flexibility and improve blood-flow."
14     Is it permissible for employees to do that
15 while on paid time?
16 A.  We need to define "mini breaks."  If an
17 employee wants to, after a bird goes by, if they
18 work in a certain area, they can stop for a minute
19 and move.
20     I mean, I don't know the definition of this
21 question.
22 Q.  But you think up to a minute employees would
23 be within their rights to —

108

1  A.  It's according to what position they're
2  working in.
3  Q.  Do you know any positions that employees
4  would not be allowed to take mini breaks in order
5  to flex and stretch frequently?
6  A.  Define "mini breaks."  I don't know what
7  m-i-n-i, means, mini.  As in what's the time frame
8  of a mini break?
9  Q.  What would it be in your view?
10 A.  I don't know.  I mean, I don't really know
11 what your definition of a mini break is.
12 Q.  Would employees be considered to be in the
13 wrong if they took three to five minutes?
14 A.  Yes.
15 Q.  Would they be considered to be in the wrong
16 to take a full minute?
17 A.  According to what position they're in, where
18 they're at.
19 Q.  Which positions would employees have the
20 right to take a minute off to frequently flex and
21 stretch to improve flexibility and increase
22 blood-flow?
23 A.  There could be numbers of them; and I don't

109

1  know all of them off the top of my head.
2  Q.  All right.  Turn over to page 71 of the
3  orientation manual.
4     By the way, let me ask you this question
5  before we go to page 71:  If an employee took a
6  mini break during production time, would they
7  still be considered to be at work or working?
8  A.  It goes back to the definition of mini
9  break.
10 Q.  I mean, if an employee were flexing or
11 stretching in order to increase blood-flow, would
12 that be considered part of their work?
13 A.  It's according to the definition of mini
14 break.
15 Q.  Within whatever definition the company
16 recognizes, which you said you don't know what it
17 is, but within whatever the company considers a
18 mini break, is that considered to be work time?
19     MR. ROSENTHAL:  Objection to the form
20 of the question.  You can answer if you can.
21 A.  I don't know the answer to that question.
22 Q.  All right.  Let's go to page 71 of the
23 orientation manual, Exhibit 9.

FREEDOM COURT REPORTING

110

1    This is called "Hazardous Communications,
2    Hazardous Materials, & Personal Protective
3    Equipment."
4        One of the bullet points says,
5    "Demonstration of donning and appropriate use of
6    required PPE."
7        Have you ever seen that demonstration by the
8    company as to how employees are supposed to don
9    their PPE?
10   A.   No, I have not.
11   Q.   Who provides that demonstration of proper
12   donning of PPE?
13   A.   I can't answer that.  Probably supervisors.
14   I don't know the answer to that.
15   Q.   Do you know if the company provides a
16   demonstration of proper donning of smocks, gloves,
17   aprons, or sleeves?
18   A.   I don't know the answer to that.
19   Q.   Let's go to page 80 of the orientation
20   manual.  It's called "Clean-Up and Safe
21   Housekeeping."
22       The first bullet point says, "After an
23   accident, the entire area must be cleaned with

111

1    disinfectant."
2        Give me an example of what kind of accident
3    we're talking about there.
4    A.   I don't know.  I've never seen this before.
5    Q.   What type of event would occur in one of
6    your two plants that would require employees to
7    clean with disinfectant?
8    A.   If an employee gets cut, for example.
9    That's all I can think of because I'm not familiar
10   with this document.
11   Q.   If an employee, in that situation of being
12   cut and having to clean with disinfectant, is that
13   considered to be part of their work or their paid
14   time?
15   A.   Which employee are you talking about?
16   Q.   Any employee in your two plants.  If they
17   were -- During the period they're having to clean
18   with disinfectant, is that considered to be part
19   of their work and paid time?
20   A.   Yes.
21   Q.   All right.  Then it says, next bullet point
22   in Exhibit 9, page 80 of the orientation manual,
23   that, "Cleaning equipment must be disinfected."

112

1    Is that required at the plant?
2    A.   I don't even know what that means.
3    Q.   Do you provide any disinfectants to clean
4    equipment?
5    A.   We have disinfectants that we clean the
6    plant with.
7    Q.   When employees clean equipment with
8    disinfectant, are they considered to be working?
9    A.   Yes.
10   Q.   Is that considered to be compensable time?
11   A.   Paid time?
12   Q.   Paid time.
13   A.   Yes.
14   Q.   Next page, 81, "Common Sense Rules" is the
15   heading, in the orientation manual.
16       Are each of these items practices followed
17   in your two plants?
18   A.   I can't answer that.  First time I ever seen
19   it.
20   Q.   But in terms of the practices followed in
21   your two plants, is it a rule that employees must,
22   quote, Wash hands and remove protective clothing
23   before eating, drinking, smoking, handling contact

113

1    lenses, applying lip balm or cosmetics?
2    A.   Not that I'm aware of.
3    Q.   But you don't have any reason to believe
4    that this is not an item that employees are taught
5    to do in the orientation?
6    A.   As I said earlier, I don't know what they
7    teach them in orientation.  I don't know.
8    Q.   I know you don't know.  But do you have any
9    reason to suspect that this is not taught?
10       MR. ROSENTHAL:  Objection to the form
11   of the question.
12   A.   I don't know.
13   Q.   Let's go to page 83 of the orientation
14   manual called "Other Exposure Hazards."  It says
15   this to the employees:  "Always wear gloves and
16   protective apron or clothing."
17       Is that an accurate statement of what
18   employees have been required to do?
19   A.   I can't answer that, not on "explosion" of
20   hazardous.  I would think so on "explosion" of
21   hazard, but I don't know.  Exposure of hazards.  I
22   don't know.
23   Q.   Yeah.  You were saying "explosion," but the

114

1    word -- let's get the record straight.
2        The wording at the top is "Other Exposure
3    Hazards," correct?
4    A.    Yes.
5    Q.    What's an exposure hazard?
6    A.    I don't know.
7    Q.    All right. Let's look at page 91 of the
8    Employee Orientation Manual, Exhibit 9 called
9    "Good Manufacturing Practices (GMP'S)."
10       Have all of these items listed on this page
11   been requirements that employees have been
12   required to comply with since March of 2004?
13       (The witness examines the
14       document.)
15   A.    The best of my knowledge.
16   Q.    Okay. Let's look at Exhibit 11, the last
17   two pages which is called "7 Minute Safety
18   Training."
19       "Protect yourself with universal
20   precautions." Trainer outline 4:30.
21       Are you familiar with this type of training
22   document?
23   A.    No, I'm not.

115

1    Q.    Let's look at the contract. And if you need
2    the full contract, I think we have it out here for
3    you somewhere.
4        MR. ROSENTHAL: If you need it, I have
5    a copy of it.
6    Q.    Do you know of any items within the
7    2004-2008 contract that were not in force or that
8    were modified in some way?
9    A.    I'm not that familiar with the contract. I
10   don't remember it word for word. I'd have to look
11   through it and see.
12   Q.    Well, let's take the pages that I've
13   excerpted out here in Exhibit 12 in order to
14   narrow it down a little bit. These are the pages
15   that look like they might be relevant to this
16   case.
17       Tell me, on those pages in Exhibit 12, are
18   there any parts that were not in force during the
19   2004 to 2008 contract period?
20   A.    These smocks, again, as stated earlier.
21   Sometime during this contract we started
22   furnishing them smocks, and they pick them up at
23   the supply window. They was not issued three

116

1    smocks. That happened in this contract. I don't
2    know the time frame.
3    Q.    Okay. Anything else?
4    A.    To the best of my knowledge, we've followed
5    everything else that's in the contract.
6    Q.    Okay. I'm going to come back to one or two
7    of those items. Let me finish these documents
8    first.
9        Look at Exhibit 13. What is this? It's
10   called "Work Rules," but I can't figure out what
11   it is.
12   A.    I don't have a clue.
13   Q.    Look at the first page of it and see if it
14   gives you any idea even remotely what it might be.
15   A.    No, I have no idea.
16   Q.    Who would probably know something about what
17   this is?
18   A.    I can't answer that.
19   Q.    All right. Let's look at Exhibit 14. There
20   are two letters here that were produced by the
21   company from the Department of Labor, but they're
22   not addressed to Equity Group, or anybody really.
23       But one document has got a 2007 date, E 171

117

1    to 172; the other one has a 2002 date, E 167 and
2    168.
3        Have you ever seen these before?
4    A.    I'm not familiar with these documents.
5    Q.    Have you ever had any responsibility for
6    keeping abreast of Department of Labor
7    requirements on overtime?
8    A.    No.
9    Q.    Have you ever had any responsibility for
10   determining compliance with overtime rules or
11   regulations?
12   A.    No.
13   Q.    Do you know anybody in the company who has
14   had responsibility for keeping abreast of overtime
15   requirements of the Department of Labor?
16   A.    I don't have a clue. I mean, I don't know.
17   Q.    Do you know who made the decision not to pay
18   employees for donning, doffing, or sanitizing
19   activities before their production line begins?
20       MR. ROSENTHAL: Objection to the form
21   of the question. You can answer.
22   A.    We're just following the union contract.
23   Everything was negotiated in the union contract,

FREEDOM COURT REPORTING

118

1    and that's what we go by.
2    Q.   But do you know who made the decision that
3    the company would not pay for donning, doffing, or
4    sanitizing time that occurs before the production
5    line commences?
6         MR. ROSENTHAL:   Again, I object to the
7    form for the same reason.
8    A.   No.  We were just following the union
9    contract.
10   Q.   So then it wasn't your decision, obviously,
11   correct?
12   A.   No.  We just follow in the union contract
13   what we negotiated with the union.
14   Q.   Who do you think is the most knowledgeable
15   of the Department of Labor overtime requirements
16   or regulations?
17   A.   I can't answer that.
18   Q.   Do you know anybody who's knowledgeable?
19   A.   No.  I don't know who would be knowledgeable
20   of that.
21   Q.   Let's go to the last exhibit in the book,
22   Exhibit 15.  This is called "Equity Group Eufaula
23   Division Payroll Processing Manual."

119

1         Do you use this?
2    A.   This manual?
3    Q.   Yes.  Or any parts of the manual that we
4    have there in that exhibit.  I excerpted out
5    certain pages.  I'm just asking you about these
6    pages.
7    A.   I don't know because I don't do time sheets.
8    I don't know what's being used.
9    Q.   Have you ever seen this manual before?
10   A.   No.
11   Q.   The whole manual?  This is the whole manual.
12   A.   No, I've never seen it.
13   Q.   This is not something that you use in your
14   work?
15   A.   No, I don't.
16   Q.   Does anybody under you use this manual?
17   A.   I can't answer that.
18   Q.   Let's look at page 1, which is E 695 of
19   Exhibit 15.  This is called a "Time Detail"
20   report, correct?
21   A.   Yes.
22   Q.   Do you use that type of document in your
23   work?

120

1    A.   I don't.
2    Q.   Do you know how to read this document?
3    A.   No.  I don't use this document.
4    Q.   Okay.  But do you know how to read it?
5    A.   I could figure it out.  But, you know, I'm
6    not familiar with it because I don't use it.  I
7    don't have hourly associates reporting to me.
8    Q.   Okay.  Let's look at the next page, E 696.
9    Do you use this type of document or are you
10   knowledgeable of it?
11   A.   I don't use it.  I mean, I know what it is.
12   Q.   What is it?
13   A.   It just tells the positions and the payroll
14   department and the supervisor in that area is, you
15   know, what I get out of it.  I don't know what
16   else you could use it for.
17   Q.   Let's take the first line, for example.  It
18   says, Department 21A, Security; Supervisor, J.B.
19   Glass; Monday In/Out, and then it has an "E."
20        Do you know what that is telling?
21   A.   No.
22   Q.   All right.  Let's go to E 698 of Exhibit 15.
23   This is called "Editing."

121

1         Do you edit time sheets?
2    A.   No.
3    Q.   And do you have any knowledge about the time
4    sheet editing process?
5    A.   No.
6    Q.   Who would be knowledgeable about the editing
7    of time sheets?
8    A.   I can't answer that.
9    Q.   We talked earlier about if an employee is
10   late by a minute, his payroll will be reduced by
11   that minute.  How does the company go about doing
12   that?
13   A.   The supervisor would make the changes on the
14   time sheets, and then payroll would make the
15   adjustments.
16   Q.   So the supervisor would have the punch-in
17   time, correct?
18   A.   Yes.  It would be on his time sheet.
19   Q.   And where does the supervisor get the
20   punch-in time from?
21   A.   Payroll department.
22   Q.   Is it on line where he can just dial in to
23   it?

122

1    A.  I don't know.
2    Q.  And what does he compare the punch-in time
3    to, to determine if someone is late?
4    A.   Master card time.  Start time/ending time,
5    according to what schedule he's on.
6    Q.  All right.  Master card time, is that the
7    same thing as line time?
8    A.   Yes, I would think so.
9    Q.  All right.  Let's look back at the
10   collective bargaining agreement, Exhibit 12.
11   Let's look at page 20 of the agreement, Section
12   12.5 called "Line Time."
13       It consists of this one sentence:  "All
14   employees will be paid according to the hours of
15   work indicated by the Master Line Time Card."
16   Correct?
17   A.   Yes, sir.
18   Q.  Now, you earlier told us though that that's
19   not true for all employees that are under the
20   collective bargaining agreement, correct?
21   A.   Correct.
22   Q.  Do you have a list of jobs or employees for
23   which it is not true that they will be paid

123

1    according to the Master Line Time Card?
2    A.   I do not.
3    Q.  Can you name any such jobs?
4    A.   Floor personnel would be one.  I mean,
5    there's probably many, but I don't know them all.
6    Q.  Tell us the ones you do know.
7    A.   I honestly don't know.  I know floor
8    personnel wouldn't because they come early and
9    stay late.  They're on a different time than the
10   line card.  I don't know what employees are on
11   what time system, whether it be master card, clock
12   in to clock out, so I don't know.
13   Q.  If you were to attempt to determine that,
14   what documents would you want to look at?
15   A.   I would have to just do some research.  I
16   don't know what documents I'd look at because
17   right now I wouldn't know where to look.
18   Q.  Who would be the first person you would ask
19   because you would think they were the most
20   knowledgeable?
21   A.   Payroll department.
22   Q.  Who in the payroll department?
23   A.   You've got Joe Preston who's the accountant

124

1    which is over the payroll department.  I would ask
2    him who I needed to talk to, and he would send me
3    in the right direction.
4    Q.  All right.  Are there floor personnel in the
5    evisceration department?
6    A.   I would think so, yes.
7    Q.  Do you know how many?
8    A.   No.
9    Q.  Are there floor personnel in the debone
10   department?
11   A.   Yeah, I think so.
12   Q.  Is a floor person different than a setup
13   person?
14   A.   I don't know the answer to that.  I don't
15   know how they've got it staffed.
16       MR. WIGGINS:  Now, do you have his
17   affidavit that he can look at?
18       MR. ROSENTHAL:  I don't have an extra
19   copy of it.
20       MR. WIGGINS:  Okay.
21       MR. GOULD:  Would this be a good time
22   to take a break?
23       MR. WIGGINS:  Sure.

125

1        (A lunch recess was taken.)
2    (BY MR. WIGGINS)
3    Q.  All right.  We're talking about the two
4    plants you had under you.  How many employees are
5    in each plant, hourly?
6    A.   A guess, 11-, 1200 total.  That's a guess.
7    Q.  And that's in both plants together?
8    A.   Yes.
9    Q.  And how many in the fresh plant?
10   A.   A guess, a thousand.
11   Q.  All right.  And are there any practices
12   different in the further processing plant from
13   those in the fresh plant?
14   A.   Yes.
15   Q.  All right.  And are there any practices on
16   donning, doffing, or sanitizing that are different
17   between the two plants?
18   A.   Yes.
19   Q.  What?
20   A.   Boot sanitation is not required at further
21   processing.
22   Q.  What is the McDonald's rule?
23   A.   On?

FREEDOM COURT REPORTING

126

1  Q.  I've just heard referred to the McDonald's
2  rule.  Do you know what that means?
3  A.  No, I don't.
4      MR. ROSENTHAL:  They don't use tomatoes
5  anymore.
6  Q.  Is McDonald's a customer?
7  A.  Yes.
8  Q.  And is it a customer of both plants, fresh
9  plant and further processing?
10 A.  The fresh plant feeds to further processing
11 plant.
12 Q.  Is McDonald's one of your bigger customers?
13 A.  Yes.
14 Q.  Is it your biggest customer?
15 A.  Yes.
16 Q.  And does it have certain sanitation
17 requirements for you to operate under?
18 A.  Yes.
19 Q.  What are they?
20 A.  I don't know all of them.  I don't know.
21 Q.  Tell me the ones you know.
22 A.  Pretty much what we went over today on
23 GMP's, SSOPs.  Just standard operating procedures.

127

1  Q.  McDonald's requires all those things?
2  A.  They require us to produce safe food is
3  their requirements.
4  Q.  All right.  And all your GMP's are put
5  together in order to satisfy that requirement?
6  A.  Not all of them.
7  Q.  All right.  Are most of them for that
8  purpose?
9  A.  No, I wouldn't say most of them.  And I
10 don't know how many.
11 Q.  Okay.  Do you deal with McDonald's?
12 A.  No.
13 Q.  Does anybody under you deal with McDonald's?
14 A.  Nothing but produce product for them.
15 Q.  Who does interact with McDonald's, if
16 anyone, at the Eufaula Division?
17 A.  No one directly deals with McDonald's at
18 Eufaula Division.
19 Q.  Okay.  Who is your second biggest customer?
20 A.  I don't know the answer to that.
21 Q.  All right.  Does the company market chicken
22 products to the public itself?
23 A.  No.

128

1  Q.  When you said there were 11- or 1200 hourly
2  employees at the two plants, are all those
3  employees subject to the collective bargaining
4  agreement?
5  A.  No.
6  Q.  How many are subject to the collective
7  bargaining agreement?
8  A.  I don't know the answer to that.
9  Q.  Which employees are not subject to the
10 collective bargaining agreement?
11 A.  QA department, maintenance department.
12 Q.  Does QA have hourly employees?
13 A.  Yes.
14 Q.  How many employees are in QA?
15 A.  I don't know the answer to that.
16 Q.  And QA stands for quality assurance?
17 A.  Quality assurance.
18 Q.  Does the quality assurance department
19 interact with McDonald's?
20 A.  Not directly with McDonald's, no.
21 Q.  Does McDonald's review and sign off on or
22 approve your GMP's on sanitation?
23 A.  Not at my location they don't.

129

1  Q.  Do you know if they do that anywhere?
2  A.  I don't know that.
3  Q.  How many departments are in the fresh plant?
4  A.  I don't know.  When you say "department,"
5  job codes?  I don't know how many there are
6  totally.
7  Q.  Each department has a job code?
8  A.  Yes.
9  Q.  Well, we had identified various areas here.
10 Let me see if I can get the nomenclature down.
11     Evisceration, that's a department, correct?
12 A.  There could be two or three departments
13 within that department.  Evis is an area.
14 Q.  What departments are within the evisceration
15 department?
16 A.  You've got salvage.  I mean, I don't know
17 how they're all broke out.  I honestly don't.
18 You've got salvage; you've got line 1, line 2;
19 you've got rehang; you've got picking and
20 receiving; you've got live shacklers.
21     There's a lot of them, and I don't know all
22 the departments, how they're broke out.
23 Q.  Okay.  And what about evisceration?

FREEDOM COURT REPORTING

130

1    A.   That's what I was talking about.
2    Q.   I'm sorry. Debone. How many departments
3    are within debone?
4    A.   I honestly don't know. Several.
5    Q.   More than five?
6    A.   I would say so. That's a guess.
7    Q.   Are there any documents that would reflect
8    the areas or departments within the debone
9    department?
10   A.   I don't know the answer to that. Payroll
11   may have something, but I don't know that. I
12   don't know.
13   Q.   What areas in the production or processing
14   part of the plant are not a part of debone or
15   evisceration?
16   A.   DSI is not a part of either.
17   Q.   All right. Any others?
18   A.   Shipping, QA, HACCP, maintenance. Those are
19   just a few I can name.
20   Q.   How many employees are in HACCP?
21   A.   I don't know the answer to that.
22   Q.   And HACCP, that's the H-A-C-C-P; is that
23   what that is?

131

1    A.   Yes.
2    Q.   Okay. And does it have hourly employees?
3    Did I ask you that?
4    A.   Yes.
5    Q.   And you don't know how many?
6    A.   Huh-uh.
7    Q.   Do you know approximately how many?
8    A.   No.
9    Q.   How many employees are in shipping?
10   A.   I don't know the answer to that.
11   Q.   Give me a ballpark.
12   A.   It's a total guess: 30.
13   Q.   And those are all hourly?
14   A.   Yes.
15   Q.   And DSI. How many employees are in DSI?
16   A.   This is an estimate: I'm guessing 160.
17   That's a guess; I don't know.
18   Q.   All right. What about the cooler employees?
19   Is that a department?
20   A.   Shipping.
21   Q.   Part of shipping? And tell me again what
22   DSI stands for.
23   A.   I don't really know.

132

1    Q.   What do they do over there?
2    A.   Cut meat with a water jet.
3    Q.   The back dock, is that a department?
4    A.   Picking and receiving.
5    Q.   So that's part of the evisceration
6    department?
7    A.   It's got a department of its own, but it
8    falls under the first processing or evisceration
9    department.
10   Q.   Now, at the further processing plant, it
11   doesn't have an evisceration or debone?
12   A.   No.
13   Q.   What does it have?
14   A.   You've got several areas, but I don't know
15   all those departments either, how the people are
16   laid out. But you've got a prep area; you've got
17   a laydown area; you've got packout area.
18   Q.   Does McDonald's conduct on-site audits of
19   the plant?
20   A.   McDonald's don't.
21   Q.   Does someone do that for McDonald's?
22   A.   Keystone has a group out of Philadelphia
23   that does audits.

133

1    Q.   Who is that?
2    A.   Keystone.
3    Q.   I know. But who? What persons?
4    A.   I don't know all of them's names. They're
5    out of Philadelphia. I don't know.
6    Q.   And Keystone is the corporation that you are
7    employed by; is that correct?
8    A.   As far as I know. I hope so.
9    Q.   What's the name of this area that does
10   audits of your plant?
11   A.   Keystone. They're part of the company.
12   Q.   I mean, is it a department? Does it have a
13   name?
14   A.   Food safety group.
15   Q.   Who is the head of that group?
16   A.   Dane Bernard, I think. And I'm not for sure
17   of that.
18   Q.   How often do they audit your food safety
19   standards, your practices?
20   A.   This is a guess totally; I don't know:
21   annually. It's according to what part of it
22   you're talking about auditing.
23   Q.   What do they audit?

134

1    A.   Sanitation; they audit animal welfare, pest
2    control.  Those are three that I know.  They may
3    audit more than that.
4    Q.   Is the donning, doffing, and sanitizing
5    activities done by employees with their gloves,
6    smocks, aprons, sleeves, that type of thing, is
7    that part of the sanitation audit?
8    A.   I don't know.  I don't remember.  I honestly
9    don't know.
10   Q.   Do you get a report on the results of the
11   audit?
12   A.   I don't know the answer to that.
13   Q.   Do you know if anybody at the plant
14   interacts with the food safety department more
15   than you?
16   A.   QA department.
17   Q.   But you don't know any outside group or
18   entity that audits or reviews your food safety
19   practices or your sanitation practices other than
20   USDA?
21   A.   Not that I'm aware of.  They may, but I'm
22   not aware of it.
23   Q.   Now, you told me the different areas that

135

1    are in the plant.  Write them down for me on this
2    map that we have marked.  Write each of the
3    production areas down and show me where they're
4    at.
5    A.   Explain what you're wanting me to write
6    down.  I mean, like, parking lot, debone.
7    Q.   The production area.  Tell us where each
8    thing is.
9    A.   First off, this print is not up to date, so
10   whatever I write down won't be accurate because
11   the plant has been changed since whenever this
12   print was made.
13   Q.   When was it changed?
14   A.   It was back the first of this year, I
15   believe.
16   Q.   How was it changed?
17   A.   We added to it, put another line in.  This
18   plant is not nothing like what the plant is now.
19   Q.   Even the old part is not laid out the same
20   way?
21   A.   Not all of it.  Some of it is; some of it's
22   not.
23   Q.   All right.  Well, why don't you just take a

136

1    sheet of paper and just draw further processing
2    for me roughly.
3    A.   I'm not good at drawing, sir.  I'm not a
4    draftsman.
5    Q.   Yeah.  Well, I understand that.
6    A.   Well, I'll just point them to you on this
7    piece of paper.
8    Q.   All right.
9    A.   There's one of these over here.
10   Q.   What is that?
11   A.   Fry line.
12   Q.   Okay.
13   A.   There's a marination room back here; there's
14   another spiral freezer sitting right here; another
15   packout area right here; forklift battery pallet
16   jack area right here has been added on;
17   refrigeration room has been added onto; and a
18   hydraulic room built on here.
19        That's most of the changes that we've made
20   in the plant.
21   Q.   How many hourly employees did you have
22   before the changes at the further processing
23   plant?

137

1    A.   Total guess:  100.
2    Q.   And now you've got about 200?
3    A.   Yes.  And them are all ballpark figures.  I
4    do not know the exact numbers.
5    Q.   How many fry lines do you have?
6    A.   Two.
7    Q.   And before the change you had one?
8    A.   Yes.
9    Q.   How many marination do you have?
10   A.   Explain to me what you're asking.
11   Q.   You said you have a marination area over
12   here now.  Is that the only one you've got?
13   A.   The marination feeds the fry room.  Yes,
14   that's the only one we have.
15   Q.   How many spiral freezers do you have now?
16   A.   Two.
17   Q.   And you had one before the change?
18   A.   Yes.
19   Q.   You have two packout areas now?
20   A.   Yes.
21   Q.   And you had one before the change?
22   A.   Yes.
23   Q.   The forklift battery pallet jack area, did

FREEDOM COURT REPORTING

138

1  you have one before the change?
2  A.  Yes.
3  Q.  And now you have two?
4  A.  No, we just have one.  We had to move this
5  one to put marination in it.
6  Q.  Okay.  And the refrigeration room.  You had
7  one before the change?
8  A.  Yes.
9  Q.  And how many do you have now?
10  A.  We've got one, but it's a lot larger.
11  Q.  Okay.  And the hydraulic area, did you have
12  that before the change?
13  A.  Yes.
14  Q.  Do you have two now or just a larger one?
15  A.  Just one.
16  Q.  Okay.  Now, what production areas do you
17  have in the further processing, other than fry
18  line, marination, spiral freezer, packout,
19  forklift battery, refrigeration, and hydraulic?
20  A.  Got a cooler and we've got a freezer.
21  Q.  Anything else?
22  A.  That's all I can remember.
23  Q.  All right.  Now, organizationally, are each

139

1  of those considered a separate department?
2  A.  I don't know how the employees are charged
3  to what area.  I don't know that.  I don't know.
4  Q.  Do you have any administrative offices at
5  the further processing plant?
6  A.  Yes.
7  Q.  Where are they?
8  A.  Right here, these four offices.  There's an
9  office in the maintenance shop; there's an office
10  right here in the maintenance shop; there's an
11  office right here; there's a USDA office right
12  here; there's an office right here; there's an
13  office right here; all accounting offices is over
14  here; general manager's office is right here.
15  Q.  So is there an HR function in the further
16  processing plant?
17  A.  No.
18  Q.  Is there a QA function within that plant?
19  A.  Yes.
20  Q.  Where are they?
21  A.  Right in this area.
22  Q.  Okay.  And where do employees enter the
23  further processing plant?

140

1  A.  Normally, right here.
2  Q.  Okay.  Just write "entry" right there.
3  A.  (Witness complies.)
4  Q.  And is that location of the entry the same
5  before and after the recent changes?
6  A.  Yes.  An entry here, got an entry right
7  here, maintenance and QA enters here, there's an
8  entrance, accounting/admin entrance here.
9  Q.  Now, which entrance does the production room
10  employees come through?
11  A.  Mainly right here.
12  Q.  And that's the one next to the picnic area?
13  A.  Yes.
14  Q.  Y'all have one picnic area for that plant?
15  A.  Yes.
16  Q.  And they come into a hall?
17  A.  Yes.
18  Q.  And the first thing they have there is a
19  break room?
20  A.  Yes.
21  Q.  Where's the supply room?
22  A.  Right there.
23  Q.  All right.  So that's down the hall from the

141

1  break room, correct?
2  A.  Yes.
3  Q.  Where do you enter the production area?
4  A.  Right here.
5  Q.  All right.  So you come in the door by the
6  picnic area, you walk down a hall that runs
7  adjacent to the break room; and at the end of the
8  break room, you turn right into another hall that
9  leads into the entry door to the production area?
10  A.  Yes.
11  Q.  Now, where's the time clock?
12  A.  Right here, I believe.  Right in that
13  hallway, right on the break room wall, I think.
14  Q.  And you have no boot sanitation in this
15  plant; is that correct?
16  A.  No.
17  Q.  Is that correct?
18  A.  Correct.
19  Q.  Never have had any?
20  A.  Not as I'm aware of.
21  Q.  Where are the restrooms?
22  A.  I believe they're right here.
23  Q.  Across the hall from the break room?

FREEDOM COURT REPORTING

142

1    A.   And right here.
2    Q.   Okay.
3    A.   It's hard to tell on this print.
4    Q.   Yeah, it is.  So there are no restrooms
5    within the production area in either plant,
6    correct?
7    A.   Correct.
8    Q.   There are no break rooms in the production
9    area in either plant?
10   A.   Correct.
11   Q.   Where is the nurse's station?
12   A.   Nurse's station?  I believe that's labeled
13   nurse's station.
14   Q.   And that serves both plants?
15   A.   Yes.
16   Q.   And it's, just for the record's sake, it
17   looks like it's a separate building; is that
18   right?
19   A.   Yes.
20   Q.   And it sits out by the parking lot?
21   A.   Yes.  Right off the sidewalk.
22   Q.   Right out front of the fresh processing
23   plant, correct?

143

1    A.   Correct.
2    Q.   All right.  Employees are not allowed to
3    have candy, gum, food, drink, or anything of that
4    sort, in the production area; is that correct?
5    A.   Correct.
6    Q.   So employees have to leave the production
7    area to either get supplies from the supply room,
8    to go to the nurse's station, to go to bathroom,
9    to go to the QA office, correct?
10   A.   Correct.
11   Q.   Is that true of both plants?
12   A.   Yes.
13   Q.   All right.  Do you know how much time it
14   takes for employees to walk from the front door to
15   the time clock?
16   A.   No.
17   Q.   Do you know how long it takes employees to
18   walk from the supply room to the entry to the
19   production room?
20   A.   No.
21   Q.   Do you know how long it takes employees to
22   walk from the break room to the entry to the
23   production area?

144

1    A.   No.
2    Q.   Do you know how long it takes employees to
3    walk from their station on the line back to the
4    bathroom?
5    A.   No.
6    Q.   Or to the break room?
7    A.   No.
8    Q.   Or to the QA department?
9    A.   No.
10   Q.   Do you know the amount of times it takes
11   employees to don or doff or sanitize their
12   protective gear or equipment?
13   A.   No.
14   Q.   Has the company ever studied any of the
15   amounts of time it takes to do any task related to
16   donning, doffing, or sanitizing protective gear or
17   equipment?
18   A.   Not that I'm aware of, but I don't know.
19   Q.   Has the company, or anyone on behalf of the
20   company, videotaped employees donning, doffing,
21   sanitizing, or walking time?
22   A.   Has the company — are you talking about the
23   company officials?

145

1    Q.   The company, or anybody acting on the
2    company's behalf, such as an outside consultant or
3    person.
4         Has anybody ever videotaped employees when
5    they are performing activities related to donning,
6    doffing, or sanitizing protective gear or
7    equipment, or walking from a supply room, break
8    room, or bathroom to their workstation?
9    A.   Yes.
10   Q.   When was that done?
11   A.   I don't know the answer to that.
12   Q.   Approximately when?
13   A.   I don't have a clue how to even guess.  I
14   don't remember.
15   Q.   Is it possible it was within the last year?
16   A.   It's possible, but I don't know the date.
17   Q.   Did you see them videotape?
18   A.   No, I did not see them videotape.
19   Q.   What's the source of your knowledge?
20   A.   Just that somebody come in and done a study
21   on how long it would take to don and doff.
22   Q.   And have you seen the results of the study?
23   A.   No, I have not.

FREEDOM COURT REPORTING

146

1  Q.  Do you know any of the amounts of time that
2  were learned or determined?
3  A.  No.
4  Q.  Do you know who it is that did the
5  videotaping?
6  A.  No.
7  Q.  Did you assist in making arrangements for
8  the videotaping?
9  A.  No, I did not.
10  Q.  Have you watched the videotapes?
11  A.  No.
12  Q.  Have you seen any parts, pictures or
13  anything, produced from the videotapes?
14  A.  No.
15  Q.  Do you know anybody at the plant who has
16  been involved with the videotaping?
17  A.  Not directly I do not.
18  Q.  Who was in charge of supervising the
19  videotape process?
20  A.  I don't know.  I honestly don't know.
21  Q.  Why did you do the videotaping?
22  A.  I don't know that.
23  Q.  Have you ever made a determination that it

147

1  is administratively impractical to keep up with
2  employees' donning, doffing, or sanitizing time?
3  A.  Repeat the question.
4  Q.  Have you ever made a determination that it's
5  administratively impractical to record or keep up
6  with the amount of time employees are spending
7  donning, doffing, or sanitizing protective gear or
8  equipment?
9      MR. ROSENTHAL:  Objection to the form
10  of the question.  You can answer.
11  A.  I don't know the answer.  I don't understand
12  the question.
13  Q.  Have you ever made a determination that
14  it's, from an administrative standpoint,
15  impractical for the company to track and record
16  and then pay for the amount of time it takes to
17  don or doff or sanitize protective gear or
18  equipment?
19      MR. ROSENTHAL:  Objection again to the
20  form of the question.
21  A.  Not that I'm aware of.  I really don't know.
22  Are you asking me have I made a decision not to
23  pay for donning and doffing, in simple terms?  Is

148

1  that what you're asking?
2  Q.  No.  I think I asked you that earlier today.
3  But right now I'm just asking if you've made a
4  decision or made a determination that it's
5  administratively too difficult or impractical to
6  keep up with the amount of time employees
7  typically take to don, doff, or sanitize their
8  protective gear or equipment.
9      MR. ROSENTHAL:  Objection to the form
10  of the question.
11  A.  No, I haven't made that decision.
12  Q.  Do you know anybody who has?
13  A.  No.
14  Q.  Do you know anybody who has that as part of
15  their responsibility?
16  A.  Not that I'm aware of.
17  Q.  Did you participate in the decision to pay
18  three minutes for donning and doffing time?
19  A.  I was at the negotiating table when it was
20  negotiated between the company and RWDSU.
21  Q.  Other than sitting at the table, did you
22  participate in that decision, that three minutes
23  would be the amount of time the company would pay

149

1  for donning and doffing clothes or equipment?
2  A.  As a group, that's what we negotiated as a
3  group.
4  Q.  Okay.  Yeah.  I'm going to get into the
5  negotiation in a minute.  But right now I'm trying
6  to figure out are you the decision maker.
7      Did you make the decision that three minutes
8  was the appropriate amount of time, or were you
9  just going along for the ride?
10  A.  As a group, we made the decision.
11  Q.  What role did you play in that decision?
12  A.  As a group member.
13  Q.  But you said you never tried to determine
14  the actual time it takes to do these activities,
15  correct?
16  A.  No, I have not.
17  Q.  Do you know anybody who has?
18  A.  No.
19  Q.  Do you know how they arrived at three
20  minutes?
21  A.  I get dressed and go out in the plant, and
22  it don't take me three minutes.
23  Q.  What do you put on?

150

1   A.   Smock, hair net, beard net, earplugs, boots.
2   Q.   You don't wear your boots during the regular
3   part of your day?
4   A.   No.
5   Q.   Now, do you know anybody who has made a
6   determination that three minutes is the actual
7   amount of time it takes to do donning/doffing of
8   protective gear or equipment?
9   A.   Not that I'm aware of.
10  Q.   Did you ever see any documents that
11  referenced three minutes as the amount of time to
12  be paid or negotiated for donning and doffing?
13  A.   No.
14  Q.   Did the union, to your knowledge, make any
15  time study or effort to determine the amount of
16  time it actually takes to don and doff?
17  A.   I can't answer that. Not to my knowledge,
18  but I don't know.
19  Q.   Who was in the group that you say was
20  involved in the negotiations that led to the
21  three-minute time period?
22  A.   It's listed in the contract. I don't
23  remember all the names, but it's on the contract.

151

1   Q.   All right. Tell me what part your speaking
2   of.
3   A.   This is not a signed contract. It would be
4   one with signatures in it.
5   Q.   See if that's one.
6   A.   (Witness complies.)
7   Q.   Okay. Page 29 you're handing me, which is
8   Bates number E 6007. I don't see your name on
9   here. There you are. Okay.
10       So for the company it's Tim Esslinger, Jim
11  Bice, Greg Mills, and Kathy Gilmore?
12  A.   Yes.
13  Q.   Anyone else involved in that decision to
14  agree to three minutes?
15  A.   Just the ones on that list, and the union.
16  Q.   And the union members are listed to the left
17  of your name on page 29 of that exhibit?
18  A.   Yes.
19  Q.   Are all the union members employees of
20  Equity Food Group, except Henry Jenkins?
21  A.   Jerry Foster's not.
22  Q.   Okay. Have you had any administrative
23  difficulties since paying the three minutes?

152

1   A.   Not as I'm aware of.
2   Q.   Have you ever looked into what other
3   companies do in terms of keeping up with the time
4   taken to don or doff protective gear or equipment
5   for pay purposes?
6   A.   No, I haven't.
7   Q.   Do you know anything at all that was
8   considered in deciding that three minutes would be
9   the appropriate amount of time to pay for donning
10  and doffing?
11  A.   Other than our own personal time for what it
12  takes for us to get dressed and walk out to the
13  plant. That's all I know. That's what I based my
14  ruling on.
15  Q.   What did the union propose as the
16  appropriate amount of time, prior to reaching the
17  final agreement?
18  A.   I can't remember. I can't answer that. I
19  don't know.
20  Q.   Now, we were given some documents this
21  morning, Exhibits 19 and 20, which had to do with
22  union proposals and company responses.
23       Do any of those documents reference the

153

1   negotiations over the three minutes?
2   A.   I do not see anything in 19; I don't see
3   anything in Exhibit 20 either.
4   Q.   Okay. Is Spence Jernigan still with the
5   company?
6   A.   Yes.
7   Q.   What's his job now?
8   A.   I don't know his job title, but he's
9   director of HR.
10  Q.   Where is he located?
11  A.   Huntsville.
12  Q.   Did he play any role in the new contract
13  negotiations in 2008?
14  A.   No.
15  Q.   Is James Davis still with the company?
16  A.   No.
17  Q.   Where is he now?
18  A.   He's working for another firm in Eufaula.
19  Q.   And what's the name of it?
20  A.   I think Cooper Lighting, but I don't know.
21  Q.   It's not a poultry --
22  A.   No.
23  Q.   Why did he leave the company?

FREEDOM COURT REPORTING

154

1   A.   Better benefits he said, and better
2   opportunity.
3   Q.   Now, when you signed the 2004 contract, you
4   signed it as plant manager, correct?
5   A.   Yes.
6   Q.   Were you in charge of both plants at that
7   time?
8   A.   No.
9   Q.   Did this contract apply to both plants, the
10  2004 contract?
11  A.   Yes.
12  Q.   It did?
13  A.   Yes.  All bargaining units.
14  Q.   Okay.  What employees in the further
15  processing plant are not subject to the collective
16  bargaining agreement?
17  A.   QA and maintenance.
18  Q.   Now, are employees rotated from job to job?
19  A.   Yes.
20  Q.   Are there any employees who are not subject
21  to rotation?
22  A.   Yes.
23  Q.   Hourly employees, I mean, production

155

1   employees.  Are any of them not subject to
2   rotation?
3   A.   I don't know the answer to that.
4   Q.   Why do you rotate employees?
5   A.   Repetitive motion.
6   Q.   Is that a physical injury type thing?
7   A.   Yes.
8   Q.   What part of the body does it affect?
9   A.   Could be wrists, hands, arms.
10  Q.   How often do you rotate employees?
11  A.   I don't know the answer to that.
12  Q.   Are employees subject to rotation on a daily
13  basis?
14  A.   I don't know the answer to that.  People
15  under me does the rotation; I don't.  I don't get
16  involved in that.
17  Q.   Do you know of any documents that speak to
18  the issue of rotation?
19  A.   I don't.
20  Q.   How long have you been rotating employees?
21  A.   I don't know the time frame.
22  Q.   Are there documents that would show on a
23  particular day what a given employee would be

156

1   performing, what job he would be performing?
2   A.   I don't know.  I don't know the answer to
3   that at this point.
4   Q.   Who do you think would be knowledgeable on
5   that subject?
6   A.   Supervisors or shift managers.
7   Q.   But employees, when they come to work in the
8   morning, don't know which job they're going to be
9   assigned?
10  A.   I don't know the answer to that.  I don't
11  know how they manage their people.
12  Q.   You said earlier that the company has
13  employees doing physical exercises in some areas,
14  correct?
15  A.   I don't remember saying that.
16  Q.   Well, I thought I remember you saying this
17  morning that the employees at some point in time
18  have done physical exercises during the day.
19  A.   They have at some point in time.
20  Q.   Are they doing that currently?
21  A.   I don't know the answer to that.
22  Q.   Were they doing that on paid or unpaid time?
23  A.   Paid.

157

1   Q.   What part of the day were those exercises
2   being done?
3   A.   In the mornings, normally after they got on
4   their line.
5   Q.   And how long would they do the physical
6   exercises?
7   A.   I don't know the answer to that.
8   Q.   I think I asked you this, but I want to make
9   sure:  Do you know which departments did the
10  physical exercises?
11  A.   The best of my knowledge, debone was the
12  only department doing that.
13  Q.   And was it the whole department?
14  A.   I don't know the answer to that.
15  Q.   Did the company consider doing physical
16  exercises to be work?
17  A.   Yes.  They was on the clock.  It was after
18  the line was started, after they got on the line.
19  Q.   Are all activities that employees are paid
20  for considered work?
21  A.   Yes.
22  Q.   Now, you said you started with the company
23  September '99, correct?

4a4efcd4-222a-4134-9214-747cf2d63865

FREEDOM COURT REPORTING

158

1   A.   I believe that's correct.
2        MR. ROSENTHAL: He said started with
3   CP.
4   Q.   CP in September of '99. And were you
5   involved in the collective bargaining negotiations
6   while you were with CP?
7   A.   No.
8   Q.   And the contract that CP had ran from 2000
9   to 2004; is that correct? Or do you know?
10  A.   I don't know.
11  Q.   How many employees are paid on a piece
12  basis?
13  A.   None.
14  Q.   When did that cease?
15  A.   I don't recall the date.
16  Q.   How many, when you were paying employees on
17  a piece basis, did you have that you were doing
18  that?
19  A.   I don't remember the number of employees.
20  Q.   Which employees were paid on a piece basis?
21  A.   Tender sizing and thigh sizing.
22  Q.   How are they paid now?
23  A.   That department no longer exists.

159

1   Q.   Now, you said earlier you didn't know if you
2   had any setup employees?
3   A.   Correct.
4   Q.   Do you have any personal knowledge about the
5   collective bargaining agreement while CP ran the
6   plant?
7   A.   No, other than the handbook that we had to
8   go by. I don't recall what was in the union
9   handbook. I was not part of the negotiations.
10  Q.   You're calling the handbook the contract?
11  A.   I meant the contract. Sorry.
12  Q.   Do you know who negotiated on behalf of the
13  union when CP ran the plant and the collective
14  bargaining was being negotiated?
15  A.   No, I don't.
16  Q.   Do you know of any differences in the way CP
17  paid employees and the way Equity Group pays
18  employees?
19  A.   No, I don't. The same system we had then
20  carried through all contracts.
21  Q.   Were you involved in any of the decision
22  making that led Equity Group to take over the
23  plant from CP?

160

1   A.   Tell me what you're talking about.
2   Q.   Were you involved in making any of the
3   decisions that went into the transition of
4   ownership from CP to Equity Group?
5   A.   No.
6   Q.   Were you involved in any of the decisions or
7   considerations that went into whether or not
8   Equity Group would follow the customs or practices
9   of CP?
10  A.   No.
11  Q.   Do you have any knowledge on that subject?
12  A.   No.
13  Q.   Have you ever had any conversations with
14  Jacqueline Davis about donning and doffing?
15  A.   She was in the negotiations.
16  Q.   Do you remember anything she said?
17  A.   No, not her personally.
18  Q.   Have you ever heard Jacqueline Davis say
19  anything that touched on the subject of donning
20  and doffing or pay for donning and doffing?
21  A.   No. I read her depositions where --
22  Q.   When did you do that?
23  A.   When this come up, I read everything about

161

1   donning and doffing that I knew. And I knew that
2   she had filed a case against us, so I read her,
3   you know -- we reviewed her documents.
4   Q.   "We" being who?
5   A.   Myself, Kathy Gilmore.
6   Q.   All right. So did you read her deposition
7   in this case or some other case?
8   A.   I read one she made in another case.
9   Q.   And that's when CP owned the plant?
10  A.   I don't remember who owned it at the time.
11  Q.   Do you remember anything you learned?
12  A.   There's some in my affidavit about what
13  was in there about the Jackie Davis case
14  about the donning and doffing.
15  Q.   Yeah. But I'm talking now about what you
16  learned when you read the deposition.
17  A.   I learned that the judge didn't grant her
18  any donning and doffing pay.
19  Q.   Okay. Anything else?
20  A.   No. That was the main concern.
21  Q.   Do you know what Jacqueline Davis understood
22  or said she understood about whether she could
23  expect to be paid for donning and doffing

FREEDOM COURT REPORTING

162

1   activities while CP ran the plant?
2   A.   She wasn't expecting to be paid for it, as
3   far as I know.
4   Q.   But have you ever heard her express her
5   understanding?
6   A.   No, I have not.
7   Q.   Have you ever read anything in which she
8   expressed her understanding?
9   A.   I don't recall.
10  Q.   Have you ever read or heard anything that
11  indicated what Jacqueline Davis understood about
12  whether it's a well-known practice for CP to pay
13  only for time worked at the workstation?
14  A.   From what I read, that's what she understood
15  she got paid.  That it was understood that she got
16  paid for time worked at the workstation.
17  Q.   But you never heard her say that?
18  A.   I never heard her say that.
19  Q.   Do you know why CP decided to sell the
20  plant?
21  A.   I've heard rumors.
22  Q.   What did you hear?
23  A.   Nonprofit organization.

163

1   Q.   Wasn't make any money?
2   A.   No money.
3        MR. ROSENTHAL:  It was a profit-making
4   organization that was not making profit.
5        MR. WIGGINS:  Right.
6   Q.   Have you ever heard Jacqueline Davis say
7   anything to Jenkins or Foster?
8        MR. ROSENTHAL:  Anything at all?
9   Q.   About donning and doffing.
10  A.   Not that I recall, but I'm sure she did in
11  the contract negotiations.
12  Q.   Now, Jenkins and Foster were the union
13  representatives, correct?
14  A.   Correct.
15  Q.   But did you ever hear Davis say anything to
16  Jenkins or Foster about donning and doffing; and
17  if so, what did you hear?
18  A.   I don't recall.
19  Q.   Do you handle grievances, union grievances?
20  A.   If they come up to my level.
21  Q.   What's your level?
22  A.   Operations manager.
23  Q.   Is that the fourth level? third? second?

164

1   What is that?
2   A.   I don't remember.  I haven't seen a
3   grievance in years.
4   Q.   How many?
5   A.   I don't recall.
6   Q.   All right.  So you don't have any knowledge
7   about grievances until they reach your level,
8   correct.
9   A.   Correct.
10  Q.   Let's see if we can figure out what your
11  level is.  Look in this union contract.  Can you
12  find where it defines your level?
13  A.   Actually, I'm not even on here.  But I know
14  about them if it goes to the plant manager level.
15  We have a grievance if it gets to the step two.
16  If it gets to the plant manager, I'm made aware of
17  it.
18  Q.   Okay.
19  A.   If we ever have one.
20  Q.   But you have no knowledge of any grievances
21  that only went to the step one?
22  A.   No.
23  Q.   Who was the chief negotiator for the company

165

1   in the collective bargaining in 2008?
2   A.   Howard Rosenthal.
3   Q.   All right.  And who was the chief negotiator
4   for the company in the collective bargaining in
5   2004?
6   A.   Howard.
7   Q.   Okay.  Were there any other attorneys
8   involved in either of the collective bargaining
9   years that went on, 2004 and 2008?
10  A.   Not that I'm aware of.
11  Q.   Now I may be assuming too much.  Has the
12  collective bargaining agreement ever been
13  negotiated, to your knowledge, except in 2004 and
14  2008?
15  A.   Not to my knowledge, no.
16  Q.   You haven't had any midterm or interim
17  negotiations?
18  A.   No, not to my knowledge.
19  Q.   Who was the chief negotiator for the union
20  in 2004?
21  A.   I would guess Henry Jenkins.
22  Q.   What about 2008?
23  A.   Same.

FREEDOM COURT REPORTING

166

1    Q.  I'm showing you the new exhibit you gave me
2    this morning, Exhibit 17, called "Good
3    Manufacturing Practices." Look at page 3.  Who is
4    Jretha Diggs?
5    A.  She was a QA supervisor, I believe.
6    Q.  Is she still with the company?
7    A.  No.
8    Q.  Do you know where she is now?
9    A.  No.
10   Q.  Do you know if she's in the Eufaula area?
11   A.  I don't have a clue.
12   Q.  And why did she leave the company?
13   A.  I don't know the answer to that.
14   Q.  Is she the same person as Jretha Thompson?
15   A.  Yes.
16   Q.  And it looks like she was still with the
17   company as of August 18, 2007, according to this
18   page, correct?
19   A.  Correct.
20   Q.  Who replaced her?
21   A.  I don't know the answer to that.
22   Q.  And what was her title?
23   A.  QA supervisor, I believe.

167

1    Q.  And how long did she hold that job?
2    A.  I don't know the answer to that.
3    Q.  Was she with CP?
4    A.  I don't know the answer to that.
5    Q.  Look at page 4, under the title "Purpose."
6    It says, "The following GMP's were established to
7    minimize the introduction of bacteria,
8    contaminants, or foreign material into our
9    manufacturing environment and must be adhered to
10   by all team members and visitors while in
11   production areas including coolers, shipping, and
12   receiving docks."
13       Do you know of any other purpose for these
14   practices that are then listed in the policy?
15   A.  Not as I'm aware of.
16   Q.  Under "Responsibility" it says, "The Quality
17   Assurance Department primarily administers this
18   program."
19       How do they do that?
20   A.  I don't know.
21   Q.  Do you know of any recordkeeping they do in
22   terms of checking employees' donning, doffing, or
23   sanitizing practices?

168

1    A.  No.  But I'm not that familiar with the QA.
2    They don't report to me.
3    Q.  When it uses the words "team members," what
4    does that mean?
5    A.  Everybody, I would guess.  I don't know.
6    Q.  That would include you?
7    A.  Every team member.  I don't know what the
8    definition of it is in this sentence.
9    Q.  But you don't divide employees into teams?
10   A.  No.
11   Q.  How many first line supervisors do you have
12   in debone?
13   A.  I don't remember off the top of my head.
14   It's in the flowchart or organizational chart.
15   Q.  Okay.  Now, look at the "Grounds" section,
16   page 4.  Do you see that section?
17   A.  Yes.
18   Q.  Has that always been the practice since
19   March of 2004?
20   A.  Yes.
21   Q.  And the purpose of that part of the GMP is
22   to prevent contamination of the poultry products?
23   A.  Not the grounds.  Grounds is to protect

169

1    against insects.  Pest control.  That sort of
2    stuff that could lead into the plant: rats
3    rodents, so forth, on the grounds.  Grounds is
4    outside perimeter, not the plant.
5    Q.  All right.  Let's go to the next page to the
6    "Plant Construction and Design" section.
7        It says, "Plant buildings and structure
8    shall be suitable in size, construction and design
9    to facilitate maintenance and sanitary operations
10   for food - manufacturing purposes."  Correct?
11   A.  Yes.
12   Q.  Now, have you always followed these
13   practices listed under "Plant Construction and
14   Design" at the two plants here in Eufaula, since
15   March of 2004?
16   A.  To the best of my knowledge.
17   Q.  And then under "General Requirements," do
18   you see any part of the general requirements that
19   have not always been required of employees since
20   March of 2004?
21       (The witness examines the
22        document.)
23   A.  I don't know if this goes all the way back

FREEDOM COURT REPORTING

170

1　to 2004; but to the best of my knowledge after
2　briefly reading through it, these are the rules
3　that we follow today.
4　Q.　And sitting here watching you, you read
5　through all 41 items; is that right?
6　A.　I scanned through it. I didn't read every
7　one of them word for word.
8　Q.　All right. Let's look at No. 2. It says,
9　"All team members and visitors must wash and
10　sanitize hands before starting work..."
11　　　That's always been a requirement, correct?
12　A.　Best of my knowledge.
13　Q.　And then it says, "All team members must
14　wash and sanitize hands after each absence from
15　the work area...," correct?
16　A.　Yes.
17　Q.　And that's always been a requirement,
18　correct?
19　A.　Best of my knowledge.
20　Q.　And what will cause absences from the work
21　area?
22　A.　If you leave and go to the break room, or
23　you go to the nurse's station, or you go to HR,

171

1　QA, anywhere you go.
2　Q.　Restroom?
3　A.　Restroom, which it states up here.
4　Q.　And the reason for that rule No. 2 that you
5　must wash and sanitize hands after each absence
6　from the work area and before starting work is to
7　protect the poultry products from contamination,
8　correct?
9　A.　Yes. You're handling food.
10　Q.　And that's the reason for the rule; is that
11　right?
12　A.　Correct.
13　Q.　Now, No. 4 says, "A solid (non-mesh) hair
14　net must be worn to contain the hair as completely
15　as possible."
16　　　That's always been the rule that employees
17　are required to follow?
18　A.　Not always, but it has been for the last
19　period of time. I don't know how long.
20　Q.　Since March of 2004 at least?
21　A.　I would think, but I don't know that.
22　Q.　And No. 6 says, "A clean smock must be
23　obtained daily."

172

1　　　That's been required since at least March of
2　2004, correct?
3　A.　No.
4　Q.　When did that first start?
5　A.　I don't know.
6　Q.　The next sentence of Rule 6 under General
7　Requirements says, "Smocks are to be changed
8　during the shift if needed."
9　　　Has that always been a rule?
10　A.　Yes.
11　Q.　And when will a change in smocks be needed?
12　A.　Only if they get contaminated.
13　Q.　And what would contaminate a smock?
14　A.　Wet, bloody, for example.
15　Q.　Are there any jobs in which employees never
16　get wet, bloody, or contaminated?
17　A.　Yes.
18　Q.　Which ones?
19　A.　QA, for example. I don't know all the jobs
20　and what does and don't get contaminated or
21　bloody.
22　Q.　Okay. The next sentence of Rule 6 of
23　General Requirements says, "Smocks must fasten or

173

1　tie properly to cover street clothes. Smocks may
2　not have sewn on buttons or an external upper
3　pocket."
4　　　Has that always been true since March of
5　2004?
6　A.　I can't answer that since March of 2004.
7　Q.　Why do you have a rule that the smocks must
8　fasten or tie properly to cover street clothes?
9　A.　To cover street clothes.
10　Q.　Is that to protect the poultry from
11　contamination by street clothes?
12　A.　Yes. And to protect the clothing of the
13　employee.
14　Q.　All right. "Smocks may not have sewn on
15　buttons."
16　　　What purpose does that serve?
17　A.　You don't want a button getting in your
18　product.
19　Q.　And can't have an external upper pocket.
20　What purpose does that serve?
21　A.　You don't want nothing in your pocket to
22　fall over in your product.
23　Q.　It would contaminate the product?

174

1    A.   Yes.
2    Q.   And then Rule 7 of General Requirements
3    says, "Smocks, hair nets, and beard nets must be
4    removed before exiting the facility."
5         And I believe you've already said that's
6    always been the rule?
7    A.   Yes.  Can't wear them outside.
8    Q.   Why?
9    A.   Contamination.
10   Q.   Of the poultry product?
11   A.   Yes.  Of the smock that's going back to the
12   poultry product.
13   Q.   Okay.  Then Rule 8 says, "Keep hands and
14   fingernails clean.  Keep fingernails properly
15   trimmed, and if fingernail polish or false
16   fingernails are worn, gloves must cover hands
17   while in any production area, including box rooms,
18   shipping/receiving, dry storage, product storage."
19        Has that always been the requirement that
20   employees are required to follow?
21   A.   I don't know about always.  It is today.
22   Q.   Do you know if that's been since March of
23   2004?

175

1    A.   No, I don't.  I don't recall that far back.
2    Q.   Rule 10 of the General Requirements says,
3    "Clothing must be clean at the start of operation
4    and kept reasonably clean during operations."
5         Which clothing is that talking about?
6    A.   Smock.
7    Q.   Is it talking about the street clothes too?
8    A.   No.
9    Q.   Well, are you just repeating yourself in No.
10   10 from what you said in No. 6 about smocks?
11   A.   Looks that way.
12   Q.   Did you author these rules?  Did you have
13   any role in the authorship of these rules?
14   A.   No.
15   Q.   Rule 11 of the General Requirements says,
16   "Plastic sleeve covers will be worn to cover any
17   street clothes that extend beyond smock coverage
18   on the arms when handling product."
19        Is the purpose of that to prevent
20   contamination of the chicken product?
21   A.   And to cover your street clothes.
22   Q.   To prevent contamination?
23   A.   And to keep your street clothes from getting

176

1    messed up.
2    Q.   And the company furnishes the plastic
3    sleeves to the employees?
4    A.   Yes, according to the union contract.
5    Q.   Do you know how often?
6    A.   No.  It's in the contract.
7    Q.   I believe that's the rule that you said part
8    of it you no longer follow, like the three smocks.
9         MR. ROSENTHAL:  Objection to the form
10   of the question.
11   Q.   When you say it's in the contract, are you
12   speaking of Section 13.4, page 21, of the
13   2004-2008 contract?
14   A.   See right there, sleeves?
15   Q.   Right.  But that's what you were referring
16   to is that 13.4 Section, correct?
17   A.   Referring to as this being in the contract?
18   Q.   In your last answer you said it was in the
19   contract.  Is that what you were referring to?
20   A.   Yes.  You said the company supplied them;
21   that's what I'm referring to.
22   Q.   Okay.  Rule 12 of the General Requirements
23   in Exhibit 17 says, "Maintain gloves used for

177

1    handling food and food contact packaging supplies
2    intact and in a sanitary condition."
3         The purpose of that is to protect the
4    chicken from contamination, correct?
5    A.   Yes, and to cover your hands.
6    Q.   To cover your hands so your hands can't
7    touch the chicken, right?
8    A.   Or the chicken can't touch your hand, yeah.
9    Q.   Rule 13 says, "Gum, candy, cough drops, and
10   tobacco products are not permitted in any
11   production area."
12        Has that been a rule since at least March of
13   2004?
14   A.   Best of my knowledge.
15   Q.   Rule 14:  "Maintain lockers clean and free
16   of trash or soiled clothing."
17        Has that always been a rule?
18   A.   Yes, best of my knowledge.
19   Q.   Rule 15 says, "No food or beverages are
20   allowed in production areas and placing food in
21   lockers is highly discouraged unless there is no
22   other alternative and it must be properly sealed
23   and removed daily."

FREEDOM COURT REPORTING

178

1    What's the purpose of that rule?
2    A.   Pests.
3    Q.   To keep down pests that would cause poultry
4    contamination?
5    A.   Yeah.  You don't want food or beverage in
6    your production area.
7    Q.   Because it might lead to the contamination
8    of the poultry?
9    A.   And it's a USDA requirement.
10   Q.   And the USDA requirement is put there in
11   order to protect poultry from contamination?
12   A.   I would think so, yes.
13   Q.   And then Rule 16 says, "Don't use hands or
14   equipment for practices which may result in
15   contamination of food products.  Such practices
16   include but are not limited to:  touching face,
17   wiping forehead; scratching head or body; placing
18   fingers on/or in mouth, nose, or ears."
19       Has that always been a rule?
20   A.   I can't answer that.  I don't know.  It is
21   today.
22   Q.   But the purpose of that rule is stated on
23   its face, correct, that it might result in

179

1    contamination of food products?
2    A.   Yes.
3    Q.   And then Rule 17 says, "Avoid uncontrolled,
4    uncovered coughing or sneezing.  Sanitize hands
5    afterwards."
6        Has that always been a rule?
7    A.   I don't know the answer to that.
8    Q.   Now, the purpose of that rule is to protect
9    the poultry from contamination, correct?
10   A.   To keep from sneezing over the food that
11   somebody is going to eat.
12   Q.   Rule 24 says, "Any item that becomes
13   contaminated must be washed and sanitized before
14   being placed back into use.  Processing tools and
15   utensils are, but not limited to the following
16   items:  pens, calculators, thermometers,
17   clipboards, pans, edible totes, edible shovels,
18   earplugs, maintenance tools, etc."
19       Has that always been the rule since at least
20   March of 2004?
21   A.   I can't answer that since March of 2004.
22   It's a rule today.
23   Q.   And the reason for requiring that type of

180

1    equipment to be kept free from contamination,
2    including the earplugs, is to prevent
3    contamination of the poultry products, correct?
4    A.   Contamination of the earplugs could
5    contaminate a human's ears.  You want to clean
6    them before you put them in your ears, I would
7    think.
8    Q.   For example, it says, "Any item that becomes
9    contaminated must be washed and sanitized..."  And
10   it gives examples like pens, calculators,
11   thermometers, clipboards, pans, etc.
12       You pay employees for that sanitation,
13   correct?
14   A.   Yes.
15   Q.   That's considered work?
16   A.   Yes.
17   Q.   Now, Rule 25 says, "Only approved footwear
18   shall be worn in the processing area to include
19   coolers, shipping, and receiving docks."
20       Is there any footwear approved other than
21   that which the company distributes to the
22   employees?
23   A.   Yes.

181

1    Q.   The company does provide boots to employees,
2    correct?
3    A.   Yes.
4    Q.   Free of charge?
5    A.   Yes.
6    Q.   And why does it do that?
7    A.   Because it's required to wear washable
8    footwear, so we supply boots.
9    Q.   And is that to prevent contamination of the
10   poultry processing areas?
11   A.   It's a requirement by the USDA.
12   Q.   And the purpose of their requirement is to
13   prevent contamination of the poultry processing?
14   A.   I guess.  But as it states here, you can
15   also wear shoe covers.
16   Q.   Does the company furnish the shoe covers?
17   A.   We have them available.  They're not in the
18   contract, but they can buy them if they would
19   rather have the shoe covers than the rubber boots.
20   Q.   Well, the company pays for the rubber boots.
21   Does it pay for the shoe covers?
22   A.   Not as I'm aware of.
23   Q.   Do most employees wear the rubber boots?

182

1   A.   Yes.
2   Q.   It says, "Rubber boots are available at the
3   Supply and may be cut down..."
4        What does that mean, "cut down"?
5   A.   If you don't like them coming all the way up
6   to your knees, you can cut them off.  A lot of
7   employees do that.
8   Q.   These are boots that come all the way to
9   your knee if you don't cut them down?
10  A.   Yes.
11  Q.   Then it goes on to say, "...but cannot be
12  left where they are hanging loose or flapping
13  over.  Do not cut below the ankle."
14       Has that always been a rule?
15  A.   I can't answer that.  It's a practice we
16  have today.
17  Q.   What's the purpose of that rule about not
18  cutting your boots or letting them flap?
19  A.   Safety.  Safety for the employee.
20  Q.   And does it also have to do with sanitation?
21  A.   No.  It's for the safety of the employee.
22  Q.   Are the rubber boots provided for sanitary
23  purposes?

183

1   A.   They're provided because it's a USDA
2   regulation.
3   Q.   There's nothing in the union contract about
4   boots?
5   A.   Yes, it's in the union contract.
6   Q.   What does the union contract say about
7   boots?
8   A.   I don't recall.  We do furnish them.
9   Q.   Rule 34 says, "Only approved tools may be
10  used... Examples of non-approved tools:
11  pocketknives, fingernail clippers, etc. or any
12  tool with a wooden handle."
13       What's the purpose of that rule?
14  A.   Because the tools have to be cleanable,
15  sanitizable, and we furnish the tools.  We don't
16  want the employees to have to furnish tools.  We
17  furnish tools for the employees.
18  Q.   And that's so you can make sure you keep the
19  poultry processing area in a sanitary condition?
20  A.   So the tools meet the USDA requirements.
21  Q.   And the requirements of USDA are to ensure
22  the sanitary production of uncontaminated chicken
23  products?

184

1   A.   Yes.
2   Q.   Rule 35 talks about work stands, ergo
3   stands.  What are those?
4   A.   The stands they get up on to make their job
5   more ergonomically correct.
6   Q.   Where are they provided at?
7   A.   On the lines where the employees work.
8   Q.   Turn to page 11 of Exhibit 17.
9   A.   (Witness complies.)
10  Q.   Under "Sanitation Related" for "Slaughter,
11  Deboning, and Further Processing," Rule 2 says,
12  "Follow cleaning procedures as outlined in Company
13  Sanitation Master manual."
14       I haven't seen that master manual.  Are you
15  familiar with what it is?
16  A.   I know what it is; I don't know what's in
17  it.
18  Q.   Have you ever read it?
19  A.   No.
20  Q.   You don't use it at all?
21  A.   I don't.
22  Q.   Does the Company Sanitation Master manual
23  have anything in it related to donning, doffing,

185

1   or sanitizing protective equipment?
2   A.   I don't know that.  I've never read it.
3        MR. WIGGINS:  Howard, we'd like to have
4   that sanitation master manual.
5        MR. ROSENTHAL:  We'll consider your
6   request.
7   Q.   Now, page 13 of this Exhibit 17 closes by
8   saying, "The above GMP's will be strictly
9   enforced."
10       Has that always been the case?
11  A.   No.  We have not strictly enforced them,
12  unfortunately.  They have things that went by that
13  we didn't take action on.  But to the best of our
14  ability, we strictly enforce them.
15  Q.   Have you ever been written up by USDA?
16  A.   Have I?
17  Q.   Or cited or anything like that?
18  A.   The company has, yes.
19  Q.   Have you ever been written up or cited about
20  donning and doffing?
21  A.   No.
22  Q.   What about sanitizing protective equipment?
23  A.   Not as I recall.

186

1   Q.   Have you been written up about contaminated
2   poultry products?
3   A.   Yes.
4   Q.   How many times?
5   A.   I don't know the answer to that.
6   Q.   What was the cause of the contamination?
7   A.   Different ones.  I don't recall all of it.
8   Q.   What does USDA call that type of write-up?
9   A.   NR.
10  Q.   And who's in charge of NRs?
11  A.   USDA.
12  Q.   What does NR mean?
13  A.   Noncompliance report.
14  Q.   Who's in charge at the company of NRs?
15  A.   Nobody at the company's in charge of it.
16  USDA's in charge of it.  They write them and issue
17  them.
18  Q.   Okay.  But who's responsible for responding
19  to the problem?
20  A.   It's according to who gets the NR.
21  Q.   I mean, is that a first class supervisor job
22  or –
23  A.   It entails the first line supervisor all the

187

1   way up to the plant manager.
2   Q.   Does it involve quality assurance?
3   A.   Yes.
4   Q.   Safety department?
5   A.   It's according to what the NR was written
6   on.
7   Q.   Okay.  And how long do you keep your NRs?
8   A.   I don't recall.  They have to be kept on
9   site.  I don't know.
10  Q.   Who's the recordkeeper for the NRs for the
11  company?
12  A.   Probably QA.  I don't know the answer to
13  that.
14  Q.   Are they kept electronically?
15  A.   No, not as I'm aware of.  I don't know.
16  Q.   And then the next sentence in the closing
17  paragraph of Exhibit 17, after listing all those
18  rules we went over, says, "Anyone failing to
19  comply with these procedures will be subject to
20  being corrected immediately, possible disciplinary
21  action up to and including termination."  Correct?
22  A.   Yes.
23  Q.   Have you disciplined employees for improper

188

1   donning and doffing?
2   A.   I haven't.
3   Q.   Has the company?
4   A.   I don't know the answer to that.
5   Q.   What about for improper sanitizing
6   protective gear or equipment?
7   A.   I don't know the answer to that.
8   Q.   But employees are subject to discipline and
9   discharge for improper donning and doffing or
10  sanitizing, correct?
11  A.   Yes, subject to it.
12  Q.   Do you remember any NRs that you received
13  about contaminated poultry products?
14  A.   I don't remember.  I'm sure we have had
15  some, but I don't remember.
16  Q.   What are your duties and responsibilities as
17  complex operations manager?
18  A.   My duties and responsibilities are that both
19  plant managers report to me.  And I deal with, as
20  the organizational chart states, the plant
21  managers, the maintenance complex manager, and the
22  sanitation managers on third shift.  They report
23  to me.  I'm also over the projects which falls up

189

1   under the maintenance umbrella.
2   Q.   The company has a sanitation department,
3   correct?
4   A.   Correct.
5   Q.   And you said it comes in under third shift?
6   A.   Yes.
7   Q.   Do they have any employees on the first or
8   second shift?
9   A.   No.
10  Q.   Describe what the company does to sanitize
11  the production area on the third shift.
12  A.   They clean the production area.
13  Q.   How do they go about doing that?
14  A.   Wash it, scrub it, foam it, rinse it, and
15  then spray it down with sanitizer.
16  Q.   And does the USDA inspect it?
17  A.   Yes.
18  Q.   Does the USDA have to release it before you
19  can start up production?
20  A.   Yes.
21  Q.   Is that in writing?
22  A.   It's a USDA regulation.
23  Q.   I mean, the release every day.  Is that

FREEDOM COURT REPORTING

190

1    recorded in some way as the time of day that you
2    were released?
3    A.   We know our down time.  If we're not
4    released by our normal start-up time, we know our
5    down time.
6    Q.   What records show your down time?
7    A.   Production records.
8    Q.   And employees get paid for that type of
9    sanitation activity?
10   A.   Which employees are you talking about.
11   Q.   Your sanitation department.  Employees are
12   paid to sanitize the company's equipment?
13   A.   Yes.
14   Q.   You also sanitize on lunch breaks, meal
15   breaks?
16   A.   No.
17   Q.   I thought y'all, during break periods,
18   you're setup or your floor persons have to
19   resanitize.
20   A.   No.
21   Q.   That's never been the case?
22   A.   Not sanitize, no.
23   Q.   Do they do anything during the break, while

191

1    the normal production line employees are gone on
2    break?
3    A.   Some areas are rinsed down.  But they don't
4    sanitize.
5    Q.   Okay.  What's the difference between rinsing
6    down and sanitizing?
7    A.   Rinsing down and sanitizing.
8    Q.   Physically what's the difference?  What are
9    you doing differently?
10   A.   Taking a water hose and washing it down
11   would be rinsing it down.  If you're sanitizing,
12   you would be spraying sanitizer on it.
13   Q.   What kind of sanitizer do you use?
14   A.   Chlorine, Clorox.
15   Q.   So you don't use any sanitizer except on the
16   third shift, in terms of sanitizing the production
17   area itself?
18   A.   Unless we have a breakdown and maintenance
19   has to work on that piece of equipment.  Then it
20   has to be rinsed off and sanitized.
21   Q.   Who sanitizes knives or arm guards?
22   A.   I don't know the answer to that.
23   Q.   But somebody is in charge of sanitizing the

192

1    knives and arm guards, correct?
2    A.   Yes.
3    Q.   And they're paid for that, correct?
4    A.   Yes.
5    Q.   And that's considered work?
6    A.   Correct.
7    Q.   If any employee is scheduled to be at work,
8    arrives at work, there's no work for him, he has
9    to wait, is he paid?
10   A.   Yes.
11   Q.   Is there a rule on that?
12   A.   They're paid at their normal start time or
13   their master card time, which starts at a certain
14   time every day and ends at a certain time.
15   Q.   And they're paid even though they're just
16   sitting?
17   A.   Exactly.
18   Q.   Doing nothing?
19   A.   Correct.
20   Q.   That's still considered work that has got to
21   be paid?
22   A.   Correct.
23   Q.   That's always been the case?

193

1    A.   Yes.
2    Q.   So the company --
3         MR. WIGGINS:  Strike that.
4    Q.   Now, the sanitation department employees are
5    paid eight hours even if they work less, correct?
6    A.   Correct.
7    Q.   What's the least amount of time you've known
8    an employee to work and get paid for eight hours?
9    A.   I don't know exactly on times.  I mean, I
10   would guess five, six hours.
11   Q.   And is that typical that employees will
12   spend five or six hours but get paid for eight?
13   A.   On sanitation, yes.
14   Q.   And their time after five or six hours,
15   they're at home, correct?  They've left the
16   building?
17   A.   Not necessarily.
18   Q.   Well, employees are paid in the sanitation
19   department even though they've left the premises?
20   A.   Correct.
21   Q.   Even though they may be home?
22   A.   Correct.
23   Q.   Even though they may be in the bed asleep?

FREEDOM COURT REPORTING

194

1  A.  Correct.
2  Q.  They're still considered to be working on
3  paid time?
4  A.  They're paid eight hours a day, unless they
5  work over eight hours.
6  Q.  So the company does not require you to exert
7  yourself in order to be considered working,
8  correct?
9        MR. ROSENTHAL:  Objection to the form
10  of the question.  You can answer.
11  A.  I don't know the answer.  I don't know what
12  your question is.
13  Q.  Well, the company pays employees sometimes
14  when they're sleeping, sometimes when they're
15  sitting and doing nothing, correct?
16  A.  Correct.
17  Q.  Okay.  Now, in your affidavit you said, in
18  paragraph 16 -- Well, let's start at paragraph 14.
19        You said, "These production employees are
20  paid" -- Well, let's see which production
21  employees you're talking about.  Paragraph 11.
22        Let me show you a copy of your affidavit.
23        In paragraph 11 you're taking about employees in

195

1  the production department of the fresh plant,
2  evisceration and debone, are generally paid under
3  a form of line time or master card time, correct?
4  A.  Correct.
5  Q.  And you then describe, in the next several
6  paragraphs, various things about these employees
7  that are subject to master card time or line time,
8  correct?
9  A.  Yes.
10  Q.  And then paragraph 14, about them you say
11  this:  "These production employees are paid
12  together with hours worked before the start of
13  line time or after completion of line time on the
14  basis of the master card system."
15        Now, what type of activities are those that
16  you are describing that are before the start of
17  line time or after the completion of line time?
18  A.  I need to go back and read it all.  But what
19  it states here is if we have an employee to come
20  in early to set up or we ask them to stay late,
21  come in early or stay late, we pay them on the
22  outside of the master card time.  That time is
23  adjusted by the supervisor to the actual time

196

1  worked.
2  Q.  Based on their personal time card?
3  A.  Yes.
4  Q.  All right.  Now --
5  A.  Anyone that's not falling within the window
6  of the master card.
7  Q.  Right.  Now, are there any jobs that that
8  type of before-line-time and after-line-time
9  activities is in regular part of their job?
10  A.  Yes.  There's some people that's not on the
11  master card system.
12  Q.  Even though they're subject to the
13  collective bargaining agreement?
14  A.  Correct.
15  Q.  And I think I asked you this earlier, but I
16  want to ask you one more time to make sure:  Are
17  you able to name those jobs?
18  A.  No, I'm not.
19  Q.  The only one you named earlier was the floor
20  person.
21  A.  Correct.  Setup people, floor person, could
22  be the same.
23  Q.  Now, you earlier said you didn't know

197

1  anything about setup persons, but are you now
2  remembering?
3  A.  No.  I said it could be floor person or
4  setup person.
5  Q.  All right.  Is that two different kinds of
6  employees?
7  A.  I don't know.  I said "or."
8  Q.  Okay.  Do you know of any part of the
9  production area that does not have floor persons
10  or setup persons?
11  A.  No, I don't.
12  Q.  Do you know how many floor persons or setup
13  persons you have?
14  A.  No.
15  Q.  Is that a job that's rotated?
16  A.  I can't answer that.  I don't know.
17  Q.  Who would know that?
18  A.  Production supervisors.
19  Q.  Then the next paragraph, 15, refers to the
20  master card being swiped at the end of the shift.
21        Is there a master card swiped at the
22  beginning of a shift?
23  A.  Yes.

FREEDOM COURT REPORTING

198

1   Q.   Is the master card used --
2        MR. WIGGINS:  I'm sorry.  Strike that.
3   Q.   Is the master card swipe used for pay
4   purposes at the start of the day for any employee?
5   A.   For people that's on the master card, yes;
6   for people that's on the master card time.
7   Q.   The reason I ask is your paragraph 15 says,
8   "As employees are paid from the scheduled start
9   time, employees are required to be at their
10  workstations through the time when the master card
11  is swiped at the end of the shift when the last
12  bird to be processed passes the final
13  workstation."
14       Is that a true statement?
15  A.   Yes.
16  Q.   Has that always been true since March of
17  2004?
18  A.   I can't answer that.  Best of my knowledge,
19  it has been.
20  Q.   Is there any document that describes a rule
21  or requirement that the master card be swiped only
22  after the last bird passes the final workstation?
23  A.   I don't know of a document.  I'm not aware

199

1   of one.
2   Q.   If an employee's scheduled work time is --
3   Well, let me ask you this:  Give me an example.
4   Let's take debone.  What's their scheduled start
5   time?
6   A.   Day shift?
7   Q.   Day shift.
8   A.   7:30.
9   Q.   If an employee's scheduled start time is
10  7:30 and the master card is swiped at 7:35, which
11  controls the pay of the employee?
12  A.   The master card would be swiped at 7:30.
13  Q.   Well, let's say that something prevents the
14  supervisor from getting back out to the break room
15  to swipe it.
16  A.   7:30.
17  Q.   So the scheduled time would control?
18  A.   Yes.
19  Q.   At the end of the day, what's the 7:30 shift
20  end time?
21  A.   4:30.
22  Q.   If the supervisor swipes the master card at
23  4:35, which controls? the scheduled time or the

200

1   swipe time?
2   A.   It's according to the situation.
3   Q.   How does it vary?
4   A.   Normal, 99 percent of the time you've got to
5   walk on/walk off.  They would be leaving.  But if
6   we only run one shift, which we haven't done in
7   years, and they have to work until 4:35, they'll
8   get paid until 4:35.
9   Q.   They won't get paid until their clock-out
10  time person --
11  A.   No.  They'll get paid by master card time,
12  which you said 4:35.
13  Q.   Okay.  Now, if the master card is swiped at
14  4:25, what controls the pay?
15  A.   Going back to my answer, if we're only
16  running one shift that day and they get through at
17  4:25, they'll get paid at 4:25.  As stated
18  earlier, when the last bird goes down the line is
19  when it's swiped.  But on a normal basis, it's
20  7:30 to 4:30 on day shift.
21  Q.   How is it different on the evening shift?
22  A.   You run until you get finished.  It starts
23  at 4:30 in debone and runs until you get finished.

201

1   Q.   But the evening shift though, the start of
2   pay is on scheduled time?
3   A.   Yes.  At 4:30.
4   Q.   And that's the scheduled time, correct?
5   A.   Correct.
6   Q.   If the master card is swiped at a time
7   different than 4:30, the 4:30 scheduled time still
8   controls the pay?
9   A.   Unless there's a reason why it was swiped
10  later.
11  Q.   Okay.  Now, you mentioned something in your
12  affidavit about a three- to five-minute lag in one
13  area, in change over from one shift to the other?
14  A.   Yeah.
15  Q.   Do you recall that?
16  A.   Let me find it.
17  Q.   Says, "In debone, work is stopped for
18  approximately three to five minutes between
19  shifts."
20       Why is that?
21  A.   To gather up the knives and the metal
22  gloves, for them to have the other ones out for
23  the employees when they get out there.

FREEDOM COURT REPORTING

202

1    Q.   Okay.  So in debone, after the last bird
2    passes the final station, the master card is
3    swiped for the first shift, day shift; is that
4    right?
5    A.   Correct.
6    Q.   And you said that normally is at 4:30?
7    A.   Normally.
8    Q.   All right.  You also said the evening shift,
9    their scheduled start time is 4:30?
10   A.   Correct.
11   Q.   So how does this three- to five minutes
12   work?
13   A.   There's no birds on the line at that time.
14   They're not actually working.  They're out there
15   but they're not working.
16   Q.   So this is like from 4:33 to 4:35?
17   A.   I can't give you a definite answer on what
18   time it is.  But it takes three to five minutes to
19   gather all the tools up and put the new tools out
20   for the second shift to start.  So that's in
21   between day shift and the second shift.
22        They're out there but they're not actually
23   working on the line during that three to five

203

1    minutes.
2    Q.   So are the debone employees getting paid for
3    that three to five minutes?
4    A.   Yes.
5    Q.   Are there records that will reflect this
6    down time of three to five minutes?
7    A.   No, not as I'm aware of.
8    Q.   Do you know of any documents that describe
9    this practice?
10   A.   Not as I'm aware of.
11   Q.   All the other areas, besides debone, you
12   just have a skip in the line; and second shift
13   steps up as the first shift steps off?
14   A.   Correct.
15   Q.   How much is the skip?
16   A.   I don't know the exact time amount of that.
17   It's short.  I don't know.
18   Q.   Is it as much as a minute?
19   A.   I don't know, as I stated.
20   Q.   What's the longest time, that you're aware
21   of, from the first station to the last station, in
22   terms of from the time a bird arrives at the first
23   station until it arrives at the last station?

204

1    A.   What department are you talking about?
2    Q.   The longest.  Just pick what you think is
3    the longest.
4    A.   Evis is about ten minutes.  That's a guess;
5    I don't actually know.
6    Q.   What's a typical amount of time from the
7    first bird to the last?
8        MR. ROSENTHAL:  Objection to the form
9    of the question.
10   A.   In what area are you talking about?  What
11   plant are you talking about?
12   Q.   Well, let's do it this way:  What's the
13   shortest amount of time it takes a bird to travel
14   from the first station to the last station on a
15   given line?
16       MR. ROSENTHAL:  Objection to the form
17   of the question.  You can answer.
18   A.   I don't know how to answer because I don't
19   know what area you're talking about.
20   Q.   I'm hoping to talk about the shortest one.
21   A.   Which could be?
22   Q.   That's what I wanted you to tell me.
23   A.   The cone line is less than two minutes.  The

205

1    rest of them, I really don't know.  I know evis is
2    approximately ten minutes.
3    Q.   Look at paragraph 31 of your affidavit.  It
4    says, "Before breaks or at the end of the day
5    employees may spend a brief amount of time rinsing
6    their work clothing."
7        Is that a requirement?
8    A.   It's according to if they've got on an apron
9    and there's nothing on it, no, they don't have to
10   rinse it.
11   Q.   How about their gloves and sleeves?
12   A.   It's a standard practice for them to rinse
13   them.
14   Q.   Where do they rinse?
15   A.   In the sinks, as they go out of the plant.
16   Q.   What do they rinse it with?
17   A.   Soap and water.
18   Q.   Is that part of the process you require in
19   order to produce uncontaminated chicken products?
20   A.   I guess you could say that.
21   Q.   You don't want blood and guts and other
22   things building up on the aprons, sleeves, gloves,
23   and harboring or growing microorganisms, correct?

FREEDOM COURT REPORTING

206

1  A.  Correct.
2  Q.  And employees are reusing gloves, aprons, or
3  sleeves the next day sometimes?
4  A.  Yes.
5  Q.  And they're storing them in their lockers?
6  A.  Yes.
7  Q.  And the purpose of that rule that they have
8  to wash their aprons, gloves, and sleeves at the
9  end of the day or on breaks is to prevent
10 contamination to the chicken, correct?
11 A.  Yes.
12 Q.  And the wash basins, for that purpose, are
13 in the production area, correct?
14 A.  Yes.
15 Q.  Employees, at that point, still have on
16 their smocks, correct?
17 A.  I can't answer that.  Some do; some don't.
18 I can't answer that.
19 Q.  They don't -- The employees at the end of
20 the day are required to put their smocks in a bin?
21 A.  Correct.
22 Q.  The bin's outside of the production area?
23 A.  Correct.

207

1  Q.  So they still have their smocks with them
2  when they're cleaning their aprons, gloves, and
3  sleeves?
4  A.  Yes.  But they could have them off.
5  Q.  I was thinking -- I need to read the rules,
6  and I don't have time to really, but I was
7  thinking though the rules say you had to take your
8  smock off after you left the production room.  Am
9  I wrong in that?
10 A.  Take the smock off before you leave the
11 production area.  At the end of the shift, they
12 take them off as they go out the door because
13 they're not going to wear them back in.
14 Q.  Okay.  At breaks, employees are not allowed
15 to take their aprons and smocks outside the
16 production area, correct?
17 A.  Correct.  They hang them on a rack that's
18 supplied for them.
19 Q.  And they're not allowed to take their gloves
20 or sleeves outside the production area either, are
21 they?
22 A.  Correct.
23 Q.  And they're not allowed to take their hair

208

1  nets or beard net out of the production area
2  during breaks, correct?
3  A.  They can wear their hair nets and beard nets
4  outside the production area.
5  Q.  How long has that been the case?
6  A.  I can't answer that.  As long as I can
7  remember.  They can't wear them outside, but they
8  can wear them outside the production area.
9  Q.  Employee breaks are automatically deducted
10 through the computer payroll system rather than
11 through the use of a master card swipe, correct?
12 A.  The best of my knowledge.  I don't know.
13 Q.  Have you ever known a master card to be used
14 to determine breaks?
15 A.  No.
16 Q.  Have you ever known a personal time card to
17 be used to determine breaks?
18 A.  Yeah.  I have known that.
19 Q.  When?
20 A.  It's been several years ago, before I come
21 to work here.  But we used to clock in and out for
22 breaks.
23 Q.  Which company was that?

209

1  A.  Wayne Farms.
2  Q.  But that was never a practice at CP?
3  A.  Not to the best of my knowledge.
4  Q.  And it's never been under Equity Group?
5  A.  Best of my knowledge it's hasn't been, no.
6  Q.  Equity Group is not calculating the amount
7  of time employees actually spend on break free
8  from any responsibilities; it's simply deducting a
9  standard 30 minutes, correct?
10 A.  Yes.
11 Q.  And the 30 minutes begins when the last
12 chicken passes the last station on the line?
13 A.  No.  The 30 minutes begins when it passes
14 your station, whether you be the first or the
15 last.
16 Q.  Is that in writing anywhere?
17 A.  Not as I know of.
18 Q.  Have you observed when employees are being
19 sent on break?
20 A.  I've seen employees leave the line as soon
21 as the last bird passes them, and they follow
22 pursuit back in.
23 Q.  Now, at the time the last bird passes their

FREEDOM COURT REPORTING

210

1  station at break, they still have on their smock,
2  apron, gloves, sleeves, earplugs, hair nets, beard
3  nets, and boots; is that right?
4  A.  Correct.
5  Q.  Before they can leave the production area,
6  they've got to doff all that?
7  A.  No.
8  Q.  Except for, I think you said, the hair net
9  and the beard net?
10  A.  And their boots and their earplugs.
11  Q.  Okay.  But everything else they've got to
12  doff after the break has begun?
13  A.  After they leave the line.
14  Q.  So they're doffing all of that on unpaid
15  time, correct?
16  A.  As far as I know.  But I've never put a
17  stopwatch on it.
18  Q.  Now, when an employee goes to the restroom
19  while the line is running, they also have to doff
20  everything, as you have already told us, before
21  they can leave the production area, correct?
22  A.  Correct.
23  Q.  That's considered work time and they're paid

211

1  for it, correct?
2  A.  They get paid for that.
3  Q.  They're exerting the same amount of effort
4  to doff when they go to the restroom during the
5  production line as they are when they doff on an
6  unpaid break, correct?
7      MR. ROSENTHAL:  Objection to the form
8  of the question.  You can answer.
9  A.  I would say so.
10  Q.  And during the break, the employees are
11  required to sanitize their hands, gloves, sleeves,
12  aprons that they're using when they return --
13  before they return to the production area, or when
14  they return to the production area?
15  A.  When they return to the production room.
16  Q.  They have to do that inside the production
17  room at the sinks; is that right?
18  A.  Correct.
19  Q.  But their pay time doesn't begin until after
20  that, when they return to the line and the
21  chickens start coming again, correct?
22  A.  No.  Their 30 minutes is up when they're
23  called back to break.  And then they walk through

212

1  the door and they start getting ready to go to the
2  line.
3  Q.  But an employee's break continues until he's
4  back on the line working?
5  A.  Not necessarily.
6  Q.  I don't know if you might have an exception,
7  but that's the standard situation, isn't it?
8  A.  I don't know the answer to that.  I've never
9  timed them.
10  Q.  Well, an employee's unpaid time is from the
11  time he peels off the production line until the
12  time he's back on the production line.  That's
13  supposed to be 30 minutes, correct?
14  A.  He's got 30 minutes of unpaid breaks.
15  Q.  And that 30 minutes he's required to be on
16  the line at the commencement of it and back on the
17  line at the end of it, correct?
18  A.  Should be.
19  Q.  And during that period he has had to doff
20  all of his protective equipment, resanitize it,
21  and redon it, correct?
22  A.  Yeah.
23  Q.  And all that's on unpaid time during the

213

1  break?
2  A.  Yes.
3  Q.  But if he goes to the nurse's station or to
4  the quality assurance office or to the restroom or
5  to the supply room during the production line, he
6  does the exact same amount of activities, but he's
7  paid for that?
8      MR. ROSENTHAL:  Objection to the form
9  of the question.
10  Q.  Correct?
11  A.  Yes.
12      MR. WIGGINS:  Let's take a break.  I'm
13  about done.
14      (A brief recess was taken.)
15  (BY MR. WIGGINS)
16  Q.  Employees rotate jobs when they come back
17  from break too, don't they?
18  A.  I can't answer that.  I don't know.
19  Q.  You mentioned a HACCP plan.  That's a
20  written document, correct?
21  A.  Correct.
22  Q.  You said it's required to be kept out on the
23  floor, along with the sanitation master plan?

FREEDOM COURT REPORTING

214

1    A.  No.  It's required to be kept on site.  Not
2    on the floor, on site.
3    Q.  Okay.  What's covered in the HACCP plan?
4    A.  HACCP plan is a government-regulated
5    program.  And I don't know really the details.
6    But you have to go through the entire process and
7    list critical control points, CCPs as they are
8    called, and you have to follow that plan.  It's a
9    plan that's mandated by USDA.
10    Q.  Okay.  Now, looking at Exhibit 17, it's got
11    this P-20322 number right below the name of the
12    plant.  Do you see that?
13    A.  Yes.
14    Q.  What does that stand for?
15    A.  That's the plant number.  That's the number
16    that USDA issued that plant.
17    Q.  So USDA is treating slaughter, debone, and
18    further processing as one plant?
19    A.  Yes.
20    Q.  Has that always been the case?
21    A.  Here, yes.
22    Q.  In Eufaula?
23    A.  Yes.

215

1    Q.  And what's that P number used for?
2    A.  That's our number that USDA -- that's our
3    name for USDA.
4    Q.  To track meat?
5    A.  Track meat.  That's our number.
6    Q.  In other words, if poultry gets out in the
7    market and something's wrong with it, they can
8    track it back to you; is that the purpose?
9    A.  Yes.  That number is on our labels of our
10    product.
11    Q.  Okay.  And when I asked you the various
12    questions about whether the activities listed in
13    Exhibit 17, such as the donning, doffing, and the
14    sanitizing activities were for the purpose of
15    preventing contamination of chicken, that's a
16    requirement of the USDA, correct?
17        MR. ROSENTHAL:  Objection to the form
18    of the question.  It's not a summary of what the
19    witness said.  But you can answer.
20    A.  I don't remember what's in 17 at this point.
21    But, you know, the USDA does have regulations.
22    Q.  That's 17, the one we went over for a good
23    bit after lunch.

216

1    A.  Talking about this entire 17?
2    Q.  Yes.
3    A.  Some of it is USDA requirements; some of it
4    is our requirements.
5    Q.  But the items that you do to prevent
6    contamination of poultry product is because that's
7    a requirement of the USDA?
8        MR. ROSENTHAL:  Objection to the form
9    of the question.
10    A.  The USDA, us as a company, both.
11    Q.  Both the company requirement and the USDA
12    requirement?
13    A.  Could be both.  Could be.
14    Q.  All right.  Now, as I understand -- And I've
15    never been in a chicken plant, so you tell me if
16    I've got a bad understanding -- the line is a
17    continuous production line, correct?
18    A.  Yes, most of them are.
19    Q.  It doesn't stop from when it goes from
20    evisceration to debone?
21    A.  Yes, it stops.  There's no one line that
22    runs all the way through that facility.
23    Q.  Does the chicken on the --

217

1    A.  The production flow starts here and goes to
2    here, but there's not no one line.
3    Q.  Okay.  But for any one line, the flow
4    doesn't stop when it moves from evisceration to
5    debone, does it?
6    A.  No.
7    Q.  So you really couldn't stop for three to
8    five minutes in debone without stopping for three
9    to five minutes in evisceration, could you?
10    A.  Yes.
11    Q.  How would you do that?
12    A.  Combo the birds off.  We've got a system
13    that will hold birds.
14    Q.  What do you mean by "combo the birds off"?
15    A.  Put them into a container.
16    Q.  Is that done every shift?
17    A.  Yeah.  Do it every day to some degree.  Some
18    days worse than others.
19    Q.  Are there days when you don't do that?
20    A.  If there is additional space on tables and
21    areas that we have for birds to stay, yes, we can
22    do that.  We can stop for three minutes and not
23    shut down the entire plant.

FREEDOM COURT REPORTING

218

1  Q.  Now, in that three to five minutes, you said
2  that the employees are being paid on the evening
3  shift, even though there's no birds coming down
4  the line?
5  A.  Evening or day shift, whichever it falls in.
6  It could be half on each.  I don't know the answer
7  to that.  But they are being paid because it's
8  within their time frame at work.
9  Q.  So they're being paid -- Either or both of
10  the day shift and evening shift are being paid for
11  the three to five minutes that there is no
12  chickens on the line?
13  A.  Correct.
14  Q.  And that three to five minutes is obviously
15  not line time because there are no chickens on the
16  line, correct?
17  A.  Correct.
18  Q.  And that's handled in the same way you
19  handle the three minutes for donning and doffing?
20  A.  No.
21  Q.  You said you pay them three minutes?
22  A.  We pay them three minutes.
23  Q.  And the same thing on the three to five

219

1  minutes on the shift changeover; you simply pay it
2  even though it's not line time, correct?
3  A.  Correct.  But the three minutes on donning
4  and doffing that we now pay is just added to their
5  normal ever how many hours they work that week.
6  Q.  And they normally work eight hours, correct?
7  A.  On day shift.
8  Q.  So they are now been paid eight hours and
9  three minutes?
10  A.  If they work an eight-hour shift that day,
11  they're getting paid eight hours and three
12  minutes, whatever the contract says.
13  Q.  And that's simply programmed into the
14  computer payroll system?
15  A.  Correct.
16  Q.  And that three minutes is not paid by any
17  master card swipe time?
18  A.  It's on their check as D&D or donning and
19  doffing or some way.  It's set up where it pays
20  that.  It's shown it on the bottom of their check.
21  Q.  Now, that three to five minutes in the
22  debone department between day shift and evening
23  shift, that's not on master card time either?

220

1  A.  Yes, it is.
2  Q.  As I understand it, the evening shift swipes
3  and then -- I'm sorry.  Let me start over.
4      The day shift swipes three to five minutes
5  different than the evening shift swipes on the
6  master card?
7  A.  I don't know.  I don't know the answer to
8  that.  I wouldn't think so.  Our normal ending
9  time is at 4:30 on day shift; our normal start
10  time is at 4:30 on evening shift.
11  Q.  Is there any other time of day that you
12  combo the birds off the line?
13  A.  Sure.  Any time we have a breakdown we have
14  to combo them.
15  Q.  And combo-ing the birds off means that you
16  take the birds off the moving line, put them in
17  some storage container, keep them there for three
18  to five minutes, and then put them back on the
19  line, right?
20      MR. ROSENTHAL:  Objection.  You're
21  talking about the three to five minutes between
22  the shifts or at any time?
23      MR. WIGGINS:  Between the shifts.

221

1  A.  We put them back on the line whenever we can
2  work them back in.
3  Q.  But that's extra work that you're having to
4  do that you wouldn't have to do if you left them
5  on a continuous line, correct?
6  A.  Correct.
7  Q.  And who's responsible for that extra work?
8  A.  The debone employees, or wherever it's at,
9  whatever department it's in any time we have a
10  mechanical breakdown.  So it could be evis.
11  Q.  Have you ever known any item to be
12  negotiated in the collective bargaining process
13  without having a written proposal from the union
14  or the company on that topic?
15  A.  I don't recall.  Not that I'm aware of.  I
16  don't recall.
17  Q.  Did the four people that signed the 2008
18  collective bargaining agreement have the authority
19  to agree to that three minutes to be paid for
20  donning and doffing by themselves, without getting
21  any higher approval?
22  A.  I don't know the answer to that.  Because
23  when the final decision was made, Huntsville was

FREEDOM COURT REPORTING

222

1    made aware of what we had come up with, and then
2    decided on it.
3    Q.   Had other Equity Group plants put in three
4    minutes for donning and doffing?
5    A.   I don't know.
6    Q.   Do you know who had the final authority to
7    agree to that three minutes?
8    A.   No.  The four that signed the contract, I
9    guess, with leadership from our attorney and our
10   Huntsville group involved in it.
11   Q.   Who in the Huntsville group?
12   A.   I don't know the answer to that.
13   Q.   Do you still have your copy of Exhibit 17
14   there?
15   A.   Here it is.
16   Q.   Turn to page 6.
17   A.   (Witness complies.)
18   Q.   Do you see at the top of the page, the end
19   of No. 3, it refers to Section 7.1, 7.2 of Codex
20   Alimentarius?
21   A.   Yeah, I see it.
22   Q.   What is that?
23   A.   I have no idea. I don't know.

223

1    Q.   Turn over to page 11.
2    A.   (Witness complies.)
3    Q.   No. 18. It refers to a quality assurance
4    hold. What is that?
5    A.   If for any reason product doesn't meet spec,
6    QA puts the product on hold and applies a QA hold
7    tag that states "QA Hold."
8    Q.   If you had employees on the line who had not
9    sanitized their hands, gloves, sleeves, or apron,
10   would it be subject to a quality assurance hold?
11   A.   I've never been made aware that anything's
12   been put on QA hold for not washing their hands.
13   Q.   First of all, are you knowledgeable of the
14   reasons for quality assurance holds?
15   A.   Some of them, not all of them.
16   Q.   What type of sanitation matters would cause
17   a quality assurance hold?
18   A.   If the plant's not clean.
19   Q.   What about the employees? What if they're
20   not meeting sanitation requirements?
21   A.   I've never known of anything being put on
22   hold that the employee was dirty.
23        If the employee drops product on the floor

224

1    and picks it up and puts it into a clean edible
2    tote, it's put on hold.
3    Q.   If an employee drops product on the floor
4    and touches it and doesn't resanitize his hands,
5    is it put on hold?
6    A.   Yes, can be.
7    Q.   And then it refers in the same paragraph to
8    a USDA hold. What type of sanitation infraction
9    would cause a USDA hold?
10   A.   Same thing, if they catch you before QA
11   does.
12   Q.   You have USDA employees inspecting on every
13   part of the production process?
14   A.   Yes.
15   Q.   How many USDA employees do you have in your
16   fresh plant?
17   A.   A minimum of 11 per shift.
18   Q.   And do you have them in there during the
19   sanitation shift also?
20   A.   No.
21   Q.   That's just your two operating shifts?
22   A.   Two operating shifts.
23   Q.   Do you have USDA in during the sanitation

225

1    shift?
2    A.   Part of it.
3    Q.   Which part?
4    A.   At the ending of the cleanup.
5    Q.   Do you keep records of your quality
6    assurance holds?
7    A.   I don't; QA does.
8    Q.   Do you know how long you keep those?
9    A.   No.
10   Q.   What about your USDA holds? Do you keep
11   those for any period of time?
12   A.   No, I don't; USDA does.
13   Q.   I mean, does the company?
14   A.   If it does, QA keeps them. I'm not aware of
15   it. They may.
16   Q.   Top of page 12, it refers to posting a "Wash
17   Hands before Returning to Work" sign. Has that
18   been done?
19   A.   I don't know the answer to that.
20   Q.   It says that's supposed to be in the
21   restrooms, correct?
22   A.   That's what it says.
23   Q.   Employees are required to wash and sanitize

226

1  their hands before leaving the restroom, correct?
2  A.  Correct.
3  Q.  They then can go either to the break room,
4  supply room, or outside, correct?
5  A.  Repeat your question.
6  Q.  After they have washed their hands in the
7  restroom, if they're still on break they can go on
8  outside, or to the supply room, or to the break
9  room, or anywhere they want to go, correct?
10  A.  Correct.
11  Q.  But when they enter the production area
12  again, they have to resanitize their hands a
13  second time, correct?
14  A.  Have to rewash their hands, correct.
15  Q.  And that's true on any type of leaving the
16  work area, whether it's on production line time or
17  on break time, correct?
18  A.  Correct.
19  Q.  Employees are not allowed to stay in the
20  production area during breaks, are they?
21  A.  Yeah, they can.  I mean, some do; some
22  don't.  Very few do.  But they can stay in there.
23  That's their choice.

227

1  Q.  But you've already told us there's no food
2  or drink allowed.
3  A.  Correct.
4  Q.  And there's no bathrooms in there?
5  A.  No bathrooms.
6  Q.  Okay.  Thank you.
7       MR. ROSENTHAL:  I don't have any
8  questions for you.
9       MR. WIGGINS:  Howard, we want, in
10  addition to the sanitation manual we asked for, we
11  think that the SOPs of sanitation, boots, all
12  these SOPs that deal with donning, doffing,
13  sanitation, that type of thing are due to be
14  produced.
15      We'd like to have an updated layout of the
16  plant now that it's been revised, if you've got
17  one.  And we'd like to have HACCP plan.  Anything
18  else?
19      MS. MCGOWAN:  When we were having our
20  conversation, I kept saying, "Do we have this in
21  an electronic version?"  And y'all kept saying,
22  "We've produced everything."
23      MR. ROSENTHAL:  No, no.

228

1       MS. MCGOWAN:  Well, for some reason we
2  had a communication problem.  So just so we're
3  clear, so there's no communication problem, we
4  want the Kronos information on electronic disk,
5  because you keep it, don't you?
6       MR. ROSENTHAL:  We don't have one.  The
7  Kronos information is in hard copy, and it's
8  available for you to review.
9       MS. MCGOWAN:  What are you using now?
10      MR. ROSENTHAL:  I've got the hard
11  copies.
12      MS. MCGOWAN:  I know.  But do you use
13  Kronos now?
14      MR. ROSENTHAL:  They're not something
15  which we can convert.  It's a specialized program.
16  We have the hard copies.  It's the only thing that
17  I'm aware of that I can give you, and we've made
18  them available since September.  And that's what
19  we told you.  We read right from the response.
20      MS. MCGOWAN:  Well, we can agree to
21  disagree what I understand and what you
22  understood, but --
23      MR. ROSENTHAL:  And those documents

229

1  are --
2       MS. MCGOWAN:  You printed it off.  Do
3  they print it every day and dump it, or why is it
4  not available electronically?
5       MR. ROSENTHAL:  I can't answer that
6  question, Candis.  I can tell you what we have
7  available and what we've offered to make
8  available.  It's the same thing we've offered
9  since September.
10      I can't today find out what else will be
11  available when the first time we got a request was
12  today.
13      MS. MCGOWAN:  No, no.
14      MR. ROSENTHAL:  That's the first
15  request we had.  We were not asked for an
16  electronic copy from the time we responded to
17  discovery last September.  You asked about it last
18  Friday, and I told you what the answer was.
19      MR. WIGGINS:  Let me see if I
20  understand you, Howard.  Y'all have it on
21  electronic form, but you say it's a problem
22  converting it?
23      MR. ROSENTHAL:  I don't know that we

FREEDOM COURT REPORTING

230

1   have it for every employee going back as far as
2   March of 2004. And all I'm saying is I will have
3   some time after this week to determine what's
4   available and what we can make available and how
5   we can make it available.
6        MR. WIGGINS: Well, I hope it doesn't
7   come to this, but once we get these SOPs and these
8   other things I've listed, it could trigger some
9   questions of this witness.
10        MR. ROSENTHAL: Our position is very
11   simple: We produced responses to discovery in
12   September. The first time we were asked to
13   present witnesses was when we received the Notice
14   of Deposition. We objected to the Request For
15   Production; that's been ruled on.
16        So I'm not suggesting that you have a right
17   to bring anyone back.
18        MR. WIGGINS: Yeah, I understand you're
19   not. And I'm not taking a position on it until I
20   see the documents. But I do want to be clear
21   though that the documents that I've asked for --
22   and I don't know much about the Kronos thing --
23   but the documents I'd asked for I think were due

231

1   under the original document production.
2        MR. ROSENTHAL: I disagree with that.
3   And at the close of this deposition, our position
4   is that you're done with this witness. I
5   understand you can take a different position.
6        As I said to Candis last week, we'll take
7   all requests under advisement and get the
8   documents to you to the extent that we can. It
9   won't happen this week.
10        MR. WIGGINS: I understand. And it may
11   be Much Ado About Nothing when we see them.
12        MR. ROSENTHAL: Even to the extent we
13   can locate them, I'm going to assume that whatever
14   you told the court reporter is the extent of what
15   you're asking for, and we'll see what we can do.
16        For example, I don't know that there's any
17   layout of the plant as it is currently; we'll
18   certainly look for that.
19        MR. WIGGINS: Well, the ones I listed
20   were just ones that showed up today. There may be
21   some that will show up with the next witness, I
22   don't know. But we can worry about that later. I
23   just wanted to tell you that it could trigger the

232

1   need for further questions. Hopefully, it won't.
2        MR. ROSENTHAL: Okay.
3
4        (The deposition was concluded
5        at 4:30 p.m.)

233

1        C E R T I F I C A T E
2
3   STATE OF ALABAMA
4   BARBOUR COUNTY
5
6        I hereby certify that the above and
7   foregoing deposition was taken down by me in
8   stenotype and the questions and answers thereto
9   were transcribed by means of computer-aided
10   transcription, and that the foregoing represents
11   a true and correct transcript of the testimony
12   given by said witness upon said hearing.
13        I further certify that I am neither of
14   counsel, nor kin to the parties to the action,
15   nor am I in anywise interested in the result of
16   said cause.
17
18
19        CYNTHIA M. NOAKES, Commissioner
20        Certified Court Reporter,
21        ACCR #327 - Expires 09/30/2008
22
23        Commission Expires 07/08/2009

**TAB 40**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


NO.:  2:06-CV-1081-MEF


BETTY ANN BURKS, et al.,

          Plaintiff(s),

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

          Defendant(s).




                    DEPOSITION OF

                    SHAKERIA MOORE

                         JOB NO. 1101-58403




BEFORE:    Victoria M. Castillo

           Certified Court Reporter and

           Notary Public

           ACCR# 17, Expires 9/30/2008

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

e0bcecd9-186c-4ba3-bd18-66173036ea80

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

**2**

1    In accordance with Rule 5(d) of
2    The Alabama Rules of Civil Procedure, as Amended,
3    effective May 15, 1988, I, Victoria M. Castillo, am
4    hereby delivering to HOWARD A. ROSENTHAL, ESQ. the
5    original transcript of the oral testimony taken on
6    the 22nd day of May, 2008, along with exhibits.
7        Please be advised that this is
8    the same and not retained by the Court Reporter,
9    nor filed with the Court.
10
11    S T I P U L A T I O N
12
13        IT IS STIPULATED AND AGREED, by
14    and between the parties through their respective
15    counsel, that the deposition of SHAKERIA MOORE may
16    be taken before Victoria M. Castillo, Commissioner,
17    at WILLIAMS, POTTHOFF, WILLIAMS & SMITH, 125 South
18    Orange Avenue, Eufaula, Alabama 36027 on the 22nd
19    day of May, 2008.
20        IT IS FURTHER STIPULATED AND
21    AGREED that the signature to and the reading of the
22    deposition by the witness is waived, the deposition
23    is said to have the same force and effect as if

**3**

1    full compliance had been had with all laws and
2    rules of Court relating to the taking of
3    depositions.
4        IT IS FURTHER STIPULATED AND
5    AGREED that it shall not be necessary for any
6    objections to be made by counsel to any questions,
7    except as to form or leading questions, and that
8    counsel for the parties may make objections and
9    assign grounds at the time of trial, or at the time
10    said deposition is offered in evidence, or prior
11    thereto.
12        IT IS FURTHER STIPULATED AND
13    AGREED that notice of filing of the deposition by
14    the Commissioner is waived.
15
16
17
18
19
20
21
22
23

**4**

1    I N D E X
2
3    EXAMINATION BY:            PAGE NUMBER:
4    Mr. Fry                    6
5    Mr. Underwood                  40
6
7    EXHIBITS:          PAGE NUMBER:
8    (No Exhibits Were Marked.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**5**

1    A P P E A R A N C E S
2
3    FOR THE PLAINTIFF(S):
4        Carl E. Underwood, III, Esq.
5        THE COCHRAN FIRM
6        163 West Main Street
7        Dothan, Alabama 36302
8
9        M. John Steensland, III, Esq.
10        PARKMAN, ADAMS & WHITE
11        739 West Main Street
12        Dothan, Alabama 36301
13
14    FOR EQUITY GROUP EUFAULA DIVISION
15        Gary D. Fry, Esq.
16        Pelino & Lentz
17        One Liberty Place
18        Thirty-Second Floor
19        1650 Market Street
20        Philadelphia, Pennsylvania 19103
21
22    **********************
23

6

1        I, Victoria M. Castillo, a Court
2    Reporter of Montgomery, Alabama, acting as
3    Commissioner, certify that on this date, as
4    provided by the Alabama Rules of Civil Procedure
5    and the foregoing stipulation of counsel, there
6    came before me at WILLIAMS, POTTHOFF, WILLIAMS &
7    SMITH, 125 South Orange Avenue, Eufaula, Alabama
8    36027, commencing at 3:57 p.m., SHAKERIA MOORE, in
9    the above cause, for oral examination, whereupon
10   the following proceedings were had:
11
12       SHAKERIA MOORE,
13   being first duly sworn, was examined and
14       testified as follows:
15
16       COURT REPORTER:  Usual
17   stipulations?
18       MR. FRY:  That's fine.
19       MR. UNDERWOOD:  Yes.
20
21   EXAMINATION BY MR. FRY:
22   Q.    Good afternoon.  How are we doing?
23   A.    All right.  How are you?

7

1    Q.    Ms. Moore, my name is Gary Fry.  I'm
2    an attorney, and I represent Equity Group Eufaula,
3    the folks that run the poultry plant out in Baker
4    Hill, and we have asked you to come here today to
5    put questions to you concerning the claims
6    that you and some other folks have made against
7    Equity with respect to wages and hours at that
8    plant.  Have you ever been deposed before?
9    A.    I don't know what you mean by
10   "deposed"?
11   Q.    Have you ever done something like
12   this before to your knowledge?
13   A.    No.
14   Q.    Your lawyers probably told you a
15   little bit about the procedure.  Let me briefly
16   explain.  I will be asking the questions.  You will
17   be supplying me with the answers, and Victoria, our
18   court reporter, will be taking down what we both
19   say.  If you don't understand my question, it's
20   important for you to let me know that so I that can
21   rephrase it.  If you don't hear my question, let me
22   know so I can repeat.  You have to keep all of your
23   answers verbal.  You can't nod or shake your head.

8

1    Okay?
2    A.    Okay.
3    Q.    Because she can't take that down.
4    A.    Okay.
5    Q.    And the last rule is:  Let's not try
6    and talk over one another because she can't take
7    down two people talking at the same time.  Okay?
8    A.    Okay.
9    Q.    What's your home address?
10   A.    759 Rocky Mount Church Road, and it's
11   Eufaula.
12   Q.    And what's your date of birth?
13   A.    4/27 of '87.
14   Q.    Are you currently employed?
15   A.    Yes, by another employer.  I am no
16   longer employed with Keystone.
17   Q.    When did you last work for Keystone?
18   A.    February of '07.
19   Q.    I'm going to refer to Keystone as
20   Equity.  Is that okay with you?
21   A.    Okay.
22   Q.    How long did you work there?
23   A.    About 17, 18 months.

9

1    Q.    So that would take us back into '06
2    sometime.  Do you recall your start date?
3    A.    I started in September of '05.
4    Q.    September of '05?
5    A.    Uh-huh.
6    Q.    And for what reason did you leave
7    that job?
8    A.    A conversation with another employee.
9    Q.    You got a better job, another job?
10   A.    Another job.
11   Q.    What did you do when you worked
12   there?
13   A.    Debone.
14   Q.    What did you do in debone?
15   A.    I was on the line, debone line.
16   Q.    And were you in that position the
17   whole time you worked there?
18   A.    No.
19   Q.    Was that the position that you had
20   right when you left?
21   A.    No.
22   Q.    That was your first position?
23   A.    Yes, that was my first position.

e0bcecd9-186c-4ba3-bd18-66173036ea80

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

10

1   Q.   And how long did you have that job?
2   A.   About two months at the most.
3   Q.   And what shift was that?
4   A.   Second.
5   Q.   What were your hours?
6   A.   4:30 to 1:30.
7   Q.   That's 4:30 p.m. to 1:30 a.m.?
8   A.   Uh-huh.
9   Q.   And after two months on the debone
10  line, what did you do?
11  A.   The wash station.
12  Q.   Pardon?
13  A.   Wash station.
14  Q.   Wash station?
15  A.   Yes.
16  Q.   And what sort of job was that?
17  A.   Washing the product.
18  Q.   Was that in the debone department?
19  A.   Yes.
20  Q.   Where was that located with respect
21  to the debone line itself?
22  A.   Right across from the lines.
23  Q.   What did you do on the debone line?

11

1   A.   Cut the meat.
2   Q.   Did you rotate positions on that
3   line?
4   A.   Yes.
5   Q.   Did you rotate daily?
6   A.   Yes.
7   Q.   How many times per day would you
8   rotate?
9   A.   I think it was like three.
10  Q.   Explain to me in a little bit more
11  detail what you did at the wash station?
12  A.   I washed the product that came from
13  the line that fell to the floor. We would wash it.
14  Q.   So that was your job, to wash the
15  stuff that fell on the floor?
16  A.   Yes.
17  Q.   And to do that, did you walk up and
18  down the line to police the floor, or was the
19  product brought to you?
20  A.   At times it was brought to me, but
21  most of the time we would have to go and walk the
22  lines ourselves.
23  Q.   How long did you do that job?

12

1   A.   Right after I left from the debone
2   line. After the two months of being on the line,
3   that was my job until I left.
4   Q.   Until you left --
5   A.   Uh-huh.
6   Q.   -- second shift?
7   A.   Yes.
8   Q.   Did you work any other jobs while you
9   were employed by Equity?
10  A.   No.
11  Q.   Who was your supervisor, if you can
12  recall?
13  A.   I remember her first name. I don't
14  remember her last name. First name was Sheila. I
15  can't recall her last name.
16  Q.   What was your rate of pay when you
17  left?
18  A.   I think $9.45 -- I'm not sure.
19  Q.   Did you work 40 hours per week?
20  A.   Yes.
21  Q.   Monday through Friday?
22  A.   Yes.
23  Q.   Were you a member of the Union while

13

1   you were there?
2   A.   No.
3   Q.   It's my understanding that you are a
4   party to this lawsuit that we're talking about,
5   correct?
6   A.   Yes.
7   Q.   How did you find out about the
8   lawsuit?
9   A.   A friend of mine.
10  Q.   What was the friend's name?
11  A.   I can't remember. I just knew her
12  from work. I can't remember her name.
13  Q.   What did the friend tell you?
14  A.   She just mentioned that she had heard
15  that they was getting sued for not paying us for
16  our wages. And I asked my supervisor when I got
17  back to work, and she said that they was getting a
18  lawsuit against them.
19  Q.   Did your supervisor try to discourage
20  you from joining the lawsuit?
21  A.   Yes, at first.
22  Q.   What did she say?
23  A.   That -- I can't remember her exact

e0bcecd9-186c-4ba3-bd18-66173036ea80

14

1   words. I don't know. I can't recall her exact
2   words.
3       Q.   What was your understanding of what
4   your claim is in this lawsuit?
5       A.   Not getting paid for time served.
6       Q.   What time served, what were you doing
7   during that time for which you weren't paid?
8       A.   Working.
9       Q.   What work did you perform for which
10  you weren't paid?
11      A.   The wash station.
12      Q.   Pardon?
13      A.   The wash station.
14      Q.   At the wash station. So your claim
15  is that you were working at the wash station and
16  you weren't being paid for what you were doing
17  there, which was washing chickens?
18      A.   I wasn't getting paid my full time
19  while working at the wash station. Like when we go
20  to break, they wasn't paying us.
21      Q.   What weren't they paying you for?
22      A.   The time.
23      Q.   The time --

15

1       A.   My work.
2       Q.   The work at the wash station? I'm
3   just trying to get an understanding, Ms. Moore, as
4   to what the factual basis is for your claim, what
5   you think it is?
6       A.   Not getting paid for the hours.
7       Q.   Not being paid for the hours worked?
8       A.   Uh-huh.
9       Q.   Can you tell me what you were doing
10  during those hours that you weren't paid for?
11      A.   It's like me and my supervisor, like
12  the Master Card -- they would clock us out before
13  we even leave the floor. They wasn't giving us our
14  time.
15      Q.   Let me see if I understand you. And
16  if I don't accurately state what you told me, let
17  me know. You are making a claim for work done
18  after the Master Card was swiped?
19      A.   Yes.
20      Q.   Was that work done at the wash
21  station?
22      A.   My work was done at the wash station,
23  yes.

16

1       Q.   And it was work that you were
2   performing at the station, is that what your claim
3   is?
4       A.   Yes.
5       Q.   In order to do your job at the wash
6   station, what sort of clothing or equipment -- or
7   PPE, as some people have called it -- did you put
8   on every day?
9       A.   The smock, the apron, the cotton
10  gloves, the rubber gloves, the hair net, the ear
11  plugs, the safety goggles, the chain glove, the
12  boots.
13      Q.   Anything else?
14      A.   The sleeves. I think that's
15  everything.
16      Q.   Let me run down the list and make
17  sure we have everything. The smock, the apron, the
18  gloves, the hair net, the ear plugs, the goggles,
19  the chain mesh glove, the boots, and the plastic
20  sleeves?
21      A.   The cotton.
22      Q.   And the white cotton liners?
23      A.   Liners, yes.

17

1       Q.   Anything else?
2       A.   That's it.
3       Q.   When you moved off the debone line
4   and you went to the wash station job, which of
5   those items did you wear?
6       A.   The same items.
7       Q.   Same items?
8       A.   Yes.
9       Q.   Was it your understanding that all of
10  those items were required to be worn?
11      A.   Yes, they were.
12      Q.   Am I correct that each of those items
13  was issued to you by the company?
14      A.   When I first started, yes.
15      Q.   Did that change?
16      A.   If I needed one, then we would have
17  to go purchase it ourselves.
18      Q.   What was your understanding as to
19  when you had to purchase any of these items?
20      A.   What you mean, what was my
21  understanding?
22      Q.   I mean, you said the company issued
23  you these items initially, and then thereafter you

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

18

1  had to pay for them?
2      A.    Uh-huh.
3      Q.    Are you saying that if you wore a
4  hole in your apron, you would have to buy a new
5  one?
6      A.    Yes.
7      Q.    Did you ever have to do that?
8      A.    Yes.
9      Q.    And how much did the apron cost?
10     A.    I can't remember how much they were.
11     Q.    Which of these items did you pick up
12  on a daily basis?
13     A.    The cotton liners and the rubber
14  gloves.
15     Q.    What about your smock?
16     A.    Yes, smock also. And the hair net
17  because they would --
18     Q.    Which of these items could you wear
19  from your home?
20     A.    Your boots.
21     Q.    That's it?
22     A.    That's it.
23     Q.    When you weren't working at the

19

1  plant, did you store any of these items at the
2  plant?
3      A.    Only my sleeves and apron.
4      Q.    And you had a locker for that
5  purpose?
6      A.    Yes.
7      Q.    It's my understanding that you put on
8  all this stuff, with the exception of your boots
9  and your ear plugs and your hair net, after you got
10  on the debone production floor at the start of your
11  shift; is that correct?
12     A.    Could you repeat that?
13     Q.    Sure.
14     A.    So I make sure I get it correctly.
15     Q.    It's my understanding that you put on
16  these items that you identified for me with the
17  exception of the boots and the hair net and ear
18  plugs, you put everything else on when you went
19  onto the production floor?
20     A.    Yes.
21     Q.    At the start of the shift, correct?
22     A.    Yes.
23     Q.    And your shift started at 4:30 in the

20

1  afternoon?
2      A.    Yes.
3      Q.    How many minutes before that 4:30
4  start would you go onto the production floor to put
5  this stuff on?
6      A.    I really don't know what time I was
7  on the floor. I'd say about six or seven minutes
8  before time, to get everything on.
9      Q.    Pardon?
10     A.    About six or seven minutes at the
11  most.
12     Q.    When you were working on the debone
13  line, you used a knife, correct?
14     A.    Yes.
15     Q.    And did you use scissors?
16     A.    Yes.
17     Q.    And that's why you use the mesh
18  glove?
19     A.    Yes.
20     Q.    And were the scissors and the knife
21  and the mesh gloves provided to you at the line?
22     A.    Yes.
23     Q.    You didn't have to go pick that stuff

21

1  up, did you?
2      A.    When I started at the wash station, I
3  would have to go and get my own. But on the debone
4  line, it was provided for me.
5      Q.    Well, we are just sticking to the
6  debone line right now. We will get to the wash
7  station in a second.
8      A.    Okay.
9      Q.    So you didn't have to pick up
10  anything when you worked on the debone line?
11     A.    No.
12     Q.    When you moved over to the wash
13  station, did you go onto the floor about six or
14  seven minutes before the start of the shift to put
15  the stuff on as you did when you worked on the
16  line?
17     A.    I had to go a little earlier when I
18  went to the wash station because I had to go and
19  get my own scissors and knife and mesh gloves.
20     Q.    Where did you have to go to get that?
21     A.    To the knife room.
22     Q.    Where was the knife room located in
23  terms of the wash station?

22

1    A.    Across. Way across, on the other
2    side.
3    Q.    I'm sorry, what did you pick up there
4    again?
5    A.    The knife, the scissors, and my
6    glove.
7    Q.    I take it because you had to pick up
8    a knife and scissors and a glove that you did some
9    cutting on chickens when you were at the wash
10   station?
11   A.    Yes.
12   Q.    So you did something more than simply
13   wash off the stuff that had fallen on the floor?
14   A.    Yes.
15   Q.    So was part of your job to salvage
16   some of the meat, or what were you using the knife
17   and the scissors for?
18   A.    Like if they was cutting wings like
19   into pieces, I would have to do that also.
20   Whatever the line was doing, I would have to make
21   that chicken as what they was doing on the line.
22   Q.    How many breaks did you get?
23   A.    Two.

23

1    Q.    How long are the breaks?
2    A.    Supposed to have been 30 minutes.
3    Q.    When you say "supposed to be", I
4    suppose they weren't 30 minutes, were they?
5    A.    No.
6    Q.    How long were they?
7    A.    Not 30 minutes.
8    Q.    How much time did you get to spend in
9    the break room?
10   A.    It varies on different times,
11   depending on what I have to do when I get back in.
12   Q.    Explain that to me.
13   A.    Because at the wash station, you
14   can't have your table full of product because they
15   have to wash down and you can't have the product
16   out. So I have to wash that. And if I leave some,
17   I have to get back in to wash it before the line
18   start up. So that's why my breaks were probably a
19   little shorter.
20   Q.    How did you know when it was time for
21   you to go on your break?
22   A.    My supervisor would let me know.
23   Q.    Did you go on your break — let's

24

1    stick to the time you were working on the debone
2    bone line.
3    A.    Everybody was leaving.
4    Q.    But you couldn't leave until the last
5    piece of chicken went past you, correct?
6    A.    No.
7    Q.    And some people left before you?
8    A.    Yes, the ones that was ahead of me
9    did.
10   Q.    If you were ahead in the rotation you
11   could leave before them, the other people behind
12   you, couldn't you?
13   A.    Yes.
14   Q.    How did you know when to return from
15   the break?
16   A.    The time.
17   Q.    You just looked at the clock?
18   A.    Yes. I know what time we supposed to
19   have been back in.
20   Q.    How did you get to the plant each
21   day?
22   A.    How did I get there?
23   Q.    Yes.

25

1    A.    I drove.
2    Q.    You did. Well, not everybody did.
3    Some people got rides.
4    A.    I drove.
5    Q.    Do you have a sticker for your car?
6    A.    Yes.
7    Q.    And when you drove up to the guard
8    station, did you just drive through?
9    A.    If I was the first one up there, yes.
10   Q.    If the people in front of you all had
11   stickers, everybody just drove in, didn't they?
12   A.    Some of them would pull over, even if
13   they don't have a sticker, knowing that they can't
14   go through without a sticker.
15   Q.    Were you searched at any time to get
16   into the plant?
17   A.    Only about twice.
18   Q.    What were you searched for?
19   A.    Not searched, but I had to stop a
20   couple of times because I had people riding with me
21   that was new hires, and they had to look at their
22   badge.
23   Q.    Besides those few times when you had

e0bcecd9-186c-4ba3-bd18-66173036ea80

26

1  to stop because you had people with you, were you
2  searched before you entered the plant? Were your
3  possessions searched in any way?
4      A.   No.
5      Q.   Were you ever searched when you left
6  the plant?
7      A.   You mean searched like --
8      Q.   Yes, did anybody ask to see inside
9  your handbag?
10     A.   No.
11     Q.   When you left at the end of the day,
12 could you just drive away?
13     A.   Yes, after I cleaned my tools.
14     Q.   Once you got in your car, you could
15 just breeze out, correct?
16     A.   Yes.
17     Q.   What time did you try and arrive at
18 the plant in advance of your start time?
19     A.   About 3:40 at the most.
20     Q.   Tell me what you did from 3:40 until
21 4:30.
22     A.   Made sure I had all my gear and made
23 sure I didn't have to go purchase anything else.

27

1      Q.   So you had to go to supply and pick
2  up your smock and your hair net, correct?
3      A.   Yes.
4      Q.   Did you do that as soon as you got
5  into the plant?
6      A.   I would put my food in my locker.
7      Q.   And did you swipe in?
8      A.   Yes.
9      Q.   And then did you go to the supply
10 room?
11     A.   Yes.
12     Q.   And then what did you do?
13     A.   It depends on what time it was.  I
14 would go in and get my knife and gear up and
15 everything, get my table set.
16     Q.   So you arrived at 3:40, which is
17 about 50 minutes before your start time?
18     A.   Yes.
19     Q.   And you went, put your food away, and
20 then you went to the supply desk, correct?
21     A.   Yes.
22     Q.   And from the supply room you went
23 right onto the production floor?

28

1      A.   Yes.  Most times, yes.
2      Q.   And wasn't the first shift already
3  out there?
4      A.   Yes.
5      Q.   And what would you do then once you
6  got on the production floor?
7      A.   I would get my tools set, because we
8  don't use the same tools as they do, first shift
9  do.
10     Q.   When you arrived at 4:30, about what
11 time would you walk onto the production floor?
12     A.   Excuse me?
13     Q.   Sure.  When you arrived at the plant
14 at 3:40 for your 4:30 shift, what time would you
15 actually go out onto the production floor to make
16 sure you got everything?
17     A.   I would say about four o'clock at the
18 most, most days.
19     Q.   Four o'clock.  So you would be on the
20 production floor for about a half hour in advance
21 of your shift?
22     A.   Yes.
23     Q.   And what would you do during those 30

29

1  minutes?
2      A.   Make sure everything is set.
3      Q.   And part of what you did was put on
4  your PPE?
5      A.   Yes.
6      Q.   And --
7      A.   And also at the wash station we did
8  our own paperwork, so I have to go in the office
9  and get that also.
10     Q.   So you did paperwork, too?
11     A.   Yes.
12     Q.   So is it fair to say that you had to
13 do some prep work in advance of 4:30 to get your
14 wash station job ready, correct?
15     A.   Yes.
16     Q.   Were you paid for that prep time?
17     A.   No.  They supposed to have it ready
18 for me, but they didn't, so I have to do it
19 myself.
20     Q.   Is the work you did during that prep
21 time, is that part of your claim here?
22     A.   Yes.
23     Q.   Approximately how many minutes

e0bcecd9-186c-4ba3-bd18-66173036ea80

30

1   pre-shift were expended in doing that prep time?
2       A.   I can't recall how long it took.
3       Q.   How long did it take you to put on
4   your smock and the other things that you put on
5   when you worked at the wash station?
6       A.   About six, seven minutes, because I
7   would have to wash down and all that.
8       Q.   Did you ever ask your supervisor why
9   everything wasn't set up for you?
10      A.   I asked her a couple of times.
11      Q.   What did she say?
12      A.   She said because -- well, her
13  statement was she be busy getting her papers ready,
14  so if I didn't mind, would I do this, would I do
15  that.
16      Q.   Did you tell your supervisor you
17  wanted to be paid for that?
18      A.   Yes, I told her I wanted to be paid
19  for it.
20      Q.   And what did she say?
21      A.   She said she will look into it and
22  see if she can give me -- let me come in at this
23  hour to get paid for it.

31

1       Q.   And what happened?
2       A.   And she never brought it up again.
3       Q.   Did you ever bring it up again?
4       A.   Yes.
5       Q.   And who did you bring it up to?
6       A.   I brought it up to her again.
7       Q.   What happened the second time?
8       A.   She said that she would look into it,
9   the same thing.
10      Q.   And what happened?
11      A.   Nothing.
12      Q.   And did you go back to her again?
13      A.   Not after that.
14      Q.   When you were at the wash station,
15  and the other folks on the debone line went to
16  break, am I correct that you had to stay a little
17  later and do some cleaning up before you could go?
18      A.   Yes, because I had to cover my tables
19  before I leave out.
20      Q.   And how long did that take?
21      A.   To put the ice up there, cover it, it
22  was about three minutes at the most, because I had
23  to go get the ice.

32

1       Q.   After you did that, what did you do,
2   did you go over and wash off and take your stuff
3   off and go to the debone break room?
4       A.   Yes.
5       Q.   How long did it take you after you
6   prepped your station for your break?  How long did
7   it take you to leave the debone room and get to the
8   break room?
9       A.   After I done took everything off?
10      Q.   Yes, ma'am.
11      A.   It ain't take me no time to get out
12  the door.
13      Q.   How long did it take you to wash down
14  and take the things off?
15      A.   I say about the same length of time
16  it take to put it on, because you still got to wash
17  down, you got to take everything off.
18      Q.   Six or seven minutes?
19      A.   Uh-huh.  They always want you to
20  sanitize it before you leave and when you come
21  back.
22      Q.   Was there a line by the time you got
23  to the wash station to go to on break when you --

33

1       A.   No, everybody probably had to clear
2   out by the time I leave.
3       Q.   I take it that you had to do the
4   reverse process when your break was over?
5       A.   Yes.
6       Q.   You had to wash down, put the things
7   on, wash them down, and it took you about the same
8   amount of time?
9       A.   Yes.
10      Q.   Tell me what you had to do at the end
11  of the day when you were at the wash station line.
12      A.   Talking about when everything -- wash
13  my tools, turn it back in, make sure the tables --
14  I had to clear off the ice.  So turn in my
15  paperwork, clock out -- well, after I wash
16  everything, I take it off, clock out, go home.
17      Q.   How long did that take you?
18      A.   A long time because you have to go to
19  the back of the debone to wash the tools.
20      Q.   What's a long time?
21      A.   10, 15 minutes.
22      Q.   10 or 15 minutes--
23      A.   Uh-huh.  Because I have to look over

e0bcecd9-186c-4ba3-bd18-66173036ea80

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

34

1 the paperwork, turn it in, go wash the tools, turn
2 them in, wash down, then go to clock out.
3      Q.   So these post-shift wrap-up
4 activities that I will call them that you had to
5 do, were you paid for those?
6      A.   Talking about what I had to do before
7 I come in.
8      Q.   The activities you just described for
9 me.
10      A.   I thought I was getting paid for
11 them. I was still on the clock, but obviously not.
12      Q.   The paperwork, you weren't paid for
13 doing the paperwork, to your knowledge?
14      A.   No.
15      Q.   Did you ever ask why you weren't?
16      A.   I asked a couple of times, because we
17 really didn't have like a supervisor at the wash
18 station. It was a supervisor that tell us what to
19 do, did our paperwork and time and stuff, but it
20 wasn't like a set supervisor over there. So it was
21 really like our job to do it, as they claim.
22      Q.   Who is "they"?
23      A.   The supervisors.

35

1      Q.   What was your understanding as to how
2 the company computed the time for which you were
3 paid?
4      A.   Our time cards.
5      Q.   The time card that you swiped in and
6 swiped out?
7      A.   Yes.
8      Q.   Did you ever hear anybody talk about
9 line time?
10      A.   I always hear about a Master Card,
11 but I never knew what it was until like a couple of
12 months after I had started working.
13      Q.   Explain to me what you found out
14 about the Master Card and what it meant.
15      A.   When they hit the Master Card, that's
16 when our time stops, despite whenever we clock out.
17      Q.   Okay. So you understood that you
18 were being paid on the basis of the Master Card?
19      A.   After a while, yes.
20      Q.   These activities that you performed
21 at the end of the day, the paperwork and so forth,
22 were they all performed after the Master Card was
23 swiped?

36

1      A.   Yes.
2      Q.   Are you sure about that?
3      A.   I am positive about that.
4      Q.   And your supervisor never gave you
5 any extra time or credit for any extra time for
6 that?
7      A.   No.
8      Q.   But you complained about that?
9      A.   Yes.
10      Q.   Besides the complaints that you've
11 told us about that you made about not being paid
12 for certain functions that you did, did you ever
13 have any complaints about your actual paycheck,
14 being shorted on your pay?
15      A.   Once -- well, only when we work on
16 like Saturdays, I used to complain.
17      Q.   On overtime?
18      A.   Yes.
19      Q.   And what happened?
20      A.   It didn't look like the amount that I
21 was supposed to have been making.
22      Q.   Did you talk to your supervisor about
23 it?

37

1      A.   Yes.
2      Q.   Did he or she get back to you?
3      A.   She tried to explain how they did it,
4 but I didn't understand it though. That was the
5 end of it.
6      Q.   Why didn't you tell them that you
7 didn't understand it?
8      A.   I told her -- she tried to explain it
9 so that I could. But what she was saying wasn't
10 making no sense of how my check was looking. So if
11 she was saying it, then ain't no point in me going
12 to somebody else and saying this, because they
13 going to say the same thing.
14      Q.   While you were working there, did you
15 keep track of any of this extra time that you have
16 told us that you put in?
17      A.   No.
18      Q.   Have you made any calculations as to
19 the amount of money you think you're owed from
20 Equity?
21      A.   I used -- when I used to work the
22 overtime, I used to calculate it. That's how I
23 knew it wasn't right, but I didn't keep it.

e0bcecd9-186c-4ba3-bd18-66173036ea80

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

38

1    Q.    How often did you work overtime?
2    A.    We would work some Saturdays. I'm
3  not sure how often we worked. It was like a couple
4  of Saturdays a month.
5    Q.    Was it just that one time you a
6  problem with your overtime check?
7    A.    No. Every time I worked overtime I
8  have a problem with my check.
9    Q.    Every time?
10   A.    Yes.
11   Q.    Did you look at the payroll
12 information when you got your check?
13   A.    Uh-huh.
14   Q.    You were paid weekly, right?
15   A.    Yes.
16   Q.    And you had a stub on there that
17 showed you the amount of hours and the rate of pay?
18   A.    Yes.
19   Q.    Did it show on there the hours that
20 you worked overtime?
21   A.    Yes.
22   Q.    And did it show on there the overtime
23 rate of your pay?

39

1    A.    Yes.
2    Q.    And did it all add up?
3    A.    It had the hours, but it wasn't the
4  hours that I worked because I know what time I
5  clock out.
6    Q.    So you were --
7    A.    Going by what time I clock out.
8  That's why my checks wasn't looking like the way I
9  think they would look.
10   Q.    So you had a complaint because the
11 hours that you were paid for did not conform to the
12 hours that you clocked out in and out of; is that
13 correct?
14   A.    Yes.
15   Q.    Were you ever disciplined while you
16 worked there?
17   A.    Excuse me?
18   Q.    Were you ever disciplined while you
19 were working there, were you ever written up for
20 anything?
21   A.    Yes.
22   Q.    What sort of things were you written
23 up for?

40

1    A.    Clocking in late, coming from break
2  late. That's about it, I think.
3        MR. FRY: No further questions.
4        MR. UNDERWOOD: I've got just a
5  few follow-up, Shakeria.
6
7  EXAMINATION BY MR. UNDERWOOD:
8    Q.    As you testified to Mr. Fry, you
9  performed some activities before the Master Card
10 was swiped, right?
11   A.    Before it was swiped.
12   Q.    Yes. You came in and you performed
13 some activities at work before the Master Card was
14 swiped?
15   A.    I don't know when they swipe it.
16   Q.    That's not what I'm asking you. Did
17 you perform any activities before they swiped the
18 Master Card in the morning?
19   A.    I can't answer that because I don't
20 know what -- I don't know if they --
21   Q.    Let me rephrase it for you. What was
22 your start time on the debone line?
23   A.    4:30.

41

1    Q.    Is it your understanding that that's
2  the time that you first got paid was the 4:30 time?
3    A.    Yes.
4    Q.    Did you perform any activities before
5  4:30?
6    A.    Yes.
7    Q.    So such as putting on your PPE?
8    A.    Yes.
9    Q.    You talked about some prep stuff that
10 you did on the washing line. Did you perform those
11 activities before your start time?
12   A.    No, I didn't start the wash station
13 before 4:30 because someone else was there from
14 first shift.
15   Q.    Let's just go back to the debone
16 line. You did perform some activities before your
17 start time of 4:30?
18   A.    Not on the debone line.
19   Q.    Is that not what you just told me?
20 Am I getting it wrong?
21   A.    The wash station.
22   Q.    Let's go back again. I'm getting
23 confused. Let's go back again to the debone line.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

42

1   What was your start time?
2       A.   4:30.
3       Q.   Okay. That's what I just asked. Now
4   did you perform any activities before your start
5   time of 4:30? You didn't put on your PPE or --
6       A.   Yes, PPE. But I thought you was
7   talking about work.
8       Q.   No, activities. Did you put on your
9   PPE?
10      A.   Yes.
11      Q.   And that was before your start time
12  of 4:30?
13      A.   Yes.
14      Q.   When you got your break, did you have
15  to take off your PPE during your break time?
16      A.   Yes.
17      Q.   Did you have to put back on your PPE
18  during your break time when you were going back to
19  the line?
20      A.   Could you rephrase that?
21      Q.   You were on your break. You didn't
22  have your PPE on, right?
23      A.   No.

43

1       Q.   Didn't you have to put it on before
2   you went back to the line?
3       A.   Yes.
4       Q.   Were you paid for any of that time?
5       A.   I don't think I was.
6       Q.   When you left for the day, what time
7   did you leave for the day from the debone line? Do
8   you remember?
9       A.   No.
10      Q.   Well, at a certain time you were
11  clocked out from the debone line, is that right,
12  you had to leave your station?
13      A.   Yes, on the debone line.
14      Q.   Did you have to take off your PPE
15  after that?
16      A.   Yes.
17      Q.   And were you paid for that?
18      A.   I don't guess I was.
19      Q.   Are you requesting in this lawsuit
20  that you be paid for that time that we just
21  discussed?
22      A.   Yes.
23           MR. UNDERWOOD: That's all I got.

44

1           MR. FRY: Thank you.
2           4:36 p.m.
3   ***********************
4           FURTHER DEPONENT SAITH NOT

45

1           CERTIFICATE
2
3   STATE OF ALABAMA
4   AT LARGE
5
6           I hereby certify that the above
7   and foregoing deposition was taken down by me in
8   stenotype and the questions and answers thereto
9   were transcribed by means of computer-aided
10  transcription and that the foregoing represents a
11  true and correct transcript of the testimony given
12  by said witness upon said deposition.
13          I further certify that I am
14  neither of counsel nor of kin to the parties to the
15  action, nor am I in anywise interested in the
16  result of said cause.
17
18
19
20
21
        _____
22  Victoria M. Castillo, Certified Court Reporter
    ACCR# 17, Expires 9/30/2008
23  Commissioner and Notary Public

e0bcecd9-186c-4ba3-bd18-66173036ea80

**TAB 41**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06-CV-1081-MEF


BETTY ANN BURKS,

et al.,

     Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

     Defendant.



BEFORE:

     Cynthia M. Noakes, Commissioner

     and Certified Court Reporter


DEPOSITION TESTIMONY OF

EBONE MORRIS


*****************************

333e6e4b-2282-495d-ba7d-05ee51902e3a

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

**2**

1        STIPULATION

2

3        IT IS STIPULATED AND AGREED by and

4    between the parties through their respective

5    counsel, that the deposition of EBONE MORRIS may

6    be taken before Cynthia M. Noakes, Court

7    Reporter, at the Law Offices of WILLIAMS,

8    POTTHOFF, WILLIAMS & SMITH, 125 South Orange

9    Avenue, Eufaula, Alabama 36027, on the 22nd day

10   of May, 2008.

11       IT IS FURTHER STIPULATED AND AGREED

12   that the signature to and the reading of the

13   deposition by the witness is waived, the

14   deposition to have the same force and effect as

15   if full compliance had been had with all laws and

16   rules of Court relating to the taking of

17   depositions.

18       IT IS FURTHER STIPULATED AND AGREED

19   that it shall not be necessary for any objections

20   to be made by counsel to any questions except as

21   to the form or leading questions, and that

22   counsel for the parties may make objections and

23   assign grounds at the time of the trial, or at

**3**

1    the time said deposition is offered in evidence,

2    or prior thereto.

3        IT IS FURTHER STIPULATED AND AGREED

4    that the notice of filing of the deposition by

5    the Court Reporter is waived.

6

7

8

9

10

11

12

13

14

15

16

17   *******************************************

18

19

20

21

22

23

**4**

1              INDEX

2    EXAMINATION BY:            PAGE NUMBER:

3    MR. GOULD                  7-44

4    MR. CAMP                   44-55

5

6    EXHIBITS:

7    Defendant's Exhibit No. 1         20

8    (Collective Bargaining Agreement)

9

10   Reporter's Certificate            56

11

12

13

14

15

16

17   *******************************************

18

19

20

21

22

23

**5**

1              APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFFS:

4        MR. JACOB A. KISER

5        WIGGINS, CHILDS,

6        QUINN & PANTAZIS, LLC

7        ATTORNEYS AT LAW

8        The Kress Building

9        301 Nineteenth Street North

10       Birmingham, Alabama 35203

11       (205) 314-0614

12

13       MR. P. MARK PETRO

14       SCHREIBER & PETRO, PC

15       ATTORNEYS AT LAW

16       Two Metroplex Drive

17       Suite 250

18       Birmingham, Alabama 35209

19       (205) 871-5080

20

21   *************************

22

23

333e6e4b-2282-495d-ba7d-05ee51902e3a

6

1     APPEARANCES (continued)

2

3    ON BEHALF OF THE PLAINTIFFS:

4         MR. ROBERT J. CAMP

5         THE COCHRAN FIRM, P.C.

6         ATTORNEYS AT LAW

7         505 North 20th Street

8         Suite 825

9         Birmingham, Alabama 35203

10

11    ON BEHALF OF THE DEFENDANT:

12        MR. MALCOLM S. GOULD

13        PELINO & LENTZ

14        ATTORNEYS AT LAW

15        One Liberty Place

16        Thirty-Second Floor

17        1650 Market Street

18        Philadelphia, Pennsylvania 19103

19        (215) 665-1540

20

21

22    ******************************

23

7

1         I, CYNTHIA M. NOAKES, a Certified

2    Court Reporter of Eufaula, Alabama, acting as

3    Commissioner, certify that on this date, as

4    provided by the Alabama Rules of Civil Procedure

5    and the foregoing stipulation of counsel, there

6    came before me at the Law Offices of WILLIAMS,

7    POTTHOFF, WILLIAMS & SMITH, 125 South Orange

8    Avenue, Eufaula, Alabama 36027, beginning at

9    3:45 p.m., EBONE MORRIS, witness in the above

10   cause, for oral examination, whereupon the

11   following proceedings were had:

12

13        EBONE MORRIS,

14   being first duly sworn, was examined and

15        testified as follows:

16

17        THE COURT REPORTER:  Usual

18   stipulations?

19        MR. KISER:  Yes.

20        MR. GOULD:  Yes.

21

22        EXAMINATION

23   BY MR. GOULD:

8

1    Q.   Good afternoon, Ms. Morris.

2    A.   Afternoon.

3    Q.   My name is Malcolm Gould.  I'm an attorney

4    with the law firm of Pelino & Lentz in

5    Philadelphia.  We're attorneys for Equity Group

6    Eufaula Division, LLC, in a lawsuit that's been

7    filed in Federal Court in the Middle District of

8    Alabama.  You are a plaintiff in this lawsuit, so

9    we're here today to take your deposition.

10        As you can see, we have a court reporter

11   here.  She's going to take down my questions and

12   your answers.  For that reason, I would ask that

13   you keep all of your answers verbal, that you say

14   yes or no instead of shaking your head or saying

15   uh-huh or huh-uh.  That way we're sure she gets

16   down all of your answers to my questions.

17        I would also ask that you wait until I

18   finish my question before you start your answer.

19   That way she doesn't have to worry about us

20   talking over each other, and that way you hear my

21   entire question before you give your answer.

22        If I ask a question and you don't understand

23   what I'm asking, just let me know.  I'll either

9

1    repeat the question or try to ask the question in

2    a different way so that it's not so confusing.

3    A.   Okay.

4    Q.   If you do answer my question, I'm going to

5    assume that you understood it and that you are

6    answering truthfully to the best of your ability.

7    Okay?

8    A.   Okay.

9    Q.   I don't anticipate that the deposition will

10   take long, but if for some reason you need to take

11   a break, just let me know; we can certainly take a

12   break; that's not a problem.

13   A.   Okay.

14   Q.   Okay.  Ma'am, can you state your full name

15   for the record, please?

16   A.   Ebone Sharita Morris.

17   Q.   And, Ms. Morris, what's your home address?

18   A.   16 South Street, Clayton, Alabama 36016.

19   Q.   Are you currently employed?

20   A.   Yes.

21   Q.   And where do you work?

22   A.   Equity Group.

23   Q.   How long have you worked at the plant?

333e6e4b-2282-495d-ba7d-05ee51902e3a

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

10

1  A.  A year and a half.
2  Q.  And have you worked at the plant previous to
3  this year and a half that you have been employed?
4  A.  No.
5  Q.  So that's the only time that you've worked
6  at the plant?
7  A.  Yes.
8  Q.  And in which department are you currently
9  employed?
10  A.  Evisceration.
11  Q.  And what is your position?
12  A.  USDA trimmer.
13  Q.  And have you worked in that position the
14  entire time you've been at the plant?
15  A.  No.
16  Q.  What other positions have you worked in?
17  A.  DSI.
18  Q.  And are those the only two positions you've
19  worked in?
20  A.  Yes.
21  Q.  How long did you work in DSI?
22  A.  Six months.
23  Q.  Were those the first six months you worked

11

1  at the plant?
2  A.  Yes.
3  Q.  And then you've worked in evis as a USDA
4  trimmer for approximately a year?
5  A.  Yes.
6  Q.  Now, you understand that you are a plaintiff
7  in this lawsuit, correct?
8  A.  Correct.
9  Q.  What is your understanding as to what the
10  lawsuit is about?
11  A.  Yes.
12  Q.  What do you believe is at issue in this
13  lawsuit?
14  A.  We're wanting to get paid for the time that
15  we're working and they have already stopped our
16  time.
17  Q.  Now, you're a member of the union bargaining
18  committee, correct?
19  A.  Correct.
20  Q.  And you sat on the committee that just
21  negotiated the last union contract; is that
22  correct?
23  A.  Correct.

12

1  Q.  That contract was effective from March 1,
2  2008; is that correct?
3  A.  Yes.
4  Q.  Now, when you talk about these issues of
5  wanting to get paid for time when you're working
6  but not being paid, can you explain to me what you
7  mean by that?
8  A.  When it's time for us to get off, we're
9  still on the line working; they have already
10  stopped our time, but we're still working.
11  Q.  Can you give me an example of what you mean
12  by that?
13  A.  I'm still on the line working.  Birds are
14  still coming and we're still working, but they
15  have already stopped our time.  They have already
16  clocked us out.
17  Q.  And is there anything else that you believe
18  is included within your claims in this lawsuit?
19  A.  No.
20      MR. KISER:  I'm going to object.  She
21  may not know every single claim or anything that's
22  involved with this lawsuit.  She's giving a lay
23  opinion.  She can't give a legal conclusion as to

13

1  what all is involved here.
2      MR. GOULD:  Fine.  I just asked her for
3  her understanding.
4  Q.  Do you believe that also included within
5  this lawsuit are claims for time spent putting on
6  or taking off or rinsing any sort of work clothing
7  or equipment?
8  A.  I'm not understandings what you're saying.
9  Q.  Do you have an understanding as to whether
10  there are claims for what I would call donning and
11  doffing in this lawsuit?
12      MR. KISER:  Object.  Legal definition.
13  Q.  Do you understand what I mean when I say
14  donning and doffing?
15  A.  No, I don't.
16  Q.  Okay.  I'll ask it differently.
17      Do you believe that included within this
18  lawsuit are claims for time spent putting on
19  things like a smock, apron, sleeves, any of those
20  types of items that, as an employee, you might
21  wear out on the production floor?
22  A.  Yes.
23  Q.  You believe that that's part of the lawsuit

333e6e4b-2282-495d-ba7d-05ee51902e3a

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

14

1    as well?
2    A.   Yes.
3    Q.   And the same thing for taking those items
4    off?
5    A.   Yes.
6    Q.   Other than meeting with your attorneys
7    today, have you attended any meetings where people
8    were discussing this lawsuit?
9    A.   No.
10   Q.   Did you meet with your attorneys at all to
11   prepare for your deposition today?
12   A.   No.
13   Q.   Did you meet with your attorneys today to
14   prepare for your deposition?
15   A.   Yes.
16   Q.   And that's the only time that you've met
17   with your attorneys?
18   A.   Yes.
19   Q.   And how long have you been a member of the
20   union bargaining committee?
21   A.   A year and a half.
22   Q.   So you've been a member of the union
23   bargaining committee since you started working at

15

1    the plant?
2    A.   Yes.
3    Q.   And you also serve as a union steward; is
4    that correct?
5    A.   Yes.
6    Q.   Which shift do you work?
7    A.   First.
8    Q.   Day shift?
9    A.   Yes.
10   Q.   What time does your shift run?
11   A.   Six to three.
12   Q.   Did you work day shift when your worked in
13   DSI?
14   A.   Yes.
15   Q.   And what time did your shift run then?
16   A.   7:30 to 4:30.
17   Q.   Ms. Morris, during the entire time that you
18   have worked at the plant, have employees been
19   specifically paid for the time that they are
20   putting on or taking off their items of clothing
21   or equipment?
22   A.   No.
23   Q.   And you've been aware of that since the time

16

1    that you've started working at the plant?
2    A.   Yes.
3    Q.   Now, in connection with the negotiation of
4    the current union contract with the plant, did you
5    have any discussions amongst the people in the
6    bargaining committee or with representatives of
7    the international union relating to the time that
8    employees were spending putting on or taking off
9    their clothing or equipment?
10   A.   I don't understand the question.
11   Q.   Okay.  You recall that in the current
12   contract there is a provision under which
13   employees are paid an additional three minutes per
14   day for time spent putting on, taking off, or
15   washing clothing; is that correct?
16   A.   I don't know.
17   Q.   During the time leading up to and actually
18   during the negotiations of this current union
19   contract, did you have an opportunity to sit down
20   with other people on the bargaining committee or
21   representatives from the international union
22   relating to concerns that you wanted to raise in
23   the recent negotiations?

17

1    A.   I don't understand your question.
2    Q.   All right.  Do you recall sitting in on
3    bargaining sessions relating to the current union
4    contract, the most recent union contract?
5    A.   No.
6    Q.   Did you attend sessions where you sat in a
7    room with other people who were representing the
8    employees and people from the plant, including an
9    attorney from my firm?
10   A.   Yes.
11   Q.   Howard Rosenthal, do you remember meeting
12   him?
13   A.   Yes.
14   Q.   So you sat in on those sessions; is that
15   correct?
16   A.   Yes.
17   Q.   Outside of sitting in those sessions with
18   people from the company, did you also have
19   sessions with just other people on the union
20   committee and people from the international union?
21   A.   Yes.
22   Q.   And during those particular meetings, did
23   you have a discussion as to issues which the local

333e6e4b-2282-495d-ba7d-05ee51902e3a

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

18

1    union was concerned about and wanted to raise in
2    the negotiations?
3    A.   Yes.
4    Q.   And did you have a discussion relating to
5    payment for time spent putting on or taking off
6    these items of clothing or equipment?
7    A.   Yes.
8    Q.   Now, was Jackie Davis on the union
9    bargaining committee as well?
10   A.   Yes.
11   Q.   She's a chief steward; is that right?
12   A.   Yes.
13   Q.   Do you know for how long she's been on the
14   union bargaining committee?
15   A.   I want to say as long as the plant's been
16   open. That's about ten years.
17   Q.   Now, you will admit that prior to beginning
18   the negotiations, there was a policy in place at
19   the plant of not specifically paying for time
20   spent putting on or taking off those items of
21   clothing or equipment; is that correct?
22   A.   I don't understand what you're saying.
23   Q.   All right. At the time that the

19

1    negotiations on the current contract started, is
2    it your understanding that the employees were not
3    paid specifically for time spent putting on or
4    taking off their items of clothing or equipment?
5    A.   Yes.
6    Q.   And you were specifically aware of that,
7    correct?
8    A.   Yes.
9    Q.   And did you have an opportunity to discuss
10   that particular issue of employees being paid for
11   time that they put on or take off that clothing or
12   equipment with Ms. Davis?
13   A.   Yes.
14   Q.   What did Ms. Davis tell you?
15   A.   She really didn't go into details with me.
16   She told me she would get back with me. But she
17   never came back and sat down and explained it to
18   me.
19        MR. CAMP: Malcolm, what year contract
20   are we talking about?
21        MR. GOULD: The current contract.
22        MR. CAMP: The 2008? The one that was
23   just signed?

20

1        MR. GOULD: Yes, sir.
2        MR. CAMP: Was that in March?
3        MR. GOULD: Yes.
4    Q.   And do you recall whether, in connection
5    with the bargaining sessions that occurred with
6    the most recent contract, whether there was any
7    sort of provision added for the payment for time
8    spent putting on or taking off clothing or
9    equipment?
10   A.   No.
11   Q.   You don't recall?
12   A.   No.
13        (Defendant's Exhibit No. 1 was
14        marked for identification and a
15        copy of the same is attached
16        hereto.)
17   Q.   Ms. Morris, I'm going to show you what's
18   been marked as Morris Exhibit 1. For purposes of
19   identification, it's a document with Bates numbers
20   that run E 5975 through E 6015. It's a document
21   entitled "Agreement by and between Equity Group -
22   Eufaula Division, LLC, and the Detail, Wholesale
23   and Department Store Union, Effective March 1,

21

1    2008, to March 1, 2011."
2        Now, Ms. Morris, take a second to look over
3    the document. And then after you've had a second
4    to familiarize yourself with it, tell me whether
5    you've seen this document before.
6        (The witness examines the
7        document.)
8    Q.   Ms. Morris, you don't have to read the whole
9    document; I just wanted you to take a look at it
10   and see if you're familiar with it.
11   A.   Okay. But I have not received the contract
12   since we've done it. That's why I was looking
13   over it.
14        MR. CAMP: Can we take a break for one
15   minute? I want to talk to Petro.
16        MR. GOULD: Okay.
17        (A brief recess was taken.)
18   (BY MR. GOULD)
19   Q.   Okay. Ms. Morris, have you had an
20   opportunity to look over what's been marked as
21   Morris Exhibit 1?
22   A.   Yes.
23   Q.   And do you recognize this document?

333e6e4b-2282-495d-ba7d-05ee51902e3a

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

22

1   A.   Yes.
2   Q.   Turn to page 28 of the document -- excuse me
3   -- 29.
4   A.   (Witness complies.)
5   Q.   And is that your signature at the bottom of
6   the page?
7   A.   Uh-huh.
8   Q.   Above your name?
9   A.   Yes.
10  Q.   And does this appear to you to be the
11  collective bargaining agreement that was
12  negotiated leading up to your signing of the
13  document?
14  A.   Yes.
15  Q.   And you were involved in those negotiations,
16  correct?
17  A.   Yes.
18  Q.   And does this agreement appear to accurately
19  include everything that was agreed to at the
20  bargaining sessions?
21  A.   Yes.
22  Q.   If you'll turn to page 21 of that document.
23  A.   (Witness complies.)

23

1   Q.   If you could look at provision 12.5 entitled
2   Line Time, please.  12.5(A) indicates, "All
3   employees will be paid according to the hours of
4   work indicated by the Master Line Time Card."
5        What is your understanding, as a member of
6   the union bargaining committee, that this
7   provision meant when you signed it?
8   A.   I don't know what you're saying.
9   Q.   All right.  You were aware, prior to signing
10  this contract, that this contract included this
11  particular provision 12.5(A), correct?
12  A.   Yes.
13  Q.   And you read this provision before signing
14  the contract?
15  A.   Yes.
16  Q.   Do you understand what it means when it says
17  that all employees will be paid according to the
18  hours of work indicated by the Master Line Time
19  Card?
20  A.   Could you repeat the question, please?
21  Q.   Let me word it differently.  What is your
22  understanding of what 12.5(A) means?
23  A.   I don't understand.

24

1   Q.   All right.  Can you look at 12.5(B)?  It
2   says, "All employees shall be paid an additional 3
3   minutes per day, at their regular rate, for
4   clothes changing and cleaning time, in addition to
5   any pay for hours worked.  Such payment shall be
6   paid at the employee's normal hourly rate."
7        Do you recall if that was a new provision
8   that was added into that particular provision?
9   A.   We don't change clothes.  It's the PPEs.  We
10  don't change clothes.
11  Q.   Okay.  Do you do any clothes changing at the
12  plant?
13  A.   No.  We don't change clothes; we have PPEs.
14  Q.   Okay.  Then what did it mean to you when
15  that particular provision was being added in, that
16  employees were being paid an additional three
17  minutes for clothes changing and cleaning?
18  A.   I don't understand what you're saying.
19  Q.   Well, I'm asking you if -- you're saying
20  that there's no clothes changing at the plant; is
21  that right?
22  A.   Right.
23  Q.   Now, you had indicated previously that you

25

1   had discussed with the union bargaining committee
2   that --
3        MR. GOULD:  Strike that.  Let's start
4   this question over again.
5   Q.   You had testified previously that you had
6   discussed within the union bargaining committee
7   the issue of employees not being paid for the time
8   that they spent putting on or taking off their
9   work clothing or equipment; is that correct?
10  A.   Yes.
11  Q.   And you indicated that you discussed this in
12  and amongst both the union delegates from the
13  plant as well as the international union
14  representatives; is that correct?
15  A.   Yes.
16  Q.   Now, do you recall what the reason was that
17  this paragraph 12.5(B) was added to the contract?
18  A.   I don't know.
19  Q.   But you did understand before the contract
20  was signed that employees were not being paid for
21  the time that they were spending putting on or
22  taking off any work clothes or equipment, correct?
23  A.   Yes.

333e6e4b-2282-495d-ba7d-05ee51902e3a

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

26

1      MR. CAMP: She filed the lawsuit. I
2  would think she did.
3  Q.   Now, during the time that you served as a
4  union steward, there was a previous collective
5  bargaining agreement in place as well, correct?
6  A.   I don't understand.
7  Q.   Was there a collective bargaining agreement
8  in place that predated this March 1, 2008
9  contract?
10  A.   Yes.
11  Q.   So there was one in place for the period
12  prior to this agreement; is that correct?
13  A.   Yes.
14  Q.   And you were a union steward while that
15  contract was in place as well; is that correct?
16  A.   No.
17  Q.   You were not a union steward prior to March
18  1 of 2008?
19  A.   No.
20  Q.   I thought you previously told me that you
21  had been a union steward for a year and a half.
22  A.   No.  You asked me was I a union member.
23  Q.   You've been a union member for a year and a

27

1  half?
2  A.   Yes.
3  Q.   How long have you been a union steward?
4  A.   Six months.
5  Q.   Do you recall when you first became a union
6  steward?
7  A.   No, I don't.
8  Q.   All right.  Six months ago takes us past
9  March of 2008, going backwards, doesn't it?
10  A.   Yes, it does.
11  Q.   So were you a union steward prior to March 1
12  of 2008?
13  A.   Yes.
14  Q.   So you were a union steward during the time
15  that the previous contract was in place?
16  A.   It was in place before I became a union
17  steward.
18  Q.   Okay.  So you didn't serve on the bargaining
19  committee for the previous contract?
20  A.   Correct.
21  Q.   But you were a union steward while that
22  contract was in place?
23  A.   Yes.

28

1  Q.   Do you recall whether or not provision
2  12.5(B) was in the previous union contract?
3  A.   I don't know.
4  Q.   Now, you previously indicated to me that you
5  work in evis as a USDA trimmer currently; is that
6  correct?
7  A.   Yes.
8  Q.   Are there items of equipment or clothing
9  that you have to wear when you are out on the
10  production line?
11  A.   Yes.
12  Q.   And can you list those for me?
13  A.   Hair net, earplugs, apron, smock, boots, or
14  shoe covers some wear, safety glasses.
15  Q.   I'm just talking about what you wear.
16  A.   All right.  That's it.  Arm guard and chain
17  glove and cotton liners and blue glove.
18  Q.   Do you wear sleeves?
19  A.   No.
20  Q.   Do you wear safety glasses?
21  A.   No.
22  Q.   Now, during the course of a normal shift, do
23  you rotate between different positions on the

29

1  evisceration line?
2  A.   Yes.
3  Q.   What other positions would you rotate to?
4  A.   Open cut or to the mirror.
5  Q.   It's called a mirror trimmer; is that what
6  that's called?
7  A.   Yes.
8  Q.   And you normally rotate to each of those
9  positions in your normal shift?
10  A.   Yes.
11  Q.   So you'll start off at the position of USDA
12  trimmer?
13  A.   Sometimes.
14  Q.   And other times you'll start in one of these
15  other positions?
16  A.   Yes.
17  Q.   But you'll rotate to each one of those
18  positions during your shift?
19  A.   Yes.
20  Q.   And do you wear the same equipment or
21  clothing for each of those positions?
22  A.   Yes.
23  Q.   You don't wear anything different?

333e6e4b-2282-495d-ba7d-05ee51902e3a

30

1  A.  No.
2  Q.  Can you describe for me what the job
3  responsibilities are in the position of open cut?
4  A.  Making sure the bird is open.
5  Q.  When you say "open," can you tell me what
6  you mean?
7  A.  Where the machine will pull the viscera out
8  of the bird; make sure the viscera would be pulled
9  out of the bird.
10  Q.  So you make sure it's open before it enters
11  the machine?
12  A.  The machine opens the bird; but if it misses
13  it and doesn't open it, then I will have to open
14  it.
15  Q.  So you're checking it after it comes out of
16  the machine?
17  A.  Yes.
18  Q.  And can you describe what the mirror trimmer
19  does?
20  A.  Cut the bad wings off, or the bad legs.
21  Q.  And that's one of those positions that's
22  towards the end of the line, over by the salvage
23  area?

31

1  A.  Yes.  After the birds leave the USDA stands.
2  Q.  Right.  I understand.  And you work with a
3  knife or scissors in each one of those positions?
4  A.  Yes.
5  Q.  Now, during the time you've been employed at
6  the plant, has this equipment that you've worn in
7  this particular department been the same?
8  A.  Yes.
9  Q.  And during the time that you've been
10  employed at the plant, have you been able to wear
11  your boots from home?
12  A.  Yes.
13  Q.  And that's been the case throughout the
14  entire time you've been employed at the plant?
15  A.  Yes.
16  Q.  Are there any other of these items that you
17  can wear from home?
18  A.  No.
19  Q.  Just your boots?
20  A.  Yes.
21  Q.  Now, do you normally drive yourself to work?
22  A.  Yes.
23  Q.  When you arrive at the plant, is there any

32

1  sort of security that you have to clear?
2  A.  No.
3  Q.  Is there a guard shack on the driveway?
4  A.  Yes.
5  Q.  Do you have to stop and be searched?
6  A.  No.
7  Q.  You have a sticker; is that correct?
8  A.  Yes.
9  Q.  And as long as you have that sticker on your
10  car, you can drive through?
11  A.  Yes.
12  Q.  After you get to the parking lot, is there
13  any other security that you have to go through?
14  A.  No.
15  Q.  There's no metal detectors or turnstiles?
16  A.  No.
17  Q.  You can just walk right into the plant?
18  A.  Yes.
19  Q.  On a normal day, after you park your car --
20  and right now we're just going to focus on your
21  current position in evisceration.
22     What time do you normally arrive at the
23  plant?

33

1  A.  5:30.
2  Q.  And when you arrive at the parking lot, do
3  you normally just get out of your car?
4  A.  No.
5  Q.  What do you do?
6  A.  I find my -- get my stuff together, then go
7  on the inside of the plant.
8  Q.  So you take these items of equipment or
9  clothing home with you?
10  A.  Sometimes.
11  Q.  And if you've taken them home with you, then
12  you get them out of your car to take them into the
13  plant?
14  A.  Yes.
15  Q.  Is there a locker room at the plant?
16  A.  Yes, there is.
17  Q.  Do you have a locker?
18  A.  Yes.
19  Q.  And you could store them in your locker if
20  you wanted to?
21  A.  Yes.
22  Q.  Once you gather your items and leave your
23  car, what's the next thing you do?

333e6e4b-2282-495d-ba7d-05ee51902e3a

34

1  A.  I go into the building and go in the break
2  room and clock in.  If my stuff is in my locker, I
3  get my stuff out of my locker and go to supply and
4  get my smock or other items that I need.
5  Q.  Out of these items that you identified for
6  me, are there any that you will always get a new
7  one every day?
8  A.  No.
9  Q.  Do you normally get a new smock every day?
10  A.  Yes.
11  Q.  Other than that, do you replace all of your
12  other items every single day?
13  A.  No.  Every other day.
14  Q.  So you replace your apron every other day?
15  A.  No.
16  There's some items you would replace every
17  other day?
18  A.  Yes.
19  Q.  Which ones are those?
20  A.  My cotton liners, blue gloves, hair nets.
21  Q.  Are you required to replace those every
22  other day?
23  A.  No.

35

1  Q.  That's just your choice?
2  A.  Yes.
3  Q.  Where do you normally clock in?
4  A.  In debone break room.
5  Q.  And then you indicated after you do that, if
6  your equipment is in your locker, you'll get it
7  from there?
8  A.  Yes.
9  Q.  And if that clothing or equipment is in your
10  locker, do you take it into the break room.
11  A.  Yes.
12  Q.  Do you put anything on after you clock in
13  but before you go to the supply desk?
14  A.  My earplugs and hair net.
15  Q.  After you go to the supply area, what do you
16  do next?
17  A.  I go back to the break room until five 'til.
18  Q.  And do you get anything to eat or anything
19  to drink?
20  A.  No.
21  Q.  You just sit there?
22  A.  Yes.
23  Q.  And do you talk with other employees?

36

1  A.  No.
2  Q.  You sit by yourself?
3  A.  Yes.
4  Q.  And then at five 'til -- that's five 'til
5  six? --
6  A.  Yes.
7  Q.  -- what do you do?
8  A.  Go into the production area.
9  Q.  And at that time, you're wearing your boots
10  and your hair net?
11  A.  Yes.
12  Q.  And your earplugs?
13  A.  Yes.
14  Q.  Can you describe for me what you do as you
15  enter the production area.
16  A.  I clean and sanitize my boots before I go
17  all the way into the production floor.  Then I
18  wash the soap and stuff out of my boots, go to the
19  smock rack and put my smock and everything else
20  on.
21  Q.  Do you put your chain glove on then?
22  A.  No.  I have to go to my line leader to get
23  my chain glove.

37

1  Q.  Does your line leader have your chain glove
2  out by the evis line?
3  A.  Yes.
4  Q.  What about knife or scissors?  Do you have
5  to bring that from home or keep that in your
6  locker?
7  A.  No.
8  Q.  Are those given to you out on the line?
9  A.  They already be on the line.
10  Q.  You're not responsible for going to a knife
11  room or anything like that?
12  A.  No.
13  Q.  So after you put on the rest of your
14  clothing or equipment, what do you do next?
15  A.  I go to my line leader to get my chain glove
16  and find out what station I need to go to.
17  Q.  And then you go to your position on the
18  line?
19  A.  Yes.
20  Q.  Approximately how long does it take you from
21  the time you enter the production doors to get to
22  your position on the line?
23  A.  I'd say about five minutes.

333e6e4b-2282-495d-ba7d-05ee51902e3a

38

1   Q.   During the course of your shift, do you get
2   any breaks?
3   A.   Yes.
4   Q.   How many breaks do you get?
5   A.   Two.
6   Q.   And how long are those breaks?
7   A.   Supposedly 30 minutes.
8   Q.   Now, when is your first break?
9   A.   8:30.
10  Q.   And when is your second break?
11  A.   11:30.
12  Q.   And how do you know when it is time for you
13  to leave for your break?
14  A.   When there's no more birds coming and
15  everybody else is leaving.
16  Q.   And when do you actually leave for break?
17  A.   When the last bird has came to my station.
18  Q.   And when the last bird passes your station
19  before your first break, what do you do then?
20  A.   I put my knife down, turn in my chain glove,
21  and go to the smock rack and take off my PPEs.
22  Q.   Now, are there any items that you don't have
23  to take off before leaving the production floor?

39

1   A.   Could you repeat that question?
2   Q.   Sure.  Are there any items that you do not
3   have to take off before leaving the production
4   area?
5   A.   Yes.
6   Q.   And what are those?
7   A.   Hair net and earplugs.
8   Q.   And your boots?
9   A.   And boots.
10  Q.   Do you take everything else off?
11  A.   Yes.
12  Q.   Do you do anything else?
13  A.   No.
14  Q.   Approximately how long does it take you from
15  the time the last bird passes your position on the
16  line until the time that you are walking back out
17  of the production doors?
18  A.   I don't understand.
19  Q.   Okay.  How long does it take you from the
20  time that last bird passes your position, when you
21  are getting ready to leave on your first break,
22  until the time that you are actually exiting the
23  production area out into the hallway?

40

1   A.   Five minutes.
2   Q.   And once you exit the production area into
3   the hallway, what do you do then?
4   A.   Go to the break room.
5   Q.   And what do you do out in the break room?
6   A.   I get me something to eat.
7   Q.   How do you know when it's time to come back
8   from break?
9   A.   Because we only get 30 minutes and it's time
10  to go back in.
11  Q.   Do you watch the clock?
12  A.   Yes.
13  Q.   And you know what time you left?
14  A.   Yes.
15  Q.   And you know what time you have to be back?
16  A.   Yes.
17  Q.   And I believe you said that your first break
18  is at 8:30?
19  A.   Yes.
20  Q.   When do you normally leave to return to the
21  line?
22  A.   Five minutes until nine.
23  Q.   And can you describe for me what you do from

41

1   the time you leave the break room until the time
2   you get back to your position on the line?
3   A.   Go back to the production area, put on my
4   PPEs, everything I'm supposed to have on, get my
5   chain glove, ask my line leader where I'm supposed
6   to go, and go to my designated area.
7   Q.   Similar to what you do when you were going
8   out at the beginning of your shift?
9   A.   Yes.
10  Q.   And approximately how long does it take you
11  from the time that you leave the break room until
12  the time you're back on the production line?
13  A.   Five minutes.
14  Q.   And is that routine normally the same for
15  your second break?
16  A.   Yes.
17  Q.   You do the same things before and after?
18  A.   Yes.
19  Q.   Takes about the same amount of time?
20  A.   Yes.
21  Q.   And how do you know when your shift is over?
22  A.   Because the second shift is coming in and I
23  ask somebody what time it is.

333e6e4b-2282-495d-ba7d-05ee51902e3a

42

1   Q.   And when are you able to leave your position
2   on the line?
3   A.   When the last bird comes.
4   Q.   Just like when you would leave for break?
5   A.   Yes.
6   Q.   And then someone steps up onto the line to
7   take your position?
8   A.   Sometimes.
9   Q.   Can you leave before somebody reports to
10  take your position?
11  A.   Yes.
12  Q.   You just need to wait until the last bird
13  passes your position?
14  A.   Yes.
15  Q.   And then what do you do after the last bird
16  passes your position?
17  A.   I go turn in my chain glove, wash down, take
18  my stuff off, put it together, leave out the
19  production area, go clock out.  And sometimes I'll
20  put my stuff in my locker.
21  Q.   Now, do you normally wear your boots from
22  your car into the building?
23  A.   Yes.

43

1   Q.   Approximately how long does it take you from
2   the time you leave your position on the line at
3   the end of your shift to the time you're exiting
4   the production doors?
5   A.   Five to six minutes.
6   Q.   Do you also throw your smock in a bin?
7   A.   Yes.
8   Q.   You don't take your smock home with you?
9   A.   No.
10  Q.   Is there a bin right by your break room
11  where you would clock out?
12  A.   Yes.
13  Q.   Now, Ms. Morris, how often do you get paid?
14  Weekly; is that correct?
15  A.   Yes.
16  Q.   When you get your paycheck, do you normally
17  look at it to check to see if you've been paid the
18  proper amount of hours?
19  A.   Yes.
20  Q.   Have you ever had any instance where you got
21  your paycheck and you didn't believe it reflected
22  the proper hours and you went and complained to
23  your supervisor or someone in payroll?

44

1   A.   No.
2   Q.   Do you have an understanding as to how the
3   number of hours that is listed on your paycheck,
4   how that number is calculated?
5   A.   I don't know.
6   Q.   What is your understanding of how your start
7   time for which you are paid is calculated on a
8   given day?
9   A.   I don't understand what you're saying.
10  Q.   Are you paid from the time that you clock
11  in?
12  A.   No.
13  Q.   Do you know what time you begin to be paid
14  at?
15  A.   Supposed to be six o'clock.
16  Q.   And are you paid until you clock out?
17  A.   No.
18  Q.   Do you know what time the end period for
19  your pay is determined?
20  A.   Three o'clock.
21  Q.   I think those are the only questions I have
22  for you right now.  I appreciate your time.
23  BY MR. CAMP:

45

1   Q.   I've got a few for you, Ms. Morris.
2   A.   Okay.
3   Q.   When you enter the plant, you said that you
4   sanitize your boots.  How do you do that?
5   A.   There is a machine sitting on the wall as
6   you come in the production doors, and you have to
7   mash that button for the foam to come out.  And
8   you stand there and let the foam come out on your
9   boots.
10  Q.   You stand there.  And does it spray the foam
11  on your boots?
12  A.   Yes.
13  Q.   And when you push the button, the spray gets
14  on your boots?
15  A.   Yes.
16  Q.   Do you have to move your feet up and down to
17  make sure that it's covered all over your boots?
18  A.   Yes.
19  Q.   And then you walk out?
20  A.   Yes.
21  Q.   And you start to put on your PPE?
22  A.   Yes.
23  Q.   Other than the hair net that you already had

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

46

1  on and your earplugs and boots?
2  A.  Correct.
3  Q.  When you would come back from break, would
4  you have to sanitize your boots?
5  A.  Yes.
6  Q.  Same process?
7  A.  Yes.
8  Q.  Same process both breaks?
9  A.  Yes.
10  Q.  When you would leave the production facility
11  -- the production area, not the facility -- to go
12  out on break, would you sanitize your boots?
13  A.  Sometimes.
14  Q.  When you leave for the end of the day, would
15  you clean your boots?
16  A.  Sometimes.
17  Q.  The last thing you have to do before you
18  clock out for the end of the day is place your
19  smock in a bin?
20  A.  Correct.
21  Q.  And do they wash that smock for you?
22  A.  They have a company that comes in and gets
23  the smocks and takes them out and have them

47

1  laundered.  Sometimes they do it their selves.
2  Q.  Sometimes the company does?
3  A.  (Witness nods head.)
4  Q.  So you had told us that every day you have
5  to go obtain a new smock?
6  A.  Yes.
7  Q.  Do you ever wash any of your PPE? your apron
8  your sleeves, or anything like that?
9  A.  You're saying wash them at home?
10  Q.  Wash them at the plant.
11  A.  Yes.
12  Q.  When would you do that?
13  A.  Before the shift, before break -- I mean,
14  after I come from break -- after I come from every
15  break -- and then end of shift.
16  Q.  So before the shift, before the break, after
17  the break, and at the end of the shift?
18  A.  Yes.
19  Q.  You said that you replace some items every
20  day.  You replace some items every day or every
21  other day, but you don't have to.  Do you remember
22  which items you said that was?
23  A.  Blue gloves, cotton liners, and hair net.

48

1  Q.  Does the company know when you replace those
2  items?
3  A.  Yes.
4  Q.  And I wasn't here for the first part of the
5  deposition.  You've been there a year and a half?
6  A.  Yes.
7  Q.  And you've been a steward for approximately
8  six months?
9  A.  Yes.
10  Q.  How did you get that job?
11  A.  The guy that's over all of us, he asked me
12  would I be a union rep for the evis department.
13  Jerry Foster.
14  Q.  The guy that's over all of you?
15  A.  Yes.
16  Q.  Does he work for Equity Group?
17  A.  No.  He's, I guess, international, in
18  Birmingham.
19  Q.  He's not a local; he's international?
20  A.  Yes.
21  Q.  Do you know how you were selected? how he
22  came to pick you?
23  A.  No.

49

1  Q.  Has there been any changes, since you've
2  been there in the last year and a half, in the way
3  that you are allowed to hit your time clock?
4  A.  No.
5  Q.  The attendance time clock?
6  A.  No.
7  Q.  There are no changes?
8  A.  No.
9  Q.  Can you hit the time clock any time you
10  want, the attendance time clock?  Can you swipe it
11  at any time you want?
12  A.  I don't understand.
13  Q.  What time do you get there in the morning?
14  A.  5:30.
15  Q.  What time do you start?
16  A.  Six.
17  Q.  Can you hit it at 5:30?
18  A.  Yes.
19  Q.  Okay.  Were you present at the union
20  negotiations?
21  A.  Yes.
22  Q.  Where, I guess, there would probably be the
23  guy from Birmingham maybe or a local and maybe

333e6e4b-2282-495d-ba7d-05ee51902e3a

50

1  some attorneys for Equity Group. Were you present
2  at that meeting?
3  A.  Yes.
4  Q.  How many of those were there?
5  A.  Four.
6  Q.  Four? Over how long? Do you know?
7  A.  I don't understand.
8  Q.  How many months did it take? or did it take
9  a week?
10  A.  It took four days.
11  Q.  You did it in four days?
12  A.  Yes.
13  Q.  Four consecutive days?
14  A.  No.
15  Q.  Okay.
16  A.  It was one day one week, and three days the
17  next week.
18  Q.  Okay. So just over a couple weeks?
19  A.  Yes.
20  Q.  Did you attend each and every meeting?
21  A.  Yes.
22  Q.  Did you actually negotiate any of the
23  agreement, talking to the people with that Equity

51

1  Group?
2  A.  No.
3  Q.  What did you do, just sit in there and
4  watch?
5  A.  And listen.
6  Q.  And listen?
7  A.  Yes.
8  Q.  A lot of times, at the end of a negotiation
9  like that, they'll give the employees from the
10  plant an opportunity to voice their concerns or
11  the opinions. Did y'all get to do that?
12  A.  Yes. But I didn't.
13  Q.  But you didn't?
14  A.  It was my first time.
15  Q.  Sure. Who is Jacqueline Davis?
16  A.  The chief steward.
17  Q.  Sharon Brinson?
18  A.  She's a shop steward.
19  Q.  Adrian Scovil?
20  A.  She's a steward, shop steward.
21  Q.  Kelvin Granger?
22  A.  Shop steward.
23  Q.  Tim Smith?

52

1  A.  Shop steward.
2  Q.  Are you a shop steward?
3  A.  Yes.
4  Q.  Was there anybody on this negotiation
5  committee that was not a steward?
6  A.  Kathy Gilmore.
7  Q.  I'm sorry. Let me rephrase that. Any
8  hourly employees on the list of people underneath
9  the union that was not a steward or somehow
10  associated with the union?
11  A.  No.
12  Q.  Any just hourly employees from the plant,
13  union members?
14  A.  No.
15  Q.  Do you know Jim Bice?
16  A.  Yes.
17  Q.  Do you see him a lot? Is he the human
18  resource director?
19  A.  I see him every now and then.
20  Q.  Is he there a lot?
21  A.  Yes.
22  Q.  Does he have an office there at the plant?
23  A.  Yes.

53

1  Q.  Do you know if he's over the -- as far as
2  human resources goes, if he's over your plant, the
3  cook plant, the hatchery, and the feed mill?
4  A.  I don't know.
5  Q.  You don't know? You just know him from your
6  plant?
7  A.  Yes.
8  Q.  How about Kathy Gilmore? Do you know her?
9  A.  Yes, I know her.
10  Q.  Who in HR do you deal with the most or would
11  you have the most contact with?
12  A.  Kathy.
13  Q.  Is there anybody under Kathy? Anybody in HR
14  that works underneath Kathy?
15  A.  I don't know.
16  Q.  Is there a payroll lady?
17  A.  Yes. I don't know her name.
18  Q.  Where is she located?
19  A.  I don't know.
20  Q.  Is she in with HR?
21  A.  I don't know.
22  Q.  Okay. Fair enough. You said Jerry Foster
23  picked you, right?

333e6e4b-2282-495d-ba7d-05ee51902e3a

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

54

1   A.   Yes.
2   Q.   You said you wear a hair net, earplugs,
3   apron, smock, boots or shoe covers, arm guard,
4   blue glove, chain glove, cotton liners?
5   A.   Yes.
6   Q.   Are these the items you refer to as PPE?
7   A.   Yes.
8   Q.   PPE stands for personal protective
9   equipment?
10  A.   Yes.
11  Q.   You said you don't change any clothes at the
12  plant?
13  A.   Correct.
14  Q.   When you were presented to sign this, did
15  they give you the entire book and ask you to sign
16  it, or did they just give you this page?
17  A.   Just this page.
18  Q.   And it's your understanding that this
19  lawsuit is to compensate you or seek compensation
20  for all hours that you've worked?
21  A.   Yes.
22  Q.   Starting from the time that you put on your
23  first piece of clothing until the last job

55

1   requirement of the day?
2        MR. GOULD:  Let me object to the form.
3   I've given you a lot of leeway here.
4   Q.   You can answer.
5   A.   Yes.
6   Q.   I think that's it.
7        MR. GOULD:  I don't have any other
8   questions.  Thank you very much.
9
10       (The deposition was concluded.)
11
12
13
14
15
16
17
18
19
20
21
22
23

56

1        C E R T I F I C A T E
2
3   STATE OF ALABAMA
4   BARBOUR COUNTY
5
6        I hereby certify that the above and
7   foregoing deposition was taken down by me in
8   stenotype and the questions and answers thereto
9   were transcribed by means of computer-aided
10  transcription, and that the foregoing represents
11  a true and correct transcript of the testimony
12  given by said witness upon said hearing.
13       I further certify that I am neither of
14  counsel, nor kin to the parties to the action,
15  nor am I in anywise interested in the result of
16  said cause.
17
18
19       CYNTHIA M. NOAKES, Commissioner
20       Certified Court Reporter,
21       ACCR #327 - Expires 09/30/2008
22
23       Commission Expires 07/08/2009

**TAB 42**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


NO.:  2:06-CV-1081-MEF


BETTY ANN BURKS, et al.,

        Plaintiff(s),

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

        Defendant(s).



                    DEPOSITION OF

                 ANTONIO PEARSON

                          JOB NO. 1101-58505



    BEFORE:    Victoria M. Castillo

               Certified Court Reporter and

               Notary Public

               ACCR# 17, Expires 9/30/2008

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

**2**

1    In accordance with Rule 5(d) of
2    The Alabama Rules of Civil Procedure, as Amended,
3    effective May 15, 1988, I, Victoria M. Castillo, am
4    hereby delivering to HOWARD A. ROSENTHAL, ESQ. the
5    original transcript of the oral testimony taken on
6    the 23rd day of May, 2008, along with exhibits.
7            Please be advised that this is
8    the same and not retained by the Court Reporter,
9    nor filed with the Court.
10
11        S T I P U L A T I O N
12
13        IT IS STIPULATED AND AGREED, by
14    and between the parties through their respective
15    counsel, that the deposition of ANTONIO PEARSON may
16    be taken before Victoria M. Castillo, Commissioner,
17    at WILLIAMS, POTTHOFF, WILLIAMS & SMITH, 125 South
18    Orange Avenue, Eufaula, Alabama 36027 on the 23rd
19    day of May, 2008.
20        IT IS FURTHER STIPULATED AND
21    AGREED that the signature to and the reading of the
22    deposition by the witness is waived, the deposition
23    is said to have the same force and effect as if

**3**

1    full compliance had been had with all laws and
2    rules of Court relating to the taking of
3    depositions.
4        IT IS FURTHER STIPULATED AND
5    AGREED that it shall not be necessary for any
6    objections to be made by counsel to any questions,
7    except as to form or leading questions, and that
8    counsel for the parties may make objections and
9    assign grounds at the time of trial, or at the time
10    said deposition is offered in evidence, or prior
11    thereto.
12        IT IS FURTHER STIPULATED AND
13    AGREED that notice of filing of the deposition by
14    the Commissioner is waived.
15
16
17
18
19
20
21
22
23

**4**

1            I N D E X
2
3    EXAMINATION BY:              PAGE NUMBER:
4    Mr. Fry                      6, 35
5    Mr. Steensland                31
6
7    EXHIBITS:              PAGE NUMBER:
8    (No Exhibits Were Marked.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**5**

1        A P P E A R A N C E S
2
3    FOR THE PLAINTIFF(S):
4        M. John Steensland, III, Esq.
5        PARKMAN, ADAMS & WHITE
6        739 West Main Street
7        Dothan, Alabama 36301
8
9    FOR EQUITY GROUP EUFAULA DIVISION
10        Gary D. Fry, Esq.
11        Pelino & Lentz
12        One Liberty Place
13        Thirty-Second Floor
14        1650 Market Street
15        Philadelphia, Pennsylvania 19103
16
17        *********************
18
19        I, Victoria M. Castillo, a Court
20    Reporter of Montgomery, Alabama, acting as
21    Commissioner, certify that on this date, as
22    provided by the Alabama Rules of Civil Procedure
23    and the foregoing stipulation of counsel, there

**6**

1  came before me at WILLIAMS, POTTHOFF, WILLIAMS &
2  SMITH, 125 South Orange Avenue, Eufaula, Alabama
3  36027, commencing at 10:57 a.m., ANTONIO PEARSON,
4  in the above cause, for oral examination, whereupon
5  the following proceedings were had:
6
7                    ANTONIO PEARSON,
8        being first duly sworn, was examined and
9                testified as follows:
10
11  EXAMINATION BY MR. FRY:
12   Q.   Good morning, Mr. Pearson.
13   A.   Good morning.
14   Q.   How are you?
15   A.   All right. And you?
16   Q.   My name is Gary Fry. I'm one of the
17  lawyers representing Equity Group Eufaula, the
18  operator of the poultry plant in Baker Hill. We
19  have asked you to come here today to answer some
20  questions with respect to a lawsuit which you and
21  other folks have brought against the company. Have
22  you ever been deposed before?
23   A.   No.

**7**

1   Q.   I'm going to be asking you questions,
2  and you will be giving me the answers. Victoria
3  will be taking down everything we say. If you
4  don't understand any of my questions, please let me
5  know and I will try and rephrase it so you
6  hopefully will be able to answer it. Sometimes my
7  questions aren't very artful, and so I'm sure you
8  will be able to point that out to me. If you don't
9  hear anything or a portion of a question, let me
10  know and I will repeat it. She can only take down
11  one person at a time, so it would be helpful if we
12  both remember not to talk over one another. You
13  know how that goes. And the last thing I would ask
14  is that any response to my questions be verbal
15  because she can't take down a nod of the head and
16  she doesn't do well with huh-uhs and uh-huhs.
17   A.   Okay.
18   Q.   What's your home address?
19   A.   794 Sid Bush Road, Clayton, Alabama.
20   Q.   What's your date of birth?
21   A.   9/18/78.
22   Q.   Are you presently employed?
23   A.   Yes, I am.

**8**

1   Q.   By whom?
2   A.   WestPoint Home.
3   Q.   At one point in time you were
4  employed by Equity?
5   A.   Yes, I was.
6   Q.   What period of time?
7   A.   Between 2003 to 2005.
8   Q.   So when you started CP operated the
9  plant?
10   A.   Yes, they sure did.
11   Q.   And for what reason did your
12  employment there end?
13   A.   I went to a job to make more money.
14   Q.   When you left Equity, what were you
15  doing for them?
16   A.   Shipping.
17   Q.   Did you have any other jobs at that
18  facility?
19   A.   No.
20   Q.   So during the period that CP had it
21  and Equity, the whole time you were there, you
22  worked in shipping?
23   A.   Yes, I did.

**9**

1   Q.   What shift?
2   A.   First.
3   Q.   And what were the hours?
4   A.   8:30 to 5:30.
5   Q.   And that's 8:30 a.m. to 5:30 p.m.?
6   A.   Yes.
7   Q.   What was your job in shipping?
8   A.   Load and unload product.
9   Q.   What were you loading and unloading
10  product from?
11   A.   Trailers.
12   Q.   And where did you do this job?
13   A.   At CP -- where --
14   Q.   That's one of my unartful questions.
15  Part of your work took place on a dock area?
16   A.   Yes, it did, a cooler and a dock.
17   Q.   Were you in the same building that
18  the debone and evis operations took place?
19   A.   Yes, I was.
20   Q.   And you worked at that dock area
21  that's in between that building and the cook plant?
22   A.   Yes.
23   Q.   So you picked up boxed products from

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

10

1    a cooler and loaded it onto refrigerated trailers?
2        A.    Yes, I did.
3        Q.    And what did you unload?
4        A.    Incoming product, chicken -- incoming
5    chicken.
6        Q.    That's a surprise.  And what did you
7    do with that, put it in --
8        A.    Into a cooler.
9        Q.    Who was your supervisor?
10       A.    Melvin Arnold.
11       Q.    When you left, what was your rate of
12   pay?
13       A.    $8.75.
14       Q.    How many hours a week did you work?
15       A.    Forty -- at least forty.
16       Q.    Sometimes you worked overtime?
17       A.    Sometimes.
18       Q.    Generally was it a
19   Monday-through-Friday job?
20       A.    Yes.
21       Q.    It's my understanding that you're a
22   plaintiff in this lawsuit, a party, correct?
23       A.    Yes.

11

1        Q.    And how did you find out about the
2    suit?
3        A.    Word of mouth.
4        Q.    And what did you learn about it
5    through word of mouth?
6        A.    That the chicken plant was -- that
7    they were paying lost wage time, lost wages of
8    time.
9        Q.    What's your understanding of the
10   claim that you have in this case?
11           MR. STEENSLAND: Objection. Asks
12   for a legal question.  You can answer.
13       A.    Managed lost wages for time that it
14   took from putting equipment on, to taking it off,
15   breaks.
16       Q.    (Mr. Fry)  What about the breaks?
17       A.    The time it took to put equipment on
18   and take it off and extra time for a break.
19       Q.    And how did you get that
20   understanding that that was what your claim was in
21   this case?
22       A.    I don't know at this time.  I can't
23   think of an answer.

12

1        Q.    No answer?
2        A.    No answer at this time.
3        Q.    When you were working for either CP
4    or Equity, were you a member of the Union?
5        A.    Yes, I was.
6        Q.    Were you ever a Union steward?
7        A.    No.
8        Q.    Were you on any negotiating
9    committees?
10       A.    No.
11       Q.    Did you ever go to any Union
12   meetings?
13       A.    No, I didn't.
14       Q.    Have you ever been to any meetings
15   that discuss this lawsuit, meetings with your
16   coworkers?
17       A.    No.
18       Q.    Did you review any papers to prepare
19   yourself to come here?
20       A.    No, I didn't.
21       Q.    Did you talk with anybody about your
22   appearance here?
23       A.    No.

13

1        Q.    Now, you made reference to
2    equipment.  Do you recall that?
3        A.    Yes.
4        Q.    What equipment are you referring to?
5        A.    Hair net, beard net, ear plugs,
6    smock, boots.
7        Q.    Hold on.  Hair net, beard net --
8        A.    Ear plugs, smock, boots, safety
9    goggles.
10       Q.    Anything else?
11       A.    No, that was all.
12       Q.    Let me go down the list and make sure
13   I have everything.  A hair net, a beard net, ear
14   plugs, smock, boots, and goggles, correct?
15       A.    Yes.
16       Q.    As a shipper which of these items, to
17   your understanding, were you required to wear?
18       A.    All of them.
19       Q.    Were you ever written up for not
20   wearing any of them?
21       A.    No.
22       Q.    From what you were able to observe in
23   the two years you worked there, did other employees

3965239d-7ef0-4dc0-b5c7-6c1f7f3f398d

14

1    with other different kinds of jobs wear different
2    kinds of equipment?
3        A.    Yes.
4        Q.    What different kinds of equipment did
5    you observe them wearing?
6        A.    They wore sleeves, aprons, rubber
7    gloves.  That's about it.
8        Q.    You didn't have to wear any of that?
9        A.    No.
10       Q.    Which of these items that you
11   identified that you wore were issued to you by
12   either CP or Equity?
13       A.    All of them.
14       Q.    Including the boots?
15       A.    Yes.
16       Q.    Were you permitted to wear boots from
17   home?
18       A.    No.
19       Q.    Which of these items did you pick up
20   on a daily basis?
21       A.    You can get hair nets and beard nets,
22   but you have to pay for them.
23       Q.    Which items did you pick up on a

15

1    daily basis?
2        A.    Neither -- I tried to keep it as
3    long as I could, because smocks you had to take
4    home and wash.
5        Q.    Did you have to do that the whole
6    time you were working there?
7        A.    Yes.
8        Q.    So can I assume from what you're
9    telling me that there were days of the week that
10   you didn't have to pick up anything?
11       A.    Yes, that is right.
12       Q.    How many days of the week on a
13   typical workweek?
14       A.    Two.
15       Q.    There were two days that you did not
16   have to pick up anything?
17       A.    Yes.
18       Q.    Could you wear any of these things
19   that you wore from home?
20       A.    No.
21       Q.    During the time that you were there,
22   you were never permitted to wear your boots from
23   home; is that correct?

16

1        A.    That is right.
2        Q.    When you weren't working and you
3    weren't at the plant, did you store any of these
4    things at the plant?
5        A.    Yes, I had a locker.
6        Q.    What did you store in your locker?
7        A.    All of my equipment.
8        Q.    And what equipment, the things you
9    just described to me?
10       A.    Yes.
11       Q.    You didn't work with a knife, did
12   you?
13       A.    No, I didn't.
14       Q.    How many breaks per day did you get?
15       A.    Two.
16       Q.    How long were the breaks?
17       A.    One 30-minute and one 20-minute.
18       Q.    Where did you take your breaks?
19       A.    The break room.
20       Q.    What break room?
21       A.    The main break room at the front of
22   the building.
23       Q.    Are you referring to the debone break

17

1    room?
2        A.    Yes.
3        Q.    How did you know when it was time for
4    you to take your break?
5        A.    I would walk in the office and look
6    at the time.
7        Q.    Pardon?
8        A.    I would walk in the office and look
9    at the time.
10       Q.    So which was first, the 30 or the
11   20-minute break?
12       A.    The 30.
13       Q.    And if you started at 8:30 in the
14   morning, when would you take that break?
15       A.    We would go to break at twelve.
16       Q.    So at twelve noon you just took your
17   break?
18       A.    I could not take a break if I was
19   still loading the trucks.  When I finished loading,
20   I would go to break.
21       Q.    Would you still get your 30 minutes?
22       A.    Yes.
23       Q.    And how would you know when your

3965239d-7ef0-4dc0-b5c7-6c1f7f3f398d

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

18

1   break period ended?
2      A.   By the clock.
3      Q.   So at the end of the time, you would
4   just go back to work?
5      A.   Yes.
6      Q.   How did you get to work every day?
7      A.   By car.
8      Q.   Is it your own car?
9      A.   Yes.
10     Q.   Did you have a sticker on it?
11     A.   No.  At the time, they didn't use
12  stickers -- parking pass.
13     Q.   What did you have to do to get on the
14  property?  You had to pass through the guard shack?
15     A.   Yes.
16     Q.   And did they stop you there?
17     A.   No.
18     Q.   Just drove on if you had a -- what
19  did you do, show a badge?
20     A.   Hangs in your window.
21     Q.   You just drove right by the guard?
22     A.   Yes.
23     Q.   And at the end of the day you just

20

1      Q.   When would you clock in?
2      A.   I would clock in at 8:30.
3      Q.   Was it your understanding that your
4   pay period started from when you clocked in?
5      A.   Yes, until I clock out.
6      Q.   And who told you that?
7      A.   That's what the supervisor said.
8      Q.   That's what the supervisor said?
9      A.   Yes.
10     Q.   That was Mr. Arnold?
11     A.   Yes.
12     Q.   The supplies that you identified for
13  me -- the hair net, the beard net, the ear plugs,
14  the smock -- where would you put those on?
15     A.   Right before entering the floor.
16     Q.   What floor?
17     A.   You cannot enter -- you cannot go
18  inside without putting those on.
19     Q.   Inside where?
20     A.   Inside of the actual working area of
21  the plant.
22     Q.   Where you worked, where the coolers
23  were and where --

19

1   drove off?
2      A.   Yes.
3      Q.   Were you ever searched?
4      A.   No.
5      Q.   You didn't have to pass through or
6   clear any security, did you?
7      A.   No.
8      Q.   What time did you typically try to
9   get to work in the morning to get to your 8:30
10  shift on time?
11     A.   What time did I swipe in?
12     Q.   What time did you drive in onto the
13  property?
14     A.   Maybe 8:20.
15     Q.   Tell me what you did from 8:20 for
16  the next ten minutes.
17     A.   I would go to the supply room and get
18  my supplies for the day, put my boots on, and get
19  ready for my shift to start.
20     Q.   And what would you do to get ready
21  for your shift to start?
22     A.   I wait until 8:30 when it was time to
23  go.

21

1      A.   No, I would have to go through the
2   plant to go back to where I work at.  So I would
3   have to put mine on and then walk through.
4      Q.   Okay.  I'm not sure I understand.  I
5   know it's a lot simpler for you, but bear with me
6   here if I can sort of take you through this.  You
7   go to supply on those days when you had to pick
8   something up?
9      A.   Yes.
10     Q.   Sometime between 8:20 and 8:30,
11  correct?
12     A.   Yes.
13     Q.   And you never had to wait in line at
14  supply at that hour, did you?
15     A.   Yes.
16     Q.   You did?
17     A.   A lot of time you did.
18     Q.   And why was that?
19     A.   There just be people up there.
20     Q.   What shift was coming on at the same
21  time you were?
22     A.   Sanitation be there, first shift be
23  up there, debone, evis.

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

3965239d-7ef0-4dc0-b5c7-6c1f7f3f398d

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

22

1  Q. Don't those shifts start before 8:30?
2  A. Yes.
3  Q. In fact, they start an hour or so
4  before 8:30, don't they?
5  A. Yes.
6  Q. So those folks wouldn't be there,
7  would they, generally?
8  A. Yes.
9  Q. They would, they would still be
10 there?
11 A. Yes -- don't know why.
12 Q. Anyway -- so there are some people
13 there. What is your longest wait there at the
14 supply room?
15 A. Maybe ten minutes.
16 Q. Then you went to the debone break
17 room and you put your boots on?
18 A. Yes.
19 Q. And from there you would go to your
20 work area?
21 A. Yes.
22 Q. And once you got to your work area,
23 is the first thing you did you clocked in?

23

1  A. No, I clocked in before I left the
2  break room.
3  Q. You clocked in at the break room?
4  A. Yes.
5  Q. And you clocked in at 8:30?
6  A. Yes.
7  Q. And it was your understanding that
8  you were paid right from 8:30, correct?
9  A. Yes.
10 Q. And did you ever learn differently
11 that you weren't?
12 A. No.
13 Q. After you clocked in, you walked to
14 your work area?
15 A. Yes.
16 Q. And at that point in time you put on
17 your supplies?
18 A. No, I put it on before.
19 Q. When did you put it on?
20 A. When I entered the doors to actually
21 go on the floor. You can't walk through when they
22 processing chicken without your equipment on.
23 Q. Did you put on your supplies after

24

1  you clocked in at 8:30?
2  A. Yes.
3  Q. You clocked in, put on your supplies,
4  and walked to your work area?
5  A. Yes.
6  Q. How long does it take you, or did it
7  take you, to put on these supplies?
8  A. I don't know.
9  Q. Can you estimate it?
10 A. Maybe five minutes.
11 Q. It doesn't take very long to put on
12 those things, does it?
13 A. I never really counted.
14 Q. It's not very difficult, is it?
15 A. No.
16 Q. Before you started your job in
17 shipping, did you have to pick up any tools or
18 utensils, or anything?
19 A. No.
20 Q. Did you operate a forklift?
21 A. Yes.
22 Q. Am I correct that you had to take off
23 some of these pieces of equipment, as you described

25

1  them, in order to go on your break?
2  A. Yes.
3  Q. Describe for me what you did in that
4  respect.
5  A. What I took off?
6  Q. Where you went, what you took off.
7  A. I would take it off before I leave
8  out the door. After I leave off the shipping dock
9  and go out the door.
10 Q. So you could take your stuff off in
11 the shipping dock and hang it right there?
12 A. Yes.
13 Q. And then you just walk to the break
14 room?
15 A. Yes.
16 Q. Did you take your breaks at the
17 debone break room?
18 A. Yes, I did.
19 Q. Did you have to take anything off to
20 go on break besides your smock?
21 A. Smock, hair net, beard net.
22 Q. Were you required to take your hair
23 net off?

26

1    A.    Yes.
2    Q.    You didn't have to do any washing?
3    A.    No.
4    Q.    Didn't take you very long to take
5   that stuff off and hang it up, did it?
6    A.    A few minutes.
7    Q.    Two minutes?
8    A.    Never really counted.
9    Q.    Never counted it?
10   A.    No.
11   Q.    Okay. And when your break was over,
12  I assume that you did the reverse process, you
13  walked from the break room back to the shipping
14  dock, put the stuff back on, and went back to work?
15   A.    Yes, I did.
16   Q.    When you went on break, did you clock
17  out?
18   A.    No.
19   Q.    How many people did you work with on
20  the shipping dock?
21   A.    Seven.
22   Q.    Were they doing the same things you
23  were doing?

27

1    A.    Yes, they were.
2    Q.    Did this routine that you just
3   described for me that you did when you took your
4   breaks, did you do that for -- was it pretty much
5   similar for both breaks?
6    A.    Yes, every break.
7    Q.    Tell me what you did at the end of
8   your shift in terms of this equipment.
9    A.    I repeat the process. I store
10  everything in my locker, and I clock out and go
11  home.
12   Q.    When it came to 5:30, you stopped
13  work on the dock?
14   A.    Yes.
15   Q.    And you took off your equipment in
16  the dock area?
17   A.    Yes, sir, I did.
18   Q.    And then you walked to the debone
19  break room?
20   A.    Yes.
21   Q.    And that's when you clocked out?
22   A.    After I stored everything.
23   Q.    After you stored it, and then you

28

1   clocked out, and then you were free to leave?
2    A.    Yes.
3    Q.    Was it your understanding that the
4   company kept track of your work hours pursuant to
5   your actual swipe-in, swipe-out times?
6    A.    No, I didn't know that.
7    Q.    You didn't know that?
8    A.    No.
9    Q.    Did you ever ask?
10   A.    No.
11   Q.    What was your understanding as to how
12  the company kept track of your time?
13   A.    By me clocking in and out.
14   Q.    So that was your understanding? I am
15  sorry, maybe my question wasn't clear.
16          MR. STEENSLAND: I think one
17  question you swiped and one question you clocked.
18          MR. FRY: Okay. We have been
19  going at this for three days.
20   Q.    (Mr. Fry) Was it your understanding,
21  Mr. Pearson, that the time for which you were paid
22  was computed based on when you swiped in at 8:30 in
23  the morning and then when you swiped out at 5:30 in

29

1   the afternoon?
2    A.    Yes.
3          MR. STEENSLAND: Objection.
4   Asked and answered. You can answer.
5    Q.    (Mr. Fry) And were you told that?
6    A.    Yes.
7    Q.    Did you ever have occasion to go to
8   your supervisor and complain about any payroll
9   issues?
10   A.    Yes.
11   Q.    And what sort of issues did you have?
12   A.    Short of time.
13   Q.    And what happened?
14   A.    They resolved it.
15   Q.    He resolved it for you?
16   A.    Yes.
17   Q.    Other than swiping-in and
18  swiping-out, did you keep track in any other
19  fashion of the hours you spent there?
20   A.    No.
21   Q.    Have you made any sort of
22  calculations as to what you believe you're entitled
23  to in this lawsuit?

3965239d-7ef0-4dc0-b5c7-6c1f7f3f398d

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

30

1     A.    No.
2     Q.    Were you ever asked or required to
3  work overtime?
4     A.    Yes.
5     Q.    And when that occurred, were you paid
6  time-and-a-half?
7     A.    To my understanding.
8     Q.    Did you ever have any complaints
9  about your overtime, how it was computed?
10    A.    No.
11    Q.    And again, were the overtime hours,
12  from what you were able to understand, based on
13  your swipe time?
14    A.    Yes.
15    Q.    Did you ever file a grievance with
16  the Union?
17    A.    No.
18    Q.    Were you ever disciplined while you
19  were working there?
20    A.    Yes, I have.
21    Q.    And what were you disciplined for?
22    A.    Hitting the door.
23    Q.    Pardon?

31

1     A.    Hitting the door.
2     Q.    With a forklift?
3     A.    Yes.
4     Q.    Is that the only thing?
5     A.    That's the only thing I can think of
6  at this moment.
7     Q.    We went through what you did on a
8  daily basis here. Did your routine change in any
9  way when Keystone took over?
10    A.    No.
11    Q.    You did pretty much the same routine
12  for CP and Keystone?
13    A.    Yes.
14          MR. FRY: That's all I have.
15
16  EXAMINATION BY MR. STEENSLAND:
17    Q.    Mr. Pearson, when you were working
18  there the time you worked for Equity Group, did you
19  have to take your smock home with you?
20    A.    Yes, I did.
21    Q.    How many smocks were you issued?
22    A.    Three.
23    Q.    And what did you have to do with them

32

1  when you took them home?
2     A.    Wash them.
3     Q.    Were you required to do that?
4     A.    Yes, I was.
5     Q.    At any point in time when you were
6  working there, did that arrangement change, did
7  that requirement change?
8     A.    Recently when I went back they was
9  actually issuing them to you.
10    Q.    They were issuing them to you?
11    A.    Yes.
12    Q.    And how long was that period of time?
13    A.    A month.
14    Q.    During both periods of time when you
15  worked there, before you could put on your
16  equipment, did you have to sanitize your boots?
17    A.    Yes, I did.
18    Q.    That was the first thing you had to
19  do before you could put on all this equipment we
20  talked about?
21    A.    Yes.
22    Q.    Did you have to wash that equipment
23  down once you had it put on?

33

1     A.    No.
2     Q.    And this last part when you were
3  working there before you swiped the card to leave,
4  what did you have to do with your smock?
5     A.    I put it in the bin.
6     Q.    Was that the last thing you did
7  before you swiped the card?
8     A.    Yes.
9     Q.    For your breaks, the beginning and
10  end part of your breaks, you either had to take off
11  the equipment or put on the equipment. Is that
12  what your testimony was?
13    A.    Yes.
14    Q.    Then you had to walk somewhere?
15    A.    Yes.
16    Q.    Is it your understanding that that
17  was included in your 30-minute break, or 20-minute
18  break?
19    A.    No, I didn't.
20    Q.    Did time spent doing those things
21  prevent you from enjoying the full period of the
22  break?
23    A.    Yes, it did.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

34

1  MR. STEENSLAND:  One more
2  question.
3  Q.  (Mr. Steensland)  When you were
4  working there, could you wear your boots home with
5  you?
6  A.  No.  They wanted you to take them off
7  before you left the premises.
8  Q.  Both times that you worked there?
9  A.  Yes.
10  Q.  So when you say they wanted you to,
11  what happens if you walked out wearing your boots
12  outside?
13  MR. FRY:  Objection.
14  Q.  (Mr. Steensland)  If you know.
15  A.  They will write you up.
16  Q.  So what did you do if you had your
17  boots on and you were leaving, what would you do?
18  A.  You would take them off first.
19  Q.  Is this after you swiped your card?
20  A.  No, before.
21  Q.  And you would carry them with you, or
22  what would you do?
23  A.  Yes, you would carry them.  If you

---

35

1  were not issued a locker, you would carry them with
2  you.
3  Q.  When you came back for work the next
4  day, you'd have to carry the boots back in?
5  A.  Yes, sir.
6  Q.  And at some point in time were you
7  allowed to wear the boots home?
8  A.  No.
9  Q.  At no point in time when you worked
10  there could you wear your boots home?
11  A.  No.
12  MR. STEENSLAND:  Nothing further.
13  MR. FRY:  Just two questions, I
14  think.
15
16  EXAMINATION BY MR. FRY:
17  Q.  In the morning when you sanitized
18  your boots, was that after you swiped in at 8:30?
19  A.  Yes.
20  Q.  When you left in the evening at 5:30,
21  did you sanitize your boots before you swiped out?
22  A.  Yes.
23  MR. FRY:  That's all.

---

36

1  MR. STEENSLAND:  Nothing further.
2  11:29 a.m.
3  ************************
4  FURTHER DEPONENT SAITH NOT

---

37

1  CERTIFICATE
2
3  STATE OF ALABAMA
4  AT LARGE
5
6  I hereby certify that the above
7  and foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10  transcription and that the foregoing represents a
11  true and correct transcript of the testimony given
12  by said witness upon said deposition.
13  I further certify that I am
14  neither of counsel nor of kin to the parties to the
15  action, nor am I in anywise interested in the
16  result of said cause.
17
18
19
20
21
22  Victoria M. Castillo, Certified Court Reporter
    ACCR# 17, Expires 9/30/2008
23  Commissioner and Notary Public

---

TAB 43

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


NO.:  2:06-CV-1081-MEF


BETTY ANN BURKS, et al.,

        Plaintiff(s),

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

        Defendant(s).



DEPOSITION OF

MARQUITA PERSON

                    JOB NO. 1101-58505



BEFORE:    Victoria M. Castillo

           Certified Court Reporter and

           Notary Public

           ACCR# 17, Expires 9/30/2008

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

2

1    In accordance with Rule 5(d) of
2    The Alabama Rules of Civil Procedure, as Amended,
3    effective May 15, 1988, I, Victoria M. Castillo, am
4    hereby delivering to HOWARD A. ROSENTHAL, ESQ. the
5    original transcript of the oral testimony taken on
6    the 23rd day of May, 2008, along with exhibits.
7        Please be advised that this is
8    the same and not retained by the Court Reporter,
9    nor filed with the Court.
10
11    S T I P U L A T I O N
12
13        IT IS STIPULATED AND AGREED, by
14    and between the parties through their respective
15    counsel, that the deposition of MARQUITA PERSON may
16    be taken before Victoria M. Castillo, Commissioner,
17    at WILLIAMS, POTTHOFF, WILLIAMS & SMITH, 125 South
18    Orange Avenue, Eufaula, Alabama 36027 on the 23rd
19    day of May, 2008.
20        IT IS FURTHER STIPULATED AND
21    AGREED that the signature to and the reading of the
22    deposition by the witness is waived, the deposition
23    is said to have the same force and effect as if

4

1        I N D E X
2
3    EXAMINATION BY:            PAGE NUMBER:
4    Mr. Fry                   6, 46, 50
5    Mr. Steensland            43, 48, 51
6
7    EXHIBITS:                 PAGE NUMBER:
8    (No Exhibits Were Marked.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

3

1    full compliance had been had with all laws and
2    rules of Court relating to the taking of
3    depositions.
4        IT IS FURTHER STIPULATED AND
5    AGREED that it shall not be necessary for any
6    objections to be made by counsel to any questions,
7    except as to form or leading questions, and that
8    counsel for the parties may make objections and
9    assign grounds at the time of trial, or at the time
10    said deposition is offered in evidence, or prior
11    thereto.
12        IT IS FURTHER STIPULATED AND
13    AGREED that notice of filing of the deposition by
14    the Commissioner is waived.
15
16
17
18
19
20
21
22
23

5

1        A P P E A R A N C E S
2
3    FOR THE PLAINTIFF(S):
4        M. John Steensland, III, Esq.
5        PARKMAN, ADAMS & WHITE
6        739 West Main Street
7        Dothan, Alabama 36301
8
9    FOR EQUITY GROUP EUFAULA DIVISION
10        Gary D. Fry, Esq.
11        Pelino & Lentz
12        One Liberty Place
13        Thirty-Second Floor
14        1650 Market Street
15        Philadelphia, Pennsylvania 19103
16
17    ALSO PRESENT:
18        Two children with the Plaintiff
19
20    ***********************
21
22        I, Victoria M. Castillo, a Court
23    Reporter of Montgomery, Alabama, acting as

6

1  Commissioner, certify that on this date, as
2  provided by the Alabama Rules of Civil Procedure
3  and the foregoing stipulation of counsel, there
4  came before me at WILLIAMS, POTTHOFF, WILLIAMS &
5  SMITH, 125 South Orange Avenue, Eufaula, Alabama
6  36027, commencing at 8:53 a.m., MARQUITA PERSON, in
7  the above cause, for oral examination, whereupon
8  the following proceedings were had:
9
10           MARQUITA PERSON,
11      being first duly sworn, was examined and
12          testified as follows:
13
14           COURT REPORTER:  Usual
15  stipulations?
16           MR. FRY:  Sure.
17           MR. STEENSLAND:  Sure.
18
19  EXAMINATION BY MR. FRY:
20      Q.   Good morning, Ms. Person.  How are
21  you?
22      A.   Fine.
23      Q.   My name is Gary Fry.  I'm one of the

7

1  lawyers representing Equity Group Eufaula, and
2  that's the folks that run the poultry plant out in
3  Baker Hill, and we have asked you here today to put
4  some questions to you concerning some claims that
5  you and some others folks have made in a lawsuit
6  against the company?
7      A.   Okay.
8      Q.   Have you ever been in a deposition
9  before?
10      A.   No, sir.
11      Q.   It's fairly simple.  I will be asking
12  you the questions, and you will be giving me the
13  answers, and our court reporter, Victoria, will be
14  taking down the information.  If you don't
15  understand my question, it's important that you let
16  me know so that I can rephrase it in a manner
17  hopefully in which you will understand it.  Okay?
18  If you don't hear any portion of a question -- and
19  I don't think that will happen -- but if you don't,
20  let me know and I will repeat it.  Your answers
21  need to be verbal because she can't take down a nod
22  or a shake of the head.  Okay?
23      A.   Okay.  Yes, sir.

8

1      Q.   And she can only take down one person
2  talking at a time, so we should not talk over one
3  another, if that's at all possible.  I don't think
4  that's going to happen.
5      A.   Okay.
6      Q.   What's your home address?
7      A.   My home address is 52 Lonnie Wilson
8  Road, Clayton, Alabama, 36016.
9      Q.   What is your date of birth?
10      A.   11/19/83.
11      Q.   Are you currently employed?
12      A.   No, sir.
13      Q.   At one point in time it's my
14  understanding you worked at the poultry plant at
15  Baker Hill?
16      A.   Yes, sir.
17      Q.   And you worked for Equity during that
18  time?
19      A.   Yes, sir.
20      Q.   What period of time did you work
21  there?
22      A.   Six months.
23      Q.   When did you start?

9

1      A.   I started -- it was 2005.
2      Q.   Do you recall what time of year it
3  was?
4      A.   It was in August.
5      Q.   In August?
6      A.   Uh-huh.
7      Q.   So you worked from August of 2005 for
8  the next six months into 2006?
9      A.   Yes, sir.
10      Q.   So you worked until about February of
11  '06?
12      A.   Yes, sir.
13      Q.   What department did you work in?
14      A.   DSI.
15      Q.   Is that the only department you
16  worked in?
17      A.   Yes, sir.
18      Q.   What shift did you work?
19      A.   First.
20      Q.   What were your hours?
21      A.   7:30 to 4:30.
22      Q.   Am I correct that the DSI area where
23  you worked was in the debone production room,

29785888-d434-4638-bf91-039729d17610

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

10

1  adjacent to it?
2      A.   Yes, sir.
3      Q.   Did you work any other shifts?
4      A.   No, sir.
5      Q.   You worked no other jobs except DSI?
6      A.   Yes, sir.
7      Q.   What did you do?
8      A.   I was -- they had the line going down
9  with the chicken, and I had to pull the breast or
10  either the thigh, and put them like in a bin, and
11  that's it.
12      Q.   Were you on a line?
13      A.   Yes, sir.
14      Q.   And who is your supervisor?
15      A.   Leon Jones.
16      Q.   What was your rate of pay?
17      A.   I started at $7, and when I quit, I
18  was making $7.35.
19      Q.   Why did you quit?
20      A.   Why did I quit?
21      Q.   Yes.
22      A.   Because I pointed out.
23      Q.   You pointed out?

11

1      A.   Yes, sir.
2      Q.   So you were terminated because of
3  attendance policies?
4      A.   Yes, sir.
5      Q.   How many hours per week did you work?
6      A.   Forty.
7      Q.   Monday through Friday?
8      A.   Yes.
9      Q.   Were you a member of the Union when
10  you were there?
11      A.   No, sir.
12      Q.   How did you find out about this
13  lawsuit?
14      A.   Well, I had got a -- okay, well I
15  heard some friends talking about it, and I called,
16  and they sent me some papers, and I filled them
17  out.
18      Q.   What did you hear your friends saying
19  about it?
20      A.   They was just telling me that they a
21  had a lawsuit against the chicken plant about that
22  they was wasn't giving us all our hours, and so she
23  had got the number from one of her friends, and we

12

1  both called, and they sent out a paper in the mail,
2  and we had to fill them out and send them back.
3      Q.   What is your understanding as to what
4  your claim is in this case?
5      A.   That I wasn't getting all my time.
6  Because when we first get in in the morning, we
7  have to put our supplies on.  And we wasn't getting
8  paid for it.  It was laying up some of our time.
9  Then when we leave that day, we have to wash our
10  supplies off and take them off.
11      Q.   And that's your claim?
12      A.   Yes.
13      Q.   And how did you come to that
14  understanding?
15      A.   Sir?
16      Q.   How did you come to that
17  understanding that that was what your claim was?
18      A.   Because --
19          MR. STEENSLAND:  Object.  That
20  calls for a legal conclusion.  You can answer.
21          MR. FRY:  You can answer.
22      A.   Okay.  Because when I first heard
23  about it, that's what they said, it was taking our

13

1  hours, because, you know what I am saying, of our
2  supplies.  Then I went to other meetings, or
3  whatever, and that is what, you know what I'm
4  saying, taking about.
5      Q.   (Mr. Fry)  What meeting did you go
6  to?
7      A.   I had to go to some meetings out in
8  at the motel out here.  What's the name of the
9  motel, out by the skate rink.  I had to go out
10  there.  Then I had talked to people over the phone.
11      Q.   Who was at the meetings?
12      A.   Who was at the meetings?
13      Q.   Yes, ma'am.
14      A.   Well, I really don't know their
15  names, but we had to go.  And it was a lot of
16  people that was in the lawsuit.  They had to come
17  there, too.  We had to fill out papers and stuff
18  like that.
19      Q.   Did anybody speak at the meetings?
20      A.   No, sir.
21      Q.   The meetings were just for you to
22  fill out the papers?
23      A.   Yes, fill out the paper.  And we had

14

1  to read over the papers and make sure we knew what
2  was what.
3      Q.    How many meetings did you go to?
4      A.    I went to one meeting, and I talked
5  to two people over the phone.
6      Q.    Lawyers?
7      A.    Yes, sir.
8      Q.    When was the one meeting that you
9  went to?  Do you recall when it was?
10     A.    No, sir.  It was during the
11 summertime.
12     Q.    Last summer?  Was it last summer?
13     A.    No, it was this summer.
14     Q.    This summer?
15     A.    Yes.
16     Q.    Just recently?
17     A.    Hold on, hold on.
18     Q.    Take your time.
19     A.    Okay.  No, it was last summer.  It
20 was last summer, I'm sorry.
21     Q.    How many people were at the meeting?
22     A.    I know I talked to two ladies, and it
23 was some more people there, too, like some mens.

15

1      Q.    Other coworkers?
2      A.    Not coworkers, the ones that we dealt
3  with, the people that they had us filling the
4  papers out and stuff.
5      Q.    Were they the lawyers?
6      A.    Uh-huh.
7      Q.    Did anybody make any speeches?
8      A.    No, they were just telling us --
9          MR. STEENSLAND:  I'm going to
10 object if we're talking about lawyers here.
11     Q.    (Mr. Fry)  I don't want to know what
12 the lawyers told you.  Okay?
13     A.    Okay.
14     Q.    Did anybody that was not a lawyer
15 talk to you there?
16     A.    Huh-uh.
17     Q.    How long were you at the meeting?
18     A.    We stayed there about -- I stayed
19 there about an hour because they had to call the
20 people down the line by names to come up and talk
21 and check over the paperwork and make sure we did
22 everything right.
23     Q.    And the meeting was at a hotel around

16

1  here?
2      A.    Yes.
3      Q.    Did you review any papers in
4  preparation for coming here today?
5      A.    No, sir.
6      Q.    Did you speak with anybody about
7  coming here today except your lawyers?
8      A.    Yes, sir.
9      Q.    Who did you speak with?
10     A.    Jennifer.
11     Q.    Who is Jennifer?
12     A.    I don't know her last name.
13     Q.    And what did you speak with Jennifer
14 about?
15     A.    Well, Jennifer called me at my
16 mother's house, and my mother had gave me the
17 number to call her, and I called her, and --
18         MR. STEENSLAND:  Is Jennifer with
19 a law firm?
20         THE DEPONENT:  I don't know
21 Jennifer and Christie?
22         MR. STEENSLAND:  She's with a law
23 firm.

17

1          MR. FRY:  She's with a law firm.
2      Q.    (Mr. Fry)  When did Jennifer call
3  you?
4      A.    Jennifer called me -- she called me
5  day before yesterday, and then she called me
6  yesterday to let me know to make sure that I be
7  here.
8      Q.    Did you speak with anybody else
9  besides Jennifer?
10     A.    No, sir.
11     Q.    You told me that your claim is for
12 the time you spent putting on supplies and taking
13 off supplies.  Do you recall that?
14     A.    Yes, sir.
15     Q.    Can you identify for me what supplies
16 you were talking about?
17     A.    Well, we have to put on our smock,
18 our apron; we had to put on our sleeves; we had to
19 put on our safety gloves; we had to put on our
20 cotton gloves; we had to make sure our ear plugs
21 was in our ear, hair nets; we had to put on our
22 safety glasses.
23     Q.    Anything else?

29785888-d434-4638-bf91-039729d17610

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

18

1    A.    No, sir.
2    Q.    Let me make sure I have the complete
3  list. You identified a smock, an apron, sleeves,
4  gloves, safety gloves, ear plugs, hair net, and
5  glasses.
6    A.    Yes.
7    Q.    Anything else?
8    A.    No, sir.
9    Q.    Which of these items were you
10  required to wear?
11    A.    Well, we were -- all the ones that I
12  just told you on the paper, we had all those. All
13  of those that we had to put on. We had to put on
14  all those.
15    Q.    What paper were you referring to?
16    A.    The paper that --
17    Q.    The paper that I am writing on. So
18  you were required to wear all these items?
19    A.    Yes, sir.
20    Q.    Who told you that?
21    A.    The supervisor, and we have to go out
22  there for our orientation, they tell us what do we
23  have to -- that we have to wear all those before we

19

1  get on the floor.
2    Q.    Did everybody in DSI wear the same
3  items?
4    A.    Yes, sir. Except for the supervisors
5  and the line leaders. Unless they have to get on
6  the line, then they have to put them on.
7    Q.    During the six months you worked
8  there, was anybody ever written up for not wearing
9  any of these items?
10    A.    Yes, sir.
11    Q.    Can you give me any examples?
12    A.    Well, I know a couple of people that
13  wrote up because they didn't have their ear plugs.
14  Some people got wrote up because they didn't have
15  their safety glasses. But, yes, and then some of
16  them, they probably didn't bring they sleeves, and
17  they was running late, and they couldn't make it to
18  the supply to get more. And when they came by to
19  write them up, the people that came by and wrote
20  them up, they have to take them to the supply room
21  or make them go and get the supplies.
22    Q.    Which of these items that you have
23  identified for me were given to you by the

20

1  company?
2    A.    What were given to me by the company
3  were all the supplies that I told you we had to
4  wear, the time that we had to be on the floor and
5  off the floor.
6    Q.    I just wanted to know which of these,
7  and I think you told me all of these things were
8  given to you by the company?
9    A.    Yes, sir.
10    Q.    Which of these items did you pick up
11  on a daily basis?
12    A.    Well, my hair nets. We had to pick
13  up our smocks because they had -- well, at first we
14  had to start washing them, and then they had to
15  start getting them, and we had to put them in the
16  bin every day before we leave, and they wash them,
17  and really that's about it.
18    Q.    Am I correct that when you first
19  started working there, you had to wash your
20  smocks?
21    A.    Yes.
22    Q.    And how long did you have to do that
23  before that stopped?

21

1    A.    I really don't know because it done
2  been a minute since I've been out there.
3    Q.    But sometimes during that six months
4  they switched policies --
5    A.    Yes.
6    Q.    You have to wait until I finish.
7    A.    Okay.
8    Q.    All right. Sometime during that six
9  months you worked there Equity switched its
10  procedures and it provided you with a smock every
11  day; is that correct?
12    A.    Yes, sir.
13    Q.    Which, if any, of these items were
14  you permitted to wear from home?
15    A.    Our hair nets; we can put our ear
16  plugs in before we leave home; and that's it. Then
17  our shoes before they start, you know, because at
18  first we couldn't walk out the door with the shoes
19  on, but then they changed the policy.
20    Q.    So when you started you could not
21  wear the shoes you wore in the production floor
22  outside --
23    A.    You had to --

29785888-d434-4638-bf91-039729d17610

22

1    Q.    You wanted to say something, go
2    ahead.
3    A.    This is how it was.  We couldn't have
4    our boots on walking down the, you know, in the --
5    in the evis group on the floor, we couldn't walk
6    them on.  We had to take them off and put our shoes
7    on and before we go out the door.
8    Q.    And did that --
9    A.    They changed it.
10   Q.    -- policy change?
11   A.    Yes.
12   Q.    And do you recall when that changed?
13   A.    No, sir.
14   Q.    Sometime during the time you were
15   there?
16   A.    Yes, sir.
17   Q.    After the policy changed, were you
18   permitted to wear your boots from home?
19   A.    Yes, sir.
20   Q.    And were your boots provided to you
21   by the company?
22   A.    Yes, sir.
23   Q.    And was that also one of the other

23

1    items you were required to wear?
2    A.    Yes, sir.
3    Q.    When you weren't working on the job,
4    where did you store these items?  What did you do
5    with them?
6    A.    Well, I had -- I gave -- I have to
7    give them back the smocks before -- and before I
8    get, you know what I'm saying, before I get my last
9    check, but everything else I kept.
10   Q.    Everything else you what?
11   A.    I kept them and I throw them away.
12   Q.    Did you take your apron home?
13   A.    My apron home -- yes, sir.
14   Q.    Did you have a locker at the plant?
15   A.    No, sir.
16   Q.    You didn't?  Did you take the sleeves
17   home?
18   A.    Yes, sir, because I had to wash all
19   the linens.
20   Q.    When you came to work each day, where
21   did you put these items of supplies that you just
22   described for me on?
23   A.    When we walked inside the plant,

24

1    inside the debone, you know what I'm saying, inside
2    the plant.  You know what I'm saying?
3    Q.    On the production floor?
4    A.    Yes, sir, on the production floor.
5    Q.    And am I correct that you could wear
6    your -- I think you just told me -- your hair net,
7    your ear plugs, and your boots you could wear those
8    from home?
9    A.    Yes, sir.
10   Q.    So you put on the rest of these
11   things in the production floor?
12   A.    Yes, sir.
13   Q.    Right before you started working?
14   A.    Yes, sir.
15   Q.    Your shift started at 7:30, I think
16   you told me?
17   A.    Yes, sir.
18   Q.    How soon before 7:30 would you go
19   into the production floor to put on these items of
20   supplies?
21   A.    Well, we have to be on the floor
22   before 7:30 before the line start running, and I
23   leave -- like if I be on the break room, I leave by

25

1    like 7:20 to go in there and wash my boots off and
2    put my supplies on, and it depends on how fast you
3    are before you put your supplies on.
4    Q.    What do you mean?
5    A.    And I was kind of a little fast of
6    putting my stuff on, so I was on the floor way
7    before 7:30.
8    Q.    So you are fast to put on the stuff?
9    A.    Uh-huh.
10   Q.    So how fast?  How long will it take
11   you?
12   A.    It will take me about five or six
13   minutes.
14   Q.    So you would try and get on the
15   production floor by 7:20, and it took you five to
16   six minutes to put these supplies on?
17   A.    Yes, sir.
18   Q.    And then you went to your area in
19   DSI?
20   A.    Yes, sir.
21   Q.    And you were always early?
22   A.    Yes, sir.
23   Q.    Is that correct?  Did other people

29785888-d434-4638-bf91-039729d17610

26

1    come in after you to the production floor to put on
2    their supplies?
3        A.    Yes, sir, it be a lot of people.
4        Q.    Was it possible to put on any of
5    these things while you are walking to the DSI area?
6        A.    Yes, you can.  But mostly you have
7    to -- well, the rule was when you put on your
8    supplies, you have to go to the water and put soap
9    and stuff on it and wash it off and make sure they
10   are clean, or whatever, but some people they will
11   just walk to the floor putting stuff on, you know,
12   walking to the line.
13       Q.    Were you required to wash it down
14   each morning?
15       A.    Yes, sir.
16       Q.    Did you use a knife on the job?
17       A.    No, sir.
18       Q.    Did you use scissors?
19       A.    No, sir.
20       Q.    What sort of safety gloves did you
21   wear?
22       A.    I just wore the cotton gloves, and
23   the --

27

1        Q.    The plastic gloves?
2        A.    The plastic gloves, yes, sir.
3        Q.    So you didn't wear any chain mesh
4    gloves?
5        A.    No, because I ain't had to use no
6    scissors when I was back there in DSI.
7        Q.    So when you told me that you wore
8    safety gloves, you are referring to the white
9    cotton liners and the plastic gloves on top?
10       A.    Yes, sir.
11       Q.    Did you use any tools or equipment
12   when you were on the DSI line?
13       A.    No, sir.
14       Q.    How many breaks did you get during
15   the day?
16       A.    Two.
17       Q.    How long were they?
18       A.    30 minutes -- no, the first one was
19   15 minutes.  The second one was 30 minutes.
20       Q.    At what time in the morning did you
21   get your first 15-minute break?
22       A.    I think it was at 9:45, if I'm not
23   mistaken.

28

1        Q.    When was the 30-minute break?
2        A.    I really don't know about that one.
3    I done forgot.
4        Q.    Did you have these two breaks, one
5    for 15 minutes and one for 30 minutes, over the
6    whole six months you worked there?
7        A.    Yes, sir.
8        Q.    What was your understanding as to
9    whether you were paid for these breaks?
10       A.    No, sir.
11       Q.    It was your understanding you were
12   not paid for these breaks; is that correct?
13       A.    Yes, sir.
14       Q.    Where did you take your breaks?
15       A.    Out there in the lobby at the chicken
16   plant.
17       Q.    Pardon?
18       A.    Out there in the lobby where the
19   snack machines and stuff at.
20       Q.    In the debone break room?
21       A.    Uh-huh.
22       Q.    You have to say yes.
23       A.    Yes, sir.  I am sorry.

29

1        Q.    It's all right.  How did you know it
2    was time to take your break?
3        A.    Because they -- our supervisor just
4    say "break time", when they say "break time" and if
5    the meat come down the line, we got to stay on the
6    line until all the meat run out, and then we got to
7    go take the stuff off and go on break.
8        Q.    Did some people farther up in the
9    line get to leave for break earlier than the people
10   down the line?
11       A.    Yes, sir.
12       Q.    How did you know it was time to go
13   back to work after the break was ended?
14       A.    Because they have a clock in the
15   break room.
16       Q.    And you just watched the clock?
17       A.    Uh-huh.
18       Q.    And what was your understanding as to
19   when you had to be back on the line?
20       A.    We had to be back in line before we
21   leave out at 9:45.  We had to be back in at -- we
22   had to be back in at ten -- I think it was ten,
23   something like that.  But we had to be back in, and

29785888-d434-4638-bf91-039729d17610

30

1   I know they time as we go out. We got to be back
2   in before the time that we have to -- the 15
3   minutes. We have to be on the line before the meat
4   start running on the line.
5       Q.    So as long as you were on back on the
6   line before the meat got there, you were on time?
7       A.    Yes, sir.
8            MR. STEENSLAND: Objection. That
9   -- never mind, too late.
10      Q.    (Mr. Fry) How did you get to work
11  each day?
12      A.    My car.
13      Q.    Did you have to clear security to get
14  into the plant?
15      A.    No, sir, because we had a little
16  sticker thing on our car that they give everyone
17  that work at Keystone.
18      Q.    So am I correct that you just drove
19  onto the property?
20      A.    Yes, sir.
21      Q.    Were you ever searched in any way?
22      A.    No, sir.
23      Q.    Were you ever searched when you left

31

1   for the day?
2       A.    No, sir.
3       Q.    And when you left for the day, could
4   you just drive off the property?
5       A.    Yes, sir.
6       Q.    What time did you try and get to work
7   every day?
8       A.    Well, I get to work every day about
9   seven o'clock.
10      Q.    Seven o'clock?
11      A.    Yes, sir.
12      Q.    Tell me, in as much detail as you can
13  remember, what you did from the time you arrived at
14  seven o'clock until you started working on the DSI
15  line.
16      A.    Well, when I get there I may -- I go
17  in there, clock in. I get -- like if I don't have
18  the supplies I need to get, I go get them, and I go
19  out the door, sit, talk, or I will go in the break
20  room until it's time for me to go in.
21      Q.    What would you do in the break room?
22      A.    I will sit down or if I see somebody
23  I can talk to, like my mama or somebody, I go over

32

1   there and talk to them, and that's it.
2       Q.    How long did you spend at the supply
3   room?
4       A.    It depends on how long the line is.
5   If the line is long, you are going to spend a good
6   little minute. So you ain't got no choice but to
7   just get your supplies and go straight to the line.
8       Q.    How long did it take the line to go
9   down?
10      A.    It depends on the people because some
11  people they be in the supply room, some of them
12  faster than other ones.
13      Q.    What's the longest you ever waited in
14  the supply line?
15      A.    About 15 minutes.
16      Q.    What's the shortest?
17      A.    About six, seven minutes.
18      Q.    So after the supply room, you went to
19  the break room and you waited until it was time for
20  you to go on the floor. And I think you told me
21  you tried to go on the floor about 7:20?
22      A.    Uh-huh.
23      Q.    Did you enter the debone production

33

1   area by going through those double doors right
2   across from the debone break room?
3       A.    No, sir.
4       Q.    How did you get to your workstation?
5       A.    When you come into the plant, it's a
6   little aisle that you go down on the -- on the left
7   hand side. You go down there, and then it's double
8   doors right there that you have to go in the DSI.
9       Q.    So the DSI folks went in a different
10  door --
11      A.    The DSI --
12      Q.    You have to wait until I am done.
13  The DSI folks went on to their production area in a
14  different door than the people who worked in the
15  debone line?
16      A.    Yes, sir.
17      Q.    And you went through a pair of double
18  doors?
19      A.    Yes, sir.
20      Q.    And was there a foot bath there?
21      A.    Yes, sir.
22      Q.    Did you have to stop in that foot
23  bath?

29785888-d434-4638-bf91-039729d17810

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

34

1      A.    You have to just stop and just punch
2   the little button, and they will just come on your
3   feet, on your shoes, and then you just go on.
4      Q.    How long did that take?
5      A.    Not long.
6      Q.    Less than a minute?
7      A.    Yes, sir.
8      Q.    How long does it take you, or did it
9   take you to walk from the break room into the DSI
10  room?
11     A.    About three minutes.  It's not long,
12  not far.
13     Q.    When it was time to take your
14  15-minute break, what did you have to do to get out
15  of the DSI area?
16     A.    You have to take out all of your
17  supplies, besides your hair net and ear plugs, and
18  you take your safety glasses with you.  That's it.
19     Q.    Kept your boots on, right?
20     A.    Uh-huh.
21     Q.    Did you have to wash those items
22  down?
23     A.    Yes, sir.  You have to wash the items

35

1   down before you take them off.
2      Q.    And where did you do this?
3      A.    In the part -- in the part that we
4   had to work at.  We have to walk up there, wash
5   them down, take them off, hang them up.
6      Q.    Did the DSI folks have their own wash
7   station?
8      A.    Yes, sir.
9      Q.    And their own hangers?
10     A.    Yes, sir.
11     Q.    How many people worked in that area?
12     A.    It was a lot of people.
13     Q.    About how many?
14     A.    I really don't know.
15     Q.    More than ten?
16     A.    Yes, more than ten.
17     Q.    More than 20?
18     A.    I'd say about a good 25.
19     Q.    How long would it take you from the
20  time you left your workstation until you got into
21  the break room to take your break?
22     A.    I'd say about probably a little less
23  than ten minutes because the 15-minute break, we

36

1   really don't have any 15-minute break for real.
2   Because I was at the end of the line, and the ones
3   in the front when the meat run on down, that's when
4   we can go.  And the ones in the top, they leave out
5   before we do.
6      Q.    Did everybody in the DSI area wash
7   down before they went on break?
8      A.    No.
9      Q.    Were they supposed to?
10     A.    Yes.
11     Q.    Was there a wait at the wash stand?
12     A.    No, sir.
13     Q.    At the end of your 15-minute break,
14  tell me what you did to go back to work in terms of
15  your supplies.
16     A.    We had to go back in; we have to --
17  well, before we get on the floor, we have to have
18  our safety glasses on, and then we have to go
19  through the shoe sanitizer thing, and then we have
20  to go and put our supplies on and go and wash off
21  again and get the little napkins and rinse the
22  water off, and then we will go back to our section
23  where you work at.

37

1      Q.    Approximately how much time did that
2   take you?
3      A.    It don't take no more than about --
4   about five to six minutes.
5      Q.    Did you follow generally the same
6   routine to leave and come back when you went on
7   your 30-minute break?
8      A.    Yes, sir.
9      Q.    Tell me what you did now at the end
10  of the day when it was time to go home and your
11  work was finished.
12     A.    Well I go up, wash my little supplies
13  off, get my -- you have to roll them up and pull
14  them all together, and I go drop my smock and my
15  cotton gloves off and put them in a little bin, and
16  I go clock out and leave and go home.
17     Q.    When you say "rolling up", are you
18  referring --
19     A.    You know, like my sleeves, my apron,
20  and my -- the other gloves I have to put on top of
21  my --
22     Q.    Plastic gloves?
23     A.    Yes, my plastic gloves.

2100   Third Avenue North, Suite 960   *   Birmingham, AL   35203
1-800-888-DEPO   or   205-251-4200

29785888-d434-4638-bf91-039729d17610

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

38

1    Q.    How long did that process take you?
2    A.    About the same, five to six minutes.
3    Q.    From the time you left your
4    workstation until you clocked out?
5    A.    Talking about the time I clock out?
6    Well, sometimes we will probably be up there at the
7    clock machine before time to clock out, but that
8    just how long it take me to take all my supplies
9    off and to wash them and then make sure they -- all
10   the meat and stuff off of them.
11   Q.    Explain that to me. I don't
12   understand. You told me that you would be at the
13   clock machine before it's time to clock out.
14   A.    Yes, sometimes like if the last
15   bundle of meat that they put in the machine, and if
16   they run out before 4:30, we get to leave when that
17   run out, because they cannot put no more meat in
18   the machine because second shift got to come in.
19   Q.    So sometimes you stop working before
20   4:30?
21   A.    Uh-huh.
22   Q.    Was it your understanding you were
23   paid until 4:30, though?

39

1    A.    Yes, sir.
2    Q.    But am I correct on a normal day it
3    took you five or six minutes from the time you
4    could leave your workstation until you clocked out?
5    A.    Yes, sir.
6    Q.    What was your understanding as to how
7    the company kept track of your time in order to pay
8    you?
9    A.    I don't understand.
10   Q.    Was it your understanding you were
11   paid for an eight-hour day?
12   A.    Yes, sir.
13   Q.    What was your understanding of when
14   -- of how the company kept track of those eight
15   hours?
16   A.    I don't know.
17   Q.    You understood you were paid for --
18   A.    For eight hours.
19   Q.    For eight hours that started at 7:30
20   in the morning and ended at 4:30 in the afternoon?
21   A.    Yes, sir.
22   Q.    With two unpaid breaks in the middle,
23   correct?

40

1    A.    Yes, sir.
2    Q.    Did you ever hear the phrase line
3    time?
4    A.    No, sir.
5    Q.    What about Master Card?
6    A.    No, sir.
7    Q.    Did you ever complain to your
8    supervisor or to the payroll people that your check
9    was short?
10   A.    Yes, sir.
11   Q.    And what happened?
12   A.    He went and corrected it. But if he
13   couldn't correct it that day or whatever, he just
14   will just put it on our next check.
15   Q.    How many times did that happen?
16   A.    It would happen to me about two or
17   three times.
18   Q.    And was it always corrected?
19   A.    Yes, sir.
20   Q.    You were paid every week?
21   A.    Yes, sir.
22   Q.    And did you look at the payroll
23   information on the check stub?

41

1    A.    Yes, sir.
2    Q.    Did you keep track of the hours that
3    you spent in the plant while you were working
4    there?
5    A.    Yes, sir.
6    Q.    How did you do that?
7    A.    I just -- I just know how long I
8    stayed in there, and I just count up every day just
9    to make sure I have my right hours.
10   Q.    Did you keep any notes or notebook or
11   diary of those hours?
12   A.    No, sir.
13   Q.    Do you know anybody that did?
14   A.    No, sir.
15   Q.    Have you made any calculations as to
16   the amount of money you think you are owed in this
17   lawsuit?
18   A.    No, sir.
19   Q.    Were you ever asked to work overtime?
20   A.    Yes, sir.
21   Q.    How often did that happen?
22   A.    Not often. We will probably work
23   some Saturdays, and like if -- like if they need

29785888-d434-4638-bf91-039729d17610

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

42

1   some work caught up, they will ask you could you
2   stay for like 30 minutes or hour just to try to
3   catch the work up.
4       Q.   On those occasions when you did work
5   overtime, were you paid for that overtime work at
6   time-and-a-half?
7       A.   Yes, sir. But then was the time that
8   I had to go to my supervisor to tell him that my
9   check wasn't right.
10      Q.   And did your supervisor fix it for
11  you?
12      A.   Yes, sir.
13      Q.   Besides those few times where you
14  just told me that you complained to your supervisor
15  about the short in your paycheck, did you ever at
16  any other time complain to any supervisor about any
17  pay issues?
18      A.   No, sir.
19      Q.   During the time you were there, were
20  you ever written up for anything?
21      A.   No, sir.
22          MR. FRY: Thank you. That's all
23  I have.

43

1          THE DEPONENT: Okay.
2
3   EXAMINATION BY MR. STEENSLAND:
4       Q.   I think at one in point in time,
5   Ms. Person, in speaking with Mr. Fry, you referred
6   to shoes that you had to wear home, and at some
7   point you had to keep them there. Shoes, is that
8   boots that we are referring to?
9       A.   Yes, sir.
10      Q.   And at one point in time, you could
11  not take your boots home with you; is that right?
12      A.   No, we could take them home, but we
13  just couldn't walk outside in the boots.
14      Q.   Did that change at some point in
15  time?
16      A.   Yes, sir.
17      Q.   At some point in time you were able
18  to wear them home?
19      A.   Yes, sir.
20      Q.   The first thing you did before you
21  could begin putting on your equipment that you
22  listed, was that to sanitize your boots? Is that
23  what I heard you say?

44

1       A.   Yes, sir.
2       Q.   And before you swiped your card at
3   the end of the day, what was the last thing you
4   did?
5       A.   The last thing I did when I swiped my
6   card?
7       Q.   Before you swiped your card?
8       A.   I have to put my smock and my cotton
9   gloves in this little -- in a little buggy so they
10  can come and get them and wash them.
11      Q.   When you were on break, when the
12  break was over, did everybody have to be back at
13  the line at the same time?
14      A.   Yes, sir.
15      Q.   The chicken is running on this line,
16  right?
17      A.   Yes, sir.
18      Q.   And I think did you say you were at
19  the back of the line?
20      A.   Yes, sir.
21      Q.   Could you just wait until that
22  chicken got right before you on the line before you
23  got there?

45

1       A.   No, sir, you are not supposed to do
2   that.
3       Q.   What would happen if you waited --
4       A.   You'd get wrote up.
5          MR. FRY: Objection.
6       Q.   (Mr. Steensland) Did you have to be
7   back on the line at the same time the person on the
8   front of the line had to be there?
9       A.   Yes, sir.
10      Q.   I believe it was mentioned that not
11  everybody washed down before break. Do you recall
12  saying that?
13      A.   Yes, sir.
14      Q.   What would happen if you were caught
15  not washing down before break?
16          MR. FRY: Objection.
17      A.   You would get wrote up.
18      Q.   (Mr. Steensland) Your shift ended at
19  4:30; is that right?
20      A.   Yes, sir.
21      Q.   You said sometimes the chicken will
22  -- I guess the chicken on the line will finish
23  getting to you before 4:30?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

46

1    A.    Yes, sir.
2    Q.    And they don't make you just stand on
3  the line after that?
4    A.    No, sir.
5    Q.    What about were there ever occasions
6  where the chicken was still coming after 4:30?
7    A.    We have to sit there and wait until
8  it run out, because we wasn't
9  supposed to leave no chicken on the line when
10 second shift come in.
11   Q.    Were there any occasions, if you
12 remember, where the chicken was still coming and
13 still on the line after the 4:30 shift should have
14 ended?
15   A.    Yes, sir.
16   Q.    Were the boots part of the supplies,
17 I believe was it referred to, was that one of them?
18   A.    Yes, sir.
19        MR. STEENSLAND:  Nothing further.
20
21 EXAMINATION BY MR. FRY:
22   Q.    When you stayed on the line after
23 4:30, do you know whether you were paid for that

47

1  time?
2    A.    No, sir, we wasn't.
3    Q.    How do you know?
4    A.    Because I look at my check.
5    Q.    Were you ever asked to stay and work
6  overtime after 4:30?
7    A.    Yes, sir.
8    Q.    And when that occurred, did you get
9  paid for overtime?
10   A.    Yes, sir.
11   Q.    Do you know of anyone who was ever
12 written up for failure to get back to the DSI line
13 before the chickens got there?
14   A.    Yes, sir.
15   Q.    Do you know of anyone who was ever
16 written up for not washing down before break?
17   A.    Yes, sir.
18   Q.    How many people?
19   A.    A lot of them.
20   Q.    Are you sure?
21   A.    Yes, sir.
22   Q.    How do you know they were written
23 up?

48

1    A.    Because when they walked back to the
2  line, the supervisor, they will walk around and
3  make sure everybody in their spot.  And if they
4  apron and they sleeve gloves or they gloves do not
5  look like they been cleaned, you will know, because
6  they will tell them to get off the line and go wash
7  them.  And they will write them up.  If you see
8  them with they little pen and their paper, they
9  writing them up.
10   Q.    How do you know what they are
11 writing?
12   A.    I'm going to tell you the majority of
13 the people that you work with on the line, you-all
14 conversate, and they will tell you.
15        MR. FRY:  Thank you.
16        MR. STEENSLAND:  One last thing.
17
18 EXAMINATION BY MR. STEENSLAND:
19   Q.    At any point in time when you were
20 working on the line at DSI, were you asked or
21 instructed prior to beginning your shift to do some
22 type of stretching or exercises?
23   A.    Yes, sir, sometimes.

49

1    Q.    What were those exercises or
2  stretching?
3    A.    We will do this right here, or we
4  will do this right here, or we will like bend like
5  this right here.  That's about it.
6    Q.    Doing this right here.  Obviously, we
7  can't describe that on the record.  So is that some
8  type of bending over?
9    A.    Yes, bend over.
10   Q.    And raising your arms up?
11   A.    Raising arm up, raising arm out.
12   Q.    So various exercises?
13   A.    Yes, sir.
14   Q.    How did you know to do this?  Who
15 told you to do this?
16   A.    The supervisor or the line leader.
17   Q.    Were you doing this on your own by
18 yourself, or are other people participating?
19   A.    Other people participating.
20   Q.    What's your understanding of what
21 would happen if you didn't do it?
22   A.    No, sir.
23   Q.    What was your understanding of what

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

29785888-d434-4638-bf91-039729d17610

50

1  would happen if you chose not to do those exercises
2  while everybody else was?
3      A.   You will get wrote up.
4           MR. STEENSLAND:  Nothing further.
5
6  EXAMINATION BY MR. FRY:
7      Q.   When you did these exercises, where
8  were you?
9      A.   Inside the plant.
10     Q.   On the line?
11     A.   Yes, right there by the line.
12     Q.   Was everybody on the line?
13     A.   Yes.
14     Q.   Doing these exercises?
15     A.   Yes, sir.
16     Q.   And had the line started to move yet?
17     A.   No, sir.
18     Q.   But everybody was on the line, fully
19  dressed in their supplies?
20     A.   Yes, sir.
21     Q.   So the exercises occurred at or about
22  7:30?
23     A.   Yes, sir.

51

1           MR. FRY:  Thank you.
2
3  EXAMINATION BY MR. STEENSLAND:
4      Q.   Did sometimes the exercises start
5  before 7:30?
6      A.   Well, it depends.  If everybody be on
7  the line, it will start.
8      Q.   So if everybody was on the line
9  before 7:30, were there times when the exercises
10  started before 7:30?
11     A.   Yes, sir.
12          MR. STEENSLAND:  Nothing further.
13          MR. FRY:  Nothing further.
14          9:39 a.m.
15  ************************
16     FURTHER DEPONENT SAITH NOT
17
18
19
20
21
22
23

52

1                    CERTIFICATE
2
3  STATE OF ALABAMA
4  AT LARGE
5
6           I hereby certify that the above
7  and foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10  transcription and that the foregoing represents a
11  true and correct transcript of the testimony given
12  by said witness upon said deposition.
13          I further certify that I am
14  neither of counsel nor of kin to the parties to the
15  action, nor am I in anywise interested in the
16  result of said cause.
17
18
19
20
21
                    _____
22     Victoria M. Castillo, Certified Court Reporter
       ACCR# 17, Expires 9/30/2008
23     Commissioner and Notary Public

29785888-d434-4638-bf91-039729d17610

TAB 44

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


CASE NUMBER:  2:06-CV-01081-MEF-DRB

BETTY ANN BURKS, ET AL.,

        Plaintiffs,

        vs.

EQUITY GROUP, EUFAULA DIVISION, L.L.C.,

        Defendant.


S T I P U L A T I O N

        IT IS STIPULATED AND AGREED by and
between the parties through their respective
counsel, that the deposition of Joseph
Preston may be taken before Sara Mahler,
CCR, at the offices of Williams, Pothoff,
Williams & Smith, at 125 South Orange
Avenue, Eufaula, Alabama 36027, on the 12th
day of June, 2008.


DEPOSITION OF JOSEPH PRESTON

371ef939-b8db-4017-995b-f47fc7508720

**2**

1        IT IS FURTHER STIPULATED AND
2    AGREED that the signature to and the reading
3    of the deposition by the witness is not
4    waived, the deposition to have the same
5    force and effect as if full compliance had
6    been had with all laws and rules of Court
7    relating to the taking of depositions.
8        IT IS FURTHER STIPULATED AND
9    AGREED that it shall not be necessary for
10   any objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17       IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20
21       * * * * * * * * * * * * *
22
23

**3**

1        * * * * * * * * * * * * *
2              I N D E X
3            EXAMINATION
4                          PAGE
5    By Ms. McGowan ..................... 6
6
7        PLAINTIFF'S EXHIBITS
8                          PAGE
9    Exhibit 23 - Time edits ............ 10
10
11   (Exhibit Retained By Attorney)
12
13       * * * * * * * * * * * * *
14
15
16
17
18
19
20
21
22
23

**4**

1    IN THE UNITED STATES DISTRICT COURT
2      FOR THE MIDDLE DISTRICT OF ALABAMA
3            MONTGOMERY DIVISION
4
5    CASE NUMBER:  2:06-CV-01081-MEF-DRB
6
7    BETTY ANN BURKS, ET AL.,
8          Plaintiffs,
9          vs.
10   EQUITY GROUP EUFAULA DIVISION, L.L.C.,
11         Defendant.
12
13   BEFORE:
14       SARA MAHLER, Commissioner.
15
16   APPEARANCES:
17       CANDIS A. MCGOWAN, ESQUIRE, of
18   WIGGINS, CHILDS, QUINN & PANTAZIS, 301
19   Nineteenth Street North, Birmingham, Alabama
20   35203, appearing on behalf of the
21   Plaintiffs.
22
23

**5**

1    APPEARANCES:  (Cont.)
2        JACOB A. KISER, ESQUIRE, of
3    WIGGINS, CHILDS, QUINN & PANTAZIS, 301
4    Nineteenth Street North, Birmingham, Alabama
5    35203, appearing on behalf of the
6    Plaintiffs.
7        ROBERT J. CAMP, ESQUIRE, of THE
8    COCHRAN FIRM, 505 North 20th Street, Suite
9    825, Birmingham, Alabama 35203, appearing on
10   behalf of the Plaintiffs.
11       HOWARD A. ROSENTHAL, ESQUIRE, of
12   PELINO & LENTZ, 1650 Market Street,
13   Thirty-Second Floor, Philadelphia,
14   Pennsylvania 19103, appearing on behalf of
15   the Defendant.
16       * * * * * *
17       I, SARA MAHLER, CCR, a Court
18   Reporter of Wetumpka, Alabama, acting as
19   Commissioner, certify that on this date, as
20   provided by the Federal Rules of Civil
21   Procedure and the foregoing stipulation of
22   counsel, there came before me at the offices
23   of Williams, Pothoff, Williams & Smith, 125

FREEDOM COURT REPORTING

**6**

1  South Orange Avenue, Eufaula, Alabama 36027,
2  beginning at 4:45 p.m., Joseph Preston,
3  witness in the above cause, for oral
4  examination, whereupon the following
5  proceedings were had:
6       JOSEPH PRESTON,
7  Being first duly sworn, was examined and
8  testified as follows:
9       COURT REPORTER:  Usual
10 stipulations?
11      MS. MCGOWAN:  Yes.
12      MR. ROSENTHAL:  We'll reserve
13 reading and signing.
14      EXAMINATION
15 BY MS. MCGOWAN:
16      Q.   Would you state your name for
17 the Record, please.
18      A.   Full name?
19      Q.   Yes.
20      A.   Charles Joseph Preston.
21      Q.   Mr. Preston, where are you
22 employed?
23      A.   The Equity Group, Eufaula

**7**

1  Division.
2       Q.   In what position?
3       A.   Controller.
4       Q.   How long have you been
5  employed with Equity Group, Eufaula
6  Division, as controller?
7       A.   Since August '04.
8       Q.   My name is Candis McGowan.
9  I'm going to be taking your deposition this
10 afternoon and asking you a series of
11 questions.
12      Have you ever had your
13 deposition taken before today?
14      A.   Yes.
15      On other matters, you mean?
16      Q.   Yes.
17      A.   Yes.
18      Q.   Do you understand that you
19 need to give a verbal response so the court
20 reporter can make a Record?
21      A.   Yes.
22      Q.   And not shake your head yes or
23 no?

**8**

1       A.   Yes.
2       Q.   Can we have the agreement that
3  if you don't understand me, or my question,
4  you will ask me to repeat or rephrase the
5  question?
6       A.   I will.
7       Q.   Can we also have the agreement
8  that if you don't hear me, you will ask me
9  to repeat or rephrase the question?
10      A.   I will.
11      Q.   Can we further have an
12 agreement that if you don't ask me to
13 rephrase or repeat the question, that you
14 heard my question, you understand my
15 question, and you are giving me the best
16 possible answer to that question?
17      A.   Yes.
18      Q.   What did you do to prepare for
19 this deposition?
20      A.   I guess I don't understand the
21 question.
22      Q.   Did you do anything to prepare
23 for this deposition?

**9**

1       A.   Basically, my preparation is
2  the job that I do.  I have discussed with
3  our attorneys.
4       Q.   Did you review any
5  documents -- I don't need to discuss what
6  you did with your attorney.  That's why I
7  cut you off.
8       Have you discussed your
9  deposition with anyone other than the
10 attorneys?
11      A.   No.
12      Q.   Did you review any documents?
13      A.   These time edits I reviewed.
14      Q.   You reviewed those?
15      A.   Yes.
16      (Whereupon, Plaintiff's
17      Exhibit No. 23 was marked
18      for identification.)
19      Q.   And we've marked those as
20 Plaintiff's Exhibit --
21      MR. ROSENTHAL: 23.
22      Q.   -- 23.  Is that -- When you
23 say you reviewed these time edits, are these

FREEDOM COURT REPORTING

10

1  the time edits you reviewed (indicating)?
2      A.    Yes.
3      Q.    All right. And this is --
4  Tell me what these are, Plaintiff's Exhibit
5  23 to your deposition.
6      A.    This is department 6OE, breast
7  deboning, second shift. The top half
8  section of the front page is what we call
9  the master of the line time.
10      Q.    Okay. Backup just a second.
11  Where do you see the department number?
12      A.    Right where it says: Employee
13  6OE.
14      Q.    Okay. That's debone?
15      A.    Breast deboning, yes.
16      Q.    Does each department have a
17  number like 6OE.
18      A.    Yes.
19      Q.    So this is the master card
20  time?
21      A.    Correct. The top half.
22      Q.    Are these records that you
23  produced -- these thirteen pages, what does

11

1  this thirteen-page document reflect?
2      A.    The top half is the master
3  card line time; after that are the
4  individual employees that are in that
5  department for that week.
6      Q.    And this is for the week of?
7      A.    Let's see. June the 9th. It
8  would have been the prior week.
9      Q.    Okay.
10      A.    The first week of June.
11      Q.    So there's a stamp on it that
12  says: June 9th, 2008. Do you know who put
13  that received stamp on here?
14      A.    Well, the computer -- When we
15  execute these documents, that's the date
16  they were executed.
17      Q.    I'm talking about the
18  receipt --
19      A.    Okay. This is the accounting
20  stamp when it comes back to us approved.
21      Q.    Who is M. Smith?
22      A.    That's a supervisor in that
23  department.

12

1      Q.    Supervisor in debone?
2      A.    Yes.
3      Q.    What is the process of these
4  records?
5      A.    Okay. We have a time keeping
6  system that's called Kronos.
7      Q.    Yes.
8      A.    Our employees swipe their
9  badges when they come in, when they go out,
10  and that produces the records starting with
11  the bottom half with Jacqueline Cooper.
12          This is accumulated within our
13  system, and this is the one for the end of
14  the week. So this accumulates all
15  information, including the master card time,
16  and at the end of the week we -- We produce
17  these every day for the supervisor's review,
18  but this is the one we actually pay from
19  that they approve, that they approved that
20  these times are correct.
21      Q.    Who is they?
22      A.    Supervisors, M. Smith.
23      Q.    Okay. Other than what's the

13

1  Exhibits marked as 2- --- Exhibit 23, did you
2  review any other Kronos reports before -- to
3  decide which ones to bring to the
4  deposition?
5      A.    No.
6      Q.    Okay. Where did you get this
7  report?
8      A.    From one of my payroll clerks.
9      Q.    Did she give you more than
10  just this report?
11      A.    I said: I need a department,
12  deboning department, for our most current
13  week that would be indicative of a line time
14  department with the employees attached.
15      Q.    Okay. When you said
16  indicative, what do you mean by that?
17      A.    Representative. It didn't
18  matter which one it would be. She --
19      Q.    Who is she?
20      A.    Her name is Wakeela Glanton.
21      Q.    What's her title?
22      A.    Payroll clerk.
23      Q.    Why did you say debone?

371ef939-b8db-4017-995b-f47fc7508720

FREEDOM COURT REPORTING

14

1       A.      Howard asked me to get a
2   deboning department time record.
3       Q.      This department number, how
4   many of these are in debone?  How many
5   reports like Exhibit 23 do you get for the
6   debone department per week?
7       A.      I don't know.
8       Q.      Is there more than one?
9       A.      Oh, sure.  We have time
10  reports on fifteen hundred employees.
11      Q.      I know.  But is it done by a
12  department like this?
13      A.      Yes.
14      Q.      Okay.  So is there like three
15  or four printouts like Exhibit 23 for
16  debone --
17      A.      We have.
18      Q.      -- per week?
19      A.      We have eight debone lines,
20  and each of those have two shifts, so we
21  would have -- on this particular area of the
22  plant, we would have sixteen.
23      Q.      Does this Exhibit 23 represent

15

1   a shift -- a line and a shift in debone?
2       A.      Yes.
3       Q.      Okay.  Which shift, can you
4   tell?
5       A.      Two.
6       Q.      Second shift?
7       A.      Second.
8       Q.      And can you tell which line?
9       A.      No, I can't.
10      Q.      Is there a way for someone
11  else to tell which line it is?
12      A.      Sure.  Sure.
13      Q.      How would they tell?
14      A.      Well, I manage the payroll
15  department.  It comes under the controller's
16  office.  I have people that work with these
17  every day, and they can -- they are
18  obviously the ones that are directly
19  involved on a daily basis and know more
20  about -- this debone 1-2 means something,
21  but I can't say that it's line 1 and 2, or
22  it's line 1, and a sub -- the 2 is a sub off
23  of that.

16

1       Q.      Look up here at the top of the
2   page --
3       A.      That says line 5 up there.
4       Q.      Would that be a way to tell?
5       A.      Sounds good, yes.  I would say
6   that would be a better description.  That
7   would be 6OE second shift, debone line 5.
8       Q.      Now --
9       A.      Thank you.
10      Q.      The master card time at the
11  top, it appears that it's an automatic start
12  up time of 4:30?
13      A.      (Witness nods head in the
14  affirmative.)
15      Q.      Is that preset in the computer
16  or does the --
17      A.      No, it's not preset.  That is
18  the scheduled walk-on/walk-off time for --
19  for first to second shift.  So first shift
20  always walks off at 4:30 and second shift
21  walks on.  That -- And the reason it's not
22  preset is because that can change.  So if we
23  change the production schedule for some

17

1   reason, that could change.
2       Q.      Okay.  Look at the master card
3   at the top that's for this week of June 2nd
4   through June 6th.  There are no in punch
5   times except on the first day at 4:30.
6       A.      Right.
7       Q.      So is that just the scheduled
8   time every day for 4:30 for this week?
9       A.      It is 4:30 every day.
10              When I asked for these records
11  today and I looked at that and I said, why
12  is it only there once, okay?  We went
13  back -- We had an upgrade in the Kronos
14  program at the end of March.  And before the
15  upgrade, it showed up every day, 4:30, but
16  now it shows up once.
17      Q.      Is the supervisor actually
18  clocking in at 4:30 every day?
19      A.      No.  This is a set time every
20  day.
21      Q.      In the computer?
22      A.      No.  This is a set time every
23  day that my department -- my payroll

FREEDOM COURT REPORTING

18

1    department keys in every day provided that
2    is still the start time.
3        Q.    So the supervisor doesn't have
4    to clock in at the beginning of the shift?
5        A.    That's right.
6        Q.    All right. So it's a set
7    time --
8        A.    Yes.
9        Q.    -- to start the shift. Is
10   that in every department on the production
11   line in debone?
12       A.    Yes.
13       Q.    How about evisc, is that in --
14   the start time every -- a set time in every
15   department?
16       A.    I'm not sure.
17       Q.    What about live hang, that
18   area?
19       A.    In the morning, there's a set
20   start time for live hang and evisc, okay?
21   similar to this being the 4:30 for debone,
22   okay?
23       I'm not sure if at the end of

19

1    that shift it's a walk-on/walk-off like
2    deboning is or not.
3        Q.    Any other departments that are
4    production workers that have a set time? We
5    talked about live hang, evisc, debone. Am I
6    missing a department?
7        A.    Well, we have a lot of other
8    departments, okay, and I can't list those
9    for you through --
10       Q.    Do you know --
11       A.    -- memory. Each one can be --
12   I mean, they can be the same as each other,
13   they can be different, depending on our
14   production.
15       Q.    But do you know any other
16   department in which production hourly
17   employees work that do not have a set start
18   time to begin -- start the shift?
19       A.    That do not have a set start
20   time?
21       Q.    Yes.
22       A.    I can't say that I do.
23       Q.    Do you know any employees that

20

1    are paid on a clock-in/clock-out of their
2    personal clock time?
3        A.    We have employees like that.
4    I can't name any for you.
5        Q.    Do you know the job positions?
6        A.    No.
7        Q.    Who would know that?
8        A.    That information is within --
9    If I were in my office and somebody asked me
10   that question, I could go find out. But I
11   can't do that from here.
12       Q.    What would you do to find out?
13       A.    Ask.
14       Q.    Who would you ask?
15       A.    I'd start with my payroll
16   manager.
17       Q.    And that is?
18       A.    Shauna Bouterse.
19       Q.    Spell that for the Record.
20       A.    B-O-U-T-E-R-S-E.
21       Q.    And Shauna, can you spell that
22   for the court reporter?
23       A.    S-H-A-U-N-A.

21

1        Q.    Is it a fair statement that
2    the majority of the employees on the
3    production line, the hourly employees, are
4    paid from a preset start time, and then the
5    master card clock-out time?
6        A.    More than -- The majority of
7    the entire complex or the fresh plant?
8        Q.    Fresh plant.
9        A.    Okay. I don't think I could
10   say.
11       Q.    Who could say?
12       A.    I could, if I had -- if I had
13   the --
14       MR. ROSENTHAL: The question
15   was who could say?
16       THE WITNESS: Who could say?
17       A.    I don't know.
18       Q.    You don't know who would know?
19       A.    No.
20       Q.    Could you research it to find
21   out?
22       A.    Yes.
23       Q.    What would you have to do to

FREEDOM COURT REPORTING

22

1  research?
2      A.   Just know the question.
3      Q.   I mean to know which --
4  whether the majority of the employees are
5  paid in the fresh plant on a preset time to
6  master card clock out?
7      A.   Go to -- Go through the -- I
8  mean, we have so many employees and so many
9  managers and clerks and so on and so forth
10  that I know who to start with, and I
11  don't -- I would go to individuals and to
12  records until I was able to get to the
13  answer.
14      Q.   Has anyone -- Let me show you
15  what was marked as Plaintiff's Exhibit
16  Number 21. Have you seen this document
17  before today?
18      A.   No.
19          Oh, excuse me.
20          THE WITNESS:  Can I ask you a
21  question?
22          MR. ROSENTHAL:  Let's step
23  outside.

23

1          MS. MCGOWAN:  There's a
2  question on the table.
3          MR. ROSENTHAL:  I think it has
4  to do with whether there's a privilege that
5  can be asserted.
6      A.   I need to ask him a question
7  about this document.
8      Q.   Okay. But my question is have
9  you seen this document before today? That's
10  my question. That's a yes or no. I don't
11  think there's a privilege involved in that.
12          MR. ROSENTHAL:  We're stepping
13  outside.
14          MS. MCGOWAN:  Let the Record
15  reflect that there's a question on the
16  floor, and I think it's proper that I get a
17  yes or no before you go talk about
18  privilege. I didn't ask anything about a
19  privilege; all I've asked is have you seen
20  it. There's no privilege on the floor.
21          (Recess taken.)
22          MR. ROSENTHAL:  Can you read
23  the question back?

24

1          (Requested portion of the
2          Record was read by the
3          Reporter.)
4      A.   I don't recall seeing this
5  document.
6      Q.   You don't recall it.
7      A.   (Witness shakes head in the
8  negative.)
9      Q.   You don't recall it? Were you
10  informed that you were being put up as the
11  corporate representative on certain areas of
12  testimony?
13      A.   Could you repeat that, please?
14      Q.   Are you aware that you are
15  here today testifying as the representative
16  of Equity Foods for certain areas of
17  testimony?
18      A.   Yes.
19      Q.   And were you informed that you
20  would be knowledgeable about these areas of
21  testimony?
22      A.   Yes.
23      Q.   All right. Let's look at

25

1  Exhibit 21. And you are being listed here
2  as knowledgeable about subject two.
3          MR. ROSENTHAL:  Objection to
4  the form of the question since it's limited
5  to particular parts of question two. Area
6  two.
7      Q.   Look at area two. It says:
8  That you are being designated as a
9  representative that is knowledgeable about
10  these areas as it relates to maintenance of
11  records. Do you see area two?
12      A.   Yes.
13      Q.   Do you have any information or
14  knowledge about the maintenance of records
15  on Equity's policies and practices regarding
16  the maintenance of records of hours worked
17  and wages paid for nonexempt workers at the
18  chicken processing plant, including the
19  positions of persons involved in formulating
20  the policies; what training, if any, is
21  provided to inform employees and supervisors
22  of these policies; and what measures, if
23  any, are taken to ensure compliance to these

FREEDOM COURT REPORTING

26

1    policies.
2            So you're being designated on
3    the maintenance of records.
4        A.    Okay.
5        Q.    All right.  How are the --
6    What is your understanding of how the
7    records are maintained on the hours worked
8    and wages paid, for nonexempt employees?  Is
9    there a written policy on how long records
10   are maintained?
11       A.    Yes.
12       Q.    What is that policy called?
13       A.    Seven years.
14       Q.    And where are these records
15   maintained?
16       A.    In a storage building on
17   the -- at the complex location.
18       Q.    And when you say complex
19   location, what do you mean by that?
20       A.    At our address, at 57 Melvin
21   Clark Road, Bakerhill.
22       Q.    Do you mean the complex that's
23   the fresh plant and the further processing

27

1    plant?
2        A.    Yes.
3        Q.    Is there anything else in the
4    complex at that location?
5        A.    Yes.
6        Q.    What else?
7        A.    We have -- We have a waste
8    water and laboratory buildings.  We have a
9    live haul manager's building, employment
10   office, an HR building, and I believe that's
11   it.
12       Q.    Okay.  Are the records of the
13   hours worked and wages paid for the
14   nonexempt workers in the production plant,
15   either the further processing or the fresh
16   plant, are those maintained separately from
17   the other workers' records?
18       A.    No.
19       Q.    All right.  How are they all
20   maintained?
21       A.    They're maintained by week and
22   by month.
23       Q.    For all employees of the

28

1    plant?
2        A.    Yes.
3        Q.    In what form are they
4    maintained?
5        A.    The form in Exhibit 23.
6        Q.    This is a weekly report?
7        A.    Yes.
8        Q.    23 is?  Is there a monthly
9    report done such as 23?
10       A.    No.
11       Q.    When you say maintained by
12   month, do you take all the reports from a
13   week and put them in some kind of monthly
14   document or a folder or what do you mean by
15   that?
16       A.    In a folder.
17       Q.    Okay.  Are these folders
18   labeled?
19       A.    Yes.
20       Q.    So if I wanted to go into the
21   storage room, I could pull a folder that
22   says the week of August 5, 2007?
23       A.    Yes.

29

1        Q.    If that was -- Is it beginning
2    date or ending date for the week?
3        A.    I'm not sure.
4        Q.    Okay.  And that folder would
5    have these records, such as Exhibit 23, for
6    every job position that uses the Kronos time
7    at the plant or would it be for every
8    employee?
9        A.    Every employee.
10       Q.    Is every employee on the
11   Kronos system?
12       A.    No.
13       Q.    What employees are on the
14   Kronos system?
15       A.    I can't -- I couldn't answer
16   that.
17       Q.    Who could answer that?
18       A.    Someone in my department.
19       Q.    Are there any production
20   workers on the production line, the hourly
21   workers, that are not on the Kronos system?
22       A.    Not to my knowledge.
23       Q.    What other type reports would

371ef939-b8db-4017-995b-f47fc7508720

FREEDOM COURT REPORTING

30

1    be in that week ending, other than a Kronos
2    report like this, in that weekly folder --
3    or monthly folder, I think is what you said?
4        A.    If they're not on the Kronos
5    system, it would be another form of
6    documentation to represent the time they
7    worked that week.
8        Q.    What kind of documentation?
9        A.    A time sheet of some sort.
10       Q.    Would these be manually done?
11       A.    Could be, yes.
12       Q.    Is there another payroll
13   system you use?
14       A.    No.
15       Q.    Does debone department on
16   second shift normally work overtime?
17            MR. ROSENTHAL:  Objection to
18   the form of the question.  You can answer.
19       Q.    You can answer.
20       A.    Restate the question, please.
21       Q.    Does the debone department on
22   second shift normally work overtime?
23       A.    I don't know.

31

1        Q.    Okay.  Who would know?
2        A.    Someone in my department.
3        Q.    Do you review the time reports
4    to see which departments are working a lot
5    of overtime?
6        A.    No.
7        Q.    Who does that?
8        A.    Someone in my department.
9        Q.    Does anybody report to you
10   what departments are working overtime?
11       A.    Yes.
12       Q.    What person reports that to
13   you?
14       A.    It could be anyone in my
15   payroll department.
16       Q.    Is there, like, a weekly
17   meeting or monthly meeting where you discuss
18   what departments are working overtime with
19   the people in your department?
20       A.    No.
21       Q.    Is there a staff meeting where
22   they make these reports to you?
23       A.    No.

32

1        Q.    Why would they be telling you
2    that a department is working overtime?
3        A.    It's a report that I requested
4    to be assembled and e-mailed to me weekly.
5        Q.    When did you make this
6    request?
7        A.    I don't know.
8        Q.    Has it been -- this request
9    been in effect for more than a year?
10       A.    Yes.
11       Q.    Two years?
12       A.    Yes.
13       Q.    Three years?
14       A.    Yes.
15       Q.    Four years?
16       A.    No.  I haven't been there four
17   years.
18       Q.    When you came on, did you make
19   this request?
20       A.    Yes.
21       Q.    So you get a weekly report
22   e-mailed to you on what departments are
23   working overtime?

33

1        A.    Yes.
2        Q.    In reviewing these weekly
3    reports that are sent to you, is second
4    shift debone one of the departments that
5    usually has overtime?
6        A.    I don't know.
7        Q.    What departments -- Are there
8    any departments that usually have overtime?
9        A.    I can't answer without a
10   report in front of me.
11       Q.    So you're telling me that you
12   look at these reports every week, and
13   there's not one department that usually
14   triggers overtime, that comes up with having
15   overtime a lot more than other departments?
16       A.    No.
17       Q.    Do you recall any department
18   that usually has overtime?
19       A.    No.
20       Q.    What day of the week do you
21   get these reports e-mailed to you?
22       A.    Wednesday.
23       Q.    And today is Thursday;

FREEDOM COURT REPORTING

34

1  correct?
2       A.    (Witness nods head in the
3  affirmative.)
4       Q.    Did you review a report
5  yesterday?
6       A.    No.
7       Q.    Have you reviewed a report
8  today?
9       A.    No.
10      Q.    When do you review the reports
11 that are e-mailed to you on Wednesday?
12      A.    Tuesday.
13      Q.    You review them Tuesday?  The
14 following Tuesday?
15      A.    Yes.
16      Q.    You have them almost a week
17 before you review them?
18      A.    Yes.
19      Q.    All right.  On Tuesday of this
20 week, which was two days ago, did you review
21 a report?
22      A.    Yes.
23      Q.    Do you recall which

35

1  departments had overtime?
2       A.    No.
3       Q.    How many departments are in
4  this report?
5       A.    Several.
6       Q.    How many?
7       A.    I can't say.
8       Q.    How are they broken down?  By
9  departments?
10      A.    By name and number.
11      Q.    Is this the whole complex?
12      A.    Yes.
13      Q.    Do you recall any department
14 in the fresh plant that had overtime?
15      A.    No.
16      Q.    Let's back up a little bit.
17 What is your educational background?
18      A.    Bachelor's degree in
19 accounting.
20      Q.    From where?
21      A.    University of Kentucky.
22      Q.    When did you receive your
23 bachelor's degree in accounting?

36

1       A.    1969.
2       Q.    Do you have your CPA?
3       A.    No.
4       Q.    Do you have any certification?
5       A.    No.
6       Q.    What are your duties or
7  responsibilities as comptroller?
8       A.    The same duties that go with
9  any comptroller's job.
10      Q.    What are those duties?
11      A.    To oversee the accounting.
12      Q.    Would it be an accurate
13 statement to say that you're pretty good
14 with numbers?
15      A.    Yes.
16      Q.    But you can't recall any
17 department that you looked at two days ago
18 that had overtime?
19      A.    No.
20      Q.    And what do you use this
21 information in overtime for?
22      A.    As a trend.
23      Q.    What kind of trend?

37

1       A.    A overtime trend, graph.
2       Q.    Who prepares the overtime
3  trend, graph?
4       A.    I do.
5       Q.    When was the last graph that
6  you prepared?
7       A.    Monday.
8       Q.    And how is the graph done?  Is
9  it reflected by department, or what does it
10 reflect?
11      A.    No.  It's the total.
12      Q.    For the whole plant?
13      A.    Yes.  For the whole complex.
14      Q.    Whole complex.  And what is
15 the trend on the graph that you prepared
16 Monday?
17      A.    I don't know how to answer
18 that question.
19      Q.    What does the graph reflect?
20      A.    I'm sorry, what was that
21 question?
22      Q.    What does the graph reflect?
23      A.    It reflects the actual

FREEDOM COURT REPORTING

38

1   overtime by week of the total complex.
2        Q.    By week?
3        A.    (Witness nods head in the
4   affirmative.)
5        Q.    For what period of time?
6        A.    The graph is for one year.
7        Q.    The graph you prepared Monday,
8   what period of time was it?
9        A.    It would have been the current
10  year to date.
11       Q.    And what does the trend show
12  for the current year to date?
13       A.    It shows the weekly pattern of
14  the actual overtime.
15       Q.    And what was the -- What is
16  the weekly pattern in the graph you drew
17  Monday?
18       A.    There's not -- There's not
19  a -- There's not a trend.
20       Q.    What do you mean there's not a
21  trend?
22       A.    This graph are points in time
23  that show what each week standing by itself,

39

1   connected, dots connected by a line that
2   shows the actual overtime for each week.
3        Q.    Does it show in hours or
4   dollars?
5        A.    Percent.
6        Q.    Percent of what?
7        A.    Percent overtime hours to
8   total hours -- to regular hours, excuse me.
9        Q.    Percent of overtime hours to
10  regular hours?
11       A.    Yes.
12       Q.    What do you mean by regular
13  hours?
14       A.    Regular hours would be those
15  not subject -- straight time hours.
16       Q.    Forty hours?
17       A.    Yes.  If that's what it is.
18       Q.    Does it vary from job to job
19  what the regular hours would be?
20       A.    Yes.
21       Q.    How is that reflected in your
22  graph?
23       A.    It's not.

40

1        Q.    What do you do with this
2   graph?
3        A.    It's for management review.
4        Q.    What management?
5        A.    Staff, senior staff.
6        Q.    What senior staff?
7        A.    What is senior staff?
8        Q.    Correct.
9        A.    The individuals that report to
10  the general manager.
11       Q.    Give me the job titles of
12  these individuals.
13       A.    Controller, purchasing
14  manager, HR manager, operations manager, IT
15  manager, and administrative assistant.
16       Q.    What administrative assistant?
17       A.    The general manager's
18  administrative assistant.
19       Q.    Who's the general manager?
20       A.    Tim Esslinger.
21             Also present would be the two
22  plant managers and the complex maintenance
23  manager.

41

1        Q.    The what?
2        A.    The complex maintenance
3   manager.
4        Q.    All right.  And you said these
5   graphs are given and used by the management
6   team?
7        A.    It's a report that I do, yes,
8   weekly.
9        Q.    Do you have a meeting to
10  discuss them weekly?
11       A.    No.
12       Q.    Do you just send it out to
13  them?
14       A.    The normal weekly staff
15  meeting.
16       Q.    Right.  So they're discussed
17  in the normal weekly staff meeting?
18       A.    Yes.
19       Q.    Why do you want to know what
20  the overtime trend is?
21       A.    It's a -- It's a reporting
22  factor that most businesses look at on some
23  routine basis.

371ef939-b8db-4017-995b-f47fc7508720

42

1    Q.    Why?
2    A.    Why?
3    Q.    Yes.
4    A.    We want to know.
5    Q.    Why do you want to know?
6    A.    It's a measurement of some of
7  our costs.
8    Q.    And why are you measuring
9  these costs?
10    A.    Why do we measure our costs?
11    Q.    Of overtime, yes.
12    A.    It's just one of the factors
13  we look at -- we look at.
14    Q.    What other factors do you look
15  at?
16    A.    Anything to do with
17  performance or costs that happens to be
18  normal in our business.
19    Q.    What do you mean by normal?
20    A.    It's not different from any
21  other business, just costs and --
22  performance factors and costs.  Just like
23  any business.

43

1    Q.    What do you mean by a factor
2  that's normal in your business?  What
3  factors are normal in your business?
4    A.    Income, expense, and profit.
5    Q.    Are you looking at the
6  overtime as to how it affects your profit?
7    A.    We're looking at it as a -- as
8  one of the measurements, one of the factors
9  that affects our business.
10    Q.    What other factors affect the
11  business?
12    A.    Anything to do with cost or
13  performance.
14    Q.    Have you brought any of these
15  graphs that reflect -- Let me back up.
16    Are there specific e-mails for
17  the overtime -- or in the e-mail you get, or
18  the report, are the reports broken down by
19  departments within the fresh plant, showing
20  the overtime by department?
21    A.    Yes.
22    Q.    Is it detailed by employee?
23    A.    No.

44

1    Q.    Does it just show the hours
2  per department?
3    A.    No.
4    Q.    What does it show?
5    A.    The hours and the dollars
6  related to those hours.
7    Q.    Have you produced any of those
8  to the attorneys in this case, these reports
9  showing the hours?
10    A.    No.
11    Q.    Have you been asked by anyone
12  to go through and produce any records in
13  this case?
14    MR. ROSENTHAL:  You can answer
15  the question as to whether or not you've
16  been asked to produce records, yes or no.
17    A.    Yes.
18    Q.    Have you produced any records
19  in this case?
20    A.    Yes.
21    Q.    What records have you
22  produced?
23    A.    I can't answer that with a yes

45

1  or no.
2    Q.    It's not a yes or no question.
3  What records have you produced?
4    A.    Earnings records.
5    Q.    When you say earnings records,
6  what kind of earnings records, earnings of
7  whom?
8    A.    For the individuals that have
9  been provided to me to provide the
10  information for.
11    Q.    Is this like copies of their
12  pay stubs, or their total yearly earnings
13  like W-2s, or what kind of documents?
14    A.    W-2s and earning statements.
15    Q.    Do these earning statements
16  show their actual clock-in and clock-out
17  times?
18    A.    No.
19    Q.    What records show employees
20  actual clock-in and clock-out times?
21    A.    Exhibit 23.
22    Q.    The Kronos reports?
23    A.    Yes.

371ef939-b8db-4017-995b-f47fc7508720

FREEDOM COURT REPORTING

46

1    Q.    Have you produced any Kronos
2  reports, other than Exhibit 23?
3    A.    No.
4    Q.    Have you been asked to gather
5  up and put together the Kronos reports so
6  they could be produced?
7    A.    No.
8    Q.    Where are the Kronos reports?
9    A.    In the storage buildings at 57
10 Melvin Clark Road.
11   Q.    When did you first become
12 aware that we wanted to see the Kronos
13 reports in this case?
14   A.    I'm not sure.
15   Q.    Okay.  Has it been a while or
16 just recently?
17   A.    Yes, it's been a while.
18   Q.    Now, this Exhibit 23, you said
19 this is the weekly reports.  Are there daily
20 reports?
21   A.    Yes.
22   Q.    Okay.  Tell me -- Describe
23 these daily reports.

47

1    A.    They're just like the
2  weeklies.
3    Q.    They look just like this?
4    A.    Except it would have one day
5  on there, or two days or three days.
6    Q.    Let's start with the daily
7  report.  What's the process?
8    A.    The same as the weekly.
9  They're sent to the supervisors for their
10 review and approval.
11   Q.    Who sends it?
12   A.    My department, my payroll
13 department.
14   Q.    What does the supervisor do
15 when they get the report?
16   A.    They review it, make notes,
17 sign off, send it back.
18   Q.    And what does your department
19 do when they get it back?
20   A.    Go through it and make the
21 corrections that the supervisors have
22 indicated.
23   Q.    Where do they make the

48

1  corrections?
2    A.    On the document.
3    Q.    Does anybody make the
4  corrections in the computer system?
5    A.    Yes.
6    Q.    Who does that?
7    A.    My payroll department.
8    Q.    Can supervisors make
9  corrections in the computer system?
10   A.    Yes.
11   Q.    Do they normally do that?
12   A.    Yes.
13   Q.    Who's ultimately responsible
14 for making the corrections in the computer
15 system?
16   A.    My payroll department.
17   Q.    Can the supervisors change the
18 start time for the department in the
19 computer system?
20   A.    No.
21   Q.    Who can do that?
22   A.    My payroll department.
23   Q.    What time of day do the

49

1  supervisors get these daily times?
2    A.    Different times.
3    Q.    When you say different times,
4  how does it vary?
5    A.    It's based on the work hours
6  and the shift times and when they're
7  finished.
8    Q.    Is there a certain amount of
9  time when those shifts start that you try to
10 get the daily reports to them?
11   A.    Yes.
12   Q.    Tell me what that is.
13   A.    I don't know.
14   Q.    Who would know that?
15   A.    My payroll department.
16   Q.    When you say your payroll
17 department, is there a certain person or job
18 title?
19   A.    No.  I have three people in
20 the payroll department, so it could be any
21 of the three.
22   Q.    Who are the three people?
23   A.    Shauna Bouterse, Wakeela

FREEDOM COURT REPORTING

50

1  Glanton, Denise Webster.
2      Q.   Spell Wakeela.
3      A.   W-A-K-E-E-L-A.
4      Q.   What was her last name,
5  Blanton?
6      A.   Glanton.
7      Q.   G-L --
8      A.   -- A-N-T-O-N.
9      Q.   And the third person?
10     A.   Denise Webster.
11     Q.   Do they -- What are their
12 titles?  What's Shauna's title?
13     A.   Payroll manager.
14     Q.   What's Wakeela's title?
15     A.   Payroll clerk.
16     Q.   And what's Denise's title?
17     A.   Payroll clerk.
18     Q.   How many employees report
19 directly to you?
20     A.   Fifteen.
21          That's wrong.  Four.
22     Q.   Four employees report directly
23 to you?

51

1      A.   Yes.
2      Q.   What -- Does Shauna report
3  directly to you?
4      A.   Yes.
5      Q.   Does Wakeela report directly
6  to you?
7      A.   Shauna.
8      Q.   Other than Shauna, what
9  employees report directly to you?
10     A.   Their names?
11     Q.   Yes.  And title.
12     A.   John Fulford, live accounting
13 manager.
14     Q.   What accounting manager?
15     A.   Live
16     MR. ROSENTHAL:  Can you spell
17 his last name.
18     A.   F-U-L-F-O-R-D.
19          Dawn Cortner, fresh plant
20 accounting manager; Jeff Champion, further
21 plant accounting manager.
22     MR. KISER:  What was that last
23 name?

52

1      THE WITNESS:  Champion.
2      MR. KISER:  First name?
3      THE WITNESS:  Jeff.
4      Q.   When you say live accounting
5  manager what does that mean?
6      A.   That's the portion of our
7  business that deals with the live chickens.
8      Q.   Going back to the daily
9  reports that the supervisors get, I asked
10 you if there was a set time that you tried
11 to get them -- like a certain amount of time
12 after the shift stopped.  Do you know what
13 that is?
14     A.   No.
15     Q.   Is that written -- Is that a
16 written policy?
17     A.   No.
18     Q.   Do you know who established
19 the policy?
20     A.   It's not a policy.
21     Q.   Who established the practice?
22     A.   It's a procedure.  Established
23 by my payroll department.

53

1      Q.   Okay.  Was that -- You went to
2  work for Equity in '04?
3      A.   Uh-huh.
4      Q.   Was that procedure in effect
5  when you came in to work at Equity?
6      A.   There was a procedure in
7  place, yes.
8      Q.   Have you changed the procedure
9  since you've been there?
10     A.   I haven't, no.
11     Q.   Okay.  Has your payroll
12 department changed the procedure?
13     A.   Yes.
14     Q.   Okay.  How did it change?
15     A.   It changed based on shift --
16 the start -- the stop times and when they
17 can be made available to the supervisors.
18     Q.   How long does it take your
19 payroll department to get these reports
20 printed and done to make available for
21 payroll?
22     A.   I don't know.
23     Q.   Is it -- Do they get the

FREEDOM COURT REPORTING

54

1    report from the day before, or do they get
2    them during the shift?
3        A.    At the end of the shift.
4        Q.    All right.  Are the employees
5    still on the line when they get their
6    reports?
7        A.    No.
8        Q.    Do the supervisors stay longer
9    than the employees on the line?
10       A.    I don't know.
11       Q.    Do they have to stay and
12   complete these reports before they can
13   leave?
14       A.    No.
15       Q.    Or how does that process work?
16       A.    They have to have them
17   completed and back to my department by a
18   certain time so that we can enter that day's
19   corrections and at the end of the week
20   compile the payroll for the total week.
21       Q.    And what is that certain time
22   that they have to have them completed and
23   back to your department?

55

1        A.    I don't know.
2        Q.    If you don't know the actual
3    time, what is the procedure?  Is it the same
4    day?  Is it the next day, or is it three
5    weeks, or when is it?
6        A.    It's monitored by my payroll
7    department.
8        Q.    Do you know whether it's the
9    same day?
10       A.    It's every day.
11       Q.    Are they done on the same day
12   that the time's entered?  Are they given the
13   report at the end of the shift, and they
14   turn them back in the same day -- the next
15   day?
16       A.    It could be either.
17       Q.    How do you determine which one
18   it is?
19       A.    My department keeps up with
20   when they're turned in and if they meet the
21   deadlines that have been set.  That's part
22   of their job.
23       Q.    Part of whose job?

56

1        A.    My payroll department.
2        Q.    What deadlines are you talking
3    about that have been set?
4        A.    In order for us to enter the
5    corrections, we have to have them by a
6    certain time.
7        Q.    And do you know what that
8    certain time is?
9        A.    No.
10       Q.    Who would know?
11       A.    My payroll department.
12       Q.    What hours does your payroll
13   department work?
14       A.    Eight to five.
15       Q.    Would these deadlines be
16   within eight to five?
17       A.    Yes.
18       Q.    If you were on first shift
19   debone, line 5, do you know what the
20   deadline would be to turn back in your
21   corrections to the payroll report?
22       A.    No.
23       Q.    Who would know that?

57

1        A.    My payroll department.
2        Q.    Do you know what time second
3    shift runs for production?
4        MR. ROSENTHAL:  Which
5    department?
6        MS. MCGOWAN:  Any
7    department --
8        Q.    From the whole -- Do you know
9    what time any department on second shift
10   runs?
11       A.    I know that second shift
12   deboning starts at 4:30 as evidenced by this
13   document.
14       Q.    4:30 p.m.  Do you know what
15   time it gets off?
16       A.    No.
17       Q.    Do you know whether any of the
18   second shift departments start after your
19   payroll department leaves work for the day?
20       A.    No.
21       Q.    You don't know?
22       A.    (Witness shakes head in the
23   negative.)

FREEDOM COURT REPORTING

58

1    Q.    You know they don't or you
2  don't know?
3    A.    Repeat the question.
4    Q.    Do you know if any department
5  starts after five o'clock, after your
6  payroll department leaves at five?
7    A.    No.
8    Q.    You don't know?
9    A.    (Witness shakes head in the
10 negative.)
11   Q.    You have to be verbal.
12   A.    No.
13   Q.    How -- Do you know when the
14 debone department that starts at 4:30 gets
15 their report from your payroll department,
16 their daily report to add in?
17   A.    At the end of the shift.
18   Q.    Is there somebody in your
19 department to give it to them?
20   A.    It's set up in the computer to
21 send an e-mail at a certain time when the
22 shift is over.
23   Q.    So your payroll department

59

1  doesn't actually print these out and hand
2  them in -- hand them to the second shift
3  supervisors?
4    A.    No.
5    Q.    Do they print them out and
6  hand them to the first shift supervisors?
7    A.    No.
8    Q.    So all of the supervisors go
9  into the computer and print these
10 themselves?
11   A.    Yes.
12   Q.    Do they receive an e-mail with
13 this information?
14   A.    Yes.
15   Q.    Does that e-mail tell them
16 when they have to get back?
17   A.    No.
18   Q.    How do they know when they're
19 due back?
20   A.    There is a procedure set down
21 in writing that has been distributed to the
22 supervisors.
23   Q.    That tells them when they must

60

1  be returned?
2    A.    Yes.
3    Q.    Where is this procedure
4  located?
5    A.    It's in an e-mail.
6    Q.    From whom?
7    A.    Payroll manager.
8    Q.    Shauna?
9    A.    Yes.
10   Q.    And do you know what it says?
11   A.    No.  Not without having it in
12 front of me.
13   Q.    Do you know the general
14 process?
15   A.    Yes.  The general process is
16 to tell them what time the time sheets are
17 due back.
18   Q.    Do you have a general
19 understanding of what time of day that is?
20   A.    I have a general understanding
21 that we have a procedure that says what time
22 they must be turned back in.
23   Q.    Is that like they have to be

61

1  in by noon, or they have to be in thirty
2  minutes before your shift starts, or do you
3  know what the general understanding?
4    A.    No, I don't know specifically.
5  I know the general understanding.
6    Q.    All right.  Tell me what you
7  know the general understanding to mean.
8    A.    That there is a time -- There
9  is a deadline for them to be turned back in.
10   Q.    What happens if it's not
11 turned back in by the deadline?
12   A.    We -- They, my payroll
13 department, makes contact with the
14 supervisors.
15   Q.    How do they make contact?
16   A.    E-mail, radio, or telephone.
17   Q.    When you say they get e-mails,
18 are there computer terminals set up out in
19 the --
20   A.    Yes.
21   Q.    -- production line?
22   A.    No.
23   Q.    Where are the computer

FREEDOM COURT REPORTING

62

1  terminals?
2      A.    Offices at the production
3  plant.
4      Q.    Does each supervisor have an
5  office?
6      A.    No.
7      Q.    How do the supervisors --
8  where -- What computers do the supervisors
9  use to get these e-mails?
10     A.    I don't know.
11     Q.    If a supervisor doesn't submit
12 an edited report, is it assumed correct and
13 accepted?
14     A.    No.
15     Q.    Do the supervisors e-mail back
16 the changes or do they actually,
17 physically --
18     A.    Physically.
19     Q.    -- send them in writing and
20 turn them in?
21     A.    Yes.
22     Q.    How are they returned?
23     A.    They're physically handed back

63

1  in.
2      Q.    Where do they hand them back
3  in?
4      A.    In the accounting office
5  payroll department.
6      Q.    Is there one person that's
7  responsible for receiving these?
8      A.    Three people.
9      Q.    They can hand them to any of
10 them?
11     A.    Yes.
12     Q.    Is there like an inbox they go
13 in?
14     A.    Yes.  We also have an inbox.
15     Q.    And where's that located?
16     A.    In the administrative break
17 room.
18     Q.    Where's administrative break
19 room?
20     A.    Physically?
21     Q.    Yes.
22     A.    In the same building with the
23 accounting department.

64

1      Q.    Where's the accounting
2  department located?  Which building?
3      A.    The -- I don't know how to
4  describe it.
5      Q.    Why don't you look at a map.
6  Let me show you what we've marked previously
7  as Exhibit 22.
8      A.    Okay.  Here (indicating).
9      Q.    And you're looking at the
10 further processing building?
11     A.    This is the further processing
12 building (indicating).  This is the
13 accounting office right here (indicating).
14     Q.    Who all is located in the
15 accounting office besides the payroll
16 department?
17     A.    The other three managers and
18 their direct reports.
19     Q.    The other three managers that
20 report to you?
21     A.    Yes.
22     Q.    And you're also in that area?
23     A.    Yes.

65

1      Q.    Okay.  And where is the
2  administrative break room?
3      A.    Right there (indicating).
4      Q.    Now, how long does it take to
5  implement the changes to the Kronos reports?
6      A.    The corrections?
7      Q.    Yes.
8      A.    It's done the next day.  I
9  don't know how long it takes.
10     Q.    Who actually performs the
11 corrections?
12     A.    Any of the three employees in
13 the payroll department.
14     Q.    If master card on Exhibit 23
15 shows that line 5 debone shift ended at 3:04
16 a.m., would that supervisor have to turn in
17 his corrections to this report before 3:04
18 a.m. or as soon as possible after 3:04 a.m.?
19     A.    After.
20     Q.    After?
21     A.    (Witness nods head in the
22 affirmative.)
23     Q.    Do you know how long after?

66

1    A.    No.
2    Q.    Would that be in that e-mail?
3    A.    Yes.
4          MS. MCGOWAN:  Howard, I
5    haven't seen that e-mail.
6          MR. ROSENTHAL:  You haven't
7    requested it.
8          MS. MCGOWAN:  We've asked for
9    all documents on how time is edited and
10   done.
11         MR. ROSENTHAL:  I suggest you
12   go back and read the document that we --
13   that you requested, used at your request
14   before you make that statement.
15         Ms. McGowan, it hasn't been
16   requested.  If you make a request now, we'll
17   consider it.
18   Q.    Is it your understanding that
19   this supervisor has to make corrections
20   before, if the shift ends at 3:04, they
21   leave the plant that day?
22   A.    I don't know.
23   Q.    Can you turn it in the next

67

1    day when he returns at 4 -- when the second
2    shift begins at 4:30?
3    A.    I don't -- I don't know the
4    times in the e-mail without looking at it.
5    Q.    No.  I'm just saying can he
6    wait and turn it in the next day when he
7    returns to work at the beginning of his
8    shift at 4:30 in the afternoon?
9    A.    Yes.
10   Q.    Why do you have the deadlines
11   established?
12   A.    So that we can process the
13   payroll in a timely manner.
14   Q.    How often is payroll
15   processed?
16   A.    Once a week.
17   Q.    What day does payroll --
18   A.    Tuesday.
19   Q.    Is it the day it's paid or the
20   day it's processed?
21   A.    Processed.
22   Q.    And is that for the week
23   before?

68

1    A.    Yes.
2    Q.    And what is the cutoff date on
3    the week?  The payroll period is from what
4    day to what day?
5    A.    It's from Sunday through
6    Saturday.
7    Q.    So the payroll that's
8    processed on Tuesday would be for the time
9    that ended the previous Saturday?
10   A.    Yes.
11   Q.    How many days a week does the
12   plant operate, the fresh plant?
13   A.    It's normally five.
14   Q.    Is that Monday through Friday?
15   A.    Yes.
16   Q.    Look at Exhibit 23.  And on
17   the first page for Jacqueline Cooper, under
18   6/2/08, do you see that?
19   A.    Yes.
20   Q.    Does that reflect the first
21   number of the time she punched in, or is
22   that the master time?
23   A.    The time she clocked in.

69

1    Q.    Is that her time she swiped
2    in?
3    A.    Yes.
4    Q.    What does VE stand for?
5    A.    I don't know.
6    Q.    You don't know?
7    A.    No.
8    Q.    Above -- Under the master
9    card, what does MP stand for?
10   A.    Master -- I don't know.  I
11   don't know.
12   Q.    Who would know?
13   A.    My payroll department would.
14   Q.    Are there any policies,
15   written documents that tell you what these
16   things stand for?
17   A.    I don't know.
18   Q.    Have you ever reviewed any
19   written documents that describe the Kronos
20   report?
21   A.    No.
22   Q.    Have you ever seen any written
23   documents that describe the Kronos report?

371ef939-b8db-4017-995b-f47fc7508720

**70**

1   A.   Yes.
2   Q.   Okay. What have you seen?
3   A.   A manual.
4   Q.   What is this manual called?
5   A.   I don't know the name.
6   Q.   What's in this manual?
7   A.   Kronos information.
8   Q.   Do you know who prepared it?
9   A.   No.
10   Q.   Do you have a copy of it in
11 your office?
12   A.   No.
13   Q.   Where's this manual
14 maintained?
15   A.   In my payroll department.
16   Q.   Look at -- Let's go back to
17 the master card up at the top, on 6/2. 3:04
18 a.m., is that the time that the master card
19 was swiped out by the department supervisor?
20   A.   Yes.
21   Q.   And you look over at total
22 amount, and that's 9:34?
23   A.   Yes.

**71**

1   Q.   Does that represent nine hours
2 and thirty-four minutes?
3   A.   Yes.
4   Q.   And at the bottom, it shows on
5 6/6, twenty-eight for the master card,
6 forty-six hours and fifty-two minutes worked
7 that week?
8   A.   Yes.
9   Q.   Now, does the computer
10 automatically deduct the one hour for the
11 two thirty-minute breaks?
12   A.   Yes.
13   Q.   So the supervisor is not
14 swiping in and out for the thirty-minute
15 breaks?
16   A.   That's correct.
17   Q.   Can a supervisor go in to the
18 system and change the swipe out time?
19   A.   No.
20   Q.   Who can change that?
21   A.   Payroll department.
22   Q.   Go down to the -- Ms. Cook.
23 Under the total amounts worked on the next

**72**

1 to the last column on the right, do those
2 reflect the times from the master card swipe
3 and not the personal in and out swipe?
4   A.   Yes.
5   Q.   Do you -- can the payroll
6 department use the personal swipe in and out
7 time for any reason at all?
8   MR. ROSENTHAL: For Jacqueline
9 Cooper?
10   A.   No.
11   Q.   For any employee?
12   A.   For Diane Holmes.
13   Q.   What page are you on?
14   A.   Page four.
15   Q.   All right. And why are you
16 using Diane Holmes?
17   A.   The supervisor didn't know to
18 pay clock-out.
19   Q.   Okay. Do you ever use
20 clock-in times for anything?
21   A.   Yes.
22   Q.   When?
23   A.   I don't have an example in

**73**

1 that for that. It would be the same thing.
2   Q.   Do you know of an example?
3   A.   No.
4   Q.   If an employee's late, do you
5 use clock-in or clock-out -- do you use the
6 clock-in time or master time?
7   A.   Clock-in.
8   Q.   So that would be an example of
9 when you would use the clock-in time for the
10 employee?
11   A.   Yes.
12   Q.   Is the computer set up to
13 recognize that, the computer Kronos system,
14 if an employee's late, or does the
15 supervisor have to physically denote -- do a
16 notation?
17   A.   If they swipe their card, the
18 computer will see it.
19   Q.   And pay them on the clock-in
20 time if that's late?
21   A.   Yes.
22   Q.   Is there a code flagging that?
23   A.   I don't know.

FREEDOM COURT REPORTING

---

74

1    Q.    Can the Kronos system be set
2  to pay employees by their clock-in time?
3    A.    These employees?
4    Q.    Any employee.
5    A.    Yes.
6    Q.    Okay.  How would that be
7  achieved?
8    A.    By the pay rule.
9    Q.    Payroll can go in and set --
10   A.    Pay rule.
11   Q.    Pay rule?  What's pay rule?
12   A.    Pay rule means line time would
13 be a pay rule; clock-in and clock-out would
14 be pay rule; schedule would be pay rule.
15   Q.    So there are some pay rules
16 where employees are paid on the Kronos
17 system from clock-in to clock-out?
18   A.    If they are paid under that
19 pay rule.
20   Q.    Is it a hard process to change
21 in the computer to pay employees on the pay
22 rule from clock-in to clock-out?
23         Or is it just a code you have

---

75

1  to put in for that employee?
2    A.    It's a code you have to put
3  in.
4    Q.    Who puts that code in?
5    A.    Human resources.
6    Q.    And the computer automatically
7  picks up that code and pays from clock-in to
8  clock-out?
9    A.    That's right.
10   Q.    Look at Exhibit Number 13.  Do
11 you know what these are?
12   A.    Work rules.
13   Q.    And what are --
14   A.    It's the same thing, it's pay
15 rule.  It's just a different name for them.
16   Q.    So you call them pay rules?
17   A.    Yeah.
18   Q.    So this would be the computer
19 where it sets in how the people are paid?
20   A.    Yes.
21   Q.    Explain number -- The first
22 page, the work rule, do you know what kind
23 of employee this is at the top?  It says two

---

76

1  breaks, line time, do you know what that
2  means?
3    A.    That's just like Exhibit 23.
4    Q.    Okay.  So they're paid based
5  on a set time and the master card time?
6    A.    Yes.
7    Q.    The next one is two breaks,
8  minute to minute, what does that mean?
9    A.    Clock-in to clock-out.
10   Q.    Does HR determine what pay
11 rules apply?
12   A.    Yes.
13   Q.    Who in HR does that?
14   A.    I don't know.
15   Q.    Do you have any involvement?
16   A.    No.
17   Q.    Look at Exhibit -- back to 23.
18 Are all employees in debone line 5 paid the
19 same amount -- the forty-six point fifty-two
20 hours for this work week unless there was
21 some notation by the supervisor or they came
22 in late?
23   A.    Yes.

---

77

1    Q.    How do you reflect the three
2  minutes that are being paid per day under
3  the new contract?
4    A.    It's reflected on their check
5  stub.
6    Q.    How is it reflected in these?
7    A.    No.
8    Q.    It's not on the Kronos?
9    A.    (Witness shakes head in the
10 negative.)
11   Q.    How is that added?
12   A.    To the check stub.
13   Q.    So after it's added to this
14 forty-six point -- forty-six minutes and
15 fifty-two --
16   A.    (Witness nods head in the
17 affirmative.)
18   Q.    Forty-six hours and fifty-two
19 minutes, I'm sorry.
20   A.    (Witness nods head in the
21 affirmative.)
22   Q.    Yes?
23   A.    Yes.

---

FREEDOM COURT REPORTING

78

1    Q.    So after that, payroll
2    department would had an additional fifteen
3    minutes?
4    A.    The computer does it.
5    Q.    Computer would add an
6    additional fifteen minutes, if it's three
7    minutes a day for five days?
8    A.    Yes.  That's correct.
9    Q.    Did you have to do anything to
10   set up this three minutes in the computer?
11   A.    Me personally?
12   Q.    Yes.
13   A.    No.
14   Q.    Do you know who did that?
15   A.    Corporate.
16   Q.    What do you mean by corporate?
17   A.    The corporate office of our
18   parent company.
19   Q.    Where's that?
20   A.    West Conshohocken,
21   Pennsylvania.
22   Q.    And they went in and set
23   computers at that end?

79

1    A.    Yes.
2    Q.    Is there an IT department that
3    did that?
4    A.    Yes.
5    Q.    Do you know if any other
6    plants pay an additional three minutes or
7    some kind of minutes for donning and
8    doffing?
9    A.    No, I don't.
10   Q.    Did you have any involvement
11   in the decision to pay additional time for
12   donning and doffing?
13   A.    No.
14   Q.    Did you have any involvement
15   in the union contract negotiations?
16   A.    No.
17   Q.    How did you learn that an
18   additional three minutes was being paid?
19   A.    By the notification of the
20   contract -- notification of the new
21   contract.
22   Q.    Who notified you?
23         You say the notification of

80

1    the new contract, what do you mean by that?
2    A.    Once something like that would
3    happen, that would be a communication
4    between the general manager and the
5    controller.
6    Q.    Do you use that three minutes
7    in your overtime trend?
8    A.    No.
9    Q.    Are production workers
10   scheduled for forty hours a week, production
11   line workers?
12   A.    I'm not involved in that
13   process.
14   Q.    Are you aware of any that are
15   scheduled for less than forty hours per
16   week?
17   A.    I don't know.
18   Q.    Do you see that in your
19   reports that you're getting?
20   A.    No.
21   Q.    Have you had any decision --
22   or involvement in any decision on whether or
23   not to pay employees for the time they spent

81

1    donning and doffing?
2    A.    No.
3    Q.    When I say donning and
4    doffing, do you understand what I'm talking
5    about?
6    A.    Yes.
7    Q.    Have you been asked to prepare
8    any cost analysis reports?
9    A.    No.
10   Q.    On paying for donning and
11   doffing?
12   A.    No.
13   Q.    The Kronos information that's
14   in these reports that shows the punch in and
15   punch out times for each employee, is that
16   maintained electronically also?
17   A.    Yes.
18   Q.    In what version?  Do you back
19   it up every day or how do you maintain it?
20   A.    We have -- Our Kronos version
21   currently is on the Internet, the web.
22   Q.    What do you mean by that?
23   A.    It's web based.  Prior to

371ef939-b8db-4017-995b-f47fc7508720

82

1  this -- And this happened in September of
2  '07. Prior to that, we maintained it on
3  local servers at our facility.
4      Q.    And then when you maintained
5  it on the local servers, did you back it
6  up --
7      A.    Yes.
8      Q.    -- this electronic data?
9      A.    Yes.
10      Q.    And what form of backup did
11  you use for the electronic data?
12      A.    I'm not qualified to speak to
13  that, because that's an IT department.
14      Q.    Somebody in IT was responsible
15  for backing this information up?
16      A.    Exactly. Yes.
17      Q.    Is this electronic information
18  also subject to the seven-year retention
19  policy, document retention policy?
20      A.    I'm not sure.
21      Q.    Do you know if the Kronos
22  information prior to September of '07 is
23  still available electronically?

83

1      A.    Yes.
2      Q.    You do know or yes, it is?
3      A.    Yes, it is.
4      Q.    And who maintains this record?
5      A.    It's maintained on the servers
6  at our facility.
7      Q.    Now, since September of '07,
8  this information is maintained on the web.
9  Is it still accessible by your --
10      A.    Yes.
11      Q.    -- department?
12      A.    Yes.
13      Q.    If you wanted to go back and
14  research something on a clock-in and
15  clock-out time for an employee in October of
16  '07, could you go online and get it now?
17      A.    Yes.
18      Q.    Do you still, after September
19  of '07, do the daily reports and keep them
20  in a folder by month?
21      A.    Yes.
22      Q.    I mean a weekly report and
23  folder by month?

84

1      A.    Yes.
2      Q.    Has anyone ever asked you to
3  review the weekly reports and determine how
4  much time employees have at the end of the
5  shift that's different -- the clock-out time
6  different from the master card?
7      A.    No.
8      Q.    Has anyone ever asked you to
9  do an analysis of how much it would cost the
10  company to pay for donning and doffing?
11      A.    No.
12      Q.    Were you asked to do an
13  analysis on cost for the company for the
14  three minutes before it was agreed to do
15  from the contract negotiations?
16      A.    No.
17      Q.    Were you aware that the
18  company was considering agreeing to pay for
19  some donning and doffing time prior to the
20  negotiations?
21      A.    Yes.
22      Q.    How did you become aware?
23      A.    At the weekly staff meeting.

85

1      Q.    What was discussed at the
2  weekly staff meeting?
3      A.    Just that it was being
4  discussed.
5      Q.    Who told you that?
6      A.    I don't know.
7      Q.    Do you know when?
8      A.    No.
9      Q.    How many times was this
10  discussed in a weekly staff meeting?
11      A.    I don't know.
12      Q.    Was it just the once?
13      A.    No.
14      Q.    Did you make any comments on
15  whether the company should pay for it?
16      A.    No.
17      Q.    Do you recall anyone making
18  any comments in the --
19      A.    No.
20      Q.    When you say it was discussed,
21  was it just -- were you just informed of it
22  or was there an actual discussion among all
23  of the people in the staff meeting?

371ef939-b8db-4017-995b-f47fc7508720

FREEDOM COURT REPORTING

86

1    A.    Just general information.
2    Q.    Do you know who provided this
3 general information?
4    A.    No.
5    Q.    Who leads the weekly staff
6 meeting?
7    A.    General manager.
8    Q.    And that's Mr. --
9    A.    Tim Esslinger.
10    Q.    What information is maintained
11 or retrievable on the computer or other
12 electronic means about employees that work
13 for Equity?  What kind of employment
14 information is maintained?
15    A.    I have to hear that question
16 again.
17    Q.    What kind of -- Do you
18 maintain computer records on all employees
19 in addition to the Kronos system or is it
20 just the Kronos information?
21    A.    Yes, we do.
22    Q.    What kind of information is
23 maintained electronically?

87

1    A.    Standard employee information
2 just like any company would.
3    Q.    I can promise you, my company
4 doesn't have electronic records on people,
5 so you need to tell me.
6        Do you keep like payroll
7 records -- I mean, employee log records or
8 what information does -- when you say
9 standard, what do you mean by standard?
10 What does Equity keep electronically?
11    A.    I can't begin to list
12 everything that we keep without having
13 something in front of me.  If you will ask
14 me and I know that we keep it, I'll be glad
15 to say.
16    Q.    In your job in the payroll
17 department, what information do you know
18 that they keep electronically on employees?
19    A.    Name, address, withholdings,
20 job code, department, pay rate, phone
21 number.  That's about all I can think of off
22 the top of my head.
23    Q.    Does it show the -- Do you

88

1 keep total number of hours that they work
2 electronically?
3    A.    It's in there.
4    Q.    Is there any other program
5 that you're aware of other than the Kronos
6 that Equity uses that shows how many hours
7 an employee worked?
8    A.    Lawson.
9    Q.    Spell that?
10    A.    L-A-W-S-O-N.
11    Q.    And what is that program?
12    A.    What I just described to you,
13 what we just talked about.
14    Q.    So that's something different
15 than the clock-in/clock-out Kronos program?
16    A.    Yes.  This is only for time
17 keeping.
18    Q.    Kronos is only for time
19 keeping?
20    A.    Yes.
21    Q.    This other information is
22 stored through Lawson, and that's the name
23 of the program?

89

1    A.    Yes.
2    Q.    Would the Lawson program also
3 prepare the W-2 forms, or is that prepared
4 by another program?
5    A.    I'm not sure.  That's done at
6 corporate.
7    Q.    Do you have any involvement in
8 preparing any work rules for employees or
9 policies for employees?
10    A.    No.
11    Q.    The hourly employees?
12    A.    (Witness shakes head in the
13 negative.)
14    Q.    Do you have any involvement in
15 employee orientation?
16    A.    No.
17    Q.    Do you have any involvement in
18 preparing the employee handbook?
19    A.    No.
20    Q.    Let me show you what was
21 marked as Exhibit 16.
22        MS. MCGOWAN:  Howard, do you
23 have that?

FREEDOM COURT REPORTING

```
                                        90
1          MR. ROSENTHAL:  The
2   organizational chart?
3          MS. MCGOWAN:  Yes.
4          MR. ROSENTHAL:  I don't have
5   an extra copy.
6     Q.    Look at Exhibit 16 and see if
7   you can find your organizational chart for
8   your department or where you are in those.
9     A.    Well, it's not in here --
10    Q.    Let me have you look at --
11    A.    -- other than right here
12  (indicating).
13    Q.    Okay.  On the general
14  organization chart?
15    A.    Right.
16    Q.    It shows where you are a
17  direct report to Tim?
18    A.    Yes.
19    Q.    All right.
20    A.    But my organizational chart is
21  not in there.
22    Q.    Let me have you look at
23  Exhibit Number 10 and see if your
```

```
                                        91
1   organizational chart is in here.
2     A.    No.
3     Q.    Are you listed in the general
4   organizational chart in Exhibit 10?
5     A.    No.
6     Q.    You told me you had four
7   direct reports?
8     A.    Yes.
9     Q.    How many employees do you have
10  under your supervision?
11    A.    Fifteen.
12    Q.    Fifteen?
13    A.    (Witness nods head in the
14  affirmative.)
15    Q.    And other than the three
16  people in your payroll department you told
17  me about, and the three other managers that
18  report directly to you, what other job
19  classifications are under your supervision?
20    A.    Under their supervision?
21    Q.    Under your department.  You
22  said fifteen, of those fifteen, tell me what
23  the other job classifications are.
```

```
                                        92
1     A.    Under John Fulford, the live
2   accounting manager, he has breeder clerk,
3   broiler clerk, receptionist, and feed clerk.
4     Q.    When you say clerk, are these
5   like --
6     A.    Salary, non-exempt.
7     Q.    What do they do, what kind of
8   work?
9     A.    Office work.
10    Q.    They're not out feeding?
11    A.    No.
12    Q.    These are, like, payroll
13  people?
14    A.    Yes.
15    Q.    Is this another payroll.
16    A.    Shauna has two pay clerks and
17  a fixed asset cash receivables clerk.  Jeff
18  has a cost clerk and Dawn has a yield clerk
19  and three accounts payable clerks.
20    Q.    What does a yield clerk do?
21    A.    Calculates the dressed weight
22  from a live chicken.
23    Q.    How many pounds you're getting
```

```
                                        93
1   per bird?
2     A.    That's it.
3     Q.    You went to work for Equity in
4   '04.  Where did you work prior to that?
5     A.    Three years prior to that was
6   with ConAgra Poultry.
7     Q.    Where?
8     A.    Canton, Georgia.
9     Q.    What job?
10    A.    Controller.
11    Q.    Why did you leave ConAgra?
12    A.    To come to Equity Group,
13  Eufaula.
14    Q.    Prior to ConAgra where -- Were
15  you always the controller?
16    A.    Uh-huh.
17    Q.    Prior to ConAgra, where were
18  you?
19    A.    Tyson Foods.
20    Q.    Where?
21    A.    Oxford, Alabama, and
22  Springdale, Arkansas.
23    Q.    When were you in Oxford?
```

371ef939-b8db-4017-995b-f47fc7508720

94

| | |
|---|---|
| 1 | A.    Where in Oxford? |
| 2 | Q.    When? |
| 3 | A.    1975 to 1999. |
| 4 | Q.    What position? |
| 5 | A.    Manager of financial analysis |
| 6 | and then controller, those two positions. |
| 7 | Q.    To whom did you report as |
| 8 | controller? |
| 9 | A.    It was owned by Kentucky Fried |
| 10 | Chicken and Lane Processing, I reported to |
| 11 | the general manager. |
| 12 | When it was purchased by Tyson |
| 13 | Foods, then I reported to the finance |
| 14 | department in Springdale, Arkansas, the |
| 15 | corporate headquarters. |
| 16 | Q.    When were you at Springdale? |
| 17 | A.    1999 to 2001. |
| 18 | Q.    What position? |
| 19 | A.    I was the corporate grow-out |
| 20 | controller. |
| 21 | Q.    To whom did you report? |
| 22 | A.    Reported to the director of |
| 23 | operational accounting. |

95

| | |
|---|---|
| 1 | Q.    Who was that? |
| 2 | A.    Ron Van Es, V-A-N E-S. |
| 3 | Q.    Is that one word? |
| 4 | A.    Two. |
| 5 | Q.    Why did you leave Tyson? |
| 6 | A.    For the job with ConAgra |
| 7 | Poultry in Canton, Georgia. |
| 8 | Q.    Prior to the Oxford, Alabama, |
| 9 | location, where did you work? |
| 10 | A.    I was at Kentucky Fried |
| 11 | Chicken in Louisville, Kentucky, for two |
| 12 | years prior to that. |
| 13 | Q.    What'd you do for them? |
| 14 | A.    I was a senior financial |
| 15 | analyst. |
| 16 | Q.    And prior to Kentucky Fried |
| 17 | Chicken? |
| 18 | A.    Three years with a CPA named |
| 19 | Touche Ross, that was in Louisville, |
| 20 | Kentucky. |
| 21 | Q.    Are you from Louisville? |
| 22 | A.    No. I'm from central |
| 23 | Kentucky. |

96

| | |
|---|---|
| 1 | Q.    Do you have any relatives in |
| 2 | Alabama? |
| 3 | A.    I married someone from Alabama |
| 4 | when I came down -- when I moved to Alabama, |
| 5 | and so I have -- |
| 6 | Q.    In-laws? |
| 7 | A.    -- those relatives. |
| 8 | Q.    What was your -- those |
| 9 | relatives last names? |
| 10 | A.    James, Gilmore. That's it. |
| 11 | Q.    Are you related to Kathy |
| 12 | Gilmore? |
| 13 | A.    No. |
| 14 | Q.    Are they located in this area, |
| 15 | the Eufaula area, the relatives in -- |
| 16 | A.    Pell City. |
| 17 | Q.    Pell City? |
| 18 | A.    Yes. |
| 19 | Q.    Any located outside of the |
| 20 | Pell City area, any relatives in Alabama? |
| 21 | A.    There are some in Northport. |
| 22 | Q.    That's the Tuscaloosa area? |
| 23 | A.    My wife's aunts, if that's |

97

| | |
|---|---|
| 1 | what you're talking about. |
| 2 | Q.    I want to make sure they would |
| 3 | not be on the jury if they're down here. |
| 4 | Are they all in north Alabama? |
| 5 | A.    Yes. |
| 6 | MS. MCGOWAN: Can we take a |
| 7 | break? |
| 8 | (Recess taken.) |
| 9 | Q.    (BY MS. MCGOWAN): Have you |
| 10 | had any training or seminars on the Fair |
| 11 | Labor Standards Act and requirements? |
| 12 | A.    No. |
| 13 | Q.    Have you had any training or |
| 14 | seminars on wage and hour loss? |
| 15 | A.    No. |
| 16 | Q.    Do managers in the fresh plant |
| 17 | or the further processing plant receive |
| 18 | bonuses for keeping their overtime hours |
| 19 | down? |
| 20 | A.    No. |
| 21 | Q.    Are you aware of any -- |
| 22 | A.    Wait. I'm not aware of it if |
| 23 | they do. |

FREEDOM COURT REPORTING

98

1    Q.   Does anybody use your
2  information on overtime hours to get
3  bonuses?
4    A.   Not to my knowledge.
5    Q.   Are you aware of any DOL,
6  Department of Labor, investigations or
7  inquiries at Equity for pay practices?
8    A.   No, I'm not.
9    Q.   Are you aware of any Social
10 Security mismatch letters that have come in?
11      MR. ROSENTHAL:  Objection.
12 I'm going to direct the witness not to
13 answer.  Nothing to do with this litigation.
14      MS. MCGOWAN:  Well, we're in
15 discovery, and it could lead to relevant
16 information as to their record retention
17 information.
18      MR. ROSENTHAL:  Bring it up to
19 the Judge.
20      MS. MCGOWAN:  Unless there is
21 privilege, you have to answer.
22      MR. ROSENTHAL:  I've directed
23 the witness not to answer.  Bring it up with

99

1  the Judge.
2    Q.   Okay.  In the Kronos reports,
3  if you look at Exhibit Number 27 -- 23,
4  under the third line down, it says -- at the
5  very top left, it says:  Time period query,
6  and then it has actual/adjusted.  Do you
7  know what that means?
8    A.   I'm not finding that.
9    Q.   Right here (indicating), where
10 it says:  Actual hours only.  Do you know
11 what that means?
12    A.   No.
13    Q.   Do you know who would know
14 what that means?
15    A.   No, I wouldn't know who.
16      MS. MCGOWAN:  Howard, in
17 response to your request that I look at the
18 request for productions to see if we've
19 requested those documents, it's our position
20 that number -- request number six would have
21 been the e-mail setting out the guidelines
22 for when these edits are due back would be
23 encompassed under request number six.  We've

100

1  asked for any practices or guidelines with
2  regards to edited payroll records.
3      And, also, I think when we
4  were talking about looking at the Kronos
5  reports, and you said you were going to
6  check into whether or not that could be done
7  electronically, whether we could get that if
8  you had anything, have you found out about
9  that?
10      MR. ROSENTHAL:  No.  I told
11 you I'd follow-up next week.
12      MS. MCGOWAN:  What about when
13 can we go inspect the hard copies?
14      MR. ROSENTHAL:  I'll have to
15 resolve that next week.
16      MS. MCGOWAN:  Okay.  They
17 wouldn't be available for inspection
18 tomorrow?
19      MR. ROSENTHAL:  No.
20      MS. MCGOWAN:  That's all I
21 have.
22 (The deposition was concluded at 7:00 p.m.,
23 June 12th, 2008.)

101

1      REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  ELMORE COUNTY,
4      I, Sara Mahler, Certified Court
5  Reporter and Commissioner for the State of
6  Alabama at Large, do hereby certify that the
7  above and foregoing proceeding was taken
8  down by me by stenographic means, and that
9  the content herein was produced in
10 transcript form by computer aid under my
11 supervision, and that the foregoing
12 represents, to the best of my ability, a
13 true and correct transcript of the
14 proceedings occurring on said date and at
15 said time.
16      I further certify that I am neither
17 of kin nor of counsel to the parties to the
18 action; nor in any manner interested in the
19 result of said case.
20
21
22
     _____
     Sara Mahler, CCR
23   ACCR #420

**TAB 45**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


NO.:  2:06-CV-1081-MEF


BETTY ANN BURKS, et al.,

        Plaintiff(s),

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

        Defendant(s).



                    DEPOSITION OF

                CORETTA REEVES

                        JOB NO. 1101-58403



BEFORE:    Victoria M. Castillo

           Certified Court Reporter and

           Notary Public

           ACCR# 17, Expires 9/30/2008

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

**2**

1      In accordance with Rule 5(d) of
2    The Alabama Rules of Civil Procedure, as Amended,
3    effective May 15, 1988, I, Victoria M. Castillo, am
4    hereby delivering to HOWARD A. ROSENTHAL, ESQ. the
5    original transcript of the oral testimony taken on
6    the 22nd day of May, 2008, along with exhibits.
7         Please be advised that this is
8    the same and not retained by the Court Reporter,
9    nor filed with the Court.
10
11    S T I P U L A T I O N
12
13         IT IS STIPULATED AND AGREED, by
14    and between the parties through their respective
15    counsel, that the deposition of CORETTA REEVES may
16    be taken before Victoria M. Castillo, Commissioner,
17    at WILLIAMS, POTTHOFF, WILLIAMS & SMITH, 125 South
18    Orange Avenue, Eufaula, Alabama 36027 on the 22nd
19    day of May, 2008.
20         IT IS FURTHER STIPULATED AND
21    AGREED that the signature to and the reading of the
22    deposition by the witness is waived, the deposition
23    is said to have the same force and effect as if

**3**

1    full compliance had been had with all laws and
2    rules of Court relating to the taking of
3    depositions.
4         IT IS FURTHER STIPULATED AND
5    AGREED that it shall not be necessary for any
6    objections to be made by counsel to any questions,
7    except as to form or leading questions, and that
8    counsel for the parties may make objections and
9    assign grounds at the time of trial, or at the time
10    said deposition is offered in evidence, or prior
11    thereto.
12         IT IS FURTHER STIPULATED AND
13    AGREED that notice of filing of the deposition by
14    the Commissioner is waived.
15
16
17
18
19
20
21
22
23

**4**

1    I N D E X
2
3    EXAMINATION BY:            PAGE NUMBER:
4    Mr. Fry                        6
5    Mr. Steensland                38
6
7    EXHIBITS:              PAGE NUMBER:
8    (No Exhibits Were Marked.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**5**

1    A P P E A R A N C E S
2
3    FOR THE PLAINTIFF(S):
4        M. John Steensland, III, Esq.
5        PARKMAN, ADAMS & WHITE
6        739 West Main Street
7        Dothan, Alabama 36301
8
9    FOR EQUITY GROUP EUFAULA DIVISION
10        Gary D. Fry, Esq.
11        Pelino & Lentz
12        One Liberty Place
13        Thirty-Second Floor
14        1650 Market Street
15        Philadelphia, Pennsylvania 19103
16
17        *********************
18
19         I, Victoria M. Castillo, a Court
20    Reporter of Montgomery, Alabama, acting as
21    Commissioner, certify that on this date, as
22    provided by the Alabama Rules of Civil Procedure
23    and the foregoing stipulation of counsel, there

6

1  came before me at WILLIAMS, POTTHOFF, WILLIAMS &
2  SMITH, 125 South Orange Avenue, Eufaula, Alabama
3  36027, commencing at 4:39 p.m., CORETTA REEVES, in
4  the above cause, for oral examination, whereupon
5  the following proceedings were had:
6
7           CORETTA REEVES,
8  being first duly sworn, was examined and
9       testified as follows:
10
11 EXAMINATION BY MR. FRY:
12     Q.    Good afternoon, Ms. Reeves. How are
13 you?
14     A.    Fine. And you?
15     Q.    My name is Gary Fry. I'm a lawyer
16 for Equity Group Eufaula, the plant over in Baker
17 Hill. And we have asked you to come here today to
18 answer some questions that we have about the
19 lawsuit that you and some of the other folks have
20 brought against the company. Have you ever been
21 deposed before?
22     A.    No.
23     Q.    I'm going to be asking you some

7

1  questions, and you will be giving me your answers,
2  and Victoria will be taking down all of our words.
3  Because she's recording this, she can't record us
4  if we are talking at the same time. So if we don't
5  talk over each other, that will be best -- then so
6  we can try to avoid that. And if you can remember
7  to keep your responses verbal, because she can't
8  take down a nod or a shake of the head. Okay?
9      A.    Okay.
10     Q.    If you don't understand any of my
11 questions, it's important that you let me know that
12 so I can rephrase it. Sometimes my questions
13 aren't all that clear, as your lawyer can testify
14 to, I'm sure. So let me know, and I will try and
15 rephrase the question so that it will be clear to
16 you. And if you don't hear anything I say, again
17 let me know, and I will repeat it. Okay?
18     A.    Okay.
19     Q.    Where do you live?
20     A.    Georgetown, Georgia.
21     Q.    And what is your date of birth?
22     A.    2/4/1969.
23     Q.    Are you currently employed?

8

1      A.    Yes.
2      Q.    By whom?
3      A.    Equipment Transit.
4      Q.    At one point you worked at the Equity
5  plant?
6      A.    Yes.
7      Q.    And for what period of time?
8      A.    Overall a period of maybe
9  two-and-a-half years.
10     Q.    Can you give me when you started and
11 when you stopped?
12     A.    The first time I was there, it was
13 back in maybe 2001. And the second time was maybe
14 2003 also, and maybe -- the last of 2005 this last
15 time -- no, sorry about that -- 2007 was this last
16 time.
17     Q.    Okay. So you worked there on three
18 separate occasions?
19     A.    Uh-huh.
20     Q.    On each of those occasions was it
21 just a couple of months, or was it as long as a
22 year?
23     A.    It was about a year, year and a

9

1  half. Then the last time I worked there it was
2  like a total of maybe two, two-and-a-half weeks.
3      Q.    In 2007?
4      A.    Yes.
5      Q.    You only worked two weeks in 2007?
6      A.    About two weeks, yes.
7      Q.    How long did you work there in 2003?
8      A.    I would say about a year, maybe a
9  year and three months.
10     Q.    And how about in 2001?
11     A.    Maybe -- not quite two years. Maybe
12 a year and eight months, or something like that.
13 From 2001 -- about a year.
14     Q.    So in or about 2001 you worked for
15 about a year and eight months?
16     A.    Yes.
17     Q.    And then in 2003 a year and three
18 months?
19     A.    Yes.
20     Q.    And then in 2007 you worked for two
21 weeks?
22     A.    Yes.
23     Q.    And am I correct that in 2001 the

3ebec829-9d79-47d7-8303-203f93b86393

10

1    plant was operated by CP?
2        A.    It was, yes.
3        Q.    And you know who I'm referring to
4    when I say CP?
5        A.    Yes, Charoen Pokphand.
6        Q.    And the plant was also operated by CP
7    in 2003?
8        A.    I believe it was with -- yes. I'm
9    not quite -- yes, because they were fixing to go
10   into the Equity Group then. I don't know if it was
11   the last of that or first of 2004.
12       Q.    And Equity had it when you were there
13   for the couple of weeks in '07?
14       A.    Yes.
15       Q.    What job did you have at the plant in
16   the first period, the 2001 period?
17       A.    I was working in -- it was -- let me
18   see exactly what's the name of it. It was -- yes,
19   QA, quality assurance.
20       Q.    The whole time?
21       A.    Yes, I was doing on the line and then
22   I was doing QA.
23       Q.    What were your job duties? What were

11

1    your functions?
2        A.    Okay. Because I was having a lot of
3    problems with my hands at the time, so I started
4    out like cutting tenders -- I mean, pulling
5    tendons. Then I started out like doing the breast,
6    like breast sampling, and then that's when I ended
7    up at the line doing the QA, bone sampling at the
8    end of the line.
9        Q.    Describe for me what you did each
10   day.
11       A.    Just pulling the tenders and checking
12   for bones.
13       Q.    That's all you did?
14       A.    Mostly all stay in the same spot
15   doing that.
16       Q.    You would pull representative samples
17   of the tenders and check to see if there were any
18   bones?
19       A.    No, the tenders I just pull them off
20   and put them on the conveyor belt, and they go down
21   the line.
22       Q.    What did you do during the middle
23   period in 2003 for a year and three months?

12

1        A.    Working over at the cook plant, and I
2    was like doing -- I was at pack-out, and you do
3    like lots of sampling of the meat, like the bad
4    meat you take it off the conveyor belt and you put
5    it down a little shoot, and then also like when we
6    switch out like for every two hours, then I go down
7    and I do the packing.
8        Q.    That was all done in the cook plant?
9        A.    Yes.
10       Q.    What did you do for two weeks in
11   2007?
12       A.    In evis I like cut the -- trim the
13   fat off of the chickens, and it be on the line --
14   assembly line, and then we switch out. I might
15   like cut the chicken -- like cut them in half, and
16   actually sucks the insides out of it, clean it out.
17       Q.    So you worked on the evis line?
18       A.    Yes.
19       Q.    For two weeks?
20       A.    Uh-huh.
21       Q.    You're a party to this lawsuit? You
22   have a claim, correct?
23       A.    Yes, sir.

13

1        Q.    What's your understanding of what
2    your claim is?
3        A.    To my understanding is we work -- was
4    working hours and stuff, but we wasn't actually
5    getting paid for everything that we was working,
6    all the hours that we was working.
7        Q.    What work did you do that you weren't
8    paid for, what's your understanding?
9        A.    Well, to my understanding, the best
10   of my knowledge, like when we first come to work
11   and put on our PPE and going to do our wash down,
12   get to our workstation, and then once on our break,
13   like coming from break we have to take the PPE off,
14   had to go and hang it up, then coming back from
15   break, putting it back on, going home, taking it
16   off, and like that's basically what it was. We
17   wasn't getting paid for all that.
18       Q.    Is it your understanding that your
19   claim relates to all three periods in which you
20   worked?
21       A.    Yes.
22       Q.    Were you a member of the Union?
23       A.    No, I wasn't.

3ebec829-9d79-47d7-8303-203f93b86393

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

14

1    Q.    Did you review any documents in
2  preparation for coming here today?
3    A.    No.
4    Q.    Did you talk with anybody besides
5  your lawyers about coming here today?
6    A.    Only thing they did, they called me
7  and told me what time to be here, and I got off of
8  work and came here.
9    Q.    The PPE that you referred to, let's
10  go back to 2001 when you were working for CP in QA,
11  what sort of outer garments, or PPE, did you wear
12  on that job?
13    A.    We had to wear face mask, hair nets.
14  We had to wear like the smocks, aprons, the gloves,
15  of course the boots and the goggles.
16    Q.    The first thing you mentioned was a
17  face mask?
18    A.    No, like the beard mask.
19    Q.    The beard mask. So --
20    A.    Had to wear ear plugs.
21    Q.    Anything else?
22    A.    No more just the glove, the warmers,
23  the aprons.

15

1    Q.    Let me run down the list and make
2  sure we got everything. When you were working at
3  QA for CP in 2001, what you were wearing were beard
4  net, the hair net, a smock, an apron, gloves,
5  boots, goggles, and ear plugs?
6    A.    Uh-huh.
7    Q.    Anything else?
8    A.    Not that I can recall.
9    Q.    Was it your understanding that each
10  of those items was required for your job?
11    A.    Yes.
12    Q.    Let's go to the 2003 period at CP
13  when you're working at the cook plant. What did
14  you wear?
15    A.    We wear the same garments that we was
16  wearing -- the apron, the smocks; we had to wear
17  the hair net, the beard net; we had to wear ear
18  plugs, goggles, boots, the hand warmers, the
19  gloves, the sleeves. Basically that was all.
20    Q.    Apron, smock, hair net, beard net,
21  ear plugs, goggles, sleeves?
22    A.    Yes.
23    Q.    Anything else?

16

1    A.    Just the boots.
2    Q.    And boots?
3    A.    Uh-huh.
4    Q.    You didn't have to wear the sleeves
5  when you worked in QA in 2001, did you?
6    A.    No, not in the bone sampling part, we
7  didn't. We wasn't really recommended to have to
8  put those on.
9    Q.    What did you wear for two weeks in
10  evis in 2007?
11    A.    We had to wear the smocks; we wore
12  the aprons, the sleeves; we wore the goggles, the
13  ear plugs, the boots, the gloves, the hand warmers;
14  and we also had to wear, like it was some kind of
15  like glove, like a little cutting glove we had to
16  put on.
17    Q.    A chain mesh glove?
18    A.    Yes.
19    Q.    You have mentioned on two occasions
20  here hand warmers. What were they?
21    A.    We had to put those up under the blue
22  or the green gloves that we had to wear, and we had
23  to wear those up under it.

17

1    Q.    What were the hand warmers?
2    A.    To me, I didn't see any purpose, but
3  we had to have them on. I guess to keep your hands
4  warm and stuff because touching the poultry and
5  all, some of it be cold, and you have to put those
6  on.
7    Q.    Are you referring to the white cotton
8  lining gloves, those are the hand warmers you are
9  referring to?
10    A.    Yes.
11    Q.    So at evis you wore a smock, an
12  apron, sleeves, goggles, ear plugs, boots, gloves
13  with the white cotton liners, and you wore a mesh
14  glove, or used a mesh glove on the line?
15    A.    Yes.
16    Q.    Was it your understanding that you
17  were required to wear all of these things at all
18  three jobs?
19    A.    Yes.
20    Q.    At all three jobs did the company, be
21  it CP or Equity, issue you these items?
22    A.    Yes, they will issue it to you.
23    Q.    With the QA job, did you pick up any

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

18

1  of these items on a daily basis?
2      A.    Yes.
3      Q.    What did you pick up on a daily
4  basis?
5      A.    Mostly what we had to do is pick up
6  the smocks, maybe the hair net, ear plugs, and the
7  beard mask.
8      Q.    What about when you worked at the
9  cook plant, what items did you pick up on a daily
10 basis?
11     A.    We had ear plugs, the hair net, the
12 beard net; we had to pick up -- sometimes the
13 gloves, the rubber gloves.
14     Q.    On a daily basis?
15     A.    Yes.
16     Q.    And the smock, too?
17     A.    Yes.
18     Q.    When you worked in evis in 2007, what
19 did you pick up on a daily basis?
20     A.    The smocks, the hair net, beard net,
21 the ear plugs -- well, they gave you the glove, the
22 cutting glove.
23     Q.    On any of these jobs were you

19

1  permitted to wear any of these items from your
2  home?
3      A.    No.
4      Q.    Not even the boots?
5      A.    The boots we could.  Yes, the boots.
6      Q.    When you worked for QA, tell me where
7  in the plant you worked.
8      A.    At the very end of the line.
9      Q.    In the debone department?
10     A.    Uh-huh, yes.
11     Q.    And when you worked for QA, where did
12 you put all these things on that you just described
13 for me?
14     A.    We had to put them on inside of the
15 plant, inside the work area.
16     Q.    On the debone production floor?
17     A.    Yes, sir.
18     Q.    How much time would you estimate that
19 it took you to put this stuff on in the morning?
20     A.    Anywhere from, I would say five to
21 seven minutes.
22     Q.    Incidentally, what shift did you work
23 at the CP plant in 2001, when you were in QA?

20

1      A.    The second.
2      Q.    So when I said the morning, that
3  wasn't correct.  You went to work in the
4  afternoon.  What were your hours, do you recall?
5      A.    No, I don't.
6      Q.    Do you recall what shift you worked
7  at CP in 2003 when you worked in the cook plant?
8      A.    Yes, first.
9      Q.    So you started in the morning?
10     A.    Uh-huh.
11     Q.    And those items of clothing that you
12 told me you wore in the cook plant, where did you
13 put those on?
14     A.    Inside of the -- right before you go
15 into the cook plant, it's a little area right there
16 where you can hang your garments up.  Once you come
17 out of there, you have to hang them up in the
18 little -- we got dressed in that area.
19     Q.    You might have told me this -- and if
20 you did, I apologize -- but what did you do at the
21 cook plant?
22     A.    I ran the assembly line, like the bad
23 meat that comes down the conveyor belt, you had to

21

1  take it out from the good meat and throw it down,
2  then we swap out like every two hours, and then I
3  pack the meat in the boxes to be shipped out.
4      Q.    And the cook plant, the function of
5  the cook plant, am I correct, was to cook the meat?
6      A.    It be processed meat.
7      Q.    The cook plant was separated from the
8  portion of the plant that the debone and the
9  evisceration departments were in?
10     A.    Yes.
11     Q.    And the debone and evisceration
12 departments did their job, and then that fresh meat
13 was transported over to the cook plant where you
14 worked on it in 2003; is that correct?
15     A.    Yes.
16     Q.    What shift did you work in 2007 when
17 you worked in evis?
18     A.    Second.
19     Q.    What were the hours of your shift?
20     A.    I'm not sure.
21     Q.    Let me go back to the cook plant.
22 Those items of clothing that you put on, how long
23 did it take you to put those on?

22

1    A.    Anywhere from five to seven minutes.
2    Q.    Okay. When you worked in evis in
3  2007, where did you put those items on?
4    A.    In 2007 we put it on in the
5  workstation inside of evisceration.
6    Q.    On the evis floor?
7    A.    Yes.
8    Q.    Approximately how long would it take
9  you to put those on?
10    A.    I would say maybe six to eight
11  minutes with that, because you have to put on the
12  little cutting glove, the wire gloves.
13    Q.    Was the job that you did at evis, is
14  that the only one of these three jobs that you used
15  a knife or scissors?
16    A.    Yes.
17    Q.    Were those implements provided to you
18  when you were on the line?
19    A.    Yes. Once we got to the line, they
20  brought them around.
21    Q.    Is that where you also got the mesh
22  glove?
23    A.    Yes, at the workstation they give it

23

1  to you.
2    Q.    How many breaks did you get in 2001
3  when you worked in QA for CP?
4    A.    To be honest that been so long ago, I
5  want to say maybe -- during that time it was maybe
6  three breaks, because like it was like one
7  15-minute break and two 10-minutes.
8    Q.    One 15 and two 10?
9    A.    Uh-huh.
10    Q.    So you had three breaks that total 35
11  minutes?
12    A.    It wasn't actually 35, but it was --
13  yes, I think it was.
14    Q.    How many breaks did you get when you
15  were working at CP in 2003 at the cook plant?
16    A.    At the cook plant it was two breaks.
17    Q.    How long were the two breaks?
18    A.    To be honest, I don't know. I never
19  really timed it, but they said it was for -- it
20  supposed to be like two 30-minute breaks, but I
21  never timed it.
22    Q.    What about in evis?
23    A.    The same.

24

1    Q.    Two 30-minutes?
2    A.    Uh-huh.
3    Q.    When you came onto the property for
4  any of these three jobs, did you have to go through
5  any security procedures?
6    A.    Like at the gate when you first
7  coming in?
8    Q.    Yes.
9    A.    Well, you had to come through and
10  show your badge, and sometimes you had to stop
11  because the other cars that's in front of you they
12  maybe didn't have what they needed or whatever,
13  they took longer.
14    Q.    So if you had your badge, they just
15  waved you on through?
16    A.    Sometimes they would.
17    Q.    Did that method of access, was that
18  in existence at all three jobs -- if you showed
19  your badge, you could go in?
20    A.    Yes.
21    Q.    Were you ever searched when you
22  entered or left the premises on any of these jobs?
23    A.    No, I wasn't.

25

1    Q.    When you left after the end of the
2  workday on each of these jobs, could you just drive
3  out?
4    A.    Yes.
5    Q.    When you worked QA in 2001, you told
6  us that you put on these items of clothing on the
7  production floor in advance of the start of your
8  shift and it took you five to seven minutes. Would
9  you enter -- you have to say yes.
10    A.    Okay.
11    Q.    Would you enter the production floor
12  about five to seven minutes before the start in
13  order to put on your stuff?
14    A.    I entered in time enough to put on my
15  stuff. But once you get -- because you have to go
16  through the wash station and all that, and
17  sometimes that takes longer because other people be
18  on there. But most of the time I have on
19  everything I am supposed to have on until I can get
20  to the sanitizing part.
21    Q.    When you are working QA, you had to
22  go through a foot bath?
23    A.    Yes.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

26

1    Q.    And you were carrying your PPE with
2    you when you went through the foot bath?
3    A.    Yes. That's when we started put it
4    on, once we got back to it.
5    Q.    Once you got in, you started putting
6    it on?
7    A.    We started putting on like our hair
8    nets and the ear plugs, the beard mask. But
9    actually before you can put on the smock, you had
10   to be inside on the floor.
11   Q.    How many minutes before the start of
12   the shift would you start that process?
13   A.    Rephrase that for me. I didn't quite
14   understand that one.
15   Q.    I think you told me you didn't
16   recollect the start time when you worked QA in
17   2001; is that correct?
18   A.    No, I don't know exactly what was the
19   shift at that time. I don't remember. Being
20   honest with you, I don't.
21   Q.    But we know that you did have a start
22   time?
23   A.    Yes.

27

1    Q.    You had to be on the floor ready to
2    go do your QA job?
3    A.    Uh-huh.
4    Q.    And you couldn't put your stuff on
5    before you walked onto the floor, correct?
6    A.    Yes, correct.
7    Q.    How many minutes before the start
8    time of your job did you walk onto that floor to
9    put your stuff on?
10   A.    I don't know if it's the right time.
11   But I if I had to be there like at work on the
12   floor at 4:30, I usually try to get in there at
13   least about 4:15, no later than 4:20.
14   Q.    Same question for the cook plant.
15   A.    I always allow myself to try to get
16   to work at least about 15, at least after or plenty
17   -- at least give myself maybe 10 to 15 minutes to
18   allow time to get on my stuff and be out on the
19   floor the time I'm supposed to be on it.
20   Q.    So you would get in 10 to 15 minutes
21   before --
22   A.    Like 15 minutes after or something.
23   Then like if I have -- say for instance I had to be

28

1    there at 4:30, I at least try to get in there by
2    4:15, no later than 4:20.
3    Q.    And what about when you worked in
4    evis in 2007?
5    A.    Same.
6    Q.    About 15 minutes you would go on the
7    floor?
8    A.    About 15 minutes after.
9    Q.    Let's go in reverse order now. Let's
10   start with evis in 2007, because that might be more
11   fresh in your memory. And let's talk about
12   breaks. How did you know when it was time for you
13   to go on your break?
14   A.    The only reason that I know that it
15   was time to go on break, like I see, the following
16   people that's ahead of the line start leaving the
17   line, and I assume that it would be break time
18   then.
19   Q.    And you were permitted to leave when
20   the last bird passed your station?
21   A.    Yes.
22   Q.    What did you have to do in order to
23   be permitted to leave the evis production floor?

29

1    You had to wash off your --
2    A.    Yes, we had to wash our clothes --
3    off the apron and stuff, wash it down, sanitize our
4    hands with the gloves on. We had to take all our
5    PPE equipments off, hang them up, then that's when
6    we proceed to go out of the work area.
7    Q.    How long would that process take you?
8    A.    About -- to take off stuff, maybe
9    about anywhere from five, maybe six minutes.
10   Q.    When you came back from break, you
11   did the reverse, correct?
12   A.    Yes.
13   Q.    And would it take you the same amount
14   of time?
15   A.    Yes, anywhere from six, seven minutes
16   putting it on because you have to do your boots and
17   sanitize all that coming out -- coming back in.
18   Q.    At the end of the day during those
19   two weeks you worked in evis, did you do
20   essentially what you did at breaks, in terms of
21   washing yourself off and taking your stuff off
22   before you left the room?
23   A.    Sure, I did.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

30

1    Q.    What did you do with the smock?
2    A.    Once we got ready to leave for the
3  end of the shift, we had to put our smocks outside
4  in a barrel for dirty linen.
5    Q.    How long did that process take from
6  the time you left the line position in evis until
7  you walked out the door?
8    A.    Anywhere from -- I'd say about six
9  minutes.
10    Q.    What did you have to do in terms of
11  clothing to go on a break when you worked in the
12  cook plant?
13    A.    We had to do the same procedure --
14  wash down, and take off all our PPE, hang them up
15  in a designated area for them, and go out on break.
16    Q.    How long did that take you?
17    A.    Anywhere from six to seven minutes.
18    Q.    You did the reverse when you came
19  back from break?
20    A.    Yes.
21    Q.    And did it take about the same amount
22  of time?
23    A.    About the same, maybe a little --

---

31

1  well, no more than about seven.
2    Q.    At the end of the day, how long did
3  it take you to do the things you needed to do in
4  order to get out of the plant?
5    A.    Anywhere from six to seven minutes.
6    Q.    Your first job in QA you had you
7  think you recall three breaks then, correct?
8    A.    Yes, I think that's it.
9    Q.    And did you have to do a similar
10  washing and taking off the things to go on those
11  breaks?
12    A.    We had to do the same thing.
13    Q.    How long did that take you?
14    A.    Anywhere from six to seven minutes.
15    Q.    And you did the reverse coming back?
16    A.    Yes.
17    Q.    And the same amount of time?
18    A.    Uh-huh.
19    Q.    And at the end of the day?
20    A.    Same.
21    Q.    Why did you leave CP after that first
22  period of employment there?
23    A.    Another job offer.

---

32

1    Q.    But then you went back in 2003?
2    A.    Yes, because the job that I was on,
3  they had closed down the business.
4    Q.    Then why did you leave CP then after
5  that stint?
6    A.    In 2003?
7    Q.    Yes, 2003.
8    A.    Because I went into another field of
9  work.
10    Q.    And then you came back for a couple
11  of weeks in 2007?
12    A.    Yes.
13    Q.    How did your employment end there?
14    A.    Because I was having problems with my
15  hands swelling a lot.
16    Q.    When you were working QA, did you
17  have an understanding as to how the company
18  computed your hours for purposes of your pay?
19    A.    Yes, they did it with a Master Card,
20  swiper card.
21    Q.    The Master Card?
22    A.    I guess that's the name of it.  They
23  call it -- a little card, and then they write your

---

33

1  time down when you stop and when you start back and
2  all that.
3    Q.    When you were working QA, did you
4  have to swipe in and swipe out at the end of each
5  day?
6    A.    Yes.
7    Q.    Did you understand that those times
8  weren't the times to which the company was going to
9  compute your pay?
10    A.    No, I wasn't under that.
11    Q.    You thought that those were the
12  times, is that what you're saying?
13    A.    Yes, I thought we was getting paid
14  that.
15    Q.    So you thought you swiped the Master
16  Card?
17    A.    Yes, I thought I was doing it.
18    Q.    What about when you worked at the
19  cook plant?
20    A.    Same.
21    Q.    You thought that when you swiped in,
22  you got paid for that one --
23    A.    Got paid for that from the time I

---

3ebec829-9d79-47d7-8303-203f93b86393

34

1  swiped that in.
2      Q.   And what about evis?
3      A.   Same thing -- thought that when I
4  swiped in, that I was getting paid for everything
5  that I worked.
6      Q.   On any of these three jobs, did you
7  ever complain to your supervisor about any problems
8  with your pay?
9      A.   Well, a couple of times I complained
10  about it, you know, because I was like well we work
11  this many hours, this many hours, why our pay is
12  not adding up, and they was like well, only thing
13  we can tell you they taking out taxes or whatever,
14  but they never went into detail of telling us why.
15      Q.   Which job is that?
16      A.   When I was working in the, not the
17  QA, but the cook plant part.
18      Q.   The cook plant, when CP had it.  Did
19  you have any complaints about your pay when you
20  worked in the evis room for two weeks in 2007?
21      A.   No, because I didn't really stay
22  around.
23      Q.   What about when you worked QA back in

35

1  2001?
2      A.   No.  I was just assuming that I was
3  getting paid what I was supposed to have been
4  getting paid.
5      Q.   Did you ever work overtime on any of
6  those three jobs?
7      A.   On evis.
8      Q.   Did you get paid time-and-a-half for
9  overtime?
10      A.   No.
11      Q.   You didn't?
12      A.   No.
13      Q.   And how do you know you were working
14  overtime?
15      A.   Because anything over 40 hours is
16  supposed to have been time-and-a-half, but we
17  wasn't getting paid for that.  And also when we was
18  in the cook plant, we was working Saturdays and
19  some Sundays, and you couldn't tell it.
20      Q.   Saturday and Sunday work at the cook
21  plant?
22      A.   Yes, we worked a couple of Sundays.
23      Q.   And you don't believe you were paid

36

1  time-and-a-half?
2      A.   No.
3      Q.   What about when you worked QA?
4      A.   I didn't do no overtime.
5      Q.   How much overtime did you do in the
6  two weeks that you were working in evis?
7      A.   I didn't keep up with it, but I know
8  we worked some overtime.
9      Q.   Did you complain?
10      A.   No, I said -- just complaining a
11  couple of times to the line leader, but I didn't
12  say anything to the supervisors.
13      Q.   Why not?
14      A.   I just -- I'm the type I'm not a
15  troublemaker, so I mean I just didn't say
16  anything.  And then after I did I stay that long, I
17  didn't make no big issue of it.
18      Q.   How long was the overtime that you
19  recollect that you worked in the evis department
20  during those two weeks in 2007?
21      A.   Lots of time we worked, I know maybe
22  what, sometimes an hour or two over.
23      Q.   An hour or two over?

37

1      A.   Uh-huh, but I never did see it on the
2  check or anything.  I was thinking that we was
3  getting paid for it, but I didn't see no big
4  difference.
5      Q.   You only worked two weeks, correct?
6      A.   Yes.
7      Q.   And you got two checks for each of
8  those two weeks?
9      A.   Yes.
10      Q.   And with those checks did you get a
11  stub that showed your hours and rate of pay?
12      A.   Yes.
13      Q.   Do you recall reviewing those?
14      A.   I don't recall -- I don't recall any
15  overtime being on it.
16      Q.   You don't recall any overtime being
17  shown on those stubs?
18      A.   No.
19      Q.   During any of these three jobs that
20  you worked, were you ever disciplined for anything?
21      A.   No, I wasn't.
22          MR. FRY:  That's all I have.
23          MR. STEENSLAND:  Just a few.

3ebec829-9d79-47d7-8303-203f93b86393

38

1
2    EXAMINATION BY MR. STEENSLAND:
3        Q.    Ms. Reeves, both when you worked at
4    the QA, the job with QA and with CP, as we were
5    referring to it, and when you were working the evis
6    much more recently, was one of the first things you
7    did when you came in was have to sanitize your
8    boots?
9        A.    Yes.
10        Q.    And you mentioned about, here with
11    evis recently, I think you said you put your smocks
12    in a barrel before leaving.  Do you recall saying
13    that?
14        A.    Yes.
15        Q.    By barrel, was it like a bin or
16    something?
17        A.    It was a bin.
18        Q.    And before leaving, does that mean
19    leaving for your shift?
20        A.    Leaving for the day.
21        Q.    Is that the last thing you do?
22        A.    The very last thing, yes.
23        Q.    When you showed up before you go on

39

1    the production floor in evis and when you were
2    working with QA, did you have to wash or somehow
3    sanitize or wash the gloves, apron?
4        A.    Yes.
5        Q.    Sleeves -- that equipment you were
6    putting on?
7        A.    Yes.
8        Q.    And was that done at a wash station
9    there?
10        A.    Yes, it was.
11        Q.    To begin your break, both when you
12    were at QA and evis, did you have to wash this
13    equipment again before you took it off?
14        A.    Yes, we sure did.
15        Q.    And when you were coming back from
16    that break, again did you have to wash that
17    equipment, sanitize your boots, same as before?
18        A.    Yes.
19        Q.    And that was for both breaks, did the
20    same?
21        A.    Both breaks.  If you leave off the
22    line and try to go to the bathroom.  You have to do
23    it.  Every time you leave or come back you had to

40

1    sanitize everything.
2        Q.    If you didn't do it, what would be
3    the repercussions?
4        A.    Probably get wrote up or in trouble,
5    but I always did what I was supposed to have done.
6        Q.    Before your shift when you were
7    leaving you line, before you could leave the
8    production room, you again have to wash these
9    things down?
10        A.    You have to wash them down, yes.
11        Q.    When you were at QA, did you ever
12    have to take your smock home with you?
13        A.    During QA, no.
14        Q.    When you were leaving for your break
15    when you were at evis and QA, how did you know you
16    could leave for your break?
17        A.    Only way that I know that I could
18    leave from a break is, like I said, when the
19    peoples in front of me start leaving the line, and
20    then they come on down, and I notice all of them
21    leaving, and once it get to me and the chicken and
22    all pass by, then that's when I can leave.
23        Q.    So when there's no more chicken

41

1    coming, is that your signal?
2        A.    Yes.
3        Q.    When you're reporting back to the
4    line at the end of your break, did everybody have
5    to report at the same time?
6        A.    Yes.
7        Q.    You couldn't just wait until the
8    chicken got to your spot and get there right before
9    it got there?
10        A.    No, we all had to be on the line
11    before the first bird come down.
12        Q.    Before the first bird came to the
13    first person on the line?
14        A.    Yes, we had to be on the line.
15        Q.    And let's say you're not there before
16    the first bird hits the line, but you get there
17    before the bird gets to you.  Would you be
18    considered late?
19        A.    Yes.
20        Q.    What would happen to you in that
21    scenario?
22        A.    Probably would get wrote up, but me I
23    never got that far, so I don't know.

3ebec829-9d79-47d7-8303-203f93b86393

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

42

1    Q.   Planned ahead?
2    A.   Yes.
3           MR. STEENSLAND:  Nothing
4    further.  Thank you, Ms. Reeves.
5           MR. FRY:  Thank you.
6           5:30 p.m.
7    ************************
8    FURTHER DEPONENT SAITH NOT
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

43

1                CERTIFICATE
2
3    STATE OF ALABAMA
4    AT LARGE
5
6           I hereby certify that the above
7    and foregoing deposition was taken down by me in
8    stenotype and the questions and answers thereto
9    were transcribed by means of computer-aided
10   transcription and that the foregoing represents a
11   true and correct transcript of the testimony given
12   by said witness upon said deposition.
13           I further certify that I am
14   neither of counsel nor of kin to the parties to the
15   action, nor am I in anywise interested in the
16   result of said cause.
17
18
19
20
21
    _____
22   Victoria M. Castillo, Certified Court Reporter
     ACCR# 17, Expires 9/30/2008
23   Commissioner and Notary Public

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

3ebec829-9d79-47d7-8303-203f93b86393

**TAB 46**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


NO.:  2:06-CV-1081-MEF


BETTY ANN BURKS, et al.,

        Plaintiff(s),

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

        Defendant(s).



DEPOSITION OF

MARCUS RICE

JOB NO. 1101-58505



BEFORE:    Victoria M. Castillo

           Certified Court Reporter and

           Notary Public

           ACCR# 17, Expires 9/30/2008

2b891d13-8555-41c1-85fc-be1159c25bf1

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

**2**

1  In accordance with Rule 5(d) of
2  The Alabama Rules of Civil Procedure, as Amended,
3  effective May 15, 1988, I, Victoria M. Castillo, am
4  hereby delivering to HOWARD A. ROSENTHAL, ESQ. the
5  original transcript of the oral testimony taken on
6  the 23rd day of May, 2008, along with exhibits.
7        Please be advised that this is
8  the same and not retained by the Court Reporter,
9  nor filed with the Court.
10
11    S T I P U L A T I O N
12
13    IT IS STIPULATED AND AGREED, by
14  and between the parties through their respective
15  counsel, that the deposition of MARCUS RICE may be
16  taken before Victoria M. Castillo, Commissioner, at
17  WILLIAMS, POTTHOFF, WILLIAMS & SMITH, 125 South
18  Orange Avenue, Eufaula, Alabama 36027 on the 23rd
19  day of May, 2008.
20    IT IS FURTHER STIPULATED AND
21  AGREED that the signature to and the reading of the
22  deposition by the witness is waived, the deposition
23  is said to have the same force and effect as if

**3**

1  full compliance had been had with all laws and
2  rules of Court relating to the taking of
3  depositions.
4    IT IS FURTHER STIPULATED AND
5  AGREED that it shall not be necessary for any
6  objections to be made by counsel to any questions,
7  except as to form or leading questions, and that
8  counsel for the parties may make objections and
9  assign grounds at the time of trial, or at the time
10  said deposition is offered in evidence, or prior
11  thereto.
12    IT IS FURTHER STIPULATED AND
13  AGREED that notice of filing of the deposition by
14  the Commissioner is waived.
15
16
17
18
19
20
21
22
23

**4**

1    I N D E X
2
3  EXAMINATION BY:        PAGE NUMBER:
4  Mr. Fry                     6
5
6  EXHIBITS:             PAGE NUMBER:
7  (No Exhibits Were Marked.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**5**

1    A P P E A R A N C E S
2
3  FOR THE PLAINTIFF(S):
4    M. John Steensland, III, Esq.
5    PARKMAN, ADAMS & WHITE
6    739 West Main Street
7    Dothan, Alabama 36301
8
9  FOR EQUITY GROUP EUFAULA DIVISION
10    Gary D. Fry, Esq.
11    Pelino & Lentz
12    One Liberty Place
13    Thirty-Second Floor
14    1650 Market Street
15    Philadelphia, Pennsylvania 19103
16
17    ***********************
18
19    I, Victoria M. Castillo, a Court
20  Reporter of Montgomery, Alabama, acting as
21  Commissioner, certify that on this date, as
22  provided by the Alabama Rules of Civil Procedure
23  and the foregoing stipulation of counsel, there

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

6

1  came before me at WILLIAMS, POTTHOFF, WILLIAMS &
2  SMITH, 125 South Orange Avenue, Eufaula, Alabama
3  36027, commencing at 4:08 p.m., MARCUS RICE, in the
4  above cause, for oral examination, whereupon the
5  following proceedings were had:
6
7                    MARCUS RICE,
8        being first duly sworn, was examined and
9              testified as follows:
10
11  EXAMINATION BY MR. FRY:
12     Q.    Good afternoon, Mr. Rice.  How are
13  you doing?
14     A.    Fine.
15     Q.    You were sitting in here when I took
16  Krista Oliver's deposition, correct?
17     A.    Yes.
18     Q.    And did you hear the instructions
19  that I gave her?
20     A.    Yes, somewhat.
21     Q.    Would you like me to give them to
22  you?
23     A.    You can if you want.

7

1     Q.    As I told Ms. Oliver, my name is Gary
2  Fry, and I'm one of the lawyers for the company
3  Equity Group Eufaula, and we have asked you here
4  today to put some questions to you concerning a
5  lawsuit which you and some other folks have brought
6  against the company.  A deposition consists of me
7  asking you questions and you giving me the answers
8  and our court reporter taking down what we both
9  say.  If you don't understand a question that I ask
10  you, please let me know and I will rephrase it
11  hopefully so you will understand it.  If you don't
12  hear anything that I say, let me know and I will
13  repeat it.  She can only take down one speaker at a
14  time, so we should try and avoid speaking at the
15  same time.
16     A.    Okay.
17     Q.    And finally, any response you give to
18  one of my questions, I would ask that it be verbal
19  as opposed to a nod or a shake of the head.  Okay?
20     A.    Okay.
21     Q.    Where do you live?
22     A.    Georgetown, Georgia.
23     Q.    What is your date of birth?

8

1     A.    First month, 31st day, '78.
2     Q.    Do you currently work for Equity?
3     A.    No.
4     Q.    When did you work for Equity?
5     A.    Actually from '98 to 2004.
6     Q.    So you started at the Baker Hill
7  facility when CP owned it?
8     A.    Yes.
9     Q.    What was your first job at the plant?
10     A.    Rehang.
11     Q.    Rehang?
12     A.    Yes.
13     Q.    And what did that job entail?
14     A.    Excuse me?
15     Q.    What did you do in rehang?
16     A.    Hang chickens.
17     Q.    Were you in live hang?
18     A.    No, that was in the debone area.
19     Q.    Stuff that fell off?
20     A.    That means you rehang the chicken.
21  They come from live hang, through the chiller -- it
22  comes through the process, you know what I'm
23  saying.  It goes from live hang, to the evis room,

9

1  to the chilling room, to the rehang.
2     Q.    So you got the birds after they went
3  through the chiller?
4     A.    Right.
5     Q.    And you rehung them on the line?
6     A.    What you call shackles.
7     Q.    How long were you in rehang?
8     A.    Probably the whole time.  I mean,
9  went from -- the whole time I was there.
10     Q.    Right up through 2004?
11     A.    Right.
12     Q.    And that was in the debone
13  department?
14     A.    Right.
15     Q.    And is that the only job you ever had
16  in that plant?
17     A.    Actually, I was a line leader, and I
18  had to drive the drive pallet jacks, and I had
19  different areas that I had to cover.
20        MR. STEENSLAND:  I may have
21  missed that one.  He said he left the plant in
22  '04?
23        MR. FRY:  Yes.

2b891d13-8555-41c1-85fc-be1159c25bf1

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

10

1      MR. STEENSLAND:  Sorry about
2  that.
3      Q.   (Mr. Fry)  How soon after you started
4  work at the plant did you become a line leader?
5      A.   Maybe about a year or so.
6      Q.   So you became a line leader in around
7  1999 or 2000?
8      A.   Somewhat.
9      Q.   And were you a line leader in the
10  debone line?
11      A.   No, I was the line leader of the
12  rehang line.
13      Q.   And you indicated that you drove a
14  pallet jack.  Was that in connection with your job
15  duties as a line leader in rehang?
16      A.   Right.
17      Q.   That was all part of what you did?
18      A.   Right.
19      Q.   Tell me everything that you did as a
20  line leader in rehang.
21      A.   Well, I had to make sure that the
22  other people was doing their job.  I had to make
23  sure that the wash area was rewashing the chicken,

11

1  and I had to make sure the ice room kept up the
2  ice, I had to make sure the back dock -- the trash
3  that come from the rehang line was out.  It was
4  different areas.
5      Q.   Why did you leave Equity in 2004?
6      A.   Pointed out.
7      Q.   The attendance policy?
8      A.   Yes.
9      Q.   What shift did you work?
10      A.   First.
11      Q.   That was from 7:30 to 4:30?
12      A.   Supposed to be.
13      Q.   7:30 a.m. to 4:30 p.m.?
14      A.   Supposed to.
15      Q.   You say it's supposed to.  Why do you
16  say that?
17      A.   Because most of the time I started at
18  a different times.
19      Q.   What time did you start?
20      A.   At different times.  I can't tell you
21  this, that time.  I don't know.
22      Q.   How much in advance of 7:30 did you
23  start?

12

1      A.   Excuse me?
2      Q.   You said you started at different
3  times?
4      A.   Right.  Sometimes I had to be in
5  there later, and sometimes I had to be in there
6  earlier.  Because when I got there -- the shift was
7  supposed to start at 7:30.  Sometimes I got there
8  earlier so I can set up all the departments that I
9  had that I supposed to cover.  So sometimes I
10  started early, but I don't think I got paid for it
11  though.
12      Q.   Well, how early would you come in?
13      A.   Well, if the shift started at 7:30, I
14  usually be there like around seven o'clock.
15      Q.   You're telling me that you had to do
16  certain job functions in order to prepare the
17  rehang area for the start of production?
18      A.   Right.
19      Q.   And are you telling me that you
20  weren't paid for those?
21      A.   No.
22      Q.   And is that part of your claim in
23  this case?

13

1      A.   Right.
2      Q.   And those kinds of pre-shift set-up
3  activities that you said, you only did those when
4  you were a line leader, right?
5      A.   I did it before I turned to line
6  leader.
7      Q.   Okay.  How did you find out about
8  this lawsuit?
9      A.   Through friends, relatives.
10      Q.   What did your friends and relatives
11  tell you about it?
12      A.   What did they say -- well, they said
13  that they had a lawsuit against the plant for all
14  the hours that they worked for the plant, so I
15  signed up for it.
16      Q.   What's your understanding of what
17  you're claiming here?
18      MR. STEENSLAND:  Objection.
19      A.   For all the hours that I worked for
20  the plant.
21      Q.   (Mr. Fry)  Including the work you did
22  --
23      A.   Including from the time that I

2b891d13-8555-41c1-85fc-be1159c25bf1

14

1  started until the time that I ended -- that
2  included breaks, before breaks, the time that I
3  took the equipment off to the time I had to put it
4  back on, and through the second break from the time
5  I had to put -- take it off, put it back on, and to
6  the time I had to leave the plant.
7       Q.   So what you're telling me is:  Part
8  of part claim is for the time you took to put on
9  and take off the supplies, or PPE --
10      A.   The PPE.
11      Q.   That you wore, correct?
12           MR. STEENSLAND:  Objection.
13      A.   Right.
14      Q.   (Mr. Fry)  And are you also telling
15  me that you have additional claims for work you did
16  for set-up?
17      A.   Right.
18      Q.   Do you believe that you performed
19  certain activities after the production shift ended
20  for which you are entitled?
21      A.   Right.
22      Q.   That's not related to dressing or
23  non-dressing?

15

1       A.   All that included undressing because,
2  see, at the end of the shift I had to make sure
3  everything was clean and all my areas were clean
4  and the back dock was -- all the trash taken out,
5  and had to spray down.  And after all that, I had
6  to take off my PPE, wash them down, and wash off
7  boots before I leave.
8       Q.   But you have two claims here -- one
9  for putting on PPE and taking it off, and one for
10  these pre-shift and post-shift activities you did
11  in terms of cleaning up your area and getting your
12  area ready for work.  Is that what you are telling
13  me?
14      A.   Yes, sir.
15      Q.   What was your rate of pay?
16      A.   $8.90 an hour.
17      Q.   And that was as of when you pointed
18  out?
19      A.   Right.
20      Q.   And who was your supervisor when you
21  pointed out?
22      A.   Sampson Reeves.
23      Q.   Did you work 40 hours a week?  You

16

1  were scheduled to work 40 hours a week?
2       A.   Right.
3       Q.   Five days a week?
4       A.   Somewhat.
5       Q.   Were you in the Union?
6       A.   Not really.  They just made you have
7  -- it was -- I mean, they were taking out, so
8  evidently you was in it.  They were taking out for
9  it, so evidently you was in it.  I don't think I
10  was in it.
11      Q.   You are telling me they deducted
12  Union dues from your --
13      A.   Whether you wanted to be in it or
14  not, so they still took it.
15      Q.   So I take you didn't occupy any
16  position with the Union?
17      A.   No, I just protected myself.
18      Q.   And you never went to any Union
19  meetings?
20      A.   No.
21      Q.   Have you ever attended any meetings
22  of Equity workers that were called to discuss this
23  lawsuit?

17

1       A.   Yes.
2       Q.   And how many such meetings did you
3  attend?
4       A.   One or two maybe.
5       Q.   When was the last one you attended?
6       A.   I don't know.
7       Q.   Where were these meetings?
8       A.   It was at one of these motels, as far
9  as I can remember.
10      Q.   What happened at this meeting?  What
11  did you do there?
12      A.   I just sat and listened.
13      Q.   Pardon?
14      A.   Just sat and listened.
15      Q.   Who talked?
16      A.   I can't remember who talked.
17      Q.   Was it a lawyer?
18      A.   Right.
19      Q.   Was there anybody else in the room
20  besides a lawyer and Equity employees?
21      A.   A bunch of people, just a bunch of
22  people in there from --
23      Q.   Were they Equity employees?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

18

1    A.    Yes.
2    Q.    Anybody else?
3    A.    Just far as I remember, yes.
4    Q.    At the time of that meeting, had you
5    signed up for this lawsuit?
6    A.    Excuse me?
7    Q.    You signed a paper.  Do you recall
8    signing a paper to join this lawsuit?
9    A.    Right.
10   Q.    At the time of the meeting, had you
11   signed that paper yet?
12   A.    Right.
13   Q.    Right what?
14   A.    I don't know.  I signed up for it.  I
15   can't tell you the exact time when I signed up for
16   it, whatever.  I don't know that.
17   Q.    Okay.  Tell me each of the items of
18   PPE that you wore each morning when you went to
19   work.
20   A.    Smock, hair net, beard net, sleeves,
21   boots, gloves -- cotton gloves, rubber gloves --
22   ear plugs.  I had to have an apron.
23   Q.    Anything else?

19

1    A.    That's it.
2    Q.    Was it your understanding that you
3    were required to wear each of these items?
4    A.    They told me we had to wear them.
5    Q.    Did you get all of these items from
6    the company?
7    A.    Right.
8    Q.    Could you wear any of these items
9    from home?
10   A.    Well, at one point in time you could
11   take them home.
12   Q.    What could you take home?
13   A.    You could take everything home.
14   Q.    Did that policy change at some point?
15   A.    It did.  I don't know what time or
16   when did it change.  I don't know.  I just did what
17   I did.
18   Q.    Well, were there certain of these
19   items that you picked up at the supply room on a
20   daily basis?
21   A.    All of it.
22   Q.    You picked them all up on a daily
23   basis?

20

1    A.    All of it.
2    Q.    The smock, the hair net, the beard
3    net, the sleeves?
4    A.    Ear plugs.
5    Q.    Every single day you got new stuff?
6    A.    Yes, because I didn't keep the same
7    thing.
8    Q.    And did you pick it up every day
9    throughout the whole six years you worked there?
10   A.    Right.
11   Q.    Did you ever take any of the stuff
12   home?
13   A.    Well, I took it home, but I didn't
14   wear the same thing back.  Always got new stuff.
15   The apron that I used, I just threw it away.  I
16   didn't use the same thing.  I just got new stuff.
17   Every time I came in, and I went to the supply room
18   and got new stuff.
19   Q.    I just want to make sure I'm
20   understanding what you are telling me.  Every
21   single morning of every day that you worked there
22   you went to the supply room, and you got all new
23   PPE?

21

1    A.    Right.
2    Q.    At the end of the day, what would you
3    do with what you wore that day?
4    A.    I'd take it home, but I just didn't
5    wear it back.
6    Q.    And what did you do with it once you
7    took it home?
8    A.    Threw it away.
9    Q.    You just threw it away?
10   A.    Right.
11   Q.    These items that you have identified
12   for me of PPE, when did you put them on in the
13   morning?
14   A.    Maybe when I -- when I got to the
15   plant.  After I went through the supply line -- and
16   you had to wait because it would be so many people
17   in the line, so whenever I got -- when it was my
18   turn to get my stuff, that's when I put it on.
19   Q.    Let's start when you got to the
20   plant.  You say you arrived at the plant at
21   7 a.m.?
22   A.    Yes, and you have to wait in line.
23   Q.    Where do you have to wait in line, in

22

1  the building?
2      A.   It's in the hallway.  It's in the
3  building.
4      Q.   Did you drive to work?
5      A.   Right.
6      Q.   Did you have to clear security?
7      A.   You have to pass through the guard
8  shack, and they have to check your badge and see
9  it -- see did you have your badge.  Once they see
10 that you had your badge, then you can go on
11 through.
12     Q.   They didn't search your car or
13 anything?
14     A.   No, not unless you were suspicious or
15 bringing a weapon or something like that.
16 Sometimes they will now.
17     Q.   Did you have a sticker on your car?
18     A.   No.
19     Q.   You just flashed them your badge?
20     A.   Yes, sir.
21     Q.   At the end of the day could you just
22 leave?
23     A.   At the end of the day of work?

23

1      Q.   Yes.
2      A.   No -- well, after I got through with
3  what I was supposed to do.
4      Q.   One you got in your car, you drove --
5      A.   You had to go back through the guard
6  shack.
7      Q.   And did you just drive through?
8      A.   Sometimes.  And sometimes they have
9  like a weapon check, and you have to wait, pull
10 over for a couple of minutes, and they check, and
11 then you go.
12     Q.   How often did that happen?
13     A.   Maybe every month or so, whenever you
14 suspicious or something.
15     Q.   You got to the plant around 7 a.m.,
16 you went to the supply shack?
17     A.   Right.
18     Q.   And you say you waited in line?
19     A.   Right.
20     Q.   How long did you wait in line?
21     A.   I don't know.
22     Q.   You picked up all of your PPE at that
23 point?

24

1      A.   Right.
2      Q.   Then what did you do?
3      A.   You had to put it on.
4      Q.   In this PPE that you listed for me,
5  did that include boots?
6      A.   Yes, that's protective.
7      Q.   Where did you put the stuff on?
8      A.   Actually, we were putting it on in
9  the hallway.  You used to put it on in the
10 hallway.  And when you put it on in the hallway,
11 you walk through this door and the lady spray your
12 hand with soap, and you get the soap, and you walk
13 through the puddle, and you go to the wash station,
14 and you have to wash it off before you touch the
15 chicken or other people get on the line.  You have
16 to wait until everybody else do that.
17     Q.   Where in the plant did you put on
18 your smock, your sleeves, your apron, those sort of
19 things?
20     A.   In the hallway.
21     Q.   What hallway?
22     A.   The hallway before you entered the
23 department of debone.

25

1      Q.   The hallway -- are you talking about
2  the hallway that separates the break room from the
3  production floor?
4      A.   Right.
5      Q.   That is where you put your stuff on?
6      A.   Right.
7      Q.   And you put that stuff on there in
8  that hallway right after you picked it up at supply
9  every morning?
10     A.   Right.
11     Q.   And then you proceeded into the
12 production floor?
13     A.   Right.
14     Q.   And you had to pass through that foot
15 bath?
16     A.   Right.
17     Q.   And then what happened?
18     A.   You got to go to the wash station.
19 The soap in your hand, you got to go to the wash
20 station and wipe all that stuff off.
21     Q.   How long did it take you to put this
22 stuff on in the hallway?
23     A.   I don't know, man.  I ain't really

2b891d13-8555-41c1-85fc-be1159c25bf1

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

26

1   timed that. I just put it on.
2      Q.   It doesn't take too long to put a
3   smock on, does it?
4      A.   Probably not.
5      Q.   It's not too --
6      A.   I just don't know the time.
7      Q.   It doesn't take too long to tie an
8   apron on, does it?
9      A.   I wouldn't know the exact time
10  because I didn't time it.
11     Q.   You have no idea how long it took
12  you?
13     A.   No, I just put it on.
14     Q.   Then you went in and washed off?
15     A.   Yes, you have to wash it off.
16     Q.   And then did you proceed to do these
17  pre-shift set-up activities that you described for
18  me?
19     A.   Right.
20     Q.   And then your shift started at 7:30?
21     A.   Shift supposed to start at 7:30.
22     Q.   What would you do on those days when
23  Sanitation was still in there cleaning?

27

1      A.   You have to wait until Sanitation
2   comes out. They won't let you in there.
3      Q.   How many breaks did you get in
4   rehang?
5      A.   I was supposed to get two, but most
6   of the time I didn't take one.
7      Q.   Why not?
8      A.   Because I couldn't.
9      Q.   Pardon?
10     A.   I couldn't.
11     Q.   Why couldn't you take your breaks?
12     A.   I couldn't take one until I was able
13  to take one because I was the line leader on the
14  floor, and I had to maintain the floor until
15  somebody told me I had to take a break. Most of
16  the time I didn't take one.
17     Q.   And is that part of your claim?
18     A.   Right.
19     Q.   That you didn't get breaks at all?
20     A.   Right.
21     Q.   How often could you take a break?
22     A.   Just whenever they told me I could
23  take one.

28

1      Q.   How often did that happen?
2      A.   Not often.
3      Q.   Well, you were line leader for about
4   six years, right?
5      A.   Yes, sir.
6      Q.   Excuse me -- you were a line leader
7   for about five years, right?
8      A.   Right -- well, right, you can say
9   that.
10     Q.   From 1999 to --
11     A.   '98 to all the way to 2004.
12     Q.   So you were line leader all those
13  years?
14     A.   Well, not the first couple of years.
15     Q.   For those years that you were line
16  leader, on an average week how often could you go
17  on break?
18     A.   Just whenever they told me I could.
19     Q.   Can you estimate for me how often you
20  could take a break?
21     A.   No.
22     Q.   So you have no idea how many days you
23  did not take a break?

29

1      A.   No, I don't have no idea. I couldn't
2   tell you.
3      Q.   How did the company keep track of
4   your hours as a line leader for purposes of your
5   pay?
6      A.   Well, a Master Card, the
7   superintendent swipe the card.
8      Q.   To your knowledge, were you given any
9   pay for any of these set-up or post-shift
10  activities?
11     A.   No.
12     Q.   You were paid strictly on the basis
13  of MasterCard time. Is that your understanding?
14     A.   It's just whenever. I don't know.
15  All I know is I swiped my attendance card, and
16  that's it. And how I get paid, I mean, I don't
17  know. They do the time sheets and stuff. I don't
18  see none of those, so I wouldn't know.
19     Q.   You knew there was a difference
20  between the card that you swiped in on, your
21  attendance card, and the Master Card?
22     A.   Somewhat. Well, actually I know that
23  my card that I swipe supposed to just swipe me in,

2b891d13-8555-41c1-85fc-be1159c25bf1

30

1    and I guess that's the same thing as theirs, I
2    guess. I don't know.
3        Q.    Did you ever complain to anyone that
4    you weren't getting your breaks?
5        A.    Yes.
6        Q.    Who did you complain to?
7        A.    Supervisor.
8        Q.    That's Sampson Reeves?
9        A.    Right.
10       Q.    And what did he tell you?
11       A.    He told me I can take a break once I
12   get everything -- once everything is in order. So
13   if all that stuff wasn't in order, then I couldn't
14   take a break until it was, and so most of the time
15   I didn't take one.
16       Q.    Did you ever complain to your Union
17   representative that you weren't getting your
18   breaks?
19       A.    Well, I mentioned it to one, but
20   really it didn't help none.
21       Q.    Who did you mention it to?
22       A.    It's been a while, man. I don't even
23   remember.

31

1        Q.    Does the name Jackie Davis ring a
2    bell?
3        A.    No.
4        Q.    How about the woman with the last
5    name Green?
6        A.    No.
7        Q.    Is it your testimony that you recall
8    complaining to --
9            MR. STEENSLAND: Wait.
10           THE DEPONENT: Okay.
11       Q.    (Mr. Fry) Is it your testimony that
12   you do recall making a complaint to your Union
13   representative that you weren't getting your
14   breaks?
15       A.    One of the shop stewards, Ms. Johanna
16   Bussey, I remember her, but the rest I don't
17   remember.
18       Q.    Did you complain to Johanna?
19       A.    Right.
20       Q.    And do you recall when that was?
21       A.    No.
22       Q.    And did she ever get back to you?
23       A.    Some of the time. She just gave me a

32

1    word of advice, and that was it.
2        Q.    What did she tell you?
3        A.    That she will get with me, and they
4    will handle it, but it never got handled.
5        Q.    Pardon?
6        A.    She said she would handle it, but it
7    never got handled.
8        Q.    Did you ever fill out a grievance
9    form?
10       A.    No.
11       Q.    Why not?
12       A.    Because they never took it to us,
13   they never got that far.
14       Q.    Couldn't you have filled out a
15   grievance and submitted it on your own?
16       A.    Yes, once it got -- if they gave you
17   the form.
18       Q.    Did you ever ask for the form?
19       A.    No, because I mean -- no.
20       Q.    Why not?
21       A.    I don't know.
22       Q.    How many people did you have working
23   for you in rehang when you were a line leader?

33

1        A.    Maybe about 20 people.
2        Q.    And how many breaks did they get?
3        A.    Supposed to get two. I don't know.
4        Q.    Did they take their breaks?
5        A.    I guess.
6        Q.    You were their line leader, right?
7        A.    Right.
8        Q.    And was it up to you to tell them
9    when to go on breaks?
10       A.    Not exactly. It was up to the
11   supervisor to tell them whether they can go on
12   break or not.
13       Q.    And how long were their breaks?
14       A.    I guess they supposed to get 30
15   minutes. They supposed to get 30 minutes, and it
16   was like one 30 and one 20 when I was working
17   there.
18       Q.    And what did the people that were
19   under you in rehang, what did they have to do to go
20   on break?
21       A.    What did they have to do?
22       Q.    Yes.
23       A.    When the supervisor said they can go

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

34

1  to break, they go to break.  They have to -- first
2  they have to take off the stuff at the wash station
3  area, hang the smock up, hang the apron up, take
4  the gloves off, take the -- all the other stuff
5  off, and just go to break.
6      Q.   And how long did it take them to do
7  that?
8      A.   I don't know.
9      Q.   Did they all go the break at once?
10     A.   Right.
11     Q.   Did they all come back at once?
12     A.   Supposed to.
13     Q.   Did they?
14     A.   I wouldn't know because I had to do
15  my little stuff, and the supervisors stayed there
16  up front, so I wouldn't know.  I was in different
17  areas.  I had different areas I had to go make
18  sure.
19     Q.   Did you keep track of the hours that
20  you worked for which you think you are owed pay?
21     A.   No.
22     Q.   Do you have any idea?
23     A.   No.

35

1      Q.   Besides pointing out, were you ever
2  disciplined when you worked there?
3      A.   Probably wrote up one time.
4      Q.   What for?
5      A.   Me and a supervisor got into it.
6          MR. FRY:  I don't have any other
7  questions.
8          MR. STEENSLAND:  I don't have any
9  questions either.
10         MR. FRY:  Thank you very much.
11             4:41 p.m.
12     ************************
13     FURTHER DEPONENT SAITH NOT
14
15
16
17
18
19
20
21
22
23

36

1              CERTIFICATE
2
3  STATE OF ALABAMA
4  AT LARGE
5
6          I hereby certify that the above
7  and foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10  transcription and that the foregoing represents a
11  true and correct transcript of the testimony given
12  by said witness upon said deposition.
13         I further certify that I am
14  neither of counsel nor of kin to the parties to the
15  action, nor am I in anywise interested in the
16  result of said cause.
17
18
19
20
21
   _____
22  Victoria M. Castillo, Certified Court Reporter
    ACCR# 17, Expires 9/30/2008
23  Commissioner and Notary Public

2b891d13-8555-41c1-85fc-be1159c25bf1

**TAB  47**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06-CV-1081-MEF


BETTY ANN BURKS,

et al.,

        Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

        Defendant.



BEFORE:

        Cynthia M. Noakes, Commissioner

        and Certified Court Reporter


        DEPOSITION TESTIMONY OF

        SAMUEL A. SHABAZZ


        *****************************

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

2

1    S T I P U L A T I O N

2

3       IT IS STIPULATED AND AGREED by and

4    between the parties through their respective

5    counsel, that the deposition of SAMUEL A. SHABAZZ

6    may be taken before Cynthia M. Noakes, Court

7    Reporter, at the Law Offices of WILLIAMS,

8    POTTHOFF, WILLIAMS & SMITH, 125 South Orange

9    Avenue, Eufaula, Alabama 36027, on the 23rd day

10   of May, 2008.

11      IT IS FURTHER STIPULATED AND AGREED

12   that the signature to and the reading of the

13   deposition by the witness is waived, the

14   deposition to have the same force and effect as

15   if full compliance had been had with all laws and

16   rules of Court relating to the taking of

17   depositions.

18      IT IS FURTHER STIPULATED AND AGREED

19   that it shall not be necessary for any objections

20   to be made by counsel to any questions except as

21   to the form or leading questions, and that

22   counsel for the parties may make objections and

23   assign grounds at the time of the trial, or at

3

1    the time said deposition is offered in evidence,

2    or prior thereto.

3       IT IS FURTHER STIPULATED AND AGREED

4    that the notice of filing of the deposition by

5    the Court Reporter is waived.

6

7

8

9

10

11

12

13

14

15

16

17   *******************************************

18

19

20

21

22

23

4

1                    INDEX

2    EXAMINATION BY:              PAGE NUMBER:

3    MR. SMITH                    6-64

4

5    EXHIBITS:

6    (No exhibits were

7    submitted to said deposition.)

8

9    Reporter's Certificate        65

10

11

12

13

14

15

16

17

18

19

20   *******************************************

21

22

23

5

1                 APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFFS:

4        MR. P. MARK PETRO

5        SCHREIBER & PETRO, PC

6        ATTORNEYS AT LAW

7        Two Metroplex Drive

8        Suite 250

9        Birmingham, Alabama 35209

10

11   ON BEHALF OF THE DEFENDANT:

12       MR. JOEL P. SMITH, JR.

13       WILLIAMS, POTTHOFF,

14       WILLIAMS & SMITH, L.L.C.

15       ATTORNEYS AT LAW

16       125 South Orange Avenue

17       Eufaula, Alabama 36027

18       (334) 687-5834

19

20   *****************************

21

22       I, CYNTHIA M. NOAKES, a Certified

23   Court Reporter of Eufaula, Alabama, acting as

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

6

1   Commissioner, certify that on this date, as
2   provided by the Alabama Rules of Civil Procedure
3   and the foregoing stipulation of counsel, there
4   came before me at the Law Offices of WILLIAMS,
5   POTTHOFF, WILLIAMS & SMITH, 125 South Orange
6   Avenue, Eufaula, Alabama 36027, beginning at
7   9:30 a.m., SAMUEL A. SHABAZZ, witness in the above
8   cause, for oral examination, whereupon the
9   following proceedings were had:
10
11          SAMUEL A. SHABAZZ,
12   being first duly sworn, was examined and
13          testified as follows:
14
15          THE COURT REPORTER: Usual
16   stipulations?
17          MR. PETRO: Yes.
18          MR. SMITH: Yes.
19
20          EXAMINATION
21   BY MR. SMITH:
22   Q.  Mr. Shabazz, we met earlier. I'm Joel Smith
23   and I represent Equity Group Eufaula Division in

7

1   this case that you are a part of. I'm just going
2   to ask you a series of questions relating to the
3   claims made in the lawsuit.
4       Just a couple of ground rules. If you don't
5   understand my question, just ask me to rephrase it
6   or repeat it, and I'll be happy to.
7       And the other one is to speak out your
8   answer so Cindy can get it down. Instead of
9   nodding or shaking your head, make sure you say
10  yes or no. Okay?
11  A.  Okay.
12  Q.  All right. Let me get you to state your
13  name, please.
14  A.  Samuel Shabazz.
15  Q.  And your home address?
16  A.  99 Cool Branch, Georgetown, Georgia.
17  Q.  How long have you been there?
18  A.  Eight years.
19  Q.  Okay. And your date of birth?
20  A.  10/17/52.
21  Q.  And your current employment?
22  A.  Chattahoochee Veneer.
23  Q.  That's down there on 431, right over the

8

1   bridge, right?
2   A.  Right.
3   Q.  Okay. Who is your boss there?
4   A.  T.J. Calloway.
5   Q.  Is that Mr. Barnett's company?
6   A.  Right.
7   Q.  So Mr. Calloway is your supervisor?
8   A.  Supervisor.
9   Q.  Okay. What do you do there?
10  A.  I feed the dryer.
11  Q.  Feed the dryer? Does that involve you
12  putting wood chips in the dryer?
13  A.  No. Veneer sheets.
14  Q.  Okay. When they're already made, you put
15  them in the dryer?
16  A.  Right.
17  Q.  Okay. Where did you work before
18  Chattahoochee Veneer? Was it Equity Group?
19  A.  No. I think it was City of Eufaula.
20  Q.  What did you do for the City?
21  A.  Maintenance. Lawn maintenance.
22  Q.  All right. How long were you there?
23  A.  About eight months.

9

1   Q.  And who was your supervisor there at the
2   City?
3   A.  I think it was Melvin Tillman.
4   Q.  Okay. And before the City, did you work for
5   Equity Group?
6   A.  No. I worked with Whispering Pines.
7   Q.  In Georgetown?
8   A.  Right.
9   Q.  Over on the lake in Georgetown?
10  A.  Right.
11  Q.  What did you do for them?
12  A.  Lawn maintenance.
13  Q.  What about before that, where did you work?
14  A.  I worked at HKC, Hartz Vending Machine.
15  Q.  For Mr. John Bush and his kids down there?
16  A.  Right.
17  Q.  What did you do for them?
18  A.  Putting snacks and stuff in machines.
19  Q.  All right. And what about before that?
20  A.  Anderson OMO.
21  Q.  What is that?
22  A.  Anderson Construction.
23  Q.  Oh, yeah. Jerry Anderson?

cf316f16-beda-4a40-a932-f59755ebbd85

10

1   A.   Right. Anderson OMO.
2   Q.   What does OMO mean?
3   A.   Something to do with the Army.
4   Q.   Were you doing construction projects for the
5   Army?
6   A.   No. I was maintaining the parks and stuff.
7   Q.   Oh, okay. So they had a contract to do the
8   lawn maintenance for the Army?
9   A.   Yes.
10  Q.   Okay. I'm really trying to get back to your
11  chicken plant days.
12      When did you work for the chicken plant?
13  A.   Back around the year 2000.
14  Q.   Okay. So the year 2000. It was CP back
15  then, right?
16  A.   And it changed over to Keystone.
17  Q.   Right. Tell me the years that you worked
18  for the chicken plant.
19  A.   All right. I first started off in the year
20  2000 up to the year 2001. I left, went back to
21  Florida, came back to the chicken plant, stayed
22  about a year.
23  Q.   Wait a second. How long did you stay back

11

1   in Florida?
2   A.   About eight months.
3   Q.   So did you come back -- you went down to
4   Florida in 2001. Was it 2001 or 2002 when you
5   came back?
6   A.   2002.
7   Q.   Okay. And you went to work. It was CP
8   then, right?
9   A.   Right.
10  Q.   Okay. And how long were you there?
11  A.   I'm trying to think. Six months.
12  Q.   Okay. What were you doing during that
13  period of time at the plant?
14  A.   At that time then, I was working doing
15  janitorial work.
16  Q.   Janitorial?
17  A.   Janitorial.
18  Q.   Okay. All right. And that was a six-month
19  period in 2002?
20  A.   Right. I left, went back to Anderson six
21  months, left, came back to the chicken plant.
22  Q.   All right. So let me see if I can figure
23  all this up.

12

1       You worked six months in 2002, and then you
2   left and you were six months at Anderson. Did
3   that get you to 2003 when you came back to the
4   chicken plant, or was it still 2002?
5   A.   It was about 2003 or close to 2004.
6   Q.   Was it CP?
7   A.   It was Keystone.
8   Q.   It was Keystone when you came back?
9   A.   Right.
10  Q.   So that would make it 2004, I believe; is
11  that right?
12  A.   Something like that.
13  Q.   Okay. So when you were hired back for the
14  third time at the chicken plant, you're certain it
15  was Keystone or Equity Group?
16  A.   Yes.
17  Q.   Tell me what you were hired in to do there.
18  A.   I was working in storage, a forklifter.
19  Q.   Okay. You drove a forklift?
20  A.   No. It was a hand forklift, one of them
21  kind that you've got to...(demonstrating). It
22  wasn't like no automobile.
23  Q.   Okay. So is it like a pallet jack?

13

1   A.   Yeah, it was like a pallet jack.
2   Q.   Okay. You didn't have to have any kind of
3   license to drive it or anything?
4   A.   No.
5   Q.   It was one that I could do if you showed me
6   how to do it?
7   A.   Right.
8   Q.   Okay. So what department was that job in or
9   what plant were you in?
10  A.   Cold storage.
11  Q.   Okay. So is that in the first processing
12  plant or the cook plant?
13  A.   First processing.
14  Q.   Okay. And I take it you're obviously no
15  longer with Equity Group. How long were you there
16  after you came back in 2004 working on the pallet
17  jack? How long did you stay on that job?
18  A.   I don't know.
19  Q.   Okay. Do you have an estimate of how long
20  you were there?
21  A.   Nope.
22  Q.   Was it more than six months?
23  A.   I don't know.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

14

1    Q.   Okay.  Was it more than a year?
2    A.   It wasn't no year.
3    Q.   So we know it's less than a year.  Am I
4    right there?
5    A.   It was less than a year.
6    Q.   Okay.  So less than a year.  Did you do the
7    same job the whole time?
8    A.   Yes.
9    Q.   Okay.  And what shift were you on?
10   A.   Third shift.
11   Q.   Was the plant running when you were working?
12   A.   Plant was running.
13   Q.   Plant was running?
14   A.   Right.
15   Q.   So what were your hours that you were
16   supposed to be there?
17   A.   From twelve to eight.
18   Q.   12 a.m. to 8 a.m.?
19   A.   Yes.
20   Q.   Okay.  Tell me, if you would -- I know
21   you've said you ran sort of a forklift.  Tell me
22   exactly what you were doing though.  I mean, as
23   far as day to day.  What were you lifting with the

15

1    forklift and moving?  What was your job?
2    A.   Load trucks.
3    Q.   So you were loading trucks with frozen
4    chicken or was it fresh?  Was it frozen or was it
5    just chilled?
6    A.   It was frozen.
7    Q.   Okay.  So your job, you worked back between
8    the loading dock and the cold storage?
9    A.   That's right.
10   Q.   And you ran -- I'm not trying to put words
11   in your mouth; I'm just trying to understand what
12   you did.
13        You would go back and forth between the cold
14   storage and the trucks on the loading dock?
15   A.   Yes.
16   Q.   What else did you do?
17   A.   Inventory.
18   Q.   Okay.  What did that involve?
19   A.   Make sure that everything was put up and
20   numbered and dated.
21   Q.   Did you have to write down records on that?
22   A.   Yes.
23   Q.   Okay.  Anything else you did?

16

1    A.   Not that I can recall.
2    Q.   Okay.  Who was your supervisor?
3    A.   I don't know.  I don't remember his name.
4    Q.   Can you describe him?
5    A.   All I know, they called him Jabo or
6    something like that.
7    Q.   Banjo?
8    A.   Jabo.  They called him Jabo.
9    Q.   What did he look like?
10   A.   Heavyset.
11   Q.   How old or how young?  What was his
12   approximate age?
13   A.   45 to 50 years old.
14   Q.   Okay.  White or black or Hispanic?
15   A.   Black.
16   Q.   All right.  Jabo.  Was he still there when
17   you left?
18   A.   Yes.
19   Q.   Okay.  What was your pay rate?
20   A.   I don't want to speculate.  I think about
21   $6, I think; I'm not sure.
22   Q.   You think it was $6 an hour?
23   A.   I think; I'm not sure.

17

1    Q.   And I'm talking about when Equity Group had
2    it.
3    A.   Yeah.
4    Q.   And did you get other benefits, like health
5    insurance?
6    A.   No.
7    Q.   How many hours per week would you work
8    typically?
9    A.   Forty.
10   Q.   40-hour week?  Okay.  Were there certain
11   days you didn't work?  I mean, were you on a
12   straight Monday-through-Friday, or did you overlap
13   into Saturdays?
14   A.   We'd overlap into Saturdays and be off on
15   Sundays.
16   Q.   How long were you working on Saturdays?
17   A.   About two hours.
18   Q.   Okay.  And I guess your shift would start --
19   I mean, we're dealing with the night shift here.
20   So your shift would start Saturday morning at
21   midnight, I guess, Friday night to Saturday
22   morning would be a normal work day?
23   A.   Right.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

18

1  Q.  Was that an eight-hour shift there?
2  A.  (No response.)
3  Q.  What day would your work week start on? on a
4  Monday?
5  A.  On a Tuesday.
6  Q.  Would you have Monday off?
7  A.  Have Monday off.
8  Q.  Okay.  So you would go Tuesday night,
9  Wednesday night, Thursday night, and Friday night?
10  A.  Right.
11  Q.  And then would you work Saturday nights too?
12  A.  No.
13  Q.  But you would go -- 40 hours was your
14  typical week?
15  A.  Right, 40 hours.
16  Q.  Did you ever have occasions to work more
17  than 40 hours?
18  A.  No.
19  Q.  Did you ever have less than 40, where y'all
20  were scaled back?
21  A.  Yes.
22  Q.  How did that work?  How often was that?
23  A.  The days I don't go to work.

19

1  Q.  Right.  I mean, you could have personal days
2  or sick leave or something like that; is that
3  right?
4  A.  Right.
5  Q.  I'm talking about days where the company
6  said, "We're not working today."  For whatever
7  reason.  Maybe the plant's down or something like
8  that.  Did you ever have those types of weeks?
9  A.  No.
10  Q.  Did you have vacation days?
11  A.  No.
12  Q.  Were there days where you just didn't go to
13  work?
14  A.  Yeah.
15  Q.  How many of those --
16  A.  It varied.
17  Q.  Okay.  I mean, did it happen on a regular
18  basis?
19  A.  No.
20  Q.  All right.  Why did you leave Equity Group?
21  A.  I found a better job.
22  Q.  Okay.  And tell me where you went after
23  Equity Group.

20

1  A.  Down here at Dawson.  It's like a mill
2  company.
3  Q.  In Dawson, Georgia?
4  A.  Right.  What's the name of that place?  I
5  can't think of the name right now.
6  Q.  You took a job in Dawson, Georgia.  Did you
7  leave Equity Group on your own or did they
8  terminate you?
9  A.  I left on my own.
10  Q.  You went in and told them, "I got a better
11  job; I don't want this job anymore"?
12  A.  Right.
13  Q.  And your best estimate you can give me on
14  how long you worked at Equity Group was that it
15  was less than a year.
16  A.  Less than a year.
17  Q.  Was it more than a month?
18  A.  Yeah.
19  Q.  More than two months?
20  A.  Yeah.
21  Q.  How about three?
22  A.  Let's round it off like this:  I think right
23  at four months.

21

1  Q.  Okay.  Now, you understand that you are a
2  plaintiff in a lawsuit that a number of people
3  have brought against Equity Group?
4  A.  Yes.
5  Q.  How did you first learn about the lawsuit?
6  A.  A friend.
7  Q.  Who was that?
8  A.  Clifford Jones.
9  Q.  Is he a plaintiff in the case?
10  A.  I don't know.
11  Q.  He just told you about it?
12  A.  Yes.
13  Q.  Was he employed out there at Equity Group?
14  A.  Yes.
15  Q.  And do you remember when you got into the
16  lawsuit, when you joined it?
17  A.  I think about a year ago.
18  Q.  Okay.  What is your understanding of the
19  claims that are being made in the lawsuit?
20  A.  For not getting paid for the work we did.
21  Q.  Not getting paid for the work you did?
22  A.  Right.
23  Q.  What specific work did you not get paid for?

cf316f16-beda-4a40-a932-f59755ebbd85

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

22

1   A.   Such as putting our smocks on, boots on,
2   goggles, so forth and so forth.
3   Q.   So smocks, boots, goggles?
4   A.   Right.
5   Q.   And then what did you mean by "so forth and
6   so forth"?
7   A.   Anything else that was required for us to
8   put on.
9   Q.   What would those items be?
10  A.   Such as gloves.
11  Q.   Okay.
12  A.   That's about it.
13  Q.   Okay.  And how did you get the understanding
14  that that's what was being claimed in the lawsuit?
15  Did it come from your friend or how did that come
16  about?
17  A.   That came about because when I inquired to
18  my supervisor why we had to come in so early to
19  get prepared for work and not get paid for it.
20  Q.   Who was that supervisor?
21  A.   Jabo.
22  Q.   What was his response?
23  A.   He said that it's an ongoing trend.

23

1   Q.   Ongoing trend?
2   A.   Right.
3   Q.   Okay.  How early would you have to come in?
4   A.   Well, I be to work about a quarter to 12.
5   Q.   So you would need to be there at
6   11:45 p.m.?
7   A.   Yes.
8   Q.   Okay.  And who told you you had to be there
9   at 11:45?
10  A.   Jabo.
11  Q.   Okay.  And tell me -- let's go through what
12  you did when you arrived at work each day, or each
13  night.
14  A.   I'd drive through the gates, get out my car,
15  walk in the door, go to my locker, get all my
16  stuff.  Then I go up to the door, put my shoes on,
17  dip my feet, go through some more double doors.
18  Q.   You're saying dip your feet?
19  A.   Right.  My boots rather.  And then I'd put
20  my equipment on.
21  Q.   All right.  When you were driving in, would
22  you have your boots on?
23  A.   No.

24

1   Q.   You would keep them at the plant?
2   A.   Right.
3   Q.   And where was your locker?
4   A.   In the break room.
5   Q.   Okay.  And just walk me through it, because
6   I'm not sure I've been back to that loading dock.
7        When you walk through that front door to the
8   plant, and if you walk through the hall, the
9   production floor is straight out in front of you,
10  right?  Would you come in from that side, the main
11  side of the plant?
12  A.   Yes.
13  Q.   Opposite from where the loading docks are?
14  A.   Yes.
15  Q.   And then would you take a left to go down to
16  that break room that's on the left?  I'm trying to
17  figure out where your locker is.
18  A.   You take a right.
19  Q.   And there's a break room down there?
20  A.   Right.
21  Q.   And as you go down there, you have live hang
22  on your left as you go that direction?
23  A.   Which way are you coming in?

25

1   Q.   I'm coming in from that main entrance to the
2   first processing plant.  And you go in and you
3   come in the hall, and you can see out there the
4   production floor.  And you can take a right; that
5   would make you go down toward live hang.  Or you
6   could take a left and you could go the other way.
7   And there's a break room down on the left.  I'm
8   trying to get an idea of where your locker was.
9   A.   If you're coming through the main door
10  there, it would be on the left.
11  Q.   So it was right there near the front of the
12  building?
13  A.   Right.
14  Q.   Okay.  So you would have on your ordinary
15  street clothes?
16  A.   Right.
17  Q.   And then you would go to your locker.  Tell
18  me what would go on there at your locker.
19  A.   That's where I started putting my stuff on.
20  Q.   When would you swipe your timecard?
21  A.   Right when twelve o'clock get there.
22  Q.   You wouldn't come in and swipe it?
23  A.   No.  Couldn't do that.

cf316f16-beda-4a40-a932-f59755ebbd85

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

26

1   Q.   So you would go -- just keep telling me what
2   you were doing as you go to your locker. Let's go
3   through that.
4   A.   I don't understand the question.
5   Q.   Well, you said you would go straight to your
6   locker, correct?
7   A.   Correct.
8   Q.   And then tell me what you would do when you
9   got to your locker.
10  A.   I just told you.
11  Q.   I know. Sometimes I've got to hear it more
12  than once to get it set in my mind.
13  A.   I told you. I put my stuff on.
14  Q.   You would take your shoes off?
15  A.   I had the kind of boots they slide them on
16  your -- what do you call them? I've got a pair.
17       MR. PETRO:   Boot covers?
18       THE WITNESS:   Yeah.
19  A.   You want to see them? I've got them in my
20  car.
21  Q.   That's okay. You wouldn't have to take your
22  shoes off; you would just put a boot cover on over
23  them?

27

1   A.   Right.
2   Q.   Tell me what items of clothing or PPE you
3   would have to put on over your street clothes.
4   A.   Your smock, then you have to put on a beard
5   net.
6   Q.   Okay. You had some kind of net that would
7   cover up your beard?
8   A.   Right.
9   Q.   And what else?
10  A.   The goggles.
11  Q.   Okay. Anything else you would wear?
12  A.   Your gloves. But you don't put your gloves
13  on right then.
14  Q.   So at your locker you would put on boot
15  covers, smock, head net?
16  A.   Beard net.
17  Q.   What about a head net?
18  A.   Yeah, a hair net. Yeah.
19  Q.   So that's a yes to boot covers, smock, head
20  net, beard net?
21  A.   Yes.
22  Q.   Anything else?
23  A.   Not that I can recall.

28

1   Q.   What else do you recall putting on at your
2   locker?
3   A.   That's about it.
4   Q.   Was that pretty much what you wore for your
5   job?
6   A.   Yes.
7   Q.   Anything else you wore?
8   A.   No.
9   Q.   Would you ever wear gloves? You mentioned
10  gloves.
11  A.   We didn't put them on right then. But you
12  do have to put on gloves to go in cold storage,
13  walk-in freezer.
14  Q.   So when would you put on gloves?
15  A.   When I went in the walk-in freezer.
16  Q.   You could do that as you were walking in,
17  not at your locker?
18  A.   No.
19  Q.   You wouldn't wear them -- if you were out on
20  the loading dock, would you wear gloves?
21  A.   No.
22  Q.   Only if it was cold and you had to be in
23  there working?

29

1   A.   When I had to go in the freezer.
2   Q.   Would you put on other clothes when you went
3   in the freezer?
4   A.   No. I already had them on.
5   Q.   Okay. Let's back up just a minute. At
6   Equity Group, the only job you performed was the
7   one you're telling me about on the forklift? When
8   you were working for Keystone, you didn't do any
9   other job other than working on the forklift; is
10  that right?
11  A.   That's right.
12  Q.   And what was the name of the department?
13  A.   Cold storage.
14  Q.   Okay. When you worked for CP did you work
15  in the cold storage department also?
16  A.   No.
17  Q.   I know you worked in janitorial?
18  A.   Yeah.
19  Q.   Nothing else?
20  A.   No, nothing else.
21  Q.   And you didn't have to wear any kind of
22  smock or anything like that in janitorial?
23  A.   Only if I walked through the live hang.

cf316f16-beda-4a40-a932-f59755ebbd85

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

30

1   Q.  Okay. So when you would be cleaning up like
2  the hallway and break rooms, you could wear what
3  you're wearing now?
4   A.  Right.
5   Q.  Did part of your job include cleaning up the
6  production floor? or was that for sanitation?
7   A.  Just the break room.
8   Q.  So you didn't have responsibility over the
9  production out there where debone and evis is?
10  A.  No.
11   Q.  Okay. Did you have any job duties at that
12  time in an area of the plant where they were
13  actually processing chickens?
14  A.  No.
15   Q.  And so you could wear your normal clothes
16  like you're wearing today for that job?
17  A.  Yes.
18   Q.  Any other jobs you performed out there at
19  the chicken plant, whether it was CP or Keystone,
20  other than janitorial and the forklift job?
21  A.  No.
22   Q.  Okay. That was it?
23  A.  (Witness nods head.)

31

1   Q.  Okay. Do you remember on janitorial what
2  your pay rate was? I think you told me when you
3  initially went to Equity Group it was $6. Do you
4  remember what it was back then?
5   A.  I think it was 5.50.
6   Q.  On janitorial?
7   A.  I think it was 5.50.
8   Q.  Okay. While you were at either CP or Equity
9  Group, were you a member of the union?
10  A.  No.
11   Q.  Never were?
12  A.  No.
13   Q.  On either employment?
14  A.  Either employment.
15   Q.  Okay. Did you ever attend a union meeting
16  even though you weren't a union member?
17  A.  No.
18   Q.  Let me just go back to the items of
19  protective equipment you would put on at your
20  locker there. I want to make sure I've got them
21  all or there aren't others.
22      You would use gloves when you would go into
23  the cold storage, but you wouldn't put gloves on

32

1  at your locker, correct?
2   A.  Right.
3   Q.  And would those be rubber gloves or what
4  kind of gloves?
5   A.  Cotton.
6   Q.  And did the company issue those to you?
7   A.  Yes.
8   Q.  Did you wear any kind of plastic apron or
9  sleeves?
10  A.  No.
11   Q.  You didn't need that because you weren't
12  processing chickens, correct?
13  A.  Right.
14   Q.  Did you wear any kind of chain glove or
15  safety gloves?
16  A.  No.
17   Q.  How about earplugs?
18  A.  No.
19   Q.  What about a bump cap? Did you wear any
20  kind of cap on your head?
21  A.  What's that?
22   Q.  It's a cap they put on. Did you wear any
23  kind of cap, other than your head net?

33

1   A.  No.
2   Q.  Did you wear goggles?
3   A.  Yes.
4   Q.  Would those come from the company?
5   A.  Yes.
6   Q.  So your company-issued items are your cotton
7  gloves and your goggles and then your smock?
8   A.  Right.
9   Q.  And then your beard and head net?
10  A.  Right.
11   Q.  Okay. Did you wear any kind of coveralls?
12  A.  No.
13   Q.  And your boot covers, they were issued by
14  the company?
15  A.  Yes.
16   Q.  So as far as what the company or your
17  supervisor said you had to wear, tell me what
18  items were required, that you were required to
19  wear, out of those that we just talked about.
20  A.  Everything you put down there you're
21  required to wear.
22   Q.  So you were required to wear goggles?
23  A.  Cotton gloves, smock, beard net, hair net,

cf316f16-beda-4a40-a932-f59755ebbd85

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

34

1   and boot covers.
2   Q.   Right.  But on the gloves, my understanding
3   is you would wear them only in the cold storage?
4   A.   Right.
5   Q.   Did you ever get disciplined for not wearing
6   any of those items?
7   A.   No.
8   Q.   Are you aware of anybody that ever got
9   disciplined?
10  A.   No.
11  Q.   Did you have any understanding that you
12  could be disciplined if you didn't wear these
13  items?
14  A.   Yes.
15  Q.   And how did you have that understanding?
16  A.   It was in the handbook.
17  Q.   Okay.  And they gave you a handbook?
18  A.   Yes.
19  Q.   And you read it?
20  A.   Right.
21  Q.   So would you store each of these items in
22  your locker?
23  A.   All except my safety goggles.

---

35

1   Q.   All except your goggles?
2   A.   Right.  Like this right here.
3   Q.   Did you keep those with you?
4   A.   Yeah.
5   Q.   So when you would come in, like you
6   described earlier, when you would drive through
7   the gate to the plant, you would have your goggles
8   in your pocket?
9   A.   On my head, just like now.
10  Q.   Okay.  But the rest of the items, the
11  gloves --
12  A.   I stored in my locker.
13  Q.   Okay.  Did all the employees have lockers?
14  A.   I couldn't say.
15  Q.   But you know you did?
16  A.   Yes.
17  Q.   How many lockers were around where yours
18  was?
19  A.   I couldn't say.
20  Q.   Did you ever have occasion to lose
21  any of those items?
22  A.   No.
23  Q.   Okay.  This time when you worked at Equity

---

36

1   Group on the forklift, when you started work they
2   issued you each of those items, correct?
3   A.   Right.
4   Q.   And you never lost them during that time?
5   A.   No.
6   Q.   So you never had to go to the supply room
7   and obtain any of these replacement items?
8   A.   No.
9   Q.   Your activities as far as putting those on
10  would simply be at your locker you would put them
11  on?
12  A.   Right.
13  Q.   Can you go through and tell me the purpose
14  of each of these items, like the purpose of the
15  goggles?
16  A.   Purpose of the goggles was to make sure to
17  keep debris out your eyes and stuff.
18  Q.   How about the gloves?
19  A.   Keep your hands warm when you go in the
20  freezer.
21  Q.   Okay.  How about the smock?
22  A.   The smock?  I never did figure out why you
23  needed a smock.

---

37

1   Q.   Okay.  You weren't processing?
2   A.   No, I wasn't processing.
3   Q.   So you didn't need a smock?
4   A.   Yeah, that's what I'm saying.
5   Q.   You didn't feel you needed it; is that what
6   you're saying?
7   A.   Yeah.
8   Q.   How about the beard net and head net?
9   A.   Keep your hair from -- if it might break
10  off, it might get in some of the meat and stuff.
11  Q.   What about the boot covers?
12  A.   Sometimes the floor be wet; and your shoes,
13  you might slip.
14  Q.   They help with gripping the floor?
15  A.   Yes.
16  Q.   All right.  I want to take you back to when
17  you would get to the plant and you would go to
18  your locker.  Okay?
19       You've got your goggles on your head, like
20  you have now.  Tell me what process you would go
21  through to get ready for work.  Tell me what you
22  would put on first.
23  A.   What part you got lost at?

---

cf316f16-beda-4a40-a932-f59755ebbd85

38

1      MR. PETRO: Just answer his question.
2   Q.   I'm not lost. I haven't asked you this
3   question yet. You've told me generally what you
4   did, and now I'm asking the order in which you
5   would put on these items.
6   A.   Okay. I'll put my smock on first sometimes.
7   Q.   Okay.
8   A.   Or I'll put my boots on first sometimes.
9   Q.   Okay.
10  A.   And I'll put my beard net on and then my
11  hair net on.
12  Q.   Could you have taken any of those items home
13  and put them on if you had wanted to?
14  A.   No.
15  Q.   Why not?
16  A.   Not allowed to.
17  Q.   They wouldn't let you do it?
18  A.   No.
19  Q.   Okay. And your gloves, you wouldn't put
20  those on at your locker; is that correct?
21  A.   That's correct.
22  Q.   You would put them in your pocket, I take
23  it?

39

1   A.   I'd have them in my hand.
2   Q.   And you can put your gloves on while you're
3   walking, correct?
4   A.   If you wanted to.
5   Q.   Is that what you did?
6   A.   No.
7   Q.   How did you do it?
8   A.   I only put my gloves on when I was going in
9   the freezer.
10  Q.   Right. But when you were going in the
11  freezer, you could pull you gloves on?
12  A.   Right.
13  Q.   What about your smock? Could you put that
14  on while you were walking?
15  A.   I'd already have it on.
16  Q.   But you physically could put the smock on
17  while you were walking, correct?
18  A.   Yes, if you wanted to.
19  Q.   And the same with the head net and beard
20  net?
21  A.   You've got to put that on almost
22  immediately.
23  Q.   Right. Before you go back in the production

40

1   area?
2   A.   Right.
3   Q.   But you could, as you were walking, you
4   could put the head net on, correct?
5   A.   I'm trying to understand that question.
6   Q.   All right. I'm just saying -- if I said,
7   "How about, while you're walking, put your hair
8   net on," you could do that, couldn't you?
9   A.   You mean, inside the processing plant?
10  Q.   Out in the hallway.
11  A.   Yeah.
12  Q.   As you're just walking, you could --
13  A.   In the hallway?
14  Q.   Right.
15  A.   Yes.
16  Q.   And so how long does it take you to put your
17  smock on?
18  A.   Sometimes it might take me -- well, it's
19  like how long it takes to put on a shirt.
20  Q.   I mean, 30 seconds?
21  A.   You could say that.
22  Q.   Okay. And then the head net and beard net,
23  is that the same it takes to put a hat on?

41

1   A.   Yeah.
2   Q.   So a few seconds?
3   A.   Just put it this way here: Round it all off
4   to put on everything, you're looking at anywhere
5   from 10 -- 10 minutes or more.
6   Q.   So we've got 30 seconds on the smock. How
7   about on the head net?
8       MR. PETRO: Object to the form. I
9   think he tried to answer it the best he can. But
10  go ahead.
11  A.   I just answered it.
12  Q.   Well, I want you to give me an estimate. I
13  think I asked the question: Is it like putting a
14  hat on? And you said yeah.
15  A.   (No response.)
16  Q.   And I'm just asking you for your estimate of
17  how many seconds it takes you to put your head net
18  and beard net on.
19  A.   I just told you, to round everything, to put
20  on everything, you're looking at 10-plus.
21  Q.   I know. I understand you said that. But
22  I'm entitled to ask you how long it takes.
23  A.   Well, that's the best I can answer the

cf316f16-beda-4a40-a932-f59755ebbd85

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

42

1    question.
2    Q.   Well, I'm going to ask you each item how
3    long it takes to put it on.
4    A.   I don't know.
5    Q.   Then how do you know it takes 10 minutes?
6    A.   Look, I ain't trying to be rude.  It takes
7    from 10-plus to put on everything.
8    Q.   All right.  How long does it take you to put
9    your boot covers on?
10   A.   I don't know.
11   Q.   And the answer on head net was that you
12   don't know, right?
13   A.   Right.
14   Q.   And then gloves.  You put those on as you
15   are walking into the cooler; is that correct?
16   A.   Right.
17   Q.   You don't have to use knives or scissors on
18   your job?
19   A.   No.
20   Q.   What other tools or equipment do you use to
21   perform your job duties?
22   A.   None.
23   Q.   You just get on the forklift and drive,

43

1    right, or push, or whatever you do?
2    A.   Right.
3    Q.   How many other people did the same job you
4    did at the time you would be working?  Were there
5    other forklift operators?
6    A.   There was pallet jack operators, but I
7    couldn't tell you how many there was.
8    Q.   I used the term pallet jack earlier.  Is
9    that what you call your piece of equipment, a
10   pallet jack?
11   A.   Some people called it a forklift.  It
12   varies.
13   Q.   What I'm thinking of when I say pallet jack,
14   it's got like forklift pieces on it, but it's on
15   rollers and you push it; and it's got like a
16   hydraulic where you could pump it up.
17   A.   No.  This is ran by battery, and you do like
18   (indicating).
19   Q.   I see.  But you didn't sit in it; it was
20   like pushing a lawn mower or something?
21   A.   Right.
22   Q.   Okay.  I understand.  So there were other
23   people that were operating that same equipment at

44

1    that time?
2    A.   Right.
3    Q.   And would they wear the same items as you
4    would?
5    A.   Right.
6    Q.   Goggles, smock, head net, beard net, boot
7    covers?
8    A.   Right.
9    Q.   Did any of those other people wear any
10   equipment in addition to what you wore?
11   A.   Rephrase that again.
12   Q.   Of the people that operated the pallet jacks
13   like you did, did they wear any protective gear or
14   equipment that you did not wear?  Did they wear
15   anything in addition to what you wore?
16   A.   We all wore the same thing.
17   Q.   Okay.
18   A.   Same thing.
19   Q.   You told me earlier your shift ended at
20   8 a.m.?
21   A.   Yes.
22   Q.   And you said you would clock in at what
23   time? midnight?

45

1    A.   Twelve.
2    Q.   Twelve.  And then clock out at eight?
3    A.   Right.
4    Q.   And to get into the plant, you would have to
5    go in through security?
6    A.   Right.
7    Q.   Would you have to wait in line to do that or
8    could you drive on through?
9    A.   Had to wait in line sometimes.
10   Q.   And you would be pulling through security
11   typically at what time?
12   A.   Well, I'd say about 20 'til.
13   Q.   Okay.  And that's just a matter of showing
14   them your badge or your identification, and then
15   they would let you through?
16   A.   Right.  And take you about five minutes to
17   get your parking space.  And that be about a
18   quarter 'til, 11:45, coming in.
19   Q.   I understand.  And then how many breaks did
20   you get once you started working?
21   A.   It's done been so long.  I want to be as
22   truthful as I possibly can.  I think two 30-minute
23   breaks.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

46

1  Q.  Okay.  And how did you spend your break
2  time?  Did you go to a break room?  Tell me what
3  you did.
4  A.  I'd mostly go to the break room and read.
5  Q.  What would you read?
6  A.  The Holy Quran.
7  Q.  Okay.  So to get from your work area to the
8  break room, tell me what you would do.  Would you
9  take your smock and so forth off?
10  A.  Yes.
11  Q.  Where would you do that?
12  A.  Right there by the -- I call it the
13  cesspool, because it's got all that sanitizer in
14  it.
15  Q.  You call it what?
16  A.  I call it cesspool.
17     MR. PETRO:  Cesspool.
18  Q.  Like c-e-s-s pool?
19  A.  Yeah.  That's what I called it.
20  Q.  And tell me where that area is.
21  A.  You got me throwed off.  Live hang and
22  debone, and then another department is called
23  something else.  Evis.  Yeah.  Debone.

47

1  Q.  So you would hang it in the debone area?
2  A.  Right.
3  Q.  And then what break room would you take your
4  break in?
5  A.  Right across from debone.
6  Q.  Is that the same one where your locker was?
7  A.  Right.  It's been a long time since I've
8  been there.
9  Q.  Sure.  So you would get into the break room
10  and you would read?
11  A.  Right.
12  Q.  And then what else would you do? anything
13  else?
14  A.  I might eat me a snack and I might not.
15  Q.  Okay.  And how would you know -- did you
16  have a set time every day for every break that you
17  would take?  I mean, like would it be at like
18  2:30 a.m. every morning, or how would that work?
19  I'm just using that as an example.
20  A.  That varies too, see.  Sometimes they'll
21  tell you to go early; sometimes they'll tell you
22  to go late.
23  Q.  And who would tell you that?

48

1  A.  Jabo.
2  Q.  And would you clock out or in or what?
3  A.  No.  You just go to break.
4  Q.  Did you keep track of how long your break
5  lasted?
6  A.  Only time I knew when it was over with,
7  he'll call you in.
8  Q.  So he would tell you when to go to break and
9  when to come back?
10  A.  Right.
11  Q.  Would y'all all take the break at the same
12  time?
13  A.  No.
14  Q.  Okay.  How would that work?
15  A.  Because, to give a good example, you may
16  have a truck got to be loaded up.  I might not
17  have nothing to be loaded up.  He'll tell you to
18  load your truck up and tell me to go to break.
19  Q.  And when he gets finished, he may go to
20  break?
21  A.  Right.  That's how that worked there.
22  Q.  So you really couldn't control when the
23  trucks were there, so somebody had to be there

49

1  when the trucks would come in; is that what I'm
2  hearing?
3  A.  Right.
4  Q.  And would you drive yourself to work every
5  day or would you ride with somebody?
6  A.  I drove my own car.
7  Q.  Okay.  When you would be there at your
8  locker when you would come in at the beginning of
9  your shift, would you do anything other than put
10  your PPE on, your smock and your head net?  Would
11  you go to a snack machine or do anything like
12  that?
13  A.  No.
14  Q.  Did you have any other part of your daily
15  routine?  Did you do anything other than put on
16  your stuff at the locker?
17  A.  When I get to work, I'd get prepared to go
18  to work.  I ain't got time to walk around and do
19  nothing else.
20  Q.  Okay.  And tell me, when you would swipe
21  your card, you're telling me that they wouldn't
22  allow you to swipe it until midnight?
23  A.  Right.

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

**50**

1 Q. How many people would be there to swipe the
2 card at the same time?
3 A. Oh, man. It would be however many people on
4 the shift.
5 Q. It would be a lot of people standing there?
6 A. A lot of people waiting.
7 Q. And where is that machine that you would
8 swipe your card?
9 A. Right across from debone.
10 Q. And that is the one you would have to use?
11 A. Right.
12 Q. Did some of the employees -- when you would
13 be in there at your locker, would you notice other
14 employees --
15     MR. SMITH: Strike that.
16 Q. When you would be at your locker getting
17 dressed for your shift, would there be other
18 employees in the break room sitting around at the
19 tables, talking and eating and so forth? Did you
20 ever notice that?
21 A. Yes.
22 Q. And would those be people that had just
23 gotten to work early that were having a snack or

---

**51**

1 something?
2 A. It would be some getting ready to go home.
3 Q. So they would be sitting around there at the
4 end?
5 A. Right.
6 Q. What about those that would be starting?
7 Would there be any about to start work?
8 A. Yes.
9 Q. How many? Any estimate of how many normally
10 would be there?
11 A. I don't know.
12 Q. What time were you required to be at your
13 position ready to work?
14 A. At twelve o'clock.
15 Q. Would that mean you would have to clock in
16 before twelve?
17 A. You couldn't. You clocked in at twelve.
18 Q. How could you wait in line with all those
19 people and be all the way back to the loading dock
20 at twelve? How could you do both of those things
21 at twelve?
22 A. Well, let's try to be rational. When you've
23 got a person whose mind is irrational, if he's not

---

**52**

1 thinking correctly he would tell you to be in the
2 back at twelve o'clock. Do you understand what
3 I'm saying?
4 Q. Sure.
5 A. I mean, you've got to rush to clock in and
6 get to the back; you understand? knowing you might
7 be five minutes late or ten minutes late. But
8 you've got to clock in at twelve o'clock.
9 Q. Did you ever see anybody clock in before
10 twelve?
11 A. No.
12 Q. All right. So have you told me everything
13 you'd do from the time you'd drive through that
14 gate until the time you started work?
15 A. Say that again.
16 Q. Have you told me everything that you would
17 do from the time you'd drive through the security
18 gate until the time you started performing your
19 job duties?
20 A. Have I told you that?
21 Q. Have you told me all the activities you'd
22 undertake?
23 A. Yes.

---

**53**

1 Q. Okay. And as I understand it, that is drive
2 through the security gate, park your car; you walk
3 to your locker; you put on your smock, beard net,
4 head net, boot covers; you go swipe in your card,
5 and then you start working?
6 A. Right.
7 Q. Anything else in between all those
8 activities?
9 A. Nothing else.
10 Q. You mentioned you would be out there and
11 there would be a lot of people there waiting in
12 line to swipe your timecard in. Do you remember
13 you told me that? to clock in?
14 A. Yes.
15 Q. Did you ever see anybody out there in that
16 area putting on their smock or their hat as they
17 were going toward the time clock?
18 A. No.
19 Q. Okay. So you're saying -- did you ever see
20 them doing anything like putting gloves on, gear
21 on, as they walked toward the time clock?
22 A. No.
23 Q. Where would they put it on, people that you

---

cf316f16-beda-4a40-a932-f59755ebbd85

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

**54**

1  observed?
2  A.  By their locker.
3  Q.  Okay.  How long would it take you to walk
4  from your work area to the break room where you
5  took your breaks?
6  A.  It varied.
7  Q.  Okay.
8  A.  Because you've got a whole department.  I
9  mean, hypothetical.  You've got 50 people in
10  there, and everybody's trying to get out front,
11  and you're the last one.
12  Q.  All right.  How long would that take you?
13  A.  I really couldn't tell you.
14  Q.  If there was nobody there, how long would it
15  take you?
16  A.  I really couldn't tell you.
17  Q.  One minute? five minutes?
18  A.  I really couldn't tell you.
19  Q.  Did you ever time it?
20  A.  No.
21  Q.  When you would go on break, did you have to
22  wash your hands or go to a wash station or
23  anything like that?

**55**

1  A.  No.
2  Q.  I guess you weren't working with the raw
3  poultry so you didn't have to clean up; is that
4  correct?
5  A.  No.
6  Q.  Were there any items, like your smock or
7  your head net, that you would keep on during the
8  break?
9  A.  No.  Let me rectify something.
10  Q.  Okay.
11  A.  You said keep on during the break.  You
12  would take them off.
13  Q.  Okay.  So I guess you're saying you would
14  take off everything at break?
15  A.  Everything except for my boots.
16  Q.  You would leave your boot covers on, put
17  your goggles on your head like you have them now?
18  A.  Right.
19  Q.  And you would take off your smock and your
20  head net?
21  A.  I'd take my smock off.
22  Q.  What about your head net?
23  A.  I'd keep that on.

**56**

1  Q.  So the only thing that you would take off at
2  break was your smock?
3  A.  I'd take off my smock.
4  Q.  Okay.  Can you give me any estimate of how
5  long, what the length of time is between when
6  you'd leave your work area and when you'd leave
7  the break room?
8  A.  No, I can't.
9  Q.  Is that because you can't recall?
10  A.  I don't know.
11  Q.  Don't know.  Okay.  And while you were on
12  break, you've said that you would read, correct?
13  A.  Correct.
14  Q.  And that would be in the break room?
15  A.  In the break room.
16  Q.  Did you have the ability to go outside the
17  break room, like outside the plant, if you wanted
18  to?
19  A.  Yes.
20  Q.  So you could leave the building?
21  A.  Yes.
22  Q.  What else could you do?  Could you go
23  outside into the parking lot to your car?

**57**

1  A.  Yes, I could.
2  Q.  That wouldn't be against the rules?
3  A.  No.
4  Q.  Could you leave the plant premises?  Could
5  you get in your car and drive outside the plant on
6  break?
7  A.  Yes, you could.
8  Q.  You could do that?
9  A.  Yes.
10  Q.  And I think you told me earlier your breaks
11  were normally 30 minutes?
12  A.  Yes.
13  Q.  And you had two of those per shift?
14  A.  Yes.
15  Q.  And then when you would come off your break,
16  you would make your way straight back to the area
17  where you worked?
18  A.  Right.
19  Q.  Where would you put your smock on?
20  A.  When I'd get back inside debone.
21  Q.  You would put your smock on inside?
22  A.  Dip my feet, then put my smock back on.
23  Q.  And would you put your smock on as you were

58

1    walking to your work area?
2    A.   No. I'd put it on right then.
3    Q.   At the end of your shift, tell me what you
4    would do, when you would get done working.
5    A.   Be prepared to go home.
6    Q.   I guess I'm asking you what steps are
7    involved in that. You finished work. What was
8    the first thing you would do? Did you clock out?
9    A.   I started walking toward the front.
10   Q.   And then you would clock out? Walk me
11   through it.
12   A.   I'd walk to the front, walk through the
13   doors, take my smock off, walk to my locker and
14   put stuff in my locker. When I finished that
15   there, then I'd go to the time clock, clock out,
16   then go home.
17   Q.   So you would clock out after you'd take that
18   stuff off?
19   A.   Right.
20   Q.   What time normally would you swipe that
21   card? Do you have any idea?
22   A.   No, I don't have no idea.
23   Q.   Okay. What is your understanding of how

59

1    Equity Group kept track of the time that you
2    worked?
3    A.   I don't understand the question.
4    Q.   Do you have any understanding -- they paid
5    you by the hour, correct? You would get paid an
6    hourly rate?
7    A.   Right.
8    Q.   So they would need to keep up with how many
9    hours you worked?
10   A.   Right.
11   Q.   Do you have any understanding of how they
12   kept up with how many hours you worked?
13   A.   The timecard.
14   Q.   So you swiped in, and the time system would
15   keep track of that?
16   A.   Yes.
17   Q.   Do you have an understanding of when your
18   pay would start, when the time would start running
19   for what they would base your pay on?
20   A.   Give me an example.
21   Q.   Well, at what point do you think the time --
22   they have to keep track of your time so they could
23   pay you based on your time, correct? You

60

1    understand that?
2    A.   Yeah.
3    Q.   When would that time start?
4    A.   When you clocked in.
5    Q.   That's your understanding?
6    A.   Right.
7    Q.   When would it stop?
8    A.   When you clocked out.
9    Q.   Okay. Did you ever have any occasion where
10   you had to go to payroll or to human resources and
11   complain that your check was short, that you
12   weren't paid what you thought you should be paid?
13   A.   Yes.
14   Q.   When was that?
15   A.   My lunch period.
16   Q.   But did you ever go complain to anybody?
17   A.   Yes. I complained to Jabo.
18   Q.   When was that?
19   A.   When I was there. On numerous occasions.
20   Q.   And that was that you wanted to be paid for
21   your break?
22   A.   I wanted to be paid for the work I was doing
23   and wasn't getting paid for.

61

1    Q.   Tell me what work that was.
2    A.   Such as getting prepared to go to work.
3    Q.   So what we've been talking about?
4    A.   Right.
5    Q.   Nothing other than that?
6    A.   Nothing other than that.
7    Q.   Okay. Were you paid weekly?
8    A.   Right, weekly.
9    Q.   Would you study your check? There's a pay
10   stub on there, correct?
11   A.   Yes.
12   Q.   Would you look that over?
13   A.   I looked over all my checks.
14   Q.   And was that to make sure you were getting
15   paid for what you worked?
16   A.   Right, for what I worked.
17   Q.   And it would show on there how many hours
18   they were paying you for, correct?
19   A.   Right.
20   Q.   Okay. And do you have any reason to think
21   that any of these paychecks or those pay stubs
22   that had that information on it were inaccurate?
23   A.   Yes.

cf316f16-beda-4a40-a932-f59755ebbd85

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

62

1   Q.   Why was that?
2   A.   I just told you.  I wasn't getting paid for
3   getting ready to go to work.
4   Q.   Okay.  Did you ever keep your own set of
5   time records on how much you worked?  In other
6   words, would you write down when you got there,
7   when you'd leave, when you went on break?
8   A.   No.
9   Q.   Do you know anybody that would keep those
10  kind of records?
11  A.   No, I don't.
12  Q.   Any other employees?
13  A.   No, I don't.
14  Q.   Have you tried to add up how much time you
15  had that you claim you're due to be paid for, as
16  far as for putting on your smock and so forth?
17  Have you figured that up?
18  A.   I attempted to one time.  I lost interest in
19  it.
20  Q.   Why is that?
21  A.   It's like beating your head against the
22  wall.
23  Q.   You weren't able to figure it out?

---

63

1   A.   I mean, it was like beating your head
2   against the wall.
3   Q.   Did you write down some calculations?
4   A.   Yes, I did.
5   Q.   Do you have those?
6   A.   No, I don't.
7   Q.   Do you remember what you came up with?
8   A.   No, I don't.
9   Q.   Did you ever have to stay past 8 a.m. to
10  work overtime?
11  A.   No.
12  Q.   They never asked you to stay extra?
13  A.   Never asked me.
14  Q.   Okay.  And you're not a union member, but
15  have you ever filed any kind of grievance with the
16  union?
17  A.   No.
18  Q.   Okay.  And other than your complaints that
19  you told me about with Jabo, have you made any
20  other complaints to him about your work conditions
21  or your pay or anything like that?
22  A.   No.
23  Q.   Have you filed any kind of claim with the

---

64

1   Department of Labor or with the EEOC or any kind
2   of governmental agency about your pay?
3   A.   No.
4   Q.   Did you ever have any kind of disciplinary
5   action against you or any counseling while you
6   worked at Equity Group?
7   A.   No.  Can I call my work and let them know
8   this is going to take longer?
9   Q.   Go ahead.  That's fine.
10          (A brief recess was taken.)
11          MR. SMITH:  I'm done.  Thank you for
12  your time.
13          MR. PETRO:  No questions.
14
15      (The deposition was concluded.)
16
17
18
19
20
21
22
23

---

65

1           C E R T I F I C A T E
2
3   STATE OF ALABAMA
4   BARBOUR COUNTY
5
6       I hereby certify that the above and
7   foregoing deposition was taken down by me in
8   stenotype and the questions and answers thereto
9   were transcribed by means of computer-aided
10  transcription, and that the foregoing represents
11  a true and correct transcript of the testimony
12  given by said witness upon said hearing.
13      I further certify that I am neither of
14  counsel, nor kin to the parties to the action,
15  nor am I in anywise interested in the result of
16  said cause.
17
18
19      CYNTHIA M. NOAKES, Commissioner
20      Certified Court Reporter,
21      ACCR #327 - Expires 09/30/2008
22
23      Commission Expires 07/08/2009

---

TAB 48

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


NO.:  2:06-CV-1081-MEF


BETTY ANN BURKS, et al.,

        Plaintiff(s),

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

        Defendant(s).


DEPOSITION OF

ROSE D. SHAW

JOB NO. 1101-58505


BEFORE:    Victoria M. Castillo

           Certified Court Reporter and

           Notary Public

           ACCR# 17, Expires 9/30/2008


2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO   or   205-251-4200

1952a282-b6ee-4fc9-bdb2-b36bb41beb04

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

**2**

1     In accordance with Rule 5(d) of
2   The Alabama Rules of Civil Procedure, as Amended,
3   effective May 15, 1988, I, Victoria M. Castillo, am
4   hereby delivering to HOWARD A. ROSENTHAL, ESQ. the
5   original transcript of the oral testimony taken on
6   the 23rd day of May, 2008, along with exhibits.
7     Please be advised that this is
8   the same and not retained by the Court Reporter,
9   nor filed with the Court.
10
11     S T I P U L A T I O N
12
13     IT IS STIPULATED AND AGREED, by
14   and between the parties through their respective
15   counsel, that the deposition of ROSE D. SHAW may be
16   taken before Victoria M. Castillo, Commissioner, at
17   WILLIAMS, POTTHOFF, WILLIAMS & SMITH, 125 South
18   Orange Avenue, Eufaula, Alabama 36027 on the 23rd
19   day of May, 2008.
20     IT IS FURTHER STIPULATED AND
21   AGREED that the signature to and the reading of the
22   deposition by the witness is waived, the deposition
23   is said to have the same force and effect as if

---

**3**

1   full compliance had been had with all laws and
2   rules of Court relating to the taking of
3   depositions.
4     IT IS FURTHER STIPULATED AND
5   AGREED that it shall not be necessary for any
6   objections to be made by counsel to any questions,
7   except as to form or leading questions, and that
8   counsel for the parties may make objections and
9   assign grounds at the time of trial, or at the time
10   said deposition is offered in evidence, or prior
11   thereto.
12     IT IS FURTHER STIPULATED AND
13   AGREED that notice of filing of the deposition by
14   the Commissioner is waived.
15
16
17
18
19
20
21
22
23

---

**4**

1     I N D E X
2
3   EXAMINATION BY:          PAGE NUMBER:
4   Mr. Fry                  6, 60
5   Mr. Steensland              50
6
7   EXHIBITS:              PAGE NUMBER:
8   * Shaw Exhibit 1            46
9
10   * Exhibit was retained by counsel.
11
12
13
14
15
16
17
18
19
20
21
22
23

---

**5**

1     A P P E A R A N C E S
2
3   FOR THE PLAINTIFF(S):
4     M. John Steensland, III, Esq.
5     PARKMAN, ADAMS & WHITE
6     739 West Main Street
7     Dothan, Alabama 36301
8
9   FOR EQUITY GROUP EUFAULA DIVISION
10     Gary D. Fry, Esq.
11     Pelino & Lentz
12     One Liberty Place
13     Thirty-Second Floor
14     1650 Market Street
15     Philadelphia, Pennsylvania 19103
16
17     *********************
18
19     I, Victoria M. Castillo, a Court
20   Reporter of Montgomery, Alabama, acting as
21   Commissioner, certify that on this date, as
22   provided by the Alabama Rules of Civil Procedure
23   and the foregoing stipulation of counsel, there

---

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

1952a282-b6ee-4fc9-bdb2-b36bb41beb04

6

1  came before me at WILLIAMS, POTTHOFF, WILLIAMS &
2  SMITH, 125 South Orange Avenue, Eufaula, Alabama
3  36027, commencing at 11:41 a.m., ROSE D. SHAW, in
4  the above cause, for oral examination, whereupon
5  the following proceedings were had:
6
7           ROSE D. SHAW,
8      being first duly sworn, was examined and
9          testified as follows:
10
11  EXAMINATION BY MR. FRY:
12      Q.    Ms. Shaw, my name is Gary Fry.  I'm
13  one of the lawyers for Equity Group Eufaula that
14  operate that poultry plant that you worked at at
15  some point -- and you may still do -- out at Baker
16  Hill.  We've asked you here today to put some
17  questions to you.  Have you ever given a
18  deposition?
19      A.    I think I have.
20      Q.    Well, we've asked you here to put
21  some questions to you about the lawsuit that you
22  and some other folks have brought against the
23  company.  I will be asking you some questions, and

7

1  you will be answering, and Victoria, the court
2  reporter, will be taking down what we say.  She can
3  only take down one of us at a time, so let's not
4  try and talk over one another.  And if you don't
5  understand any of my questions, it's important for
6  you to let me know that and I will try and rephrase
7  it so you will understand it.  If you don't hear
8  anything that I say, let me know.  And finally, any
9  answer that you give, it has to be verbal because
10  she can't record a nod or a shake of the head.
11  Okay?
12      A.    Okay.
13      Q.    Where do you live?
14      A.    Clay County, Georgia.
15      Q.    Could you give us your address?
16      A.    19 Red Fox Lane, Bluffton, Georgia.
17      Q.    And what is your date of birth?
18      A.    November 28th, 1956.
19      Q.    Are you currently employed?
20      A.    Yes.
21      Q.    By whom?
22      A.    By Equity Group.
23      Q.    How long have you worked for Equity?

8

1      A.    Ever since they took over about --
2  they have been there about three years.
3      Q.    If I would suggest to you that they
4  took over in around March of 2004, would that be
5  consistent with your recollection?
6      A.    2004, I guess.  I thought it was --
7  yes.
8      Q.    When you went to work there, was it
9  operated by Equity?
10      A.    No.
11      Q.    CP was still there?
12      A.    Yes.
13      Q.    How long after you started did Equity
14  take over?
15      A.    I don't know when they had took
16  over.  I don't understand what you mean.
17      Q.    When do you recall starting to work
18  at that plant?
19      A.    August 1998.
20      Q.    You've been there a long time.  So
21  you've been there almost ten years?
22      A.    Yes.
23      Q.    What's your current job out there?

9

1      A.    I'm down at the bottom of the line
2  working in the combos, checking to make sure there
3  is no skin, no bones, or nothing in the combo or on
4  the meat.  So I really work -- they put me there in
5  the combos at the end of the line to check for to
6  make sure no bone in the breast meat or no skin on
7  the breast meat, make sure everything out the
8  combos, but they do move me around.
9      Q.    Am I correct that you work in the
10  debone department?
11      A.    Yes.
12      Q.    And you work around the debone
13  production line?
14      A.    Right, at the end of the line.
15      Q.    Do you actually get on the line and
16  cut chickens?
17      A.    No.
18      Q.    How long have you had this job?
19      A.    It's been about two years or more.  I
20  think -- I'm not for sure.
21      Q.    Does the company have a name for the
22  job you do?
23      A.    I don't know.

10

1    Q.    But you check chicken that's already
2    in the combos?
3    A.    Right, I'm checking the chicken
4    coming down the line, falling into the combos.
5    Q.    To make sure it gets into the combos?
6    A.    Well, it going to get into the
7    combos. I am there to make sure nothing else don't
8    go in the combo but the chicken -- no bone, no
9    skin.
10   Q.    And you indicated to me from time to
11   time they move you around and you do some other
12   things?
13   A.    Yes.
14   Q.    What are some of the other things
15   they do?
16   A.    I go down and turn the meat on the
17   end of the line, which is about the last -- make
18   sure it go through the skin puller, turn it over.
19   Q.    To make sure it's --
20   A.    The skin off of it.
21   Q.    The skin comes off properly, it's in
22   the right position, is that what you do?
23   A.    Right.

11

1    Q.    How long have you had this job that
2    you have described for me?
3    A.    I had that ever since they put the
4    skin pull over -- I can't really. It's been over
5    some years, about two or three years.
6    Q.    What job did you do before this job?
7    A.    I worked on the line.
8    Q.    On the debone line?
9    A.    Uh-huh.
10   Q.    Cutting chicken?
11   A.    Mostly pulling breasts and pulling
12   tenders.
13   Q.    You were a tender puller?
14   A.    Uh-huh.
15   Q.    And how long did you do that?
16   A.    I don't know, I really don't.
17   Q.    What were you doing when you first
18   went to work there when CP had it?
19   A.    I was at the end of the line, making
20   sure the bones and skin off the breast meat.
21   Q.    So you were a --
22   A.    Inspector.
23   Q.    And how long did you do that?

12

1    A.    They change so much, I really can't
2    say.
3    Q.    What's your current rate of pay?
4    A.    $10.
5    Q.    And who is your supervisor?
6    A.    Donna Bell.
7    Q.    How many hours per week do you work?
8    A.    Forty.
9    Q.    Monday through Friday?
10   A.    Yes.
11   Q.    How long were you a tender puller?
12   A.    I pull tenders now sometimes if they
13   need me.
14   Q.    Since you started at the plant, have
15   you always worked in the debone department?
16   A.    Yes.
17   Q.    Have you always worked either on or
18   around the debone line?
19   A.    Right.
20   Q.    Have you always worn the same kind of
21   outer garments and supplies and PPE?
22   A.    PPE every day, yes.
23   Q.    The stuff that you wear, has it been

13

1    pretty much the same from the time you started to
2    today?
3    A.    No, they done changed. Because we
4    used to couldn't wear our boots out. Now we wear
5    them out.
6    Q.    But the things you actually wear, has
7    that remained pretty much unchanged?
8    A.    Yes, it's still the same.
9    Q.    You understand that you are a party
10   to this lawsuit?
11   A.    Yes.
12   Q.    How did you find out about the
13   lawsuit?
14   A.    I can't remember.
15   Q.    What's your understanding about what
16   your claim is in this lawsuit?
17   A.    Like we be working, right? Like I'm
18   at the end of the line, and when the line stop at
19   ten -- I say 10:15. When it get down there to me,
20   it probably 10:25, but all of us on the same
21   break, right? All of us got to come back at the
22   same time. But me I'm going out at 10:30, half of
23   the people gone and sitting down eating when I'm

1952a282-b6ee-4fc9-bdb2-b36bb41beb04

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

**14**

1  back -- before I get out.
2     Q.   So your claim is for lost break time?
3     A.   Yes.
4     Q.   What shift do you work?
5     A.   First shift.
6     Q.   Have you always worked first shift?
7     A.   Yes.
8     Q.   And what are the hours that you work,
9  from when to when?
10     A.   It's supposed to be from 7:30 to
11  4:30.
12     Q.   7:30 a.m. to 4:30 p.m.?
13     A.   Yes.
14     Q.   Are you a member of the Union?
15     A.   Yes.
16     Q.   How long have you been a Union
17  member?
18     A.   Ever since the Union been.
19     Q.   So since CP days?  You've been a
20  member of the Union since CP had the --
21     A.   Whenever they started, I've been in
22  it.
23     Q.   Have you ever been a Union steward?

**15**

1     A.   No.
2     Q.   Have you ever held any position with
3  the Union?
4     A.   No.
5     Q.   You have never been on any
6  negotiating committee?
7     A.   No.
8     Q.   Have you ever attended any Union
9  meetings?
10     A.   No.
11     Q.   Did you review any documents before
12  you came here today to prepare yourself?
13     A.   Did I review --
14     Q.   Look at any papers?
15     A.   No.
16     Q.   Did you talk with anyone about your
17  appearance here today besides your lawyers?
18     A.   No.
19     Q.   Have you ever attended any meetings
20  with your co-employees where this lawsuit was
21  discussed?
22     A.   What you mean?
23     Q.   Have you ever been to a meeting where

**16**

1  this lawsuit was discussed when there were other
2  employees around?
3     A.   Well, no, I went -- when -- I don't
4  understand that.
5     Q.   Have you ever gone to a hotel where
6  there were other employees and met with other
7  employees and the lawsuit was discussed?
8     A.   Like employees that I work with?
9     Q.   Yes, ma'am.
10     A.   No.
11     Q.   You don't recall any meetings where
12  this lawsuit was discussed that you attended?
13     A.   No, I don't.
14     Q.   What sort of clothing, PPE -- however
15  you want to describe it -- are you supposed to put
16  on to do your job every day?
17     A.   Every day I put on ear plugs, and I
18  put on my hair net -- or I come in, then when I get
19  in, I have to have on my boots before I get in, and
20  once I come in the door, I have to make sure they
21  sanitized, and then I have to go and put on my
22  smock and my sleeves and my apron and my gloves --
23  my cotton gloves -- cotton liners -- and my blue

**17**

1  gloves, and then wash -- make sure they washed
2  down.
3     Q.   So the things that you wear are your
4  ear plugs, your hair net, and your boots?
5     A.   Yes.
6     Q.   And you are permitted to put those on
7  before you go into the production area, right?
8     A.   Yes.
9     Q.   Are you permitted to wear your boots
10  from home?
11     A.   Yes.
12     Q.   Now?
13     A.   Now, I am.
14     Q.   At one point in time, though, you
15  weren't allowed to do that, right?
16     A.   No.
17     Q.   And that changed at some point when
18  Equity took over?
19     A.   I don't know.  I really don't.
20     Q.   What about your ear plugs, can you
21  wear those from home?
22     A.   No -- I mean, yes, I guess if you
23  want to, but I don't.  Most of them put them on at

1952a282-b6ee-4fc9-bdb2-b36bb41beb04

18

1   work.
2       Q.    So let me run down this list to make
3   sure I have everything. Ear plugs, hair net,
4   boots, smock, plastic sleeves, apron, gloves, and
5   white liners?
6       A.    And the blue gloves.
7       Q.    Is that list complete?
8       A.    For me.
9       Q.    Do other people wear other things?
10      A.    Yes, they wear different stuff than
11  that.
12      Q.    Because they do other jobs?
13      A.    Right.
14      Q.    What do other people wear that you
15  don't wear?
16      A.    Well, they have to have the arm
17  guard; they have to have their safety -- another
18  chain glove.
19      Q.    Does your job require you to use a
20  knife or scissors?
21      A.    No, not now because the doctor -- I
22  got tendinitis in my right hand.
23      Q.    When you were a tender puller, did

19

1   you have to use a knife?
2       A.    No.
3       Q.    Did you ever use a knife on any job
4   that you had there?
5       A.    Yes.
6       Q.    And what job were you doing when you
7   used a knife?
8       A.    I was deboning. I just debone -- I
9   used the scissors.
10      Q.    When did you do that?
11      A.    What, debone?
12      Q.    Yes.
13      A.    It's been a while.
14      Q.    Was it back when CP had the place?
15      A.    Yes, CP had it. And since Equity had
16  it too, the scissors.
17      Q.    So since Equity has taken over, you
18  have spent some time on the line?
19      A.    Yes.
20      Q.    Cutting up chicken?
21      A.    Yes, pulling breasts.
22      Q.    Is it your understanding that the
23  items that you identified for me are required?

20

1       A.    Yes.
2       Q.    Do you pick these items up at the
3   supply room ever?
4       A.    Yes, you have to go to the supply
5   room and get them.
6       Q.    Which of these items do you get every
7   day?
8       A.    My smock.
9       Q.    Anything else?
10      A.    Yes, on Monday we get everything.
11  Some days I have to go back and get like gloves.
12  Most of the time I have to go get gloves every
13  day.
14      Q.    Do you have a locker at the place?
15      A.    I did, yes.
16      Q.    You do?
17      A.    Uh-huh.
18      Q.    Do you store things overnight in the
19  locker?
20      A.    Do I store stuff?
21      Q.    Yes.
22      A.    No. I go back there and get my --
23  like I have my purse and stuff. Yes, your food and

21

1   stuff, I guess if you want to store it, you can --
2   not overnight, you put it in there.
3       Q.    At the end of the day, do you take
4   your sleeves and your apron home?
5       A.    Yes.
6       Q.    These items that you told me that you
7   wear, when do you put them on?
8       A.    Which one? I put my hair nets and my
9   ear plugs on before I go in.
10      Q.    Before you go onto the production
11  floor?
12      A.    Uh-huh.
13      Q.    Yes?
14      A.    Yes.
15      Q.    And you already have your boots on,
16  right?
17      A.    Yes.
18      Q.    And once you are on the production
19  floor, that's when you put on your smock, your
20  sleeves, and your apron, and your gloves?
21      A.    Uh-huh.
22      Q.    If your shift starts at 7:30 a.m.,
23  what time do you go into the production floor in

1952a282-b6ee-4fc9-bdb2-b36bb41beb04

22

1    order to put these things on?
2    A.    You got to get in there by 7:25.
3    Q.    7:25?
4    A.    Yes, sir, to get it on, to be ready
5    -- you know, you got to be in there early enough to
6    have it on.
7    Q.    What time do you --
8    A.    Do I go?
9    Q.    Yes.
10   A.    Most of the time I try to get in
11   there.  It all depends -- if I clock in at -- I
12   have to go up and get my smock, the stuff.  And it
13   all depends on if the people there cleaning up, we
14   have to wait.  And then when they say "come in", we
15   have to be ready to go in.
16   Q.    So it varies because sometimes the
17   room might not be cleaned by the sanitation people?
18   A.    Yes.
19   Q.    When the room is ready for you and
20   you're going to start at 7:30, what time do you
21   usually go into that room to put on your clothes
22   and your PPE?
23   A.    I try to be in there at least before

23

1    about -- I'd say about 25 after seven.  It all
2    depends.
3    Q.    When you used the scissors on the
4    line, were the scissors provided to you on the
5    line?
6    A.    Yes.
7    Q.    You didn't have to go pick them up?
8    A.    No, somebody bring them to you.
9    Q.    Did you ever use a knife?
10   A.    Yes, I did.
11   Q.    You didn't have to go pick that knife
12   up anywhere, did you?
13   A.    No.
14   Q.    That was provided to you on the line?
15   A.    Yes.
16   Q.    How many breaks do you get in a day?
17   A.    Two.
18   Q.    How long are they?
19   A.    They say 30 minutes.
20   Q.    Your shift starts at 7:30, correct?
21   A.    Yes.
22   Q.    When do you take your first break?
23   A.    Supposed to start at 10:15.

24

1    Q.    You indicated to me that you have to
2    stay while the other people go on break, correct?
3    A.    Well, the line start breaking down at
4    10:15.  By the time it gets down there to me, it be
5    way after.
6    Q.    What time do you get to leave your
7    job post?
8    A.    Probably about sometime like --
9    sometime I come out, it be like 10:30.
10   Q.    And what time do you get in the break
11   room?
12   A.    I really -- I really can't say, you
13   know, because I look at the clock.  I got to be the
14   last one there and make sure they get the combos
15   and stuff, then I got to wash down, and do that.
16   Q.    So sometimes you don't leave the
17   production line until 10:30, is that what you're
18   telling me?
19   A.    Right.
20   Q.    And are you in the break room at
21   10:30?
22   A.    No.
23   Q.    Takes you some time to do what you

25

1    need to do?
2    A.    Right.
3    Q.    What time then do you actually get
4    into the break room?
5    A.    You know what, I really ain't pay it
6    no attention.
7    Q.    I assume though that you pay
8    attention about what time you have to be back?
9    A.    Yes, I have to be back when everybody
10   else come back.
11   Q.    And what time is that?
12   A.    10:45.
13   Q.    How do you get to work in the
14   morning?
15   A.    I ride with someone, carpool with
16   someone.
17   Q.    Do you have to spend any time passing
18   through any security procedures?
19   A.    Yes, I do.  I do, because I don't
20   have no sticker on my car.
21   Q.    So what do you have to do?
22   A.    I have to go through the guard shack,
23   stop, and show my ID, and they ask me where I'm

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

**26**

1  going, then they give me a little pad -- a little
2  thing -- tag, and I put it in my window.
3      Q.    And when you leave at night, you have
4  to stop and hand that tag back in?
5      A.    Yes.
6      Q.    Why haven't you gotten a sticker for
7  your car?
8      A.    Well, the one I did have, he tore up.
9      Q.    Who tore up?
10     A.    My car.  My car is not fixed.
11     Q.    So why haven't you gotten a sticker?
12     A.    Because they said I had to pay $10.
13  But the girl I ride with -- if you lose your
14  sticker, you have to go through the guard shack --
15  I mean, go stop and wait, and I ain't been back up
16  there.  They said I had to pay $10, but I got one.
17  But I think they got to take it off or something,
18  so it didn't go through the red tape.
19     Q.    Do the people that have stickers on
20  their cars, do they just drive right through?
21     A.    Yes.
22     Q.    And they drive right out at the end
23  of the day?

---

**27**

1      A.    What you mean?
2      Q.    They don't have to stop?
3      A.    Yes, they have to stop because I'm
4  getting my tag back.
5      Q.    I'm talking about other people, not
6  the people that don't have -- the people that have
7  stickers that don't have to get tags, they just
8  drive on and drive off, don't they?
9      A.    Yes, sometimes.  But the line is like
10  I'm over here to get my sticker, so I got to ease
11  out, then they got to slow up for me to come out
12  sometimes.
13     Q.    Do you hold up the line?
14     A.    Yes, because they got to wait until I
15  come out.
16     Q.    Have you ever been searched to get
17  into that plant?
18     A.    I don't think so, no.
19     Q.    Have you ever been searched when you
20  left the plant?
21     A.    Huh-uh.
22     Q.    What time do you usually get to the
23  plant in the morning?

---

**28**

1      A.    I got to get there about 7:10, or
2  seven after seven.
3      Q.    And tell me what you do from the time
4  you get there until you go on to the production
5  floor.
6      A.    First thing I do I go and get my
7  smock, then sometimes I come back and clock, then
8  sometimes I clock before I go.  Then I go -- you
9  got to go every day to get your smock, so you got
10  to be there to get your smock, because there is a
11  lot of us.  And then you need gloves, you got to
12  wait in line to get your gloves and stuff.
13     Q.    How long is the line?
14     A.    On Monday it's way back there because
15  everybody is trying to get it.
16     Q.    What about on Tuesday, or Wednesday,
17  or Thursday?
18     A.    Well, it's the same thing because
19  somebody -- most people probably throw theirs away
20  because they don't want to wash it, take it home
21  and wash it.  They go and get it every day.
22     Q.    At the present time you don't have to
23  wash your smock, do you?

---

**29**

1      A.    Yes, not my smock.  My apron, yes.
2      Q.    So what's the longest you've ever
3  waited in the supply line?
4      A.    I ain't never timed it, you know, but
5  I would have waited until they get through and put
6  everybody else.
7      Q.    Can you put an approximation on it?
8      A.    Depend on how fast it go.  I'd say
9  from five-to-six minutes away.
10     Q.    Is that the average?
11     A.    Depends on how long the line is.  I
12  can't really say.
13     Q.    In the ten years that you have worked
14  there, have you ever waited in that line as long as
15  an hour?
16     A.    No.
17     Q.    Do you know anyone who has?
18     A.    No, I don't know nobody that waited
19  no hour.
20     Q.    You get your supplies, and then where
21  do you go, to the break room?
22     A.    Me, uh-huh, I go to the break room.
23     Q.    And that's the debone break room?

---

30

1     A.    Debone break room.
2     Q.    And what do you do there?
3     A.    I get ready to put on my ear plugs
4  and my hair nets and get ready to go in the debone
5  area.
6     Q.    Then what do you do?
7     A.    When I go into debone area, I make
8  sure my boots is washed off.
9     Q.    We are going to get to that in a
10  second. But after you go back to the break area
11  after getting your smock, is there some waiting
12  time then?
13     A.    Yes.
14     Q.    And what do you --
15     A.    Got other people up ahead of you.
16  You already got people, you know, because there's
17  so many of us.
18     Q.    But after you go back to the break
19  room, is there some time for you to sit down and
20  talk and use the vending machines if you want?
21     A.    If you come early enough.
22     Q.    Is there time for you to do that?
23     A.    Yes, sometimes, not often.

31

1     Q.    Do some people come before you to
2  work?
3     A.    Yes, some people come like 30 minutes
4  before, you know, and get --
5     Q.    Do some people come to work after you
6  get there?
7     A.    Yes.
8     Q.    So people come there at all minutes
9  of the day?
10     A.    Yes.
11     Q.    Prior to the shift, correct?
12     A.    Uh-huh.
13     Q.    So what time do you try and go into
14  the production floor if the room is ready?
15     A.    If the room is ready, I try to go in
16  there at least, you know, by five or six or seven
17  minutes, you know, to give me time -- because one
18  time I had got in that situation that I go in there
19  about 25 minutes after -- I be late, you know. You
20  can't get there late because if you do, somebody
21  going to write you up. And sometimes I be late
22  getting to the line because I don't have my gloves,
23  because I done went in the line, you know, the

32

1  chicken be coming. And I have to be there in that
2  -- you got to be down there -- you got to be in --
3  they say you got to be in your area at 7:30, and
4  either time I don't.
5     Q.    In order to get into the production
6  floor, you go --
7     A.    You got to be --
8          MR. FRY:  You have to wait until
9  I finish my question. Remember, we're not going to
10  talk over one another.
11          THE DEPONENT:  Okay, yes.
12     Q.    (Mr. Fry)  In order to get into the
13  production floor, you have to first go through two
14  double doors, and you go into where your boots are
15  sanitized?
16     A.    Uh-huh.
17     Q.    And what happens where your boots are
18  sanitized?  What do you have to do there?
19     A.    Sometimes it's not enough sanitizer
20  on the floor, you got to mash that button and
21  sanitize your shoes, your boots.
22     Q.    What if there is enough stuff on the
23  floor, what do you have to do?

33

1     A.    Most of the time I have to just make
2  sure mine are rinsed off.  I stop and do that.
3     Q.    How much time does that take?
4     A.    I don't know.
5     Q.    Less than a minute?
6     A.    Maybe.  I don't really know.
7     Q.    So then you go in and you put on your
8  supplies?
9     A.    Uh-huh.
10     Q.    How long does that take you, just to
11  put them on?
12     A.    It take me anywhere from about seven
13  to eight minutes because --
14     Q.    And then you have to rinse them off?
15     A.    Yes, I have to go back and try to get
16  in line, because you have to try to be a little
17  early to do anything.  You have to make sure
18  there's -- you got the sanitize soap and the stuff
19  over there.
20     Q.    And then you go to work?
21     A.    Yes.
22     Q.    We talked about the times when you go
23  and come back from break, but tell me what you have

1952a282-b6ee-4fc9-bdb2-b36bb41beb04

**34**

1  to do with your equipment and PPE when you go on to
2  break?
3      A.    First thing I have to do is go and
4  wash it down because I have a lot of chicken on
5  me. Wash it down real good, and then take it off,
6  you know, dry it off, and then hang it up.
7      Q.    How long does that take?
8      A.    I'd say anywhere from -- I really --
9  I really can't say because it depends on how much
10 grease. I got to have hot water to try to get the
11 stuff off.
12     Q.    Does everybody wash before they go on
13 break?
14     A.    I can't answer -- I don't know that.
15 I just -- what I do -- some of them do it when they
16 -- they have to be on wash before they come back on
17 that line.
18     Q.    And am I correct that you just do
19 everything in reverse when you come off break?
20     A.    Right, you have to do the same thing.
21     Q.    Go through and sanitize your boots,
22 put the stuff back on, and get back on the line?
23     A.    Right.

**35**

1      Q.    How long does that take?
2      A.    What you mean, how much?
3      Q.    How many minutes does it take you to
4  get back in a position to start working again?
5      A.    You better try to be back in there
6  before your time, because they going to write you
7  up if you don't.
8      Q.    I understand. How long does it take
9  you from the time you leave the break room until
10 you are at your position?
11     A.    Anywhere from -- this is a guess
12 now -- I don't know.
13     Q.    I don't want you to guess. If you
14 don't know, you don't know.
15     A.    I don't know.
16     Q.    That's fair enough. We're at the end
17 of the day now. It's quitting time. What do you
18 do?
19     A.    What do I do?
20     Q.    Yes, to get out.
21     A.    I got to make sure that they got the
22 combos gone from night shift because night shift,
23 they ready to go on, and then they come and move

**36**

1  all them -- our combos for first shift. Then I got
2  to walk down, and I wash down, then I go and clean,
3  then I go in the break area -- but now everybody in
4  the break area when I go in there at 4:30. They
5  say 4:30 on the line "everybody off the line", but
6  when I go in the break area, I done washed down --
7  ain't nobody went out the door. But when I goes in
8  there, everybody is standing in line.
9      Q.    Why are they standing --
10     A.    To clock out.
11     Q.    How long does it take you to get from
12 where you're working to into the break room?
13     A.    I really -- how long it take?
14     Q.    How long does it take you, yes, to go
15 over, wash down, take your stuff off, walk out
16 those doors, and go to the break room? How long
17 does that take?
18     A.    At the end of the day?
19     Q.    Yes, ma'am.
20     A.    I'd say it takes it about -- for me
21 by the time the line go down --
22          MR. STEENSLAND: He's not asking
23 that.

**37**

1      A.    I don't know. I have to guess. I
2  don't know.
3      Q.    (Mr. Fry) But after you do that,
4  then you have to clock out. And you're telling me
5  there's a line there?
6      A.    Uh-huh.
7      Q.    How quickly does that line move?
8      A.    The clock in there on debone -- they
9  said 4:30, but the clock in there where we clock
10 out at, it probably be like -- we have to wait
11 about three about four minutes before we clock
12 out -- or four or five, I guess.
13          MR. STEENSLAND: Don't guess.
14     A.    I don't know. I don't know.
15     Q.    (Mr. Fry) Ms. Shaw, what is your
16 understanding as to how the company keeps track of
17 your time in order to pay you right?
18     A.    Now, what I am thinking -- this is
19 what I'm thinking -- by my time clock, when I hit
20 the clock.
21     Q.    When you swipe in?
22     A.    When I swipe in.
23     Q.    Have you ever heard the phrase Master

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

38

1   Card?
2       A.   Yes, I heard that.
3       Q.   And does it have any meaning to you?
4   Do you understand what that is?
5       A.   I thought they clock -- they said
6   they clock the line out after we clock out.
7       Q.   What's your understanding of Master
8   Card time?
9       A.   The supervisor got the Master Card.
10  Everybody is supposed to be on clock-out before
11  they clock it, right?  That is my understanding.  I
12  don't know what they do.  But my understanding --
13  my understanding was is if I clock out at 5:35,
14  they supposed to pay me at 5:35, so I don't know.
15      Q.   Do you pay attention to the time that
16  you actually clock out?
17      A.   Yes, now I do because the line is --
18  you ain't going to clock out until 4:30 now the way
19  they got it.  Because they got everybody in there
20  hold up at -- like I say, the line -- we off the
21  line -- the line is supposed to be through at
22  4:30.  But when I go in there to clock my card,
23  everybody, so there way after four.

39

1       Q.   What times do you recollect
2   clocking-out recently?
3       A.   It's going to be 4:30 because that
4   way the clock fixed.
5       Q.   Your shift ends at 4:30?
6       A.   Right, that's when it ends.
7       Q.   And you clock out in the debone room
8   at sometime after that, right?
9       A.   Yes, I guess so.
10      Q.   Can you --
11          MR. STEENSLAND:  Don't guess.
12      A.   I don't know.
13      Q.   (Mr. Fry) Can you recall any recent
14  days, the time at which you actually clocked out in
15  the debone room at the end of the day?
16          MR. STEENSLAND:  Objection.
17  Asked and answered.  You can answer that.
18      A.   Do I -- it going to be -- like I
19  said, they got it set up.  It's going to be 4:30
20  either way it goes because, I mean, they are
21  waiting until 4:30 come.
22      Q.   (Mr. Fry) You've --
23      A.   On the clock I clock out, I got to

40

1   wait until it get 4:30 to clock out.
2       Q.   So sometimes you're not allowed to
3   clock out until 4:30, is that what you're telling
4   me?
5       A.   No, they ain't what I'm telling you.
6   I'm telling you it be 4:30 on the line.  At 4:30
7   when I come out the door out of debone area, it's
8   supposed to be 4:30.  Only thing I'm supposed to do
9   when I come out is clock out, but I can't do that.
10      Q.   Because there's a line there, right?
11      A.   No, because they are waiting on 4:30
12  on our clock-out card.
13      Q.   What time then do you actually clock
14  out?  Do you look at the clock when you clock out?
15      A.   They will say 4:30 everybody start
16  clocking.
17          MR. STEENSLAND:  That's not the
18  question he asked.  Take your time and listen to
19  the question he asked.
20      Q.   (Mr. Fry) When you clock out, you
21  can tell what actual time the clock says, correct?
22      A.   Yes, you can.
23      Q.   What time or times do you remember

41

1   swiping out at the end of the day?
2       A.   About --
3          MR. STEENSLAND:  Objection.
4   Asked and answered.  You can answer it.
5       A.   4:30.
6       Q.   (Mr. Fry) About 4:30?
7       A.   4:30 or 4:31.
8       Q.   That's the time you actually clock
9   out?
10      A.   Right.
11      Q.   Have you ever had any problems with
12  your paycheck where you thought it might be short
13  or inaccurate?
14      A.   Yes, but they -- yes.
15      Q.   Did you go to your supervisor about
16  that?
17      A.   Uh-huh.
18      Q.   Say yes?
19      A.   Yes.
20      Q.   And has your supervisor fixed things
21  for you?
22      A.   Yes, she fixed it.
23      Q.   Do you keep track of the hours you

**42**

1  spend in the plant in any way with notes or
2  notebook or anything?
3      A.   No, no.
4      Q.   Do you know anybody that does?
5      A.   No.
6      Q.   Have you ever been asked to stay and
7  work overtime?
8      A.   Uh-huh, yes.
9      Q.   And did you get time-and-a-half for
10  that?
11      A.   Yes.
12      Q.   Have you ever had any problems with
13  the overtime pay?
14      A.   No.
15      Q.   Have you made any calculations as to
16  how much money you think you are owed in this
17  lawsuit?
18      A.   No, but I feel that they owe me
19  something.
20      Q.   Have you ever filed a grievance with
21  the Union?
22      A.   I don't get what you said.  Have I
23  ever what?

**43**

1      Q.   Filed a grievance with the Union?
2      A.   What you mean?
3      Q.   Have you ever made a complaint to the
4  Union about your working conditions or your wages?
5      A.   Yes, now I have did that.  I have
6  told, you know, I have talked to Jackie --
7          MR. STEENSLAND:  Ms. Shaw, he
8  just asked you have you ever filed one or made a
9  complaint, and the answer is what?
10          THE DEPONENT:  Yes.
11      Q.   (Mr. Fry) You talked to Jackie.
12  That's Jackie Davis?
13      A.   I don't really know her last name.
14      Q.   So you talked to Jackie.  To your
15  understanding, did Jackie have a position in the
16  Union?
17      A.   Yes.
18      Q.   And what did you talk with Jackie
19  about?
20      A.   About the time, you know, how much --
21  like I talk to her about I'm not getting 30-minute
22  breaks.  It might not be Jackie.  Matter of fact, I
23  done talked to somebody about it.  I'm not getting

**44**

1  my 30-minute break because I'm in there, and some
2  of the people at the head of the line, they might
3  be already out.  I'm still in there working.
4      Q.   So are you telling me that you recall
5  talking to Jackie about your breaks, your break
6  time?
7      A.   It might have been Jackie, and then
8  it could have been -- I just talked to her -- it's
9  just a lot of talk about, you know.
10      Q.   I think my original question was:
11  Have you ever made any complaints to the Union
12  about any of your hours or your time or your wages?
13      A.   Yes, I think I have.  I think I have.
14      Q.   And what do you recollect?
15      A.   I don't think it never got back with
16  me.
17      Q.   What did you complain to the Union
18  about?
19      A.   About I wasn't getting my 30 minutes,
20  and then they didn't -- because we have to be in
21  there early to get our stuff -- our stuff we got
22  work on, and stuff like that.  You know, that was
23  time.  That was our time, and we had to -- always

**45**

1  in a rush, rush.
2      Q.   So you recollect making a complaint
3  to somebody with the Union --
4      A.   Yes.
5      Q.   You have to wait until I finish.  You
6  recollect making some complaints to somebody that
7  you understood had a position in the Union
8  concerning your not getting paid for putting your
9  equipment on and taking it off and for your break
10  time?
11      A.   Yes.
12      Q.   And how many times did you make that
13  complaint?
14      A.   I don't know.
15      Q.   More than once?
16      A.   Yes.
17      Q.   And do you recall when you made those
18  complaints?
19      A.   No, I don't know.
20      Q.   Did it go back to the CP days?
21      A.   I don't know.
22      Q.   But it was sometime over the last ten
23  years?

1952a282-b6ee-4fc9-bdb2-b36bb41beb04

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

46

1    A.    Yes.
2    Q.    Was it earlier in those ten years or
3  more later or in the middle?
4    A.    I don't know.
5    Q.    But you do remember making those
6  complaints?
7    A.    Yes.
8    Q.    Have you ever been disciplined?  Have
9  you ever been written up for anything?
10   A.    I believe I've been written up for
11 being late.
12   Q.    How many times?
13   A.    Maybe once.
14   Q.    Maybe once?
15   A.    Maybe.
16   Q.    I just have one more thing that I
17 want to ask you about, and then you're done.
18        MR. FRY:  If you would mark this
19 Shaw Exhibit 1.
20        (WHEREUPON, a document was marked
21        as Shaw Exhibit 1 and was
22        retained by counsel.)
23   Q.    (Mr. Fry) Ms. Shaw, I'm showing you

47

1  a document which we have marked Shaw Exhibit 1.  It
2  is a document that at the top says Declaration, and
3  under Paragraph 1 is written "my name is", and then
4  somebody wrote in there "Rose Shaw".  Do you see
5  that?
6    A.    Uh-huh.
7    Q.    Could you take a minute and review
8  this document for me and tell me when you're
9  finished?  I just have a few questions for you.
10        (Plaintiff reviews Shaw Exhibit
11        1.)
12   Q.    (Mr. Fry) Okay?
13   A.    Okay.
14   Q.    Is that your signature on Page 3?
15   A.    Yes.
16   Q.    Do you recall signing this?
17   A.    Yes.
18   Q.    Do you recall reading it before you
19 signed it?
20   A.    Yes.
21   Q.    And do you recall that you signed it
22 on or about February 24 of 2007?
23   A.    Yes.

48

1    Q.    Do you recall where you signed it?
2    A.    I think over here at this hotel, I
3  think.
4    Q.    The hotel?
5    A.    Yes.
6    Q.    Did you read it before you signed it?
7    A.    I had my daughter there to read it.
8    Q.    Pardon?
9    A.    My daughter was there to read it.
10   Q.    Can you read?
11   A.    Not that good -- some.
12   Q.    Did your daughter read it to you?
13   A.    Yes.
14   Q.    And did everything that she read to
15 you sound accurate to you when she read it to you?
16   A.    Yes, I guess so, from the sound of
17 it.
18   Q.    Do you know of any of your
19 co-employees who have not joined in this lawsuit
20 because they were afraid that the company would do
21 something to them?
22   A.    Yes, I started out -- they said that
23 we would be fired.

49

1    Q.    Who said that?
2    A.    I can't recall who said it, but
3  that's what it was going around at work.
4    Q.    Listen to my question now.  Do you
5  know of anybody, any person, who has refused to
6  join this lawsuit because they were afraid?
7    A.    Yes.
8        MR. STEENSLAND:  Objection.
9  Asked and answered.  Go ahead.
10   A.    Yes.
11   Q.    (Mr. Fry) How many?
12   A.    I don't know how many.  But I know,
13 yes.
14   Q.    Do you know of anybody that was
15 threatened if they joined this lawsuit?
16   A.    What you mean by "threatened"?
17   Q.    Do you know of any instance where --
18 and I'm asking if you know personally -- of any
19 instance where somebody from the company actually
20 threatened an employee --
21   A.    No.
22   Q.    You have to wait until I finish
23 here.  Do you know of any instance where an

1952a282-b6ee-4fc9-bdb2-b36bb41beb04

50

1  employee was actually threatened by the company, a
2  member of management of the company, that something
3  bad would happen to them if they joined this
4  lawsuit?
5      A.   No.
6          MR. FRY:  I don't have any more
7  questions.  Thank you.
8          MR. STEENSLAND:  Hang on,
9  Ms. Shaw.  I've got a few.
10
11  EXAMINATION BY MR. STEENSLAND:
12     Q.   Are you asking in this lawsuit to be
13 paid for all the hours that you have worked for
14 Equity Group?
15     A.   Yes.
16     Q.   When you've worked for Equity Group,
17 was there a point in time when you had to take your
18 smock home and wash it?
19     A.   I do it, yes.
20     Q.   Your smock?
21     A.   Yes -- not my smock, no.
22     Q.   Was there a point in time in the past
23 when you had the take your smock home and wash it?

51

1      A.   No.
2      Q.   Never have had to do that?
3      A.   Yes, but it wasn't -- it was not
4  under Equity, but it was under somebody else.
5      Q.   Under CP?
6      A.   Yes.
7      Q.   Did you change jobs when Equity took
8  over CP, or did you stay in the same job?
9      A.   Stayed in the same job.
10     Q.   When you were working that same job
11 right when Equity took over, can you recall if you
12 had to take your smock home with you?
13     A.   I believe we did.  I ain't for sure,
14 but I believe we did.
15     Q.   I'm not asking you to guess.  I don't
16 want you guessing at Gary's answers.  I don't want
17 you guessing at my answers either.
18     A.   I don't know.
19     Q.   Can you recall a point in time when
20 you no longer had to take the smock home, and they
21 let you put it in some type of bin there at the
22 plant?
23     A.   Yes.

52

1      Q.   Can you recall what company was
2  running the plant when that occurred?
3      A.   The company that I'm working for now.
4      Q.   Equity?
5      A.   Right.
6      Q.   Was that the first day that Equity
7  took over, they immediately changed it to where you
8  put your smock in a bin?
9      A.   No.
10     Q.   And you were working for the company
11 before Equity took over, right?
12     A.   Right.
13     Q.   So does that refresh your
14 recollection as to if you ever had to take the
15 smock home?
16     A.   Yes.
17     Q.   What did you do with the smock when
18 you took it home?
19     A.   I washed it.
20     Q.   How many smocks did you have?
21     A.   Five.
22     Q.   Who issued them to you?
23     A.   At the supply room, I think.  I don't

53

1  know.
2      Q.   The company?
3      A.   Yes.
4      Q.   We've gone through that -- that's not
5  currently the policy, though, right?  And at some
6  point in time they began issuing you one every day?
7      A.   Right.
8      Q.   A new one?
9      A.   Right.
10     Q.   When you first get to the plant,
11 Ms. Shaw, before you can put on your PPE, as it was
12 referred to, do you have to sanitize your boots?
13     A.   Yes.
14     Q.   Is that the first thing you have to
15 do before you can put on the equipment?
16     A.   Talking about the smock and the --
17     Q.   Yes, ma'am, before you can do that.
18     A.   Yes, you got to sanitize your boots.
19     Q.   With regards to the boots -- I'm
20 going to take you back now -- was there at any
21 point in time since you have worked with Equity or
22 worked for Equity that you could not wear your
23 boots home?  Let me rephrase the question.  Was

54

1   there a point in time where you had to take your
2   boots off before you left?
3       A.    Yes, because one time we couldn't --
4   you know, one time we couldn't even wear them
5   outside.
6       Q.    I'm not asking you to guess.  At some
7   point in time --
8       A.    Some point in time.  I don't know
9   when, but we did.
10      Q.    At some point in time that changed
11  where you could wear your boots home?
12      A.    Right.
13      Q.    When that policy changed, who owned
14  the company?
15      A.    Equity.
16      Q.    Did that policy change the day that
17  Equity bought the company?
18      A.    Huh-uh.
19      Q.    So does that refresh your
20  recollection as to whether or not you could not
21  wear your boots home at some point in time when
22  Equity ran the group?
23      A.    Right.

55

1       Q.    Yes or right?
2       A.    Yes.
3       Q.    At the end of the day, your shift is
4   over, before you swipe your card, what's the last
5   thing that you do before you swipe your card?
6       A.    The last thing I do after I come out
7   the debone area?
8       Q.    Yes, ma'am.
9       A.    I have to stand in line.
10      Q.    Before you stand in line.
11      A.    Wait on 4:30 on the card --
12      Q.    I don't want to go there again.  I
13  don't want to go back to this clocking in and out
14  at 4:30.  What do you have to do with your smock at
15  the end of the day?
16      A.    I have to go -- before I leave
17  debone, I have to go wash it off -- wash it on up,
18  wash it off, and I get my sleeve and my gloves, all
19  my stuff there -- except the smock.  I have to
20  throw the smock in the container outside.  Then I
21  put my stuff -- I take it home because I want to
22  wear it back.  I got to go wash it and bring it
23  back for the next day.

56

1       Q.    Ms. Shaw, do you remember the
2   question I asked you?  What's the last thing you
3   have to do with your smock?
4       A.    Throw it in the thing when I come out
5   the door.
6       Q.    In the thing -- is this the bin that
7   you are referring to?
8       A.    The bin.
9       Q.    And where is the bin?
10      A.    On the outside of the debone area.
11      Q.    Outside of the production floor?
12      A.    Yes.
13      Q.    That is after you have washed
14  everything down?
15      A.    Right.
16      Q.    What do you do after you put the
17  smock in the bin?
18      A.    Then I go in the debone area, I get
19  in line, and then I wait.
20      Q.    When you say "debone area", are you
21  talking about the production area or the break
22  room?
23      A.    Break room -- go in the break room.

57

1       Q.    And what happens in the break room?
2       A.    Then I wait until 4:30 and swipe my
3   card and go home.
4       Q.    I don't think we quite touched on
5   it.  But both breaks that you get each day, before
6   you can leave that production floor, you have to
7   wash off all this equipment?
8       A.    Yes.
9       Q.    And then take it off?
10      A.    Take it off.
11      Q.    And the same thing for when you come
12  back?
13      A.    Come back.
14      Q.    Is that right?
15      A.    Right.
16      Q.    When you're reporting back to your
17  break, does everybody have to be back at the line
18  at the same time?
19      A.    Yes.
20      Q.    Is that before the chickens start
21  coming?
22      A.    You have to be back when your 45
23  minutes up.  What you mean before your chicken

1952a282-b6ee-4fc9-bdb2-b36bb41beb04

58

1   start?
2       Q.   When your 45 are minutes up, or when
3   your 30 minutes are up?
4       A.   Well, yes, our 30 minutes.
5       Q.   Can you take your time and get back
6   to the line right before the chicken gets to your
7   position?
8       A.   No.
9       Q.   What would happen to you, if you
10  know, if you did that?
11          MR. FRY:  Objection.  You can
12  answer the question.
13      A.   I get wrote up.
14      Q.   (Mr. Steensland)  At any point in
15  time during your employment with Equity, has anyone
16  instructed you to do exercises or stretching before
17  you start your work on the line?
18      A.   We used to do that now.  Yes, they
19  used to.
20      Q.   Was it an everyday thing?
21      A.   Yes, one time it was.
22      Q.   And who ran the plant or owned the
23  plant when you can recall this occurring?

59

1       A.   Equity.
2       Q.   Equity?
3       A.   Yes.
4       Q.   And who would instruct you to do
5   these exercises or stretching?
6       A.   The supervisor.
7       Q.   I'm not asking you to demonstrate
8   them because the record won't be able to reflect
9   that.  But can you tell us what the exercises or
10  stretching involve as far as body parts?
11      A.   Wrists.
12      Q.   What are those things that are
13  moving?
14      A.   Your fingers.  And your arms, you
15  have to do the arms.
16      Q.   Are those arm circles or something?
17      A.   Yes, like that.  And then you had to
18  do the neck.
19      Q.   Move your head around?
20      A.   Uh-huh.
21      Q.   And stretch your neck out?
22      A.   Yes.
23      Q.   What happens if your supervisor has

60

1   everybody doing it and you chose not to do it?
2       A.   You going to get wrote up.
3          MR. STEENSLAND:  Nothing further.
4          MR. FRY:  Just a few questions.
5
6   EXAMINATION BY MR. FRY:
7       Q.   When did you do these exercises?
8       A.   When we got on the line.
9       Q.   Everybody is on the line, right?
10      A.   Right, you have to be on the line.
11      Q.   You have to be on the line.
12  Everybody is fully dressed, correct?
13      A.   You have to.  If they ain't, they
14  come late.
15      Q.   But everybody is on the line,
16  correct?
17      A.   Uh-huh.
18      Q.   Now, is it true that the line starts
19  running and it takes a little bit of time before
20  the chicken gets there, and you can hear the line
21  running?
22      A.   I can hear the line running.
23      Q.   Can you hear the line running before

61

1   the chickens even come to the debone line?
2       A.   Yes, because the line -- I mean, yes,
3   because it's a lot of noise.
4       Q.   You can hear it, but the chickens are
5   there yet, right?
6       A.   No, most of the time we did exercise
7   -- can I say this?
8          MR. STEENSLAND:  If it answers
9   his question.
10         MR. FRY:  Sure.
11         MR. STEENSLAND:  Do you remember
12  what his question was?
13         THE DEPONENT:  He said do
14  everybody be on the line --
15      A.   Yes, they do.
16      Q.   (Mr. Fry)  And you do these exercises
17  while you are there on the line?
18      A.   Uh-huh.
19      Q.   And while you are waiting for the
20  chicken to come, correct?
21      A.   Yes.
22      Q.   And while you are doing those
23  exercises, can you hear the lines running?

1952a282-b6ee-4fc9-bdb2-b36bb41beb04

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

62

1    A.    Yes, you hear the line running. They
2  going to run the line -- the line going to be on
3  when we come in the debone area.
4    Q.    Okay. And how long of a period of
5  time do you do these exercises for?
6    A.    I don't know. I don't really --
7  because you have to do -- you want to know the
8  honest truth -- most of the time we do those
9  exercises when there is something wrong with the
10 chiller or nothing coming. When the chicken come,
11 we have to quit.
12   Q.    But you're waiting for the chickens
13 to come when you're doing them, right?
14   A.    Right, when we're doing them.
15   Q.    How long of a period of time, how
16 many minutes do you take doing the exercises?
17   A.    I really don't know.
18       MR. FRY:  That's all I have.
19 Thank you.
20       MR. STEENSLAND:  Nothing
21 further. Thank you, Ms. Shaw.
22       12:43 p.m.
23       ************************

63

1        FURTHER DEPONENT SAITH NOT
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

64

1            CERTIFICATE
2
3  STATE OF ALABAMA
4  AT LARGE
5
6        I hereby certify that the above
7  and foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10 transcription and that the foregoing represents a
11 true and correct transcript of the testimony given
12 by said witness upon said deposition.
13        I further certify that I am
14 neither of counsel nor of kin to the parties to the
15 action, nor am I in anywise interested in the
16 result of said cause.
17
18
19
20
21
_____
22 Victoria M. Castillo, Certified Court Reporter
   ACCR# 17, Expires 9/30/2008
23 Commissioner and Notary Public

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

1952a282-b6ee-4fc9-bdb2-b36bb41beb04

**TAB 49**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06-CV-1081-MEF


BETTY ANN BURKS,

et al.,

        Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

        Defendant.



BEFORE:

        Cynthia M. Noakes, Commissioner

        and Certified Court Reporter


        DEPOSITION TESTIMONY OF

        REBECCA H. SHORTER


        ****************************

474ff13f-eea6-4d59-b513-5f18eb603dbf

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

---

2

1                      STIPULATION

2

3            IT IS STIPULATED AND AGREED by and

4    between the parties through their respective

5    counsel, that the deposition of REBECCA H.

6    SHORTER may be taken before Cynthia M. Noakes,

7    Court Reporter, at the Law Offices of WILLIAMS,

8    POTTHOFF, WILLIAMS & SMITH, 125 South Orange

9    Avenue, Eufaula, Alabama 36027, on the 22nd day

10   of May, 2008.

11           IT IS FURTHER STIPULATED AND AGREED

12   that the signature to and the reading of the

13   deposition by the witness is waived, the

14   deposition to have the same force and effect as

15   if full compliance had been had with all laws and

16   rules of Court relating to the taking of

17   depositions.

18           IT IS FURTHER STIPULATED AND AGREED

19   that it shall not be necessary for any objections

20   to be made by counsel to any questions except as

21   to the form or leading questions, and that

22   counsel for the parties may make objections and

23   assign grounds at the time of the trial, or at

---

4

1                       INDEX

2    EXAMINATION BY:              PAGE NUMBER:

3    MR. GOULD                 6-17, 18-37

4    MR. STEENSLAND               17-18

5

6    EXHIBITS:

7    (No exhibits were

8    submitted to said deposition.)

9

10   Reporter's Certificate        38

11

12

13

14

15

16

17

18

19

20   *******************************************

21

22

23

---

3

1    the time said deposition is offered in evidence,

2    or prior thereto.

3            IT IS FURTHER STIPULATED AND AGREED

4    that the notice of filing of the deposition by

5    the Court Reporter is waived.

6

7

8

9

10

11

12

13

14

15

16

17   *******************************************

18

19

20

21

22

23

---

5

1                     APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFFS:

4        MR. M. JOHN STEENSLAND, III

5        PARKMAN, ADAMS & WHITE

6        ATTORNEYS AT LAW

7        739 West Main Street

8        Dothan, Alabama 36301

9        (334) 792-1900

10

11   ON BEHALF OF THE DEFENDANT:

12        MR. MALCOLM S. GOULD

13        PELINO & LENTZ

14        ATTORNEYS AT LAW

15        One Liberty Place

16        Thirty-Second Floor

17        1650 Market Street

18        Philadelphia, Pennsylvania 19103

19        (215) 665-1540

20

21   *****************************

22

23

---

2100 Third Avenue North, Suite 960, Birmingham, Alabama 35203
1-800-888-3376

474ff13f-eea6-4d59-b513-5f18eb603dbf

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

6

1       I, CYNTHIA M. NOAKES, a Certified
2   Court Reporter of Eufaula, Alabama, acting as
3   Commissioner, certify that on this date, as
4   provided by the Alabama Rules of Civil Procedure
5   and the foregoing stipulation of counsel, there
6   came before me at the Law Offices of WILLIAMS,
7   POTTHOFF, WILLIAMS & SMITH, 125 South Orange
8   Avenue, Eufaula, Alabama 36027, beginning at
9   6:55 p.m., REBECCA H. SHORTER, witness in the
10  above cause, for oral examination, whereupon the
11  following proceedings were had:
12
13      REBECCA H. SHORTER,
14  being first duly sworn, was examined and
15      testified as follows:
16
17      THE COURT REPORTER:  Usual
18  stipulations?
19      MR. KISER:  Yes.
20      MR. GOULD:  Yes.
21
22      EXAMINATION
23  BY MR. GOULD:

7

1   Q.   Good afternoon, Ms. Shorter.
2   A.   Good afternoon.
3   Q.   My name is Malcolm Gould.  I'm an attorney
4   with the law firm of Pelino & Lentz in
5   Philadelphia.  I represent Equity Group Eufaula
6   Division in a lawsuit that's been filed in Federal
7   Court in the Middle District of Alabama.  We're
8   here to take your deposition today.  You're a
9   plaintiff in that lawsuit.
10      I have a few ground rules for the deposition
11  that will hopefully make it move a little bit more
12  smoothly.
13      You see we have a court reporter here.
14  She's going to take down my questions and your
15  answers.  I would ask that you keep all of your
16  answers verbal, that you say yes or no instead of
17  nodding your head or shrugging your shoulders or
18  saying uh-huh or huh-uh.  That way we're sure that
19  the court reporter gets down your answers to my
20  questions.
21      I would also ask that you wait until I
22  finish my question before you give your answer.
23  That way we're not talking over each other.  It

8

1   makes her job a little bit easier.  It also means
2   that you'll hear my whole question before you give
3   your answer.
4       If I ask a question and you don't understand
5   it, just let me know.  I'll try and repeat the
6   question or ask the question differently so it's
7   not so confusing.
8       If you do answer my question, I'm going to
9   assume that you understood it and that you're
10  answering truthfully and to the best of your
11  ability.  Okay?
12  A.   Yes.
13  Q.   Now, if you need to take a break during the
14  course of the deposition, just let me know.
15  That's not a problem; we can take a break.
16      Now, can you please state your full name for
17  the record?
18  A.   Rebecca A. Shorter.
19  Q.   Ms. Shorter, what is your home address?
20  A.   809 Spruce Drive, Eufaula, Alabama.
21  Q.   Are you currently employed?
22  A.   Yes.
23  Q.   Where do you work?

9

1   A.   Equity Group.
2   Q.   And that's at the plant in Baker Hill?
3   A.   Yes.
4   Q.   How long have you worked there?
5   A.   Nine years.
6   Q.   Now, when you first started working at the
7   plant, was it owned by Equity Group?
8   A.   No.
9   Q.   Do you remember who it was owned by?
10  A.   CP.
11  Q.   And do you recall when the ownership of the
12  plant changed?
13  A.   I can't recall.
14  Q.   Ma'am, are you a member of the union?
15  A.   No.
16  Q.   Have you ever been a member of the union
17  during the time you've been employed at the plant?
18  A.   Yes.
19  Q.   Were you a member of the union when the
20  plant was owned by CP?
21  A.   Yes.
22  Q.   And were you a member of the union at some
23  point in time when the plant was owned by Equity?

474ff13f-eea6-4d59-b513-5f18eb603dbf

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

10

1   A.   I'm not for sure.
2   Q.   So it's been a while since you've been a
3   member of the union?
4   A.   Yes.
5   Q.   Years?
6   A.   I can't recall.
7   Q.   All right.  Several years?
8   A.   I can't recall.
9   Q.   Okay.  Now, you understand that you are a
10  plaintiff in this lawsuit, correct?
11  A.   Yes.
12  Q.   What is your understanding as to what the
13  lawsuit is about?
14  A.   Well, I haven't been paid all of my hourly
15  wages.
16  Q.   And what activities or time do you believe
17  you haven't been paid for?
18  A.   I don't understand.
19  Q.   All right.  Well, you indicated that you
20  don't believe you've been paid all of your hourly
21  wages, correct?
22  A.   Yes.
23  Q.   Can you explain for me what you mean by

11

1   that?
2   A.   Well, in changing in and out of our PPEs, a
3   lot of time we haven't been paid for our hourly
4   wages in changing out.  Coming in, first of all,
5   and going out to break and coming back in from
6   break, and the process of washing up and being
7   sanitized and all that stuff.
8   Q.   Is there anything else that you believe
9   falls within your claims in this lawsuit?
10  A.   I don't understand.
11  Q.   All right.  Other than what you have just
12  described for me, is there anything else that you
13  believe you're not being paid properly for?
14  A.   No.
15  Q.   How did you first learn about this lawsuit?
16  A.   I can't remember.  I'm sorry.
17  Q.   Have you met with anyone to prepare for your
18  deposition today?
19       MR. STEENSLAND:  Objection, if that
20  calls for meeting with the lawyers.
21  Q.   You can answer the question.
22       MR. STEENSLAND:  You can answer.  I
23  apologize.  It's been a long day.

12

1   A.   Repeat your question.
2   Q.   I asked you if you had any meetings with
3   anyone to prepare for your deposition.
4       MR. STEENSLAND:  Same objection.
5   A.   I don't understand.
6   Q.   All right.  Well, did you meet with anybody
7   today, before you sat down here for your
8   deposition, to discuss your deposition?
9   A.   I still don't understand.
10  Q.   All right.  Have you discussed your
11  deposition with anybody, before you sat down here
12  in this chair?
13  A.   I don't understand what you're asking.
14  Q.   I'm asking if you have sat down with anybody
15  prior to your deposition today to talk about
16  things that might come up in your deposition.
17  A.   No.
18  Q.   Did you sit down and talk with Mr.
19  Steensland or anybody else about your deposition?
20  A.   I don't understand what you're saying.
21       MR. STEENSLAND:  Can I help?
22       MR. GOULD:  Please.
23       MR. STEENSLAND:  Did you talk with the

13

1   lawyers before you came in here today?
2       THE WITNESS:  I was just sitting there
3   waiting on -- I don't understand what you're
4   saying.
5       MR. STEENSLAND:  Did you speak with us
6   in that room out there before you came in here
7   today?
8       THE WITNESS:  About what?
9       MR. STEENSLAND:  Just about the case.
10  I'm not asking you what you said.  But did you
11  speak with us?
12      THE WITNESS:  I sat in the room.
13      MR. STEENSLAND:  Okay.  Fair enough.
14  (BY MR. GOULD)
15  Q.   I understand.  Did you sit in on any other
16  meetings, other than a meeting today, to discuss
17  this deposition?
18  A.   No.
19  Q.   Have you been to any meetings that discussed
20  this case?
21  A.   No.
22  Q.   I'm not trying to trick you or anything
23  here, ma'am.

474ff13f-eea6-4d59-b513-5f18eb603dbf

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

14

1     MR. STEENSLAND: I think I understand
2  where we were confused.
3  Q.  What is your current position at the plant?
4  A.  I don't understand.
5  Q.  Do you have a job title or a job that you do
6  when you are at the plant?
7  A.  What are we speaking on?  I don't
8  understand.
9  Q.  All right.  You work at the Equity Group,
10  correct?
11  A.  Right.
12  Q.  When you go to work, what do you do?
13  A.  I work on the laydown line.
14  Q.  And can you describe for me what happens at
15  the laydown line?
16  A.  You're laying meat down flat on the belt.
17  If it's not flat, you correct it.
18  Q.  All right.  And why are you laying it out
19  flat?
20  A.  That's the way they want it.
21  Q.  Does it go into a machine after you lay it
22  out flat?
23  A.  Yes, some.

15

1  Q.  And it's cut by the machine; is that right?
2  A.  The meat have to be flat at all times.
3  Q.  So that the machine can cut it properly; is
4  that correct?
5  A.  No.
6  Q.  Okay.  Where is the laydown line located?
7  A.  In the cook building.
8  Q.  That's what I thought.  How long have you
9  worked in the cook plant?
10  A.  I can't recall the times.  I worked in
11  different jobs.
12  Q.  So you've worked at the plant for nine
13  years.  Have you ever worked in the fresh plant?
14  A.  The what?
15  Q.  What I would call the fresh plant.  The
16  other building.  Not the cook plant, but the other
17  building?
18  A.  What is the other building?
19  Q.  Where they have the evisceration and the
20  debone department.
21  A.  Yes.
22  Q.  In what areas have you worked in that
23  building?

16

1  A.  Debone.
2  Q.  Did you work on a debone line?
3  A.  Yes.
4  Q.  Now, you indicated that you had transferred
5  between buildings; is that correct?
6  A.  I said I have worked different jobs.
7  Q.  All right.  What other jobs have you worked
8  other than the debone line or the laydown line?
9  A.  Beg your pardon?
10  Q.  You've worked different jobs, correct?  Is
11  that what you have testified to, ma'am?
12  A.  Yes, sir.
13  Q.  And so far, you've told me that you -- you
14  currently work on the laydown line; is that
15  correct?
16  A.  Yes, sir.
17  Q.  And you've told me that you have also worked
18  on a debone line; is that correct?
19  A.  Yes.
20  Q.  Other than those two jobs, have you had any
21  other jobs at the plant?
22  A.  No.
23  Q.  So over the course of your nine years

17

1  working at the plant in Baker Hill, you've worked
2  either on the debone line or on the laydown line,
3  and that's it; is that correct?
4  A.  That I can recall.
5  Q.  Have you worked on the laydown line since
6  the plant has been owned by Equity?
7  A.  Yes.
8  Q.  And that's in the cook plant?
9  A.  Yes.
10  Q.  Okay.  Those are the only questions I have
11  for you.  Thank you.
12  BY MR. STEENSLAND:
13  Q.  Ms. Shorter, do you remember when Equity
14  bought out that plant?  Do you remember that?
15  A.  Yes.
16  Q.  Okay.  And you testified that you had worked
17  in the cook building since Equity had purchased
18  that plant?
19  A.  Say that again now.
20  Q.  Okay.  What I'm trying to get at is, have
21  you worked in the other building, what we're
22  referring to as the fresh building or the raw
23  building, since Equity took over that plant?

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

18

1    A.   Yes.
2    Q.   You have?
3    A.   Yes.
4    Q.   Okay. No further questions. I'm sure Mr.
5    Gould has some more.
6    BY MR. GOULD:
7    Q.   All right. Then I do have questions for
8    you, ma'am.
9         All right. Since Equity has acquired the
10   plant, what positions in the raw plant have you
11   worked in?
12   A.   Packout in the debone.
13   Q.   Any other positions, ma'am?
14   A.   No.
15   Q.   And do you have an idea as to how long you
16   worked in packout since Equity has owned the
17   plant?
18   A.   I can't recall.
19   Q.   And packout is located in the debone room;
20   is that correct?
21   A.   It's on the floor.
22   Q.   And that's located in the same general area
23   as the debone lines; is that correct?

19

1    A.   Yes.
2    Q.   Did you work night shift or day shift when
3    you worked in packout?
4    A.   Day.
5    Q.   And do you know what time your shift
6    started?
7    A.   (No response.)
8    Q.   If you don't remember, "I don't remember" is
9    an acceptable answer.
10   A.   I don't remember.
11   Q.   That's fine. As an employee in the packout
12   department, were there any items of clothing or
13   equipment that you had to wear when you were out
14   on the production floor?
15   A.   What is clothing?
16   Q.   It could be a smock; it could be an apron.
17   When I say "clothing or equipment," I'm just using
18   the terms very generally.
19        Were there any items that you had to wear
20   that were supplied to you by the company that you
21   wore when you were out on the production floor?
22   A.   I don't understand.
23   Q.   What don't you understand?

20

1    A.   You said "clothing." I'm confused.
2    Q.   I'm going to ask you a new question. Were
3    there any items or objects, things that were given
4    to you, supplied to you by the company, that you
5    would wear when you were out on the production
6    floor when you were working in packout?
7    A.   (No response.)
8    Q.   It's not a trick question, ma'am. I'm not
9    trying to trick you here.
10        Did you wear a smock when you worked in
11   packout?
12   A.   Yes.
13   Q.   Did you wear boots when you worked in
14   packout?
15   A.   Yes.
16   Q.   Were those boots that were supplied to you
17   by the company?
18   A.   Yes.
19   Q.   All right. Did you wear a hair net?
20   A.   Yes.
21   Q.   Did you wear earplugs?
22   A.   Yes.
23   Q.   When you worked in packout, did you wear any

21

1    kind of gloves?
2    A.   Yes.
3    Q.   What kind of gloves did you wear?
4    A.   Plastic gloves and cloth gloves.
5    Q.   Did you wear an apron?
6    A.   Yes.
7    Q.   What was the apron like? Can you describe
8    it for me?
9    A.   A plastic apron.
10   Q.   It was a blue plastic apron?
11   A.   Yes.
12   Q.   Did you wear any sort of plastic sleeves?
13   A.   Yes.
14   Q.   Did you wear a chain glove when you worked
15   in packout?
16   A.   No.
17   Q.   When you worked out in packout, would you be
18   working with a knife or with scissors?
19   A.   I don't understand.
20   Q.   Well, can you describe for me what you would
21   do for your job when you were working in packout?
22   A.   Pack the meat out in bags.
23   Q.   All right. Was there a machine that would

474ff13f-eea6-4d59-b513-5f18eb603dbf

22

1  drop the meat into the bag?
2  A.  I'll say yes.
3  Q.  All right.  In performing your work on the
4  packout line, were you required to use a knife to
5  cut meat, or was the meat already cut?
6  A.  No.
7  Q.  So you did not have to use a knife?
8  A.  Correct.
9  Q.  Did you have to use scissors to cut meat?
10  A.  I can't recall.
11  Q.  During the time that you worked in packout,
12  could you wear your boots from home?  Could you
13  wear them from outside of the plant?
14  A.  No.
15  Q.  Would you normally drive yourself to work
16  during the time that you were working in packout?
17  A.  I don't understand.
18  Q.  How would you get to work when you were
19  working in packout?  How would you get from the
20  place where you live to the plant?
21  A.  I drove.
22  Q.  Okay.  When you would arrive at the plant,
23  did you have to go through any kind of security?

23

1  A.  Yes.
2  Q.  And can you describe that security for me,
3  please?
4  A.  I don't understand.
5  Q.  Was there – when you would arrive at the
6  plant, was there a guard house on the driveway?
7  A.  Yes.
8  Q.  Would you have to stop at that guard house
9  and have your car searched?
10  A.  No.
11  Q.  All right.  Did you have a sticker for your
12  car that indicated that you were an employee?
13  A.  I don't understand.
14  Q.  Okay.  You indicated that there is a guard
15  house on the driveway?
16  A.  Right.
17  Q.  Did you have to show something to get past
18  the guard house, or could you just drive right in?
19  A.  Show something.
20  Q.  And what did you have to show?
21  A.  I don't understand.
22  Q.  Okay.  Do you have some sort of sticker on
23  your car?

24

1  A.  Yes.
2  Q.  And if you have that sticker on your car can
3  you just drive past the security station that's in
4  the driveway?
5  A.  Yes.
6  Q.  And did you have that sticker on your car
7  when you worked in the packout department, ma'am?
8  A.  I can't recall.
9  Q.  When you were working in packout, once you
10  got into the parking lot, was there any sort of
11  metal detectors or turnstiles that you had to pass
12  through to get into the building?
13  A.  I don't understand.
14  Q.  All right.  You would get past the guard
15  shack and you would park in the parking lot,
16  correct?
17  A.  Yes.
18  Q.  Would you then go to enter the building, the
19  plant?
20  A.  Yes.
21  Q.  Did you have to go through any sort of metal
22  detectors at the doors?
23  A.  (No response.)

25

1  Q.  Do you understand what I'm saying when I say
2  metal detectors?
3  A.  No.
4  Q.  Would you just open the door and walk into
5  the plant?
6  A.  Yes.
7  Q.  Okay.  Would you be carrying any of your
8  items, the things that we've identified
9  previously:  your gloves, your smock, your
10  sleeves?  Any of those particular items, would you
11  be carrying those when you entered the building?
12  A.  I don't understand.
13  Q.  Okay.  I'll try and ask the question
14  differently.
15      When you would arrive at the plant and you
16  would walk into the door, would you be carrying
17  anything?
18  A.  Yes.
19  Q.  And what would you be carrying?
20  A.  Lunch.
21  Q.  Okay.  Would you be carrying anything else?
22  A.  I don't understand.
23  Q.  Ma'am, would you be carrying your gloves

474ff13f-eea6-4d59-b513-5f18eb603dbf

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

26

1    when you would enter the plant when you were
2    working in packout, if you remember?
3    A.    (No response.)
4    Q.    Ma'am, you seem to be having difficulty
5    answering my question.  Is it just because you're
6    having problems remembering, or is it because you
7    just don't understand the questions I'm asking?
8    A.    If I have them.
9    Q.    So if you had gloves, you would be carrying
10   them.  I understand the point you're making,
11   ma'am.  I'm not trying to trick you or anything;
12   I'm just trying to ask some questions and get
13   answers.  I'm not trying to fool you into saying
14   something or anything like that.  I'm just trying
15   to get some facts from you and that's all.  I'm
16   certainly not trying to play games here.
17          Did you have a locker at the plant when you
18   were working in packout?
19   A.    I can't recall.
20   Q.    Okay.  Now, you've listed items for me that
21   you would wear when you were working in packout,
22   including boots, smock, apron, gloves, hair net.
23          Where would you keep those items when you

27

1    weren't working?
2    A.    I'd carry them with me.
3    Q.    So you would take them home with you at the
4    end of your shift, and then you would bring them
5    with you for the beginning of your shift?
6    A.    Yes.
7    Q.    Now, when you would first enter the plant,
8    when you were working in packout and you passed
9    through the doors to enter the plant, what would
10   be the first thing you would do?
11   A.    Clock in.
12   Q.    And where would you clock in?
13   A.    Break room.
14   Q.    Which break room?
15   A.    The first one.
16   Q.    Is that the debone break room?  The bigger
17   break room or the smaller break room?
18   A.    Large.
19   Q.    Okay.  And then after you clocked in, what
20   would you do?
21   A.    Supply.
22   Q.    You would go and get your supplies?
23   A.    Yes.

28

1    Q.    Would you put your lunch someplace or would
2    you still be carrying that?
3    A.    Put it someplace.
4    Q.    And then you would go to the supply area?
5    A.    Yes.
6    Q.    And would you still be carrying any of your
7    other items of clothing or equipment that you had
8    taken home with you?
9    A.    Only if I had it.
10   Q.    Okay.  And what would you pick up at the
11   supply room when you were working in packout?
12   A.    Hair net, beard net, earplugs, safety
13   glasses, plastic arm sleeves, plastic gloves,
14   cloth gloves, apron.  That's all I can recall.
15   Q.    And then what would you do after you went to
16   the supply room?
17   A.    Get ready for work.
18   Q.    All right.  Where would you get ready for
19   work?
20   A.    In the workplace.
21   Q.    Would you put your boots on someplace?
22   A.    Yes.
23   Q.    Where would you put your boots on?

29

1    A.    While I'm in the break room.
2    Q.    Would you put your hair net on someplace?
3    A.    In the workplace.
4    Q.    When you say "in the workplace," are you
5    talking about out in the production area after you
6    walked through those double doors?  You've left
7    the hallway and walked through those double doors?
8    A.    Ask your question again.
9    Q.    Yes, ma'am.
10   A.    What was your question?
11   Q.    I'm sorry.
12   A.    What was your question?
13   Q.    Okay.  My question was:  When you say, "in
14   the workplace," were you talking about out on the
15   production floor?  After you walked through these
16   double doors, you left the hallway, and moved into
17   the production area?  Is that what you mean when
18   you say, "in the workplace"?
19   A.    Except you have to put your net on before
20   you go in there, and earplugs and safety glasses.
21   Then you can enter.
22   Q.    All right.  So you would put those items on
23   before going through the double doors?

474ff13f-eea6-4d59-b513-5f18eb603dbf

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

30

1   A.   Yes.
2   Q.   And what would you do then, after you passed
3   through the double doors?
4   A.   You have -- your feet have to be sanitized,
5   your boots.
6   Q.   How would that work?
7   A.   We have sanitizing stuff in the floor when
8   you enter in.
9   Q.   Was it normally already sitting on the
10  floor? Was it some sort of foam; is that correct?
11  A.   Foam.
12  Q.   Would that foam already be there for you to
13  walk through?
14  A.   I don't understand what you're saying.
15  Q.   You've indicated to me that you would
16  sanitize your boots; is that correct?
17  A.   Right.
18  Q.   Can you explain to me how you would do that?
19  How would it happen?
20  A.   The sanitizing stuff they've got there in
21  the area.
22  Q.   And how did the sanitizing stuff get there
23  for you to sanitize your boots?

31

1   A.   It's there in the area for you to use.
2   Q.   And then after you sanitized your boots,
3   what would you do next?
4   A.   Go in and gear up.
5   Q.   Okay. And that's when you would put on the
6   other items that you had not already put on?
7   A.   Yes.
8   Q.   And then what would you do after that?
9   A.   Wash.
10  Q.   Can you describe for me what it is you would
11  do?
12  A.   You have to sanitize the stuff you have on,
13  the sleeves and your apron and wash your hands.
14  Q.   Okay. And when you say "sanitize" your
15  apron and your sleeves, can you describe for me
16  what it is you did?
17  A.   You have to wash.
18  Q.   Were there sinks inside the production area?
19  A.   Yes.
20  Q.   And was there soap?
21  A.   Yes.
22  Q.   And is that what you would use?
23  A.   Yes.

32

1   Q.   And then after you did that, what would you
2   do?
3   A.   Go to the workstation.
4   Q.   All right. Now, can you estimate for me how
5   long it would take from the time that you entered
6   through the double doors, before you sanitized
7   your boots, to the time you got out to your
8   workstation?
9   A.   About five to ten minutes.
10  Q.   Now, during the time you worked in packout,
11  did you get any breaks?
12  A.   Yes.
13  Q.   How many breaks did you get?
14  A.   Two.
15  Q.   Do you know how long those breaks were?
16  A.   30 minutes.
17  Q.   How would you know when it was time to go on
18  break, when you were released and you could leave
19  the line and go on break?
20  A.   Somebody would tell you.
21  Q.   A supervisor or somebody would tell you?
22  A.   Yes.
23  Q.   Can you describe for me what you would do

33

1   from the time the person told you you could leave
2   on break until the time you left the production
3   area and were out in the hallway by the break
4   room?
5   A.   Say that again.
6   Q.   All right. Can you describe for me what you
7   would do when it was time for you to go out on
8   break? So from the time that you would leave your
9   spot in the packout area until the time that you
10  exited the production area and were outside in the
11  hallway by the break rooms?
12  A.   I would leave and go to the wash station and
13  stand in line until I can get to the sink. And
14  then I would wash all over again, sleeves, aprons,
15  my gloves.
16  Q.   And then what would you do after that?
17  A.   Then we have to get -- I would have to get
18  out of the clothes, hang them up inside the
19  workplace, except for the safety glasses and the
20  hair net.
21  Q.   Could you keep your boots on?
22  A.   Yes. And we have to go back through the
23  sanitizing for the boots again.

474ff13f-eea6-4d59-b513-5f18eb603dbf

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

34

1  Q.  And then you would go out into the hallway?
2  A.  Yes.
3  Q.  And then what would you do when you got out
4  into the hallway?
5  A.  Go into the break room.
6  Q.  And when you got into the break room, what
7  would you do?
8  A.  Take my break.
9  Q.  Would you eat something or drink something?
10  A.  Sometimes.
11  Q.  Other times would you sit down and talk with
12  coworkers?
13  A.  Rest.
14  Q.  Rest? Okay. Approximately how long do you
15  think it took you from the time you left the
16  packout line until the time you were walking out
17  through the door into the hallway?
18  A.  Five to ten minutes.
19  Q.  And what about when you would return from
20  break? Would that also be five to ten minutes?
21  A.  Yes.
22  Q.  And would you do the same thing before and
23  after your second break as you did before and

35

1  after your first break?
2  A.  Do the same thing.
3  Q.  Would it take the same amount of time?
4  A.  Yes.
5  Q.  And how would you know when it was the end
6  of your shift?
7  A.  I don't understand.
8  Q.  All right. Well, when you would return from
9  your second break, you would still have to work
10  before it was the end of your shift; is that
11  correct?
12  A.  Right.
13  Q.  How would you know when it was the end of
14  your shift and you were allowed to leave?
15  A.  The supervisor would tell you or the line
16  leader.
17  Q.  So you would be told that it was okay to
18  leave?
19  A.  Right.
20  Q.  And when you were told it was okay to leave,
21  what would you do then?
22  A.  Go to the wash station.
23  Q.  Okay. And what would you do there?

36

1  A.  Wash my sleeves, wash my apron, wash my
2  gloves. I'd stand in line and wait until you can
3  get to the wash station.
4  Q.  And then after you washed, what would you
5  do?
6  A.  Pull off my apron, my sleeves, once we walk
7  out the door. I keep my safety glasses and
8  earplugs on. I'll pull off all the other stuff.
9  Q.  And then would you exit the production area?
10  A.  Go back through the foot sanitizer, and
11  exit.
12  Q.  And during the time that you worked in
13  packout, did you have to wash your own smock?
14  A.  Yes.
15  Q.  So you would take your smock home with you?
16  A.  Yes.
17  Q.  Approximately how long would it take you at
18  the end of your shift from the time you left your
19  spot in the packout area until the time you walked
20  out through the double doors?
21  A.  Say that again.
22  Q.  At the end of your shift, approximately how
23  long would it take you from the time that you left

37

1  your position on the line until the time you were
2  exiting the production area, you were walking out
3  into the hallway?
4  A.  Five to ten minutes.
5  Q.  Those are the only questions I have for you,
6  ma'am. Thank you very much. I appreciate your
7  patience with me.
8  A.  You're welcome.
9      MR. STEENSLAND: I have nothing
10  further. Thank you.
11
12      (The deposition was concluded.)

474ff13f-eea6-4d59-b513-5f18eb603dbf

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trial Services

38

```
1        C E R T I F I C A T E
2
3    STATE OF ALABAMA
4    BARBOUR COUNTY
5
6         I hereby certify that the above and
7    foregoing deposition was taken down by me in
8    stenotype and the questions and answers thereto
9    were transcribed by means of computer-aided
10   transcription, and that the foregoing represents
11   a true and correct transcript of the testimony
12   given by said witness upon said hearing.
13        I further certify that I am neither of
14   counsel, nor kin to the parties to the action,
15   nor am I in anywise interested in the result of
16   said cause.
17
18
19        CYNTHIA M. NOAKES, Commissioner
20        Certified Court Reporter,
21        ACCR #327 - Expires 09/30/2008
22
23        Commission Expires 07/08/2009
```

474ff13f-eea6-4d59-b513-5f18eb603dbf

**TAB 50**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06-CV-1081-MEF


BETTY ANN BURKS,

et al.,

        Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

        Defendant.



BEFORE:

        Cynthia M. Noakes, Commissioner

        and Certified Court Reporter


        DEPOSITION TESTIMONY OF

        KENDRICK LANAN SPANN


        * * * * * * * * * * * * * * * * * * * * * * * * * * *

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

e9e70d03-5ffa-45e1-ba14-0e44be079b92

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

2

```
 1        STIPULATION
 2
 3        IT IS STIPULATED AND AGREED by and
 4   between the parties through their respective
 5   counsel, that the deposition of KENDRICK LANAN
 6   SPANN may be taken before Cynthia M. Noakes,
 7   Court Reporter, at the Law Offices of WILLIAMS,
 8   POTTHOFF, WILLIAMS & SMITH, 125 South Orange
 9   Avenue, Eufaula, Alabama 36027, on the 23rd day
10   of May, 2008.
11        IT IS FURTHER STIPULATED AND AGREED
12   that the signature to and the reading of the
13   deposition by the witness is waived, the
14   deposition to have the same force and effect as
15   if full compliance had been had with all laws and
16   rules of Court relating to the taking of
17   depositions.
18        IT IS FURTHER STIPULATED AND AGREED
19   that it shall not be necessary for any objections
20   to be made by counsel to any questions except as
21   to the form or leading questions, and that
22   counsel for the parties may make objections and
23   assign grounds at the time of the trial, or at
```

3

```
 1   the time said deposition is offered in evidence,
 2   or prior thereto.
 3        IT IS FURTHER STIPULATED AND AGREED
 4   that the notice of filing of the deposition by
 5   the Court Reporter is waived.
 6
 7
 8
 9
10
11
12
13
14
15
16
17   ********************************************
18
19
20
21
22
23
```

4

```
 1                 INDEX
 2   EXAMINATION BY:              PAGE NUMBER:
 3   MR. GOULD                    6-37
 4
 5   EXHIBITS:
 6   (No exhibits were
 7   submitted to said deposition.)
 8
 9   Reporter's Certificate       38
10
11
12
13
14
15
16
17
18
19
20   ********************************************
21
22
23
```

5

```
 1                 APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFFS:
 4        MR. P. MARK PETRO
 5        SCHREIBER & PETRO, PC
 6        ATTORNEYS AT LAW
 7        Two Metroplex Drive
 8        Suite 250
 9        Birmingham, Alabama 35209
10        (205) 871-5080
11
12   ON BEHALF OF THE DEFENDANT:
13        MR. MALCOLM S. GOULD
14        PELINO & LENTZ
15        ATTORNEYS AT LAW
16        One Liberty Place
17        Thirty-Second Floor
18        Philadelphia, Pennsylvania 19103
19        (215) 665-1540
20
21   ALSO PRESENT:
22        Annie Ivery, Co-Plaintiff
23   ****************************
```

e9e70d03-5ffa-45e1-ba14-0e44be079b92

6

1    I, CYNTHIA M. NOAKES, a Certified
2  Court Reporter of Eufaula, Alabama, acting as
3  Commissioner, certify that on this date, as
4  provided by the Alabama Rules of Civil Procedure
5  and the foregoing stipulation of counsel, there
6  came before me at the Law Offices of WILLIAMS,
7  POTTHOFF, WILLIAMS & SMITH, 125 South Orange
8  Avenue, Eufaula, Alabama 36027, beginning at
9  1:35 p.m., KENDRICK LANAN SPANN, witness in the
10  above cause, for oral examination, whereupon the
11  following proceedings were had:
12
13    KENDRICK LANAN SPANN,
14  being first duly sworn, was examined and
15    testified as follows:
16
17    THE COURT REPORTER:  Usual
18  stipulations?
19    MR. PETRO:  Yes.
20    MR. GOULD:  Yes.
21
22    EXAMINATION
23  BY MR. GOULD:

7

1  Q.   Good afternoon, Mr. Spann?
2  A.   Good afternoon.
3  Q.   My name is Malcolm Gould.  I'm an attorney
4  with the law firm of Pelino & Lentz in
5  Philadelphia.  I am an attorney for Equity Group
6  Eufaula Division in a lawsuit that's been filed in
7  Federal Court in the Middle District of Alabama.
8  You're a plaintiff in that lawsuit, and we're here
9  to take your deposition today.
10    As you can see, we have a court reporter
11  here.  She's going to take down my questions and
12  your answers.  For that reason I would ask that
13  you keep all of your answers verbal.  Say yes or
14  no instead of nodding your head or shaking your
15  head.  I'd also ask that you say yes or no instead
16  of saying uh-huh or huh-uh.  That way we're sure
17  that she takes down the right answer that you've
18  given me.  Okay?
19  A.   Yes, sir.
20  Q.   I would also ask that you wait until I
21  finish my question before you give your answer.
22  That way we're not talking over each other.  It
23  makes her job easier, and it also makes sure that

8

1  you hear my whole question before you give your
2  answer.  Okay?
3  A.   Yes, sir.
4  Q.   Now, if I ask a question and you don't
5  understand it, just let me know.  I'll either
6  repeat the question or try and ask the question in
7  a different way so it's not so confusing.
8    If you answer my question, I'm going to
9  assume that you understood the question and you're
10  answering truthfully and to the best of your
11  ability.  Okay?
12  A.   Yes, sir.
13  Q.   I don't anticipate the deposition will take
14  long, but if you need to take a break, just let me
15  know and we'll take a break.
16  A.   Yes, sir.
17  Q.   Now, can you please state your full name?
18  A.   Kendrick Lanan Spann.
19  Q.   Mr. Spann, what is your home address?
20  A.   415 South Randolph Avenue.
21  Q.   Is that here in Eufaula?
22  A.   Eufaula, Alabama.
23  Q.   Sir, are you currently employed?

9

1  A.   Yes, sir.
2  Q.   And where do you work?
3  A.   Beaulieu of America.
4  Q.   And where is that?
5  A.   On State Docks Road.
6  Q.   And were you at one time employed at the
7  chicken processing plant in Baker Hill?
8  A.   Yes, sir.
9  Q.   When was the last time you worked there?
10  A.   In 2005.
11  Q.   And how long did you work at the plant?
12  A.   Five years.
13  Q.   When you first started working at the plant,
14  who owned it?
15  A.   CP.
16  Q.   And when you stopped working at the plant
17  was it owned by a different company?
18  A.   Yes, sir.
19  Q.   And who was it owned by?
20  A.   Keystone.
21  Q.   Equity Group?
22  A.   Yes, sir.
23  Q.   Now, during the time you worked at the

e9e70d03-5ffa-45e1-ba14-0e44be079b92

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

10

1   plant, what was your position?
2   A.   Debone.
3   Q.   Did you work in a debone line?
4   A.   Debone, yes, and at the rehang table.
5   Q.   When you left the chicken plant, where were
6   you working? in what position?
7   A.   I worked at the rehang table.
8   Q.   And how long did you work at the rehang
9   table?
10  A.   I worked at the rehang table for two years.
11  Q.   So that would take you back to 2003?
12  A.   Yes.
13  Q.   Now, you understand that you are a plaintiff
14  in this lawsuit, correct?
15  A.   Yes.
16  Q.   What is your understanding as to what the
17  lawsuit is about?
18  A.   It's about back time.
19  Q.   Can you describe for me what you mean when
20  you say "back time"?
21  A.   When I worked out there back then, back then
22  when I worked in 2001 between 2005.
23  Q.   Are there any particular activities that you

11

1   are claiming you should have been paid for?
2   A.   Overtime.
3   Q.   And are you claiming that you stayed late at
4   work and you weren't paid for that?
5   A.   Yes.
6   Q.   And what caused you to stay late at work?
7   A.   I worked on the rehang table; you have to
8   stay late to make combos and clean up and
9   everything.
10  Q.   Now, the rehang, is that at the beginning of
11  the debone line?
12  A.   It's right beside, on Line 1 and 2. It's in
13  between. It's a long table, and they've got some
14  things that you hang the chicken on.
15  Q.   So the chickens would come out of the
16  hatchery?
17  A.   Yeah. We had to push the chicken in the bin
18  and then come on down on the rehang table so we
19  had to hang them.
20  Q.   So as the chickens came out of the hatchery,
21  you would hang them back up so that they could go
22  to the different debone lines?
23  A.   Yes.

12

1   Q.   Other than this time that you stayed late,
2   are there any other claims that you are asserting
3   in this lawsuit? Any other things you're claiming
4   you should have been paid for?
5        MR. PETRO: Object to the form. Calls
6   for a legal conclusion. But you can answer. He's
7   asking your understanding of what you're claiming.
8   A.   Yes, sir.
9   Q.   What else is there?
10  A.   Getting paid for my breaks and stuff.
11  Q.   And what about your breaks do you want to be
12  paid for?
13  A.   The breaks that we wasn't getting our
14  full-time breaks.
15  Q.   Anything else?
16  A.   Then while we were working, they always
17  swiped the card and stuff, the master card.
18  Q.   When you were talking about master card,
19  what do you mean?
20  A.   It's a little card they swiped while you was
21  working.
22  Q.   Did you ever see the master card being
23  swiped?

13

1   A.   I seen the supervisor had them in their
2   hand, but I didn't never know what it was.
3   Q.   When did you learn what a master card was?
4   A.   I was told it was a master card.
5   Q.   Who told you?
6   A.   I just heard. I didn't know. I don't know
7   the person it is I heard.
8        MR. PETRO: You don't have to tell them
9   anything your lawyers told you or discussed with
10  you. That's privileged.
11  Q.   Do you know when you learned the term
12  "master card"? when you heard of it?
13  A.   No, sir.
14  Q.   Was it while you were working at the plant
15  or after you left the plant?
16  A.   I can't remember.
17  Q.   Sir, when you worked in rehang, did you have
18  to wear any items of clothing or equipment when
19  you were out on the production floor?
20  A.   Equipment.
21  Q.   Can you list those for me?
22  A.   Hair net, sleeves, arm guard, gloves, cotton
23  liners, earplugs, smocks, and an apron, and safety

14

1  glasses.
2  Q.  Did you have to wear boots?
3  A.  And boots, yes.
4  Q.  In your position in rehang, did you have to
5  work with a knife or scissors?
6  A.  No, sir.
7  Q.  And you told me you had to wear an arm
8  guard?
9  A.  Yeah, when I was working on the --
10  Q.  I'm just asking about when you were working
11  on rehang.  When you were working at rehang, did
12  you have to wear an arm guard?
13  A.  No, sir.
14  Q.  During the time that you were working in
15  rehang, were you able to wear your boots from
16  home?
17  A.  I don't understand what you're talking
18  about.
19  Q.  Okay.  You indicated to me that you had to
20  wear boots when you were out on the floor?
21  A.  Yeah.
22  Q.  Now, could you wear those boots outside of
23  the plant?

15

1  A.  No, we couldn't.
2  Q.  So you couldn't wear your boots to your car
3  or put them in your car and wear them into the
4  plant?
5  A.  No.
6  Q.  Sir, how did you first learn about this
7  lawsuit?
8  A.  I heard about it on the Internet.
9  Q.  I'm sorry?
10  A.  On the Internet.
11  Q.  Where on the Internet did you find out about
12  it?
13  A.  It was on MySpace.com.
14  Q.  Was there a listing for the lawsuit or was
15  it on some person's MySpace page?
16  A.  I can't remember.
17  Q.  And what did you do after you read about the
18  lawsuit on MySpace?
19  A.  I had called around to see was it true or
20  not.
21  Q.  Was there a phone number on the listing?
22  A.  I can't remember the phone number.
23  Q.  But was there a phone number on the MySpace

16

1  page?
2  A.  Yes, sir.
3  Q.  And do you remember what the phone number
4  was for or who the phone number was for?
5  A.  No, sir.
6  Q.  Did you call the phone number?
7  A.  No, sir.
8  Q.  Now, you told me that you made some calls to
9  try and find out about the lawsuit; is that
10  correct?
11  A.  Yes.
12  Q.  Who did you call?
13  A.  I can't remember who I called.  I can't
14  remember who it was I called.
15  Q.  Was it other people who worked with you at
16  the plant?
17  A.  Yes, sir.
18  Q.  Sir, other than meeting with lawyers this
19  morning or today to prepare for your deposition,
20  have you attended any other meetings where this
21  lawsuit had been discussed?
22  A.  Yes, sir.
23  Q.  How many times, other than today?

17

1  A.  I think it was three or four times.  I can't
2  remember.
3  Q.  Did you attend a meeting this week?
4  A.  This week?  No, sir.
5  Q.  When you would attend these meetings, where
6  would they be held?
7  A.  Mostly they would be held at a hotel.
8  Q.  Which hotel?
9  A.  I can't remember.  It's in Eufaula.  I can't
10  remember the hotel.
11  Q.  When you would attend these meetings, would
12  you take anyone with you?
13  A.  Yes, sir.
14  Q.  And who would you take with you?
15  A.  I'd take my wife.
16  Q.  Was your wife an employee at the plant?
17  A.  Yes, sir.
18  Q.  Do you know if she's a plaintiff in this
19  lawsuit?
20  A.  No, sir.
21  Q.  You don't know or she is not?
22  A.  I don't know.
23  Q.  What is your wife's name?

18

1   A.   LaWanda Morris.
2   Q.   LaWanda Morris?
3   A.   Yes, sir.
4   Q.   Did you take anybody else with you to the
5   meeting?
6   A.   That's the only person I took with me.
7   Q.   Now, sir, you provided me with a list of
8   items you would wear out on the production floor
9   when you were working in rehang.
10      Could you take any of these items home with
11  you at the end of the day?
12  A.   You could take the smocks home, yes.
13  Q.   At the time you worked at the plant -- and
14  I'm talking about just the time you were working
15  in rehang -- were you responsible for washing your
16  own smock?
17  A.   Yes, sir.
18  Q.   And was that true the entire time that you
19  were working at the plant?
20  A.   Yes, sir.
21  Q.   Were you given more than one smock?
22  A.   Just one smock.
23  Q.   That's what you would wear?

19

1   A.   Yes.
2   Q.   Did you have other ones at home?
3   A.   No, sir.
4   Q.   Sir, could you describe for me what you
5   would do when you arrived at the plant?
6   A.   When I'd first get to the plant, I had to
7   stop at the gate.
8   Q.   Okay.  A security gate?
9   A.   Security gate, yes.
10  Q.   And did you have to stop and have your car
11  searched?
12  A.   We had to stop and make sure that we had our
13  card and stuff like that.
14  Q.   Did you have a sticker for your car?
15  A.   Yes, sir.
16  Q.   And if you had your sticker, could you drive
17  through?
18  A.   Yes, sir.
19  Q.   You didn't have to get out of your car or
20  nobody searched your trunk or anything like that?
21  A.   No, sir.
22  Q.   And after you pulled into the parking lot
23  and you were about to enter the building, what

20

1   would you do next?
2   A.   Park.
3   Q.   And then what would you do?
4   A.   Come to -- go the inside of the plant.
5   Q.   Was there any sort of security at the door?
6   A.   Not at that time.
7   Q.   Was there ever security at the door?
8   A.   They had a security guard back then, but not
9   inside the plant they didn't.
10  Q.   You didn't have to go through metal
11  detectors?
12  A.   No, sir.
13  Q.   You didn't have to go through turnstiles?
14  A.   No, sir.
15  Q.   You could just open the door and go in; is
16  that correct?
17  A.   Yes, sir.
18  Q.   After you would enter the building, what
19  would you do next?
20  A.   Go in the break room and sit down.
21  Q.   Which break room would you go to?
22  A.   Debone break room.
23  Q.   Which shift did you work?

21

1   A.   Second shift.
2   Q.   That would be the night shift?
3   A.   Yes, sir.
4   Q.   Did your shift have a scheduled start time?
5   A.   We had to be on the floor at 4:30.
6   Q.   Did your shift have a scheduled end time?
7   A.   We supposed to be off the floor at 2:30, but
8   we worked over sometimes.
9   Q.   So you would work until the production was
10  finished for the day?
11  A.   Yes, sir.
12  Q.   After you sat down in the break room, what
13  would you do next?
14  A.   I would just sit and wait until it was time
15  to go in.
16  Q.   Would you clock in?
17  A.   Not as soon as I get there, no.
18  Q.   What time would you normally arrive at the
19  plant?
20  A.   About four o'clock.
21  Q.   And what time would you normally clock in?
22  A.   About 4:20, about.
23  Q.   While you were sitting in the break room

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

22

1 waiting to clock in, what would you do?
2 A.   I mostly had me something to eat or
3 something like that.
4 Q.   You indicated to me at 4:20 you would
5 normally clock in?
6 A.   Yes.
7 Q.   What would you do after that?
8 A.   Just wait until it was time to get on the
9 floor.
10 Q.   What time would you normally head out to the
11 floor?
12 A.   About 4:25.
13 Q.   And could you describe for me what you would
14 do when you left the break room and you were
15 heading out to the production area?
16 A.   Go through the door; you've got to put your
17 smock and stuff on; and push the button to
18 sanitize your boots.
19 Q.   Now, did you have to push the button every
20 time to sanitize your boots, or would there be
21 times when there was sanitizer out there?
22 A.   Sometimes there'd be sanitizer already out
23 there.

23

1 Q.   And you could just walk through it?
2 A.   Yes, sir.
3 Q.   And then after you sanitized your boots,
4 what would you do next?
5 A.   Go inside two doors.  There's one door like
6 that and one door like that (pointing).
7 Q.   One door to the right and one to the left?
8 A.   Yes, sir.
9 Q.   And what would you do next?
10 A.   Go to the right.
11 Q.   And what would you do after that?
12 A.   Put my equipment on.
13 Q.   When you came into the production doors,
14 what items would you already be wearing?
15 A.   Just the smock.
16 Q.   Would you have your boots on?
17 A.   Yes, sir.
18 Q.   Could you put your boots on in the break
19 room?
20 A.   No, sir.
21 Q.   Where did you put on your boots?
22 A.   Mostly in the hallway.
23 Q.   Would you be wearing your hair net?

24

1 A.   Yes, sir.
2 Q.   You could put that on before you went out
3 onto the production floor?
4 A.   Yeah.  You're supposed to have it on before
5 you hit the floor.
6 Q.   What about your earplugs?
7 A.   Yes, sir.
8 Q.   And then after you would put on your items
9 on the production floor, what would you do then?
10 A.   Just wait until it's time to start up.
11 Q.   Approximately how long would it take you
12 from the time that you walked through the doors to
13 the production area to the time that you got to
14 your spot on the line?
15 A.   About a couple of minutes.
16 Q.   Now, during the course of your shift, would
17 you get any breaks?
18 A.   Yes, sir.
19 Q.   How many breaks would you get?
20 A.   Two.
21 Q.   How long were your breaks?
22 A.   It was 30 minutes.
23 Q.   When you were working in rehang, how would

25

1 you know that you were cleared or allowed to leave
2 for your break?
3 A.   They would call break.
4 Q.   So your supervisor would release you?
5 A.   Yes.
6 Q.   Would the chickens stop coming down the
7 line?
8 A.   They would just call break; and as soon as
9 the person called break, the first person in the
10 line could go.
11 Q.   Okay.  Did you have staggered breaks in your
12 particular area in rehang?  Would all of rehang go
13 out on break at one time or would you take turns?
14 A.   I don't understand what you're talking
15 about.
16 Q.   Okay.  When it was time to leave for break
17 when you were working in rehang, were there other
18 people working beside you in rehang?
19 A.   Yes, sir.
20 Q.   Would all of the people who were working
21 beside you in rehang go on break at the same time?
22 A.   Yes, sir.
23 Q.   Can you describe for me what you would do

e9e70d03-5ffa-45e1-ba14-0e44be079b92

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

26

1  after you were released from break?
2  A.  Go to the wash station and wash everything
3  off.
4  Q.  Can you describe for me what you would do to
5  wash everything off?
6  A.  It's a water -- it's a water thing at the
7  table over there.  You had to put your foot on the
8  metal for the water to come out.
9  Q.  There was a sink?
10  A.  Yes.
11  Q.  And the sink was activated by stepping on a
12  bar?
13  A.  Yes.
14  Q.  Was there soap there?
15  A.  Yes, sir.
16  Q.  And when you say you would wash everything,
17  what would you wash?
18  A.  The apron, the sleeves and everything.
19  Q.  And the gloves?
20  A.  Yes.
21  Q.  And you would rinse them off?
22  A.  Yes, sir.
23  Q.  And what would you do next?

27

1  A.  Go to break.
2  Q.  Would you take any items off?
3  A.  No.  You hang it up on a hook and go to
4  break.
5  Q.  What items would you take off?
6  A.  The smock and apron and sleeves.
7  Q.  And gloves?
8  A.  And gloves.
9  Q.  Did you keep your boots on?
10  A.  Yes.
11  Q.  And could you keep your hair net on?
12  A.  Yes, sir.
13  Q.  Could you keep your earplugs on?
14  A.  You would take the earplugs out when you go
15  out the debone area.
16  Q.  Approximately how long would it take you
17  from the time you stepped off the line to the time
18  you exited the production area?
19  A.  About five minutes.
20  Q.  Now, did you ever time yourself with a
21  stopwatch or anything like that?
22  A.  No.
23  Q.  This is just an estimate?  This five minute

28

1  time is an estimate?
2  A.  Yes, sir.
3  Q.  Once you would exit into the hallway, what
4  would you do next?
5  A.  Go to the break room.
6  Q.  Would you go to the debone break room?
7  A.  Yes, sir.
8  Q.  What would you do in the break room?
9  A.  Sit down and rest until it was time to go
10  back in.
11  Q.  Was there a set time or a scheduled time
12  when you would normally take your first break?
13  A.  I can't remember what time it was.
14  Q.  Okay.  Once you got to the break room, how
15  long would you normally wait in the break room?
16  A.  About 30 minutes before you go back in.
17  Q.  And how would you know when it was time to
18  return from break?
19  A.  It would just be a clock inside that would
20  tell you what time it is.
21  Q.  Was there a clock inside the production
22  area?
23  A.  Yes.  They used to have a clock on the side.

29

1  Q.  I'm just trying to determine how you would
2  know what time you had to return from break?
3  A.  Watch the time.  The supervisor will tell
4  you what time it is.
5  Q.  Okay.  And can you describe for me what you
6  would do when you would return from break?
7  A.  Come back in the area to sanitize your
8  boots, and go back in and put your stuff back on.
9  Q.  Is that everything you would do before you
10  would go back to your position on the line?
11  A.  Then you go put on your apron, smock,
12  sleeves, and everything back on.
13  Q.  And then after that you would walk to your
14  position on the line?
15  A.  Yes, sir.
16  Q.  And approximately how long would that take
17  you from the time you entered the production doors
18  to the time you got back on the line?
19  A.  About five minutes.
20  Q.  How long would it take you to put your smock
21  on?
22  A.  I really don't know how much time it was.
23  Q.  How long would it take you to put your

30

1  gloves on?
2  A.  A couple of seconds.
3  Q.  Could you put your gloves on while you were
4  walking to your position on the line?
5  A.  No, sir.  I'd already have them on.
6  Q.  How long would it take you to put on your
7  apron?
8  A.  I don't know what time.
9  Q.  You already had your boots on; is that
10  correct?
11  A.  Yes, sir.
12  Q.  And you would already have your hair net on;
13  is that correct?
14  A.  Yes, sir.
15  Q.  You could wear your hair net out in the
16  break room?
17  A.  Yes, sir.
18  Q.  Could you wear it outside?
19  A.  No, sir.
20  Q.  So if you went outside you had to take your
21  hair net off?
22  A.  Yes, sir.
23  Q.  What would you do with it? put it in your

31

1  pocket?
2  A.  Yes, sir.
3  Q.  Did you ever time yourself returning from
4  break?
5  A.  No, sir.
6  Q.  How many breaks did you have over the course
7  of a shift?
8  A.  Two.
9  Q.  Would you do pretty much the same thing
10  before and after your second break?
11  A.  Yes, sir.
12  Q.  There wasn't really any difference between
13  what you would do?
14  A.  No, sir.
15  Q.  Sir, when you were at the plant, were you a
16  member of the union?
17  A.  No, sir.
18  Q.  Did you ever attend any union meetings?
19  A.  No, sir.
20  Q.  When you were working in rehang, how would
21  you know when it was the end of your shift and you
22  were approved to leave?
23  A.  The supervisor would tell us.

32

1  Q.  And would everyone working in your
2  particular area in rehang be released to leave at
3  the same time?
4  A.  Yes, sir.
5  Q.  And can you describe for me what you would
6  do at the end of your shift after you would leave
7  the line?
8  A.  Sanitize.  I would go to the wash station
9  and wash everything off.
10  Q.  When you say you would wash everything off,
11  what would you wash?
12  A.  Apron, sleeves.
13  Q.  Your gloves?
14  A.  Gloves.
15  Q.  Anything else?
16  A.  That would be all.
17  Q.  And then what would you do?
18  A.  Go out the door and sanitize your boots
19  again.
20  Q.  Would you take those items off?
21  A.  Yeah.  Once you get in the break room, yeah.
22  Q.  Before you exited the production floor, what
23  items would you take off, before you sanitized

33

1  your boots?
2  A.  I don't understand what you're talking
3  about.
4  Q.  When you were at the end of your shift, when
5  you were getting ready to leave, I think you told
6  me that there were some things that you would wash
7  or rinse; is that correct?
8  A.  Yes, sir.
9  Q.  After you finished that, would you take off
10  any of these items?
11  A.  Yes, sir.  Take it off, yes.
12  Q.  Would you take off your gloves and your
13  sleeves and you apron?
14  A.  Yes, sir.
15  Q.  Would you also take off your smock?
16  A.  Yes, sir.
17  Q.  And then after that, is there anything else
18  you would take off?
19  A.  That would be all.
20  Q.  And then you would leave the production
21  floor?
22  A.  Yes, sir.
23  Q.  What would you do after you passed through

e9e70d03-5ffa-45e1-ba14-0e44be079b92

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

34

1   the doors and left the production floor?
2   A.   Sanitize your boots.  Then I would go
3   outside, then clock out and go home.
4   Q.   Where would you clock out?
5   A.   Debone area.
6   Q.   Same place where you would clock in?
7   A.   Yes, sir.
8   Q.   Approximately how long would it take you
9   from the time you left the line to the time you
10  exited the production floor?
11  A.   I don't really know what time.
12  Q.   Sir, while you were working in rehang, do
13  you have an understanding as to when the time for
14  which you got paid started?
15  A.   The time you start and the time you go home?
16  Q.   I just want to know -- I'm just asking you
17  about the time for starting.  Do you know when the
18  company would start paying you?
19  A.   No, sir.
20  Q.   Do you know at what point in time during the
21  day the company would stop paying you?
22  A.   No, sir.
23  Q.   Do you know whether you were paid from the

35

1   time you clocked in until the time you clocked
2   out?
3   A.   Yes, sir.
4   Q.   Do you think you were paid from the time you
5   clocked in until the time you clocked out?
6   A.   Yes, sir.
7   Q.   So if you clocked in at 7:20, you believe
8   that you started being paid from 7:20?
9   A.   No, sir.
10  Q.   What time do you believe you started to be
11  paid?
12  A.   At 7:30.
13  Q.   And if you clocked out at five o'clock, do
14  you believe that you were paid until five o'clock?
15  A.   Yes, sir.
16  Q.   Actually, I think you told me you worked
17  night shift; is that correct?
18  A.   Yes, sir.
19  Q.   So if you clocked in at 4:20, do you believe
20  you started to be paid at 4:20?
21  A.   No, sir.
22  Q.   What time do you believe you started to be
23  paid?

36

1   A.   At 4:30.
2   Q.   And if you clocked out at three o'clock, do
3   you believe that you were paid until three
4   o'clock?
5   A.   No, sir.
6   Q.   Do you have an understanding as to when the
7   time that you were paid ended?
8   A.   Most of the time we ended was at 2:30.
9   Q.   Would you get paid weekly when you worked at
10  the plant?
11  A.   Yes, sir.
12  Q.   And did you get a paycheck every week?
13  A.   Yes, sir.
14  Q.   Would you check your paycheck to see the
15  amount of hours for which you were paid?
16  A.   Yes, sir.
17  Q.   Was there ever an occasion where you looked
18  at your paycheck and you felt you weren't paid for
19  all the hours you worked?
20  A.   Yes, sir.
21  Q.   How often did that happen?
22  A.   It happened a lot.
23  Q.   And when that would happen, would you raise

37

1   it with your supervisor?
2   A.   Yes, sir.
3   Q.   And what would happen?
4   A.   My supervisor most of the time would go to
5   the office and see what had happened.
6   Q.   And these times when you claim that you
7   weren't paid for all the hours that you worked,
8   were those issues resolved?
9   A.   Not really.
10  Q.   Were you paid for extra time?
11  A.   No.
12  Q.   Was that part of what you are claiming in
13  this lawsuit?
14  A.   Yes, sir.
15  Q.   I think those are all the questions I have
16  for you, sir.
17       MR. PETRO:  That's all we have.
18       MR. GOULD:  Thank you for your time.
19
20       (The deposition was concluded.)
21
22
23

e9e70d03-5ffa-45e1-ba14-0e44be079b92

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

38

```
1          C E R T I F I C A T E
2
3    STATE OF ALABAMA
4    BARBOUR COUNTY
5
6         I hereby certify that the above and
7    foregoing deposition was taken down by me in
8    stenotype and the questions and answers thereto
9    were transcribed by means of computer-aided
10   transcription, and that the foregoing represents
11   a true and correct transcript of the testimony
12   given by said witness upon said hearing.
13        I further certify that I am neither of
14   counsel, nor kin to the parties to the action,
15   nor am I in anywise interested in the result of
16   said cause.
17
18
19        CYNTHIA M. NOAKES, Commissioner
20        Certified Court Reporter,
21        ACCR #327 - Expires 09/30/2008
22
23        Commission Expires 07/08/2009
```

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

e9e70d03-5ffa-45e1-ba14-0e44be079b92

**TAB 51**

FREEDOM COURT REPORTING

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

MONTGOMERY DIVISION


CASE NUMBER:  2:06-CV-01081-MEF-DRB

BETTY ANN BURKS, ET AL.,

        Plaintiffs,

        vs.

EQUITY GROUP, EUFAULA DIVISION, L.L.C.,

        Defendant.


S T I P U L A T I O N

        IT IS STIPULATED AND AGREED by and
between the parties through their respective
counsel, that the deposition of Robin
Stevens may be taken before Sara Mahler,
CCR, at the offices of Williams, Pothoff,
Williams & Smith, at 125 South Orange
Avenue, Eufaula, Alabama 36027, on the 12th
day of June, 2008.


DEPOSITION OF ROBIN STEVENS

FREEDOM COURT REPORTING

2

1    IT IS FURTHER STIPULATED AND
2  AGREED that the signature to and the reading
3  of the deposition by the witness is not
4  waived, the deposition to have the same
5  force and effect as if full compliance had
6  been had with all laws and rules of Court
7  relating to the taking of depositions.
8    IT IS FURTHER STIPULATED AND
9  AGREED that it shall not be necessary for
10  any objections to be made by counsel to any
11  questions except as to form or leading
12  questions, and that counsel for the parties
13  may make objections and assign grounds at
14  the time of the trial, or at the time said
15  deposition is offered in evidence, or prior
16  thereto.
17    IT IS FURTHER STIPULATED AND
18  AGREED that the notice of filing of the
19  deposition by the Commissioner is waived.
20
21    * * * * * * * * * * * * *
22
23

3

1    * * * * * * * * * * * * *
2    I N D E X
3    EXAMINATION
4    PAGE
5  By Ms. McGowan ...................... 7
6
7
8  (There Were No Exhibits Marked)
9
10
11    * * * * * * * * * * * * *
12
13
14
15
16
17
18
19
20
21
22
23

4

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3    MONTGOMERY DIVISION
4
5  CASE NUMBER:  2:06-CV-01081-MEF-DRB
6
7  BETTY ANN BURKS, ET AL.,
8    Plaintiffs,
9    vs.
10  EQUITY GROUP EUFAULA DIVISION, L.L.C.,
11    Defendant.
12
13  BEFORE:
14    SARA MAHLER, Commissioner.
15
16  APPEARANCES:
17    CANDIS A. MCGOWAN, ESQUIRE, of
18  WIGGINS, CHILDS, QUINN & PANTAZIS, 301
19  Nineteenth Street North, Birmingham, Alabama
20  35203, appearing on behalf of the
21  Plaintiffs.
22
23

5

1  APPEARANCES:  (Cont.)
2    JACOB A. KISER, ESQUIRE, of
3  WIGGINS, CHILDS, QUINN & PANTAZIS, 301
4  Nineteenth Street North, Birmingham, Alabama
5  35203, appearing on behalf of the
6  Plaintiffs.
7    ROBERT J. CAMP, ESQUIRE, of THE
8  COCHRAN FIRM, 505 North 20th Street, Suite
9  825, Birmingham, Alabama 35203, appearing on
10  behalf of the Plaintiffs.
11    HOWARD A. ROSENTHAL, ESQUIRE, of
12  PELINO & LENTZ, 1650 Market Street,
13  Thirty-Second Floor, Philadelphia,
14  Pennsylvania 19103, appearing on behalf of
15  the Defendant.
16
17    * * * * * *
18
19    I, SARA MAHLER, CCR, a Court
20  Reporter of Wetumpka, Alabama, acting as
21  Commissioner, certify that on this date, as
22  provided by the Federal Rules of Civil
23  Procedure and the foregoing stipulation of

FREEDOM COURT REPORTING

**6**

1 counsel, there came before me at the offices
2 of Williams, Pothoff, Williams & Smith, 125
3 South Orange Avenue, Eufaula, Alabama 36027,
4 beginning at 8:30 a.m., Robin Stevens,
5 witness in the above cause, for oral
6 examination, whereupon the following
7 proceedings were had:
8      ROBIN STEVENS,
9 being first duly sworn, was examined and
10 testified as follows:
11      COURT REPORTER:  Usual
12 stipulations?
13      MS. MCGOWAN:  Yes.
14      MR. ROSENTHAL:  We're going to
15 reserve reading and signing.
16      MS. MCGOWAN:  Okay.  We may
17 have a -- for the summary judgment response,
18 it may be -- I don't think you will have
19 time to read and sign before we file the
20 transcript.
21      MR. ROSENTHAL:  I wouldn't
22 think so.
23      EXAMINATION

**7**

1 BY MS. MCGOWAN:
2   Q.    State your name for the
3 Record, please.
4   A.    Robin Stevens.
5   Q.    And Robin, is that R-O-B-I-N?
6   A.    Correct.
7   Q.    S-T-E-V-E-N-S?
8   A.    Correct.
9   Q.    Give me your address, where do
10 you live?
11   A.    5479 County Road 3319, Troy,
12 Alabama 36079.
13   Q.    Where are you employed?
14   A.    Equity Group.
15   Q.    How long have you been with
16 Equity Group?
17   A.    Since September of '04.
18   Q.    What is your job position?
19   A.    Plant manager.
20   Q.    Which plant?
21   A.    Fresh plant.
22   Q.    And how do you define fresh
23 plant?

**8**

1   A.    It's where we bring live birds
2 in, slaughter them, and take them through
3 the deboning process.
4   Q.    Some people refer to that as
5 the live kill plant?
6   A.    That would be a live kill
7 plant, yes, ma'am.
8   Q.    It's also been referred to as
9 a debone plant.  Is that a plant within your
10 plant, or is that just a department within
11 your plant, or is that a separate plant?
12   A.    That would be a department.
13   Q.    That was within your plant?
14   A.    Yes, ma'am.
15   Q.    And where is this plant
16 located?
17   A.    Baker Hill.
18   Q.    How long have you been the
19 plant manager?
20   A.    Since '05.  I don't remember
21 the month, but since '05.
22   Q.    Was it the middle of the year,
23 the first of the year?

**9**

1      Do you remember about the
2 season, if that will help?
3   A.    I'm going to say sometime in
4 spring, maybe early summer, the best I can
5 recall.
6   Q.    You said you started in
7 September of '04 with Equity?
8   A.    I did.
9   Q.    What was your first position
10 in September of '04 when you first started?
11   A.    Quality assurance manager.
12   Q.    For which plant?
13   A.    At the time, it was both
14 plants, fresh and further processing.
15   Q.    When you say at the time, did
16 it change?
17   A.    No, ma'am, it didn't.  It
18 didn't change.
19   Q.    So you stayed the QA manager
20 for both the fresh plant and the further
21 processing plant from September until
22 when -- of '04 until when?
23   A.    Until I took over as plant

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

10

1    manager.
2        Q.    Give me your educational
3    background.
4        A.    I have a BS degree in animal
5    and dairy science, Auburn University.
6        Q.    War Eagle.  When did you
7    obtain your BS?
8        A.    1992.
9        Q.    What was your first job after
10   college?
11       A.    I worked for a temporary
12   agency.
13       Q.    What temporary agency and
14   where was it located?
15       A.    I don't recall the name, but
16   it was in Hartselle, Alabama.
17       Q.    Are you from Hartselle?
18       A.    I am from Decatur.
19       Q.    What did you do for the temp
20   agency?
21       A.    I worked at Wolverine Tube
22   Company in Decatur, Alabama.
23       Q.    What did you do for Wolverine

11

1    Tube?
2        A.    Just a general laborer.
3        Q.    What do they make?  Is it
4    steel tubes?
5        A.    Copper tubing.
6        Q.    How long did you work for
7    Wolverine Tube?
8        A.    I don't remember.
9        Q.    Was it a short time?  A year,
10   longer?
11       A.    I want to say somewhere around
12   six months.
13       Q.    Was the whole time through the
14   temp agency or did you ever become a
15   permanent employee?
16       A.    It was through the temporary
17   agency.
18       Q.    Then what did you do after you
19   left Wolverine Tube?
20       A.    I went to work for Wayne
21   Farms.
22       Q.    Where?
23       A.    Decatur, Alabama.

12

1        Q.    What position?
2        A.    Quality assurance supervisor.
3        Q.    Did you leave Wolverine Tube
4    on your own or were you asked to leave or
5    was there a layoff or anything?  Why did you
6    leave Wolverine Tube?
7        A.    For the opportunity to get
8    into management, a salary position at Wayne
9    Farms.
10       Q.    When did you start Wayne
11   Farms?
12       A.    March of 1993.
13       Q.    How long were you with Wayne
14   Farms?
15       A.    Until January of 1997.
16       Q.    Did you hold the same position
17   the entire time?
18       A.    No.
19       Q.    Okay.  Let's go through your
20   positions you held.  Your first was QA
21   supervisor?
22       A.    Correct.
23       Q.    How many employees did you

13

1    supervise?
2        A.    I don't recall the exact
3    number, but somewhere between fifteen and
4    twenty-five.
5        Q.    Were these all QA employees?
6        A.    Yes.
7        Q.    And when we say QA, we're
8    talking about quality assurance?
9        A.    Yes.
10       Q.    Just so the Record will be
11   clear.
12       A.    Okay.
13       Q.    How long were you the QA
14   supervisor?
15       A.    The best that I can remember,
16   I was a QA supervisor until the fall of '93.
17       Q.    Then what happened?
18       A.    I was promoted to quality
19   assurance manager.
20       Q.    And how long were you the
21   quality assurance manager for Wayne Farms?
22       A.    I was a QA manager until I
23   left the company in January of 1997.

32dfca94-3d46-40ea-bc43-060dcff911ff

14

1   Q.   Why did you leave the company
2   in January of 1977?
3        MR. ROSENTHAL:  '97.
4   Q.   '97, I'm sorry.
5   A.   I went to work for ConAgra
6   Foods.
7   Q.   Where?
8   A.   Enterprise, Alabama.
9   Q.   What position?
10  A.   Quality assurance manager.
11  Q.   Was this a lateral transfer?
12  A.   Yes.
13  Q.   Did you leave voluntarily from
14  Wayne Foods (sic)?
15  A.   Yes.
16  Q.   Who was your supervisor when
17  you left at Wayne -- your last supervisor at
18  Wayne Foods?  Or to whom did you report?
19  A.   Sandy Bishop.
20  Q.   What was Sandy Bishop's title?
21  A.   I don't recall her exact
22  title, but she was over the QA managers.
23  She worked in the corporate office.

15

1   Q.   Where is the corporate office?
2   A.   Duluth, Georgia.
3   Q.   When you went to ConAgra Foods
4   in January of 1997 as the QA manager, to
5   whom did you report?
6   A.   Ted Simmons.
7   Q.   What was Ted Simmons' job?
8   A.   General manager.
9   Q.   Was there one plant or was it
10  a complex in Enterprise?  When you say he
11  was general manager, he was general manager
12  of what?
13  A.   One plant.
14  Q.   What kind of plant?
15  A.   Slaughter plant.
16  Q.   And I'm just assuming, and
17  that's probably bad, but Wayne Farms was a
18  slaughter plant also?
19  A.   Yes, ma'am.
20  Q.   How long were you with ConAgra
21  Foods in Enterprise?
22  A.   Summer of '04, I believe the
23  month was August.

16

1   Q.   What happened then?
2   A.   Termination.
3   Q.   Why were you terminated?
4   A.   It was some general things.
5   At the time that I was terminated, I was a
6   plant -- I was operations manager of that
7   facility.
8   Q.   When you say general things,
9   can you give me more specific information?
10  A.   There was just some processing
11  inefficiencies and some goals that were not
12  met.
13  Q.   How long had you been
14  operations manager?
15  A.   At that time, approximately
16  two years.
17  Q.   What other positions did you
18  hold at ConAgra besides -- Let's just back
19  up.  You started as the QA manager in
20  January of '97?
21  A.   Correct.
22  Q.   How long were you QA manager
23  at ConAgra Foods in Enterprise?

17

1   A.   I don't recall how long I was
2   the QA manager.
3   Q.   What was your next position
4   there?
5   A.   I was promoted to a second
6   processing manager.
7   Q.   Second processing, tell me
8   what that is at ConAgra Foods.
9   A.   ConAgra Foods was a fast food
10  operation where they took the birds and cut
11  them up into parts and sold them as fast
12  food parts to fast food stores.
13  Q.   Such as McDonald's or Burger
14  King and things like that?
15  A.   No, ma'am.  It would have been
16  Kentucky Fried Chicken or Popeye's or
17  Hardee's at the time.  And I was over both
18  shifts of that operation in those
19  departments.
20  Q.   How long were you the -- or
21  the further processing manager -- shift
22  manager, is that what you said?
23  A.   Second processing manager.

Case 2:06-cv-01081-MEF-TFM    Document 106-12    Filed 08/01/2008    Page 19 of 57

FREEDOM COURT REPORTING

**18**

1    Q.    Second processing manager.
2    A.    I don't recall when I was
3 promoted.
4    Q.    What was the next position?
5    A.    Went into the operations
6 manager.
7    Q.    In the organizational
8 structure for ConAgra Foods, was operations
9 manager over the general manager or how did
10 that work?
11    A.    No.  The general manager was
12 over the operations manager.
13    Q.    And then to whom did the
14 general manager report?
15    A.    I don't recall titles.  We
16 reported to someone in the corporate office.
17    Q.    The general manager was the
18 facilities manager or the plant manager?
19    A.    He was over the facility.
20    Q.    Then you went to work for
21 Equity?
22    A.    Yes.
23    Q.    I think we've already

**19**

1 discussed your jobs with Equity.  Or have
2 you told me?
3          What was your first job with
4 Equity?
5    A.    QA manager.
6    Q.    And now you are the plant
7 manager?
8    A.    Yes.
9    Q.    Have you held any other
10 positions with Equity?
11    A.    Yes.
12    Q.    What others?
13    A.    I was promoted to complex QA
14 manager.
15    Q.    When were you complex QA
16 manager?
17    A.    The best that I can recall, I
18 think it was the fall of '04.
19    Q.    How long were you the complex
20 QA manager?
21    A.    Until I took over the position
22 as plant manager.
23    Q.    And that was since spring or

**20**

1 early summer of '05?
2    A.    Yes.
3    Q.    When you say complex QA
4 manager, what do you mean by complex?
5    A.    I was responsible for the
6 quality assurance department in both
7 facilities, in both fresh processing and
8 further processing.
9    Q.    Now you just have
10 responsibility for the fresh processing?
11    A.    Yes.
12    Q.    Not further processing?
13    A.    Yes.
14    Q.    Who is the plant manager for
15 the further processing?
16    A.    Mike Cortner.
17    Q.    Mike who?
18    A.    Cortner.
19    Q.    Can you spell that?
20    A.    C-O-R-T-N-E-R.
21    Q.    To whom do you report as plant
22 manager?
23    A.    The operations manager.

**21**

1    Q.    That's Greg Mills?
2    A.    Correct.
3    Q.    Let me backup just a little
4 bit because we just jumped into this
5 deposition.  I didn't ask you:  Have you
6 ever had your deposition taken before?
7    A.    No ma'am.
8    Q.    As you see, I'm asking you a
9 series of questions, and you're going to
10 need to give a verbal response so the court
11 reporter can make a Record.  And then in
12 everyday conversation we'll shake our heads
13 yes, or we'll say uh-huh.  But can you make
14 sure and say yes or no if that's the answer,
15 so the court reporter can make a Record?
16    A.    I will.
17    Q.    If at any point you don't hear
18 me because I tend to look down and talk
19 softly or if you don't understand what I
20 said, could you ask me to repeat or rephrase
21 the question?
22    A.    I will.
23    Q.    Can we have an understanding

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

22

1  that if you don't ask me to repeat or
2  rephrase the question, that you heard my
3  question, you understand my question, and
4  you've given me the best possible answer to
5  that question?
6     A.   Yes.
7     Q.   What did you do to prepare for
8  this deposition?
9     A.   Nothing.
10    Q.   Did you review any documents?
11    A.   No.
12    Q.   Did you look at any documents?
13    A.   No.
14    Q.   Did you look at any other
15 employee's testimony?
16    A.   No.
17    Q.   Or deposition transcripts?
18    A.   No.
19    Q.   Do you know what this
20 lawsuit's about?
21    A.   Yes.
22    Q.   What is your understanding of
23 this lawsuit?

23

1     A.   I don't have a very good
2  understanding about it.  I know it's about
3  donning and doffing, that's all I know.
4     Q.   What about donning and
5  doffing?  Do you know what the employees are
6  claiming or asking for with regards to
7  donning and doffing?
8     A.   No.
9     Q.   What is your under — your
10 definition of donning and doffing?
11    A.   Putting on and taking off
12 clothing.
13    Q.   Have you been involved in any
14 union negotiations?
15    A.   No.
16    Q.   Not just at Equity, have you
17 been involved in any union negotiations at
18 any of the plants in which you've worked?
19    A.   No.
20    Q.   Have you attended any union
21 negotiations?
22    A.   No.
23           MS. MCGOWAN:  Do you have

24

1  another one he can look at while I --
2           MR. ROSENTHAL:  P-16?
3           MS. MCGOWAN:  Yes.
4     Q.   Let me show what you we marked
5  as Plaintiff's Exhibit 16, and this appears
6  to be an Equity Group, Eufaula Division,
7  organizational chart.  Would you agree with
8  me on that?
9     A.   Yes.
10    Q.   And the first page, if I can
11 read, it's kind of dark, but is that your
12 name as the fresh plant manager at the top?
13    A.   Yes.
14    Q.   Okay.  Is this how the fresh
15 plant is organized?
16    A.   Yes.
17    Q.   Okay.  What departments are in
18 the fresh plant?
19    A.   First processing.
20    Q.   Which includes what?
21    A.   It's where the birds are
22 slaughtered, eviscerated, and inspected by
23 USDA.

25

1     Q.   USDA is not an employee --
2  that's not -- those employees, they are not
3  employees of Equity, they're separate; is
4  that correct?
5     A.   Yes.
6     Q.   Anything -- Any other
7  functions done in first processing?
8     A.   No.
9     Q.   All right.  How many shifts
10 are at the plant?
11    A.   Three.
12    Q.   What are those shifts?
13    A.   We have two processing shifts
14 and one sanitation shift.
15    Q.   What is the processing -- The
16 first processing shift, what are the hours
17 for that?
18    A.   Which department?
19    Q.   Is there like a general range?
20 Let me ask you this.  If you are an
21 employee, it doesn't matter what department
22 you're in, but, like, first processing
23 shift, is it like -- does it go from a

32dfca94-3d46-40ea-bc43-060dcff911ff

26

1  certain time to a certain time, but it may
2  vary depending on what department you're in;
3  and then a second shift will start at
4  another time; or is sanitation in between
5  the two shifts? Or how does that work?
6         You said you've got two shifts
7  and a sanitation shift, is that -- is
8  sanitation between the shifts, or is that
9  after the second shift?
10        MR. ROSENTHAL: I'm going to
11  object to the form of the question because
12  I'm not sure -- I think you asked about six
13  questions there.
14        MS. MCGOWAN: I know.
15    Q.    Let me find out: Where is
16  sanitation shift? Is it between the two
17  shifts or is it after the two shifts?
18    A.    After.
19    Q.    Okay. What time does
20  sanitation shift start?
21    A.    When the second shift is
22  complete.
23    Q.    Is there generally a range

27

1  about when it should start? I know
2  sometimes you run over, but is it -- If you
3  work on sanitation shift, do you have an
4  idea about when you will report to work?
5    A.    They would start cleaning
6  first processing 11:30, twelve o'clock.
7    Q.    And that's p.m.?
8    A.    Yes.
9    Q.    11:30 p.m. If you are an
10  employee working on first shift, what is the
11  first department that begins working on
12  first shift?
13    A.    Live hang.
14    Q.    What would be the time you
15  would start on that shift?
16    A.    5:50.
17    Q.    What is the last department on
18  first shift?
19    A.    Which department?
20    Q.    The last -- Employees that
21  would be the last to leave the plant on
22  first shift?
23    A.    Their shift would end at 4:30.

28

1    Q.    So first shift runs anywhere
2  from 5:50 to 4:30, if everything operates
3  smoothly?
4    A.    Correct.
5    Q.    What time would second shift
6  begin, if everything's operating smoothly?
7    A.    4:30.
8    Q.    Would that be live hang?
9    A.    That would be deboning.
10    Q.    What departments operate on
11  second shift?
12    A.    Live hang, evisceration,
13  salvage.
14    Q.    The whole plant?
15    A.    The whole plant.
16    Q.    So when would second shift
17  live hang start?
18    A.    2:50 p.m.
19    Q.    Is that the first group of
20  employees that would report to second shift?
21    A.    Yes.
22    Q.    So second shift would range
23  between 2:50 and when? What's the last time

29

1  an employee would get off on the second
2  shift?
3    A.    When we're through processing
4  birds.
5    Q.    And is there an average time,
6  or a normal time, if everything's running
7  smoothly?
8    A.    Evisceration would get off at
9  eleven o'clock, which would be first
10  processing and deboning, two o'clock in the
11  morning.
12    Q.    So sanitation is doing
13  different departments at 11:30, while you
14  have the last departments of deboning and
15  evisceration operating on the second shift?
16    A.    Sanitation would be cleaning
17  first processing if it is finished, while
18  deboning will continue to operate.
19    Q.    What are the departments as
20  you say -- Let's go from the when the bird
21  enters the plant until it leaves the plant,
22  walk me through the departments. Of course
23  you have live hang.

FREEDOM COURT REPORTING

30

1    A.    You have live hang.
2    Q.    Is that the first department?
3    A.    Yes.
4    Q.    Okay.
5    A.    The next department would be
6    evisceration department, and then there's
7    the salvage department. We have a paw room
8    department. And then we have the deboning,
9    pack out, shipping, DSI.
10    Q.    What is DSI?
11    A.    It's a portioning department.
12    It is separate from the deboning department.
13    Q.    Any others?
14    A.    (Witness shakes head in the
15    negative.)
16    Q.    Is DSI before shipping and
17    pack out, in the line or is it — where is
18    it in the line?
19    A.    It would be before shipping.
20    Q.    How many employees are
21    employed at the fresh plant facility, total,
22    all shifts?
23    A.    I don't know an exact number.

31

1    Q.    Do you know how many employees
2    per shift?
3    A.    I don't know an exact number.
4    Q.    Do you know an approximate
5    number of total employees of all shifts?
6    A.    An approximate number would be
7    thirteen hundred.
8    Q.    That's all three shifts?
9    A.    That would be the two
10    processing shifts.
11    Q.    Approximately how many
12    sanitation shift employees?
13    A.    Eighty-five.
14    Q.    Looking at Exhibit 16, does
15    this accurately reflect the direct reports
16    to you?
17    A.    Yes.
18    Q.    All right. How many direct
19    reports do you have?
20    A.    Five.
21    Q.    Tell me those.
22    A.    Sharon Bouyer.
23    Q.    Is she production coordinator?

32

1    A.    Yes.
2    Q.    What does she do as production
3    coordinator?
4    A.    She schedules the plant on
5    what products to produce. Bobby Barnett.
6    Q.    What does he do?
7    A.    Bobby's responsible for first
8    processing, both shifts.
9    Q.    All right.
10    A.    Russel Spivey.
11    Q.    And what does Russel Spivey
12    do?
13    A.    He's responsible for shipping.
14    Q.    All right.
15    A.    James Henderson.
16    Q.    What does James Henderson do?
17    A.    He's responsible for
18    transportation. And Ricky Lewis.
19    Q.    What does Ricky do?
20    A.    He's responsible for debone
21    and DSI.
22    Q.    So he has dual departments?
23    A.    Yes.

33

1    Q.    Are debone and DSI located
2    near each other?
3    A.    They're in the same building.
4    Q.    I've got a map here. It's
5    kind of hard to read, but — And we've
6    previously marked it as exhibit —
7    MR. ROSENTHAL: 22.
8    MS. MCGOWAN: Is it 22? I
9    can't find the sticker on it. There it is.
10    Q.    Can you tell me where DSI is,
11    if it's on here?
12    A.    Right here (indicating).
13    Q.    Can you write DSI, or is it
14    already on there?
15    MR. ROSENTHAL: It's already
16    there.
17    Q.    Right there?
18    A.    Yes.
19    Q.    Okay. And you said it's in
20    the same building. But debone is in the
21    same building with the rest of the fresh
22    kill or is it in a separate building?
23    A.    What I'm talking about is, we

FREEDOM COURT REPORTING

34

1   separate first processing from second
2   processing with a wall, and it's in the same
3   area.
4        Q.    Okay. But debone, DSI, and
5   fresh kill are all in the same actual
6   physical building, they're just different
7   departments within the building, so that I'm
8   correct?
9        A.    Yes.
10       Q.    Okay. All right. Thanks.
11            In the organizational
12   structure, you have supervisors -- or
13   actually you have managers reporting to you.
14   What's the next level down?
15       A.    Superintendent.
16       Q.    And what does the
17   superintendent do?
18       A.    Responsible for specific
19   departments.
20       Q.    And then under the
21   superintendent, what do you have?
22       A.    Supervisors.
23       Q.    What do the supervisors do?

35

1        A.    They're responsible for a
2   specific line or an area within that
3   department.
4        Q.    How many lines are there?
5        A.    What lines?
6        Q.    Are there different -- Does it
7   vary based on department?
8        A.    Yes.
9        Q.    All right. And live -- And
10   the first part of the plant, you call that
11   first processing?
12       A.    Yes.
13       Q.    How many lines are in live
14   kill or live hanging?
15       A.    Just one.
16       Q.    Okay. Then it goes into --
17   Walk me through the plant as chicken goes
18   through and walk me through the lines.
19            It goes from live hang to
20   where?
21       A.    Evisceration.
22       Q.    How many lines are in
23   evisceration?

36

1        A.    Two.
2        Q.    Then it goes to salvage?
3        A.    Salvage is a department within
4   evisceration.
5        Q.    How many lines are in the paw
6   room department?
7        A.    There's no actual lines. It's
8   where they pack out the paws.
9        Q.    And where does it go from
10   salvage or evisceration?
11       A.    To the chiller.
12       Q.    How many lines are in the
13   chiller?
14       A.    There's no lines. It's two
15   chillers, water chillers.
16       Q.    Then it goes to where?
17       A.    Deboning.
18       Q.    How many lines are in
19   deboning?
20       A.    What specific lines?
21       Q.    Okay. Tell me what's in
22   deboning.
23       A.    There's two overhead lines, to

37

1   rehang.
2        Q.    To rehang?
3        A.    Yes.
4        Q.    Then what happens?
5        A.    With what part of the bird?
6        Q.    You tell me. I want you to
7   describe what goes on as the bird goes
8   through. I don't know.
9        A.    The bird is halved and the
10   front half drops off to a -- it feeds to the
11   debone line.
12       Q.    Is that a machine that halves
13   them?
14       A.    Yes.
15            There are eight debone lines.
16       Q.    Eight debone lines?
17       A.    Uh-huh. And the rear half of
18   the bird stays on the line and goes to leg
19   quarter pack out.
20       Q.    How many lines are in the leg
21   quarter pack out?
22       A.    There's five areas for the
23   dark meat to drop off to be packaged.

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

38

1    Q.    If it doesn't go on the
2  overhead, it stays on -- are there lines
3  that it stays on below?
4         When you say it stays on the
5  overhead, what do you call that in debone?
6  Is that where they put it on the cones or do
7  you use the cones?
8    A.    The birds are rehung out of
9  the chiller on a line.
10   Q.    Okay.  But I'm talking about
11  debone, how is it set up.  Explain that to
12  me.
13        You said there are eight
14  debone lines.
15   A.    The front half is placed on
16  the moving cones.
17   Q.    All right.  And pack out, are
18  there lines there or is it just a belt going
19  through?
20   A.    Again, you're going to have
21  to --
22   Q.    Tell me what's in pack out.
23  Are there departments within pack out?

39

1    A.    Yes.
2    Q.    What departments are within
3  pack out?
4    A.    Leg quarter, wings, tenders.
5    Q.    Is that it?
6    A.    Uh-huh.  Yes.
7    Q.    And leg quarters, are there --
8  How many lines or areas are in leg quarter?
9    A.    Five.
10   Q.    Is it five lines?
11   A.    It's five bagging hoppers.
12   Q.    All right.  What about wings,
13  how many areas?
14   A.    Four.
15   Q.    And what are those?
16   A.    They're bagging hoppers as
17  well.
18   Q.    What about tenders?
19   A.    One belt.
20   Q.    One belt?
21   A.    (Witness nods head in the
22  affirmative.)
23   Q.    Within the plant, what -- is

40

1  it the superintendent or the supervisor
2  that's responsible for editing employees'
3  time on a daily basis?
4    A.    Supervisors.
5    Q.    Supervisors?
6    A.    Uh-huh.
7    Q.    Do you have any responsibility
8  with regards to the editing of the time for
9  employees?
10   A.    I do not edit time sheets.
11   Q.    Do you review the daily time
12  information?
13   A.    No.
14   Q.    Do you review it weekly?
15   A.    No.
16   Q.    Do you review it monthly?
17   A.    No.
18   Q.    Do you review it ever?
19   A.    No.
20   Q.    Who is responsible for
21  reviewing the time information, time sheets
22  for employees?
23   A.    Supervisors.

41

1    Q.    But above the supervisors, is
2  there anyone to look at their raw numbers?
3    A.    Accounting.
4    Q.    Who is head of accounting?
5    A.    Joe Preston.
6    Q.    Do you know how the time
7  system works at your plant?
8    A.    What specific part?
9    Q.    How the employees are paid.
10   A.    Paid off the Kronos system.
11   Q.    An employee comes to work in
12  the morning.  How do they make sure they're
13  accounted for and their time's going to be
14  paid?
15   A.    They need to clock in.
16   Q.    And where do they clock in?
17   A.    Time clocks.
18   Q.    Where are they located?
19   A.    Break rooms.
20   Q.    How many break rooms are
21  there?
22   A.    Three break rooms.  But the
23  time clocks are in deboning and first

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

42

1  processing.
2      Q.    In the plant or in the break
3  rooms?
4      A.    In the break room.
5      Q.    There's a separate break room
6  for deboning?
7      A.    It's just what we call them.
8  They're in the same hallway.
9      Q.    Can employees use either break
10 room?
11     A.    Yes.
12     Q.    Are employees paid from their
13 punch-in time to their punch-out time?
14     A.    It depends on the employee.
15     Q.    Production line employees, are
16 they paid from punch-in to punch-out?
17     A.    If they are on a scheduled
18 time or clock-in/clock-out, they would be
19 paid from clock-in to clock-out.
20     Q.    What employees are on the
21 clock-in to clock-out?
22     A.    I don't know specifics.  But a
23 lead person could be setting up on a

43

1  clock-in/clock-out.
2      Q.    And any other type jobs that
3  you know of that are on a clock-in to
4  clock-out?
5      A.    I don't know.
6      Q.    Who would know?
7      A.    The supervisors that do the
8  time sheets.
9      Q.    Who determines whether the
10 employee is on a clock-in to clock-out?  Who
11 makes that determination?
12     A.    Specific departments are set
13 up on master cards, but then a supervisor
14 would designate employees to be on a
15 clock-in/clock-out, if they were a setup
16 person or somebody that stayed late.
17     Q.    Are the setup persons or the
18 lead -- are they the same as the lead
19 person?
20     A.    Some of them could be, yes.
21     Q.    Are they covered by the
22 collective bargaining agreement?
23     A.    I don't know the details on

44

1  bargaining agreement.
2      Q.    You don't know which employees
3  are covered?
4      A.    I don't know the specifics of
5  it.  I know there is a bargaining unit, but
6  I don't know the specifics of it.
7      Q.    You don't know what job
8  positions are covered by it?
9      A.    (Witness shakes head in the
10 negative.)
11     Q.    You have to say yes or no.
12     A.    No.  Not without looking at
13 it.
14     Q.    I thought we marked it in.
15 Let me show you what's been marked as
16 Exhibit 12, and that's part of those, which
17 is the union contract that's been provided
18 to us.
19     A.    Uh-huh.
20     Q.    I'm not sure it's all of it.
21 I think it's just parts of it.
22          MS. MCGOWAN:  Or is this the
23 whole thing, this one?

45

1          MR. ROSENTHAL:  This is just
2  an excerpt.  This is the 2004 to 2008
3  contract.
4          MS. MCGOWAN:  I'm sorry.  Do
5  we have that one in?
6          MR. ROSENTHAL:  It was
7  produced.  I don't know if it was marked.
8      Q.    Well, do you know whether or
9  not the bargaining unit changed from the
10 2004 to the 2008 agreement?
11         MR. ROSENTHAL:  First, you
12 have to answer that question.  Do you know
13 whether there's been any changes in the
14 unit?
15     A.    There was changes in the pay.
16     Q.    I'm saying the unit.
17     A.    I don't know.
18     Q.    You don't know if people were
19 added or taken away from it?
20     A.    I don't know.
21     Q.    Okay.  Let me show you what
22 was previously marked in a deposition for
23 Jackie Davis as Defendant's Exhibit 4, and

46

1  that is the current union contract. And
2  take a look at the coverage of the
3  bargaining unit and compare it and see if
4  there have been any changes, please, sir.
5      A.    (Witness complies.)  There
6  hasn't been any changes.
7      Q.    You said you knew there was
8  changes to the pay.  How did you know that?
9      A.    Because I reviewed those with
10 my supervisors.
11     Q.    Who's your supervisor?
12     A.    With my supervisors.
13     Q.    You reviewed them with your
14 supervisors?
15     A.    Uh-huh.
16     Q.    Who asked you to review it
17 with your supervisors?
18     A.    I don't recall if anyone asked
19 me to.
20     Q.    How did you learn that there
21 were changes to the pay?
22     A.    Because I knew that there was
23 a new contract negotiation, and I knew that

47

1  it was supposed to change in March of this
2  year.
3      Q.    Okay.  But how did you learn
4  of the actual changes?
5      A.    I don't recall if it was
6  verbally or a piece of paper.  I don't
7  remember how it was told.
8      Q.    What did you learn were the
9  changes?
10     A.    There was an increase in the
11 starting wage rate.
12     Q.    What else?
13     A.    There was some changes in the
14 amount of supplies that were going to be
15 given to the employees.
16     Q.    Anything else that you went
17 over with your supervisors?
18     A.    I don't recall to the extent
19 of what all we went over.
20     Q.    Did you make notes?
21     A.    I don't recall making any
22 notes.
23     Q.    Did you have -- given them a

48

1  handout about these are the new changes?
2      A.    Yeah.  I had a signed copy of
3  the document.
4      Q.    Of the contract?
5      A.    Yeah.  Yes.
6      Q.    Did you, like, have a sheet --
7  like, in addition to the contract saying:
8  Here are the changes to this contract, or
9  did you just give them all the new contract?
10     A.    I covered just what I thought
11 was necessary for them to cover -- them to
12 know about the contract, the supply changes
13 and the wage rate changes.
14     Q.    Okay.  Anything else you
15 recall covering with them?
16     A.    Not that I recall.
17     Q.    Did you go over anything about
18 paying for donning and doffing?
19     A.    No.
20     Q.    Or time keeping?
21     A.    Not that I remember.
22     Q.    Can I get that one back,
23 please?

49

1      A.    Uh-huh.
2      Q.    Are you aware of any other job
3  positions that are paid from clock-in to
4  clock-out other than maybe a lead person or
5  setup person?
6      A.    Not that I'm aware of.
7      Q.    Is there any reason why all
8  employees can't be paid from clock-in to
9  clock-out?
10     A.    Yes.
11     Q.    What is that reason?
12     A.    We pay them on line time.
13     Q.    But if you didn't use line
14 time, is there any reason that would
15 prohibit Equity from paying from clock-in to
16 clock-out?
17     A.    You have to keep a handle on
18 employees.  If you paid them clock-in to
19 clock-out, some of them would maybe sitting
20 in the break room or out in their car, not
21 actually working.
22     Q.    You could write them up or
23 fire them if they weren't working, couldn't

FREEDOM COURT REPORTING

50

1  you?
2        MR. ROSENTHAL:  Objection to
3  the form of the question.  You're arguing
4  with the witness.  He answered your first
5  question.
6    Q.    Could you discipline them if
7  they were not working?
8        Let me make this -- restart
9  this.
10        If an employee is not working,
11  could you take disciplinary action against
12  them?
13    A.    At what time?
14    Q.    At any time.
15    A.    Repeat the question.
16    Q.    If an employee is not working,
17  can you take disciplinary action against
18  them?
19        MR. ROSENTHAL:  Object to the
20  form of the question.  You can answer if you
21  can.
22        MS. MCGOWAN:  What's wrong
23  with the form that question?

51

1        MR. ROSENTHAL:  Any time means
2  twenty-four hours a day.  You're not
3  limiting it to reasons why this witness is
4  here, and you're not being specific.  He's
5  already said to you what time of day is it?
6        MS. MCGOWAN:  No.  And I
7  repeated the question.  I said if an
8  employee is not working, can you discipline
9  the employee?
10        MR. ROSENTHAL:  And I
11  objected.
12        MS. MCGOWAN:  There's nothing
13  about any time in that question.
14    Q.    If you have an employee that's
15  not working, can you take disciplinary
16  action against that employee?
17        MR. ROSENTHAL:  Are you
18  limiting it to after he's clocked in or
19  before he's clocked in?
20    Q.    After an employee clocks in,
21  if he's not working, can you take
22  disciplinary action against that employee?
23    A.    If they're not performing

52

1  their job function on the floor, on their
2  job, if they're not performing their job, if
3  they leave the line without telling their
4  supervisor, and they come up abandoned their
5  job, yes, you can take disciplinary action.
6    Q.    All right.  If an employee is
7  doing things on their break time, when
8  they're away from the line, they're in
9  violation of company policy.  Can you
10  discipline that employee?
11        MR. ROSENTHAL:  Objection to
12  the form of the question.
13    Q.    You can answer.
14    A.    The thirty-minute break time
15  is their time.
16    Q.    During the thirty-minute break
17  time, do employees have to abide by company
18  policies?
19        MR. ROSENTHAL:  Objection to
20  the form of the question.
21    Q.    Conduct policies?
22        MR. ROSENTHAL:  Objection to
23  the form of the question.  You can answer if

53

1  you can.
2    Q.    You can answer.
3    A.    Which policies?
4    Q.    Any conduct policies.
5    A.    What specific policies?
6    Q.    Can an employee drink during
7  their break time?
8    A.    Drink what?
9    Q.    Alcohol.
10    A.    No.
11    Q.    If an employee was drinking
12  alcohol during their break time, could you
13  discipline them?
14    A.    Alcoholic beverages are not
15  allowed on the company property.
16    Q.    My question is, if an employee
17  is drinking alcohol during their break time,
18  could you take disciplinary action against
19  them?
20    A.    I would take them to HR, yes.
21    Q.    An HR person --
22    A.    Yes.
23    Q.    -- does the discipline?

FREEDOM COURT REPORTING

54

1    A.    Yes.
2    Q.    If an employee wears their PPE
3    out into the parking lot, can you discipline
4    them?
5          MR. ROSENTHAL:  Objection to
6    the form of the question.
7    Q.    If an employee wears any of
8    their PPE out into the parking lot during
9    their break, can you discipline them?
10         MR. ROSENTHAL:  Objection to
11   the form of the question.  You can answer if
12   you can.
13   Q.    He's not answering, you are.
14   The question is to you.  Can you --
15   A.    I know.
16   Q.    Can you answer that question?
17   A.    The employees are not allowed
18   to wear their equipment outside the
19   building.
20   Q.    If an employee does wear their
21   equipment outside of the building, can you
22   write them up?
23   A.    We would take the progressive

55

1    discipline with them.
2    Q.    So you can discipline them;
3    correct?
4    A.    If they wear their hair net --
5    Personal protective equipment, to me, would
6    be an arm guard or a chained glove.
7    Q.    If an employee wears their
8    hair net out into the parking lot, can you
9    discipline them?
10   A.    We ask them to take it off.
11   And we would take the progressive discipline
12   and continue.
13   Q.    So you have control of the
14   employees through the progressive discipline
15   policy, if they're violating any of your
16   work rules or policies; is that correct?
17   A.    Repeat the question.
18   Q.    Equity Foods has control of
19   employees through the progressive
20   disciplining policy, if an employee violates
21   policies or work rules?
22   A.    Yes.
23   Q.    All right.  Any other reason,

56

1    other than you wouldn't have control of
2    employees, that Equity could not pay
3    employees from punch-in to punch-out time?
4    A.    I don't understand the
5    question.
6    Q.    I asked you previously why
7    Equity -- was there any reason why Equity
8    couldn't pay employees from punch-in to
9    punch-out time, and you stated, well, you
10   couldn't keep control of the employees.
11   They may go out in the parking lot and not
12   work.
13         Is there any other reason why
14   Equity could not pay employees from their
15   punch-in or punch-out time or clock-in to
16   clock-out as you call it?
17   A.    Employees are set up on
18   specific departments, and they're paid
19   according to the pay scale and how that's
20   set up with accounting, so that's how
21   they're paid.
22   Q.    All right.  But could
23   accounting decide that they're going to set

57

1    up debone employees to pay them from
2    clock-in to clock-out time?
3          MR. ROSENTHAL:  Objection to
4    the form of the question.  You can answer.
5    A.    No.
6    Q.    And why not?
7    A.    Because we set those rules.
8    Q.    Who sets those rules?
9    A.    We, as a company, set those
10   rules.
11   Q.    Okay.  Could the company
12   decide to change those rules and pay from
13   clock-in to clock-out time?
14         MR. ROSENTHAL:  Objection to
15   the form of the question.  You can answer.
16   A.    I don't know.
17   Q.    Who would have that authority
18   to change those rules?
19   A.    General manager.
20   Q.    And who is that?
21   A.    Tim Esslinger.
22   Q.    Who would have a list of all
23   the employees that are paid at your plant

FREEDOM COURT REPORTING

58

1  from clock-in to clock-out?
2       A.  I don't know.  Not specific
3  employees names, I don't know.
4       Q.  Or departments?
5       A.  Accounting would have that.
6       Q.  In the morning when an
7  employee arrives to start a shift as a
8  processing employee, do they report to the
9  same position every day?
10      A.  Generally, yes.
11      Q.  What do you mean by generally
12 yes?
13      A.  They would report to the same
14 department, but within that department if
15 employees were absent, after we got
16 everything going, employees may be asked to
17 move to a different position on the line.
18      Q.  Are employees rotated on the
19 line on a daily basis?
20      A.  Which department?
21      Q.  In any of the processing
22 departments.
23      A.  Yes.

59

1       Q.  Who makes the decision of
2  where they'll be working on the line that
3  day?
4       A.  Supervisors.
5       Q.  Why are employees rotated?
6       A.  We rotate them to try to take
7  care of them where they don't do the same --
8  use the same motion all the time.
9       Q.  Is it to cut down on injuries?
10      A.  It's to cut down on ergonomic
11 issues with the employees, try to take care
12 of them.
13      Q.  Like carpal tunnel syndrome?
14      A.  Yes.
15      Q.  And worker compensation claims
16 for the same?
17      A.  Cut down on carpal tunnel.
18      Q.  Do the employees rotate
19 throughout the day or is it just at the
20 beginning of the shift?
21      A.  I'm not that familiar with the
22 rotation schedules because I don't do those
23 every day.  I'm not that close to them.

60

1       Q.  Who would know that?
2       A.  Supervisors.
3       Q.  If some of the employees
4  testified that they rotated when they came
5  back from shifts -- their two unpaid breaks,
6  would you dispute that testimony?
7           MR. ROSENTHAL:  Objection to
8  the form of the question.
9       Q.  You can answer.
10      A.  First off, an employee
11 wouldn't work two shifts.
12      Q.  I'm talking about -- Let me
13 back up.  Employees are entitled to two
14 thirty-minute unpaid breaks per shift; is
15 that correct?
16      A.  Correct.
17      Q.  All right.  And if an
18 employee -- If some of the employees have
19 previously testified in this case that when
20 they returned from their two thirty-minute
21 unpaid breaks, they were rotated to
22 different locations on the line, would you
23 have any reason to dispute that testimony?

61

1           MR. ROSENTHAL:  Objection to
2  the form of the question and to the premise.
3  You can answer.
4       A.  I don't know.
5       Q.  Do you know of any policy or
6  written document that would dispute that
7  testimony?
8           MR. ROSENTHAL:  Objection to
9  the form of the question.  You can answer as
10 to any documents you're aware of.
11      A.  I don't know if there's a
12 document.
13      Q.  Are there any written
14 documents as to when employees are supposed
15 to be rotated?
16      A.  I don't know.
17      Q.  Who would know?
18      A.  I don't know.
19      Q.  Do you instruct the
20 supervisors to rotate the employees?
21      A.  I do not instruct them to
22 rotate employees.
23      Q.  Who does?

FREEDOM COURT REPORTING

62

1      A.    Superintendent would handle
2  all the job rotations.
3      Q.    Who lets the superintendent
4  know that they should instruct the
5  supervisors to rotate employees?
6      A.    I'm not involved in rotations.
7      Q.    Who would be involved in that?
8      A.    The superintendent and
9  supervisors would be involved in job
10  rotations.
11      Q.    But you're over the
12  superintendents?
13      A.    The processing managers report
14  to me.
15      Q.    So would the processing
16  managers be the person telling the
17  superintendents to make sure the employees
18  are being rotated?
19      A.    I don't get involved in
20  rotations.
21      Q.    I'm trying to find out who
22  does, other than the superintendent and
23  supervisors.

63

1      A.    As far as I know the
2  supervisors handle the rotations.
3      Q.    Is there anybody above them
4  making sure that the superintendent and
5  supervisors are handling the rotations?
6      A.    There is an ergonomics team
7  that evaluates rotation sheets.
8      Q.    Rotation sheets?  What are
9  those?
10      A.    They audit them for proper
11  rotation.
12      Q.    What is a rotation sheet?
13      A.    I don't know.
14      Q.    Have you ever seen one?
15      A.    No.
16      Q.    Who maintains rotation sheets?
17      A.    I don't know.
18      Q.    Are these something that are
19  kept at the plant?
20      A.    I don't know where they're
21  kept.
22      Q.    How do you know about rotation
23  sheets?

64

1      A.    Because I've -- They're
2  covered with the ergonomics safety team.
3  They cover them in a monthly meeting.  They
4  review them and they were done.
5      Q.    Who's on the ergonomics team?
6      A.    Bobby Barnett is the team
7  leader, and I'm not sure who's on the team.
8      Q.    What's Bobby Barnett's job?
9      A.    First processing manager.
10      Q.    Do you attend these monthly
11  safety meetings?
12      A.    I do.
13      Q.    All right.  Who else attends
14  them?
15      A.    Other managers.
16      Q.    Tell me who.
17      A.    Tim Esslinger, Jim Bice.
18      Q.    What's Jim Bice's title?
19      A.    Complex HR manager.  Butch
20  White.
21      Q.    Who's Butch White?
22      A.    Complex QA manager.
23      Q.    Who else?

65

1      A.    Bobby Barnett.
2      Q.    He's the first and second
3  shift processing manager?
4      A.    He's first processing manager.
5      Q.    Okay.
6      A.    Ricky Lewis.
7      Q.    Who's Ricky Lewis?
8      A.    Processing manager for debone
9  and DSI.
10      Q.    All right.  Who else?
11      A.    Ken Edwards.
12      Q.    Who's Ken Edwards?
13      A.    Live operations manager.
14      Q.    Who else?
15      A.    Mike Cortner.
16      Q.    Mike who?
17      A.    Cortner.
18      Q.    What's his title?
19      A.    Further processing manager.
20      Q.    Who else?
21      A.    Robin Jones.
22      Q.    Who's Robin Jones?
23      A.    The administrative assistant.

32dfca94-3d46-40ea-bc43-060dcff911ff

66

1    Q.    To whom?
2    A.    Tim.
3    Q.    Who else?
4    A.    Carldon Grant, C-A-R-L-D-O-N,
5    Grant.
6    Q.    What is Carldon Grant's title?
7    A.    Live haul manager.  Billy
8    Kelly.
9    Q.    Who's Billy Kelly?
10   A.    Maintenance manager.  Terrence
11   Skinner.
12   Q.    Who's Terrence Skinner?
13   A.    He's the maintenance manager
14   as well.
15   Q.    Both are maintenance managers?
16   A.    Uh-huh.
17   Q.    Do they have different areas?
18   A.    Billy's in charge of further
19   plant, Terrence is in charge of fresh plant.
20   Q.    Anyone else?
21   A.    Reb Bludsworth.
22   Q.    Who?
23   A.    Reb Bludsworth.

67

1    Q.    R-E-B?
2    A.    Uh-huh.
3    Q.    Bludsworth?
4    A.    B-L-U-D-S-W-O-R-T-H.
5    Q.    Who is that?
6    A.    Complex maintenance manager.
7    Q.    Anyone else?
8    A.    Harry Wilson, safety manager.
9    Q.    Anyone else?
10   A.    Jeanette Anglin.
11   Q.    Jeanette who?
12   A.    Anglin, A-N-G-L-I-N.
13   Q.    What's Jeanette's title?
14   A.    She's in charge of -- She's
15   the nurse.  She's head of all the -- I'm not
16   sure of her exact title.
17   Q.    Over all the plants?
18   A.    Yes.
19   Q.    Anyone else attend this
20   monthly meeting?
21   A.    There are some others from
22   other departments, but I don't recall their
23   names.

68

1    Q.    Other than the ergonomic
2    reports or the rotation sheets, what else is
3    discussed in these monthly safety meetings?
4    A.    On-the-job, off-the-job
5    safety, safety audits, the first response,
6    and safety statistics.
7    Q.    When you say on-the-job,
8    off-the-job safety, what do you mean by
9    that?
10   A.    There are committees that do
11   different things to promote on-the-job
12   safety and off-the-job safety when people go
13   home.
14   Q.    When you're talking about
15   off-the-job safety, you mean from the time
16   they clock out until they leave the
17   facility?
18   A.    When they go home.
19   Q.    Like leave -- Like at their
20   home?
21   A.    At their home.
22   Q.    What area?
23   A.    We talk about topics depending

69

1    on the season, could be heat-related safety
2    or swimming safety or boating safety, things
3    like that.
4    Q.    What are safety audits?
5    A.    Safety audits are performed by
6    supervisors and managers in a plant.
7    Q.    What are they auditing?
8    A.    Auditing the unsafe acts and
9    conditions of the plant, whether it's a
10   person doing something that's unsafe or
11   there's an unsafe condition in the plant.
12   Q.    What about first response,
13   what is that?
14   A.    They are made up of the HAZMAT
15   team.  So they go over what they've done for
16   the month, the previous month, and what
17   they've got in store for the next month.
18   Q.    Do you have monthly safety
19   meetings with the employees?
20   A.    I do not.
21   Q.    Does someone at the plant?
22   A.    Supervisors.
23   Q.    When are these held?

70
1     A.    During operations.
2     Q.    What are safety statistics?
3     A.    Cover hours worked, cover any
4  accidents that may have happened for the
5  previous month, and look at recordables and
6  frequency rate.
7     Q.    Do you look at lost time?
8     A.    If there has been one, yes.
9     Q.    These rotation sheets, do they
10 give those out or a report from those
11 rotation sheets in these meetings?
12    A.    No.  They don't give those
13 out.
14    Q.    Do they give you a summary of
15 them?
16    A.    They give a summary of what's
17 been audited.
18    Q.    Do you know how often the
19 rotation sheets are completed?
20    A.    I do not.
21    Q.    Is it something that's done
22 daily or weekly by a supervisor?
23    A.    I don't look at them, so I

72
1  they post on the bulletin board.  That's
2  just to try to help employees, whether it be
3  monitoring high blood pressure, things like
4  that.  I don't remember.
5     Q.    Can you recall anything else
6  we haven't already discussed?
7     A.    There's some other issues
8  discussed on the refrigeration side, but I
9  don't know exactly what they are.
10    Q.    Other than the rotation
11 sheets, are you aware of any other
12 documentation that would reflect the actual
13 rotation of the employees on the production
14 line?
15    A.    I'm not.
16    Q.    Would an employee's time
17 records reflect where they were actually
18 working?
19    A.    It would reflect the -- It
20 would reflect the department that they were
21 charged to; it would not reflect where they
22 were actually working.
23    Q.    Okay.  Are the employees

71
1  don't know.
2     Q.    Anything else discussed in the
3  monthly meetings, safety meetings?
4     A.    Transportation.
5     Q.    With regards to?
6     A.    Just hours driven -- I'm sorry
7  miles driven and reviewing accidents.
8     Q.    Is that delivering the
9  product?
10    A.    No.  That would be delivering
11 feed or delivering live birds to the plant.
12    Q.    Where are your live birds
13 maintained?  Is that an operation by Equity,
14 or do you purchase them from farmers, or how
15 do you get your live birds?
16    A.    They're -- Contract growers
17 raise the birds.
18    Q.    Anything else discussed in
19 these safety meetings?
20    A.    There's a wellness committee.
21    Q.    What does the wellness
22 committee do?
23    A.    They have a monthly topic that

73
1  rotated within the department that they're
2  assigned to, or are they moved to other
3  departments, if you know?
4     A.    They would be rotated within
5  the deboning department.
6     Q.    Any other department rotate?
7     A.    Evisceration, I believe.
8  Evisceration.
9     Q.    Are they the only two
10 departments, to your knowledge, that rotate
11 employees?
12    A.    As far as I'm aware, they are.
13    Q.    What are the policies of
14 Equity -- of Equity Group regarding personal
15 identification cards or clock-in cards for
16 your employees?  What are their requirements
17 with regards to when they report to work?
18    MR. ROSENTHAL:  Objection to
19 the form.  Several questions.  You can
20 answer if you can.
21    A.    You are going to have to get
22 more specific.
23    Q.    Do all employees have a

74

1    personal identification card or an ID card
2    or badge?  How do they clock in?
3         A.    They have an employee badge.
4         Q.    What do they do with this
5    employee badge?
6         A.    They're supposed to use it to
7    clock in and clock out.
8         Q.    Is it used for anything else?
9         A.    To purchase their supplies.
10        Q.    Does it have a picture of them
11   on it?  What does it look like?
12        A.    Yes.
13        Q.    Yes, it has a picture?
14        A.    It has a picture.
15        Q.    Do they have to use it to
16   enter the plant?
17        A.    No.
18        Q.    Okay.  So are there any rules
19   with regards to when they can clock in?
20        A.    No.
21        Q.    Do you have like a ten-minute
22   rule, like they shouldn't clock in ten
23   minutes before their shift or anything like

75

1    that?
2         A.    No.
3         Q.    Is there anything that
4    prohibits Equity Food from establishing a
5    policy of when an employee can clock in?
6              MR. ROSENTHAL:  Objection to
7    the form of the question.  You can answer.
8         A.    Repeat the question.
9         Q.    Is there anything that
10   prohibits Equity Food from establishing a
11   policy of when an employee -- how soon an
12   employee can clock in before their shift
13   begins?
14             MR. ROSENTHAL:  Same
15   objection.  You can answer.
16        A.    I don't recall anything that
17   prohibits.  I -- I'm not -- I don't know.
18        Q.    Have you ever been in any
19   meetings where there have been any
20   discussions about establishing a policy with
21   regards to the time length before an
22   employee can check in?
23        A.    No.

76

1         Q.    If an employee is assigned to
2    work on the evisc line, what time would it
3    start on first shift, that department?  In
4    the evisc department -- What time does the
5    first shift of the evisc department start?
6         A.    The live hang department
7    starts at ten till, and as the birds travel
8    through the process, it comes to eviscerate.
9         Q.    What's the first station after
10   the birds -- Is the chiller in that evisc
11   department or is it outside?
12        A.    It's the last stage of that
13   department.
14        Q.    What is the first position
15   outside of the chiller on the line?
16        A.    Which direction?
17        Q.    Is there more than one
18   direction?
19             MR. ROSENTHAL:  Both sides of
20   the chiller.
21        Q.    After you leave the chiller,
22   as the bird goes through the process, what's
23   the first position after?  Is it the chiller

77

1    hanger?
2         A.    Rehang.
3         Q.    Rehang.  What department is
4    that in?
5         A.    It's in deboning.  But it is
6    rehang within the debone department.
7         Q.    What time does the person
8    working on the rehang in the debone have to
9    report to work on first shift?
10        A.    7:30.
11        Q.    Is that when that department
12   starts?
13        A.    When the workload gets there.
14   Depending on how the production is running.
15   If we have a breakdown, or something, the
16   workload may not get there.
17        Q.    Is that what time it's
18   scheduled to start?
19        A.    Scheduled time to start is
20   7:30.
21        Q.    Are people working as
22   rehangers in the debone department paid on
23   scheduled time or line time?

FREEDOM COURT REPORTING

78

1    A.    It should be a line time.
2    Q.    How does that operate?
3    A.    They are -- The master card of
4    the line time is swiped at the end of the
5    shift when the work is complete.
6    Q.    What about at the beginning of
7    the shift, how do they start it?
8    A.    The employees, they swipe in
9    whenever they get ready, as long as it's
10   before 7:30.
11   Q.    What if an employee swipes in
12   at 7:31, what happens?
13   A.    They would be late.
14   Q.    Are they deducted that one
15   minute of pay?
16   A.    I don't do the time sheets,
17   so --
18   Q.    Do you know, if an employee
19   swipes in after 7:30, are they paid from
20   7:30 or are they paid from when they swipe
21   in?
22   A.    If you were late, you'd be
23   paid from when you clock in.

79

1    Q.    If an employee swipes in
2    before -- clocks in before 7:30, are they
3    paid from their clock in or are they paid
4    from the scheduled time of 7:30?
5    A.    It depends on how it's set up.
6    It depends on what department you're working
7    in.
8    Q.    What department --
9    A.    If you're scheduled to -- If
10   you're on a schedule, you could be paid from
11   that time until you clock out; but on line
12   time, it would be start and stop.
13   Q.    For the whole department?
14   When you say there would be start and stop,
15   what do you mean?
16   A.    There would be a master card
17   swiped at the end of that shift.
18   Q.    I'm focusing on the beginning.
19   A.    The employees clock in.
20   Q.    So employees are paid from
21   their clock-in time until the master card is
22   swiped at the end, if you're working on the
23   production line?

80

1    A.    Not all employees.
2    Q.    Which employees are paid from
3    when they clock in until the master card is
4    swiped on the production line?
5    A.    Employees that are on the
6    master card time are paid from the scheduled
7    start time of that department.
8    Q.    Does each department have a
9    scheduled start time?
10   A.    The debone department starts
11   up at 7:30.
12   Q.    Are all -- The whole
13   department starts -- I think you said there
14   are different positions within the debone
15   department.  Does the whole -- Do all the
16   positions start at 7:30?  Is that the
17   scheduled start time?
18   A.    Yes.
19   Q.    What positions are within
20   debone department?  I know we've talked
21   about the rehangers, the chiller rehangers.
22   What other positions?
23   A.    For a deboning line?

81

1    Q.    For the debone department.
2    I'm talking about the whole department, what
3    positions are there?
4    A.    There's a cone loader, there's
5    a shoulder cutter, breast inspector, tender
6    scorer.
7    Q.    Scorer, like you're scoring
8    something?
9    A.    Uh-huh.  Tender puller.
10   Q.    We've got a chiller rehanger,
11   a cone loader, a shoulder cutter, a breast
12   inspector, a tender scorer, a tender puller?
13   A.    There would be a line lead.
14   Q.    What's a line lead?
15   A.    They would --
16   Q.    Are they like a floor person?
17   A.    Well, you'd have floor persons
18   in the department, but they help take care
19   of the line, take care of the employees on
20   the line, relieve them to go to the
21   bathrooms, get their knives and scissors out
22   for them.
23        Then there's a skinner

FREEDOM COURT REPORTING

82

1  operator.
2      Q.    Anybody else in debone?
3      A.    There's some pallet jack
4  operators.  That would be it for the
5  deboning line.
6      Q.    And everybody in that whole
7  department, their scheduled start time is
8  7:30?
9      A.    Yes.
10     Q.    Okay.  And they're paid until
11 the master card is swiped at the end of the
12 shift?  They go by the master card swipe;
13 correct?
14     A.    Correct.  Yes.
15     Q.    Okay.  And then at the
16 beginning of the shift, they're paid from
17 the scheduled time to start?
18     A.    From 7:30.
19     Q.    At 7:30.
20         MS. MCGOWAN:  Let's take a
21 quick break.
22         (Recess taken.)
23         MS. MCGOWAN:  We're back on

83

1  the Record.
2      Q.    (BY MS. MCGOWAN:)  Before we
3  left, we were talking about rotating
4  employees.  In your meetings, the safety
5  meetings, do they -- you said they talk
6  about auditing the rotation sheets.  Is
7  there anything else discussed with regards
8  to how the employees are rotated, other than
9  just the audit of the sheets?
10     A.    Not that I recall.
11     Q.    If you work in the debone
12 department, what are you required -- the
13 employees required to actually wear into the
14 department?
15         MR. ROSENTHAL:  Objection to
16 the form of the question.  You can answer.
17     A.    Which department?
18     Q.    Debone.  Is that one
19 department?
20     A.    There's goings on in that room
21 we call the deboning, but there's other
22 goings on in there.
23     Q.    What other building?

84

1      A.    There's pack out, wings,
2  tenders, those kind of things.  But
3  employees need to wear -- Did you say --
4  repeat the question again.
5      Q.    What are employees required to
6  wear in the debone department?
7      A.    To go in, you need to put your
8  hair net on; beard net if you have facial
9  hair; ear plugs; a smock.
10     Q.    Anything else?
11     A.    That's to go in the -- To get
12 inside the debone area:  Put your hair net
13 on, beard net on, ear plugs on, and go in
14 and put your smock on.
15     Q.    Is that a policy of Equity,
16 that you have to do that to go into the
17 area?
18     A.    Policy to?
19     Q.    You said, to go in the debone
20 area, you have to put your hair net, your
21 beard net, and ear plugs on, and then put
22 your smock on when you get in.
23     A.    Yes.

85

1      Q.    Is that a written policy?
2      A.    I'm not sure if it's a written
3  policy.
4      Q.    Is it a company policy?
5      A.    It's a company policy.
6      Q.    Why does the company have that
7  policy?
8      A.    We had a lot of trouble
9  with -- The reason you put your smock on in
10 the room is because we had a lot of
11 employees going into the bathrooms with
12 their smocks on, and that's -- you can't do
13 that as far as USDA.  All that's USDA
14 policies.
15     Q.    Can they wear their hair nets
16 into the rest room?
17     A.    No.  They must take those off.
18 You can wear them outside the production
19 area into the break room.  They must take
20 those off before they go in the bathroom,
21 hair nets and beard nets.
22     Q.    Can they wear ear plugs into
23 the rest room?

FREEDOM COURT REPORTING

86

1    A.    Most of them have them around
2  their neck.  They don't have them in their
3  ear, but around their neck.
4         They can wear their boots in
5  there as well.
6    Q.    Do they have to have boots on
7  to go on the production floor?
8    A.    Yes.
9    Q.    What does an employee have to
10  have on to go onto the production floor in
11  addition to -- Well, you said debone.  Is
12  debone considered the production floor?
13    A.    Yes.
14    Q.    So let's go over what an
15  employee must have on to go onto the
16  production floor.  You have to have a hair
17  net?
18    A.    Yes.
19    Q.    Beard net?
20    A.    Yes.
21    Q.    Ear plugs?
22    A.    Yes.
23    Q.    Boots?

87

1    A.    Yes.
2    Q.    Anything else?
3    A.    No.
4    Q.    And once they get on to the
5  production floor, they put their smock on?
6    A.    Yes.
7    Q.    All right.  How many doors are
8  there on to the production floor?  Is there
9  one door or several doors?
10    A.    Are you talking about just the
11  deboning floor?
12    Q.    For the employees that --
13  let's start debone because that's a separate
14  department; right?
15    A.    Employees can go in different
16  entrances.
17    Q.    How many are there?
18    A.    There's three in the main
19  hallway.
20    Q.    The main hallway of debone
21  area?
22    A.    Uh-huh.
23    Q.    All right.  Where do the

88

1  employees put on the smock once they enter
2  the production area?  Is there a certain
3  place they have to put the smock on?
4    A.    No.
5    Q.    Could you walk to the line
6  without it on?  Could you go up to the
7  tender line without a smock on?
8    A.    They put it on right inside
9  the door, there.
10    Q.    So they have to put it on once
11  they get right inside the door --
12    A.    Yeah.
13    Q.    -- the smock?
14         When I say it, they have to
15  put the smock on right when they come in the
16  door?
17    A.    When they get in the
18  production area, they put on their smock.
19    Q.    Is it one door right in or is
20  it double doors?
21    A.    There's double doors.
22    Q.    All right.  What do they do --
23  Are there any wash basins?  Do they have to

89

1  wash when they come on the floor, or what do
2  they have to do before they put their smock
3  on?
4         MR. ROSENTHAL:  Object to the
5  form of the question.  You can answer.
6    Q.    If anything?
7    A.    There's hand wash stations
8  available.
9    Q.    All right.  If you are an
10  employee that worked on the tender puller
11  line, what would you do at the beginning of
12  the shift, once you start going into the
13  production area?  Tell me what an employee
14  would do.
15         MR. ROSENTHAL:  Objection to
16  the form of the question, but you can
17  answer.
18    Q.    With regards to this equipment
19  or these required items.
20    A.    After I got my supplies as I
21  was going to the production floor, I'd put
22  on my hair net, beard net, ear plugs, have
23  my boots on, go through the foot sanitizers,

FREEDOM COURT REPORTING

90

1  continue on in, put my smock on, and wash my
2  hands, and head to the line.
3        Q.    Where is the foot sanitizer?
4        A.    In the floor, it sprays across
5  the floor entrance going into the production
6  area.
7        Q.    Is that in -- When you're
8  talking about the double doors, where would
9  it be with regard to the double doors?
10       A.    It would spray across the
11 threshold of the doors.
12       Q.    The first set or the second
13 set?  Which doors?
14       A.    That would be my question to
15 you, which doors are you talking about?
16       Q.    Is it different?  Do all the
17 doors have a foot sprayer?
18       A.    Where employees go through
19 production line, yes.
20       Q.    All right.  How many doors are
21 there with the foot sprayers where employees
22 go to the production line?
23       A.    For --

91

1        Q.    In the whole plant or just
2  debone?  When you say four, what area?
3        A.    I say for --
4        Q.    For.
5        A.    For which area?
6        Q.    For deboning.
7        A.    For just deboning?
8        Q.    Yes.
9        A.    There would be three.
10       Q.    Three.  But you said --
11 Earlier did you say there was four areas
12 where you could come into debone, or did you
13 tell me there was three?
14       A.    There was four areas -- Four
15 sanitizers, and the other one would be over
16 on evisceration side by live hang and the
17 rehang area, that way.
18       Q.    That's for the whole deboning
19 area or for the whole plant?
20       A.    That would be for the plant.
21 Generally, those deboning employees would go
22 through those three doors.
23       Q.    Okay.  So for the whole plant,

92

1  there are four area doors that have the
2  sanitizers that production employees can go
3  through?
4        A.    Yes.
5        Q.    Okay.  Do all employees have
6  to wear the boots and go through the
7  sanitizers, production employees?
8        A.    Yes.
9        Q.    Can employees wear their boots
10 from home?
11       A.    Yes.
12       Q.    Do you ever observe employees
13 in the morning -- or maybe not the morning,
14 but the beginning of their shift reporting
15 to work and putting on their required items?
16       A.    I don't understand the
17 question.
18       Q.    Do you ever watch them?
19       A.    Do what?
20       Q.    Do you watch the employees
21 when they come into work at the beginning of
22 their shift when they're putting on these
23 required items?

93

1        A.    No, I don't.  I don't,
2  generally.  I don't sit there and watch them
3  put on stuff, no, I don't.
4        Q.    Okay.  Once an employee --
5  Where -- Do each of the four entrances have
6  the double-door thing that we talked about
7  that one of the debone areas have, or do any
8  of them go straight on to the production
9  floor?
10       A.    Are you talking about the foot
11 sanitizer?
12       Q.    Is the foot sanitizer on the
13 outside of the production door, or is it on
14 the inside?
15             And maybe I'm not making it
16 clear.  You've talked about there being
17 double doors or double areas.
18       A.    Right.
19       Q.    Explain that.  Is it like a
20 door where you go through and there's a
21 little area where you go through the foot
22 sanitizers, then you go through another door
23 to get to the production floor?  Is that

32dfca94-3d46-40ea-bc43-060dcff911ff

94

1   what you're saying?
2       A.   You would go through the
3   double doors, and then there's -- there's
4   different setups for the different doors.
5       Q.   Okay.  That's what I'm trying
6   to find out.
7       A.   For the deboning area
8   production floor, there's a set of double
9   doors.  And when you go through that double
10  set, you could either go right or left.
11  There's a little vestibule, and there's
12  spray, sanitizer spraying across both of
13  those door openings.  The requirement is to
14  have visible foam there and spraying across
15  the entranceway.
16      Q.   Is that the actual -- You're
17  on then in the production area where the
18  spray is?
19      A.   Yes.
20      Q.   Then after they walk through
21  the spray, you said they put on their smock,
22  or do they already have it on when they walk
23  through the spray?

95

1       A.   Some of them start putting it
2   on as they come through the doors.
3       Q.   All right.
4       A.   The first set of doors.
5       Q.   Then they -- After they do
6   that, what is the next thing an employee
7   does after they walk through the foot spray?
8       A.   It depends on which employee
9   and where they're going and what they're
10  going to wear when they go to the line or go
11  to a specific job in that deboning
12  department.
13      Q.   Are they all required to wash
14  their hands?
15      A.   That is a requirement, to wash
16  your hands.
17      Q.   Does that have to be done
18  before you report to the line?
19      A.   Yes.
20      Q.   And they have to use a
21  sanitizing soap to wash their hands?
22      A.   There is a soap.  I don't
23  know.

96

1       Q.   The company provides the soap?
2       A.   Yes.
3       Q.   And it has whatever sanitation
4   in it?
5       A.   Whatever's in it, yes.
6       Q.   It's not like the soap -- It's
7   not like a floral-smelling soap you get at
8   Bath and Body Works.  It's like some soap
9   that the company puts in there for the
10  employees to use; correct?
11      A.   Yes.
12      Q.   Then after they wash their
13  hands, are they required to wash their
14  gloves?
15      A.   When I say you've got to wash
16  your hands, most of them have already got
17  their gloves on, and they wash their gloves
18  and head to the line.  Me, when I go in,
19  I've already got my stuff on, hit the sink,
20  wash my hands, and go on.  Because I don't
21  normally wear the gloves when I go in.
22      Q.   When do you have to wear
23  gloves?

97

1       A.   When you're handling product.
2       Q.   Is that a requirement of Koch
3   Foods?
4           MR. ROSENTHAL:  Of what?
5       Q.   I'm sorry, of Equity.  I
6   called you Koch Foods.
7       A.   If you're going to handle
8   product, you need to wear the gloves.
9       Q.   That is a requirement of
10  Equity Foods?
11      A.   Yes.
12      Q.   What about -- Are there any
13  requirements with regards to wearing plastic
14  sleeves?
15      A.   To cover your street clothes,
16  if you've got them exposed working on the
17  debone line.  And that's there for the
18  employees, to keep themself dry.  They need
19  to be dry.
20      Q.   If you -- Are your smocks long
21  sleeve or short sleeve?
22      A.   They're three-quarter.
23      Q.   So if you had on a long sleeve

FREEDOM COURT REPORTING

98

1    shirt under your smock that stuck out past
2    the smock, are there any requirements with
3    regards to sleeves?
4        A.    You need to cover your street
5    clothes.
6        Q.    So you'd have to wear the
7    plastic sleeves to cover your street
8    clothes --
9        A.    Uh-huh.
10        Q.    -- if your street clothes
11    stuck out below the smock sleeve; is that
12    correct?
13        A.    Yes.
14        Q.    Is that a requirement of
15    Equity Foods?
16        A.    As far as I know it is, yes.
17        Q.    And that is to keep the
18    product uncontaminated by the street
19    clothes?
20        A.    Just to keep the street
21    clothes from coming in contact with the
22    product.
23        Q.    Which would contaminate the

99

1    product, correct, if they came in contact?
2        A.    Contamination is a big word.
3        Q.    Is that a USDA requirement,
4    that the street clothes can't come in
5    contact with the product?
6        A.    That is something that they
7    monitor. I don't know how it's written in
8    their regulations, but they do monitor that.
9        Q.    They being USDA?
10        A.    Uh-huh.
11        Q.    If USDA finds employees at
12    Equity Group having their street clothes
13    come in contact with the product, what
14    happens?
15        MR. ROSENTHAL: Objection to
16    the form of the question. You can answer.
17        A.    I've never had anything happen
18    that's been brought to my attention.
19        Q.    What could happen?
20        A.    I don't know. We'd have to
21    ask them. I've never had that happen.
22        Q.    Does USDA, when they are
23    monitoring your production process, if they

100

1    find your employees aren't washing their
2    hands before they touch the meat, what would
3    happen?
4        MR. ROSENTHAL: Objection to
5    the form of the question.
6        Q.    Or touching the product?
7        A.    They never said anything about
8    it.
9        Q.    I'm not asking if they ever
10    did, I'm asking what would happen if they
11    did find it.
12        MR. ROSENTHAL: Objection to
13    the form of the question.
14        A.    I don't know because I've
15    never encountered.
16        Q.    Why is USDA there?
17        A.    They monitor production.
18        Q.    If they don't like something
19    that they see in the production, what, if
20    anything, can they do?
21        MR. ROSENTHAL: Objection to
22    the form of the question.
23        A.    It depends on -- They have

101

1    different actions that they take depending
2    on what's taking place.
3        Q.    What actions can they take?
4        A.    It depends on what's going on.
5        Q.    Right. Tell me what -- Give
6    me examples.
7        A.    Ask me a question and I'll
8    give you --
9        Q.    I said what actions can USDA
10    take?
11        A.    They could issue a
12    noncompliance report.
13        Q.    What's a noncompliance report?
14        A.    It's where they write the
15    deficiency down where something was done
16    wrong or some regulation wasn't met, and
17    then you'd have to answer that; or they
18    could shut your operation down.
19        Q.    Would employees' street
20    clothes touching the product be something
21    that would be subject to a noncompliance
22    report by USDA?
23        MR. ROSENTHAL: Objection to

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

102

1    the form of the question.
2        A.    I don't know.
3        Q.    Do you know what would be
4    subject to a noncompliance report of the
5    USDA?
6            MR. ROSENTHAL: Objection.
7    You can answer.
8        A.    Line speed going faster than
9    you're supposed to in eviscerate.
10       Q.    Anything else?
11       A.    Not adhering to the HACCP
12   plans.
13       Q.    The what plans?
14           MR. ROSENTHAL: HACCP.
15       Q.    What is that?
16       A.    Hazard Analysis Critical
17   Control Point plan.
18       Q.    What is covered by that plan?
19       A.    I don't know the detail of it.
20   There's a lot of stuff covered as far as the
21   HACCP program. I don't know. The
22   department handles that.
23       Q.    Do you know anything that's

103

1    covered in the HACCP plan?
2        A.    There's critical control
3    points.
4        Q.    What are critical control
5    points?
6        A.    Control points that you have
7    to monitor throughout the facility and stay
8    within those guidelines set in the HACCP
9    plan.
10       Q.    Tell me what points are
11   monitored.
12       A.    One that I know of would be
13   fecal, no online fecal.
14       Q.    What's monitored with regards
15   to online fecal?
16       A.    You have to check product,
17   check a specific number of birds, at
18   specific intervals, and check for fecal
19   material; if it's there, if they find it,
20   they would issue a noncompliance report.
21       Q.    If an employee was not wearing
22   a smock in the plant, would that be subject
23   to a noncompliance report by USDA?

104

1        A.    I've never had it happen.
2        Q.    My question is: If an
3    employee was not wearing a smock on the
4    production floor, would that be an area that
5    would be subject to a noncompliance report
6    by the USDA?
7        A.    I guess it could. I've never
8    had that happen.
9        Q.    If an employee was not wearing
10   a hair net on the production floor, is that
11   an area that could be subject to a
12   noncompliance report by the USDA?
13       A.    Yes.
14       Q.    Have you ever had that happen?
15       A.    No, I haven't.
16       Q.    What happens if the USDA tags
17   a bird?
18       A.    Depends on what it's tagged
19   for.
20       Q.    What does that mean, if they
21   tag a bird?
22           MR. ROSENTHAL: Objection to
23   the form of the question. You can answer.

105

1        A.    If they retain it -- If they
2    retain that bird.
3        Q.    Why would -- What are areas
4    that they can tag it for, the bird, USDA?
5            That's not a good question.
6    Let me start over.
7            What are reasons that the USDA
8    can tag a bird?
9        A.    Sometimes they tag specific
10   birds because they want to evaluate them
11   more or they want to evaluate them with
12   their online inspectors.
13       Q.    Is food safety the top
14   priority for Equity Food?
15       A.    It is a top priority.
16       Q.    And the policies with regards
17   to how employees work on the line and handle
18   the product, does that go towards --
19   majority of it towards food safety?
20       A.    Yes.
21       Q.    The use of a hair net, does
22   that go towards -- by employees, does that
23   go towards food safety?

FREEDOM COURT REPORTING

106

1     A.    It's for food safety, yes.
2     Q.    The use of the smocks by the
3  employees, does that go towards food safety?
4     A.    Yes.
5     Q.    The use of the rubber gloves
6  by the employees, does that go to food
7  safety?
8     A.    It protects their hands and it
9  is for food safety, yes.
10    Q.    And the use of beard nets, is
11  that for food safety?
12    A.    Yes.
13    Q.    The use of the rubber boots,
14  is that for food safety?
15    A.    That's a requirement from
16  Russia. It's a Russian requirement for
17  USDA.
18    Q.    It's a Russian requirement for
19  USDA, is that a customer?
20    A.    It's -- We ship all of our
21  dark meat to Russia, and you have to adhere
22  to their requirements. They require all
23  employees to wear rubber boots, pervious to

107

1  water clinging to surface?
2     Q.    Is that for food safety
3  reasons for Russia?
4     A.    I don't know why they
5  implemented that program.
6     Q.    Prior to -- Well, let me back
7  up. Since you've been at the Equity plant,
8  have they always had the foam and rubber
9  boots requirement, or this Russian
10  requirement as you called it?
11    A.    They just changed
12  throughout -- There's been a lot of changes
13  for that requirement as far as what we were
14  forced to do by USDA there.
15    Q.    All right. Was there ever a
16  time when the employees had to punch a
17  button to get the sanitizers to work on the
18  boots, to your knowledge?
19    A.    No. It's automatic.
20    Q.    Has it always been automatic
21  since you've been there?
22    A.    Yes.
23    Q.    Do you know whether, in the

108

1  processing plant, if they ever had to push a
2  button?
3     MR. ROSENTHAL: Objection to
4  the form of the question.
5     A.    I don't know.
6     Q.    Is the walking through the
7  foot sanitizer or the boot sanitizer the
8  first act of sanitizing the equipment that
9  the employees do when they walk on the
10  production floor?
11    MR. ROSENTHAL: Objection to
12  the form of the question.
13    A.    That's the first sanitizing of
14  what the employee would be wearing, which is
15  their boots.
16    Q.    Okay. And those boots are
17  required by USDA because of the Russian
18  requirement; correct?
19    A.    We have to adhere to that
20  policy, and that policy would require us to
21  wear rubber boots or a shoe cover to cover
22  up their regular shoe if they have it on.
23    Q.    Does USDA also require that

109

1  they be sanitized, the rubber boot or the
2  rubber shoe cover? Or does it just require
3  wearing the boots?
4     A.    I'm not sure how the policy
5  reads, but we've always had the sanitizers.
6  They were there when I got there. I'm not
7  sure what the policy states.
8     Q.    You don't know who requires
9  the sanitizing of the rubber boots or rubber
10  shoe covers?
11    A.    Like I said, the sanitizers
12  are there and have been there.
13    Q.    My question is: Do you know
14  who requires that sanitizing of the rubber
15  boots or the shoe covers?
16    A.    Like I said, I'm sure it's
17  listed in the Russian requirements. I just
18  haven't read it, and I don't know the
19  details of it.
20    Q.    Are you involved any in the
21  new-hire training?
22    A.    No.
23    Q.    Has USDA -- To your knowledge

FREEDOM COURT REPORTING

110

1  has USDA ever tagged Equity for
2  noncompliance on a finished product?
3      A.    What sort of finished product?
4      Q.    Any.  After it's gone through.
5      A.    Gone through what?
6      Q.    The whole processing, at the
7  end of the stage before it's packed up and
8  shipped out?
9      A.    They have applied a tag to
10  finished product, the answer would be yes.
11      Q.    Okay.  And what was that for?
12      A.    What I recall would be for
13  temperature.
14      Q.    Temperature of the product?
15      A.    Temperature of the product.
16      Q.    Are there requirements on the
17  temperature of the product?
18      A.    Yes.  Must be less than forty
19  degrees prior to shipment.
20      Q.    Prior to shipment?
21      A.    Uh-huh.
22      Q.    What is the temperature of the
23  product as it goes through -- after it comes

111

1  out of the chiller?
2      A.    Birds exiting the chiller must
3  be below forty.  That's a requirement.
4      Q.    What is the temperature of
5  most of the birds that come out of your
6  chiller?  You said it must be below forty.
7  Is there an average temperature?
8      A.    The average temperature range
9  is between thirty-four and thirty-six.
10      Q.    Degrees?
11      A.    Uh-huh.
12      Q.    Is that throughout the whole
13  process of preparing the birds for shipping
14  and finishing?
15      A.    No.
16      Q.    All right.  After the chiller,
17  is that the average temperature, thirty-four
18  degrees to thirty-six degrees?
19      A.    After the chiller, after the
20  bird's come out of the chiller, yes, prior
21  to going to debone.
22      Q.    In debone, what is the average
23  temperature once they get on the cone?

112

1      A.    I haven't taken any
2  temperatures, I couldn't tell you.  The more
3  you handle the product in that environment,
4  it's going to heat up.  We apply
5  refrigerant, whether that's ice or $CO_2$, to
6  bring the temperature back down, and once
7  the product is packed it goes to the cooler.
8      Q.    What is the goal temperature
9  that Equity tries to keep the product?
10      A.    Depends on what stage you're
11  at.
12      Q.    After the chiller portion?
13      A.    Obviously, you want to keep it
14  as cold as you can.  I don't know if there's
15  any set requirements.  As far as USDA
16  regulations, product can get up to
17  fifty-five degrees during processing.
18  Obviously, we want to keep it as cold as we
19  can.
20      Q.    Okay.  What is the temperature
21  in the plant after the -- Are there set --
22  Is there one temperature throughout the
23  plant or does it vary by department?

113

1      A.    What area are you talking
2  about?
3      Q.    That's what I'm trying to find
4  out.  Does it vary by -- Does the
5  temperature in the plant vary by the
6  department?
7      A.    Departments within the debone
8  department would generally be the same
9  temperature.
10      Q.    Okay.  Live hanging is not air
11  conditioned, is it, or kept chilled?
12      A.    There is a unit there, but
13  it's not kept -- It's kept comfortable, but
14  it's not like you would be working in
15  deboning, it's not that cold.
16      Q.    What is the average
17  temperature in the debone department?
18      A.    I'm not sure.
19      Q.    Is it seventy degrees?  Below
20  that?
21          MR. ROSENTHAL:  Objection to
22  the form of the question.
23      A.    I haven't taken any

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

114

1  temperatures. I don't know what temperature
2  it is.
3        Q.   You've walked in the plant,
4  haven't you?
5        A.   Sure.
6        Q.   Is it cold?
7        A.   No.
8        Q.   It's not the normal office
9  setting or what you would keep in your home
10 unless you like it freezing cold; correct?
11       A.   I don't know how you keep your
12 home.
13       Q.   Well, earlier we had to cut
14 the air up because everybody was cold in
15 here. Is it colder in the plant than we had
16 it in here?
17       MR. ROSENTHAL: Objection to
18 the form of the question. You can answer.
19       A.   Like I said, I've never taken
20 any temperatures. It's cool in the plant
21 and it's cold in the plant.
22       Q.   Are there any requirements on
23 how cold the plant has to be kept?

115

1        A.   Not that I'm aware of.
2        Q.   Okay. Is the plant kept
3  colder than seventy degrees?
4        MR. ROSENTHAL: Objection to
5  the form.
6        A.   Like I said, I have never
7  taken any temperatures. I don't know.
8        Q.   Do you see workers wearing
9  coats to keep warm in the plant or long
10 sleeves -- not coats, but long sleeves to
11 keep warm in the plant?
12       MR. ROSENTHAL: Objection to
13 the form of the question.
14       A.   I've seen employees wear a
15 long sleeve. I don't know if it's a coat or
16 not. Normally when I see them, it's on the
17 floor.
18       Q.   The plant is kept below
19 seventy-two degrees, isn't it?
20       A.   I don't know. I don't take
21 any temperatures.
22       Q.   Is the plant kept below
23 seventy-five degrees?

116

1        MR. ROSENTHAL: Objection to
2  the form of the question.
3        Q.   Is the plant kept cold enough
4  to prevent condensation from forming on the
5  ceiling and falling on the product?
6        A.   We do prevent condensation.
7  We keep refrigeration on and exhaust fans
8  running and try to make up air and try to
9  keep it comfortable and try to keep the
10 ceiling from sweating so we prevent
11 condensation.
12       Q.   How many times a week do you
13 walk in the plant on the production floor?
14       A.   Going in the plant daily, just
15 in and out of the plant.
16       Q.   And you don't have an estimate
17 as to what the temperature is in the plant,
18 on the production floor in debone?
19       MR. ROSENTHAL: Objection to
20 the form of the question.
21       A.   Like I said, I've never taken
22 any temperatures.
23       Q.   My question, do you have an

117

1  estimate?
2        MR. ROSENTHAL: And he
3  answered that multiple times for you.
4        MS. MCGOWAN: No. He said he
5  hasn't taken temperatures. I'm asking if he
6  has an estimate.
7        MR. ROSENTHAL: He's answered
8  that question multiple times.
9        A.   It's comfortable in the plant.
10 I don't know what the temperature is.
11       Q.   What are cotton gloves for,
12 cotton liners, for the employees?
13       A.   They're there for if they need
14 them, warm. Most of them wear them under
15 their rubber gloves if they so choose.
16       Q.   Is that to keep their hands
17 warm?
18       A.   Could be, if they -- if that's
19 why they wanted them.
20       Q.   Has there been any discussion
21 in the safety meetings or by the ergonomic
22 team that employees -- about employees
23 wearing the cotton liners to help with

118

1  circulation?
2       A.   I'm not involved in the
3  ergonomics committee.
4       Q.   No, sir.  My question is:  In
5  the safety meetings that you attend where
6  the ergonomic team makes a report, has there
7  been any discussion about the use of cotton
8  liners?
9       A.   I don't recall any.
10      Q.   Who can change an employee's
11 time reports if someone forgets to clock in
12 or clock out at the beginning or end of a
13 shift?
14      A.   The supervisors audit time
15 sheets and make the changes if necessary.
16      Q.   You said at the end of a
17 shift, the master card's swiped?
18      A.   Uh-huh.
19      Q.   Is that a physical swipe?
20      A.   Yes.
21      Q.   Where is that done by the --
22 Does the supervisor do that?
23      A.   The superintendents would

119

1  handle that.  I don't know how they've got
2  it set up, whether they do it or they have a
3  supervisor do it.  Some of them do it
4  differently.
5       Q.   Which clock do they use to do
6  it?
7       A.   There's clocks in the break
8  room, there's a clock in the supply room.  I
9  don't know which clock they use to do it
10 with, unless they use a -- Any time clock
11 will.
12      Q.   Do you know when they -- Do
13 they swipe the clock at the end of the
14 shift?
15      MR. ROSENTHAL:  Objection to
16 the form of the question.
17      A.   Which shift?
18      Q.   You say that a supervisor goes
19 and swipes the master card at the end of a
20 shift.  Is there a policy about you do it
21 when the bird hits the first station in that
22 department or the last station or when do
23 they swipe the card?

120

1      MR. ROSENTHAL:  Objection to
2  the form of the question.
3       A.   Which shift?
4       Q.   First shift.
5       A.   First shift, they would swipe
6  it when the work was done depending on the
7  department, 4:30, when the work's complete;
8  and the live hanging would be when they stop
9  hanging birds, and the next shift is coming
10 on.
11      Q.   What about second shift?
12      A.   They would swipe it when the
13 work was complete.  There's no set schedule
14 or time when they get off.
15      Q.   Sanitation is not on master
16 card are they, time?
17      A.   I'm not in charge of
18 sanitation, but I don't think they are on
19 master card.
20      Q.   When are employees required to
21 be on the line at the beginning of their
22 shift?
23      A.   At the beginning of the shift,

121

1  they would need to be there to perform their
2  job that they're assigned to do.
3       Q.   At the scheduled time, the
4  scheduled start time?
5       A.   They need to be in there when
6  their workload hits their station.
7       Q.   Are they required to be fully
8  dressed with their required items and washed
9  and sanitized and ready to begin performing
10 when their scheduled shift starts, or can
11 they do that after 7:30 -- If you're
12 scheduled to start at 7:30, do you have to
13 be on the line ready to go at 7:30 or can
14 you be at the wash station washing your
15 hands at 7:30?
16      A.   You need to be inside the
17 production area, and if your workload is
18 there, you need to be there to perform your
19 tasks.
20      Q.   If you're being rotated, do
21 you have to know where you're going
22 beforehand?
23      A.   I'm not sure how the rotations

FREEDOM COURT REPORTING

---

122

1    take place. But, yeah, a supervisor would
2    tell employees where.
3        Q.    Do you know when employees are
4    told about the rotation?
5        A.    I don't.
6        Q.    What positions require a
7    cutting glove on the production line?
8        A.    That would be for the
9    employee's personal protection, if they were
10   using a knife or a scissor.
11       Q.    Any other equipment that's
12   required, if you're using a knife or
13   scissors?
14       A.    You would need to wear an arm
15   guard to protect your arm.
16       Q.    Is an arm guard different than
17   a sleeve?
18       A.    Yes.
19       Q.    Anything else?
20       A.    Of course you'd have on your
21   rubber gloves and the regular attire.
22       Q.    And the regular attire, we're
23   talking about the hair net, beard net,

---

123

1    smock, ear plugs, rubber gloves, and boots
2    or shoe covers?
3        A.    Uh-huh. Yes.
4        Q.    Anything else you consider to
5    be regular attire?
6        A.    No.
7        Q.    When are aprons required?
8        A.    They're available for the
9    employees.
10       Q.    Are there any jobs that
11   require an apron?
12       A.    It's not required.
13       Q.    Why are they required for the
14   employees?
15       A.    They're there for the
16   employee, if they want to wear them.
17       Q.    Why would an employee want to
18   wear them?
19            MR. ROSENTHAL: Objection to
20   the form of the question. You can answer.
21       A.    Employees, if they were
22   getting wet, if they wanted to keep themself
23   from getting wet.

---

124

1        Q.    What happens if an employee's
2    smock gets wet?
3        A.    They go get a dry one.
4        Q.    Do they have to change it? Is
5    that a requirement?
6        A.    It's not a requirement. If
7    they get damp, if they get heavily soiled,
8    they can change it.
9        Q.    Would an apron prevent a smock
10   from getting heavily soiled?
11       A.    It depends on what job you
12   were doing. I suppose it could.
13       Q.    What about chiller rehangers,
14   do they wear aprons? Have you observed them
15   wearing aprons?
16       A.    I've seen some wear them and
17   some not wear them.
18       Q.    Is that a job where the
19   employees get wet?
20       A.    I've hung birds there and I
21   don't get wet.
22       Q.    And you say you've hung birds.
23   How long have you worked the shift?

---

125

1        A.    Probably the most would be a
2    couple of hours hanging birds.
3        Q.    Why were you hanging birds?
4        A.    Short of help.
5        Q.    And you didn't wear an apron?
6        A.    No. I don't ever wear an
7    apron.
8        Q.    Did you wear plastic sleeves?
9        A.    No.
10       Q.    Did you wear a smock?
11       A.    Yes.
12       Q.    Did you have on a long sleeve
13   shirt or a short sleeve?
14       A.    I don't recall.
15       Q.    If you'd have had on a long
16   sleeve shirt that stuck out from under your
17   smock, would you have had to put on the
18   plastic sleeves?
19       A.    If they were going to come in
20   contact with the product, I would have. But
21   your gloves come up and cover a portion of
22   your clothing as well.
23       Q.    Did you wear cotton liners?

---

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

126

1    A.    I don't ever wear cotton
2  liners.
3    Q.    Do you know whether there have
4  been any time studies conducted in your
5  plant on how long it takes employees to put
6  on and sanitize this equipment at the
7  beginning of the shift?
8    A.    There was some video taken as
9  part of this litigation, but I wasn't
10  involved in that and don't know really what
11  it entails.  But as far as time studies,
12  that's all that I'm aware of.
13    Q.    Do you know who conducted the
14  video-taking?
15    A.    Malcolm, as part of -- I don't
16  know the other folks.
17    Q.    Do you know -- Have you ever
18  timed how long it takes to put on this
19  equipment and sanitize?
20    A.    No.
21    Q.    Do you know how long it takes
22  employees to put on the equipment and
23  sanitize at the beginning of a shift?

127

1    A.    It don't take that long to do
2  it.  It don't take me long to go in, get
3  dressed and go in.
4    Q.    How long do you typically stay
5  on the plant floor when you go in?
6    A.    Depends on what the situation
7  is and what's happening.
8    Q.    Do you ever stay on it and
9  work a full eight-hour shift?
10    A.    Not generally.  I wouldn't be
11  on there eight hours.
12    Q.    Employees are entitled to two
13  breaks per day; is that correct?
14    A.    Two thirty-minute breaks, yes.
15    Q.    Are there any requirements
16  when they go on their break on what they can
17  wear outside the production floor?
18    A.    Are you talking about
19  production?  Are you talking about deboning,
20  inside where the processing --
21    Q.    Inside the plant.  Anywhere on
22  the production floor where you -- I think
23  you've got deboning and further processing

128

1  on what's called the actual production
2  floor?
3    MR. ROSENTHAL:  Objection.
4  Further processing is a separate plant.
5    MS. MCGOWAN:  Okay.
6    Q.    When you say further
7  processing, are you talking about the other
8  plant or are you talking about a different
9  department within your plant?
10    A.    I'm talking about the other
11  plant.
12    Q.    Okay.  After debone, are there
13  other departments in your plant?
14    A.    There's a DSI department,
15  shipping department.
16    Q.    Are those departments
17  considered on the production floor, where
18  they have to put on the required items?
19    A.    DSI would be, yes.
20    Q.    Okay.  But not shipping?
21    A.    Shipping is part of the plant.
22  I mean, they're in and out of the production
23  floor.

129

1    Q.    What do you consider the
2  production floor?
3    A.    Where the work is being done,
4  deboning and DSI, eviscerating, those areas.
5    Q.    Do you consider live hang part
6  of the production floor?
7    A.    If you're going to use that
8  terminology, it could be, yeah.
9    Q.    Is live hang through the doors
10  where you have to walk through the
11  sanitizer?
12    A.    There's two double doors down
13  by live hang that they go through.
14    Q.    Do they have to walk through a
15  sanitizer?
16    A.    I don't recall.  I believe
17  there's sanitizer down there.  I don't
18  recall.
19    Q.    If you're working in debone
20  and you want to go on break, or evisc and
21  you want to go on break, can you wear your
22  items outside of the production area?
23    A.    You can wear -- Obviously

130

1  you've got your boots on and you can wear
2  your hair net and beard net and you have
3  your ear plugs on.  You can wear those out
4  of the production floor into the hallways to
5  go to the break room.
6      Q.    Can you wear them in the break
7  room?  Can you wear your smock in the break
8  room?
9      A.    You cannot wear your smock.
10  You leave that hanging on the production
11  floor.
12      Q.    What about your rubber gloves?
13      A.    Some employees take some of
14  that with them.  Some employees leave the
15  smock hanging, some roll them up and take
16  them with them.  Some leave their gloves,
17  some take them with them.
18      Q.    Can you wear your hair net to
19  the rest room?
20      A.    No.
21      Q.    Can you wear your hair net
22  outside?
23      A.    No.

131

1      Q.    Is the only place you can wear
2  your hair net in the hall or the break room?
3      A.    You can wear it on the
4  production floor.
5      Q.    Outside the production floor.
6      A.    They wear them in the offices.
7      Q.    All right.  Anywhere else in
8  the plant?
9      A.    Obviously, you have to have
10  them on to go to the box room.
11      Q.    I'm talking about off the
12  production floor.  If you're on break, if
13  you're an employee on break, and you leave
14  the production floor, other than the break
15  room is there anywhere else -- and maybe the
16  office, is there anywhere else you can wear
17  your hair net?
18      A.    No.
19      Q.    And why is that?  Why can't
20  they wear them outside?
21      A.    It's company requirement.
22      Q.    Why can't they wear them in
23  the rest room?

132

1      A.    Company requirement.
2      Q.    And is it a company
3  requirement that you have to leave the smock
4  on the production floor?
5      A.    We have hooks available for
6  them to hang their smock on.  But if there's
7  no hook available, they could take it with
8  them.  We prefer them to leave it inside the
9  production area.
10      Q.    Is it a company requirement
11  they can't wear it in the break room?
12      A.    They cannot wear it in the
13  break room?
14      Q.    Yes.  The smock?
15      A.    Yes.
16      Q.    And is it a company
17  requirement that they cannot wear their
18  smock in the rest room?
19      A.    Yes.  They cannot wear it in
20  the rest room.
21      Q.    Are there any requirements by
22  the company with regards to returning to
23  their line or their position on the line

133

1  after a break?
2      Can they just walk back in or
3  are there any requirements that they have to
4  do before they can return to the line?
5      A.    Obviously, they're going to go
6  through the foot sanitizer as they walk back
7  in; they've got the hair net, beard net on
8  as they walk back through the door; they've
9  got their ear plugs in; and they're going to
10  dress out, wash their hands, and wear their
11  gloves on, and go to the line.
12      Q.    They have to wash their hands
13  again before they return to the line?
14      A.    Yeah.
15      Q.    Are there any requirements
16  about when you have to wash your hands -- or
17  wash your gloves?
18      A.    Any requirements --
19      Q.    Any company requirements when
20  you must wash your gloves?
21      A.    They can wash them before
22  break or after break, depending on.  I mean
23  there's no requirement that says you have to

134

1   wash them before you go back to the line,
2   yes.
3       Q.    What about if they pick up a
4   piece of product off the floor?  Are there
5   any rules about that with regards to washing
6   gloves?
7       A.    We've got people that are
8   assigned to do those jobs, a floor person, a
9   condemn person.  And, yes, if a regular
10  employee were to pick up meat off the floor,
11  they should go wash their hands before they
12  go back to the line.
13      Q.    And that's a company
14  requirement?
15      A.    Yes.
16      Q.    Does Equity use any hand
17  sanitizer dips or glove dips?
18      A.    Not that I'm aware of.
19      Q.    Who is responsible for
20  supervising and monitoring the employees on
21  the production line on a day-to-day basis to
22  make sure they've got on their items and
23  have washed and sanitized their equipment?

135

1           MR. ROSENTHAL:  Objection to
2   the form of the question.
3       A.    Supervisors are responsible
4   for their employees on their line.
5       Q.    Is there anyone responsible
6   for making sure all employees actually
7   sanitize their gloves before they go to the
8   line?
9       A.    Obviously, if we stand there
10  as management, they're going to do that.
11  But there's times I'm sure they don't
12  sanitize before they go back to the line.
13      Q.    Is there a management person
14  that's responsible for standing there?
15      A.    We don't do that all the time,
16  no, ma'am.
17      Q.    In your answer it seems to
18  indicate you do it sometimes.  Is there any
19  set time, you do it?
20      A.    As far as we do what?
21      Q.    Stand there and make sure they
22  sanitize?
23      A.    It's not something -- We don't

136

1   station a person there all the time.  But
2   there are times, yes, that we do stand there
3   and make sure employees are washing.
4       Q.    How do you decide when you
5   will stand there and make sure they're
6   washing?
7       A.    It just depends on -- I leave
8   it up to the supervisors, superintendents to
9   decide what they need to do.
10      Q.    Do you ever -- I mean, is
11  there like a --
12      A.    We think there's a big issue
13  or something, where people are not doing it,
14  then we'll stand there and make sure they go
15  through.
16      Q.    How do you find out if there's
17  an issue of people not monitoring -- or not
18  washing?
19      A.    Someone would normally tell
20  me, or we've got the QA department, hey,
21  we've got people not washing their hands.
22      Q.    What is the QA department's
23  responsibility?

137

1       A.    It's a vast majority of
2   responsibilities, several things to do in
3   the plant.
4       Q.    All right.  What are those
5   things?
6       A.    It depends on the department.
7       Q.    With regards to production
8   line.
9       A.    Depends on what production
10  area.
11      Q.    Debone.
12      A.    Debone, QA would perform tasks
13  of checking the product to make sure that it
14  met product specifications as it was being
15  packaged.
16      Q.    What about evisc?  What's QA's
17  responsibility?  I'm sorry, did I interrupt
18  you?  Have you told me everything?
19      A.    There's other responsibilities
20  in deboning.
21      Q.    Tell me about those then.
22      A.    They monitor the floor
23  conditions, sanitary conditions, they

32dfca94-3d46-40ea-bc43-060dcff911ff

138

1    monitor employees.
2        Q.    What do they monitor with
3    regards to the employees?
4        A.    Make sure the employees are
5    adhering to sanitary conditions and the
6    guidelines set. They've got their hair net
7    on, beard net on, ear plugs in. Monitor for
8    condensation.
9        Q.    How do they monitor for
10   condensation?
11       A.    Walk around and look for it.
12       Q.    Are you talking about on the
13   walls and ceilings?
14       A.    Uh-huh.
15       Q.    All right. Anything else?
16       A.    I'm not over that department
17   now. I'm sure there's a lot of other stuff
18   they do.
19       Q.    What about evisc department?
20       A.    They would do specific line
21   checks to make sure product was being
22   produced accordingly over there as well, and
23   then they would make -- do the same

139

1    monitoring of the employees, monitor the
2    area for condensation, do specific checks
3    that are required by the U.S. government,
4    presentation, pre- and post-chill checks.
5    And also they would work in salvage
6    department and make sure that operation is
7    running right.
8            There's also some
9    temperatures, where they would need to be
10   taking temperatures, do paw checks and make
11   sure the paw system is operating efficiently
12   and correctly.
13       Q.    The salvage department, tell
14   me again what that does.
15       A.    If USDA, on a bird-by-bird
16   inspection, if they deem a bird salvageable,
17   which means there's an effective part that
18   needs to be removed, they would take that
19   bird off the evisceration line and send it
20   to salvage. And then those employees in the
21   salvage department, depending on what's
22   wrong with that bird, what it was sent over
23   there for, they would cut it off or clean it

140

1    up and get it ready for the chiller. Then
2    it would be inspected and passed before it
3    would go into the chiller.
4        Q.    Are the employees in the
5    salvage department required to wear any
6    specific items?
7        A.    What specific items?
8        Q.    Do they have to wear a hair
9    net, beard net, smock, or can they work in
10   their street clothes, the salvage
11   department?
12       A.    They need to have those items
13   on, the hair net, beard net, smock, ear
14   plugs, they wear the rubber boots; if
15   they're going to use a knife or a scissor,
16   they need to have on a chain glove and a arm
17   guard.
18       Q.    Do they have to wear rubber
19   gloves?
20       A.    They would have on rubber
21   gloves, yes.
22       Q.    Can employees wear baseball
23   caps?

141

1        A.    No.
2        Q.    What about safety glasses?
3        A.    It's not a requirement. There
4    are some specific departments that we do
5    issue safety glasses to, but we issue them
6    and record them and take them up at the end
7    of the shift.
8        Q.    Did employees used to wear
9    safety glasses in the plant?
10       A.    Yes, they did.
11       Q.    When was that practice
12   eliminated?
13       A.    I don't recall the exact time
14   frame when it was eliminated.
15       Q.    Has it been within the last
16   year?
17       A.    I honestly can't remember.
18   It's not been that long ago, but I don't
19   recall.
20       Q.    Why was the practice
21   eliminated?
22       A.    It was company choice to pull
23   those off due to not being able to maintain

142

1  control of them and track them and keep them
2  out from getting into product. And so we
3  evaluated the process and decided that only
4  specific areas needed to wear safety
5  glasses, and the other areas didn't have to
6  wear them.
7      Q.    What areas needed safety
8  glasses?
9      A.    We've got them assigned to
10 live hang, they wear a safety goggle. And
11 then the safety goggles are also available
12 for folks who use high pressure hoses.
13     Q.    Any other areas?
14     A.    There's some in the QA
15 department, but not everyone wears them in
16 the QA department. I'm not sure of those
17 jobs.
18     Q.    Would the people using the
19 high pressure hoses be in sanitation?
20     A.    No, ma'am.
21     Q.    Who uses high pressure hoses?
22     A.    We would use them to clean up
23 the floor at break and stuff like that;

143

1  break time production people would. Whether
2  be it a high pressure or medium pressure,
3  they're required to wear the goggles. And
4  then sanitation has always worn the safety
5  goggles.
6      Q.    During breaks, do you clean
7  the area while the -- When you say the
8  people during breaks, explain what's
9  happening cleaning with the hoses during
10 break.
11     A.    There's always general cleanup
12 going on, even while the operation is
13 running; we have people that are assigned to
14 keep the floor in order. And as employees
15 leave the line for breaks, there are people
16 assigned to take up the knives and scissors
17 if they're out and exchange those, and the
18 area's rinsed down and try to knock down the
19 bigger pieces of product, knock them down
20 off the machinery and get them into a drain
21 and cleanup the area before the employees
22 come back.
23     Q.    Are employees allowed to eat

144

1  in the production area?
2      A.    No.
3      Q.    Are employees allowed to stay
4  on the production line area during the
5  break, if they're washing down the area?
6      A.    No. They need to go off the
7  production floor.
8      Q.    Look at what was marked as
9  Exhibit 17. Do you know what this is?
10     A.    It says good manufacturing
11 practices.
12     Q.    Have you ever seen this
13 document?
14     A.    Not before now.
15     Q.    Not before now?
16     A.    Not before today, no.
17     Q.    It's got a place for your
18 signature on it.
19     A.    It does.
20     Q.    Have you ever signed any such
21 similar document? Maybe not this one.
22     A.    I don't recall signing this
23 document, no.

145

1          There's people that put these
2  things together. The QA department only
3  does it. I'm responsible, but I've never
4  signed it, that I recall.
5      Q.    And you've never seen it
6  before today?
7      A.    No.
8      Q.    No, you've never seen it?
9      A.    Not before today, no.
10     Q.    Okay. Let's look at the front
11 page of it, where it says P 20322 under
12 slaughter debone and further processing. Do
13 you see that number?
14     A.    (Witness nods head in the
15 affirmative.)
16     Q.    What is that number?
17     A.    P 20322?
18     Q.    Uh-huh.
19     A.    That's the plant number issued
20 by the USDA. That's the plant -- number of
21 the plant.
22     Q.    Does that include the whole
23 complex or just the first processing?

FREEDOM COURT REPORTING

146

1    A.    It includes the whole complex.
2    Q.    Including further processing
3  plant?
4    A.    Yes.
5    Q.    All right. Take a moment and
6  flip through this, since you've never seen
7  it, because I want to ask you some questions
8  about it.
9    A.    (Witness complies.)
10   Q.    Have you had a chance to look
11 at it?
12   A.    I've scanned it.
13   Q.    All right. In scanning
14 Plaintiff's Exhibit 17, do you know whether
15 these good manufacturing practices are in
16 effect at the plant today?
17       MR. ROSENTHAL: Objection to
18 the form of the question. You can answer.
19   A.    As I said, I've never seen the
20 document, so I --
21   Q.    What are GMPs, or good
22 manufacturing practices?
23   A.    Guidelines to follow when

147

1  you're producing edible product. I mean,
2  you need to.
3    Q.    Go ahead. I didn't mean to
4  interrupt you.
5    A.    All companies set those
6  policies. They're different for different
7  companies.
8    Q.    Does Equity have -- Can we
9  call them GMPs for short?
10   A.    Uh-huh.
11   Q.    Does Equity have GMPs?
12   A.    Yes.
13   Q.    All right. Look at what was
14 previously marked as Exhibit Number 4 -- 3,
15 in this book here (indicating)?
16   A.    Tab 3?
17   Q.    Tab 3.
18   A.    Okay.
19   Q.    Are these the -- Have you ever
20 seen this document that's entitled Equity
21 Group, Eufaula Division, L.L.C., good
22 manufacturing practices, fresh processing,
23 with a revision date of 10/2/06?

148

1    A.    I don't -- I don't recall
2  seeing the document. No, I don't.
3    Q.    Have you ever seen any written
4  GMPs for the fresh product plant -- fresh
5  processing plant?
6    A.    I don't recall seeing any.
7    Q.    Are there written GMPs for
8  your plant?
9        MR. ROSENTHAL: Objection to
10 the form of the question.
11   A.    There are policies that we
12 follow. But like I said, I've never seen
13 either one of these.
14   Q.    All right. What kind of
15 policies do you follow? You said there are
16 policies that you follow. Are they written
17 policies?
18   A.    I don't see the -- A lot of
19 time I don't see the written documentation.
20 I mean, I know through my years in the
21 business kind of what's allowed and what's
22 not allowed and what people should do.
23   Q.    Who's responsible for making

149

1  sure there are written GMPs?
2    A.    QA department.
3    Q.    And the reason for GMPs again?
4  Why do you have GMPs?
5    A.    They are good manufacturing
6  practices that you want to establish for
7  things -- rules you want to follow while
8  you're producing product to make sure you're
9  producing them safely and wholesome.
10   Q.    Is that so you have
11 noncontaminated product?
12   A.    Like, again, contamination is
13 a big word. But, yeah, you don't want stuff
14 to end up in your product and get to a
15 customer. And you don't want -- you want --
16 There's just certain rules you have to
17 follow.
18   Q.    All right. Take a moment and
19 flip through these exhibits that have been
20 marked one through fifteen in this book and
21 see if there are any -- You said you don't
22 recognize that document, if there are any
23 GMPs that you do recognize?

FREEDOM COURT REPORTING

150

1    A.    Okay.
2    Q.    Or work rules relating to
3  GMPs?
4    A.    (Witness complies.)
5        I don't recognize anything
6  pertaining to the GMPs that I've seen.
7    Q.    Okay.  Are you aware of any
8  documents relating to GMPs that are not
9  in -- look and see if there are any here.
10  These documents or those?
11    A.    What other one?
12    Q.    That's not going to have any
13  GMPs in it.  Are you aware of -- Just so
14  I'm -- Just so your testimony's clear,
15  you've seen other documents relating to
16  GMPs, but you don't see any of those
17  documents here today?
18        MR. ROSENTHAL:  Object to the
19  form of the question.
20    Q.    Is that correct?
21    A.    No.  What I said was that all
22  companies develop GMPs, and I recall in my
23  past working on GMPs in other companies,

151

1  things you learn throughout where you're
2  working is what I'm saying.  But I don't
3  recall seeing these documents.
4    Q.    I'm trying to find out while
5  you're working at Equity -- since you've
6  been working at Equity, have you seen any
7  written GMPs?
8    A.    I know they're posted.  But I
9  don't -- Like I said, I don't read them.  I
10  don't get down to the -- Go ahead.
11    Q.    Go ahead.  I didn't mean to
12  interrupt you.
13    A.    Go ahead.
14    Q.    Finish your answer.  I didn't
15  mean to interrupt you.
16        MR. ROSENTHAL:  I think his
17  answer's done.
18    A.    I'm done.
19    Q.    Look at Exhibit Number 2.
20  Have you ever seen a document like this?
21    A.    I don't recall ever seeing
22  this specific document, no.
23    Q.    Do you know whether employees

152

1  are required to sign a document such as
2  Exhibit Number 2 when they come to work?
3    A.    Do I know this -- We have an
4  employee orientation manual.  I don't know
5  what's entailed in it, and I'm not involved
6  in orientation.
7    Q.    Who does the orientation?
8    A.    The human resource group.
9    Q.    Do you know who is responsible
10  for training the employees on the GMPs for
11  Equity?
12    A.    They get their initial
13  training in human resource, and then I'm
14  sure on the job, employees will learn from
15  their supervisors.  Like I said, I don't get
16  involved in these documents.
17    Q.    Do you get involved in any of
18  the training?
19    A.    I don't get involved in any of
20  the training either.
21    Q.    Look at Exhibit Number 1.
22  Have you had any involvement in new hire
23  GMP -- drafting new hire GMP policy?

153

1    A.    No.
2    Q.    Since you've been at Equity,
3  have you had any involvement in drafting GMP
4  policy?
5    A.    Not that I can recall.
6    Q.    Since you've been at Equity,
7  have you had any involvement in drafting
8  work rules?
9    A.    Work rules?
10    Q.    Uh-huh.  For employees.
11    A.    I haven't been -- I'm sure
12  there's stuff we discuss verbally.  I don't
13  know how much written stuff has been done,
14  but as far as work rules, as far as changing
15  stuff on the floor.
16    Q.    With whom would you have these
17  discussions?
18    A.    Well, they would be different
19  things.  Like the amount of $CO_2$ we put on
20  product, that you change depending on what
21  season it is.  But as far as work rules as
22  far as --
23    Q.    For the employees.

FREEDOM COURT REPORTING

154

1    A.    -- as far as developing
2  procedures and other, it would be hands-on
3  and managing the people and verbally
4  communicating with them.  That's pretty much
5  what takes place.
6    Q.    Are you involved in the
7  disciplinary process of employees --
8    A.    Yes.
9    Q.    -- in your position?
10   A.    Yes.
11   Q.    What's your involvement?
12   A.    If it makes it to me, then I'm
13  involved with normally HR, human resource,
14  the employee, and union representative.  And
15  we decide what progressive discipline or
16  decide what needs to be done depending on
17  the situation.  But they very seldom make it
18  to me.  That's normally handled with the
19  supervisor and HR -- or superintendent.
20   Q.    Do you have an estimate of
21  about how many have been brought to you as
22  plant manager?
23   A.    I don't.

155

1    Q.    Less than a dozen?
2    A.    I don't know exact.  It could
3  be more than that, I don't remember.  It's
4  not something I keep up with.
5    Q.    All right.  Look at Exhibit
6  Number 13 and tell me if you know what
7  this -- if you've ever seen this document.
8    A.    No.
9    Q.    Do you know what this is?
10   A.    I really don't know what it
11  is.
12   Q.    Okay.  Do you keep up with --
13  it looks like it says work rules, and it
14  looks like it's printed off the computer.
15  Is there some program that you're aware of
16  that provides this information?
17   A.    I do not know.
18   Q.    Do you have -- Do you ever use
19  the Kronos, K-R-O-N-O-S, time report?  Do
20  you ever go into the computer and look at
21  any of that?
22   A.    I do not.
23   Q.    Have you reviewed the Kronos

156

1  manual?
2    A.    I have not.
3    Q.    Look at Exhibit 14, which
4  appear to be -- and flip through 14.
5          There are two letters from
6  the -- form letters from the DOL.  Have you
7  ever seen these documents?
8    A.    No.
9    Q.    All right.  Look at Exhibit
10  Number 9.  Have you ever seen this employee
11  orientation manual?
12   A.    I've seen the outside cover of
13  it but I've never looked through it.
14   Q.    Who's responsible for
15  preparing the employee orientation manual?
16   A.    The human resource department,
17  I assume takes care of all that.
18   Q.    Do you have any involvement in
19  orientation process for new hires?
20   A.    I do not.
21   Q.    Do you have any involvement in
22  hiring new hires?
23   A.    I do not.

157

1    Q.    Look at page fifty-two of
2  Exhibit 9.
3    A.    (Witness complies.)
4    Q.    Under ergonomic principles,
5  three up from the bottom, the little bullet
6  points, it says:  Take mini breaks during
7  work.
8          Do you know what they're
9  talking about there?
10   A.    I have no idea.
11   Q.    Do you know whether employees
12  take mini breaks during work?
13   A.    I don't know.
14   Q.    Scan through these ergonomic
15  principles and see if these are things that
16  are discussed during your safety minutes and
17  when the ergonomic team gives their report.
18   A.    (Witness complies.)
19          As I said earlier, the only
20  thing that's brought to my attention are the
21  rotation sheets and the number that they
22  audited.  And I don't know what's discussed
23  in here.

FREEDOM COURT REPORTING

158

1    Q.    What's the goal of the audit
2  team?
3    A.    I don't know that we've ever
4  discussed a goal. But I'm sure that the
5  more -- the higher the number, the better
6  we're going to be as far as taking care of
7  the employees. I don't know that a goal has
8  ever been mentioned that I'm aware of.
9    Q.    When you say higher the
10 number, I don't know what you mean. Can you
11 explain?
12   A.    That successfully rotate a
13 high percentage of employees.
14   Q.    Are you aware whether
15 employees actually do ergonomic exercises?
16   A.    We have done them in the past.
17   Q.    And why were they doing these
18 exercises in the past?
19   A.    To help the employee loosen
20 up, loosen up their hands and mainly their
21 shoulders before they begin work.
22   Q.    Were these exercises you did
23 in the past mandatory?

159

1    A.    When we were doing them, yes.
2  But we lack in that area. We don't do them
3  like we should.
4    Q.    And where were they conducted?
5    A.    Once the employees got on the
6  line or got in their area. It's mainly just
7  before the debone lines.
8    Q.    Is this before the scheduled
9  shift of 7:30?
10   A.    No.
11   Q.    After 7:30?
12   A.    It would be after the employee
13 got on the line, yes.
14   Q.    Look at Exhibit 17, on page
15 eleven of thirteen, under sanitation
16 related --
17   A.    Uh-huh.
18   Q.    -- number four. Read that,
19 please.
20   A.    (Witness complies.) Okay.
21   Q.    The second sentence says:
22 Employees must wash and sanitize hands
23 before starting work after each absence from

160

1  the work area, after visiting rest rooms,
2  and at any other times when hands have
3  become soiled or contaminated.
4    Is that practice in effect
5  today at Equity Group?
6    A.    It is in effect that employees
7  should wash their hands. But as I stated
8  earlier, I'm sure there's some that do not
9  that we do not catch.
10   Q.    If you catch an employee not
11 washing their hand after visiting the rest
12 room and returning to the production floor,
13 could you use progressive discipline on that
14 employee?
15   A.    Yes.
16   Q.    Do you know what the speed of
17 the line is?
18   MR. ROSENTHAL: Objection to
19 the form of the question.
20   A.    What line are you talking
21 about?
22   Q.    Let's say once in the evisc
23 department, what is that? Is there a set

161

1  speed to the line, how many birds per
2  minute?
3    A.    Generally, we try to run about
4  two hundred and forty birds per minute on
5  the kill line; when that branches off to the
6  evisc line, it's one twenty. It fluctuates
7  throughout the day.
8    Q.    The evisc line is one hundred
9  and twenty birds per minute?
10   A.    One twenty and one twenty,
11 there's two of those.
12   Q.    What about in debone? What is
13 the speed of the line in birds per minute?
14   A.    Some lines vary depending on
15 the tenure of the employee. If you're on a
16 training line, it runs eight or ten birds a
17 minute, all the way up to if you're on a
18 seasoned line where you've got tenured
19 employees, it could get up to thirty-eight a
20 minute.
21   Q.    At the end of the shift, the
22 employees leave for the day, are they
23 required to sanitize any of their equipment

32dfca94-3d46-40ea-bc43-060dcff911ff

FREEDOM COURT REPORTING

162

1  or items?
2       A.    I don't know that it's a
3  requirement.  I see a lot of them clean up
4  at the end of the day.  It needs to be clean
5  before they start the next morning.  I'm
6  sure, again, there's some that get through
7  and don't wash up.
8       Q.    What do they do with their
9  smocks at the end of the day?
10      A.    They drop them in the clothes
11 bin just outside the double doors.
12      Q.    Can they take them home and
13 wash them?
14      A.    No.
15      Q.    If an employee is working in
16 debone, and they're going to be rotated, do
17 they have to have all of the -- like an arm
18 guard available once they get on the line,
19 have it with them in case they need to be
20 rotated to a position that has to -- that
21 uses knives and need an arm guard?
22      MR. ROSENTHAL:  Objection to
23 the form of the question.

163

1       A.    If an employee is going to
2  work on the debone line and they need a
3  knife or a scissor, they would have to wear
4  an arm guard.
5       Q.    Is that provided by their
6  supervisor or do they have to have it with
7  them when they get to the line?
8       A.    It's provided to them, the arm
9  guard.
10      Q.    That's something the company
11 keeps and hands out?
12      A.    It's at the supply window, and
13 they provide it for them.
14      Q.    No.  No.  I'm talking about --
15 I didn't make that clear.
16      If an employee is working on
17 the debone line and they're using knives,
18 they don't bring the knives to the line with
19 them, do they?
20      A.    The employee does not, no.
21      Q.    Those are put on the line by
22 either their supervisor or the setup person;
23 is that correct?

164

1       A.    The knife and the chain glove
2  are there for that position, yes.
3       Q.    What about the arm guard?  Is
4  that there with the knife and the chain
5  glove, or does the employee have to have
6  that with them when they report to the line?
7       A.    The employee has that with
8  them.
9       Q.    Did you ever see the results
10 of any of the videotape studies done?
11      A.    No.
12      Q.    Were you ever told by anyone
13 what the results of the videotape studies
14 were?
15      A.    No.
16      MS. MCGOWAN:  Let me have a
17 quick five-minute break.
18      (Recess taken.)
19      Q.    (BY MS. MCGOWAN):  Was there
20 ever a time that employees took home their
21 smocks and washed them?
22      A.    Yes.
23      Q.    When was that?

165

1       A.    Prior to us going to our own
2  laundry service.
3       Q.    When did you go to your own
4  laundry service?
5       A.    I don't know the exact time.
6  But I know the contract is up for renewal
7  this year.  I think it was a three-year
8  contract, so sometime in -- I don't really
9  know, sometime in '05, I assume.  I don't
10 really recall.
11      Q.    Did you have any involvement
12 in making the decision to enter into the
13 laundry service contract?
14      A.    No.
15      Q.    Who made that decision?
16      A.    I really don't know who was
17 involved in all that.
18      Q.    Do you know why the decision
19 was made?
20      A.    The decision was made -- I do
21 know why.  The decision was made to maintain
22 control over those smocks, as far as the
23 food safety aspect.  Employees were taking

166

1 them and laundering them, and maybe they
2 were and maybe they wasn't and storing them
3 in their car. We wanted to give them a
4 fresh, clean smock every day before they
5 went onto the floor.
6     Q.    For good safety standards?
7     A.    Uh-huh.
8     Q.    Yes?
9     A.    Yes.
10     Q.    Do you know whether employees
11 ever have to return early from their break
12 time to find out where they're going to be
13 on the line, when they're rotating them from
14 position to position?
15     A.    I'm not aware of that, no.
16     Q.    Do you know when employees are
17 told with regards to break whether they'll
18 be rotated?
19     A.    Like I said, I'm not involved
20 in rotation, so I don't know how that's --
21 how that takes place.
22     Q.    All right. You keep saying HR
23 handles certain things. Who is HR? Who are

167

1 you referring to when you say HR handles
2 something?
3     A.    I would be referring to the
4 department as a whole. But there's specific
5 people in that department.
6     Q.    Is there a HR department for
7 each plant or for the whole complex or how
8 does that work?
9     A.    There's one HR department for
10 both facilities, both fresh and the further
11 plant.
12     Q.    Okay. Who is Kathy Gilmore?
13     A.    She is the human resource
14 manager.
15     Q.    For the whole complex?
16     A.    Yes.
17     Q.    Okay. Does she have anything
18 to do with discipline?
19     A.    Yes.
20     Q.    What's her job with
21 discipline?
22     A.    She gets involved with
23 discipline if necessary to make sure we --

168

1 supervisors adhere to the policy and
2 following the right procedures.
3     Q.    Who in HR does the employee
4 orientation?
5     A.    I don't know how that's done.
6     Q.    Okay. Do you know who in HR
7 does the informing the employees about these
8 GMPs?
9     A.    I don't know how that's
10 covered in the orientation, I don't know.
11     Q.    Who is Lisa Ledbetter?
12     A.    Lisa Ledbetter is a person
13 that works in -- I'm sorry. I don't know if
14 that's her name or not. I'm not sure who
15 Lisa Ledbetter is. I'm thinking if that was
16 her name or not, and I'm not sure. I don't
17 know.
18     Q.    Is there a manager named Lisa
19 in HR?
20     MR. KISER: Is it Felicia?
21     A.    There is a Felicia, but I
22 don't know her last name.
23     Q.    And Felicia, what is her job?

169

1     A.    To be honest with y'all, I
2 don't know if her name is Felicia or not. I
3 don't know. You're going to have to ask me
4 about somebody else, because I don't know.
5     Q.    I'm trying to find out what
6 this person does. Do you know what she
7 does?
8     MR. ROSENTHAL: If you don't
9 know who she is --
10     A.    I don't.
11     Q.    All right. With regards to
12 the donning and doffing and sanitizing of
13 these items or protective gear, does it
14 differ any from department to department?
15     A.    Repeat that question one more
16 time.
17     Q.    With regards to the donning
18 and doffing or putting on at the beginning
19 of the shift and sanitizing and the taking
20 off and cleaning up, either during breaks or
21 at the end of the day, does that differ any
22 from department to department?
23     MR. ROSENTHAL: Objection to

FREEDOM COURT REPORTING

170

1  the form of the question.
2       Q.    In the production lines.
3       A.    On the deboning line,
4  generally, everybody does things virtually
5  the same as far as the way they put on and
6  take off their clothing.  Evisceration
7  should be the same as well.
8            When I go in, I put mine on
9  the same way all the time, and it takes me
10  about thirty seconds, forty seconds, it's on
11  and I'm in the plant, my hands are washed,
12  and I'm on the line.
13       Q.    So everybody has to put on
14  this equipment and wash their hands to go in
15  the plant; correct?
16       A.    Not everybody would wear the
17  same equipment, no.  You're going to have to
18  specify what you're talking about they're
19  putting on.
20       Q.    Well, there's basic equipment
21  everybody has to put on; correct?
22            MR. ROSENTHAL:  Objection to
23  the form of the question.

171

1       Q.    Basic items.  You've got to
2  have your boots, your hair net, your beard
3  net, your ear plugs, and a smock?
4       A.    Correct.
5       Q.    And you have to wash your
6  hands or your gloves before you can get on
7  the line; correct -- or before you can go
8  through the plant?
9       A.    For -- There's maintenance
10  mechanics that don't wear gloves.
11       Q.    Do they have to wash their
12  hands when they enter the floor?
13       A.    They should wash their hands
14  before they enter the floor.
15       Q.    That's what I'm trying to find
16  out.  Everybody has to do that before they
17  go on the floor?
18       A.    They should do that, yes.
19       Q.    And then if you're working
20  with a knife or scissors, you may add an arm
21  guard?
22       A.    You should have that with you
23  when you go through the door.

172

1       Q.    Right.  Do you have to
2  sanitize that arm guard?
3       A.    I'm sure when they're
4  washing -- I don't know if they sanitize
5  them or not.
6       Q.    Do you know whether they
7  sanitize their aprons?
8       A.    I don't know what they do with
9  their aprons.
10       Q.    Or their sleeves?
11       A.    They clean them up.  I'm not
12  sure how -- I haven't watched to see how
13  they -- what they put on them to clean up.
14  I'm not sure if it's just water.
15            MS. MCGOWAN:  That's all I
16  have.
17            MR. ROSENTHAL:  I don't have
18  any, Robin.
19  (The deposition was concluded at 12:15 p.m.,
20  June 12th, 2008.)
21
22
23

173

1         REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  ELMORE COUNTY,
4         I, Sara Mahler, Certified Court
5  Reporter and Commissioner for the State of
6  Alabama at Large, do hereby certify that the
7  above and foregoing proceeding was taken
8  down by me by stenographic means, and that
9  the content herein was produced in
10  transcript form by computer aid under my
11  supervision, and that the foregoing
12  represents, to the best of my ability, a
13  true and correct transcript of the
14  proceedings occurring on said date and at
15  said time.
16         I further certify that I am neither
17  of kin nor of counsel to the parties to the
18  action; nor in any manner interested in the
19  result of said case.
20
21
22  _____
            Sara Mahler, CCR
23            ACCR #420

**TAB 52**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06-CV-1081-MEF


BETTY ANN BURKS,

et al.,

        Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

        Defendant.



BEFORE:

        Cynthia M. Noakes, Commissioner

        and Certified Court Reporter


        DEPOSITION TESTIMONY OF

        LARRY THOMAS, JR.


        ****************************

1049ab53-2880-4ca6-bcdf-832369d37970

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

2

1    S T I P U L A T I O N

2

3        IT IS STIPULATED AND AGREED by and

4    between the parties through their respective

5    counsel, that the deposition of LARRY THOMAS,

6    JR., may be taken before Cynthia M. Noakes, Court

7    Reporter, at the Law Offices of WILLIAMS,

8    POTTHOFF, WILLIAMS & SMITH, 125 South Orange

9    Avenue, Eufaula, Alabama 36027, on the 23rd day

10   of May, 2008.

11       IT IS FURTHER STIPULATED AND AGREED

12   that the signature to and the reading of the

13   deposition by the witness is waived, the

14   deposition to have the same force and effect as

15   if full compliance had been had with all laws and

16   rules of Court relating to the taking of

17   depositions.

18       IT IS FURTHER STIPULATED AND AGREED

19   that it shall not be necessary for any objections

20   to be made by counsel to any questions except as

21   to the form or leading questions, and that

22   counsel for the parties may make objections and

23   assign grounds at the time of the trial, or at

3

1    the time said deposition is offered in evidence,

2    or prior thereto.

3        IT IS FURTHER STIPULATED AND AGREED

4    that the notice of filing of the deposition by

5    the Court Reporter is waived.

6

7

8

9

10

11

12

13

14

15

16

17   *******************************************

18

19

20

21

22

23

4

1                INDEX

2    EXAMINATION BY:              PAGE NUMBER:

3    MR. GOULD                    6-28, 30-38

4    MR. PETRO                    28-29

5

6    EXHIBITS:

7    (No exhibits were

8    submitted to said deposition.)

9

10   Reporter's Certificate            39

11

12

13

14

15

16

17

18

19

20

21   *******************************************

22

23

5

1

2        APPEARANCES

3

4    ON BEHALF OF THE PLAINTIFFS:

5        MR. P. MARK PETRO

6        SCHREIBER & PETRO, PC

7        ATTORNEYS AT LAW

8        Two Metroplex Drive

9        Suite 250

10       Birmingham, Alabama 35209

11       (205) 871-5080

12

13   ON BEHALF OF THE DEFENDANT:

14       MR. MALCOLM S. GOULD

15       PELINO & LENTZ

16       ATTORNEYS AT LAW

17       One Liberty Place

18       Thirty-Second Floor

19       Philadelphia, Pennsylvania 19103

20       (215) 665-1540

21   *****************************

22

23

1049ab53-2880-4ca6-bcdf-832369d37970

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

6

1    I, CYNTHIA M. NOAKES, a Certified
2  Court Reporter of Eufaula, Alabama, acting as
3  Commissioner, certify that on this date, as
4  provided by the Alabama Rules of Civil Procedure
5  and the foregoing stipulation of counsel, there
6  came before me at the Law Offices of WILLIAMS,
7  POTTHOFF, WILLIAMS & SMITH, 125 South Orange
8  Avenue, Eufaula, Alabama 36027, beginning at
9  3:40 p.m., LARRY THOMAS, JR., witness in the above
10  cause, for oral examination, whereupon the
11  following proceedings were had:
12
13    LARRY THOMAS, JR.,
14  being first duly sworn, was examined and
15    testified as follows:
16
17    THE COURT REPORTER:  Usual
18  stipulations?
19    MR. PETRO:  Yes.
20    MR. GOULD:  Yes.
21
22    EXAMINATION
23  BY MR. GOULD:

7

1  Q.   Good afternoon, Mr. Thomas.
2  A.   Good afternoon.
3  Q.   My name is Malcolm Gould.  I'm an attorney
4  with the law firm of Pelino & Lentz in
5  Philadelphia.  I'm here to take your deposition
6  today in a lawsuit that's been filed in Federal
7  Court in the Middle District of Alabama.
8    As you can see, we have a court reporter
9  here.  She's going to take down my questions and
10  your answers.  I would ask that you keep all of
11  your answers verbal, that you say yes or no
12  instead of nodding your head or shaking your head.
13  That way she can take down your answers.
14    I would also ask that you wait until I
15  finish my question before you give your answer.
16  That way we're not talking over each other and
17  you'll hear my whole question before you answer
18  it.
19    I'd also ask that you say yes or no instead
20  of saying uh-huh or huh-uh.  That way we're sure
21  that the court reporter gets down your answer to
22  the question.
23    If I ask a question and you don't understand

8

1  my question, just let me know.  I'll either repeat
2  the question or I'll ask the question in a
3  different way.
4    If you feel you need to take a break during
5  the deposition, just let me know.
6    If you do answer my question, I'm going to
7  assume that you understood the question and that
8  you're answering that question truthfully and to
9  the best of your ability.  Okay?
10  A.   All right.
11  Q.   Sir, can you please state your full name?
12  A.   Larry Jerome Thomas, Jr.
13  Q.   And, Mr. Thomas, are you currently employed?
14  A.   Yes.
15  Q.   And where do you work?
16  A.   Keystone Equity Group Eufaula.
17  Q.   And how long have you worked there?
18  A.   Two years and three months.
19  Q.   And what is your home address?
20  A.   14 Mary Person Road, Midway, Alabama.
21  Q.   And what current position do you work in at
22  Equity Group?
23  A.   Well, I'm in QA now.  I was a bone sampler

9

1  for a year.
2  Q.   So how long have you worked in QA?
3  A.   A year and three months.
4  Q.   And you were a bone sampler for a year
5  before that?
6  A.   Yes, sir.
7  Q.   And in your job in QA, do you have an
8  understanding as to how you are paid?  Are you
9  paid from clock-in to clock-out?
10  A.   Yes, sir.
11  Q.   So that's different from how you were paid
12  when you were a bone sampler?
13  A.   Yes, sir.
14  Q.   So the questions I'm going to ask today are
15  just going to be about when you were a bone
16  sampler.  Okay?
17  A.   Okay.
18  Q.   Now, bone sampler, that's on the debone
19  line; is that correct?
20  A.   Yes, sir.  End of the line.
21  Q.   And did you work day shift or night shift?
22  A.   Day shift.
23  Q.   Mr. Thomas, how did you first learn about

1049ab53-2880-4ca6-bcdf-832369d37970

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

10

1  this lawsuit?
2  A.  Through friends.  Somebody told me to call
3  the number, and I called it.
4  Q.  Someone at the plant?
5  A.  Yes.
6  Q.  Do you recall who it was?
7  A.  Serenda Lampley.
8  Q.  And what did she tell you?
9  A.  They was already talking about the lawsuit.
10  She told me to call the number.  They were getting
11  a lawsuit against the chicken plant about the
12  breaks and things.
13  Q.  Are you a member of the union, sir?
14  A.  No, sir.
15  Q.  Have you ever been a member of the union?
16  A.  No.
17  Q.  Have you ever attended any union meetings?
18  A.  No, sir.
19  Q.  What is your understanding as to what this
20  lawsuit is about?
21  A.  To get paid for all the hours worked from
22  the beginning of the shift to the end.
23  Q.  And for you in particular, are you claiming

11

1  that while working in QA you weren't paid for work
2  that you did?
3  A.  Bone sampler.
4  Q.  So only as a bone sampler?
5  A.  Yes.
6  Q.  You don't have any claim for the time that
7  you have been working in QA?
8  A.  No, sir.
9  Q.  Can you give me some examples of hours that
10  you claim you have not been paid for?
11  A.  Like, when you come in in the morning, you
12  have to be on the floor.  The shift starts at
13  7:30, but you have to be there before 7:30 to
14  sanitize and put on your hair net, and you've got
15  to get your paperwork and stuff, and you have to
16  know what line you be on.
17  You have to put on all the equipment and
18  make sure it's on, because you get up wrote up if
19  you don't.  You have to put on the equipment and
20  sanitize it.  Sometimes you have to wait in line
21  to sanitize, so it takes longer.  Then you have to
22  wash.  Then you have to be on the line before the
23  chicken reaches your workstation.

12

1  And at the end of the day, you have to wait
2  'til after all the pieces of meat go down the
3  belt.  Then you can go.
4  Q.  So part of your claim is for time that you
5  spent putting on or taking off items of clothing
6  or equipment?
7  A.  Yes.
8  Q.  And do you have any other claims in addition
9  to that?
10  MR. PETRO:  Object to the form.  You
11  can answer if you want to.  It's really a legal
12  question.
13  Q.  Is it your understanding that you have any
14  other claims in addition to claims for time spent
15  putting on and taking off clothing or equipment?
16  A.  No.  If somebody steals your stuff, you have
17  to buy it all over.  The third time, you get wrote
18  up for that.
19  Q.  All right, sir.  When you worked as a bone
20  sampler, did you have any items of clothing or
21  equipment that you would have to wear when you
22  were out on the production floor?
23  A.  Equipment.  You've got to wear your hair

13

1  nets, your beard nets, your earplugs, a smock,
2  your apron, and your sleeves, your cotton liners,
3  and your blue gloves, your boots.  And that's
4  about it.  And some warm clothing.  You better
5  wear some warm clothing.
6  Q.  When you say "warm clothing," that's not
7  company issued?
8  A.  Right.
9  Q.  That's just whatever you would wear from
10  home?
11  A.  Yes, sir.
12  Q.  During the time you've worked at the plant
13  have you been able to wear your boots from home?
14  A.  Yes, sir.
15  Q.  Are there any other --
16  A.  Boots from home?  You have to wear the
17  company boots.
18  Q.  Right.  I understand.  You can wear the
19  company boots home from work; is that correct?
20  A.  Yes, sir.
21  Q.  And you can wear them from home to work?
22  A.  Yes, sir.
23  Q.  Are there any other items of this clothing

1049ab53-2880-4ca6-bcdf-832369d37970

14

1 or equipment that you can wear from home to the
2 plant?
3 A. No, sir. You can't wear nothing but your
4 boots.
5 Q. Do you normally drive yourself to work?
6 A. Yes, sir.
7 Q. When you arrive at the plant do you have to
8 clear any security?
9 A. Well, if you drive another car, a vehicle
10 without a sticker on it, they have to check out
11 all the people that ride with you, and get your
12 tag too, have to write that down. You get a
13 sticker and then go on to the plant.
14 Q. Do you have a sticker on your car?
15 A. Yes, sir.
16 Q. And as long as you have that sticker, you
17 can drive right through?
18 A. Yes, sir.
19 Q. After you park in the parking lot, is there
20 any other security that you have to go through?
21 A. No, sir.
22 Q. You can just walk right into the plant?
23 A. Yes, sir.

15

1 Q. After you arrive at the plant and you go to
2 enter the building, what's the first thing that
3 you normally do?
4 A. I go clock in first. Then I go to the QA
5 office and get your supplies: your clipboard and
6 the paperwork, your numbers, all that.
7 Q. And that's what you would do as a bone
8 sampler?
9 A. Yes, sir. Then you go buy your supplies,
10 all the supplies needed.
11 Q. Where would you normally clock in?
12 A. At evis break room.
13 Q. And then you said you would go to the QA
14 office?
15 A. Yes, sir.
16 Q. Were there items that you had to pick up as
17 a bone sampler?
18 A. Clipboard and numbers. And you had to sign
19 out your stopwatch and all that.
20 Q. And what did you need the stopwatch for?
21 A. To write the times. When you check the
22 birds, you have to write the time down.
23 Q. And as a bone sampler you're checking

16

1 chicken to see if there are any pieces of bone in
2 the chicken; is that correct?
3 A. Yes, sir.
4 Q. And you use the clock to see at what time
5 you checked the chicken?
6 A. Yes, sir.
7 Q. So they have an idea as to what time that
8 sample was taken?
9 A. Yes, sir.
10 Q. And you said you have to pick up numbers; is
11 that correct?
12 A. Yes, sir.
13 Q. What do you use the numbers for?
14 A. Let supervisors know how many bones you
15 have. You have a number 1, 2, 3, 4, and hold.
16 Q. And you said after you picked up those items
17 at the QA office, then you'll go to the supply
18 room?
19 A. Yes, sir.
20 Q. Are there certain items that you have to get
21 every day?
22 A. Another pair of cotton liners, get blue
23 gloves; and your hair net, because they get holes

17

1 in it; and your beard net, they tear up; and the
2 apron, it smells bad, you know.
3 Q. Do you have to replace those every day?
4 A. The hair net I do. And the cotton liners.
5 Q. Do you have to get a smock every day?
6 A. Oh, the white smock, yes, sir.
7 Q. What about your apron? Can you use that for
8 more than one day?
9 A. Yes, sir.
10 Q. And your rubber gloves, can you use those
11 for more than one day?
12 A. Yes, sir.
13 Q. After you have picked up your supplies, what
14 do you do next?
15 A. Go on the floor.
16 Q. What time as a bone sampler did your shift
17 start?
18 A. 7:30.
19 Q. What time do you normally arrive at the
20 plant?
21 A. Like seven o'clock.
22 Q. And what time do you normally go out onto
23 the floor?

1049ab53-2880-4ca6-bcdf-832369d37970

18

1    A.   About 7:25.
2    Q.   Can you describe for me what you would do
3    once you got to the double doors to the production
4    area to go in? Can you describe what you would do
5    at the beginning of your shift?
6    A.   I put on my hair net and earplugs and beard
7    net before walking into the production area. Then
8    you have to go to the rack where you put your
9    clothes on, your smock, your apron, your sleeves,
10   your cotton liners, your blue gloves. And you get
11   sanitized after that. Then you go to the line and
12   put your numbers up.
13   Q.   When you said you had to sanitize, can you
14   explain what you were doing?
15   A.   Put soap on your hands and wash them. But
16   you have to wait in line sometimes.
17   Q.   And as a bone sampler, what time did you
18   have to be on the line at the start of your shift?
19   A.   You had to be there -- well, sometimes they
20   start before 7:30. The chicken come down before
21   that. So we have to be on line before the first
22   piece of breast meat reaches our area.
23   Q.   So you would be considered late if you

19

1    weren't at your position before the first piece of
2    breast meat reached your area?
3    A.   Yes, sir. Written up.
4    Q.   So if you weren't on the line when the first
5    bird was placed on the first cone, you wouldn't be
6    considered late then?
7    A.   No, sir.
8    Q.   Just as long as you are at your position on
9    the line when that first --
10   A.   Yes, sir.
11   Q.   Approximately how long would it take you
12   from the time you entered the production area
13   through the double doors to the time you got to
14   your spot on the line?
15   A.   Five minutes.
16   Q.   And how long would it take you to just put
17   on your items of clothing or equipment on the
18   production floor?
19   A.   Like three.
20   Q.   And how much time would you spend cleaning
21   or washing or sanitizing?
22   A.   That depends on if there's somebody at the
23   sink before me.

20

1    Q.   And which debone line did you work on?
2    A.   We had like a new line every week.
3    Q.   So you would switch lines every week?
4    A.   Yes, sir.
5    Q.   So you would have a chance to work on all
6    the lines?
7    A.   Yes, sir.
8    Q.   Did you ever time yourself with your
9    stopwatch to see how long it was taking you to put
10   your items of clothing or equipment on?
11   A.   No, sir.
12   Q.   Did you ever time yourself to see how long
13   it would take you to wash or sanitize?
14   A.   No, sir.
15   Q.   Did you get any breaks during the course of
16   your shift?
17   A.   We get two 30-minute breaks.
18   Q.   And would those normally occur at the same
19   time every day?
20   A.   Yes, sir.
21   Q.   And what time were your breaks?
22   A.   10:15 through 10:45.
23   Q.   And when was your second one?

21

1    A.   1:15 to 1:45.
2    Q.   In your position as a bone sampler, how
3    would you know when you were cleared to leave for
4    break?
5    A.   When the last piece of meat falls in the
6    combo.
7    Q.   So when that last piece of meat passes your
8    position, then you are free to go?
9    A.   Yes, sir.
10   Q.   And can you describe for me -- can you
11   describe for me what you would do after you were
12   cleared to leave for break?
13   A.   You have to clean out your pan first, then
14   you flip that over. Your clipboard, you tie it up
15   in a bag. And then you can leave. Take off your
16   smock -- sanitize first. Then take off your smock
17   and apron, and you walk out the door.
18   Q.   When you say you would sanitize before
19   leaving for break, can you describe what that was?
20   A.   Put soap in your hand, wash your hands and
21   your apron off.
22   Q.   And then after you did that, you would take
23   off some of your clothing or equipment?

1049ab53-2880-4ca6-bcdf-832369d37970

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

22

1   A.   Take off your equipment. Take off your
2   smock, apron, sleeves and gloves, and your cotton
3   liners.
4   Q.   What items could you still wear outside of
5   the production area?
6   A.   Your hair net, beard net, and earplugs.
7   Q.   And your boots?
8   A.   Yes, sir.
9   Q.   But you would take everything else off?
10  A.   Yes, sir.
11  Q.   And after you would exit the production
12  doors what would you do next?
13  A.   I would take off my hair net and beard net
14  and earplugs, and keep on the boots.
15  Q.   Would you go to a break room?
16  A.   Yes, sir.
17  Q.   And what would you do when you got into the
18  break room?
19  A.   Buy snacks, warm up food.
20  Q.   So you would get something to eat or drink?
21  A.   Yes, sir.
22  Q.   Would you socialize with your coworkers?
23  A.   Yes, sir, after I eat. Because I've got to

23

1   eat first.
2   Q.   Approximately how long would you be in the
3   break room?
4   A.   Be in there about 30 minutes.
5   Q.   And how would you know when it was time to
6   return from break?
7   A.   You would look at the clock, make sure
8   you've got enough time to put on all of your
9   equipment.
10  Q.   What time would you normally leave the break
11  room?
12  A.   Leave at 10:40, the first break.
13  Q.   Right. Can you describe for me what you
14  would do after you left the break room on your way
15  back onto the floor to your position on the line?
16  A.   Throw the food away, put on my hair net,
17  beard net, my earplugs; go back on the floor.
18  When I got on the floor, put back on your smock
19  and apron, your cotton liners and your sleeves and
20  your blue gloves; then I would sanitize. I would
21  put stuff on my hands, wash my hands and apron
22  off. Then I would head back to my work area.
23  Q.   And when would you be -- what is your

24

1   understanding as to when you would be considered
2   late returning from break?
3   A.   Say that again.
4   Q.   What's your understanding as to when you
5   would be considered late returning from break?
6   A.   You would be late if the meat passes your
7   work area without you being there; you would be
8   late.
9   Q.   Okay. Approximately how much time would it
10  take you from the time you passed through the
11  production doors to the time you go to your spot
12  on the line when you were returning from break?
13  A.   Five minutes.
14  Q.   Did you ever time that?
15  A.   No, sir.
16  Q.   And would that be the same then for
17  returning from your second break?
18  A.   Yes, sir.
19  Q.   The same things you would do?
20  A.   Yes, sir.
21  Q.   And it would take about the same amount of
22  time?
23  A.   Yes, sir.

25

1   Q.   And how would you know that you were
2   released at the end of your shift?
3   A.   When the last piece of meat rolls down your
4   belt, falls into the combo.
5   Q.   And can you describe for me what you would
6   do at the end of your shift when you were released
7   to leave until the time that you left the
8   production area?
9   A.   Well, I'd add how many tickets I got within
10  the hour; wash my pan out, flip it over; get all
11  my paperwork, put it in the clipboard, take it to
12  the office.
13       Well, first you have to take off your smock,
14  apron, sleeves, cotton liners, and blue gloves.
15  You have to sanitize that before you take it off.
16  Then you take it off and go clock out. Well, you
17  have to wait in line to clock out.
18  Q.   So you would leave the line and you would go
19  to a sink; is that correct?
20  A.   Yes.
21  Q.   And you said you would wash off your items
22  again?
23  A.   Yes, sir.

1049ab53-2880-4ca6-bcdf-832369d37970

26

1  Q.  And take them off?
2  A.  Yes, sir.
3  Q.  Is there anything that you would still be
4  wearing when you were leaving the production
5  floor?
6  A.  Hair net, beard net, and earplugs.
7  Q.  And your boots?
8  A.  Yes, sir.
9  Q.  And I think you said you had to drop
10  something off?
11  A.  Drop your paperwork off into the office.
12  Q.  Would you do that before you left the
13  production area or after you left the production
14  area?
15  A.  After.
16  Q.  Take it to QA?
17  A.  Right.
18  Q.  You would take it to the QA office?
19  A.  Yes, sir.
20  Q.  Is that out in the hallway?
21  A.  It's in the office; it's in a little room.
22  Q.  Right.  That's off of the hallway outside of
23  the production area?

27

1  A.  Yes, sir.
2  Q.  And then after that, you would clock out?
3  A.  Yes, sir.
4  Q.  Would you do something with your smock?
5  A.  I'd throw it in the little basket thing
6  they've got outside.
7  Q.  There's a bin by the break room?
8  A.  Yes, sir.
9  Q.  On your way to clock out, you could drop it
10  there?
11  A.  Yes, sir.
12  Q.  Approximately how long would it take you
13  from the time you left your spot on the line until
14  the time you exited the production floor?
15  A.  Take, like, seven minutes, because you've
16  got to get your paperwork and stuff together.
17  Q.  What time would you normally clock out?
18  A.  Clock out, like, 4:32.  If the line be long,
19  it might take me longer than that, like four
20  minutes.
21  Q.  Okay.  Now, during the time that you were
22  working as a bone sampler, what is your
23  understanding as to when the time for which you

28

1  were paid started?
2  A.  7:30 to 4:30.
3  Q.  And so what is your understanding as to when
4  the time for which you were paid ended?
5  A.  You get paid 7:30 to 4:30.
6  Q.  I think those are all the questions I have
7  for you, sir.
8  BY MR. PETRO:
9  Q.  I've got a question, Larry, just to make
10  sure that the record's clear.
11  Several times you were asked about
12  sanitizing your equipment, and you said you were
13  sanitizing your hands.  What you were really doing
14  was sanitizing the gloves you were wearing?
15  A.  Yes, sir.
16  MR. PETRO:  Let's take one break.  I
17  just want to clarify something.  I think you said
18  something about this QA is not part of the
19  lawsuit?
20  MR. GOULD:  I didn't say it was not
21  part of the lawsuit.  I believe it's probably
22  outside because they are paid differently.
23  MR. PETRO:  Okay.  Come on; let me ask

29

1  you something.
2  (A brief recess was taken.)
3  MR. PETRO:  I don't have any questions.
4  But just for the record, there was some discussion
5  about him being in the QA department and whether
6  or not he's entitled to make a claim for donning
7  and doffing.  And I'm just saying we're not
8  agreeing with you.  Whether or not you want to ask
9  him is up to you.
10  MR. GOULD:  Okay.  Well, I asked him
11  what his understanding of the positions for which
12  he was seeking to assert claims in this lawsuit
13  were, and he said only for the time he was a bone
14  sampler.
15  MR. PETRO:  Okay.  Well, he's not a
16  lawyer, so I guess...
17  MR. GOULD:  He should still,
18  nonetheless, have an idea as to the positions for
19  which he's asserting a claim.
20  MR. PETRO:  Okay.  I thought you were
21  the one that was brushing it off saying that he
22  was not entitled to it.
23  I just wanted to make sure that you know

1049ab53-2880-4ca6-bcdf-832369d37970

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

30

1 that we are asserting a claim for donning and
2 doffing with respect to his QA position.
3        MR. GOULD:  So you're saying that
4 despite his statement that he is not asserting a
5 claim for the period of time that he's working in
6 QA, despite that admission, you're claiming that
7 you still are?
8        MR. PETRO:  Right.
9        MR. GOULD:  Well, then we are going to
10 ask more questions.
11        MR. PETRO:  Okay.
12 BY MR. GOULD:
13 Q.   Mr. Thomas, I asked you earlier as to the
14 positions for which you were seeking to recover in
15 this lawsuit.  You indicated to me that you were
16 seeking to recover money for the time that you
17 served as a bone sampler in debone; is that
18 correct?
19 A.   Yes, sir.
20 Q.   And maybe I misunderstood you, but I thought
21 you told me that that was the only period of your
22 employment with the company for which you were
23 seeking to recover money; is that correct?

31

1 A.   Yes, sir.
2 Q.   Is that what you said to me?
3 A.   Yes, sir.
4 Q.   All right.  Now that you have had an
5 opportunity to review that issue, has that answer
6 changed?
7 A.   Yes, sir.
8 Q.   So now you are also claiming that you should
9 be compensated in this lawsuit for activities done
10 while you were working in a QA position?
11 A.   Yes, sir.
12 Q.   Can you describe for me what it is that you
13 believe you are claiming in connection with your
14 work in the QA department?
15 A.   The time being on the floor.
16 Q.   Can you describe for me what it is you mean
17 by that?
18 A.   We're supposed to be on the floor to watch
19 everybody else come in, before everybody else get
20 in there.
21 Q.   So you're supposed to be on the floor to
22 watch other people come out onto the production
23 floor?

32

1 A.   Yes, sir.
2 Q.   And can you explain to me why you have to be
3 on the floor to watch other people come onto the
4 floor?
5 A.   Make sure they have their hair nets on
6 properly, make sure your hair not showing; make
7 sure your hood's not outside of the smock; if your
8 hood out, you have to put a hair net over the
9 hood; and make sure they're not chewing gum before
10 they come in the production area.
11 Q.   Now, as a worker in QA, do you have an
12 understanding as to when the time for which you
13 are paid starts?
14 A.   Yes, sir.
15 Q.   And what's that?
16 A.   7:30 to 4:30.
17 Q.   Now, when I asked you earlier, you told me
18 that you were paid from, the time you clocked in
19 until the time you clocked out; is that correct,
20 for when you were working in QA?
21 A.   I sure did.  Yes, sir, I said that.
22 Q.   Is that correct or incorrect?
23 A.   Incorrect.

33

1 Q.   So for the time that you work in QA, when
2 does the time that you are paid start?
3 A.   7:30 to 4:30.
4 Q.   And in connection with your work -- let me
5 back up.
6        Can you describe for me what it is you do in
7 your job as working in QA?
8 A.   I do rework.  Whatever goes on hold, have to
9 rework it and take it off and make sure it's
10 right.
11 Q.   So you do rework?
12 A.   Yes, sir.
13 Q.   And I think you also told me that you are
14 out on the floor watching other people as they
15 come onto the floor?
16 A.   Yes, sir.
17 Q.   And in doing rework, do you work with a
18 knife or scissors?
19 A.   No, sir.
20 Q.   In your position in QA, are you aware
21 whether or not you get any time added on to your
22 shift at the beginning or at the end?
23 A.   No, sir.

1049ab53-2880-4ca6-bcdf-832369d37970

34

1  Q.  In other words, what I'm asking you is:  Do
2  you get paid any extra money beyond 7:30 to 4:30?
3  A.  No, sir.
4  Q.  You got paid today; is that correct?
5  A.  Yes, sir.
6  Q.  You got a paycheck today?
7  A.  Yes, sir.
8  Q.  It listed on there how many hours for which
9  you were paid?
10  A.  Yes, sir.
11  Q.  And how many hours were you paid for in this
12  paycheck?
13  A.  Well, this paycheck we worked last Saturday.
14  You know, you get overtime on Saturdays.
15  Q.  And how long did you work on Saturday?
16  A.  I worked the whole day, I think.
17  Q.  And how many hours were your paid for on
18  your last paycheck, the one that you just got
19  today?
20  A.  48 hours, I think.
21  Q.  And were any of those hours paid at
22  overtime?
23  A.  Yes, sir.

35

1  Q.  Eight hours were paid at overtime?
2  A.  Yes, sir.
3  Q.  And that's for the eight hours you worked on
4  Saturday?
5  A.  Yes, sir.
6  Q.  In your position in QA, what time do you
7  normally report to the plant?
8  A.  Seven o'clock.
9  Q.  Now, the items of clothing or equipment you
10  would wear, were they any different than what you
11  would wear when you were working as a bone
12  sampler?
13  A.  No, sir.
14  Q.  Same things?
15  A.  Same things.
16  Q.  And your routine that you would do in the
17  morning when you arrived at the plant --
18  A.  Same thing.
19  Q.  It was the same thing?  Did you have to pick
20  up any paperwork?
21  A.  Yes, sir.  Clipboard and pen and all that.
22  Q.  And you still get that at the QA office?
23  A.  Yes, sir.

36

1  Q.  And the routine that you would do at the
2  beginning of the day in terms of going out on the
3  production floor, was that the same?
4  A.  Yes, sir.
5  Q.  At what time would you normally go out on
6  the production floor in your position in QA?
7  A.  They tell us to try to make it out before
8  7:24 so we can see everybody walk in.
9  Q.  So is that what time you want to be out on
10  the floor, or is that what time you leave to go
11  out onto the floor?
12  A.  That's what time we have to be out there.
13  Q.  What time do you normally leave to go out
14  onto the production floor?
15  A.  7:22, something like that.
16  Q.  So you'd leave around 7:22; and then by 7:24
17  you're normally in your equipment and out on the
18  floor?
19  A.  I'd be out on the floor, but not in my
20  equipment yet.
21  Q.  I just want to make sure I understand what
22  you're saying correctly.
23      You would normally head out to the floor

37

1  around 7:22?
2  A.  Yes, sir.
3  Q.  And at what point in time are you in your
4  equipment and clothing and able to watch everybody
5  else?
6  A.  7:26.
7  Q.  And in terms of this function of watching
8  people when they come out onto the floor, do you
9  also do that before and after breaks?
10  A.  Yes, sir.
11  Q.  Before breaks or just after breaks?
12  A.  After breaks.
13  Q.  You don't have to watch them before they go
14  out on break?
15  A.  No, sir.
16  Q.  And do you have to do anything in terms of
17  watching people at the end of the shift?
18  A.  No, sir.  Because the other set of QAs come
19  in.
20  Q.  And they'll watch the people who are coming
21  on for second shift?
22  A.  Yes, sir.
23  Q.  And in terms of what you would do at the end

1049ab53-2880-4ca6-bcdf-832369d37970

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

38

1  of your shift in QA, is it any different than what
2  you would do at the end of your shift when you
3  were a bone sampler?
4  A.   Get all my equipment together.  Well, you'll
5  wash off your apron and stuff, pull off your
6  cotton liners and all that, sanitize it, wash your
7  hands -- wash your gloves, I mean, and take them
8  off.  And then get your stuff and go.  Go out
9  there and take your smock off, and then you go to
10  the QA office.
11  Q.   So it's pretty much the same as what you did
12  as a bone sampler?
13  A.   Yes, sir.
14  Q.   And is it fair to say it would take you the
15  same amount of time?
16  A.   Yes, sir.
17  Q.   Those are all the questions I have.  Thank
18  you.
19       MR. PETRO:  I don't have anything.
20
21       (The deposition was concluded.)
22
23

39

1        C E R T I F I C A T E
2
3  STATE OF ALABAMA
4  BARBOUR COUNTY
5
6        I hereby certify that the above and
7  foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10  transcription, and that the foregoing represents
11  a true and correct transcript of the testimony
12  given by said witness upon said hearing.
13        I further certify that I am neither of
14  counsel, nor kin to the parties to the action,
15  nor am I in anywise interested in the result of
16  said cause.
17
18
19        CYNTHIA M. NOAKES, Commissioner
20        Certified Court Reporter,
21        ACCR #327 - Expires 09/30/2008
22
23        Commission Expires 07/08/2009

1049ab53-2880-4ca6-bcdf-832369d37970

**TAB 53**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


NO.:  2:06-CV-1081-MEF


BETTY ANN BURKS, et al.,

        Plaintiff(s),

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

        Defendant(s).



                    DEPOSITION OF

                CAROLINE TURNER

                        JOB NO. 1101-58505



BEFORE:    Victoria M. Castillo

           Certified Court Reporter and

           Notary Public

           ACCR# 17, Expires 9/30/2008

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

2

1    In accordance with Rule 5(d) of
2    The Alabama Rules of Civil Procedure, as Amended,
3    effective May 15, 1988, I, Victoria M. Castillo, am
4    hereby delivering to HOWARD A. ROSENTHAL, ESQ. the
5    original transcript of the oral testimony taken on
6    the 23rd day of May, 2008, along with exhibits.
7        Please be advised that this is
8    the same and not retained by the Court Reporter,
9    nor filed with the Court.
10
11        S T I P U L A T I O N
12
13        IT IS STIPULATED AND AGREED, by
14    and between the parties through their respective
15    counsel, that the deposition of CAROLINE TURNER may
16    be taken before Victoria M. Castillo, Commissioner,
17    at WILLIAMS, POTTHOFF, WILLIAMS & SMITH, 125 South
18    Orange Avenue, Eufaula, Alabama 36027 on the 23rd
19    day of May, 2008.
20        IT IS FURTHER STIPULATED AND
21    AGREED that the signature to and the reading of the
22    deposition by the witness is waived, the deposition
23    is said to have the same force and effect as if

3

1    full compliance had been had with all laws and
2    rules of Court relating to the taking of
3    depositions.
4        IT IS FURTHER STIPULATED AND
5    AGREED that it shall not be necessary for any
6    objections to be made by counsel to any questions,
7    except as to form or leading questions, and that
8    counsel for the parties may make objections and
9    assign grounds at the time of trial, or at the time
10    said deposition is offered in evidence, or prior
11    thereto.
12        IT IS FURTHER STIPULATED AND
13    AGREED that notice of filing of the deposition by
14    the Commissioner is waived.
15
16
17
18
19
20
21
22
23

4

                    I N D E X

EXAMINATION BY:            PAGE NUMBER:
Mr. Fry                        6
Mr. Steensland                 50


EXHIBITS:                  PAGE NUMBER:
(No Exhibits Were Marked.)

5

            A P P E A R A N C E S

FOR THE PLAINTIFF(S):
    M. John Steensland, III, Esq.
    PARKMAN, ADAMS & WHITE
    739 West Main Street
    Dothan, Alabama 36301

FOR EQUITY GROUP EUFAULA DIVISION
    Gary D. Fry, Esq.
    Pelino & Lentz
    One Liberty Place
    Thirty-Second Floor
    1650 Market Street
    Philadelphia, Pennsylvania 19103

    ***********************

        I, Victoria M. Castillo, a Court
Reporter of Montgomery, Alabama, acting as
Commissioner, certify that on this date, as
provided by the Alabama Rules of Civil Procedure
and the foregoing stipulation of counsel, there

67fccb2c-7310-4ef9-b37d-681f8e753666

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

**6**

1  came before me at WILLIAMS, POTTHOFF, WILLIAMS &
2  SMITH, 125 South Orange Avenue, Eufaula, Alabama
3  36027, commencing at 1:27 p.m., CAROLINE TURNER, in
4  the above cause, for oral examination, whereupon
5  the following proceedings were had:
6
7              CAROLINE TURNER,
8      being first duly sworn, was examined and
9          testified as follows:
10
11 EXAMINATION BY MR. FRY:
12     Q.   Good afternoon, Ms. Turner.
13     A.   Good afternoon.
14     Q.   How are you?
15     A.   I'm nervous.
16     Q.   There is nothing to be nervous
17 about.  You can believe me on that.  My name is
18 Gary Fry.  I'm one of the lawyers that's
19 representing Equity Group Eufaula Division, the
20 folks that operate the plant at Baker Hill.  As you
21 are probably aware, we have asked you to come here
22 today to put some questions to you concerning the
23 claims that you and some other folks have made in a

---

**7**

1  lawsuit that has been filed against Equity.  Have
2  you ever gone through this process before?
3     A.   No, sir.
4     Q.   It's pretty simple and painless.  I
5  will be asking the questions and you will be
6  answering.  Victoria, our court reporter, will be
7  taking down what we say.  If you don't understand
8  one of my questions, it's important that you let me
9  know that, and I will be able to hopefully rephrase
10 the question so you will be able to understand it.
11 If you don't hear anything I say, let me know and I
12 will repeat it.  She can only take down one of us
13 at a time talking, so we should not talk across
14 each other.  I don't think that will be a problem.
15 But if you can wait until I get my question out to
16 answer and I will wait for you to complete your
17 answer, we will get along great.  And the only
18 other thing I would ask you would be all your
19 answers should be verbal -- yes and no, or an
20 explanation -- and no shaking or nodding of the
21 head or that sort of thing.
22     A.   Okay.
23     Q.   What's your home address?

---

**8**

1     A.   6299 County Road 75.
2     Q.   What town?
3     A.   Clopton.
4     Q.   What state?
5     A.   Well, I drawed a blank there.
6          MR. STEENSLAND:  What was the
7  question?
8          MR. FRY:  What state?
9          MR. STEENSLAND:  What state do
10 you live in?
11    A.   It's between Abbeville and --
12         MR. STEENSLAND:  Listen to his
13 question.
14    Q.   (Mr. Fry)  What state -- is it in
15 Alabama or Georgia?
16    A.   Alabama.
17    Q.   What's your date of birth?
18    A.   6/8/50.
19    Q.   Are you currently employed?
20    A.   Yes, sir.
21    Q.   By whom?
22    A.   Keystone, CP.
23    Q.   Is it okay with you if I refer to

---

**9**

1  Keystone as Equity?
2     A.   Right, that is fine.
3     Q.   How long have you worked for Equity?
4     A.   The 6th of August will be ten years.
5     Q.   So you have been there since 1998,
6  August of 1998?
7     A.   Yes, sir.
8     Q.   And you first started when CP had the
9  place?
10    A.   Yes, sir.
11    Q.   What's your current job at Equity?
12    A.   DSI.
13    Q.   What do you do in the DSI room?
14    A.   We pick up chicken, pick up the good
15 pieces and throw them on the top belt, and they go
16 in the combo for McDonald's or for the cook plant.
17    Q.   So where do you pick your pieces up
18 from?
19    A.   The belt is coming down, and we pick
20 them up and put them on the top belt.  We pick up
21 the good pieces and put them on the top belt.
22    Q.   Do you screen out the bad product?
23    A.   Uh-huh.

---

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

10

1    Q.    You have to say yes.
2    A.    Yes, sir.
3    Q.    How long have you had that job in
4    DSI?
5    A.    I'm thinking three years.
6    Q.    What shift do you work?
7    A.    First shift, day shift.
8    Q.    What are the hours?
9    A.    7:30 to 4:30.
10    Q.    That's a.m. and p.m.?
11    A.    Yes.
12    Q.    Before you went to work in the DSI
13    portion of the operation, what did you do?
14    A.    I picked up chicken.  I pick up
15    chicken off the floor and carry it to the wash
16    station.
17    Q.    And what department was that?
18    A.    Debone.
19    Q.    And did your job have a particular
20    title?
21    A.    Floor person is what they would call
22    it.
23    Q.    How long were you a floor person?

11

1    A.    That's difficult.  I was at the wash
2    station and like doing both, back and forth, for --
3    let's see, I was there -- just give me a minute.
4    Q.    Take your time.
5    A.    I would say most of the years I was
6    there, except for three years I was in DSI.
7    Q.    So the last three years you've been
8    in DSI?
9    A.    And the rest --
10    Q.    And for the prior years you were, as
11    you can best recollect back into the CP period, you
12    were a floor person or you worked at the wash
13    station?
14    A.    Yes, sir.
15    Q.    Did you work day shift for all those
16    years?
17    A.    Yes, sir.
18    Q.    Who is your current supervisor?
19    A.    Well, Leon is one of the
20    supervisors.  We have three.  So Leon was mainly my
21    supervisor.
22    Q.    Do you know Leon's last name?
23    A.    Spinks, I think.  I'm not sure now.

12

1    Q.    What's your current rate of pay?
2    A.    $9.45.
3    Q.    How long have you been at that rate?
4    A.    Since March 1st, and we got a raise.
5    Q.    You work 40 hours a week?
6    A.    Well, 40 -- we've been working seven
7    days a week here lately.  But just regular 40
8    hours.
9    Q.    Regular it's generally 40 hours per
10    week, Monday through Friday?
11    A.    Yes, sir.
12    Q.    And you've been working overtime?
13    A.    Yes, sir.
14    Q.    You understand that you are a
15    plaintiff or a party in this lawsuit?
16    A.    Yes, sir.
17    Q.    How did you find out about the
18    lawsuit?
19    A.    From friends at work.
20    Q.    What did the friends tell you?
21    A.    The friend, she gave me a number to
22    call and told me what was going on and told me I
23    could call that number and get in touch with them,

13

1    and they would send me some papers through the mail
2    to fill out.
3    Q.    What did your friend tell you about
4    the lawsuit?
5    A.    She just explained that it was for
6    the back hours that we worked and didn't get no pay
7    that we should have got paid for, and that if I
8    wanted to be in with the lawsuit, that to just call
9    that number.
10    Q.    What's your understanding as to your
11    claim in this lawsuit?
12    A.    It's back pay that we should have got
13    and we didn't.
14    Q.    Back pay for doing what?
15    A.    For work and stuff that we did and we
16    didn't get paid.
17    Q.    What work do you believe you
18    performed for which you weren't paid?
19    A.    Being on the line, being working, and
20    we're not getting paid for it.
21    Q.    Actual production work?
22    A.    Right.
23    Q.    Production work on the DSI line?

67fccb2c-7310-4ef9-b37d-681f8e753666

14

1    A.    Yes, sir.
2    Q.    Putting the chicken up on the belt?
3    A.    Yes, sir.
4    Q.    You believe that you were doing that
5  job for hours for which you weren't paid?
6    A.    Right.
7    Q.    Have you ever been involved in any
8  other lawsuits?
9    A.    No, sir.
10   Q.    Are you a member of the Union?
11   A.    Yes, sir.
12   Q.    Have you long have you been a member
13  of the Union?
14   A.    I'd say about four years, somewhere
15  around there.
16   Q.    Have you ever had any position with
17  the Union, like a steward?
18   A.    No, sir.
19   Q.    Have you ever been on a negotiating
20  committee?
21   A.    No, sir.
22   Q.    Have you ever attended any Union
23  meetings?

15

1    A.    No, sir.
2    Q.    Do you know who the Union
3  representatives are in the plant?
4    A.    I know one.
5    Q.    Who do you know?
6    A.    But I don't know her name.
7    Q.    Have you ever discussed your claim
8  for not being paid for production work with any
9  Union representative?
10   A.    No, sir.
11   Q.    Have you ever attended any meetings
12  with your fellow employees concerning this lawsuit
13  or your claim?
14   A.    No, sir.
15   Q.    Did you review any papers before you
16  came here today to prepare yourself?
17   A.    No, sir.
18   Q.    Did you talk with anybody about your
19  appearance here today besides your lawyers?
20   A.    Just my work -- just my supervisor
21  saying I was coming, you know, where I was going,
22  you know, because I had to -- other than that, no,
23  sir.

16

1    Q.    It's my understanding that when
2  you're working in the DSI area of the plant, that
3  you wear certain items of outer garments and
4  equipment, or PPE; is that correct?
5    A.    Yes, sir.
6    Q.    And can you identify for me those
7  items that you wear?
8    A.    Well, it's just equipment, stuff that
9  you put on.
10      MR. STEENSLAND:  Listen to his
11  question.
12      THE DEPONENT:  Okay.
13   Q.    (Mr. Fry)  Can you just list for me
14  those items that you put on to do your job?
15   A.    Smock, apron, gloves, warming gloves,
16  hair net, rubber gloves, ear plugs, rubber boots,
17  arm sleeves.  I think that's it.
18   Q.    Let me go down the list and make sure
19  we have the full list.  You told me that you wear a
20  smock, an apron, gloves --
21   A.    Rubber gloves.
22   Q.    And you wear the white liner gloves
23  with them?

17

1    A.    Yes, sir.
2    Q.    A hair net?
3    A.    Yes, sir.
4    Q.    Ear plugs?
5    A.    Yes, sir.
6    Q.    Boots?
7    A.    Yes, sir.
8    Q.    And sleeves?
9    A.    Yes, sir.
10   Q.    Anything else?
11   A.    Huh-uh.
12   Q.    During that period of time that you
13  were working at the plant when you were a floor
14  person, did you wear these same items?
15   A.    Yes, sir.
16   Q.    Which of these items, to your
17  understanding, are required?
18   A.    All of them.
19   Q.    Does everybody in the debone room
20  wear these items?
21   A.    No, sir.
22   Q.    Do some employees wear additional
23  items depending on their job?

67fccb2c-7310-4ef9-b37d-681f8e753666

18

1    A.    Yes, sir.
2    Q.    Does the company provide you with
3 these items that you wear?
4    A.    Yes, sir.
5    Q.    Which of the items that you have
6 listed for me do you get on a daily basis?
7    A.    On a daily basis -- we get gloves --
8 rubber gloves, and aprons, and warming gloves, and
9 hair nets. And that's it.
10    Q.    What about a smock?
11    A.    Smock, yes.
12    Q.    As I understand it, there was a
13 period of time in the past when you didn't get a
14 smock every day that you were required to, or you
15 took your smocks home and washed them yourself; is
16 that true?
17    A.    Yes, sir.
18    Q.    At some point after Equity took over
19 that process changed?
20    A.    Yes, sir.
21    Q.    Do you recall when that process
22 changed?
23    A.    When it changed -- it's been a

19

1 while. I'd say about four or five years. I am
2 guessing, but right about that.
3    Q.    Can you wear any of these items that
4 you have listed for me from your home?
5    A.    No, sir.
6    Q.    What about your boots?
7    A.    No, sir.
8    Q.    You can't wear your boots from home?
9    A.    You can, but they'd rather you --
10 that you didn't. I'd rather not because I'd rather
11 have them on clean. But you can put them on in
12 your car and go on in with them. That's what they
13 usually do.
14    Q.    Do you have a locker at the plant?
15    A.    Yes, sir.
16    Q.    And do you store any of these items
17 in the locker when you leave work at the end of the
18 day?
19    A.    No, sir.
20    Q.    You take the apron and the sleeves
21 home with you?
22    A.    I take everything home and wash it.
23    Q.    When do you put on these items that

20

1 you have listed for me in the morning after you get
2 to work?
3    A.    I get there at ten minutes after
4 seven, and I go get my smock and come back and
5 divide everything and put everything that I need in
6 my locker, and I take what I'm going to wear, and
7 then I put it there. And when we go in, I take it
8 in and put it on inside the plant, inside where you
9 work.
10    Q.    So am I correct that you put these
11 items on, most of them, on the debone production
12 floor?
13    A.    Yes, sir, except my boots. I put my
14 boots on in the break room.
15    Q.    And do you put your hair net on in
16 the break room?
17    A.    Yes, sir.
18    Q.    And do you put your ear plugs in in
19 the break room?
20    A.    Yes, sir.
21    Q.    But everything else you take with you
22 into the floor and you put it on there, correct?
23    A.    Yes, sir, because we are not allowed

21

1 to wear it out and back in.
2    Q.    Your shift starts at 7:30 a.m.?
3    A.    Yes, sir.
4    Q.    And how many minutes before that 7:30
5 start time do you go into the debone room and put
6 on these items that you just identified for me?
7    A.    It's usually five minutes 'til
8 before. Not 7:30, but five minutes 'til.
9    Q.    You give yourself five minutes to go
10 in and put the stuff on?
11    A.    Well, it takes us five minutes to get
12 from up front to our back back there, and then we
13 start putting it on.
14    Q.    So when are you required to be on the
15 line?
16    A.    We are required to be on the line at
17 7:30, but I mean I'm not -- well, maybe I shouldn't
18 --
19    Q.    Go ahead. Tell me how it works.
20    A.    I'm early.
21    Q.    I want to know how it works.
22    A.    I'm early, so I get mine on before
23 the others. I don't put on mine in the back. I

67fccb2c-7310-4ef9-b37d-681f8e753666

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

---

22

1  put on mine in the front.
2      Q.   When you say "the front", what are
3  you referring to?
4      A.   Like when you go in, there is a sink
5  and stuff there.  And most of them can put it on
6  there and go on back to the back.  So then that way
7  if you in there and you got your stuff on, they
8  consider you not late.  So if you are in there and
9  can go there and put your stuff on and then you are
10 not late.
11     Q.   When you say "go to the back", you
12 mean go to your DSI area?
13     A.   Work area.
14     Q.   So you told me that if you put your
15 stuff on in the area right when you first go in --
16     A.   Yes.
17     Q.   -- and if you get it on there, then
18 you say you're not considered late?
19     A.   No, sir.
20     Q.   What do you mean by that?
21     A.   If I go in five minutes before, it
22 takes me five minutes to get my stuff on.
23     Q.   Okay.

---

23

1      A.   And if I got it on, I'm considered
2  not late.
3      Q.   You are not late?
4      A.   If you get your stuff on, you are not
5  late.
6      Q.   And you have your stuff on, then it
7  takes you a few minutes to go back to the DSI room?
8      A.   Yes, just a few seconds.
9      Q.   So if you leave the break room at
10 7:25, you have time to do everything and not be
11 late for the start of production; is that correct?
12     A.   Yes, sir.
13     Q.   Does your job in DSI require you to
14 use a knife?
15     A.   No, sir.
16     Q.   When you were a floor person, did
17 that job require you to use a knife or scissors?
18     A.   It did, but I messed up this hand and
19 they wouldn't allow me to use scissors or knives.
20     Q.   You don't use scissors in DSI either,
21 do you?
22     A.   No, sir.
23     Q.   In your DSI job do you use any tools

---

24

1  or implements?
2      A.   No, sir.
3      Q.   How many breaks do you get per day?
4      A.   Two.
5      Q.   How long are they?
6      A.   30 minutes.
7      Q.   After your 7:30 start time, when is
8  the first 30-minute break?  What time does it
9  occur?  When can you take it?
10     A.   10:40.
11     Q.   When is the second 30-minute break?
12     A.   1:40.
13     Q.   Do the DSI folks go on break at the
14 same time as the debone lines go on break?
15     A.   The supervisors or the line leaders?
16     Q.   No.  Let me go back.  The DSI folks,
17 they go on break at 10:40?
18     A.   Yes, sir.
19     Q.   The people that are working in the
20 debone and in the room with the lines, do they go
21 on break at the same time you do?
22     A.   No, sir.
23     Q.   They go before?

---

25

1      A.   Yes, sir.
2      Q.   How do you know when it's time for
3  you to take your break?
4      A.   Well, I can't the see the clock, so
5  when there's no meat coming down, because I can't
6  see the clock, I can just tell when it's time.
7      Q.   You can just tell.  After ten years
8  you can just tell?
9      A.   I can just tell.
10     Q.   And where do you take your break?
11     A.   In the break room.
12     Q.   Do you take it in the debone break
13 room?
14     A.   Yes, sir.
15     Q.   How do you know it's time to go back
16 from break to go back to work?
17     A.   I watch the clock, and I know.
18     Q.   If your break starts at 10:40, you
19 need to be back at ten after eleven?
20     A.   Yes.
21     Q.   And what time do you usually leave
22 the break room in order to be back on the line?
23     A.   About 10:40, because we just go to

---

67fccb2c-7310-4ef9-b37d-681f8e753666

26

1    the wash station.
2             MR. STEENSLAND: Listen to his
3    question.
4        Q.    (Mr. Fry) Take your time. Just
5    listen to my question. You're on break --
6        A.    Yes, sir.
7        Q.    You just told me that your break ends
8    at 11:10, ten minutes after eleven. Is that when
9    it ends?
10       A.    I'm back on the line at about 10, 20
11   minutes after.
12       Q.    20 minutes after?
13       A.    Uh-huh. I'm sorry, but that kind of
14   confuses me when I'm going on break.
15            MR. STEENSLAND: I think you just
16   confused us.
17       A.    I'm sorry, because we go on break at
18   10:40, and it's just like I'm going in there to the
19   bathroom and hustling and eating, and then when I
20   get through, I just kind of like breathe for a
21   little while, and then I get up and go back, and
22   I'm not -- and I try not to be late.
23       Q.    (Mr. Fry) And --

27

1        A.    But usually if we go on break at
2    10:40, I'm back in there by -- that's hard to
3    explain. I am not late.
4        Q.    Okay, you are not late.
5        A.    No, I am not late.
6        Q.    But what time do you --
7        A.    About five -- let's see, 15 after
8    eleven, if that is correct.
9        Q.    And that's your experience that
10   you're usually back by around 10:15, and as long as
11   you're there --
12            MR. STEENSLAND: Objection. That
13   mischaracterizes what she says.
14            THE DEPONENT: I'm trying to
15   correct it.
16       Q.    (Mr. Fry) Let me ask you again.
17   Your first break starts at 10:40 in the morning?
18       A.    Uh-huh.
19       Q.    What time do you recollect that you
20   generally are back at your workstation ready to go?
21       A.    Okay, 15 after eleven.
22       Q.    15 after eleven?
23       A.    That is my correction.

28

1        Q.    That is your recollection?
2        A.    Uh-huh.
3        Q.    And you're on time, correct?
4        A.    Correct.
5        Q.    How do you get to the plant on the
6    workday in the morning?
7        A.    I drive to work.
8        Q.    You drive?
9        A.    Yes, sir.
10       Q.    Do you have a sticker on your car?
11       A.    Yes, sir.
12       Q.    And when you get to the plant, you
13   can just drive on, correct?
14       A.    Correct, yes, sir.
15       Q.    And at the end of the day, you can
16   just drive off?
17       A.    Correct, yes, sir.
18       Q.    You don't have to stop and pass
19   through any security, do you?
20       A.    No, sir.
21       Q.    I think you started to tell me a
22   little bit ago what you do after you arrive, but I
23   want to go back and go through that in just a

29

1    little bit more detail. You indicated that you
2    generally arrive around 7:10 a.m.?
3        A.    Yes, sir.
4        Q.    Tell me what you do from the time you
5    arrive at the plant until 7:25 when you walk into
6    the debone room.
7        A.    I go take my stuff in the break room
8    that I bring, go get my smock and come back, and
9    get out all my stuff that I need to work with, and
10   put my stuff in the lockers, and then I go -- if
11   they allow us to go in, I go in to work. If they
12   don't, we have to wait.
13       Q.    Sometimes the Sanitation people
14   aren't finished; is that right?
15       A.    Right.
16       Q.    So the first thing you do is go to
17   the break room?
18       A.    Yes, sir.
19       Q.    And then you go to the supply room?
20       A.    Yes, sir.
21       Q.    And pick up whatever you need?
22       A.    My smock.
23       Q.    How long does it take you to pick up

67fccb2c-7310-4ef9-b37d-681f8e753666

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

30

1   your smock at the supply room?
2       A.   I'd say about five minutes. Yes,
3   about that.
4       Q.   There is a line there?
5       A.   There is a line, yes, sir.
6       Q.   What is the longest you have ever
7   waited in that supply room?
8       A.   The longest I waited -- not that
9   long, no, sir. I mean, I have waited. But just
10  about that, yes.
11      Q.   Does the line go pretty quickly?
12      A.   Yes, sir, it does when you're picking
13  up your smock. You know, it's all right.
14      Q.   Have you ever heard of anybody
15  waiting in that line for an hour?
16      A.   An hour?
17      Q.   Yes.
18      A.   Yes, sir, I have.
19      Q.   Really?
20      A.   Uh-huh.
21      Q.   And did you understand what happened
22  that they were waiting in the line for an hour?
23      A.   Well, the people up there were slow.

31

1   They wasn't getting their stuff out.
2       Q.   How often did that happen?
3       A.   Quite a bit.
4       Q.   An hour wait?
5       A.   Yes, sir, they have waited until time
6   to go in to get their stuff.
7       Q.   So that means they had to arrive an
8   hour before they had to start?
9       A.   Well --
10      Q.   Have you ever done that?
11      A.   No, sir, I haven't done that.
12      Q.   Have you ever had to wait there an
13  hour?
14      A.   No, sir.
15      Q.   Have you ever seen anybody waiting
16  there an hour?
17      A.   Yes, sir.
18      Q.   How many times?
19      A.   A lot of times.
20      Q.   How do you know they wait there an
21  hour?
22      A.   Well, they are there -- some of them
23  is there before I am, which is way before seven

32

1   o'clock, and then they go wait in line, and then
2   they are still in line when I go up there. Then
3   they call people telling them to work, and they are
4   still in line. So a lot them don't get their
5   stuff. They have to just get what they can get.
6       Q.   What about you?
7       A.   Well, I wait in line to get my stuff,
8   and I try to get out as quick as I can. I try to
9   get up there and get my stuff in line and get out.
10      Q.   Well, you have to wait behind all
11  those people, don't you?
12      A.   Yes, it just depends on where you at
13  in line. But I usually try to get my stuff and get
14  in there, but it's hard.
15      Q.   How do you know that those people
16  have been waiting there for an hour?
17      A.   Well, some of them tells me they been
18  there 30 minutes, an hour, waiting on their stuff.
19      Q.   Really?
20      A.   Yes, sir.
21      Q.   You're not required to pick up any
22  special tools or anything to do your job before you
23  go to work, are you?

33

1       A.   No, sir.
2       Q.   In order to get on to the production
3   floor, you need to go through double doors right
4   across from the debone break room?
5       A.   Yes, sir.
6       Q.   And you go through those first set of
7   doors, and there is a place to sanitize your boots?
8       A.   Yes, sir.
9       Q.   And do you have to stop in that
10  little space?
11      A.   Yes, sir.
12      Q.   And how long does it take to sanitize
13  your boots?
14      A.   About three or four minutes there, to
15  get them all.
16      Q.   Three or four minutes?
17      A.   To get it all on the shoes.
18      Q.   And then you go through another set
19  of doors into the production room, right?
20      A.   Yes, sir.
21      Q.   And that's where you put on the
22  equipment that you told me about, the clothing?
23      A.   Yes, sir.

67fccb2c-7310-4ef9-b37d-681f8e753666

34

1    Q.    And how long does it take you to put
2  the smock and the apron and gloves on?
3    A.    Five minutes.  They trained us for
4  five minutes.
5    Q.    Pardon?
6    A.    They trained me for five minutes.  It
7  takes other people longer.
8    Q.    You had training on how to put it on
9  in five minutes?
10   A.    Yes, sir.
11   Q.    And then you go to the DSI room?
12   A.    Yes, sir.
13   Q.    And you said that's not far?
14   A.    Not too far, huh-uh.
15   Q.    Tell me what you have to do with your
16  smock and your apron and so forth when it's time
17  for you to go on your break.
18   A.    We take it all off and hang it on the
19  hangers that they got in there.
20   Q.    Okay.
21   A.    And just leave it until we come back.
22   Q.    Do you wash it before you take it
23  off?

35

1    A.    Yes, sir, in the sink, wash it off.
2    Q.    And then you take it off and you go
3  to the break room?
4    A.    Yes, sir.
5    Q.    How long does it take you from the
6  time you leave your place at DSI until you actually
7  get into the break room?
8    A.    Until I actually get into the break
9  room, okay.  Well, you mean from taking off my
10  stuff and getting in there?
11   Q.    Yes.
12   A.    Well, I'd say about two or three
13  minutes, somewhere around there.
14   Q.    Two or three minutes?
15   A.    Somewhere around there.
16   Q.    At the end of the break when it's
17  time for you to end your break and you go the
18  reverse way, you go back to work, you have to go
19  through the foot bath again?
20   A.    Yes, sir.
21   Q.    And you go in and put your stuff on
22  and go back to the DSI room, correct?
23   A.    Yes, sir.

36

1    Q.    How long does that process take?
2    A.    From the time you do your shoes
3  and -- are you saying from?
4    Q.    From the time that you leave the
5  break room until you get to the DSI room?
6    A.    It takes me five minutes to get my
7  stuff on and then to get through that -- well,
8  altogether -- and wash my hands.  I have to wash my
9  hands off again, you know, my gloves off.
10        MR. STEENSLAND:  Your what off?
11        THE DEPONENT:  The gloves, you
12  have to wash the gloves again.
13   A.    So getting through the thing bath,
14  I'd say about five -- about ten minutes during all
15  that.
16   Q.    (Mr. Fry)  How much time do you
17  estimate that you spend doing whatever you need to
18  do on break, whether it be go to the bathroom or
19  get something to eat?
20   A.    I don't understand what you're --
21   Q.    Once you get into the break room to
22  start your break, how much time do you have in
23  there until you have to leave the break room to go

37

1  back to work, in your experience?
2    A.    From the time I get in, I leave to go
3  in there at 10:40, and then I go right -- I get all
4  this other stuff off and everything, and are you --
5  you've got me stumped here.  I am not getting what
6  you're --
7        MR. STEENSLAND:  Listen to his
8  question.
9    A.    -- asking me.
10   Q.    (Mr. Fry)  How much time do you have
11  to yourself in the break room?
12   A.    In the break room after I get in
13  there I've got three, four minutes to myself
14  eating-wise.  Because really actually to rest, you
15  ain't got no time between eating.  Because time you
16  eat and put your stuff back in the locker, you've
17  got to go back to work.
18   Q.    So is that your bathroom break as
19  well?
20   A.    Yes, sir.
21   Q.    If you combine all that time
22  together, it's got to be more than two or three
23  minutes, doesn't it?

67fccb2c-7310-4ef9-b37d-681f8e753666

38

1      A.    And if you are going to heat anything
2   -- I do not heat nothing, because it takes you too
3   much time.  You can't get to the microwave.  So I
4   have to get my stuff and come back to eat what I
5   got to eat, and then put it back in the locker, and
6   so you ain't got no time to rest.  Time you do what
7   you got to do, you got to go back to work.
8          MR. STEENSLAND:  Ms. Turner, do
9   you remember what his question was?
10         THE DEPONENT:  Well, I'm working
11  on it here.
12         MR. STEENSLAND:  I know you are.
13  Just try to listen.
14     Q.    (Mr. Fry) From the time you enter
15  the break room from your break, after you have done
16  everything you need to do to get into the break
17  room, until the time you leave the break room to go
18  back to work after your break, just that time
19  you're in the break room and doing whatever you do,
20  how much time do you estimate that to be?
21     A.    I'm thinking on this now.
22     Q.    Take your time.
23     A.    Actually, about two or three minutes,

39

1   I would say.
2      Q.    Two or three minutes?
3      A.    Because in between that time when I
4   get in there -- around three, somewhere around
5   there.  I am counting the time -- I look at the
6   clock, and then I glance back at it, and I try to
7   keep up with it so I don't be late getting back and
8   eating my food.  And when I straight come out, I go
9   to the bathroom, get all that done, get my stuff
10  and come back, and then I look at the clock.  It's
11  about ten after.
12     Q.    What you have just described to me --
13  eating, going to the bathroom -- that has to take
14  you more than two or three minutes.
15     A.    Well, I do know what time I go back
16  in.  I have told you that, and in between getting
17  off and -- I told you, I don't know.
18         MR. STEENSLAND:  Ms. Turner, you
19  answer the question as best you can.
20         MR. FRY:  Yes, you did.  Thank
21  you.
22         THE DEPONENT:  I am sorry,
23  you-all.

40

1          MR. STEENSLAND:  Don't apologize.
2          MR. FRY:  No need to be sorry.
3   You are doing fine.
4      Q.    (Mr. Fry) Tell me what you do at the
5   end of the day in terms of the steps you have to
6   take when you leave the DSI line to when you walk
7   out of the building to get in your car to go home.
8      A.    When we can go, we go to the sink and
9   wash up, wash all of our stuff, dry it off, take it
10  off, and then I divide my smock from other stuff,
11  and I roll it up after I dry it off, and then
12  that's in the back back there if we get to the
13  sink, and then we come through and come out, and I
14  throw my smock in that -- they got some things up
15  there that you throw your smock -- throw it in
16  there, and then I go to the break room and get all
17  my other stuff up, and then I get in line with the
18  others to clock out, and then I leave.
19     Q.    How long a period of time do those
20  activities take?
21     A.    That's another question.  If they let
22  us out at 4:30, if we have to stay back there until
23  4:30, we get up there, and we wait to clock out.  I

41

1   got to think on this again.
2          MR. STEENSLAND:  Ms. Turner,
3   think to yourself and then answer the question.
4   Let's try that approach.
5          THE DEPONENT:  I am sorry.
6          MR. STEENSLAND:  That is okay.
7   You can write it out if you want.
8          THE DEPONENT:  No, just give me a
9   little second to think.
10     A.    It's so confusing because I don't
11  ever look at the clock.  About ten minutes 'til
12  five I'm going to my car.  That's close enough.
13     Q.    (Mr. Fry) Does the actual production
14  sometimes end before 4:30?
15     A.    Yes, sir.
16     Q.    And what happens on those occasions?
17     A.    We stay back there, and sometimes
18  they might let us go.  It's just according to
19  how -- it's according to the supervisor.
20     Q.    Do you have any idea as to how the
21  company keeps track of your hours for purposes of
22  paying you?
23     A.    They have a little card that they use

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

42

1    if they want to clock you out.
2        Q.    Who is "they"?
3        A.    Vickie Whitland, I think she's the
4    boss, one of the bosses.
5        Q.    Have you ever heard the phrase Master
6    Card time?
7        A.    Yes, sir.
8        Q.    Does that have any meaning to you?
9        A.    Yes, sir.
10       Q.    And what does it mean to you?
11       A.    It means that they can clock you out
12   when they want to, even though you are working.
13       Q.    Is it your understanding that you are
14   paid on the basis of Master Card time?
15       A.    Yes, sir.
16       Q.    And is it your claim in this lawsuit
17   that you performed production work after the Master
18   Card was swiped to end production?
19       A.    Yes, sir.
20       Q.    And you were still in the DSI line
21   putting the chicken up on the upper belt?
22       A.    Yes, sir.
23       Q.    And that's your claim in this

43

1    lawsuit?
2        A.    Yes, sir.
3        Q.    Are you sure about that?
4        A.    Yes, sir.
5        Q.    Have you ever had occasion to
6    complain to your supervisor about any mistakes in
7    your paycheck?
8        A.    Yes, sir.
9        Q.    And what happened?
10       A.    Well, they'd say I didn't stay there,
11   or they'd come up with some kind of excuse, the
12   reason I didn't get it, the pay that I was supposed
13   to get.
14       Q.    So you complained that you thought
15   you worked more hours than --
16       A.    Yes, sir.
17       Q.    How many times has that occurred?
18       A.    As many as I have been out a lot. I
19   can't say how many times, but.
20       Q.    Do you get paid every week?
21       A.    Yes, sir.
22       Q.    And do you review the payroll
23   information that's on the stub?

44

1        A.    I look it over, yes, sir, but.
2        Q.    And that information shows the number
3    of hours you worked?
4        A.    Yes, sir.
5        Q.    And it shows your hourly rate, and
6    then it shows a total?
7        A.    Yes, sir.
8        Q.    And you review that information?
9        A.    Yes, sir.
10       Q.    And are you telling me that there
11   have been times when you reviewed that information
12   and you felt it to be inaccurate?
13       A.    Yes, sir.
14       Q.    And you went to your supervisor?
15       A.    Yes, sir.
16       Q.    And how many times did that occur?
17       A.    Actually, I can't remember the
18   times. I have been there -- I have been there so
19   long.
20            MR. STEENSLAND: Ms. Turner, what
21   was his question?
22            THE DEPONENT: I know his
23   question.

45

1            MR. STEENSLAND: I think the
2    first part of your answer was I don't know?
3        A.    Yes, sir, I don't know specifically
4    how many times.
5        Q.    (Mr. Fry)  And what was the result of
6    your complaint?
7        A.    You're saying did I get what I didn't
8    get?
9        Q.    On any of these those occasions, did
10   they come back to you and say -- we made a mistake
11   and we are going to make it right?
12       A.    Yes, sir.
13       Q.    And am I correct that on other
14   occasions they said -- no, Ms. Turner, you made a
15   mistake and we're accurate?  Did they say that?
16   Did that ever happen?
17       A.    Yes, sir, it did.
18       Q.    So sometimes you thought they made an
19   error, and they did -- and other times you thought
20   they made an error, and they said they didn't?
21       A.    Yes, sir.
22       Q.    Do you keep track of the hours that
23   you worked there in any fashion by notes or

46

1  notebook or anything?
2      A.   Calendar sometimes.
3      Q.   And what kind of information do you
4  record on this calendar?
5      A.   I put the days and like the hours.
6      Q.   The number of hours you worked?
7      A.   Yes, sir.
8      Q.   When did you start keeping this
9  calendar?
10     A.   Here recently I've been keeping them,
11  but sometimes I wouldn't keep up with it, and then
12  I'd start doing it again to make sure, if they
13  changed supervisors or something.
14     Q.   And why did you decide to keep these
15  calendars?
16     A.   Because they wouldn't -- they would
17  miss some hours on there.
18     Q.   Do you still have these calendars in
19  your possession?
20     A.   No, sir, I think I throwed them away.
21     Q.   You threw them all away?  You don't
22  have any of them now?
23     A.   No, sir.

47

1      Q.   Do you recall when you threw them
2  away?
3      A.   It's been a while, a couple of months
4  ago.  I just threw them in the trash.
5      Q.   Before you threw them out or since
6  then, did any of the attorneys ask you for that
7  information, if you had any such documents?
8      A.   No, sir.
9      Q.   Have you made any sort of
10  calculations as to what you think you're owed for
11  these extra hours you worked on the production
12  line?
13     A.   No, sir.
14     Q.   Those notes that you made on the
15  calendar, did they show the extra hours you worked
16  on the production line that you say you're owed
17  money for?
18     A.   No, sir.  Most of them just like --
19  well, to be honest with you, I ain't got no
20  education.  So I put it down there like I want to
21  put it down there, and I just put an "X" on the
22  days I work, and if I work one day half a day, I
23  put it down there so I can keep up with the days,

48

1  the half days.  That's the way I do it.
2      Q.   From time to time are you asked to
3  work overtime?
4      A.   Yes, sir.
5      Q.   And on those occasions, are you paid
6  time-and-a-half?
7      A.   Yes, sir.
8      Q.   Have you ever filed a grievance with
9  the Union?
10     A.   There used to be a lady.  She was a
11  Union representative there, but she's not there any
12  more -- Ms. Barbara Green.  She would do it for
13  me.  I didn't have no education, and when things
14  would come up, she would do it for me.
15     Q.   What would she do for you?
16     A.   Like if they wanted to write me up
17  for something that I didn't do or was going to give
18  me a point for a day that they wasn't supposed to
19  give it to me, she would help me.
20     Q.   She would take care of it for you?
21     A.   Yes.
22     Q.   Did you ever complain to Barbara
23  Green with respect to these hours that you say you

49

1  worked and you weren't paid for?
2      A.   Yes, sir.
3      Q.   Do you recall when you made those
4  complaints?
5      A.   About three years ago.
6      Q.   What became of your complaints, if
7  you know?
8      A.   I don't know.
9      Q.   You never heard any feedback?
10     A.   No, sir.
11     Q.   Is that the only time you have ever
12  complained to the Union about your unpaid hours?
13     A.   Yes, sir.
14     Q.   Have you complained to your
15  supervisors about your unpaid hours of production
16  work?
17     A.   Yes, sir, but they wouldn't talk to
18  me.
19     Q.   Who did you complain to?
20     A.   Let me think.  I got to think again.
21  I am trying to think of his name.
22          MR. STEENSLAND:  Just think to
23  yourself, Ms. Turner.

67ffccb2c-7310-4ef9-b37d-681f8e753666

50

1          THE DEPONENT:  I am sorry.
2      A.   His first name was Sampson.
3      Q.   (Mr. Fry)  Sampson?
4      A.   Uh-huh.
5      Q.   Have you ever been written up for
6  anything at the plant?
7      A.   No, sir.
8          MR. FRY:  Thank you.  That's all
9  I have.
10          MR. STEENSLAND:  We're not done
11  yet, because I have some questions, Ms. Turner.
12
13  EXAMINATION BY MR. STEENSLAND:
14      Q.   Ms. Turner, are you asking in this
15  lawsuit to be paid for all your hours that you have
16  worked for the company there at the plant?
17      A.   Yes, sir.
18      Q.   Mr. Fry was talking about production
19  time.  Are there other times that you feel like
20  that you aren't being paid even though you are
21  doing work for the company?
22      A.   Yes, sir, I do.
23      Q.   Are we talking about times with

51

1  putting on and putting off and washing PPE?
2      A.   Yes, sir.
3          MR. FRY:  Objection.
4      Q.   (Mr. Steensland)  What is production
5  time?  What do you consider production time?
6      A.   Production time?
7      Q.   Remember you and Mr. Fry were talking
8  about that?
9      A.   When you are on the job and you are
10  working.
11      Q.   And what is your job?
12      A.   To get the meat out, get the product
13  out.
14      Q.   And where do you perform your job?
15      A.   At work on the --
16      Q.   On the line?
17      A.   On the line.
18      Q.   Are there other things that you do
19  that are not on the line?
20      A.   No, sir.
21      Q.   How do you get to the line?  You
22  don't walk there in your clothing that you are
23  wearing today, do you?

52

1      A.   No, sir.
2      Q.   What do you have to put on to get to
3  the line?
4      A.   You have to put on your equipment
5  that you work with.
6      Q.   Remember all that discussion about
7  how long it took you to do that.  Do you feel like
8  you are being paid for that time?
9      A.   No, I don't.
10      Q.   That is not considered production
11  time, is it?
12          MR. FRY:  Objection.
13      A.   No.
14      Q.   (Mr. Steensland)  Would you consider
15  that production time?
16      A.   Putting on your stuff?
17      Q.   Yes.  Verbal answer, yes or no.
18  Would you consider the time putting on and taking
19  off --
20      A.   Yes.
21      Q.   Is that considered production time?
22      A.   Yes.
23      Q.   That's considered production time

53

1  when you are on the line?
2      A.   Yes.
3      Q.   Are you asking to get paid for all
4  the time it takes you to put on and take off your
5  PPE?
6      A.   Yes.
7      Q.   Both at the beginning and at the end
8  of the shift?
9      A.   Yes, sir.
10      Q.   The two 30-minute breaks that you
11  get, do you feel like you get to use all of those
12  30 minutes?
13      A.   No, sir.
14      Q.   And what is the reason why you don't
15  feel like you get to use all those 30-minute
16  breaks?
17      A.   Because it takes you five minutes to
18  get your stuff on and five to get it off, and they
19  add in with your 30 minutes.
20      Q.   And what is that stuff you are
21  referring to?
22      A.   My equipment.
23      Q.   And when you're doing that stuff,

67fccb2c-7310-4ef9-b37d-681f8e753666

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

54

1    taking on and off the equipment, that is not on the
2    production line, is it?
3        A.    No.
4        Q.    Yes or no?
5        A.    No, sir.
6        Q.    You worked there during a period of
7    time when you had to take your smock home and wash
8    it, did I hear that right?
9        A.    Yes, sir.
10       Q.    And was that the period of time when
11   you worked for Equity Group?
12       A.    Yes, sir.
13       Q.    Do you remember how long that period
14   was?
15       A.    Ever since I had started working
16   there until the other company took over.
17       Q.    At some point in time, the policy
18   changed and you were issued smocks every day; is
19   that right?
20       A.    Yes, sir.
21       Q.    Was that done the day that Equity
22   took over, or was that done sometime after?
23       A.    That was done at the beginning. When

55

1    we first started working there, what they issued
2    us -- they issued everything, including three
3    smocks.
4        Q.    And the reason they issued you three
5    smocks is because you take them home and wash them?
6        A.    Yes, sir, everything we took home.
7        Q.    At some point in time, that policy
8    changed?
9        A.    Yes, sir.
10       Q.    What about your boots -- during the
11   time you worked for Equity, have you always been
12   able to take home or wear home your boots?
13       A.    No, sir.
14       Q.    Is there any point in time when you
15   had to take them off before you worked out of that
16   plant?
17       A.    Yes, sir.
18       Q.    There was a time?
19       A.    There was a time.
20       Q.    Was that a time when you worked with
21   Equity, when Equity was in charge of the plant, if
22   you know?
23       A.    Yes, sir, I think so.  I am --

56

1        Q.    That's good enough.  I want to go
2    over this break time.  We talked about one of your
3    breaks began at 10:40.  Do you remember that?
4        A.    Yes, sir.
5        Q.    And how long is each one of your
6    breaks?
7        A.    30 minutes.
8        Q.    And I believe you said that you had
9    not been written up before; is that right?
10       A.    That is correct.
11       Q.    Would you be written up if you were
12   late returning to the line?
13       A.    Yes, sir.
14       Q.    And if the break started at 10:40,
15   what's 30 minutes after 10:40?
16       A.    Give me time to think a little.
17       Q.    What's 30 minutes after 10:30?
18       A.    We have to be back on the line by
19   eleven --
20       Q.    Do you get confused on time?
21       A.    Yes, I do.
22       Q.    You know time periods, but you get
23   confused on the actual time on the clock?

57

1        A.    I get confused, yes.
2        Q.    You know for sure your break was 30
3    minutes.  Are you positive about that?
4        A.    Yes, sir.
5        Q.    And are you ever late coming back
6    from your lunch break, or your 10:40 break?
7        A.    I have been, yes.
8        Q.    Are you always late coming back from
9    it?
10       A.    No, sir.
11       Q.    So taking on, washing off your
12   equipment, enjoying your break, and then putting
13   that equipment back on, and washing, and getting
14   back to your line, you can normally do that in 30
15   minutes?
16       A.    Yes, sir.
17       Q.    So it would be incorrect for you to
18   say that it took you 45 minutes?
19            MR. FRY:  Objection.
20            MR. STEENSLAND:  You can answer
21   the question.
22       Q.    (Mr. Steensland)  It didn't take you
23   45 minutes, did it?

67fccb2c-7310-4ef9-b37d-681f8e753666

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

58

1    MR. FRY: She never said it took
2  her 45 minutes.
3    MR. STEENSLAND: She was saying
4  11:15 minutes.
5    MR. FRY: Well, that is not 45
6  minutes. It was the other lady that said 45
7  minutes.
8    MR. STEENSLAND: It was a good
9  question. I am sorry.
10    THE DEPONENT: Can I say
11  something here?
12    MR. STEENSLAND: Hang on. Let me
13  ask you a question.
14    Q.  (Mr. Steensland) Does the 10:40
15  break, does that end at 11:10 or 11:15?
16    A.  Well, 11:15 I am going back in
17  there. So I've never had anybody say anything to
18  me.
19    Q.  All right.
20    A.  And I can get my -- if I say this --
21  I can get my stuff on and get back in there, and
22  well I --
23    Q.  We will move on. Last thing -- on

59

1  the training. You said you were trained to put
2  your gear on and have it washed in five minutes?
3    A.  Yes, sir.
4    Q.  Is that right?
5    A.  Yes, sir.
6    Q.  Who trained you?
7    A.  His name was Bernard, but I don't
8  know his last name.
9    Q.  Somebody at the plant?
10    A.  Yes, sir. We wasn't trained at that
11  plant.
12    MR. STEENSLAND: Nothing further.
13    MR. FRY: Thank you, Ms. Turner.
14    2:26 p.m.
15  ************************
16    FURTHER DEPONENT SAITH NOT
17
18
19
20
21
22
23

60

1        CERTIFICATE
2
3  STATE OF ALABAMA
4  AT LARGE
5
6        I hereby certify that the above
7  and foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10  transcription and that the foregoing represents a
11  true and correct transcript of the testimony given
12  by said witness upon said deposition.
13        I further certify that I am
14  neither of counsel nor of kin to the parties to the
15  action, nor am I in anywise interested in the
16  result of said cause.
17
18
19
20
21
22  _____
    Victoria M. Castillo, Certified Court Reporter
    ACCR# 17, Expires 9/30/2008
23  Commissioner and Notary Public

67fccb2c-7310-4ef9-b37d-681f8e753666

**TAB 54**

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06-CV-1081-MEF


BETTY ANN BURKS,

et al.,

     Plaintiffs,

vs.

EQUITY GROUP EUFAULA

DIVISION, LLC,

     Defendant.



BEFORE:

     Cynthia M. Noakes, Commissioner

     and Certified Court Reporter


DEPOSITION TESTIMONY OF

LAKESHIA WARREN


* * * * * * * * * * * * * * * * * * * * * * * * * * *

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

**2**

1    STIPULATION

2

3    IT IS STIPULATED AND AGREED by and

4    between the parties through their respective

5    counsel, that the deposition of LAKESHIA WARREN

6    may be taken before Cynthia M. Noakes, Court

7    Reporter, at the Law Offices of WILLIAMS,

8    POTTHOFF, WILLIAMS & SMITH, 125 South Orange

9    Avenue, Eufaula, Alabama 36027, on the 23rd day

10    of May, 2008.

11    IT IS FURTHER STIPULATED AND AGREED

12    that the signature to and the reading of the

13    deposition by the witness is waived, the

14    deposition to have the same force and effect as

15    if full compliance had been had with all laws and

16    rules of Court relating to the taking of

17    depositions.

18    IT IS FURTHER STIPULATED AND AGREED

19    that it shall not be necessary for any objections

20    to be made by counsel to any questions except as

21    to the form or leading questions, and that

22    counsel for the parties may make objections and

23    assign grounds at the time of the trial, or at

**3**

1    the time said deposition is offered in evidence,

2    or prior thereto.

3    IT IS FURTHER STIPULATED AND AGREED

4    that the notice of filing of the deposition by

5    the Court Reporter is waived.

6

7

8

9

10

11

12

13

14

15

16

17    *****************************************

18

19

20

21

22

23

**4**

1    INDEX

2    EXAMINATION BY:    PAGE NUMBER:

3    MR. GOULD    6-35

4

5    EXHIBITS:

6    (No exhibits were

7    submitted to said deposition.)

8

9    Reporter's Certificate    36

10

11

12

13

14

15

16

17

18

19

20    *****************************************

21

22

23

**5**

1    APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFFS:

4    MR. P. MARK PETRO

5    SCHREIBER & PETRO, PC

6    ATTORNEYS AT LAW

7    Two Metroplex Drive

8    Suite 250

9    Birmingham, Alabama 35209

10    (205) 871-5080

11

12    ON BEHALF OF THE DEFENDANT:

13    MR. MALCOLM S. GOULD

14    PELINO & LENTZ

15    ATTORNEYS AT LAW

16    One Liberty Place

17    Thirty-Second Floor

18    Philadelphia, Pennsylvania 19103

19    (215) 665-1540

20

21    *****************************

22

23

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

8bd32da5-ecee-477d-be47-f01a69c2dc3a

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

6

1    I, CYNTHIA M. NOAKES, a Certified
2    Court Reporter of Eufaula, Alabama, acting as
3    Commissioner, certify that on this date, as
4    provided by the Alabama Rules of Civil Procedure
5    and the foregoing stipulation of counsel, there
6    came before me at the Law Offices of WILLIAMS,
7    POTTHOFF, WILLIAMS & SMITH, 125 South Orange
8    Avenue, Eufaula, Alabama 36027, beginning at
9    4:20 p.m., LAKESHIA WARREN, witness in the above
10   cause, for oral examination, whereupon the
11   following proceedings were had:
12
13        LAKESHIA WARREN,
14   being first duly sworn, was examined and
15        testified as follows:
16
17        THE COURT REPORTER:  Usual
18   stipulations?
19   MR. PETRO:  Yes.
20   MR. GOULD:  Yes.
21
22        EXAMINATION
23   BY MR. GOULD:

7

1    Q.  Good afternoon, Ms. Warren?
2    A.  Good afternoon.
3    Q.  My name is Malcolm Gould.  I'm an attorney
4    with the law firm of Pelino & Lentz in
5    Philadelphia.  I'm an attorney for Equity Group
6    Eufaula Division.  We're here to take your
7    deposition in relation to a lawsuit that's been
8    filed in the Middle District of Alabama in Federal
9    Court.  You are a plaintiff in that lawsuit.
10       As you see here, we have a court reporter.
11   She's going to take down my questions and your
12   answers.  I would ask that you keep all of your
13   answers verbal.  Say yes or no instead of nodding
14   your head or shaking your head.
15   A.  Okay.
16   Q.  I'd also ask that you say yes or no instead
17   of saying uh-huh or huh-uh.  That way we're sure
18   that she gets down the correct answer to your
19   question.
20   A.  Yes, sir.
21   Q.  If you have any questions or if the question
22   I ask you isn't clear, just let me know.  I'll
23   either repeat the question or try and ask it

8

1    differently.
2        In addition, if you answer my question, I'm
3    to going assume that you understood it and you've
4    answered it truthfully and to the best of your
5    ability.
6    A.  Okay.
7    Q.  I don't anticipate that the deposition will
8    take long, but if you need to take a break, let me
9    know and we'll take a break.
10   A.  Okay.
11   Q.  Okay.  Now, can you state your name for the
12   record, please?
13   A.  My name is Lakeshia Evette Warren.
14   Q.  And, Ms. Warren, what is your home address?
15   A.  16 Paul Lee Parkway 3, Eufaula, Alabama
16   36027.
17   Q.  Is that there by the Comfort Suites?
18   A.  Right.
19   Q.  Are you currently employed?
20   A.  Yes, I am.
21   Q.  Where do you work?
22   A.  Barbour County Sheriff's Department.
23   Q.  And how long have you been employed there?

9

1    A.  Eight months.
2    Q.  And did you previously work at the chicken
3    processing facility in Baker Hill?
4    A.  Yes, I did.
5    Q.  And how long did you work there?
6    A.  Three and a half years.
7    Q.  And when was the last time that you worked
8    there?
9    A.  End of 2006 almost.  Maybe around November
10   or something like that.
11   Q.  Ms. Warren, when you started working at the
12   plant, was it owned by Equity Group?
13   A.  Yes, sir.
14   Q.  And when you left the plant, what position
15   were you working in?
16   A.  Packout.
17   Q.  Did you work in any other positions at the
18   plant?
19   A.  Yes, sir, I did.
20   Q.  And what other positions did you work in?
21   A.  I worked on the line for a couple of months,
22   and then I went to rehang, and then I went to
23   packout and I stayed in packout.  I went to the

8bd32da5-ecee-477d-be47-f01a69c2dc3a

**10**

1   pallet ticket table. I worked in DSI sometimes.
2   I was all over the plant.
3   Q.   In which position did you spend the majority
4   of your time?
5   A.   I worked in the rehang for over a year until
6   I got pregnant. So when I came back, I went to
7   packout, and I was there for a year or so.
8   Q.   And how long did you work on the debone
9   line?
10  A.   Not long. Maybe three months, four months
11  or something.
12  Q.   Which position did you work in first?
13  A.   Debone, on the line.
14  Q.   And then did you also indicate that you
15  worked in DSI?
16  A.   Yes.
17  Q.   And how long did you work in DSI?
18  A.   Maybe for a day or two. When they were
19  short of help, they'd pull people and send them
20  here and send them there.
21  Q.   I understand.
22  A.   It wasn't no permanent job.
23  Q.   So in DSI, it would be more like a fill-in

**11**

1   situation?
2   A.   On some occasions, yes.
3   Q.   And is that when you were working in
4   packout? You would be pulled from packout to go
5   into DSI?
6   A.   No, not necessarily packout. That's
7   anywhere in the plant, all the way from debone.
8   Q.   Ma'am, in connection with your employment in
9   packout, did you work with a knife or scissors?
10  A.   No, sir.
11  Q.   And in connection with your work in rehang,
12  did you work with a knife or scissors?
13  A.   In rehang?
14  Q.   Yes, ma'am.
15  A.   No, sir.
16  Q.   And in connection with your work in DSI, did
17  you work with a knife or scissors?
18  A.   Yes. I take that back. In packout, some
19  days, when they had a bunch of feathers on the
20  chickens, you might have to work with scissors.
21  It just depends on whether they're bad chickens or
22  they're good chickens.
23  Q.   And then you said that you also worked at

**12**

1   the ticket table?
2   A.   The pallet ticket table.
3   Q.   And what did you do there?
4   A.   The pallet ticket table is when packout bags
5   the meat, box it, put ice on it, fill it,
6   whatever, and they stack them on a pallet so many
7   high.
8        And they bring them over there, and I scan
9   them and write a ticket for them. And then the
10  pallet jack person will wrap them, and they'll
11  take them and put them on a truck or put them in a
12  cooler. It's an accurate count of what they've
13  done.
14  Q.   In connection with your work at the pallet
15  ticket table, did you have to wear any items of
16  clothing or equipment when you were out on the
17  production floor?
18  A.   Yes.
19  Q.   Can you list those for me?
20  A.   Smock, cutting gloves, hair net, earplugs,
21  safety glasses, boots of course, apron, sleeves,
22  because that stuff be dripping everywhere. No arm
23  guard. That's it.

**13**

1        Make sure. Ear plugs, hair net, apron,
2   smock, boots, sleeves, and blue gloves.
3   Q.   Did you say you had to wear an arm guard?
4   A.   No, no arm guard.
5   Q.   Okay. And did you wear rubber gloves when
6   you were at the pallet ticket table?
7   A.   Sometimes. I always had cotton liners, two
8   pair, because it was cold from that dry ice. So
9   sometimes. Majority. Or if I put on two pair of
10  cotton gloves, then I wouldn't put on the blue
11  gloves.
12  Q.   Okay.
13  A.   They pop so easy.
14  Q.   And when you worked in packout, would you
15  wear those same items or would you wear different
16  items?
17  A.   You wear the same, but with the blue gloves
18  and -- yeah. With the apron, yeah. I said apron,
19  didn't I?
20  Q.   Yes. Were you required to wear an apron
21  when you worked at the pallet ticket table?
22  A.   Yeah, unless you wanted to mess up your
23  clothes. That stuff, it drips from the boxes and

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

14

1  the juices off the chicken. Yeah, you have to
2  wear an apron.
3  Q.  And when you worked in rehang, what items
4  did you have to wear?
5  A.  The same except the arm guard.
6  Q.  So you would wear a hard plastic arm guard
7  when you worked in rehang?
8  A.  I said the same except an arm guard.
9  Q.  Okay. So when you worked in packout you
10 would wear an arm guard?
11 A.  No.
12 Q.  When you worked at the pallet ticket table
13 you would wear an arm guard.
14 A.  No. Just on the debone line you would wear
15 an arm guard. Unless you were working with the
16 scissors, then you have to wear an arm guard.
17     Like I said, in packout, if you had to work
18 with scissors that day or DSI, you had to wear an
19 arm guard because you were using the scissors.
20 But rehang, no; pallet ticket table, no. You
21 don't work with those items over there, knives and
22 scissors.
23 Q.  Ma'am, when you worked at the plant were you

15

1  a member of the union?
2  A.  I was.
3  Q.  Did you ever attend any union meetings?
4  A.  A couple at work, yes, sir.
5  Q.  Do you recall what was discussed at those
6  union meetings?
7  A.  Something, just complaints. I'll tell you
8  in a second. One was a problem about this right
9  here, our breaks. That was it. The other stuff
10 that was going on don't have anything to do with
11 you guys.
12 Q.  What other things would they have been?
13 A.  Just little stuff that goes on, you know.
14 May have a problem with something that went on
15 that you had with your supervisor or something, so
16 you would go talk with your union rep about it, if
17 there was a write-up or anything like that. Stuff
18 like that. Point system.
19 Q.  Now, when you said that you had discussed at
20 a union meeting something about breaks, can you
21 describe for me what that was?
22 A.  We was saying that we were getting wrote up
23 for it, and we were saying we don't have enough

16

1  time; something needs to be did about this. Stuff
2  like that. Well, we're getting up; and we'd say,
3  we don't have time; they're always calling break.
4      We don't have, I say, not that much time to
5  do anything. You have to unsanitize yourself,
6  sanitize yourself; you have to -- at one point in
7  time you had to take your boots off to go outside,
8  you had to take your hair nets off and all that.
9  So we didn't have enough time for anything, to do
10 anything.
11 Q.  And was this a union meeting where there
12 were multiple people attending, or was this just a
13 conversation that you were having with a union
14 representative?
15 A.  Well, at one point in time it was. But,
16 yeah, it was with a group of people.
17 Q.  Where was the union meeting?
18 A.  We've got union reps that work there with us
19 at the chicken plant, of course. So it could have
20 been when we're coming to work or between breaks
21 or something, when you just say, I'm really upset;
22 I'm going to talk to my union rep about this, or
23 whatever. And you'll just go and say something to

17

1  them right quick. And they'll say, well,
2  so-and-so, you know, like that. And then, "Well,
3  I'll check it out and get back with you and we'll
4  let you know." Like that. It wasn't this no
5  meeting, a meeting like a five- or 10- or 20-
6  minute meeting, or like this, no. It's just you
7  go tell them what your problem is; and they'll
8  listen, and then they'll get back with you, even
9  if it's inside the plant or wherever.
10 Q.  Do you recall the names of any of your union
11 representatives?
12 A.  Uh-huh.
13 Q.  And which ones do you remember?
14 A.  I remember Ms. Jackie Massey; I remember --
15     THE COURT REPORTER:  Ms. Jackie who?
16     THE WITNESS:  Massey. I think it's
17 Massey. What's Jackie's last name? I think it's
18 Massey.
19 A.  Jerome Lewis, Roger. I don't know his last
20 name.
21 Q.  All right. Ma'am, I'm to going to ask you
22 some questions about the time that you worked in
23 packout.

18

1     When you worked in packout, can do you
2   remember what time your shift started?
3   A.   (Witness nods head.)
4   Q.   What was that?
5   A.   7:30.
6   Q.   So you worked day shift?
7   A.   Yes, sir.
8   Q.   And did you work day shift the entire time
9   you worked at the plant?
10  A.   Yes, sir.
11  Q.   And when you worked in packout, when you
12  would report to the plant, did you have to clear
13  any kind of security?
14  A.   When we were all coming on the premises of
15  the chicken plant?
16  Q.   Yes, ma'am.
17  A.   No.  No, sir.  Because they have an ID decal
18  on your car, so they look at it.  Unless you don't
19  have one, then you have to stop; and they'll give
20  you a little pass to get in or something.
21  Q.   But as long as you had the sticker, you
22  could drive through?
23  A.   Correct.

19

1   Q.   And was there any other security that you
2   had to clear to enter the building?
3   A.   No, sir.
4   Q.   No metal detectors or turnstiles?
5   A.   No, sir.
6   Q.   No pat-downs?
7   A.   No, sir.
8   Q.   Okay.  And when you arrived at the plant and
9   you entered the building, what would be the next
10  thing you would do?
11  A.   Go get your supplies.
12  Q.   Would you clock in?
13  A.   Yes.
14  Q.   Would you do that first?
15  A.   It just depends, you know.  The first thing
16  we'd do would -- yeah, you would clock in first,
17  so that you're going to clock in before 7:30.  And
18  it depends on what time you got there.
19     So if you feel like you have enough time to
20  go ahead and get your supplies, you wouldn't clock
21  in.
22     Maybe you're standing in the line and you
23  say, "Oh, my God, what time is it?  What time is

20

1   it?  What time is it?"  You get out of the line
2   and go clock in, when you probably should have
3   just clocked in first.  But it's still going to be
4   the same thing.  You're still going to be in that
5   long line getting your supplies.
6   Q.   I think you said all of that without taking
7   a break.  You're putting the court reporter to
8   work here.
9        MR. PETRO:  Yeah.  Slow down just a
10  little bit.
11       THE WITNESS:  I'm sorry.
12  Q.   Now, ma'am, during the time that you were
13  working at the plant, could you wear your boots
14  from home?
15  A.   At one point in time you could; then they
16  started saying that you couldn't wear them
17  outside, period.
18  Q.   So for part of the time you could and for
19  part of the time you couldn't?
20  A.   Right.  And the same thing went for the hair
21  nets.  At one point in time you could wear them --
22       MR. PETRO:  He wasn't asking you about
23  the hair nets.

21

1        THE WITNESS:  Yeah, I know, but I was
2   just telling him it was the same thing about the
3   hair nets as the boots.  Both of that, you
4   couldn't wear them outside the plant again.
5        MR. PETRO:  Just answer his question.
6        THE WITNESS:  10-4.
7   Q.   Were there any other items that you could
8   wear outside of the plant?
9   A.   That you couldn't or could?
10  Q.   That you could.
11  A.   No, sir.
12  Q.   So when you would arrive at the plant, would
13  you be carrying any of your items or equipment
14  with you?
15  A.   Yes.
16  Q.   So you would have taken them home with you
17  at the end of your shift?
18  A.   Yes.
19  Q.   Which ones would you be carrying with you
20  when you arrived at the plant?
21  A.   Everything we had to wash:  Smock, apron,
22  sleeves.  Whatever you had.
23  Q.   At the time you worked at the plant, you had

8bd32da5-ecee-477d-be47-f01a69c2dc3a

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

22

1    to take your smock home and wash it?
2    A.   (Witness nods head.)  And then they stopped
3    it and then washed it themselves.  Because it was
4    a big problem.  Everybody was complaining.
5        They were saying they were dingy, so I guess
6    they started washing them themselves for that
7    reason; I don't know.
8    Q.   So at some point in time you were able to
9    just leave your smock at the plant?
10   A.   Correct.
11   Q.   And the company washed them?
12   A.   Yes, sir.
13   Q.   And then you would have to get a new smock
14   every day?
15   A.   Yes, sir.
16   Q.   Do you recall when that changed?
17   A.   It changed around 2006, somewhere up in
18   there.  End of 2005, 2006, something like that.
19   Q.   Now, when you worked in packout, you
20   indicated to me that sometimes you might get your
21   supplies first and sometimes you might clock in
22   first; is that correct?
23   A.   Yes.

23

1    Q.   After you clocked in and got your supplies,
2    what would you do next?
3    A.   You would go in.  And they'll tell you when
4    you could come in and when you couldn't come in.
5    Like, if sanitation was there and working late or
6    whatever, you couldn't come in until a certain
7    time.  So that's when they would be standing at
8    the door and they'll come out and say, "It's time
9    to come in.  It's time to come in."  And everybody
10   will start coming in.
11       But as far as you just going to get your
12   supplies and go in, it just depends on what was
13   going on that morning or something.  But most of
14   the time you couldn't just go ahead and go in
15   after you got your supplies.
16       On a Monday or something, you could go.  But
17   everybody gets their supplies on Monday.
18   Everybody.
19   Q.   When you were working in packout, what's
20   your understanding as to when the time for which
21   you were paid started?
22   A.   When the time I was paid started?
23   Q.   Yes, ma'am.

24

1    A.   When did it start?
2    Q.   Yes.
3    A.   It sure didn't start when I walked in the
4    door.  It should have.  7:30.
5    Q.   If sanitation was still cleaning the
6    production area and you couldn't actually go out
7    onto the floor, were you still paid starting at
8    7:30?
9    A.   Yes.
10   Q.   When would you normally arrive at the plant
11   when you were working in packout?
12   A.   Between 7:10, 7:05, something like that.
13   You'd get there early.
14   Q.   Can you describe for me what you would do
15   when you went out to the production floor?
16   A.   After I walked through the doors?
17   Q.   Yes, ma'am.  After you had picked up your
18   supplies and clocked in.  I'm talking about when
19   you actually go out onto the floor.
20   A.   Well, when you open the doors to go in the
21   place, there's the little boot sanitation thing.
22   You spray your boots off.  Even though you didn't
23   wear them, you've still got to clean them.  Go to

25

1    where you want to dress-in at within the debone
2    doors.  And you put on your supplies.  Everybody's
3    putting on supplies.  You had to find a spot to
4    put it on at anyway.  And then we got fully
5    dressed and you go and take your spot and start to
6    work.
7    Q.   Approximately how long would it take you
8    from the time you walked through the double doors
9    to the time you got on the floor?
10   A.   Maybe seven, eight minutes, something like
11   that.  Because you've got to also sanitize your
12   stuff.  Even if it's brand new, you've still got
13   to sanitize it.
14   Q.   When you say "sanitize your stuff" --
15   A.   You have to go to the sink and wash your
16   gloves, wash your sleeves, wash your smock, and go
17   to your spot.
18   Q.   Did you ever actually time yourself with a
19   stopwatch or anything like that?
20   A.   You don't have to; they're yelling what time
21   it is.  It's such and such a time.  The line
22   started at 7:30.  You don't have to; they're
23   yelling at you.  "Go to the line."

8bd32da5-ecee-477d-be47-f01a69c2dc3a

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

26

1    But it's a big clock right there anyway, so
2    you can see what time it is.
3    Q.   Did you ever actually time yourself for the
4    amount of time it took you to put on your stuff
5    and to wash it or sanitize it?
6    A.   Not really, no, sir. But you know what time
7    it is. Like I said, you're always asking, "What
8    time is it?" And then I had a stopwatch anyway,
9    so I was always looking at my stopwatch. Because
10   you're going to get wrote up if you're not in
11   there at 7:30, so you're constantly looking. And
12   everybody knows and is trying to see what time it
13   is. So, yeah, I guess that answer would be yes.
14   Q.   Did you get any breaks during the course of
15   your shift?
16   A.   Yes.
17   Q.   And how many breaks did you get?
18   A.   Two.
19   Q.   And how long were your breaks?
20   A.   They were supposed to be 30 minutes. They
21   were supposed to be 30 minutes, but...
22   Q.   Okay. You answered my question. I'll ask
23   you some more questions. I appreciate your

27

1    enthusiasm this late in the day. I will give you
2    plenty of opportunities to say more, but I'd
3    appreciate it, in fairness to everybody else who's
4    waiting outside to have their deposition taken, if
5    you could just answer my questions.
6    A.   Okay.
7    Q.   Thank you. And would your breaks normally
8    occur at the same time every day?
9    A.   Yes, sir.
10   Q.   And what times would your breaks occur?
11   A.   Let me remember. 10:15 or 10:20 would be
12   the first one, and I think the second one would be
13   12:15 or 11:40 or something like that. And I --
14   you told me just to answer the questions; that's
15   what I'm going to do.
16   Q.   Thank you.
17   A.   You're welcome.
18   Q.   Can you tell me how you would know when you
19   were released from break?
20   A.   The supervisor or someone would call break,
21   and that's how we would know.
22   Q.   So when you were working in packout, your
23   supervisor would tell you it was okay to leave for

28

1    break?
2    A.   Yeah. And you would see everybody running
3    and everything anyway, so you knew it was break
4    time.
5    Q.   And can you describe for me what you would
6    do from the time you were released from break to
7    the time you would exit the production floor?
8    A.   Yes, sir. When you left from break you
9    would go and you wash your stuff off, your gloves
10   and your hands, wash all that off. Then you go
11   back over there to the rack and take all that
12   stuff off and hang it up. If you're going outside
13   or whatever, you have to take your boots off, go
14   out, and get your stuff to eat for a break.
15   That's what you do when you go out.
16   Q.   All right. Thank you. Approximately how
17   long would it take you from the time you left the
18   line to the time you exited the production floor?
19   A.   It's kind of hard to answer because -- I'd
20   say maybe the same. About eight minutes, maybe
21   nine, ten, something like that. It just depends;
22   it really does. It would be the same amount of
23   time almost every day; it might be a little

29

1    longer. It may be seven or eight minutes every
2    day. It just depends.
3    Q.   Okay. So your answer is that you're not
4    sure; it could change?
5    A.   It depends on what kind of day it has been
6    or if we were real, real busy that day or if
7    they've got the lines turned up extremely high.
8    It just depends. But I would say seven to eight
9    minutes.
10   Q.   Okay. Thank you. Now, after you exited the
11   production doors, what would you do next? Would
12   you go out to the break room?
13   A.   Yes.
14   Q.   Would you go into the debone break room?
15   A.   Yes.
16   Q.   And what would you do when you got into the
17   break room?
18   A.   You would eat. Go to the vending machine
19   and get what you wanted, if you didn't bring your
20   lunch, and try to eat it. And then it's time to
21   go back to work.
22   Q.   And how would you know when it's time to go
23   back to work?

30

1   A.   We've got a clock in the break room.
2   Q.   How long would you normally be in the break
3   room?
4   A.   Me?
5   Q.   Yes, you.
6   A.   I'd probably be in there maybe five minutes.
7   Five minutes, yeah.
8   Q.   Why just five minutes?
9   A.   Because I have to go outside and smoke a
10  cigarette.
11  Q.   Okay.
12  A.   There's just enough time to smoke one too.
13  Q.   So you would eat your food and then you
14  would go out and have a cigarette?
15  A.   I'm eating on the go baby, eating on the go.
16  Q.   That doesn't surprise me.
17       What time would you normally return from
18  your first break?  What time would you go back out
19  onto the production floor?
20  A.   Okay.  About 10:35, 10:37, something like
21  that.  In between -35 and -37.
22  Q.   Can you describe for me what you would do
23  when you would pass back through the double doors

31

1   and go back out onto the production floor?
2   A.   You would be walking extremely fast going
3   and getting your stuff and putting it back on.
4   Then after that, you probably wouldn't tie your
5   smock up because they're already screaming you're
6   going to be late; so go and wash off right quick
7   like this, and go and work.  You be doing
8   everything while you're walking and rushing and
9   hurrying anyway.
10  Q.   So you could put some of this stuff while
11  you were walking to your spot on the line, put
12  some of the items on?
13  A.   Right.  All the time you have to wash off,
14  sanitize off or whatever, and go on back.
15  Q.   And approximately how long would it take you
16  from the time you entered the production area to
17  the time you got back to your spot on the line
18  when you were returning from break?
19  A.   How long would it take to get back to your
20  spot?
21  Q.   Yes, ma'am.
22  A.   I'd say, coming from break, seven or eight
23  minutes.

32

1   Q.   Now, you took a little while to think about
2   that.  Is that something that you're relatively
3   certain about?
4   A.   I'm doing it in my head like I'm still
5   there.  I was there three and a half years, and
6   the same thing every day.  About seven or eight
7   minutes.
8   Q.   And would you go generally do the same thing
9   before and after your second break as you did
10  before and after your first break?
11  A.   Correct.
12  Q.   And the amount of time would normally be
13  about the same?
14  A.   Correct.
15  Q.   I'm almost afraid to ask.  Can you describe
16  for me what you would do at the end of your shift?
17  How would you know you were released to leave?
18  A.   At the end of the shift, second shift is
19  coming in, so you know it's about time to go.  And
20  they let you know it's about time to go.  Somebody
21  would say, "Time to go."
22       So whenever the last bird gets past wherever
23  you are, you are released to go.  You can't just

33

1   walk off the line and leave; you have to wait
2   until all the chickens are gone.
3        You take -- wash all your stuff, and then
4   take it off.  You take it off and fold it up or
5   throw it in a bag, pull your shoes off and put
6   your regular shoes on, stuff like that, clock out
7   and go home.
8   Q.   What time would you normally clock out?
9   A.   Sometimes I usually clocked out about 4:40,
10  4:45, something like that.
11  Q.   During the time that you were working at the
12  plant, did you get paid weekly?
13  A.   Yes, sir.
14  Q.   And would you normally check your paycheck
15  to look at the hours for which you were paid?
16  A.   Of course.
17  Q.   Did you ever have an instance when you
18  looked at the hours for which you were paid and
19  you went and complained to your supervisor or
20  someone in payroll that the amount of hours was
21  not correct?
22  A.   What they going to do about it?  I mean,
23  it's been done and nothing was did about it.

8bd32da5-ecee-477d-be47-f01a69c2dc3a

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Video * Litigation Support * Trial Services

34

1  Q.   That's not my question.  My question was
2  whether you ever got your paycheck, looked at the
3  number of hours and felt it was incorrect, and
4  went and complained.
5  A.   Yes, sir.
6  Q.   And how many times did you do that?
7  A.   After about once or twice.
8  Q.   And was that because you felt there were
9  hours missing from your paycheck?
10  A.   Correct.
11  Q.   And did you go to your supervisor?
12  A.   At first.
13  Q.   And what was your -- do you specifically
14  remember any of those instances?
15  A.   You mean when I went to my supervisor?
16  Q.   Yes, ma'am.
17  A.   As far as the specific time frame or
18  whatever, I couldn't tell you that.  But I do
19  remember going to my supervisor and complaining
20  about it.
21  Q.   And what were you complaining about?
22  A.   Like such and such, my check's not right.
23  I'm supposed to have such and such.  And they're

35

1  like, "You need to go to personnel."  And that was
2  it.
3  Q.   And did you go to personnel or payroll and
4  register your complaint?
5  A.   One time I did.
6  Q.   And how was that resolved?
7  A.   It wasn't.
8  Q.   I think those are the only questions I have
9  for you, ma'am.  Thank you.
10       MR. PETRO:  No questions.
11
12       (The deposition was concluded.)
13
14
15
16
17
18
19
20
21
22
23

36

1       C E R T I F I C A T E
2
3  STATE OF ALABAMA
4  BARBOUR COUNTY
5
6       I hereby certify that the above and
7  foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10  transcription, and that the foregoing represents
11  a true and correct transcript of the testimony
12  given by said witness upon said hearing.
13       I further certify that I am neither of
14  counsel, nor kin to the parties to the action,
15  nor am I in anywise interested in the result of
16  said cause.
17
18
19       CYNTHIA M. NOAKES, Commissioner
20       Certified Court Reporter,
21       ACCR #327 - Expires 09/30/2008
22
23       Commission Expires 07/08/2009

2100  Third Avenue North, Suite 960  *  Birmingham, AL  35203
1-800-888-DEPO  or  205-251-4200

8bd32da5-ecee-477d-be47-f01a69c2dc3a